James H. Weingarten, DC Bar # 985070
Charles Dickinson, DC Bar # 997153
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, DC 20580
Tel: (202) 326-3570
*jweingarten@ftc.gov; cdickinson@ftc.gov*

Attorneys for Plaintiff Federal Trade Commission

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, STATE OF ARIZONA, STATE OF CALIFORNIA, DISTRICT OF COLUMBIA, STATE OF ILLINOIS, STATE OF MARYLAND, STATE OF NEVADA, STATE OF NEW MEXICO, STATE OF OREGON, and STATE OF WYOMING,<br><br>Plaintiffs,<br><br>v.<br><br>THE KROGER COMPANY and ALBERTSONS COMPANIES, INC.,<br><br>Defendants. | Case No.: 3:24-cv-00347<br><br>**COMPLAINT FOR TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF**<br><br>*Redacted Version of Document Sought to be Sealed* |

This case involves a $24.6 billion proposed merger between two head-to-head competitors: The Kroger Company—the nation's largest traditional supermarket chain—with Albertsons Companies, Inc.—the nation's second largest traditional supermarket chain. As the two largest traditional supermarket chains in the United States, Kroger and Albertsons today compete

COMPLAINT                                    1

intensely to attract and retain customers and workers in hundreds of communities all across America. The fierce competition between these two grocery giants has benefited millions of American consumers through lower prices for food and household essentials. It has also benefited hundreds of thousands of grocery store workers who, as a result of competition for their labor, earn better wages and benefits. If allowed to proceed, the proposed acquisition would destroy this competition, likely making it more expensive for millions of families to put food on the table.

On February 26, 2024, the Federal Trade Commission found reason to believe that this proposed acquisition may substantially lessen competition in violation of the nation's antitrust laws. To assess the legality of the proposed acquisition, the Commission commenced an administrative proceeding and scheduled a full trial on the antitrust merits—where all parties will have the opportunity to conduct discovery and present testimony and other evidence. The administrative proceeding is set to begin on July 31, 2024.

Plaintiffs Federal Trade Commission (the "FTC" or "Commission") and the States of Arizona, California, Illinois, Maryland, Nevada, New Mexico, Oregon, and Wyoming and the District of Columbia, by and through their respective Attorneys General (together, the "Plaintiff States" and collectively with the FTC, "Plaintiffs"), petition this Court for a preliminary injunction to prevent Kroger from completing its proposed acquisition of Albertsons until after the FTC concludes the pending administrative proceeding. Allowing Defendants to merge and combine their operations before a decision on the merits would narrow millions of consumers' choices for where to buy groceries and may materially increase the cost of essential food and household items. The proposed acquisition also may substantially increase Kroger's and Albertsons's leverage in negotiating with workers, reducing wages, benefits, opportunities, and the quality of workplace conditions and protections.

COMPLAINT                                    2

Unless this Court grants a preliminary injunction, Defendants will be free to consummate a transaction that may ultimately be found to violate the antitrust laws. The pause Plaintiffs seek from this Court is necessary to maintain the status quo and prevent harm to millions of consumers and tens of thousands of workers until the Commission can fully adjudicate whether the proposed acquisition is unlawful.

## I.  NATURE OF THE CASE

1. In the fall of 2022, Kroger and Albertsons executed an agreement for Kroger to buy 100% of the equity of Albertsons for approximately $24.6 billion. The proposed acquisition is by far the largest supermarket merger in U.S. history. If allowed, this merger would substantially lessen competition, likely resulting in Americans paying millions of dollars more for food and other essential household goods, as well as reducing the ability of hundreds of thousands of workers to secure better wages and benefits.

2. The stakes for Americans are exceptionally high. Over the past four years, grocery prices have risen significantly. The increase in prices has meant that more and more Americans are reportedly struggling with the cost of putting food on the table and feeding their families. Our most vulnerable citizens have suffered the most: a 2022 report showed that over a third of households with income below the federal poverty line are food insecure, with many low-income families spending almost one-third of their income on food.

3. Especially against this backdrop, the merger of two grocery giants could have severe consequences for consumers in communities across the country. Kroger and Albertsons are the #1 and #2 traditional supermarket chains in the United States. Their combined footprint is vast—approximately 5,000 stores, 4,000 retail pharmacies, and 700,000 employees across 48 states.

4. Kroger and Albertsons acquired their massive size through numerous mergers over the past three decades, part of a broader trend of significant consolidation in the United States grocery

industry. Examples of Kroger-owned supermarket banners include Fred Meyer, Quality Food Center (QFC), King Soopers, Mariano's, Ralphs, Smith's, and Harris Teeter, while Albertsons-owned banners include Safeway, Vons, Jewel-Osco, Haggen, and Carrs, among others.

5. Today, Kroger and Albertsons compete intensely for consumers and workers in hundreds of communities across the country. As Albertsons's CEO declared, ████████████ ████████████████████████████████ Kroger executives, in turn, describe Albertsons banners as "our #1 direct competitor" and ██████████████ For millions of consumers, direct competition between Kroger and Albertsons has brought grocery prices down and the quality of grocery products and services up.

6. The proposed acquisition would destroy this competition, leaving consumers to foot the bill. As an Albertsons executive communicated to colleagues shortly after the merger announcement, ███████████████████████████████ █████████████████████████████ Similarly, Albertsons's Chief Operating Officer emailed Albertsons's Division Leadership on the day the deal was announced, ████████████████████████████████████ ████████████████████████████ A Kroger executive commented on some of the geographies impacted by the deal, ████████████ ████████████████████████ The destruction of competition between these two head-to-head rivals risks raising prices, worsening services, and lowering quality for the millions of consumers who rely on Kroger and Albertsons for their groceries and other everyday goods.

7. Consumers are not the only ones who will pay the price if the proposed acquisition is completed: the hundreds of thousands of people who work for Kroger and Albertsons would suffer

too. Today, Kroger and Albertsons compete aggressively with one another to hire and retain grocery workers, principally through collective bargaining negotiations with local unions (i.e., the process by which workers, though the unions that represent them, negotiate agreements with their employers that determine the terms and conditions of employment). This competition has resulted in higher wages, better benefits, and improved working conditions for employees. The proposed acquisition would eliminate this competition, threatening the ability of hundreds of thousands of grocery store workers to secure stronger contracts with improved wages and benefits.

8. Kroger's and Albertsons's own executives recognized that the proposed acquisition would be an unlawful merger under the antitrust laws. For example, when rumors of a merger emerged, one Albertsons executive stated, ███████████████████████████████████ ███████████████████████████████████████ Another Albertsons executive agreed: ███████████████████████████████████████ Another Kroger executive stated the day before the deal was announced, ████████████████████ ███████████████████████████

9. These executives were right to be concerned. In many hundreds of local supermarket and labor markets, the proposed acquisition would increase Kroger's market shares by so much as to be presumptively unlawful under the antitrust laws.

10. Recognizing that their proposed merger would be unlawful, Kroger and Albertsons propose to divest a hodgepodge of several hundred of their more than 5,000 stores and castoff assets to C&S Wholesale Grocers ("proposed divestiture"). Until very recently, C&S's century-long business model was that of a wholesale supplier specializing in grocery supply chain solutions. As recently as 2021, C&S operated only two retail supermarkets. Today, C&S operates twenty-three supermarkets and a single retail pharmacy, mostly in New York and Wisconsin.

Through this divestiture, C&S is seeking to grow its retail footprint nearly 18-fold overnight. Yet, up until 2021, C&S stated in its quarterly reports that "[w]e do not intend to grow our grocery retailing operations or to operate the retail grocery stores in the long term."

11. Divesting these individual assets to a grocery wholesaler with limited experience operating retail supermarkets will fail to mitigate the substantial harm to consumers and workers from lost competition between Kroger and Albertsons. C&S would be acquiring a patchwork of assets cobbled together by Kroger's antitrust lawyers, not a standalone business likely to succeed. The proposed divestiture ignores hundreds of affected markets that serve millions of consumers, as well as the merger's destruction of labor market competition. C&S will face multiple significant obstacles stitching together a viable business—let alone a successful competitor—from the assortment of divested stores, and any operational shortcoming would imperil competition in many local markets. There are major execution risks associated with Defendants' proposed divestiture, and the American public—not Defendants—would bear the costs of any failure.

12. On February 26, 2024, the Commission found reason to believe that the proposed acquisition may substantially lessen competition in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45, and commenced an administrative proceeding on the legality of the proposed acquisition. This administrative hearing on the antitrust merits will begin on July 31, 2024.

13. The parties stipulated to a temporary restraining order to preserve the status quo and protect competition while this Court considers the Commission's application for a preliminary injunction.

14. It is necessary for this Court to issue a preliminary injunction to preserve the status quo and protect competition during the Commission's ongoing administrative proceeding. Allowing

the parties to proceed with the proposed acquisition before the Commission assesses its legality would impair the Commission's ability to order any necessary relief.

15. If consummated, the proposed acquisition may substantially lessen competition in ways that irreparably harm millions of Americans who shop for groceries and work in supermarkets across the country. Kroger and Albertsons should not be allowed to consummate the proposed acquisition before the Commission's administrative adjudication determines whether the proposed acquisition violates the antitrust laws.

## II.  THE PARTIES

16. Plaintiff Federal Trade Commission is an administrative agency of the United States government established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41 *et seq*., with its principal offices at 600 Pennsylvania Avenue, N.W., Washington, D.C. 20580.

17. Plaintiff State of Arizona is a sovereign state of the United States. This action is brought by and through its Attorney General, Kristin K. Mayes, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Office of the Attorney General of the State of Arizona has its principal offices at 2005 N. Central Avenue, Phoenix, AZ 85004.

18. Plaintiff State of California is a sovereign state of the United States. This action is brought by and through its Attorney General, Rob Bonta, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Office of the Attorney General of the State of California has its principal offices at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102.

19. Plaintiff District of Columbia is a sovereign municipal corporation of the United States. This action is brought by and through its Attorney General, Brian Schwalb, who is the chief law enforcement officer of the District, with the authority to bring this action on behalf of the District

COMPLAINT                                7

pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Office of the Attorney General of the District of Columbia has its principal offices at 400 6th Street, N.W., 10th Floor, Washington, DC 20001.

20. Plaintiff State of Illinois is a sovereign state of the United States. This action is brought by and through its Attorney General, Kwame Raoul, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Office of the Attorney General of the State of Illinois has its principal offices at 115 S. LaSalle Street, Chicago, IL 60603.

21. Plaintiff State of Maryland is a sovereign state of the United States. This action is brought by and through its Attorney General, Anthony G. Brown, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Office of the Attorney General of the State of Maryland has its principal offices at 200 St. Paul Place, 19th Floor, Baltimore, MD 21202.

22. Plaintiff State of Nevada is a sovereign state of the United States. This action is brought by and through its Attorney General, Aaron D. Ford, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and Nevada Revised Statutes §§ 598A.050, 598A.070, 598A.080, and 228.380. The Office of the Attorney General of the State of Nevada has its principal offices at 100 N. Carson Street, Carson City, NV 89701.

23. Plaintiff State of New Mexico is a sovereign state of the United States. This action is brought by and through its Attorney General, Raúl Torrez, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of

the Clayton Act, 15 U.S.C. § 26. The New Mexico Department of Justice has its principal offices at 408 Galisteo Street, Santa Fe, NM 87504.

24. Plaintiff State of Oregon is a sovereign state of the United States. This action is brought by and through its Attorney General, Ellen F. Rosenblum, who is the chief law officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Office of the Attorney General of the State of Oregon has its principal offices at 1162 Court Street NE, Salem, OR 97301.

25. Plaintiff State of Wyoming is a sovereign state of the United States. This action is brought by and through its Attorney General, Bridget Hill, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Office of the Attorney General of the State of Wyoming has its principal offices at 109 State Capitol, Cheyenne, WY 82002.

26. Each State and the District of Columbia is seeking relief pursuant to Clayton Act § 16, 15 U.S.C. § 26.

27. Defendant Kroger is the largest traditional supermarket chain and the largest employer of union grocery workers in the United States. In 2022, Kroger generated over $148 billion in revenues. Today, Kroger operates approximately 2,726 supermarkets and 2,252 retail pharmacies under numerous banners (e.g., Kroger, Fred Meyer, Quality Food Center (QFC), Baker's, City Market, Dillons, Food 4 Less, Foods Co, Fry's, Gerbes, Harris Teeter, JayC, King Soopers, Mariano's, Metro Market, Pay-Less, Pick'n Save, Ralphs, Ruler, Smith's) across thirty-six states as shown in the illustration below.



Kroger also employs approximately 430,000 workers and is a party to over 300 collective bargaining agreements, with labor unions representing most of its workforce.

28. Kroger's present-day portfolio of stores and banners is the product of four decades of continuous consolidation:

- 1983: Kroger acquired Dillon Companies (including Dillons, King Soopers, City Market, Fry's, and Gerbes banners)

- 1999: Kroger acquired JayC (including JayC and Ruler banners)

- 1999: Kroger acquired Pay Less

- 1999: Kroger acquired Fred Meyer for ~$13 billion (including Fred Meyer, Ralphs, Food 4 Less, QFC, and Smith's banners)

- 2001: Kroger acquired Baker's

- 2014: Kroger acquired Harris Teeter for ~$2.5 billion

- 2015: Kroger acquired Roundy's for ~$800 million (including Roundy's, Pick 'N Save, Metro Markets, and Mariano's banners)

Touting its history of growth by acquisitions, Kroger notes on its website that, "Mergers have played a key role in our growth."



29. Defendant Albertsons is the second largest traditional supermarket chain and the second largest employer of union grocery workers in the United States. In 2022, Albertsons generated approximately $72 billion in revenues. Albertsons operates approximately 2,276

supermarkets and 1,722 retail pharmacies under numerous banners (e.g., Albertsons, Safeway, Haggen, Acme, Andronico's, Amigos, Balducci's, Carrs, Eagle Quality Center, Jewel-Osco, Kings Food Markets, Lucky, Market Street, Pak'N Save, Pavilions, Randalls, Shaw's, Star Market, Tom Thumb, United Supermarkets, Vons) across thirty-five states as shown in the illustration below.



Albertsons also employs over 290,000 workers, most of whom are covered by collective bargaining agreements.

30. Much like Kroger, Albertsons Companies today is the product of serial acquisitions:

- 1998: Albertsons acquired American Stores Company for ~$13 billion (including Jewel-Osco, Lucky, and Acme banners)

- 2004: Albertsons acquired Shaw's Supermarkets for ~$2.5 billion (including Shaw's and Star Market banners)

- 2013: Albertsons acquired United Supermarkets for ~$385 million (including United, Market Street, and Amigos banners)

- 2015: Albertsons acquired Safeway for ~$9.2 billion (including Safeway, Carrs, Tom Thumb, Randalls, Vons, and Pavilions banners)

- 2016: Albertsons acquired Haggen, including numerous stores it had previously divested to Haggen in the Safeway transaction just a year prior.



## III. JURISDICTION AND VENUE

31. This Court's jurisdiction arises under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b); Section 16 of the Clayton Act, 15 U.S.C. § 26; and 28 U.S.C. §§ 1331, 1337, and 1345. This is a civil action arising under Acts of Congress protecting trade and commerce against restraints and monopolies. An Act of Congress authorizes the FTC and Plaintiff States to bring this action. Defendants, and each of their relevant operating entities and parent entities are, and at all relevant times have been, engaged in commerce or in activities affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12. Defendants also are, and at all relevant times have been, engaged in commerce in the States of Arizona, California, Illinois, Maryland, Nevada, New Mexico, Oregon, and Wyoming and the District of Columbia.

COMPLAINT                                13

32. Defendants transact business in Oregon and are subject to personal jurisdiction therein. Kroger and Albertsons operate 55 and 121 supermarkets in Oregon, respectively. Combined, Defendants have over 28,000 employees in Oregon. Kroger's Fred Meyer banner is headquartered in Portland, Oregon and Albertsons's Safeway banner has a division office in Oregon as well. Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) and 15 U.S.C. § 53(b).

33. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides in pertinent part:

(b) Whenever the Commission has reason to believe –
(1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and
(2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public – the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond . . .

34. The FTC enforces the Clayton Act. Section 7 of the Clayton Act prohibits mergers and acquisitions in "any line of commerce . . . in any section of the country," where the effect "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18.

35. The proposed acquisition is subject to Section 7 of the Clayton Act, 15 U.S.C § 18.

36. Alongside the Commission, Plaintiff States seek a preliminary injunction under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain Kroger and Albertsons from violating Section 7 of the Clayton Act, 15 U.S.C. § 18, pending the Commission's administrative trial. Plaintiff States have standing to bring this action because the proposed acquisition would cause antitrust injury in their respective states.

37. Section 16 of the Clayton Act, 15 U.S.C. § 26, provides in pertinent part:

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including section 13, 14, 18 and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue . . . .

## IV. THE PROPOSED ACQUISITION MAY SUBSTANTIALLY LESSEN COMPETITION IN LOCAL MARKETS FOR THE SALE OF FOOD AND GROCERY PRODUCTS AT SUPERMARKETS

38. Kroger and Albertsons are two of the largest supermarket chains in thousands of local communities throughout the country. In hundreds of those communities, the proposed acquisition would create a single supermarket with market shares so high as to be presumptively unlawful under the antitrust laws. The proposed acquisition would also eliminate the substantial head-to-head competition between Kroger and Albertsons that exists today, which risks higher prices and lower quality for consumers. Albertsons's executives have acknowledged that the combination of these two companies would harm competition, writing: ██████████████████████ ██████████████████████████████████ and ██████████████████████ ████

39. Defendants are unique in their scale and size. Today, Kroger's and Albertsons's supermarkets are part of an ecosystem of store banners (e.g., Safeway, Fred Meyer, and QFC) that benefit from manufacturing and distribution networks that operate across broad areas of the country and enjoy local brand recognition. Kroger's go-to-market strategy is to benefit from ████ ████████████████████████████████████████████████████████████████ ██████████████ Albertsons also benefits from the company's ████████████████ strategy.

40. Defendants organize their supermarkets into "divisions," which are geographic organizational units that have some level of operational autonomy. Defendants' supermarkets also benefit from broad banner and operational division-level branding, marketing, pricing, and promotional strategies. Defendants' strategies include building a profitable "flywheel" (assets that work together to enable continuous growth) of data science capabilities, including loyalty program data that provide insights into consumer behavior and are utilized in retail media networks. These corporate capabilities are integral to the success of Defendants' individual stores. According to Albertsons's CEO: ███████████████████████████████████████████

41. Kroger and Albertsons also offer additional services to attract supermarket customers, such as fuel stations and pharmacies. For instance, Defendants recognize that offering pharmacy services in their supermarkets can help drive customer traffic, and that customers who come to the pharmacies tend to also purchase groceries. Offering these additional services contributes to the success of Defendants' overall supermarket business.

42. By leveraging these networks and services, Kroger and Albertsons compete head-to-head across multiple dimensions. For example, Albertsons's Portland Division has developed a specific plan for success against Kroger to ███████████████████ and Kroger's QFC division refers to Safeway as its "#1 direct competitor." Defendants' supermarkets alter their pricing and promotions in response to each other and compete with one another to improve the quality of their products and services. Eliminating this head-to-head competition between Defendants may lead to higher prices and reduced services for consumers.

## A. SUPERMARKETS ARE A RELEVANT PRODUCT MARKET

43. The retail sale of food and other grocery products in traditional supermarkets and supercenters constitutes a relevant product market. For brevity, this relevant product market is referred to here as "supermarkets."

COMPLAINT                                          16

44. Supermarkets offer consumers convenient "one-stop shopping" for food and grocery products, which, in Kroger's words, is a "simpler and more convenient" alternative to multiple shopping trips. Indeed, Kroger boasts that "one-stop shopping" is their "innovation #1" and has grown into something that would make [company founder] Barney [Kroger] smile." Compared to other types of food retailers, supermarkets typically have a broad and deep product assortment of tens of thousands of stock-keeping units ("SKUs") in a variety of package sizes, as well as a deep inventory of those items. To accommodate the large number of food and non-food products necessary for one-stop shopping, supermarkets are large stores that typically have at least 10,000 square feet of selling space.

45. Supermarkets allow customers to purchase most or all of their food and grocery shopping requirements in a single trip to a store that offers substantial products in each of the following categories: bread and baked goods; dairy products; refrigerated food and beverage products; frozen food and beverage products; fresh and prepared meats and poultry; fresh fruits and vegetables; shelf-stable food and beverage products, including canned, jarred, bottled, boxed, and other types of packaged products; staple foodstuffs, such as salt, sugar, flour, sauces, spices, coffee, tea, and other staples; other grocery products, including nonfood items such as soaps, detergents, paper goods, other household products, and health and beauty aids; and, to the extent permitted by law, wine, beer, or distilled spirits. Supermarkets also offer customer service options including deli, butcher, seafood, bakery, prepared meals (e.g., sushi, hot bar), or floral counters.

46. Supermarkets recognize other supermarkets as a distinct type of food and grocery retailer. For example, supermarkets track and respond to other supermarkets' promotions and customer-service options. When determining their pricing, supermarkets primarily consider the pricing of other supermarkets. This is true for Defendants. Kroger predominantly price checks

████████████████████████████████████████████ Similarly, Albertsons's pricing

program focuses on █████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

47. A relevant antitrust market need not include all substitute products or services. The loss of competition between a narrower group of substitutes can cause harm, making the narrower group a properly defined antitrust market. The hypothetical monopolist test is a tool used to determine if a group of products (i.e., type of retailers) is sufficiently broad to be a properly defined antitrust product market. If a single firm (i.e., a hypothetical monopolist) seeking to maximize profits controlled all sellers of a set of products or services and likely would undertake a small but significant and non-transitory increase in price or other worsening of terms ("SSNIPT"), then that group of products (i.e., type of retailer) is a properly defined antitrust product market.

48. A hypothetical monopolist of supermarkets likely would undertake a SSNIPT on consumers. In response to a SSNIPT, supermarket customers would not shift enough of their purchases to non-supermarket retail formats to make a hypothetical monopolist of supermarkets unlikely to undertake a SSNIPT. The reason consumers would not shift a significant enough volume of purchases is because these non-supermarket retail offerings provide a very differentiated customer experience. For example:

- Club stores (e.g., Costco, Sam's Club) require membership fees, typically offer larger package sizes, and frequently rotate their product assortments. Club stores have more square footage but offer far fewer food and grocery SKUs than supermarkets. Club stores also have fewer store locations than supermarkets, requiring consumers to travel longer distances.

COMPLAINT                    18

- Limited assortment stores (e.g., Aldi, Lidl) offer a differentiated, narrower selection of product SKUs. Most of the SKUs limited assortment stores offer are private label (i.e., store brand) as opposed to national brands. Limited assortment stores often offer products on a rotating, limited time, or seasonal basis, meaning customers are not always able to find the products they want. Limited assortment stores generally have smaller square footage and do not offer as many customer service options, including deli, butcher, bakery, prepared food, and pharmacy, as supermarkets offer.

- Premium natural and organic stores ("PNOS") (e.g., Whole Foods, Sprouts Farmers Market) focus on a set of customers that is distinct from supermarket customers, and PNOS generally have higher prices than supermarkets. PNOS also carry a differentiated, narrower product assortment that is more focused on organic and fresh products.

- Dollar stores offer a much narrower range of grocery product SKUs than supermarkets (i.e., little or no fresh produce, meat, or dairy). Dollar stores also do not offer the kind of customer service options, including deli, butcher, seafood, bakery, prepared meals, or floral counter, that supermarkets offer.

- E-commerce retailers (e.g., Amazon.com) offer a very different consumer experience from in-person shopping across many dimensions. For example, e-commerce retailers do not allow customers to inspect produce before purchase, require waiting for delivery, and/or require scheduling convenient delivery windows for perishable products. E-commerce retailers also may charge additional service and delivery fees that increase the total cost of grocery orders.

COMPLAINT                              19

49. The price increase would be profitable for the hypothetical monopolist because supermarkets would not lose sufficient sales to non-supermarkets to make the price increase unprofitable. The fact that a hypothetical monopolist of supermarkets would likely undertake a SSNIPT means that other kinds of retailers are not a sufficient competitive constraint on supermarkets to prevent a SSNIPT. Therefore, supermarkets constitute a properly defined product market.

50. Grocery delivery services (e.g., Instacart, DoorDash) are not in the relevant product market. Grocery delivery services are not independent suppliers of grocery products; rather, grocery delivery service shoppers procure products from brick-and-mortar retailers and deliver them to customers, typically during a pre-scheduled time window. Grocery delivery services are partners to, not substitutes for, brick-and-mortar retailers.

## B. LOCAL AREAS AROUND STORES ARE RELEVANT GEOGRAPHIC MARKETS

51. Customers prefer to purchase grocery products at retailers near where they live or work. Supermarket competition therefore primarily occurs locally. Relevant geographic markets for retail supermarkets are localized areas around each store. Indeed, in their internal documents and securities filings, Defendants focus their competitive analysis on a radius of several miles around each store, but that may vary somewhat due to local conditions.

52. Localized markets around Defendants' stores within the below areas are geographic markets in which to assess the competitive effects of the proposed acquisition. A hypothetical monopolist controlling all supermarkets in any one of these localized markets within one of the below core-based-statistical areas (i.e., metropolitan and micropolitan areas) or rural geographies could profitably implement a SSNIPT in that market.

- **Alaska**: Anchorage; Fairbanks; Juneau; Kenai; Soldotna

- **Arizona**: Flagstaff; Lake Havasu City-Kingman; Payson, Phoenix-Mesa-Chandler; Prescott Valley-Prescott; Sierra Vista-Douglas; Tucson; Yuma

- **California**: Bakersfield; El Centro; Fresno; Los Angeles-Long Beach-Anaheim; Oxnard-Thousand Oaks-Ventura; Riverside-San Bernardino-Ontario; Salinas; San Diego-Chula Vista-Carlsbad; San Francisco-Oakland-Berkeley; San Luis Obispo-Paso Robles; Santa Maria-Santa Barbara

- **Colorado**: Alamosa; Boulder; Cañon City; Colorado Springs; Cortez; Delta; Denver-Aurora-Lakewood; Durango; Edwards; Fort Collins; Fraser; Granby; Grand Junction; Greeley; Gunnison; Montrose; Pueblo; Steamboat Springs

- **District of Columbia and Virginia**: Washington-Arlington-Alexandria

- **Idaho**: Boise-Meridian-Nampa; Coeur d'Alene; Idaho Falls; Pocatello; Twin Falls

- **Illinois and Indiana**: Bloomington; Chicago-Naperville-Elgin; Kankakee

- **Louisiana**: Alexandria; Lake Charles; Shreveport-Bossier City

- **Maryland**: Baltimore-Columbia-Towson; Easton

- **Montana**: Bozeman; Great Falls; Kalispell

- **New Mexico**: Albuquerque; Farmington; Santa Fe; Taos

- **Nevada**: Elko; Las Vegas-Henderson-Paradise; Pahrump; Reno

- **Oregon**: Albany-Lebanon; Bend; Coos Bay; Corvallis; Eugene-Springfield; Grants Pass; Klamath Falls; Medford; Newport; Portland-Vancouver-Hillsboro; Roseburg; Salem; The Dalles; Tillamook

- **Texas**: Dallas-Fort Worth-Arlington; Houston-The Woodlands-Sugar Land; Sherman-Denison

- **Utah**: Salt Lake City; St. George

COMPLAINT                                      21

- **Washington**: Bellingham; Bremerton-Silverdale-Port Orchard; Ellensburg; Hadlock; Kennewick-Richland; Longview; Mount Vernon-Anacortes; Olympia-Lacey-Tumwater; Port Angeles; Port Townsend; Seattle-Tacoma-Bellevue; Shelton; Spokane-Spokane Valley; Wenatchee; Yakima

- **Wyoming**: Casper; Cheyenne; Gillette; Jackson; Rock Springs

### C. THE PROPOSED ACQUISITION IS PRESUMPTIVELY UNLAWFUL

53. The Herfindahl-Hirschman Index ("HHI") is a well-established method for calculating concentration in a market. The HHI is the sum of the squares of the market shares of the market participants. For example, a market with five firms, each with 20% market share, would have an HHI of 2000 ($20^2 + 20^2 + 20^2 + 20^2 + 20^2 = 2000$). The HHI is low when there are many small firms and grows higher as the market becomes more concentrated. A market with a single firm would have an HHI of 10,000 ($100^2 = 10,000$).

54. The Department of Justice and the Federal Trade Commission jointly publish the Merger Guidelines. Rooted in established caselaw and widely accepted economic thinking, the Merger Guidelines outline the legal tests, analytical frameworks, and economic methodologies both agencies use to assess whether transactions violate the antitrust laws, including measuring market shares and changes in market concentration from a merger. The Merger Guidelines—themselves guided by numerous court decisions—support using the HHI method to calculate market concentration.

55. The increase in market concentration caused by the proposed acquisition is indicative of the merger's likely negative impact on competition. The Merger Guidelines explain that a merger that significantly increases market concentration is presumptively unlawful. Specifically:

- A merger that creates a firm with a market share of over 30 percent and that increases the HHI of the market by more than 100 points is presumed to substantially lessen competition in that market and is thus presumptively illegal.

- A merger is also likely to create or enhance market power—and, again, is presumptively illegal—when the post-merger HHI exceeds 1800 and the merger increases the HHI by more than 100 points.

56. The proposed acquisition is presumptively illegal in overlapping local markets surrounding more than 1500 Kroger and Albertsons supermarkets within the above referenced geographic areas. The proposed acquisition is presumed likely to create or enhance market power—and is presumptively illegal—in each of these local geographic markets because the merger increases the HHI by more than 100 points and (i) Defendants' combined market shares exceed 30 percent or (ii) the post-merger HHI exceeds 1800.

57. Even if the non-supermarket retail formats described above are included in the relevant product market, the proposed acquisition is still presumptively unlawful in most of the identified geographic markets.

## D. THE PROPOSED ACQUISITION WOULD ELIMINATE HEAD-TO-HEAD COMPETITION BETWEEN DEFENDANTS

58. The elimination of head-to-head competition between Defendants also makes the proposed acquisition unlawful. A merger is unlawful if it substantially lessens competition between the parties independent of the analysis of market shares, as recognized by the Merger Guidelines.

59. The proposed acquisition would eliminate substantial head-to-head competition between Defendants in the communities in which both firms operate supermarkets today. The

likely result would be higher prices, lower quality, and worse service for consumers around the country.

60. **Pricing competition.** Kroger's and Albertsons's loyalty data indicates that their overlapping supermarkets compete for the same customer base, drawing shoppers from the same local communities. Today, Kroger and Albertsons engage in aggressive price competition that benefits these consumers. For example, both Defendants frequently price check each other at a local level and often alter pricing in response to competition from each other. ██████████████ ████████████████████████████ ████████████████████████████ ██████████████████████████ This pricing competition between Defendants exists in both base pricing (non-promotional price) and promotional pricing (sale price). The proposed acquisition would eliminate that competition, leading to higher prices for consumers.

61. In some divisions, Kroger benchmarks its base pricing ████████████████████ ███████ Additionally, for multiple product categories, Kroger policies demand that its base prices ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████

62. Likewise, Albertsons identifies Kroger ████████████████████ ████████████████████████ Albertsons checks prices ████████████████████ ████████████████ Using the price check data, Albertsons's pricing software alerts employees when an item's base price is too high or low ████████████████ Albertsons's long-term goal is to create an ████████████████████████████████████ ████████████ This price competition has benefited consumers in the form of lower prices.

63. Kroger and Albertsons also compete by offering promotional pricing discounts on products. Both Defendants engineer their promotional programs and discounts in part to drive customers towards their own supermarkets, and away from the other's supermarkets. Defendants also monitor each other's promotional offers and respond accordingly. In divisions where Defendants' supermarkets overlap, Kroger routinely compares ███████████████████ ██████████████████████████████████████████████ Albertsons also monitors ███████ ██████████████; for example, Albertsons's Denver Division President testified that Albertsons strives ███████████████████████████████████████ ███████████████

64. Promotional competition between Kroger and Albertsons is a regular occurrence. For example, in response to Fred Meyer (Kroger) ads in Portland, Oregon, Albertsons's Chief Operating Officer wrote, ██████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████ Albertsons's Vice President of Marketing and Merchandising commented, ████████████████████ ██████████████████████████████████████████ In 2022, Albertsons's Senior Vice President of Marketing and Merchandising for the Seattle Division noted in response to Fred Meyer ads, ███████████████████████████ ██████████████████████████████████████ Again, the proposed acquisition would eliminate promotional pricing competition between Kroger and Albertsons, leading to higher prices for consumers.

COMPLAINT                                      25

65. **Product quality competition.** Kroger and Albertsons also compete with one another to improve the quality and variety of their products and offerings, such as the freshness and assortment of their produce. Kroger's internal analyses show that ███████████████████ ███████ and ████████████████████████████████████████ Similarly, Albertsons's Division President in Portland stated in 2022, ████████████████████ ███████████████████████████████████ and that Albertsons needed to ███████████████████████████ to compete with Kroger and Walmart.

66. Recognizing the importance of freshness and the assortment of fresh products to customer choice, Defendants compete closely to offer the freshest, highest quality produce. Consumers regularly benefit from this competition. For example, after noting the selection of in-store cut produce at Vons (Albertsons) stores in late 2022, a Ralphs (Kroger) produce manager directed his team ██████████████████████████ Similarly, in April 2022, Albertsons conducted a test comparing the freshness of ██████████████████████ ████████████████████████

67. Kroger and Albertsons also compete by monitoring each other's branded and private-label products. For example, in 2020, Kroger compared the quality ██████████████████ ████████████████████████████████████████ ████ As a result of this assessment, Kroger recognized a need ██████████████████ ████████████████████████████████████████ ████████████ The proposed acquisition would eliminate that competition, leading to lower quality private-label offerings for consumers.

68. **Store condition and customer service competition.** Defendants try to attract customer volume by prioritizing store re-models where they face more robust competition. For

example, when Kroger opened a Fry's supermarket in Arizona near an Albertsons, the Albertsons's

District Manager noted its store was ███████████████████████████████████████

██████████████████████ He added, ████████████████████████████████████████

████ Also, for example, a Ralphs employee stated a particular store was a ██████████████

████████████████████████████████████████████████████████████

69. Competition between Defendants also spurs them to offer superior customer services.

Albertsons's 2022 Portland Division plan to compete against Kroger included ███████████████

████████████████████████████████████████████████████████ The improved

customer services include store hours and pick-up centers. For example, in 2022, the president of

Kroger's QFC division ████████████████████████████ to bring them closer to its

"#1 direct competitor," Albertsons's Safeway. Competition between the Defendants has also

motivated them to improve offerings such as curb-side pickup. In 2021, Kroger's Chief Merchant

and Marketing Officer commented to its CFO: ████████████████████████████████

████████████████████████████████ The following year, the same Kroger executive expressed

urgency about improving Kroger's pick-up services ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ Albertsons also decided to add

pick-up centers at some of its supermarkets directly in response to actions by Kroger███████████

█████████████

70. Defendants also compete for supermarket customers through robust in-store services

such as meat-cutting, bakeries, Starbucks counters, floral counters, pharmacies, and more. For

example, Albertsons saw an opportunity to take advantage and win customers after seeing

unstaffed deli counters at Kroger's Fred Meyer. Albertsons's Chief Operating Officer suggested

that ███████████████████████████ which the Seattle Division President said ███

███████████████ Albertsons planned ███████████████████████ and to ███████

███████████████████████████████████████████████████ Also, for

example, in 2022, Kroger's Ralphs Division President

71. **Pharmacy services competition.** Offering pharmacy services is an important way that Defendants' supermarkets compete to attract supermarket customers because attracting pharmacy patients increases supermarket revenue from customers who are also purchasing groceries. For example, when Kroger went out-of-network with a major pharmacy benefits manager (meaning beneficiaries of certain health insurance plans could no longer fill prescriptions at Kroger pharmacies), Albertsons viewed the event as █████████████████████████████

█████████████████████████████ Defendants recognize that pharmacy patients visit stores more frequently and spend more during shopping trips than shoppers who do not visit the pharmacies. As Albertsons's Director of Managed Care stated, █████████████

███████████████████████████████████████████████████████

█████████████ Kroger cited competition with ███████████████████████████████

███████████████████████████████████████████████████████

█████████████████

72. Defendants compete with each other to win pharmacy patients, retain prescriptions, and to offer other pharmacy services (e.g., vaccines). For example, in 2021 Kroger offered a fuel points incentive for all COVID-19 vaccine doses in ███████████████████████████████

██████████████████ Also in 2021, Kroger began offering grocery promotions in Dallas for COVID-19 patients ███████████████████████. After Kroger went out of certain payor

networks in 2023, ██████████████████████████████████

██████████████████████████████████ Albertsons began offering pharmacy

patients a $75 discount for grocery items when they transferred a prescription. ████████

██████████████████████████

73. The competition to fill prescriptions and provide other pharmacy services incentivizes Defendants to offer promotions and adjust pharmacy hours and staffing to be more attractive to pharmacy patients. For example, Kroger's King Soopers banner ████████████████████

██████████████████████████████████████████████

██████████████████

74. The proposed acquisition, by reducing competition between Kroger and Albertsons for supermarket grocery customers, would reduce the Defendants' incentive to continue offering the same level of pharmacy services to attract those customers. The combined Kroger/Albertsons would have a reduced incentive to offer promotions or improved customer service.

75. The proposed acquisition would eliminate this head-to-head competition between Defendants' supermarkets, reducing their incentives to improve pricing, product quality, and customer services.

## V. THE PROPOSED ACQUISITION MAY SUBSTANTIALLY LESSEN COMPETITION FOR LABOR

76. A merger of competing buyers, including employers as buyers of labor, can substantially lessen competition between the merging buyers. The same tools used to assess the effects of a merger of sellers can be used to analyze a merger of employers as buyers of labor.

77. The proposed acquisition may substantially lessen competition between Kroger and Albertsons for employees. Defendants are each massive employers of grocery workers, with over

COMPLAINT                                29

700,000 combined employees throughout the country, and they compete aggressively to hire and

retain workers in the areas where their supermarket operations overlap.

78. Defendants monitor wages and benefits set at local competitors, including each other,

and often attempt to match or exceed competing wage and benefit offers. To retain high-

performing workers, Defendants often promote them, offer retention bonuses, or improve their

hours. Kroger and Albertsons also try to poach grocery workers from each other.

79. There are many real-world examples of this competition. For example, in 2021,

Albertsons's Executive Vice President of Retail Operations directed district managers, sales

managers, and store directors to ███████████████████████████████

███████████████ He emphasized, by hiring Kroger's workers, ████████████████

███████████████ Also in 2021, Kroger's Fred Meyer Division President emailed Kroger's

Senior Vice President of Retail Operations about ████████████████████████████

██████████████████████████

80. This competition for workers is most acute and apparent in the context of collective

bargaining negotiations with union grocery workers. Most of Defendants' workers are members

of unions, predominantly the United Food and Commercial Workers ("UFCW"). Kroger employs

UFCW union grocery workers in 30 states, while Albertsons has union grocery workers in 26

states. Indeed, in Alaska, Arizona, California, Colorado, Idaho, Illinois, Indiana, Montana, New

Mexico, Nevada, Oregon, Utah, Virginia, Washington, and Wyoming, both Kroger and Albertsons

operate stores that employ UFCW union grocery workers.

81. Today, in many markets where both Defendants employ union workers, the unions that

represent grocery workers leverage the fact that Kroger and Albertsons are separate companies

competing for customers and workers to negotiate better terms of employment for union grocery

workers. The proposed acquisition would eliminate that competition, likely leading to lower wages and reduced benefits, opportunities, and quality of workplace conditions and protections for thousands of Defendants' employees.

## A. UNION GROCERY LABOR IS A RELEVANT MARKET

82. Union grocery labor is a relevant market in which to analyze the probable effects of the proposed acquisition. Unions typically negotiate collective bargaining agreements ("CBAs") with grocery employers, including Defendants, on behalf of their worker members every few years. CBAs determine each union worker's wages, health and pension benefits, scheduling, leave, and myriad other workplace conditions. Union grocery workers can move between grocery employers covered by their union while retaining their pension and healthcare benefits, as well as other valuable workplace benefits and protections provided by the CBAs. If a union grocery worker leaves for a non-union employer, however, the worker will lose any non-vested CBA benefits and protections.

83. Union grocery workers value their robust pension and healthcare benefits, as well as other benefits and protections provided by the CBAs. Because union grocery worker pensions vest after a certain number of years of employment, and union healthcare benefits often improve over time, union grocery workers have a strong preference to remain with their union employers.

## B. LOCAL CBA AREAS ARE RELEVANT GEOGRAPHIC MARKETS

84. Defendants typically negotiate CBAs that cover defined localized areas where they operate union supermarkets. When preparing for collective bargaining negotiations, Defendants survey wages and benefits in the local areas subject to the CBA. Recognizing that grocery workers prefer to work near where they live, Defendants also make job posting and hiring decisions locally, typically at the store level.

COMPLAINT                                            31

85. The geographic areas covered by each CBA's jurisdiction, referred to here as the local CBA areas, are relevant geographic markets in which to analyze the proposed acquisition's probable effects.

86. Because the unions gain leverage by playing competing grocery chains against each other during CBA negotiations, a hypothetical operator of all union grocery stores within a local CBA area would likely undertake the equivalent of a SSNIPT (i.e., a small but significant non-transitory worsening of employment terms) with respect to its CBAs.

## C. THE PROPOSED ACQUISITION IS PRESUMPTIVELY UNLAWFUL

87. Kroger and Albertsons are the two largest employers of union grocery labor in the United States. In many states, including Arizona, California, Colorado, Illinois, New Mexico, Nevada, Oregon, and Washington, Defendants both negotiate with the same local unions, and Kroger and Albertsons are often the only two, or two of few, union grocery employers. The proposed acquisition is presumed likely to lessen competition—and is thus presumptively illegal—in many local CBA areas within each state where Defendants negotiate with the same local unions because the combined firm will enjoy a market share of over 30 percent and the merger increases the HHI of the market by more than 100 points. For example, the Defendants have a combined share of union grocery labor exceeding 65% in each of the below local CBA areas. Indeed, the proposed acquisition would be a merger to monopsony in approximately half of the local CBA areas listed below and would leave the merged Kroger/Albertsons as the only remaining employer of union grocery labor in those CBA areas. A non-exhaustive list of shared CBA areas is below:

- **California**: (i) Imperial, Inyo, Kern, Los Angeles, Mono, Orange, Riverside, San Bernadino, San Diego, San Luis Obispo, Santa Barbara, and Ventura Counties;

- **Colorado**: (i) Boulder and Louisville; (ii) Broomfield; (iii) Colorado Springs; (iv) Denver; (v) Fort Collins; (vi) Grand Junction and Clifton; (vii) Greeley; (viii) Longmont; (ix) Loveland; (x) Parker; (xi) Pueblo;

- **Oregon**: (i) Bend, Redmond, and Madras; (ii) Coos and Western Douglas Counties; (iii) Eugene (Lane County); (iv) Florence; (v) Jackson and Josephine Counties; (vi) Lincoln County; (vii) Portland (Multnomah, Washington, Clackamas, Columbia, and Yamhill Counties); (viii) Roseburg, Sutherlin, Winston, Riddle, and Myrtle Creek; (ix) Salem (Marion, Polk, Linn, and Benton Counties); (x) Wasco and Hood River Counties;

- **Washington**: (i) Chelan, Douglas, and Kittitas Counties; (ii) Clark County; (iii) Cowlitz and Wahkiakum Counties; (iv) Jefferson and Clallam Counties; (v) King, Kitsap, and Snohomish Counties; (vi) Island, Skagit, and Whatcom Counties; (vii) Mason and Thurston Counties; (viii) Spokane County; (ix) Yakima County.

### D.  THE PROPOSED ACQUISITION WOULD ELIMINATE COMPETITION BETWEEN DEFENDANTS FOR UNION GROCERY LABOR

88. Separate from the increase in concentration, the elimination of current head-to-head competition between Defendants for union grocery labor in many of their shared local CBA areas also makes the proposed acquisition unlawful.

89. By eliminating the current competition for union grocery labor between Kroger and Albertsons, the proposed acquisition would prevent the unions from being able to play them off each other during collective bargaining negotiations, substantially increasing Kroger's negotiating leverage. Kroger could use this increased negotiating leverage to reduce (or refuse to increase) wages, to reduce (or refuse to improve) worker benefits, and to degrade (or refuse to improve) working conditions or commit to fewer workplace protections.

90. Kroger and Albertsons are the two largest union grocery operators in the United States. Kroger and Albertsons each negotiate with local unions representing their workforces to determine wages, benefits, and working conditions for union grocery workers. Where Defendants overlap, they compete to attract and retain union grocery workers. To remain competitive, Defendants monitor and often match each other's wage increases for union grocery workers.

91. Where Defendants' union grocery operations overlap, they often negotiate CBAs separately but simultaneously against local chapters of labor unions representing grocery workers. During these negotiations, local unions try to play Kroger and Albertsons against each other, typically by obtaining a favorable deal from one Defendant and then leveraging that deal against the other Defendant to demand similar or better terms. The local unions can play Defendants against each other because Defendants closely compete for customers and workers and Defendants do not want to risk losing either customers or workers to their competitor. Albertsons's Vice President of Labor Relations refers to Kroger as its ████████████████ because Kroger and Albertsons compete for sales and talent while engaging in bargaining with local unions at the same time. During CBA negotiations with Defendants, the local unions have been able to improve wages, benefits, and working conditions by leveraging the competition between Kroger and Albertsons.

92. Union grocery workers' primary leverage during CBA negotiations is the ability to credibly threaten a strike. When workers withhold their labor during a strike, workers also encourage customers to shop at a competing supermarket, preferably another union grocery employer. Thus, a strike is effective because the employer loses sales and customers to competing supermarkets. The unions leverage the fact that Kroger and Albertsons compete for customers by striking or threatening to strike Kroger and encouraging Kroger's customers to shop elsewhere,

including at Albertsons, and vice versa. Once either Kroger or Albertsons agrees to a certain term in a union contract, the union can turn to the other firm and threaten a strike if it does not agree to a similar or better term. Kroger's Vice President of Labor Relations stated during 2022 Seattle negotiations: ██████████████████████████████████████████████████

██████████████████████████████████████████████

93.  UFCW Local 7's strike against Kroger in Colorado illustrates how the unions play Defendants off one another during a strike. In January 2022, UFCW Local 7 struck Kroger's King Soopers supermarkets in the Denver, Colorado CBA area. Leading up to and during the strike, Kroger's union grocery workers encouraged Kroger customers and employees to transfer their prescriptions to and shop at Albertsons stores instead of Kroger stores.

94.  Kroger's concern about losing customers led them to ask Albertsons ████████████████ ████████████████████████████████████████████ Albertsons's Senior Vice President of Labor Relations emailed Kroger that ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

95. During the strike, Kroger lost ████████████ of dollars in sales and profits, with ████████████████████████████████████████████ Albertsons's Denver Division President wrote that Albertsons gained ████████████████████████████████ and ████████████ ████████████████████████████████████████████ He also noted that Kroger was ████████████████████████████ due to the strike, which was a ████████████ ████████████ for Albertsons.

96. Ultimately, the strike ended when Kroger agreed to improvements to its CBA, including wage increases and safety protections for its workers. UFCW Local 7 then took the Kroger agreement to Albertsons, threatening that it would strike Albertsons next. Using this leverage, UFCW Local 7 got Albertsons to agree to the same wage increases and other important contract terms like benefits and protections. By striking just Kroger, and encouraging Kroger's customers to shop at Kroger's bargaining competitor, UFCW Local 7 was able to improve the terms in its CBAs with both employers, leading to improved wages and benefits for thousands of their members.

97. Executives from both Defendants acknowledge that the unions' ability to play them off one another using credible strike threats creates pressure to meet or beat each other's agreements. This competitive pressure benefits workers at both firms. For example, during the 2022 Denver negotiations with Local 7, Albertsons's Labor Relations Director expressed this concern: ████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████

98. To counter the unions' strategy, Defendants have tried to coordinate and align more closely during negotiations. A 2021 labor strategy white paper prepared for Kroger's CEO and other senior leaders recommended that ████████████████████████████████████████

█████████████████████████████████████████████████

███████ Similarly, a presentation for Albertsons's CEO identified ███████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████

99. To date, Defendants' coordination efforts have often been unsuccessful. During 2022 negotiations in Southern California, for example, Kroger's Chief People Officer remarked: ██ ███████████████████████████████████ Kroger's Vice President of Labor Relations echoed his frustration: ████████████████████████████████████ ███████████████████

100. Defendants' lack of alignment during negotiations has led to union contracts with more favorable salaries and benefits for workers. By contrast, where Kroger and Albertsons have successfully coordinated, as in Portland negotiations in 2019, ████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

The proposed acquisition is ███████████████ that would allow Defendants to have total alignment in future negotiations, to the detriment of union grocery workers.

101. The proposed acquisition would eliminate a competing employer for union grocery workers and would greatly increase Defendants' leverage during negotiations with local unions. With more leverage, the combined Kroger/Albertsons would likely be able to impose terms on union grocery workers that slow wage increases and improvements to benefits or degrade working conditions.

## VI. LACK OF COUNTERVAILING FACTORS

### A. ENTRY WOULD NOT DETER OR COUNTERACT THE ANTICOMPETITIVE EFFECTS OF THE PROPOSED ACQUISITION

102. Entry into the relevant markets for the retail sale of grocery products in supermarkets would not be timely, likely, or sufficient in magnitude to deter or counteract the anticompetitive effects of the proposed acquisition. Significant entry barriers include the time and costs associated with conducting necessary market research for opening a new supermarket, selecting an appropriate location for a supermarket, obtaining necessary permits and approvals, negotiating a lease, constructing a new supermarket or converting an existing structure to a supermarket, and generating sufficient sales to have a meaningful impact on the market. Additional entry barriers for supermarket operators without an established presence in a geography include establishing brand recognition and developing adequate distribution and supply networks to service new stores.

103. Timely entry by other union grocery employers is also not likely, and any potential entry by smaller union grocers would not be sufficient in magnitude to impact negotiations with the combined Kroger/Albertsons.

### B. DEFENDANTS CANNOT DEMONSTRATE EFFICIENCIES SUFFICIENT TO REBUT THE PRESUMPTION OF HARM

104. Defendants cannot demonstrate merger-specific, verifiable, and cognizable efficiencies sufficient to rebut the presumption of harm indicated by the proposed acquisition's impact on market shares and concentration and the evidence that the proposed acquisition may eliminate substantial head-to-head competition in the relevant markets.

### C.  THE PROPOSED DIVESTITURE DOES NOT SUFFICIENTLY MITIGATE THE LIKELY ANTICOMPETITIVE EFFECTS OF THE PROPOSED ACQUISITION

105. On September 8, 2023, Defendants announced that they intend to divest a hodgepodge of 413 stores and other castoff assets across 17 states and the District of Columbia to C&S Wholesale Grocers, LLC.

106. The proposed divestiture does not solve the competitive issues created by the proposed acquisition. C&S will not acquire an ongoing business operated by either Defendant today in any geography. In many local markets where Defendants overlap, C&S will not acquire any assets, leaving local market conditions unchanged. Additionally, in many local markets where C&S is acquiring stores, Defendants cannot show the proposed divestiture will prevent a substantial lessening of competition. The proposed divestiture thus does not contain sufficient assets to enable C&S or any putative acquirer to maintain or replicate the competitive intensity that currently exists between Kroger's and Albertsons's supermarkets, nor will it be able to effectively replace Albertsons's position today as a union grocery employer. Thus, the proposed divestiture does not justify allowing this illegal merger to proceed.

107. The proposed divestiture creates a substantial risk of flawed or failed integration and operation of the stores for at least three reasons. First, Defendants did not include any full, intact business units in the proposed divestiture, and the assets included are insufficient to operate a supermarket business that substantially replaces Kroger or Albertsons. Second, Defendants structured the proposed divestiture in a way that inextricably entangles Defendants' and C&S's competitive activities for years. Third, Defendants selected a buyer in C&S that is poorly positioned to operate these stores successfully. The public—not Defendants—would bear the risk of this failure.

108. **Insufficient Assets.** The construction of the proposed divestiture package creates a substantial risk of competitive diminution or outright failure. C&S will operate only approximately 436 supermarkets in total, compared with the approximately 5,000 supermarkets that a combined Kroger/Albertsons will operate. Defendants did not divest any ongoing business units to C&S. ███ ████████████, the proposed divestiture lacks the scale and necessary assets—including banners, distribution centers, information technology, corporate contracts, loyalty programs, manufacturing assets, pharmacy resources, data analytics and e-commerce tools, employees, and others—that Defendants rely on today to successfully operate their respective businesses.

109. C&S will need to construct a brand-new supermarket business on the fly, including new banner names at over 80 percent of the locations, new private label products, new loyalty programs, and new e-commerce platforms. C&S will need to do that while scrambling to recover from the loss of numerous assets that Defendants chose not to include in the package ████ ██████████). For example, Defendants will not be providing some of Albertsons's most popular private label brands, certain self-manufacturing facilities, established data-analytics capabilities, and experienced regional and corporate support teams. The deficiencies in the proposed divestiture pose unacceptable risks to competition, consumers, and workers.

110. **Anticompetitive Entanglements.** The proposed divestiture does not provide any meaningful relief during a lengthy transition period, as the combined Kroger/Albertsons and C&S will extensively coordinate on competitively relevant services—including pricing and promotional activities—for a set transition period. ████████████████████████████ ██████████████████████████ Thus, the entanglement between the parties created by the transition plan ties C&S to Defendants in a way that does not sufficiently mitigate

the effects of the proposed acquisition or sufficiently restore the competitive intensity lost through the merger.

111. **Flaws with C&S as Buyer**. C&S—a wholesaler with limited supermarket operating experience—is a poor choice for a divestiture buyer and increases the likelihood that the divested stores will flounder or fail. C&S operates only 23 Piggly-Wiggly and Grand Union retail supermarkets and only one retail pharmacy today, most of which C&S acquired in 2021 and 2022. Due to its lack of experience running a supermarket, C&S requested a call with Kroger during due diligence ███████████████████████████████████ C&S previously tried and failed to operate other supermarkets successfully, even at a much smaller scale than this vast and complex transaction. Many of the reasons for C&S's past failures include a complicated integration of multiple banners, store sizes, and formats and expansion into retail geographies where C&S has little to no familiarity or retail experience. Each of those concerns are present, if not compounded, here.

112. As a result of its supermarket retail operating deficiencies and past failures, C&S has spent most of the last decade seeking to avoid being a supermarket operator. As recently as 2021, C&S expressly stated in its regularly prepared financial reports: "From time to time, we acquire retail store locations in connection with strategic transactions to maintain or expand our grocery wholesaling and distribution business. . . Where possible, we seek to sell these locations to buyers who are already customers under existing contracts with our grocery wholesaling and distribution business. We do not intend to grow our grocery retailing operations or to operate the retail grocery stores in the long term. We expect to divest our retail grocery stores as opportunities arise." C&S, Kroger, and Albertsons now claim the opposite—that C&S is a seasoned, well-positioned supermarket operator that plans to operate the divestiture supermarkets itself into the future.

113. Kroger, Albertsons, and C&S have also claimed that there will be "no store closures," but ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████ Tellingly, C&S's then-CEO, Bob Palmer, shared the following concern to the incoming CEO, Eric Winn, when reviewing a draft press release touting the commitment: "Do we have to say that we won't close stores? (the 'all' is a problem) – the trick is that they stay open as they transition but then what? Are we committed to this?"

114. Furthermore, even if C&S fails to successfully operate the acquired stores, its financial downside from the proposed divestiture is mitigated due to the value of the real estate assets it is acquiring. In an internal assessment of the proposed divestiture, C&S estimated ██████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████ The risk of C&S not operating the divested assets successfully falls on the shoulders of the American consumer far more than those of C&S.

115. Defendants also have a track record of advocating for divestiture remedies that ultimately prove ineffective, with the public bearing the cost of these failures. Albertsons has done exactly this twice in the last decade alone—in its 2014 acquisition of United Supermarkets and in its 2015 acquisition of Safeway.

- In 2014, Albertsons divested two supermarkets to Lawrence Bros., a regional chain with 20 supermarkets. Within just five years, Lawrence Bros had closed both divested supermarkets. Albertsons re-acquired one of the two divestiture stores, and the other still sits idle. As a result, in neither instance did the divestiture maintain competition.

COMPLAINT                                    42

- In 2015, Albertsons proposed selling 168 supermarkets to resolve the competition concerns with the Safeway acquisition. Those stores were sold to multiple buyers, including large national/regional wholesale grocers (with existing distribution systems and some supermarket retail operating experience, albeit more limited compared to Albertsons). Many stores were also sold to Haggen, a regional Pacific Northwest chain. Albertsons advocated at the time that the sale of stores to Haggen would ███████████████████████████████████████████ ████████████████████████ But the divestitures to Haggen and the other buyers did not preserve competition, as Albertsons promised. Within a year, Haggen filed for bankruptcy, most of the divested stores were closed or sold (often converting to a non-supermarket use), and many workers lost their jobs. Shortly after Haggen's failure, Albertsons itself re-acquired 56 of its divested supermarkets, as well as the remains of the original Haggen chain out of bankruptcy.

116. In fact, Kroger has proposed to divest to C&S some of the same supermarkets that were previously divested to other buyers as part of these prior failed remedy attempts. Kroger is only able to propose re-divesting these supermarkets today because the prior Albertsons-sponsored remedy attempts failed.

117. Even in the event Kroger changes the divestiture proposal from what it announced last year, any remaining problems—e.g., lack of complete business units, insufficient and/or mix-and-matched assets, ongoing entanglements, and flaws with C&S as a buyer—would still create a substantial risk of flawed or failed integration and operation of the stores. Such a divestiture also would not sufficiently mitigate this merger's harms to competition.

COMPLAINT                                     43

## VII.    LIKELIHOOD OF SUCCESS ON THE MERITS, BALANCE OF EQUITIES, AND NEED FOR RELIEF

118. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the Commission, whenever it has reason to believe that a proposed merger is unlawful, to seek preliminary injunctive relief to prevent consummation of a merger until the Commission has had an opportunity to adjudicate the merger's legality in an administrative proceeding. Section 16 of the Clayton Act, 15 U.S.C. § 26, authorizes the Plaintiff States to sue for and have injunctive relief to prevent threatened loss or damage from Defendants' consummation of the proposed acquisition.

119. In deciding whether to grant relief, the Court should consider the likelihood of the Commission's ultimate success on the merits and the equities. The Commission is likely to succeed in proving that the effect of the proposed acquisition may be substantially to lessen competition or tend to create a monopoly in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, or Section 5 of the FTC Act, 15 U.S.C § 45.

120. In particular, the Commission is likely to succeed in the administrative proceeding in proving that the proposed acquisition may substantially lessen competition in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45. In particular, the Commission is likely to succeed in demonstrating, among other things, that the proposed acquisition may substantially lessen competition for labor and the sale of food and grocery products in supermarkets.

121. Plaintiffs need only demonstrate that the FTC is likely to succeed in proving that the proposed acquisition's effect may be to lessen competition substantially in one relevant antitrust market, as such a finding in any individual relevant market constitutes an independent basis to grant the requested preliminary injunction under Section 5 of the FTC Act, 15 U.S.C. § 45.

122. Preliminary relief is warranted and necessary. The Commission voted to issue an administrative complaint. Should the Commission rule, after the full administrative trial, that the proposed acquisition is unlawful, reestablishing the pre-merger state of competition between Defendants would be difficult, if not impossible, if the proposed acquisition has already occurred. Allowing the proposed acquisition to close before the completion of any administrative proceeding would cause irreparable harm by, among other things, enabling the combined firm to begin altering Albertsons's operations and business plans, accessing Albertsons's sensitive business information, and potentially eliminating Albertsons personnel.

123. Moreover, unless this Court grants the requested relief, substantial harm to competition likely would occur in the interim, even if suitable divestiture remedies were obtained later. Because any meaningful pro-competitive benefits of completing the proposed acquisition before the FTC adjudicates its legality do not outweigh the significant interim harm to competition, customers, and workers, the public equities weigh strongly in favor of Plaintiffs' request for preliminary injunctive relief.

124. Accordingly, the equitable relief requested here is in the public interest.

For the reasons set forth above, Plaintiffs respectfully request that the Court:

a. Enter the parties' stipulated temporary restraining order;

b. Preliminarily enjoin Defendants from taking any further steps to consummate the proposed acquisition, or any other acquisition of stock, assets, or other interests of one another, either directly or indirectly;

c. Retain jurisdiction and maintain the status quo until the Commission concludes its administrative proceeding;

d. Award costs of this action to Plaintiff States, including attorneys' fees; and

e. Award such other and further relief as the Court may determine is appropriate, just, and proper.

Dated: February 26, 2024                                FEDERAL TRADE COMMISSION

Of Counsel:                                             /s/ Charles Dickinson
                                                        Charles Dickinson, DC Bar # 997153
HENRY LIU                                               James H. Weingarten, DC Bar # 985070
Director                                                Elizabeth Arens, DC Bar # 982662
Bureau of Competition                                   Katherine Bies, CA Bar # 316749
                                                        Emily Blackburn, DC Bar # 1032506
RAHUL RAO                                               Katherine Drummonds, DC Bar # 1044289
Deputy Director                                         Paul Frangie, DC Bar # 474225
Bureau of Competition                                   Laura Hall, NY Bar # 4337408
                                                        Jacob Hamburger, DC Bar # 1025538
SHAOUL SUSSMAN                                          Lily Hough, CA Bar # 315277
Associate Director                                      Janet Kim, DC Bar # 489075
Bureau of Competition                                   Kenneth A. Libby, NY Bar # 2035129
                                                        Eric Olson, DC Bar # 1708530
                                                        Rohan Pai, DC Bar # 1015652
                                                        Harris Rothman, NY Bar # 5780283
                                                        Mark Seidman, DC Bar # 980662
                                                        Joshua Smith, MD Bar
                                                        Albert Teng, DC Bar # 1021115

                                                        Federal Trade Commission
                                                        600 Pennsylvania Avenue, NW
                                                        Washington, DC 20580
                                                        Tel: (202) 326-2617

                                                        *Attorneys for Plaintiff Federal Trade Commission*

COMPLAINT                          46

FOR PLAINTIFF STATE OF ARIZONA:

KRISTIN K. MAYES
Attorney General

/s/ Robert A. Bernheim

ROBERT A. BERNHEIM
Unit Chief Counsel
AZ Bar No. 024664

JAYME L. WEBER,
Senior Litigation Counsel
AZ Bar No. 032608

VINNY VENKAT
Assistant Attorney General
AZ Bar No. 038587

CONNOR NOLAN
Assistant Attorney General
AZ Bar No. 038088

Arizona Office of the Attorney General
2005 N. Central Avenue
Phoenix, AZ 85004
Tel: (602) 542-5025
Email: Robert.Bernheim@azag.gov
          Jayme.Weber@azag.gov
          Vinny.Venkat@azag.gov
          Connor.Nolan@azag.gov

*Attorneys for Plaintiff State of Arizona*

FOR PLAINTIFF STATE OF CALIFORNIA:

ROB BONTA
Attorney General of California

PAULA L. BLIZZARD
Senior Assistant Attorney General

NATALIE MANZO
Supervising Deputy Attorney General

/s/ Nicole Gordon

NICOLE GORDON
Deputy Attorney General
CA Bar No. 224138

SHIRA HOFFMAN
Deputy Attorneys General
CA Bar No. 337659

State of California
California Department of Justice
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102
Tel: (415) 510-3458
Facsimile: (415) 703-5480
E-mail: Nicole.Gordon@doj.ca.gov
        Shira.Hoffman@doj.ca.gov

*Attorneys for Plaintiff State of California*

FOR PLAINTIFF DISTRICT OF COLUMBIA:

BRIAN SCHWALB
Attorney General

/s/ Adam Gitlin

ADAM GITLIN
Chief, Antitrust and Nonprofit Enforcement
Section
DC Bar No. 90004308

AMANDA HAMILTON
Assistant Attorney General
DC Bar No. 499646

C. WILLIAM MARGRABE
Assistant Attorney General
DC Bar No. 90013916

Office of the Attorney General for the
District of Columbia
400 6th Street, N.W, 10th Floor
Washington, D.C. 20001
Tel: (202) 727-3400
Email: Amanda.Hamilton@dc.gov
        Will.Margrabe@dc.gov

*Attorneys for Plaintiff District of Columbia*

FOR PLAINTIFF STATE OF ILLINOIS:

KWAME RAOUL
Attorney General

/s/ Brian M. Yost

BRIAN M. YOST
Assistant Attorney General
IL Bar No. 6334138

PAUL J. HARPER
Assistant Attorney General
IL Bar No. 6335001

ALICE RIECHERS
Assistant Attorney General
IL Bar No. 6272933

Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
Tel: (872) 276-3598
Email: Brian.Yost@ilag.gov
        Paul.Harper@ilag.gov
        Alice.Riechers@ilag.gov

*Attorneys for Plaintiff State of Illinois*

FOR PLAINTIFF STATE OF MARYLAND:

ANTHONY G. BROWN
Attorney General

/s/ Schonette J. Walker

SCHONETTE J. WALKER
Assistant Attorney General and
Chief of the Antitrust Division
MD Bar No. 0512290008

GARY HONICK
Assistant Attorney General and
Deputy Chief of the Antitrust Division
MD Bar No. 7806010078

BYRON WARREN
Assistant Attorney General
MD Bar No. 1612140330

Office of the Attorney General
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
Tel: (410) 576-6470
Email: swalker@oag.state.md.us
        ghonick@oag.state.md.us
        bwarren@oag.state.md.us

*Attorneys for Plaintiff State of Maryland*

FOR PLAINTIFF STATE OF NEVADA:

AARON D. FORD, Attorney General

ERNEST D. FIGUEROA
Consumer Advocate

 /s/ Lucas J. Tucker
_____

LUCAS J. TUCKER
Senior Deputy Attorney General
NV Bar No. 10252

SAMANTHA B. FEELEY
Deputy Attorney General
NV Bar No. 14034

Office of the Nevada Attorney General
100 N. Carson St.
Carson City, Nevada 89701
Tel: (775) 684-1100
Email: ltucker@ag.nv.gov
        sfeeley@ag.nv.gov

*Attorneys for Plaintiff State of Nevada*

FOR PLAINTIFF STATE OF NEW MEXICO:

RAÚL TORREZ
Attorney General

/s/ Julie Ann Meade

JULIE ANN MEADE
Deputy Attorney General
NM Bar No. 8143

JEFF DAN HERRERA
Assistant Attorney General
NM Bar No. 154030

New Mexico Department of Justice
408 Galisteo St.
Santa Fe, NM 87504
Tel: (505) 717-3500
Email: jmeade@nmag.gov
        jherrera@nmag.gov

*Attorneys for Plaintiff State of New Mexico*

COMPLAINT                        53

FOR PLAINTIFF STATE OF OREGON:

ELLEN F. ROSENBLUM
Attorney General

 /s/ Cheryl F. Hiemstra

CHERYL F. HIEMSTRA
Assistant Attorney General
OSB#133857

TIM D. NORD
Special Counsel
OSB#882800

CHRIS KAYSER
Special Assistant Attorney General
OSB#984244

TANIA MANNERS
Special Assistant Attorney General
OSB#140363

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel: (503) 934-4400
Facsimile: (503) 378-5017
Email: Cheryl.Hiemstra@doj.state.or.us
          Tim.D.Nord@doj.state.or.us
          cjkayser@lvklaw.com
          tmanners@lvklaw.com

*Attorneys for Plaintiff State of Oregon*

FOR PLAINTIFF STATE OF WYOMING:

BRIDGET HILL
Attorney General

/s/ William Young
_____

WILLIAM YOUNG
Assistant Attorney General
WY Bar No. 8-6746

Office of the Wyoming Attorney General
109 State Capitol
Cheyenne, WY 82002
Tel: (307) 777-7847
Email: William.Young@wyo.gov

*Attorneys for Plaintiff State of Wyoming*