Case 3:24-cv-00347-AN   Document 202-2   Filed 07/26/24   Page 1 of 475

11/8/23, 10:28 AM                    Cerberus Institutional Partners V, LP., AB Acquisition LLC, and Safeway Inc., In the Matter of | Federal Trade Commission



**FEDERAL TRADE COMMISSION**
PROTECTING AMERICA'S CONSUMERS

# Cerberus Institutional Partners V, LP., AB Acquisition LLC, and Safeway Inc., In the Matter of

**Tags:** Competition | Merger | Retail | Grocery/Supermarkets

**Last Updated:** April 12, 2017

In the Matter of Cerberus Institutional Partners V, LP., a limited partnership; AB Acquisition LLC, a limited liability company; and Safeway Inc., a corporation

**FTC Matter/File Number:** 141 0108
**Enforcement Type:** Part 2 Consents

## Case Summary

Supermarket operators Albertsons and Safeway Inc. agreed to sell 168 supermarkets to settle FTC charges that their proposed $9.2 billion merger would likely be anticompetitive in 130 local markets in Arizona, California, Montana, Nevada, Oregon, Texas, Washington, and Wyoming. Under the settlement, Haggen Holdings, LLC will acquire 146 Albertsons and Safeway stores located in Arizona, California, Nevada, Oregon, and Washington; Supervalu Inc. will acquire two Albertsons stores in Washington; Associated Wholesale Grocers, Inc. will acquire 12 Albertsons and Safeway stores in Texas; and Associated Food Stores Inc. will acquire eight Albertsons and Safeway stores in Montana and Wyoming. It is expected that Associated Wholesale Grocers, Inc. will assign its operating rights in the 12 Texas stores it is acquiring to RLS Supermarkets, LLC (doing business as Minyard Food Stores) and that Associated Food Stores Inc. will assign its rights in the eight Montana and Wyoming stores it is acquiring to Missoula Fresh Market LLC, Ridley's Family Markets, Inc., and Stokes Inc.

PX6001-001

# Case Timeline

**April 12, 2017**

Commission Letter Approving Application Filed by Supervalu To Sell the Lake Stevens, Washington Store To Saar's (43.4 KB)

Letter To Commenter (42.44 KB)

PRESS RELEASE: FTC Approves SuperValu Application to Sell Supermarket to Saar's

---

**February 10, 2017**

Application Filed by SuperValu, Inc. For Commission Approval of Divestiture of Supermarket in Lake Stevens, Washington to Sarr's, Inc. and Affiliates [Redacted Public Version] (5.6 MB)

PRESS RELEASE: FTC Requests Public Comment on Application from SuperValu Inc. to Sell Supermarket Divested by Safeway and Albertsons

---

**September 25, 2015**

Commission Letter Approving Application for Approval of Waiver Agreement to the Haggen Divestiture Agreement Filed by Albertson's on September 24, 2015 (41.17 KB)

Application For Approval of Waiver Agreement To the Haggen Divestiture Agreement [Redacted Public Version] (1.48 MB)

PRESS RELEASE: FTC Approves Application for Modification of Divestiture Agreement Between Albertsons and Haggen Holdings, LLC

---

**July 2, 2015**

Decision and Order [Redacted Public Version] (125.72 KB)

Order To Maintain Assets (39.5 KB)

Complaint (111.04 KB)

Letters To Commenters (83.36 KB)

PX6001-002

PRESS RELEASE: FTC Issues Final Order Preserving Supermarket Competition in 130 Local Markets

---

January 27, 2015

Agreement Containing Consent Order (43.56 KB)

Decision and Order [Public Record Version] (120.94 KB)

Order to Maintain Assets (34.89 KB)

Complaint (106.52 KB)

Analysis of Proposed Consent Order to Aid Public Comment (779.23 KB)

PRESS RELEASE: FTC Requires Albertsons and Safeway to Sell 168 Stores as a Condition of Merger

PX6001-003

11/8/23, 10:33 AM                    Documents: Closing Wichita Falls grocer has warrant filed for owed taxes

# Times Record News

LOCAL

# Documents: Closing Wichita Falls grocery store has warrant filed for owed taxes



**Patrick Johnston**
Wichita

Published 4:19 p.m. CT Jan. 5, 2019 | Updated 11:56 a.m. CT Jan. 7, 2019

*Clarification: Jay Lawrence, President of MAL Enterprises Inc., said the business has until Jan. 31, 2019 to pay the taxes before they become delinquent.*

*The Times Record News is working to obtain more information regarding why the tax warrant was filed before the money was due.*

The troubles for the Wichita Falls' Cash Saver continue as an application for tax warrant was filed against the store's parent company Thursday.

The store is facing liquidation as it closes due to declining sales at the location, according to local media reports in December.

Documents filed in the 30th District Court state that MAL Enterprises Inc., owners of the business property located at 2720 Southwest Pkwy., owes taxes for 2018 to the city of Wichita Falls, Wichita Falls ISD and Wichita County.

MAL Enterprises Inc. is listed on the documents to have a P.O. box in Sweetwater, Texas.

The company also operates under the name Lawrence Brothers IGA, according to Buzzfile.

Previously an Albertson's, the grocery store on Southwest Parkway changed ownership and reopened under the Cash Saver brand in January of 2014.

MAL Enterprises reportedly owes a total of $48,483.07 in local taxes for 2018 – $13,573.63 to the city; $22,688.43 to WFISD; and $12,221.01 to the county.

That total is only good though if paid by Jan. 31, 2019. It increases to $51,876.88 if not paid until February and to $52,856.55 if not paid until March.

The estimated taxes for 2019 are expected to be the same – a total of $48,483.07.

PX6002-001

The "taxing units have contracted with the law firm of Perdue, Brandon, Fielder, Collins & Mott, LLP to enforce the collection of their delinquent taxes, penalties and interest" in accordance with the Texas Property Tax Code, the document states.

The law firm is to be compensated 20 percent of the amount it collects. In this instance, the attorney fees would be $9,696.61 for the collection of each the 2018 taxes and estimated 2019 taxes – a total compensation of $19,393.22.

In a signed affidavit, a deputy tax collector claimed the department has "reason to believe and do believe that (MAL Enterprises, Inc.) is about to remove, or cause to be removed, personal property from Wichita County on which taxes for the current year have been or will be assessed."

If granted, the tax warrant would command any peace officer and the tax collector for the taxing units "to seize as much of the taxpayer's personal property as may be necessary for the payment of all taxes, penalties, interest and costs of seizure and sale of said property."

It can also direct MAL Enterprises, LLC "to disclose the names and address of any other persons having an interest in the property."

PX6002-002





INDUSTRY NEWS (/INDUSTRY-NEWS)      RETAILER DEEP DIVES (HTTPS://PROGRESSIVEGROCER.COM/RETAILER-DEEP-DIVE)

RESEARCH (/RESEARCH-ANALYSIS)    E-COMMERCE (HTTPS://PROGRESSIVEGROCER.COM/E-COMMERCE)

CENTER STORE (/CENTER-STORE)    PERIMETER (/PERIMETER)    SOLUTIONS (/SOLUTIONS)

TOP 100 (/PG-100-NORTH-AMERICAS-TOP-RETAILERS-FOOD-AND-CONSUMABLES-0) ⌄

TOP WOMEN (/TOP-WOMEN-GROCERY-PODCAST) ⌄    |    MORE (/) ⌄

ADVERTISEMENT

03/13/2016

# Albertsons' United Div. Acquires 7 Lawrence Bros. Stores

United Supermarkets has agreed to acquire seven Lawrence Bros. Co. stores in west Texas and New Mexico. Lawrence Bros. will continue to own and operate 17 of its original 24 locations.

The Texas stores are located in Abilene, Breckenridge, Clyde, Seminole and Seymour. The New Mexico locations include Roswell and Ruidoso. The transitions are scheduled to be complete by early summer. Stores in Breckenridge, Seymour, Clyde and Abilene will reopen as United Supermarkets locations, while the Roswell and Ruidoso stores will be converted to the Albertsons banner. The Seminole store, meanwhile, will reopen as a Super Saver Foods.

"The conversions and remodel of these stores will give the people of West Texas and Eastern New Mexico new and fresh options for their shopping experience," said Robert Taylor, president of Albertsons' Lubbock, Texas-based United Family division. "Our Lubbock-based distribution center is located within 250 miles of these cities. Since we serve other stores and cities in the area, United is well-positioned to include these new stores efficiently and effectively, translating into great quality and ultimate service for store guests."

Current store team members will have the opportunity to remain at their existing location. By leveraging synergies of United's 66-store division, Taylor said there is potential for creating additional jobs in the future.

Taylor and Jay Lawrence, president and CEO of Lawrence Bros., are working together to ensure a smooth transition for team members and store guests. Now in its third generation, the company operates supermarkets, pharmacies, and fuel centers in 24 markets in West Texas and New Mexico, under the Lawrence Bros. and CashSaver Cost-Plus banners.

"The Lawrence Bros. Company wishes the Albertsons/United organization much success in this new venture, and wants to thank the many customers we have served and especially our family of associates we have worked with over many, many years," said Lawrence. "It has been an honor and privilege to be a part of these seven communities and neighborhoods. We look forward to continuing to serve our remaining 17 markets in Texas under the Lawrence Bros. and CashSaver Cost-Plus banners."

**The Food Partners** (http://www.thefoodpartners.com), a national investment banking firm, served as advisor to seller.

In its 100th year of operation, United Supermarkets LLC – d.b.a. The United Family – serves 36 communities in West Texas, Dallas-Fort Worth and New Mexico. A wholly-owned subsidiary of Albertson's LLC, the self-distributing chain has distribution centers in Lubbock and Roanoke and operates 66 stores under five banners: United Supermarkets, Market Street, Amigos, Albertsons Market and United Express. It also operates ancillary operations R.C. Taylor Distributing, Praters and Llano Logistics.

  

ADVERTISEMENT

# Related Topics

Food Retailers (/food-retailers)     Mergers & Acquisitions (/mergers-acquisitions)

ADVERTISEMENT

## You May Also Like



(/spartannash-q3-net-sales-slow-comps-rise)

**SpartanNash Q3 Net Sales Slow, But Comps Rise (/spartannash-q3-net-sales-slow-comps-rise)**



(/doordash-taking-hsa-and-fsa-payments)

**DoorDash Taking HSA and FSA Payments (/doordash-taking-hsa-and-fsa-payments)**

ADVERTISEMENT

# Stay Fresh. Stay Progressive.

## Get the Newsletter

Get news highlights delivered directly to your e-mail inbox.

**SUBSCRIBE (/NEWSLETTER)**

## Get the Magazine

See if you qualify for a free subscription to our industry leading paper magazine.

**SUBSCRIBE (HTTPS://EIQ.DRAGONFORMS.COM/PG_QUAL? PK=WEBSITE)**

(https://www.linkedin.com/company/progressive-grocer/about/?viewAsMember=true)

CONTACT US (/CONTACT-US)    ADVERTISE (/ADVERTISE)    PRIVACY STATEMENT (HTTP://WWW.ENSEMBLEIQ.COM/PRIVACY)

TERMS & CONDITIONS (HTTP://WWW.ENSEMBLEIQ.COM/TERMS)



(https://ensembleiq.com)



© 2023 EnsembleIQ, All Rights Reserved



Notice of 2023 Annual Meeting of Shareholders

2023 Proxy Statement

and

2022 Annual Report on Form 10-K

PX6009-001

# Kroger FAMILY OF COMPANIES

   

  

   

  

 

    

Dear Fellow Shareholders,

One of the things I love about food retail is that customers are always evolving. As tastes and needs continually shift, accommodating those shifts with agility earn us the privilege of continuing to serve our customers. This is what makes our industry so exciting.

The ways customers shop for food is ever evolving and always changing. Customers used to shop once a week, checking off items from handwritten lists. Today, our customers manage their groceries with a mix of in-person and online shopping, rely on digital technologies to make lists and track spending, and shop for more ready-made meal solutions. Outside our stores, we know customers spend approximately half of their food budgets at restaurants.

What hasn't changed is our passion to deliver fresh, affordable food to the communities we serve and inspire our customers to discover their love for food. Our business model is built around offering fresh products at competitive prices with <u>no compromise</u> on quality, selection, and convenience. This is a time-tested approach in any operating environment, and we remain committed to it into the future. Every day, we provide our customers with lower prices on the foods they love and more choices to meet their needs and wants.

Our passion for our customers, associates and communities is also on display in our willingness to take on difficult challenges and see them through. We see it in the way our store and supply chain teams respond to natural disasters, always the first to help our communities. We see it in the way our associates worked with the White House, governors, and mayors to ensure America had access to fresh, affordable food during the pandemic. And we see it in our willingness to address one of our food systems most intractable challenges – that more than 40% of the food produced goes to waste each year while one in eight Americans struggle with hunger – through our Zero Hunger | Zero Waste impact plan.

Kroger has the fortitude to take on these challenges because we know that when we take care of our customers, associates and communities, our shareholders will benefit.

We continue delivering value for our shareholders. On a three-year basis, Kroger's adjusted net earnings per diluted share has grown at a compounded annual growth rate of 24.5% which has helped support a total shareholder return of 78.2% over the same period.

This incredible outcome is the result of our dedicated and thriving associates delivering a full, fresh and friendly experience for more than 11 million customers every day. It's no wonder Kroger was recently included in a list of America's Most Trustworthy Companies. From our manufacturing facilities and fulfillment centers to our store and office teams, we appreciate everything our associates do to embody Our Purpose: *To Feed the Human Spirit*.

Our associates are driving consistent execution of our go-to-market strategy in every interaction, everyday positioning the company for sustainable, long-term growth.

Kroger is building momentum and has the people, the plan, and the operational discipline to win today and in the future.

*        *        *

**Update on proposed merger with Albertsons Co.**
In October 2022, we announced our definitive merger agreement with Albertsons Companies, Inc. We are incredibly impressed with the Albertsons team and their commitment to their associates, culture, customers, and communities.

*Lower prices. More Choices.*

We believe bringing our highly complementary organizations together will provide customers with lower prices and more choices. Our proposed merger will mean more value for our customers, with lower prices and more food choices to discover. And we will begin on day one post-close, with $500 million already committed to bringing down prices.

*Empower our associates' success*

Our associates are responsible for our success, and we are committed to investing in theirs. The proposed combination will secure the long-term future of union jobs while creating a more competitive alternative to larger, non-union retailers. We have already committed $1 billion to continue raising associate wages and comprehensive, industry-leading benefits.

It is vital that we support our associates as they explore what their individual career paths will be. So many of our associates come to Kroger to experience their first job. In 2022, approximately 20% of our new hires were 18 years old or younger. It is amazing that Kroger introduces so many young people to a fulfilling career in the grocery industry. We demonstrate how our associates can choose from many different paths and how a foundation in amazing customer service supports associates' long-term goals, no matter where associates choose to build their careers.

At Kroger, associates get to help families discover healthier answers to the question, "what's for dinner tonight;" create technology that makes customers' shopping trips simpler; make healthcare more accessible for their neighbors – and even dream up a job that has yet to be created. The career opportunities are truly endless.

*Build healthier communities free of hunger*

The proposed merger will also allow our organization to invest in our communities in ways we simply cannot do on our own. I am so proud of what we have accomplished in our Zero Hunger | Zero Waste work and am impressed by the Albertsons team's commitment to supporting their communities as outlined in their Recipe for Change plan. We know that when families eat together, it supports their children's success across all aspects of their lives. I cannot wait to see how our combined efforts will connect people with the meals they need to thrive.

We look forward to continue working cooperatively with regulators and remain on track for a projected closure of the merger in early 2024.

**2022 in Review**

As the pandemic continued to fade and inflation caused ongoing economic uncertainty, our associates showed up for our customers. Last year, Kroger associates did everything we could to minimize the impact of inflation and help stretch tight food budgets so families could access fresh, affordable food, with zero compromise on convenience or selection. Our *Leading with Fresh and Accelerating with Digital* strategy and key focus areas of Fresh, *Our Brands*, seamless and personalization give us the flexibility to navigate a changing operating environment – all while providing value to our customers and our associates. We will continue to consider a five- to ten-year time horizon as we make key decisions.

During the year, we:
- Achieved positive identical sales without fuel of 5.6%
- Increased associate wages, resulting in an average hourly wage of $18 and rate of more than $23 with comprehensive benefits
- Exceeded $1 billion in cost savings for the fifth consecutive year
- Announced 14 additional Kroger Delivery locations across the U.S.

The subsequent sections will highlight progress we made across our business in 2022 and ways we intend to continue building on our momentum moving forward.

**Leading with Fresh**

For us, *Fresh for Everyone*$^{TM}$ is more than a brand promise. It's a commitment to bringing fresh, affordable foods to more people in more neighborhoods. Fresh foods are central to families living healthy, thriving lives. And our customers prioritize fresh when they shop with Kroger – with more than more than 90% of customers purchasing fresh foods. Many companies claim they are focused on fresh – we have demonstrated success in creating fresher shopping experiences, and our customers are rewarding us for it.

In the last year, we continued to put our focus on fresh, both with our in-store and e-commerce experiences. The End-to-End Fresh initiative is at the center of how we are changing the way we bring fresh to life in our stores. Today, we have more than 1,400 stores implementing this initiative in their produce departments, driving higher produce and overall store sales. We look forward to exploring how we can expand this work in other fresh departments in 2023 and beyond.

We are also working closely with our technology and supply chain teams to understand ways we can add days of freshness to our products. From optimizing delivery routes to simplifying associate tasks, we want to ensure our customers can buy food at its peak of freshness and trust those items will remain fresh in their homes.

Freshness is also important when we think about innovation in Our Brands. In 2022, we launched a simplified opening-price-point brand known as Smart Way™. This new concept is easily identifiable for customers who want to stretch their budgets. It joins Kroger's carefully curated, extensive Our Brands portfolio, which includes the company's namesake Kroger brand, Simple Truth®, Private Selection®, Home Chef® and Heritage Farm®, among others.

In addition to the Smart Way brand introduction, we launched more than 680 new, unique *Our Brands* products last year. We engage with food trends throughout the year to understand what our customers are craving and ensure we have those items on our shelves. We aim to bring every customer the high-quality, affordable products they love – from pantry staples and fresh foods to ready-to-heat, restaurant-quality meals.

**Accelerating with Digital**

We continue to invest in our seamless ecosystem – bringing our customers the products they love when and where they want them. We see customers shift the ways they interact with us based on their individual needs, which aligns with our vision of a truly seamless shopping experience.

Our goal remains to be there for our customers – however they need us in a particular moment.

When it fits their day's plans, customers may choose to shop in our stores. Sometimes, they find a Kroger Delivery order easier during a busy weekend. Or when nothing looks good in the refrigerator or the last paper towel comes off the roll, we're here with Kroger Delivery Now, delivering in as little as 30 minutes. We remain well-positioned to achieve double-digit digital growth in the next three years.

Our brick-and-mortar stores and automated fulfillment centers work together to ensure our customers have access to the fresh foods and pantry staples they want when they need them most.

Our efforts to bring a truly personalized shopping experience to life are creating value for our customers. We serve the right promotions at the right time, directly to the customers who would be most interested in the offer. From providing suggestions to start a basket to offering a new item, we are providing customers real value. In 2022 alone, customers saved $1.4 billion through a combination of paper and digital coupons.

Last year, we also launched Boost by Kroger, the retail industry's most-affordable membership program. We are already exceeding internal expectations in both incremental engagement and household spend. We look forward to evolving our membership program to appeal to more customers and create additional value.

The *Accelerating with Digital* piece of our strategy continues to drive our profit flywheel. We are improving margins by reducing digital cost-to-serve, all while growing our alternative profit streams.

**Investing in Our Associates**

Our associates are at the heart of everything we do. I am always impressed at the ways they create memorable food moments for our customers every day. I regularly think back to my time working in a Kroger store when I began my career more than 40 years ago. I learned how to run a successful store, how to create real community with my customers and coworkers, and how important our stores are to the neighborhoods they serve.

Kroger provides opportunities for people seeking their first job, a new beginning, or a new challenge to discover a fulfilling career path. And we continue to invest in our associates. Earlier this year we committed nearly $800 million to raise wages and benefits, create new training opportunities, and improve healthcare options in 2023.

This investment builds on our $1.9 billion in incremental investments in wages and comprehensive benefits Kroger has made since 2018. As a result, we raised our average hourly rate to $18, or $23.50 an hour with comprehensive benefits.

We understand we must support our associates' holistic well-being. To accomplish this goal, Kroger creates programs that power our associates' growth, including a world-class educational benefit program offering associates up to $21,000 toward continuing education opportunities – whatever that may mean to our associates. In 2022 alone, more than 5,000 people engaged with this program. We provide affordable, accessible healthcare options, which includes free counseling. Also in 2022, we introduced a first-of-its-kind free financial coaching services to all our hourly associates. We remain committed to helping our associates thrive in their careers and at home, ensuring Kroger remains an employer of choice.

**Environmental Sustainability and Social Impact**

Kroger is committed to responsible sourcing practices, respecting human rights, and advancing animal welfare. Our comprehensive programs hold our suppliers accountable to meet our high standards and support our continual improvement. We rely on deep knowledge from our category sourcing leaders, data insights and input from our investors, industry groups, NGOs, and subject-matter experts.

In 2022, we published our greenhouse gas (GHG) reduction goal roadmap. We are diligently working to reduce absolute Scope 1 and 2 GHG emissions from our operations by 30% by 2030 against a 2018 baseline. This goal was developed using climate science, supporting a well-below 2ºC climate scenario according to the absolute contraction method.

Kroger made considerable progress against our *Framework for Action: Diversity, Equity & Inclusion* plan. Launched in 2020, this action plan is accelerating change across the entire company. Since its introduction, we successfully provided unconscious bias training to all leaders and nearly half a million associates. We are working with 53 Historically Black Colleges and Universities, and institutions serving Hispanic, Asian American and Pacific Islander, and Native American students. And we are taking strong steps to achieve our goal of increasing our spend with diverse suppliers to $10 billion annually by 2030.

We are growing the many ways we participate in our communities – both big and small. In 2022, we celebrated the fifth anniversary of our Zero Hunger | Zero Waste impact plan. Since its inception, we

directed more than $1.65 billion in food and funds to help end hunger, which includes more than 2.3 billion meals. We remain on track to donate 3 billion meals to our neighbors by 2025.

One accomplishment I am so proud of is our stores' work to achieve 100% execution of our food rescue program in participating Kroger stores. Flawless execution is an ideal for which we always strive. It is inspirational to see the way our store teams embrace our mission of providing healthy food to their communities.

**Looking to the Future**

I am optimistic for what 2023 and beyond will mean for Kroger, our customers, our associates, and our communities. We are committed to providing the freshest food to our customers, with zero compromise on value, convenience, or selection. We are investing in the business to continuously optimize our approach to freshness – and our customers are taking notice. Our teams are always looking for new opportunities to bring fresh *Our Brands* items to our customers, both capitalizing on food trends and creating experiences that can only come from Kroger.

Customers continue to expect the convenience our digital experience offers. We are working toward innovative ways to ensure grocery shopping fits easily into our customers' days – whether they are looking for a need-it-now item, a weekly stock-up shop, or the perfect ingredient to make a special meal more memorable. And we do more than make it convenient – we make the shopping experience personal. We know our customers, and we earn their trust daily by providing engaging offers on the foods they love.

And our amazing associates bring it all to life. In addition to creating a full, fresh, and friendly shopping experience for every customer, every time, our associates are committed to making their communities a better place to live. This year, we are recognizing 50 outstanding associates who raised significant funds for our Zero Hunger | Zero Waste Foundation. These dollars support our nonprofit partners across America who are working to create communities free from hunger and waste. Congratulations to each of these "Zero Heroes" for making measurable change for your neighbors.

I would like to thank our customers, associates, and shareholders for your ongoing support for Kroger. I look forward to everything we will do together in the year ahead.

With gratitude,

*Rodney*

Rodney McMullen
Chairman and CEO, The Kroger Co.

**Safe Harbor Statement**

This letter contains "forward-looking statements" within the meaning of the safe harbor provisions of the United States Private Securities Litigation Reform Act of 1995 about future performance of Kroger, including with respect to Kroger's ability to achieve sustainable net earnings growth, strategic capital deployment, strong and attractive total shareholder return, strong free cash flow and ability to increase the dividend, ability to achieve certain operational goals, as well as ESG targets, goals, and commitments outlined in this proxy statement, or elsewhere among other statements. These statements are based on management's assumptions and beliefs in light of the information currently available to it. These statements are indicated by words such as "will," "aim," "model," "driving," "goal," "plan," "continue," "on track," "committed" and "believe," as well as similar words or phrases. These statements are subject to known and unknown risks, uncertainties and other important factors that could cause actual results and outcomes to differ materially from those contained in the forward-looking statements, including the specific risk factors identified in "Risk Factors" in Kroger's most recent Annual Report on Form 10-K and any subsequent filings with the Securities and Exchange Commission. Kroger assumes no obligation to update the information contained herein, unless required to do so by applicable law.

### Zero Hunger | Zero Waste: Associate Fundraising Heroes

The Kroger Co. Zero Hunger | Zero Waste Foundation is a nonprofit public charity designed to help align philanthropy with the company's Zero Hunger | Zero Waste social and environmental impact plan. We invite customers of the Kroger Family of Companies to join our journey by rounding up their purchase to the nearest dollar at checkout to benefit the Zero Hunger | Zero Waste Foundation.

Cashiers across the country are leading the way in activating donations through Round Up. Dollars raised are directed to nonprofit partners that help end hunger and waste in our communities. These are our 2022 Zero Heroes:

**Atlanta Division**
Jessica Wellborn
Dianne Perkins
Rachel Dickens
Betalhem Tolla

**Fred Meyer Division**
Pat Sears

**Mid-Atlantic Division**
Dee Dee Hamby

**Central Division**
Carol Dietz
Jess Warburton
Rebekah Lehman
Sheri Fornter

**Fry's Division**
Jayne Cota
Melissa Horowitz
Barbara Stockton

**Nashville Division**
Linda Whitfield

**Cincinnati-Dayton Division**
Jen Tudor

**Houston Division**
Debra Van Matre
Mashuny Squierdo

**Ralphs Division**
John Dailey
Marquett Valencia
Debra Sutton
Pedro Daniel

**Columbus Division**
Colleen Burrows

**King Soopers Division**
Chris Vellos
Dan Cahill

**Roundy's Division**
Nancy Johnson

**Dallas Division**
Jon Mullin
Julie Olinick
Tonja Buckley

**Louisville Division**
Stacey Harrison
Laury Shulhafer
Robin Adams

**QFC Division**
Kurt Mincin
Amber Brask

**Delta Division**
Sherbert Ware
Laura Sparks
Mae Watson

**Mariano's Division**
Loran Henderson
Vikki Hornbaker

**Smith's Division**
Tonya Tall

**Dillons Division**
Trista Soendker
Pam Meyer
Joan Rogers

**Michigan Division**
Tammy Depuy
Tracey Regits

**Food 4 Less**
Jimmy Hu
Maricruz Chico
Mayra Sanguino
Rufina Kniefel

**Food 4 Less - MW**
Tamara Primm
Rohel Terrazas

[This page intentionally left blank]

PX6009-010

## Proxy Summary

*This summary highlights information contained elsewhere in this Proxy Statement. It does not contain all of the information that you should consider. You should read the entire Proxy Statement carefully before voting.*

### *Overview of Voting Matters and Board Recommendations*

| Proposals | Board Recommendation |
|---|---|
| No. 1 – <u>Election of Directors</u> | **FOR**<br>Each Director Nominee<br>recommended by<br>your Board |
| No. 2 <u>Advisory Vote to Approve Executive Compensation</u> | **FOR** |
| No. 3 <u>Advisory Vote on Frequency of Future Advisory Votes on Executive Compensation</u> | **ONE YEAR** |
| No. 4 <u>Ratification of Independent Auditors</u> | **FOR** |
| Nos. 5 – 9 <u>Shareholder Proposals</u> | **AGAINST**<br>Each Proposal |

### *Corporate Governance Highlights*

Kroger is committed to strong corporate governance. We believe that strong governance builds trust and promotes the long-term interests of our shareholders. Highlights of our corporate governance practices include the following:

**Board Governance Practices**

- ✓ Strong Board oversight of enterprise risk.
- ✓ Strong experienced independent Lead Director with clearly defined role and responsibilities.
- ✓ Commitment to Board refreshment and diversity.
- ✓ 5 of 11 director nominees are women.
- ✓ The chairs of the Audit, Finance, and Public Responsibilities Committees are women.
- ✓ Annual evaluation of the Chairman and CEO by the independent directors, led by the independent Lead Director.
- ✓ All director nominees are independent, except for the CEO.
- ✓ All five Board Committees are fully independent.
- ✓ Annual Board and Committee self-assessments conducted by independent Lead Director or an independent third party.
- ✓ Regular executive sessions of the independent directors, at the Board and Committee level.
- ✓ High degree of Board interaction with management to ensure successful oversight and succession planning.
- ✓ Balanced tenure.
- ✓ Robust shareholder engagement program.
- ✓ Robust code of ethics.

PX6009-011

**Environmental, Social, & Governance (ESG) Practices**

- ✓ Long-standing Board Committee dedicated to ESG oversight — Public Responsibilities Committee — formed in 1977.
  - o Amended the Committee Charter in 2021 to more specifically reflect the Committee's focused and prioritized approach to material ESG topics related to environmental issues, sustainability, and social impact

- ✓ Annual ESG report, sharing progress on our goals for Zero Hunger | Zero Waste, Just & Inclusive Economy, Food Waste, Operational Waste, Water, Packaging, Climate Impact, and Responsible Sourcing.
  - o The 2022 ESG report represented the 16th year of describing our progress and initiatives regarding sustainability and other ESG matters

- ✓ Committed to transparency in our disclosure, informed by frameworks consistent with shareholder expectations:
  - o SASB's Food Retailers and Distributors Standard
  - o GRI Global Sustainability Reporting Standards
  - o Task Force on Climate-related Financial Disclosures (TCFD) framework

- ✓ Established formal Diversity, Equity & Inclusion (DE&I) Framework for Action to:
  - o Create a more inclusive culture
  - o Develop diverse talent
  - o Advance diverse partnerships
  - o Advance equitable communities
  - o Listen deeply and report progress

- ✓ Specifically include diverse candidates in every external executive officer and Board director search.

- ✓ Disclose EEO-1 data annually.

**Shareholder Rights**

- ✓ Annual director election.

- ✓ Simple majority standard for uncontested director elections and plurality in contested elections.

- ✓ No poison pill.

- ✓ Shareholders have the right to call a special meeting.

- ✓ Robust, long-standing shareholder engagement program with regular engagements, including with independent directors, to better understand shareholders' perspectives and concerns on a broad array of topics, such as corporate governance and ESG matters.

- ✓ Adopted proxy access for director nominees, enabling a shareholder, or group of up to 20 shareholders, holding 3% of the Company's common shares for at least three years to nominate candidates for the greater of two seats or 20% of Board nominees.

**Compensation Governance**

- ✓ Robust clawback and recoupment policy.

- ✓ Pay program tied to performance and business strategy.

- ✓ Majority of pay is long-term and at-risk with no guaranteed bonuses or salary increases.

- ✓ Stock ownership guidelines align executive and director interests with those of shareholders.

- ✓ Prohibition on all hedging, pledging, and short sales of Kroger securities by directors and executive officers.

- ✓ No tax gross-up payments to executives.

PX6009-012

**Environmental, Social, & Governance Strategy**

Kroger's Environmental, Social & Governance Strategy is called **Thriving Together**. This strategy reflects the evolution of the Company's long history of operating responsibly, advancing economic opportunity and sustainability in our own operations and supply chain, and giving back meaningfully to our communities.

Our ESG objective is to achieve positive and lasting change through a shared-value framework that benefits people and our planet and creates more resilient systems for the future. The centerpiece of Kroger's ESG strategy is our Zero Hunger | Zero Waste social and environmental impact plan. Introduced five years ago, Zero Hunger | Zero Waste is an industry-leading platform for collective action and systems change at global, national, and local levels.

Our ESG strategy aims to address material topics of importance to our business and key stakeholders, including our associates, customers, shareholders, and others. Key ESG topics — informed by a structured materiality assessment and engagement with our shareholders and other stakeholders — align to three strategic pillars: People, Planet and Systems. Please see more details here in Kroger's annual ESG Report: https://www.thekrogerco.com/wp-content/uploads/2022/08/Kroger-Co-2022-ESG-Report.pdf. The information on, or accessible through, this website is not part of, or incorporated by reference into, this proxy statement.

PX6009-013

### Director Nominee Highlights

| Name | Age* | Primary Occupation | Independent | Director Since | A | C&T | CG | F | PR | Other Public Company Boards |
|---|---|---|---|---|---|---|---|---|---|---|
| Nora A. Aufreiter | 63 | Director Emeritus of McKinsey & Company | ✓ | 2014 | | | | ● | Committee Chair | 2 |
| Kevin M. Brown | 60 | Executive Vice President and Chief Supply Chain Officer of Dell Technologies | ✓ | 2021 | ● | | | | ● | |
| Elaine L. Chao | 70 | Former U.S. Secretary of Transportation and U.S. Secretary of Labor | ✓ | 2021 | | | ● | | ● | 2 |
| Anne Gates | 63 | Former President of MGA Entertainment, Inc. | ✓ | 2015 | $ Committee Chair | | ● | | | 2 |
| Karen M. Hoguet | 66 | Former Chief Financial Officer of Macy's, Inc. | ✓ | 2019 | $ ● | | | Committee Chair | | |
| W. Rodney McMullen | 62 | Chairman of the Board and Chief Executive Officer of The Kroger Co. | | 2003 | | | | | | 1 |
| Clyde R. Moore | 69 | Former Chairman of First Service Networks | ✓ | 1997 | | Committee Chair | ● | | | |
| Ronald L. Sargent † | 67 | Former Chairman and Chief Executive Officer of Staples, Inc. | ✓ | 2006 | $ ● | | Committee Chair | | ● | 2 |
| J. Amanda Sourry Knox (Amanda Sourry) | 59 | Former President of North America for Unilever | ✓ | 2021 | | ● | | ● | | 1 |
| Mark S. Sutton | 61 | Chairman and Chief Executive Officer of International Paper | ✓ | 2017 | | ● | | ● | | 1 |
| Ashok Vemuri | 55 | Former Chief Executive Officer and Director of Conduent Incorporated | ✓ | 2019 | $ ● | | | ● | | 1 |

A     Audit Committee
C&T   Compensation & Talent Development Committee
CG    Corporate Governance Committee
F     Finance Committee
PR    Public Responsibilities Committee

● Member
Committee Chair
$ Financial Expert

*Age as of record date
† Lead Director

PX6009-014

**2023 Director Nominee Snapshot**

**Diversity and Tenure**



**Skills and Experience**

### Key Attributes and Skills of All Kroger Director Nominees

- Intellectual and analytical skills
- High integrity and business ethics
- Strength of character and judgement
- Ability to devote significant time to Board duties
- Desire and ability to continually build expertise in emerging areas of strategic focus for our Company
- Demonstrated focus on promoting equality

- Business and professional achievements
- Ability to represent the interests of all shareholders
- Knowledge of corporate governance matters
- Understanding of the advisory and proactive oversight responsibility of our Board
- Comprehension of their his or her as a public company director and the fiduciary duties owed to shareholders
- Ability to work cooperatively with other members of the board

PX6009-015

|  | Nora Aufreiter | Kevin Brown | Elaine Chao | Anne Gates | Karen Hoguet | Rodney McMullen | Clyde Moore | Ronald Sargent | Amanda Sourry | Mark Sutton | Ashok Vemuri | Total (of 11) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Business Management | • | • | • | • | • | • | • | • | • | • | • | 11 |
| Retail | • |  |  | • | • | • |  | • | • |  |  | 6 |
| Consumer | • | • | • | • | • | • |  | • | • |  |  | 8 |
| Financial Expertise | • | • | • | • | • | • | • | • | • | • | • | 11 |
| Risk Management |  | • | • | • | • | • | • | • | • | • | • | 10 |
| Operations & Technology | • | • | • | • |  | • | • | • | • |  | • | 10 |
| ESG | • | • | • | • | • | • | • | • | • | • | • | 11 |
| Manufacturing |  | • |  | • |  |  | • |  |  | • |  | 4 |

### 2022 Compensation Highlights

*Executive Compensation Philosophy*

### Executive Summary



**We delivered exceptional performance in 2022.** Kroger achieved exceptional results in 2022 as we executed on our *Leading with Fresh and Accelerating with Digital* strategy, building on record years in 2020 and 2021. We are delivering a fresh, affordable, and seamless shopping experience for our customers, with zero compromise on quality, selection, or convenience. We are delivering on our financial commitments through our strong, resilient Value Creation Model. In 2022, we achieved financial performance results of ID sales, without fuel, of 5.6%, and adjusted FIFO operating profit, including fuel, of $5.1 billion[1].



**Our executive compensation program aligns with long-term shareholder value creation.** 91% of our CEO's target total direct compensation and, on average, 84% of the other NEOs' compensation is at risk and performance-based, tied to achievement of performance targets that are important to our shareholders or our long-term share price performance.



**The annual performance incentive was earned above target reflecting our 2022 performance.** The annual incentive program, based on a grid of identical sales, excluding fuel, and adjusted FIFO operating profit, including fuel, paid out at 192.40% of target. In light of macroeconomic conditions, including inflation, as well as the Compensation Committee's desire to create ongoing alignment with shareholders and reward sustained performance beyond 2022, the Compensation Committee determined to structure the payout to the NEOs as follows: 150% in cash and the remaining 42.4% in restricted stock vesting in one year.



**The long-term performance incentive payout reflects alignment with performance over fiscal years 2020, 2021, and 2022.** Long-term performance unit equity awards granted in 2020 and tied to commitments made to our investors and other stakeholders regarding long-term sales growth, adjusted FIFO operating profit growth, free cash flow generation, our commitment to Fresh, and Relative Total Shareholder Return were earned at 93.75% of target.

---

[1] See pages 27 – 33 of our Annual Report on Form 10-K for the fiscal year ended January 28, 2023, filed with the SEC on March 28, 2023, for a reconciliation of GAAP operating profit to adjusted FIFO operating profit.

PX6009-016

 **We prioritized investment in our people.** We strive to create a culture of opportunity for nearly 430,000 associates and take seriously our role as a leading employer in the United States. In 2022, we invested more than ever in our associates by continuing to raise our average hourly wage to $18, or over $23, including industry-leading benefits.

 **In response to our shareholder feedback, we incorporated an ESG metric focused on diversity and inclusion into our 2022 individual performance management program.** Our core values of Diversity, Equity & Inclusion are incorporated into compensation decisions made for our associates who supervise a team of others, which range from store department leaders through our NEOs. These performance goals are factored into compensation decisions for these leaders, including salary increases and the amount of the annual grant of equity awards.

### *Summary of Key Compensation Practices*

To achieve our objectives, the Compensation Committee seeks to ensure that compensation is competitive and that there is a direct link between pay and performance. To do so, it is guided by the following principles:

- Compensation must be designed to attract and retain those individuals who are best suited to be an NEO at Kroger.
- A significant portion of pay should be performance-based, with the percentage of total pay tied to performance increasing proportionally with an NEO's level of responsibility.
- Compensation should include incentive-based pay to drive performance, providing superior pay for superior performance, including both a short- and long-term focus.
- Compensation policies should include an opportunity for, and a requirement of, significant equity ownership to align the interests of NEOs and shareholders.
- Components of compensation should be tied to an evaluation of business and individual performance measured against metrics that directly drive our business strategy and progress toward our corporate ESG priorities.
- Compensation plans should provide a direct line of sight to company performance.
- Compensation programs should be aligned with market practices.
- Compensation programs should serve to both motivate and retain talent.

### Names Executive Officers (NEOs) for 2022

For the 2022 fiscal year ended January 28, 2023, the NEOs were

| Name | Title |
|---|---|
| W. Rodney McMullen | Chairman and Chief Executive Officer |
| Gary Millerchip | Senior Vice President and Chief Financial Officer |
| Stuart W. Aitken | Senior Vice President and Chief Merchandising & Marketing Officer |
| Yael Cosset | Senior Vice President and Chief Information Officer |
| Timothy A. Massa | Senior Vice President and Chief People Officer |

PX6009-017



**Notice of 2023 Annual Meeting of Shareholders**

**Fellow Kroger Shareholders:**

**We are pleased to invite you to join us for Kroger's 2023 Annual Meeting of Shareholders on June 22, 2023 at 11:00 a.m. eastern time. The 2023 Annual Meeting of Shareholders will once again be a completely virtual meeting conducted via webcast. We believe this is the most effective approach for enabling the highest possible attendance.**

You will be able to participate in the virtual meeting online, vote your shares electronically, and submit questions during the meeting by visiting www.virtualshareholdermeeting.com/KR2023.

| | |
|---|---|
| **When:** | June 22, 2023, at 11:00 a.m. eastern time. |
| **Where:** | Webcast at www.virtualshareholdermeeting.com/KR2023 |
| **Items of Business:** | 1. To elect 11 director nominees |
| | 2. To approve our executive compensation, on an advisory basis. |
| | 3. To select the frequency of future advisory votes on executive compensation, on an advisory basis. |
| | 4. To ratify the selection of our independent auditor for fiscal year 2023. |
| | 5. To vote on five shareholder proposals, if properly presented at the meeting. |
| | 6. To transact other business as may properly come before the meeting. |
| **Who can Vote:** | Holders of Kroger common shares at the close of business on the record date April 24, 2023 are entitled to notice of and to vote at the meeting. |
| **How to Vote:** | **YOUR VOTE IS EXTREMELY IMPORTANT NO MATTER HOW MANY SHARES YOU OWN!** Please vote your proxy in one of the following ways: |
| | 1. *By the internet,* you can vote by the Internet by visiting www.proxyvote.com. |
| | 2. *By telephone,* you can vote by telephone by following the instructions on your proxy card, voting instruction form, or notice. |
| | 3. *By mail,* you can vote by mail by signing and dating your proxy card if you requested printed materials, or your voting instruction form, and returning it in the postage-paid envelope provided with this proxy statement. |
| | 4. *By mobile device,* by scanning the QR code on your proxy card, notice of internet availability of proxy materials, or voting instruction form. |
| | 5. *By attending and voting electronically* during the virtual Annual Meeting at www.virtualshareholdermeeting.com/KR2023. |
| **Attending the Meeting:** | Shareholders holding shares at the close of business on the record date may attend the virtual meeting. You will be able to attend the Annual Meeting, vote and submit your questions in advance of and real-time during the meeting via a live audio webcast by visiting www.virtualshareholdermeeting.com/KR2023. To participate in the meeting, you must have your sixteen-digit control number that is shown on your Notice of Internet Availability of Proxy Materials or on your proxy card if you receive the proxy materials by mail.  There is no physical location for the Annual Meeting. You may only attend the Annual Meeting virtually. |

   **Our Board of Directors unanimously recommends that you vote "FOR ALL" of Kroger's director nominees on the proxy card, "FOR" the management proposals 2 and 4, "FOR" one year for management proposal 3, and "AGAINST" the shareholder proposals 5 through 9.**

   We appreciate your continued confidence in Kroger, and we look forward to your participation in our virtual meeting.

| | |
|---|---|
| May 12, 2023 | By Order of the Board of Directors, |
| Cincinnati, Ohio | Christine S. Wheatley, Secretary |

PX6009-018

Proxy Statement

May 12, 2023

We are providing this notice, proxy statement, and annual report to the shareholders of The Kroger Co. ("Kroger", "we", "us", "our") in connection with the solicitation of proxies by the Board of Directors of Kroger (the "Board") for use at the Annual Meeting of Shareholders to be held on June 22, 2023 at 11:00 a.m. eastern time, and at any adjournments thereof. The Annual Meeting will be held virtually and can be accessed online at www.virtualshareholdermeeting.com/KR2023. There is no physical location for the 2023 Annual Meeting of Shareholders.

Our principal executive offices are located at 1014 Vine Street, Cincinnati, Ohio 45202-1100. Our telephone number is 513-762-4000. This notice, proxy statement, and annual report, and the accompanying proxy card are first being sent or given to shareholders on or about May 12, 2023.

## Questions and Answers about the Annual Meeting

### Why are you holding a virtual meeting?

We believe a virtual meeting is the most effective approach for enabling the highest possible attendance. Based on our experience with virtual meetings during the COVID-19 pandemic, we believe this facilitates shareholder attendance and participation, and has allowed a greater number of questions from a broader group of shareholders to be asked and answered at the Meeting than in an in-person format. It also reduces our costs and in a small way the carbon footprint of our activities. Therefore, our 2023 Annual Meeting is being held on a virtual-only basis with no physical location. Our goal for the Annual Meeting is to enable the broadest number of shareholders to participate in the meeting, while providing substantially the same access and exchange with Management and the Board as an in-person meeting. We believe that we are observing best practices for virtual shareholder meetings, including by providing a support line for technical assistance and addressing as many shareholder questions as time allows.

### Who can vote?

You can vote if, as of the close of business on April 24, 2023, the record date, you were a shareholder of record of Kroger common shares.

### Who is asking for my vote, and who pays for this proxy solicitation?

Your proxy is being solicited by Kroger's Board of Directors. Kroger is paying the cost of solicitation. We have hired D.F. King & Co., Inc., a proxy solicitation firm, to assist us in soliciting proxies and we will pay them a fee estimated not to exceed $17,500, plus reasonable expenses for the solicitation.

We also will reimburse banks, brokers, nominees, and other fiduciaries for postage and reasonable expenses incurred by them in forwarding the proxy material to beneficial owners of our common shares.

Proxies may be solicited personally, by telephone, electronically via the Internet, or by mail.

### Who are the members of the Proxy Committee?

Anne Gates, W. Rodney McMullen, and Ronald L. Sargent, all Kroger Directors, are the members of the Proxy Committee for our 2023 Annual Meeting.

### What is the difference between a "shareholder of record" and a "beneficial shareholder" of shares held in street name?

You are the "shareholder of record" for any Kroger common shares that you own directly in your name in an account with Kroger's stock transfer agent, EQ Shareowner Services.

You are a "beneficial shareholder" of shares held in street name if your Kroger common shares are held in an account with a broker, bank, or other nominee as custodian on your behalf. The broker, bank, or other nominee is considered the shareholder of record of these shares. As the beneficial owner, you have the right to instruct the broker, bank, or other nominee on how to vote your Kroger common shares.

PX6009-019

**How do I vote my shares held in street name?**

If your shares are held by a bank, broker, or other holder of record, you will receive voting instructions from the holder of record. Your broker is required to vote your shares in accordance with your instructions. In most cases, you may vote by telephone or over the internet as instructed.

**How do I vote my proxy?**

You can vote your proxy in one of the following ways:
1. By the internet, you can vote by the Internet by visiting www.proxyvote.com.
2. By telephone, you can vote by telephone by following the instructions on your proxy card, voting instruction form, or notice.
3. By mail, you can vote by mail by signing and dating your proxy card if you requested printed materials, or your voting instruction form, and returning it in the postage-paid envelope provided with this proxy statement.
4. By mobile device, by scanning the QR code on your proxy card, notice of internet availability of proxy materials, or voting instruction form.
5. By attending and voting electronically during the virtual Annual Meeting at www.virtualshareholdermeeting.com/KR2023

**How can I participate and ask questions at the Annual Meeting?**

We are committed to ensuring that our shareholders have substantially the same opportunities to participate in the virtual Annual Meeting as they would at an in-person meeting. In order to submit a question at the Annual Meeting, you will need your 16-digit control number that is printed on the Notice or proxy card that you received in the mail, or via email if you have elected to receive material electronically. You may log in 15 minutes before the start of the Annual Meeting and submit questions online. You will be able to submit questions during the Annual Meeting as well. We encourage you to submit any question that is relevant to the business of the meeting. Questions asked during the Annual Meeting will be read and addressed during the meeting. Shareholders are encouraged to log into the webcast at least 15 minutes prior to the start of the meeting to test their Internet connectivity. You may also submit questions in advance of the meeting via the internet at www.proxyvote.com when you vote your shares.

**What documentation must I provide to be admitted to the virtual Annual Meeting and how do I attend?**

If your shares are registered in your name, you will need to provide your sixteen-digit control number included on your Notice or your proxy card (if you receive a printed copy of the proxy materials) in order to be able to participate in the meeting. If your shares are not registered in your name (if, for instance, your shares are held in "street name" for you by your broker, bank or other institution), you must follow the instructions printed on your Voting Instruction Form. In order to participate in the Annual Meeting, please log on to www.virtualshareholdermeeting.com/KR2023 at least 15 minutes prior to the start of the Annual Meeting to provide time to register and download the required software, if needed. The webcast replay will be available at www.virtualshareholdermeeting.com/KR2023 until the 2024 Annual Meeting of Shareholders. If you access the meeting but do not enter your control number, you will be able to listen to the proceedings, but you will not be able to vote or otherwise participate.

**What if I have technical or other "IT" problems logging into or participating in the Annual Meeting webcast?**

We have provided a toll-free technical support "help line" that can be accessed by any shareholder who is having challenges logging into or participating in the virtual Annual Meeting. If you encounter any difficulties accessing the virtual meeting during the check-in or meeting time, please call the technical support line number that will be posted on the virtual Annual Meeting login page.

**What documentation must I provide to vote online at the Annual Meeting?**

If you are a shareholder of record and provide your sixteen-digit control number when you access the meeting, you may vote all shares registered in your name during the Annual Meeting webcast. If you are not a shareholder of record as to any of your shares (i.e., instead of being registered in your name, all or a portion of your shares are registered in "street name" and held by your broker, bank or other institution for your benefit), you must follow the instructions printed on your Voting Instruction Form.

PX6009-020

**How do I submit a question at the Annual Meeting?**

If you would like to submit a question during the Annual Meeting, once you have logged into the webcast at www.virtualshareholdermeeting.com/KR2023, simply type your question in the "ask a question" box and click "submit". You may also submit questions in advance of the meeting via the internet at www.proxyvote.com when you vote your shares.

**When should I submit my question at the Annual Meeting?**

Each year at the Annual Meeting, we hold a question-and-answer session following the formal business portion of the meeting during which shareholders may submit questions to us. We anticipate having such a question-and-answer session at the 2023 Annual Meeting. You can submit a question up to 15 minutes prior to the start of the Annual Meeting and up until the time we indicate that the question-and-answer session is concluded. However, we encourage you to submit your questions before or during the formal business portion of the meeting and our prepared statements, in advance of the question-and-answer session, in order to ensure that there is adequate time to address questions in an orderly manner. You may also submit questions in advance of the meeting via the internet at www.proxyvote.com when you vote your shares.

**Can I change or revoke my proxy?**

The common shares represented by each proxy will be voted in the manner you specified unless your proxy is revoked before it is exercised. You may change or revoke your proxy by providing written notice to Kroger's Secretary at 1014 Vine Street, Cincinnati, Ohio 45202, by executing and sending us a subsequent proxy, or by voting your shares while logged in and participating in the 2023 Annual Meeting of Shareholders.

**How many shares are outstanding?**

As of the close of business on April 24, 2023, the record date, our outstanding voting securities consisted of 717,648,391 common shares.

**How many votes per share?**

Each common share outstanding on the record date will be entitled to one vote on each of the 11 director nominees and one vote on each other proposal. Shareholders may not cumulate votes in the election of directors.

**What voting instructions can I provide?**

You may instruct the proxies to vote "For" or "Against" each proposal (except for Proposal 3), or you may instruct the proxies to "Abstain" from voting. For Proposal 3, you may instruct the proxies to vote for "One," "Two," or "Three" years.

**What happens if proxy cards or voting instruction forms are returned without instructions?**

If you are a registered shareholder and you return your proxy card without instructions, the Proxy Committee will vote in accordance with the recommendations of the Board.

If you hold shares in street name and do not provide your broker with specific voting instructions on proposals 1, 2, 3, and 5 – 9, which are considered non-routine matters, your broker does not have the authority to vote on those proposals. This is generally referred to as a "broker non-vote." Proposal 4, ratification of auditors, is usually considered a routine matter and, therefore, your broker may vote your shares according to your broker's discretion.

The vote required, including the effect of broker non-votes and abstentions for each of the matters presented for shareholder vote, is set forth below.

PX6009-021

**What are the voting requirements and voting recommendation for each of the proposals?**

| Proposals | Board Recommendation | Voting Approval Standard | Effect of Abstention | Effect of broker non-vote |
|---|---|---|---|---|
| No. 1 – Election of Directors | **FOR** Each Director Nominee recommended by your Board | More votes "FOR" than "AGAINST" since it is an uncontested election | No Effect | No Effect |
| No. 2 Advisory Vote to Approve Executive Compensation | **FOR** | Affirmative vote of the majority of shares participating in the voting[1] | No Effect | No Effect |
| No. 3 Advisory Vote on Frequency of Future Advisory Votes on Executive Compensation | **ONE YEAR** | The option that receives the highest number of votes cast by shareholders[1] | No Effect | No Effect |
| No. 4 Ratification of Independent Auditors | **FOR** | Affirmative vote of the majority of shares participating in the voting | No Effect | No Effect |
| Nos. 5 – 9 Shareholder Proposals | **AGAINST** Each Proposal | Affirmative vote of the majority of shares participating in the voting | No Effect | No Effect |

(1) Although this is an advisory vote, the Board will take into consideration the outcome of the vote based on this standard.

**Important Notice Regarding the Availability of Proxy Materials for the Shareholder Meeting to be Held on June 22, 2023**

The Notice of 2023 Annual Meeting, Proxy Statement and 2022 Annual Report and the means to vote by internet are available at www.proxyvote.com.

PX6009-022

## Kroger's Corporate Governance Practices

Kroger is committed to strong corporate governance. We believe that strong governance builds trust and promotes the long-term interests of our shareholders. Highlights of our corporate governance practices include the following:

### Board Governance Practices

- ✓ Strong Board oversight of enterprise risk.
- ✓ Strong experienced independent Lead Director with clearly defined role and responsibilities.
- ✓ Commitment to Board refreshment and diversity.
- ✓ 5 of 11 director nominees are women.
- ✓ The chairs of the Audit, Finance, and Public Responsibilities Committees are women.
- ✓ Annual evaluation of the Chairman and CEO by the independent directors, led by the independent Lead Director.
- ✓ All director nominees are independent, except for the CEO.
- ✓ All five Board Committees are fully independent.
- ✓ Annual Board and Committee self-assessments conducted by independent Lead Director or an independent third party.
- ✓ Regular executive sessions of the independent directors, at the Board and Committee level.
- ✓ High degree of Board interaction with management to ensure successful oversight and succession planning.
- ✓ Balanced tenure.
- ✓ Robust shareholder engagement program.
- ✓ Robust code of ethics.

### Environmental, Social, & Governance (ESG) Practices

- ✓ Long-standing Board Committee dedicated to ESG oversight — Public Responsibilities Committee — formed in 1977.
  - o Amended the Committee Charter in 2021 to more specifically reflect the Committee's focused and prioritized approach to material ESG topics related to environmental issues, sustainability, and social impact
- ✓ Annual ESG report, sharing progress on our goals for Zero Hunger | Zero Waste, Just & Inclusive Economy, Food Waste, Operational Waste, Water, Packaging, Climate Impact, and Responsible Sourcing.
  - o The 2022 ESG report represented the 16th year of describing our progress and initiatives regarding sustainability and other ESG matters
- ✓ Committed to transparency in our disclosure, informed by frameworks consistent with shareholder expectations:
  - o SASB's Food Retailers and Distributors Standard
  - o GRI Global Sustainability Reporting Standards
  - o Task Force on Climate-related Financial Disclosures (TCFD) framework
- ✓ Established formal Diversity, Equity & Inclusion (DE&I) Framework for Action to:
  - o Create a more inclusive culture
  - o Develop diverse talent
  - o Advance diverse partnerships
  - o Advance equitable communities
  - o Listen deeply and report progress
- ✓ Specifically include diverse candidates in every external executive officer and Board director search.
- ✓ Disclose EEO-1 data annually.

PX6009-023

**Shareholder Rights**

- ✓ Annual director election.

- ✓ Simple majority standard for uncontested director elections and plurality in contested elections.

- ✓ No poison pill.

- ✓ Shareholders have the right to call a special meeting.

- ✓ Robust, long-standing shareholder engagement program with regular engagements, including with independent directors, to better understand shareholders' perspectives and concerns on a broad array of topics, such as corporate governance and ESG matters.

- ✓ Adopted proxy access for director nominees, enabling a shareholder, or group of up to 20 shareholders, holding 3% of the Company's common shares for at least three years to nominate candidates for the greater of two seats or 20% of Board nominees.

**Compensation Governance**

- ✓ Robust clawback and recoupment policy.

- ✓ Pay program tied to performance and business strategy.

- ✓ Majority of pay is long-term and at-risk with no guaranteed bonuses or salary increases.

- ✓ Stock ownership guidelines align executive and director interests with those of shareholders.

- ✓ Prohibition on all hedging, pledging, and short sales of Kroger securities by directors and executive officers.

- ✓ No tax gross-up payments to executives.

**Environmental, Social, & Governance Strategy**

Kroger's Environmental, Social & Governance Strategy is called **Thriving Together**. This strategy reflects the evolution of the Company's long history of operating responsibly, advancing economic opportunity and sustainability in our own operations and supply chain, and giving back meaningfully to our communities.

Our ESG objective is to achieve positive and lasting change through a shared-value framework that benefits people and our planet and creates more resilient systems for the future. The centerpiece of Kroger's ESG strategy is our Zero Hunger | Zero Waste social and environmental impact plan. Introduced five years ago, Zero Hunger | Zero Waste is an industry-leading platform for collective action and systems change at global, national, and local levels.

Our ESG strategy aims to address material topics of importance to our business and key stakeholders, including our associates, customers, shareholders, and others. Key ESG topics — informed by a structured materiality assessment and engagement with our shareholders and other stakeholders — align to three strategic pillars: People, Planet and Systems. Please see more details here in Kroger's annual ESG Report: https://www.thekrogerco.com/wp-content/uploads/2022/08/Kroger-Co-2022-ESG-Report.pdf. The information on, or accessible through, this website is not part of, or incorporated by reference into, this proxy statement.

PX6009-024

**People** — Our Aspiration: Help billions live healthier, more sustainable lifestyles

**Food Access, Health, & Nutrition**

Kroger's brand promise, Fresh for Everyone, reflects our belief that everyone should have access to affordable, fresh food. We are committed to food and product safety and to improving food access, food security, and health and nutrition for all. Protecting our associates' and customers' health and safety and enhancing our shopping experience are also key focus areas.

- Kroger associates have rescued more than 575 million pounds of wholesome surplus food to help end hunger since introducing Zero Hunger | Zero Waste.

- In the same period, Kroger directed a total of $1.2 billion in charitable giving for hunger relief in our communities.

- With food and funds combined, Kroger directed 2.8 billion meals to our communities since 2017, well ahead of our goal of 3 billion meals by 2025.

**Just & Inclusive Economy**

We offer access to employment, benefits, and more, providing good jobs for individuals ages 15 to 95 with a wide range of experience, skills, and career aspirations. In 2020, Kroger introduced our **Framework for Action: Diversity, Equity, & Inclusion**, a 10-point plan with short- and long-term steps to accelerate and promote greater change in the workplace and communities we serve.

- Since 2020, Kroger has trained 661,000 leaders and associates in diversity, equity, & inclusion, including Unconscious Bias training.

- We achieved nearly $4 billion in diverse supplier spend annually, on track to our goal of $10 billion annually by 2030.

- Kroger achieved a perfect score of 100 on the Human Rights Campaign Corporate Equality Index for the fourth consecutive year and was listed among the Best Places to Work for Disability Inclusion by the Disability Equality Index.

- The Kroger Co. Foundation established a $5 million Racial Equity Fund and subsequently increased funding to $10M to support organizations driving change at national and local levels. To date, the fund has directed a total of $5.7 million in grants to nonprofit organizations advancing meaningful change in our communities.

**Planet** — Our Aspiration: Protect and restore natural resources for a brighter future

**Climate Impact**

Kroger is committed to reducing the impact of our business on the climate and assessing the potential future risk of a changing climate to our business operations. We support the transition to a lower-carbon economy by investing in energy efficiency and renewable energy and by reducing greenhouse gas (GHG) emissions and food waste.

- Kroger's current commitment is to reduce Scope 1 and 2 GHG emissions by 30% by 2030 using a 2018 baseline. Reflecting updated guidance from the Intergovernmental Panel on Climate Change and the Science Based Targets initiative (SBTi), Kroger is in the process of resetting this target to be more ambitious and align to a 1.5°C scenario.

- In addition, Kroger is conducting analysis to inform a new Scope 3 target to reduce GHG emissions in our value chain. We expect to complete the goal-setting process in early 2024. To align with SBTi guidance, Kroger is also setting a new Forest, Land, and Agriculture (FLAG) target to further reduce emissions in land-intensive sectors like food and agricultural production.

- Reducing food waste is another way Kroger is helping reduce climate impacts. In 2021, we reduced retail food waste generated and improved retail food waste diversion from landfill to 48.8% through our Zero Hunger | Zero Waste plan, on the path to achieving 95%+ diversion by 2025.

PX6009-025

*Resource Conservation*

As a responsible business, we conserve natural resources to help safeguard people and our planet. Our current goal is to divert 90% or more of waste from landfills company-wide by 2025 and to identify alternative methods of waste management.

- We have a comprehensive set of sustainable packaging goals that include seeking to achieve 100% recyclable, reusable, or compostable packaging for *Our Brands* products by 2030. In 2022, we completed an *Our Brands* packaging footprint and baseline to inform our roadmap to 2030.

- Kroger partnered with TerraCycle to launch a first-of-its-kind recycling program for flexible plastic packaging across the *Our Brands* portfolio. Now, Kroger customers can collect flexible snack and chip bags, pouches, pet food packaging, and more — items typically not eligible for curbside recycling — for easy and free mail-in recycling.

- In 2022, Kroger also conducted a six-month pilot with the innovative Loop reusable consumer product packaging platform at 25 Fred Meyer stores in the Portland, Oregon, area. We plan to publish a report outlining what may be needed to achieve commercial scale with reusable packaging in the future.

- To support more sustainable agriculture, Kroger offers an expanding selection of natural, organic, free-from, and plant-based products, including our popular Simple Truth® product line. The company also is in the process of developing a sustainable agriculture commitment for its fresh produce supply chain.

**Systems —** Our Aspiration: Build more responsible and inclusive global systems

*Business Integration*

Kroger is committed to strong corporate and ESG governance. Business and functional leaders are engaged in our ESG strategy and accountable for results. Operationalizing ESG is a journey; however, we believe our centralized structure, vertical integration and commitment to responsible sourcing enables our progress.

- We are committed to Board refreshment and diversity, with five of 11 directors being women, including the chairs of the Audit, Finance, and Public Responsibilities Committees.

- The Public Responsibilities Committee meets three times a year to discuss progress related to the company's ESG strategy and key topics. In 2022, areas of focused engagement included Kroger's GHG emissions reduction roadmap and approach to responsible sourcing.

- A core ESG team leads internal cross-functional working groups focused on policy, issues management and strategy implementation for key ESG topics, including food and product access and affordability, climate impacts, sustainable packaging, and supply chain accountability.

*Responsible & Resilient Systems*

Kroger is part of – and dependent on – an interconnected global food system and consumer goods supply chain. A renewed focus on these natural systems and the policies and practices governing them will help protect our planet and workers whose livelihoods depend on a resilient and responsible supply chain.

- Kroger continues to advance its commitment to align our human rights practice with the UN Guiding Principles on Business and Human Rights and develop a comprehensive human rights due diligence framework. In the past year, Kroger conducted two human rights impact assessments in different sectors of our global supply chain.

- We continue to offer a wide assortment of Fair Trade Certified products in the *Our Brands* assortment to support communities around the world.

- Kroger continues to transition the foundation of our animal welfare policy to the Five Domains of Animal Welfare, an internationally respected approach that emphasizes current animal science and outcome-based standards. We are working with our suppliers to measure and report progress toward our goals.

- Our long-standing commitment to seafood sustainability includes partnerships and programs aimed at improving marine ecosystems through conservation and fishery improvement practices.

- Kroger's No-Deforestation Commitment for *Our Brands* aims to address deforestation impacts in higher-risk supply chains, such as palm oil, pulp and paper, soy, and beef.

PX6009-026

**Proposals to Shareholders**

### Item No. 1.    Election of Directors

**You are being asked to elect 11 director nominees for a one-year term.**

| FOR | The Board of Directors unanimously recommends that you vote "FOR ALL" of Kroger's director nominees. |

| Name | Age* | Primary Occupation | Independent | Director Since | Standing Committee Membership | | | | | Other Public Company Boards |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | A | C&T | CG | F | PR | |
| Nora A. Aufreiter | 63 | Director Emeritus of McKinsey & Company | ✓ | 2014 | | | | ● | ⚜ Chair | 2 |
| Kevin M. Brown | 60 | Executive Vice President and Chief Supply Chain Officer of Dell Technologies | ✓ | 2021 | ● | | | | ● | |
| Elaine L. Chao | 70 | Former U.S. Secretary of Transportation and U.S. Secretary of Labor | ✓ | 2021 | | | ● | | ● | 2 |
| Anne Gates | 63 | Former President of MGA Entertainment, Inc. | ✓ | 2015 | $ ⚜ Chair | | ● | | | 2 |
| Karen M. Hoguet | 66 | Former Chief Financial Officer of Macy's, Inc. | ✓ | 2019 | $ ● | | | ⚜ Chair | | |
| W. Rodney McMullen | 62 | Chairman of the Board and Chief Executive Officer of The Kroger Co. | | 2003 | | | | | | 1 |
| Clyde R. Moore | 69 | Former Chairman of First Service Networks | ✓ | 1997 | | ⚜ Chair | ● | | | |
| Ronald L. Sargent † | 67 | Former Chairman and Chief Executive Officer of Staples, Inc. | ✓ | 2006 | $ ● | | ⚜ Chair | | ● | 2 |
| J. Amanda Sourry Knox (Amanda Sourry) | 59 | Former President of North America for Unilever | ✓ | 2021 | | ● | | ● | | 1 |
| Mark S. Sutton | 61 | Chairman and Chief Executive Officer of International Paper | ✓ | 2017 | | ● | | ● | | 1 |
| Ashok Vemuri | 55 | Former Chief Executive Officer and Director of Conduent Incorporated | ✓ | 2019 | $ ● | | | ● | | 1 |

| A | Audit Committee | ● Member | *Age as of record date |
|---|---|---|---|
| C&T | Compensation & Talent Development Committee | ⚜ Committee Chair | † Lead Director |
| CG | Corporate Governance Committee | $ Financial Expert | |
| F | Finance Committee | | |
| PR | Public Responsibilities Committee | | |

17

PX6009-027

As of the date of this proxy statement, Kroger's Board of Directors consists of 11 members. All nominees, if elected at the 2023 Annual Meeting, will serve until the annual meeting in 2024 or until his or her successors have been elected by the shareholders or by the Board pursuant to Kroger's Regulations, and qualified. Each of our director nominees identified in this proxy statement has consented to being named as a nominee in our proxy materials and has accepted the nomination and agreed to serve as a director if elected by Kroger's shareholders.

Kroger's Articles of Incorporation provide that the vote required for election of a director nominee by the shareholders, except in a contested election or when cumulative voting is in effect, is the affirmative vote of a majority of the votes cast for or against the election of a nominee.

The Committee memberships stated below are those in effect as of the date of this proxy statement. The experience, qualifications, attributes, and skills that led the Corporate Governance Committee and the Board to conclude that the following individuals should serve as directors are set forth opposite each individual's name. In addition, all of our Director Nominees demonstrate the following qualities:

### Key Attributes and Skills of All Kroger Director Nominees

- Intellectual and analytical skills
- High integrity and business ethics
- Strength of character and judgement
- Ability to devote significant time to Board duties
- Desire and ability to continually build expertise in emerging areas of strategic focus for our Company
- Demonstrated focus on promoting equality

- Business and professional achievements
- Ability to represent the interests of all shareholders
- Knowledge of corporate governance matters
- Understanding of the advisory and proactive oversight responsibility of our Board
- Comprehension of their his or her as a public company director and the fiduciary duties owed to shareholders
- Ability to work cooperatively with other members of the board

PX6009-028

**Board Nominees for Directors for Terms of Office Continuing until 2024**



| Age | Director Since |
|---|---|
| 63 | 2014 |

**Committees:**
Finance
Public Responsibilities[1]

**Qualifications:**
Business Management
Retail
Consumer
Financial Expertise
Operations & Technology
ESG

### Nora A. Aufreiter

Ms. Aufreiter is Director Emeritus of McKinsey & Company, a global management consulting firm. She retired in June 2014 after more than 27 years with McKinsey, most recently as a director and senior partner. During that time, she worked extensively in the U.S., Canada, and internationally with major retailers, financial institutions, and other consumer-facing companies. Before joining McKinsey, Ms. Aufreiter spent three years in financial services working in corporate finance and investment banking. She is a member of the Board of Directors of The Bank of Nova Scotia and is chair of the Board of Directors of MYT Netherlands Parent B.V., the parent company of MyTheresa.com, an e-commerce retailer. She is also on the board of a privately held company, Cadillac Fairview, a subsidiary of Ontario Teachers Pension Plan, which is one of North America's largest owners, operators, and developers of commercial real estate. Ms. Aufreiter also serves on the boards of St. Michael's Hospital and the Canadian Opera Company, and is a member of the Dean's Advisory Board for the Ivey Business School in Ontario, Canada.

Ms. Aufreiter has over 30 years of broad business experience in a variety of retail sectors. Her vast experience in leading McKinsey's North American Retail Practice, North American Branding service line and the Consumer Digital and Omnichannel service line is of particular value to the Board. In addition, during her tenure with McKinsey, the firm advised consulting clients on a variety of matters, including ESG topics and setting and achieving sustainability goals which is of value to the Board and the Public Responsibilities Committee. Ms. Aufreiter has served on our Public Responsibilities Committee for eight years, the last three as chair. In 2021, she led the Board's review of ESG accountability to clarify committee oversight of ESG topics and led the revision of the Committee's charter to reflect the Committee's increasing focus on material environmental sustainability and social impact topics. She also brings to the Board valuable insight on commercial real estate. In her current role as Chair of the Human Capital and Compensation Committee for the Bank of Nova Scotia, Ms. Aufreiter has responsibility for overseeing senior management succession and CEO evaluation and incentive compensation. In her previous role as Chair of the Corporate Governance Committee of The Bank of Nova Scotia, Ms. Aufreiter had responsibility for overseeing shareholder engagement, the composition of its Board of Directors, including diversity, the effectiveness of the diversity policy of its Board of Directors, ESG strategy and priorities, and the Bank's statement on human rights. This experience is of particular value to the Board and to her role as the Chair of the Public Responsibilities Committee.

[1]Denotes Chair of Committee

PX6009-029



**Kevin M. Brown**

Mr. Brown is the Executive Vice President and Chief Supply Chain Officer at Dell Technologies, a leading global technology company. His previous roles at Dell include senior leadership roles in procurement, product quality, and manufacturing. Mr. Brown joined Dell in 1998 and has held roles of increasing responsibility throughout his career, including Chief Procurement Officer and Vice President, ODM Fulfillment & Supply Chain Strategy before being named Chief Supply Chain Officer in 2013. Before Dell, he spent 10 years in the shipbuilding industry, directing U.S. Department of Defense projects.

Mr. Brown currently serves on the National Committee of the Council on Foreign Relations and on the Boards of the Congressional Black Caucus Foundation and the Howard University Center for Supply Chain Excellence. He is also a member of the Executive Leadership Council.

Mr. Brown is a global leader with over twenty years of leadership experience and supply chain innovation experience. His efforts led Dell to be recognized as having one of the most efficient, sustainable, and innovative supply chains. Mr. Brown has established himself as an authority on sustainable business practices. His combined deep global supply chain and procurement expertise and track record of sustainability and resilience leadership, as well as his experience in circular economic business practices, are of value to the Board in his role as director and member of the Public Responsibilities Committee. His deep expertise in all matters related to supply chain, supply chain resilience, and risk and crisis management are of particular value to the Board.

| Age | Director Since |
|-----|----------------|
| 60  | 2021           |

**Committees:**
Audit
Public Responsibilities

**Qualifications:**
Business Management
Consumer
Financial Expertise
Risk Management
Operations & Technology
ESG
Manufacturing

PX6009-030



Age: 70

Director Since: 2021

**Committees:**
Corporate Governance
Public Responsibilities

**Qualifications:**
Business Management
Consumer
Financial Expertise
Risk Management
Operations & Technology
ESG

### Elaine L. Chao

Ms. Chao served as the 18th U.S. Secretary of Transportation from January 2017 until January 2021. Prior thereto, she served as the 24th U.S. Secretary of Labor from January 2001 until January 2009, and was the first woman of Asian American & Pacific Islander heritage to serve in a President's cabinet in history. Previously, Ms. Chao was President and CEO of United Way of America, Director of the Peace Corps and a banker with Citicorp and BankAmerica Capital Markets Group. She earned her M.B.A. from Harvard Business School and has served on a number of Fortune 500 and nonprofit boards. She currently serves on the Board of Directors of ChargePoint Holdings, Inc. and Embark Technology, Inc., both of which are new economy technology companies in the mobile sector focusing on sustainable and environmentally friendly transportation. In the past five years, she also served as a director of and Hyliion Holdings Corp. Recognized for her extensive record of accomplishments and public service, she is also the recipient of 38 honorary doctorate degrees. In her capacity as a director on numerous public boards while out of government, she has advocated for innovation and business transformations. She has also been a director on many private and nonprofit boards, including Harvard Business School Board of Dean's Advisors and Global Advisory Board, Los Angeles Organizing Committee for the Olympic and Paraolympic Games 2028, and a trustee of the Kennedy Center for the Performing Arts.

Ms. Chao brings to the Board extensive experience in the public, private and non-profit sectors. In her two cabinet positions, she led high-profile organizations, navigating complex regulatory and public policy environments, and she provides the Board with valuable insight on strategy, logistics, transportation, and workforce issues. Under her leadership, the Department of Labor set up a record number of health and safety partnerships with labor unions. While she was Director of the Peace Corps, she launched the first Peace Corps programs in the newly independent Baltic states and the former republics of the former Soviet Union, including Ukraine. This experience leading social impact at scale is of value to the Board in her role as an independent director and member of the Public Responsibilities Committee. Ms. Chao's leadership and governance expertise gained from her government service, nonprofits, and public company boards is of value to the Board.

PX6009-031



**Age**
63

**Director Since**
2015

**Committees:**
Audit[1]
Corporate Governance

**Qualifications:**
Business Management
Retail
Consumer
Financial Expertise
Risk Management
Operations & Technology
ESG
Manufacturing

### Anne Gates

Ms. Gates was President of MGA Entertainment, Inc., a privately-held developer, manufacturer, and marketer of toy and entertainment products for children, from 2014 until her retirement in 2017. Ms. Gates held roles of increasing responsibility with The Walt Disney Company from 1992-2012. Her roles included Chief Financial Officer for Disney Consumer Products (DCP) and Managing Director, DCP, Europe and emerging markets. She is currently a director of Tapestry, Inc., where she serves as Chair of the Board, Chair of the Governance Committee, and is on the Tapestry Foundation Board. She is also a director of Raymond James Financial, Inc., where she is the Chair of the Corporate Governance ESG Committee. She is also a member of the Boards of the Salzburg Global Seminar, PBS SoCal, Save the Children, and the Packard Foundation, one of the largest global foundations focused on environmental and other key ESG issues.

Ms. Gates has over 25 years of experience in the retail and consumer products industry. She brings to Kroger financial expertise gained while serving as President of MGA and CFO of a division of The Walt Disney Company. Ms. Gates has a broad business background in finance, marketing, strategy and business development, including international business. As the chair of the Corporate Governance and ESG Committee at Raymond James Financial, Inc., she oversees their code of ethics, Board composition, including diversity, environmental policies and programs, sustainability targets and ESG reporting which are aligned with SASB, shareholder proposals, and shareholder engagements efforts, including social justice, community relations and charitable giving. Ms. Gates is also Chair of the Tapestry Governance Committee, which also includes oversight of ESG responsibilities. These experiences are of particular value to the Board in her role as an independent director and member of the Corporate Governance Committee. Her financial leadership and consumer products expertise is of particular value to the Board. Ms. Gates has been designated an Audit Committee financial expert and serves as Chair of the Audit Committee.

---

[1] Denotes Chair of Committee

PX6009-032



**Age**
66

**Director Since**
2019

**Committees:**
Audit
Finance[1]

**Qualifications:**
Business Management
Retail
Consumer
Financial Expertise
Risk Management
ESG

### Karen M. Hoguet

Ms. Hoguet served as the Chief Financial Officer of Macy's, Inc. from October 1997 until July of 2018 when she became a strategic advisor to the Chief Executive Officer until her retirement in 2019. Previously, she served on the boards of Nielsen Holdings plc, The Chubb Corporation and Cincinnati Bell as the chairman of the audit committee and a member of the finance committee, member of the Audit and Finance Committee and the Audit Committee, respectively. She also serves on the board of UCHealth.

Ms. Hoguet has over 35 years of broad financial and operational leadership experience within the omnichannel retail sector. She has a proven track record of success in driving transformations, delivering strong financial performance, and forming strong relationships with investors and industry analysts. She has extensive knowledge across all areas of finance, including financial planning, investor relations, M&A, accounting, treasury and tax, as well as strategic planning, credit card services and real estate. Ms. Hoguet played a critical role in the successful turnaround of Federated Department Stores, from bankruptcy to an industry leading omnichannel retailer, which was accomplished through acquisitions, divestiture and other strategic changes including building an omnichannel model and developing a new strategic approach to real estate. Her long tenure as a senior executive of a publicly traded company with financial, audit, strategy, and risk oversight experience is of value to the Board as is her public company experience, both as a long serving executive, and as a board member. In addition, her strong business acumen, understanding of diverse cross-functional issues, and ability to identify potential risks and opportunities are also of value to the Board. Ms. Hoguet has been designated an Audit Committee financial expert and serves as Chair of the Finance Committee.



**Age**
62

**Director Since**
2003

**Qualifications:**
Business Management
Retail
Consumer
Financial Expertise
Risk Management
Operations & Technology
ESG

### W. Rodney McMullen

Mr. McMullen was elected Chairman of the Board in January 2015 and Chief Executive Officer of Kroger in January 2014. He served as Kroger's President and Chief Operating Officer from August 2009 to December 2013. Prior to that, Mr. McMullen was elected to various roles at Kroger including Vice Chairman in 2003, Executive Vice President, Strategy, Planning, and Finance in 1999, Senior Vice President in 1997, Group Vice President and Chief Financial Officer in June 1995, and Vice President, Planning and Capital Management in 1989. He is a director of VF Corporation. In the past five years, he also served as a director of Cincinnati Financial Corporation.

Mr. McMullen has broad experience in the supermarket business, having spent his career spanning over 40 years with Kroger. He has a strong background in finance, operations, and strategic partnerships, having served in a variety of roles with Kroger, including as our CFO, COO, and Vice Chairman. His previous service as chair of Cincinnati Financial Corporation's Compensation Committee and on its Executive and Investment Committees, as well as his service on the Audit and Governance and Corporate Responsibilities Committees of VF Corporation, adds depth to his extensive retail experience.

---

[1] Denotes Chair of Committee

PX6009-033



**Age** 69

**Director Since** 1997

**Committees:**
Compensation & Talent
Development[1]
Corporate Governance

**Qualifications:**
Business Management
Financial Expertise
Risk Management
Operations & Technology
ESG
Manufacturing

### Clyde R. Moore

Mr. Moore was Chairman and Chief Executive Officer of First Service Networks, a national provider of facility and maintenance repair services, from 2000 to 2014, and Chairman until his retirement in 2015. Previously, Mr. Moore was President and CEO of Thomas & Betts, a global manufacturer of electric connectors and components, and President and COO of FL Industries, Inc., an electrical component manufacturing company. Mr. Moore is currently President and CEO of Gliocas LLC, a management consulting firm serving small businesses and non-profits. Mr. Moore was a leader in the founding of the Industry Data Exchange Association (IDEA), which standardized product identification data for the electrical industry, allowing the industry to make the successful transition to digital commerce. Mr. Moore was Chairman of the National Electric Manufacturers Association and served on the Executive Committee of the Board of Governors. He served on the advisory board of Mayer Electrical Supply for over 20 years, including time as lead director, until the sale of the company in late-2021.

Mr. Moore has over 30 years of general management experience in public and private companies. He has extensive experience as a corporate leader overseeing all aspects of a facilities management firm and numerous manufacturing companies. Mr. Moore's expertise broadens the scope of the Board's experience to provide oversight to Kroger's facilities, digital, and manufacturing businesses, and he has a wealth of Fortune 500 experience in implementing technology transformations. Additionally, his expertise and leadership as Chair of the Compensation Committee is of particular value to the Board. Mr. Moore presided over the Compensation Committee during the company's introduction of its Framework for Action: Diversity, Equity, & Inclusion plan. Additionally, he was Chair of the Compensation Committee and led the inclusion of talent development into the Committee's name and charter.



**Age** 67

**Director Since** 2006

**Committees:**
Audit
Corporate Governance[1]
Public Responsibilities

**Qualifications:**
Business Management
Retail
Consumer
Financial Expertise
Risk Management
Operations & Technology
ESG

### Ronald L. Sargent

Mr. Sargent was Chairman and Chief Executive Officer of Staples, Inc., a business products retailer, where he was employed from 1989 until his retirement in 2017. Prior to joining Staples, Mr. Sargent spent 10 years with Kroger in various positions. He is a director of Five Below, Inc. and Wells Fargo & Company. Previously, he served as a director of The Home Depot, Inc. and Mattel, Inc. Currently, Mr. Sargent is a member of the board of governors of the Boys & Girls Clubs of America, the board of directors of City of Hope, and the board of trustees of Northeastern University. He is also chairman of the board of directors of the John F. Kennedy Library Foundation.

Mr. Sargent has over 35 years of retail experience, first with Kroger and then with increasing levels of responsibility and leadership at Staples, Inc. His efforts helped carve out a new market niche for the international retailer. In his role as Chair of the Wells Fargo Human Resources Committee, he oversees human capital management, including diversity, equity, and inclusion, human capital risk, and culture and ethics. In his role as a member of the Five Below Nominating and Corporate Governance Committee, he oversees social and environmental governance, including corporate citizenship. These committee experiences are of value to the Board in his role as a member of the Public Responsibilities Committee and Lead Director of the Board. His understanding of retail operations, consumer insights, and e-commerce are also of value to the Board. Mr. Sargent has been designated an Audit Committee financial expert and serves as Chair of the Corporate Governance Committee and Lead Director of the Board. Mr. Sargent's strong insights into corporate governance and his executive leadership experience serve as the basis for his leadership role as Lead Director.

[1] Denotes Chair of Committee

PX6009-034



**Age** 59

**Director Since** 2021

**Committees:**
Compensation & Talent
Development
Finance

**Qualifications:**
Business Management
Retail
Consumer
Financial Expertise
Risk Management
Operations & Technology
ESG

### J. Amanda Sourry Knox (Amanda Sourry)

Ms. Sourry was President of North America for Unilever, a personal care, foods, refreshment, and home care consumer products company, from 2018 until her retirement in December 2019. She held leadership roles of increasing responsibility during her more than 30 years at Unilever, both in the U.S. and Europe, including president of global foods, executive vice president of global hair care, and executive vice president of the firm's UK and Ireland business. From 2015 to 2017, she served as President of their Global Foods Category. Ms. Sourry currently serves on the board for PVH Corp., where she chairs the Compensation Committee and serves on the Nominating, Governance & Management Development Committee. She is also a non-executive director of OFI, a provider of on-trend, natural and plant-based products, focused on delivering sustainable and innovative solutions to consumers across the world, and a member of their Remuneration and Talent Committee and the Audit and Risk Committee. She is also a supervisory director of Trivium Packaging B.V., a sustainable packaging company, and a director of Beautycounter LLC.

Ms. Sourry has over thirty years of experience in the CPG and retail industry. As a member of PVH Corp.'s Nominating, Governance, & Management Development Committee, her experience with monitoring issues of corporate conduct and culture, and providing oversight of diversity, equity and inclusion policies and programs as it relates to management development, talent assessment and succession planning programs and processes is of particular value to her role as a member of the Compensation & Talent Development Committee and the Board. She brings to the Board her extensive global marketing and business experience in consumer-packaged goods as well as customer development, including overseeing Unilever's digital efforts. Ms. Sourry was actively involved in Unilever's global diversity, gender balance, and sustainable living initiatives which is of value to the Board and to the Compensation & Talent Development Committee. She also has a track record of driving sustainable, profitable growth across scale operating companies and global categories across both developed and emerging markets. Ms. Sourry's history in profit and loss responsibility and oversight, people and ESG leadership and capabilities development is of value to the Board.

PX6009-035



| Age | Director Since |
|-----|----------------|
| 61  | 2017           |

**Committees:**
Compensation & Talent
Development
Finance

**Qualifications:**
Business Management
Financial Expertise
Risk Management
Operations & Technology
ESG
Manufacturing

### Mark S. Sutton

Mr. Sutton is Chairman and Chief Executive Officer of International Paper, a leading global producer of renewable fiber-based packaging, pulp, and paper products. Prior to becoming CEO in 2014, he served as President and Chief Operating Officer with responsibility for running International Paper's global business. Mr. Sutton joined International Paper in 1984 as an Electrical Engineer. He held roles of increasing responsibility throughout his career, including Mill Manager, Vice President of Corrugated Packaging Operations across Europe, the Middle East and Africa, Vice President of Corporate Strategic Planning, and Senior Vice President of several business units, including global supply chain. Mr. Sutton is a member of The Business Council, serves on the American Forest & Paper Association board of directors, and on the Business Roundtable. He also serves on the board of directors of Memphis Tomorrow.

Mr. Sutton has over 30 years of leadership experience with increasing levels of responsibility and leadership at International Paper. At International Paper, he oversees their robust ESG disclosures which are aligned with GRI, and their Vision 2030, which sets forth ambitious forest stewardship targets and plans to transition to renewable solutions and sustainable operations. He also oversees International Paper's Vision 2030 goals pertaining to diversity and inclusion. He brings to the Board the critical thinking that comes with an electrical engineering background as well as his experience leading a global company with labor unions. His strong strategic planning background, manufacturing and supply chain and experience, and his ESG leadership are of value to the Board.



| Age | Director Since |
|-----|----------------|
| 55  | 2019           |

**Committees:**
Audit
Finance

**Qualifications:**
Business Management
Financial Expertise
Risk Management
Operations & Technology
ESG

### Ashok Vemuri

Mr. Vemuri was Chief Executive Officer and a Director of Conduent Incorporated, a global digital interactions company, from its inception as a result of the spin-off from Xerox Corporation in January 2017 to 2019. He previously served as Chief Executive Officer of Xerox Business Services, LLC and as an Executive Vice President of Xerox Corporation from July 2017 to December 2017. Prior to that, he was President, Chief Executive Officer, and a member of the Board of Directors of IGATE Corporation, a New Jersey-based global technology and services company now part of Capgemini, from 2013 to 2015. Before joining IGATE, Mr. Vemuri spent 14 years at Infosys Limited, a multinational consulting and technology services company, in a variety of leadership and business development roles and served on the board of Infosys from 2011 to 2013. Prior to joining Infosys in 1999, Mr. Vemuri worked in the investment banking industry at Deutsche Bank and Bank of America. In the past five years, he served as a director of Conduent Incorporated. Mr. Vemuri is a member of the Board of Directors of Opal Fuels and is chair of the Audit Committee.

Mr. Vemuri brings to the Board a proven track record of leading technology services companies through growth and corporate transformations. His experience as CEO of global technology companies as well as his experience with cyber security and risk oversight are of value to the Board as he brings a unique operational, financial, and client experience perspective. Additionally, Mr. Vemuri served on our Public Responsibilities Committee which gives him additional perspectives on risk oversight that he brings to the Audit Committee. Mr. Vemuri has been designated an Audit Committee financial expert.

PX6009-036

**YOUR VOTE IS EXTREMELY IMPORTANT. The Board of Directors unanimously recommends a vote "FOR ALL" of Kroger's director nominees.**

### Board Succession Planning and Refreshment Mechanisms

Board succession planning is an ongoing, year-round process. The Corporate Governance Committee recognizes the importance of thoughtful Board refreshment and engages in a continuing process of identifying attributes sought for future Board members. The Corporate Governance Committee takes into account the Board and Committee evaluations regarding the specific qualities, skills, and experiences that would contribute to overall Board and Committee effectiveness, as well as the future needs of the Board and its Committees in light of Kroger's current and long-term business strategies, and the skills and qualifications of directors who are expected to retire in the future including as a result of our Board retirement policy, which requires directors to retire at the annual meeting following their 72nd birthday.

### Outside Board Service

No director who is an officer of the Company may serve as a director of another company without the approval of the Corporate Governance Committee. Directors who are not officers of the Company may not serve as a director of another company if in so doing such service would interfere with the director's ability to properly perform his or her responsibilities on behalf of the Company and its shareholders, as determined by the Corporate Governance Committee. None of our current directors serve on more than three public company Boards, including Kroger's Board.

### Board Diversity

Our director nominees reflect a wide array of experience, skills, and backgrounds. Each director is individually qualified to make unique and substantial contributions to Kroger. Collectively, our directors' diverse viewpoints and independent-mindedness enhance the quality and effectiveness of Board deliberations and decision-making. Our Board is a dynamic group of new and experienced members, which reflects an appropriate balance of institutional knowledge and fresh perspectives about Kroger due to the varied length of tenure on the Board. We believe this blend of qualifications, attributes, and tenure enables highly effective Board leadership.

The Corporate Governance Committee considers racial, ethnic, and gender diversity to be important elements in promoting full, open, and balanced deliberations of issues presented to the Board. When evaluating potential nominees to our Board, the Corporate Governance Committee considers director candidates who would help the Board reflect the diversity of our shareholders, associates, customers, and the communities in which we operate, including by considering their geographic locations to align directors' physical locations with Kroger's operating areas where possible. In connection with the use of a third-party search firm to identify candidates for Board positions, the Corporate Governance Committee instructs the third-party search firm to include in its initial list qualified female and racially/ethnically diverse candidates. Four of our 11 director nominees self-identify as racially/ethnically diverse: Mr. Brown and Ms. Gates self-identify as Black/African American and Ms. Chao and Mr. Vemuri self-identify as Asian. Five of our 11 directors are women.

The Corporate Governance Committee believes that it has been successful in its efforts to promote gender and ethnic diversity on our Board. Further, the Board aims to foster a diverse and inclusive culture throughout the Company and believes that the Board nominees are well suited to do so. The Corporate Governance Committee and Board believe that our director nominees for election at our 2023 Annual Meeting bring to our Board a variety of different experiences, skills, and qualifications that contribute to a well-functioning diverse Board that effectively oversees the Company's strategy and management. The charts below show the diversity of our director nominees and the skills and experience that we consider important for our directors in light of our current business, strategy, and structure:

PX6009-037

| | Nora Aufreiter | Kevin Brown | Elaine Chao | Anne Gates | Karen Hoguet | Rodney McMullen | Clyde Moore | Ronald Sargent | Amanda Sourry | Mark Sutton | Ashok Vemuri | Total (of 11) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Business Management | • | • | • | • | • | • | • | • | • | • | • | 11 |
| Retail | • | | | • | • | • | | • | • | | | 6 |
| Consumer | • | • | • | • | • | • | | • | • | | | 8 |
| Financial Expertise | • | • | • | • | • | • | • | • | • | • | • | 11 |
| Risk Management | | • | • | • | • | • | • | • | • | • | • | 10 |
| Operations & Technology | • | • | • | • | | • | • | • | • | • | • | 10 |
| ESG | • | • | • | • | • | • | • | • | • | • | • | 11 |
| Manufacturing | | • | | • | | | • | | | • | | 4 |



**Gender Diversity**

45% Women

**Ethnic Diversity**

36% of Board is ethnically diverse

**Tenure of Director Nominees**



5 directors <5 years

3 director 5-10 years

3 directors 10+ years

5

3

Average Tenure is 8.9 years

PX6009-038

## Information Concerning the Board of Directors

**Board Leadership Structure and Independent Lead Director**

Kroger has a governance structure in which independent directors exercise meaningful and rigorous oversight. The Board's leadership structure, in particular, is designed with those principles in mind and to allow the Board to evaluate its needs and determine, from time to time, who should lead the Board. Our Corporate Governance Guidelines (the "*Guidelines*") provide the flexibility for the Board to modify our leadership structure in the future as appropriate. We believe that Kroger is well-served by this flexible leadership structure.

In order to promote thoughtful oversight, independence, and overall effectiveness, the Board's leadership includes Mr. McMullen, our Chairman and CEO, and an independent Lead Director designated by the Board among the independent directors. The Lead Director works with the Chairman to share governance responsibilities, facilitate the development of Kroger's strategy, and grow shareholder value. The Lead Director serves a variety of roles, consistent with current best practices, including:

- reviewing and approving Board meeting agendas, materials, and schedules to confirm that the appropriate topics are reviewed, with sufficient information provided to directors on each topic and appropriate time is allocated to each;
- serving as the principal liaison between the Chairman, management, and the independent directors;
- presiding at the executive sessions of independent directors and at all other meetings of the Board at which the Chairman is not present;
- calling meetings of independent directors at any time; and
- serving as the Board's representative for any consultation and direct communication, following a request, with major shareholders.

The independent Lead Director carries out these responsibilities in numerous ways, including by:

- facilitating communication and collegiality among the Board members;
- soliciting direct feedback from independent directors;
- overseeing the succession planning process, including meeting with a wide range of associates including corporate and division management associates;
- meeting with the CEO frequently to discuss strategy;
- serving as a sounding Board and advisor to the CEO;
- leading annual CEO evaluation process; and
- discussing Company matters with other directors between meetings.

Unless otherwise determined by the independent members of the Board, the Chair of the Corporate Governance Committee is designated as the Lead Director. Ronald L. Sargent, an independent director and the Chair of the Corporate Governance Committee, was appointed as our Board's independent Lead Director in June 2018. Mr. Sargent is an effective Lead Director for Kroger due to, among other things, his:

- independence;
- deep strategic and operational understanding of Kroger obtained while serving as a Kroger director;
- insight into corporate governance;
- experience as the CEO of an international ecommerce and brick and mortar retailer;
- experience on the Boards of other large publicly traded companies; and
- engagement and commitment to carrying out the role and responsibilities of the Lead Director.

With respect to the roles of Chairman and CEO, the *Guidelines* provide that the Board will determine whether it is in the best interests of Kroger and its shareholders for the roles to be combined. The Board exercises this judgment as it deems appropriate in light of prevailing circumstances. The Board believes that this leadership structure improves the Board's ability to focus on key policy and operational issues and helps the Company operate in the long-term interest of shareholders. Additionally, this structure provides an effective balance between strong Company leadership and appropriate safeguards and oversight by independent directors. Our CEO's strong background in finance, operations, and strategic partnerships is particularly important to the Board given Kroger's current growth strategy. Our CEO's consistent leadership, deep industry expertise, and extensive knowledge of the Company are also especially critical in the midst of the rapidly evolving retail and digital landscape. The Board believes that the structure of the Chairman and independent Lead Director position should continue to be considered as part of the succession planning process.

PX6009-039

**Annual Board Evaluation Process**

The Board and each of its Committees conduct an annual evaluation to determine whether the Board is functioning effectively both at the Board and at the Committee levels. As part of this annual evaluation, the Board assesses whether the current leadership structure and function continues to be appropriate for Kroger and its shareholders, including in consideration of director succession planning.

Every year, the Board's goal is to increase the effectiveness of the Board and the results of these evaluations are used for this purpose. The Board recognizes that a robust evaluation process is an essential component of strong corporate governance practices and ensuring Board effectiveness. The Corporate Governance Committee oversees an annual evaluation process led by either the Lead Independent Director or an independent third party.

Each director completes a detailed annual evaluation of the Board and the Committees on which he or she serves and the Lead Director or an independent third-party conducts interviews with each of the directors. This year, the annual evaluation was conducted by the Lead Director.

Topics covered include, among others:

- The effectiveness of the Board and Board Committees and the active participation of all directors

- The Board and Committees' skills and experience and whether additional skills or experience are needed

- The effectiveness of Board and Committee meetings, including the frequency of the meetings

- Board interaction with management, including the level of access to management, and the responsiveness of management

- The effectiveness of the Board's evaluation of management performance

- Additional subject matters the Board would like to see presented at their meetings or Committee meetings

- Board's governance procedures

- The culture of the Board to promote participation in a meaningful and constructive way

The results of this Board evaluation are discussed by the full Board and each Committee, as applicable, and changes to the Board's and its Committees' practices are implemented as appropriate.

Over the past several years, this evaluation process has contributed to various enhancements in the way the Board and the Committees operate, including increased focus on continuous Board refreshment and diversity of its members as well as ensuring that Board and Committee agendas are appropriately focused on strategic priorities and provide adequate time for director discussion and input.

PX6009-040

**Director Onboarding and Engagement**

All directors are expected to invest the time and energy required to gain an in-depth understanding of our business and operations in order to enhance their strategic value to our Board. We develop tailored onboarding plans for each new director. We arrange meetings for each new director with appropriate officers and associates in order to familiarize him or her with the Company's strategic plans, financial statements, and key policies and practices. We also provide training on fiduciary obligations of board members and corporate governance topics, as well as committee-specific onboarding. From time to time, the Company will provide Board members with presentations from experts within and outside of the Company on topics relevant to the Board's responsibilities. Any member of the Board may attend accredited third-party training and the expenses will be paid by the Company. Board meetings are periodically held at a location away from our home office in a geography in which we operate. In connection with these Board meetings, our directors learn more about the local business environment through meetings with our regional business leaders and visits to our stores, competitors' stores, manufacturing facilities, distribution facilities, and/or customer fulfillment centers.

**Committees of the Board of Directors**

To assist the Board in undertaking its responsibilities, and to allow deeper engagement in certain areas of company oversight, the Board has established five standing Committees: Audit, Compensation and Talent Development ("Compensation"), Corporate Governance, Finance, and Public Responsibilities. All Committees are composed exclusively of independent directors, as determined under the NYSE listing standards. Each Committee has the responsibilities set forth in its respective charter, each of which has been approved by the Board. The current charter of each Board Committee is available on our website at ir.kroger.com under Investors — Governance — Corporate Governance Guidelines.

The current membership, 2022 meetings, and responsibilities of each Committee are summarized below.

| Name of Committee, Number of Meetings, and Current Members | Primary Committee Responsibilities |
|---|---|
| **Audit Committee**<br><br>**Meetings in 2022: 5**<br><br>**Members:**<br>Anne Gates, *Chair*<br>Kevin M. Brown<br>Karen M. Hoguet<br>Ronald L. Sargent<br>Ashok Vemuri | • Oversees the Company's financial reporting and accounting matters, including review of the Company's financial statements and the audit thereof, the Company's financial reporting and accounting process, and the Company's systems of internal control over financial reporting<br>• Selects, evaluates, and oversees the compensation and work of the independent registered public accounting firm and reviews its performance, qualifications, and independence<br>• Oversees and evaluates the Company's internal audit function, including review of its audit plan, policies and procedures, and significant findings<br>• Oversees enterprise risk assessment and risk management, including review of cybersecurity risks and regular reports received from management and independent third parties<br>• Reviews significant legal and regulatory matters<br>• Reviews and monitors the Company's operational and third-party compliance programs and updates thereto<br>• Reviews Ethics Hotline reports and discusses material matters<br>• Reviews and approves related party transactions<br>• Conducts executive sessions with independent registered public accounting firm and Vice President, Internal Audit at each meeting<br>• Conducts executive sessions with the Senior Vice President, Secretary and General Counsel, Vice President and Chief Ethics & Compliance Officer, and Senior Vice President and Chief Financial Officer individually at least once per year |

PX6009-041

| Name of Committee, Number of Meetings, and Current Members | Primary Committee Responsibilities |
|---|---|
| **Compensation Committee**<br><br>**Meetings in 2022: 5**<br><br>**Members:**<br>   Clyde R. Moore, *Chair*<br>   Amanda Sourry<br>   Mark S. Sutton | • Recommends for approval by the independent directors the compensation of the CEO and approves the compensation of senior officers<br>• Administers the Company's executive compensation policies and programs, including determining grants of equity awards under the plans<br>• Reviews annual incentive plans and long-term incentive plan metrics and plan design<br>• Reviews emerging legislation and governance issues and retail compensation trends<br>• Reviews the Company's executive compensation peer group<br>• Reviews CEO pay analysis<br>• Reviews Human Capital Management, including Diversity, Equity, & Inclusion<br>• Has sole authority to retain and direct the Committee's compensation consultant<br>• Assists the full Board with senior management succession planning<br>• Conducts executive sessions with Senior Vice President and Chief People Officer and independent compensation consultant |
| **Corporate Governance Committee**<br><br>**Meetings in 2022: 3**<br><br>**Members:**<br>   Ronald L. Sargent, *Chair*<br>   Elaine L. Chao<br>   Anne Gates<br>   Clyde R. Moore | • Oversees the Company's corporate governance policies and procedures<br>• Develops criteria for selecting and retaining directors, including identifying and recommending qualified candidates to be director nominees<br>• Designates membership and Chairs of Board Committees<br>• Oversees and administers Board evaluation process<br>• Reviews the Board's performance<br>• Establishes and reviews the practices and procedures by which the Board performs its functions<br>• Reviews director independence, financial literacy, and designation of financial expertise<br>• Administers director nomination process<br>• Interviews and nominates candidates for director election<br>• Reviews compliance with share ownership guidelines<br>• Reviews and participates in shareholder engagement<br>• Reviews and establishes independent director compensation<br>• Oversees the annual CEO evaluation process conducted by the full Board |

PX6009-042

| Name of Committee, Number of Meetings, and Current Members | Primary Committee Responsibilities |
|---|---|
| **Finance Committee**<br><br>**Meetings in 2022: 6**<br><br>**Members:**<br>  Karen M. Hoguet, *Chair*<br>  Nora A. Aufreiter<br>  Amanda Sourry<br>  Mark Sutton<br>  Ashok Vemuri | • Oversees the Company's financial affairs and management of the Company's financial resources<br>• Reviews the Company's annual and long-term financial plans, capital spending plans, capital allocation strategy, and use of cash<br>• Approves and recommends for approval to the Board certain capital expenditures<br>• Reviews the Company's dividend policy and share buybacks<br>• Reviews strategic transactions, capital structure, including potential issuance of debt or equity securities, credit agreements, and other financing transactions<br>• Monitors the investment management of assets held in pension and profit-sharing plans administered by the Company<br>• Oversees the Company's policies and procedures on hedging, swaps, risk management, and other derivative transactions<br>• Oversees the Company's engagement and relationships with, and standing in, the financial community |
| **Public Responsibilities Committee**<br><br>**Meetings in 2022: 3**<br><br>**Members:**<br>  Nora A. Aufreiter, *Chair*<br>  Kevin M. Brown<br>  Elaine L. Chao<br>  Ronald L. Sargent | • Reviews the practices of the Company affecting its responsibility as a corporate citizen<br>• Examines and reviews the Company's practices related to environmental sustainability, and social impact, including but not limited to<br>  ✓ climate impacts<br>  ✓ packaging<br>  ✓ food and operational waste<br>  ✓ food access<br>  ✓ responsible sourcing<br>  ✓ supplier diversity<br>  ✓ people safety, food safety, and pharmacy safety<br>• Examines and reviews the Company's ESG strategy<br>• Reviews the Company's community engagement and philanthropy<br>• Reviews the Company's advocacy and public policy<br>• Reviews the Company's communications and Corporate Brand stewardship<br>• Assesses the Company's effort in evaluating and responding to changing public expectations and public issues that affect the business |

PX6009-043

**Shareholder Engagement**

Maintaining ongoing relationships with our shareholders, and understanding our shareholders' views, is a priority for both our Board and management team. We have a longstanding history of engaging with our shareholders and through our investor relations program and our year-round governance outreach program, including participation for our independent directors. In 2022, under the direction of the Board, we requested engagement meetings with 34 shareholders representing 48% of our outstanding shares and subsequently met with 18 shareholders representing 41% of our outstanding shares (many of those shareholders we met with more than once). Some investors we contacted either did not respond or confirmed that a discussion was not needed at this time.

| ENGAGEMENT | COMMUNICATION | FEEDBACK |
|---|---|---|
| Executive management, Investor Relations, Corporate Affairs, and the General Counsel engage on a regular basis with shareholders to solicit feedback on a variety of corporate governance matters, including, but not limited to, executive compensation, corporate governance policies and ESG practices. We proactively manage relationships to foster open dialogue with, and capture feedback from, more than 70 organizations on over 40 ESG topics. | Kroger has a robust investor relations program, routinely interacting and communicating with shareholders through a number of other forums, including quarterly earnings presentations, SEC filings, and the Annual Report and Proxy Statement, the annual shareholder meeting, investor meetings and conferences and web communications. We also publish our Sustainability Report sharing our ESG strategy, and progress and achievements. | We share our shareholder feedback and trends and developments about corporate governance matters with our Board and its Committees as we seek to enhance our governance and ESG practices and improve our disclosures. |

We conduct shareholder outreach throughout the year to engage with shareholders on issues that are important to them and us. During these engagements we discussed and solicited feedback on a range of topics, which informed Board discussions and decisions, including but not limited to:

**Business Strategy**

- Kroger's growth strategy, priorities, and value drivers
- Our strong value creation model and recent performance

**ESG Practices & Disclosures**

- Discussions with socially conscious investors and NGOs helped inform our new ESG strategy and long-term commitments
- Thriving Together, Kroger's ESG strategy, including long-term environmental sustainability, social impact, and responsible sourcing commitments, progress updates, and steps being taken to achieve our ambitious goals
- Board oversight of ESG strategy and updated Committee responsibilities
- Kroger's ESG reporting and disclosures, including our alignment with the TCFD, SASB, and GRI reporting frameworks
- The centerpiece of our ESG strategy is Zero Hunger | Zero Waste, an industry-leading platform for collective action and systems change to end hunger in our communities and eliminate waste across our company

**Human Capital Management**

- Our DE&I Framework for Action and steps we are taking to ensure our workforce reflects the communities we serve
- Our focus on our associates' well-being, including increasing our average hourly associate wage, comprehensive benefits, and opportunities for internal progression and leadership development training
- Workforce diversity reporting, including EEO-1 demographic disclosure
- Robust Board oversight of human rights in our supply chain

PX6009-044

**Compensation Structure**

- Overview of compensation program design and alignment of pay and performance
- Consideration of short- and long-term metrics, including financial and non-financial metrics, such as ESG metrics
- The balance of equity and cash compensation, as well as fixed versus at risk compensation

**Board and Board Oversight**

- Our Board's approach to board refreshment considering diversity, balance of tenure, and alignment of board skills and experience with Kroger's current and long-term business strategies
- Board and Committee responsibilities for oversight of ESG priorities, and approach to risk management

Discussions with socially conscious investors and NGOs helped inform our ESG strategy and long-term commitments. Overall shareholders expressed appreciation for the opportunity to have an ongoing discussion and were complementary of Kroger's ESG practices. Specifically, shareholders recognized the actions we took to formalize our ESG strategy, Thriving Together, and how our Board oversees this strategy, including our ESG targets and initiatives. These conversations provided valuable insights into our shareholders' evolving perspectives, which were shared with our full Board.

**Board's Response to Shareholder Proposals**

Accountability to our shareholders continues to be an important component of our success. We actively engage with our shareholder proponents. Every year, following our Annual Shareholders' Meeting, our Corporate Governance Committee considers the voting outcomes for shareholder proposals. In addition, our Corporate Governance Committee and other Committees, as appropriate, consider proposed courses of action in light of the voting outcomes for shareholder proposals under their oversight, as well as feedback provided directly from our shareholders.

**Director Nominee Selection Process**

The Corporate Governance Committee is responsible for recommending to the Board a slate of nominees for election at each annual meeting of shareholders. The Corporate Governance Committee recruits candidates for Board membership through its own efforts and through recommendations from other directors and shareholders. In addition, the Corporate Governance Committee retains an independent, third-party search firm to assist in identifying and recruiting director candidates who meet the criteria established by the Corporate Governance Committee.

These criteria are:

- demonstrated ability in fields considered to be of value to the Board, including business management, retail, consumer, operations, technology, financial, sustainability, manufacturing, public service, education, science, law, and government;
- experience in high growth companies and nominees whose business experience can help the Company innovate and derive new value from existing assets;
- highest standards of personal character and conduct;
- willingness to fulfil the obligations of directors and to make the contribution of which he or she is capable, including regular attendance and participation at Board and Committee meetings, and preparation for all meetings, including review of all meeting materials provided in advance of the meeting; and
- ability to understand the perspectives of Kroger's customers, taking into consideration the diversity of our customers, including regional and geographic differences.

PX6009-045

Additionally, in connection with the use of an independent, third-party search firm to identify director candidates, the Corporate Governance Committee will instruct the firm to include in its initial list qualified female and racially/ethnically diverse candidates.

The Corporate Governance Committee also considers diversity, as discussed in detail under "Board Diversity" above, and the specific experience and abilities of director candidates in light of our current business, strategy, and structure, and the current or expected needs of the Board in its identification and recruitment of director candidates.

The criteria for Board membership applied by the Corporate Governance Committee in its evaluation of potential Board members does not vary based on whether a candidate is recommended by our directors, a third-party search firm, or shareholders.

| Identifying Director Candidates | Review of Candidate Pool | In-Depth Candidate Review | Recommend Director Nominee Slate |
|---|---|---|---|
| Potential candidates for director may be identified by our directors, third-party search firm or shareholders. | The Governance Committee reviews candidates to determine whether candidates warrant further consideration. | Candidates will meet with Governance Committee members and be evaluated for independence and potential conflicts, skills and experience and diversity. | The Governance Committee recommends candidates for appointment or election to the Board. |

**Candidates Nominated by Shareholders**

The Corporate Governance Committee will consider shareholder recommendations for director nominees for election to the Board. If shareholders wish to nominate a person or persons for election to the Board at our 2024 annual meeting, written notice must be submitted to Kroger's Secretary, and received at our executive offices, in accordance with Kroger's Regulations, not later than March 28, 2024. Such notice should include the name, age, business address, and residence address of such person, the principal occupation or employment of such person, the number of Kroger common shares owned of record or beneficially by such person and any other information relating to the person that would be required to be included in a proxy statement relating to the election of directors. The Secretary will forward the information to the Corporate Governance Committee for its consideration. The Corporate Governance Committee will use the same criteria in evaluating candidates submitted by shareholders as it uses in evaluating candidates identified by the Corporate Governance Committee, as described above. See "Director Nominee Selection Process."

Additionally, to comply with the universal proxy rules, shareholders who intend to solicit proxies in support of director nominees other than our nominees must provide notice to Kroger's Secretary that sets forth the information required by Rule 14a-19 of the Exchange Act no later than April 23, 2024, and must comply with the additional requirements of Rule 14a-19(b).

Eligible shareholders have the ability to submit director nominees for inclusion in our proxy statement for the 2024 annual meeting of shareholders. To be eligible, shareholders must have owned at least 3% of our common shares for at least three years. Up to 20 shareholders are able to aggregate for this purpose. Nominations must be submitted to our Corporate Secretary at our principal executive offices no earlier than December 14, 2023 and no later than January 13, 2024.

**Corporate Governance Guidelines**

The Board has adopted the *Guidelines,* which provide a framework for the Board's governance and oversight of the Company. The *Guidelines* are available on our website at ir.kroger.com under Investors — Governance — Corporate Governance Guidelines. Shareholders may also obtain a copy of the *Guidelines,* at no cost, by making a written request to Kroger's Secretary at our executive offices. Certain key principles addressed in the *Guidelines* are summarized below.

PX6009-046

**Independence**

The Board has determined that all of the current independent directors and nominees have no material relationships with Kroger and satisfy the criteria for independence set forth in Rule 303A.02 of the NYSE Listed Company Manual. Therefore, all independent directors and nominees are independent for purposes of the NYSE listing standards. The Board made its determination based on information furnished to the Company by each of the directors regarding their relationships with Kroger and its management, and other relevant information. The Board considered, among other things, that

- the value of any business transactions between Kroger and entities with which the directors are affiliated falls below the thresholds identified by the NYSE listing standards, and
- no directors had any material relationships with Kroger other than serving on our Board.

**Audit Committee Independence and Expertise**

The Board has determined that Anne Gates, Karen M. Hoguet, Ronald L. Sargent, and Ashok Vemuri, independent directors, each of whom is a member of the Audit Committee, are "Audit Committee financial experts" as defined by applicable Securities and Exchange Commission ("SEC") regulations and that all members of the Audit Committee are "financially literate" as that term is used in the NYSE listing standards and are independent in accordance with Rule 10A-3 of the Securities Exchange Act of 1934.

**Code of Ethics**

The Board has adopted *The Kroger Co. Policy on Business Ethics*, applicable to all officers, associates, and directors, including Kroger's principal executive, financial, and accounting officers. The *Policy on Business Ethics* is available on our website at ir.kroger.com under Investors — Governance — Policy on Business Ethics. Shareholders may also obtain a copy of the *Policy on Business Ethics* by making a written request to Kroger's Secretary at our executive offices.

**Communications with the Board**

The Board has established two separate mechanisms for shareholders and interested parties to communicate with the Board. Any shareholder or interested party who has concerns regarding accounting, improper use of Kroger assets, or ethical improprieties may report these concerns via the toll-free hotline (800-689-4609) or website (ethicspoint.com) established by the Board's Audit Committee. The concerns are investigated by Kroger's Vice President, Chief Ethics and Compliance Officer, and the Vice President of Internal Audit and reported to the Audit Committee as deemed appropriate.

Shareholders or interested parties also may communicate with the Board in writing directed to Kroger's Secretary at our executive offices. Communications relating to personnel issues, ordinary business operations, or companies seeking to do business with us, will be forwarded to the business unit of Kroger that the Secretary deems appropriate. Other communications will be forwarded to the Chair of the Corporate Governance Committee for further consideration. The Chair of the Corporate Governance Committee will take such action as he or she deems appropriate, which may include referral to the full Corporate Governance Committee or the entire Board.

**Executive Officer Succession Planning**

The *Guidelines* provide that the Compensation Committee will review Company policies and programs for talent development and evaluation of executive officers, and will review management succession planning. In connection with the use of a third-party search firm to identify external candidates for executive officer positions, including the chief executive officer, the Board and/or the Company, as the case may be, will instruct the third-party search firm to include in its initial list qualified female and racially/ethnically diverse candidates.

**Attendance**

The Board held 14 meetings in fiscal year 2022. During fiscal 2022, all incumbent directors attended at least 75% of the aggregate number of meetings of the Board and Committees on which that director served. Members of the Board are expected to use their best efforts to attend all annual meetings of shareholders. All Board members attended last year's virtual annual meeting.

PX6009-047

## Independent Compensation Consultants

The Compensation Committee directly engages a compensation consultant to advise the Compensation Committee in the design of Kroger's executive compensation. The Committee retained Korn Ferry Hay (US) ("Korn Ferry") beginning in December 2017. Retained by – and reporting directly to – the Compensation Committee, Korn Ferry provided the Committee with assistance in evaluating Kroger's executive compensation programs and policies.

In fiscal 2022, Kroger paid Korn Ferry $402,007 for work performed for the Compensation Committee. Kroger, on management's recommendation, retained Korn Ferry to provide other services for Kroger in fiscal 2022 for which Kroger paid $69,500. These other services primarily related to salary surveys, benchmarking, integrated reporting, and operational finance review. The Compensation Committee expressly approved Korn Ferry performing these additional services. After taking into consideration the NYSE's independence standards and the SEC rules, the Compensation Committee determined that Korn Ferry was independent, and their work has not raised any conflict of interest.

The Compensation Committee may engage an additional compensation consultant from time to time as it deems advisable.

## Compensation Committee Interlocks and Insider Participation

No member of the Compensation Committee was an officer or associate of Kroger during fiscal 2022, and no member of the Compensation Committee is a former officer of Kroger or was a party to any related person transaction involving Kroger required to be disclosed under Item 404 of Regulation S-K. During fiscal 2022, none of our executive officers served on the Board of directors or on the compensation Committee of any other entity that has or had executive officers serving as a member of Kroger's Board of Directors or Compensation Committee of the Board.

## The Board's Role in Risk Oversight

While risk management is primarily the responsibility of Kroger's management team, the Board is responsible for strategic planning and overall supervision of our risk management activities. The Board's oversight of the material risks faced by Kroger occurs at both the full Board level and at the Committee level, each of which may engage advisors and experts from time to time to provide advice and counsel on risk-related matters.

We believe that our approach to risk oversight optimizes our ability to assess inter-relationships among the various risks, make informed cost-benefit decisions, and approach emerging risks in a proactive manner for Kroger. We also believe that our risk oversight structure complements our current Board leadership structure, as it allows our independent directors, through the five fully independent Board Committees, and in executive sessions of independent directors led by the Lead Director, to exercise effective oversight of the actions of management's identification of risk and implementation of effective risk management policies and controls.

The Board receives presentations throughout the year from various department and business unit leaders that include discussion of significant risks, including newly identified and evolving high priority risks. When new risks are identified, management conducts, and either the full Board or the appropriate Board committee reviews and discusses, an enterprise risk assessment related to such new risks which may include human capital, supply chain, associate and customer health and safety, legal, regulatory, and other risks. Management and the Board then discuss the relative severity of each category of risk as well as mitigating actions and considerations relating to disclosures of material risks.

At each Board meeting, the CEO addresses matters of particular importance or concern, including any significant areas of risk, such as newly identified risks, that require Board attention. Additionally, through dedicated sessions focusing entirely on corporate strategy, the full Board reviews in detail Kroger's short- and long-term strategies, including consideration of significant risks facing Kroger – either immediately or longer term – and their potential impact. The independent directors, in executive sessions led by the Lead Director, address matters of particular concern, including significant areas of risk, that warrant further discussion or consideration outside the presence of Kroger employees. At the committee level, reports are given by management subject matter experts to each Committee on risks within the scope of their charters. Each Committee reports to the full Board at each meeting, including any areas of risk discussed by the Committee.

The Audit Committee has oversight responsibility not only for financial reporting of Kroger's major financial exposures and the steps management has taken to monitor and control those exposures, but also for the effectiveness of management's processes that monitor and manage key business risks facing Kroger, as well as the major areas of risk exposure, and management's efforts to monitor and control the major areas of risk exposure. The Audit

PX6009-048

Committee incorporates its risk oversight function into its regular reports to the Board and also discusses with management its policies with respect to risk assessment and risk management.

Our Vice President, Chief Ethics and Compliance Officer provides regular updates to the Audit Committee on our compliance risks and actions taken to mitigate that risk. In addition, the Audit Committee is charged with oversight of data privacy and cybersecurity risks. Protection of our customers' data is a fundamental priority for our Board and management team. Our Chief Information Officer and our Chief Information Security Officer provide updates at each quarterly Committee meeting on our cybersecurity risks and actions taken to mitigate that risk to the Audit Committee and meet with the full Board at least annually. The Chief Information Security Officer reports on compliance and regulatory issues, continuously evolving threats and mitigating actions, and presents a NIST Cybersecurity Framework Scorecard to the Audit Committee. In overseeing cybersecurity risks, the Audit Committee focuses on thematic issues within an aggregated strategic lens and uses a risk-based approach. Oversight of cybersecurity risk incorporates strategy metrics, third party assessments, and internal audit and controls. Finally, an independent third party also regularly reports to the Audit Committee/Board on cybersecurity and outside counsel advises the Board about best practices for cybersecurity oversight by the Board, and the evolution of that oversight over time. Management also reports on strategic key risk indicators, ongoing initiatives, and significant incidents and their impact.

## Board Oversight of Environmental, Sustainability, and Governance

We are aligned with the desire of our customers, associates, and shareholders to engage in our communities and reduce our impacts on the environment while continuing to create positive economic value over the long-term. Given the breadth of topics and their importance to us, all of our Board Committees have direct oversight of environmental, social, and governance topics. ESG topics our Board Committees oversee are as follows:

| **Audit** | • Legal & Regulatory<br>• Ethics<br>• Operational and Third-Party Compliance<br>• Data Privacy & Cyber Security<br>• Financial Integrity |
|---|---|
| **Compensation & Talent Development** | • Human Capital Management<br>• Talent Development<br>• Executive Compensation<br>• Diversity, Equity & Inclusion |
| **Corporate Governance** | • Board recruitment/diversity<br>• Board succession<br>• Shareholder engagement program<br>• Shareholder advisory votes & shareholder proposals<br>• Independent director compensation |
| **Finance** | • Capital spending to ensure consistency with ESG strategy and goals |
| **Public Responsibilities** | • Environmental Sustainability<br>  ✓ Climate Impacts<br>  ✓ Packaging<br>  ✓ Food Waste (*Zero Waste*)<br>• Social Impact<br>  ✓ Food Access and Affordability (*Zero Hunger*)<br>  ✓ Local Communities<br>  ✓ Philanthropy<br>  ✓ Responsible Sourcing<br>    ➢ Human Rights<br>    ➢ Animal Welfare<br>• Safety<br>  ✓ Food<br>  ✓ People<br>  ✓ Pharmacy<br>• Advocacy & Public Policy<br>  ✓ Government Relations<br>  ✓ Political action (KroPAC)<br>• Communications & Brand Stewardship<br>  ✓ Associate & External Communications<br>• Stakeholder Relations |

PX6009-049

Our commitment to ESG matters is not new. Our Public Responsibilities Committee was established in 1977. For the past 16 years, our Company has prepared and produced an annual report describing our progress and initiatives regarding sustainability and other ESG matters. For the most recent information regarding our ESG initiatives and related matters, please visit https://www.thekrogerco.com/esgreport/. The information on, or accessible through, this website is not part of, or incorporated by reference into, this proxy statement.

In addition, our full Board oversees issues related to diversity and inclusion within the Kroger workplace. Diversity and inclusion have been deeply rooted in Kroger's values for decades. We are committed to fostering an environment of inclusion in the workplace, marketplace, and workforce where the diversity of cultures, backgrounds, experiences, perspectives, and ideas are valued and appreciated. Kroger's corporate team and retail divisions have strategic collaborations with universities, educational institutions, and community organizations to improve how we attract candidates from all backgrounds and ethnicities for jobs at all levels. Diversity and inclusion will continue to be a key ingredient in feeding Kroger's innovation, long-term sustainability, and the human spirit.

The Kroger family of companies provides inclusion training to all management and all hourly associates. Most work locations (stores, plants, distribution centers, and offices) have an inclusion-focused team, called Our Promise team. The teams work on projects that reflect Kroger's values, offer leaders valuable feedback and suggestions on improving diversity and inclusion, and facilitate communication to champion business priorities.

*Our Commitment to Diversity, Equity, & Inclusion*

Kroger's Chief People Officer leads Human Resources & Labor Relations, which includes our Diversity, Equity & Inclusion team. This function — with human resources professionals in place across our lines of business and retail divisions — advocates for and fosters an associate experience that reflects our Values. It also monitors and measures progress toward goals and identifies potential opportunities for improvement.

Kroger publicly affirmed our commitment with our Framework for Action: Diversity, Equity, & Inclusion, a 10-point plan outlining short- and longer-term steps developed with associates and leaders to promote greater change in the workplace and the communities we serve. This framework outlines five focus areas: Create More Inclusive Culture, Develop Diverse Talent, Advance Diverse Partnerships, Advance Equitable Communities, and Deeply Listen and Report Progress. More details about the plan are available here: https://www.thekrogerco.com/community/standing-together/. The information on, or accessible through, this website is not part of, or incorporated by reference into, this proxy statement.

*Enabling Connections*

As part of the framework, we committed to provide inclusion training for our associates. More than 661,000 leaders and associates have completed diversity and inclusion training since 2020. In 2020, Kroger formed an internal Diversity, Equity, & Inclusion Advisory Council comprised of leaders from across the organization. The Council works closely with our executive leadership team and other business leaders to identify opportunities and action steps for improvement. We also created an Associate Influencer Group to facilitate representation and input from all levels of the company.

Kroger also operates 15 internal Associate Resource Groups (ARGs), or affinity groups, some of which also have local chapters. These groups enable stronger connections across our family of companies, lift up shared experiences, promote personal and professional growth, and influence business decisions. Kroger leaders sponsor and personally engage with the ARGs.

*Workplace Equity*

Kroger strives to attract, retain, and develop diverse leaders and associates who reflect the communities we serve. We offer accessible employment for a wide range of people across the country. Because of our unique business model, we help unlock economic opportunity for more than 430,000 people of all ages and aspirations, from those wanting an entry-level part-time job to graduate-degree specialists across corporate functions.

Kroger strategically invests in our associates' growth and movement across levels, lines of business, and geographies. Our goal is to shift the demographic representation of women and people of color at company-wide and local levels to reflect our changing country, communities, and neighborhoods. The Diversity, Equity, & Inclusion Advisory Council helps define aspirations for our workforce of the future.

PX6009-050

*Community Engagement*

As part of our Framework for Action, the Company also pledged to invest in advancing equitable communities. Kroger directed a total of $10 million to establish and advance The Kroger Co. Foundation's Racial Equity Fund in 2020. To date, the Foundation has directed $5.7 million in grants to organizations driving positive change at national and local levels.

In 2022, the Foundation directed $1 million to The Asian American Foundation to support the Asian-American community. As part of its continuing relationship with the Thurgood Marshall College Fund, the Foundation also hosted its second annual Zero Hunger | Zero Waste Innovation Challenge. During the three-day business pitch competition with 36 students from Historically Black Colleges and Universities across the U.S., the Foundation awarded a total of $75,000 in scholarships. In collaboration with Proctor & Gamble, the Foundation also introduced the Game Changers Scholarship program and awarded $25,000 in scholarships to five diverse female students in the Greater Cincinnati area.

PX6009-051

**Director Compensation**

## 2022 Director Compensation

The following table describes the fiscal year 2022 compensation for independent directors. Mr. McMullen does not receive compensation for his Board service.

| Name | Fees Earned or Paid in Cash | Stock Awards[1] | Change in Pension Value and Nonqualified Deferred Compensation[2] | Total |
|---|---|---|---|---|
| Nora A. Aufreiter | $114,691 | $186,382 | $0 | $301,073 |
| Kevin M. Brown | $109,704 | $186,382 | $0 | $296,086 |
| Elaine L. Chao | $99,731 | $186,382 | $0 | $286,113 |
| Anne Gates | $134,637 | $186,382 | $0 | $321,019 |
| Karen M. Hoguet | $124,664 | $186,382 | $0 | $311,046 |
| Clyde R. Moore | $119,677 | $186,382 | — | $306,059 |
| Ronald L. Sargent | $162,063 | $186,382 | $5,282 | $353,727 |
| Amanda Sourry | $99,731 | $186,382 | $0 | $286,113 |
| Mark S. Sutton | $99,731 | $186,382 | $0 | $286,113 |
| Ashok Vemuri | $109,704 | $186,382 | $0 | $296,086 |

(1) Amounts reported in the Stock Awards column represent the aggregate grant date fair value of the annual incentive share award, computed in accordance with FASB ASC Topic 718. On July 13, 2022, each independent director then serving received 3,887 incentive shares with a grant date fair value of $186,382.

(2) The amount reported for Mr. Sargent represents preferential earnings on nonqualified deferred compensation. For a complete explanation of preferential earnings, please refer to footnote 4 to the Summary Compensation Table. Mr. Moore's pension value decreased by $210,996 which represents the change in actuarial present value of his accumulated benefit under the pension plan for independent directors. This change in value of accumulated pension benefits is not included in the Director Compensation Table because the value decreased. Pension values may fluctuate significantly from year to year depending on a number of factors, including age, average annual earnings, and the assumptions used to determine the present value, such as the discount rate. The decrease in the actuarial present value of his accumulated pension benefit for 2022 is primarily due to the increase in the discount rate as well as the change in value due to aging.

## Annual Compensation

Each independent director receives an annual cash retainer of $100,000. The Lead Director receives an additional annual retainer of $37,500 per year; the members of the Audit Committee each receive an additional annual retainer of $10,000; the Chair of the Audit Committee receives an additional annual retainer of $25,000; the Chair of the Compensation Committee receives an additional annual retainer of $20,000; and the Chair of each of the other Committees receives an additional annual retainer of $15,000. Each independent director also receives an annual grant of incentive shares (Kroger common shares) with a value of approximately $185,000.

PX6009-052

The Board has determined that compensation of independent directors must be competitive on an ongoing basis to attract and retain directors who meet the qualifications for service on the Board. Independent director compensation was adjusted in 2021 and will be reviewed from time to time as the Corporate Governance Committee deems appropriate.

**Pension Plan**

Independent directors first elected prior to July 17, 1997 receive an unfunded retirement benefit equal to the average cash compensation for the five calendar years preceding retirement. Only Mr. Moore is eligible for this benefit. Benefits begin at the later of actual retirement or age 65.

**Nonqualified Deferred Compensation**

We also maintain a deferred compensation plan for independent directors. Participants may defer up to 100% of their cash compensation and/or the receipt of all (and not less than all) of the annual award of incentive shares.

**Cash Deferrals**

Cash deferrals are credited to a participant's deferred compensation account. Participants may elect from either or both of the following two alternative methods of determining benefits:

- interest accrues until paid out at the rate of interest determined prior to the beginning of the deferral year to represent Kroger's cost of ten-year debt; and/or
- amounts are credited in "phantom" stock accounts and the amounts in those accounts fluctuate with the price of Kroger common shares.

In both cases, deferred amounts are paid out only in cash, based on deferral options selected by the participant at the time the deferral elections are made. Participants can elect to have distributions made in a lump sum or in quarterly installments, and may make comparable elections for designated beneficiaries who receive benefits in the event that deferred compensation is not completely paid out upon the death of the participant.

**Incentive Share Deferrals**

Participants may also defer the receipt of all (and not less than all) of the annual award of incentive shares. Distributions will be made by delivery of Kroger common shares within 30 days after the date which is six months after the participant's separation of service.

**Director Stock Ownership Guidelines**

Independent directors are required to own shares equivalent to five times their annual base cash retainer. For more details on the Stock Ownership Guidelines, see page 60.

PX6009-053

## Beneficial Ownership of Common Stock

The following table sets forth the common shares beneficially owned as of April 24, 2023 by Kroger's directors, the NEOs, and the directors and executive officers as a group. The percentage of ownership is based on 723,532,073 of Kroger common shares outstanding on April 24, 2023. Shares reported as beneficially owned include shares held indirectly through Kroger's defined contribution plans and other shares held indirectly, as well as shares subject to stock options exercisable on or before June 23, 2023. Except as otherwise noted, each beneficial owner listed in the table has sole voting and investment power with regard to the common shares beneficially owned by such owner. Unless otherwise indicated, the address of each of the beneficial owners listed below is c/o The Kroger Co., Corporate Secretary, 1014 Vine Street, Cincinnati, OH 45202.

| Name | Amount and Nature of Beneficial Ownership[1] | Options Exercisable on or before June 23, 2023 – included in column (a) |
|---|---|---|
| Stuart W. Aitken[2] | 441,766 | 260,420 |
| Nora A. Aufreiter[3] | 48,543 | — |
| Kevin M. Brown | 11,004 | — |
| Elaine L. Chao[3] | 8,036 | |
| Yael Cosset | 399,835 | 248,377 |
| Anne Gates[3] | 43,125 | — |
| Karen M. Hoguet[4] | 19,552 | — |
| Timothy A. Massa | 506,660 | 311,704 |
| W. Rodney McMullen | 6,353,306 | 2,772,130 |
| Gary Millerchip | 540,043 | 354,620 |
| Clyde R. Moore | 121,423 | — |
| Ronald L. Sargent[3] | 180,871 | — |
| Amanda Sourry | 11,004 | — |
| Mark S. Sutton[3] | 38,452 | — |
| Ashok Vemuri | 24,900 | — |
| Directors and executive officers as a group (22 persons, including those named above) | 9,988,204 | 4,579,577 |

(1) No director or officer owned as much as 1% of Kroger common shares. The directors and executive officers as a group beneficially owned 1.4% of Kroger common shares.

(2) This amount includes 3,018 shares held by Mr. Aitken's spouse. He disclaims beneficial ownership of these shares.

(3) This amount includes incentive share awards that were deferred under the deferred compensation plan for independent directors in the following amounts: Ms. Aufreiter, 10,037; Ms. Chao, 3,952; Ms. Gates, 12,100; Mr. Sargent, 55,960; Mr. Sutton, 6,909.

(4) This amount includes 2,075 shares held by Ms. Hoguet's spouse. She disclaims beneficial ownership of these shares.

PX6009-054

The following table sets forth information regarding the beneficial owners of more than five percent of Kroger common shares as of April 24, 2023 based on reports on Schedule 13G filed with the SEC.

| Name | Address | Amount and Nature of Ownership | Percentage of Class |
|---|---|---|---|
| Berkshire Hathaway Inc. | 3555 Farnam Street Omaha, NE 68131 | 50,000,000[1] | 7.0% |
| BlackRock, Inc. | 55 East 52nd Street New York, NY 10055 | 65,963,885[2] | 9.2% |
| The Vanguard Group | 100 Vanguard Blvd. Malvern, PA 19355 | 82,426,702[3] | 11.51% |

(1) Reflects beneficial ownership by Berkshire Hathaway Inc. as of December 31, 2022, as reported on Schedule 13G filed with the SEC on February 14, 2023, reporting shared voting power with respect to 50,000,000 common shares, and shared dispositive power with regard to 50,000,000 common shares.

(2) Reflects beneficial ownership by BlackRock Inc., as of December 31, 2022, as reported on Amendment No. 15 to Schedule 13G filed with the SEC on January 24, 2023, reporting sole voting power with respect to 59,579,943 common shares, and sole dispositive power with regard to 65,963,885 common shares.

(3) Reflects beneficial ownership by The Vanguard Group as of December 30, 2022, as reported on Amendment No. 8 to Schedule 13G filed with the SEC on February 9, 2023, reporting shared voting power with respect to 931,562 common shares, sole dispositive power of 79,719,502 common shares, and shared dispositive power of 2,707,200 common shares.

## Related Person Transactions

The Board has adopted a written policy requiring that any Related Person Transaction may be consummated or continue only if the Audit Committee approves or ratifies the transaction in accordance with the policy. A "Related Person Transaction" is one (a) involving Kroger, (b) in which one of our directors, nominees for director, executive officers, or greater than five percent shareholders, or their immediate family members, have a direct or indirect material interest; and (c) the amount involved exceeds $120,000 in a fiscal year.

The Audit Committee will approve only those Related Person Transactions that are in, or not inconsistent with, the best interests of Kroger and its shareholders, as determined by the Audit Committee in good faith in accordance with its business judgment. No director may participate in any review, approval, or ratification of any transaction if he or she, or an immediate family member, has a direct or indirect material interest in the transaction.

Where a Related Person Transaction will be ongoing, the Audit Committee may establish guidelines for management to follow in its ongoing dealings with the related person and the Audit Committee will review and assess the relationship on an annual basis to ensure it complies with such guidelines and that the Related Person Transaction remains appropriate.

PX6009-055

## Compensation Discussion and Analysis

This Compensation Discussion and Analysis provides an overview of the elements and philosophy of our executive compensation program as well as how and why the Compensation Committee and our Board of Directors make specific compensation decisions and policies with respect to our Named Executive Officers ("NEOs").

### Executive Summary



**We delivered exceptional performance in 2022.** Kroger achieved exceptional results in 2022 as we executed on our *Leading with Fresh and Accelerating with Digital* strategy, building on record years in 2020 and 2021. We are delivering a fresh, affordable, and seamless shopping experience for our customers, with zero compromise on quality, selection, or convenience. We are delivering on our financial commitments through our strong, resilient Value Creation Model. In 2022, we achieved financial performance results of ID sales, without fuel, of 5.6%, and adjusted FIFO operating profit, including fuel, of $5.1 billion[1].



**Our executive compensation program aligns with long-term shareholder value creation.** 91% of our CEO's target total direct compensation and, on average, 84% of the other NEOs' compensation is at risk and performance-based, tied to achievement of performance targets that are important to our shareholders or our long-term share price performance.



**The annual performance incentive was earned above target reflecting our 2022 performance.** The annual incentive program, based on a grid of identical sales, excluding fuel, and adjusted FIFO operating profit, including fuel, paid out at 192.40% of target. In light of macroeconomic conditions, including inflation, as well as the Compensation Committee's desire to create ongoing alignment with shareholders and reward sustained performance beyond 2022, the Compensation Committee determined to structure the payout to the NEOs as follows: 150% in cash and the remaining 42.4% in restricted stock vesting in one year.



**The long-term performance incentive payout reflects alignment with performance over fiscal years 2020, 2021, and 2022.** Long-term performance unit equity awards granted in 2020 and tied to commitments made to our investors and other stakeholders regarding long-term sales growth, adjusted FIFO operating profit growth, free cash flow generation, our commitment to Fresh, and Relative Total Shareholder Return were earned at 93.75% of target.



**We prioritized investment in our people.** We strive to create a culture of opportunity for nearly 430,000 associates and take seriously our role as a leading employer in the United States. In 2022, we invested more than ever in our associates by continuing to raise our average hourly wage to $18, or over $23, including industry-leading benefits.



**In response to our shareholder feedback, we incorporated an ESG metric focused on diversity and inclusion into our 2022 individual performance management program.** Our core values of Diversity, Equity & Inclusion are incorporated into compensation decisions made for our associates who supervise a team of others, which range from store department leaders through our NEOs. These performance goals are factored into compensation decisions for these leaders, including salary increases and the amount of the annual grant of equity awards.

---

[1]  See pages 27 – 33 of our Annual Report on Form 10-K for the fiscal year ended January 28, 2023, filed with the SEC on March 28, 2023, for a reconciliation of GAAP operating profit to adjusted FIFO operating profit.

PX6009-056

**Our Named Executive Officers for Fiscal 2022**

| Name | Title |
|---|---|
| W. Rodney McMullen | Chairman and Chief Executive Officer |
| Gary Millerchip | Senior Vice President and Chief Financial Officer |
| Stuart W. Aitken | Senior Vice President and Chief Merchandising & Marketing Officer |
| Yael Cosset | Senior Vice President and Chief Information Officer |
| Timothy A. Massa | Senior Vice President and Chief People Officer |

## *Fiscal 2022 Financial and Strategic Performance Highlights*

Driven by our unwavering purpose to Feed the Human Spirit, Kroger achieved exceptional results in 2022 as we executed on our *Leading with Fresh and Accelerating with Digital* strategy, building on record years in 2020 and 2021. Our associates are customer-focused, delivering the products customers want, when and how they want them, with zero compromise on quality, convenience, and selection.

In 2022, we achieved financial performance results of ID sales, without fuel, of 5.6%, and adjusted FIFO operating profit of $5.1 billion. We have built a digital platform that offers a seamless shopping experience, allowing customers to shift effortlessly between store, pickup and delivery solutions. In 2022, we increased delivery sales, opened new customer fulfilment centers, increased digitally engaged households, and grew loyalty as our customers more deeply engaged with personalized coupons and fuel rewards.

Our associates enable our success, and we are committed to investing in theirs by continuing to improve wages, comprehensive benefits, and career development opportunities. We invested approximately $600 million in incremental wages in 2022, for a total of $1.9 billion in incremental investments since 2018.

Continued strategic efforts to streamline our operations allowed us to achieve cost savings greater than $1 billion for the fifth consecutive year to balance these investments without compromising food affordability for our customers across our communities.

As part of our Zero Hunger | Zero Waste social and environmental impact plan, in 2022, we donated nearly 600 million meals to feed families across America.

Our proven go-to-market strategy enables us to successfully navigate many operating environments. We believe that by delivering value for our customers, investing in our associates and serving our communities, we will continue to achieve attractive and sustainable total returns for our shareholders.

### 2022 Advisory Vote to Approve Executive Compensation and Shareholder Engagement

At the 2022 annual meeting, we held our annual advisory vote on executive compensation. Approximately 92% of the votes cast were in favor of the advisory vote. As part of our ongoing dialogue with our shareholders regarding governance matters, in 2022, we requested meetings with 32 shareholders representing 49% of our outstanding shares during proxy season and off-season engagement and 7 shareholders representing 24% of our outstanding shares accepted our invitation to share feedback. Some investors we contacted either did not respond or confirmed that a discussion was not needed at that time.

Conversations in these meetings included discussions about our NEO's compensation program, with our shareholders providing feedback that they appreciated the pay-for-performance structure of our executive pay program. The Compensation Committee considers both the general and specific feedback received from shareholders, and with the guidance of our independent compensation consultant, incorporates that input into pay design.

During shareholder engagement, we specifically discuss our shareholders' perspectives on ESG metrics in executive compensation programs. Our investors are all supportive of companies' decisions to incorporate ESG metrics, but none are prescriptive about how to do so. Our investors share our view that a range of ESG matters are essential to our current and future success, and acknowledge that ESG priorities are embedded into our strategic and operational priorities. Management collects and reports the feedback to the Compensation Committee, and the Committee decided, beginning in 2022, to integrate our core values of Diversity, Equity & Inclusion into compensation decisions made for our associates who supervise a team of others, which range from store department leaders through our NEOs. Specifically, one of several performance goals established for these associates and senior officers relate to improvement in the Diversity, Equity, & Inclusion category score as measured by our annual Associate Insights Survey and active mentorship and development of at least one other associate with a different

PX6009-057

background. These performance goals are factored into compensation decisions for these associates and senior officers, including salary increases and the amount of the annual grant of equity awards, consistent with our program design as described herein.

**2022 Compensation Program Overview**

The fixed and at-risk pay elements of the NEO compensation program are reflected in the following table and charts.

| | Element | Form | Description | |
|---|---|---|---|---|
| **ANNUAL / SHORT-TERM INCENTIVE** | Base Salary | Cash | • Attract, incentivize, retain talented executives<br>• Fixed cash component<br>• Reviewed annually | • No automatic or guaranteed increases<br>• Based on individual performance & experience | **FIXED** |
| | Annual Incentive Plan | Cash Bonus | • Metrics and targets align with annual business goals; payout depends on actual performance against each goal<br>• Rewards and incentivizes Kroger employees, including NEOs, for annual performance on key financial and operational metrics | | **VARIABLE / AT-RISK** |
| **LONG-TERM INCENTIVE** | Performance-Based Equity | Performance Units | • Performance units are equity grants which are "paid out" in Kroger common shares, dependent upon company performance against each goal, at the end of the 3-year performance period<br>• Measures performance on key financial and operational metrics over a 3-year period and payout is subject to a relative TSR modifier<br>• Designed to create shareholder value, foster executive retention, and align NEO and shareholder interests | | |
| | Time-Based Equity | Restricted Stock / Stock Options | • Stock options and restricted stock for NEOs vest ratably over 4 years; exercise price of stock options is closing price on day of grant<br>• Provides direct alignment to stock price appreciation and rewards executives for the achievement of long-term business objectives and providing incentives for the creation of shareholder value | | |

**Fiscal Year 2022 CEO Compensation**

The Compensation Committee establishes Mr. McMullen's target direct compensation such that only 9% of his compensation is fixed. The remaining 91% of target compensation is at-risk, meaning that the actual compensation Mr. McMullen receives will depend on the extent to which the Company achieves the performance metrics set by the Compensation Committee, and with respect to all of the equity vehicles, the future value of Kroger common shares.

The table below compares fiscal 2022 to 2021 target direct compensation. Target total direct compensation is a more accurate reflection of how the Compensation Committee benchmarks and establishes CEO compensation than the disclosure provided in the Summary Compensation Table, which includes a combination of actual base salaries and annual incentive compensation earned in the fiscal year, the grant date fair market value of at-risk equity compensation to be earned in future fiscal years, and the actuarial value of future pension benefits.

Increases to Mr. McMullen's pay elements shown below were based on our independent compensation consultant's examination of pay levels and the Committee's intention to achieve median pay levels among our peer group. Target total compensation, which is the sum of target annual compensation and target long term compensation is positioned around market median.

PX6009-058

*($000s)*

| | | Annual | | Long-Term | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Year | Salary | Target Annual Incentive | Total Annual | Performance Units | Restricted Stock | Stock Options | Total LTI | Target TDC | Increase |
| 2022 | 1,400 | 2,800 | 4,200 | 5,750 | 3,450 | 2,300 | 11,500 | 15,700 | +5.6% |
| 2021 | 1,355 | 2,500 | 3,855 | 5,500 | 3,300 | 2,200 | 11,000 | 14,855 | |

### CEO and Named Executive Officer Target Pay Mix

The amounts used in the charts below are based on 2022 target total direct compensation for the CEO and the average of other NEOs. As illustrated below, 91% of the CEO's target total direct compensation is at-risk. On average, 84% of the other NEOs' compensation is at risk.



*Total exceeds 100% due to rounding.

## Our Compensation Philosophy and Objectives

Our executive compensation philosophy is to attract and retain the best management talent as well as motivate these associates to achieve our business and financial goals. Kroger's incentive plans are designed to reward the actions that lead to long-term value creation. We believe our strategy creates value for shareholders in a manner consistent with Kroger's purpose: To Feed the Human Spirit. The Compensation Committee believes that there is a strong link between our business strategy, the performance metrics in our short-term and long-term incentive programs, and the business results that drive shareholder value.

To achieve our objectives, the Compensation Committee seeks to ensure that compensation is competitive and that there is a direct link between pay and performance. To do so, it is guided by the following principles:

- Compensation must be designed to attract and retain those individuals who are best suited to be an NEO at Kroger.
- A significant portion of pay should be performance-based, with the percentage of total pay tied to performance increasing proportionally with an NEO's level of responsibility.
- Compensation should include incentive-based pay to drive performance, providing superior pay for superior performance, including both a short- and long-term focus.
- Compensation policies should include an opportunity for, and a requirement of, significant equity ownership to align the interests of NEOs and shareholders.
- Components of compensation should be tied to an evaluation of business and individual performance measured against metrics that directly drive our business strategy and progress toward our corporate ESG priorities.
- Compensation plans should provide a direct line of sight to company performance.
- Compensation programs should be aligned with market practices.
- Compensation programs should serve to both motivate and retain talent.

PX6009-059

*Summary of Key Compensation Practices*

| What we do: | What we do not do: |
|---|---|
| ✓ Alignment of pay and performance | ✕ No employment contracts with executive officers |
| ✓ Stock ownership guidelines for executives | ✕ No special severance or change in control programs applicable only to executive officers |
| ✓ Multiple performance metrics under our short- and long-term performance-based plans discourage excessive risk taking and align with our long-term value creation strategy | ✕ No cash component in long-term incentive plans |
| | ✕ No tax gross-up payments for executives |
| ✓ Double-trigger change in control provisions in all equity awards | ✕ No special executive life insurance benefit |
| ✓ Double-trigger change in control provisions in cash severance benefits | ✕ No re-pricing or backdating of stock options without shareholder approval |
| ✓ All long-term compensation is equity-based | ✕ No guaranteed salary increases or bonuses |
| ✓ Engagement of an independent compensation consultant | ✕ No payment of dividends or dividend equivalents until performance units are earned |
| ✓ Robust clawback policy | ✕ No evergreen or reload feature; no shares can be added to stock plan without shareholder approval |
| ✓ Ban on hedging, pledging, and short sales of Kroger securities | |
| ✓ Minimal perquisites | |

**Establishing Each Component of Executive Compensation**

The Compensation Committee recommends, and the independent members of the Board determine, each component of the CEO's compensation. The CEO recommends, and the Compensation Committee determines, each component of the other NEOs' compensation. The Compensation Committee and the Board made changes to compensation in March of 2022. Equity awards were granted in March and salary and annual incentive plan increases were effective April 1, 2022.

The Compensation Committee determines the amount of each NEO's salary, annual cash incentive plan target, and long-term equity compensation by taking into consideration numerous factors including:
- An assessment of individual contribution and performance;
- Benchmarking with comparable positions at peer group companies;
- Level in organization and tenure in role; and
- Internal equity among executives.

The assessment of individual contribution and performance is a qualitative determination, based on the following factors:
- Leadership;
- Contribution to the executive officer group;
- Achievement of established performance objectives;
- Decision-making abilities;
- Performance of the areas or groups directly reporting to the NEO;
- Support of company culture;
- Strategic thinking; and
- Demonstrated commitment to Kroger's Values: Safety, Honesty, Integrity, Respect, Diversity, and Inclusion, including improvement in the DE&I category score as measured by our annual Associate Insights Survey and active mentorship and development of at least one other associate with a different background.

PX6009-060

At the end of each year, individual performance is evaluated based on the NEO's performance objectives listed above, and the results of that evaluation are used in the determination of salary increases and the grant amount of all annual equity awards: restricted stock and stock options, which are time-based, and performance units granted under the long-term incentive plan, which are performance- based.

**Elements of Compensation**

**Salary**

Our philosophy with respect to salary is to provide a sufficient and stable source of fixed cash compensation that is competitive with the market to attract and retain a high caliber leadership team. NEO salaries, effective April 1, 2021 and April 1, 2022 were as follows:

| Name | 2021 Base Salary | 2022 Base Salary |
|------|------------------|------------------|
| W. Rodney McMullen | $1,355,000 | $1,400,000 |
| Gary Millerchip | $750,000 | $825,000 |
| Stuart W. Aitken | $885,000 | $925,000 |
| Yael Cosset | $750,000 | $825,000 |
| Timothy A. Massa | $800,000 | $850,000 |

**2022 Annual Incentive Plan**

The NEOs participate in a corporate performance-based annual cash incentive plan. The value of annual cash incentive awards that the NEOs earn each year is based upon Kroger's overall company performance compared to goals established by the Compensation Committee based on the business plan adopted by the Board of Directors.

A minimum level of performance must be achieved before any payout is earned, while a payout of up to 210% of target incentive potential can be achieved for superior performance on the corporate plan metrics. There are no guaranteed or minimum payouts; if none of the performance goals are achieved, then none of the incentive amount is earned, and no payout is made.

The annual cash incentive plan is designed to encourage decisions and behavior that drive the annual operating results and the long-term success of the Company. Kroger's success is based on a combination of factors, and accordingly the Compensation Committee believes that it is important to encourage behavior that supports multiple elements of our business strategy. The corporate annual cash incentive plan is a broad-based plan used across the Kroger enterprise. Approximately 53,000 associates are eligible to receive incentive payouts based all or in part on the incentive plan described below.

NEO target incentive potentials for fiscal years 2021 and 2022, were as follows:

| Name | 2021 Target Annual Incentive | 2022 Target Annual Incentive |
|------|------------------------------|------------------------------|
| W. Rodney McMullen | $2,500,000 | $2,800,000 |
| Gary Millerchip | $825,000 | $850,000 |
| Stuart W. Aitken | $825,000 | $850,000 |
| Yael Cosset | $825,000 | $850,000 |
| Timothy A. Massa | $650,000 | $775,000 |

PX6009-061

## 2022 Annual Incentive Plan Metrics

| Metric | Rationale for Use |
|---|---|
| Sales and Profit Grid, maximum payout of 200% | |
| ID Sales, excluding Fuel | • Identical Sales ("ID Sales") represent sales, excluding fuel, at our supermarkets that have been open without expansion or relocation for five full quarters, excluding supermarket fuel sales, plus sales growth at all other customer-facing non-supermarket businesses.<br>• We believe that ID Sales are the best measure of real growth of our sales across the enterprise. A key driver of our model is ID Sales growth. |
| Adjusted FIFO Operating Profit, including Fuel | • This financial metric equals gross profit, excluding the LIFO charge, minus OG&A, minus rent, and minus depreciation and amortization.<br>• Adjusted FIFO Operating Profit, including fuel, is a key measure of company success as it tracks our earnings from operations, and it measures our day-to-day operational effectiveness. It is a useful measure to investors because it reflects the revenue and expense that a company can control. |
| Kicker, worth an additional 10% | |
| E-commerce Kicker | • E-commerce sales are key drivers of our overall digital strategy – meeting customers where and how they choose to shop. E-commerce is a key component of our strategic pillar of Seamless.<br>• Up to an additional 10% is earned if Kroger achieves certain pre-determined goals with respect to e-commerce sales. |

Potential payouts under the plan are based on Company performance on two primary metrics, ID Sales, excluding Fuel, and Adjusted FIFO Operating Profit, including Fuel. The performance objectives are shown in the grids below, with payouts interpolated for actual performance between levels.

The goals established by the Compensation Committee were as follows:

### ID Sales, excluding Fuel and Adjusted FIFO Operating Profit, including Fuel

| | | ID Sales, excluding Fuel | | | | |
|---|---|---|---|---|---|---|
| | | 0% | 1.5% | 3.0% | 4.5% | 6.0% |
| Adjusted FIFO Operating Profit, including Fuel ($ in millions) | ≥3,934 | 0 | 14 | 20 | 29 | 40 |
| | ≥4,134 | 20 | 65 | 80 | 95 | 115 |
| | ≥4,334 | 40 | 85 | 100 | 115 | 160 |
| | ≥4,534 | 70 | 105 | 120 | 135 | 180 |
| | ≥4,734 | 110 | 125 | 140 | 170 | 200 |

PX6009-062

**2022 Annual Incentive Plan – Actual Results and Payout Percentage**

| Corporate Plan Metric | 2022 Performance[1] | Payout |
|---|---|---|
| Identical Sales, excluding fuel | 5.62% | 192.40% |
| Adjusted FIFO Operating Profit, including fuel | $5.08B | |
| Ecommerce Total Sales Kicker[2] | | 0% |
| Total Payout | | 192.40% |

(1) See grid above.

(2) Up to an additional 10% would have been earned if Kroger had achieved a certain goal with respect to e-commerce. That challenging goal was established by the Compensation Committee but was not achieved. The goal is not disclosed because it is competitively sensitive.

Following the close of the 2022 fiscal year, the Compensation Committee reviewed Kroger's performance against each of the metrics outlined above and determined the extent to which Kroger achieved those objectives. Our performance compared to the goals established by the Compensation Committee resulted in a payout of 192.40% of the participant's incentive plan target for the NEOs, with the exception of Mr. Aitken.

Mr. Aitken's annual bonus payout equaled 190.98% of his bonus potential because it included the corporate annual plan described above and a team metric as follows. The merchandising team metric measured supermarket ID sales excluding pharmacy and fuel, and supermarket selling gross dollars less shrink dollars for all departments excluding pharmacy and fuel.

| | Payout Percentage | Weight |
|---|---|---|
| Corporate Annual Bonus Plan | 192.40% | 60% |
| Merchandising Team Metric | 188.86% | 40% |
| Total Earned | (192.40% x 0.6) + (188.86% x 0.4%) = 190.98% | |

The Compensation Committee maintains the ability to reduce the annual cash incentive payout for all executive officers, including the NEOs, and the independent directors retain that discretion for the CEO's incentive payout if they determine for any reason that the incentive payouts were not appropriate given their assessment of Company or individual performance. No adjustments were made to the incentive payout amount in 2022. The annual incentive plan is typically an all-cash plan. While performance was achieved at 192.40%, in light of macroeconomic conditions, including inflation, as well as the Compensation Committee's desire to create ongoing alignment with shareholders and reward sustained performance beyond 2022, the Compensation Committee determined to structure the payout to the NEOs as follows: 150% in cash and the remaining 42.4% (41.0% for Mr. Aitken) in restricted stock vesting in one year.

As described above, the corporate annual incentive payout percentage is applied to each NEO's incentive plan target which is determined by the Compensation Committee, and the independent directors in the case of the CEO. The actual amounts of performance-based annual incentive paid to the NEOs for 2022 are reported in the Summary Compensation Table in the "Non-Equity Incentive Plan Compensation" column and the "Stock Awards" column.

**Long-Term Compensation Program**

The Compensation Committee believes in the importance of providing an incentive to the NEOs to achieve the long-term goals established by the Board. As such, a majority of NEO compensation is dependent on the achievement of those goals. Long-term compensation promotes long-term value creation and discourages the over-emphasis of attaining short-term goals at the expense of long-term growth.

The long-term incentive program is structured to be a combination of performance- and time-based compensation that reflects elements of financial and common share performance to provide both retention value and alignment with company performance. The Compensation Committee determined that all long-term compensation would be equity-based as follows: 50% of equity granted under the program would be performance-based and the remaining 50% of equity would be time-based, consisting of 30% in restricted stock and 20% in stock options.

PX6009-063

Each year, NEOs receive grants under the long-term compensation program, which is structured as follows:

- *Performance-Based (50% of NEO long-term target compensation)*
  - Long-term performance-based compensation is provided under a Long-Term Incentive Plan adopted by the Compensation Committee. The Committee adopts a new plan every year, measuring improvement on the Company's long-term goals over successive three-year periods. Accordingly, at any one time there are three plans outstanding, which are summarized below.
  - Under the Long-Term Incentive Plans, NEOs receive grants of equity called performance units. A target number of performance units based on level and individual performance is awarded to each participant at the beginning of the three-year performance period.
  - Payouts under the plan are contingent on the achievement of certain strategic performance and financial measures and incentivize recipients to promote long-term value creation and enhance shareholder wealth by supporting the Company's long-term strategic goals.
  - The payout percentage, based on the extent to which the performance metrics are achieved, is applied to the number of performance units awarded. Then, a modifier based on Relative Total Shareholder Return compared to the S&P 500 is applied, which can increase or decrease the payout.
  - Performance units are paid out in Kroger common shares based on actual performance, along with dividend equivalents for the performance period on the number of issued common shares.
- *Time-Based (50% of NEO long-term target compensation)*
  - Long-term time-based compensation consists of 20% stock options and 30% restricted stock, which are linked to common share performance, creating alignment between the NEOs' and our shareholders' interests. Grants vest ratably over four years.
  - Stock options have no initial value and recipients only realize benefits if the value of our common shares increases following the date of grant, further aligning the NEOs' and our shareholders' interests.

Amounts of long-term compensation awards issued and outstanding for the NEOs are set forth in the Executive Compensation Tables section.

### Summary of Three Long-Term Incentive Plans Outstanding During 2022

With respect to our long-term performance-based compensation, in November 2019, Kroger committed to investors an 8 – 11% Total Shareholder Return (TSR) target over time. The Compensation Committee redesigned plan metrics to align with Kroger's long-term business plans and growth model that we communicated to shareholders. These metrics are the key elements in driving Kroger's TSR.

The Compensation Committee adopts a new Long-Term Incentive Plan each year, which provides for overlapping three-year performance periods. Additional detail regarding each of the three plans is provided below, and a summary of the design of the plans outstanding during 2022 is as follows:

| | 2020 – 2022 LTIP | 2021 – 2023 LTIP | 2022 – 2024 LTIP |
|---|---|---|---|
| **Performance Units and Dividend Equivalents** | Performance units are equity grants which are paid out in Kroger common shares, based on actual performance at the end of the 3-year performance period, along with dividend equivalents for the performance period on the number of issued common shares ultimately earned. | | |
| **Performance Metrics** | • Total Sales without Fuel + Fuel Gallons; <br> • Growth in Adjusted FIFO Operating Profit, including Fuel <br> • Cumulative Adjusted Free Cash Flow; <br> • Fresh Equity metric; and <br> • Relative Total Shareholder Return modifier | | • Total Sales without Fuel + Fuel Gallons; <br> • Value Creation Metric (rTSR) Percentage <br> • Fresh Equity metric; and <br> • Relative Total Shareholder Return modifier |
| **Determination of Payout** | The payout percentage, based on the extent to which the performance metrics are achieved, is applied to number of performance units awarded. | | |
| **Maximum Payout** | 125% | 187.5% | 187.5% |
| **Payout Date** | March 2023 | March 2024 | March 2025 |

PX6009-064

*2020-2022 and 2021-2023 Long-Term Incentive Plan – Metrics*

Both the 2020 – 2022 and the 2021-2023 Long-Term Incentive Plans have the following components which support our long-term business plans, each accounting for 25% of the payout calculation:

| Metric | Rationale for Use | Weighting |
|---|---|---|
| **Total Sales without Fuel + Fuel Gallons** | • This metric represents total revenue dollars without fuel + the number of fuel gallons sold over the three-year term of the plan. It represents the important metric of top line growth of the business from all channels. | 25% |
| **Growth in Adjusted FIFO Operating Profit, including Fuel** | • This financial metric equals gross profit, excluding the LIFO charge, minus OG&A, minus rent, and minus depreciation and amortization.<br>• Adjusted FIFO Operating Profit, including fuel, is a key measure of company success as it tracks our earnings from operations, and it measures our day-to-day operational effectiveness. It is a useful measure to investors because it reflects the revenue and expense that a company can control. It is particularly important to focus on growth of this financial measure over time. | 25% |
| **Cumulative Adjusted Free Cash Flow** | • Adjusted Free Cash Flow is an adjusted free cash flow measure calculated as net cash provided by operating activities minus payments for property and equipment, including payments for lease buyout, plus or minus adjustments for certain items.<br>• It is an important measure for the business because it reflects the cash left over after the company pays for operating expenses and capital expenditures. | 25% |
| **Fresh Equity metric** | • Fresh is a key element of how people decide where to shop. It drives trips and therefore delivers business results. Fresh is the core focus of how we differentiate and drive great engagement with customers and it will be a key driver of our growth. | 25% |

After the calculation of the four metrics above, a modifier based on Relative Total Shareholder Return compared to the S&P 500 will be applied which can increase or decrease the payout, as follows, interpolated for actual results between thresholds:

| TSR Relative to S&P 500 | Modifier |
|---|---|
| 25th percentile | 75% |
| 50th percentile | 100% |
| 75th percentile | 125% |

The payout percentage, as modified by the Relative TSR modifier, will be applied to the number of performance units granted under the plan to determine the payout amount. The maximum payout under the 2020-2022 Long-Term Incentive Plan is 125% and the maximum payout under the 2021-2023 Long Term Incentive Plan is 187.5% as further described below.

PX6009-065

*2020-2022 Long-Term Incentive Plan – Results and Payout*

The results and payout of the 2020-2022 Long-Term Incentive Plan are as follows.

| Metric | Performance | Goal | Payout Percentage |
|---|---|---|---|
| Total Sales without Fuel + Fuel Gallons | $134.3B | $123.6B | 100% |
| Growth in Adjusted FIFO Operating Profit, including Fuel | $5.1B | $3.47B | 100% |
| Cumulative Adjusted Free Cash Flow | $9.6B | $5.7B | 100% |
| Fresh Equity metric | 43.3 | 45.4 | 0% |
| Payout Before Modifier | | | 75% |
| Relative TSR Modifier | 75th Percentile | >50th Percentile | 125% |
| Total Payout | | | 93.75% |

The NEOs were issued the number of Kroger common shares equal to 93.75% of the number of performance units awarded to that executive, along with dividend equivalents for the three-year performance period on the number of issued common shares.

The dividend equivalents paid on common shares earned under the 2020 – 2022 Long-Term Incentive Plan are reported in the "All Other Compensation" column of the Summary Compensation Table and footnote 5 to that table, and the common shares issued under the plan are reported in the 2022 Option Exercises and Stock Vested Table and footnote 2 to that table.

The annual and long-term performance-based compensation awards described herein were made pursuant to our 2019 Long-Term Incentive Plan, which was approved by our shareholders in June 2019, and the 2019 Amended and Restated Long-Term Incentive Plan, which was approved by our shareholders in June 2022.

*Additional Features of the 2021-2023 Long-Term Incentive Plan*

Going into 2021, there were an extraordinary number and degree of unknowns that could have impacted our financial results. The Compensation Committee considered, among other factors, the course of the pandemic, including new COVID variants, availability and outcomes of vaccine programs, continuing sales trends, food at home and food away from home trends, inflation/deflation, and other potential market influencing events. To account for these unknowns, the Compensation Committee designed the 2021 long-term plan with an incremental goal setting approach due to our inability to forecast reliable long-term performance targets against the background of the market uncertainty at the time. The Committee designed the plan to take into account the extraordinary uncertainties going into the three-year plan, while aligning to our identical sales and operating profit growth and productivity improvement goals, all in support of our long-term value creation model. Under the incremental goal setting approach, the plan was designed with clearly defined financial performance goals for 2021, and a mechanism for setting the 2022-2023 goals based on actual 2021 results.

This approach does not change the timing of the payout. The payout for the three-year plan will be calculated following the close of fiscal year 2023 and, if earned, will be paid out to participants in the form of common shares, and corresponding accrued dividend equivalents, in March of 2024.

For the 2021-2023 Long-Term Incentive Plan, the Compensation Committee aligned the plan with market practices, increasing the maximum payout potential on the four metrics from 100% to 150%. The highest payout from the four metrics alone equals 100%. However, the payout may exceed 100%, if for years 2 and 3 of the plan: (1) the Total Sales without Fuel + Fuel Gallons metric, the Growth in Adjusted FIFO Operating Profit, including Fuel, metric, and the Cumulative Adjusted Free Cash Flow metric all achieve 100%, and (2) the 2-year compound annual growth rate of Total Sales without Fuel + Fuel Gallons exceeds 3.5%. The plan payout will increase incrementally from 100%, up to 150% maximum if the 2-year compound annual growth rate on the Total Sales without Fuel + Fuel Gallons metric is 5.0%. With the potential application of the relative TSR modifier, the total maximum payout would be 187.5%.

PX6009-066

*2022 – 2024 Long-Term Incentive Plan Metrics*

     The 2022-2024 Long-Term Incentive Plan metrics have been designed to reflect commitments made to our investors and other stakeholders regarding long-term sales growth, our Value Creation algorithm (through intrinsic Total Shareholder Return, or iTSR) and our commitment to Fresh as a strategic differentiator. The plan also includes a modifier based on our shareholder return relative to the S&P 500 shareholder return.

| Metric | Rationale for Use | Weighting |
|---|---|---|
| Total Sales without Fuel + Fuel Gallons | • This metric represents total revenue dollars without fuel + the number of fuel gallons sold over the three-year term of the plan. It represents the important metric of top line growth of the business from all channels. | 25% |
| Value Creation Metric (iTSR) Percentage | • This financial metric equals Adjusted Earnings per diluted share (EPS) growth plus Dividend Yield. | 50% |
| Fresh Equity metric | • Fresh is a key element of how people decide where to shop. It drives trips and therefore delivers business results. Fresh is the core focus of how we differentiate and drive great engagement with customers and it will be a key driver of our growth. | 25% |

     The highest payout from the three metrics alone equals 100%. However, the payout may exceed 100% if: (1) both the Total Sales without Fuel + Fuel Gallons metric and the iTSR metric achieve 100%, and (2) the 3-year compound annual growth rate of Total Sales without Fuel + Fuel Gallons exceeds 3.5%. The plan payout will increase incrementally from 100%, up to 150% maximum if the 3-year compound annual growth rate on the Total Sales without Fuel + Fuel Gallons metric is 5.0%.

     After the calculation described above, a modifier based on Relative Total Shareholder Return compared to the S&P 500 will be applied, as follows, interpolated for actual results between the 25th percentile and 75th percentile thresholds:

| TSR Relative to S&P 500 | Modifier |
|---|---|
| 25th percentile | 75% |
| 50th percentile | 100% |
| 75th percentile | 125% |

     The payout percentage, as modified by the Relative TSR modifier, will be applied to the number of performance units granted under the plan to determine the payout amount. If all three metrics are achieved at the maximum level and the Relative Total Shareholder Return modifier is maximized, the total plan payout would be 187.5%.

*Stock Options and Restricted Stock*

     Stock options and restricted stock continue to play an important role in rewarding NEOs for the achievement of long-term business objectives and providing incentives for the creation of shareholder value. Awards based on Kroger's common shares are granted annually to the NEOs. Kroger historically has distributed time-based equity awards widely, aligning the interests of associates with interests of shareholders.

     The options permit the holder to purchase Kroger common shares at an option price equal to the closing price of Kroger common shares on the date of the grant. Options are granted only on one of the four dates of Board meetings conducted after Kroger's public release of its quarterly earnings results.

     The Compensation Committee determines the vesting schedule for stock options and restricted stock. During 2022, the Compensation Committee granted to the NEOs stock options and restricted stock, each with a four-year ratable vesting schedule.

     Restricted stock awards are reported in the "Stock Awards" column of the Summary Compensation Table and footnote 1 to the table and the 2022 Grants of Plan Based Awards Table. Stock option awards are reported in the "Option Awards" column of the Summary Compensation Table and the "All other Option Awards" column of the 2022 Grants of Plan Based Awards Table.

PX6009-067

**Retirement and Other Benefits**

Kroger maintains several defined benefit and defined contribution retirement plans for its associates. The NEOs participate in one or more of these plans, as well as one or more excess plans designed to make up the shortfall in retirement benefits created by limitations under the Internal Revenue Code (the "Code") on benefits to highly compensated individuals under qualified plans. Additional details regarding certain retirement benefits available to the NEOs can be found below in footnote 5 to the Summary Compensation Table and the 2022 Pension Benefits Table and the accompanying narrative.

Kroger also maintains an executive deferred compensation plan in which the CEO has elected to participate. This plan is a nonqualified plan under which participants can elect to defer up to 100% of their cash compensation each year. Additional details regarding our nonqualified deferred compensation plans available to the NEOs can be found below in the 2022 Nonqualified Deferred Compensation Table and the accompanying narrative.

Kroger also maintains The Kroger Co. Employee Protection Plan ("KEPP"), which covers all of our management associates who are classified as exempt under the federal Fair Labor Standards Act and certain administrative or technical support personnel who are not covered by a collective bargaining agreement, with at least one year of service. KEPP has a double trigger change in control provision, and it provides for severance benefits and extended Kroger-paid health care, as well as the continuation of other benefits as described in the plan, when an associate is actually or constructively terminated without cause within two years following a change in control of Kroger (as defined in KEPP). Participants are entitled to severance pay of up to 24 months' salary and annual incentive target. The actual amount is dependent upon pay level and years of service. KEPP can be amended or terminated by the Board at any time prior to a change in control.

Stock option and restricted stock grant agreements with award recipients provide that those awards "vest," with options becoming immediately exercisable, and restrictions on restricted stock lapsing upon a change in control as described in the grant agreements, but only if an associate is actually or constructively terminated without cause within two years following a change in control of Kroger (as defined in the grant agreement, and consistent with KEPP).

None of the NEOs are party to an employment agreement.

**Perquisites**

Our NEOs receive limited perquisites as the Compensation Committee does not believe that it is necessary for the attraction or retention of management talent to provide executives a substantial amount of compensation in the form of perquisites.

**Process for Establishing Executive Compensation**

The Compensation Committee of the Board has the primary responsibility for establishing the compensation of our executive officers, including the NEOs, with the exception of the CEO. The Compensation Committee's role regarding the CEO's compensation is to make recommendations to the independent members of the Board; those members of the Board establish the CEO's compensation.

The Compensation Committee directly engaged Korn Ferry as a compensation consultant to advise the Compensation Committee in the design of compensation for executive officers and to advise with respect to the unique circumstances of the 2022 compensation cycle.

Korn Ferry conducted an annual competitive assessment of executive positions at Kroger for the Compensation Committee. The assessment is one of several factors, as described above, on which the Compensation Committee determines compensation. The consultant assessed:

- base salary;

- target performance-based annual cash incentive;

- target annual cash compensation (the sum of salary and annual cash incentive potential);

- long-term incentive compensation, comprised of performance units, stock options and restricted stock; and

- total direct compensation (the sum of target annual cash compensation and long-term compensation).

In addition to the factors identified above, the consultant also reviewed actual payout amounts against the targeted amounts.

PX6009-068

The consultant compared these elements against those of other companies in a group of publicly traded companies selected by the Compensation Committee. For 2022, our peer group consisted of:

| | | |
|---|---|---|
| Albertsons | CVS Health | Sysco |
| AmerisourceBergen | Home Depot | Target |
| Best Buy | Johnson & Johnson | TJX Companies |
| Cardinal Health | Lowe's | Walgreens Boots Alliance |
| Costco Wholesale | Procter & Gamble | Walmart |

The make-up of the compensation peer group is reviewed annually and modified as circumstances warrant. In addition, the Compensation Committee considered supplemental data provided by its independent compensation consultant from "general industry" companies, a representation the Fortune 40, excluding financial services companies. This data provided reference points, particularly for senior executive positions where competition for talent extends beyond the retail sector. The peer group includes a combination of food and drug retailers, other large retailers based on revenue size, and large consumer-facing companies. Median 2022 revenue for the peer group was $119.3 billion, compared to our 2022 revenue of $148.3 billion.

Considering the size of Kroger in relation to other peer group companies, the Compensation Committee believes that salaries paid to our NEOs should be competitively positioned relative to amounts paid by peer group companies for comparable positions. The Compensation Committee also aims to provide an annual cash incentive potential to our NEOs around the market median. Actual payouts may be as low as zero if performance does not meet the baselines established by the Compensation Committee while superior financial performance is rewarded with compensation falling above the median.

The independent members of the Board have the exclusive authority to determine the amount of the CEO's compensation. In setting total compensation, the independent directors consider the median compensation of the peer group's CEOs. With respect to the annual incentive plan, the independent directors make two determinations: (1) the annual cash incentive potential that will be multiplied by the corporate annual cash incentive payout percentage earned that is applicable to the NEOs and (2) the annual cash incentive amount paid to the CEO by retaining discretion to reduce the annual cash incentive percentage payout the CEO would otherwise receive under the formulaic plan. The independent directors also retain discretion to determine the form of payout, to include a portion in equity in place of cash.

The Compensation Committee performs the same function and exercises the same authority as to the other NEOs. In its annual review of compensation for the NEOs, the Compensation Committee:

- Conducts an annual review of all components of compensation, quantifying total compensation for the NEOs including a summary for each NEO of salary; performance-based annual cash incentive; and long-term performance-based equity comprised of performance units, stock options and restricted stock.

- Considers internal pay equity at Kroger to ensure that the CEO is not compensated disproportionately. The Compensation Committee has determined that the compensation of the CEO and that of the other NEOs bears a reasonable relationship to the compensation levels of other executive positions at Kroger taking into consideration performance and differences in responsibilities.

- Reviews a report from the Compensation Committee's compensation consultant reflecting a comprehensive review of each element of pay, both annual and long-term and comparing NEO compensation with that of other companies, including both our peer group of competitors and a larger general industry group, to ensure that the Compensation Committee's objectives of competitiveness are met.

- Takes into account a recommendation from the CEO for salary, annual cash incentive potential and long-term compensation awards for each of the senior officers including the other NEOs. The CEO's recommendation takes into consideration the objectives established by and the reports received by the Compensation Committee as well as his assessment of individual job performance and contribution to our management team.

The Compensation Committee does not make use of a formula, but both qualitatively and quantitatively considers each of the factors identified above in setting compensation.

PX6009-069

## Stock Ownership Guidelines

To more closely align the interests of our officers and directors with your interests as shareholders, the Board has adopted stock ownership guidelines. These guidelines require independent directors, executive officers, and other key executives to acquire and hold a minimum dollar value of Kroger common shares as set forth below:

| Position | Multiple |
|---|---|
| Chief Executive Officer | 5 times base salary |
| President and Chief Operating Officer | 4 times base salary |
| Executive Vice Presidents and Senior Vice Presidents | 3 times base salary |
| Independent Directors | 5 times annual base cash retainer |

All covered individuals are expected to achieve the target level within five years of appointment to their positions. Until the requirements are met, covered individuals, including the NEOs, must hold 100% of common shares issued pursuant to performance units earned, shares received upon the exercise of stock options and upon the vesting of restricted stock, except those necessary to pay the exercise price of the options and/or applicable taxes, and must retain all Kroger common shares unless the disposition is approved in advance by the CEO, or by the Board or Compensation Committee for the CEO.

## Executive Compensation Recoupment Policy (Clawback)

Under the 2019 Amended and Restated Long-Term Incentive Plan (the "2019 Plan"), unless an award agreement provides otherwise, if a participant's employment or service is terminated for cause, or if after termination the Compensation Committee determines either that (i) prior to termination, the participant engaged in an act or omission that would have warranted termination for cause or (ii) after termination, the participant violates any continuing obligation or duty of the participant with respect to Kroger, any gain realized by the participant from the exercise, vesting or payment of any award may be cancelled, forfeited or recouped in the sole discretion of the Committee. Under the 2019 Plan, any gain realized by the participant from the exercise, vesting or payment of any award may also be recouped if, within one year after such exercise, vesting or payment, (i) a participant is terminated for cause, (ii) the Compensation Committee determines that the participant is subject to recoupment pursuant to any Kroger policy, or (iii) after a participant's termination for any reason, the Compensation Committee determines either that (1) prior to termination the participant engaged in an act or omission that would have warranted termination for cause, or (2) after termination the participant violates any continuing obligation or duty of the participant with respect to Kroger. Unless otherwise defined under 2019 Plan award agreement, "cause" has the meaning as defined in The Kroger Co. Employee Protection Plan, as amended from time to time.

Additionally, if an award based on financial statements that are subsequently restated in a way that would decrease the value of such award, the participant will, to the extent not otherwise prohibited by law, upon the written request of Kroger, forfeit and repay to Kroger the difference between what was received and what should have been received based on the accounting restatement, which will be repaid in accordance with any applicable Kroger policy or applicable law, including Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act and any rules or regulations adopted thereunder. We intend our policy to comply with the NYSE listing rules regarding recoupment of incentive compensation when those rules become effective. Kroger also has a recoupment policy, which provides that if a material error of facts results in the payment to an executive officer at the level of Group Vice President or higher of an annual cash incentive or a long-term cash incentive in an amount higher than otherwise would have been paid, as determined by the Compensation Committee, then the officer, upon demand from the Compensation Committee, will reimburse Kroger for the amounts that would not have been paid if the error had not occurred. This recoupment policy applies to those amounts paid by Kroger within 36 months prior to the detection and public disclosure of the error. In enforcing the policy, the Compensation Committee will take into consideration all factors that it deems appropriate, including:

- the materiality of the amount of payment involved;
- the extent to which other benefits were reduced in other years as a result of the achievement of performance levels based on the error;
- individual officer culpability, if any; and
- other factors that should offset the amount of overpayment.

PX6009-070

**Prohibition on Hedging and Pledging**

The Board adopted a policy prohibiting Kroger directors and executive officers from engaging, directly or indirectly, in the pledging of, hedging transactions in, or short sales of, Kroger securities.

**Section 162(m) of the Internal Revenue Code**

Prior to the effective date of the Tax Cuts and Jobs Act of 2017, Section 162(m) of the Code generally disallowed a federal tax deduction to public companies for compensation greater than $1 million paid in any tax year to specified executive officers unless the compensation was "qualified performance-based compensation" under that section. Pursuant to the Tax Cuts and Jobs Act of 2017, the exception for "qualified performance-based compensation" under Section 162(m) of the Code was eliminated with respect to all remuneration in excess of $1 million other than qualified performance-based compensation pursuant to a written binding contract in effect on November 2, 2017 or earlier which was not modified in any material respect on or after such date (the legislation providing for such transition rule, the "Transition Rule").

As a result, performance-based compensation that the Compensation Committee structured with the intent of qualifying as performance-based compensation under Section 162(m) prior to the change in the law may or may not be fully deductible, depending on the application of the Transition Rule. In addition, compensation arrangements structured following the change in law will be subject to the Section 162(m) limitation (without any exception for performance-based compensation). Consistent with its past practice, the Committee will continue to retain flexibility to design compensation programs that are in the best long-term interests of the Company and our shareholders, with deductibility of compensation being one of a variety of considerations taken into account.

**Compensation Committee Report**

The Compensation Committee has reviewed and discussed with Kroger's management the Compensation Discussion and Analysis contained in this proxy statement. Based on its review and discussions with management, the Compensation Committee has recommended to the Board that the Compensation Discussion and Analysis be included in Kroger's proxy statement and incorporated by reference into its Annual Report on Form 10-K.

Compensation Committee:
    Clyde R. Moore, Chair
    Amanda Sourry
    Mark Sutton

PX6009-071

## Executive Compensation Tables

**Summary Compensation Table**

The following table and footnotes provide information regarding the compensation of the NEOs for the fiscal years presented.

| Name and Principal Position | Fiscal Year | Salary ($) | Bonus ($) | Stock Awards ($)[1] | Option Awards ($)[2] | Non-Equity Incentive Plan Compensation ($)[3] | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($)[4] | All Other Compensation ($)[6] | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| W. Rodney McMullen Chairman and Chief Executive Officer | 2022 | 1,388,495 | | 10,367,639 | 2,299,636 | 4,130,769 | 175,750 | 847,554 | 19,209,843 |
| | 2021 | 1,351,358 | | 8,800,023 | 2,199,162 | 4,647,750 | 159,640 | 1,010,797 | 18,168,730 |
| | 2020 | 1,341,060 | 769,231 | 10,900,041 | 2,101,581 | 4,888,929 | 1,795,455 | 577,277 | 22,373,574 |
| Gary Millerchip Senior Vice President and Chief Financial Officer | 2022 | 809,879 | | 3,358,792 | 749,879 | 1,269,231 | | 265,342 | 6,453,123 |
| | 2021 | 726,815 | | 2,800,022 | 699,735 | 1,498,006 | | 261,842 | 5,986,420 |
| | 2020 | 601,050 | 312,426 | 2,498,469 | 540,409 | 1,092,959 | | 122,377 | 5,167,690 |
| Stuart W. Aitken Senior Vice President and Chief Merchandising & Marketing Officer | 2022 | 915,632 | | 3,346,838 | 749,879 | 1,269,231 | | 277,694 | 6,559,274 |
| | 2021 | 878,387 | | 2,800,022 | 699,735 | 1,527,013 | | 300,214 | 6,205,371 |
| | 2020 | 849,484 | 323,077 | 3,010,038 | 540,409 | 1,586,363 | | 177,900 | 6,487,271 |
| Yael Cosset Senior Vice President and Chief Information Officer | 2022 | 809,879 | | 3,358,792 | 749,879 | 1,269,231 | | 267,548 | 6,455,329 |
| | 2021 | 739,685 | | 2,800,022 | 699,735 | 1,498,006 | | 265,342 | 6,002,790 |
| | 2020 | 689,567 | 312,426 | 2,998,473 | 540,409 | 1,338,239 | | 121,168 | 6,000,282 |
| Timothy A. Massa Senior Vice President and Chief People Officer | 2022 | 839,113 | | 2,320,484 | 499,919 | 1,133,654 | | 208,794 | 5,001,964 |
| | 2021 | 780,914 | | 1,760,033 | 439,836 | 1,194,114 | | 210,350 | 4,385,247 |

(1) Amounts reflect the grant date fair value of restricted stock and performance units granted each fiscal year, as computed in accordance with FASB ASC Topic 718. The following table reflects the value of each type of award granted to the NEOs in 2022:

| Name | Restricted Stock | Performance Units |
|---|---|---|
| Mr. McMullen | $4,617,648 | $5,749,991 |
| Mr. Millerchip | $1,483,785 | $1,875,007 |
| Mr. Aitken | $1,471,831 | $1,875,007 |
| Mr. Cosset | $1,483,785 | $1,875,007 |
| Mr. Massa | $1,070,498 | $1,249,986 |

The Restricted Stock values include the annual grant of restricted stock in 2022 as well as the grant in 2023, which was granted with respect to a portion of the 2022 Annual Incentive Plan as further described in the Compensation Discussion and Analysis and in the Grants of Plan Based Awards Table.

The grant date fair value of the performance units reflected in the stock awards column and in the table above is computed based on the probable outcome of the performance conditions as of the grant date. This amount is consistent with the estimate of aggregate compensation cost to be recognized by the Company over the three-year performance period of the award determined as of the grant date under FASB ASC Topic 718, excluding the effect of estimated forfeitures. The assumptions used in calculating the valuations are set forth in Note 11 to the consolidated financial statements in Kroger's Form 10-K for fiscal year 2022.

PX6009-072

Assuming that the highest level of performance conditions is achieved, the aggregate fair value of the 2022 performance unit awards at the grant date is as follows:

| Name | Value of Performance Units Assuming Maximum Performance |
|---|---|
| Mr. McMullen | $10,781,233 |
| Mr. Millerchip | $3,515,638 |
| Mr. Aitken | $3,515,638 |
| Mr. Cosset | $3,515,638 |
| Mr. Massa | $2,343,724 |

(2)    These amounts represent the aggregate grant date fair value of option awards computed in accordance with FASB ASC Topic 718. The assumptions used in calculating the valuations are set forth in Note 11 to the consolidated financial statements in Kroger's Form 10-K for fiscal year 2022.

(3)    Non-equity incentive plan compensation earned for 2022 consists of amounts earned under the 2022 Annual Incentive Plan. The 2022 Annual Incentive Plan was calculated at 192.40.% and was applied to each NEO's annual incentive plan target, except for Mr. Aitken. Mr. Aitken's payout of 190.98% of his annual incentive target was calculated based on the Annual Incentive Plan metrics and the merchandising team metrics. For the 2022 Annual Incentive Plan, the payout consisted of 150% cash and the remainder in restricted shares which are included in footnote (1) above.  See "2022 Annual Incentive Plan Results" in the Compensation Discussion and Analysis for more information on this plan.

(4)    The amount reported consists of preferential earnings on nonqualified deferred compensation, which only applies to Mr. McMullen. The remainder of the NEOs do not participate in a defined benefit pension plan or in a nonqualified deferred compensation plan.

*Change in Pension Value.*  The actuarial present value of Mr. McMullen's accumulated pension benefits decreased by $4,395,890. This change in value of accumulated pension benefits is not included in the Summary Compensation Table because the value decreased. The value of accrued benefits decreased primarily due to the change in value of the benefit due to aging. The Company froze the compensation and service periods used to calculate pension benefits for active associates who participate in the affected pension plans, including Mr. McMullen's, as of December 31, 2019. Beginning January 1, 2020, the affected active associates will no longer accrue additional benefits for future service and eligible compensation received under these plans. Please see the 2022 Pension Benefits section for further information regarding the assumptions used in calculating pension benefits.

*Preferential Earnings on Nonqualified Deferred Compensation.*  Mr. McMullen participates in The Kroger Co. Executive Deferred Compensation Plan (the "Deferred Compensation Plan") and received preferential earnings of $175,750. Under the plan, deferred compensation earns interest at a rate representing Kroger's cost of ten-year debt, as determined by the CFO, and approved by the Compensation Committee prior to the beginning of each deferral year. For each participant, a separate deferral account is created each year and the interest rate established for that year is applied to that deferral account until the deferred compensation is paid out. If the interest rate established by Kroger for a particular year exceeds 120% of the applicable federal long-term interest rate that corresponds most closely to the plan rate, the amount by which the plan rate exceeds 120% of the corresponding federal rate is deemed to be above-market or preferential. For each of the deferral accounts in which the plan rate is deemed to be above-market, Kroger calculates the amount by which the actual annual earnings on the account exceed what the annual earnings would have been if the account earned interest at 120% of the corresponding federal rate, and discloses those amounts as preferential earnings.

(5)    Amounts reported in the "All Other Compensation" column for 2022 include Company contributions to defined contribution retirement plans, dividend equivalents paid on earned performance units, and dividends paid on unvested restricted stock. In 2022, the total amount of perquisites and personal benefits for each of the NEOs was less than $10,000. The following table identifies the value of each element of All Other Compensation:

PX6009-073

| Name | Retirement Plan Contributions[a] | Payment of Dividend Equivalents on Earned Performance Units | Dividends Paid on Unvested Restricted Stock |
|---|---|---|---|
| Mr. McMullen | $ 195,500 | $ 405,648 | $ 246,406 |
| Mr. Millerchip | $ 89,457 | $ 104,310 | $ 71,575 |
| Mr. Aitken | $ 99,188 | $ 104,310 | $ 74,196 |
| Mr. Cosset | $ 90,407 | $ 104,310 | $ 72,831 |
| Mr. Massa | $ 85,923 | $ 77,267 | $ 45,604 |

(a)  *Retirement plan contributions.*  The Company makes automatic and matching contributions to NEOs' accounts under the applicable defined contribution plan on the same terms and using the same formulas as other participating associates. The Company also makes contributions to NEOs' accounts under the applicable defined contribution plan restoration plan, which is intended to make up the shortfall in retirement benefits caused by the limitations on benefits to highly compensated individuals under the defined contribution plans in accordance with the Code.

## 2022 Grants of Plan-Based Awards

The following table provides information about equity and non-equity incentive awards granted to the NEOs in 2022.

| Name | Grant Date | Estimated Possible Payouts Under Non-Equity Incentive Plan Awards | | Estimated Future Payouts Under Equity Incentive Plan Awards | | All Other Stock Awards: Number of Shares of Stock or Units (#)[3] | All Other Option Awards: Number of Securities Underlying Options (#)[4] | Exercise or Base Price of Option Awards ($/Sh) | Grant Date Fair Value of Stock and Option Awards |
|---|---|---|---|---|---|---|---|---|---|
| | | Target ($)[1] | Maximum ($)[1] | Target (#)[2] | Maximum (#)[2] | | | | |
| W. Rodney McMullen | | 2,800,000 | 5,880,000 | | | | | | |
| | 3/10/2022 | | | | | 60,431 | | | 3,450,006 |
| | 3/10/2022 | | | | | | 142,858 | $57.09 | 2,299,636 |
| | 3/10/2022 | | | 100,718 | 188,846 | | | | 5,749,991 |
| | 3/9/2023 | | | | | 24,712 | | | 1,167,642 |
| Gary Millerchip | | 850,000 | 1,785,000 | | | | | | |
| | 3/10/2022 | | | | | 19,706 | | | 1,125,016 |
| | 3/10/2022 | | | | | | 46,584 | $57.09 | 749,879 |
| | 3/10/2022 | | | 32,843 | 61,581 | | | | 1,875,007 |
| | 3/9/2023 | | | | | 7,593 | | | 358,769 |
| Stuart W. Aitken | | 850,000 | 1,785,000 | | | | | | |
| | 3/10/2022 | | | | | 19,706 | | | 1,125,016 |
| | 3/10/2022 | | | | | | 46,584 | $57.09 | 749,879 |
| | 3/10/2022 | | | 32,843 | 61,581 | | | | 1,875,007 |
| | 3/9/2023 | | | | | 7,340 | | | 346,815 |
| Yael Cosset | | 850,000 | 1,785,000 | | | | | | |
| | 3/10/2022 | | | | | 19,706 | | | 1,125,016 |
| | 3/10/2022 | | | | | | 46,584 | $57.09 | 749,879 |
| | 3/10/2022 | | | 32,843 | 61,581 | | | | 1,875,007 |
| | 3/9/2023 | | | | | 7,593 | | | 358,769 |
| Timothy A. Massa | | 775,000 | 1,627,500 | | | | | | |
| | 3/10/2022 | | | | | 13,138 | | | 750,048 |
| | 3/10/2022 | | | | | | 31,056 | $57.09 | 499,919 |
| | 3/10/2022 | | | 21,895 | 41,053 | | | | 1,249,986 |
| | 3/9/2023 | | | | | 6,782 | | | 320,450 |

PX6009-074

(1)  These amounts relate to the 2022 performance-based annual incentive plan. The amount listed under "Target" represents the annual incentive potential of the NEO. By the terms of the plan, payouts are limited to no more than 210% of a participant's annual incentive potential; accordingly, the amount listed under "Maximum" is 210% of that officer's annual incentive potential amount. The amounts actually earned under this plan were paid out in March 2023; are described in the Compensation Discussion and Analysis; and are included in the Summary Compensation Table for 2022 in the "Non-Equity Incentive Plan Compensation" column and the "Stock Awards" column, and described in footnotes 1 and 3 to that table. See "2022 Annual Cash Incentive Plan" in CD&A for more information about the program for 2022.

(2)  These amounts represent performance units awarded under the 2022 Long-Term Incentive Plan, which covers performance during fiscal years 2022, 2023, and 2024. The amount listed under "Maximum" represents the maximum number of common shares that can be earned by the NEO under the award or 187.5% of the target amount. This amount is consistent with the estimate of aggregate compensation cost to be recognized by the Company over the three-year performance period of the award determined as of the grant date under FASB ASC Topic 718, excluding the effect of estimated forfeitures. The grant date fair value reported in the last column is based on the probable outcome of the performance conditions as of the grant date. The aggregate grant date fair value of these awards is included in the Summary Compensation Table for 2022 in the "Stock Awards" column and described in footnote 1 to that table.

(3)  These amounts represent the number of shares of restricted stock granted in 2022 as well as the number of shares of restricted stock granted in 2023 with respect to a portion of the 2022 Annual Incentive Plan. The aggregate grant date fair value reported in the last column is calculated in accordance with FASB ASC Topic 718. The aggregate grant date fair value of these awards is included in the Summary Compensation Table for 2022 in the "Stock Awards" column and described in footnote 1 to that table.

(4)  These amounts represent the number of stock options granted in 2022. Options are granted with an exercise price equal to the closing price of Kroger common shares on the grant date. The aggregate grant date fair value reported in the last column is calculated in accordance with FASB ASC Topic 718. The aggregate grant date fair value of these awards is included in the Summary Compensation Table for 2022 in the "Option Awards" column and described in footnote 2 to that table.


The Compensation Committee, and the independent members of the Board in the case of the CEO, established the incentive potential amounts for the performance-based annual incentive awards (shown in this table as "Target") and the number of performance units awarded for the long-term incentive awards (shown in this table as "Target"). Amounts are payable to the extent that Kroger's actual performance meets specific performance metrics established by the Compensation Committee at the beginning of the performance period. There are no guaranteed or minimum payouts; if none of the performance metrics are achieved, then none of the award is earned and no payout is made. As described in the CD&A, actual earnings under the performance-based annual incentive plan may exceed the target amount if the Company's performance exceeds the performance goals, but are limited to 210% of the target amount. The potential values for performance units awarded under the 2022-2024 Long-Term Incentive Plan are more particularly described in the CD&A.

The annual restricted stock and nonqualified stock options awards granted to the NEOs vest in equal amounts on each of the first four anniversaries of the grant date, so long as the officer remains a Kroger associate, except for the restricted stock granted in March 2023 with respect to a portion of the 2022 Annual Incentive Plan which vests on the first anniversary of the grant date. Any dividends declared on Kroger common shares are payable on unvested restricted stock.

PX6009-075

## 2022 Outstanding Equity Awards at Fiscal Year-End

The following table provides information about outstanding equity-based incentive compensation awards for the NEOs as of the end of 2022. The vesting schedule for each award is described in the footnotes to this table. The market value of unvested restricted stock and unearned performance units is based on the closing price of Kroger's common shares of $45.05 on January 27, 2023, the last trading day of fiscal 2022.

| | Option Awards | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|
| Name | Number of Securities Underlying Unexercised Options Exercisable (#) | Number of Securities Underlying Unexercised Options Unexercisable (#) | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested ($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($) |
| W. Rodney McMullen | 194,880 | | $18.88 | 7/15/2023 | 31,819[6] | $1,433,446 | | |
| | 300,000 | | $24.67 | 7/15/2024 | 54,087[7] | $2,436,619 | | |
| | 235,415 | | $38.33 | 7/15/2025 | 70,836[8] | $3,191,162 | | |
| | 358,091 | | $37.48 | 7/13/2026 | 60,431[9] | $2,722,417 | | |
| | 573,127 | | $22.92 | 7/13/2027 | | | 118,060[12] | $5,644,448 |
| | 349,293 | | $28.05 | 7/13/2028 | | | 100,718[13] | $4,841,514 |
| | 261,194 | 87,065[1] | $24.75 | 3/14/2029 | | | | |
| | 164,577 | 164,577[2] | $29.12 | 3/12/2030 | | | | |
| | 65,243 | 195,730[3] | $34.94 | 3/11/2031 | | | | |
| | | 142,858[4] | $57.09 | 3/10/2032 | | | | |
| Gary Millerchip | 9,600 | | $24.67 | 7/15/2024 | 6,061[6] | $273,048 | | |
| | 13,992 | | $38.33 | 7/15/2025 | 5,945[10] | $267,822 | | |
| | 27,972 | | $37.48 | 7/13/2026 | 13,908[7] | $626,555 | | |
| | 34,905 | | $22.92 | 7/13/2027 | 22,539[8] | $1,015,382 | | |
| | 30,251 | | $28.05 | 7/13/2028 | 19,706[9] | $887,755 | | |
| | 66,335 | 16,584[1] | $24.75 | 3/14/2029 | | | 37,565[12] | $1,795,981 |
| | 38,337 | 12,779[5] | $22.08 | 7/15/2029 | | | 32,843[13] | $1,578,763 |
| | 42,320 | 42,320[2] | $29.12 | 3/12/2030 | | | | |
| | 20,759 | 62,278[3] | $34.94 | 3/11/2031 | | | | |
| | | 46,584[4] | $57.09 | 3/10/2032 | | | | |
| Stuart W. Aitken | 11,149 | | $22.92 | 7/13/2027 | 7,576[6] | $341,299 | | |
| | 33,124 | | $28.05 | 7/13/2028 | 13,908[7] | $626,555 | | |
| | 78,773 | 20,730[1] | $24.75 | 3/14/2029 | 5,127[11] | $230,971 | | |
| | 42,320 | 42,320[2] | $29.12 | 3/12/2030 | 22,539[8] | $1,015,382 | | |
| | 20,759 | 62,278[3] | $34.94 | 3/11/2031 | 19,706[9] | $887,755 | | |
| | | 46,584[4] | $57.09 | 3/10/2032 | | | 37,565[12] | $1,795,981 |
| | | | | | | | 32,843[13] | $1,578,763 |
| Yael Cosset | 10,611 | | $28.83 | 3/9/2027 | 6,061[6] | $273,048 | | |
| | 8,704 | | $22.92 | 7/13/2027 | 13,908[7] | $626,555 | | |
| | 29,499 | | $28.05 | 7/13/2028 | 5,127[11] | $230,971 | | |
| | 66,335 | 16,584[1] | $24.75 | 3/14/2029 | 22,539[8] | $1,015,382 | | |
| | 42,320 | 42,320[2] | $29.12 | 3/12/2030 | 19,706[9] | $887,755 | | |
| | 20,759 | 62,278[3] | $34.94 | 3/11/2031 | | | 37,565[12] | $1,795,981 |
| | | 46,584[4] | $57.09 | 3/10/2032 | | | 32,843[13] | $1,578,763 |

PX6009-076

| Timothy A. Massa | | | | | | | |
|---|---|---|---|---|---|---|---|
| 46,000 | | $24.67 | 7/15/2024 | 4,546[6] | $204,797 | | |
| 29,970 | | $38.33 | 7/15/2025 | 10,303[7] | $464,150 | | |
| 25,889 | | $37.48 | 7/13/2026 | 14,168[8] | $638,268 | | |
| 45,065 | | $22.92 | 7/13/2027 | 13,138[9] | $591,867 | | |
| 40,561 | | $28.05 | 7/13/2028 | | | 23,612[12] | $1,128,891 |
| 53,898 | 12,438[1] | $24.75 | 3/14/2029 | | | 21,895[13] | $1,052,493 |
| 31,348 | 31,348[2] | $29.12 | 3/12/2030 | | | | |
| 13,048 | 39,147[5] | $34.94 | 3/11/2031 | | | | |
| | 31,056[4] | $57.09 | 3/10/2032 | | | | |

(1) Stock options vest on 3/14/2023.
(2) Stock options vest in equal amounts on 3/12/2023 and 3/12/2024.
(3) Stock options vest in equal amounts on 3/11/2023, 3/11/2024, and 3/11/2025.
(4) Stock options vest in equal amounts on 3/10/2023, 3/10/2024, 3/10/2025, and 3/10/2026.
(5) Stock options vest on 7/15/2023.
(6) Restricted stock vests on 3/14/2023.
(7) Restricted stock vests in equal amounts on 3/12/2023 and 3/12/2024.
(8) Restricted stock vests in equal amounts on 3/11/2023, 3/11/2024, and 3/11/2025.
(9) Restricted stock vests in equal amounts on 3/10/2023, 3/10/2024, 3/10/2025, and 3/10/2026.
(10) Restricted stock vests on 7/15/2023.
(11) Restricted stock vests on 9/17/2023.
(12) Performance units granted under the 2021 long-term incentive plan are earned as of the last day of fiscal 2023, to the extent performance conditions are achieved. Because the awards earned are not currently determinable, in accordance with SEC rules, the number of units and the corresponding market value reflect a representative amount based on performance through 2022, including cash payments equal to projected dividend equivalent payments.
(13) Performance units granted under the 2022 long-term incentive plan are earned as of the last day of fiscal 2024, to the extent performance conditions are achieved. Because the awards earned are not currently determinable, in accordance with SEC rules, the number of units and the corresponding market value reflect a representative amount based on performance in 2022, including cash payments equal to projected dividend equivalent payments.

## 2022 Option Exercises and Stock Vested

The following table provides information regarding 2022 stock options exercised, restricted stock vested, and common shares issued pursuant to performance units earned under long-term incentive plans.

| | Option Awards[1] | | Stock Awards[2] | |
|---|---|---|---|---|
| Name | Number of Shares Acquired on Exercise (#) | Value Realized on Exercise ($) | Number of Shares Acquired on Vesting (#) | Value Realized on Vesting ($) |
| W. Rodney McMullen | 194,880 | 8,661,442 | 376,876 | 19,160,902 |
| Gary Millerchip | — | — | 87,809 | 4,438,529 |
| Stuart W. Aitken | 101,747 | 2,768,087 | 90,240 | 4,566,794 |
| Yael Cosset | 73,566 | 2,079,679 | 90,012 | 4,550,119 |
| Timothy A. Massa | 16,000 | 627,275 | 65,961 | 3,342,585 |

(1) Stock options have a ten-year life and expire if not exercised within that ten-year period. The value realized on exercise is the difference between the exercise price of the option and the closing price of Kroger's common shares on the exercise date.

67

(2)  The Stock Awards columns include vested restricted stock and earned performance units, as follows:

| Name | Vested Restricted Stock | | Earned Performance Units | |
|---|---|---|---|---|
| | Number of Shares | Value Realized | Number of Shares | Value Realized |
| W. Rodney McMullen | 207,856 | $11,174,707 | 169,020 | $7,986,195 |
| Gary Millerchip | 44,346 | $2,384,902 | 43,463 | $2,053,627 |
| Stuart W. Aitken | 46,777 | $2,513,167 | 43,463 | $2,053,627 |
| Yael Cosset | 46,549 | $2,496,492 | 43,463 | $2,053,627 |
| Timothy A. Massa | 33,766 | $1,821,371 | 32,195 | $1,521,214 |

*Restricted stock.*  The table includes the number of shares acquired upon vesting of restricted stock and the value realized on the vesting of restricted stock, based on the closing price of Kroger common shares on the vesting date.

*Performance Units.*  Participants in the 2020-2022 Long-Term Incentive Plan were awarded performance units that were earned based on performance criteria established by the Compensation Committee as described in "2020-2022 Long-Term Incentive Plan — Results and Payout" in the CD&A. Actual payouts were based on the level of performance achieved and were paid in common shares. The number of common shares issued, and the value realized based on the closing price of Kroger common shares of $47.25 on March 9, 2023, the date of deemed delivery of the shares, are reflected in the table above.

## 2022 Pension Benefits

The following table provides information regarding pension benefits for the NEOs as of the last day of fiscal 2022. Only Mr. McMullen participates in a pension plan.

| Name | Plan Name | Number of Years Credited Service (#)[1] | Present Value of Accumulated Benefit ($)[2] | Payments during Last fiscal year ($) |
|---|---|---|---|---|
| W. Rodney McMullen | Pension Plan | 34 | 1,610,951 | — |
| | Excess Plan | 34 | 18,009,437 | — |
| Gary Millerchip | Pension Plan | — | — | — |
| | Excess Plan | — | — | — |
| Stuart W. Aitken | Pension Plan | — | — | — |
| | Excess Plan | — | — | — |
| Yael Cosset | Pension Plan | — | — | — |
| | Excess Plan | — | — | — |
| Timothy A. Massa | Pension Plan | — | — | — |
| | Excess Plan | — | — | — |

(1)  In 2018, the Company froze the service periods used to calculate pension benefits and thus, Mr. McMullen's number of years of credited service is less than his actual 44 years of service.

(2)  The discount rate used to determine the present values was 4.89% for The Kroger Consolidated Retirement Benefit Plan Spin Off (the "Pension Plan") and 4.92% for The Kroger Co. Consolidated Retirement Excess Benefit Plan (the "Excess Plan"), which are the same rates used at the measurement date for financial reporting purposes. Additional assumptions used in calculating the present values are set forth in Note 14 to the consolidated financial statements in Kroger's 10-K for fiscal year 2022.

PX6009-078

*Pension Plan and Excess Plan*

In 2022, Mr. McMullen was a participant in the Pension Plan, which is a qualified defined benefit pension plan. Mr. McMullen also participates in the Excess Plan, which is a nonqualified deferred compensation plan as defined in Section 409A of the Code. The purpose of the Excess Plan is to make up the shortfall in retirement benefits caused by the limitations on benefits to highly compensated individuals under the qualified defined benefit pension plans in accordance with the Code.

Although participants generally receive credited service beginning at age 21, certain participants in the Pension Plan and the Excess Plan who commenced employment prior to 1986, including Mr. McMullen, began to accrue credited service after attaining age 25 and one year of service. The Pension Plan and the Excess Plan generally determine accrued benefits using a cash balance formula but retain benefit formulas applicable under prior plans for certain "grandfathered participants" who were employed by Kroger on December 31, 2000. Mr. McMullen is eligible for these grandfathered benefits.

*Grandfathered Participants*

Benefits for grandfathered participants are determined using formulas applicable under prior plans, including the Kroger formula covering service to The Kroger Co. As a "grandfathered participant," Mr. McMullen will receive benefits under the Pension Plan and the Excess Plan, determined as follows:

- $1\frac{1}{2}$% times years of credited service multiplied by the average of the highest five years of total earnings (base salary and annual cash incentive) during the last ten calendar years of employment, reduced by $1\frac{1}{4}$% times years of credited service multiplied by the primary social security benefit;

- normal retirement age is 65; and

- unreduced benefits are payable beginning at age 62.

In 2018, we announced changes to these company-sponsored pension plans. The Company froze the compensation and service periods used to calculate pension benefits for active associates who participate in the affected pension plans, including the NEO participants, as of December 31, 2019. Beginning January 1, 2020, the affected active associates no longer accrue additional benefits for future service and eligible compensation received under these plans.

## 2022 Nonqualified Deferred Compensation

The following table provides information on nonqualified deferred compensation for the NEOs for 2022. Only Mr. McMullen participates in a nonqualified deferred compensation plan.

| Name | Executive Contributions in Last FY | Aggregate Earnings in Last FY[1] | Aggregate Balance at Last FYE[2] |
|---|---|---|---|
| W. Rodney McMullen | — | $895,310 | $14,106,653 |
| Gary Millerchip | — | — | — |
| Stuart W. Aitken | — | — | — |
| Yael Cosset | — | — | — |
| Timothy A. Massa | — | — | — |

(1) These amounts include the aggregate earnings on all accounts for each NEO, including any above-market or preferential earnings. The following amounts earned in 2022 are deemed to be preferential earnings and are included in the "Change in Pension Value and Nonqualified Deferred Compensation Earnings" column of the Summary Compensation Table for 2022: Mr. McMullen, $175,750.

(2) The following amounts in the Aggregate Balance column were reported in the Summary Compensation Tables covering fiscal years 2006 – 2021: Mr. McMullen, $4,012,771.

*Executive Deferred Compensation Plan*

Mr. McMullen participates in the Deferred Compensation Plan, which is a nonqualified deferred compensation plan. Participants may elect to defer up to 100% of the amount of their salary that exceeds the sum of the FICA wage base and pre-tax insurance and other Code Section 125 plan deductions, as well as up to 100% of their annual and long-term cash incentive compensation. Kroger does not match any deferral or provide other contributions. Deferral account amounts are credited with interest at the rate representing Kroger's cost of ten-year debt as determined by Kroger's CFO and approved by the Compensation Committee prior to the beginning of each deferral year. The interest rate established for deferral amounts for each deferral year will be applied to those deferral

PX6009-079

amounts for all subsequent years until the deferred compensation is paid out. Participants can elect to receive lump sum distributions or quarterly installments for periods up to ten years. Participants also can elect between lump sum distributions and quarterly installments to be received by designated beneficiaries if the participant dies before distribution of deferred compensation is completed.

Participants may not withdraw amounts from their accounts until they leave Kroger, except that Kroger has discretion to approve an early distribution to a participant upon the occurrence of an unforeseen emergency. Participants who are "specified associates" under Section 409A of the Code, which includes the NEOs, may not receive a post-termination distribution for at least six months following separation. If the associate dies prior to or during the distribution period, the remainder of the account will be distributed to his or her designated beneficiary in lump sum or quarterly installments, according to the participant's prior election.

## Potential Payments upon Termination or Change in Control

Kroger does not have employment agreements that provide for payments to the NEOs in connection with a termination of employment or a change in control of Kroger. However, KEPP and award agreements for stock options, restricted stock and performance units provide for certain payments and benefits to participants, including the NEOs, in the event of a termination of employment or a change in control of Kroger, as defined in the applicable plan or agreement. Our pension plans and nonqualified deferred compensation plan also provide for certain payments and benefits to participants in the event of a termination of employment, as described above in the 2022 Pension Benefits section and the 2022 Nonqualified Deferred Compensation section, respectively.

## The Kroger Co. Employee Protection Plan

KEPP applies to all management associates who are classified as exempt under the federal Fair Labor Standards Act and to certain administrative or technical support personnel who are not covered by a collective bargaining agreement, with at least one year of service, including the NEOs. KEPP provides severance benefits when a participant's employment is terminated actually or constructively within two years following a change in control of Kroger, as defined in KEPP. The actual amount of the severance benefit is dependent on pay level and years of service. Exempt associates, including the NEOs, are eligible for the following benefits:

- a lump sum severance payment equal to up to 24 months of the participant's annual base salary and target annual incentive potential;

- a lump sum payment equal to the participant's accrued and unpaid vacation, including banked vacation;

- continued medical and dental benefits for up to 24 months and continued group term life insurance coverage for up to six months; and

- up to $10,000 as reimbursement for eligible outplacement expenses.

In the event that any payments or benefits received or to be received by an eligible associate in connection with a change in control or termination of employment (whether pursuant to KEPP or any other plan, arrangement or agreement with Kroger or any person whose actions result in a change in control) would constitute parachute payments within the meaning of Section 280G of the Code and would be subject to the excise tax under Section 4999 of the Code, then such payments and benefits will either be (i) paid in full or (ii) reduced to the minimum extent necessary to ensure that no portion of such payments or benefits will be subject to the excise tax, whichever results in the eligible associate receiving the greatest aggregate amount on an after-tax basis.

PX6009-080

*Long-Term Incentive Awards*

The following table describes the treatment of long-term incentive awards following a termination of employment or change in control of Kroger, as defined in the applicable agreement. In each case, the continued vesting, exercisability or eligibility for the incentive awards will end if the participant provides services to a competitor of Kroger.

| Triggering Event | Stock Options | Restricted Stock | Performance Units |
|---|---|---|---|
| **Involuntary Termination** | Forfeit all unvested options. Previously vested options remain exercisable for the shorter of one year after termination or the remainder of the original 10-year term | Forfeit all unvested shares | Forfeit all rights to units for which the three-year performance period has not ended |
| **Voluntary Termination/Retirement**<br>• Prior to minimum age and five years of service[1] | Forfeit all unvested options. Previously vested options remain exercisable for the shorter of one year after termination or the remainder of the original 10-year term | Forfeit all unvested shares | Forfeit all rights to units for which the three-year performance period has not ended |
| **Voluntary Termination/ Retirement**<br>• After minimum age and five years of service[1] | Unvested options held greater than one year continue vesting on the original schedule. All options are exercisable for remainder of the original 10-year term | Unvested shares held greater than one year continue vesting on the original schedule | Pro rata portion[2] of units earned based on performance results over the full three-year period |
| **Death** | Unvested options are immediately vested. All options are exercisable for the remainder of the original 10-year term | Unvested shares immediately vest | Pro rata portion[2] of units earned based on performance results through the end of the fiscal year in which death occurs. Award will be paid following the end of such fiscal year |
| **Disability** | Unvested options are immediately vested. All options are exercisable for remainder of the original 10-year term | Unvested shares immediately vest | Pro rata portion[2] of units earned based on performance results over the full three-year period |
| **Change in Control[3]**<br>• For awards prior to 2019 | Unvested options are immediately vested and exercisable | Unvested shares immediately vest | 50% of the units granted at the beginning of the performance period earned immediately |
| **Change in Control[3]**<br>• For awards in March 2019 and thereafter | Unvested options only vest and become exercisable upon an actual or constructive termination of employment within two years following a change in control | Unvested shares only vest upon an actual or constructive termination of employment within two years following a change in control | 50% of the units granted at the beginning of the performance period earned upon an actual or constructive termination of employment within two years following a change in control |

(1)  The minimum age requirement is age 62 for stock options and restricted stock and age 55 for performance units.

(2)  The prorated amount is equal to the number of weeks of active employment during the performance period divided by the total number of weeks in the performance period.

(3)  These benefits are payable upon an actual or constructive termination of employment within two years after a change in control, as defined in the applicable agreements.

*Quantification of Payments upon Termination or Change in Control*

The following table provides information regarding certain potential payments that would have been made to the NEOs if the triggering event occurred on the last day of the fiscal year, January 28, 2023, given compensation, age and service levels as of that date and, where applicable, based on the closing market price per Kroger common share on the last trading day of the fiscal year ($45.05 on January 27, 2023). Amounts actually received upon the occurrence of a triggering event will vary based on factors such as the timing during the year of such event, the market price of Kroger common shares, and the officer's age, length of service and compensation level.

PX6009-081

| Name | Involuntary Termination | Voluntary Termination/ Retirement | Death | Disability | Change in Control without Termination | Change in Control with Termination |
|---|---|---|---|---|---|---|
| **W. Rodney McMullen** | | | | | | |
| Accrued and Banked Vacation | $638,750 | $638,750 | $638,750 | $638,750 | $638,750 | $638,750 |
| Severance | – | – | – | – | – | $8,400,000 |
| Continued Health and Welfare Benefits[1] | – | – | – | – | – | $49,101 |
| Stock Options[2] | $0 | $0 | $6,367,962 | $6,367,962 | $0 | $6,367,962 |
| Restricted Stock[3] | $0 | $0 | $9,783,644 | $9,783,644 | $0 | $9,783,644 |
| Performance Units[4] | $0 | $5,058,176 | $5,058,176 | $5,058,176 | $0 | $5,814,401 |
| Executive Group Life Insurance | – | – | $2,000,000 | – | – | – |
| **Gary Millerchip** | | | | | | |
| Accrued and Banked Vacation | $0 | $0 | $0 | $0 | $0 | $0 |
| Severance | – | – | – | – | – | $3,210,432 |
| Continued Health and Welfare Benefits[1] | – | – | – | – | – | $57,269 |
| Stock Options[2] | $0 | $0 | $1,933,978 | $1,933,978 | $0 | $1,933,978 |
| Restricted Stock[3] | $0 | $0 | $3,070,563 | $3,070,563 | $0 | $3,070,563 |
| Performance Units[4] | $0 | $0 | $1,621,380 | $1,621,380 | $0 | $1,867,976 |
| Executive Group Life Insurance | – | – | $1,237,500 | – | – | – |
| **Stuart W. Aitken** | | | | | | |
| Accrued and Banked Vacation | $0 | $0 | $0 | $0 | $0 | $0 |
| Severance | – | – | – | – | – | $3,550,008 |
| Continued Health and Welfare Benefits[1] | – | – | – | – | – | $59,895 |
| Stock Options[2] | $0 | $0 | $1,724,608 | $1,724,608 | $0 | $1,724,608 |
| Restricted Stock[3] | $0 | $0 | $3,101,963 | $3,101,963 | $0 | $3,101,963 |
| Performance Units[4] | $0 | $0 | $1,621,380 | $1,621,380 | $0 | $1,867,976 |
| Executive Group Life Insurance | – | – | $1,387,500 | – | – | – |
| **Yael Cosset** | | | | | | |
| Accrued and Banked Vacation | $0 | $0 | $0 | $0 | $0 | $0 |
| Severance | – | – | – | – | – | $3,350,016 |
| Continued Health and Welfare Benefits[1] | – | – | – | – | – | $44,303 |
| Stock Options[2] | $0 | $0 | $1,640,444 | $1,640,444 | $0 | $1,640,444 |
| Restricted Stock[3] | $0 | $0 | $3,033,712 | $3,033,712 | $0 | $3,033,712 |
| Performance Units[4] | $0 | $0 | $1,621,380 | $1,621,380 | $0 | $1,867,976 |
| Executive Group Life Insurance | – | – | $1,237,500 | – | – | – |
| **Timothy A. Massa** | | | | | | |
| Accrued and Banked Vacation | $0 | $0 | $0 | $0 | $0 | $0 |
| Severance | – | – | – | – | – | $3,250,008 |
| Continued Health and Welfare Benefits[1] | – | – | – | – | – | $48,839 |
| Stock Options[2] | $0 | $0 | $1,147,641 | $1,147,641 | $0 | $1,147,641 |
| Restricted Stock[3] | $0 | $0 | $1,899,083 | $1,899,083 | $0 | $1,899,083 |
| Performance Units[4] | $0 | $1,037,944 | $1,037,944 | $1,037,944 | $0 | $1,202,339 |
| Executive Group Life Insurance | – | – | $1,275,000 | – | – | – |

(1) Represents the aggregate present value of continued participation in the Company's medical, dental and executive term life insurance plans, based on the premiums payable by the Company during the eligible period. The eligible period for continued medical and dental benefits is based on the level and length of service, which is 24 months for all NEOs. The eligible period for continued executive term life insurance coverage is six months for the NEOs. The amounts reported may ultimately be lower if the NEO is no longer eligible to receive benefits, which could occur upon obtaining other employment and becoming eligible for substantially equivalent benefits through the new employer.

PX6009-082

(2) Amounts reported in the "Death," "Disability," and "Change in Control" columns represent the intrinsic value of the accelerated vesting of unvested stock options, calculated as the difference between the exercise price of the stock option and the closing price per Kroger common share on January 27, 2023. A value of $0 is attributed to stock options with an exercise price greater than the market price on the last day of the fiscal year. In accordance with SEC rules, no amount is reported in the "Voluntary Termination/Retirement" column because vesting is not accelerated, but the options may continue to vest on the original schedule if the conditions described above are met.

(3) Amounts reported in the "Death," "Disability," and "Change in Control" columns represent the aggregate value of the accelerated vesting of unvested restricted stock. In accordance with SEC rules, no amount is reported in the "Voluntary Termination/Retirement" column because vesting is not accelerated, but the restricted stock may continue to vest on the original schedule if the conditions described above are met.

(4) Amounts reported in the "Voluntary Termination/Retirement," "Death" and "Disability" columns represent the aggregate value of the performance units granted in 2021 and 2022, based on performance through the last day of fiscal 2022 and prorated for the portion of the performance period completed. Amounts reported in the change in control column represent the aggregate value of 50% of the maximum number of performance units granted in 2021 and 2022. Awards under the 2020 Long-Term Incentive Plan were earned as of the last day of 2022 so each NEO age 55 or over was entitled to receive (regardless of the triggering event) the amount actually earned, which is reported in the Stock Awards column of the 2022 Option Exercises and Stock Vested Table.

## Pay Versus Performance

As required by Section 953(a) of the Dodd-Frank Wall Street Reform and Consumer Protection Act, and Item 402(v) of Regulation S-K, we are providing the following information about the relationship between executive "compensation actually paid," or "CAP," and certain financial performance of the Company. For further information concerning the Company's pay-for-performance philosophy and how the Company aligns executive compensation with the Company's performance, refer to the CD&A beginning on page 46.

### PAY VERSUS PERFORMANCE TABLE*

| (a) | (b) | (c) | (d) | (e) | (f) | | (g) | (h) |
|---|---|---|---|---|---|---|---|---|
| | | | | | Value of Initial Fixed $100 Investment Based on[5] | | | |
| Year | Summary Compensation Table Total for PEO ($)[1] | Compensation Actually Paid to PEO ($)[2] | Average Summary Compensation Table Total for Non-PEO NEOs ($)[3] | Average Compensation Actually Paid to Non-PEO NEOs ($)[4] | Total Share-holder Return ($) | Peer Group Total Share-holder Return ($) | Net Income ($)[6] (in millions) | Adjusted FIFO Operating Profit ($)[7] (in millions) |
| 2022 | 19,209,843 | 23,325,794 | 6,117,423 | 6,281,085 | 178.23 | 140.77 | 2,244 | 5,079 |
| 2021 | 18,168,730 | 36,111,316 | 5,644,957 | 9,323,327 | 168.66 | 145.25 | 1,655 | 4,310 |
| 2020 | 22,373,574 | 29,840,084 | 6,932,437 | 9,191,933 | 131.19 | 123.01 | 2,585 | 4,056 |

*Totals in the above table might not equal the summation of the columns due to rounding amounts to the nearest dollar.

1. During fiscal 2020, 2021, and 2022, Mr. McMullen served as our Principal Executive Officer ("PEO"). The dollar amounts reported in column (b) are the amounts of total compensation reported for each corresponding year in the Total column of the Summary Compensation Table ("SCT").

2. The dollar amounts reported in column (c) represent the amount of "compensation actually paid" to Mr. McMullen as computed in accordance with Item 402(v) of Regulation S-K. The amounts do not reflect the actual amount of compensation earned by or paid to Mr. McMullen during the applicable year. In accordance with the requirements of Item 402(v) of Regulation S-K, the following adjustments were made to Mr. McMullen's total compensation for each year to determine the CAP:

PX6009-083

| | | | | | | |
|---|---|---|---|---|---|---|
| **PEO SCT Total to CAP Reconciliation** | | | | | | |
| Year | Reported Summary Compensation Table for PEO ($) | Reported Summary Compensation Table Value of Equity Awards(a) ($) | Equity Award Adjustments(b) ($) | Reported Change in the APV of Pension Benefits in Summary Compensation Table (c) ($) | Plus: Pension Benefit Adjustments(b)(c) ($) | Compensation Actually Paid to PEO ($) |
| 2022 | 19,209,843 | 12,667,275 | 16,783,226 | – | – | 23,325,794 |
| 2021 | 18,168,730 | 10,999,185 | 28,941,771 | – | – | 36,111,316 |
| 2020 | 22,373,574 | 13,001,622 | 22,126,697 | 1,658,565 | – | 29,840,084 |

a) The amounts included in this column are the amounts reported in "Stock Awards" and "Option Awards" column of the SCT for each applicable year and are subtracted from the Reported Summary Compensation Table for PEO.

b) The equity award and pension benefit adjustments for each applicable year were calculated in accordance with the methodology required by Item 402(v) of Regulation S-K as follow: the equity award adjustments for each applicable year include the addition (or subtraction, as applicable) of the following: (i) the year-end fair value of any equity awards granted in the applicable year that are outstanding and unvested as of the end of the year; (ii) the amount equal to the change as of the end of the applicable year (from the end of the prior fiscal year) in the fair value of any awards granted in prior years that are outstanding and unvested as of the end of the applicable year; (iii) for awards that are granted and vest in the same applicable year, the fair value as of the vesting date; (iv) for awards granted in prior years that vest in the applicable year, the amount equal to the change as of the vesting date (from the end of the prior fiscal year) in fair value; (v) for awards granted in prior years that are determined to fail to meet the applicable vesting conditions during the applicable year, a deduction for the amount equal to the fair value at the end of the prior fiscal year; and (vi) the dollar value of any dividends or other earnings paid on stock or option awards in the applicable year prior to the vesting date that are not otherwise reflected in the fair value of such award or included in any other component of total compensation for the applicable year. The valuation assumptions used to calculate fair values did not materially differ from those disclosed at the time of grant. The amounts deducted or added in calculating the equity award adjustments for the PEO are provided in the table below:

| | | | | | |
|---|---|---|---|---|---|
| **PEO Equity Award Adjustments** | | | | | |
| Year | Year End Fair Value of Awards Granted in the Year ($) | YoY Change in Fair Value of Outstanding & Unvested Awards ($) | Fair Value as of Vesting Date of Awards Granted and Vested in the Year ($) | Year over Year Change in Fair Value of Awards Granted in Prior Years that Vested in the Year ($) | Total Equity Award Adjustments ($) |
| 2022 | 9,214,146 | (855,562) | – | 8,424,642 | 16,783,226 |
| 2021 | 17,014,361 | 2,769,331 | – | 9,158,079 | 28,941,771 |
| 2020 | 12,561,917 | 6,145,551 | – | 3,419,229 | 22,126,697 |

c) The amounts included in this column are the amounts reported in "Change in Pension and Nonqualified Deferred Compensation" of the SCT for each applicable year. Total Pension Benefit Adjustments are equal to the Pension Service Costs incurred during the relevant period. No Prior Service Costs were incurred as no modifications were made to the pension plan during the relevant period.

3. The dollar amounts reported in column (d) represent the average of the amounts reported for our non-PEO NEOs as a group in the Total column of the SCT in each applicable year. The names of each of these NEOs included for purposes of calculating the average amounts in each applicable year are as follows: (i)

PX6009-084

for Fiscal 2022 and 2021, Mr. Millerchip, Mr. Aitken, Mr. Cosset, and Mr. Massa; and (ii) for Fiscal 2020, Mr. Millerchip, Mr. Aitken, Mr. Cosset, and Mr. Donnelly.

4. The dollar amounts reported in column (e) represent the average amount of "compensation actually paid" to the Non-PEO NEOs as a group as identified in footnote 3 above, as computed in accordance with Item 402(v) of Regulation S-K. The dollar amounts do not reflect the actual average amount of compensation earned by or paid to these NEOs as a group during the applicable year. In accordance with the requirements of Item 402(v) of Regulation S-K, the following adjustments were made to the average total compensation for these NEOs as a group for each year to determine the CAP using the same methodology as described in footnote 2:

| | | | | | | |
|---|---|---|---|---|---|---|
| *Average Non-PEO NEOs Summary Compensation Table Total to CAP Reconciliation* | | | | | | |
| Year | Average Reported Summary Compensation Table for Non-PEO NEOs ($) | Average Reported Summary Compensation Table Value of Equity Awards for non-PEO NEOs ($) | Average Equity Award Adjustments[a] ($) | Average Reported Change in the APV of Pension Benefits in SCT[b] ($) | Plus: Average Pension Benefit Adjustments ($) | Average Compensation Actually Paid to non-PEO NEOs ($) |
| 2022 | 6,117,423 | 3,783,616 | 3,947,278 | – | – | 6,281,085 |
| 2021 | 5,644,957 | 3,174,785 | 6,853,155 | – | – | 9,323,327 |
| 2020 | 6,932,437 | 3,807,225 | 6,291,210 | 224,490 | – | 9,191,933 |

(a) The amounts deducted or added in calculating the total average equity award adjustments are provided in the table below:

| | | | | | |
|---|---|---|---|---|---|
| *Equity Award Adjustments for Non-PEO NEOs* | | | | | |
| Year | Average Year End Fair Value of Awards Granted in the Year ($) | Year over Year Average Change in Fair Value of Outstanding & Unvested Awards ($) | Average Fair Value as of Vesting Date of Awards Granted and Vested in the Year ($) | Year over Year Average Change in Fair Value of Awards Granted in Prior Years that Vested in the Year ($) | Total Average Equity Award Adjustment ($) |
| 2022 | 2,606,281 | (259,317) | – | 1,600,314 | 3,947,278 |
| 2021 | 4,424,764 | 667,315 | – | 1,761,076 | 6,853,155 |
| 2020 | 4,033,879 | 1,507,771 | – | 749,561 | 6,291,210 |

(b) Total Pension Benefit Adjustments are equal to the Pension Service Costs incurred during the relevant period. No Prior Service Costs were incurred as no modifications were made to the pension plan during the relevant period. Only Mr. Donnelly participated in the pension plan.

5. Cumulative TSR is calculated by dividing (a) the sum of the cumulative amount of dividends for the measurement period, assuming dividend reinvestment, and the difference between the Company's share price at the end and the beginning of the measurement period by (b) the Company's share price at the beginning of the measurement period. The peer group selected by the Company for purposes of the TSR benchmarking for the pay versus performance disclosures is the same peer group the Company uses for its performance graph in the Annual Report on Form 10-K pursuant to Item 201(e) of Regulation S-K. The Peer Group consists of Albertsons Companies, Inc. (included from June 26, 2020 when it began trading), Costco Wholesale Corporation, CVS Health Corporation, Koninklijke Ahold Delhaize N.V., Target Corp., Walgreens Boots Alliance Inc. and Walmart Inc. The cumulative TSR depicts a hypothetical $100 investment in Kroger common shares on February 1, 2020, and shows the value of that investment over time (assuming the reinvestment of dividends) for each calendar year. A hypothetical $100 investment in the Peer Group using the same methodology is shown for comparison.

6. Net income is as reported in the Company's audited financial statements for the applicable year in accordance with U.S. GAAP.

PX6009-085

7.  Adjusted FIFO Operating Profit equals gross profit, excluding the LIFO charge, minus OG&A, minus rent, and minus depreciation and amortization. For a reconciliation of non-GAAP information, see pages 27 – 33 of our Annual Report on Form 10-K for the fiscal year ended January 28, 2023, filed with the SEC on March 28, 2023.

**Most Important Performance Measures**

The three measures listed below represent the most important financial performance measures used by the Company to link CAP to Company performance for the 2022 fiscal year,

- Adjusted FIFO Operating Profit
- ID sales, without fuel
- Adjusted net earnings per diluted share attributable to The Kroger Co.

For a reconciliation of non-GAAP information, see pages 27 – 33 of our Annual Report on Form 10-K for the fiscal year ended January 28, 2023, filed with the SEC on March 28, 2023.

PX6009-086

**COMPANY SELECTED METRIC – Adjusted FIFO Operating Profit**



**NET INCOME GRAPHICAL REPRESENTATION**



77

**KROGER TSR GRAPHICAL REPRESENTATION**



**CEO Pay Ratio**

As required by Section 953(b) of the Dodd-Frank Wall Street Reform and Consumer Protection Act, and Item 402(u) of Regulation S-K, we are providing the following information regarding the ratio of the annual total compensation of our Chairman and CEO, Mr. McMullen, to the annual total compensation of our median associate.

As reported in the Summary Compensation Table, our CEO had annual total compensation for 2022 of $19,209,843. Using this Summary Compensation Table methodology, the annual total compensation of our median associate for 2022 was $28,644. As a result, we estimate that the ratio of our CEO's annual total compensation to that of our median associate for fiscal 2022 was 671 to 1. Our median employee is a full-time associate in the Southeast region. Over half of Kroger's associates are part-time workers.

This pay ratio is a reasonable estimate calculated in a manner consistent with SEC rules based on our payroll records and the methodology described below. The SEC rules for identifying the median compensated associate and calculating the pay ratio based on that associate's annual total compensation allow companies to adopt a variety of methodologies, to apply certain exclusions, and to make reasonable estimates and assumptions that reflect their compensation practices. As such, other companies may have different employment and compensation practices and may utilize different methodologies, exclusions, estimates and assumptions in calculating their own pay ratios. Therefore, the estimated pay ratio reported above may not be comparable to the pay ratios reported by other companies and should not be used as a basis for comparison between companies.

We then determined the median associate's annual total compensation using the Summary Compensation Table methodology as detailed in Item 402(c)(2)(x) of Regulation S-K and compared it to the annual total compensation of Mr. McMullen as detailed in the "Total" column of the Summary Compensation Table for 2022, to arrive at the pay ratio disclosed above. Due to a material increase in salary of our median associate in fiscal 2022, we identified a substitute median associate as permitted under SEC rules on April 3, 2023 because we reasonably believed that continuing to use the prior median associate would have significantly affected our CEO pay ratio disclosure and the CEO pay ratio would not reflect the actual ratio that was used to calculate the pay ratio.

**Compensation Policies as They Relate to Risk Management**

As part of the Compensation Committee's review of our compensation practices, the Compensation Committee considers and analyzes the extent to which risks arise from such practices and their impact on Kroger's business. As discussed in this Compensation Discussion and Analysis, our policies and practices for compensating associates are designed to, among other things, attract and retain high quality and engaged associates. In this process, the Compensation Committee also focuses on minimizing risk through the implementation of certain practices and policies, such as the executive compensation recoupment policy, which is described above. Accordingly, we do not believe that our compensation practices and policies create risks that are reasonably likely to have a material adverse effect on Kroger.

PX6009-088

**Item No. 2    Advisory Vote to Approve Executive Compensation**

**You are being asked to vote, on an advisory basis, to approve the compensation of our NEOs.**

| | |
|---|---|
| **FOR** | The Board recommends a vote FOR the approval of compensation of our NEOs. |

The Dodd-Frank Wall Street Reform and Consumer Protection Act, enacted in July 2010, requires that we give our shareholders the right to approve, on a nonbinding, advisory basis, the compensation of our NEOs as disclosed earlier in this proxy statement in accordance with the SEC's rules.

As discussed earlier in the CD&A, our compensation philosophy is to attract and retain the best management talent and to motivate these associates to achieve our business and financial goals. Our incentive plans are designed to reward the actions that lead to long-term value creation. To achieve our objectives, we seek to ensure that compensation is competitive and that there is a direct link between pay and performance. To do so, we are guided by the following principles:

- Compensation must be designed to retract and retain the individuals to be an executive at Kroger;

- A significant portion of pay should be performance-based, with the percentage of total pay tied to performance increasing proportionally with an executive's level of responsibility;

- Compensation should include incentive-based pay to drive performance, providing superior pay for superior performance, including both a short- and long-term focus;

- Compensation policies should include an opportunity for, and a requirement of, significant equity ownership to align the interests of executives and shareholders;

- Components of compensation should be tied to an evaluation of business and individual performance measured against metrics that directly drive our business strategy;

- Compensation plans should provide a direct line of sight to company performance;

- Compensation programs should be aligned with market practices; and

- Compensation programs should serve to both motivate and retain talent.

The vote on this resolution is not intended to address any specific element of compensation. Rather, the vote relates to the compensation of our NEOs as described in this proxy statement. The vote is advisory. This means that the vote is not binding on Kroger. The Compensation Committee of the Board is responsible for establishing executive compensation. In so doing, the Compensation Committee will consider, along with all other relevant factors, the results of this vote.

We ask our shareholders to vote on the following resolution:

"RESOLVED, that the compensation paid to the Company's NEOs, as disclosed pursuant to Item 402 of Regulation S-K, including the Compensation Discussion and Analysis, compensation tables, and the related narrative discussion, is hereby APPROVED."

The next advisory vote will occur at our 2024 Annual Meeting subject to shareholders approving one year as the frequency of the advisory vote in Item No. 3 below.

**Item No. 3 Advisory Vote on the Frequency of Future Advisory Votes on Executive Compensation**

**You are being asked to vote, on an advisory basis, on the frequency of future advisory votes on executive compensation. The Board of Directors recommends a vote of ONE YEAR for the frequency of future advisory votes on executive compensation.**

The Dodd-Frank Wall Street Reform and Consumer Protection Act and Section 14A of the Securities Exchange Act also require that shareholders be given the right to vote, again on a nonbinding, advisory basis, for their preference as to how frequently we should seek future advisory votes on the compensation of our named executive officers.

When the advisory vote was last held in 2017, shareholders indicated a preference to hold the advisory vote on executive compensation each year and the Board implemented this standard. The Board of Directors believes that an advisory vote on executive compensation that occurs every year is the most appropriate alternative for Kroger and it therefore recommends that you vote for the one year alternative.

PX6009-089

The vote is advisory. This means that the vote is not binding on Kroger. Our Board of Directors will determine the actual voting frequency for approval of executive compensation. In so doing the Board will consider, along with all other relevant factors, the results of this vote. The Board may decide to hold an advisory vote on executive compensation more or less frequently than the frequency receiving the most votes cast by shareholders.

The proxy card provides shareholders the opportunity to choose among four options for the frequency of the advisory vote: every one, two, or three years, or abstain from casting a vote. Shareholders will not be voting to approve or to disapprove the recommendation of the Board of Directors. The option receiving the most affirmative votes will be the outcome of the advisory vote. Broker non-votes and abstentions will have no effect on the outcome of this vote.

**The Board of Directors Recommends a Vote of <u>One Year</u> for this Proposal.**

**Item No. 4    Ratification of the Appointment of Kroger's Independent Auditor**

**You are being asked to ratify the appointment of Kroger's independent auditor, PricewaterhouseCoopers LLP.**

| | |
|---|---|
| **FOR** | The Board recommends a vote FOR the ratification of PricewaterhouseCoopers LLP as our independent registered public accounting firm. |

The primary function of the Audit Committee is to assist the Board of Directors in fulfilling its oversight responsibilities regarding the Company's financial reporting and accounting practices including the integrity of the Company's financial statements; the Company's compliance with legal and regulatory requirements; the independent public accountants' qualifications and independence; the performance of the Company's internal audit function and independent public accountants; and the preparation of the Audit Committee Report. The Audit Committee performs this work pursuant to a written charter approved by the Board of Directors. The Audit Committee charter most recently was revised during fiscal 2012 and is available on the Company's website at ir.kroger.com under Investors — Governance — Committee Composition. The Audit Committee has implemented procedures to assist it during the course of each fiscal year in devoting the attention that is necessary and appropriate to each of the matters assigned to it under the Audit Committee's charter. The Audit Committee held 5 meetings during fiscal year 2022.

**Selection of Independent Auditor**

The Audit Committee of the Board of Directors is directly responsible for the appointment, compensation, retention, and oversight of Kroger's independent auditor, as required by law and by applicable NYSE rules. On March 8, 2023, the Audit Committee appointed PricewaterhouseCoopers LLP as Kroger's independent auditor for the fiscal year ending January 27, 2024. PricewaterhouseCoopers LLP or its predecessor firm has been the Company's independent auditor since 1929.

In determining whether to reappoint the independent auditor, our Audit Committee:

- Reviews PricewaterhouseCoopers LLP's independence and performance;

- Considers the tenure of the independent registered public accounting firm and safeguards around auditor independence;

- Reviews, in advance, all non-audit services provided by PricewaterhouseCoopers LLP, specifically with regard to the effect on the firm's independence;

- Conducts an annual assessment of PricewaterhouseCoopers LLP's performance, including an internal survey of their service quality by members of management and the Audit Committee;

- Conducts regular executive sessions with PricewaterhouseCoopers LLP;

- Conducts regular executive sessions with the Vice President of Internal Audit;

- Considers PricewaterhouseCoopers LLP's familiarity with our operations, businesses, accounting policies and practices and internal control over financial reporting;

- Reviews candidates for the lead engagement partner in conjunction with the mandated rotation of the public accountants' lead engagement partner;

PX6009-090

- Reviews recent Public Company Accounting Oversight Board reports on PricewaterhouseCoopers LLP and its peer firms; and

- Obtains and reviews a report from PricewaterhouseCoopers LLP describing all relationships between the independent auditor and Kroger at least annually to assess the independence of the internal auditor.

As a result, the members of the Audit Committee believe that the continued retention of PricewaterhouseCoopers LLP to serve as our independent registered public accounting firm is in the best interests of our Company and its shareholders.

While shareholder ratification of the selection of PricewaterhouseCoopers LLP as our independent auditor is not required by Kroger's Regulations or otherwise, the Board of Directors is submitting the selection of PricewaterhouseCoopers LLP to shareholders for ratification, as it has in past years, as a good corporate governance practice. If the shareholders fail to ratify the selection, the Audit Committee may, but is not required to, reconsider whether to retain that firm. Even if the selection is ratified, the Audit Committee in its discretion may direct the appointment of a different auditor at any time during the year if it determines that such a change would be in the best interests of our Company and our shareholders.

A representative of PricewaterhouseCoopers LLP is expected to participate in the meeting to respond to appropriate questions and to make a statement if he or she desires to do so.

## Audit and Non-Audit Fees

The following table presents the aggregate fees billed for professional services performed by PricewaterhouseCoopers LLP for the annual audit and quarterly reviews of our consolidated financial statements for fiscal 2022 and 2021, and for audit-related, tax and all other services performed in 2022 and 2021.

|  | Fiscal Year Ended | |
| --- | --- | --- |
|  | January 28, 2023 ($) | January 29, 2022 ($) |
| Audit Fees[1] | 5,886,900 | 5,427,500 |
| Audit-Related Fees | 982,000 | 0 |
| Tax Fees[2] | 153,000 | 25,000 |
| All Other Fees[3] | 5,850 | 3,150 |
| Total | 7,027,750 | 5,455,650 |

(1) Includes annual audit and quarterly reviews of Kroger's consolidated financial statements, the issuance of comfort letters to underwriters, consents, and assistance with review of documents filed with the SEC.

(2) Includes pre-approved assistance with tax compliance and assistance in connection with tax audits.

(3) Includes use of accounting research tool.

The Audit Committee requires that it approve in advance all audit and non-audit work performed by PricewaterhouseCoopers LLP. Pursuant to the Audit Committee audit and non-audit service pre-approval policy, the Committee will annually pre-approve certain defined services that are expected to be provided by the independent auditors. If it becomes appropriate during the year to engage the independent accountant for additional services, the Audit Committee must first approve the specific services before the independent accountant may perform the additional work.

PricewaterhouseCoopers LLP has advised the Audit Committee that neither the firm, nor any member of the firm, has any financial interest, direct or indirect, in any capacity in Kroger or its subsidiaries.

**The Board of Directors Recommends a Vote _For_ This Proposal.**

PX6009-091

## Audit Committee Report

Management of the Company is responsible for the preparation and presentation of the Company's financial statements, the Company's accounting and financial reporting principles and internal controls, and procedures that are designed to provide reasonable assurance regarding compliance with accounting standards and applicable laws and regulations. The independent public accountants are responsible for auditing the Company's financial statements and expressing opinions as to the financial statements' conformity with generally accepted accounting principles and the effectiveness of the Company's internal control over financial reporting.

In performing its functions, the Audit Committee:

- Met separately with the Company's internal auditor and PricewaterhouseCoopers LLP with and without management present to discuss the results of the audits, their evaluation and management's assessment of the effectiveness of Kroger's internal controls over financial reporting and the overall quality of the Company's financial reporting;

- Met separately with the Company's Chief Financial Officer or the Company's General Counsel when needed;

- Met regularly in executive sessions;

- Reviewed and discussed with management the audited financial statements included in our Annual Report;

- Discussed with PricewaterhouseCoopers LLP the matters required to be discussed under the applicable requirements of the Public Company Accounting Oversight Board and the SEC; and

- Received the written disclosures and the letter from PricewaterhouseCoopers LLP required by the applicable requirements of the Public Accounting Oversight Board regarding the independent public accountant's communication with the Audit Committee concerning independence and discussed the matters related to their independence.

Based upon the review and discussions described in this report, the Audit Committee recommended to the Board of Directors that the audited consolidated financial statements be included in the Company's Annual Report on Form 10-K for the year ended January 28, 2022, as filed with the SEC.

This report is submitted by the Audit Committee.
Anne Gates, Chair
Kevin M. Brown
Karen M. Hoguet
Ronald L. Sargent
Ashok Vemuri

PX6009-092

**Items 5 – 9**

**SHAREHOLDER PROPOSALS**

Included in this proxy statement are five separate shareholder proposals that have been submitted under SEC rules by shareholders who notified the company of their intention to present the proposals for voting at the 2023 Annual Shareholders' Meeting. Some shareholder proposals and supporting statements may contain assertions about Kroger that we believe are incorrect, and we have not tried to refute all such inaccuracies in the company's responses. All statements and citations contained in a shareholder proposal and its supporting statements are the sole responsibility of the proponent of that shareholder proposal. Our company will provide the names, addresses, and shareholdings (to our company's knowledge) of the proponents of any shareholder proposal upon oral or written request made to Corporate Secretary, The Kroger Co., 1014 Vine Street, Cincinnati, Ohio 45202-1100. The information on, or accessible through, Kroger's websites or report links included in this proxy statement, including the statements that follow, is not part of, or incorporated by reference into, this proxy statement.

| | |
|---|---|
| **AGAINST** | The Board recommends a vote AGAINST each of the following shareholder proposals, in each case if properly presented at the meeting, for the reasons stated in Kroger's statements in opposition following each shareholder proposal. |

**Item No. 5        Shareholder Proposal – Report on Public Health Costs from Sale of Tobacco Products**

We have been advised that The Sisters of St. Francis of Philadelphia or an appointed representative, along with nine co-filers, will present the following proposal for consideration during the 2023 Annual Shareholders' Meeting.

**"RESOLVED,** shareholders ask that the board commission and disclose a report on the external public health costs created by the sale of tobacco products by our company (the "Company") and the manner in which such costs affect the vast majority of its shareholders who rely on overall market returns.

The negative health and productivity impacts from the consumption of tobacco products impose $1.2 trillion in social damage; tobacco's unpriced social burden amounts to almost 3 percent of global GDP annually.[1]

Yet, in spite of the Company dedicating an entire division, Kroger Health, to addressing its customers' healthcare needs[2], as well as the overwhelming evidence that tobacco – a known carcinogen that impairs respiratory function – significantly prejudices the health outcomes of smokers, and particularly smokers infected with COVID-19, the Company continues to sell tobacco products in its stores.

These public health costs, year after year, are devastating to economic growth and further compound the financial devastation wrought by the COVID-19 pandemic.  Yet Kroger does not disclose any methodology to address the public health costs of its tobacco sales.  Thus, shareholders have no guidance as to costs the Company is externalizing and consequent economic harm.  This information is essential to shareholders, the majority of whom are beneficial owners with broadly diversified interests.

But Kroger undermines its commitments to promoting good health and ultimately the interests of its diversified shareholders by not disclosing the social and environmental costs and risks imposed on stakeholders, even when these costs and risks threaten society, the economy and the performance of other companies.  All stakeholders are unalterably harmed when companies impose costs on the economy that lower GDP, which reduces equity value.[3]  While the Company may profit by ignoring costs it externalizes, diversified shareholders will ultimately pay these costs, and they have a right to ask what they are.

The Company's disclosures do not address the issue, because they do not address the public health costs that Kroger's tobacco sales impose on shareholders as diversified investors who must fund retirement, education, public goods and other critical social needs.  This is a separate social issue of great importance.  A report would help shareholders determine whether these externalized costs and the economic harm they may create ultimately serve their interests."

---

[1] https://www.cdc.gov/tobacco/data_statistics/fact_sheets/economics/econ_facts/index.htm
[2] Kroger Health – Business & Community Health Solutions
[3] https://www.unepfi.org/fileadmin/documents/universal_ownership_full.pdf

PX6009-093

**The Board of Directors Recommends a Vote <u>Against</u> This Proposal for the Following Reasons:**

Kroger takes the responsibility of selling tobacco products very seriously and has established policies and processes to limit the sale of these items only to customers who are legally permitted to purchase them. We offer customers a wide range of choices across all product categories to meet wide-ranging tastes and preferences, including food and discretionary items.

**The Company has the management systems and governance to limit the sale of tobacco products and to support choices for better health.**

The Kroger family of companies is committed to ethical and responsible behavior in all parts of our business. Our behavior is rooted in Our Purpose – to Feed the Human Spirit™ – and our promise to our customers. This includes upholding Our Values, which have been the foundation of Kroger's culture for decades.

The Audit Committee and Public Responsibilities Committee of the board of directors oversee progress in regulatory compliance and pharmacy safety measures.

We recognize our responsibility as a business to support our communities and help families by making it easier for them to live healthier lives. We also believe in our customers' freedom of choice, and adult customers can choose to purchase tobacco products understanding fully the potential health impacts.  The Company continually reviews its product assortment, including tobacco and tobacco cessation products.

Notably, recent studies that show the percentage of U.S. adults who smoke cigarettes has reached a new low, driven by sharply lower smoking rates among young adults.[1] Sales for both tobacco products and tobacco cessation products at Kroger have similarly decreased in recent years.

**How We Limit Tobacco Sales**

Tobacco sales, like the sales of many products, are governed by regulations, which we strictly follow. The Company's Tobacco Sales Policy is designed to comply with these regulations and affirm our commitment to the health and welfare of our nation's youth by reducing adolescent access to tobacco. The Policy outlines internal business procedures and best practices to maintain compliance at retail stores.

**How We Promote Health and Healthier Choices**

We aim to serve and improve health for millions of people across the country through our business operations, Environmental, Social and Governance Strategy – *Thriving Together* – and Kroger Health's strategy and services.

Kroger Health leads the company's health and nutrition strategy, services and programs. It includes retail, mail order, central fill and specialty pharmacy operations; retail health clinics; nutrition and dietitian services; and health advocacy. A team of 22,000 healthcare practitioners, including pharmacists, nurse practitioners, dietitians and technicians, serves more than 14 million customers annually.

We aim to support our customers and communities with tools, resources and services that advance population health for all. We inform our Customers and Associates about the importance of healthy lifestyles, and we equip our pharmacy and health clinic teams to support people trying to quit tobacco. Specifically related to the use of tobacco products, we:

- Offer smoking cessation coaching programs that are available to all, including coaching through telehealth services;

---

[1] https://news.gallup.com/poll/405884/cigarette-smoking-rates-down-sharply-among-young-adults.aspx#:~:text=U.S.%20Cigarette%20Smoking%20Rates%2C%20by%20Age%20Group&text=That%20dropped%20to%20an%20average,those%20ages%2065%20and%20older

PX6009-094

- Offer affordable prescription and over-the-counter smoking cessation products that are available to all; and
- Encourage Associates not to use tobacco through Company health plan incentives, coverage for smoking cessation products, and employee assistance programs for smoking cessation.

Kroger continues to make a wide range of health and wellness services more affordable and convenient for millions of customers and for local communities across the U.S. As a trusted local partner, we also provided essential support and services during the COVID-19 pandemic, rapidly scaling testing and vaccine distributions when needed most.

Assessing the external public health costs related to the Company's sale of a single category of products is not reasonable or practicable given the resources and expertise required to consider all externalities and related topics outside of our control. In light of the above, we do not believe an additional report would add meaningfully to the extensive body of research currently available on this subject and therefore do not believe such an additional report is necessary.

**For the foregoing reasons, we urge you to vote AGAINST this proposal.**

### Item No. 6 – Listing of Charitable Contributions of $10,000 or more

We have been advised that The Louis B & Diana R Eichold Trust or an appointed representative will present the following proposal for consideration during the 2023 Annual Shareholders' Meeting.

"**Whereas** the Company's charitable contributions, properly managed, are likely to enhance the reputation of the Company:

Whereas increased disclosure regarding appropriate charitable contributions can create goodwill for our Company .

Whereas making the benefits of our Company's philanthropic programs better known is likely to promote the Company's interests:

Whereas feedback from employees, shareholders, and customers could help guide the Company's future charitable giving process.

**Resolved:**  The Proponent requests that the Board of Directors consider listing on the Company website any recipient of $10,000 or more of direct contributions, excluding employee matching gifts.

Supporting Statement

Absent a system of accountability and transparency; some charitable contributions may be made unwisely, potentially harming the Company's reputation and shareholder value. Corporate philanthropic gifts should be given as much exposure as possible, lest their intended impact on goodwill is diminished. For example, if we gave to the American Cancer Society, thousands of our stakeholders might potentially approve of our interest in challenging this disease. Likewise, our support of Planned Parenthood could win the praise of millions of Americans who have had an abortion at one of their facilities. Educational organizations like the Southern Poverty Law Center have seen an increase in funding since they included several conservative Christian organizations on their list of hate groups. Our stakeholders and customers might be similarly enthused if we supported them. Be it the Girl Scouts, American Heart Association, Boys and Girls Club of America, Red Cross, or countless other possible recipients, our support should be publicly noted. Those who might disagree with our decisions can play a valuable role also.

Some charities may be controversial. Charitable contributions come from the fruit of our employee's labor and belong to our shareholders. Both groups represent a wide diversity of opinions. More importantly, we market ourselves to the general public and should avoid offending segments of this most critical group. It would be unfortunate if a charitable contribution resulted in lower employee morale and shareholder interest, much less a loss of potential revenue.

Fuller disclosure would provide enhanced feedback opportunities from which our Company could make more beneficial choices."

85

**The Board of Directors Recommends a Vote <u>Against</u> This Proposal for the Following Reasons:**

Kroger has a long history of giving back meaningfully in the communities we serve. Charitable giving is central to Our Purpose – to Feed the Human Spirit – and strategically aligned to our mission – Kroger's Zero Hunger | Zero Waste social and environmental impact plan. This plan empowers Kroger to pursue our goal to help create communities free of hunger and waste across the country. Additionally, we provide annual public disclosures related to charitable giving areas of focus and annual grant-making.

Every year, we direct charitable contributions at the national, regional and local levels to advance positive impacts for people and our planet. This giving includes funds, in-kind product donations, and retail store donations of surplus fresh food that our associates recover for local food bank partners through our leading Zero Hunger | Zero Waste Food Rescue program. For example, in 2022, 100% of our retail stores participated in the Food Rescue program, donating more than 100 million pounds of fresh food to our communities.

Through corporate giving and the work of our two nonprofit foundations – The Kroger Co. Foundation and The Kroger Co. Zero Hunger | Zero Waste Foundation – we direct more than $300 million annually to partners and causes that align with our mission. Of this, more than 75% supports hunger relief programs to feed individuals and families where we live and work. These totals include generous support from our associates and customers through in-store fundraising programs at checkout. The largest share of corporate funds, in-kind product donations, and customer donations is directed to the Feeding America-affiliated network of local food banks, pantries and agencies in our communities.

Other national organizations receiving significant charitable funds from Kroger include No Kid Hungry, American Red Cross, United Service Organizations (USO), American Heart Association and World Wildlife Fund. Notably, Kroger is the largest cumulative corporate donor to the USO in the organization's history, showing our long-standing support for the nation's active-duty military service men and women and their families. At the regional and local levels, we support other nonprofit organizations and causes that matter most to our associates and customers.

**Foundation Grants**

Kroger provides detailed annual disclosures on the work of our two foundations. **The Kroger Co. Foundation**, the company's private foundation established in 1987, which focuses grant-making on causes that support hunger relief; sustainability; disaster relief; diversity and inclusion; and education and youth development. The Foundation's 2022 Report, including grantee highlights and specific grant funding levels across the country, is available here: https://www.thekrogerco.com/wp-content/uploads/2022/08/Kroger-Co-Foundation-2022-Report.pdf.

In 2021, the Foundation directed $12.7 million in grants, of which 58% aligned with hunger relief and sustainability causes, and 24% supported emergency assistance and disaster relief efforts. Specific grants and grant recipients are highlighted in the annual The Kroger Co. Foundation report.

**The Kroger Co. Zero Hunger | Zero Waste Foundation**, a nonprofit public charity established in 2018, is designed to advance collective action and innovation to build a better food system for the future. More about the Zero Hunger | Zero Waste Foundation is available on its website: https://thekrogercozerohungerzerowastefoundation.com/. More details about the Foundation's general grant-making and signature program, the Zero Hunger | Zero Waste Innovation Fund, are disclosed in its annual report: https://www.thekrogerco.com/wp-content/uploads/2022/08/Kroger-Co-Zero-Hunger-Zero-Waste-Foundation-2022-Report.pdf.

In 2021, the Zero Hunger | Zero Waste Foundation directed $18 million in grants; of these,  97% aligned to hunger relief and sustainability causes. Grants included $11.7 million in funds to improve food access and food security and $4.5 million to advance more sustainable food systems. Grant highlights are included in the Zero Hunger | Zero Waste Foundation report.

PX6009-096

**Guidelines & Policies:**

We follow best practices and specific guidelines when reviewing grant requests. Our Donation Guidelines provide direction on the types of organizations that Kroger supports and, importantly, make clear the types of organizations to which donations will not be granted. We accept and consider donation requests from 501(c)(3) registered nonprofit organizations through an online grant management platform. We use the *Guidestar Charity Check* to confirm they meet all Internal Revenue Service requirements to receive grants and donations. The Donation Guidelines are publicly available on our corporate website: https://thekrogerco.versaic.com/login?Select-A-Store=Enabled&ReturnTo=/default.aspx

We do not make charitable donations to individuals, political campaigns, sectarian or religious organizations for projects that serve only its own members or supporters, or organizations that discriminate based on race, color, sex, pregnancy, disability, age, national origin, religion, sexual orientation, gender identity, genetic information or any other characteristic protected by applicable law.

**The Company has adequate public disclosures related to its charitable giving areas of focus and annual grant-making.**

Kroger recognizes that disclosure of its corporate philanthropic efforts is important and provides stakeholders with an opportunity to review Kroger charitable programs. We believe the extensive information and other disclosures provided in Kroger's annual ESG Report, The Kroger Co. Foundation annual report, The Kroger Co. Zero Hunger | Zero Waste Foundation annual report and our website provide ample disclosures related to our approach to charitable giving, which supports Our Purpose, ESG Strategy, and Zero Hunger | Zero Waste impact plan.

**For the foregoing reasons, we urge you to vote AGAINST this proposal.**

**Item No. 7    Shareholder Proposal — Recyclability of Packaging**

We have been advised that As You Sow on behalf of the Michael Monteiro 2016 Trust or an appointed representative, along with one co-filer, will present the following proposal for consideration during the 2023 Annual Shareholders' Meeting.

**"WHEREAS:**  The growing plastic pollution crisis poses increasing risks to Kroger. Corporations could face an annual financial risk of approximately $100 billion should governments require them to cover the waste management costs of the packaging they produce.[1]  New laws to this effect were recently passed in Maine, Oregon, Colorado, and California,[2] while the European Union has enacted a $1 per kilogram tax on all non-recycled plastic packaging waste.[3]

Pew Charitable Trusts released a groundbreaking study, *Breaking the Plastic Wave* ("Pew Report"), concluding that improved recycling is insufficient and at least one-third of overall plastic use must be eliminated to stem the global plastic pollution crisis. It finds that plastic use reduction is the most viable solution from environmental, economic, and social perspectives . Without immediate and sustained new commitments, annual flows of plastics into oceans could nearly triple by 2040.[4]

Kroger has fallen behind its peers in plastic packaging reductions. Kroger is notably absent from the Ellen MacArthur Foundation's Global Commitment to reduce plastic pollution, in which brand signatories have committed to reduce virgin plastic use by an average of 20% by 2025.[5] The majority of signatories have already reduced their use of plastic packaging over a 2018 baseline.[6]

---

[1] https://www.pewtrusts.org/-/media/assets/2020/07/breakingtheplasticwave_report.pdf
[2] https://www.packworld.com/news/sustainability/article/22419036/four-states-enact-packaging-epr-laws
[3] https://commission.europa.eu/strategy-and-policy/eu-budget/long-term-eu-budget/2021-2027/revenue/own-resources/plastics-own-resource_en
[4] https://www.pewtrusts.org/-/media/assets/2020/07/breakingtheplasticwave_report.pdf
[5] https://emf.thirdlight.com/link/f6oxost9xeso-nsjoqe/@/#id=2
[6] https://emf.thirdlight.com/link/f6oxost9xeso-nsjoqe/@/#id=2, p. 11

PX6009-097

Unilever has taken the most significant action to date, agreeing to cut virgin plastic use by 50% by 2025, including an absolute elimination of 100,000 tons of plastic packaging. At least sixty other consumer goods and retail companies currently have goals to reduce use of virgin plastic packaging, including competitors Walmart and Target.[7]  Kroger has no plastic reduction goal.

Starbucks, Coca-Cola, and Pepsi are leading the industry in reducing disposable packaging, each having set new goals to expand use of zero-waste reusable packaging. As a retail partner of the global reuse platform Loop, Kroger is poised to increase use of reusable packaging, yet has made no commitment to make reusable packaging permanent.

Our company could avoid regulatory, environmental, and competitive risks, and keep up with its peers by, for example, setting new commitments to reduce use of disposable virgin plastic and invest in reusable packaging.

**RESOLVED:** Shareholders request that the Kroger Board issue a report, at reasonable expense and excluding proprietary information, describing how the Company could reduce its plastics use in alignment with the one-third reduction findings of the Pew Report, or other authoritative sources, to reduce its contribution to ocean plastics pollution.

**SUPPORTING STATEMENT:** The report should, at Board discretion:

- Assess the reputational, financial, and operational risks associated with continuing to use substantial amounts of single-use plastic packaging while plastic pollution grows;
- Evaluate dramatically reducing the amount of plastic used in our packaging through transitioning to reusables; and
- Describe how the Company can further reduce single-use packaging, including any planned reduction strategies or goals, materials redesign, substitution, or reductions in use of virgin plastic."

**The Board of Directors Recommends a Vote <u>Against</u> This Proposal for the Following Reasons:**

The Kroger family of companies is committed to protecting people and our planet by advancing positive change in our company and our communities. Through our Zero Hunger | Zero Waste social and environmental impact plan, we are on a journey to help create communities free of hunger and waste.

**Our sustainable packaging commitments**

Kroger has focused on improving the environmental attributes of product packaging for many years through a series of ambitious sustainable packaging goals. Our goals demonstrate Kroger's continued commitment to help create a more circular economy and reduce plastics found in nature by using more sustainable packaging options where feasible; supporting reusable packaging models; using recyclable packaging and incorporating recycled content; and increasing consumer awareness about reuse and recycling.

We are also committed to upholding the highest standards of food safety and quality for our customers. Decisions about *Our Brands* food packaging consider critical attributes needed to protect and preserve food safety, quality, freshness, and affordability as well as to reduce greenhouse gas emissions related to the manufacture and transportation of items.

Kroger's 2030 sustainable packaging commitments include the following elements:
- Complete an *Our Brands* baseline product packaging footprint to fully understand current packaging impacts.
- Seek to achieve 100% recyclable, compostable and/or reusable packaging for *Our Brands* products.
- Increase recycled content in packaging so that the *Our Brands* product portfolio collectively contains at least 10% recycled content in packaging.
- Reduce unnecessary packaging.

---

[7] https://gc-22.emf.org/ppu/?_gl=1*1p3bi1c*_ga*nzEwMDEwNTU0LjE2NjI1NjQ4MTY.*_ga_V32N675KJX*MTY3MTlyMTM1OS4xMS4xLjE2NzEyMjE0OTTMuNjAuMC4w

PX6009-098

- Increase awareness among Kroger customers about how to properly manage **Our Brands** product packaging at end of life.

**Taking Action to Achieve our 2030 Goals**

In 2022, we developed our baseline packaging footprint with guidance from a consultant and input from our suppliers and internal subject matter experts. We found that 40% of **Our Brands** product packaging meets our definition of recyclable, when measured by weight of packaging material. In addition, the packaging portfolio captured in our baseline includes 14% post-consumer recycled content (PCR) material. We plan to update and refine our packaging baseline over time to track goal progress and inform goal achievement.

In 2023, we are continuing our work to build a roadmap to achieving our goals by 2030 and prioritize opportunities to adjust our packaging and/or support infrastructure changes. Our roadmap will also accommodate changes required by packaging legislation in the states and municipalities in which Kroger operates. In addition, the packaging baseline will inform any adjustments or refinements to our current goals.

**More detailed information about our packaging baseline and key action steps to increase packaging sustainability is available in our 2022 Environmental, Social & Governance (ESG) report (https://www.thekrogerco.com/wp-content/uploads/2022/08/Kroger-Co-2022-ESG-Report.pdf).**

We continue to evaluate and implement opportunities to reduce plastic use and improve end-of-life management opportunities for product packaging. Examples include:

**Plastic Reduction & Circularity:**

- In 2022, Kroger added 50% post-consumer recycled content (PCR) PET plastic to a new line of **Our Brands** spice products. We continue to pilot different levels of PCR material in our product packaging, particularly in those products that are subject to packaging legislation, evaluating factors such as function, shelf-life, and aesthetic.

- Kroger-operated manufacturing plants continue to reduce plastic use and packaging weights for **Our Brands** items, where feasible. Last year, we reduced the amount of plastic used in our carbonated soft drinks and cultured dairy tub product packages, saving approximately 450,000 pounds of plastic annually.

- Kroger was the first U.S. grocery retail partner for the innovative Loop reusable packaging platform. In 2022, Kroger conducted a pilot at 25 Fred Meyer stores in the Portland, OR, area, selling more than 20 items representing popular brands, to gauge consumer response to this alternative to single-use packaging. Our pilot collected valuable insights on what may be needed to scale reusable packaging solutions in our industry.

**End-of-Life Solutions:**

- We continue to offer the Kroger **Our Brands** packaging recycling program so our customers can collect flexible plastic packaging and mail it free of charge to TerraCycle for recycling. Kroger is the first retailer to offer this type of recycling program across an entire private-label portfolio. Program engagement and recycling volume continues to grow, with Kroger customers returning more than 1 million packages—the equivalent of more than 22,000 pounds of plastic—to date.

- Kroger continued adding the How2Recycle logo to **Our Brands** items to increase our customers' awareness of how to recycle product packaging, including those items eligible for front-of-store plastic film recycling programs—which we offer across the enterprise.

- The Kroger Co. Zero Hunger | Zero Waste Foundation supports the multi-stakeholder Polypropylene Recycling Coalition, facilitated by The Recycling Partnership, which aims to improve community-level infrastructure to enable curbside polypropylene collection and recycling. In 2022, the Foundation expanded this support to help fund the PET Recycling Coalition, which aims to increase the recyclability of PET (polyethylene terephthalate) plastic packaging.

89

PX6009-099

- Kroger is the Grocery Sector Lead partner for Closed Loop Partners' Beyond the Bag Initiative, launched by the Consortium to Reinvent the Retail Bag. This multi-year collaboration across retail sectors aims to identify, test and implement innovative new design solutions to replace the single-use plastic retail shopping bag.

Given the above progress on our sustainable packaging roadmap, including detailed reporting available in Kroger's 2022 ESG Report, we don't believe additional reporting on packaging and plastics use is additive at this time.

**For the foregoing reasons, we urge you to vote AGAINST this proposal.**

**Item No. 8 Report on Racial and Gender Pay Gaps**

We have been advised that Arujna Capital on behalf of Susan Silver or an appointed representative along with one co-filer will present the following proposal for consideration during the 2023 Annual Shareholders' Meeting.

"**Whereas:** Pay inequities persist across race and gender and pose substantial risks to companies and society. Black workers' hourly median earnings represent 64 percent of white wages. The median income for women working full time is 83 percent that of men. Intersecting race, Black women earn 63 percent, Native women 60 percent, and Latina women 55 percent. At the current rate, women will not reach pay equity until 2059, Black women in 2130, and Latina women in 2224 .[1]

Citigroup estimates closing minority and gender wage gaps 20 years ago could have generated 12 trillion dollars in additional national income. PwC estimates closing the gender pay gap could boost Organization for Economic Cooperation and Development (OECD) countries' economies by 2 trillion dollars annually.[2]

Actively managing pay equity is associated with improved representation. Diversity in leadership is linked to superior stock performance and return on equity.[3]  Minorities represent 38.5 percent of Kroger's workforce and 26 percent of Store Leaders. Women represent 50.5 percent of the workforce and 33 percent of Store Leaders.[4]

Best practice pay equity reporting consists of two parts:

1. *unadjusted* median pay gaps, assessing equal opportunity to high paying roles,
2. statistically *adjusted* gaps, assessing whether minorities and non-minorities, men and women, are paid the same for similar roles.

Kroger does not report quantitative unadjusted or adjusted pay gaps. Over 20 percent of the 100 largest U.S. employers currently report adjusted gaps, and an increasing number of companies disclose unadjusted gaps to address the structural bias women and minorities face regarding job opportunity and pay.[5]

Racial and gender *unadjusted* median pay gaps are accepted as *the* valid way of measuring pay inequity by the United States Census Bureau, Department of Labor, OECD, and International Labor Organization. The United Kingdom and Ireland mandate disclosure of median pay gaps, and the United Kingdom is considering racial pay reporting.[6]

**Resolved:** Shareholders request The Kroger Co. report on both quantitative *median and adjusted* pay gaps across race and gender, including associated policy, reputational, competitive, and operational risks, and risks related to recruiting and retaining diverse talent. The report should be prepared at reasonable cost, omitting proprietary information, litigation strategy and legal compliance information.

---

[1] https://static1.squarespace.com/static/5bc65db67d0c9102cca54b74/t/622f4567fae4ea772ae60492/1647265128087/Racial+Gender+Pay+Scorecard+2022+-+Arjuna+Capital.pdf
[2] Ibid.
[3] Ibid.
[4] https://www.thekrogerco.com/wp-content/uploads/2022/08/Kroger-Co-2022-ESG-Report.pdf
[5] https://diversiq.com/which-sp-500-companies-disclose-gender-pay-equity-data/
[6] https://static1.squarespace.com/static/5bc65db67d0c9102cca54b74/t/622f4567fae4ea772ae60492/1647265128087/Racial+Gender+Pay+Scorecard+2022+-+Arjuna+Capital.pdf

PX6009-100

Racial/gender pay gaps are defined as the difference between non-minority and minority/male and female *median* earnings expressed as a percentage of non-minority/male earnings (Wikipedia/OECD, respectively).

**Supporting Statement:** An annual report adequate for investors to assess performance could, with board discretion, integrate base, bonus and equity compensation to calculate:

- percentage median and adjusted gender pay gap, globally and/or by country, where appropriate
- percentage median and adjusted racial/minority/ethnicity pay gap, US and/or by country, where appropriate"

**The Board of Directors Recommends a Vote <u>Against</u> This Proposal for the Following Reasons:**

Kroger welcomes associates from every race, culture, gender and ability, and is actively creating and maintaining an equitable workplace where every associate is empowered, supported, and feels valued and a sense of belonging. Our aspiration is for the demographic representation of women and people of color to reflect our communities, at both the organization-wide and local levels.

**Kroger already has an established approach to pay equity.** Kroger has been performing an annual pay equity analysis since 2016, which takes into consideration gender and race for all salaried roles. We review our pay equity analysis annually with the Compensation and Talent Development Committee of the Board of Directors**.** The organization also equips and enables our leaders to promote pay equity and transparency. We have robust and comprehensive pay administration guidelines for non-bargaining-unit employees, enabling our managers to effectively manage compensation throughout the year to reward performance and address progression within pay ranges. In addition to these guidelines, we provide additional training to managers in preparation for annual compensation planning.

**Kroger provides robust disclosure of representation annually.** Kroger consistently discloses and discusses its diverse associate representation in the organization's annual ESG Report. We publish our annual EEO-1 reports as filed with the EEOC (https://www.thekrogerco.com/wp-content/uploads/2022/08/EEO-1-2021.pdf). In addition, Kroger provides a detailed discussion of our workforce strategy and total rewards and benefits approach in our Annual Report and Form 10-K. The organization also discusses its approach to Human Capital Management in its annual ESG report. The report, available on www.thekrogerco.com/esgreport, includes disclosures related to associate health and safety; Kroger's *Framework for Action: Diversity, Equity & Inclusion* plan; talent attraction and retention; and labor relations.

**The majority of Kroger's workforce is covered under collective bargaining agreements, which facilitate pay equity for frontline associates.** Kroger's compensation structure supports fair pay.  Wages, health care and pensions are included in more than 354 collective bargaining agreements that cover approximately 64% of our associates. The negotiated pay structures within those agreements facilitate standard and consistent pay progression based on tenure and experience. Pay is determined using structured wage progressions where an associate moves through the progression based on time in role or hours worked. Associates move through the wage progression based on the same definitions and criteria as other associates working in the same roles. Pay parity is promoted within the model because of the structured wage grids and inherent progression framework.

Non-union hourly roles follow similar wage progressions. Where we use a pay-for-performance model for non-union, hourly roles, those workplaces follow compensation guidelines that provide for a framework of tying pay to performance and using pay levels.

**Kroger provides comprehensive benefits for associates.** The organization has invested an incremental $1.9 billion in associate wages and training since 2018. This has increased our national average hourly rate of pay from $13.66 to $18, or $23.50 per hour with comprehensive benefits.
Kroger has announced plans to continue investing in wages, with plans for a more than $770 million incremental investment in associates during 2023.

In addition to market-competitive wages, our associates have access to a wide variety of benefits that provide value in their lives today and in the future. We invest in the whole person with a benefits package that generally includes:

PX6009-101

quality, affordable healthcare; retirement savings plans and pension plans; on-demand access to mental health assistance and free counseling to support emotional wellness; career advancement opportunities; financial education programs to help associates manage their day-to-day finances; and an industry-leading continuing education benefit that provides up to $21,000 for associates, part-time and full-time alike, which, along with scholarships for children of associates — most of whom are first-generation college attendees — provide pathways to social mobility to associates who choose to participate. We also offer associates a variety of grocery discounts, volunteer opportunities, and other perks and rewards.

**Diversity and inclusion are part of Kroger's core organizational values, and the organization has strong programs in place to create and maintain an equitable workplace and inclusive culture.**
Diversity and inclusion have been longstanding Kroger values. In 2020, we introduced Kroger's *Framework for Action* to further advance diversity, equity and inclusion in our culture and communities. The plan's action steps include creating a DE&I advisory council reporting to senior leadership, providing diversity training to our associate population, improving diverse talent recruiting through expanded partnerships with HBCUs and Hispanic-serving institutions, establishing two-way mentorship and advocacy programs, increasing spend with diverse suppliers, and more. We report progress against these goals in Kroger's annual ESG report.

Kroger strives to attract, retain and develop leaders and associates who best reflect our communities. Because of our unique business model, we help unlock economic opportunity for nearly half a million people of various ages and aspirations, from those wanting an entry-level part-time job to graduate-degree specialists across corporate functions. We also aim to develop and promote diverse leaders to roles with increasing levels of responsibility. For open leadership positions, we assemble a diverse slate of candidates for consideration.

In 2022, every manager across the organization was expected to actively mentor and develop an associate who has a different background than them. This, along with other objectives, is used to assess the manager's performance and ultimately affects their compensation. Currently, over 80% of retail division executive leadership teams have at least one diverse leader.

We believe that Kroger's current compensation practices promote diversity, inclusion and fair pay across our workforce.  While Kroger welcomes continued engagement with shareholders on these issues, we believe that the adoption of this proposal is not necessary in light of our existing practices.

**For the foregoing reasons, we urge you to vote AGAINST this proposal.**

**Item No. 9 – Report on EEO Policy Risks**

We have been advised that the National Center for Public Policy Research or an appointed representative will present the following proposal for consideration during the 2023 Annual Shareholders' Meeting.  We will promptly provide the shareholdings upon written or oral request to Kroger's Secretary at our executive offices.

**"RESOLVED**

Shareholders request the Kroger Company ("Kroger") issue a public report detailing the potential risks associated with omitting "viewpoint" and "ideology" from its written equal employment opportunity (EEO) policy. The report should be available within a reasonable timeframe, prepared at a reasonable expense and omit proprietary information.

**SUPPORTING  STATEMENT**

Kroger does not explicitly prohibit discrimination based on viewpoint or ideology in its written EEO policy.

Kroger's lack of a company-wide best practice EEO policy sends mixed signals to company employees and prospective employees and calls into question the extent to which individuals are protected due to inconsistent state policies and the absence of a relevant federal protection.  Approximately half of Americans live and work in a jurisdiction with no legal protections if their employer takes action against them for their political activities or discriminates on the basis of viewpoint in the workplace.

PX6009-102

Companies with inclusive policies are better able to recruit the most talented employees from a broad labor pool, resolve complaints internally to avoid costly litigation or reputational damage, and minimize employee turnover. Moreover, inclusive policies contribute to more efficient human capital management by eliminating the need to maintain different policies in different locations.

There is ample evidence that individuals with conservative viewpoints may face discrimination at Kroger.

Kroger recently kowtowed to leftwing social media criticism by removing patriotic and Second Amendment related paraphernalia from store shelves. For instance, after someone complained on Twitter about a drink sleeve that stated, "Arms Change, Rights Don't", the Company reportedly recalled the items.[1]  Kroger's subsidiary grocery store, Harris Teeter, likewise complied with liberal demands to pull "Freedom Series" items from its shelves, removing items that read, "Give me liberty or give me death" and "America, love it or leave it."[2]

While removing patriotic items from its stores, Kroger has simultaneously pushed a leftwing social agenda. Published in2021, the Company released  an "allyship guide" that told employees to use "inclusive language" and celebrate transgender holidays.[3]  Defining terms such as "non-binary," "transgender," and "pansexual," the guide asserts that, "Some people's morality can be a barrier to accepting LGBTQ+ people."[4]

Removing pro-America items from store shelves while publishing "allyship" training guides for staff certainly raise concerns over how Kroger treats employees with diverse points of view, particularly those who disagree with the Company's blatant leftwing actions. This places the Company in reputational, legal, and financial risk, as evidenced by a recent settlement with fired employees who refused to wear a Company issued apron adorning a rainbow on account of it violating their religious beliefs.[5]

Presently, shareholders are unable to evaluate how Kroger prevents discrimination towards employees based on their ideology or viewpoint, mitigates employee concerns of potential discrimination, and ensures a respectful and supportive work atmosphere that bolsters employee performance.

We recommend that the report evaluate risks including, but not limited to, negative effects on employee hiring and retention, as well as litigation risks from conflicting state and company anti-discrimination  policies."

**The Board of Directors Recommends a Vote <u>Against</u> This Proposal for the Following Reasons:**

**Kroger strives to reflect the communities we serve and foster a culture that empowers everyone to be their true self, inspires collaboration, and feeds the human spirit.**

We are committed to a policy of equal opportunity for all associates without regard to race, color, religion, sex, national origin, age, disability, sexual orientation, or gender identity. In implementing our policy, we seek and embrace differences in the backgrounds, cultures, and perspectives of all associates, and we encourage and expect all of our associates to collaborate and actively work together regardless of these differences. Moreover, as we identify in our ESG Report, our diversity, equity and inclusion (DE&I) programs demonstrate our commitment to building a diverse and inclusive workforce, fostering an environment where diversity is a competitive advantage and providing equal opportunities for associates.

**We are focused on creating a culture of fairness and respect.**

Our formal DE&I Framework for Action, launched in 2020, is focused on creating a more inclusive culture and advancing equitable communities, among other goals, underscoring Kroger's commitment to standing together and mobilizing our people, passion, scale and resources to transform our culture and our communities. The framework is

---

[1] https://www.bizpacreview.com/2022/06/21/harris-teeter-kroger-remove-pro-america-items-from-shelves-after-woke-complaints-backlash-is-swift-1252599/; https://www.foxbusiness.com/retail/harris-teeter-kroger-backlash-pro-america-items-complaints
[2] https://www.bizpacreview.com/2022/06/21/harris-teeter-kroger-remove-pro-america-items-from-shelves-after-woke-complaints-backlash-is-swift-1252599/; https://www.foxbusiness.com/retail/harris-teeter-kroger-backlash-pro-america-items-complaints
[3] https://www.breitbart.com/social-justice/2022/08/31/kroger-allyship-guide-tells-employees-to-celebrate-trans-holidays-support-bail-fund/
[4] https://www.thekrogerco.com/wp-content/uploads/2021/03/AAPI-Allyship-Guide_v3.2-External-merged.pdf
[5] https://news.yahoo.com/kroger-pay-180K-lawsuit-over-162047710.html

PX6009-103

built around pillars focused on creating a more inclusive culture, developing diverse talent, advancing diverse partnerships, advancing equitable communities and deeply listening and reporting progress.

In particular, we understand that our associates have a wide range of viewpoints. We are committed to a culture of fairness, respect and inclusion that drives us to value and embrace differences. As part of our Framework for Action, we are engaging with external and internal stakeholders to seek perspectives and provide associates with platforms to continue sharing their stories and feedback. To that end, Kroger launched an internal DEI Advisory Council made up of cross-functional leaders who are committed to advancing this progress, working closely with senior officers and business leaders to identify opportunities and specific actions for improvement, as well as the Board's Compensation & Talent Development Committee overseeing progress on our human capital efforts, including DEI.

**Diverse viewpoints are respected and encouraged.**

Our policies and practices demonstrate that diverse viewpoints are respected and encouraged and are an essential part of advancing our business. In light of our demonstrated commitment to our core values of diversity and inclusion for all stakeholders, we do not believe that issuing a public report detailing the potential risks associated with omitting 'viewpoint' and 'ideology' from our equal employment opportunity policy, as contemplated by this proposal, is necessary or in the best interests of Kroger or our shareholders.

**For the foregoing reasons, we urge you to vote AGAINST this proposal.**

PX6009-104

### Shareholder Proposals and Director Nominations — 2024 Annual Meeting

Pursuant to Rule 14a-8 under the Securities Exchange Act of 1934, as amended, shareholder proposals intended for inclusion in the proxy material relating to Kroger's annual meeting of shareholders in June 2024 should be addressed to Kroger's Secretary and must be received at our executive offices not later than January 13, 2024. These proposals must comply with Rule 14a-8 and the SEC's proxy rules. If a shareholder submits a proposal outside of Rule 14a-8 for the 2023 annual meeting and such proposal is not delivered within the time frame specified in the Regulations, Kroger's proxy may confer discretionary authority on persons being appointed as proxies on behalf of Kroger to vote on such proposal.

In addition, Kroger's Regulations contain an advance notice of shareholder business and director nominations requirement, which generally prescribes the procedures that a shareholder of Kroger must follow if the shareholder intends, at an annual meeting, to nominate a person for election to Kroger's Board of Directors or to propose other business to be considered by shareholders. These procedures include, among other things, that the shareholder give timely notice to Kroger's Secretary of the nomination or other proposed business, that the notice contain specified information, and that the shareholder comply with certain other requirements. In order to be timely, this notice must be delivered in writing to Kroger's Secretary, at our principal executive offices, not later than 45 calendar days prior to the date on which our proxy statement for the prior year's annual meeting of shareholders was mailed to shareholders. If a shareholder's nomination or proposal is not in compliance with the procedures set forth in the Regulations, we may disregard such nomination or proposal. Accordingly, if a shareholder intends, at the 2024 Annual Meeting, to nominate a person for election to the Board of Directors or to propose other business, the shareholder must deliver a notice of such nomination or proposal to Kroger's Secretary not later than March 28, 2024 and comply with the requirements of the Regulations.

Furthermore, in addition to the requirements of SEC Rule 14a-8 or our Regulations, as applicable, as described above, to comply with the universal proxy rules, shareholders who intend to solicit proxies in support of director nominees other than our nominees must provide notice to Kroger's Secretary that sets forth the information required by Rule 14a-19 of the Exchange Act no later than April 23, 2024, and must comply with the additional requirements of Rule 14a-19(b).

Eligible shareholders may also submit director nominees for inclusion in our proxy statement for the 2024 annual meeting of shareholders. To be eligible, shareholders must have owned at least three percent of our common shares for at least three years. Up to 20 shareholders will be able to aggregate for this purpose. Nominations must be submitted to our Corporate Secretary at our principal executive offices no earlier than December 14, 2023 and no later than January 13, 2024.

Shareholder proposals, director nominations, including, if applicable pursuant to proxy access, and advance notices must be addressed in writing, and addressed and delivered timely to: Corporate Secretary, The Kroger Co., 1014 Vine Street, Cincinnati, Ohio 45202-1100.

PX6009-105

**Householding of Proxy Materials**

We have adopted a procedure approved by the SEC called "householding." Under this procedure, shareholders of record who have the same address and last name will receive only one copy of the proxy materials unless one or more of these shareholders notifies us that they wish to continue receiving individual copies. This procedure will reduce our printing costs and postage fees. Householding will not in any way affect dividend check mailings.

If you are eligible for householding, but you and other shareholders of record with whom you share an address currently receive multiple copies of our proxy materials or if you hold in more than one account, and in either case you wish to receive only a single copy for your household or if you prefer to receive separate copies of our documents in the future, please contact your bank or broker, or contact Kroger's Secretary at 1014 Vine Street, Cincinnati, Ohio 45202 or via telephone at 513-762-4000.

Beneficial shareholders can request information about householding from their banks, brokers or other holders of record.

───────────────

The management knows of no other matters that are to be presented at the meeting, but, if any should be presented, the Proxy Committee expects to vote thereon according to its best judgment.

<u>**Available Information**</u>

The Company files Annual Reports on Form 10-K with the Securities and Exchange Commission. A copy of the Annual Report on Form 10-K for the fiscal year ended January 28, 2023 (except for certain exhibits thereto), including our audited financial statements and financial statement schedules, may be obtained, free of charge, upon written request by any shareholder to Kroger's Secretary at 1014 Vine Street, Cincinnati, Ohio 45202 or via telephone at 513-762-4000. Copies of all exhibits to the Annual Report on Form 10-K are available upon a similar request, subject to reimbursing the Company for its expenses in supplying any exhibit.

By order of the Board of Directors,
Christine S. Wheatley, Secretary

PX6009-106

PX6009-107

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

(Mark One)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended January 28, 2023.

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from           to

Commission file number 1-303

# THE KROGER CO.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Ohio** | **31-0345740** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| **1014 Vine Street, Cincinnati, OH** | **45202** |
| (Address of Principal Executive Offices) | (Zip Code) |

Registrant's telephone number, including area code **(513) 762-4000**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| Common, $1.00 Par Value | KR | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act:

**NONE**
**(Title of class)**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

Yes ☒    No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.

Yes ☐    No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).

Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements.

Yes ☐    No ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b).

Yes ☐    No ☐

Indicate by check mark whether the registrant is a shell company (as defined by Rule 12b-2 of the Exchange Act).

Yes ☐    No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates computed by reference to the average bid and asked price of such common equity, as of the last business day of the registrant's most recently completed second fiscal quarter (August 13, 2022). $33.6 billion.

The number of shares outstanding of the registrant's common stock, as of the latest practicable date. 717,467,532, shares of Common Stock of $1 par value, as of March 22, 2023.

**Documents Incorporated by Reference:**

Portions of Kroger's definitive proxy statement for its 2023 annual meeting of shareholders, which shall be filed with the Securities and Exchange Commission within 120 days after the end of the fiscal year to which this Report relates, are incorporated by reference into Part III of this Report.

PX6009-108

PX6009-109

**The Kroger Co.**
**Form 10-K**

**For the Fiscal Year Ended January 28, 2023**

**Table of Contents**

|  |  | Page |
|---|---|---|
| Part I | | 2 |
| Item 1 | Business | 3 |
| Item 1A | Risk Factors | 11 |
| Item 1B | Unresolved Staff Comments | 19 |
| Item 2 | Properties | 19 |
| Item 3 | Legal Proceedings | 20 |
| Item 4 | Mine Safety Disclosures | 20 |
| | | |
| Part II | | 20 |
| Item 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 20 |
| Item 6 | Reserved | 22 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 23 |
| Item 7A | Quantitative and Qualitative Disclosures About Market Risk | 45 |
| Item 8 | Financial Statements and Supplementary Data | 48 |
| Item 9 | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 94 |
| Item 9A | Evaluation of Disclosure Controls and Procedures | 94 |
| Item 9B | Other Information | 94 |
| Item 9C | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 94 |
| | | |
| Part III | | 95 |
| Item 10 | Directors, Executive Officers and Corporate Governance | 95 |
| Item 11 | Executive Compensation | 95 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 95 |
| Item 13 | Certain Relationships and Related Transactions, and Director Independence | 96 |
| Item 14 | Principal Accounting Fees and Services | 96 |
| | | |
| Part IV | | 97 |
| Item 15 | Exhibits, Financial Statement Schedules | 97 |
| Item 16 | Form 10-K Summary | 99 |
| | Signatures | 100 |

PART I

**FORWARD LOOKING STATEMENTS.**

This Annual Report on Form 10-K contains forward-looking statements about our future performance.  These statements are based on our assumptions and beliefs in light of the information currently available to us.  These statements are subject to a number of known and unknown risks, uncertainties and other important factors, including the risks and other factors discussed in "Risk Factors" below, that could cause actual results and outcomes to differ materially from any future results or outcomes expressed or implied by such forward looking statements.  Such statements are indicated by words such as "achieve," "affect," "anticipate," "believe," "committed," "continue," "could," "deliver," "effect," "enable," "estimate," "expects," "future," "goal," "growth," "intended," "likely," "may," "model," "objective," "plan," "position," "program," "range," "result," "strategy," "strive," "strong," "target," "trend," "will" and "would," and similar words or phrases.  Moreover, statements in the sections entitled Risk Factors, Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), and elsewhere in this report regarding our expectations, projections, beliefs, intentions or strategies are forward-looking statements within the meaning of Section 21E of the Securities Exchange Act of 1934, as amended.

Various uncertainties and other factors could cause actual results to differ materially from those contained in the forward-looking statements.  These include:

- The extent to which our sources of liquidity are sufficient to meet our requirements may be affected by the state of the financial markets and the effect that such condition has on our ability to issue commercial paper at acceptable rates. Our ability to borrow under our committed lines of credit, including our bank credit facilities, could be impaired if one or more of our lenders under those lines is unwilling or unable to honor its contractual obligation to lend to us, or in the event that global pandemics, including the ongoing COVID-19 pandemic (including any variant), natural disasters or weather conditions interfere with the ability of our lenders to lend to us. Our ability to refinance maturing debt may be affected by the state of the financial markets.

PX6009-111

- Our ability to achieve sales, earnings and incremental FIFO operating profit goals may be affected by: the risks relating to or arising from our proposed transaction with Albertsons Companies, Inc. ("Albertsons") announced in October 2022, including, among others, our ability to consummate the proposed transaction, including on the terms of the merger agreement, on the anticipated timeline, and/or with the required regulatory approvals; COVID-19 pandemic related factors, risks and challenges; labor negotiations; potential work stoppages; changes in the unemployment rate; pressures in the labor market; changes in government-funded benefit programs; changes in the types and numbers of businesses that compete with us; pricing and promotional activities of existing and new competitors, including non-traditional competitors, and the aggressiveness of that competition; our response to these actions; the state of the economy, including interest rates, the current inflationary environment and future potential inflationary and/or deflationary trends and such trends in certain commodities, products and/or operating costs; the geopolitical environment including the war in Ukraine; unstable political situations and social unrest; changes in tariffs; the effect that fuel costs have on consumer spending; volatility of fuel margins; manufacturing commodity costs; supply constraints; diesel fuel costs related to our logistics operations; trends in consumer spending; the extent to which our customers exercise caution in their purchasing in response to economic conditions; the uncertainty of economic growth or recession; stock repurchases; changes in the regulatory environment in which we operate; our ability to retain pharmacy sales from third party payors; consolidation in the healthcare industry, including pharmacy benefit managers; our ability to negotiate modifications to multi-employer pension plans; natural disasters or adverse weather conditions; the effect of public health crises or other significant catastrophic events; the potential costs and risks associated with potential cyber-attacks or data security breaches; the success of our future growth plans; the ability to execute our go-to-market strategy and value creation model, including continued cost savings, growth of our alternative profit businesses, and our ability to better serve our customers and to generate customer loyalty and sustainable growth through our strategic pillars of fresh, *Our Brands*, personalization, and seamless; and the successful integration of merged companies and new partnerships.

- Our ability to achieve these goals may also be affected by our ability to manage the factors identified above. Our ability to execute our financial strategy may be affected by our ability to generate cash flow.

- Our effective tax rate may differ from the expected rate due to changes in tax laws, the status of pending items with various taxing authorities, and the deductibility of certain expenses.

We cannot fully foresee the effects of changes in economic conditions on our business.

Other factors and assumptions not identified above, including those discussed in Part I, Item 1A of this Annual Report, could also cause actual results to differ materially from those set forth in the forward-looking information. Accordingly, actual events and results may vary significantly from those included in, contemplated or implied by forward-looking statements made by us or our representatives. We undertake no obligation to update the forward-looking information contained in this filing.

Our ability to complete our proposed transaction with Albertsons may be affected by various factors, including those set forth in Part I, Item 1A of this Annual Report. Risk Factors included in this Annual Report on Form 10-K and other factors as may be described in subsequent filings with the SEC.

**ITEM 1.    BUSINESS.**

The Kroger Co. (the "Company" or "Kroger") was founded in 1883 and incorporated in 1902. Our Company is built on the foundation of our food retail business, which includes the added convenience of our retail pharmacies and fuel centers. Our strategy is focused on growing customer loyalty by delivering great value and convenience, and investing in four strategic pillars: Fresh, *Our Brands*, Data & Personalization and Seamless.

We also utilize the data and traffic generated by our retail business to deliver incremental value and services for our customers that generates alternative profit streams. These alternative profit streams would not exist without our core retail business.

PX6009-112

Our revenues are predominately earned and cash is generated as consumer products are sold to customers in our stores, fuel centers and via our online platforms.  We earn income predominately by selling products at price levels that produce revenues in excess of the costs we incur to make these products available to our customers.  Such costs include procurement and distribution costs, facility occupancy and operational costs, and overhead expenses.  Our fiscal year ends on the Saturday closest to January 31.  All references to 2022, 2021 and 2020 are to the fiscal years ended January 28, 2023, January 29, 2022 and January 30, 2021, respectively, unless specifically indicated otherwise.

We maintain a web site (www.thekrogerco.com) that includes the Kroger Fact Book and other additional information about the Company.  Kroger's website and any reports or other information made available by Kroger through its website are not part of or incorporated by reference into this Annual Report on Form 10-K.  We make available through our web site, free of charge, our annual reports on Form 10-K, our quarterly reports on Form 10-Q, our current reports on Form 8-K and our interactive data files, including amendments.  These forms are available as soon as reasonably practicable after we have filed them with, or furnished them electronically to, the SEC.

Kroger is diversified across brands, product categories, channels of distribution, geographies and consumer demographics.  Our combination of assets include the following:

*Stores*

As of January 28, 2023, Kroger operates supermarkets under a variety of local banner names in 35 states and the District of Columbia.  As of January 28, 2023, Kroger operated, either directly or through its subsidiaries, 2,719 supermarkets, of which 2,252 had pharmacies and 1,637 had fuel centers.  Approximately 50% of our supermarkets were operated in Company-owned facilities, including some Company-owned buildings on leased land.  Our stores operate under a variety of banners that have strong local ties and brand recognition.  We connect with customers through our expanding seamless ecosystem and the consistent delivery of a full, fresh, and friendly customer experience.  Fuel sales are an important part of our revenue, net earnings and loyalty offering.  Our fuel strategy is to include a fuel center at each of our supermarket locations when it is feasible and it is expected to be profitable.  Each fuel center typically includes 5 to 10 islands of fuel dispensers and storage tanks with capacity for 40,000 to 50,000 gallons of fuel. Supermarkets are generally operated under one of the following formats: combination food and drug stores ("combo stores"); multi-department stores; marketplace stores; or price impact warehouses.

The combo store is the primary food store format.  We believe this format is successful because the stores are large enough to offer the specialty departments that customers desire for one-stop shopping, including natural food and organic sections, pharmacies, general merchandise, pet centers and high-quality perishables such as fresh seafood and organic produce.

Multi-department stores are significantly larger in size than combo stores.  In addition to the departments offered at a typical combo store, multi-department stores sell a wide selection of general merchandise items such as apparel, home fashion and furnishings, outdoor living, electronics, automotive products and toys.

Marketplace stores are smaller in size than multi-department stores.  They offer full-service grocery, pharmacy and health and beauty care departments as well as an expanded perishable offering and general merchandise area that includes apparel, home goods and toys.

Price impact warehouse stores offer a "no-frills, low cost" warehouse format and feature everyday low prices plus promotions for a wide selection of grocery and health and beauty care items. Quality meat, dairy, baked goods and fresh produce items provide strategic differentiation for price impact warehouse stores. The average size of a price impact warehouse store is similar to that of a combo store.

PX6009-113

*Seamless Digital Ecosystem*

We offer a convenient shopping experience for our customers regardless of how they choose to shop with us, including Pickup, Delivery and Ship.  We offer Pickup and Harris Teeter ExpressLane™ — personalized, order online, pick up at the store services — at 2,274 of our supermarkets and provide Delivery, which allows us to offer digital solutions to substantially all of our customers.  Our Delivery solutions include orders delivered to customers from retail store locations and customer fulfillment centers powered by Ocado. These channels allow us to serve customers anything, anytime, and anywhere with zero compromise on selection, convenience, and price.  We also provide relevant customer-facing apps and interfaces that have the features customers want that are also reliable, easy to use and deliver a seamless customer experience across our store and digital channels.

*Merchandising and Manufacturing*

*Our Brands* products play an important role in our merchandising strategy and represented over $30 billion of our sales in 2022. Our supermarkets, on average, stock over 13,500 private label items. *Our Brands* products are primarily produced and sold in three "tiers." Private Selection® is our main premium quality brand, offering customers culinary foods and ingredients that deliver amazing eating experiences. The Kroger® brand, which represents the majority of our private label items, is designed to consistently satisfy and delight customers with quality products that exceed or meet the national brand in taste and efficacy, as well as with unique and differentiated products. Big K®, Smart Way® and Heritage Farm® are some of our value brands, designed to deliver good quality at a very affordable price.  In addition to our three "tiers," *Our Brands* offers customers a variety of natural and organic products with Simple Truth® and Simple Truth Organic®. Both Simple Truth and Simple Truth Organic are free from a defined list of artificial ingredients that some customers have told us they do not want in their food, and the Simple Truth Organic products are USDA certified organic.

Approximately 30% of *Our Brands* units and 42% of the grocery category *Our Brands* units sold in our supermarkets are produced in our food production plants; the remaining *Our Brands* items are produced to our strict specifications by outside manufacturers.  We perform a "make or buy" analysis on *Our Brands* products and decisions are based upon a comparison of market-based transfer prices versus open market purchases.  As of January 28, 2023, we operated 33 food production plants. These plants consisted of 14 dairies, 9 deli or bakery plants, five grocery product plants, two beverage plants, one meat plant and two cheese plants.

*Our Data*

The traffic and data generated by our retail supermarket business, including pharmacies and fuel centers, is enabling this transformation. Kroger serves approximately 60 million households annually and because of our rewards program, over 90% of customer transactions are tethered to a Kroger loyalty card.  Our 20 years of investment in data science capabilities is allowing us to utilize this data to create personalized experiences and value for our customers and is also enabling our fast-growing, high operating margin alternative profit businesses, including data analytic services and third party media revenue.  Our retail media business – Kroger Precision Marketing – provides differentiated media capabilities for our consumer packaged goods partners and is a key driver of our digital profitability and alternative profit.

*Proposed Merger with Albertsons*

As previously disclosed, on October 13, 2022, we entered into a merger agreement with Albertsons.  The proposed merger is expected to accelerate our go-to-market strategy that includes Fresh, *Our Brands*, Personalization and Seamless, and continue our track record of investments across lowering prices, enhancing the customer experience, and increasing associate wages and benefits.  For additional information about the proposed merger with Albertsons, see Note 16 to the Consolidated Financial Statements.

PX6009-114

## SEGMENTS

We operate supermarkets, multi-department stores and fulfillment centers throughout the United States.  Our retail operations, which represent 97% of our consolidated sales, is our only reportable segment.  We aggregate our operating divisions into one reportable segment due to the operating divisions having similar economic characteristics with similar long-term financial performance.  In addition, our operating divisions offer customers similar products, have similar distribution methods, operate in similar regulatory environments, purchase the majority of the merchandise for retail sale from similar (and in many cases identical) vendors on a coordinated basis from a centralized location, serve similar types of customers, and are allocated capital from a centralized location.  Our operating divisions are organized primarily on a geographical basis so that the operating division management team can be responsive to local needs of the operating division and can execute company strategic plans and initiatives throughout the locations in their operating division. This geographical separation is the primary differentiation between these retail operating divisions.  The geographical basis of organization reflects how the business is managed and how our Chief Executive Officer, who acts as our chief operating decision maker, assesses performance internally.  All of our operations are domestic.  Revenues, profits and losses and total assets are shown in our Consolidated Financial Statements set forth in Item 8 below.

## SEASONALITY

The majority of our revenues are generally not seasonal in nature.  However, revenues tend to be higher during the major holidays throughout the year.  Additionally, certain significant events including inclement weather systems, particularly winter storms, tend to affect our sales trends.

## HUMAN CAPITAL MANAGEMENT

### Our People

We want Kroger to be a place where our customers love to shop and associates love to work. This is why we aim to create working environments where associates feel encouraged and supported to be their best selves every day.  As of January 28, 2023, Kroger employed nearly 430,000 full- and part-time employees.  Our people are essential to our success, and we focus intentionally on attracting, developing and engaging a diverse workforce that represents the communities we serve.  We strive to create a culture of opportunity and take seriously our role as a leading employer in the United States. Kroger has provided a large number of people with first jobs, new beginnings and lifelong careers.  We have long been guided by our core values – Honesty, Integrity, Respect, Safety, Diversity and Inclusion.

### Attracting & Developing Our Talent

To deliver on our customers' experiences, we continually improve how we attract and retain talent. In addition to competitive wages, quality benefits and a safe work environment, we offer a broad range of employment opportunities for workers of all ages and aspirations.  Many supermarket roles offer opportunities to learn new skills, grow and advance careers.

Associates at all levels of the Company have access to training and education programs to build their skills and prepare for the roles they want. In 2023, we expect to spend approximately $175 million on training our associates through onboarding, leadership development programs, and programs designed to upskill associates across the Company. We continue to invest in new platforms and applications to make learning more accessible to our associates.

Beyond our own programs, associates can take advantage of our tuition reimbursement benefit, which offers up to $3,500 annually — $21,000 over the course of employment — toward continuing education. These funds can be applied to education programs like certifications, associate or graduate degrees.  Approximately 5,000 associates, 90% of whom are hourly, have taken advantage of our tuition reimbursement program in 2022.  Kroger has invested more than $50 million in this program since it launched in 2018.

PX6009-115

*Rewarding Our Associates*

As we continue to operate in a challenging labor market, we are dedicated to attracting and retaining the right talent across the organization to be able to continue delivering for our customers. We are investing in our associates by expanding our industry-leading benefits, including continuing education, training and development, health and wellness. During 2022, we raised our average hourly rates by more than 6% and have now invested an incremental $1.9 billion in associate wages since 2018. Our average hourly rate is now more than $18 and more than $23, when comprehensive benefits are included.  We are committed to sustainably increasing associate wages and plan to invest more than $770 million in associates in 2023.

*Promoting Diversity, Equity & Inclusion*

Diversity and inclusion have been among Kroger's values for decades. We strive to reflect the communities we serve and foster a culture that empowers everyone to be their true self, inspires collaboration, and feeds the human spirit. We have taken a very thoughtful and purposeful approach to enact meaningful change and develop what we believe are the right actions to achieve true and lasting equality. Our *Framework for Action: Diversity, Equity & Inclusion* plan reflects our desire to redefine, deepen, and advance our commitment, mobilizing our people, passion, scale and resources.  The following summarizes our framework: Create a More Inclusive Culture; Develop Diverse Talent; Advance Diverse Partnerships; Advance Equitable Communities; and Deeply Listen and Report Progress.

*Creating a Safe Environment*

Our associates' safety is a top priority and it is one of our core values. We prioritize providing the right safety training and equipment, safe working conditions and resources to maintain and improve associates' well-being. Through our strategy to set clear expectations, routine monitoring, and regular communication and engagement, we reduce the number of injuries and accidents that happen in our workplace.  We track health and safety metrics centrally for an enterprise-wide view of issues, trends and opportunities and monitor associate injury performance including total injuries, Occupational Safety and Health Administration ("OSHA") injury rates, and lost-time injuries, as well as customer injury metrics like slip-and-fall injuries. We also track the completion of required training for associates and we regularly share these metrics with leaders and relevant team members to inform management decisions.

*Supporting Labor Relations*

A majority of our employees are covered by collective bargaining agreements negotiated with local unions affiliated with one of several different international unions. There are approximately 320 such agreements, usually with terms of three to five years.  Wages, health care and pensions are included in all of these collective bargaining agreements that cover approximately 65% of our associates.  Our objective is to negotiate contracts that balance competitive wage increases and affordable healthcare for associates with keeping groceries affordable for the communities we serve. Our obligation is to do this in a way that maintains a financially sustainable business.

## MANAGING CLIMATE IMPACTS

Managing climate change impacts is an important part of *Thriving Together*, Kroger's Environmental, Social & Governance ("ESG") strategy, and has been a focus for our business for many years. With a large portfolio of supermarkets, distribution warehouses and food production plants, as well as a complex supply chain, we recognize Kroger's impact on our climate.  We continue to explore opportunities and take steps to reduce the effects of our operations on the environment and to reduce the potential risk of a changing climate on our operations.  This includes enhancing our operational efficiency, increasing our usage of renewable energy and investing in new technologies.  The key elements of our climate strategy are included below.

PX6009-116

*Governance*

Climate effects are managed by leadership with input from several departments across the business. The Public Responsibilities Committee of the Board of Directors oversees our responsibilities as a corporate citizen and the Company's practices related to environmental sustainability, including climate effects, along with other environmental and social topics of material importance. Kroger discloses detailed energy and emissions data, as well as our approach to managing climate-related topics, in our annual ESG Report, which can be found at www.thekrogerco.com/esgreport.

*Risk assessment*

To help identify and manage climate-related risks to our business, we conduct both qualitative and quantitative risk assessments.  We conducted our first quantitative climate risk assessment to determine the likelihood that different physical climate risks, including drought, extreme heat and extreme precipitation, would affect Kroger's operations at representative facilities in different geographies and, in turn, potentially increase operating costs for these facilities.  As a result of our risk assessments, we do not currently anticipate the modeled physical risks to adversely affect our financial condition, results of operations or cash flows for the foreseeable future.  We plan to continue these qualitative and quantitative risk assessments moving forward.

Kroger also acknowledges that current and emerging climate-related legislation could affect our business. As a result of forthcoming state and federal requirements regarding the phase down of hydrofluorocarbon ("HFC") refrigerants, we anticipate steadily replacing our refrigerant infrastructure to reach required levels, which could incur significant costs to the business.  If legislation required an accelerated timeline regarding the phase down of HFC refrigerants, we could incur higher costs.  Any such legislation will affect all retailers using refrigerants in their operations.

*Climate adaptation*

To help prepare for and manage a variety of risk scenarios, including natural disasters and business disruptions to our supply chain, we maintain more than 200 business continuity plans. We have installed technologies and processes to ensure our supermarkets, food production plants, fulfillment centers and supply chain can respond quickly and remain operational. We also monitor energy availability and costs to help anticipate how changing climate patterns, like increasing temperatures, could affect our energy-sourcing costs and activities. Our teams also monitor transition risks due to climate change, including the effect possible new legislation may have on our business.

*Climate mitigation*

For many years, Kroger has implemented emission reduction projects, including energy efficiency improvements, refrigerant leak detection and mitigation measures, renewable energy installations and procurement and fleet efficiencies. In 2020, we set a goal to reduce absolute greenhouse gas ("GHG") emissions from our operations (scope 1 and 2 emissions) by 30% by 2030, against a 2018 baseline. The goal was developed using climate science and is aligned with the Paris Agreement, specifically supporting a well-below 2°C climate scenario according to the absolute contraction method.  Kroger is in the process of resetting its GHG reduction target to align with the requirements of the Science Based Targets initiative. This includes resetting our current Scope 1 and 2 emissions goal to support the 1.5°C scenario, and setting new Scope 3 emissions goals.

Additional discussion about our approach to managing climate effects is included in our annual ESG Report.  The information in our ESG Report is not part of or incorporated by reference into this Annual Report on Form 10-K.

PX6009-117

**INFORMATION ABOUT OUR EXECUTIVE OFFICERS**

The following is a list of the names and ages of the executive officers and the positions held by each such person. Except as otherwise noted, each person has held office for at least five years. Each officer will hold office at the discretion of the Board for the ensuing year until removed or replaced.

| Name | Age | Recent Employment History |
| --- | --- | --- |
| Mary E. Adcock | 47 | Ms. Adcock was elected Senior Vice President effective May 1, 2019 and is responsible for retail operations as well as the oversight of all Kroger retail divisions. From June 2016 to April 2019, she served as Group Vice President of Retail Operations. Prior to that, Ms. Adcock held leadership roles in Kroger's Columbus Division, including Vice President of Operations and Vice President of Merchandising. Prior to that, Ms. Adcock served as Vice President of Natural Foods Merchandising and as Vice President of Deli/Bakery Manufacturing and held several leadership positions in the manufacturing department, including human resources manager, general manager and division operations manager. Ms. Adcock joined Kroger in 1999 as human resources assistant manager at the Country Oven Bakery in Bowling Green, Kentucky. |
| Stuart W. Aitken | 51 | Mr. Aitken was named Senior Vice President and Chief Merchant and Marketing Officer in August 2020. He was elected Senior Vice President in February 2019 and served as Group Vice President from June 2015 to February 2019. He is responsible for sales, pricing, promotional and category planning for fresh foods, center store and general merchandise categories, as well as analytics & execution, e-commerce and Digital Merchandising, and *Our Brands*. Prior to joining Kroger, he served as the chief executive officer of dunnhumby USA, LLC. Mr. Aitken has over 15 years of marketing, academic and technical experience across a variety of industries, and held various leadership roles with other companies, including Michaels Stores and Safeway, Inc. |
| Gabriel Arreaga | 48 | Mr. Arreaga was elected Senior Vice President of Supply Chain in December 2020. He is responsible for the company's industry-leading Supply Chain organization, Logistics, Inventory & Replenishment, Manufacturing, and Fulfillment Centers. Prior to Kroger, Mr. Arreaga served as Senior Vice President of Supply Chains for Mondelez, where he was responsible for all operations and functions from field to consumer, internal and external factories, fulfillment centers, direct to store branches, Logistics and product development. He was also Global Vice President of Operations for Stanley Black and Decker and held numerous leadership roles at Unilever including Vice President of Food and Beverage Operations. |
| Yael Cosset | 49 | Mr. Cosset was elected Senior Vice President and Chief Information Officer in May 2019 and is responsible for leading Kroger's digital strategy, focused on building Kroger's presence in the marketplace in digital channels, personalization and e-commerce. In August 2020, he also assumed responsibility for Kroger's alternative profit businesses, including Kroger's data analytics subsidiary, 84.51°LLC and Kroger Personal Finance. Prior to that, Mr. Cosset served as Group Vice President and Chief Digital Officer, and also as Chief Commercial Officer and Chief Information Officer of 84.51° LLC. Prior to joining Kroger, Mr. Cosset served in several leadership roles at dunnhumby USA, LLC, including Executive Vice President of Consumer Markets and Global Chief Information Officer. |

PX6009-118

| | | |
|---|---|---|
| Carin L. Fike | 54 | Ms. Fike was elected Vice President and Treasurer effective April 2017. Prior to that, she served as Assistant Treasurer and also as Director of Investor Relations. Ms. Fike began her career with Kroger in 1999 as a manager in the Financial Reporting department after working with PricewaterhouseCoopers in various roles, including audit manager. |
| Todd A. Foley | 53 | Mr. Foley was named Group Vice President, Corporate Controller on October 1, 2021. From April 2017 to September 2021, he served as Vice President and Corporate Controller. Before that, he held several leadership roles, including Vice President and Treasurer, Assistant Corporate Controller, and Controller of Kroger's Cincinnati/Dayton division. Mr. Foley began his career with Kroger in 2001 as an audit manager in the Internal Audit Department after working for PricewaterhouseCoopers in various roles, including senior audit manager. |
| Valerie L. Jabbar | 54 | Ms. Jabbar was elected Senior Vice President effective August 19, 2021 and is responsible for the oversight of several Kroger retail divisions. From July 2020 to August 2021, she served as Group Vice President of Center Store Merchandising, and from September 2018 to June 2020, as Group Vice President of Merchandising. Prior to that, she served as President of the Ralphs Division from July 2016 to August 2018. Before that, Ms. Jabbar served as Vice President of Merchandising for the Ralphs Division and as Vice President of Merchandising for the Mid-Atlantic Division. She also held several leadership roles, including assistant store director, category manager, Drug/GM coordinator, G.O. Seasonal manager, assistant director of Drug/GM and director of Drug GM, and district manager in the Fry's Division. She joined the Company in 1987 as a clerk in the Fry's Division. |
| Kenneth C. Kimball | 57 | Mr. Kimball was elected Senior Vice President in March 2022 and is responsible for the oversight of several Kroger retail divisions. From April 2016 to March 2022, he served as President of the Smith's Division. Prior to that, he held several leadership roles with the Ralphs Division, including Vice President of Operations and Vice President of Merchandising. Prior to that, he held leadership roles, including store manager, district manager, and director in the Smith's Division as well as Senior Vice President of Sales and Merchandising and Group Vice President of Retail Operations. Mr. Kimball joined the Company in 1984 as a clerk in the Smith's Division. |
| Timothy A. Massa | 56 | Mr. Massa was elected Senior Vice President of Human Resources and Labor Relations in June 2018. Prior to that, he served as Group Vice President of Human Resources and Labor Relations from June 2014 to June 2018. Mr. Massa joined Kroger in October 2010 as Vice President, Corporate Human Resources and Talent Development. Prior to joining Kroger, he served in various Human Resources leadership roles for 21 years at Procter & Gamble, most recently serving as Global Human Resources Director of Customer Business Development. |

PX6009-119

| W. Rodney McMullen | 62 | Mr. McMullen was elected Chairman of the Board effective January 1, 2015, and Chief Executive Officer effective January 1, 2014.  Prior to that, he served as President and Chief Operating Officer from August 2009 to December 2013.  Prior to that he held numerous leadership roles, including Vice Chairman, Executive Vice President of Strategy, Planning and Finance, Executive Vice President and Chief Financial Officer, Senior Vice President, Group Vice President and Chief Financial Officer, Vice President, Control and Financial Services, and Vice President, Planning and Capital Management. Mr. McMullen joined Kroger in 1978 as a part-time stock clerk. |
| Gary Millerchip | 51 | Mr. Millerchip was elected Senior Vice President and Chief Financial Officer effective April 2019.  From July 2010 to April 2019, he served as Chief Executive Officer of Kroger Personal Finance.  Before coming to Kroger, Mr. Millerchip was responsible for the Royal Bank of Scotland (RBS) Personal Credit Card business in the United Kingdom.  He joined RBS in 1987 and held leadership positions in Sales & Marketing, Finance, Change Management, Retail Banking Distribution Strategy and Branch Operations during his time there. |
| Christine S. Wheatley | 52 | Ms. Wheatley was elected Group Vice President, Secretary and General Counsel in May 2014.  She joined Kroger in February 2008 as Corporate Counsel, and thereafter served as Senior Attorney, Senior Counsel, and Vice President. Before joining Kroger, Ms. Wheatley was engaged in the private practice of law for 11 years, most recently as a partner at Porter Wright Morris & Arthur in Cincinnati. |

**COMPETITIVE ENVIRONMENT**

For the disclosure related to our competitive environment, see Item 1A under the heading "Competitive Environment."

**ITEM 1A.   RISK FACTORS.**

There are risks and uncertainties that can affect our business.  The significant risk factors are discussed below.  The following information should be read together with "Management's Discussion and Analysis of Financial Condition and Results of Operations," which includes forward-looking statements and factors that could cause us not to realize our goals or meet our expectations.

PX6009-120

**OUR PROPOSED TRANSACTION WITH ALBERTSONS CREATES INCREMENTAL BUSINESS, REGULATORY AND REPUTATIONAL RISKS**

On October 13, 2022, we entered into a merger agreement with Albertsons Companies Inc. ("Albertsons"), which sets forth the terms of our proposed transaction. The proposed transaction with Albertsons entails important risks, including, among others: the expected timing and likelihood of completion of the proposed transaction, including the timing, receipt and terms and conditions of any required governmental and regulatory clearance of the proposed transaction; the effect and terms and conditions of any potential divestitures, including those that may be imposed by regulators as a condition to the approval of the proposed transaction, and/or the separation of SpinCo (as described in the merger agreement); the occurrence of any event, change or other circumstances that could give rise to the termination of the merger agreement; the outcome of any legal proceedings that have been instituted and may in the future be instituted against the parties and others following announcement of the merger agreement and proposed transaction; the inability to consummate the proposed transaction due to the failure to satisfy other conditions to complete the proposed transaction; risks that the proposed transaction disrupts our current plans and operations; the ability to identify and recognize, including on the expected timeline, the anticipated total shareholder return ("TSR"), revenue and EBITDA expectations; the amount of the costs, fees, expenses and charges related to the proposed transaction; the risk that transaction and/or integration costs are greater than expected, including as a result of conditions regulators put on any approvals of the transaction; the potential effect of the announcement and/or consummation of the proposed transaction on relationships, including with associates, suppliers and competitors; our ability to maintain an investment grade credit rating; the risk that management's attention is diverted from other matters; risks related to the potential effect of general economic, political and market factors, including changes in the financial markets as a result of inflation or measures implemented to address inflation, and any epidemic, pandemic or disease outbreaks, on Kroger, Albertsons or the proposed transaction; the risk of adverse effects on the market price of our or Albertsons's securities or on Albertsons's or the Company's operating results for any reason; the occurrence of any event, change or other circumstances that could give rise to the termination of the merger agreement; and other risks described in our filings with the SEC.

**INTEGRATION OF NEW BUSINESS AND STRATEGIC ALLIANCES**

In addition to the above, we enter into mergers, acquisitions and strategic alliances with expected benefits including, among other things, operating efficiencies, procurement savings, innovation and sharing of best practices, that may allow for future growth. Achieving the anticipated or desired benefits may be subject to a number of significant challenges and uncertainties, including, without limitation, whether unique corporate cultures will work collaboratively in an efficient and effective manner, the coordination of geographically separate organizations, the possibility of imprecise assumptions underlying expectations regarding potential synergies, capital requirements, and the integration process, unforeseen expenses and delays, and competitive factors in the marketplace. We could also encounter unforeseen transaction and integration-related costs or other circumstances such as unforeseen liabilities or other issues. Many of these potential circumstances are outside of our control and any of them could result in increased costs, decreased revenue, decreased synergies and the diversion of management time and attention. If we are unable to achieve our objectives within the anticipated time frame, or at all, the expected benefits may not be realized fully or at all, or may take longer to realize than expected, which could have an adverse effect on our business, financial condition, results of operations or cash flows.

**COMPETITIVE ENVIRONMENT**

The operating environment for the food retailing industry continues to be characterized by the fragmentation of local, regional, and national retailers, including both retail and digital formats, intense competition and entry of non-traditional competitors. Customer behavior shifted quickly and considerably during the pandemic, including a shift from food away from home to food at home. We see three major trends shaping the industry: e-commerce, cooking at home and prepared foods to go. If we do not appropriately or accurately anticipate customer preferences or fail to quickly adapt to these changing preferences, or if trends shift more quickly to food away from home, our sales and profitability could be adversely affected. If we fail to meet the evolving needs of our customers, our ability to compete and our financial condition, results of operations or cash flows could be adversely affected.

PX6009-121

We are continuing to enhance the customer connection with investments in our four strategic pillars – Seamless, Personalization, Fresh, and *Our Brands*. Each of these are strategies designed to better serve our customers and to generate customer loyalty and sustainable growth momentum. We believe our plans to continue to improve these four strategic pillars will enable us to meet the wide-ranging needs and expectations of our customers. If we are unable to continue to enhance the foregoing key elements of our connection with customers, or they fail to strengthen customer loyalty, our ability to compete and our financial condition, results of operations or cash flows could be adversely affected. Our ecosystem monetizes the traffic and data insights generated by our retail supermarket business to create fast-growing, asset-light and margin rich revenue streams. We may be unsuccessful in implementing our alternative profit strategy, which could adversely affect our business growth and our financial condition, results of operations or cash flows. The nature and extent to which our competitors respond to the evolving and competitive industry by developing and implementing their competitive strategies could adversely affect our profitability.

In addition, evolving customer preferences and the advancement of online, delivery, ship to home, and mobile channels in our industry increase the competitive environment. We must anticipate and meet these evolving customer preferences and continue to implement technology, software and processes to be able to conveniently and cost-effectively fulfill customer orders. Providing flexible fulfillment options and implementing new technology is complex and may not meet customer preferences. If we are not successful in reducing or offsetting the cost of fulfilling orders outside of our traditional in-store channel with efficiencies, cost-savings, expense reductions, or alternative revenues, our financial condition, results of operations or cash flows could be adversely affected.

In addition, if we do not successfully develop and maintain a relevant digital experience for our customers, our business, financial condition, results of operations or cash flows could be adversely affected. Digital retailing is rapidly evolving, and we must keep pace with new developments by our competitors as well as the evolving needs and preferences of our customers. Our digital business accelerated significantly during the COVID-19 pandemic. We must compete by offering a convenient shopping experience for our customers regardless of how they choose to shop with us, and by investing in, providing and maintaining relevant customer-facing apps and interfaces that have the features customers want that are also reliable and easy to use. The future success of the digital business will also depend on the efficiency and cost effectiveness of fulfilling orders across our modalities, whether in store, in pickup-only locations, or through customer fulfillment centers powered by Ocado.

**PRODUCT SAFETY**

Customers count on Kroger to provide them with safe food and drugs and other merchandise. Concerns regarding the safety of the products that we sell could cause shoppers to avoid purchasing certain products from us, or to seek alternative sources of supply even if the basis for the concern is outside of our control. Any lost confidence on the part of our customers would be difficult and costly to reestablish. We could be adversely affected by personal injury or product liability claims, product recalls, or other health and safety issues, which occur from time to time. If we sell products that cause illness or injury to customers, resulting from product contamination or spoilage, the presence of certain substances, or damage caused in handling, storage or transportation, we could be exposed to claims or litigation. Any issue regarding the safety of items, whether *Our Brands* items manufactured by the Company or for the Company or CPG products we sell, regardless of the cause, could have a substantial and adverse effect on our reputation, financial condition, results of operations or cash flows.

**EMPLOYEE MATTERS**

A majority of our associates are covered by collective bargaining agreements with unions, and our relationship with those unions, including a prolonged work stoppage affecting a substantial number of locations, could have a material adverse effect on our financial condition, results of operations or cash flows. We are a party to approximately 310 collective bargaining agreements. Upon the expiration of our collective bargaining agreements, work stoppages by the affected workers could occur (and have occurred in the past) if we are unable to negotiate new contracts with labor unions. In addition, changes to national labor policy could affect labor relations with our associates and relationships with unions. Further, if we are unable to control health care, pension and wage costs, or if we have insufficient operational flexibility under our collective bargaining agreements, we may experience increased operating costs and an adverse effect on our financial condition, results of operations or cash flows.

13

We have committed to paying fair wages and providing the benefits that were collectively bargained with the United Food and Commercial Workers ("UFCW") and other labor unions representing associates. Our ability to control labor and benefit costs is subject to numerous internal and external factors, including regulatory changes, wage rates, and healthcare and other insurance costs. Changes to wage regulations, including further increases in the minimum wage and extra pay ordinances enacted by local governments, could have an impact on our future financial condition, results of operations or cash flows.  Our ability to meet our labor needs, while controlling wages and other costs, is subject to numerous external factors, including the available qualified workforce in each area where we are located, unemployment levels within those areas, wage rates, and changes in employment and labor laws.

Our continued success depends on the ongoing contributions of our associates, including members of our senior management and other key personnel. We must recruit, hire, develop and retain qualified associates with an increasingly large range of skills to meet the needs of our evolving and complex business. We compete with other retail and non-retail businesses for these associates and invest significant resources in training and motivating them. Competition among potential employers has resulted, and may in the future result, in increased associate costs and has from time to time affected our ability to recruit and retain associates.  There is no assurance that we will be able to attract or retain sufficient highly qualified associates in the future, which could have a material adverse effect on our business, financial condition, results of operations or cash flows.

## DATA AND TECHNOLOGY

Our business is increasingly dependent on information technology systems that are complex and vital to continuing operations, resulting in an expansion of our technological presence and corresponding risk exposure.  If we were to experience difficulties maintaining or operating existing systems or implementing new systems, we could incur significant losses due to disruptions in our operations.  As we modernize legacy systems, if we are unable to successfully implement those systems in a coordinated manner across internal and external stakeholders, we could be subject to business interruption or reputation risk with our customers, suppliers or associates.

Through our sales and marketing activities, we collect and store some personal information that our customers provide to us. We also gather and retain information about our associates in the normal course of business. Under certain circumstances, we may share information with vendors that assist us in conducting our business, as required by law, or otherwise in accordance with our privacy policy.

Our technology systems have been, and may be in the future, disrupted from circumstances beyond our control, as we regularly defend against and respond to data security incidents.  Cyber-attackers have targeted and accessed, and may in the future again target and, if successful, access, information stored in our or our vendors' systems in order to misappropriate confidential customer or business information.  Due to the ongoing war between Russia and Ukraine, there is an increased possibility of cyberattacks that could either directly or indirectly affect our operations.  Although we have implemented procedures to protect our information, and require our vendors to do the same, we cannot be certain that our security systems will successfully defend against, or be able to effectively respond to, rapidly evolving, increasingly sophisticated cyber-attacks as they become more difficult to detect and defend against.  Further, a Kroger associate, a contractor or other third party with whom we do business may in the future circumvent our security measures in order to obtain information or may inadvertently cause a breach involving information.  In addition, hardware, software or applications we may use may have inherent defects, vulnerabilities, or could be inadvertently or intentionally applied or used in a way that could compromise our information security.

PX6009-123

Our cybersecurity program, continued investment in our information technology systems, and our processes to evaluate and select vendors with reasonable information security controls may not effectively insulate us from potential attacks, data breaches or disruptions to our business operations, which could result in a loss of customers or business information, negative publicity, damage to our reputation, and exposure to claims from customers, financial institutions, regulatory authorities, payment card associations, associates and other persons.  Any such events could have an adverse effect on our business, financial condition, results of operations or cash flows and may not be covered by our insurance. In addition, compliance with privacy and information security laws and standards may result in significant expense due to increased investment in technology and the development of new operational processes and may require us to devote significant management resources to address these issues.  The costs of attempting to protect against the foregoing risks and the costs of responding to cyber-attacks are significant. Following a cyber-attack, our and/or our vendors' remediation efforts may not be successful, and a cyber-attack could result in interruptions, delays or cessation of service, and loss of existing or potential customers.  In addition, breaches of our and/or our vendors' security measures and the unauthorized dissemination of sensitive personal information or confidential information about us or our customers could expose our customers' private information and our customers to the risk of financial or medical identity theft, or expose us or other third parties to a risk of loss or misuse of this information, and result in investigations, regulatory enforcement actions, material fines and penalties, loss of customers and business relationships, litigation or other actions which could have a material adverse effect on our brands, reputation, business, financial condition, results of operations or cash flows.

Data governance failures can adversely affect our reputation and business. Our business depends on our customers' willingness to entrust us with their personal information. Events that adversely affect that trust, including inadequate disclosure to our customers of our uses of their information, failures to honor new and evolving data privacy rights, failing to keep our information technology systems and our customers' sensitive information secure from significant attack, theft, damage, loss or unauthorized disclosure or access, whether as a result of our action or inaction (including human error) or that of our business associates, vendors or other third parties, could adversely affect our brand and reputation and operating results and also could expose and/or has exposed us to mandatory disclosure to the media, litigation (including class action litigation), governmental investigations and enforcement proceedings, material fines, penalties and/or remediation costs, and compensatory, special, punitive and statutory damages, consent orders, and/or injunctive relief, any of which could adversely affect our businesses, financial condition, results of operations or cash flows. Large scale data breaches at other entities, including supply chain security vulnerabilities, increase the challenge we and our vendors face in maintaining the security of our information technology systems and proprietary information and of our customers' information. There can be no assurance that such failures will not occur, or if any do occur, that we will detect them or that they can be sufficiently remediated.

The use of data by our business and our business associates is highly regulated.  Privacy and information-security laws and regulations change, and compliance with them may result in cost increases due to, among other things, systems changes and the development of new processes. If we, our third party service providers, or those with whom we share information fail to comply with laws and regulations, or self-regulatory regimes, that apply to all or parts of our business, such as section 5 of the FTC Act, the California Consumer Privacy Act (CCPA), the Health Insurance Portability and Accountability Act (HIPAA), or applicable international laws such as the EU General Data Protection Regulation (GDPR), our reputation could be damaged, possibly resulting in lost business, and we could be subjected to additional legal risk or financial losses as a result of non-compliance.

PX6009-124

## PAYMENT SYSTEMS

We accept payments using a variety of methods, including cash and checks, select credit and debit cards, and Kroger Pay, a mobile payment solution.  As we offer new payment options to our customers, we may be subject to additional rules, regulations, compliance requirements, and higher fraud losses. For certain payment methods, we pay interchange and other related acceptance fees, along with additional transaction processing fees. We rely on third parties to provide payment transaction processing services for credit and debit cards. It could disrupt our business if these companies become unwilling or unable to provide these services to us, including due to short term disruption of service. We are also subject to evolving payment card association and network operating rules, including data security rules, certification requirements and rules governing electronic funds transfers. For example, we are subject to Payment Card Industry Data Security Standards ("PCI DSS"), which contain compliance guidelines and standards with regard to our security surrounding the physical and electronic storage, processing and transmission of individual cardholder data. If our payment card terminals or internal systems are breached or compromised, we may be liable for card re-issuance costs and other costs, subject to fines and higher transaction fees, and lose our ability to accept card payments from our members, or if our third-party service providers' systems are breached or compromised, our business, financial condition, results of operations or cash flows could be adversely affected.

## INDEBTEDNESS

Our indebtedness could reduce our ability to obtain additional financing for working capital, mergers and acquisitions or other purposes and could make us vulnerable to future economic downturns as well as competitive pressures.  If debt markets do not permit us to refinance certain maturing debt, we may be required to dedicate a substantial portion of our cash flow from operations to payments on our indebtedness.  Changes in our credit ratings, or in the interest rate environment, could have an adverse effect on our financing costs and structure.

## LEGAL PROCEEDINGS AND INSURANCE

From time to time, we are a party to legal proceedings, including matters involving personnel and employment issues, personal injury, contract disputes, regulatory claims and other proceedings.  Other legal proceedings purport to be brought as class actions on behalf of similarly situated parties.  Some of these proceedings could result in a substantial loss to Kroger.  We estimate our exposure to these legal proceedings and establish accruals for the estimated liabilities, where it is reasonably possible to estimate and where an adverse outcome is probable.  Assessing and predicting the outcome of these matters involves substantial uncertainties.  Adverse outcomes in these legal proceedings, or changes in our evaluations or predictions about the proceedings, could have an adverse effect on our financial condition, results of operations or cash flows.  Please also refer to the "Litigation" section in Note 12 to the Consolidated Financial Statements.

We use a combination of insurance and self-insurance to provide for potential liability for workers' compensation, automobile and general liability, property, director and officers' liability, cyber risk exposure and associate health care benefits.  Any actuarial projection of losses is subject to a high degree of variability. With respect to insured matters, we are liable for retention amounts that vary by the nature of the claim, and some losses may not be covered by insurance. Changes in legal claims, trends and interpretations, variability in inflation rates, changes in the nature and method of claims settlement, benefit level changes due to changes in applicable laws, insolvency of insurance carriers, and changes in discount rates could all affect our financial condition, results of operations or cash flows.

16

PX6009-125

## MULTI-EMPLOYER PENSION OBLIGATIONS

As discussed in more detail below in "Management's Discussion and Analysis of Financial Condition and Results of Operations-Critical Accounting Policies-Multi-Employer Pension Plans," Kroger contributes to several multi-employer pension plans based on obligations arising under collective bargaining agreements with unions representing associates covered by those agreements. We believe the present value of actuarially accrued liabilities in most of these multi-employer plans exceeds the value of the assets held in trust to pay benefits, and we expect that Kroger's contributions to most of these funds will increase over the next few years. A significant increase to those funding requirements could adversely affect our financial condition, results of operations or cash flows. Despite the fact that the pension obligations of these funds are not the liability or responsibility of the Company, except as noted below, there is a risk that the agencies that rate our outstanding debt instruments could view the underfunded nature of these plans unfavorably, or adjust their current views unfavorably, when determining their ratings on our debt securities. Any downgrading of our debt ratings likely would adversely affect our cost of borrowing and access to capital.

We also currently bear the investment risk of two multi-employer pension plans in which we participate. In addition, we have been designated as the named fiduciary of these funds with sole investment authority of the assets of these funds. If investment results fail to meet our expectations, we could be required to make additional contributions to fund a portion of or the entire shortfall, which could have an adverse effect on our business, financial condition, results of operations or cash flows.

## FUEL

We sell a significant amount of fuel in our 1,637 fuel centers, which could face increased regulation, including due to climate change or other environmental concerns, and demand could be affected by concerns about the effect of emissions on the environment as well as retail price increases. We are unable to predict future regulations, environmental effects, political unrest, acts of war or terrorism, disruptions to the economy, including but not limited to the COVID-19 pandemic, the war between Russia and Ukraine, and other matters that affect the cost and availability of fuel, and how our customers will react to such factors, which could adversely affect our financial condition, results of operations or cash flows.

## ECONOMIC CONDITIONS

Our operating results could be materially affected by changes in overall economic conditions and other economic factors that impact consumer confidence and spending, including discretionary spending. Future economic conditions affecting disposable consumer income such as employment levels, business conditions, overall economic slowdown or recession, changes in housing market conditions, changes in government benefits such as SNAP/EBT or child care credits, the availability of credit, interest rates, inflation or deflation, tax rates and other matters could reduce consumer spending. Inflation could materially affect our operating results through increases to our cost of goods, supply chain costs and labor costs. In addition, the economic factors listed above, or any other economic factors or circumstances resulting in higher transportation, labor, insurance or healthcare costs or commodity prices, and other economic factors can increase our merchandise costs and operating, general and administrative expenses and otherwise adversely affect our financial condition, results of operations or cash flows. Increased fuel prices also have an effect on consumer spending and on our costs of producing and procuring products that we sell. A deterioration in overall economic conditions, including the uncertainty caused by inflation rate volatility, could adversely affect our business in many ways, including slowing sales growth, reducing overall sales and reducing gross margins. We regularly maintain cash balances at third-party financial institutions in excess of the Federal Deposit Insurance Corporation ("FDIC") insurance limit and are therefore reliant on banks and other financial institutions to safeguard and allow ready access to these assets. If banks or financial institutions enter receivership or become insolvent in the future in response to financial conditions affecting the banking system and financial markets, our ability to access our existing cash, cash equivalents and investments may be threatened. We are unable to predict how the global economy and financial markets will perform. If the global economy and financial markets do not perform as we expect, it could adversely affect our business, financial condition, results of operations or cash flows.

PX6009-126

**COVID-19**

COVID-19 has impacted and may continue to impact our business, including our supply chain, store operations and merchandising functions, as well as our associates. While our operations have generally stabilized since the peak of the pandemic, we cannot predict with certainty the extent that our operations may continue to be impacted by any continuing effects of COVID-19 on us or on our customers, suppliers, vendors, and other business partners, and each of their financial conditions; however, any adverse effect on these parties could materially and adversely impact us. To the extent that COVID-19 continues to affect the U.S. and global economy and our business, it may also heighten other risks described in this section, including but not limited to those related to consumer behavior and expectations, competition, implementation of strategic initiatives, cybersecurity threats, payment-related risks, supply chain disruptions, labor availability and cost, litigation and operational risk as a result of regulatory requirements.

**LEGAL AND GOVERNMENT REGULATION**

We are subject to various laws, regulations, and administrative practices that affect our business, including laws and regulations involving antitrust and competition, privacy, data protection, environmental, healthcare, anti-bribery, anti-corruption, tax, accounting, and financial reporting or other matters. These and other rapidly changing laws, regulations, policies and related interpretations, as well as increased enforcement actions by various governmental and regulatory agencies, create challenges for the Company, may alter the environment in which we do business and may increase the ongoing costs of compliance, which could adversely affect our financial condition, results of operations and cash flows. If we are unable to continue to meet these challenges and comply with all laws, regulations, policies and related interpretations, it could negatively affect our reputation and our business results. Additionally, we are currently, and in the future may be, subject to a number of inquiries, investigations, claims, proceeding, and requests for information from governmental agencies or private parties, the adverse outcomes of which could harm our business. Failure to successfully manage these new or pending regulatory and legal matters and resolve such matters without significant liability or damage to our reputation may adversely affect our financial condition, results of operations and cash flows. Furthermore, if new or pending legal or regulatory matters result in fines or costs in excess of the amounts accrued to date, that may also materially affect our financial condition, results of operations or cash flows.

In addition, increasing governmental and societal attention to environmental, social, and governance (ESG) matters, including expanding voluntary reporting, diligence, and disclosure on topics such as climate change, waste production, water usage, human capital, labor, and risk oversight, could expand the nature, scope, and complexity of matters that we are required to control, assess, and report and could negatively affect the Company's reputation.

Additionally, we must comply with numerous provisions regulating, among other things, health and sanitation standards, food labeling and safety, equal employment opportunity, minimum wages and licensing for the sale of food, drugs, and alcoholic beverages. We cannot predict future laws, regulations, interpretations, administrative orders, or applications, or the effect they will have on our operations. They could, however, significantly increase the cost of doing business. They also could require the reformulation of some of the products that we sell (or manufacture for sale to third parties) to meet new standards. We also could be required to recall or discontinue the sale of products that cannot be reformulated. These changes could result in additional record keeping, expanded documentation of the properties of certain products, expanded or different labeling, or scientific substantiation. Any or all of these requirements could have an adverse effect on our financial condition, results of operations or cash flows.

**WEATHER, NATURAL DISASTERS AND OTHER EVENTS**

A large number of our stores, distribution facilities and fulfillment centers are geographically located in areas that are susceptible to hurricanes, tornadoes, floods, droughts, ice and snow storms and earthquakes. Weather conditions and natural disasters have, and may again in the future, disrupt our operations at one or more of our facilities, interrupt the delivery of products to our stores, substantially increase the cost of products, including supplies and materials and substantially increase the cost of energy needed to operate our facilities or deliver products to our facilities. Moreover, the effects of climate change, including those associated with extreme weather events, may affect our ability to procure needed commodities at costs and in quantities that are optimal for us or at all. Adverse weather, natural disasters, geopolitical and catastrophic events, such as war, civil unrest, acts of terrorism or other acts of violence, including active shooter situations (which have occurred in the past at our locations), or pandemics, such as the spread of COVID-19, or other future pandemics and other matters that could reduce consumer spending, could materially affect our financial condition, results of operations or cash flows.

PX6009-127

**CLIMATE IMPACT**

The long-term effects of global climate change present both physical risks, such as extreme weather conditions or rising sea levels, and transition risks, such as regulatory or technology changes, which are expected to be widespread and unpredictable. These changes could over time affect, for example, the availability and cost of products, commodities and energy including utilities, which in turn may impact our ability to procure goods or services required for the operation of our business at the quantities and levels we require. In addition, many of our operations and facilities are in locations that may be affected by the physical risks of climate change, and we face the risk of losses incurred as a result of physical damage to stores, distribution or fulfillment centers, loss or spoilage of inventory and business interruption caused by such events. We also use natural gas, diesel fuel, gasoline and electricity in our operations, all of which could face increased regulation and cost increases as a result of climate change or other environmental concerns. Transitioning to alternative energy sources, such as renewable electricity or electric vehicles, and investments in new technologies, could incur higher costs. Regulations limiting greenhouse gas emissions and energy inputs will also increase in coming years, which may increase our costs associated with compliance, tracking, reporting, and sourcing. These events and their impacts could otherwise disrupt and adversely affect our operations and could have an adverse effect on our financial condition, results of operations or cash flows.

**SUPPLY CHAIN**

Disruption in our global supply chain could negatively affect our business. The products we sell are sourced from a wide variety of domestic and international vendors, and any future disruption in our supply chain or inability to find qualified vendors and access products that meet requisite quality and safety standards in a timely and efficient manner could adversely affect our business. The loss or disruption of such supply arrangements for any reason, labor disputes, loss or impairment of key manufacturing sites, acts of war or terrorism, disruptive global political events, such as the ongoing war between Russia and Ukraine, quality control issues, a supplier's financial distress, natural disasters or health crises, including the COVID-19 pandemic, regulatory actions or ethical sourcing issues, trade sanctions or other external factors over which we have no control, could interrupt product supply and, if not effectively managed and remedied, have an adverse effect on our business, financial condition, results of operations or cash flows.

**ITEM 1B.    UNRESOLVED STAFF COMMENTS.**

None.

**ITEM 2.    PROPERTIES.**

As of January 28, 2023, we operated approximately 2,800 owned or leased supermarkets, distribution warehouses and food production plants through divisions, subsidiaries or affiliates. These facilities are located throughout the United States. We generally own store equipment, fixtures and leasehold improvements, as well as processing and food production equipment. The total cost of our owned assets and finance leases at January 28, 2023, was $53.4 billion while the accumulated depreciation was $28.6 billion.

We lease certain store real estate, warehouses, distribution centers, office space and equipment. We operate in leased facilities in approximately half of our store locations. Lease terms generally range from 10 to 20 years with options to renew for varying terms at our sole discretion. Certain leases also include options to purchase the leased property. Leases with an initial term of 12 months or less are not recorded on the balance sheet. Certain leases include escalation clauses or payment of executory costs such as property taxes, utilities or insurance and maintenance. Rent expense for leases with escalation clauses or other lease concessions are accounted for on a straight-line basis over the lease term. Our lease agreements do not contain any material residual value guarantees or material restrictive covenants. Certain properties or portions thereof are subleased to others for periods generally ranging from one to 20 years. For additional information on lease obligations, see Note 9 to the Consolidated Financial Statements.

PX6009-128

**ITEM 3.    LEGAL PROCEEDINGS.**

Incorporated by reference herein is information regarding certain legal proceedings in which we are involved as set forth under "Litigation" contained in Note 12 – "Commitments and Contingencies" in the notes to the Consolidated Financial Statements in Item 8 of Part II of this Annual Report.

**ITEM 4.    MINE SAFETY DISCLOSURES.**

Not applicable.

## PART II

**ITEM 5.    MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES.**

Our common stock is listed on the New York Stock Exchange under the symbol "KR." As of March 22, 2023, there were 25,062 shareholders of record.

During 2022, we paid two quarterly cash dividends of $0.21 per share and two quarterly cash dividends of $0.26 per share.  During 2021, we paid two quarterly cash dividends of $0.18 per share and two quarterly cash dividends of $0.21 per share.  On March 1, 2023, we paid a quarterly cash dividend of $0.26 per share.  On March 9, 2023, we announced that our Board of Directors declared a quarterly cash dividend of $0.26 per share, payable on June 1, 2023, to shareholders of record at the close of business on May 15, 2023.  We currently expect to continue to pay comparable cash dividends on a quarterly basis, that will increase over time, depending on our earnings and other factors, including approval by our Board.

For information on securities authorized for issuance under our existing equity compensation plans, see Item 12 under the heading "Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters."

PX6009-129

## PERFORMANCE GRAPH

Set forth below is a line graph comparing the five-year cumulative total shareholder return on our common shares, based on the market price of the common shares and assuming reinvestment of dividends, with the cumulative total return of companies in the Standard & Poor's 500 Stock Index and a peer group composed of food and drug companies.



| Company Name/Index | Base Period 2017 | INDEXED RETURNS Years Ending | | | | |
|---|---|---|---|---|---|---|
| | | 2018 | 2019 | 2020 | 2021 | 2022 |
| The Kroger Co. | 100 | 97.48 | 95.47 | 125.25 | 161.03 | 170.17 |
| S&P 500 Index | 100 | 99.94 | 121.49 | 142.45 | 172.36 | 160.94 |
| Peer Group | 100 | 97.12 | 117.20 | 144.16 | 170.23 | 164.97 |

Kroger's fiscal year ends on the Saturday closest to January 31.

Data supplied by Standard & Poor's.

The foregoing Performance Graph will not be deemed incorporated by reference into any other filing, absent an express reference thereto.

---

\*    Total assumes $100 invested on February 3, 2018, in The Kroger Co., S&P 500 Index, and the Peer Group, with reinvestment of dividends.

\*\*    The Peer Group consists of Albertsons Companies, Inc. (included from June 26, 2020 when it began trading), Costco Wholesale Corporation, CVS Health Corporation, Koninklijke Ahold Delhaize N.V., Supervalu Inc. (included through October 19, 2018 when it was acquired by United Natural Foods), Target Corp., Walgreens Boots Alliance Inc. and Walmart Inc.

PX6009-130

The following table presents information on our purchases of our common shares during the fourth quarter of 2022:

## ISSUER PURCHASES OF EQUITY SECURITIES

| Period[1] | Total Number of Shares Purchased[2] | Average Price Paid Per Share[2] | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs[3] | Approximate Dollar Value of Shares that May Yet Be Purchased Under the Plans or Programs[4] (in millions) |
|---|---|---|---|---|
| First four weeks | | | | |
| November 6, 2022 to December 3, 2022 | 26,566 | $ 47.90 | 26,566 | $ 1,000 |
| Second four weeks | | | | |
| December 4, 2022 to December 31, 2022 | 87,928 | $ 45.83 | 66,804 | $ 1,000 |
| Third four weeks | | | | |
| January 1, 2023 to January 28, 2023 | 83,500 | $ 45.15 | 83,500 | $ 1,000 |
| Total | 197,994 | $ 45.82 | 176,870 | $ 1,000 |

(1) The reported periods conform to our fiscal calendar composed of thirteen 28-day periods. The fourth quarter of 2022 contained three 28-day periods.

(2) Includes (i) shares repurchased under a program announced on December 6, 1999 to repurchase common shares to reduce dilution resulting from our employee stock option and long-term incentive plans, under which repurchases are limited to proceeds received from exercises of stock options and the tax benefits associated therewith ("1999 Repurchase Program") and (ii) 21,124 shares that were surrendered to the Company by participants under our long-term incentive plans to pay for taxes on restricted stock awards.

(3) Represents shares repurchased under the 1999 Repurchase Program.

(4) On September 9, 2022, our Board of Directors approved a $1.0 billion share repurchase program to reacquire shares via open market purchase or privately negotiated transactions, block trades, or pursuant to trades intending to comply with Rule 10b5-1 under the Securities Exchange Act of 1934, as amended (the "September 2022 Repurchase Program"). The amounts shown in this column reflect the amount remaining under the September 2022 Repurchase Program as of the specified period end dates. Amounts available under the 1999 Repurchase Program are dependent upon option exercise activity. The September 2022 Repurchase Program and the 1999 Repurchase Program do not have an expiration date but may be suspended or terminated by our Board of Directors at any time. No shares have been repurchased under the September 2022 authorization. During the third quarter of 2022, we paused our share repurchase program to prioritize de-leveraging following the proposed merger with Albertsons.

## ITEM 6.    RESERVED.

Not applicable.

PX6009-131

**ITEM 7.    MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.**

The following discussion and analysis of financial condition and results of operations of The Kroger Co. should be read in conjunction with the "Forward-looking Statements" section set forth in Part I and the "Risk Factors" section set forth in Item 1A of Part I.  MD&A is provided as a supplement to, and should be read in conjunction with, our Consolidated Financial Statements and the accompanying notes thereto contained in Item 8 of this report, as well as Part II, Item 7 "Management's Discussion and Analysis of Financial Condition and Results of Operations" of our Form 10-K for the year ended January 29, 2022, which provides additional information on comparisons of fiscal years 2021 and 2020.  Kroger is unable to provide a full reconciliation of forward-looking GAAP and non-GAAP measures used in this Annual Report on Form 10-K without unreasonable effort because it is not possible to predict certain of our adjustment items with a reasonable degree of certainty. This information is dependent upon future events and may be outside of our control and its unavailability could have a significant effect on future financial results.

**OUR VALUE CREATION MODEL – DELIVERING CONSISTENT AND ATTRACTIVE TOTAL SHAREHOLDER RETURN**

Kroger's proven value creation model is allowing us to deliver today and invest for the future. The foundation of our value creation model is our omnichannel food retail business, which is built on Kroger's strategic assets: our stores, digital ecosystem, *Our Brands* and our data. These assets, when combined with our go-to-market strategy, deliver a compelling value proposition for our customers. We continue to build long-term customer loyalty through Fresh, *Our Brands*, Personalization and our seamless shopping experience to drive sustainable sales growth in our retail supermarket business, including fuel and health and wellness. This, in turn, generates the data and traffic that enables our fast growing, high operating margin alternative profit businesses. We are evolving from a traditional food retailer into a more diverse, food first business that we expect will consistently deliver net earnings growth in the future. This will be achieved by:

- Growing identical sales without fuel. Our plan involves maximizing growth opportunities in our supermarket business and is supported by continued strategic investments in our customers, associates, and our seamless ecosystem to ensure we deliver a full, friendly and fresh experience for every customer, every time. As more and more customers incorporate ecommerce into their permanent routines, we expect digital sales to grow at a double-digit rate – a faster pace than other food at home sales – over time; and

- Expanding operating margin, through a balanced model where strategic price investments for our customers, investments in our associates' wages and benefits and investments in technology to deliver a better associate and customer experience are offset by (i) our cost savings program, which has delivered $1 billion in cost savings annually for the past five fiscal years, (ii) improving our product mix, as we accelerate momentum with our Fresh and *Our Brands* initiatives, and (iii) growing our alternative profit businesses.

We expect to continue to generate strong free cash flow and are committed to being disciplined with capital deployment in support of our value creation model and stated capital allocation priorities. Our first priority is to invest in the business through attractive high return opportunities that drive long-term sustainable net earnings growth. We are committed to maintaining our current investment grade debt rating and our net total debt to adjusted EBITDA ratio target range of 2.30 to 2.50. We also expect to continue to grow our dividend over time and return excess cash to shareholders via stock repurchases, subject to Board approval. During the third quarter of 2022, we paused our share repurchase program to prioritize de-leveraging following the proposed merger with Albertsons.

We expect our value creation model will result in total shareholder return within our target range of 8% to 11% over time, which does not contemplate the effect of the proposed merger with Albertsons.

PX6009-132

**2022 EXECUTIVE SUMMARY**

We achieved exceptional results in 2022 as we executed on our *Leading with Fresh and Accelerating with Digital* strategy, building on record years in 2020 and 2021. These results were driven by positive identical sales without fuel of 5.6%, disciplined margin management and strong fuel profitability.  Our proven go-to-market strategy enables us to successfully navigate many operating environments, which has allowed us to effectively manage product cost inflation through strong sourcing practices while maintaining competitive prices and helping customers manage their budgets.

Our value proposition, which includes providing great quality, fresh products at affordable prices, data-driven promotions, trusted *Our Brands* products and our fuel rewards program, is resonating with shoppers and driving total household growth and enhanced customer loyalty.  During the year, we continued to invest in wages and the associate experience and in creating zero hunger, zero waste communities, as we believe these components of our strategy are critical to achieving long term sustainable growth.  In 2022, our average hourly rates increased by more than 6% and we have now invested an incremental $1.9 billion in associate wages since 2018. Our average hourly rate is now more than $18 and more than $23, when comprehensive benefits are included.

In 2023, we expect to build on this momentum and deliver revenue and adjusted net earnings per diluted share growth on top of the record results achieved over the past three years.  We expect to grow revenue by continuing to invest in our customers through competitive pricing and personalization, fresh products and a better shopping experience. Building on our significant investments over the past four years, we will also continue to increase associate wages. We will fund these investments through product mix improvements, cost saving initiatives and growth in our alternative profit businesses.  Looking forward, we believe we are well positioned to successfully operate in an evolving economic environment and continue to deliver attractive and sustainable total shareholder return within our target range of 8% to 11% over time, which does not contemplate the effect of the proposed merger with Albertsons.

The following table provides highlights of our financial performance:

**Financial Performance Data**
($ in millions, except per share amounts)

| | | Fiscal Year | | | |
|---|---|---|---|---|---|
| | | 2022 | Percentage Change | | 2021 |
| Sales | $ | 148,258 | 7.5 % | $ | 137,888 |
| Sales without fuel | $ | 129,626 | 5.2 % | $ | 123,210 |
| Net earnings attributable to The Kroger Co. | $ | 2,244 | 35.6 % | $ | 1,655 |
| Adjusted net earnings attributable to The Kroger Co. | $ | 3,104 | 10.8 % | $ | 2,802 |
| Net earnings attributable to The Kroger Co. per diluted common share | $ | 3.06 | 41.0 % | $ | 2.17 |
| Adjusted net earnings attributable to The Kroger Co. per diluted common share | $ | 4.23 | 14.9 % | $ | 3.68 |
| Operating profit | $ | 4,126 | 18.7 % | $ | 3,477 |
| Adjusted FIFO operating profit | $ | 5,079 | 17.8 % | $ | 4,310 |
| Dividends paid | $ | 682 | 15.8 % | $ | 589 |
| Dividends paid per common share | $ | 0.94 | 20.5 % | $ | 0.78 |
| Identical sales excluding fuel | | 5.6 % | N/A | | 0.2 % |
| FIFO gross margin rate, excluding fuel, bps decrease | | (0.09) | N/A | | (0.43) |
| OG&A rate, excluding fuel and Adjusted Items, bps decrease | | 0.19 | N/A | | 0.61 |
| Increase (decrease) in total debt, including obligations under finance leases compared to prior fiscal year end | $ | 14 | N/A | $ | (49) |
| Share repurchases | $ | 993 | N/A | $ | 1,647 |

PX6009-133

**OVERVIEW**

Notable items for 2022 are:

*Shareholder Return*

- Achieved net earnings attributable to The Kroger Co. per diluted common share of $3.06, which represents a 41% increase compared to 2021.

- Achieved adjusted net earnings attributable to The Kroger Co. per diluted common share of $4.23, which represents a 15% increase compared to 2021.

- Achieved operating profit of $4.1 billion, which represents a 19% increase compared to 2021.

- Achieved adjusted FIFO operating profit of $5.1 billion, which represents an 18% increase compared to 2021.

- Generated cash flows from operations of $4.5 billion.

- Returned $1.7 billion to shareholders through share repurchases and dividend payments. During the third quarter of 2022, we paused our share repurchase program to prioritize deleveraging following the proposed merger with Albertsons.

*Other Financial Results*

- Identical sales, excluding fuel, increased 5.6%, which included identical sales growth in *Our Brands* categories of 9.0%. Identical sales, excluding fuel, would have grown 5.8% in 2022 if not for the reduction in pharmacy sales from our termination of our agreement with Express Scripts effective December 31, 2022. This terminated agreement had no material effect on profitability.

- Digital sales increased 4%, which was led by strength in our Delivery solutions, which grew by 25%. Delivery solutions growth was driven by our Boost membership program and expansion of our Kroger Delivery network. Digital sales include products ordered online and picked up at our stores and our Delivery and Ship solutions. Our Delivery solutions include orders delivered to customers from retail store locations, customer fulfillment centers powered by Ocado and orders placed through third-party platforms. Our Ship solutions primarily include online orders placed through our owned platforms that are dispatched using mail service or third-party courier.

- We are currently operating in a more volatile inflationary environment and we experienced higher product cost inflation during 2022, compared to 2021. Our LIFO charge for 2022 was $626 million, compared to $197 million in 2021. This increase was attributable to higher product cost inflation primarily in grocery.

- Achieved cost savings greater than $1 billion for the fifth consecutive year.

*Significant Events*

- As previously disclosed, on October 13, 2022, we entered into a merger agreement with Albertsons. In connection with the merger agreement, we entered into a commitment letter for a bridge term loan facility and executed a term loan credit agreement. During the third quarter of 2022, we paused our share repurchase program to prioritize deleveraging following the proposed merger with Albertsons. For additional information about the proposed merger with Albertsons, see Note 16 to the Consolidated Financial Statements.

- During 2022, we opened four additional Kroger Delivery customer fulfillment centers powered by Ocado's automated smart platform — one in Dallas, Texas, one in Pleasant Prairie, Wisconsin, one in Romulus, Michigan and one in Aurora, Colorado.

PX6009-134

- During 2022, we recognized legal settlement costs of $85 million, $67 million net of tax, relating to the settlement of all opioid litigation claims with the State of New Mexico. This amount was excluded from our adjusted FIFO operating profit and adjusted net earnings results to reflect the unique and non-recurring nature of the charge. This settlement is not an admission of wrongdoing or liability by Kroger and we will continue to vigorously defend against other claims and lawsuits relating to opioids. This settlement is based on a set of unique and specific facts relating to New Mexico, and we do not believe that the settlement amount or any other terms of our agreement with New Mexico can or should be extrapolated to any other opioid-related cases pending against us. It is our view that this settlement is not a reliable proxy for the outcome of any other cases or the overall level of our exposure.

- During 2022, we recorded a goodwill and fixed asset impairment charge related to Vitacost.com for $164 million.  The talent and capabilities gained through the merger with Vitacost in 2014 have been key to advancing Kroger's digital platform and growing our digital business to more than $10 billion in annual sales. As our digital strategy has evolved, our primary focus looking forward will be to effectively utilize our Pickup and Delivery capabilities and this reprioritization resulted in the impairment charge. Vitacost.com will continue to operate as an online platform providing great value natural, organic, and eco-friendly products for customers.

## OUR BUSINESS

The Kroger Co. (the "Company" or "Kroger") was founded in 1883 and incorporated in 1902.  Our Company is built on the foundation of our food retail business, which includes the added convenience of our retail pharmacies and fuel centers.  Our strategy is focused on growing customer loyalty by delivering great value and convenience, and investing in four strategic pillars: Fresh, *Our Brands*, Data & Personalization and Seamless.

We also utilize the data and traffic generated by our retail business to deliver incremental value and services for our customers that generates alternative profit streams. These alternative profit streams would not exist without our core retail business.

Our revenues are predominately earned and cash is generated as consumer products are sold to customers in our stores, fuel centers and via our online platforms.  We earn income predominately by selling products at price levels that produce revenues in excess of the costs we incur to make these products available to our customers.  Such costs include procurement and distribution costs, facility occupancy and operational costs, and overhead expenses.  Our retail operations, which represent 97% of our consolidated sales, is our only reportable segment.

Kroger is diversified across brands, product categories, channels of distribution, geographies and consumer demographics.  Our combination of assets include the following:

*Stores*

As of January 28, 2023, Kroger operates supermarkets under a variety of local banner names in 35 states and the District of Columbia.  As of January 28, 2023, Kroger operated, either directly or through its subsidiaries, 2,719 supermarkets, of which 2,252 had pharmacies and 1,637 had fuel centers.  We connect with customers through our expanding seamless ecosystem and the consistent delivery of a full, fresh, and friendly customer experience.  Fuel sales are an important part of our revenue, net earnings and loyalty offering.  Our fuel strategy is to include a fuel center at each of our supermarket locations when it is feasible and it is expected to be profitable.

PX6009-135

*Seamless Digital Ecosystem*

We offer a convenient shopping experience for our customers regardless of how they choose to shop with us, including Pickup, Delivery and Ship.  We offer Pickup and Harris Teeter ExpressLane™ — personalized, order online, pick up at the store services — at 2,274 of our supermarkets and provide Delivery, which allows us to offer digital solutions to substantially all of our customers.  Our Delivery solutions include orders delivered to customers from retail store locations and customer fulfillment centers powered by Ocado. These channels allow us to serve customers anything, anytime, and anywhere with zero compromise on selection, convenience, and price.  We also provide relevant customer-facing apps and interfaces that have the features customers want that are also reliable, easy to use and deliver a seamless customer experience across our store and digital channels.

*Merchandising and Manufacturing*

*Our Brands* products play an important role in our merchandising strategy and represented over $30 billion of our sales in 2022.  We operate 33 food production plants, primarily bakeries and dairies, which supply approximately 30% of *Our Brands* units and 42% of the grocery category *Our Brands* units sold in our supermarkets; the remaining *Our Brands* items are produced to our strict specifications by outside manufacturers.

*Our Data*

We are evolving from a traditional food retailer into a more diverse, food first business.  The traffic and data generated by our retail supermarket business, including pharmacies and fuel centers, is enabling this transformation.  Kroger serves approximately 60 million households annually and because of our rewards program, over 90% of customer transactions are tethered to a Kroger loyalty card.  Our 20 years of investment in data science capabilities is allowing us to utilize this data to create personalized experiences and value for our customers and is also enabling our fast-growing, high operating margin alternative profit businesses, including data analytic services and third party media revenue.  Our retail media business – Kroger Precision Marketing – provides best in class media capabilities for our consumer packaged goods partners and is a key driver of our digital profitability and alternative profit.

*Proposed Merger with Albertsons*

As previously disclosed, on October 13, 2022, we entered into a merger agreement with Albertsons.  The proposed merger is expected to accelerate our go-to-market strategy that includes Fresh, *Our Brands*, Personalization and Seamless, and continue our track record of investments across lowering prices, enhancing the customer experience, and increasing associate wages and benefits.  For additional information about the proposed merger with Albertsons, see Note 16 to the Consolidated Financial Statements.

## USE OF NON-GAAP FINANCIAL MEASURES

The accompanying Consolidated Financial Statements, including the related notes, are presented in accordance with generally accepted accounting principles ("GAAP"). We provide non-GAAP measures, including First-In, First-Out ("FIFO") gross margin, FIFO operating profit, adjusted FIFO operating profit, adjusted net earnings and adjusted net earnings per diluted share because management believes these metrics are useful to investors and analysts. These non-GAAP financial measures should not be considered as an alternative to gross margin, operating profit, net earnings and net earnings per diluted share or any other GAAP measure of performance. These measures should not be reviewed in isolation or considered as a substitute for our financial results as reported in accordance with GAAP.

We calculate FIFO gross margin as FIFO gross profit divided by sales. FIFO gross profit is calculated as sales less merchandise costs, including advertising, warehousing, and transportation expenses, but excluding the Last-In, First-Out ("LIFO") charge. Merchandise costs exclude depreciation and rent expenses. FIFO gross margin is an important measure used by management and management believes FIFO gross margin is a useful metric to investors and analysts because it measures the merchandising and operational effectiveness of our go-to-market strategy.

We calculate FIFO operating profit as operating profit excluding the LIFO charge. FIFO operating profit is an important measure used by management and management believes FIFO operating profit is a useful metric to investors and analysts because it measures the operational effectiveness of our financial model.

PX6009-136

The adjusted net earnings, adjusted net earnings per diluted share and adjusted FIFO operating profit metrics are important measures used by management to compare the performance of core operating results between periods. We believe adjusted net earnings, adjusted net earnings per diluted share and adjusted FIFO operating profit are useful metrics to investors and analysts because they present more accurate year-over-year comparisons of our net earnings, net earnings per diluted share and FIFO operating profit because adjusted items are not the result of our normal operations. Net earnings for 2022 include the following, which we define as the "2022 Adjusted Items:"

- Charges to operating, general and administrative expenses ("OG&A") of $25 million, $19 million net of tax, for obligations related to withdrawal liabilities for certain multi-employer pension funds, $20 million, $15 million net of tax, for the revaluation of Home Chef contingent consideration, $44 million, $34 million net of tax, for merger related costs, $85 million, $67 million net of tax, for legal settlement costs and $164 million for goodwill and fixed asset impairment charges related to Vitacost.com (the "2022 OG&A Adjusted Items").

- Losses in other income (expense) of $728 million, $561 million net of tax, for the unrealized loss on investments (the "2022 Other Income (Expense) Adjusted Items").

Net earnings for 2021 include the following, which we define as the "2021 Adjusted Items:"

- Charges to OG&A of $449 million, $344 million net of tax, for obligations related to withdrawal liabilities for a certain multi-employer pension fund, $66 million, $50 million net of tax, for the revaluation of Home Chef contingent consideration and $136 million, $104 million net of tax, for transformation costs (the "2021 OG&A Adjusted Items").

- Losses in other income (expense) of $87 million, $68 million net of tax, related to company-sponsored pension plan settlements and $821 million, $628 million net of tax, for the unrealized loss on investments (the "2021 Other Income (Expense) Adjusted Items").

- A reduction to income tax expense of $47 million primarily due to the completion of income tax audit examinations covering multiple years.

Net earnings for 2020 include the following, which we define as the "2020 Adjusted Items:"

- Charges to OG&A of $989 million, $754 million net of tax, for commitments to certain multi-employer pension funds, $189 million, $141 million net of tax, for the revaluation of Home Chef contingent consideration and $111 million, $81 million net of tax, for transformation costs (the "2020 OG&A Adjusted Items").

- Gains in other income (expense) of $1.1 billion, $821 million net of tax, for the unrealized gain on investments (the "2020 Other Income (Expense) Adjusted Item").

The table below provides a reconciliation of net earnings attributable to The Kroger Co. to adjusted net earnings attributable to The Kroger Co. and a reconciliation of net earnings attributable to The Kroger Co. per diluted common share to adjusted net earnings attributable to The Kroger Co. per diluted common share excluding the 2022, 2021 and 2020 Adjusted Items:

PX6009-137

**Net Earnings per Diluted Share excluding the Adjusted Items**
($ in millions, except per share amounts)

| | 2022 | 2021 | 2020 |
|---|---|---|---|
| Net earnings attributable to The Kroger Co. | $ 2,244 | $ 1,655 | $ 2,585 |
| (Income) expense adjustments | | | |
| Adjustment for pension plan withdrawal liabilities[(1)(2)] | 19 | 344 | 754 |
| Adjustment for company-sponsored pension plan settlement charges[(1)(3)] | — | 68 | — |
| Adjustment for loss (gain) on investments[(1)(4)] | 561 | 628 | (821) |
| Adjustment for Home Chef contingent consideration[(1)(5)] | 15 | 50 | 141 |
| Adjustment for transformation costs[(1)(6)] | — | 104 | 81 |
| Adjustment for merger related costs[(1)(7)] | 34 | — | — |
| Adjustment for legal settlement costs[(1)(8)] | 67 | — | — |
| Adjustment for goodwill and fixed asset impairment charges related to Vitacost.com[(1)(9)] | 164 | — | — |
| Adjustment for income tax audit examinations[(1)] | — | (47) | — |
| Total Adjusted Items | 860 | 1,147 | 155 |
| | | | |
| Net earnings attributable to The Kroger Co. excluding the Adjusted Items | $ 3,104 | $ 2,802 | $ 2,740 |
| | | | |
| Net earnings attributable to The Kroger Co. per diluted common share | $ 3.06 | $ 2.17 | $ 3.27 |
| (Income) expense adjustments | | | |
| Adjustment for pension plan withdrawal liabilities[(10)] | 0.03 | 0.45 | 0.95 |
| Adjustment for company-sponsored pension plan settlement charges[(10)] | — | 0.09 | — |
| Adjustment for loss (gain) on investments[(10)] | 0.76 | 0.83 | (1.05) |
| Adjustment for Home Chef contingent consideration[(10)] | 0.02 | 0.07 | 0.18 |
| Adjustment for transformation costs[(10)] | — | 0.14 | 0.12 |
| Adjustment for merger related costs[(10)] | 0.05 | — | — |
| Adjustment for legal settlement costs[(10)] | 0.09 | — | — |
| Adjustment for goodwill and fixed asset impairment charges related to Vitacost.com[(10)] | 0.22 | — | — |
| Adjustment for income tax audit examinations[(10)] | — | (0.07) | — |
| Total Adjusted Items | 1.17 | 1.51 | 0.20 |
| | | | |
| Net earnings attributable to The Kroger Co. per diluted common share excluding the Adjusted Items | $ 4.23 | $ 3.68 | $ 3.47 |
| | | | |
| Average numbers of common shares used in diluted calculation | 727 | 754 | 781 |

(1) The amounts presented represent the after-tax effect of each adjustment, which was calculated using discrete tax rates.

(2) The pre-tax adjustment for pension plan withdrawal liabilities was $25 in 2022, $449 in 2021 and $989 in 2020.

(3) The pre-tax adjustment for company-sponsored pension plan settlement charges was $87.

(4) The pre-tax adjustment for loss (gain) on investments was $728 in 2022, $821 in 2021 and ($1,105) in 2020.

(5) The pre-tax adjustment for Home Chef contingent consideration was $20 in 2022, $66 in 2021 and $189 in 2020.

(6) The pre-tax adjustment for transformation costs was $136 in 2021 and $111 in 2020. Transformation costs primarily include costs related to store and business closure costs and third party professional consulting fees associated with business transformation and cost saving initiatives.

(7) The pre-tax adjustment for merger related costs was $44. Merger related costs primarily include third-party professional fees and credit facility fees associated with the proposed merger with Albertsons.

(8) The pre-tax adjustment for legal settlement costs was $85.

(9) The pre-tax and after-tax adjustments for goodwill and fixed asset impairment charges related to Vitacost.com was $164.

(10) The amount presented represents the net earnings per diluted common share effect of each adjustment.

PX6009-138

*Key Performance Indicators*

We evaluate our results of operations and cash flows using a variety of key performance indicators, such as sales, identical sales, excluding fuel, FIFO gross margin, adjusted FIFO operating profit, adjusted net earnings, adjusted net earnings per diluted share and return on invested capital. We use these financial metrics and related computations to evaluate our operational effectiveness and our results of operations from period to period and to plan for near and long-term operating and strategic decisions. These key performance indicators should not be reviewed in isolation or considered as a substitute for our financial results as reported in accordance with GAAP. These measures, which are described in more detail in this Annual Report on Form 10-K, may not be comparable to similarly-titled performance indicators used by other companies.

**RESULTS OF OPERATIONS**

*Sales*

<table>
<tr><td></td><td colspan="6">**Total Sales**<br>($ in millions)</td></tr>
<tr><td></td><td>**2022**</td><td>**Percentage Change**[1]</td><td>**2021**</td><td>**Percentage Change**[2]</td><td>**2020**</td></tr>
<tr><td>Total sales to retail customers without fuel[3]</td><td>$ 128,664</td><td>5.2 %</td><td>$ 122,293</td><td>0.1 %</td><td>$ 122,134</td></tr>
<tr><td>Supermarket fuel sales</td><td>18,632</td><td>26.9 %</td><td>14,678</td><td>54.7 %</td><td>9,486</td></tr>
<tr><td>Other sales[4]</td><td>962</td><td>4.9 %</td><td>917</td><td>4.4 %</td><td>878</td></tr>
<tr><td>Total sales</td><td>$ 148,258</td><td>7.5 %</td><td>$ 137,888</td><td>4.1 %</td><td>$ 132,498</td></tr>
</table>

(1)  This column represents the percentage change in 2022 compared to 2021.
(2)  This column represents the percentage change in 2021 compared to 2020.
(3)  Digital sales are included in the "total sales to retail customers without fuel" line above. Digital sales include products ordered online and picked up at our stores and our Delivery and Ship solutions. Our Delivery solutions include orders delivered to customers from retail store locations, customer fulfillment centers powered by Ocado and orders placed through third-party platforms. Our Ship solutions primarily include online orders placed through our owned platforms that are dispatched using mail service or third-party courier. Digital sales increased approximately 4% in 2022, decreased approximately 3% in 2021 and grew approximately 116% in 2020. Digital sales growth for 2022 was led by strength in our Delivery solutions, which grew by 25% in 2022. Delivery solutions growth was driven by our Boost membership program and expansion of our Kroger Delivery network. The change in results for 2021 compared to 2020 is primarily due to cycling COVID-19 trends. While digital sales decreased 3% during 2021, almost all customers who reduced their online spend during the year continued to shop with us in store, highlighting the power of our seamless ecosystem and our ability to create a meaningful customer experience across channels.
(4)  Other sales primarily relate to external sales at food production plants, data analytic services and third-party media revenue. The increase in 2022, compared to 2021, and the increase in 2021, compared to 2020, is primarily due to an increase in data analytic services and third-party media revenue, partially offset by decreased external sales at food production plants due to the closing of a plant during 2021.

Total sales increased in 2022, compared to 2021, by 7.5%. The increase was primarily due to increases in supermarket fuel sales and total sales to retail customers without fuel. Total sales, excluding fuel, increased 5.2% in 2022, compared to 2021, which was primarily due to our identical sales increase, excluding fuel, of 5.6%, partially offset by discontinued patient therapies at Kroger Specialty Pharmacy. Identical sales, excluding fuel, for 2022, compared to 2021, increased primarily due to an increase in the number of households shopping with us and an increase in basket value due to retail inflation, partially offset by a reduction in the number of items in basket and the termination of our agreement with Express Scripts. Identical sales without fuel would have grown 5.8% in 2022 if not for the reduction in pharmacy sales from our termination of our agreement with Express Scripts effective December 31, 2022. Total supermarket fuel sales increased 26.9% in 2022, compared to 2021, primarily due to an increase in the average retail fuel price of 28.5%, partially offset by a decrease in fuel gallons sold of 1.2%, which was less than the national average decline. The increase in the average retail fuel price was caused by an increase in the product cost of fuel.

PX6009-139

Total sales increased in 2021, compared to 2020, by 4.1%.  The increase was primarily due to an increase in supermarket fuel. Total sales, excluding fuel, increased 0.2% in 2021, compared to 2020, which was primarily due to our identical sales increase, excluding fuel, of 0.2%. Identical sales, excluding fuel, increased in 2021 on top of record sales results in 2020, which was primarily caused by unprecedented demand due to the COVID-19 pandemic during 2020.  Total supermarket fuel sales increased 54.7% in 2021, compared to 2020, primarily due to an increase in fuel gallons sold of 7.9% and an increase in the average retail fuel price of 43.6%. The increase in the average retail fuel price was caused by an increase in the product cost of fuel.

 We calculate identical sales, excluding fuel, as sales to retail customers, including sales from all departments at identical supermarket locations, Kroger Specialty Pharmacy businesses and Delivery and Ship solutions. We define a supermarket as identical when it has been in operation without expansion or relocation for five full quarters. We define Kroger Specialty Pharmacy businesses as identical when physical locations have been in operation continuously for five full quarters; discontinued patient therapies are excluded from the identical sales calculation starting in the quarter of transfer or termination. We define Kroger Delivery identical sales powered by Ocado based on geography. We include Kroger Delivery sales powered by Ocado as identical if the delivery occurs in an existing Kroger supermarket geography. If the Kroger Delivery sales powered by Ocado occur in a new geography, these sales are included as identical when deliveries have occurred to the new geography for five full quarters. Although identical sales is a relatively standard term, numerous methods exist for calculating identical sales growth. As a result, the method used by our management to calculate identical sales may differ from methods other companies use to calculate identical sales. It is important to understand the methods used by other companies to calculate identical sales before comparing our identical sales to those of other such companies. Our identical sales, excluding fuel, results are summarized in the following table. We used the identical sales, excluding fuel, dollar figures presented below to calculate percentage changes for 2022 and 2021.

**Identical Sales**
($ in millions)

|  | 2022 | 2021 |
|---|---|---|
| Excluding fuel | $  127,635 | $  120,846 |
| Excluding fuel | 5.6 % | 0.2 % |

### Gross Margin, LIFO and FIFO Gross Margin

We define gross margin as sales minus merchandise costs, including advertising, warehousing, and transportation. Rent expense, depreciation and amortization expense, and interest expense are not included in gross margin.

Our gross margin rates, as a percentage of sales, were 21.43% in 2022 and 22.01% in 2021.  The decrease in rate in 2022, compared to 2021, resulted primarily from increased fuel sales, which have a lower gross margin rate, a decrease in our fuel gross margin, increased shrink, as a percentage of sales, and a higher LIFO charge, partially offset by our ability to effectively manage product cost inflation through strong sourcing practices while maintaining competitive prices and helping customers manage their budgets and the cycling of a write down related to a donation of personal protective equipment inventory from the prior year.

Our LIFO charge was $626 million in 2022 and $197 million in 2021.  The increase in our LIFO charge was attributable to higher product cost inflation primarily in grocery.

Our FIFO gross margin rate, which excludes the LIFO charge, was 21.86% in 2022, compared to 22.15% in 2021. Our fuel sales lower our FIFO gross margin rate due to the very low FIFO gross margin rate, as a percentage of sales, of fuel sales compared to non-fuel sales.  Excluding the effect of fuel, our FIFO gross margin rate decreased 9 basis points in 2022, compared to 2021. This decrease resulted primarily from increased shrink, as a percentage of sales, partially offset by our ability to effectively manage product cost inflation through strong sourcing practices while maintaining competitive prices and helping customers manage their budgets and the cycling of a write down related to a donation of personal protective equipment inventory from the prior year.

PX6009-140

*Operating, General and Administrative Expenses*

OG&A expenses consist primarily of employee-related costs such as wages, healthcare benefit costs, retirement plan costs, utilities, and credit card fees. Rent expense, depreciation and amortization expense, and interest expense are not included in OG&A.

OG&A expenses, as a percentage of sales, were 16.09% in 2022 and 16.83% in 2021.  The decrease in 2022, compared to 2021, resulted primarily from the effect of sales leverage across fuel and supermarkets, which decreases our OG&A rate, as a percentage of sales, lower contributions to multi-employer pension plans, decreased healthcare costs, the 2021 OG&A Adjusted Items and broad-based improvement from cost savings initiatives that drive administrative efficiencies, store productivity and sourcing cost reductions, partially offset by investments in our associates, costs related to strategic investments in various margin expansion initiatives that will drive future growth and the 2022 OG&A Adjusted Items.

Our fuel sales lower our OG&A rate, as a percentage of sales, due to the very low OG&A rate, as a percentage of sales, of fuel sales compared to non-fuel sales.  Excluding the effect of fuel, the 2022 OG&A Adjusted Items and the 2021 OG&A Adjusted Items, our OG&A rate decreased 19 basis points in 2022, compared to 2021.  This decrease resulted primarily from the effect of supermarket sales leverage, which decreases our OG&A rate, as a percentage of sales, lower contributions to multi-employer pension plans, decreased healthcare costs and broad-based improvement from cost savings initiatives that drive administrative efficiencies, store productivity and sourcing cost reductions, partially offset by investments in our associates and costs related to strategic investments in various margin expansion initiatives that will drive future growth.

*Rent Expense*

Rent expense was $839 million, or 0.57% of sales, for 2022, compared to $845 million, or 0.61% of sales, for 2021. Rent expense, as a percentage of sales, decreased 4 basis points in 2022, compared to 2021, primarily due to sales leverage and the completion of a property transaction during the first quarter of 2021 related to 28 previously leased properties that we are now accounting for as owned locations and therefore recognizing depreciation and amortization expense over their useful life. For additional information about this transaction, see Note 5 to the Consolidated Financial Statements.

*Depreciation and Amortization Expense*

Depreciation and amortization expense was $3.0 billion, or 2.00% of sales, for 2022, compared to $2.8 billion, or 2.05% of sales, for 2021.  Depreciation and amortization expense, as a percentage of sales, decreased 5 basis points in 2022, compared to 2021, primarily due to sales leverage.

*Operating Profit and FIFO Operating Profit*

Operating profit was $4.1 billion, or 2.78% of sales, for 2022, compared to $3.5 billion, or 2.52% of sales, for 2021. Operating profit, as a percentage of sales, increased 26 basis points in 2022, compared to 2021, due to decreased OG&A expense, as a percentage of sales, partially offset by an increased LIFO charge and a lower FIFO gross margin rate. Fuel earnings also contributed to our operating profit growth for 2022, compared to 2021.

FIFO operating profit was $4.8 billion, or 3.21% of sales, for 2022, compared to $3.7 billion, or 2.66% of sales, for 2021.  FIFO operating profit, as a percentage of sales, excluding the 2022 and 2021 Adjusted Items, increased 30 basis points in 2022, compared to 2021, due to decreased OG&A expense, as a percentage of sales, partially offset by a lower FIFO gross margin rate.  Fuel earnings also contributed to our FIFO operating profit growth for 2022, compared to 2021.

Specific factors contributing to the trends driving operating profit and FIFO operating profit identified above are discussed earlier in this section.

PX6009-141

The following table provides a reconciliation of operating profit to FIFO operating profit, and to Adjusted FIFO operating profit, excluding the 2022 and 2021 Adjusted Items:

**Operating Profit excluding the Adjusted Items**
($ in millions)

| | 2022 | 2021 |
|---|---|---|
| Operating profit | $ 4,126 | $ 3,477 |
| LIFO charge | 626 | 197 |
| | | |
| FIFO Operating profit | 4,752 | 3,674 |
| | | |
| Adjustment for pension plan withdrawal liabilities | 25 | 449 |
| Adjustment for Home Chef contingent consideration | 20 | 66 |
| Adjustment for transformation costs[1] | — | 136 |
| Adjustment for merger related costs[2] | 44 | — |
| Adjustment for legal settlement costs | 85 | — |
| Adjustment for goodwill and fixed asset impairment charges related to Vitacost.com | 164 | — |
| Other | (11) | (15) |
| | | |
| 2022 and 2021 Adjusted items | 327 | 636 |
| | | |
| Adjusted FIFO operating profit excluding the adjusted items above | $ 5,079 | $ 4,310 |

(1) Transformation costs primarily include costs related to third-party professional consulting fees associated with business transformation and cost saving initiatives.
(2) Merger related costs primarily include third party professional fees and credit facility fees associated with the proposed merger with Albertsons.

*Interest Expense*

Interest expense totaled $535 million in 2022 and $571 million in 2021. The decrease in interest expense in 2022, compared to 2021, was primarily due to decreased average total outstanding debt throughout 2022, compared to 2021, including both the current and long-term portions of obligations under finance leases, and increased interest income earned on our cash and temporary cash investments due to rising interest rates throughout 2022, compared to 2021.

*Income Taxes*

Our effective income tax rate was 22.5% in 2022 and 18.8% in 2021. The 2022 tax rate differed from the federal statutory rate due to the effect of state income taxes and non-deductible goodwill impairment charges related to Vitacost.com, partially offset by the benefit from share-based payments and the utilization of tax credits. The 2021 tax rate differed from the federal statutory rate due to a discrete benefit of $47 million which was primarily from the favorable outcome of income tax audit examinations covering multiple years, the benefit from share-based payments and the utilization of tax credits, partially offset by the effect of state income taxes.

*Net Earnings and Net Earnings Per Diluted Share*

Our net earnings are based on the factors discussed in the Results of Operations section.

Net earnings of $3.06 per diluted share for 2022 represented an increase of 41.0% compared to net earnings of $2.17 per diluted share for 2021. Adjusted net earnings of $4.23 per diluted share for 2022 represented an increase of 14.9% compared to adjusted net earnings of $3.68 per diluted share for 2021. The increase in adjusted net earnings per diluted share resulted primarily from increased FIFO operating profit, excluding fuel, increased fuel earnings and lower weighted average common shares outstanding due to common share repurchases, partially offset by a higher LIFO charge and higher income tax expense.

PX6009-142

**RETURN ON INVESTED CAPITAL**

We calculate return on invested capital ("ROIC") by dividing adjusted ROIC operating profit for the prior four quarters by the average invested capital. Adjusted operating profit for ROIC purposes is calculated by excluding certain items included in operating profit, and adding back our LIFO charge, depreciation and amortization and rent to our U.S. GAAP operating profit of the prior four quarters. Average invested capital is calculated as the sum of (i) the average of our total assets, (ii) the average LIFO reserve and (iii) the average accumulated depreciation and amortization; minus (i) the average taxes receivable, (ii) the average trade accounts payable, (iii) the average accrued salaries and wages and (iv) the average other current liabilities, excluding accrued income taxes. Averages are calculated for ROIC by adding the beginning balance of the first quarter and the ending balance of the fourth quarter, of the last four quarters, and dividing by two. ROIC is a non-GAAP financial measure of performance. ROIC should not be reviewed in isolation or considered as a substitute for our financial results as reported in accordance with GAAP. ROIC is an important measure used by management to evaluate our investment returns on capital. Management believes ROIC is a useful metric to investors and analysts because it measures how effectively we are deploying our assets.

Although ROIC is a relatively standard financial term, numerous methods exist for calculating a company's ROIC. As a result, the method used by our management to calculate ROIC may differ from methods other companies use to calculate their ROIC. We urge you to understand the methods used by other companies to calculate their ROIC before comparing our ROIC to that of such other companies.

The following table provides a calculation of ROIC for 2022 and 2021 on a 52 week basis ($ in millions):

| | Fiscal Year Ended | |
| --- | --- | --- |
| | January 28, 2023 | January 29, 2022 |
| Return on Invested Capital | | |
| Numerator | | |
| Operating profit | $ 4,126 | $ 3,477 |
| LIFO charge | 626 | 197 |
| Depreciation and amortization | 2,965 | 2,824 |
| Rent | 839 | 845 |
| Adjustment for Home Chef contingent consideration | 20 | 66 |
| Adjustment for pension plan withdrawal liabilities | 25 | 449 |
| Adjustment for goodwill and fixed asset impairment charges related to Vitacost.com | 164 | — |
| Adjustment for merger related costs | 44 | — |
| Adjustment for transformation costs | — | 136 |
| Adjustment for legal settlement costs | 85 | — |
| Adjusted ROIC operating profit | $ 8,894 | $ 7,994 |
| | | |
| Denominator | | |
| Average total assets | $ 49,355 | $ 48,874 |
| Average taxes receivable[1] | (137) | (54) |
| Average LIFO reserve | 1,883 | 1,472 |
| Average accumulated depreciation and amortization[2] | 27,843 | 24,868 |
| Average trade accounts payable | (7,118) | (6,898) |
| Average accrued salaries and wages | (1,741) | (1,575) |
| Average other current liabilities[3] | (6,333) | (5,976) |
| Average invested capital | $ 63,752 | $ 60,711 |
| Return on Invested Capital | 13.95 % | 13.17 % |

(1) Taxes receivable were $231 as of January 28, 2023, $42 as of January 29, 2022 and $66 as of January 30, 2021.

(2) Accumulated depreciation and amortization includes depreciation for property, plant and equipment and amortization for definite-lived intangible assets.

(3) Other current liabilities included accrued income taxes of $9 as of January 30, 2021. We did not have any accrued income taxes as of January 28, 2023 or January 29, 2022. Accrued income taxes are removed from other current liabilities in the calculation of average invested capital.

PX6009-143

**CRITICAL ACCOUNTING ESTIMATES**

We have chosen accounting policies that we believe are appropriate to report accurately and fairly our operating results and financial position, and we apply those accounting policies in a consistent manner.  Our significant accounting policies are summarized in Note 1 to the Consolidated Financial Statements.

The preparation of financial statements in conformity with GAAP requires us to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenues, and expenses, and related disclosures of contingent assets and liabilities.  We base our estimates on historical experience and other factors we believe to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources.  Actual results could differ from those estimates.

We believe the following accounting estimates are the most critical in the preparation of our financial statements because they involve the most difficult, subjective or complex judgments about the effect of matters that are inherently uncertain.

*Impairments of Long-Lived Assets*

We monitor the carrying value of long-lived assets for potential impairment each quarter based on whether certain triggering events have occurred.  These events include current period losses combined with a history of losses or a projection of continuing losses or a significant decrease in the market value of an asset.  When a triggering event occurs, we perform an impairment calculation, comparing projected undiscounted cash flows, utilizing current cash flow information and expected growth rates related to specific stores, to the carrying value for those stores.  If we identify impairment for long-lived assets to be held and used, we compare the assets' current carrying value to the assets' fair value.  Fair value is determined based on market values or discounted future cash flows.  We record impairment when the carrying value exceeds fair market value.  With respect to owned property and equipment held for disposal, we adjust the value of the property and equipment to reflect recoverable values based on our previous efforts to dispose of similar assets and current economic conditions.  We recognize impairment for the excess of the carrying value over the estimated fair market value, reduced by estimated direct costs of disposal.  We recorded asset impairments in the normal course of business totaling $68 million in 2022 and $64 million in 2021.  We record costs to reduce the carrying value of long-lived assets in the Consolidated Statements of Operations as OG&A expense.

The factors that most significantly affect the impairment calculation are our estimates of future cash flows.  Our cash flow projections look several years into the future and include assumptions on variables such as inflation, the economy and market competition.  Application of alternative assumptions and definitions, such as reviewing long-lived assets for impairment at a different level, could produce significantly different results.

*Business Combinations*

We account for business combinations using the acquisition method of accounting.  All the assets acquired, liabilities assumed and amounts attributable to noncontrolling interests are recorded at their respective fair values at the date of acquisition once we obtain control of an entity. The determination of fair values of identifiable assets and liabilities involves estimates and the use of valuation techniques when market value is not readily available.  We use various techniques to determine fair value in such instances, including the income approach.  Significant estimates used in determining fair value include, but are not limited to, the amount and timing of future cash flows, growth rates, discount rates and useful lives. The excess of the purchase price over fair values of identifiable assets and liabilities is recorded as goodwill.  See Note 2 for further information about goodwill.

PX6009-144

*Goodwill*

Our goodwill totaled $2.9 billion as of January 28, 2023.  We review goodwill for impairment in the fourth quarter of each year, and also upon the occurrence of triggering events.  We perform reviews of each of our operating divisions and other consolidated entities (collectively, "reporting units") that have goodwill balances.  Generally, fair value is determined using a multiple of earnings, or discounted projected future cash flows, and we compare fair value to the carrying value of a reporting unit for purposes of identifying potential impairment.  We base projected future cash flows on management's knowledge of the current operating environment and expectations for the future.  We recognize goodwill impairment for any excess of a reporting unit's carrying value over its fair value, not to exceed the total amount of goodwill allocated to the reporting unit.

In 2022, we recorded a goodwill impairment charge for Vitacost.com totaling $160 million.  The talent and capabilities gained through the merger with Vitacost in 2014 have been key to advancing Kroger's digital platform and growing our digital business to more than $10 billion in annual sales. As our digital strategy has evolved, our primary focus looking forward will be to effectively utilize our Pickup and Delivery capabilities.  This reprioritization resulted in reduced long-term profitability expectations and a decline in the market value for one underlying channel of business and led to the impairment charge. Vitacost.com will continue to operate as an online platform providing great value natural, organic, and eco-friendly products for customers.

The annual evaluation of goodwill performed in 2022, 2021 and 2020 did not result in impairment for any of our reporting units other than Vitacost.com described above.  Based on current and future expected cash flows, we believe additional goodwill impairments are not reasonably likely.  A 10% reduction in fair value of our reporting units would not indicate a potential for impairment of our goodwill balance.

The 2022 fair value of our Kroger Specialty Pharmacy ("KSP") reporting unit was estimated using multiple valuation techniques: a discounted cash flow model (income approach), a market multiple model and a comparable mergers and acquisition model (market approaches), with each method weighted in the calculation. The income approach relies on management's projected future cash flows, estimates of revenue growth rates, margin assumptions and an appropriate discount rate. The market approaches require the determination of an appropriate peer group, which is utilized to derive estimated fair values based on selected market multiples.  Our KSP reporting unit has a goodwill balance of $243 million.

For additional information relating to our results of the goodwill impairment reviews performed during 2022, 2021 and 2020, see Note 2 to the Consolidated Financial Statements.

The impairment review requires the extensive use of management judgment and financial estimates.  Application of alternative estimates and assumptions could produce significantly different results.  The cash flow projections embedded in our goodwill impairment reviews can be affected by several factors such as inflation, business valuations in the market, the economy, market competition and our ability to successfully integrate recently acquired businesses.

*Multi-Employer Pension Plans*

We contribute to various multi-employer pension plans based on obligations arising from collective bargaining agreements.  These multi-employer pension plans provide retirement benefits to participants based on their service to contributing employers.  The benefits are paid from assets held in trust for that purpose.  Trustees are appointed in equal number by employers and unions.  The trustees typically are responsible for determining the level of benefits to be provided to participants as well as for such matters as the investment of the assets and the administration of the plans.

We recognize expense in connection with these plans as contributions are funded or when commitments are probable and reasonably estimable, in accordance with GAAP.  We made cash contributions to these plans of $620 million in 2022, $1.1 billion in 2021 and $619 million in 2020.  The decrease in 2022, compared to 2021, and the increase in 2021, compared to 2020, are due to the contractual payments we made in 2021 related to our commitments established for the restructuring of certain multi-employer pension plan agreements.

PX6009-145

We continue to evaluate and address our potential exposure to under-funded multi-employer pension plans as it relates to our associates who are beneficiaries of these plans. These under-fundings are not our liability. When an opportunity arises that is economically feasible and beneficial to us and our associates, we may negotiate the restructuring of under-funded multi-employer pension plan obligations to help stabilize associates' future benefits and become the fiduciary of the restructured multi-employer pension plan. The commitments from these restructurings do not change our debt profile as it relates to our credit rating since these off-balance sheet commitments are typically considered in our investment grade debt rating. We are currently designated as the named fiduciary of the UFCW Consolidated Pension Plan and the International Brotherhood of Teamsters ("IBT") Consolidated Pension Fund and have sole investment authority over these assets. Significant effects of these restructuring agreements recorded in our Consolidated Financial Statements are:

- In 2022, we incurred a $25 million charge, $19 million net of tax, for obligations related to withdrawal liabilities for certain multi-employer pension funds.

- In 2021, we incurred a $449 million charge, $344 million net of tax, for obligations related to withdrawal liabilities for a certain multi-employer pension fund.

- In 2020, we incurred a $989 million charge, $754 million net of tax, for commitments to certain multi-employer pension funds.

As we continue to work to find solutions to under-funded multi-employer pension plans, it is possible we could incur withdrawal liabilities for certain funds.

Based on the most recent information available to us, we believe the present value of actuarially accrued liabilities in most of these multi-employer plans exceeds the value of the assets held in trust to pay benefits, and we expect that our contributions to most of these funds will increase over the next few years. We have attempted to estimate the amount by which these liabilities exceed the assets, (i.e., the amount of underfunding), as of December 31, 2022. Because we are only one of a number of employers contributing to these plans, we also have attempted to estimate the ratio of our contributions to the total of all contributions to these plans in a year as a way of assessing our "share" of the underfunding. Nonetheless, the underfunding is not a direct obligation or liability of ours or of any employer.

As of December 31, 2022, we estimate our share of the underfunding of multi-employer pension plans to which we contribute was approximately $2.5 billion, $1.9 billion net of tax. This represents an increase in the estimated amount of underfunding of approximately $1.4 billion, $1.1 billion net of tax, as of December 31, 2022, compared to December 31, 2021. The increase in the amount of underfunding is primarily attributable to lower than expected returns on assets in the funds during 2022. Our estimate is based on the most current information available to us including actuarial evaluations and other data (that include the estimates of others), and such information may be outdated or otherwise unreliable.

We have made and disclosed this estimate not because, except as noted above, this underfunding is a direct liability of ours. Rather, we believe the underfunding is likely to have important consequences. In the event we were to exit certain markets or otherwise cease making contributions to these plans, we could trigger a substantial withdrawal liability. Any adjustment for withdrawal liability will be recorded when it is probable that a liability exists and can be reasonably estimated, in accordance with GAAP.

The amount of underfunding described above is an estimate and could change based on contract negotiations, returns on the assets held in the multi-employer pension plans, benefit payments or future restructuring agreements. The amount could decline, and our future expense would be favorably affected, if the values of the assets held in the trust significantly increase or if further changes occur through collective bargaining, trustee action or favorable legislation. On the other hand, our share of the underfunding could increase and our future expense could be adversely affected if the asset values decline, if employers currently contributing to these funds cease participation or if changes occur through collective bargaining, trustee action or adverse legislation. We continue to evaluate our potential exposure to under-funded multi-employer pension plans. Although these liabilities are not a direct obligation or liability of ours, any commitments to fund certain multi-employer pension plans will be expensed when our commitment is probable and an estimate can be made.

PX6009-146

The American Rescue Plan Act ("ARP Act"), which was signed into law on March 11, 2021, established a special financial assistance program for financially troubled multi-employer pension plans. Under the ARP Act, eligible multi-employer plans can apply to receive a cash payment in an amount projected by the Pension Benefit Guaranty Corporation to pay pension benefits through the plan year ending 2051. At the end of 2022, we expect certain multi-employer pension plans in which we participate, for which our estimated share of underfunding is approximately $1.0 billion, $750 million net of tax, to apply for funding in 2023, which may reduce a portion of our share of unfunded multi-employer pension plan liabilities.

See Note 15 to the Consolidated Financial Statements for more information relating to our participation in these multi-employer pension plans.

**NEW ACCOUNTING STANDARDS**

Refer to Note 17 to the Consolidated Financial Statements for recently issued accounting standards not yet adopted as of January 28, 2023.

**LIQUIDITY AND CAPITAL RESOURCES**

*Cash Flow Information*

The following table summarizes our net (decrease) increase in cash and temporary cash investments for 2022 and 2021:

| | Fiscal Year | |
| --- | --- | --- |
| | 2022 | 2021 |
| Net cash provided by (used in) | | |
| Operating activities | $ 4,498 | $ 6,190 |
| Investing activities | (3,015) | (2,611) |
| Financing activities | (2,289) | (3,445) |
| Net (decrease) increase in cash and temporary cash investments | $ (806) | $ 134 |

Net cash provided by operating activities

We generated $4.5 billion of cash from operations in 2022, compared to $6.2 billion in 2021. Net earnings including noncontrolling interests, adjusted for non-cash items, generated approximately $7.7 billion of operating cash flow in 2022 compared to $6.4 billion in 2021. Cash used by operating activities for changes in operating assets and liabilities, including working capital, was $3.2 billion in 2022 compared to $229 million in 2021. The increase in cash used by operating activities for changes in operating assets and liabilities, including working capital, in 2022 compared to 2021, and compared to management's expectations, was primarily due to a variety of factors, including the effect of higher inflation on inventory balances, some forward buying of inventory to protect margins, and the timing of payments related to certain trade accounts payable and receivables. Specifically:

- An increase in pharmacy receivables at the end of 2022, compared to the end of 2021, primarily due to timing of cash receipts;

- An increase in FIFO inventory at the end of 2022, compared to the end of 2021, primarily due to rising costs resulting from continued inflationary cost pressures, in stock inventory returning to pre-pandemic levels due to a reduction of supply chain constraints and increased forward buying to protect gross margin;

- A decrease in prepaid and other current assets at the end of 2021, compared to the end of 2020, primarily due to the transfer of prepaid escrow funds in the first quarter of 2021 to fulfill obligations related to the restructuring of multi-employer pension plans;

- An increase in trade accounts payable at the end of 2021, compared to the end of 2020, primarily due to timing of payments;

PX6009-147

- An increase in cash used by operating activities for changes in accrued expenses in 2022, compared to 2021, primarily due to the following:

    o An increase in accrued payroll at the end of 2021, compared to the end of 2020, primarily due to timing of payments;

    o A decrease in accrued expenses at the end of 2022, compared to the end of 2021, primarily due to the payment of the employer portion of social security tax in 2022 that had previously been deferred under the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") which was enacted in 2020; and

- An increase in income taxes receivable at the end of 2022, compared to the end of 2021, primarily due to the implementation of a tax planning strategy toward the end of 2022.

Cash paid for taxes increased in 2022, compared to 2021, primarily due to higher taxable income in 2022, compared to 2021.

<u>Net cash used by investing activities</u>

Investing activities used cash of $3.0 billion in 2022, compared to $2.6 billion in 2021. The amount of cash used by investing activities increased in 2022, compared to 2021, primarily due to increased payments for property and equipment in 2022.

<u>Net cash used by financing activities</u>

We used $2.3 billion of cash for financing activities in 2022, compared to $3.4 billion in 2021. The amount of cash used for financing activities decreased in 2022, compared to 2021, primarily due to the following:

- Decreased payments on long-term debt including obligations under finance leases; and

- Decreased treasury stock purchases;

- Partially offset by decreased proceeds from financing arrangement.

*Capital Investments*

Capital investments, including changes in construction-in-progress payables and excluding the purchase of leased facilities, totaled $3.3 billion in 2022 and $3.2 billion in 2021. Capital investments for the purchase of leased facilities totaled $21 million in 2022. We did not purchase any leased facilities in 2021. Our capital priorities align directly with our value creation model and our target to consistently grow net earnings. Our capital program includes initiatives to enhance the customer experience in stores, improve our process efficiency and enhance our digital capabilities through technology developments. As such, we increased our allocation of capital investments related to digital and technology compared to prior years. These investments are expected to drive digital sales growth and improve operating efficiency by removing cost and waste from our business.

PX6009-148

The table below shows our supermarket storing activity and our total supermarket square footage for 2022, 2021 and 2020:

**Supermarket Storing Activity**

|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| Beginning of year | 2,726 | 2,742 | 2,757 |
| Opened | 3 | 4 | 5 |
| Opened (relocation) | 1 | 4 | 6 |
| Closed (operational) | (10) | (20) | (20) |
| Closed (relocation) | (1) | (4) | (6) |
| End of year | 2,719 | 2,726 | 2,742 |
|  |  |  |  |
| Total supermarket square footage (in millions) | 179 | 179 | 179 |

### Debt Management

Total debt, including both the current and long-term portions of obligations under finance leases, increased $14 million to $13.4 billion as of year-end 2022 compared to 2021. This increase resulted primarily from a net increase in obligations under finance leases of $466 million primarily related to our four additional Kroger Delivery customer fulfillment center openings during 2022, partially offset by the payment of $400 million of senior notes bearing an interest rate of 2.80%.

### Common Share Repurchase Programs

We maintain share repurchase programs that comply with Rule 10b5-1 of the Securities Exchange Act of 1934, as amended (the "Exchange Act") and allow for the orderly repurchase of our common shares, from time to time. The share repurchase programs do not have an expiration date but may be suspended or terminated by our Board of Directors at any time. We made open market purchases of our common shares totaling $821 million in 2022 and $1.4 billion in 2021. During the third quarter of 2022, we paused our share repurchase program to prioritize de-leveraging following the proposed merger with Albertsons.

In addition to these repurchase programs, we also repurchase common shares to reduce dilution resulting from our employee stock option plans. This program is solely funded by proceeds from stock option exercises, and the tax benefit from these exercises. We repurchased approximately $172 million in 2022 and $225 million in 2021 of our common shares under the stock option program.

On December 30, 2021, our Board of Directors approved a $1.0 billion share repurchase program to reacquire shares via open market purchase or privately negotiated transactions, block trades, or pursuant to trades intending to comply with Rule 10b5-1 under the Exchange Act (the "December 2021 Repurchase Program"). The December 2021 Repurchase Program was exhausted during the third quarter of 2022. On September 9, 2022, our Board of Directors approved a $1.0 billion share repurchase program to reacquire shares via open market purchase or privately negotiated transactions, block trades, or pursuant to trades intending to comply with Rule 10b5-1 under the Exchange Act (the "September 2022 Repurchase Program"). No shares have been repurchased under the September 2022 authorization. During the third quarter of 2022, we paused our share repurchase program to prioritize de-leveraging following the proposed merger with Albertsons.

The shares we repurchased in 2022 were reacquired under the following share repurchase programs:

- The December 2021 Repurchase Program.

- A program announced on December 6, 1999 to repurchase common shares to reduce dilution resulting from our employee stock option and long-term incentive plans, under which repurchases are limited to proceeds received from exercises of stock options and the tax benefits associated therewith ("1999 Repurchase Program").

As of January 28, 2023, there was $1.0 billion remaining under the September 2022 Repurchase Program.

PX6009-149

*Dividends*

The following table provides dividend information for 2022 and 2021 ($ in millions, except per share amounts):

|  | 2022 | 2021 |
|---|---|---|
| Cash dividends paid | $ 682 | $ 589 |
| Cash dividends paid per common share | $ 0.94 | $ 0.78 |

*Liquidity Needs*

We held cash and temporary cash investments of $1.0 billion, as of the end of 2022, which reflects our elevated operating performance over the last few years. We actively manage our cash and temporary cash investments in order to internally fund operating activities, support and invest in our core businesses, make scheduled interest and principal payments on our borrowings and return cash to shareholders through cash dividend payments and share repurchases. Our current levels of cash, borrowing capacity and balance sheet leverage provide us with the operational flexibility to adjust to changes in economic and market conditions. We remain committed to our dividend, and growing our dividend over time, subject to board approval, as well as share repurchase programs and we will evaluate the optimal use of any excess free cash flow, consistent with our capital allocation strategy. During the third quarter of 2022, we paused our share repurchase program to prioritize de-leveraging following the proposed merger with Albertsons.

PX6009-150

The table below summarizes our short-term and long-term material cash requirements, based on year of maturity or settlement, as of January 28, 2023 (in millions of dollars):

| Contractual Obligations[1][2] | 2023 | 2024 | 2025 | 2026 | 2027 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| Long-term debt[3] | $ 1,153 | $ 25 | $ 84 | $ 1,386 | $ 607 | $ 8,037 | $ 11,292 |
| Interest on long-term debt[4] | 480 | 439 | 422 | 400 | 376 | 4,548 | 6,665 |
| Finance lease obligations | 228 | 226 | 222 | 221 | 223 | 1,492 | 2,612 |
| Operating lease obligations | 930 | 864 | 791 | 740 | 683 | 5,688 | 9,696 |
| Self-insurance liability[5] | 236 | 162 | 106 | 65 | 38 | 105 | 712 |
| Construction commitments[6] | 1,718 | — | — | — | — | — | 1,718 |
| Purchase obligations[7] | 725 | 330 | 274 | 303 | 283 | 1,937 | 3,852 |
| **Total** | $ 5,470 | $ 2,046 | $ 1,899 | $ 3,115 | $ 2,210 | $ 21,807 | $ 36,547 |

(1)   The contractual obligations table excludes funding of pension and other postretirement benefit obligations, which totaled approximately $38 million in 2022. For additional information about these obligations, see Note 14 to the Consolidated Financial Statements. This table also excludes contributions under various multi-employer pension plans, which totaled $620 million in 2022. For additional information about these multi-employer pension plans, see Note 15 to the Consolidated Financial Statements.

(2)   The liability related to unrecognized tax benefits has been excluded from the contractual obligations table because a reasonable estimate of the timing of future tax settlements cannot be determined.

(3)   As of January 28, 2023, we had no outstanding commercial paper and no borrowings under our credit facility.

(4)   Amounts include contractual interest payments using the interest rate as of January 28, 2023 and stated fixed and swapped interest rates, if applicable, for all other debt instruments.

(5)   The amounts included for self-insurance liability related to workers' compensation claims have been stated on a present value basis.

(6)   Amounts include funds owed to third parties for projects currently under construction. These amounts are reflected in "Other current liabilities" in our Consolidated Balance Sheets.

(7)   Amounts include commitments, many of which are short-term in nature, to be utilized in the normal course of business, such as several contracts to purchase raw materials utilized in our food production plants and several contracts to purchase energy to be used in our stores and food production plants. Our obligations also include management fees for facilities operated by third parties and outside service contracts. Any upfront vendor allowances or incentives associated with outstanding purchase commitments are recorded as either current or long-term liabilities in our Consolidated Balance Sheets. We included our future commitments for customer fulfillment centers for which we have placed an order as of January 28, 2023. We did not include our commitments associated with additional customer fulfillment centers that have not yet been ordered. We expect our future commitments for customer fulfillment centers will continue to grow as we place orders for additional customer fulfillment centers.

We expect to meet our short-term and long-term liquidity needs with cash and temporary cash investments on hand as of January 28, 2023, cash flows from our operating activities and other sources of liquidity, including borrowings under our commercial paper program and bank credit facility. Our short-term and long-term liquidity needs include anticipated requirements for working capital to maintain our operations, pension plan commitments, interest payments and scheduled principal payments of debt and commercial paper, settlement of interest rate swap liabilities, servicing our lease obligations, self-insurance liabilities, capital investments and other purchase obligations. We may also require additional capital in the future to fund organic growth opportunities, additional customer fulfillment centers, joint ventures or other business partnerships, property development, acquisitions, dividends and share repurchases. In addition, we generally operate with a working capital deficit due to our efficient use of cash in funding operations and because we have consistent access to the capital markets. We believe we have adequate coverage of our debt covenants to continue to maintain our current investment grade debt ratings and to respond effectively to competitive conditions.

PX6009-151

As previously disclosed, on October 13, 2022, we entered into a merger agreement with Albertsons. We expect to meet our liquidity needs for the proposed merger with cash and temporary cash investments on hand as of the merger closing date, cash flows from our operating activities and other sources of liquidity, including borrowings under our commercial paper program, senior notes issuances, bank credit facility and other sources of financing. In connection with the proposed merger, we entered into a commitment letter for a bridge term loan facility and executed a term loan credit agreement. During the third quarter of 2022, we paused our share repurchase program to prioritize de-leveraging following the proposed merger with Albertsons. For additional information about the proposed merger with Albertsons, see Note 16 to the Consolidated Financial Statements.

For additional information about our debt activity in 2022, see Note 5 to the Consolidated Financial Statements.

*Factors Affecting Liquidity*

We can currently borrow on a daily basis approximately $2.75 billion under our commercial paper program. At January 28, 2023, we had no outstanding commercial paper. Commercial paper borrowings are backed by our credit facility and reduce the amount we can borrow under the credit facility. If our short-term credit ratings fall, the ability to borrow under our current commercial paper program could be adversely affected for a period of time and increase our interest cost on daily borrowings under our commercial paper program. This could require us to borrow additional funds under the credit facility, under which we believe we have sufficient capacity. However, in the event of a ratings decline, we do not anticipate that our borrowing capacity under our commercial paper program would be any lower than $500 million on a daily basis. Factors that could affect our credit rating include changes in our operating performance and financial position, the state of the economy, the current inflationary environment, conditions in the food retail industry and changes in our business model. Further information on the risks and uncertainties that can affect our business can be found in the "Risk Factors" section set forth in Item 1A of Part I of this Annual Report on Form 10-K. Although our ability to borrow under the credit facility is not affected by our credit rating, the interest cost and applicable margin on borrowings under the credit facility could be affected by a downgrade in our Public Debt Rating. "Public Debt Rating" means, as of any date, the rating that has been most recently announced by either S&P or Moody's, as the case may be, for any class of non-credit enhanced long-term senior unsecured debt issued by the Company. As of March 22, 2023, we had no commercial paper borrowings outstanding.

Our credit facility requires the maintenance of a Leverage Ratio (our "financial covenant"). A failure to maintain our financial covenant would impair our ability to borrow under the credit facility. This financial covenant is described below:

- Our Leverage Ratio (the ratio of Net Debt to Adjusted EBITDA, as defined in the credit facility) was 1.34 to 1 as of January 28, 2023. If this ratio were to exceed 3.50 to 1, we would be in default of our revolving credit facility and our ability to borrow under the facility would be impaired.

Our credit facility is more fully described in Note 5 to the Consolidated Financial Statements. We were in compliance with our financial covenant at January 28, 2023.

As of January 28, 2023, we maintained a $2.75 billion (with the ability to increase by $1.25 billion), unsecured revolving credit facility that, unless extended, terminates on July 6, 2026. Outstanding borrowings under the credit facility, commercial paper borrowings, and some outstanding letters of credit reduce funds available under the credit facility. As of January 28, 2023, we had no outstanding commercial paper and no borrowings under our revolving credit facility. The outstanding letters of credit that reduce funds available under our credit facility totaled $2 million as of January 28, 2023.

In connection with the proposed merger with Albertsons, on October 13, 2022, we entered into a commitment letter with certain lenders pursuant to which the lenders have committed to provide a 364-day $17.4 billion senior unsecured bridge term loan facility. The commitments are intended to be drawn to finance the proposed merger with Albertsons only to the extent we do not arrange for alternative financing prior to closing. As alternative financing for the proposed merger is secured, the commitments with respect to the bridge term loan facility under the commitment letter will be reduced.

PX6009-152

On November 9, 2022, we executed a term loan credit agreement with certain lenders pursuant to which the lenders committed to provide, contingent upon the completion of the proposed merger with Albertsons and certain other customary conditions to funding, (1) senior unsecured term loans in an aggregate principal amount of $3.0 billion maturing on the third anniversary of the proposed merger closing date and (2) senior unsecured term loans in an aggregate principal amount of $1.75 billion maturing on the date that is 18 months after the proposed merger closing date (collectively, the "Term Loan Facilities"). Borrowings under the Term Loan Facilities will be used to pay a portion of the consideration and other amounts payable in connection with the proposed merger with Albertsons. The duration of the Term Loan Facilities will allow us to achieve our net total debt to adjusted EBITDA ratio target range of 2.30 to 2.50 within the first 18 to 24 months after the proposed merger closing date. The entry into the term loan credit agreement reduced the commitments under our bridge facility commitment letter from $17.4 billion to $12.65 billion. Borrowings under the Term Loan Facilities will bear interest at rates that vary based on the type of loan and our debt rating.

In addition to the available credit mentioned above, as of January 28, 2023, we had authorized for issuance $3.3 billion of securities remaining under a shelf registration statement filed with the SEC and effective on May 20, 2022.

We maintain surety bonds related primarily to our self-insured workers' compensation claims. These bonds are required by most states in which we are self-insured for workers' compensation and are placed with predominately third-party insurance providers to insure payment of our obligations in the event we are unable to meet our claim payment obligations up to our self-insured retention levels. These bonds do not represent liabilities of ours, as we already have reserves on our books for the claims costs. Market changes may make the surety bonds more costly and, in some instances, availability of these bonds may become more limited, which could affect our costs of, or access to, such bonds. Although we do not believe increased costs or decreased availability would significantly affect our ability to access these surety bonds, if this does become an issue, we would issue letters of credit, in states where allowed, to meet the state bonding requirements. This could increase our cost or decrease the funds available under our credit facility if the letters of credit were issued against our credit facility. We had $467 million of outstanding surety bonds as of January 28, 2023. These surety bonds expire during fiscal year 2023 and are expected to be renewed.

We have standby letters of credit outstanding as part of our insurance program and for other business purposes. The letters of credit for our insurance program collateralize obligations to our insurance carriers in connection with the settlement of potential claims. We have also provided a letter of credit which supports our commitment to build a certain number of fulfillment centers. The balance of this letter of credit reduces primarily upon the construction of each fulfillment center. If we do not reach our total purchase commitment, we will be responsible for the balance remaining on the letter of credit. We had $310 million of outstanding standby letters of credit as of January 28, 2023. These standby letters of credit expire during fiscal year 2023 and are expected to be renewed. Letters of credit do not represent liabilities of ours and are not reflected in the Company's Consolidated Balance Sheets.

We also are contingently liable for leases that have been assigned to various third parties in connection with facility closings and dispositions. We could be required to satisfy obligations under the leases if any of the assignees are unable to fulfill their lease obligations. Due to the wide distribution of our assignments among third parties, and various other remedies available to us, we believe the likelihood that we will be required to assume a material amount of these obligations is remote. We have agreed to indemnify certain third-party logistics operators for certain expenses, including multi-employer pension plan obligations and withdrawal liabilities.

In addition to the above, we enter into various indemnification agreements and take on indemnification obligations in the ordinary course of business. Such arrangements include indemnities against third-party claims arising out of agreements to provide services to us; indemnities related to the sale of our securities; indemnities of directors, officers and employees in connection with the performance of their work; and indemnities of individuals serving as fiduciaries on benefit plans. While our aggregate indemnification obligation could result in a material liability, we are not aware of any current matter that could result in a material liability.

PX6009-153

**ITEM 7A.   QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.**

**FINANCIAL RISK MANAGEMENT**

In addition to the risks inherent in our operations, we are exposed to market risk from a variety of sources, including changes in interest rates, commodity prices, the fair value of certain equity investments and defined benefit pension and other post-retirement benefit plans.  Our market risk exposures are discussed below.

*Interest Rate Risk*

We manage our exposure to interest rates and changes in the fair value of our debt instruments primarily through the strategic use of our commercial paper program, variable and fixed rate debt, and interest rate swaps. Our current program relative to interest rate protection contemplates hedging the exposure to changes in the fair value of fixed-rate debt attributable to changes in interest rates. To do this, we use the following guidelines: (i) use average daily outstanding borrowings to determine annual debt amounts subject to interest rate exposure, (ii) limit the average annual amount subject to interest rate reset and the amount of floating rate debt to a combined total amount that represents 25% of the carrying value of our debt portfolio or less, (iii) include no leveraged products, and (iv) hedge without regard to profit motive or sensitivity to current mark-to-market status.

When we use derivative financial instruments, it is primarily to manage our exposure to fluctuations in interest rates. We do not enter into derivative financial instruments for trading purposes. As a matter of policy, all of our derivative positions are intended to reduce risk by hedging an underlying economic exposure. Because of the high correlation between the hedging instrument and the underlying exposure, fluctuations in the value of the instruments generally are offset by reciprocal changes in the value of the underlying exposure. The interest rate derivatives we use are straightforward instruments with liquid markets.

As of January 28, 2023, we maintained five forward-starting interest rate swap agreements with a maturity date of August 1, 2027 with an aggregate notional amount totaling $5.4 billion. A forward-starting interest rate swap is an agreement that effectively hedges the variability in future benchmark interest payments attributable to changes in interest rates on the forecasted issuance of fixed-rate debt. We entered into these forward-starting interest rate swaps in order to lock in fixed interest rates on our forecasted issuances of debt. The fixed interest rates for these forward-starting interest rate swaps range from 3.00% to 3.78%. The variable rate component on the forward-starting interest rate swaps is the Secured Overnight Financing Rate (SOFR).  A notional amount of $2.4 billion of these forward-starting interest rate swaps was designated as a cash-flow hedge as defined by GAAP.  Accordingly, the changes in fair value of these forward-starting interest rate swaps are recorded to other comprehensive income and reclassified into net earnings when the hedged transaction affects net earnings.  As of January 28, 2023, the fair value of the interest rate swaps designated as cash flow hedges was recorded in "Other long-term liabilities" for $116 million and accumulated other comprehensive loss for $89 million, net of tax.  The remainder of the notional amount of $3.0 billion of the forward-starting interest rate swaps was not designated as a cash-flow hedge. Accordingly, the changes in the fair value of these forward-starting interest rate swaps not designated as cash-flow hedges are recognized through net earnings. As of January 28, 2023, the fair value of these swaps was recorded in "Other long-term liabilities" for $142 million. During 2022, we recognized an unrealized loss of $142 million that is included in "(Loss) gain on investments" in our Consolidated Statements of Operations.  We had no forward-starting interest rate swap agreements outstanding as of January 29, 2022.

Annually, we review with the Finance Committee of our Board of Directors compliance with the guidelines described above. The guidelines may change as our business needs dictate.

PX6009-154

The tables below provide information about our underlying debt portfolio as of January 28, 2023 and January 29, 2022. The amounts shown for each year represent the contractual maturities of long-term debt, excluding finance leases, as of January 28, 2023 and January 29, 2022. Interest rates reflect the weighted average rate for the outstanding instruments. The variable rate debt is based on a reference rate using the forward yield curve as of January 28, 2023 and January 29, 2022. The Fair Value column includes the fair value of our debt instruments as of January 28, 2023 and January 29, 2022. We had no outstanding interest rate derivatives classified as fair value hedges as of January 28, 2023 or January 29, 2022. See Notes 5, 6 and 7 to the Consolidated Financial Statements.

| | January 28, 2023 Expected Year of Maturity | | | | | | | |
| | 2023 | 2024 | 2025 | 2026 | 2027 | Thereafter | Total | Fair Value |
|---|---|---|---|---|---|---|---|---|
| | (in millions) | | | | | | | |
| **Debt** | | | | | | | | |
| Fixed rate | $ (1,118) | $ (3) | $ (3) | $ (1,386) | $ (607) | $ (8,037) | $ (11,154) | $ (10,455) |
| Average interest rate | 4.52 % | 1.53 % | 3.64 % | 4.26 % | 4.68 % | 4.54 % | | |
| Variable rate | $ (35) | $ (22) | $ (81) | $ — | $ — | $ — | $ (138) | $ (138) |
| Average interest rate | 6.32 % | 7.07 % | 1.70 % | | | | | |

| | January 29, 2022 Expected Year of Maturity | | | | | | | |
| | 2022 | 2023 | 2024 | 2025 | 2026 | Thereafter | Total | Fair Value |
|---|---|---|---|---|---|---|---|---|
| | (in millions) | | | | | | | |
| **Debt** | | | | | | | | |
| Fixed rate | $ (416) | $ (1,107) | $ (5) | $ (3) | $ (1,387) | $ (8,688) | $ (11,606) | $ (13,050) |
| Average interest rate | 4.38 % | 4.50 % | 1.51 % | 3.53 % | 4.27 % | 4.46 % | | |
| Variable rate | $ (35) | $ (23) | $ — | $ (81) | $ — | $ — | $ (139) | $ (139) |
| Average interest rate | 1.86 % | 2.61 % | — | 0.12 % | | | | |

Based on our year-end 2022 variable rate debt levels, a 10 percent change in interest rates would be immaterial. See Note 6 to the Consolidated Financial Statements for further discussion of derivatives and hedging policies.

*Commodity Price Risk*

We are subject to commodity price risk generated by our purchases of meat, seafood and dairy products, among other food items. We purchase, manufacture and sell various commodity related food products and risk arises from the price volatility of these commodities. The price and availability of these commodities directly impacts our results of operations. To help manage or minimize the effect of commodity price risk exposure on our operations, we use a combination of pricing features embedded within supply contracts, such as fixed-price and price-to-be-fixed contracts, and have the ability to increase or decrease retail prices to our customers as commodity prices change.

We are exposed to changes in the prices of diesel and unleaded fuel. The majority of our fuel contracts utilize index-based pricing formulas plus or minus a fixed locational/supplier differential. We expect to take delivery of these commitments in the normal course of business, and, as a result, these contracts qualify as normal purchases. While many of the indices are aligned, each index may fluctuate at a different pace, driving variability in the prices paid for fuel. Because of this, our operating results may be affected should the market price of fuel suddenly change by a significant amount, which can affect our operating results either positively or negatively in the short-term.

We have entered into fixed price contracts to purchase electricity and natural gas for a portion of our energy needs. We expect to take delivery of these commitments in the normal course of business, and, as a result, these contracts qualify as normal purchases.

As of January 28, 2023 and January 29, 2022, we had no commodity derivative contracts outstanding.

PX6009-155

*Equity Investment Risk*

We are exposed to market price volatility for our investment in Ocado Group plc ("Ocado"), which is measured at fair value through net earnings.  Fair value adjustments flow through "(Loss) gain on investments" in our Consolidated Statements of Operations.  The change in fair value of this investment resulted in an unrealized (loss) gain on investments of ($586) million in 2022, ($821) million in 2021 and $1.0 billion in 2020.  As of January 28, 2023, the value of our investment in Ocado was $401 million. As of January 28, 2023, a 10% change in the fair value of this investment would be approximately $40 million.  For additional details on this investment, see Note 7 to the Consolidated Financial Statements.

*Company-Sponsored Benefit Plans*

We sponsor defined benefit pension plans and post-retirement healthcare plans for certain eligible employees. Changes in interest rates affect our liabilities associated with these retirement plans, as well as the amount of expense recognized for these retirement plans. Increased interest rates could result in a lower fair value of plan assets and increased pension expense in the following years.  The target plan asset allocations are established based on our LDI strategy. An LDI strategy focuses on maintaining a close to fully-funded status over the long-term with minimal funded status risk. This is achieved by investing more of the plan assets in fixed income instruments to more closely match the duration of the plan liability.  As of January 28, 2023, our defined benefit pension plans had total investment assets of $2.5 billion. Declines in the fair value of plan assets could diminish the funded status of our defined benefit pension plans and potentially increase our requirement to make contributions to these plans.  For additional details, see Note 14 to the Consolidated Financial Statements.

PX6009-156

**ITEM 8.    FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA.**

**Consolidated Financial Statements of The Kroger Co.**
**For the Fiscal Year Ended January 28, 2023**

**Table of Contents**

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | 49 |
| Consolidated Balance Sheets | 52 |
| Consolidated Statements of Operations | 53 |
| Consolidated Statements of Comprehensive Income | 54 |
| Consolidated Statements of Cash Flows | 55 |
| Consolidated Statements of Changes in Shareholders' Equity | 56 |
| Notes to Consolidated Financial Statements | 57 |

PX6009-157

## Report of Independent Registered Public Accounting Firm

To the Board of Directors and Shareholders of The Kroger Co.

### *Opinions on the Financial Statements and Internal Control over Financial Reporting*

We have audited the accompanying consolidated balance sheets of The Kroger Co. and its subsidiaries (the "Company") as of January 28, 2023 and January 29, 2022, and the related consolidated statements of operations, of comprehensive income, of changes in shareholders' equity and of cash flows for each of the three years in the period ended January 28, 2023, including the related notes (collectively referred to as the "consolidated financial statements"). We also have audited the Company's internal control over financial reporting as of January 28, 2023, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of January 28, 2023 and January 29, 2022, and the results of its operations and its cash flows for each of the three years in the period ended January 28, 2023 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of January 28, 2023, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the COSO.

### *Basis for Opinions*

The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in Management's Report on Internal Control over Financial Reporting appearing under Item 9A. Our responsibility is to express opinions on the Company's consolidated financial statements and on the Company's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the consolidated financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

PX6009-158

### *Definition and Limitations of Internal Control over Financial Reporting*

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

### *Critical Audit Matters*

The critical audit matter communicated below is a matter arising from the current period audit of the consolidated financial statements that was communicated or required to be communicated to the audit committee and that (i) relates to accounts or disclosures that are material to the consolidated financial statements and (ii) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

*Goodwill Impairment Assessment – Kroger Specialty Pharmacy ("KSP") Reporting Unit*

As described in Notes 1 and 2 to the consolidated financial statements, the Company's consolidated goodwill balance was $2.9 billion as of January 28, 2023 and the goodwill associated with the KSP reporting unit was $243 million. Management reviews goodwill annually for impairment in the fourth quarter of each year, and also upon the occurrence of triggering events. The fair value of a reporting unit is compared to its carrying value for purposes of identifying potential impairment. Goodwill impairment is recognized for any excess of the reporting unit's carrying value over its fair value, not to exceed the total amount of goodwill allocated to the reporting unit. The fair value of the Company's KSP reporting unit was estimated using multiple valuation techniques, a discounted cash flow model (income approach), a market multiple model and comparable mergers and acquisition model (market approaches), with each method weighted in the calculation. The income approach relies on management's estimates of revenue growth rates, margin assumptions, and discount rate to estimate future cash flows. The market approaches require the determination of an appropriate peer group, which is utilized to derive estimated fair values based on selected market multiples.

The principal considerations for our determination that performing procedures relating to the goodwill impairment assessment of the KSP reporting unit is a critical audit matter are (i) the significant judgment by management when developing the fair value measurement of the reporting unit; (ii) the high degree of auditor judgment, subjectivity, and effort in performing procedures to evaluate management's cash flow projections and significant assumptions related to revenue growth rates, margin assumptions, discount rate, peer group determination, and market multiple selection; and (iii) the audit effort involved the use of professionals with specialized skill and knowledge.

PX6009-159

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. These procedures included testing the effectiveness of controls relating to management's goodwill impairment assessment, including controls over the valuation of the Company's KSP reporting unit. These procedures also included, among others, testing management's process for developing the fair value estimate, evaluating the appropriateness of the income and market approach models, testing the completeness, accuracy, and relevance of the underlying data used in the models and evaluating the significant assumptions used by management related to the revenue growth rates, margin assumptions, discount rate, peer group determination, and market multiple selection. Evaluating management's assumptions relating to revenue growth rates and margin assumptions involved evaluating whether the assumptions used by management were reasonable considering (i) the current and past performance of the reporting unit, (ii) the consistency with external market and industry data, and (iii) whether these assumptions were consistent with evidence obtained in other areas of the audit. Evaluating the Company's peer group determinations included evaluating the appropriateness of the identified peer companies. Professionals with specialized skill and knowledge were used to assist in the evaluation of the Company's discounted cash flow and market models, and certain significant assumptions related to the discount rate, peer group determination, and market multiples.

/s/ PricewaterhouseCoopers LLP
Cincinnati, Ohio
March 28, 2023

We have served as the Company's auditor since 1929.

PX6009-160

**THE KROGER CO.**
**CONSOLIDATED BALANCE SHEETS**

| (In millions, except par amounts) | | January 28, 2023 | | January 29, 2022 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current assets | | | | |
| Cash and temporary cash investments | $ | 1,015 | $ | 1,821 |
| Store deposits in-transit | | 1,127 | | 1,082 |
| Receivables | | 2,234 | | 1,828 |
| FIFO inventory | | 9,756 | | 8,353 |
| LIFO reserve | | (2,196) | | (1,570) |
| Prepaid and other current assets | | 734 | | 660 |
| Total current assets | | 12,670 | | 12,174 |
| | | | | |
| Property, plant and equipment, net | | 24,726 | | 23,789 |
| Operating lease assets | | 6,662 | | 6,695 |
| Intangibles, net | | 899 | | 942 |
| Goodwill | | 2,916 | | 3,076 |
| Other assets | | 1,750 | | 2,410 |
| | | | | |
| Total Assets | $ | 49,623 | $ | 49,086 |
| | | | | |
| **LIABILITIES** | | | | |
| Current liabilities | | | | |
| Current portion of long-term debt including obligations under finance leases | $ | 1,310 | $ | 555 |
| Current portion of operating lease liabilities | | 662 | | 650 |
| Trade accounts payable | | 7,119 | | 7,117 |
| Accrued salaries and wages | | 1,746 | | 1,736 |
| Other current liabilities | | 6,401 | | 6,265 |
| Total current liabilities | | 17,238 | | 16,323 |
| | | | | |
| Long-term debt including obligations under finance leases | | 12,068 | | 12,809 |
| Noncurrent operating lease liabilities | | 6,372 | | 6,426 |
| Deferred income taxes | | 1,672 | | 1,562 |
| Pension and postretirement benefit obligations | | 436 | | 478 |
| Other long-term liabilities | | 1,823 | | 2,059 |
| | | | | |
| Total Liabilities | | 39,609 | | 39,657 |
| | | | | |
| Commitments and contingencies see Note 12 | | | | |
| | | | | |
| **SHAREOWNERS' EQUITY** | | | | |
| | | | | |
| Preferred shares, $100 par per share, 5 shares authorized and unissued | | — | | — |
| Common shares, $1 par per share, 2,000 shares authorized; 1,918 shares issued in 2022 and 2021 | | 1,918 | | 1,918 |
| Additional paid-in capital | | 3,805 | | 3,657 |
| Accumulated other comprehensive loss | | (632) | | (467) |
| Accumulated earnings | | 25,601 | | 24,066 |
| Common shares in treasury, at cost, 1,202 shares in 2022 and 1,191 shares in 2021 | | (20,650) | | (19,722) |
| | | | | |
| Total Shareowners' Equity - The Kroger Co. | | 10,042 | | 9,452 |
| Noncontrolling interests | | (28) | | (23) |
| | | | | |
| Total Equity | | 10,014 | | 9,429 |
| | | | | |
| Total Liabilities and Equity | $ | 49,623 | $ | 49,086 |

The accompanying notes are an integral part of the consolidated financial statements.

PX6009-161

**THE KROGER CO.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

Years Ended January 28, 2023, January 29, 2022 and January 30, 2021

| (In millions, except per share amounts) | 2022 (52 weeks) | 2021 (52 weeks) | 2020 (52 weeks) |
|---|---|---|---|
| Sales | $ 148,258 | $ 137,888 | $ 132,498 |
| Operating expenses | | | |
| Merchandise costs, including advertising, warehousing, and transportation, excluding items shown separately below | 116,480 | 107,539 | 101,597 |
| Operating, general and administrative | 23,848 | 23,203 | 24,500 |
| Rent | 839 | 845 | 874 |
| Depreciation and amortization | 2,965 | 2,824 | 2,747 |
| Operating profit | 4,126 | 3,477 | 2,780 |
| Other income (expense) | | | |
| Interest expense | (535) | (571) | (544) |
| Non-service component of company-sponsored pension plan benefits (costs) | 39 | (34) | 29 |
| (Loss) gain on investments | (728) | (821) | 1,105 |
| Net earnings before income tax expense | 2,902 | 2,051 | 3,370 |
| Income tax expense | 653 | 385 | 782 |
| Net earnings including noncontrolling interests | 2,249 | 1,666 | 2,588 |
| Net income attributable to noncontrolling interests | 5 | 11 | 3 |
| Net earnings attributable to The Kroger Co. | $ 2,244 | $ 1,655 | $ 2,585 |
| Net earnings attributable to The Kroger Co. per basic common share | $ 3.10 | $ 2.20 | $ 3.31 |
| Average number of common shares used in basic calculation | 718 | 744 | 773 |
| Net earnings attributable to The Kroger Co. per diluted common share | $ 3.06 | $ 2.17 | $ 3.27 |
| Average number of common shares used in diluted calculation | 727 | 754 | 781 |

The accompanying notes are an integral part of the consolidated financial statements.

PX6009-162

# THE KROGER CO.
## CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME

Years Ended January 28, 2023, January 29, 2022 and January 30, 2021

| (In millions) | 2022 (52 weeks) | 2021 (52 weeks) | 2020 (52 weeks) |
|---|---|---|---|
| Net earnings including noncontrolling interests | $ 2,249 | $ 1,666 | $ 2,588 |
| | | | |
| Other comprehensive (loss) income | | | |
| Change in pension and other postretirement defined benefit plans, net of income tax[1] | (83) | 156 | 22 |
| Unrealized gains and losses on cash flow hedging activities, net of income tax[2] | (89) | — | (14) |
| Amortization of unrealized gains and losses on cash flow hedging activities, net of income tax[3] | 7 | 7 | 2 |
| | | | |
| Total other comprehensive (loss) income | (165) | 163 | 10 |
| | | | |
| Comprehensive income | 2,084 | 1,829 | 2,598 |
| Comprehensive income attributable to noncontrolling interests | 5 | 11 | 3 |
| Comprehensive income attributable to The Kroger Co. | $ 2,079 | $ 1,818 | $ 2,595 |

(1) Amount is net of tax (benefit) expense of ($26) in 2022, $48 in 2021 and $7 in 2020.

(2) Amount is net of tax benefit of ($27) in 2022 and ($8) in 2020.

(3) Amount is net of tax expense of $2 in 2022, $3 in 2021 and $2 in 2020.

The accompanying notes are an integral part of the consolidated financial statements.

PX6009-163

THE KROGER CO.
CONSOLIDATED STATEMENTS OF CASH FLOWS

Years Ended January 28, 2023, January 29, 2022 and January 30, 2021

| (In millions) | 2022 (52 weeks) | 2021 (52 weeks) | 2020 (52 weeks) |
|---|---|---|---|
| Cash Flows from Operating Activities: | | | |
| Net earnings including noncontrolling interests | $ 2,249 | $ 1,666 | $ 2,588 |
| Adjustments to reconcile net earnings including noncontrolling interests to net cash provided by operating activities: | | | |
| Depreciation and amortization | 2,965 | 2,824 | 2,747 |
| Asset impairment charges | 68 | 64 | 70 |
| Goodwill and fixed asset impairment charges related to Vitacost.com | 164 | — | — |
| Operating lease asset amortization | 614 | 605 | 626 |
| LIFO charge (credit) | 626 | 197 | (7) |
| Share-based employee compensation | 190 | 203 | 185 |
| Company-sponsored pension plans (benefit) expense | (26) | 50 | (9) |
| Deferred income taxes | 161 | (31) | 73 |
| Gain on the sale of assets | (40) | (44) | (59) |
| Loss (gain) on investments | 728 | 821 | (1,105) |
| Other | (8) | 64 | 165 |
| Changes in operating assets and liabilities: | | | |
| Store deposits in-transit | (45) | 13 | 83 |
| Receivables | (222) | (61) | (90) |
| Inventories | (1,370) | 80 | 7 |
| Prepaid and other current assets | (36) | 232 | (342) |
| Trade accounts payable | 3 | 438 | 330 |
| Accrued expenses | (126) | 331 | 1,382 |
| Income taxes receivable and payable | (190) | 16 | 24 |
| Operating lease liabilities | (622) | (618) | (552) |
| Other | (585) | (660) | 699 |
| Net cash provided by operating activities | 4,498 | 6,190 | 6,815 |
| Cash Flows from Investing Activities: | | | |
| Payments for property and equipment, including payments for lease buyouts | (3,078) | (2,614) | (2,865) |
| Proceeds from sale of assets | 78 | 153 | 165 |
| Other | (15) | (150) | (114) |
| Net cash used by investing activities | (3,015) | (2,611) | (2,814) |
| Cash Flows from Financing Activities: | | | |
| Proceeds from issuance of long-term debt | — | 56 | 1,049 |
| Payments on long-term debt including obligations under finance leases | (552) | (1,442) | (747) |
| Net payments on commercial paper | — | — | (1,150) |
| Dividends paid | (682) | (589) | (534) |
| Financing fees paid | (84) | (5) | (9) |
| Proceeds from issuance of capital stock | 134 | 172 | 127 |
| Treasury stock purchases | (993) | (1,647) | (1,324) |
| Proceeds from financing arrangement | — | 166 | — |
| Other | (112) | (156) | (125) |
| Net cash used by financing activities | (2,289) | (3,445) | (2,713) |
| Net (decrease) increase in cash and temporary cash investments | (806) | 134 | 1,288 |
| Cash and temporary cash investments: | | | |
| Beginning of year | 1,821 | 1,687 | 399 |
| End of year | $ 1,015 | $ 1,821 | $ 1,687 |
| Reconciliation of capital investments: | | | |
| Payments for property and equipment, including payments for lease buyouts | $ (3,078) | $ (2,614) | $ (2,865) |
| Payments for lease buyouts | 21 | — | 58 |
| Changes in construction-in-progress payables | (281) | (542) | (359) |
| Total capital investments, excluding lease buyouts | $ (3,338) | $ (3,156) | $ (3,166) |
| Disclosure of cash flow information: | | | |
| Cash paid during the year for interest | $ 545 | $ 607 | $ 564 |
| Cash paid during the year for income taxes | $ 698 | $ 513 | $ 659 |

The accompanying notes are an integral part of the consolidated financial statements

PX6009-164

# THE KROGER CO.
## CONSOLIDATED STATEMENT OF CHANGES IN SHAREHOLDERS' EQUITY

Years Ended January 28, 2023, January 29, 2022 and January 30, 2021

| (In millions, except per share amounts) | Common Stock Shares | Common Stock Amount | Additional Paid-In Capital | Treasury Stock Shares | Treasury Stock Amount | Accumulated Other Comprehensive Income (Loss) | Accumulated Earnings | Noncontrolling Interest | Total |
|---|---|---|---|---|---|---|---|---|---|
| Balances at February 1, 2020 | 1,918 | $ 1,918 | $ 3,337 | 1,130 | $ (16,991) | $ (640) | $ 20,978 | $ (29) | $ 8,573 |
| Issuance of common stock: | | | | | | | | | |
| Stock options exercised | | | — | (7) | 127 | | | | 127 |
| Restricted stock issued | | | (134) | (3) | 71 | | | | (63) |
| Treasury stock activity: | | | | | | | | | |
| Treasury stock purchases, at cost | | | | 36 | (1,196) | | | | (1,196) |
| Stock options exchanged | | | | 4 | (128) | | | | (128) |
| Share-based employee compensation | | | 185 | | | | | | 185 |
| Other comprehensive income net of tax of $1 | | | | | | 10 | | | 10 |
| Other | | | 73 | | (74) | | | | (1) |
| Cash dividends declared ($0.70 per common share) | | | | | | | (545) | | (545) |
| Net earnings including non-controlling interests | | | | | | | 2,585 | 3 | 2,588 |
| Balances at January 30, 2021 | 1,918 | $ 1,918 | $ 3,461 | 1,160 | $ (18,191) | $ (630) | $ 23,018 | $ (26) | $ 9,550 |
| Issuance of common stock: | | | | | | | | | |
| Stock options exercised | | | — | (7) | 172 | | | | 172 |
| Restricted stock issued | | | (137) | (3) | 73 | | | | (64) |
| Treasury stock activity: | | | | | | | | | |
| Treasury stock purchases, at cost | | | | 35 | (1,422) | | | | (1,422) |
| Stock options exchanged | | | | 6 | (225) | | | | (225) |
| Share-based employee compensation | | | 203 | | | | | | 203 |
| Other comprehensive income net of tax of $51 | | | | | | 163 | | | 163 |
| Other | | | 130 | | (129) | | | (8) | (7) |
| Cash dividends declared ($0.81 per common share) | | | | | | | (607) | | (607) |
| Net earnings including non-controlling interests | | | | | | | 1,655 | 11 | 1,666 |
| Balances at January 29, 2022 | 1,918 | $ 1,918 | $ 3,657 | 1,191 | $ (19,722) | $ (467) | $ 24,066 | $ (23) | $ 9,429 |
| Issuance of common stock: | | | | | | | | | |
| Stock options exercised | | | — | (4) | 134 | | | | 134 |
| Restricted stock issued | | | (173) | (4) | 62 | | | | (111) |
| Treasury stock activity: | | | | | | | | | |
| Treasury stock purchases, at cost | | | | 16 | (821) | | | | (821) |
| Stock options exchanged | | | | 3 | (172) | | | | (172) |
| Share-based employee compensation | | | 190 | | | | | | 190 |
| Other comprehensive loss net of tax of ($51) | | | | | | (165) | | | (165) |
| Other | | | 131 | | (131) | | | (10) | (10) |
| Cash dividends declared ($0.99 per common share) | | | | | | | (709) | | (709) |
| Net earnings including non-controlling interests | | | | | | | 2,244 | 5 | 2,249 |
| Balances at January 28, 2023 | 1,918 | $ 1,918 | $ 3,805 | 1,202 | $ (20,650) | $ (632) | $ 25,601 | $ (28) | $ 10,014 |

The accompanying notes are an integral part of the consolidated financial statements.

56

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

All amounts in the Notes to Consolidated Financial Statements are in millions except per share amounts.

### 1.  ACCOUNTING POLICIES

The following is a summary of the significant accounting policies followed in preparing these financial statements.

*Description of Business, Basis of Presentation and Principles of Consolidation*

The Kroger Co. (the "Company") was founded in 1883 and incorporated in 1902.  The Company is a food and drug retailer that operates 2,719 supermarkets, 2,252 pharmacies and 1,637 fuel centers across 35 states while also operating online through a digital ecosystem to offer customers an omnichannel shopping experience.  The Company also manufactures and processes food for sale by its supermarkets and online.  The accompanying financial statements include the consolidated accounts of the Company, its wholly-owned subsidiaries and other consolidated entities.  Intercompany transactions and balances have been eliminated.

*Fiscal Year*

The Company's fiscal year ends on the Saturday nearest January 31.  The last three fiscal years consist of the 52-week periods ended January 28, 2023, January 29, 2022 and January 30, 2021.

*Pervasiveness of Estimates*

The preparation of financial statements in conformity with generally accepted accounting principles ("GAAP") requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities.  Disclosure of contingent assets and liabilities as of the date of the consolidated financial statements and the reported amounts of consolidated revenues and expenses during the reporting period is also required.  Actual results could differ from those estimates.

*Cash, Temporary Cash Investments and Book Overdrafts*

Cash and temporary cash investments represent store cash and short-term investments with original maturities of less than three months.  Book overdrafts are included in "Trade accounts payable" and "Accrued salaries and wages" in the Consolidated Balance Sheets.

*Deposits In-Transit*

Deposits in-transit generally represent funds deposited to the Company's bank accounts at the end of the year related to sales, a majority of which were paid for with debit cards, credit cards and checks, to which the Company does not have immediate access but settle within a few days of the sales transaction.

*Inventories*

Inventories are stated at the lower of cost (principally on a last-in, first-out "LIFO" basis) or market.  In total, approximately 89% of inventories in 2022 and 91% of inventories in 2021 were valued using the LIFO method.  The remaining inventories, including substantially all fuel inventories, are stated at the lower of cost (on a FIFO basis) or net realizable value.  Replacement cost was higher than the carrying amount by $2,196 at January 28, 2023 and $1,570 at January 29, 2022.  The Company follows the Link-Chain, Dollar-Value LIFO method for purposes of calculating its LIFO charge or credit.  During 2020, the Company had a LIFO liquidation primarily related to pharmacy inventory. The liquidated inventory was carried at lower costs prevailing in prior years as compared with current costs. The effect of this reduction in inventory decreased "Merchandise costs" by approximately $76, $58 net of tax.

PX6009-166

The item-cost method of accounting to determine inventory cost before the LIFO adjustment is followed for substantially all store inventories at the Company's supermarket divisions.  This method involves counting each item in inventory, assigning costs to each of these items based on the actual purchase costs (net of vendor allowances and cash discounts) of each item and recording the cost of items sold. The item-cost method of accounting allows for more accurate reporting of periodic inventory balances and enables management to more precisely manage inventory.  In addition, substantially all of the Company's inventory consists of finished goods and is recorded at actual purchase costs (net of vendor allowances and cash discounts).

The Company evaluates inventory shortages throughout the year based on actual physical counts in its facilities. Allowances for inventory shortages are recorded based on the results of these counts to provide for estimated shortages as of the financial statement date.

*Property, Plant and Equipment*

Property, plant and equipment are recorded at cost or, in the case of assets acquired in a business combination, at fair value.  Depreciation and amortization expense, which includes the depreciation of assets recorded under finance leases, is computed principally using the straight-line method over the estimated useful lives of individual assets. Buildings and land improvements are depreciated based on lives varying from 10 to 40 years.  All new purchases of store equipment are assigned lives varying from three to nine years.  Leasehold improvements are amortized over the shorter of the lease term to which they relate, which generally varies from four to 25 years, or the useful life of the asset.  Food production plant, fulfillment center and distribution center equipment is depreciated over lives varying from three to 15 years.  Information technology assets are generally depreciated over three to five years.  Depreciation and amortization expense was $2,965 in 2022, $2,824 in 2021 and $2,747 in 2020.

Interest costs on significant projects constructed for the Company's own use are capitalized as part of the costs of the newly constructed facilities.  Upon retirement or disposal of assets, the cost and related accumulated depreciation and amortization are removed from the balance sheet and any gain or loss is reflected in net earnings.  Refer to Note 3 for further information regarding the Company's property, plant and equipment.

*Leases*

The Company leases certain store real estate, warehouses, distribution centers, fulfillment centers, office space and equipment.  The Company determines if an arrangement is a lease at inception.  Finance and operating lease assets and liabilities are recognized at the lease commencement date.  Finance and operating lease liabilities represent the present value of minimum lease payments not yet paid. Operating lease assets represent the right to use an underlying asset and are based upon the operating lease liabilities adjusted for prepayments, lease incentives and impairment, if any. To determine the present value of lease payments, the Company estimates an incremental borrowing rate which represents the rate used for a secured borrowing of a similar term as the lease.

Lease terms generally range from 10 to 20 years with options to renew for varying terms at the Company's sole discretion. The lease term includes the initial contractual term as well as any options to extend the lease when it is reasonably certain that the Company will exercise that option. Leases with an initial term of 12 months or less are not recorded on the balance sheet.  Certain leases include escalation clauses or payment of executory costs such as property taxes, utilities or insurance and maintenance.  Operating lease payments are charged on a straight-line basis to rent expense over the lease term and finance lease payments are charged to interest expense and depreciation and amortization expense over the lease term.  Assets under finance leases are amortized in accordance with the Company's normal depreciation policy for owned assets or over the lease term, if shorter.  The Company's lease agreements do not contain any residual value guarantees or material restrictive covenants.  For additional information on leases, see Note 9 to the Consolidated Financial Statements.

PX6009-167

*Goodwill*

The Company reviews goodwill for impairment during the fourth quarter of each year, or earlier upon the occurrence of a triggering event.  The Company performs reviews of each of its operating divisions and other consolidated entities (collectively, "reporting units") that have goodwill balances.  Generally, fair value is determined using a market multiple model, or discounted projected future cash flows, and is compared to the carrying value of a reporting unit for purposes of identifying potential impairment.  Projected future cash flows are based on management's knowledge of the current operating environment and expectations for the future.  Goodwill impairment is recognized for any excess of the reporting unit's carrying value over its fair value, not to exceed the total amount of goodwill allocated to the reporting unit.  Results of the goodwill impairment reviews performed during 2022, 2021 and 2020 are summarized in Note 2.

*Impairment of Long-Lived Assets*

The Company monitors the carrying value of long-lived assets for potential impairment each quarter based on whether certain triggering events have occurred.  These events include current period losses combined with a history of losses or a projection of continuing losses or a significant decrease in the market value of an asset.  When a triggering event occurs, an impairment calculation is performed, comparing projected undiscounted future cash flows, utilizing current cash flow information and expected growth rates related to specific stores, to the carrying value for those stores.  If the Company identifies impairment for long-lived assets to be held and used, the Company compares the assets' current carrying value to the assets' fair value.  Fair value is based on current market values or discounted future cash flows.  The Company records impairment when the carrying value exceeds fair market value.  With respect to owned property and equipment held for disposal, the value of the property and equipment is adjusted to reflect recoverable values based on previous efforts to dispose of similar assets and current economic conditions.  Impairment is recognized for the excess of the carrying value over the estimated fair market value, reduced by estimated direct costs of disposal.  The Company recorded asset impairments totaling $68, $64 and $70 in 2022, 2021 and 2020, respectively.  Costs to reduce the carrying value of long-lived assets for each of the years presented have been included in the Consolidated Statements of Operations as Operating, general and administrative ("OG&A") expense.

*Accounts Payable Financing Arrangement*

The Company has an agreement with a third party to provide an accounts payable tracking system which facilitates participating suppliers' ability to finance payment obligations from the Company with designated third-party financial institutions.  Participating suppliers may, at their sole discretion, make offers to finance one or more payment obligations of the Company prior to their scheduled due dates at a discounted price to participating financial institutions.  The Company's obligations to its suppliers, including amounts due and scheduled payment dates, are not affected by suppliers' decisions to finance amounts under this arrangement.  As of January 28, 2023, the Company had $65 and $249 in "Other current liabilities" and "Trade accounts payable," respectively, associated with financing arrangements.  As of January 29, 2022, the Company had $59 and $236 in "Other current liabilities" and "Trade accounts payable," respectively, associated with financing arrangements.

*Contingent Consideration*

The Company's Home Chef business combination involves potential payment of future consideration that is contingent upon the achievement of certain performance milestones. The Company recorded contingent consideration at fair value at the date of acquisition based on the consideration expected to be transferred, estimated as the probability-weighted future cash flows, discounted back to present value using a discount rate determined in accordance with accepted valuation methods.  The liability for contingent consideration is remeasured to fair value at each reporting period using Level 3 inputs, and the change in fair value, including accretion for the passage of time, is recognized in earnings until the contingency is resolved.  In 2022, 2021 and 2020, adjustments to increase the contingent consideration liability as of year-end were recorded for $20, $66 and $189, respectively, in OG&A expense.  During the first quarter of 2023, the Company will make the final contingent consideration payment, which is based on the fair value of the outstanding year-end 2022 liability.

PX6009-168

*Store Closing Costs*

The Company regularly evaluates the performance of its stores and periodically closes those stores that are underperforming.  Related liabilities arise, such as severance, contractual obligations and other accruals associated with store closings.  The Company records a liability for costs associated with an exit or disposal activity when the liability is incurred, usually in the period the store closes.  Adjustments to closed store liabilities primarily relate to actual exit costs differing from original estimates. Adjustments are made for changes in estimates in the period in which the change becomes known.

Owned stores held for disposal are reduced to their estimated net realizable value. Costs to reduce the carrying values of property, plant, equipment and operating lease assets are accounted for in accordance with the Company's policy on impairment of long-lived assets.  Inventory write-downs, if any, in connection with store closings, are classified in the Consolidated Statements of Operations as "Merchandise costs".  Costs to transfer inventory and equipment from closed stores are expensed as incurred.

*Interest Rate Risk Management*

The Company uses derivative instruments primarily to manage its exposure to changes in interest rates.  The Company's current program relative to interest rate protection and the methods by which the Company accounts for its derivative instruments are described in Note 6.

*Benefit Plans and Multi-Employer Pension Plans*

The Company recognizes the funded status of its retirement plans on the Consolidated Balance Sheets.  Actuarial gains or losses, prior service costs or credits and transition obligations that have not yet been recognized as part of net periodic benefit cost are required to be recorded as a component of Accumulated Other Comprehensive Income ("AOCI").  The Company has elected to measure defined benefit plan assets and obligations as of January 31, which is the month-end that is closest to its fiscal year-ends, which were January 28, 2023 for fiscal 2022 and January 29, 2022 for fiscal 2021.

The determination of the obligation and expense for company-sponsored pension plans and other post-retirement benefits is dependent on the selection of assumptions used by actuaries and the Company in calculating those amounts.  Those assumptions are described in Note 14 and include, among others, the discount rate, the expected long-term rate of return on plan assets, mortality and the rates of increase in compensation and health care costs.  Actual results that differ from the assumptions are accumulated and amortized over future periods and, therefore, generally affect the recognized expense and recorded obligation in future periods.  While the Company believes that the assumptions are appropriate, significant differences in actual experience or significant changes in assumptions may materially affect the pension and other post-retirement obligations and future expense.

The Company also participates in various multi-employer plans for substantially all union employees.  Pension expense for these plans is recognized as contributions are funded or when commitments are probable and reasonably estimable, in accordance with GAAP.  Refer to Note 15 for additional information regarding the Company's participation in these various multi-employer pension plans.

The Company administers and makes contributions to the employee 401(k) retirement savings accounts.  Contributions to the employee 401(k) retirement savings accounts are expensed when contributed or over the service period in the case of automatic contributions.  Refer to Note 14 for additional information regarding the Company's benefit plans.

PX6009-169

*Share Based Compensation*

The Company recognizes compensation expense for all share-based payments granted under fair value recognition provisions. The Company recognizes share-based compensation expense, net of an estimated forfeiture rate, over the requisite service period of the award based on the fair value at the date of the grant.  The Company grants options for common shares ("stock options") to employees under various plans at an option price equal to the fair market value of the stock option at the date of grant.  Stock options typically expire 10 years from the date of grant. Stock options vest between one and four years from the date of grant.  In addition to stock options, the Company awards restricted stock to employees and incentive shares to nonemployee directors under various plans. The restrictions on these restricted stock awards generally lapse between one and four years from the date of the awards. The Company determines the fair value for restricted stock awards in an amount equal to the fair market value of the underlying shares on the grant date of the award.

*Deferred Income Taxes*

Deferred income taxes are recorded to reflect the tax consequences of differences between the tax basis of assets and liabilities and their financial reporting basis.  Refer to Note 4 for the types of differences that give rise to significant portions of deferred income tax assets and liabilities.

*Uncertain Tax Positions*

The Company reviews the tax positions taken or expected to be taken on tax returns to determine whether and to what extent a benefit can be recognized in its consolidated financial statements.  Refer to Note 4 for the amount of unrecognized tax benefits and other related disclosures related to uncertain tax positions.

Various taxing authorities periodically audit the Company's income tax returns.  These audits include questions regarding the Company's tax filing positions, including the timing and amount of deductions and the allocation of income to various tax jurisdictions.  In evaluating the exposures connected with these various tax filing positions, including state and local taxes, the Company records allowances for probable exposures.  A number of years may elapse before a particular matter, for which an allowance has been established, is audited and fully resolved.  As of January 28, 2023, the years ended February 1, 2020 and forward remain open for review for federal income tax purposes.

The assessment of the Company's tax position relies on the judgment of management to estimate the exposures associated with the Company's various filing positions.

*Self-Insurance Costs*

The Company is primarily self-insured for costs related to workers' compensation and general liability claims.  Liabilities are actuarially determined and are recognized based on claims filed and an estimate of claims incurred but not reported.  The liabilities for workers' compensation claims are accounted for on a present value basis.  The Company has purchased stop-loss coverage to limit its exposure to any significant exposure on a per claim basis.  The Company is insured for covered costs in excess of these per claim limits.

The following table summarizes the changes in the Company's self-insurance liability through January 28, 2023:

|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| Beginning balance | $ 721 | $ 731 | $ 689 |
| Expense | 227 | 226 | 262 |
| Claim payments | (236) | (236) | (220) |
| Ending balance | 712 | 721 | 731 |
| Less: Current portion | (236) | (236) | (220) |
| Long-term portion | $ 476 | $ 485 | $ 511 |

The current portion of the self-insured liability is included in "Other current liabilities," and the long-term portion is included in "Other long-term liabilities" in the Consolidated Balance Sheets.

PX6009-170

The Company maintains surety bonds related to self-insured workers' compensation claims.  These bonds are required by most states in which the Company is self-insured for workers' compensation and are placed with third-party insurance providers to insure payment of the Company's obligations in the event the Company is unable to meet its claim payment obligations up to its self-insured retention levels.  These bonds do not represent liabilities of the Company, as the Company has recorded reserves for the claim costs.

The Company also maintains insurance coverages for certain risks, including cyber exposure and property-related losses.  The Company's insurance coverage begins for these exposures ranging from $25 to $30.

*Revenue Recognition*

Sales

The Company recognizes revenues from the retail sale of products, net of sales taxes, at the point of sale.  Pharmacy sales are recorded when the product is provided to the customer.  Digital channel originated sales are recognized either upon pickup in store or upon delivery to the customer.  Amounts billed to a customer related to shipping and delivery represent revenues earned for the goods provided and are classified as sales.  When shipping is discounted, it is recorded as an adjustment to sales.  Discounts provided to customers by the Company at the time of sale, including those provided in connection with loyalty cards, are recognized as a reduction in sales as the products are sold.  Discounts provided by vendors, usually in the form of coupons, are not recognized as a reduction in sales provided the coupons are redeemable at any retailer that accepts coupons.  The Company records a receivable from the vendor for the difference in sales price and cash received.  For merchandise sold in one of the Company's stores or online, tender is accepted at the point of sale.  The Company acts as principal in certain vendor arrangements where the purchase and sale of inventory are virtually simultaneous. The Company records revenue and related costs on a gross basis for these arrangements.  For pharmacy sales, collection of third-party receivables is typically expected within three months or less from the time of purchase.  The third-party receivables from pharmacy sales are recorded in "Receivables" in the Company's Consolidated Balance Sheets and were $867 as of January 28, 2023 and $774 as of January 29, 2022.

Gift Cards and Gift Certificates

The Company does not recognize revenue when it sells its own gift cards and gift certificates (collectively "gift cards").  Rather, it records a deferred revenue liability equal to the amount received.  A sale is then recognized when the gift cards are redeemed to purchase the Company's products.  The Company's gift cards do not expire.  While gift cards are generally redeemed within 12 months, some are never fully redeemed. The Company recognizes gift card breakage under the proportional method, where recognition of breakage income is based upon the historical run-off rate of unredeemed gift cards.  The Company's gift card deferred revenue liability was $200 as of January 28, 2023 and $185 as of January 29, 2022.

PX6009-171

*Disaggregated Revenues*

The following table presents sales revenue by type of product for the year-ended January 28, 2023, January 29, 2022, and January 30, 2021:

| | 2022 | | 2021 | | 2020 | |
|---|---|---|---|---|---|---|
| | Amount | % of total | Amount | % of total | Amount | % of total |
| Non Perishable[1] | $ 74,121 | 50.0 % | $ 69,648 | 50.6 % | $ 71,434 | 53.9 % |
| Fresh[2] | 35,433 | 23.9 % | 33,972 | 24.6 % | 33,449 | 25.2 % |
| Supermarket Fuel | 18,632 | 12.6 % | 14,678 | 10.6 % | 9,486 | 7.2 % |
| Pharmacy | 13,377 | 9.0 % | 12,401 | 9.0 % | 11,388 | 8.6 % |
| Other[3] | 6,695 | 4.5 % | 7,189 | 5.2 % | 6,741 | 5.1 % |
| Total Sales | $ 148,258 | 100 % | $ 137,888 | 100 % | $ 132,498 | 100 % |

(1) Consists primarily of grocery, general merchandise, health and beauty care and natural foods.

(2) Consists primarily of produce, floral, meat, seafood, deli, bakery and fresh prepared.

(3) Consists primarily of sales related to food production plants to outside parties, data analytic services, third-party media revenue, other consolidated entities, specialty pharmacy, in-store health clinics, digital coupon services and other online sales not included in the categories above. The decrease in 2022, compared to 2021, is primarily due to discontinued patient therapies at Kroger Specialty Pharmacy.

*Merchandise Costs*

The "Merchandise costs" line item of the Consolidated Statements of Operations includes product costs, net of discounts and allowances; advertising costs (see separate discussion below); inbound freight charges; warehousing costs, including receiving and inspection costs; transportation costs; and food production and operational costs. Warehousing, transportation and manufacturing management salaries are also included in the "Merchandise costs" line item; however, purchasing management salaries and administration costs are included in the "OG&A" line item along with most of the Company's other managerial and administrative costs. Shipping and delivery costs associated with the Company's digital offerings originating from non-retail store locations are included in the "Merchandise costs" line item. Rent expense and depreciation and amortization expense are shown separately in the Consolidated Statements of Operations.

Warehousing and transportation costs include distribution center direct wages, transportation direct wages, repairs and maintenance, utilities, inbound freight and, where applicable, third-party warehouse management fees. These costs are recognized in the periods the related expenses are incurred.

The Company believes the classification of costs included in merchandise costs could vary widely throughout the industry. The Company's approach is to include in the "Merchandise costs" line item the direct, net costs of acquiring products and making them available to customers. The Company believes this approach most accurately presents the actual costs of products sold.

The Company recognizes all vendor allowances as a reduction in merchandise costs when the related product is sold. When possible, vendor allowances are applied to the related product cost by item and, therefore, reduce the carrying value of inventory by item. When the items are sold, the vendor allowance is recognized. When it is not possible, due to systems constraints, to allocate vendor allowances to the product by item, vendor allowances are recognized as a reduction in merchandise costs based on inventory turns and, therefore, recognized as the product is sold.

*Advertising Costs*

The Company's advertising costs are recognized in the periods the related expenses are incurred and are included in the "Merchandise costs" line item of the Consolidated Statements of Operations. The Company's advertising costs totaled $1,030 in 2022, $984 in 2021 and $888 in 2020. The Company does not record vendor allowances for co-operative advertising as a reduction of advertising expense.

PX6009-172

*Operating, General and Administrative Expenses*

OG&A expenses consist primarily of employee-related costs such as wages, healthcare benefit costs, retirement plan costs, utilities, and credit card fees. Shipping and delivery costs associated with the Company's digital offerings originating from retail store locations, including third-party delivery fees, are included in the "OG&A" line item of the Consolidated Statements of Operations. Rent expense, depreciation and amortization expense and interest expense are shown separately in the Consolidated Statement of Operations.

*Consolidated Statements of Cash Flows*

For purposes of the Consolidated Statements of Cash Flows, the Company considers all highly liquid debt instruments purchased with an original maturity of three months or less to be temporary cash investments.

*Segments*

The Company operates supermarkets, multi-department stores and fulfillment centers throughout the United States. The Company's retail operations, which represent 97% of the Company's consolidated sales, are its only reportable segment. The Company aggregates its operating divisions into one reportable segment due to the operating divisions having similar economic characteristics with similar long-term financial performance. In addition, the Company's operating divisions offer customers similar products, have similar distribution methods, operate in similar regulatory environments, purchase the majority of the merchandise for retail sale from similar (and in many cases identical) vendors on a coordinated basis from a centralized location, serve similar types of customers, and are allocated capital from a centralized location. Operating divisions are organized primarily on a geographical basis so that the operating division management team can be responsive to local needs of the operating division and can execute company strategic plans and initiatives throughout the locations in their operating division. This geographical separation is the primary differentiation between these retail operating divisions. The geographical basis of organization reflects how the business is managed and how the Company's Chief Executive Officer, who acts as the Company's chief operating decision maker, assesses performance internally. All of the Company's operations are domestic.

## 2.  GOODWILL AND INTANGIBLE ASSETS

The following table summarizes the changes in the Company's net goodwill balance through January 28, 2023:

|  | 2022 | 2021 |
|---|---|---|
| Balance beginning of year |  |  |
| Goodwill | $  5,737 | $  5,737 |
| Accumulated impairment losses | (2,661) | (2,661) |
| Subtotal | 3,076 | 3,076 |
|  |  |  |
| Activity during the year |  |  |
| Impairment charge related to Vitacost.com | (160) | — |
|  |  |  |
|  |  |  |
| Balance end of year |  |  |
| Goodwill | 5,737 | 5,737 |
| Accumulated impairment losses | (2,821) | (2,661) |
| Total Goodwill | $  2,916 | $  3,076 |

Testing for impairment is performed annually, or on an interim basis upon the occurrence of a triggering event or a change in circumstances that would more likely than not reduce the fair value of a reporting unit below its carrying amount. The annual evaluation of goodwill and indefinite-lived intangible assets was performed during the fourth quarter of 2021 and 2020 and did not result in impairment.

PX6009-173

Based on the results of the Company's impairment assessment in the fourth quarter of 2022, Vitacost.com recorded a $160 goodwill impairment. In the fourth quarter of 2022, as the Company's digital strategy evolved, the Company's primary focus will be to effectively utilize its Pickup and Delivery capabilities. This reprioritization resulted in reduced long-term profitability expectations and a decline in the market value for one underlying channel of business and led to the pre-tax and after-tax impairment charge of $160. The pre-impairment goodwill balance for Vitacost.com was $160 as of the fourth quarter 2022. There is no goodwill remaining for Vitacost.com as of January 28, 2023.

The following table summarizes the Company's intangible assets balance through January 28, 2023:

| | 2022 | | 2021 | |
| | Gross carrying amount | Accumulated amortization[1] | Gross carrying amount | Accumulated amortization[1] |
|---|---|---|---|---|
| Definite-lived pharmacy prescription files | $    325 | $    (230) | $    317 | $    (199) |
| Definite-lived customer relationships | 186 | (173) | 186 | (160) |
| Definite-lived other | 112 | (96) | 111 | (88) |
| Indefinite-lived trade name | 685 | — | 685 | — |
| Indefinite-lived liquor licenses | 90 | — | 90 | — |
| Total | $    1,398 | $    (499) | $    1,389 | $    (447) |

(1) Pharmacy prescription files are amortized to merchandise costs, customer relationships are amortized to depreciation and amortization expense and other intangibles are amortized to OG&A expense and depreciation and amortization expense.

Amortization expense associated with intangible assets totaled approximately $52, $59 and $67, during fiscal years 2022, 2021 and 2020, respectively. Future amortization expense associated with the net carrying amount of definite-lived intangible assets for the years subsequent to 2022 is estimated to be approximately:

| | |
|---|---|
| 2023 | $    41 |
| 2024 | 36 |
| 2025 | 32 |
| 2026 | 11 |
| 2027 | 2 |
| Thereafter | 2 |
| Total future estimated amortization associated with definite-lived intangible assets | $    124 |

### 3. PROPERTY, PLANT AND EQUIPMENT, NET

Property, plant and equipment, net consists of:

| | 2022 | 2021 |
|---|---|---|
| Land | $    3,442 | $    3,395 |
| Buildings and land improvements | 14,539 | 13,996 |
| Equipment | 17,328 | 15,951 |
| Leasehold improvements | 11,435 | 10,775 |
| Construction-in-progress | 4,044 | 3,831 |
| Leased property under finance leases | 2,580 | 1,939 |
| Total property, plant and equipment | 53,368 | 49,887 |
| Accumulated depreciation and amortization | (28,642) | (26,098) |
| Property, plant and equipment, net | $    24,726 | $    23,789 |

Accumulated depreciation and amortization for leased property under finance leases was $562 at January 28, 2023 and $414 at January 29, 2022.

PX6009-174

Approximately $124 and $136, net book value, of property, plant and equipment collateralized certain mortgages at January 28, 2023 and January 29, 2022, respectively.

Capitalized implementation costs associated with cloud computing arrangements of $193, net of accumulated amortization of $36, and $151, net of accumulated amortization of $15, are included in "Other assets" in the Company's Consolidated Balance Sheets as of January 28, 2023 and January 29, 2022, respectively. The corresponding cash flows related to these arrangements are included in "Net cash provided by operating activities" in the Company's Consolidated Statements of Cash Flows.

**4.    TAXES BASED ON INCOME**

The provision for taxes based on income consists of:

|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| Federal |  |  |  |
| Current | $ 401 | $ 349 | $ 577 |
| Deferred | 162 | (46) | 75 |
|  |  |  |  |
| Subtotal federal | 563 | 303 | 652 |
|  |  |  |  |
| State and local |  |  |  |
| Current | 91 | 67 | 133 |
| Deferred | (1) | 15 | (3) |
|  |  |  |  |
| Subtotal state and local | 90 | 82 | 130 |
|  |  |  |  |
| Total | $ 653 | $ 385 | $ 782 |

A reconciliation of the statutory federal rate and the effective rate follows:

|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| Statutory rate | 21.0 % | 21.0 % | 21.0 % |
| State income taxes, net of federal tax benefit | 2.5 | 3.2 | 3.0 |
| Credits | (0.8) | (1.3) | (0.7) |
| Resolution of tax audit examinations | (0.2) | (3.1) | — |
| Excess tax benefits from share-based payments | (1.9) | (1.3) | (0.8) |
| Impairment of goodwill related to Vitacost.com | 1.2 | — | — |
| Non-deductible executive compensation | 0.5 | 0.6 | 0.3 |
| Other changes, net | 0.2 | (0.3) | 0.4 |
|  |  |  |  |
|  | 22.5 % | 18.8 % | 23.2 % |

The Company's effective income tax rates were 22.5% in 2022, 18.8% in 2021, and 23.2% in 2020.

The 2022 tax rate differed from the federal statutory rate due to the effect of state income taxes and non-deductible goodwill impairment charges related to Vitacost.com, partially offset by the benefits from share-based payments and the utilization of tax credits.

The 2021 tax rate differed from the federal statutory rate primarily due to a discrete benefit of $47 which was primarily from the favorable outcome of income tax audit examinations covering multiple years, the benefit from share-based payments and the utilization of tax credits, partially offset by the effect of state income taxes.

The 2020 tax rate differed from the federal statutory rate primarily due to the effect of state income taxes, partially offset by the utilization of tax credits and deductions.

PX6009-175

The tax effects of significant temporary differences that comprise tax balances were as follows:

|  | 2022 | 2021 |
|---|---|---|
| **Deferred tax assets:** | | |
| Compensation related costs | $ 409 | $ 560 |
| Lease liabilities | 1,892 | 1,926 |
| Closed store reserves | 51 | 46 |
| Unrealized losses on hedging instruments | 74 | — |
| Net operating loss and credit carryforwards | 101 | 98 |
| Deferred income | 104 | 126 |
| Allowance for uncollectible receivables | 26 | 36 |
| Other | 13 | 25 |
| Subtotal | 2,670 | 2,817 |
| Valuation allowance | (83) | (72) |
| Total deferred tax assets | 2,587 | 2,745 |
| **Deferred tax liabilities:** | | |
| Depreciation and amortization | (1,954) | (2,006) |
| Operating lease assets | (1,759) | (1,790) |
| Insurance related costs | (257) | (54) |
| Inventory related costs | (281) | (310) |
| Equity investments in excess of tax basis | (8) | (147) |
| Total deferred tax liabilities | (4,259) | (4,307) |
| **Deferred taxes** | $ (1,672) | $ (1,562) |

At January 28, 2023, the Company had net operating loss carryforwards for state income tax purposes of $1,468. These net operating loss carryforwards expire from 2023 through 2042. The utilization of certain of the Company's state net operating loss carryforwards may be limited in a given year. Further, the Company has recorded a valuation allowance against certain deferred tax assets resulting from its state net operating losses.

At January 28, 2023, the Company had state credit carryforwards of $34. These state credit carryforwards expire from 2023 through 2036. The utilization of certain of the Company's credits may be limited in a given year. Further, the Company has recorded a valuation allowance against certain deferred tax assets resulting from its state credits.

The Company regularly reviews all deferred tax assets on a tax filer and jurisdictional basis to estimate whether these assets are more likely than not to be realized based on all available evidence. This evidence includes historical taxable income, projected future taxable income, the expected timing of the reversal of existing temporary differences and the implementation of tax planning strategies. Projected future taxable income is based on expected results and assumptions as to the jurisdiction in which the income will be earned. The expected timing of the reversals of existing temporary differences is based on current tax law and the Company's tax methods of accounting. Unless deferred tax assets are more likely than not to be realized, a valuation allowance is established to reduce the carrying value of the deferred tax asset until such time that realization becomes more likely than not. Increases and decreases in these valuation allowances are included in "Income tax expense" in the Consolidated Statements of Operations. As of January 28, 2023, January 29, 2022 and January 28, 2021 the total valuation allowance was $83, $72 and $53, respectively.

PX6009-176

A reconciliation of the beginning and ending amount of unrecognized tax benefits, including positions impacting only the timing of tax benefits, is as follows:

|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| Beginning balance | $ 100 | $ 193 | $ 174 |
| Additions based on tax positions related to the current year | 8 | 10 | 7 |
| Additions for tax positions of prior years | 6 | 9 | 16 |
| Reductions for tax positions of prior years | (4) | (108) | — |
| Settlements | (9) | — | — |
| Lapse of statute | (8) | (4) | (4) |
| Ending balance | $ 93 | $ 100 | $ 193 |

As of January 28, 2023, January 29, 2022 and January 30, 2021, the amount of unrecognized tax benefits that, if recognized, would effect the effective tax rate was $66, $73 and $85, respectively.

To the extent interest and penalties would be assessed by taxing authorities on any underpayment of income tax, such amounts have been accrued and classified as a component of income tax expense. During the years ended January 28, 2023, January 29, 2022 and January 30, 2021, the Company recognized approximately $(6), $(15) and $7, respectively, in interest and penalties (recoveries). The Company had accrued approximately $14, $22 and $38 for the payment of interest and penalties as of January 28, 2023, January 29, 2022 and January 30, 2021, respectively.

As of January 28, 2023, the years ended February 1, 2020 and forward remain open for review for federal income tax purposes.

## 5.  DEBT OBLIGATIONS

Long-term debt consists of:

|  | January 28, 2023 | January 29, 2022 |
|---|---|---|
| 1.70% to 8.00% Senior Notes due through 2049 | $ 10,215 | $ 10,607 |
| Other | 1,077 | 1,138 |
|  |  |  |
| Total debt, excluding obligations under finance leases | 11,292 | 11,745 |
| Less current portion | (1,153) | (451) |
|  |  |  |
| Total long-term debt, excluding obligations under finance leases | $ 10,139 | $ 11,294 |

In 2022, the Company repaid $400 of senior notes bearing an interest rate of 2.80% using cash on hand.

In 2021, the Company repaid $300 of senior notes bearing an interest rate of 2.60%, $500 of senior notes bearing an interest rate of 2.95%, and $500 of senior notes bearing an interest rate of 3.40%, all using cash on hand.

Additionally in 2021, the Company acquired 28, previously leased, properties for a purchase price of $455. Separately, the Company also entered into a transaction to sell those properties to a third party for total proceeds of $621. Total cash proceeds received as a result of the transactions was $166. The sale transaction did not qualify for sale-leaseback accounting treatment. As a result, the Company recorded property, plant and equipment for the $455 price paid and recorded a $621 financing obligation. The leases have a base term of 25 years and twelve option periods of five years each. The Company has the option to purchase the individual properties for fair market value at the end of the base term or at the end of any option period. The Company is obligated to repurchase the properties at the end of the base term for $300 if the lessor exercises its put option.

PX6009-177

On July 6, 2021, the Company entered into an amended and restated credit agreement, which credit agreement was further amended on November 9, 2022 (as so amended, the "Credit Agreement") providing for a $2,750 unsecured revolving credit facility (the "Revolving Credit Facility"), with a termination date of July 6, 2026, unless extended as permitted under the Credit Agreement. The Company has the ability to increase the size of the Revolving Credit Facility by up to an additional $1,250, subject to certain conditions.

Borrowings under the Credit Agreement bear interest, at the Company's option, at either (i) adjusted Term SOFR plus a market spread, based on the Company's Public Debt Rating or (ii) the base rate, defined as the highest of (a) the Federal Funds Rate plus 0.5%, (b) Bank of America's prime rate, and (c) one-month Term SOFR plus 1.0%, plus a market rate spread based on the Company's Public Debt Rating. The Company will also pay a Commitment Fee based on its Public Debt Rating and Letter of Credit fees equal to a market rate spread based on the Company's Public Debt Rating. "Public Debt Rating" means, as of any date, the rating that has been most recently announced by either S&P or Moody's, as the case may be, for any class of non-credit enhanced long-term senior unsecured debt issued by the Company.

The Credit Agreement contains a covenant, which, among other things, requires the maintenance of a Leverage Ratio of not greater than (i) 3.50:1.00 or (ii) upon the consummation of the proposed merger with Albertsons, 4.50 to 1.00, with step downs to 4.25:1.00, 4.00:1.00, 3.75:1.00 and 3.50:1.00 effective at the end of the third, fifth, seventh and ninth, full fiscal quarters after the consummation of the proposed merger, respectively. The Company may repay the Credit Agreement in whole or in part at any time without premium or penalty. The Credit Agreement is not guaranteed by the Company's subsidiaries.

On October 13, 2022, the Company entered into a merger agreement with Albertsons Companies, Inc. ("Albertsons"). For additional information about the Company's unsecured bridge term loan facility and term loan credit agreement associated with the merger agreement, see Note 16 to the Consolidated Financial Statements.

As of January 28, 2023, and January 29, 2022, the Company had no commercial paper borrowings and no borrowings under the Credit Agreement.

As of January 28, 2023, the Company had outstanding letters of credit in the amount of $310, of which $2 reduces funds available under the Credit Agreement. As of January 29, 2022, the Company had outstanding letters of credit in the amount of $363, of which $2 reduces funds available under the Credit Agreement. The letters of credit are maintained primarily to support performance, payment, deposit or surety obligations of the Company.

Most of the Company's outstanding public debt is subject to early redemption at varying times and premiums, at the option of the Company. In addition, subject to certain conditions, some of the Company's publicly issued debt will be subject to redemption, in whole or in part, at the option of the holder upon the occurrence of a redemption event, upon not less than five days' notice prior to the date of redemption, at a redemption price equal to the default amount, plus a specified premium. "Redemption Event" is defined in the indentures as the occurrence of (i) any person or group, together with any affiliate thereof, beneficially owning 50% or more of the voting power of the Company, (ii) any one person or group, or affiliate thereof, succeeding in having a majority of its nominees elected to the Company's Board of Directors, in each case, without the consent of a majority of the continuing directors of the Company or (iii) both a change of control and a below investment grade rating.

The aggregate annual maturities and scheduled payments of long-term debt, as of year-end 2022, and for the years subsequent to 2022 are:

| | |
|---|---:|
| 2023 | $ 1,153 |
| 2024 | 25 |
| 2025 | 84 |
| 2026 | 1,386 |
| 2027 | 607 |
| Thereafter | 8,037 |
| Total debt | $ 11,292 |

PX6009-178

## 6.  DERIVATIVE FINANCIAL INSTRUMENTS

GAAP requires that derivatives be carried at fair value on the balance sheet and provides for hedge accounting when certain conditions are met.  The Company's derivative financial instruments are recognized on the balance sheet at fair value.  Changes in the fair value of derivative instruments designated as "cash flow" hedges, to the extent the hedges are highly effective, are recorded in other comprehensive income, net of tax effects.  Ineffective cash flow hedges, if any, are recognized in current period earnings.  Other comprehensive income or loss is reclassified into current period earnings when the hedged transaction affects earnings.  Changes in the fair value of derivative instruments designated as "fair value" hedges, along with corresponding changes in the fair values of the hedged assets or liabilities, are recorded in current period earnings.  Ineffective fair value hedges, if any, are recognized in current period earnings.  Changes in fair value of derivative instruments not designated as hedges are recognized in current period earnings and included in "(Loss) gain on investments" in the Company's Consolidated Statements of Operations.

The Company assesses, both at the inception of the hedge and on an ongoing basis, whether derivatives used as hedging instruments are highly effective in offsetting the changes in the fair value or cash flow of the hedged items.  If it is determined that a derivative is not highly effective as a hedge or ceases to be highly effective, the Company discontinues hedge accounting prospectively.

*Interest Rate Risk Management*

The Company is exposed to market risk from fluctuations in interest rates. The Company manages its exposure to interest rate fluctuations through the use of a commercial paper program, interest rate swaps (fair value hedges) and forward-starting interest rate swaps (cash flow hedges). The Company's current program relative to interest rate protection contemplates hedging the exposure to changes in the fair value of fixed-rate debt attributable to changes in interest rates. To do this, the Company uses the following guidelines: (i) use average daily outstanding borrowings to determine annual debt amounts subject to interest rate exposure, (ii) limit the average annual amount subject to interest rate reset and the amount of floating rate debt to a combined total amount that represents 25% of the carrying value of the Company's debt portfolio or less, (iii) include no leveraged products, and (iv) hedge without regard to profit motive or sensitivity to current mark-to-market status.

The Company reviews compliance with these guidelines annually with the Finance Committee of the Board of Directors.  These guidelines may change as the Company's needs dictate.

Fair Value Interest Rate Swaps

The Company did not have any outstanding interest rate derivatives classified as fair value hedges as of January 28, 2023 and January 29, 2022.

Cash Flow Forward-Starting Interest Rate Swaps

As of January 28, 2023, the Company had five forward-starting interest rate swap agreements with a maturity date of August 2027 with an aggregate notional amount totaling $5,350. A forward-starting interest rate swap is an agreement that effectively hedges the variability in future benchmark interest payments attributable to changes in interest rates on the forecasted issuance of fixed-rate debt. The Company entered into these forward-starting interest rate swaps in order to lock in fixed interest rates on its forecasted issuances of debt. A notional amount of $2,350 of these forward-starting interest rate swaps was designated as a cash flow hedge as defined by GAAP. Accordingly, the changes in fair value of these forward-starting interest rate swaps are recorded to other comprehensive income and reclassified into net earnings when the hedged transaction affects net earnings. As of January 28, 2023, the fair value of these interest rate swaps designated as cash flow hedges was recorded in other long-term liabilities for $116 and accumulated other comprehensive income for $89, net of tax. The remainder of the notional amount of $3,000 of the forward-starting interest rate swaps was not designated as a cash-flow hedge. Accordingly, the changes in the fair value of these forward-starting interest rate swaps not designated as cash-flow hedges are recognized through net earnings. As of January 28, 2023, the fair value of these swaps was recorded in other long-term liabilities for $142. In 2022, the Company recognized an unrealized loss of $142 related to these swaps that is included in "(Loss) gain on investments" in the Company's Consolidated Statements of Operations.

PX6009-179

The Company did not have any outstanding forward-starting interest rate swap agreements as of January 29, 2022.

The following table summarizes the effect of the Company's derivative instruments designated as cash flow hedges for 2022, 2021 and 2020:

| | Year-To-Date | | | | | | |
|---|---|---|---|---|---|---|---|
| Derivatives in Cash Flow Hedging Relationships | Amount of Gain/(Loss) in AOCI on Derivative | | | Amount of Gain/(Loss) Reclassified from AOCI into Income | | | Location of Gain/(Loss) Reclassified into Income |
| | 2022 | 2021 | 2020 | 2022 | 2021 | 2020 | |
| Forward-Starting Interest Rate Swaps, net of tax[1] | $ (129) | $ (47) | $ (54) | $ (7) | $ (7) | $ (2) | Interest expense |

(1) The amounts of Gain/(Loss) reclassified from AOCI into income on derivatives include unamortized proceeds and payments from forward-starting interest rate swaps once classified as cash flow hedges that were terminated prior to the end of 2020.

For the above cash flow interest rate swaps, the Company has entered into International Swaps and Derivatives Association master netting agreements that permit the net settlement of amounts owed under their respective derivative contracts. Under these master netting agreements, net settlement generally permits the Company or the counterparty to determine the net amount payable for contracts due on the same date and in the same currency for similar types of derivative transactions. These master netting agreements generally also provide for net settlement of all outstanding contracts with a counterparty in the case of an event of default or a termination event.

Collateral is generally not required of the counterparties or of the Company under these master netting agreements. As of January 28, 2023, no cash collateral was received or pledged under the master netting agreements.

The effect of the net settlement provisions of these master netting agreements on the Company's derivative balances upon an event of default or termination event is as follows as of January 28, 2023:

| | | | | Gross Amounts Not Offset in the Balance Sheet | | |
|---|---|---|---|---|---|---|
| January 28, 2023 | Gross Amount Recognized | Gross Amounts Offset in the Balance Sheet | Net Amount Presented in the Balance Sheet | Financial Instruments | Cash Collateral | Net Amount |
| **Liabilities** | | | | | | |
| Cash Flow Forward-Starting Interest Rate Swaps | $ 258 | $ — | $ 258 | $ — | $ — | $ 258 |

## 7.  FAIR VALUE MEASUREMENTS

GAAP establishes a fair value hierarchy that prioritizes the inputs used to measure fair value. The three levels of the fair value hierarchy defined in the standards are as follows:

Level 1 - Quoted prices are available in active markets for identical assets or liabilities;

Level 2 - Pricing inputs are other than quoted prices in active markets included in Level 1, which are either directly or indirectly observable;

Level 3 - Unobservable pricing inputs in which little or no market activity exists, therefore requiring an entity to develop its own assumptions about the assumptions that market participants would use in pricing an asset or liability.

PX6009-180

For items carried at (or adjusted to) fair value in the consolidated financial statements, the following tables summarize the fair value of these instruments at January 28, 2023 and January 29, 2022:

### January 28, 2023 Fair Value Measurements Using

| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Total |
|---|---|---|---|
| Marketable Securities | $ 463 | $ — | $ 463 |
| Interest Rate Hedges | — | (258) | (258) |
| Total | $ 463 | $ (258) | $ 205 |

### January 29, 2022 Fair Value Measurements Using

| | Quoted Prices in Active Markets for Identical Assets (Level 1) |
|---|---|
| Marketable Securities | $ 1,054 |

The company values interest rate hedges using observable forward yield curves. These forward yield curves are classified as Level 2 inputs.

Fair value measurements of non-financial assets and non-financial liabilities are primarily used in the impairment analysis of goodwill, other intangible assets, long-lived assets and in the valuation of store lease exit costs. The Company reviews goodwill and indefinite-lived intangible assets for impairment annually, during the fourth quarter of each fiscal year, and as circumstances indicate the possibility of impairment. See Note 2 for further discussion related to the Company's carrying value of goodwill. Long-lived assets and store lease exit costs were measured at fair value on a nonrecurring basis using Level 3 inputs as defined in the fair value hierarchy. See Note 1 for further discussion of the Company's policies for impairments of long-lived assets and valuation of store lease exit costs. In 2022, long-lived assets with a carrying amount of $69 were written down to their fair value of $1, resulting in an impairment charge of $68. In 2021, long-lived assets with a carrying amount of $74 were written down to their fair value of $10, resulting in an impairment charge of $64.

Fair Value of Other Financial Instruments

*Current and Long-term Debt*

The fair value of the Company's long-term debt, including current maturities, was estimated based on the quoted market prices for the same or similar issues adjusted for illiquidity based on available market evidence. If quoted market prices were not available, the fair value was based upon the net present value of the future cash flow using the forward interest rate yield curve in effect at respective year-ends. At January 28, 2023, the fair value of total debt excluding obligations under finance leases was $10,593 compared to a carrying value of $11,292. At January 29, 2022, the fair value of total debt excluding obligations under finance leases was $13,189 compared to a carrying value of $11,745.

PX6009-181

*Contingent Consideration*

As a result of the Home Chef merger in 2018, the Company recognized a contingent liability of $91 on the acquisition date. The contingent consideration was measured using unobservable (Level 3) inputs and was included in "Other long-term liabilities" within the Consolidated Balance Sheet. The Company estimated the fair value of the earnout liability by applying a Monte-Carlo simulation method using the Company's projection of future operating results for both the online and offline businesses related to the Home Chef merger and the estimated probability of achievement of the earnout target metrics. The Monte-Carlo simulation is a generally accepted statistical technique used to generate a defined number of valuation paths in order to develop a reasonable estimate of the fair value of the earnout liability. The liability is remeasured to fair value using the Monte-Carlo simulation method at each reporting period, and the change in fair value, including accretion for the passage of time, is recognized in net earnings until the contingency is resolved. In 2020, the Company amended the contingent consideration agreement including the performance milestones to align with the Company's current business strategies. In 2022 and 2021, the Company recorded adjustments to increase the contingent consideration liability for $20 and $66, respectively, in OG&A. During the first quarter of 2023, the Company will make the final contingent consideration payment, which is based on the fair value of the outstanding year-end 2022 liability.

*Cash and Temporary Cash Investments, Store Deposits In-Transit, Receivables, Prepaid and Other Current Assets, Trade Accounts Payable, Accrued Salaries and Wages and Other Current Liabilities*

The carrying amounts of these items approximated fair value due to their short term nature.

*Other Assets*

The equity investment in Ocado Group plc is measured at fair value through net earnings. The fair value of all shares owned, which is measured using Level 1 inputs, was $401 and $987 as of January 28, 2023 and January 29, 2022, respectively, and is included in "Other assets" in the Company's Consolidated Balance Sheets. The unrealized (loss) gain for this Level 1 investment was approximately ($586), ($821) and $1,032 for 2022, 2021, and 2020, respectively, and is included in "(Loss) Gain on investments" in the Company's Consolidated Statements of Operations.

The Company held other equity investments without a readily determinable fair value. These investments are measured initially at cost and remeasured for observable price changes to fair value through net earnings. The value of these investments was $320 and $309 as of January 28, 2023 and January 29, 2022, respectively, and is included in "Other assets" in the Company's Consolidated Balance Sheets. There were no observable price changes or impairments for these investments during 2022 or 2021, and as such, they are excluded from the fair value measurements table above for January 28, 2023 and January 29, 2022.

The following table presents the Company's remaining other assets as of January 28, 2023 and January 29 2022:

| Other Assets | January 28, 2023 | January 29, 2022 |
|---|---|---|
| Equity method and other long-term investments | $ 274 | $ 282 |
| Notes receivable | 169 | 191 |
| Prepaid deposits under certain contractual arrangements | 199 | 214 |
| Implementation costs related to cloud computing arrangements | 193 | 151 |
| Funded asset status of pension plans | 69 | 156 |
| Other | 125 | 120 |
| Total | $ 1,029 | $ 1,114 |

PX6009-182

## 8.  ACCUMULATED OTHER COMPREHENSIVE INCOME (LOSS)

The following table represents the changes in AOCI by component for the years ended January 28, 2023 and January 29, 2022:

| | Cash Flow Hedging Activities[1] | | Pension and Postretirement Defined Benefit Plans[1] | | Total[1] | |
|---|---|---|---|---|---|---|
| Balance at January 30, 2021 | $ | (54) | $ | (576) | $ | (630) |
| OCI before reclassifications[2] | | — | | 82 | | 82 |
| Amounts reclassified out of AOCI[3] | | 7 | | 74 | | 81 |
| Net current-period OCI | | 7 | | 156 | | 163 |
| Balance at January 29, 2022 | $ | (47) | $ | (420) | $ | (467) |
| | | | | | | |
| Balance at January 29, 2022 | $ | (47) | $ | (420) | $ | (467) |
| OCI before reclassifications[2] | | (89) | | (88) | | (177) |
| Amounts reclassified out of AOCI[3] | | 7 | | 5 | | 12 |
| Net current-period OCI | | (82) | | (83) | | (165) |
| Balance at January 28, 2023 | $ | (129) | $ | (503) | $ | (632) |

(1)  All amounts are net of tax.
(2)  Net of tax of $25 for pension and postretirement defined benefit plans as of January 29, 2022.  Net of tax of ($28) and ($27) for pension and postretirement defined benefit plans and cash flow hedging activities, respectively, as of January 28, 2023.
(3)  Net of tax of $23 and $3 for pension and postretirement defined benefit plans and cash flow hedging activities, respectively, as of January 29, 2022.  Net of tax of $2 and $2 for pension and postretirement defined benefit plans and cash flow hedging activities, respectively, as of January 28, 2023.

The following table represents the items reclassified out of AOCI and the related tax effects for the years ended January 28, 2023, January 29, 2022 and January 30, 2021:

| | For the year ended January 28, 2023 | | For the year ended January 29, 2022 | | For the year ended January 30, 2021 | |
|---|---|---|---|---|---|---|
| Cash flow hedging activity items | | | | | | |
| Amortization of gains and losses on cash flow hedging activities[1] | $ | 9 | $ | 10 | $ | 4 |
| Tax expense | | (2) | | (3) | | (2) |
| Net of tax | | 7 | | 7 | | 2 |
| | | | | | | |
| Pension and postretirement defined benefit plan items | | | | | | |
| Amortization of amounts included in net periodic pension cost[2] | | 7 | | 97 | | 19 |
| Tax expense | | (2) | | (23) | | (5) |
| Net of tax | | 5 | | 74 | | 14 |
| Total reclassifications, net of tax | $ | 12 | $ | 81 | $ | 16 |

(1)  Reclassified from AOCI into interest expense.
(2)  Reclassified from AOCI into non-service component of company-sponsored pension plan costs.  These components are included in the computation of net periodic pension expense.

PX6009-183

## 9.  LEASES AND LEASE-FINANCED TRANSACTIONS

The Company leases certain store real estate, warehouses, distribution centers, fulfillment centers, office space and equipment.  The Company operates in leased facilities in approximately half of its store locations.  Lease terms generally range from 10 to 20 years with options to renew for varying terms at the Company's sole discretion.  Certain leases also include options to purchase the leased property.  Leases with an initial term of 12 months or less are not recorded on the balance sheet.  Certain leases include escalation clauses or payment of executory costs such as property taxes, utilities or insurance and maintenance.  Rent expense for leases with escalation clauses or other lease concessions are accounted for on a straight-line basis over the lease term.  The Company's lease agreements do not contain any material residual value guarantees or material restrictive covenants.  Certain properties or portions thereof are subleased to others for periods generally ranging from one to 20 years.

The following table provides supplemental balance sheet classification information related to leases:

|  | Classification | January 28, 2023 | January 29, 2022 |
|---|---|---|---|
| **Assets** | | | |
| Operating | Operating lease assets | $ 6,662 | $ 6,695 |
| Finance | Property, plant and equipment, net[1] | 2,018 | 1,525 |
| Total leased assets | | $ 8,680 | $ 8,220 |
| **Liabilities** | | | |
| Current | | | |
| Operating | Current portion of operating lease liabilities | $ 662 | $ 650 |
| Finance | Current portion of long-term debt including obligations under finance leases | 157 | 104 |
| Noncurrent | | | |
| Operating | Noncurrent operating lease liabilities | 6,372 | 6,426 |
| Finance | Long-term debt including obligations under finance leases | 1,929 | 1,515 |
| Total lease liabilities | | $ 9,120 | $ 8,695 |

(1)  Finance lease assets are recorded net of accumulated amortization of $562 and $414 as of January 28, 2023 and January 29, 2022.

The following table provides the components of lease cost:

| Lease Cost | Classification | Year-To-Date January 28, 2023 | Year-To-Date January 29, 2022 |
|---|---|---|---|
| Operating lease cost[1] | Rent Expense | $ 950 | $ 954 |
| Sublease and other rental income | Rent Expense | (111) | (109) |
| Finance lease cost | | | |
| Amortization of leased assets | Depreciation and Amortization | 161 | 95 |
| Interest on lease liabilities | Interest Expense | 66 | 52 |
| Net lease cost | | $ 1,066 | $ 992 |

(1)  Includes short-term leases and variable lease costs, which are immaterial.

PX6009-184

Maturities of operating and finance lease liabilities are listed below. Amounts in the table include options to extend lease terms that are reasonably certain of being exercised.

| | Operating Leases | | Finance Leases | | Total | |
|---|---|---|---|---|---|---|
| 2023 | $ | 930 | $ | 228 | $ | 1,158 |
| 2024 | | 864 | | 226 | | 1,090 |
| 2025 | | 791 | | 222 | | 1,013 |
| 2026 | | 740 | | 221 | | 961 |
| 2027 | | 683 | | 223 | | 906 |
| Thereafter | | 5,688 | | 1,492 | | 7,180 |
| Total lease payments | | 9,696 | | 2,612 | $ | 12,308 |
| Less amount representing interest | | 2,662 | | 526 | | |
| Present value of lease liabilities[1] | $ | 7,034 | $ | 2,086 | | |

(1) Includes the current portion of $662 for operating leases and $157 for finance leases.

Total future minimum rentals under non-cancellable subleases at January 28, 2023 were $232.

The following table provides the weighted-average lease term and discount rate for operating and finance leases:

| | January 28, 2023 | January 29, 2022 |
|---|---|---|
| Weighted-average remaining lease term (years) | | |
| Operating leases | 14.3 | 14.9 |
| Finance leases | 12.7 | 14.7 |
| Weighted-average discount rate | | |
| Operating leases | 4.2 % | 4.1 % |
| Finance leases | 3.5 % | 3.7 % |

The following table provides supplemental cash flow information related to leases:

| | Year-To-Date January 28, 2023 | | Year-To-Date January 29, 2022 | |
|---|---|---|---|---|
| Cash paid for amounts included in the measurement of lease liabilities | | | | |
| Operating cash flows from operating leases | $ | 903 | $ | 897 |
| Operating cash flows from finance leases | $ | 66 | $ | 52 |
| Financing cash flows from finance leases | $ | 132 | $ | 127 |
| Leased assets obtained in exchange for new operating lease liabilities | $ | 602 | $ | 669 |
| Leased assets obtained in exchange for new finance lease liabilities | $ | 656 | $ | 753 |
| Net gain recognized from sale and leaseback transactions[1] | $ | 30 | $ | 35 |
| Impairment of operating lease assets | $ | 1 | $ | 8 |
| Impairment of finance lease assets | $ | 2 | $ | 4 |

(1) In 2022, the Company entered into sale leaseback transactions related to five properties, which resulted in total proceeds of $44. In 2021, the Company entered into sale leaseback transactions related to seven properties, which resulted in total proceeds of $79.

PX6009-185

On May 17, 2018, the Company entered into a Partnership Framework Agreement with Ocado International Holdings Limited and Ocado Group plc ("Ocado"), which has since been amended. Under this agreement, Ocado will partner exclusively with the Company in the U.S., enhancing the Company's digital and robotics capabilities in its distribution networks. In 2022, the Company opened four additional Kroger Delivery customer fulfillment centers in Romulus, Michigan, Dallas, Texas, Pleasant Prairie, Wisconsin, and Aurora, Colorado. The Company determined the arrangement with Ocado contains a lease of the robotic equipment used to fulfill customer orders. As a result, the Company establishes a finance lease when each facility begins fulfilling orders to customers. The base term of each lease is 10 years with options to renew at the Company's sole discretion. The Company elected to combine the lease and non-lease elements in the contract. As a result, the Company will account for all payments to Ocado as lease payments. In 2022, the Company recorded finance lease assets of $629 and finance lease liabilities of $583 related to these location openings. In 2021, the Company recorded finance lease assets of $401 and finance lease liabilities of $372 related to openings during 2021.

## 10. EARNINGS PER COMMON SHARE

Net earnings attributable to The Kroger Co. per basic common share equals net earnings attributable to The Kroger Co. less income allocated to participating securities divided by the weighted average number of common shares outstanding. Net earnings attributable to The Kroger Co. per diluted common share equals net earnings attributable to The Kroger Co. less income allocated to participating securities divided by the weighted average number of common shares outstanding, after giving effect to dilutive stock options. The following table provides a reconciliation of net earnings attributable to The Kroger Co. and shares used in calculating net earnings attributable to The Kroger Co. per basic common share to those used in calculating net earnings attributable to The Kroger Co. per diluted common share:

| (in millions, except per share amounts) | For the year ended January 28, 2023 | | | For the year ended January 29, 2022 | | | For the year ended January 30, 2021 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Earnings (Numerator) | Shares (Denominator) | Per Share Amount | Earnings (Numerator) | Shares (Denominator) | Per Share Amount | Earnings (Numerator) | Shares (Denominator) | Per Share Amount |
| Net earnings attributable to The Kroger Co. per basic common share | $ 2,224 | 718 | $ 3.10 | $ 1,639 | 744 | $ 2.20 | $ 2,556 | 773 | $ 3.31 |
| Dilutive effect of stock options | | 9 | | | 10 | | | 8 | |
| Net earnings attributable to The Kroger Co. per diluted common share | $ 2,224 | 727 | $ 3.06 | $ 1,639 | 754 | $ 2.17 | $ 2,556 | 781 | $ 3.27 |

The Company had combined undistributed and distributed earnings to participating securities totaling $20, $16 and $29 in 2022, 2021 and 2020, respectively.

The Company had stock options outstanding for approximately 1.7 million, 2.4 million and 9.1 million shares, respectively, for the years ended January 28, 2023, January 29, 2022, and January 30, 2021, which were excluded from the computations of net earnings per diluted common share because their inclusion would have had an anti-dilutive effect on net earnings per diluted share.

## 11. STOCK-BASED COMPENSATION

The Company recognizes compensation expense for all share-based payments granted. The Company recognizes share-based compensation expense, net of an estimated forfeiture rate, over the requisite service period of the award based on the fair value at the date of the grant.

The Company grants options for common shares ("stock options") to employees under various plans at an option price equal to the fair market value of the stock option at the date of grant. The Company accounts for stock options under the fair value recognition provisions. Stock options typically expire 10 years from the date of grant. Stock options vest between one and four years from the date of grant.

In addition to the stock options described above, the Company awards restricted stock to employees and incentive shares to nonemployee directors under various plans. The restrictions on the restricted share awards generally lapse between one and four years from the date of the awards. The Company determines the fair value for restricted stock awards in an amount equal to the fair market value of the underlying shares on the grant date of the award.

PX6009-186

At January 28, 2023, approximately 53 million common shares were available for future options or restricted stock grants under the 2019 Amended and Restated Long-Term Incentive Plan. Options granted reduce the shares available under the Plans at a ratio of one to one.  Restricted stock grants reduce the shares available under the Plans at a ratio of 2.83 to one.

Equity awards granted are based on the aggregate value of the award on the grant date. This can affect the number of shares granted in a given year as equity awards. Excess tax benefits related to equity awards are recognized in the provision for income taxes. Equity awards may be approved at one of four meetings of its Board of Directors occurring shortly after the Company's release of quarterly earnings. The 2022 primary grants were made in conjunction with the March and June meetings of the Company's Board of Directors.

All awards become immediately exercisable upon certain changes of control of the Company.

*Stock Options*

Changes in options outstanding under the stock option plans are summarized below:

| | Shares subject to option (in millions) | | Weighted-average exercise price |
|---|---|---|---|
| Outstanding, year-end 2019 | 32.2 | $ | 24.52 |
| Granted | 2.9 | $ | 29.31 |
| Exercised | (7.3) | $ | 17.72 |
| Canceled or Forfeited | (1.0) | $ | 30.53 |
| | | | |
| Outstanding, year-end 2020 | 26.8 | $ | 26.65 |
| Granted | 2.1 | $ | 35.45 |
| Exercised | (7.1) | $ | 24.70 |
| Canceled or Forfeited | (0.7) | $ | 28.88 |
| | | | |
| Outstanding, year-end 2021 | 21.1 | $ | 28.15 |
| Granted | 1.2 | $ | 56.13 |
| Exercised | (5.4) | $ | 26.02 |
| Canceled or Forfeited | (0.3) | $ | 31.54 |
| | | | |
| Outstanding, year-end 2022 | 16.6 | $ | 30.81 |

A summary of options outstanding, exercisable and expected to vest at January 28, 2023 follows:

| | Number of shares (in millions) | Weighted-average remaining contractual life (in years) | Weighted-average exercise price | | Aggregate intrinsic value (in millions) |
|---|---|---|---|---|---|
| Options Outstanding | 16.6 | 5.08 | $ | 30.81 | $ | 250 |
| Options Exercisable | 12.3 | 4.07 | $ | 28.29 | $ | 205 |
| Options Expected to Vest | 4.3 | 7.89 | $ | 37.77 | $ | 44 |

PX6009-187

*Restricted stock*

Changes in restricted stock outstanding under the restricted stock plans are summarized below:

| | Restricted shares outstanding (in millions) | | Weighted-average grant-date fair value |
|---|---|---|---|
| Outstanding, year-end 2019 | 9.3 | $ | 24.85 |
| Granted | 4.0 | $ | 31.99 |
| Lapsed | (4.9) | $ | 24.69 |
| Canceled or Forfeited | (0.6) | $ | 26.71 |
| | | | |
| Outstanding, year-end 2020 | 7.8 | $ | 28.46 |
| Granted | 3.9 | $ | 37.29 |
| Lapsed | (4.0) | $ | 29.58 |
| Canceled or Forfeited | (0.5) | $ | 31.31 |
| | | | |
| Outstanding, year-end 2021 | 7.2 | $ | 32.52 |
| Granted | 3.0 | $ | 50.50 |
| Lapsed | (4.0) | $ | 32.16 |
| Canceled or Forfeited | (0.4) | $ | 38.32 |
| | | | |
| Outstanding, year-end 2022 | 5.8 | $ | 41.76 |

The weighted-average grant date fair value of stock options granted during 2022, 2021 and 2020 was $15.91, $8.54 and $6.43, respectively.  The fair value of each stock option grant was estimated on the date of grant using the Black-Scholes option-pricing model, based on the assumptions shown in the table below.  The Black-Scholes model utilizes accounting judgment and financial estimates, including the term option holders are expected to retain their stock options before exercising them, the volatility of the Company's share price over that expected term, the dividend yield over the term and the number of awards expected to be forfeited before they vest.  Using alternative assumptions in the calculation of fair value would produce fair values for stock option grants that could be different than those used to record stock-based compensation expense in the Consolidated Statements of Operations.  The increase in the fair value of the stock options granted during 2022, compared to 2021, resulted primarily from increases in the Company's share price, the weighted-average expected volatility, and an increase in the weighted-average risk-free interest rate.  The increase in the fair value of the stock options granted during 2021, compared to 2020, resulted primarily from increases in the Company's share price and the weighted-average expected volatility.

The following table reflects the weighted-average assumptions used for grants awarded to option holders:

| | 2022 | 2021 | 2020 |
|---|---|---|---|
| Weighted average expected volatility | 30.47 % | 28.52 % | 26.96 % |
| Weighted average risk-free interest rate | 2.09 % | 1.21 % | 0.82 % |
| Expected dividend yield | 1.82 % | 2.00 % | 2.00 % |
| Expected term (based on historical results) | 7.2 years | 7.2 years | 7.2 years |

The weighted-average risk-free interest rate was based on the yield of a treasury note as of the grant date, continuously compounded, which matures at a date that approximates the expected term of the options.  The dividend yield was based on our history and expectation of dividend payouts.  Expected volatility was determined based upon historical stock volatilities; however, implied volatility was also considered.  Expected term was determined based upon historical exercise and cancellation experience.

Total stock compensation recognized in 2022, 2021 and 2020 was $190, $203 and $185, respectively.  Stock option compensation recognized in 2022, 2021 and 2020 was $19, $20 and $22, respectively.  Restricted shares compensation recognized in 2022, 2021 and 2020 was $171, $183 and $163, respectively.

PX6009-188

The total intrinsic value of stock options exercised was $159, $121 and $115 in 2022, 2021 and 2020, respectively. The total amount of cash received in 2022 by the Company from the exercise of stock options granted under share-based payment arrangements was $134. As of January 28, 2023, there was $206 of total unrecognized compensation expense remaining related to non-vested share-based compensation arrangements granted under the Plans. This cost is expected to be recognized over a weighted-average period of approximately two years. The total fair value of options that vested was $19, $20 and $23 in 2022, 2021 and 2020, respectively.

Shares issued as a result of stock option exercises may be newly issued shares or reissued treasury shares. Proceeds received from the exercise of options, and the related tax benefit, may be utilized to repurchase the Company's common shares under a stock repurchase program adopted by the Company's Board of Directors. During 2022, the Company repurchased approximately three million common shares in such a manner.

## 12.  COMMITMENTS AND CONTINGENCIES

The Company continuously evaluates contingencies based upon the best available evidence.

The Company believes that allowances for loss have been provided to the extent necessary and that its assessment of contingencies is reasonable. To the extent that resolution of contingencies results in amounts that vary from the Company's estimates, future earnings will be charged or credited.

The principal contingencies are described below:

*Insurance* — The Company's workers' compensation risks are self-insured in most states. In addition, other workers' compensation risks and certain levels of insured general liability risks are based on retrospective premium plans, deductible plans, and self-insured retention plans. The liability for workers' compensation risks is accounted for on a present value basis. Actual claim settlements and expenses incident thereto may differ from the provisions for loss. Property risks have been underwritten by a subsidiary and are all reinsured with unrelated insurance companies. Operating divisions and subsidiaries have paid premiums, and the insurance subsidiary has provided loss allowances, based upon actuarially determined estimates.

*Litigation* — Various claims and lawsuits arising in the normal course of business, including personal injury, contract disputes, employment discrimination, wage and hour and other regulatory claims are pending against the Company. Some of these suits purport or have been determined to be class actions and/or seek substantial damages. Although it is not possible at this time to evaluate the merits of all of these claims and lawsuits, nor their likelihood of success, the Company is of the belief that any resulting liability will not have a material effect on the Company's financial position, results of operations, or cash flows.

The Company continually evaluates its exposure to loss contingencies arising from pending or threatened litigation and believes it has made provisions where it is reasonably possible to estimate and when an adverse outcome is probable. Nonetheless, assessing and predicting the outcomes of these matters involves substantial uncertainties. Management currently believes that the aggregate range of loss for the Company's exposure is not material to the Company. It remains possible that despite management's current belief, material differences in actual outcomes or changes in management's evaluation or predictions could arise that could have a material adverse effect on the Company's financial condition, results of operations, or cash flows.

The Company is one of dozens of companies that have been named in various lawsuits alleging that defendants contributed to create a public nuisance through the distribution and dispensing of opioids.

At present, the Company is named in a significant number of lawsuits pending in various state courts, including cases brought by certain state Attorneys General, as well as in the United States District Court for the Northern District of Ohio, where over 2,000 cases have been consolidated as Multi-District Litigation ("MDL") pursuant to 28 U.S.C. §1407 in a case entitled In re National Prescription Opiate Litigation. Most of these cases have been stayed pending developments in bellwether MDL cases, including some in which the Company is named, which are proceeding on a staggered discovery schedule. Once discovery is completed, those cases will be remanded to the originating federal court for trial. In addition, the Company has received requests for documents and information from government agencies regarding opioids. The Company has and will cooperate with these inquiries.

PX6009-189

The Company is vigorously defending these matters and believes that these cases are without merit. At this stage in the proceedings, the Company is unable to determine the probability of the outcome of these matters or the range of reasonably possible loss, if any.

In the third quarter of 2022, the Company recorded a charge of $85 relating to a settlement of opioid litigation claims with the State of New Mexico. The agreed upon settlement framework allocates $85 among various constituents related to the state of New Mexico. This settlement agreement resolved all opioid lawsuits and claims by the state of New Mexico against the Company. Kroger continues to vigorously defend against all claims and lawsuits relating to opioids.

*Assignments* — The Company is contingently liable for leases that have been assigned to various third parties in connection with facility closings and dispositions. The Company could be required to satisfy the obligations under the leases if any of the assignees is unable to fulfill its lease obligations. Due to the wide distribution of the Company's assignments among third parties, and various other remedies available, the Company believes the likelihood that it will be required to assume a material amount of these obligations is remote.

## 13. STOCK

*Preferred Shares*

The Company has authorized five million shares of voting cumulative preferred shares; two million shares were available for issuance at January 28, 2023. The shares have a par value of $100 per share and are issuable in series.

*Common Shares*

The Company has authorized two billion common shares, $1 par value per share.

*Common Stock Repurchase Program*

The Company maintains stock repurchase programs that comply with Rule 10b5-1 of the Securities Exchange Act of 1934 to allow for the orderly repurchase of The Kroger Co. common shares, from time to time. The Company made open market purchases totaling $821, $1,422 and $1,196 under these repurchase programs in 2022, 2021 and 2020, respectively.

In addition to these repurchase programs, in December 1999, the Company began a program to repurchase common shares to reduce dilution resulting from its employee stock option plans. This program is solely funded by proceeds from stock option exercises and the related tax benefit. The Company repurchased approximately $172, $225 and $128 under the stock option program during 2022, 2021 and 2020, respectively.

## 14. COMPANY- SPONSORED BENEFIT PLANS

The Company administers non-contributory defined benefit retirement plans for some non-union employees and union-represented employees as determined by the terms and conditions of collective bargaining agreements. These include several qualified pension plans (the "Qualified Plans") and non-qualified pension plans (the "Non-Qualified Plans"). The Non-Qualified Plans pay benefits to any employee that earns in excess of the maximum allowed for the Qualified Plans by Section 415 of the Internal Revenue Code. The Company only funds obligations under the Qualified Plans. Funding for the company-sponsored pension plans is based on a review of the specific requirements and on evaluation of the assets and liabilities of each plan.

In addition to providing pension benefits, the Company provides certain health care benefits for retired employees. Based on employee's age, years of service and position with the Company, the employee may be eligible for retiree health care benefits. Funding of retiree health care benefits occurs as claims or premiums are paid.

PX6009-190

The Company recognizes the funded status of its retirement plans on the Consolidated Balance Sheets. Actuarial gains or losses and prior service credits that have not yet been recognized as part of net periodic benefit cost are required to be recorded as a component of AOCI. The Company has elected to measure defined benefit plan assets and obligations as of January 31, which is the month-end that is closest to its fiscal year-ends, which were January 28, 2023 for fiscal 2022 and January 29, 2022 for fiscal 2021.

Amounts recognized in AOCI as of January 28, 2023 and January 29, 2022 consist of the following (pre-tax):

| | Pension Benefits | | Other Benefits | | Total | |
|---|---|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 | 2022 | 2021 |
| Net actuarial loss (gain) | $ 785 | $ 715 | $ (108) | $ (127) | $ 677 | $ 588 |
| Prior service credit | — | — | (23) | (43) | (23) | (43) |
| Total | $ 785 | $ 715 | $ (131) | $ (170) | $ 654 | $ 545 |

Other changes recognized in other comprehensive income (loss) in 2022, 2021 and 2020 were as follows (pre-tax):

| | Pension Benefits | | | Other Benefits | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2022 | 2021 | 2020 | 2022 | 2021 | 2020 | 2022 | 2021 | 2020 |
| Incurred net actuarial loss (gain) | $ 101 | $ (109) | $ 36 | $ 15 | $ 2 | $ (46) | $ 116 | $ (107) | $ (10) |
| Amortization of prior service credit | — | — | — | 13 | 12 | 13 | 13 | 12 | 13 |
| Amortization of net actuarial gain (loss) | (31) | (126) | (40) | 11 | 17 | 8 | (20) | (109) | (32) |
| Total recognized in other comprehensive income (loss) | $ 70 | $ (235) | $ (4) | $ 39 | $ 31 | $ (25) | $ 109 | $ (204) | $ (29) |
| Total recognized in net periodic benefit cost and other comprehensive income (loss) | $ 58 | $ (164) | $ (4) | $ 25 | $ 10 | $ (34) | $ 83 | $ (154) | $ (38) |

PX6009-191

Information with respect to change in benefit obligation, change in plan assets, the funded status of the plans recorded in the Consolidated Balance Sheets, net amounts recognized at the end of fiscal years, weighted-average assumptions and components of net periodic benefit cost follow:

| | Pension Benefits | | | | Other Benefits | |
| | Qualified Plans | | Non-Qualified Plans | | | |
| | 2022 | 2021 | 2022 | 2021 | 2022 | 2021 |
|---|---|---|---|---|---|---|
| Change in benefit obligation: | | | | | | |
| Benefit obligation at beginning of fiscal year | $ 2,977 | $ 3,615 | $ 325 | $ 351 | $ 150 | $ 152 |
| Service cost | 8 | 12 | — | — | 5 | 4 |
| Interest cost | 92 | 92 | 10 | 9 | 5 | 4 |
| Plan participants' contributions | 4 | — | — | — | 12 | 13 |
| Actuarial (gain) loss | (421) | (125) | (40) | (12) | 8 | 2 |
| Plan settlements | (33) | (442) | (2) | — | — | — |
| Benefits paid | (159) | (172) | (22) | (24) | (22) | (25) |
| Other | (5) | (3) | — | 1 | 7 | — |
| Benefit obligation at end of fiscal year | $ 2,463 | $ 2,977 | $ 271 | $ 325 | $ 165 | $ 150 |
| | | | | | | |
| Change in plan assets: | | | | | | |
| Fair value of plan assets at beginning of fiscal year | $ 3,096 | $ 3,569 | $ — | $ — | $ — | $ — |
| Actual return on plan assets | (409) | 141 | — | — | — | — |
| Employer contributions | 2 | — | 24 | 24 | 10 | 12 |
| Plan participants' contributions | 4 | — | — | — | 12 | 13 |
| Plan settlements | (33) | (442) | (2) | — | — | — |
| Benefits paid | (159) | (172) | (22) | (24) | (22) | (25) |
| Other | (5) | — | — | — | — | — |
| Fair value of plan assets at end of fiscal year | $ 2,496 | $ 3,096 | $ — | $ — | $ — | $ — |
| Funded status and net asset and liability recognized at end of fiscal year | $ 33 | $ 119 | $ (271) | $ (325) | $ (165) | $ (150) |

As of January 28, 2023, other assets and other current liabilities include $69 and $36, respectively, of the net asset and liability recognized for the above benefit plans. As of January 29, 2022, other assets and other current liabilities include $156 and $34, respectively, of the net asset and liability recognized for the above benefit plans. Pension plan assets do not include common shares of The Kroger Co.

In 2021, the Company settled certain company-sponsored pension plan obligations using existing assets of the plans. The Company recognized a non-cash settlement charge of $87, $68 net of tax, associated with the settlement of its obligations for the eligible participants' pension balances that were distributed out of the plans via a lump sum distribution or the purchase of an annuity contract, based on each participant's election. The settlement charge is included in "Non-service component of company-sponsored pension plan costs" in the Consolidated Statements of Operations.

PX6009-192

The following table outlines the weighted average assumptions associated with pension and other benefit costs for 2022, 2021 and 2020:

| Weighted average assumptions | Pension Benefits | | | Other Benefits | | |
|---|---|---|---|---|---|---|
| | 2022 | 2021 | 2020 | 2022 | 2021 | 2020 |
| Discount rate — Benefit obligation | 4.90 % | 3.17 % | 2.72 % | 4.86 % | 3.01 % | 2.43 % |
| Discount rate — Net periodic benefit cost | 3.17 % | 2.72 % | 3.01 % | 3.01 % | 2.43 % | 2.97 % |
| Expected long-term rate of return on plan assets | 5.50 % | 5.50 % | 5.50 % | | | |
| Rate of compensation increase — Net periodic benefit cost | 3.05 % | 3.03 % | 3.03 % | | | |
| Rate of compensation increase — Benefit obligation | 2.57 % | 3.05 % | 3.03 % | | | |
| Cash Balance plan interest crediting rate | 3.30 % | 3.30 % | 3.30 % | | | |

The Company's discount rate assumptions were intended to reflect the rates at which the pension benefits could be effectively settled. They take into account the timing and amount of benefits that would be available under the plans. The Company's policy is to match the plan's cash flows to that of a hypothetical bond portfolio whose cash flow from coupons and maturities match the plan's projected benefit cash flows. The discount rates are the single rates that produce the same present value of cash flows. The selection of the 4.90% and 4.86% discount rates as of year-end 2022 for pension and other benefits, respectively, represents the hypothetical bond portfolio using bonds with an AA or better rating constructed with the assistance of an outside consultant. A 100 basis point increase in the discount rate would decrease the projected pension benefit obligation as of January 28, 2023, by approximately $225.

The Company's assumed pension plan investment return rate was 5.50% in 2022, 2021, and 2020. The value of all investments in the company-sponsored defined benefit pension plans during the calendar year ended December 31, 2022, net of investment management fees and expenses, decreased 22.5% and for fiscal year 2022 investments decreased 15.4%. Historically, the Company's pension plans' average rate of return was 4.4% for the 10 calendar years ended December 31, 2022, net of all investment management fees and expenses. For the past 20 years, the Company's pension plans' average annual rate of return has been 7.0%. To determine the expected rate of return on pension plan assets held by the Company, the Company considers current and forecasted plan asset allocations as well as historical and forecasted rates of return on various asset categories.

The Company calculates its expected return on plan assets by using the market-related value of plan assets. The market-related value of plan assets is determined by adjusting the actual fair value of plan assets for gains or losses on plan assets. Gains or losses represent the difference between actual and expected returns on plan investments for each plan year. Gains or losses on plan assets are recognized evenly over a five-year period. Using a different method to calculate the market-related value of plan assets would provide a different expected return on plan assets.

The pension benefit unfunded status increased in 2022, compared to 2021, due primarily to a lower actual rate of return on plan assets, partially offset by an increase in discount rates, which lowered the benefit obligation. The Company's Qualified Plans were fully funded as of January 28, 2023 and January 29, 2022.

PX6009-193

The following table provides the components of the Company's net periodic benefit costs for 2022, 2021 and 2020:

| | Pension Benefits | | | | | | Other Benefits | | |
| | Qualified Plans | | | Non-Qualified Plans | | | | | |
| Components of net periodic benefit cost: | 2022 | 2021 | 2020 | 2022 | 2021 | 2020 | 2022 | 2021 | 2020 |
|---|---|---|---|---|---|---|---|---|---|
| Service cost | $ 8 | $ 12 | $ 13 | $ — | $ — | $ — | $ 5 | $ 4 | $ 7 |
| Interest cost | 92 | 92 | 104 | 10 | 9 | 10 | 5 | 4 | 6 |
| Expected return on plan assets | (153) | (168) | (168) | — | — | — | — | — | — |
| Amortization of: | | | | | | | | | |
| Prior service credit | — | — | — | — | — | — | (13) | (12) | (13) |
| Actuarial (gain) loss | 22 | 33 | 35 | 5 | 6 | 5 | (11) | (17) | (8) |
| Settlement loss recognized | 4 | 87 | — | — | — | — | — | — | — |
| Other | — | (1) | 1 | — | 1 | — | — | — | (1) |
| Net periodic benefit cost | $ (27) | $ 55 | $ (15) | $ 15 | $ 16 | $ 15 | $ (14) | $ (21) | $ (9) |

The following table provides the projected benefit obligation ("PBO") and the fair value of plan assets for those company-sponsored pension plans with projected benefit obligations in excess of plan assets:

| | Qualified Plans | | Non-Qualified Plans | |
| | 2022 | 2021 | 2022 | 2021 |
|---|---|---|---|---|
| PBO at end of fiscal year | $ 176 | $ 244 | $ 271 | $ 325 |
| Fair value of plan assets at end of year | $ 141 | $ 207 | $ — | $ — |

The following table provides the accumulated benefit obligation ("ABO") and the fair value of plan assets for those company-sponsored pension plans with accumulated benefit obligations in excess of plan assets:

| | Qualified Plans | | Non-Qualified Plans | |
| | 2022 | 2021 | 2022 | 2021 |
|---|---|---|---|---|
| ABO at end of fiscal year | $ 176 | $ 244 | $ 271 | $ 325 |
| Fair value of plan assets at end of year | $ 141 | $ 207 | $ — | $ — |

The following table provides information about the Company's estimated future benefit payments:

| | Pension Benefits | Other Benefits |
|---|---|---|
| 2023 | $ 206 | $ 13 |
| 2024 | $ 209 | $ 14 |
| 2025 | $ 210 | $ 15 |
| 2026 | $ 211 | $ 16 |
| 2027 | $ 210 | $ 16 |
| 2028 —2032 | $ 998 | $ 75 |

PX6009-194

The following table provides information about the target and actual pension plan asset allocations as of January 28, 2023:

| | Target allocations | Actual Allocations | |
|---|---|---|---|
| | 2022 | 2022 | 2021 |
| Pension plan asset allocation | | | |
| Global equity securities | 5.0 % | 4.9 % | 7.0 % |
| Emerging market equity securities | — | — | 1.7 |
| Investment grade debt securities | 78.0 | 75.8 | 73.6 |
| High yield debt securities | 3.0 | 2.9 | 2.5 |
| Private equity | 10.0 | 9.8 | 10.6 |
| Hedge funds | 2.0 | 2.3 | 2.9 |
| Real estate | 2.0 | 1.8 | 1.7 |
| Other | — | 2.5 | — |
| Total | 100.0 % | 100.0 % | 100.0 % |

Investment objectives, policies and strategies are set by the Retirement Benefit Plan Management Committee (the "Committee"). The primary objectives include holding and investing the assets and distributing benefits to participants and beneficiaries of the pension plans. Investment objectives have been established based on a comprehensive review of the capital markets and each underlying plan's current and projected financial requirements. The time horizon of the investment objectives is long-term in nature and plan assets are managed on a going-concern basis.

Investment objectives and guidelines specifically applicable to each manager of assets are established and reviewed annually. Derivative instruments may be used for specified purposes, including rebalancing exposures to certain asset classes. Any use of derivative instruments for a purpose or in a manner not specifically authorized is prohibited, unless approved in advance by the Committee.

The target allocations shown for 2022 were established at the beginning of 2022 based on the Company's liability-driven investment ("LDI") strategy. An LDI strategy focuses on maintaining a close to fully-funded status over the long-term with minimal funded status risk. This is achieved by investing more of the plan assets in fixed income instruments to more closely match the duration of the plan liability.

The Company did not make any significant contributions to its company-sponsored pension plans in 2022, and the Company is not required to make any contributions to these plans in 2023. If the Company does make any contributions in 2023, the Company expects these contributions will decrease its required contributions in future years. Among other things, investment performance of plan assets, the interest rates required to be used to calculate the pension obligations, and future changes in legislation, will determine the amounts of any contributions. The Company expects 2023 net periodic benefit costs for company-sponsored pension plans to be approximately ($7).

Assumed health care cost trend rates have a significant effect on the amounts reported for the health care plans. The Company used a 6.20% initial health care cost trend rate, which is assumed to decrease on a linear basis to a 4.00% ultimate health care cost trend rate in 2046, to determine its expense.

PX6009-195

The following tables, set forth by level within the fair value hierarchy, present the Qualified Plans' assets at fair value as of January 28, 2023 and January 29, 2022:

Assets at Fair Value as of January 28, 2023

| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Assets Measured at NAV | Total |
|---|---|---|---|---|---|
| Cash and cash equivalents | $ 178 | $ — | $ — | $ — | $ 178 |
| Corporate Stocks | 4 | — | — | — | 4 |
| Corporate Bonds | — | 1,113 | — | — | 1,113 |
| U.S. Government Securities | — | 115 | — | — | 115 |
| Mutual Funds | 124 | — | — | — | 124 |
| Collective Trusts | — | — | — | 514 | 514 |
| Hedge Funds | — | — | 31 | 28 | 59 |
| Private Equity | — | — | — | 248 | 248 |
| Real Estate | — | — | 28 | 16 | 44 |
| Other | — | 98 | — | — | 98 |
| Total | $ 306 | $ 1,326 | $ 59 | $ 806 | $ 2,497 |

Assets at Fair Value as of January 29, 2022

| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Assets Measured at NAV | Total |
|---|---|---|---|---|---|
| Cash and cash equivalents | $ 80 | $ — | $ — | $ — | $ 80 |
| Corporate Stocks | 98 | — | — | — | 98 |
| Corporate Bonds | — | 1,070 | — | — | 1,070 |
| U.S. Government Securities | — | 144 | — | — | 144 |
| Mutual Funds | 265 | — | — | — | 265 |
| Collective Trusts | — | — | — | 871 | 871 |
| Hedge Funds | — | — | 39 | 49 | 88 |
| Private Equity | — | — | — | 326 | 326 |
| Real Estate | — | — | 37 | 16 | 53 |
| Other | — | 101 | — | — | 101 |
| Total | $ 443 | $ 1,315 | $ 76 | $ 1,262 | $ 3,096 |

Certain investments that are measured at fair value using the NAV per share (or its equivalent) have not been classified in the fair value hierarchy. The fair value amounts presented for these investments in the preceding tables are intended to permit reconciliation of the fair value hierarchies to the total fair value of plan assets.

PX6009-196

For measurements using significant unobservable inputs (Level 3) during 2022 and 2021, a reconciliation of the beginning and ending balances is as follows:

| | Hedge Funds | Real Estate |
|---|---|---|
| Ending balance, January 30, 2021 | $       35 | $       39 |
| Contributions into Fund | — | 1 |
| Realized gains | 2 | 2 |
| Unrealized gains | 7 | 6 |
| Distributions | (5) | (11) |
| | | |
| Ending balance, January 29, 2022 | 39 | 37 |
| Contributions into Fund | — | 1 |
| Realized gains | — | 12 |
| Unrealized losses | (3) | (6) |
| Distributions | (5) | (16) |
| | | |
| Ending balance, January 28, 2023 | $       31 | $       28 |

See Note 7 for a discussion of the levels of the fair value hierarchy. The assets' fair value measurement level above is based on the lowest level of any input that is significant to the fair value measurement.

The following is a description of the valuation methods used for the Qualified Plans' assets measured at fair value in the above tables:

- Cash and cash equivalents: The carrying value approximates fair value.

- Corporate Stocks: The fair values of these securities are based on observable market quotations for identical assets and are valued at the closing price reported on the active market on which the individual securities are traded.

- Corporate Bonds: The fair values of these securities are primarily based on observable market quotations for similar bonds, valued at the closing price reported on the active market on which the individual securities are traded. When such quoted prices are not available, the bonds are valued using a discounted cash flow approach using current yields on similar instruments of issuers with similar credit ratings, including adjustments for certain risks that may not be observable, such as credit and liquidity risks.

- U.S. Government Securities: Certain U.S. Government securities are valued at the closing price reported in the active market in which the security is traded. Other U.S. government securities are valued based on yields currently available on comparable securities of issuers with similar credit ratings. When quoted prices are not available for similar securities, the security is valued under a discounted cash flow approach that maximizes observable inputs, such as current yields of similar instruments, but includes adjustments for certain risks that may not be observable, such as credit and liquidity risks.

- Mutual Funds: The fair values of these securities are based on observable market quotations for identical assets and are valued at the closing price reported on the active market on which the individual securities are traded.

- Collective Trusts: The collective trust funds are public investment vehicles valued using a Net Asset Value (NAV) provided by the manager of each fund. These assets have been valued using NAV as a practical expedient.

- Hedge Funds: The Hedge funds classified as Level 3 include investments that are not readily tradeable and have valuations that are not based on readily observable data inputs. The fair value of these assets is estimated based on information provided by the fund managers or the general partners. Therefore, these assets are classified as Level 3. Certain other hedge funds are private investment vehicles valued using a NAV provided by the manager of each fund. These assets have been valued using NAV as a practical expedient.

PX6009-197

- Private Equity: Private Equity investments are valued based on the fair value of the underlying securities within the fund, which include investments both traded on an active market and not traded on an active market. For those investments that are traded on an active market, the values are based on the closing price reported on the active market on which those individual securities are traded.  For investments not traded on an active market, or for which a quoted price is not publicly available, a variety of unobservable valuation methodologies, including discounted cash flow, market multiple and cost valuation approaches, are employed by the fund manager to value investments.  Fair values of all investments are adjusted annually, if necessary, based on audits of the private equity fund financial statements; such adjustments are reflected in the fair value of the plan's assets.

- Real Estate: Real estate investments include investments in real estate funds managed by a fund manager.  These investments are valued using a variety of unobservable valuation methodologies, including discounted cash flow, market multiple and cost valuation approaches.  The valuations for these investments are not based on readily observable inputs and are classified as Level 3 investments.  Certain other real estate investments are valued using a NAV provided by the manager of each fund.  These assets have been valued using NAV as a practical expedient.

The methods described above may produce a fair value calculation that may not be indicative of net realizable value or reflective of future fair values.  Furthermore, while the Company believes its valuation methods are appropriate and consistent with other market participants, the use of different methodologies or assumptions to determine the fair value of certain financial instruments could result in a different fair value measurement.

The Company contributed and expensed $315, $289 and $294 to employee 401(k) retirement savings accounts in 2022, 2021 and 2020, respectively.  The 401(k) retirement savings account plans provide to eligible employees both matching contributions and automatic contributions from the Company based on participant contributions, compensation as defined by the plan and length of service.

## 15. MULTI-EMPLOYER PENSION PLANS

The Company contributes to various multi-employer pension plans based on obligations arising from collective bargaining agreements.  These multi-employer pension plans provide retirement benefits to participants based on their service to contributing employers.  The benefits are paid from assets held in trust for that purpose.  Trustees are appointed in equal number by employers and unions.  The trustees typically are responsible for determining the level of benefits to be provided to participants as well as for such matters as the investment of the assets and the administration of the plans.

The Company recognizes expense in connection with these plans as contributions are funded or when commitments are probable and reasonably estimable, in accordance with GAAP.  The Company made cash contributions to these plans of $620 in 2022, $1,109 in 2021 and $619 in 2020. The decrease in 2022, compared to 2021, and the increase in 2021, compared to 2020, are due to the contractual payments the Company made in 2021 related to its commitments established for the restructuring of certain multi-employer pension plan agreements.

The Company continues to evaluate and address potential exposure to under-funded multi-employer pension plans as it relates to the Company's associates who are beneficiaries of these plans.  These under-fundings are not a liability of the Company.  When an opportunity arises that is economically feasible and beneficial to the Company and its associates, the Company may negotiate the restructuring of under-funded multi-employer pension plan obligations to help stabilize associates' future benefits and become the fiduciary of the restructured multi-employer pension plan.  The commitments from these restructurings do not change the Company's debt profile as it relates to its credit rating since these off balance sheet commitments are typically considered in the Company's investment grade debt rating.

PX6009-198

The Company is currently designated as the named fiduciary of the United Food and Commercial Workers ("UFCW") Consolidated Pension Plan and the International Brotherhood of Teamsters ("IBT") Consolidated Pension Fund and has sole investment authority over these assets. Due to opportunities arising, the Company has restructured certain multi-employer pension plans. The significant effects of these restructuring agreements recorded in our Consolidated Financial Statements are:

- In 2022, the Company incurred a $25 charge, $19 net of tax, for obligations related to withdrawal liabilities for certain multi-employer pension funds.

- In 2021, associates within the Fred Meyer and QFC divisions ratified an agreement for the transfer of liabilities from the Sound Retirement Trust to the UFCW Consolidated Pension Plan. The Company transferred $449, $344 net of tax, in net accrued pension liabilities and prepaid escrow funds to fulfill obligations for past service for associates and retirees. The agreement will be satisfied by cash installment payments to the UFCW Consolidated Pension Plan and will be paid evenly over seven years.

- In 2020, certain of the Company's associates ratified an agreement with certain UFCW local unions to withdraw from the UFCW International Union-Industry Pension Fund ("National Fund"). Due to the ratification of the agreement, the Company incurred a withdrawal liability charge of $962, on a pre-tax basis, to fulfill obligations for past service for associates and retirees in the National Fund. The Company also incurred an additional $27 commitment to a transition reserve in the new variable annuity pension plan. On an after-tax basis, the withdrawal liability and commitment to the transition reserve totaled $754. As of January 29, 2022, the current portion of the commitment of $233 is included in "Other current liabilities" and the long-term portion of the commitment of $233 is included in "Other long-term liabilities" in the Company's Consolidated Balance Sheets. As of January 28, 2023, the current portion of the commitment of $240 is included in "Other current liabilities" in the Company's Consolidated Balance Sheets. In 2022 and 2021, the Company paid $226 and $523 of these commitments, respectively. The original commitment of $962 on a pre-tax basis, will be satisfied by payment to the National Fund over three years. In 2020, in "Other" within "Changes in operating assets and liabilities", the Company's Consolidated Statements of Cash Flows includes the change related to recording the long-term portion of the withdrawal liability commitment.

The risks of participating in multi-employer pension plans are different from the risks of participating in single-employer pension plans in the following respects:

- Assets contributed to the multi-employer plan by one employer may be used to provide benefits to employees of other participating employers.

- If a participating employer stops contributing to the plan, the unfunded obligations of the plan allocable to such withdrawing employer may be borne by the remaining participating employers.

- If the Company stops participating in some of its multi-employer pension plans, the Company may be required to pay those plans an amount based on its allocable share of the unfunded vested benefits of the plan, referred to as a withdrawal liability.

The Company's participation in multi-employer plans is outlined in the following tables. The EIN / Pension Plan Number column provides the Employer Identification Number ("EIN") and the three-digit pension plan number. The most recent Pension Protection Act Zone Status available in 2022 and 2021 is for the plan's year-end at December 31, 2021 and December 31, 2020, respectively. Among other factors, generally, plans in the red zone are less than 65 percent funded, plans in the yellow zone are less than 80 percent funded and plans in the green zone are at least 80 percent funded. The zone status is confirmed by each plan's actuarial valuation. The FIP/RP Status Pending / Implemented Column indicates plans for which a funding improvement plan ("FIP") or a rehabilitation plan ("RP") is either pending or has been implemented. Unless otherwise noted, the information for these tables was obtained from the Forms 5500 filed for each plan's year-end at December 31, 2021 and December 31, 2020. The multi-employer contributions listed in the table below are the Company's multi-employer contributions made in fiscal years 2022, 2021 and 2020.

PX6009-199

The following table contains information about the Company's multi-employer pension plans:

| Pension Fund | EIN / Pension Plan Number | Pension Protection Act Zone Status | | FIP/RP Status Pending/ Implemented | Multi-Employer Contributions | | | Surcharge Imposed[6] |
| | | 2022 | 2021 | | 2022 | 2021 | 2020 | |
|---|---|---|---|---|---|---|---|---|
| SO CA UFCW Unions & Food Employers Joint Pension Trust Fund[1][2] | 95-1939092 - 001 | Red | Yellow | Implemented | $ 84 | $ 83 | $ 86 | No |
| Desert States Employers & UFCW Unions Pension Plan[1] | 84-6277982 - 001 | Green | Green | No | 20 | 22 | 19 | No |
| Sound Variable Annuity Trust[1][3] | 86-3278029 - 001 | Green | Yellow | No | 14 | 24 | 29 | No |
| Rocky Mountain UFCW Unions and Employers Pension Plan[1] | 84-6045986 - 001 | Green | Green | No | 27 | 29 | 28 | No |
| Oregon Retail Employees Pension Plan[1] | 93-6074377 - 001 | Red | Green | Implemented | 9 | 10 | 9 | No |
| Bakery and Confectionary Union & Industry International Pension Fund[1] | 52-6118572 - 001 | Red | Red | Implemented | 7 | 8 | 8 | No |
| Retail Food Employers & UFCW Local 711 Pension[1] | 51-6031512 - 001 | Red | Yellow | Implemented | 11 | 11 | 11 | No |
| UFCW International Union — Industry Variable Annuity Pension Plan[1][4] | 51-6055922 - 001 | Green | Green | No | 282 | 550 | 29 | No |
| Western Conference of Teamsters Pension Plan | 91-6145047 - 001 | Green | Green | No | 40 | 37 | 35 | No |
| Central States, Southeast & Southwest Areas Pension Plan | 36-6044243 - 001 | Red | Red | Implemented | 34 | 37 | 12 | No |
| UFCW Consolidated Pension Plan[1] | 58-6101602 - 001 | Green | Green | No | 56 | 243 | 321 | No |
| IBT Consolidated Pension Plan[1][6] | 82-2153627 - 001 | N/A | N/A | No | 7 | 29 | 18 | No |
| Other | | | | | 29 | 26 | 14 | |
| Total Contributions | | | | | $ 620 | $ 1,109 | $ 619 | |

(1)   The Company's multi-employer contributions to these respective funds represent more than 5% of the total contributions received by the pension funds.

(2)   The information for this fund was obtained from the Form 5500 filed for the plan's year-end at March 31, 2022 and March 31, 2021.

(3)   The information for this fund was obtained from the Form 5500 filed for the plan's year-end at September 30, 2021 and September 30, 2020.

(4)   The information for this fund was obtained from the Form 5500 filed for the plan's year-end at June 30, 2021 and June 30, 2020.

(5)   Under the Pension Protection Act, a surcharge may be imposed when employers make contributions under a collective bargaining agreement that is not in compliance with a rehabilitation plan. As of January 28, 2023, the collective bargaining agreements under which the Company was making contributions were in compliance with rehabilitation plans adopted by the applicable pension fund.

(6)   The plan was formed after 2006, and therefore is not subject to zone status certifications.

PX6009-200

The following table describes (a) the expiration date of the Company's collective bargaining agreements and (b) the expiration date of the Company's most significant collective bargaining agreements for each of the material multi-employer funds in which the Company participates:

| Pension Fund | Expiration Date of Collective Bargaining Agreements | Most Significant Collective Bargaining Agreements[1] | |
|---|---|---|---|
| | | Count | Expiration |
| SO CA UFCW Unions & Food Employers Joint Pension Trust Fund | June 2024 to March 2025 | 2 | June 2024 to March 2025 |
| UFCW Consolidated Pension Plan | February 2023 to July 2026 | 3 | February 2024 to March 2026 |
| Desert States Employers & UFCW Unions Pension Plan | April 2023 to June 2025 | 1 | October 2023 |
| Sound Variable Annuity Pension Trust | June 2023 to February 2026 | 5 | May 2025 to August 2025 |
| Rocky Mountain UFCW Unions and Employers Pension Plan | January 2025 to February 2025 | 2 | January 2025 |
| Oregon Retail Employees Pension Plan | August 2024 to March 2026 | 3 | August 2024 to July 2025 |
| Bakery and Confectionary Union & Industry International Pension Fund | April 2024 to September 2025 | 4 | May 2024 to October 2024 |
| Retail Food Employers & UFCW Local 711 Pension | April 2023 to March 2025 | 1 | March 2025 |
| UFCW International Union — Industry Variable Annuity Pension Plan | June 2025 | 1 | June 2025 |
| Western Conference of Teamsters Pension Plan | April 2023 to September 2025 | 5 | April 2024 to September 2025 |
| IBT Consolidated Pension Plan | September 2024 to September 2027 | 3 | September 2024 to September 2027 |

(1) This column represents the number of significant collective bargaining agreements and their expiration date for each of the Company's pension funds listed above. For the purposes of this table, the "significant collective bargaining agreements" are the largest based on covered employees that, when aggregated, cover the majority of the employees for which we make multi-employer contributions for the referenced pension fund.

In 2020, the Company held escrow deposits amounting to $271 due to certain restructuring agreements. These payments were included in "Prepaid and other current assets" in the Company's Consolidated Balance Sheets. These escrow deposits were paid in 2021.

Based on the most recent information available to it, the Company believes the present value of actuarial accrued liabilities in most of these multi-employer plans exceeds the value of the assets held in trust to pay benefits. Moreover, if the Company were to exit certain markets or otherwise cease making contributions to these funds, the Company could trigger a withdrawal liability. Any adjustment for withdrawal liability will be recorded when it is probable that a liability exists and it can be reasonably estimated.

The Company also contributes to various other multi-employer benefit plans that provide health and welfare benefits to active and retired participants. Total contributions made by the Company to these other multi-employer health and welfare plans were approximately $1,129 in 2022, $1,197 in 2021, and $1,262 in 2020.

## 16. PROPOSED MERGER WITH ALBERTSONS COMPANIES, INC.

As previously disclosed, on October 13, 2022, the Company entered into a merger agreement with Albertsons pursuant to which all of the outstanding shares of Albertsons common and preferred stock (on an as converted basis) automatically will be converted into the right to receive $34.10 per share, subject to certain reductions described below. This price implies a total enterprise value of approximately $24,600, including the assumption of approximately $4,700 of Albertsons net debt.

PX6009-201

In connection with obtaining the requisite regulatory clearance necessary to consummate the transaction, the Company and Albertsons expect to make store divestitures. Subject to the outcome of the divestiture process and as described in the merger agreement, Albertsons is prepared to establish an Albertsons subsidiary ("SpinCo"). SpinCo would be spun-off to Albertsons shareholders immediately prior to the closing of the merger and operate as a standalone public company. The Company and Albertsons have agreed to work together to determine which stores, if any, would comprise SpinCo, as well as the pro forma capitalization of SpinCo. The per share cash purchase price of $34.10 payable to Albertsons shareholders in the merger would be reduced by an amount equal to (i) $6.85, which is the per share amount of a special pre-closing cash dividend that was paid on January 20, 2023 to Albertsons shareholders of record as of October 24, 2022 plus (ii) three times the four-wall adjusted EBITDA for the stores contributed to SpinCo., if any, divided by the number of shares of Albertsons common stock (including shares of Albertsons common stock issuable upon conversion of Albertsons preferred stock) outstanding as of the record date for the spin-off. The Company and Albertsons continue to work to determine whether any stores will be contributed to SpinCo. The current adjusted per share cash purchase price is expected to be $27.25, pending determination of any required adjustments for SpinCo.

In connection with the merger agreement, on October 13, 2022, the Company entered into a commitment letter with certain lenders pursuant to which the lenders have committed to provide a $17,400 senior unsecured bridge term loan facility, which, if entered into, would mature 364 days after the closing date of the merger. The commitments are intended to be drawn to finance the merger with Albertsons only to the extent the Company does not arrange for alternative financing prior to closing. As alternative financing for the merger is secured, the commitments with respect to the bridge term loan facility under the commitment letter will be reduced. Upfront fees with respect to the bridge term loan facility are included in "Financing fees paid" in the Company's Consolidated Statements of Cash Flows and will be recognized as operating, general and administrative expense in the Company's Consolidated Statements of Operations over the commitment period.

On November 9, 2022, the Company executed a term loan credit agreement with certain lenders pursuant to which the lenders committed to provide, contingent upon the completion of the merger with Albertsons and certain other customary conditions to funding, (1) senior unsecured term loans in an aggregate principal amount of $3,000 maturing on the third anniversary of the merger closing date and (2) senior unsecured term loans in an aggregate principal amount of $1,750 maturing on the date that is 18 months after the merger closing date (collectively, the "Term Loan Facilities"). Borrowings under the Term Loan Facilities will be used to pay a portion of the consideration and other amounts payable in connection with the merger with Albertsons. The entry into the term loan credit agreement reduces the commitments under the Company's $17,400 bridge facility commitment by $4,750. Borrowings under the Term Loan Facilities will bear interest at rates that vary based on the type of loan and the Company's debt rating. In addition to the sources of financing described above, the Company expects to finance the transaction with senior notes issuances, borrowings under its commercial paper program, bank credit facility capacity and cash on hand.

The agreement provides for certain termination rights for the Company and Albertsons, including if the closing does not occur on or prior to January 13, 2024 (the "Outside Date"), provided that the Outside Date may be extended by either party for up to 270 days in the aggregate. The Company will be obligated to pay a termination fee of $600 if the merger agreement is terminated by either party in connection with the occurrence of the Outside Date, and, at the time of such termination, all closing conditions other than regulatory approval have been satisfied. The transaction is expected to close in early 2024, subject to the receipt of required regulatory clearance and other customary closing conditions.

## 17.  RECENTLY ISSUED ACCOUNTING STANDARDS

In September 2022, the FASB issued ASU No. 2022-04, "Liabilities - Supplier Finance Programs (Subtopic 405-50): Disclosure of Supplier Finance Program Obligations". This guidance requires annual and interim disclosures for entities that use supplier finance programs in connection with the purchase of goods and services. These amendments are effective for fiscal years beginning after December 15, 2022, except for the amendment on roll forward information, which is effective for fiscal years beginning after December 15, 2023. The Company is currently assessing the effect that adoption of this guidance will have on its Consolidated Financial Statements.

PX6009-202

**ITEM 9.    CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE.**

None.

**ITEM 9A.    EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES.**

As of January 28, 2023, our Chief Executive Officer and Chief Financial Officer, together with a disclosure review committee appointed by the Chief Executive Officer, evaluated the Company's disclosure controls and procedures.  Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective as of January 28, 2023.

**CHANGES IN INTERNAL CONTROL OVER FINANCIAL REPORTING**

The Company is in the process of implementing a broad, multi-year, technology transformation project to modernize mainframe, middleware and legacy systems to achieve better process efficiencies across customer service, merchandising, sourcing, payroll and accounting through the use of various solutions. Implementation of new accounting ERP modules for general ledger, accounts receivable, accounts payable, fixed assets and a new indirect procurement module were implemented at the beginning of the first quarter of 2021. In the third quarter of 2022, a new payroll module was implemented.  Additional phases of the project will continue to be implemented over the next several years. As of January 28, 2023, there have been no material additional implementations of modules since the third quarter of 2022.  As the Company's technology transformation project continues, the Company continues to emphasize the maintenance of effective internal controls and assessment of the design and operating effectiveness of key control activities throughout development and deployment of each phase and will evaluate as additional phases are deployed.

There were no changes in Kroger's internal control over financial reporting that materially affected, or were reasonably likely to materially affect, Kroger's internal control over financial reporting during the quarter ended January 28, 2023.

**MANAGEMENT'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING**

Management is responsible for establishing and maintaining adequate internal control over financial reporting for the Company.  With the participation of the Chief Executive Officer and the Chief Financial Officer, our management conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework and criteria established in *Internal Control — Integrated Framework (2013)*, issued by the Committee of Sponsoring Organizations of the Treadway Commission.  Based on the evaluation, management has concluded that the Company's internal control over financial reporting was effective as of January 28, 2023.

The effectiveness of the Company's internal control over financial reporting as of January 28, 2023, has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report, which can be found in Item 8 of this Form 10-K.

**ITEM 9B.    OTHER INFORMATION.**

None.

**ITEM 9C.  DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS.**

Not applicable.

PX6009-203

## PART III

### ITEM 10.    DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE.

Our board of directors has adopted The Kroger Co. Policy on Business Ethics, applicable to all officers, employees and directors, including Kroger's principal executive, financial and accounting officers. The Policy on Business Ethics is available on our website at ir.kroger.com under Investors – Governance – Policy on Business Ethics. A copy of the Code of Ethics is available in print free of charge to any shareholder who requests a copy. Shareholders may make a written request to Kroger's Secretary at our executive offices at 1014 Vine Street, Cincinnati, Ohio 45202. We intend to satisfy the disclosure requirement regarding any amendment to, or a waiver from, a provision of the Policy on Business Ethics for our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions, by posting such information on our website.

The information required by this Item 10 with respect to executive officers is included within Item 1 in Part I of this Annual Report on Form 10-K under the caption "Information about our Executive Officers."  The information required by this Item not otherwise set forth in Part I above or in this Item 10 of Part III is set forth under the headings Election of Directors, Information Concerning the Board of Directors- Committees of the Board, Information Concerning the Board of Directors- Audit Committee and Delinquent 16(a) Reports, if required, in the definitive proxy statement to be filed by the Company with the Securities and Exchange Commission within 120 days after the end of the fiscal year 2022 (the "2023 proxy statement") and is hereby incorporated by reference into this Form 10-K.

### ITEM 11.    EXECUTIVE COMPENSATION.

The information required by this Item is set forth in the sections entitled Compensation Discussion and Analysis, Compensation Committee Report, and Compensation Tables in the 2023 proxy statement and is hereby incorporated by reference into this Form 10-K.

### ITEM 12.    SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS.

The following table provides information regarding shares outstanding and available for issuance under our existing equity compensation plans:

#### Equity Compensation Plan Information

| Plan Category | (a) Number of securities to be issued upon exercise of outstanding options, warrants and rights[1] | (b) Weighted-average exercise price of outstanding options, warrants and rights[1] | (c) Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 20,021,688 | $ 30.81 | 53,470,441 |
| Equity compensation plans not approved by security holders | — | $ — | — |
| Total | 20,021,688 | $ 30.81 | 53,470,441 |

(1) The total number of securities reported includes the maximum number of common shares, 3,383,338, that may be issued under performance units granted under our long-term incentive plans. The nature of the awards is more particularly described in the Compensation Discussion and Analysis section of the definitive 2023 proxy statement and is hereby incorporated by reference into this Form 10-K. The weighted-average exercise price in column (b) does not take these performance unit awards into account. Based on historical data, or in the case of the awards made in 2020 through 2022 and earned in 2022 the actual payout percentage, our best estimate of the number of common shares that will be issued under the performance unit grants is approximately 3,872,462.

PX6009-204

The remainder of the information required by this Item is set forth in the section entitled Beneficial Ownership of Common Stock in the 2023 proxy statement and is hereby incorporated by reference into this Form 10-K.

**ITEM 13.    CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE.**

The information required by this Item is set forth in the sections entitled Related Person Transactions and Information Concerning the Board of Directors-Independence in the 2023 proxy statement and is hereby incorporated by reference into this Form 10-K.

**ITEM 14.    PRINCIPAL ACCOUNTING FEES AND SERVICES.**

The information required by this Item is set forth in the section entitled Ratification of the Appointment of Kroger's Independent Auditor in the 2023 proxy statement and is hereby incorporated by reference into this Form 10-K.

PX6009-205

PART IV

**ITEM 15.    EXHIBITS, FINANCIAL STATEMENT SCHEDULES.**

(a)1.†    Financial Statements:
Report of Independent Registered Public Accounting Firm (PCAOB ID 238)
Consolidated Balance Sheets as of January 28, 2023 and January 29, 2022
Consolidated Statements of Operations for the years ended January 28, 2023, January 29, 2022 and January 30, 2021
Consolidated Statements of Comprehensive Income for the years ended January 28, 2023, January 29, 2022 and January 30, 2021
Consolidated Statements of Cash Flows for the years ended January 28, 2023, January 29, 2022 and January 30, 2021
Consolidated Statement of Changes in Shareholders' Equity for the years ended January 28, 2023, January 29, 2022 and January 30, 2021
Notes to Consolidated Financial Statements

(a)2.    Financial Statement Schedules:
There are no Financial Statement Schedules included with this filing for the reason that they are not applicable or are not required or the information is included in the financial statements or notes thereto.

(a)3.(b)    Exhibits

2.1    Agreement and Plan of Merger, dated as of October 13, 2022, by and among the Company, Parent and Merger Sub, is hereby incorporated by reference to Exhibit 2.1 of the Company's 8-K filed with the SEC on October 14, 2022.

3.1    Amended Articles of Incorporation are hereby incorporated by reference to Exhibit 3.1 of the Company's Quarterly Report on Form 10-Q for the quarter ended May 22, 2010, as amended by the Amendment to Amended Articles of Incorporation, which is hereby incorporated by reference to Exhibit 3.1 of the Company's Quarterly Report on Form 10-Q for the quarter ended May 23, 2015.

3.2    The Company's Regulations are hereby incorporated by reference to Exhibit 3.1 of the Company's Current Report on Form 8-K filed with the SEC on June 27, 2019.

4.1    Instruments defining the rights of holders of long-term debt of the Company and its subsidiaries are not filed as Exhibits because the amount of debt under each instrument is less than 10% of the consolidated assets of the Company.  The Company undertakes to file these instruments with the SEC upon request.

4.2    Description of Securities.  Incorporated by reference to Exhibit 4.2 of the Company's Annual Report on Form 10-K for the fiscal year ended February 1, 2020.

10.1*    The Kroger Co. Deferred Compensation Plan for Independent Directors. Incorporated by reference to Exhibit 10.2 of the Company's Annual Report on Form 10-K for the fiscal year ended January 30, 2016.

10.2*    The Kroger Co. Executive Deferred Compensation Plan.  Incorporated by reference to Exhibit 10.4 of the Company's Annual Report on Form 10-K for the fiscal year ended January 29, 2005.

10.3*    The Kroger Co. 401(k) Retirement Savings Account Restoration Plan. Incorporated by reference to Exhibit 10.4 of the Company's Annual Report on Form 10-K for the fiscal year ended February 3, 2007.

10.4*    The Kroger Co. Supplemental Retirement Plans for Certain Retirement Benefit Plan Participants. Incorporated by reference to Exhibit 10.6 of the Company's Annual Report on Form 10-K for the fiscal year ended February 3, 2007.

10.5*    The Kroger Co. Employee Protection Plan dated January 13, 2017. Incorporated by reference to Exhibit 10.5 of the Company's Annual Report on Form 10-K for the fiscal year ended January 28, 2017.

10.6    Term Loan agreement, dated as of November 9, 2022, by and among The Kroger Co., the lenders from time to time party thereto, and Citibank, N.A., as administrative agent for the lenders, incorporated by reference to Exhibit 10.1 of the Company's Current Report on Form 8-K filed with the SEC on November 10, 2022.

PX6009-206

| 10.7 | Amendment No. 1 to Credit Agreement, dated as of November 9, 2022, by and among The Kroger Co., the lenders party thereto, and Bank of America, N.A., as paying agent to the Amended and Restated Credit Agreement dated July 6, 2021, incorporated by reference to Exhibit 10.2 of the Company's Current Report on Form 8-K filed with the SEC on November 10, 2022. |
|---|---|
| 10.8 | The Kroger Co. 2008 Long-Term Incentive and Cash Bonus Plan. Incorporated by reference to Exhibit 4.2 of the Company's Form S-8 filed with the SEC on June 26, 2008. |
| 10.9 | The Kroger Co. 2011 Long-Term Incentive and Cash Bonus Plan. Incorporated by reference to Exhibit 4.2 of the Company's Form S-8 filed with the SEC on June 23, 2011. |
| 10.10 | The Kroger Co. 2014 Long-Term Incentive and Cash Bonus Plan. Incorporated by reference to Exhibit 4.2 of the Company's Form S-8 filed with the SEC on July 29, 2014. |
| 10.11* | The Kroger Co. 2019 Long-Term Incentive Plan.  Incorporated by reference to Exhibit 99.1 of the Company's Form S-8 filed with the SEC on June 28, 2019. |
| 10.12* | Form of Restricted Stock Grant Agreement under Long-Term Incentive Cash Bonus Plans.  Incorporated by reference to Exhibit 10.11 of the Company's Annual Report on Form 10-K for the fiscal year ended February 1, 2020. |
| 10.13* | Form of Restricted Stock Grant Agreement under Long-Term Incentive and Cash Bonus Plans. Incorporated by reference to Exhibit 10.9 of the Company's Annual Report on Form 10-K for the fiscal year ended February 3, 2007. |
| 10.14* | Form of Non-Qualified Stock Option Grant Agreement under Long-Term Incentive and Cash Bonus Plan. Incorporated by reference to Exhibit 10.13 of the Company's Annual Report on Form 10-K for the fiscal year ended February 1, 2020. |
| 10.15* | Form of Non-Qualified Stock Option Grant Agreement under Long-Term Incentive and Cash Bonus Plans. Incorporated by reference to Exhibit 10.1 of the Company's Quarterly Report on Form 10-Q for the quarter ended May 24, 2008. |
| 10.16* | Form of Performance Unit Award Agreement under Long-Term Incentive and Cash Bonus Plans. Incorporated by reference to Exhibit 10.15 of the Company's Annual Report on Form 10-K for the fiscal year ended February 1, 2020. |
| 10.17* | Form of Restricted Stock Grant Agreement under Long-Term Incentive and Cash Bonus Plan.  Incorporated by reference to Exhibit 10.16 of the Company's Annual Report on Form 10-K for the fiscal year ended January 30, 2021. |
| 21.1 | Subsidiaries of the Registrant. |
| 23.1 | Consent of Independent Registered Public Accounting Firm. |
| 24.1 | Powers of Attorney. |
| 31.1 | Rule 13a-14(a)/15d-14(a) Certification. |
| 31.2 | Rule 13a-14(a)/15d-14(a) Certification. |
| 32.1 | Section 1350 Certifications. |
| 101.INS | XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. |
| 101.SCH | XBRL Taxonomy Extension Schema Document. |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document. |

PX6009-207

## <u>SIGNATURES</u>

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Company has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

THE KROGER CO.

Dated: March 28, 2023

/s/ W. Rodney McMullen
W. Rodney McMullen
Chairman of the Board and Chief Executive Officer
(principal executive officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Company and in the capacities indicated on the 28th of March 2023.

| | |
|---|---|
| /s/ Gary Millerchip | Senior Vice President and Chief Financial Officer |
| Gary Millerchip | (principal financial officer) |
| | |
| /s/ Todd A. Foley | Group Vice President & Corporate Controller |
| Todd A Foley | (principal accounting officer) |
| | |
| * | Director |
| Nora A. Aufreiter | |
| * | Director |
| Kevin M. Brown | |
| * | Director |
| Elaine L. Chao | |
| * | Director |
| Anne Gates | |
| * | Director |
| Karen M. Hoguet | |
| * | Chairman of the Board and Chief Executive Officer |
| W. Rodney McMullen | |
| * | Director |
| Clyde R. Moore | |
| * | Director |
| Ronald L. Sargent | |
| * | Director |
| J. Amanda Sourry Knox | |
| * | Director |
| Mark S. Sutton | |
| * | Director |
| Ashok Vemuri | |

\* By: /s/ Christine S. Wheatley
   Christine S. Wheatley
   Attorney-in-fact

PX6009-209

SHAREHOLDERS: EQ Shareowner Services is Registrar and Transfer Agent for Kroger's common shares.  For questions concerning payment of dividends, changes of address, etc., individual shareholders should  contact:

EQ Shareowner Services
P. O. Box 64854
Saint Paul, MN 55164-
0854  Toll Free 1-855-
854-1369

Shareholder questions and requests for forms available on the Internet should be directed to: www.shareowneronline.com.

FINANCIAL INFORMATION: Call (513) 762-1220 (option "1") to request printed financial information,  including Kroger's most recent report on Form 10-Q or 10-K, or press release. Written inquiries should be  addressed to Shareholder Relations, The Kroger Co., 1014 Vine Street, Cincinnati, Ohio 45202-1100.  Information also is available on Kroger's corporate website at ir.kroger.com.

Kroger has a variety of plans under which employees may acquire common shares of Kroger. Employees  of Kroger and its subsidiaries own shares through a profit sharing plan, as well as 401(k) plans and a payroll  deduction plan called the Kroger Stock Exchange. If employees have questions concerning their shares in the  Kroger Stock Exchange, or if they wish to sell shares they have purchased through this plan, they should contact:

Computershare Plan
Managers PO Box 505039
Louisville, KY 40233-
5039
Phone 800 872 3307

Questions regarding Kroger's 401(k) plans should be directed to the employee's Human Resources  Department or 1-800-2KROGER. Questions concerning any of the other plans should be directed to the  employee's Human Resources Department.

## EXECUTIVE OFFICERS

**Mary Ellen Adcock**
Senior Vice President, Operations

**Carin L. Fike**
Vice President and Treasurer

**Timothy A. Massa**
Senior Vice President and
Chief People Officer

**Stuart W. Aitken**
Senior Vice President and Chief
Merchandising & Marketing Officer

**Todd A. Foley**
Group Vice President, Controller

**W. Rodney McMullen**
Chairman of the Board and
Chief Executive Officer

**Gabriel Arreaga**
Senior Vice President

**Valerie L. Jabbar**
Senior Vice President

**Gary Millerchip**
Senior Vice President and
Chief Financial Officer

**Yael Cosset**
Senior Vice President and
Chief Information Officer

**Kenneth C. Kimball**
Senior Vice President

**Christine S. Wheatley**
Senior Vice President, General
Counsel and Secretary

## OPERATING UNIT HEADS

**Jake Cannon**
Louisville Division

**Colleen Juergensen**
Central Division

**Ann M. Reed**
Cincinnati Division

**Micheal E. Cristal**
Delta Division

**Todd A. Kammeyer**
Fred Meyer Stores

**David W. Richard**
QFC

**Tammy DeBoer**
Harris Teeter

**Bryan H. Kaltenbach**
Food 4 Less

**Thomas L. Schwilke**
Ralphs

**Ken DeLuca**
Michigan Division

**Joe Kelley**
King Soopers/City Market

**Keith Shoemaker**
Dallas Division

**Steve Dreher**
Dillons Food Stores

**Kenneth C. Kimball**
Smith's

**Victor Smith**
Atlanta Division

**Monica Garnes**
Fry's Food & Drug

**Colleen R. Lindholz**
Kroger Health

**Jeff B. Talbot**
Kroger Personal Finance

**Laura Gump**
Houston Division

**Michael Marx**
Roundy's

**Nicholas Tranchina**
Murray's Cheese

**Sonya Hostetler**
Nashville Division

**Lori Raya**
Mid-Atlantic Division

**Dana Zurcher**
Columbus Division

**Erik Jensen**
Home Chef

PX6009-211



www.thekrogerco.com

The Kroger Co.

1014 Vine Street  ·  Cincinnati, Ohio 45202  ·  513-762-4000




PUBLIC

**UNITED STATES OF AMERICA
BEFORE THE FEDERAL TRADE COMMISSION**

| | |
|---|---|
| **In the Matter of** | |
| **Cerberus Institutional Partners V, L.P.** <br> **a limited partnership;** | |
| **AB Acquisition LLC,** <br> **a limited liability company;** | **Docket No. C-4504** <br> **PUBLIC VERSION** |
| **and** <br> **Safeway Inc.,** <br> **a corporation** | |

**APPLICATION FOR APPROVAL OF PROPOSED SALE OF
SUPERVALU ASSETS TO SAAR'S AND REQUEST FOR EXPEDITED TREATMENT**

Pursuant to Section 2.41(f) of the Federal Trade Commission ("Commission") Rules of Practice and Procedure, 16 C.F.R § 2.41(f) (2016), and Paragraph VII of the Commission's Decision and Order in the above-captioned matter, SuperValu Inc. ("SuperValu") hereby petitions the Commission to approve the proposed sale of a supermarket located in Lake Stevens, Washington to Saar's Inc. ("Saar's") and affiliates.

## I.    INTRODUCTION

On March 6, 2014, AB Acquisition LLC ("Albertson's") and Safeway Inc. ("Safeway") entered into an agreement whereby Albertson's would acquire all outstanding shares of Safeway in a transaction valued at approximately $9.2 billion. On January 17, 2015, the Commission issued a complaint alleging that the transaction would substantially lessen competition for the retail sale of food and other grocery products in supermarkets located in 130 local markets. On the same day, the Commission accepted an Agreement Containing Consent Order, including a proposed Decision and Order and an Order to Maintain Assets, resolving the charges in the

PX6010-001

complaint. Following a public comment period, the Commission approved the final Decision and Order ("Order") on July 2, 2015.

The Order required Albertson's, its parent company Cerberus Institutional Partners V, L.P., and Safeway to divest 168 supermarkets located in Arizona, California, Nevada, Oregon, and Washington to various approved buyers. Paragraph II.A.4 of the Order required the divestiture of two supermarkets to SuperValu within 100 days of closing: (1) Albertson's Store No. 459, located at 14019 Woodinville-Duvall Road, Woodinville, Washington (King County); and (2) Albertson's Store No. 477, located at 303 91st Avenue NE, Lake Stevens, Washington (Snohomish County) ("Lake Stevens Store") (collectively, the "SuperValu Divestiture Assets"). The Order further provides that for three years following the Order's date of issuance, SuperValu must obtain the Commission's prior approval for the sale of any SuperValu Divestiture Assets, and may only sell such assets to a buyer approved by the Commission.

SuperValu has entered into a definitive agreement to sell the Lake Stevens Store to Saar's ("Transaction"). SuperValu hereby requests the Commission to approve the proposed Transaction. This petition outlines the principal terms of the Transaction, describes SuperValu's rationale for the proposed Transaction and its efforts to shop the assets to potential buyers, and explains why the proposed Transaction merits Commission approval. The Commission should approve the proposed Transaction because (1) ██████████████████████████ ████████████████████████████████████ Saar's is a strong value-driven supermarket operator with a proven track record of success in markets such as Lake Stevens; and (2) Saar's has the financial strength, operational capability, and strategic direction necessary to operate the Lake Stevens Store competitively, as well as a commitment to grow using SuperValu

PX6010-002

as its wholesaler. For these reasons, sale of the Lake Stevens Store to Saar's will promote competition and advance the objectives of the Commission's Order.

## II.    REQUEST FOR EXPEDITED TREATMENT

SuperValu desires to complete the proposed Transaction as soon as possible following Commission approval. The Lake Stevens Store has been closed since September 2016. Expedited review and consummation of the transaction would allow Saar's to reopen the store quickly, move forward with its business plans to operative the store competitively, and provide a valuable competitive alternative to consumers in the Lake Stevens area. It would also enable SuperValu to mitigate its continuing losses from holding this closed store. In light of these circumstances and the clear bases for approval set forth below, SuperValu requests that the Commission shorten the customary 30-day public comment period as permitted under Section 2.41(f)(2) of the Commission Rules of Practice and Procedure, 16 C.F.R. § 2.41(f)(2), and approve the proposed Transaction by February 25, 2017, which marks the end of SuperValu's fiscal year.

## III.    TRANSACTION DESCRIPTION

On January 12, 2017, a Purchase and Sale Agreement ("PSA"), attached herewith as Exhibit A, was executed by and between SUPERVALU WA, L.L.C.; SUPERVALU Holdings, Inc. (collectively, "SUPERVALU"); Saar Properties VIII, LLC; and Saar's Inc. (collectively, "SAAR"). Pursuant to the PSA, SUPERVALU will sell to SAAR the Lake Stevens Store, located at 303 91st Avenue NE, Lake Stevens, Washington (Snohomish County) ("Property"), certain improvements thereto ("Improvements"), and all furniture, equipment, trade fixtures, and personal property located therein ("FFE"). ████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

3

PUBLIC

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

## IV.    TRANSACTION RATIONALE

### A.  SuperValu's Reasons for Pursuing the Transaction

SuperValu acquired the Lake Stevens Store on April 30, 2015. SuperValu operated the store as a company-owned County Market from May 2015 until September 2016, when it closed the store due to poor performance ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████    SuperValu's costs to maintain the closed store are significant.

### B.  Saar's is a Successful Value-Driven Supermarket Retailer

Saar's is an independent, value-driven supermarket retailer headquartered in Auburn, Washington. Since opening its first store in 1988, Saar's has expanded to nine stores in the greater Puget Sound area.[1] Saar's value-driven retail format is focused on tailoring each store's merchandise and footprint to the demographics of the surrounding community. Saar's has had success with this value-driven format. The company had 2015 sales of approximately ████

████████████████████████████. Saar's financial statements for the last three years (2014, 2015, and 2016 through October 2016), and its most recent, regularly prepared balance sheet (Q3

---

[1] Saar's currently owns and operates stores in Port Orchard, Parkland, Renton, Oak Harbor, Seattle, Tukwila, Bremerton, and Auburn. The nearest Saar's store to the Lake Stevens Store is 38 miles away, in Renton, a suburb of Seattle. ████████████████████████████

4

PUBLIC

2016) are attached herewith as Exhibits B, C, and D. A company profile of Saar's is attached herewith as Exhibit E.

### C. Saar's is a Financially Sound Buyer Capable of Operating the Lake Stevens Store Competitively

SuperValu marketed the Lake Stevens Store to several SuperValu-supplied retailers, non-SuperValu-supplied retailers, and third-party real estate developers. SuperValu would prefer to sell the Lake Stevens Store to an independent grocery store operator, with SuperValu as the supplier. After shopping the store to a number of potential buyers, SuperValu concluded that Saar's offered the best fit due to (1) its proven track record of success with its value-driven format in markets similar to Lake Stevens; (2) its ability to fill a competitive need in the Lake Stevens community; (3) its overall financial and operational strength, including robust sales expectations; and (4) its desire to grow using SuperValu as its wholesaler.

## V.    CONCLUSION

For the foregoing reasons, SuperValu respectfully requests that the Commission expeditiously approve the proposed Transaction as soon as practicable during the public comment period, and in any event before February 25, 2017.

## VI.    REQUEST FOR CONFIDENTIAL TREATMENT

This application contains confidential, competitively sensitive information regarding the transaction, the Lake Stevens Store, and the business activities of SuperValu and Saar's. Disclosure of this information would prejudice SuperValu and Saar's and harm the ability of each company to compete effectively. Accordingly, pursuant to Sections 2.41(f)(4), 4.9(c), and 4.10(a)(2) of the Commission's Rules of Practice and Procedure, 16 C.F.R. §§ 2.41(f)(4), 4.9(c), 4.10(a)(2), and Sections 6(f) and 21(c) of the Federal Trade Commission Act, 15 U.S.C. §§ 46(f), 57b-2(c), SuperValu requests that this information be treated as strictly confidential. In

5

accordance with Section 4.2(d) of the Commission's Rules of Practice and Procedure, SuperValu

is submitting a public version of the application with confidential information redacted, as well

as a confidential version including such information.

Respectfully Submitted,

Vishal Mehta
Baker Botts LLP
1299 Pennsylvania Ave., NW
Washington, D.C. 20004

Counsel for SuperValu, Inc.

Dated: February 6, 2017

PX6010-006

**PUBLIC**

# Exhibit A

# Purchase and Sale Agreement

# REDACTED

**PUBLIC**

# Exhibit B

# Saar's, Inc. Financial Statement (2014)

# REDACTED

**PUBLIC**

# Exhibit C

# Saar's, Inc. Financial Statement (2015)

# REDACTED

PUBLIC

# Exhibit D

# Saar's, Inc. Financial Statement and Balance Sheet (2016)

# REDACTED

**PUBLIC**

# Exhibit E

# Saar s Inc. Company Profile

PX6010-011

PUBLIC

# Retailer Profile

| | |
|---|---|
| *Name of Retailer* | Saar's Marketplace & Saar's Super Saver  |
| *Office Address* | **1702 Auburn Way N**<br>**Auburn, WA. 98002** |
| *Key Retailer Players (Name/Title)* | **Greg Saar, Owner**<br>**John Hames, General Manager**<br>**Mary Garner, Buyer**<br>**Brian Crofts, Meat & Deli Supervisor/Buyer** |
| *Brief Company History* | Greg originally started with a Thriftway store in Oak Harbor nearly 3 decades ago. Since then they have re-invented the company into a powerhouse organization focused as a price operator that also caters to the various ethnic communities surrounding their locations. Each store is merchandised differently depending on the ethnic demographics of the community they serve. The most recent location in Auburn is their largest store at 65,000 square feet. Saar's currently has 9 locations located in the greater Puget Sound area. The locations are in Port Orchard, Parkland, Renton, Oak Harbor, Seattle (2), Tukwila, Bremerton & Auburn. |

**Following is from a news release done at the opening of the White Center location:**

When Greg Saar opened the first Saar's Market Place grocery store in 1988, the company was founded on a platform of providing variety and value. Over the last 20 years, Saar's has taken that platform, originally built in Oak Harbor, Wash., and successfully expanded to 9 locations thanks to the work of long tenured employees.

"We always say we are both a great place to work and shop," said John Hames, general manager. "We have some people who have been here for 20 years, we have less turnover and better loyalty than others, and the senior staff, store directors, and store staff are really the ones driving this business."

Each Saar's location is different. Saar's doesn't have a specific footprint for each store. Instead, the company takes a niche marketing approach based on appealing to the demographic around the store. The key is finding a location with a

PUBLIC

population looking for the variety and value Saar's stores offer. Some locations are tailored to local ethnic groups. Hames said each store has a different concentration of Hispanic, Asian, Eastern European, or traditional American consumers. "We market each store according to its specific demographic while keeping with our overall strategy," he said.

The company drives its center store with what it calls category killers. Although Saar's may not have a particularly deep SKU count, the company will source extreme value items and display them in four-foot display bunkers within their product category. The idea is to drive sales and the Saar's price image through merchandising category killers.

This is important given current economic conditions. Hames said Saar's customers are looking for more value than ever. Since Saar's is a value-driven store, this presents an opportunity with customers who are looking to make the change from national brands to private labels. Hames said the company has seen a dramatic increase in coupon sales. Saar's has a weekly flyer and an active web-site that highlights a different event each week, be it a meat sale, produce sale, or $0.99 sale.

"We are event-driven, and we drive our sales based on those events," Hames said. "We don't use a loyalty card program because we feel that loyalty is old fashioned and earned with good pricing for everyone, good service, clean stores, and special events to make a fun shopping experience. That will drive loyalty the old fashioned way—by earning it."

PUBLIC

# Ad Program



**Mother's Day 12-Inch Hanging Baskets**

Assorted Varieties

$12.99

**Bone-In Beef Rib Steak**

5 lbs. or More

$4.49 lb.

Recipe: Mediterranean Steak Sandwiches

**Boneless Beef Bottom Round or Shoulder Clod Roast**

5 lbs. or More

$3.29 lb.

Recipe: Savory Beef Stew with Roasted Balsamic Vegetables

**Fryer Drumsticks or Thighs**

10 lbs. or More

99¢ lb.

Recipe: Crispy Ranch Chicken

**Pork Spareribs Tips**

Whole in the Bag

$1.99 lb.

PUBLIC

## Greg Saar – left, Kyle Saar – right



## John Hames – left, Mary Garner – right



PUBLIC

# White Center, Seattle





PUBLIC



## White Center Grand Opening



PUBLIC

# Bunker Merchandising – White Center





PUBLIC

# AUBURN STORE





PUBLIC





PUBLIC





PX6010-021

PUBLIC







PUBLIC







PUBLIC





PUBLIC





**PUBLIC**





**KROGER CORPORATE > ABOUT KROGER > HISTORY**



# The History of Kroger

Our story began in 1883 when Barney Kroger invested his life savings of $372 to open a single grocery store at 66 Pearl Street in downtown Cincinnati. He had a simple motto: "Be particular. Never sell anything you would not want yourself."

Nearly 140 years later, the Kroger Company is still particular about how we serve customers and community, how we innovate and who we hire. As the nation's largest grocer with nearly 2,800 stores in 35 states operating under 28 different names, we meet our customers' changing needs by making fresh food accessible to all. Our current practices are rooted in Barney Kroger's early efforts to serve customers through food freshness, low prices and innovation—fundamentals that remain at the heart of our

PX6030-001

Kroger mission today. This is the story of all the people in our history who helped change the way we shop. People who continue to make a difference in the lives of our customers every day.

# A History of Innovation Inspires Today's Shopping Experience

Barney was a born innovator–always looking for new ways to serve customers. In the early 1900s, grocers typically purchased bread from local bakeries then resold it. Bread, Barney reasoned, was the most basic of staples and something he sold a lot of. He realized if he could bake the bread himself, he'd cut his costs and offer customers a fresher loaf at a lower price.

### Innovation #1: One-Stop Shopping

Early on, people had to shop a butcher, a baker, and a grocer. Barney knew it would be simpler and more convenient if they could buy everything at one stop from one store, so 1901, Kroger became the first grocer in the country to establish its own bakeries, followed by integration of the meat department.

Today one-stop shopping has grown into something that would make Barney smile—a complete shopping universe with endless variety, in-store dining, wine and cheese shops, sushi and even Starbucks.

PX6030-002

## Innovation #2: Private Label Manufacturing

Ever the innovator, Barney saw the potential in making his own products. When farmers rolled into town with a harvest bounty of cabbage, Barney saw it was cheap and he bought a lot; more than he could sell—but he had an idea! He took that cabbage home to his mother, and she turned it into lots of delicious sauerkraut. He knew his German Cincinnati customers would love it, and he was right.

The little manufacturing effort born in Mrs. Kroger's kitchen was the beginning of something big—today, we're the largest food manufacturing business in America. Kroger operates our 35 food manufacturing facilities that make everything from bread, cookies and milk to soda pop, ice cream and peanut butter. About 40% of private-label items are made at one of our Kroger manufacturing plants. They account for 26% of Kroger's total store dollar sales, giving our company a significant strategic advantage. We offer an array of private label brands at every price point. With dozens of manufacturing facilities and distribution centers around the country, we also have one of the largest privately-owned truck fleets in the country.

## Innovation #3: Grocery Delivery

What began with a horse named Dan, has grown into a national grocery delivery service. In his early days, Barney would saddle up his horse Dan to his wagon and deliver groceries to customer around the greater Cincinnati, Ohio area.

PX6030-003

History – The Kroger Co.

Today, collaborative work with specialized technology partners gives us the expertise to offer our customers even more. Kroger has partnered with Nuro (Robotics), Kitchen United (food delivery systems), Microsoft, and Ocado (a world leader in grocery ecommerce technology) to help optimize an anything, anytime, anywhere customer experience. Exciting new Drone Express technology allows delivery not only to a street address but to the exact location of a customer's smartphone. Now, customers will be able to order delivery of picnic supplies to a park, sunscreen to the beach, or condiments to a backyard cookout! We also partner with DoorDash to deliver Kroger Sushi to customers.

## Innovation #4: Product Quality Monitoring & Testing

Throughout our history, we have been both innovator and pioneer in the food retail industry. During the 1930s, we were the first grocery chain to routinely monitor product quality and scientifically test foods.

In 2012, the company's long-standing commitment to food safety and quality earned it the highly prestigious Black Pearl Award, awarded to only one company each year by the International Association for Food Protection.

## Innovation #5: The Electronic Scanner

In 1972, Kroger became the first grocery retailer in America to test an electronic scanner. Visitors from around the country attended the event in a suburban Cincinnati store. Technology is key at store operations today. Kroger

pioneered QueVision, a faster checkout program that has reduced the time customers wait in line to check out, on average, from four minutes in 2010 to less than 30 seconds in stores today.



PX6030-005

With nearly 2,800 stores in 35 states under two dozen banners and annual sales of more than $132.5 billion, Kroger today ranks as one of the world's largest retailers.



# Bigger Stores, Better Services

In the 1980s, our supermarkets evolved into combination stores, adding pharmacy, beauty and health care to a growing store selection. Our stores today offer everything from basic grocery staples to organic vegetables, natural foods, and hot meals ready to eat. We operate more than 2,255 in-store pharmacies that fill 238 million prescriptions a year. Floral shops boom with enough blooms to make us the world's largest florist. And fuel centers in more than 1,545 locations let our customers gas up and save where they shop.

Our marketplace stores have elevated one-stop shopping convenience to a new level. Multi-department stores under the Fred Meyer banner are huge at over 161,000 square feet. We offer a store format for every kind of shopper, including price impact stores and fine jewelry stores.

# Growing by Leaps, Bounds & Mergers

Mergers have played a key role in our growth. In 1983, 100 years after our company's founding, Kroger merged with Dillon Companies Inc. in Kansas to become a coast-to-coast operator of food, drug and convenience stores. This brought not only Dillon's, but also King Soopers, Fry's, City Market and Gerbes into the Kroger family.

The biggest merger in our history came in 1999, when we merged with Fred Meyer, Inc. (owner of Smith's Ralphs, Food 4 Less and QFC) in a $13 billion deal that created a supermarket chain with the broadest geographic coverage and the widest variety of formats in the food retailing industry. That year, we also merged with JayC, Owens Market and Pay Less.

And the mergers didn't stop there. In 2001, we merged with Baker's, follower by mergers with Harris Teeter in 2014 and Roundy's, Pick 'N Save, Metro Markets and Mariano's in 2015. This expanded our reach through the Mid-Atlantic states and the northern Mid-West.

We've also expanded our business with mergers and partnerships outside the brick and mortar of a grocery store. In 2014, we merged with Vitacost.com, one of the largest pure e-commerce companies in the nutrition and healthy living market. Their platform accelerated our entry into the e-commerce space by several years, helping us serve customers through ship-to-home orders and expanding our reach into all 50 states and internationally. In 2018, we merged with Home Chef to make dinner easier for millions of Americans and partnered with Ocado to revolutionize home grocery delivery.

PX6030-007

History – The Kroger Co.

# Thriving Together Today & Tomorrow: Sustainability

Innovation is also at the heart of Kroger's sustainability efforts. In the mid-2000s, we created a process to rescue safe, edible fresh products and donate them quickly to local food banks. This model has been replicated by other retailers and today fresh products make up more than half of the food distributed nationwide by Feeding America, America's largest food bank network. Today, we partner with local resources like Last Mile Food Rescue in Cincinnati to get unused food from restaurants and institutions into areas of food scarcity.

The goal of our Environmental, Social and Governance (ESG) strategy is to achieve lasting positive impacts through a shared value framework. It benefits people and our planet and creates more resilient systems for our future. The vision for this initiative is: We imagine a world where everyone is Thriving Together. The centerpiece of our ESG strategy is the Zero Hunger | Zero Waste social and environmental impact plan. Introduced four years ago, Zero Hunger | Zero Waste is an industry-leading platform for collective action and systems change at global, national and local levels.

More than a century ago, Barney Kroger laid the foundation for what today is one of the largest companies in America. The business principles that made the first Kroger store successful in 1883—service, selection, value, and a belief that people are what matter most–continue to guide our company's operations today. As America's grocer, we take pride in bringing diverse teams with a passion for food and people together with one purpose– to feed the human spirit.

PX6030-008

# Learn More About The Kroger Co.

## Our Commitment

### SEE OUR ZERO HUNGER | ZERO WASTE PLAN

## Kroger News

### STAY UP TO DATE

## The Fact Book

### DOWNLOAD A PDF

PX6030-009



PX6030-010

**Home (https://www.thekrogerco.com/?page_id=50)**

**About (https://www.thekrogerco.com/about-kroger/)**

**Newsroom (https://www.thekrogerco.com/newsroom/)**

**Investors (http://ir.kroger.com/CorporateProfile)**

**Community (https://www.thekrogerco.com/community/)**

**Sustainability (https://www.thekrogerco.com/sustainability/)**

**Careers (https://www.thekrogerco.com/careers/)**

**Suppliers (https://www.thekrogerco.com/vendors-suppliers/)**

**Contact Us (https://www.thekrogerco.com/contact-us/)**

The Kroger Co.
Customer Relations
1014 Vine Street
Cincinnati, Ohio 45202-1100
(513) 762-4000

STAY CONNECTED

 (https://www.facebook.com/Kroger/)

 (https://twitter.com/kroger)
CUSTOMER

 (https://twitter.com/krogernews)
MEDIA

 (https://www.instagram.com/krogerco/?hl=en)

PX6030-011

**ⓟ** (https://www.pinterest.com/krogerco/)

**You Tube** (https://www.youtube.com/user/kroger)

Terms & Conditions (https://www.thekrogerco.com/terms-conditions/)

Privacy Policy (https://www.kroger.com/topic/privacy-policy-7)    Sitemap (https://www.thekrogerco.com/sitemap/)

All Comments © Copyright 2017 Kroger

The Kroger Co. (https://www.thekrogerco.com) All Rights Reserved

PX6030-012

# Kroger and Albertsons Companies Announce Definitive Merger Agreement



NEWS PROVIDED BY
**The Kroger Co. →**
Oct 14, 2022, 07:03 ET

---

*Establishes National Footprint to Serve America with Fresh, Affordable Food for Everyone*

*Combines Two Companies with Shared Values to Unite Around Kroger's Purpose to Feed the Human Spirit*

*Accelerates Kroger's Go-to-Market Strategy and Positions Combined Company as a Premier Omnichannel Food Retailer, Delivering Quality, Value, Convenience and Choice for Customers*

*Continuing Track Record of Investments Across Lowering Prices, Enhancing the Customer Experience, and Increasing Associate Wages and Benefits*

*Strengthens Kroger's Value Creation Model to Drive Profitability and Enhance Shareholder Returns*

*Albertsons Companies Shareholders Expected to Receive Total Consideration Valued at $34.10 Per Share*

*Kroger to Host Conference Call at 8:30 a.m. ET Today, October 14, 2022*

CINCINNATI and BOISE, Idaho, Oct. 14, 2022 /PRNewswire/ -- Kroger (NYSE: **KR**) and Albertsons Companies, Inc. (NYSE: **ACI**) today announced that they have entered into a definitive agreement under which the companies will merge two complementary organizations with iconic brands and deep roots in their local communities to establish a national footprint and unite around Kroger's Purpose to Feed the Human Spirit. Through a family of well-known and trusted supermarket banners, this combination will expand customer reach and improve proximity to deliver fresh and affordable food to approximately 85 million households with a premier omnichannel experience.

Under the terms of the merger agreement, which has been unanimously approved by the board of directors of each company, Kroger will acquire all of the outstanding shares of Albertsons Companies, Inc. ("Albertsons Cos.") common and preferred stock (on an as converted basis) for an estimated total consideration of $34.10 per share, implying a total enterprise value of approximately $24.6 billion, including the assumption of approximately $4.7 billion of Albertsons Cos. net debt. Subject to the outcome of a store divestiture process, the cash component of the $34.10 per share consideration may be reduced by the per share value of a newly created standalone public company ("SpinCo") that Albertsons Cos. is prepared to spin off at closing in conjunction with the regulatory clearance process described further in the Transaction Details below. As part of the transaction, Albertsons Cos. will pay a special cash dividend of up to $4 billion to its shareholders. The cash component of the $34.10 per share consideration will be reduced by the per share amount of the special cash dividend, which is expected to be approximately $6.85 per share. This cash dividend will be payable on November 7, 2022, to shareholders of record as of the close of business on October 24, 2022.

The purchase price represents a premium of approximately 32.8% to the unaffected closing price of Albertsons Cos. common stock on October 12, 2022, and 29.7% to the 30-day volume-weighted average price.

Together, Albertsons Cos. and Kroger currently employ more than 710,000 associates and operate a total of 4,996 stores, 66 distribution centers, 52 manufacturing plants, 3,972 pharmacies and 2,015 fuel centers. The combination creates a premier seamless ecosystem across 48 states and the District of Columbia, providing customers with a best-in-class

shopping experience across both stores and digital channels. Both Kroger and Albertsons Cos. are anchored by shared values focused on ensuring associates, customers and communities thrive. The combined company will drive profitable growth and sustainable value for all stakeholders.

Kroger has a long track record of lowering prices, improving the customer experience and investing in its associates and communities. Consistent with prior transactions, Kroger plans to invest in lowering prices for customers and expects to reinvest approximately half a billion dollars of cost savings from synergies to reduce prices for customers. An incremental $1.3 billion will also be invested into Albertsons Cos. stores to enhance the customer experience. Kroger will also build on its recent investments in associate wages, training and benefits. Kroger has invested an incremental $1.2 billion in associate compensation and benefits since 2018. The combined company expects to invest $1 billion to continue raising associate wages and comprehensive benefits after close.

"We are bringing together two purpose-driven organizations to deliver superior value to customers, associates, communities and shareholders," said Rodney McMullen, Kroger Chairman and Chief Executive Officer, who will continue serving as Chairman and CEO of the combined company. "Albertsons Cos. brings a complementary footprint and operates in several parts of the country with very few or no Kroger stores. This merger advances our commitment to build a more equitable and sustainable food system by expanding our footprint into new geographies to serve more of America with fresh and affordable food and accelerates our position as a more compelling alternative to larger and non-union competitors. As a combined entity, we will be better positioned to advance Kroger's successful go-to-market strategy by providing an incredible seamless shopping experience, expanding Our Brands portfolio, and delivering personalized value and savings. We'll also be able to further enhance technology and innovation, promote healthier lifestyles, extend our health care and pharmacy network and grow our alternative profit businesses. We believe this transaction will lead to faster and more profitable growth and generate greater returns for our shareholders."

Mr. McMullen added, "This transaction is a testament to the passion and commitment of both Albertsons Cos. and Kroger associates. Supporting and investing in our associates is foundational to both of our organizations and will continue to be a critical pillar of our success. Kroger has a track record of successful integrations that combine the strengths of each

company while maintaining and enhancing each organizations' distinctive banners and storied histories. As a combined company, we will build on our similar values to create a culture that embraces diversity, equity and inclusion and fosters a best-in-class associate experience by enabling, supporting and empowering our associates to unlock their full potential. Importantly, the merger secures union jobs and we will continue to work with local unions across America to serve our communities. We look forward to bringing the Albertsons Cos. and Kroger families together to create new and exciting career opportunities for associates."

"We have been on a transformational journey to evolve Albertsons Cos. into a modern and efficient omnichannel food and drug retailer focused on building deep and lasting relationships with our customers and communities. I am proud of what our 290,000 associates have accomplished, delivering top-tier performance while furthering our purpose to bring people together around the joys of food and to inspire well-being. Today's announcement is a testament to their success," said Vivek Sankaran, CEO of Albertsons Cos.

"At Albertsons Cos., we are guided by an ambition to create customers for life. Together with Kroger, our combined iconic banners will be able to provide customers with even more value and greater access to fresh food and essential pharmacy services. Given the similarities in the culture and values at Kroger and Albertsons Cos., I am confident that the combination will also have a positive impact on our associates and the communities we are proud to serve. We look forward to working together with Kroger to capture the compelling opportunities ahead."

"Today's announcement marks the successful outcome of the Board-led review of strategic alternatives Albertsons Cos. announced in February," said Chan Galbato, Co-Chair of the Albertsons Cos. Board of Directors and Chief Executive Officer of Cerberus Operations. "This transaction with Kroger provides substantial value to shareholders and exciting opportunities for associates to be part of a combined organization with the ability to better support the lives and health of millions of Americans."

**Accelerates Kroger's Go-to-Market Strategy**

The transaction is expected to advance Kroger's strategy of Leading with Fresh, Accelerating with Digital and will enable the combined company to build on Kroger's go-to-market strategy that includes Fresh, Our Brands, Personalization and Seamless. Kroger looks forward to

PX6084-004

bringing the best of Albertsons Cos.' own omnichannel capabilities to more customers to improve the shopping experience.

- **Enables Kroger to Serve America with Fresher Food, Faster.** Together, Kroger and Albertsons Cos. will have an expanded network of stores and distribution centers, as well as a broader supplier base. Utilizing Kroger's End-to-End Fresh initiative across a broader network will enable the combined company to optimize its supply chain to deliver the freshest products from field to table to more customers more quickly. By bringing together Kroger's Fresh for Everyone strategy and Albertsons Cos.' Customers for Life strategy, the combined company will expand its portfolio of fresh products, extend shelf lives and accelerate the penetration of its Fresh portfolio.

- **Creates Broader Selection of Our Brands Products to Offer Customers Higher Quality and Better Value.** At a time when people are increasingly shopping for groceries and eating at home, Kroger and Albertsons Cos. will be better positioned to relieve the inflationary pressures facing shoppers with a combined portfolio of approximately 34,000 total private label products across premium, natural and organic, and opening price point brands. Kroger and Albertsons Cos. have strong track records of providing quality products at great value. The combined company's innovation capabilities, increased manufacturing footprint and expanded national reach will drive improved quality and efficiency allowing its Our Brands portfolio to accelerate growth and profitability while remaining affordable and accessible to customers.

- **Offers Customers Best-in-Class Personalized Experience.** The combined company will be able to generate stronger customer insights and offer improved tailor-made experiences. With a customer base of approximately 85 million households, the combined company will have one of the most comprehensive first-party data repositories in the food and retail space and will be able to use Kroger's leading data science capabilities to develop an even more compelling retail loyalty program. The combined company will provide an unmatched customer experience by offering more relevant recommendations and promotions to save customers time and money. More customers will benefit from Kroger's data analytics by receiving personalized recommendations for healthier alternatives to products customers love as part of Kroger's Food as Medicine initiative.

- **Delivers an Enhanced Seamless Customer Experience Requiring Zero Compromise.** The combined company will benefit from shared operational learnings across both large and small store formats, a more extensive and efficient distribution network of customer fulfillment facilities and capabilities, and an expanded pickup footprint. By bringing

together Kroger and Albertsons Cos.' technology, infrastructure, and digital and delivery service providers into a single seamless ecosystem, the combined company will be able to offer customers a more personalized and convenient omnichannel experience including in-store shopping, enhanced pickup capabilities, faster delivery times, and more capabilities to serve the customer anything, anytime, anywhere with zero compromise on quality, selection and affordability.

- **Powers Continued Progress Toward Shared ESG Initiatives.** Both companies have ambitious sustainability programs and a range of initiatives focused on responsible corporate stewardship, including those focused on increasing workforce diversity and fighting food insecurity. By joining forces, the combined company will be better positioned to advance a comprehensive ESG strategy focused on Kroger and Albertsons Cos.' shared mission to support the communities they serve and pursue a more sustainable future. The addition of Albertsons Cos.' sustainability program and resources will accelerate progress on Kroger's Zero Hunger | Zero Waste social and environmental impact plan to create a more equitable and sustainable food system.

**Strengthens Kroger's Value Creation Model To Deliver Enhanced Returns**

- **Grows Core Business to Power Value Creation Flywheel.** The addition of Albertsons Cos.' portfolio expands Kroger's core supermarket, fuel, and pharmacy businesses, bolstering the combined company's ability to drive additional traffic into stores and digital channels. The increase in customer traffic and data will in turn power the combined company's higher-growth, higher-margin alternative profit businesses to support continued reinvestment in the business. On a combined basis, the companies delivered approximately $210 billion in revenue, $3.3 billion in net earnings, and $11.6 billion of adjusted EBITDA in fiscal year 2021[1].

- **Expands National Reach to Accelerate Alternative Profit Businesses Like Retail Media.** The combined company will be able to reach an expanded national audience of approximately 85 million households nationwide, fueling growth in alternative profit businesses such as Retail Media, Kroger Personal Finance, and Customer Insights. With an expanded footprint and the addition of the recently launched Albertsons Cos. Media Collective, Kroger will enhance its services to media clients and provide more targeted, sophisticated solutions. The combined capabilities will accelerate the growth of Kroger's higher-margin revenue streams by extending the portfolio of solutions and accelerating their respective growth.

- **Provides Significant Synergies to Reinvest in Customer and Associate Benefits.** The combined company expects to achieve approximately $1 billion of annual run-rate synergies net of divestitures within the first four years of combined operations with approximately 50% being achieved within the first two years following close. The companies expect to achieve synergies largely through improved sourcing, optimization of manufacturing and distribution networks, and technology investment amplification opportunities.

- **Creates Path to Deliver Enhanced Total Shareholder Returns (TSR):** The combination creates a more resilient business model, with a devoted customer base and strong cash flows, that during the first four years post close is expected to deliver TSR well above Kroger's standalone TSR model of 8 – 11%. Kroger expects the transaction to be accretive to earnings in the first year following close, and double digit accretive to earnings by year four, excluding one-time costs. Consistent with its long-term commitment to returning cash to shareholders, Kroger intends to continue paying its quarterly dividend and

expects to raise its dividend over time, subject to Board approval, while managing free cash flow to reduce leverage.

**Transaction Details**

In connection with obtaining the requisite regulatory clearance necessary to consummate the transaction, Kroger and Albertsons Cos. expect to make store divestitures. As described in the merger agreement and subject to the outcome of the divestiture process, Albertsons Cos. is prepared to establish an Albertsons Cos. subsidiary (SpinCo). SpinCo would be spun-off to Albertsons Cos. shareholders immediately prior to merger closing and operate as a standalone public company. Kroger and Albertsons Cos. have agreed to work together to determine which stores would comprise SpinCo, as well as the pro forma capitalization of SpinCo. The establishment of SpinCo, which is estimated to comprise between 100 and 375 stores, would create a new, agile competitor with quality stores, experienced management, operational flexibility, a strong balance sheet, and focused allocation of capital and resources to provide customers with continued value and quality service and associates with ongoing compelling career opportunities.

[1] Based on combined results for each company's most recent fiscal year, respectively. Pro forma results as presented in this press release represent the combined Kroger and Albertsons Cos. FY 2021 results and are not intended to represent pro forma financials under Section 11 of Regulation S-X under the Securities Exchange Act of 1934, as amended. See the Appendix for a reconciliation of historical non-GAAP measures.

Kroger and Albertsons Cos. will provide additional detail regarding SpinCo prior to closing.

The per share cash purchase price payable to Albertsons Cos. shareholders in the merger would be reduced by an amount equal to (i) three times four-wall adjusted EBITDA for the stores contributed to SpinCo divided by the number of Albertsons Cos. common shares (including common shares issuable upon conversion of Albertsons Cos.' preferred stock) outstanding as of the record date for the spin-off plus (ii) the per share amount of a special pre-closing cash dividend of up to $4 billion payable to Albertsons Cos. shareholders, which is expected to be approximately $6.85 per share. This cash dividend is expected to be payable on November 7, 2022, to shareholders of record as of the close of business on October 24, 2022.

Kroger has $17.4 billion of fully committed bridge financing in place from Citi and Wells Fargo. At closing, the Company plans to fund the transaction using a combination of cash on hand and proceeds from new debt financing. Kroger expects to continue to have a solid balance sheet supported by strong free cash flow of the combined business.

Kroger has engaged with the rating agencies and is strongly committed to an investment grade credit rating. Kroger has already paused its share repurchase program to prioritize de-leveraging following the merger to achieve its net leverage target of 2.5x EBITDA in the first 18 – 24 months post close.

Following the close of the transaction, Rodney McMullen will continue to serve as Chairman and Chief Executive Officer and Gary Millerchip will continue to serve as Chief Financial Officer of the combined company.

**Timing and Approvals**

Albertsons Cos. shareholders holding more than a majority of Albertsons Cos.' common stock have either delivered a written consent or committed to delivering a written consent approving the transaction no later than October 18, 2022 and Albertsons Cos. shareholders holding more than a majority of Albertsons Cos.' preferred stock have already approved the transaction. No further action by Albertsons Cos.' shareholders will be needed or solicited in connection with the merger.

The transaction is expected to close in early 2024, subject to the receipt of required regulatory clearance and other customary closing conditions, including receipt of clearance under the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

**Kroger Conference Call**

Kroger will host a conference call to discuss the transaction tomorrow, October 14, 2022 at 8:30 a.m. ET.

The conference call will broadcast online at **ir.kroger.com**. An on-demand replay of the webcast will be available at approximately 1:00 p.m. ET on October 14, 2022.

Associated presentation materials and an infographic regarding the transaction will be available on the investor relations section of each company's website as well as a joint transaction website **www.KrogerAlbertsons.com**.

## Advisors

Citi and Wells Fargo Securities, LLC are serving as financial advisors and Weil, Gotshal & Manges LLP and Arnold & Porter Kaye Scholer LLP are serving as legal counsel to Kroger.

Goldman Sachs & Co. LLC and Credit Suisse are serving as financial advisors and Jenner & Block LLP is serving as corporate legal counsel and White & Case LLP and Debevoise & Plimpton LLP are serving as antitrust legal counsel to Albertsons Cos.

## About Kroger

At The Kroger Co. (NYSE: **KR**), we are Fresh for Everyone™ and dedicated to our Purpose: To Feed the Human Spirit®. We are, across our family of companies, nearly half a million associates who serve over 11 million customers daily through a seamless shopping experience under a variety of banner names. We are committed to creating #ZeroHungerZeroWaste communities by 2025. To learn more about us, visit our **newsroom** and **investor relations** site.

## About Albertsons Companies

Albertsons Companies is a leading food and drug retailer in the United States. As of June 18, 2022, Albertsons Companies operated 2,273 retail food and drug stores with 1,720 pharmacies, 402 associated fuel centers, 22 dedicated distribution centers and 19 manufacturing facilities. Albertsons Companies operates stores across 34 states and the District of Columbia with 24 banners including Albertsons Safeway, Vons, Jewel-Osco, Shaw's, Acme, Tom Thumb, Randalls, United Supermarkets, Pavilions, Star Market, Haggen, Carrs, Kings Food Markets and Balducci's Food Lovers Market. Albertsons Companies is committed to helping people across the country

live better lives by making a meaningful difference, neighborhood by neighborhood. In 2021, along with the Albertsons Companies Foundation, the Company contributed nearly $200 million in food and financial support, including approximately $40 million through our Nourishing Neighbors Program to ensure those living in our communities have enough to eat.

This press release contains certain statements that constitute "forward-looking statements" within the meaning of federal securities laws, including statements regarding the effects of the proposed transaction. These statements are based on the assumptions and beliefs of Kroger and Albertsons Companies management in light of the information currently available to them. Such statements are indicated by words or phrases such as "accelerate," "create," "committed," "confident," "continue," "deliver," "driving," "expect," "future," "guidance," "positioned," "strategy," "target," "synergies," "trends," and "will." Various uncertainties and other factors could cause actual results to differ materially from those contained in the forward-looking statements. These include the specific risk factors identified in "Risk Factors" in each of Kroger's and Albertsons Companies' annual report on Form 10-K for the last fiscal year and any subsequent filings, as well as the following:

the expected timing and likelihood of completion of the proposed transaction, including the timing, receipt and terms and conditions of any required governmental and regulatory clearance of the proposed transaction; the impact and terms and conditions of any potential divestitures and/or the separation of SpinCo; the occurrence of any event, change or other circumstances that could give rise to the termination of the merger agreement; the outcome of any legal proceedings that may be instituted against the parties and others following announcement of the merger agreement and proposed transaction; the inability to consummate the proposed transaction due to the failure to satisfy other conditions to complete the proposed transaction; risks that the proposed transaction disrupts current plans and operations of Kroger and Albertsons Companies; the ability to identify and recognize the anticipated benefits of the proposed transaction, including anticipated TSR, revenue and EBITDA expectations and synergies; the amount of the costs, fees, expenses and charges related to the proposed transaction; and the ability of Kroger and Albertsons Companies to successfully integrate their businesses and related operations; the ability of Kroger to maintain an investment grade credit rating; risks related to the potential impact of general economic,

political and market factors on the companies or the proposed transaction. The ability of Kroger and Albertsons Companies to achieve the goals for the proposed transaction may also be affected by their ability to manage the factors identified above.

The forward-looking statements by Kroger and Albertsons Companies included in this press release speak only as of the date the statements were made. Neither Kroger nor Albertsons Companies assumes the obligation to update the information contained herein unless required by applicable law. Please refer to the reports and filings of Kroger and Albertsons Companies with the Securities and Exchange Commission for a further discussion of the risks and uncertainties that affect them and their respective businesses.

This press release also includes certain forward-looking non-GAAP financial measures, which Kroger and Albertsons Companies management believe to be useful to investors and analysts. A reconciliation to historical non-GAAP figures is provided in the Appendix below. Kroger and Albertsons Companies are unable to provide a full reconciliation of the non-GAAP measures used in the forward-looking measures without unreasonable effort because it is not possible to predict with a reasonable degree of certainty the information necessary to calculate such measures on a GAAP basis because such information is dependent on future events that may be outside of Kroger's and Albertsons Companies' control. The unavailable information could have a significant impact on Kroger's and Albertsons Companies' GAAP financial results.

**Additional Information About Albertsons Companies and Where to Find It**

Albertsons Companies will prepare an information statement on Schedule 14C for its stockholders with respect to the approval of the transaction referenced herein.  When completed, the information statement will be mailed to Albertsons Companies' stockholders. You may obtain copies of all documents filed by Albertsons Companies with the SEC regarding this transaction, free of charge, at the SEC's website, **www.sec.gov** or from Albertsons Companies's website **www.albertsonscompanies.com/investors**.

**Appendix: Pro Forma Adjusted EBITDA Reconciliations[1]**

| ($ mm) | Kroger | Albertsons | Pro Forma |
|---|---|---|---|
| FY 2021 Sales | $137,888 | $71,887 | $209,775 |

| ($ mm) | Kroger | Albertsons | Pro Forma |
|---|---|---|---|
| FY 2021 Net Income | $1,655 | $1,620 | $3,275 |

| ($ mm) | Kroger | Albertsons | Pro Forma |
|---|---|---|---|
| FY 2021 Adjusted EBITDA | $7,185 | $4,398 | $11,583 |

| Kroger ($ mm) | FY 2021 |
|---|---|
| **Net earnings attributable to The Kroger Co.** | **$1,655** |
| LIFO charge (credit) | 197 |
| Depreciation and amortization | 2,824 |
| Interest expense | 571 |
| Income tax expense | 385 |
| Adjustment for pension plan withdrawal liabilities | 449 |
| Adjustment for company-sponsored pension plan settlement charges | 87 |
| Adjustment for loss (gain) on investments | 821 |
| Adjustment for Home Chef contingent consideration | 66 |
| Adjustment for transformation costs[2] | 136 |
| Other | (6) |
| **Adjusted EBITDA** | **$7,185** |

| Albertsons ($ mm) | FY 2021 |
|---|---|
| **Net Income** | **$1,620** |
| (Gain) loss on interest rate and commodity hedges, net | (23) |
| Facility closures and transformation[3] | 57 |
| Acquisition and integration costs[4] | 9 |
| Equity-based compensation expense | 101 |
| Gain on property dispositions and impairment losses, net | (15) |
| LIFO expense | 115 |
| Government-mandated incremental COVID-19 pandemic related pay[5] | 58 |
| Amortization of debt discount and deferred financing costs | 23 |
| Loss on debt extinguishment | 4 |
| Amortization of intangible assets resulting from acquisitions | 49 |
| Combined Plan and UFCW National Fund withdrawal[6] | (106) |
| Miscellaneous adjustments[7] | (63) |
| Tax impact of adjustments to Adjusted net income | (46) |
| **Adjusted Net Income** | **$1,781** |
| Tax impact of adjustments to Adjusted net income | 46 |
| Income tax expense | 480 |
| Amortization of debt discount and deferred financing costs | (23) |
| Interest expense, net | 482 |
| Amortization of intangible assets resulting from acquisitions | (49) |
| Depreciation and amortization | 1,681 |
| **Adjusted EBITDA** | **$4,398** |

[1] Pro forma results presented in this presentation represent the combined Kroger and Albertsons FY 2021 results and are not intended to represent pro forma financials under Section 11 of Regulation S-X under the Securities Exchange Act of 1934, as amended.

[2] Transformation costs primarily include costs related to store and business closure costs and third party professional consulting fees associated with business transformation and cost saving initiatives.

[3] Includes costs related to closures of operating facilities and third-party consulting fees related to strategic priorities and associated business transformation.

[4] Related to conversion activities and related costs associated with integrating acquired businesses. Also includes expenses related to management fees paid in prior fiscal years in connection with acquisition and financing activities.

[5] Represents incremental pay that is legislatively required in certain municipalities in which Albertsons operates.

[6] Related to the Combined Plan during the fourth quarter of fiscal 2021.

[7] Miscellaneous adjustments include non-cash lease-related adjustments, lease and lease-related costs for surplus and closed stores, net realized and unrealized gain on non-operating investments, certain legal and regulatory accruals and settlements, net and other (primarily includes adjustments for pension settlement gain, unconsolidated equity investments and certain contract terminations).

SOURCE The Kroger Co.

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-K

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the fiscal year ended February 24, 2024**

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the transition period from _____ to _____**

**Commission File Number: 001-39350**



## Albertsons Companies, Inc.
**(Exact name of registrant as specified in its charter)**

| Delaware | 47-4376911 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**250 Parkcenter Blvd.**
**Boise, Idaho, 83706**
**(Address of principal executive offices and zip code)**

**(208) 395-6200**
**(Registrant's telephone number, including area code)**

Securities registered under Section 12(b) of the Exchange Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Class A common stock, $0.01 par value | ACI | New York Stock Exchange |

Securities registered under Section 12(g) of the Exchange Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

As of September 8, 2023, the last business day of the registrant's most recently completed second fiscal quarter, the aggregate market value of the registrant's common stock held by non-affiliates was approximately $9.9 billion.

As of April 18, 2024, the registrant had 577,407,663 shares of Class A common stock, par value $0.01 per share, outstanding.

DOCUMENTS INCORPORATED BY REFERENCE

Items 10, 11, 12, 13 and 14 of Part III incorporate information by reference from the registrant's definitive proxy statement related to its 2024 Annual Meeting of Stockholders, to be filed with the Securities and Exchange Commission within 120 days after the end of the fiscal year ended February 24, 2024 (the "Proxy Statement").

# Albertsons Companies, Inc. and Subsidiaries

|  | Page |
|---|---|
| **PART I** | 4 |
| Item 1 - Business | 8 |
| Item 1A - Risk Factors | 14 |
| Item 1B - Unresolved Staff Comments | 30 |
| Item 1C - Cybersecurity | 31 |
| Item 2 - Properties | 33 |
| Item 3 - Legal Proceedings | 33 |
| Item 4 - Mine Safety Disclosures | 34 |
|  |  |
| **PART II** | 35 |
| Item 5 - Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 35 |
| Item 6 - [Reserved] | 37 |
| Item 7 - Management's Discussion and Analysis of Financial Condition and Results of Operations | 38 |
| Item 7A - Quantitative and Qualitative Disclosures About Market Risk | 50 |
| Item 8 - Financial Statements and Supplementary Data | 52 |
| Item 9 - Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 101 |
| Item 9A - Controls and Procedures | 102 |
| Item 9B - Other Information | 102 |
| Item 9C - Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 102 |
|  |  |
| **PART III** | 103 |
| Item 10 - Directors, Executive Officers and Corporate Governance | 103 |
| Item 11 - Executive Compensation | 103 |
| Item 12 - Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 103 |
| Item 13 - Certain Relationships and Related Transactions, and Director Independence | 103 |
| Item 14 - Principal Accountant Fees and Services | 103 |
|  |  |
| **PART IV** | 104 |
| Item 15 - Exhibits, Financial Statement Schedules | 104 |
| Item 16 - Form 10-K Summary | 108 |
|  |  |
| **SIGNATURES** | 109 |

Table of Contents

*As used in this Annual Report on Form 10-K, unless the context otherwise requires, references to "Albertsons," the "Company," "ACI," "we," "us" and "our" refer to Albertsons Companies, Inc. and, where appropriate, its consolidated subsidiaries. Our last three fiscal years consisted of the 52 weeks ended February 24, 2024 ("fiscal 2023"), the 52 weeks ended February 25, 2023 ("fiscal 2022") and the 52 weeks ended February 26, 2022 ("fiscal 2021"). Our next three fiscal years consist of the 52 weeks ending February 22, 2025 ("fiscal 2024"), the 53 weeks ending February 28, 2026 ("fiscal 2025"), and the 52 weeks ending February 27, 2027 ("fiscal 2026").*

**PART I**

**SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This Annual Report on Form 10-K includes "forward-looking statements" within the meaning of the federal securities laws. The "forward-looking statements" include our current expectations, assumptions, estimates and projections about our business, our industry and the outcome of the Merger. They include statements relating to our future operating or financial performance which the Company believes to be reasonable at this time. You can identify forward-looking statements by the use of words such as "outlook," "may," "should," "could," "estimates," "predicts," "potential," "continue," "anticipates," "believes," "plans," "expects," "future", "intends" and similar expressions which are intended to identify forward-looking statements.

These statements are not guarantees of future performance and are subject to numerous risks and uncertainties which are beyond our control and difficult to predict and could cause actual results to differ materially from the results expressed or implied by the statements. Risks and uncertainties that could cause actual results to differ materially from such statements include:

- uncertainties related to the Merger, including our ability to close the transactions contemplated by the Merger Agreement, and the impact of the costs related to the Merger;
- erosion of consumer confidence as a result of the Merger and the transactions contemplated by the Merger Agreement;
- changes in macroeconomic conditions and uncertainty regarding the geopolitical environment;
- rates of food price inflation or deflation, as well as fuel and commodity prices;
- changes in consumer behavior and spending due to the impact of macroeconomic factors, including the expiration of student loan payment deferments;
- challenges in attracting, retaining and motivating our employees until the closing of the Merger;
- failure to achieve productivity initiatives, unexpected changes in our objectives and plans, inability to implement our strategies, plans, programs and initiatives, or enter into strategic transactions, investments or partnerships in the future on terms acceptable to us, or at all;
- changes in wage rates, ability to attract and retain qualified associates and negotiate acceptable contracts with labor unions;
- litigation related to the transactions contemplated by the Merger Agreement;
- restrictions on our ability to operate as a result of the Merger Agreement;
- availability and cost of goods used in our food products;
- challenges with our supply chain;
- operational and financial effects resulting from cyber incidents at the Company or at a third party, including outages in the cloud environment and the effectiveness of business continuity plans during a ransomware or other cyber incident; and
- continued reduction in governmental assistance programs such as SNAP.

4

PX6153-004

Table of Contents

All forward-looking statements attributable to us or persons acting on our behalf are expressly qualified in their entirety by these cautionary statements and risk factors. Forward-looking statements contained in this Annual Report on Form 10-K reflect our view only as of the date of this Annual Report. We undertake no obligation, other than as required by law, to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

In evaluating our financial results and forward-looking statements, you should carefully consider the risks and uncertainties more fully described in the section of this Annual Report on Form 10-K entitled "Risk Factors." Consequently, all of the forward-looking statements we make in this Annual Report on Form 10-K are qualified by the information contained in this section and the information discussed under "Part I—Item 1A. Risk Factors."

### SUMMARY RISK FACTORS

The following is a summary of the principal factors that create risk in investing in our securities:

### Risks Related to Our Business and Operations

Risks related to:

- general economic conditions affecting the food and drug retail industry and various operating factors;
- availability of a significant amount of energy to manufacture, store, transport and sell products;
- failure to realize anticipated benefits from our productivity initiatives; and
- impact of environmental, social and governance matters, including inability to meet goals and commitments established in relation to such matters.

### Risks Related to the Merger

Risks related to:

- the Merger Agreement and the pendency of the Merger;
- restrictions on our business activities while the Merger Agreement is in effect;
- litigation related to the Merger;
- the ability to complete the Merger and the transactions contemplated by the Merger; and
- significant delay or the failure to complete the Merger.

### Risks Related to Our Industry

Risks related to:

- intensity of the competition in our industry;
- our ability to timely identify or effectively respond to consumer trends;
- consolidation in the healthcare industry; and
- providing pharmacy products and services and the adequacy of our insurance to cover any claims.

5

PX6153-005

Table of Contents

## Risks Related to Our Supply Chain

Risks related to:

- product and raw material supply disruptions, especially of fresh products, including from severe weather, natural disasters and climate change;
- threats or potential threats to security of food and drug safety, including the occurrence of a widespread health epidemic and/or pandemic, and loss of consumer confidence in the supply chain; and
- availability and increased prices of fuel or commodities.

## Risks Related to Our Workforce

Risks related to:

- our relationship with unions, including labor disputes or work stoppages, and increased pension expenses, contributions and surcharges;
- increases to the minimum wage and changes to wage regulations; and
- the failure to attract and retain qualified associates.

## Legal and Regulatory Risks

Risks related to:

- unfavorable changes in government regulation and environmental laws;
- unfavorable changes in the tax code;
- legal or other proceedings; and
- our use of insurance and self-insurance to address potential liabilities.

## Risks Related to Information Security, Cybersecurity, Data Privacy and Evolving Technologies

Risks related to:

- our dependence on IT systems;
- improper activities by third parties and the loss of confidence from a data security incident involving our customers, employees or vendors; and
- the use of artificial intelligence in our business.

## Risks Related to Our Indebtedness

Risks related to:

- our level of indebtedness and our ability to generate cash;
- our debt instruments limiting our flexibility in operating our business; and
- increases in interest rates, a downgrade of our credit ratings and/or instability in credit markets.

## Risks Related to Owning Our Common Stock

Risks related to:

- the volatility of the price of our common stock and the possibility of a decline regardless of our operating performance;
- our largest stockholder may have conflicts of interest with other stockholders in the future;

PX6153-006

Table of Contents

- provisions in our charter documents and Delaware law and certain other agreements that could delay or prevent a change of control; and
- our ability to pay dividends to our stockholders.

See "Part I—Item 1A. Risk Factors" for a more complete discussion of the material risks facing our business.

## NON-GAAP FINANCIAL MEASURES

We define EBITDA as generally accepted accounting principles ("GAAP") earnings (net loss) before interest, income taxes, depreciation and amortization. We define Adjusted EBITDA as earnings (net loss) before interest, income taxes, depreciation and amortization, further adjusted to eliminate the effects of items management does not consider in assessing our ongoing core performance. We define Adjusted net income as GAAP net income adjusted to eliminate the effects of items management does not consider in assessing our ongoing core performance. We define Adjusted net income per Class A common share as Adjusted net income divided by the weighted average diluted Class A common shares outstanding, as adjusted to reflect all restricted stock units and awards outstanding at the end of the period, as well as the conversion of Convertible Preferred Stock when it is antidilutive for GAAP. See "Part II—Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" for further discussion and a reconciliation of Adjusted EBITDA, Adjusted net income and Adjusted net income per Class A common share.

EBITDA, Adjusted EBITDA, Adjusted net income and Adjusted net income per Class A common share (collectively, the "Non-GAAP Measures") are performance measures that provide supplemental information we believe is useful to analysts and investors to evaluate our ongoing results of operations, when considered alongside other GAAP measures such as net income, operating income, gross margin and net income per Class A common share. These Non-GAAP Measures exclude the financial impact of items management does not consider in assessing our ongoing core operating performance, and thereby provide useful measures to analysts and investors of our operating performance on a period-to-period basis. Other companies may have different definitions of Non-GAAP Measures and provide for different adjustments, and comparability to our results of operations may be impacted by such differences. We also use Adjusted EBITDA for board of director and bank compliance reporting. Our presentation of Non-GAAP Measures should not be construed as an inference that our future results will be unaffected by unusual or non-recurring items.

Non-GAAP Measures should not be considered as measures of discretionary cash available to us to invest in the growth of our business. We compensate for these limitations by relying primarily on our GAAP results and using Non-GAAP Measures only for supplemental purposes.

7

Table of Contents

## Item 1 - Business

### Overview

Albertsons is one of the largest food and drug retailers in the United States, with both strong local presence and national scale. We also manufacture and process some of the food for sale in our stores. We maintain a website (www.Albertsonscompanies.com) that includes additional information about the Company. We make available through our website, free of charge, our annual reports on Form 10-K, our quarterly reports on Form 10-Q, our current reports on Form 8-K and our interactive data files, including amendments to those reports. These forms are available as soon as reasonably practicable after we have filed them with, or furnished them electronically to, the Securities and Exchange Commission ("SEC"). Additionally, all of our filings with the SEC can be accessed on the SEC's website at www.sec.gov.

### Retail Operations

As of February 24, 2024, we operated 2,269 stores across 34 states and the District of Columbia under more than 20 well known banners including *Albertsons, Safeway, Vons, Pavilions, Randalls, Tom Thumb, Carrs, Jewel-Osco, Acme, Shaw's, Star Market, United Supermarkets, Market Street, Haggen, Kings Food Markets* and *Balducci's Food Lovers Market*. Additionally, as of February 24, 2024, we operated 1,725 pharmacies, 1,336 in-store branded coffee shops, 402 adjacent fuel centers, 22 dedicated distribution centers, 19 manufacturing facilities and various digital platforms. Our stores operate in First-and-Main retail locations and have leading market share within attractive and growing geographies. We hold a #1 or #2 position by market share in 70% of the 121 metropolitan statistical areas ("MSAs") in which we operate. Our portfolio of well-located, full-service stores provides the foundation of our omnichannel platform, and we have continued to enhance our capabilities, including automated self-checkout options, to meet customer demand for convenience and flexibility. Our Drive Up & Go curbside pickup service is offered in more than 2,200 locations and we offer delivery services across more than 2,100 of our stores. In our delivery service, we have expanded the number of stores with in-house delivery services, and in our third-party services we have continued to partner with Instacart, DoorDash and Uber to engage with customers on the platform of their choice. Our Customers for Life transformation strategy is anchored on placing the customer at the center of everything we do, with the ultimate goal of supporting them every day, every week, and for a lifetime. We seek to tailor our offerings to local demographics and preferences of the markets in which we operate. Our *Locally Great, Nationally Strong* operating structure empowers decision making at the local level, which we believe better serves our customers and communities, while also providing the technology platforms, systems, analytics and buying power afforded by an organization with national scale.

### Segments

We are engaged in the operation of food and drug retail stores that offer grocery products, general merchandise, health and beauty care products, pharmacy, fuel and other items and services in our stores or through digital channels. Our retail operating divisions are geographically based, have similar economic characteristics and similar expected long-term financial performance. Our operating segments and reporting units are made up of 12 divisions, which are reported in one reportable segment. Each reporting unit constitutes a business for which discrete financial information is available and for which management regularly reviews the operating results. Across all operating segments, the Company operates primarily one store format. Each division offers, through its stores and digital channels, the same general mix of products with similar pricing to similar categories of customers, has similar distribution methods, operates in similar regulatory environments and purchases merchandise from similar or the same vendors.

PX6153-008

Table of Contents

### Products

Our stores offer grocery products, general merchandise, health and beauty care products, pharmacy, fuel and other items and services. We are not dependent on any individual supplier; only one third-party supplier represented more than 5% of our sales for fiscal 2023.

### Merchandising and Manufacturing

Our Own Brands portfolio provides high-quality products to our customers at a great value, offering more than 14,000 unique items. The Own Brands portfolio includes but is not limited to the registered trademarks *Signature SELECT®, O Organics®, Open Nature®, Signature Café®, Lucerne®, Waterfront BISTRO®, Primo Taglio®, Signature Care®, Signature Reserve®* and *Value Corner®.* Our Own Brands products resonate well with our customers, as evidenced by Own Brands sales of $16.5 billion in fiscal 2023.

As measured by units for fiscal 2023, 10.1% of our Own Brands products were manufactured in Company-owned facilities, and the remainder was purchased from third parties. We closely monitor make-versus-buy decisions to optimize their quality and profitability. In addition, we believe that our scale will provide opportunities to leverage our fixed manufacturing costs in order to drive innovation across our Own Brands portfolio. As of February 24, 2024, we operated 19 food production plants. These plants consisted of seven milk plants, three soft drink bottling plants, three bakery plants, two ice cream product plants, two grocery/prepared food plants, one ice plant and one soup plant.

### Intellectual Property

Our banners, brand image and Own Brands portfolio are significant to our business strategy. We own numerous registered trademarks and service marks and seek to obtain and preserve intellectual property protection of our marks and to ensure that any third-party uses are properly licensed.

### Distribution

As of February 24, 2024, we operated 22 strategically located distribution centers, approximately 36% of which are owned or ground-leased. Our distribution centers collectively provide approximately 63% of all products to our retail operating areas.

### Marketing and Advertising

Our marketing efforts involve collaboration between our national marketing and merchandising team and local divisions and stores. We augment the local division teams with corporate resources and are focused on providing expertise, sharing best practices and leveraging scale in partnership with leading consumer packaged goods vendors. Our corporate teams support divisions by providing strategic guidance in order to drive key areas of our business, including pharmacy, general merchandise and our Own Brands. Our local marketing teams set brand strategy and communicate brand messages through our integrated digital and physical marketing and advertising channels.

We devote significant resources to differentiating our banners in the local markets where we operate and invest in loyalty programs to drive traffic through our omnichannel approach. Our local merchandising teams spend considerable time working with store directors to make sure we are satisfying consumer preferences. We also strive to achieve and maintain favorable recognition of our Own Brands offerings by marketing them to consumers and enhancing value for consumers, particularly in respect of branded products.

We measure price competitiveness through systematic, selective and thoughtful price investment to drive customer traffic and basket size. We also use our loyalty program to target promotional activity and improve our customers'

9

Table of Contents

experience. This includes leveraging customer and transaction information with data driven analytics to provide both personalized deals and digital coupons, as well as gas and grocery rewards. We have 39.8 million members currently enrolled in our loyalty program. We have achieved significant success with active participants in our loyalty program, which drives higher sales and customer retention. We have recently deployed and are continuing to refine cloud-based enterprise solutions to quickly process proprietary customer, product and transaction data and efficiently provide our local managers with targeted marketing strategies for customers in their communities. In addition, we use data analytics to optimize shelf assortment and space in our stores by continually and systematically reviewing the performance of each product.

In our digital strategies, we capitalize on our rich and proprietary data under our Albertsons Media Collective ("AMC"). AMC offers new and existing business partners a robust digital marketing platform that reaches our extensive customer network and leverages our strong market share, especially in the 70% of MSAs where we hold a #1 or #2 share position. We believe AMC will be a contributor to our growth and a profit driver in the future.

### Raw Materials

Various agricultural commodities constitute the principal raw materials used by us in the manufacture of our food products. Although historically raw materials for our products have not been in short supply and have been readily available, see "Part I—Item 1A. Risk Factors" regarding the potential adverse impact on our results of operations due to the lack of, or reduced availability of, raw materials.

### Environmental

Our operations are subject to regulation under environmental laws, including those relating to waste management, air emissions and underground storage tanks. In addition, as an owner and operator of commercial real estate, we may be subject to liability under applicable environmental laws for clean-up of contamination at our facilities. Compliance with and clean-up liability under these laws has not had and is not expected to have a material adverse effect upon our business, financial condition, liquidity or operating results.

We work hard to maintain the highest standards of environmental stewardship (including procuring and offering sustainably sourced products). During fiscal 2023, we recycled more than 865 million pounds of cardboard and more than 25 million pounds of plastic bags and film from our operations and completed over 500 energy efficiency projects. Moreover, 100% of our Own Brands *Waterfront BISTRO®* and *Open Nature®* seafood is sourced to meet our Responsible Seafood Policy.

### Human Capital

As one of the largest food and drug retailers in the U.S., serving 35.3 million customers per week, we recognize that our success and ability to delight our customers lies in the engagement of our associates. We remain committed to attracting, developing and retaining associates by fostering a diverse and inclusive culture through our investment in talent development and supporting the personal health and well-being of associates and their families.

As of February 24, 2024, we employed approximately 285,000 associates, of which approximately 62% were part-time and approximately 200,000 associates were covered by collective bargaining agreements. A significant number of our associates have long tenure and during fiscal 2023, more than 61,000 of our associates celebrated at least 15 years of service, and more than 44,000 associates celebrated over 20 years of service.

We commit to create a workplace where inclusion thrives through diverse representation across all levels of our workforce. In fiscal 2023, we integrated Belonging into our strategic framework and transitioned to Diversity, Equity, Inclusion & Belonging ("DEI&B"). To promote DEI&B among our associates, we support our associate resource groups ("ARGs"). The ARGs collectively comprise over 7,000 members and are based on employee

10

Table of Contents

interests. During fiscal 2023, we added our newest ARG – the Women of Color ("WOC") Alliance, which provides a platform for women of color and their allies through education, awareness, and knowledge. The WOC Alliance joined our existing ARGs, which include the Women's Inspiration and Inclusion Network, the Hispanic Leadership Network, the Asian Network, the African American Leadership Council, the Pride Alliance, Recipe for Change Alliance, Veterans Associate Resource Group and diverseABILITY. In 2023, we also introduced an ally component to our ARGs to enable the participation of any associate who wants to support and take action to help that group.

As part of our ongoing commitment, we have integrated DEI&B goals into the performance plans of our top leaders and during fiscal 2023 we successfully integrated Leading With Inclusion ("LWI") within our in-house curriculum. We continue to expand opportunities for our associates to learn more about DEI&B, including facilitated discussions of leaders on how to be more inclusive, and bi-annual store and supply chain huddles to further embed DEI&B into our frontline.

We are proud to offer our associates a myriad of opportunities to grow and advance in their careers. We have a talent management process that is designed to enable us to identify and assess talent across the organization and provide equal and consistent opportunities for employees to develop their skills. Several levels of associates participate in our annual performance management process that includes goal setting, feedback and development to support their personal growth and development. We engage associates across the organization to provide input through our annual Associate Experience Survey. We hold regular town hall meetings where any employee can ask questions of executives and make their voice heard.

We also offer formal and informal learning and development opportunities to all associates through synchronous, asynchronous and hybrid experiences. These offerings include eLearning and on-demand content, virtual and in-person classes, on-the-job training, virtual reality and mentoring programs. In addition to our internal learning offerings, through partnerships with third parties, we offer development programs and conferences to our top talent based on nominations.

We are continually evaluating and developing our compensation and benefits programs to offer competitive wages and job-appropriate compensation. Our benefits are designed to attract and retain our employees and vary from location, seniority and employment status. In addition to comprehensive, accessible and affordable healthcare coverage, we offer paid time off, flexible work schedules, family leave, associate assistance programs and a 401(k)-retirement savings and investment plan.

The health and safety of our associates remains at the forefront of our business, and we remain committed to the prevention of injury and illness through strong health and safety management, employee empowerment and accountability, and strict compliance with health and safety regulations. We are also focused on fostering a safe, open and accountable work environment and we provide a hotline for all associates to report workplace concerns and violations.

*Seasonality*

Our business is generally not seasonal in nature, but a larger share of annual revenues may be generated in November and December due to the major holidays.

*Competitive Environment*

The food and drug retail industry is highly competitive. The principal competitive factors that affect our business are location, price, quality, fresh, service, selection, convenience and condition of assets such as our stores. The operating environment for the food and drug retailing industry continues to be characterized by intense competition,

11

Table of Contents

aggressive expansion, increasing specialization of retail and digital formats, entry of non-traditional competitors and consolidation.

We face intense competition from supercenters, other food and/or drug retailers, club stores, online retailers, specialty and niche supermarkets, "limited assortment" stores, drug stores, general merchandisers, wholesale stores, dollar and discount stores, grocery outlets, convenience stores, natural food stores, farmers' markets, local chains and stand-alone stores that cater to the individual cultural preferences of specific neighborhoods, restaurants and a growing number of internet-based home delivery and meal solution companies. We and our competitors engage in price and non-price competition which has adversely affected our operating margins.

### *Executive Officers of the Registrant*

The following table sets forth information regarding our executive officers as of April 22, 2024:

| Name | Age | Position |
| --- | --- | --- |
| Vivek Sankaran | 61 | Chief Executive Officer; Director |
| Sharon McCollam | 61 | President, Chief Financial Officer |
| Anuj Dhanda | 61 | Executive Vice President, Chief Technology & Transformation Officer |
| Omer Gajial | 50 | Executive Vice President, Chief Merchandising & Digital Officer |
| Thomas Moriarty | 61 | Executive Vice President, General Counsel and Chief Policy Officer |
| Susan Morris | 55 | Executive Vice President, Chief Operations Officer |
| Robert Backus | 51 | Executive Vice President, Retail Operations, East Region |
| Michelle Larson | 47 | Executive Vice President, Retail Operations, West Region |
| Evan Rainwater | 61 | Executive Vice President, Supply Chain, Manufacturing and Strategic Sourcing |
| Jennifer Saenz | 46 | Executive Vice President, Pharmacy & eCommerce |
| Michael Theilmann | 60 | Executive Vice President, Chief Human Resources Officer |

*Vivek Sankaran* has served as our Chief Executive Officer and Director since September 2021, and our Chief Executive Officer, President and Director since April 2019. Prior to joining the Company, since 2009 Mr. Sankaran served in various leadership and executive positions at PepsiCo, Inc. ("PepsiCo"), a multinational food, snack, and beverage corporation. From January to March 2019, he served as Chief Executive Officer of PepsiCo Foods North America, a business unit within PepsiCo, where he led PepsiCo's snack and convenient foods business. Prior to that position, Mr. Sankaran served as President and Chief Operating Officer of Frito-Lay North America, a subsidiary of PepsiCo, from April 2016 to December 2018, its Chief Operating Officer from February to April 2016 and Chief Commercial Officer, North America, of PepsiCo from 2014 to February 2016, where he led PepsiCo's cross-divisional performance across its North American customers. Prior to joining PepsiCo in 2009, Mr. Sankaran was a partner at McKinsey and Company, where he served various Fortune 100 companies, bringing a strong focus on strategy and operations.

*Sharon McCollam* has served as our President and Chief Financial Officer since September 2021. Ms. McCollam previously served as Executive Vice President, Chief Administrative and Chief Financial Officer at Best Buy Co. Inc. ("Best Buy"), a multinational consumer electronics retailer, from 2012 to 2016. Prior to Best Buy, Ms. McCollam held several transformational leadership positions at Williams-Sonoma, Inc., a consumer retail company, from 2000 to 2012, including Chief Operating and Chief Financial Officer from 2006 to 2012.

*Anuj Dhanda* has served as our Executive Vice President and Chief Technology & Transformation Officer since 2023 and as our Executive Vice President and Chief Information Officer since joining the Company in December 2015. Prior to joining the Company, Mr. Dhanda served as Senior Vice President of Digital Commerce of the Giant Eagle supermarket chain from March to December 2015, and as its Chief Information Officer from September 2013.

12

Table of Contents

Prior to Giant Eagle, from March 2008 to August 2013, Mr. Dhanda served as Chief Information Officer of PNC Financial Services, a bank holding company and financial services corporation.

*Omer Gajial* has served as our Executive Vice President and Chief Merchandising & Digital Officer since April 2024, as our Executive Vice President of Health and Chief Digital Officer since August 2022, as our Executive Vice President of Pharmacy and Health since February 2022 and as our Senior Vice President, Rx Health and Wellness since September 2020. Prior to joining the Company, from January 2016 until August 2020, Mr. Gajial was the General Manager for Amazon Marketplace business, an e-commerce platform owned and operated by Amazon, across Hardlines, Softlines, and Consumables categories for the U.S., Canada, and Mexico. At Amazon Mr. Gajial led sales, business development, product, program, and fulfillment teams to launch strategic sellers into North America. Prior to Amazon, from July 2000 until December 2015, Mr. Gajial held several positions of increasing responsibility at PepsiCo in Dubai and New York, before being named VP Global Strategy, Category Management & Insights for PepsiCo's Walmart Customer team.

*Thomas Moriarty* has served as our Executive Vice President, General Counsel and Chief Policy Officer since June 2023. Prior to joining the Company, Mr. Moriarty served as EVP, Chief Policy and External Affairs Officer and General Counsel at CVS Health. Mr. Moriarty spent twelve years at Medco Health Solutions, serving in various leadership roles in corporate strategy, legal affairs, global supply chain management, and mergers and acquisitions.

*Susan Morris* has served as our Executive Vice President and Chief Operations Officer since January 2018. Ms. Morris has served in various executive positions at the Company since 2010 including serving as our Executive Vice President, Retail Operations, West Region from April 2017 to January 2018 and Executive Vice President, Retail Operations, East Region from April 2016 to April 2017. Prior to joining the Company, Ms. Morris served as Senior Vice President of Sales and Merchandising and Vice President of Customer Satisfaction at SuperValu.

*Robert Backus* has served as our Executive Vice President of Retail Operations, East Region since April 2024. Mr. Backus previously served as Shaw's Division President from 2020 and as Senior Vice President of Operations from 2016. Mr. Backus also served in various roles and positions of increasing responsibility at Safeway prior to its merger with the Company dating back to October 1990.

*Michelle Larson* has served as our Executive Vice President of Retail Operations, West Region since April 2024. Ms. Larson previously served as our Executive Vice President of Retail Operations, East Region since March 2023 and as our Southwest and Shaw's Division President since 2018. Ms. Larson joined the Company in 2016 as Senior Vice President of Merchandising, Southwest.

*Evan Rainwater* has served as our Executive Vice President, Supply Chain, Manufacturing and Strategic Sourcing since March 2020 and our Senior Vice President, Supply Manufacturing since May 2019. Mr. Rainwater joined the Company in May 2005 as Vice President, Manufacturing.

*Jennifer Saenz* has served as our Executive Vice President, Pharmacy & eCommerce since April 2024 and our Chief Merchandising Officer since July 2021. Prior to joining the Company, since 2006, Ms. Saenz served in several executive positions at PepsiCo. From October 2019 until July 2021, Ms. Saenz served as Global Chief Marketing Officer for PepsiCo, and President, Global Foods, responsible for overseeing the marketing function across foods and beverages and growing the PepsiCo Foods portfolio across all global markets. From January 2016 to October 2019 Ms. Saenz served as Senior Vice President & Chief Marketing Officer of PepsiCo Foods North America where she managed the business unit's snacking portfolio.

*Michael Theilmann* has served as our Executive Vice President and Chief Human Resources Officer since August 2019. Prior to joining the Company, Mr. Theilmann served as Global Practice Managing Partner, Human Resources

13

Table of Contents

Officers Practice, from February 2018 to August 2019, and as Partner, Consumer Markets Practice, from June 2017 to January 2018, of Heidrick & Struggles International Incorporated, a worldwide executive search firm.

### Item 1A - Risk Factors

There are risks and uncertainties that can affect our business. The most significant risk factors are discussed below. The following information should be read together with "Part II—Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" of this Form 10-K, which includes forward-looking statements and factors that could cause us not to realize our goals or meet our expectations.

Risks Related to Our Business and Operations

***General economic conditions affecting the food and drug retail industry and various operating factors may affect our business and may adversely affect our business and operating results.***

Our operations and financial performance are affected by economic conditions such as macroeconomic factors, credit market conditions and the level of consumer confidence. Both inflation and deflation affect our business. Food deflation could reduce sales growth and earnings, while food inflation could reduce gross margin rates and consumer spending. We have observed increased inflation during the past year with varying impacts on our business. We are unable to predict the direction of the economy or if inflation will increase materially or revert to deflation. The continued increase in energy costs, including fuel, could also have an effect on consumer spending and on our costs of producing and procuring products that we sell. If the economy weakens, energy costs continue to increase or inflationary trends continue, our business and operating results could be adversely affected. We may also experience materially adverse impacts to our business as a result of consumers' perceptions of the economy, and a decrease in their personal financial condition could hurt overall consumer confidence and reduce demand for many of our product offerings. Consumers may reduce spending on non-essential items, purchase value-oriented products or increasingly rely on food discounters in an effort to secure the food and drug products that they need, all of which could impact our sales and profit. Governmental and regulatory changes and reductions in governmental subsidies such as SNAP could also materially impact our business adversely.

We compete within our industry not only for customers, but also for associates. Since the beginning of the COVID-19 pandemic, we have faced a competitive labor market due to labor shortages and turnover. Our inability to invest in, manage costs and keep pace with technological changes, including those adopted by our competitors, may adversely impact our business initiatives and affect our financial performance. We may be limited in our ability to implement automation-related technological changes in certain of our operations if we are unable to negotiate appropriate terms in our contracts with our labor unions. Our success is also dependent in large part upon our ability to maintain and enhance the goodwill and reputation of our banners, our customers' connection to our banners, and a positive relationship with the communities in which we serve. Additionally, acts of violence at, or threatened against, our stores, including active shooter situations, may, in addition to other operational impact, result in damage and restricted access to our stores and/or store closures for short or extended periods of time, all of which could materially adversely affect our financial performance.

***Our operations are dependent upon the availability of a significant amount of energy and fuel to manufacture, store, transport and sell products.***

Our operations are dependent upon the availability of a significant amount of energy and fuel to manufacture, store, transport and sell products. Energy and fuel costs are influenced by domestic and international political and economic circumstances and have experienced volatility both recently and over time. While we have entered into contracts to reduce the impact of volatile energy and fuel costs for our future energy needs, volatility that exceeds offsetting contractual arrangements could adversely affect our results of operations.

14

PX6153-014

Table of Contents

***Failure to realize anticipated benefits from our productivity initiatives could adversely affect our financial performance and competitive position.***

While we have identified and are implementing a broad range of specific productivity initiatives to help offset cost inflation, increase growth and improve earnings, the savings from these productivity initiatives represent management's estimates and remain subject to risks and uncertainties. There can be no assurance that all of our initiatives will be successful or that we will realize the estimated benefits in the currently anticipated amounts or timeframe, if at all. Also, certain of our initiatives may involve significant changes to our operating processes and systems that could result in disruptions in our operations and impact our results of operations.

***We may be adversely impacted by environmental, social and governance matters, including inability to meet goals and commitments that we establish in relation to such matters.***

In recent years, there has been an increased focus from investors, governmental and nongovernmental entities, and the public on environmental, social and governance ("ESG") matters, including greenhouse gas emissions, renewable energy, packaging and waste, practices related to sustainable supply chain, energy and water use, diversity, equity and inclusion, human rights, animal rights and social commitment. A variety of organizations evaluate, and measure the performance of, companies on such ESG matters, and the results of these assessments can be widely publicized. Given our commitment to ESG, we have established and publicly announced certain goals, commitments, and targets which we may change in the future. Execution of our ESG strategies to achieve these goals, commitments, and targets are subject to risks and uncertainties, many of which may be outside of our control and prove to be more costly than we anticipated. These risks and uncertainties include, but are not limited to, our ability to achieve our goals, commitments, and targets within the currently projected costs and the expected timeframes; unforeseen operational and technological difficulties; changes in investment assessments or increases in projected investments and our ability to invest accordingly; changes in frameworks we have agreed to; actions by our competitors in setting or achieving similar goals; the outcome of research efforts and future technology developments; and the success of our collaborations with third parties. Any failure, or perceived failure, to achieve our ESG goals, commitments, and targets, or perceived lack of intensity of our commitment to ESG initiatives or to otherwise meet evolving and varied stakeholder expectations could damage our reputation and customer, investor and other stakeholder relationships, and may even result in regulatory enforcement action. Such conditions could have an adverse effect on our business, results of operations and financial condition.

### Risks Related to the Merger

***The Merger Agreement and the pendency of the Merger could have a material adverse effect on our business, results of operations, financial condition and stock price.***

On October 13, 2022 the Company, The Kroger Co. ("Kroger" or "Parent") and Kettle Merger Sub, Inc., a wholly owned subsidiary of Parent ("Merger Sub"), entered into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which Merger Sub will be merged with and into the Company (the "Merger"), with the Company surviving the Merger as the surviving corporation and a direct, wholly owned subsidiary of Parent. The Merger Agreement is subject to the satisfaction of various covenants and agreements, including, among others the expiration or termination of the applicable waiting period (and any extension thereof) under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended ("HSR Act") and certain other approvals and clearances.

During the period between the date of signing of the Merger Agreement and the closing of the Merger (the "Closing"), our business is exposed to certain inherent risks due to the effect of the announcement or pendency of the Merger and the transactions contemplated by the Merger, including the divestiture plan with C&S Wholesale Grocers, LLC, which may impact our business relationships, financial condition and operating results. Some of these risk factors include:

15

Table of Contents

- difficulties maintaining relationships with customers, distributors, vendors, suppliers, service providers and other business partners, who may defer decisions about working with us, move to our competitors, seek to delay or change existing business relationships with us;
- uncertainties caused by negative sentiment in the marketplace with respect to the Merger, which could adversely impact investor confidence in the Company;
- distraction of our current employees as a result of the Merger which could result in a decline in their productivity or cause distractions in the workplace;
- our inability to attract new employees or retain current employees may be exacerbated due to uncertainties related to the Merger;
- diversion of significant management time and resources towards the completion of the Merger and transactions related to the Merger;
- impact of costs related to completion of the Merger and transactions related to the Merger, including any costs related to any divestitures for which we are required to obtain regulatory approvals;
- our inability to solicit other acquisition proposals, pursue alternative business opportunities, make strategic changes to our business and other restrictions on our ability to conduct our business pursuant to the Merger Agreement; and
- other developments beyond our control, including, but not limited to, changes in domestic or global economic conditions that may affect the timing or success of the Merger.

***While the Merger Agreement is in effect, we are subject to restrictions on our business activities.***

While the Merger Agreement is in effect, we are generally required to conduct our business in the ordinary course consistent with past practices. However, we are restricted from taking certain actions without Kroger's prior consent, which is not to be unreasonably withheld, conditioned or delayed. These limitations include, among other things, certain restrictions on our ability to amend our organizational documents, acquire other businesses and assets, dispose of our assets, make investments, repurchase, reclassify or issue securities, make loans, pay dividends, incur indebtedness, make capital expenditures, enter into, amend or terminate certain contracts, change accounting policies or procedures, initiate or settle certain litigation, change tax classifications and elections, or take certain actions relating to intellectual property. These restrictions could prevent us from pursuing strategic business opportunities and taking extraordinary actions with respect to our business during this period.

***Litigation related to the Merger could prevent or delay completion of the Merger or otherwise negatively affect our businesses and operations.***

Putative stockholder complaints, including stockholder class action complaints, demands for books and records and other complaints or actions may be filed against us, our board of directors, Kroger, Kroger's board of directors, and others in connection with the transactions contemplated by the Merger Agreement. The outcome of litigation is uncertain, and we may not be successful in defending against any such future claims. Lawsuits that may be filed against us, our board of directors, Kroger, or Kroger's board of directors could delay or prevent the Merger and otherwise adversely affect our business, results of operations, and financial condition.

***The ability to complete the Merger is subject to the receipt of consents and approvals from government entities, which may impose conditions that could cause us or Kroger to abandon the Merger.***

On February 26, 2024, the United States Federal Trade Commission ("FTC") issued an administrative complaint and authorized a lawsuit in federal court to enjoin the Merger. A group of nine states joined the FTC complaint and two states have filed suits in respective state courts to enjoin the Merger. Completion of the Merger is conditioned upon, among other things, the expiration or termination of the required waiting period (and any extension thereof) applicable to the Merger and any transactions contemplated by the Merger under the HSR Act, and resolution with

PX6153-016

Table of Contents

the FTC and the states who have filed or may file suit. We cannot provide any assurance that we or Kroger will prevail in court or obtain the necessary approvals to complete the Merger. Failure to prevail in any legal challenge to the Merger may result in the delay or abandonment of the Merger.

***The Merger may not be completed within the expected timeframe, or at all, and significant delay or the failure to complete the Merger could adversely affect our business.***

We cannot assure that our business, our relationships or our financial condition will not be adversely affected if the Merger is not consummated within the expected timeframe, or at all. Failure to complete the Merger within the expected timeframe, or at all, could adversely affect our business and the market price of our common stock in several ways, including the following:

- to the extent that the current market price of our common stock reflects an assumption that the Merger will be completed, it may be negatively impacted because of a failure to complete the Merger within the expected timeframe or at all;
- investor and consumer confidence in our business could decline, litigation could be brought against us, relationships with vendors, service providers, investors and other business partners may be adversely impacted, and we may be unable to retain key personnel;
- we have incurred, and will continue to incur, significant costs, expenses and fees for professional services and other costs in connection with the Merger and the transactions contemplated by the Merger, for which we may receive little or no benefit if the Merger and the transactions contemplated by the Merger are not completed. Many of these fees and costs will be payable by us even if the Merger and the transactions contemplated by the Merger are not completed and may relate to activities that we would not have undertaken other than to complete the Merger; and
- failure to complete the Merger, may result in negative publicity and a negative impression of us in the investment community.

The occurrence of any of these events individually or in combination could materially and adversely affect our business, results of operations, financial condition, and our stock price.

### Risks Related to Our Industry

***Competition in our industry is intense, and our failure to compete successfully may adversely affect our profitability and operating results.***

The food and drug retail industry is large and dynamic, characterized by intense competition among a collection of local, regional and national participants. In addition to new entrants to the market, we face strong competition from existing supercenters, other brick and mortar food and/or drug retailers, club stores, dollar and discount stores, grocery outlets, online retailers and distributors, specialty and niche supermarkets, drug stores, general merchandisers, wholesale stores, convenience stores, natural food stores, farmers' markets, local chains and stand-alone stores that cater to the individual cultural preferences of specific neighborhoods, restaurants, catering companies and home delivery and meal solution companies. Shifts in the competitive landscape, consumer preference or market share may have an adverse effect on our profitability and results of operations.

As a result of consumers' growing desire to shop online, we also face increasing competition from both our existing competitors that have incorporated the internet as a direct-to-consumer channel and online providers that sell grocery products. Although we have accelerated the expansion of our digital business to offer our customers the ability to shop online for both home delivery and Drive Up & Go curbside pickup, there is no assurance that these online initiatives will continue to be successful. In addition, these initiatives may have an adverse impact on our profitability because of lower gross margins or greater operating costs to compete.

17

Table of Contents

Our ability to attract customers is dependent, in large part, upon a combination of channel preference, location, store conditions, quality, price, service, convenience and selection and our ability to leverage existing and emerging digital technologies. In each of these areas, other companies compete with us and may successfully attract our customers by matching or exceeding what we offer or by providing greater shopping convenience or better offerings. In recent years, many of our competitors have aggressively added locations and adopted a multi-channel approach to marketing and advertising. Our responses to competitive pressures, such as additional promotions, increased advertising, additional capital investment including for development of our digital offerings and retail media network, could adversely affect our profitability and cash flow. We cannot guarantee that our competitive response will succeed in increasing or maintaining our share of retail food sales.

An increasingly competitive industry and inflation and deflation in the prices of certain foods have made it difficult for food retailers to achieve positive identical sales growth on a consistent basis. We and our competitors have attempted to maintain or grow our respective share of retail food sales through capital and price investment, increased promotional activity and new and remodeled stores, creating a more difficult environment to consistently increase year-over-year sales. Some of our primary competitors are larger than us, have greater financial resources available to them or sell a diversified mix of non-food products, and, therefore, may be able to devote greater resources to grow their share of retail food sales or offset lower food margins with higher-margin non-food products. Price investment by our competitors has also adversely affected our operating margins.

Our continued success to effectively compete in the food retail industry is dependent upon our ability to control operating expenses, replicating competitor capabilities, making appropriate investments, managing product and labor costs in an increasingly competitive labor market and health care and pension costs stipulated by our collective bargaining agreements. Several of our primary competitors are larger than we are, or are not subject to collective bargaining agreements, allowing them to more effectively leverage their fixed costs or more easily reduce operating expenses. Changes in our product mix also may negatively affect our profitability. Our inability to adequately control and prevent shrink has impacted our results of operations and could impact our results of operations in the future. Failure to accomplish our objectives could impair our ability to compete successfully and adversely affect our profitability. Profit margins in the food retail industry are low. In order to increase or maintain our profit margins, we develop operating strategies to increase revenues, increase gross margins and reduce costs, such as new marketing programs, new advertising campaigns, productivity improvements, shrink-reduction initiatives, distribution center efficiencies, manufacturing efficiencies, energy efficiency programs and other similar strategies. Our failure to achieve forecasted revenue growth, gross margin improvement or cost reductions could have a material adverse effect on our profitability and operating results.

***We may not timely identify or effectively respond to consumer trends, which could negatively affect our relationship with our customers, the demand for our products and services and our market share.***

Because we face intense competition, our success depends, in part, on effectively anticipating evolving trends in demographics and responding to changing consumer preferences and demands. It is difficult to predict consistently and successfully the products and services our customers will demand over time. Failure to timely identify or effectively respond to changing consumer tastes, preferences and spending patterns could lead us to offer our customers a mix of products or a level of pricing that they do not find attractive. This could negatively affect our relationship with our customers, leading them to reduce their visits to our stores and the amount they spend. Further, while we have significantly expanded our digital capabilities and grown our loyalty programs over the last several years, as technology advances, and as the way our customers interact with technology changes, we will need to continue to develop and offer digital, loyalty and media solutions that are both cost effective and compelling to our customers. Our failure to anticipate or respond to customer expectations for products, services, digital and loyalty programs would adversely affect the demand for our products and services and our market share and could have an adverse effect on our financial performance, margins, and operating income.

PX6153-018

Table of Contents

***Consolidation in the healthcare industry could adversely affect our business and financial condition.***

Many organizations in the healthcare industry have consolidated to create larger healthcare enterprises with greater market power, which has resulted in increased pricing pressures. If this consolidation trend continues, it could give the resulting enterprises even greater bargaining power, which may lead to further pressure on the prices for our pharmacy products and services. If these pressures result in reductions in our prices, we will become less profitable unless we are able to achieve corresponding reductions in costs or develop profitable new revenue streams. We expect that market demand, government regulation, third-party reimbursement policies, government contracting requirements, litigation and societal pressures will continue to cause the healthcare industry to evolve, potentially resulting in further business consolidations and alliances among the industry participants we engage with, which may adversely impact our business, financial condition and results of operations.

***Certain risks are inherent in providing pharmacy products and services, and our insurance may not be adequate to cover any claims against us.***

We currently operate 1,725 pharmacies. As a result, we are exposed to risks inherent in the packaging, dispensing, billing, display, distribution and disposal of pharmaceuticals and other healthcare products, including risks of liability for products such as opioids. Although we maintain insurance against such liabilities, we cannot guarantee that the coverage limits under our insurance programs will be adequate to protect us against future claims, or that we will be able to maintain this insurance on acceptable terms in the future, or at all for healthcare and pharmaceutical liabilities. Our results of operations, financial condition or cash flows may be materially adversely affected if in the future our insurance coverage proves to be inadequate or unavailable, or there is an increase in the liability for which we self-insure, or we suffer harm to our reputation because of an error or omission. Also, our business operations and operating results could be materially adversely impacted by legislative, enforcement, regulatory, judicial and public policy changes.

We are subject to numerous federal and state regulations. Each of our in-store pharmacies are enrolled in government healthcare programs and must be licensed by the respective state government. The licensing and enrollment requirements vary from state to state. An additional registration certificate must be granted by the U.S. Drug Enforcement Administration, and, in some states, a separate controlled substance license must be obtained to dispense controlled substances. In addition, pharmacies selling controlled substances are required to maintain extensive records and often report information to state and federal agencies. If we fail to comply with existing or future laws and regulations, we could suffer substantial civil or criminal penalties, including the loss of our licenses to operate pharmacies and our ability to participate in federal and state healthcare programs. Because of the severe penalties we could face, we must devote significant operational and managerial resources to complying with these laws and regulations.

Application of federal and state laws and regulations could subject our current practices to allegations of impropriety or illegality, or could require us to make significant changes to our operations. In addition, we cannot predict the impact of future legislation and regulatory changes on our pharmacy operations or assure that we will be able to obtain or maintain the regulatory approvals required to operate our business.

## Risks Related to Our Supply Chain

***Product and raw material supply disruptions, especially those related to fresh products, may have an adverse effect on our profitability and operating results.***

Reflecting consumer preferences, we have a significant focus on fresh products. We rely on various suppliers and vendors to provide and deliver our fresh and other product inventory on a continuous basis and to supply the raw materials to manufacture certain of our Own Brands products. We could suffer significant fresh and other product inventory losses and significant lost revenue in the event of the loss or a shutdown of a major supplier or vendor,

19

Table of Contents

disruption of our distribution network, extended power outages, natural disasters, foreign conflicts or other catastrophic or unexpected occurrences such as a pandemic like COVID-19. We expect our suppliers to comply with applicable laws, including labor, safety and environmental laws. Our ability to find qualified suppliers who uphold our standards and requirements for products, including fresh, and to access such products in a timely and operationally efficient manner in volumes we may demand may become a significant challenge

***Severe weather, natural disasters and other climate changes may adversely affect our business.***

Severe weather conditions such as hurricanes, earthquakes, floods, wildfires, mudslides, winter storms, tornadoes, as well as other natural disasters in areas in which we have stores or distribution centers have caused and may cause physical damage to our properties, closure of one or more of our stores, manufacturing facilities or distribution centers, lack of an adequate work force, disruption in the manufacture and supply of products, disruption and delays in transportation and delivery of goods, reduction in customer traffic and generally a reduction in the availability of products in our stores.

In addition, adverse climate conditions, weather patterns and their respective impacts such as drought, flood, wildfires, mudslides and rising ambient temperatures adversely impact product cultivation conditions for farmers, ranchers and fishermen, including by disrupting ecosystems and severely altering the growing conditions, nutrient levels, soil moisture, and water availability necessary for the growth and cultivation of crops and raising of animals. As extreme shifts in climate conditions make it more difficult to raise and produce crops, livestock, and seafood, there may be a decrease in the product quality and the yield quantity of food products. Consequently, such a decreased food supply may adversely affect the availability or cost of certain products within the grocery supply chain, which could lead to shortages or reduced gross profit margins as such products become more expensive. At the global level, the impact of climate change on food supply is more likely to lead to food insecurity in countries which, unlike the United States, have climates insufficient to sustain diverse food production. Thus, there may be increased demand for agricultural exports from regions that experience production difficulties yet have sufficient wealth to purchase imports. This may impact the availability of products for us to purchase.

In addition, legislative and regulatory efforts to combat climate change or other environmental issues could result in new or more stringent forms of oversight and mandatory or voluntary reporting, diligence and disclosure, which could increase costs, result in additional taxes and other expenses, and further impact our business, results of operations and financial condition.

***Threats or potential threats to food and drug safety, the occurrence of a widespread health epidemic and/or pandemic or regulatory concerns in our supply chain may adversely affect our business.***

Acts or threats, whether perceived or real, of war or terror or other criminal activity directed at the food and drug industry or the transportation industry, whether or not directly involving our stores, could increase our operating costs or impact general consumer behavior and consumer spending. Other events that give rise to actual or potential food contamination, drug contamination or food-borne illnesses, or a widespread regional, national or global health epidemic and/or pandemic could have an adverse effect on our operating results or disrupt production and delivery of the products we sell, our ability to appropriately and safely staff our stores and cause customers to avoid public gathering places or otherwise change their shopping behaviors.

We source our products from vendors and suppliers and related networks across the globe who may be subject to regulatory actions or face criticism due to actual or perceived social injustices, including human trafficking, non-sustainable practices, child labor or environmental, health and safety violations. A disruption in our supply chain due to any regulatory action or social injustice could have an adverse impact on our supply chain and ultimately our business, including potential harm to our reputation.

PX6153-020

Table of Contents

***We could be affected if consumers lose confidence in the food supply chain or the quality and safety of our products.***

We could be adversely affected if consumers lose confidence in the safety and quality of certain food products. Adverse publicity about these types of concerns, whether valid or not, may discourage consumers from buying our products or cause production and delivery disruptions. To the extent that a pathogen is food-borne, or perceived to be food-borne, future outbreaks may adversely affect the price and availability of certain food products and cause our customers to eat less of such products. In addition, recalls or withdrawals of food products, and in particular the food products we manufacture or are sold under any of our Own Brands product names, may involve costs to us or reputational harm to us. The real or perceived sale of contaminated food products by us could result in product liability claims, a loss of consumer confidence and product recalls, which could have a material adverse effect on our business.

***Fuel prices and availability may adversely affect our results of operations.***

We currently operate 402 fuel centers that are adjacent to many of our store locations. As a result, we sell a significant amount of gasoline and diesel fuel. Increased regulation or significant increases in wholesale fuel costs could result in lower gross margins on fuel sales, and demand could be negatively impacted by retail price increases as well as by concerns about the effect of emissions on the environment. We are unable to predict future regulations, environmental effects, political unrest, geopolitical tensions, hostilities or boycotts, acts of terrorism, the actions of major oil producing countries to regulate oil production and other matters that may affect the cost and availability of fuel, and how our customers will react to any of the preceding matters, which could adversely affect our results of operations.

***Increased commodity prices may adversely impact our profitability.***

Many of our own and sourced products include ingredients such as wheat, corn, oils, milk, sugar, proteins, cocoa and other commodities. Commodity prices can be volatile and can be impacted by global conflicts such as the impact on wheat and corn prices by the armed conflict between Russia and Ukraine. Any increase in commodity prices may cause an increase in our input costs or the prices our vendors seek from us. Although we typically are able to pass on modest commodity price increases or mitigate vendor efforts to increase our costs, we may be unable to continue to do so, either in whole or in part, if commodity prices increase materially or there are significant inflationary pressures. If we are forced to increase prices, our customers may reduce their purchases at our stores or trade down to less profitable products. Both may adversely impact our profitability as a result of reduced revenue or reduced margins.

**Risks Related to Our Workforce**

***A significant majority of our employees are unionized, and our relationship with unions, including labor disputes or work stoppages, could have an adverse impact on our operations and financial results.***

As of February 24, 2024, approximately 200,000 of our employees were covered by collective bargaining agreements. During fiscal 2023, collective bargaining agreements covering approximately 32,500 employees expired and were successfully renegotiated. In fiscal 2024 collective bargaining agreements covering approximately 28,500 employees are scheduled to expire. In future negotiations with labor unions, we expect that health care, pension costs and/or contributions and wage costs, among other issues, will be important topics for negotiation. If, upon the expiration of such collective bargaining agreements, we are unable to negotiate acceptable contracts with labor unions, it could result in strikes by the affected workers and thereby significantly disrupt our operations. As

21

Table of Contents

part of our collective bargaining agreements, we may need to fund additional pension contributions, which would negatively impact our operating costs.

***Increased pension expenses, contributions and surcharges may have an adverse impact on our financial results.***

We currently contribute to 27 multiemployer pension plans for a substantial majority of employees represented by unions pursuant to collective bargaining agreements that require us to contribute to these plans. Under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), the Pension Benefit Guaranty Corporation (the "PBGC") has any authority to petition a court to terminate an underfunded pension plan in limited circumstances. In the event that our defined benefit pension plans are terminated for any reason, we could be liable for the entire amount of the underfunding, as calculated by the PBGC based on its own assumptions (which would result in a larger obligation than that based on the actuarial assumptions used to fund such plans). Under ERISA and the Internal Revenue Code, as amended (the "Code"), the liability under these defined benefit plans is joint and several with all members of our control group, such that each member of our control group is potentially liable for the defined benefit plans of each other member of the control group.

Based on an assessment of the most recent information available, we believe that most of the multiemployer plans to which we contribute are underfunded, which is the amount by which the actuarial determined plan liabilities exceed the value of the plan assets. We are only one of a number of employers contributing to these plans and the underfunding of any of these plans to which we contribute are not our liability. Though we are not obligated nor the guarantor for any of the underfunding of multiemployer plans to which we contribute, as of December 31, 2023, we attempted to estimate our allocable share of the underfunding of multiemployer plans to which we contribute, based on the ratio of our contributions to the total of all contributions to these plans in a year. Our estimate of the Company's allocable share of the underfunding of multiemployer plans to which we contribute was $4.5 billion. Our estimate is based on the most current information available to us including actuarial evaluations and other data (that includes the estimates of others), and such information may be outdated or otherwise unreliable. Our estimate could also change based on the amount contributed to the plans, investment returns on the assets held in the plans, actions taken by trustees who manage the plans' benefit payments, interest rates, the amount of withdrawal liability payments made to the plans, if the employers currently contributing to these plans cease participation, and requirements under the Pension Protection Act of 2006, the Multiemployer Pension Reform Act of 2014 and applicable provisions of the Code.

The American Rescue Plan Act ("ARP Act") establishes a special financial assistance program for financially troubled multiemployer pension plans. Under the ARP Act, eligible multiemployer plans can apply to receive a one-time cash payment in the amount needed to pay pension benefits through the plan year ending 2051. We participate in 16 multiemployer plans that may be eligible for the special financial assistance.

In the event we were to exit certain markets or otherwise cease contributing to multiemployer plans, we could trigger a substantial withdrawal liability. Such withdrawal liability may have a material adverse impact on our financial results.

We are also the sponsors of defined benefit retirement plans for certain employees. The funded status of these plans is a significant factor in determining annual pension expense and cash contributions to fund the plans. Unfavorable investment performance, increased pension expense and cash contributions may have an adverse impact on our financial results.

***The minimum wage continues to increase and is subject to factors outside of our control. Changes to wage regulations could have an impact on our future results of operations.***

A considerable number of our employees are paid at rates related to the federal minimum wage. Additionally, many of our stores are located in states, including California, where the minimum wage is greater than the federal

22

Table of Contents

minimum wage and where a considerable number of employees receive compensation equal to the state's minimum wage which are also slated to increase over the next few years. As examples, in California and New Jersey, where we employed 70,000 and 8,000 associates, respectively, as of February 24, 2024, the current minimum wage was increased to $16.00 per hour and $15.13 per hour, respectively, effective January 1, 2024. Moreover, municipalities may set minimum wages above the applicable state standards. Increases in the federal minimum wage or the enactment of additional state or local minimum wage increases could increase our labor costs, which may adversely affect our results of operations and financial condition.

The food retail industry is labor intensive. Our ability to meet our labor needs, while controlling wage and labor-related costs, is subject to numerous external factors, including the availability of qualified persons in the workforce in the local markets in which we are located, unemployment levels within those markets, prevailing wage rates, changing demographics, attitudes toward employment in the food and drug retail industry, the perception of our corporate values and business strategy, health and other insurance costs, the impact of the Merger and changes in employment and labor laws. Such laws related to employee hours, wages, job classification and benefits could significantly increase our operating costs. In the event of increasing wage rates, if we fail to increase our wages competitively, the quality of our workforce could decline, causing our customer service to suffer, while increasing wages for our employees could cause our gross margins to decrease. If we are unable to hire and retain employees capable of meeting our business needs and expectations, our business and brand image may be impaired. Any failure to meet our staffing needs or any material increase in turnover rates of our employees may adversely affect our business, results of operations and financial condition.

***Failure to attract and retain qualified associates could materially adversely affect our financial performance and our ability to successfully execute our business strategy.***

Our ability to continue to conduct and expand our operations depends on our ability to attract and retain a large and growing number of qualified associates. Our ability to meet our labor needs, including our ability to find qualified personnel to fill positions that become vacant at our existing stores and distribution centers, while controlling our associate wage and related labor costs, is generally subject to numerous external factors, including the availability of a sufficient number of qualified persons in the work force of the markets in which we operate, unemployment levels within those markets, prevailing wage rates, changing demographics, attitudes toward employment in the food and drug retail industry, the perception of our corporate values and business strategy, health and other insurance costs, the impact of the Merger and adoption of new or revised employment and labor laws and regulations. If we are unable to locate, to attract or to retain qualified personnel, the quality of service we provide to our customers may decrease and our financial performance may be adversely affected.

The continued successful implementation of our business strategy depends in large part upon the ability and experience of members of our senior management. In addition, our financial performance is dependent on our ability to identify, hire, train, motivate and retain qualified management, technical, sales and marketing and retail personnel. If we lose the services of members of our senior management or are unable to continue to attract and retain the necessary personnel, we may not be able to successfully execute our business strategy, which could have an adverse effect on our business.

### Legal and Regulatory Risks

***Unfavorable changes in government regulation may have a material adverse effect on our business.***

We operate our business within strict and complex regulatory environments and could be materially adversely affected by changes to, and/or any failure to comply with, existing and new legal requirements. In addition, our industry faces significant political, societal, and media scrutiny, and we may be subject to frequent or increasing challenges which may impact our reputation and business. Additionally, shifts in enforcement practices or regulatory scrutiny generally cannot be anticipated or predicted or our predictions may not be accurate. If we fail to

23

Table of Contents

predict or respond adequately to regulatory changes or expanding disclosure requirements, or do not respond as effectively as our competitors, our reputation, business, operations, and financial performance may be adversely affected. Political, governmental, and regulatory regimes and practices can quickly change as a result of elections or other events over which we have little to no control. Such changes, including those which may occur due to elections held in 2024, are unpredictable and may have negative impacts on our business and operations. Compliance with laws, regulations, policies, and enforcement practices may become challenging requiring operational changes which may be difficult to implement, increase our operating costs, require significant capital expenditures, or result in adverse publicity and harm our reputation.

***Tax matters could adversely affect our results of operations and financial conditions.***

We may be affected by higher rates of federal, state, or local tax imposed as a result of political developments or economic conditions, which could affect our effective tax rate. Our effective tax rate and future tax liability could be adversely affected by regulatory and legal changes, the results of tax audits and examinations, and changes in accounting principles and interpretations relating to tax matters, all of which could negatively impact our business. In addition, changes in tax rates, tax laws, and regulations that impact our customers or the economy generally may also impact our financial condition and results of operations.

***Unfavorable changes in, failure to comply with or increased costs to comply with environmental laws and regulations could adversely affect us. The storage and sale of petroleum products could expose us to potentially significant liabilities.***

Our operations, including our 402 fuel centers, are subject to various laws and regulations relating to the protection of the environment, including those governing the storage, management, disposal and cleanup of hazardous materials. Some environmental laws, such as the Comprehensive Environmental Response, Compensation and Liability Act and similar state statutes, impose strict, and under certain circumstances joint and several, liability for costs to remediate a contaminated site, and also impose liability for damages to natural resources.

Third-party claims in connection with releases of, or exposure to, hazardous materials relating to our current or former properties or third-party waste disposal sites can also arise. In addition, the presence of contamination at any of our properties could impair our ability to sell or lease the contaminated properties or to borrow money using any of these properties as collateral. The costs and liabilities associated with any such contamination could be substantial and could have a material adverse effect on our business. Under current environmental laws, we may be held responsible for the remediation of environmental conditions regardless of whether we lease, sublease or own the stores or other facilities and regardless of whether such environmental conditions were created by us or a prior owner or tenant. In addition, the increased focus on climate change, waste management and other environmental issues may result in new environmental laws or regulations that negatively affect us directly or indirectly through increased costs on our suppliers. There can be no assurance that environmental contamination relating to prior, existing or future sites or other environmental changes will not adversely affect us through, for example, business interruption, cost of remediation or adverse publicity.

***We are subject to, and may in the future be subject to, legal or other proceedings that could have a material adverse effect on us.***

In the course of conducting our business, arising in or outside of the ordinary course, we are and may become a party to various legal proceedings, including class actions in matters involving personnel and employment issues, federal and state wage and hour laws, personal injury, antitrust claims based on both federal and state law, packaging or product claims, claims related to the sale of drug or pharmacy products, such as opioids, claims invoking consumer-protection statutes, intellectual property claims and fiduciary and securities claims. We may also become subject to governmental and regulatory inquiries related to our operations. We estimate our exposure to legal proceedings and establish reserves for the estimated liabilities. We are unable to predict the outcome of any

24

Table of Contents

litigation, investigation or any action by governmental entities and can provide no assurance as to the scope and outcome of these matters and whether our business, financial position, results of operations or cash flows will not be materially adversely affected.

***We use a combination of insurance and self-insurance to address potential liabilities for workers' compensation, automobile and general liability, property risk (including earthquake and flood coverage), director and officers' liability, employment practices liability, pharmacy liability, employee health care benefits and cyber and terrorism risks.***

We estimate the liabilities associated with the risks retained by us, in part, by considering historical claims experience, demographic and severity factors and other actuarial assumptions which, by their nature, are subject to a high degree of variability. Among the causes of this variability are unpredictable external factors affecting future inflation rates, discount rates, litigation trends, legal interpretations, benefit level changes and claim settlement patterns. The majority of our workers' compensation liability is from claims occurring in California, where workers' compensation has received intense scrutiny from the state's politicians, insurers, employers and providers, as well as the public in general. If other states adopt workers' compensation programs similar to California's, then our workers' compensation liability may increase which could have a material adverse impact on our results of operations.

### Risks Related to Information Security, Cybersecurity, Data Privacy and Evolving Technologies

***We may be adversely affected by risks related to our dependence on IT systems. Any future changes to or intrusion into these IT systems, even if we are compliant with industry security standards, could materially adversely affect our financial condition and operating results.***

We have complex information technology systems that are important to the success of our business operations, financial reporting and marketing initiatives. Our information systems are subject to outages, unplanned downtime, program transitions, breakdowns, ransomware attacks, viruses, malicious programs and other cyber incidents. If we fail to timely or successfully mitigate such adverse events affecting these systems, or experience difficulties accessing the proprietary business data stored in these systems, or in maintaining, expanding or upgrading existing systems or implementing new systems, we could incur significant losses to our business and operations. These risks may be further exacerbated by the deployment and use of cloud-based enterprise solutions. In a cloud computing environment, we could be subject to outages by third-party service providers and security breaches to their systems, which we may have little control over. In the case of a cloud computing outage, the reconstitution of our business services running on those computing resources will be dependent on the third-party hosting provider restoring availability.

***Improper activities by third parties, exploitation of encryption technology, new data-hacking tools and discoveries and other events or developments may result in future intrusions into or compromise of our networks, payment card terminals or other payment systems.***

We regularly defend against and respond to data security incidents. While we are vigilant in monitoring the security of our information technology systems, we may not be able to prevent all unauthorized access or remediate the impact of such unauthorized access. The techniques used by cyber criminals change frequently and often cannot be recognized until launched against a target; accordingly, we may not be able to anticipate these frequently changing techniques, implement adequate preventive measures for all of them or remediate any unauthorized access on a timely basis. In addition, ongoing geopolitical conflicts may increase the risk of cyberattacks which could impact our operations. Any unauthorized access to our customers' sensitive information, data belonging to us or our vendors or employee data, even if we are compliant with industry security standards, could put us at a competitive disadvantage, result in deterioration of our customers', vendors' and employees' confidence in us and subject us to

PX6153-025

Table of Contents

investigations, required notifications, potential litigation, liability, fines and penalties and consent decrees, resulting in a possible material adverse impact on our financial condition and results of operations.

As a merchant that accepts debit and credit cards for payment, we are subject to the Payment Card Industry ("PCI") Data Security Standard ("PCI DSS"), issued by the PCI Council. PCI DSS contains compliance guidelines and standards with regard to security surrounding the physical administrative and technical storage, processing and transmission of individual cardholder data. By accepting debit cards for payment, we are also subject to compliance with American National Standards Institute ("ANSI") data encryption standards and payment network security operating guidelines. Failure to be PCI compliant or to meet other payment card standards may result in the imposition of financial penalties or the allocation by the card brands of the costs of fraudulent charges to us. As well, the Fair and Accurate Credit Transactions Act ("FACTA") requires systems that print payment card receipts to employ personal account number truncation so that the consumer's full account number is not viewable on the slip. Despite our efforts to comply with these or other payment card standards and other information security measures, we cannot be certain that all of our IT systems will be able to prevent, contain or detect all cyber-attacks or intrusions. To the extent that any disruption results in the loss, damage or misappropriation of information, we may be adversely affected by claims from customers, financial institutions, regulatory authorities, payment card associations and others. In addition, privacy and information security laws and standards continue to evolve and could expose us to further regulatory burdens. The cost of complying with stricter laws and standards, including PCI DSS, ANSI and FACTA data encryption standards and the California Privacy Rights Act and other state laws, could be significant.

***The loss of confidence from a data security incident involving our customers, employees or vendors could materially adversely affect our financial condition and operating results.***

We receive and store personal information in connection with our business including from processing credit card data, digital marketing, and human resources records. The protection of our customer, employee and vendor data is critically important to us. Despite our considerable efforts to secure, upgrade and maintain our computer networks, our information security could be compromised, and customer, employee and vendor confidential information could be misappropriated whether as a result of cyberattacks on our information systems, the information systems hosted by third party providers or otherwise. If we experience a data security incident, we could be exposed to government enforcement actions, ransomware claims, loss of business information, negative publicity and possible claims from customers, associates, financial institutions and payment card associations. In addition, our customers could lose confidence in our ability to protect their personal information, which could cause them to stop shopping at our stores altogether and materially adversely affect our financial condition and operating results.

***We and our third parties may use artificial intelligence in our business, which could result in competitive and reputational harm, and legal liability, and adversely affect our results of operations.***

We and our third parties are increasingly incorporating artificial intelligence ("AI") solutions into our operations, systems, and services. Our competitors may incorporate AI into their products more quickly or more successfully than us, which could impair our ability to compete effectively in the market. Additionally, if the content, analyses, or recommendations that AI applications assist in producing are or are alleged to be deficient, inaccurate, or biased, our business, financial condition, and results of operations may be adversely affected.

AI presents emerging ethical issues and potential harms to our customers, patients, and associates and if our use of AI becomes controversial, we may experience competitive harm, brand or reputational harm, or legal liability. The rapid evolution of AI, including expected government regulation of AI and automated decision making, requires resources, formalized AI governance, a commitment to the ethical and responsible use of data, and processes to best meet these challenges. If we fail to adopt AI in a thoughtful and strategic manner, the risks above may be exacerbated.

26

PX6153-026

Table of Contents

### Risks Related to Our Indebtedness

***Our indebtedness could adversely affect our financial condition and prevent us from fulfilling our obligations under our indebtedness.***

As of February 24, 2024, we had approximately $7.7 billion of debt outstanding (other than finance lease obligations), and, subject to our borrowing base, we would have been able to borrow an additional $3.8 billion under our asset-based loan ("ABL") facility (the "ABL Facility"). As of February 24, 2024, we and our subsidiaries had approximately $0.5 billion of finance lease obligations.

Our indebtedness could have important consequences. For example, it could:

- increase our vulnerability to general adverse economic and industry conditions;
- require us to dedicate a substantial portion of our cash flow from operations to payments on our indebtedness, thereby reducing the availability of our cash flow to fund working capital, capital expenditures and other general corporate purposes, including acquisitions;
- limit our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate;
- place us at a competitive disadvantage compared to our competitors that have less debt; and
- limit our ability to borrow additional funds.

In addition, there can be no assurance that we will be able to refinance any of our debt or that we will be able to refinance on commercially reasonable terms. If we were unable to make payments or refinance our debt or obtain new financing under these circumstances, we would have to consider other options, such as:

- sales of assets;
- sales of equity; or
- restructure of the applicable debt.

***We may incur substantially more debt in the future.***

We and our subsidiaries may incur substantial additional indebtedness in the future. The terms of the credit agreement that governs the ABL Facility and the indentures that govern our indebtedness, as disclosed in "Part II—Item 8. Financial Statements and Supplementary Data—Note 12", permit us to incur significant additional debt, subject to certain limitations. If new indebtedness is added to our and our subsidiaries' current debt levels, the related risks that we and they now face would increase.

***To service our indebtedness, we require a significant amount of cash, and our ability to generate cash depends on many factors beyond our control.***

Our ability to make cash payments on and to refinance the indebtedness and to fund planned capital expenditures will depend on our ability to generate significant operating cash flow in the future, as described in the section entitled "Part II—Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" of this Annual Report on Form 10-K. This ability is, to a significant extent, subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond our control.

Our business may not generate sufficient cash flow from operations to enable us to pay our indebtedness or to fund our other liquidity needs. In any such circumstance, we may need to refinance all or a portion of our indebtedness, on or before maturity. We may not be able to refinance any indebtedness on commercially reasonable terms, or at all. If we cannot service our indebtedness, we may have to take actions such as selling assets, seeking additional

PX6153-027

Table of Contents

equity or reducing or delaying capital expenditures, strategic acquisitions and investments. Any such action, if necessary, may not be effected on commercially reasonable terms, or at all. The instruments governing our indebtedness may restrict our ability to sell assets and our use of the proceeds from such sales.

If we are unable to generate sufficient cash flow or are otherwise unable to obtain funds necessary to meet required payments of principal, premium, if any, and interest on our indebtedness, or if we otherwise fail to comply with the various covenants in the instruments governing our indebtedness, we could be in default under the terms of the agreements governing such indebtedness. In the event of such default, the holders of such indebtedness could elect to declare all the funds borrowed thereunder to be due and payable, together with accrued and unpaid interest, the lenders under our credit agreement, or any replacement revolving credit facility in respect thereof, could elect to terminate their revolving commitments thereunder, cease making further loans and institute foreclosure proceedings against our assets, and we could be forced into bankruptcy or liquidation.

On February 15, 2023, we entered into a LIBOR Transition Amendment with the lenders under the ABL Facility, which, among other things, replaced LIBOR with a term SOFR (of terms of one, three or six months, or if available, other periods of twelve months or less). Since the initial publication of SOFR, daily changes in the rate have, on occasion, been more volatile than daily changes in comparable benchmark or market rates, and SOFR over time may bear little or no relation to the historical actual or historical indicative data. It is possible that the volatility of and uncertainty around SOFR as a LIBOR replacement rate could increase loan rates and borrowing costs under the ABL Facility.

***Our debt instruments limit our flexibility in operating our business.***

Our debt instruments contain various covenants that limit our and our restricted subsidiaries' ability to engage in specified types of transactions. A breach of any of these covenants could result in a default under our debt instruments. Any debt agreements we enter into in the future may further limit our ability to enter into certain types of transactions. In addition, certain of the covenants governing the ABL Facility and our existing notes restrict, among other things, our and our restricted subsidiaries' ability to:

- incur additional indebtedness or provide guarantees in respect of obligations of other persons;
- pay dividends on, repurchase stock from or make distributions to our stockholders, or make other restricted payments or make certain investments;
- prepay, redeem or repurchase debt;
- make loans, investments and capital expenditures;
- sell or otherwise dispose of certain assets;
- incur liens;
- engage in sale leaseback transactions;
- restrict dividends, loans or asset transfers from our subsidiaries;
- consolidate, merge, sell or otherwise dispose of all or substantially all of our assets;
- enter into a new or different line of business; and
- enter into certain transactions with our affiliates.

In addition, the restrictive covenants in our ABL Facility require us, in certain circumstances, to maintain a specific fixed charge coverage ratio. Our ability to meet that financial ratio can be affected by events beyond our control, and there can be no assurance that we will meet it. A breach of this covenant could result in a default under such facilities. Moreover, the occurrence of a default under our ABL Facility could result in an event of default under our other indebtedness. Upon the occurrence of an event of default under our ABL Facility, the lenders could elect to declare all amounts outstanding under the ABL Facility to be immediately due and payable and terminate all

PX6153-028

Table of Contents

commitments to extend further credit. Even if we can obtain new financing, it may not be on commercially reasonable terms, or terms that are acceptable to us.

***Increases in interest rates, a downgrade of our credit ratings and/or instability in the credit market could negatively affect our financing costs and our ability to access capital.***

We have exposure to future interest rates based on the variable rate debt under our ABL Facility and to the extent we raise additional debt in the capital markets to meet maturing debt obligations, to fund our capital expenditures, working capital needs and to finance future acquisitions. Daily working capital requirements are typically financed with operational cash flow and use of our ABL Facility. The interest rate on these borrowing arrangements is generally determined from the inter-bank offering rate at the borrowing date plus a pre-set margin. Significant and sustained increases in market interest rates could materially increase our financing costs and negatively impact our reported results.

We rely on access to bank and capital markets as sources of liquidity for cash requirements not satisfied by cash flows from operations. A downgrade in our credit ratings from the internationally recognized credit rating agencies could negatively affect our ability to access the bank and capital markets, especially in a time of uncertainty in either of those markets. A rating downgrade could also impact our ability to grow our business by substantially increasing the cost of, or limiting access to, capital.

### Risks Related to Owning Our Common Stock

***The price of our common stock may be volatile or may decline regardless of our operating performance, and you may suffer a decline in value.***

The market price of our common stock is volatile and may be influenced by many factors, some of which are beyond our control, including:

- uncertainties related to the pendency of the Merger;
- if a substantial number of shares of our common stock becomes available for sale and are sold in a short period of time, the market price of our common stock could decline;
- the failure of securities analysts to cover our common stock, or changes in financial estimates by analysts;
- if one or more securities analysts downgrade our shares or if those analysts issue a sell recommendation or other unfavorable commentary or cease publishing reports about us or our business;
- changes in, or investors' perception of, the food and drug retail industry;
- the activities of competitors;
- future issuances and sales of our common stock, including in connection with acquisitions;
- future sales of our common stock by our largest stockholder;
- our quarterly or annual earnings or those of other companies in our industry;
- the public's reaction to our press releases, our other public announcements and our filings with the SEC; and
- litigation involving us, our industry, or both.

***Our largest stockholder is Cerberus, which may have conflicts of interest with other stockholders in the future.***

Cerberus controls in the aggregate approximately 26% of our common stock and Cerberus has certain governance rights pursuant to a Stockholders' Agreement. As a result, Cerberus may be able to influence (i) the election of our directors, (ii) our corporate and management policies and (iii) other matters submitted to our stockholders for approval. The interests of Cerberus may not coincide with the interests of other holders of our common stock. Additionally, Cerberus is in the business of making investments in companies and may, from time to time, acquire

29

Table of Contents

and hold interests in businesses that compete directly or indirectly with us. Cerberus may also pursue, for its own account, acquisition opportunities that may be complementary to our business, and as a result, those acquisition opportunities may not be available to us. So long as Cerberus continues to own a significant amount of the outstanding shares of our common stock, Cerberus will continue to be able to strongly influence our decisions.

***Provisions in our charter documents and Delaware law may prevent attempts by our stockholders to replace or remove our current management, even if beneficial to our stockholders.***

Provisions in our amended and restated certificate of incorporation, as amended ("certificate of incorporation"), and our amended and restated bylaws ("bylaws") may restrict the ability of stockholders to make changes in our governance that they may consider advantageous or desirable. In addition, these provisions may frustrate or prevent any attempts by our stockholders to replace members of our board of directors. Because our board of directors is responsible for appointing the members of our management team, these provisions could in turn affect any attempt by our stockholders to replace members of our management team.

Our certificate of incorporation authorizes our board of directors to issue up to 100,000,000 shares of preferred stock. The preferred stock may be issued in one or more series, the terms of which may be determined by our board of directors at the time of issuance or fixed by resolution without further action by the stockholders. These terms may include voting rights, preferences as to dividends and liquidation, conversion rights, redemption rights, and sinking fund provisions. The issuance of preferred stock could diminish the rights of holders of our common stock, and therefore could reduce the value of our common stock. In addition, specific rights granted to holders of preferred stock could be used to restrict our ability to merge with, or sell assets to, a third party. The ability of our board of directors to issue preferred stock could delay, discourage, prevent, or make it more difficult or costly to acquire or effect a change in control, thereby preserving the current stockholders' control.

***Our ability to pay dividends to our stockholders is restricted by applicable laws and regulations and requirements under certain of our securities and debt agreements, including the ABL Facility, and our existing notes.***

Holders of our common stock are only entitled to receive such cash dividends as our board of directors, in its sole discretion, may declare out of funds legally available for such payments, including minimum capital requirements and limited by contractual obligations or covenants in any financing arrangements that we are currently a party to, including the ABL Facility and our existing notes, or any that we may enter into in the future. As a consequence of these various limitations and restrictions, we may not be able to make, or may have to reduce or eliminate at any time, the payment of dividends on our common stock.

## Item 1B - Unresolved Staff Comments

None.

30

Table of Contents

**Item 1C - Cybersecurity**

**Risk Management and Strategy**

Our cybersecurity risk management processes for assessing and managing risks from cybersecurity threats include proactively identifying and detecting internal and external threats and vulnerabilities and mitigating, containing or eradicating attacks, as necessary. To ensure the highest levels of availability and integrity of critical business systems and services, we have designed a comprehensive risk reduction strategy. Our cybersecurity related risk management processes include assessing risk based on business criticality, data classification, disaster recovery rating, and security monitoring our operations (e.g., network, systems, retail stores, manufacturing plants and distribution centers) to determine where and how critical business operations could be impacted by a cyber incident. We maintain a risk repository and partner with technology and business teams to remediate risk. Our cybersecurity team conducts regular risk assessments to analyze the likelihood of compromise and magnitude of harm caused by unauthorized access, use, disclosure, disruption, modification, or destruction of the Company's systems and data. We also perform risk assessments on our third-party suppliers. We make reasonable efforts to require third-party service providers to manage vulnerabilities in their environments to prevent the risk of impact to our business operations and enterprise network. We also undertake an annual National Institute of Standards and Technology (NIST) Cybersecurity Framework assessment, conducted by a third party, to ensure our cybersecurity program is maturing in-line with industry and includes the key functions and capabilities to address key risk areas.

Collectively with our technology partners, we continuously (24/7) monitor our systems and assets to quickly respond to cybersecurity threats against our business. We conduct vulnerability scanning of our infrastructure and applications to identify risk and work with relevant stakeholders to proactively remediate risk where necessary. Additionally, we partner with multiple third-party managed security service providers ("MSSP") for enhanced monitoring of our information technology and data security environment and to perform proactive detection and investigation of malicious activity within our network. We have defined processes with our third-party MSSPs for handling and escalating identified potential malicious activity within the Company's information technology environment. MSSPs and internal stakeholders perform response actions when a security event is identified. Additionally, we meet regularly with our MSSPs to enhance processes and to ensure service level requirements are being met.

Information security risk events are managed by following our cyber incident response plan and executed by our cybersecurity team in coordination with stakeholders (including legal counsel) who review and assess materiality based on qualitative and quantitative factors. In the case of a risk event that has a broad organizational impact, the event will be escalated to the Company's Corporate Crisis Management Team comprised of senior leadership who will execute a tailored response plan, activate notification procedures where applicable, and guided by legal counsel, coordinate communications with appropriate business partners, and manage the incidents through closure. We conduct annual tabletop exercises to test our response processes and incident management procedures. The outcomes from these exercises are used to drive continuous improvement in how we handle cybersecurity incidents.

**Governance**

Our Board of Directors ("Board") is engaged in risk management and the oversight of Company-wide risks. To supplement its risk oversight function, our Board has delegated certain risk management responsibilities to the Audit and Risk Committee (the "Audit Committee") and the Technology Committee of the Board.

As part of its responsibility related to enterprise-wide risk management, the Audit Committee reviews and discusses with management cybersecurity risks, how they are being addressed and the effectiveness of risk management policies and practices to help safeguard the Company's operations, financial systems, and data in an ever-evolving threat landscape. The internal audit team, in its quarterly compliance and risk assessment update to the Audit Committee, reports on its reviews of the Company's cybersecurity risk exposures, controls and management actions.

31

Table of Contents

In addition to this regular reporting, significant cybersecurity incidents, risks or threats may also be escalated on an as-needed basis to the Audit Committee.

The Technology Committee is responsible for oversight of the Company's technology risk management, including but not limited to the Company's technology related policies, technology architecture, significant emerging technology issues and trends that may affect the Company, and practices and safeguards for information technology, cybersecurity, and data security. Our Chief Information Security Officer ("CISO") presents cybersecurity related topics quarterly to the Technology Committee, including reviews of key information security risk metrics and program maturity progress, and annually updates the Board on external assessments.

At the management level, our cybersecurity organization is led by the Company's CISO, who reports to the Company's Chief Technology and Transformation Officer. The CISO is responsible for all aspects of our cybersecurity program across the Company, which includes cybersecurity engineering and architecture, cybersecurity operations, incident response, threat intelligence, identity and access management, cybersecurity risk and compliance, and vulnerability management. Our CISO has served in leadership roles across the retail, financial services, and national security sectors. Before joining the Company, he was Deputy CISO at Capital One Financial Corp. and Deputy Assistant Secretary of Defense for Cyber Policy. He earned a BS in Mechanical Engineering from the University of Virginia, MS in Telecommunications and Computers from George Washington University, and MBA from the Stanford Graduate School of Business. He continues to serve as a Colonel in the United States Air Force Reserve as a Senior Advisor to the Commander of USCYBERCOM.

**Risks from Material Cybersecurity Threats**

As of the date of this report, we have not identified any cybersecurity threats that have materially affected or are reasonably anticipated to have a material effect on the Company. Although we have not experienced cybersecurity incidents that are individually, or in the aggregate, material, we have experienced cyberattacks in the past, which have been mitigated by preventive, detective, and responsive measures put in place by the Company.

For a detailed discussion of the Company's cybersecurity related risks, see "Item 1A. Risk Factors— Risks Related to Information Security, Cybersecurity, Data Privacy and Evolving Technologies."

PX6153-032

Table of Contents

## Item 2 - Properties

As of February 24, 2024, we operated 2,269 stores located in 34 states and the District of Columbia as shown in the following table:

| Location | Number of stores | Location | Number of stores | Location | Number of stores |
|---|---|---|---|---|---|
| Alaska | 25 | Iowa | 1 | North Dakota | 1 |
| Arizona | 135 | Louisiana | 16 | Oregon | 121 |
| Arkansas | 1 | Maine | 19 | Pennsylvania | 50 |
| California | 586 | Maryland | 68 | Rhode Island | 8 |
| Colorado | 105 | Massachusetts | 76 | South Dakota | 3 |
| Connecticut | 7 | Montana | 40 | Texas | 208 |
| Delaware | 18 | Nebraska | 5 | Utah | 6 |
| District of Columbia | 12 | Nevada | 50 | Vermont | 19 |
| Hawaii | 23 | New Hampshire | 26 | Virginia | 39 |
| Idaho | 44 | New Jersey | 87 | Washington | 215 |
| Illinois | 183 | New Mexico | 34 | Wyoming | 15 |
| Indiana | 4 | New York | 19 | | |

The following table summarizes our stores by size as of February 24, 2024:

| Square Footage | Number of stores | Percent of total |
|---|---|---|
| Less than 30,000 | 217 | 9.6 % |
| 30,000 to 50,000 | 778 | 34.3 % |
| More than 50,000 | 1,274 | 56.1 % |
| Total stores | 2,269 | 100.0 % |

We own or ground-lease approximately 39% of our operating stores and 53% of our industrial properties (distribution centers, warehouses and manufacturing plants).

Our corporate headquarters are located in Boise, Idaho. We own our headquarters. The premises is approximately 250,000 square feet in size. In addition to our corporate headquarters, we have corporate offices in Pleasanton, California, Phoenix, Arizona and Plano, Texas. We believe our properties are well maintained, in good operating condition and suitable for operating our business.

## Item 3 - Legal Proceedings

The Company is subject from time to time to various claims and lawsuits arising in the ordinary course of business, including lawsuits involving trade practices, lawsuits alleging violations of state and/or federal wage and hour laws (including alleged violations of meal and rest period laws and alleged misclassification issues), real estate disputes and other matters. Some of these claims or suits purport or may be determined to be class actions and/or seek substantial damages. It is the opinion of the Company's management that although the amount of liability with respect to certain of the matters described herein cannot be ascertained at this time, any resulting liability of these and other matters, including any punitive damages, will not have a material adverse effect on the Company's business or overall financial condition. See also the matters under the caption *Legal Proceedings* in "Part II—Item 8. Financial Statements and Supplementary Data—Note 13."

PX6153-033

Table of Contents

The Company continually evaluates its exposure to loss contingencies arising from pending or threatened litigation and believes it has made provisions where the loss contingency is probable and can be reasonably estimated. Nonetheless, assessing and predicting the outcomes of these matters involves substantial uncertainties. While management currently believes that the aggregate estimated liabilities currently recorded are reasonable, it remains possible that differences in actual outcomes or changes in management's evaluation or predictions could arise that could be material to the Company's results of operations or cash flows.

*Environmental Matters*

Our operations are subject to regulation under environmental laws, including those relating to waste management, air emissions and underground storage tanks. In addition, as an owner and operator of commercial real estate, we may be subject to liability under applicable environmental laws for clean-up of contamination at our facilities. SEC regulations require us to disclose certain environmental matters arising under federal, state, or local environmental provisions if we reasonably believe that such proceedings may result in monetary sanctions above a stated threshold. Pursuant to SEC regulations, we use a threshold of $1 million for purposes of determining whether disclosure of any such proceedings is required.

**Item 4 - Mine Safety Disclosures**

Not applicable.

34

Table of Contents

## PART II

### Item 5 - Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities

*Market Information for Common Stock*

The Company's Class A common stock began trading on the NYSE on June 26, 2020 under the symbol "ACI." Prior to that date, there was no public market for the Company's Class A common stock. As of April 18, 2024, there were 72 holders of record of our Class A common stock.

*Performance Graph*

The following graph shows a comparison of the total cumulative stockholder return on our Class A common stock with the total return for (i) the S&P 500 Index and (ii) the S&P 500 Retail Composite Index for the period from June 26, 2020 (the date our Class A common stock commenced trading on the NYSE) through February 24, 2024. The graph assumes an investment of $100 in our Class A common stock at market close on June 26, 2020 and the reinvestment of dividends. The comparisons in the table are not intended to forecast or be indicative of possible future performance of our Class A common stock.



Comparison of Cumulative Total Return (Since Listing)

|  | 6/26/20 | 9/12/20 | 2/27/21 | 9/11/21 | 2/26/22 | 9/10/22 | 2/25/23 | 9/9/23 | 2/24/24 |
|---|---|---|---|---|---|---|---|---|---|
| ACI | $ 100.00 | $ 91.59 | $ 105.93 | $ 198.74 | $ 198.34 | $ 199.99 | $ 186.27 | $ 216.72 | $ 198.81 |
| S&P 500 | 100.00 | 111.03 | 126.66 | 148.17 | 145.72 | 139.81 | 137.55 | 155.83 | 179.15 |
| S&P 500 Retail Composite | 100.00 | 115.16 | 118.97 | 139.92 | 131.03 | 122.55 | 107.09 | 128.66 | 154.67 |

35

PX6153-035

*Issuer Purchases of Equity Securities*

On October 14, 2020, the Company's board of directors authorized a share repurchase program that allows the Company to repurchase up to $300.0 million of the Company's Common Stock. As of February 24, 2024, authorization for $180.9 million of share repurchases remained under the share repurchase program. We did not repurchase any shares of our Class A common stock during fiscal 2023 and fiscal 2022.

*Unregistered Sales of Equity Securities*

During fiscal 2023, a holder of the Company's Convertible Preferred Stock converted the remaining 50,000 shares of Convertible Preferred Stock into 2,903,200 shares of the Company's Class A common stock. During fiscal 2022 and fiscal 2021, certain holders of Convertible Preferred Stock converted approximately 1,349,186 and 350,814 shares of Convertible Preferred Stock, respectively, into approximately 78,339,120 and 20,369,582 shares of Class A common stock, respectively. Each share of Convertible Preferred Stock was convertible at a rate of 58.064 shares of Class A common stock (with cash delivered in lieu of any fractional shares of Class A common stock) and were issued from the Company's treasury stock account. The shares of Class A common stock were issued in exchange for Convertible Preferred Stock in reliance on an exemption from the registration requirements of the Securities Act of 1933, as amended (the "Act"), under Section 3(a)(9) of the Act.

PX6153-036

Table of Contents

**Item 6 - [Reserved]**

37

Table of Contents

**Item 7 - Management's Discussion and Analysis of Financial Condition and Results of Operations**

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our Consolidated Financial Statements and related notes found in "Part II—Item 8. Financial Statements and Supplementary Data" in this Form 10-K, as well as "Part II—Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" included in our Annual Report on Form 10-K for the fiscal year ended February 25, 2023 filed with the SEC on April 25, 2023, which provides comparisons of fiscal 2022 and fiscal 2021. This discussion contains forward-looking statements based upon current expectations that involve numerous risks and uncertainties. Our actual results may differ materially from those contained in any forward-looking statements as a result of various factors, including those discussed below and elsewhere in this Annual Report on Form 10-K, particularly in the section entitled "Special Note Regarding Forward-Looking Statements" set forth in Part I and in Item 1A. "Risk Factors."*

*Our last three fiscal years consisted of the 52 weeks ended February 24, 2024 ("fiscal 2023"), the 52 weeks ended February 25, 2023 ("fiscal 2022") and the 52 weeks ended February 26, 2022 ("fiscal 2021"). In this Management's Discussion and Analysis of Financial Condition and Results of Operations of Albertsons Companies, Inc., the words "Albertsons," the "Company," "we," "us," "our" and "ours" refer to Albertsons Companies, Inc., together with its subsidiaries.*

**EXECUTIVE SUMMARY - FISCAL 2023 OVERVIEW**

We are one of the largest food retailers in the United States, with 2,269 stores across 34 states and the District of Columbia as of February 24, 2024. We operate more than 20 well known banners including *Albertsons, Safeway, Vons, Pavilions, Randalls, Tom Thumb, Carrs, Jewel-Osco, Acme, Shaw's, Star Market, United Supermarkets, Market Street, Haggen, Kings Food Markets* and *Balducci's Food Lovers Market*, with approximately 285,000 talented and dedicated employees, as of February 24, 2024, who serve on average 35.3 million customers each week. Additionally, as of February 24, 2024, we operated 1,725 pharmacies, 1,336 in-store branded coffee shops, 402 adjacent fuel centers, 22 dedicated distribution centers, 19 manufacturing facilities and various digital platforms.

*Merger Agreement*

On October 13, 2022, the Company, The Kroger Co. ("Parent") and Kettle Merger Sub, Inc., a wholly owned subsidiary of Parent ("Merger Sub"), entered into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which Merger Sub will be merged with and into the Company (the "Merger"), with the Company surviving the Merger as the surviving corporation and a direct, wholly owned subsidiary of Parent. For additional information about the Merger, see Part II—Item 8. Financial Statements and Supplementary Data—Note 2".

The Company has filed with the SEC a definitive information statement on Schedule 14C with respect to the approval of the Merger and has mailed the definitive information statement to the Company's stockholders. You may obtain copies of all documents filed by the Company with the SEC regarding this transaction, free of charge, at the SEC's website, www.sec.gov or from the Company's website at https://www.albertsonscompanies.com/investors/overview/.

*Fiscal 2023 highlights*

In summary, our financial and operating highlights for fiscal 2023 include:

- Identical sales increased 3.0%

- Digital sales increased 22%

- Loyalty members increased 16% to 39.8 million

38

Table of Contents

- Net income of $1,296 million, or $2.23 per Class A common share
- Adjusted net income of $1,694 million, or $2.88 per Class A common share
- Adjusted EBITDA of $4,318 million
- Operating cash flows of $2,660 million
- Continued modernization of our store fleet, including completing 150 remodels and opening six new stores

*Stores*

The following table shows stores operating, acquired, opened and closed during the periods presented:

| | Fiscal 2023 | Fiscal 2022 | Fiscal 2021 |
|---|---|---|---|
| Stores, beginning of period | 2,271 | 2,276 | 2,277 |
| Acquired | — | — | 3 |
| Opened | 6 | 5 | 7 |
| Closed | (8) | (10) | (11) |
| Stores, end of period | 2,269 | 2,271 | 2,276 |

The following table summarizes our stores by size:

| Square Footage | Number of Stores | | Percent of Total | | Retail Square Feet (1) | |
|---|---|---|---|---|---|---|
| | February 24, 2024 | February 25, 2023 | February 24, 2024 | February 25, 2023 | February 24, 2024 | February 25, 2023 |
| Less than 30,000 | 217 | 219 | 9.6 % | 9.6 % | 4.9 | 5.0 |
| 30,000 to 50,000 | 778 | 779 | 34.3 % | 34.3 % | 32.6 | 32.6 |
| More than 50,000 | 1,274 | 1,273 | 56.1 % | 56.1 % | 75.3 | 75.2 |
| Total Stores | 2,269 | 2,271 | 100.0 % | 100.0 % | 112.8 | 112.8 |

(1) In millions, reflects total square footage of retail stores operating at the end of the period.

## NON-GAAP FINANCIAL MEASURES

We define EBITDA as generally accepted accounting principles ("GAAP") earnings (net loss) before interest, income taxes, depreciation and amortization. We define Adjusted EBITDA as earnings (net loss) before interest, income taxes, depreciation and amortization, further adjusted to eliminate the effects of items management does not consider in assessing our ongoing core performance. We define Adjusted net income as GAAP net income adjusted to eliminate the effects of items management does not consider in assessing our ongoing core performance. We define Adjusted net income per Class A common share as Adjusted net income divided by the weighted average diluted Class A common shares outstanding, as adjusted to reflect all restricted stock units and awards outstanding at the end of the period, as well as the conversion of Convertible Preferred Stock when it is antidilutive for GAAP.

EBITDA, Adjusted EBITDA, Adjusted net income and Adjusted net income per Class A common share (collectively, the "Non-GAAP Measures") are performance measures that provide supplemental information we believe is useful to analysts and investors to evaluate our ongoing results of operations, when considered alongside other GAAP measures such as net income, operating income, gross margin and net income per Class A common share. These Non-GAAP Measures exclude the financial impact of items management does not consider in assessing our ongoing core operating performance, and thereby provide useful measures to analysts and investors of our operating performance on a period-to-period basis. Other companies may have different definitions of Non-GAAP Measures and provide for different adjustments, and comparability to our results of operations may be impacted by such differences. We also use Adjusted EBITDA for board of director and bank compliance reporting.

PX6153-039

Table of Contents

Our presentation of Non-GAAP Measures should not be construed as an inference that our future results will be unaffected by unusual or non-recurring items.

Non-GAAP Measures should not be considered as measures of discretionary cash available to us to invest in the growth of our business. We compensate for these limitations by relying primarily on our GAAP results and using Non-GAAP Measures only for supplemental purposes.

## RESULTS OF OPERATIONS

The following information summarizes the components of our Consolidated Statements of Operations for fiscal 2023 compared to fiscal 2022.

*Summary of Consolidated Statements of Operations (dollars in millions, except per share data):*

| | Fiscal 2023 | | Fiscal 2022 | | Fiscal 2021 | |
|---|---|---|---|---|---|---|
| Net sales and other revenue | $ 79,237.7 | 100.0 % | $ 77,649.7 | 100.0 % | $ 71,887.0 | 100.0 % |
| Cost of sales | 57,192.0 | 72.2 | 55,894.1 | 72.0 | 51,164.6 | 71.2 |
| Gross margin | 22,045.7 | 27.8 | 21,755.6 | 28.0 | 20,722.4 | 28.8 |
| Selling and administrative expenses | 19,932.9 | 25.2 | 19,596.0 | 25.2 | 18,300.5 | 25.5 |
| Loss (gain) on property dispositions and impairment losses, net | 43.9 | — | (147.5) | (0.2) | (15.0) | — |
| Operating income | 2,068.9 | 2.6 | 2,307.1 | 3.0 | 2,436.9 | 3.3 |
| Interest expense, net | 492.1 | 0.6 | 404.6 | 0.5 | 481.9 | 0.7 |
| Loss on debt extinguishment | — | — | — | — | 3.7 | — |
| Other income, net | (12.2) | — | (33.0) | — | (148.2) | (0.2) |
| Income before income taxes | 1,589.0 | 2.0 | 1,935.5 | 2.5 | 2,099.5 | 2.8 |
| Income tax expense | 293.0 | 0.4 | 422.0 | 0.5 | 479.9 | 0.7 |
| Net income | $ 1,296.0 | 1.6 % | $ 1,513.5 | 2.0 % | $ 1,619.6 | 2.1 % |
| | | | | | | |
| Basic net income per Class A common share | $ 2.25 | | $ 2.29 | | $ 2.73 | |
| Diluted net income per Class A common share | 2.23 | | 2.27 | | 2.70 | |

## Net Sales and Other Revenue

Net sales and other revenue increased $1,588.0 million, or 2.0%, to $79,237.7 million in fiscal 2023 from $77,649.7 million in fiscal 2022. The increase in Net sales and other revenue in fiscal 2023 as compared to fiscal 2022 was primarily driven by our 3.0% increase in identical sales, with growth in pharmacy sales and increasing digital sales being the primary contributors to the identical sales increase. The increase in Net sales and other revenue was partially offset by lower fuel sales. The components of the change in Net sales and other revenue for fiscal 2023 were as follows (in millions):

| | Fiscal 2023 |
|---|---|
| Net sales and other revenue for fiscal 2022 | $ 77,649.7 |
| Identical sales increase of 3.0% | 2,164.6 |
| Decrease in fuel sales | (460.9) |
| Decrease in sales due to store closures, net of new store openings | (1.2) |
| Other, net | (114.5) |
| Net sales and other revenue for fiscal 2023 | $ 79,237.7 |

PX6153-040

Table of Contents

*Identical Sales, Excluding Fuel*

Identical sales include stores operating during the same period in both the current year and the prior year, comparing sales on a daily basis. Direct to consumer digital sales are included in identical sales, and fuel sales are excluded from identical sales. Acquired stores become identical on the one-year anniversary date of the acquisition. Identical sales results, on an actual basis, for the past three fiscal years were as follows:

|  | Fiscal 2023 | Fiscal 2022 | Fiscal 2021 |
|---|---|---|---|
| Identical sales, excluding fuel | 3.0% | 6.9% | (0.1)% |

The following table represents Net sales and other revenue by product type (dollars in millions):

|  | Fiscal 2023 | | Fiscal 2022 | |
|---|---|---|---|---|
|  | Amount (1) | % of Total | Amount (1) | % of Total |
| Non-perishables (2) | $ 39,977.3 | 50.5 % | $ 39,142.4 | 50.4 % |
| Fresh (3) | 25,442.7 | 32.1 % | 25,585.4 | 32.9 % |
| Pharmacy | 8,240.0 | 10.4 % | 6,769.3 | 8.7 % |
| Fuel | 4,396.7 | 5.5 % | 4,857.6 | 6.3 % |
| Other (4) | 1,181.0 | 1.5 % | 1,295.0 | 1.7 % |
| Total | $ 79,237.7 | 100.0 % | $ 77,649.7 | 100.0 % |

(1) Digital related sales are included in the categories to which the revenue pertains.

(2) Consists primarily of general merchandise, grocery, dairy and frozen foods.

(3) Consists primarily of produce, meat, deli and prepared foods, bakery, floral and seafood.

(4) Consists primarily of wholesale sales to third parties, commissions, rental income and other miscellaneous revenue.

**Gross Margin**

Gross margin represents the portion of Net sales and other revenue remaining after deducting Cost of sales during the period, including purchase and distribution costs. These costs include, among other things, purchasing and sourcing costs, inbound freight costs, product quality testing costs, warehousing and distribution costs, Own Brands program costs and digital-related delivery and handling costs. Advertising, promotional expenses and vendor allowances are also components of Cost of sales.

Gross margin rate decreased 20 basis points to 27.8% in fiscal 2023 compared to 28.0% in fiscal 2022. Excluding the impacts of fuel and LIFO, gross margin rate decreased 64 basis points. The rate decrease was primarily driven by pharmacy operations, increases in shrink and increases in picking and delivery costs related to the continued growth in our digital sales, partially offset by our procurement and sourcing productivity initiatives. The gross margin rate decrease in fiscal 2023 related to pharmacy operations was primarily due to growth in pharmacy sales and a lower margin rate on COVID-19 vaccines. In addition, the benefits from our productivity initiatives allowed us to provide incremental targeted price investments to our customers during fiscal 2023.

**Selling and Administrative Expenses**

Selling and administrative expenses consist primarily of store level costs, including wages, employee benefits, rent, depreciation and utilities, in addition to certain back-office expenses related to our corporate and division offices.

Selling and administrative expenses remained flat at 25.2% of Net sales and other revenue in both fiscal 2023 and fiscal 2022. Excluding the impact of fuel, Selling and administrative expenses as a percentage of Net sales and other

Table of Contents

revenue decreased 29 basis points during fiscal 2023 compared to fiscal 2022. The decrease in Selling and administrative expenses as a percentage of Net sales and other revenue was primarily attributable to sales leverage of employee costs, which includes the benefit of ongoing productivity initiatives, lower legal and regulatory accruals and settlements and lower depreciation and amortization, partially offset by an increase in operating expenses related to the ongoing development of our digital and omnichannel capabilities, ongoing Merger-related costs and increased store occupancy costs and additional third-party store security services. We expect a continued trend in increased digital spend as we enhance and maintain the modernization of our technology platforms.

**Loss (Gain) on Property Dispositions and Impairment Losses, Net**

For fiscal 2023, net loss on property dispositions and impairment losses was $43.9 million, primarily driven by the impairment and disposal of certain technology assets, partially offset by net gains from the sale of assets. For fiscal 2022, net gain on property dispositions and impairment losses was $147.5 million, primarily driven by $152.6 million of gains from the sale of real estate assets, partially offset by $5.1 million of asset impairments.

**Interest Expense, Net**

Interest expense, net was $492.1 million in fiscal 2023 compared to $404.6 million in fiscal 2022. The increase in Interest expense, net was primarily due to lower interest income, as well as higher average outstanding borrowings and higher average interest rates. The weighted average interest rate was 5.6% and 5.3% during fiscal 2023 and fiscal 2022, respectively, excluding amortization of debt discounts and deferred financing costs.

**Other Income, Net**

For fiscal 2023, Other income, net was $12.2 million primarily driven by non-service cost components of net pension and post-retirement income, realized gains from non-operating investments and income related to our equity interest and gain on sale of El Rancho during fiscal 2023, partially offset by realized and unrealized losses from non-operating investments. For fiscal 2022, Other income, net was $33.0 million primarily driven by non-service cost components of net pension and post-retirement income and income related to our equity investment, partially offset by unrealized losses from non-operating investments.

**Income Taxes**

Income tax expense was $293.0 million, representing a 18.4% effective tax rate, in fiscal 2023, and $422.0 million, representing a 21.8% effective tax rate, in fiscal 2022. The favorability in the effective income tax rate during fiscal 2023 compared to fiscal 2022 was driven by incremental benefits in the reduction of reserves for uncertain tax positions primarily due to the expiration of a foreign statute during fiscal 2023, and additional federal tax credits.

**Net Income and Adjusted Net Income**

Net income was $1,296.0 million or $2.23 per diluted share during fiscal 2023 compared to $1,513.5 million or $2.27 per diluted share during fiscal 2022. Adjusted net income was $1,693.7 million, or $2.88 per share, during fiscal 2023 compared to $1,965.1 million, or $3.37 per share, during fiscal 2022.

**Adjusted EBITDA**

Adjusted EBITDA was $4,317.7 million, or 5.4% of Net sales and other revenue, during fiscal 2023 compared to $4,677.0 million, or 6.0% of Net sales and other revenue, during fiscal 2022.

PX6153-042

Table of Contents

*Reconciliation of Non-GAAP Measures*

The following tables reconcile Net income to Adjusted net income, and diluted net income per Class A common share to Adjusted net income per Class A common share (in millions, except per share data):

| | | Fiscal 2023 | | Fiscal 2022 | | Fiscal 2021 |
|---|---|---|---|---|---|---|
| **Numerator:** | | | | | | |
| Net income | $ | 1,296.0 | $ | 1,513.5 | $ | 1,619.6 |
| Adjustments: | | | | | | |
| Gain on interest rate swaps and energy hedges, net (d) | | (3.2) | | (8.4) | | (22.8) |
| Business transformation (1)(b) | | 45.1 | | 78.3 | | 56.6 |
| Equity-based compensation expense (b) | | 104.5 | | 138.3 | | 101.2 |
| Loss (gain) on property dispositions and impairment losses, net | | 43.9 | | (147.5) | | (15.0) |
| LIFO expense (a) | | 52.0 | | 268.0 | | 115.2 |
| Government-mandated incremental COVID-19 pandemic related pay (2) (b) | | — | | 10.8 | | 57.9 |
| Merger-related costs (3)(b) | | 180.6 | | 56.5 | | — |
| Certain legal and regulatory accruals and settlements, net (b) | | (6.7) | | 100.7 | | (31.0) |
| Amortization of debt discount and deferred financing costs (c) | | 15.5 | | 16.8 | | 23.2 |
| Loss on debt extinguishment | | — | | — | | 3.7 |
| Amortization of intangible assets resulting from acquisitions (b) | | 48.6 | | 50.9 | | 48.5 |
| Combined Plan (4)(b) | | — | | (19.0) | | (106.3) |
| Miscellaneous adjustments (5)(f) | | 41.4 | | 52.1 | | (23.8) |
| Tax impact of adjustments to Adjusted net income | | (124.0) | | (145.9) | | (46.0) |
| Adjusted net income | $ | 1,693.7 | $ | 1,965.1 | $ | 1,781.0 |
| | | | | | | |
| **Denominator:** | | | | | | |
| Weighted average Class A common shares outstanding - diluted | | 581.1 | | 534.0 | | 475.3 |
| Adjustments: | | | | | | |
| Convertible Preferred Stock (6) | | 0.3 | | 42.7 | | 97.7 |
| Restricted stock units and awards (7) | | 6.4 | | 5.9 | | 7.4 |
| Adjusted weighted average Class A common shares outstanding – diluted | | 587.8 | | 582.6 | | 580.4 |
| | | | | | | |
| Adjusted net income per Class A common share - diluted | $ | 2.88 | $ | 3.37 | $ | 3.07 |

43

Table of Contents

|  | Fiscal 2023 | Fiscal 2022 | Fiscal 2021 |
|---|---|---|---|
| Net income per Class A common share - diluted | $ 2.23 | $ 2.27 | $ 2.70 |
| Convertible Preferred Stock (6) | — | 0.36 | 0.13 |
| Non-GAAP adjustments (8) | 0.68 | 0.78 | 0.28 |
| Restricted stock units and awards (7) | (0.03) | (0.04) | (0.04) |
| Adjusted net income per Class A common share - diluted | $ 2.88 | $ 3.37 | $ 3.07 |

The following table is a reconciliation of Adjusted net income to Adjusted EBITDA:

|  | Fiscal 2023 | Fiscal 2022 | Fiscal 2021 |
|---|---|---|---|
| Adjusted net income (9) | $ 1,693.7 | $ 1,965.1 | $ 1,781.0 |
| Tax impact of adjustments to Adjusted net income | 124.0 | 145.9 | 46.0 |
| Income tax expense | 293.0 | 422.0 | 479.9 |
| Amortization of debt discount and deferred financing costs (c) | (15.5) | (16.8) | (23.2) |
| Interest expense, net | 492.1 | 404.6 | 481.9 |
| Amortization of intangible assets resulting from acquisitions (b) | (48.6) | (50.9) | (48.5) |
| Depreciation and amortization (e) | 1,779.0 | 1,807.1 | 1,681.3 |
| Adjusted EBITDA | $ 4,317.7 | $ 4,677.0 | $ 4,398.4 |

(1) Includes costs associated with third-party consulting fees related to our operational priorities and associated business transformation.

(2) Represents incremental COVID-19 related pay legislatively required in certain municipalities in which we operate.

(3) Primarily relates to third-party legal and advisor fees and retention program expense related to the proposed Merger and costs in connection with our previously-announced Board-led review of potential strategic alternatives.

(4) Related to the Combined Plan during the second quarter of fiscal 2022 and fourth quarter of fiscal 2021. See "Part II - Item 8. Financial Statements and Supplementary Data - Note 11" for more information.

(5) Miscellaneous adjustments include the following (see table below):

|  | Fiscal 2023 | Fiscal 2022 | Fiscal 2021 |
|---|---|---|---|
| Non-cash lease-related adjustments | $ 4.2 | $ 5.6 | $ 9.7 |
| Lease and lease-related costs for surplus and closed stores | 19.4 | 22.7 | 27.5 |
| Net realized and unrealized loss (gain) on non-operating investments | 8.6 | 25.2 | (57.8) |
| Other (i) | 9.2 | (1.4) | (3.2) |
| Total miscellaneous adjustments | $ 41.4 | $ 52.1 | $ (23.8) |

(i) Primarily includes adjustments for unconsolidated equity investments, certain contract terminations and other costs not considered in our core performance.

(6) Represents the conversion of Convertible Preferred Stock to the fully outstanding as-converted Class A common shares as of the end of each respective period, for periods in which the Convertible Preferred Stock is antidilutive under GAAP. Fiscal 2022 reflects the impact of the Special Dividend (as defined below) that is attributable to the holders of Convertible Preferred Stock on an as-converted basis.

(7) Represents incremental unvested RSUs and unvested RSAs to adjust the diluted weighted average Class A common shares outstanding during each respective period to the fully outstanding RSUs and RSAs as of the end of each respective period.

(8) Reflects the per share impact of Non-GAAP adjustments for each period. See the reconciliation of Net income to Adjusted net income above for further details.

(9) See the reconciliation of Net income to Adjusted net income above for further details.

Non-GAAP adjustment classifications within the Consolidated Statements of Operations:

(a) Cost of sales

(b) Selling and administrative expenses

PX6153-044

Table of Contents

(c) Interest expense, net

(d) Gain on interest rate swaps and energy hedges, net:

| | Fiscal 2023 | | Fiscal 2022 | | Fiscal 2021 |
|---|---|---|---|---|---|
| Cost of sales | $ | (2.2) | $ | (4.8) | $ | (15.9) |
| Selling and administrative expenses | | (1.0) | | 4.8 | | (3.6) |
| Other income, net | | — | | (8.4) | | (3.3) |
| Total Gain on interest rate swaps and energy hedges, net | $ | (3.2) | $ | (8.4) | $ | (22.8) |

(e) Depreciation and amortization:

| | Fiscal 2023 | | Fiscal 2022 | | Fiscal 2021 |
|---|---|---|---|---|---|
| Cost of sales | $ | 169.0 | $ | 162.7 | $ | 164.7 |
| Selling and administrative expenses | | 1,610.0 | | 1,644.4 | | 1,516.6 |
| Total Depreciation and amortization | $ | 1,779.0 | $ | 1,807.1 | $ | 1,681.3 |

(f) Miscellaneous adjustments:

| | Fiscal 2023 | | Fiscal 2022 | | Fiscal 2021 |
|---|---|---|---|---|---|
| Selling and administrative expenses | $ | 34.7 | $ | 28.9 | $ | 32.7 |
| Other income, net | | 6.7 | | 23.2 | | (56.5) |
| Total Miscellaneous adjustments | $ | 41.4 | $ | 52.1 | $ | (23.8) |

## LIQUIDITY AND FINANCIAL RESOURCES

The following table sets forth the major sources and uses of cash and cash equivalents and restricted cash for each period (in millions):

| | February 24, 2024 | | February 25, 2023 | | February 26, 2022 |
|---|---|---|---|---|---|
| Cash and cash equivalents and restricted cash at end of period | $ | 193.2 | $ | 463.8 | $ | 2,952.6 |
| Cash flows provided by operating activities | | 2,659.5 | | 2,853.9 | | 3,513.4 |
| Cash flows used in investing activities | | (1,746.7) | | (1,977.3) | | (1,538.9) |
| Cash flows used in financing activities | | (1,183.4) | | (3,365.4) | | (789.5) |

*Net Cash Provided By Operating Activities*

Net cash provided by operating activities was $2,659.5 million during fiscal 2023 compared to $2,853.9 million during fiscal 2022. The decrease in cash flow from operating activities during fiscal 2023 compared to fiscal 2022 was due to a decrease in Adjusted EBITDA and more cash paid for income taxes, ongoing Merger-related costs, legal settlements and interest. The decrease was partially offset by changes in working capital primarily related to inventory and accounts payable, including the final payment in fiscal 2022 related to the CARES Act deferral of the employer-paid portion of social security taxes.

*Net Cash Used In Investing Activities*

Net cash used in investing activities during fiscal 2023 was $1,746.7 million primarily due to payments for property, equipment and intangibles of $2,036.6 million, partially offset by proceeds from the sale of assets of

45

Table of Contents

$217.6 million, which includes $166.1 million related to the sale of our equity interest in El Rancho during fiscal 2023. Payments for property, equipment and intangibles included the completion of 150 remodels, the opening of six new stores and continued investment in our digital and technology platforms.

Net cash used in investing activities during fiscal 2022 was $1,977.3 million primarily due to payments for property, equipment and intangibles of $2,156.7 million, partially offset by proceeds primarily from the sale of real estate assets of $195.2 million. Payments for property, equipment and intangibles included continued investments in our digital and technology platforms, the completion of 173 remodels, and the opening of five new stores.

In fiscal 2024, we expect capital expenditures to be in the range of $2.0 billion to $2.1 billion.

### Net Cash Used In Financing Activities

Net cash used in financing activities was $1,183.4 million in fiscal 2023 primarily consisting of the $950.0 million partial repayment of the asset-based loan facility (as amended, the "ABL Facility") and dividends paid on our Class A common stock, partially offset by $150.0 million of proceeds from the issuance of debt under the ABL Facility.

Net cash used in financing activities was $3,365.4 million in fiscal 2022 primarily consisting of dividends paid on our Class A common stock and Convertible Preferred Stock, including the $3,916.9 million payment of the special cash dividend of $6.85 per share of Class A common stock (the "Special Dividend") during the fourth quarter of fiscal 2022, partially offset by the $1,400.0 million borrowing and $400.0 million subsequent partial repayment of the ABL Facility in respect of the Special Dividend. Proceeds from the issuance of long-term debt and payments on long-term debt also included a $750 million issuance and subsequent $750 million redemption of senior unsecured notes.

See "Part II—Item 8. Financial Statements and Supplementary Data—Note 6 and Note 8" for additional information.

### Debt Management

Total debt, including both the current and long-term portions of finance lease obligations, net of debt discounts and deferred financing costs, decreased $841.5 million to $8,068.6 million as of the end of fiscal 2023 compared to $8,910.1 million as of the end of fiscal 2022.

Outstanding debt, including current maturities, net of debt discounts and deferred financing costs, principally consisted of (in millions):

|  | February 24, 2024 |
|---|---|
| Senior Unsecured Notes, New Albertson's L.P. Notes and Safeway Inc. Notes | $ 7,361.9 |
| ABL Facility | 200.0 |
| Finance lease obligations | 460.4 |
| Other financing obligations and mortgage notes payable | 46.3 |
| Total debt, including finance leases | $ 8,068.6 |

During fiscal 2023, we repaid $800.0 million, net, of the ABL Facility. As of February 24, 2024, we had $200.0 million of borrowings that remained outstanding under the ABL Facility and total availability of $3,751.7 million (net of letter of credit usage).

During fiscal 2023 and fiscal 2022, there were no financial maintenance covenants in effect under the ABL Facility because the conditions had not been met.

46

PX6153-046

Table of Contents

See "Part II—Item 8. Financial Statements and Supplementary Data—Note 6" for additional information.

### Dividends

We have established a dividend policy pursuant to which we intend to pay a quarterly dividend on our Class A common stock. Cash dividends paid on our Class A common stock were $276.2 million ($0.48 per common share), $255.1 million ($0.48 per common share) and $207.4 million ($0.44 per common share) during fiscal 2023, fiscal 2022 and fiscal 2021, respectively. On April 11, 2024, we announced the next quarterly dividend payment of $0.12 per share of Class A common stock to be paid on May 10, 2024 to stockholders of record as of the close of business on April 26, 2024.

During the first quarter of fiscal 2023, the conversion of the remaining Convertible Preferred Stock was completed. The holders of Convertible Preferred Stock were entitled to a quarterly dividend at a rate per annum of 6.75% of the liquidation preference per share of the Convertible Preferred Stock. In addition, the holders of Convertible Preferred Stock participated in cash dividends that we pay on our common stock to the extent that such cash dividends exceed $206.25 million per fiscal year and shares of Convertible Preferred Stock remain outstanding as of the applicable record date to participate in such dividends. Cash dividends paid to holders of the Convertible Preferred Stock were $0.8 million, $65.3 million and $114.6 million during fiscal 2023, fiscal 2022 and fiscal 2021, respectively.

On October 13, 2022, we declared the Special Dividend, payable to stockholders of record, including holders of Series A preferred stock on an as-converted basis, as of the close of business on October 24, 2022. On January 20, 2023, the Special Dividend of $3,916.9 million was paid.

### Liquidity and Factors Affecting Liquidity

Based on current operating trends, we believe that we have significant sources of cash to meet our liquidity needs for the next 12 months and for the foreseeable future, including cash on hand, cash flows from operating activities and other sources of liquidity, including borrowings under our ABL Facility. We estimate our liquidity needs over the next 12 months to be in the range of $5,100 million to $5,300 million. This includes $200.0 million related to outstanding borrowings under our ABL Facility for which we may, at our discretion, elect to pay all or a portion of the outstanding balance within the next 12 months, and anticipated requirements for incremental working capital, incremental Merger-related costs, capital expenditures, pension obligations, interest payments, quarterly dividends on Class A common stock, operating leases and finance leases. In addition, we may enter into refinancing and sale leaseback transactions from time to time. We believe we have adequate cash flow to continue to maintain our current debt ratings and to respond effectively to competitive conditions.

The table below presents our material cash requirements as of February 24, 2024 (in millions):

| | Payments Due Per Fiscal Year [1] | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **Total** | | **2024** | | **2025-2026** | | **2027-2028** | | **Thereafter** | |
| Long-term debt (2) | $ | 7,684.2 | $ | 217.0 | $ | 2,774.2 | $ | 1,700.6 | $ | 2,992.4 |
| Estimated interest on long-term debt (3) | | 1,700.6 | | 403.0 | | 741.3 | | 399.1 | | 157.2 |
| Operating leases (4) | | 8,727.4 | | 974.3 | | 1,932.9 | | 1,598.3 | | 4,221.9 |
| Finance leases (4) | | 666.2 | | 94.7 | | 166.7 | | 120.5 | | 284.3 |
| Other obligations (5) | | 1,774.9 | | 390.9 | | 491.6 | | 222.7 | | 669.7 |
| Purchase obligations (6) | | 493.0 | | 285.2 | | 180.6 | | 14.1 | | 13.1 |
| Total contractual obligations | $ | 21,046.3 | $ | 2,365.1 | $ | 6,287.3 | $ | 4,055.3 | $ | 8,338.6 |

(1) The cash requirements table excludes funding of pension and other postretirement benefit obligations, which totaled $18.3 million in fiscal 2023 and is expected to total approximately $85 million in fiscal 2024. This table also excludes recurring contributions under various multiemployer pension plans, which totaled $545.5 million in fiscal 2023 and is expected to total approximately $560 million in fiscal 2024.

47

Table of Contents

(2) Long-term debt amounts exclude any debt discounts and deferred financing costs. See "Part II—Item 8. Financial Statements and Supplementary Data—Note 6" for additional information.

(3) Amounts include contractual interest payments using the stated fixed interest rate or the variable interest rate in effect as of February 24, 2024. See "Part II—Item 8. Financial Statements and Supplementary Data—Note 6" for additional information.

(4) Represents the minimum rents payable under operating and finance leases, excluding common area maintenance, insurance or tax payments, for which we are obligated.

(5) Consists of self-insurance liabilities, which have not been reduced by insurance-related receivables, as well as payment obligations related to the Combined Plan. The table excludes the unfunded pension and postretirement benefit obligation of $259.8 million. The potential settlement payments related to unrecognized tax benefits have been excluded from the contractual obligations table because a reasonably reliable estimate of the timing of future tax settlements cannot be determined. Also excludes deferred tax liabilities and certain other deferred liabilities that will not be settled in cash.

(6) Purchase obligations include various obligations that have specified purchase commitments. As of February 24, 2024, future purchase obligations primarily relate to fixed asset, marketing and information technology commitments, including fixed price contracts. In addition, not included in the contractual obligations table are supply contracts to purchase product for resale to consumers which are typically of a short-term nature with limited or no purchase commitments. We also enter into supply contracts which typically include either volume commitments or fixed expiration dates, termination provisions and other customary contractual considerations. The supply contracts that are cancelable have not been included above.

## Multiemployer Pension Plans

We currently contribute to 27 multiemployer plans which provide retirement benefits to participants based on their service to contributing employers. The benefits are paid from assets held in trust for that purpose and the respective plan trustees are responsible for determining the level of benefits to be provided to participants, the management of the plan assets and plan administration. We continue to monitor any potential exposure to underfunded multiemployer plans for our associates who are beneficiaries of these plans. The underfunding of any of these plans to which we contribute are not our liability and though we are not obligated nor the guarantor for any of the underfunding, we have estimated, based on the ratio of our contributions to the total of all contributions to these plans, our allocable share of the underfunding (the amount by which the actuarial determined plan liabilities exceed the value of the plan assets) of these multiemployer plans to which we contribute to be approximately $4.5 billion.

The American Rescue Plan Act ("ARP Act") establishes a special financial assistance program for financially troubled multiemployer pension plans. Under the ARP Act, eligible multiemployer plans can apply to receive a one-time cash payment in the amount projected by the PBGC to pay pension benefits through the plan year ending 2051. The payment received by the multiemployer plan under this special financial assistance program would not be considered a loan and would not need to be paid back. Any financial assistance received by the multiemployer plan would need to be segregated from the other assets of the multiemployer plans and invested in investment grade bonds or other investments permitted by the PBGC.

Of the 27 multiemployer plans to which we contribute, 16 plans are classified as "Critical" or "Critical and Declining" and potentially eligible for some level of relief under the special financial assistance program through the ARP Act. On July 9, 2021, the PBGC issued its interim final rule with respect to the special financial assistance program. The PBGC interim final rule provides direction on the application requirements, identifies which plans will have priority, eligibility requirements, the determination of the amount of financial assistance to be provided and establishes conditions and restrictions that apply to plans that receive assistance. During the second quarter of fiscal 2022, the PBGC issued the final rule with respect to the special financial assistance program which allowed for both additional funding and the investment of one third of the special financial assistance funds into return-seeking investments. Though the amount of financial assistance that each of these 16 plans could receive will vary by plan, we currently estimate that these 16 plans represent over 90% of the $4.5 billion estimated underfunding. Under the PBGC guidance, these multiemployer plans can apply for assistance based on a priority designation set by the PBGC starting in March 2023 through December 2025. We expect the special financial assistance program

PX6153-048

Table of Contents

under these regulations to provide the funding for these plans to remain solvent for at least the next 25 to 30 years and continue to provide benefits to our associates who are beneficiaries of these multiemployer plans.

We will continue to make our contributions based on collective bargaining agreements for each of the multiemployer plans to which we contribute. Our contributions to multiemployer plans were $545.5 million, $546.5 million and $523.7 million during fiscal 2023, fiscal 2022 and fiscal 2021, respectively, and we expect to contribute approximately $560 million in fiscal 2024. Refer to "Part I—Item 1A. Risk Factors" and "Part II—Item 8. Financial Statements and Supplementary Data—Note 11" for additional information.

*Guarantees*

We are party to a variety of contractual agreements pursuant to which we may be obligated to indemnify the other party for certain matters. These contracts primarily relate to our commercial contracts, operating leases and other real estate contracts, trademarks, intellectual property, financial agreements and various other agreements. Under these agreements, we may provide certain routine indemnifications relating to representations and warranties (for example, ownership of assets, environmental or tax indemnifications) or personal injury matters. The terms of these indemnifications range in duration and may not be explicitly defined. We believe that if we were to incur a loss in any of these matters, the loss would not have a material effect on our financial statements.

We are liable for certain operating leases that were assigned to third parties. If any of these third parties fail to perform their obligations under the leases, we could be responsible for the lease obligation. Because of the wide dispersion among third parties and the variety of remedies available, we believe that if an assignee became insolvent it would not have a material effect on our financial condition, results of operations or cash flows.

In the ordinary course of business, we enter into various supply contracts to purchase products for resale and purchase and service contracts for fixed asset and information technology commitments. We have also entered into fixed price contracts to purchase electricity and natural gas for a portion of our energy needs. These contracts typically include volume commitments or fixed expiration dates, termination provisions and other standard contractual considerations.

*Letters of Credit*

We had letters of credit of $48.3 million outstanding as of February 24, 2024. The letters of credit are maintained primarily to support our performance, payment, deposit or surety obligations. We typically pay bank fees of 1.25% plus a fronting fee of 0.125% on the face amount of the letters of credit.

## NEW ACCOUNTING POLICIES

See "Part II—Item 8. Financial Statements and Supplementary Data—Note 1" for new accounting pronouncements.

## CRITICAL ACCOUNTING POLICIES

The preparation of consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities as of the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

We have chosen accounting policies that we believe are appropriate to report accurately and fairly our operating results and financial position, and we apply those accounting policies in a fair and consistent manner. See "Part II—Item 8. Financial Statements and Supplementary Data—Note 1" for a discussion of our significant accounting policies.

49

Table of Contents

Management believes the following critical accounting policies reflect its more subjective or complex judgments and estimates used in the preparation of our consolidated financial statements.

### *Self-Insurance Liabilities*

We are primarily self-insured for workers' compensation, property, automobile and general liability. The self-insurance liability is undiscounted and determined actuarially, based on claims filed and an estimate of claims incurred but not yet reported. We have established stop-loss amounts that limit our further exposure after a claim reaches the designated stop-loss threshold. In determining our self-insurance liabilities, we perform a continuing review of our overall position and reserving techniques. Since recorded amounts are based on estimates, the ultimate cost of all incurred claims and related expenses may be more or less than the recorded liabilities.

Any actuarial projection of self-insured losses is subject to a high degree of variability. Litigation trends, legal interpretations, benefit level changes, claim settlement patterns and similar factors influenced historical development trends that were used to determine the current year expense and, therefore, contributed to the variability in the annual expense. However, these factors are not direct inputs into the actuarial projection, and thus their individual impact cannot be quantified.

### *Contingencies*

We are involved in a number of legal proceedings and certain regulatory matters. We record a liability when it is probable that a loss has been incurred and the amount is reasonably estimable. We also perform an assessment of the materiality of loss contingencies where a loss is either reasonably possible or it is reasonably possible that an estimated liability could materially change. If a loss or change in the estimated liability has at least a reasonable possibility of occurring and the impact on the financial statements would be material, we provide disclosure of the nature of the uncertainty and estimate of possible loss or range of loss to the extent such estimate can be made. We review all contingencies at least quarterly to determine whether the likelihood of loss has changed and whether a reasonable estimate of the loss can be made. The assessment of the outcome of litigation can be very difficult to predict as it is subject to legal processes that are highly complex, subject to many factors, including those that are not within our control, and highly dependent on individual facts and circumstances. While management currently believes that the estimated liabilities currently recorded are reasonable, it remains possible that differences in actual outcomes or changes in management's evaluation or predictions could arise that could be material to our financial condition, results of operations or cash flows. In addition, although we are not able to predict the outcome or reasonably estimate a range of possible losses in certain matters described in Part II —Item 8. Financial Statements and Supplementary Data—Note 13" and have not recorded an associated accrual related to these matters, an adverse judgment or negotiated settlement in these matters could be material to our financial condition, results of operations or cash flows.

### Item 7A - Quantitative and Qualitative Disclosures About Market Risk

We are exposed to market risk from a variety of sources, including changes in interest rates and energy prices. We have from time to time selectively used derivative financial instruments to reduce these market risks. Our market risk exposures related to interest rates and energy prices are discussed below.

### *Interest Rate Risk and Long-Term Debt*

We are exposed to market risk from fluctuations in interest rates. From time to time, we manage our exposure to interest rate fluctuations through the use of interest rate swaps. At the time of entering into interest rate swap contracts, our risk management objective and strategy is to utilize them to protect us against adverse fluctuations in interest rates by reducing our exposure to variability in cash flows relating to interest payments on a portion of our

PX6153-050

Table of Contents

outstanding debt. The interest rate swaps are not designated as cash flow hedges, and as a result, changes in the fair value of these instruments are recognized in earnings. Our exposure to changes in Term SOFR primarily relates to our ABL Facility which had a $200.0 million outstanding balance as of February 24, 2024. All of our interest rate swaps expired in March 2023. Therefore, we estimate that a 100 basis point increase on our variable interest rates would increase our interest expense by approximately $2 million per year.

The table below provides information about debt instruments that are sensitive to changes in interest rates, and presents principal amounts due and related weighted average interest rates by expected maturity dates (dollars in millions):

| | Fiscal 2024 | Fiscal 2025 | Fiscal 2026 | Fiscal 2027 | Fiscal 2028 | Thereafter | Total | Fair Value |
|---|---|---|---|---|---|---|---|---|
| **Long-Term Debt** | | | | | | | | |
| Fixed Rate - Principal payments | $ 17.0 | $ 14.1 | $ 2,760.1 | $ 1,656.6 | $ 44.0 | $ 2,992.4 | $ 7,484.2 | $ 7,257.2 |
| Weighted average interest rate (1) | 4.61% | 1.50% | 4.94% | 6.29% | 6.60% | 4.87% | 5.21% | |
| Variable Rate - Principal payments | $ 200.0 | $ — | $ — | $ — | $ — | $ — | $ 200.0 | $ 200.0 |
| Weighted average interest rate (1) | 6.67% | 0% | 0% | 0% | 0% | 0% | 6.67% | |

(1) Excludes debt discounts and deferred financing costs.

*Energy Price Risk*

We have entered into fixed price contracts to purchase electricity and natural gas for a portion of our energy needs. We expect to take delivery of these commitments in the normal course of business, and, as a result, these commitments qualify as normal purchases. We also manage our exposure to changes in diesel prices utilized in our distribution process through the use of short-term heating oil derivative contracts. These contracts are economic hedges of price risk and are not designated or accounted for as hedging instruments for accounting purposes. Changes in the fair value of these instruments are recognized in earnings. We do not believe that these energy swaps would cause a material change to our financial position.

51

Table of Contents

**Item 8** - **Financial Statements and Supplementary Data**

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Stockholders and the Board of Directors of Albertsons Companies, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Albertsons Companies, Inc. and subsidiaries (the "Company") as of February 24, 2024 and February 25, 2023, the related consolidated statements of operations and comprehensive income, cash flows, and stockholders' equity for each of the 52 weeks ended February 24, 2024, February 25, 2023, and February 26, 2022, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of February 24, 2024 and February 25 2023, and the results of its operations and its cash flows for each of the three years in the period ended February 24, 2024, in conformity with accounting principles generally accepted in the United States of America.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of February 24, 2024, based on criteria established in *Internal Control — Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated April 22, 2024, expressed an unqualified opinion on the Company's internal control over financial reporting.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the US federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matter**

The critical audit matter communicated below is a matter arising from the current-period audit of the financial statements that was communicated or required to be communicated to the audit committee and that (1) relates to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

PX6153-052

Table of Contents

***Self-Insurance Liabilities—Refer to Note 1 to the financial statements***

*Critical Audit Matter Description*

The Company is primarily self-insured for workers' compensation, property, automobile, and general liability. The self-insurance liability is undiscounted and determined actuarially, based on claims filed and an estimate of claims incurred but not yet reported. The Company has established stop-loss amounts that limit the Company's further exposure after a claim reaches the designated stop-loss threshold. The projected settlement values are estimated based on the Company's historical claim experience, supplemented with industry experience, as necessary and are established using actuarial methods followed in the insurance industry.

We identified the Company's self-insurance liabilities for general liability and workers' compensation as a critical audit matter because estimating projected settlement value of reported and unreported claims involves significant estimation by management, and changes in actuarial assumptions could have a significant impact on management's estimate. This required a high degree of auditor judgment and an increased extent of effort, including the need to involve our actuarial specialists, when performing audit procedures to evaluate whether self-insurance liabilities were appropriately recorded as of February 24, 2024.

*How the Critical Audit Matter Was Addressed in the Audit*

Our audit procedures related to the Company's self-insurance liabilities for general liability and workers' compensation included the following, among others:

- We tested the effectiveness of controls related to these self-insurance liabilities, including management's controls over the projection of settlement value of reported and unreported claims, management's controls over the review of the actuarial report and evaluation of the external actuarial expert's qualifications, competency, and objectivity and evaluation of the underlying data sent to the external actuary.
- We evaluated the methods and assumptions used by management to estimate these self-insurance liabilities by:
    – Reading the Company's insurance policies and comparing the coverage and terms to the assumptions used by management.
    – Testing the underlying data that served as the basis for the actuarial analysis, including historical claims, to test that the inputs to the actuarial estimate were accurate and complete.
    – With the assistance of our actuarial specialists, we:
        ◦ Compared management's prior-year assumptions of expected development and ultimate loss to actuals incurred during the current year to identify potential bias in the determination of these self-insurance liabilities.
        ◦ Developed an independent estimated range of actuarial liabilities for these self-insurance liabilities and compared our estimates to management's estimates.
        ◦ Evaluated the qualifications of the Company's external actuary by assessing their certifications and determining whether they met the Qualification Standards of the American Academy of Actuaries to render the statements of actuarial opinion implicit in their analyses.

/s/ Deloitte & Touche LLP

Boise, Idaho
April 22, 2024

We have served as the Company's auditor since 2006.

PX6153-053

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Stockholders and the Board of Directors of Albertsons Companies, Inc.

**Opinion on Internal Control over Financial Reporting**

We have audited the internal control over financial reporting of Albertsons Companies, Inc. and subsidiaries (the "Company") as of February 24, 2024, based on criteria established in *Internal Control — Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of February 24, 2024, based on criteria established in Internal Control — Integrated Framework (2013) issued by COSO.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated financial statements as of and for the year ended February 24, 2024, of the Company and our report dated April 22, 2024, expressed an unqualified opinion on those financial statements.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

PX6153-054

Table of Contents

/s/ Deloitte & Touche LLP

Boise, Idaho
April 22, 2024

55

PX6153-055

Table of Contents

**Albertsons Companies, Inc. and Subsidiaries**
**Consolidated Balance Sheets**
**(in millions, except share data)**

|  | February 24, 2024 | February 25, 2023 |
|---|---|---|
| **ASSETS** | | |
| **Current assets** | | |
| Cash and cash equivalents | $ 188.7 | $ 455.8 |
| Receivables, net | 724.4 | 687.6 |
| Inventories, net | 4,945.2 | 4,782.0 |
| Prepaid assets | 370.3 | 302.7 |
| Other current assets | 58.9 | 42.3 |
| **Total current assets** | 6,287.5 | 6,270.4 |
| Property and equipment, net | 9,570.3 | 9,358.7 |
| Operating lease right-of-use assets | 5,981.6 | 5,879.1 |
| Intangible assets, net | 2,434.5 | 2,465.4 |
| Goodwill | 1,201.0 | 1,201.0 |
| Other assets | 746.2 | 993.6 |
| **TOTAL ASSETS** | $ 26,221.1 | $ 26,168.2 |
| **LIABILITIES** | | |
| **Current liabilities** | | |
| Accounts payable | $ 4,218.2 | $ 4,173.1 |
| Accrued salaries and wages | 1,302.6 | 1,317.4 |
| Current maturities of long-term debt and finance lease obligations | 285.2 | 1,075.7 |
| Current operating lease obligations | 677.6 | 664.8 |
| Current portion of self-insurance liability | 367.7 | 355.5 |
| Taxes other than income taxes | 325.4 | 382.3 |
| Other current liabilities | 281.0 | 460.0 |
| **Total current liabilities** | 7,457.7 | 8,428.8 |
| Long-term debt and finance lease obligations | 7,783.4 | 7,834.4 |
| Long-term operating lease obligations | 5,493.2 | 5,386.2 |
| Deferred income taxes | 807.6 | 854.0 |
| Long-term self-insurance liability | 899.9 | 878.6 |
| Other long-term liabilities | 1,031.8 | 1,129.8 |
| Commitments and contingencies | | |
| Series A convertible preferred stock, $0.01 par value; 1,750,000 shares authorized, no shares issued and outstanding as of February 24, 2024, and 50,000 shares issued and outstanding as of February 25, 2023 | — | 45.7 |
| Series A-1 convertible preferred stock, $0.01 par value; 1,410,000 shares authorized, no shares issued and outstanding as of February 24, 2024 and February 25, 2023 | — | — |
| **STOCKHOLDERS' EQUITY** | | |
| Undesignated preferred stock, $0.01 par value; 96,840,000 shares authorized, no shares issued as of February 24, 2024 and February 25, 2023 | — | — |
| Class A common stock, $0.01 par value; 1,000,000,000 shares authorized, 594,445,268 and 590,968,600 shares issued as of February 24, 2024 and February 25, 2023, respectively | 5.9 | 5.9 |
| Class A-1 convertible common stock, $0.01 par value; 150,000,000 shares authorized, no shares issued as of February 24, 2024 and February 25, 2023 | — | — |
| Additional paid-in capital | 2,129.6 | 2,072.7 |
| Treasury stock, at cost, 18,397,745 and 21,300,945 shares held as of February 24, 2024 and February 25, 2023, respectively | (304.2) | (352.6) |
| Accumulated other comprehensive income | 88.0 | 69.3 |
| Retained earnings (accumulated deficit) | 828.2 | (185.0) |
| **Total stockholders' equity** | 2,747.5 | 1,610.7 |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | $ 26,221.1 | $ 26,168.2 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

PX6153-056

Table of Contents

**Albertsons Companies, Inc. and Subsidiaries**
**Consolidated Statements of Operations and Comprehensive Income**
(in millions, except per share data)

| | 52 weeks ended February 24, 2024 | | 52 weeks ended February 25, 2023 | | 52 weeks ended February 26, 2022 | |
|---|---|---|---|---|---|---|
| Net sales and other revenue | $ | 79,237.7 | $ | 77,649.7 | $ | 71,887.0 |
| Cost of sales | | 57,192.0 | | 55,894.1 | | 51,164.6 |
| Gross margin | | 22,045.7 | | 21,755.6 | | 20,722.4 |
| | | | | | | |
| Selling and administrative expenses | | 19,932.9 | | 19,596.0 | | 18,300.5 |
| Loss (gain) on property dispositions and impairment losses, net | | 43.9 | | (147.5) | | (15.0) |
| Operating income | | 2,068.9 | | 2,307.1 | | 2,436.9 |
| | | | | | | |
| Interest expense, net | | 492.1 | | 404.6 | | 481.9 |
| Loss on debt extinguishment | | — | | — | | 3.7 |
| Other income, net | | (12.2) | | (33.0) | | (148.2) |
| Income before income taxes | | 1,589.0 | | 1,935.5 | | 2,099.5 |
| | | | | | | |
| Income tax expense | | 293.0 | | 422.0 | | 479.9 |
| Net income | $ | 1,296.0 | $ | 1,513.5 | $ | 1,619.6 |
| | | | | | | |
| Other comprehensive income (loss), net of tax: | | | | | | |
| Recognition of pension gain | | 15.8 | | 4.6 | | 5.8 |
| Other | | 2.9 | | (4.3) | | (0.3) |
| Other comprehensive income | $ | 18.7 | $ | 0.3 | $ | 5.5 |
| | | | | | | |
| Comprehensive income | $ | 1,314.7 | $ | 1,513.8 | $ | 1,625.1 |
| | | | | | | |
| Net income per Class A common share: | | | | | | |
| Basic net income per Class A common share | $ | 2.25 | $ | 2.29 | $ | 2.73 |
| Diluted net income per Class A common share | | 2.23 | | 2.27 | | 2.70 |
| Weighted average Class A common shares outstanding: | | | | | | |
| Basic | | 575.4 | | 529.0 | | 469.6 |
| Diluted | | 581.1 | | 534.0 | | 475.3 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

PX6153-057

Table of Contents

**Albertsons Companies, Inc. and Subsidiaries**
**Consolidated Statements of Cash Flows**
(in millions)

| | 52 weeks ended February 24, 2024 | 52 weeks ended February 25, 2023 | 52 weeks ended February 26, 2022 |
|---|---|---|---|
| **Cash flows from operating activities:** | | | |
| Net income | $ 1,296.0 | $ 1,513.5 | $ 1,619.6 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Loss (gain) on property dispositions and impairment losses, net | 43.9 | (147.5) | (15.0) |
| Depreciation and amortization | 1,779.0 | 1,807.1 | 1,681.3 |
| Operating lease right-of-use assets amortization | 665.2 | 652.7 | 623.9 |
| LIFO expense | 52.0 | 268.0 | 115.2 |
| Deferred income tax | (112.6) | 12.9 | 219.0 |
| Pension and post-retirement benefits income | (2.9) | (21.7) | (54.7) |
| Contributions to pension and post-retirement benefit plans | (18.3) | (27.3) | (29.8) |
| Gain on interest rate swaps and energy hedges, net | (3.2) | (8.4) | (22.8) |
| Deferred financing costs | 15.6 | 16.9 | 23.4 |
| Loss on debt extinguishment | — | — | 3.7 |
| Equity-based compensation expense | 104.5 | 138.3 | 101.2 |
| Other operating activities | 4.6 | 1.8 | (77.0) |
| Changes in operating assets and liabilities, net of effects of acquisition of businesses: | | | |
| Receivables, net | (36.3) | (127.1) | (22.4) |
| Inventories, net | (215.3) | (549.1) | (313.8) |
| Accounts payable, accrued salaries and wages and other accrued liabilities | 100.5 | (164.2) | 679.5 |
| Operating lease liabilities | (654.1) | (637.7) | (604.6) |
| Pension withdrawal liabilities | (88.7) | (103.4) | (131.0) |
| Self-insurance assets and liabilities | 30.6 | 56.2 | 18.6 |
| Other operating assets and liabilities | (301.0) | 172.9 | (300.9) |
| **Net cash provided by operating activities** | 2,659.5 | 2,853.9 | 3,513.4 |
| **Cash flows from investing activities:** | | | |
| Payments for property, equipment and intangibles, including lease buyouts | (2,031.3) | (2,153.9) | (1,606.5) |
| Proceeds from sale of assets | 217.6 | 195.2 | 51.9 |
| Business acquisitions, net of cash acquired | — | — | (25.4) |
| Other investing activities | 67.0 | (18.6) | 41.1 |
| **Net cash used in investing activities** | (1,746.7) | (1,977.3) | (1,538.9) |

PX6153-058

Table of Contents

**Albertsons Companies, Inc. and Subsidiaries**
**Consolidated Statements of Cash Flows**
(in millions)

| | 52 weeks ended February 24, 2024 | 52 weeks ended February 25, 2023 | 52 weeks ended February 26, 2022 |
|---|---|---|---|
| **Cash flows from financing activities:** | | | |
| Proceeds from issuance of long-term debt, including ABL facility | $ 150.0 | $ 2,150.0 | $ — |
| Payments on long-term borrowings, including ABL facility | (950.8) | (1,150.8) | (330.9) |
| Payments of obligations under finance leases | (69.3) | (71.6) | (78.0) |
| Special dividend paid | — | (3,916.9) | — |
| Dividends paid on common stock | (276.2) | (255.1) | (207.4) |
| Dividends paid on convertible preferred stock | (0.8) | (65.3) | (114.6) |
| Employee tax withholding on vesting of restricted stock units | (38.8) | (44.0) | (29.4) |
| Other financing activities | 2.5 | (11.7) | (29.2) |
| **Net cash used in financing activities** | (1,183.4) | (3,365.4) | (789.5) |
| | | | |
| **Net (decrease) increase in cash and cash equivalents and restricted cash** | (270.6) | (2,488.8) | 1,185.0 |
| **Cash and cash equivalents and restricted cash at beginning of period** | 463.8 | 2,952.6 | 1,767.6 |
| **Cash and cash equivalents and restricted cash at end of period** | $ 193.2 | $ 463.8 | $ 2,952.6 |
| | | | |
| **Reconciliation of capital investments:** | | | |
| Payments for property, equipment and intangibles, including payments for lease buyouts | $ (2,031.3) | $ (2,153.9) | $ (1,606.5) |
| Lease buyouts | (5.3) | (2.8) | 11.7 |
| Total payments for capital investments, excluding lease buyouts | $ (2,036.6) | $ (2,156.7) | $ (1,594.8) |
| | | | |
| **Supplemental cash flow information:** | | | |
| Non-cash investing and financing activities were as follows: | | | |
| Additions of finance lease obligations, excluding business acquisitions | $ 21.6 | $ 23.3 | $ 81.0 |
| Purchases of property and equipment included in accounts payable | 246.8 | 333.5 | 499.7 |
| Interest and income taxes paid: | | | |
| Interest paid, net of amount capitalized | 484.2 | 395.3 | 480.3 |
| Income taxes paid | 405.4 | 220.9 | 240.9 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

PX6153-059

Table of Contents

# Albertsons Companies, Inc. and Subsidiaries
## Consolidated Statements of Stockholders' Equity
### (in millions, except share data)

| | Class A Common Stock | | Additional paid in capital | Treasury Stock | | Accumulated other comprehensive income | Retained earnings (accumulated deficit) | Total stockholders' equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | | Shares | Amount | | | |
| **Balance as of February 27, 2021** | 585,574,666 | $ 5.9 | $ 1,898.9 | 120,009,647 | $ (1,907.0) | $ 63.5 | $ 1,263.0 | $ 1,324.3 |
| Equity-based compensation | — | — | 101.2 | — | — | — | — | 101.2 |
| Shares issued and employee tax withholding on vesting of restricted stock units | 2,329,617 | — | (29.4) | — | — | — | — | (29.4) |
| Convertible preferred stock conversions | — | — | 61.0 | (20,369,582) | 259.6 | — | — | 320.6 |
| Cash dividends declared on common stock ($0.44 per common share) | — | — | — | — | — | — | (207.4) | (207.4) |
| Dividends accrued on convertible preferred stock | — | — | — | — | — | — | (109.4) | (109.4) |
| Net income | — | — | — | — | — | — | 1,619.6 | 1,619.6 |
| Other comprehensive income, net of tax | — | — | — | — | — | 5.5 | — | 5.5 |
| Other activity | — | — | 0.5 | — | — | — | (0.9) | (0.4) |
| **Balance as of February 26, 2022** | 587,904,283 | 5.9 | 2,032.2 | 99,640,065 | (1,647.4) | 69.0 | 2,564.9 | 3,024.6 |
| Equity-based compensation | — | — | 112.4 | — | — | — | — | 112.4 |
| Shares issued and employee tax withholding on vesting of restricted stock units | 3,064,317 | — | (44.0) | — | — | — | — | (44.0) |
| Convertible preferred stock conversions | — | — | (61.0) | (78,339,120) | 1,295.2 | — | (1.4) | 1,232.8 |
| Special dividend declared ($6.85 per share) | — | — | 31.3 | — | — | — | (3,952.6) | (3,921.3) |
| Cash dividends declared on common stock ($0.48 per common share) | — | — | — | — | — | — | (255.1) | (255.1) |
| Dividends accrued on convertible preferred stock | — | — | — | — | — | — | (51.0) | (51.0) |
| Net income | — | — | — | — | — | — | 1,513.5 | 1,513.5 |
| Other comprehensive income, net of tax | — | — | — | — | — | 0.3 | — | 0.3 |
| Other activity | — | — | 1.8 | — | — | — | (3.3) | (1.5) |
| **Balance as of February 25, 2023** | 590,968,600 | 5.9 | 2,072.7 | 21,300,945 | (352.2) | 69.3 | (185.0) | 1,610.7 |
| Equity-based compensation | — | — | 91.5 | — | — | — | — | 91.5 |
| Shares issued and employee tax withholding on vesting of restricted stock units | 3,476,668 | — | (38.8) | — | — | — | — | (38.8) |
| Convertible preferred stock conversions | — | — | — | (2,903,200) | 48.0 | — | (2.3) | 45.7 |
| Cash dividends declared on common stock ($0.48 per common share) | — | — | — | — | — | — | (276.2) | (276.2) |
| Dividends accrued on convertible preferred stock | — | — | — | — | — | — | (0.3) | (0.3) |
| Net income | — | — | — | — | — | — | 1,296.0 | 1,296.0 |
| Other comprehensive income, net of tax | — | — | — | — | — | 18.7 | — | 18.7 |
| Other activity | — | — | 4.2 | — | — | — | (4.0) | 0.2 |
| **Balance as of February 24, 2024** | 594,445,268 | $ 5.9 | $ 2,129.6 | 18,397,745 | $ (304.2) | $ 88.0 | $ 828.2 | $ 2,747.5 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

60

Table of Contents

**Albertsons Companies, Inc. and Subsidiaries**
**Notes to Consolidated Financial Statements**

# NOTE 1 - DESCRIPTION OF BUSINESS, BASIS OF PRESENTATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Description of Business

Albertsons Companies, Inc. and its subsidiaries (the "Company" or "ACI") is a food and drug retailer that, as of February 24, 2024, operated 2,269 retail stores together with 402 associated fuel centers, 22 dedicated distribution centers, 19 manufacturing facilities and various digital platforms. The Company's retail food businesses and in-store pharmacies operate throughout the United States under more than 20 well known banners including *Albertsons, Safeway, Vons, Pavilions, Randalls, Tom Thumb, Carrs, Jewel-Osco, Acme, Shaw's, Star Market, United Supermarkets, Market Street, Haggen, Kings Food Markets* and *Balducci's Food Lovers Market*. The Company has no separate assets or liabilities other than its investments in its subsidiaries, and all of its business operations are conducted through its operating subsidiaries.

### Basis of Presentation

The Company's Consolidated Financial Statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP"). Intercompany transactions and accounts have been eliminated in consolidation for all periods presented.

### Significant Accounting Policies

**Fiscal year:** The Company's fiscal year ends on the last Saturday in February. Unless the context otherwise indicates, reference to a fiscal year of the Company refers to the calendar year in which such fiscal year commences. The Company's first quarter consists of 16 weeks, the second, third and fourth quarters generally each consist of 12 weeks, and the fiscal year generally consists of 52 weeks.

**Use of estimates:** The preparation of the Company's Consolidated Financial Statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses for the reporting periods presented. Certain estimates require difficult, subjective or complex judgments about matters that are inherently uncertain. Actual results could differ from those estimates.

**Cash and cash equivalents:** Cash equivalents include all highly liquid investments with original maturities of three months or less at the time of purchase and outstanding deposits related to credit and debit card sales transactions that settle within a few days. Cash and cash equivalents related to credit and debit card transactions were $558.9 million and $576.9 million as of February 24, 2024 and February 25, 2023, respectively. The Company has cash and cash equivalents that are in excess of federally insured limits. Though the Company has not experienced any losses on its cash and cash equivalents to date and it does not anticipate incurring any losses, the Company cannot be assured that it will not experience losses on its cash and cash equivalents.

**Restricted cash:** Restricted cash is included in Other current assets and Other assets within the Consolidated Balance Sheets and primarily relates to surety bonds and funds held in escrow. The Company had $4.5 million and $8.0 million of restricted cash as of February 24, 2024 and February 25, 2023, respectively.

**Receivables, net:** Receivables consist primarily of trade accounts receivable, pharmacy accounts receivable, tenant receivables and vendor receivables. Management makes estimates of the uncollectibility of its accounts receivable. In determining the adequacy of the allowances for doubtful accounts, management analyzes the value of collateral, historical collection experience, aging of receivables and other economic and industry factors. It is possible that the accuracy of the estimation process could be materially impacted by different judgments, estimations and

61

Table of Contents

assumptions based on the information considered and could result in a further adjustment of receivables. The allowance for doubtful accounts and bad debt expense were not material for any of the periods presented.

**Inventories, net:** Substantially all of the Company's inventories consist of finished goods valued at the lower of cost or market and net of vendor allowances.

As of February 24, 2024, and February 25, 2023, approximately 85.5% and 85.1%, respectively, of the Company's inventories were valued under the last-in, first-out ("LIFO") method. The Company primarily uses the retail inventory or the cost method to determine inventory cost before application of any LIFO adjustment. Under the retail inventory method, inventory cost is determined, before the application of any LIFO adjustment, by applying a cost-to-retail ratio to various categories of similar items to the retail value of those items. Under the cost method, the most recent purchase cost is used to determine the cost of inventory before the application of any LIFO adjustment. Replacement or current cost was higher than the carrying amount of inventories valued using LIFO by $637.4 million and $585.4 million as of February 24, 2024 and February 25, 2023, respectively. During fiscal 2023, fiscal 2022 and fiscal 2021, inventory quantities in certain LIFO layers were reduced. These reductions resulted in a liquidation of LIFO inventory quantities carried at lower costs prevailing in prior years as compared with the cost of fiscal 2023, fiscal 2022 and fiscal 2021 purchases. As a result, cost of sales decreased by $19.0 million, $0.5 million and $11.3 million in fiscal 2023, fiscal 2022 and fiscal 2021, respectively. Cost for the remaining inventories, which consists primarily of certain perishable and fuel inventories, was determined using the most recent purchase cost, which approximates the first-in, first-out ("FIFO") method. Perishables are counted every four weeks and are carried at the last purchased cost which approximates FIFO cost. Fuel inventories are carried at the last purchased cost, which approximates FIFO cost. The Company records inventory shortages based on actual physical counts at its facilities and also provides allowances for inventory shortages for the period between the last physical count and the balance sheet date.

**Property and equipment, net:** Property and equipment is recorded at cost or fair value for assets acquired as part of a business combination, and depreciation is calculated on the straight-line method over the estimated useful lives of the assets. Estimated useful lives are generally as follows: buildings - seven to 40 years; leasehold improvements - the shorter of the remaining lease term or ten to 20 years; and fixtures and equipment - three to 20 years.

Property and equipment under finance leases are recorded at the lower of the present value of the future minimum lease payments or the fair value of the asset and are amortized on the straight-line method over the lesser of the lease term or the estimated useful life. Interest capitalized on property under construction was immaterial for all periods presented.

**Leases:** The Company leases certain retail stores, distribution centers, office facilities and equipment from third parties. The Company determines whether a contract is or contains a lease at contract inception. Operating and finance lease assets and liabilities are recognized at the lease commencement date. Operating leases are included in operating lease right-of-use ("ROU") assets, current operating lease obligations and long-term operating lease obligations on the Consolidated Balance Sheets. Finance leases are included in Property and equipment, net, current maturities of long-term debt and finance lease obligations and long-term debt and finance lease obligations on the Consolidated Balance Sheets. Operating lease assets represent the Company's right to use an underlying asset for the lease term, and lease liabilities represent the Company's obligation to make lease payments arising from the lease. Lease liabilities are based on the present value of remaining lease payments over the lease term. As the rate implicit in the Company's leases is not readily determinable, the Company's applicable incremental borrowing rate, which is estimated to approximate the interest rate on a collateralized basis with similar terms, is used in calculating the present value of the sum of the lease payments. Operating lease assets are based on the lease liability, adjusted for any prepayments, lease incentives and initial direct costs incurred. The typical real estate lease period is 15 to 20 years with renewal options for varying terms and, to a limited extent, options to purchase. The Company includes renewal options that are reasonably certain to be exercised as part of the lease term.

Table of Contents

The Company has lease agreements with non-lease components that relate to the lease components. Certain leases contain percent rent based on sales, escalation clauses or payment of executory costs such as property taxes, utilities, insurance and maintenance. Non-lease components primarily relate to common area maintenance. Non-lease components and the lease components to which they relate are accounted for together as a single lease component for all asset classes. The Company recognizes lease payments for short-term leases as expense either straight-line over the lease term or as incurred depending on whether lease payments are fixed or variable.

**Impairment of long-lived assets:** The Company regularly reviews the operating performance of our individual stores and other long-lived assets, together with current market conditions, for indicators of impairment. When events or changes in circumstances indicate that the carrying value of the individual store's assets or other long-lived assets may not be recoverable, their future undiscounted cash flows are compared to the carrying value. If the carrying value of the asset is greater than the estimated undiscounted future cash flows, the carrying value of the asset is compared to the asset's estimated fair value and an impairment loss is recognized when the asset's carrying value exceeds its estimated fair value. For assets held for sale, the Company recognizes impairment charges for the excess of the carrying value plus estimated costs of disposal over the fair value. Fair values are based on discounted cash flows or current market rates. These estimates of fair value can be significantly impacted by factors such as changes in the current economic environment and real estate market conditions. Long-lived asset impairments are recorded as a component of Loss (gain) on property dispositions and impairment losses, net.

**Intangible assets, net:** Intangible assets with finite lives consist primarily of trade names, customer prescription files and internally developed software. Intangible assets with finite lives are amortized on a straight-line basis over an estimated economic life ranging from three to 40 years. The Company reviews finite-lived intangible assets for impairment in accordance with its policy for long-lived assets. Intangible assets with indefinite useful lives, which are not amortized, consist of restricted covenants and liquor licenses. The Company reviews intangible assets with indefinite useful lives and tests for impairment annually on the first day of the fourth quarter and also if events or changes in circumstances indicate the occurrence of a triggering event. The review consists of comparing the estimated fair value of the cash flows generated by the asset to the carrying value of the asset.

**Cloud computing arrangements that are service contracts:** The Company enters into hosted cloud computing arrangements that are considered to be service contracts and capitalizes certain development costs related to implementing the cloud computing arrangement. As of February 24, 2024 and February 25, 2023, the Company had capitalized implementation costs of $275.9 million and $272.3 million, respectively, included in Other assets. The Company amortizes the costs over the related service contract period of the hosting arrangement. Amortization expense for the implementation costs was $80.5 million, $64.9 million and $38.3 million for fiscal 2023, fiscal 2022 and fiscal 2021 respectively, and is included within Selling and administrative expenses. In fiscal 2023, there was $23.4 million of impairment and disposal losses related to capitalized implementation costs, recorded as a component of Loss (gain) on property dispositions and impairment losses, net. In fiscal 2022 and fiscal 2021, there were no impairment and disposal losses related to capitalized implementation costs.

**Goodwill:** Goodwill represents the difference between the purchase price and the fair value of assets and liabilities acquired in a business combination. Goodwill is not amortized as the Company reviews goodwill for impairment annually on the first day of its fourth quarter and also if events or changes in circumstances indicate the occurrence of a triggering event. The Company reviews goodwill for impairment by initially considering qualitative factors to determine whether it is necessary to perform a quantitative analysis. If it is determined that it is more likely than not that the fair value of reporting unit is less than its carrying amount, a quantitative analysis is performed to identify goodwill impairment. If it is determined that it is not more likely than not that the fair value of the reporting unit is less than its carrying amount, it is unnecessary to perform a quantitative analysis. The Company may elect to bypass the qualitative assessment and proceed directly to performing a quantitative analysis. Based on the qualitative analysis performed in fiscal 2023, the Company determined that there was no goodwill impairment.

Table of Contents

**Business combination measurements:** In accordance with applicable accounting standards, the Company estimates the fair value of acquired assets and assumed liabilities as of the acquisition date of business combinations. These fair value adjustments are input into the calculation of goodwill related to the excess of the purchase price over the fair value of the tangible and identifiable intangible assets acquired and liabilities assumed in the acquisition.

The fair value of assets acquired and liabilities assumed are determined using market, income and cost approaches from the perspective of a market participant. The fair value measurements can be based on significant inputs that are not readily observable in the market. The market approach indicates value for a subject asset based on available market pricing for comparable assets. The market approach used includes prices and other relevant information generated by market transactions involving comparable assets, as well as pricing guides and other sources. The income approach indicates value for a subject asset based on the present value of cash flows projected to be generated by the asset. Projected cash flows are discounted at a required market rate of return that reflects the relative risk of achieving the cash flows and the time value of money. The cost approach, which estimates value by determining the current cost of replacing an asset with another of equivalent economic utility, is used for certain assets for which the market and income approaches could not be applied due to the nature of the asset. The cost to replace a given asset reflects the estimated reproduction or replacement cost for the asset, adjusted for obsolescence, whether physical, functional or economic.

**Equity method investments:** Investments in certain companies over which the Company exerts significant influence, but does not control the financial and operating decisions, are accounted for as equity method investments. For equity method investments, the Company regularly reviews its investments to determine whether there is a decline in fair value below carrying value. If there is a decline that is other-than-temporary, the investment is written down to fair value. As of February 24, 2024 and February 25, 2023, the Company has equity method investments of $78.2 million and $250.1 million, respectively, included in Other assets. Equity in earnings from unconsolidated affiliates is included in Other income, net, including losses of $8.7 million in fiscal 2023, and gains of $11.8 million and $63.5 million in fiscal 2022 and fiscal 2021, respectively.

The Company's equity method investments included an equity interest in Mexico Foods Parent LLC and La Fabrica Parent LLC ("El Rancho"), a Texas-based specialty grocer. During fiscal 2023, El Rancho exercised its contractual option to repurchase the Company's 45% ownership interest in El Rancho and the Company received proceeds of $166.1 million. As a result, the Company realized a gain of $10.5 million during fiscal 2023, included in Other income, net.

**Other investments:** Investments in equity securities with a readily determinable fair value, not accounted for under the equity method, are recorded at fair value with realized and unrealized gains and losses included in Other income, net. For equity securities without a readily determinable fair value, the investment is recorded at cost, less any impairment, plus or minus adjustments related to observable transactions for the same or similar securities, with realized and unrealized gains and losses included in Other income, net. As of February 24, 2024 and February 25, 2023, the Company has other investments of $39.4 million and $116.9 million, respectively, included in Other assets. Net realized and unrealized losses were $1.3 million and $11.5 million for fiscal 2023 and fiscal 2022, respectively. Net realized and unrealized gains were $15.5 million for fiscal 2021.

**Company-Owned life insurance policies ("COLI"):** The Company has COLI policies that have a cash surrender value. The Company has loans against these policies. The Company has no intention of repaying the loans prior to maturity or cancellation of the policies. Therefore, the Company offsets the cash surrender value by the related loans. As of February 24, 2024 and February 25, 2023, the cash surrender values of the policies were $136.2 million and $135.6 million, and the balances of the policy loans were $82.3 million and $82.9 million, respectively. The net balance of the COLI policies is included in Other assets.

64

Table of Contents

**Derivatives:** The Company has entered into several pay fixed, receive variable interest rate swap contracts ("Swaps") to manage its exposure to changes in interest rates. Swaps are recognized in the Consolidated Balance Sheets at fair value. The Swaps are not designated as cash flow hedges, and as a result, all changes in fair value are recorded in current period earnings, rather than through other comprehensive income (loss). All of the Company's Swaps expired in March 2023.

The Company has also entered into contracts to purchase electricity and natural gas at fixed prices for a portion of its energy needs. The Company expects to take delivery of the electricity and natural gas in the normal course of business. Contracts that qualify for the normal purchase exception under derivatives and hedging accounting guidance are not recorded at fair value. Energy purchased under these contracts is expensed as delivered. The Company also manages its exposure to changes in diesel prices utilized in the Company's distribution process through the use of short-term heating oil derivative contracts. These contracts are economic hedges of price risk and are not designated or accounted for as hedging instruments for accounting purposes. Changes in the fair value of these instruments are recognized in current period earnings.

**Self-Insurance liabilities**: The Company is primarily self-insured for workers' compensation, property, automobile and general liability. The self-insurance liability is undiscounted and determined actuarially, based on claims filed and an estimate of claims incurred but not yet reported. The Company has established stop-loss amounts that limit the Company's further exposure after a claim reaches the designated stop-loss threshold. Stop-loss amounts for claims incurred for the years presented range from $0.25 million to $5.0 million per claim, depending upon the type of insurance coverage and the year the claim was incurred. In determining its self-insurance liabilities, the Company performs a continuing review of its overall position and reserving techniques. Since recorded amounts are based on estimates, the ultimate cost of all incurred claims and related expenses may be more or less than the recorded liabilities.

The Company has reinsurance receivables of $21.2 million and $21.7 million recorded within Receivables, net and $53.5 million and $50.1 million recorded within Other assets as of February 24, 2024 and February 25, 2023, respectively. The self-insurance liabilities and related reinsurance receivables are recorded gross.

Changes in self-insurance liabilities consisted of the following (in millions):

| | February 24, 2024 | | February 25, 2023 |
|---|---|---|---|
| Beginning balance | $ | 1,234.1 | $ | 1,171.1 |
| Expense, net of actuarial adjustments | | 373.0 | | 373.3 |
| Claim payments | | (339.5) | | (310.3) |
| Ending balance | | 1,267.6 | | 1,234.1 |
| Less current portion | | (367.7) | | (355.5) |
| Long-term portion | $ | 899.9 | $ | 878.6 |

**Benefit plans and Multiemployer plans:** Substantially all of the Company's employees are covered by various contributory and non-contributory pension, profit sharing or 401(k) plans, in addition to sponsored defined benefit plans. Certain employees participate in a long-term retention incentive bonus plan. The Company also provides certain health and welfare benefits, including short-term and long-term disability benefits to inactive disabled employees prior to retirement.

The Company recognizes a liability for the underfunded status of the defined benefit plans as a component of Other long-term liabilities. Actuarial gains or losses and prior service costs or credits are recorded within Other comprehensive income (loss). The determination of the Company's obligation and related expense for its sponsored pensions and other post-retirement benefits is dependent, in part, on management's selection of certain actuarial

PX6153-065

Table of Contents

assumptions in calculating these amounts. These assumptions include, among other things, the discount rate and expected long-term rate of return on plan assets.

Most union employees participate in multiemployer retirement plans pursuant to collective bargaining agreements, unless the collective bargaining agreement provides for participation in plans sponsored by the Company. Pension expense for the multiemployer plans is recognized as contributions are funded.

**Equity-based compensation:** The Company recognizes equity-based compensation expense for restricted stock units ("Restricted Stock Units" or "RSUs") and restricted common stock of the Company ("RSAs") granted to employees and non-employee directors. Actual forfeitures are recognized as they occur. Equity-based compensation expense is based on the fair value on the grant date and is recognized over the requisite service period of the award, generally between one and three years from the date of the award. The fair value of the RSUs and RSAs with a service condition or performance-based condition is generally determined using the fair market value of the Company's Class A common stock on the grant date.

**Revenue recognition:** Revenues from the retail sale of products are recognized at the point of sale or delivery to the customer, net of returns and sales tax. Pharmacy sales are recorded upon the customer receiving the prescription. Third-party receivables from pharmacy sales were $376.1 million and $313.5 million as of February 24, 2024 and February 25, 2023, respectively, and are recorded in Receivables, net. For digital related sales, which primarily include home delivery and Drive Up & Go curbside pickup, revenues are recognized upon either pickup in store or delivery to the customer and may include revenue for separately charged delivery services. Discounts provided to customers by the Company at the time of sale are recognized as a reduction in sales as the products are sold. Discounts provided to customers by vendors, usually in the form of coupons, are not recognized as a reduction in sales, provided the coupons are redeemable at any retailer that accepts coupons. The Company recognizes revenue and records a corresponding receivable from the vendor for the difference between the sales prices and the cash received from the customer. The Company records a contract liability when rewards are earned by customers in connection with the Company's loyalty programs. As rewards are redeemed or expire, the Company reduces the contract liability and recognizes revenue. The contract liability balance was immaterial in fiscal 2023 and fiscal 2022.

The Company records a contract liability when it sells its own proprietary gift cards. The Company records a sale when the customer redeems the gift card. The Company's gift cards do not expire. The Company reduces the contract liability and records revenue for the unused portion of gift cards in proportion to its customers' pattern of redemption, which the Company determined to be the historical redemption rate. The Company's contract liability related to gift cards was $111.4 million and $115.0 million as of February 24, 2024 and February 25, 2023, respectively.

66

PX6153-066

Table of Contents

*Disaggregated Revenues*

The following table represents Net sales and other revenue by product type (dollars in millions):

| | Fiscal 2023 | | Fiscal 2022 | | Fiscal 2021 | |
|---|---|---|---|---|---|---|
| | Amount (1) | % of Total | Amount (1) | % of Total | Amount (1) | % of Total |
| Non-perishables (2) | $ 39,977.3 | 50.5 % | $ 39,142.4 | 50.4 % | $ 36,486.7 | 50.8 % |
| Fresh (3) | 25,442.7 | 32.1 % | 25,585.4 | 32.9 % | 24,636.8 | 34.3 % |
| Pharmacy | 8,240.0 | 10.4 % | 6,769.3 | 8.7 % | 5,823.3 | 8.1 % |
| Fuel | 4,396.7 | 5.5 % | 4,857.6 | 6.3 % | 3,747.5 | 5.2 % |
| Other (4) | 1,181.0 | 1.5 % | 1,295.0 | 1.7 % | 1,192.7 | 1.6 % |
| Total | $ 79,237.7 | 100.0 % | $ 77,649.7 | 100.0 % | $ 71,887.0 | 100.0 % |

(1) Digital related sales are included in the categories to which the revenue pertains.

(2) Consists primarily of general merchandise, grocery, dairy and frozen foods.

(3) Consists primarily of produce, meat, deli and prepared foods, bakery, floral and seafood.

(4) Consists primarily of wholesale sales to third parties, commissions, rental income and other miscellaneous revenue.

**Cost of sales and vendor allowances:** Cost of sales includes, among other things, purchasing and sourcing costs, inbound freight costs, product quality testing costs, warehousing and distribution costs, Own Brands program costs and digital-related delivery and handling costs.

The Company receives vendor allowances or rebates ("Vendor Allowances") for a variety of merchandising initiatives and buying activities. The terms of the Company's Vendor Allowances arrangements vary in length but are primarily expected to be completed within a quarter. The Company records Vendor Allowances as a reduction of Cost of sales when the associated products are sold. Vendor Allowances that have been earned as a result of completing the required performance under terms of the underlying agreements but for which the product has not yet been sold are recognized as reductions of inventory. The reduction of inventory for these Vendor Allowances was $66.6 million and $55.7 million as of February 24, 2024 and February 25, 2023, respectively.

Advertising costs are included in Cost of sales and are expensed in the period the advertising occurs. Cooperative advertising funds are recorded as a reduction of Cost of sales when the advertising occurs. Advertising costs were $535.7 million, $498.2 million and $440.5 million, net of cooperative advertising allowances of $67.0 million, $63.9 million and $72.9 million for fiscal 2023, fiscal 2022 and fiscal 2021, respectively.

**Selling and administrative expenses:** Selling and administrative expenses consist primarily of store and corporate employee-related costs such as salaries and wages, health and welfare, workers' compensation and pension benefits, as well as marketing and merchandising, rent, occupancy and operating costs, amortization of intangibles and other administrative costs.

**Income taxes:** The Company's income before taxes is primarily from domestic operations. Deferred taxes are provided for the net tax effects of temporary differences between the financial reporting and income tax basis of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to reverse. The effect of a change in tax rates on deferred tax assets and liabilities is recognized in income in the period that includes the enactment date. Valuation allowances are established where management determines that it is more likely than not that some portion or all of a deferred tax asset will not be realized. The Company reviews tax positions taken or expected to be taken on tax returns to determine whether and to what extent a tax benefit can be recognized. The Company evaluates its positions taken and establishes liabilities in accordance with the applicable accounting guidance for uncertain tax positions. The Company reviews these liabilities as facts and circumstances change and adjusts accordingly. The Company recognizes any interest and penalties associated with uncertain tax

Table of Contents

positions as a component of Income tax expense. U.S. shareholders of a controlled foreign corporation are required to provide U.S. taxes on its share of global intangible low-taxed income ("GILTI"). The current and deferred tax impact of GILTI is not material to the Company. Accordingly, the Company will report the tax impact of GILTI as a period cost and not provide deferred taxes for the basis difference that would be expected to reverse as GILTI.

**Segments**: The Company and its subsidiaries offer grocery products, general merchandise, health and beauty care products, pharmacy, fuel and other items and services in its stores or through digital channels. The Company's retail operating divisions are geographically based, have similar economic characteristics and similar expected long-term financial performance. The Company's operating segments and reporting units are its 12 divisions, which are reported in one reportable segment. Each reporting unit constitutes a business for which discrete financial information is available and for which management regularly reviews the operating results. Across all operating segments, the Company operates primarily one store format. Each division offers, through its stores and digital channels, the same general mix of products with similar pricing to similar categories of customers, has similar distribution methods, operates in similar regulatory environments and purchases merchandise from similar or the same vendors.

**Recently issued accounting standards:** In November 2023, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") 2023-07, "*Segment Reporting Topic (280): Improvements to Reportable Segment Disclosure."* The ASU improves reportable segment disclosure requirements, primarily through enhanced disclosures about significant segment expenses. The amendments in this ASU are effective for fiscal years beginning after December 15, 2023, and interim periods within fiscal years beginning after December 15, 2024 on a retrospective basis. Early adoption is permitted. The Company is currently evaluating the impact of this ASU on its Consolidated Financial Statements and related disclosures.

In December 2023, the FASB issued ASU 2023-09, "*Income Taxes (Topic 740): Improvements to Income Tax Disclosures."* The ASU enhances the transparency and decision usefulness of income tax disclosures and is effective for annual periods beginning after December 15, 2024 on a prospective basis. Early adoption is permitted. The Company is currently evaluating the impact of this ASU on its Consolidated Financial Statements and related disclosures.

## NOTE 2 - MERGERS AND ACQUISITIONS

### Merger Agreement

On October 13, 2022, the Company, The Kroger Co. ("Parent") and Kettle Merger Sub, Inc., a wholly owned subsidiary of Parent ("Merger Sub"), entered into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which Merger Sub will be merged with and into the Company (the "Merger"), with the Company surviving the Merger as the surviving corporation and a direct, wholly owned subsidiary of Parent.

Pursuant to the Merger Agreement, each share of Class A common stock issued and outstanding immediately prior to the effective time of the Merger (the "Effective Time"), shall be converted automatically at the Effective Time into the right to receive from Parent $34.10 per share in cash, without interest. The $34.10 per share consideration to be paid by Parent is subject to certain reductions described below.

At the Effective Time, each outstanding equity award denominated in shares of Class A common stock will be converted into a corresponding award with respect to shares of Parent common stock (the "Converted Awards"). The Converted Awards will remain outstanding and subject to the same terms and conditions (including vesting and forfeiture terms) as were applied to the corresponding Company equity award immediately prior to the Effective Time; provided that any Company equity award with a performance-based vesting condition will have such vesting condition deemed satisfied at (i) the greater of target performance and actual performance (for such awards subject to an open performance period at the Effective Time) and (ii) target performance (for such awards subject to a

68

Table of Contents

performance period that begins after the Effective Time). For purposes of the conversion described above, the number of shares of Parent common stock subject to a Converted Award will be based upon the number of shares of Class A common stock subject to such Company equity award immediately prior to the Effective Time multiplied by an exchange ratio equal to (i) $34.10 less the Special Dividend (as defined below in Note 8 - Stockholders' Equity and Convertible Preferred Stock), divided by (ii) the average closing price of shares of Parent common stock for five trading days preceding the Closing.

In connection with obtaining the requisite regulatory clearance necessary to consummate the Merger, the Company and Parent expect to make divestitures of stores owned by the Company and Parent to a third party. As described in the Merger Agreement and subject to the outcome of the divestiture process and negotiations with applicable government authorities, the Company was prepared to establish a Company subsidiary ("SpinCo") as part of this process. If utilized, the common stock or interests in SpinCo would be distributed to Company stockholders no later than the closing of the Merger (the "Closing") and SpinCo would operate as a standalone public company, or the equity of SpinCo would be contributed to a trust for later distribution to Company stockholders. As described in more detail below, on September 8, 2023, the Company and Kroger announced that they entered into a comprehensive divestiture plan with C&S Wholesale Grocers, LLC ("C&S"). As a result of the comprehensive divestiture plan announced with C&S, Kroger has exercised its right under the Merger Agreement to sell what would have been the SpinCo business to C&S. Consequently, the creation of SpinCo and spin-off previously contemplated by the Company and Kroger is no longer a requirement under the Merger Agreement and will no longer be pursued by the Company and Kroger.

On September 8, 2023, the Company and Kroger announced that the parties had entered into a definitive agreement, dated September 8, 2023, with C&S for the sale of select stores, banners, distribution centers, offices and private label brands to C&S (collectively, the "Divestiture Assets"). The Divestiture Assets will be divested by Kroger following the Closing. The definitive agreement has customary representations and warranties and covenants of a transaction of its type. The divestiture to C&S is subject to fulfillment of customary closing conditions, including clearance by the United States Federal Trade Commission ("FTC") and the completion of the proposed Merger.

In accordance with the Merger Agreement, the Company has extended, and may continue to extend the original outside date of January 13, 2024 from time to time in 30-day increments for up to 270 days in the aggregate ending on October 9, 2024 (the "Outside Date"). The Parent will be obligated to pay a termination fee of $600 million to the Company if the Merger Agreement is terminated by either party in connection with the occurrence of the Outside Date, and, at the time of such termination, all closing conditions other than regulatory approval have been satisfied.

On February 26, 2024, the FTC instituted an administrative proceeding to prohibit the Merger. On the same day, the FTC (joined by nine states) filed suit in the United States District Court for the District of Oregon, requesting a preliminary injunction to enjoin the Merger (the "Federal Action"). On January 15, 2024 and February 14, 2024, the attorneys general of States of Washington and Colorado, respectively, filed suit in their respective state courts, also seeking to enjoin the Merger. In the Federal Action, the Company and Parent have stipulated to a temporary restraining order that prevents the Merger from closing until 11:59 PM Eastern Time on the fifth business day after the court rules on the FTC's motion for a preliminary injunction or until after the date set by the court, whichever is later. The FTC administrative proceeding is currently scheduled to begin on July 31, 2024, while a preliminary injunction hearing in the Federal Action is set to begin on August 26, 2024. A trial on the State of Washington's request for a permanent injunction is scheduled to begin on September 16, 2024. In conjunction with the State of Washington's suit, the Company and Parent have committed that they will not close the Merger until five days after that court rules (so long as that ruling occurs by a certain date). In the Colorado case, the court has scheduled a preliminary injunction hearing to begin on August 12, 2024 and a permanent injunction hearing to begin on September 30, 2024. In addition to these regulatory actions, private plaintiffs have filed suit in the United States District Court for the Northern District of California also seeking to enjoin the Merger. That case is stayed pending resolution of the FTC's motion for a preliminary injunction.

69

Table of Contents

## NOTE 3 - PROPERTY AND EQUIPMENT

Property and equipment, net consisted of the following (in millions):

| | February 24, 2024 | | February 25, 2023 | |
|---|---|---|---|---|
| Land | $ | 2,118.9 | $ | 2,114.6 |
| Buildings | | 5,537.7 | | 5,366.0 |
| Property under construction | | 692.4 | | 849.2 |
| Leasehold improvements | | 2,699.0 | | 2,353.7 |
| Fixtures and equipment | | 8,792.1 | | 8,056.5 |
| Property and equipment under finance leases | | 679.3 | | 708.3 |
| Total property and equipment | | 20,519.4 | | 19,448.3 |
| Accumulated depreciation and amortization | | (10,949.1) | | (10,089.6) |
| Total property and equipment, net | $ | 9,570.3 | $ | 9,358.7 |

Depreciation expense was $1,334.1 million, $1,433.1 million and $1,392.0 million for fiscal 2023, fiscal 2022 and fiscal 2021, respectively. Amortization expense related to finance lease assets was $51.7 million, $55.5 million and $63.8 million in fiscal 2023, fiscal 2022 and fiscal 2021, respectively. Fixed asset impairment losses of $0.9 million, $5.1 million and $2.6 million were recorded as a component of Loss (gain) on property dispositions and impairment losses, net in fiscal 2023, fiscal 2022 and fiscal 2021, respectively.

## NOTE 4 - INTANGIBLE ASSETS

Intangible assets, net consisted of the following (in millions):

| | Estimated useful lives (Years) | February 24, 2024 | | | February 25, 2023 | | |
|---|---|---|---|---|---|---|---|
| | | Gross carrying amount | Accumulated amortization | Net | Gross carrying amount | Accumulated amortization | Net |
| Trade names | 40 | $ 1,935.8 | $ (459.1) | $ 1,476.7 | $ 1,935.8 | $ (410.5) | $ 1,525.3 |
| Customer prescription files | 5 | 1,430.9 | (1,389.1) | 41.8 | 1,405.3 | (1,381.6) | 23.7 |
| Internally developed software | 3 to 5 | 1,769.5 | (944.3) | 825.2 | 1,570.1 | (747.4) | 822.7 |
| Other intangible assets (1) | 3 to 6 | 66.1 | (61.5) | 4.6 | 65.5 | (58.0) | 7.5 |
| Total finite-lived intangible assets | | 5,202.3 | (2,854.0) | 2,348.3 | 4,976.7 | (2,597.5) | 2,379.2 |
| Liquor licenses and restricted covenants | Indefinite | 86.2 | — | 86.2 | 86.2 | — | 86.2 |
| Total intangible assets, net | | $ 5,288.5 | $ (2,854.0) | $ 2,434.5 | $ 5,062.9 | $ (2,597.5) | $ 2,465.4 |

(1) Other intangible assets includes covenants not to compete, specialty accreditation and licenses and patents.

Table of Contents

Amortization expense for intangible assets was $312.7 million, $253.6 million and $187.2 million for fiscal 2023, fiscal 2022 and fiscal 2021, respectively. Estimated future amortization expense associated with the net carrying amount of intangibles with finite lives is as follows (in millions):

| Fiscal Year | Amortization Expected |
|---|---|
| 2024 | $ 341.7 |
| 2025 | 304.3 |
| 2026 | 228.2 |
| 2027 | 124.8 |
| 2028 | 59.0 |
| Thereafter | 1,290.3 |
| Total | $ 2,348.3 |

In fiscal 2023 and fiscal 2021, there were $39.9 million and $12.3 million, respectively, of intangible asset impairment and disposal losses related to internally developed software recorded as a component of Loss (gain) on property dispositions and impairment losses, net. There were no intangible asset impairment and disposal losses in fiscal 2022.

## NOTE 5 - FAIR VALUE MEASUREMENTS

The accounting guidance for fair value established a framework for measuring fair value and established a three-level valuation hierarchy for disclosure of fair value measurement. The valuation hierarchy is based upon the transparency of inputs to the valuation of an asset or liability at the measurement date. The three levels are defined as follows:

Level 1 - Quoted prices in active markets for identical assets or liabilities;

Level 2 - Inputs other than quoted prices included within Level 1 that are either directly or indirectly observable; and

Level 3 - Unobservable inputs in which little or no market activity exists, requiring an entity to develop its own assumptions that market participants would use to value the asset or liability.

Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.

71

Table of Contents

The following table presents certain assets which are measured at fair value on a recurring basis as of February 24, 2024 (in millions):

| | | Fair Value Measurements | | |
| | Total | Quoted prices in active markets for identical assets (Level 1) | Significant observable inputs (Level 2) | Significant unobservable inputs (Level 3) |
|---|---|---|---|---|
| **Assets:** | | | | |
| Short-term investments (1) | $ 23.3 | $ 5.3 | $ 18.0 | $ — |
| Non-current investments (2) | 107.3 | 6.4 | 100.9 | — |
| Derivative contracts (3) | 1.5 | — | 1.5 | — |
| Total | $ 132.1 | $ 11.7 | $ 120.4 | $ — |
| | | | | |
| **Liabilities:** | | | | |
| Derivative contracts (3) | $ 0.8 | $ — | $ 0.8 | $ — |
| Total | $ 0.8 | $ — | $ 0.8 | $ — |

(1) Primarily relates to Mutual Funds (Level 1) and Certificates of Deposit (Level 2). Included in Other current assets.

(2) Primarily relates to investments in Exchange-Traded Funds (Level 1) and certain equity investments, U.S. Treasury Notes and Corporate Bonds (Level 2). Included in Other assets.

(3) Primarily relates to energy derivative contracts. Included in Other assets or Other current liabilities.

The following table presents certain assets which are measured at fair value on a recurring basis as of February 25, 2023 (in millions):

| | | Fair Value Measurements | | |
| | Total | Quoted prices in active markets for identical assets (Level 1) | Significant observable inputs (Level 2) | Significant unobservable inputs (Level 3) |
|---|---|---|---|---|
| **Assets:** | | | | |
| Short-term investments (1) | $ 21.4 | $ 4.6 | $ 16.8 | $ — |
| Non-current investments (2) | 99.3 | — | 99.3 | — |
| Derivative contracts (3) | 1.5 | — | 1.5 | — |
| Total | $ 122.2 | $ 4.6 | $ 117.6 | $ — |

(1) Primarily relates to Mutual Funds (Level 1) and Certificates of Deposit (Level 2). Included in Other current assets.

(2) Primarily relates to certain equity investments, U.S. Treasury Notes and Corporate Bonds (Level 2). Included in Other assets.

(3) Primarily relates to energy derivative contracts and interest rate swaps. Included in Other assets.

The Company records cash and cash equivalents, restricted cash, accounts receivable and accounts payable at cost. The recorded values of these financial instruments approximate fair value based on their short-term nature.

The estimated fair value of the Company's debt, including current maturities, was based on Level 2 inputs, being market quotes or values for similar instruments, and interest rates currently available to the Company for the issuance of debt with similar terms and remaining maturities as a discount rate for the remaining principal payments. As of February 24, 2024, the fair value of total debt was $7,457.2 million compared to a carrying value of $7,684.2 million, excluding debt discounts and deferred financing costs. As of February 25, 2023, the fair value

PX6153-072

Table of Contents

of total debt was $8,009.1 million compared to the carrying value of $8,483.7 million, excluding debt discounts and deferred financing costs.

*Assets Measured at Fair Value on a Nonrecurring Basis*

The Company measures certain assets at fair value on a non-recurring basis, including long-lived assets and goodwill, which are evaluated for impairment. Long-lived assets include store-related assets such as property and equipment, operating lease assets and certain intangible assets. The inputs used to determine the fair value of long-lived assets and a reporting unit are considered Level 3 measurements due to their subjective nature.

The Company recorded long-lived asset impairment and disposal losses of $42.6 million, $5.1 million and $31.1 million during fiscal 2023, fiscal 2022 and fiscal 2021, respectively.

**NOTE 6 - LONG-TERM DEBT AND FINANCE LEASE OBLIGATIONS**

The Company's long-term debt and finance lease obligations as of February 24, 2024 and February 25, 2023, net of unamortized debt discounts of $33.3 million and $37.5 million, respectively, and deferred financing costs of $42.7 million and $53.2 million, respectively, consisted of the following (in millions):

|  | February 24, 2024 | | February 25, 2023 |
|---|---|---|---|
| Senior Unsecured Notes due 2026 to 2030, interest rate range of 3.25% to 7.50% | $ | 6,506.4 | $ | 6,496.4 |
| New Albertsons L.P. Notes due 2026 to 2031, interest rate range of 6.52% to 8.70% | | 480.1 | | 476.2 |
| Safeway Inc. Notes due 2027 to 2031, interest rate range of 7.25% to 7.45% | | 375.4 | | 374.9 |
| ABL Facility | | 200.0 | | 1,000.0 |
| Other financing obligations | | 29.9 | | 28.8 |
| Mortgage notes payable, secured | | 16.4 | | 16.7 |
| Finance lease obligations (see Note 7) | | 460.4 | | 517.1 |
| Total debt | | 8,068.6 | | 8,910.1 |
| Less current maturities | | (285.2) | | (1,075.7) |
| Long-term portion | $ | 7,783.4 | $ | 7,834.4 |

As of February 24, 2024, the future maturities of long-term debt, excluding finance lease obligations, debt discounts and deferred financing costs, consisted of the following (in millions):

| | | |
|---|---|---|
| 2024 | $ | 217.0 |
| 2025 | | 14.1 |
| 2026 | | 2,760.1 |
| 2027 | | 1,656.6 |
| 2028 | | 44.0 |
| Thereafter | | 2,992.4 |
| Total | $ | 7,684.2 |

The Company's amended and restated senior secured asset-based loan facility (as amended, the "ABL Facility") and certain of the outstanding notes and debentures have restrictive covenants, subject to the right to cure in certain circumstances, calling for the acceleration of payments due in the event of a breach of a covenant or a default in the payment of a specified amount of indebtedness due under certain debt arrangements. There are no restrictions on the Company's ability to receive distributions from its subsidiaries to fund interest and principal payments due under the ABL Facility and the Company's senior unsecured notes (the "Senior Unsecured Notes"). Each of the ABL Facility and the Senior Unsecured Notes restrict the ability of the Company to pay dividends and distribute property to the

Table of Contents

Company's stockholders. As a result, all of the Company's consolidated net assets are effectively restricted with respect to their ability to be transferred to the Company's stockholders. Notwithstanding the foregoing, the ABL Facility and the Senior Unsecured Notes each contain customary exceptions for certain dividends and distributions, if certain conditions are satisfied under the documentation governing the ABL Facility and the Senior Unsecured Notes. The Company was in compliance with all such covenants and provisions as of and for the fiscal year ended February 24, 2024.

### *ABL Facility*

The Company's ABL Facility provides for a $4,000.0 million senior secured revolving credit facility, maturing on December 20, 2026. The ABL Facility has an interest rate of Term SOFR plus a margin ranging from 1.25% to 1.50% and also provides for a letters of credit ("LOC") sub-facility of $1,500.0 million. The unused commitment fee is 0.25% per annum.

As of February 24, 2024, $200.0 million remained outstanding under the ABL Facility as the Company repaid $950.0 million and borrowed $150.0 million during fiscal 2023, and LOC issued under the LOC sub-facility were $48.3 million. As of February 25, 2023, there was $1,000.0 million outstanding under the ABL Facility and LOC issued under the LOC sub-facility were $53.3 million. On November 2, 2022, the Company provided notice to the lenders to borrow $1,400.0 million under the ABL Facility, which together with cash on hand was used to fund the payment of the Special Dividend (as defined below in Note 8 - Stockholders' Equity and Convertible Preferred Stock). Subsequently, during fiscal 2022, the Company repaid $400.0 million of the ABL Facility. During the fiscal years ended February 24, 2024 and February 25, 2023, the average interest rate on the ABL Facility was 6.5% and 5.8%, respectively.

The outstanding balance is recorded in Current maturities of long-term debt and finance lease obligations as the balance has an interest rate maturity period of 30 days, which can be extended and reset through the maturity date of the ABL Facility of December 20, 2026. Though the Company has the ability to extend the payment on a long-term basis, the Company, at its own discretion, may pay all or a portion of the outstanding balance within the next 12 months with any future surplus cash flows.

The ABL Facility is guaranteed by the Company's existing and future direct and indirect wholly owned domestic subsidiaries that are not borrowers, subject to certain exceptions. The ABL Facility is secured by, subject to certain exceptions, (i) a first-priority lien on substantially all of the ABL Facility priority collateral and (ii) a first-priority lien on substantially all other assets (other than real property). The ABL Facility contains no financial covenant unless and until (a) excess availability is less than (i) 10.0% of the lesser of the aggregate commitments and the then-current borrowing base at any time or is (ii) $250.0 million at any time or (b) an event of default is continuing. If any of such events occur, the Company must maintain a fixed charge coverage ratio of 1.0 to 1.0 from the date such triggering event occurs until such event of default is cured or waived and/or the 30th day that all such triggers under clause (a) no longer exist.

### *Senior Unsecured Notes*

On February 13, 2023, the Company and substantially all of its subsidiaries completed the issuance of $750.0 million in aggregate principal amount of 6.500% senior unsecured notes due February 15, 2028 (the "New 2028 Notes"). Interest on the New 2028 Notes is payable semi-annually in arrears on February 15 and August 15 of each year, and the first payment commenced on August 15, 2023. On February 15, 2023, proceeds from the New 2028 Notes, together with approximately $7.1 million of cash on hand, were used to (i) repay in full the $750.0 million outstanding of the Company's 3.50% senior unsecured notes due February 15, 2023 and (ii) pay fees and expenses related to the issuance of the New 2028 Notes.

PX6153-074

Table of Contents

On November 1, 2021, the Company redeemed the remaining $200.0 million aggregate principal amount outstanding of the Company's 5.750% senior unsecured notes due September 2025 (the "2025 Redemption"), which were redeemed using cash on hand, at a redemption price of 101.438% of the principal amount thereof plus accrued and unpaid interest. The Company recorded a $3.7 million loss on debt extinguishment related to the 2025 Redemption, comprised of a $2.9 million redemption premium and a $0.8 million write-off of deferred financing costs.

The Senior Unsecured Notes have not been and will not be registered with the SEC. Each of these notes are also fully and unconditionally guaranteed, jointly and severally, by substantially all of the Company's subsidiaries that are not issuers under the indenture governing such notes.

The Company, an issuer and direct or indirect parent of each of the other issuers of the Senior Unsecured Notes, has no independent assets or operations. All of the direct or indirect subsidiaries of the Company, other than subsidiaries that are issuers, or guarantors, as applicable, of the Senior Unsecured Notes are minor, individually and in the aggregate.

*Safeway Notes*

The Company repaid the remaining $130.0 million in aggregate principal amount of Safeway's 4.75% Notes due 2021 on their maturity date, December 1, 2021.

*Deferred Financing Costs and Interest Expense, Net*

Financing costs incurred to obtain all financing, except for ABL Facility financing, are recognized as a direct reduction from the carrying amount of the debt liability and are amortized over the term of the related debt using the effective interest method. Financing costs incurred to obtain ABL Facility financing are capitalized and amortized over the ABL Facility term using the straight-line method. Deferred financing costs associated with ABL Facility financing are included in Other assets and were $14.7 million and $19.9 million as of February 24, 2024 and February 25, 2023, respectively.

Interest expense, net consisted of the following (in millions):

|  | Fiscal 2023 | | Fiscal 2022 | | Fiscal 2021 |
|---|---|---|---|---|---|
| ABL Facility, senior secured and unsecured notes, and debentures | $ | 446.9 | $ | 404.9 | $ | 400.0 |
| Finance lease obligations |  | 45.5 |  | 51.4 |  | 61.6 |
| Amortization of deferred financing costs |  | 15.6 |  | 16.9 |  | 23.4 |
| Other interest income, net |  | (15.9) |  | (68.6) |  | (3.1) |
| Interest expense, net | $ | 492.1 | $ | 404.6 | $ | 481.9 |

PX6153-075

## NOTE 7 - LEASES

The components of total lease cost, net consisted of the following (in millions):

| | Classification | Fiscal 2023 | Fiscal 2022 | Fiscal 2021 |
|---|---|---|---|---|
| Operating lease cost (1) | Cost of sales and Selling and administrative expenses (3) | $ 1,082.8 | $ 1,062.8 | $ 1,046.9 |
| Finance lease cost | | | | |
|   Amortization of lease assets | Cost of sales and Selling and administrative expenses (3) | 51.7 | 55.5 | 63.8 |
|   Interest on lease liabilities | Interest expense, net | 45.5 | 51.4 | 61.6 |
| Variable lease cost (2) | Cost of sales and Selling and administrative expenses (3) | 456.3 | 441.9 | 428.6 |
| Sublease income | Net sales and other revenue | (78.6) | (83.3) | (84.3) |
|   Total lease cost, net | | $ 1,557.7 | $ 1,528.3 | $ 1,516.6 |

(1) Includes short-term lease cost, which is immaterial.

(2) Represents variable lease costs for both operating and finance leases. Includes contingent rent expense and other non-fixed lease-related costs, including property taxes, common area maintenance and property insurance.

(3) Supply chain-related amounts are included in Cost of sales.

Balance sheet information related to leases as of February 24, 2024 and February 25, 2023 consisted of the following (in millions):

| | Classification | February 24, 2024 | February 25, 2023 |
|---|---|---|---|
| **Assets** | | | |
|   Operating | Operating lease right-of-use assets | $ 5,981.6 | $ 5,879.1 |
|   Finance | Property and equipment, net | 300.2 | 332.9 |
| Total lease assets | | $ 6,281.8 | $ 6,212.0 |
| | | | |
| **Liabilities** | | | |
| Current | | | |
|   Operating | Current operating lease obligations | $ 677.6 | $ 664.8 |
|   Finance | Current maturities of long-term debt and finance lease obligations | 68.3 | 74.8 |
| Long-term | | | |
|   Operating | Long-term operating lease obligations | 5,493.2 | 5,386.2 |
|   Finance | Long-term debt and finance lease obligations | 392.1 | 442.3 |
| Total lease liabilities | | $ 6,631.2 | $ 6,568.1 |

76

The following table presents cash flow information for leases (in millions):

| | Fiscal 2023 | Fiscal 2022 | Fiscal 2021 |
|---|---|---|---|
| Cash paid for amounts included in the measurement of lease liabilities: | | | |
| Operating cash flows from operating leases | $ 1,042.0 | $ 1,020.2 | $ 1,001.6 |
| Operating cash flows from finance leases | 45.5 | 51.4 | 61.6 |
| Financing cash flows from finance leases | 69.3 | 71.6 | 78.0 |
| Right-of-use assets obtained in exchange for operating lease obligations | 773.0 | 629.5 | 606.2 |
| Right-of-use assets obtained in exchange for finance lease obligations | 22.6 | 22.8 | 75.4 |
| Impairment of right-of-use operating lease assets | 1.8 | — | 14.7 |
| Impairment of right-of-use finance lease assets | — | — | 1.5 |

The following table presents the weighted average lease term and discount rate for leases:

| | February 24, 2024 | February 25, 2023 |
|---|---|---|
| Weighted average remaining lease term - operating leases | 10.5 years | 10.6 years |
| Weighted average remaining lease term - finance leases | 8.7 years | 8.8 years |
| Weighted average discount rate - operating leases | 6.4 % | 6.4 % |
| Weighted average discount rate - finance leases | 10.1 % | 10.6 % |

Future minimum lease payments for operating and finance lease obligations as of February 24, 2024 consisted of the following (in millions):

| | Lease Obligations | |
|---|---|---|
| Fiscal year | Operating Leases | Finance Leases |
| 2024 | $ 974.3 | $ 94.7 |
| 2025 | 1,000.5 | 91.0 |
| 2026 | 932.4 | 75.7 |
| 2027 | 842.3 | 64.4 |
| 2028 | 756.0 | 56.1 |
| Thereafter | 4,221.9 | 284.3 |
| Total future minimum obligations | 8,727.4 | 666.2 |
| Less interest | (2,556.6) | (205.8) |
| Present value of net future minimum lease obligations | 6,170.8 | 460.4 |
| Less current portion | (677.6) | (68.3) |
| Long-term obligations | $ 5,493.2 | $ 392.1 |

The Company subleases certain property to third parties. Future minimum tenant operating lease payments remaining under these non-cancelable operating leases as of February 24, 2024 was $267.8 million.

## NOTE 8 - STOCKHOLDERS' EQUITY AND CONVERTIBLE PREFERRED STOCK

### Common Stock

On June 8, 2020, the Company amended and restated its certificate of incorporation to authorize 1,150,000,000 shares of common stock, par value $0.01 per share, of which 1,000,000,000 shares were classified as Class A

77

common stock ("Class A common stock") and 150,000,000 shares were classified as Class A-1 convertible common stock ("Class A-1 common stock"). As of February 24, 2024, there were 594,445,268 and 576,047,523 shares of Class A common stock issued and outstanding, respectively, and no shares of Class A-1 common stock issued or outstanding. As of February 25, 2023, there were 590,968,600 and 569,667,655 shares of Class A common stock issued and outstanding, respectively, and no shares of Class A-1 common stock issued or outstanding.

The terms of the Class A common stock are substantially identical to the terms of the Class A-1 common stock, except that the Class A-1 common stock does not have voting rights. Each holder of Class A common stock is entitled to one vote for each share owned of record on all matters voted upon by stockholders. A majority vote is required for all action to be taken by stockholders, except as otherwise provided for in the Company's amended and restated certificate of incorporation and amended and restated bylaws or as required by law. Subject to preferences that may be applicable to any then outstanding preferred stock, holders of the Company's Class A common stock and Class A-1 common stock are entitled to receive ratably those dividends, if any, as may be declared from time to time by the board of directors out of legally available funds. In the event of the Company's liquidation, dissolution or winding-up, the holders of Class A common stock and Class A-1 common stock are entitled to share equally and ratably in the Company's assets, if any, remaining after the payment of all debts and liabilities and the liquidation preference of any outstanding preferred stock. When permitted under the relevant antitrust restrictions, any issued shares of Class A-1 common stock would automatically convert on a one-for-one basis to voting shares of Class A common stock.

The Company has established a dividend policy pursuant to which the Company intends to pay a quarterly dividend on its Class A common stock. The Company paid cash dividends on its Class A common stock of $276.2 million during fiscal 2023, $255.1 million during fiscal 2022, excluding the Special Dividend (as defined below), and $207.4 million during fiscal 2021. On April 11, 2024, the Company announced the next quarterly dividend payment of $0.12 per share of Class A common stock to be paid on May 10, 2024 to stockholders of record as of the close of business on April 26, 2024. Future dividends will be made at the discretion of the Company's board of directors and will depend on, among other things, general and economic conditions, industry standards, the Company's financial condition and operating results, the Company's available cash and current and anticipated cash needs, restrictions under the documentation governing certain of the Company's indebtedness, including the ABL Facility and Senior Unsecured Notes, capital requirements, regulations and contractual, legal, tax and regulatory restrictions, and such other factors as the Company's board of directors may deem relevant.

*Special Dividend*

In connection with the Company's previously-announced Board-led review of potential strategic alternatives to enhance the Company's growth and maximize stockholder value, on October 13, 2022, the Company declared a special cash dividend of $6.85 per share of Class A common stock (the "Special Dividend"). The Special Dividend was payable to stockholders of record, including holders of Series A preferred stock on an as-converted basis, as of the close of business on October 24, 2022. On January 20, 2023, the Special Dividend of $3,916.9 million was paid.

*Convertible Preferred Stock and Investor Exchange Right*

On June 8, 2020, the Company amended and restated its certificate of incorporation to authorize 100,000,000 shares of convertible preferred stock, par value $0.01 per share, of which 1,750,000 shares were designated Series A preferred stock ("Series A preferred stock") and 1,410,000 shares were designated Series A-1 convertible preferred stock ("Series A-1 preferred stock" and together with the Series A preferred stock, the "Convertible Preferred Stock"). On June 9, 2020 (the "Preferred Closing Date"), the Company sold and issued (i) an aggregate of 1,410,000 shares of Series A-1 preferred stock and (ii) an aggregate of 340,000 shares of Series A preferred stock. The Company received aggregate proceeds of $1,680.0 million from the sale and issuance of the Convertible Preferred Stock which had an aggregate liquidation preference of $1,750.0 million. The Convertible Preferred Stock was presented outside of permanent equity at its original issuance price less costs incurred, due to it being contingently

78

redeemable. The Series A preferred stock was convertible at the option of the holders thereof at any time into shares of Class A common stock, each at an initial conversion price of $17.22 per share and an initial conversion rate of 58.064 shares of Common Stock per share of Convertible Preferred Stock, subject to certain anti-dilution adjustments.

The terms of the Series A preferred stock were substantially identical to the terms of the Series A-1 preferred stock, except that the Series A preferred stock voted together with Class A common stock on an as-converted basis, but the Series A-1 preferred stock could not vote with Class A common stock on an as converted basis. The Convertible Preferred Stock, with respect to dividend rights and/or distribution rights upon the liquidation, winding-up or dissolution, as applicable, ranked senior to each class of common stock and junior to existing and future indebtedness and other liabilities.

During fiscal 2023, fiscal 2022 and fiscal 2021, certain holders of the Company's Convertible Preferred Stock converted 50,000, 1,349,186 and 350,814 shares of Convertible Preferred Stock, respectively, into 2,903,200, 78,339,120 and 20,369,582 shares of the Company's Class A common stock, respectively, which were issued from treasury stock. See *Treasury Stock* below and the Consolidated Statements of Stockholders' Equity for additional information. As a result, the Company has issued, in the aggregate, 101,611,902 shares of Class A common stock to holders of Convertible Preferred Stock. These non-cash conversions represent 100% of the originally issued Convertible Preferred Stock. As of February 24, 2024, no shares of Convertible Preferred Stock are outstanding.

Concurrent with the issuance and sale of the Convertible Preferred Stock during the first quarter of fiscal 2020, a consolidated real estate subsidiary of the Company entered into a real estate agreement with an affiliate of the holders of the Convertible Preferred Stock. Under the terms of the real estate agreement, the Company placed fee owned real estate properties into its real estate subsidiary and contributed $36.5 million of cash into a restricted preferred account, with a total value of $2.9 billion (165% of the liquidation preference of the Convertible Preferred Stock at the time of issue). The real estate agreement provided that the Company may release properties and/or cash from the restricted escrow account if the holders of Convertible Preferred Stock convert their shares into Class A common stock, provided that certain conversion thresholds are met. Due to the conversion of 100% of the originally issued Convertible Preferred Stock discussed above, all real estate properties and cash have been released from the restricted escrow account. As of February 24, 2024, no assets of the Company were held in the restricted escrow account.

The holders of Convertible Preferred Stock were entitled to a quarterly dividend at a rate per annum of 6.75% of the liquidation preference per share of the Convertible Preferred Stock. In addition, the holders of Convertible Preferred Stock participated in cash dividends that the Company pays on its common stock to the extent that such cash dividends exceeded $206.25 million per fiscal year. The Company paid cash dividends to holders of the Convertible Preferred Stock of $0.8 million during fiscal 2023, $65.3 million during fiscal 2022, excluding the Special Dividend, and $114.6 million during fiscal 2021.

*Treasury Stock*

On October 14, 2020, the Company's board of directors authorized a share repurchase program that allows the Company to repurchase up to $300.0 million of its Class A common stock. During fiscal 2023, fiscal 2022 and fiscal 2021, there were no share repurchases as part of the share repurchase program.

During fiscal 2023, fiscal 2022 and fiscal 2021, the Company reissued 2,903,200, 78,339,120 and 20,369,582 shares of treasury stock, at cost, respectively, upon conversion of approximately 50,000, 1,349,186 and 350,814 shares of Convertible Preferred Stock, respectively into Class A common stock. Shares of treasury stock are reissued based on specific identification.

79

Table of Contents

## NOTE 9 - EQUITY-BASED COMPENSATION

The Company maintains the Albertsons Companies, Inc. Restricted Stock Unit Plan (the "Restricted Stock Unit Plan"). Under the Restricted Stock Unit Plan, subsequent to the IPO, 43.6 million shares of Class A common stock have been authorized for issuance as equity awards. As of February 24, 2024, 29.8 million shares of Class A common stock remained available for future awards.

Under the Restricted Stock Unit Plan, the Company recognizes equity-based compensation expense for RSUs and RSAs granted to employees and non-employee directors. Upon vesting, RSUs and RSAs will be settled in shares of the Company's Class A common stock. RSUs generally vest over three years from the grant date, based on a service period, or upon a combination of both a service period and achievement of certain performance-based thresholds, and RSAs generally vest over five years from the grant date, with 50% based solely on a service period and 50% upon a service period and achievement of certain performance-based thresholds. For performance-based RSUs ("PBRSUs") and RSAs ("PBRSAs") granted in fiscal 2023, the number of shares of the Company's Class A common stock to be received at vesting can be adjusted within a predetermined range based on the Company's achieved performance for fiscal 2023 relative to the fiscal 2023 performance target.

In fiscal 2022, all unvested equity awards outstanding participated in the Special Dividend, according to the same vesting terms and conditions as the underlying equity award. Unvested equity awards with dividend equivalent rights ("DERs") received the Special Dividend through the issuance of additional RSUs. Unvested equity awards without DERs received the Special Dividend in cash subject to anti-dilution provisions. For the Special Dividend that settles in cash upon vesting, modification accounting was applied during fiscal 2022 to reflect liability classification. The modification did not result in a material impact to the Company's financial position or results of operations. For further description of the Special Dividend, see Note 8 - Stockholders' Equity and Convertible Preferred Stock.

Equity-based compensation expense recognized in the Consolidated Statements of Operations, net of forfeitures, was as follows (in millions):

|  | | Fiscal 2023 | | Fiscal 2022 | | Fiscal 2021 |
|---|---|---|---|---|---|---|
| RSUs | $ | 88.3 | $ | 104.0 | $ | 93.2 |
| RSAs | | 3.2 | | 8.4 | | 8.0 |
| Liability-classified awards | | 13.0 | | 25.9 | | — |
| Total equity-based compensation expense | $ | 104.5 | $ | 138.3 | $ | 101.2 |
| Total related tax benefit | $ | 19.5 | $ | 26.9 | $ | 23.9 |

During fiscal 2023, the Company issued 5.6 million RSUs to its employees and directors, of which 4.0 million shares were granted for accounting purposes. The 4.0 million issued and granted awards consist of 3.1 million RSUs that have solely time-based vesting and 0.9 million PBRSUs that were granted upon the establishment of the fiscal 2023 performance target and that would vest upon both the achievement of such performance target and continued service through the vesting period. Additionally, 1.1 million previously issued PBRSUs and PBRSAs were granted in fiscal 2023 upon the establishment of the fiscal 2023 annual performance target and that would vest upon both the achievement of such performance target and continued service through the vesting period, and an additional 1.3 million PBRSUs were granted in fiscal 2023 related to previously issued awards based on achieved performance for fiscal 2022 relative to the fiscal 2022 performance target. The 6.4 million RSUs and RSAs granted in fiscal 2023 have an aggregate grant date value of $129.5 million. The aggregate grant date value of RSUs and RSAs granted was $120.1 million and $113.2 million in fiscal 2022 and fiscal 2021, respectively.

PX6153-080

Table of Contents

The following summarizes the activity of RSUs and RSAs during fiscal 2023:

| | Time-Based | | Performance-Based | |
| --- | --- | --- | --- | --- |
| | Number of shares (in millions) | Weighted average grant date fair value | Number of shares (in millions) | Weighted average grant date fair value |
| Unvested, February 25, 2023 | 4.1 $ | 23.78 | 4.7 $ | 18.72 |
| Granted | 3.1 | 19.62 | 2.0 | 19.85 |
| Performance adjustment (1) | — | — | 1.3 | 22.33 |
| Vested | (3.1) | 20.74 | (2.7) | 16.94 |
| Forfeited or cancelled | (0.5) | 21.83 | (0.4) | 19.51 |
| Unvested, February 24, 2024 | 3.6 $ | 22.61 | 4.9 $ | 20.98 |

(1) Represents additional PBRSUs based on achieved performance for fiscal 2022 relative to the fiscal 2022 performance target. The performance adjustment does not include 0.1 million additional PBRSUs based on achieved performance for fiscal 2023 relative to the fiscal 2023 performance target, although these shares have been estimated and included in the determination of equity-based compensation expense and the calculation of diluted net income per common share for fiscal 2023.

During fiscal 2023, fiscal 2022 and fiscal 2021, the aggregate fair value of RSUs and RSAs that vested was $119.2 million, $137.9 million and $120.9 million, respectively. The number of RSUs and RSAs vested includes shares of common stock that the Company withheld on behalf of employees to satisfy statutory tax withholding requirements.

As of February 24, 2024, the Company had $65.9 million of unrecognized compensation cost related to 8.3 million unvested granted RSUs. That cost is expected to be recognized over a weighted average period of 1.6 years. As of February 24, 2024, the Company had $0.2 million unrecognized costs related to 0.2 million unvested granted RSAs. That cost is expected to be recognized over a weighted average period of 0.2 years. As of February 24, 2024, the Company had $7.3 million of unrecognized costs related to unvested liability-classified awards. That cost is expected to be recognized over a weighted average period of 1.0 year.

Upon the establishment of the annual performance target for fiscal 2024 and fiscal 2025, the remaining 2.0 million issued PBRSUs will be granted for accounting purposes. As of February 24, 2024, there are no PBRSAs that have not been granted for accounting purposes.

PX6153-081

Table of Contents

## NOTE 10 - INCOME TAXES

The components of income tax expense consisted of the following (in millions):

| | | Fiscal 2023 | | Fiscal 2022 | | Fiscal 2021 |
|---|---|---|---|---|---|---|
| Current | | | | | | |
| Federal (1) | $ | 348.2 | $ | 320.5 | $ | 211.1 |
| State | | 56.4 | | 88.1 | | 49.2 |
| Foreign | | 1.0 | | 0.5 | | 0.6 |
| Total Current | | 405.6 | | 409.1 | | 260.9 |
| Deferred | | | | | | |
| Federal | | (83.1) | | (7.6) | | 198.3 |
| State | | 31.7 | | 11.1 | | 12.4 |
| Foreign | | (61.2) | | 9.4 | | 8.3 |
| Total Deferred | | (112.6) | | 12.9 | | 219.0 |
| Income tax expense | $ | 293.0 | $ | 422.0 | $ | 479.9 |

(1) Federal current tax expense is net of $0.3 million, $0.5 million and $0.5 million tax benefit of net operating losses ("NOL") in fiscal 2023, fiscal 2022 and fiscal 2021, respectively.

The difference between the actual tax provision and the tax provision computed by applying the statutory federal income tax rate of 21% to Income before income taxes was attributable to the following (in millions):

| | | Fiscal 2023 | | Fiscal 2022 | | Fiscal 2021 |
|---|---|---|---|---|---|---|
| Income tax expense at federal statutory rate | $ | 333.7 | $ | 406.4 | $ | 440.9 |
| State income taxes, net of federal benefit | | 58.5 | | 85.9 | | 100.7 |
| Change in valuation allowance | | 3.2 | | 0.1 | | (2.5) |
| Unrecognized tax benefits | | (67.3) | | (41.8) | | (33.9) |
| Tax credits | | (37.1) | | (26.2) | | (20.3) |
| Other | | 2.0 | | (2.4) | | (5.0) |
| Income tax expense | $ | 293.0 | $ | 422.0 | $ | 479.9 |

PX6153-082

Table of Contents

Deferred income taxes reflect the net tax effects of temporary differences between the bases of assets and liabilities for financial reporting and income tax purposes. The Company's deferred tax assets and liabilities consisted of the following (in millions):

| | February 24, 2024 | | February 25, 2023 | |
|---|---|---|---|---|
| Deferred tax assets: | | | | |
| Compensation and benefits | $ | 204.3 | $ | 190.6 |
| Net operating loss | | 71.2 | | 99.5 |
| Pension & postretirement benefits | | 215.9 | | 248.9 |
| Self-Insurance | | 299.8 | | 289.7 |
| Tax credits | | 8.5 | | 26.2 |
| Lease obligations | | 1,735.1 | | 1,722.4 |
| Other | | 104.4 | | 110.9 |
| Gross deferred tax assets | | 2,639.2 | | 2,688.2 |
| Less: valuation allowance | | (65.6) | | (102.3) |
| Total deferred tax assets | | 2,573.6 | | 2,585.9 |
| Deferred tax liabilities: | | | | |
| Depreciation and amortization | | 1,359.9 | | 1,360.2 |
| Inventories | | 374.9 | | 373.1 |
| Operating lease assets | | 1,543.3 | | 1,518.9 |
| Other | | 103.1 | | 187.7 |
| Total deferred tax liabilities | | 3,381.2 | | 3,439.9 |
| Net deferred tax liability | $ | (807.6) | $ | (854.0) |
| Noncurrent deferred tax asset | $ | — | $ | — |
| Noncurrent deferred tax liability | | (807.6) | | (854.0) |
| Total | $ | (807.6) | $ | (854.0) |

The valuation allowance activity on deferred tax assets was as follows (in millions):

| | February 24, 2024 | | February 25, 2023 | | February 26, 2022 | |
|---|---|---|---|---|---|---|
| Beginning balance | $ | 102.3 | $ | 113.6 | $ | 130.4 |
| Additions charged to income tax expense | | 6.0 | | 3.1 | | 2.1 |
| Reductions credited to income tax expense | | (2.8) | | (3.0) | | (4.6) |
| Changes to other comprehensive income or loss and other | | (39.9) | | (11.4) | | (14.3) |
| Ending balance | $ | 65.6 | $ | 102.3 | $ | 113.6 |

The Company assesses the available positive and negative evidence to estimate if sufficient future taxable income will be generated to use the existing deferred tax assets. On the basis of this evaluation, as of February 24, 2024, a valuation allowance of $65.6 million has been recorded for the portion of the deferred tax asset that is not more likely than not to be realized, consisting primarily of tax credits and carryovers in jurisdictions where the Company has minimal presence or does not expect to have future taxable income. The Company will continue to evaluate the need to adjust the valuation allowance. The amount of the deferred tax asset considered realizable, however, could be adjusted depending on the Company's performance in certain subsidiaries or jurisdictions.

The Company currently has federal and state NOL carryforwards of $17.5 million and $1,222.0 million, respectively, which will begin to expire in 2024 and continue through the fiscal year ending February 2044. As of

Table of Contents

February 24, 2024, the Company had $8.5 million of state credit carryforwards, which will begin to expire in 2024 and continue through the fiscal year ending February 2029. The Company had no federal credit carryforwards as of February 24, 2024.

Changes in the Company's unrecognized tax benefits consisted of the following (in millions):

|  | Fiscal 2023 | Fiscal 2022 | Fiscal 2021 |
|---|---|---|---|
| Beginning balance | $ 216.0 | $ 276.0 | $ 368.8 |
| Increase related to tax positions taken in the current year | 9.6 | 5.0 | 1.2 |
| Increase related to tax positions taken in prior years | — | 2.1 | 0.3 |
| Decrease related to tax position taken in prior years | (0.9) | — | (0.1) |
| Decrease related to settlements with taxing authorities | (5.6) | (20.7) | (72.9) |
| Decrease related to lapse of statute of limitations | (40.3) | (46.4) | (21.3) |
| Ending balance | $ 178.8 | $ 216.0 | $ 276.0 |

Included in the balance of unrecognized tax benefits as of February 24, 2024, February 25, 2023 and February 26, 2022 are tax positions of $118.1 million, $151.1 million and $202.6 million, respectively, which would reduce the Company's effective tax rate if recognized in future periods. Of the $118.1 million that could impact tax expense, the Company has recorded $3.6 million of indemnification assets that would offset any future recognition. As of February 24, 2024, the Company is no longer subject to federal income tax examinations for the fiscal years prior to 2020 and in most states, is no longer subject to state income tax examinations for fiscal years before 2012. The Company recognizes accrued interest and penalties related to unrecognized tax benefits as a component of income tax expense. The Company recognized a benefit related to interest and penalties, net of settlement adjustments, of $27.2 million for fiscal 2023, and expense for fiscal 2022 and fiscal 2021 of $2.4 million and $3.0 million, respectively.

The Company believes it is reasonably possible that the reserve for uncertain tax positions may be reduced by approximately $130 million in the next 12 months due to ongoing tax examinations and expiration of statutes of limitations.

## NOTE 11 - EMPLOYEE BENEFIT PLANS AND COLLECTIVE BARGAINING AGREEMENTS

*Employer Sponsored Pension Plans*

The Company sponsors a defined benefit pension plan (the "Safeway Plan") for certain employees not participating in multiemployer pension plans. The Safeway Plan is frozen to non-union employees but continues to remain fully open to union employees, and past service benefits, including future interest credits, for non-union employees continue to be accrued under the Safeway Plan. The Company also sponsors a defined benefit pension plan (the "Shaw's Plan") covering union employees under the Shaw's banner. Under the United banner, the Company sponsors a frozen plan (the "United Plan") covering certain United employees and an unfunded Retirement Restoration Plan that provides death benefits and supplemental income payments for certain executives after retirement. On December 21, 2023, the Company initiated the process of terminating the United Plan which is expected to be finalized during fiscal 2024. In connection with the withdrawal from the Combined Plan (as defined below) in fiscal 2020, the Company established and contributes to the Safeway Variable Annuity Pension Plan (the "Safeway VAPP") that provides benefits to participants for future services.

84

Table of Contents

### Other Post-Retirement Benefits

In addition to the Company's pension plans, the Company provides post-retirement medical and life insurance benefits to certain employees. Retirees share a portion of the cost of the post-retirement medical plans. The Company pays all the cost of the life insurance plans. These plans are unfunded.

The following table provides a reconciliation of the changes in the retirement plans' benefit obligation and fair value of assets over the two-year period ended February 24, 2024 and a statement of funded status as of February 24, 2024 and February 25, 2023 (in millions):

|  | Pension | | Other Post-Retirement Benefits | |
|---|---|---|---|---|
|  | February 24, 2024 | February 25, 2023 | February 24, 2024 | February 25, 2023 |
| Change in projected benefit obligation: | | | | |
| Beginning balance | $ 1,697.5 | $ 2,001.2 | $ 12.4 | $ 19.0 |
| Service cost | 17.3 | 19.9 | — | — |
| Interest cost | 83.6 | 51.4 | 0.6 | 0.4 |
| Actuarial loss (gain) | 28.6 | (230.8) | 0.9 | (5.5) |
| Benefit payments (including settlements) | (135.4) | (144.7) | (1.9) | (1.5) |
| Plan amendments | (0.1) | 0.5 | — | — |
| Ending balance | $ 1,691.5 | $ 1,697.5 | $ 12.0 | $ 12.4 |
| Change in fair value of plan assets: | | | | |
| Beginning balance | $ 1,407.3 | $ 1,662.3 | $ — | $ — |
| Actual return on plan assets | 155.4 | (136.1) | — | — |
| Employer contributions | 16.4 | 25.8 | 1.9 | 1.5 |
| Benefit payments (including settlements) | (135.4) | (144.7) | (1.9) | (1.5) |
| Ending balance | $ 1,443.7 | $ 1,407.3 | $ — | $ — |
| Components of net amount recognized in financial position: | | | | |
| Other current liabilities | $ (13.8) | $ (6.8) | $ (2.0) | $ (2.0) |
| Other long-term liabilities | (234.0) | (283.4) | (10.0) | (10.4) |
| Funded status | $ (247.8) | $ (290.2) | $ (12.0) | $ (12.4) |

The actuarial loss in fiscal 2023 related to the projected benefit obligation was primarily driven by cash balance interest crediting rates and benefit payments. The actuarial gain in fiscal 2022 related to the projected benefit obligation was primarily driven by an increase in discount rates.

Amounts recognized in Accumulated other comprehensive income (loss) consisted of the following (in millions):

|  | Pension | | Other Post-Retirement Benefits | |
|---|---|---|---|---|
|  | February 24, 2024 | February 25, 2023 | February 24, 2024 | February 25, 2023 |
| Net actuarial gain | $ (108.0) | $ (85.2) | $ (11.5) | $ (13.4) |
| Prior service cost | 1.4 | 2.0 | — | — |
|  | $ (106.6) | $ (83.2) | $ (11.5) | $ (13.4) |

Table of Contents

Information for the Company's pension plans, all of which have an accumulated benefit obligation in excess of plan assets as of February 24, 2024 and February 25, 2023, is shown below (in millions):

|  | February 24, 2024 | February 25, 2023 |
|---|---|---|
| Projected benefit obligation | $ 1,691.5 | $ 1,697.5 |
| Accumulated benefit obligation | 1,688.6 | 1,694.4 |
| Fair value of plan assets | 1,443.7 | 1,407.3 |

The following table provides the components of net pension and post-retirement (income) expense for the retirement plans and other changes in plan assets and benefit obligations recognized in Other comprehensive income (loss) (in millions):

|  | Pension | | | Other Post-Retirement Benefits | | |
|---|---|---|---|---|---|---|
|  | Fiscal 2023 | Fiscal 2022 | Fiscal 2021 | Fiscal 2023 | Fiscal 2022 | Fiscal 2021 |
| Components of net (income) expense: |  |  |  |  |  |  |
| Estimated return on plan assets | $ (98.5) | $ (92.9) | $ (101.1) | $ — | $ — | $ — |
| Service cost | 17.3 | 19.9 | 21.8 | — | — | — |
| Interest cost | 83.6 | 51.4 | 39.9 | 0.6 | 0.4 | 0.2 |
| Amortization of prior service cost | 0.4 | 0.3 | 0.3 | — | — | — |
| Amortization of net actuarial (gain) loss | (5.5) | 0.2 | 0.8 | (1.1) | (0.4) | (0.4) |
| Loss (income) due to settlement accounting | 0.3 | (0.6) | (16.2) | — | — | — |
| (Income) expense, net | (2.4) | (21.7) | (54.5) | (0.5) | — | (0.2) |
| | | | | | | |
| Changes in plan assets and benefit obligations recognized in Other comprehensive income (loss): | | | | | | |
| Net actuarial (gain) loss | (28.0) | (1.1) | (23.2) | 0.8 | (5.4) | (0.4) |
| Amortization of net actuarial gain (loss) | 5.5 | (0.2) | (0.8) | 1.1 | 0.4 | 0.4 |
| Prior service cost | (0.2) | 0.5 | 0.7 | — | — | — |
| Amortization of prior service cost | (0.4) | (0.3) | (0.3) | — | — | — |
| (Loss) income due to settlement accounting | (0.3) | 0.6 | 16.2 | — | — | — |
| Total recognized in Other comprehensive income (loss) | (23.4) | (0.5) | (7.4) | 1.9 | (5.0) | — |
| Total net expense and changes in plan assets and benefit obligations recognized in Other comprehensive income (loss) | $ (25.8) | $ (22.2) | $ (61.9) | $ 1.4 | $ (5.0) | $ (0.2) |

During fiscal 2021, the Company purchased a group annuity policy and transferred $203.5 million of pension plan assets to an insurance company (the "Annuity Purchase"), thereby reducing the Company's defined benefit pension obligations by $205.4 million. As a result of the Annuity Purchase, the Company recorded a settlement gain of $11.1 million during fiscal 2021.

Prior service costs are amortized on a straight-line basis over the average remaining service period of active participants. When the accumulation of actuarial gains and losses exceeds 10% of the greater of the projected

86

Table of Contents

benefit obligation and the fair value of plan assets, the excess is amortized over either the average remaining lifetime of all participants or the average remaining service period of active participants. No significant prior service costs or estimated net actuarial gain or loss is expected to be amortized from Other comprehensive income (loss) into periodic benefit cost during fiscal 2024.

*Assumptions*

The weighted average actuarial assumptions used to determine year-end projected benefit obligations for pension plans were as follows:

|  | February 24, 2024 | February 25, 2023 |
|---|---|---|
| Discount rate | 5.31 % | 5.17 % |
| Rate of compensation increase | 3.20 % | 3.03 % |
| Cash balance plan interest crediting rate | 4.25 % | 3.65 % |

The weighted average actuarial assumptions used to determine net periodic benefit costs for pension plans were as follows:

|  | February 24, 2024 | February 25, 2023 | February 26, 2022 |
|---|---|---|---|
| Discount rate | 5.17 % | 3.26 % | 2.60 % |
| Expected return on plan assets | 7.40 % | 5.97 % | 5.73 % |
| Cash balance plan interest crediting rate | 3.65 % | 2.35 % | 2.35 % |

*Discount Rate Assumption.* The discount rate reflects the current rate at which the pension obligations could be settled at each measurement date. In all years presented, the discount rates were determined by matching the expected plan benefit payments against a spot rate yield curve constructed to replicate above median yields of AA-graded corporate bonds.

*Asset Return Assumption.* Expected return on pension plan assets is based on historical experience of the Company's portfolios and the review of projected returns by asset class on broad, publicly traded equity and fixed-income indices, as well as target asset allocation.

*Retirement and Mortality Rates.* On February 26, 2022, the Company adopted the MP-2021 mortality improvement projection scale which assumes an improvement in life expectancy at a marginally faster rate than the MP-2020 projection scale. The mortality assumption was not updated during fiscal 2023 and fiscal 2022 as a new improvement scale has not been released.

*Investment Policies and Strategies.* The Company has adopted and implemented an investment policy for the defined benefit pension plans that incorporates a strategic long-term asset allocation mix designed to meet the Company's long-term pension requirements. This asset allocation policy is reviewed annually and, on a regular basis, actual allocations are rebalanced to the prevailing targets. The investment policy also emphasizes the following key objectives: (1) maintaining a diversified portfolio among asset classes and investment styles; (2) maintaining an acceptable level of risk in pursuit of long-term economic benefit; (3) maximizing the opportunity for value-added returns from active investment management while establishing investment guidelines and monitoring procedures for each investment manager to ensure the characteristics of the portfolio are consistent with the original investment mandate; and (4) maintaining adequate controls over administrative costs.

PX6153-087

Table of Contents

The following table summarizes actual allocations for the Safeway Plan which had $1,175.4 million in plan assets as of February 24, 2024:

| Asset category | Target | Plan Assets February 24, 2024 | Plan Assets February 25, 2023 |
|---|---|---|---|
| Equity | 75% | 76.8 % | 74.0 % |
| Fixed income | 25% | 21.4 % | 23.7 % |
| Cash and other | —% | 1.8 % | 2.3 % |
| Total | 100% | 100.0 % | 100.0 % |

The following table summarizes the actual allocations for the Shaw's Plan which had $216.6 million in plan assets as of February 24, 2024:

| Asset category | Target (1) | Plan Assets February 24, 2024 | Plan Assets February 25, 2023 |
|---|---|---|---|
| Equity | 61% | 63.9 % | 66.4 % |
| Fixed income | 39% | 34.7 % | 32.5 % |
| Cash and other | —% | 1.4 % | 1.1 % |
| Total | 100% | 100.0 % | 100.0 % |

(1) In accordance with the Shaw's Plan investment policy, the target asset allocation was adjusted in fiscal 2023 based on the funded ratio of the Shaw's Plan.

The following table summarizes the actual allocations for the United Plan which had $27.3 million in plan assets as of February 24, 2024:

| Asset category | Target (1) | Plan Assets February 24, 2024 | Plan Assets February 25, 2023 |
|---|---|---|---|
| Equity | —% | 3.0 % | 41.5 % |
| Fixed income | 100% | 95.2 % | 54.5 % |
| Cash and other | —% | 1.8 % | 4.0 % |
| Total | 100% | 100.0 % | 100.0 % |

(1) As a result of the Company initiating the process of terminating the United Plan during fiscal 2023, the investment policy targets were adjusted in order to achieve the goals of the United Plan heading into termination.

88

Table of Contents

The following table summarizes the actual allocations for the Safeway VAPP which had $24.4 million in plan assets as of February 24, 2024:

| Asset category | Target (2) | Plan Assets (1) February 24, 2024 | February 25, 2023 |
|---|---|---|---|
| Equity | 15% | 13.9 % | — % |
| Fixed income | 60% | 58.9 % | — % |
| Other (3) | 25% | 23.5 % | 3.4 % |
| Cash | —% | 3.7 % | 96.6 % |
| Total | 100% | 100.0 % | 100.0 % |

(1) As of February 25. 2023, the assets were primarily invested in cash as these assets were contributed during fiscal 2022 and had not yet been allocated based on the Safeway VAPP policy.

(2) Reflects updates to the investment policy targets made during fiscal 2023.

(3) Includes real estate, global tactical asset allocation, private equity investments and money market funds.

*Pension Plan Assets*

The fair value of the Company's pension plan assets as of February 24, 2024, excluding pending transactions of $47.8 million payable to an intermediary agent, by asset category are as follows (in millions):

| Asset category | Total | Fair Value Measurements Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Assets Measured at NAV |
|---|---|---|---|---|---|
| Cash and cash equivalents (1) | $ 5.7 | $ 5.2 | $ 0.5 | $ — | $ — |
| Short-term investment collective trust (2) | 34.3 | — | — | — | 34.3 |
| Common and preferred stock: (3) | | | | | |
| Domestic common and preferred stock | 164.8 | 164.8 | — | — | — |
| International common stock | 57.7 | 57.7 | — | — | — |
| Collective trust funds (2) | 636.5 | — | — | — | 636.5 |
| Corporate bonds (4) | 84.0 | — | 84.0 | — | — |
| Mortgage- and other asset-backed securities (5) | 22.3 | — | 22.3 | — | — |
| Mutual funds (6) | 166.2 | 138.8 | 27.4 | — | — |
| U.S. government securities (7) | 250.2 | — | 250.2 | — | — |
| Other securities (8) | 69.8 | — | 19.3 | — | 50.5 |
| Total | $ 1,491.5 | $ 366.5 | $ 403.7 | $ — | $ 721.3 |

PX6153-089

Table of Contents

The fair value of the Company's pension plan assets as of February 25, 2023, excluding pending transactions of $51.6 million payable to an intermediary agent, by asset category are as follows (in millions):

| Asset category | Total | Fair Value Measurements | | | |
| | | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Assets Measured at NAV |
|---|---|---|---|---|---|
| Cash and cash equivalents (1) | $ 20.4 | $ 16.7 | $ 3.7 | $ — | $ — |
| Short-term investment collective trust (2) | 36.9 | — | — | — | 36.9 |
| Common and preferred stock: (3) | | | | | |
| Domestic common and preferred stock | 153.5 | 153.5 | — | — | — |
| International common stock | 58.3 | 58.3 | — | — | — |
| Collective trust funds (2) | 601.0 | — | — | — | 601.0 |
| Corporate bonds (4) | 70.4 | — | 70.4 | — | — |
| Mortgage- and other asset-backed securities (5) | 35.6 | — | 35.6 | — | — |
| Mutual funds (6) | 204.9 | 161.9 | 43.0 | — | — |
| U.S. government securities (7) | 209.2 | — | 209.2 | — | — |
| Other securities (8) | 68.7 | 0.2 | 24.2 | — | 44.3 |
| Total | $ 1,458.9 | $ 390.6 | $ 386.1 | $ | $ 682.2 |

(1) The carrying value of these items approximates fair value.

(2) These investments are valued based on the Net Asset Value ("NAV") of the underlying investments and are provided by the fund issuers. There are no unfunded commitments or redemption restrictions for these funds.

(3) The fair value of common stock is based on the exchange quoted market prices. When quoted prices are not available for identical stock, an industry valuation model is used which maximizes observable inputs.

(4) The fair value of corporate bonds is generally based on yields currently available on comparable securities of the same or similar issuers with similar credit ratings and maturities. When quoted prices are not available for identical or similar bonds, the fair value is based upon an industry valuation model, which maximizes observable inputs.

(5) The fair value of mortgage- and other asset-backed securities is generally based on yields currently available on comparable securities of the same or similar issuers with similar credit ratings and maturities. When quoted prices are not available for comparable securities, the fair value is based upon an industry valuation model which maximizes observable inputs.

(6) These investments are open-ended mutual funds that are registered with the SEC which are valued using the NAV. The NAV of the mutual funds is a published price in an active market. The NAV is determined once a day after the closing of the exchange based upon the underlying assets in the fund, less the fund's liabilities, expressed on a per-share basis. There are no unfunded commitments, or redemption restrictions for these funds, and the funds are required to transact at the published price.

(7) The fair value of U.S. government securities is based on quoted market prices where available. When quoted prices are not available, the fair value of U.S. government securities is based on yields currently available on comparable securities or on an industry valuation model which maximizes observable inputs.

(8) Level 2 Other securities, which consist primarily of U.S. municipal bonds, foreign government bonds and foreign agency securities are valued based on yields currently available on comparable securities of issuers with similar credit ratings. Also included in Other securities is a commingled fund valued based on the NAV of the underlying investments and is provided by the issuer and exchange-traded derivatives that are valued based on quoted prices in an active market for identical derivatives, assets and liabilities. Funds meeting the practical expedient are included in the Assets Measured at NAV column. Exchange-traded derivatives are valued based on quoted prices in an active market for identical derivatives assets and liabilities. Non-exchange-traded derivatives are valued using industry valuation models, which maximize observable inputs, such as interest-rate yield curve data, foreign exchange rates and applicable spot and forward rates.

## Contributions

In fiscal 2023, fiscal 2022 and fiscal 2021, the Company contributed $18.3 million, $27.3 million and $29.8 million, respectively, to its pension and post-retirement plans. The Company's funding policy for the defined benefit pension plan is to contribute the minimum contribution required under the Employee Retirement Income Security Act of

PX6153-090

Table of Contents

1974, as amended, and other applicable laws as determined by the Company's external actuarial consultant. At the Company's discretion, additional funds may be contributed to the defined benefit pension plans. The Company expects to contribute approximately $85 million to its pension and post-retirement plans in fiscal 2024. The Company will recognize contributions in accordance with applicable regulations, with consideration given to recognition for the earliest plan year permitted.

### Estimated Future Benefit Payments

The following benefit payments, which reflect expected future service as appropriate, are expected to be paid to plan participants (in millions):

|  | Pension Benefits | Other Benefits |
| --- | --- | --- |
| 2024 | $ 197.5 | $ 2.1 |
| 2025 | 152.1 | 1.9 |
| 2026 | 149.4 | 1.6 |
| 2027 | 147.6 | 1.5 |
| 2028 | 142.8 | 1.3 |
| 2029 – 2033 | 654.5 | 4.1 |

### Multiemployer Pension Plans

The Company currently contributes to 27 multiemployer pension plans. These multiemployer plans generally provide retirement benefits to participants based on their service to contributing employers. The benefits are paid from assets held in trust for that purpose. Plan trustees typically are responsible for determining the level of benefits to be provided to participants, the investment of the assets and plan administration. Expense is recognized in connection with these plans as contributions are funded.

The risks of participating in these multiemployer plans are different from the risks associated with single-employer plans in the following respects:

- Assets contributed to the multiemployer plan by one employer may be used to provide benefits to employees of other participating employers.
- Though the unfunded obligations of a multiemployer plan are not a liability of the Company, if a participating employer stops contributing to the plan, the unfunded obligations of the plan may be borne by the remaining participating employers.
- With respect to some multiemployer plans, if the Company chooses to stop participating, or makes market exits or store closures or otherwise has participation in the plan fall below certain levels, the Company may be required to pay the plan an amount based on the underfunded status of the plan, referred to as withdrawal liability. The Company generally records the actuarially determined liability at an undiscounted amount.

The Company's participation in these plans is outlined in the table below. The EIN-Pension Plan Number column provides the Employer Identification Number ("EIN") and the three-digit plan number, if applicable. Unless otherwise noted, the most recent Pension Protection Act of 2006 ("PPA") zone status available for fiscal 2023 and fiscal 2022 is for the plan's year ended December 31, 2022 and December 31, 2021, respectively. The zone status is based on information received from the plans and is certified by each plan's actuary. The FIP/RP Status Pending/Implemented column indicates plans for which a funding improvement plan ("FIP") or a rehabilitation plan ("RP") is either pending or has been implemented by the plan trustees.

91

PX6153-091

Table of Contents

The following tables contain information about the Company's multiemployer plans. Certain plans have been aggregated in the Other funds line in the following table, as the contributions to each of these plans are not individually material.

| Pension fund | EIN - PN | Pension Protection Act zone status (1) | | Company's 5% of total plan contributions | | FIP/RP status pending/implemented |
|---|---|---|---|---|---|---|
| | | 2023 | 2022 | 2022 | 2021 | |
| UFCW-Northern California Employers Joint Pension Trust Fund | 946313554 - 001 | Red | Red | Yes | Yes | Implemented |
| Western Conference of Teamsters Pension Plan | 916145047 - 001 | Green | Green | No | No | No |
| Southern California United Food & Commercial Workers Unions and Food Employers Joint Pension Plan (4) | 951939092 - 001 | Red | Red | Yes | Yes | Implemented |
| Sound Retirement Trust (6) | 916069306 - 001 | Green | Red | Yes | Yes | Implemented |
| Bakery and Confectionery Union and Industry International Pension Fund | 526118572 - 001 | Red | Red | Yes | Yes | Implemented |
| UFCW Union and Participating Food Industry Employers Tri-State Pension Fund | 236396097 - 001 | Red | Red | Yes | Yes | Implemented |
| Rocky Mountain UFCW Unions & Employers Pension Plan | 846045986 - 001 | Green | Green | Yes | Yes | No |
| UFCW Local 152 Retail Meat Pension Fund (5) | 236209656 - 001 | Red | Red | Yes | Yes | Implemented |
| Desert States Employers & UFCW Unions Pension Plan | 846277982 - 001 | Green | Green | Yes | Yes | No |
| UFCW Int'l Union- Albertsons Variable Annuity Pension Fund (5) | 853326342 - 001 | Green | Green | Yes | Yes | No |
| Retail Food Employers and UFCW Local 711 Pension Trust Fund | 516031512 - 001 | Red | Red | Yes | Yes | Implemented |
| Oregon Retail Employees Pension Trust | 936074377 - 001 | Red | Red | Yes | Yes | Implemented |
| Intermountain Retail Store Employees Pension Trust (7) | 916187192 - 001 | Red | Red | Yes | Yes | Implemented |
| UFCW Local 1245 Labor Management Pension Plan | 516090661 - 001 | Red | Red | Yes | Yes | Implemented |

92

PX6153-092

Table of Contents

| Pension fund | Contributions of Company (in millions) | | | Surcharge imposed (2) | Expiration date of collective bargaining agreements | Total collective bargaining agreements | Most significant collective bargaining agreement(s)(3) | |
|---|---|---|---|---|---|---|---|---|
| | 2023 | 2022 | 2021 | | | | Count | Expiration |
| UFCW–Northern California Employers Joint Pension Trust Fund | $ 132.1 | $ 135.2 | $ 128.1 | No | 4/12/2025 to 2/26/2026 | 83 | 79 | 4/12/2025 |
| Western Conference of Teamsters Pension Plan | 75.9 | 73.5 | 68.6 | No | 7/18/2024 to 10/7/2028 | 56 | 10 | 9/21/2025 |
| Southern California United Food & Commercial Workers Unions and Food Employers Joint Pension Plan (4) | 138.5 | 141.8 | 138.4 | No | 4/4/2024 to 3/6/2026 | 46 | 44 | 3/4/2025 |
| Sound Retirement Trust (6) | 70.1 | 66.6 | 61.4 | No | 4/13/2024 to 6/6/2025 | 131 | 27 | 5/3/2025 |
| Bakery and Confectionery Union and Industry International Pension Fund | 18.7 | 18.3 | 18.2 | No | 3/9/2024 to 1/23/2027 | 110 | 35 | 9/6/2025 |
| UFCW Union and Participating Food Industry Employers Tri-State Pension Fund | 10.7 | 11.5 | 12.0 | No | 3/29/2024 to 2/1/2028 | 6 | 2 | 3/29/2024 |
| Rocky Mountain UFCW Unions & Employers Pension Plan | 16.9 | 17.2 | 15.7 | No | 1/4/2025 to 8/29/2026 | 85 | 27 | 2/15/2025 |
| UFCW Local 152 Retail Meat Pension Fund (5) | 11.2 | 11.4 | 11.6 | No | 5/2/2024 | 4 | 4 | 5/2/2024 |
| Desert States Employers & UFCW Unions Pension Plan | 11.0 | 10.8 | 11.6 | No | 6/14/2025 to 3/7/2026 | 17 | 15 | 3/7/2026 |
| UFCW Int'l Union- Albertsons Variable Annuity Pension Fund (5) | 9.6 | 8.9 | 9.6 | No | 7/13/2024 to 12/16/2027 | 26 | 7 | 6/14/2025 |
| Retail Food Employers and UFCW Local 711 Pension Trust Fund | 8.6 | 9.0 | 8.6 | No | 3/1/2025 to 12/19/2026 | 7 | 4 | 3/1/2025 |
| Oregon Retail Employees Pension Trust | 12.8 | 12.1 | 12.0 | No | 6/7/2024 to 2/9/2026 | 129 | 31 | 8/10/2024 |
| Intermountain Retail Store Employees Pension Trust (7) | 7.9 | 8.0 | 7.9 | No | 4/6/2024 to 12/13/2025 | 54 | 18 | 4/6/2024 |
| UFCW Local 1245 Labor Management Pension Plan | 6.0 | 5.7 | 4.8 | No | 4/6/2024 to 11/28/2026 | 4 | 3 | 11/28/2026 |
| Other funds | 15.5 | 16.5 | 15.2 | | | | | |
| Total Company contributions to U.S. multiemployer pension plans | $ 545.5 | $ 546.5 | $ 523.7 | | | | | |

(1) PPA established three categories (or "zones") of plans: (1) "Green Zone" for healthy; (2) "Yellow Zone" for endangered; and (3) "Red Zone" for critical. These categories are based upon multiple factors, including the funding ratio of the plan assets to plan liabilities.

(2) Under the PPA, a surcharge may be imposed when employers make contributions under a collective bargaining agreement that is not in compliance with a rehabilitation plan. As of February 24, 2024, the collective bargaining agreements under which the Company was making contributions were in compliance with rehabilitation plans adopted by the applicable pension fund.

(3) These columns represent the number of most significant collective bargaining agreements aggregated by common expiration dates for each of the pension funds listed above.

(4) The information for this fund was obtained from the Form 5500 filed for the plan's year-end at March 31, 2023 and March 31, 2022.

(5) The information for this fund was obtained from the Form 5500 filed for the plan's year-end at June 30, 2022 and June 30, 2021.

(6) The information for this fund was obtained from the Form 5500 filed for the plan's year-end at September 30, 2022 and September 30, 2021.

(7) The information for this fund was obtained from the Form 5500 filed for the plan's year-end at August 31, 2022 and August 31, 2021.

**FELRA and MAP:** The Company was the second largest contributing employer to the Food Employers Labor Relations Association and United Food and Commercial Workers Pension Fund ("FELRA") which was projected by FELRA to become insolvent in the first quarter of 2021, and to the Mid-Atlantic UFCW and Participating Pension Fund ("MAP"). The Company continued to fund all of its required contributions to FELRA and MAP.

On December 31, 2020, the Company reached agreement with the two local unions, along with the largest contributing employer, and the Pension Benefit Guaranty Corporation ("PBGC") to combine MAP into FELRA (the

93

Table of Contents

"Combined Plan") effective December 31, 2020. As a result, the Company withdrew from the Combined Plan under the terms of the agreement with the applicable unions, the largest contributing employer and the PBGC and received a release of all withdrawal liability and mass withdrawal liability from FELRA, MAP, the Combined Plan and the PBGC. Commencing February 2021, the Company is required to annually pay $23.2 million to the Combined Plan for the next 25 years. This payment replaces the Company's previous annual contribution to both FELRA and MAP. In addition to the $23.2 million annual payment, the Company was expected to contribute to a new multiemployer pension plan limited to providing benefits to the former participants in MAP and FELRA in excess of the benefits the PBGC insures under law (the "Excess Plan"). These contributions were expected to commence in June 2022 and were expected to be approximately $13.7 million annually for 10 years. The Company recorded a non-cash pre-tax charge of $607.2 million ($449.4 million, net of tax) in the fourth quarter of fiscal 2020 to record the pension obligation for these benefits earned for prior service. The pension obligation was determined using a risk-free rate commensurate with the respective payment term related to the Combined Plan and the Excess Plan.

The American Rescue Plan Act ("ARP Act") established a special financial assistance program for financially troubled multiemployer pension plans. Under the ARP Act, eligible multiemployer plans can apply to receive a one-time cash payment in the amount projected by the PBGC to pay pension benefits through the plan year ending 2051. On July 9, 2021, the PBGC issued its interim final rule with respect to the special financial assistance program. The PBGC interim final rule provided direction on the application and eligibility requirements, including which plans will have priority, the determination of the amount of financial assistance to be provided and conditions and restrictions that apply to plans that receive the assistance. The Combined Plan was eligible to receive one-time special financial assistance and qualified to submit its application for $1.2 billion in special financial assistance in the fourth quarter of fiscal 2021. The $1.2 billion in special financial assistance was expected to provide the funding for the Combined Plan to remain solvent for at least 25 years. Although the special financial assistance will have no impact on the Company's $23.2 million payment obligation to the Combined Plan, the Company's estimated funding requirements for the Excess Plan were reduced as the contributions were not expected to commence until approximately 2045. As a result, in the fourth quarter of fiscal 2021, the Company recorded a non-cash pre-tax gain of $106.3 million ($78.7 million, net of tax) to reduce the pension liability for the Excess Plan to approximately $19 million. During the first quarter of fiscal 2022, the Combined Plan received approval and payment from the PBGC for the $1.2 billion in special financial assistance.

During the second quarter of fiscal 2022, the PBGC issued the final rule with respect to the special financial assistance program which allowed for both additional funding and the investment of one third of the special financial assistance funds into return-seeking investments. Based on the final rule, on August 8, 2022, the Combined Plan submitted a supplemented application for additional funding of approximately $120 million. The Combined Plan is now expected to remain solvent and therefore the Company currently does not expect to have any funding requirements for the Excess Plan. As a result, during fiscal 2022, the Company recorded a non-cash pre-tax gain of $19.0 million to remove the pension liability for the Excess Plan. During the fourth quarter of fiscal 2022, the Combined Plan received approval and payment of the additional funding.

**National Fund:** On July 21, 2020, the Company announced that it had entered into an agreement with the trustees of the United Food and Commercial Workers International Union ("UFCW") Union-Industry Pension Fund ("National Fund"), providing that the Company will permanently cease to have any obligation to contribute to the National Fund, a multiemployer pension plan, and will completely withdraw from the National Fund, effective as of June 30, 2020. The Company and nine UFCW local unions entered into a Memorandum of Understanding that permitted the withdrawal and required the establishment of a new multiemployer Variable Annuity Pension Plan (the "National VAPP") that will provide benefits to participants for future services, effective as of July 1, 2020. On November 30, 2020, these agreements became effective upon ratification by the membership of each of these nine local unions and the related agreements with the local unions whose members participate in the National Fund and are employed by the two largest contributors to the National Fund. As a result, the Company agreed to pay an aggregate of $285.7 million to the National Fund, in full satisfaction of the Company's withdrawal liability amount and mass withdrawal liability amount. The Company made the final payment of $73.0 million, including

94

Table of Contents

$3.9 million of accrued interest in fiscal 2023. The Company paid $73.6 million, including $4.4 million of accrued interest in fiscal 2022. During fiscal 2021, the Company also pre-funded a transition reserve in the National VAPP to support certain grandfathered participants of approximately $8 million to the National VAPP.

*Collective Bargaining Agreements*

As of February 24, 2024, the Company had approximately 285,000 employees, of which approximately 200,000 were covered by collective bargaining agreements. During fiscal 2023, collective bargaining agreements covering approximately 32,500 employees were successfully renegotiated. As of February 24, 2024, collective bargaining agreements covering approximately 28,500 employees have expired or are scheduled to expire in fiscal 2024.

*Multiemployer Health and Welfare Plans*

The Company makes contributions to multiemployer health and welfare plans in amounts specified in the applicable collective bargaining agreements. These plans provide medical, dental, pharmacy, vision, and other ancillary benefits to active employees and retirees as determined by the trustees of each plan. The majority of the Company's contributions cover active employees and as such, may not constitute contributions to a postretirement benefit plan. However, the Company is unable to separate contribution amounts to postretirement benefit plans from contribution amounts paid to active employee plans. Total contributions to multiemployer health and welfare plans were $1.3 billion, $1.3 billion and $1.2 billion for fiscal 2023, fiscal 2022 and fiscal 2021, respectively.

*Defined Contribution Plans and Supplemental Retirement Plans*

Many of the Company's employees are eligible to contribute a percentage of their compensation to defined contribution plans ("401(k) Plans"). Participants in the 401(k) Plans may become eligible to receive a profit-sharing allocation in the form of a discretionary Company contribution based on employee compensation. In addition, the Company may also provide matching contributions based on the amount of eligible compensation contributed by the employee. All Company contributions to the 401(k) Plans are made at the discretion of the Company's board of directors. The Company provides supplemental retirement benefits through a Company sponsored deferred executive compensation plan, which provides certain key employees with retirement benefits that supplement those provided by the 401(k) Plans. Total contributions accrued for these plans were $83.0 million, $89.3 million and $75.5 million for fiscal 2023, fiscal 2022 and fiscal 2021, respectively.

*Merger-Related Retention Benefits*

The Merger Agreement provides for the Company to establish a retention program to promote retention and to incentivize efforts to close the Merger and to ensure a successful and efficient integration process. On December 18, 2022, the retention program was approved, with an aggregate amount of up to $100 million, as amended, covering certain executive officers and employees of the Company. The timing and amounts of the payments related to this retention program will depend on the timing of the Closing and executives and certain employees remaining active through the payment dates with 50% of the award being paid upon Closing and 50% of the award being paid six months after Closing. In the event the Merger Agreement is terminated, 50% of the award will be paid on October 13, 2024 and 50% will be paid on October 13, 2025. Retention bonus expense was $35.0 million for fiscal 2023 and $5.3 million for fiscal 2022, and is included within Selling and administrative expenses.

## NOTE 12 - RELATED PARTIES

The Company paid Cerberus Operations and Advisory Company, LLC ("COAC"), an affiliate of Cerberus Capital Management, L.P. ("Cerberus"), fees totaling approximately $0.1 million, $0.5 million and $0.2 million for fiscal 2023, fiscal 2022 and fiscal 2021, respectively, for consulting services provided in connection with improving the Company's operations.

95

Table of Contents

The Company paid Cerberus Technology Solutions ("CTS"), an affiliate of Cerberus, fees totaling approximately $5.5 million, $5.5 million, and $7.0 million for fiscal 2023, fiscal 2022 and fiscal 2021, respectively, for information technology advisory and implementation services in connection with modernizing the Company's information systems.

## NOTE 13 - COMMITMENTS AND CONTINGENCIES AND OFF BALANCE SHEET ARRANGEMENTS

*Guarantees*

**Lease Guarantees:** The Company may have liability under certain operating leases that were assigned to third parties. If any of these third parties fail to perform their obligations under the leases, the Company could be responsible for the lease obligation. Because of the wide dispersion among third parties and the variety of remedies available, the Company believes that if an assignee became insolvent, it would not have a material effect on the Company's financial condition, results of operations or cash flows.

The Company also provides guarantees, indemnifications and assurances to others in the ordinary course of its business.

*Legal Proceedings*

The Company is subject from time to time to various claims and lawsuits, including matters involving trade practices, personnel and employment issues, lawsuits alleging violations of state and/or federal wage and hour laws, real estate disputes, personal injury, antitrust claims, packaging or product claims, claims related to the sale of drug or pharmacy products, such as opioids, intellectual property claims and other proceedings arising in or outside of the ordinary course of business. Some of these claims or suits purport or may be determined to be class actions and/or seek substantial damages. It is the opinion of the Company's management that although the amount of liability with respect to certain of the matters described herein cannot be ascertained at this time, any resulting liability of these and other matters, including any punitive damages, will not have a material adverse effect on the Company's business or overall financial condition.

The Company continually evaluates its exposure to loss contingencies arising from pending or threatened litigation and believes it has made provisions where the loss contingency is probable and can be reasonably estimated. Nonetheless, assessing and predicting the outcomes of these matters involves substantial uncertainties. While management currently believes that the aggregate estimated liabilities currently recorded are reasonable, it remains possible that differences in actual outcomes or changes in management's evaluation or predictions could arise that could be material to the Company's results of operations or cash flows.

**False Claims Act**: Two qui tam actions alleging violations of the False Claims Act ("FCA") have been filed against the Company and its subsidiaries. Violations of the FCA are subject to treble damages and penalties of up to a specified dollar amount per false claim.

In *United States ex rel. Proctor v. Safeway*, filed in the United States District Court for the Central District of Illinois, the relator alleges that Safeway overcharged federal government healthcare programs by not providing the federal government, as part of its usual and customary prices, the benefit of discounts given to customers in pharmacy membership discount and price-matching programs. The relator filed his complaint under seal on November 11, 2011, and the complaint was unsealed on August 26, 2015. The relator amended the complaint on March 31, 2016. On June 12, 2020, the District Court granted Safeway's motion for summary judgment, holding that the relator could not prove that Safeway acted with the intent required under the FCA, and judgment was issued on June 15, 2020. On July 10, 2020, the relator filed a motion to alter or amend the judgment and to supplement the record, which Safeway opposed. On November 13, 2020, the District Court denied relator's motion, and on

96

Table of Contents

December 11, 2020, relator filed a notice of appeal. The Seventh Circuit Court of Appeals affirmed the judgment in the Company's favor on April 5, 2022. On August 3, 2022, relators filed a petition seeking review by the U.S. Supreme Court.

In *United States ex rel. Schutte and Yarberry v. SuperValu, New Albertson's, Inc., et al.*, also filed in the Central District of Illinois, the relators allege that defendants (including various subsidiaries of the Company) overcharged federal government healthcare programs by not providing the federal government, as a part of usual and customary prices, the benefit of discounts given to customers who requested that defendants match competitor prices. The complaint was originally filed under seal and amended on November 30, 2015. On August 5, 2019, the District Court granted relators' motion for partial summary judgment, holding that price-matched prices are the usual and customary prices for those drugs. On July 1, 2020, the District Court granted the defendants' motions for summary judgment and dismissed the case, holding that the relator could not prove that defendants acted with the intent required under the FCA. Judgment was issued on July 2, 2020. On July 9, 2020, the relators filed a notice of appeal. On August 12, 2021, the Court of Appeals for the Seventh Circuit affirmed the grant of summary judgment in the Company's favor. On September 23, 2021, the relators filed a petition for rehearing *en banc* with the Seventh Circuit. On December 3, 2021, the Seventh Circuit denied relators' petition. On April 1, 2022, relators filed a petition seeking review by the U.S. Supreme Court.

The U.S. Supreme Court decided to hear the appeals filed by the relators in *Proctor* and *Schutte*. The Supreme Court consolidated the two cases for the purpose of hearing the appeal. The Supreme Court heard oral arguments on April 18, 2023. On June 1, 2023, the Supreme Court issued an opinion adverse to the Company that reversed the lower court's rulings. On July 3, 2023, the Supreme Court issued the order remanding both cases back to the Court of Appeals for the Seventh Circuit for further review. On July 27, 2023, the Court of Appeals remanded both cases back to the U.S. District Court for the Central District of Illinois. On August 22, 2023, the District Court - as to *Schutte* - set a pretrial conference for March 4, 2024, and a trial date of April 29, 2024. At the same July 27 hearing, the District Court also gave the defendants leave to file motions for summary judgment on a schedule to be agreed upon. On October 11, 2023, the Company and co-defendant filed a motion for summary judgment. On the same day, the relators filed motions for partial summary judgment. Both sides' motions are pending. On February 16, 2024, the Company and co-defendant filed a motion to reconsider a prior grant of partial summary judgment against the defendants, and also a motion to continue the trial. On February 27, 2024, the District Court granted the motion to continue and vacated the April 29, 2024 trial date. At a pretrial conference on March 4, 2024, the District Court scheduled oral argument on the pending motions to take place on May 20, 2024 – and reset the trial for September 30, 2024. The District Court has not set any trial date for *Proctor* as of yet, and no motions are pending in that case.

In both of the above cases, the federal government previously investigated the relators' allegations and declined to intervene. The relators elected to pursue their respective cases on their own and in each case have alleged FCA damages in excess of $100 million before trebling and excluding penalties. The Company is vigorously defending each of these matters. The Company has recorded an estimated liability for these matters.

**Pharmacy Benefit Manager (PBM) Litigation:** The Company (including its subsidiary, Safeway Inc.) is a defendant in a lawsuit filed on January 21, 2021, in Minnesota state court, captioned *Health Care Service Corp. et al. v. Albertsons Companies, LLC, et al.* The action challenges certain prescription-drug prices reported by the Company to a pharmacy benefit manager, Prime Therapeutics LLC ("Prime"), which in turn contracted with the health-insurer plaintiffs to adjudicate and process prescription-drug reimbursement claims.

On December 7, 2021, the Company filed a motion to dismiss the complaint. On January 14, 2022, the court denied the Company's motion to dismiss as to all but one count, plaintiffs' claim of negligent misrepresentation. On January 21, 2022, the Company and co-defendant SUPERVALU, Inc. ("SUPERVALU") filed a third-party complaint against Prime, asserting various claims, including: indemnification, fraud and unjust enrichment. On February 17, 2022, the Company filed in the Minnesota Court of Appeals an interlocutory appeal of the denial of their motion to dismiss on personal jurisdiction grounds (the "Jurisdictional Appeal"). On February 24, 2022, the Company and

97

Table of Contents

SUPERVALU filed in the trial court an unopposed motion to stay proceedings, pending the resolution of the Jurisdictional Appeal. The parties agreed on March 6, 2022, to an interim stay in the trial court pending a ruling on the unopposed motion to stay proceedings. On September 6, 2022, the Minnesota Court of Appeals denied the Jurisdictional Appeal and affirmed the trial court's denial of the Company's motion to dismiss. On October 6, 2022, the Company and SUPERVALU filed a petition seeking review by the Minnesota Supreme Court. On November 23, 2022, the Minnesota Supreme Court denied that petition. The Company and co-defendant SUPERVALU filed an answer to the complaint on January 23, 2023. On March 9, 2023, Prime moved to dismiss the third-party complaint filed by the Company and SUPERVALU. The court heard oral arguments on the motion on May 11, 2023. On August 9, 2023, the court denied Prime's motion as to 16 of the 17 counts in the third-party complaint, and dismissed one count without prejudice. On September 18, 2023, the Company and SUPERVALU filed an amended third-party complaint, which repleaded the one count that had been dismissed (in addition to the other claims asserted in the initial third-party complaint). On October 2, 2023, Prime filed an answer to the amended third-party complaint. The parties are presently engaged in discovery. The case is currently scheduled to be ready for trial on or after July 21, 2025.

The Company is vigorously defending the claims filed against it, and the Company also intends to prosecute its claims against Prime with equal vigor. The Company has recorded an estimated liability for this matter.

**Opioid Litigation:** The Company is one of dozens of companies that have been named as defendants in lawsuits filed by various plaintiffs, including counties, cities, Native American tribes, and hospitals, alleging that defendants contributed to the national opioid epidemic. At present, the Company is named in approximately 85 suits pending in various state courts as well as in the United States District Court for the Northern District of Ohio, where over 2,000 cases against various defendants have been consolidated as Multi-District Litigation pursuant to 28 U.S.C. §1407. Most of the cases naming the Company have been stayed pending multiple bellwether trials, including one involving the Company in Tarrant County (Texas). The Tarrant County matter is currently in discovery. The relief sought by the various plaintiffs in these matters includes compensatory damages, abatement and punitive damages as well as injunctive relief.

Prior to the start of a state-court trial that was scheduled for September 6, 2022, the Company reached an agreement to settle with the state of New Mexico. The New Mexico counties and municipal entities that filed 14 additional lawsuits, including Santa Fe County, agreed to the terms of the settlement. Thus, all 15 cases filed by New Mexico entities have been dismissed as a result of the settlement. The Company has also executed an agreement to settle three matters pending in Nevada state court. The Company recorded a liability of $21.5 million for the settlements of the cases in New Mexico and Nevada which was paid by our insurers in the fourth quarter of fiscal 2022. With respect to the remaining pending state court claims, which may not be covered by insurance, two claims are currently proceeding through discovery, with trial dates scheduled in 2025. The Company believes that it has substantial factual and legal defenses to these claims, and is vigorously defending these matters. At this stage in the proceedings, the Company is unable to determine the probability of the outcome of these remaining matters or the range of reasonably possible loss, if any.

The Company has also received, subpoenas, Civil Investigative Demands and other requests for documents and information from the U.S. Department of Justice and certain state Attorneys General, and has had preliminary discussions with the Department of Justice with respect to purported violations of the federal Controlled Substances Act and the FCA in dispensing prescriptions. The Company has been cooperating with the government with respect to these requests for information.

**Oregon Class Action:** A class action lawsuit entitled *Schearon Stewart and Jason Stewart v. Safeway Inc.* was filed in Circuit Court, County of Multnomah, State of Oregon. Plaintiffs have alleged that Safeway engaged in unfair trade practices, in violation of Oregon's Unlawful Trade Practices Act (ORS 646.608), regarding the sale of certain meat products in 2015 and 2016 in the state of Oregon with its "Buy One, Get One Free" and similar promotions.

98

Table of Contents

On February 17, 2023, plaintiffs and Safeway executed an agreement which settled all claims in the lawsuit for $107 million. The settlement included a claim administration process whereby affected customers, who do not elect to opt-out of the settlement, filed a claim to participate in the settlement. The court granted final approval of the class settlement by way of an order dated July 20, 2023, and the case has been dismissed. The Company had a liability recorded equal to the amount of the settlement, and the Company paid the settlement on September 11, 2023.

**Plated Litigation:** On September 1, 2020, a complaint was filed in Delaware Court of Chancery, by which complaint Shareholder Representative Services LLC, solely in its capacity as agent for the former shareholders and rightsholders of DineInFresh, Inc. d/b/a Plated ("Plated"), sued the Company. Plaintiff alleged that, following the Company's acquisition of Plated, pursuant to a September 19, 2017 Agreement and Plan of Merger, the Company intentionally engaged in conduct to prevent Plated from reaching certain milestones that would have resulted in post-acquisition consideration paid to Plated's former shareholders and rightsholders. Plaintiff alleged breach of contract, breach of the implied covenant of good faith and fair dealing, and fraudulent inducement. On October 21, 2020, the Company filed a motion to dismiss the complaint. On June 7, 2021, the Court granted the motion in part, dismissing all claims except for the breach-of-contract claim. The Company and Plated have agreed on a settlement and the case has been dismissed. The Company recorded a liability equal to the amount of the settlement, and the Company paid the settlement in fiscal 2023.

*Other Commitments*

In the ordinary course of business, the Company enters into various supply contracts to purchase products for resale and purchase and service contracts for fixed asset and information technology commitments. These contracts typically include volume commitments or fixed expiration dates, termination provisions and other standard contractual considerations.

## NOTE 14 - OTHER COMPREHENSIVE INCOME OR LOSS

Total comprehensive earnings are defined as all changes in stockholders' equity during a period, other than those from investments by or distributions to stockholders. Generally, for the Company, total comprehensive income equals net income plus or minus adjustments for pension and other post-retirement liabilities. Total comprehensive earnings represent the activity for a period net of tax.

While total comprehensive earnings are the activity in a period and are largely driven by net earnings in that period, accumulated other comprehensive income or loss ("AOCI") represents the cumulative balance of other comprehensive income, net of tax, as of the balance sheet date. Changes in the AOCI balance by component are shown below (in millions):

| | | Fiscal 2023 | | | | |
|---|---|---|---|---|---|---|
| | | **Total** | | **Pension and Post-retirement benefit plan items** | | **Other** |
| Beginning AOCI balance | $ | 69.3 | $ | 71.7 | $ | (2.4) |
| Other comprehensive income before reclassifications | | 31.2 | | 27.3 | | 3.9 |
| Amounts reclassified from Accumulated other comprehensive income (1) | | (5.9) | | (5.9) | | — |
| Tax expense | | (6.6) | | (5.6) | | (1.0) |
| Current-period other comprehensive income, net | | 18.7 | | 15.8 | | 2.9 |
| Ending AOCI balance | $ | 88.0 | $ | 87.5 | $ | 0.5 |

PX6153-099

Table of Contents

| | | Fiscal 2022 | |
| | Total | Pension and Post-retirement benefit plan items | Other |
|---|---|---|---|
| Beginning AOCI balance | $ 69.0 | $ 67.1 | $ 1.9 |
| Other comprehensive income (loss) before reclassifications | 0.2 | 6.0 | (5.8) |
| Amounts reclassified from Accumulated other comprehensive income (1) | (0.5) | (0.5) | — |
| Tax benefit (expense) | 0.6 | (0.9) | 1.5 |
| Current-period other comprehensive income (loss), net | 0.3 | 4.6 | (4.3) |
| Ending AOCI balance | $ 69.3 | $ 71.7 | $ (2.4) |

(1) These amounts are included in the computation of net pension and post-retirement (income) expense. For additional information, see Note 11 - Employee benefit plans and collective bargaining agreements.

## NOTE 15 - NET INCOME PER COMMON SHARE

The Company calculates basic and diluted net income per Class A common share using the two-class method. The two-class method is an allocation formula that determines net income per Class A common share for each share of Class A common stock and Convertible Preferred Stock, a participating security, according to dividends declared and participation rights in undistributed earnings. Under this method, all earnings (distributed and undistributed) are allocated to Class A common shares and Convertible Preferred Stock based on their respective rights to receive dividends. The holders of Convertible Preferred Stock participate in cash dividends that the Company pays on its common stock to the extent that such cash dividends exceed $206.25 million per fiscal year and shares of Convertible Preferred Stock remain outstanding as of the applicable record date to participate in such dividends. In applying the two-class method to interim periods, the Company allocates income to its quarterly periods independently and discretely from its year-to-date and annual periods. Basic net income per Class A common share is computed by dividing net income allocated to Class A common stockholders by the weighted average number of Class A common shares outstanding for the period, including Class A common shares to be issued with no prior remaining contingencies prior to issuance. Diluted net income per Class A common share is computed based on the weighted average number of shares of Class A common stock outstanding during each period, plus potential Class A common shares considered outstanding during the period, as long as the inclusion of such awards is not antidilutive. Potential Class A common shares consist of unvested RSUs and RSAs and Convertible Preferred Stock, using the more dilutive of either the two-class method or as-converted stock method. PBRSUs and PBRSAs are considered dilutive when the related performance criterion has been met.

100

Table of Contents

The components of basic and diluted net income per Class A common share were as follows (in millions, except per share data):

| | Fiscal 2023 | | Fiscal 2022 | | Fiscal 2021 | |
|---|---|---|---|---|---|---|
| Basic net income per Class A common share | | | | | | |
| Net income | $ | 1,296.0 | $ | 1,513.5 | $ | 1,619.6 |
| Special Dividend on Convertible Preferred Stock | | — | | (252.2) | | — |
| Accrued dividends on Convertible Preferred Stock | | (0.3) | | (51.0) | | (109.4) |
| Earnings allocated to Convertible Preferred Stock | | (0.7) | | — | | (226.2) |
| Net income allocated to Class A common stockholders - Basic | $ | 1,295.0 | $ | 1,210.3 | $ | 1,284.0 |
| | | | | | | |
| Weighted average Class A common shares outstanding - Basic (1) | | 575.4 | | 529.0 | | 469.6 |
| | | | | | | |
| Basic net income per Class A common share | $ | 2.25 | $ | 2.29 | $ | 2.73 |
| | | | | | | |
| Diluted net income per Class A common share | | | | | | |
| Net income allocated to Class A common stockholders - Basic | $ | 1,295.0 | $ | 1,210.3 | $ | 1,284.0 |
| Accrued dividends on Convertible Preferred Stock | | — | | — | | — |
| Earnings allocated to Convertible Preferred Stock | | — | | — | | — |
| Net income allocated to Class A common stockholders - Diluted | $ | 1,295.0 | $ | 1,210.3 | $ | 1,284.0 |
| | | | | | | |
| Weighted average Class A common shares outstanding - Basic (1) | | 575.4 | | 529.0 | | 469.6 |
| Dilutive effect of: | | | | | | |
| Restricted stock units and awards | | 5.7 | | 5.0 | | 5.7 |
| Convertible Preferred Stock (2) | | — | | — | | — |
| Weighted average Class A common shares outstanding - Diluted (3) | | 581.1 | | 534.0 | | 475.3 |
| | | | | | | |
| Diluted net income per Class A common share | $ | 2.23 | $ | 2.27 | $ | 2.70 |

(1) Fiscal 2023, fiscal 2022 and fiscal 2021 include 3.0 million, 2.8 million and 2.7 million Class A common shares remaining to be issued, respectively.

(2) For fiscal 2023, fiscal 2022 and fiscal 2021, 0.3 million, 42.7 million and 97.7 million potential common shares outstanding related to Convertible Preferred Stock were antidilutive, respectively.

(3) The number of potential Class A common shares outstanding related to RSUs and RSAs that were antidilutive for fiscal 2023, fiscal 2022 and fiscal 2021 were not material.

**Item 9 - Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

Not applicable.

101

Table of Contents

## Item 9A - Controls and Procedures

*Disclosure Controls and Procedures*

We maintain a system of disclosure controls and procedures that are designed to ensure that information required to be disclosed in the Company's reports under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure. In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives.

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures, as defined in Rule 13a-15(e) of the Exchange Act, as of February 24, 2024. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of February 24, 2024.

*Management's Report on Internal Control Over Financial Reporting*

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act). All internal control systems, no matter how well designed, have inherent limitations. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation. Further, because of changes in conditions, the effectiveness of internal control over financial reporting may vary over time. Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the 2013 framework set forth in the report entitled *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

Based on our evaluation under such framework, our management concluded that our internal control over financial reporting was effective as of February 24, 2024.

The attestation of Deloitte & Touche LLP, our independent registered public accounting firm, on the effectiveness of our internal control over financial reporting is included in "Part II—Item 8. Financial Statements and Supplementary Data" in this Annual Report on Form 10-K.

*Changes in Internal Control Over Financial Reporting*

There were no changes in our internal control over financial reporting during the fourth quarter of fiscal 2023 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

## Item 9B - Other Information

In the fourth quarter of fiscal 2023, none of the Company's directors or officers adopted or terminated a Rule 10b5-1 trading arrangement or a non-Rule 10b5-1 trading arrangement, as defined in Item 408(a) of Regulation S-K.

## Item 9C - Disclosure Regarding Foreign Jurisdictions that Prevent Inspections

Not applicable.

Table of Contents

# PART III

### Item 10 - Directors, Executive Officers and Corporate Governance

For information concerning executive officers, see "Executive Officers of the Registrant" located under "Part I—Item 1. Business" herein.

Information concerning directors and certain other corporate governance matters is included under the captions "Proposal 1 - Election of Directors," "Delinquent Section 16(a) Reports" and "Corporate Governance" in the Proxy Statement for our 2024 Annual Meeting of Stockholders, to be filed within 120 days after the end of fiscal 2023, and that information is incorporated by reference herein.

We have adopted a code of business conduct and ethics that applies to all of our employees, officers and directors, including those officers responsible for financial reporting. We have made a current copy of the code available on our website, www.Albertsonscompanies.com and the code is also available to any stockholder who requests a copy. In addition, we intend to post on our website all disclosures that are required by law or NYSE listing standards concerning any amendments to, or waivers from, any provision of the code.

### Item 11 - Executive Compensation

Information required by this Item is included under the captions "Compensation Discussion and Analysis," "Director Compensation," "Compensation Committee Interlocks and Insider Participation" and "Compensation Committee Report" in the Proxy Statement for our 2024 Annual Meeting of Stockholders, to be filed within 120 days after the end of fiscal 2023, and that information is incorporated by reference herein.

### Item 12 - Security Ownership of Certain Beneficial Owners and Management, and Related Member Matters

Information required by this Item is included under the captions "Security Ownership of Certain Beneficial Owners and Management" and "Equity Compensation Plan Information" in the Proxy Statement for our 2024 Annual Meeting of Stockholders, to be filed within 120 days after the end of fiscal 2023, and that information is incorporated by reference herein.

### Item 13 - Certain Relationships and Related Transactions, and Director Independence

Information required by this Item is included under the captions "Certain Relationships and Related Party Transactions" and "Corporate Governance" in the Proxy Statement for our 2024 Annual Meeting of Stockholders, to be filed within 120 days after the end of fiscal 2023, and that information is incorporated by reference herein.

### Item 14 - Principal Accountant Fees and Services

Information required by this Item is included under the caption "Proposal 2 - Ratification of Independent Registered Accounting Firm" in the Proxy Statement for our 2024 Annual Meeting of Stockholders, to be filed within 120 days after the end of fiscal 2023, and that information is incorporated by reference herein.

PX6153-103

Table of Contents

# PART IV

## Item 15 - Exhibits, Financial Statement Schedules

|  |  | Page |
|---|---|---|
| (a)1. | Financial Statements: | |
| | Report of Independent Registered Public Accounting Firm (PCAOB ID No. 34) | 52 |
| | Consolidated Balance Sheets as of February 24, 2024 and February 25, 2023 | 56 |
| | Consolidated Statements of Operations and Comprehensive Income for the years ended February 24, 2024, February 25, 2023 and February 26, 2022 | 57 |
| | Consolidated Statements of Cash Flows for the years ended February 24, 2024, February 25, 2023 and February 26, 2022 | 58 |
| | Consolidated Statements of Stockholders' Equity for the years ended February 24, 2024, February 25, 2023 and February 26, 2022 | 60 |
| | Notes to Consolidated Financial Statements | 61 |

(a)2.     Financial Statement Schedules:

There are no Financial Statement Schedules included in this filing for the reason that they are not applicable or are not required or the information is included elsewhere in this Form 10-K.

(a)3.&(b)     Exhibits:

| Exhibit No. | Description |
|---|---|
| 2.1 | Agreement and Plan of Merger, dated as of October 13, 2022, by and among Albertsons Companies Inc., the Kroger Co. and Kettle Merger Sub, Inc. (incorporated by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K filed with the SEC on October 14, 2022) |
| 3.1 | Amended and Restated Certificate of Incorporation of Albertsons Companies, Inc. (incorporated by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K filed with the SEC on June 9, 2020) |
| 3.1.1 | Certificate of Amendment to the Amended and Restated Certificate of Incorporation of Albertsons Companies, Inc. (incorporated by reference to Exhibit 3.1.1 to the Company's Registration Statement on Form S-1 filed with the SEC on June 18, 2020) |
| 3.1.2 | Certificate of Amendment to the Amended and Restated Certificate of Incorporation of Albertsons Companies, Inc. (incorporated by reference to Exhibit 3.1 to the Company's Quarterly Report on Form 10-Q filed with the SEC on October 20, 2021) |
| 3.2 | Amended and Restated Bylaws of Albertsons Companies, Inc. (incorporated by reference to Exhibit 3.3 to the Company's Current Report on Form 8-K filed with the SEC on June 30, 2020) |
| 3.3 | Certificate of Designations of 6.75% Series A Convertible Preferred Stock of Albertsons Companies, Inc. (incorporated by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K filed with the SEC on October 19, 2022) |
| 4.1 | Stockholders' Agreement by and among Albertsons Companies, Inc. and holders of stock of Albertsons Companies, Inc. signatory thereto (incorporated by reference to Exhibit 4.1 to the Company's Current Report on Form 8-K filed with the SEC on June 30, 2020) |
| 4.2 | Registration Rights Agreement by and among Albertsons Companies, Inc. and the other parties thereto (incorporated by reference to Exhibit 4.1 to the Company's Current Report on Form 8-K filed with the SEC on June 30, 2020) |
| 4.2.1 | Amendment No. 1, dated as of December 9, 2021, to the Registration Rights Agreement by and among Albertsons Companies, Inc. and the investors party thereto, dated June 9th 2020 (incorporated by reference to Exhibit 4.1 to the Company's Quarterly Report on Form 10-Q filed with the SEC on January 12, 2022) |
| 4.3 | Indenture, dated September 10, 1997, between Safeway Inc., and the Bank of New York, as trustee (incorporated by reference to Exhibit 4.1 to the Albertsons Companies, LLC's Registration Statement on Form S-4 filed with the SEC on May 19, 2017) |
| 4.4 | Form of Officers' Certificate establishing the terms of Safeway Inc.'s 7.45% Senior Debentures due 2027, including the form of Notes (incorporated by reference to Exhibit 4.6 to the Albertsons Companies, LLC's Registration Statement on Form S-4 filed with the SEC on May 19, 2017) |

PX6153-104

Table of Contents

| Exhibit No. | Description |
|---|---|
| 4.5 | Form of Officers' Certificate establishing the terms of Safeway Inc.'s 7.25% Debentures due 2031, including the form of Notes (incorporated by reference to Exhibit 4.7 to the Albertsons Companies, LLC's Registration Statement on Form S-4 filed with the SEC on May 19, 2017) |
| 4.6 | Indenture, dated May 1, 1992, between New Albertson's, Inc. (as successor to Albertson's, Inc.) and U.S. Bank Trust National Association (as successor to Morgan Guaranty Trust Company of New York), as trustee (as supplemented by Supplemental Indenture No. 1, dated as of May 7, 2004; Supplemental Indenture No. 2, dated as of June 1, 2006; Supplemental Indenture No. 3, dated as of December 29, 2008 and Supplemental Indenture No. 4, dated as of December 3, 2017) (incorporated by reference to Exhibit 4.10 to the Company's Registration Statement on Form S-4 filed with the SEC on April 6, 2018) |
| 4.7 | Indenture, dated May 1, 1995, between American Stores Company, LLC and Wells Fargo Bank, National Association (as successor to The First National bank of Chicago), as trustee (as further supplemented) (incorporated by reference to Exhibit 4.11 to the Albertsons Companies, LLC's Registration Statement on Form S-4 filed with the SEC on May 19, 2017) |
| 4.8 | Indenture, dated as of February 5, 2019, by and among Albertsons Companies, Inc., Safeway Inc., New Albertsons, L.P., Albertson's LLC, the guarantors party thereto from time to time, and Wilmington Trust, National Association, as Trustee with respect to the 7.5% Senior Notes due 2026 (incorporated by reference to Exhibit 4.1 to the Company's Current Report on Form 8-K filed with the SEC on February 15, 2019) |
| 4.8.1 | First Supplemental Indenture, dated as of April 17, 2019, by and among Albertsons Companies, Inc., Safeway Inc., New Albertsons, L.P., Albertson's LLC, the guarantors party thereto from time to time, and Wilmington Trust, National Association, as trustee with respect to the 7.5% Senior Notes due 2026 (incorporated by reference to Exhibit 4.11.1 to the Company's Annual Report on Form 10-K filed with the SEC on April 24, 2019) |
| 4.8.2 | Second Supplemental Indenture, dated as of June 9, 2020, by and among Albertsons Companies, Inc., Safeway Inc., New Albertsons, L.P., Albertson's LLC, the guarantors party thereto from time to time, and Wilmington Trust, National Association, as trustee with respect to the 7.5% Senior Notes due 2026 (incorporated by reference to Exhibit 4.13.2 to the Company's Registration Statement on Form S-1 filed with the SEC on June 10, 2020) |
| 4.9 | Indenture, dated as of August 15, 2019, by and among Albertsons Companies, Inc., Safeway Inc., New Albertsons, L.P., Albertson's LLC, the guarantors party thereto from time to time, and Wilmington Trust, National Association, as Trustee with respect to the 5.875% Senior Notes due 2028 (incorporated by reference to Exhibit 4.1 to the Company's Current Report on Form 8-K filed with the SEC on August 15, 2019) |
| 4.9.1 | First Supplemental Indenture, dated as of June 9, 2020, by and among Albertsons Companies, Inc., Safeway Inc., New Albertsons, L.P., Albertson's LLC, the guarantors party thereto from time to time, and Wilmington Trust, National Association, as trustee with respect to the 5.875% Senior Notes due 2028 (incorporated by reference to Exhibit 4.14.1 to the Company's Registration Statement on Form S-1 filed with the SEC on June 10, 2020) |
| 4.10 | Indenture, dated as of November 22, 2019, by and among Albertsons Companies, Inc., Safeway Inc., New Albertsons, L.P., Albertson's LLC, the guarantors party thereto from time to time, and Wilmington Trust, National Association, as Trustee with respect to the 4.625% Senior Notes due 2027 (incorporated by reference to Exhibit 4.1 to the Company's Current Report on Form 8-K filed with the SEC on November 22, 2019) |
| 4.10.1 | First Supplemental Indenture, dated as of June 9, 2020, by and among Albertsons Companies, Inc., Safeway Inc., New Albertsons, L.P., Albertson's LLC, the guarantors party thereto from time to time, and Wilmington Trust, National Association, as trustee with respect to the 4.625% Senior Notes due 2027 (incorporated by reference to Exhibit 4.15.1 to the Company's Registration Statement on Form S-1 filed with the SEC on June 10, 2020) |
| 4.11 | Indenture, dated as of February 5, 2020, by and among Albertsons Companies Inc., Safeway Inc., New Albertsons, L.P., Albertson's LLC, the guarantors party thereto from time to time, and Wilmington Trust, National Association, as Trustee, with respect to the 3.50% Senior Notes due 2023 (incorporated by reference to Exhibit 4.1 to the Company's Current Report on Form 8-K filed with the SEC on February 5, 2020) |
| 4.11.1 | First Supplemental Indenture, dated as of June 9, 2020, by and among Albertsons Companies, Inc., Safeway Inc., New Albertsons, L.P., Albertson's LLC, the guarantors party thereto from time to time, and Wilmington Trust, National Association, as trustee with respect to the 3.50% Senior Notes due 2023 (incorporated by reference to Exhibit 4.16.1 to the Company's Registration Statement on Form S-1 filed with the SEC on June 10, 2020) |
| 4.12 | Indenture, dated as of February 5, 2020, by and among Albertsons Companies Inc., Safeway Inc., New Albertsons, L.P., Albertson's LLC, the guarantors party thereto from time to time, and Wilmington Trust, National Association, as Trustee, with respect to the 4.875% Senior Notes due 2030 (incorporated by reference to Exhibit 4.3 to the Company's Current Report on Form 8-K filed with the SEC on February 5, 2020) |
| 4.12.1 | First Supplemental Indenture, dated as of June 9, 2020, by and among Albertsons Companies, Inc., Safeway Inc., New Albertsons, L.P., Albertson's LLC, the guarantors party thereto from time to time, and Wilmington Trust, National Association, as trustee with respect to the 4.875% Senior Notes due 2030 (incorporated by reference to Exhibit 4.17.1 to the Company's Registration Statement on Form S-1 filed with the SEC on June 10, 2020) |

PX6153-105

Table of Contents

| Exhibit No. | Description |
|---|---|
| 4.13 | Indenture, dated as of August 31, 2020, by and among Albertsons Companies, Inc., Safeway Inc., New Albertsons L.P., Albertson's LLC, the guarantors party thereto from time to time, and Wilmington Trust, National Association, as Trustee, with respect to the 3.250% Senior Notes due 2026 (incorporated by reference to Exhibit 4.1 to the Company's Current Report on Form 8-K filed with the SEC on August 31, 2020) |
| 4.14 | Indenture, dated as of August 31, 2020, by and among Albertsons Companies, Inc., Safeway Inc., New Albertsons L.P., Albertson's LLC, the guarantors party thereto from time to time, and Wilmington Trust, National Association, as Trustee, with respect to the 3.500% Senior Notes due 2029 (incorporated by reference to Exhibit 4.2 to the Company's Current Report on Form 8-K filed with the SEC on August 31, 2020) |
| 4.15 | Indenture, dated as of February 13, 2023, by and among Albertsons Companies, Inc., Safeway Inc., New Albertsons L.P., Albertson's LLC, the guarantors party thereto from time to time, and Wilmington Trust, National Association, as Trustee, with respect to the 6.500% Senior Notes, due 2028 (Incorporated by reference to Exhibit 4.1 to the Company's Current Report on Form 8-K filed with the SEC on February 14, 2023) |
| 10.1 | Third Amended and Restated Asset-Based Revolving Credit Agreement, dated as of November 16, 2018, among Albertsons Companies, Inc., as lead borrower, the subsidiary borrowers and guarantors from time to time party thereto, the lenders from time to time party thereto and Bank of America, N.A., as administrative and collateral agent (incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K filed with the SEC on November 16, 2018) |
| 10.1.1 | Amendment No. 1, dated as of May 20, 2020, to the Third Amended and Restated Asset-Based Revolving Credit Agreement, dated as of November 16, 2018, among Albertsons Companies, Inc., as lead borrower, the subsidiary borrowers and guarantors from time to time party thereto and Bank of America, N.A. as administrative and collateral agent (incorporated by reference to Exhibit 10.3 to the Company's Current Report on Form 8-K filed with the SEC on May 27, 2020) |
| 10.1.2 | Fourth Amended and Restated Asset-Based Revolving Credit Agreement, dated as of December 20, 2021, by and among Albertsons Companies, Inc. certain of its subsidiaries signatory thereto, the lenders from time to time party thereto and Bank of America, N.A., as administrative agent and collateral agent (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the SEC on December 23, 2021) |
| 10.2† | Employment Agreement, dated March 25, 2019, between Albertsons Companies, Inc. and Vivek Sankaran (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the SEC on March 29, 2019) |
| 10.3† | Employment Agreement, dated August 4, 2021, between Albertsons Companies, Inc. and Sharon McCollam (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the SEC on August 11, 2021) |
| 10.4†* | Non-employee director compensation policy |
| 10.5 | Form of Indemnification Agreement (incorporated by reference to Exhibit 10.22 to the Company's Registration Statement on Form S-1 filed with the SEC on March 6, 2020) |
| 10.6† | Albertsons Companies, Inc. 2020 Omnibus Incentive Plan (incorporated by reference to Exhibit 10.23 to Amendment No. 3 to the Company's Registration Statement on Form S-1 filed with the SEC on June 18, 2020) |
| 10.7† | Albertsons Companies, Inc. Restricted Stock Unit Plan (incorporated by reference to Exhibit 10.24 to Amendment No. 2 to the Company's Registration Statement on Form S-1 filed with the SEC on June 10, 2020) |
| 10.8† | Form of time-based restricted stock unit agreement (fiscal 2021 award cycle) (incorporated by reference to Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q filed with the SEC on July 29, 2021) |
| 10.9† | Form of performance-based restricted stock unit agreement (fiscal 2021 award cycle) (incorporated by reference to Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q filed with the SEC on July 29, 2021) |
| 10.9.1† | Amendment No. 1, dated February 23, 2022, to 2021 performance-based restricted stock unit award agreement (incorporated by reference to Exhibit 10.19.1 to the Company's Annual Report on Form 10-K filed with the SEC on April 26, 2022) |
| 10.10† | Form of time-based restricted stock unit agreement (fiscal 2022 award cycle) (incorporated by reference to Exhibit 10.20 to the Company's Annual Report on Form 10-K filed with the SEC on April 26, 2022) |
| 10.11† | Form of performance-based restricted stock unit agreement (fiscal 2022 award cycle) (incorporated by reference to Exhibit 10.21 to the Company's Annual Report on Form 10-K filed with the SEC on April 26, 2022) |
| 10.12† | Form of performance-based restricted stock unit agreement (fiscal 2023 award cycle) (incorporated by reference to Exhibit 10.36 to the Company's Annual Report on Form 10-K filed with the SEC on April 25, 2023) |
| 10.13† | Form of time-based restricted stock unit agreement (fiscal 2023 award cycle) (incorporated by reference to Exhibit 10.37 to the Company's Annual Report on Form 10-K filed with the SEC on April 25, 2023) |

PX6153-106

Table of Contents

| Exhibit No. | Description |
|---|---|
| 10.14† | Form of Special Retention Incentive Agreement (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the SEC on March 7, 2023) |
| 10.15† | Form of time-based restricted stock unit agreement (grant date anniversary vest) (incorporated by reference to Exhibit 10.38 to the Company's Annual Report on Form 10-K filed with the SEC on April 25, 2023) |
| 10.16† | Form of time-based restricted stock unit agreement (board of directors) (incorporated by reference to Exhibit 10.39 to the Company's Annual Report on Form 10-K filed with the SEC on April 25, 2023) |
| 10.17† | Amendment No. 1 to form of performance-based restricted stock unit agreement (fiscal 2022 award cycle) (incorporated by reference to Exhibit 10.40 to the Company's Annual Report on Form 10-K filed with the SEC on April 25, 2023) |
| 10.18†* | Form of time-based restricted stock unit agreement (fiscal 2024 award cycle) |
| 10.19†* | Form of performance-based restricted stock unit agreement (fiscal 2024 award cycle) |
| 21.1* | Schedule of Subsidiaries of Albertsons Companies, Inc. |
| 23.1* | Consent of Deloitte and Touche LLP |
| 31.1* | Certification of the Principal Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2* | Certification of the Principal Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1** | Certification of the Principal Executive Officer and the Principal Financial Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 97.1* | Albertsons Companies, Inc. Restatement Clawback Policy |
| 101.INS | Inline XBRL Instance Document |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | Inline XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document |
| 104 | The cover page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101) |

*Filed herewith.

** Furnished herewith.

† Constitutes a compensatory plan or arrangement required to be filed with this Form 10-K.

107

Table of Contents

**Item 16** - **Form 10-K Summary**

None.

108

Table of Contents

SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Albertsons Companies, Inc.

Date:    April 22, 2024

By:    /s/ Vivek Sankaran

Vivek Sankaran
Chief Executive Officer and Director
(Principal Executive Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Vivek Sankaran<br>Vivek Sankaran | Chief Executive Officer and Director<br>(Principal Executive Officer) | April 22, 2024 |
| /s/ Sharon McCollam<br>Sharon McCollam | President and Chief Financial Officer<br>(Principal Financial Officer) | April 22, 2024 |
| /s/ Robert B. Larson<br>Robert B. Larson | Senior Vice President and Chief Accounting Officer<br>(Principal Accounting Officer) | April 22, 2024 |
| /s/ James L. Donald<br>James L. Donald | Co-Chairman | April 22, 2024 |
| /s/ Chan Galbato<br>Chan Galbato | Co-Chairman | April 22, 2024 |
| /s/ Sharon L. Allen<br>Sharon L. Allen | Director | April 22, 2024 |
| /s/ Kim Fennebresque<br>Kim Fennebresque | Director | April 22, 2024 |
| /s/ Allen M. Gibson<br>Allen M. Gibson | Director | April 22, 2024 |
| /s/ Lisa Gray<br>Lisa Gray | Director | April 22, 2024 |

PX6153-109

Table of Contents

| **Signature** | **Title** | **Date** |
|---|---|---|
| /s/ Sarah Mensah | Director | April 22, 2024 |
| Sarah Mensah | | |
| /s/ Alan H. Schumacher | Director | April 22, 2024 |
| Alan H. Schumacher | | |
| /s/ B. Kevin Turner | Vice Chairman | April 22, 2024 |
| B. Kevin Turner | | |
| /s/ Mary Beth West | Director | April 22, 2024 |
| Mary Beth West | | |

110

PX6153-110

Exhibit 10.4

**ALBERTSONS COMPANIES, INC.**

**NON-EMPLOYEE DIRECTOR COMPENSATION POLICY**

Adopted: February 14, 2024

**Introduction:**

 The purpose of this Non-Employee Director Compensation Policy (this "Policy") is to attract and retain qualified Non-Employee Directors and to advance the interests of Albertsons Companies, Inc. (the "Company") and its stockholders.

**Eligibility**:

 Only those members of the Company's board of directors (the "Board") who constitute Non-Employee Directors are eligible to receive compensation under this Policy. For purposes of this Policy, "Non-Employee Director" means any member of the Board who is not an employee of the Company or any of its subsidiaries. Directors who are employees of the Company or any of its subsidiaries are not entitled to additional compensation on account of such director's service on the Board. For the avoidance of doubt, any director who is an employee of any stockholder of the Company may be considered a Non-Employee Director.

**Cash Compensation:**

 A. Each Non-Employee Director shall be entitled to receive the following annual compensation (as applicable to such Non-Employee Director) in connection with the service of such Non-Employee Director as a member of the Board:

  (a) Annual cash retainer of $125,000; and additionally, as applicable,

  (b) A cash retainer of $25,000 if such Non-Employee Director serves as a member of the Audit and Risk Committee of the Board (the "Audit Committee"); and an additional cash retainer of $25,000 if such Non-Employee Director serves as the chair of the Audit Committee;

  (c) A cash retainer of $20,000 if such Non-Employee Director serves as a member of the Compensation Committee of the Board (the "Compensation Committee"); and an additional cash retainer of $20,000 if such Non-Employee Director serves as the chair of the Compensation Committee;

  (d) A cash retainer of $20,000 if such Non-Employee Director serves as a member of the Governance, Compliance and ESG Committee of the Board (the "Governance Committee"); and an additional cash retainer of $20,000 if such Non-Employee Director serves as the chair of the Governance Committee;

  (e) A cash retainer of $20,000 if such Non-Employee Director serves as a member of the Finance Committee of the Board (the "Finance Committee"); and an additional cash

retainer of $20,000 if such Non-Employee Director serves as the chair of the Finance Committee; and

(f) A cash retainer of $20,000 if such Non-Employee Director serves as a member of the Technology Committee of the Board (the "Technology Committee"); and an additional cash retainer of $20,000 if such Non-Employee Director serves as the chair of the Technology Committee.

B.  In addition to the compensation under Section A above, as applicable, each non-executive co-chairman of the Board shall be entitled to receive an annual cash retainer of $100,000 with an aggregate compensation of $200,000 for the position of the chair of the Board.

**Cash Payment**:

Each Non-Employee Director shall be paid, as soon as administratively possible, the amount of cash retainer applicable to such Non-Employee Director in four (4) quarterly payments following the end of each fiscal quarter of the Company during which such Non-Employee Director has served as a member of the Board (or applicable committee of the Board). In the event a Non-Employee Director assumes or vacates a position on the Board or one of its committees during a quarter, such Non-Employee Director shall be entitled to a prorated portion of the cash compensation for such position for that quarter based on the percentage of days in that quarter during which such Non-Employee Director served in the position for which the cash retainer is payable under this Policy.

**Expense Reimbursement**:

All Non-Employee Directors shall be entitled to reimbursement from the Company for their reasonable travel (including commercial airfare and ground transportation), lodging and meal expenses incident to attending in-person meetings of the Board or committees thereof or in connection with other Board related business as approved by the Company. The Company shall also reimburse Non-Employee Directors for reasonable expenses related to attendance at director continuing education programs that are relevant to their service on the Board and which attendance is pre-approved by the chair of the Governance Committee or any chair or co-chair of the Board. The Company shall reimburse a Non-Employee Director as soon as administratively possible following submission by the Non-Employee Director of reasonable written substantiation for the expenses.

**Equity Compensation**:

Promptly following the initial election of a Non-Employee Director to the Board, or promptly following a Board member meeting the criteria of a Non-Employee Director, such Non-Employee Director shall receive a grant of Time-Based Restricted Stock Units ("TBRSUs") valued at $145,000 prorated from the date of election or meeting the criteria of a Non-Employee Director to the remainder of the fiscal year (the "Initial Award"). Thereafter, a continuing Non-Employee Director shall annually receive a grant of TBRSUs valued at $145,000 (the "Annual Award"). The number of TBRSUs subject to the Initial Award and the Annual Award will be determined by dividing $145,000 (or as

may be prorated for the Initial Award) by the closing price of the Company's common stock on the grant date, rounded down to the nearest whole share. The grant date of the Annual Award shall be the first business day of the Company's fiscal year. The Initial Award and each Annual Award shall vest on the last day of the fiscal year in which the grant was made, subject to the Non-Employee Director's continued service to the Company through the vesting dates. All grants of TBRSUs shall be made pursuant to the Company's current equity incentive plan. The descriptions of these grants set forth above are subject and qualified in their entirety by reference to the terms and conditions of the equity incentive plan and the applicable Time-Based Restricted Share Award Agreement issued thereunder.

**Annual Review**: This Policy shall be reviewed annually by the Compensation Committee and modified as necessary to ensure its terms remain consistent with the stated interests of the Company and its stockholders. The Compensation Committee shall have the power to construe this Policy to determine all questions arising thereunder, and to adopt and amend such rules and regulations for the administration of this Policy as it may deem desirable. The Compensation Committee shall determine the members of the Board who qualify as Non-Employee Directors and are eligible to receive compensation under the terms of this Policy. Any decisions of the Compensation Committee in the administration of this Policy shall be final and conclusive. The Compensation Committee may authorize one or more of its members or any officer of the Company to execute and deliver documents on its behalf. No member of the Compensation Committee shall be liable for anything done or omitted to be done by such member or by any other member of the Board or the Compensation Committee in connection with this Policy, except for such member's own willful misconduct or gross negligence (unless the Company's Certificate of Incorporation or Bylaws, or any indemnification agreement between the Company and such person, in each case in accordance with applicable law, provides otherwise).The Compensation Committee shall have the power to engage outside consultants, auditors or other professional help to assist in the fulfillment of the duties of the Compensation Committee under this Policy at the Company's expense.

***

Exhibit 10.18

## ALBERTSONS COMPANIES, INC.

## 2020 OMNIBUS INCENTIVE PLAN

## RESTRICTED STOCK UNIT AWARD AGREEMENT

Albertsons Companies, Inc. (the "Company"), pursuant to the Albertsons Companies, Inc. 2020 Omnibus Incentive Plan (the "Plan"), hereby grants to the Participant named below an Award of Restricted Stock Units. Unless otherwise defined herein, the capitalized terms used in this Restricted Stock Unit Award Agreement (the "Agreement"), which includes the Notice of Grant (the "Notice of Grant") and the Terms and Conditions of Restricted Stock Unit Grant, attached hereto as Exhibit A, shall have the meanings ascribed to such terms in the Plan.

### NOTICE OF GRANT

| | |
|---|---|
| Participant: | #Participant Name# |
| Grant Date: | #Grant Date# |
| Award: | #Number of Awards Granted# Restricted Stock Units |

Vesting Schedule:     The Participant shall become vested in the Award in three equal installments on the last day of each of the next three (3) fiscal years of the Company (excluding fiscal years of less than 12 months) (each, a "Fiscal Year"), as follows: (a) one-third (1/3) on the last day of the Company's 2024 Fiscal Year; (b) one-third (1/3) on the last day of the Company's 2025 Fiscal Year; and (c) one-third (1/3) on the last day of the Company's 2026 Fiscal Year.

The Participant and the Company agree that this Award of Restricted Stock Units is granted under and governed by the terms and conditions of the Plan and this Agreement, including the Terms and Conditions of Restricted Stock Unit Grant, attached hereto as Exhibit A, all of which are incorporated into this Agreement.

ALBERTSONS COMPANIES, INC.                    PARTICIPANT:

By: _____

    Name: Tom Moriarty                                    #Participant Name#
    Title: EVP, General Counsel & Chief Policy Officer

## EXHIBIT A

### TERMS AND CONDITIONS OF RESTRICTED STOCK UNIT GRANT

1.    Grant. The Company hereby grants to the individual named in the Notice of Grant (the "Participant") an Award of Restricted Stock Units set forth in the Notice of Grant, subject to all of the terms and conditions in this Agreement and the Plan.

2.    Definitions.

"Cause" shall have the meaning ascribed to such term in the Plan.

"Change in Control Period" means the 24-month period following a Change in Control.

"Competitive Activity" means the Participant's engagement, directly or indirectly, as principal, agent, independent contractor, consultant, director, officer, employee, employer, advisor, stockholder, partner, member or in any other individual or representative capacity whatsoever, whether paid or unpaid, either for the Participant's own benefit or the benefit of any other person or entity, other than on behalf of the Company, to organize, establish, own, operate, manage, control, engage in, participate in, invest in, permit the Participant's name to be used by, act as a consultant or advisor to, render services for (alone or in association with any person, firm, corporation or business organization), or otherwise assist any person or entity that engages in or owns, invests in, operates, manages or controls any venture or enterprise which engages or proposes to engage in (a) the business conducted by the Company or any of its subsidiaries on the date of the Participant's Termination of Service in the geographic locations where the Company or any of its subsidiaries engage in such business or (b) any business which, to the Participant's knowledge, the Company or any of its subsidiaries propose to engage in within the twelve (12) month period following the date of the Participant's Termination of Service in the geographic locations where the Company or any of its subsidiaries propose to engage in such business.

"Data" shall have the meaning set forth in Section 9(q).

"Disability" shall have the meaning ascribed to such term in the Plan.

"Early Retirement" means, prior to the Participant's attainment of age 62, the Participant's Termination of Service for any reason, other than for Cause, death or Disability, on or after the Participant's (i) attainment of age 55 and (ii) completion of 10 years of continuous service with the Company or any of its subsidiaries. A Participant's years of service shall be determined by the Committee in accordance with predetermined, nondiscretionary rules established by the Company.

"Good Reason" has the meaning set forth in the Participant's written employment agreement with the Company, if any. If the participant does not have a written employment

2

agreement with the Company that defines such term, then this definition, and the corresponding parenthetical set forth in Section 5(d)(iii), is inapplicable to the Participant.

"Normal Retirement" means the Participant's Termination of Service for any reason, other than for Cause, death or Disability, on or after the Participant's attainment of age 62, and forbearance from engaging in any work or activity that would constitute Competitive Activity. Notwithstanding the foregoing, if the Participant's primary place of employment or services as of the Participant's Termination of Service is California, North Dakota, Oklahoma or any state that prohibits the enforcement of post-employment non-competition agreements, the Participant's engaging in any work or activity that would constitute Competitive Activity after the Participant's Termination of Service shall not cause the Participant to fail to qualify for Normal Retirement.

3.    Vesting. Except as otherwise set forth in Section 5, the Award shall vest in accordance with the vesting schedule set forth in the Notice of Grant.

4.    Dividend Equivalent Rights. If the Company declares a cash dividend on the shares of Common Stock, the Participant shall be credited with an additional number of Restricted Stock Units equal to: (i) the product of (A) the number of Restricted Stock Units subject to this Award (including additional Restricted Stock Units previously credited in accordance with this Section 4) that have not been settled as of the dividend payment date, and (B) the amount of the cash dividend paid per share of Common Stock; divided by (ii) the Fair Market Value (which shall be equal to the closing price) of a share of Common Stock on the dividend payment date. Each additional Restricted Stock Unit credited pursuant to this Section 4 shall be subject to the same vesting and settlement and other terms, conditions and restrictions as the underlying Restricted Stock Unit to which such additional Restricted Stock Unit relates.

5.    Termination of Service.

(a)    Unvested Restricted Stock Units. Except as otherwise provided in this Section 5, upon the Participant's Termination of Service for any reason, any portion of the Award in which the Participant has not yet become vested shall be immediately forfeited by the Participant and cancelled, without the payment of consideration.

(b)    Death or Disability. Upon the Participant's Termination of Service due to the Participant's death or Disability at any time, the Participant shall become immediately vested in any portion of the Award in which the Participant has not yet become vested, to the extent not previously forfeited or cancelled.

(c)    Retirement.

(i)    If the Participant incurs a Termination of Service that qualifies as an Early Retirement, the Participant shall become immediately vested in a number of Restricted Stock Units equal to the product of (A) the number of Restricted Stock Units subject to the Award that would have otherwise vested at the end of the Fiscal Year in which the Participant's Early Retirement occurs and (B) a fraction, the numerator of which is the number of

3

days elapsed in the period beginning on the first day of the Fiscal Year in which the Participant's Early Retirement occurs and ending on the date the Participant's Termination of Service occurs and the denominator of which is the number of days in the Fiscal Year in which the Participant's Early Retirement occurs. [1]

      (ii)    If the Participant incurs a Termination of Service that qualifies as a Normal Retirement, the Participant shall continue to vest in the Award in accordance with the vesting schedule set forth in the Notice of Grant, with delivery of the shares of Common Stock in respect of such Restricted Stock Units to be made at the same time as if Participant had remained employed by the Company through the applicable vesting dates, provided that, in the event of the Participant's death following the Participant's Normal Retirement, the Participant shall become immediately vested in any portion of the Award in which the Participant has not yet become vested, to the extent not previously forfeited or cancelled. Notwithstanding anything in this Section 5(c)(ii) to the contrary, if the Participant engages in work or other activity that causes the Participant to no longer qualify for Normal Retirement treatment (such as Competitive Activity) following the Participant's Termination of Service, (i) with respect to a Participant who is otherwise eligible for Early Retirement (i.e., age 62 or older with 10 years of service), they will be eligible for Early Retirement treatment, and (ii) otherwise, the Participant will no longer be qualified to receive and retain any portion of the Award that has not yet vested as of the date the Participant engages in activity that causes the Participant to no longer qualify for Normal Retirement. For the avoidance of any doubt, if a Participant engages in Competitive Activity prior to the end of the Fiscal Year in which they incur a Termination of Service that would qualify a Normal Retirement, any Restricted Stock Units that would vest in the Fiscal Year of the Termination of Service shall be treated as if the Participant was eligible for Early Retirement, but will be settled at the same time as if the Participant had remained employed by the Company through the applicable vesting date, and all other Restricted Stock Units that have not yet vested will be forfeited and cancelled. If a Participant engages in Competitive Activity after the Fiscal Year of the Termination of Service, all Restricted Stock Units that have not yet vested will be forfeited and cancelled. The Participant must immediately provide notice to the Company as set forth in Section 9(b) if the Participant engages in Competitive Activity.

      (d)    <u>Change in Control</u>. Notwithstanding anything in this Agreement to the contrary, if, during a Change in Control Period, the Participant incurs a Termination of Service (i) due to the Participant's death or Disability, (ii) that qualifies as an Early Retirement or Normal Retirement, or (iii) by the Company for any reason other than for Cause (including for the avoidance of doubt, a Participant's resignation for Good Reason to the extent the Participant has an employment agreement with the Company that defines Good Reason), the Participant shall become immediately vested in any portion of the Award in which the Participant has not yet become vested, to the extent not previously forfeited or cancelled.

      (e)    <u>Termination of Service for Cause</u>. Upon the Participant's Termination of Service by the Company for Cause, the entire Award, including all of the

---

[1] To the extent the vesting dates are based on non-fiscal year-ends, the proration period will be aligned with the anniversary years of such vesting dates.

PX6153-117

Restricted Stock Units subject to the Award, whether vested or unvested, shall be immediately forfeited by the Participant and cancelled, without the payment of consideration.

6.    Award Settlement. Subject to Section 7 of this Agreement, and subject to Section 13(b) of the Plan, upon the Participant becoming vested in any portion of the Award, the Company shall deliver to the Participant one share of Common Stock for each vested Restricted Stock Unit in accordance with this Agreement (with any fractional shares of Common Stock being rounded to the nearest whole share of Common Stock). Delivery of such shares of Common Stock shall be made as soon as reasonably practicable following the applicable date the Participant becomes vested in the Restricted Stock Units, but in no event later than the fifteenth day of the third month following the end of the Fiscal Year in which the Participant becomes vested in the Restricted Stock Units; provided, that, if the Award is considered "nonqualified deferred compensation" (within the meaning of Section 409A of the Code), delivery of such shares of Common Stock shall be within the calendar year in which the Participant becomes vested in the Restricted Stock Units.

7.    Section 409A Compliance. To the extent the Award constitutes "nonqualified deferred compensation" (within the meaning of Section 409A of the Code), then (a) this Agreement is intended to comply with the requirements of Section 409A of the Code and the Restricted Stock Units subject to this Agreement shall be interpreted in a manner consistent with this intent; and (b) if the Participant is a "specified employee" as defined in Section 409A of the Code at the time of the Participant's Termination of Service, then solely to the extent necessary to comply with Section 409A of the Code, no shares of Common Stock shall be delivered in respect of any Restricted Stock Units until the date that is six months following the date of the Participant's Termination of Service or, if earlier, the Participant's death.

8.    Taxes. The Company shall have the power and the right to require the Participant to remit to the Company the amount necessary to satisfy federal, state, provincial and local taxes, domestic or foreign, required by law or regulation to be withheld, and to deduct or withhold shares of Common Stock (or, as applicable, the number of Restricted Stock Units in the Participant's Account) deliverable under the Award to satisfy such withholding obligation. Unless otherwise determined by the Compensation Committee, the Company shall withhold a number of shares of Common Stock (or, as applicable, the number of Restricted Stock Units in the Participant's Account) equal in value to the amount necessary to satisfy federal, state, provincial and local taxes, domestic or foreign, required by law or regulation to be withheld. The amount withheld shall be the amount necessary to satisfy the Participant's tax liability up to the maximum expected tax liability, provided that such withholding does not result in adverse tax or accounting consequences to the Company.

9.    General.

(a)    Amendments. No amendment, suspension or termination of this Agreement shall materially and adversely affect the rights of the Participant under this Agreement without the consent of the Participant.

PX6153-118

(b)  Notices. Any notice or other communication required or which may be given hereunder shall be in writing and shall be deemed to have been given (i) on the date of transmission, if delivered by facsimile or electronic mail, (ii) on the date of delivery, if delivered by hand, (iii) on the first (1st) business day following the date of mailing, if sent by a nationally recognized overnight express mail service, or (iv) on the fourth (4th) business day after the date of mailing, if sent by United States registered or certified mail, return receipt requested, postage prepaid, as follows:

    (i)  If to the Company, to:

        Albertsons Companies, Inc.
        250 Parkcenter Blvd.
        Boise, ID 83706
        Attention: Executive Vice President, Chief Human Resources Officer

        With a copy to: General Counsel

    (ii)  If to the Participant, to the address listed in the personnel records of the Company.

(c)  Successors and Assigns. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, successors and permitted assigns. The Participant may not assign any of its rights or obligations under this Agreement without the prior written consent of the Company.

(d)  Counterparts. This Agreement may be executed in two or more counterparts, each of which, when so executed and delivered, shall be deemed to be an original, but all of which counterparts, taken together, shall constitute one and the same instrument.

(e)  Descriptive Headings, Etc. The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning of terms contained herein. Unless the context of this Agreement otherwise requires: (i) words of any gender shall be deemed to include each other gender; (ii) words using the singular or plural number shall also include the plural or singular number, respectively; (iii) the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section and paragraph references are to the Sections and paragraphs of this Agreement unless otherwise specified; (iv) the word "including" and words of similar import when used in this Agreement shall mean "including, without limitation," unless otherwise specified; (v) "or" is not exclusive; and (vi) provisions apply to successive events and transactions.

(f)  Severability. If any provision of this Agreement shall be determined to be illegal or unenforceable by any court of law in any jurisdiction, the remaining provisions hereof and thereof shall be severable and enforceable in accordance with their terms, and all provisions shall remain enforceable in any other jurisdiction.

(g)    <u>Choice of Law and Venue</u>. This Agreement shall be governed by and interpreted in accordance with the laws of the State of Delaware, without reference to the principles of conflicts of laws, and to applicable federal laws. The parties agree that any legal claim arising from or related to this Agreement that may be pursued in a court of law shall be pursued exclusively in a court of competent subject matter jurisdiction located Idaho, and the parties consent to the personal jurisdiction of the courts located in Idaho and waive all objections to same (based on convenience, cost, location of witnesses or evidence, or otherwise); provided, however, that if for any reason personal jurisdiction cannot be maintained over a party in accordance with the forgoing choice of venue clause then it shall not apply.

(h)    <u>Waiver of Jury Trial</u>. THE PARTIES HERETO HEREBY WAIVE, TO THE EXTENT PERMITTED BY APPLICABLE LAW, TRIAL BY JURY IN ANY LITIGATION IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH, OR ARISING OUT OF THIS AGREEMENT OR THE VALIDITY, INTERPRETATION OR ENFORCEMENT HEREOF. THE PARTIES HERETO AGREE THAT THIS SECTION IS A SPECIFIC AND MATERIAL ASPECT OF THIS AGREEMENT AND WOULD NOT ENTER INTO THIS AGREEMENT IF THIS SECTION WERE NOT PART OF THIS AGREEMENT.

(i)    <u>Entire Agreement</u>. This Agreement is intended by the parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the parties hereto in respect of the subject matter contained herein. There are no restrictions, promises, representations, warranties, covenants or undertakings relating to such subject matter, other than those set forth or referred to herein. This Agreement supersedes all prior agreements and understandings between the parties hereto with respect to such subject matter.

(j)    <u>Further Assurances</u>. Each party hereto shall do and perform or cause to be done and performed all such further acts and things and shall execute and deliver all such other agreements, certificates, instruments and documents as any other party hereto reasonably may request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

(k)    <u>Construction</u>. The Company and the Participant acknowledge that each of them has had the benefit of legal counsel of its own choice and has been afforded an opportunity to review this Agreement with its legal counsel and that this Agreement shall be construed as if jointly drafted by the Company and the Participant.

(l)    <u>Unfunded Status of Award</u>. Except upon the issuance of shares of Common Stock pursuant to this Agreement, any rights of the Participant under the Plan and this Agreement shall be those of a general unsecured creditor of the Company, and neither the Participant nor the Participant's permitted transferees or estate shall have any other interest in any assets of the Company or its subsidiaries by virtue of the Plan or this Agreement.

(m)    <u>Plan Governs</u>. This Award is made pursuant to the terms and conditions of the Plan. In the event of a conflict between this Agreement and the Plan, the provisions of the Plan shall govern.

7

(n)    <u>No Employment Rights</u>. Nothing in the Plan or this Agreement shall confer upon the Participant any right to continue in the Service of the Company or any of its subsidiaries or interfere in any way with the right of the Company or any of its subsidiaries to terminate the employment or other service relationship of the Participant for any reason or no reason at any time.

(o)    <u>No Rights as Stockholder</u>. The Participant shall not have any rights as a stockholder with respect to the shares subject to this Award until shares of Common Stock are delivered to the Participant pursuant to this Agreement.

(p)    <u>Electronic Delivery and Acceptance</u>. The Company may, in its sole discretion: (i) deliver any documents related to the Award by electronic means or (ii) request the Participant's consent to participate in the Plan by electronic means. The Participant hereby consents to receive all documentation applicable to the Award by electronic delivery and to participate in the Plan through an on-line (and/or voice activated) system established and maintained by the Company or a third party vendor designated by the Company. If the Participant does not accept this Award in the manner designated by the Company not later than 90 days after the Grant Date above (or within 90 days of the electronic notification of such Grant, whichever occurs later) this Award may be rendered void and without effect.

(q)    <u>Data Privacy</u>. The Participant acknowledges and consents to the collection, use, processing and transfer of personal Data (defined below) as described in this subsection. The Company and its affiliates hold certain personal information about the Participant, including the Participant's name, home address, personal telephone number, email address, date of birth, social security number or other employee identification number, salary, nationality, job title, information regarding Shares held or equivalent benefits awarded, canceled, purchased, vested, unvested or outstanding in the Participant's favor, for the purpose of managing and administering the Plan ("<u>Data</u>"). The Company and its affiliates may transfer Data amongst themselves as necessary for the purpose of implementation, administration and management of the Participant's participation in the Plan, and the Company and its affiliates may each further transfer Data to any third parties assisting the Company or any such related entity in the implementation, administration and management of the Plan. The Participant acknowledges that the transferors and transferees of such Data may be located anywhere in the world and hereby authorizes each of them to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the Participant's participation in the Plan, including any transfer of such Data as may be required for the administration of the Plan and/or the subsequent holding of Shares on the Participant's behalf to a broker or other third party with whom the Participant may elect to deposit any Shares acquired under the Plan (whether pursuant to the Award or otherwise).

8

**Exhibit 10.19**

**ALBERTSONS COMPANIES, INC.**
**2020 OMNIBUS INCENTIVE PLAN**

**RESTRICTED STOCK UNIT AWARD AGREEMENT**

Albertsons Companies, Inc. (the "Company"), pursuant to the Albertsons Companies, Inc. 2020 Omnibus Incentive Plan (the "Plan"), hereby grants to the Participant named below an Award of Restricted Stock Units. Unless otherwise defined herein, the capitalized terms used in this Restricted Stock Unit Award Agreement (the "Agreement"), which includes the Notice of Grant (the "Notice of Grant") and Terms and Conditions of Restricted Stock Unit Grant, attached hereto as Exhibit A (including the Appendix), shall have the meanings ascribed to such terms in the Plan.

## NOTICE OF GRANT

Participant:                                     #Participant Name#
Grant Date:                                      #Grant Date#
Award Term:                                      2024-2026

Target Number of Restricted Stock Units:

| Fiscal Year: | 2024 | 2025 | 2026 |
|---|---|---|---|
| Target Number: | #Vest Qty 1# | #Vest Qty 2# | #Vest Qty 3# |

Vesting Schedule:                               See the Appendix to Exhibit A, attached hereto

The Participant and the Company agree that this Award of Restricted Stock Units is granted under and governed by the terms and conditions of the Plan and this Agreement, including the Terms and Conditions of Restricted Stock Unit Grant, attached hereto as Exhibit A, all of which are incorporated into this Agreement.

ALBERTSONS COMPANIES, INC.                      PARTICIPANT:

By:_____                     _____
    Name: Tom Moriarty                              #Participant Name#
    Title: EVP, General Counsel &
    Chief Policy Officer

## EXHIBIT A

**TERMS AND CONDITIONS OF RESTRICTED STOCK UNIT GRANT**

1. <u>Grant</u>. The Company hereby grants to the individual named in the Notice of Grant (the "<u>Participant</u>") the right to be awarded Restricted Stock Units in respect of each Fiscal Year during the Award Term, subject to all of the terms and conditions in this Agreement and the Plan.

2. <u>Awarding and Vesting</u>. The Participant shall be awarded and become vested in the Restricted Stock Units subject to the Award as set forth on the Appendix.

3. <u>Section 409A Compliance</u>. To the extent the Award constitutes "nonqualified deferred compensation" (within the meaning of Section 409A of the Code), then (a) this Agreement is intended to comply with the requirements of Section 409A of the Code and the Restricted Stock Units subject to this Agreement shall be interpreted in a manner consistent with this intent; and (b) if the Participant is a "specified employee" as defined in Section 409A of the Code at the time of the Participant's Termination of Service, then solely to the extent necessary to comply with Section 409A of the Code, no shares of Common Stock shall be delivered in respect of any Restricted Stock Units until the date that is six months following the date of the Participant's Termination of Service or, if earlier, the Participant's death.

4. <u>Taxes</u>. The Company shall have the power and the right to require the Participant to remit to the Company the amount necessary to satisfy federal, state, provincial and local taxes, domestic or foreign, required by law or regulation to be withheld, and to deduct or withhold shares of Common Stock (or, as applicable, the number of Restricted Stock Units in the Participant's Account) deliverable under the Award to satisfy such withholding obligation. Unless otherwise determined by the Compensation Committee, the Company shall withhold a number of shares of Common Stock (or, as applicable, the number of Restricted Stock Units in the Participant's Account) equal in value to the amount necessary to satisfy federal, state, provincial and local taxes, domestic or foreign, required by law or regulation to be withheld. The amount withheld shall be the amount necessary to satisfy the Participant's tax liability up to the maximum expected tax liability, provided that such withholding does not result in adverse tax or accounting consequences to the Company.

5. <u>General</u>.

    (a)    <u>Amendments</u>. No amendment, suspension or termination of this Agreement shall materially and adversely affect the rights of the Participant under this Agreement without the consent of the Participant.

    (b)    <u>Notices</u>. Any notice or other communication required or which may be given hereunder shall be in writing and shall be deemed to have been given (i) on the date of

transmission, if delivered by facsimile or electronic mail, (ii) on the date of delivery, if delivered by hand, (iii) on the first business day following the date of mailing, if sent by a nationally recognized overnight express mail service, or (iv) on the fourth business day after the date of mailing, if sent by United States registered or certified mail, return receipt requested, postage prepaid, as follows:

      (i)   If to the Company, to:

         Albertsons Companies, Inc.
         250 Parkcenter Blvd.
         Boise, ID 83706
         Attention: Executive Vice President, Chief Human Resources Officer

         With a copy to: General Counsel

      (ii)   If to the Participant, to the address listed in the personnel records of the Company.

      (c)   <u>Successors and Assigns</u>. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, successors and permitted assigns. The Participant may not assign any of its rights or obligations under this Agreement without the prior written consent of the Company.

      (d)   <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which, when so executed and delivered, shall be deemed to be an original, but all of which counterparts, taken together, shall constitute one and the same instrument.

      (e)   <u>Descriptive Headings, Etc.</u> The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning of terms contained herein. Unless the context of this Agreement otherwise requires: (i) words of any gender shall be deemed to include each other gender; (ii) words using the singular or plural number shall also include the plural or singular number, respectively; (iii) the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section and paragraph references are to the Sections and paragraphs of this Agreement unless otherwise specified; (iv) the word "including" and words of similar import when used in this Agreement shall mean "including, without limitation," unless otherwise specified; (v) "or" is not exclusive; and (vi) provisions apply to successive events and transactions.

      (f)   <u>Severability</u>. If any provision of this Agreement shall be determined to be illegal or unenforceable by any court of law in any jurisdiction, the remaining provisions hereof and thereof shall be severable and enforceable in accordance with their terms, and all provisions shall remain enforceable in any other jurisdiction.

(g)    <u>Choice of Law and Venue</u>. This Agreement shall be governed by and interpreted in accordance with the laws of the State of Delaware, without reference to the principles of conflicts of laws, and to applicable federal laws. The parties agree that any legal claim arising from or related to this Agreement that may be pursued in a court of law shall be pursued exclusively in a court of competent subject matter jurisdiction located Idaho, and the parties consent to the personal jurisdiction of the courts located in Idaho and waive all objections to same (based on convenience, cost, location of witnesses or evidence, or otherwise); provided, however, that if for any reason personal jurisdiction cannot be maintained over a party in accordance with the forgoing choice of venue clause then it shall not apply.

(h)    <u>Waiver of Jury Trial</u>. THE PARTIES HERETO HEREBY WAIVE, TO THE EXTENT PERMITTED BY APPLICABLE LAW, TRIAL BY JURY IN ANY LITIGATION IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH, OR ARISING OUT OF THIS AGREEMENT OR THE VALIDITY, INTERPRETATION OR ENFORCEMENT HEREOF. THE PARTIES HERETO AGREE THAT THIS SECTION IS A SPECIFIC AND MATERIAL ASPECT OF THIS AGREEMENT AND WOULD NOT ENTER INTO THIS AGREEMENT IF THIS SECTION WERE NOT PART OF THIS AGREEMENT.

(i)    <u>Entire Agreement</u>. This Agreement is intended by the parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the parties hereto in respect of the subject matter contained herein. There are no restrictions, promises, representations, warranties, covenants or undertakings relating to such subject matter, other than those set forth or referred to herein. This Agreement supersedes all prior agreements and understandings between the parties hereto with respect to such subject matter.

(j)    <u>Further Assurances</u>. Each party hereto shall do and perform or cause to be done and performed all such further acts and things and shall execute and deliver all such other agreements, certificates, instruments and documents as any other party hereto reasonably may request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

(k)    <u>Construction</u>. The Company and the Participant acknowledge that each of them has had the benefit of legal counsel of its own choice and has been afforded an opportunity to review this Agreement with its legal counsel and that this Agreement shall be construed as if jointly drafted by the Company and the Participant.

(l)    <u>Unfunded Status of Award</u>. Except upon the issuance of shares of Common Stock pursuant to this Agreement, any rights of the Participant under the Plan and this Agreement shall be those of a general unsecured creditor of the Company, and neither the Participant nor the Participant's permitted transferees or estate shall have any other interest in any assets of the Company or its subsidiaries by virtue of the Plan or this Agreement.

(m) <u>Plan Governs</u>. This Award is made pursuant to the terms and conditions of the Plan. In the event of a conflict between this Agreement and the Plan, the provisions of the Plan shall govern.

(n) <u>No Employment Rights</u>. Nothing in the Plan or this Agreement shall confer upon the Participant any right to continue in the Service of the Company or any of its subsidiaries or interfere in any way with the right of the Company or any of its subsidiaries to terminate the employment or other service relationship of the Participant for any reason or no reason at any time.

(o) <u>No Rights as Stockholder</u>. The Participant shall not have any rights as a stockholder with respect to the shares subject to this Award until shares of Common Stock are delivered to the Participant pursuant to this Agreement.

(p) <u>Electronic Delivery and Acceptance</u>. The Company may, in its sole discretion: (i) deliver any documents related to the Award by electronic means or (ii) request the Participant's consent to participate in the Plan by electronic means. The Participant hereby consents to receive all documentation applicable to the Award by electronic delivery and to participate in the Plan through an on-line (and/or voice activated) system established and maintained by the Company or a third party vendor designated by the Company. If the Participant does not accept this Award in the manner designated by the Company not later than 90 days after the Grant Date above (or within 90 days of the electronic notification of such Grant, whichever occurs later) this Award may be rendered void and without effect.

(q) <u>Data Privacy</u>. The Participant acknowledges and consents to the collection, use, processing and transfer of personal Data (defined below) as described in this subsection. The Company and its affiliates hold certain personal information about the Participant, including the Participant's name, home address, personal telephone number, email address, date of birth, social security number or other employee identification number, salary, nationality, job title, information regarding Shares held or equivalent benefits awarded, canceled, purchased, vested, unvested or outstanding in the Participant's favor, for the purpose of managing and administering the Plan ("<u>Data</u>"). The Company and its affiliates may transfer Data amongst themselves as necessary for the purpose of implementation, administration and management of the Participant's participation in the Plan, and the Company and its affiliates may each further transfer Data to any third parties assisting the Company or any such related entity in the implementation, administration and management of the Plan. The Participant acknowledges that the transferors and transferees of such Data may be located anywhere in the world and hereby authorizes each of them to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the Participant's participation in the Plan, including any transfer of such Data as may be required for the administration of the Plan and/or the subsequent holding of Shares on the Participant's behalf to a broker or other third party with whom the Participant may elect to deposit any Shares acquired under the Plan (whether pursuant to the Award or otherwise).

## APPENDIX

1. Definitions.

"Accrual Factor" means, with respect to a Fiscal Year, a number equal to the product of (i) the EPS Accrual Percentage (as determined in accordance with Section 2(a)) and (ii) the ROIC Modifier (as determined in accordance with Section 2(b)).

"Accrued RSUs" means the Restricted Stock Units credited to the Participant's RSU Account in accordance with this Appendix.

"Cause" shall have the meaning ascribed to such term in the Plan.

"Change in Control Period" means the 24-month period following a Change in Control.

"Competitive Activity" means the Participant's engagement, directly or indirectly, as principal, agent, independent contractor, consultant, director, officer, employee, employer, advisor, stockholder, partner, member or in any other individual or representative capacity whatsoever, whether paid or unpaid, either for the Participant's own benefit or the benefit of any other person or entity, other than on behalf of the Company, to organize, establish, own, operate, manage, control, engage in, participate in, invest in, permit the Participant's name to be used by, act as a consultant or advisor to, render services for (alone or in association with any person, firm, corporation or business organization), or otherwise assist any person or entity that engages in or owns, invests in, operates, manages or controls any venture or enterprise which engages or proposes to engage in (i) the business conducted by the Company or any of its subsidiaries on the date of the Participant's Termination of Service in the geographic locations where the Company or any of its subsidiaries engage in such business or (ii) any business which, to the Participant's knowledge, the Company or any of its subsidiaries propose to engage in within the twelve (12) month period following the date of the Participant's Termination of Service in the geographic locations where the Company or any of its subsidiaries propose to engage in such business.

"Closed Fiscal Year" means a Fiscal Year in the Award Term that has ended.

"Disability" shall have the meaning ascribed to such term in the Plan.

"Early Retirement" means, prior to the Participant's attainment of age 62, the Participant's Termination of Service for any reason, other than for Cause, death or Disability, on or after the Participant's (i) attainment of age 55 and (ii) completion of 10 years of continuous service with the Company or any of its subsidiaries. The Participant's years of service shall be determined by the Committee in accordance with predetermined, nondiscretionary rules established by the Company.

"EPS" means, with respect to a particular Fiscal Year, the Company's Adjusted Net Income Per Class A Common Share, as defined in the Company's Form 10-K for such Fiscal

Year, as consistently applied to each Fiscal Year and in a manner determined and approved by the Committee within a reasonable time period following the commencement of the Fiscal Year.

"EPS Goal" means, with respect to a particular Fiscal Year, a target amount of EPS to be achieved by the Company during such Fiscal Year, as set by the Committee in its sole discretion.

"Final Date" means the final day of the third Fiscal Year of the Award Term.

"Fiscal Year" means a fiscal year of the Company (excluding fiscal years of less than 12 months).

"Good Reason" has the meaning set forth in the Participant's written employment agreement with the Company, if any. If the participant does not have a written employment agreement with the Company that defines such term, then this definition, and the corresponding provision set forth in Section 6(c) of this Appendix, is inapplicable to the Participant.

"Normal Retirement" means the Participant's Termination of Service for any reason, other than for Cause, death or Disability, on or after the Participant's attainment of age 62, and forbearance from engaging in any work or activity that would constitute Competitive Activity. Notwithstanding the foregoing, if the Participant's primary place of employment or services as of the Participant's Termination of Service is California, North Dakota, Oklahoma or any state that prohibits the enforcement of post-employment non-competition agreements, the Participant's engaging in any work or activity that would constitute Competitive Activity after the Participant's Termination of Service shall not cause the Participant to fail to qualify for Normal Retirement.

"Open Fiscal Year" means each Fiscal Year in the Award Term that has commenced but not yet ended or has not yet commenced.

"ROIC" means, with respect to a particular Fiscal Year, the Company's return on invested capital for a Fiscal Year, determined by dividing (i) the Company's adjusted operating profit for such Fiscal Year, by (ii) the Company's average invested capital for such Fiscal Year. For purposes of the calculation of ROIC, the Company's adjusted operating profit for a Fiscal Year shall exclude certain items included in the Company's U.S. GAAP operating profit that management does not consider in assessing core performance in addition to adjustments for LIFO charges (credits), depreciation and amortization and rent to the Company's U.S. GAAP operating profit for the Fiscal Year. For purposes of the calculation of ROIC, the Company's average invested capital for a Fiscal Year shall be calculated as the sum of (i) the average of the Company's total assets, (ii) the average LIFO reserve, (iii) the average accumulated depreciation and amortization; minus (i) the average taxes receivable, (ii) the average trade accounts payable, (iii) the average accrued salaries and wages, (iv) the average other current liabilities, excluding accrued income taxes and (v) certain other adjustments as appropriately determined. ROIC shall be consistently applied to each Fiscal Year and approved by the Committee within a reasonable time period following the commencement of the Fiscal Year.

"ROIC Goal" means, with respect to a particular Fiscal Year, a target amount of ROIC to be achieved by the Company during such Fiscal Year, as set by the Committee in its sole discretion.

"RSU Account" means an unfunded bookkeeping account, notionally established on behalf of the Participant, that will be credited with any Accrued RSUs pursuant to the terms of this Agreement.

"Target Number" means, with respect to a particular Fiscal Year, the target number of Restricted Stock Units in respect of such Fiscal Year specified in the Notice of Grant.

2.    Performance Criteria. At the end of each Fiscal Year of the Award Term, the Participant's RSU Account shall be credited with that number of Accrued RSUs equal to the Target Number for such Fiscal Year multiplied by the Accrual Factor for such Fiscal Year.

(a)    EPS Accrual Percentage. The "EPS Accrual Percentage" for a particular Fiscal Year shall be determined as indicated in the table below by comparing the Company's EPS for such Fiscal Year to the EPS Goal for such Fiscal Year (expressed as a percentage):

| Attainment of EPS Goal (EPS/EPS Goal) | EPS Accrual Percentage |
|---|---|
| Less than 70% | 0% |
| 70% | 50% |
| 100% | 100% |
| Greater than or equal to 120% | 160% |

If the Company's EPS for a Fiscal Year as compared to the EPS Goal for such Fiscal Year falls between the percentiles specified in the table above, the EPS Accrual Percentage for such Fiscal Year shall be determined on a straight-line interpolated basis. In no event shall the EPS Accrual Percentage for a Fiscal Year be more than 160%.

(b)    ROIC Modifier. The "ROIC Modifier" for a particular Fiscal Year shall be determined as indicated in the table below by comparing the Company's ROIC for such Fiscal Year to the ROIC Goal for such Fiscal Year (expressed as a percentage):

| Attainment of ROIC Goal (ROIC/ROIC Goal) | ROIC Modifier |
|---|---|
| Less than or equal to 89% | 75% |
| Greater than 89% but less than 107% | 100% |
| Greater than or equal to 107% | 125% |

In no event shall the ROIC Modifier for a Fiscal Year be more than 125%.

3. <u>Dividend Equivalent Rights</u>. If the Company declares and pays a cash dividend on the shares of Common Stock, the Participant's RSU Account will be credited with an additional number of Accrued RSUs equal to: (a) the product of (i) the number of Accrued RSUs in the Participant's RSU Account (including additional Accrued RSUs previously credited to the Participant's RSU Account in accordance with this Section 3) for which shares of Common Stock have not been delivered to the Participant as of the dividend payment date, and (ii) the amount of the cash dividend paid per share of Common Stock; divided by (b) the Fair Market Value (which shall be equal to the closing price) of a share of Common Stock on the dividend payment date. Each additional Accrued RSU credited to the Participant's RSU Account pursuant to this Section 3 shall be subject to the same terms, conditions and restrictions as the underlying Accrued RSUs to which such additional Accrued RSU relates.

4. <u>Termination of Service</u>.

(a)    If the Participant incurs a Termination of Service prior to the Final Date other than due to Participant's death, Disability, Early Retirement or Normal Retirement, the entire Award, including any Accrued RSUs credited to the Participant's RSU Account in respect of any Completed Fiscal Year, shall be immediately forfeited by the Participant and cancelled, without the payment of consideration.

(b)    If the Participant incurs a Termination of Service due to the Participant's death or Disability:

(i)    the Participant's RSU Account shall be immediately credited with that number of Accrued RSUs equal to the Target Number in respect of each Open Fiscal Year; and

(ii)    the Participant shall not be entitled to have any additional Accrued RSUs credited to the Participant's RSU Account in respect of the Award Term or under this Agreement.

(c)    If the Participant incurs a Termination of Service that qualifies as an Early Retirement:

(i)    at the end of the Fiscal Year in which the Participant's Early Retirement occurs, the Participant's RSU Account shall be credited with that number of Accrued RSUs equal to the product of (A) that number of Accrued RSUs, calculated pursuant to Section 2 of this Appendix, which would have been credited to the Participant's RSU Account for the Open Fiscal Year in which the Participant's Early Retirement occurs, and (B) a fraction, the numerator of which is the number of days elapsed in the period beginning on the first day of the Fiscal Year in which the Participant's Early Retirement occurs and ending on the date the Participant's Early Retirement occurs and the denominator of which is the number of days in the Fiscal Year in which the Participant's Early Retirement occurs; and

    (ii) the Participant shall not be entitled to have any additional Accrued RSUs credited to the Participant's RSU Account in respect of the Award Term or under this Agreement.

    (d) If the Participant incurs a Termination of Service that qualifies as a Normal Retirement, at the end of each Open Fiscal Year, the Participant's RSU Account shall be credited with that number of Accrued RSUs, calculated pursuant to Section 2 of this Appendix which would have been credited to the Participant's RSU Account in respect of such Open Fiscal Year. Notwithstanding the foregoing, in the event of the Participant's death following the Participant's Normal Retirement but prior to the Final Date, the Participant's RSU Account shall be credited with that number of Accrued RSUs equal to the Target Number in respect of each Open Fiscal Year (determined as of the date of the Participant's death) and the Participant shall not be entitled to have any additional Accrued RSUs credited to the Participant's RSU Account in respect of the Award Term or under this Agreement. Notwithstanding anything in this Section 4(d) to the contrary, if the Participant engages in work or other activity that causes the Participant to no longer qualify for Normal Retirement treatment (such as Competitive Activity) following the Participant's Termination of Service, (i) with respect to a Participant who is otherwise eligible for Early Retirement (i.e., age 62 or older with 10 years of service), they will be eligible for Early Retirement treatment, and (ii) otherwise, the Participant will no longer be qualified to receive and retain any portion of the Award that has not yet vested as of the date the Participant engages in activity that causes the Participant to no longer qualify for Normal Retirement. The Participant must immediately provide notice to the Company as set forth in Section 5(b) of the Agreement if the Participant engages in Competitive Activity.

    5. <u>Award Settlement</u>. Subject to Section 3 of the Agreement, as soon as reasonably practicable following the applicable settlement date, but in no event later than the fifteenth day of the third month following the end of the Fiscal Year in which the applicable settlement date occurs, the Company shall deliver to the Participant one share of Common Stock for each Accrued RSU in the Participant's RSU Account (with any fractional shares of Common Stock being rounded to the nearest whole share of Common Stock), to the extent not otherwise forfeited or cancelled pursuant to the terms of this Agreement (provided, that, if the Award is considered "nonqualified deferred compensation" (within the meaning of Section 409A of the Code), delivery of such Common Stock shall be within the calendar year in which the applicable settlement date occurs). For purposes of this Section 5, the applicable settlement date shall be the Final Date, provided, however, if the Participant incurs a Termination of Service due to the Participant's death or Disability, the applicable settlement date shall be the Participant's Termination of Service.

    6. <u>Change in Control</u>. Notwithstanding anything in this Appendix to the contrary, if a Change in Control occurs during the Award Term:

    (a) Upon such Change in Control, the Participant's RSU Account shall immediately be credited with a number of Accrued RSUs equal to the Target Number in respect of each Open Fiscal Year as of the date of the Change in Control and thereafter Participant shall

not be entitled to have any additional Accrued RSUs credited to the Participant's RSU Account in respect of the Award Term or under this Agreement.

(b)    If, during a Change in Control Period, the Participant incurs a Termination of Service by the Company without Cause, the Participant shall become fully vested in any portion of the Award that has not yet vested (to the extent not previously forfeited or cancelled) immediately upon such Termination of Service by the Company.

(c)    To the extent the Participant has an employment agreement with the Company that defines Good Reason, if the Participant resigns for Good Reason, the Participant shall become fully vested in any portion of the Award that has not yet vested (to the extent not previously forfeited or cancelled) immediately upon such Termination of Service.

(d)    If, prior to the Change in Control, the Participant has incurred a Termination of Service which qualifies as an Early Retirement, then to the extent such Change in Control occurs in the Fiscal Year in which the Participant's Early Retirement occurs:

(i)    the Participant's RSU Account shall immediately be credited with that number of Accrued RSUs equal to the product of (i) the Target Number for the Open Fiscal Year in which the Participant's Early Retirement occurs, and (B) a fraction, the numerator of which is the number of days elapsed in the period beginning on the first day of the Fiscal Year in which the Participant's Early Retirement occurs and ending on the date the Participant's Early Retirement occurs and the denominator of which is the number of days in the Fiscal Year in which the Participant's Early Retirement occurs; and

(ii)    the Participant shall not be entitled to have any additional Accrued RSUs credited to the Participant's RSU Account in respect of the Award Term or under this Agreement.

(e)    If, prior to the Change in Control, the Participant has incurred a Termination of Service which qualifies as a Normal Retirement, upon such Change in Control, the Participant's RSU Account shall immediately be credited with a number of Accrued RSUs equal to the Target Number in respect of each Open Fiscal Year as of the date of the Change in Control and thereafter the Participant shall not be entitled to have any additional Accrued RSUs credited to the Participant's RSU Account in respect of the Award Term or under this Agreement.

(f) Subject to Section 3 of this Agreement and Section 13(b) of the Plan, as soon as reasonably practicable following the applicable settlement date, but in no event later than the fifteenth day of the third month following the end of the Fiscal Year in which the applicable settlement date occurs, the Company shall deliver to the Participant one share of Common Stock for each Accrued RSU in the Participant's RSU Account (with any fractional shares of Common Stock being rounded to the nearest whole share of Common Stock), to the extent not otherwise forfeited or cancelled pursuant to the terms of this Agreement (provided, that, if the Award is considered "nonqualified deferred compensation" (within the meaning of Section 409A of the Code), delivery of such Common Stock shall be within the calendar year in which the applicable

settlement date occurs). For purposes of this Section 6(f), the applicable settlement date shall be the Final Date, provided, however, if the Participant incurs a Termination of Service during a Change in Control Period, the applicable Settlement Date shall be date of the Participant's Termination of Service.

7. Termination of Service for Cause. Notwithstanding anything in this Agreement or the Plan to the contrary, upon the Participant's Termination of Service by the Company for Cause, the entire Award, including any Accrued RSUs in the Participant's RSU Account, shall be immediately forfeited by the Participant and cancelled, without the payment of consideration.

Exhibit 21.1

## ALBERTSONS COMPANIES, INC.

SCHEDULE OF SUBSIDIARIES

The following is a list of all the Company's subsidiaries, excluding twenty-eight (28) companies, which are not listed because they: (i) are not actively conducting business; (ii) are maintained solely for the purpose of holding licenses; (iii) hold no assets; or (iv) are less than majority owned.

AB Management Services Corp. (DE)
Ink Holdings, LLC (DE)
Albertsons Safeway LLC and its subsidiaries (DE)
  Albertson's LLC and its subsidiaries: (DE)
    ABS Real Estate Holdings LLC and its subsidiaries: (DE)
      ABS Mezzanine III LLC and its subsidiaries: (DE)
        ABS CA-GL LLC (DE)
        ABS CA-O DC1 LLC (DE)
        ABS CA-O DC2 LLC (DE)
        ABS CA-O LLC (DE)
        ABS ID-GL LLC (DE)
        ABS ID-O DC LLC (DE)
        ABS ID-O LLC and its subsidiary: (DE)
          Warm Springs Development, LLC and its subsidiary: (ID)
            Warm Springs & 10th LLC (ID)
        ABS MT-GL LLC (DE)
        ABS MT-O LLC (DE)
        ABS NV-GL LLC (DE)
        ABS NV-O LLC (DE)
        ABS OR-GL LLC (DE)
        ABS OR-O DC LLC (DE)
        ABS OR-O LLC (DE)
        ABS Surplus-O LLC (DE)
        ABS UT-GL LLC (DE)
        ABS UT-O DC LLC (DE)
        ABS UT-O LLC (DE)
        ABS WA-GL LLC (DE)
        ABS WA-O LLC (DE)
        ABS WY-GL LLC (DE)
        ABS WY-O LLC (DE)
      ABS Real Estate Company LLC (DE)
      ABS Real Estate Investor Holdings LLC and its subsidiary: (DE)
        ABS Mezzanine I LLC and its subsidiaries: (DE)
          ABS DFW Investor LLC and its subsidiary: (DE)
            ABS DFW Lease Investor LLC (DE)
          ABS FLA Investor LLC and its subsidiary: (DE)
            ABS FLA Lease Investor LLC (DE)
          ABS RM Investor LLC and its subsidiary: (DE)
            ABS RM Lease Investor LLC (DE)
          ABS SW Investor LLC and its subsidiary: (DE)

ABS SW Lease Investor LLC (DE)
ABS TX Investor LP and its subsidiaries: (TX)


ASP SW Investor LLC (DE)
ABS Real Estate Owner Holdings LLC and its subsidiary: (DE)
ABS FLA Lease Owner LLC (DE)
ASP NoCal Lease Owner LLC (DE)
Albertson's Liquors, Inc. (WY)
Albertson's Stores Sub Holdings LLC and its subsidiary: (DE)
AB Acquisition LLC and its subsidiary: (DE)
Albertson's Stores Sub LLC (DE)
American Food and Drug LLC and its subsidiaries: (DE)
American Stores Properties LLC (DE)
Jewel Osco Southwest LLC (IL)
Sunrich Mercantile LLC (CA)
American Stores Realty Company, LLC (DE)
Fresh Holdings LLC and its subsidiary: (DE)
Extreme LLC and its subsidiaries: (DE)
Newco Investments, LLC (DE)
NHI Investment Partners, LP (DE)
Good Spirits LLC (TX)
Malin Acquisitions, LLC (DE)
Spirit Acquisition Holdings LLC and its subsidiary: (DE)
United Supermarkets, L.L.C. and its subsidiaries: (TX)
LLano Logistics, Inc. (DE)
USM Manufacturing L.L.C. (TX)
Safeway Inc. and its subsidiaries: (DE)
Association of Unit Owners Safeway Beretania (HI)
Better Living Brands LLC (DE)
Casa Ley Services, Inc. (DE)
Cayam Energy, LLC (DE)
DineInFresh, LLC (DE)
Divario Ventures LLC (DE)
Dominick's Supermarkets, LLC and its subsidiary: (DE)
Dominick's Finer Foods, LLC and its subsidiary: (DE)
Dominick's Finer Foods, Inc. of Illinois (IL)
Eureka Land Management LLC and its subsidiary: (WA)
Eureka Development LLC (WA)
GFM Holdings I, Inc. and its subsidiary: (DE)
GFM Holdings LLC and its subsidiary: (DE)
Genuardi's Family Markets LP (DE)
JA Procurement LLC (DE)
Lehua Insurance Company, Inc. (HI)
Lucerne Foods, Inc. and its subsidiaries: (DE)
Eating Right LLC (DE)
Lucerne Dairy Products LLC (DE)
Lucerne North America LLC (DE)
O Organics LLC (DE)
Milford Insurance Brokerage Services, Inc. (DE)
NAI Holdings GP LLC (DE)
New Albertsons L.P. and its subsidiaries: (DE)

—

ABS Finance Co., Inc. (DE)
Albertsons Companies Specialty Care, LLC (DE)
American Stores Company, LLC and its subsidiaries: (DE)
  American Drug Stores LLC and its subsidiary: (DE)
    American Partners, L.P. (IN)
    American Procurement and Logistics Company LLC and its subsidiary:
    (DE)
    APLC Procurement, Inc. (UT)
  ASC Media Services, Inc. and its subsidiary: (UT)
    U.S. Satellite Corporation (UT)
  ASP Realty, LLC (DE)
  Beryl American Corporation (VT)
  Jewel Companies, Inc. and its subsidiaries: (DE)
    Acme Markets, Inc. and its subsidiary: (DE)
      Giant of Salisbury, Inc. (MD)
    Jewel Food Stores, Inc. and its subsidiary: (OH)
      Jetco Properties, Inc. (DE)
  Lucky Stores LLC (OH)
  Scolari's Stores LLC (CA)
Medcart Specialty Care, LLC (DE)
NAI Saturn Eastern LLC and its subsidiary: (DE)
  Collington Services LLC (DE)
SSM Holdings Company and its subsidiary: (DE)
  Shaw's Supermarkets, Inc. and its subsidiaries: (MA)
    28 Pond Street Realty, LLC (NH)
    300 Main Street Realty, LLC (NH)
    360 Chauncy Street Realty Trust (MA)
    675 Randolph Realty Trust (MA)
    693 Randolph Avenue LLC (MA)
    739 Realty Trust (MA)
    861 Edgell Road LLC (MA)
    99 Water Street LLC (MA)
    Adrian Realty Trust (MA)
    Border Street Realty Trust (MA)
    BP Realty, LLC (MA)
    CH Project LLC (MA)
    Clifford W. Perham, Inc. (ME)
    Gorham Markets, LLC (NH)
    Hayward Street Investment Trust and its subsidiary: (MA)
      DLS Realty Trust (MA)
    Heath Street, LLC (MA)
    HNHP Realty, LLC (NH)
    K&J Realty Trust (MA)
    Keene Realty Trust (NH)
    LRT Realty Trust (MA)
    Mashpee Realty LLC (MA)
    Michael's Realty Trust and its subsidiary: (MA)
      EP Realty LLC (MA)
    Milford Realty LLC (MA)
    MK Investments LLC (MA)
    PNHP Realty LLC (NH)
    Shaw's Realty Co. and its subsidiary: (ME)

        Arles, LLC (NH)
      Shaw's Realty Trust and its subsidiary: (MA)
        Galway Realty Trust (MA)
      SNH Realty, LLC (MA)
      SRA REALTY LLC (MA)
      Star Markets Holdings, Inc. and its subsidiary: (MA)
        Star Markets Company, Inc. (MA)
      WP Properties, LLC (RI)
   Wildcat Acquisition Holdings LLC and its subsidiary: (DE)
     Vons REIT, Inc. and its subsidiary: (DE)
      Wildcat Markets Opco LLC (DE)
Oakland Property Brokerage Inc. (DE)
Pak 'N Save, Inc. (CA)
Paradise Development LLC and its subsidiaries: (WA)
   Paradise Real Property LLC and its subsidiary: (WA)
   Boulder Investco LLC (DE)
Randall's Holdings, Inc. and its subsidiaries: (DE)
   Randall's Finance Company, Inc. (DE)
   Randall's Food Markets, Inc. and its subsidiary: (DE)
     Randall's Food & Drugs LP and its subsidiary: (DE)
       Randall's Management Company, Inc. and its subsidiary:    (DE)
        Randall's Beverage Company, Inc. (TX)
   Randall's Investments, Inc. (DE)
Retail Service Insights LLC (DE)
Safeway #0638 Exchange, LLC (OR)
Safeway Australia Holdings, Inc. (DE)
Safeway Canada Holdings, Inc. and its subsidiary: (DE)
   Safeway New Canada, Inc. and its subsidiary: (DE)
     CSL IT Services ULC (formerly Canada Safeway Limited) and its
       subsidiary: (British Columbia)
      Mealime Meal Plans ULC (British Columbia)
   Safeway Corporate, Inc. and its subsidiaries: (DE)
   Safeway Stores 67, Inc. (DE)
   Safeway Stores 68, Inc. (DE)
   Safeway Stores 69, Inc. (DE)
   Safeway Stores 70, Inc. (DE)
Safeway Dallas, Inc. and its subsidiaries: (DE)
   Avia Partners, Inc. (DE)
   Safeway Stores 78, Inc. (DE)
   Safeway Stores 79, Inc. (DE)
   Safeway Stores 80, Inc. (DE)
   Safeway Stores 82, Inc. (DE)
   Safeway Stores 85, Inc. (DE)
   Safeway Stores 86, Inc. (DE)
   Safeway Stores 87, Inc. (DE)
   Safeway Stores 88, Inc. (DE)
   Safeway Stores 89, Inc. (DE)
   Safeway Stores 90, Inc. (DE)
   Safeway Stores 91, Inc. (DE)
   Safeway Stores 92, Inc. (DE)
   Safeway Stores 96, Inc. (DE)
   Safeway Stores 97, Inc. (DE)

—

Safeway Stores 98, Inc. (DE)
Safeway Denver, Inc. and its subsidiaries: (DE)
   Safeway Stores 44, Inc. (DE)
   Safeway Stores 45, Inc. (DE)
   Safeway Stores 46, Inc. (DE)
   Safeway Stores 47, Inc. (DE)
   Safeway Stores 48, Inc. (DE)
   Safeway Stores 49, Inc. (DE)
   Safeway Stores 50, Inc. (DE)
Safeway Gift Cards, LLC (AZ)
Safeway Holdings I, LLC and its subsidiary: (DE)
   GroceryWorks.com, LLC and its subsidiary: (DE)
     GroceryWorks.com Operating Company, LLC (DE)
Safeway Leasing, Inc. (DE)
Safeway Philtech Holdings, Inc. and its subsidiary: (DE)
   Safeway Philtech Inc. (Philippines)
Safeway Realty LLC and its subsidiary: (DE)
   ACI Real Estate Holding I Company LLC and its subsidiary: (DE)
     ACI Real Estate Holding II Company LLC and its subsidiary: (DE)
       ACI Real Estate Company LLC and its subsidiaries: (DE)
         ACI Real Estate SPE 102, LLC (DE)
         ACI Real Estate SPE 103, LLC (DE)
         ACI Real Estate SPE 106, LLC (DE)
         ACI Real Estate SPE 109, LLC (DE)
         ACI Real Estate SPE 110, LLC (DE)
         ACI Real Estate SPE 112, LLC (DE)
         ACI Real Estate SPE 118, LLC (DE)
         ACI Real Estate SPE 119, LLC (DE)
         ACI Real Estate SPE 120, LLC (DE)
         ACI Real Estate SPE 121, LLC (DE)
         ACI Real Estate SPE 122, LLC (DE)
         ACI Real Estate SPE 123, LLC (DE)
         ACI Real Estate SPE 126, LLC (DE)
         ACI Real Estate SPE 127, LLC (DE)
         ACI Real Estate SPE 132, LLC (DE)
         ACI Real Estate SPE 134, LLC (DE)
         ACI Real Estate SPE 135, LLC (DE)
         ACI Real Estate SPE 136, LLC (DE)
         ACI Real Estate SPE 137, LLC (DE)
         ACI Real Estate SPE 143, LLC (DE)
         ACI Real Estate SPE 147, LLC (DE)
         ACI Real Estate SPE 148, LLC (DE)
         ACI Real Estate SPE 153, LLC (DE)
         ACI Real Estate SPE 154, LLC (DE)
         ACI Real Estate SPE 155, LLC (DE)
         ACI Real Estate SPE 157, LLC (DE)
         ACI Real Estate SPE 158, LLC (DE)
         ACI Real Estate SPE 159, LLC (DE)
         ACI Real Estate SPE 160, LLC (DE)
         ACI Real Estate SPE 161, LLC (DE)
Safeway Richmond, Inc. and its subsidiary: (DE)
   Safeway Stores 58, Inc. and its subsidiary: (DE)

Safelease, Inc. (DE)
Safeway Select Gift Source, Inc. (DE)
Safeway Southern California, Inc. and its subsidiaries: (DE)
   Safeway Stores 18, Inc. (DE)
   Safeway Stores 26, Inc. (DE)
   Safeway Stores 28, Inc. (DE)
   Safeway Stores 31, Inc. (DE)
   The Vons Companies, Inc. and its subsidiary: (MI)
     Vons Sherman Oaks, LLC (OR)
Safeway Stores 42, Inc. (DE)
Safeway Stores 43, Inc. (DE)
Safeway Supply, Inc. and its subsidiaries: (DE)
   Consolidated Procurement Services, Inc. (DE)
   Safeway Stores 71, Inc. (DE)
   Safeway Stores 72, Inc. (DE)
   Safeway Stores 73, Inc. (DE)
   Safeway Stores 74, Inc. (DE)
   Safeway Stores 75, Inc. (DE)
   Safeway Stores 76, Inc. (DE)
   Safeway Stores 77, Inc. (DE)
Safeway Trucking, Inc. (DE)
Saturn Development I, Inc. (DE)
Saturn Development LLC (DE)
SRG, Inc. (DE)
SSI – AK Holdings, Inc. and its subsidiary: (DE)
   Carr-Gottstein Foods Co. and its subsidiaries: (DE)
     AOL Express, Inc. (AK)
     APR Forwarders, Inc. (AK)
Stoneridge Holdings, LLC and its subsidiary: (DE)
   Safeway Health Inc. (DE)
Taylor Properties, Inc. (DE)

PX6153-139

**Exhibit 23.1**

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We consent to the incorporation by reference in Registration Statement No. 333-239520 on Form S-8 of our reports dated April 22, 2024, relating to the consolidated financial statements of Albertsons Companies, Inc. and subsidiaries (the "Company") and the effectiveness of the Company's internal control over financial reporting appearing in this Annual Report on Form 10-K for the 52 weeks ended February 24, 2024.

*/s/ Deloitte & Touche LLP*

Boise, Idaho
April 22, 2024

Exhibit 31.1

**Certification of the Principal Executive Officer pursuant**

**to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Vivek Sankaran, certify that:

1. I have reviewed this Annual Report on Form 10-K of Albertsons Companies, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting, which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: April 22, 2024                                    /s/ Vivek Sankaran
                                                        _____
                                                        Vivek Sankaran
                                                        *Chief Executive Officer and Director (Principal Executive Officer)*

Exhibit 31.2

**Certification of the Principal Financial Officer pursuant**

**to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Sharon McCollam, certify that:

1. I have reviewed this Annual Report on Form 10-K of Albertsons Companies, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting, which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: April 22, 2024

/s/ Sharon McCollam
Sharon McCollam
*President and Chief Financial Officer (Principal Financial Officer)*

Exhibit 32.1

**Certification Pursuant to 18 U.S.C. Section 1350,**

**as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report of Albertsons Companies, Inc. (the "Company") on Form 10-K for the period ended February 24, 2024 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), each of the undersigned certifies, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that:

1.  The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:     April 22, 2024

/s/ Vivek Sankaran
Vivek Sankaran
Chief Executive Officer and Director (Principal Executive Officer)

/s/ Sharon McCollam
Sharon McCollam
President and Chief Financial Officer (Principal Financial Officer)

PX6153-143

Exhibit 97.1

### ALBERTSONS COMPANIES, INC.

### RESTATEMENT CLAWBACK POLICY

Adopted October 17, 2023

This Restatement Clawback Policy (this "<u>Policy</u>") has been established and adopted by the Board of Directors (the "<u>Board</u>") of Albertsons Companies, Inc. (the "Company") and will be administered by the Compensation Committee (the "<u>Committee</u>") of the Board.

**Restatement Clawback Policy**

1. <u>Name and Purpose</u>. This Policy is intended to satisfy the Company's obligations pursuant to Section 10D of the Securities Exchange Act of 1934, as amended (the "<u>Exchange Act</u>"), Rule 10D-1 of the Exchange Act, and other applicable rules of the Securities and Exchange Commission ("<u>SEC</u>") and the New York Stock Exchange ("<u>NYSE</u>"). All capitalized terms used and not otherwise defined herein shall have the meanings set forth in Section 11 below.

2. <u>Authority; Administration</u>: This Policy shall be administered by the Committee, except as otherwise set forth herein. The Committee is authorized to administer, interpret, issue and revoke rules and construe this Policy and the terms hereof. In furtherance of this authority, the Committee is authorized to make all determinations advisable, appropriate, necessary or useful for the administration of this Policy, including any factual determinations and to correct any defect, ambiguity, omission or inconsistency in this Policy. Any interpretations, rules or determinations made by the Committee shall be final and binding on the Company and all affected individuals and need not be consistent or uniform with respect to each Executive Officer subject to this Policy. Notwithstanding the foregoing, except as set forth in Section 9 below, in no event may the Company accept an amount that is less than the amount of Erroneously Awarded Compensation in satisfaction of an Executive Officer's obligations hereunder.

3. <u>Delegation; Cooperation</u>: To the extent permitted by applicable law and policies of the Company, the Committee may authorize and delegate to any officer or employee of the Company or any subsidiary to take all actions necessary or appropriate to carry out the objectives, purpose and intent of this Policy. The Committee is directed to consult with the Board and the Audit Committee, as may be necessary or appropriate as to matters within the scope of each respective committee's responsibility and authority as set forth in the respective charter of the Committee and Audit Committee or as otherwise determined by the Board.

4. <u>Subject Individuals</u>. This Policy shall be binding and enforceable against all Executive Officers of the Company and, to the extent required by applicable law or guidance from the SEC or NYSE, their beneficiaries, heirs, executors, administrators or other legal representatives.

5. <u>Clawback Requirement</u>. The Company will recover, recoup, cancel or forfeit reasonably promptly the amount of Erroneously Awarded Compensation in the event that the Company is required to prepare a Restatement (the "<u>Clawback Requirement</u>") in accordance with the terms of this Policy.

6. <u>Timing</u>. The Clawback Requirement applies to all Incentive Compensation Received by an Executive Officer subject to this Policy:

    a. After beginning service as an Executive Officer of the Company;

    b.  Who served as an Executive Officer of the Company at any time during the performance period for a particular element of Incentive Compensation;

    c.  While the Company has a class of securities listed on a national securities exchange or a national securities association; and

    d.  During the three completed fiscal years immediately preceding the date that the Company is required to prepare an applicable Restatement.[1]

The Company's obligation to recover Erroneously Awarded Compensation is not dependent on when or if the restated financial statements are filed.

    7.  <u>Clawback Amount</u>. The amount of Incentive Compensation that is subject to the Clawback Requirement ("<u>Erroneously Awarded Compensation</u>") is the amount of Incentive Compensation Received that exceeds the amount of Incentive Compensation that otherwise would have been Received had it been determined based on the restated amounts, and must be computed without regard to any taxes paid by or on behalf of the Executive Officer on such Erroneously Awarded Compensation.

For Incentive Compensation based on stock price or total shareholder return, where the amount of Erroneously Awarded Compensation is not subject to mathematical recalculation directly from the information in the Restatement:

    a.  The amount must be based on a reasonable estimate of the effect of the Restatement on the stock price or total shareholder return upon which the Incentive Compensation was Received; and

    b.  The Company must maintain documentation of the determination of that reasonable estimate and provide such documentation, as required, to the NYSE.

In making estimates, the Committee may reasonably rely on financial and/or valuation consultants and the advice of legal counsel.

    8.  <u>Manner of Enforcement</u>. Subject to Section 9 below, the Committee shall determine, in its sole discretion, the method, timing and manner for recovering Incentive Compensation in accordance with this Policy, which may include without limitation:

    a.  seeking recovery or reimbursement of any cash (including bonus or retention awards) and equity-based award made to the Executive Officer;

    b.  cancelling or offsetting against any contractually required or planned future cash (including bonus or retention awards) or equity-based awards made to the Executive Officer;

    c.  requiring the forfeiture of or cancelling any previously-granted or awarded cash (including bonus or retention awards) or equity-based awards made to the Executive Officer;

    d.  offsetting amounts paid in salary or commissions to the Executive Officer or director fees if the Executive Officer is serving as a director of the Company;

---

[1] In addition to these last three completed fiscal years, this Restatement Clawback Policy shall apply to any transition period (that results from a change in the Company's fiscal year) within or immediately following those three completed fiscal years. However, a transition period between the last day of the Company's previous fiscal year end and the first day of its new fiscal year that comprises a period of nine to 12 months would be deemed a completed fiscal year.

2

e. offsetting, requiring the forfeiture of or cancelling amounts paid or to be paid in severance to the Executive Officer pursuant to any severance or similar policy of the Company;

f. forfeiture of or cancelling any dividend equivalents or dividend equivalent rights on any equity-based award;

g. forfeiture of deferred compensation, subject to compliance with Section 409A ("Section 409A") of the Internal Revenue Code of 1986, as amended (the "Code"), and regulations thereunder; and

h. any other manner or method authorized by applicable law, plan or contract as may be approved by the Committee in its sole discretion.

For the avoidance of doubt, any compensation paid or granted to any Executive Officer which is subject to the Clawback Requirement shall not trigger any "Good Reason" or similar provision under any plan, contract, employment agreement or other compensation arrangement between the Company and the Executive Officer.

9. Exceptions to the Clawback Requirement. The Company must recover Erroneously Awarded Compensation in compliance with this Policy except to the extent that the conditions in clauses (a), (b) or (c) set forth below are met, and the Committee, or in the absence of such a committee, a majority of the independent directors serving on the Board, has made a determination that recovery would be impracticable.

a. The direct expense paid to a third party to assist in enforcing this Policy would exceed the amount to be recovered. Before concluding that it would be impracticable to recover any amount of Erroneously Awarded Compensation based on expense of enforcement, the Company must make a reasonable attempt to recover such Erroneously Awarded Compensation, document such reasonable attempt(s) to recover, and provide that documentation to the NYSE.

b. Recovery would violate home country law where that law was adopted prior to November 28, 2022. Before concluding that it would be impracticable to recover any amount of Erroneously Awarded Compensation based on violation of home country law, the Company must obtain an opinion of home country counsel, acceptable to the NYSE, that recovery would result in such a violation, and must provide such opinion to the NYSE.

c. Recovery would likely cause an otherwise tax-qualified retirement plan, under which benefits are broadly available to employees of the Company, to fail to meet the requirements of Sections 401(a)(13) or 411(a) of the Code and regulations thereunder.

10. Disclosure in SEC Filings. The Company must file all disclosures with respect to this Policy in accordance with the requirements of the Federal securities laws, including the disclosure required by the Exchange Act and any applicable SEC filings.

11. Definitions and Rules. Unless the context otherwise requires, the following definitions and rules apply for purposes of this Policy:

3

a.  "Executive Officer" means a current or former officer of the Company as defined in the rules promulgated under Section 16 of the Exchange Act, including the Company's president, principal financial officer, principal accounting officer (or if there is no such accounting officer, the controller), any vice-president of the Company in charge of a principal business unit, division, or function (such as sales, administration, or finance), any other officer who performs a policy-making function, or any other person who performs similar policy-making functions for the Company. Executive officers of the Company's parent(s) or subsidiaries are deemed executive officers of the Company if they perform such policy making functions for the Company. Policy-making function is not intended to include policy-making functions that are not significant. Identification of an executive officer for purposes of Section 303A.14 of the NYSE Listing Rules would include at a minimum executive officers identified by the Company pursuant to 17 CFR 229.401(b) (Item 401(b) of Regulation S-K).

b.  "Financial Reporting Measure" means a measure that is determined and presented in accordance with the accounting principles used in preparing the Company's financial statements, and any measure that is derived wholly or in part from any such measure. Stock price and total shareholder return are also Financial Reporting Measures. A Financial Reporting Measure need not be presented within the financial statements or included in a filing with the SEC.

c.  "Incentive Compensation" means any compensation, cash or equity, that is granted, earned, or vested based wholly or in part upon the attainment of a Financial Reporting Measure.

d.  "Restatement" means an accounting restatement due to the material noncompliance of the Company with any financial reporting requirement under the securities laws, including any required accounting restatement to correct an error in previously issued financial statements that is material to the previously issued financial statements, or that would result in a material misstatement if the error were corrected in the current period or left uncorrected in the current period.

e.  Incentive Compensation is deemed "Received" in the Company's fiscal period during which the financial reporting measure specified in the Incentive Compensation award is attained, even if the payment or grant of the incentive-based compensation occurs after the end of that period.

f.  For purposes of determining the relevant recovery period, the date that the Company is required to prepare a Restatement is the earlier to occur of:

   i. The date the Board, a committee of the Board, or the officer or officers of the Company authorized to take such action if board action is not required, concludes, or reasonably should have concluded, that the Company is required to prepare a Restatement; or

PX6153-147

ii.    The date a court, regulator, or other legally authorized body directs the Company to prepare a Restatement.

12. <u>Transition</u>. This Policy shall apply to Incentive Compensation Received by Executive Officers on or after October 2, 2023.

13. <u>Applicable Law</u>. This Policy shall be governed by the laws of the state of Delaware excluding any conflicts or choice of law rule or principle that might otherwise refer construction or interpretation of this Policy to the substantive law of another jurisdiction.

14. <u>No Indemnification</u>. Notwithstanding the terms of any (a) provision of the Company's Amended and Restated Certificate of Incorporation (as amended, the "<u>Certificate of Incorporation</u>"), (b) Amended and Restated Bylaws ("<u>Bylaws</u>"), (c) indemnification agreement entered into with the Company by any Executive Officer or (d) insurance policy maintained by or on behalf of the Company for the benefit of the Company or any Executive Officer, the Company shall not indemnify or reimburse (or cause to be reimbursed through any existing or new compensation arrangement) any Executive Officer against the loss of any Incentive Compensation, including any payment or reimbursement for the cost of third-party insurance or other indemnification arrangement purchased by any Executive Officer to fund Clawback Requirements under this Policy.

15. <u>Actions in Furtherance of Policy</u>: Subject to requirements of the (a) laws of the state of Delaware, (b) the Certificate of Incorporation and Bylaws of the Company and (c) any other applicable policy of the Company each individual who is or shall have been a member of the Board or the Committee shall be indemnified and held harmless by the Company against and from any loss, cost, liability, or expense that may be imposed upon or reasonably incurred by him or her in connection with or resulting from any claim, action, suit or proceeding to which he or she may be a party or in which he or she may be involved by reason of any action taken under this Policy and against and from any and all amounts paid by him or her in settlement thereof. The foregoing right of indemnification shall not be exclusive of any other rights of indemnification to which such individuals may be entitled as a matter of law or otherwise, or any power that the Company may have to indemnify them or hold them harmless. The Board or Committee may engage such compensation consultants, external legal advisors, accountants and other advisors as it shall deem desirable from time to time, at the cost and expense of the Company, in each case in accordance with applicable law and the terms of this Policy, to assist the Board or Committee in carrying out the terms of this Policy or making any determination under this Policy, including the calculation of Incentive Compensation subject to the Clawback Requirement.

16. <u>Amendment, Termination</u>: The Board may amend, modify or supplement any provision of this Policy at any time and from time to time in its sole discretion. The Board shall amend the Policy, to take effect retroactively or otherwise, as deemed necessary or advisable for the purpose of conforming this Policy to any applicable

PX6153-148

law or any rules, standards or interpretations adopted by a national securities exchange on which the Company's securities are listed.

17. <u>Non-Exclusivity</u>: This Policy shall not be construed as creating any limitations on the power of the Board or Committee to adopt such other clawback or recoupment compensation policies, agreements or arrangements as it may deem desirable for any individual or enable the Company to pursue any remedies or rights that may be available to the Company under applicable law to recoup or clawback compensation of any type.

18. <u>Code Section 409A</u>. No otherwise permitted clawback, forfeiture or offset may be made against a "nonqualified deferred compensation plan" (as defined in Section 409A to the extent such offset would cause adverse tax consequences under Section 409A. Notwithstanding the forgoing, the Company does not guarantee and is not responsible for any particular tax result associated with actions required or permitted by this Policy.

6

nielsen    

# Retail Trade Channel and Sub-Channel Overview

| Trade Channel | Description | Sub-Channel |
|---|---|---|
| **Supermarket** | Grocery store with +$2MM/year ACV (FMI)<br>• Includes all Supercenters<br>• Includes all chain and independent stores | • *Conventional Supermarket*<br>• *Limited Assortment*<br>• *Natural/Gourmet Foods*<br>• *Supercenter*<br>• *Cash & Carry Warehouse*<br>• *Military Commissary* |
| **Superette** | Grocery store with $1MM-$2MM/year ACV | • *Superette* |
| **Convenience Store** | Small format store selling high convenience items such as beverages, snacks and tobacco plus limited grocery items including milk and bread (NACS)<br>• May also sell gasoline and offer fast food services<br>• 500-1500 SKUs and 800-3000 Square Feet | • *Conventional*<br>• *Military*<br>• *Gas Station/Kiosk* |
| **Drug** | Health and beauty care (HBC) retailer or independent pharmacy. | • *Conventional*<br>• *Rx Only & Small Independent Drug* |
| **Mass, General Merchandiser, and Dollar Stores** | High-volume store with large selection of household goods, general merchandise and/or HBC, food and paper products. | • *Mass Merchandiser*<br>• *General Merchandiser*<br>• *Dollar Store*<br>• *Military Exchange* |
| **Wholesale Club** | Membership store offering a large variety of consumer products. | • *Conventional* |
| **Liquor Store** | Retailer catering to consumers whose primary destination is alcoholic beverages. | • *Super Store*<br>• *Conventional*<br>• *Military*<br>• *Wine Specialty*<br>• *Beer Specialty* |
| **Cigarette Outlets** | Retailer catering to consumers whose primary destination is the purchase of cigarette & e-cigarette products. | • *Conventional*<br>• *Vape Store* |
| **Category Killer** | Large format store dominating a specific category within the market. | • *Auto Aftermarket*<br>• *Beauty Care*<br>• *Books*<br>• *Computer Stores*<br>• *Consumer Electronics*<br>• *Craft/Hobby*<br>• *Department Store*<br>• *Discount Department Store*<br>• *Family Apparel*<br>• *Home Improvement*<br>• *Home/Bed/Bath*<br>• *Office Supplies*<br>• *Sporting Goods*<br>• *Farm and Feed*<br>• *Nutraceuticals* |

Copyright © 2020 The Nielsen Company. All rights reserved.
TD Retail Channel + Sub-Channel Overview
Rev. 1/2020

PX6166-001




| **Pet Stores** | Retail location whose primary purpose is the sale of animal supplies, various pets, and accessories. | • *Pet Superstore*<br>• *Neighborhood Pet*<br>• *Vet Clinic* |
|---|---|---|
| **Fulfillment Centers** | Dedicated, stand-alone physical location supporting the pick-up or delivery of e-commerce shopping. | • *Fulfillment* |
| **Cannabis** | Retailer catering to consumers whose primary destination is marijuana for medical or recreational use. | • *Medical*<br>• *Recreational*<br>• *Combination* |

## Technical Support

If you require further assistance, please contact the Environics Analytics support team between 9:00 a.m. and 8:00 p.m. (Monday through Friday, EST) at support@environicsanalytics.com or 888.339.3304.



PX6166-002

# News Details

VIEW ALL NEWS

## Kroger, Albertsons Companies and C&S Wholesale Grocers, LLC Announce an Updated and Expanded Divestiture Plan

April 22, 2024

*Amended Divestiture Plan Adds Stores, Facilities and Banner Names to
Enhance Competition in Overlap Geographies and to Address Regulator Concerns*

CINCINNATI, April 22, 2024 /PRNewswire/ -- The Kroger Co. (NYSE: KR) and Albertsons Companies Inc. (NYSE: ACI) announced today that they have amended their definitive agreement with C&S Wholesale Grocers, LLC (C&S) for the sale of assets in connection with their proposed merger previously announced on October 14, 2022. This amended package modifies and builds on the initial divestiture package that was announced on September 8, 2023.

The amended divestiture package responds to concerns raised by federal and state antitrust regulators regarding the original agreement. The enhanced divestiture package includes a modified and expanded store set and additional non-store assets to further enable C&S to operate competitively following the completion of the proposed merger. The companies believe the amended divestiture package will bolster their position in regulatory challenges to the proposed merger, including pending court proceedings.

"We have reached an agreement with C&S for an updated divestiture package that maintains Kroger's commitments to customers, associates and communities, addresses concerns raised by regulators, and will further ensure that C&S can successfully operate the divested stores as they are operated today," said Rodney McMullen, Kroger's Chairman and CEO. "Importantly, the updated divestiture plan continues to ensure no stores will close as a result of the merger and that all frontline associates will remain employed, all existing collective bargaining agreements will continue, and associates will continue to receive industry-leading health care and pension benefits alongside bargained-for wages. Our proposed merger with Albertsons will bring lower prices and more choices to more customers and secure the long-term future of unionized grocery jobs."

The proposed merger will create meaningful and measurable benefits for America's consumers, Kroger and Albertsons Cos. associates, and communities that both Kroger and Albertsons Cos. serve by expanding access to fresh,

PX6253-001

affordable food and establishing a more compelling alternative to large, non-union retailers. This updated divestiture plan marks another next step toward the completion of the merger by adding a well-capitalized competitor into new geographies.

"We are confident this expanded divestiture package will provide the stores, supporting assets and expert operators needed to ensure these stores continue to successfully serve their communities for many generations to come," said Eric Winn, CEO of C&S. "C&S is a leader in the grocery industry, and we are excited for this expansion of our current retail business, which is a key part of our long-term growth strategy. We look forward to welcoming storied banners, quality private label brands, and a team of experienced retail associates into the C&S family. This amended agreement enables C&S's heritage of selection, value and customer service to continue our legacy of ***braggingly happy customers***."

**Transaction Details**

The updated divestiture package increases the total store count by 166 to include 579 stores that will be sold to, and continue operating as they do today by the new owner, C&S.

It maintains the sale to C&S of the QFC, Mariano's and Carrs banner names. Under the amended agreement, Kroger will also sell the Haggen banner to C&S. Stores currently under these banners that are retained by Kroger will be re-bannered into one of the retained Kroger or Albertsons Cos. banners following the close of the transaction with C&S.

Under the amended agreement, C&S will license the Albertsons banner in California and Wyoming and the Safeway banner in Arizona and Colorado. In these states, Kroger will re-banner the retained Albertsons and Safeway bannered stores following the closing of the merger. Kroger will maintain the Albertsons and Safeway banners in the remaining states.

The number of stores contained in the divestiture plan by geography is as follows:

- WA: 124 Albertsons Cos. and Kroger stores
- CA: 63 Albertsons Cos. stores
- CO: 91 Albertsons Cos. stores
- OR: 62 Albertsons Cos. and Kroger stores
- TX/LA: 30 Albertsons Cos. stores
- AZ: 101 Albertsons Cos. stores
- NV: 16 Albertsons Cos. stores
- IL: 35 Albertsons Cos. and Kroger stores
- AK: 18 Albertsons Cos. stores
- ID: 10 Albertsons Cos. stores
- NM: 9 Albertsons Cos. stores
- MT/UT/WY: 11 Albertsons Cos. stores
- DC/MD/VA/DE: 9 Harris Teeter stores

The above stores (regardless of banner) will be sold by Kroger to C&S following the closing of the merger with Albertsons Cos.

In connection with the additional stores being conveyed to C&S, the updated divestiture package includes increased distribution capacity through a combination of different and larger facilities as well as expanded transition services agreements to support C&S and the addition of one dairy facility.

The amended divestiture package also expands the corporate and office infrastructure provided to C&S given the increased store set to ensure C&S can continue to operate the divested stores competitively and cohesively. All fuel centers and pharmacies associated with the divested stores will remain with the stores and continue to operate.

The amended agreement maintains the divestiture of private label brands Debi Lilly Design, Primo Taglio, Open Nature, ReadyMeals and Waterfront Bistro to C&S. The revised agreement also provides C&S with access to the Signature and O Organics private label brands.

The updated plan will:

- Extend a competitor to new geographies through the sale of stores to a well-capitalized buyer that is led by seasoned operators with a strong balance sheet and a sound business plan;
- Ensure that no stores will close as a result of the merger;
- Maintain all current collective bargaining agreements, which include industry-leading healthcare and pension benefits, bargained-for wages, and ensuring frontline associates remain employed; and

PX6253-002

Case 3:24-cv-00347-AN   Document 202-2   Filed 07/26/24   Page 427 of 475

6/14/24, 3:11 PM          The Kroger Co. - Kroger, Albertsons Companies and C&S Wholesale Grocers, LLC Announce an Updated and Expanded Divestitu…

- Commit to invest in associates and stores for the long term.

Subject to fulfillment of customary closing conditions, including Federal Trade Commission and/or other governmental clearance, and the completion of the Kroger-Albertsons merger, C&S will pay Kroger an all-cash consideration of approximately $2.9 billion, including customary adjustments.

### Merger creates meaningful benefits for customers, associates and communities
The proposed merger with Albertsons Cos. will produce meaningful and measurable benefits for customers, associates and communities across the country. The combined company committed that no stores, distribution centers or manufacturing facilities will close as a result of the merger.

Customers will benefit from lower prices and more choices following the merger close. Kroger committed to investing $500 million to begin lowering prices day one post-close, and an additional $1.3 billion to improve Albertsons Cos.' stores.

This commitment builds on Kroger's long track record of reducing prices every year, with $5 billion invested to lower prices since 2003. Customers will also have access to more favorite items from their own communities, as Kroger committed to increasing the number of local products in its stores by 10 percent post-close. This merger creates more opportunities for families to access the fresh, affordable foods they love.

As a combined company, Kroger committed to investing $1 billion to raise wages and comprehensive benefits. This builds on the incremental $2.4 billion Kroger invested to improve wages and comprehensive benefits since 2018. To provide the best holistic support for each associate, the company will also extend continuing education and financial literacy benefits to all associates following the merger close. As union membership continues to decline nationwide, especially in the grocery industry, this merger is the best way to secure union jobs. Kroger has added more than 100,000 good-paying union jobs since 2012.

The proposed merger will allow the combined company to invest more deeply to end hunger in communities across America. In 2023, Kroger committed to donating 10 billion meals to families across the U.S. by 2030. Bringing these companies together provides one more step toward achieving communities that are free from hunger and food waste.

Kroger and Albertsons Cos. remain committed to defending the merger in court and unlocking the many benefits it offers.

Read more about the combined company's commitment to customers, associates and communities at www.krogeralbertsons.com

### About Kroger
At The Kroger Co. (NYSE: KR), we are dedicated to our Purpose: To Feed the Human Spirit™. We are, across our family of companies nearly half a million associates who serve over 11 million customers daily through a seamless digital shopping experience and retail food stores under a variety of banner names, serving America through food inspiration and uplift, and creating #ZeroHungerZeroWaste communities by 2025. To learn more about us, visit our newsroom and investor relations site.

This press release contains certain statements that constitute "forward-looking statements" within the meaning of federal securities laws, including statements regarding the effects of the proposed transaction and updated divestiture plan. These statements are based on the assumptions and beliefs of Kroger and Albertsons management in light of the information currently available to them. Such statements are indicated by words or phrases such as "create," "committed," "expand," "establish," "ensure," "enhance," "extend," "completion," "continue," and "will." Various uncertainties and other factors could cause actual results to differ materially from those contained in the forward-looking statements. These include the specific risk factors identified in "Risk Factors" in each of Kroger's and Albertsons' annual report on Form 10-K for the last fiscal year and any subsequent filings, as well as the following: the expected timing and likelihood of completion of the proposed transaction and updated divestiture plan, including the timing, receipt and terms and conditions of any required governmental and regulatory clearance of the proposed transaction and updated divestiture plan and/or resolution of pending litigation challenging the merger; the impact of the proposed updated divestiture plan; the occurrence of any event, change or other circumstances that could give rise to the termination of the updated divestiture agreement; the outcome of any legal proceedings that may be instituted against the parties and others following announcement of the merger agreement and proposed transaction or updated divestiture plan; the inability to consummate the proposed transaction or updated divestiture plan due to the failure to satisfy other conditions to complete the proposed transaction or updated divestiture plan; risks that the proposed transaction disrupts current plans and operations of Kroger and Albertsons Cos.; the ability to identify and recognize the anticipated benefits of the updated divestiture plan, including but not limited to the ability to enhance competition in overlap geographies and to address regulator concerns, create meaningful and measurable benefits for America's

PX6253-003

consumers, Kroger and Albertsons associates, and communities that both Kroger and Albertsons serve, expand access to fresh, affordable food and establish a more compelling alternative to large, non-union retailers, and commitment that all frontline associates will remain employed, all existing collective bargaining agreements will continue, and associates will continue to receive industry-leading health care and pension benefits alongside bargained-for wages; the ability of the combined company to achieve its commitment that no stores, distribution centers or manufacturing facilities will close as a result of the proposed transaction, to invest $500 million to begin lowering prices post-close, and an additional $1.3 billion to improve Albertsons Cos.' stores; the amount of the costs, fees, expenses and charges related to the proposed transaction or updated divestiture plan; and the ability of Kroger and Albertsons Cos. to successfully integrate their businesses and related operations; the ability of Kroger to maintain an investment grade credit rating; risks related to the potential impact of general economic, political and market factors on the companies or the proposed transaction or updated divestiture plan. The ability of Kroger and Albertsons Cos. to achieve the goals for the proposed transaction may also be affected by their ability to manage the factors identified above.

The forward-looking statements by Kroger and Albertsons included in this press release speak only as of the date the statements were made. Neither Kroger nor Albertsons assumes the obligation to update the information contained herein unless required by applicable law. Please refer to the reports and filings of Kroger and Albertsons with the Securities and Exchange Commission for a further discussion of the risks and uncertainties that affect them and their respective businesses.

View original content:https://www.prnewswire.com/news-releases/kroger-albertsons-companies-and-cs-wholesale-grocers-llc-announce-an-updated-and-expanded-divestiture-plan-302123299.html

SOURCE The Kroger Co.

VIEW ALL NEWS

PX6253-004

# Kroger and Albertsons Companies Announce Comprehensive Divestiture Plan with C&S Wholesale Grocers, LLC in Connection with Proposed Merger



NEWS PROVIDED BY

**The Kroger Co.** ➡

Sep 08, 2023, 08:14 ET

*Plan Marks Key Step in Merger Process*

*Both the Kroger and Albertsons Cos. Combination and the Divestiture Sale to C&S will Create Meaningful and Measurable Benefits for Associates, Customers and Communities*

*Agreement with C&S Includes Sale of 413 Stores, 8 Distribution Centers, 2 Offices and 5 Private Label Brands Across 17 States and the District of Columbia Extending a Well-Capitalized Competitor into New Geographies*

*Agreement Includes Sale of the QFC, Mariano's and Carrs Brand Names and the Exclusive Licensing Rights to the Albertsons Brand Name in Arizona, California, Colorado and Wyoming*

PX6287-001

*C&S, an Industry Leader in Wholesale Grocery Supply and One of the Largest*
*Privately Held Companies in the United States, Brings 104 Years of Food Industry Experience*
*and a Track Record as a Successful Grocery Retailer*

*C&S Agrees to Maintain Collective Bargaining Agreements, Securing the Future of Union Jobs*

*Merger Remains on Track to Close in Early 2024,*
*Subject to Regulatory Clearance and Other Closing Conditions*

CINCINNATI and BOISE, Idaho, Sept. 8, 2023 /PRNewswire/ -- The Kroger Co. (NYSE: **KR**) and Albertsons Companies Inc. (NYSE: **ACI**) announced today that they have entered a definitive agreement with C&S Wholesale Grocers, LLC for the sale of select stores, banners, distribution centers, offices and private label brands in connection with their **proposed merger** previously announced on October 14, 2022.

The proposed merger will create meaningful and measurable benefits for America's consumers, Kroger and Albertsons associates, and communities that both Kroger and Albertsons serve by expanding access to fresh, affordable food and establishing a more compelling alternative to large, non-union retailers. This comprehensive divestiture plan marks a key next step toward the completion of the merger by extending a well-capitalized competitor into new geographies. The divestiture plan ensures no stores will close as a result of the merger and that all frontline associates will remain employed, all existing collective bargaining agreements will continue, and associates will continue to receive industry-leading health care and pension benefits alongside bargained-for wages.

C&S is an industry leader in wholesale grocery supply and supply chain solutions, with a strong track record as a successful grocery retailer. Founded in 1918 as a supplier to independent grocery stores, C&S services customers of all sizes, supplying more than 7,500 independent supermarkets, retail chain stores and military bases. Grounded in its commitment to feeding families across America, C&S currently operates Grand Union grocery stores and Piggly Wiggly® franchise and corporate-owned stores in the Midwest and Carolinas. C&S is deeply invested in the communities where it operates, and this retail expansion will continue its long-standing mission to keep communities fed. Through its wholesale and retail operations, C&S purchases more than 100,000 products, giving it the ability to provide customers with the best product selection and pricing available. In addition to its franchise and corporate owned supermarkets, C&S provides end-to-end wholesale, supply and marketing services to its retailer customers. C&S also brings experience with the merger process, having been an FTC-approved divestiture buyer in prior grocery

transactions with a strong track record of successfully transitioning union employees and their associated collective bargaining agreements. In anticipation of the agreement, C&S's 1918 Winter Street Partners retail holding company has been established to ensure a seamless closing process. C&S's depth of industry knowledge, financial strength and commitment to growing its associates' careers makes it the right fit to ensure the divested stores, distribution centers and offices grow and thrive for years to come.

"Following the announcement of our proposed merger with Albertsons Cos., we embarked on a robust and thoughtful process to identify a well-capitalized buyer who will operate as a fierce competitor and ensure divested stores and their associates will continue serving their communities in the ways they do today. C&S achieves all these objectives," said Rodney McMullen, chairman and CEO of The Kroger Co. "C&S is led by an experienced management team with an extensive background in food retail and distribution and has the financial strength to continue investing in associates and the business for the long run. Importantly in our agreement, C&S commits to honoring all collective bargaining agreements which include industry-leading benefits, retaining frontline associates and further investing for growth."

McMullen continued, "We appreciate our incredible associates who support and serve our customers and communities, and who help both of our companies succeed. C&S will offer exciting opportunities for associates to advance their careers – from frontline associates and store leaders to merchants and other professionals. We are confident the associates joining the C&S family will have an amazing opportunity to continue to build a thriving career in the food industry in one of the largest private companies in our country. C&S's strong operational focus and financial resources, along with a comprehensive operational infrastructure included as part of the divestiture agreement, will position it to successfully operate and continue to grow these iconic brands for years to come. C&S is a values-driven organization that is committed to ending hunger while creating healthier communities – now and for future generations."

The divestiture plan fulfills the commitments Kroger and Albertsons Cos. set out in their original merger agreement in October 2022 with regard to divesting stores, including:

- Extending a competitor to new geographies through the sale of stores to a well-capitalized buyer that is led by seasoned operators with a strong balance sheet and a sound business plan;
- Ensuring that no stores will close as a result of the merger;
- Maintaining all current collective bargaining agreements, which include industry-leading healthcare and pension benefits, bargained-for wages, and ensuring frontline associates remain employed; and
- Committing to invest in associates and stores for the long term.

Kroger took several steps to ensure a thoughtful and comprehensive divestiture plan. The terms of the plan support C&S's ability to operate divested stores effectively and efficiently by providing:

- Strong teams, with deep industry expertise and the ability to operate at scale, and to drive growth and operational advancements in the divested business;
- A cohesive set of stores in each geography supported by two regional headquarters as well as banners, and private label brands with strong consumer recognition that will provide C&S with an established base on which to grow its store network; and
- A robust operational infrastructure, including distribution centers and offices to support both the immediate and long-term success of the divested business.

"I have long respected C&S and its leadership team," said Vivek Sankaran, CEO of Albertsons Companies. "I am thrilled that C&S's outstanding capabilities and financial strength will ensure these divestiture stores can continue to grow and serve their communities as they do today. Most importantly, they have made a clear commitment to continuing to invest in and care for associates, including by honoring all collective bargaining agreements currently in place. I echo Rodney's confidence in the bright future ahead for the associates joining the C&S team."

"We look forward to welcoming thousands of new associates to the C&S family and providing them the opportunity to build long and successful careers," said Eric Winn, Chief Operating Officer and designated Chief Executive Officer (effective October 2) of C&S Wholesale Grocers. "As a leader in the grocery industry, we have a strong heritage of value and customer service that is enabled by a deep commitment to our consumers, employees and communities. Today's announcement is another exciting opportunity for C&S to further expand into the retail market, which is an important component of our growth and future success. We look forward to providing a superior shopping experience that delivers both quality and value to our customers."

**Transaction Details**

The divestiture transaction includes 413 stores, along with QFC, Mariano's and Carrs brand names. Stores currently under these banners that are retained by Kroger will be re-bannered into one of the retained Kroger or Albertsons Cos. banners following the close of the transaction. In the four states where C&S will have the license to the Albertsons banner, Kroger will re-banner the retained stores following the close of

PX6287-004

the merger with Albertsons Cos. Kroger will maintain the Albertsons banner in the remaining states. In addition, Kroger will divest the Debi Lilly Design, Primo Taglio, Open Nature, ReadyMeals and Waterfront Bistro private label brands.

The number of stores contained in the divestiture plan by geography is as follows:

- WA: 104 Albertsons Cos. and Kroger stores
- CA: 66 Albertsons Cos. and Kroger stores
- CO: 52 Albertsons Cos. stores
- OR: 49 Albertsons Cos. and Kroger stores
- TX/LA: 28 Albertsons Cos. stores
- AZ: 24 Albertsons Cos. stores
- NV: 15 Albertsons Cos. stores
- IL: 14 Kroger stores
- AK: 14 Albertsons Cos. stores
- ID: 13 Albertsons Cos. stores
- NM: 12 Albertsons Cos. stores
- MT/UT/WY: 12 Albertsons Cos. stores
- DC/MD/VA: 10 Harris Teeter stores

The above stores (regardless of banner) will be divested by Kroger following the closing of the merger with Albertsons Cos.

**Additional Terms of the Transaction**

The definitive purchase agreement has customary representations and warranties and covenants of a transaction of its type. The transaction also provides a comprehensive operational infrastructure including eight distribution centers, two offices, five private label brands, and expert district, division and functional associates, to ensure C&S can continue to operate the divested stores competitively and cohesively with no disruption to the associate or customer experience. All fuel centers and pharmacies associated with the divested stores will remain with the stores and continue to operate.

Subject to fulfillment of customary closing conditions, including FTC and other governmental clearance, and the completion of the Kroger-Albertsons merger, C&S will pay Kroger an all-cash consideration of approximately $1.9 billion, including customary adjustments.

Prior to the closing, Kroger may, in connection with securing FTC and other governmental clearance, require C&S to purchase up to an additional 237 stores in certain geographies. If additional stores are added to the transaction, C&S will pay to Kroger additional cash consideration based upon an agreed upon formula.

As a result of the comprehensive divestiture plan announced with C&S, Kroger has exercised its right under the merger agreement to sell what would have been the SpinCo business to C&S. Consequently, the spin-off previously contemplated by Kroger and Albertsons Cos. is no longer a requirement under the merger agreement and will no longer be pursued by Kroger and Albertsons Cos.

**Merger creates meaningful benefits for customers, associates and communities**

The divestiture plan is another key step toward the completion of the proposed merger between Kroger and Albertsons Companies. The combination will bring together two complementary companies and create meaningful and measurable benefits for customers, associates and communities. The combination will advance Kroger's *Leading with Fresh, Accelerating with Digital* strategy, which is grounded in Fresh, *Our Brands*, personalization and seamless. By doing so, the combined company will continue to invest in improving the customer experience and serving more communities across the country with fresh, affordable food. With a family of well-known, trusted brands, the combined company will offer customers lower prices and more choices for the fresh foods customers need, want and love – all with a seamless, omnichannel shopping experience.

The combination will allow Kroger and Albertsons Cos. to unlock significant benefits, including:

- **Advancing a Brighter Future for Our Associates.** The combined company will benefit associates seeking to grow their careers. Kroger added more than 100,000 good-paying union jobs since 2012, and it anticipates continuing on this trajectory. The retailer committed to investing $1 billion in improving associates' wages and comprehensive benefits post close. This commitment builds on the $1.9 billion in incremental investments Kroger made in wages and comprehensive benefits since 2018. The combined company has also committed to providing associates with programs aimed at continuing education and financial literacy following the completion of the merger. The combination will create a compelling alternative to large, non-union competitors.

- **Serving More of America with Fresh, High-Quality and Affordable Food.** Kroger built its business model on a foundation of bringing customers lower prices and more choices for the foods their families need to thrive. The retailer committed to investing $500 million beginning day one post close to reduce prices for customers in stores across the U.S. An incremental $1.3 billion will also be invested to enhance the customer experience. The combination advances Kroger's work to make its products more affordable and accessible to more families, ultimately supporting a food system that will feed people across the U.S. for years to come.

- **Driving Meaningful Improvements Where It Matters Most.** The combination will create more opportunities to invest in communities across America as the company continues its journey to eliminate hunger and food waste. In June 2023, Kroger announced its commitment to donate 10 billion meals as a combined company upon completion of the proposed merger to families across the country by 2030. Putting this commitment into context, ten billion meals are enough to feed every person in the cities of Seattle, Denver, Chicago and Boston every meal, every day, for nearly two years. As a result of a strategic focus on donating surplus fresh food and charitable giving, the combined company will accelerate its ability to feed its neighbors and reduce waste, especially food waste.

The merger remains on track to close in early 2024, subject to the receipt of required regulatory clearance and other customary closing conditions, including receipt of clearance under the Hart-Scott-Rodino Antitrust Improvements Act of 1976. Kroger and Albertsons Cos. remain committed to working cooperatively with the regulators and all other interested parties to complete the transaction and unlock the many benefits it offers.

Read more about the combined company's commitment to customers, associates and communities at **www.krogeralbertsons.com**

**Kroger Second Quarter 2023 Earnings Results and Conference Call**

In a separate press release issued today, Kroger reported its second quarter 2023 results.

Kroger's quarterly conference call with investors will be broadcast as scheduled at 10 a.m. (ET) on September 8, 2023 at ir.kroger.com. An on-demand replay of the webcast will be available at approximately 1 p.m. (ET) on Friday, September 8, 2023.

**Advisors**

Citi and Wells Fargo Securities, LLC are serving as financial advisors and Weil, Gotshal & Manges LLP and Arnold & Porter Kaye Scholer LLP are serving as legal counsel to Kroger.

Goldman Sachs & Co. LLC and Credit Suisse are serving as financial advisors and Jenner & Block LLP is serving as corporate legal counsel and White & Case LLP and Debevoise & Plimpton LLP are serving as antitrust legal counsel to Albertsons Cos.

**About Kroger**

At The **Kroger** Co. (NYSE: **KR**), we are dedicated to our Purpose: To Feed the Human Spirit™. We are, across our family of companies nearly half a million associates who serve over 11 million customers daily through a seamless digital shopping experience and retail food stores under a variety of **banner names**, serving America through food inspiration and uplift, and creating #ZeroHungerZeroWaste communities by 2025. To learn more about us, visit our **newsroom** and **investor relations** site.

**About Albertsons Companies, Inc.**

Albertsons Companies is a leading food and drug retailer in the United States. As of June 17, 2023, the Company operated 2,272 retail food and drug stores with 1,726 pharmacies, 401 associated fuel centers, 22 dedicated distribution centers and 19 manufacturing facilities. The Company operates stores across 34 states and the District of Columbia with 24 banners including Albertsons, Safeway, Vons, Jewel-Osco, Shaw's, Acme, Tom Thumb, Randalls, United Supermarkets, Pavilions, Star Market, Haggen, Carrs, Kings Food Markets and Balducci's Food Lovers Market. The Company is committed to helping people across the country live better lives by making a meaningful difference, neighborhood by neighborhood. In 2022, along with the Albertsons Companies Foundation, the Company contributed more than $200 million in food and financial support, including more than $40 million through our Nourishing Neighbors Program to ensure those living in our communities and those impacted by disasters have enough to eat.

PX6287-008

**About C&S Wholesale Grocers, LLC**

C&S Wholesale Grocers, LLC is an industry leader in supply chain solutions and wholesale grocery supply in the United States. Founded in 1918 as a supplier to independent grocery stores, C&S now services customers of all sizes, supplying more than 7,500 independent supermarkets, chain stores, military bases and institutions with over 100,000 different products. We are an engaged corporate citizen, supporting causes that positively impact our communities. To learn more, please visit **www.cswg.com**.

This press release contains certain statements that constitute "forward-looking statements" within the meaning of federal securities laws, including statements regarding the effects of the proposed transaction and divestiture plan. These statements are based on the assumptions and beliefs of Kroger and Albertsons Cos. management in light of the information currently available to them. Such statements are indicated by words or phrases such as "accelerate," "anticipates," "create," "committed," "confident," "continue," "deliver," "driving," "expect," "future," "guidance," "positioned," "strategy," "target," "synergies," "trends," and "will." Various uncertainties and other factors could cause actual results to differ materially from those contained in the forward-looking statements. These include the specific risk factors identified in "Risk Factors" in each of Kroger's and Albertsons Cos.' annual report on Form 10-K for the last fiscal year and any subsequent filings, as well as the following: the expected timing and likelihood of completion of the proposed transaction and divestiture plan, including the timing, receipt and terms and conditions of any required governmental and regulatory clearance of the proposed transaction and divestiture plan; the impact of the proposed divestiture plan; the occurrence of any event, change or other circumstances that could give rise to the termination of the merger agreement or divestiture agreement; the outcome of any legal proceedings that may be instituted against the parties and others following announcement of the merger agreement and proposed transaction or divestiture plan; the inability to consummate the proposed transaction or divestiture plan due to the failure to satisfy other conditions to complete the proposed transaction or divestiture plan; risks that the proposed transaction disrupts current plans and operations of Kroger and Albertsons Cos.; the ability to identify and recognize the anticipated benefits of the proposed transaction, including expectations and synergies; the amount of the costs, fees, expenses and charges related to the proposed transaction or divestiture plan; and the ability of Kroger and Albertsons Cos. to successfully integrate their businesses and related operations; the ability of Kroger to maintain an investment grade credit rating; risks related to the potential impact of general economic, political and market factors on the companies or the proposed transaction. The ability of Kroger and Albertsons Cos. to achieve the goals for the proposed transaction may also be affected by their ability to manage the factors identified above.

The forward-looking statements by Kroger and Albertsons Cos. included in this press release speak only as of the date the statements were made. Neither Kroger nor Albertsons Cos. assumes the obligation to update the information contained herein unless required by applicable law. Please refer to the reports and filings of Kroger and Albertsons Cos. with the Securities and Exchange Commission for a further discussion of the risks and uncertainties that affect them and their respective businesses.

SOURCE The Kroger Co.

## PREHEARING CONFERENCE - July 19, 2024

Page 1

1         DISTRICT COURT, CITY AND COUNTY OF DENVER
                          COLORADO
2

3 Case No. 2024-CV-30459
  Division 414
4 July 19, 2024

5 _____

6 PREHEARING CONFERENCE

7 _____

8 STATE OF COLORADO, ex rel. PHILIP J. WEISER, Attorney
  General,
9         Plaintiff,

10 vs.

11 THE KROGER CO.;ALBERTSONS COMPANIES, INC.; and C&S
   WHOLESALE GROCERS, LLC,
12
         Defendants.
13 _____
   APPEARANCES:
14   COLORADO DEPARTMENT OF LAW
       By Arthur Biller, Esq. and
15       Steve Kaufman, Esq.
         1300 Broadway
16       Denver, Colorado  80203
         arthur.biller@coag.gov
17       steve.kaufman@coag.gov
         Appearing for State of Colorado.
18
   ARNOLD & PORTER
19   By Sonia K. Pfaffenroth, Esq.and
       Randall H. Miller, Esq.
20     1144 Fifteenth Street, Suite 3100
       Denver, Colorado 80202
21     randy.miller@arnoldporter.com
       sonia.pfaffenroth@arnoldporter.com
22     and
   WEIL, GOTSHAL & MANGES, LLP
23     By Mark A. Perry, Esq.
       2001 M Street NW, Suite 600
24     Washington D.C.  20036
       mark.perry@weil.com
25     Appearing for Kroger Co.

Page 2

1           APPEARANCES (CON'T)
2  WILLIAMS & CONNOLLY, LLP
     By Enu Mainigi, Esq.
3      680 Maine Avenue, S.W.
       Washington D.C.  20024
4      emainigi@wc.com
       and
5  HOLLAND & HART
     By Christopher H. Toll, Esq.
6      555 17th Street, Suite 3200
       Denver, Colorado 80202
7      ctoll@hollandhart.com
       Appearing for Albertsons Companies, Inc.
8
   SULLIVAN & CROMWELL
9    By Samantha F. Hynes, Esq.
       1700 New York Avenue, N.W.
10     Suite 700
       Washington D.C.  20006
11     hyness@sullcrom.com
12
13        Pursuant to Notice and the Colorado Rules
   of Civil Procedure, the Prehearing Conference
14 in front of Judge Andrew J. Luxen, commencing at 12:15
15 p.m., at Remotely, before Harriet S. Weisenthal,
16 Registered Professional Reporter and Notary Public
17 within and for the State of Colorado.
18
19
20
21
22
23
24
25

Page 3

1           P R O C E E D I N G S

2           JUDGE LUXEN:  Good afternoon.  This is
3 Case No. 2024-CV-30459, State of Colorado versus Kroger
4 et al.  Entries, please.
5           MR. BILLER:  Good afternoon, Your Honor.
6 Arthur Biller, from the Attorney General, on behalf of
7 the State of Colorado.  I have several colleagues on
8 with me today as well.
9           JUDGE LUXEN:  Good afternoon, Mr. Biller.
10          MS. PFAFFENROTH:  Your Honor, it's Sonia
11 Pfaffenroth, from Arnold & Porter, on behalf of Kroger.
12 Today with me as well is Mark Perry, and my partner,
13 Randall Miller, from Arnold & Porter.
14          MR. MAINIGI:  Good afternoon.  This is
15 Enu Mainigi, here on behalf of Albertsons.  And Chris
16 Toll is here on behalf of Albertsons as well.
17          JUDGE LUXEN:  Good afternoon,
18 Ms. Mainigi.
19          MR. TOLL:  Chris Toll, on behalf of
20 Albertsons as well.  Good afternoon.
21          JUDGE LUXEN:  Good afternoon.  We're here
22 for a pretrial prehearing conference.  We have the
23 hearing slotted to begin on August 12th.  I have a few
24 things I would like to talk about, but, I think maybe
25 it makes sense to start with Mr. Biller, begin with

Page 4

1 whatever issues you have.
2           MR. BILLER:  Thank you, Your Honor.
3 Actually, I'm going to let Ms. Pfaffenroth, I think, go
4 first.  And, then -- we have a development that we've
5 been working on, but I will let her describe it, and,
6 then, I may have something to add, but I will allow her
7 to go first.
8           JUDGE LUXEN:  Thank you.  Ms.
9 Pfaffenroth.
10          MS. PFAFFENROTH:  Thank you, Mr. Biller.
11 Your Honor, we wanted to make -- we and the state
12 wanted to make the Court aware that the parties are
13 discussing a potential stipulation, that will eliminate
14 the need for the August hearing --
15               (Off the record.)
16          JUDGE LUXEN:  What we're going to do,
17 Ms. French is going to mute everybody else, then we
18 will -- we are going to attempt to mute everyone except
19 the person who is speaking.
20          MS. PFAFFENROTH:  Should I continue, Your
21 Honor?
22          JUDGE LUXEN:  Thank you.  The court
23 reporter, I am going to unmute you.  Let us know if you
24 can't hear, or if there is some other concern on your
25 end.  Go ahead.

## CALDERWOOD-MACKELPRANG, INC.
### (303) 477-3500

## PREHEARING CONFERENCE - July 19, 2024

Page 5

1          MS. PFAFFENROTH:  Thank you, Your Honor.
2          So, the parties are discussing a
3 potential stipulation to eliminate the need for the
4 hearing that's currently set to start on August the
5 12th.  This is something we want to bring to your
6 attention right away, even though it's still in
7 process.
8          And, specifically, the defendants would
9 be stipulating not to close the primary transaction
10 until the earlier of the fifth day following Your
11 Honor's ruling on the permanent -- on the ruling for
12 the permanent injunction hearing, or November 8th,
13 whichever was earlier.  And, also, we appreciate our
14 constructive conversations with the state so far on
15 this.
16          I think the parties are all cognizant of
17 the burden that -- the close proximity of the
18 preliminary and the permanent injunction hearing places
19 on the Court.  So, our goal is to try to eliminate the
20 need for that first hearing.
21          And we recognize that November the 8th is
22 a somewhat limited window, after the hearing, for the
23 Court's decision.  It is driven by operational and
24 financing considerations, leading up to -- apologies --
25 just in terms of process.  But that is something the

Page 6

1 parties have been discussing, and we will continue to
2 discuss.
3          And we are -- I'll say, on behalf of
4 Kroger, we are optimistic, and we would certainly work
5 with the state, in the context of the permanent
6 injunction hearing, to streamline the presentation of
7 evidence, because the permanent injunction hearing
8 would be following both the Federal Trade Commission
9 preliminary injunction hearing, in the District of
10 Oregon, and the Washington State proceeding.
11          JUDGE LUXEN:  Thank you.  How do you
12 believe that impacts what we should discuss today?
13          MS. PFAFFENROTH:  So, I think we would
14 take Your Honor's direction on that.  We would
15 certainly be happy to discuss both the issues that Your
16 Honor raises in the order, regarding courtroom sealing
17 issues, in the context of the permanent injunction
18 hearing, if we end up not needing to proceed with the
19 preliminary injunction hearing.  We're happy to take
20 the Court's direction.
21          JUDGE LUXEN:  Why don't I hear, first,
22 from Albertsons.  Any comments on that?
23          MS. MAINIGI:  Your Honor, no comment on
24 what you would like to cover the remainder of today.
25 The one thing I wanted to underscore, with respect to

Page 7

1 Kroger counsel's comments, is I realize we're catching
2 you a bit by surprise by this proposal.  Hopefully, it
3 is welcomed by you, that you may get some of your
4 priorities back.
5          I think -- what I think parties would
6 hope to understand, and it does not have to necessarily
7 be on this call, but it is your reaction to the concept
8 laid out by Kroger's counsel; that is when the Court
9 might be able to get a decision out, on the permanent
10 injunction, by this November 8th time period, because
11 that would kind of be implicit in this proposed
12 stipulation that we're discussing with the state.
13          And, again, Your Honor, I recognize we
14 are very much catching you by surprise on this, but we
15 are hopeful that we can make a stipulation among the
16 parties work.
17          JUDGE LUXEN:  Let me ask C&S, do you have
18 anything you would like to say before we talk about
19 that issue?
20          MS. HYNES:  This is Samantha Hynes, from
21 Sullivan & Cromwell, on behalf of C&S.  We don't have
22 anything to add on top of what Kroger and Albertsons
23 discussed.
24          JUDGE LUXEN:  Mr. Biller, someone for the
25 Attorney General.

Page 8

1          MR. BILLER:  Thank you, Your Honor.
2 We've received a proposal from the defendant on this,
3 and we've started exchanging some language, and we're
4 engaging on the terms of the proposal.
5          I'll just say, we're appreciative of the
6 defendants' willingness to push their closing date past
7 the trial on the merits, to try to culminate the trial
8 and streamline the litigation.  We think that the
9 concept should work, to provide for judicial economy,
10 and, obviously, not require the Court and the parties
11 to appear for a preliminary injunction hearing next
12 month.  There are still details that we need to work
13 out.
14          In our view, obviously, this is -- the
15 Court controls the calendar and the dockets, and if the
16 Court determined that it would need more time to issue
17 a ruling, past whatever the November date is that we
18 land on, then, in our view, the Court could issue a
19 preliminary injunction, or TRO, at that time, if the
20 requirements for our relief were established through
21 the evidence at trial.
22          But, we still need to work out the
23 details and the mechanics, and a potential stipulation.
24 And I think the parties are in agreement; that we're
25 going to try to give ourselves the next several days to

## PREHEARING CONFERENCE - July 19, 2024

Page 9

1  do that, with the goal of presenting it to the court,
2  hopefully, early next week.
3           JUDGE LUXEN:  What does -- if we have a
4  preliminary injunction hearing, and then the trial on
5  the merits, we can consider evidence from the
6  preliminary injunction hearing on a trial of the
7  merits.  What does not having the preliminary
8  injunction hearing do to those 14 days scheduled for
9  the trial on the merits?
10          MR. BILLER:  I think that the time that
11  the Court has set aside for the trial would still
12  remain in place.  We would have to work out, between
13  the parties, whether there would be anything in the
14  other proceedings that could potentially streamline the
15  trial.
16          I don't know whether that's possible or
17  not, but I don't think -- we would not need a longer
18  trial.  So, I think those days that we've reserved
19  would be sufficient.
20          JUDGE LUXEN:  For Kroger.
21          MS. PFAFFENROTH:  Yes, Your Honor.  We
22  agree.  We certainly don't think that a longer
23  proceeding would be necessary, for the hearing, if the
24  permanent injunction hearing were taken off the
25  calendar.

Page 10

1           We share Mr. Biller's assertion here,
2  that we would be able to streamline, given there will
3  be -- we have a number of weeks of trial, on the same
4  topic, in other jurisdictions.  And that's something we
5  would certainly work closely with the state, in order
6  to streamline the proceedings as much as possible, for
7  Your Honor, with the goal of, perhaps, having an even
8  shorter hearing than is currently set-aside on the
9  Court's calendar.
10          JUDGE LUXEN:  For Albertsons.
11          MS. MAINIGI:  Agreed, Your Honor.  I
12  think that the hearing can only go shorter, given that
13  it would be coming after a couple of other hearings.
14  And there's also the possibility, Your Honor, that
15  there may be opinions that have come out from the other
16  courts that would have already heard this matter.
17          JUDGE LUXEN:  For C&S.
18          MS. HYNES:  Nothing else to add on top of
19  what others have said, Your Honor.
20          JUDGE LUXEN:  I'm supposed to address the
21  question directly, if I would provide assurance, or
22  whatever you might find to describe it, that I would
23  have a ruling on the permanent injunction trial, on the
24  merits, which also involves the second claim, by
25  approximately three weeks after the close of our

Page 11

1  evidence, which is October 17th -- I'm sorry.  It will
2  be October 18th, 2024, is when we're scheduled to begin
3  our 14 days together.
4           I would not make that assurance; that is,
5  particularly if I permit the parties to submit
6  appropriate findings of fact and conclusions of law,
7  after the conclusion of the hearing, I am not going to
8  hamstring myself, or the Court, into making my
9  guarantees about when an order would be out.
10          So, to the extent that that informs the
11  decisions here, that's my position on order timing.  I
12  will certainly move, with all reasonable speed, to get
13  the order out, like I do with everything that comes
14  through here, but three weeks is just a remarkably
15  short amount of time to get an order, on both claims,
16  on the merits, out to the parties.
17          Any comments or thoughts on that,
18  Mr. Biller?
19          MR. BILLER:  I don't have any comments to
20  that, Your Honor.  That's helpful information,
21  certainly, to inform our discussions.  But, you know,
22  in our view, as I said, the Court obviously controls
23  the calendar, so, we appreciate that information.
24          JUDGE LUXEN:  For Kroger.
25          MS. PFAFFENROTH:  Your Honor, I would add

Page 12

1  on that, I think that the November 8th date would be
2  pertinent -- and we could make this clear in any
3  proposed stipulation -- and with respect to Count 1,
4  not with respect to Count 2, because the same timing
5  considerations for the parties are not implicated by
6  Count 2.
7           JUDGE LUXEN:  For Albertsons.
8           MS. MAINIGI:  Your Honor, we appreciate
9  your candor, and in terms of what you think is
10  achievable.  I'm wondering if you have, or you, in your
11  mind, kind of what you thought the timing might be with
12  respect to an opinion.  And you may not, Your Honor.  I
13  completely understand how we're catching you by
14  surprise on this.
15          JUDGE LUXEN:  The short answer is, no.
16          MS. MAINIGI:  Understood Your Honor.
17          JUDGE LUXEN:  For C&S.
18          MS. HYNES:  Nothing else to add, Your
19  Honor.  Thank you for your candor.
20          JUDGE LUXEN:  Yes.  I have two thoughts:
21  One, we talk about logistical issues involving the
22  preliminary injunction hearing now.  Second thought, we
23  reset this hearing for Thursday of next week -- it
24  would need to be Thursday afternoon of next week -- if
25  there's not a stipulation with respect to the

## PREHEARING CONFERENCE - July 19, 2024

Page 13

1 preliminary injunction hearing, work through the
2 logistical things we need to talk about.
3          If there is a stipulation with respect to
4 the preliminary injunction hearing, we don't need to
5 spend our time and energy talking about those details,
6 and the parties can get back to work, doing whatever
7 else you might need to do.  Any thoughts or comments on
8 those options, Mr. Biller?
9          MR. BILLER:  Yes, Your Honor.  I think
10 the parties are prepared to discuss certain issues,
11 which -- and maybe we don't have to go into them, into
12 quite as in-depth as we otherwise would, but just, at
13 least as an update on what we're working on, in the
14 event that we do have a preliminary injunction hearing,
15 and there are a couple of issues that I think we might
16 appreciate the Court's guidance on, just in terms of
17 some logistical and, in effect, technology issues.
18          So, it may be productive to spend time
19 going through that, and if we don't have a preliminary
20 injunction hearing, we can, you know, take any
21 instruction with us, as we prepare for trial later on.
22          JUDGE LUXEN:  For Kroger.
23          MS. PFAFFENROTH:  Your Honor, I'll pass
24 this to Mr. Perry.
25          MR. PERRY:  Good afternoon, Your Honor.

Page 14

1 Mark Perry for Kroger.
2          I agree with Mr. Biller.  We have been
3 working through issues.  The one thing we were going to
4 propose, just a preview, was submitting a joint
5 pretrial order, of sorts, as to where we have
6 agreements, and competing positions, if we don't.
7 We're not quite there yet, but that's something we've
8 been working on, already, and we were going to ask the
9 Court if that would be acceptable.
10          And the Court did have specific issues,
11 about closing the courtroom, and confidentiality, which
12 may affect some of the exhibit lists, and other, you
13 know, mechanicals for the parties, that we're prepared
14 to discuss and explain.  I would respond to the Court's
15 questions, if the Court remains interested.
16          JUDGE LUXEN:  For Albertsons.
17          MS. MAINIGI:  Your Honor, we're fine
18 having this high-level discussion on some of the key
19 points.
20          JUDGE LUXEN:  For C&S.
21          MS. HYNES:  Your Honor, we're fine with
22 the high-level discussion that everyone has discussed.
23          JUDGE LUXEN:  Let's dive in, Mr. Biller,
24 or who would like to start?
25          MR. BILLER:  I can start.  Thank you,

Page 15

1 Your Honor.  So, one issue that Your Honor raised was
2 with respect to closing the courtroom and
3 confidentiality issues.
4          So, we have been discussing that among
5 the parties.  From our perspective, you know, we
6 started from the proposition that closing the courtroom
7 is a high bar to meet, but that the Court does have
8 authority to close the courtroom, to protect trade
9 secrets, as the Court observed, and other truly
10 competitively sensitive information.
11          From an antitrust perspective, we
12 certainly have an interest in avoiding public
13 disclosure of information that would be harmful to
14 competition.  And we think that Rule 42 allows for
15 that, which creates an exception to proceedings, when
16 orderly procedure requires it.
17          As the Court acknowledged, in the Curtis
18 decision, from the Colorado Supreme Court, when a trial
19 involves trade secrets, where public dissemination
20 could injure a party, it's firmly within the provision
21 to close the courtroom.
22          And, in our view.  Curtis does not limit
23 closing the courtroom to only trade secret protections,
24 but when other certain confidential information might
25 be implicated.  And that view is consistent with a high

Page 16

1 bar to closure, that the Federal courts typically set,
2 which involve balancing various interests, but
3 acknowledge that protecting an entity's competitive
4 standing is valid in that determination.
5          So, the key will be for the parties and
6 relevant nonparties to work together, to only seek
7 protections for matters that are truly deserving of it,
8 and not make overbroad assertions of confidentiality.
9 But that's our view of certain, with respect to this
10 case, the types of matters that potentially warrant
11 closing the courtroom.
12          JUDGE LUXEN:  Does the Federal Trade
13 Commission administrative proceedings, are those open
14 to the public?
15          MR. BILLER:  Um, Mr. Perry or other
16 defendants' counsel might be in a better position to
17 answer that than I am.  My understanding is that they
18 are at least partially public, but I think that the
19 protections in the administrative proceedings are more
20 broad than a Federal district court, but I think Mr.
21 Perry, or someone, can elaborate on that.
22          MR. PERRY:  I am happy to do that now or
23 later, Your Honor, as you wish.
24          JUDGE LUXEN:  Go ahead, Mr. Perry.
25          MR. PERRY:  Thank you, Your Honor.  This

**PREHEARING CONFERENCE - July 19, 2024**

Page 17

1 issue -- let me start by saying, this issue does arise
2 in merger litigation, on a regular basis, as the Court
3 may imagine.  These cases almost always involve
4 competitively sensitive information, pricing, business
5 planning, other information involving competitors.
6 And, if the deal closes, there will remain competitors,
7 in the marketplace; and if the deal doesn't close, then
8 the parties remain competitors.  So, it's important to
9 have certain guardrails in place.
10          The Federal courts, in 13(b) challenges,
11 which is the rough equivalent of what we're having
12 here, have developed a set of guidelines for these
13 proceedings.  The Court asked for some relevant
14 authority in the order.
15          The Curtis case, of course, is from
16 Colorado, but if I could give the Court just one
17 Federal case, that cites a whole bunch of others, so
18 it's a good place to look.  It's called: United States
19 versus Sabre Corp -- S-a-b-r-e -- 452 Federal Supp 3d,
20 page 97.  It's a Delaware case from 2020.
21          The relevant passage is page 149.  And,
22 as I said, it cites a number of other cases, and it's
23 exactly what Mr. Biller said.  This is the area, by the
24 way, that I don't think that the state and the
25 defendants are in disagreement.  This is a -- we agree

Page 18

1 that the Court should remain open; that these should be
2 public proceedings, that it is a high bar, but that bar
3 will be cleared, in this case, on certain occasions.
4          What the same report said, and the
5 general standard is, in the Federal court, and I am
6 quoting, "This issue often emerges in trials of
7 government challenges to a proposed merger based on
8 antitrust concerns, during which witnesses almost
9 inevitably discuss sensitive business information such
10 as prices, forward-looking strategy and analyses of
11 competitive conditions.  To balance the public's right
12 of access with the parties' interest in avoiding
13 competitive injury, courts routinely close courtrooms
14 when witnesses discuss 'competitively sensitive
15 information' while otherwise allowing full public
16 access."
17          And that phrase, "competitively sensitive
18 information," has garnered a meaning, if you will, in
19 Federal cases involving mergers, as current pricing,
20 current competitive analyses, some other things that
21 the parties are used to dealing with; and that
22 typically, there is a -- those are worked out, in
23 agreement, in advance of hearing, so that we know what
24 it is.
25          The other thing that happens in these

Page 19

1 cases, typically, that there are several levels of
2 this.  If it's in a document, we may be able to submit
3 an unredacted document to the Court, and redacted
4 document on the public record.  Witnesses can simply
5 refer to the document, without saying a number out
6 loud.
7          For example, if, for example, if it's a
8 specific figure, we don't need to close the courtroom.
9 The Court would have the figure on the bench, but
10 disclosure is not made in public.  That's often called
11 for, and an avenue -- we do that quite routinely.
12          Another way is to not display information
13 on the public screens, on a Website, if that's an
14 available option.  And, then, if it is necessary -- and
15 it often is -- for part of a, you know, financial
16 competitive testimony, or particularly expert witnesses
17 often do a competitive analysis, their own, that is
18 based on market -- nonpublic information about market
19 conditions.
20          The parties know that in advance, and we
21 try to agree that, either at the beginning or the end
22 of the witness's testimony would be the closed session
23 part, to minimize the closed period to only that
24 material that is truly competitively sensitive, without
25 upsetting the proceedings by clearing the courtroom,

Page 20

1 bringing people back in, by question or answer, but by
2 module instead.  It's not perfect, but it works pretty
3 well in the Federal cases.
4          To the Court's question about
5 administrative proceedings, there are fewer of those.
6 The standard, as Mr. Biller said -- it's not Federal
7 court -- so it's -- there is more protected
8 information.  They are public proceedings, by default.
9 But it's the same general process that there are closed
10 sessions, or closed portions of sessions, precisely for
11 the same reason that they involve competitively
12 sensitive information, about pricing and competitive
13 strategies.
14          JUDGE LUXEN:  Do Federal judges make --
15 or did the U.S. District Court, in Delaware, make
16 specific findings, in advance of closing the courtroom,
17 about these -- the confidentiality?
18          MR. PERRY:  Yes, Your Honor.  What
19 usually happens is the final pretrial conference, the
20 parties would address the types of evidence in that
21 case, that are sensitive; and, in this case, it would
22 be pricing information, competitive landscape, you
23 know, there will be, for example, revenue information.
24 I'm sure there are many competitors that don't wish
25 that current information, if it's not public, to be

## PREHEARING CONFERENCE - July 19, 2024

Page 21

1 disclosed.

2            And the findings that are required, under
3 the First Amendment, in the state, Federal guidelines
4 can be applied, on an eligible basis, and, then, a
5 showing can be made, on the individual evidence, that,
6 you know, we're now moving into that period, explain
7 why.

8            And different courts do it in different
9 ways.  Some do it before the start of the hearing day,
10 some do it before the start of the witness, some do it
11 before the entire proceedings, sort of -- it's harder,
12 by the way, before the entire proceeding, because, as
13 things develop, it may not come up, so you sort of have
14 to do more work, in advance.  It's easier to do it on a
15 day-by-day or witness-by-witness basis.

16            I will just tell you, from experience,
17 which is why I think this -- the supplemental order
18 that we had submitted had a sort of rolling protocol,
19 where things would be identified in stages, in advance,
20 precisely for that reason; that it may not be necessary
21 to do the work, if a witness comes off a list, or the
22 exhibit comes off the list, and something like that,
23 because, yes, Your Honor would have to ultimately make
24 the required finding, that this competitively sensitive
25 information is justifying a limited closure of the

Page 22

1 courtroom, to protect the competitive process.  We
2 would be assuring the public's general right of access
3 to the court.

4            JUDGE LUXEN:  Your experience, though, is
5 that doing it all in advance is less efficient or
6 doesn't provide the same kind of clarity that doing it
7 as the trial unfolds would provide, because of the
8 shifting landscape of the evidence, et cetera.

9            MR. PERRY:  That's correct, Your Honor.
10 I mean, we can do it, conceivably, in advance.  In
11 other words, we could give the Court some examples of
12 documents or witness testimony, that would be the kinds
13 of things that will come up, so that you'll understand,
14 you know, what you are about to be hearing.

15            But the witness by witness, or document
16 by document, it takes a lot of time, I will just tell
17 you that, by the parties, right, because you have to go
18 almost line by line through a deposition transcript, or
19 through a document -- just take a document.  If it's a
20 financial statement, it may never require -- it may
21 require enormous redactions.  If the propounding party
22 decides not to use that document, then, that would be
23 hours of time that was sort of not necessary, until we
24 get there.

25            That's the issue.  It's a very practical

Page 23

1 one, but the process of trial preparation tends to wind
2 down the number of witnesses and the number of
3 documents that actually get presented.  And the
4 question for the Court, really, only arises, in the
5 event, when the witness is on the stand or being called
6 to the stand, and the question is, will there be
7 confidential information.

8            I should add one more point that's
9 important in this context.  This is just for the
10 parties' information.  We're talking about, right,
11 there are -- Kroger has confidential information --
12 Albertsons and C&S can speak for themselves -- but, I
13 believe, for sure, they do as well.

14            These cases also involve third-party
15 information.  There are other competitors in the
16 marketplace, and we have their data, through discovery,
17 and they are not going to want that -- some of that
18 disclosed publicly.  So, we have to coordinate with
19 them, the parties do, and give them notice; and, then,
20 they have a right to come in and make a showing; and,
21 again, if that witness of a third party is not going to
22 be called, then all of that work is sort of wasted, if
23 it's done a month in advance, whereas at trial, or on
24 the eve of trial, it's much more efficient to know
25 who's actually coming .

Page 24

1            JUDGE LUXEN:  What happens, then, if
2 Grocery Store A -- there's material that's been learned
3 through discovery, about Grocery Store A, which is the
4 competitor, or potential competitor, and the attorney
5 general wants to introduce the evidence.  And the
6 general counsel for Grocery Store A says, "Gosh, we
7 have a problem."

8            How does that get sorted out?  Do we have
9 a hearing before that evidence gets put on, the morning
10 that evidence is expected to be presented?

11            MR. PERRY:  So, Your Honor, my own
12 experience is with the FTC, it is not with the Colorado
13 Attorney General, but regulators, in general, I believe
14 the balance that Mr. Biller describes is always
15 present, that public access is good.  But these are
16 antitrust cases.  We don't want competitive -- nobody
17 wants sensitive information to be released.  What I was
18 saying is, there is often agreement, amongst the
19 parties and, then, a court joint presentation is made.

20            I would tell you that disagreements do
21 arise.  Often third parties want over-inclusive
22 proceedings, right, because they don't want -- they are
23 not party to the case, and they, basically, don't want
24 anything said about them on the public record.

25            And there may be disputes that the Court

## PREHEARING CONFERENCE - July 19, 2024

Page 25

1 will have to resolve.  I am not aware of anything in
2 this case, right now.  I will tell you, just from past
3 experience, there are notice requirements, in the
4 protective order, and so forth.  In other words, if a
5 third party is going to be called, a document is going
6 to be used, the parties have to tell them, that party
7 either has a right to object or not object.
8           And it will be the case, I predict, that
9 a few of those will come to the Court's attention for
10 resolution, I suspect most of them, if they don't get
11 resolved by negotiation and the back and forth of the
12 parties.  I do expect the protocol -- I don't want to
13 whitewash this, Your Honor -- I do expect there would
14 be some disputes that the Court will have to resolve
15 during the hearing, on the scope, I mean, there will be
16 some concern, probably, of competitive sensitive
17 information for every witness, about how broad that
18 protection is.
19           What judges often do is sort of establish
20 a standard, and apply it, you know, pretty much to all
21 witnesses, because that's what judges do.  The Court
22 will conduct the hearing, as it wishes.  That's been
23 the observation, I think.
24           JUDGE LUXEN:  What happens when the
25 Denver Post raises their hand and says, "We don't think

Page 26

1 the courtroom should be closed"?
2           MR. PERRY:  Your Honor, this goes back to
3 the standard, under Colorado Rule 42(c), or the Federal
4 equivalent, and, then, of course, the First Amendment
5 overlay, the right of the public access is strong but
6 not absolute.  It is very important -- free press is
7 very important to all of us.
8           At the same time, this is information
9 that is not part of the public record.  These are
10 confidential secrets of corporations, right, that would
11 not be disclosed to shareholders, and there are
12 concerns with moving markets, with people making trades
13 with this information becoming available, there are
14 employment decisions at issue, there are, you know,
15 very competitive sensitive information.  That is the
16 balance that is struck.
17           I'm not aware of a case -- we can
18 certainly look, Your Honor -- where the press has
19 actually litigated that issue.  It tends to be limited
20 closure, and it tends to be limited to information that
21 is not public already, therefore, it is competitively
22 sensitive.
23           JUDGE LUXEN:  Your experience -- maybe I
24 am conflating these two things -- but, is it correct
25 that your experience and your proposal is that you

Page 27

1 find -- the parties present a more general outline of
2 how they expect potential closures to play out?
3           MR. PERRY:  Your Honor, I'm not sure
4 we've discussed it in this level of granularity with
5 the Attorney General, but the standard, in Federal
6 court -- and I think it's a similar thing we're talking
7 about in this court -- is competitively sensitive
8 information.  What does that mean, right?  Usually it
9 means current pricing, current, you know, it doesn't
10 mean price from 10 years ago, but current pricing
11 information, current competitively sensitive landscape
12 information.
13           My own view -- and, again, I have not
14 discussed this with the Attorney General, so I wish to
15 make that clear -- would be that we could make a
16 presentation to the Court, at the final prehearing
17 conference of the parties, views, either joint or
18 separate, on what the general contours of the
19 comprehensive sensitive information are, that would
20 be -- that would warrant redactions or closure, that,
21 then, could be applied in particular circumstances.
22           And I do think it would be helpful to the
23 parties, and the Court, to give a few examples of
24 things that we do think are in that category, you know,
25 specific documents, rather than concepts.  I think we

Page 28

1 can all agree on concepts.  The hard part is looking at
2 the document and saying, is that document within the
3 concept.
4           JUDGE LUXEN:  For Albertsons.
5           MS. MAINIGI:  Your Honor, we're in
6 agreement with Kroger's counsel.  We don't really have
7 anything to add on this particular issue.
8           JUDGE LUXEN:  For C&S.
9           MS. HYNES:  We're also in agreement.  I
10 would just add that C&S does have a particular interest
11 in protecting its confidential information here.
12 Throughout the discovery process, C&S has produced
13 information about virtually every aspect of its
14 forward-looking business plan, for how it would run the
15 divestiture business.
16           And, so, it's quite important to be able
17 to protect things, like pricing strategies, market
18 strategies, and other things, that will go to the core
19 of how C&S intends to compete, with these assets, in
20 the market.  So, I will just agree with everything that
21 Mr. Perry said, and add that for C&S.
22           JUDGE LUXEN:  Mr. Biller.
23           MR. BILLER:  Thank you, Your Honor.  So,
24 my colleague, Steve Kaufman, has been a little bit
25 closer to these discussions.  And, if it's okay, I

## PREHEARING CONFERENCE - July 19, 2024

Page 29

1 would like to pass it to him to just add a few points.
2          JUDGE LUXEN:  Mr. Kaufman.
3          MR. KAUFMAN:  Good afternoon, Your Honor.
4 Steve Kaufman, on behalf of the state.
5          I agree with the things articulated by
6 Mr. Perry.  I would like to fill in a few more open
7 places I think would help clarify the issue; that, for
8 third-party information, the type of information we're
9 talking about is testimony and data.  The data would
10 probably come in through expert reports --
11          (Off the record.)
12          MR. KAUFMAN:  I apologize.  I will try to
13 speak up a bit.  The data would probably come in
14 through expert reports, and there are mechanisms by
15 which the data, for the particular competitors, could
16 be anonymized, or put within summary types of data, in
17 what is presented to the Court, and there could be some
18 other in camera submissions.
19          To the third-party testimony, I believe
20 that most of the third-party testimony, in this case,
21 will actually be coming in by deposition.  Most of the
22 third parties -- I'm sorry, Your Honor.  I think
23 there's some background noise from someone else's line.
24          (Off the record.)
25          JUDGE LUXEN:  It can be mine too.

Page 30

1          MR. KAUFMAN:  Your Honor, the third-party
2 testimony, because the third-party witnesses are
3 largely out of state, and unlike the Federal
4 government, we do not have nationwide power.  So, that
5 testimony will largely be coming in by deposition, and
6 that could be done on an in camera basis, without the
7 need to provide that, or, certainly, the depositions
8 could be redacted in a way that the public versions of
9 them were more limited.
10          I agree with what Mr. Parry suggested, in
11 terms of the court setting out some general guidelines
12 and expectations, for example, in a final pretrial
13 conference, or even at an earlier conference, where the
14 parties could provide some examples of information, and
15 the Court could give guidance that would inform the
16 proceedings going forward in a very significant way.
17          I think that one of the things we've seen
18 here is that, during the discovery process, parties and
19 nonparties tend to over-designate confidential
20 information, but when it comes to trial, the specific
21 information that might be used at trial can often be
22 viewed in a public context.
23          For example, there are significant
24 aspects of the party divestiture agreement, that are
25 already in the public domain, whereas that divestiture

Page 31

1 agreement has been designated as highly confidential in
2 all filings with the Court.  So, I think that when
3 we're getting to presentations, for trial, we'll be
4 able to backtrack a bit, and the parties will be able
5 to backtrack on that significantly.
6          I have been involved in litigation where
7 the press has been involved.  Just last year, I was
8 involved in a case where the New York Times intervened
9 and sought broader disclosure.
10          I have two comments about that.  One is a
11 cautionary one.  The New York Times articles that they
12 published, as well as the published articles about the
13 case from the other press, put significant pressure on
14 the parties and the Court to open things up more than
15 the Judge was willing to do at the beginning of the
16 case.  I think he was respecting the defendants and
17 nonparties overbroad assertions of protections, and the
18 publication of those had an effect on the Judge.
19          Further, the parties -- the New York
20 Times intervention in the case also pushed parties and
21 nonparties to be more judicious in their designations
22 of confidentiality.  That's not to say that, even with
23 that intervention, that the Court still oftentimes
24 found that there was competitively sensitive
25 information, that either had to be reviewed in camera,

Page 32

1 or through a redaction that was presented in open
2 court.
3          The final issue that I would note, Your
4 Honor, is that your findings of fact and conclusions of
5 law, in this case, will necessarily have to also rely
6 on some of the confidential information that's here.
7 What the courts typically do with that is they will
8 issue their findings of fact and conclusions of law
9 only to the parties of the case, and, then, it's the
10 burden on the parties to come back to the court to
11 suggest redactions of that, for a publicly released
12 version, that can be provided at a later time.
13          JUDGE LUXEN:  I would be interested in
14 examples of that, you know, this is not a national
15 security court.  This is a state district court.  We
16 don't do things in secret.  So, I'm very curious about
17 that last point, Mr. Kaufman.
18          MR. KAUFMAN:  Yes, Your Honor.  I think
19 we could provide some examples of that, but it's not
20 uncommon for courts to issue orders where there is
21 specific competitive information that is just blacked
22 out, but the substance of the court's order is the
23 majority of the reasoning and the detailed facts
24 supporting the reasoning, are, for the most part, in
25 public view, but there are a few minor portions that

PX6680-008

## PREHEARING CONFERENCE - July 19, 2024

Page 33

1 get redacted.
2           JUDGE LUXEN:  Thank you.  Any comments on
3 those things, Mr. Perry?
4           MR. PERRY:  Thank you, Your Honor, and
5 very briefly.  As I said, I don't think we're in a
6 great disagreement here.  I would just note that, when
7 the state talks about the over-designation, there is a
8 dynamic here.  The state, as a regulator, tends to want
9 more information on the record, because they have got
10 no secrets to hide; and the companies tend to want more
11 kept secret, because they are trying to run a business.
12           And it's that dynamic that you have to
13 deal with down the road.  I am just previewing that,
14 right?  I'm also previewing, however, that generally
15 these things are handled by negotiation and agreement,
16 rather than presenting everything to you for dispute,
17 you know, there's that.
18           Mr. Kaufman is exactly right on many
19 things, but, especially on this issue, it is much less
20 problematic for documents, depositions, transcripts,
21 expert reports, other written materials.  The parties
22 can agree on redactions, and submit them in advance.
23 The Court can review that, at the hearing, with the
24 unredacted version.  If there's dispute about
25 redactions, this is easier to address either before or

Page 34

1 afterwards.
2           The issue, actually, is more difficult,
3 with witnesses, where we request closing the courtroom,
4 which I think was the Court's original question, right,
5 because I don't quite know what they are going to say.
6 That's why we try to break it up into modules.
7           The last thing I would note, on the
8 order, the Court does not operate in secret.  Nobody is
9 asking the Court to operate in secret.
10           The Court has many options.  The Court
11 could issue a ruling, the injunction is granted, the
12 injunction is denied, an opinion, so the public knows
13 what the answer is.  This could speed things up too.
14 And we're talking about a stipulation and issuing a
15 decision.
16           Some courts go through and do, you know,
17 make sure their decision is entirely based on public
18 information.  That's fine.  Some courts decide that
19 what's in their decision is, by definition, public
20 information.  That's, you know, a way that it is.
21           In cases where there's a significant
22 amount of confidential information, my experience is
23 the same as Mr. Kaufman's; the courts do often issue a
24 version for the parties, and hold it for a short period
25 of time, just to make sure that they didn't miss

Page 35

1 something, or there's not something in there that would
2 create a problem.
3           I'm sure we could discuss that, you know,
4 when it's ripe, or towards -- right now, it's a little
5 in advance, but we can certainly give you examples.
6 I'm sure both sides could find some, where Federal
7 courts, and in merger cases, and other antitrust cases,
8 have done that, because it's a fairly common thing, in
9 these kind of cases, not every case, to be clear, but
10 it is not uncommon, Your Honor.
11           JUDGE LUXEN:  Anything further for
12 Albertsons on these issues?
13           MS. MAINIGI:  No, Your Honor.
14           JUDGE LUXEN:  For C&S.
15           MS. HYNES:  No, Your Honor.
16           JUDGE LUXEN:  I've expressed my
17 skepticism, under Rule 42, about closing the courtroom.
18 I've heard parties thoughts on a way forward.
19           It sounds to me like what may make the
20 most sense is to allow you to continue to confer, and
21 when we come together, at our second or final
22 prehearing conference -- call it our, "second
23 prehearing," in case we need another one, after this,
24 that -- or after that one, that the parties propose
25 what they would like to do with respect to the

Page 36

1 courtroom closure, indicate to me what they believe the
2 standard I should apply to closing courtroom is, and,
3 then, we can proceed from there.
4           I'm amenable to the concept of a daily
5 update, or a daily presentation in the morning, before
6 we begin presentation of evidence, about when, during
7 the day, with which witness, et cetera, the parties
8 believe the courtroom could be closed, instead of doing
9 that all at once, in advance of beginning the hearing
10 on August 12th.  That seems reasonable to me and
11 ultimately may be a more efficient use of everybody's
12 time.
13           Any questions on or thoughts on those
14 comments, Mr. Perry?
15           MR. PERRY:  That sounds like a good path
16 forward to Kroger, Your Honor.
17           JUDGE LUXEN:  For Albertsons?
18           MS. MAINIGI:  Us as well, Your Honor.
19           JUDGE LUXEN:  C&S.
20           MS. HYNES:  Same, Your Honor.
21           JUDGE LUXEN:  For the state.
22           MR. KAUFMAN:  Your Honor, that sounds
23 like a good plan.  Thank you.
24           JUDGE LUXEN:  Thank you.  Well, we
25 started -- I think, Ms. Pfaffenroth, you were -- is

PREHEARING CONFERENCE - July 19, 2024

Page 37

1 that where we were? I don't remember now.
2            MR. BILLER: Your Honor, Arthur Biller
3 for Colorado. I think we were just going to run
4 through some of the issues. So that confidentiality
5 and closing the courtroom was the first one.
6            JUDGE LUXEN: Great.
7            MR. BILLER: So we can move onto the next
8 couple of items.
9       So, the other thing that the parties are
10 working on, as I think Mr. Perry previewed, is a joint
11 pretrial order. And this will largely address
12 logistical issues. And we would intend to submit that
13 before the next prehearing conference.
14       It will address issues like courtroom
15 technology, use of demonstratives, and including
16 exchanging demonstratives, between the parties,
17 sequestering fact witnesses. Obviously, closing the
18 courtroom, as we were just talking about, and how to
19 track time used during the course of the hearings,
20 between each side. And, potentially, some other
21 issues, like opening and closing statements. So,
22 that's sort of what we're working on and contemplating
23 for that.
24       And, happy to answer any questions, or,
25 if there's anything else that the Court thinks should

Page 38

1 be included.
2            JUDGE LUXEN: I want to talk about remote
3 witnesses. Do you anticipate calling any remote
4 witnesses under Rule 43?
5            MR. BILLER: I don't think so. That's
6 something that the parties haven't discussed at this
7 point. From our perspective, the witnesses would be
8 live, but that would be subject to other, whether, you
9 know, someone says that's not possible, for some reason
10 and, you know, and we'll have to look at whether it
11 meets the requirements of the rules.
12            JUDGE LUXEN: For Kroger, do you expect
13 to call any remote witnesses?
14            MR. PERRY: We are not currently
15 expecting that. As Mr. Biller said, we have not
16 suggested that or discussed that. I would propose that
17 we put that on the list, for the parties to discuss,
18 and include a section on it in the joint PTO. We still
19 have Covid, among other things, so it's probably worth
20 discussing reality.
21            JUDGE LUXEN: For Albertsons.
22            MS. MAINIGI: Agree, Your Honor.
23            JUDGE LUXEN: For C&S.
24            MS. HYNES: Agree, Your Honor.
25            JUDGE LUXEN: Rule 43(I) has a very

Page 39

1 specific procedure for permitting remote testimony,
2 including a three-day response period. What I would
3 like to do is provide some definition to that.
4            I am going to order that motions that are
5 not stipulated to, for remote testimony, under Rule
6 43(I), be filed no later than Friday, August 2nd,
7 responses due within three days of reply, and, then, I
8 will give parties just about a week, in case there's
9 some dispute about remote testimony, and who is allowed
10 to appear via Webex, more notice than not, to make
11 those travel arrangements.
12            If there's agreement about remote
13 testimony, I don't believe you need to file it, a Rule
14 43 motion. If everyone agrees, it's fine for a witness
15 to appear remotely. I don't need to see a motion.
16 It's only if there is disagreement about remote, travel
17 and due risk, or of the Rule 43 requirements.
18            Any other things you identified,
19 Mr. Biller, in the prehearing order? All sounds fine
20 to me. Do you expect any of the lawyers will be
21 conducting examination or presenting evidence to be
22 remote?
23            MR. BILLER: No, Your Honor. The lawyers
24 that would be conducting exams would all be live.
25            One of the things that we would like

Page 40

1 to -- the Court's guidance on is there will be lawyers
2 that will be observing remotely, and part of that would
3 involve sort of the mechanism for doing that, and
4 whether we would have Webex streaming of the
5 proceedings, and sort of how we set up cameras for
6 those, obviously. And we would have to kind of figure
7 out a way to do that, with respect to the public and,
8 also, with respect to the counsel.
9            And sometimes there are different feeds
10 or sort of the breakout rooms, that you can use within
11 video conferencing technology. Sometimes you might,
12 you know, turn certain cameras on and off. So, that's
13 something that I think the parties have to work through
14 as well, but if the Court has any direction, as we
15 discuss that, we would appreciate it.
16            JUDGE LUXEN: We have a technology
17 called, "Live Streaming," which is now been set up in
18 this courtroom. My plan, for the preliminary
19 injunction hearing/trial on the merits, is to ask that
20 the only people who are on Webex are people who are
21 attorneys, who are participating remotely, as in your
22 conducting some kind of examination, or you have some
23 other reason to address the Court and witnesses, who
24 potentially would be appearing remotely.
25            Everyone else, the general public,

PREHEARING CONFERENCE - July 19, 2024

Page 41

1 counsel, members of your team, would all watch the
2 proceeding through live stream, which is a separate
3 Website.  I think I included it in my amended case
4 management order.  We can certainly share that link,
5 again.
6             And, essentially, it is like watching
7 television.  It is noninteractive.  We have a Website,
8 run by the state of Colorado, that allows anyone to
9 watch the proceedings.  There would be two cameras that
10 the Court controls.  One would point at me, the other
11 one would be a broad or wide shot of counsel table, the
12 podium, and the witness who's testifying here in court.
13            It would, then, fall on the parties to
14 arrange a camera that would point at the person
15 conducting the examination.  So, you would,
16 essentially, need a laptop or iPad, or something that
17 has a camera feature, that could go on the podium, or
18 wherever it is you're conducting your examination from,
19 so the person who is -- so whoever might be watching
20 the live stream can see who it is that's talking.
21            The way your images and sound appear on
22 the live stream is through Webex.  Webex is the program
23 vehicle that allows the sound and the images to come
24 together on the live stream.  So, you would still use
25 the Webex technology.

Page 42

1            It would be -- the main difference is,
2 instead of what we're doing now, which I understand can
3 tax the bandwidth, when there are more people than we
4 have right now watching.  Further, it reduces the
5 opportunity for people, who are not parties, to somehow
6 unmute their microphones, or do some other thing on
7 camera, that's completely taken out of the equation.
8 Everybody would just be able to watch, like you would
9 your television at home.
10            So, that's kind of the logistics on the
11 broadcasting piece, the remote participation piece, at
12 this point in time.  Questions, comments on that, Mr.
13 Biller?
14            MR. BILLER:  That all makes sense, Your
15 Honor.  Thank you.  That's very helpful to know.
16            JUDGE LUXEN:  I believe Ms. French is
17 going to share that live stream link with you.  This is
18 being live streamed now, and, so, you are able to go
19 and look at it on the state live stream page.
20            My thought is that I will start each day
21 and say, if you are here to participate remotely, or
22 would like to watch and listen to the preliminary
23 injunction hearing, please go to the live stream
24 address and not here on Webex.
25            For Kroger, any thoughts or comments on

Page 43

1 that, the live stream issue?
2            MR. PERRY:  No comments on the live
3 stream issue.  Understood, Your Honor.  It does raise a
4 broader technology issue, that I think is on the list
5 to discuss with you, but just putting a placeholder for
6 that.
7            JUDGE LUXEN:  Great.  For Albertsons.
8            MS. MAINIGI:  No, Your Honor.  It all
9 makes sense.
10            JUDGE LUXEN:  For C&S.
11            MS. HYNES:  Nothing to add, Your Honor.
12            JUDGE LUXEN:  What else, Mr. Biller?
13            MR. BILLER:  So, in terms of the
14 technology, we would be looking to the Court to provide
15 a day, in advance of the hearing, where everybody could
16 come in and set up their technology.  So if we want to
17 try to do that now, that's something that we would
18 need.
19            JUDGE LUXEN:  If you would like to
20 confer -- we can do it a couple of different ways.
21 Everybody can bring their own technology team in.
22 Parties can confer and organize one team of people to
23 arrange all of the technology.
24            I think, at this point, most of you have
25 been in the courtroom and seen the limitation of what

Page 44

1 we have here.  You're able to coordinate that through
2 the division e-mail address, which should be --
3            (Discussion off the record between Judge
4 Luxen and Ms. French.)
5            JUDGE LUXEN:  So, that's the e-mail
6 address everybody has been using for other purposes.
7 You can just reach out to that e-mail address and
8 arrangements can be made.
9            MR. BILLER:  Understood, Your Honor.
10 Thank you.
11            JUDGE LUXEN:  What else, Mr. Biller?
12            MR. BILLER:  Does the Court have any
13 preferences in terms of technology that the parties
14 might be able to bring in?
15            JUDGE LUXEN:  Your short answer is, no.
16 The two monitors that I have, on my table, are just my
17 computers.  If you want me to have a screen, so I can
18 view electronic images, or evidence, or whatever it
19 might be, you're welcome to have one of those set up.
20            The TV that's in the courtroom will be
21 available to you.  In the 18 months I have been here,
22 people have done all kinds of things.  We have had
23 projectors, put images up on the wall, it really is
24 kind of up to you.  I don't have very strong
25 preferences.

PREHEARING CONFERENCE - July 19, 2024

Page 45

1    MR. BILLER:  Understood.  Thank you.
2    JUDGE LUXEN:  What else?
3    MR. BILLER:  So, then, I think one other
4 question, well, I guess, two other questions the
5 parties have.  One is, the Court's pretrial procedures
6 require an order of proof for trial.  Would the Court
7 like an order of proof for the preliminary injunction
8 hearing?
9    JUDGE LUXEN:  Yes, please.  I would also
10 appreciate good faith estimates of direct, cross, and
11 redirect.  Is there going to be separate examination by
12 each of the three defendants of witnesses?
13    MR. PERRY:  Your Honor, I will start,
14 unless Mr. Biller would like to take a stab at that
15 one.
16    I suspect we will, for most witnesses,
17 have a single counsel, or at least a primary counsel.
18 We are acutely conscious of the Court's time and its
19 need for efficient proceedings.  We have been
20 coordinating, among ourselves, of course, for
21 discovery, and so forth, in that way.
22    I don't want to say there won't be
23 multiple counsel for at least some witnesses, just
24 because of the nature of the issues.  I think it's safe
25 to say we're not going to try the Court's patience with

Page 46

1 three standalone examinations for each witness.
2    JUDGE LUXEN:  For Albertsons.
3    MS. MAINIGI:  Agreed, Your Honor.
4    JUDGE LUXEN:  For C&S.
5    MS. HYNES:  Agree, Your Honor.
6    JUDGE LUXEN:  If the order of proof
7 would -- if there's going to be multiple examinations,
8 by different defendant counsel, for a witness, just
9 break that out.  That would be helpful.
10    Mr. Biller.
11    MR. BILLER:  Um, I think the only other
12 question that we have -- and, then, there's one other
13 issue that I would like to turn to -- but is whether
14 the Court has a preference for length of time of
15 opening statements.
16    JUDGE LUXEN:  (Shaking head in the
17 negative.)  Do you have a suggestion?
18    MR. BILLER:  We haven't conferred on it
19 yet, although, I would think that something like 30
20 minutes, 40 minutes, and certainly no more than an hour
21 would be necessary.
22    JUDGE LUXEN:  For Kroger.
23    MR. PERRY:  Your Honor, we, certainly, we
24 have not conferred on it.  We would think an hour for
25 the parties.

Page 47

1    Now, here's a scenario where we do have
2 potentially divergent issues, so it may be a bit of an
3 imbalance.  I would suggest, on this one, as some of
4 the others, if we talk to the state, perhaps we're all
5 in agreement, if the Court doesn't have guidance for
6 us.  If we don't have agreement, we can come back to
7 you.  I'm not sure we do have disagreement, by the way.
8 We just haven't talked about it.
9    JUDGE LUXEN:  For Albertsons.
10    MS. MAINIGI:  Agree, Your Honor.  I think
11 we just need to discuss it, and I suspect we can come
12 up with an agreement.
13    JUDGE LUXEN:  For C&S.
14    MS. HYNES:  Agree, Your Honor.  We can
15 come up with an agreement.
16    JUDGE LUXEN:  I'll ask the parties to
17 confer, and, then, when we come back together, if
18 there's disagreement, we can talk about it further.
19    While we're on the subject, on when we
20 come back together, we had scheduled Friday, August 9th
21 at 9 a.m.  I would like to move that forward.
22    I know that I can't -- I can't remember
23 exactly.  What I remember, from when we set it on the
24 9th, was the parties had concerns that there would be
25 issues that came up at the last minute.  That's still,

Page 48

1 potentially, is fine.  As I said, I am not going to
2 physically be here at the end of that week.
3    And given what happened today, with
4 computers, et cetera, I would feel better if we had our
5 final prehearing conference on August 5th, in the
6 afternoon, just in case there are things that need to
7 be worked through, by the Court, by the parties, in
8 that week before the hearing.
9    How does the afternoon of Monday, August
10 5th look?  Who could to it at three o'clock?
11    MR. BILLER:  That should be fine for
12 Colorado, Your Honor.
13    JUDGE LUXEN:  For Kroger.
14    MR. PERRY:  Kroger will have at least one
15 of us there, Your Honor.
16    JUDGE LUXEN:  For Albertsons.
17    MS. MAINIGI:  That's fine, Your Honor.
18    JUDGE LUXEN:  C&S.
19    MS. HYNES:  Fine, Your Honor.
20    JUDGE LUXEN:  We'll move that final
21 prehearing conference to that Monday, August 5th, three
22 o'clock.  Parties are welcome to be here in person and
23 welcome to participate remotely, whichever you prefer.
24    What else do you have, Mr. Biller?
25    MR. BILLER:  So, the last thing on my

PX6680-012

## PREHEARING CONFERENCE - July 19, 2024

Page 49

1 agenda, Your Honor, is just an update that there's a
2 pending Motion to Compel before the Special Master; and
3 the parties have filed on the docket notices of the
4 briefs they have submitted to the Special Master; and
5 Judge Mix has set a hearing on that motion for Tuesday,
6 July 23rd.
7          And, depending on the Special Master's
8 ruling, there may be some issues that come out of that,
9 depending on the shape of that ruling. It's probably
10 premature to discuss all of the implications at this
11 point, but I wanted to just provide an update there,
12 and that there may be a need to re-open discovery.
13          And if the Court could take a look at
14 that schedule, in some aspects, depending on how Judge
15 Mix rules, so I just want to bring that to the Court's
16 attention.
17          JUDGE LUXEN: Thank you. For Kroger.
18          MR. PERRY: Thank you, Your Honor. On
19 the last point, I think that's why we have a Special
20 Master, so we'll get a ruling after the hearing next
21 week.
22          I did have a couple of clarifications,
23 with the Court's indulgence, on technology. During the
24 preliminary injunction hearing, would we be able to
25 leave monitors, and so forth, in the courtroom, or

Page 50

1 would we need to get them out for other proceedings?
2          JUDGE LUXEN: You are the only thing
3 going on here for those days. There are hearings that
4 will happen over lunch hour, and we will, potentially,
5 have to do things after 5 o'clock.
6          There won't be any reason you'll have to
7 take down all of your equipment. It's up to you, if
8 you want to leave materials in the courtroom. The
9 courtroom will be locked when I am not here, so you are
10 free to do that as well.
11          MR. PERRY: We appreciate that, Your
12 Honor. And the Court mentioned a monitor for the bench
13 for electronic exhibits. Does the Court prefer
14 electronic exhibits? Does the Court prefer a hard
15 copy? Both? We can do it either way. It's really
16 what the Court prefers.
17          JUDGE LUXEN: I would prefer a -- I would
18 prefer both. I guess -- here's the thing. I would --
19 how much are we going to be talking about? 400
20 exhibits, like my case management order discusses?
21 What are we talking about?
22          MR. PERRY: There are, you know, it will
23 not be hundreds a day. There are a significant number
24 of exhibits in the case. I think some are, you know,
25 there are -- there's data in the case. Numbers that

Page 51

1 need to be displayed, and in tables, and so forth.
2 There will be also charts and graphics that the
3 experts use in the usual way, to illustrate their
4 points.
5          So, you know, whatever the Court finds
6 useful, you know, we are happy to provide both. And,
7 if either one or the other works better, we can adjust,
8 shouldn't -- on the fly. It's a matter of how we get
9 to set up the computer.
10          JUDGE LUXEN: I would prefer paper, and I
11 would ask for an electronic version as well. I think
12 both are going to be helpful in doing the work that
13 needs to be done.
14          MR. PERRY: Very good.
15          JUDGE LUXEN: Thank you.
16          MR. PERRY: Judge, checking my notes, Mr.
17 Biller -- we discussed this in advance. I think we
18 pretty much covered everything. So, I believe that's
19 all for Kroger for today, Your Honor. Thank you very
20 much for your time.
21          JUDGE LUXEN: Thank you. For Albertsons.
22          MS. MAINIGI: Nothing further, Your
23 Honor.
24          JUDGE LUXEN: For C&S.
25          MS. HYNES: Nothing further, Your Honor.

Page 52

1          JUDGE LUXEN: We'll talk about the
2 proposed findings of fact and conclusions of law. When
3 the amended case management order talks about how I
4 would like transcripts cited, I would ask the parties
5 to refer to people. I am also going to ask the parties
6 to refer to people, in their proposed findings of fact
7 and conclusions of law, by their courtesy titles, and
8 their last name, Dr. This, Mr. This, Professor That,
9 however they are referred to in the courtroom. If you
10 would use those courtesy titles in your proposed
11 findings, that would be helpful to me as well.
12          I would like to take just a couple of
13 minutes to gather my thoughts here, and come back out.
14 Is that okay with you, with the parties?
15          MR. BILLER: Of course, Your Honor.
16          MR. PERRY: Of course, Your Honor.
17          JUDGE LUXEN: Thank you.
18          (Recess.)
19          JUDGE LUXEN: Back on the record in
20 24-CV-30459. Parties counsel are all present again.
21          Few things on reflection. Because of the
22 possibility of courtroom closure, and the uncertainty
23 of who all might be in our Webex courtroom, the best
24 way for the Court to control access to information that
25 might be presented, that the parties don't want

## PREHEARING CONFERENCE - July 19, 2024

Page 53

1 available to the public, is for any witness or evidence
2 noticed, and any lawyer who's asking questions about
3 that evidence, or asking questions about -- of that
4 witness, be physically here in the courtroom, which
5 means I can look in the back, see who is in the
6 gallery, parties can let me know if there's someone who
7 shouldn't be here, and then we can lock the door,
8 physically lock the door, so no one else can walk in.
9          When we are talking about -- and we turn
10 the live stream broadcast off, the video and audio off,
11 and we have a bunch of people, like we do today, in
12 Webex, it becomes a real difficult challenge to figure
13 out who should and shouldn't be here; and I just can't
14 control public access in the same way, or limit public
15 access in the same way as I could if everyone is
16 physically here in the courtroom.
17          Any questions or comments on that,
18 Mr. Biller?
19          MR. BILLER:  (Shaking head in the
20 negative.)  No questions from us, Your Honor.  We will
21 plan for our attorneys' examinations to all be
22 physically in the courtroom.
23          JUDGE LUXEN:  Ms. Pfaffenroth.
24          MS. PFAFFENROTH:  Same, Your Honor.
25          JUDGE LUXEN:  Ms. Mainigi.

Page 54

1          MS. MAINIGI:  No problem, Your Honor.
2          JUDGE LUXEN:  Ms. Hynes.
3          MS. HYNES:  Same, Your Honor.
4          JUDGE LUXEN:  And, then, one other thing
5 on the technology front, if you want monitors, in
6 addition to a potential monitor for me, so I can see
7 what material is being shown to a witness, you would
8 need a monitor for the witness stand.
9          Then, at counsel table, there are also no
10 monitors, so you would need monitors there, all that to
11 say, there's basically just the one 42-inch flat screen
12 TV, on a roller cart, with a HDMI cable, and the
13 microphones.  Those are the only pieces of technology
14 here in the courtroom.
15          Then, the final thing I have is just a
16 fair warning about our lunch options in downtown.  They
17 are much more limited than they were before Covid, and
18 if we take an hour for lunch, and you may consider
19 being thoughtful about your lunch time arrangements.
20          In the past, parties have had lunch
21 brought in.  There are a number of services that will
22 do that.  Walking from here to get lunch would mean
23 that you're on a very short deadline.  There just
24 aren't a lot of great options close to the courtroom,
25 so another consideration for you.

Page 55

1          You will be free to bring coffee, soda,
2 whatever else you might like to drink into the
3 courtroom.  If you need a bar, piece of fruit or
4 whatever, to keep going, while we're here in the
5 preliminary injunction period, together, you are free
6 to do that.  You don't need to ask permission or
7 anything.  You are not going to hurt my feelings.
8          Anything else we can talk about today,
9 Mr. Biller?
10          MR. BILLER:  Nothing else from Colorado,
11 Your Honor.  Thank you.
12          JUDGE LUXEN:  Thank you.  For Kroger.
13          MS. PFAFFENROTH:  Your Honor, just
14 following up on one point that Mr. Perry made for the
15 Court's consideration.  This goes back to our first
16 topic of consideration, but in context of the time.
17          The potential stipulation, with respect
18 to being able to take the preliminary injunction
19 hearing off the calendar, I believe, from our
20 perspective, an order by the November 8th date, with an
21 opinion to follow at a later date, would provide the
22 necessary certainty, and, again, answer, for
23 defendants, from Kroger's perspective.
24          I want to put that out there for the
25 Court's consideration, in terms of timing, in case that

Page 56

1 assisted with the Court's consideration of an earlier
2 date.
3          JUDGE LUXEN:  How does that work with a
4 potential appeal?
5          MS. PFAFFENROTH:  Well, Your Honor, this
6 is something that -- it came up with -- on the hearing
7 we would have.  So, we will discuss that with the
8 state, and we would be more than happy to do so.  But
9 we did want to put that out there, for the Court's
10 consideration, just given that, the timing interests
11 from the parties.  We would like to do anything we can
12 to facilitate clearing the Court's schedule in August.
13          JUDGE LUXEN:  Any thoughts on that point,
14 Mr. Biller?
15          MR. BILLER:  Apologies Your Honor.  I cut
16 out, I think, because of the global issues.  My
17 computer did an emergency patch.  So, I missed a fair
18 bit of what Ms. Pfaffenroth said.
19          MS. PFAFFENROTH:  I am happy to say it,
20 again.
21          JUDGE LUXEN:  Thank you.
22          MS. PFAFFENROTH:  So, Mr. Biller, I was
23 following up on the point that Mr. Perry had raised, in
24 the context of sometimes the delay with opinions and
25 redactions, that, in the context of defendant's

## CALDERWOOD-MACKELPRANG, INC.
## (303) 477-3500

## PREHEARING CONFERENCE - July 19, 2024

Page 57

1 discussion with the state, with respect to a
2 stipulation with respect to the preliminary
3 injunction -- this is from, I think, defendant's
4 perspective -- an order with an opinion to follow by
5 the November 8th date would be sufficient to provide
6 the parties with -- the defendants with the certainty
7 that we would be seeking there.  I won't speak,
8 obviously, on behalf of Albertsons and C&S, but that's
9 something that we wanted to raise, for the Court's
10 consideration, in the context of the November 8th date,
11 and the possibility of an order by November 8th, if not
12 an opinion.
13          MR. BILLER:  So, my reaction is, I've
14 seen courts do that, issue just a bottom line order
15 with opinion to follow.  But, I think that's 100%
16 within Your Honor's discretion.  And, as we said at the
17 beginning, the Court controls its calendar and the
18 docket.
19          So, if the Court wants to provide any
20 further guidance than it already has, parties are, I
21 think, happy to hear it.  But, otherwise we'll continue
22 to confer on this and see if we're able to work
23 something out, with the knowledge of the Court's view
24 of what it can do.
25          JUDGE LUXEN:  Ms.  Mainigi, for

Page 58

1 Albertsons.
2          MS. MAINIGI:  Your Honor, we join
3 Kroger's counsel in just noting, if that were a
4 possibility, for the Court, that could certainly help
5 with the stipulation with respect to the preliminary
6 injunction hearing.
7          JUDGE LUXEN:  Ms. Hynes for C&S.
8          MS. HYNES:  I want to join with Kroger
9 and Albertsons, with the proposal that could be very
10 helpful to facilitate a stipulation.
11          JUDGE LUXEN:  Just one moment.
12          (Pause.)
13          JUDGE LUXEN:  Apologies for the brief
14 delay.
15          Let's play that out, Ms. Pfaffenroth.
16 So, if I were to, on November 7, issue an order
17 granting the relief requested by the state, to Count 1,
18 and Kroger, Albertsons and C&S appeal that on November
19 8th, to the Court of Appeals, doesn't that order get --
20 doesn't my order get sent back to me immediately for
21 insufficient findings?  Then the Court of Appeals could
22 do whatever they might want to do, with the relief that
23 I've granted.
24          MS. PFAFFENROTH:  So, Your Honor,
25 understanding that, that does make sense, if one were

Page 59

1 to be appealing from an order that simply says grant or
2 deny.  However --
3          JUDGE LUXEN:  I assure you, my job would
4 be a lot easier if I could just stamp everything that
5 comes through here grant or deny, but I don't believe I
6 can do that.
7          MS. PFAFFENROTH:  Understood, Your Honor
8 I mean, I would suggest that, perhaps, the parties and
9 the state could discuss the timing and the appellate
10 issue, come back to Your Honor with respect to that
11 question.
12          I do think that, from the defendants'
13 perspective, from Kroger's perspective, everybody's
14 understanding, by the 8th, what the Court's ruling is
15 would be key.  But, I understand the considerations and
16 that is something that we could discuss further with
17 the state.
18          JUDGE LUXEN:  Then the option would be,
19 if I grant -- if I deny the relief requested by the
20 state, in Count 1, the Attorney General goes and
21 appeals, potentially, I think, we're in the same
22 position.  The Court of Appeals returns it to me for
23 insufficient finding.  The merger has gone through,
24 perhaps, although I suppose Mr. Biller, maybe to your
25 -- but it's not a preliminary injunction.  It's a trial

Page 60

1 on merits.
2          So, we're not talking about a temporary
3 restraining order or preliminary injunction.  We're
4 talking about a trial on the merits.  I would hear from
5 anyone who has thoughts on these prospective issues.
6          MS. MAINIGI:  I understand.  I think,
7 Your Honor, if Your Honor is open to us discussing this
8 further with the state, and that it remains a
9 possibility, I think we can have some of these
10 conversations, and, then, come back to Your Honor and
11 play out the various scenarios that are possible here,
12 including the appellate possibilities as well.
13          MR. BILLER:  I would just add, Your
14 Honor, that sometimes courts may stay the effect of
15 their ruling for a short period of time, to allow for
16 an emergency appeal.  And I don't know if this would be
17 helpful for the defendants, but sort of a bottom line
18 order, but without entering final judgment, is another
19 possibility.
20          I think we do have to kind of discuss
21 this amongst ourselves, and probably do a little bit of
22 research as well, but we're happy to do that over the
23 next several days and see if we can work something out.
24          JUDGE LUXEN:  Thank you.  For C&S,
25 Ms. Hynes.

## PREHEARING CONFERENCE - July 19, 2024

Page 61

1          MS. HYNES:  I agree.  I think the parties
2 need to discuss, both internally and together, off
3 line, and come back to you.
4          JUDGE LUXEN:  Any further thoughts,
5 Ms. Pfaffenroth?
6          MS. PFAFFENROTH:  No, Your Honor.  Thank
7 you.
8          JUDGE LUXEN:  Those are the additional
9 items that were on my list.  Is there any reason to set
10 a time next week, for us to come together?
11          MS. MAINIGI:  I think that might make
12 sense, Your Honor, so we have time, on the calendar, to
13 discuss the progress we have made with respect to the
14 stipulation, by then.
15          MR. BILLER:  I agree.
16          MS. PFAFFENROTH:  Agree, Your Honor.
17          MS. HYNES:  Agree, Your Honor.
18          JUDGE LUXEN:  How does Thursday, July
19 25th, at 3 o'clock, look?
20          MS. MAINIGI:  Your Honor, I think -- I am
21 wondering if we might be able to do it a day earlier,
22 perhaps.  I think some of us are going to be en route
23 to Oregon for a hearing before Judge Nelson.
24 Otherwise, we'll make it work, if that's the only time
25 you have, Your Honor.

Page 62

1          JUDGE LUXEN:  We have a jury trial in
2 here next week.  I can just -- hold on.
3          (Discussion off the record between Judge
4 Luxen and Ms. French.)
5          JUDGE LUXEN:  Would Tuesday, July 23rd,
6 at 5 p.m. work?
7          MS. MAINIGI:  That works for us, Your
8 Honor.
9          MS. PFAFFENROTH:  Yes, Your Honor.
10 That's fine for Kroger.
11          MS. HYNES:  And fine for C&S.
12          MR. BILLER:  Yes, Your Honor.  It works
13 for Colorado.
14          JUDGE LUXEN:  Five p.m. Mountain time, on
15 Tuesday, July 23rd, 2024, for further status
16 conference.  You're welcome to appear remotely.  The
17 courtroom will be open.  You are welcome to be here in
18 person.  Let me double-check one thing.
19          (Discussion off the record between Judge
20 Luxen and Ms. French.)
21          JUDGE LUXEN:  I'm not positive when the
22 doors lock to the Denver City and County building.
23 It's either 5 o'clock or 6 o'clock.  If you are coming
24 in in person, for the 5 o'clock hearing, I would ask
25 you to make plans accordingly, in case the building

Page 63

1 does lock at 5 o'clock.  Monday it stays open later for
2 city council, but I think the rest of the week, the
3 doors may lock at five.
4          So, just if you are going to be here in
5 person, don't plan on walking in at 5 o'clock.  What
6 else can we talk about today?
7          MR. BILLER:  Nothing else from the
8 Attorney General, Your Honor.  Thank you.
9          MS. PFAFFENROTH:  Nothing further from
10 Kroger.  Thank you.
11          MS. MAINIGI:  Nothing for Albertsons,
12 Your Honor.
13          MS. HYNES:  Nothing for C&S.
14          JUDGE LUXEN:  Thank you very much for
15 your time.  I appreciate it.  Have a nice afternoon.
16          (Whereupon these proceedings were
17 adjourned at 2:00 p.m. on July 19, 2024.)
18
19
20
21
22
23
24
25

Page 64

1                    CERTIFICATE
2 I, HARRIET S. WEISENTHAL, Registered Professional
3 Reporter, in and for the State of Colorado, do hereby
4 certify that I reported the foregoing proceedings, and
5 that later the same was reduced to typewritten form
6 under my direct supervision and control; I further
7 certify that the foregoing is a true and complete
8 transcription of my stenographic notes then and there
9 taken.
10 Dated July 21, 2024.
11          *Harriet S. Weisenthal*
12 _____
   HARRIET S. WEISENTHAL
13 Calderwood Mackelprang, Inc.
   501 S. Cherry Street, Suite 1100
14 Denver, CO 80246
   (303) 477-3500
15
16
17
18
19
20
21
22
23
24
25

## CALDERWOOD-MACKELPRANG, INC.
## (303) 477-3500

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 07/08/2024 OSCAR NO. 611143 -PAGE Page 1 of 21 * PUBLIC *

**PUBLIC**

# UNITED STATES OF AMERICA
# FEDERAL TRADE COMMISSION
# OFFICE OF ADMINISTRATIVE LAW JUDGES

| | |
|---|---|
| **In the Matter of** | |
| **The Kroger Company** | **Docket No. 9428** |
| **and** | |
| **Albertsons Companies, Inc.** | |

## RESPONDENTS' MOTION
## TO RECESS THE EVIDENTIARY PORTION
## OF THE PART 3 ADMINSITRATIVE HEARING

Kroger and Albertsons face an extraordinary and unprecedented litigation schedule in connection with their proposed merger. Three separate regulators have initiated four separate proceedings challenging the transaction, and there are five separate hearings currently scheduled in those cases over a 12-week period in different locations around the country. Some of these hearings are currently scheduled to overlap—including the Part 3 hearing (scheduled to begin on July 31); the preliminary injunction hearing in Colorado (scheduled to begin on August 12); and the FTC's federal court lawsuit seeking to enjoin the transaction (scheduled to begin on August 26).

Although the Part 3 proceeding must be formally gaveled in on July 31 under the Commission's May 29 Order, that same order recognized that this Court has discretion over the hearing schedule—including the authority to recess the evidentiary portion of the proceeding. Respondents respectfully request that the Court exercise its scheduling discretion to recess the evidentiary portion of the hearing after it commences on July 31 and resume the hearing once the hearings in the various parallel litigations are complete. This approach is efficient and will

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 07/08/2024 OSCAR NO. 611143 -PAGE Page 2 of 21 * PUBLIC *

**PUBLIC**

conserve the resources of the Court, third parties, and the parties, in part because the parallel proceedings will likely narrow and possibly eliminate the need for some or all of the Part 3 proceeding.  It also would avoid piecemeal, disjointed litigation that would hinder the Court's review of the evidence.

Even though the Commission recognized the Court's authority to manage its own docket, Complaint Counsel seeks to force Respondents to try multiple cases (with many of the same witnesses) at the same time in different tribunals located thousands of miles apart.  But this approach is unrealistic, unnecessary, and highly prejudicial to Respondents—and, on top of all that, it is inconsistent with Complaint Counsel's prior statement on the unfairness of litigating multiple proceedings simultaneously.  Complaint Counsel's insistence that the Part 3 proceeding go forward on its current schedule despite multiple overlapping proceedings should be rejected because it would prejudice Respondents.

The Court should grant Respondents' motion and recess the evidentiary portion of the Part 3 hearing until the trials in the parallel actions are complete.  Alternatively, the Court should structure the Part 3 hearing to promote efficiency and avoid unduly burdening third parties, the parties, and the Court, including by conducting a virtual hearing.  Complaint Counsel joins in the request for a virtual hearing but opposes the other requested relief.

## BACKGROUND

### I.    Kroger and Albertsons Face Five Partially Overlapping Trials

Below are the current trial dates in the five actions brought by three regulators in four jurisdictions challenging the proposed acquisition:

1. **Part 3 administrative proceeding (Washington, DC)**:  The hearing will be gaveled in by this Court on July 31.  Absent any recesses, the hearing could last until mid-September given the 210 hours of available trial time.

PX6681-002

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 07/08/2024 OSCAR NO. 611143 -PAGE Page 3 of 21 * PUBLIC *

**PUBLIC**

2.  **Colorado preliminary injunction proceeding (Denver, CO)**:  The hearing will begin in state court on August 12 and is scheduled to last until August 22.

3.  **FTC preliminary injunction hearing (Portland, OR)**:  The hearing will begin in federal court on August 26 and is scheduled to last until September 13.

4.  **Washington permanent injunction proceeding (Seattle, WA)**:  The hearing will begin in state court on September 16 and will likely last until early October.

5.  **Colorado permanent injunction proceeding (Denver, CO)**:  The hearing will begin in state court on September 30 and is scheduled to last until October 18.

The chart below depicts these trial dates and shows their overlap.



These overlapping trials involve virtually identical issues.[1]  Respondents expect many of the same witnesses to be called in the parallel cases.  For example, based on the current witness

---

[1] Complaint Counsel may attempt to distinguish the parallel cases, but the plaintiffs in the parallel cases agreed to coordinate fact depositions in the parallel cases.  The plaintiffs divided responsibilities for depositions, and Complaint Counsel had Washington and Colorado take the lead on certain depositions noticed in this action.  This level of coordination would have made no sense if the parallel cases were materially distinct.

PX6681-003

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 07/08/2024 OSCAR NO. 611143 -PAGE Page 4 of 21 * PUBLIC *

**PUBLIC**

lists in Colorado and Part 3, there are at least ***17 potentially overlapping witnesses*** (13 fact and 4 expert).

### II.        Complaint Counsel Refuse to Coordinate the Proceedings

Respondents moved to continue the Part 3 hearing, over Complaint Counsel's objection. The Commission denied that motion in a 3-2 decision, but it recognized that the Chief Administrative Law Judge could recess the hearing to account for the parallel proceedings. Commission May 29 Order at 2 ("The ALJ, in consultation with the parties, could avoid any overlap in the proceedings by recessing the administrative hearing during the pendency of the federal court hearing."). The dissent recognized that the "burden and inefficiency of running overlapping trials on opposite sides of the country will be substantial." *Id.*

Judge Chappell subsequently instructed the parties to confer on recessing the hearing. The parties did so but were unable to reach agreement. Respondents proposed the same relief they seek here. Complaint Counsel proposed a contingent counteroffer: "if Defendants will join the FTC's request to have full trial days from July 31 to August 9, the FTC would be willing to agree to a joint motion to adjourn the Part 3 proceedings during the Colorado and Oregon proceedings"; however, if Respondents did not agree, Complaint Counsel would "intend[] to oppose Defendants' motion to adjourn during the Colorado and Washington proceedings in full but will remain willing to coordinate scheduling around appearances in Colorado and Washington as well as consider specific requests for witnesses on Defendants' witness list to appear remotely." Ex. A. Respondents could not agree to this proposal.

Respondents also proposed submitting joint position statements on July 8, but Complaint Counsel rejected this proposal too. Ex. A.

PX6681-004

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 07/08/2024 OSCAR NO. 611143 -PAGE Page 5 of 21 * PUBLIC *

**PUBLIC**

## ARGUMENT

### I.    The Court Should Recess the Evidentiary Portion of the Part 3 Hearing

Given the unprecedented litigation schedule Respondents face, the Court should exercise its discretion to gavel in the Part 3 hearing on July 31 and then recess the evidentiary portion of the hearing (with our without opening statements, as the Court prefers) until the hearings in the other parallel cases have concluded.  This approach would promote efficiency and avoid undue burdens for numerous reasons.  First, recessing the evidentiary portion of the Part 3 hearing would avoid any overlap in proceedings.  Second, it would avoid having a disjointed Part 3 hearing with a gap of many weeks—which could hinder the Court's review of the evidence.  Finally, it could conserve the resources of non-parties, the parties, and this Court.  Many witnesses from the parties' Part 3 final witness lists will also be witnesses in the parallel proceedings; the parties could avoid burdening those witnesses with testifying twice (or more) by relying on their federal court trial transcripts in Part 3.  The FTC Rules specifically contemplate submitting trial transcripts as evidence in the Part 3 proceeding.  *See* 16 C.F.R. § 3.43(b) ("If otherwise meeting the standards for admissibility . . . prior testimony" in "other proceedings . . . shall be admissible").  Respondents are open to submitting trial transcripts from the federal court preliminary injunction proceeding as evidence in Part 3, rather than having party and non-party witnesses testify live, but this will only be possible if the Part 3 hearing follows the parallel actions.

Moreover, the current schedule is unduly prejudicial to Respondents—who, during the currently-scheduled Part 3 hearing, would simultaneously have to prepare for multiple upcoming trials.  Complaint Counsel suggests this would not prejudice Respondents because they "remain willing to coordinate scheduling around appearances in Colorado and Washington as well as consider specific requests for witnesses on Defendants' witness list to appear remotely."  Ex. A. But Complaint Counsel's generic offer does not meaningfully address the logistical and practical

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 07/08/2024 OSCAR NO. 611143 -PAGE Page 6 of 21 * PUBLIC *

PUBLIC

difficulties of multiple trials occurring at the same time.  For example, specific teams of lawyers (both outside counsel and in-house attorneys) are working with the same fact and expert witnesses across all of the proceedings.  Complaint Counsel's approach would require these attorneys to not only prepare for (and participate in) multiple hearings at the same time, but also travel back-and-forth across the country to appear before different courts.  This process would be unwieldly and extremely difficult to coordinate, and Complaint Counsel has made no real effort to do so.  And the Commission's decision to file the preliminary injunction action across the country in Oregon (rather than down the street from the Commission in D.C.) only adds to these logistical difficulties.

Complaint Counsel previously agreed that having multiple simultaneous hearings would be unfair and impractical.  As Complaint Counsel explained to the federal court in Oregon:  "I respectfully tender it will be quite a burden and indeed an unfair one to force the FTC to litigate simultaneously . . . .  You can only imagine the burden on the party witnesses, the defense witnesses, and even to third parties if again you're having simultaneous cross-country trials, where some will appear in Portland on a Monday and potentially in Washington, D.C. in the FTC courtroom on a Tuesday."  May 29 Dissenting Statement of Commissioner Melissa Holyoak, at 2 (quoting D. Or. Status Conf. Tr. at 21:25-22:8).  Yet the FTC is now seeking to impose this exact burden on Respondents.  The burden would also fall on third parties:  There are 20 third parties on the parties' Part 3 final witness lists (excluding duplicates and employees of the divestiture buyer C&S), and Respondents expect many of these third parties will also be witnesses in the parallel cases.  This underscores how coordinating simultaneous trials is unworkable and would substantially burden many third parties.

Nor would recessing the evidentiary portion of the Part 3 hearing prejudice Complaint Counsel.  The FTC argues the Part 3 proceeding is the "trial on the merits" and "should proceed

PX6681-006

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 07/08/2024 OSCAR NO. 611143 -PAGE Page 7 of 21 * PUBLIC *

**PUBLIC**

as quickly as possible to ensure an expeditious resolution of this case." Ex. A. But in the other parallel cases—including the FTC's own case in the District of Oregon—the plaintiffs seek to enjoin the transaction from closing before the contractual outside date. In contrast, any decision by the Commission (and ultimately a decision by a United States Court of Appeals) would occur well *after* the outside date to close the transaction.

Moreover, as this Court knows, the federal court preliminary injunction proceeding typically determines the fate of mergers challenged by the FTC. *See, e.g.*, 16 C.F.R. § 3.26(c) (authorizing Part 3 withdrawal after preliminary injunction denial); Maureen K. Ohlhausen, F.T.C., Remarks to U.S. Chamber of Commerce: A SMARTER Section 5, at 17 (Sept. 25, 2015), https://www.ftc.gov/system/files/documents/public_statements/804511/150925smartersection5.p ("the Commission has not pursued a Part III proceeding following a PI loss in federal court for twenty years"). That the preliminary injunction proceeding could narrow, or obviate the need for, the Part 3 hearing further demonstrates that granting this motion will not prejudice Complaint Counsel.

FTC Rule 3.41(b) expressly permits this Court to recess a Part 3 proceeding for "brief intervals of the sort normally involved in judicial proceedings." And in other judicial proceedings, the "scope of the district court's discretion to manage trials before it is and must be particularly broad." *United States v. Janati*, 374 F.3d 263, 273 (4th Cir. 2004). Here, the unprecedented overlapping proceedings only magnify the need for the Court to exercise its broad scheduling discretion to ensure the hearing proceeds as efficiently and effectively as possible.

Recessing the Part 3 hearing is particularly appropriate because the overlap in proceedings is due to regulators' actions (including regulators' own refusal to coordinate with one another), and not any action by Respondents. Similarly, Complaint Counsel is refusing to coordinate expert

PX6681-007

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 07/08/2024 OSCAR NO. 611143 -PAGE Page 8 of 21 * PUBLIC *

**PUBLIC**

depositions in the parallel actions—even though Respondents will have the same experts across the parallel proceedings—which means that Respondents' experts will likely be required to sit for depositions in the parallel proceedings in late July or early August, when the Part 3 proceeding is scheduled to occur.  This is yet another scheduling conflict, given that Respondents' experts would likely attend the Part 3 proceeding to listen to fact testimony, and it compounds the prejudice to Respondents of proceeding with Part 3 on the current schedule.  That Complaint Counsel's own conduct exacerbated Respondents' scheduling conflicts underscores why it is appropriate for this Court to exercise its discretion to recess the Part 3 hearing.

II.    **Alternatively, and at a Minimum, the Court Should Structure the Part 3 Hearing To Ensure Efficiency**

If the Court declines to recess the evidentiary portion of the Part 3 hearing in its entirety after gaveling in the proceeding on July 31, it can and should still structure the hearing in a manner that promotes efficiency and avoids unduly burdening the Court, third parties, and the parties.  The Court could achieve these goals in multiple ways, including through one or more of the proposals below.

- Holding opening statements on July 31 and scheduling oral argument on pending motions (e.g., motions in limine, sealing motions) thereafter, and then recessing the evidentiary portion of the hearing.

- Holding some trial days until August 6 (totaling one week), shortly before the start of the Colorado preliminary injunction proceeding, but tailoring those trial days so they are efficient and not unduly burdensome in one or more of the following ways:

  - Requiring the parties to present only third-party testimony by video deposition designation—to avoid unduly burdening party witnesses who will testify live in the parallel proceedings, and whose trial transcripts could be submitted to Judge Chappell under FTC Rule 3.43(b);

  - Requiring the parties to present only either (a) third-party testimony by video deposition designation or (b) testimony from Complaint Counsel's experts; or

PX6681-008

**PUBLIC**

o  Requiring the parties to present testimony only from fact witnesses and Complaint Counsel's expert witnesses who they do not intend to call in the parallel federal court proceeding (if any).

- Holding some trial days until August 6, but limiting the amount of trial time—e.g., conducting half days, or having non-consecutive trial days.

- At a minimum, recessing the hearing after August 6, until the parallel proceedings are complete.

- In all events, having all trial days be virtual given the overlapping parallel proceedings around the country and the associated travel burdens on fact witnesses and experts. Complaint Counsel join Respondents' request for a virtual hearing.

These proposals would enable the Court to hear some trial testimony before the other parallel

cases begin, but keep the trial days streamlined.

## CONCLUSION

The Court should grant Respondents' motion and recess the evidentiary portion of the Part

3 hearing until after the hearings in Colorado, Oregon, and Washington have concluded.[2]

July 8, 2024                                    Respectfully submitted,


                                                By:  /s/ *Matthew M. Wolf*
                                                     Matthew M. Wolf
                                                     Sonia K. Pfaffenroth
                                                     Arnold & Porter Kaye Scholer LLP
                                                     601 Massachusetts Avenue, N.W.
                                                     Washington, D.C. 20001
                                                     Telephone: 202 942 6831

                                                     Mark A. Perry
                                                     Luke Sullivan
                                                     Weil, Gotshal & Manges LLP
                                                     2001 M Street NW Suite 600
                                                     Washington, DC 20036

                                                     Luna Barrington
                                                     Weil, Gotshal & Manges LLP

---

[2] Complaint Counsel has agreed to file its response to this motion by Thursday, July 11.  *See* Ex. A.

9

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 07/08/2024 OSCAR NO. 611143 -PAGE Page 10 of 21 * PUBLIC *

**PUBLIC**

767 Fifth Avenue
New York, NY 10053
Telephone: 212 310 8421

*Counsel for Respondent The Kroger
Company*

*/s/ Enu A. Mainigi*
Enu A. Mainigi
Jonathan B. Pitt
A. Joshua Podoll
Williams & Connolly LLP
680 Maine Avenue SW
Washington, DC 20024
Telephone: 202.434.5000

Michael G. Cowie
Dechert LLP
1900 K Street, N.W.
Washington, D.C. 20006
Telephone: 202 261 3300
mike.cowie@dechert.com

Edward D. Hassi
Debevoise & Plimpton LLP
801 Pennsylvania Ave. N.W.
Washington D.C. 20004
Telephone: 202 383 8203
thassi@debevoise.com

*Counsel for Respondent Albertsons
Companies, Inc.*

PX6681-010

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 07/08/2024 OSCAR NO. 611143 -PAGE Page 11 of 21 * PUBLIC *

**PUBLIC**

## UNITED STATES OF AMERICA
## FEDERAL TRADE COMMISSION
## OFFICE OF ADMINISTRATIVE LAW JUDGES

**In the Matter of**

**The Kroger Company**

    **and**

**Albertsons Companies, Inc.**

Docket No. 9428

### [Proposed] Order Granting Respondents' Motion

Having considered Respondents' motion, the motion is hereby GRANTED.

ORDERED.

_____

Chief Administrative Law Judge Chappell

Date: _____, 2024.

11

PX6681-011

**PUBLIC**

### CERTIFICATE OF CONFERRAL

Respondents and Complaint Counsel conferred by telephone on July 3, 2024.  Counsel on the teleconference included Mark Perry, Luna Barrington, and Susan Musser, among others.  The parties also further conferred via email; that correspondence is attached as Exhibit A.

/s/ Luna Barrington
Luna Barrington
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10053

PX6681-012

**PUBLIC**

## CERTIFICATE OF SERVICE

I hereby certify that, on July 8, 2024, I caused the foregoing document to be electronically filed with the Secretary of the Commission using the Federal Trade Commission's e-filing system, causing the document to be served on all of the following registered participants:

| | |
|---|---|
| April J. Tabor | The Honorable D. Michael Chappell |
| Secretary of the Federal Trade Commission | Administrative Law Judge |
| FEDERAL TRADE COMMISSION | FEDERAL TRADE COMMISSION |
| 600 Pennsylvania Ave., NW, Rm. H-113 | 600 Pennsylvania Ave., NW, Rm. H-110 |
| Washington, D.C. 20580 | Washington, D.C. 205080 |
| ElectronicFilings@ftc.gov | OALJ@ftc.gov |

I also certify that I caused the foregoing document to be served via email to:

PX6681-013

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 07/08/2024 OSCAR NO. 611143 -PAGE Page 14 of 21 * PUBLIC *

**PUBLIC**

Charles Dickinson
Susan Musser
Emily Blackburn
Paul Frangie
Laura Hall
Janet Kim
Kenneth A. Libby
Eric Olson
Rohan Pai
Harris Rothman
Albert Teng
Elizabeth Arens
Jacob Hamburger
Joshua Smith
Katherine Bies
Katherine Drummonds
Lily Hough
Federal Trade Commission
600 Pennsylvania Avenue,
N.W.
Washington, D.C. 20580
Telephone: 202 326 2617
cdickinson@ftc.gov
smusser@ftc.gov

eblackburn@ftc.gov
pfrangie@ftc.gov
lhall1@ftc.gov
jkim3@ftc.gov
klibby@ftc.gov
eolson@ftc.gov
rpai@ftc.gov
hrothman@ftc.gov
ateng@ftc.gov
earens@ftc.gov
jhamburger1@ftc.gov
jsmith3@ftc.gov
kbies@ftc.gov
kdrummonds@ftc.gov
lhough@ftc.gov

*Complaint Counsel*

PX6681-014

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 07/08/2024 OSCAR NO. 611143 -PAGE Page 15 of 21 * PUBLIC *

**PUBLIC**

James A. Fishkin
Michael G. Cowie
Dechert LLP
1900 K Street, N.W.
Washington, D.C. 20006
Telephone: 202 261 3300
james.fishkin@dechert.com
mike.cowie@dechert.com

Edward D. Hassi
Debevoise & Plimpton LLP
801 Pennsylvania Ave.
N.W.
Washington D.C. 20004
Telephone: 202 383 8203
thassi@debevoise.com


Michael Schaper
Shannon Rose Selden
J. Robert Abraham
Natascha Born
Debevoise & Plimpton LLP
66 Hudson Boulevard
New York, NY 10001
Telephone: 212 909 6000
mschaper@debevoise.com
srselden@debevoise.com
jrabraham@debevoise.com
nborn@debevoise.com

*Counsel for Respondent
Albertsons Companies, Inc.*

Matthew M. Wolf
Michael B. Bernstein
Jason C. Ewart
Joshua M. Davis
Matthew M. Shultz
Yasmine Harik
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Telephone: 202 942 5000
matthew.wolf@arnoldporter.com
michael.b.bernstein@arnoldporter.com
jason.ewart@arnoldporter.com
joshua.davis@arnoldporter.com
matthew.shultz@arnoldporter.com
yasmine.harik@arnoldporter.com


John Holler
Arnold & Porter Kaye Scholer LLP
250 W. 55th St.
New York, NY 10019
Telephone: 212 836 7739
john.holler@arnoldporter.com

Mark A. Perry
Luke Sullivan
Weil, Gotshal & Manges LLP
2001 M Street NW Suite 600
Washington, DC 20036
Telephone: (202) 682-7000
mark.perry@weil.com
luke.sullivan@weil.com

*Counsel for Respondent The Kroger
Company*


By: /s/ *Luna Barrington*
     Luna Barrington
     Weil, Gotshal & Manges LLP
     767 Fifth Avenue
     New York, NY 10053
     Telephone: 212 310 8421

     *Counsel for Respondent The Kroger
     Company*

PX6681-015

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 07/08/2024 OSCAR NO. 611143 -PAGE Page 16 of 21 * PUBLIC *

**PUBLIC**

# EXHIBIT A

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 07/08/2024 OSCAR NO. 611143 -PAGE Page 17 of 21 * PUBLIC *

PUBLIC

| | |
|---|---|
| **From:** | Musser, Susan |
| **To:** | Sullivan, Luke; sonia.pfaffenroth@arnoldporter.com |
| **Cc:** | matthew.wolf@arnoldporter.com; michael.kientzle@arnoldporter.com; john.holler@arnoldporter.com; Perry, Mark; Barrington, Luna; Obaro, Bambo; emainigi@wc.com; apodoll@wc.com; mike.cowie@dechert.com; Hassi, Ted; Hall, Laura; Dickinson, Charles; Pai, Rohan; Callan, Nicole |
| **Subject:** | RE: Part 3 |
| **Date:** | Monday, July 8, 2024 4:24:06 PM |
| **Attachments:** | image002.png |

Counsel –

As we have consistently explained, we cannot agree to fully adjourn the administrative hearing – which effectively is what your first proposal suggests.  We likewise are disappointed in the substance of your alternative proposal seeking to limit both which witnesses Complaint Counsel can call in its case-in-chief as well as the form of their testimony (i.e., calling third parties by deposition designation only).  Respondents' proposal does not appear designed to lead to an efficient and fair administrative proceeding but rather will only serve to hamper the ability of Complaint Counsel to effectively put on its case in the administrative proceeding. As you are well aware, Complaint Counsel bears the burden of proof in the administrative hearing.  Respondents' proposal uses scheduling issues of its own creation to hamstring both how Complaint Counsel can present its case as well as the extent of the case it can present in the administrative hearing.  Moreover, Respondents' proposal also appears to envision the submission of additional evidence from proceedings which Complaint Counsel has limited-to-no access to.  Besides being procedurally improper under Rule 3.43(b), evidence from other proceedings is not a substitute for Complaint Counsel's ability to try its case in the administrative proceeding.

That being said, we are more than willing to work around true scheduling conflicts (days in which a particular witness has to appear in a separate proceeding or is unavailable for personal reasons) and will do our best to avoid calling Party witnesses in both the administrative and federal proceeding.  To that end, we request that you provide dates Party witnesses listed on Complaint Counsel's witness list are unavailable as soon as possible.  Separately, we can agree to join Respondents' request to the court for a virtual hearing.   As far as the briefing schedule goes, we are willing to agree to file our response this Thursday (July 11) if Respondents file today and will file our response Friday (July 12) if Respondents file tomorrow.

Best,

Susan

**From:** Sullivan, Luke <Luke.Sullivan@weil.com>
**Sent:** Monday, July 8, 2024 11:22 AM
**To:** Musser, Susan <smusser@ftc.gov>; sonia.pfaffenroth@arnoldporter.com
**Cc:** matthew.wolf@arnoldporter.com; michael.kientzle@arnoldporter.com; john.holler@arnoldporter.com; Perry, Mark <Mark.Perry@weil.com>; Barrington, Luna <Luna.Barrington@weil.com>; Obaro, Bambo <Bambo.Obaro@weil.com>; emainigi@wc.com; apodoll@wc.com; mike.cowie@dechert.com; Hassi, Ted <thassi@debevoise.com>; Hall, Laura

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 07/08/2024 OSCAR NO. 611143 -PAGE Page 18 of 21 * PUBLIC *

PUBLIC

<lhall1@ftc.gov>; Dickinson, Charles <cdickinson@ftc.gov>; Pai, Rohan <rpai@ftc.gov>; Callan, Nicole <ncallan@ftc.gov>
**Subject:** RE: Part 3

Counsel –

Thank you for your email.  Respondents are disappointed that Complaint Counsel has rejected Respondents' proposal to recess the evidentiary portion of the Part 3 hearing until the parallel proceedings are complete, which is the most efficient path forward and would preserve the resources of Judge Chappell and his staff, third parties, and the parties.  We are also disappointed that Complaint Counsel has declined to submit competing position statements to Judge Chappell on this issue, which would have accelerated the Court's consideration of this important and time-sensitive issue.

Respondents intend to file a motion today or tomorrow that requests that Judge Chappell recess the evidentiary portion of the hearing (with or without opening statements) until the parallel proceedings are complete.  Alternatively, if Judge Chappell declines to grant that relief, Respondents intend to ask Judge Chappell to structure the Part 3 hearing in a manner that promotes efficiency and avoids unduly burdening the Court, third parties, and the parties.  Respondents intend to propose multiple ways Judge Chappell could structure the hearing to achieve these goals, including the ones listed below.

- Holding opening statements and oral argument on pending motions on or after July 31 (e.g., motions in limine, sealing motions) and then recessing the evidentiary portion of the hearing.

- Holding some trial days until August 6, shortly before the start of the Colorado preliminary injunction proceeding, but tailoring those trial days so they are efficient and not unduly burdensome in one or more of the following ways:

  - Requiring the parties to present only third-party testimony by video deposition designation—to avoid unduly burdening party witnesses who will testify live in the parallel proceedings, and whose trial transcripts could be submitted to Judge Chappell under FTC Rule 3.43(b);

  - Requiring the parties to present only either (a) third-party testimony by video deposition designation or (b) expert testimony from Complaint Counsel's experts; or

  - Requiring the parties to present testimony only from fact witnesses and Complaint Counsel's expert witnesses who they do not intend to call in the parallel federal court proceeding (if any).

- Holding some trial days until August 6, shortly before the start of the Colorado preliminary injunction proceeding, but limiting the amount of trial time—e.g., conducting half days, or having non-consecutive trial days—given the parties' preparation for the other parallel proceedings and corresponding trial schedules.

- At a minimum, recessing the hearing after August 6, close to when the Colorado preliminary injunction proceeding begins (similar to the FTC's counter-proposal to

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 07/08/2024 OSCAR NO. 611143 -PAGE Page 19 of 21 * PUBLIC *

PUBLIC

Respondents), until the parallel proceedings are complete.

- In all events, having all trial days be virtual given the overlapping parallel proceedings around the country and the associated travel burdens on fact witnesses and experts (who may be sitting for depositions in parallel actions while the Part 3 hearing is scheduled to occur).

Please let us know by 5:00 PM today whether Complaint Counsel would consent to any of these alternative proposals.

Respondents also intend to request that Judge Chappell order Complaint Counsel to submit an expedited opposition. If Respondents file the motion today, we will request a response by Wednesday, July 10. If Respondents file the motion tomorrow, we will request a response by Thursday, July 11. This expedited schedule is necessary given the need for third parties, the parties, and Judge Chappell to have certainty on the upcoming schedule. Please let us know if Complaint Counsel will consent to these expedited response times.

Finally, as the message above indicates, Respondents cannot accept the FTC's proposal of having "full trial days from July 31 to August 9" and then recessing "the Part 3 proceedings during the Colorado and Oregon proceedings," but not the other parallel proceedings.

Best,
Luke

**Weil**

**Luke Sullivan**

Weil, Gotshal & Manges LLP
2001 M Street NW, Suite 600
Washington, DC 20036
Luke.Sullivan@weil.com
+1 202 682 7006 Direct
+1 202 857 0940 Fax

---

**From:** Musser, Susan <smusser@ftc.gov>
**Sent:** Friday, July 5, 2024 1:35 PM
**To:** sonia.pfaffenroth@arnoldporter.com
**Cc:** matthew.wolf@arnoldporter.com; michael.kientzle@arnoldporter.com; john.holler@arnoldporter.com; Perry, Mark <Mark.Perry@weil.com>; Barrington, Luna <Luna.Barrington@weil.com>; Obaro, Bambo <Bambo.Obaro@weil.com>; Sullivan, Luke <Luke.Sullivan@weil.com>; emainigi@wc.com; apodoll@wc.com; mike.cowie@dechert.com; Hassi, Ted <thassi@debevoise.com>; Hall, Laura <lhall1@ftc.gov>; Dickinson, Charles <cdickinson@ftc.gov>; Pai, Rohan <rpai@ftc.gov>; Callan, Nicole <ncallan@ftc.gov>
**Subject:** RE: Part 3

PX6681-019

FEDERAL TRADE COMMISSION | OFFICE OF THE SECRETARY | FILED 07/08/2024 OSCAR NO. 611143 -PAGE Page 20 of 21 * PUBLIC *

PUBLIC

Counsel --

We write to follow up on our meet and confer from July 3. As we have stated both before Judge Nelson as well as in our opposition to your motion to stay the Part 3 proceeding, the FTC's position remains that as the trial on the merits, the Part 3 hearing should proceed as quickly as possible to ensure an expeditious resolution of this case. That being said, if Defendants will join the FTC's request to have full trial days from July 31 to August 9, the FTC would be willing to agree to a joint motion to adjourn the Part 3 proceedings during the Colorado and Oregon proceedings. If the Parties do not agree with this proposal, the FTC intends to oppose Defendants' motion to adjourn during the Colorado and Washington proceedings in full but will remain willing to coordinate scheduling around appearances in Colorado and Washington as well as consider specific requests for witnesses on Defendants' witness list to appear remotely. We note that Judge Chappell specifically requested the filing of a motion, and therefore believe that, if we do not have agreement on a joint motion, the proper procedure would be for Respondents to file their motion to adjourn and for Complaint Counsel to file its opposition in due course.

Best,

Susan

---

**From:** Pfaffenroth, Sonia Kuester <Sonia.Pfaffenroth@arnoldporter.com>
**Sent:** Monday, July 1, 2024 5:35 PM
**To:** Musser, Susan <smusser@ftc.gov>
**Cc:** Wolf, Matthew M. <Matthew.Wolf@arnoldporter.com>; Kientzle, Michael <Michael.Kientzle@arnoldporter.com>; Holler, John <John.Holler@arnoldporter.com>; Perry, Mark <Mark.Perry@weil.com>; Luna.Barrington@weil.com; Bambo.Obaro@weil.com; Luke.Sullivan@weil.com; emainigi@wc.com; apodoll@wc.com; mike.cowie@dechert.com; Hassi, Ted <thassi@debevoise.com>
**Subject:** Part 3

Susan,

I'm following up on our discussion of the Part 3 hearing.

Respondents plan to serve their Part 3 final witness list on the morning of July 3. Judge Chappell instructed the parties to confer on recessing the hearing after that. Given the time sensitivity of the issue, we propose that the parties meet and confer in the afternoon on July 3 and, if necessary, on July 5 as well. The parties can then plan to submit briefing on this issue on July 8. If we are unable to reach agreement and submit a joint proposal, we believe that filing joint position statements on July 8 is the most efficient path forward. This process will ensure that the parties have sufficient time to confer on this issue and also can promptly receive guidance from Judge Chappell if necessary.

Please let us know what times the FTC is available on the afternoon of July 3 for a meet and confer. We can send an invitation once we are aligned on a time.

Additionally, to make the discussion more productive on July 3, we're sharing Respondents'

PUBLIC

current position on the Part 3 hearing.  In light of the Commission denying Respondents' motion for a continuance, we understand that Judge Chappell will gavel in the hearing on July 31.  After that, Judge Chappell has discretion over the trial scheduling.  Our position is that, once Judge Chappell has gaveled in the hearing, the most efficient path forward is for Judge Chappell to recess the evidentiary portion of the hearing (with or without opening statements, as the Court prefers) until the other parallel proceedings are complete.

This approach would avoid any overlap in proceedings (which involve many of the same witnesses).  It also would avoid having a disjointed Part 3 hearing with breaks for other parallel actions, which could hinder the Court's review of the evidence.  Finally, recessing the hearing could conserve the resources of non-parties, the parties, and Judge Chappell and his staff.  Many party and non-party witnesses from the FTC's final witness list will likely also be witnesses in the parallel proceedings; as a result, the parties could avoid burdening those non-party and party witnesses with testifying twice (or more) by relying on their other trial transcripts in Part 3, rather than having the witnesses testify live multiple times.  This counsels in favor of recessing the evidentiary Part 3 hearing after Judge Chappell has gaveled it in.

Best,
Sonia

_____

Sonia Pfaffenroth

Partner | Bio

## Arnold&Porter

601 Massachusetts Ave., NW
Washington, DC 20001-3743
T: +1 202.942.6831
Sonia.Pfaffenroth@arnoldporter.com
www.arnoldporter.com | LinkedIn

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

For more information about Arnold & Porter, click here:
http://www.arnoldporter.com

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.