Susan A. Musser, DC Bar # 1531486
Charles Dickinson, DC Bar # 997153
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel: (202) 326-2122
Tel: (202) 326-2617
*smusser@ftc.gov; cdickinson@ftc.gov*

Attorneys for Plaintiff Federal Trade Commission

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br>STATE OF ARIZONA,<br>STATE OF CALIFORNIA,<br>DISTRICT OF COLUMBIA,<br>STATE OF ILLINOIS,<br>STATE OF MARYLAND,<br>STATE OF NEVADA,<br>STATE OF NEW MEXICO,<br>STATE OF OREGON, and<br>STATE OF WYOMING,<br><br>Plaintiffs,<br><br>v.<br><br>THE KROGER COMPANY and<br>ALBERTSONS COMPANIES, INC.,<br><br>Defendants. | Case No.: 3:24-cv-00347-AN<br><br>**PLAINTIFFS' MEMORANUDM OF<br>LAW IN SUPPORT OF PLAINTIFFS'<br>PRELIMINARY INJUNCTION<br>MOTION**<br><br>**REDACTED VERSION** |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 3

ANALYSIS ...................................................................................................................... 6

I.   THE FTC IS LIKELY TO SUCCEED ON THE MERITS ................................... 7

   A.  The Acquisition Is Unlawful Because It Will Eliminate Substantial Head-To-Head Competition ...................................................................................................... 8

     i.  Kroger and Albertsons Constrain Each Other's Prices ................................... 9

     ii.  Kroger and Albertsons Compete Closely on Non-price Factors Like Product Quality and Assortment, Better Service, and Convenience ..................................... 14

     iii.  Expert Economic Analysis Confirms that Kroger and Albertsons Are Close Competitors and that the Acquisition Would Eliminate this Substantial Competition ............................................................................................... 16

     iv.  Competition Between Kroger and Albertsons Drives Better Wages and Benefits for Union Grocery Workers ................................................................................. 17

   B.  The Acquisition Is Presumptively Unlawful In Multiple Highly-Concentrated Markets ...................................................................................................... 21

     i.  The Acquisition Increases Concentration in Local Areas Near Supermarkets Across the Country ................................................................................................. 22

       a)  Supermarkets are a relevant product market ......................................... 22

       b)  Local areas around Defendants' stores are relevant geographic markets ............ 28

       c)  Economic analysis confirms that supermarkets in local areas are antitrust markets ............................................................................................... 30

       d)  The Acquisition is Presumptively Unlawful Because It Increases Concentration in the Relevant Supermarket Local Areas ................................................. 31

     ii.  This Acquisition Increases Concentration in the Market for Union Grocery Labor in Collective Bargaining Agreement Areas ................................................... 33

       a)  Union grocery labor is a relevant antitrust market ................................ 33

       b)  CBA areas are relevant geographic markets ......................................... 35

       c)  This acquisition is presumptively unlawful because it significantly increases concentration for union grocery labor in many CBA areas ................................. 36

   C.  The Proposed Divestiture Will Not Prevent a Substantial Lessening Of Competition .. 37

     i.  The Divestiture Fails to Mitigate a Substantial Lessening of Competition for Retail Supermarkets ................................................................................................. 37

       a)  The divestiture leaves hundreds of local markets unremedied ..................... 38

       b)  C&S lacks the experience to operate the divested stores ........................... 39

  c) C&S cannot match the divested assets' current performance..............................40

  d) C&S's low purchase price disincentivizes competition........................................42

 ii. The Divestiture Fails to Mitigate a Substantial Lessening of Competition in the Labor Market .................................................................................................................42

 iii. The Divestiture Will Not Be Timely ........................................................................43

  a) The divestiture is uncertain to occur as planned......................................................44

  b) Entanglements will undermine C&S's ability to compete.......................................45

  c) Kroger can undercut C&S for at least four years....................................................46

 D. Entry or Expansion Is Unlikely To Be Timely or Sufficient To Preserve Competition 46

 E. Defendants Do Not Show Efficiencies Outweigh Likely Competitive Harm ...............47

II. THE EQUITIES HEAVILY FAVOR A PRELIMINARY INJUNCTION ....................49

CONCLUSION....................................................................................................................50

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Bon-Ton Stores, Inc. v. May Dep't Stores Co.*, 881 F. Supp. 860 (W.D.N.Y. 1994) ............. 25, 26

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ........................................ *passim*

*California v. Am. Stores Co.*, 697 F. Supp. 1125 (C.D. Cal. 1988) ................................ 24

*California v. Am. Stores Co.*, 872 F.2d 837 (9th Cir. 1989) .................................... 25, 28

*Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410 (5th Cir. 2008) ................................ 7, 31

*Colorado v. Kroger Co.*, No. 2024-CV-30459 (Colo. Dist. Ct. July 19, 2024) .......................... 50

*FTC v. Advocate Health Care Network*, 841 F.3d 460 (7th Cir. 2016) ...................................... 30

*FTC v. Affordable Media*, 179 F.3d 1228 (9th Cir. 1999) .......................................... 6, 7

*FTC v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26 (D.D.C. 2009) ...................................... 45

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) ........................................ *passim*

*FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160 (3d Cir. 2022) ...................................... 7

*FTC v. IQVIA Holdings Inc.*, No. 23-cv-06188, 2024 WL 81232

  (S.D.N.Y. Jan. 8, 2024) ........................................................... 9, 14, 31, 32

*FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327 (3d Cir. 2016) ..................................... 8, 50

*FTC v. Staples, Inc.,* 970 F. Supp. 1066 (D.D.C. 1997) ..................................... 23, 24, 26

*FTC v. Staples, Inc.*, 190 F. Supp. 3d 100 (D.D.C. 2016) .......................................... 22

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015) .......................................... *passim*

*FTC v. Tronox, Ltd.*, 332 F. Supp. 3d 187 (D.D.C. 2018) .......................................... 33

*FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156 (9th Cir. 1984) .......................................... *passim*

*FTC v. Whole Foods Mkt., Inc.* 548 F.3d 1028 (D.C. Cir. 2008) ....................................... 7, 22, 49

*FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27 (D.D.C. 2018) ................... 47, 48, 49

*Illumina, Inc. v. FTC*, 88 F.4th 1036 (5th Cir. 2023) .................................................... 37

*In re Otto Bock HealthCare N. Am., Inc.*, 2019 WL 5957363 (F.T.C. Nov. 1, 2019) .................. 7

*Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409 (7th Cir. 1989) ...................... 28

*Pargas, Inc. v. Empire Gas Corp.*, 423 F. Supp. 199 (D. Md. 1976) .......................................... 38

*Pargas, Inc. v. Empire Gas Corp.*, 546 F.2d 25 (4th Cir. 1976) ................................................ 38

*RSR Corp. v. FTC*, 602 F.2d 1317 (9th Cir. 1979) ................................................................ 32, 48

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775

   (9th Cir. 2015) ..................................................................................................... *passim*

*Smith v. United States*, 568 U.S. 106 (2013) .............................................................. 47

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) ...................................................... 35

*Tops Mkt. v. Quality Mkts.*, 142 F.3d 90 (2d Cir. 1998) ............................................... 28

*United States v. Aetna, Inc.*, 240 F. Supp. 3d 1 (D.D.C. 2017) .............................. 42, 46, 47, 48

*United States v. Anthem*, 236 F. Supp. 3d 171 (D.D.C. 2017) .............................. 22, 32

*United States v. Anthem*, 855 F.3d at 368 (D.C. Cir. 2017) ........................................... 38

*United States v. Bazaarvoice, Inc.*, No. 13-cv-00133, 2014 WL 203966

   (N.D. Cal. Jan. 8, 2014) ....................................................................................... 47

*United States v. First Nat'l Bank & Tr. Co. of Lexington*, 376 U.S. 665 (1964) ........................... 9

*United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) ...................................... 47

*United States v. Marine Bancorp., Inc.*, 418 U.S. 602 (1974) .................................................... 7

*United States v. Mfrs. Hanover Trust Co.*, 240 F. Supp. 867 (S.D.N.Y. 1965) ...................... 8, 21

*United States v. Philadelphia Nat'l Bank*, 374 U.S. 321 (1963) .......................................... *passim*

**Statutes**

15 U.S.C. § 1 .................................................................................................................... 8

15 U.S.C. § 18 ................................................................................................ *passim*

15 U.S.C. § 26 ................................................................................................ 6

15 U.S.C. § 45 ................................................................................ 6, 8, 22, 49

15 U.S.C. 53(b) ............................................................................................... 6

16 C.F.R. § 3.41(b) ......................................................................................... 2

**Other Authorities**

U.S. Dep't of Justice & Fed. Trade Com'n, *Horizontal Merger Guidelines* (2010) .................... 32

U.S. Dep't of Justice & Fed. Trade Com'n, *Merger Guidelines* (2023) ............................... *passim*

**INTRODUCTION**

Supermarkets are a central pillar of American communities.  Every day, millions of people across the country depend on supermarkets to provide fresh, healthy, and affordable groceries.  In recent years, grocery prices have skyrocketed, making it harder for Americans to afford the food on their tables.[1]  Against this backdrop, The Kroger Company ("Kroger")—the largest traditional supermarket chain in the country—seeks to acquire one of its top competitors, Albertsons Companies, Inc. ("Albertsons").  If allowed to proceed, the acquisition would eliminate fierce competition between these two grocery giants that has benefited shoppers and workers.  As one Albertsons executive explained shortly after the deal's announcement, "███████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████"[2]  Albertsons' COO similarly emailed the company's division leaders that "█████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ████████████"[3]  The loss of competition between these two head-to-head rivals risks raising prices and lowering quality for millions of shoppers who turn to Kroger and Albertsons for their household needs.

The acquisition also threatens the wages and benefits of hundreds of thousands of workers.  Today, Kroger and Albertsons are two of the largest union employers in the country. The unions have a long history of leveraging Defendants against each other to obtain higher wages and better benefits for workers.  Unions will lose that leverage if Defendants merge.  As a

---

[1] Abha Bhattarai & Jeff Stein, *Inflation Has Fallen. Why Are Groceries Still So Expensive?*, WASHINGTON POST (Feb. 2, 2024), *available at* https://www.washingtonpost.com/business/2024/02/02/grocery-price-inflation-biden/.
[2] PX2505 (Albertsons) at 001.
[3] PX2616 (Albertsons) at 001.

combined company, Defendants will likely enjoy greater leverage to successfully negotiate smaller wage increases, reduced benefits, or degraded working conditions.  Given this risk, it is no surprise that many local unions have objected to the acquisition.

Defendants concede that ███████████████████. In a filing before the Administrative Law Judge, Defendants agreed that █████████████████████ ███████████████████████████████████████████████████████ ████████████████████."[4]  Nonetheless, Defendants allege that the loss of competition would be alleviated because their lawyers hand-picked a list of stores that they now propose to divest to C&S Wholesale Grocers, LLC ("C&S").  Defendants' crafted-for-litigation divestiture leaves hundreds of markets throughout the country unremedied.  Even in the markets where C&S will acquire stores, the divestiture assumes that C&S—a wholesaler that has repeatedly failed at running supermarkets—will be able to effectively run a cobbled-together set of assets.  It also leaves C&S ██████████████████, depriving shoppers of the benefits of Defendants' fierce competition today.[5]  In light of Defendants' concession that their mega-deal ███████ ████████████, American shoppers and workers should not bear the risk that this made-for-litigation divestiture will fail to prevent that loss of competition.

For these reasons, the Federal Trade Commission unanimously voted to start an administrative proceeding to determine whether the acquisition violates the antitrust laws.  At the upcoming hearing in this administrative proceeding, the parties will have up to 210 hours to present evidence on whether this acquisition *may* substantially lessen competition in violation of Section 7 of the Clayton Act.  16 C.F.R. § 3.41(b).  The issue before this Court is the

---

[4] Albertsons' May 17, 2024 Opp. to Complaint Counsel's Mot. to Compel at 6, ECF No. 152-1.
[5] PX4030 (Winn (C&S) IH 136:18-137:8).

Commission's and the Plaintiff States' (collectively, "Plaintiffs") request to preliminarily enjoin Defendants from closing their deal pending resolution of a trial on the merits.  To meet their burden, Plaintiffs must raise "serious and substantial questions" going to the merits to make them "fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals."  *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1162 (9th Cir. 1984).  Here, Plaintiffs show that, by eliminating head-to-head competition and by increasing concentration in thousands of markets across the country, the acquisition has a reasonable probability of substantially lessening competition.  Because Plaintiffs will easily raise "serious and substantial questions" that the acquisition may substantially lessen competition in violation of the Clayton Act, Plaintiffs respectfully ask this Court to preliminarily enjoin consummation of the acquisition.

## BACKGROUND

In fall 2022, Kroger agreed to acquire Albertsons for $25 billion.[6]  Together, these two supermarket chains operate approximately 5,000 stores under roughly 40 retail banners,[7] 4,000 pharmacies, 2,000 fuel centers, 66 distribution centers, and 52 manufacturing plants.[8]  If the acquisition is consummated, it would be by far the largest supermarket merger in U.S. history: the combined company would operate across 48 states and the District of Columbia, control $190 billion of annual commerce,[9] and employ 710,000 workers.[10]

Founded in 1883, Kroger (and the roughly 20 chains it owns) is the largest traditional

---

[6] PX6084 (Kroger) at 002.
[7] Appendix A sets forth Kroger's and Albertsons' respective banners.
[8] PX6084 (Kroger) at 002.
[9] PX7004 (Hill Rpt.) 009-010, Figs. 1 and 2; MASS MARKET RETAILERS, *Kroger and Albertsons Cos. Announce Merger Deal* (Oct. 14, 2022), *available at* https://massmarketretailers.com/kroger-and-albertsons-announce-merger-deal/.
[10] PX7004 (Hill Rpt.) ¶ 248; PX6084 (Kroger) at 002.

supermarket corporation in the country as well as the single largest employer of union grocery workers.[11]  When it agreed to acquire Albertsons, Kroger owned approximately 2,700 supermarkets (2,250 with pharmacies and 1,600 with fuel centers).[12]  That year, Kroger had an operating profit of $4.1 billion.[13]  Kroger's massive scale is the product of over four decades of continuous expansion and consolidation of supermarket chains across the country.[14]  As a result, Kroger's supermarkets operate under approximately 20 local trade names, or banners, across 35 states and the District of Columbia.[15]

Founded in 1939, Albertsons is—behind Kroger—the second-largest traditional supermarket corporation and the second-largest employer of union grocery workers in the United States.[16]  Like Kroger, Albertsons has grown by a series of acquisitions, and now operates 2,269 supermarkets across 34 states and the District of Columbia under approximately 20 banners. Albertsons also operates 1,725 pharmacies, 402 adjacent fuel centers, 22 distribution centers, 19 manufacturing facilities, and various digital platforms.[17]  In fiscal year 2023, Albertsons generated almost $1.3 billion in net income.[18]  Albertsons has been so profitable that, since its initial public offering in 2020, Albertsons' total cumulative stockholder return has exceeded the S&P 500 and S&P 500 Retail Composite.[19]  Shortly after announcing the acquisition, Albertsons

---

[11] PX4015 (McPherson (Kroger) IH 114:8-11); PX4059 (Sankaran (Albertsons) Dep. 109:14-16); PX6009 (Kroger) at 113.
[12] PX6009 (Kroger) at 113.
[13] PX6009 (Kroger) at 133.
[14] PX6030 (Kroger) at 007.
[15] Answer (Kroger) ¶ 27, ECF No. 90 (Apr. 29, 2024).
[16] PX4059 (Sankaran (Albertsons) Dep. 108:16-21); PX7004 (Hill Rpt.) ¶ 247; PX2315 (Albertsons) at 011.
[17] PX6153 (Albertsons) at 008.
[18] PX6153 (Albertsons) at 039.
[19] PX6153 (Albertsons) at 035.

also announced a $4 billion dividend.[20]  Albertsons employs 285,000 employees, approximately

200,000 of whom are covered by collective bargaining agreements with unions.[21]

In an attempt to stave off antitrust concerns, Defendants agreed to sell 579 Kroger and

Albertsons stores to C&S for $2.9 billion.[22]  In contrast to Kroger and Albertsons, C&S is a

wholesaler whose primary business is providing retail operators with grocery products.  As a

wholesaler, C&S has a checkered track record of owning, operating, and closing grocery stores.

Since 2000, C&S has sold or closed almost all of the over 370 stores it purchased within a few

years of acquiring them.[23]  Rather than focusing on store operations, C&S is dependent on ███

████████████████████████████[24] and C&S's retail acquisitions are in service of its

wholesale business.  As C&S stated in its latest annual report "████████████████████

████████████████████████████████████████████████████

████████████████████"[25]

C&S lacks the infrastructure to operate 579 stores in 18 states and the District of

Columbia.[26]  It operated only 23 retail grocery stores as of fiscal year 2023, mostly in upstate

New York and Wisconsin.[27]  And even the few stores C&S owns are ████████████████

████████████████████████████████.[28]  Retail services C&S

provides to franchised and wholesale customer stores represent ████████████ of annual

---

[20] PX4059 (Sankaran (Albertsons) Dep. 22:2-13).
[21] PX6153 (Albertsons) at 095.
[22] PX6253 (Kroger).
[23] *See generally* PX7002 (Fox Rpt.) ¶¶ 13-18, Figs. 4 & 5; PX3128 (C&S).
[24] PX3948 (C&S) at 008.
[25] PX3948 (C&S) at 011.
[26] PX1641 (Kroger); PX7008 (Fox Rebuttal Rpt.) ¶ 45.
[27] PX7002 (Fox Rpt.) ¶ 11.
[28] PX4060 (Winn (C&S) Dep. 31:6-9); PX4050 (McGowan (C&S) Dep. 35:7-36:2).

PLS' MEMO ISO PI MOTION

revenue.[29]  To wit, one competitor to C&S and bidder on the divestiture assets characterized

C&S's store operations as ███████████████████[30]  Because C&S is not acquiring a standalone

supermarket business and currently only has limited retail capabilities itself, Defendants have

pledged to provide a variety of "transition services" to their purported future "competitor" C&S

(some of which extend for up to four years).[31]  C&S's capabilities and assets, however, will pale

in comparison to the combined supermarket behemoth Kroger will become.

## <u>ANALYSIS</u>

Plaintiffs bring an action to preliminarily enjoin this acquisition pending the

Commission's adjudication of whether it violates Section 7 of the Clayton Act.  Complaint at 1,

ECF No. 1 (Feb. 26, 2024); 15 U.S.C. § 53(b).  Section 7 prohibits mergers the effect of which

"may be substantially to lessen competition, or to tend to create a monopoly."  15 U.S.C. § 18.

Plaintiffs ask this Court to grant a preliminary injunction to preserve the status quo until the

administrative proceeding concludes, to preserve the Commission's ability to order meaningful

relief.

Section 13(b) of the FTC Act authorizes this Court to issue a preliminary injunction

"upon a proper showing that, weighing the equities and considering the Commission's likelihood

of ultimate success, such action would be in the public interest."  *FTC v. Affordable Media*, 179

F.3d 1228, 1233 (9th Cir. 1999) (quoting 15 U.S.C. § 53(b)).  Section 16 of the Clayton Act

enables the State Plaintiffs to bring this action on behalf of each respective State.  15 U.S.C.

§ 26.  Section 13(b) of the FTC Act "places a lighter burden on the Commission than that

imposed on private litigants by the traditional equity standard."  *Warner*, 742 F.2d at 1159.

---

[29] *Compare* PX4030 (Winn (C&S) IH 337:10-20) *with* PX3112 (C&S) at 003.
[30] ████████████████████ IH 101:24-103:12).
[31] PX7008 (Fox Rebuttal Rpt.) ¶ 45; PX7002 (Fox Rpt.) at 012, Fig. 3.

"Under this more lenient standard, 'a court must 1) determine the likelihood that the Commission will ultimately succeed on the merits and 2) balance the equities.'" *Affordable Media*, 179 F.3d at 1233 (quoting *Warner*, 742 F.2d at 1160). Congress omitted requirements like irreparable harm. *Warner*, 742 F.2d at 1159; *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 714 (D.C. Cir. 2001).

## I. THE FTC IS LIKELY TO SUCCEED ON THE MERITS

The Ninth Circuit has held that the FTC shows a likelihood of success if it raises questions going to the merits sufficient to make them "fair ground for thorough investigation, study, deliberation, and determination by the FTC in the first instance and ultimately by the Court of Appeals." *Warner*, 742 F.2d at 1162. The Court "is not to make a final determination on whether the proposed merger violates" the antitrust laws. *Id.* That "adjudicatory function . . . is vested in the FTC in the first instance." *FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 165 n.2 (3d Cir. 2022); *FTC v. Whole Foods Mkt., Inc.* 548 F.3d 1028, 1042 (D.C. Cir. 2008) (Tatel, J., concurring). The Court's task is "rather to make only a preliminary assessment of the merger's impact on competition." *Warner*, 742 F.2d at 1162.

In the administrative proceeding, the Commission will apply a three-step burden-shifting framework to assess the legality of the acquisition. *See In re Otto Bock HealthCare N. Am., Inc.*, 2019 WL 5957363, at *11-12 (F.T.C. Nov. 1, 2019); *Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 424 (5th Cir. 2008). At step one, the plaintiff "must first establish a prima facie case that a merger is anticompetitive." *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015) ("*St. Luke's*"). If the plaintiff establishes a prima facie case, the burden of production shifts to the defendants to "produce evidence showing that the plaintiff's evidence paints an inaccurate picture of the merger's likely competitive effects." *United States v. Marine Bancorp., Inc.*, 418 U.S. 602, 631 (1974). If the defendants meet their burden, the burden of production shifts back to the plaintiff to produce additional evidence of

competitive harm and merges with the ultimate burden of persuasion, which remains with the plaintiff. *St. Luke's*, 778 F.3d at 783.  The stronger the prima facie case, however, "the more evidence the defendant must present to rebut it successfully." *Heinz*, 246 F.3d at 725.  Section 7 of the Clayton Act requires the analysis to focus on "probabilities, not certainties," *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d, 327, 337 (3d Cir. 2016) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962)), embodying Congress's intent "to arrest anticompetitive tendencies in their 'incipiency,'" *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 362 (1963) (quoting *Brown Shoe*, 370 U.S. at 317, 322).  Thus, "doubts are to be resolved against the transaction." *Hershey*, 838 F.3d at 337.

Under Section 13(b), this Court's task is simply to determine the FTC's likelihood of success under this burden-shifting framework. *See Heinz*, 246 F.3d at 715.  Because the issue of whether the FTC has presented evidence to raise substantial doubts about the acquisition is a "narrow one," the Court need not "resolve the conflicts in the evidence, compare concentration ratios and effects on competition in other cases, or undertake an extensive analysis of the antitrust issues." *Warner*, 742 F.2d at 1164.

Here, the FTC is likely to succeed on the merits by showing that this acquisition both eliminates substantial head-to-head competition and significantly increases concentration in many markets.  Defendants cannot produce evidence to rebut the FTC's strong showing of harm.

### A.  The Acquisition Is Unlawful Because It Will Eliminate Substantial Head-To-Head Competition

Kroger and Albertsons compete closely in hundreds of communities across the country. The elimination of significant competition between major competitors may by "'itself constitute[] a violation of § 1 of the Sherman Act,' and, a fortiori, of the Clayton Act." *United States v. Mfrs. Hanover Trust Co.*, 240 F. Supp. 867, 950 (S.D.N.Y. 1965) (citing *United States*

*v. First Nat'l Bank & Tr. Co. of Lexington*, 376 U.S. 665, 671 (1964)); *see also FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 61 (D.D.C. 2015) (collecting cases holding that "a merger that eliminates head-to-head competition between close competitors can result in a substantial lessening of competition"); U.S. Dep't of Justice & Fed. Trade Comm'n, *Merger Guidelines* § 2.2 (2023) ("Merger Guidelines").  When conducting this analysis, "[c]ourts frequently rely on ordinary course documents and witness testimony illustrating that two merging parties view each other as strong competitors."  *FTC v. IQVIA Holdings Inc.*, No. 23-cv-06188, 2024 WL 81232, at *37 (S.D.N.Y. Jan. 8, 2024) (collecting cases).

There is overwhelming evidence that Kroger and Albertsons strive to attract shoppers by competing fiercely on convenience, price, quality, service, selection, shopping experience, and location.[32]  As Albertsons' CEO explained, Albertsons tries to "█████████████████████ ████████████████████████████████████████████[33]  Indeed, Albertsons focuses ███████████████████████████████████████████████████████ ████████████[34]  Likewise, Kroger ████████████████████████████████████████████ █████████████████████████████████████████████.[35]  If the acquisition occurs, this competition will be eliminated in thousands of communities.  And shoppers will bear the risk of worsening quality and higher grocery prices.

   *i. Kroger and Albertsons Constrain Each Other's Prices*

---

[32] PX4069 (Humayun (Albertsons) Dep. 27:12-29:1, 51:25-52:9); PX2315 (Albertsons) at 008-010; PX4044 (Jabbar (Kroger) Dep. 150:12-152:9); PX4035 (Davidson (Albertsons) Dep. 57:7-58:25); PX4063 (Adcock (Kroger) Dep. 171:22-172:6); PX4026 (Broderick (Albertsons) IH 25:5-37:13, 127:25-130:4); PX4084 (Huntington (Albertsons) Dep. 17:20-21:9); PX4043 (Kammeyer (Kroger) Dep. 43:13-44:21).
[33] PX2322 (Albertsons) at 002.
[34] PX12392 (Albertsons) at 010.
[35] PX1308 (Kroger) at 001; PX1420 (Kroger) at 001; PX4044 (Jabbar (Kroger) Dep. 193:5-194:16).

PLS' MEMO ISO PI MOTION

Today, Kroger and Albertsons closely monitor and fiercely compete on both regular ("base") and promotional pricing, thereby constraining each other's pricing.

**Base Pricing**.  Kroger is a strong, if not the strongest, influence and constraint on Albertsons' pricing. ███████████████████████████████████ ████████████████████████████[36] Specifically, Albertsons' goal is to have ████████████ ██████████████████████████████.[37] Albertsons overwhelmingly ████████████ ████████████████████████████████████████.[38] Critically, Albertsons' ████████████████████████████████████████████████████ ██████████████████████████████[39]

Albertsons' pricing is also an important constraint on Kroger. ███████████████ ████████████████████████████████████████████.[40] For most of its other divisions, Kroger seeks to set prices ████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████



---

[36] *See* PX4056 (Silva (Albertsons) Dep. 106:11-25); PX4017 (Silva (Albertsons) IH 91:10-23, 193:12-19); PX4018 (Cowgill (Albertsons) IH 46:19-48:18, 100:5-101:6, 149:17-150:11, 156:17-157:11, 176:2-7).
[37] PX4018 (Cowgill (Albertsons) IH 149:17-151:9).
[38] ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████ PX2419 (Albertsons) at 008-012; *see also* PX7004 (Hill Rpt. ¶ 170, Fig. 36; PX4018 (Cowgill (Albertsons) IH 150:12-151:6). ████████████████████████████████████████████████████ ████████████████████████████████████ *See* PX2614 (Albertsons) at 027, 033, 037, 044, 052, 054, 061; PX2613 (Albertsons) at 002, 008, 023, 029.
[39] PX4018 (Cowgill (Albertsons) IH 156:17-25); PX4056, (Silva (Albertsons) Dep. 105:19-106:25); PX7004 (Hill Rpt.) ¶ 170, Fig. 36.
[40] PX4054 (Groff (Kroger) Dep. 192:12-194:13).
[41] ████████████████████████████████████████████. PX1130 (Kroger) 008-018.



██████████████████████████████████ [42] Kroger considers ██████████████████████████████████ ██████████████████████████████████ ████████████████████████████,"[43]

Albertsons banners ████████████████████████████ ██████████████████████████████████ ████████████████████ [44] One executive described ████████████████ ████████████████████ [45] When Kroger ████████ ██████████████████████████████████ ██████████████████████████████████.[46] This pricing competition with Albertsons would be lost if this acquisition is allowed to go through.

Kroger invests to compete with Albertsons' pricing in other ways, too. For instance, Kroger observed that the ████████████████████████████████████.[47] In response, Kroger planned to ████████████████████████████████████ ████████████████,"[48] resulting in ████████████████████████.[49] Similarly, in the

[42] PX1109 (Kroger) at 007; PX1110 (Kroger) at 001-002; PX4016 (Groff (Kroger) IH 163:13-179:6); PX4054 (Groff (Kroger) Dep. 78:16-82:9).
[43] PX1109 (Kroger) at 007; PX1130 (Kroger) at 009; *see also* PX1110 (Kroger) at 001-002; PX4016 (Groff (Kroger) IH 163:13-179:6); PX4054 (Groff (Kroger) Dep. 78:16-79:1).
[44] PX1109 (Kroger) at 007; PX4016 (Groff (Kroger) IH 120:12-121:17, 183:1-184:25); PX4054 (Groff (Kroger) Dep. 79:2-82:13); *see also* PX1115 (Kroger) at 003-006.
[45] PX1125 (Kroger) at 003.
[46] *See* PX1109 (Kroger) at 007; PX4016 (Groff (Kroger) IH 181:23-182:25).
[47] PX4016 (Groff (Kroger) IH 185:22-187:8); PX1109 (Kroger) at 009; PX1123 (Kroger) at 001; PX1125 (Kroger) at 002-003.
[48] PX1109 (Kroger) at 009; PX1125 (Kroger) at 003; PX4016 (Groff (Kroger) IH 190:5-191:10).
[49] PX1125 (Kroger) at 003.

PLS' MEMO ISO PI MOTION

summer of 2021, Kroger budgeted █████████████████████████████████
█████████████████████████████████████████████████████████████████
███████████████████████.[50]  Kroger's Senior Director of Pricing Strategy and Execution

observed that during this time, ███████████████████████████████████
█████████████████████████████████████████████████████████

██████[51]

**Promotional Pricing**.  Kroger and Albertsons also compete aggressively on promotional

pricing ██████████████████████████████████████████.[52]  For

example, in Las Vegas, a Kroger employee noted ████████████████████

████████████████████ and urged ██████████████████████████[53]  In

another example, before a Super Bowl, Kroger employees wanted ████████████████

█████████████████████████████████████████████████████████████

█████████████████████[54]  Similarly, for Thanksgiving advertisements, Kroger ████████

█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████

██████████████████████████████████[55]  Kroger regularly █████████

█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████

---

[50] PX1109 (Kroger) at 004.
[51] PX1125 (Kroger) at 002.
[52] *See, e.g.*, PX1249 (Kroger) at 001-012; PX1292 (Kroger) at 011-020; PX1368 (Kroger) at 004-017; PX1281 (Kroger) at 003-010; PX12029 (Albertsons) at 001; PX2783 (Albertsons).
[53] PX1372 (Kroger) at 001; *see also* PX1303 (Kroger) at 001.
[54] PX1573 (Kroger) at 001.
[55] PX11252 (Kroger) at 001.

PLS' MEMO ISO PI MOTION



[56]

Albertsons likewise ███████████████████████████.  In 2021, for instance, Albertsons' Seattle division announced plans to ███████████████████████ [57] Albertsons also ███████████████████ ███████████████████████████ [58]  A similar ███████████ for Thanksgiving 2020 boasted that Albertsons ███████████ ███████████████████ [59]  In December 2020, after Kroger's Fred Meyer banner introduced ███████████████ Albertsons ███████████████████ ███████████████ [60]  Albertsons' ███████████████████████████ ███████████████ for Easter 2021, for instance, Albertsons ███████████████████████████████ ███████████████████████████████ [61]  And leading up to Independence Day 2022, Albertsons ███████████████████ ███████████████ noting ███████████████████████████ ███████████████████████████ [62]

The fierce competition between Defendants across the country serves as an important constraint on both Kroger's and Albertsons' pricing—base and promotional—leading to lower prices for shoppers at both Kroger and Albertsons supermarkets.  The acquisition would

---

[56] *See, e.g.*, PX1249 (Kroger) at 001-012; PX1292 (Kroger) at 011-020; PX1368 (Kroger) at 004-017; PX1281 (Kroger) at 003-013.
[57] PX2492 (Albertsons) at 019.
[58] PX2464 (Albertsons) at 001.
[59] PX2484 (Albertsons) at 001.
[60] PX2783 (Albertsons) at 001; PX4034 (Whitney (Albertsons) Dep. 163:10-164:4).
[61] PX2478 (Albertsons) at 001.
[62] PX12029 (Albertsons) at 001.

eliminate this head-to-head competition, which in turn would raise prices for food and essential household items for millions of shoppers.

ii.   *Kroger and Albertsons Compete Closely on Non-price Factors Like Product Quality and Assortment, Better Service, and Convenience*

Kroger and Albertsons also compete across many non-price dimensions. *See, e.g.*, *IQVIA*, 2024 WL 81232, at *38-39, *53 (preliminarily enjoining merger that eliminated substantial competition on price and non-price dimensions). Defendants seek to lure shoppers away from each other by offering higher quality products, more low-priced private label goods, and a broader assortment of products and services. Defendants also compete to offer better customer service, longer store hours, new amenities, and updated and remodeled stores to attract and win shoppers from each other. The acquisition would eliminate this non-price competition.

**Product Quality and Assortment**. Kroger and Albertsons constantly monitor and respond to each other to improve product quality and assortment. As Kroger's CEO testified,



[63] and Kroger's internal analyses show that ███████████ ████[64] Albertsons ██████████████████ ███████.[65] For example, Albertsons' Portland Division in 2022 identified ████████ ████████████████████████████████[66]

Kroger and Albertsons also compete directly with one another by expanding and improving their private label offerings, which are typically high-quality and low-cost products. Indeed, Kroger recognizes Albertsons' ████████████████ and Kroger's

---

[63] PX4024 (McMullen (Kroger) IH 146:13-147:3).
[64] PX1240 (Kroger) at 003; PX4021 (Aitken (Kroger) IH 70:14-73:1).
[65] PX2412 (Albertsons) at 035, 089.
[66] PX2545 (Albertsons) at 001.

Chief Merchant and Marketing Officer wants ██████████████████████████████

██████████████████[67]    ██████████████    Kroger found that ████████████████

████████████████████████████████    and Kroger sought to ████████████████████

████████████████████████████[68]

    **Customer Service**.  Kroger and Albertsons also compete intensely to offer better

customer service that benefits consumers.  In Seattle, for instance, Albertsons 2021 annual

operating plan noted its ████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████████████████[69]  Similarly, in California, Albertsons

specifically noted ████████████████████████████████████████████████████████

██████████████████[70]  QFC (Kroger) in Washington ████████████████████████

██████████████████████████████████████████████████████████

██████████████████    Additionally, when Albertsons' COO ████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████[72]

    **Customer Convenience**.  Kroger and Albertsons also compete to improve customer

convenience and in-store experiences with updated stores and new amenities.  For pick-up

services, Kroger ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

---

[67] PX4021 (Aitken (Kroger) IH 106:2-8).
[68] PX1244 (Kroger) at 001-002; PX1247 (Kroger) at 001; PX4021 (Aitken (Kroger) IH 104:6-109:2).
[69] PX2492 (Albertsons) at 007.
[70] PX2490 (Albertsons) at 001, 003.
[71] PX11276 (Kroger) at 002-003.
[72] PX2480 (Albertsons) at 001.



[73] In response, ████████████████████ ████████████████████████████████████████ because ██████████ ████████████████████ [74] Kroger has also ████████████████████ ████████████████████████████████████████.[75] Similarly, Albertsons has made significant investments ██████████████████████████ ████████████████████████████████████████████████ ████████████████[76]

This competition between Kroger and Albertsons has led to significant benefits for shoppers wherever these two entities compete—competition that this acquisition will eliminate.

      *iii.*    *Expert Economic Analysis Confirms that Kroger and Albertsons Are Close Competitors and that the Acquisition Would Eliminate this Substantial Competition*

Plaintiffs' expert, Dr. Nicholas Hill,[77] evaluated whether the acquisition is likely to substantially reduce competition using an economic method called "compensating marginal cost reduction" or "CMCR."[78] CMCR analysis calculates a value that represents the reduction in marginal costs that would be necessary to offset the merged firm's incentives to raise prices.[79] If the CMCR value is greater than the marginal cost reductions predicted to result from the acquisition, then the merged firm is likely to increase prices due to the acquisition.[80]

---

[73] PX1358 (Kroger) at 001.
[74] PX1232 (Kroger) at 001; PX1361 (Kroger) at 002.
[75] PX1308 (Kroger) at 001; *see also* PX1310 (Kroger) at 003, 012.
[76] PX2441 (Albertsons) at 001; PX2434 (Albertsons) at 001.
[77] Dr. Hill is a partner at Bates White Economic Consulting who specializes in antitrust analysis. He has testified eight times about mergers and conduct in a wide variety of industries, including book publishing, chemicals, airlines, telecommunications, and banking. Dr. Hill has also served as Assistant Section Chief of the Economic Analysis Group at the Department of Justice Antitrust Division and as a staff economist at both DOJ and FTC. PX7004 (Hill Rpt.) ¶¶ 1-3.
[78] PX7004 (Hill Rpt.) ¶ 188.
[79] PX7004 (Hill Rpt.) ¶ 188.
[80] PX7004 (Hill Rpt.) ¶¶ 188-189.

Dr. Hill's economic analysis shows that the proposed acquisition is likely to substantially reduce competition in 1,472 local markets.[81]  This means that for those stores, the acquisition is likely to result in a price increase unless it were to reduce the firm's marginal costs by more than 5%.[82]  In this case, the total reductions in marginal costs that Defendants estimate—regardless of whether such estimates are verified or merger-specific—are less than 1% of Defendants' combined total operating costs.[83]  Dr. Hill's CMCR analysis thus confirms that substantial competition will be eliminated and is conservative in using a 5% threshold to reach that conclusion.[84]

> iv.    *Competition Between Kroger and Albertsons Drives Better Wages and Benefits for Union Grocery Workers*

In addition to eliminating fierce competition between Kroger and Albertsons for supermarket shoppers, the acquisition also removes unions' primary source of leverage in collective bargaining negotiations: the ability to credibly threaten a strike, boycott, or other action against an employer.[85]  Strikes are an ███████████████[86]  When workers strike, impacted stores cannot operate normally or may have to close.[87]  Struck supermarkets are at risk of lasting damage to their reputation and permanently losing shoppers to competing stores.[88]

---

[81] PX7006 (Hill Rebuttal Rpt.) at 106, Fig. 46.

[82] PX7004 (Hill Rpt.) ¶ 193.  Dr. Hill's CMCR results are qualitatively the same for the supermarket product market and his more conservative "large format store" product market.  *Id.*  Dr. Hill's analysis does not imply that markets with a CMCR of less than 5% are unlikely to suffer competitive harm.  He uses the 5% threshold to be conservative.  PX7006 (Hill Rebuttal Rpt.) ¶ 78 & n.80.

[83] PX7006 (Hill Rebuttal Rpt.) ¶¶ 180-182, n.200; PX7011 (Yeater Rebuttal Rpt.) ¶ 11.

[84] PX7006 (Hill Rebuttal Rpt.) ¶ 182.

[85] PX4014 (Dosenbach (Albertsons) IH 186:12-17); PX4015 (McPherson (Kroger) IH 164:1-165:2, 165:24-166:17).

[86] PX4015 (McPherson (Kroger) IH 163:18-25, 168:4-8).

[87] PX4015 (McPherson (Kroger) IH 285:3–286:6).

[88] *See* PX4014 (Dosenbach (Albertsons) IH 187:13–188:10, 208:3–10, 219:24–220:8); PX5014 (UFCW Local 3000 Decl.) ¶ 9; PX5011 (UFCW Local 7 Decl.) ¶ 11.

PLS' MEMO ISO PI MOTION

The strike target is also at risk of losing workers, who may decide to take jobs elsewhere.[89] Because strikes damage an employer's sales, reputation, and employee relationships, unions can use strikes—or even the credible threat of a strike—to pressure an employer to offer better wages, benefits, and working conditions.[90]

Kroger's and Albertsons' unions employ a negotiating tactic called a "whipsaw strike," during which workers threaten to strike to force one union employer to agree to certain terms.[91] Once an agreement is reached, the workers shift their strike threat to that employers' competitor—this is the "whipsaw"—to get the competitor to match or improve upon that agreement.[92] This strategy is effective because Kroger and Albertsons do not want to lose sales or shoppers to each other and (naturally) each would prefer that the unions target the other with a strike instead.[93] Unions leverage their ability to direct Kroger's shoppers to Albertsons, or vice versa, to reach more favorable agreements with these employers.[94]

There is ample evidence of such competition benefiting workers. In December 2021, for example, UFCW Local 555 leveraged competition between Kroger and Albertsons with a whipsaw strike in Portland, Oregon. Following a one-day strike against its stores, Kroger agreed to wage increases proposed by the union that were ████████████████████████

---

[89] PX5014 (UFCW Local 3000 Decl.) ¶ 9; PX5011 (UFCW Local 7 Decl.) ¶ 11.
[90] PX5014 (UFCW Local 3000 Decl.) ¶ 9; PX5011 (UFCW Local 7 Decl.) ¶ 11; PX5010 (UFCW Local 324 Decl.) ¶¶ 12, 16.
[91] PX4015 (McPherson (Kroger) IH 274:3–12); PX4095 (Massa (Kroger) Dep. 169:11-18).
[92] PX4042 (Dosenbach (Albertsons) Dep. 150:14-151:1); PX4095 (Massa (Kroger) Dep. 169:11-18); PX5014 (UFCW Local 3000) Decl.) ¶ 13.
[93] PX5010 (UFCW Local 324 Decl.) ¶ 14; PX5014 (UFCW Local 3000) Decl.) ¶ 12; PX5011 (UFCW Local 7 Decl.) ¶ 11.
[94] PX5014 (UFCW Local 3000 Decl.) ¶¶ 13-15; PX5011 (UFCW Local 7 Decl.) ¶¶ 12-18; PX5010 (UFCW Local 324 Decl.) ¶¶ 14-15.

PLS' MEMO ISO PI MOTION

████ [95]  Albertsons then followed suit.[96]  As Albertsons' Senior Vice President of Labor

Relations, Dan Dosenbach, stated, ████████████████████████████████████

████████████████████ [97]

Defendants are well aware of the unions' strategy and acknowledge that it creates

pressure for them to match or beat each other's agreements.  For example, Mr. Dosenbach

explained: ████████████████████████████████████████████

████████████████████████████████████████████

████ [98]  Similarly, Kroger's Vice President of Labor Relations, Jon McPherson, updated

Kroger's CEO and other senior leaders about an April 2022 negotiation in Seattle, explaining:

████████████████████████████████████████████████████

████████████████████████████████████ [99]

To counter the unions' strategy, Kroger and Albertsons have tried to align on their union

negotiations, but coordination is costly, imperfect, and often unsuccessful.[100]  Kroger believes

████████████████████████████████████████████████████

████████████████████████ , [101] while Albertsons ████████████████

████████████████████████████████████████

████ [102]  As a result, Albertsons ████████████████████████

---

[95] PX4138 (Clay (UFCW Local 555) Dep. 118:20-120:11); PX4014 (Dosenbach (Albertsons) IH
226:19–229:19); PX4015 (McPherson (Kroger) IH 277:13-278:21).
[96] PX4014 (Dosenbach (Albertsons) IH 228:24-230:12).
[97] PX2151 (Albertsons) at 001; *see also* PX4014 (Dosenbach (Albertsons) IH 226:25-228:15).
[98] PX4042 (Dosenbach (Albertsons) Dep. 152:14-153:1).
[99] PX1154 (Kroger) at 001.
[100] PX5010 (UFCW Local 324 Decl.) ¶ 14; PX5011 (UFCW Local 7 Decl.) ¶ 9.
[101] PX4015 (McPherson (Kroger) IH 222:9-21, 250:6-251:4); PX4113 (McPherson (Kroger)
Dep. 146:20-147:23).
[102] PX4014 (Dosenbach (Albertsons) IH 197:25-198:2, 201:7-23).

PLS' MEMO ISO PI MOTION

██████████████████████████████████████████[103]  Defendants' frequent failure to align

in bargaining, despite their best efforts, gives unions even greater negotiating leverage.

This misalignment is most evident in ████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████[104]  Facing strike threats in

contentious negotiations, Kroger ███████████████████████████[105]

███████[106] ████████████████████[107] ████████████████████

███████████████████████████████████████████████████

██████████████████████████[108]

The acquisition provides Kroger and Albertsons with a perfect—and permanent—████

████ being played off each other in labor negotiations.[109]  It will allow Kroger and Albertsons

to achieve total alignment in all future labor negotiations, preventing unions from using whipsaw

strike tactics in negotiations.  Post-acquisition, Defendants will conduct union negotiations with

fewer (or, in some geographies, zero) union grocery competitors, and unions will have fewer (or

no) union grocery employers in many geographic areas to leverage against one another.  With

more leverage, the combined entity will be better able to successfully negotiate smaller wage

---

[103] PX2157 (Albertsons) at 001; *see also* PX4014 (Dosenbach (Albertsons) IH 212:23-213:7).
[104] PX4014 (Dosenbach (Albertsons) IH 207:14-208:10); PX4015 (McPherson (Kroger) IH 173:19-176:3).
[105] PX1040 (Kroger) at 002.
[106] PX4015 (McPherson (Kroger) IH 275:3-14); *see also* PX2148 (Albertsons) at 001.
[107] PX4015 (McPherson (Kroger) IH 264:17-265:3).
[108] PX4015 (McPherson (Kroger) IH 176:4-10); *see also* PX4113 (McPherson (Kroger) Dep. 149:5-149:14).
[109] *See* PX1282 (Kroger) at 004.

increases, reduce benefits, or degrade working conditions to the detriment of hundreds of

thousands of union grocery employees.[110]

***

Plaintiffs meet their prima facie case by showing that this acquisition will eliminate head-

to-head competition for shoppers and union grocery workers in markets across the country.  *See*

15 U.S.C. § 18 (An acquisition is illegal where its "effect . . . may be substantially to lessen

competition."); *Mfrs. Hanover*, 240 F. Supp. at 950; *see also infra* § I.B.

### B.  The Acquisition Is Presumptively Unlawful In Multiple Highly-Concentrated Markets

Apart from showing a merger will eliminate head-to-head competition, the government

also can meet its prima facie burden by showing that the acquisition is presumptively unlawful

because it will lead to undue concentration in a relevant market.  *See St. Luke's*, 778 F.3d at 785.

Under Supreme Court precedent, "a merger which produces a firm controlling an undue

percentage share of the relevant market, and results in a significant increase in the concentration

of firms in that market is so inherently likely to lessen competition substantially that it must be

enjoined in the absence of evidence clearly showing that the merger is not likely to have such

anticompetitive effects."  *Phila. Nat'l Bank*, 374 U.S. at 363.

The first step in assessing concentration is to determine the "line of commerce" and

"section of the country" where the relevant competition occurs—i.e., defining a relevant product

and geographic market.  15 U.S.C. § 18; *St. Luke's*, 778 F.3d at 783-84.  "The outer boundaries

of a product market are determined by the reasonable interchangeability of use [by consumers] or

the cross-elasticity of demand between the product itself and substitutes for it."  *Brown Shoe*,

370 U.S. at 325.

---

[110] *See generally* PX7010 (Ashenfelter Rebuttal Rpt.) ¶¶ 51-58.

Congress prescribed "a pragmatic, factual approach" to market definition because the market "cannot be measured in metes and bounds." *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 193 (D.D.C. 2017) (cleaned up). In particular, commercial realities reflecting competition between the merging parties can inform market definition. *See FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 124 (D.D.C. 2016) ("*Staples II*"); Merger Guidelines § 4.3 ("Direct evidence of substantial competition between the merging parties can demonstrate that a relevant market exists in which the merger may substantially lessen competition and can be sufficient to identify the line of commerce and section of the country affected by a merger, even if the metes and bounds of the market are only broadly characterized.").

At the Section 13(b) stage, the FTC is only required to establish "a reasonable probability that it will be able to prove its asserted market." *Whole Foods*, 548 F.3d at 1049 (Tatel, J., concurring); *see also Warner*, 742 F.2d at 1162. Because the Section 13(b) inquiry "is a narrow one," courts are not required to resolve "conflicting evidence on the relevant product market, market concentration, [or] market shares." *Warner*, 742 F.2d at 1162, 1164. At the Section 13(b) stage, the FTC meets its burden if it simply "rais[es] some question of whether [the alleged market] is a well-defined market." *Whole Foods*, 548 F.3d at 1036–37.

> i. *The Acquisition Increases Concentration in Local Areas Near Supermarkets Across the Country*

Defendants compete in a product market of supermarkets in hundreds of local geographic areas around the country. The acquisition would significantly increase concentration for supermarkets in these local areas, far exceeding the thresholds for a presumption of illegality.

> a) *Supermarkets are a relevant product market*

"The outer boundaries of a product market are determined by the reasonable interchangeability of use [by consumers] or the cross-elasticity of demand between the product

itself and substitutes for it." *Brown Shoe*, 370 U.S. at 325. "[T]he mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes." *Sysco*, 113 F. Supp. 3d at 26 (cleaned up). Within a broad market, "well-defined submarkets may exist, which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe*, 370 U.S. at 325. To define a relevant product market, courts often evaluate "*Brown Shoe* factors," which are "such practical indicia as industry or public recognition of the [relevant market] as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id*.

The *Brown Shoe* factors establish that supermarkets are a relevant product market. Supermarkets, including supercenters such as Walmart,[111] are retail stores that sell a variety and depth of goods ranging from food items (e.g., fresh produce, meat, seafood, dairy products, frozen foods, shelf-stable foods, and beverages) to household goods (e.g., laundry detergent, cleaning supplies, pet foods, medications, and health and beauty care products).[112] Shoppers can purchase most of their household needs at supermarkets, with size and brand options.[113] Kroger and Albertsons stores are supermarkets that offer this "unique combination of size, selection, depth and breadth of inventory" and services.[114] *See FTC v. Staples, Inc.*, 970 F. Supp. 1066,

---

[111] Supercenters, like traditional supermarkets, "sell a full line of groceries, meat and produce, . . . as well as additional non-food, mass merchandise products not typically offered at a traditional supermarket." PX7004 (Hill Rpt.) ¶ 37 (internal quotations omitted). As such, supercenters like Target and Walmart are appropriately considered as a subset of the supermarket product market. PX7004 (Hill Rpt.) ¶ 67, n.84.
[112] PX7004 (Hill Rpt.) ¶¶ 33, 35; *see also* PX4081 (McMullen (Kroger) Dep. 24:4-11); PX4022 (Sankaran (Albertsons) IH 100:24-101:25, 123:18-124:17); DX0952 (C&S) at 243.
[113] PX4081 (McMullen (Kroger) Dep. 25:25-26:24).
[114] *See, e.g.*, PX2670 (Albertsons) at 017; PX4089 (Shores (Albertsons) Dep. 104:24-105:2); PX12380 (Albertsons) at 001; PX4059 (Sankaran (Albertsons) Dep. 108:12-109:16); PX6009 (Kroger) at 113; PX4011 (Lindholz (Kroger) IH 52:10-53:9).

1079 (D.D.C. 1997) ("*Staples I*").

In particular, supermarkets' distinct characteristics provide customers with a one-stop shopping experience that distinguishes them from other retailers.[115]  *See Staples I*, 970 F. Supp. at 1079.  Supermarkets fulfill their customers' "one-stop shop" demand by offering both a *broad* range of product types and a *deep* selection within each product type, stocking private label products, national brands, organic products, and multiple package sizes, flavors, and options to suit any customer need.[116]  Likewise, supermarkets often have a range of other services like pharmacies, florists, fuel centers, butchers, and deli and seafood counters.[117]  For that reason, Defendants' own executives and business records discuss supermarkets separately from other store formats.  For example, Albertsons routinely identifies itself as ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮[118]  *See also supra* § I.A.i-ii.  Other industry participants, such as other store formats, or observers also view supermarkets as distinct grocery retailers.[119]

It makes no difference that individual goods available in supermarkets can be purchased at other retail stores.  As the court explained in *California v. Am. Stores Co.*, 697 F. Supp. 1125

---

[115] PX6030 (Kroger) at 002; PX4039 (Kinney (Albertsons) Dep. 81:24-83:3); PX4083 (Knopf (Raley's) Dep. 41:10-22, 103:22-104:16); PX1164 (Kroger) at 010; PX4063 (Adcock (Kroger) Dep. 286:9-16); PX4058 (Garnes (Kroger) Dep. 105:15-1); PX4043 (Kammeyer (Kroger) Dep. 43:13-21); PX4088 (Stewart (Kroger) Dep. 34:21-35:2); PX4071 (Yates (Ahold) Dep. 21:25-22:5); PX4031 (Van Helden (Stater Bros.) Dep. 39:11-23. 40:4-9); PX2932 (Albertsons) at 001.
[116] PX4063 (Adcock (Kroger) Dep. 286:9-24); PX4114 (Broderick (Albertsons) Dep. 45:17-46:22, 178:23-179:5); PX4075 (Kimball (Kroger) Dep. 50:23-51:5); PX4088 (Stewart (Kroger) Dep. 35:17-25, 40:11-41:8); PX4097 (Morris (Albertsons) Dep. 233:8-13); PX4031 (Van Helden (Stater Bros.) Dep. 14:17-24); PX4071 (Yates (Ahold) Dep. 58:1-18, 62:19-21, 69:21-25).
[117] PX4022 (Sankaran (Albertsons) IH 115:2-116:5); PX4081 (McMullen (Kroger) Dep. 35:15-41:1); PX4031 (Van Helden (Stater Bros.) IH 20:7-13); PX6030 (Kroger) at 001-002; PX4063 (Adcock (Kroger) Dep. 288:1-289:12); PX4097 (Morris (Albertsons) Dep. 123:4-124:6).
[118] *See*, *e.g.*, PX12450 (Albertsons).
[119] PX6166 (Nielsen) at 001; PX4071 (Yates (Ahold) Dep. 109:25-110:20); *see also* PX4031 (Van Helden (Stater Bros.) Dep. 13:11-20; PX4083 (Knopf (Raley's) Dep. 25:3-26:15, 179:6-180:2); PX4050 (McGowan (C&S) Dep. 45:21-46:5); PX4062 (Leary (BJ's Wholesale) Dep. 73:25-74:13); PX4120 (Neal (Sprouts) Dep. 124:16-125:7).

(C.D. Cal. 1988), the mere fact that other outlets also sell groceries does not mean that "grocery shoppers seriously consider, for example, gasoline service stations or department stores as competing sources with supermarkets for their grocery needs." *Id.* at 1129, *rev'd on other grounds*, 872 F.2d 837 (9th Cir. 1989). Here, supermarkets—as recognized by industry participants—have peculiar uses and characteristics, unique production facilities, and distinct customers and prices that other store formats do not offer.

Supermarkets offer a unique store layout compared to other retail stores—for instance, supermarkets require a large footprint to shelve the number of SKUs that they offer and their various staffed departments (e.g., deli, seafood, or bakery).[120] Apart from store footprint, supermarkets also differ from other retail formats in customer experience.[121] *See Bon-Ton Stores, Inc. v. May Dep't Stores Co.*, 881 F. Supp. 860, 874 (W.D.N.Y. 1994) (analyzing as a *Brown Shoe* factor the physical appearance of retail stores, for example, "the location of checkout counters, the manner in which goods are displayed, and so on"). Finally, supermarkets price differently than other formats and set pricing primarily based on other supermarkets.[122] *See*

---

[120] PX7004 (Hill Rpt.) ¶ 30, Fig. 3; PX4081 (McMullen (Kroger) Dep. 45:3-47:3, 48:17-50:24, 54:14-58:23); PX4071 (Yates (Ahold) Dep. 126:18-130:14); PX4065 (Colgrove (Albertsons) Dep. 247:20-24); PX4097 (Morris (Albertsons) Dep. 137:8-138:13); PX4063 (Adcock (Kroger) Dep. 260:13-261:6); PX4062 (Leary (BJ's Wholesale) Dep. 129:22-131:5).

[121] *See, e.g.*, PX5006 (Costco Decl.) ¶ 3; PX4116 (Snow (Dollar General) Dep. 98:4-10); PX4055 (Larson (Albertsons) Dep. 57:19-58:12); PX4071 (Yates (Ahold) Dep. 127:1-9); PX4096 (George (Costco) Dep. 107:24-108:18); PX4010 (Unkelbach (Dollar Tree) IH 94:25-95:13); PX4090 (Unkelbach (Dollar Tree) Dep. 95:7-102:20); PX4035 (Davidson (Albertsons) Dep. 110:13-113:1, 129:5-131:1); PX4126 (Heyworth (Amazon) Dep. 95:3-5); PX4140 (Perkins (Albertsons) Dep. 109:9-25); PX12392 (Albertsons) at 003.

[122] *Compare, e.g.*, PX4136 (Sitter (Aldi) Dep. 119:18-121:1); PX4144 (Kerr (Lidl) Dep. 133:12-18, 145:16-146:16); PX4091 (Cahan (Trader Joe's) Dep. 54:5-17, 99:23-100:19) *with* PX4083 (Knopf (Raley's) Dep. 179:6-183:24); PX4050 (McGowan (C&S) Dep. 45:14-46:18); PX4088 (Stewart (Albertsons) Dep. 77:17-78:22); PX4080 (Albi (Kroger) Dep. 189:23-190:14); PX4045 (Marx (Kroger) Dep. 119:15-120:5); *see also* PX4120 (Neal (Sprouts) Dep. 123:4-124:15); PX4135 (Grisham (Sam's Club) Dep. 46:7-16); PX5006 (Costco Decl.) ¶¶ 11-12; PX4058

---

PLS' MEMO ISO PI MOTION

*also supra* § I.A.i.

Other store formats such as natural and gourmet food stores, club stores, limited assortment stores, dollar stores, drug and convenience stores, and e-commerce stores do not offer the same shopping experience.[123]  *Staples I*, 970 F. Supp. at 1078 (finding "that office superstores are, in fact, very different in appearance, physical size, format, the number and variety of SKU's offered, and the type of customers targeted and served than other sellers of office supplies"); *Bon-Ton Stores, Inc.*, 881 F. Supp. at 873 ("Department stores are distinguishable from other categories of vendors based on the types of products they sell, their prices, staffing policies . . . .").

For example, websites like Amazon.com that only sell groceries online without physical stores (the shipment format of "grocery e-commerce")[124] provide a different shopping experience than supermarkets.  First, grocery e-commerce retailers often charge additional service and delivery fees that increase the total cost of grocery orders to the consumer.[125]  Second, shoppers are unable to browse, view, or select specific items from a grocery e-commerce store in the same way they could select a particular cut of meat from a supermarket's butcher counter or inspect a fresh peach for ripeness before purchasing it.[126]  Third, when using grocery e-commerce,

---

(Garnes (Kroger) Dep. 92:24-93:8); PX4046 (Meyer (Kroger) Dep. 150:20-153:15); PX4116 (Snow (Dollar General) Dep. 94:18-95:25); PX4010 (Unkelbach (Dollar Tree) IH 83:13-84:5); PX4030 (Winn (C&S) IH 209:1-5, 313:12-314:4).
[123] PX7004 (Hill Rpt.) ¶¶ 38-53; *see also infra* notes 130-135.
[124] The grocery industry has three primary e-commerce formats: pickup (where shoppers can place orders and pick up at the brick and mortar location), delivery (where shoppers order online and delivery occurs through either a grocery store's own service or a third-party delivery service such as Instacart), and shipment (where shoppers order online groceries from a website without a brick and mortar business).  PX7004 (Hill Rpt.) ¶¶ 46-49.
[125] PX4031 (Van Helden (Stater Bros) IH 26:5-27:10); PX4016 (Groff (Kroger) IH 69:24-70:21); PX4111 (Pollnow (DoorDash) Dep. 24:18-25:10); PX5012 (Instacart Decl.) ¶¶ 14-15.
[126] PX4126 (Heyworth (Amazon) Dep. 116:17-20); PX4088 (Stewart (Kroger) Dep. 34:10-15); PX4031 (Van Helden (Stater Bros.) IH 27:11-28:4); PX12392 (Albertsons) at 005.

PLS' MEMO ISO PI MOTION

shoppers must wait anywhere from hours to days to receive their groceries, unlike the immediate convenience of walking into a supermarket and walking out with the products they need.[127] Finally, grocery e-commerce stores typically have a more limited selection due to shipping limitations; for example, it is difficult to ship fresh meat and produce long distances.[128] As a result, grocery e-commerce retailers are a poor substitute for supermarkets.[129]

Alternative store formats are similarly distinct from supermarkets. Club stores, such as Costco, require customers to become members for a fee, and offer members a more limited selection of bulk items, most of which supermarkets do not offer in the same volume and packaging.[130] Premium natural and organic stores (e.g., Whole Foods Market and Sprouts Farmers Market) focus on a different core customer from supermarkets, and they do not offer many of the familiar national branded products (e.g., Tide, Coca-Cola, or Oreos) found in supermarkets.[131] Supermarkets are also distinct from limited assortment stores (discount retailers like Aldi and Lidl that carry a limited selection of brands and products),[132] dollar stores (deep-

---

[127] *See* PX4126 (Heyworth (Amazon) Dep. 70:22-72:1); PX4141 (Lieberman (Walmart) Dep. 118:15-120:3).

[128] PX4126 (Heyworth (Amazon) Dep. 18:14-25, 102:17-103:21); PX4141 (Lieberman (Walmart) Dep. 26:19-27:3).

[129] PX4031 (Van Helden (Stater Bros.) IH 27:6-28:4); PX4071 (Yates (Ahold) Dep. 251:10-253:4); PX4120 (Neal (Sprouts) Dep. 106:9-107:3,177:2-9); PX4141 (Lieberman (Walmart) Dep. 109:12-111:14, 113:11-21, 115:19-116:5).

[130] PX7004 (Hill Rpt.) ¶¶ 39-40; PX4096 (George (Costco) Dep. 34:24-35:7, 36:17-37:3, 106:14-108:18); *see also* PX4135 (Grisham (Sam's Club) Dep. 14:17-15:1, 671:20-72:11; PX5009 (Sam's Club Decl.) ¶¶ 2-6, 8-11; PX4062 (Leary (BJ's Wholesale) Dep. 41:23-42:10, 112:18-113:1, 128:22-131:5, 195:23-196:9); PX5006 (Costco Decl.) ¶¶ 2-5, 7; PX4081 (McMullen (Kroger) Dep. 42:1-47:3); PX4031 (Van Helden (Stater Bros.) IH 18:12-20:6); PX4110 (Van Helden (Stater Bros.) Dep. 193:13-195:18); PX12392 (Albertsons) at 003.

[131] PX4120 (Neal (Sprouts) Dep. 110:13-112:10); PX5003 (Sprouts Decl.) ¶ 5; PX4091 (Cahan (Trader Joe's) Dep. 26:4-14, 101:13-102:10); PX4059 (Sankaran (Albertsons) Dep. 227:21-228:3); PX4143 (Huber (Natural Grocers) Dep. 114:1-14).

[132] PX7004 (Hill Rpt.) ¶ 41; PX4081 (McMullen (Kroger) Dep. 48:23-53:24); PX4055 (Larson (Albertsons) Dep. 50:20-52:10); PX4044 (Jabbar (Kroger) Dep. 128:5-130:15); PX4035

discounters that primarily sell non-grocery items),[133] convenience stores (such as 7-Eleven),[134] and drug stores (such as Walgreens).[135]

***

Taken together, an analysis of the *Brown Shoe* factors shows key differences between supermarkets and other store formats and indicates shoppers do not view other store formats as reasonably interchangeable with supermarkets.  As in previous cases, witness testimony, ordinary course documents, and quantitative analysis all support that the "line of commerce" to assess the competitive effects of this acquisition is supermarkets.  *See, e.g.*, *Am. Stores*, 872 F.2d at 841; *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409 (7th Cir. 1989); *Tops Mkt. v. Quality Mkts.*, 142 F.3d 90 (2d Cir. 1998).

> ### b)  Local areas around Defendants' stores are relevant geographic markets

The next step is to determine the geographic market.  "The relevant geographic market is the area of effective competition where buyers can turn for alternative sources of supply."  *St. Luke's*, 778 F.3d at 784 (cleaned up).  As Defendants' economic consultants agree, the distance

---

(Davidson (Albertsons) Dep. 120:24-126:17); PX4109 (Curry (Albertsons) Dep. 97:2-99:16); PX4144 (Kerr (Lidl) Dep. 100:4-13); PX4031 (Van Helden) (Stater Bros.) IH 14:25-16:10); PX4136 (Sitter (Aldi) Dep. 87:7-88:6, 108:12-110:05, 180:7-181:10); PX4040 (Withers (Albertsons) Dep. 67:20-67:25, 68:22-69:6); PX4059 (Sankaran (Albertsons) Dep. 227:21-228:3); PX4071 (Yates (Ahold) Dep. 122:20-123:14); PX12392 (Albertsons) at 003.
[133] PX7004 (Hill Rpt.) ¶ 44; PX4010 (Unkelbach (Dollar Tree) IH 28:4-18, 48:5-50:18, 97:4-23, 118:15-20); PX4027 (Snow (Dollar General) IH 40:23-44:5); PX4081 (McMullen (Kroger) Dep. 57:4-58:4); PX4071 Yates (Ahold) Dep. 137:21-138:6).
[134] PX4071 (Yates (Ahold) Dep. 120:18-20); PX4055 (Larson (Albertsons) Dep. 65:16-25); PX4044 (Jabbar (Kroger) Dep. 63:19-66:3); PX4035 (Davidson (Albertsons) Dep. 129:5-131:1); PX4109 (Curry (Albertsons) Dep. 110:14-23); PX4043 (Kammeyer (Kroger) Dep. 129:4-11, 133:6-134:3).
[135] PX4071 (Yates (Ahold) Dep. 120:15-22); PX4043 (Kammeyer (Kroger) Dep. 50:2-51:16, 136:20-22, 137:25-138:3); PX4104 (Kelley (Kroger) Dep. 59:6-60:2).

customers must travel to Defendants' stores is important in defining relevant markets.[136]  And

Defendants' executives recognize that both Kroger and Albertsons █████████████

████████████████████████████████████████████[137]

　　　Witness testimony and expert analysis confirm that supermarket competition is local.

The majority of supermarkets' sales tend to come ████████████████████████████

████[138]  As a result, supermarkets focus on the competitors in close proximity to their existing

or planned store locations when conducting competitive analyses or determining where to site

their stores.[139]  To do this, supermarkets often assess a trade area or the local area surrounding a

store from which that store draws the majority of its customers.[140]  Defendants' economic

consultants agree that Defendants' trade areas are █████████████████████████████

██████████████████████████████████████[141]  Consistent with these

statements, the Plaintiffs' expert Dr. Hill defined a candidate geographic market around each

party store in the overlap areas based upon where that store's customers come from.[142]

---

[136] PX10007 (Compass Lexecon) at 003-004; *see also* DX2494 (Israel Rpt.) ¶ 62.

[137] PX4024 (McMullen (Kroger) IH 12:2-13); PX4022 (Sankaran (Albertsons) IH 137:06-16, 68:10-17); *see also* PX4017 (Silva (Albertsons) IH 77:14-20, 169:4-6); PX4069 (Humayun (Albertsons) Dep. 182:10-183:3); PX4055 (Larson (Albertsons) Dep. 93:4-24, 94:22-95:9).

[138] PX4032 (Knopf (Raley's) IH 13:21-14:3); PX4031 (Van Helden (Stater Bros.) IH 60:25-61:13, 40:25-41:3); *see also* PX7004 (Hill Rpt.) ¶ 107 and Fig. 21.

[139] PX4031 (Van Helden (Stater Bros.) IH 60:20-61:19); PX2423 (Albertsons) at 005; PX1180 (Kroger) at 007; PX1291 (Kroger) at 004.

[140] PX4071 (Yates (Ahold) Dep. 159:25-160:14); PX1286 (Kroger); PX4080 (Albi (Kroger) Dep. 43:21-44:11, 102:2-7); PX4110 (Van Helden (Stater Bros.) Dep. 102:25-103:25).

[141] PX10007 (Compass Lexecon) at 002; *see also* PX1286 (Kroger) at 003.

[142] PX7004 (Hill Rpt.) ¶ 101. To define a candidate geographic market for a particular Kroger or Albertsons "focal" store, Dr. Hill used Defendants' customer loyalty data to calculate that store's 75% catchment area (that is, the geographic area from which the store pulls 75% of its sales) and then doubled it to ensure he was not excluding any customers for whom the store competes.  *Id*. ¶¶ 102-106.  After accounting for variances in data, Dr. Hill found that the average 75% catchment area radii for Albertsons and Kroger stores in overlap areas were ███████████████ ████ respectively, although these store-specific catchment areas varied with local conditions such as population density.  *Id*. ¶¶ 109-111 and Fig. 23.

> c) *Economic analysis confirms that supermarkets in local areas are antitrust markets*

In addition to the *Brown Shoe* factors, economic analysis can be used to define a relevant antitrust market. Courts have endorsed the Hypothetical Monopolist Test ("HMT") as one economic tool for defining relevant antitrust markets. *See St. Luke's*, 778 F.3d at 784; *FTC v. Advocate Health Care Network*, 841 F.3d 460, 468-69 (7th Cir. 2016); Merger Guidelines § 4.3. Economists often use the HMT to determine which products and geographies are close enough substitutes to be included in a market.[143] The HMT asks whether a "monopolist of the specified products in the specified geography would raise prices, lower quality, or take other actions to make consumers worse off compared to current conditions."[144] If, for example, a hypothetical monopolist of all supermarkets in the local area around one of Defendants' stores could impose a small but significant price increase without losing enough sales to make the price increase unprofitable, then that product and geographic market passes the HMT and is a properly defined antitrust market that does not exclude important competitive substitutes.

Many hundreds of supermarkets in local areas easily satisfy the HMT. To conduct the HMT, Dr. Hill first identified "candidate markets" consisting of a party store and the surrounding area.[145] Dr. Hill then implemented the HMT by conducting a critical loss analysis, a common tool in market definition.[146] Critical loss analysis asks whether a hypothetical monopolist that raised prices would lose sufficient sales to stores outside the candidate market that the price increase would become unprofitable.[147] If the volume of sales switching to stores outside of the

---

[143] PX7004 (Hill Rpt.) ¶¶ 114-15.
[144] PX7004 (Hill Rpt.) ¶ 65; *see also* Merger Guidelines § 4.3.
[145] PX7004 (Hill Rpt.) ¶ 101.
[146] PX7004 (Hill Rpt.) ¶ 123.
[147] PX7004 (Hill Rpt.) ¶ 126.

candidate market is small enough that the price increase would be profitable, then the candidate

market passes the HMT.[148]   Relying on (i) sales data provided by Albertsons, Kroger, and third

parties, (ii) party loyalty data, and (iii) Census data, Dr. Hill found that approximately 2,000

supermarket candidate markets pass the HMT, and thus are properly defined antitrust markets.[149]

> #### d)   The Acquisition is Presumptively Unlawful Because It Increases Concentration in the Relevant Supermarket Local Areas

Having defined a relevant market, the next step is to determine whether the acquisition

would increase concentration to a presumptively unlawful level.  *St. Luke's*, 778 F.3d at 785.  "A

commonly used metric for determining market share is the Herfindahl–Hirschman Index

('HHI')."  *St. Luke's*, 778 F.3d at 786.  The HHI for a market is calculated by taking "the sum of

the squares of the market shares."  Merger Guidelines § 2.1.  The HHI is small when there are

many small firms in the market and grows larger the more concentrated the market becomes.  *Id.*

Plaintiffs can establish a prima facie case by showing that the acquisition will yield high

market concentrations.  *St. Luke's*, 778 F.3d at 785.  The Merger Guidelines explain that an

acquisition is presumptively unlawful when the increase in HHI from the merger is greater than

100 and results in either (a) post-merger market share greater than 30% or (b) post-merger HHI

exceeding 1,800.  Merger Guidelines § 2.1.  These presumption thresholds, mirroring those in

the 1992 Merger Guidelines, have been endorsed by numerous courts.  *See, e.g.*, *Heinz*, 246 F.3d

at 716; *Chicago Bridge & Iron*, 534 F.3d at 431; *IQVIA*, 2024 WL 81232, at *33 (discussing

market share presumption).  The Supreme Court has also held that mergers are presumptively

unlawful if they result in a single entity controlling a 30% market share.  *See Phila. Nat'l Bank*,

---

[148] PX7004 (Hill Rpt.) ¶ 126.
[149] PX7004 (Hill Rpt.) ¶ 141 & Fig. 29.

374 U.S. at 364; *see also IQVIA*, 2024 WL 81232, at *33.  Here, Dr. Hill found that 1,922

supermarket markets meet the presumption of illegality under the Merger Guidelines.[150]

Importantly, the presumptively illegal nature of Defendants' acquisition does not depend

on the supermarket product market.  Dr. Hill also defined and calculated market shares for a

broader, and more conservative, product market—"large format stores"—which includes the sale

of food and groceries in traditional supermarkets and supercenters as well as in club stores,

natural and gourmet food stores, and limited assortment stores.[151]  The large format store market

is conservative in Defendants' favor because it includes a much broader range of store formats

that—as discussed *supra*—may not be reasonable substitutes for supermarkets.  Yet even using

this more conservative assumption, Dr. Hill found that the acquisition is presumptively unlawful

in 1,785 large format store markets under the Merger Guidelines thresholds.[152]  In other words,

even if Defendants are right that the appropriate product market must include all large format

stores, Dr. Hill's analysis shows the acquisition is still presumptively illegal in over 1,500

markets.  Notably, a finding of harm in any one of these markets would be sufficient for

Plaintiffs to meet their prima facie burden.  *See RSR Corp. v. FTC*, 602 F.2d 1317, 1323 (9th Cir.

1979) (holding merger violates Section 7 "'if anticompetitive effects of a merger are probable in

"any" significant market'") (quoting *Brown Shoe*, 370 U.S. at 337); *Anthem*, 236 F. Supp. 3d at

---

[150] PX7006 (Hill Rebuttal Rpt.) at 103, Fig. 43.  Under the prior merger guidelines, a merger was presumed to be anticompetitive if it increased HHI by 200 and resulted in a post-merger HHI above 2,500.  U.S. Dep't of Justice & Fed. Trade Comm'n, 2010 Horizontal Merger Guidelines at § 5.3.  Dr. Hill also assessed market concentration under the 2010 Horizonal Merger Guidelines and found that 1,574 supermarket markets satisfy the structural presumption under that standard.  PX7006 (Hill Rebuttal Rpt.) Fig. 43.

[151] The large format store market includes the sale of food and groceries in traditional supermarkets, supercenters, club stores, natural and gourmet food stores, and limited assortment stores.  PX7004 (Hill Rpt.) ¶ 67.

[152] PX7006 (Hill Rebuttal Rpt.) Fig. 10.  Dr. Hill also found that the acquisition is presumptively unlawful in 911 large format store markets under the 2010 Merger Guidelines thresholds.  *Id.*

254 ("The Court concludes that the merger is likely to lessen competition substantially in

Richmond, Virginia at least, and it does not reach any of the other markets.").

> ii.    *This Acquisition Increases Concentration in the Market for Union*
> *Grocery Labor in Collective Bargaining Agreement Areas*

The acquisition is also presumptively unlawful because it would lead to undue

concentration in the market for union grocery labor.  The unions explain the real-world impact

that competition between Kroger and Albertsons has on their ability to secure wage increases,

favorable working conditions, and better benefits for their members.  *Supra* § I.A.iv.

Eliminating this competition will hurt unions' ability to bargain on behalf of grocery workers,

illustrating that, consistent with "business realities," *FTC v. Tronox, Ltd.*, 332 F. Supp. 3d 187,

212 (D.D.C. 2018), "union grocery labor" is a line of commerce impacted by this acquisition.

An analysis of the *Brown Shoe* factors and the market realities similarly support a finding that

union grocery labor in collective bargaining agreement ("CBA") areas is a relevant antitrust

market.

> a)   *Union grocery labor is a relevant antitrust market*

Union grocery labor is a relevant antitrust market, because—from the perspective of

union grocery workers and their unions—union grocery employers are not reasonably

interchangeable with non-union or non-grocery employers.  *See Brown Shoe*, 370 U.S. at 325;

*Warner*, 742 F.2d at 1163 (A relevant market "is determined by examining the reasonable

interchangeability" of it "and substitutes.").  Specifically, an analysis of the *Brown Shoe* factors

shows that union grocery labor has peculiar uses, industry recognition, and distinct pricing.  370

U.S. at 325.  For union grocery workers, grocery work at union employers has unique benefits

that cannot be found elsewhere.  Many union grocery workers—particularly those whose

benefits have vested—would not switch to a non-union employer, because they would lose the

valuable union benefits and job protections that have been negotiated in their CBA.[153]  Union

grocery workers also value the healthcare and pension benefits and other job protections

provided by the CBAs, including paid vacation time and sick leave, overtime pay, safer working

conditions, more prescribed schedules, guaranteed hours, and better protections against

discriminatory practices.[154]  For this reason, turnover for union grocery workers decreases

significantly after workers accrue these benefits.[155]  When a union grocery worker leaves their

union job for a non-union employer, they lose all these bargained-for advantages.[156]  Defendants

recognize the distinctions in compensation between union and non-union grocery jobs, as shown

through ████████████████████████████████████████████████████████

████████████████████████[157]

      Union jobs in other industries are also poor substitutes for grocery jobs.  First, union

grocery workers tend to be more highly compensated than other union jobs.  Other unionized

industries, such as the retail or healthcare sectors, do not offer comparable wages or benefits.[158]

Second, many roles in a grocery store require different skills and experiences than other jobs

outside the grocery industry.  For example, meatcutters employed in a Kroger or Albertsons store

require a multi-year apprenticeship with training programs covering topics such as knife and

equipment skills, food safety and handling, customer service, and preparing specialty cuts of

---

[153] *See* PX4014 (Dosenbach (Albertsons) IH 135:1-20); PX4015 (McPherson (Kroger) IH 139:8-140:16).
[154] PX5010 (UFCW Local 324 Decl.) ¶¶ 2-3; PX5014 (UFCW Local 3000 Decl.) ¶¶ 2-3.
[155] PX4014 (Dosenbach (Albertsons) IH 82:3-22, 83:2-21); PX5010 (UFCW Local 324 Decl.)
¶ 3; PX5014 (UFCW Local 3000 Decl.) ¶ 3; PX5011 (UFCW Local 7 Decl.) ¶ 5.
[156] PX4015 (McPherson (Kroger) IH 93:24-95:8); PX5010 (UFCW Local 324 Decl.) ¶ 3;
PX5014 (UFCW Local 3000 Decl.) ¶ 3.
[157] PX4015 (McPherson (Kroger) IH 25:3-16, 27:6-19, 87: 21-23, 89:24-90:21, 137:12-20);
PX4014 (Dosenbach (Albertsons) IH 43:1-17, 127:18-128:19).
[158] PX5014 (UFCW Local 3000 Decl.) ¶ 3.

meat.[159]  By contrast, working at a meatpacking plant, for instance, is a very different work environment, requires different skills, and often pays less.[160]  As a result, many grocery workers would not be able to easily substitute to another job outside of a grocery store.

That employment in alternative industries may be acceptable to some workers in some circumstances does not render the preferences of union grocery workers irrelevant.  *See Todd v. Exxon Corp.*, 275 F.3d 191, 204 (2d Cir. 2001) (finding a plausible antitrust labor market for certain employees in the oil and petrochemical industry notwithstanding the possibility of constraints imposed by employment in alternative industries).  This is particularly true in the context of the harm alleged here—a reduced ability to negotiate as a collective bargaining unit.  If the collective bargaining process results in worse outcomes, it is not just one or two workers who will be affected—it is the entire unionized workforce.

### b) CBA areas are relevant geographic markets

Each CBA covers a defined geographic area.[161]  The negotiated wages, benefits, and working conditions cover all the union grocery workers at stores within the CBA's defined area.  Any changes in wages or benefits due to negotiations impact all union workers at stores covered by the CBA.[162]  Defendants recognize that ███████████████████████████████ ████████████████████████████████████████████[163] ████████████████

---

[159] PX5010 (UFCW Local 324 Decl.) ¶ 5; PX5014 (UFCW Local 3000 Decl.) ¶ 6; PX5011 (UFCW Local 7 Decl.) ¶ 8; PX4014 (Dosenbach (Albertsons) IH 60:5-15, 61:2-62:17); PX4015 (McPherson (Kroger) IH 46:18-47:4).
[160] PX5010 (UFCW Local 324 Decl.) ¶ 5; PX5014 (UFCW Local 3000 Decl.) ¶ 6; PX5011 (UFCW Local 7 Decl.) ¶ 8.
[161] *See, e.g.,* PX4074 (Zinder (UFCW Local 324) Dep. 186:19-21); PX1381 (Kroger); PX2252 (Albertsons) at 084-085; PX2257 (Albertsons) at 006.
[162] PX4112 (Cordova (UFCW Local 7) Dep. 189:2-191:9); *see also* PX4074 (Zinder (UFCW Local 324) Dep. 185:25-186:21).
[163] PX2148 (Albertsons) at 004; *see also* PX12686 (Albertsons) at 003.

████████████████████████████████████████████████████████████

████████████████████████████████████ [164]  Thus, the geographic areas covered by each

CBA are relevant geographic markets illuminating the competitive effects of this acquisition.

*See* Merger Guidelines § 4.3.D.8 ("[G]eographic market definition may involve assessing

whether workers may be targeted for less favorable wages or other terms of employment

according to factors such as . . . work locations.").

> *c) This acquisition is presumptively unlawful because it significantly increases concentration for union grocery labor in many CBA areas*

The acquisition would create a dominant employer of union grocery workers in many

geographic areas where Defendants compete for workers and negotiate with unions.  Dr. Hill

calculated market shares in four states where Defendants have overlapping CBA areas: Oregon,

Washington, California, and Colorado.  These calculations show that Defendants' combined

market shares, market concentration, and increases in concentration easily surpass the levels that

create a presumption of illegality.  In overlapping Colorado CBA areas, for example, there are no

other union grocery employers at all, making the acquisition a merger-to-monopoly.[165]  In

Southern California, Dr. Hill calculates a combined worker share of nearly 75%.[166]  In the

overlapping CBA areas of UFCW Local 555, covering parts of Oregon and Washington, Dr. Hill

shows that the merged firm would employ over 70% of union grocery workers.[167]  And in each

of the overlapping CBA areas of UFCW Local 3000 in Washington, Dr. Hill finds that the

---

[164] PX2148 (Albertsons) at 004; PX12686 (Albertsons) at 003.
[165] PX7004 (Hill Rpt.) Fig. 59.
[166] PX7004 (Hill Rpt.) Fig. 60.
[167] PX7004 (Hill Rpt.) Fig. 61-62.

acquisition would give Defendants a combined worker share of more than 75%.[168]  No court has allowed an acquisition to proceed with market shares of this magnitude.

***

Plaintiffs carry their prima facie burden both by showing the acquisition will eliminate significant head-to-head competition between Kroger and Albertsons, *supra* § I.A, and by showing that the acquisition will result in increased concentration that triggers the presumption of illegality under the Merger Guidelines.

### C.  The Proposed Divestiture Will Not Prevent a Substantial Lessening Of Competition

Recognizing the acquisition is unlawful, Defendants propose a made-for-litigation divestiture of 579 stores to C&S, a wholesaler with little experience running grocery stores and lacking the necessary infrastructure.  To rebut Plaintiffs' prima facie case, Defendants have the burden to establish a divestiture would "sufficiently *mitigate* the merger's effect such that it [i]s no longer likely to *substantially* lessen competition."  *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1059 (5th Cir. 2023); *see also Sysco*, 113 F. Supp. 3d at 72 (divestiture must "restore competition" and "replac[e] the *competitive intensity* lost as a result of the merger").  Defendants cannot satisfy that burden and the American public should not bear the risk of failure.

#### i.  The Divestiture Fails to Mitigate a Substantial Lessening of Competition for Retail Supermarkets

The divestiture will not mitigate the anticompetitive effects of the acquisition in the supermarket or large format store market for at least four reasons.  First, it fails to address hundreds of markets where the acquisition will harm consumers.  Second, C&S is a wholesaler with a long history of failing to operate supermarkets.  Third, C&S will be acquiring a

---

[168] PX7004 (Hill Rpt.) Fig. 63-64.

hodgepodge of Kroger and Albertsons stores without the assets necessary to support them. Finally, C&S will profit from the divestiture *regardless* of whether the stores effectively compete, diminishing its incentive to compete with Defendants.

> a)  *The divestiture leaves hundreds of local markets unremedied*

The divestiture ignores hundreds of affected markets serving millions of people.  Even assuming a *perfectly* successful divestiture,[169] Dr. Hill identifies 1,002 supermarket markets (totaling $37 billion in sales) in which the acquisition would be presumptively unlawful.[170]  *See* Merger Guidelines § 2.1; *Phila. Nat'l Bank*, 374 U.S. at 364.  And even if Defendants' flawed arguments about the supermarket market definition were correct—and the market included club stores, natural and gourmet food stores, and limited assortment stores—the acquisition would still be presumptively illegal in 551 large format store markets (totaling $23 billion in sales) assuming a perfectly successful divestiture.[171]  This is reason enough to reject the divestiture because a finding of anticompetitive harm in just one market—let alone hundreds—"provides an independent basis for the injunction."  *United States v. Anthem*, 855 F.3d 345, 368 (D.C. Cir. 2017); *see also Pargas, Inc. v. Empire Gas Corp.*, 423 F. Supp. 199, 227 (D. Md. 1976), *aff'd*, 546 F.2d 25 (4th Cir. 1976) (preliminarily enjoining acquisition alleged to affect "only a limited number of communities" since divestiture must address "any geographic area").

---

[169] That is, assuming each and every store divested to C&S not only remains open, but also ██████████████████████ maintains its pre-divestiture sales levels.

[170] PX7006 (Hill Rebuttal Rpt.) at 103-104, Figs. 43-44.

[171] PX7006 (Hill Rebuttal Rpt.) ¶ 69, Fig. 10, ¶ 74, Fig. 11.  Moreover, in 335 supermarket markets and 234 large format store markets, Dr. Hill found that the acquisition not only is above the threshold for presuming a merger to be unlawful, but also is likely to substantially reduce competition based on CMCR analysis assuming a perfectly successful divestiture.  *Id*. at 106, Fig. 46, ¶¶ 78-82, Fig. 13.

b) *C&S lacks the experience to operate the divested stores.*

C&S is a poor divestiture buyer for these stores. C&S operated only 23 retail stores as of FY2023, most acquired in 2021 and 2022.[172] As recently as 2021, C&S stated, ███████

████████████████████████████████████████████████████████████

██████████████████████████████████████████[173] C&S is so

inexperienced that it requested ████████████████████████████████████████

███████████[174]

C&S previously has failed to operate supermarkets at much smaller scale. From 2001 to 2012, C&S acquired over 370 grocery stores, but by November 2012 █████████████ and operated only three.[175] C&S's ████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████[176] C&S also █████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████[177] Each of these risks is magnified here.

C&S also has struggled as a divestiture buyer. In 2022, C&S purchased 12 stores divested in connection with the Price Chopper / Tops merger.[178] Today, those stores' future looks bleak.[179] C&S's President of Retail testified that the stores ███████████████

████████████████████

---

[172] PX7002 (Fox Rpt.) ¶¶ 11, 22.
[173] PX3077 (C&S) at 037.
[174] PX1272 (Kroger) at 001.
[175] PX7002 (Fox Rpt.) ¶¶ 12-18, Figs. 4 & 5; PX3128 (C&S) at 001, 003, 006-008, 013, 017; DX2304 (C&S) at 8-9.
[176] DX2304 (C&S) at 9.
[177] DX2304 (C&S) at 9.
[178] PX3069 (C&S) at 009.
[179] PX7004 (Hill Rpt.) ¶ 225, Fig. 56.

████████████████████████████████████████████[180]  In March

2024, year-to-date sales were ████████████████████████████████████████

████[181]  If C&S cannot handle 12 stores from a single regional chain, it has no business

operating 579 stores scattered around the country.

Defendants' prior divestitures have also failed.  In Albertsons' 2015 acquisition of

Safeway, it proposed divestitures, including selling 146 stores to Haggen, that it claimed would

████████████████████████████████████████████████████████

████████[182]  But Haggen ██████████████████████████████████

████████████  and filed bankruptcy within months.[183]  Albertsons reacquired 54 Haggen stores

and made it a wholly-owned subsidiary.[184]  Other divestiture buyers from the

Albertsons/Safeway merger also failed.[185]

> c)  *C&S cannot match the divested assets' current performance.*

C&S will not be receiving sufficient assets to compete effectively.  Its own deal model

projects ████████████████████████████████████████████████████

████████████████████████████████[186]  The divestiture does not include ███

████████████████████████████████████████████████████████  for

---

[180] PX4050 (McGowan (C&S) Dep. 35:7-36:2, 66:25-67:7, 75:16-25).

[181] PX3421 (C&S) at tab "GU Retail P&L v Plan (Stores)."

[182] PX6001 (FTC) at 001; PX2615 (Albertsons) at 020.

[183] PX4025 (Clougher (Albertsons) IH 28:22-29:13, 30:7-31:8, 39:7-40:2, 70:18-25, 80:9-80:19, 82:18-84:5, 89:11-91:8, 122:11-25 152:19-153:21, 155:3-156:18, 181:12-184:2, 184:8-185:6).

[184] PX2777 (Albertsons); PX2446 (Albertsons) at 008; PX7004 (Hill Rpt.) ¶¶ 235-36; Haggen, *About Us*, https://www.haggen.com/about-us.html (last visited Jan. 4, 2024).

[185] PX5016 (Smith (AWG) Decl.) ¶¶ 3-4, 7-20; PX2777 (Albertsons); PX6010 (FTC); PX2446 (Albertsons) at 005, 008, 010; PX6004, *Albertsons' United Div. Acquires 7 Lawrence Bros. Stores*, Progressive Grocer (Mar. 13, 2016); PX6002, *Closing Wichita Falls grocery store has warrant filed for owed taxes*, Times Record News (Jan. 7, 2019).

[186] PX3602 (C&S) at tab "Assumptions and CF Impacts"; PX4072 (Florenz (C&S) Dep. 89:2-8).

the divested stores .[187]  The stores ██████████████████████████ [188] ██

██████████████████████████████████, [189] and are ████████████████

████████████████ [190]  C&S will also not receive assets needed to operate a successful

modern grocery chain, including:

- an existing banner in each geography;[191]

- ████████████████████████████ [192]

- private label manufacturing facilities (other than a single dairy plant);[193]

- ██████████████████ [194]

- ████████████ [195]

- ████████████████████ [196] and

- ██████████ [197]

C&S will be particularly hindered by rebannering half the divested stores and receiving

limited private label assets.  Banners with strong brand equity are essential to a successful retail

grocery operation.[198]  Almost half of the divested stores will have to be rebannered to one of six

acquired or licensed banners that are ██████████████████████

---

[187] PX4060 (Winn (C&S) Dep. 165:24-167:5, 168:15-168:24; 324:1-325:13, 332:2-5, 335:10-12); PX4050 (McGowan (C&S) Dep. 84:9-17, 105:5-108:4).
[188] PX7004 (Hill Rpt.) ¶¶ 221-23; PX1641 (Kroger).
[189] PX1641 (Kroger); PX7004 (Hill Rpt.) ¶¶ 221-23; *see also* PX7002 (Fox Rpt.) ¶ 45.
[190] PX7002 (Fox Rpt.) ¶ 219, Fig. 35.
[191] PX7002 (Fox Rpt.) ¶ 63, Fig. 14; PX6253 (Kroger & Albertsons) at 002.
[192] PX7002 (Fox Rpt.) ¶¶ 75-120.
[193] PX7002 (Fox Rpt.) ¶¶ 80-82, 84-88; PX6253 (Kroger & Albertsons) at 002.
[194] PX7002 (Fox Rpt.) ¶¶121-29, 141-50.
[195] PX7002 (Fox Rpt.) ¶¶ 130-31, 151-53.
[196] PX7002 (Fox Rpt.) ¶¶ 167-80.
[197] PX7002 (Fox Rpt.) ¶¶ 159-168, 175, 181-184.
[198] PX7002 (Fox Rpt.) ¶¶ 75-76, 79; DX2497 (Kleinberger Rpt.) ¶¶ 65-66, Fig. 14.



[199] Rebannering will require ████████████████[200] and C&S projects ████

████████████████[201] And while C&S ████████████████████

████████ the divestiture package only includes ██████████████████████

████████████████████████████████[202] The *Sysco*

court rejected a divestiture whose buyer had one-third as many private label products as the

combined firm. 113 F. Supp. 3d at 76. Likewise, here, C&S will struggle to compete with

limited private label offerings.

> ### d)  C&S's low purchase price disincentivizes competition.

The divestiture purchase price is extremely low compared to Defendants' current profits

from these assets.[203] C&S will generate significant profits—and can recoup its investment—

even if it cannot operate all of the 579 divested stores successfully or if it loses considerable

sales.[204] That C&S will profit even if the purchased stores fail to compete successfully with

Defendants underscores why the divestiture will not mitigate anticompetitive effects of the

acquisition. *See United States v. Aetna*, 240 F. Supp. 3d 1, 72 (D.D.C. 2017) (rejecting

divestiture whose "low purchase price further supports the conclusion that [the buyer] has

serious doubts about its own ability to manage all the divestiture [assets]").

> ## ii.  The Divestiture Fails to Mitigate a Substantial Lessening of
> Competition in the Labor Market

---

[199] PX4072 (Florenz (C&S) Dep. 233:10-234:6, 243:14-244:2, 245:22-246:22); PX7002 (Fox Rpt.) ¶ 63, Fig. 14; PX4060 (Winn (C&S) Dep. 91:16-94:11); PX4107 (Keptner (C&S) Dep. 118:23-119:23).

[200] PX7002 (Fox Rpt.) ¶¶ 51-54.

[201] PX3602 (C&S) at tab "Inputs;" PX4072 (Florenz (C&S) Dep. 46:3-47:13).

[202] PX3068 (C&S) at 003; PX7002 (Fox Rpt.) ¶¶ 76-77, 83, 85, 89, 100-101, Figs. 17-18, 20, 23; PX3106 (C&S) at 007; PX4030 (Winn (C&S) IH 37:15-38:25).

[203] *See* PX3775 (SoftBank) at 002; PX4101 (Davison (SoftBank) Dep. 50:10-51:3).

[204] PX3776 (SoftBank) at 018; PX4101 (Davison (SoftBank) Dep. 61:18-62:2); PX4029 (Millerchip (Kroger) IH 67:1-19, 69:11-24); DX2495 (Galante Rpt.) ¶¶ 60, 120.

The proposed divestiture should also be rejected because it fails to mitigate lost competition in the market for union grocery labor.

*First*, C&S would be too small for unions to leverage against a combined Kroger and Albertsons.  Unions can play off competing employers only where they are of comparable size.[205]  In Washington, Oregon, and Southern California, post-divestiture C&S will be significantly smaller than either Kroger or Albertsons is today.[206]  Rather than being a competing union employer whose actions could constrain Defendants, C&S is likely to accept a "me-too" agreement mirroring what the merged firm negotiates with the union.[207]

*Second*, entanglements between C&S and the merged firm will eliminate any leverage.  Today, unions are able to pit Kroger and Albertsons against each other because ███████████ ████████████████████████[208]  For the first year post-divestiture, however, Kroger will have substantial influence over C&S's labor strategy because ████████████████████████████ ███████████████████████████[209]  Even after that year, C&S's dependency on Kroger ███ ███████████████████████ will make it susceptible to pressure to coordinate negotiating strategy—pressure that Albertsons does not face today.

### iii.    The Divestiture Will Not Be Timely

To meet their burden, Defendants must show that their divestiture will timely mitigate the loss of competition.  *See Sysco*, 113 F. Supp. 3d at 73-74 (rejecting divestiture projected to be ineffective for at least five years).  Where, when, how, and if C&S will compete is uncertain.

---

[205] PX5019 (UFCW Local 400 Decl.) ¶ 7; PX5010 (UFCW Local 324 Decl.) ¶ 11.
[206] PX7004 (Hill Rpt.) ¶ 276, Fig. 65.
[207] *See* PX5014 (UFCW Local 3000 Decl.) ¶¶ 17-20.
[208] PX5010 (UFCW Local 324 Decl.) ¶ 14; PX5011 (UFCW Local 7 Decl.) ¶ 9; PX4042 (Dosenbach (Albertsons) Dep. 139:15-21); PX4015 (McPherson (Kroger) IH 231:19–232:1).
[209] PX1654B (Kroger) at 071-074, 199-201.

*a)  The divestiture is uncertain to occur as planned.*

The divestiture is subject to post-closing contingencies that threaten C&S's success.

*First*, ███████████████████████████████████████████████████

███████████████████████████████████[210]  If consents are not obtained, such stores

cannot be divested at all and they may simply be █████████████████████████[211]

*Second*, C&S may close or sell divested stores in the near term.  Defendants' expert calculates

that ████████████████████████████████[212] and C&S predicts ████████████

███████████████[213]  Defendants tout C&S's purported commitment not to close stores or

lay off frontline staff,[214] but ███████████[215]  Tellingly, C&S's then-CEO, Bob Palmer, asked,

████████████████████████████████████████████████████████████████████

█████████████████████████████████████[216]  Closing or selling many of

the divested stores would further undermine C&S's ability to compete with Defendants.[217]

*Third*, C&S plans ████████████████████████████████████████

███████████████████████████ but, at the corporate level, only one senior

executive █████████████████████████████████ and Kroger ███████████

██████████████████████[218]  To date, ██████████████████████

---

[210] PX11257 (Kroger) at 129.
[211] PX1654 (Kroger) at 054-058.
[212] DX2495 (Galante Rpt.) ¶ 80, Fig. 11.
[213] PX4072 (Florenz (C&S) Dep. 35:5-36:1).
[214] PX6287 (Kroger) at 002.
[215] PX4072 (Florenz (C&S) Dep. 259:9-19, 265:19-266:9).
[216] PX3115 (C&S) at 1.
[217] *See* PX4030 (Winn (C&S) IH 29:12-31:5); PX7002 (Fox Rpt.) ¶ 74; PX7008 (Fox Rebuttal Rpt.) ¶ 38, Figs. 1-7; PX4107 (Keptner (C&S) Dep. 123:22-125:8); PX3406 (C&S) at 008.
[218] PX4030 (Winn (C&S) IH 58:22-59:1); PX4060 (Winn (C&S) Dep. 72:9-13); PX4149 (Galante Dep. 71:14-19); PX1654 (Kroger) at 111-112.

██████ [219] Kroger ████████████████████████████████████████████

████████████████████████████████████████████████ [220] In short,

C&S will need thousands of new employees, but it is unclear who they will be.

### b) Entanglements will undermine C&S's ability to compete.

Courts discredit divestitures that leave the buyer dependent on the merged party for years

post-closing. *See*, *e.g.*, *Sysco*, 113 F. Supp. 3d at 77 (holding buyer reliant on merged entity for

private label products supply and customer database would not be "a truly independent

competitor"). Here, the transition services agreement ████████████████████████████

████ [221]

Remarkably, C&S concedes that it ████████████████████████████████████

████ [222] Instead, C&S ████████████████████████████████████████████

████████████████████████████████████████████ and Kroger ████████

████████████████████████ [223] But this could last for years, as C&S ██████████

████████████████████████████████ [224] and ██████████████████████

████████████████████████ [225] As C&S's CEO conceded, ████████████████████

████████████████████████████████ [226] During this time, C&S will not be an

effective competitor in any market. *See FTC v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26, 59

---

[219] DX2495 (Galante Rpt.) ¶¶ 104-05; PX3956 (C&S) at 2; PX7008 (Fox Rebuttal Rpt.) ¶ 65, Fig. 8.
[220] PX1654 (Kroger) at 111-112; PX12673 (Albertsons) at 002, 004.
[221] PX4060 (Winn (C&S) Dep. 237:25-238:25); DX2495 (Galante Rpt.) ¶¶ 65, 129.
[222] PX3956 (C&S) at 045.
[223] PX3956 (C&S) at 045; PX4107 (Keptner (C&S) Dep. 189:9-195:11).
[224] *Compare* PX1654 (Kroger) at 013 *and* PX1274 at 012; *see also* PX4072 (Florenz (C&S) Dep. 129:8-130:6).
[225] PX4072 (Florenz (C&S) Dep. 149:23-150:8).
[226] PX4030 (Winn (C&S) IH 136:18-137:8).

(D.D.C. 2009) ("[D]ivestitures must be made to . . . a willing, *independent* competitor." (emphasis in original) (cleaned up)).

### c)  Kroger can undercut C&S for at least four years.

C&S will rely on Defendants to provide ██████████████████████ ████████████████████████████████████████████████████████████ ████████████[227]  Thus, effectiveness of the divestiture remedy depends on Defendants' performance of contractual obligations to the new competitor, which are ██████████ ████████████[228]  Courts rightly discount the likelihood of a divestiture buyer restoring competitive intensity while it is reliant on the sellers.  *Aetna*, 240 F. Supp. 3d at 71 ("The Court will not rely too heavily on the ASA, because Aetna and Humana have no incentive to provide any assistance beyond the bare minimum during this period, lest they create too powerful a competitor.").

\*\*\*

Defendants fall far short of meeting their burden to show that their made-for-litigation "fix" mitigates the substantial anticompetitive effects of this acquisition.  It fails to remedy hundreds of markets where the acquisition is presumptively illegal.  Even in the markets it reaches, the divestiture is fatally flawed by C&S's lack of experience, mixed incentives, insufficient assets, and prolonged dependence on Defendants.  Consumers should not bear even one of these risks, let alone all of them.

### D.  Entry or Expansion Is Unlikely To Be Timely or Sufficient To Preserve Competition

Defendants cannot rebut Plaintiffs' prima facie case by showing entry or expansion

---

[227] PX1654 (Kroger) at 221, Schedule 2.1(a).
[228] PX4060 (Winn (C&S) Dep. 329:15-18).

would be timely, likely, and sufficient to counteract or deter the acquisition's likely anticompetitive effects. *See* Merger Guidelines § 3.2 (Entry must be sufficient in "magnitude, character, and scope" to offset the loss of the independent competitor.). To be timely, entry must occur before the acquisition causes anticompetitive effects and, to be sufficient, must maintain competition over the long term. *Aetna*, 240 F. Supp. 3d at 52–53. Defendants bear the burden of providing evidence that "low barriers to entry" rebut Plaintiffs' prima facie case. *United States v. Bazaarvoice, Inc.*, No. 13-cv-00133, 2014 WL 203966, at *71 (N.D. Cal. Jan. 8, 2014); *see also Heinz*, 246 F.3d at 715 n.7. Here, entry or expansion will not be timely, likely, or sufficient to replace lost competition. For instance, building a single new supermarket takes more than █████ and can cost anywhere from ███████████.[229] Accordingly, rates of new entry by supermarkets and other large format stores are low, at less than 3% increases per year.[230]

### E. Defendants Do Not Show Efficiencies Outweigh Likely Competitive Harm

Defendants likewise cannot "carry the[] burden to demonstrate the verifiability of their claimed efficiencies." *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 73 (D.D.C. 2018). This is Defendants' burden because, as the Supreme Court has explained, "where the facts with regard to an issue lie peculiarly in the knowledge of a party, that party is best situated to bear the burden of proof." *Smith v. United States*, 568 U.S. 106, 112 (2013) (cleaned up). Courts apply strict standards in their review of claims that efficiencies may prevent a substantial lessening of competition from an acquisition, and indeed, the Supreme Court has never recognized an efficiencies defense. *See Phila. Nat'l Bank*, 374 U.S. at 371; *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 89 (D.D.C. 2011). Efficiencies must be cognizable and "of a

---

[229] PX4059 (Sankaran (Albertsons) Dep. 204:10-18, 205:7-16); PX4071 (Yates (Ahold) Dep. 165:8-166:3); PX4031 (Van Helden (Stater Bros) IH 61:23-64:14).
[230] PX7004 (Hill Rpt.) ¶ 196.

nature, magnitude, and likelihood that no substantial lessening of competition is threatened by the merger in any relevant market."  Merger Guidelines § 3.3.  To meet their burden, Defendants must demonstrate that their efficiencies are (1) "verified, using reliable methodology and evidence not dependent on the subjective predictions of the merging parties or their agents," Merger Guidelines § 3.3, (2) merger specific—i.e., "a type of cost saving that could not be achieved without the merger," *Wilhelmsen*, 341 F. Supp. 3d at 72 (cleaned up), and (3) accrue to the benefit of competition and not simply to the merging parties, *St. Luke's*, 778 F.3d at 792 (Defendants must "demonstrate that efficiencies resulting from the merger would have a *positive effect on competition*." (emphasis added)).  Further, "anticompetitive effects in one market cannot be offset by procompetitive effects in another market."  *RSR*, 602 F.2d at 1325.

Defendants' claimed efficiencies cannot meet this rigorous standard because they are largely not cognizable, and, even if they were credited in full, they would be insufficient to prevent the competitive harm.  Defendants claim two primary categories of efficiencies: (1) incremental revenue and profits; and (2) cost savings.[231]  Both claims suffer from similar infirmities.  The claimed efficiencies are simply identified, without a demonstration of how they will be achieved (i.e., they are not verifiable); an explanation of why this merger is necessary to achieve them (i.e., they are not merger specific); and how they will prevent the substantial lessening of competition from the acquisition.  *First*, Defendants' claims related to incremental revenue and profits[232] should be excluded because they fail to show "that their claimed efficiencies would benefit customers . . . and, more particularly, the customers in the challenged markets."  *Aetna*, 240 F. Supp. 3d at 94 (cleaned up).  *Second*, Defendants are unable to show

---

[231] DX2493 (Gokhale Rpt.) ¶¶ 19-20.
[232] DX2493 (Gokhale Rpt.) ¶¶ 215-46.

that the vast majority of the second category of claimed benefits—cost savings—are verifiable or merger specific.  Defendants primarily rest on a panoply of unsupported assumptions by their paid-for consultants and party executives.[233]  "[B]ecause the bases for the assumptions [Defendant's expert] identified and their role in the efficiencies analysis is unclear, the reasonableness of those assumptions, along with the ultimate determinations of likelihood and magnitude, cannot be verified with any degree of rigor."  *Wilhelmsen,* 341 F. Supp. 3d at 73 (cleaned up).

## II.  THE EQUITIES HEAVILY FAVOR A PRELIMINARY INJUNCTION

Under Section 13(b) of the FTC Act, this Court must also "balance the equities." *Warner*, 742 F.2d at 1165.  If the FTC has shown a likelihood of success, "a countershowing of private equities alone does not justify denial of a preliminary injunction."  *Id.*  The "principal public equity" favoring a preliminary injunction is "the public interest in effective enforcement of the antitrust laws."  *Heinz*, 246 F.3d at 726.  Without preliminary relief, the Commission may face the "exceedingly difficult"—and potentially impossible—task of "unscrambling the eggs" if the acquisition is ultimately deemed unlawful.  *Warner*, 742 F.2d at 1165; *Whole Foods*, 548 F.3d at 1034.

Here, the equities weigh strongly in favor of a preliminary injunction.  If permitted to consolidate, Kroger and Albertsons would have strong financial incentives to implement higher prices, eliminate key Albertsons leadership and other staff, and share competitively sensitive information.[234]  Indeed, in a related proceeding in Colorado, Defendants acknowledged the need for "guardrails" on the presentation of evidence in open court to avoid disclosure of

---

[233] *See* DX2493 (Gokhale Rpt.) ¶¶ 42-44, 48, 76, 80-84.
[234] *See supra* § I.A.

competitively sensitive pricing and business strategies.  PX6680, Prehearing Conf. Tr. 16:25-17:9, *Colorado v. Kroger Co.*, No. 2024-CV-30459 (Colo. Dist. Ct. July 19, 2024) ("[I]f the deal doesn't close, then the parties remain competitors.  So it's important to have certain guardrails in place."); *see also id.* 28:9-21 (C&S urged that "it's quite important to protect things, like pricing strategies, market strategies, and other things, that will go to the core of how C&S intends to compete.").  That very same sensitive information—pricing plans, forward-looking business strategies—could immediately change hands between two fierce rivals if the acquisition is permitted to close before the Commission has an opportunity to rule on its lawfulness.  At that point, it would be extremely difficult, if not impossible, to unwind the damage and return to the status quo.  *Hershey*, 838 F.3d at 352-53.  Preliminary injunctive relief is necessary to prevent harm to competition and consumers while the merits proceeding before the Commission is ongoing.

Defendants cannot argue that they will be harmed by delay in closing this acquisition.  Defendants repeatedly have staved off the FTC's attempts to expedite the administrative hearing both before this Court and in front of the Administrative Law Judge.  *See* PX6681, Defendants' Motion to Recess the Evidentiary Portion of the Part 3 Administrative Hearing, FTC Dkt. 9428 (July 8, 2024).  Defendants cannot on the one hand delay the underlying merits proceeding, and on the other hand cite the delayed merits proceeding as cause for denying a preliminary injunction.  Further, there is "no reason why, if the merger makes economic sense now, it would not be equally sensible to consummate the merger following an FTC adjudication on the merits that finds the merger lawful."  *Hershey*, 838 F.3d at 353; *accord Heinz*, 246 F.3d at 726.

## **<u>CONCLUSION</u>**

Plaintiffs respectfully request that this Court grant the preliminary injunction.

*PLS' MEMO ISO PI MOTION*

Dated: July 26, 2024                    Respectfully submitted,

                                        /s/ Susan A. Musser
                                        Susan A. Musser, DC Bar # 1531486
                                        Charles Dickinson, DC Bar # 997153
                                        Rohan Pai, DC Bar # 1015652
                                        Laura Hall, NY Bar # 4337408
                                        Barrett Anderson, CA Bar # 318539
                                        Elizabeth Arens, DC Bar # 982662
                                        Jeanine Balbach, MD Bar
                                        Emily Blackburn, DC Bar # 1032506
                                        Alexander J. Bryson, VA Bar # 85737
                                        Guia Dixon, CA Bar # 305751
                                        Katherine Drummonds, DC Bar # 1044289
                                        Paul Frangie, DC Bar # 474225
                                        Trisha Grant, DC Bar # 1021419
                                        Jacob Hamburger, DC Bar # 1025538
                                        Lily Hough, CA Bar # 315277
                                        Janet Kim, DC Bar # 489075
                                        Kenneth A. Libby, NY Bar # 2035129
                                        Eric Olson, DC Bar # 1708530
                                        Harris Rothman, NY Bar # 5780283
                                        Anjelica Sarmiento, NY Bar # 5636154
                                        Joshua Smith, MD Bar
                                        Albert Teng, DC Bar # 1021115
                                        Le'Ora Tyree, IL Bar # 6288669
                                        Theodore Zang, Jr., NY Bar # 2186518

                                        Federal Trade Commission
                                        Bureau of Competition
                                        600 Pennsylvania Avenue, NW
                                        Washington, DC 20580
                                        Telephone: (202) 326-2122
                                        smusser@ftc.gov
                                        cdickinson@ftc.gov

                                        *Attorneys for Plaintiff Federal Trade Commission*

/s/ Robert A. Bernheim
Robert A. Bernheim, AZ Bar No. 024664
Jayme L. Weber, AZ Bar No. 032608
Vinny Venkat, AZ Bar No. 038587
Connor Nolan, AZ Bar No. 038088

Arizona Office of the Attorney General
2005 N. Central Avenue
Phoenix, AZ 85004
Tel: (602) 542-5025
Robert.Bernheim@azag.gov
Jayme.Weber@azag.gov
Vinny.Venkat@azag.gov
Connor.Nolan@azag.gov

*Attorneys for Plaintiff State of Arizona*

PLS' MEMO ISO PI MOTION

/s/ Nicole Gordon
Nicole Gordon, CA Bar No. 224138
Shira Hoffman, CA Bar No. 337659

State of California
California Department of Justice
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102
Tel: (415) 510-3458
Facsimile: (415) 703-5480
Nicole.Gordon@doj.ca.gov
Shira.Hoffman@doj.ca.gov

*Attorneys for Plaintiff State of California*

/s/ C. William Margrabe

C. William Margrabe, DC Bar No. 90013916

Office of the Attorney General for the District of
Columbia
400 6th Street, N.W, 10th Floor
Washington, D.C. 20001
Tel: (202) 727-3400
Will.Margrabe@dc.gov

*Attorney for Plaintiff District of Columbia*

/s/ Brian M. Yost

Brian M. Yost, IL Bar No. 6334138
Paul J. Harper, IL Bar No. 6335001
Alice Riechers, IL Bar No. 6272933

Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
Tel: (872) 276-3598
Email: Brian.Yost@ilag.gov
Paul.Harper@ilag.gov
Alice.Riechers@ilag.gov

*Attorneys for Plaintiff State of Illinois*

/s/ Schonette J. Walker
Schonette J. Walker, MD Bar No. 0512290008
Gary Honick, MD Bar No. 7806010078
Byron Warren, MD Bar No. 1612140330

Office of the Attorney General
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
Tel: (410) 576-6470
swalker@oag.state.md.us
ghonick@oag.state.md.us
bwarren@oag.state.md.us

*Attorneys for Plaintiff State of Maryland*

/s/ Lucas J. Tucker
Lucas J. Tucker, NV Bar No. 10252
Samantha B. Feeley, NV Bar No. 14034

Office of the Nevada Attorney General
100 N. Carson St.
Carson City, Nevada 89701
Tel: (775) 684-1100
ltucker@ag.nv.gov
sfeeley@ag.nv.gov

*Attorneys for Plaintiff State of Nevada*

/s/ Julie Ann Meade
Julie Ann Meade, NM Bar No. 8143
Jeff Dan Herrera, NM Bar No. 154030

New Mexico Department of Justice
408 Galisteo St.
Santa Fe, NM 87504
Tel: (505) 717-3500
jmeade@nmag.gov
jherrera@nmag.gov

*Attorneys for Plaintiff State of New Mexico*

/s/ Cheryl F. Hiemstra
Cheryl F. Hiemstra, OSB#133857
Tim D. Nord, OSB#882800
Chris Kayser, OSB#984244
Tania Manners, OSB#140363

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel: (503) 934-4400
Facsimile: (503) 378-5017
Cheryl.Hiemstra@doj.state.or.us
Tim.D.Nord@doj.state.or.us
cjkayser@lvklaw.com
tmanners@lvklaw.com

*Attorneys for Plaintiff State of Oregon*

/s/ William Young

William Young, WY Bar No. 8-6746

Office of the Wyoming Attorney General
109 State Capitol
Cheyenne, WY 82002
Tel: (307) 777-7847
William.Young@wyo.gov

*Attorney for Plaintiff State of Wyoming*

PLS' MEMO ISO PI MOTION

# **Appendix A**





## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the Court's ordered page limitation, provided in the Court's Case Management and Scheduling Order, ECF No. 88 (April 12, 2024), because it does not exceed 50 pages, including headings, footnotes, and quotations, but excluding the caption, table of cases and authorities, signature block, exhibits, and any certificates of counsel.