B. JOHN CASEY, OSB No. 120025
john.casey@stoel.com
RACHEL C. LEE, OSB No. 102944
rachel.lee@stoel.com
JACOB GOLDBERG, OSB No.
162565
jacob.goldberg@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Telephone: 503.224.3380

MATTHEW M. WOLF (*Pro Hac Vice*)
matthew.wolf@arnoldporter.com
ARNOLD & PORTER KAYE
SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: 202.942.5000

*Attorneys for Defendant The Kroger Company*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, STATE OF ARIZONA, STATE OF CALIFORNIA, DISTRICT OF COLUMBIA, STATE OF ILLINOIS, STATE OF MARYLAND, STATE OF NEVADA, STATE OF NEW MEXICO, STATE OF OREGON, and STATE OF WYOMING, | Case No.: 3:24-cv-00347-AN |
| | DEFENDANTS THE KROGER COMPANY'S AND ALBERTSONS COMPANIES, INC.'S RESPONSE TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION |
| Plaintiffs, | |
| v. | REDACTED VERSION |
| THE KROGER COMPANY and ALBERTSONS COMPANIES, INC., | |
| Defendants. | |

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................ i

TABLE OF AUTHORITIES .................................................................................... ii

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 5

    A.    The Modern Grocery Industry ........................................................... 5

    B.    The Three Parties to the Transaction ................................................ 9

    C.    The Merger Transaction ................................................................. 11

LEGAL STANDARDS ......................................................................................... 14

    A.    The Preliminary Injunction Standard .............................................. 14

    B.    The *Baker Hughes* Framework ...................................................... 15

ARGUMENT ........................................................................................................ 16

I.    PLAINTIFFS CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS IN A RETAIL GROCERY MARKET ........................................ 16

    A.    Plaintiffs Cannot Establish a Presumption of Anticompetitive Effects ............... 16

    B.    Defendants Have Met Their Burden of Production on Rebuttal.......................... 38

    C.    Plaintiffs Cannot Carry Their Ultimate Burden of Persuasion ........................... 41

II.    PLAINTIFFS CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS IN A MARKET FOR UNION GROCERY LABOR ...................... 41

    A.    Plaintiffs' Labor Theory Is Not Legally Cognizable ........................... 42

    B.    Plaintiffs' Labor Theory Fails on Its Own Terms.............................. 43

III.    PLAINTIFFS FAIL TO SHOW A BALANCE OF EQUITIES IN THEIR FAVOR ...... 47

IV.    PLAINTIFFS FAIL TO ESTABLISH ANY IRREPARABLE HARM.......................... 48

V.    PLAINTIFFS' PROPOSED REMEDY IS FATALLY OVERBROAD ........................ 49

CONCLUSION ..................................................................................................... 50

CERTIFICATE OF COMPLIANCE ..................................................................... 54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apex Hosiery Co. v. Leader*,
310 U.S. 469 (1940)...................................................................................42

*Bartlett v. United States*,
401 U.S. 986 (1971)...................................................................................25

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
441 U.S. 1 (1979).......................................................................................33

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962)........................................................................... *passim*

*Brown v. Pro Football, Inc.*,
518 U.S. 231 (1996)...................................................................................43

*Clarett v. Nat'l Football League*,
369 F.3d 124 (2d Cir. 2004)......................................................................43

*Coronavirus Rep. v. Apple, Inc.*,
85 F.4th 948 (9th Cir. 2023) .....................................................................17

*DeHoog v. Anheuser-Busch InBev SA/NV*,
899 F.3d 758 (9th Cir. 2018) ...............................................................15, 25

*Dresses for Less, Inc. v. CIT Grp./Com. Servs., Inc.*,
2002 WL 31164482 (S.D.N.Y. Sept. 30, 2002).......................................33

*E. Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021) ....................................................................50

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
98 F.4th 1180 (9th Cir. 2024) ...................................................................49

*FTC v. Arch Coal, Inc.*,
2004 WL 7389952 (D.D.C. July 7, 2004)......................................15, 25, 26, 40

*FTC v. CCC Holdings Inc.*,
605 F. Supp. 2d 26 (D.D.C. 2009).......................................................39, 47

*FTC v. Exxon Corp.*,
636 F. 2d 1336 (D.C. Cir. 1980) ..............................................................14

*FTC v. Food Town Stores, Inc.*,
    539 F.2d 1339 (4th Cir. 1976) ........................................................................34

*FTC v. H.J. Heinz*,
    246 F.3d 708 (D.C. Cir. 2001) ........................................................................39

*FTC v. Microsoft Corp.*,
    681 F. Supp. 3d 1069 (N.D. Cal. 2023) ...................................................25, 47

*FTC v. Occidental Petroleum Corp.*,
    1986 WL 952 (D.D.C. Apr. 29, 1986) ..............................................................38

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) ..........................................................................15

*FTC v. RAG-Stiftung*,
    436 F. Supp. 3d 278 (D.D.C. 2020) ..........................................................29, 33

*FTC v. Staples, Inc.*,
    970 F. Supp. 1066 (D.D.C. 1997) ..............................................................34, 36

*FTC v. Sysco Corp.*,
    113 F. Supp. 3d 1 (D.D.C. 2015) ....................................................................34

*FTC v. Tenet Health Care Corp.*,
    186 F.3d 1045 (8th Cir. 1999) ..................................................................17, 23

*FTC v. Thomas Jefferson Univ.*,
    505 F. Supp. 3d 522 (E.D. Pa. 2020) ..............................................................36

*FTC v. Warner Commc'ns Inc.*,
    742 F.2d 1156 (9th Cir. 1984) ..................................................................15, 47

*Galvez v. Jaddou*,
    52 F.4th 821 (9th Cir. 2022) ..........................................................................49

*Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*,
    386 F.3d 485 (2d Cir. 2004) ............................................................................20

*Illumina, Inc. v. FTC*,
    88 F.4th 1036 (5th Cir. 2023) ....................................................................15, 26

*Kaplan v. Burroughs Corp.*,
    611 F.2d 286 (9th Cir. 1979) ......................................................................17, 21

*King v. Burwell*,
    576 U.S. 473 (2015) ........................................................................................42

*Labrador v. Poe by & through Poe*,
    144 S. Ct. 921 (2024) ................................................................................49

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
    941 F.2d 970 (9th Cir. 1991) .....................................................................49

*Maney v. Brown*,
    464 F. Supp. 3d 1191 (D. Or. 2020) ..........................................................48

*McNeil v. Aguilos*,
    831 F. Sup. 1079, 1086 (S.D.N.Y. 1993) ..................................................42

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010).................................................................................49

*Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*,
    889 F.2d 524 (4th Cir. 1989) .....................................................................18

*Murthy v. Missouri*,
    144 S. Ct. 1972 (2024)..............................................................................49

*New York v. Deutsche Telekom AG*,
    439 F. Supp. 3d 179 (S.D.N.Y. 2020)........................................................40

*Nichols v. Spencer Int'l Press, Inc.*,
    371 F.2d 332 (7th Cir. 1967) .....................................................................42

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018)..................................................................................17

*Plumbers & Steamfitters, Loc. 598 v. Morris*,
    1981 WL 27190 (E.D. Wash. Apr. 9, 1981)................................................42

*In re Price Chopper/Tops Markets*,
    FTC Dkt. No. C-4753 ................................................................................11

*Reifert v. S. Cent. Wis. MLS Corp.*,
    450 F.3d 312 (7th Cir. 2006) .....................................................................21

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
    792 F.2d 210 (D.C. Cir. 1986) ...................................................................20

*RSR Corp. v. FTC*,
    602 F.2d 1317 (9th Cir. 1979) ...................................................................50

*Spiegel v. Buntrock*,
    571 A.2d 767 (Del. 1990) ..........................................................................27

*Starbucks Corp. v. McKinney*,
    144 S. Ct. 1570 (2024) ...................................................................................14, 48, 49

*Tanaka v. Univ. of S. Cal.*,
    252 F.3d 1059 (9th Cir. 2001) .................................................................................46

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
    875 F.2d 1369 (9th Cir. 1989) .................................................................................22

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001).....................................................................................45

*Tunis Bros. Co. v. Ford Motor Co.*,
    952 F.2d 715 (3d Cir. 1991).....................................................................................46

*United Mine Workers of Am. v. Pennington*,
    381 U.S. 657 (1965).................................................................................................43

*United States v. Am. Express Co.*,
    838 F.3d 179 (2d Cir. 2016).....................................................................................17

*United States v. AT&T Inc.*,
    916 F.3d 1029 (D.C. Cir. 2019) .................................................................15, 16, 44, 45

*United States v. Atl. Richfield Co.*,
    297 F. Supp. 1061 (S.D.N.Y. 1969).........................................................................25

*United States v. Baker Hughes Inc.*,
    908 F.2d 981 (D.C. Cir. 1990) .......................................................................... *passim*

*United States v. H & R Block, Inc.*,
    833 F. Supp. 2d 36 (D.D.C. 2011) ...........................................................................40

*United States v. Long Island Jewish Med. Ctr.*,
    983 F. Supp. 121 (E.D.N.Y. 1997) ..........................................................................17

*United States v. Marine Bancorporation*,
    418 U.S. 602 (1974).............................................................................................17, 43

*United States v. Mfrs. Hanover Tr. Co.*,
    240 F. Supp. 867 (S.D.N.Y. 1965) ..........................................................................33

*United States v. Oracle Corp.*,
    331 F. Supp. 2d 1098 (N.D. Cal. 2004) ....................................................................33

*United States v. Rockford Mem'l Corp.*,
    898 F.2d 1278 (7th Cir. 1990) .............................................................................33, 34

*United States v. UnitedHealth Grp., Inc.*,
   630 F. Supp. 3d 118 (D.D.C. 2022) .................................................................... *passim*

*Winter v. NRDC*,
   555 U.S. 7 (2008) ............................................................................................14, 47

**Statutes**

15 U.S.C. § 17.............................................................................................................42

15 U.S.C. § 53(b) .......................................................................................................14

**Other Authorities**

Charles Wright & Arthur Miller, *Fed. Practice & Proc.* § 5122 (2d ed.) ....................................38

J. Edward Moreno, *Walmart to Add 150 U.S. Stores in Five-Year Expansion
   Drive*, N.Y. Times (Jan. 31, 2024),
   https://www.nytimes.com/2024/01/31/business/walmart-stores-
   expansion.html .................................................................................................39

Peyton Bigora & Jasmine Ye Han, *Mapping Sprouts' Ambitious Growth Plan*,
   Grocery Dive (Dec. 13, 2023), https://www.grocerydive.com/news/mapping-
   sprouts-ambitious-growth-plan/701032/ .................................................................39

Sarah Nassauer, *Walmart's Reign as America's Biggest Retailer Is Under Threat*,
   Wall Street Journal (May 15, 2024) ........................................................................2, 6

U.S.D.A. ERS, Interactive Charts: Food Expenditures, https://bit.ly/3XAGRJh ...........................9

## INTRODUCTION

The FTC and nine state attorneys general ask this Court for the "extraordinary relief" of a preliminary injunction to block the $24.6 billion merger of Kroger and Albertsons. Plaintiffs have not satisfied and cannot satisfy their burden to show that an injunction is permissible or warranted. To understand why plaintiffs' motion fails, it is crucial to understand *what* the merger will do and *why* defendants have agreed to it—context that plaintiffs' motion distorts or omits.

First, the *what*: Kroger's acquisition of Albertsons will provide consumers nationwide with lower prices and better shopping experiences at their local grocery stores beginning on Day 1. As part of the merger, Kroger will invest billions of dollars into lower prices, capital improvements, and associate wages and benefits at Albertsons stores across the country. Kroger will help ensure that no stores close as a result of the merger, that all frontline associates remain employed, that all collective bargaining agreements continue, and that associates continue to receive industry-leading healthcare and pension benefits. In short, the merger will improve consumers' and employees' experiences *immediately* and for years to come.

Now, the *why*. The reason is existential—Kroger must expand, adapt, and most importantly, continue to lower prices to compete with global behemoths like Walmart, Costco, and Amazon, which have moved aggressively, rapidly, and effectively to dominate grocery retailing. In this evolving and highly competitive landscape, the merger is necessary to ensure continued robust competition in the grocery industry. In particular, the merger will allow Kroger to better compete with Walmart, the nation's largest grocery retailer and the biggest company by revenue in the country; with Costco, the twelfth largest company in the country, which has grown exponentially over the past decade while increasing its grocery options and share of grocery spend; and with Amazon, the multinational powerhouse, which has leapt into the grocery space through its massive online platform, its acquisition of Whole Foods, and its launch of Amazon Fresh.

These goliaths are laser-focused on the grocery retail market: Groceries provide Walmart with "most of its U.S. revenue," and it "competes fiercely" with grocery retailers, "including discounters like Aldi and traditional grocers such as Publix and Kroger."[1] Costco has grown to become the third largest grocery retailer in the country, ███████████████████████ ████████████████████████████████████████████[2] And "Amazon could grab up to 20% of the U.S. grocery market by 2030."[3] Simply put, competition for groceries and "household goods" extends far beyond Kroger and Albertsons, and Kroger must embrace this reality to compete effectively and offer consumers the lowest possible prices, while offering better-paid jobs to union workers.

Plaintiffs entirely ignore this competitive context because it undermines their narrative, contradicts their outdated assumptions about consumer and competitive realities in the grocery market, and ultimately dooms their case against the merger. In *this* context—which is supported by extensive documentary evidence and expert testimony—plaintiffs cannot carry their burden to establish the requirements to obtain an injunction, much less the sweeping nationwide injunction sought here.

*First*, plaintiffs are *unlikely to succeed on the merits* because they cannot even identify a well-defined market in which to assess competition. This is a fundamental prerequisite to proving any antitrust claim, because one cannot assess the anticipated *effect* on competition without first identifying the relevant market where that supposed effect will take place. Plaintiffs' motion fails to identify who competes against whom, for what, and where. Instead, plaintiffs identify several

---

[1] Sarah Nassauer, *Walmart's Reign as America's Biggest Retailer Is Under Threat*, Wall Street Journal (May 15, 2024).
[2] DX 2625 (Kleinberger Rep.) fig. 5; Costco Dep. 67:10-24; 76:8-15; 85:3-7.
[3] Nassauer, *supra* note 1.

categories of grocery competitors (*i.e.*, mass merchandisers, club stores, natural grocers) and then conveniently exclude those categories entirely from the definition of their purported "supermarkets" market without examining the data showing where and how consumers *actually* shop for groceries. In the real world—as under antitrust law—regulators do not determine the scope of a relevant product market; consumers do. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962) (emphasizing market definition must reflect "commercial realities of the industry"). And concrete, real-world data on how consumers shop fundamentally undermines plaintiffs' proposed product market.

*Second*, plaintiffs cannot carry their burden of showing "undue concentration" in a properly defined market. Plaintiffs ignore that Kroger and Albertsons operate largely in different regions, even though their proffered market expert conceded that ████████████████████████ ████████████████████████████████. And where there is overlap, defendants have contracted for an arm's-length divestiture with third-party grocery wholesaler C&S Wholesale Grocers, LLC. C&S is the eighth largest privately owned company in the United States, with a massive procurement network that will enable it to aggressively compete in the grocery retail market, and one that the Commission itself approved as a divestiture buyer of retail grocery stores less than three years ago. That fact, which plaintiffs gloss over, is key. As an integral part of the merger, Kroger will divest to C&S 579 grocery stores along with supporting distribution and production facilities, sell several valuable private label brands, and provide transitional support services, among other things. The divestiture will preserve competition in every market in which plaintiffs could conceivably allege competitive harm.

Unable to identify a valid market or show undue market concentration or anticompetitive effects, plaintiffs urge the Court to adopt an antitrust rule never before applied by any court in the

century since the Clayton Act's enactment: that a merger is unlawful if it would reduce "head-to-head competition." No court has ever endorsed this theory, which is contrary to the longstanding *Baker Hughes* framework courts use to assess mergers between competitors in the same industry. Plaintiffs' approach also makes no sense: By definition, horizontal mergers eliminate whatever competition may have existed between the merging parties. Under plaintiffs' view, a merger of two companies with only one percent market share that have no competitive significance would be unlawful because they compete head-to-head. The Court should not forge new legal ground and embrace such an absurd result, and in any case, plaintiffs' novel theory fails even on its own terms.

Plaintiffs also urge the Court to ignore the traditional distinction between antitrust and labor law by asserting that the merger will somehow reduce competition in a market for "union grocery labor." This unprecedented theory also has never been adopted by any court and is at odds with the Clayton Act, which does not recognize human labor as an article of commerce capable of monopolization. The antitrust laws regulate competition, not the bargaining power between unions and employers. Indeed, plaintiffs' hand-picked experts disclaimed this untenable theory, refusing to offer any opinion on competitive effects based on any "union grocery labor" market.

Finally, plaintiffs fail to satisfy the standard for obtaining a preliminary injunction because they make no meaningful effort to show that blocking the merger would serve the public interest or that the equities tip in their favor. Plaintiffs do not dispute that the merger will benefit consumers in a majority of states, which have not joined this action and will enjoy the lower prices that the transaction promises. And even if plaintiffs' theory of localized harm were correct, targeted divestiture would be the proper result, not the sweeping nationwide injunction that plaintiffs seek.

Plaintiffs have failed to meet their burden to obtain the extraordinary remedy they seek, and the Court should deny their motion.

## BACKGROUND

### A.     The Modern Grocery Industry

Plaintiffs' complaint tells a tale of a retail grocery market from a bygone era, in which one member of a household would do all their family's weekly shopping in a single trip to a single store. Times have changed, as have the competitive landscape and consumer preferences. In today's grocery market, a wide array of retailers and retail formats compete for consumer dollars. And consumers increasingly mix and match among many options to meet their grocery needs.

####      1.     The Competitive Landscape

In an effort to artificially segregate defendants from their competitive rivals, plaintiffs describe groups of different grocery retailers, suggesting that any retailer whose format is different from defendants' is irrelevant to the antitrust analysis. In so doing, plaintiffs merely highlight the wide range of choices consumers have and the robust competition defendants face.

***"Traditional" Supermarkets.*** Plaintiffs focus on so-called "traditional" supermarkets. According to plaintiffs, stores like Kroger and Albertsons "offer consumers convenient 'one-stop shopping' for food and grocery products" and "typically have a broad and deep product assortment of tens of thousands of stock-keeping units."[4] Many other retail formats provide a similar experience. But even within plaintiffs' artificial "traditional" category, competition is fierce and includes key competitors like Publix, Ahold Delhaize, Wegmans, H-E-B, Hy-Vee, among others.[5]

***Mass Merchandisers.*** Powerful mass merchandisers have reshaped the way Americans shop. Today, Walmart is Kroger's largest competitor and the nation's largest grocery retailer by sales volume and operates ███████████████████████████[6]███████████████████

---

[4] Compl. ¶¶ 43–44.
[5] DX 2182.
[6] DX 2625 (Kleinberger Rep.) ████████████████████████
████████████████████

██████████████████████[7] Grocery sales provide Walmart with "most of its U.S. revenue" as it "competes fiercely" with all grocery retailers, ███████████████████████████ ████████████████[8] ██████████████████████████████ ████████████████████████████████████ ██████████████████████████████[9] Like Walmart, mass merchandiser Target is a chief competitor of Kroger and Albertsons.[10]

**Club Stores.** Club stores like Costco, Sam's Club, and BJ's Wholesale Club continue to expand their grocery footprints. Club stores use a business model that allows them to sell grocery products to consumers at wholesale prices.[11] ████████████████████████ ████████████████████[12] ██████████████████████████████████████ ████████████████████████████████████ █████████[13] ████████████████████████████████████[14]

**Premium, Natural, and Organic Stores.** Consumer demand for "natural" products has increased organic and fresh products offered by grocery retailers. Whole Foods and other grocery retailers like Sprouts and Natural Grocers have capitalized on these consumer preferences,[15]

---

[7] PX 4054 (Groff (Kroger) Dep. Tr.) 92:21–93:1; DX 0929 at 16 ████████████████████ ████████████████.

[8] Sarah Nassauer, *Walmart's Reign as America's Biggest Retailer Is Under Threat*, Wall Street Journal (May 15, 2024).

[9] DX 2530 (Lieberman (Walmart) Dep. Tr.) 43:15–24.

[10] DX 0336 █████████████; DX 0929 at 10, 15 ████████ ████████████.

[11] DX 2625 (Kleinberger Rep.) ¶ 19.

[12] *Id.* fig. 5 ██████████████████████ ██████████.

[13] DX 2524 Grisham (Sam's Club) Dep. Tr.) 27:6–13, 39:14–21.

[14] DX 0943 ████████████████████████; DX 2213 at 2, 8–9

[15] DX 2531 (Oblisk (Whole Foods) Dep. Tr.) 12:10–21; DX 2525 (Neal (Sprouts) Dep. Tr.) 112:11–20.

though these formats also offer national brands and mainstream grocery products.[16] These grocers have experienced dramatic growth—Whole Foods currently operates 516 stores, and Sprouts operates approximately 407 stores in the United States.[17] These premium grocery retailers and defendants view each other as competitors.[18]

　　　　**Limited Assortment, Dollar, and Ethnic Stores.** Other types of grocery retailers who offer customers a curated assortment of products have established significant footholds in the grocery industry, too. Aldi is among the top four grocery retailers for consumers' everyday grocery purchases, along with Walmart, Costco, and Target, with more than $23 billion in grocery sales.[19] ████████████████████████████████████████████████[20] Dollar stores such as Dollar General and Dollar Tree also ████████████████████████████ ████████████[21] And "ethnic" grocery retailers—including H Mart, 99 Ranch Market, Uwajimaya, Vallarta, and Cardenas—vigorously compete for grocery dollars, too.[22] Both defendants' internal documents and testimony from their competitors confirm that ████████ ████████████████████████[23]

---

[16] DX 2531 (Oblisk (Whole Foods) Dep. Tr.) 107:16–18, 108:13–17, 153:6–154:1.
[17] DX 2625 (Kleinberger Rep.) ¶¶ 61 (Whole Foods), 67 (Sprouts).
[18] DX 0454 at 8, 51; DX 0929 at 9–10; DX 0223 at 8 ████████████████████████████████████ ████████████████████████.
[19] DX 2718 (Statista, *Grocery Shopping by Store Brand in the U.S. as of March 2024*) (surveying various grocery retailers from April 2023 to March 2024).
[20] DX 2528 (Cahan (Trader Joe's) Dep. Tr.) 39:15–21, 151:5–9.
[21] DX 2509 (Snow (Dollar General) Dep. Tr.) 37:12–38:14; DX 0795 at 9 ████████████████████ ████████████████.
[22] *See* DX 1245 (news article observing that "[a]s Asian groceries like H Mart, Patel Brothers and 99 Ranch expand, they are reshaping American eating habits, and the American grocery market"); *see also* DX 0929 at 15 ████████████████████████████████████████████.
[23] DX 2530 (Lieberman (Walmart) Dep. Tr.) 105:9–18; *see also* DX 2511 (Gaylord (Fiesta Foods)) Dep. Tr. 34:1–35:4, 47:11–24 ████████████████████████████████; DX 2529 (Kaminsky (Vallarta) Dep. Tr.) 56:14–17, 58:8–13, 59:1–8 ████████████████████████████████████████████; DX 1290/1290A ████; ████████████████████████████████████████████████████████████████;

***Online Grocery Operations.*** Finally, technology has made it easy for online delivery upstarts to facilitate consumers' grocery purchases. ███████████████████████████████ ████████████████████████████████[24]████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████.[25]████████████████████████ ███████████████████████████████████████████████████████[26] Other online delivery companies like Instacart have also burst onto the grocery scene, allowing customers to shop online with the convenience of delivery from local retailers.[27]

## 2. The Modern Grocery Consumer

Customers' increasing preference for varied shopping options defines the modern grocery market. Today, less than ██ of U.S. customers shop exclusively at one food store in a month.[28] Consumers instead seek value across different banners and formats rather than relying on the alleged "ease of one-stop shopping." In 2023, the average household made ██ trips to purchase groceries each week.[29]

Americans' shopping trips—and consumers' grocery dollars—are no longer limited to so-called "traditional" supermarkets. Consumers who shop at supermarkets visit an average of five different banners per month and 4.2 different grocery formats per quarter, including supercenters

---

DX 0929 ███████
██████████████████████████████████████ DX 2251 (Kroger strategy document containing a "Competitive Shopping Customer Profile" for "Discounters (Aldi, Lidl, Dollar)").
[24] DX 2625 (Kleinberger Rep.) fig. 5 ████████████████████████████████████████.
[25] DX 2502 (Heyworth (Amazon) Dep. Tr.) 21:1–6, 63:3–11, 88:3–6.
[26] *Id.* at 48:18–49:8 ████████████████████████████████████████ █████████████████; DX 0425; DX 0929 at 10, 21; DX 2396.
[27] DX 2041 at 3.
[28] DX 2094 at 17.
[29] *Id.* at 16.

and club stores. ████████ of grocery consumers do not shop at supermarkets at all.[30] The Department of Agriculture found that, in 1997, "grocery stores" accounted for 72% of food for home consumption.[31] By 2022, however, that figure had dropped to 54%.[32] In contrast, consumers increased their share of food spending almost threefold at "warehouse clubs and supercenters" like Costco and Walmart over the same period, from 8% to about 22%.[33]

### B.    The Three Parties to the Transaction

#### 1.    Kroger

Kroger, an Ohio Corporation, was founded in 1883.[34] Kroger is a leading food retailer, but its business also includes retail pharmacies and fuel centers. Kroger operates in a fiercely competitive environment under a variety of store names (known as "banners") and formats, including supermarkets, seamless digital shopping options, price-impact warehouse stores, and multidepartment stores. Kroger also operates manufacturing facilities that produce high-quality private-label products providing extraordinary value for its customers.[35] Kroger sets its prices



[36] Kroger also recognizes and

---

[30] DX 2625 (Kleinberger Rep.) ¶¶ 39, 74.
[31] DX 1251; U.S.D.A. ERS, Interactive Charts: Food Expenditures, last updated Sept. 27, 2023, https://bit.ly/3XAGRJh..
[32] *Id.*
[33] *Id.*
[34] DX 2738 (Galante Rep.) ¶ 14.
[35] *Id.* ¶ 14.
[36] PX 4054 (Groff (Kroger) Dep. Tr.) 92:21–93:1 ████████████
████████ ; *see also id.* at 92:17–93:18, 329:20–330:16.
[37] PX 4081 (McMullen (Kroger) Dep. Tr.) 170:22–171:1; *see also id.* at 171:22–24.
████████████████ PX 4076 (Aitken (Kroger) Dep. Tr.) 36:2–24.

responds to competition from other sources, ████████████████████████████[38]

### 2.    Albertsons

Albertsons, an Idaho corporation founded in 1939, is a leading food retailer that operates over 2,200 grocery stores under a variety of banners, including Albertsons, Safeway, Vons, and Carrs, across 34 states and the District of Columbia.[39] Albertsons operates production facilities to manufacture its "Own Brands" private label that provides high quality and excellent value to consumers and also acquires "Own Brands" products manufactured by third parties.[40] Albertsons faces intense competition from a variety of retailers—particularly Walmart and Costco.[41]

████████████████████████████████████████████████████

████████████████████████████████████████████████████[42]

### 3.    C&S

C&S is the largest grocery wholesale distributor in the United States and the eighth largest privately owned U.S. company.[43] ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████[44] But C&S is much more than a wholesaler: Its customers look to it for every foundational service needed to run a successful grocery store, including procurement, private label merchandising, supply chain services, category management, vendor negotiations, retail technology, digital marketing, store design and layout, equipment supply, business planning

---

[38] *See* PX 4054 (Groff (Kroger) Dep. Tr.) 342:22–343:4; *see also id.* at 312:7–17 ████████████████████████.

[39] PX 6077 at 1; PX 6153 at 8.

[40] PX 4059 (Sankaran (Albertsons) Dep. Tr.) 305:21–23.

[41] *Id.* at 241:4–9; *see also* DX 1135 at 2.

[42] *Id.* at 43:8-13.

[43] DX 1058 at 7; DX 2322 at 3.

[44] DX 2738 (Galante Rep.) ¶ 17; DX 1058 at 7.

and insurance, pricing strategy, mobile order entry, point of sale systems, and security.[45] The FTC itself approved C&S as a divestiture buyer of grocery retailers, and C&S continues to operate all but one of the stores it acquired through the 2021 and 2022 Piggly Wiggly Midwest and Tops Market divestitures.[46] ████████████████████████████████████

████████████████████████████████████████████

██████████████████████████[47]

### C.    The Merger Transaction

#### 1.    Structure of the Merger

On October 13, 2022, Kroger and Albertsons announced the merger, under which Kroger will acquire Albertsons for $24.6 billion, subject to certain adjustments.[48] Although Kroger and Albertsons both operate in more than 30 states nationwide, they do not overlap in the majority of the states.[49] Instead, their respective footprints are largely complementary:[50]



The transaction does not present even *arguable* competitive concerns in the majority of

---

[45] DX 2738 (Galante Rep.) ¶ 16; *see also* DX 1058 at 7–12; http://www.cswg.com/services.
[46] PX 4050 (McGowan (C&S) Dep. Tr.) 27:18–28:6; *see also In re Price Chopper/Tops Markets*, FTC Dkt. No. C-4753, https://bit.ly/45wUxXW.
[47] DX 2283 at 7, 12.
[48] DX 1254 at 6.
[49] DX 1254 at 8.
[50] DX 1254 at 8.

states. Plaintiffs' ███████████████████████████████████████████████

███████████████████████████████████████████████████████.[51]

###    2.    Divestiture

Divestiture was a critical component of the merger agreement from the start. The October

2022 agreement ████████████████████████████████████████████[52]

████████████████████████████████████,[53] with the goal of ensuring

that ████████████████████████████████████████[54]

████████████████████████████████████████████

███████████████████████[55] ████████████████████████

████████████████████████████████████████████

███████████████████████[56] In September 2023, Kroger and Albertsons

announced an initial divestiture package including 413 stores and additional supporting assets,

with the option to add up to 237 additional stores.[57] Under the final divesture package, announced

in April 2024, C&S agreed to pay ████████████ in exchange for the following assets:[58]

---

[51] PX 4128 (Hill Dep. Tr.) 192:9-193:5. ████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████

[52] DX 2552 at 13.
[53] DX 2738 (Galante Rep.) ¶ 24; DX 2308.
[54] PX 4081 (McMullen (Kroger) Dep. Tr.) 183:9–184:1. ████████████████
████████████████████████████████████████████
██████████████████████ McMullen (Kroger)
Dep. Tr. 183:9–184:1.
[55] DX 2311 at 1-7; DX 0206 at 2; DX 2738 (Galante Rep.) ¶ 26.
[56] PX 4064 (Maharoof (Kroger) June 4, 2024 Dep. Tr.) 195:6–196:19 (testifying C&S' experience
"gave us comfort overall that they have the ability to continue to run a successful supermarket
business.").
[57] DX 1255 at 1; DX 2318 at 52.
[58] DX 2738 (Galante Rep.) ¶ 61; DX 2238 §§ 1.1, 2.3, 2.9, 2.10, 6.16, 6.15, 9.1; DX 2239 (Am.
C&S Agreement, Schedule 2.1(a)-K, Schedule 2.1(c)-A, Schedule 2.1(c)-K); DX 1058, at 14, 54.

- 579 supermarkets in areas where Kroger and Albertsons overlap;
- 

### 3.    Consumer Benefits, Cost Savings, and Efficiencies

[59] Kroger's focus on

[60] and it is backed by a proven track record.

[61]                                                                                  [62]

Lower prices are a key component of Kroger's business model, which it will implement at

acquired stores with the help of the significant efficiencies the merger will create.

---

[59] *See* DX 2239 (Schedule 9.1); *see* DX 2838 at 4; PX 4081 (McMullen (Kroger) Dep. Tr.) 98:4–99:20; PX 4064 (Maharoof (Kroger) June 4, 2023 Dep. Tr.) 111:23–112:9; *see also* DX 1254 at 5.
[60] PX 4076 (Aitken (Kroger) Dep. Tr.) 210:9–211:8.
[61] PX 4131 (Springer (Kroger) Dep. Tr.) 20:4–20, 22:17–23:1, 115:21–116:5.
[62] DX 1954 at 2–3.



[63] ███████████████████████████████████████████

[64] ███████████████████████████ [65] ██████████████████ [66]

[67] ███████████████████████████████████████

[68] Expert analysis confirms that ████████████████████████████████████

[69]

## LEGAL STANDARDS

### A.      The Preliminary Injunction Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008). Relief is available only if a plaintiff can "make a clear showing that [1] 'he is likely to succeed on the merits, that [2] he is likely to suffer irreparable harm in the absence of preliminary relief, that [3] the balance of equities tips in his favor, and that [4] an injunction is in the public interest.'" *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1575 (2024) (quoting *Winter*, 555 U.S. at 20); *see also* 15 U.S.C. § 53(b) (providing that court "may" issue preliminary injunction after "weighing the equities" and considering "the Commission's likelihood of ultimate success" and "the public interest"). In actions under Section 13(b), the Commission must meet a high burden to justify the "extraordinary and drastic" remedy of preliminary injunction because that relief "may prevent the transaction from ever being consummated." *FTC v. Exxon Corp.*, 636 F. 2d 1336, 1343 (D.C. Cir. 1980) (quotations omitted). Although plaintiffs

---

[63] DX 1727 at 15; PX 4081 (McMullen (Kroger) Dep. Tr.) 252:19–253:2.
[64] PX 4064 (Maharoof (Kroger) June 4, 2024 Dep. Tr.) 22:25–23:9, 28:12–20, 31:8–18.
[65] PX 4081 (McMullen (Kroger) Dep. Tr.) 30:16–23.
[66] *Id.* at 32:25–33:10.
[67] *Id.* at 180:14–22.
[68] PX 4064 (Maharoof (Kroger) June 4, 2024 Dep. Tr.) 54:19-21, 56:9-19; 134:7-12; *see also id.* at 16:18–24, 20:9–21:8, 35:21–23, 36:8–10, 41:4–42:16.
[69] DX 2736 (Gokhale Rep.) ¶¶ 13(a), 24 & tbl.3.

contend that Section 13(b) imposes a "lighter burden" and a "more lenient standard" that "omit[s] requirements like irreparable harm," Plf. Br. 6-7 (citing *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1162 (9th Cir. 1984)), that position is at odds with recent Supreme Court precedent, as explained below. In any event, plaintiffs fail even under their more lenient standard.

### B.    The *Baker Hughes* Framework

To establish a Clayton Act violation, plaintiffs bear the burden of proving a "reasonable probability" that the proposed merger will "*substantially*" lessen competition in a "line of commerce." *United States v. AT&T Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019) (citation omitted). The harm to competition must be "substantial"—merging parties need not "preserve exactly the same level of competition that existed before the merger." *United States v. UnitedHealth Grp., Inc.*, 630 F. Supp. 3d 118, 133 (D.D.C. 2022); *see also Illumina, Inc. v. FTC*, 88 F.4th 1036, 1058–59 (5th Cir. 2023) (observing that a contrary standard "would effectively erase the word 'substantially' from [the statute]").

Horizontal mergers are analyzed using the three-part burden-shifting framework from *United States v. Baker Hughes Inc.*, 908 F.2d 981 (D.C. Cir. 1990).

*First*, plaintiffs must produce evidence to "establish a prima facie case that a merger is anticompetitive." *DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 763 (9th Cir. 2018) (citation omitted). To do so, plaintiffs must "accurately define the relevant market, which refers to 'the area of effective competition.'" *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (citation omitted). Plaintiffs then must prove that the merger will result in "undue concentration" in a properly defined market. *Baker Hughes*, 908 F.2d at 982–83. That analysis must account for "the *entire* transaction in question," including any divestiture. *FTC v. Arch Coal, Inc.*, 2004 WL 7389952, at *3 (D.D.C. July 7, 2004) ("*Arch Coal* in Limine Order").

*Second*, the burden of production shifts to defendants to offer evidence that the merger

would not substantially lessen competition. *Baker Hughes*, 908 F.2d at 982–83. Defendants need only identify sufficient evidence to "show that the prima facie case inaccurately predicts the relevant transaction's probable effect on future competition." *Id.* at 991.

*Third*, the burden of production then shifts back to plaintiffs to offer "additional evidence of anticompetitive effect[s]." *Baker Hughes*, 908 F.2d at 983. Plaintiffs retain "the ultimate burden of proving a [Clayton Act] violation by a preponderance of the evidence," and a "failure of proof in any respect will mean the transaction should not be enjoined." *AT&T*, 310 F. Supp. 3d at 189.

## ARGUMENT

Plaintiffs offer two alternative theories for blocking the merger: that the merger will substantially reduce competition in (1) local retail grocery markets, and (2) a market for "union grocery labor." But they cannot establish a likelihood of success on the merits under either theory, which is reason enough to deny a preliminary injunction. Beyond that, the equities weigh heavily against enjoining a merger that would lower prices for customers nationwide, particularly where targeted divestiture would address any supposed localized harms.

## I.    PLAINTIFFS CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS IN A RETAIL GROCERY MARKET

### A.    Plaintiffs Cannot Establish a Presumption of Anticompetitive Effects

To establish a *prima facie* case under the *Baker Hughes* framework, plaintiffs must (1) accurately define the relevant market; and (2) show that the merger will result in undue concentration in that market. *Baker Hughes*, 908 F.2d at 982–83. They fail to do either. Seeking to remedy this fatal defect in their case, plaintiffs alternatively urge the Court to disregard the established *Baker Hughes* framework in favor of a novel "head-to-head competition" theory, but that fails too.

### 1.    Plaintiffs Cannot Establish a Cognizable "Supermarket" Market

To establish a *prima facie* case, Plaintiffs must first define the relevant antitrust market. *United States v. Marine Bancorporation*, 418 U.S. 602, 618 (1974). A "relevant market" consists of (a) a product market; and (b) a geographic market. *Id.* at 618. "The proper market definition can be determined only after a factual inquiry into the *commercial realities* faced by consumers." *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1052 (8th Cir. 1999) (emphasis added). "Without a definition of the market there is no way to measure the defendant's ability to lessen or destroy competition." *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018) (citation and brackets omitted). Plaintiffs bear the burden to establish a cognizable market, and "[f]ailing to define a relevant market alone is fatal to an antitrust claim." *Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 957 (9th Cir. 2023). Plaintiffs cannot meet that burden here.

### a.    Plaintiffs' "Supermarket" Product Market Is Unjustifiably and Arbitrarily Narrow

The boundaries of a product market are determined by the "reasonable interchangeability of use or the cross-elasticity of demand" between the product and its substitutes. *Brown Shoe*, 370 U.S. at 325. "A properly defined market includes potential suppliers who can readily offer consumers a suitable alternative to the defendants' services." *United States v. Long Island Jewish Med. Ctr.*, 983 F. Supp. 121, 136 (E.D.N.Y. 1997); *see also Kaplan v. Burroughs Corp.*, 611 F.2d 286, 292 (9th Cir. 1979) ("A market definition must look at all relevant sources of supply, either actual rivals or eager potential entrants to the market."). Typically, a market is defined by asking whether a hypothetical monopolist of the proposed market "would be 'substantially constrain[ed]' from increasing prices by the ability of customers to switch to other producers." *United States v. Am. Express Co.*, 838 F.3d 179, 198 (2d Cir. 2016) (alteration in original and citation omitted).

According to plaintiffs' complaint, the relevant "product market" includes *only* "traditional

supermarkets and supercenters." Compl. ¶ 43. Plaintiffs' proposed market improperly excludes relevant competitors—including club stores; premium, natural, and organic stores; and limited assortment stores—meaning those stores play *no* role in plaintiffs' competitive calculus. Yet those retailers offer the same products and services defendants do; defendants treat them as competitors; and those retailers treat defendants as competitors too. And most importantly, the data shows that *consumers* view a wide array of grocery retailers as alternatives for defendants' offerings.

With no evidence on their side, plaintiffs skip any direct analysis of "reasonable interchangeability" in their proposed product market, instead pointing to superficial differences ranging from the fatally subjective ("customer experience," Plf. Br. 25) to the utterly trivial (different product "packaging," Plf. Br. 27). But product differentiation is a hallmark of healthy competition and says nothing about whether consumers view those products as interchangeable. *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*, 889 F.2d 524, 528 (4th Cir. 1989) (interchangeability "presumes that consumers are willing to make tradeoffs on some of the very factors the [plaintiffs] attempt to use to define their market").

***Reasonable Interchangeability.*** Each of the types of grocery retailers plaintiffs exclude from their proposed product market is reasonably interchangeable with "traditional" supermarkets, and consumers readily substitute among them.

<u>Club stores</u>. Extensive evidence demonstrates that defendants view club stores like Costco—the Nation's third largest grocery retailer—as significant competitors,[70] and Costco likewise recognizes that it ███████████████████████████████[71]████████████

---

[70] PX 2623 (Israel Rep.) ¶¶ 80–84 (DX 0090; DX 0143 at 3; DX 0417; DX 1112; DX 1187; DX 2213; DX 2219; PX 4054 (Groff (Kroger) Dep. Tr.) 342:22–343:4; PX 4104 (Kelley (Kroger) Dep. Tr.) 27:17–28:11; DX 1134.

[71] DX 2507 (George (Costco) Dep. Tr.) 22:22–23:10, 26:7–27:3, 27:16–24.

█████████████████████████████████████████████████████████████████

████████████████████████████████████████████ [72] This ████████

████████ data is particularly useful in measuring demand substitution because, as defendants'

economics expert, Dr. Mark Israel, explains, it is much easier for consumers to substitute at places

where they already shop for groceries.[73] █████████████████████████████████████

███████████████████████████████████████ [74] Plaintiffs' economics expert, Dr.

Hill, concedes that ██████████████████████████████████████████

██████████████████ [75]

    *Premium, natural, and organic stores*. Premium, natural, and organic stores compete

vigorously with defendants. Kroger's internal documents show that ████████████████████

████████████████████████████████████████ [76] ████████████████████

████████████████████████████████████ [77] Dr. Israel's diversion analysis

confirms that ████████████████████████████████████████████████ [78]

    *Limited assortment, dollar, and ethnic grocery retailers*. The facts also show competition

between defendants and limited assortment, dollar, and ethnic stores. ████████████████████

█████████████████████████████████████████████████████████████████

███████████████████████████████████ [79] Here too, Dr. Israel's modeling

demonstrates that ██████████████████████████████████████████████████

---

[72] DX 2623 (Israel Rep.) ¶ 77 & tbl. 2.
[73] *Id.* ¶ 72.
[74] *Id.* ¶ 105.
[75] PX 7006 (Hill Rebuttal Rep.) ¶ 118 & fig. 24.
[76] DX 2623 (Israel Rep.) ¶ 92.
[77] DX 2531 (Oblisk (Whole Foods) Dep. Tr.) 15:3–16:13, 132:3–18.
[78] DX 2623 (Israel Rep.) ¶ 106.
[79] *Id.* ¶ 92.

███████████████████████████████ 80 ████████████████████████████████

██████████████████████████████████████████████████ 81

_E-commerce retailers._ Plaintiffs also ignore the competitive effects of online retailers like

Amazon, whose ███████████████████████████████████████████████████

██████████████████████████ 82 In plaintiffs' view, Amazon and other e-commerce options

exert *zero* competitive pressure on other grocery retailers. That is contrary to commercial reality.

**The** Brown Shoe *"Practical Indicia."* Seeking a shortcut around their evidentiary burden,

plaintiffs skip any analysis of whether customers actually substitute among these classes of grocery

retailers. Instead, they focus on proxies for interchangeability that *Brown Shoe* called "practical

indicia" of a market. 370 U.S. at 325. These indicia include "industry or public recognition of the

submarket as a separate economic entity, the product's peculiar characteristics and uses, unique

production facilities, distinct customers, distinct prices, sensitivity to price changes, and

specialized vendors." *Id.*

But the *Brown Shoe* factors are an *aid*, not a *substitute*, for determining whether products

are reasonably interchangeable. "Reasonable interchangeability sketches the boundaries of a

market," and the *Brown Shoe* practical indicia are used only to "clarif[y] whether two products are

in fact 'reasonable' substitutes and are therefore part of the same market." *Geneva Pharms. Tech.

Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 496 (2d Cir. 2004). At best, the *Brown Shoe* practical

indicia "seem to be evidentiary proxies for direct proof of substitutability." *Rothery Storage & Van

Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C. Cir. 1986). They "were never intended to

---

[80] *Id.* ¶ 106.
[81] *See, e.g.*, DX 2511 (Gaylord (Fiesta Foods) Dep. Tr.) 34:1–35:4, 47:11–24.
[82] DX 2501 (Heyworth (Amazon) Dep. Tr.) 24:12–25:19, 28:8–13, 30:3–8, 48:18–49:8, 67:22–68:2.

exclude economic analysis altogether." *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 320 (7th Cir. 2006); *see also Kaplan v. Burroughs Corp.*, 611 F.2d 286, 292–93 (9th Cir. 1979) (practical indicial are not "mechanically dispositive"). Where, as here, data directly shows *actual* interchangeability among competitors, resort to the *Brown Shoe* practical indicia is unnecessary and misleading. In any event, those factors do not support plaintiffs' gerrymandered market.

*First*, the grocery industry and the broader public do not recognize "traditional supermarkets and supercenters" as "separate economic entit[ies]" from other types of grocery retailers. *Brown Shoe*, 370 U.S. at 325. ██████████████████████████████ ████████████████████████████████████████████████████████████████

███████████████████[83] Other third-party retailers testified that they compete on a variety of relevant dimensions. For instance, Walmart testified that ████████████████████████████ ████████████████████████████████████████████████████████████████

██████[84] Whole Foods testified that ████████████████████████████████████ ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████[85] Aldi testified that ████ ████████████████████████████████████████████████[86] Costco likewise testified that ██ ████████████████████████████████████████████████████████████████

██████████████[87] Other retailers testified the same.[88] And competition in the grocery industry spans

---

[83] Ex. A (Conlin (Target) Dep. Tr.) 94:2–9.
[84] DX 2530 (Lieberman (Walmart) Dep. Tr.) at 23:3–23:24.
[85] DX 2531 (Oblisk (Whole Foods) Dep. Tr.) 13:10–17:2.
[86] DX 2501 (Sitter (Aldi) Dep. Tr.) 24:23–25:2.
[87] DX 2507 (George (Costco) Dep. Tr.) 27:25-28:15.
[88] DX 2500 (Yates (Ahold) Dep. Tr.) 28:6-30:9 ██████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████; DX 2512 (Swanson (H-E-B) Dep. Tr.) 49:12–

a variety of dimensions, including ████████████████████████████████████████

███████████████████████████████ [89]

News sources similarly recognize competition across formats.[90] The fact that some use the term "traditional supermarkets" is insufficient to conclude that this market is distinct in any economically significant sense. *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1376 (9th Cir. 1989) ("Without a showing of the role that industry and public perception … play in motivating and shaping consumer decisions, the demarcation of a submarket … cannot be justified."). References to a category of "traditional supermarkets" without "supercenters" also shows that plaintiffs' "traditional supermarkets *and* supercenters" market is wholly artificial.

*Second*, "traditional supermarkets and supercenters" do not systematically differ from other grocery retailers in offerings, customer base, or pricing. Products within a market need only be "*reasonabl[y]*" interchangeable—not identical. *Brown Shoe* 370 U.S. at 325 (emphasis added). As plaintiffs concede, "individual goods available in supermarkets can be purchased at other retail stores." Plf. Br. 24. ███████████████████████████████████████████

████████████████████████████████████████████████ [91] And while pricing varies among many stores, those variations ████████████████████████████████████████████

██████████████████████████████████████ [92] In short, none of the superficial differences plaintiffs identify have any economic salience, and plaintiffs offer no response to the hard data and direct

---

13, 54:15–16, 55:1–2, 56:25 ████████████████████████████████████████████████
████.
[89] DX 2507 (George (Costco) Dep. Tr.) 22:22–23:10.
[90] DX 2273 ("Supermarkets Are Losing This Food Fight: Costco, Walmart, Aldi and Amazon are all chipping away at the supermarket's once-dominant position selling Americans their food.").
[91] *See, e.g.*, DX 2531 (Oblisk (Whole Foods) Dep. Tr.) 107:16–18, 108:13–17, 153:6–154:1; DX 2502 (Heyworth (Amazon) Dep. Tr.) 24:12–25:19, 28:8–13, 30:3–8, 48:18–49:8, 67:22–68:2.
[92] ████████████████████████████████████████████████████████████████████████████████
███████ *See* DX 2623 (Israel Rep.) ¶¶ 297–98 & tbl. 16; DX 0149A-I.

evidence of demand substitution.

### b.    Plaintiffs' Geographic Markets Are Arbitrary

The defects in plaintiffs' market analysis extend to its proposed geographic markets, too. Dr. Hill defines the geographic market for each focal store by drawing circles around defendants' stores based on an arbitrary 75% "catchment area" for which he offers no economic justification.[93] First, he identifies a focal store, determines the radius that captures customers accounting for 75% of that store's sales, and then draws a circle around the focal store using double that radius.[94] He then identifies all "supermarket" stores within that circle and assigns each store competitive weight based purely on its estimated share of sales within that circle.[95] All stores outside the circle by even the smallest margin are ignored.

Like plaintiffs' fictional product market, Dr. Hill's circle-drawing approach does not align with the "commercial realities" of how customers shop. *Tenet Health Care Corp.*, 186 F.3d at 1052. When deciding where to shop, consumers weigh distance along with price and many factors—they ███████████████████████████████████████████████ ██████████████████████████████████████████████████[96] And consumer preferences may vary among areas with different geography and demographics. A proper market definition would account for the actual substitution among nearby stores—which varies considerably based on the type of store and local conditions—rather than relying on Dr. Hill's arbitrary and unsupported "75% times two" shortcut.

---

[93] *See* PX 7004 (Hill Rep.) ¶ 101 & n.131.
[94] *Id.* ¶ 105 fig. 20.
[95] *Id.* ¶ 112.
[96] DX 2623 (Israel Rep.) ¶¶ 60, 152.

c.    Dr. Hill's Retreat to a So-Called "Large Format Stores" Market
      Exemplifies the Defects in Plaintiffs' Proposed Market Definitions

Plaintiffs cannot articulate a coherent market definition, much less satisfy their burden to establish one. For instance, although plaintiffs' complaint alleges only a "supermarket" market, Dr. Hill subsequently ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████[97] Plaintiffs point to this alternative market as a "more conservative" backstop for their "supermarkets" market. Plf. Br. 32. The fact plaintiffs and their expert cannot settle on a single market definition for the sale of groceries is emblematic of their failure to satisfy their evidentiary and analytical burdens in their case.[98]

Regardless, Dr. Hill's "large format" market only exemplifies the defects in plaintiffs' approach to competition. By giving full weight to all stores within a particular radius while excluding stores outside it, Dr. Hill's analysis is both under- and over-inclusive. It is underinclusive because it ignores the impact of more distant stores like club stores and supercenters that typically pull consumers from farther away. And it is overinclusive because it assigns undue competitive significance to Kroger and Albertsons stores near the boundary of the circle that are often miles away from the focal store, diluting the importance of competitors located closer to the focal store that may have lower overall sales but greater competitive significance.[99]

███████████████████████████████████████████████████████████████[100]

2.    The Merger Would Result in No Undue Market Concentration

Even if plaintiffs could establish a properly defined market (they cannot), their claim still

---

[97] PX 7004 (Hill Rep.) ¶ 67.
[98] DX 2623 (Israel Rep.) ¶ 192.
[99] *Id.* ¶ 147.
[100] *Id.*

would fail because they cannot establish that the merger will result in "undue concentration" in that market. *Baker Hughes*, 908 F.2d at 982–83. That analysis must account for "the *entire* transaction in question," including any divestiture. *Arch Coal* in Limine Order, at *3. Plaintiffs completely fail in this regard as well. Plaintiffs' market concentration analysis is premised on a fictional transaction that does not include divestiture, and when accounting for the divestiture, plaintiffs' economic critiques of the merger fall apart.

### a.    The Divestiture Overwhelmingly Addresses Plaintiffs' Claimed Areas of Undue Market Concentration

Contrary to plaintiffs' contention, Plf. Br. 37, they bear the burden to account for the divestiture in their *prima facie* case, because it is an essential component of the transaction that plaintiffs seek to enjoin. *See United States v. Atl. Richfield Co.*, 297 F. Supp. 1061, 1067–68 (S.D.N.Y. 1969) (criticizing complaint that "carefully avoid[ed] even a mention" of a planned divestiture as presenting less than "the complete picture"), *aff'd sub nom. Bartlett v. United States*, 401 U.S. 986 (1971). And the facts show that the overwhelming majority of alleged markets in which plaintiffs claim undue market concentration include stores that will be divested to C&S.

***Plaintiffs Must Account for Divestiture.*** Divestiture is part of plaintiffs' *prima facie* case. *See FTC v. Microsoft Corp.*, 681 F. Supp. 3d 1069, 1093 (N.D. Cal. 2023) ("[T]he FTC must address the circumstances surrounding the merger as they actually exist."); *see also DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 763–64 (9th Cir. 2018) (finding no reduction in competition in light of divesture). Indeed, divestiture is critical to the analysis because determining whether a "challenged transaction may substantially lessen competition in violation of Section 7 of the Clayton Act requires the adjudicator to review the *entire* transaction in question," including any "divestiture" of assets to a third party. *Arch Coal* in Limine Order, 2004 WL 7389952, at *3.

In *UnitedHealth*, the court expressly rejected the plaintiffs' argument that courts should

treat acquisition and divestiture as "separate transactions" and place the burden on defendants to show that "that the divestiture will replace the competitive intensity lost as a result of the merger." *UnitedHealth*, 630 F. Supp. 3d at 132–33. The court explained that doing so would "contradict[] the text of Section 7 and the *Baker Hughes* framework," *id.* at 133, reasoning that the relevant transaction is "the proposed acquisition agreement *including* the proposed divestiture." *Id.* at 134 n.5; *see also Arch Coal* in Limine Order, 2004 WL 7389952, at *2. "[T]reating the acquisition and the divestiture as separate transactions that must be analyzed in separate steps" would improperly allow a plaintiff to "to meet its *prima facie* burden based on a fictional transaction and fictional market shares." *UnitedHealth Grp.*, 630 F. Supp. 3d at 134 n.5. And requiring defendants to show that divestiture would preserve identical levels of competition would "effectively erase the word 'substantially' from Section 7." *Illumina*, 88 F.4th at 1059 (citation omitted).

Divestiture has been a core component of the merger transaction since its inception. To allow plaintiffs to ignore the divesture package or shift their burden to defendants would be to permit them to redefine the very transaction that they challenge, "tantamount to turning a blind eye to the elephant in the room." *Arch Coal* in Limine Order, 2004 WL 7389952, at *3.

***Divestiture Will Resolve Any Competitive Concerns.*** Even if plaintiffs did not have to account for divestiture in their *prima facie* case, they retain the ultimate burden of persuasion under the third *Baker Hughes* step to show that the transaction—including all its material components— will substantially lessen competition. Because divestiture will resolve any competitive concerns, plaintiffs cannot carry this burden.

Appropriately accounting for the divestiture wholly undermines plaintiffs' economic analysis of the merger. Dr. Israel's real-world analysis (or "actual monopolist test") shows that, after accounting for the divestiture, ██████████████████████████████

████████████████████████ [101] Even under Dr. Hill's "hypothetical" monopolist test, the number of "large format" markets that are presumptively anticompetitive post-merger—after accounting for the divestiture, correcting basic errors, and applying the 2010 Merger Guidelines—plummets from ██████████ [102] Even that resulting number vastly overstates the competitive impact of the merger, *see* section I.B, *infra*, but the miniscule number of markets in which plaintiffs can even *claim* presumptive harm shows how off-base plaintiffs' account of competitive conditions is.

Plaintiffs principally argue that they need not account for the divestiture because the entire divestiture is doomed to fail. Plf. Br. 39–42. At the outset, C&S—the largest grocery wholesale distributor in the United States with decades of industry experience and billions in annual sales—is surely sophisticated enough to decide for itself, after comprehensive due diligence, whether its ████████ divestiture investment is a viable business venture. Courts do not typically second-guess the informed business judgment of disinterested companies, *see Spiegel v. Buntrock*, 571 A.2d 767, 774 (Del. 1990), and plaintiffs offer no reason for this Court to do so here.

In any event, the facts firmly refute plaintiffs' speculation about C&S's business prospects. To assess whether a divestiture will maintain competition, courts typically consider several factors, including [1] "the likelihood of the divestiture; [2] the experience of the divestiture buyer; [3] the scope of the divestiture[;] [and] [4] the independence of the divestiture buyer from the merging seller and the purchase price." *UnitedHealth Group*, 630 F. Supp. 3d at 135 (citation omitted). Plaintiffs cannot carry their burden on any of those factors.

---

[101] DX 2623 (Israel Rep.) ¶¶ 198-210 & tbl. 12. ████████████████████████ ████████████ *See id*. at tbl. 11.
[102] *Id.* ¶ 180 & tbl. 10. No court has ever adopted the 2023 Guidelines that Dr. Hill relies on, which the Commission published *just months* before it brought this suit, and whose enforcement-friendly threshold presumptions are ██████████████████████ *See id.* ¶ 138 & n.215. This Court should not be the first.

*Likelihood of Divestiture*. The divestiture is a "virtual certainty" if the deal goes forward. *UnitedHealth*, 630 F. Supp. 3d at 135. The divestiture's only remaining precondition is the merger's closing after resolution of this litigation. ████████████████████████████ ██████████████████████████████████████████████████████████[103]

Beyond that, C&S has committed to █████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████[104]

Plaintiffs have identified no "*significant* obstacles to closing." *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 307 (D.D.C. 2020) (emphasis added). The purported obstacles they do identify border on frivolous. ███████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████[105] And plaintiffs' evidence-free assertion that it is "uncertain" whether divestiture will mitigate any lost competition in a timely manner has no basis in reality. *Id.* at 43. Plaintiffs offer no authority for an alternative "timely" schedule for divestiture, and C&S's timeline matches the timelines endorsed in other cases. *See UnitedHealth*, 630 F. Supp. 3d at 136 ("By doubling [acquiree company's] budget within the next four years, TPG expects that it will be able to improve the product 'and accelerate revenues as a result.'").[106]

*C&S's Experience*. Contrary to plaintiffs' assertions, C&S has vast expertise to vigorously

---

[103] DX 2738 (Galante Rep.) ¶ 51; PX 4115 (Cohen (C&S owner and executive chairman) Dep. Tr.) 56:8–18.
[104] DX 2738 (Galante Rep.) ¶ 38; DX 0953 at 2.
[105] *See* PX 11257 at 129 n.11, 129–147.
[106] ██████████████████████████████████████████████████ *See* PX 4060 (Winn (C&S) June 4, 2024 Dep. Tr.) 109:10–18; PX 4072 (Florenz (C&S) Dep. Tr.) 131:2–18.

compete in the retail market, and indeed the Commission has previously approved C&S as a divestiture buyer. C&S is the largest wholesale distributor in the country, and its existing distribution network positions it well for retail expansion.[107] For decades, C&S has also provided retail customers the services self-distributing retailers must typically handle for their own stores, such as wholesale procurement, private label merchandising, supply chain services, category management, vendor negotiations, retail technology, and digital marketing.[108]

C&S has direct grocery retail experience, too. It currently operates 25 retail supermarkets and is a franchisor of 165 additional locations.[109] C&S successfully completed two acquisitions as part of its strategic plan to promote new channels of growth[110] ███████████████████████ ████████████████████████████████████████████████████████ ████████████████████ [111] Piggly Wiggly Midwest has exceeded C&S's deal model projections, and C&S has since expanded the number of stores and the offerings within those stores.[112] And unlike other divesture buyers like Haggen that have been less successful, ████████████████████ ████████████████████████████████████████████████████████████████ [113]

Plaintiffs also overlook C&S's management team's "wealth of experience" in grocery retail, which is likely to be "an important component in helping [C&S] replace [Kroger's] competitive intensity." *RAG-Stiftung*, 436 F. Supp. 3d at 305; *see UnitedHealth Grp.*, 630 F. Supp. 3d at 137 (crediting the buyer's "large team of individuals with extensive experience"). ██████

---

[107] DX 1058, at 7; DX 2322 at 3–4.
[108] DX 1058, at 7–12; http://www.cswg.com/services.
[109] DX 2738 (Galante Rep.) ¶ 18; DX 1058 at 10, 16.
[110] DX 2304 at 308.
[111] PX 4050 (McGowan (C&S) Dep. Tr.) 27:18–28:6.
[112] DX 1058 at 16, 17.
[113] *Id.* at 7. ████████████████████████████████████████████ ████████████████████ PX 4066 (Clougher (Haggen) Dep. Tr.) 45:1–47:1.

[REDACTED] [114] [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] [115] [REDACTED]

[REDACTED]

[REDACTED] [116] [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] [117]

*Scope of Divestiture.* The divestiture provides C&S with the assets and human capital it will need to compete post-merger. From the outset, one of Kroger's goals was to [REDACTED] [REDACTED] [118] [REDACTED] [REDACTED] [119] In addition to physical assets, C&S will also receive private label and technology assets that will ensure it can hit the ground running. [REDACTED] [120] [REDACTED]

[REDACTED]

[REDACTED]

---

[114] DX 1058, at 29; PX 4099 (Morris (Albertsons) Dep. Tr.) 646:7–647:1; PX 4072 (Florenz (C&S) Dep. Tr.) 283:5–284:4.
[115] DX 1058 at 29.
[116] *Id.*
[117] *Id.*
[118] PX 4029 (Millerchip (former Kroger CFO)) Dec. 6, 2023 IH Tr. 40:13–25.
[119] PX 4064 (Maharoof (Kroger) June 4, 2024 Dep. Tr.) 199:22–200:13; 204:19–205:2.
[120] PX 4097 (Morris (Albertsons) Dep. Tr.) 251:12–24.



*C&S's Independence/Purchase Price*. Nothing in the record suggests that C&S lacks independence or that the ████████ purchase price is insufficient. *See, e.g.*, *UnitedHealth Grp.*, 630 F. Supp. 3d at 128, 139-40 (finding purchase price was adequate absent evidence to the contrary). The process to find a buyer was competitive: ████████████████████████████
████████████████████████████████████████████████████[125] The ████
████ that C&S will pay reflects the thoroughness of C&S's due diligence and the standalone value of the divestiture business. Plaintiffs contend that because C&S can make a profit even if sales decline, it has no incentive to vigorously compete, a suggestion that ignores economic reality. Plf. Br. 38. Businesses always have an incentive to make more money, not less. And that C&S projects a modest, temporary fall in revenues reflects only that it has realistically assessed the risks that any expanding business faces.

### b.    Plaintiffs' Market-Concentration Analysis Suffers from Other Defects

Plaintiffs' analysis of market concentration is also deficient because it produces results that cannot be squared with commercial reality. To provide just one example of how Dr. Hill's analysis mischaracterizes the commercial realities of on-the-ground competition: ████████████████
████████████████████████████████████████████████████████

---

[121] DX 1058 at 55.
[122] PX 4061 (Winn (C&S) June 5, 2024 Dep. Tr.) 456:16–457:17; 537:10–24.
[123] PX 4072 (Florenz (C&S) Dep. Tr.) 152:24–153:25.
[124] PX 4050 (McGowan (C&S) Dep. Tr.) 243:4–19.
[125] *See* DX 2738 (Galante Rep.) ¶¶ 25–26.

██████████████████████████████████████████████████████████

████ [126] But Dr. Hill's analysis ████████████████████████████████████

████████████████████████████████████████████████████████ [127]

Dr. Israel details other examples of similarly absurd results.[128]

The same defects are present for Dr. Hill's broader "large format stores" market, where Dr. Hill both understates competition from nearby grocery stores and overstates competition from more distant ones. Again, there are several examples detailed in Dr. Israel's report,[129] but defendants highlight just one here: Dr. Hill applies ████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████ [130] Plainly, that is not an accurate depiction of the competition ████████████████████████████

███████████████████████████████████████████████████████.

### 3.     Plaintiffs' "Head-to-Head Competition" Theory Fails

Unable to establish a *prima facie* case under the *Baker Hughes* framework, plaintiffs urge the Court to apply a different and unprecedented standard—one that no court in more than a century of antitrust jurisprudence has ever endorsed: that the elimination of direct competition between the merging parties is sufficient, on its own, to establish a *prima facie* case. Plaintiffs are wrong as matter of law and fact.

### a.     Plaintiffs' "Head-to-Head Competition" Theory Is Legally Deficient

There is not "a single case in which a court has enjoined a merger … where the [plaintiffs]

---

[126] DX 2623 (Israel Rep.) fig. 8.
[127] *Id.*
[128] *See id.* ¶ 145 & figs. 8–10.
[129] *Id.* ¶¶ 155, 159 & figs. 11–16, 19–24.
[130] *Id.* fig. 20.

failed to show undue concentration in a relevant market as its prima facie case requires, almost always through an HHI or similar metric." *RAG-Stiftung*, 436 F. Supp. 3d at 310–12. Indeed, plaintiffs' theory would render all horizontal-merger caselaw obsolete. By definition, a horizontal merger eliminates "whatever competition previously may have existed … between the parties to the merger." *Brown Shoe*, 370 U.S. at 335. But while all horizontal "[m]ergers among competitors eliminate competition, including price competition," such mergers "are not *per se* illegal, and many of them withstand attack under any existing antitrust standard." *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 23 (1979); *see Brown Shoe*, 370 U.S. at 335 (mergers between direct competitors must be "gauged on a broader scale: their effect on competition generally in an economically significant market"). For that reason, courts have repeatedly held that "the mere fact that a merger eliminates competition between the firms concerned has never been a sufficient basis for illegality." *Dresses for Less, Inc. v. CIT Grp./Com. Servs., Inc.*, 2002 WL 31164482, at *12 (S.D.N.Y. Sept. 30, 2002); *see, e.g.*, *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1169 (N.D. Cal. 2004).

To support their theory, plaintiffs seize on a single line from a nearly 60-year-old district court case. Plf. Br. 8. But that decision relied primarily on extensive analysis of market conditions to conclude that the "merger significantly increases concentration," not head-to-head competition. *United States v. Mfrs. Hanover Tr. Co.*, 240 F. Supp. 867, 948 (S.D.N.Y. 1965). If the line plaintiffs quote were read literally, it would "impl[y]—since every merger eliminates competition between the parties to the merger—that any very large horizontal merger violated the statute." *United States v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1282 (7th Cir. 1990). But that proposition is out of step with modern antitrust jurisprudence. "[A] more moderate interpretation of section 7 has prevailed" in the decades since, and "the current understanding of section 7 is that it forbids mergers that are

likely to hurt consumers, as by making it easier for the firms in the market to collude." *Id.* at 1282–83 (quotation marks omitted).

Nor do the other cases plaintiffs cite support the sweeping theory they invoke here. In *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015), the court concluded that the elimination of head-to-head competition could be relevant "*if the acquiring firm will have the incentive to raise prices or reduce quality after the acquisition,*" *Sysco*, 113 F. Supp. 3d at 61 (emphasis added; quotation marks omitted); *see FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1345 (4th Cir. 1976) (relying on market concentration for the *prima facie* case); *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1081–83 (D.D.C. 1997) (analyzing the elimination of direct competition as one "factor" *after* having already found high "concentration statistics and HHIs within the geographic markets"). Under well-established precedent, plaintiffs must prove harm to competition and harm to consumers; they cannot rely simply on the fact that the merging firms compete with one another.

> **b.    The Merger Is Unlikely to Harm Competition by Eliminating Head-to-Head Competition**

In any event, the merger is unlikely to produce anticompetitive effects through the elimination of head-to-head competition. Although Kroger and Albertsons do compete in some local markets, the anecdotal evidence plaintiffs offer falls far short of showing that Albertsons exerts *unique* competitive force on Kroger such that the merger will substantially reduce competition. To the contrary, the evidence reflects that *other* competitors are the primary constraint on Kroger's pricing. Moreover, plaintiffs' novel head-to-head theory fails to identify any *specific* market in which to analyze anticompetitive effects, and it ignores the divestiture altogether.

Extensive evidence shows that ███████████████████████████████████

████████████████████████████████████████████████████████████████

[131] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[132] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[133] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[134] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[135] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Empirical data confirms that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The fact that there are many areas in the country where either Kroger or Albertsons, but not both, are present allows for analysis of their effect on one another's pricing. Using regression analysis of margin data, Dr. Israel found that ▮▮▮▮▮▮▮

[136] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [137]

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [138] Plaintiffs make no effort to address this data. And notably, it is the exact kind of data courts have relied on to *enjoin* mergers when it shows that two firms have a statistically significant effect on each other's prices. *See FTC v. Whole Foods*, 548 F.3d 1028,

---

[131] DX 2623 (Israel Rep.) ¶¶ 286–99.
[132] *See id.* tbl. 14–15, App'x A; *see also* DX 2257.
[133] DX 2623 (Israel Rep.) ¶¶ 297–98 & tbl. 16.
[134] PX 4054 (Groff (Kroger) Dep. Tr.) 92:21–93:1; *see also id.* at 106:14–19 ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

[135] PX 4081 (McMullen (Kroger) Dep. Tr.) 259:18–260:1.
[136] DX 2623 (Israel Rep.) ¶ 222 & Appendix D tables 1-4.
▮▮▮▮▮ *Id.* ▮▮▮
[137] *Id.* ¶ 222 & fig. 34. ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮ *Id.* ¶ 224 & fig. 35. ▮▮▮
▮▮▮▮▮▮▮▮ *Id.* ¶ 226 & figs. 36–37.
[138] *Id.* ¶¶ 229–30 & figs. 38–39.

1039–40 (D.D.C. 2008); *Staples*, 970 F. Supp. at 1082. The inverse evidence here compels the inverse result.[139]

The indirect and anecdotal evidence plaintiffs offer cannot supplant the cold, hard data. Plaintiffs point to Dr. Hill's analysis of sales diversion between Kroger and Albertsons stores, which he asserts could translate to an increase in prices. Plf. Br. 16–17. But that speculative analysis of *theoretical* price effects is no substitute for Dr. Israel's "direct evidence" of *actual* price effects under real-world conditions. *Staples*, 970 F. Supp. at 1082; *see, e.g.*, *FTC v. Thomas Jefferson Univ.*, 505 F. Supp. 3d 522, 543 (E.D. Pa. 2020) (diversion of patients between hospitals not necessarily indicative of whether a hypothetical monopolist could impose a price change). Apart from Dr. Hill's flawed sales-diversion analysis, plaintiffs rely overwhelmingly on cherry-picked documents in which Kroger or Albertsons employees discuss the other's pricing or offerings. Plf. Br. 9–14. Notably, most of those documents are from Albertsons, not Kroger, and so are irrelevant to assessing competition because Kroger prices ▇▇▇▇▇▇▇, and Kroger's policies will control after the merger.[140] Conspicuously absent from plaintiffs' narrative are the numerous documents showing ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇[141]

Plaintiffs also significantly overstate competition between defendants on non-price factors. Even the documents on which plaintiffs rely show competition across a variety of firms. For

---



[139] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ DX 7006 (Hill Rebuttal Rep.) ¶ 123. *See* DX 2623 (Israel Rep.) ¶ 206 & App. E. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

[140] DX 2623 (Israel Rep.) ¶ 283, n.320.
[141] *See, e.g.*, DX 0301; DX 302; DX 0308; DX 315; DX 0324; DX 0510; DX 0586; DX 0608; DX 0637; DX 1635; DX 1674; DX 1682.

example, plaintiffs cite ████████████████████████████████████████████████

Plf. Br. 14. But plaintiffs fail to mention that the same document states that ████████████



.[142] Plaintiffs also conveniently omit a multitude of documents

showing ████████████████████████████████████████████████████████

████████████████████████████████████[143]

████████████████████████████████[144]

████████████████████████████████[145]

██████████████████████[146]

     Finally, plaintiffs' novel "head-to-head" theory neglects the divestiture, which will ensure

continued direct competition between current Kroger and Albertsons stores in precisely those

markets that plaintiffs highlight. Plaintiffs point to purported direct competition on customer

service between QFC and certain Albertsons banners in the Seattle area, for example. Plf. Br. 15.

████████████████████████████████████████████████████████████

████████████████████████████[147] At most, plaintiffs' evidence shows that Albertsons is

one of many firms Kroger competes with. Such evidence—present in nearly any horizontal

merger—does not relieve plaintiffs of their burden to make out a *prima facie* case under the *Baker*

*Hughes* framework.

---

[142] PX 2412 at 19, 20, 39.
[143] DX 0321 (Costco and Target); DX 0323 (Walmart).
[144] DX 0333 (Amazon), DX 0523 (Costco, Sam's Club, Aldi, Fresh Thyme, and Meijer).
[145] DX 0338 (Walmart and Amazon); DX 0348 (Costco); DX 0401 (Target, Walmart, Amazon Fresh, and Whole Foods), DX 0420 (Walmart).
[146] DX 0346.
[147] DX2239 (Schedule 2.1(a)-A; Schedule 2.1(a)-K; Schedule 2.1(c)-A; Schedule 2.1(c)-K).

**B.      Defendants Have Met Their Burden of Production on Rebuttal**

Even if plaintiffs could establish their *prima facie* case under their first part of the *Baker Hughes* standard (they cannot), defendants easily satisfy their burden of production on rebuttal. *See Baker Hughes*, 908 F.2d at 989. That burden is a modest one: "the party must introduce sufficient evidence to support a jury finding in his behalf." Charles Wright & Arthur Miller, *Fed. Practice & Proc.* § 5122 (2d ed.). And defendants have offered extensive evidence showing both that the flawed market shares Dr. Hill calculates are a poor indication of competitive harm in this case and that the merger will generate substantial efficiencies.

**1.      Any Increase in Market Concentration Will Not Translate to Market Power**

The question on rebuttal is whether any evidence suggests that plaintiffs' presumptive case "inaccurately predicts the relevant transaction's probable effect on future competition." *Baker Hughes*, 908 F.2d at 991. Market concentration is the beginning—not the end—of the antitrust analysis, because "market share" does not always translate to "market power, which is the ultimate consideration." *Id.* at 992 (cleaned up). And several factors show that any increase in market concentration here is unlikely to produce anticompetitive effects.

*First*, estimates of market concentration or anecdotal allegations of competition are not a substitute for data showing *actual* price competition between the parties and other firms—these are just "prox[ies] for predicting the ability of firms in the market to exercise market power." *FTC v. Occidental Petroleum Corp.*, 1986 WL 952, at *7 (D.D.C. Apr. 29, 1986). Here, extensive evidence shows that the merger will eliminate no meaningful pricing constraints. Using an established grocery industry-specific model developed outside the litigation context to analyze the diversion of sales between grocery retailers, applying the defendants' variable (not gross) margins, and accounting for the divestiture, Dr. Israel determined that the merger is unlikely to lead to price

increases post-merger.[148] Dr. Hill admitted that his models match Dr. Israel's results when using variable margins and accounting for the divestiture.[149]

*Second*, market concentration is a poor measure of competition where, like here, "the threat of outside entry" constrains pricing by "deterring the remaining entities" from "exercising market power." *FTC v. H.J. Heinz*, 246 F.3d 708, 717 n.13 (D.C. Cir. 2001) (citation omitted). ███████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███[150] And some of Kroger's fiercest competitors have plans to expand—Sprouts is slated to open "35 new stores in both new and established markets" this year,[151] Walmart plans to add 150 new stores over the next five years,[152] ██████████████████████████████████

████████[153]████████████████████████████████████████

███████[154] "The ability and willingness of current competitors to expand their foothold in the market and/or reposition greatly reduces the anticompetitive effects of a merger, and is essentially equivalent to new entry." *FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26, 57 (D.D.C. 2009).[155]

---

[148] DX 2623 (Israel Rep.) ¶¶ 252–54, figs. 40–41; *see also* section I.A.3.b, *supra*. Dr. Israel's analysis using Dr. Hill's CMCR methodology similarly found that there would be no significant price effect. DX 2623 (Israel Rep.) App. C, fig. 1.

[149] PX 4128 (Hill Dep. Tr.) 124:19-125:18.

[150] Ex. B (excerpts of spreadsheet submitted as part of Kroger Second Request Responses, Revised Ex. 27-1).

[151] Peyton Bigora & Jasmine Ye Han, *Mapping Sprouts' Ambitious Growth Plan*, Grocery Dive (Dec. 13, 2023), https://www.grocerydive.com/news/mapping-sprouts-ambitious-growth-plan/701032/.

[152] J. Edward Moreno, *Walmart to Add 150 U.S. Stores in Five-Year Expansion Drive*, N.Y. Times (Jan. 31, 2024), https://www.nytimes.com/2024/01/31/business/walmart-stores-expansion.html.

[153] DX 2268.

[154] DX 2531 (Oblisk (Whole Foods) Dep. Tr.) 155:5–156:20.

[155] Courts have also held that market concentration is probative primarily where a merger would likely foster "interdependent anticompetitive conduct." *H.J. Heinz*, 246 F.3d at 715–16. Plaintiffs have not even attempted to make such a showing here.

## 2. The Merger Will Generate Significant Efficiencies and Lower Prices

The significant efficiencies and consumer benefits the merger will generate also rebut plaintiffs' *prima facie* case. Courts have long recognized that mergers can create efficiencies that will enhance competition and consumer welfare. *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 89 (D.D.C. 2011). The "trend among lower courts has … been to recognize or at least assume that evidence of efficiencies may rebut the presumption that a merger's effects will be anticompetitive." *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 207 (S.D.N.Y. 2020); *see also Arch Coal*, 329 F. Supp. 2d at 151 (efficiencies can affect "whether the proposed transaction will substantially lessen competition."). To be cognizable, efficiencies must be both merger-specific and verifiable. *See H & R Block*, 833 F. Supp. 2d at 89–90; *see also* 2010 Merger Guidelines § 10.[156] But efficiencies need only rise above the "speculative" level—defendants need not show they will be realized with absolute certainty. *Deutsche Telekom*, 439 F. Supp. 3d at 213.



[156] As discussed above, *supra* n.102, the 2023 Merger Guidelines plaintiffs rely one have never been adopted by any court. In any event, the claimed efficiencies would be cognizable under either set of guidelines. *See* DX 2736 (Gokhale Rep.) ¶ 18.

[157] DX 1727 at 15; DX 2237 at 2.

[158] PX 4064 (Maharoof (Kroger) June 4, 2024 Dep. Tr.) 112:1–9; PX 4076 (Aitken (Kroger) Dep. Tr.) 210:9–18; PX 4054 (Groff (Kroger) Dep. Tr.) 43:9–19; PX 4081 (McMullen (Kroger) Dep. Tr.) 247:12–18.

[159] PX 4064 (Maharoof (Kroger) June 4, 2024 Dep. Tr.) 69:15-70:6, 54:19-21, 56:9-19, 134:7-12; DX 2503 (S. Rowland Dep. Tr.) 25:5-36:14; DX 2503 (J. Kiernan Dep. Tr.) 22:6-24:2.

██████████████████████████████████████████[160] The parties' plans are also

consistent with third-party research demonstrating that mergers typically generate cost savings and

other synergies of a similar magnitude.[161] And expert analysis confirms ████████████████

████████████████████████[162]

### C.    Plaintiffs Cannot Carry Their Ultimate Burden of Persuasion

Because defendants easily carry their modest burden of production (even if plaintiffs could

make out a *prima facie* case), the burden of production returns to plaintiffs and merges with their

ultimate burden of persuasion. *See Baker Hughes*, 908 F.2d at 982–83. Dr. Hill's economic

analysis is insufficient to satisfy that burden. *First*, although he purports to analyze competitive

effects apart from market structure, Dr. Hill's analysis rests entirely on his computation of local

market shares, and thus does little more than restate his conclusions about market concentration.[163]

*Second*, the input data he relies on is fatally flawed. As Dr. Israel points out, Dr. Hill's gross

margins improperly exclude many categories of variable costs (like hourly labor, supplies,

warehousing, transportation, and packaging), inflating those margins and overstating estimated

competitive harm—which direct evidence shows will be negligible at most.[164]

## II.    PLAINTIFFS CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS IN A MARKET FOR UNION GROCERY LABOR

In the alternative, plaintiffs seek to block the merger on the ground that it will supposedly

lessen competition for union grocery labor. The Court should reject this unprecedented attempt to

use antitrust law to meddle in labor relations, which contravenes the Clayton Act's unambiguous

text and has been disclaimed by plaintiffs' own experts.

---

[160] Springer (Kroger) Dep. Tr. 20:4–20, 22:17–23:1, 115:21–116:5.
[161] DX 1984 at 6; DX 1979 Exhibit 2; DX 1988 at 649.
[162] DX 2736 (Gokhale Rep.) ¶¶ 13(a), 24 & tbl. 3.
[163] PX 7004 (Hill Rep.) ¶ 135; *see also* DX 2623 (Israel Rep.) ¶ 241.
[164] DX 2623 (Israel Rep.) ¶ 244.

## A.    Plaintiffs' Labor Theory Is Not Legally Cognizable

Before this case, no plaintiff in history has sought to block a merger under the Clayton Act by alleging that it may change power distribution between unions and employers. For good reason: text and precedent make clear that the antitrust laws have no place in the field of labor relations.

The Clayton Act's text is plain, and so courts "must enforce it according to its terms." *King v. Burwell*, 576 U.S. 473, 486 (2015). "The labor of a human being is not a commodity or article of commerce." 15 U.S.C. § 17. Consistent with that unambiguous language, the Supreme Court has explained that "it would seem plain that restraints on the sale of the employee's services to the employer … are not in themselves combinations or conspiracies in restraint of trade or commerce." *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 503 (1940). Courts have repeatedly recognized that "the antitrust laws were not enacted for the purpose of preserving freedom in the labor market, nor of regulating employment practices as such." *Nichols v. Spencer Int'l Press, Inc.*, 371 F.2d 332, 335–36 (7th Cir. 1967); *see, e.g.*, *McNeil v. Aguilos*, 831 F. Supp. 1079, 1086 (S.D.N.Y. 1993); *Plumbers & Steamfitters, Loc. 598 v. Morris*, 1981 WL 27190, at *6 (E.D. Wash. Apr. 9, 1981). Plaintiffs' theory that union labor is a "line of commerce" in which the merger would lessen competition, Plf. Br. 33, cannot be squared with the statutory text. Indeed, plaintiffs' use of "CBA areas" as their proposed geographic markets confirms that the gravamen of their claim is a diminishment in the bargaining power of particular unions.[165]

Even setting aside the statute's plain text, plaintiffs' theory is legally defective because it falls within the so-called implicit or nonstatutory antitrust exemption for labor activity. "[I]t has long been recognized that in order to accommodate the collective bargaining process, certain concerted activity among and between labor and employers must be held to be beyond the reach

---

[165] Plaintiffs' labor theory focuses on 31 CBA areas, mainly in the Pacific Northwest. *See* DX 2739 (McCrary Rep.) ¶ 135. It has no applicability to the majority of the United States.

of the antitrust laws." *Clarett v. Nat'l Football League*, 369 F.3d 124, 130 (2d Cir. 2004) (Sotomayor, J.). Indeed, one of Congress's chief objectives in creating the National Labor Relations Board "was to take from antitrust courts the authority to determine, through application of the antitrust laws, what is socially or economically desirable collective-bargaining policy." *Brown v. Pro Football, Inc.*, 518 U.S. 231, 242 (1996); *see also United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 664 (1965) ("the elimination of competition based on wages among the employers in [a] bargaining unit" is "not the kind of restraint Congress intended the [antitrust laws] to proscribe"). The FTC has no labor-relations authority or expertise. For that reason, the Supreme Court has expressly rejected the argument that coordinated action by employers in bargaining with organized labor can amount to an antitrust violation. *See Brown*, 518 U.S. at 234–35. Plaintiffs here seek to do precisely what the Supreme Court's precedent forbids: use the antitrust laws to set "collective-bargaining policy." *Id.* at 242.

Underscoring the implausibility of plaintiffs' theory, the antitrust laws would permit Kroger and Albertsons to join forces in collective bargaining *today*. *Id.* at 234–35. That is, plaintiffs' position is that the merger should be enjoined to prevent defendants from doing what they may already do. That is not what the Clayton Act requires.

### B.    Plaintiffs' Labor Theory Fails on Its Own Terms

Even if plaintiffs' labor theory were legally cognizable, that theory would fail.

### 1.    Plaintiffs Cannot Establish a Cognizable Union Labor Market

As discussed in section I.A.1, *supra*, defining an appropriate antitrust market is a threshold element of plaintiffs' prima facia case. *See Marine Bancorporation*, 418 U.S. at 618. Plaintiffs cannot substantiate either their proposed product or geographic markets—indeed, even their own economics experts refused to defend their position.

### a.    "Union Grocery Labor" Is Not a Cognizable Product Market

Plaintiffs offer no economic evidence supporting their proposed product market of union grocery labor.



[172] Plaintiffs cannot carry their prima facie burden (or their ultimate burden of persuasion) when they fail to "come to Court with economic evidence of any kind." *AT&T*, 310 F. Supp. 3d at 252.

That plaintiffs' economic experts refused to endorse their labor theory is unsurprising, because the available data firmly refutes their proposed product market. As defendants' labor economics expert, Dr. Justin McCrary, shows, Kroger and Albertsons employees hold a variety of different in-store roles—including cashiers, clerks, baristas, meat cutters, and bakers—that exist

---

[166] PX 4128 (Hill Dep. Tr.) 205:1–4.

[167] *Id.* at 205:5–8.

[168] *Id.* at 208:10–14.

[169] *Id.* at 208:20–23.

[170] *Id.* at 208:24–209:2.

[171] *Id.* at 206:6–24.

[172] Ex. C (Ashenfelter Dep. Tr.) 58:15–59:6, 59:19–24, 59:7–10, 72:21–73:9, 73:17–23.

in many non-grocery industries.[173] 

[174] That sharply

distinguishes this case from wage-fixing cases in which employees had "accumulate[d] industry-specific knowledge" that was not readily transferrable outside the industry in question. *Todd v. Exxon Corp.*, 275 F.3d 191, 203 (2d Cir. 2001).



[178] The

"subjective testimony" from union representatives that plaintiffs rely on provides no basis to ignore the direct evidence that union grocery labor is readily interchangeable with both non-union work and union jobs in other industries. *AT&T*, 310 F. Supp. 3d at 211 (quotation marks omitted).

        **b.**    **"CBA Areas" Are Not Cognizable Geographic Markets**

      Plaintiffs' proposed geographic markets—so-called "CBA areas," consisting of those geographic areas covered by a CBA with either Kroger or Albertsons—are even more arbitrary. And here too, plaintiffs' economic expert offers no defense of plaintiffs' proposed market

---

[173] DX 2739 (McCrary Rep.) ¶¶ 27–34, 93–96 & Exs. 1–2, 4.
[174] *Id.* ¶ 118 & Ex. 11.
[175] *Id.* ¶ 108; *see also* PX 4014 (Dosenbach (Albertsons) IH Tr.) 260:7–13.
[176] DX 2739 (McCrary Rep.) ¶ 114 & Ex. 9.
[177] *Id.* Ex. 10.
[178] *Id.* ¶ 131 (citing DX 0108; DX 1213; DX 1234; DX 2357; DX 2358; DX 2359; DX 2360; DX 2361; DX 2362; DX 2363; DX 2364; DX 2367; DX 2375) and ¶ 106.

definition. A geographic market must extend to the area in which "buyers can turn for alternative sources of supply." *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001); *see also Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 726 (3d Cir. 1991) (a "geographic market is not comprised of the region in which the seller attempts to sell its product, but rather is comprised of the area where his customers would look to buy such a product"). Dr. Hill does not even attempt to analyze where union grocery employees would turn for alternative employment.[179] And as Dr. McCrary explains, ███████████████████████████████████████████████████

███████████████████████████████████████████████████[180]

### 2.    The Merger Would Not Substantially Reduce Competition for Union Labor

Beyond failing to show a cognizable market, plaintiffs cannot show any likelihood of anticompetitive effects. To start, the antitrust laws permit multiemployer bargaining, *see Brown*, 518 U.S. at 234–35, and so plaintiffs' theory that the merger would harm competition by transforming defendants into a *de facto* multiemployer bargaining unit makes no sense.

No economic evidence supports plaintiffs' theory either. Indeed, ███████████████



███████████████████████[181] ███████████████████████████████

███████████████████████████[182] meaning that the presence or absence of a nearby Albertsons has no measurable effect on the wage rates that Kroger negotiates with unions. Where Albertsons overlaps with a Kroger CBA area, ███████████████████

███████████████████████████████████████████████████

██████[183] Moreover, Dr. McCrary's regression analysis shows that ███████████████

---

[179] *Id.* ¶ 139 (citing Hill Rep. ¶ 253).
[180] *Id.* ¶ 148–49; *see also* DX 2740 (King Rep.) ¶¶ 17–26.
[181] DX 2739 (McCrary Rep.) ¶ 148 & Ex. 8; *id.* Ex. 9.
[182] *Id.* ¶¶ 223, 227.
[183] *Id.* ¶¶ 180–81; PX 4042 (Dosenbach (Albertsons) Dep. Tr.) 132:2–132:15.

[REDACTED] [184] Plaintiffs also overlook that a larger union at a single employer would likely have even greater bargaining power than unions in the relevant "CBA areas" enjoy today. One of the union presidents whose testimony plaintiffs rely on has stated as much.[185] As defendants' labor industry expert, Mr. Roger King, explains, [REDACTED]

[REDACTED] [186]

## III.    PLAINTIFFS FAIL TO SHOW A BALANCE OF EQUITIES IN THEIR FAVOR

"In determining whether to grant a preliminary injunction under section 13(b), a court must … balance the equities." *FTC v. Warner Commc'ns*, 742 F.2d 1156, 1160 (9th Cir. 1984); *see Winter*, 555 U.S. at 19. Even if plaintiffs established a likelihood of success on the merits (they cannot), a failure to show that the balance of equities tilts in their favor is "a separate, independent reason the FTC's motion must be denied." *Microsoft Corp.*, 681 F. Supp. 3d at 1100–01. "For instance, if potential merger partners can present credible evidence that the merged company will lower consumer prices because of extraordinary efficiencies (even when the same efficiencies might not suffice to overcome the presumption in favor of the FTC's prima facie case on the merits), and those efficiencies and lowered prices will be lost forever if the merger is preliminarily enjoined, the public equities in favor of the merger might outweigh the FTC's likelihood of success on the merits." *CCC Holdings*, 605 F. Supp. 2d at 76.

The merger will generate billions of dollars in synergies and substantial price reductions for consumers nationwide.[187] Prices will drop; consumers will experience improved shopping conditions; and Kroger will make substantial investments in its associates. By contrast, if the

---

[184] *Id.* ¶ 209 & Ex. I.
[185] DX 2740 (King Rep.) ¶ 44 n.71.
[186] *Id.* ¶¶ 44, 59; PX 2042 (Dosenbach (Albertsons) Dep. Tr.) 99:7–100:1.
[187] DX 1727 at 15; DX 2237 at 2.

merger were enjoined, several state AGs (including three plaintiffs here) predicted in recent court filings that Albertsons would be unable to "compet[e] with other supermarkets, including Kroger, leaving shoppers facing higher prices, worse services, less innovation, or even closure of their local Safeway or Albertsons supermarket."[188] The merger addresses all those concerns.

On the other side of the equities ledger, plaintiffs allege harm only in narrow local markets; in the majority of states where defendants do not overlap, the merger can only benefit consumers. Plaintiffs offer no reason the balance of equities or public interest should favor the interests of consumers in a handful of local markets, if any, where they (wrongly) allege competition may be reduced, when consumers across the country will experience only benefits from this merger. *See Maney v. Brown*, 464 F. Supp. 3d 1191, 1217 (D. Or. 2020) ("[t]he public interest also commands respect for federalism and comity"). And the equities particularly disfavor enjoining the merger in its entirety where additional targeted divestitures could mitigate any minimal competitive impact.

## IV.   PLAINTIFFS FAIL TO ESTABLISH ANY IRREPARABLE HARM

The traditional four-factor test that must be satisfied to obtain extraordinary injunctive relief includes the requirement that the moving party must establish that plaintiffs will suffer irreparable harm. *Starbucks*, 144 S. Ct. at 1576–77. Plaintiffs do not even try to establish irreparable harm, instead asserting under Section 13(b) they have a "lighter burden" and a "more lenient standard" that "omit[s] requirements like irreparable harm." Plf. Br. 6-7. Plaintiffs' position cannot be squared with recent Supreme Court authority. Just last term, the Court held that a similar remedial provision in the National Labor Relations Act did not displace the traditional equitable standard for preliminary injunctive relief. *Starbucks*, 144 S. Ct. at 1576–77. "[A]bsent a clear command from Congress, courts must adhere to the traditional four-factor test." *Id.* at 1576. And

---

[188] Mem. of Law in Supp. of TRO Mot. at 2, *District of Columbia v. The Kroger Co.*, No. 22-cv-3357 (D.D.C. Nov. 2, 2022).

the Court has uniformly rejected arguments that various federal statutes supplanted the "established principles" governing equitable relief. *See id.* Indeed, the Court has held that even mandatory language "far more favorable to the agency" than Section 13(b)'s permissive authorization falls short of the "clear command" required. *Id.* at 1576–77.

To be sure, the Court need not reach this question since plaintiffs fail to satisfy the other threshold requirements to obtain injunctive relief. *See supra*. At a minimum, that plaintiffs do not even contend there would be any irreparable harm if defendants close the merger, is another reason that counsels in favor of allowing the transaction to proceed.

## V.    PLAINTIFFS' PROPOSED REMEDY IS FATALLY OVERBROAD

Finally, even if plaintiffs could satisfy all the requirements for a preliminary injunction— and they cannot—they would not be entitled to the sweeping nationwide relief that they seek. As both the Supreme Court and the Ninth Circuit have repeatedly cautioned in recent years, injunctive relief "must be tailored to remedy the specific harm alleged." *Galvez v. Jaddou*, 52 F.4th 821, 834 (9th Cir. 2022) (quoting *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991)); *see, e.g.*, *Murthy v. Missouri*, 144 S. Ct. 1972, 1981 (2024) (criticizing court of appeals for "affirm[ing] a sweeping preliminary injunction"); *Labrador v. Poe by & through Poe*, 144 S. Ct. 921 (2024) (staying injunction insofar as it was overbroad). When awarding injunctive relief, courts must always consider "[i]f a less drastic remedy" would be "sufficient to redress" the injury a plaintiff has shown. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010). "It is an abuse of discretion to issue an overly broad injunction." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1196-97 (9th Cir. 2024) (remanding because injunction's "expansive geographical scope" was not "necessary to prevent" the alleged harm).

As plaintiffs readily acknowledge, their challenge turns on "local markets." Plf. Br. 38. The harms they allege are highly localized, too. Plaintiffs contend that the relevant markets

typically span only around ten miles, with more distant stores exerting *zero* influence in each antitrust market. *Id.* at 29 n.142. Unlike cases in which the Ninth Circuit has permitted nationwide relief, any competitive harm in one of the thousands of local markets plaintiffs identify is circumscribed by "neat geographic boundaries." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 680 (9th Cir. 2021) (citation omitted). ████████████████████████████

████████████████████████████████████████████

███████████████████████████ In that context, a nationwide injunction makes no sense where targeted divestiture could address any purported local harms.

Plaintiffs' only response on this issue is that courts have previously enjoined mergers after finding anticompetitive effects in a single market. Plf. Br. 32. But none of those cases held that a global remedy is permissible when more tailored alternatives would eliminate competitive harms. To the contrary, the sole Ninth Circuit case plaintiffs cite held that "a limited divesture order" was appropriate, observing that divestiture "should always be in the forefront of a court's mind when a violation of [the antitrust laws] has been found." *RSR Corp. v. FTC*, 602 F.2d 1317, 1326 (9th Cir. 1979) (citation omitted). At a fundamental level, plaintiffs do not—and cannot—articulate any reason to scuttle a multi-billion-dollar deal and deprive consumers in the overwhelming majority of the country with lower prices to redress alleged competitive harms in (at most) a handful of local markets. That result is profoundly inequitable, contrary to the public interest, and would contravene both the Clayton Act and binding precent.

## CONCLUSION

For the foregoing reasons, this Court should deny plaintiffs' motion for a preliminary injunction.

DATED: August 12, 2024

ANGELI LAW GROUP LLC

/s/ David H. Angeli
DAVID H. ANGELI, Bar No. 020244
david@angelilaw.com
PETER D. HAWKES, Bar No. 071986
peter@angelilaw.com
121 SW Morrison Street, Suite 400
Portland, OR 97204
Telephone: 503.954.2232

AND

DEBEVOISE & PLIMPTON LLP

EDWARD D. HASSI (*Pro Hac Vice*)
thassi@debevoise.com
801 Pennsylvania Avenue NW
Washington, DC 20004
Telephone: 202.942.5000

MICHAEL SCHAPER (*Pro Hac Vice*)
mschaper@debevoise.com
SHANNON ROSE SELDEN (*Pro Hac Vice*)
srselden@debevoise.com
J. ROBERT ABRAHAM (*Pro Hac Vice*)
jrabraham@debevoise.com
NATASCHA BORN (*Pro Hac Vice*)
nborn@debevoise.com
66 Hudson Boulevard
New York, NY 10001
Telephone: 212.909.6000

AND

WILLIAMS & CONNOLLY LLP

ENU A. MAINIGI (*Pro Hac Vice*)
emainigi@wc.com
JONATHAN B. PITT (*Pro Hac Vice*)
jpitt@wc.com
A. JOSHUA PODOLL (*Pro Hac Vice*)
apodoll@wc.com
THOMAS W. RYAN (*Pro Hac Vice*)
tryan@wc.com
TYLER INFINGER(*Pro Hac Vice*)

STOEL RIVES LLP

/s/ B. John Casey
B. JOHN CASEY, OSB No. 120025
john.casey@stoel.com
RACHEL C. LEE, OSB No. 102944
rachel.lee@stoel.com
JACOB GOLDBERG, OSB No. 162565
jacob.goldberg@stoel.com

AND

ARNOLD & PORTER KAYE SCHOLER LLP

MATTHEW M. WOLF (*Pro Hac Vice*)
matthew.wolf@arnoldporter.com
SONIA K. PFAFFENROTH (*Pro Hac Vice*)
sonia.pfaffenroth@arnoldporter.com
JOSHUA M. DAVIS (*Pro Hac Vice*)
joshua.davis@arnoldporter.com
KOLYA D. GLICK (*Pro Hac Vice*)
kolya.glick@arnoldporter.com
JASON C. EWART (*Pro Hac Vice*)
jason.ewart@arnoldporter.com
MICHAEL E. KIENTZLE (*Pro Hac Vice*)
michael.kientzle@arnoldporter.com
MATTHEW M. SHULTZ (*Pro Hac Vice*)
matthew.shultz@arnoldporter.com
DAVID B. BERGMAN (*Pro Hac Vice*)
david.bergman@arnoldporter.com
MICHAEL L. WALDEN (*Pro Hac Vice*)
mike.walden@arnoldporter.com
YASMINE L. HARIK (*Pro Hac Vice*)
yasmine.harik@arnoldporter.com
ALLISON GARDNER (*Pro Hac Vice*)
allison.gardner@arnoldporter.com
BARBARA H. WOOTTON (*Pro Hac Vice*)
barbara.wootton@arnoldporter.com
CHRISTIAN SCHULTZ (*Pro Hac Vice*)
christian.schultz@arnoldporter.com
DAVID EMANUELSON (*Pro Hac Vice*)
david.emanuelson@arnoldporter.com
MEI-WAH LEE (*Pro Hac Vice*)
mei-wah.lee@arnoldporter.com
WILSON DELOSS MUDGE (*Pro Hac Vice*)
wilson.mudge@arnoldporter.com

tinfinger@wc.com
WILLIAM ASHWORTH (*Pro Hac Vice*)
washworth@wc.com
680 Maine Avenue SW
Washington, DC 20024
Telephone: 202.434.5000

AND

DECHERT LLP

JAMES A. FISHKIN (*Pro Hac Vice*)
james.fishkin@dechert.com
MICHAEL COWIE (*Pro Hac Vice*)
mike.cowie@dechert.com
ELENA KAMENIR (*Pro Hac Vice*)
elena.kamenir@dechert.com
1900 K Street NW
Washington, DC 20006
Telephone: 202.261.3300

HOWARD. M. ULLMAN (*Pro Hac Vice*)
howard.ullman@dechert.com
45 Fremont St, 26th Floor
San Francisco, CA 94105
Telephone: 415.262.4500

ROSS UFBERG (*Pro Hac Vice*)
ross.ufberg@dechert.com
YOSEF WEITZMAN (*Pro Hac Vice*)
yosi.weitzman@dechert.com
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
Telephone: 215.994.2422

*Attorneys for Defendant Albertsons
Companies, Inc.*

601 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: 202.942.5000

JOHN A. HOLLER (*Pro Hac Vice*)
john.holler@arnoldporter.com
250 W 55th Street
New York, NY 10019
Telephone: 212.836.8000

BRIAN K. CONDON (*Pro Hac Vice*)
brian.condon@arnoldporter.com
777 S. Figueroa Street, 44th Floor
Los Angeles, CA 90017
Telephone: 213.243.4000

JEREMY T. KAMRAS (*Pro Hac Vice*)
jeremy.kamras@arnoldporter.com
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111
Telephone: 415.471.3100

AND

WEIL, GOTSHAL & MANGES LLP

MARK A. PERRY (*Pro Hac Vice*)
mark.perry@weil.com
LUKE SULLIVAN (*Pro Hac Vice*)
luke.sullivan@weil.com
JASON N. KLEINWAKS (*Pro Hac Vice*)
jason.kleinwaks@weil.com
2001 M Street, NW, Suite 600
Washington, DC 20036
Telephone: 202.682.7000

LUNA N. BARRINGTON (*Pro Hac Vice*)
luna.barrington@weil.com
767 Fifth Avenue
New York, NY 10153
Telephone: 212.310.8000

SARAH M. STERNLIEB (*Pro Hac Vice*)
sarah.sternlieb@weil.com
700 Louisiana Street, Suite 3700
Houston, TX 77002

Telephone: 713.546.5000

BAMBO OBARO (*Pro Hac Vice*)
bambo.obaro@weil.com
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone: 650.802.3000

THOMAS B. FIASCONE (*Pro Hac Vice*)
tom.fiascone@weil.com
REBECCA SIVITZ (*Pro Hac Vice*)
rebecca.sivitz@weil.com
100 Federal Street, Floor 34
Boston, MA 02110
Telephone: 617.722.8314

*Attorneys for Defendant The Kroger Company*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the Court's ordered page limitation, provided in the Court's Case

Management and Scheduling Order, ECF No. 88 (April 12, 2024), because it does not exceed 50

pages, including headings, footnotes, and quotations, but excluding the caption, table of cases and

authorities, signature block, exhibits, and any certificates of counsel.


DATED this 12th day of August, 2024.          */s/ B. John Casey*
                                              B. John Casey