# DX 0090

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 0108

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 0143

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 0149

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 0149A

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 0149B

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 0149C

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 0149D

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 0149E

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 0149F

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 0149G

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 0149H

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 0149I

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# 6J 0206

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 0223

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 0301

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX "%$

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX "%"*

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX "%#

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX "%&#

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX "%S%

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX "%S& 

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX "%88%

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX "986

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX "%8*

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX "%&*

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX "&'#

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX "&#)

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX "&S"

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# 6J "& &

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 0510

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 0523

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 0586

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 0608

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 0637

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 0795

EXHIBIT
0001
Kurt Unkelbach
05.30.24

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 10-K

(Mark One)

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended February 3, 2024

or

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from to

Commission file number: 0-25464



**DOLLAR TREE, INC.**
(Exact name of registrant as specified in its charter)

| Virginia | 26-2018846 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| 500 Volvo Parkway | |
| Chesapeake, Virginia | 23320 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (757) 321-5000

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $.01 per share | DLTR | NASDAQ Global Select Market |

Securities registered pursuant to section 12(g) of the Act:
None
(Title of Class)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

Yes    ☒         No    ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.

Yes    ☐         No    ☒



## Competition

We operate in the discount retail sector, which is currently and is expected to continue to be highly competitive with respect to price, store location, merchandise quality, assortment and presentation, and customer service, including merchandise delivery and checkout options. Our competitors include dollar stores, mass merchandisers, online retailers, discount retailers, drug stores, convenience stores, independently-operated discount stores, grocery stores and a wide variety of other retailers. These other retail companies operate stores in many of the areas where we operate, and many of them engage in extensive advertising and marketing efforts. We believe we differentiate ourselves from other retailers by providing high-value, high-quality, low-cost merchandise in attractively-designed stores that are conveniently located.

## Government Regulation

We are subject to a wide variety of local, state and federal laws and regulations within the United States and Canada. These laws and regulations relate to, among other things, the operation of our facilities and the sale of products, including without limitation product and food safety, marketing and labeling; labor and employment, including wage and hour, benefits, healthcare and workplace safety; pricing; antitrust and fair competition; privacy and information security; tariff and trade; energy and environmental protection; financial reporting and disclosure; licensing; intellectual property; and taxes. We routinely incur significant compliance-related costs, both direct and indirect, with respect to these laws and regulations which may have a material effect on our capital expenditures, earnings or competitive position. For more information, see "Item 1A. Risk Factors."

## Intellectual Property

We are the owners of several trademarks including "Dollar Tree," the "Dollar Tree" logo, "Family Dollar," "Family Dollar Stores" and other names and designs of certain merchandise sold in our Dollar Tree and Family Dollar stores. Our trademarks are generally valid and may be renewed indefinitely as long as they are in use and/or their registrations are properly maintained.

## Our People

Our business success, customer satisfaction and employee engagement are built upon our dedicated associates who work and live in the communities we serve. Our goal is to provide a work environment that is welcoming and inclusive, offers competitive pay and benefits, supports growth and development, and affirms our corporate values. We recruit and hire in the communities we serve using associate referrals, local job fairs and social media as well as local community service partners to provide part-time and full-time jobs that can become lasting careers. Our Human Resources team, with oversight from our Board of Directors and its committees, develops and executes programs for compensation and benefits, onboarding and training, professional and leadership development, performance management, recognition and succession planning.

We show care for our people by investing in their personal well-being and professional growth through a variety of people programs and initiatives, including:

- *Compensation, benefits and well-being.* We are committed to providing market-competitive pay for all positions, and we are a pay-for-performance organization, offering performance-based compensation opportunities at nearly all levels of the organization, including certain hourly-paid positions. In the last year, we made approximately $175.0 million in annualized wage investments across the organization, which includes $60.5 million of statutorily required minimum wage increases. We strive to ensure gender and racial pay equity for associates performing equal or substantially similar work. Eligible associates can participate in our Retirement Savings Plan, which provides a dollar-for-dollar match on the first 5% of associate contributions, and all associates can participate in our Employee Stock Purchase Plan. All full-time and part-time associates are eligible for health and welfare benefits, including medical, dental and vision. Associates may be eligible for other benefits including educational assistance, disability and life insurance as well as paid maternity and parental leave. Financial support to associates recovering from natural disasters and personal hardships as well as a scholarship program for associates with children pursuing higher education are also available. Associates are offered the flexibility to advance their payday earnings to meet their personal bills and expenses.

- *Talent development and retention.* We believe in the growth and development of our associates and are committed to building a culture of learning that gives associates the opportunity to enhance their skills at every stage of their career. To support this objective, we provide a multitude of professional and leadership development experiences, including online and instructor-led trainings, tuition reimbursement for graduate, undergraduate, General Educational Development ("GED") and English as a Second Language classes, and discounted tuition at hundreds of colleges and universities for our associates and their families. Retention of our associates is a focus for all leaders and we continuously aim to improve our turnover rate. To identify high-potential individuals, leadership assesses talent at the store manager level and above on a regular basis through structured talent reviews and succession planning paired with customized development plans. This focus on talent resulted in more than 48,400 promotions in fiscal 2023. In fiscal 2023 we also started building our first

9

# DX "+S+

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 0943

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# 6J "+' %

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX #'' *

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 1112

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 1134

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 1135

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# Exhibit 1187

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 1234

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 1245

| | |
|---|---|
| Document title: | How Asian Groceries Like H Mart and Patel Brothers Are Reshaping America - The New York Times |
| Capture URL: | https://www.nytimes.com/2024/06/11/dining/asian-grocery-stores-america.html?unlocked_article_code=1.y00.goFD.lfRkHFyLmIld |
| Page loaded at (UTC): | Fri, 28 Jun 2024 10:22:55 GMT |
| Capture timestamp (UTC): | Fri, 28 Jun 2024 10:23:49 GMT |
| Capture tool: | 10.47.5-beta.1 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (X11; Linux x86_64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/124.0.0.0 Safari/537.36 |
| Operating system: | Linux (Node 20.11.1) |
| PDF length: | 13 |
| Capture ID: | tcY67jYy4VtsQZkTT1Hxew |
| User: | ap-jchang |

DX 1245



# Don't Call It an 'Ethnic' Grocery Store

As Asian groceries like H Mart, Patel Brothers and 99 Ranch expand, they are reshaping American eating habits, and the American grocery market.

Tell us about yourself. **Take the survey.**



Once small, mom-and-pop businesses, Asian grocery stores in the United States are growing rapidly and shaping how Americans cook and eat.



By **Priya Krishna**   Photographs by Tommy Kha
Published June 11, 2024   Updated June 21, 2024

Last year, Americans bought half a billion packets of Shin Ramyun, the spicy, beefy Korean instant noodle. The bold red-and-black packaging feels inescapable: It's a staple of college dorm rooms, bodegas, middle-of-the-country Walmarts and viral TikTok videos.

But 30 years ago, the noodles were largely unknown in the United States. No grocery store would stock them, said Kevin Chang, the director of marketing for Nongshim, Shin Ramyun's parent company. Except, that is, for a few small Korean grocers, including a fledgling shop in Woodside, Queens, called H Mart.

ADVERTISEMENT

---

## Recipe: Perfect Instant Ramen

---

In the 1970s and '80s, as Asian immigration to the United States soared, grocers like H Mart; Patel Brothers, an Indian grocery founded in Chicago; and 99 Ranch Market, originally focused on foods from China and Taiwan, opened to meet the demand for ingredients that tasted like home. These were tiny mom-and-pop shops in suburban strip malls or outer boroughs with large Asian immigrant populations. They weren't fancy, but they were vital to

Tell us about yourself. **Take the survey.**                                              ›

Document title: How Asian Groceries Like H Mart and Patel Brothers Are Reshaping America - The New York Times
Capture URL: https://www.nytimes.com/2024/06/11/dining/asian-grocery-stores-america.html?unlocked_article_code=1.y00.goFD.lfRkHFyLmIId
Capture timestamp (UTC): Fri, 28 Jun 2024 10:23:49 GMT

founded in Chicago, and 99 Ranch Market, originally focused on food from China and Taiwan, opened to provide specialty ingredients that tasted like home. These were tiny mom-and-pop shops in suburban strip malls or outer boroughs with large Asian immigrant populations. They weren't fancy, but they were vital to their communities.

Now, those same shops have transformed into sleekly designed chains with in-store roti machines, mobile ordering apps and locations across the country — all aiming to serve the fastest growing ethnic group in the United States and the millions of others who now crave flavors like Shin Ramyun, chili crisp, chaat masala and chai.

The H Mart of today is a $2 billion company with 96 stores and a namesake book (the best-selling memoir "Crying in H Mart," by the musician Michelle Zauner). Last month, the chain purchased an entire shopping center in San Francisco for $37 million. Patel Brothers has 52 locations in 20 states, with six more stores planned in the next two years. 99 Ranch opened four new branches just last year, bringing its reach to 62 stores in 11 states. Weee!, an online Asian food store, is valued at $4.1 billion.

Asian grocery stores are no longer niche businesses: They are a cultural phenomenon.



Tell us about yourself. **Take the survey.**

The New York Times



FOOD · Don't Call It an 'Ethnic' Grocery Store

672

H Mart, started in Woodside, Queens, has become a part of American popular culture, known for its wide aisles of kimchi and tofu.





Asian stores have helped popularize products like Shin Ramyun in the United States.

These stores still function as community centers for Asian Americans to gather and socialize.

## Turning specialties into staples

Despite their recent growth, Asian American grocers still represent less than one percent of the total U.S. grocery business, which is dominated by retailers such as Kroger and Walmart, said Dymfke Kuijpers, a senior partner at the consulting firm McKinsey who specializes in retail. But these stores exercise an outsize impact, she said, as they dictate which products the big-box chains stock.

ADVERTISEMENT

Tell us about yourself. **Take the survey.**                                              ›

Americans have become deeply enamored with Asian flavors: From April 2023 to April 2024, sales of items in the "Asian/ethnic aisle" in U.S. grocery stores grew nearly four times more than overall sales, according to the data analytics company Circana. And more than any restaurant, cookbook or online video, Asian grocers are driving this shift.

"They are the vanguard of mainstreaming," said Errol Schweizer, who was the vice president of grocery at Whole Foods Market from 2009 to 2016. Miso, ghee, turmeric, soy sauce — their journeys to becoming widely available pantry staples all began with an Asian grocer.

"Without Asian grocery stores, it is extremely hard to get into the mainstream market," said Mr. Chang, from Nongshim. They make accessible those ingredients that people grew up with, ate in a restaurant or saw online, he said. Brian Kwon, the president of H Mart, said he's used to seeing employees from major grocers show up at one of his stores and note down which brands are available.

But H Mart is attracting the clientele of the big grocers, too. Thirty percent of its shoppers today are non Asian, Mr. Kwon said, and he's made changes to continue drawing them as the company expands into areas with smaller Asian populations — placing more emphasis on in-store tastings, explaining how ingredients are used and posting signs in both Korean and English. Similarly, at 99 Ranch, the announcements ring out in Mandarin and English, and Western music has been added to the store playlists.

ADVERTISEMENT

Swetal Patel, a partner at Patel Brothers, said that as the chain has

Tell us about yourself. **Take the survey.**    ›

Document title: How Asian Groceries Like H Mart and Patel Brothers Are Reshaping America - The New York Times
Capture URL: https://www.nytimes.com/2024/06/11/dining/asian-grocery-stores-america.html?unlocked_article_code=1.y00.goFD.lfRkHFyLmIld
Capture timestamp (UTC): Fri, 28 Jun 2024 10:23:49 GMT

Swetal Patel, a partner at Patel Brothers, said that as the chain has expanded its audience — he estimates that 20 to 25 percent of shoppers are now non South Asian — stores now look more like a Whole Foods, with wide aisles and glass windows. "It is not your mom and dad's Indian grocery store anymore."

This evolution has not been welcomed by everyone.

Toral Dalal, a retired financial planner in Fulton, Md., said she used to frequent a small Indian store run by a husband-and-wife team she befriended — until a Patel Brothers opened nearby in 2019, and the shop closed in part because it couldn't compete on price. While she does shop at Patel Brothers, she said, "it feels like a chore." She very rarely buys anything new, and she doesn't know any of the store employees. "It is impersonal."

She lamented: When did the Indian grocery store get so corporate?



New locations of Patel Brothers are designed to look more like a Whole Foods, with glass windows and expansive aisles.

Tell us about yourself. **Take the survey.**    ›

Document title: How Asian Groceries Like H Mart and Patel Brothers Are Reshaping America - The New York Times
Capture URL: https://www.nytimes.com/2024/06/11/dining/asian-grocery-stores-america.html?unlocked_article_code=1.y00.goFD.lfRkHFyLmIld
Capture timestamp (UTC): Fri, 28 Jun 2024 10:23:49 GMT

New locations of Patel Brothers are designed to look more like a Whole Foods, with glass windows and expansive aisles.



It's not uncommon for a dish or ingredient from an Asian grocery store to go viral on social media, causing it to sell out immediately.



These stores are increasingly attracting non-Asian customers, lured in by the quality of the produce and their love for these flavors.

### 'The feeling of being home'

Even as many Asian grocers have adapted to their changing customer bases, they insist that the communities that got them started remain top of mind.

At the Dallas-based chain India Bazaar, for example, organic lentils are on offer, and the bhakri is labeled gluten free — tweaks that not only help bring in non South Asians, but also keep the store relevant for second-generation South Asians, said Anuja Ranade, the chief operating officer.

South Asians will always be the priority, said Ms. Ranade, even as store design or product packaging might evolve.

"It is about the feeling of being home when they walk into my store," she said. The shops still smell of spices and the employees speak various South Asian dialects and wish customers a happy Diwali — "because when you go to Walmart, they say, 'Merry Christmas! Happy Thanksgiving!'"

That authenticity is precisely the appeal for many non Asian customers as well.

Tell us about yourself. **Take the survey.**





FOOD — Don't Call It an 'Ethnic' Grocery Store



Let's Talk About Hollywood Portrayals of Asian and Asian American Men (and Real-Life Romance)
June 5, 2024

That authenticity is precisely the appeal for many non Asian customers as well.

"I find it fascinating that there are things on the shelf that I have no idea what they are," said Jill Connors, an economic development director for the city of Dubuque, Iowa, who started shopping at Hornbill Asian Market earlier this year because she and her husband became vegan and wanted high-quality tofu at a reasonable price.

ADVERTISEMENT

The sheer variety of foods to explore "brings more joy to the shopping and cooking process," said Alexine Casanova, a nonprofit operations manager in Hamden, Conn., who shops at G Mart and Farmer's India Market.

Sheil Shukla, who lives in the Chicago area and wrote the cookbook Plant-Based India, said the wide popularity of stores like Patel Brothers has given him more flexibility as a recipe developer. "It has made me not shy away from using traditional ingredients," he said. "If I were developing my cookbook 10 years ago, I probably wouldn't have a garam masala recipe in there because I wouldn't think anyone would actually make it."

These chains have also paved the way for more regionalized Asian grocery stores, like the Taiwanese shop Yun Hai in Brooklyn or Sua Superette, a Sichuan marketplace in Los Angeles — both run by second-generation Asian Americans.



Tell us about yourself. **Take the survey.**

Document title: How Asian Groceries Like H Mart and Patel Brothers Are Reshaping America - The New York Times
Capture URL: https://www.nytimes.com/2024/06/11/dining/asian-grocery-stores-america.html?unlocked_article_code=1.y00.goFD.lfRkHFyLmIId
Capture timestamp (UTC): Fri, 28 Jun 2024 10:23:49 GMT



Asian grocers represent a tiny slice of the grocery business, but their influence on American culture is significant.

"We are building on the work that previous people, like 99 Ranch, have done before," said Lisa Cheng Smith, the founder of Yun Hai. "Without them, we wouldn't be able to go to this next level of specialization."

ADVERTISEMENT

Many customers said they still missed the original stores — the

Tell us about yourself. **Take the survey.**

 

Many customers said they still missed the original stores — the humble community anchors where they hung out as children, or that made them feel welcome in their first years in a new country. But even as they expand, many of these grocers continue to function as so-called third places, spaces for social gathering. Mary Anne Amper, a Filipino American genetics researcher in Astoria, Queens, said she plans trips to H Mart with her Asian American friends; they catch up as they wander the aisles looking at snacks.

Kat Lieu, the Seattle-based author of the cookbook Modern Asian Kitchen, said she didn't mind the influx of non Asian customers into these spaces.

"In an Asian grocery store I feel like a queen," she said. "If I see a confused white person, I am like, 'That's the best soy sauce.'"

This story is part of a series on how Asian Americans are shaping American popular culture. The series is funded through a grant from The Asian American Foundation. Funders have no control over the selection and focus of stories or the editing process and do not review stories before publication. The Times retains full editorial control of this series.

*A correction was made on June 11, 2024: An earlier version of this article misstated the surname of Mary Anne Amper, a Filipino American genetics researcher in Astoria, Queens,*

————

When we learn of a mistake, we acknowledge it with a correction. If you spot an error, please let us know at nytnews@nytimes.com. Learn more

**Priya Krishna** is a reporter in the Food section of The Times. More about Priya Krishna

READ 672 COMMENTS

Share full article        672

ADVERTISEMENT

Tell us about yourself. **Take the survey.**    >

Keep tabs on dining trends, restaurant reviews and recipes.

- Since the early 2000s, the variety and quality of pizza made by ambitious chefs all over the United States have only gotten better. Here are 22 of the best pizza places in the country.

- Golden, salty schmaltz seasons a vibrant tomato and onion salad in this savory dish of chicken thighs from Melissa Clark.

- Pink lemonade, a circus concession turned classic, is the drink of the summer every year.

- Blanketed with cheese, this filling stuffed pepper recipe featuring spiced chickpeas is perfect for summer and surprisingly light.

### Eating in New York City

- The New York Times Food staff has searched all five boroughs for the 57 sandwiches that define the city, and here are 13 of the sandwiches our readers live for.

- Pete Wells, our restaurant critic, ranked his top 100 restaurants in New York City.

- Almost everything on the menu at Penny in the East Village contains seafood. You sit at a counter to eat it. The only surprise is how well it all works together, Wells writes.

- Paul Carmichael, the former chef at Momofuku Seiobo in Sydney, Australia, returns to New York to play a key role in shaping the company. He'll start with a new spot in the East Village.

ADVERTISEMENT

Tell us about yourself. **Take the survey.**    ›

---

Document title: How Asian Groceries Like H Mart and Patel Brothers Are Reshaping America - The New York Times
Capture URL: https://www.nytimes.com/2024/06/11/dining/asian-grocery-stores-america.html?unlocked_article_code=1.y00.goFD.lfRkHFyLmIId
Capture timestamp (UTC): Fri, 28 Jun 2024 10:23:49 GMT

Keep tabs on dining trends, restaurant reviews and recipes.

- Since the early 2000s, the variety and quality of pizza made by ambitious chefs all over the United States have only gotten better. Here are 22 of the best pizza places in the country.

- Golden, salty schmaltz seasons a vibrant tomato and onion salad in this savory dish of chicken thighs from Melissa Clark.

- Pink lemonade, a circus concession turned classic, is the drink of the summer every year.

- Blanketed with cheese, this filling stuffed pepper recipe featuring spiced chickpeas is perfect for summer and surprisingly light.

### Eating in New York City

- The New York Times Food staff has searched all five boroughs for the 57 sandwiches that define the city, and here are 13 of the sandwiches our readers live for.

- Pete Wells, our restaurant critic, ranked his top 100 restaurants in New York City.

- Almost everything on the menu at Penny in the East Village contains seafood. You sit at a counter to eat it. The only surprise is how well it all works together, Wells writes.

- Paul Carmichael, the former chef at Momofuku Seiobo in Sydney, Australia, returns to New York to play a key role in shaping the company. He'll start with a new spot in the East Village.

ADVERTISEMENT

**NEWS**
Home Page
U.S.
World
Politics
New York
Education
Sports
Business
Tech
Science
Weather
The Great Read
Obituaries
Headway
Visual Investigations
The Magazine

**ARTS**
Books
Best Sellers Book List
Dance
Movies
Music
Pop Culture
Television
Theater
Visual Arts

**LIFESTYLE**
Health
Well
Food
Restaurant Reviews
Love
Travel
Style
Fashion
Real Estate
T Magazine

**OPINION**
Today's Opinion
Columnists
Editorials
Guest Essays
Op-Docs
Letters
Sunday Opinion
Opinion Video
Opinion Audio

**MORE**
Audio
Games
Cooking
Wirecutter
The Athletic
Jobs
Video
Graphics
Trending
Live Events
Corrections
Reader Center
TimesMachine
The Learning Network
School of The NYT
inEducation

**ACCOUNT**
Subscribe
Manage My Account
Home Delivery
Gift Subscriptions

Group Subscriptions
Gift Articles
Email Newsletters

NYT Licensing
Replica Edition
Times Store

© 2024 The New York Times Company   NYTCo   Contact Us   Accessibility   Work with us   Advertise   T Brand Studio   Your Ad Choices   Privacy Policy   Terms of Service   Terms of Sale   Site Map   Help   Subscriptions

Tell us about yourself. **Take the survey.**  ›

# DX 1251


United States Department of Agriculture
Economic Research Service

🇺🇸 An official website of the United States government    Here's how you know


United States Department of Agriculture
Economic Research Service

 (/) Economic Research Service (/)                                    MENU

## Food Expenditure Series

The USDA, Economic Research Service (ERS) Food Expenditure Series (FES) is a comprehensive data set that measures the U.S. food system—quantifying the value of food acquired in the United States by type of product, outlet, and purchaser. The data series measures:

- the value of food acquired—including food and beverage sales (as well as taxes and tips), and
- the value of food produced at home, donated, and furnished to employees and institutionalized persons.

Food expenditure data are estimates at the national and State levels. National-level food expenditures are allocated annually between four types of products from various outlets and three types of purchasers and users. In addition to the annual estimates, monthly sales of food at home (FAH) and food away from home (FAFH) are available, benchmarked to the annual estimates, with each annual revision. State-level expenditures are allocated annually for FAH and FAFH, benchmarked to the national-level estimates.

The FES is a tool for government agencies, academics, and private sector stakeholders to assess and track developments in consumer food purchasing behaviors and the food supply. Annual national and State data for the previous year are typically released in early June. Monthly national data updates are typically released June through February between the 17th and the 21st of each month.

The source data and methods for the national-level estimates were comprehensively updated in 2018 as described in the Technical Bulletin, *Measuring the Value of the U.S. Food System: Revisions to the Food Expenditure Series* (/publications/pub-details/?pubid=90154). The current series provides data starting in 1997. Estimates through 2017 are final estimates, and estimates from 2018 and beyond are subject to change until the release of the next Economic Census, published by the Department of Commerce's Bureau of the Census (additional details are provided in the Documentation (/data-products/food-expenditure-series/documentation/)).

The State-level food expenditure estimates were published in 2023 using the methodology detailed in the report, *Estimating the State-Level Food Expenditure Series* (/publications/pub-details/?pubid=106408), and revised in 2024 as described in the Addendum, *Addendum to Estimating the State-Level Food Expenditure Series* (/publications/pub-details/?pubid=106408), due to data availability (additional details are provided in the Documentation (/data-products/food-expenditure-series/documentation/)). The State-level estimates provide total and per capita food expenditure estimates for FAH and FAFH from 1997 forward.

The food expenditures data complement current ERS data sets: Food Availability (Per Capita) Data System (/data-products/food-availability-per-capita-data-system/), Food Price Outlook (/data-products/food-price-outlook/), Food Dollar Series (/data-products/food-dollar-series/), and FoodAPS National Household Food Acquisition and Purchase Survey (/data-products/foodaps-national-household-food-acquisition-and-purchase-survey/). For data by selected counties on expenditures on food and alcoholic beverages that were consumed at home, see International Consumer and Food Industry Trends (/topics/international-markets-u-s-trade/international-consumer-and-food-industry-trends/).

DX 1251

Note: The food expenditure series data sets using the previous methodologies are available under the Archived Food Expenditure Tables. This includes national spending estimates continuously from 1889 to 2014 and State sales estimates from 1997 to 2020. For ease of use, these estimates are organized in a tabular format consistent with the comprehensive revision.

- National Food Expenditure Series (/data-products/food-expenditure-series/food-expenditure-series/#National Food Expenditure Series)

- State Food Expenditure Series (/data-products/food-expenditure-series/food-expenditure-series/#State Food Expenditure Series)

- Archived Food Expenditure Tables (/data-products/food-expenditure-series/food-expenditure-series/#Archived Food Expenditure Tables)

| Data Set | Last Updated | Next Update |
|---|---|---|
| **National Food Expenditure Series** | | |
| Nominal food and alcohol expenditures, with taxes and tips, for all purchasers (/webdocs/DataFiles/105933/nominal_expenditures.xlsx?v=486) (/webdocs/DataFiles/105933/nominal_expenditures.csv?v=486) | 6/3/2024 | 6/2/2025 |
| Nominal food and alcohol expenditures, without taxes and tips, for all purchasers (/webdocs/DataFiles/105933/nominal_expenditures_no_taxes_tips.xlsx?v=486) (/webdocs/DataFiles/105933/nominal_expenditures_no_taxes_tips.csv?v=486) | 6/3/2024 | 6/2/2025 |
| Constant dollar food and alcohol expenditures, with taxes and tips, for all purchasers (/webdocs/DataFiles/105933/constant_dollar_expenditures.xlsx?v=486) (/webdocs/DataFiles/105933/constant_dollar_expenditures.csv?v=486) | 6/3/2024 | 6/2/2025 |
| Constant dollar food and alcohol expenditures, without taxes and tips, for all purchasers (/webdocs/DataFiles/105933/constant_dollar_expenditures_no_taxes_tips.xlsx?v=486) (/webdocs/DataFiles/105933/constant_dollar_expenditures_no_taxes_tips.csv?v=486) | 6/3/2024 | 6/2/2025 |
| Food expenditures by final purchaser (/webdocs/DataFiles/105933/food_expenditures_source_funds.xlsx?v=486) (/webdocs/DataFiles/105933/food_expenditures_source_funds.csv?v=486) | 6/3/2024 | 6/2/2025 |
| Normalized food expenditures by all purchasers and household final users (/webdocs/DataFiles/105933/normalized_food_expenditures.xlsx?v=486) (/webdocs/DataFiles/105933/normalized_food_expenditures.csv?v=486) | 6/3/2024 | 6/2/2025 |
| Monthly sales of food, with taxes and tips, for all purchasers, by outlet type (/webdocs/DataFiles/105933/monthly_sales by outlet.xlsx?v=486) (/webdocs/DataFiles/105933/monthly_sales by outlet.csv?v=486) | 6/3/2024 | 6/2/2025 |
| Monthly sales of food, with taxes and tips, for all purchasers (/webdocs/DataFiles/105933/monthly_sales.xlsx?v=486) (/webdocs/DataFiles/105933/monthly_sales.csv?v=486) | 6/21/2024 | 7/18/2024 |
| **State Food Expenditure Series** | | |
| State food sales, with taxes and tips, for all purchasers (/webdocs/DataFiles/105933/state_sales.xlsx?v=486) (/webdocs/DataFiles/105933/state_sales.csv?v=486) | 6/3/2024 | 6/2/2025 |
| State food sales, without taxes and tips, for all purchasers (/webdocs/DataFiles/105933/state_sales_no_taxes_tips.xlsx?v=486) (/webdocs/DataFiles/105933/state_sales_no_taxes_tips.csv?v=486) | 6/3/2024 | 6/2/2025 |

| Data Set | Last Updated | Next Update |
|---|---|---|
| State food sales per capita, with taxes and tips, for all purchasers (/webdocs/DataFiles/105933/state_sales_per_capita.xlsx?v=486) (/webdocs/DataFiles/105933/state_sales_per_capita.csv?v=486) | 6/3/2024 | 6/2/2025 |
| State food sales per capita, without taxes and tips, for all purchasers (/webdocs/DataFiles/105933/state_sales_per_capita_no_taxes_tips.xlsx?v=486) (/webdocs/DataFiles/105933/state_sales_per_capita_no_taxes_tips.csv?v=486) | 6/3/2024 | 6/2/2025 |
| **Archived Food Expenditure Tables** | | |
| Nominal food expenditures, with taxes and tips, from previously-published estimates (/webdocs/DataFiles/105933/archived_nominal_expenditures_1.xlsx?v=486) (/webdocs/DataFiles/105933/archived_nominal_expenditures_1.csv?v=486) | 9/20/2018 | |
| Food expenditures by final purchaser, from previously published estimates (/webdocs/DataFiles/105933/archived_expenditures_purchaser_2.xlsx?v=486) (/webdocs/DataFiles/105933/archived_expenditures_purchaser_2.csv?v=486) | 2/5/2019 | |
| Normalized food expenditures by final purchasers and users, from previously-published estimates (/webdocs/DataFiles/105933/archived_normalized_expenditures_3.xlsx?v=486)     (/webdocs/DataFiles/105933/archived_normalized_expenditures_3.csv?v=486) | 9/20/2018 | |
| Monthly sales of food, with taxes and tips, from previously-published estimates (/webdocs/DataFiles/105933/archived_monthly_4.xlsx?v=486) (/webdocs/DataFiles/105933/archived_monthly_4.csv?v=486) | 9/20/2018 | |
| State food sales, with taxes and tips, for all purchasers, previously published estimates (/webdocs/DataFiles/105933/archived_state_sales.xlsx?v=486) (/webdocs/DataFiles/105933/archived_state_sales.csv?v=486) | 2/22/2024 | |
| State food sales, without taxes and tips, for all purchasers, previously published estimates (/webdocs/DataFiles/105933/archived_state_sales_no_taxes_tips.xlsx?v=486)     (/webdocs/DataFiles/105933/archived_state_sales_no_taxes_tips.csv?v=486) | 2/22/2024 | |
| State food sales per capita, with taxes and tips, for all purchasers, previously published estimates (/webdocs/DataFiles/105933/archived_state_sales_per_capita.xlsx?v=486)     (/webdocs/DataFiles/105933/archived_state_sales_per_capita.csv?v=486) | 2/22/2024 | |

| Data Set | Last Updated | Next Update |
|---|---|---|
| State food sales per capita, without taxes and tips, for all purchasers, previously published estimates (/webdocs/DataFiles/105933/archived_state_sales_per_capita_no_taxes_tips.xlsx?v=486) (/webdocs/DataFiles/105933/archived_state_sales_per_capita_no_taxes_tips.csv?v=486) | 2/22/2024 | |

## Food Expenditure Series

Overview (/data-products/food-expenditure-series/)

Documentation (/data-products/food-expenditure-series/documentation/)

Interactive Charts: Food Expenditures (/data-products/food-expenditure-series/interactive-charts-food-expenditures/)

### Related Topics

Food Markets & Prices (/topics/food-markets-prices/)

Consumer Information and Labeling (/topics/food-choices-health/consumer-information-and-labeling/)

Food Access (/topics/food-choices-health/food-access/)

Consumer and Producer Price Indexes (/topics/food-markets-prices/consumer-and-producer-price-indexes/)

Local Foods (/topics/food-markets-prices/local-foods/)

Processing & Marketing (/topics/food-markets-prices/processing-marketing/)

ERS Coronavirus (COVID-19) Media Resources (/newsroom/trending-topics/ers-coronavirus-covid-19-media-resources/)

Food Prices, Expenditures, and Establishments (/topics/food-markets-prices/food-prices-expenditures-and-establishments/)

Food Service Industry (/topics/food-markets-prices/food-service-industry/)

Food Consumption & Demand (/topics/food-choices-health/food-consumption-demand/)

Retailing & Wholesaling (/topics/food-markets-prices/retailing-wholesaling/)

**Last updated:** Friday, June 21, 2024

**For more information, contact:** Eliana Zeballos (/authors/ers-staff-directory/eliana-zeballos/) and Wilson Sinclair (/authors/ers-staff-directory/wilson-sinclair/)

Return to top

## ERS Links

ERS Home (/)

Accessibility (/help/accessibility/)

Careers (/about-ers/careers-at-ers/)

Contact Us (/contact-us/)

E-Mail Updates (https://visitor.r20.constantcontact.com/d.jsp?llr=fnrkbelab&p=oi&m=1111458399653)

Help (/help/)

Information Quality (/about-ers/policies-and-standards/information-quality/)

Site Map (/sitemap/)

Privacy Policy & Non-Discrimination Statement (/privacy/)

## USDA Links

FOIA (/freedom-of-information-act/)

Plain Writing (https://www.usda.gov/plain-writing)

Report Fraud (https://www.usda.gov/oig/forms/contractor-fraud)

USDA.gov (http://www.USDA.gov)

USA.gov (http://www.usa.gov)

White House.gov (http://www.WhiteHouse.gov)

## Sign Up for Updates

Subscribe (http://visitor.r20.constantcontact.com, llr=fnrkbelab&p=oi&m=11114583996

USDA (/)   Economic Research Service (/)
U.S. DEPARTMENT OF AGRICULTURE (HTTPS://WWW.USDA.GOV/)

(http://t(https://(https://(https://(https://(https://www.usda.gov/)usda/blog/tag/economic
economin... economie econo research
research- llr=fnrkbelab&p=oi&m=1111458399653)research)
service/) service)

# DX 1254





OCTOBER 14, 2022



DX 1254

# Continuing Track Record of Investing in Customers, Communities and Associates

Post closing, Kroger will invest approximately…



## $500M
to lower prices[1]



## $1.3B
into Albertsons stores to enhance customer experience



## $1B
to continue raising associate wages & comprehensive benefits



 

(1) Expects to reinvest cost savings from synergies to reduce prices for customers

5

# Transaction Overview

**Consideration**
- Kroger will acquire all outstanding shares of Albertsons for estimated total consideration of $34.10 per share in cash, subject to certain per share reductions
- Implies total enterprise value of ~$24.6B, including assumption of ~$4.7B of Albertson's net debt
- Represents 32.8% premium to unaffected closing price of Albertson's common stock on October 12, 2022 and 29.7% to 30-day VWAP
- Albertsons will pay a special cash dividend of up to $4 billion to its shareholders, which is expected to be approximately $6.85 per share and will reduce purchase price commensurately

**Enhanced Financial Performance and Value Creation**
- Delivered combined ~$210B revenue, $11.6B of adjusted EBITDA and 3.3 billion in net earnings in FY 2021
- Expected average TSR well above Kroger standalone model of 8-11% in the first four years following close
- Accretive to earnings in the first year following close and double digit accretive to earnings by year four, excluding one-time costs
- Expects to achieve $1B annual run-rate synergies net of divestitures within first four years post-close; approximately 50% achieved within first two years post-close

**Financing**
- Kroger will fund transaction with cash on hand and proceeds from new debt financing
- Albertson's existing bonds will roll into pro forma capital structure and rank pari passu with Kroger's bonds
- Engaged with rating agencies and strongly committed to current investment grade credit rating

**Capital Allocation**
- Will continue to invest in high return projects that support strategy
- Intend to continue paying quarterly dividend and expect to raise dividend over time, subject to Board approval
- Prioritizing de-leveraging to achieve 2.5x EBITDA net leverage target in first 18 – 24 months post close; repurchase program has been paused until net leverage target achieved

**Leadership**
- Rodney McMullen, Chairman and CEO of Kroger, will be Chairman and CEO of combined company
- Gary Millerchip, SVP and CFO will continue his role in the combined company

**Path to Close**
- Transaction subject to required regulatory approvals and other customary closing conditions
- Targeted close in early 2024
- Transaction approved by Albertsons shareholders holding a majority of outstanding common and preferred stock
- Merger agreement contemplates some store divestitures may be accomplished through establishment of Albertsons subsidiary to be spun-off to Albertsons shareholders immediately prior to close, that would operate as standalone public company; SpinCo would be a new, agile competitor with quality stores, experienced management, operational flexibility, a strong balance sheet, and focused capital allocation and resources to provide customers with continued value and quality service and associates with ongoing compelling career opportunities; would comprise minimum of 100 stores and up to 375 stores



Note: Pro forma results as presented in this slide represent the combined Kroger and Albertsons FY 2021 results and are not intended to represent pro forma financials under Section 11 of Regulation S-X under the Securities Exchange Act of 1934, as amended. See Appendix for reconciliation of historical non-GAAP measures.

6

# Complementary National Footprint with Iconic and Trusted Supermarket Banners



 STORES

 STORES



8

# DX 1255

**Page Vault**

| | |
|---|---|
| Document title: | The Kroger Co. - Kroger and Albertsons Companies Announce Comprehensive Divestiture Plan with C&S Wholesale Grocers, LLC in Connection with Proposed Merger |
| Capture URL: | https://bit.ly/4bgcUBx |
| Page loaded at (UTC): | Fri, 28 Jun 2024 07:04:06 GMT |
| Capture timestamp (UTC): | Fri, 28 Jun 2024 07:04:08 GMT |
| Capture tool: | 2.58.2 |
| Collection server IP: | 54.175.14.236 |
| Browser engine: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/121.0.6167.85 Safari/537.36 |
| Operating system: | linux x64 (Node v20.5.1) |
| PDF length: | 6 |
| Capture ID: | 1y28shpSazA2KV2GihTm8w |
| User: | automation@page-vaul |

DX 1255





# News Details

VIEW ALL NEWS →

## Kroger and Albertsons Companies Announce Comprehensive Divestiture Plan with C&S Wholesale Grocers, LLC in Connection with Proposed Merger

September 8, 2023

*Plan Marks Key Step in Merger Process*

*Both the Kroger and Albertsons Cos. Combination and the Divestiture Sale to C&S will Create Meaningful and Measurable Benefits for Associates, Customers and Communities*

*Agreement with C&S Includes Sale of 413 Stores, 8 Distribution Centers,*
*2 Offices and 5 Private Label Brands Across 17 States and the District of Columbia*
*Extending a Well-Capitalized Competitor into New Geographies*

*Agreement Includes Sale of the QFC, Mariano's and Carrs Brand Names and the Exclusive Licensing Rights to the Albertsons Brand Name in Arizona, California, Colorado and Wyoming*

*C&S, an Industry Leader in Wholesale Grocery Supply and One of the Largest*
*Privately Held Companies in the United States, Brings 104 Years of Food Industry Experience*
*and a Track Record as a Successful Grocery Retailer*

*C&S Agrees to Maintain Collective Bargaining Agreements, Securing the Future of Union Jobs*

*Merger Remains on Track to Close in Early 2024,*
*Subject to Regulatory Clearance and Other Closing Conditions*

CINCINNATI and BOISE, Idaho, Sept. 8, 2023 /PRNewswire/ -- The Kroger Co. (NYSE: KR) and Albertsons Companies Inc. (NYSE: ACI) announced today that they have entered a definitive agreement with C&S Wholesale Grocers, LLC for the sale of select stores, banners, distribution centers, offices and private label brands in connection with their proposed merger previously announced on October 14, 2022.






The proposed merger will create meaningful and measurable benefits for America's consumers, Kroger and Albertsons, and communities that both Kroger and Albertsons serve by expanding access to fresh, affordable food and establishing a more compelling alternative to large, non-union retailers. This comprehensive divestiture plan marks a key next step toward the completion of the merger by extending a well-capitalized competitor into new geographies. The divestiture plan ensures no stores will close as a result of the merger and that all frontline associates will remain employed, all existing collective bargaining agreements will continue, and associates will continue to receive industry-leading health care and pension benefits alongside bargained-for wages.

C&S is an industry leader in wholesale grocery supply and supply chain solutions, with a strong track record as a successful grocery retailer. Founded in 1918 as a supplier to independent grocery stores, C&S services customers of all sizes, supplying more than 7,500 independent supermarkets, retail chain stores and military bases. Grounded in its commitment to feeding families across America, C&S currently operates Grand Union grocery stores and Piggly Wiggly® franchise and corporate-owned stores in the Midwest and Carolinas. C&S is deeply invested in the communities where it operates, and this retail expansion will continue its long-standing mission to keep communities fed. Through its wholesale and retail operations, C&S purchases more than 100,000 products, giving it the ability to provide customers with the best product selection and pricing available. In addition to its franchise and corporate owned supermarkets, C&S provides end-to-end wholesale, supply and marketing services to its retailer customers. C&S also brings experience with the merger process, having been an FTC-approved divestiture buyer in prior grocery transactions with a strong track record of successfully transitioning union employees and their associated collective bargaining agreements. In anticipation of the agreement, C&S's 1918 Winter Street Partners retail holding company has been established to ensure a seamless closing process. C&S's depth of industry knowledge, financial strength and commitment to growing its associates' careers makes it the right fit to ensure the divested stores, distribution centers and offices grow and thrive for years to come.

"Following the announcement of our proposed merger with Albertsons Cos., we embarked on a robust and thoughtful process to identify a well-capitalized buyer who will operate as a fierce competitor and ensure divested stores and their associates will continue serving their communities in the ways they do today. C&S achieves all these objectives," said Rodney McMullen, chairman and CEO of The Kroger Co. "C&S is led by an experienced management team with an extensive background in food retail and distribution and has the financial strength to continue investing in associates and the business for the long run. Importantly in our agreement, C&S commits to honoring all collective bargaining agreements which include industry-leading benefits, retaining frontline associates and further investing for growth."

McMullen continued, "We appreciate our incredible associates who support and serve our customers and communities, and who help both of our companies succeed. C&S will offer exciting opportunities for associates to advance their careers – from frontline associates and store leaders to merchants and other professionals. We are confident the associates joining the C&S family will have an amazing opportunity to continue to build a thriving career in the food industry in one of the largest private companies in our country. C&S's strong operational focus and financial resources, along with a comprehensive operational infrastructure included as part of the divestiture agreement, will position it to successfully operate and continue to grow these iconic brands for years to come. C&S is a values-driven organization that is committed to ending hunger while creating healthier communities – now and for future generations."

The divestiture plan fulfills the commitments Kroger and Albertsons Cos. set out in their original merger agreement in October 2022 with regard to divesting stores, including:

- Extending a competitor to new geographies through the sale of stores to a well-capitalized buyer that is led by seasoned operators with a strong balance sheet and a sound business plan;
- Ensuring that no stores will close as a result of the merger;
- Maintaining all current collective bargaining agreements, which include industry-leading healthcare and pension benefits, bargained-for wages, and ensuring frontline associates remain employed; and
- Committing to invest in associates and stores for the long term.

Kroger took several steps to ensure a thoughtful and comprehensive divestiture plan. The terms of the plan support C&S's ability to operate divested stores effectively and efficiently by providing:

- Strong teams, with deep industry expertise and the ability to operate at scale, and to drive growth and operational advancements in the divested business;
- A cohesive set of stores in each geography supported by two regional headquarters as well as banners, and private label brands with strong consumer recognition that will provide C&S with an established base on which to grow its store network; and
- A robust operational infrastructure, including distribution centers and offices to support both the immediate and long-term success of the divested business.

"I have long respected C&S and its leadership team," said Vivek Sankaran, CEO of Albertsons Companies. "I am thrilled that C&S's outstanding capabilities and financial strength will ensure these divestiture stores can continue to grow and serve their communities as they do today. Most importantly, they have made a clear commitment to continuing to invest in and care for associates, including by honoring all collective bargaining agreements currently in place. I echo Rodney's confidence in the bright future ahead for the associates joining the C&S team."

"We look forward to welcoming thousands of new associates to the C&S family and providing them the opportunity to build long and successful careers," said Eric Winn, Chief Operating Officer and designated Chief Executive Officer (effective October 2) of C&S Wholesale Grocers. "As a leader in the grocery industry, we have a strong heritage of value and customer service that is enabled by a deep commitment to our consumers, employees and communities. Today's announcement is another exciting opportunity for C&S to further expand into the retail market, which is an important component of our growth and future success. We look forward to providing a superior shopping experience that delivers both quality and value to our customers."

**Transaction Details**



heritage of value and customer service that is enabled by a deep commitment to our consumers, employees and communities. Today's announcement is another exciting opportunity for C&S to further expand into the retail market, which is an important component of our growth and future success. We look forward to providing a superior shopping experience that delivers both quality and value to our customers."

**Transaction Details**

The divestiture transaction includes 413 stores, along with QFC, Mariano's and Carrs brand names. Stores currently under these banners that are retained by Kroger will be re-bannered into one of the retained Kroger or Albertsons Cos. banners following the close of the transaction. In the four states where C&S will have the license to the Albertsons banner, Kroger will re-banner the retained stores following the close of the merger with Albertsons Cos. Kroger will maintain the Albertsons banner in the remaining states. In addition, Kroger will divest the Debi Lilly Design, Primo Taglio, Open Nature, ReadyMeals and Waterfront Bistro private label brands.

The number of stores contained in the divestiture plan by geography is as follows:

- WA: 104 Albertsons Cos. and Kroger stores
- CA: 66 Albertsons Cos. and Kroger stores
- CO: 52 Albertsons Cos. stores
- OR: 49 Albertsons Cos. and Kroger stores
- TX/LA: 28 Albertsons Cos. stores
- AZ: 24 Albertsons Cos. stores
- NV: 15 Albertsons Cos. stores
- IL: 14 Kroger stores
- AK: 14 Albertsons Cos. stores
- ID: 13 Albertsons Cos. stores
- NM: 12 Albertsons Cos. stores
- MT/UT/WY: 12 Albertsons Cos. stores
- DC/MD/VA: 10 Harris Teeter stores

The above stores (regardless of banner) will be divested by Kroger following the closing of the merger with Albertsons Cos.

**Additional Terms of the Transaction**

The definitive purchase agreement has customary representations and warranties and covenants of a transaction of its type. The transaction also provides a comprehensive operational infrastructure including eight distribution centers, two offices, five private label brands, and expert district, division and functional associates, to ensure C&S can continue to operate the divested stores competitively and cohesively with no disruption to the associate or customer experience. All fuel centers and pharmacies associated with the divested stores will remain with the stores and continue to operate.

Subject to fulfillment of customary closing conditions, including FTC and other governmental clearance, and the completion of the Kroger-Albertsons merger, C&S will pay Kroger an all-cash consideration of approximately $1.9 billion, including customary adjustments.

Prior to the closing, Kroger may, in connection with securing FTC and other governmental clearance, require C&S to purchase up to an additional 237 stores in certain geographies. If additional stores are added to the transaction, C&S will pay to Kroger additional cash consideration based upon an agreed upon formula.

As a result of the comprehensive divestiture plan announced with C&S, Kroger has exercised its right under the merger agreement to sell what would have been the SpinCo business to C&S. Consequently, the spin-off previously contemplated by Kroger and Albertsons Cos. is no longer a requirement under the merger agreement and will no longer be pursued by Kroger and Albertsons Cos.

**Merger creates meaningful benefits for customers, associates and communities**

The divestiture plan is another key step toward the completion of the proposed merger between Kroger and Albertsons Companies. The combination will bring together two complementary companies and create meaningful and measurable benefits for customers, associates and communities. The combination will advance Kroger's *Leading with Fresh, Accelerating with Digital* strategy, which is grounded in Fresh, *Our Brands*, personalization and seamless. By doing so, the combined company will continue to invest in improving the customer experience and serving more communities across the country with fresh, affordable food. With a family of well-known, trusted brands, the combined company will offer customers lower prices and more choices for the fresh foods customers need, want and love – all with a seamless, omnichannel shopping experience.

The combination will allow Kroger and Albertsons Cos. to unlock significant benefits, including:

- **Advancing a Brighter Future for Our Associates.** The combined company will benefit associates seeking to grow their careers. Kroger added more than 100,000 good-paying union jobs since 2012, and it anticipates continuing on this trajectory. The retailer committed to investing $1 billion in improving associates' wages and comprehensive benefits post close. This commitment builds on the $1.9 billion in incremental investments Kroger made in wages and comprehensive benefits since 2018. The combined company has also committed to providing associates with programs aimed at continuing education and financial literacy following the completion of the merger. The combination will create a compelling alternative to large, non-union competitors.
- **Serving More of America with Fresh, High-Quality and Affordable Food.** Kroger built its business model on a foundation of bringing customers lower prices and more choices for the foods their families need to thrive. The retailer committed to investing $500 million beginning day one post close to reduce prices for customers in stores across the U.S. An incremental $1.3 billion will also be invested to enhance the customer experience. The combination advances Kroger's work to make its products more affordable and accessible to more families, ultimately supporting a food system that will feed people across the U.S. for years to come.


of the merger. The combination will create a compelling alternative to large, non-union competitors.

- **Serving More of America with Fresh, High-Quality and Affordable Food.** Kroger built its business model on a foundation of bringing customers lower prices and more choices for the foods their families need to thrive. The retailer committed to investing $500 million beginning day one post close to reduce prices for customers in stores across the U.S. An incremental $1.3 billion will also be invested to enhance the customer experience. The combination advances Kroger's work to make its products more affordable and accessible to more families, ultimately supporting a food system that will feed people across the U.S. for years to come.
- **Driving Meaningful Improvements Where It Matters Most.** The combination will create more opportunities to invest in communities across America as the company continues its journey to eliminate hunger and food waste. In June 2023, Kroger announced its commitment to donate 10 billion meals as a combined company upon completion of the proposed merger to families across the country by 2030. Putting this commitment into context, ten billion meals are enough to feed every person in the cities of Seattle, Denver, Chicago and Boston every meal, every day, for nearly two years. As a result of a strategic focus on donating surplus fresh food and charitable giving, the combined company will accelerate its ability to feed its neighbors and reduce waste, especially food waste.

The merger remains on track to close in early 2024, subject to the receipt of required regulatory clearance and other customary closing conditions, including receipt of clearance under the Hart-Scott-Rodino Antitrust Improvements Act of 1976. Kroger and Albertsons Cos. remain committed to working cooperatively with the regulators and all other interested parties to complete the transaction and unlock the many benefits it offers.

Read more about the combined company's commitment to customers, associates and communities at www.krogeralbertsons.com

**Kroger Second Quarter 2023 Earnings Results and Conference Call**

In a separate press release issued today, Kroger reported its second quarter 2023 results.

Kroger's quarterly conference call with investors will be broadcast as scheduled at 10 a.m. (ET) on September 8, 2023 at ir.kroger.com. An on-demand replay of the webcast will be available at approximately 1 p.m. (ET) on Friday, September 8, 2023.

**Advisors**

Citi and Wells Fargo Securities, LLC are serving as financial advisors and Weil, Gotshal & Manges LLP and Arnold & Porter Kaye Scholer LLP are serving as legal counsel to Kroger.

Goldman Sachs & Co. LLC and Credit Suisse are serving as financial advisors and Jenner & Block LLP is serving as corporate legal counsel and White & Case LLP and Debevoise & Plimpton LLP are serving as antitrust legal counsel to Albertsons Cos.

**About Kroger**

At The Kroger Co. (NYSE: KR), we are dedicated to our Purpose: To Feed the Human Spirit™. We are, across our family of companies nearly half a million associates who serve over 11 million customers daily through a seamless digital shopping experience and retail food stores under a variety of banner names, serving America through food inspiration and uplift, and creating #ZeroHungerZeroWaste communities by 2025. To learn more about us, visit our newsroom and investor relations site.

**About Albertsons Companies, Inc.**

Albertsons Companies is a leading food and drug retailer in the United States. As of June 17, 2023, the Company operated 2,272 retail food and drug stores with 1,726 pharmacies, 401 associated fuel centers, 22 dedicated distribution centers and 19 manufacturing facilities. The Company operates stores across 34 states and the District of Columbia with 24 banners including Albertsons, Safeway, Vons, Jewel-Osco, Shaw's, Acme, Tom Thumb, Randalls, United Supermarkets, Pavilions, Star Market, Haggen, Carrs, Kings Food Markets and Balducci's Food Lovers Market. The Company is committed to helping people across the country live better lives by making a meaningful difference, neighborhood by neighborhood. In 2022, along with the Albertsons Companies Foundation, the Company contributed more than $200 million in food and financial support, including more than $40 million through our Nourishing Neighbors Program to ensure those living in our communities and those impacted by disasters have enough to eat.

**About C&S Wholesale Grocers, LLC**

C&S Wholesale Grocers, LLC is an industry leader in supply chain solutions and wholesale grocery supply in the United States. Founded in 1918 as a supplier to independent grocery stores, C&S now services customers of all sizes, supplying more than 7,500 independent supermarkets, chain stores, military bases and institutions with over 100,000 different products. We are an engaged corporate citizen, supporting causes that positively impact our communities. To learn more, please visit www.cswg.com.

This press release contains certain statements that constitute "forward-looking statements" within the meaning of federal securities laws, including statements regarding the effects of the proposed transaction and divestiture plan. These statements are based on the assumptions and beliefs of Kroger and Albertsons Cos. management in light of the information currently available to them. Such statements are indicated by words or phrases such as "accelerate," "anticipates," "create," "committed," "confident," "continue," "deliver," "driving," "expect," "future," "guidance," "positioned," "strategy," "target," "synergies," "trends," and "will." Various uncertainties and other factors could cause actual results to differ materially from those contained in the forward-looking statements. These include the specific risk factors identified in "Risk Factors" in each of Kroger's and Albertsons Cos.' annual report on Form 10-K for the last fiscal year and any subsequent filings, as well as the following: the expected timing and likelihood of completion of the proposed transaction and divestiture plan, including the timing, receipt and terms and conditions of any required governmental and regulatory clearance of the proposed transaction and divestiture plan; the impact of the proposed divestiture plan; the occurrence of any event, change or other circumstances that could give rise to the termination of the merger agreement or divestiture agreement; the outcome of any legal proceedings that may be instituted against the parties and others following announcement of the merger agreement and proposed transaction or divestiture plan; the inability to consummate the proposed transaction or divestiture plan due to the failure to satisfy other conditions to complete the proposed transaction or divestiture plan; risks that the proposed transaction disrupts current plans and operations of Kroger and Albertsons Cos.; the ability to identify and recognize the anticipated benefits of the proposed transaction, including expectations and synergies; the amount of the costs, fees, expenses and charges related to the proposed transaction or divestiture plan; and the ability of Kroger and Albertsons Cos. to successfully integrate their businesses and related operations; the ability of Kroger to maintain an investment grade credit rating; risks related to the potential impact of general economic, political and market

**About C&S Wholesale Grocers, LLC**

C&S Wholesale Grocers, LLC is an industry leader in supply chain solutions and wholesale grocery supply in the United States. Founded in 1918 as a supplier to independent grocery stores, C&S now services customers of all sizes, supplying more than 7,500 independent supermarkets, chain stores, military bases and institutions with over 100,000 different products. We are an engaged corporate citizen, supporting causes that positively impact our communities. To learn more, please visit www.cswg.com.

This press release contains certain statements that constitute "forward-looking statements" within the meaning of federal securities laws, including statements regarding the effects of the proposed transaction and divestiture plan. These statements are based on the assumptions and beliefs of Kroger and Albertsons Cos. management in light of the information currently available to them. Such statements are indicated by words or phrases such as "accelerate," "anticipates," "create," "committed," "confident," "continue," "deliver," "driving," "expect," "future," "guidance," "positioned," "strategy," "target," "synergies," "trends," and "will." Various uncertainties and other factors could cause actual results to differ materially from those contained in the forward-looking statements. These include the specific risk factors identified in "Risk Factors" in each of Kroger's and Albertsons Cos.' annual report on Form 10-K for the last fiscal year and any subsequent filings, as well as the following: the expected timing and likelihood of completion of the proposed transaction and divestiture plan, including the timing, receipt and terms and conditions of any required governmental and regulatory clearance of the proposed transaction and divestiture plan; the impact of the proposed divestiture plan; the occurrence of any event, change or other circumstances that could give rise to the termination of the merger agreement or divestiture agreement; the outcome of any legal proceedings that may be instituted against the parties and others following announcement of the merger agreement and proposed transaction or divestiture plan; the inability to consummate the proposed transaction or divestiture plan due to the failure to satisfy other conditions to complete the proposed transaction or divestiture plan; risks that the proposed transaction disrupts current plans and operations of Kroger and Albertsons Cos.; the ability to identify and recognize the anticipated benefits of the proposed transaction, including expectations and synergies; the amount of the costs, fees, expenses and charges related to the proposed transaction or divestiture plan; and the ability of Kroger and Albertsons Cos. to successfully integrate their businesses and related operations; the ability of Kroger to maintain an investment grade credit rating; risks related to the potential impact of general economic, political and market factors on the companies or the proposed transaction. The ability of Kroger and Albertsons Cos. to achieve the goals for the proposed transaction may also be affected by their ability to manage the factors identified above.

The forward-looking statements by Kroger and Albertsons Cos. included in this press release speak only as of the date the statements were made. Neither Kroger nor Albertsons Cos. assumes the obligation to update the information contained herein unless required by applicable law. Please refer to the reports and filings of Kroger and Albertsons Cos. with the Securities and Exchange Commission for a further discussion of the risks and uncertainties that affect them and their respective businesses.

View original content to download multimedia:https://www.prnewswire.com/news-releases/kroger-and-albertsons-companies-announce-comprehensive-divestiture-plan-with-cs-wholesale-grocers-llc-in-connection-with-proposed-merger-301921933.html

SOURCE The Kroger Co.

VIEW ALL NEWS →

**Kroger**

Your Privacy Choices

**Contact Us**

Rob Quast
Senior Director of Investor Relations

investorrelations@kroger.com

**Investor Email Alerts**

Enter your Email Address

SIGN UP

☐ News          ☐ Quarterly Reports     ☐ Annual Reports
☐ SEC Filings   ☐ End of Day Stock Quote ☐ Events & Presentations

Unsubscribe

Privacy Policy   |   Terms & Conditions   |   Site Map               © 2024 The Kroger Co. - All rights reserved               Powered By Q4 Inc. 5.128.1.2

# DX 1290

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 1290A

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 1635

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 1674

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 1682

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX # 9

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 1954

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 1979



DX 1979

Elliott Golden

# Where **mergers** go wrong

*Most buyers routinely overvalue the synergies to be had from acquisitions. They should learn from experience.*

**Scott A. Christofferson, Robert S. McNish, and Diane L. Sias**

——————

**It's known as the winner's curse.** When companies merge, most of the shareholder value created is likely to go not to the buyer but to the seller. Indeed, on average, the buyer pays the seller all of the value generated by a merger, in the form of a premium of from 10 to 35 percent of the target company's preannouncement market value. The fact is well established, but the reasons for it are less clear.[1]

Our exploration of postmerger integration efforts points to the main source of the winner's curse: the fact that the average acquirer materially overestimates the synergies a merger will yield.[2] These synergies can come from economies of scale and scope, best practice, the sharing of capabilities and opportunities, and, often, the stimulating effect of the combination on the individual companies. However, it takes only a very small degree of error in estimating these values to cause an acquisition effort to stumble.

Acquirers must undoubtedly cope with an acute lack of information. To help them assess synergies and set targets, they usually have little data about the target company; limited access to its managers, suppliers, channel partners, and customers; and insufficient experience. Even highly seasoned buyers rarely capture data systematically enough to improve

---

[1] Hans Bieshaar, Jeremy Knight, and Alexander van Wassenaer, "Deals that create value," *The McKinsey Quarterly*, 2001 Number 1, pp. 64–73 (www.mckinseyquarterly.com/links/10272).
[2] Richard H. Thaler, *The Winner's Curse: Paradoxes and Anomalies in Economic Life*, Princeton, New Jersey: Princeton University Press, 1992.

their estimates for the next deal. And external transaction advisers—usually investment banks—are seldom involved in the kind of detailed, bottom-up estimation of synergies that would be needed to develop meaningful benchmarks before a deal. Fewer still get involved in the post-merger work, when premerger estimates come face-to-face with reality.

### Lessons learned

To address this challenge, we have used our extensive experience of postmerger integration efforts across a range of industries, geographies, and deal types to set up a database of estimated and realized merger synergies.[3] After combing through the data from 160 mergers (so far)—as well as our knowledge of the companies and their industries—we have found six practical measures that executives can take to improve the chance of achieving synergies from acquisitions.

For starters, executives should cast a gimlet eye over estimates of top-line synergies, which we often found to be inflated. They should also try to anticipate common "dis-synergies" (such as the loss of customers and difficulties reconciling different service terms) and consider raising their estimates of onetime costs. Additional steps include vetting assumptions about pricing and market share, making better use of benchmarks to deliver cost savings, and forming more realistic assessments of how long it will take to capture synergies. When applied by an acquisition team chosen for its expertise and its ability to counter gaps in information, these six measures should help buyers avoid the winner's curse and improve the quality of most of their deals.

### Reduce top-line synergy estimates

Wall Street wisdom warns against paying for revenue synergies, and in this case it is right. The greatest errors in estimation appear on the revenue side—which is particularly unfortunate, since revenue synergies form the basis of the strategic rationales for entire classes of deals, such as those pursued to gain access to a target's customers, channels, and geographies. Almost 70 percent of the mergers in our database failed to achieve the synergies expected in this area (Exhibit 1).

### Acknowledge revenue dis-synergies

Another common reason for errors in estimating revenues is the failure of most acquirers to account explicitly for the revenue dis-synergies that befall merging companies. These dis-synergies sometimes result from the disruption of a company's ability to execute and sometimes directly from efforts to reduce costs.

---

[3] As our database expands, we will continue to deepen our understanding of realized merger synergies and share the insights that emerge.

EXHIBIT I



**Top-line tribulations**

% of companies (n = 77)

**70% of mergers failed to achieve expected revenue synergies**

% of anticipated revenue synergies captured after merger

Source: 2002 McKinsey postmerger-management survey

In retail banking, for example, important cost-based synergies are expected to come from consolidating branch networks. The acquiring bank assumes that while some customers might leave, cost savings will more than make up for the losses. But when one large US bank acquired a competitor with a substantial geographic overlap, the acquirer suffered unusually high losses among the target company's customers, rendering the deal unprofitable and exposing the merged entity to a takeover. Due diligence on the target's customers would have revealed that they were heavy branch users and thus especially likely to defect as a result of an integration process that closed more than 75 percent of the acquired company's branches. This experience may be relatively extreme, but our experience indicates that the average merging company loses 2 to 5 percent of its combined customers.[4]

Most acquiring companies can do better, especially in industries, such as retail banking, that have already seen a good deal of consolidation. Data on the level of customer losses experienced by merging banks are available from a range of sources, including industry associations, regulatory filings, and articles in the press. Examples are numerous enough to help buyers identify not just helpful benchmarks (for example, when a branch closes, 8 percent of retail deposits will be lost to competitors) but also the underlying factors that determine whether a deal produces losses above or below the benchmark (for instance, the number of customers who also bank with a competitor, the distance to the next-closest remaining branch, and the presence of competitors to take over closing branches). In other industries, a search of this kind might yield no more than two or three good precedents and only limited data on them—but even that much information can greatly improve revenue estimates.

### Increase estimates of onetime costs

Many deal teams neglect or underestimate the impact of onetime costs. A chemical manufacturer, for instance, publicly committed itself to reducing annual expenses by $210 million, at a onetime cost of $250 million.[5] Had the company put as much due diligence into that onetime figure as it did

---

[4] In the 124 mergers for which we have relevant data, these are the 25th- and 75th-percentile figures, respectively. Not all merging parties lost customers, but some lost more than 30 percent.

[5] In this and other examples derived from our client experience, we have altered the figures (but not the proportions) as needed to disguise the company's identity.

into the annual synergy target, it would have found a few relevant earlier transactions suggesting that the onetime cost wasn't likely to be less than $450 million. In trying to fulfill the original commitment, the company ended up running over budget, underdelivering on promised synergies, and falling well short of revenue growth targets.

## Compare projections with realities

Many acquirers rely too heavily on assumptions about pricing and market share that are not consistent with overall market growth and competitive realities. One global financial concern estimated that a recent acquisition would net €1 billion ($1.18 billion) in mostly top-line synergies within five years and 13 percent profit growth in the first year. But limited overall market growth meant that these goals could be achieved only if the company took significant share from competitors through cross-selling, and then only if the competitors didn't respond successfully. Actual profit growth was a mere 2 percent. The message is that acquirers need to calibrate the market share and margin assumptions in their pro forma analysis with the realities of the market.



E X H I B I T   2



**Mixed results**

% of companies  (n = 92)

**One-quarter overestimated cost synergies by at least 25%**

% of anticipated cost synergies captured after merger

Source: 2002 McKinsey postmerger-management survey

## Apply outside-in benchmarks to cost synergies

While managers in about 60 percent of mergers deliver the planned cost synergies almost totally, in about a quarter of all cases they are overestimated by at least 25 percent (Exhibit 2), a miscalculation that can easily translate into a 5 to 10 percent valuation error. In one merger we assisted, the target's net present value (stand-alone value plus "base-case" synergies) was $2.5 billion; if the acquirer's cost synergy estimates had been 25 percent too high, the NPV would have been only $2.3 billion.

A company risks overestimating synergies if it neglects to use the available benchmarks as a sanity check. One European industrial company that acquired another planned for cost savings of €110 million from selling, general, and administrative expenses, even though precedents suggested that a range of €25 million to €90 million was more realistic. Furthermore, the company neglected to conduct a bottom-up analysis to justify the higher figure. Still worse, it was especially risky to aim for deep cuts in

sales and marketing expenditures because this approach puts revenue growth at risk, and the net present value of presynergy revenue growth was roughly four times greater than all synergies combined.

Be realistic about timing

Deal teams often make simplistic and optimistic assumptions about how long it will take to capture synergies and how sustainable they will be. As a result, important deal metrics, such as near-term earnings and cash flow accretion, can end up looking better than they deserve, which leads companies to overestimate the net present value of synergies substantially.

One company we worked with budgeted head-count cost savings as if they would be spread out evenly over each quarter. In practice, managers tended to wait until the last month of a quarter before making reductions. As it happened, this error didn't have a material impact on the transaction's net present value, but it did cause the postmerger integration leaders to miss their projections for first-year synergies, thereby undermining the credibility of the process.

Moreover, many savings, while real, aren't perpetual and must be phased out. Often, for example, companies plan to reduce their operating costs by squeezing production capacity and logistics across the merged organization. But if each merging company is growing quickly in its own right, sloppy incremental analysis might attribute to the merger certain benefits that would be realized anyway by the individual companies. One of our medical-product clients, which had been growing by 10 to 15 percent a year, forecast that without a merger it would be using the full capacity of its own plants within three to four years. At that pace, much of the money saved by closing or streamlining plants in the context of a proposed merger couldn't really be expected to last very long, because closed facilities would soon have to be reopened. In general, we believe that it is overoptimistic to include the full amount of targeted annual synergies in the "continuing-value" calculation of a net-present-value model.

The problem isn't just properly translating the timing of synergies into present values: bad timing can prevent synergies from occurring at all. Persistent management attention is needed to capture them. We have found evidence to suggest that unless synergies are realized within, say, the first full budget year after consolidation, they might be overtaken by subsequent events and wholly fail to materialize. We have also observed that synergies are captured more quickly and efficiently when a transaction closes at the start of the merging companies' annual operational-planning and budgeting process. One financial institution even found that its plans to migrate its own IT systems to an acquired company's platform had to be radically altered

to accommodate a relatively narrow window of opportunity between peaks in the lending season.

### Effective deal teams

While estimating synergies is difficult, doing so is vital and requires more investment than it usually gets. The companies we studied used various ways to improve their synergy estimates.

#### Involve key line managers

Involving line managers in problem solving and due diligence improves the quality of estimates and also builds support for postmerger integration initiatives. Synergy analysis also illuminates issues that will shape due diligence, the structure of deals, and the negotiations that lead up to them.

One of our clients had its head of operations take the lead in estimating the savings from rationalizing manufacturing capacity, distribution networks, and suppliers. His knowledge of the unusual manufacturing requirements of a key product line and of looming investment needs at the acquirer's main plant helped improve the estimates. He also learned from a due-diligence interview with the head of operations at the target that it had recently renegotiated its supply contracts and had yet to implement an enterprise-resource-planning (ERP) system, both facts that made it possible to refine synergy estimates. All of this helped his employer (the buyer) during the negotiations and deal structuring: the buyer knew, for instance, that it could promise to retain the main European location of the target but could not give similar promises about that company's main US facility. Moreover, his involvement ensured that he was prepared to act quickly and decisively to realize savings once the deal closed.

By contrast, another company with substantial acquisition experience left the estimation of synergies up to the M&A department and paid the price. Using an accurate but high-level financial analysis—total cost per customer served—the department concluded that integrating customer service operations would have no value. Had line managers been involved, their due diligence would probably have revealed the fact that the target's smaller centers had much lower labor productivity but compensated for it with an innovative Web-servicing program. Consolidating operations could have both improved the merged entity's labor productivity and brought the Web-servicing program into the acquirer's larger service center. But the acquirer missed the "unfreezing" time immediately following the merger announcement and lost the opportunity.

#### Codify experiences

Internal M&A teams should do more to codify and improve their synergy-estimation techniques. Every deal represents a valuable lesson, and some

specific procedures, we have discovered, make a difference. They include holding a formal postintegration debriefing session with the integration and M&A teams (which ideally should overlap), requiring future M&A and integration leaders to review the results of past deals, tracking synergies against the plan for two years, and calculating retroactively what the net present value of a transaction turned out to be.

Having said all this, we must sound a note of caution. Companies shouldn't overstate what can really be learned from experience, since not all deals are alike. One bank skillfully balanced what it discovered from its first acquisition against the idiosyncrasies of its second big acquisition. The first had gone badly; the bank underestimated the integration costs by a factor of three. The second time around, the executives leading the deal understood that they had to get the estimates for costs (and deposit losses) right. Instead of simply applying the loss data from the first merger, which involved much less geographic overlap than the second, they brought in a line manager who had worked on a recent branch-closure program. By applying benchmarks carefully and consulting line managers, the bank avoided making the same estimation error twice.

----

Companies with access to reliable data can develop sound benchmarks for estimating realistic synergies and finding insights into the sources and patterns of error in estimating them. Obviously, these efforts can be thorny, but in our experience they are well worth the effort.

A more comprehensive database would help to resolve other strategic issues—for instance, whether some synergies are consistently embedded in the acquisition premium paid while others are captured by the acquirer and whether the stimulating effect of a transaction is necessary to improve the acquirer's stand-alone performance. The answers to the first question will obviously inform price-setting and negotiation strategies; those to the second could lead companies to consider tactics other than acquisitions to raise their performance. Finally, it's important to recognize that a well-designed postmerger integration effort can sometimes help companies do even better than they had hoped.[6] $Q$

[6] In our experience, companies are routinely amazed to find that "unbeatable" deals they negotiated with suppliers are inferior to their merger counterparts' deals—sometimes with the same suppliers.

**Scott Christofferson** is a consultant and **Rob McNish** is a principal in McKinsey's Washington, DC, office; **Diane Sias** is a principal in the New Jersey office. A version of this article appeared in *McKinsey on Finance*, Winter 2004, pp. 1–6. Copyright © 2004 McKinsey & Company. All rights reserved.

# DX 1984



# How Successful M&A Deals Split the Synergies

## Divide and Conquer

**MARCH 27, 2013**

By Jens Kengelbach, Dennis Utzerath, Christoph Kaserer, and Sebastian Schatt

Academic research has repeatedly confirmed that about two-thirds of all mergers and acquisitions among public companies destroy value for the acquirer, at least in the short term. Even when acquirers justify deals by pointing out the ample synergy opportunities that they offer, capital markets remain skeptical. Yet a significant minority of acquisitions do manage to create value for the owners of both the acquirer and the target, demonstrating that despite the doubters in the capital markets, the overriding M&A rationale—value creation—remains valid.

Of course, the specific path to value creation varies widely by company, depending on the economics of its business, its valuation in the marketplace, and the terms of any given M&A transaction. But whether by buying out-of-favor targets near their cyclical lows, realizing cost efficiencies, or boosting the top line through organic growth, acquirers and M&A partners *can* create value—provided the transaction is accurately priced and specific value-creation strategies are executed effectively.

Most acquirers seek to create value by capturing cost synergies. But there is more to value creation than simply identifying synergies and executing strategies to realize those synergies. The Boston Consulting Group teamed up with the Technische Universität München (TUM) to compile new research demonstrating that in successful deals, buyers and sellers share the synergies. Acquirers cannot expect to capture 100 percent of those synergies for themselves; sellers will anticipate the buyers' synergies and demand takeover premiums, reasoning that the target is worth more in the hands of the acquirers than in their own. Our research suggests that sellers collect, on average, 31 percent of the average capitalized value of expected synergies. However, in practice, the seller's share varies widely.

Potential synergies may include closing redundant plants or production lines, realizing economies of scale in purchasing, centralizing administrative functions, reducing headcount, or pushing forward other forms of streamlining. Not every acquisition has synergistic potential, however. In regulated industries such as transportation, utilities, and telecommunications, for example, there are sometimes few synergies available—even though they often operate as part of "natural monopolies" that, in theory, have high potential for synergies. Companies in such industries tend to be influenced and constrained by national regulators that generally bar them from realizing all available synergies for the benefit of the end consumer, and thus the net value of any synergies disclosed at the time of a merger announcement is relatively low.

Industries with a high ongoing level of international consolidation, on the other hand, can generate significant synergies, ranging from 2 to 10 percent of the target company's latest annual sales (a median of 4.8 percent), or 1 to 3 percent of the

combined sales of target and acquirer (a median of 1.5 percent). (See Exhibit 1.) Among the industries with ample opportunities for realizing synergies are mining and chemicals, which have experienced a wave of global consolidation in recent years, and health care, especially early-stage pharmaceutical companies that can dramatically increase value by joining forces with large organizations that have the manufacturing and distribution clout needed to overcome the lofty barriers to international market entry.



**EXHIBIT 1 | The Most Globally Consolidated Industries Have the Greatest Synergy Potential**

Median announced synergy per industry (combined sales) — Median = 1.5%

| Industry | Announced synergies (%) |
| --- | --- |
| Mining | 3.3 |
| Chemicals | 2.5 |
| Other | 2.5 |
| Paper | 2.1 |
| Finance | 2.0 |
| Service | 2.0 |
| Health care | 1.9 |
| Business equipment | 1.7 |
| Books | 1.6 |
| Construction | 1.5 |
| Retail | 1.3 |
| Transportation | 1.3 |
| Steel | 1.2 |
| Telecommunications | 1.1 |
| Food | 1.1 |
| Fabricated products | 1.1 |
| Household | 1.1 |
| Beer | 1.0 |
| Autos | 1.0 |
| Oil | 0.9 |
| Gaming | 0.9 |
| Utilities | 0.9 |
| Wholesale | 0.5 |

Median announced synergy per industry (target sales) — Median = 4.8%

| Industry | Announced synergies (%) |
| --- | --- |
| Mining | 7.3 |
| Chemicals | 8.0 |
| Other | 5.7 |
| Paper | Not available |
| Finance | 8.6 |
| Service | 4.9 |
| Health care | 9.9 |
| Business equipment | 5.4 |
| Books | 4.4 |
| Construction | 5.6 |
| Retail | 3.0 |
| Transportation | 3.9 |
| Steel | 3.2 |
| Telecommunications | 4.4 |
| Food | 3.2 |
| Fabricated products | 5.7 |
| Household | 5.1 |
| Beer | 4.2 |
| Autos | 2.9 |
| Oil | 2.4 |
| Gaming | 1.8 |
| Utilities | 2.5 |
| Wholesale | 2.0 |

**Sources:** Thomson Reuters Datastream; Thomson Reuters Worldscope; company investor-relations material; press searches; BCG analysis.
**Note:** Results are based on a sample of 365 deals with transaction values of more than $300 million that took place from 2000 through 2011; industries with a sample population of fewer than three are not included.
[1]Value of announced total synergies per year.

## ACQUIRERS CAN USE SYNERGIES TO SET TAKEOVER PREMIUMS

BCG and TUM have developed a sophisticated method, based on the empirical experiences of our clients, of analyzing the relationship between synergies and the effect of M&A announcements on capital markets. This approach allows companies to quantify the value of synergies in terms of transaction price, thereby revealing whether the acquirer will retain adequate space to create value for shareholders in the combined entity. The acquisition price premium is expressed in relation to the discounted value of potential synergies and rests upon three interlocking assumptions:

- The value of a company to the seller is the sum of the company's standalone future cash flows. The seller may anticipate that an industry buyer will be able to capture synergies and—because those specific synergies are unique to that company—might demand a share of them in the form of a takeover price higher than the asset's standalone valuation.

- The value of a company to a buyer is the target's standalone cash flows plus the value of the synergies that the acquirer can capture. But if the acquirer pays the full value of those synergies to the seller (in the form of a takeover premium), then the deal offers no headroom for value creation. Thus the acquirer seeks a price somewhere between

the standalone net present value of the future cash flows and the full value of the synergies plus the standalone value. [1]

*Notes:*

*1 Because synergies tend to mount over time and become fully effective after roughly two years (assuming skillful management by the acquirer), the value of synergies can be stated as the present value of ongoing synergies after two years.*

- By sharing the value of synergies with the seller, the acquirer can pay a price that induces the seller to conduct the transaction while still enabling both acquirer and seller to create value for their shareholders. Further, by disclosing the value of potential synergies at the time of an acquisition, the acquirer can shore up its market valuation during the period following the merger announcement, offsetting the erosion in market value that frequently occurs as investors react to the uncertainty engendered by such announcements.

## SYNERGY POTENTIAL VARIES WIDELY BY INDUSTRY AND COMPANY

Identifying synergy-rich deals and expressing the value of those synergies with precision are complex tasks. Synergy value fluctuates widely even among M&A deals within a single industry. (See Exhibit 2.) When Suncor Energy announced its acquisition of Petro-Canada in 2009, for example, it promised shareholders synergies equal to 2.8 percent of the combined company's annual sales. Statoil's 2006 acquisition of Norsk Hydro, by contrast, offered synergies equal to 0.7 percent of combined sales—roughly in line with the industry median. (Statoil shareholders nonetheless supported the deal because of its sound strategic logic and modest takeover premium.)



Moreover, synergy expectations are no longer tethered to M&A activity cycles. In the past, synergy expectations were high during periods of intense M&A activity and low during slumps. Today, expectations are high even though merger activity is depressed, as financing remains tight and acquirers have become picky. (See Exhibit 3.)



**EXHIBIT 3 | Despite Today's Low Deal Volume, Synergy Expectations Are High**

**Synergy announcements are not tied to M&A activity**

Sources: Thomson Reuters Datastream; Thomson Reuters Worldscope; company investor-relations material; press searches; BCG analysis.
Note: Results are based on a sample of 1,172 deals with transaction values of more than $300 million that took place from 2000 through 2011.

Although synergies can play a key role in price negotiations and in supporting the acquirer's stock valuation following the deal announcement, companies generally focus only on cost-saving synergies when communicating such values to shareholders, omitting any mention of potential synergies on the revenue side. Indeed, 94 percent of merger announcements that disclose the value of synergies mention only cost synergies or don't mention the specific nature of the synergies at all. By contrast, only 5 percent of announcements that disclose synergies mention revenue synergies.

Companies leave revenue synergies out of the conversation for two main reasons. One is that cost synergies are simply easier to talk about. Whether they're derived from shared sourcing, rationalized manufacturing operations, elimination of overlapping functions, shared services, or other activities, cost synergies are relatively easy to quantify with some precision. And though realizing those synergies can hardly be called easy, acquirers can reliably realize them through their own efforts—provided they have developed a detailed plan for postmerger integration (PMI) that they execute successfully.

Revenue synergies, on the other hand, are more difficult both to realize and to quantify, depending as they do on the behavior of third parties such as customers. Although concepts such as cross-selling, up-selling, and concentrating on the highest-margin products and segments are conceptually easy to grasp, realizing them calls for exceptional management and execution. As a result, analysts and investors tend to view revenue synergies with great skepticism, preferring to believe in them only after they have come to fruition. Acquirers, by the same token, tend to downplay talk of revenue synergies during deal negotiations to avoid the risk that the seller will demand a share of synergies that ultimately may not materialize.

The rewards for realizing revenue synergies can be considerable, however—though those rewards often arrive some time after the transaction is finalized. Mittal Steel's 2006 acquisition of another leading global steelmaker, Arcelor, is an instructive case in point. (See "Mittal's Winning Synergy Strategy.") BCG, with its finance and industry expertise, is able to

assist acquirers by looking beyond costs to other sources of synergies, capturing their value, and, at the appropriate time, communicating that value to investors.

___

## MITTAL'S WINNING SYNERGY STRATEGY      —

Part of our assistance involves uncovering potential synergies from sources other than operating costs and revenues. A new owner can create synergies by its mere presence, either because it can offer advantageous financing, optimize the target company's tax situation, or provide other crucial advantages. And identifying and capturing alternative synergy sources can provide potential acquirers with a decided advantage over rival suitors, because it allows acquirers to offer the target a higher price while retaining adequate headroom for future value creation.

### IT PAYS TO SHARE SYNERGIES WITH SELLERS

In M&A as in life, you can't have your cake and eat it, too. To arrive at a transaction price acceptable to the seller, in most cases, the acquirer must agree to share expected synergies. The key word in that sentence is "share"—the deal price will fall in the range between the standalone value of the target and that value plus the maximum value of potential synergies. The amount of the seller's share does not correlate with M&A cycles—that is, it doesn't rise during M&A-intensive periods and decline during lulls in the cycle. It varies instead according to factors such as the relative negotiating strengths of the buyer and seller and the amount of competition to acquire the target.

Nonetheless, the seller's share has been trending upward during the past several years—to a current median of 31 percent—indicating that sellers have grown more sophisticated in assessing the synergy potential of their assets. Sellers in markets outside Europe and the U.S. have tended to collect the largest share, most likely because acquirers have been willing to accept a lower share in return for access to those markets. For example, in deals announced from 2000 through 2011, sellers in manufacturing industries, many based in rapidly developing economies (RDEs), captured 39 percent of the net present value of announced synergies, well above the median for all industries. (See Exhibit 4.) During the same time frame, sellers in the oil, gas, and coal industry—which is also concentrated in RDEs—captured 48 percent of the net present value of announced synergies.



**EXHIBIT 4 | Sellers in Industries with a High RDE Concentration Capture the Greatest Share of Synergies**

**Median amount of synergies captured by target shareholders per industry**

Median = 31%

Locally operating industries

| Industry | Percentage |
|---|---|
| Telecommunications | 6 |
| Utilities | 13 |
| Business equipment | 21 |
| Wholesale/retail | 23 |
| Finance | 23 |
| Consumer durables | 29 |
| Consumer nondurables | 30 |
| Chemicals | 39 |
| Manufacturing | 39 |
| Other | 44 |
| Oil, gas, and coal | 48 |
| Health care | 51 |

Globally operating industries

Percentage[1]

**Sources:** Thomson Reuters Datastream; Thomson Reuters Worldscope; company investor-relations material; press searches; BCG analysis.
**Note:** Results are based on a sample of 365 deals with transaction values of more than $300 million from 2000 through 2011.
[1] Target cumulative abnormal return is the median percentage of the net present value of announced total synergies per year and per industry.

Sellers in industries with a high level of expected synergies generally stand to collect a larger cut, in part because investors have learned through experience that sellers in such industries typically command higher takeover premiums than sellers in industries known for their low synergy potential. For example, sellers of telecommunications companies, whose synergy potential is generally low because of regulatory constraints, captured only 6 percent of the net present value of announced synergies in deals executed from 2000 through 2011, compared with a 51 percent share for health care companies over the same time frame.

It's impossible to say in advance how much the seller will demand in any given deal. As a general rule, however, the acquirer will reap twice as much of the synergies' value as the seller, because the acquirer is assuming the risk of realizing the synergies, whereas the seller collects its share at closing and thus assumes no risk. Like synergies themselves, the seller's share depends on the target company's industry and the specific terms of the transaction. The seller's share does not appear to correlate with its size or profitability, although it does seem linked positively to the profitability of the acquirer and negatively to the return on the acquirer's shares during the period of the deal announcement. (See Exhibit 5.)



**EXHIBIT 5 | The Target's Share of Synergies Depends on the Deal and the Acquirer's Performance**

The better the deal for the acquirer, the higher synergy share captured by the seller

Synergies captured by target shareholder[1] (%)

Best-performing acquirers share more synergies with target shareholders

Synergies captured by target shareholder[1] (%)

Total capital-market deal performance: Highest CAR quartile 42, 51, 24, Lowest CAR quartile 9

Acquirer EBIT margin: Highest operative performance 47, 39, 29, Lowest operative performance 21

**Sources:** Thomson Reuters Datastream; Thomson Reuters Worldscope; company investor-relations material; press searches; BCG analysis.
**Note:** Results are based on a sample of 365 deals with transaction values of more than $300 million from 2000 through 2011. CAR = cumulative abnormal return.
[1]Target CAR is represented as the median percentage of the net present value of announced total synergies per year and per industry.

Ultimately, the parties to the deal negotiation determine the seller's share of synergies, and both have an interest in arriving at a percentage that shareholders of both acquirer and target regard as fair and reasonable. Consider the merger of The Stanley Works and Black & Decker, a stock swap valued at $3.5 billion that gave Stanley shareholders a 50.5 percent stake in the combined enterprise. When the deal was announced in November 2009 (it closed in March 2010), top management of both companies justified the transaction by arguing that the combination of two companies roughly equal in size and with overlapping product lines would generate cost savings and produce an industry leader in the engineering and power tools business.

Both sides made a point of mentioning cost synergy potential in their merger announcements. Their conservative initial estimates called for cost savings of $350 million in three years. That figure translated to 7.3 percent of Black & Decker's annual sales, well above industry median cost savings. That initial estimate was subsequently revised twice, first to $450 million and finally to $500 million, with the bulk of the savings coming from reduced selling, general, and administrative expenses, as well as streamlined manufacturing and purchasing. Following deal closing, management of the combined company regularly reported its progress toward realizing those savings, enhancing the credibility of its estimates.

Both companies reaped the rewards of their careful attention to and communication of expected synergies. The Stanley Works, the acquirer, posted returns 8 percent higher than the industry median in the seven trading days following the deal announcement, while Black & Decker posted returns 29 percent higher than the industry median seller's return. It's worth noting that Black & Decker posted those returns despite its having collected only 38 percent of the deal's expected synergies, compared with the industry median of 44 percent. This was most likely because, as minority holders of the combined company, Black & Decker shareholders would continue to share in the expected savings.

There's a final lesson in the story of this merger. Management of Stanley Black & Decker, the combined company, knew that the initial market reaction to the deal announcement would destroy value because of uncertainty that the deal would be completed and because of the inevitable disruption to operations that the merger would cause. (The market has generally come to expect mergers to destroy value.) To counteract this downward pressure, management stressed the importance of PMI and concentrated much of its energy and attention on realizing the savings promised when the deal was announced. Other acquirers should consider plotting a similar postmerger course, as they, too, will be operating in an environment in which the market assumes the deal will destroy value. An aggressive PMI agenda is the surest means to counteract diminished market expectations and restore the value lost as a result.

## THE VALUE OF COMMUNICATION

PMI actually begins the moment the deal is announced, when management communicates the rationale for the transaction and quantifies the synergies that shareholders can expect. Recent M&A history conclusively demonstrates that shareholders welcome details about the logic underlying a transaction and reward communicative acquirers with higher-than-expected valuations during the period after merger announcements. The valuations of acquirers that quantify synergies as part of merger announcements are roughly 5 percent higher, on average, than those of acquirers that make no such disclosure, while the valuation of the combined companies is approximately 6 percent higher than it is for comparable companies that don't disclose synergies. (See Exhibit 6.) The value-creating potential of such announcements is especially high in transparent markets that are well-covered by equity analysts. In such cases, sellers and their shareholders tend to have a clear idea of the potential synergies they are relinquishing by selling.



**EXHIBIT 6 | Disclosing Synergy Expectations When a Deal Is Announced Preserves Value**

Sources: Thomson Reuters Datastream; Thomson Reuters Worldscope; company investor-relations material; press searches; BCG analysis.
Note: The charts on the left are stylized. Results are based on a sample of 1,172 deals with transaction values of more than $300 million from 2000 through 2011.

All the communication in the world, however, cannot preserve the value of a combined company that fails to deliver against the synergy expectations it creates. BCG has identified a set of best practices for setting synergy expectations at the time the deal is announced and for tracking progress against synergy targets. These best practices include the following:

- Provide a context for the current deal by referring back to earlier transactions that demonstrate that each new deal is premised on sound, consistent strategic logic.

- Explain in detail the rationale for the current deal in the form of a narrative that takes into account macroeconomic conditions, industry fundamentals, and the competitive positions and differentiating strengths of both acquirer and target.

- Disclose the value of anticipated synergies and their sources and provide—and regularly update—a timetable for realizing that value.

As varied as these practices are, they are rooted in a single imperative: be straightforward, candid, and as accurate as possible. Setting expectations too low risks making the seller's investors feel sandbagged when the company overdelivers against them, but setting them unrealistically high risks harming the company's long-term credibility in the marketplace. Investors will welcome and reward over¬delivery against credible expectations, of course, but the long-term cost of unrealistic promises far outweighs whatever short-term gains those promises may produce. Using BCG's unique synergies-based approach to M&A pricing, companies can realistically assess the synergy potential of particular industries, companies, and business models, and they can develop PMI plans that ensure that acquirers capture the full value of the synergies they identify.

# Authors



**Jens Kengelbach**
Managing Director & Senior Partner; Global Leader of Mergers & Acquisitions
Munich



**Dennis Utzerath**
Managing Director & Partner
Cologne

**Christoph Kaserer**

**Sebastian Schatt**
Alumnus

1   Because synergies tend to mount over time and become fully effective after roughly two years (assuming skillful management by the acquirer), the value of synergies can be stated as the present value of ongoing synergies after two years.

ABOUT BOSTON CONSULTING GROUP

Boston Consulting Group partners with leaders in business and society to tackle their most important challenges and capture their greatest opportunities. BCG was the pioneer in business strategy when it was founded in 1963. Today, we work closely with clients to embrace a transformational approach aimed at benefiting all stakeholders—empowering organizations to grow, build sustainable competitive advantage, and drive positive societal impact.

Our diverse, global teams bring deep industry and functional expertise and a range of perspectives that question the status quo and spark change. BCG delivers solutions through leading-edge management consulting, technology and design, and corporate and digital ventures. We work in a uniquely collaborative model across the firm and throughout all levels of the client organization, fueled by the goal of helping our clients thrive and enabling them to make the world a better place.

© Boston Consulting Group 2024. All rights reserved.

For information or permission to reprint, please contact BCG at permissions@bcg.com. To find the latest BCG content and register to receive e-alerts on this topic or others, please visit bcg.com. Follow Boston Consulting Group on Facebook and X (formerly Twitter).

# DX 1988



THIRD EDITION

# INVESTMENT BANKS,
# HEDGE FUNDS, AND PRIVATE EQUITY

### DAVID P. STOWELL



DX 1988

**TABLE C11.2**    Median Announced Synergies as a Percentage (%) of Target Sales

| Health care | 9.9% | Service | 4.9% | Food | 3.2% |
|---|---|---|---|---|---|
| Finance | 8.6% | Construction | 4.4% | Retail | 3.0% |
| Chemicals | 8.0% | Communications | 4.4% | Autos | 2.9% |
| Mining | 7.3% | Beer | 4.2% | Oil | 2.4% |
| Household | 5.1% | Technology | 4.0% | Wholesale | 2.0% |
| Average | 5.0% | | | | |

Source: *Adapted from FactSet and Jens Kengelbach, Dennis Utzerath, Christoph Kaserer, and Sebastian Schatt, Boston Consulting Group and Technische Universität München, "Divide and Conquer: How Successful M&A Deals Split the Synergies," March 2013,* http://www.bcg.de/documents/file130658.pdf.

In the Heinz transaction, both buyers had investments in related business: Berkshire Hathaway owned See's Candies, The Pampered Chef, Mars Inc., and Dairy Queen, while 3G Capital owned Burger King Holdings. Despite these complimentary portfolio companies, the buyers estimated virtually zero synergies in the Heinz acquisition. Heinz management and the buyers repeatedly stated that Heinz would continue to operate as an independent portfolio company.



NOTE: PREMIUM IS THE DIFFERENCE BETWEEN THE OFFERING PRICE AND THE PRICE AT WHICH THE TARGET COMPANY'S STOCK CLOSED AT ON THE DAY BEFORE THE DEAL WAS ANNOUNCED.

**FIGURE C11.1**    Historical acquisition premiums. *Dealogic 2013.*

## ACQUISITION PREMIUM

Fig. C11.1 depicts historical acquisition premiums: the acquisition price compared to the target company's share price 1 day prior to announcement of the acquisition. For comparative purposes, Heinz's acquisition price was approximately 20% above the company's previous day closing share price.

# DX 2041

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX S'+&

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 2182



# US Grocers, Play to Your Strengths

**JUNE 03, 2024**

By Jill Wang, Aileen Lee, Stephanie Halgren, Travis Jackson, and Aftab Hussain

**READING TIME: 5 MIN**

US grocery consumers are increasingly focused on low prices while also seeking out quality products, including fresh food offerings, and a favorable shopping experience.

## The So What

It's difficult for grocery retailers to do all three well. To win greater market share, they need to differentiate themselves on at least one of these fronts—and preferably more.

**Flight to Value.** Post-COVID inflationary effects have stretched the budgets of price-conscious US consumers. The resulting search for savings means that price-competitive retailers such as mass, club, and discount stores are winning share over national grocery chains and smaller regionals. According to Mintel:

- 31% of consumers say that rising prices have made them switch to a lower-cost or discount grocer.

- 46% of consumers are purchasing more store brands than in the past in order to save money.

**Fresh Offerings.** Many consumers are looking to improve their health through better fresh food offerings, including seafood, prepared foods, and produce. Fresh items have delivered double-digit topline CAGR in the mass, club, and discount channels over the past four years, according to NielsenIQ xAOC. Shoppers have become more comfortable with the quality of purchases made outside of the traditional supermarket channel.

**Consolidation.** In a bid to retain share, national grocers and other large players are consolidating and expanding. Discount supermarket chain Aldi, for one, has announced plans to open an additional 800 stores by the end of 2028, half through store conversions from its Southeastern Grocers acquisition and half in new locations. As of 2023, the top ten grocers in the US generated 50% of the industry's $1.8 trillion in sales. This is up from 40% in 2009, according to BCG analysis of public filings and Flywheel data.

## Dive Deeper



**The Club Channel.** As consumers flock to higher-value merchandise and patronize membership or spending-based formats, like warehouse store formats such as club to gain cost savings, our research finds. Club stores have also been strengthening their position in fresh categories. As a result, the channel has emerged as a clear share winner over the past five years. (See Exhibit 1.)

## Exhibit 1 - The US Grocery Market Is Growing Steadily, but Share Is Shifting Away from Most Traditional Grocery Retailers



US grocery market share by channel (%)

Share Δ (2019–2023)

- **Club** emerging as the clear winner, with 270 basis points share growth
- **Flight to value** driving discount players, with 40 basis points share growth
- **Traditional grocery** lost share to other channels as inflation climbed
- **The top three regionals** (Ahold Delhaize, Publix, H-E-B) gained share, with most share loss from the long tail of regional players

**Sources:** Flywheel; BCG analysis.

**Note:** Nationals = Kroger, Albertsons, and Whole Foods; Mass = Walmart, Target, and Amazon; Club = Costco, BJ's and Sam's Club, Discount = Aldi, Lidl, Trader Joe's, Dollar Tree, and Dollar General; Regional and local = all other supermarket players, including Wegmans, Hy-Vee, Meijer, Ahold Delhaize, and Publix.

**The Discount Channel.** The flight to value has proven powerful for discount players, such as Aldi and Save A Lot, which have seen steady gains in share. Discount is the only channel (with the exception of mass retailer Walmart) that consumers associate with "affordability" in our research. It is also winning customers with increasing fresh food selections and by over-indexing on convenience compared to other channels.

**The Mass Retail Channel.** Mass retailers such as Walmart are well positioned in the grocery industry, having capitalized on the consumer flight to value. Scale and omnichannel sales give Walmart, in particular, an edge.

**The National Grocery Channel.** While consumers see national grocery store chains as convenient, reliable, and able to deliver the basic necessities, they do not perceive them as strongly differentiated from other retail channels on value or quality. This channel has lost share over the past five years.

**The Regional Grocery Channel.** Traditional regional grocers struggle to provide strong value, likely due to their lack of scale vis-à-vis mass, discount, and national chains. Nonetheless, many consumers still choose regionals for their community orientation, organic and local offerings, and meal solutions. (See Exhibit 2.) The top-three regional chains, Ahold, Publix, and H-E-B, which have differentiated themselves in these areas, have gained share in recent years.

**Exhibit 2 – Grocery Players Win Customers by Differentiating on Value, Quality, and/or Experience**

| | Club/wholesale | Discount | Mass retail | National and regional |
|---|---|---|---|---|
| **Example retailers** | Costco<br>Sam's Club | Aldi<br>Save A Lot | Walmart<br>Target | Kroger<br>Publix |
| **Highest associations** | 1. Meal solutions<br>2. Inspired me to try new products<br>3. High-quality goods<br>4. A fun shopping experience<br>5. Great deals | 1. Low prices<br>2. Great deals<br>3. Convenience<br>4. I feel like I'm making a smart shopping decision<br>5. I'm familiar with the store | 1. One-stop shop<br>2. Low prices<br>3. A fun shopping experience<br>4. Variety of options<br>5. Its products satisfy my wants and cravings | 1. Local, community-oriented store<br>2. I feel appreciated and treated like family<br>3. Healthy and high-quality products<br>4. Organic, local products<br>5. Meal solutions |

● Value   ● Quality   ● Experience   ● Other

Source: BCG proprietary research.

# Now What

In a highly competitive landscape, grocery retailers must explicitly choose what they stand for if they are to stand out. Specifically, we recommend that they define an optimal customer value proposition and take the following actions.

**Club stores** should concentrate on their strengths, remaining cost-focused while continuing to improve their fresh product offerings. In addition, they can leverage consumer insights to increase their appeal to younger generations of shoppers looking for meal solutions and quality.

**Discount players** should continue to deliver on price and ease of shopping, while building a product assortment that can win a greater share of the consumer basket.

**Mass players** should stay laser-focused on pricing and special deals while continuing to advance their omnichannel digital capabilities and "one-stop shop" offering.

**National grocery stores,** defending their market share against more price-competitive channels, should focus on their ability to deliver convenience. They can do so through their growing store footprints and their resultant ability to scale investments in market-leading digital capabilities, elevating their omnichannel presence.

**Regional stores** can keep focusing on their strong customer value proposition around healthy, quality products and meal solutions. They should also continue boosting customer loyalty through rewards programs as well as local involvement, such as partnerships with local charities.

*The authors would like to thank Peter Jin and Ryan Downey for their contributions to this publication.*

# Authors



### Jill Wang

**MANAGING DIRECTOR & PARTNER**

New Jersey



### Aileen Lee

**PROJECT LEADER**

New Jersey



### Stephanie Halgren

**KNOWLEDGE EXPERT**

Washington, DC



### Travis Jackson

**MANAGING DIRECTOR & PARTNER**

New Jersey



### Aftab Hussain

**MANAGING DIRECTOR & SENIOR PARTNER**

New Jersey

**ABOUT BOSTON CONSULTING GROUP**

Boston Consulting Group partners with leaders in business and society to tackle their most important challenges and capture their greatest opportunities. BCG was the pioneer in business strategy when it was founded in 1963. Today, we work closely with clients to embrace a transformational approach aimed at benefiting all stakeholders—empowering organizations to grow, build sustainable competitive advantage, and drive positive societal impact.

Our diverse, global teams bring deep industry and functional expertise and a range of perspectives that question the status quo and spark change. BCG delivers solutions through leading-edge management consulting, technology and design, and corporate and digital ventures. We work in a uniquely collaborative model across the firm and throughout all levels of the client organization, fueled by the goal of helping our clients thrive and enabling them to make the world a better place.

© Boston Consulting Group 2024. All rights reserved.

For information or permission to reprint, please contact BCG at permissions@bcg.com. To find the latest BCG content and register to receive e-alerts on this topic or others, please visit bcg.com. Follow Boston Consulting Group on Facebook and X (formerly Twitter).

RELATED CONTENT

## What's Next

Read more insights from BCG's teams of experts.



ARTICLE

### The $2.5 Trillion Opportunity for Grocers That Are First to the Future

The COVID-19 pandemic is radically transforming grocery retail business models. Winning companies will be best at…



FOCUS

### Omnichannel Alchemy: Turning Online Grocery Sales to Gold

Brick-and-mortar grocers that dismiss the potential of online grocery sales risk being left behind. Follow our four-point game plan to…



SLIDESHOW

### Winning Over the Holiday Consumer

The unprecedented shift to online purchasing has created a unique opportunity for retailers to deepen their relationship with consumers…

1 / 6

# DX 2213

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 2219

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# 6J SS%

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX SS38

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX SS%

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 2251

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 2257

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 2268

**America's Low-Price Leader ALDI Expands Footprint Nationwide with 800 New Stores by the End of 2028**

*Organic growth coupled with the completion of the Southeastern Grocers acquisition will help bring great products at the lowest possible prices to even more communities*

**BATAVIA, Ill., March 7, 2024 –** ALDI, one of the fastest-growing grocers in the U.S., today announced plans to add 800 stores nationwide by the end of 2028 through a combination of new openings and store conversions. This five-year expansion plan will bring even more communities great products at the lowest possible prices during a time when consumers are more focused than ever on saving money. As a key part of its plans, ALDI also announced the successful completion of its acquisition of Southeastern Grocers and its Winn-Dixie and Harveys Supermarket banners, which will drive significant growth in the Southeast region over the next few years.

"Our growth is fueled by our customers, and they are asking for more ALDI stores in their neighborhoods nationwide," said Jason Hart, CEO, ALDI. "With up to 40% savings on groceries, new customers are inspired to try us out, and existing customers keep coming back. While price is important, we earn their loyalty by stocking our shelves with only the best products and offering a quicker, easier, and more enjoyable shopping experience. With this commitment to add 800 stores in the next five years, we'll be where our shoppers need us while positively impacting the communities we serve."

ALDI will invest more than $9 billion over the next five years on its national expansion, adding new locations across the country. As part of its growth trajectory, ALDI will strengthen its already strong presence in the Northeast and Midwest, adding nearly 330 stores across both regions by the end of 2028. ALDI will also grow its presence in the West by adding more stores in Southern California and Phoenix — and by entering new cities, like Las Vegas.

"For more than a decade, ALDI has added hundreds of stores per year across the country," added Hart. "This success would not be possible without our dedicated team members and supplier partners that bring our customers value and convenience every day. With our growth comes exciting opportunities for our teams and suppliers to grow with us."

In the Southeast, the acquisition of Southeastern Grocers and its Winn-Dixie and Harveys Supermarket banners support ALDI expansion in a key region. In addition to organic growth through new store openings, a significant number of Winn-Dixie and Harveys Supermarkets will convert to the ALDI format over the next several years. Starting mid-summer, ALDI will begin a phased approach to the store conversion process. ALDI anticipates that approximately 50 stores will begin the conversion process during the latter half of 2024, with the majority of these stores reopening as ALDI in 2025. As announced last August, ALDI intends for a meaningful amount of Winn-Dixie and Harveys Supermarkets to continue to operate under their current banners. Both ALDI and Southeastern Grocers are committed to a seamless transition and continuing to deliver excellent value and customer service to their shoppers.

"With a long history of serving the Southeast, our steadfast commitment to helping our customers stretch their hard-earned dollars has remained a constant priority," said Anthony Hucker, President and CEO, Southeastern Grocers. "As we begin this next chapter, we will continue to deliver the quality, service and value our customers have come to expect from us."

"With the acquisition of Winn-Dixie and Harveys Supermarkets, ALDI will serve even more communities in the Southeast, bringing us closer to our customers in a region where we've already experienced significant demand for affordable, quality groceries," said Hart. "As we look ahead to this next chapter in our company history, both the ALDI and SEG teams will play a critical role in driving the business forward for our future collective success."

DX 2268

As ALDI expands its footprint with new and converted store locations, customers can expect the same experience that keeps millions of customers shopping its aisles every month. With easy-to-shop stores that get customers in and out, shelves stocked only with the best products at even better prices, and seasonal ALDI Finds that take grocery shopping from errand to adventure, ALDI continues to earn the loyalty of new customers with every community it enters. Throughout the expansion, ALDI remains committed to making a positive impact on communities and ensuring its environmental footprint doesn't grow with it. As part of its growth, ALDI will build and remodel stores with sustainable features such as energy-efficient LED lighting, environmentally friendly refrigeration systems, rooftop solar systems and more.

**About ALDI**

ALDI is one of America's fastest-growing retailers, serving millions of customers across the country each month. Our disciplined approach to operating with simplicity and efficiency gives our customers great products at the lowest possible prices. For seven years running, ALDI has been recognized by the dunnhumby Retailer Preference Index as #1 in Everyday Low Price.* ALDI strives to have a positive impact on its customers, employees and communities by being socially and environmentally responsible, earning ALDI recognition as a leading grocer in sustainability.** In addition to helping protect the planet, ALDI helps customers save time and money through convenient shopping options via in-store, curbside pickup or delivery at shop.aldi.us. For more information about ALDI, visit aldi.us.

*According to the dunnhumby® ©2024 Retailer Preference Index.*
*\*\*According to Progressive Grocer's 2023 Top 10 Most Sustainable Grocers list.*

**About Southeastern Grocers**

Southeastern Grocers Inc. (SEG), parent company and home of Harveys Supermarket and Winn-Dixie grocery stores, is an omnichannel retailer serving customers in brick-and-mortar grocery stores and liquor stores, as well as online with convenient grocery delivery and curbside pickup throughout Alabama, Florida, Georgia, Louisiana and Mississippi. Harveys Supermarket and Winn-Dixie are well-known and well-respected regional brands with deep heritages, strong neighborhood ties, proud histories of giving back, talented and caring associates and a strong commitment to providing the best possible quality and value to customers. For more information, visit www.harveyssupermarkets.com and www.winndixie.com.

**Contact:**
Zeno Group
ALDIPR@zenogroup.com

# DX 2273

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/supermarkets-competition-costco-walmart-aldi-4f3c0d0c

**HEARD ON THE STREET** [Follow]

# Supermarkets Are Losing This Food Fight

Costco, Walmart, Aldi and Amazon are all chipping away at the supermarket's once-dominant position selling Americans their food

*By Jinjoo Lee* [Follow]

*Updated July 21, 2023 12:00 am ET*

When supermarkets were first introduced, they were a disruptive concept, putting general stores, butchers, greengrocers and bakeries out of business. Is it now their turn to fade away?

Piggly Wiggly in Memphis, Tenn., was the first to establish the concept of self-service shopping in 1916. King Kullen, which was founded in Queens, New York, in 1930 by a former Kroger KR **1.28%** ▲ employee, introduced the concept of a large-format store with separate food departments and discount pricing. Supermarkets expanded with suburbia and car ownership: They went from accounting for 35% of retail food sales in 1950 to 70% by 1960, according to trade publication Progressive Grocer. Not only that, but U.S. population growth was robust—at a rate of about 15% per decade—between 1950 and 1970, which meant that the size of the food market was growing.



Piggly Wiggly, in Memphis, Tenn., was the first to establish the concept of self-service shopping in 1916.
PHOTO: LIBRARY OF CONGRESS

That market isn't growing as quickly anymore: Population growth slowed to 7.4% in the decade ended 2020. Meanwhile, competition for food dollars has grown, both from formats that compete on value such as big-box retailers like Costco COST **3.45%** ▲ and Walmart WMT **1.07%** ▲ , and on convenience, such as Amazon AMZN **1.96%** ▲ –and even from fast-food places and restaurants. Another format growing in popularity is the smaller-footprint discount grocer, typified by Aldi and Lidl, which offers a smaller selection of products—often private label—and has low overhead costs. Dollar stores have been taking share, too, with Dollar General DG **0.92%** ▲ expanding the number of stores with refrigerated and frozen foods in recent years.

Supermarkets and smaller-format grocers accounted for about 37% of Americans' total food spending in 1997. As of 2022 that was down to about a quarter of the total, according to the U.S. Department of Agriculture. By contrast, warehouse clubs and supercenters such as Costco and Walmart increased their share of food spending from 4% in 1997 to 10%. Restaurants and fast-

food restaurants, which accounted for 33.6% of households' food budgets in 1997, now account for 37.4% of their food spending. Data from Nielsen's NIQ shows that grocers (including supermarkets) and drugstores are the only two retail formats that lost food market share in the year ended May 2023 compared with the year-earlier period.

Supermarkets' share is most endangered in the so-called center aisle, where many competitors sell the same brands of toilet paper, cleaning materials and cereals, often at lower prices. They simply have more advantaged business models on those types of repeat purchases. Costco, for example, has a highly efficient operating model and leans on membership fees and sales volume rather than retail margins. Mass merchants such as Walmart and Target sell a mix of products—such as apparel and home products—with higher margins to compensate for low profits on consumables. Discount grocers, meanwhile, have smaller formats and a narrower selection of products, reducing overhead. And then there is the internet: It is difficult to beat the convenience of having repeat purchases delivered directly to consumers' doorsteps. Amazon has made these purchases stickier by offering discounts for households that opt to "subscribe and save."

Yet supermarkets have resisted reinventing their center aisle because they rely heavily on the money that national brands such as General Mills and J.M. Smucker pay them to promote their products, whether through in-store displays or coupons. So-called trade funding can account for more than a half of supermarkets' operating profits, according to Matthew Hamory, partner at consulting firm AlixPartners. Relying on that source of profit could start to work against

them. Manufacturers will naturally want to allocate more of those dollars to retailers growing the most sales volume, which recently have been big-box mass merchants like Walmart and warehouse clubs like Costco, according to Scott Mushkin, chief executive of industry research firm at R5 Capital.

A study published in 2016 by economist Peter Arcidiacono and others examining Walmart's impact on grocers in the 1990s and 2000s found that large, incumbent grocery chains competing directly suffered most from its entry, while businesses with completely different offerings—such as those with an ethnic or gourmet focus—actually expanded. And another study published by Lauren Chenarides and others in 2021 showed that when a discount grocer enters a market, sales actually increase for retailers nearby. This could be because consumers are drawn to the discounter as they search for low prices but then finish their shopping at the nearest retailers to find everything else they need. The key is to offer something big-box retailers and discount grocers can't.



Seafood in a refrigerator during the grand opening of a Costco Wholesale store in Kyle, Texas, in March. The likes of Costco, Walmart and Aldi have improved their offerings of produce, meats and seafood in recent years, further edging into the domain of supermarkets. PHOTO: JORDAN VONDERHAAR/BLOOMBERG NEWS

Supermarkets need to find that soon. Fresh products like produce, deli, meats and seafood, which typically account for around 40% of a supermarket's sales, were the categories where they had an edge. Competitors such as Walmart, Costco and Aldi have all gotten better at those in recent years, according to Mushkin. The share of shoppers that said mass-market retailers, such as

Walmart, or club retailers are their primary shopping channels rose to 42% this year from 29% in 2014, according to a report from food industry association FMI. The percentage of those choosing supermarkets declined to 38% from 52%.

For investors, this means looking for supermarket chains with clear differentiators, not incremental ones. H-E-B, a Texas-based chain that zeroed in on local, specialty items to outcompete Walmart, isn't publicly listed but is a good example: It was one of the few supermarket chains that grew market share since 2019, according to data from Numerator. Albertsons ACI **0.85%** ▲ , which has had a strategic focus on fresh produce in recent years, kept its market share flat over the same period. Organic-focused Sprouts Farmers Market SFM **1.19%** ▲ and Amazon-owned Whole Foods saw only slight drops in market share. By contrast, No. 1 supermarket chain Kroger's market share shrank to 10.7% in the first quarter from 12.4% in the same period in 2019, according to Numerator. It should get more firepower to invest if its proposed merger with Albertsons is approved by antitrust regulators, but it may take a radical makeover of its aisles to fend off competitors.

Write to Jinjoo Lee at jinjoo.lee@wsj.com

*Appeared in the July 22, 2023, print edition as 'The Stores Losing The Food Fight'.*

# DX SS83

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX S%&

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 2308

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX S%&##

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# 6J S%#*

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 2322

**ANALYSIS OF AGREEMENT CONTAINING CONSENT ORDER
TO AID PUBLIC COMMENT**

***In the Matter of The Golub Corporation and Tops Markets Corporation
File No. 211-0002, Docket No. C-4753***

## I.    INTRODUCTION AND BACKGROUND

The Federal Trade Commission ("Commission") has accepted for public comment, subject to final approval, an Agreement Containing Consent Orders ("Consent Agreement") from The Golub Corporation, which operates Price Chopper, Market 32, and Market Bistro stores (collectively, "Golub") and Tops Markets Corporation ("Tops") (collectively, the "Respondents").  Pursuant to an Agreement and Plan of Merger dated February 8, 2021, Golub and Tops intend to combine their businesses through a merger ("the Merger").  The Merger will result in a combined company with nearly 300 supermarkets across six states.  The purpose of the Consent Agreement is to remedy the anticompetitive effects that otherwise would result from the Merger.  Under the terms of the proposed Decision and Order ("Order"), Respondents are required to divest twelve supermarkets and related assets in eleven local geographic markets (collectively, the "relevant markets") in New York and Vermont to a Commission-approved buyer, C&S Wholesale Grocers ("C&S").  The Commission and Respondents have agreed to an Order to Maintain Assets that requires Respondents to operate and maintain each divestiture store in the normal course of business through the date the store is ultimately divested to C&S. The Commission also issued the Order to Maintain Assets.

The Commission's Complaint alleges that the Merger, if consummated, would violate Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the FTC Act, as amended, 15 U.S.C. § 45, by removing a direct and substantial supermarket competitor in each of the eleven relevant markets.  The elimination of this competition would result in significant competitive harm; specifically, absent a remedy, the Merger would allow the merged firm to increase prices above competitive levels, unilaterally or through coordinated interaction among the remaining market participants.  Similarly, there is significant risk that the merged firm may decrease quality and service aspects of its stores below competitive levels.  The proposed Order would remedy the alleged violations by requiring divestitures to replace competition that otherwise would be lost in the relevant markets because of the Merger.

The Consent Agreement has been placed on the public record for 30 days for receipt of comments from interested persons.  Comments received during this period will become part of the public record.  After 30 days, the Commission will review the comments received and decide whether it should withdraw, modify, or finalize the proposed Order.

## II.    THE RESPONDENTS

Respondent Golub owns and operates 131 grocery stores under the Price Chopper, Market 32, and Market Bistro banners.  The Golub stores are located in New York, Connecticut, Vermont, Massachusetts, New Hampshire, and Pennsylvania.



Respondent Tops owns and operates a supermarket chain with 162 stores under the Tops banner in New York, Pennsylvania, and Vermont.

## III.    RETAIL SALE OF FOOD AND OTHER GROCERY PRODUCTS IN SUPERMARKETS

The Merger presents substantial antitrust concerns for the retail sale of food and other grocery products in supermarkets.  Supermarkets are traditional full-line retail grocery stores that sell food and non-food products that customers regularly consume at home—including, but not limited to, fresh produce and meat, dairy products, frozen foods, beverages, bakery goods, dry groceries, household products, detergents, and health and beauty products.  Supermarkets also provide service options that enhance the shopping experience, including deli, butcher, seafood, bakery, and floral counters.  This broad set of products and services provides consumers with a "one-stop shopping" experience by enabling them to shop in a single store for all of their food and grocery needs.  The ability to offer consumers one-stop shopping is the critical difference between supermarkets and other food retailers.

The relevant product market includes supermarkets within "hypermarkets" such as Walmart Supercenters.  Hypermarkets also sell an array of products not found in traditional supermarkets.  Like conventional supermarkets, however, hypermarkets contain bakeries, delis, dairy, produce, fresh meat, and sufficient product offerings to enable customers to purchase all of their weekly grocery requirements in a single shopping visit.

Other types of retailers, such as hard discounters, limited assortment stores, natural and organic markets, ethnic specialty stores, and club stores, also sell food and grocery items.  These types of retailers are not in the relevant product market because they offer a more limited range of products and services than supermarkets and because they appeal to a distinct customer type.  Shoppers typically do not view these other food and grocery retailers as adequate substitutes for supermarkets.[1]  Consistent with prior Commission precedent, the Commission has excluded these other types of retailers from the relevant product market.[2]

The relevant geographic markets in which to analyze the effects of the Merger are localized areas in which Respondents' supermarkets compete.  Most of Respondents' overlapping supermarkets raising concerns are within approximately eight miles or less of each

---

[1] That is, supermarket shoppers would be unlikely to switch to one of these other types of retailers in response to a small but significant nontransitory increase in price or "SSNIP" by a hypothetical supermarket monopolist.  *See* U.S. DOJ and FTC Horizontal Merger Guidelines § 4.1.1 (2010).

[2] *See, e.g.*, Koninklijke Ahold N.V./ Delhaize Group, Docket C-4588 (Jul. 22, 2016); Cerberus Institutional Partners, L.P./Safeway, Inc., Docket C-4504 (Jul. 2, 2015); Bi-Lo Holdings, LLC/Delhaize America, LLC, Docket C-4440 (Feb. 25, 2014); AB Acquisition, LLC, Docket C-4424 (Dec. 23, 2013); Koninklijke Ahold N.V./Safeway Inc., Docket C-4367 (Aug. 17, 2012); Shaw's/Star Markets, Docket C-3934 (Jun. 28, 1999); Kroger/Fred Meyer, Docket C-3917 (Jan. 10, 2000); Albertson's/American Stores, Docket C–3986 (Jun. 22, 1999); Ahold/Giant, Docket C-3861 (Apr. 5, 1999); Albertson's/Buttrey, Docket C-3838 (Dec. 8, 1998); Jitney-Jungle Stores of America, Inc., Docket C-3784 (Jan. 30, 1998).  *But see* Wal-Mart/Supermercados Amigo, Docket C-4066 (Nov. 21, 2002) (the Commission's complaint alleged that in Puerto Rico, club stores should be included in a product market that included supermarkets because club stores in Puerto Rico enabled consumers to purchase substantially all of their weekly food and grocery requirements in a single shopping visit).

other. The contours of the relevant geographic markets depend on factors such as population density, traffic patterns, and other specific characteristics of each market. Where the Respondents' supermarkets are located in rural areas, the relevant geographic areas are larger than areas where Respondents' supermarkets are located in more densely populated cities.

Absent relief, of the eleven geographic markets, the Merger would result in a merger-to-monopoly in three markets and a merger-to-duopoly in four markets. In the remaining markets, the Merger would reduce the number of market participants from four to three in three markets and from five to four in one market.[3] Each relevant market would be highly concentrated following the Merger.

The Merger would also eliminate substantial competition between Golub and Tops and would increase the ability and incentive of the combined company to raise prices unilaterally after the Merger. The fact that few supermarket competitors will remain in each of these areas also increases the likelihood of competitive harm through coordinated interaction. The Merger would also decrease incentives to compete on non-price factors, such as service levels, convenience, and quality.

New entry or expansion in the relevant markets is unlikely to deter or counteract the anticompetitive effects of the Merger. Even if a prospective entrant existed, the entrant must secure an economically-viable location, obtain the necessary permits and governmental approvals, build its retail establishment or renovate an existing building, and open to customers before it could begin operating and serve as a relevant competitive constraint. As a result, new entry sufficient to achieve a significant market impact and act as a competitive constraint is unlikely to occur in a timely manner.

## IV.    THE PROPOSED ORDER AND THE ORDER TO MAINTAIN ASSETS

The proposed Order and the Order to Maintain Assets remedy the likely anticompetitive effects in the relevant markets. The proposed Order, which requires the divestiture of Tops supermarkets in each relevant market to a Commission-approved upfront buyer, C&S, will restore fully the competition that otherwise would be eliminated in these markets as a result of the Merger.

The proposed buyer appears to be a suitable purchaser that is well-positioned to enter the relevant markets through the divested stores and prevent the increase in market concentration and likely competitive harm that otherwise would have resulted from the Merger. The supermarkets currently owned by C&S are all located outside the relevant geographic markets in which it is purchasing divested stores.

C&S is the largest private wholesale grocery supply company and is the eleventh largest company in America. C&S has owned and operated retail stores in the past, including in certain of the relevant markets. C&S recently expanded its retail operations with the acquisition of eleven Piggly Wiggly Midwest retail stores, and hired a former retail grocery executive with significant retail experience to lead retail efforts. C&S has sufficient financing to fund the

---

[3] *See* Exhibit A.

acquisition and operate the business.  C&S also has sufficient distribution and supply capabilities through its wholesale business, which can efficiently supply the twelve stores.

The proposed Order requires Respondents to divest the twelve Tops stores and related assets as ongoing businesses to C&S on a rolling basis, beginning by January 17, 2022, and continuing (two stores per week) for six weeks.  The proposed Order also contains additional provisions designed to ensure the adequacy of the proposed relief.  For example, the proposed Order and the Order to Maintain Assets require Respondents to continue operating and maintaining the divestiture stores in the normal course of business until the date that each store is sold to C&S.  If, at the time before the proposed Order is made final, the Commission determines that C&S is not an acceptable buyer, Respondents must rescind the divestiture(s) and divest the assets to a different buyer that receives the Commission's prior approval.  The proposed Order imposes other terms, including the obligation to provide Transition Assistance to C&S as may be needed, an obligation to facilitate C&S's interviewing and hiring of employees, and the appointment of a Monitor to oversee the Respondents' compliance with the requirements of the proposed Order and Order to Maintain Assets.  The proposed Order requires the Respondents to receive the Commission's prior approval, for a period of ten years, to acquire any interest in a supermarket that has operated or is operating in the counties in which the relevant markets are located.  Finally, the proposed Order also prohibits the Respondents from entering into or enforcing agreements to restrict a new owner from operating a supermarket at any store Respondents may sell in these areas.

The proposed Order also contains a ten-year prior approval provision relating to C&S, which prohibits C&S from selling acquired stores for a period of three years after the Order is issued, except to an acquirer that receives the prior approval of the Commission.  The initial three-year period is followed by an additional seven-year period during which C&S is required to receive prior approval from the Commission to sell an acquired store to a buyer that operates one or more supermarkets in the same county.  Similar to the prohibition on Respondents, the proposed Order also prohibits C&S from entering into or enforcing certain restrictive covenants in any of relevant markets for the duration of the Order.

*     *     *

The purpose of this analysis is to facilitate public comment on the Consent Agreement and proposed Order to aid the Commission in determining whether it should make the proposed Order final.  This analysis is not an official interpretation of the proposed Order and does not modify its terms in any way.

**Exhibit A**

| State | City | Merger Result | Divested Store(s) |
|:---:|:---:|:---:|:---:|
| **NY** | Cooperstown<br>(Otsego County) | 2 to 1 | Tops 568 |
| **NY** | Cortland<br>(Cortland County) | 4 to 3 | Tops 517 |
| **NY** | Lake Placid/Saranac Lake<br>(Franklin County) | 3 to 2 | Tops 707 |
| **NY** | Norwich<br>(Chenango County) | 3 to 2 | Tops 569 |
| **NY** | Oneida/Sherrill<br>(Oneida County) | 3 to 2 | Tops 364 |
| **NY** | Owego<br>(Tioga County) | 2 to 1 | Tops 579 |
| **NY** | Plattsburgh/Peru<br>(Clinton County) | 5 to 4 | Tops 713 |
| **NY** | Rome<br>(Oneida County) | 4 to 3 | Tops 587 |
| **NY** | Warrensburg<br>(Warren County) | 2 to 1 | Tops 701 |
| **NY** | Watertown<br>(Jefferson County) | 4 to 3 | Tops 597, Tops 589 |
| **VT** | Rutland<br>(Rutland County) | 3 to 2 | Tops 740 |

5

# DX 2344

Case 3:24-cv-00347-AN    Document 237-1    Filed 08/12/24    Page 150 of 200



**FEDERAL TRADE COMMISSION**
PROTECTING AMERICA'S CONSUMERS

For Your Information

# FTC Approves Final Order Requiring Northeast Supermarkets Price Chopper and Tops Market Corp. to Sell 12 Stores as a Condition of Merger

January 24, 2022     

**Tags:** Competition    |    Bureau of Competition    |    Merger    |    Horizontal    |    Retail    |    Grocery/Supermarkets

Following a public comment period, the Federal Trade Commission has approved a final order settling charges that the merger of New York-based supermarket operators The Golub Corp., which owns the Price Chopper chain, and Tops Market Corp. would likely be anticompetitive in 11 local markets across upstate New York and Vermont.

Under the terms of the final settlement, the supermarket operators have agreed to divest 12 Tops supermarkets to C&S Wholesale Grocers. The order requires the parties to obtain the prior approval of the FTC before selling or acquiring supermarkets in the affected markets. The order also requires C&S Wholesale Grocers to obtain the prior approval of the FTC before selling any of the assets it is acquiring in this divestiture.

First announced in November 2021, the complaint alleged that the merger as proposed was likely to substantially lessen competition for the sale of grocery products in the New York communities of Cooperstown, Cortland, Oneida, Owego, Norwich, Warrensburg, Lake Placid, Rome, Watertown, and Plattsburgh; and in Rutland, Vermont. Under the order, the supermarket operators will divest one supermarket in each market except for Watertown, where they will divest two.

The Commission vote to approve the final order was 4-0.

DX 2344

The Federal Trade Commission works to [promote competition](#), and protect and educate consumers. The FTC will never demand money, make threats, tell you to transfer money, or promise you a prize. You can learn more about [how competition benefits consumers](#) or [file an antitrust complaint](#). For the latest news and resources, [follow the FTC on social media](#), [subscribe to press releases](#) and [read our blog](#).

**Press Release Reference**

[FTC Requires Northeast Supermarkets Price Chopper and Tops Market Corp. to Sell 12 Stores as a Condition of Merger](#)

## Contact Information

### Media Contact

[Betsy Lordan](#)
Office of Public Affairs
[202-326-2180](#)

### Staff Contact

Jeanne Nichols
Bureau of Competition
[202-326-3572](#)

Give Feedback

# DX 2357

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 2358

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 2359

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 2360

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 2361

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 2363

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 2364

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 2367

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 2375

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# 6J ϛ ""

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX S "#

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# 6J S "S

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX S "%

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX S "%

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 2057

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX S̲ "+

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 2511

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX S #S

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**



**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX $ $

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 2528

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 55+

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX S %

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX S %#

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 2552

Execution Version

---

# AGREEMENT AND PLAN OF MERGER

## BY AND AMONG

## ALBERTSONS COMPANIES, INC.

## THE KROGER CO.

## AND

## KETTLE MERGER SUB, INC.

### Dated as of October 13, 2022

---



3(b)-1
The Kroger Co.
November 3, 2022
CONFIDENTIAL

"Licensed Intellectual Property" has the meaning set forth in Section 4.17(b).

"Lien" means any mortgage, lien, statutory lien, charge, restriction (including restrictions on transfer), pledge, security interest, option, right of first offer or refusal, preemptive right, lease or sublease, claim, right of any third party, covenant, option, conditional sale or other title retention agreement, right of way, easement, encroachment or encumbrance of any kind.

"Material Divestment Event" means Parent, the Company or their respective Subsidiaries divesting (by way of sale, separation or otherwise), prior to, as of, or immediately following the Effective Time, in excess of 650 Stores (inclusive of the Stores divested by virtue of the Distribution to the extent the Distribution is consummated as of the Effective Time) in order to eliminate and resolve any and all impediments under Antitrust Laws with respect to the Transactions.

"Measurement Date" has the meaning set forth in Section 4.2(a).

"Merger" has the meaning set forth in the Recitals.

"Merger Consideration" means the Common Merger Consideration or the Preferred Merger Consideration, as applicable.

"Merger Sub" has the meaning set forth in the Preamble.

"Merger Sub Common Stock" has the meaning set forth in Section 3.1(a)(i).

"Merger Sub Board" has the meaning set forth in the Recitals.

"Modified Common Merger Consideration" means an amount in cash equal to (a) $34.10 *minus* (b) the per share amount of the Pre-Closing Dividend payable to each holder of Company Common Stock.

"Multiemployer Plan" means a multiemployer plan within the meaning of Section 3(37) or 4001(a)(3) of ERISA.

"NYSE" means the New York Stock Exchange.

"Open Source Software" means any Software that is subject to or licensed, provided or distributed under, any license meeting the Open Source Definition (as promulgated by the Open Source Initiative as of the date of this Agreement) or the Free Software Definition (as promulgated by the Free Software Foundation as of the date of this Agreement) or any similar license for "free," "publicly available" or "open source" Software, including the GNU General Public License, the Lesser GNU General Public License, the Apache License, the BSD License, Mozilla Public License (MPL), and the MIT License.

"Organizational Documents" means (a) with respect to a corporation, the charter, articles or certificate of incorporation, as applicable, and bylaws thereof, (b) with respect to a limited liability company, the articles of formation or organization or certificate of formation or organization, as applicable, and the operating or limited liability company agreement thereof, (c) with respect to a partnership (general or limited), the certificate of formation or partnership and the partnership agreement, and (d) with respect to any other Person the organizational, constituent or governing documents or instruments of such Person.

13

# DX 2623

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 625

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 2718

**Document Produced in Native Format**

Statista - 2024.05 - Grocery shopping by store brand

**Statistic as Excel data file**

Grocery shopping by store brand in the U.S. as of March 2024

Access data

**Source**

| | |
|---|---|
| Source | Statista Consumer Insights |
| Conducted by | Statista |
| Survey period | April 2023 to March 2024 |
| Region | United States |
| Type of survey | *n.a.* |
| Number of respondents | 10051 |
| Age group | 18-64 years |
| Special characteristics | *n.a.* |
| Note | Multiple answers were possible. During the survey, the question was phrased as follows: "From which of these stores do you regularly buy food and products for everyday use?" If you need more information, you can have a look at the Consumer Insights Methodology . |

**Publication**

| | |
|---|---|
| Published by | Statista |
| Publication date | May 2024 |
| Original source | Consumer Insights Global survey |
| ID | 997237 |

**Description**

We asked U.S. consumers about "Grocery shopping by store brand" and found that "Walmart" takes the top spot, while "Lidl" is at the other end of the ranking.

Find this and more survey data on grocery shopping by store brand in the U.S. in our Consumer Insights tool . Filter by countless demographics, drill down to your own, hand-tailored target audience, and compare results across countries worldwide.

**Grocery shopping by store brand in the U.S. 2024**
Grocery shopping by store brand in the U.S. as of March 2024

| | |
|---|---:|
| Walmart | 65 in % |
| Aldi | 26 in % |
| Target | 26 in % |
| Costco | 24 in % |
| Kroger | 23 in % |
| Sam's Club | 20 in % |
| Food Lion | 12 in % |
| Whole Foods Markets | 12 in % |
| Albertsons | 11 in % |
| BJ's | 11 in % |
| Safeway | 11 in % |
| Publix | 10 in % |
| Trader Joe's | 10 in % |
| ACME | 7 in % |
| H-E-B | 7 in % |
| Fred Meyer | 6 in % |
| Stop & Shop | 6 in % |
| Hy-Vee | 5 in % |
| Wegmans | 5 in % |
| Lidl | 3 in % |
| I do not buy food or products of everyday use | 2 in % |
| Other | 15 in % |

# DX S736

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX S738

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX S739

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 5740

**(Filed Under Seal)**

**Contains material designated CONFIDENTIAL or HIGHLY CONFIDENTIAL**

# DX 2838



UFCW Local 3000

**EX 0006**

P.S. 6.10.24

# Kroger, Albertsons Companies and C&S Wholesale Grocers, LLC Announce an Updated and Expanded Divestiture Plan

NEWS PROVIDED BY
**The Kroger Co.** →
Apr 22, 2024, 08:30 ET

*Amended Divestiture Plan Adds Stores, Facilities and Banner Names to Enhance Competition in Overlap Geographies and to Address Regulator Concerns*

CINCINNATI, April 22, 2024 /PRNewswire/ -- The Kroger Co. (NYSE: **KR**) and Albertsons Companies Inc. (NYSE: **ACI**) announced today that they have amended their definitive agreement with C&S Wholesale Grocers, LLC (C&S) for the sale of assets in connection with their **proposed merger** previously announced on October 14, 2022. This amended package modifies and builds on the **initial divestiture package** that was announced on September 8, 2023.

The amended divestiture package responds to concerns raised by federal and state antitrust regulators regarding the original agreement. The enhanced divestiture package includes a modified and expanded store set and additional non-store assets to further enable C&S to operate competitively following the completion of the proposed merger. The companies believe the amended divestiture package will bolster their position in regulatory challenges to the proposed merger, including pending court proceedings.

"We have reached an agreement with C&S for an updated divestiture package that maintains Kroger's commitments to customers, associates and communities, addresses concerns raised by regulators, and will further ensure that C&S can successfully operate the divested stores as

Oligario-006-001

they are operated today," said Rodney McMullen, Kroger's Chairman and CEO. "Importantly, the updated divestiture plan continues to ensure no stores will close as a result of the merger and that all frontline associates will remain employed, all existing collective bargaining agreements will continue, and associates will continue to receive industry-leading health care and pension benefits alongside bargained-for wages. Our proposed merger with Albertsons will bring lower prices and more choices to more customers and secure the long-term future of unionized grocery jobs."

The proposed merger will create meaningful and measurable benefits for America's consumers, Kroger and Albertsons Cos. associates, and communities that both Kroger and Albertsons Cos. serve by expanding access to fresh, affordable food and establishing a more compelling alternative to large, non-union retailers. This updated divestiture plan marks another next step toward the completion of the merger by adding a well-capitalized competitor into new geographies.

"We are confident this expanded divestiture package will provide the stores, supporting assets and expert operators needed to ensure these stores continue to successfully serve their communities for many generations to come," said Eric Winn, CEO of C&S. "C&S is a leader in the grocery industry, and we are excited for this expansion of our current retail business, which is a key part of our long-term growth strategy. We look forward to welcoming storied banners, quality private label brands, and a team of experienced retail associates into the C&S family. This amended agreement enables C&S's heritage of selection, value and customer service to continue our legacy of ***braggingly happy customers***."

## Transaction Details

The updated divestiture package increases the total store count by 166 to include 579 stores that will be sold to, and continue operating as they do today by the new owner, C&S.

It maintains the sale to C&S of the QFC, Mariano's and Carrs banner names. Under the amended agreement, Kroger will also sell the Haggen banner to C&S. Stores currently under these banners that are retained by Kroger will be re-bannered into one of the retained Kroger or Albertsons Cos. banners following the close of the transaction with C&S.

Under the amended agreement, C&S will license the Albertsons banner in California and Wyoming and the Safeway banner in Arizona and Colorado. In these states, Kroger will re-banner the retained Albertsons and Safeway bannered stores following the closing of the merger. Kroger will maintain the Albertsons and Safeway banners in the remaining states.

The number of stores contained in the divestiture plan by geography is as follows:

- WA: 124 Albertsons Cos. and Kroger stores
- CA: 63 Albertsons Cos. stores
- CO: 91 Albertsons Cos. stores
- OR: 62 Albertsons Cos. and Kroger stores
- TX/LA: 30 Albertsons Cos. stores
- AZ: 101 Albertsons Cos. stores
- NV: 16 Albertsons Cos. stores
- IL: 35 Albertsons Cos. and Kroger stores
- AK: 18 Albertsons Cos. stores
- ID: 10 Albertsons Cos. stores
- NM: 9 Albertsons Cos. stores
- MT/UT/WY: 11 Albertsons Cos. stores
- DC/MD/VA/DE: 9 Harris Teeter stores

The above stores (regardless of banner) will be sold by Kroger to C&S following the closing of the merger with Albertsons Cos.

In connection with the additional stores being conveyed to C&S, the updated divestiture package includes increased distribution capacity through a combination of different and larger facilities as well as expanded transition services agreements to support C&S and the addition of one dairy facility.

The amended divestiture package also expands the corporate and office infrastructure provided to C&S given the increased store set to ensure C&S can continue to operate the divested stores competitively and cohesively. All fuel centers and pharmacies associated with the divested stores will remain with the stores and continue to operate.

The amended agreement maintains the divestiture of private label brands Debi Lilly Design, Primo Taglio, Open Nature, ReadyMeals and Waterfront Bistro to C&S. The revised agreement also provides C&S with access to the Signature and O Organics private label brands.

The updated plan will:

- Extend a competitor to new geographies through the sale of stores to a well-capitalized buyer that is led by seasoned operators with a strong balance sheet and a sound business plan;
- Ensure that no stores will close as a result of the merger;
- Maintain all current collective bargaining agreements, which include industry-leading healthcare and pension benefits, bargained-for wages, and ensuring frontline associates remain employed; and
- Commit to invest in associates and stores for the long term.

Subject to fulfillment of customary closing conditions, including Federal Trade Commission and/or other governmental clearance, and the completion of the Kroger-Albertsons merger, C&S will pay Kroger an all-cash consideration of approximately $2.9 billion, including customary adjustments.

**Merger creates meaningful benefits for customers, associates and communities**

The proposed merger with Albertsons Cos. will produce meaningful and measurable benefits for customers, associates and communities across the country. The combined company committed that no stores, distribution centers or manufacturing facilities will close as a result of the merger.

Customers will benefit from lower prices and more choices following the merger close. Kroger committed to investing $500 million to begin lowering prices day one post-close, and an additional $1.3 billion to improve Albertsons Cos.' stores.

This commitment builds on Kroger's long track record of reducing prices every year, with $5 billion invested to lower prices since 2003. Customers will also have access to more favorite items from their own communities, as Kroger committed to increasing the number of local

products in its stores by 10 percent post-close. This merger creates more opportunities for families to access the fresh, affordable foods they love.

As a combined company, Kroger committed to investing $1 billion to raise wages and comprehensive benefits. This builds on the incremental $2.4 billion Kroger invested to improve wages and comprehensive benefits since 2018. To provide the best holistic support for each associate, the company will also extend continuing education and financial literacy benefits to all associates following the merger close. As union membership continues to decline nationwide, especially in the grocery industry, this merger is the best way to secure union jobs. Kroger has added more than 100,000 good-paying union jobs since 2012.

The proposed merger will allow the combined company to invest more deeply to end hunger in communities across America. In 2023, Kroger committed to donating 10 billion meals to families across the U.S. by 2030. Bringing these companies together provides one more step toward achieving communities that are free from hunger and food waste.

Kroger and Albertsons Cos. remain committed to defending the merger in court and unlocking the many benefits it offers.

Read more about the combined company's commitment to customers, associates and communities at **www.krogeralbertsons.com**

**About Kroger**

At The **Kroger** Co. (NYSE: **KR**), we are dedicated to our Purpose: To Feed the Human Spirit™. We are, across our family of companies nearly half a million associates who serve over 11 million customers daily through a seamless digital shopping experience and retail food stores under a variety of **banner names**, serving America through food inspiration and uplift, and creating #ZeroHungerZeroWaste communities by 2025. To learn more about us, visit our **newsroom** and **investor relations** site.

This press release contains certain statements that constitute "forward-looking statements" within the meaning of federal securities laws, including statements regarding the effects of the proposed transaction and updated divestiture plan. These statements are based on the assumptions and beliefs of Kroger and Albertsons management in light of the information

currently available to them. Such statements are indicated by words or phrases such as "create," "committed," "expand," "establish," "ensure," "enhance," "extend," "completion," "continue," and "will." Various uncertainties and other factors could cause actual results to differ materially from those contained in the forward-looking statements. These include the specific risk factors identified in "Risk Factors" in each of Kroger's and Albertsons' annual report on Form 10-K for the last fiscal year and any subsequent filings, as well as the following: the expected timing and likelihood of completion of the proposed transaction and updated divestiture plan, including the timing, receipt and terms and conditions of any required governmental and regulatory clearance of the proposed transaction and updated divestiture plan and/or resolution of pending litigation challenging the merger; the impact of the proposed updated divestiture plan; the occurrence of any event, change or other circumstances that could give rise to the termination of the updated divestiture agreement; the outcome of any legal proceedings that may be instituted against the parties and others following announcement of the merger agreement and proposed transaction or updated divestiture plan; the inability to consummate the proposed transaction or updated divestiture plan due to the failure to satisfy other conditions to complete the proposed transaction or updated divestiture plan; risks that the proposed transaction disrupts current plans and operations of Kroger and Albertsons Cos.; the ability to identify and recognize the anticipated benefits of the updated divestiture plan, including but not limited to the ability to enhance competition in overlap geographies and to address regulator concerns, create meaningful and measurable benefits for America's consumers, Kroger and Albertsons associates, and communities that both Kroger and Albertsons serve, expand access to fresh, affordable food and establish a more compelling alternative to large, non-union retailers, and commitment that all frontline associates will remain employed, all existing collective bargaining agreements will continue, and associates will continue to receive industry-leading health care and pension benefits alongside bargained-for wages; the ability of the combined company to achieve its commitment that no stores, distribution centers or manufacturing facilities will close as a result of the proposed transaction, to invest $500 million to begin lowering prices post-close, and an additional $1.3 billion to improve Albertsons Cos.' stores; the amount of the costs, fees, expenses and charges related to the proposed transaction or updated divestiture plan; and the ability of Kroger and Albertsons Cos. to successfully integrate their businesses and related operations; the ability of Kroger to maintain an investment grade credit rating; risks related to the potential impact of general economic, political and market factors on the

companies or the proposed transaction or updated divestiture plan. The ability of Kroger and Albertsons Cos. to achieve the goals for the proposed transaction may also be affected by their ability to manage the factors identified above.

The forward-looking statements by Kroger and Albertsons included in this press release speak only as of the date the statements were made. Neither Kroger nor Albertsons assumes the obligation to update the information contained herein unless required by applicable law. Please refer to the reports and filings of Kroger and Albertsons with the Securities and Exchange Commission for a further discussion of the risks and uncertainties that affect them and their respective businesses.

SOURCE The Kroger Co.