**Nadia H. Dahab**, OSB No. 125630
SUGERMAN DAHAB
101 SW Main Street, Ste. 910
Portland, OR 97204
Tel: (503) 228-6474
nadia@sugermandahab.com

**Amanda G. Lewis** (*pro hac vice*)
CUNEO GILBERT & LADUCA, LLP
4725 Wisconsin Avenue NW, Suite 200
Washington, DC 20016
Tel: (202) 789-3960
alewis@cuneolaw.com

**Christian Hudson** (*pro hac vice*)
CUNEO GILBERT & LADUCA, LLP
300 Cadman Plaza West, 12th Floor, Ste. 12060
Brooklyn, NY 11201
Tel: (202) 789-3960
christian@cuneolaw.com

*Attorneys for Amici Curiae*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| Federal Trade Commission et al.,<br><br>Plaintiffs,<br><br>v.<br><br>Kroger Company et al.,<br><br>Defendants. | Case No. 3:24-cv-00347-AN<br><br>**BRIEF OF *AMICI CURIAE* MEMBERS OF CONGRESS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

## TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* ................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 2

LEGAL STANDARD................................................................................ 3

ARGUMENT ............................................................................................ 6

I.  **The Commission is likely to prove that the proposed merger may substantially lessen competition in the relevant markets for unionized grocery labor and supermarkets**................................................................................**6**

    A.    The FTC correctly identified unionized grocery labor and supermarkets as markets in which the proposed merger may substantially lessen competition......6

    B.    The proposed merger arises in the context of a wider trend toward consolidation and reduced competition in the supermarket industry…..……....10

    C.    Experience with past mergers in the supermarket industry indicates that Kroger's proposed acquisition of Albertsons is likely to result in similar harms………………………………………………………......…….11

II.  **The equities weigh heavily in favor of granting the FTC's requested relief**………...**17**

    A.    Although the Commission does not have to prove irreparable harm, allowing the merger to proceed would cause irreparable harm to consumers and workers………………………………………………..…….17

    B.    The proposal to divest stores to C&S is unlikely to be successful in maintaining current level of competition………………………......…………20

    C.    If the Commission ultimately finds that the merger is illegal, unscrambling the eggs would be difficult, if not impossible………………......……………24

    D.    The proposed merger is unlikely to result in any meaningful offsetting benefits to consumers, workers, or the public in general……………….............25

    E.    Any claimed private equities on behalf of Kroger and Albertsons pale in comparison to the likely harm to consumers and workers…....................25

**CONCLUSION**..................................................................................... **25**

## TABLE OF AUTHORITIES

**Cases**

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962) ........................................................................................ 4, 5, 8

*California v. Am. Stores Co.*,
   495 U.S. 271 (1990) ................................................................................................. 5

*FTC v. Elders Grain, Inc.*,
   868 F.2d 901 (7th Cir. 1989) ................................................................................... 5

*FTC v. Penn St. Hershey Med. Ctr.*,
   838 F.3d 327 (3rd Cir. 2016) ................................................................................... 4

*FTC v. Simeon Mgmt. Corp.*,
   532 F.2d 708 (9th Cir. 1976) ................................................................................... 4

*FTC v. Sysco Corp.*,
   113 F. Supp. 3d 1 (D. D. C. 2015) ................................................................... 20, 25

*FTC v. Warner Commc'ns*,
   742 F.2d 1156 (9th Cir. 1984) .............................................................................. 4, 5

*FTC v. Whole Foods Mkt., Inc.*,
   548 F.3d 1028 (D.C. Cir. 2008) ............................................................................ 4, 5

*Saint Alphonsus Med. Ctr.-Nampa v. St. Luke's*,
   778 F.3d 775 (9th Cir. 2015) ................................................................................... 5

*United States v. Bertelsmann SE & Co. KGaA*,
   646 F. Supp. 3d 1 (D.D.C. 2022) .................................................................. 4, 6, 7, 8

*United States v. Pabst Brewing*,
   384 U.S. 546 (1966) ............................................................................................... 10

**Statutes**

Clayton Act,
   15 U.S.C. § 18 ................................................................................................ 3, 4, 5, 6

Federal Trade Commission Act,
   15 U.S.C. § 53(b) ..................................................................................................... 3

 **Congressional Materials**

H.R. Rep. No. 93-624, at 31 (1973) (Conf. Rep.),
   *as reprinted in* 1973 U.S.C.C.A.N. 2417, 2533 .................................................. 4, 5

Letter from Rep. Barbara Lee & Rep. Pramila Jayapal, Members of Cong. et al.,
   to Lina Khan, Chair, Fed. Trade Comm'n (Dec. 12, 2023)...................................... 11

Letter from Rep. Pramila Jayapal & Rep. Jerrold Nadler, Members of Cong. et al.,
   to Lina Khan, Chair, Fed. Trade Comm'n (Nov. 21, 2022) ............................... 12, 16

Letter from Sen. Lisa Murkowski & Sen. Dan Sullivan, Alaskan Senators,
   to Lina Khan, Chair, Fed. Trade Comm'n (Sept. 22, 2023)..................................... 21

Letter from Sen. Ron Wyden, Member of Cong.,
   to Lina Khan, Chair, Fed. Trade Comm'n (Dec. 15, 2023)...................................... 14

**Press Releases**

Press Release, Bob Ferguson, AG Ferguson Files Lawsuit to Block Kroger-Albertsons
   Merger (Jan. 15, 2024) ........................................................................................... 12

Press Release, Fed. Trade Comm'n, FTC Challenges Kroger's Acquisition
   of Albertsons (Feb. 26, 2024).................................................................................. 17

Press Release, Phil Weiser, Colorado Attorney General Phil Weiser Files Lawsuit to

Block Proposed Kroger/Albertsons Merger (Feb. 14, 2024)....................................... 12
Press Release, U.S. Dep't of Just., Justice Department Sues to Block Penguin Random
House's Acquisition of Rival Publisher Simon & Schuster (Nov. 2, 2021) .............................. 7
Press Release, UFCW Local 770, UFCW Locals Press Conference on
Kroger-Albertsons Merger (July 11, 2024) ................................................................. 20

**Federal and State Agency Materials**
Fed. Trade Comm'n & Dep't of Just.,
Merger Guidelines § 1 (2023) ...................................................................... passim
Oregon Health Authority,
Kroger-Albertsons Community Review Board Summary Report (2024) ................................. 21
U.S. Dep't. of Agric., Econ. Rsch. Rep., No. (ERR-314): *A Disaggregated View of*
*Market Concentration in the Food Retail Industry* (2023)........................................ 10

**Other Authorities**
Am. Econ. Liberties Project., Comment Letter on Fed. Trade Comm'n
Draft Merger Guidelines (Sept. 18, 2023)............................................................. 15
Amy McCarthy & Jaya Saxena, *A Kroger-Albertsons Merger Would Be Bad for*
*Almost Everyone*, Eater (Feb. 27, 2024)......................................................... 19, 20
Ben Zipper, *Kroger-Albertsons Merger Will Harm Grocery Store Workers Wages*,
Econ. Pol'y Inst. (May 1, 2023) ..................................................................... 23
Brent Kendall, *Haggen Struggles After Trying to Digest Albertsons Stores*,
Wall St. J. (Oct. 9, 2015) ........................................................................... 14
Eric Peterson, *Sale of Grand Union Stores Finally Closes*, Globest (Mar. 6, 2001)..................... 27
*Examining the Competitive Impact of the Proposed Kroger-Albertsons Transaction*,
Before the S. Subcomm. on Competition Pol'y, Antitrust, & Consumer Rts.
117th Cong. 5 (2022).............................................................................. 26, 28
Gretchen Morgenson, *'Cash Grab?' Wealthy Investors Will Reap Billions if Kroger*
*Takes Over Albertsons. Workers and Shoppers May Be Less Happy*,
NBC News (Nov. 5, 2022) ............................................................................ 20
Ioana Marinescu & Herbert J. Hovenkamp, *Anticompetitive Mergers in Labor Markets*,
94 Ind. L. Rev. 1031 (2019) ......................................................................... 7
John Kwoka, *Conduct Remedies, With 2020 Hindsight: Have We Learned the*
*Last Decade?* 5 Competition Pol'y Int'l (Apr. 20, 2020)...................................... 14, 16, 27
Jon Springer, *Deep South*, Supermarket News (Nov. 27, 2006) ......................................... 28
Jon Talton, *Haggen: What Went Wrong?*, Seattle Times (Mar. 15, 2016) ................................ 18
Kevin Smith, *Employees Speak Out Against Proposed Kroger/Albertsons Merger*,
L.A. Daily News (Jan. 26, 2024)..................................................................... 19
Krista Brown, *Supermarket Squeeze: The Real Costs of the Kroger and Albertsons Deal*,
Am. Econ. Liberties Project (Nov. 2023)......................................................... 13, 15
Leah Nylen & Christopher Cannon, *Kroger-Albertsons Deal is Haunted by*
*'Spectacular' Past Failure*, Bloomberg (July 17, 2024)........................................ 16, 17
Lina Khan & Sandeep Vaheesan, *Market Power and Inequality: The Antitrust*
*Counterrevolution and Its Discontents*, 11 Harv. L. & Pol'y Rev. 235 (2017) ...................... 14
Marshall Steinbaum, *Evaluating the Competitive Effect of the Proposed*
*Kroger-Albertsons Merger in Labor Markets 1*, Univ. of Utah (2023) ........................... passim
Nina Lakhani et al., *Investigation Shows Scale of Big Food Corporations'*
*Market Dominance and Political Power*, Guardian (July 14, 2021)................................. 12
Paul Roberts, *In Seattle, Kroger-Albertsons Merger Raises Fears of Closures*,

*'Grocery Deserts'*, Seattle Times (Oct. 19, 2022)..................................................16

Paul Roberts, *Kroger-Albertsons Deal Would Remake Seattle-Area Grocery Map*,
   Seattle Times (July 15, 2024) ...................................................................29

Steven Salop, *The Purchase of Unionized Labor is a Relevant Buyer-Side Market
   in the Kroger-Albertsons Merger*, ProMarket (Mar. 6, 2024)..............................11

*Stop the Merger Coalition of UFCW Locals Holds Press Conference Following
   Kroger and Albertsons' Announcement of Proposed Divested Stores*,
   UFCW Local 400 (July 11, 2024) ..............................................................23

*The Friday Checkout: Is C&S Wholesale Grocers Fit to Run Assets Kroger,
   Albertsons Want to Divest?*, Grocery Dive (Feb. 16, 2024).................................25

Tom Banse, *'Rapid Response Teams' Organized For Mass Layoffs At Haggen
   Grocery Stores*, Jefferson Pub. Radio (Sept. 30, 2015)....................................19

*UFCW Local Unions Applaud the FTC Decision to Reject Kroger and Albertsons
   Proposed Megamerger*, UFCW Local 400 (Feb. 27, 2024).................................10

*Union Files Grievance Charges Against Haggen, Vons and Albertsons*,
   Progressive Grocer (Aug. 25, 2015)..........................................................17

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are 28 Members of Congress—4 Senators and 24 Members of the House of Representatives, representing 16 states.  (*See* Appendix A for list of *amici*.)  As Members of Congress, *amici* are uniquely positioned to inform the Court about the impact the proposed acquisition of Albertsons Companies, Inc. ("Albertsons") by The Kroger Company ("Kroger") (the "proposed merger" or "proposed acquisition") will have on their communities.  *Amici* have received thousands of constituent communications expressing concerns about this merger by email, phone, letter, and in-person at town halls.  *Amici*'s familiarity and frequent interactions with the communities they represent offer valuable perspective and insight as to the needs, concerns, and priorities of their constituents.  *Amici* are also well positioned to discuss the negative effects of previous supermarket mergers in their states and districts.

Furthermore, several *amici* have special expertise and knowledge of U.S. antitrust law and policy.  Congresswoman Jayapal has been a leader on these issues, having served as a member of the House Judiciary Committee Subcommittee on the Administrative State, Regulatory Reform, and Antitrust (previously the Subcommittee on Antitrust, Commercial and Administrative Law) since 2017, and Vice Chair of the Subcommittee in the 117th Congress. Subcommittee membership entails gaining expertise on the history, purpose, and intent of U.S. antitrust law, investigating alleged anticompetitive mergers and conduct throughout the economy, engaging in oversight of antitrust enforcement agencies, and developing legislation to improve and encourage robust enforcement of our antitrust laws.  Representatives Balint, Johnson, and Lieu are also members of the Subcommittee, and Representative Nadler has

---

[1]    This brief was not authored in whole or part by counsel for a party. No one other than *amici curiae* or their counsel made a monetary contribution to preparation or submission of this brief.

worked on antitrust issues as Chair and Ranking Member of the House Judiciary Committee since the 115th Congress.

Representative Schakowsky served as Chair of the Consumer Protection Subcommittee on the Energy and Commerce Committee in previous sessions of Congress; in that position, Representative Schakowsky led efforts to protect consumers from unfair business practices. Senator Wyden is Chair of the Senate Finance Committee. And Senator Cantwell chairs the Senate Committee on Commerce, Science, and Transportation, which has jurisdiction over the Federal Trade Commission (the "FTC" or "Commission") and other matters of interstate commerce.

Several *amici* also have special expertise with labor issues, including Representative Jayapal, who is a member of the Education and Labor Committee. Representatives Jayapal, Balint, Blunt Rochester, Budzinski, Bush, Casar, García, Hoyle, Johnson, Lee, Lieu, Ocasio-Cortez, Porter, Schakowsky, Schiff, Tlaib, Watson Coleman, and Williams are all members of the House Labor Caucus. These members have particular knowledge and expertise on labor law and policy.

## INTRODUCTION AND SUMMARY
## OF ARGUMENT

*Amici curiae* file this brief in support of the motion for injunctive relief filed by the Federal Trade Commission and the States of Arizona, California, Illinois, Maryland, Nevada, New Mexico, Oregon, and Wyoming and the District of Columbia, by and through their respective Attorneys General (collectively, "Plaintiffs") to halt Kroger's proposed acquisition of Albertsons. *Amici* file this brief to protect their constituents—the consumers and workers who live and work in the communities they represent—who will suffer irreparable harm if the Court denies Plaintiffs' motion. In particular, *amici* emphasize that the FTC's claims relating to

relevant markets for unionized grocery labor are supported by the antitrust laws, congressional intent, and the facts of this case.

Under Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b) (the "FTC Act"), the Court is obligated to stop Kroger from proceeding with the merger to (i) allow for the Commission to carry out its duty to fully litigate the lawfulness of the merger through an administrative proceeding pursuant to its express authority under Section 5 of the FTC Act; and (ii) preserve the Commission's ability to order effective relief if the merger is ultimately found to be illegal, as it should be, under Section 7 of the Clayton Act, 15 U.S.C. § 18 (the "Clayton Act"), and Section 5 of the FTC Act.

The Commission has met its burden of raising serious and substantial questions as to whether the proposed merger may substantially lessen competition in the relevant markets for unionized grocery labor and supermarkets. *Amici*'s experience with past mergers indicates that Kroger's acquisition of Albertsons is likely to result in similar harms, which will not be remedied by the proposed divestitures to C&S Wholesale Grocers, LLC ("C&S"). Although the FTC is not required to demonstrate irreparable harm, injunctive relief is necessary here to prevent immediate harm to consumers and workers. The public interest in effective enforcement of the antitrust laws as well as the prevention of harm to *amici*'s constituents weigh heavily in favor of granting the requested injunctive relief. *Amici* therefore urge this Court to grant Plaintiffs' motion for a preliminary injunction.

## LEGAL STANDARD

Under Section 13(b) of the FTC Act, the Commission may seek preliminary injunctive relief to halt the execution of a merger. Such relief is "meant to be readily available to preserve the status quo while the FTC develops its ultimate case" and determines the legality of the

merger through a full trial on the merits in an administrative proceeding. *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1036 (D.C. Cir. 2008); *see also FTC v. Penn St. Hershey Med. Ctr.*, 838 F.3d 327, 352 (3rd Cir. 2016). Congress enacted this provision for this very purpose. *See* H.R. Rep. No. 93-624, at 31 (1973) (Conf. Rep.), *as reprinted in* 1973 U.S.C.C.A.N. 2417, 2533.

Section 13(b) provides that a court must "1) determine the likelihood that the Commission will ultimately succeed on the merits and 2) balance the equities" in determining whether to grant a preliminary injunction. *FTC v. Warner Commc'ns*, 742 F.2d 1156, 1160 (9th Cir. 1984) (citing *FTC v. Simeon Mgmt. Corp.*, 532 F.2d 708, 713-14 (9th Cir. 1976)). The FTC meets its burden for the first prong of that standard if it "raise[s] questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals." *Warner*, 742 F.2d at 1162 (internal citations and quotation marks omitted).

Notably, Section 7 of the Clayton Act prohibits mergers "the effect of" which "may be substantially to lessen competition." 15 U.S.C. § 18. "Section 7 was designed to arrest anticompetitive tendencies in their incipiency." Fed. Trade Comm'n & Dep't of Just., Merger Guidelines § 1 (2023) [hereinafter Merger Guidelines]. "Congress 'sought to assure . . . the courts the power to brake this force at its outset and before it gathered momentum.'" *United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1, 22 (D.D.C. 2022) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 317–18 (1962)).

"Section 7 itself creates a relatively expansive definition of antitrust liability: To show that a merger is unlawful, a plaintiff need only prove that its effect '*may be* substantially to lessen competition.'" *California v. Am. Stores Co.*, 495 U.S. 271, 284 (1990) (quoting 15 U.S.C.

§ 18) (emphasis added) (citing _Brown Shoe_, 370 U.S. at 323). The language of the statute conveys Congress's concern with "probabilities, not certainties." _Brown Shoe_, 370 U.S. at 323; _see also Saint Alphonsus Med. Ctr.-Nampa v. St. Luke's_, 778 F.3d 775, 783 (9th Cir. 2015) ("Because § 7 of the Clayton Act bars mergers whose effect 'may be substantially to lessen competition, or to tend to create a monopoly,' 15 U.S.C. § 18, judicial analysis necessarily focuses on 'probabilities, not certainties.'") (quoting _Brown Shoe_, 370 U.S. at 323). Lastly, because Section 7 requires only "a prediction" about the impact of a merger, "doubts are to be resolved against the transaction." _FTC v. Elders Grain, Inc._, 868 F.2d 901, 906 (7th Cir. 1989).

As for weighing the equities, under the second prong, "Section 13(b) places a lighter burden on the Commission than that imposed on private litigants by the traditional equity standard." _Warner_, 742 F.2d at 1159. Thus, "the Commission need not show irreparable harm to obtain a preliminary injunction." _Id._ (citing H.R. Rep. No. 93-624, at 31 (1973) (Conf. Rep.), _as reprinted in_ 1973 U.S.C.C.A.N. 2417, 2533). "The public interest in effective enforcement of the antitrust laws was Congress's specific public equity consideration in enacting" Section 13(b). _Whole Foods Mkt., Inc._, 548 F.3d at 1035 (internal quotation marks omitted). Another key public equity consideration is preservation of the FTC's ability to order "effective relief if the Commission ultimately prevails" in its proceedings on the merits. _Warner_, 742 F.2d at 1165. "Although private equities may be considered, public equities receive far greater weight." _Id._

Page 5 - BRIEF OF _AMICI CURIAE_ MEMBERS OF CONGRESS IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**ARGUMENT**

I.    **The Commission is likely to prove that the proposed merger may substantially lessen competition in the relevant markets for unionized grocery labor and supermarkets.**

      A.    **The FTC correctly identified unionized grocery labor and supermarkets as markets in which the proposed merger may substantially lessen competition.**

The FTC correctly identified the relevant markets in which the proposed merger may substantially lessen competition.  Consistent with the law and the facts on the ground, the relevant markets include (i) the labor market for unionized grocery workers, and (ii) supermarkets.

        1.    **Section 7 of the Clayton Act protects workers by prohibiting anticompetitive mergers of competing employers.**

The FTC correctly focused their case, in part, on the proposed merger's likely harm to unionized grocery workers because the Clayton Act prohibits mergers in *any* market where the effect "may be substantially to lessen competition, or tend to create a monopoly," including labor markets.  15 U.S.C. § 18.  Although federal agencies more frequently challenge mergers that threaten harm to consumers, Section 7 of the Clayton Act protects workers from mergers of competing employers to the same degree that the law protects consumers from mergers of competing sellers.  Merger Guidelines § 2.10 ("The same general concerns as in other markets apply to labor markets where employers are the buyers of labor and workers are the sellers."); *see also* <u>Bertelsmann</u>, 646 F. Supp. 3d at 22, n. 13 (summarizing authority in support of applying same legal framework for assessing mergers among competing buyers as among competing sellers).  The application of the Clayton Act to all markets, including for the purchase and sale of labor, is consistent with the statute's broad scope reflected in its plain language, subsequent interpretations by courts, and the policy goals of U.S. antitrust law.  *See, e.g.*, Ioana Marinescu & Herbert J. Hovenkamp, *Anticompetitive Mergers in Labor Markets*, 94 Ind. L. Rev. 1031, 1033

(2019) (noting that "[t]he antitrust laws pertaining to mergers do not distinguish between seller side and buyer side competitive harm," and "the Clayton Act merger law was drafted so as to apply to anticompetitive mergers by both sellers and buyers").

Over the past decade, Federal antitrust agencies have challenged several mergers of competing buyers. In 2021, for example, DOJ challenged Penguin Random House's proposed merger with Simon & Schuster based entirely on harm to a relevant labor market (the loss of competition between two publishers for authors' work). *Bertelsmann*, 646 F. Supp. 3d 1. The DOJ alleged that if the publishers merged, their increased market power would reduce competition in the labor market for authors and allow the publishers to pay them less for their work. The court agreed with DOJ that the labor market set forth in the complaint was a relevant market, and that a merger resulting in reduced competition in that market was illegal. The court permanently enjoined the deal in a decision that, as Assistant Attorney General Kanter said, "reaffirm[ed] that the antitrust laws protect competition for the acquisition of goods and services from workers." Press Release, U.S. Dep't of Just., Justice Department Sues to Block Penguin Random House's Acquisition of Rival Publisher Simon & Schuster (Nov. 2, 2021), https://perma.cc/Y283-9L36.

### 2. The FTC's approach to market definition is consistent with workers' experience.

Unionized grocery labor is an important and distinct relevant market for which the merger is likely to substantially lessen competition. *Amici* have significant knowledge of and familiarity with how their constituents interact with supermarkets in their communities, both as consumers and workers. In this case, the practical experience of *amici's* constituents demonstrates (i) that non-union jobs are so thoroughly differentiated from union jobs that they are not a meaningful alternative, and (ii) non-union employer wages and other benefits are

largely irrelevant to the labor union's negotiations with union employers.  It follows that union grocery jobs are an appropriate and relevant market in which to assess the anticompetitive effects of this merger.  The Commission's market definition approach is consistent with *amici*'s understanding of how their constituents engage in collective bargaining and is consistent with the law.

Courts evaluate relevant product markets in monopsony cases, involving mergers of competing buyers, in part "by considering qualitative, 'practical indicia' as described by the Supreme Court in the *Brown Shoe* case," *Bertelsmann*, 646 F.Supp. 3d at 25 (quoting *Brown Shoe*, 370 U.S. at 325).  The Merger Guidelines instruct that just like buyers of a product may consider products to be differentiated according to the brand or the identity of the seller, suppliers of a service (workers) may consider different buyers (employers) to be differentiated.  Merger Guidelines § 4.3.D.8.  In evaluating relevant labor markets, it is appropriate to consider differentiation among types of jobs; this includes different wages, working conditions, and whether the workers are represented by a union.  *Id.* (An analogous example is instructive: "[I]f the suppliers are contractors, they may have distinct preferences about who they provide services to, due to different working conditions, location, reliability of buyers in terms of paying invoices on time, or the propensity of the buyer to make unexpected changes to specifications." *Id.*).  Many of *amici*'s constituents are unionized workers, and they strongly differentiate non-union from union jobs.  *See also* Marshall Steinbaum, *Evaluating the Competitive Effect of the Proposed Kroger-Albertsons Merger in Labor Markets 1*, Univ. of Utah (2023) [hereinafter Steinbaum, *Evaluating the Competitive Effect*] (noting that "seniority-driven employment benefits, such as health insurance and pension benefits, all accrue across employment spells at [Kroger and Albertsons], under their union contract(s), but not across employment spells at non-

signatories to collective bargaining agreements"). Simply put, a non-union grocery job is not a reasonable alternative to a union grocery job.

The merger will increase Kroger's and Albertsons' market power specifically over unionized workers. This is, in part, because the wages and working conditions of non-union employees are largely irrelevant to the bargaining dynamics between union workers and their employers. The proposed acquisition would affect more than 100,000 union workers currently employed by one of these companies, many of whom are represented by the United Food and Commercial Workers International Union (UFCW). *UFCW Local Unions Applaud the FTC Decision to Reject Kroger and Albertsons Proposed Megamerger*, UFCW Local 400 (Feb. 27, 2024), https://www.ufcw400.org/2024/02/27/ufcw-local-unions-applaud-the-ftc-decision-to-reject-kroger-and-albertsons-proposed-megamerger/.

Critically, in evaluating unionized labor, "the source of worker power isn't the availability of outside job offers" but rather "the power of their union to negotiate" on their behalf. Steinbaum, *Evaluating the Competitive Effect* at 8. UFCW currently negotiates wages, benefits, and other workplace conditions on behalf of most of Kroger's and Albertsons' workers, many of whom are also *amici*'s constituents. The union's leverage in negotiations is largely based on playing the competing grocery chains (*i.e.*, Kroger and Albertsons) against each other for better wages and working conditions, where each company has different risk assessments and varied willingness to accept strikes or other labor action. *See id.*; *see also* Steven Salop, *The Purchase of Unionized Labor is a Relevant Buyer-Side Market in the Kroger-Albertsons Merger*, ProMarket (Mar. 6, 2024), https://www.promarket.org/2024/03/06/the-purchase-of-unionized-labor-is-a-relevant-buyer-side-market-in-the-kroger-albertsons-merger/. In negotiations, a supermarket chain that employs most of the unionized workers in a given geography could

employ a "take-it-or-leave it offer to the union," leaving the union nowhere else to go.

Steinbaum, *Evaluating the Competitive Effect* at 8.  Absent competition for grocery workers'

labor, a firm with this level of market power would have little incentive to agree to a labor

union's request for improved wages or working conditions.

      **B.**      **The proposed merger arises in the context of a wider trend toward
consolidation and reduced competition in the supermarket industry.**

According to the Supreme Court, "a trend toward concentration in an industry, whatever

its causes, is a highly relevant factor in deciding how substantial the anti-competitive effect of a

merger may be." *United States v. Pabst Brewing*, 384 U.S. 546, 552-53 (1966).  The Merger

Guidelines similarly explain that "[i]f an industry has gone from having many competitors to

becoming concentrated, it may suggest greater risk of harm" from an individual merger.  Merger

Guidelines § 2.7.  The trend toward consolidation among supermarkets, through which the retail

grocery market has become highly concentrated over the last thirty years, indicates a greater risk

of harm from any proposed merger in the retail grocery market, including this one.  *See* U.S.

Dep't. of Agric., Econ. Rsch. Rep., No. (ERR-314): *A Disaggregated View of Market
Concentration in the Food Retail Industry* (2023).

Here, the proposed merger is part of an alarming trend toward consolidation in the

supermarket industry.  A 2023 United States Department of Agriculture (USDA) report

concluded that the food retail sector has experienced substantial consolidation over the last three

decades.  *Id.*  Today, the U.S. has one-third fewer grocery stores than it did 25 years ago.  Nina

Lakhani et al., *Investigation Shows Scale of Big Food Corporations' Market Dominance and
Political Power*, Guardian (July 14, 2021), https://www.theguardian.com/environment/ng-
interactive/2021/jul/14/food-monopoly-meals-profits-data-investigation.  This consolidation

trend leads to harmful effects for consumers, workers, and suppliers.  First, for consumers, this

consolidation often results in higher prices, less choice, and lower quality. For workers, industry

consolidation has led to job loss, lower wages, and worse working conditions. As several *amici*

previously observed, "past mergers have left some regions with just a single major employer,

who, holding monopsony power, can impose lower wages and benefits than the unions achieve in

regions where there are several employers that the union negotiators can negotiate with." Letter

from Rep. Barbara Lee & Rep. Pramila Jayapal, Members of Cong. et al., to Lina Khan, Chair,

Fed. Trade Comm'n (Dec. 12, 2023), https://lee.house.gov/imo/media/doc/kroger_merger_letter.pdf.

Third, as supermarket chains have grown, their buyer power over suppliers has also grown,

putting a squeeze on suppliers like farmers and disadvantaging smaller, independent grocers.

Krista Brown, *Supermarket Squeeze: The Real Costs of the Kroger and Albertsons Deal*, Am.

Econ. Liberties Project (Nov. 2023), https://www.economicliberties.us/wp-

content/uploads/2023/11/20231109-AELP-Supermarket-Brief_v3.pdf [hereinafter *Supermarket*

*Squeeze*].

    **C.**    **Experience with past mergers in the supermarket industry indicates that Kroger's proposed acquisition of Albertsons is likely to result in similar harms.**

        **1.**    **The 2015 Albertsons-Safeway Merger and so-called divestiture "remedy" was a "spectacular failure" resulting in store closures and harm to communities.**

There is widespread and bipartisan agreement that allowing Safeway to acquire

Albertsons in 2015 subject to a divestiture remedy was a mistake with disastrous consequences.

Albertsons and Safeway agreed to divest nearly 150 of their stores to Haggen, a small, regional

chain. Haggen's acquisition and subsequent operation of these stores was intended to restore any

lost competition. Instead, Haggen filed for bankruptcy in less than a year, negatively affecting

workers and consumers. As several *amici* observed, rather than serving as an effective remedy,

the divestiture "had a disastrous effect on workers and consumers."  Letter from Rep. Pramila

Jayapal & Rep. Jerrold Nadler, Members of Cong. et al., to Lina Khan, Chair, Fed. Trade

Comm'n (Nov. 21, 2022), https://perma.cc/DZD9-HQXS [hereinafter Jayapal & Nadler Letter].

Within two years of the Albertsons-Safeway merger, a consensus began to emerge that

the divestiture was a "spectacular failure[]."  *See, e.g.*, Lina Khan & Sandeep Vaheesan, *Market*

*Power and Inequality: The Antitrust Counterrevolution and Its Discontents*, 11 Harv. L. & Pol'y

Rev. 235, 288 (2017); Brent Kendall, *Haggen Struggles After Trying to Digest Albertsons Stores*,

Wall St. J. (Oct. 9, 2015), https://www.wsj.com/articles/haggen-struggles-after-trying-to-digest-

albertsons-stores-1444410394 (antitrust remedies expert Professor John Kwoka observed that it

"failed spectacularly"); Press Release, Bob Ferguson, AG Ferguson Files Lawsuit to Block

Kroger-Albertsons Merger (Jan. 15, 2024), https://perma.cc/B55N-L7EP (detailing "Albertsons'

failed divestiture of Washington-based stores to a[n] . . . unqualified buyer"); Press Release, Phil

Weiser, Colorado Attorney General Phil Weiser Files Lawsuit to Block Proposed

Kroger/Albertsons Merger (Feb. 14, 2024), https://coag.gov/2024/colorado-attorney-general-

phil-weiser-files-lawsuit-to-block-proposed-kroger-albertsons-merger/ (telling cautionary tale of

"Albertsons/Safeway merger, where stores closed, jobs were lost, consumers suffered, and the

divestiture failed miserably to preserve competition") (internal quotation marks omitted).

The divestiture to Haggen failed because: (i) Haggen was not a suitable buyer; and (ii)

Haggen's success in operating the stores depended in part on Albertsons' cooperation with

Haggen (a competitor) up to and through the transition period, as well as good faith adherence to

FTC-mandated safeguards.  When Haggen acquired most of the divested stores, the small

retailer's store count increased ten-fold overnight (from 18 to 146).  Am. Econ. Liberties

Project., Comment Letter on Fed. Trade Comm'n Draft Merger Guidelines at 12 (Sept. 18,

2023), https://www.economicliberties.us/wp-content/uploads/2023/09/2023-09-18-Merger-Guidelines-Labor-Comment.pdf.  The divestiture also increased Haggen's employees five-fold and expanded the chain's footprint across seven new states (previously it had only operated in Washington and Oregon).  *Id.*; *Supermarket Squeeze* at 8.  All of this proved unmanageable and unsustainable, in part due to Albertsons' failure to provide the necessary support it had promised.  These and other problems with the 2015 divestiture reflect the risks inherent in relying on partial divestitures as a remedy to otherwise anticompetitive mergers.  *See, e.g.*, John Kwoka, *Conduct Remedies, With 2020 Hindsight: Have We Learned Anything in the Last Decade?* 5 Competition Pol'y Int'l (Apr. 20, 2020), https://perma.cc/X38C-HHM4.  As explained below, Kroger's proposed divestiture remedy to C&S raises similar concerns.

The Albertsons-Safeway merger resulted in higher grocery prices and widespread store closures that created grocery and pharmacy deserts: areas with significantly reduced or no access to local grocery stores and pharmacy services.  *See, e.g.*, Paul Roberts, *In Seattle, Kroger-Albertsons Merger Raises Fears of Closures, 'Grocery Deserts'*, Seattle Times (Oct. 19, 2022), https://www.seattletimes.com/business/in-seattle-kroger-albertsons-merger-raises-fears-of-closures-grocery-deserts/; Leah Nylen & Christopher Cannon, *Kroger-Albertsons Deal is Haunted by 'Spectacular' Past Failure*, Bloomberg (July 17, 2024), https://www.bloomberg-.com/graphics/2024-albertsons-kroger-merger/ [hereinafter Nylen & Cannon, *Kroger-Albertsons Deal is Haunted*].  One of Representative Jayapal's constituents described how a Kroger store closure created a food desert in their community:

> Kroger closed my only walkable grocery store in April of 2021 blaming Seattle's $4 per hour hazard pay and claiming the location was underperforming. . . To top it off, when Kroger abandoned the neighborhood, they refused to end their lease, meaning the building will sit empty for the next 2-3 years. They are actively blocking development as our neighborhood keeps growing in density. We need a walkable grocery store!

Statement by Wash. Resident to Pramila Jayapal, Rep., U.S. H.R. (on file with Office of Rep. Jayapal).

Specific to the Albertsons-Safeway merger, in Klamath Falls, Oregon, a town with a population of 21,000, Haggen shut down two former Safeways, eliminating the only pharmacy downtown. Nylen & Cannon, *Kroger-Albertsons Deal is Haunted*.  Senator Wyden explained that the merger had significant detrimental effects in his state, writing that "[i]n the wake of the 2014 Albertsons-Safeway merger, dozens of pharmacies closed in Oregon . . . . Retail pharmacy closures reduce choices and access to health care for consumers, often requiring longer commutes as well as switching to mail-order in lieu of seeing licensed pharmacists who recommend cheaper generic medicine and can oversee medication interactions for customers." Letter from Sen. Ron Wyden, Member of Cong., to Lina Khan, Chair, Fed. Trade Comm'n (Dec. 15, 2023), https://www.wyden.senate.gov/imo/media/doc/letter_to_ftc_regarding_kroger-albertsons_merger.pdf.  By creating these grocery and pharmacy deserts, the Safeway-Albertsons merger was particularly harmful to *amici*'s constituents who live in affected rural and low-income communities.

The merger and failed divestiture also caused substantial harm to workers, resulting in layoffs, lower wages, increased job insecurity, and reduced job mobility.  Haggen cut employee hours and laid off workers from the stores it acquired through the divestiture.  *See, e.g.*, *Union Files Grievance Charges Against Haggen, Vons and Albertsons*, Progressive Grocer (Aug. 25, 2015), https://progressivegrocer.com/union-files-grievance-charges-against-haggen-vons-and-albertsons.  Less than a year after the merger, Haggen filed for bankruptcy, closing several stores and selling others back to Albertsons, resulting in additional harms to consumers and workers. Jon Talton, *Haggen: What Went Wrong?*, Seattle Times (Mar. 15, 2016),

Page 14 - BRIEF OF *AMICI CURIAE* MEMBERS OF CONGRESS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

https://www.seattletimes.com/business/economy/haggen-what-went-wrong/.  The serious harms

inflicted on *amici*'s constituents by this previous merger and failed divestiture suggest that the

consequences of a larger merger and the risks associated with a divestiture involving a much

larger number of stores could be substantial and difficult to reverse.  As explained further below,

*amici* urge the Court to consider these previous harms when weighing whether to grant a

preliminary injunction in this case.

### 2. The failed Albertsons-Safeway divestiture had particularly devastating effects on retail grocery workers.

The Albertsons-Safeway merger and failed remedy caused substantial harm to workers:

(i) many grocery workers lost their jobs; and (ii) many more suffered lower wages and worse

working conditions, including decreased job security and mobility.

Immediately following Haggen's acquisition of the divested stores, Haggen laid off a

significant number of *amici*'s constituents, while others experienced drastic cuts to their hours

and wages.  A former employee of an Albertsons-divested Haggen store in Burbank, California,

described what happened to her and many other workers: "When Haggen came in they were all

gung ho, making all kinds of promises, . . . . But they filed for bankruptcy six months later and I

was out of work for three months.  My concern is that the Kroger/Albertsons merger would be

Haggen 2.0."  Kevin Smith, *Employees Speak Out Against Proposed Kroger/Albertsons Merger*,

L.A. Daily News (Jan. 26, 2024), https://www.dailynews.com/2024/01/26/employees-speak-out-

against-proposed-kroger-albertsons-merger/ (internal quotation marks omitted).  According to

another former Haggen grocery worker, "After Haggen went bankrupt and shut down my store, I

applied for work at four different stores, . . .  I wasn't able to get a job for three months and I had

to take side jobs as a seamstress and cleaning houses to make ends meet.  That merger caused me

a lot of anxiety."  Amy McCarthy & Jaya Saxena, *A Kroger-Albertsons Merger Would Be Bad*

*for Almost Everyone*, Eater (Feb. 27, 2024), https://www.eater.com/23654209/kroger-albertsons-merger-ftc-lawsuit-effects-customers-workers [hereinafter McCarthy & Saxena, *A Kroger-Albertsons Merger Would Be Bad*] (internal quotation marks omitted).  Making matters worse, because Haggen filed for bankruptcy protection, local workers were unable to get any of the relief they were owed from their former employer.  Jayapal & Nadler Letter at 5.

Although Safeway and Albertsons reaped benefits from the merger, the consequences and costs of the failed divestiture were borne by the public.  Local government had to step in to help workers injured by the layoffs and reduced wages.  In Oregon and Washington, for example, state employment departments organized "rapid response" teams in anticipation of the layoffs. *See, e.g.*, Tom Banse, *'Rapid Response Teams' Organized For Mass Layoffs At Haggen Grocery Stores*, Jefferson Pub. Radio (Sept. 30, 2015), https://www.ijpr.org/2015-09-30/rapid-response-teams-organized-for-mass-layoffs-at-haggen-grocery-stores ("Specialists hired by the state will meet with workers at the affected store."); *see also* Gretchen Morgenson, *'Cash Grab?' Wealthy Investors Will Reap Billions if Kroger Takes Over Albertsons. Workers and Shoppers May Be Less Happy*, NBC News (Nov. 5, 2022), https://www.nbcnews.com/business/business-news/investors-will-reap-billions-kroger-takes-albertsons-workers-shoppers-rcna55597 (contrasting financial success of Albertsons "wealthy investors" with fact that "[i]n 2020, Safeway . . . ranked first among companies in Washington state for the number of employees participating in the federal food assistance program known as SNAP").

II.     **The equities weigh heavily in favor of granting the FTC's requested relief.**

      A.     **Although the Commission does not have to prove irreparable harm, allowing the merger to proceed would cause irreparable harm to consumers and workers.**

            1.     **Harm to consumers is likely to occur and will be felt immediately.**

If this merger is approved, Kroger and Albertsons would become one of the largest supermarket chains in the U.S., second only to Walmart. McCarthy & Saxena, *A Kroger-Albertsons Merger Would Be Bad*. If allowed to merge, a combined Kroger-Albertsons would operate more than 5,000 stores and about 4,000 retail pharmacies and would employ nearly 700,000 workers across 48 states. Press Release, Fed. Trade Comm'n, FTC Challenges Kroger's Acquisition of Albertsons (Feb. 26, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/02/ftc-challenges-krogers-acquisition-albertsons. There is little, if any, reason to believe that Kroger's acquisition of Albertsons would turn out differently for grocery shoppers in the communities that *amici* represent than past mergers. In the aftermath of the failed Haggen's divestiture, prices went up and stores were closed almost immediately.

Once a supermarket closes its doors, communities suffer immediate harm. *Amici* expect that the proposed merger will result in similar, if not worse, harm to consumers. One Seattle resident expressed concerns that the merger will result in higher prices and less choice:

> In Seattle, I have a QFC and Safeway within about two miles of each other. Currently, they compete on prices and I can plan my shopping based on which items are priced better, or on which item one store carries that the other does not. If the merger goes through, I expect one of these stores to close and prices will rise at the other store due to lack of competition.

Statement by Wash. Resident to Pramila Jayapal, Rep., U.S. H.R. (on file with Office of Rep. Jayapal). Offering a different perspective, a resident of Randolph, Vermont, raised concerns about how the merger will affect rural areas: "Small stores, like ours in Randolph, are at risk because of its size. Our area is not alone that this merger is dangerous. Food deserts are

potential in many rural communities," and "[p]rice increases are almost certain to happen." Statement by Vermont Resident to Becca Balint, Rep., U.S. H.R. (on file with Office of Rep. Balint). The proposed merger will eliminate the intense, head-to-head competition that currently benefits many of *amici*'s constituents. Absent the incentive to compete on price or quality, there is every reason to believe the merged company will raise prices and de-prioritize things like product variety and customer service.

### 2. Harm to workers is likely to occur and will be felt immediately

If the Court does not grant a preliminary injunction to halt the merger, harm to workers is likely to occur and will be felt immediately. Based in part on *amici*'s experience with past mergers, the proposed merger is likely to result in job losses, lower wages, and worse working conditions. Furthermore, the merger will reduce *amici*'s constituents' collective bargaining power relative to their supermarket employers. This too is likely to have an immediate impact. A Seattle resident observed, "Kroger claims this move will reduce prices, but it will only reduce their prices and increase their profits. Consumers and their employees will not see the benefits. Layoffs will certainly happen leaving hundreds of union employees without employment in the incredibly costly Seattle area." Statement by Wash. Resident to Pramila Jayapal, Rep., U.S. H.R. (on file with Office of Rep. Jayapal).

A Kroger-Albertsons merger would be harmful to grocery workers because it would substantially reduce competition for their labor, thereby decreasing their unions' collective bargaining power. Because Kroger and Albertsons both compete for union workers, these workers can collectively and simultaneously negotiate with both employers, allowing the union to effectively use favorable terms from one employer as leverage in negotiations with the other. *See, e.g.*, Steinbaum, *Evaluating the Competitive Effect* at 8. In a low-wage unionized labor

market like the retail grocery market, these collective bargaining negotiations are the primary

mechanism through which the workers' wages, benefits, and other working conditions are set.

*Id.*  A combined Kroger-Albertsons would no longer be subject to this bargaining dynamic,

significantly reducing the ability of the union to negotiate better wages and working conditions

on behalf of their members.  UFCW members who have been on the front lines of hard-fought

collective bargaining negotiations with these companies agree.  According to Bill Valdez,

UFCW Local 7 member and 50-year career meat cutter from Colorado Springs, Colorado:

> As a member of our last collective bargaining team, I'm worried about how the
> proposed merger would impact our ability to advocate for better wages, good
> health benefits, and a strong pension . . . . If these corporations merge, it would
> seriously impact our union's power in bargaining. The companies won't need to
> be competitive about pricing and they won't need to be competitive about
> bargaining.

*Stop the Merger Coalition of UFCW Locals Holds Press Conference Following Kroger and
Albertsons' Announcement of Proposed Divested Stores*, UFCW Local 400 (July 11, 2024),

https://perma.cc/8R5E-V2UK  (internal quotation marks omitted).

        After the Albertsons-Safeway merger, as well as other past mergers, many of *amici*'s

constituents lost their jobs, experienced lower wages, and suffered worse working conditions.

The combined Safeway-Albertsons and Haggen, for example, initiated store closures and

reduced hours, leading to lower wages, almost immediately after the merger.  *Amici* expect that

the proposed merger will result in similar, if not worse, harm to workers.  Several analyses

suggest that this will be the case.  *See, e.g.*, Steinbaum, *Evaluating the Competitive Effect* at 27

(concluding that "the merger is likely to harm labor market competition and thus reduce worker

welfare" by "worsen[ing] pay and job quality"); Ben Zipper, *Kroger-Albertsons Merger Will

Harm Grocery Store Workers Wages*, Econ. Pol'y Inst. (May 1, 2023),

https://www.epi.org/publication/kroger-albertsons-merger/ (concluding that "[t]he merger will

lower wages for 746,000 grocery store workers in over 50 metropolitan areas of the U.S." by an average of "$450 per year in wage income").

On top of these likely harms, if the merger is allowed to proceed, there is no question that workers will suffer from increased uncertainty and anxiety from the overnight loss of job security. As one Safeway worker, who is also a UFCW member, explained:

> Since the proposed merger of Kroger and Albertsons was announced nearly two years ago, my co-workers and I have been on edge . . . . We knew the merger would result in stores being sold, and until this week, we had no idea which stores might be on the chopping block. You can't imagine the anxiety we feel every day we come to work. We wonder: What will happen to our store? What will happen to our jobs? What about our pensions? Will I be able to retire after all these years? You worry – you worry about your co-workers, your family, and your customers. The uncertainty is causing a lot of anxiety.

Press Release, UFCW Local 770, UFCW Locals Press Conference on Kroger-Albertsons Merger (July 11, 2024), https://perma.cc/XYE5-75NS (internal quotation marks omitted).

While workers are already experiencing anxiety, if Kroger is allowed to proceed with the merger, the reduction in their union's bargaining leverage will immediately reduce their job security, as well as confidence in their ability to maintain and realize already bargained-for benefits included in their existing collective bargaining agreements.

### B.    The proposal to divest stores to C&S is unlikely to be successful in maintaining current level of competition.

Kroger's proposed divestiture falls short of "maintain[ing] the premerger level of competition," which is what the law requires to remedy an otherwise anticompetitive merger. *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 73 (D. D. C. 2015) (internal citations and quotation marks omitted). The proposed divestiture falls short of this standard primarily because (i) C&S is not prepared to operate successfully as a large-scale grocery retailer; (ii) Kroger will not be

divesting a stand-alone business, but rather a disjointed package of unconnected stores, banners, brands, and other assets; and (iii) C&S has shown itself to be a poor steward of divested assets. Divesting assets to C&S would not preserve the current level of competition, in part because C&S does not have the relevant or proven experience to operate as a large-scale grocery retailer.

Since its inception, C&S has primarily been a wholesale supplier to other grocery stores and chains. C&S currently owns and operates a small chain of 23 retail grocery stores in four states, but it lacks experience running important retail functions like pharmacy operations, internal data analytics, and customer loyalty programs. *See, e.g.*, *The Friday Checkout: Is C&S Wholesale Grocers Fit to Run Assets Kroger, Albertsons Want to Divest?*, Grocery Dive (Feb. 16, 2024), https://www.grocerydive.com/news/cs-wholesale-grocers-kroger-albertsons-divested-stores/707690/; *see also* Oregon Health Authority, Kroger-Albertsons Community Review Board Summary Report (2024), https://www.oregon.gov/oha/HPA/HP/HCMOPageDocs/013-Kroger-Albertsons-CRB-Summary-Report.pdf (finding that "C&S lacks the necessary experience to successfully operate the [divested] pharmacies"). While C&S also owns franchised stores under the Piggly Wiggly banner, those are run by the franchisees.

Because most of the proposed divested store sites are on the West Coast, New Hampshire-based C&S would be inheriting a massive retail operation, spanning the entire country, practically overnight, without preexisting administrative systems or sufficient operational experience. Local retail market conditions vary substantially from community-to-community, requiring specialized market knowledge and infrastructure. In Alaska, for example, the supply chain is "complicated and relies on the carefully choreographed movement of goods . . . in oftentimes adverse weather conditions." Letter from Sen. Lisa Murkowski & Sen. Dan Sullivan, Alaskan Senators, to Lina Khan, Chair, Fed. Trade Comm'n (Sept. 22, 2023),

https://perma.cc/58SG-KD64.

The complexity of the proposed divestiture and C&S's inexperience operating a bi-coastal retail grocery operation raise doubts as to whether C&S could effectively maintain the stores allotted to it under the proposed divestiture.  Given the risk of significant, negative consequences for consumers and workers, as *amici*'s constituents experienced from past divestitures, *amici* have serious and well-founded concerns about this severely flawed plan.

A major shortcoming of the divesture plan is that individual stores are being sold, rather than entire business chains.  *See, e.g.*, *Examining the Competitive Impact of the Proposed Kroger-Albertsons Transaction*, Before the S. Subcomm. on Competition Pol'y, Antitrust, & Consumer Rts. 117th Cong. 5 (2022) (written testimony of Andrew Sweeting, Professor of Econ. at Univ. of Md.).  Consistent with this, an FTC study found that partial divestitures (where a divestiture remedy transferred less than the entirety of a business unit) had a much lower rate of success than divestitures of entire business units.  John Kwoka, *One-and-a-Half Cheers for the New FTC Remedies Study* 6, (Feb. 1, 2017), https://perma.cc/Z5EX-JZ9C (citing 2017 FTC study and describing "partial-entity divestitures" as a "flawed strategy").

Even if Kroger and Albertsons were to try and sweeten the pot, for example, by adding stores to the divestiture package, the merger would still violate antitrust laws based *solely* on the likely harm to competition in labor markets.  Steinbaum, *Evaluating the Competitive Effect* at 2; Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co., 305 F.3d 1124, 1133-34 (10th Cir. 2002) ("The Supreme Court's treatment of monopsony cases strongly suggests that suppliers . . . are protected by antitrust laws even when the anti-competitive activity does not harm end-users."); *see also* C. Scott Hemphill & Nancy L. Rose, *Mergers that Harm Sellers*, 127 Yale L.J. 2078, 2109 (2018) (concluding that harm to sellers in an input market such as labor is sufficient to support antitrust

liability in merger cases with or without a showing of harm to consumers).

Lastly, C&S has shown itself to be a poor steward of divested assets in the past.  The wholesaler has a track record of acquiring stores and then shutting them down or reselling them. Eric Peterson, *Sale of Grand Union Stores Finally Closes*, Globest (Mar. 6, 2001), https://www.globest.com/2001/03/06/sale-of-grand-union-stores-finally-closes/?slreturn=20240726151152; Jon Springer, *Deep South*, Supermarket News (Nov. 27, 2006), https://www.supermarketnews.com/archive/deep-south; Allen Grunes & Rosa Baum, *Why the Kroger-Albertsons Merger Will Harm Labor*, Am. Prospect (Feb. 16, 2024), https://prospect.org/labor/2024-02-16-kroger-albertsons-merger-will-harm-labor/ [hereinafter Grunes & Baum, *Merger Will Harm Labor*].  C&S also has a history of acquiring unionized distribution centers, closing them down, and moving the work to non-union facilities.  Grunes & Baum, *Merger Will Harm Labor* (detailing instances where this occurred in Maine, Massachusetts, Rhode Island, Maryland, and Pennsylvania).  According to one report, C&S has eliminated over 5,000 Teamster jobs over the last two decades.  *Id.*

Any evaluation of a proposed divestiture remedy should consider the uncertainty surrounding the viability and success of a new business and must adequately restrict the risk that will be borne by the public, including *amici*'s constituents.  *See, e.g.*, *Examining the Competitive Impact of the Proposed Kroger-Albertsons Transaction*, Before the S. Subcomm. on Competition Pol'y, Antitrust, & Consumer Rts. 117th Cong. 15 (2022) (statement of Michael Needler, Jr., CEO of Fresh Encounter, Inc.).  A resident of Fairbanks, Alaska, captured this exact concern: "What guarantees are we going to have that the Safeway stores that are sold won't go out of business in the future.  There's Fred Myers and Safeways and the last time this happened, both stores were closed in Fairbanks after a year."  Statement by Alaska Resident to Mary Sattler

Peltola, Rep., U.S. H.R. (on file with Office of Rep. Peltola).

Kroger's proposed divestiture to C&S presents a high risk of failure, which is not appropriate to put on the shoulders of the consumers and workers who *amici* represent. *Amici* therefore urge the Court to grant the FTC's motion for a preliminary injunction to protect *amici*'s constituents from immediate and irreparable harm.

**C.    If the Commission ultimately finds that the merger is illegal, unscrambling the eggs would be difficult, if not impossible.**

If the FTC were to ultimately find that the proposed merger is illegal, it would be impossible to recreate the pre-merger competition because the merging parties would have already combined their operations and they would be difficult to separate, even by a later divestiture order. *See* *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 726 (D.C. Cir. 2001). There is every reason to believe that Kroger would immediately begin to "scramble the eggs," by starting to integrate Albertsons, accessing its confidential operational and business data, laying off workers, closing stores, and approaching suppliers as a uniform buyer. Similarly, C&S would immediately begin its efforts to integrate the divested stores and other assets into its operations. In early July, Kroger released a list of the 617 stores that would be divested to C&S and a significant number of them are in *amici's* home states. Paul Roberts, *Kroger-Albertsons Deal Would Remake Seattle-Area Grocery Map*, Seattle Times (July 15, 2024), https://www.seattletimes.com/business/kroger-albertsons-deal-would-remake-seattle-area-grocery-map/. In addition, any subsequent divestiture order aimed at restoring the pre-merger state of competition would necessarily cause significant disruption to consumers and workers in the affected communities.

**D.    The proposed merger is unlikely to result in any meaningful offsetting benefits to consumers, workers, or the public in general.**

Based on *amici*'s experience with past consolidation among competing supermarkets in their home states and districts, any claims that the proposed merger will result in lower prices for consumers or higher wages and better working conditions for workers is not plausible. *Amici* have not observed a single merger of competing supermarkets that has ever resulted in cost savings that were subsequently passed on to their constituents in the form of lower grocery bills.

**E.    Any claimed private equities on behalf of Kroger and Albertsons pale in comparison to the likely harm to consumers and workers.**

To the extent Kroger and Albertsons claim that they will suffer irreparable harm if they are not allowed to proceed with the merger on their preferred timeline, this is a private, rather than public, equity. Furthermore, any purported harm from delaying the consummation of a merger that may ultimately be found illegal pales in comparison to the public equities in favor of preserving the *status quo* until the FTC is able to adjudicate the legality of the merger through a full merits trial. The risk that the parties will abandon the merger rather than proceed to an administrative trial on the merits is "at best, a private equity" that cannot overcome the significant public equities weighing in favor of a preliminary injunction. *Sysco Corp.*, 113 F. Supp. 3d at 87 (quoting *Heinz Co.*, 246 F.3d at 727) (internal quotation marks omitted)).

## CONCLUSION

For the reasons described above, *amici* respectfully request that the Court grant Plaintiffs' motion for a preliminary injunction.

DATED this 2nd day of August, 2024.

By: /s/ Nadia H. Dahab
**Nadia H. Dahab,** OSB No. 125630
SUGERMAN DAHAB
101 SW Main Street, Ste. 910
Portland, OR 97204
Tel: (503) 228-6474
nadia@sugermandahab.com

**Amanda G. Lewis** (*pro hac vice*)
CUNEO GILBERT & LADUCA, LLP
4725 Wisconsin Avenue NW, Suite 200
Washington, DC 20016
Tel: (202) 789-3960
alewis@cuneolaw.com

**Christian Hudson** (*pro hac vice*)
CUNEO GILBERT & LADUCA, LLP
300 Cadman Plaza West, 12th Floor, Ste. 12060
Brooklyn, NY 11201
Tel: (202) 789-3960
christian@cuneolaw.com

*Attorneys for Proposed Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 7245 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

DATED this 2nd day of August, 2024.

<div style="margin-left:40%">

By: /s/ Nadia H. Dahab

**Nadia H. Dahab,** OSB No. 125630
SUGERMAN DAHAB
101 SW Main Street, Ste. 910
Portland, OR 97204
Tel: (503) 228-6474
nadia@sugermandahab.com

</div>

## APPENDIX A

### List of *Amici Curiae*
### MEMBERS OF CONGRESS
### 4 United States Senators

Lead Senator:

Sen. Ron Wyden (OR)

Sen. Maria Cantwell (WA)

Sen. Jacky Rosen (NV)

Sen. Elizabeth Warren (MA)

### 24 Members of the United States House of Representatives

Lead Representative:

Rep. Pramila Jayapal (WA-07)

Rep. Becca Balint (VT-At Large)

Rep. Lisa Blunt Rochester (DE-At Large)

Rep. Nikki Budzinski (IL-13)

Rep. Cori Bush (MO-01)

Rep. Greg Casar (TX-35)

Rep. Jesus G. "Chuy" García (IL-04)

Rep. Val Hoyle (OR-04)

Rep. Henry C. "Hank" Johnson (GA-04)

Rep. Raja Krishnamoorthi (IL-08)

Rep. Summer Lee (PA-12)

Rep. Ted W. Lieu (CA-36)

Rep. Jerry Nadler (NY-12)

Rep. Alexandria Ocasio-Cortez (NY-14)

Rep. Mary Sattler Peltola (AK-At Large)

Rep. Katherine Porter (CA-47)

Rep. Delia C. Ramirez (IL-03)

Rep. Jan Schakowsky (IL-09)

Rep. Adam B. Schiff (CA-30)

Rep. Kim Schrier, M.D. (WA-08)

Rep. Adam Smith (WA-09)

Rep. Rashida Tlaib (MI-12)

Rep. Bonnie Watson Coleman (NJ-12)

Rep. Nikema Williams (GA-05)