# Exhibit A

```
 1                 UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF VIRGINIA
 2                     ALEXANDRIA DIVISION
    _____
 3
    FEDERAL TRADE COMMISSION,      )
 4  and                           )
    COMMONWEALTH OF VIRGINIA      )  Docket No. 1:08-cv-460
 5  ex. rel. ROBERT F.            )  Alexandria, Virginia
    MCDONNELL, ATTORNEY           )
 6  GENERAL,                      )
                                  )  May 30, 2008
 7          Plaintiffs,           )  10:01 a.m.
                                  )
 8          v.                    )
                                  )
 9  INOVA HEALTH SYSTEM           )
    FOUNDATION,                   )
10  and                           )
    PRINCE WILLIAM HEALTH         )
11  SYSTEM,                       )
                                  )
12          Defendants.           )
    _____
13

14

                      TRANSCRIPT OF HEARING
15
            BEFORE THE HONORABLE CLAUDE M. HILTON
16
              UNITED STATES DISTRICT JUDGE
17

18

19
    APPEARANCES:
20

21   For the Plaintiffs:   David Everson, Esq.
                           Matthew J. Reilly, Assistant Director
22                         Thomas J. Lang, Esq.
                           Norman Armstrong, Jr., Deputy
23                         Assistant Director
                           Michelle L. Fetterman, Esq.
24                         Federal Trade Commission
                           600 Pennsylvania Avenue NW
25                         Washington, D.C. 20580
```

```
 1                               David B. Irvin, Esq.
                                Sr. Assistant Attorney General
 2                              Office of the Attorney General
                                900 East Main Street
 3                              Richmond, Virginia 23219

 4                               Gerard Mene, Esq.
                                Assistant United States Attorney
 5                              United State's Attorney's Office
                                2100 Jamieson Avenue
 6                              Alexandria, Virginia 22314

 7   For the Defendants:       David P. Gersch, Esq.
                                David B. Bergman, Esq.
 8                              Nicholas M. DePalma, Esq.
                                Arnold & Porter, LLP
 9                              555 Twelfth Street, NW
                                Washington, D.C. 20004-1206
10
     Court Reporter:           Tracy L. Westfall, RPR, CMRS, CCR
11                              Official Court Reporter
                                United States District Court
12                              401 Courthouse Square, 8th Floor
                                Alexandria, Virginia 22314
13                              Phone: (703)549-2080

14
     Proceedings reported by machine shorthand, transcript produced
15   by computer-aided transcription.

16

17

18

19

20

21

22

23

24

25
```

```
1                      P R O C E E D I N G S
2            THE CLERK:  Civil Action 08-460, Federal Trade
3   Commission, et al. v. Prince William Health System, et al.
4            MR. GERSCH:  Your Honor, David Gersch.  I am lead
5   counsel for the defendants in this matter, Prince William
6   Hospital and Inova, and we're here on a motion for a scheduling
7   order.
8            Our position is set out in our papers.  Very briefly,
9   the hospitals are entitled to close their merger absent the
10  entry of a preliminary injunction.  The standard for that
11  injunction in the Fourth Circuit is that the government
12  establishes a probability of success on the merits and that the
13  equities are in favor of it.  That's FTC v. Atlantic Richfield.
14           Every hospital case that the government has brought for
15  the last 15 years, they've lost.  What we're here about is to
16  set a schedule which gives us the ability to test the
17  government's case.  Now, the government says in their papers
18  they've got great facts.  We say they're wrong, but that's not
19  what we're here about today.  What we want is an ability to test
20  those facts.
21           So the parties have cooperated to a great extent.  The
22  government said initially in their papers that you shouldn't set
23  a schedule today.  I'm not sure they're adhering to that
24  position.  We've sent in a revised scheduling order.  There's a
25  tremendous amount of agreement on what we would like to do.
```

4

1          I think there are two major disputes, and those are

2    what I'd to address.  The first, and importantly to us, is the

3    government resists identifying their witnesses.  We propose that

4    they identify their witnesses on June 6th, and then what we want

5    to do is we want to be able to --

6          THE COURT:  That's for a preliminary injunction?

7          MR. GERSCH:  Yes.  We want to be able to depose

8    whomever their witnesses are.  Whether or not they're planning

9    to call them live or on paper, we feel we ought to be able to

10   depose whoever it is they're going to rely on, including their

11   experts.

12         They've told us they may have to up five experts.  So

13   all we want is to have those people identified early on and have

14   us be able to depose all of them.  If they told us, you know,

15   there's only one expert and there's only one fact witness, well,

16   then there will be less discovery.  My sense of them from other

17   cases is they've got a lot of witnesses.

18         What we want is an opportunity for them to identify

19   those witnesses and for us to depose them.  That's the first

20   matter.  The second is we're asking Your Honor for a live

21   hearing, at least to the greatest extent that the Court can

22   accommodate us.  Here's the reason for that.

23         As I think we point out in our papers, in every one of

24   these preliminary injunction cases, there have been live

25   witnesses.  But it gets back to the government's point.  They

1    say they've got facts.  So if the government says, as they say

2    in their complaint, they say, for example, that the defendants

3    admit that the merger will cause prices to rise, we don't admit

4    that.  Again, that should be tested in court.  They should call

5    their witness, we should get a chance to cross-examine.

6            They say the merger is not going to improve quality.

7    We say they're wrong.  They ought to call their witness --

8            THE COURT:  Those are issues that will be decided when

9    the case is tried before the Commission.

10           MR. GERSCH:  Yes.

11           THE COURT:  You want me to try that first before the

12   Commission tries it.

13           MR. GERSCH:  I want to address exactly that point, Your

14   Honor.  They need to show you, to obtain the injunction, they

15   need to show the probability of success on the merits.  That's

16   their burden.  If they don't meet that burden, then there's no

17   injunction and the hospitals can close.

18           So all we're asking is whatever they want to show to

19   meet their burden, we're entitled to cross-examine that and we

20   ought to be entitled to put on our own evidence in response to

21   that.

22           As far as the administrative hearing, I would make two

23   points about that, Your Honor.  First of all, legally it's

24   irrelevant.  Under the statutory scheme, hospitals are entitled

25   to close unless they meet their burden of showing a preliminary

1    injunction.   Again, they've failed in every hospital case so

2    far.

3            The second thing about the administrative hearing is,

4    and they're going to do their best to expedite the hearing,

5    they've made their representation, we were before the FTC

6    Commissioner who's going to conduct that hearing yesterday, but

7    it's still going to be a long time.

8            This is what they envision.   They're asking for a trial

9    on October 6th, and the FTC Commissioner said that's when

10   they'll hold the trial.   He wants a four-week trial with one

11   week off so now we're into November.   He's got to write a

12   decision so we're talking about the end of the year.   Then we're

13   going to the Commission on appeal, one side will appeal or the

14   other.   The Commission is committed to get that done in 90 days.

15   I'm going to assume they'll meet that.

16           Okay.   Now we're in March.   The losing party's going to

17   go to the Fourth Circuit.   Now we're a year -- at least a year

18   out.   So the question is is let them bring their case, see if

19   they can meet their burden.   We ought to be permitted to

20   examine, we ought to know who their witnesses are, we ought to

21   get a chance to depose them, and we would like for, to the

22   greatest extent possible, for that to be live.

23           The other reason we want it live, Your Honor, very

24   important issue in this case, is the Prince William Hospital

25   people, they ought to have an opportunity to come before Your

1    Honor and explain why this merger is good for their community,

2    why it is good for the quality of their hospital, why they need

3    the $200 million they're going to get.  I saw in counsels'

4    papers they said it's not really going to be $200 million.  If

5    they have a witness who's going to say that, we ought to be able

6    to cross-examine that witness.

7           Your Honor, with respect to the amount of evidence, to

8    a large degree that's going to depend on what the government

9    wants to put in, again, to meet its burden.  If they want to put

10   in a lot of evidence, well, then that's their choice, but we

11   can't control that.

12          So all we're asking here is an opportunity for them to

13   designate their witnesses.  We've got some witnesses we'll want

14   to put on, but we want a chance to depose them, including their

15   experts, and we would like an opportunity for the live

16   testimony, Your Honor.

17          THE COURT:  All right.

18          MR. GERSCH:  Thank you.

19          MR. EVERSON:  Your Honor, I'm David Everson for the

20   Federal Trade Commission.  I'm trusting that the Court wants me

21   to get to the point and not argue the merits of this case right

22   now.  So while I disagree with our having lost the last case

23   that we brought on a hospital merger, although it was in the

24   Federal Trade Commission, we did win it, but we'll put that for

25   later.

1          Our position, Your Honor, is that consistent with the

2    case in the Fourth Circuit, the *Food Town* case, which is cited

3    in our brief, that the Court has said -- that the Fourth Circuit

4    has said that the only purpose of a proceeding under Section 13,

5    which is what brings us here today, is to preserve the status

6    quo until the FTC can perform its function.  The Fourth Circuit

7    ruled.  That's Judge Winter speaking for the Fourth Circuit, and

8    that's what we're asking for here.

9          Now, what we propose is that the Court take the case on

10    the papers.  By the papers, we mean the briefing, we mean

11    declarations of witnesses which would be the same as direct

12    testimony.  All of the fact witnesses will be deposed, and so by

13    deposition designation, the cross-examinations can be submitted

14    to the Court.

15          We have taken the position thus far that we would like

16    to have the experts in this proceeding testify by declaration

17    and not be cross-examined.  The reason for that is because of

18    the schedule, and before the administrative proceeding, it's

19    going to involve cross-examination of them in August and we

20    would like to avoid it happening twice, but we're flexible on

21    that.

22          If the Court wants cross-examination of those experts,

23    we will gladly go along with that.  Therefore, the experts, just

24    like the fact witnesses, can be cross-examined and that

25    cross-examination will be submitted to the Court by deposition

1    designation.

2        THE COURT:  Are you already in discovery in front of

3    the Commission?

4        MR. EVERSON:  We are starting next week, Your Honor.

5    We jumped the gun a little bit.  The Commission said slow down

6    and start next week.  So starting next week, we will be in

7    discovery.  On Monday, for example, we'll be submitting an

8    initial list of witnesses.

9        So what we would like to do, Your Honor, if it pleases

10   the Court, would be to submit a packet to this Court.  We'll be

11   judicious in what we would submit, how much testimony, but to

12   try to give the Court enough so that we can meet the standard of

13   the Fourth Circuit in the *Food Town* case.

14       We're going to have, as Mr. Gersch said, a full hearing

15   that begins on October the 6th.  There will be full and open

16   discovery for that, Your Honor.  We have agreed with the folks

17   from Inova that all of the discovery that is used and

18   produced -- or is done in the administrative matter can be used

19   in this Court and vice versa.

20       So we're being open, flexible, but consistent with what

21   the Fourth Circuit has said, we want to present something to

22   this Court that is concise and to the point.

23       Am I being responsive to what the Court wants to hear

24   today?

25       THE COURT:  Yes indeed.

1           MR. EVERSON:  All right, sir.  I think I have responded

2    to what Mr. Gersch said.

3           Give me just a couple sentences, and I won't take but a

4    minute.  The Congress has set up the Federal Trade Commission to

5    hear these matters.  This is a very important case.  While we

6    disagree with Mr. Gersch's comments about our success in

7    hospital cases, we are not unmindful of the position that they

8    have taken.  This is a special case.

9           If you'll give me just a sentences on this.  No one

10   that we've talked to at the Federal Trade Commission can

11   remember seeing a merger case with this great a concentration,

12   75 percent.  When Inova takes over Prince William, while Prince

13   William has roughly 5 percent of the market, it will be

14   acquiring the remaining 20 percent of what's remaining in the

15   market.

16          I'm not going to argue that, but it's just so

17   important.

18          THE COURT:  Your opponents may disagree with you.

19          MR. EVERSON:  He will.

20          THE COURT:  I'm not so sure getting into the facts is

21   going to be any help to me this morning.

22          MR. EVERSON:  Yes, sir.  Thank you.

23          MR. GERSCH:  Your Honor, brief rebuttal?

24          THE COURT:  Yes.  About 30 seconds.

25          MR. GERSCH:  Certainly, Your Honor.

1        I hear them say they don't really object to identifying

2    their witnesses and I hear them say that they don't object to us

3    deposing their experts, so we would like that opportunity.  All

4    we ask is they do it by June 6th.

5        They say there'll be discovery in the administrative

6    proceeding.  Obviously to the extent there's discovery there,

7    we'll use it here.  We have a short enough time we don't want to

8    repeat anything.

9        Okay.  So on that basis we would ask the Court to enter

10    the scheduling order that we've requested.  That leaves the live

11    testimony portion.  Again, I think you've gotten a flavor of

12    what the scope of disagreements are going to be.  We think Your

13    Honor would benefit, and they've said it's a special case, we

14    think Your Honor would benefit, as all these other courts have

15    had, for an opportunity to hear those witnesses live or as many

16    of them as possible.

17        THE COURT:  All right.

18        MR. GERSCH:  Thank you, Your Honor.

19        MR. MENE:  Yes, Your Honor, if I may.  Gerard Mene,

20    U.S. Attorney's Office.  Sorry to stop the flow here.  One minor

21    housekeeping matter.

22        The Federal Trade Commission, under this statute, has

23    independent litigating authority.  They've obtained local

24    counsel.  So as a member of the bar of this Court, our office

25    was acting as local counsel, and we have a proposed order that

1    we would be withdrawing from the case, Your Honor.

2              THE COURT:  All right.

3              MR. MENE:  Thank you, Your Honor.

4              THE COURT:  No objection to that?

5              MR. GERSCH:  No objection, Your Honor.

6              THE COURT:  All right.  Well, I believe that the

7    defendant's motion here, while it's called a scheduling order

8    and expedited status conference, is an invitation for me to get

9    involved in trying this case.  That is an invitation that I'm

10   going to decline.

11             This case needs to be tried before the Commission.  The

12   issue before me is a very narrow one, as to whether or not a

13   preliminary injunction should be issued.  That should come

14   before me in due course.  You all can agree on a date and notice

15   it.  I notice in your papers you've had some discussions

16   apparently about a date in July for a hearing, and you can

17   notice it for any Friday in July that you want to do that.

18             As far as live witnesses are concerned, I find that is

19   not necessary.  You can present to me by declaration and

20   exhibits whatever evidence you want to present as far as that is

21   concerned.

22             You've already gotten discovery going so you'll even

23   have those witnesses too.  You can present whatever testimony or

24   excerpts from those depositions that you're taking there, if you

25   so desire.

1          As far as the motion for a scheduling order, that will

2    be denied.  I guess I've already given you the status

3    conference.  We've had that this morning.

4          MR. GERSCH:  Your Honor, may we have the right to

5    depose their experts?

6          THE COURT:  That's up to whatever discovery you're

7    doing with the Commission.

8          MR. GERSCH:  In the Commission, that's not going to

9    come till August.  We're asking for the right to depose their

10   experts in this proceeding.

11         THE COURT:  I'm not going to start discovery on a

12   preliminary injunction.  No, that specific request would be

13   denied.

14         MR. GERSCH:  Thank you, Your Honor.

15         THE COURT:  Whatever you have going with the

16   Commission, if you want to present any of that evidence to me

17   and whatever discovery you're having with the Commission.  He

18   says next week as I understood it.

19         MR. GERSCH:  I just want to be clear.  The expert

20   discovery will not be this next week.  It is not scheduled until

21   August.

22         THE COURT:  You know who your experts are and you can

23   submit whatever -- whatever they have to say, you can submit

24   whatever you want to.

25         MR. GERSCH:  Thank you, Your Honor.

1        THE COURT:  All right.  Thank you.

2        * * *

3        (Proceedings concluded at 10:16 a.m.)

4    _____

5                    CERTIFICATION

6

7        I certify that the foregoing is a correct transcript

8    from the record of proceedings in the above-entitled matter.

9

10        _____
          Tracy Westfall, RPR, CMRS, CCR

11        _____
                    Date

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit B

```
 1                    UNITED STATES OF AMERICA
 2                    FEDERAL TRADE COMMISSION
 3             OFFICE OF ADMINISTRATIVE LAW JUDGES
 4
 5   In the Matter of:              )
 6   ILLUMINA, INC.,                )
 7          a corporation,          )
 8   and                           ) Docket No. 9401
 9   GRAIL, INC.,                   )
10          a corporation,          )
11                  Respondents.    )
12   ------------------------------)
13
14                 Virtual Proceeding Via Zoom
15                     August 23, 2021
16                        2:00 p.m.
17                  FINAL PRETRIAL HEARING
18                     PUBLIC RECORD
19
20        BEFORE THE HONORABLE D. MICHAEL CHAPPELL
21             Chief Administrative Law Judge
22
23
24
25       Reported by:  Susanne Bergling, Court Reporter
```

2

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

```
 1                    APPEARANCES:
 2   ON BEHALF OF THE FEDERAL TRADE COMMISSION:
 3        STEPHEN A. MOHR, ESQ.
          SUSAN A. MUSSER, ESQ.
 4        DANIEL ZACH, ESQ.
          WADE LIPPARD, ESQ.
 5        SARA WOHL, ESQ.
          DAVID MORRIS, ESQ.
 6        JORDAN ANDREW, ESQ.
          STEPHANIE BOVEE, ESQ.
 7        NICOLAS STEBINGER, ESQ.
          NICHOLAS WIDNELL, ESQ.
 8        RICARDO WOOLERY, ESQ.
          WILL COOKE, ESQ.
 9        PETER COLWELL, ESQ.
          ERIC D. EDMONDSON, ESQ.
10        MATTHEW E. JOSEPH, ESQ.
          SAM FULLITON, ESQ.
11        LAUREN GASKIN, ESQ.
          DAVID GONEN, ESQ.
12        WELLS HARRELL, ESQ.
          BETTY JEAN McNEIL, ESQ.
13        NANDU MACHIRAJU, ESQ.
          CATHERINE SANCHEZ, ESQ.
14
          Federal Trade Commission
15        600 Pennsylvania Avenue, N.W.
          Washington, D.C.  20580
16        (202) 326-2859
          smohr@ftc.gov
17
18   ON BEHALF OF ILLUMINA, INC.:
19        CHRISTINE A. VARNEY, ESQ.
          RICHARD J. STARK, ESQ.
20        DAVID R. MARRIOTT, ESQ.
          J. WESLEY EARNHARDT, ESQ.
21        SHARONMOYEE GOSWAMI, ESQ.
          MICHAEL ZAKEN, ESQ.
22
          Cravath, Swaine & Moore LLP
23        Worldwide Plaza
          825 Eighth Avenue
24        New York, New York  10019-7475
          (212) 474-1000
25        cvarney@cravath.com
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

3

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                   8/23/2021

```
 1    APPEARANCES: (continued)
 2    ON BEHALF OF ILLUMINA, INC.:
 3           KARL HUTH, ESQ.
 4           Huth Reynolds LLP
             41 Cannon Court
 5           Huntington, New York  11743-2838
             (212) 731-9333
 6           huth@huthreynolds.com
 7
 8
 9    ON BEHALF OF GRAIL, INC.:
10           MICHAEL G. EGGE, ESQ.
             MARGUERITE M. SULLIVAN, ESQ.
11           ANNA M. RATHBUN, ESQ.
             DAVID L. JOHNSON, ESQ.
12
             Latham & Watkins LLP
13           555 Eleventh Street, N.W.
             Suite 1000
14           Washington, D.C.  20004-1304
             (202) 637-2200
15           michael.egge@lw.com
16                -and-
17           ALFRED C. PFEIFFER, ESQ.
18           Latham & Watkins LLP
             505 Montgomery Street
19           Suite 2000
             San Francisco, California  94111-6538
20           (415) 391-0600
             al.pfeiffer@lw.com
21
22
23
24
25
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

4

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

1                           INDEX OF RULINGS

2

3    Respondents' motion to modify the protective order:

4    Denied

5

6    Respondents' motion to exclude expert testimony of

7    Dr. Fiona Scott Morton:   Denied

8

9    Respondents' motion in limine to exclude testimony of

10   rebuttal witness Dr. Amol Navathe:   Denied

11

12   Respondent's Motion in limine to exclude testimony of

13   rebuttal expert witness Dr. Dov Rothman:   Denied

14

15   Complaint Counsel's motion in limine to exclude certain

16   opinions of Respondents' expert witness Richard Abrams,

17   M.D.:   Denied

18

19   Respondents' motion to allow direct examination to

20   proceed before cross examination of party witnesses

21   that are called by the Government:   Denied

22

23   Respondents filed a motion in limine to exclude

24   investigational hearing transcripts:   Denied

25

5

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                            8/23/2021

```
1                          INDEX OF RULINGS
2
3      Respondents motion in limine to exclude improper
4      laywitness opinion testimony:    Denied
5
6      Respondents' motion in limine to exclude evidence of a
7      fact witness' divorce proceedings:  Denied
8
9      Complaint Counsel's motion to exclude the declaration
10     and deposition transcript of George J. Serafin:
11     Granted
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

```
 1                P R O C E E D I N G S
 2                -   -   -   -   -
 3          JUDGE CHAPPELL:  All right.  Let me call to
 4    order Docket 9401 in Illumina, Inc. and GRAIL -- and
 5    that's GRAIL in all caps -- Inc.  I'll start with the
 6    appearances of the parties, the Government first.
 7          MS. MUSSER:  Good afternoon, Your Honor.  Susan
 8    Musser for Complaint Counsel, and I am joined by my
 9    colleague Steve Mohr, who's in the room with me, and
10    Jean McNeil.
11          JUDGE CHAPPELL:  All right.
12          For Respondents?  I cannot hear you.
13          MR. MARRIOTT:  Good afternoon, Your Honor.
14    David Marriott from Cravath, Swaine & Moore for
15    Illumina, and with me my partners Richard Stark and
16    Sharon Goswami, our colleague Michael Zaken, my partner
17    Christine Varney.
18          Also on are Karl Huth, and we have several
19    representatives of our client, Your Honor, if you would
20    like us to identify them as well.  That's Charles
21    Dadswell, the General Counsel of Illumina; Scott
22    Davies, who is Vice President, Legal; and Steve Keane,
23    who is also an in-house lawyer at Illumina.
24          JUDGE CHAPPELL:  All right.  Is that everyone?
25          MR. MARRIOTT:  I believe so, Your Honor.  Thank
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

7

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

1    you.  At least for Illumina it is.

2            JUDGE CHAPPELL:  Can everyone look and verify

3    the name beneath your video is correct?

4            MR. PFEIFFER:  Yes, Your Honor, it is.

5            This is Al Pfeiffer of Latham & Watkins on

6    behalf of GRAIL.  With me today are my colleagues Maggy

7    Sullivan, Anna Rathbun, and David Johnson.

8            JUDGE CHAPPELL:  I see.  There's Josett.

9    Hello, Josett.  What, do we have a backup court

10   reporter just in case?  It's going to be that rough

11   today?

12           I heard Ms. Varney identified, but I do not see

13   her.  Is she an active participant?  I'm just making

14   sure we have the right boxes.

15           MR. MARRIOTT:  She will not be an active

16   participant today, Your Honor.

17           JUDGE CHAPPELL:  All right, thank you.  So

18   everyone who is active is on video.  Am I correct?

19           MR. MARRIOTT:  Yes, sir.

20           JUDGE CHAPPELL:  Good.  I just don't want

21   anybody to be left out here.

22           All right.  You have previously received an FAQ

23   document and been through some training sessions, and I

24   hope you understand this process.  We conducted a

25   remote trial recently, and at the end, the parties and

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

```
 1    I also agreed that we didn't skip a beat.  Things went
 2    very well, and we felt like it wasn't an impediment at
 3    all.  So let's see how we do this time.
 4          I'm going to go over some issues that are
 5    unique to a virtual trial.  Here are some points that I
 6    want to emphasize or maybe additional issues relating
 7    to the virtual trial, and I'm trying to do this without
 8    a hard copy, so if I look to the left or right, I'm
 9    trying to save trees.
10          Recording.  The official court reporter is the
11    only individual permitted to record the trial.
12    Accordingly, do not video record, audio record,
13    broadcast, televise, stream, screenshot, photograph, or
14    otherwise copy the trial or any portion or parts of the
15    trial.  There shall be no exceptions to this rule.
16          Regarding who can be present at trial, as you
17    have been informed, this trial is not being publicly
18    broadcast; however, it is being made available via
19    phone link for those who want to participate.  Only
20    those persons authorized to view the trial can do so
21    via the Zoom link they are sent.
22          You are not to share your Zoom link with anyone
23    who is not authorized.  You are not to shoulder-surf or
24    allow anyone to shoulder-surf or view the trial.  You
25    are not authorized -- if you are not authorized and
```

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

1    want to view the trial, you must do so through your own
2    Zoom link, which will be provided to authorized persons
3    for each day of trial.
4         Anyone else who wants to access the trial may
5    do so over the telephone option that was issued by the
6    FTC Press Office, and I understand we have a lot of
7    people listening in.  Welcome to the public.
8         If you are not one of the designated counsel
9    who is speaking today, you must have your audio and
10   video off at all times.  If you are counsel who are
11   speaking today, you must have your video on at all
12   times and your audio on only when you are speaking.
13        During the trial, all of us at some point will
14   start speaking with the audio muted.  Don't worry about
15   it.  It's going to happen.  When it happens, you'll be
16   reminded.  Just turn it on, and we move on.
17        Regarding witnesses in the courtroom, expert
18   witnesses will be permitted in the virtual courtroom.
19   When they are not testifying, they shall turn off their
20   video and mute themselves so that they are not
21   displayed or heard.
22        Fact witnesses may not access the virtual
23   courtroom through a Zoom link or otherwise observe
24   proceedings when they are not testifying.  That means
25   they're not supposed to call in either.  They're not

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

1    supposed to be listening or watching the trial.  I'll

2    ask my staff to add that note on my agenda for next

3    trial.

4            In camera issues.  I have granted in camera

5    treatment to many nonparty documents.  Counsel are

6    instructed to be aware of the documents that are under

7    an order providing in camera treatment.  Although I

8    have issued orders that denied without prejudice -- I'm

9    sorry.

10           Also, I have issued orders that denied without

11   prejudice a number of motions, including I believe

12   Respondent GRAIL, but I think there's an update and I

13   did get that order out today.  I know I approved it

14   earlier today for GRAIL.

15           If you wish to use a document that I haven't

16   had the time yet to rule on, whether it should be

17   granted in camera treatment -- in other words, it's

18   pending in camera treatment or something out of the

19   blue that you think is in camera -- I can grant

20   provisional in camera treatment to such documents to

21   allow you to treat them as in camera until such order

22   can be issued.

23           I will remind you that if I grant in camera or

24   provisional in camera treatment, you must make a note

25   to follow up with a motion so that the record is

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

1    complete, the circle is completed there on those

2    documents.

3          If counsel wish to question a witness about the

4    confidential contents of a document -- that is, a

5    document which is in camera or has provisional in

6    camera treatment -- counsel need to request that the

7    Court move into an in camera session.  If you haven't

8    done one of these before, you will catch on quickly

9    after we do the first one.

10         To create the least disruption to the trial

11   process, counsel shall segregate their questioning in

12   such a manner that all questions on in camera material

13   will be grouped together and be dealt with in one

14   session.  This works better if you ask any questions

15   related to in camera information at the beginning or

16   end of your examination.

17         For example, Complaint Counsel calls a witness.

18   They have some in camera questioning.  At the end of

19   their examination, they move for an in camera session,

20   and we cover the in camera information.  The next

21   attorney up conducting cross would then, to make things

22   flow, handle their in camera portion of their

23   examination.

24         Things work a lot better that way, and it's

25   better for the public who is excluded every time we go

12

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

1   into in camera session and they have no idea when we're
2   coming back.  If I have some idea, I let them know
3   before they are cut off from the trial.
4           When we do move into in camera session, persons
5   who are not allowed to see or hear in camera materials,
6   such as Respondents' in-house counsel or corporate
7   representatives, will be moved out of the virtual
8   courtroom to the virtual waiting room where there is no
9   audio or video feed.  The telephone feed to the public
10  will also be muted.
11          Experts may remain in the virtual courtroom.  I
12  will need the lawyers from both sides to verify that
13  there is no one in the room with them who is not
14  allowed to see or hear in camera material before we
15  move into an in camera session.  To make things flow
16  much more easily, I have a couple paragraphs that I
17  will cover with the parties every time we move into in
18  camera to remind you.
19          One thing I'm very concerned about is
20  protecting the in camera information of nonparties,
21  third parties that don't have any skin in the game
22  here, and we're not going to release their information
23  to the public.  That's one thing I am going to be
24  watching out for, and I request the parties do the
25  same.  It's one thing -- I expect Illumina's attorneys,

13

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                  8/23/2021

1    GRAIL's attorneys, you're going to protect your
2    information, but let's all try to protect nonparties'
3    information.
4              I am going to make a ruling here.  I have a
5    number of rulings I am going to make here.  I'm sorry,
6    I have an annoying email reminder that popped up on a
7    screen and blocked what I was trying to read here.
8              I have pending Respondent Illumina's expedited
9    motion to modify the protective order.  Respondent
10   requests a limited modification to the protective order
11   to allow two Illumina in-house attorneys to hear
12   confidential testimony during the hearing and to orally
13   discuss that testimony with Illumina's outside counsel
14   on the condition that they do not take notes regarding
15   any confidential testimony or documents or receive any
16   written materials or transcripts referencing
17   confidential testimony or documents.
18             Complaint Counsel opposes the motion and
19   contends there are no exceptions to the standard
20   protective order for in-house counsel and that Illumina
21   has not articulated any valid basis for an exception.
22   Complaint Counsel further asserts that the in-house
23   counsel at issue are involved in a competitive
24   decision -- I'm sorry.  Complaint Counsel further
25   asserts that the in-house counsel at issue are involved

14

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                                8/23/2021

1    in competitive decision-making for Illumina.

2            From the arguments made in the various in

3    camera motions, it is clear -- and by the way, there

4    have been a number of in camera motions -- it is clear

5    that the evidence in this case will include proprietary

6    technology information, medical research, and

7    scientific data, product research, and detailed

8    information about the technical specifications of

9    testing products.  These materials are highly

10   sensitive.  Respondents are well represented by outside

11   counsel.  Therefore, Illumina's motion to modify the

12   protective order is denied.

13           And for the benefit of the parties and the

14   court reporters, I'm going to be making a number of

15   rulings.  We had so many motions flying in here in the

16   last couple weeks, it was impossible to issue written

17   orders on all the motions.  So for the benefit of the

18   court reporter and the attorneys, I am going to try to

19   make note to let you know when a ruling is coming here

20   during this proceeding.

21           Excuse me while I try to clear my screen.  This

22   pop-up won't leave.

23           So that this entire hearing isn't conducted in

24   camera, I want everyone to be clear about one thing.

25   General statements that are derived from confidential

15

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

1    information are not protected.  For example, I have
2    seen the name of GRAIL's product, blood testing
3    product, I have seen that name, Galleri.  I've seen it
4    in all kind of public documents, yet I see it marked in
5    camera and confidential in a number of documents.
6    There's an example of something that -- and there are
7    many of them -- that's not going to be in camera.
8          General statements that are derived from
9    confidential information are not protected.  Unless you
10   are getting into specific details contained in in
11   camera materials, you should conduct your questioning
12   during a public session.  We reserve in camera for when
13   it is necessary, but when it is necessary, we will do
14   it to protect information.
15         I don't want anyone to feel like there's some
16   chilling effect based on what I'm saying to go in in
17   camera.  When in doubt -- and that's our rule.  When in
18   doubt, ask for an in camera session.  By the way, it's
19   a good time to point out, if one party thinks another
20   party is or a witness is speaking about something in
21   camera, speak up and let us all know.  We will stop and
22   we will verify.
23         Because of the sensitivity of information about
24   this nascent industry, I gave broad leeway to
25   nonparties' requests for protection of testimony given

16

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

1    in depositions or investigational hearings; however,
2    testimony at trial will not be protected unless it
3    reveals details of confidential, proprietary, or
4    commercially sensitive information.
5         For example, questions about whether a nonparty
6    is or was developing a product to compete with
7    Respondent's product are general and do not rise to the
8    level of in camera treatment.  Questions about
9    specifications about such tests may be in camera and
10   thus protected.
11        I'm now going to go over some trial dates for
12   this trial and when you can expect that we will or will
13   not have trial.  When we are in session, you can expect
14   trial to begin at 9:45 a.m. and go until about 5:30
15   p.m.  Should counsel need more time, for example, in
16   order to finish the testimony of a witness, the hours
17   may be extended with prior approval.
18        Depending on how the events of the day unfold,
19   we will take a one-hour break and a ten-minute break in
20   both the morning and afternoon session.  I know you're
21   thinking you already know this because we sent out a
22   logistics memo or a logistics email.  However, there
23   are many, many people listening in right now that did
24   not know that, and some of them listen to everything,
25   so they've got to plan their day as well.

17

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                     8/23/2021

```
 1            I am now going to ask the parties to give me an
 2    estimate of how long you think your case will take to
 3    present.  I will start with the Government.
 4            MS. MUSSER:  Yes, Your Honor.  We expect to be
 5    able to finish up the week of 9/13.  And my apologies,
 6    let me know if you can't hear me because of this mask.
 7    Unfortunately, given our rules, we have to be masked if
 8    there is more than two people, but I am happy to speak
 9    up, and, of course, we can troubleshoot any tech as it
10    comes up, Your Honor.
11            JUDGE CHAPPELL:  Okay.  Just so I'm clear, you
12    said if it's more than two people, you have to wear a
13    mask?
14            MS. MUSSER:  More than one.  I misspoke, Your
15    Honor.  If it's more than one, we have to be masked up,
16    and my colleagues Steve Mohr and Jean McNeil are in the
17    room with me.
18            JUDGE CHAPPELL:  What if he's six feet away?
19            MS. MUSSER:  I can ask.  Unfortunately, the
20    guidance has been pretty tough, and we haven't been
21    able to get much leeway on that, but I can ask again,
22    Your Honor.
23            JUDGE CHAPPELL:  Well, there is one thing that
24    is clear.  We could all hear you a lot better without a
25    mask.
```

18

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

```
 1              Does everyone agree with that?  You may not.
 2    Anyone not agree with that?  It would be better -- I am
 3    not going to violate any -- any rules, whether they're
 4    arbitrary or not.  I don't know about -- I thought the
 5    six-foot rule was still in effect, but I don't know.
 6    I'm not in that room you're in.
 7              So why don't you have someone check on that.
 8    I'm doing most of the speaking today, so it doesn't
 9    matter a whole lot, but --
10              MS. MUSSER:  Yes, and --
11              JUDGE CHAPPELL:  -- yeah, see if there is some
12    kind of procedure whereby we can hear the speaker not
13    wearing a mask.
14              MS. MUSSER:  Okay.
15              JUDGE CHAPPELL:  If you need to wear it, wear
16    it, okay?
17              MS. MUSSER:  Thank you, Your Honor.  We will
18    ask again.  And just so you know, for tomorrow, we have
19    already planned a work-around for opening statements,
20    so you won't have the mask issue at least for tomorrow,
21    but we will try and take your guidance into effect
22    going forward.
23              JUDGE CHAPPELL:  All right.  And, again, I
24    don't want to violate any of the rules, but I think you
25    understand it's important that we all hear you clearly.
```

19

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

```
 1          MS. MUSSER:  Of course, Your Honor.  Of course,
 2    Your Honor.
 3          JUDGE CHAPPELL:  All right.  And repeat that
 4    time you think you need for trial?
 5          MS. MUSSER:  We're hoping to finish up the week
 6    of 9/13.  Of course, that depends on blackout dates and
 7    whether or not we will be able to present our experts
 8    by trial deposition, but the week of 9/13 is what we're
 9    shooting for.
10          JUDGE CHAPPELL:  Okay.  And with that estimate,
11    are you assuming that you will or will not be calling
12    witnesses who are employees of Respondents?
13          MS. MUSSER:  We are assuming that we will be
14    calling employees of Respondents.
15          JUDGE CHAPPELL:  All right, thank you.
16          Now, let me have your trial estimates from
17    Respondents.
18          MR. MARRIOTT:  Your Honor, David Marriott for
19    Illumina.  Our best estimate would be the first full
20    week of October, so probably 2 1/2 weeks beyond what is
21    presented by Complaint Counsel.  Obviously, some of our
22    witnesses are being called in their case, and so we
23    will cover that there, but I anticipate two, 2 1/2
24    weeks beyond what the FTC does, Your Honor.
25          JUDGE CHAPPELL:  Are you speaking for both
```

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

1    Respondents?

2         MR. MARRIOTT:  I meant to by that statement,

3    yes, sir.

4         JUDGE CHAPPELL:  All right.  And in that date

5    projection, are you assuming you will or will not be

6    calling your employees for the first time?

7         MR. MARRIOTT:  I'm assuming that many of them

8    will be called for the first time.  I'm assuming some

9    of them will be called in the FTC case and that we will

10   endeavor to do the cross examination or whatever we're

11   going to call it, our examination of those witnesses in

12   the FTC case.

13        We have some concern that things could come up

14   after those witnesses testify that may require them to

15   respond later in our case, but we're going to make

16   every effort, Your Honor, to have our witnesses go once

17   and only once.

18        JUDGE CHAPPELL:  All right, thank you.

19        Let's talk about specific trial dates now.  You

20   have already been provided with the dates that we will

21   not be in trial.  I'll repeat those for the benefit of

22   the public.  These are dates of no trial.

23        September 1 -- these are all dates in

24   September -- 1, 6, 14, 15, 22, 29, and 30th.  Also,

25   trial on August 26th will begin at 11:45 a.m.  In

21

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

1    addition to the September dates, I have one more day
2    which we will not be in court, and that is October 5.
3    That will get us into the first week of October, and
4    near that date, if it looks like we're not going to end
5    the trial, I will take the calendar out further and let
6    you know what dates we won't be in trial.
7              I endeavor to have trial -- and sometimes other
8    things happen and parties request days off.  I endeavor
9    to have trial four full days a week.  That gives
10   everyone involved, including the Judge, time to work on
11   other cases.  I have been where you are, and I know
12   that there are other things going on.
13             The dates I just went over in September, some
14   of these dates are related to an unavoidable scheduling
15   conflict that I have.  Should that change, I will let
16   you know as soon as I know, and if you can schedule
17   witnesses and are available, we may have trial on a few
18   of those days.
19             Let's say, for example, I realize that I'm
20   available September 29 or 30, I would let you know as
21   soon as I know, and if you can schedule witnesses and
22   make it, then that would become a trial date.
23             In addition, I received a request from at least
24   one of the parties that I hold hearings -- that I not
25   hold hearings on the following dates:  September 7, 8,

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

22

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

1    and 16.  That request is granted.  So we will not be in

2    court, in addition to the dates I already gave you,

3    September 7, 8, and 16.  That's at the party request.

4            I've also received from the Government a

5    request to go late on August 24th, and I believe that's

6    tomorrow, to accommodate a witness schedule.  That

7    request is granted.  We will go late on the 24th, but

8    no later than 7:00 p.m.

9            Madam Court Reporter, is that okay with you?

10           THE REPORTER:  Yes, Your Honor.

11           JUDGE CHAPPELL:  The amount of trial -- the

12   amount of time we have for trial is limited by Rule

13   3.41(b) -- (b) as in boy -- limited to no more than 210

14   hours.  If we assume 6 1/2-hour days with the breaks,

15   this equates to about 32 days total.  Each side is

16   allotted no more than half of that time.  So that's

17   about 16 days each.

18           Have the parties developed a system or do you

19   think we're going to need to in this case?

20           MS. MUSSER:  It is certainly my hope that we

21   don't need to in this case, but --

22           MR. MARRIOTT:  I think, Your Honor, we share

23   that hope, and if we can work together to avoid any

24   downtime and have a system that works for everyone, we

25   are going to make every effort to do that.

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                          8/23/2021

```
 1          JUDGE CHAPPELL:  All right, thank you.
 2          All right.  Let's talk about witnesses.  First,
 3   expert witnesses.  I have two issues to raise with
 4   respect to expert witnesses.  One relates to various
 5   motions in limine that have been filed.  The other
 6   relates to the presentation of expert testimony by
 7   video.  I'll first cover motions in limine on experts.
 8          Regarding these motions, evidence should be
 9   excluded on a motion in limine only when the evidence
10   is clearly inadmissible on all potential grounds.
11   That's my standard.  Relying on Daubert -- some say
12   "Daubert," I'll say Daubert -- three of the
13   Respondents' motions in limine challenge certain
14   opinions or testimony of the Government's proffered
15   expert witnesses.
16          One of Complaint Counsel's motions in limine
17   challenges certain opinions or testimony of one of
18   Respondents' proffered expert witnesses.  All of the
19   motions were opposed, contending that the standards for
20   precluding expert witnesses' testimony have not been
21   met.
22          Specifically, Respondents filed a motion in
23   limine to exclude expert testimony of Dr. Fiona Scott
24   Morton, a motion in limine to exclude certain testimony
25   of rebuttal expert witness Dr. -- I am going to
```

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

1    pronounce this phonetically -- Amol Navathe, a motion
2    in limine to exclude certain testimony of rebuttal
3    expert witness Dr. Dov Rothman.
4            Complaint Counsel filed a motion in limine to
5    exclude certain opinions of Respondents' expert witness
6    Richard Abrams, M.D.
7            Here are my rulings.  The Court's role as a
8    gatekeeper pursuant to Daubert to prevent expert
9    testimony from unduly confusing or misleading a jury
10   has little application in a bench trial.  No jury.  I
11   don't need to screen info to protect the jury, just the
12   Judge.  The better approach under Daubert in a bench
13   trial is to permit the expert testimony and allow
14   vigorous cross examination and presentation of contrary
15   evidence to test the opinion.  The challenges raised to
16   the expert witness opinions are best addressed through
17   cross examination.
18           Therefore, the following motions in limine are
19   denied:  Respondents' motion in limine to exclude
20   expert testimony of Dr. Fiona Scott Morton;
21   Respondents' motion in limine to exclude certain
22   testimony of rebuttal expert witness Dr. Amol Navathe;
23   Respondents' motion in limine to exclude certain
24   testimony of rebuttal expert witness Dr. Dov -- that's
25   D-O-V -- Rothman; and Complaint Counsel's motion in

25

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

1     limine to exclude certain opinions of Respondents'
2     expert witness Richard Abrams, M.D.
3              Susanne, did you get all that?
4              THE REPORTER:  Yes, Your Honor.
5              JUDGE CHAPPELL:  Thank you.
6              The parties should be aware that, as Judge, it
7     is my prerogative and responsibility to cut off
8     questioning of an expert witness during examination
9     when venturing into areas that the witness is not
10    qualified to opine upon.  Just letting you know.
11    Expert witnesses are not allowed to run wild in this
12    courtroom.
13             I also have a request -- I don't think it's a
14    motion -- but I have a request regarding presentation
15    by video testimony.  Because this trial is being
16    conducted remotely, the parties were encouraged to
17    submit trial depositions for their expert witnesses.
18    In a joint status report, Complaint Counsel stated its
19    intent to submit trial depositions for its three expert
20    witnesses in lieu of presenting their testimony at
21    trial.
22             In that same joint status report, Respondents
23    stated that they do not object to Complaint Counsel's
24    use of trial depositions to present their experts'
25    direct testimony, but requested to cross examine each

26

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

1    of Complainant's expert witnesses live at trial.

2          Cross examination is properly conducted at the

3    trial deposition under these circumstances, and

4    Respondents were on notice and allowed to conduct their

5    cross examination in the deposition.  Accordingly, the

6    Respondents' request to conduct another cross

7    examination of each of Complaint Counsel's expert

8    witnesses at trial is denied.

9          Let's talk about fact witnesses.

10         MR. MARRIOTT:  Your Honor, may --

11         JUDGE CHAPPELL:  Go ahead.

12         MR. MARRIOTT:  I apologize.  David Marriott for

13   Illumina.  I want to just make sure I understand the

14   ruling, as I'm concerned it might be based on an

15   inaccurate testimony of what happened.  The testimony

16   that at least I understand Complaint Counsel wishes to

17   present from their experts has not yet been taken by

18   deposition, so the witness has also, therefore, not

19   been cross examined by deposition.  That' hasn't

20   happened.

21         JUDGE CHAPPELL:  I thought it was testimony in

22   a trial deposition that was taken with all parties

23   noticed.

24         MR. MARRIOTT:  No, there was no -- the

25   witnesses were deposed previously, Your Honor, but the

27

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

1    so-called "trial deposition" that was referenced in the
2    Court's scheduling order, that never happened.  I
3    understand Complaint Counsel's proposal is to do that
4    at some point during the trial on an off day.
5          MS. MUSSER:  Your Honor, if I may?
6          JUDGE CHAPPELL:  You may.
7          MS. MUSSER:  Mr. Marriott is correct.  We were
8    providing notice to the Court that we intend to conduct
9    a trial deposition of Dr. Scott Morton.  When we
10   informed Respondents, they said that they would agree
11   to -- that the direct be in trial deposition but not
12   the cross, and it's our request that the entire direct
13   and cross be done via trial deposition.  Otherwise, we
14   would intend to present Dr. Scott Morton at trial live,
15   so to speak.
16         JUDGE CHAPPELL:  Are these trial depositions
17   scheduled?
18         MS. MUSSER:  No, Your Honor, not yet.
19         JUDGE CHAPPELL:  You are waiting on my ruling?
20         MS. MUSSER:  Yes, Your Honor.
21         JUDGE CHAPPELL:  Well, it wasn't clear to me
22   that they hadn't been conducted yet.  Maybe I missed
23   that.
24         MS. MUSSER:  Your Honor, I apologize if it was
25   unclear.

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

```
 1          JUDGE CHAPPELL:  Well, my intent in suggesting
 2     trial depositions in lieu of live testimony was to move
 3     things along, and these are not fact witnesses.  So to
 4     the extent that trial depositions are taken during
 5     trial or otherwise, my ruling stands.  Conduct whatever
 6     cross you want at the trial deposition.
 7          MS. MUSSER:  Thank you, Your Honor.
 8          MR. MARRIOTT:  Understood.  Thank you, Your
 9     Honor.
10          JUDGE CHAPPELL:  And that means you're on
11     further notice to conduct whatever cross you need,
12     Counselor.
13          MR. MARRIOTT:  Thank you.  We got it.
14          JUDGE CHAPPELL:  Let's talk about fact
15     witnesses.  Based on the filings I've seen, the
16     Government has listed 20 fact witnesses.  Respondents
17     also have listed 20 fact witnesses.  Thankfully, many
18     of these are on both -- are on the same list or the
19     same name is on both lists.  How many fact witnesses do
20     you actually anticipate calling?  I'll start with the
21     Government.
22          MS. MUSSER:  Your Honor, right now, our intent
23     is to present all 20.  That being said, of course, we
24     recognize the need for an efficient and noncumulative
25     trial, so to the extent that that can change, we
```

29
Final Pretrial Hearing
Illumina. Inc. and Grail, Inc.                                    8/23/2021

1    certainly will keep that in mind.
2         JUDGE CHAPPELL:  What was that number again?  I
3    can't understand you.
4         MS. MUSSER:  Oh, I'm sorry.  All 20 of them.
5         JUDGE CHAPPELL:  Okay.
6         Respondents?
7         MR. MARRIOTT:  Your Honor, we --
8         JUDGE CHAPPELL:  Assuming those 20 are called
9    by the Government.
10        MR. MARRIOTT:  We would -- in that case, Your
11   Honor, we would call virtually all of ours, but I
12   anticipate there's at least one we will drop, and we're
13   going to make every effort, if possible, to look for
14   others, but at the moment there's only one I anticipate
15   we would probably drop.
16        JUDGE CHAPPELL:  All right.  Let me make this
17   clear.  When a witness is testifying, we will finish
18   with that witness and not recall that witness.  That
19   means that both sides will ask whatever questions they
20   have for the witness at the time the witness is first
21   called.  If someone thinks they have a reason to recall
22   a witness, you can make a motion, and I'll consider it.
23        This leads me to a request on presentation of
24   testimony.  In one of the pretrial motions, Complaint
25   Counsel has listed seven party witnesses and

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

1   Respondents have listed the same seven witnesses, plus
2   an additional eight party witnesses.  Respondents filed
3   a motion to allow direct examination to proceed before
4   cross examination of party witnesses and requests that
5   for party witnesses appearing on both sides' witness
6   lists, that the Court permit Respondents to first
7   present direct testimony of each witness, followed by
8   Complaint Counsel's examination of each witness.
9           Respondents argue that presenting direct
10  testimony of Respondents' witnesses before they are
11  cross examined by Complaint Counsel will streamline the
12  process and allow the Court to hear their testimony in
13  a logical manner -- a more logical manner than
14  permitting complaint counsel to elicit hostile cross
15  examination testimony first.
16          Just so you know, as I'm reading this, I'm
17  inserting missing words sometimes so it will make more
18  sense.
19          Complaint Counsel -- I'm sorry.  Complaint
20  Counsel argues that, as the party with the burden of
21  proof, it has the prerogative to question the witnesses
22  first, and it's a misnomer to refer to their
23  examination as "cross," because the Government intends
24  to call certain adverse party witnesses to support its
25  case in chief, not specifically to respond to testimony

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

31
Final Pretrial Hearing
Illumina. Inc. and Grail, Inc.                                    8/23/2021

1    elicited through Respondents' direct examination.  The
2    Government further argues that Respondents' proposal is
3    unwieldy and has not been implemented in any other
4    trial.
5           I find the Government's argument persuasive.
6    Respondents' proposal, if implemented, would be
7    unprecedented.  They have not presented any compelling
8    reason to divert from normal practice.  Accordingly,
9    Respondents' motion to allow direct examination to
10   proceed before cross examination of party witnesses
11   that are called by the Government is denied.
12          Because we have two Respondents here, you need
13   to coordinate the direct and the cross when both
14   Respondents will be examining a witness to prevent
15   duplication in the record and avoid wasting time.  Now,
16   I didn't know if you had worked this out or not, but on
17   most or all witnesses, do you intend to have one person
18   conducting the witness examination, or for almost every
19   witness, do you intend to have both Respondents
20   conducting examination?
21          MR. MARRIOTT:  Your Honor, I believe that our
22   expectation is that we will have one lawyer conduct the
23   examination if at all possible.
24          JUDGE CHAPPELL:  Thank you.  And, of course,
25   the examining attorney will be the one who is allowed

32

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                          8/23/2021

1    to object.

2           MR. MARRIOTT:  Understood.

3           JUDGE CHAPPELL:  I'll briefly go back to in

4    camera motions.  I may have misspoke earlier.  There

5    are still a couple pending that were denied without

6    prejudice, I think for both Respondents, and those have

7    not gone out yet but will go out soon.

8           Let's talk about the use of exhibits with

9    witnesses.  When we have an in-person trial -- I guess

10   I should call that a normal trial -- the parties

11   usually prepare binders for witnesses and provide a

12   copy of that binder for me and for my staff.  I have

13   seen in the courtroom the witness stand, it's like an

14   ice fort.  The witness has to go around binders to sit

15   down.  We can't do that here, at least like we do in

16   the courtroom.

17          First of all, my staff and I do not need

18   binders of exhibits used with witnesses, either in hard

19   copy or electronically; however, you do need to work

20   out a way ahead of time to provide the witness with

21   exhibits you intend to use with that witness.  Find

22   some way to get a binder in front of the witness, if

23   possible, so that we may move along with trial.

24          Have the parties discussed that or worked out

25   anything regarding getting documents that you're going

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                        8/23/2021

1   to use with a witness in front of the witness?

2         MS. MUSSER:  Your Honor, we actually just met

3   and conferred about that, and I think we're close to

4   resolution, and we'll be able to work something out,

5   but we're still ironing out the details.

6         JUDGE CHAPPELL:  Love to hear about those

7   meet-and-confers.  You can't have too many of those.

8   Thank you.

9         Regarding cross examination of witnesses, it's

10  my job to make sure the trial moves along without undue

11  delay.  In that regard, should I find that one side is

12  abusing a reasonable time for cross exam -- for

13  example, taking two or more times the time taken on

14  direct -- I will impose limits on the time allowed for

15  cross.

16        However, I'm not just going to do that out of

17  the blue.  I will notify you ahead of time should I

18  decide to do this so you may plan and prepare

19  accordingly.  I have had examples where a witness was

20  on the stand for two hours and the cross lasted three

21  days.  Not acceptable.  Barely tolerable, but not

22  acceptable.

23        Rebuttal witnesses.  I want to caution the

24  parties that if any party wishes to offer a rebuttal

25  fact witness, the request shall be made in writing in

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

```
1    the form of a motion to request a rebuttal witness as
2    soon as possible.  That motion shall include the name
3    of any witness being proposed and a detailed
4    description of the rebuttal evidence being offered.
5          That motion shall also include a cite to the
6    record by page and line number to the evidence you
7    intend to rebut.  That motion shall demonstrate that
8    the witness the party seeks to call has previously been
9    designated on the witness list.  In other words, you
10   don't get to just say I want a rebuttal witness.  You
11   are going to have to point to page and line number of
12   what you intend to rebut, among the other things I've
13   just mentioned here.  I'm letting you know up front
14   what you're going to need to do for rebuttal.  That way
15   I eliminate the whining, whimpering, and snoffering
16   when your request is denied later.
17         Let's talk about exhibits.  If demonstrative
18   exhibits are used with a witness, the exhibit will be
19   marked and referred to as a demonstrative exhibit for
20   identification only.  I used to tell the parties that
21   demonstrative exhibits were not encouraged, but the
22   parties in the last trial did a good job of not overly
23   abusing and using demonstrative exhibits and keeping
24   track of them on the record.
25         Part of my problem with demonstratives is
```

35

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

1    sometimes they lead to confusion.  They're not evidence

2    and can't be cited for evidence in your briefing.  Any

3    demonstrative exhibits referred to by any witness will

4    be included in the trial record, but they may not be

5    cited to support any disputed fact.  That's why they're

6    called demonstrative.  If someone cites to a

7    demonstrative exhibit to support a fact that's in

8    dispute in their post-trial brief, I expect the

9    opposing party to point that out in their reply brief.

10           Regarding withheld documents, if either party

11   has withheld documents during discovery from the other

12   side and that is pointed out to me, such withheld

13   documents will not be admitted.

14           Regarding depositions and investigational

15   hearing transcripts, depositions and investigational

16   hearing transcripts in this matter are generally deemed

17   admissible under Commission rules.  Under 3.43(b),

18   relevant material and reliable evidence shall be

19   admitted.  Evidence that constitutes hearsay may be

20   admitted if it is relevant, material, and bears

21   satisfactory indicia of reliability so that its use is

22   fair.  If meeting those standards, depositions and

23   investigational hearings shall be admissible and shall

24   not be excluded solely on the ground that they are or

25   contain hearsay.

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

1         Here comes a ruling.  Respondents filed a
2   motion in limine to exclude investigational hearing
3   transcripts, 34 listed in their entirety.  Complaint
4   Counsel opposed the motion relying on the provisions of
5   the rule I just covered with you.  Based on that rule,
6   3.43(b), the motion in limine to exclude
7   investigational hearing transcripts is denied.
8         To the extent that testimony from an
9   investigational hearing transcript is prejudicial to
10  Respondents, I expect that to be pointed out in reply
11  briefs to any proposed findings that rely on testimony
12  given in an investigational hearing.  That means
13  they're coming in under the rule, but it doesn't mean
14  that the Judge has determined that whatever's cited to
15  prove a fact is reliable.  So the battle's not over.
16  Let me rephrase that.  As an Army Colonel, I should do
17  better.  The war's not over, just the first battle.
18       MR. HUTH:  Thank you, Your Honor.  Karl Huth,
19  Huth Reynolds, for Illumina.  Just to make sure I'm
20  clear on the process with respect to these transcripts?
21       JUDGE CHAPPELL:  Go ahead.
22       MR. HUTH:  I just want to clarify.  To the
23  extent that testimony is contained in these exhibits
24  that are being offered in full and is not cited in the
25  post-trial briefing or during the trial in this

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                           8/23/2021

```
 1   matter --
 2              JUDGE CHAPPELL:  It's vapor.  It's gone.  You
 3   don't need to worry about it.
 4              MR. HUTH:  -- it will not be part of the
 5   permanent record, correct?
 6              JUDGE CHAPPELL:  It's in the record.  Anything
 7   that's offered, whether it's admitted or not, is in the
 8   record.
 9              MR. HUTH:  But it will not be considered part
10   of the record on appeal in this case if there is
11   something that is not actually submitted in post-trial
12   briefing?
13              JUDGE CHAPPELL:  It will be in the record on
14   appeal because they are admitted.  I can't account for
15   what someone will do on an appeal.  I can tell you what
16   I will do.
17              MR. HUTH:  Okay.  And, Your Honor, without --
18   without trying to be argumentative, that goes to the
19   heart of the motion to exclude -- or not necessarily to
20   exclude, but, rather, to defer admitting these entire
21   transcripts into the record until the evidence is
22   actually cited and there's an opportunity to object,
23   because with 6000 pages of IH transcripts, there's
24   really no -- no practical way for us to raise every
25   objection to everything in those transcripts, rather
```

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

1    than just responding to what Complaint Counsel seeks to
2    put in on the post-hearing briefs.
3             JUDGE CHAPPELL:  Well, you may have done this,
4    you may have not, but if you have ever handled appeals,
5    it's pretty unlikely you are going to cite some new
6    proposition that wasn't cited in the underlying case to
7    prove some point.  If you do, that should be a pretty
8    weak argument or a weak point in my opinion, but I've
9    got to rule on point here pretty much.  My hands are
10   tied on this.  This is not my rule.  I didn't write
11   this rule.  Let's just say that rule wouldn't be
12   written that way if I wrote it, but --
13            MR. HUTH:  Understood, Your Honor.
14            JUDGE CHAPPELL:  -- but as the person making
15   this ruling in this case, anything that's cited in the
16   post-trial brief by the Government, you'll have the
17   right to attack that in your reply.  Beyond that, it's
18   out of my control.
19            MR. HUTH:  Thank you, Your Honor.
20            JUDGE CHAPPELL:  I will say that this is not a
21   ruling -- the denial of the motion in limine to exclude
22   the investigational hearing transcripts, it's not a
23   ruling on the motion to exclude the transcript of
24   Dr. Spetzler of Caris -- Caris? -- Caris Life Sciences,
25   Inc., which is part of the motion in limine concerning

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

1    Caris.  I will deal with that separately later.

2           Regarding objections within depositions and

3    investigational hearing transcripts, I didn't realize

4    how many times I had to say investigational hearing

5    transcripts.  I am now going to say IHTs.  Both sides

6    stated in their objections to exhibits that their

7    objections to depositions incorporate the objections

8    that were raised during the depositions.

9           Since we need to finish this trial sometime

10   this year, I am not going to rule on such objections in

11   advance of trial.  I will rule on them when necessary

12   and when need there be.  That means if excerpts from

13   depositions are cited to by a party in a post-hearing

14   proposed finding, the opposing party shall note any

15   objection it has to the excerpt regardless of whether

16   it raised the objection in the deposition, and that

17   should be pointed out in the reply to the proposed

18   finding.

19          So I want to make this clear.  You didn't waive

20   any objections if you didn't make them during the

21   deposition.  This is about the truth, getting to the

22   truth, and this is about fairness and justice.  I'm not

23   going to -- nobody's going to lose the case based on

24   the fact you were checking email when a question was

25   asked during a deposition.  I have found this to be

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

1    something that is very rarely an issue.  Deposition
2    excerpts generally are what they are.  I don't think
3    I've seen many smoking guns within the covers of a
4    transcript of a deposition.
5         If you don't raise an objection to some excerpt
6    in your reply brief, then you will have waived your
7    objection.  Did everyone understand that?
8         MR. MARRIOTT:  Understood, Your Honor.
9         MS. MUSSER:  Yes, Your Honor.
10        JUDGE CHAPPELL:  So I have a ruling here
11   relating to this point.  Respondents have filed a
12   motion in limine to exclude improper lay witness
13   opinion testimony.  This motion seeks to preclude
14   admission of alleged lay witness opinion testimony
15   contained in the deposition and IHT designated as
16   exhibits.  The Government has opposed the motion,
17   arguing that the request to exclude the transcripts in
18   their entirety is improper and the better procedure is
19   to raise objections in post-trial briefings if
20   objectionable testimony is relied upon.
21        As I have basically just said, Respondents'
22   motion in limine to exclude improper lay witness
23   opinion testimony is denied.  Respondents can raise
24   objections to such testimony in post-trial briefing if
25   relied upon by the Government to support a proposed

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

```
1    finding of fact.  And if you have an objection to that
2    type of testimony, don't be afraid to cite to the Rules
3    of Evidence.  It's very clear what's required for lay
4    opinion testimony, and if those standards aren't met,
5    this Judge doesn't allow the testimony.  The rules are
6    written for a reason.
7         If you talk to anyone who's been in a trial
8    with this Judge, you'll find I go by the book.  The
9    book's important.  Without the book, what do we have?
10   Anarchy.  The books are important.  We all follow the
11   rules.
12        Let's talk about objections to exhibits
13   generally.  I'm moving into now what I consider the
14   unfortunate part of this proceeding.  Each side has
15   filed numerous objections to almost all of each other's
16   exhibits.  I'm, frankly, disappointed and dismayed to
17   see the number of objections made, particularly from
18   Complaint Counsel, who I would assume know the
19   Commission's Rules of Practice and how these things
20   work.  This number of objections is just completely and
21   utterly unacceptable.
22        We have a fairly relaxed standard for
23   admissibility.  That doesn't mean it's a relaxed
24   standard for proving a point in contention or dispute,
25   but for admissibility.  You all should be aware of the
```

42

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

1    fact that the standards are relaxed here.  I believe

2    you can work out the objections you have to most of

3    these documents fairly easily.

4          Before I go into the next portion of my agenda,

5    I'd like for both parties to give me the current status

6    of your objections, because hopefully you've worked

7    some of these out.

8          I'll hear from the Government first.

9          MS. MUSSER:  Yes, Your Honor.  I think we have

10   good news on that front.  Again, we were meeting and

11   conferring this morning on that exact issue, and we

12   have put together a JX 2 per this Court's request that

13   resolves almost all of the issues.  The only two

14   categories of documents that were not on that list are

15   documents that had a possible motion in limine pending,

16   which we will be able to resolve given this Court's

17   guidance, as well as four documents that I think after

18   meeting and conferring and more information from

19   Respondents, I think we'll be able to handle.  So we

20   hear you, and hopefully we'll be able to get you that

21   JX 2 today after this proceeding.

22         JUDGE CHAPPELL:  All right.  That sounds like

23   good news.

24         Anything to add for Respondents?

25         MS. GOSWAMI:  Yes.  This is Sharon Goswami for

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                      8/23/2021

```
 1    Illumina.

 2          So if I may, Your Honor, it is correct that

 3    Respondents and Complaint Counsel have agreed to JX 2;

 4    however, Complaint Counsel has not actually dropped any

 5    of their objections, and although Respondents have

 6    largely stuck with the same objections that we lodged

 7    before Your Honor, and as we understand it, both sides

 8    are reserving those objections to be able to be

 9    reraised in post-trial briefing.  So those objections

10    are still things that we -- that both sides have

11    reserved for post-trial briefing.

12          MS. MUSSER:  And, Your Honor, if I may respond,

13    just to clarify, to make sure we're on the same page?

14          JUDGE CHAPPELL:  Please do.

15          MS. MUSSER:  So I agree with Ms. Goswwami;

16    however, to clarify, Complaint Counsel's position is

17    that those are just -- the objections remaining are

18    simply objections.  So just as Your Honor explained, we

19    could object in any reply finding and just preserve our

20    abilities to do so.  I just wanted to make sure that

21    was clear.

22          JUDGE CHAPPELL:  Anything further?

23          MS. MUSSER:  No, Your Honor.  Thank you.

24          JUDGE CHAPPELL:  All right.  If a document

25    meets the Commission's standard for admissibility, it
```

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                        8/23/2021

```
 1   will be admitted.  This is a bench trial, and I want to
 2   point out, just because a document is admitted, doesn't
 3   mean much weight, any weight, or how much weight will
 4   be given to the exhibit, particularly if it's cited
 5   without context of a witness testimony.  Both sides are
 6   encouraged to point out weaknesses in the other side's
 7   evidence in your post-trial filings, particularly in
 8   your replies to the other side's proposed findings of
 9   fact.
10            And here I will point out that the reply
11   post-trial briefs are critically important.  Don't lose
12   sight of that fact.  Any side can say what they want in
13   their post-trial brief.  Let's see what the other side
14   has to say about it.  Does it stand up under the
15   scrutiny of the other side's pointing out what may or
16   may not be actually proven or not proven?  I'm not
17   going to go over this entire rule about admissibility
18   of evidence.  I think I have made that point.
19            Let's talk about those remaining objections.
20   We're going to take a break soon, and I'm going to give
21   the parties time to work together on narrowing the
22   objections, the remaining objections, considering what
23   I've told you in the last few minutes.  During this
24   recess, the parties will get together and agree to the
25   admission of documents that meet the standards of the
```

45

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

1    rules as I've just gone over.  I expect the parties to
2    be judicious with objections and pose only objections
3    that are truly necessary and valid.
4         I do want to make clear that there's no
5    reserving objections on admissibility.  We're dealing
6    with that today.  This is going to be done today so
7    that when trial begins, trial begins.  We're not going
8    to have a witness interrupted with objections to
9    exhibits during the questioning.  This is why we're
10   having this hearing today, because it will be dealt
11   with today.
12        You've still got the right -- just remember
13   this.  I can't stress this strongly enough.
14   "Admissible" and "admitted" doesn't mean relied upon.
15   It doesn't mean I'm agreeing that something is reliable
16   and that it will support any point in contention or
17   dispute.  I do expect the parties to narrow the scope
18   of these exhibits that you continue to disagree about.
19        Let me point this out about objections, too,
20   since this occurred in the last trial.  If you've tried
21   a few cases -- and I expect all of you have, most of
22   you, at least -- there are plenty of technical
23   objections you can make when the other side is
24   questioning a witness, but stop and think, is it really
25   necessary to object to something that's technically

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

```
 1    objectionable when it doesn't have anything to do to
 2    supporting your theory of the case or something that
 3    actually matters to you or your client?  Please keep
 4    that in mind for the benefit of all of us who are
 5    participating in this trial.
 6            I see people nodding.  I think most of you know
 7    what I'm talking about.  You've seen this.  Hopefully
 8    you haven't done this, but whenever you see this and
 9    you're on the other side, you know exactly what I'm
10    talking about.  You think, why are they jumping up to
11    object to that?  Well, the Judge asks the same thing,
12    but not out loud.  So I'm letting you know today.
13            Let me get back to the break we're going to
14    have.  I do expect the parties to narrow the scope of
15    the exhibits that you continue to disagree about.  With
16    respect to the exhibits that you can agree on -- and it
17    sounds like you have already begun to do this -- once
18    you have a list of documents that both sides agree to
19    or are no longer opposed, you develop a list that sets
20    forth those exhibits.  That list shall be designated as
21    Joint Exhibit, with the JX number, and you can offer
22    that list as a joint exhibit, beginning with 1, the
23    next would be 2, the next would be 3.  We don't keep
24    coming back during trial and adding to the same JX.  We
25    will do a new JX every time.
```

47

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                        8/23/2021

```
 1            It's not necessary to rename any of the
 2     exhibits listed in a joint exhibit.  The joint exhibit
 3     may be offered first thing tomorrow.  It doesn't have
 4     to be prepared today, something you may agree on during
 5     this next break.  I don't want you thinking you have
 6     got to rush and knock it out today.
 7            If you wish to offer joint exhibits, including
 8     any additional stipulations, again, they will be marked
 9     JX, with the next number, 1, 2, or 3.  I do believe I
10     saw a stipulation come in that would be JX 1, so your
11     next JX would be 2, but if that's not right, we will
12     get it straight on the record.
13            MS. MUSSER:  Yes, Your Honor.  Both parties
14     have agreed to JX 1.
15            JUDGE CHAPPELL:  Okay.  So I'll consider that
16     an offer to admit JX 1.
17            Any opposition?
18            MS. GOSWAMI:  No opposition.
19            MR. MARRIOTT:  No, Your Honor.
20            JUDGE CHAPPELL:  JX 1 is admitted.
21            (Joint Exhibit Number 1 was admitted into
22     evidence.)
23            JUDGE CHAPPELL:  This is important.  Joint
24     exhibits shall not include a signature line for the
25     Judge.  They are joint exhibits.  I don't need to
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

48

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                          8/23/2021

1    sanctify it by signing anything.  They become part of
2    the record, and they're joint stipulations or joint
3    exhibits.
4           Now, after the break, we'll need to talk about
5    the exhibits the parties cannot agree upon.  Hopefully
6    there will be none or very few of those.  I expect the
7    parties to group these exhibits into categories.  For
8    the party offering such exhibits, that party first will
9    offer its theory of admissibility for each category of
10   these exhibits.  Then the party opposing opposition can
11   make its argument in opposition to each category of
12   exhibits.  That way I'm not shifting the burden of
13   proof here.
14          The party offering it has got to tell me what
15   their theory of admissibility is.  The party opposing
16   it gets to tell me why it's not allowed.  Sometimes the
17   way this works is the burden of proof gets turned on
18   its head.  We are not going to do that here.
19          If a document is not admitted at the final
20   prehearing conference or in the morning, the offering
21   party may re-urge admission of a document that was
22   excluded.  Let's say, for example, you have a witness
23   who can demonstrate that the document is reliable,
24   admissible, and relevant, you meet the test for
25   admissibility, then you may re-urge admission of a

49

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

1    document.  I will say that happens extremely rarely,
2    but sometimes it does.  Exhibits that are offered and
3    not admitted are part of the trial record, so no offer
4    of proof is needed.  Don't waste everybody's time with
5    an offer of proof because something's excluded.  We
6    don't need to do that.
7            Regarding providing the Judge or my staff with
8    exhibits, after the conclusion of this final prehearing
9    conference and after you complete the joint exhibit
10   listing all exhibits that have been admitted, you are
11   to provide an electronic version of all admitted
12   exhibits to my staff, OALJ.  You can get in touch with
13   Dana Gross to work on the logistics.  We do not need
14   hard-copy of those exhibits.  This is not due today but
15   when you have it ready.  Today it's more important to
16   meet and confer and knock out these objections.
17           I touched on this a little earlier.  Let's talk
18   about joint stipulations.  Under the scheduling order,
19   the parties were directed to meet and confer prior to
20   the prehearing conference regarding proposed
21   stipulations of law or fact, and I see you have already
22   done that.  You started with that.  That's a good
23   start, but that is by no means the last stipulation I
24   expect.
25           To the extent the parties are able to agree to

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

1    stipulate to things like definitions, relevant time
2    frames, any noncontested facts, that will save us all a
3    lot of time when it's decision time and briefing time.
4    And I've already admitted JX 1, which was submitted
5    earlier, and, again, I say, keep in mind, the process
6    of agreeing to stipulations does not end today.  It's
7    ongoing.
8            As we go along in the trial, the parties are
9    encouraged to continue to meet, confer, and agree on
10   additional stipulations that you may offer at any time
11   prior to filing post-trial briefs.  And if this doesn't
12   happen during trial, I will re-emphasize this at the
13   end of trial.
14           Let's talk about some outstanding pretrial
15   motions.  Most of these I have covered already today.
16   I've been talking for over an hour now, so we're going
17   to need a break soon.  I usually have the witness and
18   the attorneys talk, so I've been going way too long
19   here, but let me wrap this up and we'll take a break.
20           I will not be ruling this afternoon on
21   Respondents' motion in limine to exclude the
22   investigational hearing testimony of Dr. David Spetzler
23   and any evidence of Caris Life Sciences, Inc., which is
24   opposed by the Government.  I'm deferring ruling on
25   that at this time in light of the subpoena enforcement

51
Final Pretrial Hearing
Illumina. Inc. and Grail, Inc.                                    8/23/2021

1    request now before the Commission.  I, in fact, have
2    hopes that the people opposing that discovery will
3    concede now that it's going to a District Court.  We'll
4    see what happens.
5            Here are my rulings on the remaining motions in
6    limine.  Respondents filed a motion in limine to
7    exclude evidence of a fact witness' divorce
8    proceedings, contending that the evidence was not
9    relevant and any relevance was outweighed by prejudice.
10   Complaint Counsel opposed the motion, arguing that the
11   evidence does not reflect any divorce proceedings but a
12   separate issue and that the evidence is a matter of
13   public record and relevant to the fact witness'
14   credibility.
15           That motion in limine regarding the fact
16   witness' divorce proceedings is denied.  This evidence
17   does not reflect their divorce proceedings, so the
18   title is a bit of a misnomer.  PX 9225, which is the
19   subject of the motion, is a court decision, which is a
20   public document.  The matters discussed in it,
21   therefore, are matters of public record.  Also, I am
22   capable of assigning proper weight to any of this
23   evidence.
24           The Government filed a motion to exclude the
25   declaration and deposition transcript of George J.

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

1    Serafin on the grounds that Serafin was not properly
2    designated as an expert witness and that no firsthand
3    knowledge -- and that he has no firsthand knowledge of
4    relevant facts.  Respondents opposed the motion,
5    stating they don't intend to rely on Mr. Serafin, but
6    that his testimony is nevertheless relevant.
7          The Government's motion to exclude the
8    declaration and deposition transcript of George J.
9    Serafin is granted.  The record shows that Mr. Serafin
10   was not properly designated as an expert witness and,
11   therefore, cannot properly offer expert opinions into
12   evidence.  Furthermore, he cannot qualify as a fact
13   witness because he appears not to have any firsthand
14   knowledge of factual matters relevant to the case.
15         One last thing to cover before we take a break,
16   opening statements.  Each side -- not each party --
17   each side is permitted to make an opening statement
18   that is no more than two hours in duration.  Two hours
19   is a limit, not a goal.  I'd like to hear from the
20   parties as to whether they feel they need the full two
21   hours or how much time they need.  We will go with the
22   Government first.
23         MS. MUSSER:  Your Honor, we ought to be able to
24   complete it in less than an hour.
25         JUDGE CHAPPELL:  Thank you.  Perhaps, if you

53

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                      8/23/2021

1    are going to wear the mask, which is fine, I will ask
2    you to speak up.
3             Was that a yes?
4             MS. MUSSER:  Will do, Your Honor.  Yes.
5             JUDGE CHAPPELL:  Thank you.
6             And Respondents, what kind of time do you think
7    you'll need?
8             MR. MARRIOTT:  Your Honor, I anticipate for
9    Illumina requiring about an hour and 15 minutes, maybe
10   less --
11            JUDGE CHAPPELL:  All right, and I do know --
12   I'm sorry.  Go ahead.
13            MR. MARRIOTT:  I'm sorry, Your Honor.  Maybe
14   less, but I'm trying to not, you know, misstate it.  So
15   hopefully less than an hour and 15 minutes.
16            JUDGE CHAPPELL:  All right.  And we do have
17   more than one Respondent, so will one attorney present
18   the opening statement for all or, if not, how do you
19   plan to divide up your time limit?
20            MR. MARRIOTT:  Your Honor, I plan to speak for
21   Illumina, and I believe Mr. Pfeiffer plans to speak for
22   GRAIL, and I will let him speak for him himself.
23            MR. PFEIFFER:  Yes, Your Honor, that is
24   correct, and I would believe for GRAIL, about a half an
25   hour.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

54

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

1          JUDGE CHAPPELL:  So do I understand, then, that
2     Illumina is an hour and 15 and GRAIL is another 30
3     minutes?
4          MR. PFEIFFER:  Yes, Your Honor.
5          JUDGE CHAPPELL:  That will get us within the
6     two, all right.
7          We are going to take a break, and as I have
8     stated earlier, some moments ago, we will work -- I'm
9     sorry, you will work together on the issues, and I will
10    work to deal with any objections you have remaining.
11         I will give you an hour or so -- more time if
12    needed, less time if needed -- to work through these
13    objections.  We will then reconvene and you will
14    provide me with an update.  When you are ready to
15    reconvene, contact Dana Gross by email to inform us,
16    and we will restart the Zoom platform to continue the
17    final prehearing conference.
18         Anything further before we take a break?
19         MS. MUSSER:  Not from Complaint Counsel, Your
20    Honor.
21         MR. MARRIOTT:  Nothing here, Your Honor.  Thank
22    you.
23         JUDGE CHAPPELL:  All right.  We are in recess
24    until I hear from the parties.
25         (A brief recess was taken.)

55

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

1            JUDGE CHAPPELL:  All right.  Let's go back on

2    the record.

3            What's agreed to and what's not resolved?  Who

4    wants to give me an update?

5            MS. MUSSER:  Your Honor, Complaint Counsel can

6    give you an update.

7            JUDGE CHAPPELL:  Are you the same person who

8    had a mask on earlier?

9            MS. MUSSER:  I am.  I kicked my colleagues out,

10   and I told them Judge Chappell made me, so

11   hopefully that --

12           JUDGE CHAPPELL:  Not accurate, but it works,

13   so...

14           MS. MUSSER:  Well, I will try to be more

15   accurate going forward.

16           After meeting with Respondents, Complaint

17   Counsel is withdrawing all objections except for

18   objections on four documents.  We believe that we will

19   be able to resolve those issues and are working with

20   counsel for GRAIL to just get additional information

21   about the meta data to make sure those came from the

22   files of GRAIL employees.

23           So from our side, I think we've been able to

24   reach resolution on quite a bit.  I will let

25   Respondents' counsel provide and update where they are

56

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

1      on their pending objections, Your Honor.

2              MS. GOSWAMI:  Thank you, Your Honor, and thank

3      you, Susan.  This is Sharon Goswami for Respondents.

4      So we have also been able to drop a number of our

5      objections to admissibility.  We have a few that we are

6      going to be standing on.

7              So we have objections based on relevance to

8      four documents.  We have objections to expert reports

9      that Complaint Counsel is seeking to have admitted,

10     again, to four documents.

11             We're objecting on the basis of hearsay within

12     hearsay for I think around, you know, 20 or so emails

13     that are from the custodial files of the parties, and

14     we're also objecting on the basis of hearsay and lack

15     of foundation to about 40 documents.

16             JUDGE CHAPPELL:  Are you speaking for both

17     Respondents?

18             MS. GOSWAMI:  Yes, that's right.

19             JUDGE CHAPPELL:  Let's deal with the same order

20     you used.  What are the relevance objections?

21             MS. GOSWAMI:  So the relevance objections

22     are -- there are four documents --

23             JUDGE CHAPPELL:  Let me hear the offer first,

24     and then I will hear your objections.

25             MS. GOSWAMI:  Sure.

57

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                8/23/2021

1          MS. MUSSER:  All right.  So for the relevance

2     objections, our understanding -- and we are still

3     waiting on Respondents' confirmation on precisely what

4     exhibits they're objecting to -- but our understanding

5     is they are all related to the Ariosa litigation, and,

6     Your Honor, you will hear about the Ariosa litigation

7     as Complaint Counsel presents evidence as an example of

8     the different levers that Illumina is able to pull to

9     disadvantage its downstream competitors.

10          So that litigation and the conduct between the

11     parties will be relevant to show that the -- that

12     the -- that Illumina has the same incentives in this

13     litigation and the same ability to disadvantage GRAIL's

14     customers here.

15          JUDGE CHAPPELL:  All right.  And so do you have

16     exhibit numbers of those you're objecting to?

17          MS. GOSWAMI:  So I'm not sure -- actually, I

18     think I do.  So we have -- we have PX 2240, which I

19     think we have -- we have three more, and I'm not sure I

20     have all of them in front of me, but we were planning

21     to give the full list when we revised the JX 2.

22          JUDGE CHAPPELL:  And they're all the same

23     category or subject or type of documents as Complaint

24     Counsel just described regarding the other litigation?

25          MS. GOSWAMI:  Yes, that's right.  And, sorry,

58

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

1      my apologies.  It's PX 2240 through PX 2243.

2              JUDGE CHAPPELL:  All right.  Let me hear your

3      objection other than relevance.  What about relevance?

4      Why are they not relevant?

5              MS. GOSWAMI:  Right.  So as Complaint Counsel

6      just said, they appear to be arguing that these are

7      relevant to NIPT and the levers that Illumina can

8      allegedly pull, but, unfortunately, the documents don't

9      actually go to any of that, because these are documents

10     where Ariosa made certain complaints, and there was a

11     litigation between Illumina and Ariosa where the Court

12     found against Ariosa, and so none of those complaints

13     that Ariosa was making was found to be valid.  So it

14     actually doesn't have the relevance that Complaint

15     Counsel contends that they do.

16             JUDGE CHAPPELL:  Any response?

17             MS. MUSSER:  Yes, Your Honor.  We're -- our

18     response is first that Ariosa had to go to court and

19     felt compelled to go to court due to the conduct of

20     Illumina, and regardless of the outcome of it, the

21     complaints alleged within that litigation, it's our

22     position that is extremely relevant, and also the

23     course of the litigation and the time and the cost of

24     having to raise that dispute when there was a

25     disagreement as to Illumina's behavior also, of course,

59
Final Pretrial Hearing
Illumina. Inc. and Grail, Inc.                                    8/23/2021

1    is relevant to the ability of the open offer to be an
2    effective source of relief if you have to litigate with
3    Illumina in order to reach resolution on particular
4    claims.  So the fact of the litigation in our mind is
5    the relevance of the litigation, not the end result.
6          JUDGE CHAPPELL:  All right.  Based on the
7    representations she made, these exhibits are admitted.
8    Your objection is overruled, but they are admitted for
9    the limited purpose that she just described to us, and
10   you, of course, are free to counter that with the
11   points that you just made to me.
12         MS. GOSWAMI:  Okay.  Thank you, Your Honor.
13         JUDGE CHAPPELL:  Next?
14         MS. MUSSER:  The second category of reports are
15   expert reports.  Under Rule 3.43(b), expert reports
16   come in unless there is some indicia of unreliability.
17   Here --
18         JUDGE CHAPPELL:  Hang on.  Go to exactly what
19   she objected to, not the reports themselves, but I
20   think email contained in the reports.  Am I correct?
21         MS. GOSWAMI:  No, we're -- so that's a separate
22   objection, Your Honor.  So we are objecting to the
23   reports themselves, and then there's a separate
24   objection about emails that are hearsay within hearsay.
25         JUDGE CHAPPELL:  Okay.  Expert reports are

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                        8/23/2021

```
 1    admissible.  That's overruled.
 2              What's your next objection?
 3              MS. GOSWAMI:  Susan, I don't know if you're on
 4    mute, because I can't hear you anymore.
 5              MS. MUSSER:  I was the first one to do it.  My
 6    apologies, Your Honor and Ms. Goswwami.
 7              The second category of objections are certain
 8    emails between lower level employees --
 9              JUDGE CHAPPELL:  Let me say this.  It's very
10    rare that the properties don't just agree to allow
11    expert reports rather than objecting to them, and was
12    there an attempt to at least agree to admit expert
13    reports here by both sides?
14              MS. MUSSER:  Your Honor, Complaint Counsel's
15    position, other than its motion in limine, other than
16    those two, were that the reports should come in and had
17    no objection to Respondent.
18              JUDGE CHAPPELL:  From Respondent?
19              MS. GOSWAMI:  So in our view, because the --
20    while we understand that there may be a certain
21    practice of expert reports, you know, being admissible
22    in these proceedings, under the Federal Rules of
23    Evidence, expert reports are not evidence, and,
24    therefore, in our view, they are not admissible.
25              JUDGE CHAPPELL:  Well, I'm not saying they're
```

61

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                        8/23/2021

1      going to prove any point in dispute.  I'm just saying
2      they're admitted into evidence.  I'm not saying what
3      weight they're going to have.
4              MS. GOSWAMI:  Right.  And I think where we are
5      respectfully, Your Honor, is that, you know, regardless
6      of whether it comes in now and the weight that Your
7      Honor gives to them, there is -- it remains that
8      there's a record that goes up on appeal, and what the
9      appellate court will see is that, you know, they were
10     admitted --
11             JUDGE CHAPPELL:  But they also will see that
12     you have objected to them and you have reserved your
13     objection on appeal.
14             MS. GOSWAMI:  Understood, Your Honor, and
15     that's actually precisely why we are objecting to them.
16             JUDGE CHAPPELL:  That's fine.
17             Okay, where were we?
18             MS. MUSSER:  The third category of documents
19     are Illumina and GRAIL documents with lower level
20     employees.  Our understanding of the basis for the
21     objection is that --
22             JUDGE CHAPPELL:  Well, let me also clarify what
23     I was saying, that expert reports may come in, but that
24     clearly doesn't mean the opinions will be accepted for
25     what they purport to say.  It does not mean that at

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                              8/23/2021

```
 1    all.  It just means they're being admitted, not that
 2    they're conclusive to anything.
 3            Go ahead.
 4            MS. MUSSER:  Understood, Your Honor.
 5            So the third category of documents are Illumina
 6    and GRAIL documents from lower level employees.  Our
 7    understanding is that Respondents are objecting to
 8    those as hearsay.  Complaint Counsel's position is that
 9    hearsay alone, under the Part 3 rules, Rule 3.43(b),
10    isn't a basis for excluding those from evidence, and
11    moreover, these documents came from Illumina and
12    GRAIL's files, and there's no indication that they are
13    in any way unreliable.  As such, we believe that these
14    should be admitted into evidence.
15            JUDGE CHAPPELL:  What's your objection?
16            MS. GOSWAMI:  So we actually object both on
17    hearsay and on foundation grounds.  So these are emails
18    that are from employees who were not deposed in this
19    proceeding.  They are not going to be presenting trial
20    testimony in this proceeding.  The Complaint Counsel
21    has not, through deposition testimony, laid any grounds
22    for any kind of hearsay objection, you know, that
23    there's a -- they're a business record or some other
24    hearsay objection.  And so we feel that Complaint
25    Counsel just has not met their burden to show both the
```

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

```
 1    foundation and that this overcomes hearsay.
 2         JUDGE CHAPPELL:  Well, based on her
 3    representation that they are, number one, statements or
 4    emails from employees of a party, number one, and
 5    number two, they come from the files of the
 6    Respondents, there's something called the Lenox rule --
 7    L-E-N-O-X -- 3.43(d), as in delta.  Based on those
 8    records, these objections are overruled.
 9         Next.
10         MS. MUSSER:  And the third category is hearsay
11    within hearsay.  Our understanding is that Respondents
12    are objecting to 20 documents based on this ground.
13    Again, these documents are Illumina/GRAIL documents,
14    and hearsay alone isn't a basis for excluding those
15    from evidence under the Part 3 rules.  As such, it is
16    Complaint Counsel's position that these should be
17    entered into evidence.
18         JUDGE CHAPPELL:  Okay, go ahead.
19         MS. GOSWAMI:  So these documents are emails
20    where, you know, either the author is, you know,
21    reproducing, you know, some notes from a conversation
22    that is -- that was had that they're putting into the
23    email.  They may be reproducing, you know, interview
24    notes, and, again, that's something that they're just
25    offering that for the truth of the matter asserted,
```

64

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

1    what those notes show, and that's improper hearsay

2    within hearsay.

3              JUDGE CHAPPELL:  Response?

4              MS. MUSSER:  Your Honor, first, we don't -- I

5    think that's a document-by-document -- we don't know

6    precisely what document Ms. Goswwami is referring to,

7    but generally, the overall document, the kind of frame

8    document clearly fits within a business record

9    exception of hearsay.

10             Moreover, it's reliable, and to the extent that

11   there are any hearsay objections to statements within

12   those, those would go to the weight of the evidence,

13   not the admissibility, and, thus, our position is those

14   should be admitted.

15             JUDGE CHAPPELL:  Am I correct that these are

16   all emails that -- or at least part of emails -- all of

17   these emails generate from the parties?

18             MS. MUSSER:  Your Honor, we are still waiting

19   on Respondents to identify particularly what objections

20   they're standing on, so I can't make that

21   representation.

22             JUDGE CHAPPELL:  Well, let me make this ruling.

23   Emails from the parties are going to be admissible.  To

24   the extent there are statements within the emails that

25   are, let's say, repeated from someone else, that

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                      8/23/2021

1   doesn't mean they're going to be relied upon.  Anything
2   like that that's not covered in context or put in
3   context by a witness and not demonstrated to be why
4   it's reliable, it doesn't -- it's not going to prove
5   any point.  So you're welcome to attack anything like
6   that.  I'll just say that if document RX 507 or PX 507
7   is admitted, and you see it in a post-trial brief
8   purporting to make some point, and you realize nobody
9   talked about it, there is no connection to anything,
10  it's not a very strong point, and you can attack that
11  in your post-trial brief.
12          So I'm allowing their use by the parties.  That
13  does not mean they are going to be conclusive to prove
14  the truth of the matter of anything included in them.
15  So those are going to be admitted.
16          MS. GOSWAMI:  Thank you, Your Honor.
17          JUDGE CHAPPELL:  Anything else?
18          MS. MUSSER:  No, Your Honor.  The parties will
19  work to get you a JX list, ideally tonight, but it may
20  be tomorrow morning if that schedule works for Your
21  Honor.
22          JUDGE CHAPPELL:  And to make the record clear,
23  I think you should work together and come up with a
24  list of all the exhibits that were objected to that
25  were -- and the objections were overruled and they were

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                    8/23/2021

```
 1   admitted, just so our record is clear.  I did it very
 2   informally because I thought we could handle it that
 3   way.  Is anybody in doubt on my ruling so far?
 4   Everybody understand?
 5           MS. GOSWAMI:  No, Your Honor.
 6           MS. MUSSER:  I understand.  I'm not speaking
 7   for any others other than Complaint Counsel.
 8           JUDGE CHAPPELL:  In fact, a lot of the rules
 9   that we abide by were -- let's just say the rules were
10   changed after I came to the Federal Trade Commission
11   because of rulings I continually made applying Federal
12   Rule of Evidence.  That's all I'll say about that.  But
13   just remember, there's no jury.  It's a bench trial.
14           Is there anything else before I conclude the
15   final prehearing conference?
16           MS. MUSSER:  Not from Complaint Counsel, Your
17   Honor.
18           MR. MARRIOTT:  Nothing here, Your Honor.  Thank
19   you.  It's been very helpful.
20           JUDGE CHAPPELL:  GRAIL?  I'm sorry, I heard
21   from -- that's Illumina, right?  Have I heard from
22   GRAIL?  I don't see GRAIL.
23           MR. STARK:  Sorry, Your Honor.  I wasn't
24   intending to speak since I was off camera.  Nothing
25   further from us.  Thank you, Your Honor.
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

67

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                              8/23/2021

1          JUDGE CHAPPELL:  Hearing nothing further, we

2     will begin tomorrow at 10:00 a.m. with opening

3     statements.  I thank everyone for your attention.  And

4     with that, we are adjourned.

5          MS. MUSSER:  Thank you, Your Honor.

6          MR. MARRIOTT:  Thank you, all.

7          MS. GOSWAMI:  Thank you.

8          (Whereupon, at 4:38 p.m., the hearing was

9     adjourned.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Final Pretrial Hearing

Illumina. Inc. and Grail, Inc.                                8/23/2021

1                        CERTIFICATE OF REPORTER

2

3

4           I, Susanne Bergling, do hereby certify that the

5    foregoing proceedings were recorded by me via stenotype

6    and reduced to typewriting under my supervision; that I

7    am neither counsel for, related to, nor employed by any

8    of the parties to the action in which these proceedings

9    were transcribed; and further, that I am not a relative

10   or employee of any attorney or counsel employed by the

11   parties hereto, nor financially or otherwise interested

12   in the outcome of the action.

13

14

15

16

17

18             SUSANNE BERGLING, RMR-CRR-CLR

19

20

21

22

23

24

25

# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FEDERAL TRADE COMMISSION et al.,
*Plaintiffs,*

v.

THOMAS JEFFERSON UNIVERSITY et
al.,
*Defendants.*

CIVIL ACTION
NO. 20-01113

**ORDER**

AND NOW, this 8th day of December, 2020, it is **ORDERED** that the exhibits

listed in Exhibits A and B to ECF 274 and in Appendix A to ECF 275 are **ADMITTED**.

It is **FURTHER ORDERED** that the motions at ECF 129, 130, 173, 218, 257,

265 and 267 are **DENIED**. The motion at ECF 163 is **GRANTED** to the extent that it

seeks to keep PX1074, PX1261, PX1310, PX1365, PX1395, PX1404, PX6049, DX9372

and DX 9438 under seal, *see* (ECF 232), and is **DENIED** in all other respects.[1]

---

[1]    "It is well-settled that there exists, in both criminal and civil cases, a common law public
right of access to judicial proceedings and records." *Littlejohn v. BIC Corp.*, 851 F.2d 673, 677-78 (3d
Cir. 1988). "The 'strong presumption of openness does not permit the routine closing of judicial
records to the public.'" *In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*, 924 F.3d 662, 672
(3d Cir. 2019) (quoting *Miller v. Ind. Hosp.*, 16 F.3d 549, 551 (3d Cir. 1994)). Parties "seeking to seal
any part of a judicial record bear[ ] the heavy burden of showing that 'the material is the kind of
information that courts will protect' and that 'disclosure will work a clearly defined and serious
injury to the party seeking closure.'" *Miller*, 16 F.3d at 551 (quoting *Publicker Indus., Inc. v. Cohen*,
733 F.2d 1059, 1071 (3d Cir. 1984)). "Broad allegations of harm, bereft of specific examples or
articulated reasoning, are insufficient." *In re Cendant Corp.*, 260 F.3d 183, 194 (3d Cir. 2001)
(internal citation omitted).

The Court has reviewed all documents and materials received from the parties in this
litigation and previously placed certain documents under seal. *See* (ECF 232.) Parties and third
parties seeking to seal any other documents have not met their burden to show that disclosure will
work the kind of clearly defined and serious injury that a sealing order is intended to protect and
have not rebutted the strong presumption of openness. In addition, to the extent that parties and
third parties seek to seal information because it has been designated as "confidential" or "highly

BY THE COURT:


*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.

---

confidential" in accordance with the terms of the parties' Stipulated Protected Order (ECF 55), the Court finds that disclosure of this information is in the interest of justice.  *See* (ECF 55 at ¶ 19.)

# Exhibit D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FEDERAL TRADE COMMISSION,          .
                                   .
            Plaintiff,             .  CA No. 18-0414 (TSC)
                                   .
     v.                            .
                                   .  Washington, D.C.
WILHELM WILHELMSEN, et al.,        .  Tuesday, May 29, 2018
                                   .  9:50 a.m.
            Defendants.            .
. . . . . . . . . . . . . . . . .     Pages 1 through 134


DAY 1
TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE TANYA S. CHUTKAN
UNITED STATES DISTRICT JUDGE


For Plaintiff:                     THOMAS J. DILLICKRATH, ESQ.
                                   LLEWELLYN O. DAVIS, ESQ.
Federal Trade Commission           U.S. Federal Trade Commission
                                   Bureau of Competition
                                   400 Seventh Street, SW
                                   Washington, DC 20024
                                   (202) 326-3286


For Defendants:                    COREY W. ROUSH, ESQ.
                                   CATHERINE FAIRLEY SPILLMAN, ESQ.
Wilhelmsen Maritime                Akin Gump Strauss Hauer & Feld LLP
Wilhelmsen Holding                 1333 New Hampshire Avenue, NW
                                   Washington, DC 20036
                                   (202) 887-4000


Drew Marine Group                  MARK W. RYAN, ESQ.
Resolute Fund II                   MICHAEL E. LACKEY, JR., ESQ.
                                   Mayer Brown LLP
                                   1999 K Street, NW
                                   Washington, DC 20006
                                   (202) 263-3000


Court Reporter:                    BRYAN A. WAYNE, RPR, CRR
                                   U.S. Courthouse, Room 4704-A
                                   333 Constitution Avenue, NW
                                   Washington, DC 20001
                                   (202) 354-3186

# C O N T E N T S

Opening Statement - Plaintiff FTC ......................... 8

Opening Statement - Defendant Wilhelmsen ................. 43

Opening Statement - Defendant Drew Marine ............... 63

TESTIMONY

WITNESS:                                                    PAGE:

ROB SARRO:    Direct Examination by Mr. Davis ............. 74
              Cross-Examination by Ms. Spillman ..........101

```
 1                    P R O C E E D I N G S

 2            THE DEPUTY CLERK:  Your Honor, we have civil action

 3     18-414, Federal Trade Commission versus Wilhelmsen Maritime

 4     Services, et al.

 5          I would ask that counsel please approach the lectern,

 6     identify yourselves and those at your respective tables, please,

 7     starting with the plaintiff.

 8            MR. DILLICKRATH:  Good morning again, Your Honor.

 9     Tom Dillickrath on behalf of the Federal Trade Commission.  I'm

10     joined at counsel table today by my colleagues, James Rhilinger,

11     Christopher Caputo, Josh Goodman, Amy Dobrzynski and Llewellyn

12     Davis, along with our honors paralegal, Catherine Wayne.

13            THE COURT:  Hello.

14            MR. ROUSH:  Good morning, Your Honor.  Corey Roush

15     from Akin Gump on behalf of the Wilhelmsen defendants.  At

16     counsel table, I have with me Fairley Spillman and Catherine

17     O'Connor.  And I'd also like to introduce -- we have our

18     corporate rep in the room, Jon Bjornvold, Your Honor.

19            THE COURT:  Good morning.  Akin Gump is busy.  I

20     think I have you all in a hearing before me at 2:30 as well.

21            MR. ROUSH:  Not this team, but yes, Your Honor.

22            THE COURT:  No, not this team.

23            MR. RYAN:  Good morning, Your Honor.  Mark Ryan on

24     behalf of the Drew Marine defendants.  And with me at counsel

25     table are Oral Pottinger and Michael Lackey.  And in the
```

1   courtroom today as our corporate representative is the president

2   and CEO of Drew Marine, David Knowles.

3          THE COURT:  Good morning.  All right.  Thank you all.

4   Sorry I was a bit late.

5       Let's just take care of a couple of housekeeping matters.

6   I know we're all trying to get the evidence in and move this

7   along in an expedited fashion.  And when we were planning for

8   this, I -- as you know, I have a committee meeting in Pittsburgh

9   next week, and I thought that I would be leaving earlier.

10  Anyway, some hours opened up.  Not full days, but half days.

11  And if you all -- I know you have to plan witnesses and your

12  schedule, but if you all want to take the time, we can.

13      So Monday, which is June 4, I do not -- my flight is at

14  5:15 from Reagan, so I have -- probably have a hard stop by

15  3:00-ish, 2:30, to be certain, with rush hour.  But the entire

16  morning is available.  So if you all wanted to start at 9:00 and

17  go till 2:30 -- I don't know if you have witnesses here or not,

18  but I am here and I don't have anything scheduled.

19      Mr. Dillickrath and Mr. Roush, Mr. Ryan?

20          MR. DILLICKRATH:  Your Honor, we'll have to check on

21  witness availability, but if our witnesses can be available,

22  we're happy to --

23          THE COURT:  Okay.  That's why I wanted to let you know

24  today so you can -- you don't have to let me know today or -- I

25  mean, I'm not going to schedule anything.  The day will stay the

1   way it is, so -- believe me, if we don't sit, I have a ton of
2   stuff --
3             MR. DILLICKRATH:  That's fair, Your Honor.
4             THE COURT:  -- that I'm carrying that I can do.
5             MR. ROUSH:  And for defense case, several of our
6   witnesses are coming from overseas.
7             THE COURT:  Okay.
8             MR. ROUSH:  And so if plaintiffs are still going, we
9   would have no objection to that, but we would want to start our
10  case on June 8th if they've concluded theirs.
11            THE COURT:  Okay.  That's fine.  I am just letting you
12  know that that time is available if you all need to use it.
13       Also, I return -- I thought I was coming back on the 7th,
14  but I'm actually coming back on the evening of the 6th, which is
15  Wednesday.  So currently we're scheduled to resume on the
16  Friday.  I have one very brief matter on the Thursday and one
17  that may or may not turn into a plea.  But also I have a chunk
18  of time that day as well, probably all afternoon, if you all
19  need it.  So just letting you know as well.
20       Again, if your schedule -- if you've already set your
21  schedule and your witness lists and you can't use the time,
22  that's perfectly fine.  As I said, I have a ton of stuff that I
23  can get done.  But that's also available.
24       All right.  Also, I know I said that we'll be starting at
25  9:30, but on some day -- I can actually start at 9:00 most days.

1     Maybe what I'll do is tell you the -- you know, at the beginning

2     of the week. For example, I can start -- I can start tomorrow

3     at 9:00, if you want. Now, if you've already set up your whole

4     team to be ready for 9:30, that's fine. But I can start

5     tomorrow -- actually, for the rest of the week except Friday.

6     So Wednesday and Thursday I can start at 9:00. I have a 9:00

7     meeting on Friday. So it's up to you. Let me know what you

8     want to do at the end of the day.

9         All right. That's all the housekeeping we have -- I have.

10             MR. DILLICKRATH: Your Honor, I think -- one small

11     item?

12             THE COURT: Yes.

13             MR. DILLICKRATH: And this is with regard to exhibits.

14     We mentioned the other day that we would like to move all the

15     exhibits in en masse before the start of the hearing.

16             THE COURT: All right.

17             MR. DILLICKRATH: We sent over our sealed exhibit list

18     last night. There are a very small number of documents over

19     which we still are -- have objections on both sides. We have

20     agreed amongst ourselves -- and Mr. Roush, if I get in wrong,

21     feel free to jump in. We've agreed amongst ourselves that we

22     don't need to argue those at this point.

23             THE COURT: Okay.

24             MR. DILLICKRATH: If they come up during the course of

25     the hearing, we'll ask Your Honor to rule on those. Otherwise,

1    we think we can reserve any argument on those.  And what we

2    would like to do is move in all approximately 3,000 exhibits

3    into the record at this time.

4              THE COURT:  All right.  They -- and, Mr. Roush, is

5    this a joint motion?

6              MR. ROUSH:  Yes, Your Honor it is.

7              THE COURT:  All right.  They will be admitted into

8    evidence --

9              MR. DILLICKRATH:  Thank you, Your Honor.

10             THE COURT:  -- except for those for which the parties

11   object if they're offered during the course of the hearing.

12             MR. DILLICKRATH:  Thank you.

13             THE COURT:  And I want to tell you that I apologize

14   for all the trees that may have been murdered as part of this

15   case, because when my courtroom deputy told you I needed two

16   copies, he had no idea -- actually, I should have told him,

17   because I had an idea; we did not communicate -- of the volume

18   of documents we were talking about.  So I apologize for that.

19   Electronic is fine.  I don't think there's room in my jury room

20   for all those boxes.  So I hope you didn't go to too much

21   trouble and expense.

22        But, I mean, certainly, if I have the hard copies I can

23   look at them as we go along.

24        All right.  Mr. Dillickrath?

25             MR. DILLICKRATH:  Your Honor, my colleague has hard

1    copies.  If you would like one, he could approach.

2          (Documents tendered to the Court.)

3               OPENING STATEMENT BY COUNSEL FOR PLAINTIFF

4          MR. DILLICKRATH:  Thank you, Your Honor, may it please

5    the Court, Tom Dillickrath again, here on behalf of plaintiff,

6    the Federal Trade Commission.

7          Your Honor, what we have here today is, in essence, a very

8    simple case.  And what I'd like to do this morning -- and this

9    is what we'll do throughout the course of the hearing -- is to

10   focus the Court's attention on the issues that are really at the

11   core of this matter.  Here's what the FTC will demonstrate

12   during this hearing.

13         Wilhelmsen and Drew are the two largest competitors in the

14   world for the supply of marine water treatment products and

15   services, and they sell these products to a number of customers,

16   including owners and operators of global fleets, which are large

17   vessels that travel around the globe.  For these customers,

18   there are two, and only two, credible choices to supply the

19   marine water treatment products and services, and that's the

20   defendants, Wilhelmsen and Drew.

21         And what Wilhelmsen is doing in buying Drew is executing on

22   a strategy that it's had in place for a few years now, which is

23   to take out its largest competitor.  And the effect of this

24   transaction would be to raise price and lower quality.

25         Now, there's a straightforward way to think about this,

1    Your Honor.  First, the evidence will show that this is an

2    illegal merger of the two dominant firms in the market, indeed,

3    the only two firms that most customers consider when bidding out

4    on their requests.  And there are time-tested, well-established

5    ways used by the antitrust agencies and endorsed by the courts

6    to think, from an economic standpoint -- widely accepted ways to

7    analyze a merger's impact on competition, and using that

8    framework, we'll explain why this merger is presumptively

9    illegal.

10        Now, that's part of a burden-shifting framework.  There's a

11   rebuttable presumption -- and defendants will have the chance to

12   show that the presumption is not applicable here.  But on these

13   facts, Your Honor, and for the reasons that we'll discuss, the

14   defendants cannot even begin to move the needle, let alone

15   approach the threshold -- and it is a very high threshold --

16   that they would need to rebut the presumption.

17        And there is plenty of other evidence, Your Honor --

18   ordinary course business documents from the defendants, from

19   Clare Consultants, evidence from customers, from competitors,

20   and even from some entities that are outside of the market --

21   that will explain beyond any presumption why this merger is

22   indeed illegal.

23        And with that framework in mind, we ask the Court to apply

24   section 13(b) of the FTC Act, given the presumptive illegality

25   of the merger and the other evidence from every level of

1    industry participant, and preserve competition by enjoining the

2    merger until resolution of the administrative complaint

3    following the full hearing on the merits which is scheduled to

4    start in just a couple of months -- less than two months.

5        So why are we here, Your Honor?  And I'd like to start by

6    talking about the process.  Now, the FTC investigates many

7    mergers every year, and only challenges a small fraction of

8    those.  And the reason the FTC challenges mergers is to fulfill

9    its mission, which is to protect consumers in the U.S., and

10    ultimately, in this case, across the globe.

11        Here, Your Honor, industry participants initially expressed

12    concerns to the FTC, and you'll hear some of those concerns over

13    the next few weeks, concerns that are consistent with the other

14    evidence that we've gathered during our investigation.

15        And it's also worth noting that the two foreign competition

16    agencies that have looked at this merger, the UK and the

17    Singapore competition authorities, have found that the merger

18    was anticompetitive.  And in fact, Singapore just released its

19    preliminary decision -- or issued a press release on its

20    preliminary decision, to be specific -- last Friday.  And they

21    found a significant problem in a very similar product market to

22    that we are looking at today.

23        Now, Your Honor, I want to talk briefly about the process

24    that gets us to a complaint, because this is not something the

25    FTC takes lightly.  The FTC goes through a rigorous process, a

1   rigorous investigation, including interviews with the parties

2   and a full panoply of industry participants, and that includes

3   investigational hearings, which are essentially depositions.

4   Parties have an opportunity to present their views on the case

5   in meetings at all levels of the FTC, from the staff, to

6   management, to the commissioners themselves.  And the defendants

7   took full advantage of those opportunities.

8       We also do economic work to see what the market looks like.

9   And all that took place here in this case, Your Honor.  The

10  investigation was exhaustive.  And all sorts of industry

11  participants, or even folks that defendants suggested might one

12  day might want to be in the market, gave us information.  And

13  only then, after this exhaustive process, was a recommendation

14  made on whether to block this merger, whether that was necessary

15  to protect existing competition here in the market for marine

16  water treatment chemical products and services.

17      The Commission ultimately votes on whether to issue a

18  complain, and that is not a rubber stamp process by any means,

19  Your Honor.  But if they do vote to issue a complaint, it starts

20  the clock ticking on the administrative hearing which has to

21  take place within 210 days.

22      And our overarching goal, Your Honor, is to protect the

23  loss of competition and the effects on consumers that may result

24  from this loss.  And that is why, with the onset of the

25  administrative hearing fast approaching, we ask the Court only

1    to maintain the status quo until the decision on the merits.

2         Now, the parties may say, we prefer to just litigate the

3    preliminary injunction and we may appeal that but we'll never go

4    through the administrative proceeding.  But there is a process

5    that is put into place by Congress for them to have their chance

6    for a full hearing, to have their day in court.  And whether

7    they elect to do so or not, they cannot selectively opt out and

8    transform this hearing into a quasi-permanent injunction

9    hearing.

10        The relief we seek here is limited, and if defendants do

11   not want to take advantage of their right to a full hearing

12   before the administrative law judge, that's up to them, but it

13   does affect the standard that should be applied here.

14        So at the threshold, Your Honor, we're here to protect

15   consumers, but why this case?  Why did this one pass muster

16   where so many others did not?  Why are we taking action here

17   before this Court?

18        Well, first, Your Honor, the defendants are the only truly

19   global suppliers of marine water treatment chemical products and

20   services.  Now, you'll hear differently from defendants.

21   They'll tell you about other loose, informal networks that they

22   claim are capable of making some sales into various ports, and

23   they'll describe them as global.  They'll also tell you about

24   much smaller regional competitors who claim to be the same size

25   and scope as defendants on their websites.

1    But the facts that we'll present here at this hearing will

2    show that they are not and that customers know very well that

3    they are not.  Now, in fact, if this illegal merger were to be

4    consummated, the next largest competitor would be 15 to 20 times

5    smaller than Wilhelmsen and, in fact, even now, it's just a

6    fraction of the size of either defendant.  And that just isn't

7    consistent with the tale that defendants weave of a competitive

8    market post-merger.

9    Now, you'll hear over the next few weeks from a number of

10   customers, and they will tell you -- and you'll see in the

11   documents as well, Your Honor -- global fleets' customers need a

12   global distribution network, they need a breadth of product

13   offering, they need service and technical offerings, and they

14   need a supplier with a reputation and who can guarantee product

15   consistency.  And you'll hear that the entities who are best

16   positioned to do so are defendants.

17   And along those lines, Your Honor, defendants will tell you

18   that entry or expansion is easy, that there are no barriers to

19   entry.  But that is just not consistent with the facts.  And

20   indeed, defendants' idea of what the market will look like

21   post-merger is purely speculative.

22   Defendants also will talk about the efficiencies associated

23   with the merger, and, Your Honor, it's up to the defendants to

24   show that any efficiencies are cognizable.  And the efficiencies

25   they claim here do not pass that test.  But we'll talk more

1    about that in a few moments.

2        Now, Your Honor, I don't want to put the cart ahead of the

3    horse too much, but it's worth noting the market shares of these

4    defendants as opposed to everyone else in the market.  And if

5    you look at the two shades of blue, those are Wilhelmsen in the

6    dark blue at about 46 percent, and Drew at 39 percent in the

7    lighter blue.  And you put that forward to post-merger and

8    you're at about 85 percent, and that's for, Your Honor, I should

9    say, all water treatment chemicals.  Many of the smaller

10    providers don't track it at the same level as our relevant

11    market, which consists of boiler water and engine cooling water

12    chemicals.  But the numbers are directionally the same, and

13    indeed, this is probably a conservative estimate.

14        And this just shows you where the defendants face an

15    insuperable battle here because they cannot ignore this dominant

16    share that Wilhelmsen and Drew possess now, and even more

17    colossal share that they'll possess post-merger.

18        Now, Your Honor, I'd just like to speak briefly about each

19    of the defendants.  Wilhelmsen is a publicly traded Norwegian

20    company, 125 countries that they operate in, 4500 employees,

21    very substantial revenues, 182 warehouse locations, all of which

22    are very impressive statistics.  And I don't mind saying,

23    Your Honor, I think Wilhelmsen is a very impressive company.

24    They are the largest maritime services company in the world

25    probably because they focused on providing high-quality

products, reliable products, and -- this is very important to
purchasers -- a truly global network.

And the way that Wilhelmsen has been able to get into the
marine water treatment chemicals is historically through
acquisition. In 2005 they bought a company called Unitor, and a
press release issued at the time by one of the senior executives
said that release -- or that acquisition, excuse me, was to
create a unique global network.

Now, in 2011 they bought a company called Nalfleet which is
the marine chemicals division of a company called Nalco, which
is now Ecolab. And I apologize, Your Honor. It's like a
complicated Russian novel with all the names. I'm very sorry.
I'll try not to do too much of that. But you'll learn that
Ecolab and other industrial suppliers have no interest in being
involved in this business.

Now, in 2018, Wilhelmsen wants to buy Drew. And why? In
this acquisition, they want to acquire the only remaining
competitor, which would give them this dominant position in the
market. And they've been trying to make this acquisition for
four years with the single goal of acquiring their only truly
significant competitor.

Now, Drew is also a very impressive company, Your Honor. I
would not deny that. They tout their ability to provide
comprehensive global coverage, and they've been doing that for
about 90 years. They focus on selling water treatment programs,

1    as they call them, which are comprehensive solutions involving

2    chemicals and services and testing equipment and dosing

3    equipment.

4         And indeed, Your Honor, they also have over 400 employees,

5    I believe, they operate in 45 or 46 countries, over 80

6    distribution centers.  And they've built quite a reputation for

7    themselves for their technical capabilities.  And, really, it's

8    right in the name:  Drew Marine Technical Services.  Technical

9    services are a very important part of their business model, as

10   it is for Wilhelmsen.

11        Now, before we get too deeply into the antitrust issues,

12   Your Honor, I just want to spend a couple of minutes talking at

13   a very high level about what it is -- what are the products and

14   services that defendants supply.

15        Now, the supply of marine water treatment chemical products

16   and services includes the provision of chemicals, testing

17   equipment, related technical services, like shipboard services,

18   the ability to put an engineer actually on the ship, and

19   training, which are all sold as part of a holistic program or a

20   solution.

21        And what do these chemicals do?  Well, Your Honor, we focus

22   here on two different components of marine water treatment

23   chemicals, which are boiler water treatment and engine cooling

24   water treatment.  And in very general terms -- and we'll have

25   witnesses who can tell you in far greater detail than I -- but

1    they're designed to inhibit corrosion or prevent scaling in

2    these engines and boilers.

3        And why is this important?  Well, if the water in these

4    engines and boilers isn't maintained properly, you can have

5    engine failure or boiler failure, and that can be catastrophic.

6    It can leave a ship dead in the water, it can leave it

7    inoperable, and that results in repair costs and down time,

8    which are anathema to these operators.  They need to have those

9    ships out traveling from port to port.

10       Now, as a proportion of a fleet owner's spend, or

11   operator's spend, these chemicals are not very expensive; they

12   are relatively low cost.  But their cost is disproportionate to

13   their significance.  You could describe them as low cost but

14   very high criticality items.  And we'll talk a little bit more

15   in a few minutes about the product definition that includes

16   global fleets, but I just want to give some context on what the

17   vessels are we're talking about.

18       These are very large ships.  They can be tankers which

19   carry chemicals or oil or gases in bulk.  They can be military

20   vessels, like the ships operated by Military Sealift Command,

21   which is the civilian transportation arm of the Department of

22   Defense, and is Drew's most important customer.  Or it can be

23   bulk carriers which can transport virtually any type of cargo.

24   And these are very large ships, as measured in gross tons.

25       And the main takeaway here, Your Honor, is the interplay

1    between global fleets and these marine water treatment chemical

2    products, and that is global fleet customers will seek a

3    consistent product everywhere they travel, and that can be quite

4    unpredictable.  They often don't know where the next port is

5    going to be.  And what you'll hear is that customers do not and

6    cannot mix and match products on a port-by-port basis.

7        And just to give a sense of how these vessels travel,

8    Your Honor, and I'll just touch briefly on this hypothetical

9    vessel which starts out in Miami with a load of water treatment

10   chemicals.  It travels for about three months -- and typically

11   they carry about three months' worth of these chemicals on

12   board -- and ends up in Shanghai.  So in Shanghai, they restock

13   the chemicals, and they have a new second engineer who has just

14   come onto the ship.  And this second engineer is not familiar

15   with how to test the products.  And second engineer is actually

16   a relatively high-ranking status on the ship.  So the company

17   may want a representative from Drew or Wilhelmsen to come on

18   board and train that second engineer in how to do the testing.

19       They continue to travel on.  Their next scheduled stop is

20   in Cape Town, where they take another load of marine water

21   treatment chemicals.  At this point, they plan to sail back to

22   San Francisco, but they have an unexpected pit stop -- and these

23   happen all the time -- in Rio de Janeiro.  And while they are in

24   Rio, they say, well, we've had a problem.  We can't get the

25   testing consistent.  There are anomalous number.  We need to

1    have a representative of one of these companies come on board.

2    And they need to know that when they do this unexpected portage

3    in Rio, that they can get somebody on board who can help them

4    with the problems they've encountered.

5        Now, I spoke a little bit earlier about market shares.  And

6    there's no doubt, Your Honor, that the market shares here are

7    extremely high and raise serious antitrust concerns.  And I

8    could literally cite to dozens of documents, if not hundreds of

9    documents, Your Honor, where the defendants talk about each

10   other as meaningful competition.  And I just highlighted a

11   couple here.  The first document was a Wilhelmsen pricing

12   optimization product, and Wilhelmsen talks about their key

13   global competitor.  And who is that?  It's Drew.

14       And the defendants have described the competition between

15   each other as fierce and aggressive.  And those documents come

16   from very senior executives at Drew.  And with that in mind,

17   this merger would only eliminate that fierce and aggressive

18   competition between these two key global competitors.

19       And when you have a situation like this, with the number

20   one entity in the market acquiring the number two, which is the

21   case with Wilhelmsen acquiring Drew, there's a pretty clear

22   framework -- and I only put this slide up to highlight what

23   Judge Sullivan said in *Staples* -- there can be little doubt that

24   the acquisition of the second largest firm by the largest will

25   tend to harm competition in that market.

1        Now, if I could ask Mr. Bradley to black out the public

2    screens for the next slide.  And, Counsel, if you could -- thank

3    you.

4        And just to see how dominant the defendants are,

5    Your Honor, I'd like you to just look at this revenue data

6    that's on your screen for marine water treatment chemicals.  And

7    again, this data is at an aggregated level because that's how

8    most of the small competitors keep track.  But it is, if

9    anything, a conservative assumption.

10        And if you look at Wilhelmsen and Drew and compare them

11    with the next largest competitor, it's just an incredible

12    difference.  If my maths are right, Drew is about eight times

13    larger than the next largest competitor, Marichem.  And even if

14    I took all of these other small competitors along the right,

15    Your Honor, and I stacked them on top of the Marichem bar, it

16    still would be less than half of the revenues of Drew.

17        Mr. Bradley, you can turn the access back on.

18        And just a couple of documents to highlight the dominant

19    position of these -- sorry, I didn't click my button fast

20    enough.  My apologies.

21        If you look at this slide, Your Honor, it talks about how

22    the vessel performance products segment, which includes marine

23    water treatment chemicals, is dominated by two companies:  Drew

24    Marine and the market's largest participant, Wilhelmsen.

25        And, Your Honor, there is testimony from customers that

1    they benefit from this intense competition from Wilhelmsen and

2    Drew, and articulating their fears of what it would mean if this

3    competition is lost.

4         And Mr. Bradley, if you could, again, black out the next

5    slide.

6         And defendants, in their ordinary course of business

7    documents, do not, Your Honor, and cannot avoid the obvious fact

8    that they are each other's closest competitors.  And you can see

9    it with the examples that I've put up on the screen here,

10    highlighting the fierce and aggressive competition between them.

11         Mr. Bradley, you can turn the screen back on.

12         Now, defendants will tell you, Your Honor -- and I'm

13    confident of this -- that the FTC just plain has it wrong.  They

14    will advance a number of arguments that we will take on in turn,

15    but to be sure, defendants are wrong on the facts, defendants

16    are wrong on the law, defendants are wrong on the economic

17    analysis, and defendants are wrong in not confronting market

18    realities.

19         And this is particularly true, Your Honor, when it comes to

20    market definition arguments.  And defendants will have a real

21    problem here because their analysis is somewhat of a Jenga

22    tower.  Their facts are wrong, and the economic analysis done by

23    their expert witness is deeply flawed.  And you'll hear from us

24    over the course of the next few weeks, why that is the case.

25         And as I mentioned, Your Honor, there are some secondary

1  arguments put forth by defendants.  They claim that there would

2  be sufficient entry or expansion by existing providers to

3  maintain competitive conditions.  But there is a standard that

4  the courts apply:  Would that entry be timely, likely, and

5  sufficient to obviate the anticompetitive effects?

6      And, here, the evidence is to the contrary, notwithstanding

7  that it would be defendants' burden to demonstrate entry in the

8  first place.

9      And the same holds true for the notion that there are

10  sufficient efficiencies present to overcome the presumption.

11  That will be defendants' burden, and they cannot show that their

12  purported efficiencies are substantiated.

13      And they also make a powerful buyer argument, Your Honor,

14  that these customers are powerful buyers that can withstand any

15  attempt to raise price.  But most fundamentally here,

16  Your Honor, they ignore the fact that these customers cannot

17  have any leverage if there are no credible alternatives to turn

18  to.

19      In short, Your Honor, the defendants cannot even begin to

20  meet their burden of demonstrating some countervailing factor to

21  the presumption, should it be invoked, and it's very clear that

22  this illegal merger will result in a reduction in competition.

23  So let me talk through the standard analytical framework that's

24  applied in virtually every antitrust merger case, and that can

25  be applied here.

1    And a good place to start is with section 7 of the Clayton

2    Act, which is the operative statute.  And the important language

3    is bolded here:  Any line of commerce in any section of the

4    country where the effects of such acquisition may be

5    substantially to lessen competition.

6        And this seems a good place to briefly touch on one of

7    defendants' arguments -- and I'll just touch on it only in

8    passing -- but they claim that there is insufficient connection

9    with commerce in the United States within the meaning of the

10   statute, if I'm properly understanding their arguments.  But

11   unlike the United Kingdom, there's no *de minimis* exemption in

12   the United States antitrust laws.  And moreover, Your Honor,

13   consider that many of the major customers of these defendants

14   are U.S. companies, including Military Sealift Command, many

15   cruise ship lines, cargo or tanker operators.  And of course,

16   Drew itself is located in the State of New Jersey.  So that

17   argument doesn't make a whole lot of sense.

18       And as you can see from the plain language, Your Honor, a

19   violation of section 7 takes place where the merger may

20   substantially lessen competition.  We don't need to show that

21   the merger will result in price increases or will result in a

22   reduction in quality competition.  It may be that's the case,

23   but that's not something that we need to prove.

24       And while in many previous cases the FTC has pointed out

25   evidence of an intent to increase prices, that isn't a

1    requirement either.  Antitrust law and the related economic

2    thinking are based on the premise that competitive markets are

3    beneficial to consumers in the form of price and quality and

4    that a reduction in competition may manifest itself in a

5    reduction in price or quality, but the law only requires a

6    showing that competition will be lessened.  And we'll set forth

7    evidence making it clear that that's the case here.

8        The other legal standard that's important, Your Honor, is

9    the preliminary injunction standard.  The FTC brings preliminary

10   injunctions under section 13(b) of the FTC Act, and they're

11   decided under what's called the public interest standard.  And

12   two parts to that.  The first is a likelihood of success on the

13   merits, and that's really where the crux of the issue is at this

14   hearing.

15       Under that standard, the question before the Court is

16   straightforward:  Is it likely that the FTC would be able to

17   demonstrate the anticompetitive effects of the merger or that

18   the effect of the merger may be to lessen competition at the

19   administrative hearing?

20       And, Your Honor, two key words in that standard, is it

21   likely -- as opposed to certain -- and may -- as opposed to must

22   be -- to lessen competition.

23       And the second half of the test calls for a weighing of the

24   equities, and the balancing inherently falls on the side of the

25   FTC.  Congress created our agency to implement and ensure

1   effective enforcement of the antitrust laws.  And the public

2   equities are afforded much greater weight, and in fact, no

3   case -- no court has ever denied relief based on the equity

4   factors where the FTC has demonstrated a likelihood of success

5   on the merits.

6       Now, Your Honor, I've spoken a little bit over the course

7   of the past few minutes about a presumption that a merger is

8   anticompetitive, and that's really the guiding principle that

9   organizes the burden-shifting in an antitrust merger case.  And

10  what it means is if there are high shares in a highly

11  concentrated market and the merger causes some significant

12  increase in high concentration -- in that concentration, then a

13  presumption takes hold that makes the merger illegal.

14      So let me just summarize how this framework is routinely

15  applied by the courts.  First, definition of a relevant market

16  from both a product and a geographic standpoint.  Once the

17  market is defined, we look at the concentration.  If the market

18  is highly concentrated with high market shares and there are

19  guidelines in place to assess that, then the merger is

20  presumptively anticompetitive.

21      At that point, defendants have to rebut that presumption,

22  and there are a number of ways they can do that, here, by

23  showing entry that it's timely, likely and sufficient to

24  overcome the presumption, substantiated in merger-specific

25  efficiencies, or by meeting the elements of the power buyer

1    defense.  The burden is on defendants to rebut.  And on the
2    facts that we'll talk about today and over the next few weeks,
3    that will be a very difficult row for them to hoe.
4        Now, the Court will likely hear a fair amount of economic
5    analysis from both sides over the next few weeks, I suspect, and
6    let me just take a few minutes to give a high-level preview of
7    what it is I think may be discussed.
8        There's a standard way to work through the antitrust
9    analysis of competitive issues associated with a merger, and
10   that's using the framework outlined in the horizontal merger
11   guidelines which are put out by the DOJ and the FTC jointly.
12   These guidelines have been accepted not only by the agencies as
13   an analytic framework, but generally serve as the way -- basis
14   for the way courts think about the proper framework for
15   antitrust analysis.
16       And you can see the issues we talked about a moment ago --
17   and I'll preview just a few of these for the Court -- are set
18   forth within the guidelines.  And, Your Honor, the Court may
19   already be aware of this -- a bit of Antitrust 101 -- but two
20   components to a relevant market under the guidelines approach:
21   Product market -- in this picture, apples -- and geographic
22   market, which I've put the globe up, assuming that everybody
23   likes apples and we could all agree on a global market.
24       Now, how do we go about defining these markets, Your Honor?
25   Well, the guidelines provide a road map, and it's a road map

that economists apply using a very simple test called the
hypothetical monopolist test.  Now, Dr. Nevo, Aviv Nevo of the
University of Pennsylvania, will be here on our behalf in a few
days to explain this in more detail.  But in a fundamental way,
the test looks at whether consumers would substitute to another
product if a hypothetical monopolist can impose -- and this will
be one of the few times I'll use jargon in the course of the
opening, Your Honor -- but if the hypothetical monopolist can
impose a small but significant nontransitory increase in price,
also known as a SSNIP, which is usually 5 percent, in the market
being tested.  If the answer is yes, you've got your relevant
market.  If it's no, then you move on to the next closest
product or service, add that, and run the test again.  And
Dr. Nevo will certainly explain that far better than I can, Your
Honor.

       Now, Dr. Nevo performed the hypothetical monopolist test,
and he'll tell you about that, but the bottom line of his
conclusions:  The market here is for the supply of marine water
treatment chemical products and services to global fleets.  And
as I mentioned before, Your Honor, the marine water treatment
chemical products and services in this market include boiler
water treatment and engine cooling water treatment chemicals.
And these are clustered together for analytic purposes, and I'll
turn to why that makes sense in a moment.  The market also
includes a particular set of customers, global fleets, and these

1    are customers who can be targeted by defendants for price

2    increases.

3        And we talked about the hypothetical monopolist test a

4    moment ago.  And this market passes that test.  And it also has

5    certain practical indicia of a relevant market that are set

6    forth in a seminal Supreme Court case called *Brown Shoe*.  For

7    example, the unique characteristics and uses of the product

8    specific to maritime uses -- and you'll hear why industrial

9    water treatment chemical suppliers have a completely different

10   model with regard to distribution.  You'll hear that customers

11   value consistency with these products, that customers want a

12   single water treatment chemical supplier for their vessels, and

13   that they cannot and do not mix and match these vessels [sic] on

14   a port-by-port basis.  Now, what does all that mean?  It means

15   there are no meaningful substitutes that would allow a marine

16   water treatment chemical customer to avoid a SSNIP.

17       And the nuance I mentioned a moment ago, Your Honor,

18   boiling water treatment and cooling water treatment chemicals

19   are part of what economists call a cluster market.  It's a very

20   well established concept in the case law, and we can think of it

21   quite simply:  They're distinct products that face similar

22   competitive conditions that are combined into one market for

23   analytic convenience, the caveat being they can't be substitutes

24   for each other.

25       And here we think about the similar margins between the two

products, similar market concentration, the similar dynamics.

And one of the few things I think we'll agree upon with defendants, I think, is that these products are not substitute for each other between boiler water and engine cooling water treatment.

I mentioned a moment ago, Your Honor, targeted customers, which are the global fleets customers that we're talking about here.  And these are global fleets of ten or more globally trading vessels above 1,000 gross tons -- they're large ships -- that travel to ports that are at least 2,000 nautical miles apart within a given year.

And what's important is that these global fleets, Your Honor, have things that they need.  They need sophisticated and reliable global suppliers who can deliver consistent product wherever they need it whenever they need it.  And the guidelines specifically call for the applicability of a targeted customer approach where a hypothetical monopolist could target a particular set of customers for price discrimination.

There's no requirement that they currently be doing it, but the requirement is that they be able to do so.

And, Mr. Bradley, if you could black out the screen again.

And just a couple of examples of how the defendants themselves think about this market.  The first is from a model that Wilhelmsen uses, or used, to track its sales opportunities.  And they define their core market as large, globally trading

1    vessels.

2         Another document is from a capital markets day that

3    Wilhelmsen held a number of years ago.  In a section called "our

4    market" Wilhelmsen confirms their targeted market, targeting

5    vessels trading globally.

6         You can put the screen back up, Mr. Bradley.

7         Now, there's not a lot, again, that defendants and us agree

8    on, but one thing, again, that we do agree on is that the

9    relevant market here from a geographic standpoint is global.

10        So I want to go ahead and put these principles into

11   practice, Your Honor, and see how this widely accepted

12   methodological approach I've described, an approach used in

13   virtually every merger case, applies here.  And, Your Honor, we

14   looked at this pie chart before, and it's a very large piece of

15   pie between Wilhelmsen and Drew post-merger.  And I only show

16   this to orient the Court to the scale of the market shares that

17   we're discussing here.

18        Now, in order to apply the presumption, Your Honor, we use

19   something -- one more piece of jargon -- called the

20   Herfindahl-Hirschman index, or the HHI.  It sounds daunting.

21   The name is impressive.  But it's really just a very simple way

22   to think about the level of market concentration using some

23   thresholds to think about the presumption.  And it has two

24   dimensions.

25        First, does the post-merger HHI score -- and all that is is

1   adding up the squares of the market shares -- so does that score

2   exceed 2500?  Well, here you see the score is 7200, so it blows

3   by that threshold.

4       The second thing you look at is whether the change in HHI

5   between pre- and post-merger is over 200.  And here, Your Honor,

6   the change is about 3,563, about 16 times the threshold.  So

7   using this standard analysis, Your Honor, the presumption is

8   readily met.

9       There have been a number of cases in D.C. that have

10  examined the presumptions and have looked at cases with combined

11  shares and post-merger HHIs that, frankly, are dwarfed by those

12  present here, and in every one of those cases on this list

13  brought over the past 20 years, the merger has been enjoined.

14  That's pretty telling.

15      Now, defendants would like to lower that market share, we

16  think, and we understand that.  They'd like to lower that

17  presumption and not have to deal with it.  And they are going to

18  use their expert witness to try to find a different set of

19  market shares.  And to do so, what we see are meaningless shares

20  based strictly on vessel count, regardless of size, measuring

21  share without regard to what is sold to those vessels.

22      And the defendants would argue that regardless of vessel

23  size, that the small boat, like the tug boat positioned here, is

24  the same as the large boat in the foreground of the picture.

25  And that does not make sense and it doesn't take account of

1    actual purchases.  It's another example where the tale

2    defendants are telling does not comport with reality.

3        So this is all we really need to show to get the

4    presumption, Your Honor.  But how might the anticompetitive

5    nature of the merger manifest itself?  Well, the evidence will

6    show Wilhelmsen and Drew are the dominant suppliers, the two

7    global players, and that smaller suppliers simply cannot

8    effectively compete.

9        Moreover, Your Honor, defendants are often the number 1 and

10   2 bidders, indeed often the only bidders, on framework

11   agreements to global fleets.  Framework agreements are

12   agreements on price and terms to supply products like marine

13   water treatment chemicals.  And in order to win those

14   agreements, defendants will offer price concessions and other

15   nonprice terms.  And all of that competition would be lost

16   post-merger.

17       Now, you'll hear a lot of evidence over the next few weeks,

18   Your Honor, and that evidence will serve to confirm that strong

19   presumption that I've talked about, that this merger is

20   anticompetitive and illegal.  The evidence cuts across a lot of

21   issues, Your Honor, and one way I like to think of it is tiles

22   in a mosaic.  You put each tile down individually.  They don't

23   look like much.  But you stack the tiles up and you start

24   putting them together and a picture starts to take place.

25       And at the end of this case, when I have an opportunity to

1    summarize the evidence, I think you'll see that a very clear

2    picture is set forth in the tiles of an illegal merger.

3         And here are just a few tiles that you can expect to hear

4    about during the course of this proceeding.

5         And Mr. Bradley, if you would blank out the screen, please.

6         Now, Dr. Nevo has done a lot of economic work, a lot of --

7    I think my screen just went blank, Mr. Bradley.

8         I beg your pardon.

9              THE COURT:  I can look at the --

10             MR. DILLICKRATH:  Yeah.  I'll just --

11             THE COURT:  I'll look at the slide.

12             MR. DILLICKRATH:  Thank you.

13             THE COURT:  Just direct me to the page.

14             MR. DILLICKRATH:  So we're on slide 43, Your Honor.

15             THE COURT:  All right.

16             MR. DILLICKRATH:  So, Your Honor, Dr. Nevo has done a

17   lot of economic analysis.  And when you hear from him, he will

18   tell you a lot about that, but it's very interesting to look at

19   how often Wilhelmsen and Drew appear in their own data as each

20   other's competitors for global fleets.  And if you look at those

21   numbers which are represented on this slide, it's hardly

22   surprising how often they're the ones who show up.  And that

23   shows, Your Honor, the closeness of competition between them.

24        And, Your Honor, I won't spend too much time here, but

25   there are Drew executives, very senior executives, who will

1    testify that the biggest competitive threat to Drew comes from

2    Wilhelmsen.  And there are Wilhelmsen presentations along the

3    same line.  Another tile in the mosaic, Your Honor, and our

4    picture of an illegal merger is starting to appear.

5        There will also be sworn testimony from a number of

6    competitors, Your Honor -- a number of customers, pardon me.

7    And you'll hear from some of them this week.  Customers who will

8    tell you that there is no other proven supplier who can offer

9    the same range of products on a global basis as Wilhelmsen or

10   Drew Marine.  And that is notwithstanding other suppliers who

11   claim they can keep up with Wilhelmsen or Drew.  Customers have

12   looked at these purported competitors, and what did these

13   customers conclude?  That the smaller competitors can't handle

14   their business, they can't service all the ports, they can't

15   meet the price, they can't get product on a timely basis.  All

16   sorts of reasons.

17       Now, the defendants may show you some websites or play some

18   promotional videos from some of these supposed competitors.  And

19   what they say, Your Honor, they say.  We won't dispute that

20   these documents say what they say.

21           THE COURT:  Now, the screen seems to be coming back.

22   Is this --

23           MR. DILLICKRATH:  It appears to be some issue --

24           THE COURT:  It's partially coming back.  All right.

25   We're back --

1          MR. DILLICKRATH:  It is back, thank you.

2          THE COURT:  Okay.  Thank you.

3          MR. DILLICKRATH:  Thank you, Your Honor.  So I'll just

4    reiterate my point, that defendants are going to show you

5    probably some websites and some videos that will show

6    promotional videos or websites from these so-called competitors

7    saying that they're capable of playing in the market.  But,

8    Your Honor, these are promotional materials.  They're like a

9    ShamWow ad or a video from the chamber of commerce in Ames,

10   Iowa.  They're puff pieces or hyperbolic marketing.

11        Now, Your Honor, customers view defendants as the two

12   largest and best suppliers.  Marichem, a Greek supplier with its

13   most significance presence in the Mediterranean area, is the

14   next best choice, but like most smaller suppliers, they cannot

15   effectively service all the necessary ports, and they lack the

16   global reach and execution capabilities to do so efficiently.

17        Contrary to what defendants will tell you, it's not just a

18   matter of adding a port here or there.  Customers want a network

19   in place that will provide service at the ports where they may

20   need to be, often unexpectedly.  And for the reasons we

21   discussed earlier, no one is going to take a chance on an

22   unproven supplier.  These chemicals are too important to a

23   ship's operation and customers need timely and consistent

24   deliveries of product and services.

25        Mr. Bradley, if I can again ask you to black out the next

1    couple of slides.

2         Now, sworn testimony will tell you, Your Honor, when

3    customers consider these other competitors, these small

4    competitors, they're inevitably disabused of the notion that

5    they have a realistic choice beyond the defendants.  And if you

6    look at this chart I've prepared here, Your Honor, the left-hand

7    column are customers, and they are customers who have considered

8    the suppliers who are listed in the right-hand column.  And in

9    every case, Your Honor, the customers have learned that these

10   suppliers are simply not up to the task.

11        So it's hardly surprising, Your Honor, that while the FTC

12   has extensive customer testimony supportive of its case, the

13   defendants appear to us to have none.

14        You can put these slides back on the screen, Mr. Bradley.

15        Now, with the presumption firmly in place, Your Honor, it's

16   up to defendants to rebut that presumption, and they cannot even

17   begin to do so.  We can go back to the horizontal merger

18   guidelines very quickly.  And again, note the standard for

19   entry.  It has to be timely, likely, and sufficient to deter or

20   counteract the competitive effects of concerns.  But high entry

21   barriers, that's enough to eliminate the possibility that

22   reduced competition could be offset by entry or expansion.  And

23   consider the very characteristics of these defendants, both very

24   impressive companies, as I noted.  They operate globally,

25   between them, over 260 warehouse or distribution centers, over

1    500 employees, decades of reputation --

2         THE COURT:  Again, slow down a little bit for my court

3    reporter.

4         MR. DILLICKRATH:  I'm sorry.  I'm from New York, Your

5    Honor.  I tend to do that sometimes.

6         Decades of reputation and brand equity.

7         You'll also hear it from third parties, Your Honor, and

8    that includes competitors and companies who are not now in the

9    market, but have no interest in entering.  Entry and expansion

10   will not replace the competition lost from Drew because small

11   competitors simply can't, and other entities don't want to.

12        And, Your Honor, there are a myriad of examples of

13   defendants' awareness of these entry barriers.  Here is just one

14   from a Drew presentation to Moody's.  And, here, Drew notes that

15   their established global presence creates a significant barrier

16   to entry, and they acknowledge that it would be difficult and

17   costly to replicate.  And that is just what an entrant would

18   need to do.

19        So let me talk briefly, Your Honor, about potential

20   entrants and see what they have to say about this notion put

21   forth by the defendants that they can replace Drew in the

22   market.

23        You'll hear from small competitors that are simply unable

24   to spend the money it would take to enter the market in a big

25   way and replace the lost competition.  Indeed, you'll hear from

 1   one small business owner located in Slidell, Louisiana, who

 2   noted that he would have to win the lottery in order to expand

 3   to a global network, and as he noted, we don't have any lottery

 4   winners.

 5        Mr. Bradley, can you black out the public screen again?

 6        Now, you'll also hear from defendants about something

 7   called a ship chandler.  And ship chandlers supply all sorts of

 8   items, from cigarettes to soda to floor cleaning chemicals to

 9   vessels.  You can think of them as a high-priced Walmart of the

10   seas.  But these ship chandlers -- they do deliver some marine

11   water treatment chemical products, including some of the large

12   chandlers, but they provide no services.  They're simply a

13   delivery mechanism.

14        And even one of the largest chandlers has testified that it

15   has no plans to expand into marine water treatment chemicals so

16   as to replace Drew, and in fact, testified that it has no plans

17   to bland, to resell, to provide technical services or training

18   for marine water treatment chemicals, and that this merger does

19   not change its non-plans.

20        Defendants will also talk about toll blenders, and they are

21   companies who blend chemicals on behalf of other companies.

22   Now, defendants have a speculative theory, devoid of all factual

23   support.  They suggest that toll blenders and ship chandlers

24   will team up to create a new competitor.  There's no evidence

25   whatsoever, Your Honor, that any toll blender or chandler will

1    even consider this.  Indeed, the evidence is to the contrary.

2    One major toll blender, who is also an industrial supplier, has

3    specifically stated that it does not and has no plans to sell

4    marine water treatment chemicals directly, and in fact, the

5    former parent of that toll blender was an entity that divested a

6    marine water treatment chemicals company years ago because it no

7    longer wanted to be in that business.

8         And I mentioned industrial suppliers.  There are people who

9    supply water treatment chemicals for land-based engine and

10   boilers, nonmarine-associated uses.  And defendants have a wild

11   idea that these industrial suppliers, companies that provide

12   water treatment in a nonmarine context, will suddenly enter the

13   marine water treatment chemical market.

14        Industrial suppliers have testified they do not and have no

15   plans to enter marine water treatment chemicals because they

16   lack the infrastructure to do so.  And you'll hear from one of

17   those industrial suppliers during the hearing.

18        Mr. Bradley, you can let this screen public again.  And

19   that will be the last time I need to close the screen.

20        Now, you'll hear more about this, Your Honor, from

21   Dr. Nevo, and he'll tell you that if there were no barriers and

22   if Drew could be easily replicated, existing competitors would

23   have already one so, and you wouldn't see the share in margin

24   that you see now.  And that's a very intuitive point, and it's a

25   point well supported by the economics.

1    You might also wonder, Your Honor, what is Wilhelmsen

2    paying for if all of this entry is going to take place?  That

3    seems like a good question to us, and the answer seems

4    counterintuitive.

5    Now, I just spoke about the story defendants told about

6    chandlers and industrial suppliers partnering up.  But again,

7    economic theory would have us ask, why hasn't it happened yet?

8    And we think the answer is because the barriers to entry are

9    just too high.

10    Now, defendants will also argue that there are efficiencies

11    present sufficient to overcome the presumption.  And the case

12    law is clear, Your Honor, the bar is extremely high.  We've had

13    these cases in our briefing, and I'll most saliently point you

14    out to the case *ProMedica,* holding that no court has ever found

15    efficiencies sufficient to rescue an otherwise illegal merger,

16    and that's still a true statement.

17    You'll hear testimony from Dr. Dov Rothman about why

18    defendants fail to even approach the bar.  But just two points

19    by way of preview.  Defendants' so-called cost savings assume a

20    fixed across-the-board reduction in Drew's cost of goods sold,

21    with no explanation of how they get there.  And their

22    efficiencies are unsubstantiated, resting solely on the judgment

23    and guesstimates of Wilhelmsen employees.  And to quote Gertrude

24    Stein, there's simply no "there" there.

25    Briefly, I want to discuss defendants' arguments that

1    global fleets' customers are powerful buyers.  Defendants argue

2    that these buyers could simply stock up in fewer ports or could

3    threaten to ship their purchases of marine water treatment

4    chemicals to non -- to others -- let me start that again,

5    Your Honor.  They would threaten to shift their purchases of

6    nonmarine water treatment chemicals to others as part of a

7    negotiating ploy.  But why aren't they doing that now,

8    Your Honor?  It certainly would not become easier after the

9    merger.

10        And the hypothetical merger -- the horizontal merger

11    guidelines and the case law are both pretty clear.  Without

12    credible alternatives, buyers can't have leverage.  And the

13    evidence will show that there are no credible alternatives.

14        So, Your Honor, the plaintiffs have met and exceeded their

15    burden.  We will provide compelling evidence over the next few

16    weeks, as well as the presumption.  And as I've noted over the

17    course of the past 40 minutes, the Court will hear from a number

18    of our witnesses.  You'll hear from customers, including

19    Military Sealift Command, cruise lines, tankers, ship management

20    companies.  You'll hear from marine chemical suppliers.  You'll

21    hear from industrial chemical suppliers.  You'll hear from a

22    Wilhelmsen third-party consultant.  And you'll hear from a Drew

23    executive.  We'll also have testimony that I hope the Court will

24    find useful from an antitrust economist and an efficiencies

25    expert.

1    And our conclusions, as I said, Your Honor, are consistent

2    with two foreign competition agencies who have already

3    investigated this merger.  That's certainly not dispositive, but

4    it is interesting, because the CCCS, the Singapore agency, just

5    last Friday found a substantial lessening of competition in the

6    market for the supply of marine water treatment chemicals, and

7    also made a provisional finding that the parties are each

8    other's closest competitors.

9    So let me go back to where I started, Your Honor:  Why are

10   we here?  Well, we're here because there is overwhelming

11   evidence of an illegal merger.  The facts are clear.  The

12   analysis is straightforward and buttressed by the facts, the

13   economic analysis and decades of precedent.  Defendants have no

14   rebuttal except their own self-serving statements, unsupported

15   flights of fancy, and unproven speculative and misapplied

16   economic theories unconstrained by the record evidence.

17   Your Honor, the relief we request here is limited.  We ask

18   for a preliminary injunction only to preserve the status quo

19   until the merits proceeding set to begin in less than two months

20   is fully decided.  We ask the Court to preserve competition and

21   protect these U.S. customers from the immediate and pernicious

22   effects of allowing this illegal merger to proceed while the

23   administrative proceeding is pending.

24   I thank you for your time, Your Honor, and the FTC looks

25   forward to providing you with the support for everything that

1    I've said here today.  Thank you.

2            THE COURT:  Thank you, Mr. Dillickrath.

3        Okay.  My court reporter says he wants to keep going, so

4    we're going to keep going.

5        Mr. Roush?  And for purposes of planning for the afternoon,

6    I have a hearing on a TRO scheduled to begin at 2:30.  So we can

7    either -- we can break for lunch later and you all just resume

8    after that, or we can break for lunch at the planned time, start

9    back up for a half an hour and then break for the hearing.  We

10   can see where we are.  I'm flexible.  But we do have that

11   hearing at 2:30.

12           MR. DILLICKRATH:  Why don't we see where we are.

13           THE COURT:  Let's see where we are.  I only need about

14   half an hour for lunch, but I need to get ready for that.

15       OPENING STATEMENT BY COUNSEL FOR DEFENDANT WILHELMSEN

16           MR. ROUSH:  Thank you, Your Honor.  Corey Roush on

17   behalf of the Wilhelmsen defendants.  What you'll hear over the

18   next week from the FTC, and indeed what you just heard from the

19   FTC, is a construct of what the industry looks like today.  And

20   that word "construct" is not my word; it's the word of their

21   expert.  He will tell you that he did not look at fleets as they

22   actually exist.  Instead, he took data and he constructed the

23   global fleets.

24       And what that construct does is it gives them high market

25   shares.  Those high market shares then serve as the building

1    blocks for all of their economic analysis.

2        You'll hear about a GUPPI analysis. You'll hear about a

3    merger simulation analysis. You've heard about the hypothetical

4    monopolist test. All of them are based in some way on those

5    market shares.

6        You will also hear that those high market shares are

7    sufficiently predictive so as to be determinative. But shares

8    are not supposed to be the beginning and the end of the

9    analysis. Indeed, the relevant inquiry, put simply, here is

10   whether Wilhelmsen post-merger will be able to raise prices or

11   decrease services for a sustained period of time. And they will

12   not.

13       You will hear that defendants have a very different

14   perspective on what the market looks like today. We will

15   present evidence that Wilhelmsen and Drew are the primary

16   providers of boiler water treatment chemicals to 31 percent of

17   the relevant vessels. And they are the primary providers of

18   cooling water treatment chemicals to 33 percent of the relevant

19   vessels. Those numbers are well below the percentages needed to

20   get to the FTC's presumption. And what they mean is that 67 to

21   69 percent of the relevant vessels are getting their current

22   boiler water and cooling water treatment chemicals from somebody

23   else. And if you end up finding that our shares are right, we

24   think your analysis is largely done, Your Honor.

25       Putting that aside, defendants think this Court should look

1    at more than today's market shares when considering what will

2    happen in the future.  This Court should consider the power

3    buyers who bought the products at issue.  And we'll give you

4    evidence on that.  The Court should consider where the products

5    at issue are bought.  And we'll give you evidence on that.  The

6    Court should consider where the products could be bought.  And

7    we'll give you evidence on that.  And ultimately, Your Honor,

8    the Court should look at who those products could be bought

9    from.  And we'll give you evidence on that.

10       Ultimately, you will hear that the customers at issue will

11   not be taking price increases.  They have many options.  You

12   will hear that Wilhelmsen knows this and plans to lower prices

13   after the merger because losing customers will undercut the

14   efficiencies that are the basis for this deal.

15       To that end, you will hear that Wilhelmsen is doing this

16   deal to get tens of millions of dollars in efficiencies and to

17   better compete against current suppliers, expected entrants and

18   the digitization of the industry that is already occurring.

19       You will not hear from anyone at Wilhelmsen that they plan

20   to raise prices.  You will not hear from anyone that they have

21   assumed revenue from increased prices.  You will not see a

22   single document where Wilhelmsen anticipates a merger-related

23   increase or an expected bump in revenue.  Far from it.  You will

24   hear that Wilhelmsen, in its normal course analysis of this

25   deal, plans to drop prices to try to keep customers from going

1    somewhere else.

2         So let's look at a document that was created as they were

3    considering this transaction, Your Honor.

4         This document is a document that underpins their

5    efficiencies, but also looks at some of the risks that are

6    associated with the deal.  And two of the risks that they noted

7    as they looked at this deal was that it could create space for a

8    more agile number 2 player, and another risk where customers

9    would leave the merged company for competitors.  And that was

10   especially true for customers that wanted dual suppliers or

11   frankly just didn't like Wilhelmsen.

12        So taking those risks, Wilhelmsen said, how can we mitigate

13   that if we're going to do this deal?  So they said, we can

14   mitigate that by sharing the upside with the customers.  We can

15   lower prices.  And then they built that into their efficiencies

16   model.  So when I talk about tens of millions of dollars in

17   efficiencies, they assumed the price decrease.  And even after

18   that price decrease, the efficiencies model assumes they will

19   still lose customers to current competitors.  And they're

20   considering here in this second green flag bullet that they will

21   need to discount further in the future, although that's not

22   built into the efficiencies case.

23        And before I turn to looking at the competitors who they're

24   afraid they're going to lose customers to, the FTC wants you to

25   apply a standard that is less strenuous than you would be

applying if the plaintiff here was the Department of Justice antitrust division.  And their logic -- and they use it in all the cases that they bring -- is that the merger will actually be reviewed by an administrative law judge, and that his decision will be reviewed by the FTC commissioners, and six to eight months from now we'll have a decision on a permanent injunction.

We understand the case law that they're relying on, and we're not here to argue that it's wrong.  We are here to point out that it's inconsistent with the facts.  It's inconsistent with the fact that a preliminary injunction before Your Honor typically is the end of the analysis.  Permanent injunction cases in merger contexts do not happen.

Indeed, just a few months ago, three new commissioners at the FTC, during their senate confirmation hearings, including the new chairman of the FTC, said they disagreed with applying a different standard in merger cases when they bring it versus when the Department of Justice brings it.

Moreover, to be clear, there will be no hearing before an administrative law judge.  The defendants have agreed that if you decide to block this merger, they're done.  We've informed the administrative court of this.  We have a sworn affidavit from the president of Wilhelmsen Ship Services.  So you are the ultimate arbiter on this merger, and if you think it's a close call at the end, please don't issue a preliminary injunction because there's this fiction that there will be some other judge

1    looking at it for a permanent injunction.

2         Now to talk about those current competitors that Wilhelmsen

3    is concerned about.  You heard the FTC say essentially we should

4    ignore them.  And why should we ignore them?  Because they have

5    low revenues today.  And because they have low revenues today,

6    that means they'll have low revenues tomorrow.  They don't have

7    the ability or willingness to grow.

8         As the FTC's expert, Dr. Nevo, explained in his deposition,

9    in his view, market shares, based on those revenues, are the key

10   to determining barriers to entry.  And for that reason, he

11   didn't consider any of the alleged barriers to entry

12   individually.  But low revenue numbers today are not

13   determinative of the future in this case for at least two

14   reasons.

15        First, where the focus, based on the government's own

16   theory, is geography, where the vessels are going, and where

17   they're going to be bought, the revenues of the current

18   competitors don't matter.  What matters is where they are and

19   where they can be.  So let's look at the geographic coverage,

20   Your Honor.

21        This is Wilhelmsen 's geographic coverage map.  As you can

22   see, it's all over the world, six continents.  And we talk about

23   six continents because Antarctica doesn't have a lot of ports.

24   So six continents, countries all over the world, except along

25   the east coast of Africa.

1     This is Drew Marine's coverage map.  Largely the same
2   thing.  Wilhelmsen is not doing this deal to expand its global
3   coverage.
4     Let's look at Marichem's map.  Six continents, countries
5   all over the world.  Vecom's map.  Six continents, countries all
6   over the world.  Uniservice Group, a group of independent
7   companies that have worked together, selling the same product
8   under the same brand.  Six continents all over the world.
9     Marine Care.  Less countries, less ports, but still serving
10   over a hundred ports on six continents all over the world.
11     Bluetech.  A few less dots, but still on six continents,
12   and countries all over the world.
13     And all of the competitors that I just pointed to already
14   sell boiler and cooling water treatment chemicals.  In fact, it
15   is conceded that they are all in the market, selling products to
16   global fleets.
17     Now, another competitor does not sell boiler water
18   treatment chemicals.  It's still in the market because it sells
19   cooling water chemical treatments.  And this competitor is
20   Chevron Marine, a subsidiary of Chevron, one of the largest
21   companies in the world.  And they're on five continents,
22   countries all over the world .
23     Your Honor, if you look at the combined global coverage of
24   these competitors, there is no question that they cover the
25   entire globe except, again, for the eastern coast of Africa.

1    If you look at the United States and you take the primary

2    ports in the United States -- New York, Miami, Houston, L.A.,

3    the upper northwest -- you can see that five or all six are in

4    all of these cities.

5    And if you look at some of the major ports around the

6    world, you will see that they are all in them.  And I looked at

7    the slide that you saw in the FTC's opening, and that --

8    fortunately, for that hypothetical vessel they used, Shanghai,

9    Cape Town, Rio, and Miami, they're all already there.

10    So I said there were two reasons, Your Honor, that looking

11    at just revenues here, past revenues, is not the way to look at

12    it.  The second reason is because the past looks different than

13    the future.  It seems like a simple point, but it gets lost when

14    you focus only on past revenues.

15    So, today, the current competitive condition involves Drew

16    and Wilhelmsen and these other competitors competing.  Tomorrow,

17    Drew won't be there.  That changes opportunities and it changes

18    incentives of competitors.  And so we're going to present

19    evidence to Your Honor about what our competitors would do.  And

20    here are a few pieces of it.  Uniservice Germany:  We think our

21    water treatment chemicals business will expand considerably if

22    this merger comes to happen.

23    Marine Care:  It is our strong opinion that if the merger

24    goes through, the market will be moving a lot more towards

25    diversification, and we're going to take advantage of it.

1    Marichem:  We continue expanding our sales offices in the

2    major marine markets in the world.  We are now participating in

3    a tender to start cooperation with Incentra.  Marichem is one of

4    the largest group purchasing organizations in the world,

5    covering 900 vessels.  And a group purchasing organization in

6    this industry is like in others.  They bring together the

7    collective buying power of their members to negotiate favorable

8    terms with suppliers like Marichem.

9        Now, none of these quotes, Your Honor, are things that the

10   FTC's expert, Dr. Nevo, considered.  And the FTC would ask us

11   that we ignore these because they come from competitors.  But

12   these are the best evidence of what competitors will do in the

13   future.

14       Now, another way that the FTC -- if you'd like me to leave

15   the slides up, I can.  I just --

16           THE COURT:  No, that's fine.

17           MR. ROUSH:  Okay.  Another way that the FTC tries to

18   diminish the current level of competition and, thus, the future

19   level of competition is to define a very narrow market.  And

20   they've done that in two ways:  S narrow set of products and a

21   narrow set of customers.

22       So these are the products that Wilhelmsen and Drew -- or

23   the product categories that Wilhelmsen and Drew sell in

24   competition with one another.  And as you can see, Wilhelmsen,

25   its boiler and cooling water treatment products make up only 15

1    percent of its sales.  And for Drew, that's 26 percent.  But
2    they also sell a host of other products.  And they sell these
3    products in conjunction with one another.
4         So this is a little complicated chart, Your Honor, but what
5    it shows is that, for the vessels -- for the global fleets that
6    purchase boiler water and cooling water treatment from
7    Wilhelmsen, 99 percent of them are buying two or more other
8    product categories.  And that number is 94 percent for Drew.  So
9    there's no question that these products, the boiler and cooling
10   water treatment chemicals are being sold with other products and
11   product categories.
12        And here are some of those products and product categories.
13   And a lot of times, when you're defining a market -- and we do
14   agree with the FTC that none know of these products are
15   interchangeable.  So a lot of times when you have products that
16   are not functionally equivalent, you start with one product
17   category and you look at that and you look at the competitive
18   conditions of that one category.  But they haven't done that.
19        Now, another way of doing it is you take a group of the
20   products and you look at them and you look at the competitive
21   conditions of that group.  And that would make sense here
22   because both Wilhelmsen and Drew in all their documents talk
23   about water treatment chemicals.  They look at them from a
24   marketing perspective together.  They look at them from a
25   financing perspective together.  But they didn't do that.

1    Now, it appears they do.  If you look at the complaint, it

2    originally alleges a market that is water treatment chemicals,

3    primarily made up of boiler and cooling water treatment

4    chemicals -- and even in the first slide of the deck that you

5    just saw, it says water treatment chemicals.  But that's not the

6    market that is being alleged here, Your Honor.

7    We asked their expert if he saw any instances in any

8    Wilhelmsen and Drew documents where they marketed just these two

9    product categories together, or where they treated them

10   separately in financials.  And he couldn't recall any.  We asked

11   him, why not define it this way?  He didn't really have an

12   answer, but he did point out that these two products make up 77

13   to 80 percent of the water treatment products they sell, and

14   said that was enough.  Well, we disagree.  Pulling out 20 to 23

15   percent of the sales in a category to get to a smaller market

16   isn't the way it should be done.

17   Another way of defining a market, Your Honor, is to take

18   all the products.  And when you hear references to *Staples*,

19   that's what they did there with the exception of toner.  They

20   looked at all the products.  They looked at the products that

21   were being negotiated together, the products that were in the

22   contracts -- here, they're called framework agreements --

23   together.  They're being bought together.  They're being

24   delivered together.  But they didn't do it that way either,

25   Your Honor.

1    Now, in the FTC's reply brief, they say that there are

2    different competitive conditions for some of these categories.

3    But last Thursday, when we deposed their expert, he said he did

4    only -- and I want to quote this -- some very preliminary

5    analysis, end quote, and is not offering an opinion on whether

6    this would be an appropriate market.

7    So why is this important, Your Honor?  Because you're going

8    to be presented evidence on a market that involves two product

9    categories.  That's the analysis that's been done by their

10   expert.  That's what they're putting on.  So it's not a market

11   for boiler water treatment chemicals.  It's not a market for

12   water treatment chemicals, all of them.  It's not a market for

13   all of these.  And so if you're uncomfortable at the end that we

14   shouldn't just have a product market that includes only these

15   product categories, the analysis on market definition is done,

16   and we think the case is done.

17   Now, you will hear, Your Honor, that you shouldn't be

18   looking at boiler and cooling water treatment chemicals together

19   because they aren't bought together.  In fact, I mentioned

20   Chevron Marine.  Chevron Marine only sells cooling water

21   treatment chemicals.  So by definition, every customer that gets

22   cooling water treatment chemicals from Chevron Marine is buying

23   boiler water treatment chemicals from someone else.  And you

24   will also hear that when they are bought together, it's almost

25   never just the two of them.

1    So this is from one customer, Your Honor, who may be at

2    trial.  They have a fixed fee arrangement for a relatively small

3    number of products.  And as you can see in green, a couple of

4    them are boiler, including water treatment products.  But they

5    also have, in that same fixed fee arrangement, other water

6    treatment chemicals in blue, cleaning chemicals in orange, and

7    foam control, a separate product, in purple.  So when they are

8    being sold together, it's with other products.

9    Now, the effect of defining the market in the way that they

10   have is that it allows their efficiencies experts to narrow the

11   efficiencies on which he focuses.  So I mentioned tens of

12   millions of dollars in efficiencies.  That's across all the

13   products that we'll be bringing together.  But he said the way

14   you do the efficiencies analysis is you only look at the

15   efficiencies from the products in the alleged market.  So tens

16   of millions shrinks way down because these products only make up

17   15 percent of Wilhelmsen's sales.

18   Now, you will hear evidence that indicates that that's not

19   the right way to look at efficiencies, that where, as here, all

20   the benefits of the integration and the efficiencies come from

21   all of the products, that essentially they are inextricably

22   linked -- and that's a merger guidelines word or phrase -- that

23   you should look at all of them together.

24   Now to turn to the narrow set of customers, Your Honor.

25   There's a set of data that both experts use.  It's called

1    Lloyd's data.  So there's no dispute about the use of this data.

2    Lloyd's data indicated that as of December of 2017, there are

3    over 73,000 -- I'll call them ocean-going vessels.

4         Now, make no mistake, that Wilhelmsen, Drew, they want to

5    sell boiler and cooling water treatment chemical to every one of

6    these vessels.  But in the ordinary course, Wilhelmsen has made

7    decisions that it can't focus on all 73,000 vessels.  And so it

8    typically focuses on vessels that are over a thousand -- greater

9    than or equal to a thousand gross tons.  And that's been its

10   plan and the way it has done this for almost a decade,

11   Your Honor.  It focuses on what is calls the global fleet, and

12   that's all of these vessels as of December 2017, 47,011.

13        Now, what Dr. Nevo, the FTC's expert, does, is he says,

14   okay, we'll take your thousand; I hear you; we'll stick with the

15   thousand and won't look at the smaller ones because you're not

16   looking at them that much.  But instead of doing a

17   vessel-by-vessel analysis, or instead of looking at the way

18   fleets actually exist, he does his construct.  And the reason

19   it's called a construct is because it doesn't take fleets as

20   they exist in the normal course.  It uses that Lloyd's data and

21   it looks at a couple of fields in that and it starts breaking

22   the fleets up.

23        And to be sure, for many of the fleets, they match the real

24   world.  But for a number of fleets it doesn't match.  And so we

25   will give you examples, Your Honor, of fleets that are almost

400 vessels in the real world, and they have a pricing contract that applies to all 400. But in Nevo's construct, they are divided among over 50 fleets.

So he gets his construct -- and this is -- he has 9,407 constructed fleets. And I'm using "constructed" here. He doesn't call them constructed fleets. This is a global -- it's a global network case, so we need to say that they have to have globally trading vessels. And you heard about globally trading vessels in the FTC's opening.

Now, globally trading vessels, while that concept is certainly in Wilhelmsen's documents -- and you saw one of them -- it is not used in the normal course of business at Wilhelmsen to target customers, to look at customers, to think about customers. In the very document you saw a picture of that talked about global -- the first document you saw that talked about globally trading vessels, that very document focuses on vessels that are greater than or equal to 1,000 gross tons.

So he says it has to have a globally trading vessel. He says, no, it has to have ten globally trading vessels. And you will not see any evidence in our files, Wilhelmsen's files or from Drew's files, where anyone has ever thought about looking at customers to see whether they had ten or more globally trading vessels. And certainly no one has ever treated them differently as a result of that.

So he's got 9,407. He says, we're only going to look at

those that have ten globally trading vessels.  And all of a
sudden, we cut out 94 percent of all of his constructed vessels.

Now, you will hear that these shaded-out vessels, the ones
that the FTC and Dr. Nevo are not worried about here -- you will
hear that many of them have globally trading vessels.  Indeed,
by definition, they could all have nine globally trading
vessels, but they still wouldn't be in the alleged market.  They
don't all have nine.  But they could.

You will also hear that many are members of group
purchasing organizations, the same group purchasing
organizations that a number of the global fleets are in.  So
they're getting the advantage of the same pricing that the
global fleets are getting, but they're not in the market.

You will also hear that the 532 global fleets on which this
case is based are today getting lower prices than the rest of
these vessels.

Of the 532, you will hear from only a handful, not just at
trial, but in the declarations and in the depositions.  Despite
the exhaustive process that the FTC went through, you're only
going to hear from a handful.  And I don't think you'll hear,
Your Honor, that there's any reason to view the views of a
handful to be representative of the 532 or the 9,407 that we
think you should be focused on.

Now, is there something to the fact that defendants have
high shares among this small group?  No.  The analysis here is

1  not whether you can identify a set of customers that are

2  primarily being served by the two merging parties.  The analysis

3  is whether you can identify a set of customers against whom the

4  merging parties could implement a sustained price increase or

5  service decrease looking forward.  And you'll find that you

6  can't identify that set, Your Honor.

7      Now, ironically, once the government has constructed its

8  market, it's left with an alleged harm in the United States that

9  appears to range from 800,000 to 2.7 million.  Now, I say

10 appears to range because neither the FTC nor its expert has many

11 any effort to calculate the harm to the U.S.  The FTC says in

12 its reply brief -- and I think it said in the opening -- that

13 American consumers will be harmed by this illegal merger.  But

14 there's no citation to this statement, and you won't find a

15 single place in the record or their brief where anybody tries to

16 quantify what the harm in the U.S. will be.

17     As we talked about -- like -- we deposed Dr. Nevo last

18 Thursday.  We asked him about this:  Have you been asked to

19 calculate the potential harm in the U.S.?

20     No, I have not.

21     Have you attempted to calculate the potential harm in the

22 U.S.?

23     No, I have not.

24     If you were asked to calculate the potential harm in the

25 U.S., how would you do it?

1    I can't offer an opinion on that right now.

2    So you don't know how you would do it?

3    As I sit here today, I'd have to think about it.

4    Now, this is not a trivial issue.  Even as you heard in the

5    FTC's opening, the relevant inquiry under the Clayton Act is to

6    identify whether competition may be substantially lessened in

7    the United States, and in particular, in any section of the

8    country.  We think it is significant, Your Honor, that neither

9    the FTC nor Dr. Nevo has tried to categorically assess this.

10   Another ironic result of the FTC and their expert's

11   constructed market is that they are left focusing on huge

12   customers.  You will hear from Teekay and Crowley this

13   afternoon.  You will hear from Carnival, we believe, tomorrow.

14   You will hear about or may hear from Maersk and Royal Caribbean.

15   These are all multibillion-dollar companies.  Many of them dwarf

16   Wilhelmsen.  And their purchasing power is significant, and it's

17   very significant to Wilhelmsen, Drew, and their competitors.

18   Now, the FTC states in their reply brief that these aren't

19   power buyers, but their expert has said he had done no analysis

20   to assess that.  These fleets don't need protection because they

21   have many ways to avoid price increases.

22   We talked about earlier the multiple competitors that are

23   admittedly already in the market that are offering boiler and

24   cooling water treatment chemicals.  They could turn to any of

25   these.  And you saw their global networks.  And we weren't

looking at regional players there, Your Honor.  It wasn't like
Vecom was in the United States and Uniservice was down in South
America.  They were all all over the world.

      And these global fleets, they're traveling all over the
world.  They're traveling to 260 to 270, on average, ports every
year.  But they're buying boiler and cooling water treatment
chemicals in 15 to 20.

      So if they wanted to switch to one of our competitors and
that competitor didn't happen to be in one of the 15 to 20, they
could ask them -- or they could see if they were in one of the
other 240, and then they could shift the purchasing patterns
there.

      Now, if you look at that on a per-vessel basis, you get the
same rough percentages.  On average, the vessels in the global
fleets, they are traveling to about 20 ports a year, but they're
buying boiler and cooling water treatment chemicals at only two.
And so if, for some reason, one of our competitors wasn't in
those two, they could ask them to be in one of the other 20.

      And that sort of sponsored entry is exactly what defines a
power buyer.

      Now, I'll leave you with this, Your Honor, because I want
to leave some time for Mr. Ryan.  The other way that they could
easily defeat a price increase is to return to a slide I showed
you earlier.  The alleged market comprises only 15 percent of
Wilhelmsen's sales to these global fleets and 26 percent of

1    Drew's.  And we know that 99 percent of Wilhelmsen's global

2    fleet customers are buying two or more other categories of

3    products from Wilhelmsen, and 94 percent of Drew's.

4        So if Wilhelmsen tried to put in the roughly 50 percent

5    price increase that their expert proposes and they said, you

6    know what, I don't have a choice on boiler and cooling water,

7    but I have choices on the other 85 percent, so if you want me to

8    pay 50 percent more on boiler and cooling, I'm going elsewhere

9    with the rest of my other products.

10       And not even a hundred percent price increase would make

11   financial sense for Wilhelmsen, to raise the price a hundred

12   percent on the 15 percent of its business that is boiler and

13   cooling water treatment products, to give up the other 85

14   percent.

15       I appreciate your time, Your Honor.  Now Mr. Ryan is going

16   to talk to you about lack of barriers to entry and ease of

17   expansion.

18           THE COURT:  All right.  Just a minute, Mr. Ryan.

19       Okay.  I'm sorry -- we have to take a break.  My court

20   reporter has been going for over an hour and a half, and we're

21   going to have to take a brief break.  And we'll come back.  15

22   minutes.

23       (Recess from 11:15 a.m. to 11:36 a.m.)

24           THE COURT:  All right, Mr. Ryan.

25           MR. RYAN:  Thank you, Your Honor, and again, I'm

1    Mark Ryan for the Drew Marine defendants.

2          OPENING STATEMENT BY COUNSEL BY DEFENDANT DREW MARINE

3              A critical question in this case is whether

4    competition for the sales of boiler water and cooling water that

5    will be lost because of the acquisition will be replaced by the

6    expansion of competition from existing firms.  More

7    specifically, will there be a credible marketplace threat that

8    competition can be replaced?

9          So let's begin with the question of what Drew sells today,

10   before the merger.  What competition will be lost and what

11   competition, therefore, needs to be replaced.  That's really a

12   fundamental issue before the Court.

13         So the slide that's up on the screen now is a description

14   of Drew Marine's water treatment product sales.  And here we've

15   got, on the left, all customers, and then over on the right,

16   what are Drew's global sales to -- what are Drew's sales to

17   global fleets?  And this $22.6 million number is a number taken

18   from the FTC's expert's report.  So $22.6 million globally is

19   what we're talking about in the alleged relevant market with

20   respect to Drew.

21         Now, as the Court has heard this morning, distribution or

22   port coverage is an issue in the case.  Global fleets and other

23   fleets need product at a number of ports.  So let's look at

24   Drew's port sales.  And we'll put up the next slide.

25         This slide, Your Honor, shows the concentration of Drew's

1   sales, and it shows that they're heavily concentrated at a small

2   number of ports.  So two-thirds of Drew's sales of the relevant

3   product occur at 20 ports, 80 percent at 40 ports, and 90

4   percent at 60 ports. So as we hear evidence throughout the trial

5   about what's necessary to compete for global fleet business,

6   keep in mind that Drew's sales are heavily concentrated at a

7   small number of ports.

8        Now, these are the busiest ports in the world.  And the

9   evidence will show that at these ports there are lots of

10  competitors already present.  And someone might ask, why is

11  business so concentrated at relatively few ports?  The evidence

12  will also show that the big fleets want to do business at fewer

13  and fewer ports.  They believe that the fewer ports they can do

14  business at, the better it is for them.

15       So this is a market reality.  Big fleets demand more

16  service at bigger ports.  And suppliers respond to the big fleet

17  demands.  The big fleets call the shots in this industry,

18  Your Honor.

19       The next question is, where will the replacement of these

20  sales come from?  Who will the global fleets that the government

21  is alleging it needs to protect be able to turn to as

22  alternative suppliers?

23       So we have another slide, and that's the same slide that's

24  reflected on this board over here, Your Honor.  I might wander

25  just a little bit, but I'll keep my voice up.

1    These are the participants today participating in the

2    marine water treatment chemicals industry.  And the question for

3    the Court is, will the global fleets that we've heard about, the

4    big buyers, will they be able to work with these firms to defeat

5    any price increase or threatened price increase by Wilhelmsen?

6    Now, a very important aspect of this chart, Your Honor, you

7    can see -- I'll try to keep my voice up.  If I don't, I'll

8    return.  You see the asterisks.  The asterisks indicate firms

9    that the FTC has agreed, in interrogatories and in its expert

10   materials, are already competing in the market that the

11   government has alleged.

12   So these aren't hypothetical.  We're not coming to the

13   Court saying there might be people who are not in the business

14   that will get in it.  We're really saying that there are people

15   in the business, they've been in it for a while, and they're

16   going to take any opportunity they can to get bigger.

17   Now, what are these categories?  The global distributors --

18   and you see Drew Marine's name on there.  Those are the

19   companies that look most like Drew.  They don't make much in the

20   way of product.  They're distributors and they have global

21   networks and they specialize in the marine industry.

22   And again, every one of those has an asterisk because every

23   one of those, the FTC agrees, is currently competing for the

24   business of global fleets.

25   Global manufacturers, that's a slightly different category.

1    These are the folks that make the chemicals that the people on

2    the right distribute.  So Drew Marine doesn't -- it's not a

3    chemical manufacturer.  We buy chemicals from chemical

4    companies, and then we package it and we sell it.  And sometimes

5    the people we buy from do the packaging for us.

6        So there's a firm on there called Solenis.  Solenis is a

7    company -- it's a global company.  They have chemical

8    manufacturing operations in Houston.  We buy product from

9    Solenis and then we distribute it.  On several continents, we're

10   simply buying product from chemical manufacturers who can sell

11   for anybody else.  They can make it for any one of these firms

12   up here.  And we're reselling.

13       Now, you'll hear in Singapore we do some blending.

14   Blending is exactly what you would think.  We buy some

15   chemicals, and then we mix it up.  But there's no heating.

16   There's no chemical reaction that's going on.  We're not a

17   chemical company.  So in Singapore we do some blending.

18   Everywhere else in the world, we simply buy from other chemical

19   manufacturers.

20       Chevron Marine, kind of a hybrid.  Because Chevron is a

21   chemical manufacturer, but they also distribute directly their

22   cooling water treatment products at -- they offer it at 500

23   ports around the world.

24       And so we'll be talking about these two different

25   categories of participants in industry.  But one thing that's

1    not in dispute -- there's no allegation in this case, like there

2    is in some antitrust cases, that supply is going to be

3    restricted.  Drew doesn't control the supply of water treatment

4    chemicals.  Wilhelmsen doesn't control the supply of water

5    treatment chemicals.  And the FTC doesn't allege that anybody is

6    going to be able to control supply going forward.

7         Global testing equipment manufacturers -- around the chart

8    here, Your Honor.  So these are three companies that make

9    testing and dosing equipment.  As with chemicals, Drew doesn't

10   make any equipment.  We don't make the test kits.  We don't make

11   the dosing equipment.  We're not a manufacturer.  We buy,

12   principally from Hach and from the Parker firm there -- and

13   again, these are global companies, so we can buy all over the

14   world, have them shipped to our distribution points and then

15   sold.

16        Those companies are free to make equipment for anybody on

17   that board.  And there are times -- and it happens when these

18   global testing equipment manufacturers just sell directly to the

19   big fleets.  So the testing equipment, it's commodity stuff,

20   it's readily available, no shortage in supply of equipment.

21        And then one more set of players on the board, Your Honor,

22   the global general suppliers.  I'm not going to spend a lot of

23   time here.  But the point is, if you're a firm that wants to

24   expand globally -- say you want to open up a port -- a delivery

25   spot in Rio de Janeiro.  Do you have to buy a warehouse in Rio?

1    You could.  Do you have to rent a warehouse in Rio?  You could.

2    Do you have to hire employees in Rio?  You could.  But there's a

3    huge global industry that facilitates distribution to the marine

4    industry.

5         So you can go to these -- you can call them chandlers,

6    sometimes we'll call them third-party logistics firms -- and

7    there's a lot of them.  And you can go to them and say, help me

8    serve customers in Rio.  And they say, okay, we'll rent you

9    warehouse space.  Our employees will watch the warehouse.  Our

10   employees will make that last-mile delivery to the vessel.  You

11   don't need to have anyone on the ground.

12        That's not hypothetical, Your Honor.  Drew Marine operates

13   81 stocking points, collecting stuff that they can then

14   distribute to different ports.  81 stocking points in the world.

15   74 are done through third-party logistics firms.  No Drew

16   employees, no Drew warehouse, not even a Drew leased warehouse.

17   You simply pay as you go.  If I ship stuff for you for you to

18   distribute, then I will pay you.

19        It's a very efficient, and as you'll hear from the

20   economist, it's a very low-cost way to distribute.  There are no

21   barriers to entry n distribution in this business.  So even

22   though we have several who have -- as Mr. Roush pointed out, who

23   have large distribution networks already, to expand them is

24   absolutely an -- there is no meaningful antitrust barrier to

25   expansion of distribution networks.  And you won't hear

1    otherwise from the FTC.

2        So the global fleets can work with these firms, many of

3    whom they already work with, to keep prices competitive.  So

4    here's what we've got, Your Honor.  With multiple competitors

5    looking to grow, we have an abundant supply of chemicals, we

6    have global distribution networks that are easy to expand, and

7    we have a sophisticated, tough set of buyers that the government

8    has defined as the relevant market, the big global fleets.

9        It simply doesn't add up to an antitrust problem.

10   Competition is going to win out here.  Monopoly pricing is going

11   to fail.

12       Now, one thing about Drew's -- if -- that first slide we

13   had up there, that $22.6 million in global fleet sales, you

14   won't hear much from the government about, well, what do you

15   sell to global fleets in the United States?  What do you deliver

16   at U.S. ports that goes to global fleets?  It's less than

17   $3 million, Your Honor.  Less than $3 million.  So we're talking

18   both about substantial lessening of competition and we're

19   talking about this other issue:  What would it take to replace

20   Drew?  22.6 million globally, $3 million in the United States.

21       So we've talked about distribution.  There was another

22   alleged barrier to entry that was mentioned in the government's

23   opening, and it's service; it's service technicians that work

24   for us.  And if a ship is in port, we might visit the ship to

25   give advice on -- if the crew has questions or to show them how

to use our chemicals, and never charge for these services.  We

do not charge for our technicians.

Globally -- globally, Drew employs fewer than 45 service

technicians.  There's one in India, there's one in Canada,

there's two in Korea, eight in China, nine in the U.S.  And

there's no allegation in this case, none, that the inability to

hire service technicians is a meaningful barrier to entry.

You're just not going to hear that from the government.

Most of these people -- some have college degrees, some

have degrees that they earned through shipboard experience, a

degree in life, so to speak, Your Honor, but there's no

allegation that there's a shortage of service capabilities for

any of these firms.  And they already have service networks.

So in his deposition, which only occurred last Thursday,

Your Honor -- so the briefs don't have references to the expert

depositions, as they sometimes might -- we asked Dr. Nevo a

question -- questions about the technical service barriers.  And

we see some of his answers on the screen.

Is there a shortage of service?

No.  I don't know one way or the other.

Have you determined whether in any country or part of the

world there's a shortage of service technicians?

I haven't studied that question one way or the other.

We then asked him, have you studied -- this is a critical

question.  If you're going to allege a service barrier, have you

studied whether a competitor of Wilhelmsen that wanted to expand
would face a barrier in the form of inability to find service
technicians?

And the answer is, I haven't looked at it.  I just haven't
studied the individual barriers.

So the next question was, have you made any effort to study
the availability of technical services around the world?  Do you
know what's out there?

The answer is, I have not, no.

So when you hear witnesses questioned about service
capabilities and service components of the business they do at
Drew, keep in mind that their expert declined to look at service
as a barrier to entry.  And this is a pattern that repeats
itself -- Your Honor, just plainly, repeats itself in Dr. Nevo's
testimony over and over, an absence of analysis, an absence of
evidence.

We asked him -- I'll change topics, Your Honor.  We asked a
question about power buyers of Dr. Nevo.  Now, power buyers and
whether the fleets that belong to the market the government has
alleged, are they power buyers?  If you look in the merger
guidelines, there's a whole section on power buyers.  Section 8,
I think, in the merger guidelines.  And why do we care about
power buyers in the antitrust analysis?

The fundamental inquiry the Court is being asked to make is
how much power will the sellers have after the merger and how

1    much will they have over the buyers?

2         So sometimes, if you have power buyers, the Court says,

3    yeah, there's going to be some increase in seller power here,

4    but it's not going to be at a point where these power buyers

5    have to worry about sellers extracting monopoly prices.

6         So I asked Dr. Nevo, So as you sit here today -- and it's

7    on the screen, Your Honor -- do you have an opinion as to

8    whether the global fleets, individually or collectively, could

9    be characterized as power buyers, correctly characterized as

10   power buyers?

11        Answer:  I'm not offering an opinion on that.

12        Question:  Well, is Maersk?  Maersk is one of the largest

13   global fleets in the world.  Are they a power buyer?

14        I have not looked at them individually.

15        Teekay.  Teekay is going to be the first witness at this

16   hearing.  Did he look to see if an economic analysis would

17   suggest that Teekay is a power buyer?

18        Same answer -- answer:  Same answer.  Which is no.

19        So there hasn't been any effort by the FTC to grapple with

20   what I think has been a critical issue from day one, the power

21   buyer issue.  There hasn't been an effort to grapple with

22   service barriers to entry, which has been out there -- you can

23   look in their complaint, and they make reference to service as a

24   necessary component of what's supplied.

25        You're going to see in distribution question after question

1    Dr. Nevo was asked about his analysis of distribution barriers.

2    And you're going to hear, I didn't look at that.

3         Did you see -- does American have a sufficient distribution

4    network?

5         I didn't look at that.

6         How about -- did you identify any, any of those firms as

7    having an insufficient distribution network?

8         No.

9         Did you examine what it would take to build out the

10   network?

11        No.

12        Now, our point is this -- and it's not personal,

13   Your Honor.  I know Dr. Nevo.  I sat next to him at the

14   antitrust division of the Justice Department when we worked in

15   government together.  It's not personal.  But the absence of

16   analysis, the absence of evidence is not itself evidence.

17   Argument cannot substitute, allegations cannot substitute for

18   evidence, and that is going to be a big thrust of our case.

19        I've got one more point to make.  In the reply brief that

20   was filed last week -- last Friday, I guess it was, the FTC for

21   the first time raised the issue of these two other agencies that

22   are out there looking at this deal.  Just for the record, the UK

23   authority decided not to proceed.  The transaction has been

24   cleared in the UK.  And I want to be -- go easy here,

25   Your Honor, but they don't mention that in their papers, and

1    they don't mention it today.  They raised the UK, but they don't

2    point out that investigation is over.

3       Singapore.  Provisional.  We're talking to the Singapore

4    authorities.  We're doing what the Court might expect we would

5    do; we're trying to resolve the issue.  But certainly the FTC

6    does not believe -- certainly they don't believe that what's

7    going on in these other agencies is evidence in this proceeding.

8    It can't possibly be evidence.  So why, at the 11th hour, do

9    they raise it?  I don't know.  I can't speak for them on that.

10       As for WSS and Drew, Your Honor, this courtroom -- this

11   courtroom is the only judicial forum where the actual evidence

12   will be heard and evaluated, and we really welcome and

13   appreciate the opportunity to do that, Your Honor.  Thank you.

14            THE COURT:  Thank you, Mr. Ryan.

15       Mr. Dillickrath, are you ready for your next witness?

16            MR. DILLICKRATH:  Yes, Your Honor.  My colleague,

17   Llewellyn Davis, will examine the first witness.

18            THE COURT:  All right.

19            MR. DAVIS:  Llewellyn Davis for plaintiff, Federal

20   Trade Commission.  Plaintiff calls Mr. Rob Sarro to the stand.

21            ROB SARRO, WITNESS FOR THE PLAINTIFF, SWORN

22                      DIRECT EXAMINATION

23   BY MR. DAVIS:

24   Q.   Good afternoon, Mr. Sarro.

25   A.   Good afternoon.

1    Q.   Could you please state and spell your name for the record.

2    A.   Rob Sarro.  Last name is spelled S-A-R-R-O.

3    Q.   Who is your current employer, Mr. Sarro?

4    A.   Teekay Corporation.

5    Q.   And what does Teekay do?

6    A.   Teekay provides marine transportation for crude oil,

7    liquified natural gas, marine products, that sort of stuff.

8    Q.   As part of that marine transportation business, do you

9    operate a fleet of vessels?

10   A.   Yes, we do.

11   Q.   And where in the world do those vessels travel, Mr. Sarro?

12   A.   They travel to every continent with the exception of

13   Antarctica.

14   Q.   And approximately how many vessels are in Teekay's fleet?

15   A.   Approximately 200.

16   Q.   What kind of vessels are in Teekay's fleet?

17   A.   So we -- the main breakup is we've got crude oil tankers,

18   LNG carriers, which is liquified natural gas, and then we have

19   some specialty vessels, which are called FPSOs, FSOs.

20   Q.   And could you give us an idea, approximately how large are

21   these vessels?

22   A.   In layman's terms -- we characterize them in gross weight

23   tonnage, but -- so, like, a gross weight tonnage would be about,

24   you know, 100,000 gross weight tons to, you know, over 200,000.

25   But in relative terms, it's the size of maybe two football

1    fields in lengths.

2    Q.   And how much generally does a vessel like that cost?

3    A.   Well, it depends on the type of vessel.  So if it's a

4    tanker, it would be in the 50, 60, $80 million.  And if it's an

5    LNG carrier, it's in excess of 200 million.

6    Q.   What kind of customers charter Teekay's vessels?

7    A.   So our main customers are the oil majors, they're national

8    oil companies, they're energy traders.  That sort of stuff.

9    Q.   And what types of charters do you offer to oil majors and

10   these energy companies?

11   A.   So, basically, our charters break up to two different

12   types.  There's like, a spot charter and a time charter.

13   Q.   In a given year, how many ports do Teekay's vessels travel

14   to?

15   A.   In excess of 100.

16   Q.   In what continents are those ports located on, sir?

17   A.   Every continent with the exception of Antarctica.

18   Q.   And just a moment ago you mentioned the term spot charter.

19   Could you briefly explain what a spot charter is?

20   A.   So a spot charter is -- we call it tramping or, if I were

21   to use an equivalent, it would be like a taxi.  So that is on a

22   charter day-to-day basis, so every day we're subject to a

23   different, you know, requirement, whatever the market is

24   bearing --

25            THE COURT:  Excuse me.  Mr. Llewellyn [sic], are you

1    going to be using slides on the screen?

2              MR. DAVIS:  I am not.

3              THE COURT:  Okay.

4    BY MR. DAVIS:

5    Q.   And when you're chartering on that day-to-day basis, what

6    are the rates that Teekay might charge a customer?

7    A.   Well, it's market-dependent.  Right?  So what ends up

8    happening is -- I mean, the range can go anywhere from 8,000 a

9    day to in excess of 50,000 a day.

10   Q.   And --

11             THE COURT:  I'm sorry.  Your name is Mr. Davis, not

12   Mr. Llewellyn.

13             MR. DAVIS:  That's fine, Your Honor.  Thank you.

14   BY MR. DAVIS:

15   Q.   When Teekay's vessels are operating on a spot charter, how

16   predictable is where they're traveling to?

17   A.   Well, it's quite unpredictable, actually, because it's

18   subject to the market conditions.  So whatever charter we pick

19   up at the time -- you know, that's what ends up happening.  And

20   it's on a per-voyage basis, is whatever it is.  So whatever it

21   would be where we're loading, and then we have to discharge.

22   And that's how it works.

23   Q.   Do you know necessarily which port a spot charter will call

24   in from month to month?

25   A.   No.

1    Q.   Turning to your background, Mr. Sarro, how long have you

2    worked at the Teekay Corporation?

3    A.   16 years.

4    Q.   And what's your current title?

5    A.   Director of global procurement.

6    Q.   And how long have you been in that position as the director

7    of global procurement?

8    A.   Since 2006.

9    Q.   What are your main responsibilities as the director of

10   global procurement at Teekay?

11   A.   So my responsibilities is to negotiate and secure

12   agreements for the supply of products and services to support

13   the operations, not only the corporation, but the operations as

14   well.

15   Q.   And what are the main types of products and services you

16   secure for Teekay?

17   A.   So there's corporate stuff that we'll do, and then we talk

18   about spares and repairs, and then we call consumables.

19   Broadly, that's what we talk about.

20   Q.   What's a consumable?

21   A.   A consumable item is something that you consume.  Right?

22   So it's used and it's replenished on a regular basis.

23   Q.   And what are the main type of consumables that you're in

24   charge of procuring?

25   A.   So marine lubricants, coatings, chemicals, gases,

1    provisions, food for vessels, all that stuff.

2    Q.    And you mentioned chemicals.  What are the main types of

3    chemicals that you're in charge of procuring?

4    A.    So the main types of chemicals are cleaning chemicals,

5    they're water treatment chemicals, they're fuel treatment

6    chemicals.

7    Q.    And those are consumable items?

8    A.    Correct.

9    Q.    How long have you been involved in procuring marine

10   chemicals for?

11   A.    Since the beginning.

12   Q.    Does anyone in your department support you in procuring

13   marine chemicals?

14   A.    Yes, they do.  So our department is broken up.  We have --

15   I lead the department, and then I have a number of commodity and

16   contract specialists.  And each of them have an assignment on

17   what they deal with, so a certain commodity.  So I do have

18   somebody specifically for this group.

19   Q.    And so how do they support you in procuring marine

20   chemicals?

21   A.    Well, it's their responsibility -- they're the specialists,

22   so it's their responsibility to know the product -- know the

23   product, know the environment, know the -- you know, the

24   supplier community, all of that stuff.  That's how they --

25   that's their expertise.

1  Q.   And outside of your department, is there anybody at Teekay

2  that supports you in procuring marine chemicals?

3  A.   Yes.

4  Q.   And how is that support given to you?

5  A.   So basically, we have -- the people within my department

6  are the commercial aspect of it, and then we have technical

7  representation that -- that's not only from the fleet teams

8  themselves, but on an office-by-office perspective.

9  Q.   Who is Teekay's primary supplier of marine chemicals?

10  A.   Wilhelmsen.

11  Q.   And does Teekay have a contract with Wilhelmsen?

12  A.   Yes, we do.

13  Q.   What's your role in negotiating Teekay's contract with

14  Wilhelmsen?

15  A.   So, ultimately, my role is to negotiate the contract, the

16  ultimate contract.

17  Q.   What are the main categories of products that are included

18  in Teekay's contract with Wilhelmsen?

19  A.   So, broadly, we call them chemicals, gases, and then, like,

20  welding supplies and equipment and stuff like that.

21  Q.   And what services are covered under that contract with

22  Wilhelmsen?

23  A.   Yeah, so related to the chemicals themselves, then we have

24  technical services that's involved with it.  So the -- you know,

25  they're specialty chemicals, so we need their service to be able

1    to provide us with guidance on how, you know, to maintain the

2    equipment that they're being used on.

3    Q.   What capabilities does Teekay seek in a marine chemical

4    supplier?

5    A.   Well, generally, you know, capabilities is always the

6    same -- we call them the five rights.  Right?  So it has to be

7    the right product, the right quality, it has to be the right

8    supplier, has to be the right delivery, and then finally it has

9    to be the right price.  So broadly, that's how we do it.

10   Q.   In terms of delivery, what does Teekay look for?

11   A.   Well, the capability, not only -- you know, they have to be

12   able to deliver where and when we need it.  Right?  So that's

13   paramount.  Because of the way our ships trade, we have to have

14   the ability to get supply, because safety is job one for us.  So

15   we have to have that ability and access.

16   Q.   And where do you need a supplier to be?

17   A.   Sorry?

18   Q.   In what locations would you need a supplier to be at?

19   A.   Every potential port that we're traveling to and we're

20   working out of.

21   Q.   What suppliers have proved their capability of meeting

22   Teekay's need for marine chemicals?

23   A.   Well, there's only two.  Basically, Wilhelmsen and Drew.

24   Q.   Turning your attention to water treatment chemicals, have

25   you ever heard of engine cooling water treatment chemicals?

1    A.    Yes.

2    Q.    And, briefly, what are engine cooling water treatment

3    chemicals?

4    A.    So they work towards, you know, cooling the engine.  So

5    what it is is it's an integral part of the operations to make

6    sure that we don't have any, you know, build-up and -- just has

7    to be safe and efficient operation.

8    Q.    Does Teekay using engine cooling water treatment in --

9    A.    Yes, we do.

10   Q.    And why do you do that?

11   A.    For those reasons that I stated.

12   Q.    Do you know what types of things can happen if you don't

13   use engine cooling water treatment?

14   A.    Well, it could render the vessel inoperable.  So again, for

15   us, it's about safety.  Right?  The safe operation.  So we have

16   to have that ability to operate safely.

17   Q.    Who supplies Teekay's engine cooling water treatment?

18   A.    Wilhelmsen.

19   Q.    When your vessels replenish their stock of engine cooling

20   water treatment supply, what supplier of engine cooling water

21   treatment do they replenish with?

22   A.    With Wilhelmsen.

23   Q.    And how often do your vessels replenish their stock of

24   engine cooling water treatment?

25   A.    Well, we'd like to see them do it every quarter, on a

1    quarterly basis, but it's usually every couple of months that

2    we're getting supply.

3    Q.   Why do your vessels use the same supplier of engine cooling

4    water supplier when they replenish?

5    A.   Because we need consistency of supply.  We need to have not

6    only consistency of supply, but when you have consistency of

7    product, it has to be the same.  We don't want to mix product.

8    Q.   Why don't you want to mix product?

9    A.   Because it's -- it's for the safe operation of the vessel,

10   we do not want to introduce any risk into the vessel, and that's

11   why we do that.

12   Q.   What would a given Teekay vessel do if it was going to

13   switch from using Wilhelmsen's engine cooling water treatment to

14   a different brand of engine cooling water treatment?

15   A.   Well, there would have to be somebody who can prove that

16   they can supply not only the product, the quality -- all the

17   five rights that I talked about.  Right?  So it has to be a

18   consistent product, it has to be, you know, a quality product,

19   it has to meet our needs.

20   Q.   Turning your attention to boilers, what are boilers used

21   for on vessels?

22   A.   So for Teekay, we've got two instances where the boilers

23   are really prevalent, if you will.  So we have certain LNG

24   vessels that are actually used for propulsion.  So the steam

25   that's produced off of the boilers actually run the ships.

1    And then for our tanker fleet, they're used to run all the

2    auxiliary machinery, so cargo pumps, cargo operations and

3    heating our cargo.  So essentially they're critical -- mission

4    critical for our operations.

5    Q.   You used the word LNG before.  Could you explain what LNG

6    means?

7    A.   So it's liquified natural gas.

8    Q.   Have you heard of boiler water treatment chemicals?

9    A.   Yes.

10   Q.   Does Teekay use boiler water treatment chemicals on its

11   vessels?

12   A.   Yes, we do.

13   Q.   And who supplies Teekay's vessels with boiler water

14   treatment?

15   A.   Wilhelmsen.

16   Q.   When your vessels replenish their stock of boiler water

17   treatment, what supplier's boiler water treatment do they

18   replenish with?

19   A.   Wilhelmsen.

20   Q.   How often do your vessels replenish their stock of boiler

21   water treatment?

22   A.   It's the same as the other answer, basically.  We try to do

23   it all at the same time, and it's, you know, on a quarterly

24   basis, but it's really every couple of months.

25   Q.   Why do your vessels use the same supplier of boiler water

1    treatment when they replenish?

2    A.    Because, again, consistency of supply.  We need to have the

3    right product, and it's got to be delivered, and -- it's quality

4    and product.

5    Q.    What would a given Teekay vessel do if they were going to

6    switch to a different brand of boiler water treatment chemical?

7    A.    Well, there would be -- we have to qualify that chemical,

8    first of all, to make sure that it meets the requirements.  Sp

9    it's like -- you know, it's machinery.  Right?  And it has to be

10   right for purpose.  And then we'd have to qualify the company as

11   far as being able to deliver and have the ability to deliver on

12   a consistent basis for us.

13           MR. DAVIS:  Your Honor, I have a handful of questions

14   that I'd like to ask Mr. Sarro that have been designated as

15   confidential.  If it's okay, I'd request if we could close the

16   courtroom for this.

17           THE COURT:  Any objection?

18       Ladies and gentlemen, I am sorry to inconvenience you this

19   way.  Obviously, the presumption is for open courtrooms whenever

20   possible, but we will have portions of the trial in which

21   there's confidential commercial information that will be

22   elicited.  And so I'm going to have to close the courtroom

23   briefly.

24       How long do you think this will be, Mr. Davis?

25           MR. DAVIS:  I think maybe about five minutes.

```
1              THE COURT:  All right.

2              MR. DAVIS:  And this will be the only portion.

3              THE COURT:  All right.  So anyone who is not with one

4       of the -- well, either with the FTC or with counsel for

5       Wilhelmsen or Drew Marine or Teekay is going to have to leave

6       the courtroom at this time.  Again, we'll reopen in

7       approximately five to eight minutes.  Thank you.

8          (Closed session.)
```









1

2

3

4

5

6

7

8

9

10

11  THE COURT:  All right.  Thank you.  Okay.  We will

12  seal that portion, and we can reopen the courtroom.  Thank you.

13  (Open court.)

14  THE COURT:  You can proceed.

15  MR. DAVIS:  Thank you.

16  BY MR. DAVIS:

17  Q.  Mr. Sarro, approximately how many ports does Teekay buy

18  products from Wilhelmsen in in a given year?

19  A.  It's in excess of 100.

20  Q.  How about water treatment chemicals?  How many ports does

21  Teekay buy water treatment chemicals from Wilhelmsen in a given

22  year?

23  A.  Again, in excess of 100.

24  Q.  Is Teekay required to buy anything from Wilhelmsen under

25  its contract?

1    A.   Well, our contract is for them to supply our product and

2    services.  It's not exclusive, but it is for that purpose.

3    Q.   Under Teekay's contract with Wilhelmsen, does Teekay pay

4    different prices in different ports?

5    A.   Yes, we do.

6    Q.   How does Teekay's contract refer to those different ports?

7    A.   So we call them A, B, and C ports.

8    Q.   Can you explain what an A, B, and a C port is?

9    A.   Yeah.  So an A port is the most frequented ports.  So these

10    are the ports that all shipping and merchant marine vessels

11    attend to.  So a Singapore, Fujairah, Houston type thing.

12    Right?  So they make up about maybe ten ports globally.

13    Q.   And what's a B port?

14    A.   A B port is -- tends to be ports that we -- are specific to

15    our trade and our requirements.  So as a tanker, there's only

16    certain, you know, refineries and certain low ports and whatever

17    else that you would be going to.  So that's what we would call a

18    B port or a secondary port.

19    Q.   And a C port, what is that?

20    A.   The rest of the world.

21    Q.   Under your contract, how is the pricing different between

22    these ports?

23    A.   So an A port is the best priced.  And then, you know,

24    generally what we would say -- the B port is about 20 percent

25    premium on that.  And then a C port is another 50 percent

1    premium on top of a B port.

2    Q.   About what percent of Teekay's spend is in A ports?

3    A.   About two-thirds.

4    Q.   And what percent of Teekay's spend is in B ports?

5    A.   So the remaining third is broken up.  So I think our

6    percentage in B port is about 17 percent.

7    Q.   And do you know what the remainder is in the C ports?

8    A.   It's 20 percent.  We actually spend more in C ports than

9    B ports.

10   Q.   In a given year, does Teekay buy from every seaport that's

11   in your contract with Wilhelmsen?

12   A.   Yes.  Wilhelmsen supplies us completely.

13   Q.   Why doesn't Teekay just buy everything in A ports?

14   A.   We don't have the luxury of that.

15   Q.   What do you mean that you don't have the luxury?

16   A.   Because of the way our vessels trade, we can't always

17   ensure that we're going to be in an A port.  So, you know, when

18   I talk about a spot charter and you're tramping all over the

19   place, you just don't know where you're going to be.  So if we

20   could, we would lift always in an A port because it's

21   cost-advantageous for us.

22   Q.   Why doesn't Teekay carry more product on board its vessels?

23   A.   We don't have the luxury of space.

24   Q.   Have you ever been on board any of your vessels?

25   A.   Yes, I have.

1   Q.  Have you ever seen where the vessels store water treatment

2  chemicals?

3  A.  Yes, I have.

4  Q.  Can you describe how large the storage area for water

5  treatment chemicals is?

6  A.  So, I mean, if you can imagine, you know, when I describe

7  the size of two football fields, but we're only talking about a

8  20-by-20-foot section, because the vessels are optimized to

9  carry cargo, not supplies.

10  Q.  I'd like to turn your attention to the tender process.

11  Does Teekay use a formal tender process?

12  A.  Yes, we do.

13  Q.  Can you give a brief description of what a tender is?

14  A.  So a tender is a formal basis to go out for quotation for

15  products and services.  And -- so it entails, you know,

16  researching product, researching companies, and then issuing it

17  on a formal basis and then going through the process of, you

18  know, final negotiations.

19  Q.  And does Teekay issue tenders for marine chemicals?

20  A.  Yes, we have.

21  Q.  Are you personally involved in that process?

22  A.  Yes, I am.

23  Q.  What's your involvement?

24  A.  My involvement is to negotiate the final agreement.

25  Q.  Since 2006, when you became the global procurement

1   director, has Teekay issued a tender for marine chemicals?

2   A.   Yes, we did.

3   Q.   When was the first time you've done that since 2006?

4   A.   It was 2009.

5   Q.   Did Teekay review suppliers as part of that process?

6   A.   Yes, we did.

7   Q.   And what suppliers did you review?

8   A.   So we reviewed Wilhelmsen, Drew, Nalfleet, and Marichem

9   Marigas.

10   Q.   And out of those suppliers, which ones proved to have the

11   capabilities Teekay was looking for?

12   A.   Only the three, which was Wilhelmsen, Drew, and Nalfleet.

13   Q.   Who is Nalfleet?

14   A.   Nalfleet has since been acquired by Wilhelmsen.  So what

15   Nalfleet did is they would have -- together with Drew, they were

16   the only two suppliers that had proven high-pressure boiler

17   chemicals, and those are the boiler chemicals that are required

18   for LNG ships.  Wilhelmsen has since acquired Nalfleet.

19   Q.   Did you invite anyone to submit RFPs as part of this

20   process?

21   A.   Yes, we did.

22   Q.   And who did you invite?

23   A.   We invited Wilhelmsen, Drew, and Nalfleet.

24   Q.   And did you ultimately select a supplier as part of this

25   process?

1    A.   Sorry?

2    Q.   Did you ultimately select a supplier as part of this

3    process?

4    A.   Yes, we did.

5    Q.   And who did you select?

6    A.   We selected Wilhelmsen and Nalfleet together.

7    Q.   Okay.  And why did you select those companies?

8    A.   Because Wilhelmsen did not have the capability for

9    high-pressure boilers, and we needed high-pressure boilers.  So

10    Nalfleet was successful for that aspect.

11    Q.   You mentioned that you looked at Marichem in this process

12    too.

13    A.   Yes, we did.

14    Q.   Did you issue an RFP to Marichem?

15    A.   No, we did not.

16    Q.   Why not?

17    A.   Because we assessed that they weren't capable to meet our

18    requirements.

19    Q.   What do you mean that they weren't capable of meeting your

20    requirements?

21    A.   They did not have the footprint.  They did not -- when I

22    say footprint, they didn't have the capabilities in all the

23    ports that we required it, and they didn't have the technical

24    expertise that we deemed necessary to support us.

25    Q.   Following the 2009 tender, when was the next time that

1    Teekay began the process of issuing a competitive tender?

2    A.    It was 2013.

3    Q.    As part of that process, did you review suppliers?

4    A.    Yes, we did.

5    Q.    And what suppliers did you review in that process?

6    A.    At that point, then, we were left with Wilhelmsen, Drew,

7    and Marichem and Marigas.

8    Q.    And what suppliers did you determine had the capabilities

9    Teekay was looking for?

10   A.    The only two suppliers were Wilhelmsen and Drew.

11   Q.    What was the ultimate outcome of this process in 2013?

12   A.    So the ultimate outcome is we actually renegotiated or

13   negotiated a new agreement with Wilhelmsen without going out to

14   tender.

15   Q.    You mentioned that you looked at Marichem in 2013?

16   A.    Yes, we did.

17   Q.    Were you personally involved in considering Marichem in

18   2013?

19   A.    Yes, I was.

20   Q.    What, if anything, did you do to evaluate Marichem's

21   capabilities?

22   A.    So, you know, there's -- me personally or my team?

23   Q.    Well, what are you aware of that was done to assess

24   Marichem's capabilities?

25   A.    So again, my team -- that's their expert, is to know the

1    business, know the capabilities of the suppliers that are out

2    there and to qualify them.  So we did -- and we met with them at

3    the time, too, because part of that process isn't just -- you

4    know, what you pick up in the industry is you've got to meet

5    with them and understand what it is that they're doing, how have

6    they changed, that sort of stuff.

7    Q.    Were you at any of those meetings with Marichem?

8    A.    Yes, I was.

9    Q.    Do you know approximately how many times you would have met

10   with Marichem?

11   A.    In 2013?  Probably a couple of times, maybe, at the most.

12   It didn't take long.

13   Q.    What did you learn regarding Marichem's capabilities?

14   A.    Well, while they progressed from 20 -- you know, 2009, they

15   certainly did not, again, have the breadth to cover us and -- or

16   the expertise.

17   Q.    Turning your attention from 2013 to more recent times, are

18   you aware that Wilhelmsen is proposing to acquire Drew?

19   A.    Yes, I am.

20   Q.    And when did you learn that?

21   A.    It was last year, in the summertime or -- late spring,

22   early summer.

23   Q.    Since the time that you learned about Wilhelmsen's proposed

24   acquisition of Drew, have you met with any marine chemical

25   suppliers?

1    A.    Yes, I have.

2    Q.    And what marine chemical suppliers have you met with?

3    A.    I met with Marichem and Marigas.

4    Q.    When was the first time that you met with Marichem after

5    learning that Wilhelmsen was proposing to acquire Drew?

6    A.    It was in September of 2016 -- or 2017, sorry.

7    Q.    And why did you meet with Marichem?

8    A.    Because of this proposed acquisition, we needed to look at

9    our alternatives and see if we could have somebody viable to

10   step in and help.

11   Q.    And what was discussed at that meeting?

12   A.    So, again, what was mostly discussed was, you know, we

13   would explain to them what our requirements were, you know, the

14   ports that we're calling on, the service level that we're

15   looking for, and they provided us with their -- you know, their

16   progress, if you will, since the last time we met with them.

17   Q.    And were there any outcomes at that meeting?

18   A.    Well, one of the outcomes is we talked about potentially

19   doing a pilot with them to truly see if they were capable of

20   doing what they said they could.

21   Q.    Have there been any follow-up meetings with Marichem about

22   doing a pilot?

23   A.    Yes, there have.

24   Q.    And when have those taken place?

25   A.    Two earlier this year, on two separate occasions.

1   Q.   And were you at those meetings?

2   A.   Yes, I was.

3   Q.   And what were the purpose of those meetings?

4   A.   To actually see if we could plan out and do something like

5   this.  Right?  To do a pilot.

6   Q.   What did you learn about the ability to do a pilot?

7   A.   They're still not ready.  By their own admission, they

8   don't have the -- you know, the capability in all the ports, and

9   they certainly don't have the service technicians to support us.

10  Q.   What do you mean by they don't have the capability in all

11  the ports?

12  A.   What typically happens in our industry, and probably a lot

13  of industries, everybody says they can do something, but then

14  when you come time to actually doing it [sic] and, you know,

15  putting pen to paper that you are going to be committed to doing

16  that, that's when we find out what their true capability is.

17  And at that point, they clearly said that they just weren't

18  there as far as the coverage.

19  Q.   And what did you learn about their service capabilities?

20  A.   They're very limited on their service capabilities.  So

21  they're very limited in the people that they have.  They

22  proposed using a lot of third-party service technicians, which

23  is a big red flag for us because we need people, you know,

24  standing behind their product and not relying on a third party

25  to step in to do service.

1    Q.    Today, Mr. Sarro, what would it take for Teekay to shift

2    its entire vessel fleet to Marichem for boiler water treatment

3    and cooling water treatment?

4    A.    We wouldn't do it.

5    Q.    Why not?

6    A.    Safety and reputational risk.  We just cannot take that

7    risk.

8    Q.    If the prices of boiler water treatment and cooling water

9    treatment with Wilhelmsen and Drew were to go up by 5 percent,

10   would you switch your entire fleet to Marichem's boiler water

11   treatment and --

12   A.    Absolutely not.

13   Q.    -- cooling water treatment?

14   A.    Absolutely not.

15   Q.    What if the prices of boiler water treatment and cooling

16   water treatment with Wilhelmsen and Drew went up by 50 percent,

17   would you switch your entire fleet to Marichem's boiler water

18   treatment and cooling water treatment?

19   A.    We cannot take risks like that.  Right?  We just can't do

20   it because -- you know, free product even.  If there's no

21   service behind it or if there's no consistency of supply, then

22   it's useless.  It's worthless.

23         MR. DAVIS:  Thank you, Mr. Sarro.  I have no further

24   questions at this time.

25         Thank you, Your Honor.

```
 1              THE COURT:  Will you be examining this witness?
 2              MS. SPILLMAN:  Yes.
 3              THE COURT:  All right.
 4                          CROSS-EXAMINATION
 5     BY MS. SPILLMAN:
 6     Q.    Good morning, Mr. Sarro.
 7     A.    Hello.
 8     Q.    I'm Fairley Spillman.  Hopefully you remember me from
 9     when I spoke with you in your office in Vancouver earlier.
10     A.    I do.
11     Q.    I want to start with a few questions about Teekay.
12     A.    Sure.
13     Q.    Teekay is one of the world's largest providers of
14     international crude oil and gas maritime transportation
15     services.  Is that right?
16     A.    Yes, it is.
17     Q.    And Teekay manages approximately 13 billion in assets.  Is
18     that right?
19     A.    That is correct.
20     Q.    And Teekay owns or operates approximately 200 vessels; is
21     that right?
22     A.    That's correct.
23     Q.    So Teekay is a big company.  Is that right?
24     A.    Yes, it is.
25     Q.    And now just switching gears, I want to talk a little bit
```

1    more about your background.  My understanding is that your

2    background and work experience is all on the procurement side.

3    Is that right?

4    A.    Yes, it is.

5    Q.    So you work from an office in Vancouver.  You don't work on

6    board a ship.  Is that right?

7    A.    Not on board a ship, no.

8    Q.    And in fact, you don't have any experience working on board

9    a ship, do you?

10   A.    No, I do not.

11   Q.    And you don't have any experience working in the technical

12   operations of vessels, do you?

13   A.    No, I do not.

14   Q.    And you personally have never used marine chemicals, have

15   you?

16   A.    In the sense of applying them?

17   Q.    Correct.

18   A.    No, I have not.

19   Q.    And you don't know -- sort of moving from that, you don't

20   know about how to dose marine chemicals, do you?

21   A.    Not personally, but that's why we rely on our technical

22   teams to do that for us.

23   Q.    And you don't consider yourself a technical expert in terms

24   of the use of chemicals in boilers, do you?

25   A.    I'm certainly not an expert, but I know enough to get

1    around.

2              MS. SPILLMAN:  I have one question following up to the

3    questions that cleared the courtroom about --

4              THE COURT:  Oh.  Does it pertain to this line of

5    questioning?

6              MS. SPILLMAN:  I mean, I can hold it all the way to

7    the end.  I think that will be okay.

8              THE COURT:  Because you may have some more.

9              MS. SPILLMAN:  Okay.

10   BY MS. SPILLMAN:

11   Q.   All right.  Now, you talked about learning about the

12   transaction in the summer?

13             THE COURT:  You have to say yes.

14             THE WITNESS:  Oh, I'm sorry.

15             THE COURT:  No, it's perfectly natural to nod, but he

16   can't capture the nod.

17             THE WITNESS:  Yes, it was.  Midyear last year.

18   BY MS. SPILLMAN:

19   Q.   And in connection with the transaction, you were contacted

20   by the FTC; is that right?

21   A.   Yes, I was.

22   Q.   And that was the first contact you had with the FTC.  In

23   other words, you had not contacted the FTC about the

24   transaction.

25   A.   No, I did not.

1    Q.    And as far as you know, no one from Teekay had either.  Is

2    that right?

3    A.    That's correct.

4    Q.    And you provided a declaration to the FTC in connection

5    with the transaction.  Is that right?

6    A.    Yes, I did.

7    Q.    And the FTC drafted that declaration.  Correct?

8    A.    Yes, after some interviews.

9    Q.    Okay.  In your procurement role, you're responsible for

10   contracting all consumable items for vessels owned and managed

11   by Teekay, not just marine chemicals.  Right?

12   A.    That's correct.

13   Q.    Internally at Teekay you called this kind of product

14   commodities.  Is that right?

15   A.    Well, we call it a consumable, but it is a commodity.

16   Q.    Okay.  And you contract with many suppliers other than

17   Wilhelmsen.  Is that right?

18   A.    For commodities and consumables, yes, we do.

19   Q.    And suppliers want Teekay's business.  Right?  You're a big

20   customer?

21   A.    We're an attractive customer.  Yes, we are.

22   Q.    You negotiate framework agreements for supply of marine

23   products for Teekay vessels.  Right?

24   A.    Yes, we do.

25   Q.    But your department does not actually do the purchasing of

1    the product for particular vessels.  Is that right?

2    A.   No.  So our group would -- we would negotiate the

3    agreements, and then we have day-to-day purchasers who do the

4    transacting of the --

5    Q.   And as you mentioned in your direct testimony, your

6    agreement with Wilhelmsen is nonexclusive.

7    A.   That is correct.

8    Q.   And doesn't require Teekay to make any particular

9    purchases.  Is that right?

10    A.   That's not the intent of it.

11    Q.   But that is correct, there is --

12    A.   That's correct.

13    Q.   -- no purchasing requirement?

14    And so the actual purchase of marine products is -- the

15    purchase decisions are made at the vessel level.  Is that right?

16    A.   The -- no.  Well, no.  Because we have a contract.  So our

17    agreement is to honor the contract.  So maybe just for clarity

18    purposes, the reason why they're not exclusive is because, for

19    the safe operations of the vessels, we need to get product if

20    there's ever a problem.  So what we typically do is we have a --

21    you know, an out-clause -- right? -- whether it's 60 days, 90

22    days, or something like that.

23    So to answer your question, the expectation is that we

24    actually honor our contracts that we put in place.

25    Q.   But --

1      THE COURT:  I'm sorry.  You said you have an

2  out-clause.  So, for example, if for some reason you need a

3  particular product and you can't get it from Wilhelmsen, at that

4  point, you're allowed under the contract to go get it from

5  somebody else?

6      THE WITNESS:  Yeah.  For the safe operations of the

7  vessels, yes.

8  BY MS. SPILLMAN:

9  Q.    Just to clarify, Mr. Sarro, you're not required to purchase

10  anything under the contract as far as Wilhelmsen can't require

11  you to go -- and insist that you purchase anything.  That's

12  correct?

13  A.    That is correct.

14  Q.    And even within your framework of encouraging your vessels

15  to purchase under the contract, a particular vessel may, in

16  fact, purchase marine products from other suppliers.  That's

17  correct?

18  A.    It's possible, but I can't see why you would do that.

19  Q.    It happens, doesn't it?

20  A.    It can happen, again, if you can't get supply.  Right?  But

21  the whole point of having a contract is to get that consistency

22  of product.  You're taking a risk if you're going to do it

23  outside.  And I just don't think people take those risks.

24  Q.    Well, you have a term you call leakage.  Is that right?

25  A.    Yes.

Q.   And that's a term you use when vessels purchase outside the
contract.  Correct?

A.   Correct.  But leakage applies to things that are --
something that you don't have to worry about.  So let's say it's
a soap, a hand soap.  That for us is what's real leakage.
Right?  But when you're talking about boiler water chemicals,
that's not leakage.  Right?  That's -- you work through the
contract for that reason.  Kind of like marine lubricants.  We
don't have leakage in marine lubricants just because it's really
important that you have that product on board from that
supplier.

Q.   I want to switch gears and talk a little bit about your
marine product agreements.  I believe you said that Teekay has
essentially sole-sourced marine products from Wilhelmsen since
2003.  Is that right?

A.   That is correct.

Q.   And consistent with your testimony when you were talking to
Mr. Davis, the last formal tender Teekay made for marine
products was in 2009.  Is that right?

A.   That's correct.

Q.   And at that time, Wilhelmsen was selected.

A.   That is correct.  Wilhelmsen and Nalfleet.

Q.   Right.  And then, in 2013, an offer from Wilhelmsen was
negotiated without going to tender.  Is that right?

A.   That's correct.

1    Q.    Okay.  Now, I'm going to show you an exhibit.

2          MS. SPILLMAN:  The exhibit, I think, is confidential,

3    but I don't believe the questioning is going to be.

4          THE COURT:  All right.  So we'll just put it up on

5    your screen.

6          If you could turn your screens away.  Thank you.

7          MS. SPILLMAN:  That's going to be DX-1297.

8    BY MS. SPILLMAN:

9    Q.    Do you recognize --

10   A.    It's very blurry.  Like, I can't -- can you enhance it?

11         Yes.  Yep.

12   Q.    And if you can look at the next couple of pages.  Look at

13   page DX-1297-0002.

14   A.    0002?  Okay.  Yes.

15   Q.    And see if you can tell me what that document is?

16   A.    So it's the agreement for -- between us and -- when I say

17   "us," there's a group called TBW and Wilhelmsen.

18   Q.    And we'll get back to that in a minute.

19   A.    Okay.

20   Q.    Now I'd like you to take a look at a different document

21   that's marked DX-1299.  Is that up on your screen?

22   A.    Yes, it is.

23   Q.    The next page of the exhibit.  One more page.

24         And if you can identify the document that's DX-1299.

25   A.    If you could just scroll down so I could see the bottom.

1    There's no marking on this document.  Is it at the very bottom?

2    Q.    Yeah.  Keep scrolling down.

3    A.    Sorry, yeah.  DX-1299?  Yep.  Is there --

4    Q.    I just wanted you to identify for the record what this

5    document is.

6    A.    That is an agreement with Wilhelmsen again.

7    Q.    And am I correct, DX-1299 is an addendum to the 2013

8    agreement, which was DX-1297.  Is that right?

9    A.    Correct.

10   Q.    And -- so you effectively extended the 2013 agreement with

11   Wilhelmsen in 2016.  Is that right?

12   A.    Essentially.

13   Q.    But there were some changes made at that time --

14   A.    Yes.

15   Q.    -- as well.  And that's reflected in the addendum which is

16   DX-1299?

17   A.    Correct.

18   Q.    Okay.  I'm going to ask you a few questions starting with

19   the 2013 agreement.  So if you could turn back to DX-1297 and

20   take a look at page -0011 of the...

21        Now, this is schedule 2 of the 2013 agreement.  Correct?

22   A.    Yes.

23   Q.    And if you look down towards the bottom, there's subpart A,

24   contracted items.  Do you see that?

25   A.    Yes.

1    Q.   And then if we turn over to the next page, 0012, this

2    page -- and then we'll look at the next page in a minute --

3    these are the contracted items referred to on the previous page.

4    Is that right?

5    A.   No, they're not, actually.

6    Q.   What are these, then?

7    A.   Well, these items -- so we have a list of products that

8    we've identified where we affixed the A, B, C ports.  And these

9    are additional items that we contract that aren't

10   specifically -- so they may become a discount off of a port or

11   whatever it may be.

12   Q.   Okay.  Let's look at page 0014.  Now, my understanding was

13   that these documents starting here at subpart B are the

14   noncontracted items.

15   A.   Yes.  So there's a couple of varieties of that.  Right?  So

16   these are noncontracted items.  There are contracted items that

17   are within the agreement, but don't fall under a certain fixed

18   price for every single item.  So then they become a discount off

19   a list.

20        There's other items, like the high consumable items, where

21   we actually negotiate the actual price.  It isn't a discount off

22   a list.  It's actually a price that we negotiate.  So it's

23   rather complex, but that's why there's three aspects to it.

24   Q.   Okay.  I'm sorry to be confused here, but this page, 0014,

25   is titled, Noncontracted items.

1    A.    That's right.

2    Q.    Now, if you go back to 0011 and then follow on to 0012, it

3    would appear that starting at 0012 are contracted items.

4    A.    Yes.

5    Q.    Okay.

6    A.    Yep.

7    Q.    Okay.  And those contracted items include a variety of

8    categories.  Is that right?

9    A.    Yes, they do.

10   Q.    And that includes --

11   A.    Sorry.  Can you just scroll down on this sheet just a

12   little bit more?  Okay.  Perfect.  Thanks.

13   Q.    That includes welding consumables.  Right?

14   A.    Yes.

15   Q.    Polymer repair systems.  Right?

16   A.    Yes.

17   Q.    Gas welding cutting equipment.  Right?

18   A.    Yes.

19   Q.    Electric welding equipment.  Correct?

20   A.    Yes.

21   Q.    And then the next category is called chemicals marine.  Do

22   you see that?

23   A.    Yes.

24            MR. DAVIS:  Would it be possible to share a document

25   with him so that he can actually see this?

1      MS. SPILLMAN:  I think so.

2  BY MS. SPILLMAN:

3  Q.   Okay.  So turning back to page -- I think we're on

4  page 0012.  And the page number is the DX -- it's the 12 after

5  the DX number.

6  A.   Okay.

7  Q.   And so I was just getting ready to ask you about the

8  category chemicals marine.  Do you see that?

9  A.   Yes.

10  Q.   And that category, chemicals marine, includes boiling water

11  treatment.  Correct?

12  A.   Yes.

13  Q.   And it includes cooling water treatment.  Correct?

14  A.   Yes.

15  Q.   But it also includes a variety of additional marine

16  chemicals.  Is that right?

17  A.   That is correct.

18  Q.   Then the next category, if -- I think you have to go over

19  to the next page -- is test kit.  Do you see that?

20  A.   Yes.

21  Q.   And that includes water test kits.

22  A.   Yes.

23  Q.   And it also includes other kinds of test kits.  Is that

24  right?

25  A.   Yes.

1    Q.   And, finally, there are two additional categories,

2    gas fillings and refrigerants.  Do you see that?

3    A.   Yes, I do.

4    Q.   And then if you flip over to appendices 1 to 3, starting,

5    I think, on page 005 -- 0005 -- do you see those appendices?

6    A.   No.  The appendices are listed different than that.  I

7    don't know which appendices you're referring to.  Is it this?

8    Q.   Yeah, that is it.  I apologize, I'm sorry.

9    A.   No worries.

10   Q.   So if you could just explain what those appendices show.

11   A.   The appendices show the specific products with the

12   discounts that are applied to those products, and the prices.

13   Q.   And those appendices go on for page upon page.  Is that

14   right?

15   A.   Yes, they do.

16   Q.   So there are a lot of different products covered by this

17   agreement.  Would you agree?

18   A.   Yes, there is.

19   Q.   And in addition to contracting for many marine products in

20   a single agreement, Teekay actually purchases many marine

21   products from Wilhelmsen.  Isn't that right?

22   A.   Yes, we do.

23   Q.   And in fact, isn't it the case that marine chemicals and

24   test kits of any kind make up just over a quarter of the total

25   purchases?

1    A.    I don't know the actual figure.

2    Q.    Okay.  Let's take a look at a document that's been labeled

3    PX-40038, which again, I believe is confidential for Teekay.

4          Mr. Sarro, do you recognize document P-0038 -- PX-0038?

5    A.    And can I just look at the bottom for the reference?

6    38-001?

7    Q.    Correct.

8    A.    Yes.

9    Q.    And what do you recognize that document to be?

10   A.    That is a document from the gentleman that works for me,

11   the commodity specialist, to Lew Davis.

12   Q.    And you're cc'd on that document?

13   A.    Correct.

14   Q.    And is it correct to characterize this document as Teekay's

15   responses to some questions that the FTC posed?

16   A.    Yes, it is.

17   Q.    And if you look at page -- let's see.  I'm sorry.  I didn't

18   write it down.  I'm sorry.  I didn't write it down.  It's, like,

19   the next page -- about three more pages.  See if I can find it.

20         Yes -- no, that's not it, I'm sorry.  It's the next

21   spreadsheet.  That's it, yes.

22         If you look at this document, which is page 0009, am I

23   correct that's a breakdown of your spend for marine chemicals by

24   category?  Is that right?  I mean, your spend for marine

25   products by category.

    1    A.    Yes.

    2    Q.    And it shows -- keep scrolling down -- chemicals, 28

    3    percent?

    4    A.    Correct.

    5    Q.    And in that category, you include chemicals, test kits and

    6    equipment.

    7    A.    Correct.

    8    Q.    And that includes all marine chemicals, correct, not just

    9    boiler water treatment and cooling water treatment?

   10    A.    I believe so.  I'd have to scrutinize it completely, but

   11    yeah, generally, it probably is.

   12    Q.    Okay.  Now, looking back at DX-1297, the agreement, if you

   13    look at page 0036 --

   14    A.    Yes.

   15    Q.    -- Mr. Sarro, can you tell me what that page shows?

   16    A.    That page shows the port price breakdown between A, B, and

   17    the rest of the world.

   18    Q.    And you previously explained what's the difference between

   19    an A port and a B port.  Correct?

   20    A.    Yes, I did.

   21    Q.    And A ports are the ports most frequented by Teekay

   22    vessels.  Correct?

   23    A.    Correct.

   24    Q.    And Teekay gets a significantly discounted price for

   25    purchases at A ports.  Right?

1    A.    It's the best port for us, yes.

2    Q.    Now, if you turn your attention -- I'm sorry to do this --

3    to DX-1299.  And I actually have a hard copy for you if that

4    will be easier.

5    A.    Thank you.

6    Q.    And if you'd turn to page 0013 of 1299.

7    A.    Yes.

8    Q.    Do you have that page?

9    A.    Yes.

10   Q.    And that's also a list of A ports and B ports?

11   A.    Sorry, then.  I don't have the same one.  Which was the

12   page?  I'm looking at 1299-0003.

13   Q.    13?

14   A.    13, I'm sorry.

15   Q.    Yes.

16   A.    Okay.

17   Q.    And if you compare that to the comparable list -- this is

18   the list from the 2016 addendum.  Correct?

19   A.    Correct.

20   Q.    And if you compare that to a list from the 2013 contract,

21   the upshot is that the number of A ports and B ports was reduced

22   in --

23   A.    Correct.

24   Q.    -- the 2016 amendment.  Is that correct?

25   A.    Correct.

1    Q.    And the idea was that that would save Teekay money.  Right?

2    A.    Yeah.  So what we were able to do is we were able to

3    pinpoint, you know, where our activity was.  And so rather than

4    having more ships on certain A ports and B ports where we had no

5    activity, then it would incentivize Wilhelmsen to give us a

6    better price.

7    Q.    Okay.  Now, you testified earlier about Teekay's preference

8    that a marine products supplier have a broad distribution

9    network.  But Teekay vessels don't actually purchase product in

10   every port in which they call.  Correct?

11   A.    Not every port, no.

12   Q.    And going back to PX-40038, the Teekay answers to the FTC's

13   questions, if you look on page --

14   A.    I think that has to come up on the screen.

15   Q.    Yeah.  Just a minute.  Page 7.

16         Does this illustrate Teekay's purchases broken down by

17   port?

18   A.    Yes.  It does at that time.

19   Q.    And do you know what time period this is from?

20   A.    I'm pretty sure this is the 2013, '16, somewhere around

21   there.  I'd have to look at the document to refresh.

22   Q.    The first page?

23   A.    Yeah.  So if you bring up the first page, I think Jeff had

24   outlined what the date range was on that or when it was --

25   Q.    Here it is.

1    A.    Thank you.

2          (Witness reviewing document.)

3          So that would be for 2016.

4    Q.    For 2016.

5    A.    Correct.

6    Q.    And does that show that, in 2016, 83 percent of all of the

7    marine product purchases that Teekay made were had made at A or

8    B ports?

9    A.    Yes, it does.

10   Q.    And with the exception of Lisbon, purchases at any other

11   port were less than 1 percent of the total.  Is that right?

12   A.    That is correct.

13   Q.    And this reflects purchases of all products from Wilhelmsen

14   and Drew.  Correct?

15   A.    Yes, it does.

16   Q.    So not just boiler water treatment products or cooling

17   water treatment products?

18   A.    That's correct.

19   Q.    And presumably you don't know what the breakdown is of

20   those product purchases?

21   A.    No, I don't.  But typically, when we're lifting at any

22   port, it's not just one item.  Right?  So we end up lifting more

23   items than that.  And that's what ends up happening.

24   Q.    Do you know what proportion of Teekay's vessels visit an

25   A port or a B port at least every six months?

1    A.    I don't have that answer, no.

2    Q.    Presumably, it's a pretty high number, given the breakdown

3    of purchases.  Right?

4    A.    We hope it is, but again, it's dependent on what the

5    charters and the -- the spot charter and where we're tramping

6    around.  But that's the hope.

7    Q.    Now, I think you mentioned, but if you didn't, I'll say

8    Teekay is in a purchasing group with a company called BW Fleets.

9    Right?

10   A.    It's BW Fleet Managers.

11   Q.    Fleet Managers.

12   A.    Fleet Managers.

13   Q.    And that's reflected in both the 2013 agreement and the

14   2016 addendum, in fact, that those are actually three-way

15   agreements?

16   A.    That is correct.

17   Q.    BW Fleet manages over 100 vessels.  Is that right?

18   A.    That is correct.

19   Q.    And you believe that this contract arrangement where you

20   jointly contract with BW is advantageous to Teekay because it

21   increases your bargaining power.  Correct?

22   A.    You bet.  Yes.

23   Q.    In other words, it leverages the purchasing power of the

24   combined fleets.  Is that right?

25   A.    Yes, it does.

1    Q.   It's your experience, isn't it, that a large volume

2    purchaser has leverage not just with respect to price terms, but

3    with respect to other terms and conditions?

4    A.   That's the hope.

5    Q.   And in fact, you believe Teekay gets better pricing even

6    than other big fleets.  Is that right?

7    A.   We believe we do, but a lot of that has to do -- it's not

8    just leverage; it's our ability to negotiate.

9    Q.   So you think you're a particularly good negotiator?

10   A.   I hope to -- I'm still employed, so that's good.

11   Q.   Now, in your direct testimony, you spoke a little bit about

12   the importance that you perceive of boiler water treatment and

13   cooling water treatment.  Is that right?

14   A.   Yes.

15   Q.   And risks associated with switching suppliers for those

16   products?

17   A.   Yes.

18   Q.   But you haven't actually personally had any experience

19   switching boiler water treatment chemicals, have you?

20   A.   No, because we honor the contract.

21   Q.   And you aren't aware of any instances in which equipment

22   has actually been damaged because of switching boiler water

23   treatment chemicals.  Correct?

24   A.   To the best of my knowledge, it hasn't occurred because we

25   haven't done it.

1  Q.   And you aren't aware of any delays caused by switching

2  boiler water treatment chemicals?

3  A.   Because we haven't done it.

4  Q.   And I assume that's also true for cooling water treatment

5  chemicals.  Correct?

6  A.   That's correct.

7  Q.   And you aren't aware of any instance where a Teekay vessel

8  has run out of boiling water treating chemicals.

9  A.   I -- that -- I couldn't even answer that.  But it's

10 entirely possible that we're out of chemicals and we have to get

11 it at the next port.  And that's why maybe we -- you know, we're

12 lifting in some of these obscure ports -- right? -- because

13 literally we've lifted in over -- it's probably about 120-plus

14 ports, these products.

15 Q.   I thought you said a hundred.

16 A.   Over a hundred, I said.  Literally, it's about 120-plus.

17 Q.   But earlier you said Teekay vessels typically carry a

18 three-month, four-month supply of chemicals.

19 A.   I never said how much we carried, because I don't know how

20 much we carry.  But typically speaking, is we want to carry

21 enough that's going to carry us from quarter to quarter.  But

22 all too often we're lifting every couple of months.  We just --

23 we have limited space, so we don't have that luxury.

24 Q.   Now, in your direct testimony, you testified that you would

25 not switch suppliers if faced with a price increase.  Is that

```
1    right?

2    A.   That's correct.

3    Q.   And I believe -- well, let me show you a document, DX-1298.

4            THE COURT:  Is this also subject to protection?

5            MS. SPILLMAN:  I do not believe anyone designated this

6    confidential, but --

7            THE COURT:  Speak now or it's going to be on the

8    public screen.

9            MS. SPILLMAN:  For safety's sake, because I didn't get

10   a chance to talk to him about what he wanted confidential, so...

11           THE COURT:  All right.  Let's keep it out of the

12   public screen for now.

13           THE WITNESS:  I would suggest we do that --

14           THE COURT:  All right.

15           THE WITNESS:  -- for this one.

16   BY MS. SPILLMAN:

17   Q.   And can you identify the document that's been marked

18   DX-1298?

19   A.   It's an internal communication within Wilhelmsen.

20   Q.   Let's scroll down.  Let me get you a hard copy of this one,

21   too.  And once again, I apologize.  From now on, I'll have hard

22   copies.

23   A.   Okay.  Thank you.

24   Q.   Mr. Sarro, have you had a chance to look at that?

25   A.   Yes, I have.
```

1    Q.   And can you describe -- you described, I think, the top of

2    the first page of DX-1298.  Can you describe the document more

3    broadly than that, seeing the whole thing in hard copy?

4    A.   So this dates back to 2015 where we were negotiating the

5    agreement of -- the 2016 agreement.  And we talk about

6    there's -- the internal communication -- well, it's an internal

7    communication document, but it shows communication between the

8    TBW group and Wilhelmsen.

9    Q.   And so below that top e-mailed -- a series back and forth

10   of e-mails between or among Wilhelmsen, Teekay, and BW Fleet.

11   Is that right?

12   A.   Correct.  Well, it's really from BW and Wilhelmsen.  It's

13   their document.

14   Q.   But you're cc'd on the --

15   A.   Yes, I am.

16   Q.   -- e-mail exchanges --

17   A.   Correct.

18   Q.   -- correct?

19   A.   Correct.

20   Q.   And if you look at the bottom of the first page, page 001

21   of DX-1298 --

22   A.   Yes.

23   Q.   -- can you read the language in that message?

24   A.   Do you want me to read it?

25   Q.   If you could, yeah.  Those two paragraphs after "Hi."

1    A.    Okay.  It says, As briefly mentioned over to the phone to

2    you, it has now been more than one full year since our meeting

3    in Singapore and, unfortunately, we're still at odds with your

4    proposal.  If -- sorry.  It wouldn't be fair to say -- sorry.

5    It's really small, so I'm -- wouldn't be fair to say that we are

6    no further ahead, as WSS has made some suggestions for overall

7    savings to the TBW members.

8             THE COURT:  I think it's also on the screen.  That

9    might --

10            THE WITNESS:  Oh, perfect.  Thank you very much.

11       The issues, however, remain the same.  We're simply in no

12   position to absorb any increases on any products.  Once again,

13   we appreciate there may be limits or -- sorry -- that items that

14   are in red for WSS.  However, short of an open-book agreement,

15   we cannot accept this as the case.  Again, we point to the

16   changes in the commodity prices and strength of the U.S. dollar

17   as crucial factors in costs for WSS.

18   BY MS. SPILLMAN:

19   Q.    So in this e-mail, BW Fleet, on behalf of itself and

20   Teekay, is stating that they're in no position to absorb any

21   increases for any products.  Is that correct?

22   A.    Yeah.  That's our negotiation tactic.

23   Q.    And that's referring to price increases.  Right?

24   A.    Absolutely.

25   Q.    And so it's the case that Wilhelmsen was proposing an

1    arrangement that would result in an overall decrease in costs to

2    Teekay and BW Fleet, but to raise prices on a few products

3    under -- covered under the agreement, and Mr. Gilliam was

4    telling Wilhelmsen that this was unacceptable.  Is that right?

5    A.   Yes.  And we're trying to negotiate the very best possible

6    deal.

7    Q.   And this approach is consistent with Teekay's day-to-day

8    focus on cost efficiencies which is applied to all aspects of

9    Teekay's operations.  Is that correct?

10   A.   Yeah.  Absolutely.  We are trying to negotiate the best

11   possible deals.

12   Q.   And in fact, Teekay and BW Fleet were able to --

13   subsequently to this e-mail -- to negotiate a satisfactory

14   addendum to the agreement with Wilhelmsen.  Correct?

15   A.   Yes, we were.

16   Q.   Now, in your direct testimony, you were talking a little

17   bit about Marichem, and you indicated that you believed that

18   they didn't have the service capabilities --

19   A.   That is correct.

20   Q.   -- that Teekay wanted.  Now, if you look back at your

21   agreement, DX-1297, at page 19 -- do you have that?

22   A.   Got it on the screen, yes.

23   Q.   Okay.  And that's schedule 3 of the 2013 agreement.

24   Correct?

25   A.   Yes.

1    Q.   And it's additional terms.  And if you look at the very

2    bottom, number F, there's a reference to annual vessel visits?

3    A.   Yes.

4    Q.   And so that provision permits Teekay and BW Fleet one

5    free-of-charge chemical service visit per year for each vessel.

6    Do you see that?

7    A.   Yes.

8    Q.   So under your agreement, you're only entitled to one

9    onboard vessel -- one onboard visit per vessel per year.

10   Correct?

11   A.   That's what we were able to negotiate, yes.

12   Q.   And in fact, not even all Teekay vessels get that annual

13   visit.  Isn't that right?

14   A.   Because they can't schedule it.  Right?

15   Q.   Right.

16   A.   But the scheduled visit is to physically go on board and

17   assess.  Right?  But there's constant communication back and

18   forth to ensure that we're following suit.  Right?  It's ship's

19   operation, so we do have communication and ability to

20   communicate.

21   Q.   You've never participated in an onboard service at --

22   A.   No, I have not.

23   Q.   Do you know how often, say, boiler water is tested on a

24   Teekay vessel?

25   A.   I can't answer that question, but it's fairly frequent.

1    Q.    Do you know who does the testing?

2    A.    The ship's staff.

3    Q.    And you agree, don't you, that, ultimately, it's the ship

4    team, not the chemical supplier, that's responsible for water

5    treatment on a vessel?

6    A.    On board the ship, it's -- they're ultimately responsible.

7    They're the last line of defense.

8    Q.    Okay.  And then just switching topics again -- or a little

9    bit -- in your direct testimony, I take it that you think that

10   no one other than Wilhelmsen, or potentially Drew, could serve

11   Teekay's needs.  Is that right?

12   A.    Yeah.  Absolutely.  And I should mention, when you talked

13   about, you know, Marichem, it isn't my opinions.  They're the

14   ones who told us specifically this year that they just don't

15   have that capability.  They'd like to try, but they'd like to

16   have targeted -- and we just don't have that luxury that we can

17   just help somebody along.

18   Q.    Okay.  It's true, isn't it, that Marichem said it would

19   expand its port coverage to serve Teekay?

20   A.    As with many suppliers, they'll say they'll do that.

21   Right?  But it's the cart before the horse.  At the end of the

22   day, we're not -- they're not even going to make it past first

23   base if they don't have the capability.  So we're not there to

24   help somebody along.  We need a proven supplier.

25   Q.    But they said they'd expand to serve you.  Right?

1    A.   Suppliers say a lot of things.

2    Q.   They said that.  Right?

3    A.   Yes, they did.

4    Q.   Now, one reason you prefer Wilhelmsen, and maybe Drew, is

5    that you want a supplier with a full range of marine products.

6    Is that right?

7    A.   Yes.

8    Q.   And that's desirable because you believe consolidating your

9    spend with fewer companies gives you more negotiating leverage.

10   Is that right?

11   A.   Yes.  And there's efficiencies in dealing with one

12   supplier.  We've got -- if you can appreciate, we've got ships

13   that are going into port, and just to coordinate a supply in a

14   port is very difficult.  So Wilhelmsen has that breadth.

15   They've got that product portfolio that works well.

16   Q.   And that's why you negotiate over a whole basket of

17   products at the same time.  Right?

18   A.   Yes, that and our volumes.

19   Q.   Now, talking about the 2013 contracting, you met with Drew

20   and Marichem, but you never solicited or received formal bids

21   from either of them.  Isn't that right?

22   A.   No.  Not formal bids from either.

23   Q.   And you ended up just renegotiating and reupping with

24   Wilhelmsen.  Is that --

25   A.   Correct.

Q.   Now, other than Wilhelmsen, Drew, and Marichem, you haven't
investigated any alternative suppliers for water treatment
chemicals, have you?
A.   Not generally.  I mean, we have people that call upon us
from time to time.  Like Uniservice is one of them, but that's
about the only people that will contact us.
Q.   So you're not familiar with a company called Marine Care?
A.   No, I am not.
Q.   And you've heard of Uniservice, but you haven't personally
considered them as a supplier --
A.   No, we would not consider them.
Q.   And you're not familiar with a company called Bluetech?
A.   No.
Q.   And you're not familiar with a company called Vecom?
A.   No.
Q.   Two more questions.  Then I'll get back to the secret
question.  It's the case, is it not, that Teekay's operations
are primarily outside the United States?
A.   We're global.  So there is some operations in the U.S.,
but, yeah, we've got them throughout the world.
Q.   But you would agree that the operations are primarily
conducted outside the United States?
A.   Predominantly.
Q.   And your office is in Vancouver, as we've talked about.
Teekay doesn't have any U.S.-flagged vessels, does it?

1   A.   No U.S.-flagged vessels, no.

2        MS. SPILLMAN:  Okay.  Now I'm ready for the --

3        THE COURT:  We're going to have to clear the courtroom

4   briefly.  How many questions do you think you have?

5        MS. SPILLMAN:  I think it's two, one or two.

6        THE COURT:  So a couple of minutes.  Thank you.

7        MS. SPILLMAN:  And Drew has some questions, but...

8        THE COURT:  Right.  But do you have -- well, do you

9   have --

10       MS. SPILLMAN:  I only have -- I have one or two more

11  questions.

12       THE COURT:  And then will you be done?

13       MS. SPILLMAN:  Then I'll be done.

14       THE COURT:  And then do you all want to start with

15  your -- because how you proceed with your examination is up to

16  you, but...

17       MR. POTTINGER:  Your Honor, if we could just break

18  for lunch, and then --

19       THE COURT:  Okay.  All right.  So just a minute or

20  two, and then you can come back to for lunch.

21       (Closed session.)

22  ███████████████████████████████████████████

23  ██████████████████████████

24  ████████████

25  █  ██████████████████████████████████



23        MS. SPILLMAN:  Okay.  That's all the questions I have.

24        THE COURT:  All right.  Thank you, Mr. Sarro.

25        MS. SPILLMAN:  Thank you, Mr. Sarro.

```
 1              THE COURT:  We can reopen the court.
 2         (Open session.)
 3              THE COURT:  All right.  Thank you.  So let's break for
 4    lunch.  Here's what we're going to run up against.  I have a
 5    2:30 oral argument in a TRO motion.  And we have to eat.  And my
 6    clerk has to prepare me for that one, which I'm kind of prepared
 7    already, but -- so we can come back at 2:00 and do half an hour?
 8    But you'll still have redirect.  Right?  How do you propose?
 9    What do you want to do?  Or we can have a longer -- you can have
10    a really long lunch.
11              MR. DILLICKRATH:  Your Honor, Mr. Sarro, begging the
12    Court's indulgence, is trying to get back to Vancouver today, if
13    that's at all possible.
14              THE COURT:  I don't blame you.  Okay.  So let's do
15    what we can.  Let's get back -- if we have to break for the 2:30
16    hearing -- what time is your flight?
17              THE WITNESS:  My flight is at 5:00, so --
18              THE COURT:  Oh.  Yeah, we really --
19              THE WITNESS:  -- I need to -- if we could get through
20    this now, it would be great.
21              THE COURT:  All right.  My clerk is going to see if we
22    can move that to 4:00.  Let's come back here at 2:15.  Yeah,
23    2:15.
24              MR. DILLICKRATH:  Thank you, Your Honor.
25              THE COURT:  All right.  I think we'll be able to move
```

1    it to 4:00.  Were you leaving from Dulles?

2              THE WITNESS:  Yes.  Or, sorry, Reagan.  Sorry, Reagan.

3              THE COURT:  Better.

4         All right.  Let's break for lunch.  I'll have Mr. Bradley

5    or somebody tell you, but let's proceed under the assumption

6    that we're going to push that argument to 4:00.  All right.  So

7    let's get back here at -- did I say 2:15?  Yes.

8         (Lunch recess taken at 1:13 p.m.)

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify
that the foregoing pages are a correct transcript from the
record of proceedings in the above-entitled matter.


_Bryan A. Wayne_
BRYAN A. WAYNE

# Exhibit E

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, et al., | |
| *Plaintiffs,* | CIVIL ACTION |
| v. | NO. 20-01113 |
| THOMAS JEFFERSON UNIVERSITY, et al. | |
| *Defendants.* | |

**ORDER**

**AND NOW**, this 10th day of September 2020, upon consideration of Defendants'

Motion *in Limine* (ECF No. 132), their exhibits (ECF No. 135), and Plaintiffs' Response

(ECF No. 166), it is **ORDERED** that the Motion is **DENIED**.[1]

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.

---

[1]     Defendants seek to preclude Plaintiffs from offering declarations and third-party investigational hearing transcripts they obtained before filing their Complaint.  Arguing the documents are hearsay, needlessly cumulative and controvert Federal Rule of Civil Procedure 43's preference for live testimony, Defendants ask the Court to refrain from exercising its discretion to consider them.  (Def.'s Mot. at 2–4, ECF No. 132.)

The Court is not strictly bound by the Federal Rules of Evidence in a preliminary injunction proceeding.  As both sides acknowledge, the Court may use its discretion to consider hearsay evidence in this context.  *See Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 718–19 (3d Cir. 2004) ("District courts must exercise their discretion in weighing all the attendant factors, including the need for expedition, to assess whether, and to what extent, affidavits or other hearsay materials are appropriate given the character and objectives of the injunctive proceeding.") (internal quotation marks and citation omitted). Given that part of the Court's role in the preliminary injunction proceeding will be to determine Plaintiffs' likelihood of success on the merits in the administrative adjudication, *see FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 337 (3d Cir. 2016), Plaintiffs may present declarations or investigational hearing transcripts that they may later introduce during the administrative adjudication.  The parties are also entitled to examine live witnesses as they deem appropriate during the preliminary injunction hearing. The Court will evaluate and consider the live testimony and accompanying evidence and will give the weight it considers appropriate to any declarations or investigational hearing transcripts introduced into the record in the absence of a live witness.

# Exhibit F

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

**FEDERAL TRADE COMMISSION,**

      Plaintiff,

    v.

**META PLATFORMS, INC.,**

and

**WITHIN UNLIMITED, INC.,**

      Defendants.

Case No. 5:22-cv-04325-EJD

**JOINT STIPULATION AND [PROPOSED] ORDER REGARDING DOCUMENTS ADMITTED INTO EVIDENCE**

Plaintiff Federal Trade Commission ("FTC") and Defendants Meta Platforms, Inc. and Within Unlimited, Inc. (collectively, "the Parties") submit the following Joint Stipulation and request that the Court admit into evidence the documents listed in Exhibit A attached hereto:

**WHEREAS** on December 1, 2022, the Parties filed a Joint List of Stipulations and Issues for Pre-Hearing Conference (Dkt. No. 385);

**WHEREAS** the Court held a preliminary injunction hearing that commenced on December 8, 2022 and concluded on December 20, 2022;

**WHEREAS** the Court admitted numerous documents into evidence during the preliminary injunction hearing;

**WHEREAS** the Parties' Joint List of Stipulations and Issues for Pre-Hearing Conference (Dkt. No. 385) stated that the Parties agreed "that all evidence previously filed in connection with their pre-hearing submissions regarding Plaintiff's Motion for a Preliminary Injunction, proposed Findings of Fact and Conclusions of Law, and expert reports can be considered as evidence by this Court, irrespective of its introduction as evidence at the hearing, subject to Plaintiff's Motion in Limine (Dkt. 280) and any objections that the parties may lodge during the hearing proceedings";

**WHEREAS** in addition to the categories of documents listed in the Parties' Joint List of Stipulations and Issues for Pre-Hearing Conference (Dkt. No. 385), the Parties have agreed that select other documents may be admitted into evidence;

**NOW, THEREFORE**, the Parties hereby stipulate and request that the Court admit into evidence the documents listed on the attached Exhibit A, all of which documents are described on Plaintiff's Amended Exhibit List (Dkt. No. 458) or Defendants' Fourth Amended Exhibit List (Dkt. No. 455) or, in the case of demonstratives, were presented in open court during the preliminary injunction hearing.

1   **IT IS SO STIPULATED**.

2   Dated:  December 21, 2022                    Respectfully submitted,

3                                                */s/ Abby L. Dennis*
4                                                Abby L. Dennis
                                                 Peggy Bayer Femenella
5                                                Joshua Goodman
                                                 Jeanine Balbach
6                                                Michael Barnett
                                                 E. Eric Elmore
7                                                Justin Epner
                                                 Sean D. Hughto
8                                                Frances Anne Johnson
                                                 Andrew Lowdon
9                                                Lincoln Mayer
                                                 Erika Meyers
10                                               Adam Pergament
                                                 Kristian Rogers
11                                               Anthony R. Saunders
                                                 Timothy Singer
12                                               James Weingarten

13                                               Federal Trade Commission
                                                 600 Pennsylvania Avenue, NW
14                                               Washington, DC 20580
                                                 Tel: (202) 326-2381
15
                                                 Erika Wodinsky
16
                                                 Federal Trade Commission
17                                               90 7th Street, Suite 14-300
                                                 San Francisco, CA 94103
18
                                                 *Counsel for Plaintiff Federal Trade Commission*
19

20                                               */s/ Bambo Obaro*

21                                               BAMBO OBARO (Bar No. 267683)
22                                               bambo.obaro@weil.com
                                                 WEIL, GOTSHAL & MANGES LLP
23                                               201 Redwood Shores Parkway, 6th Floor
                                                 Redwood Shores, CA 94065-1134
24                                               Telephone: (650) 802-3000
                                                 Facsimile: (650) 802-3100
25
26                                               MICHAEL MOISEYEV (*pro hac vice*)
                                                 michael.moiseyev@weil.com
27

28  JOINT STIP. AND [PROPOSED] ORDER REGARDING DOCUMENTS ADMITTED INTO EVIDENCE
    CASE NO. 5:22-CV-04325-EJD

                                                 2

CHANTALE FIEBIG (*pro hac vice*)
chantale.fiebig@weil.com
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW, Suite 600
Washington, DC 20036
Telephone: (202) 682-7000
Facsimile: (202) 857-0940

LIZ RYAN (*pro hac vice*)
liz.ryan@weil.com
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, TX 75201
Telephone: (214) 746-7700
Facsimile: (214) 746-7777

ERIC S. HOCHSTADT (*pro hac vice*)
eric.hochstadt@weil.com
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Mark C. Hansen (*pro hac vice*)
mhansen@kellogghansen.com
Geoffrey M. Klineberg (*pro hac vice*)
gklineberg@kellogghansen.com
Aaron M. Panner (*pro hac vice*)
apanner@kellogghansen.com
KELLOGG, HANSEN, TODD, FIGEL &
FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900

Attorneys for Defendant META PLATFORMS,
INC.


*/s/ Christopher J. Cox*

CHRISTOPHER J. COX (Bar No. 151650)
chris.cox@hoganlovells.com
HOGAN LOVELLS US LLP
855 Main St., Suite 200

Redwood City, CA 94063
Telephone: (650) 463-4000
Facsimile: (650) 463-4199

LAUREN BATTAGLIA (*pro hac vice*)
lauren.battaglia@hoganlovells.com
LOGAN M. BREED (*pro hac vice*)
logan.breed@hoganlovells.com
BENJAMIN HOLT (*pro hac vice*)
benjamin.holt@hoganlovells.com
CHARLES A. LOUGHLIN (*pro hac vice*)
chuck.loughlin@hoganlovells.com
HOGAN LOVELLS US LLP
Columbia Square, 555 Thirteenth St., NW
Washington, D.C. 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910

Counsel for WITHIN UNLIMITED, INC.

## FILER'S ATTESTATION

I, Abby L. Dennis, am the ECF User whose ID and password are being used to file this JOINT STIPULATION AND [PROPOSED] ORDER REGARDING DOCUMENTS ADMITTED INTO EVIDENCE. In compliance with Civil Local Rule 5-1(h), I hereby attest that concurrence in the filing of this document has been obtained from each of the other signatories.

By: */s/ Abby L. Dennis*

Abby L. Dennis

1    *This order has been entered after consultation with the parties.* PURSUANT TO

2    STIPULATION, IT IS SO ORDERED:

3

4    Dated: _____December 22__, 2022

5                                               Honorable Edward J. Davila
                                               United States District Judge
6                                              Northern District of California

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit G

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

FEDERAL TRADE COMMISSION,      )
                               )
              Plaintiff,       )      No. 5:24-CV-28
                               )
        vs.                    )
                               )
NOVANT HEALTH, INC., and       )
COMMUNITY HEALTH SYSTEMS,      )
INC.                           )
                               )
              Defendants.      )
_____)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE KENNETH D. BELL
UNITED STATES DISTRICT COURT JUDGE
APRIL 24, 2024

<u>APPEARANCES</u>:

On Behalf of the Plaintiff:

        NATHAN BRENNER, ESQ.
        Federal Trade Commission
        600 Pennsylvania Avenue NW
        Washington, DC 20580

        NICOLAS STEBINGER, ESQ.
        KAREN HORVITZ HUNT, ESQ.
        Federal Trade Commission
        400 7th Street, SW
        Washington, DC 20024

On Behalf of Defendant Novant:

        HEIDI K. HUBBARD, ESQ.
        BETH A. STEWART, ESQ.
        Williams & Connolly
        680 Maine Avenue, SW
        Washington, DC 20024

        BRIAN S. CROMWELL, ESQ.
        Parker Poe Adams & Bernstein, LLP
        620 South Tryon Street, Suite 800
        Charlotte, North Carolina 28202

<u>APPEARANCES</u>:

On Behalf of Defendant Community Health Systems:

    ADAM KARL DOERR, ESQ.
    Robinson Bradshaw & Hinson
    101 North Tryon Street, Suite 1900
    Charlotte, North Carolina 28246

    MICHAEL J. PERRY, ESQ.
    JAMIE E. FRANCE, ESQ.
    Gibson, Dunn & Crutcher, LLP
    1050 Connecticut Avenue, NW
    Washington, DC 20036


              Cheryl A. Nuccio, RMR-CRR
              Official Court Reporter
           United States District Court
              Charlotte, North Carolina

3

1                       P R O C E E D I N G S

2            THE COURT:  All right.  Thank you all for being

3    here.

4            At 5:00 last night I was told by defense counsel

5    that there would be several days of defense evidence, and I

6    was worried that we would even be through by our new May 1st

7    date.  8:00 this morning I was told no defense evidence.  And

8    so knowing the importance of having this hearing so that --

9    because I know you need to plan for things, I scheduled this.

10   I know it's not convenient for you time, place, or any other

11   reason, but I appreciate you indulging me on this.

12           If counsel would please introduce themselves to me.

13   You may have to do it more than once because I'm terrible with

14   names.

15           MR. BRENNER:  Good afternoon, Your Honor.  Nathan

16   Brenner for the Federal Trade Commission.

17           THE COURT:  That will be easy to remember because my

18   law clerk, Mr. Brenner, has a son named Nathan.  So you I will

19   remember.

20           MR. BRENNER:  No relation as far as I know.

21           MR. STEBINGER:  And, Your Honor, Nicolas Stebinger

22   for the Federal Trade Commission.

23           THE COURT:  Pardon me, sir, I couldn't hear you.

24           MR. STEBINGER:  Nicolas Stebinger.

25           MS. HUNT:  And Karen Hunt for the Federal Trade

1   Commission.

2            THE COURT:  Yes, ma'am.

3            MS. HUBBARD:  Good afternoon, Your Honor.  Heidi

4   Hubbard from Williams & Connolly.  I'm counsel for Novant

5   Health.

6            MS. STEWART:  Good afternoon, Your Honor.  Beth

7   Stewart from Williams & Connolly.  Also counsel for Novant

8   Health.

9            MR. CROMWELL:  Good afternoon, Your Honor.  Brian

10  Cromwell from Parker Poe.  Local counsel for Novant Health.

11           THE COURT:  Your name I'll also remember.

12           MR. DOERR:  Good afternoon.  Adam Doerr with

13  Robinson Bradshaw for CHS.

14           MR. PERRY:  Good afternoon, Your Honor.  Michael

15  Perry from Gibson Dunn for CHS.

16           THE COURT:  And I think we have two or three remote

17  participants who are just listening in, as I understand it.

18  We declined a request from some of the media to attend

19  remotely.

20           All right.  So let me ask.  I've been told that you

21  would rather stay with the May 1st schedule even though we

22  could now start again on the 29th, but I understand the

23  reasons for that.  Everybody good with that?

24           MR. BRENNER:  Yes, Your Honor.

25           THE COURT:  Not inviting more than the five days we

1   had allotted for this, I will have six days if it takes that
2   long because I have several sentencing hearings and a couple
3   of other things on that following Thursday.  But we could go
4   Wednesday to Wednesday if we had to, but I'm not insisting
5   that we do so.

6           MS. HUBBARD:  Your Honor, Heidi Hubbard for Novant
7   Health.

8           I think using other proceedings of this type as
9   benchmarking, they typically go five to six days.  We are in
10  regular communication with the Federal Trade Commission and we
11  want to commit to the Court to give regular updates on how
12  we're doing on timing as the hearing gets going.  But we think
13  five to six days is a reasonable estimate to get in the
14  evidence.

15          THE COURT:  And since it's a bench trial, I mean, if
16  we have to start early and stay late, we can do that.  So if
17  it looks like we're getting behind even after the first day,
18  let me know and we'll change the hours.

19          Is there a practical drop dead date by which you
20  need an order from this Court with respect to the
21  administrative process?

22          MS. HUBBARD:  Your Honor, I'm going to address that
23  from Novant's perspective.  Again, Heidi Hubbard.

24          Obviously, the merger is terribly important to
25  Novant and CHS and we cannot close until we have a -- you

1    know, the Court -- if the Court denies the preliminary

2    injunction, which will be our request, then we would be able

3    to close.  And until we get a ruling from the Court, we are

4    not able to close.  And so we are prepared to go as quickly as

5    we can, including getting findings of facts and conclusions of

6    law in post-hearing as quickly as we can and whatever we need

7    to do to facilitate going as quickly as we can.

8            THE COURT:  I meant it from an even more practical

9    stand than that.  The administrative hearing is scheduled to

10   start the end of June, right?

11           MR. BRENNER:  Yes, Your Honor.

12           THE COURT:  I wouldn't anticipate having any trouble

13   getting an order out well before then, but what is the effect

14   if the Court didn't issue an order and the administrative

15   hearing started?

16           MR. BRENNER:  The effect would be that the

17   administrative hearing would just begin and would continue

18   whether there's an order from this Court or not.  The Court's

19   order would simply preliminarily enjoin the transaction so

20   that the administrative process could complete.  But there's

21   nothing stopping the administrative hearing from beginning.

22   There is nothing tying the administrative process from

23   beginning to your order.

24           THE COURT:  Okay.

25           MS. HUBBARD:  Your Honor, if I could, please.  Heidi

1    Hubbard again.

2          I don't know that that's ever happened.  I mean,

3    typically if the parties are waiting on the ruling on the

4    preliminary injunction, they will jointly agree to put off the

5    start time of the administrative trial.  So we would be a

6    little bit in uncharted territory at that point.

7          THE COURT:  Well, the only thing that could

8    conceivably slow the Court down is the post-hearing proposed

9    findings and conclusions because the court reporter, I spoke

10   to her last week about this.  She is frankly loaded up so if

11   she's got to turn a transcript around from this hearing, and

12   then I guess we'd have to put a really short deadline on the

13   proposed findings, and then I would have to actually think

14   about it and then draft something.  So that schedule is going

15   to be a little tight.

16         MS. HUBBARD:  Understood, Your Honor.  And I think

17   in the case management order that Your Honor so ordered, it

18   provides that proposed findings and conclusions will be not

19   earlier than ten days after the conclusion of the hearing.

20   But we are basically telling our team, let's be ready to give

21   the Court our proposed findings and conclusions ten days after

22   the conclusion of the hearing.

23         THE COURT:  And last time I talked to our court

24   reporter about this -- and I understand that there's been a

25   request for daily transcripts.

1          MR. BRENNER:  Yes, Your Honor.

2          THE COURT:  Which unless something has changed,

3     she's able to do during the part of the hearing that's next

4     week because she has support and backup enough to do it, but

5     not the following week.

6          Is that still the case?

7          THE COURT REPORTER:  Debbie is -- I talked to Tammy.

8     Debbie is going to jump on board the second week.  So we now

9     have two reporters each day.

10          THE COURT:  All right.  Good.

11          So let's get into some of the motions.  And I'll

12     just take them, I think, in the order they were filed.

13          The FTC's motion to exclude the Deloitte

14     made-for-litigation report, which is document 113.  If I'm

15     reading the motion and the response correctly, Novant asserts

16     that it will not refer or rely on that study, that report, but

17     the FTC is noncommittal.

18          MR. STEBINGER:  Thank you, Your Honor.  Nicolas --

19          THE COURT:  And just so you know, the practice in

20     this Court is that you stand up when you address the Court and

21     oddly enough you remain seated while you're examining

22     witnesses.  That's in deference to the state court because

23     that's how they do things.

24          MR. STEBINGER:  I'm sorry, Your Honor.

25          THE COURT:  No, that's all right.

1          MR. STEBINGER:  We got a preview from prior counsel

2     and thought we were doing it the proper way, so I apologize,

3     Your Honor.

4          So I think it seems that reading the response from

5     the defendants, we're in agreement that the Deloitte efficacy

6     piece shouldn't be in evidence.  The hang-up comes where we --

7     they have relied on it in their briefing and in their expert

8     reports.  And so we, I think, took a fairly straightforward

9     position that we intended to point out to Your Honor where in

10    the briefing they are relying on now excluded evidence, and

11    that was something the defendants actually objected to.

12         Also, as far as we're aware, this evidence of --

13    this delayed advocacy, which is the sole basis for $2 million

14    in claims -- I'll try to be a little more circumspect just to

15    make sure that I'm not saying anything confidential on the

16    record.

17         There are efficiencies claimed in the brief that

18    rest solely and exclusively on expert reports that incorporate

19    this Deloitte advocacy.  We're not aware of any other real

20    efficiencies analysis that has happened.  And so our concern

21    is that some of their witnesses or experts are going to

22    testify, well, we've done this analysis -- or we believe there

23    are efficiencies of this amount.  And then we probe on cross

24    and they say, oh, this was actually relying on Deloitte's

25    work.  And then we would say, Your Honor, that's something

1    that's not in evidence.  We'd move to have that excluded.

2    Bringing the fact of the Deloitte advocacy basis for some of

3    these things out on cross was also something that raised

4    concerns for defendants.

5            So I think our position -- we don't plan to make a

6    feature of it.  But to the extent that it does turn up that

7    it's being relied on somewhere, that's certainly something we

8    intend to bring to Your Honor's attention.  I think that's the

9    disconnect.  So I think I would simply request that Your Honor

10   enter the order that we've proposed and I believe it more or

11   less will resolve this issue.

12           But if defendants think that I am somehow

13   mischaracterizing the back and forth, I'm sure they will let

14   you know.

15           THE COURT:  Ms. Hubbard.

16           Sorry, Ms. Stewart.

17           MS. STEWART:  Thank you, Your Honor.  This is Beth

18   Stewart, and I'll be happy to address that.

19           So I think we've been as clear as we can be.  We do

20   not intend to admit it.  We do not intend to rely upon it.

21   And we do not intend to refer upon it.  And that includes any

22   experts that we would call.

23           At the time the Deloitte study was done, it was not

24   a made-for-litigation study.  It was made to try to avoid

25   litigation, and we are here nonetheless.  And so, Your Honor,

1    at this point our focus is not going to be on efficiences as

2    reflected in that Deloitte study, but on why there are

3    pro-competitive benefits to this transaction that make it

4    appropriate to go through.

5         And so I'm not sure there's a disconnect, but we

6    can't say it any more clearly.  We're not going to admit it.

7    We're not going to rely on it.  We're not going to refer to

8    it.

9         Now, obviously, to the extent witnesses have some

10   independent knowledge of efficiencies independent of the

11   Deloitte study, they may offer testimony about that or they

12   may not offer testimony about that, and I don't think the FTC

13   has any objection to that.  The disconnect seems to be that

14   they wanted to reserve the right, I think, to sort of jump up

15   and down and say, Your Honor, this report has been excluded.

16   Whereas, from the defendants' perspective, we're just trying

17   to streamline the trial.  And from our focus, the focus is on

18   the anti -- the pro-competitive effects of this transaction.

19   And as a result, we do not intend to admit, rely, or refer to

20   the Deloitte report.

21        THE COURT:  And you represent that none of your

22   expert witnesses will refer to it in support of their

23   opinions.

24        MS. STEWART:  That's correct, Your Honor.  There was

25   some reference in their reports in response to the FTC's

1    experts who were themselves the ones who introduced reference

2    to that.  But again, we do not intend to rely on it.  I mean,

3    I suppose it's possible that if the FTC put a hot lamp on our

4    experts, they might admit at some point there was such a

5    thing, but they don't intend to rely on it for the basis of

6    their opinions.

7           THE COURT:  Well, it sounds like that's going to

8    kind of resolve itself if things go as you project and then

9    they won't have any reason to bring it up and it won't be an

10   issue.

11          MS. STEWART:  That's right.  The deal I offered was

12   let's just both pretend it doesn't exist, and that didn't seem

13   to quite satisfy their concern.  But I think as a practical

14   matter, my hope for the Court is that today will be the last

15   time it will hear the phrase Deloitte.

16          THE COURT:  All right.  The next one is a motion in

17   limine regarding admissibility of documents and testimony by

18   the FTC, document 115.  If I understand, you're suggesting you

19   want to do just some massive dump into the record and then

20   we'll figure out what we're actually going to use after that?

21          MR. STEBINGER:  No, Your Honor, that's not the case.

22   And actually, I would like to correct some of the statements

23   in defendants' papers because they mischaracterize the relief

24   we're seeking.

25                 They said that we're trying to move in the entirety

1    of our exhibit list, and that is not the case.  We specified

2    categories of documents that we would like to admit.  So it's

3    not the 700 on our list.  It is ordinary-course documents of

4    defendants and third parties.  It is deposition transcripts

5    from this case and investigational hearing transcripts from

6    our investigation.  That is roughly 500 documents altogether.

7    A number of these will be addressed at the hearing, but a

8    number of them we anticipate will be referred to in the briefs

9    and the findings of facts.  Just for context, the defendants

10   have included 290 exhibits on their list.  And so I think that

11   this is directionally kind of consistent given that we have

12   the burden of proof.

13            The reason that we believe that these documents

14   should come in is consistent with the *G.G.* case that I'm sure

15   Your Honor has seen in the briefing.  The Fourth Circuit

16   essentially -- within the Fourth Circuit, courts can and do

17   consider hearsay where to do so is consistent with the nature

18   and the purpose of the proceeding.

19            Here, the nature and the purpose of the proceeding

20   is to understand the FTC's likelihood of success in the

21   underlying administrative proceeding.  These categories of

22   documents that we've culled out are, as a matter of course,

23   admissible in the underlying administrative proceeding.

24            For example, in the *Illumina* case, which was an

25   administrative proceeding that happened in 2021, the documents

14

1    of this nature were jointly moved in by the parties in advance

2    of the administrative hearing, about 4,000 of them, and --

3    just moved into evidence, much like in the *Wilhelm Wilhelmsen*

4    case that we cited in our papers.

5           We think that it is -- for the Court to -- frankly,

6    to do its job and understand what we're going to be doing in

7    the proceeding, it should have access to the materials and

8    consider the materials that are going to be relied upon in the

9    administrative proceeding.

10          I should note, the documents that we are citing that

11   are on our exhibit list here, we're not talking about the

12   whole evidence of -- or the whole universe of evidence that

13   will be at issue in the administrative proceeding.  There are

14   going to be additional documents, additional witnesses.  There

15   are additional depositions that are in the process of being

16   scheduled for that proceeding.

17          I think that in their response, the defendants don't

18   really address that a number of the cases we cited in our

19   papers where district courts were dealing with exactly this

20   issue admitted the deposition transcripts, hearing

21   transcripts, and ordinary-course documents of defendants and

22   third parties precisely for this reason, that this is what is

23   necessary to judge the FTC's likelihood of success.  And I'm

24   referring to the *Thomas Jefferson* case, the *Wilhelm Wilhelmsen*

25   case, the *Microsoft* case, the *Sysco* case, and the *ProMedica*

1    case.

2            I'd also like to address the defendants' suggestion

3    that we've somehow mischaracterized the holding of the *Thomas*

4    *Jefferson* judge.  In exhibits to our motion, we attached an

5    order from that judge admitting two sets of documents, docket

6    entry 274 and 275.  In their papers the defendants went back

7    into the docket, pulled docket entry 274, which -- in which

8    the judge admitted 57 documents at the FTC's request and said,

9    look, this is only 57 documents.  They neglected to also go to

10   document -- docket entry 275 in which another 150 documents

11   were admitted by defendants of exactly the sorts of documents

12   we're talking about here.  And so that is the investigational

13   hearing transcripts, deposition transcripts, and the

14   ordinary-course documents of the parties and third parties.

15           So I think that what we're asking Your Honor to do

16   is consistent with the past practice in this variety of case.

17           Now, I think the defendants also spent a lot of time

18   on the *AT&T* case in their papers in talking about why, given

19   the importance of this case, the Court should apply a stricter

20   evidentiary standard than other courts considering preliminary

21   injunction requests under Section 13(b) of the FTC Act.

22           I think *AT&T* actually really supports what the FTC

23   is asking for here and highlights why the Court here should

24   take a different approach.  And if you take a look at the *AT&T*

25   case, that was, first of all, a permanent injunction case.  So

1    that was the merits proceeding, not a preliminary injunction

2    case, brought by the Department of Justice and a six-week

3    trial with tons of document custodians.  As I'm sure Your

4    Honor just did with this recent tax fraud trial, it involves

5    sitting down with a bunch of witnesses just going through and

6    authenticating documents.

7          That -- although in the FTC's administrative

8    proceedings, the rules of evidence are relaxed and it's much

9    easier to move things in, the volume of exhibits for those

10   merits proceedings is a little more similar to what you're

11   looking at in *AT&T*.  So, for example, in the *Illumina* case

12   about 4,000 exhibits come in at the outset of the hearing and

13   there is a month and change -- or a month or so of testimony.

14         But that's not what we are here for in this case.

15   This -- in the 13(b) statutory context, the -- I think the

16   case law in this circuit and the others that we cite in our

17   papers make clear that it's the Court's role to judge whether

18   we have a fair and tenable chance of succeeding in that longer

19   proceeding.

20         And so, Your Honor, sometimes -- we're not asking

21   for this here, but there are courts that have decided these

22   preliminary injunction cases on the papers.  We have a lot of

23   good evidence in our case and we are happy to show it to you.

24   But this is not meant to be six weeks of authenticating

25   documents through records custodians.  And if we were to take

1   that approach in this case of really needing to sit down and

2   authenticate each document, we would need those four to six

3   weeks to go back and get all of defendants' employees who

4   wrote these emails, sit them down.  Did you write this, sir?

5   Did you write this?  This is not what 13(b), what this

6   statutory framework is designed to do and that's not what

7   courts should do with it.

8         What the defendants are trying to do here with this

9   request is essentially turn this -- ignore that we're in the

10   13(b) proceeding altogether and make this the ultimate final

11   trial, and it simply isn't.

12         And I think the last thing I'll say on this point, I

13   think that the defendants have characterized a lot of their

14   argument as we want the reliable evidence to come in.  This is

15   what this is about, is making sure that it's only reliable

16   evidence.

17         First of all, Your Honor has, I'm sure, decided

18   many -- is certainly capable of looking at deposition

19   transcripts and looking at evidence in the context of motions

20   and other proceedings and giving it the weight that it's

21   worth.  But if you take a look at their exhibit list, which

22   I'm sure is going to be filed at some point, you can see that

23   this is not really about making sure that it's only reliable

24   evidence that comes in.  This is about trying to simply keep

25   out as much evidence that is unfavorable to them.  And the

18

1  reason I say this is if you look at -- so they have taken the

2  position that the evidence should come in through witnesses

3  who are going to be able to authenticate the stuff and talk

4  about it.  Well, they have included as DX8 through 12, for

5  example -- these are just examples -- letters of support from

6  people out in -- I hesitate to say community members because

7  we don't know exactly who -- their name is on them.  But in

8  any event, letters of support that have been mailed to one

9  place or another from nobody on the witness list.

10         They have included as DX205 a series of deposition

11  transcripts that are, first of all, not from anyone listed as

12  a witness in this case, but not even from this case.  They're

13  from a DOJ investigation from six to eight years ago in an

14  unrelated case.  And so these are not -- these are not

15  documents that in any world would ever be presented, you know,

16  as they would couch it, reliably through a testifying witness.

17         So what we view this motion as is simply an effort

18  to try to restrict the, frankly, unfavorable evidence to the

19  defendants that we have accumulated over the course of the

20  investigation, over the course of discovery in this case.

21         So what we're asking Your Honor to do is allow us to

22  move, again, not our entire exhibit list, but these categories

23  of evidence that are going to be considered as a matter of

24  course by the administrative law judge so that Your Honor has

25  the necessary material to make these decisions.  And also so

1    that we don't turn this -- Your Honor has talked about needing

2    to move expeditiously through this proceeding to get it done

3    in the five or six days that we have.  To do that we can't be

4    sitting there going through these many, many relevant

5    documents of the defendants.  We intend to present our case

6    asking the witnesses about the relevant facts.  Where there's

7    documents that we're going to ask them about, we're going to

8    ask them about those documents.  But some of these documents

9    don't speak -- or some of these documents speak for themselves

10   and we don't need to spend all that time standing up there

11   with the witnesses, you know, just reading things off of

12   paper.

13        And so we ask the opportunity to move these in ahead

14   of the hearing and proceed expeditiously.  Highlight the most

15   relevant evidence for Your Honor.

16        Thank you.

17        THE COURT:  So is the dispute from the defendants

18   not that the documents are not authentic, that is, they are

19   ordinary-course records or they are actual transcripts, but

20   that you want each of them sponsored by -- I'm not sure how

21   that's different from authenticated by -- a witness.

22        MS. HUBBARD:  It's not limited to sponsoring, Your

23   Honor.

24        So for example, there are documents on the FTC's

25   exhibit list that have triple hearsay in them:  A news article

1   quoting two, three other people.  That, under any stretch of

2   the imagination, would normally go through a pretty hard look

3   under the Federal Rules of Evidence.

4           And we are asking for a presumption in the first

5   instance that exhibits come in one at a time so that they can

6   be:  Is there a proper foundation for them?  Are they

7   relevant?  Is there hearsay?  Is there some other problem with

8   them?

9           As I think Your Honor can tell from our brief, while

10  the standard in a preliminary injunction hearing may be

11  relaxed, it is not abandoned.  And in fact, in the cases that

12  the FTC has cited in their brief, a lot of times either the

13  parties agreed on what was going to come in or the Court was

14  saying at the preliminary injunction stage, different from our

15  situation, there's going to be a trial in federal court under

16  the Federal Rules of Evidence that is going to test these

17  exhibits so we can relax it a little bit, not abandon it.

18          And we're saying at this stage, we haven't even

19  started.  There is no way that it is possible to tell which of

20  those 500 and something documents are reliable, which of them

21  have got triple hearsay in them, which of them are completely

22  out of context, which might be drafts.  There are some of

23  them, including as we gave an example in our brief, where it

24  turned out that the quote out of context wasn't even from one

25  of the parties.  It was from some third party and it was

1   entirely unclear.  And I won't say it because it's -- I think

2   there's a confidentiality assertion over it by the third

3   party.  And we need to talk about the additional complication

4   of confidentiality.  If 500 documents just sail into the

5   record, many of them are subject to confidentiality claims.

6          But the context, so how does one tell if the FTC

7   plans to cite a lot of these things in their post-trial

8   findings of fact and conclusions of law that the Court has

9   never seen in our hearing?  How does one tell who is saying

10  that?  Why are they saying that?  Is it a draft?  Is it a

11  final?  Was it ever acted upon?  What is the context?  Is

12  there an explanation?  None of that will be apparent.

13         And I think the reason that we cited the *AT&T*

14  comments by Judge Leon so heavily is -- yeah, it was not a

15  preliminary injunction hearing, but he was identifying the

16  very real problem that exists here, too, was some kind of mass

17  admission.  I mean, Judge Leon said especially when the time

18  frame is compressed for decision, it is not helpful to have

19  some kind of blanket admission because the Court doesn't have

20  the luxury of spending months sorting through these various

21  things that are being cited to figure out what is reliable,

22  what is meaningful.

23         I think if we take a step back, FTC has not even

24  pretended that they plan to use 500 or so of these documents

25  at the hearing.  It sounds like the plan is to have a whole

1   bunch of things sail into evidence that were never mentioned,

2   no context, can't even tell who wrote them or why or when or

3   what, and then argue from them.

4           And I think it's critical that the standard that

5   they cited for the preliminary injunction is not right.  That

6   this is a federal court with a federal standard for

7   preliminary injunction, substantial likelihood of success, and

8   sort of say it doesn't matter and just let it all sail in.

9   Let's abandon the rules of evidence even though we're in

10  federal court.  It's not helpful.

11          And we have on top of that the added complication of

12  the confidentiality issues.  And I think the Court has been --

13  the docket and the wonderful clerks have been bombarded with

14  assertions of confidentiality by third parties well taken.  If

15  all these documents sail into the record, there's all kinds of

16  issues about what is confidential, what stays confidential,

17  and we're going to have those types of issues in the hearing.

18  We're going to need to work closely to be thoughtful about

19  issues where someone is asking to close the courtroom.  But it

20  is not helpful to then have this raft of documents untied to

21  any witness and really, you know, no foundation for their

22  reliability for whether they would even get close to passing

23  muster under the Federal Rules of Evidence.

24          So our proposal, which I feel like is a modest

25  proposal at this moment when we're a week out, is let's start

1   with a presumption that the parties are going to try to abide

2   by the rules that we should be abiding by.  And we did offer a

3   number of ways to try to streamline if there are some small

4   subset of additional documents that the parties can agree on

5   or, as in the *Thomas Jefferson* case, that post-trial,

6   post-hearing the parties have a limited number that they can

7   agree on.  Or if we can't, that we can at least formulate

8   meaningful objections for the Court to consider.  That I think

9   is a way to proceed that helps us be as helpful as we can with

10  the evidence we're presenting to the Court in a hearing that

11  makes all the difference in terms of whether we are going to

12  be able to acquire these two hospitals.

13           THE COURT:  All right.  So the Court accepts the

14  proposition that hearsay documents can be considered during

15  this hearing and so that's not a problem for the Court.  And

16  the same with transcripts for which there was no cross

17  examination.  The Court knows how to weigh such evidence, the

18  fact that it is hearsay or triple hearsay, perhaps, and the

19  fact that a transcript may not have included any cross

20  examination.  So I don't have any conceptual conflict with

21  those coming in.

22           But what the Court doesn't want is a bunch of

23  exhibits in the record that nobody is going to use, ever.

24  Because I can tell you this.  If a document is not discussed

25  during the hearing or referenced and discussed in post-hearing

24

1    pleadings, it's not going to be considered.  I'm not going
2    through the record to see if you all missed something and see
3    if I can find something I like.
4           So I think the way I want to do this is that the
5    exhibits will be entered at the time the witness is
6    testifying.
7           And I do not expect any arguments over authenticity,
8    right?  It's just you would say that they are inadmissible
9    under the rules of evidence, which we're not going to strictly
10   follow.
11          But that those documents come in during the hearing
12   with whatever witness is going to be discussing them.  And at
13   the end of the hearing, we will have a discussion about what
14   else do the parties want to move in.  By that time, at the end
15   of the hearing, everybody should have a pretty good idea of
16   what they're going to want to address in their post-hearing
17   briefings rather than just let's dump it all in now and figure
18   out later what we're actually going to use.
19          MS. HUBBARD:  Thank you, Your Honor.  That makes
20   sense.
21          MR. STEBINGER:  Thank you.
22          THE COURT:  All right.  So the next one is motion to
23   exclude expert testimony by Dr. Jha, a motion by the FTC at
24   docket 116 and the mirror image motion by defendants to
25   exclude portions of Dr. Tenn's testimony.

1          I have read -- haven't read everything in this case,

2    but I will be as prepared as I wanted to be since we get this

3    break.  I was worried about not being as prepared as I wanted

4    to be, but now I will be.  But I have read those.  They're

5    both going to be denied.  I have heard from both sides why I

6    should or should not give much weight to those expert opinions

7    and why.  Okay.  I'm aware.  So the motion to exclude is

8    denied.

9          Unopposed motion to allow remote testimony of Burns,

10   docket number 158.  Other than the logistics, I certainly have

11   no issue with that.  We'll just figure out how to do it.

12         MR. BRENNER:  Thank you, Your Honor.

13         THE COURT:  All right.  Now the one that's kind of

14   got me a bit wondering, the motions to consider evidence in

15   camera.

16         Do the parties have a sense as to how many of

17   these -- first of all, it's not clear to me from the motions

18   from the third parties to consider there's -- you know, they

19   say it's trade secret and yada yada yada.  Well, I don't know

20   that.  They have quoted the right language.  Whether it's

21   actually applicable I do not know.

22         I suspect there's going to be some media interest in

23   this and I'm not going to spend a bunch of time ruling on

24   motions from the press to unseal certain things, so I want to

25   limit this to the extent we can.

1          It's a long way of asking how -- do you know, either

2     side, how many of these request for in camera review of

3     documents will actually be used during this hearing?

4          MR. BRENNER:  Your Honor, I think defendants may

5     have more information about this because none of this

6     information is the FTC's and some of it is defendants'.  I do

7     suspect -- I can tell you from other antitrust cases that I've

8     been involved in that nonparties are often quite protective of

9     their documents and testimony because there are potential

10    competitors, you know, listening in.  And they're protective

11    of business -- forward-looking business strategies, pricing

12    information, things of that nature.  And we are happy to work

13    with the Court's preference on how to handle this.

14         I can tell you that the way I've seen it work in

15    past practice is that there is an open court session of direct

16    and cross examination.  I'm sorry, an open court session of

17    direct and then an open court session of cross examination.

18    Then we go into a sealed session where there would be the

19    continuation of the examination with the public not in the

20    courtroom.  And we could do that in limited fashion when the

21    examinations involve or implicate the confidential information

22    either involving defendants' material or nonparty material.

23    That's one mechanism that I've seen work.

24         And to Your Honor's question about media interest,

25    what I've seen in past cases is that after the hearing

1    transcripts are finalized by the court reporter, the parties

2    and nonparties can go through them and unredact certain

3    information and testimony that occurred in sealed session so

4    that the transcripts could be more publicly available, or we

5    could maximize public availability.

6            THE COURT:  So the original question:  How many of

7    these supposed confidential documents will actually be used?

8            MS. STEWART:  Your Honor, Beth Stewart for

9    defendants.

10           I think the good news is this is a shared problem

11   between we and the FTC and we've had some really productive

12   discussions so far about how to make this work.

13           I think the Court should generally assume that

14   essentially every third-party witness is seeking to have any

15   exhibit that they produced protected as confidential.  That's

16   what we're seeing on the docket that you're seeing as well,

17   that there have been just maybe dozens of filings in the last

18   week seeking to protect that.

19           From the perspective of CHS and Novant -- and

20   obviously, Mr. Perry will address it if he has anything to

21   modify it.  We obviously want to have an open trial as much as

22   we possibly can.  There may be very narrow segments of

23   defendants' information that we would think would need to be

24   confidential.  But we are operating on the assumption that in

25   order to have this trial done efficiently in six days, that we

1  need to be as thoughtful and as targeted as we can in terms of
2  those requests.
3          Another mechanism that we've agreed to with the FTC
4  that I think could be potentially helpful is that at least as
5  to direct examinations, we have an agreement that we will
6  exchange those exhibits at 5:00 the day before.
7          And so right now there are a thousand something
8  exhibits on the parties' collective lists.  But our hope is
9  that once we have more targeted exchanges as part of that
10 process, we can really focus in on what, if anything, actually
11 needs to be protected.  And I think, frankly, we probably need
12 to have some more discussions amongst us now that we have seen
13 the deluge on the docket of the third parties.
14         But as I say, I think this is in some significant
15 measure a concern of third parties and not of the parties to
16 this case.  Again, maybe very narrow things that we as
17 defendants would find proprietary.  But it is a hot mess, as I
18 say in Georgia.
19         THE COURT:  Yeah, the -- but again, of the six days
20 worth of hearing, how much of it would be taken up discussing
21 what is claimed to be confidential information?
22         MS. STEWART:  So one way to look at it is there are
23 roughly 32 witnesses on the parties' collective witness list
24 and about half of those are third parties.  And again, my
25 understanding is that essentially all of those third parties

1    are, at this stage at least, preserving their right to request

2    of the Court that their confidential information be sealed.  I

3    think they will be asking the Court that certainly any

4    exhibits that they've produced receive confidential treatment

5    and will perhaps also be asking the Court that testimony by

6    their witnesses be sealed.

7            As to the remaining half in terms of kind of the

8    party and expert witnesses, again, my expectation is that the

9    bulk of those examinations can happen in open court and there

10   may be very narrow slivers that we would have to close the

11   court for consistent with Mr. Brenner's explanation.

12           THE COURT:  Well, it may be, because I've seen it

13   before, that there is an overclaim of confidentiality.  And of

14   course, I won't know that until I see it or hear it.  So it

15   may be we'll have to act as if they are.  And I might be able

16   to make some decisions in the moment that that's not a sealed

17   part of the transcript, that's not a sealed document, that's

18   not a sealed exhibit.

19           So the logistics of it, would we be able -- instead

20   of just running people in and out every time we want to get a

21   new witness, is there a way to do it, like put that part of it

22   at the beginning of the day, the end of the day, set aside a

23   day -- does that make any sense -- on presenting the evidence?

24   I know it might not, but...

25           MS. STEWART:  I think it's a helpful idea, Your

1   Honor.  As I say, I think, candidly, we've learned a lot on

2   each side watching the docket expand over the last week.

3          And for what it's worth, another helpful fact is I

4   think that between the two of us, we're each in contact with

5   counsel for all of these parties.  And so why don't we commit

6   to sort of take this back and try to think of a way to make

7   this work.  Again, I think it is a largely third-party

8   concern.

9          THE COURT:  Yeah, see if you can figure out a way so

10  that we're not kicking people in and out of the courtroom and

11  inviting them back in every 30 or 40 minutes.

12         MR. BRENNER:  Your Honor, one thing that might work

13  is depending on how you break up the court day, we could start

14  after a break with sealed sessions and then reopen, or

15  something like that.  I think that would be easier given

16  travel schedules for some of these witnesses than just set

17  aside a whole day for a sealed session.  But I do think

18  arranging sealed sessions around breaks so that we were not

19  ushering spectators in and out.

20         THE COURT:  Well, do try to work on it together with

21  the goal of not shuffling people around during court time.

22         MR. BRENNER:  Yes, Your Honor.

23         MS. STEWART:  Yes, Your Honor.

24         MR. BRENNER:  Be happy to.

25         THE COURT:  And we can talk about that again on the

1    1st, I suppose.

2            The question was raised, I think in an email to

3    Mr. Brenner, Irving Brenner, whether the Court is amenable to

4    a procedure agreed upon by the parties to call witnesses

5    appearing on both sides' witness list just one time.  I am

6    very much in favor of that.

7            MR. BRENNER:  Thank you, Your Honor.

8            MS. STEWART:  Your Honor, if I can just clarify one

9    thing so we have full agreement.  Again, this is another issue

10   we've discussed at length with the FTC and I think we are in

11   full agreement.

12           Because some of our party witnesses, meaning

13   employees of Novant or potentially employees or former

14   employees of CHS will now get called in the FTC's case and

15   they will testify only once, needless to say, when we get up

16   and do our direct examinations of our own witnesses, we will

17   be exceeding the scope of what the FTC just questioned them

18   on.  I don't think there's any disagreement about that, but I

19   just wanted to make sure that we submit to that for the

20   record.

21           THE COURT:  That's the necessary result of such an

22   agreement.

23           MS. STEWART:  Thank you, Your Honor.

24           MR. BRENNER:  Yes, Your Honor.

25           THE COURT:  Other than live testimony and obviously

1    documents, is there any other evidence that you're intending

2    to put in during the hearing?

3         MS. STEWART:  So on behalf of defendants, Your

4    Honor, yes.  There are two witnesses who we intend to call by

5    video.  The Court will be relieved to hear their testimony

6    will be brief, I think.  We are in the process of working with

7    the FTC to come up with a set of designations,

8    counter-designations, et cetera.

9         I think our intention on behalf of defendants, in

10   the spirit that the Court probably doesn't need a movie night

11   at the end of the day, is to actually play the video live and

12   we can do sort of live objections as the transcript goes.  But

13   as I say, I think there will only be two such witnesses, at

14   least from our side, and I'm not aware of any from the FTC

15   side.

16        MR. BRENNER:  Your Honor, there are no additional

17   deposition designations from the FTC.

18        The other category of evidence that we have

19   discussed with counsel for defendants is a stipulation, a set

20   of facts stipulated relating to one witness's testimony who

21   was -- or is on our witness list, but we think it would be

22   most efficient for the Court if we just worked together

23   cooperatively with the defendants and put together a set of

24   stipulated facts that obviated the need for her to be called

25   as a witness.

1          THE COURT:  All right.  That all sounds good.  But

2     are you going to put in deposition or investigate interview

3     transcripts during the hearing?

4          MR. BRENNER:  We would potentially use those for

5     impeachment purposes.  I don't believe we would intend to

6     introduce any of them as exhibits, but we would -- as

7     previously discussed with my co-counsel, we would plan to cite

8     them and reference them in our proposed findings of fact after

9     the hearing.

10          MS. HUBBARD:  And Your Honor, we do not plan to use

11     and try to introduce those.  Again, for impeachment or to

12     refresh, but that's different.

13          THE COURT:  So if that's the way it goes, please,

14     when you do your designations, keep them to the truly key

15     portions of the, you know, designation of this hundred out of

16     a hundred and fifty pages we really want the Court to read.

17     Because if you want me to make a decision, give me less to

18     read.

19          MS. STEWART:  And Your Honor, is the Court

20     comfortable with us playing those limited two depositions --

21     again, I don't expect they're going to be more than probably

22     an hour and change total.  Would the Court be comfortable with

23     us playing them live and doing sort of objections as if it

24     were a normal witness being called?

25          THE COURT:  That's fine.

1          MS. STEWART:  Okay.

2          THE COURT:  And do look for any efficiencies we can

3     put into this.  You mentioned stipulations, which, of course,

4     I encourage.  But I hope not to argue over -- we can talk

5     about this a little bit -- the authenticity of exhibits.

6          MS. HUBBARD:  Your Honor, we agree with that.  I

7     mean, authenticity, is it authentic, that's like a waste of

8     everyone's time to argue over that.  When we're asking to

9     follow the rules of evidence, we're talking about more

10    substantive rules of evidence.

11         THE COURT:  Yeah, and I've already said we're not

12    going to strictly adhere to the rules of evidence.

13         MS. HUBBARD:  Understood, yes.

14         THE COURT:  I will forewarn you that if I feel the

15    need to ask a witness a question, I will.  And I've actually

16    been known to ask questions during bench trials during

17    openings and closings because if there's something I want to

18    know and you're not telling me, your purposes are not being

19    well served.  So I will try not to be a particularly hot

20    bench, but if I get curious, I'll ask some.

21         So for that first day, how long would you like for

22    opening statements?

23         MR. BRENNER:  Your Honor, for the FTC, we think 45

24    minutes to an hour would be sufficient; but we're happy to

25    comply with whatever preference you have in terms of length of

35

1    opening.

2          MS. HUBBARD:  And Your Honor, it's Heidi Hubbard

3    again.

4          For the defense total, so both Novant and CHS, we

5    were asking in our conversations with FTC to agree on 75

6    minutes, with the idea that we would try to go less.

7          THE COURT:  Well, I'll give the FTC up to an hour if

8    they would like it, but you don't have to use it.

9          MR. BRENNER:  Thank you, Your Honor.

10         THE COURT:  And we'll give the defendants a total of

11   75 minutes however you want to divide it.

12         MS. HUBBARD:  Thank you, Your Honor.

13         THE COURT:  I think the calendar entry says we're

14   going to start at 9:30.  I think that is just put in because

15   we usually start jury trials on the first day at 9:30.  We can

16   start at 9:00 if that is going to be helpful to everybody.

17         MS. HUBBARD:  That would be great.

18         MR. BRENNER:  That works for us.

19         THE COURT:  And the courthouse is open, I think it's

20   7:00 AM, so you can come in any time after that.  And we'll

21   just sort of adjust the schedule as we think we need.  If we

22   need to start taking fewer breaks or stay longer at night,

23   then we'll adjust accordingly.

24         MS. HUBBARD:  Your Honor, would you mind giving us

25   just a sense of what your typical schedule is.  It helps us

1   with witness planning.

2          THE COURT:  Well, of course, there's a difference

3   between a bench and a jury.  A jury trial I go either 9:00 or

4   8:30 to 5:00 or 5:30.  In this one I think our default

5   position, we'll go 9:00 to 5:30 or 6:00, and then start

6   getting their earlier in the morning if we need to.  And then

7   obviously we'll take a lunch break.  And we may need fewer

8   other breaks since we don't have a jury to worry about.  But

9   those are kind of ad hoc.  I don't look at the clock and say

10  hour and a half, we're quitting.

11          (The Court and the clerk conferred.)

12          THE COURT:  Well, the courthouse is open at 7:00,

13  but the guards won't let you in until 8:00, I'm told.

14          THE CLERK:  I just don't want them waiting outside

15  for an hour.

16          THE COURT:  I guess there's a difference between

17  being open and accessible.

18          I don't know if you visited our courtrooms down

19  there, but there are -- I don't know if they'll be big enough

20  for your purposes.  But outside the courtroom, my courtroom,

21  there's an attorney conference room on each side of the hall

22  so you can divvy that up as you sit fit.

23          MS. HUBBARD:  And one question that my wonderful

24  trial paralegal always asks me to ask is whether we can leave

25  hard copies of exhibits either in the courtroom or in our

1    little witness room overnight.

2         THE COURT:  Yes, you can, although typical

3    disclaimer:  If anything happens to it, it's not on us.

4         MS. HUBBARD:  Understood.

5         THE COURT:  But it's a secure building.  I leave my

6    stuff there.

7         MS. HUBBARD:  All right.  Thank you.

8         THE COURT:  So it should be all right.

9         Do any of you need training on our electronic

10   evidence presentation system?

11        MR. BRENNER:  We have a training scheduled for

12   Friday of this week, I believe.

13        MS. HUBBARD:  And we have a wonderful sort of tech

14   hot seat person who I think has been in communication with the

15   court.  The court staff has been wonderful in helping answer

16   those questions.  So we're going to try to be ready to roll

17   and know what we're doing on the morning of May 1st as far as

18   tech goes.

19        THE COURT:  Anything else you want to address

20   tonight?

21        MR. CROMWELL:  Your Honor, I try and make sure I

22   understand what the Court is ordering.  I wanted to make sure

23   I understood how long the lunch break was going to be.

24        THE COURT:  Depends on how hungry I am.

25        MR. CROMWELL:  Fair.  Fair.  But just for planning

1    purposes.

2            THE COURT:  I mean, it's usually an hour.  If

3    there's some reason, like good reason, to make it longer, but

4    it seems to me like lunch can usually be eaten in an hour.

5            MR. CROMWELL:  And then we did talk about finishing

6    within six days.  I understand the Court has some hearings on

7    the seventh day.  If we go long, are we available to come back

8    that Friday and close or are we stuck with the first three

9    days?

10           THE COURT:  I think we just have one brief thing

11   that Friday, right?

12           THE CLERK:  Correct.

13           THE COURT:  Just have the Gardasil thing.

14           THE CLERK:  Correct.

15           THE COURT:  So yeah, we would have most of the day

16   on Friday if we had to.

17           MR. CROMWELL:  If we had to.  Okay.  Great.  Thank

18   you.

19           THE COURT:  I mean, like nearly all of it.  I think

20   I have a 30- or 60-minute hearing on that Friday.

21           MR. BRENNER:  Your Honor, related to that, would you

22   envision having closing arguments immediately following the

23   evidentiary hearing or would you want to schedule those after

24   the proposed findings of fact are submitted?

25           THE COURT:  I'd just as soon do it immediately

1   after.

2          MR. BRENNER:  Thank you, Your Honor.

3          THE COURT:  If there is some good reason why you

4   don't want to do that...

5          MS. HUBBARD:  For the defense we would like to do

6   that.

7          THE COURT:  All right.  That will be the plan, then.

8          MR. BRENNER:  Thank you, Your Honor.

9          THE COURT:  Anything else we can talk about?

10         (No response.)

11         THE COURT:  Again, I appreciate everybody coming up

12  here.  I wouldn't have done this to you if I had known what

13  was going to happen today.  We could have done this at a more

14  convenient hour for all of us, but you can blame those

15  attorneys that left earlier.

16         MS. HUBBARD:  We will, but we are grateful to the

17  Court and the courtroom staff for seeing us at this hour.  So

18  thank you.

19         THE COURT:  All right.  Thank you.  Well, I'll see

20  you all on the 1st, then.

21         ALL COUNSEL:  Thank you, Your Honor.

22         (End of proceedings at 5:57 PM.)

23                      *****

24

25

40

```
 1   UNITED STATES DISTRICT COURT
 2   WESTERN DISTRICT OF NORTH CAROLINA
 3   CERTIFICATE OF REPORTER
 4
 5
 6           I, Cheryl A. Nuccio, Federal Official Realtime Court
 7   Reporter, in and for the United States District Court for the
 8   Western District of North Carolina, do hereby certify that
 9   pursuant to Section 753, Title 28, United States Code, that
10   the foregoing is a true and correct transcript of the
11   stenographically reported proceedings held in the
12   above-entitled matter and that the transcript page format is
13   in conformance with the regulations of the Judicial Conference
14   of the United States.
15
16           Dated this 25th day of April 2024.
17
18
19                       s/Cheryl A. Nuccio
                       _____
20                       Cheryl A. Nuccio, RMR-CRR
                       Official Court Reporter
21
22
23
24
25
```