B. JOHN CASEY, OSB No. 120025
john.casey@stoel.com
RACHEL C. LEE, OSB No. 102944
rachel.lee@stoel.com
JACOB GOLDBERG, OSB No.
162565
jacob.goldberg@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Telephone: 503.224.3380

MATTHEW M. WOLF (*Pro Hac Vice*)
matthew.wolf@arnoldporter.com
ARNOLD & PORTER KAYE
SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: 202.942.5000

*Attorneys for Defendant The Kroger Company*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, STATE OF ARIZONA, STATE OF CALIFORNIA, DISTRICT OF COLUMBIA, STATE OF ILLINOIS, STATE OF MARYLAND, STATE OF NEVADA, STATE OF NEW MEXICO, STATE OF OREGON, and STATE OF WYOMING, | Case No.: 3:24-cv-00347-AN<br><br>**DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>**REDACTED VERSION** |
| Plaintiffs, | |
| v. | |
| THE KROGER COMPANY and ALBERTSONS COMPANIES, INC., | |
| Defendants. | |

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

FINDINGS OF FACT.....................................................................................................9

    A. Parties to the Transaction .......................................................................... 9

        1.   Kroger ...................................................................................... 9

        2.   Albertsons ............................................................................... 9

        3.   C&S ...................................................................................... 10

    B. The Modern Grocery Industry Is Highly Competitive ................................. 11

        1.   The Modern Grocery Store(s) ................................................. 11

        2.   The Modern Grocery Consumer .............................................. 27

    C. The Merger Transaction............................................................................ 29

        1.   The Background and Structure of the Merger .......................... 30

        2.   The Divestiture...................................................................... 33

    D. Consumer Benefits, Cost Savings, and Other Efficiencies from the Merger ................. 48

        1.   Overview ............................................................................... 48

        2.   Kroger's Culture of Cost Savings and Use of Non-Grocery Revenue to Invest in Pricing ........................ 50

        3.   The Merger Will Reduce Kroger's Costs ................................ 51

        4.   The Merger Will Increase Kroger's Revenue ......................... 52

        5.   Expert Analysis of Efficiencies Under the Merger Guidelines ............................. 54

    E. Plaintiffs' Retail Grocery Markets ........................................................... 58

        1.   Plaintiffs' Inconsistent Approach to the Relevant Market........ 58

        2.   Plaintiffs' "Supermarket" Market ......................................... 60

        3.   Plaintiffs' "Large Format" Store Market ............................... 65

        4.   Competitive Effects ............................................................... 68

    F. Plaintiffs' "Union Grocery Labor" Theory ................................................ 76

        1.   The Proposed Market ............................................................. 76

        2.   The Proposed Geographic Market ........................................... 79

        3.   Competitive Effects ............................................................... 81

        4.   Unions in Divested Stores ...................................................... 83

CONCLUSIONS OF LAW ............................................................................................85

I.       LEGAL STANDARDS .....................................................................................85

A. The Preliminary Injunction Standard .................................................. 85

B. The Clayton Act ................................................................................ 87

C. The *Baker Hughes* Framework ......................................................... 88

II.    PLAINTIFFS DID NOT SHOW A "LIKELIHOOD OF ULTIMATE SUCCESS" ON THE MERITS IN ANY RETAIL GROCERY MARKET ......................................... 89

A. Plaintiffs Cannot Establish a Presumption of Anticompetitive Effects ................... 89

  1. Plaintiffs Cannot Establish a Cognizable "Supermarket" Market ........................ 89

  2. The Merger Would Result in No Undue Market Concentration ........................... 102

  3. Plaintiffs' "Head-to-Head Competition" Theory Fails ............................. 110

B. Defendants Have Met Their Burden of Production on Rebuttal .................................. 116

  1. Any Increase in Market Concentration Will Not Translate to Market Power ....... 117

  2. The Merger Will Generate Significant Efficiencies and Lower Prices ............... 119

C. Plaintiffs Cannot Carry Their Ultimate Burden of Persuasion ....................... 120

III.   PLAINTIFFS CANNOT SHOW A "LIKELIHOOD OF ULTIMATE SUCCESS" ON THE MERITS IN A UNION GROCERY LABOR MARKET ............................ 122

A. Plaintiffs' Labor Theory Is Not Legally Cognizable .................................... 122

B. Plaintiffs' Union Grocery Labor Market Was Not Supported by Expert Evidence ....... 124

C. Plaintiffs' Labor Theory Fails on Its Own Terms .......................................... 125

  1. Plaintiffs' Theory Is Untethered to Any Competition for Grocery Union Labor .. 125

  2. Plaintiffs Cannot Establish a Cognizable Union Labor Market ........................... 126

  3. The Merger Would Not Substantially Reduce Competition for Union Labor ....... 129

IV.    PLAINTIFFS FAIL TO SHOW A BALANCE OF EQUITIES IN THEIR FAVOR ........................................................................... 130

V.     PLAINTIFFS FAIL TO ESTABLISH ANY IRREPARABLE HARM ........................ 133

VI.    PLAINTIFFS' PROPOSED REMEDY IS FATALLY OVERBROAD ........................ 134

CONCLUSION ........................................................................... 135

# TABLE OF AUTHORITIES

**Cases**                                                                                       **Page(s)**

*Apex Hosiery Co. v. Leader*,
   310 U.S. 469 (1940)..................................................................................................122

*Bailey v. Allgas, Inc.*,
   284 F.3d 1237 (11th Cir. 2002) ...............................................................................124

*Berlyn, Inc. v. Gazette Newspapers, Inc.*,
   223 F. Supp. 2d 718 (D. Md. 2002)..........................................................................124

*Berlyn, Inc. v. Gazette Newspapers, Inc.*,
   73 F. App'x 576 (4th Cir. 2003)................................................................................124

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
   441 U.S. 1 (1979)......................................................................................................112

*Brown Shoe Co. v. United States.*,
   370 U.S. 294 (1962)............................................................................................. *passim*

*Brown v. Pro Football, Inc.*,
   518 U.S. 231 (1996)..........................................................................................123, 129

*Clarett v. Nat'l Football League*,
   369 F.3d 124 (2d Cir. 2004)......................................................................................123

*Cogan v. Harford Memorial Hosp.*,
   843 F. Supp. 1013 (D. Md. 1994)..............................................................................124

*Coronavirus Rep. v. Apple, Inc.*,
   85 F.4th 948 (9th Cir. 2023) .......................................................................................89

*DeHoog v. Anheuser-Busch InBev SA/NV*,
   899 F.3d 758 (9th Cir. 2018) ...............................................................................87, 102

*Deselms v. Occidental Petroleum Corp.*,
   2024 WL 1194080 (D. Wyo. Feb. 22, 2024)............................................................124

*Dresses for Less, Inc. v. CIT Grp./Com. Servs., Inc.*,
   2002 WL 31164482 (S.D.N.Y. Sept. 30, 2002)........................................................112

*Drs. Steuer & Latham, P.A. v. Nat'l Med. Enterprises, Inc.*,
   672 F. Supp. 1489 (D.S.C. 1987)..............................................................................124

*Drs. Steuer & Latham, P.A. v. Nat'l Med. Enterprises, Inc.*,
   846 F.2d 70 (4th Cir. 1988) ......................................................................................124

*E. Bay Sanctuary Covenant v. Biden*,
    993 F.3d 640 (9th Cir. 2021) ................................................................135

*Fed. Trade Comm'n v. Thomas Jefferson Univ.*,
    505 F. Supp. 3d 522 (E.D. Pa. 2020) .....................................................114

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
    98 F.4th 1180 (9th Cir. 2024) ................................................................134

*FTC v. Arch Coal, Inc.*,
    2004 WL 7389952 (D.D.C. July 7, 2004)...........................................88, 102, 103

*FTC v. Arch Coal, Inc.*,
    329 F. Supp. 2d 109 (D.D.C. 2004) ...............................................87, 119

*FTC v. CCC Holdings Inc.*,
    605 F. Supp. 2d 26 (D.D.C. 2009) .................................................118, 131

*FTC v. Exxon Corp.*,
    636 F.2d 1336 (D.C. Cir. 1980) ................................................................85

*FTC v. Food Town Stores, Inc.*,
    539 F.2d 1339 (4th Cir. 1976) ................................................................112

*FTC v. H.J. Heinz Co.*,
    246 F.3d 708 (D.C. Cir. 2001) ................................................................118

*FTC v. Microsoft Corp.*,
    681 F. Supp. 3d 1069 (N.D. Cal. 2023) .........................................86, 102, 130

*FTC v. Occidental Petroleum Corp.*,
    1986 WL 952 (D.D.C. Apr. 29, 1986) ....................................................117

*FTC v. Procter & Gamble Co.*,
    386 U.S. 568 (1967)................................................................................87

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) ................................................................87

*FTC v. RAG-Stiftung*,
    436 F. Supp. 3d 278 (D.D.C. 2020) ...........................................106, 107, 111

*FTC v. Staples*,
    970 F. Supp. 1066 (D.D.C 1997) .......................................69, 96, 113, 114

*FTC v. Staples, Inc.*,
    No. 97-cv-701 (D.D.C. 1997),
    https://www.ftc.gov/sites/default/files/documents/cases/1997/04/pubbrief.pdf...................115

*FTC v. Sysco Corp.*,
 113 F. Supp. 3d 1 (D.D.C. 2015) ............................................................ *passim*

*FTC v. Tenet Health Care Corp.*,
 186 F.3d 1045 (8th Cir. 1999) .............................................................89

*FTC v. Warner Commc'ns Inc.*,
 742 F.2d 1156 (9th Cir. 1984) ........................................................85, 130

*FTC v. Whole Foods Mkt., Inc.*,
 548 F.3d 1028 (D.D.C. 2008) ..............................................................114

*Galvez v. Jaddou*,
 52 F.4th 821 (9th Cir. 2022) ..............................................................134

*Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*,
 386 F.3d 485 (2d Cir. 2004)................................................................96

*Illumina, Inc. v. FTC*,
 88 F.4th 1036 (5th Cir. 2023) .......................................................103, 104

*In re Price Chopper/Tops Markets*,
 FTC Dkt. No. C-4753, https://bit.ly/45wUxXW ...............................107

*Int'l Shoe Co. v. FTC*,
 280 U.S. 291 (1930)............................................................................87

*Kaplan v. Burroughs Corp.*,
 611 F.2d 286 (9th Cir. 1979) .........................................................89, 96

*Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
 588 F.3d 908 (6th Cir. 2009) ............................................................125

*Kentucky v. Marathon Petroleum Co. LP*,
 464 F. Supp. 3d 880 (W.D. Ky. 2020).................................................124

*King v. Burwell*,
 576 U.S. 473 (2015)...........................................................................122

*Kleen Products LLC* v. *Int'l Paper*,
 306 F.R.D. 585 (N.D. Ill. 2015)..........................................................100

*Labrador v. Poe*,
 144 S. Ct. 921 (2024)..........................................................................134

*Lavelle-Hayden v. Legacy Health*,
 2024 WL 3822712 (D. Or. Aug. 14, 2024)......................................98, 100

*Maney v. Brown*,
     464 F. Supp. 3d 1191 (D. Or. 2020) ........................................................................133

*McNeil v. Aguilos*,
     831 F. Supp. 1079 (S.D.N.Y. 1993)........................................................................122

*Med Evac, Inc. v. AmeriCare Ambulance Serv., Inc.*,
     2007 WL 9723595 (M.D. Fla. Dec. 11, 2007).......................................................124

*Mil. Servs. Realty, Inc. v. Realty Consultants of Va., Ltd.*,
     823 F.2d 829 (4th Cir. 1987) ..................................................................................125

*Monsanto Co. v. Geertson Seed Farms*,
     561 U.S. 139 (2010)................................................................................................134

*Morgenstern v. Wilson*,
     29 F.3d 1291 (8th Cir. 1994) ....................................................................................99

*Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*,
     889 F.2d 524 (4th Cir. 1989) ....................................................................................92

*Murthy v. Missouri*,
     144 S. Ct. 1972 (2024)............................................................................................134

*Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*,
     419 F.3d 462 (6th Cir. 2005)...................................................................................127

*New York v. Deutsche Telekom*,
     439 F. Supp. 3d 179 (S.D.N.Y. 2020)..............................................................116, 119

*Nichols v. Spencer Int'l Press, Inc.*,
     371 F.2d 332 (7th Cir. 1967) ..................................................................................122

*Plumbers & Steamfitters, Loc. 598 v. Morris*,
     1981 WL 27190 (E.D. Wash. Apr. 9, 1981) ...........................................................122

*Premier Comp Sols. LLC v. UPMC*,
     377 F. Supp. 3d 506 (W.D. Pa. 2019).....................................................................124

*ProMedica Health Sys., Inc. v. FTC*,
     749 F.3d 559 (6th Cir. 2014) ....................................................................................87

*Reifert v. S. Cent. Wis. MLS Corp.*,
     450 F.3d 312 (7th Cir. 2006) ....................................................................................96

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
     792 F.2d 210 (D.C. Cir. 1986) ..................................................................................96

*RSR Corp. v. FTC*,
    602 F.2d 1317 (9th Cir. 1979) .........................................................................135

*Spiegel v. Buntrock*,
    571 A.2d 767 (Del. 1990) ...............................................................................105

*Starbucks Corp. v. McKinney*,
    144 S. Ct. 1570 (2024)...............................................................84, 85, 86, 133

*Tanaka v. Univ. of S. Cal.*,
    252 F.3d 1059 (9th Cir. 2001) .......................................................................128

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
    875 F.2d 1369 (9th Cir. 1989) .................................................................97, 126

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001).....................................................................125, 127

*United Mine Workers of Am. v. Pennington*,
    381 U.S. 657 (1965)........................................................................................123

*United States v. Am. Express Co.*,
    838 F.3d 179 (2d Cir. 2016)..............................................................................90

*United States v. AT&T Inc.*,
    310 F. Supp. 3d 161 (D.D.C. 2018) .........................................................88, 127

*United States v. AT&T, Inc.*,
    916 F.3d 1029 (D.C. Cir. 2019) ........................................................................87

*United States v. Atl. Richfield Co.*,
    297 F. Supp. 1061 (S.D.N.Y. 1969).................................................................102

*United States v. Baker Hughes, Inc.*,
    908 F.2d 981 (D.C. Cir. 1990) .................................................................. *passim*

*United States v. Bertelsmann SE & Co.*,
    646 F. Supp. 3d 1 (D.D.C. 2022) .............................................................71, 118

*United States v. H & R Block, Inc.*,
    833 F. Supp. 2d 36 (D.D.C. 2011) ..................................................................119

*United States v. Long Island Jewish Med. Ctr.*,
    983 F. Supp. 121 (E.D.N.Y. 1997) ..............................................................89, 95

*United States v. Marine Bancorporation, Inc.*,
    418 U.S. 602 (1974)..................................................................................89, 126

*United States v. Mfrs. Hanover Tr. Co.*,
   240 F. Supp. 867 (S.D.N.Y. 1965) .......................................................112

*United States v. Oracle Corp.*,
   331 F. Supp. 2d 1098 (N.D. Cal. 2004) ...............................................112

*United States v. Rockford Mem'l Corp.*,
   898 F.2d 1278 (7th Cir. 1990) .............................................................112

*United States v. UnitedHealth Group Inc.*,
   630 F. Supp. 3d 118 (D.D.C. 2022) ................................................. *passim*

*Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*,
   108 F. Supp. 2d 549 (W.D. Va. 2000) ..................................................124

*Water Craft Mgmt., L.L.C. v. Mercury Marine*,
   361 F. Supp. 2d 518 (M.D. La. 2004) ..................................................124

*Winter v. NRDC*,
   555 U.S. 7 (2008) .....................................................84, 85, 130, 134

## Statutes

15 U.S.C. § 17 ...............................................................................................122

15 U.S.C. § 18 .............................................................................86, 87, 104

15 U.S.C. § 53(b) .......................................................................................85, 86

29 U.S.C. § 160(j) ......................................................................................85

## Other Authorities

Charles Wright & Arthur Miller, 21B *Fed. Prac. & Proc.* § 5122 (2d ed. 1987) .....................116

IV Phillip E. Areeda et al., Antitrust Law ¶ 901a (1998) ...........................................112

Kroger Press Release, *Kroger and Albertsons Companies Announce Comprehensive Divestiture Plan with C&S Wholesale Grocers*, LLC in Connection with Proposed Merger (Sep. 8, 2023), https://bit.ly/4bgcUBx .............................36

Wall Street Journal (July 21, 2023), https://www.wsj.com/articles/supermarkets-competition-costco-walmart-aldi-4f3c0d0c ........................................................97

## INTRODUCTION

The merger between Kroger and Albertsons will result in lower prices for consumers, better quality stores, and higher wages and benefits for tens of thousands of frontline associates. At a time when customers face higher prices in every part of their budget, the merger would provide much-needed relief to tens of millions of American households. Defendants are seeking to advance Kroger's successful go-to-market strategy as a combined entity, to better compete; Plaintiffs seek to maintain the status quo. But the evidence shows that enjoining the merger would instead maintain the downward slide of the traditional grocery store, reducing consumer choice and reducing price competition. Such an injunction certainly would do nothing to reduce the financial strain on American grocery shoppers. Plaintiffs' motion should be denied.

The merger with Albertsons provides Kroger with the best opportunity to successfully compete with the non-union behemoths—Walmart, Costco, and Amazon—that have come to dominate the retail grocery industry, both in stores and online. Kroger's longstanding pricing policy is to narrow its spread to Walmart. While this strategy has helped Kroger close the spread with Walmart—and enabled Kroger's prices to be 10 to 12% lower than Albertsons'—Walmart continues to be the low-price leader. The addition of Albertsons' portfolio will expand Kroger's core supermarket, fuel, and pharmacy businesses, and the combined company's ability to drive additional traffic into stores and e-commerce channels. The increase in customer traffic will in turn power the combined company's non-grocery revenue to support continued investments in prices and wages. Thus, following the merger, Kroger through its increased scale and national footprint will be able (and financially incentivized) to expand its pricing model to the acquired Albertsons business.

Without the merger, Walmart, Costco, and Amazon will continue to dominate, Albertsons' customers will continue to pay more than Kroger customers, and Albertsons may have to consider

Page 1 –    DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

alternatives, such as layoffs and store closures.

The evidence shows that following the merger, Kroger's business strategy is to invest $1 billion in prices, and another $1 billion in wages, every year after a ramp-up period. Kroger will invest another $1.3 billion in store improvements. This will lead to lower prices, better stores, and improved associate wages and benefits. Kroger will ensure that no stores close as a result of the merger, that all frontline associates remain employed, that all collective bargaining agreements continue, and that associates continue to receive industry-leading healthcare and pension benefits. Any concerns about concentration (or competitive effects) in the relatively small number of areas where Kroger and Albertsons currently overlap will be addressed by the divestiture of 579 stores and other assets to C&S, the country's largest private grocery wholesaler, for nearly $3 billion.

These critical facts remain largely undisputed following a three-week evidentiary hearing. Plaintiffs' challenges to the merger are unsupported by the data and other evidence and, indeed, detached from reality. Plaintiffs contend that Kroger and Albertsons compete only with other "supermarkets," even though witness after witness—including those called by Plaintiffs—testified that competition in the grocery retail industry is fierce and broad, and the data shows that shoppers spend their food dollars at a wide variety of formats. Plaintiffs invoke "neoclassical economics" to suggest that Kroger will raise prices once Albertsons is no longer a competitor, even though the data establishes that today, in places where there is no Albertsons competing with Kroger, Kroger's prices are not higher. That is because Walmart, not Albertsons, constrains Kroger's prices. And Plaintiffs insist that C&S will not be a successful competitor post-merger, even though their own expert refused to take that position and no fact witness supported it.

In the face of this evidence, Plaintiffs seek the extraordinary remedy of a preliminary injunction that, if granted, would likely torpedo the merger. Plaintiffs bear a heavy burden in this

respect. Although the law contemplates a three-part burden-shifting framework, the ultimate burden of persuasion is *always* on Plaintiffs to show that the merger is likely to result in a substantial lessening of competition in a relevant antitrust market. That means Plaintiffs must offer *evidence*—not just attorney argument—that the post-merger world will have substantially less competition than a world without the merger. Plaintiffs thus bear the burden to disprove a number of incontrovertible facts, including that competition for retail grocery is already robust and encompasses many different retail formats; that C&S is a well-capitalized, motivated, and qualified buyer of the divestiture business; that Walmart is and will continue to be the principal price constraint on Kroger pre- and post-merger; and, most fundamentally, that Kroger will have no economic incentive or ability to raise prices post-merger because customers will simply take their grocery dollars elsewhere. Plaintiffs have failed to meet their burden on these and many other factual issues that preclude the extraordinary relief they seek.

The defects in Plaintiffs' case start with market definition. Plaintiffs alleged in their Complaint that the only proper antitrust market is limited to "supermarkets," excluding club stores like Costco; premium and organic stores like Whole Foods; value stores like Aldi; Dollar stores; and all forms of e-commerce, like Amazon.com. Yet testimony and documents from all kinds of retail formats consistently showed that these various "channels" view each other as close competitors. The evidence also confirms that consumers "cross-shop" and substitute across different grocery retailers excluded from Plaintiffs' market for the same grocery items, and that is backed up by an industry-specific diversion model that Defendants' economist used.

Plaintiffs' myopic focus on the so-called "one-stop shopper"—an archaic view of consumers that focuses on what one of Plaintiffs' witnesses described as a "35 to 45-year old female head of household with a family"—is unsupported by data or anything other than attorney

speculation, and contradicted by Plaintiffs' own economic expert. The data instead shows that customers visit multiple grocery retailers each week and that these various retail formats "leak" sales to each other. And in any event, customers *can* perform "one-stop" shopping at nearly all of the grocery retailers with whom Defendants compete. Plaintiffs' narrow market definition is endorsed by no one except their attorneys.

Plaintiffs have also tried at various times to wedge an alternative, "large format store" market into the case—despite never alleging such a market in their Complaint and referring to this market only as a "sensitivity test" in their briefing. Even if it had not been forfeited, the "large format store" market still excludes e-commerce retailers like Amazon.com from the competitive landscape. And just as crucially, Plaintiffs' economist (Dr. Hill) defined the *geographic* aspect of this purported market without considering that customers are willing to travel farther distances to shop at some of Defendants' largest competitors: supercenters and club stores. Dr. Hill's primary model for defining the geographic market was contradicted by testimony and evidence about how the grocery industry operates and how customers shop, and Dr. Hill admitted he did not have the data to justify any alternative approach to sustain his geographic markets.

Without a properly defined market, Plaintiffs' case fails. Period. There is nothing further the Court need do in order to deny Plaintiffs' motion. Market definition is a threshold and dispositive element on which Plaintiffs bear the burden, and they failed spectacularly.

But even if Plaintiffs had proven a properly defined and preserved market, their case fails for another independent reason. Plaintiffs' analysis ignored a fundamental reality of the transaction: Kroger is divesting to C&S stores (and other assets) that address any conceivable concerns of anticompetitive effects following the merger. Plaintiffs spent much of their case nibbling at the margins of C&S's deal model and business plan, challenging the assessment by

C&S and its independent advisors about the likely sales loss from rebannering of stores, the cost and time to stand up a private label brand, and the long-term growth of the divested stores. But neither Plaintiffs nor this Court sit as independent auditors of C&S's financial projections. The salient point is that C&S *has* a comprehensive plan: It has identified the risks associated with the divestiture, it has conservatively quantified and budgeted for the risks, and it has included *$1 billion* to address any unexpected expenses beyond what it has projected. C&S is well capitalized—with $900 million in *new* equity funding the purchase—and is getting a team of experienced retail executives, led by current Albertsons COO Susan Morris, along with four complete division teams and hundreds of subject matter specialists across a broad range of functions. There can be no serious question that C&S understands the business risks and has contracted for a comprehensive package of assets and transition services to mitigate those risks. That is all the law requires—to probe further would allow Plaintiffs to substitute C&S's informed business judgment with their own. The failure to adequately account for the divestiture is thus another independent reason Plaintiffs' case fails, full stop.

Even if Plaintiffs could make out a *prima facie* case, however, Defendants easily carried their modest rebuttal burden of production, and Plaintiffs have not satisfied their ultimate burden of *persuasion* to show that the merger is likely to result in a substantial lessening of competition.

At the most basic level, the evidence shows that Albertsons is a higher-priced retailer that does not constrain Kroger's prices. Kroger uses Walmart as its pricing lodestar in every relevant price division (with the only meaningful exceptions highlighted by Plaintiffs—the Mariano's and QFC divisions—largely comprised of stores that Kroger is divesting). Kroger has for years been reducing its prices to Walmart. Kroger can maintain strong revenues even while it reduces its profit margins because of its "flywheel" model: lowering prices drives more traffic to the stores, which

in turn generates non-grocery revenue through its portfolio of data-driven alternative profits businesses. Kroger uses that additional non-grocery revenue to invest in lower prices, those lower prices draw in more customers, the data and insights obtained and derived from those additional customers allow Kroger to further grow its non-grocery revenue, and the wheel keeps turning. Kroger therefore can (and does) actually make *more* money by *lowering* prices on the shelves. Looking at how Kroger *actually runs its business*, there will be no substantial lessening of competition. To the contrary, the merger will improve the scope and scale of Kroger's non-grocery revenue and e-commerce capabilities, allowing Kroger to continue making strides against the real competition—Walmart, Costco, and Amazon—that already have national footprints, ever-expanding online and brick-and-mortar grocery sales, and extensive non-grocery revenue.

The Court need not speculate on how Kroger might alter its pricing when Albertsons no longer competes in some markets, because there already are markets where Albertsons does not compete; in those markets, Kroger's prices are not any higher than in markets where Albertsons does compete. That data is further corroborated by other economic tools—used by economists from both sides—that, when used with the appropriate profit margins and accounting for the divestiture, show no threat of competitive harm in even a single locality.

Rather than confront this evidence about how Kroger operates in the real world, Plaintiffs engaged in trial-by-anecdote. Plaintiffs introduced a number of documents showing Kroger or Albertsons monitoring and sometimes responding to pricing or promotions from the other. None of those documents answers the relevant antitrust question of whether the removal of Albertsons as a competitor will substantially lessen competition such that Kroger will be economically motivated or able to increase prices or reduce quality. But the data summarized above does answer that question—the removal of Albertsons does not, in the real world today, affect Kroger's prices.

That makes sense—while Kroger and Albertsons do compete, Kroger's priorities are to lower prices for consumers while focusing on reducing the gap to Walmart, and there are scores of documents showing Kroger's competition with many other grocery retailers. Just because Kroger will be losing one competitor—while gaining another in the form of C&S—does not mean there will be a *substantial* lessening of competition in any given market.

Moreover, any concern that the merger could reduce competition is dispelled by the substantial efficiencies Kroger projects it will realize from the merger. Those efficiencies arise out of various cost savings such as those related to increasing supply chain and manufacturing efficiency, and lowering sourcing, administrative, and technology licensing costs. They also arise out of Kroger's ability to increase its non-grocery revenue, feeding the flywheel and allowing for further investments in lower prices for consumers. Even a conservative estimate of the efficiencies the merger is likely to generate shows that they outweigh the calculations of Plaintiffs' own expert regarding the possible harm to competition. On a net basis, the merger will be good for consumers, even if Plaintiffs were right on many of their assertions (which they are not).

What all this evidence shows is that Kroger cannot, would not, and will not raise prices following the merger. Just the opposite: Its economic incentives are to *lower* prices, as it has been doing for decades (both in markets where it competes with Albertsons and in markets where it does not). That is because Kroger must lower prices in order to better compete with Walmart, Costco, Amazon, and others. That is because Albertsons does not, in fact, discipline Kroger's pricing today. That is because Kroger's business model allows it—and *incentivizes* it—to lower prices as a means to increase revenue. And that is because C&S will have the talent, tools, and assets it needs to compete vigorously with Kroger. Plaintiffs rely on antiquated notions of the ideal grocery store consumer and on anecdotes of competition between Kroger and Albertsons;

Defendants rely on data, documents, and testimony about how grocery retailers operate in the real world. There is no comparison between the two.

Tacked on almost as an afterthought—or perhaps for atmospherics—is Plaintiffs' labor theory. The precise contours of this theory remain unclear. Plaintiffs have repeatedly argued that the merger will reduce competition in an alleged market for "grocery union labor." Yet none of their experts was willing to testify in support of such a market, or say that the merger is likely to have anticompetitive effects in any such market. Defendants' unrebutted evidence shows that there is no plausible product or geographic market for labor at issue here: Kroger and Albertsons compete with a wide variety of non-union and non-grocery employers for labor, and there is no threat to competition in any cognizable labor market from the merger.

In response, Plaintiffs offered testimony from two union lay witnesses contending that the merger will remove union bargaining tactics. That is not an antitrust theory—the possibility that a union will have fewer tactics during a negotiation is not an element of competition for labor. And the data shows that unions do not negotiate better deals for workers with Kroger when there is an Albertsons nearby. The evidence instead shows that the merger will provide significant *benefits* to union labor, including by protecting jobs at union grocers like Kroger and preserving all of the existing collective bargaining agreements covering tens of thousands of unionized employees.

The Biden Administration has announced the policy goal of fighting rising food prices that squeeze consumer's grocery budgets. The merger will allow Kroger to do just that, by positioning Kroger to better compete against firms like Walmart, Costco, and Amazon. Kroger has been reducing its margins for years, but it can only go so far in its current state. The merger is necessary to allow Kroger to compete harder on price *and* quality. This pro-consumer, pro-worker, pro-competitive transaction should not be enjoined.

## FINDINGS OF FACT

### A.    Parties to the Transaction

#### 1.    Kroger

1.      Founded in 1883, Kroger is a leading food retailer that operates under a variety of store names (known as "banners") and formats, including supermarkets, seamless digital shopping options, price-impact warehouse stores, and multidepartment stores.[1] Kroger also operates manufacturing facilities that produce high-quality private-label products.[2]

2.      Kroger operates more than 2,700 stores,[3] which are predominantly located in the Midwest, Southeast, and West. It has no presence in much of the country, such as the Northeast.[4]

3.      Kroger employs approximately 414,000 associates, about two-thirds of whom belong to unions.[5]

4.      As discussed in detail below, Kroger's "number one competitor [is] Walmart; Costco would be number two; and Amazon, obviously is an increasing competitor."[6] Kroger focuses on Walmart "monomaniacally," meaning "for 20 years Kroger has put in place an agenda of getting to Walmart pricing."[7]

5.      Kroger also competes with numerous other grocery retailers, including Target, Whole Foods, Aldi, and Albertsons, among many others.[8]

#### 2.    Albertsons

---

[1] *E.g.*, Hearing Transcript ("Tr.") (Aitken (Kroger)) 1828:13-1829:12; DX 2559 at 4; DX 2738 (Galante Rep.) ¶ 14.
[2] *E.g.*, DX 2738 (Galante Rep.) ¶ 14.
[3] Tr. (McMullen (Kroger)) 1573:17-18.
[4] Tr. (McMullen (Kroger)) 1574:2-4; DX 2626.
[5] Tr. (McMullen (Kroger)) 157:7-84.
[6] Tr. (McMullen (Kroger)) 1574:9-10; *accord* Tr. (Cosset (Kroger)) 2237:21-25.
[7] Tr. (Aitken (Kroger)) 1819:24-25; *accord id.* at 1900 ("[W]e are monomaniacally focused on Walmart from a pricing standpoint."); DX0149I.
[8] Tr. (Cosset (Kroger)) 2236:23-2237:5; DX 2731 at 41.

6.    Founded in 1939, Albertsons is a leading food retailer that operates under a variety of banners, and also operates production facilities to manufacture its "Own Brands" private label.[9]

7.    Albertsons operates more than 2,200 stores, which are predominantly located in the Northeast and West Coast, and has no presence in many parts of the country, such as the Midwest and Southeast.[10]

8.    Albertsons employs approximately 270,000 associates, about two-thirds of whom belong to unions.[11]

9.    Nationwide, Albertsons' biggest and most important competitors include Walmart, Costco, and Amazon.[12] It also competes with numerous other grocery retailers, including Target, Whole Foods, Aldi, and Kroger, among many others.

10.    Albertsons' groceries are generally priced 10 to 12% higher than Kroger's.[13] As Albertsons' CEO acknowledged, "Kroger has a better cost structure than us. They are bigger than us. Scale allows for better pricing. So we are not able to get the same kind of leverage."[14]

### 3.    C&S

11.    Founded in 1918, C&S is the largest private grocery wholesale distributor in the United States and the eighth-largest privately owned U.S. company.[15] As of September 2023, C&S had ███████████████████████████████████████████████████████████████████,

---

[9] PX 6077 at 1; PX 6153 at 8; *see also* Tr. (Gokhale) 2130:7-13; Tr. (Groff) 277:19-24, 281:20-21, 282:7-8.
[10] Tr. (McMullen (Kroger)) 1608:3-6; DX 2627; DX 1254 at 7, 8.
[11] Tr. (Morris (Albertsons)) 1903:22-24; Tr. (Dosenbach (Albertsons)) 2509:15-18.
[12] *See* Tr. (Sankaran (Albertsons)) 1798; *id.* at 1696; DX 0076; DX 0031; *see also* DX0011 at 18; Tr. (Kinney (Albertsons)) 2966:5-6.
[13] Tr. (Sankaran (Albertsons)) 1699:12-14; DX2631B at 3.
[14] Tr. (Sankaran (Albertsons)) 1699:16-19.
[15] DX 1058 at 7; Tr. (Winn (C&S)) 1204:3-11; Tr. Morris (Albertsons)) 1913:9-14.

servicing 7,500 customers, including retail chains and independent grocers.[16] C&S sells more than 100,000 food and non-food products, including ███████████████ through its private label, Best Yet, and brands it obtains through a grocery cooperative, Topco.[17] C&S also has comprehensive supply chain management experience, managing supply relationships with ███ ███████████████.[18]

12.    C&S is much more than a wholesaler: Its customers look to it for every foundational service needed to run a successful grocery store, including wholesale procurement, private label merchandising, supply chain services, category management, including designing the layout of shelves, vendor negotiations, retail technology, cultivating fresh offerings, and digital marketing.[19] It currently operates two dozen retail supermarkets and is a franchisor of 165 additional locations.[20] C&S is already an important partner of Albertsons, supplying two of Albertsons' divisions in the Northeast with all of their frozen food.[21]

**B.    The Modern Grocery Industry Is Highly Competitive**

13.    In today's grocery industry, a wide array of retailers and retail formats compete fiercely for every dollar that a customer spends. And consumers increasingly split their shopping across multiple grocery retailers to meet their grocery needs.

**1.    The Modern Grocery Store(s)**

14.    The grocery industry is a ferociously competitive environment with an array of

---

[16] DX 1058 at 7, 12; DX 2628 at 5; PX 3948 at 7; Tr. (Morris (Albertsons)) 1916:2-3; Tr. (Winn (C&S)) 1209:13-17.
[17] DX 2738 (Galante Rep.) ¶ 17; DX 1058 at 7; Tr. (Winn (C&S)) 1218:20-25; Tr. (McGowan (C&S)) 1062:19-21.
[18] DX 2628 at 5; DX 1058 at 7; Tr. (Winn (C&S)) 1209:12-24, 1210:16-1212:10.
[19] Tr. (Winn (C&S)) 1212:24-1218:16; DX 1058 at 7-12; DX 2628 at 8; http://www.cswg.com/services.
[20] DX 2738 (Galante Rep.) ¶ 18; DX 1058 at 10, 16; Tr. (Winn (C&S)) 1220:25-1221:21.
[21] Tr. (Sankaran (Albertsons)) 1730:22-25; Tr. (Morris (Albertsons)) 1913:15-18.

retailers and retail formats all competing against one another for customers' business.[22]

a.    *"Traditional" Supermarkets*

15.    Plaintiffs' Complaint focuses only on competition among so-called "traditional" supermarkets. According to Plaintiffs, stores like Kroger and Albertsons "offer consumers convenient 'one-stop shopping' for food and grocery products" and "typically have a broad and deep product assortment of tens of thousands of stock-keeping units."[23] Many other retail formats provide a similar experience.[24] But even within Plaintiffs' "traditional" category, competition is intense and includes key competitors like Food Lion, Amazon Fresh, Publix, Ahold Delhaize, Wegmans, H-E-B, and Hy-Vee, among others.[25]

16.    In any event, "traditional" supermarkets do not just compete against one another.[26] Rather, they compete with mass merchandisers like Walmart and Target; with club stores like Costco; and with online stores like Amazon.com. Kroger views these retailers as a threat to the very existence of the corner grocery store.[27] Albertsons likewise faces "fierce competition" for grocery sales from Walmart, Target, Costco, Amazon, Aldi, Lidl, and Trader Joe's, which has only "gotten more aggressive" in recent years.[28]

17.    Third-party witnesses from "traditional" grocery stores similarly confirmed that they face competition from all fronts. For example, Food Lion, owned by Ahold Delhaize,

---

[22] Tr. (George (Costco)) 2009:11-2012:20; Tr. (Yates (Ahold Delhaize)) 2191:17-2192:9; Tr. (Heyworth (Amazon.com)) 2802:25-2805:18; Tr. (Lieberman (Walmart)) 2339:1-23; DX 1456; DX 2403.
[23] Compl. ¶¶ 43-44; *see* ECF No. 205 ("Plf. PI Mot.") at 23-24.
[24] Tr. (Broderick (Albertsons)) 1422:18-1423:11 (identifying Walmart, Target, Costco, and Amazon as offering "one-stop" shopping experiences similar to Albertsons).
[25] Tr. (Yates (Ahold Delhaize)) 2187:15-22; PX 12485 at 24-25, 33; Tr. (Groff (Kroger)) 305:20-306:10; Tr. (Aitken (Kroger)) 1808:16-19; Tr. (Oblisk (Whole Foods)) 2296:22-2297:3.
[26] PX 1727; DX 2920.
[27] Tr. (McMullen (Kroger)) 1600:5-1601:12.
[28] Tr. (Silva (Albertsons)) 243:19-244:6, 249:3-6, 260:8-261:3; Tr. Huntington (Albertsons)) 573:4-25; PX 12485.

identified its "key" competitors to include "Publix, Harris Teeter, Walmart, Aldi, Costco, Sam's Club, Lidl, Piggly Wiggly, Wegmans, Amazon."[29] Food Lion also competes with Dollar General, Whole Foods, and Sprouts.[30] Food Lion tracks the presence and impact of Aldi, Costco, and Walmart in the regions where it operates.[31] Food Lion competes with food retailers even when those other retailers offer different product SKUs and services , such as bakeries.[32] Ordinary course documents from Raley's similarly confirmed that it competes with a wide range of competitors, including ██████████████████████████████████████████████.[33]

18.    Amazon also operates "a full-service grocery store that would have the departments consistent with what you would find at any, quote/unquote traditional grocery store," through its Amazon Fresh stores.[34] Amazon Fresh offers "a broad array of national grocery brands, everyday essentials."[35] Amazon Fresh competes with ████████████████████████████ ███████████████████████████████████████████.[36] Amazon Fresh continues to grow, and plans to ████████████████████████████████.[37]

#### b.    *Walmart, Target, and Other Mass Merchandisers*

19.    Mass merchandisers like Walmart and Target have reshaped how Americans shop.

20.    Walmart is the biggest grocery retailer in the United States, operating

---

[29] Tr. (Yates (Ahold Delhaize)) 2187:18-22; DX 2500 at 23:4-8 (████████████████████); DX 0240 at 7 ██████████████████████████████████████████████████.
[30] Tr. (Yates (Ahold Delhaize)) 2208:16-23.
[31] Tr. (Yates (Ahold Delhaize)) 2188:10-22, 2191:14-2192:9.
[32] Tr. (Yates (Ahold Delhaize)) 2207:18-2208:15.
[33] DX 2834 (Raley's); DX 2835 (Bashas'); *see also* Tr. (Van Helden (Stater)) 210:9-6, 214:18-215:1.
[34] Tr. (Oblisk (Whole Foods)) 2296:16-19.
[35] Tr. (Heyworth (Amazon.com)) 2792:24-25
[36] Tr. (Oblisk (Whole Foods)) 2296:22-2298:1; DX 2531 at 21:10-26:24.
[37] Tr. (Oblisk (Whole Foods)) 2298:24-2299:10; DX 2531 at 73:12-19.

approximately 3,600 Supercenters, 695 Neighborhood Markets, and 350 discount stores.[38] And it continues to grow at a rapid pace: During the COVID-19 pandemic, Walmart's "growth was the same size as the [entirety of] the Albertsons Companies."[39] That growth continues, and Walmart plans to open 150 new stores over the next five years.[40]

21.    Walmart views "anyone who offers similar products or services that we would offer as a competitor," including Kroger, Albertsons, Costco, Amazon, Aldi, Lidl, Whole Foods, Instacart, and Sprouts, as well as ethnic category stores.[41] In a ██████ internal analysis, the company ████████████████████████████████████████████████████[42]

22.    Walmart's "core" philosophy is its Every Day Low Price strategy.[43] Walmart is able to price groceries below its competitors because "Walmart brings unprecedented scale."[44] Its size allows Walmart to "buy goods cheaper than anybody else. They transport goods cheaper than anybody else. Their stores are more efficient than anyone else's."[45] That scale "translates into lower prices."[46] ████████████████████████████████████████████
███████████████████.[47]

23.    Walmart ████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

---

[38] Tr. (Lieberman (Walmart)) 2338:5-8.
[39] Tr. (Sankaran (Albertsons)) 1702:23-1703:06.
[40] Tr. (Lieberman (Walmart)) 2338:18-20.
[41] Tr. (Lieberman (Walmart)) 2339:1-23, 2343:2-5; DX 1340; DX 2530 at 38:1-5.
[42] Tr. (Lieberman (Walmart)) 2341:14-2344:21; DX 1340 at 8; DX 2530 at 38:2-5.
[43] Tr. (Lieberman (Walmart)) 2346:18-25; DX 0156.
[44] Tr. (Sankaran (Albertsons)) 1701.
[45] Tr. (Sankaran (Albertsons)) 1701.
[46] Tr. (Sankaran (Albertsons)) 1701.
[47] DX 156 at 2.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████[48]

24.     Walmart's Every Day Low Price pricing strategy will not change as a result of the Kroger-Albertsons merger.[49]

25.     Target also is a chief competitor of Kroger and Albertsons.[50] Target has stores in all fifty states, plans on building another 300 stores over the next 10 years, and intends to expand into new trade areas.[51] In 2017, Target's food and beverage revenue was $14.256 billion.[52] By 2023, its food and beverage revenue grew to $23.899 billion—a nearly $10 billion increase in just six years.[53] Target is "committed to growing [its] grocery business going forward."[54] In setting prices, Target looks at Nielsen and Circana data and a data feed called "MULO+."[55] Target intends and has begun to cut prices on 5,000 frequently shopped items.[56]

26.     Target considers Walmart, Sam's Club, Costco, Kroger, Albertsons, BJ's, Giant, Dollar General, Whole Foods, Trader Joe's, and Amazon to be competitors.[57] It also competes

---

[48] Tr. (Lieberman (Walmart)) 2349:2-2350:16; DX 2884 at 2.
[49] Tr. (Lieberman (Walmart)) 2355.
[50] DX 0061-61A; DX 2711 at 10, 15 (███████████████████████████); Tr. (Curry (Albertsons)) 917:21-918:4 (Albertsons has implemented changes, including carrying variety of large-pack items, in response to price-checks of Costco; Tr. (Broderick (Albertsons)) 1417:12-14, 1423:20-1424:10 (Albertsons compares its digital ads against Target's; Tr. (Kammeyer (Kroger)) 503:16-20.
[51] Tr. (Conlin (Target)) 2757:22-58:5.
[52] Tr. (Conlin (Target)) 2759:15-17; DX 2888.
[53] Tr. (Conlin (Target)) 2760:10-15; *see also* DX 2951 at 22:13-15 and 24:7-10 (Target won grocery retailer of the year award in 2021).
[54] Tr. (Conlin (Target)) 2762.
[55] Tr. (Conlin (Target)) 2771:1-5.
[56] Tr. (Conlin (Target)) 2771:14-15; DX 2967 at 1.
[57] Tr. (Conlin (Target)) 2772:7-2773:13.

with Aldi.[58] In e-commerce, Target competes with Walmart, Amazon, and Whole Foods.[59]

### c.    Costco and Other Club Stores

27.    Club stores like Costco, Sam's Club, and BJ's Wholesale Club continue to expand their grocery footprints.[60] Club stores rely on their high sales volume on select items to keep costs and prices down.[61] Club stores have been gaining market share.[62]

28.    For instance, Costco operates approximately 600 stores in forty-seven states.[63] The company has grown exponentially from 47,000 employees in 1994 to 208,000 in 2023.[64] During that period, Costco grew from 182 stores to 591.[65] Its grocery revenues in particular have increased more than 10-fold from $10 billion in 1994 to $128 billion in 2023.[66] Costco generally aims to open between 20 to 30 new stores a year, about half in the U.S., a pace that would put it on track to open between 100 to 150 new stores over the next five years.[67]

29.    Although it may have different square footage and floor plans from other grocery retailers,[68] Costco competes with "traditional" supermarkets, like Kroger and Albertsons as well as "supercenters, online retailers, gasoline stations, hard discounters, department and specialty stores."[69] "Walmart, Target, Kroger, Amazon are among our significant general merchandise retail

---

[58] Tr. (Conlin (Target)) 2773:18-19.
[59] Tr. (Conlin (Target)) 2774:104.
[60] Tr. (McMullen (Kroger)) 1594:3-25; *see also* DX0061A (███████████████████ ███████ ).
[61] Tr. (George (Costco)) 2015:23-2016:9.
[62] Tr. (McMullen (Kroger)) 1594:17-19.
[63] Tr. (George (Costco)) 2004:10-15, 2043:16-18.
[64] Tr. (George (Costco)) 2006:23-2007:1.
[65] Tr. (George (Costco)) 2007:5-8.
[66] Tr. (George (Costco)) 2008:2-5.
[67] Tr. (George (Costco)) 2025:18-21.
[68] Tr. (George (Costco)) 2028:23-24, 2063:24-206:7.
[69] Tr. (George (Costco)) 2010:2-17; DX 1456.

competitors in the U.S."[70] Costco also competes with value stores like Aldi.[71]

30.    Costco views Kroger as a significant competitor, even though Costco sells items other than groceries.[72] Costco price-checks Kroger, Albertsons, and Walmart, among others.[73]

31.    Costco's strategy relies on "driving higher volume into fewer selected items," enabling it "to purchase more of those items and make—hopefully make suppliers and ourselves and the entire supply chain more efficient, lowering cost."[74] "[B]y having the scale or the volume per individual item be higher than other supply chains … everything is able to be more efficient and purchased at a lower cost."[75] Costco's volume-focused business model and pricing strategy make it challenging for stores like Albertsons and Kroger to compete against it on price.[76]

32.    ███████████████████████████████████████████

██████████████████████████████████.[77] And just as its shoppers view club stores as ready alternatives, Kroger "absolutely" views these club stores as "major competitors."[78] Plaintiffs' economic expert's analysis showed that Costco has an impact on Kroger's sales that is substantially the same as Albertsons and Walmart.[79]

---

[70] Tr. (George (Costco)) 2011:10-12; DX 1456.
[71] Tr. (George (Costco)) 2022:19-20.
[72] Tr. (George (Costco)) 2012:8-15.
[73] Tr. (George (Costco)) 2061:1-16; *see also* PX 5006.
[74] Tr. (George (Costco)) 2014:24-2015:2.
[75] Tr. (George (Costco)) 2016:5-9.
[76] Tr. (George (Costco)) 2021:3-9.
[77] Tr. (Kinney (Albertsons)) 2948:21-23 ("Costco's share of wallet from Albertsons' customers is … the same as [Albertsons]. 12.2%"); *see also* DX 2213 at 2, 8-9 ███████████████████████████ ██████████████████); PX 12107 at 2; Tr. (Knopf (Raley's)) 938:23-939:7 (Costco customer "is not too dissimilar in affluency" from customers as Raley's, a "traditional" grocer); DX0011 at 18, 20, 22, 24, 26, 28, 30, 32, 36, 38, 40, 42, 44, 46, 48, 50, 52, 54, 56, 58, 60, 63, 64, 66.
[78] Tr. (McMullen (Kroger)) 1594:10, 1595:6.
[79] Tr. (Hill) 1513-14.

33.    Albertsons likewise considers Costco to be one of its "primary competitors."[80] Albertsons conducted a deep-dive analysis into Costco finding that "Costco is a grocery store," that 65% of Costco's sales are generated from the sale of groceries, and that Costco receives significant share of wallet in key categories such as dairy, produce, and meat.[81] When a Costco opens near an Albertsons, Albertsons loses customers, particularly for seafood, bakery products, deli products, and fresh produce.[82] Additionally, when Albertsons started getting access to Costco (and Amazon) market share data (within Circana's "MULO +" category), Albertsons' measured market share dropped significantly in markets with a heavy Costco presence.[83]

34.    Third-party witnesses confirmed that club stores compete with grocery retailers of all kinds. Plaintiffs' witness for Stater Bros. Markets testified that his company price-checks against Costco and "leaks" sales to both Costco and Sam's Club.[84] A third-party data analytics document prepared for Raley's shows that Raley's "leaks" sales to Costco ██████████████ ████████████████████████████.[85] Walmart and Target both confirmed they compete with Costco.[86]

### d.    Whole Foods and Other Premium, Natural, and Organic Stores

---

[80] Tr. (Sankaran (Albertsons)) 1714:3-8; DX 31 at 1; *see also* DX 0061-61A; Tr. (Huntington (Albertsons)) 571:23-25; Tr. (Curry (Albertsons)) 898:14-15, 903:19 (describing Costco as among Albertsons' biggest competitive threat in Southern California; and describing Albertsons' primary competitors in Southern California, in order, as Costco and Walmart, Target, followed by Kroger, and Stater Brothers), 911:14-912:2 ("Costco, Walmart, and Target were taking the greatest amount of market share" from Albertsons in Southern California), 917:21-918:4 (Albertsons has implemented changes, including carrying large-pack items, in response to price-checks of Costco).
[81] Tr. (Kinney (Albertsons)) 2950:7-2953:1; DX 2213.
[82] Tr. (Kinney (Albertsons)) 2961:14-21.
[83] Tr. (Kinney (Albertsons)) 2923:10-20 ("[I]n the markets where we have a heavy Costco presence, our share's much lower than we would like to believe it was until we got to see Costco added in."); Tr. (Curry (Albertsons)) 909:19-22 (market share in Southern California "dropped by about a third").
[84] Tr. (Van Helden (Stater)) 210:8-12, 214:18-215:1.
[85] DX 2834 at 5; DX 2835 at 6.
[86] Tr. (Lieberman (Walmart)) 2339:11-13, 2377:10-12; Tr. (Conlin (Target)) 2772:19-20.

35.     Consumer demand for "natural" products has increased organic and fresh products offered by grocery retailers. Whole Foods and other grocery retailers like Sprouts and Natural Grocers have capitalized on these shifting consumer preferences.[87] These formats also offer national brands and mainstream grocery products, and have experienced dramatic growth.[88]

36.     For instance, in 2017, in a move that "disrupted the entire industry," Amazon acquired Whole Foods.[89] "The market reacted very positively to Amazon's acquisition for Whole Foods. It rewarded them with a significant increase in market capitalization because investors … recognized the opportunity this was creating for Amazon" in the grocery industry.[90] And it "punished Kroger, along with other players in the industry," who stood to lose customers as a result.[91] Today, Whole Foods currently operates more than 500 stores, with 75 sites under development that will open in the next few years.[92]

37.     Whole Foods views itself as being in competition with "traditional" grocery stores, mass merchandise stores, online stores, club stores, and value stores.[93] And its internal data shows that is true. Like other competitors, Whole Foods share of wallet data ███████████████ ███████████████████████████████████ "supermarkets." Whole Foods ██████████ ████████████████████████████████████████████████████████████

---

[87] Tr. (McMullen (Kroger)) 1595:17-23 (identifying natural and organic stores); Tr. (Sankaran (Albertsons)) 1711:3-8 (discussing why Sprouts is a competitor of Albertsons).

[88] Tr. (Neal (Sprouts)) 394:20-397:4 (Sprouts stores typically have produce departments, bakery departments, bulk foods, milk and dairy sections, frozen foods sections, meats and seafood sections, vitamin and natural health departments; beauty departments; deli counters); Tr. (Oblisk (Whole Foods)) 2290:10-15.

[89] Tr. (Cosset (Kroger)) 2251:15-17.

[90] Tr. (Cosset (Kroger)) 2252:9-16; DX 2730 at 3.

[91] Tr. (Cosset (Kroger)) 2252:22-2253:2.

[92] Tr. (Oblisk (Whole Foods)) 2289:17-2290:3.

[93] Tr. (Oblisk (Whole Foods)) 2292:12-2293:5.

█████████████████████████████████████████████████[94]

38.     Whole Foods' acquisition by Amazon helped it compete in many ways, including allowing Whole Foods to "invest broadly in lowering prices."[95] "Starting with the acquisition itself, we had our first round of price investments continuing through today. This year alone we've lowered prices on over 25 percent of the items that we sell."[96]

39.     Whole Foods has been "outpacing the overall grocery market, both in terms of our wallet share, the segment share, as well as in terms of our unit segment share, which means that customers are really voting with their feet and their trips, and they're buying more from Whole Foods."[97] And the retailer has seen its recent price investments make its stores even more competitive to its grocery store rivals.[98]

40.     Kroger views premium, natural, and organic stores as "significant competitors."[99] Kroger's internal documents show that ██████████████████████████████████ ████████████████████████████████.[100] Albertsons also views them as significant competitors.[101] Albertsons has conducted analyses of the impact of the entry of new organic natural stores, like Whole Foods, on Albertsons' stores. Albertsons found that these openings negatively impacted Albertsons stores more than even Walmart and that all types of shoppers—including

---

[94] Tr. (Oblisk (Whole Foods)) 2294:12-18, 2300:13-2302:8, 2303:20-2304:11; DX 2531 at 13:10-17:1; DX 0270 at 12-13; DX 0271 at 22-24; DX 0272 at 22-24, 33-34; DX 0273 at 22-24; DX 0275 at 34, 61.
[95] Tr. (Oblisk (Whole Foods)) 2314:21-2315:5.
[96] Tr. (Oblisk (Whole Foods)) 2315:7-11.
[97] Tr. (Oblisk (Whole Foods)) 2315:22-2316:1.
[98] Tr. (Oblisk (Whole Foods)) 2316:10-17.
[99] Tr. (McMullen (Kroger)) 1596:6-11; Tr. (Sankaran (Albertsons)) 1711:3-14; DX 2560 (███████████████████████████████████████████████); DX0061A (█████ ███████████████████████████████████████████████).
    Tr. (Hill) 1515:15-1516:17; *see also* Tr. (Groff (Kroger)) 305:20-306:6 (identifying natural and organic stores as Kroger's competitors).
[101] Tr. (Curry (Albertsons)) 915:12-13 (Albertsons price-checking Sprouts); Tr. (Broderick (Albertsons)) 1417:12-13.

price-motivated customers—changed how they shopped with Albertsons when a Whole Foods opened nearby.[102]

41.    Again, third-party witness testimony and documents confirm that these retailers compete with a broad range of other grocery retailers. Ordinary course documents from Sprouts shows that it holds itself out as competing with Kroger, Albertsons, Target, Amazon, and club stores, and that it believes it captures share from those retailers when it opens a new store.[103] Sprouts also price-checks ███████████████.[104] And Raley's, a "traditional" grocery store witness called by Plaintiffs, also price-checks against Whole Foods.[105]

### e.    Aldi and Other Value Stores

42.    Value grocery retailers that offer customers a curated assortment of products have established significant footholds in the grocery industry. Aldi is among the top four grocery retailers, along with Walmart, Costco, and Target, with more than $23 billion in grocery sales.[106] "Aldi is one of the largest retailers in the world …. They have fundamentally changed the landscape of grocery retail in markets in Europe. They have 2,000 stores or more in the United States. And most recently, they have bolstered their commitment to supermarkets with the purchase of Winn-Dixie."[107]

43.    Stores such as Aldi and Lidl help drive grocery prices lower in the industry.



.[108] Aldi is the second fastest growing

---

[102] DX 2221; Tr. (Kinney (Albertsons)) 2982:9-2985:22.
[103] DX 0222 at 15.
[104] Tr. (Neal (Sprouts)) 408:25-410:6.
[105] Tr. (Knopf (Raley's)) 973:24-974:5; *see also* DX 2834 at 9.
[106] DX 2438; Tr. (Kinney (Albertsons)) 2987:3-6; Tr. (McMullen (Kroger)) 1601:13-1602:7 (identifying Aldi as a significant competitor of Kroger and Lidl in certain regions).
[107] Tr. (Sankaran (Albertsons)) 1709:8-15.
[108] DX156; Tr. (Lieberman (Walmart)) 2351-52.

retailer in the country (behind only Amazon.com).[109]

44.     Dollar stores such as Dollar General also ███████████████████████
███████.[110] Dollar General, in particular, has been aggressively moving into the grocery

space, with over 3,000 stores now carrying fresh produce.[111]

45.     Kroger's and Albertsons' internal documents and testimony from their competitors

confirm that ███████████████████████████████████████.[112] Albertsons has

conducted "comprehensive" entry analyses and research around value retailers, such as Trader

Joe's, Aldi, WinCo, and Dollar General.[113] Those analyses showed that when a value grocer

entered the market, ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████.[114]

### f.      "Ethnic" Grocery Stores

46.     "Ethnic" grocery retailers—including H Mart, 99 Ranch Market, Uwajimaya,

---

[109] DX2438; Tr. (Kinney (Albertsons)) 2986-87.

[110] Tr. (McMullen (Kroger)) 1603:8-17 (Kroger views Dollar General, Dollar General Market, Dollar Tree, and Family Dollar as competitors); *see also* (Unkelbach (Dollar Tree)) 473:5-8 (Dollar General competes more in the grocery space than Dollar Tree); Tr. (Sankaran (Albertsons)) 1710:10-12 (discussing threat of Dollar General and its 20,000 stores).

[111] Tr. (Sankaran (Albertsons)) 1710:10-25, 1797:13-20.

[112] Tr. (McMullen (Kroger)) 1603:1-7 (discount stores Kroger competitor for shopping dollar); Tr. (Broderick (Albertsons)) 1417:12-14; Tr. (Schwilke (Kroger)) 842:21-843:7 (Kroger store in Rolling Hills/Torrance California was operating at a 5% decrease in sales following openings of nearby Target and Grocery Outlet); Tr. (Unkelbach (Dollar Tree)) 471:17-472:5) (Dollar Tree competes with traditional grocery stores, such as Albertsons); DX 1290/1290A ██████████████ ███████████████████████████████████████████████████████ DX 2711 at 9 (███████████████████████████████████████████████ ███████████); DX0011 at 18, 20, 22, 24, 26, 30, 32, 46, 48, 50, 52, 54, 62, 64; DX 0807 at 7 ██████████████████████████████████████.

[113] DX 1290, 1290A; DX 2617; DX 2711 at slides 15, 18; Tr. (Kinney (Albertsons)) 2914:16-21, 2915:5-20, 2969:15-2980:16.

[114] DX 1290, 1290A; DX 2617; DX 2711 at slides 15, 18; Tr. (Kinney (Albertsons)) 2914:16-21, 2915:5-20, 2969:15-2980:16.

Page 22 –     DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Vallarta, and Cardenas—vigorously compete for grocery dollars.[115]

47.    Kroger "[a]bsolutely" considers ethnic grocers to be strong competitors.[116] Walmart, Target, and other "traditional" supermarkets also consider ethnic grocers to be competitors.[117] Kroger has implemented pricing changes in some stores in response to growing competition from Hispanic and other ethnic independent retailers, and "chang[ed its fresh] assortment" in response to ethnic retailers' produce.[118] Ethnic retailers like Cardenas have partnered with Amazon.com to sell grocery items to a broader audience.[119] Plaintiffs' witness from Stater Brothers confirmed that it would be a "mistake" to ignore growing retailers in its market, including Latino grocers like Northgate Markets.[120]

### g.    *Amazon.com and Online Grocery Competition*

48.    Technology has made it easy for online delivery companies to facilitate consumers' grocery purchases. "[T]he growth of online basically widens the aperture of how [retailers] think about competitors."[121]

49.    Amazon has a large and growing grocery business, and continues to expand using a variety of formats and strategies.[122] Beyond the acquisition of Whole Foods and its operation of Amazon Fresh stores, Amazon sells groceries through its e-commerce business, which boomed

---

[115] *See* Tr. (McMullen (Kroger)) 1604:5-15; Tr. (Aitken (Kroger)) 1813:8-12; Tr. (Schwilke (Kroger)) 845:17-846:1; Tr. (Lieberman (Walmart)) 2339:17-20; Tr. (Curry (Albertsons)) 898:18-20; Tr. (Yates (Ahold Delhaize)) 2208:19-21; *see also* DX 2711 at 9.
[116] Tr. (McMullen (Kroger)) 1604:8-15; *see also id.* at 1605:9-11.
[117] Tr. 2208:19-21 (Yates (Food Lion)) (Food Lion competes with ethnic grocers where they exist within its footprint); Tr. 2339:17-20 (Lieberman (Walmart)) (Walmart considers H Mart, 99 Ranch, Fiesta Mart, Cardenas to be competitors); Tr. (Conlin (Target)) 2773:14-17 (testifying that ethnic grocers compete with it to some degree).
[118] Tr. (Schwilke (Kroger)) 852:5-9; Tr. (McMullen (Kroger)) 1604:16-24.
[119] Tr. (Heyworth (Amazon.com)) 2793:11-2794:24.
[120] Tr. (Van Helden (Stater Brothers)) 210:18-20.
[121] Tr. (Oblisk (Whole Foods)) 2295:14-16.
[122] Tr. (Heyworth (Amazon.com)) 2813:14-2815:4; DX 2403.

during the COVID-19 pandemic and has continued to grow since.[123]

50.    Amazon.com offers a first-party retail model and a third-party retail model.[124] In other words, Amazon.com offers consumable products it sells itself, but also fulfills orders for third parties' products purchased through Amazon.com. Further, the company has partnered with grocery stores, such as Cardenas and Metropolitan Market, where customers can go to Amazon.com and search for products specific to those stores.[125] Amazon sells ███████ ██ of its groceries through third-party sellers.[126] "[O]ffering products through third-party sellers significantly enhances the selection we can make available to our customers."[127]

51.    For its third-party business, products can be shipped from the third parties or through one of Amazon.com's approximately 250 fulfillment centers in North America.[128] Under this model, products sold through the fulfillment center typically can be shipped to the customer through a one-to-two-day offering, sometimes the same day. Products shipped from merchants typically ship from two to six days.[129] Amazon.com also has same-day facilities, located closer to denser metropolitan areas, where it is able to ship more quickly, within a four-to-six hour window.[130] Amazon.com also allows customers to pick up products at a variety of locations.[131]

52.    Amazon.com has approximately ██████ SKUs in its consumable business.[132] The selection is broader than one would find in a "traditional" grocery store.[133] Amazon.com offers

---

[123] Tr. (Sankaran (Albertsons)) 1708:1-13.
[124] Tr. (Heyworth (Amazon.com)) 2794:1-2; DX 2403.
[125] Tr. (Heyworth (Amazon.com)) 2793:20-2796:5.
[126] Tr. (Heyworth (Amazon.com)) 2795:9-17; DX 2502 at 61:3-7.
[127] Tr. (Heyworth (Amazon.com)) 2796:3-5.
[128] Tr. (Heyworth (Amazon.com)) 2796:13-19.
[129] Tr. (Heyworth (Amazon.com)) 2794:7-13.
[130] Tr. (Heyworth (Amazon.com)) 2799:9-15; DX 2502 at 40:3-7.
[131] Tr. (Heyworth (Amazon.com)) 2800:3-4.
[132] Tr. (Heyworth (Amazon.com)) 2796:20-2797:6; DX 2502 at 67:22-68:1.
[133] Tr. (Heyworth (Amazon.com)) 2797:19-21.

a variety of package sizes for products. For perishable products, such as produce, eggs, dairy, and meat, it has approximately ███ SKUs that can be delivered on the same day.[134] It also has a Subscribe & Save program where items, including groceries, can automatically be shipped on a monthly or other schedule, which saves consumers time in procuring items they use consistently.[135]

53.    Amazon.com considers mass merchandisers, club stores, value stores, and "traditional" grocery stores to be competitors—though it does not "use the 'traditional grocery store' nomenclature."[136] Amazon.com views these retailers as competitors because "we carry the same products"; "we offer strong pricing such that the customer doesn't have to shop around"; "customers trust that Amazon offers a strong deal and comparable pricing with other retailers"; and "we offer a convenient shopping experience that mirrors or exceeds physical stores."[137] Amazon.com views the grocery business as "intensely competitive" because "[i]t is a business in which many, many, retailers compete quite fiercely for customers. It is a business in which margins are small, and it is hard to operate a business in many areas."[138] It has been working to expand its brick-and-mortar grocery offerings and plans to open more same-day fulfillment facilities.[139]

54.    Amazon.com also competes with these brick-and-mortar stores in e-commerce. "Many brick-and-mortar stores continue to expand their web offerings, their delivery offerings, their curbside pickup offerings. They continue to expand the selection method they offer. They continue to lower prices. They continue to invest in private brands."[140] Amazon.com price matches

---

[134] Tr. (Heyworth (Amazon.com)) 2798:20-2799:4; DX 2502 at 40:3-7.
[135] Tr. (Heyworth (Amazon.com)) 2800:12-22.
[136] Tr. (Heyworth (Amazon.com)) 2804; DX 2403.
[137] Tr. (Heyworth (Amazon.com)) 2804; DX 2403.
[138] Tr. (Heyworth (Amazon.com)) 2810:7-14.
[139] Tr. (Heyworth (Amazon.com)) 2814:5-13.
[140] Tr. (Heyworth (Amazon.com)) 2811:1-6.

against "traditional" grocery stores, including ███████████████, and evaluates

competitors' pricing ███████████████████████████████████████████

█████████████████.[141]

     55.     Grocery retailers understand the competitive threat Amazon.com poses. Club stores

like Costco and mass merchandisers like Target view Amazon.com as a significant competitor.[142]

Sprouts identifies Amazon as one of its competitors.[143]

     56.     Amazon.com drives grocery prices lower in the industry. ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████[144]

     57.     Kroger views Amazon as a "relentless company" and fierce competitor. Amazon's

success spurred Kroger to accelerate its growth in e-commerce, including its partnership with

Instacart, which also partners with other companies, including Albertsons, Costco, and Publix.[145]

Indeed, for the past eight years Kroger's CEO has displayed a newspaper article on his desk that

has the headline, *How Amazon is Crashing Kroger's Party*, to "remind [him] every day that

Amazon is just like Walmart, where they're going to keep adding things every single day, and they

have a balance sheet that they can continue acquiring things as well … every day it reminds me

that Amazon is going to be a bigger competitor tomorrow than yesterday, and we cannot ever lose

sight of that."[146]

     58.     Albertsons likewise views Amazon and online retailers as competitors, and its

---

[141] Tr. (Heyworth (Amazon.com)) 2811:7-17; DX 2502 at 32:16-33:5.
[142] Tr. (George (Costco)) 2012:3-7; Tr. (Conlin (Target)) 2772:7-2773:13.
[143] DX 0222 at 15.
[144] DX156; Tr. (Lieberman (Walmart)) 2351-52.
[145] Tr. (Cosset (Kroger)) 2256-2257; *see also* DX 2730 at 8, 28-29.
[146] Tr. (McMullen (Kroger)) 1599:5-13.

analyses found that customer spend on e-commerce is expected to increase by 11% in the next ten years, whereas customer spend inside a grocery store is expected to increase by 1.6%.[147]

### 2.    The Modern Grocery Consumer

59.    The increasing consumer preference for these varied shopping options defines the modern grocery market.[148]

60.    Thirty to forty years ago, there was "one place" to shop.[149] "[B]ack then there wasn't a Walmart that was selling groceries."[150] There were not club stores selling groceries. And there was no Amazon.[151]

61.    Today, by contrast, few U.S. customers shop exclusively at one food store in a month. Indeed, "well over 90 percent of people, accounting for over 95 percent of dollars of spending, are people who shop at more than one store per month."[152]

62.    Kroger's customers go to 4.8 different stores a month, including its most loyal customers.[153]

63.    Albertsons' customers shop for groceries, on average, six times at six different places in a given week.[154] Even Albertsons' most dedicated customer base, its 5% of "Elite & Best" shoppers, spend only about 50% of their grocery dollars with Albertsons.[155] Even Albertsons' very best customers, in other words, are not using Albertsons as a one-stop shop.[156]

---

[147] Tr. (Kinney (Albertsons)) 2987:1-2988:15; DX 1155 at 4.
[148] DX 2920 at 11.
[149] Tr. (Kinney (Albertsons)) 2931:8-9.
[150] Tr. (Kinney (Albertsons)) 2931:12-13.
[151] Tr. (McMullen (Kroger)) 1594:13-16; 1597:2-1598:3; Tr. (Groff (Kroger)) 347:9-15.
[152] Tr. (Israel) 2624:17-20.
[153] Tr. (Aitken (Kroger)) 1812:5-25, 1847:2-5.
[154] Tr. (Kinney (Albertsons)) 2928:14-15; DX 2090; Tr. (Curry (Albertsons)) 898:4-9 (Albertsons' customer base in his Southern California division "shops between five to seven retailers a week.").
[155] Tr. (Kinney (Albertsons)) 2934:17-2936:17.
[156] Tr. (Kinney (Albertsons)) 2934:17-2936:17.

64.     While many in the industry historically categorized grocery retailers by "channels," these channels have become increasingly blurred, to the point that "Nobody shops channels anymore."[157] Retailers like Whole Foods confirmed that their customers likewise are "very fluid about how they choose to shop across those various options that they have. They tend to, based on whatever their occasion or need is, choose a range of retailers."[158] Whole Foods customers "tend to shop four to seven different grocery retailers in any given month."[159]

65.     This is in part because the food categories purchased by consumers across retailers are largely the same: Albertsons' shoppers "are actually shopping a lot of, if not all, the same categories with us as they are elsewhere" and "they're finding the categories that you can get at an Aldi or a Costco are highly substitutable to the same categories they can get with us."[160]

66.     Cross-shopping is not limited to specialty items or brands available only at particular stores. For instance, Albertsons conducted an analysis referred to as the "toothpaste project," which found that when a customer goes into a store for a particular item, that customer is more likely to shop for other items as well. In particular, for customers who stop buying toothpaste at Albertsons, Albertsons loses 40% of those customers' total baskets over a year.[161]

67.     Because consumers shop for groceries at so many different retail formats, there is intense competition for consumers' "share of wallet." Albertsons' typical customer spends 12 cents of every grocery dollar at Albertsons—the remaining 88 cents go to other grocery retailers, including Walmart (█████████████████), Costco (███████████████), and Amazon (███████████████).[162] Albertsons' share of wallet has been falling "because there is more choices

---

[157] Tr. (Sankaran (Albertsons)) 1694:1-13; Tr. (Morris (Albertsons)) 1917:5-22.
[158] Tr. (Oblisk (Whole Foods)) 2291:23-2292:6.
[159] Tr. (Oblisk (Whole Foods)) 2292:5-11.
[160] Tr. (Kinney (Albertsons)) 2937:10-16.
[161] Tr. (Kinney (Albertsons)) 2938: 4-16.
[162] Tr. (Kinney (Albertsons)) 2932:14-17, 2933:1-3.

for customers."[163] Similarly, Kroger gets about ███ of its customers' grocery wallet.[164]

68.    Other grocery retailers confirmed that they focus on share of wallet given how many places the typical customer shops. For instance, Whole Foods conducted an internal analysis in April 2024 of the share of wallet of customers who shopped at Whole Foods two times during the past 52 weeks.[165] The analysis showed that Costco had ████████████ ████████████████████████████████████████████ ██████.[166] And throughout the country, Whole Foods customers shop at an array of other grocery stores ████████████.[167]

69.    Walmart likewise tracks customers' share of wallet in different regions in the United States. A 2023 Walmart internal analysis showed that ████████████████ ████████████████.[168]

70.    As such, the most successful grocery retailers cast a wide net rather than hoping to capture all the grocery dollars of any particular type or demographic of customer. While some grocery retailers continue to focus principally on the "35 to 45-year-old female head of household with a family,"[169] Kroger "serve[s] 60 million households a year" and looks to attract customers of all types—"the young, the elderly, those who are well off, big families, and those who don't have the resources of others,"[170] including Kroger's 9 million SNAP and WIC customers.[171]

## C.    The Merger Transaction

---

[163] Tr. (Sankaran (Albertsons)) 1698:22-1699:2
[164] DX 0011; Tr. (Aitken (Kroger)) 1809:14-1810:12.
[165] Tr. (Oblisk (Whole Foods)) 2304:1-2305:19; DX 0271 at 22.
[166] Tr. (Oblisk (Whole Foods)) 2304:1-2305:19; DX 0271 at 23.
[167] Tr. (Oblisk (Whole Foods)) 2307:16–2311:16 & DX 0272 at 28, DX 0273 at 28, DX 0275 at 55.
[168] Tr. (Lieberman (Walmart)) 2345:3–20; DX 1340 at 19.
[169] Tr. (Van Helden) (Stater Brothers)) 175:16-22.
[170] Tr. (Aitken (Kroger)) 1804:3-7.
[171] Tr. (Aitken (Kroger)) 1805:12-18.

1.    **Background and Structure of the Merger**

71.    In 2019, Vivek Sankaran joined Albertsons as its CEO. His focus from the beginning was to leverage Albertsons' existing scale and "reduce the cost of doing business so [Albertsons] could invest in the growth that [it] needed to do."[172] Those initiatives had "success," but "there [was] a limit to what [Albertsons] can do within [their] business, within the structure and scale of [their] business."[173] Accordingly, by November 2021, Albertsons began to explore strategic options, including the possibility of a merger.[174] The company considered a merger "the best path for us to get the scale" needed to compete in the ferocious competitive environment.[175]

72.    In February 2022, Albertsons announced that it was looking for a partnership or possible merger.[176] Thereafter, Kroger began analyzing whether merging with Albertsons made sense.[177] Kroger had "done a lot of work, understanding the overlaps, how to manage the overlaps" between the businesses, and ultimately contacted Albertsons in spring 2022.[178]

73.    Chief among Kroger's considerations was that Albertsons' geographic footprint would complement Kroger's and enable it to have "national coverage," and allow us to "better compete against Costco and Amazon and Walmart."[179] Whereas Albertsons had a strong presence in the Northeast and West and Texas and Northern California, Kroger is the near mirror image with presence in the Midwest, Southeast, East Texas, and the Plain States.[180] Their stores do not overlap in the majority of the states.[181]

---

[172] Tr. (Sankaran (Albertsons)) 1716:4-9.
[173] Tr. (Sankaran (Albertsons)) 1719:23-1720:5.
[174] Tr. (Sankaran (Albertsons)) 1720:6-21.
[175] Tr. (Sankaran (Albertsons)) 1720:24-1721:1.
[176] Tr. (Sankaran (Albertsons)) 1721:2-17.
[177] Tr. (McMullen (Kroger)) 1607:6-24.
[178] Tr. (McMullen (Kroger)) 1607:16–1608:1; Tr. (Sankaran (Albertsons)) 1721:12-17.
[179] Tr. (McMullen (Kroger)) 1609:21-23.
[180] Tr. (McMullen (Kroger)) 1573:24-1574:4; DX 2626; DX 2627.
[181] DX 1254 at 8.



74.    For Kroger, the merger is "vital for us to be able to compete" with large competitors like Walmart, Costco, and Amazon.[182] In particular, national coverage is "critical in order to execute [its] overall strategy" and match these competitors' national scale.[183]

75.    Albertsons similarly saw the benefits of "putting two companies with complementary geographies together; putting two companies that could bring material scale together—not as big as a Walmart but big enough to start doing some materially different things on buying synergies, distribution synergies, technology synergies … doing the kind of things that can change the growth trajectory of both companies."[184]

76.    Indeed, Albertsons came to view a potential merger with Kroger as a business necessity if it was to compete with Walmart, Costco, Amazon, and other grocery retailers going forward. The merger "was the best path … to get the scale … needed to take the next step."[185] Albertsons' "coming together with Kroger gives them a presence, not quite coast to coast. … Not

---

[182] Tr. (Aitken (Kroger)) 1836:17-20.
[183] Tr. (McMullen (Kroger)) 1609:21-1610:4.
[184] Tr. (Sankaran (Albertsons)) 1722:13-22.
[185] Tr. (Sankaran (Albertsons)) 1720:24-1721:1.

in the same way that Walmart or Amazon are, but it gives them a strength that Albertsons wouldn't have had on its own for a while."[186] While Kroger has reduced its price spread against Walmart to less than 4%,[187] Albertsons has not been able to keep pace with Walmart's prices.[188]

77.    Without the merger, Albertsons will need to consider the possibility of layoffs, store closures, and even needing to exit certain markets.[189] Albertsons lacks the scale to effectively compete with lower-priced retailers in the long term: "there's an incredible amount of pressure on price, and we've—we're not now, nor have we ever been the cheapest person in town; however, that gap is widening at a rate further …. We don't have enough productivity, enough initiatives at this moment to offset what we need to do to invest in price."[190]

78.    On October 14, 2022, Kroger and Albertsons announced their merger agreement, under which Kroger will acquire Albertsons for $24.6 billion, subject to certain adjustments.[191] Kroger would bring approximately 1,700 Albertsons stores into the Kroger family.[192]

79.    Through the merger, Albertsons stores that were priced 10 to 12% higher than Kroger's prices would be under Kroger's pricing structure.[193] Kroger has committed to a billion-dollar annual price investment in Albertsons stores and on "day one, investing in prices to lower prices to help the Albertsons' prices get closer to Kroger."[194] Further, as discussed below, Kroger has committed to a $1.3-billion commitment to improve Albertsons stores, and a billion-dollar

---

[186] Tr. (Morris (Albertsons)) 1961:15-19.
[187] Tr. (Aitken (Kroger)) 1818:20-1819:1.
[188] Tr. (Silva (Albertsons)) 259:24-260:8.
[189] Tr. (Sankaran (Albertsons)) at 1728:12-20.
[190] Tr. (Morris (Albertsons)) 1991:8-12, 1992:13-15.
[191] DX 1254 at 1, 6; Tr. (Sankaran (Albertsons)) 1721:2-23.
[192] Tr. (McMullen (Kroger)) 1610:22-24.
[193] Tr. (Aitken (Kroger)) 1819:5-6; Tr. (Israel) 2605.
[194] Tr. (McMullen (Kroger)) 1612:4-5; Tr. (Aitken (Kroger)) 1806:1-18; DX2237 at 2.

annual commitment to improve wages and benefits for its associates.[195]

## 2.    The Divestiture

80.    Divestiture was a critical component of the merger agreement from the start. The October 2022 merger agreement contemplated a divestiture of up to 650 stores ███████████ ██████████.[196] ███████████████████████████████████,[197] with the goal of "finding a buyer that would recognize the labor contracts, finding a buyer that had a lot of experience in the industry, finding a buyer that was well capitalized, and having a buyer that … people would want to go to work for."[198]

81.    Finding the best available divestiture buyer was an "absolute requirement."[199] "There is no … party that is more motivated or incentivized to find a compelling and ultimately successful divestiture buyer" than Kroger.[200] "Without [a successful divestiture buyer], Kroger doesn't get to complete the merger."[201] The process of selecting a divestiture buyer was competitive. That selection process was led and managed by Kroger's bankers (CitiBank and Wells Fargo), alongside outside advisors, counsel, economists, and antitrust experts.[202] During that bidding process, the divestiture bidders received, through intermediaries, all the necessary data to assess the assets and the nature and performance of the businesses.[203] Initially, there were 92 interested parties—72 strategic buyers and 20 financial buyers.[204] After months of vetting potential

---

[195] Tr. (Cosset (Kroger)) 2271:9-2272:1; :4; Tr. (McMullen (Kroger)) 1677:16-21; DX 2559 at 10; DX 1727 at 6; DX 2237 at 2; DX 1254.
[196] DX 2552 at 13, 65; DX 2553 at 151; *see also* Tr. (Cosset (Kroger)) 2386:21-2387:4.
[197] DX 2738 (Galante Rep.) ¶ 24.
[198] Tr. (McMullen (Kroger)) 1623:23-1624:5.
[199] Tr. (Cosset (Kroger)) 2401:6-10.
[200] Tr. (Cosset (Kroger)) 2400:25-2401:2.
[201] Tr. (Cosset (Kroger)) 2401:3-5.
[202] DX 813 at 3, 11; Tr. (Cosset (Kroger)) 2387:25-2388:4.
[203] DX 813 at 3, 11; Tr. (Cosset (Kroger)) 2388:14-20.
[204] DX 813 at 3, 11; Tr. (Cosset (Kroger)) 2390:9-12.

buyers, Kroger selected C&S as the divestiture buyer. Kroger, Albertsons, and C&S entered into a divestiture agreement in September 2023.[205]

### a.    C&S

82.    When Albertsons announced its interest in a possible merger in 2022, C&S was at a transition point in its business. In 2019, C&S had lost one of its largest customers, which the company viewed as "a very large pivot point for C&S."[206] "Ahold Delhaize represented 44 percent of our volume, our sales. They made a decision in 2019 to move their business to self-distribution."[207]

83.    C&S knew it had to evolve. "[W]e said we have to go win new customers," which they did, adding "over $5 billion in the last 26 months with new customers."[208] The company also knew it had to diversify. "Our other main wholesale competitors both have bigger spaces in retail. And as a company, a family-owned business, our owner wants the company to grow. And as we looked out at business and the future of the business, we also felt we needed to diversify. We needed to get better at serving our independents, and we needed to get better at retail. So for us it's transformational change, which our owners and our team are incredibly passionate about."[209]

84.    After navigating the COVID pandemic, around 2021, C&S start began looking for what it called a "transformational acquisition."[210] When Kroger and Albertsons announced their merger in October 2022 and began soliciting divestiture bids, C&S was already in "that exploration phase" and was discussing a different retail acquisition with a different seller.[211] C&S "backed

---

[205] Tr. (Cosset (Kroger)) 2387:25-2388:13, 2392:19-23.
[206] Tr. (McGowan (C&S)) 1045:19-25.
[207] Tr. (Winn (C&S)) 1223:3-5.
[208] Tr. (Winn (C&S)) 1224:16-20.
[209] Tr. (McGowan (C&S)) 1046:7-15.
[210] Tr. (Winn (C&S)) 1225:23-25.
[211] Tr. (Winn (C&S) 1226:3-5.

out" from that alternative opportunity in order to focus on the Kroger divestiture.[212]

85.    C&S viewed a possible divestiture as "the opportunity to double our size and be the largest wholesaler and one of the largest traditional food retailers in the United States."[213] The divestiture would give C&S an opportunity to expand its distribution footprint because C&S would be able to support new retail locations that it acquires as a distributor.[214] That would allow C&S to be in new markets, creating competition between C&S and current distributors in that market.[215] C&S believes the divestiture is "going to make us a successful retailer, but equally a better wholesaler. Our wholesale footprint with the distribution centers that we're going to acquire and build as part of this transaction will open up more markets for us as a wholesaler. It will allow us to help independents."[216]

86.    Kroger received four final bids.[217] The bidders' valuation of the divestiture package was determined using a standard method of valuating assets in mergers and acquisitions transactions—the aggregate of operating cash flow or the "four-wall EBIDTA" of the business being acquired (here, the divested stores) multiplied by a figure set by the bidder.[218] The multiple figures of the final bidders were all in a "very narrow or close range" of one another.[219]

87.    Kroger assessed the final divestiture bidders on three dimensions: (1) strategic commitment and alignment to operating the stores; (2) the experience of the bidders, including direct and indirect experience in the retail industry; and (3) the bidders' financial wherewithal.[220]

---

[212] Tr. (Winn (C&S)) 1227:5-7.
[213] Tr. (McGowan (C&S)) 1046:15-17.
[214] Tr. (McGowan (C&S)) 1049:3-9.
[215] Tr. (McGowan (C&S)) 1049:10-16.
[216] Tr. (McGowan (C&S)) 1048:2-8.
[217] DX 813 at 3; Tr. (Cosset (Kroger)) 2393:1-7.
[218] Tr. (Cosset (Kroger)) 2394:3-14; *see also* DX 813.
[219] DX 813 at 4; Tr. (Cosset (Kroger)) 2395:18-22.
[220] Tr. (Cosset (Kroger)) 2395:23-2396:7.

88.     First, it was important for Kroger that the divestiture buyer would be "committed and align[ed] with the long-term operation and ongoing operation of the divested business," which also included maintaining the employment of associates and assuming responsibility for their collective bargaining agreements.[221] Kroger determined that C&S was strategically committed to the ongoing operations of the divested business.[222]

89.     Second, as to experience, Kroger was interested in a buyer that had the "capacity and capability of operating these stores and that business."[223] C&S has both direct and indirect capabilities to succeed in retail, particularly given that it has experience supporting over 7,000 independent retailers.[224] Kroger "felt very confident that [C&S] had been providing services; supporting independent retailers; and made a commitment … to continue to invest in [these] capabilities" such that C&S would be able to successfully operate the divested stores.[225]

90.     Finally, Kroger assessed and validated that C&S was able to realize a long-term commitment to invest in the divested business, which was supported by the significant equity investments made by investors to fund the transaction.[226] C&S's shareholders and SoftBank are committing $900 million in equity to fund the divestiture, and they have open credit lines if the transaction needs more resources.[227]

91.     Defendants' expert in corporate mergers, acquisitions, and divestitures, Mr. Daniel Galante, reviewed audited financial statements and analyzed five years of statements to assess C&S's performance history and financial health. Mr. Galante determined that "C&S has a long

---

[221] Tr. (Cosset (Kroger)) 2396:11-21.
[222] Tr. (Cosset (Kroger)) 2396:22-2397:4.
[223] Tr. (Cosset (Kroger)) 2397:8-14.
[224] Tr. (Cosset (Kroger)) 2397:21-2398:11; DX 1058 at 7.
[225] Tr. (Cosset (Kroger)) 2398:12-19,
[226] Tr. (Cosset (Kroger)) 2399:4-2400:10; Tr. (Galante) 3140:3-3143:3.
[227] Tr. (Galante) 3135:16-20; DX 1058 at 88.

history of strong financial performance" and "C&S is an extremely strong buyer of this divested business."[228] And, despite top-line sales declines resulting from losing a mass merchant customer, C&S has "been able to maintain a healthy, consistent dollar profit."[229]

### b.    The Terms of the Divestiture Package

92.    In September 2023, Kroger, Albertsons, and C&S announced an initial divestiture package including 413 stores and additional supporting assets, with the option to add up to 237 additional stores.[230] Under the current divestiture package, announced in April 2024, C&S agreed to pay $2.9 billion (inclusive of transaction costs), in exchange for the following assets:[231]

- 579 supermarkets in areas where Kroger and Albertsons overlap;[232]

- 6 owned and leased distribution center campuses;[233]

- ownership of the Carr's, Quality Food Centers, Haggen, and Mariano's brands nationwide;[234]

- a royalty-free, exclusive, perpetual license to the "Albertsons" banner in California and Wyoming and the "Safeway" banner in Colorado and Arizona;[235]

- five Albertsons private label brands;[236] a royalty-free, perpetual license to recipes and formulations for any products sold under such private label brands; and a two-year license, with the option for two 12-month extensions, for C&S to sell the Kroger-retained Signature and O Organics private label products;[237]

---

[228] Tr. (Galante) 3144:9, 3148:7-8.

[229] Tr. (Galante) 3147:5-11, 3148:4-8.

[230] Tr. (Winn (C&S)) 1231:10-1232:22; DX 2738 (Galante Rep.) fig.1; Kroger Press Release, *Kroger and Albertsons Companies Announce Comprehensive Divestiture Plan with C&S Wholesale Grocers*, LLC in Connection with Proposed Merger (Sep. 8, 2023), https://bit.ly/4bgcUBx.

[231] Tr. (Winn (C&S)) 1228:9-11; DX 2738 (Galante Rep.) ¶ 61; DX 2238 §§ 1.1, 2.3, 2.9, 2.10, 6.16, 6.15, 9.1; DX 2239 (Am. C&S Agreement, Schedule 2.1(a)-K, Schedule 2.1(c)-A, Schedule 2.1(c)-K); DX 1058 at 14, 54; *see also* Tr. (Winn (C&S)) 1233:20-1235:15, 1235:18-20, 1236:3-1239:6.

[232] Tr. (Cosset (Kroger)) 2410:21-22; *see also id.* 2410:23-2412:18; DX 2239 at 16.

[233] Tr. (Cosset (Kroger)) 2417:3-6; DX 2238; DX 2239 at 79.

[234] Tr. (Cosset (Kroger)) 2413:3-6; Tr. (Morris (Albertsons)) 19372:22-1933:2, 1937:17-19; DX 2238 at 40.

[235] Tr. (Cosset (Kroger)) 2413:3-6; Tr. (Morris (Albertsons)) 1932:4–6; Tr. (McGowan (C&S)) 1029:9–11, 21–23; DX 2238 at 493, 538.

[236] Tr. (Cosset (Kroger)) 2431:9-12; Tr. (Morris (Albertsons)) 1944:20-1946:1; DX 2238 at 43.

[237] Tr. (Morris (Albertsons)) 1946:2-22; DX 2238 at 174.

- a clone of Albertsons' IT stack and Kroger's human capital management stack;[238]
- ████████████████████████████████████████████████████████████ [239]
- a dairy manufacturing plant in Denver;[240]
- ██████████████████████████████████████████

### c.    Setting Up the Divested Stores for Success

93.    The divestiture was designed to set up C&S for success. For the divested Albertsons stores, C&S will get the division presidents and key Albertsons' leaders.[241] At the store level, employees who work at a store before the divestiture will continue to do so after.[242]

94.    Susan Morris, the current Albertsons COO with some forty years of relevant experience, will become the CEO of C&S retail with responsibility for running all 579 divested stores.[243] Ms. Morris has "a tremendous industry reputation"; she "knows these stores," "markets," and "people."[244] Given her reputation and experience in the industry, C&S views securing Ms. Morris as "a really big deal."[245]

95.    Ms. Morris currently runs just under 2,300 stores for Albertsons with 270,000 associates who serve 30 million customers a week.[246] She is already leading the teams at 486 of the 579 (83.9%) divestiture stores, ensuring leadership continuity after the divestiture.[247]

96.    Ms. Morris has extensive experience in "multiple mergers and acquisitions, in

---

[238] Tr. (Cosset (Kroger)) 2439:5-2440:15; Tr. (Winn (C&S)) 1237:14-1238:3; DX 2238 at 180.
[239] *See* Tr. (Cosset (Kroger)) 2453:15-2459:10; Tr. (Galante) 3219:1-3219:10; DX 3019.
[240] Tr. (Winn (C&S)) 1238:10-12; DX 2238.
[241] Tr. (Sankaran (Albertsons)) 1733:22–1734:10; Tr. (Winn (C&S)) 1241:7-17.
[242] Tr. (Sankaran (Albertsons)) 1733:14-21.
[243] Tr. (Morris (Albertsons)) 1902:7-21; DX 1058 at 29.
[244] Tr. (McGowan (C&S)) 1056:19-1057:4; *see also* Tr. (Broderick (Albertsons)) 1416:5-23 (describing Morris as "the brightest, smartest, best grocer" he has ever worked with as part of his decision to accept the position of Denver division president at C&S following the merger).
[245] Tr. (McGowan (C&S)) 1240:15.
[246] Tr. Morris (Albertsons) 1903:22-24.
[247] Tr. (Morris (Albertsons)) 1911:25-1912:7.

converting systems, in converting banners."[248] For instance, when Albertsons acquired SuperValu in 2010, the then 200-store Albertsons picked up roughly 877 stores overnight.[249] Ms. Morris was responsible for integrating the two teams that formed the Denver Division and successfully led the acquired stores to consecutive quarters of increased sales, earnings, and market share.[250] Ms. Morris also played a role in the Safeway-Albertsons merger, which involved expanding into markets where Albertsons was not already operating.[251]

97.     Ms. Morris also has experience with brand transitions at both the store and product levels. At Albertsons, Ms. Morris has had responsibility for developing new private label products, expanding private label penetration, and supporting new item launches.[252] She also holds a great deal of rebannering experience.[253] To "rebanner" a store is to "change the banner of a store to a new one."[254] The rebannering process "will depend on the store"—"[s]ometimes it's just changing the sign," or it may "involve a remodel."[255] For more than half the divested stores (293), no rebannering will be necessary. Ms. Morris is well prepared to rebanner the remaining 286 stores.[256]

98.     Roughly 67,000 Kroger and Albertsons employees will transition to C&S.[257] "[A]ll the staff, the techs, the pharmacists that are running [the] pharmacies" in divested stores will transfer to C&S and continue running the stores following the merger.[258]

99.     In October 2023, C&S prepared a letter to the California Attorney General's Office

---

[248] Tr. (Morris (Albertsons)) 1911:21-22.
[249] Tr. (Morris (Albertsons)) 1909:6-16.
[250] Tr. (Morris (Albertsons)) 1909:22-1910:12.
[251] Tr. (Morris (Albertsons)) 1910:14-1911:13.
[252] Tr. (Morris (Albertsons)) 1940:9-1942:3.
[253] Tr. (Morris (Albertsons)) 1922:7-1932:21, 1939:1-17.
[254] Tr. (Fox) 1292:13-15.
[255] Tr. (Morris (Albertsons)) 1974:12-15.
[256] Tr. (Morris (Albertsons)) 1926:6-17.
[257] Tr. (Winn (C&S)) 1244:3-10; Tr. (Cosset (Kroger)) 2453:15-2459:10; Tr. (Galante) 3219:1-3219:10; DX 3019..
[258] Tr. (Morris (Albertsons)) 1955:22-1956:4.

assessing the execution risks associated with the initial, 413-store divestiture package.[259] The execution risks of the initial package involved ████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████ [260]

100.    The updated and current divestiture package improves upon each of these areas. C&S has fewer stores to rebanner, and those stores are more weighted to a single seller (Albertsons). C&S will have expanded access to retained banners. It will have robust access to a suite of additional private brands (beyond the five private label brands it is acquiring outright) during the transition. C&S will receive a tech stack clone to help it emerge from the transition period with a fully functioning tech stack, ████████████████████████████ ████████████, and over 1,000 team members transitioning from Kroger and Albertsons, including significant leadership.[261]

101.    In developing its plans to run the divested stores, C&S evaluated risks that were identified, quantified the impact of those risks, and incorporated those risks into a conservative deal model and business plan.[262] That deal model was developed by C&S's corporate development and financial planning team with inputs from third-party advisors.[263] As Mr. Galante identified, the conservative model has "comprehensive analysis and financial modeling."[264] The conservative model was "extremely complex" and consisted of more than 80,000 mathematical equations, "demonstrat[ing] the level of diligence as well as granularity that [the developers] felt [were]

---

[259] PX 3068.
[260] PX 3068.
[261] DX 1058, at 3, 27; Tr. (Winn (C&S)) 1239:14-1240:2.
[262] PX 3602; DX 1058; Tr. (Florenz (C&S)) 1153:10-1155:6; Tr. (Galante) 3163:19-3178:6, 3178:14-3188:10.
[263] Tr. (Florenz (C&S)) 1109:11-16.
[264] Tr. (Galante) 3168:16-20.

important in projecting the future."[265] Mr. Galante did not find any broken formulas, errors, or omissions; Plaintiffs' divestiture expert did not testify to any errors or omissions he identified in the complex deal model.[266] The deal model addresses various risks in detail. To account for rebannering, C&S included ████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████ .[267] The deal model likewise includes ████████████████████████████ ████████████████████████████████████████████████████████████[268]

102.    As Mr. Galante explained, "the deal model has a lot of conservative assumptions. When I say 'conservative assumptions,' that means conservative relative to another assumption that could have been incorporated. I think the sales detriments, the private label margin erosion, the overall sales declines incorporate conservative assumptions, and overall the deal model reflects prudent and reasonable performance of this store set over the future period."[269] Conservatively, C&S projected that the divested business would have positive operating cash flow.[270] Thus, even if costs were higher than C&S's conservative expectations, the divested business "would be able to use that positive cash flow from the operations to support those costs."[271]

### d.    The Transition Services Agreement

103.    The divestiture also includes a transition services agreement to ensure C&S

---

[265] Tr. (Galante) 3162:1-6, 3164:2-8; PX 3602.
[266] Tr. (Galante) 3167:22-3168:10.
[267] DX 1058 at 51; PX 3602, ████████████████████████████████████████; Tr. (McGowan (C&S)) 1061:18-22.
    DX 1058 at 51; Tr. (Florenz (C&S)) 1137:19-1139:1, 1140:15-21; *see also* Tr. (McGowan (C&S)) 1064:1065:9.
[269] Tr. (Galante) 3215:3-15.
[270] Tr. (Galante) 3183:8-18; PX 3602.
[271] Tr. (Galante) 3183:8-18; DX 1058 at 85.

receives support from the merging parties while it integrates divested stores into its existing business.[272] The agreement is "intended to capture any of the services [Defendants] could provide C&S to mitigate any concern or risk [C&S] may see in the actual transition of some of these assets."[273] The agreement is structured to maintain continuity for customers and associates on Day 1 following the execution of the divestiture agreement.[274]

104.   *Rebannering.* The agreement provides for a banner transition period prior to the rebannering of divested stores.[275] One of the challenges in rebannering is typically the "abrupt nature of the change in brand."[276] Under the transition services agreement and other agreements, C&S will have 36 months to rebanner stores.[277] This will allow time to "transition, inform the customers and perform a number of activities that signal[s] the shift" from one banner to another.[278] This 36-month banner transition period allows C&S "flexibility" to rebanner stores on a reasonable timeline that will provide a "smoother transition" for customers.[279]

105.   *Technology.* C&S will receive a "clone" of Albertsons' "tech stack," which is a copy of most of the technology systems that Albertsons uses to operate its business.[280] Because Albertsons already uses that tech stack at the stores C&S will acquire, those stores will not have to "change their processes [or] the way they go about doing business."[281]

106.   *Private Label.* C&S is receiving five Albertsons private label brands outright.[282]

---

[272] DX 2238, Exhibit B; Tr. (Cosset (Kroger)) 2402:25-2403:4.
[273] Tr. (Cosset (Kroger)) 2403:25-2404:11.
[274] Tr. (Winn (C&S)) 1236:22-1237:13; DX 1058 at 13.
[275] Tr. (Cosset (Kroger)) 2414:6-17; DX 2238 at 13.
[276] Tr. (Cosset (Kroger)) 2415:2-5; Tr. (Morris (Albertsons)) 1923:3-1924:13.
[277] Tr. (Cosset (Kroger)) 2413:14-17; DX 2238 at 13.
[278] Tr. (Cosset (Kroger)) 2414:10-15; Tr. (Morris (Albertsons)) 1923:3-1924:13.
[279] Tr. (Cosset (Kroger)) 2414:21-2415:5; *see also* Tr. (McGowan (C&S)) 1060:5-1062:13; Tr. (Morris (Albertsons)) 1925:10-1926:5; DX 1058 at 43, 46-47.
[280] Tr. (Cosset (Kroger)) 2439:11-2440:15; DX 2238 at 180; *see also* DX 1058 at 3, 70.
[281] Tr. (Florenz (C&S)) 1152:17-1153:9.
[282] Tr. (Winn (C&S)) 1236:5-21; DX 2238 at 43.

C&S is also receiving access to Albertsons' Signature and O Organic private brands for four years.[283] Under the transition services agreement, C&S has the ability to sell Kroger private label products in some of the divested stores for 18 to 24 months.[284] "[O]nce [C&S] no longer ha[s] access to the Kroger private label products, [C&S] would introduce Albertsons' private label products from the distribution center where the stores are going to be serviced from," and when the new C&S private label products are ready, C&S intends to then "replace those Albertsons' products."[285] C&S intends to launch 2,000 to 3,000 of its own private label items for the divestiture stores, something it views as a welcome "challenge" but also "an opportunity."[286]

107.    *Customer Data & Loyalty.* C&S will receive customer data regarding those customers who shopped at the divested stores,[287] as well as three years of historical transaction data for all divested stores.[288] Safeguards built into the agreement will prevent Kroger from using customer data from those stores to target C&S customers. Kroger may use that historical transaction data *only* to provide C&S with transition services,[289] and must delete transaction data for divested stores going back three years.[290] On top of its existing loyalty programs at Piggly Wiggly Midwest and those operated by third-party partners,[291] C&S will receive loyalty data, including historical data, which will help enable C&S to build a successful loyalty pricing and promotions system, and it has partnered with Nielsen for the data aggregation and analysis.[292]

---

[283] Tr. (Winn (C&S)) 1194:6-13.
[284] Tr. (Florenz (C&S)) 1082:11-20.
[285] Tr. (Florenz (C&S)) 1083:7-13.
[286] Tr. (Winn (C&S)) 1184:22-8; DX 1058 at 85.
[287] Tr. (Cosset (Kroger)) 2449:14-2451: 19; DX 2238 at 103.
[288] Tr. (Winn (C&S)) 1246:20-1247:8; DX 2238 at 8.
[289] Tr. (Florenz (C&S)) 1088:12-18.
[290] Tr. (Florenz (C&S)) 1092:7-22.
[291] Tr. (McGowan (C&S)) 1065:10-19.
[292] Tr. (Cosset (Kroger)) 2444:18-2446:16; Tr. (McGowan (C&S)) 1065:23-1066:8; DX 2238 at 42; DX 1058 at 31.

108.    *Pricing*. C&S will not be dependent upon Kroger for promotions and pricing. The relevant agreements not only allow C&S to independently set its own pricing and promotion decisions following the divestiture, but also ensure the merging parties will "actually set up, configure, or organize processes that enable C&S to do exactly that, which is to set up and decide how they want to run their pricing promotions plans."[293]

109.    C&S's integration plan for a post-merger divestiture is well under way.[294] Three hundred C&S employees, contractors, and third parties are working solely on the divestiture.[295] Among other things, C&S is working with Instacart to develop a robust e-commerce solution for customers, including a first-party e-commerce website.[296] C&S is also in the process of standing up its own retail media capabilities, with a current timeline of three years to achieve maturity and an expectation for revenue beginning on day one.[297] And C&S has engaged agencies and marketing partners to conduct market research as the company continues to fine-tune its rebannering plan.[298] C&S expects that divested stores will receive competitive trade funding from major suppliers[299] based on ongoing discussions.[300]

110.    Kroger likewise is working diligently on closing the divestiture transaction, with approximately 2,000 associates working on separation and integration.[301] Kroger, Albertsons, and

---

[293] Tr. (Cosset (Kroger)) 2448:16-2449:13; DX 2238 at 279.
[294] *See* DX 1058.
[295] Tr. (McGowan (C&S)) 1056:3-6; DX 0807 at 25-29.
[296] Tr. (McGowan (C&S)) 1071:24-:1072:18. Partnering with Instacart is an efficient and practical first-party solution for e-commerce. For instance, Kroger's partnership with Instacart, beginning in 2017 and 2018, was instrumental to Kroger's accelerated growth in e-commerce. Tr. (Cosset (Kroger)) 2256:4-2257:17.
[297] Tr. (McGowan (C&S)) 1023:16-1024:17.
[298] Tr. (McGowan (C&S)) 1059:20-1060:4.
[299] "Trade funding" is "what suppliers provide to grocery store[s]," including promotional funding, which "generally leads to some promotional activity, such as coupons or Fourth of July sales and so on." Tr. (Gokhale) 2121:2-9.
[300] Tr. (Winn (C&S)) 1168:23-1169:17.
[301] Tr. (Cosset (Kroger)) 2406:8-14; *see also* DX 807 at 25-29.

C&S are currently engaged in weekly governance meetings during which the parties review progress on planning and identify any potential issues.[302]

> ### e.    *Plaintiffs' Speculation About Post-Divestiture Competition and Divested Stores Being Sold Off*

111.    Plaintiffs offered no testimony or evidence that the divested stores would be unable to compete post-merger. Their divestiture expert, Edward Fox, identified various challenges C&S would face (many of the same challenges any grocery retailer faces) but refused to offer an opinion as to whether C&S's post-merger retail business would be unable to compete: "Q: Professor Fox, you never concluded in your expert reports that C&S is likely to fail as a divestiture buyer, do you? A: *No. I rendered no opinion on the likelihood of failure.*"[303] And Plaintiffs' economic expert, Dr. Hill, conceded that in light of C&S's planned price investments and capital improvements, "[i]t is possible that they will do better than the existing stores" would under Albertsons' management.[304]

112.    Dr. Fox's opinions on the potential challenges C&S may face are of little value to the Court. Dr. Fox has never worked on a divestiture, never studied divestitures, has no knowledge of private label practices, and has no knowledge of past divestiture deals.[305] Dr. Fox's testimony and the record evidence contradicts his claims that C&S will experience significant challenges.[306]

---

[302] Tr. (Cosset (Kroger)) 2407:3-2408:13; *see also* DX 2238 at 183; DX 1727 ███████████
███████████.
Tr. (Fox) 1336:8-12 (emphasis added).
[304] Tr. (Hill) 1541:15-21.
[305] Tr. (Fox) 1337:20-23, 1339:24-1343:7, 1347:22, 1352:21.
[306] Dr. Fox authored an article before he was retained as an expert by Plaintiffs in this case expressing skepticism of Plaintiffs' traditional supermarket theory. DX 2641. Dr. Fox asserted that "the increased prominence of supercenters and warehouse club stores potentially broadens the relevant competitive set beyond the traditional grocery retailers." DX 2641 at 1; Tr. (Fox) 1354:2-1356:16. Dr. Fox also wrote that "emerging channels offer different mixes of nonperishable and perishable grocery products, potentially blurring the lines of competition and the outlets considered when grocery shopping" and that there is "little doubt that supercenters, in particular Walmart supercenters, are key competitors to traditional grocery stores." DX 2641 at 1-2; Tr. (Fox) 1356:19-13658:2.

113.    *First*, Dr. Fox testified that C&S will experience challenges with its private label program as it would lack the scale and scope of the private label program at Kroger and Albertsons, focusing on C&S's manufacturing capabilities. But Dr. Fox never conducted a systematic or comprehensive analysis measuring the extent to which food retailers outsource or self-produce their private labels.[307] Dr. Fox did not benchmark his analysis against any retailers other than Albertsons, which itself outsources more than 90% of its private label manufacturing.[308] Dr. Fox was unaware that Walmart outsourced close to 100% of its private label manufacturing and that Target, Trader Joe's, Raley's, Sprouts, and Winco all outsource 100% of their private label manufacturing.[309]

114.    *Second*, Dr. Fox testified that C&S may face difficulties building brand equity due to challenges in establishing a loyalty program. Dr. Fox conceded, however, that highly successful retailers like H-E-B, Trader Joe's, and Aldi do not have traditional loyalty programs.[310]

115.    *Third*, Dr. Fox testified that rebannering will present challenges, but those opinions were based on limited case studies that excluded rebannerings that are just as, if not more, relevant than those Dr. Fox chose to highlight.[311]

116.    *Fourth*, Dr. Fox testified about challenges with C&S's planned investment and timeline in retail media networks, but he conceded that he did not use any benchmarks when forming his opinion.[312] And he conceded that Costco launched a retail media network in June 2024 and that Aldi had recently announced its intention to explore launching a retail media network.[313]

---

[307] Tr. (Fox) 1342:23-1343:7.
[308] Tr. (Fox) 1340:2-6, 1343:1-7.
[309] Tr. (Fox) 1340:7-1342:21.
[310] Tr. (Fox) 1344:25-1346:17.
[311] Tr. (Fox) 1348:6-1352:21.
[312] Tr. (Fox) 1353:13-21.
[313] Tr. (Fox) 1353:5-12.

117.    Moreover, regardless of whether Mr. Fox's assessment of the risks C&S may face is accurate, he ignored that C&S has already considered—and accounted for—those risks in its comprehensive business plans. C&S's business plans recognize, for example, that the company ██████████████████████████████████████████████[314] And C&S has already put into motion a plan to expand its private label offerings, including price investments, marketing, and development.[315] The company has similarly accounted for risks related to its loyalty and digital programs, and has already engaged or begun interviewing technology vendors, including Nielsen, to assist in developing its in-house loyalty systems and other data analytics resources.[316] Its business plans also account for the cost of rebannering, and to address rebannering risks, ████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████.[317]

118.    With no fact or expert witness testimony in support, Plaintiffs' counsel have speculated that C&S may sell off stores after the divestiture, presumably to turn a quick buck selling the real estate.[318] But Plaintiffs presented no evidence that C&S planned to do so or even that such a strategy would be financially viable. To the contrary, with a purchase price of $2.9 billion and underlying asset values of only roughly $2 billion, C&S would "lose $900 million if [it] did that."[319] And the contention that C&S might be able to turn a profit through any wholesale business gained through the sale is purely speculative and unsupported by any economic analysis.

---

[314] DX 1058 at 49.
[315] Tr. (McGowan (C&S)) 1064:10-1065:9; DX 1058 at 3 ████████████████████████ ████████████████.
       Tr. (McGowan (C&S)) 1065:12-1066:8; DX 1058 at 3, 60 ██████████████████████████ ████████████████.
       DX 1058 at 45-51; *see* Tr. (McGowan (C&S)) 1027:20-1040:6.
[318] Tr. (Plf. Opening) 68:10-12.
[319] Tr. (Winn (C&S)) 1251:7-24.

Instead, the evidence shows that C&S has "never contemplated selling them"[320] and is "not going to be sale-leasebacking these stores."[321]

119.    Susan Morris, the current COO of Albertsons who will become the CEO of C&S retail, testified that she asked the equity owner of C&S directly the plans for the stores before signing on. "Because this—I've made this my life. Right? And I care about our company. I care about our people. I care about our stores ... . I asked [Mr. Cohen] directly if this was a 'Are you going to buy them and sell them off?' because I'm not interested in that, and he said 'Absolutely not. We want to be in the grocery business.'"[322] As C&S's CEO, Eric Winn, bluntly put it, Plaintiffs' suggestion that C&S plans to walk away from its $2.9 billion investment is "a bit insulting … we wouldn't be doing everything we're doing if that was just our plan."[323]

**D.    Consumer Benefits, Cost Savings, and Other Efficiencies from the Merger**

**1.    Overview**

120.    The merger will generate significant cost savings and increased revenue for the combined company, which will in turn enable Kroger to invest $1 billion in incremental increases in wages, $1.3 billion in capital improvements, and $1 billion in lower prices on a run rate basis.[324]

121.    As Kroger's CMO made clear: "[O]n day one we will start reducing prices on 28 items; 90 days later on 650 items …. By the end of year four we will be at a billion dollars run rate. I just want to be clear on that point. A billion dollars. That's not just within the four years. That will be every year beyond that."[325] "Every year customers will save a billion dollars versus

---

[320] Tr. (Winn (C&S)) 1208:19-1209:7.
[321] Tr. (Winn (C&S)) 1208:19-1209:7.
[322] Tr. (Morris (Albertsons)) 1914:16-1915:3.
[323] Tr. (Winn (C&S)) 1251:11-13.
[324] *See* Tr. (McMullen (Kroger)) 1619:13-23, 1621:6-9; Tr. (Aitken (Kroger)) 1836:21-1837:12, 1838:9-14; DX 2239 (Schedule 9.1); *see also* DX 1254 at 5.
[325] Tr. (Aitken (Kroger)) 1836:25–1837:8, 1898:22–1899:15; DX 2237 at 2.

where they are today."[326] Kroger "is going to invest in wages … our customers will benefit in many different ways with lower prices, better service, and a better in store experience."[327]

122.    All of this will be supported through annual efficiencies of up to ████████ resulting from cost savings and revenue enhancements within four years of closing.[328] The merger will achieve these efficiencies by lowering a range of sourcing costs ████████████;[329] lowering supply chain and manufacturing costs ████████████;[330] lowering administrative costs ████████████;[331] improving margins by expanding the penetration and range of private label products at Albertsons stores ████████████;[332] improving top-line revenue growth at Albertsons stores by increasing, among other things, private label offerings ████████████;[333] increasing pharmacy revenue at Albertsons stores by, among other things, converting Albertsons' pharmacy to Kroger's pharmacy platform (████████████);[334] and increasing non-grocery revenue streams ████████████[335]

123.    Kroger's ████████ efficiencies estimate was validated through the work of multiple outside consultants—Bain & Co., A.T. Kearney, and Boston Consulting Group—who extensively analyzed Kroger's and Albertsons' data, including their competitive data in a "clean

---

[326] Tr. (McMullen (Kroger)) 1616:22-23.
[327] Tr. (Sankaran (Albertsons)) 1799; DX2237 ████████████████████████.
[328] DX 1727 at 15 ████████████████████████; Tr. (Maharoof (Kroger)) 2067:12-2068:16.
[329] Tr. (Maharoof (Kroger)) 2073:14-2074:5 (goods for resale and good not for resale); *id.* at 2075:19-24 (technology); Tr. (Gokhale) 2135:17-2136:3 (fuel); DX 1727 at 15.
[330] Tr. (Maharoof (Kroger)) 2074:6-2075:12; DX 1727 at 15.
[331] Tr. (Maharoof (Kroger)) 2075:13-18; DX 1727 at 15.
[332] Tr. (Maharoof (Kroger)) 2073:3-13; DX 1727 at 15.
[333] Tr. (Maharoof (Kroger)) 2070:25-2071:16; DX 1727 at 15.
[334] Tr. (Maharoof (Kroger)) 2072:11-2073:2.
[335] Tr. (Maharoof (Kroger)) 2071:17-2072:10; DX 1727 at 15.

room."[336] Clean-room analysis is common in merger transactions to allow the parties to assess whether the merger would be beneficial from a business perspective without exchanging information that could enable coordinated pricing.[337]

124.    As Plaintiffs' own finance and economics expert acknowledged, this analysis was performed to determine whether the deal made business sense, not for purposes of litigation.[338] These consultants took a conservative approach in analyzing the merger's efficiencies, as it was critical that there be "high confidence" in achieving the efficiency numbers.[339]

### 2.    Kroger's Culture of Cost Savings and Use of Non-Grocery Revenue to Invest in Pricing

125.    For Kroger to be successful in the highly competitive grocery industry environment, it must lower prices and close the gap with Walmart, whose "unprecedented scale" allows it to "buy goods cheaper than anybody else" and offer "lower prices."[340] Kroger must also lower prices to keep pace with Costco and Amazon.[341] Reducing costs and lowering prices is "vital" for Kroger to compete with these large competitors with national coverage.[342]

126.    Lowering costs has long been "inherent" in Kroger's business plan.[343] Kroger does "thousands of things" every day to "reduce costs."[344] Those cost savings are then invested in aspects of Kroger's business, such as pricing, associate benefits, and improved supply chain.[345]

127.    Importantly, Kroger has also focused on increasing revenue—including non-

---

[336] Tr. (Maharoof (Kroger)) 2076:1-2077:18; DX 1727 at 15.
[337] Tr. (Yeater) 3285:20-3286:11.
[338] Tr. (Yeater) 3287:12-17; *see also* Tr. (Maharoof (Kroger)) 2078:2-19.
[339] Tr. (Maharoof (Kroger)) 2076:25-2077:6; DX 1727 at 15.
[340] Tr. (Sankaran (Kroger)) 1701:1-20; Tr. (McMullen (Kroger)) 1588:13-18.
[341] Tr. (Aitken (Kroger)) 1836:17-20; Tr. (Cosset (Kroger)) 2264:16-25.
[342] Tr. (Aitken (Kroger)) 1836:10-20.
[343] Tr. (Aitken (Kroger)) 1831:19-21; DX 2970 at 27.
[344] Tr. (McMullen (Kroger)) 1591:8-16.
[345] Tr. (McMullen (Kroger)) 1591:8-16.

grocery revenue—through the longstanding "flywheel model" ███████████████
████.[346] The start of the flywheel is Kroger's grocery business: sales and loyalty data from
Kroger's grocery customers enable Kroger to produce customer insights that Kroger can sell to
producers and manufacturers to help them market more effectively to consumers.[347] Kroger's
Chief Information Officer explained the "flywheel" concept succinctly: "[T]he core business
drives traffic, drives loyalty with customers, which generates data. That data fuels the alternative
profit portfolio. That portfolio then generates profits that can be reinjected and invested in our
business … hence, creating … momentum."[348] By lowering prices for its retail grocery business,
Kroger generates more grocery sales, thus more data, thus more alternative revenue, and more
money overall. Plaintiffs have never contested the role non-grocery revenue plays in Kroger's
competitive positioning, including its ability to compete with Walmart, Costco, and Amazon.

### 3.    The Merger Will Reduce Kroger's Costs

128.    The merger will result in significant cost savings for the combined company, which
Kroger plans to pass on to customers and associates.

129.    *Sourcing.* Kroger and Albertsons pay different prices for the same products, even
when procuring that product from the same vendor.[349] The merger would allow the combined
company to negotiate prices to reduce gaps between the two, lowering overall costs.[350] In
particular, the merged entity will achieve sourcing cost efficiencies for the products it sells to
consumers ("goods for resale"), products it purchases for its own use ("goods not for resale"), and

---

[346] DX 2970 at 9.
[347] Tr. (Cosset (Kroger)) 2243:2-23; DX 2971 at 115; DX 2970 at 16. Kroger does not sell its
customers' data. Tr. (Cosset (Kroger)) 2241:5-18.
[348] Tr. (Cosset (Kroger)) 2243:19-23; DX 2970 at 16; *see also* DX 813 at 66; DX 1727 at 47; DX
2730 at 23; DX 3013 at 7; PX 6009 at 4; PX 6024 at 7.
[349] Tr. (Maharoof (Kroger)) 2073:24-2074:5.
[350] Tr. (Maharoof (Kroger)) 2073:24-2074:5.

contracts with technology vendors.[351]

130.    *Supply Chain and Manufacturing.* Kroger and Albertsons will also achieve supply chain and manufacturing efficiencies from combining their complementary geographic footprints.[352] Following the merger, the combined company will have the "opportunity to reconfigure the [distribution and manufacturing] network, enabling the combined company to manufactur[e] products closer to the stores and provide fresh products to customers sooner" while still achieving "cost savings."[353] Using Kroger's capabilities to increase the percentage of in-bound transportation that is retailer-owned will also result in transportation cost savings.[354]

131.    *Technology.* Kroger also expects the combined company will renegotiate contracts with companies like Oracle and Microsoft that supply technology to both Kroger and Albertsons so the combined company's contracts are closer to the lower end of the two prices Defendants separately pay.[355]

### 4.    The Merger Will Increase Kroger's Revenue

132.    The combination will also enable the company to generate incremental revenue.[356] Among other things, the merger will provide "national coverage, which will help us grow our e-commerce and our loyalty platform and generate data that we can monetize, which is critical for us to continue to remain relevant in the alternative profit business and compete with" Amazon, Walmart, and Costco, "who have been particularly effective at establishing a competitive advantage in this field."[357] In the grocery industry, e-commerce requires physical proximity,

---

[351] Tr. (Maharoof (Kroger)) 2073:14-2075:5, 2075:19-24.
[352] Tr. (Gokhale) 2129:1-21.
[353] Tr. (Maharoof (Kroger)) 2074:6-23.
[354] Tr. (Maharoof (Kroger)) 2074:24-2075:12.
[355] Tr. (Maharoof (Kroger)) 2075:19-24.
[356] Tr. (McMullen (Kroger)) 1628:3-10; Tr. (Aitken (Kroger)) 1830:4-9.
[357] Tr. (Cosset (Kroger)) 2262:1-10; DX 1528 at 1; *see also* DX 2730 at 3; DX 2731 at 126; PX 1502 at 13; DX 3012 at 7.

because food spoils. The merger will give Kroger nationwide scope to compete with other retailers who already have coast-to-coast coverage.[358] These additional revenue streams "allow[] [Kroger] to fuel the investment in the company" with lower prices and higher wages.[359]

133.    Kroger will be able to achieve further synergies and better serve customer demand through enhanced merchandising, including by increasing the market penetration of private label brands at the combined company. Kroger and Albertsons each perform well in different categories of private label brands.[360] For instance, Kroger's spices and salty snacks private label products perform better than Albertsons', whereas Albertsons' multicultural private label products perform better than Kroger's.[361] Increasing the penetration of private label products will generate additional grocery revenue for the combined company.

134.    Kroger will also see incremental revenue increases in its health and wellness business. Kroger's prescriptions per week are about 80% higher than Albertsons'; by leveraging in-store processes and prescription management software that enables Kroger to better connect with customers, it will be able to increase prescription sales at the acquired Albertsons stores.[362]

135.    Indeed, as discussed below, Plaintiffs' finance and economics expert, Mr. Yeater, did not dispute this determination because he never even analyzed the magnitude of the proposed revenue synergy and alternative profit streams—even though non-grocery revenue is a key part of Kroger's business model that drives lower prices.[363]

---

[358] Tr. (Cosset (Kroger)) 2264:2-5, 2266:10-25; *see also* DX 2970 at 16; DX 2730 at 41-42; DX 1254 at 9.
[359] Tr. (Cosset (Kroger)) 2264:3-15.
[360] Tr. (Maharoof (Kroger)) 2070:19-2071:8.
[361] Tr. (Maharoof (Kroger)) 2071:9-16. Mr. Gokhale explained that he did not have the data to verify the merchandising efficiencies even though he considered them to be merger-specific. But he further explained that he "expect[s] the parties will be able to achieve" this synergy. Tr. (Gokhale) 2137:1-6.
[362] Tr. (Maharoof (Kroger)) 2072:11-2073:2.
[363] Tr. (Yeater) 3282:15-3283:18; *see also* PX 1502 at 7, 13, 21.

### 5.    Expert Analysis of Efficiencies Under the Merger Guidelines

136.    Rajiv Gokhale, Defendants' expert in financial economics, analyzed Kroger's projected synergies and conservatively estimates that ████████████████ in efficiencies (of the ████████ estimated) are verifiable and merger specific, meaning they are "likely to be accomplished with the proposed merger and unlikely to be accomplished in the absence of … the proposed merger."[364]

137.    Mr. Gokhale determined that these efficiencies were merger-specific and verified them through "reasonable means" (2010 Merger Guidelines) or through "reliable methodology" (2023 Merger Guidelines).[365] Specifically, Mr. Gokhale determined that Kroger and its consultants' process for estimating synergies were likely to generate reasonable results. That determination was based on his detailed review of Kroger and Albertsons' data; granular plans of strategies to achieve key synergies categories (*e.g.*, "fact packs"); the consultants and Defendants' analyses and plans; the models underlying those plans and fact packs; deposition transcripts of relevant Albertsons' personnel; and interviews with Kroger's personnel and consultants.[366]

---

[364] DX 2736 (Gokhale Rep.) ¶¶ 13(a), 24 & tbl.3; Tr. (Gokhale) 2113:1-2115:6. To place this in context, in a horizontal merger case, the Merger Guidelines provide that evidence of a merger's efficiencies may rebut a presumption that the transaction is likely to substantially lessen competition. 2010 FTC DOJ Horizontal Merger Guidelines § 10. The 2023 Merger Guidelines have never been adopted by any court. In any event, the claimed efficiencies would nevertheless be cognizable as merger-specific, verifiable, and accruing to the benefit of competition under the 2023 Merger Guidelines. *Infra* __; DX 2736 (Gokhale Rep.) ¶ 18. In order for an efficiency to be credited as part of its rebuttal case, the efficiency should be (1) "merger-specific," meaning it is "likely to be accomplished with the proposed merger and unlikely to be accomplished in the absence of … the proposed merger"; and (2) "verif[ied] by reasonable means." 2010 FTC DOJ Horizontal Merger Guidelines § 10.

[365] Tr. (Gokhale) 2113:6-2119:7. Under the 2010 Merger Guidelines, the likelihood and magnitude of the efficiency, how and when the efficiency would be achieved, how the efficiency would enhance the merged firm's ability and incentive to compete, and why the efficiency would be merger-specific must be verified through "reasonable means." And under the 2023 Merger Guidelines, efficiencies should be credited where they "have been verified, using reliable methodology and evidence not dependent on the subjective predictions of the merging parties."

[366] Tr. (Gokhale) 2115:12-18, 2116:1-6.

138.    Mr. Gokhale's calculation of the synergies cognizable under the Merger Guidelines was conservative: a "minimum starting point" of what Defendants will likely achieve.[367]

139.    While Mr. Gokhale could not verify all efficiencies, based on the data available at the time of his report, he determined that ████████████ to ████████████ were merger-specific and testified that he "fully expect[s] that the parties will be able to actually achieve the merger[] specific efficiencies numbers."[368]

140.    By comparing his estimate of cognizable efficiencies against benchmarks from prior transactions, Mr. Gokhale concluded that Defendants will likely achieve efficiencies *higher* than what he was able to verify.[369]

141.    With respect to sourcing cost savings from procuring grocery products for resale to consumers, Mr. Gokhale determined that ████████████████ savings in national brand sourcing, ████████ in own brands sourcing, and ████████ in fresh products sourcing were merger-specific and verifiable, and thus cognizable under the Guidelines.[370] The sourcing savings largely come from "price discovery" that would otherwise not occur absent the merger: the merger gives the combined company visibility into whether Kroger and Albertsons gets a lower price, which helps the company negotiate better prices from suppliers.[371]

142.    Kroger will also generate significant cost savings in other areas. Mr. Gokhale determined that ████████ of supply chain and manufacturing synergies were cognizable under the Guidelines.[372] Combining "two independent networks that are at least a little bit overlapping or serve customers in each other's space … then optimizing the network will lead to a better

---

[367] Tr. (Gokhale) 2114:12-21.
[368] Tr. (Gokhale) 2114:12-21; DX 2736 (Gokhale Rep.) tbl. 3.
[369] Tr. (Gokhale) 2118:7-2119:7.
[370] DX 2736 (Gokhale Rep.) ¶¶ 74-132 & tbl.3.
[371] Tr. (Gokhale) 2116:13-2117:8, 2120:2-2124:19.
[372] DX 2736 (Gokhale Rep.) ¶¶ 156-204 & tbl.3.

network and will lead to an overall lower cost network."[373] Combining Kroger's operations more on the eastern side of the country and Albertsons' operations enables the combined firm to manufacture products closer to the ultimate destination of these stores and better utilize their combined scale, and therefore, manufacture products more efficiently.[374] Additionally, Mr. Gokhale determined that Kroger would realize ███████ in cognizable administrative labor efficiencies—that is, scale efficiencies achieved from combining the companies' administrative headcount—and ███████ in cognizable fuel sourcing efficiencies.[375]

143.    On the revenue side, Mr. Gokhale determined that ███████ in revenue from alternative, non-grocery profit streams was merger-specific and verified.[376] Kroger has "20 years of data science capability" which enable it "to target or help CPGs or others list ads or incentives on their websites or apps," which in turn generates incremental, non-grocery revenue for Kroger.[377] Meanwhile, Albertsons has a "similar, more fledging business that launched in 2018 and relaunched in 2022"; Albertsons is "a fair bit behind Kroger both in expertise and actual implementation" of its business.[378] Combining the companies will generate incremental non-grocery revenue by bringing Albertsons' data onto Kroger's platform.[379]

144.    As Mr. Gokhale explained, his conclusions regarding the efficiencies are the same under the 2010 Merger Guidelines and the 2023 Merger Guidelines.[380] That analysis included consideration of the 2023 Guidelines' two new competition-related factors.[381] Plaintiffs offered no

---

[373] Tr. (Gokhale) 2129:15-21.
[374] Tr. (Gokhale) 2130:14-20.
[375] DX 2736 (Gokhale Rep.) ¶¶ 205-214 & tbl.3; Tr. (Gokhale) 2133:11-2134:4, 2135:20-25.
[376] DX 2736 (Gokhale Rep.) ¶¶ 233-241 & tbl.3.
[377] Tr. (Gokhale) 2138:12-16.
[378] Tr. (Gokhale) 2138:17-21.
[379] Tr. (Gokhale) 2138:24-2139:4.
[380] Tr. (Gokhale) 2110:15-21.
[381] Tr. (Gokhale) 2111:13-2112:7.

testimony addressing these factors or rebutting Mr. Gokhale's testimony.

145.    Plaintiffs' expert, Mr. Yeater, did not offer any alternative calculation of the merger's efficiencies or benefits.[382] He testified that he did not find any problems or flaws with any of the underlying data or the analysis the consultants performed.[383] And he admitted he did not analyze the parties' projected revenue synergies, which alone approach ████.[384]

146.    Instead, analyzing only the merger's cost efficiencies, Mr. Yeater opined that most of those efficiencies were not verifiable or merger-specific.[385] He opined that the merger would not reduce Kroger and Albertson's sourcing costs because price discovery would make no difference in negotiations with consumer goods companies, who are "sophisticated negotiators."[386] But the sole consumer goods company witness Plaintiffs offered (Mr. Crane from Smucker's) testified that knowledge of the company's promotional and trade funding practices as they relate to other customers *would* give its customers a significant advantage in future negotiations.[387] And Mr. Yeater altogether ignored evidence from other consumer goods companies showing that trade or promotion funds (essentially, rebates against the list price of goods for resale) are ████████ ████████████████████████████████.[388] Ultimately, Mr. Yeater admitted that "price discovery would be valuable information."[389]

147.    Mr. Yeater concluded that other efficiencies were not verifiable because they were calculated based on data that he believed was "proprietary to BCG" and he "[did]n't have access

---

[382] Tr. (Yeater) 3288:6-21.
[383] Tr. (Yeater) 3240:17-25.
[384] Tr. (Yeater) 3282:15-3283:18.
[385] Tr. (Yeater) 3241:17-25.
[386] Tr. (Yeater) 3267:12-3268:4.
[387] Tr. (Crane (Smucker's)) 2573:11-2574:12.
[388] PX 5017 ¶ 34; Tr. (Yeater) 3302:4-25.
[389] Tr. (Yeater) 3298:6-12.

to the data."[390] But despite asking Plaintiffs' counsel for access to "all the information that was used to produce the calculation," Plaintiffs' counsel did not provide it to him, notwithstanding that Boston Consulting Group was deposed in this case.[391]

148.    Even for those efficiencies Mr. Yeater did analyze, he did not offer any alternative calculations or apply any objective measure or standard.[392] Instead, he concluded only that the assumptions underlying Defendants' efficiency calculations "didn't seem reasonable" based on his "experience" and "training in the topics relevant to the questions here."[393] But Mr. Yeater has no experience or training in the grocery industry, efficiencies, merger transactions, or auditing financial information that would support his conclusions.[394]

149.    Mr. Yeater also opined that Kroger's estimates of its past price investments may have been overstated if the mix of purchased products had changed, but conceded that he had seen no evidence that it had and "certainly [did]n't challenge the data" Kroger used in its calculations.[395]

### E.    Plaintiffs' Retail Grocery Markets

#### 1.    Plaintiffs' Inconsistent Approach to the Relevant Market

150.    Plaintiffs' Complaint identified only one relevant grocery product market: "The retail sale of food and other grocery products in *traditional supermarkets and supercenters*" (or "supermarkets").[396] Plaintiffs alleged that "[s]upermarkets allow customers to purchase most or all of their food and grocery shopping requirements in a single trip to a store" offering substantial products in a long list of categories.[397] Plaintiffs further alleged that supermarket customers "would

---

[390] Tr. (Yeater) 3284:2-8.
[391] Tr. (Yeater) 3284:19-3285:15.
[392] Tr. (Yeater) 3272:7-9, 3294:4-25.
[393] Tr. (Yeater) 3294:13-25.
[394] Tr. (Yeater) 3276:18-3277:24.
[395] Tr. (Yeater) 3279:3-3281:9.
[396] ECF No. 1 ("Compl.") ¶ 43 (emphasis added).
[397] *Id.* ¶ 45.

not shift a significant enough volume of purchases" to non-supermarket retail formats—"Club stores," "Limited assortment stores," "Premium natural and organic stores," "Dollar stores," and "E-commerce retailers"—"because these non-supermarket retail offerings provide a very differentiated customer experience."[398] Plaintiffs continued to focus on this "supermarket" market in its pre-hearing papers.[399]

151.    Although acknowledging that the "supermarket" market was the only one alleged in the Complaint,[400] Plaintiffs' expert Dr. Hill introduced in his report and at the hearing the concept of a "large format" market that includes several categories of retailers Plaintiffs exclude from their "supermarket" market.[401] This "large format" market ████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████[402] Plaintiffs described this "large format" market in their pre-hearing briefing as only a "sensitivity test."[403]

152.    Plaintiffs' theory regarding the proper geographic markets also changed over time. In Dr. Hill's opening expert report, he defined the relevant geographic markets by drawing circles around each "focal" store representing their "catchment" area.[404] After Defendants' economic expert, Dr. Israel, pointed out the flaws with that approach in his expert report, Dr. Hill in his rebuttal report offered an entirely new approach to geographic market premised on "customer-based" diversion calculated at the Census Block Group level.[405] Plaintiffs did not mention this

---

[398] *Id.* ¶ 48.
[399] *See generally* ECF No. 204 at 22-32.
[400] Tr. (Hill) 1505:15-24.
[401] PX 7004 (Hill Rep.) ¶ 67.
[402] PX 7004 (Hill Rep.) ¶ 67.
[403] ECF No. 385 (Pls. PI Reply Br.) at 3-5 ("Plaintiffs offer a broader product market definition—large format stores … as a sensitivity test").
[404] *See* PX 7004 (Hill Rep.) ¶¶ 101-102 & n.131.
[405] Tr. (Hill) 1468:19-25.

"customer-based" approach in their motion for preliminary injunction and raised it on reply only as "another sensitivity test."[406]

153.    Plaintiffs' shifting market theories ultimately left their own expert to testify that "I don't know what [Plaintiffs'] exact view of the world is."[407]

### 2.    Plaintiffs' "Supermarket" Market

154.    Plaintiffs' "supermarket" market excludes key competitors of Kroger and Albertsons—club stores, like Costco; premium natural and organic stores, like Whole Foods; value stores, like Aldi; and e-commerce retailers, like Amazon.com.[408]

155.    Grocery retailers and their customers do not view "traditional supermarkets and supercenters" as operating in a distinct market. Kroger, Albertsons, and the companies excluded from the "supermarket" market view each other as competitors,[409] and customers see their offerings as interchangeable.

156.    Expert analyses by Dr. Israel confirm this point. As Dr. Israel explained, a properly defined market asks what the set of close competitors are for any given store.[410] "And the way we define 'close competitors' is who are the close substitutes?"[411] "So the question of substitution is if Kroger attempted to increase price or reduce quality after the merger, where would shoppers turn to buy some or all of their groceries?"[412] The share of wallet and other data analyzed by Dr. Israel indicates that if Kroger raises prices post-merger, customers will substitute some of their

---

[406] Plf. PI Reply Br. 7.
[407] Tr. (Hill) 3514:3-6.
[408] Tr. (Hill) 1445:4-10; PX 7004 ¶¶ 33-37, 67.
[409] Tr. (Oblisk (Whole Foods)) 2291:24-2293:5; Tr. (Heyworth (Amazon)) 2804:10-20; Tr. (Lieberman (Walmart)) 2339:3-5; Tr. (Yates (Ahold Delhaize)) 2187:15-22; Tr. (George (Costco)) 2011:10-12.
[410] Tr. (Israel) 2622:18-25.
[411] Tr. (Israel) 2623:1-2.
[412] Tr. (Israel) 2623:8-10.

purchases at a wide range of grocery retailers, including club stores.[413]

157.    As Dr. Israel found, the "supermarket" market excludes important competitors, which artificially inflates Defendants' market shares.[414] To analyze substitution store by store, Dr. Israel employed the "EGK" model.[415] EGK is an economic model presented in a peer-reviewed journal that was developed long before this case to study competition and substitution in the grocery industry.[416] The EGK model takes into account many different variables—including the store's format, the location of the store, and the demographics of a given area. In effect, the EGK model combines the product market and geographic market analyses without having to define markets ex-ante.[417] In short, the EGK model "brings all [the variables] together and actually measures substitution."[418] Dr. Israel noted that the grocery retail industry is "rare" in the market definition sense in that there is already "a tool that does this for us."[419]

158.    The EGK model yields diversion ratios, which measure how customers substitute among grocery stores.[420] "So once you've run the model, you now have the ability for any store in the country to ask … , 'If that store were to raise its price by 5 or 10 percent, where would people go?'"[421] Because the EGK model accounts for a range of store characteristics, it does not require selecting some stores to include or exclude based on geography alone. With the EGK model, "you don't have to draw a circle to start with. You don't have to say this banner is in or out. For every store, you can figure out, based both on product and geography, what are the closest substitutes."[422]

---

[413] Tr. (Israel) 2624:1-7.
[414] Tr. (Israel) 2592:9-15.
[415] Tr. (Israel) 2625:20-2628:24.
[416] Tr. (Israel) 2627:5-8.
[417] Tr. (Israel) 2627:9-14, 2628:15-24,   2629:19-22.
[418] Tr. (Israel) 2669:17-18.
[419] Tr. (Israel) 2627:17-19.
[420] Tr. (Israel) 2629:2-3.
[421] Tr. (Israel) 2629:4-8.
[422] Tr. (Israel) 2630:2-5.

159.    Dr. Israel concluded that Plaintiffs' "supermarket" product market is too "narrow" because "[t]here's too much substitution across formats" that the market fails to account for.[423] Dr. Israel explained this as to each of the categories of grocery retailers excluded from Plaintiffs' "supermarket" market:

160.    *Club stores.* Dr. Israel determined that "club stores are a bigger source of diversion overall" than supercenters, yet they would be omitted from Plaintiffs' "supermarket and supercenter" market.[424] For example, Sam's Club and Costco combine for a diversion ratio of 13.2% from Kroger and Albertsons, yet all supercenters combined have a diversion ratio of only 12.7%.[425] One reason for this is that club stores attract Kroger and Albertsons' customers from greater distances. Actual customer data and EGK both show that customers are willing to travel much greater distances to shop at a club store than a supermarket—a point Plaintiffs' expert acknowledges.[426] "Costco, Sam's Club … can compete from much farther away, and it really draw[s] from a bigger area than supermarkets."[427] Dr. Hill, conceded that the entry of a new Costco in an area has the same effect on Kroger's sales as a new Albertsons store has.[428]

161.    *Premium, natural, and organic stores.* Dr. Israel's analysis confirms that "there is substantial diversion between the Parties … and Whole Foods."[429] He confirmed that 5.3% of the diversion for Kroger stores in overlap areas is going to Whole Foods, Trader Joe's, and Sprouts.[430] An Albertsons entry study confirms that when a Whole Foods opens near an Albertsons, "Whole

---

[423] Tr. (Israel) 2636:5-9.
[424] Tr. (Israel) 2637:20-24 (noting that in Dr. Israel's analysis, 13.2% of diversion goes to club stores, while 12.7% goes to supercenters).
[425] DX 2623 at tbl.4.
[426] Tr. (Israel) 2630-2632 .
[427] Tr. (Israel) 2630:23-25.
[428] Tr. (Israel) 2643:14-18; PX 7006 (Hill Rebuttal Rep.) ¶ 118 & fig.24; *see also* DX 2213 ██████████████████████ . DX 2623 (Israel Rep.) ¶ 106.
[430] Tr. (Israel) 2638:10-15.

Foods' entry can actually have a bigger effect even than Walmart in some cases."[431]

162.    *Value retailers.* Dr. Israel also showed "substantial diversion" between Kroger and Albertsons and value stores like Aldi and Trader Joe's.[432] Dr. Israel confirmed the importance of limited assortment retailers through ordinary course documents and data. Dr. Israel found that Aldi was ███████████████████████████████████████████████████████████ ███████████████████████████████████.[433] Albertsons documents show that 22% of its customers were also shopping at Aldi.[434] Notably, Dr. Israel also found that Walmart—the primary driver of Kroger's pricing—has a strategy to ██████████████████████████████████████████████ █████████████████████████[435]

163.    Leaving these competitors, including Costco, Whole Foods, and Aldi, out of the "supermarkets" market is inappropriate because doing so decreases and effectively ignores the real-world "competitive pressure" that Kroger and Albertsons stores face.[436]

164.    *Plaintiffs' One-Stop Shop Theory.* To justify the exclusion of these competitors, Plaintiffs relied on a "one stop shopper" theory—that "[s]upermarkets allow customers to purchase most or all of their food and grocery shopping requirements in a single trip to a store" an experience other grocery formats allegedly do not offer.[437] Plaintiffs' hypothetical shopper: a 35- to 45-year old female visiting a single store "so she can virtually buy everything she needs in that one stop

---

[431] Tr. (Israel) 2642:16-20.
[432] DX 2623 (Israel Rep.) ¶ 106.
[433] DX 2623 (Israel Rep.) ¶ 92-93.
[434] Tr. 2643 (Israel).
[435] DX 2623 (Israel Rep.) ¶ 301 n.335.
[436] Tr. (Israel) 2644:23-25. Dr. Hill testified that as a general matter, firms price-check other firms with whom they compete. Tr. (Hill) 1515:8-13. In his rebuttal report, Dr. Hill calculated Kroger's top-20 most price-checked competitors. Tr. (Hill) 1515:15-23. On that list, Whole Foods ranks third, Aldi ranks fourth, and Sprouts ranks fifth. Tr. (Hill) 1516:11-13. Thus, following Dr. Hill's own logic that firms price check the other firms with whom they compete, Plaintiffs' "traditional supermarkets" definition disregards three of Kroger's top-five most price-checked competitors.
[437] Compl. ¶ 45.

shop,"[438] or a "Johnny Shopper" who is picking up items for dinner for his wife on the way home is a relic of the past.[439] Plaintiffs' own expert, Dr. Hill, did not limit his analysis to the alleged tiny subset of grocery customers that still "one-stop shop."

165.    In any event, the evidence was clear that a multitude of formats offer a reasonably interchangeable substitute for one-stop shopping.

166.    Plaintiffs' one-stop shopper theory is belied by real-world evidence and their own economic expert. For one, customers wanting to do a one-stop shop are not limited to "traditional" grocery stores. Kroger's data alone shows that customers now shop "between four and five different stores a month." [440] A customer could do a weekly shop "at most competitors today"— "A banana is a banana is a banana. Bread, milk, eggs, sugar, you can buy at Costco, Trader Joe's."[441]

167.    Albertsons' customers shop for groceries, on average, six times at six different places in a given week.[442] "[I]f they were engaging in one-stop shopping, the number of trips for the week would be one."[443] This data confirms that the one-stop shopper fails to accept the reality of the "change in the retail landscape in the last 20 years."[444]

168.    Dr. Hill did not dispute that all the relevant competitors were one-stop shops.[445] In fact, Dr. Hill refused to offer testimony about Plaintiffs' one-stop shop theory: "I don't know what else the Government says about a one-stop-shop. I'm just not familiar with their definition of it. I

---

[438] Tr. (Van Helden) (Stater Bros)) 175:16-18.
[439] Tr. (Kammeyer (Kroger)) 480:7-11.
[440] Tr. (Aitken (Kroger)) 1811:20-1812:9.
[441] Tr. (Aitken (Kroger)) 1815:17-20; Tr. (Broderick (Albertsons)) 1422:15-1423:11 (Walmart, Amazon, Costco offer "all the same categories that we offer . . . and then some").
[442] Tr. (Kinney (Albertsons)) 2928:14-15; DX 2090.
[443] Tr. (Kinney (Albertsons)) 2930:7-11; Tr. (Curry (Albertsons)) 898:4-9.
[444] Tr. (Aitken (Kroger)) 1811:20-1812:9. *See also* Tr. (Kinney (Albertsons)) 2930-31.
[445] Tr. (Hill) 1508:9-22.

did my own independent market definition. I'm not sure what they did."[446] When asked whether Whole Foods is a one-stop shop, Dr. Hill replied that he did not look into it because "I don't think it is relevant."[447]

### 3.    Plaintiffs' "Large Format" Store Market

169.    Though not pled in Plaintiffs' complaint, Dr. Hill also put forth a "large format" store market. Although this market includes club, organic, and value stores, it still excludes e-commerce retailers, a significant part of the modern grocery retail landscape that is ██████ ████████████████████████████████████[448] *See* FOF § B.1. Plaintiffs have—to date— offered no clear indication of whether they believe "large format" is a relevant antitrust market, instead describing it only as a "sensitivity" test.

170.    But even if this market were properly before the Court, Dr. Hill failed to appropriately define its geographic boundaries. Dr. Hill initially defined the geographic market for each focal store by determining that store's 75% "catchment area," an arbitrary percentage based on how far customers are supposedly willing to travel to shop at a Kroger or Albertsons store (but not a supercenter or club store) for which he offers no economic justification.[449] He then drew a circle around the focal store using double that radius.[450] Finally, he identified all stores within that circle and assigned each store competitive weight based purely on its estimated share of sales within that circle.[451] All stores outside the circle by even a meter are ignored.[452]

171.    Dr. Hill's circles are both under- and over-inclusive.

---

[446] Tr. (Hill) 1509:1-4, 1511:25-1512:1.
[447] Tr. 1511 (Hill).
[448] DX 2623 (Israel Rep.) ¶ 273.
[449] *See* PX 7004 (Hill Rep.) ¶ 101 & n.131; *see also* Tr. (Hill) 1454:10-1455:9, 1456:13-1457:1.
[450] PX 7004 (Hill Rep.) ¶ 105, fig.20; Tr. (Hill) 1454:10-1455:9, 1456:13-1457:1.
[451] PX 7004 (Hill Rep.) ¶ 112.
[452] Tr. (Hill) 3410:19-3411:5.

172.    *Underinclusive.* Dr. Hill's large-format geographic markets are underinclusive because real-world data shows that certain competitors draw customers from farther away than Dr. Hill's circle radius. For club stores and supercenters that draw customers from a larger area than a Kroger store, "the circle would have to be … potentially much bigger," and "so one circle is not going to capture the market."[453] "[T]his sort of just 'drop a circle' blanket rule omits competitors in a lot of cases, and doesn't consider club stores and supercenters, and so on, correctly."[454]

173.    For instance, Costco customer data shows that it draws customers ███████████ ████████ a Kroger or Albertsons store.[455] Yet for a Fred Meyer in Portland, Oregon for which Dr. Hill draws a 5-mile radius circle based on *Fred Meyer's* catchment area, Dr. Hill excludes a Costco just 5.6 miles away, even though the data shows that Costco's catchment areas are larger than Kroger's.[456] Thus, as Dr. Hill conceded, Costco is "the single biggest competitor of Kroger" in that area, yet his circle analysis does not consider Costco a competitor.[457]

174.    Similarly, under Dr. Hill's framework, all the stores in Albany, Oregon—one town over from the Fred Meyer in Corvallis—are given zero competitive weight in Dr. Hill's analysis. But the data from Dr. Israel's EGK analysis shows that 22% of sales diversion at that Fred Meyer would go outside Dr. Hill's circle drawn around Corvallis to stores like the Safeway, Target, Walmart, and Costco in Albany.[458] An analysis that completely overlooks the competitors that make up nearly a quarter of a store's sales diversions does not capture real-world competition.

175.    *Overinclusive.* Dr. Hill's circles are also overinclusive because they assign undue competitive significance to Kroger and Albertsons stores near the boundary of the circle that are

---

[453] Tr. (Israel) 2631:19-24.
[454] Tr. (Israel) 2646:1-11.
[455] DX 2623, Table 9.
[456] Tr. (Israel) 2646:17-2647:9.
[457] Tr. (Hill) 3410:19-3411:5.
[458] Tr. (Hill) 2634:17-24.

Page 66 –    DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

often miles away from the focal store, diluting the importance of competitors located closer to the focal store that may have lower overall sales but greater competitive significance.[459] In total, Dr. Hill has 250 markets in which the next closest Defendant store is more than five miles away and 60 markets where Defendants' stores are separated by more than 10 miles.[460] In other words, there are a large number of markets where Dr. Hill combines the shares of Defendants' stores that do not likely actually compete with each other. Similarly, certain of Dr. Hill's markets include hundreds of stores—far more than the competitive set a Defendant store would actually compete closely against.[461]

176.    These examples illustrate the arbitrariness of using a circle to define a geographic market. As witness after witness confirmed, trade areas are not simple circles. Walmart explained that a trade area "is not a circle"; rather, it "depend[s] on roads, geographic features," and consumer preferences that differ for each market.[462] Plaintiffs' own witness for Stater Brothers conceded that to determine a trade area it looks to a number of factors like geography, highway infrastructure, and the nature of the competitors.[463] The more accurate way to think about competitive geography is that it resembles "more of a splat than it does a circle."[464]

177.    After Dr. Israel pointed out the many deficiencies in Dr. Hill's "circle" approach, Dr. Hill offered in his rebuttal report an entirely new methodology for the geographic component of market definition, using what he called a "customer-based" approach.[465] Dr. Hill conceded that this market was "nowhere" in his opening expert report.[466]

---

[459] DX 2623 (Israel Rep.) ¶ 147.
[460] Tr. 2648; DX 2623 at figs. 11-13.
[461] DX 2623 at fig. 20.
[462] Tr. (Lieberman (Walmart)) 2353.
[463] Tr. (Van Helden (Stater Bros.)) 211:21-212:12.
[464] Tr. (Aitken (Kroger)) 1814:12-16.
[465] PX 7006 (Hill Rebuttal Rep.) ¶¶ 32-34.
[466] Tr. (Hill) 3411:22-25.

178.    This approach calculates market share by looking at the amount of sales each grocery retailer makes to customers in a given Census Block group.[467] But Dr. Hill conceded that he lacked the data necessary for this analysis: for the significant *majority* of grocery retailers, he had no data showing where their customers lived because only a "very small number of firms" produced loyalty card data.[468]

179.    In any event, Dr. Hill's customer-based approach never answers the ultimate question—whether the merger will harm competition—because Dr. Hill never performed any competitive effects analysis.[469]

### 4.    Competitive Effects

180.    The evidence showed that regardless of the market definition selected, the merger is unlikely to result in higher prices or reduced quality for consumers.

181.    *Walmart, Not Albertsons, Disciplines Kroger's Prices.* The evidence showed that today, the main constraint on Kroger's prices is Walmart, and Plaintiffs presented no evidence that this constraint would disappear after the merger. Walmart typically has "the lowest price in the market,"[470] and Kroger is "monomaniacally" focused on Walmart in its pricing.[471] Kroger aims to price "very close to Walmart."[472] Kroger price-checks Walmart on a weekly, sometimes daily basis, and benchmarks nearly all of its program and non-program pricing (approximately 98% of its sales) to Walmart.[473] Unsurprisingly, the relationship between Kroger pricing and Walmart pricing is strong and holds regardless whether there is an Albertsons nearby; Albertsons has no

---

[467] Tr. (Hill) 1525:13-15.
[468] Tr. (Hill) 1526:13-16.
[469] Tr. (Hill) 3412:1-7.
[470] Tr. (Sankaran (Albertsons)) 1699.
[471] Tr. (Aitken (Kroger)) 1819:21-25; DX 813 at 43, 56; DX 2730 at 3.
[472] Tr. (Groff (Kroger)) 309:21-310:4.
[473] Tr. (McMullen (Kroger)) 1587:9-14.

incremental effect on Kroger's pricing beyond Walmart's effect.[474]

182.    The evidence Plaintiffs presented only confirmed Kroger's Walmart-focused pricing strategy. Dr. Hill's analysis of Kroger's price check data showed that Kroger's prices were correlated to Walmart at nearly three times the strength of Albertsons' prices, which Dr. Israel testified was a "low level" of correlation that did not stand out among other competitors in the market.[475] Indeed, Plaintiffs' expert, Dr. Hill, admitted that he did not do *any analysis whatsoever* on whether Walmart will cease to be the number one price determinant for Kroger after the merger.[476] Dr. Hill's failure to examine the economic reality of Kroger's competition on price renders his opinions on competitive effects divorced from the actual facts.

183.    The data shows that Albertsons, by contrast, has no effect on Kroger's prices. To examine whether Albertsons has any effect on Kroger's pricing, Dr. Israel looked at the real-world differences between places where Kroger and Albertsons compete and the places where they do not. *Cf. FTC v. Staples*, 970 F. Supp. 1066, 1076-77 (D.D.C 1997) (employing a similar analysis presented by the FTC). His analysis found that "real world data shows that Albertsons does not affect Kroger pricing. Kroger pricing does not look different when Albertsons is present or absent."[477] If Albertsons truly constrained Kroger's pricing, one would expect that Kroger's prices would be lower in places with an Albertsons nearby than places without an Albertsons. But the real-world data shows otherwise: "[T]here is no statistically significant—really no measurable effect of Albertsons' presence on Kroger pricing."[478]

184.    Kroger price-checks Albertsons in some areas as a "high-price retailer," which

---

[474] Tr. (Israel) 2600:14-2602:14, 2609:10-14; DX 2942 (Israel Appx. D) ¶ 4 & tbl.1.
[475] Tr. (Hill) 1552:13-19, 2610:3-2611:4.
[476] Tr. (Hill) 1552:2-6.
[477] Tr. (Israel) 2594:19-22.
[478] Tr. (Israel) 2615:12-26, 2616:10.

serves "as a guardrail, to make sure its prices aren't higher than that."[479] Kroger does not raise prices based on price-checks against high-priced retailers; instead, its high-priced retailer rule serves only as a "point of reference" that affects prices only when the higher-priced retailer offers prices at Kroger's pricing level. In practice, Kroger's prices are consistently lower than Albertsons', so Albertsons' impact on Kroger's prices is "very, very minimal."[480] Post-merger, Kroger will choose another retailer in areas where Albertsons fills that role today.[481]

185.    Kroger's CEO testified that if Albertsons went out of business tomorrow, Kroger would not be able to raise prices because "[o]ur base competitor that we're looking at pricing is Walmart and the spread to Walmart …. [I]f we raised our prices that much, we would lose a significant amount of business to … Aldi, Walmart, Costco, and others."[482]

186.    *GUPPI and CMCR*. To measure the competitive effects of the merger, Dr. Israel employed a competitive effects methodology called a multi-product Gross Upward Pricing Pressure (GUPPI) model, whereas Dr. Hill used the CMCR methodology.[483] Each expert then used the other's method.

187.    The difference between the two models is academic—a "kind of a 'Fahrenheit versus Celsius' thing."[484] The two models are "very similar" because they each are used to "combine diversions … as the key measure of substitution with profit margins to form a measure of whether the proposed merger leads to … significant upward pricing pressure to have a concern."[485] "[T]he multi-product GUPPI and the CMCR are literally derived from the exact same

---

[479] Tr. (Israel) 2604:20-25.
[480] Tr. (Groff) 326:18.
[481] Tr. (Groff) 327:-328; Tr. (Israel) 2606:16-2067:1.
[482] Tr. (McMullen (Kroger)) 1589:22-1590:8.
[483] Tr. (Israel) 2663:1-18.
[484] Tr. (Israel) 2668:18-22.
[485] Tr. (Israel) 2663:1-7.

equations"; "[i]t's just the … multi-product GUPPI gives an answer in terms of price pressure, and the CMCR converts that into a marginal—a cost number."[486] Both models applied by Dr. Hill and Dr. Israel employ a 5% threshold before any competitive effects are inferred.[487] The results of each model were consistent with the other.

188.    The key difference between Dr. Hill's and Dr. Israel's CMCR and GUPPI analyses is not their choice of model, but rather, their choice of inputs—in particular, which margins they used. The simple idea is the lower your profit margin, the less you can afford to lose customers by raising your prices.[488]

189.    The difference in margins is critical. Dr. Hill used *gross* margins—which do not account for costs (like labor) that increase as more units are sold—and concluded that there are 1,500 problematic stores post-merger.[489] But if Dr. Hill had used *variable* margins—which account for such costs—that number goes down to 693 stores.[490] When accounting for the divested stores, that number goes down to four.[491] And if you do the analysis at the level at which Kroger actually sets prices, the number falls to zero.[492] A key question, then, is whether gross or variable marginal rates should be used.

190.    As Dr. Israel points out, in calculating profits, gross margins improperly exclude many categories of variable costs like hourly labor, supplies, warehousing, transportation, and packaging.[493] In prior cases, Dr. Hill has advocated for the use of variable margins to calculate competitive effects. *See United States v. Bertelsmann SE & Co.*, 646 F. Supp. 3d 1, 43 n.30 (D.D.C.

---

[486] Tr. (Israel) 2663:13-18.
[487] Tr. (Israel) 2663:22-25.
[488] Tr. (Israel) 2667-2688.
[489] Tr. (Israel) 2686:23-2687:2.
[490] Tr. (Israel) 2687:23-2688:5.
[491] Tr. (Israel) 2687:17-2688:5.
[492] Tr. (Hill) 1542:8-11.
[493] Tr. (Hill) 1534:10-19.

2022).[494] Dr. Hill agreed in this case that the correct margin for a competitive effects analysis is the margin that captures variable costs to the extent one can.[495] Kroger accounts for variable costs, including the costs that Dr. Hill excludes from his margins, when making pricing decisions.[496]

191.    An analysis that ignores all variable costs does not capture what will happen post-merger. To analyze a firm's incentive (or lack thereof) to raise prices, "we have to know not only how many sales does the merger partner capture, but how much does it cost the merger partner."[497] Ignoring variable costs inflates Kroger's post-merger margins and overstates estimated competitive harm—which direct evidence shows will be negligible at most.[498]

192.    In analyzing competitive effects, Dr. Israel used variable margins from Kroger's capital finance group.[499] The variable margins used by Dr. Israel are based directly on the numbers Kroger used in the ordinary course of business to make investment decisions and long-range planning[500] (with some conservative adjustments).[501] These variable margins are rooted in a simple thought experiment: when a store's sales increase, how much do its costs increase, and thus how much incremental profit will Kroger generate?[502] Unlike Dr. Hill's gross margins,[503] the variable margins that Dr. Israel used capture all variable costs, including labor costs, supplies, and credit

---

[494] *See also* Tr. (Hill) 3397:10-14, 3399:4-9.
[495] Tr. (Hill) 1532:10-17.
[496] Tr. (Groff (Kroger)) 333:10-334:3.
[497] Tr. (Israel) 2670:17-19.
[498] DX 2623 (Israel Rep.) ¶ 244. Indeed, other retailers have testified that consumers would benefit if the merger resulted in lower prices for consumers in those retailers' markets. Tr. (Van Helden (Stater Brothers)) 217:4-7; *see also* Tr. (Knopf (Raley's)) 975:24-976:8. Indeed, Dr. Israel testified that when he uses the proper inputs, i.e., using "the GUPPIs and CMCRs correctly, you get no concern for harm, which is consistent, not surprisingly, with what the direct evidence tells us." Tr. (Israel) 2689:10-12.
[499] Tr. (Israel) 2670:24-2671:10.
[500] Tr. (Israel) 2670:24-2671:10; Tr. (Maharoof) 2088:12-2095:21.
[501] Tr. (Israel) 2729:13-2730:2.
[502] Tr. (Israel) 2670:24-2671:10, 2674:18-2676:7.
[503] *See* Tr. (Maharoof) 2087:22-23; Tr. (Israel) 2671:15-2673:8.

card fees.[504] As Dr. Israel explained, the variable margins used by Kroger in the ordinary course are an "ideal variable margin" and answer "exactly the question you need for a GUPPI or a CMCR."[505] The accuracy and reliability of these variable margins is completely uncontested; Plaintiffs asked Mr. Maharoof zero questions about them.

193.    Dr. Hill attempted to support his use of gross margins by looking at cost increases that Albertsons experienced as a result of increased sales during a ten-day strike of a nearby King Soopers.[506] But Dr. Hill admitted he only looked at store-level costs and did not look at how much of Albertsons' costs during that strike were borne at the division or enterprise level, which would greatly affect the calculation of variable margins.[507] Indeed, Albertsons documents from the strike show substantial division and enterprise level costs as it brought in "hot shot teams" from other stores outside of the area affected by the strike.[508] Dr. Hill's isolated analysis of variable margins at *Albertsons* during a ten-day strike, where he lacked necessary cost information, does not undermine Dr. Israel's reliance on ordinary course Kroger capital finance documents.

194.    Dr. Israel conducted a separate study that found variable margins almost precisely matching Kroger's capital finance documents.[509] Unlike Dr. Hill's ten-days of data, Dr. Israel examined six months of cost and sales data following two permanent QFC store closures in Seattle and found 17.5% variable margins—nearly identical to Kroger's capital finance figures.[510] This near-exact match was too close to be coincidental. Nonetheless, Dr. Hill raised two technical points in rebuttal, neither of which produced margins close to those he used in his competitive effects

---

[504] Tr. (Maharoof) 2087:17-21.
[505] Tr. (Israel) 2673:9-16, 2674:18-2676:7.
[506] Tr. (Hill) 3399:13-3400:17.
[507] Tr. (Hill) 3402:5-3404:22.
[508] Tr. (Hill) 3403:9-3404:22.
[509] Tr. (Israel) 2674:18-2675:9; 2678:3-19.
[510] Tr. (Israel) 2674:18-2675:9; 2678:3-19.

analysis.[511]

195.    Additionally, Dr. Israel's competitive effects analysis appropriately accounted for the divestiture.[512] That is because "what a GUPPI or a CMCR do[es] is take margins and diversions as they exist to look at what the competitive situation is today, and then they change who owns the firms and say what … happens to prices when some of the firms are jointly owned."[513] "The divestiture addresses nearly all markets in which the Parties have high combined market shares, according [even] to Dr. Hill's analysis."[514]

196.    Dr. Israel's analysis shows that, accounting for the diversion ratios, variable margins, and divestiture, "the overwhelming majority of the stores, all but two of the stores, have a GUPPI below the 5 percent safe harbor."[515] The "vast majority" of the stores have a GUPPI below 3%.[516] And if Dr. Israel considers Kroger's price zones in his analysis—which is how Kroger *actually* sets prices—all of the stores are below 5%.[517]

197.    Finally, Dr. Hill "insufficient[ly] focus[ed] on the extreme importance of Walmart in [the grocery] industry," particularly Walmart's pricing strategy.[518] "Kroger is laser-focused on Walmart. It sees Walmart as the fulcrum of its efforts to compete," which indicates that "Walmart will be … the firm that Kroger is chasing" post-transaction.[519]

198.    Dr. Israel, on the other hand, conducted a regression analysis that "looked at Kroger prices as they relate to Albertsons' prices," the results of which indicate that Albertsons prices

---

[511] Tr. (Hill) 3378:3-3379:19; 3405:2-20.
[512] Tr. (Israel) 2682:5-2684:10.
[513] Tr. (Israel) 2682:8-12.
[514] DX 2623 (Israel Rep.) ¶ 181 & fig.29.
[515] Tr. (Israel) 2684:12-18.
[516] Tr. (Israel) 2684:19-21.
[517] Tr. (Israel) 2684:22-2685:5.
[518] Tr. (Israel) 2591:1-20.
[519] Tr. (Israel) 2591:4-10; *see also* Tr. (Israel) 2596:19-2611:18 (discussing Kroger's pricing strategy as driven by Walmart and discussing the data underlying the analysis).

have "a much lower level of correlation with Kroger than Walmart …. Albertsons isn't a store that stands out. Walmart is the store that stands out as really driving things."[520] Ultimately, "Albertsons today is farther behind Walmart. [It cannot] target them with pricing as well," and so by Kroger taking over Albertsons and "shifting to Kroger's demonstrated strategy of getting close to Walmart, that would lead to lower Albertsons prices."[521]

199.    Because Walmart is the key constraint on Kroger, "Albertsons is not an important constraint on Kroger's pricing."[522] Indeed, Dr. Hill failed to "mak[e] use of real-world pricing data, where we have a … good and unique ability" to answer the key question "'How does Kroger price when it does or does not face competition from Albertsons?'"[523] Those areas exist today, but Dr. Hill fails to utilize them at all in his analysis.[524]

200.    At bottom, "the prices that Walmart sets, drive Kroger pricing, and that's not affected by whether there's an Albertsons there or not, both in that the Walmart relationship remains true, with or without an Albertsons, and that Kroger prices, Kroger margins, are not different at all in areas with or without an Albertsons."[525]

201.    *Economic Incentive*. Finally, Dr. Hill's analysis failed to analyze Kroger's economic incentive to raise prices post-merger after accounting for the flywheel model. Because of Kroger's larger alternative revenue streams, it can actually make more money by lowering prices, increasing consumer traffic, and enhancing its non-grocery revenue as compared to Albertsons. *See* FOF § D.1-5. Thus, Kroger's incentive to raise prices post-merger must be evaluated alongside its incentive to drive non-grocery revenue by lowering prices. Dr. Hill's failure

---

[520] Tr. (Israel) 2610:5-13.
[521] Tr. (Israel) 2591:13-17.
[522] Tr. (Israel) 2591:22-2592:7.
[523] Tr. (Israel) 2591:25-2592:4.
[524] Tr. (Israel) 2592:5-7.
[525] Tr. (Israel) 2619:3-10.

to analyze this renders his opinion on the likely economic effects unreliable.

**F.    Plaintiffs' "Union Grocery Labor" Theory**

**1.    The Proposed Market**

202.    Plaintiffs' Complaint alleged a "union grocery labor" market, contending that "Kroger and Albertsons compete aggressively with one another to hire and retain grocery workers, principally through collective bargaining negotiations with local unions (i.e., the process by which workers, through the unions that represent them, negotiate agreements with their employers that determine the terms and conditions of employment)."[526]

203.    Plaintiffs' economic experts offered no opinion on this proposed market. Plaintiffs' labor economic expert agreed he was "not actually offering any opinions on market definition."[527] No witness testified that grocery workers at unionized retail grocers would hesitate to switch to a non-grocery job or non-union job if their wages decreased by a small but significant amount.

204.    Instead, the unrebutted evidence showed that the market for labor is much broader than union grocery labor.[528] "Employees can and frequently do switch to alternative employers, and the alternative employers that they switch to are frequently outside of union grocery. They are not necessarily unionized employers, and they are not necessarily grocery."[529]

205.    For instance, ███████████████ employees who come to Kroger and Albertsons have prior work history in the retail grocery industry.[530] Employees frequently start

---

[526] Compl. ¶ 7.
[527] Tr. (Ashenfelter) 3342:23-25.
[528] Tr. (McCrary) 3064:11-16.
[529] Tr. (McCrary) 3064:11-16; DX2705A.
[530] DX 2739 (McCrary Rep.) ¶ 108; *see also* Tr. (McPherson (Kroger)) 623:22-624:5; Tr. (Dosenbach (Albertsons)) 2514:10-2515:11; Tr. (Broderick (Albertsons)) 1424:18-1425:14 (for Albertsons' Denver division stores, no prior experience is required for entry level work and most of its skilled labor in the meat and floral departments are trained in-house).

their career at Kroger and Albertsons.[531] For those who have prior work history, more than 95% of Kroger and Albertsons employees come from non-union positions or from outside the grocery industry, and a similarly high percentage of employees who leave Kroger and Albertsons go to non-union or non-grocery positions.[532] Of the top 20 most common previous employers for Albertsons and Kroger workers who had prior employment experience, most "are outside of union grocery."[533]

206.    Kroger and Albertsons' employees often come from and leave to non-grocery and non-union employers because the skills required in many of Kroger and Albertsons' positions— like cashiers or clerks—are transferrable to a wide variety of other jobs.[534] Most positions at Kroger and Albertsons are entry level jobs that require only "general skills"—"the ability to show up on time for your shift," "[r]eliability," "[c]ustomer service," "the ability to work well with other people and to communicate effectively."[535] And these are skills that "would be in demand at a

---

[531] DX 2739 (McCrary Rep.) ¶ 113 & Ex. 9 (70% of employees list Kroger or Albertsons as their first employer); Tr. (McPherson (Kroger)) 626:17-25 ("there's a lot of opportunities in entry-level jobs for people. A lot of people will come out of high school as their first job, and then they leave to go to college"); Tr. (Dosenbach (Albertsons)) 2514:10-19 ("lot of our employees, it's their first job. They will come to us at 16 years old, and it is something that I'm quite proud of. You see people who start at a young age, first job, and they go.").

[532] DX 2739 (McCrary Rep.) ¶¶ 108-14 & Exs. 9-10; Tr. (McCrary) 3082:16-3083:7, 3084:8-20; Tr. (McPherson (Kroger)) 627:1-628:19 (Kroger's exit survey report shows that associates leave Kroger for retailers outside the grocery retailer as well as to non-union grocery retailers); *see also* DX 2705A.

[533] Tr. (McCrary) 3076:1-5.

[534] Tr. (McCrary) 3068:14-3069:1, 3077:19-3078:7; Tr. (McPherson (Kroger)) 624:12-17; 1425:15-1426:4 (Albertsons' Denver division competes against "[e]veryone" for labor, including ski resorts, hotels, home improvement centers, restaurants, other grocery retailers); Tr. (Dosenbach (Albertsons) 2513:24-2514:94 (Albertsons hires entry-level positions so they are not focused on any specific experience); *id.* 2515:10-2516:3 (Many employees start working at Albertsons as their first job and for frontline hires, Albertsons look for individuals with a service background—"if you work at Bestbuy, if you work at Home Depot, if you work at Lowe's, if you work at McDonald's, those are the types of skills—Kohl's, JC Penney, that service background is helpful in coming to work for our company.").

[535] Tr. (McCrary) 3066:22-3067:3; Tr. (Dosenbach (Kroger)) 2514:1-19.

wide variety of alternative employers and a broader labor market."[536]

207.    If there were indeed a labor market specific to union grocery, one would expect to see job switching between Kroger and Albertsons.[537] Defendants' labor expert Dr. McCrary tested Plaintiffs' theory and found that there is little job-switching between Kroger and Albertsons. In fact, only 1-2% of Kroger and Albertsons' employees move between the firms.[538]

208.    Plaintiffs offered no expert or lay testimony to refute this.

209.    Witnesses consistently testified that Kroger and Albertsons compete in a broad market for labor, competing for talent with businesses like McDonald's Chipotle, Home Depot, Lowe's, and Macy's.[539]

210.    Plaintiffs' counsel sought to characterize positions at Kroger and Albertsons as requiring specialized skills, such as meat cutters.[540] But the evidence showed that those positions make up less than 1-2% of the in-store positions.[541] Plaintiffs have not advanced (much less shown) a separate union grocery labor market for a subset of employees with meat cutting skills.

211.    The evidence also showed that wages are the principal competitive metric when grocery retailers seek to attract workers.[542] Union "members get medical benefits starting at six months" and improve with seniority.[543] And union pensions vest after five years.[544] Six months after hiring, before either medical or retirement benefits vest, a "majority" of workers will have

---

[536] Tr. (McCrary) 3066:10-13; *see also id.* at 3065:8-3070:4, 3076:22-3077:5.
[537] Tr. (McCrary) 3084:17-20 (the data is "roughly opposite what you would expect" if union grocery was a distinct market).
[538] DX 2739 (McCrary Rep.) Ex. 9; Tr. (McCrary) 3084:7-16; Tr. (McCrary) 3083:12-3084:20.
[539] Tr. (McPherson (Kroger)) 625:5-11; Tr. (Broderick (Kroger)) 1425:22-1426:1; Tr. (Dosenbach (Kroger)) 2512:4-13.
[540] *See* Tr. (McPherson (Kroger)) 665:2-666:7.
[541] Tr. (McCrary) 3069:7-11.
[542] Tr. (McCrary) 3075:7-21.
[543] Tr. (Zinder) 748:17-750:4.
[544] Tr. (McPherson) 663:18-19.

left Kroger and Albertsons.[545] And, one year after hiring, 72% of Kroger workers and 71% of Albertsons workers have left their jobs, indicating that the vast majority of workers leave before accruing any union benefits at all.[546] "96 percent of job postings" by Albertsons and Kroger do not mention whether the position is unionized, indicating "that's not an important aspect of how to attract applicants."[547]

212.    Employer and union behavior confirms there is no distinct market for union grocery labor. ███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████.[548] When unions negotiate with Kroger, for instance, they regularly highlight wages and benefits being offered by non-union employers.[549] Plaintiffs' own union witnesses highlighted the lack of a distinct market. UFCW Local 555 testified that it is common for Local 555 to identify non-union employers that are offering attractive benefits as a baseline for Local 555's negotiations.[550] Meanwhile, UFCW Local 324 testified that Local 324's negotiations with non-grocery employers such as Disney, CVS, and RiteAid impact the union's contract negotiations with Kroger.[551]

## 2.    The Proposed Geographic Market

213.    Plaintiffs offered no evidence defining their proposed geographic markets—so-called "CBA areas"—described in their Complaint as geographic areas covered by a collective bargaining agreement with either Kroger or Albertsons.[552] Those purported geographic markets

---

[545] Tr. (McCrary) 3072:20-24.
[546] Tr. (McCrary) 3073:1-4.
[547] Tr. (McCrary) 3074:23-3075:6.
[548] DX 2739 (McCrary Rep.) ¶¶ 131, 106; *see also* DX 0114; DX 1213; DX 2361; PX 1323; Tr. (Dosenbach (Albertsons) 2522:3-20.
[549] Tr. (Dosenbach (Albertsons)) 2532:7-12.
[550] Tr. (Clay (UFCW Local 555)) 678:15-19.
[551] Tr. (Zinder (UFCW Local 324)) 800:9-801:9; *see also* DX 2955 at 3.
[552] Compl. ¶¶ 84-86.

bear no relationship to the realities faced by job-seekers,[553] and Plaintiffs' economic expert did not even attempt to defend them.[554]

214.    As Dr. McCrary explained, the boundaries of a given CBA reflect many factors that are not related to the underlying market and do not correspond to the reasonable interchangeability of labor demand.[555] "CBA areas don't really describe where workers are looking for employment …. [I]t is not really measuring that concept at all. If you look at CBA areas, sometimes they are large—too large, really, to be the kind of distance that a worker would be expected to commute. Sometimes they are too small. And sometimes they just have internal contradictions."[556] And that is because CBA areas are gerrymandered and drawn from historical perspectives and not based on where workers are willing to travel for work.[557]

215.    For example, a CBA area under Plaintiffs' definition would include San Diego, Los Angeles, and Bakersfield, which is "not a reasonable approach from an economic perspective" for an alternative area for workers considering other employment.[558] No grocery worker living in San Diego would view a union grocery position more than 200 miles away in Bakersfield to be a closer substitute than a local non-union position.

216.    Another CBA area under Plaintiffs' definition would include Longmont and Loveland, Colorado; this is an example of a CBA area that is too small, as the distances in question would cover only a 20-minute drive and plainly leave out alternative jobs that a worker would reasonably consider.[559]

---

[553] Tr. (Zinder (UFCW Local 324)) 796:20-797:14.
[554] DX 2739 (McCrary Rep.) ¶ 138 (citing Hill Rep. ¶ 253).
[555] DX 2739 (McCrary Rep.) ¶¶ 148-49; *see also* DX 2740 (King Rep.) ¶¶ 17-26; Tr. (McCrary) 3086:23-3087:1, 3087:21-3088:3; *see also* Tr. (Zinder (UFCW Local 324)) 798:4-799:1.
[556] Tr. (McCrary) 3064:1-7, 3087:3-7.
[557] Tr. (McCrary) 3064:19-3065:5, *see also id.* at 3036:1-7; DX 2750 (King Rep.) ¶ 23.
[558] Tr. (McCrary) 3087:11-3088:3.
[559] Tr. (McCrary) 3088:5-19.

217.    As Albertsons' senior vice president of labor relations, Dan Dosenbach, who has spent nearly 30 years in labor relations and negotiated hundreds of agreements for Albertsons, explained, the geographic areas covered by collective bargaining agreements have "huge variances,"[560] with some 500 miles wide, others only 25-30 miles "and everything in between."[561] Dosenbach noted that "CBA area" "is not a term that I've used."[562]

218.    Defendants' labor relations expert, Dr. Roger King, confirmed that the term "CBA area" is not a recognized term in labor law and that there is virtually no relationship between geography and a bargaining unit.[563] The bargaining unit covered in a single collective bargaining agreement could "be a single department in a retail food store …. It could consist of all departments …. [I]t could be a single store. It could be multiple stores. It could be a metropolitan area. It could cut across state lines. It could include various counties."[564] Plaintiffs' own union witness, with more than 40 years of bargaining experience, also testified that she was not familiar with the term "CBA area."[565]

### 3.    Competitive Effects

219.    "[T]he merger is not likely to lead to harm for workers."[566] Plaintiffs offered no expert witness regarding the likely competitive effects of the merger. Plaintiffs' expert, Dr. Ashenfelter, confirmed that he was "not offering any opinion in this case that the proposed transaction between Kroger and Albertsons is likely to substantially lessen competition in any relevant labor market."[567]

---

[560] Tr. (Dosenbach (Albertson)) 2518:23.
[561] Tr. (Dosenbach (Albertson)) 2518:20-2519:3.
[562] Tr. (Dosenbach (Albertson)) 2518:17-19.
[563] Tr. (King) 2842:1-7, 18-20.
[564] Tr. (King) 2842:1-7, 2840:10-2841:23.
[565] Tr. (Zinder (UFCWUFCW Local 324)) 796:21-23.
[566] Tr. (McCrary) 3092:15-16.
[567] Tr. (Ashenfelter) 3353:23-3354:3.

220.    Comparing areas where union Kroger and Albertsons stores overlap to those where they do not, Dr. McCrary determined that "wages are the same in between areas where there is overlap versus areas where there is not," indicating that "wages would be expected to be the same in the post-merger world."[568] Dr. McCrary's analysis confirmed that the same conclusion holds for other aspects of compensation beyond wages, including benefits and hours worked.[569] Dr. Ashenfelter conceded that "[he] didn't analyze this set of issues."[570]

221.    This analysis does not change based on union bargaining tactics. Those tactics are tools that unions use to put pressure on employers during the collective bargaining agreement negotiation process.[571] There are many tactics that unions can use during CBA negotiations.[572] Dr. McCrary's analysis shows that the availability of certain tactics used by unions where Kroger and Albertsons overlap—including strike threats and whipsaw bargaining—does not impact outcomes in CBA negotiations.[573] These overlap-specific tactics affect the *process*, but do not affect the *outcomes*, of CBA negotiations.[574] This is true for both wage, and non-wage CBA terms.[575]

222.    Moreover, Dr. McCrary's expert report shows that there is no plausible threat of significant substitution of workers between Kroger and Albertsons in the event of a strike.[576] Plaintiffs' also ignore the presence of C&S and Dr. Israel's analysis of competition in the product market when they assert that substitution of consumers between Kroger and Albertsons would

---

[568] Tr. (McCrary) 3094:20-3095:5.
[569] Tr. (McCrary) 3099:24-3100:10.
[570] Tr. (Ashenfelter) 3349:1922.
[571] Tr. (Zinder (UFCW Local 324)) 778:16-19.
[572] Tr. (Zinder (UFCW Local 324)) 778:20-784:5.
[573] Tr. (McCrary) 3101:17-3103:10.
[574] Tr. (McCrary) 3103:3-10.
[575] Tr. (McCrary) 3103:3-10.
[576] DX 2739 (McCrary Rep.) ¶ 209 & App'x I; Tr. (McCrary) 3101:17-3103:10. Indeed, *any* closure of a Kroger store, regardless of whether such a closure results from a strike, could impact Albertsons stores. Tr. (Huntington (Albertsons)) 538:4-5.

reduce the effectiveness of a strike post-merger.[577]

223.    If anything, a larger union at a single merged entity would likely have even *greater* bargaining power, or the ability to impose costs on employers, than unions in the relevant "CBA areas" enjoy today. As expert analysis shows and testimony from Plaintiffs' union witnesses acknowledges, ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████[578]

224.    Strikes and other union bargaining tactics will therefore actually be *more* effective tools for workers of the post-merger company "because they are going to be utilized with a larger bargaining unit" and "[t]here is going to be a lot more of an economic clout, an ability [for] the union to … economically cripple the target employer."[579] "When you have a larger bargaining unit, you have more leverage" because "the larger the employer bargaining unit, the greater the economic impact on that employer" from a strike.[580]

### 4.    Unions in Divested Stores

225.    Union leaders have made clear to their members that Kroger and C&S will honor all existing collective bargaining agreements and have specifically assured their members that "[y]our wages will follow the same progression, your healthcare will be in place, and your retirement will be secure."[581] C&S cannot unilaterally change the wages or benefits after a collective bargaining agreement expires.[582] Nor could it refuse to comply with the terms of the

---

[577] DX 2739 ¶ 213.
[578] DX 2740 (King Rep.) ¶¶ 44, 59; Tr. (Dosenbach (Albertsons)) 2505:6-11; Tr. (Zinder (UFCW Local 324)) 787:9-25 (testifying that a larger membership increases a union's negotiating leverage); *see also* DX 2840 at 1.
[579] Tr. (King) 2851:1-13.
[580] *See* Tr. (Dosenbach (Albertsons)) 2530.
[581] DX 912 at 3 (UFCW Local 555 March 2024 newsletter to members).
[582] Tr. (King) 2856:8-10.

collective bargaining agreements.[583] Rather, unions will have the same opportunity to negotiate different terms with C&S, just as they would have with Kroger.[584]

226.    Upon the expiration of a collective bargaining agreement, "[a]ll the terms and conditions of employment continue even though the labor agreement has expired."[585] "In the federal area of jurisprudence and labor law and common law, every term and condition of [an] expired agreement, but for a very few minor exceptions, continues."[586]

227.    Defendants' labor expert, Mr. King, testified that union employees will not see reduced wages, benefits, seniority, pension funds, pension benefits, or non-transferable benefits under their CBAs.[587] Plaintiffs agreed: "Mr. King primarily focuses on whether employees would have the same protection under labor law post acquisition. We agree with him. They will."[588]

228.    Importantly, if the merger does not go through, then every customer or dollar that Kroger and Albertsons lose to Walmart or Amazon or Costco—which are largely non-unionized[589]—would be supporting a non-union shop. And if Albertsons was forced to close or sell stores, union workers likely would struggle to find another unionized grocery job.[590] Plaintiffs' witness, UFCW Local 555, agreed that one of its largest concerns was that if the merger was not consummated, "then Albertsons' private equity owners could sell the company" and the buyer

---

[583] Tr. (King) 2856:11-13.
[584] Tr. (McPherson (Kroger)) 668:3-21; Tr. (Clay (UFCW Local 555)) 716:11-15. UFCWUFCW
[585] Tr. (King) 2855:3-4.
[586] Tr. (King) 2855:10-13.
[587] Tr. (King) 2857:5-21.
[588] Tr. (Plf. Closing) 3464:24-3465:2.
[589] Tr. (McMullen (Kroger)) 1574:16-25; *see also* Tr. (Dosenbach (Albertsons)) 2522:10-11; DX 2731 at 61-62.
[590] DX 912 at 3 ("If Cerberus doesn't sell to Kroger we can expect them to sell to large box stores like Walmart or online retailers like Amazon, neither of which are good options for workers or customers.").

"would not assume those collective bargaining agreements."[591]

## CONCLUSIONS OF LAW

### I.      LEGAL STANDARDS

#### A.      The Preliminary Injunction Standard

229.    "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008). Relief is available only if a plaintiff can "make a clear showing that [1] 'he is likely to succeed on the merits, that [2] he is likely to suffer irreparable harm in the absence of preliminary relief, that [3] the balance of equities tips in his favor, and that [4] an injunction is in the public interest.'" *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1575 (2024) (quoting *Winter*, 555 U.S. at 20).

230.    Section 13(b) of the FTC Act provides that a court may issue a preliminary injunction against a proposed merger "[u]pon a proper showing that, weighing the equities and considering the [FTC]'s likelihood of ultimate success, such action would be in the public interest." 15 U.S.C. § 53(b). Courts—including the Ninth Circuit—have interpreted that language to mean that the FTC must "raise[] questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals." *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1162 (9th Cir. 1984). *But see FTC v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C. Cir. 1980). Plaintiffs have contended that they need only to show "serious and substantial" questions on the merits and need not establish irreparable harm.[592]

---

[591] Tr. (Clay (UFCW Local 555)) 733:12-17; *see also* DX 2846 at 1 (statement by UFCW Local 555 Vice President Ann Poff that "[t]his merger, combined with a significant divestiture to C&S, represents a good outcome for workers caught in the wake of a private equity company that wants to sell Albertsons.").

[592] Tr. (Plf. Closing) 3436:19-20, 3465:8-10; Plf. PI Br. 6-7.

231.    Recent Supreme Court precedent, however, squarely rejects the position that different preliminary injunction standards govern different causes of action. In *Starbucks*, the Court evaluated the standard the National Labor Relations Board must meet in order to obtain a preliminary injunction under Section 10(j) of the National Labor Relations Act, which allows a court to grant the Board such relief "as it deems just and proper." 29 U.S.C. § 160(j). As Plaintiffs do here, the NLRB contended that this statutory authorization for preliminary injunctive relief abrogated the traditional equitable standard set forth by the Supreme Court in *Winter. Starbucks*, 144 S. Ct. at 1575. The Supreme Court disagreed, holding that "[w]hen Congress empowers courts to grant equitable relief, there is a strong presumption that courts will exercise that authority in a manner consistent with traditional principles of equity." *Id.* at 1576. Only a "clear command from Congress" will override that presumption. *Id.* Indeed, even the NLRA's "just and proper" language fell far short of what would be required to "jettison the normal equitable rules." *Id.*

232.    *Starbucks* governs. Section 13(b) permits a preliminary injunction upon a "proper showing" after "weighing the equities and considering the Commission's likelihood of ultimate success." 15 U.S.C. § 53(b). Far from a "clear command" that the traditional factors do not apply, *Starbucks*, 144 S. Ct. at 1575, the statute expressly invokes the "likelihood of ultimate success" and "equities," 15 U.S.C. § 53(b), calling forth the settled equitable framework for preliminary injunctions. That the statute states the Court must "consider[]" the FTC's likelihood of ultimate success, 15 U.S.C. § 53(b), hardly suggests a departure from traditional equitable principles either—courts always "consider" the merits at the preliminary injunction stage. Under those well-established principles, Plaintiffs must satisfy *Winter*'s four-part test.

233.    Regardless, Plaintiffs have failed to show that they are entitled to the extraordinary relief they seek under the traditional or their alternative standard. Even before *Starbucks*, courts

recognized that a preliminary injunction is always "an extraordinary and drastic remedy," and that to establish serious and substantial questions on the merits "is not insubstantial." *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 23 (D.D.C. 2015) (cleaned up). Further, evidence that the equities favor the merger is "a separate, independent reason the FTC's motion must be denied." *FTC v. Microsoft Corp.*, 681 F. Supp. 3d 1069, 1100-01 (N.D. Cal. 2023). Under any framing, therefore, Section 13(b)'s public interest standard "demands rigorous proof to block a proposed merger or acquisition." *Sysco Corp.*, 113 F. Supp. 3d at 23.

### B.    The Clayton Act

234.    Section 7 of the Clayton Act governs the FTC's claims and states that "[n]o person … shall acquire [assets] … where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18.

235.    Review under Section 7 is concerned with "probabilities, not certainties or possibilities." *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 984 (D.C. Cir. 1990). "The core question is whether a merger may substantially lessen competition, and necessarily requires a prediction of the merger's impact on competition, present and future." *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 577 (1967). To establish the requisite probability of harm, plaintiffs must prove that "the challenged acquisition [is] likely substantially to lessen competition." *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 115 (D.D.C. 2004). The "'ultimate inquiry in merger analysis' is … 'whether the merger is likely to create or enhance market power or facilitate its exercise.'" *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 570 (6th Cir. 2014) (emphasis altered).

236.    The Clayton Act bars only those transactions that threaten to lessen competition "substantially." 15 U.S.C. § 18. Even when a transaction may "result in some lessening of competition," it still is "not forbidden" by Section 7, which "deals only with such acquisitions as

probably will result in lessening competition to a substantial degree." *Int'l Shoe Co. v. FTC*, 280 U.S. 291, 298 (1930).

### C.    The *Baker Hughes* Framework

237.    To establish a Clayton Act violation, a plaintiff bears the burden of proving a "reasonable probability" that the proposed transaction will "*substantially*" lessen competition in a "line of commerce." *United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019) (citation omitted). Horizontal mergers are analyzed using the three-part burden-shifting framework from *United States v. Baker Hughes Inc.*, 908 F.2d 981 (D.C. Cir. 1990).

238.    *First*, the plaintiff must produce evidence to "establish a prima facie case that a merger is anticompetitive." *DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 763 (9th Cir. 2018) (citation omitted). To do so, the plaintiff must (a) "accurately define the relevant market, which refers to 'the area of effective competition,'" *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (citation omitted); and then (b) prove that the merger will result in "undue concentration" in a properly defined market. *Baker Hughes*, 908 F.2d at 982-83. That analysis must account for "the *entire* transaction in question," including any divestiture. *FTC v. Arch Coal, Inc.*, 2004 WL 7389952, at *3 (D.D.C. July 7, 2004).

239.    *Second,* if the plaintiff carries its initial burden, the burden of production shifts to the defendant to offer evidence that the merger would *not* substantially lessen competition. *Baker Hughes*, 908 F.2d at 982-83. That burden requires only that the defendant introduce sufficient evidence to "show that the prima facie case inaccurately predicts the relevant transaction's probable effect on future competition." *Id.* at 991.

240.    *Third*, if the defendant meets that evidentiary threshold, the burden of production then shifts back to the plaintiff to offer "additional evidence of anticompetitive effect[s]." *Id.* at 983. Plaintiffs retain "the ultimate burden of proving a [Clayton Act] violation by a preponderance

Page 88 –    DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

of the evidence," and a "failure of proof in any respect will mean the transaction should not be enjoined." *United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 189 (D.D.C. 2018).

241.     Plaintiffs offer two alternative theories for blocking the merger: that the merger will substantially reduce competition in (1) a "traditional" supermarket market; and (2) a market for "union grocery labor." But they cannot establish a likelihood of ultimate success on the merits under either theory, which is reason enough to deny a preliminary injunction. Beyond that, the equities weigh heavily against enjoining a merger that would lower prices for customers nationwide, particularly where targeted divestiture would address any supposed localized harms.

## II.    PLAINTIFFS DID NOT SHOW A "LIKELIHOOD OF ULTIMATE SUCCESS" ON THE MERITS IN ANY RETAIL GROCERY MARKET

### A.    Plaintiffs Cannot Establish a Presumption of Anticompetitive Effects

242.     To establish a *prima facie* case under *Baker Hughes*, Plaintiffs must (1) accurately define the relevant market; and (2) show that the merger will result in undue concentration in that market. *Baker Hughes*, 908 F.2d at 982-83. They failed to do either. Seeking to remedy this fatal defect in their case, Plaintiffs' alternatively urge the Court to disregard the established *Baker Hughes* framework in favor of a novel "head-to-head competition" theory, but that fails too.

#### 1.    Plaintiffs Cannot Establish a Cognizable "Supermarket" Market

243.     To establish a *prima facie* case, Plaintiffs must first define the relevant antitrust market. *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 618 (1974). A "relevant" market consists of (1) a product market; *and* (2) a geographic market. *Id.* at 618. "The proper market definition can be determined only after a factual inquiry into the *commercial realities* faced by consumers." *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1052 (8th Cir. 1999) (emphasis added). "Without a defined relevant market in terms of product or service, one cannot sensibly or seriously assess market power." *Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 957 (9th Cir. 2023).

Plaintiffs bear the burden to establish a cognizable market, and "[f]ailing to define a relevant market alone is fatal to an antitrust claim." *Id.* Plaintiffs did not meet that burden here, and that is reason enough to deny their motion for a preliminary injunction.

### a. Plaintiffs' "Supermarket" Product Market Is Unjustifiably and Arbitrarily Narrow

244.    The boundaries of a product market are set by the "reasonable interchangeability of use or the cross-elasticity of demand" between the product and its substitutes. *Brown Shoe Co. v. United States.*, 370 U.S. 294, 325 (1962). "A properly defined market includes potential suppliers who can readily offer consumers a suitable alternative to the defendants' services." *United States v. Long Island Jewish Med. Ctr.*, 983 F. Supp. 121, 136 (E.D.N.Y. 1997); *see also Kaplan v. Burroughs Corp.*, 611 F.2d 286, 292 (9th Cir. 1979) ("A market definition must look at all relevant sources of supply, either actual rivals or eager potential entrants to the market."). Typically, a market is defined by asking whether a hypothetical monopolist of the proposed market "would be 'substantially constrain[ed]' from increasing prices by the ability of customers to switch to other producers." *United States v. Am. Express Co.*, 838 F.3d 179, 198 (2d Cir. 2016).

245.    According to Plaintiffs' Complaint, the relevant "product market" includes only "traditional supermarkets and supercenters." Compl. ¶ 43. Based on the evidence presented at the hearing, Plaintiffs' proposed market is divorced from commercial reality. It improperly excludes relevant competitors—including club stores like Costco; premium, natural, and organic stores like Whole Foods; value stores like Aldi; and e-commerce grocery options like Amazon.com— meaning those stores play *no* role in Plaintiffs' competitive calculus.

246.    But the evidence demonstrated that these retailers offer the same products and services Defendants do; Defendants treat them as competitors; and those retailers treat Defendants as competitors too. The evidence further established that *consumers* view a wide array of grocery

retailers as alternatives for Defendants' offerings. *See* FOF § B.1-2.

247.    For instance, Plaintiffs' proposed market excludes Costco as a competitor. But the evidence showed that Kroger considers Costco its "number two" competitor behind Walmart;[593] Albertsons views Costco as among its "primary" competitors;[594] "traditional" grocery store Food Lion considers Costco a "key" competitor;[595] and "traditional" grocery store Amazon Fresh considers club stores competitors.[596] And Costco itself considers "traditional" supermarkets, like Kroger and Albertsons, to be competitors and price-checks Kroger and Albertsons.[597]

248.    When a Costco opens near an Albertsons, Albertsons loses customers.[598] Plaintiffs' economics expert, Dr. Hill, conceded that the entry of a new Costco in an area has the same effect on Kroger's sales as entry of a new Albertsons store would.[599]

249.    Another example: Plaintiffs' product market excludes premium, natural, and organic stores, including Whole Foods. But the evidence showed that Kroger considers Whole Foods a competitor;[600] Albertsons considers Whole Foods a competitor;[601] and "traditional"

---

[593] Tr. (McMullen (Kroger)) 1574:13-14; *accord* Tr. (Cosset (Kroger)) at 2237:21-25 ("[I]f you look at companies like Costco, like Walmart and Amazon, who have a number of assets and capabilities that are differentiated, I would say they are probably the dominant players, in aggregate, across geographies.").

[594] Tr. (Sankaran (Albertsons)) 1798:13-15; *see also id.* at 1696:22-24 ("[T]he real challenge for the Albertsons companies is the Walmarts, the Amazons, the Costcos," of the world, and "the Aldis of the future."); Tr. (Kinney (Albertsons)) 2966:5-6 (describing Albertsons' primary competitors as "Walmart, followed by Costco"); DX 0031.

[595] Tr. (Yates (Ahold Delhaize)) 2187:9-22; DX0240 at 7 ██████████████████████████████████████████████████████████
████████████ .

    Tr. (Oblisk (Whole Foods)) 2296:22-2298:1.

[597] Tr. (George (Costco)) 2010:2-24, 2012:8-20, 2061:5-7, 13-14.

[598] Tr. (Kinney (Albertsons)) 2961:14-21.

[599] PX 7006 (Hill Rebuttal Rep.) ¶ 118 & fig. 24; *see also* Tr. (Israel) 2643:14-18.

[600] Tr. (Cosset (Kroger)) 2236:23-2237:17; DX 2731 at 41.

[601] Tr. (Sankaran (Albertsons)) 1697:3-11; Tr. (Curry (Albertsons)) 899:3-8; Tr. (Kinney (Albertsons)) 2980:19-2982:1-12.

grocery store Food Lion considers Whole Foods a competitor.[602]

250.    Kroger's internal documents show that ████████████████████████████
████████████████████████████.[603]

251.    Albertsons has studied when a natural or organic store like Whole Foods opens nearby, "and it's found that Whole Foods' entry can actually have a bigger effect even than Walmart in some cases."[604]

252.    Whole Foods conducted an internal analysis in ████████ showing the share of wallet of customers who shopped at Whole Foods two times during the past 52 weeks.[605] The analysis showed that ████████████████████████████████████████████████
████████████████████████████████████████.[606]

253.    Plaintiffs' economic expert, Dr. Hill, confirmed that consumers buy groceries at a variety of store formats—many of which are not included in Plaintiffs' "traditional" supermarket market definition. Dr. Hill conceded that a "consumer may spend part of their budget on groceries and food at a traditional supermarket, and they may spend another at a supercenter or club store."[607]

254.    As Defendants' economic expert, Dr. Israel, confirmed, "[t]here's too much substitution across formats" to justify blanket exclusion of entire store categories like club, natural, and value stores. "As we see from EGK, as we see from share of wallet data, as we see from documents, as we see from Dr. Hill's own analysis, there's lots of cross-format substitution."[608]

255.    Plaintiffs skip any direct analysis of "reasonable interchangeability" in their

---

[602] Tr. (Yates (Ahold Delhaize)) 2208:16-23.
[603] DX 2623 (Israel Rep.) ¶ 92; *see also* Tr. (Groff (Kroger)) 306:4-6 (identifying natural and organic stores as Kroger's competitors).
[604] Tr. (Israel) 2642:17-22.
[605] Tr. (Oblisk (Whole Foods)) 2304:12-2305:20; DX 0271 at 23.
[606] Tr. (Oblisk (Whole Foods)) 2304-05; DX 00271 at 23.
[607] Tr. (Hill) 1453:4-6.
[608] Tr. (Israel) 2636:10-13.

proposed product market, instead pointing to superficial differences ranging from the fatally

subjective ("customer experience") to the utterly trivial ("high ceilings" and "concrete floors").[609]

But product differentiation is a hallmark of healthy competition and says nothing about whether

consumers view those products as interchangeable.[610] *Murrow Furniture Galleries, Inc. v.*

*Thomasville Furniture Indus., Inc.*, 889 F.2d 524, 528 (4th Cir. 1989) (interchangeability

"presumes that consumers are willing to make tradeoffs on some of the very factors the [plaintiffs]

attempt to use to define their market").

256.    *Reasonable Interchangeability.* Each type of grocery retailer Plaintiffs exclude

from their proposed product market is reasonably interchangeable with "traditional" supermarkets,

and consumers readily substitute among them. Plaintiffs' own witnesses from "traditional" grocers

recognized that they compete with retailers excluded from Plaintiffs' market.[611]

257.    As set forth in FOF § B.1 above, extensive testimony and ordinary course

documents show that traditional supermarkets; club stores; premium, natural, and organic stores;

value, dollar, and ethnic stores; and e-commerce vendors consider grocery retailers of all formats

to be competitors. As Walmart explained, "anyone who offers similar products or services" is a

---

[609] Tr. (George (Costco)) 2029:19-2032:1; Tr. (Yates (Ahold Delhaize)) 2198:14-20.

[610] For instance, Kroger attempts to differentiate itself from Albertsons on produce quality, Tr. (Schwilke (Kroger)) 815:2-16, demonstrating that differentiation among retailers is a form of competition and not indicative of a separate market. Similarly, Dr. Israel testified that it is "backwards" to imply "that because [stores are] different, they're weaker competitors." In fact, there are "a variety of formats that are each very good at something." *Id.* For example, Costco has "the Costco shopping experience and low prices and a variety of products. Whole Foods maybe has high quality. Aldi has very low price." And "Kroger is trying to figure out how to compete with all of those." This differentiation between stores does not weaken competition; rather, it "makes the competition intense." Tr. (Israel) 2644:4-19.

[611] *See, e.g.*, Tr. (Neal (Sprouts)) 400:4-401:1; Tr. (Van Helden (Stater Bros.)) 214:18-215:10; Tr. (Knopf (Raley's)) 969:14-970:9 (Raley's leaks sales to Walmart, Costco), 972:10-973:1 (Basha's leaks sales to Walmart, Costco), 973:24-974:18 (Raley's price-checks against Whole Foods, particularly for "healthier" products, and Walmart); *see also* DX 2834 at 9; DX 2835 at 10.

competitor, including value stores, club stores, ethnic stores, and e-commerce grocery retailers.[612]
Witnesses from Costco, Whole Foods, and Amazon uniformly said the same.[613] That testimony
aligns with the commercial reality of these retailers' interchangeable grocery offerings. Amazon,
for example—which Plaintiffs exclude even from their large-format market—offers 

.[614] It is inconceivable that any validly defined product market
in this context would exclude Amazon.

    258.    Kroger and Albertsons conduct their business operations consistent with that view
of the market for grocery products. Kroger

.[615]

.[616]

.[617] Kroger has
implemented price changes at its stores in response to growing competition from ethnic grocery
retailers.[618] Retailers with different store formats like Costco also price-check against Kroger,
Albertsons, and others.[619] As Plaintiffs' economic expert acknowledged, that one retailer price-
checks another typically means that "they compete."[620] Even under Plaintiffs' approach, their
product market excludes key competitors.

[612] Tr. (Lieberman (Walmart)) 2339:1-23.
[613] *See, e.g.*, Tr. (George (Costco)) 2010:2-24; Tr. (Oblisk (Whole Foods)) 2291:20-2293:7; Tr. (Heyworth Amazon.com)) 2803:22-2804:20.
[614] Tr. (Heyworth (Amazon.com)) 2796:20-27, 2797:18; DX 2502 at 67:22-68:1.
[615] DX 2623 (Israel Rep.) ¶ 92.
[616] DX 2623 (Israel Rep.) ¶ 92.
[617] Tr. (Hill) 1515:15-1516:13.
[618] Tr. (Schwilke (Kroger)) 852:5-1-10.
[619] Tr. (George (Costco)) 2061:5-16, *see also id.* at 2012:8-20.
[620] Tr. 1515:11-14.

259.    Most importantly, real-world evidence of how consumers shop establishes that consumers view different grocery retail formats as reasonably interchangeable, and consumers readily substitute among them.

260.    Rather than relying on "one-stop shopping," most consumers divide their grocery dollars among different grocery retailers and formats.[621] *See* FOF § B.1. Dr. Israel's EGK analysis based on actual consumer behavior, discussed in more detail in FOF § E.1-4, *supra*, confirms that there is "substantial diversion" between the parties and retailers including Costco, Sam's Club, Whole Foods, Trader Joe's, Aldi, and Lidl.[622] "Kroger customers substitute to Aldi, Trader Joe's, and Whole Foods Market to a greater degree than they do to other Albertsons banners" and "Albertsons customers similarly substitute to Aldi, Trader Joe's, and Whole Foods Market to a greater degree than they do to other Kroger banners."[623] The diversion ratios from both Kroger and Albertsons to Costco are higher than those to any other single banner except Walmart.[624] Real-world consumer behavior shows that a wide range of grocery retailers and formats—including those Plaintiffs exclude from their product market—offer a "suitable alternative to the defendants' services." *Long Island Jewish Med. Ctr.*, 983 F. Supp. at 136. A proper market definition would account for actual customer substitution among all these retail formats.

261.    Although actual consumer behavior is the best indication that grocery offerings at different retailers are reasonably interchangeable, even Dr. Hill's hypothetical monopolist approach confirms that result when accounting for real-world pricing data. *See* FOF § E.1-4. Using regression analysis, Dr. Israel compared actual pricing in geographic markets that would qualify

---

[621] DX 0011.
[622] DX 2623 (Israel Rep.) ¶ 105 & tbl.3.
[623] DX 2623 (Israel Rep.) ¶ 106.
[624] DX 2623 (Israel Rep.) ¶ 106.

as monopolies under Plaintiffs' market definition to pricing in those that would not.[625] This analysis is "an actual data version" of Dr. Hill's hypothetical monopolist test.[626] When considering actual pricing data, Dr. Israel's regression analysis showed that Plaintiffs' markets failed the hypothetical monopolist test.[627] That is, stores in areas where Plaintiffs' market definition would predict monopoly pricing did not in fact have higher prices by even a small but significant amount.[628] That is because Dr. Hill's markets leave out important competitors and fail to account for Walmart and Costco competing from outside his geographic circles.[629] This economic analysis confirms that Plaintiffs' market definition is "not useful for the competitive analysis."[630]

262.    *The* Brown Shoe *"Practical Indicia."* Instead of focusing on economic evidence of actual shopper behavior, Plaintiffs focus on proxies for interchangeability that *Brown Shoe* called "practical indicia" of a market. 370 U.S. at 325. These indicia include "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.*

263.    But the *Brown Shoe* factors are an *aid*, not a *substitute*, for determining whether products are reasonably interchangeable. "Reasonable interchangeability sketches the boundaries of a market," and the *Brown Shoe* practical indicia are used only to "clarif[y] whether two products are in fact 'reasonable' substitutes and are therefore part of the same market." *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 496 (2d Cir. 2004). At best, the *Brown Shoe* practical indicia "seem to be evidentiary proxies for direct proof of substitutability." *Rothery*

---

[625] Tr. (Israel) 2650:13-2651:9.
[626] Tr. (Israel) 2653:3-11.
[627] Tr. (Israel) 2656:1-19.
[628] Tr. (Israel) 2651:10-17, 2656:8-19.
[629] Tr. (Israel) 2659:14-25.
[630] Tr. (Israel) 2656:1-2657:4.

*Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C. Cir. 1986). They may *support* "direct evidence" of actual price effects under real-world conditions, *Staples*, 970 F. Supp. at 1075-82, but they "were never intended to exclude economic analysis altogether," *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 320 (7th Cir. 2006); *see also Kaplan*, 611 F.2d at 292-93. Where, as here, evidence directly shows *actual* interchangeability among competitors, resort to the *Brown Shoe* practical indicia is unnecessary.

264.    In any event, those factors do not support Plaintiffs' product market. *First*, the grocery industry and the broader public do not recognize traditional supermarkets and supercenters as "separate economic entit[ies]" from other types of grocery retailers. *Brown Shoe*, 370 U.S. at 325. Retailers of practically every format testified that they view any retailers that "carry the same products" as competitors regardless of the store format.[631] *See* FOF § B.1. News sources similarly recognize competition across formats.[632] That some sources use the term "traditional supermarkets" does not prove a distinct market in any economically significant sense. *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1376 (9th Cir. 1989) ("Without a showing of the role that industry and public perception … play in motivating and shaping consumer decisions, the demarcation of a submarket … cannot be justified.").

265.    *Second*, "traditional" supermarkets do not offer a peculiar or unique assortment of grocery products. Products within a market need only be "*reasonabl[y]*" interchangeable—not identical. *Brown Shoe* 370 U.S. at 325 (emphasis added). As Plaintiffs conceded, "individual goods

---

[631] Tr. (Heyworth Amazon.com)) 2804:10-20; *see* Tr. (Lieberman (Walmart)) 2339:1-23; Tr. (Yates (Ahold Delhaize)) 2187:18-22; Tr. (George (Costco)) 2010:2-2011:3; Tr. (Oblisk (Whole Foods)) 2292:12-2293:7.

[632] Jinjoo Lee, Supermarkets Are Losing This Food Fight: Costco, Walmart, Aldi and Amazon are all chipping away at the supermarket's once-dominant position selling Americans their food, Wall Street Journal (July 21, 2023), https://www.wsj.com/articles/supermarkets-competition-costco-walmart-aldi-4f3c0d0c.

available in supermarkets can be purchased at other retail stores."[633] ████████████

████████████████████████████████████████████████████████████████

████.[634] And the evidence confirms that the food categories purchased by consumers across these retailers are largely the same. *See* FOF § B.1.

266.    *Third*, supermarkets like Kroger and Albertsons do not focus on different customers from other grocery formats. Share of wallet evidence shows that rather than focusing on distinct customer groups, stores across formats typically fight for a slice of the grocery spend from customers who shop at four to seven different grocery banners each month.[635] And Kroger focuses on customers of all types and wallet sizes. *See* FOF § B.2.

267.    *Fourth*, stores in Plaintiffs' proposed product market do not systematically differ from other retail formats in pricing. While pricing varies among many stores, those variations ████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████.[636] None of the superficial differences Plaintiffs identify have economic salience, and Plaintiffs offer no response to the data and direct evidence of demand substitution.

        **b.    *Plaintiffs' "Large Format Stores" Market Exemplifies the Defects in Plaintiffs' Proposed Market Definitions***

268.    Although Plaintiffs' Complaint alleges only a "supermarket" market, Dr. Hill subsequently "focus[ed]" on an alternative market for "the sale of food and groceries in traditional supermarkets, supercenters, club stores, natural and gourmet food stores, and limited assortment

---

[633] Plf. PI Br. 24.
[634] *See* Tr. (Neal (Sprouts)) 394:20-397:8; Tr. (Oblisk (Whole Foods)) 2290:4-2291:15; Tr. (Heyworth (Amazon.com)) 2797:19-2798:8.
[635] *See* Tr. (Kinney (Albertsons)) 2932:14-17, 2933:1-3; Tr. (Oblisk (Whole Foods)) 2304:23-2305:19, 2291:20-2292:11..
[636] *See* DX 2623 (Israel Rep.) ¶¶ 297-98 & tbl.16; Tr. (Israel) 2605:11-20; Tr. (McMullen (Kroger)) 1588:13-24; Tr. (Aitken (Kroger)) 1819:5-6.

stores," which he calls "large format stores."[637] Plaintiffs point to this alternative as a "more conservative" backstop for their "supermarkets" market—a "sensitivity test."[638] By not raising this market in their Complaint or PI motion, Plaintiffs have forfeited it, and it would be erroneous for the Court to enter an injunction based on this purported market. *E.g.*, *Lavelle-Hayden v. Legacy Health*, 2024 WL 3822712, at *8 (D. Or. Aug. 14, 2024) (to permit an unpled, new theory at the time of a merits determination "would be to expect [the other side] to act as [a] mind reader"). But this "large format" market only exemplifies the defects in Plaintiffs' case.

269.    In addition to excluding key competitors, like Amazon.com, *see* FOF § E.3, the "large format" market fails to meet the threshold showing of a valid geographic market. As noted, Plaintiffs' geographic market is based on Dr. Hill's circles, which is methodologically unsound. Dr. Hill's large-format geographic markets are arbitrary and erroneous because, among other things, they are both underinclusive and overinclusive. They are underinclusive because real-world data shows that certain competitors draw customers from farther away than Dr. Hill's radius. Dr. Hill's circles are also overinclusive because they assign undue competitive significance to Kroger and Albertsons stores near the boundary of the circle that are often miles away from the focal store, diluting the importance of competitors located closer to the focal store. *See* FOF § B.1-2.

270.    A proper geographic market definition would account for actual diversion between individual grocery stores. That is, it would capture those stores to which consumers "*practicably turn for alternative sources*" of their groceries. *Morgenstern v. Wilson*, 29 F.3d 1291, 1296 (8th Cir. 1994). Dr. Israel's diversion analysis, based on measured consumer behavior, confirms that Dr. Hill's circle-drawing approach is particularly ill-suited to this case because different grocery

---

[637] PX 7004 (Hill Rep.) ¶ 67; *see also* Tr. (Hill) 1453:11-12.
[638] Plf. PI Reply Br. at 5.

banners and retail formats pull customers from different distances.[639] Put simply, customers are typically willing to drive farther for a Walmart or a Costco than for an Albertsons.[640] Dr. Hill concedes that fact but fails to account for it in his geographic market analysis.[641]

271.    While that defect also infects Plaintiffs' proposed geographic markets for the "supermarket" market, it is particularly problematic for their "large format" market because the club stores included in that market typically pull consumers from much farther away.[642]

272.    Dr. Hill's example of a market based on a Fred Meyer in Portland, Oregon illustrates how the large format market is underinclusive. That market, which Dr. Hill defines as a circle with a 5 mile radius, excludes a Costco just 0.6 miles farther, even though customers drive farther to shop at Costco stores.[643] At the same time, Dr. Hill's approach is overinclusive because it assigns undue competitive significance to Kroger and Albertsons stores near the boundary of the circle that are often miles away from the focal store, diluting the importance of competitors located closer to the focal store that may have lower overall sales but greater competitive significance.[644]

273.    Dr. Israel confirmed that Plaintiffs' large format market is defective by performing the hypothetical monopolist test using actual pricing data.[645] At bottom, Dr. Hill "consistently inflates defendants' market shares" in both the "supermarket" market and "large format" market stores "by leaving out important competitors from the markets, thus making the defendants' market shares look bigger."[646]

---

[639] Tr. (Israel) 2625:17-2628:24, 2631:1-2632:2.
[640] Tr. (Aitken (Kroger)) 1813:15-23; *see also* Tr. (Israel) 2630:16-18 ("People are willing to drive farther to go to a club store or a supercenter than they are to go to a supermarket.").
[641] Tr. (Israel) 2631:14-2632:2.
[642] Tr. (Aitken (Kroger)) 1813:15-23; *see also* Tr. (Israel) 2630:16-18.
[643] Tr. (Israel) 2646:15-2647:1.
[644] DX 2623 (Israel Rep.) ¶ 147.
[645] Tr. (Israel) 2657:12-2659:25.
[646] Tr. (Israel) 2592:9-15.

274.    As a last-ditch effort to salvage a plausible geographic market, Dr. Hill advanced

an alternative market definition for the first time in his rebuttal report that he called a "customer-

based approach."[647] Dr. Hill, conceded that this market was nowhere in Plaintiffs' Complaint, their

motion for a preliminary injunction, or Dr. Hill's opening report.[648] That is reason alone that it

fails. *See Lavelle-Hayden*, 2024 WL 3822712, at *8; *Kleen Products LLC* v. *Int'l Paper*, 306

F.R.D. 585, 591 (N.D. Ill. 2015) (new theories in expert's reply are improper). Indeed, Plaintiffs

forfeited the right to raise this market by seeking to prevent Defendants' expert Dr. Israel from

offering *any* rebuttal to this newly-raised analysis on the basis that "the plaintiffs get the last

word."[649] But Plaintiffs' failure to raise this analysis in their Complaint or Dr. Hill's initial report

have made it so that Plaintiffs have had the only word. Because Dr. Hill's alternative geographic

market analysis was presented for the first time in his reply report, which Defendants did not have

a right to sur-rebut, and because Plaintiffs objected to *any* rebuttal evidence on this alternative

geographic market analysis, Defendants have been prevented from offering competing evidence.

As a result, Plaintiffs cannot rely on this analysis to define the relevant geographic market, an

element of their *prima facie* case for which they bear the burden.

275.    In any case, Dr. Hill conceded that for all but "a very small number" of competitor

stores he lacked any customer location information necessary for that analysis.[650] Without

adequate input data, that analysis is facially unreliable.

---

[647] Tr. (Hill) 1464:2-4.
[648] Tr. (Hill) 3411:6-25.
[649] Tr. (Israel) 2681:3-12
[650] Tr. (Hill) 1525:13-1526:16. Compounding the prejudice to Defendants that would flow from
the Court's consideration of this late-arising theory, Dr. Hill admitted that he made "a mistake" at
his deposition, where he incorrectly testified that he had customer location information for *no*
competitor stores. *See id.* at 1525:22-1526:12. Defendants and their expert thus had zero
opportunity to assess Dr. Hill's use of customer location information for these stores prior to his
testimony at the hearing.

276.    "[T]he purpose of market definition is to make sure that the defined market includes sufficient competition, such that market shares are informative of defendants' ability to raise prices or reduce quality after the merger."[651] The problem is that Plaintiffs' market definitions all overlook the evidence and competitive reality that post-merger Kroger will be constrained to raise prices because of Walmart, Costco, and Amazon, all of which compete with Kroger and will continue to do so after the merger. Having failed to establish cognizable product and geographic markets, Plaintiffs cannot make out a *prima facie* case.

### 2.    The Merger Would Result in No Undue Market Concentration

277.    Even if Plaintiffs could establish a properly defined market, their claim still would fail because they cannot establish that the merger will result in "undue concentration" in that market. *Baker Hughes*, 908 F.2d at 982-83. That analysis must account for "the *entire* transaction in question," including any divestiture. *Arch Coal*, 2004 WL 7389952, at *3. Plaintiffs' market concentration analysis is premised on a fictional transaction that does not include divestiture. When accounting for the divestiture, Plaintiffs' economic critiques of the merger fall apart.

### a.    The Divestiture Overwhelmingly Addresses Plaintiffs' Claimed Areas of Undue Market Concentration

278.    Contrary to Plaintiffs' contention,[652] they bear the burden to account for the divestiture in their *prima facie* case, because it is an essential component of the transaction they seek to enjoin. *See United States v. Atl. Richfield Co.*, 297 F. Supp. 1061, 1067-68 (S.D.N.Y. 1969) (criticizing complaint that "carefully avoid[ed] even a mention" of a planned divestiture as presenting less than "the complete picture"). And the overwhelming majority of alleged markets in which Plaintiffs claim undue market concentration include stores that will be divested to C&S.

---

[651] Tr. (Plf. Closing) 3437:24-3438:3.
[652] Plf. PI Br. 37.

279.    *Plaintiffs Must Account for Divestiture.* Divestiture is part of Plaintiffs' *prima facie* case. *See FTC v. Microsoft Corp.*, 681 F. Supp. 3d 1069, 1093 (N.D. Cal. 2023) ("[T]he FTC must address the circumstances surrounding the merger as they actually exist."); *see also DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 763-64 (9th Cir. 2018) (finding no reduction in competition in light of divestiture). Merger review is not a line-item veto. Whether a "challenged transaction may substantially lessen competition in violation of Section 7 of the Clayton Act requires the [c]ourt to review the *entire* transaction in question," including any "divestiture" of assets to a third party. *Arch Coal*, 2004 WL 7389952, at *3.

280.    In *United States v. UnitedHealth Group Inc.*, the court rejected the plaintiffs' argument that courts should treat acquisition and divestiture as "separate transactions" and place the burden on defendants to show that "that the divestiture will replace the competitive intensity lost as a result of the merger." 630 F. Supp. 3d 118, 132-33 (D.D.C. 2022). The court explained that doing so would "contradict[] the text of Section 7 and the *Baker Hughes* framework," *id.* at 133, because the relevant transaction is "the proposed acquisition agreement *including* the proposed divestiture." *Id.* at 134 n.5; *see also Arch Coal*, 2004 WL 7389952, at *2.[653]

281.    Plaintiffs' characterization of the divestiture as a "defense"[654] rather than an element of the transaction that Plaintiffs seek to block is simply wrong. "[T]reating the acquisition and the divestiture as separate transactions that must be analyzed in separate steps" would improperly allow a plaintiff "to meet its *prima facie* burden based on a fictional transaction and fictional market shares." *UnitedHealth*, 630 F. Supp. 3d at 134 n.5. Requiring Defendants to show that divestiture would preserve identical levels of competition would "effectively erase the word

---

[653] The court ultimately analyzed divestiture in the defendant's rebuttal burden because "the evidence leads to the same result under either standard." *UnitedHealth*, 630 F. Supp. 3d at 134.
[654] Tr. (Plf. Closing) 3471:16-17.

'substantially' from Section 7." *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1058-59 (5th Cir. 2023).

282.    Divestiture has been a core component of the merger transaction from the start. *See supra* FOF § C.1-2. To allow Plaintiffs to ignore the divestiture or shift their burden to Defendants would redefine the very transaction that they challenge, "tantamount to turning a blind eye to the elephant in the room." *Arch Coal*, 2004 WL 7389952, at \*3.

283.    *Divestiture Will Resolve Any Competitive Concerns.* Even if Plaintiffs did not have to account for divestiture in their *prima facie* case, they retain the ultimate burden of persuasion under the third *Baker Hughes* step to show that the transaction—including all its material components—will substantially lessen competition. Regardless where divestiture fits into the *Baker Hughes* framework, Plaintiffs cannot carry their ultimate burden, because divestiture will resolve any competitive concerns.

284.    As a threshold matter, Plaintiffs' assertion that the divestiture must fully "restore all the competitive intensity lost due to the merger"[655] is a misreading of *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015). That decision merely recited nonbinding Department of Justice policy guidance because "both sides cite[d]" it. *Id.* at 72. And even that guidance says that the ultimate question is whether competitors will "discipline a merger-generated increase in market power" following divestiture—it nowhere suggests that courts should enjoin a transaction that results in only an insubstantial impact on competition. *Id.* at 73 (quoting Antitrust Div., U.S. Dep't of Justice, Antitrust Division Policy Guide to Merger Remedies 9 (Oct. 2004)).

285.    Plaintiffs' proposed standard would fundamentally change the applicable law: The Clayton Act prohibits a merger when "the effect of such acquisition may be *substantially to lessen competition*." 15 U.S.C. § 18 (emphasis added). Section 7 is "concerned only with mergers that

---

[655] Tr. (Plf. Opening) 68:24-69:3; Tr. (Plf. Closing) 3471:5-6; *see also* Plf. PI Br. 37.

'*substantially* … lessen competition,' and by requiring … a showing that the merger will 'preserve exactly the same level of competition that existed before the merger, the Government's proposed standard would effectively erase the word 'substantially' from Section 7." *Illumina*, 88 F.4th at 1058-59 (quoting *UnitedHealth*, 650 F. Supp. 3d at 133).[656]

286.    Appropriately accounting for the divestiture wholly undermines Plaintiffs' economic analysis of the merger. Dr. Israel's real-world analysis (or "actual monopolist test") shows that, after accounting for the divestiture, neither of Dr. Hill's proposed markets passes muster under both the 2010 and 2023 Merger Guidelines.[657]

287.    *Plaintiffs' Criticisms of the Divestiture Establish Nothing.* Rather than grapple with the actual transaction, Plaintiffs argue that they need not account for the divestiture because it is doomed to fail.[658] At the outset, C&S—the country's largest private grocery wholesale distributor with decades of industry experience and billions in annual sales—is surely sophisticated enough to decide, after comprehensive due diligence, whether its $2.9 billion divestiture investment is a viable business venture. Whether that investment will be as successful as C&S expects is irrelevant to the antitrust analysis under the Clayton Act, which turns on whether "the *transaction* will substantially lessen competition," not the long-term business prospects of other market participants. *Baker Hughes*, 908 F.2d at 982 (emphasis added). Plaintiffs' attempt to put C&S on trial should be rejected as a red herring. Courts do not typically second-guess the informed business

---

[656] Although *Illumina* considered the defendant's open offer as part of its rebuttal case, that offer was a standardized supply contract for customers—not a divestiture of assets—that was contingent on individual customer acceptance. *Illumina*, 88 F.4th at 1044-45. And unlike the divestiture here, it was proposed long after the merger was inked, not included as an initial term of the transaction. *See id.* Nonetheless, it rejected the FTC's "mistaken belief that the Open Offer is a remedy" and held that "Illumina was not required to show that the Open Offer would negate the anticompetitive effects of the merger entirely," vacating the FTC's decision to the contrary. *Id.* at 1058-59.
[657] DX 2623 (Israel Rep.) ¶¶ 198-210 & tbl.12. Notably, both proposed markets fail this test even without the divestiture. *See id.* at tbl.11.
[658] Plf. PI Br. 39-42; Tr. (Plf. Closing) 71:11-15, 72:10-16.

judgment of disinterested companies, *see Spiegel v. Buntrock*, 571 A.2d 767, 774 (Del. 1990), and Plaintiffs offer no sound reason to do so here.

288.    The facts also refute Plaintiffs' speculation about C&S's business prospects.[659] To assess whether a divestiture will maintain competition, courts often consider several factors, including [1] "the likelihood of the divestiture; [2] the experience of the divestiture buyer; [3] the scope of the divestiture[;] [and] [4] the independence of the divestiture buyer from the merging seller and the purchase price."[660] *UnitedHealth*, 630 F. Supp. 3d at 135 (citation omitted). Plaintiffs cannot carry their burden on any of those factors.

289.    *Likelihood of Divestiture.* The divestiture is a "virtual certainty" if the deal goes forward. *UnitedHealth*, 630 F. Supp. 3d at 135; *see* FOF § C.2. The divestiture's only remaining precondition is the merger's closing after resolution of this litigation. C&S has secured financing commitments for the $2.9-billion purchase price, demonstrating both its ability and commitment to proceed.[661] Each of the entities funding the transaction conducted significant diligence before agreeing to provide funds.[662] Beyond that, C&S has committed to investing ███████ █████████████████ to support infrastructure development, including retail transition costs, building out C&S's private label brands, and capital expenditures for rebannering and developing new distribution centers.[663]

290.    Plaintiffs have identified no "*significant* obstacles to closing." *FTC v. RAG-*

---

[659] Tr. (Fox) 1336:8-12 (testifying that he renders no opinion on the likelihood of C&S's failure as a divestiture buyer).
[660] These factors, to the extent applicable, provide only a tool to assess the transaction's *impact on competition* accounting for the divestiture. To the extent Plaintiffs read *Sysco*, 113 F. Supp. 3d at 72, as suggesting that Defendants must establish these factors to demonstrate the adequacy of a divestiture "fix," that reading cannot be squared with the Clayton Act's text.
[661] DX 2738 (Galante Rep.) ¶ 51; Tr. (Winn (C&S)) 1228:6-1231:3.
[662] Tr. (Winn (C&S)) 1229:25-1230:24; Tr. (Galante) 3149:1-3156:18.
[663] DX 2738 (Galante Rep.) ¶ 38.

*Stiftung*, 436 F. Supp. 3d 278, 307 (D.D.C. 2020) (emphasis added). And C&S's timeline matches those courts have approved in other cases. *See UnitedHealth*, 630 F. Supp. 3d at 136.

291.    *C&S's Experience*. C&S is the largest private wholesale distributor in the country, and its existing distribution network positions it well for retail expansion.[664] For decades, C&S has also provided retail customers the services self-distributing retailers must typically handle for their own stores.[665] As Albertsons' COO testified, "one of the critical pieces of running great grocery stores is having a strong, secure source of supply, and C&S has that and then some."[666]

292.    C&S has direct grocery retail experience, too. It currently operates 25 retail supermarkets and is a franchisor of 165 additional locations.[667] C&S successfully completed two acquisitions in its strategic plan to promote new channels of growth[668] and still operates all but one of the company-owned stores it acquired through the 2021 and 2022 Piggly Wiggly Midwest and Tops Market divestitures.[669] ███████████████████████████████████████████████████████████████████████████████████████████████████████████████.[670] Unlike other divestiture buyers like Haggen that have been less successful, C&S has comprehensive

---

[664] DX 1058, at 7; Tr. (McGowan (C&S)) 1078:2-11; Tr. (Winn (C&S)) 1206:4-1207:20.
[665] Tr. (Winn (C&S)) 1212:24-1218:16; DX 1058, at 7-12; http://www.cswg.com/services.
[666] Tr. (Morris (Albertsons)) 1915:23-1916:1.
[667] DX 2738 (Galante Rep.) ¶ 18; DX 1058 at 10, 16; Tr. (Winn (C&S)) 1220:25-1221:21.
[668] Tr. (McGowan (C&S)) 1043:11-22, 1045:17-1049:19 (testifying that C&S's efforts to grow in the retail space is part of the company's strategic shift as an "opportunity for the business to grow" and that diversifying its business will help the independents that C&S currently serve); *id.* at 1047:13-15 (C&S had already been exploring another retail acquisition when it learned of the Kroger/Albertsons merger); Tr. (Winn (C&S)) 1222:22-1226:5 (after losing a major customer, Ahold Delaize, in 2019, C&S acquired Piggly Wiggly and Tops Market stores, and then ultimately decided to seek to acquire a grocery retailer for a "transformational acquisition").
[669] Tr. (McGowan (C&S)) 990:21-24, 991:12-14; *see also In re Price Chopper/Tops Markets*, FTC Dkt. No. C-4753, https://bit.ly/45wUxXW.
[670] DX 1058 at 16, 17.

supply chain management experience, managing supply relationships ███████████.[671]

293.    Plaintiffs also overlook C&S's management team's "wealth of experience" in grocery retail, which is likely to be "an important component in helping [C&S] replace [Kroger's] competitive intensity." *RAG-Stiftung*, 436 F. Supp. 3d at 305; *see UnitedHealth*, 630 F. Supp. 3d at 137 (crediting the buyer's "large team of individuals with extensive experience"). Susan Morris, tapped by C&S to lead its retail division,[672] has nearly 40 years of industry experience, having led retail operations for nearly 2,300 stores as Albertsons' COO since August 2018 and worked as its executive vice president of retail operations and as a division president in two markets before then.[673] A veteran of multiple mergers and acquisitions, including Albertsons' acquisition of over 800 stores from SuperValu in 2013, Ms. Morris brings extensive experience in rebannering acquired stores. *See* FOF § C.2.[674] She already leads the teams of 486 Albertsons stores that will be divested, ensuring leadership continuity at the vast majority of divested stores.[675]

294.    Plaintiffs have focused on a prior divestiture to Haggen as part of the Safeway merger in 2015. Plaintiffs presented no direct evidence from anyone involved in the Haggen merger. The only firsthand evidence about what happened at Haggen came from Ms. Morris, who was a division president when the Safeway and Haggen merger happened. Ms. Morris testified that the buyer Comvest did not have grocery experience, the stores did not perform, and Albertsons bought the stores back.[676] Morris testified that the Haggen situation involved a "completely

---

[671] DX 1058 at 7; DX 2628 at 5. In contrast, an Albertsons executive suggested that unlike in the Haggen divestiture, one of the strengths of the buyer is its supply chain. Tr. (Morris (Albertsons)) 1936:7-12.

[672] DX 1058 at 29; Tr. (Morris (Albertsons)) 1902:3-21.

[673] DX 1058 at 29; Tr. (Winn (C&S)) 1240:10-1241:4 (testifying that Morris serving as the retail division CEO will provide "continuity" to the retail operations of the divested stores); ; Tr. (Morris (Albertsons)) 1903:22.

[674] Tr. (Morris (Albertsons)) 1911:21-22.

[675] Tr. (Morris (Albertsons)) 1911:25-1912:7.

[676] Tr. (Morris (Albertsons)) 1934:19-1936:6.

different equation" from the C&S divestiture, including the sheer number of experienced Albertsons executives and associates coming to C&S. And The Haggen stores were rebannered rapidly, some overnight.[677]

295.    *Scope of Divestiture.* The divestiture provides C&S with the assets and human capital to compete vigorously after the divestiture. Those resources are comprehensive. C&S will receive stores, divisional offices, distribution centers, and a manufacturing plant.[678]

296.    In addition to physical assets, C&S will also receive private label and technology assets that will ensure it can hit the ground running.[679] The intangible assets C&S will receive include outright ownership of four banners and perpetual, royalty-free, and exclusive licenses to the Albertsons and Safeway banners in regions where those banners are strong;[680] a clone of Albertsons' IT stack and Kroger's human capital management stack;[681] and licenses to Albertsons' Signature and O Organics private labels for up to four years. C&S's CEO expressed confidence that the company had all the banners it needs to succeed as a grocery retailer.[682]

297.    To ensure a smooth transition, the divestiture also includes a transition services agreement that guarantees C&S support while it integrates divested stores into its business. *See* FOF § C.2. As part of that agreement, C&S will receive customer loyalty data—including historical data—as well as the flexibility to take as long as three years to rebanner stores.[683]

---

[677] And unlike the Haggen divestiture, which were rebannered "[r]apidly," ███████ ███████████████████████████████. Tr. (Morris (Albertsons)) 1934:19-1935:9; Tr. (Florenz (C&S)) 1114:124-1115:3.

[678] DX 2738 (Galante Rep.) ¶ 61; DX 2238 §§ 1.1, 2.3, 2.9, 2.10, 6.16, 6.15, 9.1; DX 2239 (Am. C&S Agreement, Schedule 2.1(a)-K, Schedule 2.1(c)-A, Schedule 2.1(c)-K); DX 1058 at 14, 54; *see also* Tr. (Winn (C&S)) 1233:20-1235:15, 1235:18-20, 1236:3-1239:6.

[679] Tr. (Morris (Albertsons)) 1948:12-25; Tr. (Florenz (C&S)) 1152:23-1153:3 (describing the tech stack that C&S will be receiving as "powerful"); *see also id.* at 1156:13-18.

[680] Tr. (Cosset (Kroger)) 2413:3-6.

[681] Tr. (Cosset (Kroger)) 2439:5-2440:15.

[682] Tr. (Winn (C&S)) 1235:18-20.

[683] Tr. (Cosset (Kroger)) 2414:14-2415:5, 2444:18-2446:16.

298.  *C&S's Independence/Purchase Price.* No evidence suggested that C&S lacks independence or that the $2.9 billion purchase price is insufficient. *See, e.g.*, *UnitedHealth Grp.*, 630 F. Supp. 3d at 140 (finding purchase price was adequate absent evidence to the contrary). The process to find a buyer was competitive. *See* FOF § C.2. The $2.9 billion that C&S will pay reflects the thoroughness of C&S's due diligence and the standalone value of the divestiture business. Plaintiffs contend that because C&S can make a profit even if sales decline, it has no incentive to vigorously compete.[684] That contention ignores economic reality: Businesses always have an incentive to make more money, not less.

299.  In an indirect attempt to undermine the purchase price, Plaintiffs speculate that C&S would sell the divested stores post-merger for profit. But that is neither a serious consideration nor an economically feasible one. Although C&S briefly discussed selling some stores early in the divestiture process as it explored its options, the company is committed to operate the stores upon consummation of the merger.[685] Plaintiffs' speculation cannot be squared with C&S's massive investments, hiring, and integration planning.[686] Selling stores would make no economic sense. "[T]he math doesn't work"—with a purchase price of $2.9 billion for underlying assets of roughly $2 billion, C&S would "lose $900 million if [it] did that."[687] Plaintiffs offered no fact or expert testimony indicating that this strategy would be profitable for C&S or that anyone at C&S is contemplating it.

### 3.    Plaintiffs' "Head-to-Head Competition" Theory Fails

300.  Unable to establish a *prima facie* case under the *Baker Hughes* framework, Plaintiffs' motion urged the Court to apply a different and unprecedented standard—one that no

---

[684] Plf. PI Br. 38.
[685] Tr. (Winn (C&S)) 1208:17-1209:7; *see also* Tr. (Florenz (C&S)) 1152:10-13.
[686] Tr. (Winn (C&S)) 1242:9-13.
[687] Tr. (Winn (C&S)) 1251:7-1252:7.

court in more than a century of antitrust jurisprudence has ever endorsed: that the elimination of direct competition between the merging parties is sufficient, on its own, to establish a *prima facie* case. Plaintiffs are wrong as matter of law and fact.

### a. Plaintiffs' "Head-to-Head Competition" Theory Is Legally Deficient

301.    Plaintiffs' theory of "head-to-head" competition seeks to effect a fundamental shift in how merger cases are litigated and decided. For decades, courts have understood that incidental anecdotes of competition are not sufficient to infer a substantial lessening of competition from a merger. Instead, the *Baker Hughes* framework—which has been consistently applied by courts across the country—demands that the plaintiff establish its *prima facie* case by showing undue concentration in a properly defined market. 908 F.2d at 982-83. This framework requires a rigorous *economic* analysis of how the parties' competition actually affects prices, quality, and output—the hallmark of antitrust analysis. This requires assessment of data showing pricing effects, diversion, and efficiencies. Since *Baker Hughes* set forth the framework for merger analysis in 1990, there is not "a single case in which a court has enjoined a merger … where the [plaintiffs] failed to show undue concentration in a relevant market as its prima facie case requires." *RAG-Stiftung*, 436 F. Supp. 3d at 310-12.

302.    Plaintiffs' novel "head-to-head competition" theory would upend the *Baker Hughes* framework and the demanding burden of persuasion that Plaintiffs bear in merger cases. By definition, a horizontal merger (that is, one between competitors in the same business) eliminates "whatever competition previously may have existed … between the parties to the merger." *Brown Shoe*, 370 U.S. at 335. A plaintiff in a horizontal merger case thus will always be able to find instances of direct competition between the parties, making every horizontal merger presumptively anticompetitive under Plaintiffs' view.

303.    Plaintiffs contend that "a merger need only eliminate a close competitor" to be unlawful.[688] But they offer no standard—much less authority—for how much direct competition is required to make a competitor "close"; no framework for measuring head-to-head competition; and no limiting principle. Under their direct-competition theory, even the acquisition of one lone mom-and-pop grocery store by another would apparently be unlawful if those stores had previously price-checked one another. Both precedent and common sense say otherwise.

304.    Courts have repeatedly held that "the mere fact that a merger eliminates competition between the firms concerned has never been a sufficient basis for illegality." *Dresses for Less, Inc. v. CIT Grp./Com. Servs., Inc.*, 2002 WL 31164482, at *12 (S.D.N.Y. Sept. 30, 2002) (quoting IV Phillip E. Areeda et al., Antitrust Law ¶ 901a (1998)); *see, e.g.*, *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1168-69 (N.D. Cal. 2004). Indeed, while all horizontal "[m]ergers among competitors eliminate competition, including price competition," such mergers "are not *per se* illegal, and many of them withstand attack under any existing antitrust standard." *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 23 (1979); *see Brown Shoe*, 370 U.S. at 335 (mergers between direct competitors must be "gauged on a broader scale: their effect on competition generally in an economically significant market").

305.    To support their theory, Plaintiffs seize on a single line from a nearly 60-year-old district court case.[689] But that decision—which predates *Baker Hughes* by some 25 years—relied primarily on extensive analysis of market conditions to conclude that the "merger significantly increases concentration," not head-to-head competition. *United States v. Mfrs. Hanover Tr. Co.*, 240 F. Supp. 867, 948 (S.D.N.Y. 1965). If the line Plaintiffs quote were read literally, it would "impl[y]—since every merger eliminates competition between the parties to the merger—that any

---

[688] Tr. (Plf. Closing) 3459:12-19.
[689] Plf. PI Br. 8.

very large horizontal merger violated the statute." *United States v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1282 (7th Cir. 1990).

306.    Nor do the other cases Plaintiffs cite support the sweeping theory they invoke here. In *Sysco*, the court concluded that the elimination of head-to-head competition could be relevant "*if the acquiring firm will have the incentive to raise prices or reduce quality after the acquisition*." 113 F. Supp. 3d at 61 (emphasis added) (quotation marks omitted); *see FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1345 (4th Cir. 1976) (relying on market concentration for the *prima facie* case); *Staples*, 970 F. Supp. at 1081-83 (analyzing the elimination of direct competition as one "factor" *after* having already found high "concentration statistics and HHIs within the geographic markets"). Under well-established precedent, Plaintiffs must prove harm to competition and harm to consumers; they cannot rely simply on the fact that the merging firms compete with one another.

### b.    The Merger Is Unlikely to Harm Competition by Eliminating Head-to-Head Competition

307.    In any event, the merger is unlikely to produce anticompetitive effects through the elimination of head-to-head competition. Although Kroger and Albertsons compete in some local markets, the anecdotal evidence Plaintiffs offer falls far short of showing that Albertsons exerts *unique* competitive force on Kroger such that the merger will substantially reduce competition. To the contrary, the evidence reflects that *other* competitors—principally Walmart—are the primary constraint on Kroger's pricing. *See* FOF § E.1.

308.    Extensive evidence shows that Kroger sets its prices principally by reference to Walmart (whose prices typically are lower than Kroger's) rather than Albertsons (whose prices typically are higher). Under each of its three key pricing strategies, Kroger prices against ████ in all pricing zones where it competes with Albertsons.[690] Kroger does not raise prices

---

[690] Tr. (Israel) 2598:9-18.

based on price-checks against high-priced retailers like Albertsons; instead, it looks to a high-priced retailer in each pricing zone only as a "reference," and the resulting impact of the higher-priced Albertsons on Kroger is "very, very minimal."[691]

309.    Kroger's practice of setting prices primarily by reference to Walmart stems from business necessity. If Kroger raised prices to the level of Albertsons' prices, it "would lose a significant amount of business to … Aldi, Walmart, Costco, and others."[692]

310.    Empirical data confirms that Albertsons has no statistically significant price-disciplining effect on Kroger. *See* FOF § E.4. Using regression analysis of margin data, Dr. Israel found that Kroger's prices generally are lower when more competitors are nearby.[693] But "there is no statistically significant—really no measurable effect of Albertsons' presence on Kroger pricing."[694] Although Dr. Israel's regression analysis shows (consistent with testimony and documents) that Kroger has some effect on Albertsons' prices, it also shows that the divestiture eliminates the effect altogether.[695] Plaintiffs make no effort to address this data, instead pointing to anecdotal evidence of instances where a product may be priced lower at an Albertsons than a nearby Kroger. But regression analysis of price effects is the exact kind of data courts have relied on to *enjoin* mergers when it shows that two firms have a statistically significant effect on each other's prices. *See FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1039-40 (D.D.C. 2008); *Staples*, 970 F. Supp. at 1082. The inverse evidence here compels the inverse result.[696]

---

[691] Tr. (Groff (Kroger)) 326:19-327:3.

[692] Tr. (McMullen (Kroger)) 1590:5-8.

[693] DX 2623 (Israel Rep.) ¶ 222 & App'x D tbls.1-4. Specifically, Dr. Israel found that Kroger's prices are ~0.5% lower when there are ten or more competing grocery stores nearby. *Id. See also* Tr. (Israel) 2616:3-5 (noting that there is "no measurable effect of Albertsons' presence on Kroger pricing").

[694] Tr. (Israel) 26116:3-5.

[695] Tr. (Israel) 2617:14-2618:24.

[696] Dr. Hill argued in his rebuttal report that this data shows only correlation and not causation because of other potentially confounding factors. PX 7006 (Hill Rebuttal Rep.) ¶ 123. Dr. Israel,

311.    Dr. Hill's speculative analysis of *theoretical* price effects is no substitute for Dr. Israel's "direct evidence" of *actual* price effects under real-world conditions. *Staples*, 970 F. Supp. at 1082; *see, e.g.*, *Thomas Jefferson Univ.*, 505 F. Supp. 3d at 543. Just ask the FTC: "the court need not rely on market share based predictions [when] [t]here is real world direct evidence—based on the defendants' pricing behavior."[697] "[D]irect evidence, when it's available, [is] ... the best way to answer" whether a merger will lead to higher prices, "rather than work[ing] through the assumptions and complexities of an economic model."[698]

312.    Apart from Dr. Hill's flawed sales-diversion analysis, Plaintiffs rely on cherry-picked documents in which Kroger or Albertsons employees discuss the other's pricing or offerings.[699] Notably, most of those documents are from Albertsons, not Kroger, and so are uninformative in assessing competition because Kroger prices against Walmart, and Kroger's policies will control after the merger.[700] Conspicuously absent from Plaintiffs' narrative are the numerous documents showing ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████.[701] Even those cherry-picked Albertsons documents do not support Plaintiffs' theory. The term "primary food competitor"—to which Plaintiffs attach great significance—is used by Albertsons' pricing programs and policies to refer to a "class of trade" or a "traditional

---

however, controlled for those factors. *See* DX 2623 (Israel Rep.) ¶ 206 & App'x E. In any event, even the absence of any *correlation* between the presence of an Albertsons and lower prices at Kroger is sufficient to foreclose any inference that the merger will meaningfully reduce competition.

[697] Plaintiff's Memorandum of Points and Authorities in Support of Motions for Temporary Restraining Order and Preliminary Injunction at 3, *FTC v. Staples, Inc.*, No. 97-cv-701 (D.D.C. 1997), https://www.ftc.gov/sites/default/files/documents/cases/1997/04/pubbrief.pdf.

[698] Tr. (Israel) 2595:15-2596:2.

[699] *E.g.*, PX 1358, 1480, 1502.

[700] DX 2623 (Israel Rep.) ¶ 283, n.320.

[701] *See, e.g.*, DX 0061-61A; DX 2631B; DX 0149I; DX 00011; PX 1130 at 6; DX 2213; DX 1290, 1290A, DX 2711 at 9-10, 15, 21.

supermarket" belonging to the "FOOD" channel, as defined by Circana, a third-party market share measuring firm, from which Albertsons can easily collect pricing data.[702] It does not, as Plaintiffs claim, identify Albertsons' "biggest competitor in the market place."[703] In fact, Albertsons also collects pricing information from a Walmart in every price area where one is available.[704] And, to the extent Albertsons' pricing software recommends prices based in part on the prices collected for the "primary food competitor," those prices are merely recommendations—division personnel have final authority over the prices seen by customers, and they use that discretion to override the pricing recommendations some 60% of the time.[705]

313.    Finally, Plaintiffs' novel "head-to-head" theory neglects the divestiture, which will ensure continued direct competition between current Kroger and Albertsons stores in precisely those markets that Plaintiffs highlight. Plaintiffs point to purported direct competition on customer service between QFC and certain Albertsons banners in the Seattle area, for example.[706] ████

████████████████████████████████████████████████████████

████████████████.[707] And, in these limited markets where pricing at Kroger may have been adjusted following Albertsons' pricing, Kroger's pricing would nevertheless continue to be constrained by the next highest retailer following the merger.[708]

**B.    Defendants Have Met Their Burden of Production on Rebuttal**

314.    Even if Plaintiffs could establish their *prima facie* case under the first part of the *Baker Hughes* standard, Defendants easily satisfy their burden of production on rebuttal. 908 F.2d

---

[702] Tr. (Silva) 227:7-15; Tr. (Silva) 257:5-258:8; Tr. (Kinney) at 2923:21-2924:14.
[703] Tr. (Silva) 257:5-18.
[704] Tr. (Silva) 256:10-13
[705] Tr. (Silva) 258:17-262:10.
[706] Plf. PI Br. 15.
[707] DX 2239 (Schedule 2.1(a)-A; Schedule 2.1(a)-K; Schedule 2.1(c)-A; Schedule 2.1(c)-K).
[708] Tr. (Kammeyer (Kroger)) 487:22-488:9.

at 989. That burden is a modest one: "the party must introduce sufficient evidence to support a jury finding in his behalf." Charles Wright & Arthur Miller, 21B *Fed. Prac. & Proc.* § 5122 (2d ed. 1987); *see, e.g.*, *New York v. Deutsche Telekom*, 439 F. Supp. 3d 179, 210 (S.D.N.Y. 2020). Extensive evidence shows both that the flawed market shares Dr. Hill calculates are a poor indication of competitive harm and that the merger will generate substantial efficiencies.

### 1.    Any Increase in Market Concentration Will Not Translate to Market Power

315.    The question on rebuttal is whether any evidence suggests that Plaintiffs' presumptive case "inaccurately predicts the relevant transaction's probable effect on future competition." *Baker Hughes*, 908 F.2d at 991. Market concentration is the beginning—not the end—of the antitrust analysis, because "market share" does not always translate to "market power, which is the ultimate consideration." *Id.* at 992 (cleaned up). Several factors show that any increase in market concentration here is unlikely to produce anticompetitive effects.

316.    *First*, estimates of market concentration or anecdotal allegations of competition are not a substitute for data showing *actual* price competition between the parties and other firms— these are just "prox[ies] for predicting the ability of firms in the market to exercise market power." *FTC v. Occidental Petroleum Corp.*, 1986 WL 952, at *7 (D.D.C. Apr. 29, 1986). Here, the merger will eliminate no meaningful pricing constraints, because Albertsons does not currently discipline Kroger's prices. *See* FOF § E.4. Using an established grocery industry-specific model developed outside the litigation context to analyze the diversion of sales between grocery retailers, applying Defendants' variable (not gross) margins, and accounting for the divestiture, Dr. Israel determined that the merger is unlikely to lead to price increases post-merger.[709] Dr. Hill admitted that he does

---

[709] DX 2623 (Israel Rep.) ¶¶ 252-54, figs. 40-41; *see also* section I.A.3.b, *supra*. Dr. Israel's analysis using Dr. Hill's CMCR methodology similarly found that there would be no significant price effect. Tr. (Israel) 2688; DX 2623 (Israel Rep.) App'x C, fig.1. And as Andy Groff (Kroger)

not dispute Dr. Israel accurately calculated his results when using variable margins and accounting for the divestiture.[710] And Plaintiffs make no effort to rebut Dr. Israel's direct evidence of a lack of a price effect after the divestiture.

317.    *Second*, Kroger's flywheel model gives it different incentives than that of other firms. Kroger's mission is not to maximize revenue from grocery retail, but rather to maximize its overall revenue, including that earned from non-grocery revenue. *See* FOF § D.1-5. Because of the flywheel, Kroger is incentivized to *lower* prices in order to increase customer volume, thereby feeding the non-grocery revenue side of the flywheel and allowing for even further price investment.[711] None of Plaintiffs' economic analyses accounted for this incentive, which makes their rigid models a poor predictor of the likely effects of the merger on pricing.

318.    *Third*, market concentration is a poor measure of competition where, like here, "the threat of outside entry" constrains pricing by "deterring the remaining entities" from "exercising market power." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 717 n.13 (D.C. Cir. 2001). The evidence showed that many of Kroger's fiercest competitors, including Walmart, Costco, Amazon, Whole Foods, Target, and Aldi have concrete and aggressive plans to expand. *See* FOF § B.1. "The ability and willingness of current competitors to expand their foothold in the market and/or reposition

---

testified at the hearing, when implementing pricing, Kroger generally uses an "execution" level, which could be as large as a whole division. Kroger then prices against a Walmart in a central location in that larger zone that represents a common/average price. Tr. (Groff (Kroger)) 328:16-335:4.

[710] Tr. (Hill) 1541:22-1542:11. Dr. Hill also admitted that it is important to use variable costs when calculating GUPPI. *See* Tr. (Hill) 3399:10-12. He further acknowledged that in a previous case in which he was an expert, he told the court that using variable costs was consistent with how the merging parties made decisions in the ordinary course of business and that, therefore, it was important to use variable costs in calculating GUPPI. Tr. (Hill) 3396:24-3397:24. The court in that case even quoted Dr. Hill favorably, saying that the GUPPI model is "'explicit' that one should use firms' variable, not fixed, costs to implement the models." *United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1, 43 n.30 (D.D.C. 2022).

[711] Tr. (Cosset (Kroger)) 2243:19-23; DX 2970 at 9.

greatly reduces the anticompetitive effects of a merger, and is essentially equivalent to new entry."

*FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26, 57 (D.D.C. 2009).[712]

### 2. The Merger Will Generate Significant Efficiencies and Lower Prices

319.    The significant efficiencies and consumer benefits the merger will generate also rebut Plaintiffs' *prima facie* case. Courts have long recognized that mergers can create efficiencies that will enhance competition and consumer welfare. *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 89 (D.D.C. 2011). The "trend among lower courts has … been to recognize or at least assume that evidence of efficiencies may rebut the presumption that a merger's effects will be anticompetitive." *Deutsche Telekom AG*, 439 F. Supp. 3d at 207; *see also Arch Coal*, 329 F. Supp. 2d at 151 (efficiencies can affect "whether the proposed transaction will substantially lessen competition"). To be cognizable, efficiencies must be both merger-specific and verifiable. *See H & R Block*, 833 F. Supp. 2d at 89-90; *see also* 2010 Merger Guidelines § 10.[713] But efficiencies need only rise above the "speculative" level—defendants need not show they will be realized with absolute certainty. *Deutsche Telekom*, 439 F. Supp. 3d at 213.

320.    Kroger expects to achieve significant cost savings and revenue synergies and to use those synergies to invest $1 billion in lowering prices at Albertsons stores on a run rate basis.[714] As set forth in more detail in FOF § D.1-5, the merger will allow Kroger to generate cost savings and revenue enhancements by reducing sourcing, supply chain, and manufacturing costs, and by

---

[712] Courts have also held that market concentration is probative primarily where a merger would likely foster "interdependent anticompetitive conduct." *H.J. Heinz*, 246 F.3d at 715-16. Plaintiffs have not even attempted to make such a showing here.

[713] The 2023 Merger Guidelines Plaintiffs rely on have never been adopted by any court. In any event, the claimed efficiencies would be cognizable under either set of guidelines. *See* Tr. (Gokhale) 2110:15-18; DX 2736 (Gokhale Rep.) ¶ 18.

[714] *See* Tr. (McMullen (Kroger)) 1619:15-23, 1621:6-9; Tr. (Aitken (Kroger)) 1838:9-15. DX 2239 (Schedule 9.1); *see also* DX 1254 at 5.

improving Albertsons' private label offerings, product selection, and data analytics.[715]

321.    Kroger's estimated synergies are the result of a rigorous validation process, and expert analysis confirms that ███████████ of those efficiencies are cognizable under the Merger Guidelines.[716] Moreover, the price investments it has publicly committed to comport with its past practice. Since 2003, Kroger has invested more than $5 billion in lower prices for consumers—including, following its Harris Teeter and Roundy's acquisitions, investing over $100 million in each to lower prices.[717]

### C.    Plaintiffs Cannot Carry Their Ultimate Burden of Persuasion

322.    Because Defendants easily carry their modest rebuttal burden, the burden of production returns to Plaintiffs and "merges with the[ir] ultimate burden of persuasion." *Baker Hughes*, 908 F.2d at 982-83. Dr. Hill's economic analysis is insufficient to satisfy that burden.

323.    *First*, while Dr. Israel analyzes substitution among individual grocery stores, Dr. Hill instead extrapolates estimated diversion ratios based on "census block group market shares," "assuming diversion ratios are just proportional to [market] shares without actually measuring substitution."[718] That assumption is unreasonable.[719] Critically, Dr. Hill's diversion ratios do not "account for how close the stores are together or what format they are or how popular the store is in that area."[720] And because he assumes that diversion ratios are solely a function of the market share of each store, Dr. Hill's analysis of competitive effects does little more than restate his conclusions about market concentration.[721]

---

[715] Tr. (Maharoof (Kroger)) 2067:12-2075:24.
[716] Tr. (Maharoof (Kroger)) 2076:1-2083:7; Tr. (Gokhale) 2116:7-10.
[717] Tr. (Aitken (Kroger)) 1839:24-1840:13, 1886:18-1888:9; DX 2559 at 15.
[718] Tr. (Israel) 2668:23-2669:8.
[719] Tr. (Israel) 2669:19-22.
[720] Tr. (Israel) 2669:9-16.
[721] PX 7004 (Hill Rep.) ¶ 135; *see also* DX 2623 (Israel Rep.) ¶ 241.

324.    *Second*, Dr. Hill improperly relies on gross rather than variable margin data. Ignoring variable margins and focusing only on gross margins inflates the post-merger margins and overstates estimated competitive harm—which direct evidence shows will be negligible at most.[722] Dr. Israel uses the more accurate margins figure—the variable margins figure—which better captures all of the costs that increase as output increases.[723]

325.    As Plaintiffs recognize, the use of variable rather than gross margins data is a "key dispute" that separates Dr. Israel's and Dr. Hill's analyses of the merger's competitive effects.[724] Keeping every other aspect of Dr. Hill's analysis the same—including his flawed diversion ratios and failure to consider the divestiture—using gross rather than variable margins would flip the results of his competitive effects analysis in roughly 600 markets.[725]

326.    Dr. Israel's analysis shows that accounting for actual store diversion ratios, variable margins, and the divestiture, "the overwhelming majority of the stores, all but two of the stores, have a GUPPI below the 5 percent safe harbor."[726] The "vast majority" of the stores have a GUPPI below 3%.[727] And after also accounting for Kroger's price zones—that is, how Kroger actually sets prices— Dr. Hill concedes that no markets exhibit any risk of competitive harm.[728] Particularly when combined with the data showing that Albertsons does not constrain Kroger's pricing,

---

[722] DX 2623 (Israel Rep.) ¶ 244. Indeed, other retailers have testified that consumers would benefit if the merger resulted in lower prices for consumers in those retailers' markets. Tr. (Van Helden (Stater Brothers)) 217:4-7; *see also* Tr. (Knopf (Raley's)) 975:24-976:8 (testifying that if prices at Albertsons stores were lowered post-merger, that could be good for consumers). Indeed, Dr. Israel testified that when he uses the proper inputs, i.e., using "the GUPPIs and CMCRs correctly, you get no concern for harm, which is consistent, not surprisingly, with what the direct evidence tells us." Tr. (Israel) 2689:10-12.

[723] Tr. (Israel) 2669:23-2673:14, 2674:18-2676:7.

[724] Tr. (Plf. Closing) 3593:11-23; *see also* Tr. (Hill) 1532:7-9 (using the appropriate margin is "certainly important" to a competitive effects analysis).

[725] PX 7006 (Hill Rebuttal Rep.) fig. 13; Tr. (Hill) 1593:10-17.

[726] Tr. (Israel) 2684:12-18.

[727] Tr. (Israel) 2684:19-21.

[728] Tr. (Hill) 1542:1-11; *see also* Tr. (Israel) 2684:22-2685:5.

Plaintiffs fail entirely to carry their burden.

## III. PLAINTIFFS CANNOT SHOW A "LIKELIHOOD OF ULTIMATE SUCCESS" ON THE MERITS IN A UNION GROCERY LABOR MARKET

327.    In the alternative, Plaintiffs seek to block the merger on the ground that it will supposedly lessen competition for union grocery labor. That fails for several reasons.

### A.    Plaintiffs' Labor Theory Is Not Legally Cognizable

328.    No plaintiff in history has sought to block a merger under the Clayton Act by alleging that it may eliminate tactics unions use when bargaining with employers. For good reason: text and precedent make clear that the antitrust laws have no place in the field of labor relations.

329.    The Clayton Act's text is plain, and so courts "must enforce it according to its terms." *King v. Burwell*, 576 U.S. 473, 486 (2015). "The labor of a human being is not a commodity or article of commerce." 15 U.S.C. § 17. Consistent with that unambiguous statutory language, the Supreme Court has explained that "it would seem plain that restraints on the sale of the employee's services to the employer … are not in themselves combinations or conspiracies in restraint of trade or commerce." *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 503 (1940). Courts have repeatedly recognized that "the antitrust laws were not enacted for the purpose of preserving freedom in the labor market, nor of regulating employment practices as such." *Nichols v. Spencer Int'l Press, Inc.*, 371 F.2d 332, 335-36 (7th Cir. 1967); *see, e.g.*, *McNeil v. Aguilos*, 831 F. Supp. 1079, 1086-87 (S.D.N.Y. 1993); *Plumbers & Steamfitters, Loc. 598 v. Morris*, 1981 WL 27190, at *6 (E.D. Wash. Apr. 9, 1981). Plaintiffs' use of "CBA areas" as their proposed geographic markets confirms that the gravamen of their claim is a diminishment in the bargaining power of particular unions during collective bargaining.[729]

---

[729] Plaintiffs' labor theory focuses on 31 CBA areas, mainly in the Pacific Northwest. *See* DX 2739 (McCrary Rep.) ¶ 135. It has no applicability to the majority of the country.

330.    Plaintiffs' theory also is legally defective because the harm it alleges falls within the so-called implicit or nonstatutory antitrust exemption for labor activity. "[I]t has long been recognized that in order to accommodate the collective bargaining process, certain concerted activity among and between labor and employers must be held to be beyond the reach of the antitrust laws." *Clarett v. Nat'l Football League*, 369 F.3d 124, 130 (2d Cir. 2004). The antitrust laws do not regulate the allocation of bargaining power between unions and employers.

331.    One of Congress's chief objectives in creating the National Labor Relations Board "was to take from antitrust courts the authority to determine, through application of the antitrust laws, what is socially or economically desirable collective-bargaining policy." *Brown v. Pro Football, Inc.*, 518 U.S. 231, 242 (1996); *see also United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 664 (1965) ("the elimination of competition based on wages among the employers in [a] bargaining unit" is "not the kind of restraint Congress intended the [antitrust laws] to proscribe"). As such, the Supreme Court has rejected the argument that coordinated action by employers in bargaining with organized labor can amount to an antitrust violation. *Brown*, 518 U.S. at 234-35.

332.    Plaintiffs here seek to do precisely what the Supreme Court's precedent forbids: use the antitrust laws to set "collective-bargaining policy." *Id.* at 242. Indeed, Plaintiffs repeatedly articulated their labor theory during their closing statement in precisely those terms, contending that "Kroger's acquisition of Albertsons will permanently reduce union bargaining leverage."[730] Even if that claim were true—and it is not—a change in the allocation of bargaining leverage between unions and employers is not a cognizable lessening of competition in a line of commerce.

333.    Underscoring the implausibility of Plaintiffs' theory, the antitrust laws would

---

[730] Tr. (Plf. Closing) 3488:11-14; *see also id.* at 3437:12-15 (contending that the merger is "presumptively anticompetitive" because "the union's bargaining leverage will be reduced"); *id.* at 3464:5-9 (contending that there will be a "decrease in bargaining terms").

permit Kroger and Albertsons to join forces in collective bargaining *today*. *Id.* at 234-35. That is, Plaintiffs' position is that the merger should be enjoined to prevent Defendants from doing what they may already do. That is not what the Clayton Act requires.

**B.    Plaintiffs' Union Grocery Labor Market Was Not Supported by Expert Evidence**

334.    Plaintiffs' experts did not—indeed, would not—support any "union labor market." That independently forecloses Plaintiffs' labor claim.

335.    "Courts consistently require that expert testimony adequately define the relevant geographic and product markets in antitrust cases." *Water Craft Mgmt., L.L.C. v. Mercury Marine*, 361 F. Supp. 2d 518, 542 (M.D. La. 2004). The failure to provide any expert testimony is sufficient grounds for dismissing the claim. *See, e.g.*, *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1246 (11th Cir. 2002) ("Construction of the relevant market and a showing of monopoly power must be based on expert testimony."); *Cogan v. Harford Memorial Hosp.*, 843 F. Supp. 1013, 1020 (D. Md. 1994) (similar); *Premier Comp Sols. LLC v. UPMC*, 377 F. Supp. 3d 506, 526 (W.D. Pa. 2019) (similar); *Med Evac, Inc. v. AmeriCare Ambulance Serv., Inc.*, 2007 WL 9723595, at *5 (M.D. Fla. Dec. 11, 2007) (similar); *Deselms v. Occidental Petroleum Corp.*, 2024 WL 1194080, at *6 (D. Wyo. Feb. 22, 2024) (similar); *Kentucky v. Marathon Petroleum Co. LP*, 464 F. Supp. 3d 880, 896 (W.D. Ky. 2020) (granting summary judgment where plaintiff had no expert testimony on market definition).

336.    Even courts that do not require expert testimony as a matter of law have explained that, "[a]s a practical matter, … it would seem impossible to prove such a complex economic question without the assistance of a qualified expert, viz., an economist," *Berlyn, Inc. v. Gazette Newspapers, Inc.*, 223 F. Supp. 2d 718, 727 n.3 (D. Md. 2002), *aff'd*, 73 F. App'x 576 (4th Cir. 2003), and that "[f]ailure to adduce expert testimony on competitive issues such as market definition augurs strongly in favor of granting summary judgment against an antitrust plaintiff,"

*Drs. Steuer & Latham, P.A. v. Nat'l Med. Enterprises, Inc.*, 672 F. Supp. 1489, 1512 n.25 (D.S.C. 1987), *aff'd*, 846 F.2d 70 (4th Cir. 1988); *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*, 108 F. Supp. 2d 549, 576 (W.D. Va. 2000) (same). Courts regularly grant summary judgment in antitrust cases after excluding expert testimony or when the plaintiff relies exclusively on lay evidence. *Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 919 (6th Cir. 2009) (precluding plaintiff from using "lay testimony and internal [company] marketing documents" to show market definition "in place of expert testimony"); *Mil. Servs. Realty, Inc. v. Realty Consultants of Va., Ltd.*, 823 F.2d 829, 832 (4th Cir. 1987) (granting summary judgment because the plaintiff's "experts were simply unable, when deposed, to provide any facts concerning injury to competition, nor could they adequately identify the relevant market.").

337.    Plaintiffs' lack of expert evidence defining the union labor market forecloses their claims as a matter of law. At the very least, given that no court has ever applied the antitrust laws in this context, and Plaintiffs' lay witnesses failed to identify any cognizable basis for the proposed market, "augurs strongly in favor" of denying the extraordinary relief Plaintiffs seek here.

### C.    Plaintiffs' Labor Theory Fails on Its Own Terms

338.    Even if an antitrust theory premised on a market for grocery union labor were legally cognizable, Plaintiffs have not proven such a theory here.

#### 1.    Plaintiffs' Theory Is Untethered to Any Competition for Grocery Union Labor

339.    Plaintiffs' labor theory fails for the basic reason that it is not really a theory about competition for grocery union labor. In an antitrust case involving the provision of labor or services, the relevant question is which employers are reasonably good substitutes such that they can deprive each other of a significant number of workers. *See Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001). Plaintiffs' principal contention here is that the merger will reduce unions'

bargaining leverage by taking away their ability to leverage Albertsons against Kroger during collective bargaining.[731] As described by Plaintiffs' witnesses, this tactic is effective because upon initiation of a strike, *customers* may choose to shop at the non-striking firm, thus driving grocery sales away from the stricken firm.[732]

340.    That theory does not relate to competition for grocery union labor. In these negotiations, Kroger and Albertsons are not competing with one another for *labor*.[733] Kroger and Albertsons do not have the "actual or potential ability to deprive" one another of workers during CBA negotiations. *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989). At bottom, Plaintiffs' labor theory is not one about competition for labor, but rather simply a policy prediction that the merger will result in worse bargaining outcomes for unions. Plaintiffs cannot establish a threat that the merger will substantially reduce competition in a market for union grocery labor on a theory that has nothing to do with competition for labor.

## 2.    Plaintiffs Cannot Establish a Cognizable Union Labor Market

341.    Defining an appropriate antitrust market is a threshold element of plaintiffs' prima facia case. *See Marine Bancorporation*, 418 U.S. at 618. Plaintiffs cannot substantiate either their proposed product or geographic markets.

### a.    *"Union Grocery Labor" Is Not a Cognizable Product Market*

342.    Plaintiffs offer no economic evidence supporting their proposed product market of union grocery labor. Dr. Hill testified (over the course of just six questions) only that *if* Plaintiffs have properly defined a union grocery labor market, then his calculation of market concentration

---

[731] Tr. (Plf. Opening) 60:4-15.
[732] Tr. (Clay) 685:7-14; Tr. (Zinder) 758:14-23.
[733] Tr. (McCrary) 3101:5-16. As Mr. Dosenbach testified, Albertsons is never trying to "beat" Kroger during labor negotiations; they are merely "trying to bargain the right deal … consistent with [its] overarching principles." Tr. (Dosenbach (Albertsons)) 2526:17-22.

suggests the merger would be presumptively anticompetitive in such a market.[734] Dr. Hill did not offer any testimony about whether Plaintiffs have accurately defined a market. Dr. Ashenfelter likewise did "not offer[] any opinion that union grocery labor is a relevant product market."[735] Plaintiffs cannot carry their prima facie burden (or their ultimate burden of persuasion) when they fail to "come to Court with economic evidence of any kind." *AT&T*, 310 F. Supp. 3d at 252.

343.    That Plaintiffs' economic experts refused to endorse their labor theory is unsurprising. *See* FOF § F.1. In a labor case, "the relevant market is one where employment positions are reasonably interchangeable with those offered by defendant." *Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 472 (6th Cir. 2005). Reasonable interchangeability turns in substantial part on whether an employee can perform the same function for different employers. *Id.*

344.    Most positions at Kroger and Albertsons require only "general skills" that "would be in demand at a wide variety of alternative employers and a broader labor market."[736] Plaintiffs focus on specialized roles like meat cutters that might not exist outside grocery retailers.[737] But those are rare exceptions: "perhaps 1 or 2 percent of Kroger and Albertsons" positions.[738] The overwhelming majority of Kroger and Albertsons employees—like cashiers, sales representatives, or clerks—develop skills transferable to any retail position (and many others).[739] For that reason, many Kroger and Albertsons employees come from retailers like "Home Depot, Macy's, Lowe's," which do not sell groceries and are typically not unionized.[740] That sharply distinguishes this case

---

[734] Tr. (Hill) 1496:7-1497:8.
[735] Tr. (Ashenfelter) 3343:23-25.
[736] Tr. (McCrary) 3066:10-3067:3.
[737] *See* Tr. (Zinder (UFCW Local 324)) 751:753:1; (McPherson (Kroger)) 665:2-666:7.
[738] Tr. (McCrary) 3069:7-11.
[739] Tr. (McCrary) 3068:14-3069:1, 3077:19-3078:7.
[740] Tr. (McCrary) 3082:6-15.

from wage-fixing cases in which employees had "accumulate[d] industry-specific knowledge" that was not readily transferrable outside the industry in question. *Todd v. Exxon Corp.*, 275 F.3d 191, 203 (2d Cir. 2001).

345.    The data confirms this common-sense conclusion. As Dr. McCrary testified, "the labor market is broader than union grocery."[741] Only a tiny percentage of Kroger and Albertsons employees come from union grocery jobs or leave for union grocery jobs.[742] That is, union grocery employees readily substitute to non-union and non-grocery jobs and union grocery employers readily hire non-union and non-grocery employees. And 96% of job postings by Albertsons and Kroger do not mention whether the position is unionized, while 72% of Kroger workers and 71% of Albertsons workers have left their jobs after one year, indicating that other factors like compensation matter far more. No witness testified that Kroger and Albertsons only compete for grocery union labor.

346.    Plaintiffs' union grocery labor market also is not supported by the *Brown Shoe* practical indicia. Union grocery labor does not have distinct pricing (wages do not systematically differ between union and non-union Kroger and Albertsons stores);[743] there is no industry or public recognition of a separate labor market for union grocery labor (no witness testified to one); and union grocery labor overwhelmingly requires skills easily transferable to other non-grocery or non-union employers. *See* FOF § F.1.

### b.    *"CBA Areas" Are Not Cognizable Geographic Markets*

347.    Plaintiffs' proposed geographic markets—so-called "CBA areas," consisting of those geographic areas covered by a collective bargaining agreement with either Kroger or

---

[741] Tr. (McCrary) 3058:8-9.
[742] Tr. (McCrary) 3082:2-23.
[743] Tr. (McCrary) 3076:6-18.

Albertsons—also do not pass muster. Indeed, Plaintiffs' economic expert offers no defense of Plaintiffs' proposed market definition. A geographic market must extend to the area in which "buyers can turn for alternative sources of supply." *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001). And there is zero evidence that job-seekers or prospective employers limit their searches to areas covered by particular bargaining agreements.

348.    CBA areas bear no relationship to the realities of the employment market. *See* FOF § F.2. "There is no particular method or methodology … on the coverage of a bargaining unit."[744] A CBA might cover a single department, a single store, stores in a city, or even a region cutting across state lines.[745] The idea that jobs hundreds of miles apart would be reasonable substitutes because they fall within the same CBA area—while another union job across the street might not— has no support in caselaw or logic. And Plaintiffs' own labor witness testified that she had not heard the term "CBA area," much less heard it used to describe the bounds of a labor market.[746]

### 3.    The Merger Would Not Substantially Reduce Competition for Union Labor

349.    Even if Plaintiffs could establish a cognizable market in union grocery labor, their claim would fail because the merger will not harm workers or otherwise produce any anticompetitive effects. To start, both the antitrust and labor laws permit employers to combine bargaining power during multiemployer bargaining, *see Brown*, 518 U.S. at 234-35, and so Plaintiffs' theory that the merger would harm competition by combining Defendants into a *de facto* multiemployer bargaining unit makes no sense.

350.    No economic evidence supports plaintiffs' theory either. *See* FOF § F.3. Dr. McCrary determined that in any properly defined labor market—one that includes competitors that

---

[744] Tr. (King) 2841:22-23.
[745] Tr. (King) 2840:10-2841:23.
[746] Tr. (Zinder (UFCW Local 324)) 796:21-23.

offer credible alternatives to employment—market concentration is very low.[747]

351.    And the merger will not reduce wages for union grocery workers. "[W]ages are the same in between areas where there is overlap [between Kroger and Albertsons] versus areas where there is not," indicating that "wages would be expected to be the same in the post-merger world."[748] The same is true for non-wage compensation.[749]

352.    Finally, although a change in the allocation of power between unions and employers is not a cognizable antitrust harm, the merger would increase, rather than diminish, union bargaining power. ████████████████████████████████████████

████████████████████████████████████████████████

████████████[750] And because after the merger strikes can "be utilized with a larger bargaining unit," "[t]here is going to be a lot more of an economic clout, an ability [for] the union to … economically cripple the target employer."[751]

## IV.    PLAINTIFFS FAIL TO SHOW A BALANCE OF EQUITIES IN THEIR FAVOR

353.    "In determining whether to grant a preliminary injunction under section 13(b), a court must … balance the equities." *Warner Commc'ns*, 742 F.2d at 1160; *see Winter*, 555 U.S. at 19-20. Even if Plaintiffs established a likelihood of ultimate success on the merits (and they did not), a failure to show that the balance of equities tilts in their favor is "a separate, independent reason the FTC's motion must be denied." *Microsoft Corp.*, 681 F. Supp. 3d at 1100-01. "For instance, if potential merger partners can present credible evidence that the merged company will lower consumer prices because of extraordinary efficiencies (even when the same efficiencies

---

[747] Tr. (McCrary) 3089:18-3092:5.
[748] Tr. (McCrary) 3094:20-3095:5.
[749] Tr. (McCrary) 3099:24-3100:10.
[750] DX 2740 (King Rep.) ¶¶ 44, 59; Tr. (Zinder (UFCW Local 324) 787:9-25 (testifying that a larger membership increases union leverage).
[751] Tr. (King) 2851:1-13.

might not suffice to overcome the presumption in favor of the FTC's prima facie case on the merits), and those efficiencies and lowered prices will be lost forever if the merger is preliminarily enjoined, the public equities in favor of the merger might outweigh the FTC's likelihood of success on the merits." *CCC Holdings*, 605 F. Supp. 2d at 76.

354.    The evidence showed that if the merger goes through, it will generate ████████ ████████████ and substantial price reductions for consumers nationwide.[752] Prices will drop; consumers will experience improved shopping conditions; and Kroger will make substantial investments in its associates. *See* FOF § D.1-5.[753]

355.    The merger will also allow Kroger to have greater scale and national presence. This is the only way Kroger can achieve the type of scale that would allow it to lower its prices enough to compete with Walmart, Costco, and Amazon. So if Plaintiffs have their way and block the merger, it is actually making it harder for "traditional" supermarkets to survive and thrive in the very long term. *See* FOF § D.1-2. And that will result in fewer options for consumers.

356.    By allowing Kroger to lower prices, the merger will also enhance competition with other "traditional" grocery stores. Plaintiffs' own grocery retailer witnesses from Stater Brothers and Raley's acknowledge that if Kroger lowers prices at Albertsons stores post-merger it could place competitive price pressure on them.[754]

357.    By contrast, if the merger were enjoined, Albertsons' CEO gave uncontradicted testimony that the company's inability to compete on price with Walmart and others will result in difficult decisions. It will have to consider store closures. It will have to consider exiting certain

---

[752] DX 1727 at 15; DX 2237 at 2.
[753] Kroger has committed to investing in associate wages with over $2 billion invested in wages over the last four to five years. Tr. (McPherson (Kroger)) 630:13-20; *see also* DX 0877A.
[754] Tr. (Van Helder (Stater Bros.)) 216:17-20; Tr. (Knopf (Raley's)) 975:24-976:5.

markets.[755] "[W]e will continue to compete over the next two to three years. But … the next two, three years are going to be very different for all of us …. [W]e will have to do a lot more things than we are doing today, and maybe a lot more difficult things than we are doing today."[756]

358.    In the shorter term, under the terms of the merger agreement, the agreement may be terminated after October 9, 2024.[757] Not consummating the merger by this "outside date" would compromise Defendants' ability to execute the merger: financing commitments are tied to this date;[758] tens of thousands of associates who have been notified of their transition to C&S will be left in the dark;[759] and the integration and divestiture teams would be greatly impacted.  *See* FOF § C.2.[760]

359.    In their rebuttal, Plaintiffs asked the Court to ignore this facet of the competitive landscape, too, characterizing Albertsons' inability to effectively compete in the marketplace as relevant only to "a flailing or failing firm defense."[761] But the level of competition in the but-for world without the merger is not a "defense"; it is the fundamental benchmark of antitrust review. *See Baker Hughes*, 908 F.2d at 991 (key question is "the relevant transaction's probable effect on future competition"); *see also* Plf. PI Br. 24 (transaction must be measured against "the pre-merger level of competition that characterizes the present marketplace" (quoting *Sysco*, 113 F. Supp. 3d at 73)). And Albertsons' future is also of critical importance to the equities, where the Court must consider the world consumers will face absent the merger.

360.    The merger is critical for unionized grocery labor. Kroger and Albertsons have a

---

[755] Tr. (Sankaran) 1727:1-11728:20.
[756] Tr. (Sankaran) 1727:4-11.
[757] Tr. (Cosset (Kroger)) 2384:6-15.
[758] Tr. (Cosset (Kroger)) 2385:4-10.
[759] Tr. (Cosset (Kroger)) 2385:12-22.
[760] Tr. (Cosset (Kroger)) 2386:12-22.
[761] Tr. (Plf. Closing) 3597:8-13.

price disadvantage to Walmart, Costco, and Amazon in part because the costs of goods and labor. "This merger allows Kroger and Albertsons to close that competitive gap on the cost of goods. If the merger doesn't happen, one of two things will happen for unionized labor: One, sales will still continue to be taken by these companies who have a competitive advantage, which will reduce in fewer union members; or alternatively, Kroger and Albertsons will have to pull the labor lever and have to reduce their labor costs, which, again, will result in fewer union members."[762]

361.    On the other side of the equities ledger, Plaintiffs allege harm only in narrow local markets; in the majority of states where Defendants do not overlap, the merger can only benefit consumers. Plaintiffs offer no reason the balance of equities or public interest should favor the interests of consumers in a handful of local markets, if any, where they (wrongly) allege competition may be reduced, when consumers across the country will experience only benefits from this merger. *See Maney v. Brown*, 464 F. Supp. 3d 1191, 1217 (D. Or. 2020) ("The public interest also commands respect for federalism and comity …." (citation omitted)). And the equities particularly disfavor enjoining the merger in its entirety where additional targeted divestitures could mitigate any minimal competitive impact.

## V.    PLAINTIFFS FAIL TO ESTABLISH ANY IRREPARABLE HARM

362.    The traditional four-factor test that plaintiffs must satisfy to obtain extraordinary injunctive relief includes the requirement that the moving party must establish irreparable harm. *Starbucks*, 144 S. Ct. at 1576-77. Plaintiffs' preliminary injunction motion argued that Section 13(b) "omit[s] requirements like irreparable harm." Plf. PI Br. 6-7. As noted, Plaintiffs' position is contrary to *Starbucks*.

363.    During the hearing, Plaintiffs' did not present evidence or argue that there would

---

[762] Tr. (Dosenbach (Albertsons)) 2537:2-11.

be irreparable harm from the merger. The only reference to irreparable harm was in their reply brief where they argued that irreparable harm would occur from the merger because of the "loss of fierce competition between Defendants for shoppers and workers."[763] But that just assumes that irreparable harm flows directly from a likelihood of success on the merits, a contention that courts repeatedly have rejected. *E.g.*, *Winter*, 555 U.S. at 20-23.

364.    In any event, the Court need not reach the irreparable harm requirement since Plaintiffs fail to satisfy the other threshold requirements to obtain injunctive relief.

## VI.    PLAINTIFFS' PROPOSED REMEDY IS FATALLY OVERBROAD

365.    Finally, even if Plaintiffs could satisfy all the requirements for a preliminary injunction—and they cannot—they would not be entitled to the sweeping nationwide relief that they seek. As both the Supreme Court and the Ninth Circuit have repeatedly cautioned in recent years, injunctive relief "must be tailored to remedy the specific harm alleged." *Galvez v. Jaddou*, 52 F.4th 821, 834 (9th Cir. 2022) (quotation source omitted); *see, e.g.*, *Murthy v. Missouri*, 144 S. Ct. 1972, 1981 (2024) (criticizing court of appeals for "affirm[ing] a sweeping preliminary injunction"); *Labrador v. Poe*, 144 S. Ct. 921, 921 (2024) (staying injunction insofar as it was overbroad). When awarding injunctive relief, courts must always consider "[i]f a less drastic remedy" would be "sufficient to redress" the injury a plaintiff has shown. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010). "It is an abuse of discretion to issue an overly broad injunction." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1188, 1196-97 (9th Cir. 2024) (remanding because injunction's "expansive geographical scope" was not "necessary to prevent" the alleged harm).

366.    As Plaintiffs readily acknowledge, their challenge turns on "local markets."[764] The

---

[763] Plf. PI Reply Br. 34.
[764] Plf. PI Br. 38.

harms they allege are highly localized, too. Plaintiffs contend that the relevant markets typically span only around ten miles, with more distant stores exerting *zero* influence in each antitrust market.[765] Unlike cases in which the Ninth Circuit has permitted nationwide relief, any competitive harm in one of the thousands of local markets plaintiffs identify is circumscribed by "neat geographic boundaries." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 680 (9th Cir. 2021) (citation omitted). In *more than half the states* in the United States where Kroger and Albertsons do not overlap, the merger could not even arguably harm competition. In that context, a nationwide injunction makes no sense where targeted divestiture could address any purported local harms.

367.    Plaintiffs' only response on this issue is that courts have previously enjoined mergers after finding anticompetitive effects in a single market. But none of those cases held that a global remedy is permissible when more tailored alternatives would eliminate competitive harms. To the contrary, the sole Ninth Circuit case Plaintiffs cite held that "a limited divestiture order" was appropriate, observing that divestiture "should always be in the forefront of a court's mind when a violation of [the antitrust laws] has been found." *RSR Corp. v. FTC*, 602 F.2d 1317, 1326 (9th Cir. 1979) (citation omitted). At a fundamental level, Plaintiffs do not—and cannot—articulate any reason to scuttle a multi-billion-dollar deal and deprive consumers in the overwhelming majority of the country with lower prices to redress alleged competitive harms in (at most) a handful of local markets. That result is profoundly inequitable, contrary to the public interest, and would contravene both the Clayton Act and binding precedent.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction is DENIED.

DATED: September 27, 2024

---

[765] Plf. PI Br. at 29 n.142.

Page 135 –   DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

ANGELI LAW GROUP LLC

*/s/ David H. Angeli*
DAVID H. ANGELI, Bar No. 020244
david@angelilaw.com
PETER D. HAWKES, Bar No. 071986
peter@angelilaw.com
121 SW Morrison Street, Suite 400
Portland, OR 97204
Telephone: 503.954.2232

AND

WILLIAMS & CONNOLLY LLP

ENU A. MAINIGI (*Pro Hac Vice*)
emainigi@wc.com
JONATHAN B. PITT (*Pro Hac Vice*)
jpitt@wc.com
A. JOSHUA PODOLL (*Pro Hac Vice*)
apodoll@wc.com
THOMAS W. RYAN (*Pro Hac Vice*)
tryan@wc.com
TYLER INFINGER(*Pro Hac Vice*)
tinfinger@wc.com
WILLIAM ASHWORTH (*Pro Hac Vice*)
washworth@wc.com
680 Maine Avenue SW
Washington, DC 20024
Telephone: 202.434.5000

AND

DECHERT LLP

JAMES A. FISHKIN (*Pro Hac Vice*)
james.fishkin@dechert.com
MICHAEL COWIE (*Pro Hac Vice*)
mike.cowie@dechert.com
ELENA KAMENIR (*Pro Hac Vice*)
elena.kamenir@dechert.com
1900 K Street NW
Washington, DC 20006
Telephone: 202.261.3300

HOWARD. M. ULLMAN (*Pro Hac Vice*)

STOEL RIVES LLP

*/s/ B. John Casey*
B. JOHN CASEY, OSB No. 120025
john.casey@stoel.com
RACHEL C. LEE, OSB No. 102944
rachel.lee@stoel.com
JACOB GOLDBERG, OSB No. 162565
jacob.goldberg@stoel.com

AND

ARNOLD & PORTER KAYE SCHOLER LLP

MATTHEW M. WOLF (*Pro Hac Vice*)
matthew.wolf@arnoldporter.com
SONIA K. PFAFFENROTH (*Pro Hac Vice*)
sonia.pfaffenroth@arnoldporter.com
JOSHUA M. DAVIS (*Pro Hac Vice*)
joshua.davis@arnoldporter.com
KOLYA D. GLICK (*Pro Hac Vice*)
kolya.glick@arnoldporter.com
JASON C. EWART (*Pro Hac Vice*)
jason.ewart@arnoldporter.com
MICHAEL E. KIENTZLE (*Pro Hac Vice*)
michael.kientzle@arnoldporter.com
MATTHEW L. SHULTZ (*Pro Hac Vice*)
matthew.shultz@arnoldporter.com
DAVID B. BERGMAN (*Pro Hac Vice*)
david.bergman@arnoldporter.com
MICHAEL L. WALDEN (*Pro Hac Vice*)
mike.walden@arnoldporter.com
YASMINE L. HARIK (*Pro Hac Vice*)
yasmine.harik@arnoldporter.com
ALLISON GARDNER (*Pro Hac Vice*)
allison.gardner@arnoldporter.com
BARBARA H. WOOTTON (*Pro Hac Vice*)
barbara.wootton@arnoldporter.com
CHRISTIAN SCHULTZ (*Pro Hac Vice*)
christian.schultz@arnoldporter.com
DAVID EMANUELSON (*Pro Hac Vice*)
david.emanuelson@arnoldporter.com
MEI-WAH LEE (*Pro Hac Vice*)
mei-wah.lee@arnoldporter.com
WILSON D. MUDGE (*Pro Hac Vice*)
wilson.mudge@arnoldporter.com

howard.ullman@dechert.com
45 Fremont St, 26th Floor
San Francisco, CA 94105
Telephone: 415.262.4500

ROSS UFBERG (*Pro Hac Vice*)
ross.ufberg@dechert.com
YOSEF WEITZMAN (*Pro Hac Vice*)
yosi.weitzman@dechert.com
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
Telephone: 215.994.2422

*Attorneys for Defendant Albertsons Companies, Inc.*

601 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: 202.942.5000

JOHN A. HOLLER (*Pro Hac Vice*)
john.holler@arnoldporter.com
250 W 55th Street
New York, NY 10019
Telephone: 212.836.8000

BRIAN K. CONDON (*Pro Hac Vice*)
brian.condon@arnoldporter.com
777 S. Figueroa Street, 44th Floor
Los Angeles, CA 90017
Telephone: 213.243.4000

JEREMY T. KAMRAS (*Pro Hac Vice*)
jeremy.kamras@arnoldporter.com
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111
Telephone: 415.471.3100

AND

WEIL, GOTSHAL & MANGES LLP

MARK A. PERRY (*Pro Hac Vice*)
mark.perry@weil.com
LUKE SULLIVAN (*Pro Hac Vice*)
luke.sullivan@weil.com
JASON N. KLEINWAKS (*Pro Hac Vice*)
jason.kleinwaks@weil.com
2001 M Street, NW, Suite 600
Washington, DC 20036
Telephone: 202.682.7000

LUNA N. BARRINGTON (*Pro Hac Vice*)
luna.barrington@weil.com
767 Fifth Avenue
New York, NY 10153
Telephone: 212.310.8000

SARAH M. STERNLIEB (*Pro Hac Vice*)
sarah.sternlieb@weil.com
700 Louisiana Street, Suite 3700
Houston, TX 77002

Telephone: 713.546.5000

BAMBO OBARO (*Pro Hac Vice*)
bambo.obaro@weil.com
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone: 650.802.3000

THOMAS B. FIASCONE (*Pro Hac Vice*)
tom.fiascone@weil.com
REBECCA SIVITZ (*Pro Hac Vice*)
rebecca.sivitz@weil.com
100 Federal Street, Floor 34
Boston, MA 02110
Telephone: 617.722.8314

*Attorneys for Defendant The Kroger Company*