Susan A. Musser, DC Bar # 1531486
Charles Dickinson, DC Bar # 997153
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel: (202) 326-2122
Tel: (202) 326-2617
*smusser@ftc.gov; cdickinson@ftc.gov*

Attorneys for Plaintiff Federal Trade Commission

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, STATE OF ARIZONA, STATE OF CALIFORNIA, DISTRICT OF COLUMBIA, STATE OF ILLINOIS, STATE OF MARYLAND, STATE OF NEVADA, STATE OF NEW MEXICO, STATE OF OREGON, and STATE OF WYOMING, | Case No.: 3:24-cv-00347-AN |
| Plaintiffs, | **PLAINTIFFS' POST-HEARING BRIEF, PROPOSED FINDINGS OF FACT, AND PROPOSED CONCLUSIONS OF LAW** |
| v. | **PUBLIC VERSION** |
| THE KROGER COMPANY and ALBERTSONS COMPANIES, INC., | |
| Defendants. | |

PLS' POST-HEARING BRIEF

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...................................................................................... 1

I.   PLAINTIFFS HAVE MET THEIR *PRIMA FACIE* BURDEN ACROSS MULTIPLE RELEVANT ANTITRUST MARKETS ............................................................... 1

   A.   Plaintiffs Have Shown That the Increases in Post-Merger Market Concentration Make this Transaction Presumptively Anticompetitive .......................................................... 2

   B.   The Merger Will Eliminate Significant and Substantial Head-to-Head Competition to the Detriment of Consumers and Workers ........................................................ 5

II.  DEFENDANTS CANNOT REBUT PLAINTIFFS' STRONG *PRIMA FACIE* ................ 8

   A.   Defendants Have Not Shown That Plaintiffs' Markets are Improper ............................ 8

   B.   Defendants Fail to Show That Eliminating Competition Between Kroger and Albertsons Would not Result in a Substantial Lessening of Competition ....................................... 11

III. DEFENDANTS CANNOT MEET THEIR BURDEN TO OFFSET THE HARM ........ 13

   A.   Self-Serving Promises By Merging Party Executives Cannot Immunize an Anticompetitive Merger .............................................................................. 13

   B.   Defendants Fail to Meet their Burden to Show Sufficient Cognizable Efficiencies to Offset the Harm of this Acquisition ................................................................. 16

IV.  DEFENDANTS FAIL TO REBUT PLAINTIFFS' STRONG *PRIMA FACIE* CASE WITH AN INADEQUATE DIVESTITURE PACKAGE TO A POORLY PERFORMING BUYER ........................................................................ 19

   A.   The Divestiture Fails to Mitigate a Substantial Lessening of Competition .................. 20

   B.   Defendants Claims About the Divesture Package are Unsupported ............................. 22

   C.   Supermarket Divestitures are Inherently Risky and Have Failed to the Detriment of Consumers ............................................................................. 24

V.   CONCLUSION ............................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ................................................................. 3

*Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410 (5th Cir. 2008) ...................................... 19

*Crown Zellerbach Corp. v. FTC*, 296 F.2d 800 (9th Cir. 1961) ................................................... 20

*Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023) ....................................................... 9

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) ........................................................... 17, 18

*FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160 (3d Cir. 2022) .................................... 15

*FTC v. IQVIA Holdings Inc.*, 710 F. Supp. 3d 329 (S.D.N.Y. 2024) ............................................ 5

*FTC v. Meta Platforms, Inc.*, 654 F. Supp. 3d 892 (N.D. Cal. 2023) .......................................... 14

*FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865 (E.D. Mo. 2020) ....................................... 16

*FTC v. Procter & Gamble Co.*, 386 U.S. 568 (1967) .................................................................... 16

*FTC v. ProMedica Health*, 2011 WL 1219281 (N.D. Ohio 2011) ............................................... 17

*FTC v. Staples, Inc.*, 190 F. Supp. 3d 100 (D.D.C. 2016) ............................................................ 11

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015) .................................................... 5, 16, 19, 22

*FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) ................................................ 10

*FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27 (D.D.C. 2018) ......................... 18, 19

*FTC. v. CCC Holdings Inc.*, 605 F. Supp. 2d 26 (D.D.C. 2009) .................................................. 16

*FuboTV Inc. v. Walt Disney Co.*, No. 24-CV-01363, 2024 WL 3842116

  (S.D.N.Y. Aug. 16, 2024) ........................................................................................................... 5

*Illumina, Inc. v. FTC*, 88 F.4th 1036 (5th Cir. 2023)................................................................... 19

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466 (9th Cir. 2021) .......................... 9

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Glaser*, 945 F.3d 1076 (9th Cir. 2019) ..................... 8

*RSR Corp. v. FTC*, 602 F.2d 1317 (9th Cir. 1979) .................................................. 11, 17

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775

   (9th Cir. 2015) ........................................................................................... 8, 13, 16

*Smith v. United States*, 568 U.S. 106 (2013) ............................................................ 16

*State of Washington v. Kroger et al.,* No. 24-2-00977-9 (Wash. Super. Ct. 2020) ...................... 14

*Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594 (1953) .............................................. 8

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) ............................................................. 7

*United States v. Aetna Inc.*, 240 F. Supp. 3d 1 (D.D.C. 2017) ......................................... 16, 18, 22

*United States v. Anthem, Inc.*, 236 F. Supp. 3d 171 (D.D.C. 2017) .......................... 11, 12, 13, 19

*United States v. Anthem, Inc.*, 855 F.3d 345 (D.C. Cir. 2017) ......................................... 11, 15, 17

*United States v. AT&T*, 916 F.3d 1029 (D.C. Cir. 2019) ............................................................. 14

*United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1 (D.D.C. 2022) ............... 14, 18

*United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) ........................... 12, 14, 18

*United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1963) ........................................................... 17

*United States v. Rockford Memorial Corp.*, 898 F.2d 1278 (7th Cir. 1990) .............................. 8, 9

## Statutes

15 U.S.C § 18 ................................................................................................................. 13, 20

15 U.S.C § 26 ....................................................................................................................... 18

Federal Rule of Civil Procedure § 8 ..................................................................................... 8

## Other Authorities

U.S. Dep't of Justice & Fed. Trade Comm'n, *Merger Guidelines* (2010) ..................................... 5

U.S. Dep't of Justice & Fed. Trade Comm'n, *Merger Guidelines* (2023) ............................... 5, 17

## GLOSSARY OF ABBREVIATED TERMS, DEFINED TERMS, AND WITNESSES

### 1. Exhibits and Transcripts

| Abbreviation | Meaning |
|---|---|
| Hrg. | Preliminary Injunction Hearing Transcript |
| Dep. | Deposition Transcript |
| IH | Investigational Hearing Transcript |
| PX | Plaintiffs' Exhibit |
| DX | Defendants' Exhibit |
| Rpt. | Expert Report |
| Rebuttal Rpt. | Expert Rebuttal Report |

### 2. Documents and Filings

| Document | Full Reference |
|---|---|
| Merger Guidelines | U.S. Dep't of Justice & Fed. Trade Comm'n, 2023 Merger Guidelines |
| 2010 Merger Guidelines | U.S. Dep't of Justice & Fed. Trade Comm'n, 2010 Horizontal Merger Guidelines |
| Compl. | Plaintiffs Complaint for Temporary Restraining Order and Injunctive Relief (ECF No. 3) |
| Pls. Br. | Plaintiffs' Memorandum of Law in Support of Plaintiffs' Preliminary Injunction Motion (ECF No. 201) |
| Pls. Rep. Br. | Plaintiffs' Reply to Defendants' Response to Plaintiffs' Motion for a Preliminary Injunction (ECF No. 384) |
| FOF | Plaintiffs' Proposed Findings of Fact |
| COL | Plaintiffs' Proposed Conclusions of Law |
| Spoliation Motion | Plaintiffs' Motion *in Limine* For an Adverse Inference (ECF No. 265) |
| Sword/Shield Motion | Plaintiffs' Motion *in Limine* to Exclude Evidence or Argument Relating to Defendants' Proposed Divestiture (ECF No. 266) |
| Defs. Resp. Br. | Defendants' Response to Plaintiffs' Motion for a Preliminary Injunction (ECF No. 234) |

### 3. Names and Terms

| Shortened Form | Full Form |
|---|---|
| Ahold | Koninklijke Ahold Delhaize N.V. |
| Albertsons | Albertsons Companies |
| Amazon | Amazon.com, Inc. |
| Bain | Bain & Company |
| BJ's | BJ's Wholesale Club Holdings, Inc. |
| C&S | C&S Wholesale Grocers |
| CBA | Collective Bargaining Agreement |
| CBG | Census Block Group |

| | |
|---|---|
| CBSA | Core-based Statistical Area |
| CMCR analysis | Compensating Marginal Cost Reduction Analysis |
| Costco | Costco Wholesale Corporation |
| Dollar Tree | Dollar Tree, Inc. |
| DoorDash | DoorDash, Inc. |
| EBITDA | Earnings Before Interest, Taxes, Depreciation and Amortization |
| Family Dollar | Family Dollar Stores, Inc. |
| Grand Union | Grand Union Supermarkets |
| GUPPI | Gross Upward Pricing Pressure Index |
| HHI | Herfindahl-Hirschman Index |
| HPR Rule | High-Priced Retailer Rule (Kroger) |
| HMT | Hypothetical Monopolist Test |
| Jewel | Jewel-Osco |
| Lidl | Lidl US |
| Kroger | The Kroger Company |
| McKinsey | McKinsey & Company |
| MSA | Metropolitan Statistical Area |
| MSAA | Mutual Strike Assistance Agreement |
| Price Chopper | Price Chopper Supermarkets |
| QFC | Quality Food Centers, Inc. |
| Smucker | The J.M. Smucker Co. |
| Sprouts | Sprouts Farmers Market |
| Stater Bros. | Stater Bros. Markets |
| SKU | Stock Keeping Unit |
| Target | Target Corporation |
| Tops | Tops Friendly Markets |
| TSA | Transition Services Agreement |
| UFCW Local 7, 324, 555, 1564, 3000 | United Food and Commercial Workers Locals |
| Walmart | Walmart Inc. |
| Weis Markets or Weis | Weis Markets, Inc. |
| Whole Foods | Whole Foods Market, Inc. |

## 4. Hearing Witnesses (in order of appearance)

| Name and Position | Affiliation |
|---|---|
| Peter Van Helden, CEO | Stater Bros. |
| Anthony Silva, VP Strategic Initiatives | Albertsons |
| Andrew Groff, Director Retail Insight & Strategy | Kroger |
| John Scott Neal, Chief Merchandising Officer | Sprouts |
| Michael Marx, President, Mariano's Chicago | Kroger |

| Kurt Unkelbach, VP Merchandise Strategy & Analytics | Dollar Tree and Family Dollar |
| --- | --- |
| Todd Kammeyer, President of Fred Meyer | Kroger |
| Carl Huntington, President Southwest Division | Albertsons |
| Jon McPherson, VP Labor Relations | Kroger |
| Daniel Clay, President UFCW 555 | UFCW Local 555 |
| Andrea Zinder, President UFCW Local 324 | UFCW Local 324 |
| Thomas Schwilke, President of Ralphs | Kroger |
| Kevin Curry, President Southern California Division | Albertsons |
| Keith Knopf, CEO | Raley's Supermarkets |
| Mark McGowan, President of Retail | C&S |
| Alona Florenz, SVP Corporate Development and Financial Planning & Analysis | C&S |
| Eric Winn, CEO | C&S |
| Edward Fox, Expert in Retail Operations and Consumer Shopping Behavior | Plaintiffs' Expert |
| Todd Broderick, President Denver Division | Albertsons |
| Nicholas Hill, Expert in Industrial Organization Economics as Applied to Mergers | Plaintiffs' Expert |
| Rodney McMullen, CEO | Kroger |
| Vivek Sankaran, CEO | Albertsons |
| Stuart Aitken, Chief Merchant & Marketing Officer | Kroger |
| Susan Morris, COO | Albertsons |
| Sarah George, SVP Merchandising | Costco |
| Mafaz Maharoof, VP Strategic Finance, M&A, and Long Range Planning | Kroger |
| Rajiv Gokhale, Expert in Financial Economics | Defendants' Expert |
| Matthew Yates, VP Brand Strategy | Ahold |
| Sonya Oblisk, Chief Merchandising and Marketing Officer | Whole Foods Market |
| Marc Lieberman, VP Store Layout & Design | Walmart |
| Yael Cosset, SVP and Chief Information Officer | Kroger |
| Dan Dosenbach, VP Labor Relations | Albertsons |
| Robert Crane, SVP Head of Sales and Sales Commercialization | Smucker |
| Mark Israel, Expert in Industrial Organization Economics as Applied to Mergers | Defendants' Expert |
| John Conlin, SVP Merchandising, Food & Beverage | Target |
| Roger King, Expert in Labor Relations | Defendants' Expert |
| Samuel Heyworth, VP Consumables | Amazon |

PLS' POST-HEARING BRIEF

| | |
|---|---|
| Lisa Kinney, VP Customer and Market Intelligence | Albertsons |
| Justin McCrary, Expert in Antitrust Labor Economics | Defendants' Expert |
| Daniel Galante, Expert in Corporate Mergers, Acquisitions, and Divestitures | Defendants' Expert |
| Aaron Yeater, Expert in Finance and Economics | Plaintiffs' Expert |
| Orley Ashenfelter, Expert in Labor Economics | Plaintiffs' Expert |

### 5. Deponents Cited in Proposed Findings of Fact (in alphabetical order)

| Name and Position | Affiliation |
|---|---|
| Kathryn Cahan, EVP, General Counsel, Corporate Secretary | Trader Joe's |
| Kim Cordova, President UFCW Local 7 | UFCW Local 7 |
| Paul Davison, Partner Investment Team | SoftBank |
| Gregory Frazier, President UFCW Local 1564 | UFCW Local 1564 |
| Monica Garnes, President Fry's | Kroger |
| Faye Guenther, UFCW Local 3000 | UFCW Local 3000 |
| Frank Kerr, Chief Customer Officer | Lidl |
| Michael Leary, Former SVP of Sales | BJ's |
| Gary Millerchip, Former CFO | Kroger |
| Charles Pollnow, General Manager Grocery | DoorDash |
| Robert Sitter, Group Director of Finance Administration | Aldi |
| Nicholas Snow, VP Decision Science and Analytics | Dollar General |
| Andrea Zinder, President UFCW Local 324 | UFCW Local 324 |

PLS' POST-HEARING BRIEF

## PRELIMINARY STATEMENT

Kroger and Albertsons compete fiercely in thousands of communities across America: from the East Coast to the West Coast, from rural regions in the Mountain states to neighborhoods located in the heart of a city, millions of Americans rely on Kroger and Albertsons as their local grocery store.  In many of these communities, the head-to-head competition between Kroger and Albertsons has led to higher quality fresh groceries at lower prices.  And it is the benefits American shoppers and workers reap from this competition that are the table stakes of this litigation.

Over the course of the weeks-long hearing, Plaintiffs introduced documents, testimony, and economic analysis showing that Kroger's $24.6 billion acquisition of Albertsons is both presumptively anticompetitive in well over 1,000 local markets around the country and will eliminate significant head-to-head competition between Kroger and Albertsons, leading to higher prices, lower quality, and less choice.  In response to this voluminous evidentiary record, Defendants did not define a market of their own, nor did they seriously dispute that Kroger and Albertsons compete aggressively with each other.  Instead, Defendants first attacked Plaintiffs' *prima facie* case by highlighting the presence of alternative competitors for shoppers and workers and a supposed fundamental shift in how Americans buy groceries.  Second, Defendants made a series of promises about "prices" that would, allegedly, offset some of the harm to competition.  Neither argument can justify this anticompetitive acquisition.  Below, Plaintiffs summarize briefly the overwhelming evidence establishing their *prima facie* case and respond to Defendants' primary arguments raised throughout the hearing.

## I.    PLAINTIFFS HAVE MET THEIR *PRIMA FACIE* BURDEN ACROSS MULTIPLE RELEVANT ANTITRUST MARKETS

Plaintiffs satisfied their *prima facie* burden three times over.  First, by showing that the

PLS' POST-HEARING BRIEF

acquisition will result in an undue increase in market concentration, making it presumptively anticompetitive: (1) in the supermarkets product market (which includes supercenters like Walmart and Target), (2) in a substantially more conservative product market consisting of all large format food retail stores, and (3) in dozens of markets for union grocery labor. Second, by showing robust head-to-head competition between Kroger and Albertsons that will cease the moment the acquisition closes. And third, by showing that this acquisition will reduce union bargaining leverage, harming hundreds of thousands of union grocery workers.

### A.    Plaintiffs Have Shown That the Increases in Post-Acquisition Market Concentration Make This Acquisition Presumptively Anticompetitive

Plaintiffs have shown repeatedly that both the supermarkets and large format stores product markets are relevant antitrust markets.[1] Supermarkets (e.g., Albertsons, Kroger, and Amazon Fresh) and supercenters (e.g., Walmart, Fred Meyer, and Target) are a distinct relevant product market because they offer a convenient one-stop shopping experience where customers can obtain substantially all of their food and non-food requirements in a single visit.[2] To do that, supermarkets' large stores offer a wide breadth of grocery and household products as well as a depth of assortment within each product type including varying package sizes, national brand options, and private label options.[3] Supermarkets also have an array of services including pharmacies, florists, fuel centers, butchers, and deli and seafood counters.[4]

Plaintiffs need not prove that there is a subset of customers who *only* desire this one-stop

---

[1] FOF §§ III.A-B; Pls. Br. at 22-33. This acquisition will increase concentration for union grocery workers in CBA areas. Pls. Br. at 33-37; Pls. Rep. Br. at 16-19; FOF § IV.
[2] Compl. ¶ 44; McMullen Hrg. 1634:5-16; PX6009 (Kroger) at 113; Kammeyer Hrg. 480:7-12; Curry Hrg. 873:6-13; Van Helden Hrg. 163:19-164:14, 166:5-11; Schwilke Hrg. 811:15-21.
[3] McMullen Hrg. 1634:5-16; PX6009 (Kroger) at 113; Knopf Hrg. 934:8-19; Yates Hrg. 2193:22-25, 2194:8-10; Van Helden Hrg. 164:15-22; Broderick Hrg. 1362:3-1363:25.
[4] Van Helden Hrg. 162:22-163:9, 168:9-169:7, 169:21-170:4; Kammeyer Hrg. 476:13-477:15.

PLS' POST-HEARING BRIEF

shopping experience for groceries, or who shop at only one store.  People may "cross-shop" different retailers for different purposes.  But a customer's "need state," or what the customer is seeking to find on a particular shopping trip, determines the customer's reasonable substitutes in terms of choices of stores to visit.[5]  For instance, if a customer needs a fill-in shop or a treasure hunt experience, they may go to a dollar store.[6]  Club stores offer stock-up trips for bulk items.[7]  Premium, natural, and organic stores serve as secondary shops that offer fill-in trips for customers seeking specialty products and a curated assortment.[8]  But when a customer's need state requires a one-stop shopping experience, supermarkets are uniquely positioned to best fulfill that need for reasons illustrated by an application of the *Brown Shoe* practical indicia.[9]

Despite this, Defendants spent most of the hearing arguing that cross-shopping somehow proves that the supermarkets product market is too narrow.  This contention ignores precedent, testimony, and documents presented at the hearing.  It also disregards Plaintiffs' second proposed antitrust market (large format stores in local store-based areas) that includes nearly all the retail formats Defendants identified in their briefing or oral advocacy: every store in the supermarkets product market (i.e., traditional supermarkets and supercenters like Walmart and Target), plus club stores (e.g., Costco), limited assortment stores (e.g., Aldi and Lidl), and premium, natural and organic stores (e.g., Trader Joe's, Sprouts, and Whole Foods).[10]  Yet even in this far more inclusive market, whose breadth understates the likely competitive effects of the acquisition, serious competitive concerns remain.

---

[5] Yates Hrg. 2196:23-2197:1; Lieberman Hrg. 2359:3-2361:15.
[6] Unkelbach Hrg. 463:9-464:11.
[7] George Hrg. 2045:13-2046:2.
[8] Neal Hrg. 372:17-373:7.
[9] McMullen Hrg. 1634:5-16; Broderick Hrg. 1363:13-25.  Pls. Br. at 22-28 provides a full analysis of the *Brown Shoe* practical indicia.  *See also* FOF § III.A.1.
[10] Hill Hrg. 1445:1-16.

PLS' POST-HEARING BRIEF

Plaintiffs' economic expert, Dr. Nicholas Hill, applied the hypothetical monopolist test (HMT) to examine whether Plaintiffs' candidate markets were properly defined, confirming that both supermarkets and large format stores are relevant antitrust markets in thousands of local areas around Defendants' stores.  When applying the HMT and calculating shares and presumptions, Dr. Hill assessed each product market—supermarkets and large format stores— using two independent and complementary approaches to defining local store-based geographic markets.  Dr. Hill first used a store-based methodology akin to the approach Defendants argued for in their pre-Complaint advocacy.[11]  He then applied a customer-based rebuttal methodology that responded to Defendants' criticisms of the draw area focus of the store-based approach. Both analyses resulted in geographic markets consisting of localized areas surrounding Defendants' stores, just as Plaintiffs' Complaint alleges.[12]

Relying on a robust data set including micro-level sales and loyalty data for each party store, Dr. Hill found that 2,055 supermarket candidate markets passed the HMT using the store-based geographic market approach, and 2,674 supermarket candidate markets passed the HMT using the customer-based geographic market approach.[13]  In the broader large format store product market, 2,688 candidate markets passed the HMT under the store-based geographic market approach, and 2,498 candidate markets passed the HMT under the customer-based geographic market approach.[14]  Dr. Hill then analyzed market shares and concentration levels in each properly defined market, concluding that in 1,922 supermarket markets, the acquisition will result in presumptively anticompetitive levels of market concentration under the Guidelines

---

[11] *See* PX10007 (Compass Lexecon) at 003, 007.
[12] PX7006 (Hill Rebuttal Rpt.) ¶¶ 31-43; Compl. ¶¶ 51-52.
[13] *See* Hill Hrg. 1463:10-1464:5; PX7006 (Hill Rebuttal Rpt.) ¶ 42, Fig. 4.
[14] Hill Hrg. 1463:10-1464:5; PX7006 (Hill Rebuttal Rpt.) ¶ 42, Fig. 4.

PLS' POST-HEARING BRIEF

thresholds.[15]  Even by the more lenient standards of the 2010 Guidelines, 1,574 supermarket

markets are presumptively anticompetitive.[16]

In the large format store market, Dr. Hill concluded the acquisition is presumptively

anticompetitive in 1,785 candidate markets under the Guidelines and 911 candidate markets

under the 2010 Guidelines.[17]  However you slice it—supermarkets or large format stores, store-

based or customer-based geographic markets, 2010 or 2023 Guidelines—the acquisition is

presumptively anticompetitive in many hundreds of markets.

### B.    The Acquisition Will Eliminate Significant and Substantial Head-to-Head Competition to the Detriment of Consumers and Workers

Independent of market concentration, Plaintiffs can also establish a *prima facie* case by

showing that a merger eliminates significant head-to-head competition between close

competitors.  *See FuboTV Inc. v. Walt Disney Co.*, No. 24-CV-01363, 2024 WL 3842116, at *17,

29-30 (S.D.N.Y. Aug. 16, 2024) (granting a preliminary injunction based on competitive

effects—and not market concentration—without a "comprehensive market analysis"); *FTC v.

IQVIA Holdings Inc.*, 710 F. Supp. 3d 329, 385 (S.D.N.Y. 2024); *FTC v. Sysco Corp.*, 113 F.

Supp. 3d 1, 61 (D.D.C. 2015); U.S. Dep't of Justice & Fed. Trade Comm'n, *Merger Guidelines*

§ 2.2 (2023).  Plaintiffs showed that Kroger and Albertsons are fierce competitors with highly

similar go-to-market strategies: be the best traditional supermarket.

As Kroger's CEO Rodney McMullen explained, Defendants' supermarkets connect with

their local communities.[18]  While large companies like Amazon, Costco, and Walmart also sell

groceries, Kroger and Albertsons strive to offer a distinct consumer experience.  Indeed, both

---

[15] Hill Hrg. 1553:25-1554:5; PX7004 (Hill Rpt.) ¶ 351, Fig. 78.
[16] 2010 Merger Guidelines at §5.3; PX7006 (Hill Rebuttal Rpt.) at Fig. 43.
[17] PX7006 (Hill Rebuttal Rpt.) at Fig. 10.
[18] McMullen Hrg. 1600:20-1601:8, 1648:3-20.

PLS' POST-HEARING BRIEF

companies' SEC 10-K filings emphasize nearly identical features distinctive to a traditional supermarket, e.g., (a) a focus on fresh food products and friendly customer service; (b) substantial private-label offerings alongside national brands; and (c) promotional pricing and rewards.[19]  Unsurprisingly, Albertsons describes Kroger as its "primary food competitor" and seeks to "beat Kroger on a sustained basis."[20]  Likewise, according to Kroger's CEO, Albertsons is Kroger's number one or number two competitor in 14 of 17 major metropolitan statistical areas (MSAs) where the two companies overlap.[21]  During the hearing, executives for the two companies in charge of pricing and running the local divisions and banners confirmed the substantial local competition at risk.[22]

Consistent with the qualitative evidence, Dr. Hill's quantitative analysis showed that the merged firm would have presumptively unlawful market shares and an incentive to raise prices as a result of the acquisition in over 1,400 communities around the country.[23]  Importantly, Dr. Hill's competitive effects analysis was largely agnostic to market definition.  In other words, it accounts for the potential that customers might substitute to certain food retailers outside of both Plaintiffs' supermarkets and large store format markets (e.g., dollar stores), and yet *still* predicts that the transaction will lead to higher prices in hundreds of markets.

Defendants' attacks on the labor impacts of the acquisition are equally unavailing. Defendants agree that a lessening of competition between employers in a labor market may result in the diminution of bargaining leverage that workers can use to negotiate their compensation.[24]

---

[19] PX6154 (Kroger); PX6153 (Albertsons).
[20] Sankaran Hrg. 1755:2-4, 1766:2-8.
[21] McMullen Hrg. 1655:16-20; PX6024 (Kroger) at 058-60.
[22] *See*, *e.g.*, Groff Hrg. 285:13-286:10; Broderick Hrg. 1371:19-1372:6; Kammeyer Hrg. 487:8-18; PX1743 (Kroger).
[23] PX7006 (Hill Rebuttal Rpt.) at 040, 106, Figs. 13, 46; *see also* Hill Hrg. 1483:17-1484:4.
[24] McCrary Hrg. 3107:23-3108:7.

PLS' POST-HEARING BRIEF

Despite that concession, however, Defendants spent much of the hearing focused on the wrong labor question.  In assessing the impact of a merger of employers, the focus of the antitrust inquiry is on the views of the affected workers.  *Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001).  Defendants' misguided emphasis on the types of entry-level workers that *employers* may view as substitutes for *their* needs is irrelevant.  Rather, one must assess, from the perspective of workers, the interchangeability of a job at, e.g., Home Depot or McDonald's, with a job at a union grocery employer.  *See id.*  Here, the workers, via unions, recognize that union grocery employers are unique, and that Kroger and Albertsons are the two dominant—and often only— available union grocery employers.[25]  *Id.*  Unsurprisingly, no union supports this acquisition.[26] Finally, regardless of the status of current *labor* laws or NLRB protections, Defendants' labor law expert offered no opinion on the likely anticompetitive effects of this acquisition, in contrast to the union presidents who consistently testified that the acquisition would diminish their bargaining leverage in future negotiations and that Kroger would not follow through on its commitment to invest in workers.[27]

*        *        *

The record is replete with examples of Kroger and Albertsons competing intensely, fiercely, and head-to-head to win customers.[28]  To gain market share, Kroger and Albertsons closely monitor and respond to each other on regular pricing, promotional pricing, and non-price dimensions like freshness, service, and convenience.[29]  Thus, not only will this acquisition increase market concentration in thousands of communities nationwide, but it will also eliminate

---

[25] *See* FOF § IV.
[26] *See, e.g.*, Clay Hrg. 721:8-10; Zinder Hrg. 773:25-774:14; McPherson Hrg. 670:3-671:4.
[27] *See* King Hrg. 2872:16-18; Zinder Hrg. 772:19-776:6; Clay Hrg. 721:8-24.
[28] FOF § III.F.
[29] FOF § III.F.

PLS' POST-HEARING BRIEF

this close and substantial competition, satisfying Plaintiffs' *prima facie* burden.

## II.     DEFENDANTS CANNOT REBUT PLAINTIFFS' STRONG *PRIMA FACIE* CASE

Once Plaintiffs meet their *prima facie* burden, the burden shifts to Defendants to produce

evidence rebutting that case, or to carry their burden on efficiencies, remedy, or any additional

affirmative defenses.  *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778

F.3d 775, 783 (9th Cir. 2015) ("*St. Luke's*").  Defendants cannot meet their burden on any count.

### A.     Defendants Have Not Shown That Plaintiffs' Markets are Improper

Defendants' efforts to undermine Plaintiffs' product markets repeatedly miss the mark.

Of course, "[i]t is always possible to take pot shots at a market definition."  *United States v.*

*Rockford Memorial Corp.*, 898 F.2d 1278, 1285 (7th Cir. 1990).  But that is precisely why the

Supreme Court has instructed that "[t]he 'market,' as most concepts in law or economics, cannot

be measured by metes and bounds."  *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594,

611 (1953).  Defendants' primary contentions on market definition rely on both a

mischaracterization of the allegations in this case, and a mischaracterization of the commercial

realities in the grocery retail space.

*First*, Kroger and Albertsons profess that Plaintiffs have somehow violated their due

process rights by failing to plead a separate product market consisting of large format stores.[30]

This is both untrue and irrelevant.[31]  Plaintiffs' Complaint explicitly contemplates the existence

of broader product markets, noting: "Even if the non-supermarket retail formats described above

---

[30] Defendants' Closing Argument Hrg. 3532:16-3533:19.

[31] The liberal pleading standard under Federal Rule of Civil Procedure 8 requires that the complaint give defendants fair notice of the grounds for a claim.  *Pac. Coast Fed'n of Fishermen's Ass'ns v. Glaser*, 945 F.3d 1076, 1086 (9th Cir. 2019).  Plaintiffs provided fair notice in their complaint.  Compl. ¶ 57.  Defendants also received fair notice of Dr. Hill's expert methodologies upon receipt of his reports.  *See Pac. Coast*, 945 F.3d at 1087 (explaining that defendants received fair notice through a combination of the complaint and expert reports).

PLS' POST-HEARING BRIEF

[e.g., club, limited assortment, etc.] are included in the relevant product market, the proposed acquisition is still presumptively unlawful."[32]  Further, Dr. Hill's initial expert report and Plaintiffs' brief both discuss the large format stores market in detail.[33]  Indeed, Defendants' expert Dr. Israel responded to the large format stores market at length, referencing it dozens of times in his initial report.[34]  Finally, even if an alternative product market were not explicitly mentioned in the Complaint—which it was—that would not preclude the Court from finding that large format stores are a properly defined antitrust product market.  *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 978 n.9 (9th Cir. 2023) (rejecting the "radical argument" that a case ends if the district court finds an "in-between market" different from the plaintiffs' market); *Rockford Memorial*, 898 F.2d at 1285 (7th Cir. 1990) (affirming the district court's identification of its own relevant geographic market instead of those that the parties offered).

*Second*, Defendants say that Plaintiffs' relevant markets are too narrow because a customer can purchase the same item from various store formats.  This simplified approach to market definition is incorrect.  Instead, properly defining a relevant market requires determining which products and services are reasonable substitutes by consumers for the same purpose. *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 482 (9th Cir. 2021).  Documents and testimony presented at the hearing confirm that the mere availability of a similar food item in various store formats does not mean that each of those store formats provides a comparable customer experience to, or is a reasonable substitute for, shopping at a supermarket.[35]  For example, bananas are sold in traditional supermarkets, natural food stores, club stores, and even

---

[32] Compl. ¶ 57.
[33] PX7004 (Hill Rpt.) ¶¶ 15-19, 66-100, 114-160; Pls. Br. at 32-33, 37-38.
[34] DX2623 (Israel Rpt.) *passim.*
[35] FOF ¶¶ 9-31.

9

PLS' POST-HEARING BRIEF

at some dollar stores and convenience stores.  But a customer's decision about where to shop will depend on how many and what kind of bananas they want, what else is on their shopping list, and the in-store experience they are seeking (or can afford).[36]  More specifically, a person who wants just two bananas cannot have that need met at a club store; if they want to buy bananas along with a box of national-brand cereal, they may be out of luck at a natural food store; and if they also want access to staffed service counters, those are not available from a limited assortment store like Aldi or at a dollar store.[37]  Each store format may suit a customer's need on occasion, but the traditional supermarket's go-to-market strategy satisfies a distinct demand for a one-stop shopping experience that offers the key combination of convenience, service, high quality, and a broad and deep assortment.[38]  *See FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1037-1040 (D.C. Cir. 2008).

*Third*, Defendants wrongly suggest that customers no longer value the one-stop shopping experience at the core of Kroger's and Albertsons' business models.  Defendants claim that shoppers no longer distinguish between different retail formats, a trend they refer to as "channel blur."[39]  But Dr. Hill's quantitative analysis showed that across all overlap areas, shoppers still spend the majority (68 percent) of their grocery dollars at supermarkets (including supercenters), and that 96 percent of all food and grocery purchases are made at large format stores.[40]  These market dynamics have held stable for many years, including post-COVID, with little variation in each format's share of overall food and grocery sales.[41]  Thus, contrary to Defendants' claims,

---

[36] FOF ¶ 21.
[37] FOF ¶¶ 9-31.
[38] FOF ¶¶ 11-15.
[39] Defendants' Closing Argument Hrg. 3568:2-16.
[40] PX7004 (Hill Rpt.) ¶¶ 78, Fig. 9.
[41] Hill Hrg. 1451:14-1452:11; PX7004 (Hill Rpt.) ¶¶ 79, Fig. 10.

PLS' POST-HEARING BRIEF

there is no evidence of a recent "seismic" shift in consumer shopping behavior.

    *Fourth*, Defendants attempt to distract from all this evidence of persistent consumer demand for a supermarket one-stop shopping experience by pointing to Walmart, Costco, and Amazon as apparent game-changing retailers.  But these companies have been around for years, and Plaintiffs account for each.  Walmart and Amazon Fresh are in Plaintiffs' supermarkets product market, while Costco and Amazon's Whole Foods Market are included in Plaintiffs' large format market—and the acquisition will result in presumptively unlawful market concentration levels in all scenarios.[42]  The stable market shares calculated by Dr. Hill also contradict any claim that grocery shopping has fundamentally changed.[43]  Because Plaintiffs have already accounted for the presence of Walmart, Costco, and Amazon, Defendants' hand-waving references to these companies as supposed market disrupters is belied by the record.

### B.  Defendants Fail to Show That Eliminating Competition Between Kroger and Albertsons Would not Result in a Substantial Lessening of Competition

    Defendants placed enormous emphasis on Walmart throughout the hearing, and yet, the acquisition is anticompetitive even if accounting for Walmart in full.  "[M]ergers that eliminate head-to-head competition between close competitors often result in a lessening of competition." *United States v. Anthem*, 236 F. Supp. 3d 171, 216 (D.D.C. 2017), *aff'd*, 855 F.3d 345, 426 (D.C. Cir. 2017) (quoting *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 131 (D.D.C. 2016)).  This maxim holds true "even where the merging parties are not the only two, or even the two largest, competitors in the market."  *Id.* at 216; *see also RSR Corp. v. FTC*, 602 F.2d 1317, 1325 (9th Cir. 1979) ("[A] merger of the second and fifth largest firms . . . is not the merger of 'two small firms.").  Rather, when analyzing a transaction, the "acquired firm need not be the other's closest

---

[42] Hill Hrg. 1445:1-16, 1504:12-18.
[43] Hill Hrg. 1451:14-1452:11; PX7004 (Hill Rpt.) ¶ 79, Fig. 10; FOF ¶¶ 32, 34.

PLS' POST-HEARING BRIEF

competitor to have an anticompetitive effect; the merging parties only need to be close

competitors." *Anthem*, 236 F. Suppl. 3d at 216; *see also United States v. H&R Block, Inc.*, 833

F. Supp. 2d 36, 82-83 (D.D.C. 2011).

Even crediting Defendants' claim that Walmart is their largest competitor, this

acquisition is anticompetitive for two reasons: (1) a merger need not be between the two largest

competitors to be anticompetitive; and (2) the record demonstrates that Kroger and Albertsons

directly and aggressively compete with each other.  Plaintiffs do not ignore or discount Walmart.

Walmart is part of both the supermarket and large format markets, and thus considered in all of

Dr. Hill's analyses, e.g., price-checking, market shares, presumptions, and competitive effects.[44]

Nor is Albertsons a more distant competitor to Kroger than Walmart.  To the contrary, in 14 of

17 MSAs with overlapping operations, Albertsons is either Kroger's number one or number two

competitor.[45]  Unsurprisingly, dozens of emails, communications to shareholders, and reports

show robust price and non-price competition between Kroger and Albertsons.[46]  In response,

Defendants argue that because Kroger uses Walmart to set its price floor for certain items and in

certain divisions, competition between Kroger and Albertsons is meaningless.  The evidence

shows otherwise.  First, in many areas, Kroger does not match Walmart's price but rather prices

using a "spread" that is capped by Albertsons' pricing, making Albertsons a meaningful price

guardrail.[47]  Second, in some divisions, Kroger prices off Albertsons directly.[48]  Third, and

perhaps most important, Defendants compete fiercely on important non-price dimensions: the so-

called "full, fresh, and friendly" strategy.  And, for that, competition with Albertsons is a key

---

[44] Hill Hrg. 1445:1-16.
[45] McMullen Hrg. 1655:16-20; PX6024 (Kroger) at 58-60.
[46] FOF §§ III.F.1, III.F.3.
[47] FOF ¶¶ 60-65.
[48] FOF ¶¶ 60-61.

PLS' POST-HEARING BRIEF

driver of both innovation and quality.[49]  Kroger and Albertsons spend an enormous amount of

time and resources tracking, assessing, and responding to each other.[50]  It belies credulity that the

two largest traditional supermarket chains in the country would do so if that competition was

immaterial.  Instead, the record shows the acquisition will eliminate this substantial, direct, and

aggressive competition between Kroger and Albertsons in violation of the antitrust laws.  15

U.S.C § 18 (proscribing mergers where "the effect of such acquisition may be substantially to

lessen competition"); *Anthem*, 236 F. Supp. 3d at 216.

## III.    DEFENDANTS CANNOT MEET THEIR BURDEN TO OFFSET THE HARM

Lacking the evidence to rebut Plaintiffs' *prima facie* case, Defendants offer three

promises in rebuttal: (1) unenforceable promises including purported "price investments;" (2)

promises of claimed efficiencies that Defendants allege will benefit consumers; and (3) promises

that C&S will effectively replace the substantial lost competition.  Because these promises are

only analyzed after a finding of harm, Defendants bear a high burden under each theory to ensure

that shoppers do not bear the risk of Defendants' decision to merge.  *St. Luke's*, 778 F.3d at 783.

Defendants cannot meet their burden.

### A.    Self-Serving Promises by Merging Party Executives Cannot Immunize an Anticompetitive Acquisition

Throughout the course of this hearing, Defendants time and again referred to promises

---

[49] FOF § III.F.3.

[50] FOF §§ III.F.1, III.F.3; Pls. Br. at 8-16.  Putting aside Walmart, Defendants' second major response is that the grocery space is "competitive."  They rely on information such as aggregated national data (which ignores local competition) and generic competitor lists (which do not address the extent to which any "competitor" acts as a constraint on Defendants).  But these materials do not answer the key question: whether sufficient alternative competition would remain to make the elimination of competition between Kroger and Albertsons insubstantial.  Generic attestations that the market is "competitive" are insufficient for Defendants to refute the substantial competition between Kroger and Albertsons.

PLS' POST-HEARING BRIEF

regarding their post-acquisition conduct.  They vowed to "lower their prices," "improve their stores," and "improve associates' salaries," and asserted that "no stores will close."[51]  But self-serving promises by executives, however well intentioned, cannot rebut the anticompetitive effects of a merger.  *H&R Block*, 833 F. Supp. 2d at 82.  Courts generally have treated subjective corporate testimony with skepticism, especially when it pertains to post-merger behavior.  *FTC v. Meta Platforms*, *Inc*., 654 F. Supp. 3d 892, 937 (N.D. Cal. 2023); *Bertelsmann*, 646 F. Supp. 3d at 50.  Unenforceable promises, like a vow to lower prices, "can be broken at will"—and likely will be broken if they would not be profit-maximizing—and thus are entitled to "no weight."  *Bertelsmann*, 646 F. Supp. 3d at 50.  Indeed, as the Washington state court recently held in a parallel challenge, Defendants' promises of price investments should not be considered: "[E]vidence regarding non-binding promises, whether you call it a business plan, or a price investment, or something else" are not "admissible and I just won't consider it."  Trial Tr. 311, State of Washington v. Kroger et al., No. 24-2-00977-9, (Wash. Super. Ct. 2020).[52]

Here, Defendants' promises trigger many of the concerns recognized by past courts.  First, as Kroger's CEO admitted, a promise to undertake "price investments" is not legally enforceable.[53]  Second, any assumption that Defendants will invest more in reducing prices than they did prior to the merger is not economically rational.  *United States v. AT&T*, 916 F.3d 1029, 1044 (D.C. Cir. 2019) ("[P]rofit maximization . . . [is] a principle of antitrust law").  These promises are only considered after this Court has found that Plaintiffs meet their burden to show a reduction in competition, meaning *after* Plaintiffs have shown that Defendants will have less

---

[51] Defendants' Closing Argument Hrg. 3552:7-9.
[52] While the Court later entered an order allowing evidence of whether there would be an "economic incentive" to lower prices post-merger, Defendants have presented no such evidence here that this acquisition would somehow enhance or change their incentive to compete.
[53] McMullen Hrg. 1669:5-9, 1626:3-12, 1678:9-13.

PLS' POST-HEARING BRIEF

incentive to invest in prices to steal share from each other than they have today.  Even if Kroger

stands to make *more* money because of this acquisition (essentially what their "flywheel" says),

it will nonetheless have *less* incentive to use that windfall to compete in the markets impacted by

the acquisition because it will face less competition.  *See Anthem*, 855 F.3d at 356 (D.C. Cir.

2017) (viewing skeptically "potential price reductions subject to a number of uncertainties"

where "the merger would immediately give rise to upward pricing pressure by eliminating a

competitor").  Third, the promised price investments are far from certain.  *See id.*  One

Albertsons local division executive wrote candidly that, "we all know prices will not go down.

A $500M investment in pricing won't get our prices down to Kroger levels in my view, therefore

the conclusion that's easily drawn is overall prices will increase."[54]  Another Kroger executive

acknowledged, if Kroger's financial circumstances change—for example, if it falls short of

synergies estimates—the company might reduce or cease price investments.[55]  The same

executive explained that Kroger has reduced past price investments to achieve earnings per share

targets.[56]  While today Kroger may be sincere in its promise, Kroger's board has a fiduciary

responsibility to deliver returns to its shareholders—not to lower prices to consumers—and

tomorrow, outside this Court, Kroger will act with its duty to benefit shareholders in mind.[57]

Even if the Court treats Defendants' claimed price investments as a procompetitive

benefit to be balanced against a finding of harm, the proper framework for such assessment

would be the efficiencies defense.  *See FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160,

176 (3d Cir. 2022).  Defendants have not shown that promised price investments would benefit

---

[54] PX2376 (Albertsons) at 003; Broderick Hrg. 1412:3-14.
[55] Aitken Hrg. 1894:3-18.
[56] Aitken Hrg. 1895:10-17.
[57] Aitken Hrg. 1894:15-18.

PLS' POST-HEARING BRIEF

those communities most likely to be harmed by the acquisition, cannot show any investments would address lost non-price competition, cannot independently verify the promised investments, and cannot show price investments would be merger specific given both Kroger and Albertsons make price investments independently today.[58]   Indeed, executives from each company admitted that they were already investing in lowering prices separate and apart from the acquisition and that these investments were contingent at least in part on the realization of certain cost savings.[59]

**B.      Defendants Fail to Meet their Burden to Show Sufficient Cognizable Efficiencies to Offset the Harm of This Acquisition**

No court has ever found that efficiencies, alone, immunize an anticompetitive merger. *Sysco*, 113 F. Supp. at 82.  The Supreme Court has even cast doubt on the availability of the efficiencies defense to the antitrust laws.  *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 580 (1967).  The Ninth Circuit also "remain[s] skeptical about the efficiencies defense in general and about its scope in particular." *St. Luke's*, 778 F.3d at 790.

To establish this defense, defendants bear the burden to show: (1) that the acquisition enhances competition because of the efficiencies; (2) that the claimed efficiencies are merger specific; and (3) that efficiencies estimates are verifiable.  *St. Luke's*, 778 F.3d at 790-91. Defendants bear the burden of demonstrating that the claimed efficiencies would benefit customers in the challenged markets.  *FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865, 913 (E.D. Mo. 2020); *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 94 (D.D.C. 2017); *FTC. v. CCC Holdings Inc.*, 605 F. Supp. 2d 26, 74 (D.D.C. 2009).  Defendants bear this burden because the facts "lie peculiarly in th[eir] knowledge."  *Smith v. United States*, 568 U.S. 106, 112 (2013).

**Revenue Efficiencies.**  Defendants' first category of efficiencies—revenue synergies—

---

[58] FOF § V.E.
[59] McMullen Hrg. 1664:1-4, 1671:18-23; Sankaran Hrg. 1761:16-1762:8, 1764:6-18.

PLS' POST-HEARING BRIEF

fails out of the gate.  Revenue synergies (i.e., making more money) are not competition-enhancing; instead, "they merely shift revenue among the participants in the market and, in effect, do nothing more than increase [defendant's] bottom-line." *FTC v. ProMedica Health*, 2011 WL 1219281, at *36 (N.D. Ohio 2011).  Because incremental revenue does not benefit consumers, it does not offset competitive harm and should not be credited as a cognizable efficiency.  *Anthem*, 855 F.3d at 362.  Defendants have not demonstrated that their promised revenue synergies would benefit competition at all, let alone in the affected communities.  For instance, Defendants' Alternative Profit Synergy, a claimed opportunity to generate "incremental revenue,"[60] will benefit the combined firm, but not necessarily help competition or consumers.

**Expansions of Business.**  To the extent Defendants argue the acquisition will enhance their ability to compete in a different market (e.g., retail media) or in local communities not impacted by the acquisition, that argument fails.  Section 7 does not permit "anticompetitive effects in one market [to] be justified by procompetitive consequences in another." *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 370 (1963); *see also RSR*, 602 F.2d at 1325.

**Best-of-Both Pricing.**  Defendants also claim that the combined firm will achieve "best-of-both" pricing from large consumer product companies like Procter & Gamble—i.e., where Albertsons purchases a product for less than Kroger, the merged firm will negotiate to pay the lower Albertsons rate, and vice versa.  These and nearly all of Defendants' other claimed cost savings are neither merger specific nor verifiable, and thus are not legally cognizable.  To carry their burden of production, Defendants must show that efficiencies are merger specific; that is, they cannot readily "be achieved without the concomitant loss of a competitor." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 722 (D.C. Cir. 2001); *see also* 2023 Merger Guidelines § 3.3.

---

[60] Gokhale Hrg. 2136:4-6.

PLS' POST-HEARING BRIEF

Defendants cannot show this—Kroger and Albertsons today already work tirelessly, and independently, to cut costs, and Defendants' efficiencies expert failed to consider what cost savings Albertsons could obtain independently.[61]

Defendants also fail to establish that most of their claimed cost savings are verifiable. Merging firms must show "by reasonable means the likelihood and magnitude of each asserted efficiency." *H&R Block*, 833 F. Supp. 2d at 89. As noted in *Bertelsmann*, "because it is the parties' interest to be aggressive and optimistic in the projection of efficiencies to justify their own merger," no court has given any weight to non-verifiable efficiencies. Trial Tr. at 2755:11-24 No. 1:21-cv-02886 (D.D.C. Aug. 17, 2022). An independent party must conduct a "rigorous analysis" to verify efficiencies. *Heinz*, 246 F.3d at 721. To entrust this responsibility of verification to the merging parties or their consultants alone would allow the efficiencies defense to "swallow the whole of Section 7 of the Clayton Act" because Defendants could create estimates of any size necessary to immunize their acquisition. *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 73 (D.D.C. 2018) (citing *H&R Block*, 833 F. Supp. 2d at 91).

Kroger's efficiencies expert did not rigorously analyze Kroger's claimed efficiencies. Instead, Mr. Gokhale merely recounted work from Kroger's consultants.[62] But an expert cannot just rely on the parties' consultants. *See Aetna*, 240 F. Supp. 3d 1 at 97. Here, Mr. Gokhale testified that he did not understand Kroger or its consultants to have been estimating efficiencies in a manner consistent with the Merger Guidelines.[63] Yet after he reviewed the consultants' work product and conducted some interviews, he was "comfortable that parties' methodology was indeed designed to estimate the incremental benefit of the merger," and used that

---

[61] FOF § V.E.3.
[62] *See*, *e.g.*, DX2736 at ¶¶ 74-99; *see also* FOF § V.E.2.
[63] Gokhale Hrg. 2146:13-21.

PLS' POST-HEARING BRIEF

methodology as the basis for his opinions.[64]  Reviewing and adopting consultants' work product is not the "robust analysis" required under the law.  *Id.*  Simply identifying "best-of-both" cost differences without describing how Kroger and Albertsons could plausibly take advantage of the lowest prices from sophisticated Fortune 500 companies on each and every product they purchase is insufficient to satisfy the stringent efficiencies defense.  *Wilhelmsen*, 341 F. Supp. 3d at 73 ("Nor can reference to the merging parties' past practices, managerial expertise and incentives, or internal verification processes serve to substantiate any efficiencies."); *see also Anthem*, 236 F. Supp. 3d at 244-45 (finding claimed efficiencies not verifiable where "the record is devoid of plans specifying what method could be employed to" realize them).

## IV.    DEFENDANTS FAIL TO REBUT PLAINTIFFS' STRONG *PRIMA FACIE* CASE WITH AN INADEQUATE DIVESTITURE PACKAGE TO A POORLY PERFORMING BUYER

Defendants' made-for-litigation divestiture of 579 stores to C&S, a wholesaler with a poor track record of running grocery stores, fails to meet Defendants' substantial burden.  When the plaintiff's "*prima facie* case anticipates and addresses the respondent's rebuttal evidence," then the plaintiffs' case "is very compelling and significantly strengthened."  *Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 426 (5th Cir. 2008).  As a result, Defendants' "burden of production on rebuttal is also heightened."  *Id.*  Defendants must demonstrate that the divestiture would "sufficiently mitigate[] the merger's effect such that it [i]s no longer likely" that the merger would "substantially lessen competition."  *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1059 (5th Cir. 2023).  Any divestiture must "[r]estor[e] competition" and "replac[e] the competitive intensity lost as a result of the merger."  *Sysco*, 113 F. Supp. 3d at 72-73.  Here, Defendants' divestiture to C&S fails for the many reasons cited in Plaintiffs' pre-hearing briefing and shown

---

[64] Gokhale Hrg. 2115:12-2116:10.

PLS' POST-HEARING BRIEF

at the hearing.[65]  Plaintiffs highlight below some of the key evidence from C&S that it will not compete effectively, the lack of support for Defendants' claims to the contrary, and the cautionary tales of prior failed divestitures connected with grocery chain mergers.

## A.    The Divestiture Fails to Mitigate a Substantial Lessening of Competition

Critically, the divestiture immediately fails because it leaves hundreds of supermarket and large format markets—representing tens of billions in sales—unremedied and thus, presumptively unlawful.[66]  Dr. Hill's economic analyses confirm that prices likely will increase in hundreds of these markets, even using his conservative compensating marginal cost reduction ("CMCR") analysis.[67]  In a remarkable concession, Defendants' expert Dr. Israel agrees that there are unremedied markets under a CMCR analysis.[68]  This alone dooms the divestiture, as Section 7 proscribes mergers "where in any line of commerce . . . in any section of the country, the effect of such acquisition . . . may be substantially to lessen competition."  15 U.S.C. § 18; *see also Crown Zellerbach Corp. v. FTC*, 296 F.2d 800, 812 (9th Cir. 1961) ("[T]he statutory phrase 'in any line of commerce', the word entitled to emphasis is 'any' . . . . The line of commerce need not even be a large part of the business of any of the corporations involved.").

Even where it is receiving stores, C&S has admitted that it will not compete with Defendants for several years post-merger.[69]  C&S will not run its own pricing and promotions until the second or third year post-divestiture.[70]  As C&S admits: "[U]ntil we are fully de-coupled, we are not a separate functioning company," let alone a meaningful competitor that

---

[65] Pls. Br. at 37-46; FOF §§ V.A-B.
[66] PX7006 (Hill Rebuttal Rpt.) at Appx. E, Figs. 43-44; Hill Hrg. 3381:16-3382:5; FOF § V.A.
[67] PX7006 (Hill Rebuttal Rpt.) at Figs. 13 and 46; Hill Hrg. 3381:16-3382:5.
[68] Israel Hrg. 2687:17-2688:8; *see also* Defs. Resp. Br. at 27 (admitting the post-divestiture acquisition is presumptively illegal in 22 large format markets).
[69] Winn Hrg. 1195:5-1197:1; PX3956 (C&S) at 045.
[70] DX1058 (C&S) at 045; Florenz Hrg. 1147:4-7.

PLS' POST-HEARING BRIEF

would mitigate a substantial lessening of competition.[71]

Finally, the hearing confirmed that divested stores will perform poorly. C&S's own deal model, which fails to account for many of the associated risks, shows substantial revenue loss and increased expenditures for acquired stores.[72] To use a real world example, C&S previously purchased 12 stores as part of *Price Chopper/Tops* divestiture, rebannered them to Grand Union, and saw sales plummet by 28% in 2023—their first full year of operation.[73] And sales have continued to fall in 2024.[74] C&S's failure with this small divestiture package bodes ill for its ability to serve as a remedy for the far greater loss of competition caused by this acquisition.

Evidence of intense and aggressive head-to-head competition between Kroger and Albertsons contrasts sharply with C&S's history of failure at running supermarkets and plan to copy Kroger's base and promotional pricing for as long as possible.[75] When competing to beat Kroger on advertised pricing, Albertsons "need[s] to keep winning!"[76] When Kroger struggles, Albertsons states "[t]hese guys are spiraling down and I need to push my foot on the back of their neck."[77] In stark contrast, C&S needed to call Kroger "to discuss what it takes to operate a grocery store" when considering the divestiture.[78] The idea that C&S could replicate the intensity of lost competition from Albertsons is implausible at best.

---

[71] Winn Hrg. 1196:8-1197:1.
[72] PX3602 (C&S) at tab "Assumptions and CF Impacts"; Florenz Hrg. 1112:7-9, 1113:9-11, 1115:20-25, 1116:8-22, 1118:17-20.
[73] PX7004 (Hill Rpt.) ¶ 225, Fig. 56; McGowan Hrg. 993:19-994:18.
[74] McGowan Hrg. 1002:4-16.
[75] *See, e.g.*, Florenz Hrg. 1147:4-7; Aitken Hrg. 1876:16-1878:6; PX1358 (Kroger) at 1 (describing how Albertsons' scores "direct hit[s]" against Kroger in improving its stores, and Kroger needs to get "scrappy" to respond).
[76] Curry Hrg. 886:1-887:5, 895:16-21; PX12577 (Albertsons) at 001.
[77] Broderick Hrg. 1404:12-18; PX2395 (Albertsons) at 1.
[78] PX1272 (Kroger) at 001.

PLS' POST-HEARING BRIEF

## B.    Defendants' Claims About the Divestiture Package are Unsupported

Although the record illustrates many shortcomings of the proposed divestiture, other crucial evidence is unavailable to the Court.  That is reason alone to be deeply skeptical of Defendants' proposed remedy.  In *Sysco*, for example, the court's analysis of the divestiture was informed by the positions taken by the buyer in negotiations.  *Sysco*, 113 F. Supp. 3d at 75; *Aetna*, 240 F. Supp. 3d at 72 (finding probative "statements by [buyer] executives indicate that [the buyer] might decide to withdraw from several of the divestiture [markets] in short order, and instead only compete in some").  Here, by contrast, Defendants have withheld as privileged and work product evidence of the divestiture negotiation.[79]  The Court therefore cannot assess whether the parties' negotiating history undermines their claims that the divested assets suffice.

Because objective facts do not support Defendants' divestiture defense, they rely heavily on subjective assertions primarily from their own executives.  Susan Morris, for example, testified about her optimism for her potential role as CEO of C&S's retail operations.[80]  But her current role as COO of Albertsons prevents her from meaningfully engaging in strategy and planning for operating the divested stores, and she was not shown a single ordinary course document relating to post-divestiture operations in the course of her direct testimony.[81]  Defendants called only one C&S witness: CEO Eric Winn.  While Mr. Winn, too, expressed excitement about the future, much of his testimony focused on C&S's miniscule retail operations services business, even though C&S will not be using those capabilities to support the divested stores.[82]  Mr. Winn also acknowledged that when he and former CEO Bob Palmer discussed

---

[79] *See* Sword/Shield Motion.
[80] Morris Hrg. 1902:16-21, 1961:21-1962:15.
[81] Morris Hrg. 1919:8-1920:17 ("We don't engage in deep discussions on strategy . . . ."); *see also id.* 1915:12 ("I've seen very high-level business plans.").
[82] Winn Hrg. 1212:13-1220:1, 1261:3-10.

PLS' POST-HEARING BRIEF

closing stores acquired in the divestiture, Mr. Winn's talking points for wholesale customers left open the possibility of selling stores to them in the future.[83]  The ordinary course evidence of C&S considering selling and closing stores, and the C&S deal model projections of declining sales and below-market revenue growth, starkly contrast with Ms. Morris's and Mr. Winn's optimism.[84]  And Dr. Hill's analysis shows that those declining sales, and the resulting *increase* in sales at Kroger-owned stores, increases concentration and the already astronomical number of markets in which consumers face a likelihood of substantial harm.[85]

Defendants also make misleading claims about C&S's wholesale operations to bolster their divestiture defense.  In particular, Defendants make much of C&S's 7,500 independent customer stores, but those customers account for less than one-quarter of C&S's wholesale revenues, which are themselves a fraction of Albertsons' retail revenues.[86]  These small customers bear little resemblance to the full-service stores, carrying tens of thousands of SKUs, that Defendants own and operate.[87]  Even though C&S provides many of these independent stores with retail services—because it would be uneconomical for them to have full corporate office staffing—those services account for under 0.5% of C&S's revenues.[88]  Thus, by looking at the facts about these customers and not simply counting them, it becomes clear that C&S's services to independent customers do not prepare it to operate the divestiture stores, nor do wholesale sales to those stores give C&S the purchasing power Albertsons has today.

---

[83] Winn Hrg. 1197:2-1199:12, 1200:11-1202:1; PX3111 (C&S); PX3115 (C&S).
[84] Florenz Hrg. 1109:19-1110:7, 1111:12-20, 1112:7-9, 1113:9-11, 1115:11-25; PX3602 (C&S).
[85] Hill Hrg. 1491:12-1493:11; PX7006 (Hill Rebuttal Rpt.) at 110, Fig. 51.
[86] Winn Hrg. 1165:18-20; Morris Hrg. 1965:24-1966:1; Galante Hrg. 3206:14-3207:6; DX1058 (C&S) at 12.
[87] Winn Hrg. 1261:14-22.
[88] Winn Hrg. 1212:13-23, 1263:19-21.

PLS' POST-HEARING BRIEF

**C.**     **Supermarket Divestitures are Inherently Risky and Have Failed to the Detriment of Consumers**

Prior supermarket divestitures, including those involving Albertsons and C&S, have resulted in closed stores, bankruptcy, and the elimination of important competition.  The Court heard both fact and expert testimony about four different merger-related divestitures of grocery stores: (1) divestiture to Raley's in connection with the 1999 Albertsons/American Stores merger, (2) divestiture to Haggen and three wholesale grocers in connection with the 2015 Albertsons/Safeway merger, (3) divestiture of 81 stores in connection with the 2016 Ahold/Delhaize merger, and (4) divestiture to C&S in connection with the 2021 Price Choppers/Tops merger.[89]  In each case, the divestiture failed to replace the lost competition.  As Mr. Knopf testified, Raley's acquisition of 27 stores, 19 in Las Vegas and 8 in New Mexico, resulted in the Las Vegas stores being sold to Kroger within three years of the divestiture, and Raley's exiting the New Mexico market by selling those stores back to Albertsons.[90]  Among the challenges Raley's faced in operating those stores—challenges C&S will face here—were the continued presence in those markets of the merged firm, and the requirement to rebanner the acquired stores.[91]  When Albertsons acquired Safeway in 2015, it divested 168 stores, 146 to Haggen, and the rest to wholesalers; Dr. Hill analyzed the outcome of this divestiture and found that 57% of the divested stores closed, compared to only 8% of the retained stores.[92]  Albertsons ultimately reacquired many Haggen supermarkets and the trade name, which is slated to be

---

[89] Knopf Hrg. 957:17-966:7; Hill Hrg. 1486:19-1491:11; McGowan Hrg. 993:19-994:6.
[90] Knopf Hrg. 957:17-966:7.
[91] Knopf Hrg. 957:17-966:7.
[92] Hill Hrg. 1487:12-1489:2.

PLS' POST-HEARING BRIEF

divested to C&S.[93]  Dr. Hill found very similar results for the divestiture connected with the Ahold/Delhaize merger; there, the divested stores closed "at five to six times the rate of the retained stores."[94]  Finally, as discussed above, C&S's acquisition of stores in connection with the Price Choppers/Tops merger has resulted in █████████████, the stores have never been profitable on a retail basis, and they continue to underperform C&S's forecasts.[95]  If the Court permits Kroger's acquisition of Albertsons and the divestiture to C&S to occur, any further decline in sales, sale of stores, or closure of stores would further exacerbate the substantial lessening of competition that will already result from the acquisition.

Defendants bore a significant burden to show their divestiture is sufficient.  Due to the divestiture's many shortcomings, they failed.  The public should not shoulder the risk of this inadequacy.

## V.    CONCLUSION

For these reasons, the Court should grant the preliminary injunction.

---

[93] Morris Hrg. 1932:22-1933:2, 1935:25-1936:6; PX7004 (Hill Rpt.) ¶¶ 235-236.
[94] Hill Hrg. 1489:3-1489:18; PX7006 (Hill Rebuttal Rpt.) ¶¶147-50, Fig. 29.
[95] McGowan Hrg. 997:15-998:12, 1002:14-1003:3; Hill Hrg. 1489:19-1491:11.

PLS' POST-HEARING BRIEF

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**TABLE OF CONTENTS**

PLAINTIFFS' PROPOSED FINDINGS OF FACT ....................................................................... 1

I.      THE PARTIES TO THE PROPOSED ACQUISITION AND DIVESTITURE ........ 1

II.     PROPOSED ACQUISITION AND PROCEDURAL HISTORY .............................. 2

III.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR §7
        CHALLENGE FOR THE SALE OF GROCERIES .................................................. 4

        A.   Supermarkets are a Relevant Product Market ........................................... 4
             1.   Brown Shoe indicia establish a distinct submarket for supermarkets ................ 5
             2.   Economic analysis supports the supermarket product market ......................... 16

        B.   There is Also a Broader Product Market for Large Format Stores ...................... 17

        C.   Local Store-Based Overlap Areas are Relevant Geographic Markets .................. 18

        D.   Thousands of Local Supermarket Markets Satisfy the Hypothetical Monopolist
             Test Under Multiple Geographic Market Methodologies ..................................... 21
             1.   The HMT is a reliable methodology ....................................................... 21

        E.   Concentration Levels in Hundreds of Relevant Supermarket and Large Format
             Store Markets Establish a Presumption that the Acquisition is Illegal ................ 26

        F.   The Proposed Acquisition will Eliminate Substantial Head-to-Head Competition
             in Supermarkets .................................................................................... 27
             1.   Kroger and Albertsons constrain each other's base and promotional prices .... 28
             2.   Economic evidence shows that Defendants constrain each other's pricing ..... 36
             3.   Kroger and Albertsons compete closely on non-price factors ..................... 36
             4.   Economic analysis shows that the acquisition is likely to substantially reduce
                  competition ........................................................................................ 39

IV.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR §7
        CHALLENGE FOR UNION GROCERY LABOR ................................................... 40

        A.   Union Grocery Labor in CBA Areas Is a Relevant Labor Market ...................... 41
             1.   Brown Shoe indicia establish union grocery labor as a relevant labor market . 41
             2.   CBA areas constitute relevant geographic markets .................................... 43

        B.   High Shares in Many CBA Areas Establish Presumptive Unlawfulness ............. 44

        C.   The Acquisition Will Eliminate Substantial Head-to-Head Competition For Union
             Grocery Labor ...................................................................................... 45

V.      DEFENDANTS FAIL TO REBUT THE *PRIMA FACIE* CASE ............................ 50

        A.   The Divestiture Leaves Hundreds of Markets Unremedied ................................ 50

        B.   The Proposed Divestiture Will Not Mitigate a Substantial Lessening of
             Competition in the Remaining Markets ...................................................... 51

1.  The divestiture package is not a standalone business and lacks assets important to competitive viability ................................................................................................. 51
2.  C&S and Kroger will be entangled for up to four years post-divestiture ......... 53
3.  The divestiture presents high levels of execution risk ...................................... 54
4.  The divestiture fails to mitigate a substantial lessening of competition for union grocery labor markets ....................................................................................... 73

C.  Albertsons Is a Fierce Competitor and Will Continue to Be ................................. 74

D.  Entry or Expansion Is Unlikely to Be Timely or Sufficient to Prevent a Loss of Competition .............................................................................................................. 75

E.  Efficiencies Do Not Outweigh Likely Competitive Harm .................................... 76
1.  Defendants' claimed incremental revenue and profit synergies are neither cognizable nor cost savings ............................................................................... 76
2.  Most of Defendants' claimed cost savings have not been verified................... 78
3.  Most of Defendants' claimed cost savings are not merger-specific ................ 81
4.  Defendants' claimed efficiencies are not likely to benefit consumers ............ 84
5.  Kroger's non-binding $1 billion price investment is not an efficiency that may be passed through to consumers ....................................................................... 84

VI.     THE EQUITIES WEIGH IN FAVOR OF A PRELIMINARY INJUNCTION ....... 86

A.  If the Acquisition Closes, Significant Harm Will Result....................................... 86

B.  Alleged Benefits Remain Available After a Merits Decision................................. 87

PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW ........................................................ 88

I.      THE FTC IS LIKELY TO SUCCEED ON THE MERITS ..................................... 89

A.  The Acquisition is Presumptively Illegal and Likely to Cause Anticompetitive Effects in the Supermarkets Product Market ........................................................ 89
1.  Supermarkets are a relevant product market.................................................... 89
2.  Local areas around Defendants' stores are relevant geographic markets ......... 93
3.  Economic analysis confirms that supermarkets in local areas are relevant geographic markets ........................................................................................... 93
4.  The acquisition is illegal even when analyzed using a large format store product market .................................................................................................. 94
5.  The proposed acquisition creates a presumptively illegal increase in concentration in both the relevant supermarket local areas and in large format local areas ......................................................................................................... 95

B.  The Proposed Acquisition is Unlawful in a Market for Union Grocery Labor in Collective Bargaining Agreement Areas ............................................................... 96

C.  The Acquisition is Also Unlawful Because it Will Eliminate Substantial Head-To-Head Competition ................................................................................................... 97

D.  Defendants Cannot Rebut Plaintiffs' Case ........................................................... 99
1.  The proposed divestiture does not address the acquisition's anticompetitive harm................................................................................................................... 99
2.  The purported efficiencies do not rebut Plaintiffs' prima facie case ............. 103

3.   Defendants cannot satisfy the weakened competitor defense ......................... 105

4.   The promised "price investments" do not rebut Plaintiffs' prima facie case . 106

5.   Entry and expansion will not be timely, likely, or sufficient to counteract the acquisition's anticompetitive effects .............................................................. 106

II.    THE EQUITIES FAVOR A PRELIMINARY INJUNCTION.............................. 107

A.   Defendants' Interest in Completing the Transaction Before the Merits Proceeding Does Not Outweigh the Public Equities .............................................................. 107

B.   Plaintiffs are Not Required to Establish Irreparable Harm ................................ 109

PLS' PROPOSED FOF AND COL

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Boardman v. Pac. Seafood Grp*, 822 F.3d 1011 (9th Cir. 2016) ................................................. 109

*Bon-Ton Stores, Inc. v. May Dep't Stores Co.*, 881 F. Supp. 860 (W.D.N.Y. 1994) .................. 91

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ....................................................... *passim*

*Brown v. Pro Football, Inc.*, 518 U.S. 231 (1996) ...................................................................... 96

*California v. Am. Stores Co.*, 697 F. Supp. 1125 (C.D. Cal. 1988)............................................. 91

*California v. Am. Stores Co.*, 872 F.2d 837 (9th Cir. 1989)............................................. 90, 92, 95

*Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410 (5th Cir. 2008) ..................... 95, 100, 107

*Crown Zellerbach Corp. v. FTC*, 296 F.2d 800 (9th Cir. 1961)................................................ 100

*FTC. v. CCC Holdings Inc.*, 605 F. Supp. 2d 26 (D.D.C. 2009) ............................... 101, 103, 105

*Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023)............................................... 91, 94

*FTC v. Advocate Health Care Network*, 841 F.3d 460 (7th Cir. 2016) ....................................... 94

*FTC v. Elders Grain, Inc*., 868 F.2d 901 (7th Cir. 1989) ............................................................ 89

*FTC v. Hackensack Meridian Health, Inc.*, 2021 WL 4145062 (D.N.J. Aug. 4, 2021) ......... 94, 98

*FTC v. Hackensack Meridian Health, Inc*., 30 F.4th 160 (3d Cir. 2022) ................. 93, 94, 99, 103

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) ....................................... 95, 100, 105, 108

*FTC v. IQVIA Holdings, Inc*., 2024 WL 81232 (S.D.N.Y. Jan. 8, 2024) ............................. *passim*

*FTC v. Lancaster Colony Corp., Inc.*, 434 F. Supp. 1088 (S.D.N.Y. 1977)................. 88, 108, 109

*FTC v. Libbey, Inc*., 211 F. Supp. 2d 34 (D.D.C. 2002)............................................................ 101

*FTC v. Meta Platforms, Inc*., 2022 WL 16637996 (N.D. Cal. Nov. 2, 2022) .................... 106, 107

*FTC v. Peabody*, 492 F. Supp. 3d 918 (2020) ........................................................................... 108

*FTC v. Penn State Hershey Med. Ctr*., 838 F.3d 327 (3rd Cir. 2016) ................. 89, 103, 107, 108

*FTC v. Sanford Health*, 926 F.3d 959 (8th Cir. 2019)................................................ 104

*FTC v. Sanford Health*, 2017 WL 10810016 (D.N.D. Dec. 15, 2017)........................ 104

*FTC v. Staples, Inc.*, 190 F. Supp. 3d 100 (D.D.C. 2016) ............................................ 99

*FTC v. Staples, Inc.*, 970 F. Supp. 1066 (D.D.C. 1997) ......................................... 90, 91

*FTC v. Surescripts, LLC*, 665 F. Supp. 3d 14 (D.D.C. 2023)........................................ 91

*FTC v. Sysco*, 113 F. Supp. 3d 1 (D.D.C. 2015)................................................... *passim*

*FTC v. Univ. Health, Inc.*, 938 F.2d 1206 (11th Cir. 1991)................................ 88, 103, 104, 107

*FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156 (9th Cir. 1984)............................. 88, 106

*FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) ......................... *passim*

*FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27 (D.D.C. 2018)..................... 104, 109

*FuboTV Inc. v. Walt Disney Co.*, No. 24-CV-01363, 2024 WL 3842116

  (S.D.N.Y. Aug. 16, 2024) ................................................................ 97, 98

*Gilley v. Stabin*, 2024 WL 3507982 (D. Or. July 23, 2024) .................................... 109

*Illumina, Inc. v. FTC*, 88 F.4th 1036 (5th. Cir. 2023)................................................ 100

*Kaiser Aluminum & Chem. Corp. v. FTC*, 652 F.2d 1324 (7th Cir. 1981)............................... 105

*Olin Corp. v. FTC*, 986 F.2d 1295 (9th Cir. 1993)......................................... 89, 94, 106

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466 (9th Cir. 2021) .............. 90, 91, 97

*Pargas, Inc. v. Empire Gas Corp.*, 423 F. Supp. 199, 227 (D. Md. 1976) ............................. 100

*Pargas, Inc. v. Empire Gas Corp.*, 546 F.2d 25 (4th Cir. 1976).................................... 100

*ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559 (6th Cir. 2014) ........................... 89, 105, 106

*RSR Corp. v. FTC*, 602 F.2d 1317 (9th Cir. 1979) .............................. 95, 99, 100, 103

*Sidibe v. Sutter Health*, 2019 WL 2078788 (N.D. Cal. May 9, 2019)........................... 97

*St. Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys.*, 2014 WL 407446

PLS' PROPOSED FOF AND COL

(D. Idaho Jan. 24, 2014)............................................................................ 93

*St. Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys.*, 778 F.3d at 783 ................ *passim*

*Starbucks Corp. v. McKinney*, 144 S. Ct. 1570 (2024)............................................. 109

*State of Washington v. Kroger et al.,* No. 24-2-00977-9 (Wash. Super. Ct. 2020) .................... 106

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) ...................................................... 96

*United States v. Aetna*, 240 F. Supp. 3d 1 (D.D.C. 2017) ...................................... *passim*

*United States v. Anthem, Inc.*, 236 F. Supp. 3d 171 (D.D.C. 2017) ........................ 96, 98, 99, 100

*United States v. Bazaarvoice, Inc.*, 2014 WL 203966 (N.D. Cal. Jan. 8, 2014)........................ 107

*United States v. Bertelsmann SE & Co.*, 646 F. Supp. 3d 1 (D.D.C. 2022) ......................... *passim*

*United States v. E. I. du Pont de Nemours & Co.,* 351 U.S. 377 (1956) .................................. 108

*United States v. Google*, 2024 WL 3647498 (D.D.C. Aug. 5, 2024) ...................................... 92, 97

*United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) ............................... *passim*

*United States v. Mfrs. Hanover Tr. Co.*, 240 F. Supp. 867 (S.D.N.Y. 1965) .............................. 98

*United States v. Philadelphia Nat'l Bank*, 374 U.S. 321 (1963) ............................... 88, 89, 95, 103

*United States v. Rockford Memorial Corp.*, 898 F.2d 1278 (7th Cir. 1990).......................... 94, 97

## Statutes

15 U.S.C § 1....................................................................................................... 98

15 U.S.C. § 26................................................................................................... *passim*

15. U.S.C. § 53(b) ............................................................................ 88, 89, 107, 109

## Other Authorities

21 Cong. Rec. 2457 (Mar. 21, 1890) ............................................................... 96

H.R. Rep. No. 93-624 (1973).......................................................................... 109

U.S.C.C.A.N. 2523 ......................................................................................... 109

PLS' PROPOSED FOF AND COL

U.S. Dep't of Justice & Fed. Trade Comm'n, *Merger Guidelines* (1992) ................................... 95

U.S. Dep't of Justice & Fed. Trade Comm'n, *Merger Guidelines* (2010) ................................... 98

U.S. Dep't of Justice & Fed. Trade Comm'n, *Merger Guidelines* (2023) ............... 95, 97, 98, 107

PLS' PROPOSED FOF AND COL

## PLAINTIFFS' PROPOSED FINDINGS OF FACT

## I.    THE PARTIES TO THE PROPOSED ACQUISITION AND DIVESTITURE

1.    Founded in 1883, Kroger is the largest traditional supermarket chain in the country as well as the largest employer of union grocery workers.[1]  Today, Kroger owns around 2,700 supermarkets, of which approximately 2,250 have pharmacies and 1,600 have fuel centers.[2]  In fiscal year 2023, Kroger had an operating profit of approximately $3.1 billion.[3]  For four decades, Kroger has acquired supermarket chains across the country.[4]  Kroger now operates more than 20 local banners, including Kroger, Smith's, Dillons, King Soopers, Fry's, QFC, City Market, Jay C, Harris Teeter, Pick 'n Save, Metro Market, Mariano's, Fred Meyer, Food 4 Less, Foods Co., and Ralphs.[5]  Kroger has 33 manufacturing facilities across the U.S., including a meat plant, 2 beverage plants, 5 grocery plants, 5 bakeries, 2 frozen dough plants, 2 deli plants, 14 dairies, and 2 cheese plants, all of which Kroger uses to lower costs.[6]

2.    Founded in 1939, Albertsons is—behind Kroger—the second-largest traditional supermarket chain and the second-largest employer of union grocery workers in the country.[7]  Like Kroger, Albertsons has grown by a series of acquisitions and now operates 2,269 supermarkets across 34 states and the District of Columbia under more than 20 banners, including Albertsons, Safeway, Vons, Pavilions, Randalls, Tom Thumb, Carrs, Jewel-Osco ("Jewel"), Acme, Shaw's, Star Market, United Supermarkets, Market Street, Haggen, Kings Food Markets, and Balducci's Food Lovers Market.[8]  Albertsons also operates 1,725 pharmacies,

---

[1] Sankaran Hrg. 1745:14-15; PX7004 (Hill Rpt.) ¶ 247; PX6154 (Kroger) at 6-7.
[2] McMullen Hrg. 1573:17-18; PX6009 (Kroger) at 113.
[3] PX6154 (Kroger) at 027.
[4] PX6030 (Kroger) at 007.
[5] PX6023 (Kroger) at 001.
[6] PX6200 (Kroger) at 020.
[7] Sankaran Hrg. 1745:8-13; PX7004 (Hill Rpt.) ¶ 247; PX6153 (Albertsons) at 010.
[8] PX6153 (Albertsons) at 008.

1

402 adjacent fuel centers, 22 distribution centers, 19 manufacturing facilities, and various digital platforms.[9]  In fiscal year 2023, Albertsons generated almost $1.3 billion in net income.[10] Shortly after announcing this acquisition, Albertsons also announced a $4 billion dividend, which it paid to its shareholders in January 2023.[11]

3.      C&S Wholesale Grocers is a wholesaler that supplies retail operators with grocery products.  C&S's wholesaling business has declined by approximately 33% since 2017, and it forecasts a further decline this year.[12]  C&S does not currently have a distribution network in many of the divestiture geographies through its wholesale business.[13]  It operates only 23 retail grocery stores, mostly in upstate New York, Vermont, and Wisconsin.[14]  Defendants propose selling 579 stores in 18 states and D.C. and other assorted assets to C&S to cure the anticompetitive effects of the acquisition.[15]

## II.     PROPOSED ACQUISITION AND PROCEDURAL HISTORY

4.      In the fall of 2022, Kroger agreed to pay $24.6 billion to acquire Albertsons.[16]  In pursuit of this acquisition, Kroger and Albertsons have spent an additional $864 million in 2024 alone.[17]

5.      Defendants now vaguely claim that the rationale for this acquisition was to gain scale. But scale was not the reason Albertsons gave investors.  Instead, Albertsons told investors that it was pursuing this acquisition because of concentrated ownership of its stock by one investor,

---

[9] PX6153 (Albertsons) at 008.
[10] *Id.* at 040.
[11] Sankaran Hrg. 1772:7-10.
[12] Winn Hrg. 1165:21-1166:8.
[13] McGowan Hrg. 1077:18-1078:14 (C&S for the most part does not currently have presence in Intermountain states, Southern California, Arizona, Alaska, and Colorado).
[14] PX7002 (Fox Rpt.) ¶ 11; Winn Hrg. 1173:24-25.
[15] PX7002 (Fox Rpt.) ¶ 45; Winn Hrg. 1175:9-1178:6; 1232:20-22.
[16] PX6084 (Kroger) at 002.
[17] McMullen Hrg. 1675:21-1676:4.

which caused concern the investor might sell the shares and negatively affect the stock price.[18]

Scale was also not impeding Albertsons' growth when it decided to merge, as shown by its

increase in market share.[19]  Indeed, Albertsons' COO wrote "we are literally crushing it

consistently" and "our owners are not selling us because we are at risk, not performing, or

failing, but because they simply want to monetize their investment."[20]  Defendants admit that

none of their claimed efficiencies (*infra* at § V.E) relate to volume or scale.[21]  Defendants'

unsupported scale arguments are also inconsistent with their contention that C&S, which will be

much smaller than Kroger post-acquisition,[22] will be an effective competitor.

6.      While Plaintiffs were investigating or litigating this acquisition, four of Albertsons' seven

hearing witnesses (including its CEO) deleted responsive text messages despite receiving a

preservation hold and multiple reminders of their obligations under said notice.[23]  The Court

found "that the lost text messages should have been preserved, that [Albertsons] failed to take

reasonable steps to preserve them, they cannot be restored or replaced through additional

discovery, and the loss of the text messages prejudices plaintiffs."[24]  For instance, Todd

Broderick—Albertsons' Denver Division President—texted for work between 25 and 100 times

per day, yet deleted texts from November 2022 until October 2023,[25] including ones related to

this acquisition such as: "It is all about pricing and competition, and we all know prices will not

---

[18] PX6081 (Albertsons) at 026; Sankaran Hrg. 1770:7-1771:4.
[19] Sankaran Hrg. 1771:21-1772:6.
[20] PX2616 (Albertsons) at 001.
[21] Gokhale Hrg. 2165:18-2166:5.
[22] *See infra* ¶ 120.
[23] Spoliation Motion at 003-007; Kinney Hrg. 2945:12-2946:1; 3012:17-3015:10; 3017:2-3018:25; 3021:5-9 (Ms. Kinney did not disable auto-delete setting until shortly before May 2024 deposition and texted about her work, the acquisition, and C&S).
[24] ECF No. 407 at 002.
[25] Broderick Hrg. 1405:6-1407:3.

PLS' PROPOSED FOF AND COL

go down.  A $500M investment in pricing to our company won't get our prices down to Kroger levels in my view, therefore the conclusion that's easily drawn is overall prices will increase."[26] Likewise, Vivek Sankaran—Albertsons' CEO—texted for work approximately ten times a day, yet *enabled* his phone's auto-delete function in 2022—potentially after hearing about this acquisition—and did not disable auto-delete until the FTC raised the issue in November 2023.[27] Mr. Sankaran may have deleted over 1,700 work texts, including with Albertsons' senior leadership team, board chairs, and consultants; Kroger senior leaders; and C&S.[28]

7.      On February 26, 2024, the FTC initiated an administrative proceeding to permanently enjoin this acquisition and filed this action seeking a preliminary injunction to maintain the status quo in the meantime.  The Attorneys General of Arizona, California, District of Columbia, Illinois, Maryland, Nevada, New Mexico, Oregon, and Wyoming—following parallel investigations—joined the FTC in seeking a preliminary injunction.  The Attorneys General of Colorado and Washington have also each filed separate lawsuits to enjoin the acquisition.

8.      Defendants are subject to a preliminary injunction in the Colorado action until five days after a ruling in that case,[29] but once that expires, they may begin consolidating their operations. The acquisition agreement expires October 9, 2024, but Defendants may choose to extend the agreement past that date.[30]

## III.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR §7 CHALLENGE FOR THE SALE OF GROCERIES

### A.  Supermarkets are a Relevant Product Market

---

[26] PX2376 (Albertsons) at 003; Broderick Hrg. 1408:1-1413:25.
[27] Sankaran Hrg. 1790:2-1791:11.
[28] Sankaran Hrg. 1790:4-1791:8, 1791:16-1792:25.
[29] *See Colorado v. Kroger Co.*, No. 2024-CV-30459, Order Re: Pls' Mot. for Prelim. Inj. (Colo. Dist. Ct. July 25, 2024).
[30] DX2552 (Kroger/Albertsons) at 088.

PLS' PROPOSED FOF AND COL

9.      Supermarkets, encompassing both traditional supermarkets and supercenters,[31] are a relevant product market.  Grocery products are sold in the United States through a variety of store formats, each designed to serve a specific customer shopping mission and need.[32] Supermarkets are distinct from other grocery formats such as club stores, dollar stores, limited assortment stores, natural and organic stores, and e-commerce websites.

### 1.  Brown Shoe indicia establish a distinct submarket for supermarkets

10.     Supermarkets have peculiar characteristics and uses, unique facilities, distinct price strategies, and industry recognition as a distinct submarket, all of which supports a finding that supermarkets are a relevant product market.

#### i.    Supermarkets have peculiar characteristics and uses

11.     Supermarkets are large brick-and-mortar stores that sell a distinctly broad variety of household consumables ranging from food items like fresh produce, meat, seafood, dairy products, frozen foods, shelf-stable foods, and beverages, to non-food items such as detergents, pet foods, and health and beauty care products.[33]  This broad variety includes a deep selection within each product type, including both private label and national brands, organic options, flavor varieties, and a range of package sizes.[34]  Supermarkets also stock large selections of fresh

---

[31] Supercenters, like supermarkets, sell a full line of groceries at a variety of package sizes, brand options (i.e., both national and private label brands), and price points, and likewise provide the opportunity to meet various grocery customer need states in one stop.  Lieberman Hrg. 2356:20-2358:25.  Because they effectively contain traditional supermarkets within their footprints, supercenters are a subset of the supermarket product market.  PX7004 (Hill Rpt.) ¶ 67, n. 84.

[32] Yates Hrg. 2196:20-2198:9; Knopf Hrg. 938:12-15; 939:8-25; George Hrg. 2045:13-2046:2; Neal Hrg. 372:11-373:7; Lieberman Hrg. 2360:6-2361:12, 2362:9-18, 2363:22-2364:15.

[33] McMullen Hrg. 1634:5-16; PX6009 (Kroger) at 113; Knopf Hrg. 934:8-19; Schwilke Hrg. 808:1-809:20; Curry Hrg. 868:12-869:25; Broderick Hrg. 1361:10-1362:2.

[34] McMullen Hrg. 1573:8-13, 1634:5-16; Curry Hrg. 867:10-868:9, 871:3-873:13; Broderick Hrg. 1362:3-1363:12; Marx Hrg. 419:9-420:19; Sankaran Hrg. 1746:2-21; Knopf Hrg. 933:2-17, 934:8-19, 939:8-25; Schwilke Hrg. 807:19- 810:8, 811:7-21; Van Helden Hrg. 164:23-168:4; Lieberman Hrg. 2358:1-25.

PLS' PROPOSED FOF AND COL

items, including produce, meat, and seafood.[35]  Supermarkets view fresh items as a key factor in their customers' store choice; for example, Albertsons stated: "For our customers, fresh is the #1 driver of trust and importance in selecting their food and beverage retailer," and, according to Kroger: "Fresh is the #1 determinant of store choice, over 70% of customers decide where to shop based on Fresh Categories."[36]

12.    Supermarkets offer a range of in-store services such as butchers, bakers, deli and seafood counters, florists, coffee bars, fuel centers, and pharmacies.[37]  Supermarkets' service counters are often staffed to serve customers with custom orders, such as sliced deli meat or cheese, a custom-decorated cake, or particular floral arrangement.[38]  While these services are expensive to provide, supermarkets uniquely house this broad range of services because it is part of the one-stop shop that supermarket customers expect.[39]

13.    Supermarkets carry vastly more stock-keeping-units (SKUs) than any other retail grocery format.  Smaller Kroger stores have about 60,000 SKUs on average, and larger Kroger stores (e.g., Fred Meyer) carry up to 160,000.[40]  Albertsons stores average around 40,000 SKUs.[41] Ahold's Food Lion stores average 24,000 SKUs; Stater Bros.' stores carry around 30,000 SKUs;

---

[35] Kammeyer Hrg. 476:13-477:2; PX2272 (Albertsons) at 007; Knopf Hrg. 950:8-11.
[36] PX2272 (Albertsons) at 005; PX1240 (Kroger) at 003. *See also* PX2271 (Albertsons) at 008 ("███████████████████████████████████████████████████████████████████████ ███████████████████████████████████); PX2999 (Albertsons) at 058 ("ACI is stronger than Costco at driving trips with many fruits and vegetables, ground meat, beef, ice cream novelties, yogurt, CSD, bread, packaged cheese, and bagged salads."); Kinney Hrg. 3038:19-3039:4.
[37] Broderick Hrg. 1361:22-1362:2; Van Helden Hrg. 162:22-163:9, 168:9-169:7, 169:21-170:4; Kammeyer Hrg. 476:13-23, 477:11-15; Huntington Hrg. 519:14-520:19; Curry Hrg. 870:16-871:2; Schwilke Hrg. 808:22-809:13; Marx Hrg. 417:13-419:6; PX6030 (Kroger) at 001-002, 006.
[38] Van Helden Hrg. 168:9-169:7, 169:21-170:4; Curry Hrg. 870:1-871:2; Marx Hrg. 417:10-419:6; Knopf Hrg. 933:4-17, 934:8-19; Yates Hrg. 2195:23-2196:5.
[39] Van Helden Hrg. 168:9-170:8; Sankaran Hrg. 1746:2-1747:22; Broderick Hrg. 1363:20-25.
[40] McMullen Hrg. 1573:8-13.
[41] Huntington Hrg. 518:23-519:1.

PLS' PROPOSED FOF AND COL

and Raley's stores offer about 40,000 SKUs.[42]

14.    Supermarkets carry a broad and deep assortment of products and related services in order to provide a "one-stop shop" experience where customers can meet substantially all of their food and non-food grocery requirements in a shopping visit.[43]  Supermarkets strategically offer this assortment because they understand customers value the convenience of being able to satisfy the majority of their grocery needs in one trip.[44]  In each of its 10-K filings from 2015 to 2023, Kroger claimed that its store format is "successful because the stores are large enough to offer the specialty departments that customers desire for one-stop shopping . . . ."[45]  As an Albertsons executive observed, "[w]ith our larger basket sizes and fewer trips, [customers] are telling us they want one stop shopping – how can we best meet that demand?"[46]  Albertsons' CEO is "proud of . . . [its] position as being a one-stop shop for consumers."[47]  Defendants' division presidents agree their stores offer a one-stop shopping experience to meet customer demand.[48]

15.    Other store formats that sell grocery products have different characteristics and uses from supermarkets and, as a result, are not reasonable substitutes for supermarkets.  In particular, these formats have different product assortments and service offerings than supermarkets.

16.    **Club stores.** Club stores (e.g., Costco) have a different product offering from

---

[42] Yates Hrg. 2194:8-10; Knopf Hrg. 933:4-7; Van Helden Hrg. 164:23-165:10.

[43] McMullen Hrg. 1634:5-16; Curry Hrg. 873:6-13; Van Helden Hrg. 163:19-164:14; Schwilke Hrg. 811:15-21; Broderick Hrg. 1363:20-25; Knopf Hrg. 933:18-934:7 (customers typically can satisfy over 80% of household grocery needs shopping at a Raley's or a Bashas' store); Kinney Hrg. 3038:9-3039:18; PX2999 (Albertsons) at 058 ("Cross-shoppers of both Costco and ACI" rate Albertsons better on "one-stop shop, easy-to-find items, website/app.").

[44] Schwilke Hrg. 811:15-21; Broderick Hrg. 1363:13-25; Van Helden Hrg. 163:19-164:14, 175:13-22; Kammeyer Hrg. 476:2-15.

[45] McMullen Hrg. 1634:5-1636:14; *see also, e.g.*, PX6009 (Kroger) at 113 (2023 10-K filing).

[46] PX2932 (Albertsons) at 001.

[47] PX12380 (Albertsons) at 001.

[48] Curry Hrg. 873:6-13; Schwilke Hrg. 811:15-21; Broderick Hrg. 1363:20-25; Kammeyer Hrg. 475:14-476:15.

PLS' PROPOSED FOF AND COL

supermarkets. Club stores typically offer only one size of packaging for each product—club-sized packaging—that is both too large for many consumers and larger than the product packaging sizes supermarkets offer.[49] Large package sizes also apply to highly perishable foods such as berries, milk, and bananas.[50] Club stores' bulk pack sizes mean it is difficult for shoppers to have a one-stop shop.[51] Moreover, Costco offers fewer than ███ grocery SKUs.[52] They typically stock just a few flavors, brands, or varieties within each product category.[53] Their assortments vary over time, such that a customer may not always be able to find the product they came to buy, even if that product was in stock last week or last month.[54] Club stores lack staffed service counters like deli, butcher, bakery, and floral that would allow customers to order custom products.[55] Defendants' ordinary course documents agree that club stores like Costco are "structurally a different consumer proposition—they are not a 'daily habit' or 'food experts'."[56]

17.    **Natural and organic stores.** Natural and organic stores such as Sprouts Farmers Market focus their product assortment on organic, natural, and fresh products.[57] Sprouts describes its product mix as "differentiated"—i.e., unlike conventional, national brand products—and

---

[49] Van Helden Hrg. 173:9-14, 173:25-174:12; Silva Hrg. 250:12-24; Knopf Hrg. 939:8-25; George Hrg. 2038:11-2039:25; ███████████; Kinney Hrg. 3035:12-3036:3; PX12112 (Albertsons) at 001 (Costco "[s]ell[s] unique product configurations not sold in the rest of the market (possible exception on Wine/Spirits)").
[50] George Hrg. 2038:11-2039:8; ████████████.
[51] Van Helden Hrg. 192:9-22; George Hrg. 2040:1-11; Kinney Hrg. 3038:9-3039:25; PX2999 (Albertsons) at 058 ("Cross-shoppers of both Costco and ACI" prefer Albertsons for "one-stop shop, easy-to-find items, website/app" and, in comparison, Costco "drives trips with bath tissue, paper towels, and home cleaning").
[52] George Hrg. 2037:2-2038:10; ████████████.
[53] Yates Hrg. 2194:15-25; George Hrg. 2041:6-24; █████████████; Knopf Hrg. 939:8-25.
[54] Yates Hrg. 2194:21-25; George Hrg. 2040:24-2041:5; ███████████.
[55] George Hrg. 2041:25-2042:21; ████████████.
[56] PX12112 (Albertsons) at 001; *see also* Kinney Hrg. 3035:10-19.
[57] Neal Hrg. 367:19-368:25. Sprouts carries about 20,000 SKUs, far fewer than a supermarket. Neal Hrg. 367:22-368:2.

8

"attribute-driven"—e.g., "organic, regenerative farmed, vegan, and gluten-free."[58]  Similarly,

Whole Foods Market focuses on providing an offering of organic and natural high-quality food,

rather than well-known national brands.[59]  Natural and organic stores do not offer many of the

nationally branded products found in supermarkets in both the food and non-food household

consumable categories.[60]  Natural and organic stores like Sprouts also emphasize the "treasure

hunt" shopping experience: they want customers who visit the store to discover new, unique

items and view their offering as a complement to supermarkets.[61]

18.    **Limited assortment stores.**  Limited assortment stores (e.g., Aldi and Lidl) carry a much

narrower range of products and stock fewer SKUs compared to supermarkets.[62]  Aldi, for

instance, offers fewer than 5% of the items supermarkets offer.[63]  They predominantly stock

private label brands and do not offer popular national brands for most products.[64]  Limited

assortment stores also carry fewer options within each product category (e.g., one size bottle of

ketchup, two or three flavors of yogurt).[65]  Like club stores, limited assortment stores often rotate

stock on a seasonal basis.[66]  Limited assortment stores also lack staffed service counters.[67]

19.    **Dollar stores.**  Dollar stores offer a much narrower range of products than supermarkets

---

[58] Neal Hrg. 369:1-370:4.
[59] Heyworth Hrg. 2817:18-2818:2; Oblisk Hrg. 2290:10-2291:1; 2327:2-11.
[60] Neal Hrg. 371:18-372:10; Knopf Hrg. 941:19-22.
[61] Neal Hrg. 373:24-374:25.
[62] Van Helden Hrg. 174:13-175:7; ███████████████████████; Yates Hrg. 2195:5-11; ████████████.
[63] Van Helden Hrg. 170:14-25, 174:21-175:3.
[64] McMullen Hrg. 1601:20-1602:2; Van Helden Hrg. 174:21-175:7; Knopf Hrg. 940:10-25; █████████████████████████████████████; ████████████████████████.
[65] ████████████████████████████.
[66] ████████████████████████████.
[67] Yates Hrg. 2196:6-8; Kammeyer Hrg. 480:20-481:4; ██████████████████████; ████████████.

PLS' PROPOSED FOF AND COL

(e.g., have little-to-no fresh produce) and often at lower quality.[68]  Dollar stores offer a "fill-in" shop to a shopper needing to restock a few items.[69]  They do not have service counters.[70]  Dollar stores do not carry the same volume of inventory as grocery stores, and out-of-stocks mean customers may not always be able to find important items on the shelves.[71]  Dollar stores offer smaller-sized packages than supermarkets to maintain their lower price perception.[72]

20.    **E-commerce sites.**  Grocery e-commerce sites (e.g., Amazon.com) typically have a limited selection of fresh foods compared to supermarkets due to storage and shipping limitations, particularly fresh meat, produce, and frozen foods.[73]  To date, Amazon has only one warehouse, in Phoenix, Arizona, capable of handling perishable products.[74]

21.    As a result of these distinct characteristics, supermarkets fill customer needs that other formats do not.  Customers' choice of which format to shop is determined by their "mission" or "need state," i.e., what the customer seeks for that shopping trip, and customers typically do not seek out other formats for the same purposes as supermarkets.[75]  Customers looking for a one-stop shop at a neighborhood store can meet those needs at a supermarket.[76]  Other retail formats serve different customer need states or missions.[77]  For example, club stores like Costco appeal

---

[68] McMullen Hrg. 1644:17-22; Van Helden Hrg. 176:21-177:7; Unkelbach Hrg. 461:19-24, 466:9-14, 468:23-469:5, 469:22-470:5; Knopf Hrg. 943:7-18.

[69] Unkelbach Hrg. 463:9-463:21, 467:6-11; Lieberman Hrg. 2362:5-18.

[70] Van Helden Hrg. 170:14-171:1, 177:8-11; Unkelbach Hrg. 462:22-463:2, 466:9-14, 23-24; Knopf Hrg. 943:7-22.

[71] Van Helden Hrg. 177:5-7; Unkelbach Hrg. 460:12-21, 461:11-18, 461:25-462:21, 464:5-11, 466:15-22, 468:23-469:5; Knopf Hrg. 943:23-944:10.

[72] Unkelbach Hrg. 462:11-21, 465:22-466:8.

[73] Heyworth Hrg. 2818:21-2820:25; Knopf Hrg. 950:4-13; Lieberman Hrg. 2374:10-16.

[74] Heyworth Hrg. 2814:18-2815:4.

[75] Yates Hrg. 2196:23-2198:9; Lieberman Hrg. 2359:1-8, 2360:11-24, 2363:22-2364:15, 2362:9-18; Knopf Hrg. 936:20-937:16, 938:23-939:25; Oblisk Hrg. 2291:20-11; Neal Hrg. 373:8-23.

[76] Van Helden Hrg. 162:22-164:14; Knopf Hrg. 934:8-19, 961:8-18 ("[t]he stores are community and neighborhood centric in nature"); Lieberman Hrg. 2360:6-2361:12.

[77] Yates Hrg. 2197:2-23; Lieberman Hrg. 2361:13-15.

to households and businesses that want to purchase grocery products in bulk.[78]  Shoppers

typically visit club stores less often than supermarkets, but rather travel for bulk "stock-up

trip[s]" (e.g., "Costco Runs").[79]  Natural and organic stores such as Sprouts serve a distinct set of

core customers,[80] and focus their product assortment on organic and fresh products to attract

these customers.[81]  Natural and organic stores offer a "secondary" or fill-in shop for healthier

items, or to "discover products and find things that [customers] didn't know that they necessarily

wanted."[82]  Most dollar store customers do not purchase their weekly groceries at a dollar store;

rather, dollar stores offer a fill-in shop and a treasure hunt experience.[83]  Likewise, "[t]he mission

is very different" for a customer at a limited assortment store like Aldi, given the narrower

assortment and high percentage of private label products.[84]  Customers at limited assortment

stores are also generally highly price-focused.[85]

22.    Thus, although a customer may shop at multiple store formats, data about "cross

shopping" or "share of wallet" do not explain the purpose for which customers are shopping any

particular format, and do not demonstrate that the different formats are substitutes.[86]

---

[78] Van Helden Hrg. 173:25-174:12; Knopf Hrg. 937:25-938:15.
[79] George Hrg. 2045:13-1046:2; ███████████████; PX12385
(Albertsons) at 005; Knopf Hrg. 938:1-15, 939:8-25.
[80] Neal Hrg. 375:3-376:8, 378:6-379:4.
[81] Neal Hrg. 377:3-25.
[82] Neal Hrg. 372:11-373:23, 374:11-375:2.
[83] Unkelbach Hrg. 463:9-464:11, 467:6-11; Lieberman Hrg. 2362:9-18.
[84] Knopf Hrg. 940:10-25.
[85] Van Helden Hrg. 175:8-176:6; Sankaran Hrg. 1746:23-1747:4; Knopf Hrg. 940:10-25.
[86] Kinney Hrg. 2936:7-10; 2996:18-21; 2998:19-2999:1; 3005:19-22; Israel Hrg. 2706:8-23
(share of wallet data "doesn't answer the question [of substitutability] by itself").  *See also*
Lieberman Hrg. 2363:22-2364:15 (cross-shopping between formats reflects complementarity);
Yates Hrg. 2197:24-2198:9 (need state drives what stores are an "option" (i.e., substitute) for any
given shopping trip).  Further, the national share-of-wallet data proffered by Defendants, which
include areas where Defendants do not overlap, cannot show a lack of local competition between
Defendants in any specific trade area.  Kinney Hrg. 3004:2-13 (conceding that Kroger and

PLS' PROPOSED FOF AND COL

*ii.    Supermarkets have unique facilities*

23.     Supermarkets have distinctive physical sizes and layouts. Supermarkets typically locate the fresh departments—produce, deli, bakery, meat, seafood, and dairy—around the perimeter of the store and the dry grocery goods—including non-food items—in the center of the store.[87] Supermarkets require a large-sized store to shelve and display the high number of SKUs and the service departments that they must offer to provide a one-stop shop.[88] The average Albertsons store, for instance, is between 45,000 and 60,000 square feet.[89] Other supermarkets' store sizes are within a similar range of square footage.[90]

24.     There are other store formats that typically have smaller footprints and notable layout and customer experience differences.[91] In contrast with supermarkets, natural and organic stores like Sprouts often operate a "flipped" format with the produce department at the center of the store (and occupying more selling space) to invoke a "farmers market feel."[92] Limited assortment stores provide a "no frills" experience, with fewer employees on the sales floor to assist customers; no service counters in departments such as deli, bakery, butcher, or seafood; products displayed in the cartons or pallets in which they were shipped; and for Aldi, a requirement that customers deposit a quarter to use a shopping cart.[93] Dollar stores likewise lack typical

---

Albertsons "do not share every single market"). Albertsons does not use "share of wallet" data to set national or division pricing policies. Kinney Hrg. at 3010:23-3011:7.

[87] Yates Hrg. 2194:1-7; Knopf Hrg. 932:25-933:13; George Hrg. 2031:5-23; Van Helden Hrg. 162:22-163:12.

[88] McMullen Hrg. 1573:8-13, 1634:5-16; Broderick Hrg. 1361:15-1362:6; Knopf Hrg. 932:25-933:13; Van Helden Hrg. 164:15-165:3; PX6009 (Kroger) at 113.

[89] Curry Hrg. 866:22-867:9; Broderick Hrg. 1361:15-17.

[90] Marx Hrg. 417:10-12; Yates Hrg. 2193:22-25; Knopf Hrg. 933:2-13; Van Helden Hrg. 164:15-22.

[91] Neal Hrg. 367:18-368:19; 381:9-25; 383:5-10; Knopf Hrg. 940:10-25, 942:12-23, 943:7-22; ██████████████████████████; PX7004 (Hill Rpt.) ¶ 30, Fig. 3.

[92] Neal Hrg. 381:9-383:4; DX0222 (Sprouts) at 5-7.

[93] Knopf Hrg. 940:10-941:6; ████████████████████████████████████; Van Helden Hrg. 170:14-171:1, 174:13-20; ████████████████████████████.

PLS' PROPOSED FOF AND COL

supermarket service counters and do not offer the customer assistance that supermarkets do.[94]  Dollar stores have fewer (or no) staffed checkout lanes and devote much less, if any, of their footprint to fresh produce compared to supermarkets.[95]

25.     Club stores have a much larger footprint than supermarkets to accommodate their bulk pack sizes and assortment of non-food items like appliances, furniture, and apparel.[96]  Costco stores have a "warehouse" look, displaying large quantities of products on pallets and providing large carts built to accommodate bulk pack sizes.[97]  Costco stores have shorter hours than supermarkets and have fewer locations, thus requiring longer travel distances to reach the store.[98]  They generally do not have staffed service counters where customers can select, for example, a quarter pound of thinly-sliced fresh Swiss cheese.[99]  Lastly, club stores have staffed entrances and require shoppers to present their membership card to enter.[100]

26.     E-commerce websites like Amazon.com do not operate through consumer-facing physical stores, but rather warehouses and delivery networks.  This distinguishes them fundamentally from supermarkets, which all have physical locations, and for whom attracting customers into stores is a key strategic goal.[101]  E-commerce websites offer a different shopping experience from a supermarket trip.[102]  Shoppers cannot examine or select specific items from an

---

[94] Van Helden Hrg. 170:14-171:1; 177:8-11; Unkelbach Hrg. 462:22-463:2, 466:9-14, 23-24; Knopf Hrg. 943:7-22.
[95] Van Helden Hrg. 176:11-17; Knopf Hrg. 943:7-22; ███████████████████████████████ ; Unkelbach Hrg. 461:19-20, 464:5-11, 466:9-10, 468:23-469:5.
[96] McMullen Hrg. 1593:17-1594:3; ██████████████████████████ ; PX7004 (Hill Rpt.) ¶¶ 39-40.
[97] McMullen Hrg. 1642:15-24; ███████████████ ; George Hrg. 2029:9-2030:18; █████████ .
[98] Van Helden Hrg. 212:19-25; ████████████ .
[99] Van Helden Hrg. 172:18-173:6; Knopf Hrg. 937:25-938:19; George Hrg. 2041:25-2042:21.
[100] George Hrg. 2046:3-2047:6; Van Helden Hrg. 173:25-174:12.
[101] Yates Hrg. 2198:21-2199:4; Lieberman Hrg. 2375:23-2376:17.
[102] Yates Hrg. 2198:14-20.

PLS' PROPOSED FOF AND COL

e-commerce website in the same way they can select a cut of meat from a supermarket butcher or inspect a fresh peach for ripeness before purchasing it.[103]  Further, when using e-commerce, shoppers must wait anywhere from hours to days to receive their groceries, unlike the immediate convenience of walking into a supermarket and walking out with the products they need.[104]

27.     Similarly, delivery services such as Instacart or DoorDash do not allow customers to inspect and select the specific products they wish to purchase.[105]  Moreover, these grocery delivery services serve as partners to, not competitors of, grocery retailers.[106]  They lack an independent supply of grocery products from product manufacturers; rather, their individual "shoppers" procure products from brick-and-mortar stores and deliver them to customers.[107]

### iii.    Supermarkets have distinct price strategies

28.     Supermarkets have distinct pricing strategies that predominantly focus on other supermarkets' prices.  Traditional supermarkets like Kroger and Albertsons generally use a "high-low" method, starting with higher price positions but using promotions to attract customers.[108]  A meaningful portion of supermarkets' sales come from promoted items.[109]  Consumers looking for coupons, sales, and other promotional activities can find that shopping experience at supermarkets, but not at other formats.[110]

29.     Supermarkets also strive to match or beat one another's prices, and generally do not focus

---

[103] Curry Hrg. 868:12-21; Lieberman Hrg. 2370:11-25.
[104] Neal Hrg. 367:4-17; Heyworth Hrg. 2799:7-15.
[105] Lieberman Hrg. 2370:11-25.
[106] ███████████████████████████████████████
██████████████████████████████████████████
[107] ████████████████████████████████████ .
[108] McMullen Hrg. 1587:15-1588:4; *cf.* ███████████████████████ ; ████████████████ :
███████████████████████████████████████ .
[109] Sankaran Hrg. 1753:5-10; PX1131 (Kroger) at 023.
[110] Neal Hrg. 379:9-380:11.

PLS' PROPOSED FOF AND COL

on other formats when setting prices.[111]  Ahold's Food Lion ███████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████[112]  Kroger likewise price checks Walmart

and traditional grocers "to ensure that Kroger is in line"—including checking Albertsons in each

area where they overlap.[113]  For nearly all pricing programs, Kroger does not price check Costco,

Sam's Club, Aldi, Lidl, Trader Joe's, dollar stores, drug stores, or convenience stores.[114]

Albertsons sets base prices in each price area based on prices from other supermarkets—and no

other format—and strives to match the supermarkets or be very close in price on the items most

important to customers.[115]  Supermarkets also typically track and respond to promotions offered

by other supermarkets, but not by other formats.[116]

30.     Other retailers have distinct price points and strategies, and do not systematically target

price parity with supermarkets.  Club stores charge membership fees, and members must be

willing to pay for large pack sizes, e.g., a three-pound bunch of bananas.[117]  At the other end of

the spectrum, dollar stores, as their name suggests, have consistently low price points throughout

---

[111] Van Helden Hrg. 177:12-23; Broderick Hrg. 1367:14-17, 1369:2-23, 1373:10-1375:15,
1377:9-14; PX2369 (Albertsons) at 001, 003; Curry Hrg. 886:1-25, 889:2-891:7; PX2551
(Albertsons) at 001, 003; Schwilke Hrg. 829:15-831:12, 836:15-838:3; PX1458 (Kroger);
PX1480 (Kroger); ████████████████████████████; Silva Hrg. 249:10-19; Groff
Hrg. 271:19-272:11; PX1130 (Kroger) at 009-018.
[112] ███████████████████████████████████████████████.
[113] PX1130 (Kroger) at 009-018; Groff. Hrg. 271:19-272:11.
[114] Groff Hrg. 272:12-273:14. Kroger does not price check online-only retailers except in areas
where Kroger delivers products and does not have physical stores.  Groff Hrg. 273:5-8.
[115] Silva Hrg. 227:20-228:12, 233:11-238:10; PX12359 (Albertsons).
[116] Broderick Hrg. 1373:10-1375:15, 1377:9-14; PX2369 (Albertsons) at 001, 003; Curry Hrg.
886:1-25; PX12577 (Albertsons) at 001; Sankaran Hrg. 1756:2-1757:12; Schwilke Hrg. 821:10-
823:10, 825:1-21; PX1496 (Kroger); Knopf Hrg. 944:21-946:4, 956:8-21; PX4071 (Yates
(Ahold) Dep. 149:5-152:6.
[117] Van Helden Hrg. 172:18-173:6, 173:25-174:12; Kinney Hrg. 3036:4-14; PX12112
(Albertsons) at 001; George Hrg. 2038:17-2039:14; *see also* ██████████████████.

the store and offer much smaller pack sizes that can be sold at such ultra-low prices.[118]

                     *iv.    There is recognition of supermarkets as a distinct submarket*

31.     "Traditional supermarket" is a term with a common meaning in the retail food

industry.[119] Industry participants, including Defendants' executives, identify Kroger and

Albertsons, among other retailers that share similar features, as belonging to the "traditional" or

"conventional" supermarket channel.[120] Industry participants, including Defendants, also

repeatedly reference market share data from industry analysts such as Nielsen, which classifies

supermarkets as one of the separate categories of retailers distinct from the other grocery formats

discussed above.[121] Moreover, non-supermarket retailers recognize that they belong to different

submarkets from supermarkets.[122]

               **2.  Economic analysis supports the supermarket product market**

32.     Plaintiffs' economic expert, Dr. Nicholas Hill, analyzed sales data to measure the

importance of supermarkets to consumers' food and grocery purchases.  These data showed that

traditional supermarkets and supercenters accounted for 68% of all food and grocery sales in

---

[118] ███████████████████████████████████; Unkelbach Hrg. 458:13-24, 465:22-466:8.
[119] Yates Hrg. 2192:22-219311; ██████████████████████████; *see also* Knopf Hrg.
934:8-19; ████████████████████████████████.
[120] Van Helden Hrg. 163:10-12, 171:5-16; Knopf Hrg. 934:8-936:14; Yates Hrg. 2193:12-16;
Sankaran Hrg. 1745:8-15; PX12388 (Albertsons) at 003; *see also* PX1164 (Kroger) at 010
(Kroger's "███████████████████████████████████████████████████████████
████████████████████).
[121] *See, e.g.,* PX6166, "Retail Trade Channel and Sub-Channel Overview," Environics Analytics
& Nielsen, accessed June 14, 2024, https://environicsanalytics.com/docs/default-source/us---
data-product-support-documents/tdlinx-retail-channel-sub-channel-overview.pdf; PX12002
(Albertsons) (attaching analyst reports comparing Kroger and Albertsons and no other retailers);
Curry Hrg. 907:16-24, 925:13-24; Kinney Hrg. 2919:2-22.
[122] Neal Hrg. 385:14-387:24, 391:20-392:16; George Hrg. 2050:9-2052:5; *see also* ██████████
████████████████████████████████:███████.

areas where Kroger and Albertsons overlap in 2022; moreover, this share of sales has been consistent since 2014, indicating that consumers have not "seismically" or "tectonically" shifted their grocery dollars to non-supermarket formats in recent years.[123]

33.    Dr. Hill also analyzed data about Defendants' price-checking behavior to assess the closeness of competition between supermarkets and other formats.  He found that Defendants chiefly monitor pricing at other supermarkets in the ordinary course.  Price-checking data show that over 75% of Kroger's price checks in its "everyday essentials" and "rule-based" core pricing programs were of other supermarkets.[124]  Albertsons' use of price-check data is even more focused on traditional supermarkets than Kroger's.  Across all overlap areas, Albertsons' designated "primary food competitor" (used to generate pricing comparisons and recommendations) is another traditional supermarket 78% of the time, a supercenter 21% of the time, and a club store just 1% of the time.[125]  No other store format was listed as a primary food competitor in any price zone located in any overlap area.[126]  This evidence is consistent with both Kroger and Albertsons considering other supermarkets to be their close pricing competitors.

## B.  There is Also a Broader Product Market for Large Format Stores

34.    The large format store product market includes not only traditional supermarkets and supercenters, but also club stores such as Costco, natural and gourmet stores like Whole Foods, and limited assortment stores like Aldi.[127]  While, as discussed *infra*, supermarkets comprise their own product market, large format stores also compete for the sale of food and groceries.[128]

---

[123] Hill Hrg. 1451:14-1452:11; PX7004 (Hill Rpt.) ¶ 79, Figs. 9-10.
[124] Hill Hrg. 1447:19-1448:19, 1449:18-23; PX7004 (Hill Rpt.) ¶¶ 91-94, Figs. 15-17.
[125] Hill Hrg. 1448:23-1449:12; PX7004 (Hill Rpt.) ¶¶ 85-86, Fig. 12.
[126] Hill Hrg. 1448:23-1449:12; PX7004 (Hill Rpt.) ¶¶ 85-86, Fig. 12.
[127] Hill Hrg. 1445:1-16; PX7004 (Hill Rpt.) ¶ 70, Fig. 7.
[128] Hill Hrg. 1445:1-1446:16; PX7004 (Hill Rpt.) ¶¶ 67-70.

More distant retail formats like dollar stores, convenience stores, and pure e-commerce players are not substitutes for large format stores.[129]  Large format stores accounted for 96% of all food and grocery sales in overlap areas in 2022, a share that has remained stable since at least 2014.[130]  And while Defendants primarily price check supermarkets, 100% of Albertsons' designated "primary food competitors" and 100% of Kroger's "everyday essentials" and "rule-based" price checks in overlap areas were large format stores.[131]

### C.  Local Store-Based Overlap Areas are Relevant Geographic Markets

35.     Grocery competition is fundamentally local, and Defendants' supermarkets are connected with their local communities.[132]  People prefer to buy groceries close to where they live.[133]  Kroger's SEC filings state that their supermarkets typically draw customers from a few miles around each store (e.g., 2-2.5 miles).[134]

36.     In the ordinary course of business, supermarkets (including Defendants) assess competition and make strategic decisions based on local competitive conditions.  They frequently set pricing strategies at the local level because of competitive pressures around stores.[135]  Competition and customers differ by store, and thus supermarkets often depend on store directors to make the relevant adjustments to their stores.[136]  Defendants' expert agrees that geographic market definition starts by focusing at the store level.[137]

---

[129] *See supra* ¶¶ 19-21, 24, 26, 28-30; Hill Hrg. 1459:12-1460:2; Van Helden Hrg. 179:12-15, 180:22-24; Groff Hrg. 273:12-17; Knopf Hrg. 949:23-950:5.
[130] PX7004 (Hill Rpt.) ¶ 79, Fig. 10; Hill Hrg. 1450:8-21.
[131] PX7004 (Hill Rpt.) ¶¶ 86, 91-92, 94, Figs. 12, 15, 17; Hill Hrg. 1447:19-1449:12.
[132] McMullen Hrg. at 1648:3-25.
[133] McMullen Hrg. 1636:2-14; PX6683 (Kroger) at 003; Schwilke Hrg. 811:22-812:8; Sankaran Hrg. 1749:14-16; Kinney Hrg. 3028:14-25; PX2514 (Albertsons) at 006.
[134] McMullen Hrg. 1636:2-14; PX6683 (Kroger) at 003.
[135] Sankaran Hrg. 1760:5-8; Groff Hrg. 270:12-17.
[136] Sankaran Hrg. 1760:9-1761:1.
[137] Israel Hrg. 2622:15-23.

PLS' PROPOSED FOF AND COL

37.     Supermarkets (including Defendants' stores) track competitors' sales within local areas around each store to help them understand nearby competitive conditions and because nearby stores are likely to be competing for the same customers.[138]  To do this, supermarkets often assess a "trade area"—that is, the localized area surrounding a store, from which that store draws the bulk of its customers.[139]

38.     Kroger's trade areas are developed in the ordinary course of business based on a drive time model that relies on customer loyalty data.[140]  Third parties also use loyalty data to define their trade areas.[141]  Defendants' economic expert and Kroger's consultants agree that ordinary-course trade areas based on loyalty data are "a useful tool for defining geographic markets in this matter and in assessing potential local competitive effects."[142]  Likewise, Defendants' advocacy during Plaintiffs' investigation argued that circular store-based overlap areas are a reasonable way to assess geographic markets in retail mergers like this one.[143]

39.     Dr. Hill used Defendants' customer loyalty card data, which includes information about where shoppers live and make purchases, to calculate the 75% catchment area radius (the radius within which the store makes 75% of its sales) of each Kroger or Albertsons store in each overlap area (the market's "focal store").[144]  Although store-specific catchment areas vary with

---

[138] Yates Hrg. 2200:5-11; *see also* PX2423 (Albertsons) at 005; PX1291 (Kroger) at 003-005.
[139] Yates Hrg. 2199:24-2200:4; PX1286 (Kroger); Kinney Hrg. 2997:14-23; *see also* McMullen Hrg. 1636:2-14; PX6683 (Kroger) at 003.
[140] PX10007 (Compass Lexecon) at 002, 011-012.
[141] Yates Hrg. 2200:17-23.
[142] PX10007 (Compass Lexecon) at 002; *see also* PX1286 (Kroger) at 003.
[143] PX10007 (Compass Lexecon) at 003 ("The assessment [of geographic markets in retail mergers] generally focuses on overlaps between the merging parties' stores because it is often the case, as here, that at least some prices are set at the store level or otherwise influenced by store-level competitive conditions. . . . [T]his store-by-store assessment leads to circles or other boundaries around each overlap store such that the constraining set of competitors is included.").
[144] Hill Hrg. 1454:10-20, 1455:3-9; PX7004 (Hill Rpt.) ¶¶ 102-106.

PLS' PROPOSED FOF AND COL

local conditions, ██ of Kroger stores and ██ of Albertsons stores draw 75% of their sales from within six miles or less.[145]  The average 75% catchment area radii for Albertsons and Kroger stores in overlap areas were ██ miles and ██ miles, respectively.[146]  Dr. Hill then defined each focal store's candidate geographic market as a circle with double that radius, to ensure that it included third-party stores located outside the focal store's draw area, but that nevertheless compete for the focal store's customers.[147]

40.    Dr. Hill also defined geographic markets using a "customer-based" approach.[148]  The customer-based approach, like the store-based approach, defines localized geographic markets around party focal stores.  The term "customer-based" refers to the fact that this methodology accounts for sales by competitors, however close or far away they are from the focal store, if they draw *customers* from the same census block groups (CBGs are a small unit of population measurement determined by the U.S. Census Bureau) as does the party focal store.[149]  For instance, a relatively distant Walmart Supercenter would be included in Dr. Hill's customer-based geographic market if it made sales in the same CBG(s)—i.e., serves the same customers—as the market's focal store.[150]  Customer-based shares address Defendants' expert Dr. Israel's critique that Dr. Hill's store-based approach understates the competitive relevance of competitors beyond the catchment border and thus overstates the Defendants' shares.  As it turns out, Dr. Hill's customer-based approach largely yields higher combined shares for Defendants than his

---

[145] PX7004 (Hill Rpt.) ¶¶ 108-109, Fig. 22.  This is consistent with qualitative evidence that competition is influenced by local conditions.  *See, e.g.*, Van Helden Hrg. 211:5-10; Yates Hrg. 2200:24-2201:2.
[146] PX7004 (Hill Rpt.) ¶ 110, Fig. 23.
[147] Hill Hrg. 1454:10-1455:2; PX7004 (Hill Rpt.) ¶¶ 104-106.
[148] PX7006 (Hill Rebuttal Rpt.) ¶¶ 39-43.
[149] Hill Hrg. 1467:3-17; PX7004 (Hill Rpt.) ¶ 102, n.132 (defining CBGs).
[150] *See* Hill Hrg. 1467:3-17.

PLS' PROPOSED FOF AND COL

store-based approach—for instance, the average customer-based market share is 36.5%, the average store-based market share is 33.5%, and the customer-based market share is higher in 1,774 out of 2,498 (71%) of all markets—confirming that the store-based approach is conservative and understates the Defendants' combined shares.[151]

### D. Thousands of Local Supermarket Markets Satisfy the Hypothetical Monopolist Test Under Multiple Geographic Market Methodologies

41.     Having identified candidate product and geographic markets, Dr. Hill performed a hypothetical monopolist test ("HMT") to assess whether they were properly defined antitrust markets, concluding that both supermarkets and large format stores are properly defined antitrust markets in more than two thousand local areas.[152]

### *1. The HMT is a reliable methodology*

42.     The HMT is a widely-accepted methodology—endorsed by both the 2023 Guidelines and the 2010 Guidelines—for testing whether an antitrust market is properly defined, i.e., does not leave out important substitutes.[153]  Economists use the HMT to determine which firms are close enough substitutes that they should be included in a market.[154]  The test asks whether a "monopolist of the specified products in the specified geography [the "candidate market"] would profitably be able to raise prices, lower quality, or take other actions to make consumers worse off compared to current conditions."[155]  If the answer is yes, then the candidate market "passes" the HMT, meaning it is a properly defined antitrust market.[156]  If not—i.e., if the hypothetical monopolist would lose too many customer sales to make the price increase or worsening of terms

---

[151] PX7006 (Hill Rebuttal Rpt.) ¶¶ 37-38, Fig. 2, n.43.
[152] PX7004 (Hill Rpt.) ¶ 141, Fig. 29; PX7006 (Hill Rebuttal Rpt.) ¶ 42, Fig. 4.
[153] Hill Hrg. 1463:3-9; McCrary Hrg. 3109:23-3110:9; Merger Guidelines § 4.3.
[154] Hill Hrg. 1460:18-21.
[155] PX7004 (Hill Rpt.) ¶ 65; *see also* Merger Guidelines § 4.3.
[156] Hill Hrg. 1460:25-1463:2.

PLS' PROPOSED FOF AND COL

profitable—then the candidate market "fails" the HMT, suggesting that one or more reasonably interchangeable substitutes exist outside of the candidate market.[157]  The HMT can confirm that multiple, overlapping candidate markets are appropriately defined, because the hypothetical monopolist could profitably raise prices by a little bit in any or all of them (e.g., a merger to monopoly of motor vehicles could raise prices in markets for motor vehicles, cars, and 4WDs).

### i.    Dr. Hill's HMT uses appropriate inputs

43.    Margins are an input into both the HMT and competitive effects calculations.[158]  Dr. Hill used Defendants' ordinary course gross margins in his analyses.[159]  This is because Defendants' business documents and sworn testimony establish that they look to gross margins when analyzing or making decisions about pricing and profitability.[160]  Defendants also tout their performance to investors in terms of gross margin.[161]  Dr. Israel, in contrast, relies upon margins purportedly used by Kroger in the capital finance planning context.[162]  Defendants cite no evidence, however, indicating that they use capital planning margins to set or analyze pricing.[163]

44.    Even if the margins Kroger uses for capital planning were an appropriate measure of marginal costs—which they are not—Dr. Hill's economic analyses of recent real-world events confirm that Dr. Israel's capital finance margins substantially overstate Defendants' marginal costs, thereby understating the relevant margins (because higher costs lead to lower margins). First, Dr. Hill analyzed what happened when workers at King Soopers (Kroger) stores in Denver went on strike in January 2022, causing an increase in sales at nearby Safeway (Albertsons)

---

[157] *See* Hill Hrg. 1461:9-18.
[158] PX7004 (Hill Rpt.) ¶¶ 190-191, 327-328; Hill Hrg. 1531:20-25.
[159] *See* Hill Hrg. 1533:7-12.
[160] Aitken Hrg. 1858:14-24.  *See also* PX1129 (Kroger) at 003 (referring to opportunities to raise prices as "gross margin opportunities"); Groff Hrg. 287:14-17; Curry Hrg. 892:13-17.
[161] PX6683 (Kroger) at 014; PX6153 (Albertsons) at 041
[162] Israel Hrg. 2670:24-2671:10; Maharoof Hrg. 2087:24-2088:11.
[163] Israel Hrg. 2730:16-2731:13.

stores.  Changes in sales and costs at the 77 affected Safeway stores before, during, and after the strike imply a margin of 28%—nearly identical to Dr. Hill's ordinary-course gross margin of 29% for these stores, and in stark contrast to Dr. Israel's 19% margin.[164]  Second, once Dr. Hill corrected Dr. Israel's flawed event study of Seattle QFC (Kroger) store closures by removing non-Seattle control stores that were not subject to the same city policy affecting costs at the Seattle stores, he found margins closer to his ordinary-course gross margins than to Dr. Israel's.[165]  These two empirical analyses further support Dr. Hill's margins and illustrate why Dr. Israel's are not an appropriate input to his calculations.

45.    Dr. Hill's HMT also uses appropriate diversions as an input.  Dr. Hill implemented the HMT using a common economic technique called critical loss analysis, which analyzes whether a small price increase by the hypothetical monopolist would be profitable by comparing the sales it would lose as a result of the price increase (because people don't want to pay higher prices) to the sales it would "recapture" because the lost customers would switch (or "divert") to shopping at the other merging party's stores.[166]  Diversions are an input into critical loss analysis because they measure the level of substitution between stores in response to a price increase.[167]  Dr. Hill's diversions assume that sales lost by one firm will divert to other firms proportional to their share in the large format store market.[168]  This approach is conservative: despite evidence of supermarkets' distinctive value proposition, Dr. Hill's diversions do not assume that customers are more likely to switch between supermarkets than to another format.[169]  To test his estimates

---

[164] Hill Hrg. 3373:20-3377:5; PX7006 (Hill Rebuttal Rpt.) ¶ 49, Fig. 5.
[165] Hill Hrg. 3376:15-3377:5; PX7025 (Hill Sur-reply Rpt.) ¶ 10, Fig. 2.
[166] PX7004 (Hill Rpt.) ¶¶ 120-121.
[167] Hill Hrg. 1477:6-10, 3379:20-3380:12; PX7004 (Hill Rpt.) ¶¶ 123-125.
[168] PX7006 (Hill Rebuttal Rpt.) ¶ 50; Hill Hrg. 3380:13-16.
[169] *See* PX7004 (Hill Rpt.) ¶ 191; PX7006 (Hill Rebuttal Rpt.) ¶ 53.

PLS' PROPOSED FOF AND COL

of diversions between Defendants, Dr. Hill used the King Soopers strike as a real-world study, and found that observed customer diversions from Kroger to Albertsons were higher than his share-based estimates for 99% of the affected Safeway stores.[170]  This shows that assuming diversion proportional to share likely underestimates substitution between Defendants' stores.

46.     Dr. Israel used another diversion methodology derived from a paper by Ellickson, Grieco, and Khvastunov ("EGK"), but this difference does not drive the divergence in their results; that discrepancy results partially from Dr. Israel's use of the unreliable capital finance margins but *also* requires crediting his assumption that the divestiture will function perfectly.[171]  Dr. Hill's share-based diversions are qualitatively consistent with Dr. Israel's EGK diversions, and in fact more conservative: implementing the HMT using Dr. Israel's diversions instead of Dr. Hill's yields more than 350 additional presumptively anticompetitive supermarket markets.[172]

> ii.     *The HMT confirms that thousands of local supermarket and large format store markets are properly defined*

47.     Under the HMT, thousands of local supermarket and large format store markets are properly defined antitrust markets.[173]  Dr. Hill found that 2,055 supermarket candidate markets pass the HMT under the store-based geographic market approach.[174]  This result is not sensitive to Defendants' critiques: despite Dr. Israel's objections to Dr. Hill's store-based geographic markets, implementing the HMT on customer-based markets yields considerably more (2,674) properly defined supermarket markets.[175]  And even in the broader and more conservative large format market, Dr. Hill found that 2,498 store-based markets and 2,688 customer-based markets

---

[170] PX7006 (Hill Rebuttal Rpt.) ¶¶ 54-56, Fig. 7.
[171] Hill Hrg. 3380:19-3381:15; PX7006 (Hill Rebuttal Rpt.) ¶¶ 70-73, Figs. 10, 43.
[172] Hill Hrg. 1476:18-25; PX7006 (Hill Rebuttal Rpt.) ¶¶ 52-53, Figs. 6, 43.
[173] PX7004 (Hill Rpt.) ¶ 141, Fig. 29.
[174] *See* Hill Hrg. 1463:10-1464:5; PX7004 (Hill Rpt.) ¶¶ 140-141, Fig. 29.
[175] PX7006 (Hill Rebuttal Rpt.) ¶ 42, Fig. 4.

pass the HMT.[176]  It is thus appropriate to calculate shares and concentration statistics for these

markets, and to ask whether the acquisition is presumptively anticompetitive in any of them.

> iii.    *Defendants' expert did not perform an HMT and his critiques of Plaintiffs' market definition fail*

48.    Dr. Israel claims to have performed "an actual data version" of the hypothetical

monopolist test.[177]  Specifically, he ran a regression analysis purporting to measure the

relationship between concentration metrics (measured in terms of the Herfindahl-Hirschman

Index or "HHI") and margins in different geographic areas.[178]  Dr. Israel's claim that his

regression accurately reflects the relationship between margin and the HHI is not reliable.[179]

49.    First, regressions of price or margin on the HHI are inherently flawed for the simple

reason that supply and demand affect both market concentration and price.  For example,

suppose demand falls in a particular market when a factory closes, causing job losses and

population decline.  Lower demand may lead to lower prices in the market and also prompt some

of the stores in the market to close, increasing concentration.  A regression of price or margin on

the HHI might lead one to conclude, mistakenly, that higher concentration leads to lower prices,

when in fact an external event (the factory employer closing) was responsible for both

changes.[180]  Indeed, regressions of price/margin on the HHI have "largely been abandoned by

industrial organization researchers," because they face "severe measurement problems and worse

conceptual problems."[181]  Dr. Israel purports to have implemented controls to address these

---

[176] Hill Hrg. 1463:10-1464:5; PX7006 (Hill Rebuttal Rpt.) ¶ 42, Fig. 4.
[177] Israel Hrg. 2653:3-11.
[178] DX2623 (Israel Rebuttal Rpt.) ¶ 198.
[179] PX7006 (Hill Rebuttal Rpt.) ¶¶ 19-20.
[180] Hill Hrg. 1464:6-1465:11, 3389:25-3392:20; PX7006 (Hill Reply Rpt.) ¶ 21.
[181] Hill Hrg. 3390:7-3391:17; PX7006 (Hill Reply Rpt.) ¶ 20 n. 9.

PLS' PROPOSED FOF AND COL

concerns.[182]  But these controls are inadequate; for instance, he is unable to account for relevant local conditions that vary within a given state, such as Seattle's COVID hazard pay law that prompted Kroger to close certain QFC stores and occasioned his study of margins, nor to isolate the reason(s) why the number of competitors in any given market changed.[183]

50.     Second, Dr. Israel did not perform his own HMT and instead relied on what he coined the "actual monopolist test"—a test that is not cited in *any* case or economic literature, and for good reason.  That purported "test" yields improbable, illogical conclusions that undermine its reliability.  As Dr. Israel writes, "my results imply that even if Kroger *were a hypothetical monopolist with a 100 percent share within Dr. Hill's supermarket or large format markets,* it would not be expected to increase prices by even one percent[.]"[184]  It is facially implausible to conclude that a single firm controlling Kroger, Albertsons, Walmart, Target, Costco, Sam's Club, Whole Foods, Sprouts, Trader Joe's, Stater Bros., Raley's, Aldi, Lidl, WinCo, and all other large format stores in the relevant markets could not profitably raise prices at even *one* store by even *one* percent, particularly in light of Dr. Israel's simultaneous (and internally inconsistent) position that Walmart "is the key constraint" on Kroger's pricing that will prevent any acquisition-related consumer harm.[185]

### E.  Concentration Levels in Hundreds of Relevant Supermarket and Large Format Store Markets Establish a Presumption that the Acquisition is Illegal

51.     Under the Merger Guidelines, a merger is presumptively illegal if it significantly increases concentration (by raising the HHI by more than 100 points) in any "highly concentrated market," meaning a market where either the post-merger HHI exceeds 1,800 or the

---

[182] Israel Hrg. 2653:12-2654:19.
[183] Hill Hrg. 3390:7-3391:11.
[184] DX2623 (Israel Rebuttal Rpt.) ¶ 199 (emphasis in original).
[185] Israel Hrg. 2591:21-2592:7; Hill Hrg. 3393:1-24.

PLS' PROPOSED FOF AND COL

merged firm's market share, alone, exceeds 30%.[186]  Applying these thresholds, Dr. Hill found

that 1,922 supermarket markets satisfy the presumption.[187]  Even in the broader and more

conservative large format store product market, the acquisition is presumptively anticompetitive

in 1,785 local markets.[188]

### F.  The Proposed Acquisition will Eliminate Substantial Head-to-Head Competition in Supermarkets

52.    Defendants compete fiercely with each other for customers on both price and non-price

dimensions.  Albertsons' VP of Customer and Market Intelligence observed: "There is no way

that [Kroger] could buy all of us – too many competing markets."[189]  Albertsons refers to Kroger

as "a strong competitor"[190] and its "primary" and "top food competitor,"[191] and believes it "will

beat Kroger on a sustained basis."[192]  Likewise, Albertsons is Kroger's number one or number

two competitor in 14 of the 17 "major markets" where the two overlap.[193]  Kroger considers

Albertsons' banners "████████████████████████████████████████

████████████████████████████"[194]  While Kroger will "follow" Albertsons'

pricing,[195] or use its pricing as a "ceiling" on price sensitive everyday essentials,[196] Albertsons

has sought to be "equal to or better than [Kroger]" on its everyday prices on certain items.[197]  As

a result of targeting Kroger, Albertsons drove its own growth and "invested in many different

---

[186] Merger Guidelines § 2.1; *see* COL I.A.5, *infra*.
[187] PX7006 (Hill Rebuttal Rpt.) at 103, Fig. 43.
[188] PX7006 (Hill Rebuttal Rpt.) ¶ 69, Fig. 10.
[189] PX2514 (Albertsons) at 006; Kinney Hrg. 3028:14-25.
[190] Sankaran Hrg. 1764:22-1765:3.
[191] Huntington Hrg. 563:3-564:1; PX12476 (Albertsons) at 003-004.
[192] PX2322 (Albertsons) at 002; Sankaran Hrg. 1766:2-8.
[193] McMullen Hrg. 1655:16-20; PX6024 (Kroger) at 058-060 (list of "major markets").
[194] PX1674 (Kroger); PX1675 (Kroger); Kammeyer Hrg. 493:15-494:19.
[195] Kammeyer Hrg. 487:8-21; PX1743 (Kroger) at 001.
[196] Kammeyer Hrg. 489:3-11; PX1726 (Kroger) at 001.
[197] Huntington Hrg. 558:25-559:3; PX12483 (Kroger) at 003.

PLS' PROPOSED FOF AND COL

things, like e-commerce" and other capabilities.[198]  When Albertsons outperforms Kroger, it uses colorful language like "Crushed them!!" and "Eat our dust Kroger" to celebrate its competitive victories.[199]  During a Kroger strike, Albertsons' Denver Division President wrote, "[t]hese guys are spiraling down, and I need to push my foot on the back of their neck[.]"[200]

### 1. *Kroger and Albertsons constrain each other's base and promotional prices*

53.    **Base Pricing.**  Kroger and Albertsons adjust base—also called regular, or "white tag"—prices in response to each other's pricing.

54.    <u>**Albertsons.**</u>  Contrary to Defendants' contentions, because prices are "always moving," Albertsons' prices are in many cases lower than Kroger's.[201]  In a number of divisions, on price-sensitive everyday items like milk and bananas, Albertsons is often priced lower than Kroger.[202]

55.    Albertsons' base pricing goal is to achieve "an imperceptible price gap" to Kroger.[203]  To effectuate this strategy, Albertsons has adopted a tool called Price Advisor.[204]  In Price Advisor, Albertsons inputs a "primary food competitor" to serve as the main pricing benchmark in each price area (a subset of stores within a division that share the same base price).[205]  In every price area in the Portland, Seattle, Southwest, and Intermountain divisions;[206] all but one price area in the Denver division;[207] and in most price areas in the Southern California, Jewel-Osco, and

---

[198] Sankaran Hrg. 1767:16-23.
[199] PX12382 (Albertsons) at 002; Sankaran Hrg. 1788:20-1789:21.
[200] Broderick Hrg. 1404:12-18; PX2395 (Albertsons) at 001.
[201] Sankaran Hrg. 1758:7-11.
[202] Sankaran Hrg. 1758:7-1759:6; PX12375 (Albertsons) at 019.
[203] Silva Hrg. 248:8-25 (discussing quote from DX1087 at 003), 236:23-25, 237:1-8; PX12392 (Albertsons) at 010 ███████████████████████████████████████████.
[204] Silva Hrg. 237:1-8, 258:17-259:1.
[205] Silva Hrg. 229:10-14, 232:25-233:4, 234:16-20, 235:16-25, 238:6-10, 226:8-23.
[206] Silva Hrg. 230:5-16, 231:18-232:10; PX12359 (Albertsons) at tab "Full Primary".
[207] Silva Hrg. 231:5-17; PX12359 (Albertsons) at tab "Full Primary".

PLS' PROPOSED FOF AND COL

Southern divisions, that primary food competitor is Kroger.[208]  Thus, in these price areas, Price
Advisor generates alerts, recommendations, and guardrails pegged to Kroger's prices to steer
Albertsons to keep prices close to Kroger, or to match Kroger exactly.[209]

56.    In Illinois, Albertsons' Jewel division designates Kroger banners (most often Mariano's)
as the primary food competitor for seven of its nine price areas.[210] ██████████████████████

████████████████████████  [211]  For example, in March 2022, ██████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████"[212]

57.    Albertsons' Portland Division similarly views Kroger's Fred Meyer as its "primary" and
"top food competitor."[213]  It strives to compete with Fred Meyer on prices, in one case lowering
retail prices on 50 produce items to be "equal to or better than Fred Meyer" and highlighting
these items with special tags.[214]

58.    Albertsons' Southern California division views Kroger's Ralphs as one of its closest
competitors and monitors Ralphs pricing closely to ensure that Albertsons' stores are as
competitive as possible.[215]  For example, the division's comparison database for meat pricing

---

[208] Sankaran Hrg. 1753:16-1755:4; PX12375 (Albertsons) at 010; PX2419 (Albertsons) at 008-011; *see also* PX7004 (Hill Rpt.) at ¶ 170, Fig. 36; PX12359 (Albertsons) at tab "Full Primary".
[209] Silva Hrg. 236:6-11, 237:20-238:10, 239:19-25, 259:10-17; *see also* PX7004 (Hill Rpt.) at ¶ 170, Fig. 36.
[210] *See* PX12359 (Albertsons) at tab "Full Primary" (rows 157-165).
[211] PX2682 (Albertsons) at 001-002 ████████████████████████
██████████████; PX2670 (Albertsons) at 001, 022, 023, 025, 028, 033, 035; PX2940
(Albertsons) at 001 ██████████████████████████████
██████████████
[212] PX2482 (Albertsons) at 001-002 (emphasis in original).
[213] Huntington Hrg. 563:21-564:1; PX12476 (Albertsons) at 003-004.
[214] Huntington Hrg. 558:25-559:3; PX12483 (Albertsons) at 003.
[215] Curry Hrg. 895:16-21.

PLS' PROPOSED FOF AND COL

focuses "on the priority items for the comparison versus the primary competitor (Ralphs)."[216]

59.     Albertsons' Denver division specifically targets Kroger's pricing, and seeks to be overall no more than ▮% higher than Kroger on base pricing and even with Kroger (or no more than ▮% higher) for promotional pricing.[217]

60.     **Kroger.**  For Kroger's QFC and Mariano's divisions, Albertsons' banners, not Walmart, are the primary benchmark that Kroger monitors and responds to for pricing.[218]  Mariano's, located in Illinois, sets its regular prices in reference to Albertsons' Jewel banner[219] and watches Jewel's pricing closely to ensure that it does not price above Jewel.[220]  Defendants' egg pricing showcases their competitive dynamic in Illinois.[221]  In May 2023, after Jewel "lowered [its] white tag [price] on [18-count packs of eggs] to $4.29 to beat [Mariano's] $4.49" price,[222] Mariano's responded by matching Jewel's "very aggressive" prices, despite concerns that doing so "may just create a price war."[223]  Likewise, when Jewel held its egg prices steady, Mariano's did the same—despite both a drop in egg costs and a price cut by Walmart—declaring, "We will stay the same, which is still $0.50 lower than Jewel."[224]

61.     Kroger's QFC banner in Washington and Oregon sets pricing strategy to either match or remain slightly below Albertsons' Safeway banner.[225]  According to a Kroger pricing analyst,

---

[216] PX2551 (Albertsons) at 001, 003; Curry Hrg. 889:2-891:7.
[217] Broderick Hrg. 1366:21-1367:9, 1367:14-17, 1369:2-23; PX4026 (Broderick (Albertsons) IH at 112:2-13).
[218] Groff Hrg. 285:13-286:10. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ PX1131 (Kroger) at 017-019.
[219] Groff Hrg. 285:23-25.
[220] *See, e.g.*, PX1830 (Kroger) at 001; PX1800 (Kroger) at 001; *see also* Marx Hrg. 422:17-22.
[221] Marx Hrg. 431:1-5.
[222] PX1823 (Kroger) at 002.
[223] PX1823 (Kroger) at 002; Marx Hrg. 432:11-16.
[224] Marx Hrg. 430:6-17; PX1824 (Kroger).
[225] Groff Hrg. 286:3-10.

30

███████████████████████████████████████████████████████[226]  For

example, ███████████████████████████████████[227] and explored

███████████████████████████████████████████████[228]

62.     For most of its other divisions, Kroger seeks to set prices within a range using Walmart

as the lower bound[229] and a high-priced retailer ("HPR")—typically a traditional supermarket,

and almost always an Albertsons banner in areas where they are both present—as the upper

bound.[230]  This upper bound on Kroger's pricing—which Kroger calls the "HPR rule"—helps

Kroger to "ensure we are not priced significantly higher than the traditional retail competitor"

and "put[s] additional pressure on our traditional competitors by not allowing them to undercut

us on items that our price science indicate are important to price perception."[231]

63.     Albertsons banners are the primary HPR for eight different Kroger divisions—Dallas,

King Soopers, Fry's, Fred Meyer, Fred Meyer Alaska, Smith's (Las Vegas), Smith's

(Albuquerque), and Ralphs.[232] ███████████████████████████████████████

███████████████████[233]  When Kroger reinvigorated its use of the HPR rule in 2021, it

invested an estimated $40 million over the first year to lower prices to levels at or below

Albertsons and the other designated HPR competitors.[234]

64.     In the divisions where Albertsons banners act as the HPR, close head-to-head

---

[226] PX1414 (Kroger).
[227] PX11271 (Kroger) at 001.
[228] PX1984 (Kroger) at 001.
[229] Kroger sets pricing for many of its items at spreads of ████% above Walmart prices.
PX1130 (Kroger) at 007-018.
[230] Groff Hrg. 276:10-12.
[231] PX1109 (Kroger) at 007; *see also* PX1110 (Kroger) at 001-002; Groff Hrg. 279:22-280:11,
325:14-18.
[232] PX1109 (Kroger) at 007; Groff Hrg. 280:9-282:11; PX1115 (Kroger) at 003-006.
[233] PX1125 (Kroger) at 003.
[234] PX1109 (Kroger) at 007; Groff Hrg. 282:12-25.

PLS' PROPOSED FOF AND COL

competition between Kroger and Albertsons banners demonstrates that Albertsons acts as a constraint on Kroger pricing.  For example, Ralphs, Kroger's largest banner in Southern California, prices in a range between Walmart and Albertsons' Vons banner for white tag (or regular) pricing.[235]  Kroger price checks Albertsons and then recommends price changes to move Kroger pricing up to, but not exceeding Albertsons pricing in Southern California.[236]  For example, Ralphs increased prices for 70 feminine hygiene products based only on Albertsons' pricing,[237] and Ralphs used Vons's pricing for milk at $3.99 to inform its pricing decision to stay at $3.99 instead of using Walmart's price of $3.85.[238]  Ralphs's President wants more autonomy to benchmark pricing against Albertsons.[239]

65.     Similarly, Albertsons banners are the primary HPR for Fred Meyer divisions, and Fred Meyer's division president described Albertsons banners as "our biggest competitors with 300-plus stores."[240]  For everyday essentials products, Fred Meyer follows Safeway and Albertsons prices in price zones with no Walmart.[241]  Elsewhere, Albertsons' prices act as a "ceiling" that Fred Meyer will not exceed, even if Safeway cut its prices.[242]  Fred Meyer also compares its produce pricing against Safeway and attempts to price lower.[243]  In 2021, Kroger budgeted $9.3 million per year at Fred Meyer in part to "increase our [price] advantage over Safeway."[244]

---

[235] Schwilke Hrg. 819:3-10; PX1497_KRPROD-FTC-2R-021386277 (Kroger) at 3.
[236] Schwilke Hrg. 829:15-831:12, 836:15-838:3; PX1480 (Kroger); PX1458 (Kroger).
[237] Schwilke Hrg. 829:15-831:12; PX1480 (Kroger) at 001.
[238] Schwilke Hrg. 836:15-838:3; PX1458 (Kroger) at 001.
[239] Schwilke Hrg. 838:4-21.
[240] Kammeyer Hrg. 497:17-498:1; PX1420 (Kroger) at 001.
[241] Kammeyer Hrg. 487:8-21; PX1743 (Kroger) at 001.  Everyday essentials product prices are set in price micro-zones, typically with one Kroger store as the focal point.  Groff Hrg. 270:12-17.
[242] Kammeyer Hrg. 489:3-16; PX1726 (Kroger) at 001.
[243] Kammeyer Hrg. 491:18-23.
[244] PX1109 (Kroger) at 004.

PLS' PROPOSED FOF AND COL

During this time, Safeway had narrowed its price gap to Kroger, and Kroger was "glad we made some incremental investment . . . to keep this from being worse."[245] In Fred Meyer's Alaska division, ███████████████████████████████████████████████████████████████████

██████████████████████████████████ "[246] In New Mexico, Kroger has repeatedly lowered prices because "Albertsons prices more aggressively everyday in New Mexico."[247]

66.    **Promotional Pricing.** Defendants also compete aggressively on promotional pricing by closely monitoring and reacting to the other's advertisements and promotions.  Products on promotion make up a significant portion of Defendants' sales.[248]  Kroger regularly monitors Albertsons promotional advertisements in its Dallas, Smith's, Fry's, King Soopers, Ralphs, QFC, Fred Meyer, and Mariano's divisions—far more than it monitors any other competitors' ads.[249] Around major holidays and events, █████████████████████████████████████████

████████████████████████████████████ "[250]  Likewise, in ████████████████████

████████████████████████████████████████████████████████████

---

[245] PX1125 (Kroger) at 002.

[246] PX11363 (Kroger) at 001; *see also* PX11364 (Kroger) ████████████████████████ .

[247] PX1109 (Kroger) at 009; *see also* PX1125 (Kroger) at 003 (in 2020, using HPR rule "to keep our program items in a good spot versus Albertsons"); PX1477 (Kroger) at 014 ████████████████ ████████████████████ PX1594 (Kroger) at 001 ████████████████████████████████ ████████████ PX1425 (Kroger) at 005 ███████████████████████████████████ .

[248] Sankaran Hrg. 1753:5-10; PX1131 (Kroger) at 023 ████████████████████████████████ ████████████ .

[249] *See, e.g.*, PX1249 (Kroger); PX1292 (Kroger) at 011-020; PX1368 (Kroger) at 004-017; PX1281 (Kroger) at 003-014; PX1777 (Kroger); Schwilke Hrg. 821:10-823:10, 825:1-21; PX1496 (Kroger); PX1708 (Kroger) at 001.

[250] *See, e.g.*, PX1552 (Kroger) at 001; PX1553 (Kroger) at 001; PX1567 (Kroger) at 001; PX1568 (Kroger) at 001.

PLS' PROPOSED FOF AND COL

████████████████████ "[251]

67.    Kroger's Mariano's banner circulates weekly internal recaps of Illinois competitors' promotional pricing; these always, and sometimes only, include Albertsons' Jewel.[252]  The banner urges employees to "████████████████████████████████

████████████████████ "[253]  On items ranging from eggs to kosher products, Mariano's adjusts to "████████" when it finds itself priced above Jewel's promotional pricing.[254] Similarly, when Mariano's saw Jewel pulling back on promotional investment to later "play 'win the holiday,'" a Mariano's employee recommended doing the same to "save on some margin dollars" and prepare for these promotional "big events."[255]

68.    In the Pacific Northwest, Fred Meyer also responds to Albertsons' promotional pricing.[256]  In 2023, ████████████████████████████████████

████████████████████████████████████████████

████████████████████████ [257]  Similarly, Kroger's QFC banner lamented that

"████████████████████████████████████████

████████████████████████████████████████

████████████████████████ "[258]

---

[251] PX1372 (Kroger) at 001; *see also* PX1303 (Kroger) at 001; PX1573 (Kroger) at 001; PX1657 (Kroger) at 001.
[252] Marx Hrg. 423:8-24; *see, e.g.*, PX1778 (Kroger) at 002, 004, 008; PX1779 (Kroger) at 002, 004, 007.
[253] PX1825 (Kroger) at 001; *see also* PX1808 (Kroger) at 001-002.
[254] PX1820 (Kroger) at 001; Marx Hrg. 432:17-433:5; PX1823 (Kroger) at 001-002; *see also* PX1793 (Kroger) at 001-002 ████████████████████████████████████.
[255] PX1825 (Kroger) at 001; PX1795 (Kroger) at 001-002, 010, 012-013.
[256] Kammeyer Hrg. 495:7-15.
[257] PX1674 (Kroger) at 001; PX1675 (Kroger) at 001-002; Kammeyer Hrg. 493:15-494:19.
[258] PX11252 (Kroger) at 001.

PLS' PROPOSED FOF AND COL

69.     Albertsons likewise monitors and reacts to Kroger's promotional pricing, especially around major holidays.  In November 2020, Albertsons' Jewel banner reported ███████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████"[259]  When Albertsons' CEO asked why Jewel was losing market share, Jewel's division lead responded, "[████████████████████████ █████████████████████████████████████████████████████████████████████ ████████████████████████"[260]

70.     ████████████████████████████████████████████████ ████████████████████████████████████████████████.[261] Albertsons reported "[a] win in SoCal" for July 4, 2021, after seeing "much higher pricing" by Ralphs and Stater Bros on meat.[262] █████████████████████████████████ █████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████"[263]

71.     In Portland, Albertsons uses "history and trends to predict Fred Meyer [promotional pricing] and beat it on holidays."[264] ███████████████████████████████ ██████████████████████████████████████████ ██████████████████████████ █████████████████████████████████████████████████████████████████████ ████████████████"[266]

[259] PX2673 (Albertsons) at 001; *see also* PX2679 (Albertsons) at 001-002.
[260] PX12087 (Albertsons) at 001.
[261] PX2478 (Albertsons) at 001.
[262] Curry Hrg. 886:1-25; PX12577 (Albertsons) at 001.
[263] PX12029 (Albertsons) at 001.
[264]  Huntington Hrg. 555:4-11; PX12478 (Albertsons) at 005.
[265] PX2464 (Albertsons) at 001
[266] PX2484 (Albertsons) at 001.

PLS' PROPOSED FOF AND COL

72.    In Colorado, Albertsons compares prices and other features against Kroger's King Soopers ads to ensure it is very competitive with Kroger's advertised pricing.[267]  In 2022, when Albertsons' ad featured better deals than King Soopers', its Denver Division President wrote, "The beating continues," and King Sooper's "Lower lips are quivering."[268]  As a result, Albertsons saw a "[m]assive week" for increased market share.[269]

### 2.  *Economic evidence shows that Defendants constrain each other's pricing*

73.    The economic evidence also supports a finding that Kroger and Albertsons constrain each other's pricing.  In particular, the evidence does not support Defendants' arguments that Albertsons is irrelevant to Kroger's pricing and Walmart will sufficiently constrain the combined firm to discipline their post-merger incentives to raise prices.  Dr. Hill found that, by replicating Dr. Israel's regression model and instead focusing on the effect of Albertsons on Kroger's prices, Dr. Israel's own model finds that lower Albertsons prices are meaningfully correlated with lower Kroger prices.[270]  That analysis also found Walmart's presence does not substantially mitigate the loss of an independent Albertsons.[271]

### 3.  *Kroger and Albertsons compete closely on non-price factors*

74.    **Product Quality and Assortment.**  Defendants monitor and respond to each other to improve product quality and assortment.[272]  As described above, fresh products are important to customers, ███████████████████████████████████████████

---

[267] Broderick Hrg. 1371:19-1372:6, 1378:21-1379:1.
[268] Broderick Hrg. 1373:10-1374:11, 1374:24-1375:15, 1377:9-14; PX2369 (Albertsons) at 001, 003.
[269] Broderick Hrg. 1375:17-1376:4; PX2369 (Albertsons) at 002.
[270] Hill Hrg. 3394:16-3395:16; PX7006 (Hill Rebuttal Rpt.) ¶¶ 133-135.
[271] Hill Hrg. 3394:16-3395:16; PX7006 (Hill Rebuttal Rpt.) ¶¶ 133-135.
[272] *See, e.g.,* Broderick Hrg. 1388:10-25, 1404:4-11; Schwilke Hrg. 814:20-815:16; PX2395 (Albertsons) at 001.

██████████████████████████[273]

75.    Defendants also compete to offer desirable products. ████████████████

███████████████████████████████████████████████████████████

███████████████████.[274]  Kroger's Ralphs produce manager similarly asked his team

"██████████████████████████████████"[275]  In Illinois, Albertsons

boasted that ████████████████████████████████████████████████████

███████████████████████████████████"[276]  Another Albertsons

employee responded, "████████████████████████████████████"[277]

76.    Kroger and Albertsons likewise compete with one another to improve their private label

offerings.  Kroger uses Albertsons' private label brands as a benchmark to test the quality of its

own brands; in one instance, after finding that ████ of its private label natural and organic brands

exceeded Albertsons' in quality, Kroger sought to "████████████████████████████

████"  through a variety of improvements.[278]

77.    **Customer Service and In-Store Experience.**  Kroger and Albertsons also compete

intensely to offer better customer service, shopping conveniences, and in-store experience.[279]

Division presidents frequently visit their competing Kroger and Albertsons stores.[280]

78.    In 2021, Kroger's leadership expressed alarm about new grocery pickup statistics from an

---

[273] PX2412 (Albertsons) at 035, 089; *see also* PX2545 (Albertsons) at 001 ████████████
███████████████.

[274] PX1362 (Kroger) at 001, 004.

[275] PX1359 (Kroger) at 001.

[276] PX2479 (Albertsons) at 001.

[277] PX2479 (Albertsons) at 001; *see also* PX12467 (Albertsons) ████████████████████
███████████████████████████████████.

[278] PX1244 (Kroger) at 001-002; PX1247 (Kroger) at 001-003; Aitken Hrg. 1872:12-23.

[279] McMullen Hrg. 1649:18-1650:3; Broderick Hrg. 1388:23-25.

[280] Marx Hrg. 423:2-7; Kammeyer Hrg. 483:6-12; Huntington Hrg. 537:18-21.

PLS' PROPOSED FOF AND COL

Albertsons earnings call: "80% of [Albertsons] customers can get a pick up slot in 2 hours, that is amazing and we are not even close to this."[281]  Noting that Albertsons was "███████████" and "██████████████████████" Kroger repainted parking lots and invested millions to improve the grocery pickup infrastructure at its own stores.[282]

79.    █████████████████████████████████████████████
████████████████████████████████████
██████████████████████████"[283]  Kroger's QFC banner adjusted its service offerings[284] and store hours[285] in response to Safeway.

80.    In California, Albertsons directed that stores should be crisp, clean, and clutter-free "when compared to primary competitor Ralphs."[286]  Ralphs, too, compares itself against Albertsons on the dimensions of "full, fresh, clean, and friendly"[287] and seeks to offer a better store experience than Albertsons.[288]

81.    In Colorado, competition with Kroger's King Soopers banner—████████
███████"[289]—motivates Albertsons to make substantial improvements to its stores and services.  "█████████████████████████████████████████

---

[281] PX1358 (Kroger) at 001; Aitken Hrg. 1875:20-1878:6.
[282] PX1232 (Kroger) at 001; PX1361 (Kroger) at 002; Aitken Hrg. 1878:7-1879:21.
[283] PX2480 (Albertsons) at 001.
[284] PX11276 (Kroger) at 002-003 █████████████████████████████████
█████████████████████████; PX1310 (Kroger) at 012 ███████
████████████████████████████████████████████████.
[285] *See, e.g.*, PX11295 (Kroger) at 001 ██████████████████████████
█████████████████████████████████████████████████████;
PX1310 (Kroger) at 003 ████████████████████████████████████████
████████████████████████████████████.
[286] PX2585 (Albertsons) at 001; Curry Hrg. 882:11-884:14.
[287] Schwilke Hrg. 815:2-16.
[288] Schwilke Hrg. 815:14-16.
[289] PX2438 (Albertsons) at 001.

PLS' PROPOSED FOF AND COL

███████████████████████████████████████████████████████████████

████████████████████████████[290]  At another Colorado store, ███████████████

████████████████████████████████████████████████████████████"[291]

#### 4. *Economic analysis shows that the acquisition is likely to substantially reduce competition*

82.    Dr. Hill evaluated whether the merger is likely to substantially reduce competition using a compensating marginal cost reduction ("CMCR") analysis.[292]  CMCR analysis calculates the percentage reduction in marginal costs from the merger necessary to offset the merged firm's incentives to raise prices.[293]  If the CMCR value is greater than the marginal cost reductions predicted to result, then the merger is likely to result in the merging parties raising prices.[294]

83.    Defendants' total claimed marginal cost reductions—even including cost reductions that are not verified or merger-specific—add up to less than 1% of their combined operating costs.[295]  Nevertheless, as a conservative measure, Dr. Hill attributed a likelihood of harm only to markets with a CMCR value greater than 5%, rather than in all markets where the CMCR exceeds Defendants' claimed or verified cost reductions.[296]

84.    As in his HMT, Dr. Hill used Defendants' ordinary course gross margins and diversions

---

[290] PX2441 (Albertsons) at 001.
[291] PX2434 (Albertsons) at 001-002.

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████"  PX2438 (Albertsons) at 001.

[292] PX7004 (Hill Rpt.) ¶ 188.
[293] Hill Hrg. 1479:17-25; PX7004 (Hill Rpt.) ¶ 188.  For example, a CMCR of 5% means that a merger would have to reduce the merged firm's marginal cost by 5% or more, relative to the stand-alone firms' marginal costs, or the merger will result in a price increase.  *Id.*
[294] PX7004 (Hill Rpt.) ¶ 189.
[295] Yeater Hrg. 3272:22-3274:5; PX7011 (Yeater Rebuttal Rpt.) ¶ 11; Hill Hrg. 1480:1-13; PX7006 (Hill Rebuttal Rpt.) ¶¶ 180-182, n. 200.
[296] Hill Hrg. 1479:17-1480:13; PX7006 (Hill Rebuttal Rpt.) ¶ 87 ("Whenever the CMCR exceeds expected marginal cost reductions, it predicts that there will be a price increase. I am not aware of a CMCR safe harbor having been proposed.").

PLS' PROPOSED FOF AND COL

proportional to share as inputs to his CMCR analysis.[297]  Dr. Hill nevertheless took an additional conservative measure with his CMCR diversions by "allowing" for consumers to substitute to stores outside of the large format product market *and* outside of the focal store's store-based geographic market.[298]  Practically speaking, this means Dr. Hill's CMCR analysis is largely agnostic to disputes about the proper market definition.[299]

85.    Dr. Hill found that 1,472 local supermarket markets and 1,513 local large format store markets are both presumptively anticompetitive *and* have a CMCR value greater than 5%.[300] This means that, for those markets, the acquisition is likely to result in a price increase unless it were to reduce the firm's marginal costs by more than five times Defendants' claimed cost efficiencies of less than 1%.[301]  Thus, Dr. Hill's CMCR analysis confirms that prices likely will increase as a result of the acquisition, regardless of Defendants' claimed cost savings.[302]

86.    Finally, although Dr. Israel used the gross upward pricing pressure index ("GUPPI") methodology to measure competitive effects, and claimed that the two methodologies are functionally identical, his own academic work recommends CMCR analysis because it "account[s] for the effects of all the products [i.e., stores] of the merging parties" and allows one to "determine required efficiency levels for each product to avoid pricing pressure."[303]

## IV.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR §7 CHALLENGE FOR UNION GROCERY LABOR

---

[297] Hill Hrg. 1531:20-25, 1537:14-16; PX7004 (Hill Rpt.) ¶ 191.  These are appropriate inputs, as explained *supra* in FOF § III.D.1.i.

[298] PX7004 (Hill Rpt.) ¶ 191.

[299] Hill Hrg. 1482:24-1483:15.

[300] PX7006 (Hill Rebuttal Rpt.) at 040, 106, Figs. 13, 46.

[301] PX7004 (Hill Rpt.) ¶ 193; PX7006 (Hill Rebuttal Rpt.) ¶¶ 180-182; *see also* Hill Hrg. 1480:1-13.

[302] PX7006 (Hill Rebuttal Rpt.) ¶ 182.

[303] PX7006 (Hill Rebuttal Rpt.) ¶ 86 n.89; *see also* Israel Hrg. 2727:3-10 (testifying that his GUPPI analysis is based only on "current diversions, current competitive pressures").

PLS' PROPOSED FOF AND COL

## A. Union Grocery Labor in CBA Areas Is a Relevant Labor Market

87.    The effect of this acquisition on competition will be most directly and immediately felt by union grocery workers in the geographic areas covered by the jurisdiction of the unions' collective bargaining agreements ("CBA") areas as shown through an application of the *Brown Shoe* practical indicia.[304]

### 1. Brown Shoe indicia establish union grocery labor as a relevant labor market

88.    Union grocery labor has distinct characteristics, distinct compensation, and industry recognition as a distinct type of labor.

### i. Union grocery labor has peculiar characteristics

89.    For grocery workers and their unions, union grocery labor has distinct characteristics from other labor.  Unlike non-union jobs, union labor is governed by CBAs that guarantee certain benefits such as protections from dismissal without just cause and premium pay rates.[305] Likewise only union workers benefit from the protections of multi-employer health and pension funds ("Taft-Hartley" plans).[306]  Workers can retain these and other union-negotiated wage and non-wage benefits only when they switch jobs between *union* employers.[307]

90.    Many roles in a grocery store, such as meatcutters, pharmacy personnel, department heads, receivers, and front-end managers, require different skills and experiences from other jobs outside the grocery industry.[308]  For example, meatcutters require prior experience as a meat clerk or a multi-year apprenticeship with training programs covering topics such as knife and equipment skills, food safety and handling, customer service, and preparing specialty cuts of

---

[304] Zinder Hrg. 775:12-776:6.
[305] McPherson Hrg. 599:24-600:19; Van Helden Hrg. 196:14-197:4.
[306] Zinder Hrg. 762:17-763:1.
[307] Clay Hrg. 700:11-701:4; Zinder Hrg. 762:17-763:1; Van Helden Hrg. 197:12-15.
[308] Zinder Hrg. 750:21-751:6; *see also* Van Helden Hrg. 193:2-195:1.

PLS' PROPOSED FOF AND COL

meat.[309]  A job at a meatpacking plant, by contrast, offers a worker a very different work environment, requires different skills, and often pays relatively less.[310]

91.     In a buy-side case involving the merger of employers, the proper focus of the antitrust market definition inquiry is the interchangeability of buyers (employers) from the perspective of sellers (workers).[311]  Defendants' expert analyzes the types of skills and training in demand from the perspective of *employers*, not from the perspective of union grocery workers.[312]  Moreover, Defendants' analysis focuses on entry-level hires, not the skills of experienced workers or those with specialized positions at Kroger or Albertsons stores.[313]

*ii.    Union grocery labor has distinct compensation*

92.     Union workers at Kroger and Albertsons receive higher compensation than their non-union counterparts, including both higher total pay and stronger benefits.[314]  The total compensation package of a union grocery worker will include forms of compensation guaranteed in the union contract, including not only wage rates, but also fringe benefits such as health and welfare, retirement, vacation paid time off, disability, and more.[315]

93.     Kroger and Albertsons could reduce their union workers' total compensation by a small amount, yet still remain above the compensation levels of their non-union workers, making it possible to reduce union compensation without losing workers to other non-union employers.[316]  As a result, union grocery workers would not switch to a non-union employer if their

---

[309] Zinder Hrg. 751:7-752:5; *see also* Broderick Hrg. 1425:5-14.
[310] Zinder Hrg. 752:6-753:1.
[311] *See* COL at ¶ 35.
[312] *See* McCrary Hrg. 3065:24-3066:13.
[313] McCrary Hrg. 3067:4-17.
[314] Clay Hrg. 679:10-18; Ashenfelter Hrg. 3320:24-3328:25; PX7010 (Ashenfelter Rebuttal Rpt.) ¶¶ 14-33.
[315] Dosenbach Hrg. 2543:21-2544:18.
[316] Ashenfelter Hrg. 3339:4-20; PX7010 (Ashenfelter Rebuttal Rpt.) ¶ 33.

PLS' PROPOSED FOF AND COL

compensation was reduced by a small amount (relative to a non-union employer).[317]

94.    Defendants' labor economics expert Professor McCrary does not analyze union grocery workers' motivations to work in or switch from union stores.[318]  Professor McCrary also fails to take into account the fact that union workers receive better pay and benefits than their non-union counterparts at Kroger and Albertsons stores.[319]  By focusing primarily on entry level positions, Professor McCrary ignores the important value ascribed to union grocery compensation by more senior employees, for whom turnover decreases significantly after benefits accrue.[320]

> iii.    *Union grocery labor is recognized by industry participants as a distinct type of labor*

95.    Albertsons uses different teams and processes for setting wages and benefits for their union and non-union associates.[321]  Both Kroger and Albertsons acknowledge that union grocery workers generally receive more generous healthcare and pension benefits than their non-union counterparts receive within the same company.[322]  Stater Brothers views its competition for labor as other union grocery operators in its market.[323]

### 2.  *CBA areas constitute relevant geographic markets*

96.    Kroger and Albertsons compete for union labor in the local areas covered by the CBAs.[324]  The negotiated wages, benefits, and working conditions cover all the union grocery

---

[317] *See, e.g.*, PX4112 (Cordova (UFCW Local 7) Dep. at 46:7-24).

[318] *Cf.* McCrary Hrg. 3070:5-3071:13.

[319] Ashenfelter Hrg. 3320:24-3328:25; PX7010 (Ashenfelter Rebuttal Rpt.) ¶¶ 14-33.

[320] McMullen Hrg. 1576:20-1577:6; McPherson Hrg. 595:8-14; Zinder Hrg. 750:5-12; *see also* PX7010 (Ashenfelter Rebuttal Rpt.) at Appx. C ¶ 2, Tbl. C1.

[321] Dosenbach Hrg. 2537:25-2538:5.

[322] McPherson Hrg. 595:15-596:4; Dosenbach Hrg. 2523:2-6; *see also* PX7010 (Ashenfelter Rebuttal Rpt.) at ¶¶ 31-32, Tbl. 4.

[323] Van Helden Hrg. 195:2-7, 195:8-16.

[324] McPherson Hrg. 599:9-14; *see, e.g.*, PX4134 (Frazier (UFCW Local 1564) Dep. 15:23-16:6); PX1381 (Kroger); PX2252 (Albertsons) at 084-085 (describing geographic scope of CBA around Southern California); PX2257 (Albertsons) at 006 (describing geographic scope of CBA around Spokane, Washington).

PLS' PROPOSED FOF AND COL

workers at stores within the defined area of the CBA.[325]  As such, any changes in wages or benefits during negotiations will impact all union workers at stores covered by the CBA.[326]  Defendants recognize that the "geographic areas" impacted by changes in negotiating leverage are those areas "covered by the labor agreements."[327]  For instance, a recent mutual strike assistance agreement ("MSAA") contemplated by Defendants reflects that they seek to use mutual lockouts to counter union strike leverage in geographic areas defined by CBAs.[328]

97.    Kroger and Albertsons try to stay competitive within the jurisdiction of the CBAs by surveying the compensation offered by others in those CBA areas.[329]  Unions also focus on what other employers are paying in the local area.[330]

98.    Each CBA area ranges in size from a city or county to a group of counties.[331]  Like most workers, union grocery workers prefer to work near where they live.[332]  Most CBA areas reflect this reality.[333]  Defendants' focus on the UFCW's Southern California CBA area is misplaced because multiple unions jointly negotiated one CBA.[334]  The geographic scope of this exceptional CBA is larger than it would be if it reflected the jurisdiction of just one union.[335]

### B.  High Shares in Many CBA Areas Establish Presumptive Unlawfulness

99.    Kroger and Albertsons consistently are the two largest union grocery employers in each

---

[325] PX7004 (Hill Rpt.) ¶ 246.
[326] PX4112 (Cordova (UFCW Local 7) Dep. 189:2-191:9).
[327] PX2148 (Albertsons) at 004; *see also* Dosenbach Hrg. 2559:14-2560:9; McPherson Hrg. 607:4-13.
[328] PX2148 (Albertsons) at 004-005; *see also* Dosenbach Hrg. 2559:14-2560:9.
[329] McPherson Hrg. 598:11-14, 664:20-665:1; Dosenbach Hrg. 2539:23-2540:3; *see also* McPherson Hrg. 664:20-667:7.
[330] Clay Hrg. 677:18-23.
[331] PX7004 (Hill Rpt.) ¶ 246; *see also* McPherson Hrg. 598:4-10.
[332] Zinder Hrg. 797:25-798:3; PX7004 (Hill Rpt.) ¶¶ 246, 252.
[333] PX7004 (Hill Rpt.) ¶ 246; *see also* McPherson Hrg. 598:4-10.
[334] PX7004 (Hill Rpt.) ¶ 257; McCrary Hrg. 3124:25-3125:3.
[335] *See* Zinder Hrg. 743:17-21.

PLS' PROPOSED FOF AND COL

division and geographic area where they overlap.[336]  Dr. Hill calculated market shares in four

states where Defendants have overlapping CBA areas: Oregon, Washington, California, and

Colorado.  These calculations show that Defendants' combined market shares, market

concentration, and increases in concentration easily surpass the levels that create a presumption

of illegality.[337]  In overlapping Colorado CBA areas, there are no other union grocery employers

at all, making the acquisition a merger-to-monopoly.[338]  In Southern California, Dr. Hill

calculates a combined union grocery worker share of nearly 75%.[339]  In the overlapping CBA

areas of UFCW Local 555, covering parts of Oregon and Washington, Dr. Hill shows that the

merged firm would employ over 70% of union grocery workers.[340]  And in each of the

overlapping CBA areas of UFCW Local 3000 in Washington, Dr. Hill finds that the acquisition

would give Defendants a combined union grocery worker share of more than 75%.[341]

### C.  The Acquisition Will Eliminate Substantial Head-to-Head Competition For Union Grocery Labor

100.    Kroger and Albertsons recognize each other as a primary—and in some cases, only—

union competitor in the areas where their stores and workforces overlap.[342]  Albertsons refers to

Kroger as its "bargaining competitor," meaning they compete for sales and talent, while also

engaging in bargaining with the same unions at the same time.[343]  Both Defendants acknowledge

the importance of offering competitive wages and benefits in order to attract and retain their

union associates.[344]  If Kroger and Albertsons fail to match each other's contract wages and

---

[336] *See, e.g.*, Zinder Hrg. 756:10-15.
[337] *See* Hill Hrg. 1496:18-1497:8; *see also* Merger Guidelines § 2.1; COL at § I.A.5, *infra*.
[338] PX7004 (Hill Rpt.) at 127, Fig. 59.
[339] PX7004 (Hill Rpt.) at 128, Fig. 60.
[340] PX7004 (Hill Rpt.) at 129, Fig. 61.
[341] PX7004 (Hill Rpt.) at 130, Fig. 62.
[342] McPherson Hrg. 594:23-595:7; Broderick Hrg. 1391:17-19.
[343] Dosenbach Hrg. 2538:9-25
[344] McMullen Hrg. 1576:20-1577:6; Broderick Hrg. 1390:3-18.

PLS' PROPOSED FOF AND COL

terms, they risk losing workers to their union competitors (i.e., one another).[345]

101.    Defendants engage in coordinated bargaining with UFCW unions in many parts of the Western United States, which allows the unions to pit the companies against each other to pressure them to either match or improve on each other's proposals.[346]  Having both Kroger and Albertsons—alternative employers whose interests and priorities frequently diverge—at the bargaining table when negotiating a CBA is crucial.[347]  Unions leverage this competition for workers to achieve better wages and benefits and otherwise improve working conditions.[348]  In Colorado, for example, Albertsons' labor executives noted that if the union extracted higher wages from Kroger, then Albertsons likely would have to agree to the same higher wages.[349] And in Portland, Oregon, UFCW Local 555 secured additional pension payments and other non-wage benefits by playing Kroger and Albertsons off against each other.[350]

102.    The acquisition removes unions' primary source of leverage in collective bargaining negotiations: the ability to credibly threaten a strike, boycott, or other job action against an employer.[351]  Strikes are an "economic weapon."[352]  When workers strike or boycott, impacted stores cannot operate normally or may have to close temporarily.[353]  Struck supermarkets are at risk of lasting damage to their reputation and loss of shoppers to competing stores.[354]

---

[345] Broderick Hrg. 1396:1-8; PX2082 (Albertsons) at 002; McPherson Hrg. 650:10-17.
[346] See McPherson Hrg. 601:17-602:3; Broderick Hrg. 1393:7-1396:8; Zinder Hrg. 758:11-25; PX2082 (Albertsons) at 001-002.
[347] See McPherson Hrg. 601:23-602:7; Zinder Hrg. 756:22-758:4.
[348] Zinder Hrg. 758:5-10; McPherson Hrg. 604:8-605:6; Broderick Hrg. 1396:1-1398:9; PX2082 (Albertsons) at 002; Clay Hrg. 683:23-685:2.
[349] Broderick Hrg. 1396:1-8; PX2082 (Albertsons) at 002.
[350] Clay Hrg. 689:20-690:13.
[351] Zinder Hrg. 758:11-25, 774:15-25; Dosenbach Hrg. 2549:6-14.
[352] McPherson Hrg. 602:12-14; DX2740 (King Rpt.) ¶ 52.
[353] Clay Hrg. 685:3-14; Zinder Hrg. 758:11-25.
[354] Broderick Hrg. 1396:15-1398:9, 1399:21-1400:6, 1403:16-21; Zinder Hrg. 758:11-25; PX2395 (Albertsons) at 001.

PLS' PROPOSED FOF AND COL

103.    During strikes, the union tries to direct customers to alternative union grocery store.[355] As unions seek to redirect customers from the struck store, competing union stores are often busier during the strike and their sales increase.[356]  The strike target is also at risk of losing workers.[357]  Workers may choose to pick up shifts at other union grocery employers that remain open during the strike in order to continue getting paid and earning benefit contributions.[358]

104.    Because strikes damage an employer's sales, reputation, and employee relationships, unions can use a strike or the credible threat of a strike to pressure an employer to offer better wages, benefits, and working conditions.[359]  Unions use the strike threat in almost every negotiation against Kroger or Albertsons.[360]  "If the acquisition were to go through, the credibility of the threat would be . . . de minimis."[361]

105.    Unions also employ a negotiating tactic known as "whipsawing."[362]  In whipsaw bargaining, the union first secures an agreement with one employer, then uses it as a benchmark to leverage negotiations with the other.[363]  To increase pressure, a union may also engage in a whipsaw strike, in which a union strikes or threatens to strike one employer.[364]  Once there is agreement, the union shifts the strike threat to get a competitor to meet or beat that agreement.[365]

---

[355] Zinder Hrg. 760:15-761:5; Clay Hrg. 685:3-686:13, 687:2-5.
[356] Zinder Hrg. 761:6-762:8.
[357] PX4132 (Guenther (UFCW Local 3000) Dep. 86:5-7, 122:4-124:13).
[358] Zinder Hrg. 761:6-763:1.
[359] Zinder Hrg. 759:1-17, 764:2-12; PX2082 (Albertsons) at 002.
[360] Zinder Hrg. 759:1-17, 784:6-11.
[361] Zinder Hrg. 774:15-25.
[362] McPherson Hrg. 611:19-612:20; Dosenbach Hrg. 2558:19-23; Clay Hrg. 679:23-680:5.
[363] DX2740 (King Rpt.) ¶ 47; King Hrg. 2846:19-25, 2877:1-9; Clay Hrg. 680:1-10; McPherson Hrg. 649:14-20.
[364] DX2740 (King Rpt.) ¶ 47; King Hrg. 2846:19-25, 2877:1-9; McPherson Hrg. 656:9-13.
[365] McPherson Hrg. 602:20-25; Dosenbach Hrg. 2531:13-2532:6; Zinder Hrg. 763:2-12; Clay Hrg. 680:1-10.

This strategy is effective because Kroger and Albertsons do not want to lose sales or shoppers.[366]

106.    Unions commonly leverage competition between Defendants to benefit union grocery workers.  In December 2021, UFCW Local 555 struck several Fred Meyer (Kroger) locations in the Portland, Oregon; Bend, Oregon; and Klamath Falls, Oregon areas.[367]  As a result of the strike, Local 555 obtained the "biggest wage increases" it had ever achieved with Kroger, as well as several other important non-wage improvements.[368]  Local 555 then brought the agreement to Albertsons to negotiate a similar contract, resulting "in a much more expensive settlement."[369]

107.    In another example, in January 2022, UFCW Local 7 struck King Soopers (Kroger) stores in the Denver area.[370]  Local 7 used the leverage gained from the strike to negotiate wage increases and improve benefits with Kroger.  Once Local 7 agreed to a new CBA with Kroger, the union then used that CBA to "move" Albertsons to a new CBA with similar terms.[371]

108.    To counter the unions' strategy of playing them off one another, Kroger and Albertsons have attempted to align on their union negotiations.[372]  However, their coordination is costly, imperfect, and often unsuccessful.[373]  Defendants' frequent failure to reach alignment in bargaining, despite their best efforts, gives unions even greater negotiating leverage.[374]

109.    This misalignment is most evident in Kroger's repeated requests to Albertsons to

---

[366] McPherson Hrg. 655:19-656:13; Dosenbach Hrg. 2556:18-2557:2.

[367] Clay Hrg. 688:22-689:19; Dosenbach Hrg. 2553:10-22.

[368] Clay Hrg. 689:13-19; Dosenbach Hrg. 2553:10-2554:16.

[369] PX2251 (Albertsons) at 1; *see* Dosenbach Hrg. 2553:10-22; Clay Hrg. 683:23-684:24.

[370] McPherson Hrg. 656:14-20; Broderick Hrg. 1396:15-19, 1399:21-1400:2.

[371] PX4112 (Cordova (UFCW Local 7) Dep.128:4-130:11); *see also* Broderick Hrg. 1396:1-19; PX2082 (Albertsons) at 002.

[372] Broderick Hrg. 1393:3-1394:2; PX2082 (Albertsons) at 001.

[373] McPherson Hrg. 619:7-11; Broderick Hrg. 1391:14-1396:8; PX2082 (Albertsons) at 001-002; *see also* PX7010 (Ashenfelter Rebuttal Rpt.) ¶¶ 53-54; *compare* McPherson Hrg. 602:4-7 *with* Dosenbach Hrg. 2551:12-2552:1.

[374] Broderick Hrg. 1391:14-1396:8; PX2082 (Albertsons) at 001-002; *see* Ashenfelter Hrg. 3337:22-3339:3.

consider entering into an MSAA.[375]  An MSAA is an agreement between two employers that if one is struck, the other will lock out its union employees; the two companies may agree to share in the profits reaped from the increase in sales resulting from the strike of the competitor.[376]  An MSAA gives employers "a ton of leverage at the bargaining table to get an agreement" because it remove unions' ability to use whipsaw tactics.[377]  An MSAA also effectively increases the size of a strike so it raises the risks and costs to the union.[378]  But MSAAs are difficult to enter into when the Defendants are otherwise fierce competitors.  Facing strike threats in contentious negotiations, for example, Kroger unsuccessfully tried to convince Albertsons to enter into MSAAs in Portland (2021),[379] Denver (2022),[380] and Southern California (2022).[381]  Post-acquisition, there will be no need for the Defendants to agree to an MSAA to increase their leverage (as they attempt to do now) because one would essentially already be in place.[382]

110.    The presence of smaller union grocery employers does not impact union negotiations with Defendants.[383]  Smaller union grocery employers understand that they do not have the size and national scope to withstand the financial impact of a strike, so they follow the CBA terms negotiated by Kroger and Albertsons.[384]  Likewise, unions recognize that they cannot effectively leverage smaller grocers' CBAs against Kroger or Albertsons during collective bargaining.[385]

---

[375] McPherson Hrg. 619:7-11.
[376] Dosenbach Hrg. 2527:15-2528:3; McPherson Hrg. 605:7-17; PX7010 (Ashenfelter Rebuttal Rpt.) ¶ 38.
[377] McPherson Hrg. 605:18-606:25; PX7010 (Ashenfelter Rebuttal Rpt.) ¶¶ 41-42; PX1033 (Kroger) at 002.
[378] PX7010 (Ashenfelter Rebuttal Rpt.) ¶ 41; *see also* Dosenbach Hrg. 2552:15-2553:4.
[379] McPherson Hrg. 608:1-12; PX1040 (Kroger) at 002.
[380] McPherson Hrg. 612:21-613:13; *see also* PX2148 (Albertsons) at 001.
[381] McPherson Hrg. 615:11-14.
[382] PX7010 (Ashenfelter Rebuttal Rpt.) ¶¶ 52, 56.
[383] Zinder Hrg. 756:16-758:2.
[384] Zinder Hrg. 756:16-757:11.
[385] Zinder Hrg. 757:16-758:4.

111.    Prior consolidation among union grocery store employers has diminished union bargaining leverage.[386]  In Southern California, for instance, Albertsons' 2015 merger with Safeway reduced the number of major union grocery employers from three to two—Kroger and Albertsons.[387]  If Kroger and Albertsons merge, unions will be unable to play one off the other during collective bargaining and their ability to credibly threaten a strike or boycott will diminish.[388]  Union bargaining leverage will be "de minimis" with only one major unionized grocery employer in each relevant CBA area, and thus Kroger will "have no incentive" to agree to improved CBA terms.[389]  This reduced bargaining leverage will result in lower wage increases, reduced benefits, and worse employment terms for union grocery employees.[390]

## V.    DEFENDANTS FAIL TO REBUT THE *PRIMA FACIE* CASE

### A.  The Divestiture Leaves Hundreds of Markets Unremedied

112.    Dr. Hill's analysis shows that 1,002 supermarket markets (totaling $37 billion in annual sales at the focal stores alone) are presumptively anticompetitive, even assuming a best case scenario that each and every store divested to C&S not only remains open, but also—contrary to C&S's projections—maintains its pre-divestiture sales levels.[391]  For large format stores, the proposed acquisition is presumptively anticompetitive in 551 large format store markets (totaling $23 billion in annual focal store sales).[392]  Pursuant to Dr. Hill's CMCR analysis discussed in § III.F.4, the acquisition exceeds the conservative 5% CMCR threshold in 335 supermarket markets and 234 large format store markets, even after accounting for a perfectly performing

---

[386] *See, e.g.*, Zinder Hrg. 766:1-18, 774:10-14, 776:7-14.
[387] Zinder Hrg. 766:1-18.
[388] Zinder Hrg. 773:25-775:11.
[389] Zinder Hrg. 773:25-774:25, 775:12-776:6; *see also* Ashenfelter Hrg. 3338:11-18.
[390] Zinder Hrg. 775:12-776:6; *see also* Ashenfelter Hrg. 3339:17-20.
[391] PX7006 (Hill Rebuttal Rpt.) at ¶¶ 103-104, Figs. 43-44; Hill Hrg. 3381:16-3382:5.
[392] PX7006 (Hill Rebuttal Rpt.) at ¶¶ 035-037, Figs. 10-11; Hill Hrg. 3381:16-3382:5.

PLS' PROPOSED FOF AND COL

divestiture.[393]  Thus, Dr. Hill's CMCR analysis confirms that prices likely will increase as a result of the acquisition, regardless of the divestiture.[394]  Dr. Israel concedes there are unremedied markets, even accounting for the proposed divestiture.[395]  Further, none of Defendants' experts opines that C&S will effectively operate the divested stores[396] nor that C&S will maintain the current levels of competitive intensity.[397]

### B.  The Proposed Divestiture Will Not Mitigate a Substantial Lessening of Competition in the Remaining Markets

#### 1.  *The divestiture package is not a standalone business and lacks assets important to competitive viability*

113.    C&S is not acquiring a fully functioning company as it stands today[398] but rather an amalgamation of assets designed by antitrust lawyers as a matter of litigation strategy.[399]  Indeed, even Defendants' divestiture expert admits that the acquired assets are not a standalone business.[400]  To operate these disparate assets, C&S must obtain the resources and support it needs at significant expense over several years.[401]  C&S does not have, and will not receive, assets sufficient to compete as effectively as the divestiture stores compete today, including:

---

[393] PX7006 (Hill Rebuttal Rpt.) at ¶¶ 040, 106, Figs. 13, 46; Hill Hrg. 3381:16-3382:5.
[394] PX7006 (Hill Rebuttal Rpt.) ¶ 182.
[395] Israel Hrg. 2687:17-2688:8.
[396] Galante Hrg. 3190:3-6.
[397] Galante Hrg. 3189:14-17; Israel Hrg. 2726:8-15.  Accordingly, and in conjunction with the subsections below, Dr. Hill's assumption that the divestiture will perform perfectly is highly conservative.
[398] Winn Hrg. 1178:7-12; *compare with* Knopf Hrg. 957:2-958:5.
[399] *See* Order Denying Renewed Mot. to Compel, In the Matter of Kroger and Albertsons, FTC Docket No. 9428 (June 11, 2024) at 011, https://www.ftc.gov/system/files/ftc_gov/pdf/610942_- _order_denying_complaint_counsels_mtc_production_of_documents_and_revised_privilege_l.p df; Winn Hrg. 1169:22-1170:1; Cosset Hrg. 2479:17-22.
[400] Galante Hrg. 3136:9-14; Winn Hrg. 1178:7-12, 1194:21-1195:4; PX 7008 (Fox Rebuttal Rpt.) ¶ 58; Fox Hrg. 1330:3-1331:8.
[401] PX7002 (Fox Rpt.) ¶¶ 25-32.  Florenz Hrg. 1134:24-1141:21 (discussing numerous costs included in C&S deal model that the stores do not bear today).

PLS' PROPOSED FOF AND COL

- An existing banner in many geographies;[402]

- A significant assortment of C&S-exclusive private label products;[403]

- Manufacturing facilities for private label products (other than one dairy plant);[404]

- The primary distribution centers for 267 divestiture stores;[405]

- A sophisticated loyalty program to build brand loyalty and target customers with personalized promotions;[406]

- A retail media network, both as a standalone revenue stream and to earn vendor funds to offset cost of goods;[407]

- A substantial dataset with the data analysis and data analytic resources necessary for pricing, forecasting demand, and targeting promotions;[408] and

- E-commerce assets, including store websites and mobile phone applications.[409]

114.    The proposed divestiture does not include many of the corporate shared services and distribution centers currently supporting the included stores[410] and contains a mix and match of assets and stores (from both Defendants with different store formats and product assortments) in 18 states and D.C.,[411] under 16 banners,[412] and in multiple divisions.[413]  C&S projects over a billion dollars in additional costs, including for dis-synergies, rebannering, IT transition, and supply chain costs, to rebuild the retail infrastructure the stores are losing (only a small portion

---

[402] PX7002 (Fox Rpt.) ¶ 63, Fig. 14; Winn Hrg. 1175:21-23, 1188:1-12.
[403] PX7002 (Fox Rpt.) ¶¶ 75-120; Florenz Hrg. 1137:22-1138:6; Winn Hrg. 1175:24-1177:25.
[404] PX7002 (Fox Rpt.) ¶¶ 80-82, 84-88; Winn Hrg. 1175:12-13.
[405] Fox Hrg. 1331:9-24; PX 7002 (Fox Rpt.) ¶ 219, Fig. 35.
[406] PX7002 (Fox Rpt.) ¶¶121-29, 141-50; Winn Hrg. 1178:4-6; Cosset Hrg. 2471:19-2472:13.
[407] PX7002 (Fox Rpt.) ¶¶ 130-31, 151-53; Cosset Hrg. 2241:5-11, 2241:19-2242:13, 2493:1-9; McGowan Hrg. 1021:22-1023:11.
[408] PX7002 (Fox Rpt.) ¶¶ 167-80; Florenz Hrg. 1084:11-15, 1084:23-1085:12; Cosset Hrg. 2471:19-2472:13.
[409] PX7002 (Fox Rpt.) ¶¶ 159-168, 175, 181-184; Florenz Hrg. 1139:1-3; McGowan Hrg. 1011:7-1012:24; Cosset Hrg. 2472:9-13.
[410] Florenz Hrg. 1136:22-137:15; Winn Hrg. 1175:9-15.
[411] PX7002 (Fox Rpt.) ¶ 45; Winn Hrg. 1172:1-11 (mix and match of Defendants' stores in Oregon and Washington).
[412] PX7004 (Hill Rpt.) ¶¶ 221-23.
[413] Winn Hrg. 1171:1-16, 1187:9-22.

PLS' PROPOSED FOF AND COL

of which will be invested in stores, contrary to Defendants' assertions).[414]  Many of these costs—including ███████████ and lower private label margins—will be higher indefinitely.[415]

115.    Because of the disparate nature of the assets, the divestiture lacks density in many geographies (e.g., only one store in Delaware, one store in D.C., two stores in Houston), meaning C&S may not have scale needed for efficient fixed costs, marketing costs, fresh products, distribution, and long-term investment.[416]  As a result, Kroger will have a density advantage in major CBSAs relative to C&S, including on marketing and distribution efficiencies.[417]

116.    C&S's current distribution network is not sufficient to fill in gaps in the divested distribution network,[418] as C&S will be forced to build additional distribution center capacity at minimum in Illinois, California, and Alaska at significant cost.[419]  Even in areas where C&S is acquiring distribution center capacity, it projects ongoing increased transportation costs compared to the current distribution networks serving the divested stores today.[420]

### 2.  C&S and Kroger will be entangled for up to four years post-divestiture

117.    Pursuant to the Transition Services Agreement ("TSA"), C&S will pay the merged company ██████████████████ to provide the services it needs to operate and to compete in the retail grocery market, including store operations, distribution, product supply,

---

[414] Florenz Hrg. 1140:24-1141:6; PX3602 at Assumptions and CF Impacts Tab; Cosset Hrg. 2482:20-2483:5, 2483:25-2484:5.

[415] PX3602 (C&S) at "Assumptions and CF Impacts" tab; McGowan Hrg. 1017:5-1018:25.

[416] Fox Hrg. 1327:19-1328:18; Florenz Hrg. 1101:19-25; Winn Hrg. 1189:16-1190:14; Knopf Hrg. 962:14-18; 964:16-965:3; DX1058 (C&S) at 026 (showing small number of divestiture stores in various areas).

[417] Fox Hrg. 1327:16-1328:18; PX7008 (Fox Rebuttal Rpt.) ¶ 38, Figs. 1-7.

[418]  PX7002 (Fox Rpt.) ¶¶ 216-218; Fox Hrg. 1331:25-1332:11.

[419] Winn Hrg. 1238:23-1239:6; Florenz Hrg. 1136:4-14, 1140:5-18; PX7002 (Fox Rpt.) ¶¶ 216-217.

[420]  Florenz Hrg. 1136:25-1137:15; PX3602 (C&S) at "Model" tab, line 14 ("Wholesale Cost to Serve Detriment").

PLS' PROPOSED FOF AND COL

marketing, data exchanges, access to loyalty programs, shelf pricing, promotional planning and pricing, and cost management.[421]  The effectiveness of Defendants' proposed divestiture remedy will depend in substantial part on Kroger's performance of its contractual obligations—even though Kroger will be competing with C&S in hundreds of markets—over an extended period.[422]

118.    Due to the TSA, C&S will not be decoupled from Kroger for at least four years.[423] Kroger's contractual obligations can be enforced only through litigation,[424] so C&S will be vulnerable to Kroger's underperformance or non-performance.  C&S does not intend to fully compete with Defendants for several years and plans to "run the same program between where we share markets until banner brands are separated (pricing, promotion, loyalty, and other customer facing programs)."[425]  In light of these extensive entanglements, C&S's CEO testified that "until we are fully de-coupled, we are not a separate functioning company."[426]

### 3.    *The divestiture presents high levels of execution risk*

####     i.    *C&S lacks the capabilities necessary to operate the divested stores and is not acquiring those capabilities in the divestiture*

119.    C&S is a wholesaler with limited supermarket operating experience.  C&S operates only 23 Piggly-Wiggly and Grand Union retail supermarkets as of fiscal year 2023, most of which C&S acquired in 2021 and 2022.[427]  Reflecting C&S's relative inexperience, C&S requested a

---

[421] PX7002 (Fox Rpt.) ¶ 9, Fig. 3; PX1654B (Kroger) at Schedule 2.1(a); Florenz Hrg. 1139:4-14; PX3602 at Corporate Overhead Worksheet tab, line 42 ("TSA"); Cossett Hrg. 2485:1-24.
[422] Winn Hrg. 1192:25-1193:2; Fox Hrg. 1293:15-1294:12, 1300:9-1302:16; Knopf Hrg. 965:8-966:7 (Raley's would not have done acquisition if seller had remained in market because it would be "impossible to overcome or very unlikely that we would be successful").
[423] Winn Hrg. 1194:21-1195:4.
[424] Winn Hrg. 1193:3-8.
[425] DX1058 (C&S) at 045; Florenz Hrg. 1149:6-24; Winn Hrg. 1195:5-1197:1.  Under the TSA, Kroger will be providing base pricing, promotional plans, forecasting data, and advertising support to C&S for at least a year post-closing.  Florenz Hrg. 1147:5-7.
[426] Winn Hrg. 1195:5-1197:1 (quoting PX4030 (Winn (C&S) IH 136:18-137:8)).
[427] PX7002 (Fox Rpt.) ¶ 11; McGowan Hrg. 990:22-991:3, 993:19-21; *see also* Winn Hrg. 1260:19-1261:1.

PLS' PROPOSED FOF AND COL

call with Kroger during due diligence "to discuss what it takes to operate a grocery store."[428]

Indeed, a wholesaler's business philosophy is focused on distribution efficiency rather than on

local markets and interacting with customers—and grocery wholesalers have failed in the past at

extending wholesaling success into retail operating success.[429]

120.    C&S (~$21 billion in revenue) has less scale than Kroger (~$150 billion) or Albertsons

(~$78 billion) today and will have less scale than Kroger post-merger ($42 billion versus $207

billion).[430]  Defendants will have scale advantages over C&S post-transaction, including lower

cost of goods for private label products.[431]  Defendants are also significantly more profitable—

C&S's 2023 EBIDTA is only ▮% of Albertsons' EBIDTA and ▮% of Kroger's EBIDTA.[432]  In

contrast to the—on average—▮▮▮▮▮ that each divestiture store generates per year, C&S

only sells approximately ▮▮▮▮▮▮▮ to its 7,500 independent customer stores (i.e., ▮▮▮▮

of the average sales of a divestiture store), which account for less than a quarter of C&S's

wholesale revenues annually.[433]  The divestiture stores also carry a different assortment than

what C&S provides—for example, C&S largely does not offer fresh private label products.[434]

121.    Under its current owner, Richard Cohen, C&S has previously tried to grow its retail

operations but failed, including for reasons applicable here, e.g., due to complications integrating

multiple banners, store sizes, and formats; expansion into retail geographies where it has little to

[428] PX1272 (Kroger) at 001.
[429] *See* Van Helden Hrg. 206:16-207:2; PX7004 (Hill Rpt.) ¶¶ 237-238.
[430] Winn Hrg. 1165:18-20, 1167:14-19; DX2628 (C&S) at 005 and 016.
[431] Winn Hrg. 1168:14-22; PX 7002 (Fox Rpt.) ¶¶ 117-120; McGowan Hrg. 1017:5-8; 1017:20-1018:14; 1019:2-18; PX4050 (McGowan (C&S) Dep. 131:3-7, 17-20).
[432] Winn Hrg. 1167:20-1168:10; Sankaran Hrg. 1787:17-19; DX2628 (C&S) at 005.
[433] DX1058 (C&S) at 010, 012; Galante Hrg. 3207:19-24.
[434] *See* McGowan Hrg. 1015:14-23; Fox Hrg. 1315:24-1316:16; *compare* PX7002 (Fox Rpt.), at 068-070, Figs. 18, 20 *with* 072, Fig. 22.

PLS' PROPOSED FOF AND COL

no familiarity; and because those expansion efforts represented a "Big bite."[435]

122.    Much of C&S's history since 2000 is that of "buying and then selling or closing stores."[436]  C&S acquired over 370 retail grocery stores between 2001 and 2012.[437]  By 2012, it was operating only three retail stores, having sold or closed the other stores.[438]  In 2022, C&S purchased 12 Tops stores divested in the Price Chopper/Tops merger and rebannered those stores to Grand Union.[439]  The Grand Union stores have not met C&S's projections it presented to the FTC when it sought approval to acquire the stores.[440]  C&S has been unable to operate these stores at the level of sales and profitability they had under Tops' ownership—average weekly sales fell by 28% in fiscal year 2022 following the acquisition.[441]  As of March 2024, sales at the Grand Union stores further declined 13% compared to the prior year.[442]  Even including wholesale profits, the Grand Union stores lose about $1 million annually, and excluding wholesale profits the stores lose approximately $3 million annually.[443]  The Grand Union stores will not meet their budget for 2024.[444]  C&S was thus incorrect when it represented to the FTC in October 2023 that the stores have "always been profitable when including wholesale profitability," given that the stores had never been profitable (even including wholesale profitability) as of that time.[445]  Similarly, after promising the FTC that all of its stores would be

---

435 Winn Hrg. 1164:16-19; DX2304 (C&S) at 9.
436 Winn Hrg. 1164:3-5.
437 PX7002 (Fox Rpt.) ¶¶ 12-18, Figs. 4 and 5; Winn Hrg. 1162:5-1163:14.
438 Winn Hrg. 1162:2-1163:19; PX7002 (Fox Rpt.) ¶ 18.
439 McGowan Hrg. 993:19-21, 994:4-9, 994:19-995:5; PX7002 (Fox Rpt.) ¶¶ 22, 62.
440 McGowan Hrg. 994:10-18; Florenz Hrg. 1107:17-1108:16.
441 Hill Hrg. 1489:19-1490:8; PX7004 (Hill Rpt.) ¶ 225, Fig. 56.
442 McGowan Hrg. 1002:4-16; PX3515 (C&S) at 019.
443 McGowan Hrg. 1002:21-1003:3.
444 McGowan Hrg. 1002:4-8.
445 *Compare* PX3107 (C&S) at 017 *with* PX3515 (C&S) at 019; McGowan Hrg. 998:1-12, 1000:1-1001:5. C&S cannot currently sell these stores without FTC approval pursuant to an FTC

PLS' PROPOSED FOF AND COL

operated together after the Price Chopper/Tops divestiture, C&S subsequently sold a store it

owned in Spry, Pennsylvania to Weis Markets "to sweeten the pot and get term [i.e., extend a

wholesale agreement]," while C&S was negotiating a wholesale supply contract with Weis.[446]

Weis subsequently closed the store.[447]

123.    Prior to buying the Grand Union stores, a C&S executive correctly predicted that it would

lose money on the retail side but profit on the wholesale side and warned "don't say that

otherwise the FTC won't approve it."[448]  The poor performance of the divested stores under C&S

is the subject of running jokes by C&S employees in their work-related chat messages.[449]

124.    C&S has also struggled with the dozen or so stores it acquired as part of its 2021 Piggly

Wiggly Midwest acquisition (even though those stores were acquired as part of a larger franchise

acquisition, and thus did not require a rebannering), with C&S closing a store in 2023 for poor

performance.[450]  The Piggly Wiggly stores will be short of their 2024 budget expectations.[451]

125.    Acquiring the divested stores would increase C&S's owned retail stores by

---

order.  Florenz Hrg. 1133:10-20; Decision & Order, In the Matter of Golub Corporation et al.,
FTC Docket No. C-4753 (Jan. 20, 2022) at 019,
https://www.ftc.gov/system/files/documents/cases/price_chopper_decision_and_order.pdf.
[446] Florenz Hrg. 1102:13-1104:8.
[447] Florenz Hrg. 1104:4-8.
[448] Florenz Hrg. 1106:11-1107:16; PX13034 (C&S) at 002-004.
[449] PX13036 (C&S) at 002 (chat among C&S executives around the time of Grand Union's
FY2023 results: "Grand Union…..holy smokes . . . yeah buddy . . . its bad . . .if it was your
company, would you get rid of them? . . . I would strongly consider it . . . maybe we can't due to
[the divestiture]"); PX13038 (C&S) at 002-003 ("I hope it doesn't point to we ceded a lot of
market share [back to divestiture seller] but I have a feeling it will"); PX13037 (C&S) at 003 ("i
am worried  . . . [C&S's retail] affiliates are absolute garbage" "Yeah GU will not get better as
long as they keep raising [prices] and then have nothing to make the stores unique.").
[450] Winn Hrg. 1200:5-10, 1225:8-21; PX3107 (C&S) at 009.
[451] McGowan Hrg. 992:22-25; see also PX3517 (C&S) at 003 (As of November 2023, "All retail
location ███████████████" on net sales, with ████████████ seeing sales declines
versus FY2023; "All stores below budgeted EBITDA. 7 stores with negative EBITDA.").

PLS' PROPOSED FOF AND COL

approximately 2,500%,[452] in states where C&S does not currently have retail stores.[453]  C&S's retail stores today are smaller and offer fewer services than the divestiture stores.[454]  C&S's retail services (representing less than 0.5% of its revenue) are provided to small independents with fewer needs than those stores in the divestiture package and C&S also franchises stores—however, providing retail and franchise services is fundamentally different than owning and operating stores, as they do not involve operating stores or interacting with customers.[455]

126.    Plaintiffs' expert in retail operations and consumer shopping behavior, Dr. Edward Fox, identified challenges C&S will need to overcome to compete effectively.[456]  Dr. Fox testified C&S will face numerous substantial challenges in attracting and retaining customers to the divestiture stores, including rebannering execution risks (including the need to use banners with limited consumer awareness), disadvantages in competing with retained Kroger-Albertsons stores, lack of private label programs comparable in scale or scope to those the divested stores offer today, and challenges in developing new marketing capabilities not conveyed in the divestiture, including a loyalty program and retail media network.[457]

127.    ***Rebannering***.  Banners with strong brand equity and popular private label brands are keys to a successful retail grocery operation.[458]  Consumer familiarity is a key component of brand equity and it is challenging to introduce new retail banners.[459]  C&S previously failed to successfully operate stores after rebannering them to a new banner called Southern Family

---

[452] *Compare* Winn Hrg. 1173:24-25 *with id.* 1232:20-22.
[453] Winn Hrg. 1170:18-25.
[454] Winn Hrg. 1174:15-21.
[455] Winn Hrg. 1212:11-23, 1260:19-1261:2, 1261:14-1262:6, 1263:19-21; Fox Hrg. 1325:7-20.
[456] See generally PX7002 (Fox Rpt.) ¶¶ 25-32.
[457] Fox Hrg. 1289:5-1290:1, 1293:15-1294:12, 1307:22-1308:8, 1321:23-1322:24.
[458] PX7002 (Fox Rpt.) ¶¶ 26, 34, 38, 40, 75-76, 79; Knopf Hrg. 960:25-962:13; 962:22-963:7.
[459] McGowan Hrg. 1027:20-1028:10; PX7002 (Fox Rpt.) ¶¶ 58-66; Knopf Hrg. 960:25-961:18.

PLS' PROPOSED FOF AND COL

Markets in 2005, and by November 2006, only 56 Southern Family Markets locations remained out of the 105 stores C&S had acquired, "after waves of closures and store sales."[460]  C&S rebannering Tops stores to Grand Union in 2022 also contributed to sales declines.[461]  Other supermarkets have also experienced significant challenges rebannering stores.[462]

128.    There is no precedent for the rebannering C&S will be forced to undertake.[463]  The stores in the divestiture package use 16 different banners,[464] but almost half will have to be rebannered to one of six acquired or licensed banners, most of which are weak or unknown in the regions where C&S plans to use them.[465]  For example, C&S is acquiring the rights to the QFC banner in Oregon, where there are currently only four QFCs.[466]  C&S and its advisors have concluded that QFC is a "████████" and one of Kroger's "worst chains" and have identified challenges to utilizing the banner in geographies where it does not have market awareness.[467]  By contrast, Kroger will use the Fred Meyer, Safeway, and Albertsons banners in Oregon.[468]

129.    C&S is acquiring 129 stores that will have to change to banners that currently have no presence in the area where the divested store is located.[469]  Even in states where it is getting rights to use a banner with some existing presence, C&S's advisors have warned that it is getting

---

[460] PX7002 (Fox Rpt.) ¶¶ 15-16; Winn Hrg. 1162:16-1163:4.

[461] Winn Hrg. 1175:1-6.

[462] *See, e.g.*, Van Helden Hrg. 201:25-202:21, 203:8-204:11; PX7002 (Fox Rpt.) ¶¶ 58-66.

[463] Florenz Hrg. 1092:9-12.

[464] PX7004 (Hill Rpt.) ¶ 221.

[465] Fox Hrg. 1296:11-23; PX7002 (Fox Rpt.) ¶ 63, Fig. 14; Florenz Hrg. 1097:9-1098:5, 1098:25-1099:17, 1100:1-1101:18; PX3699.

[466] McGowan Hrg. 1032:19-1033:3.

[467] PX3406 (C&S) at 008; PX3699 (C&S) at 002; Florenz Hrg. 1096:18-1099:12 (C&S real estate consultant Consolidated Affiliates advised against acquiring QFC and Mariano's stores, which are included in the divestiture); Fox Hrg. at 1297:2-19; PX7002 (Fox Rpt.) ¶ 63 n.177.

[468] McGowan Hrg. 1032:19-1033:3.

[469] Fox Hrg. 1296:11-23; PX7002 (Fox Rpt.) ¶ 63, Fig. 14.

PLS' PROPOSED FOF AND COL

a "relatively weak" banner, including the ██████████████.[470]  C&S previously

wrote to the California Attorney General's office that rebannering "can result in permanent sales

declines at the re-bannered store" and that receiving "exclusive rights on a nationwide basis to

certain banners owned by Albertsons, including Safeway, Carrs, Vons, Tom Thumb, and Jewel-

Osco" "would substantially reduce execution risk for C&S in running the divested stores."[471]

C&S is only receiving one of those banners—Carrs (currently used only in Alaska)—on a

nationwide basis.[472]  As such, C&S's CEO testified that rebannering stores is an execution risk

and that acquiring additional banners would have reduced execution risk.[473]  Moreover, it is

difficult to effectively operate—let alone rebanner to a new banner—stores when Kroger will

remain in the same markets.[474]  Rebannered stores will see a significant drop in sales—C&S

projects an annual ██████ million sales decrease and ██████ million EBIDTA decrease.[475]

130.    C&S also faces risk of customer irritation prior to the rebannering—a customer might

receive different advertisements and different prices for the same banner in the same geographic

area from Kroger and C&S, which could cause customer irritation if the C&S store does not have

the same promotional products, selection, or pricing as the Kroger-owned store.[476]

131.    ***Private labels.***  Supermarkets typically offer private label products that contribute to their

competitiveness.[477]  Private label products emulate the key characteristics of the equivalent

---

[470] PX3406 (C&S) at 008.
[471] PX3068 (C&S) at 002-003; Winn Hrg. 1181:1-12.
[472] Fox Hrg. 1294:13-24; Winn Hrg. 1181:1-12.
[473] Winn Hrg. 1178:13-1179:11.
[474] Knopf Hrg. 965:8-966:2; Fox Hrg. 1293:15-1294:12, 1300:9-1302:16.
[475] DX1058 (C&S) at 051; Florenz Hrg. 1092:13-1094:11; PX3602 at tab "Total Detail Working Tab," columns BS-BU; PX3636 (Bain) at tab "Survey response summary".  These figures account for C&S's "endorsement" rebannering strategy.
[476] Florenz Hrg. 1147:11-25; Fox Hrg. 1297:23-1300:12; PX7002 (Fox Rpt.) ¶¶ 67-70.
[477] Van Helden Hrg. 167:5-168:1; Kammeyer Hrg. 478:6-479:4.

PLS' PROPOSED FOF AND COL

national brand but are offered to customers at a lower price.[478]  Often, the private label product

will carry the retailer's trade name or another exclusive name, and thus can help differentiate the

banner and drive customer loyalty, because a store's private label products are—in many

instances—not available at other retailers.[479]  Private label products are also typically more

profitable to the supermarket than the sale of the equivalent national brand,[480] and they form a

substantial portion—often 25-30%—of supermarkets' sales.[481]

132.    Defendants' banners derive brand equity from their respective private label offerings,

including national brand equivalents, value-priced brands, and specialty brands with a focus on

natural and organic foods.[482]  Even though C&S wanted to buy Albertsons' national brand

equivalent private label brands Signature and O Organic to "substantially reduce execution

risk,"[483] the divestiture package includes just five niche brands (Open Nature, Waterfront Bistro,

Debi Lilly Design, Ready Meals, and Primo Taglio) that together account for only 15% of

Albertsons' private label revenues.[484]  C&S's CEO testified that not receiving a full portfolio of

private brands from Defendants is an execution risk.[485]  C&S is only receiving a temporary

supply arrangement for Signature and O-Organics, which comprise ▮ of Albertsons' private

label sales.[486]  After two years, C&S will have to pay a markup for these products and the TSA

for these products expires after four years total.[487]  C&S is not acquiring ownership of any

---

[478] Van Helden Hrg. 167:5-168:1; Fox Hrg. 1305:15-1307:21.
[479] Kammeyer Hrg. 478:6-11; Van Helden Hrg. 167:5-168:1; Fox Hrg. 1305:15-1306:10.
[480] Kammeyer Hrg. 478:12-21; Fox Hrg. 1308:13-22; Van Helden Hrg. 181:3-182:2.
[481] Van Helden Hrg. 168:5-8; Fox Hrg. 1306:11-1307:11.
[482] Fox Hrg. 1305:15-1307:11; PX7002 (Fox Rpt.) ¶¶ 78, 83, Figs. 17-18, 85, Fig. 20, 100-01.
[483] PX3068 (C&S) at 002-003; Winn Hrg. 1188:13-21.
[484] PX7002 (Fox Rpt.) Fig. 23; Winn Hrg. 1182:20-1183:4; McGowan Hrg. 1017:1-4; Fox Hrg. 1313:2-7; PX7002 (Fox Rpt.) ¶¶ 89-90, Fig. 23; Galante Hrg. 3198:3-8.
[485] Winn Hrg. 1185:16-19.
[486] PX7002 (Fox Rpt.) ¶ 90, Fig. 23; Winn Hrg. 1188:13-21, 1194:6-13.
[487] Winn Hrg. 1194:6-13.

private label brands used at the Kroger stores and will have to replace all the private label products at the 94 Kroger divested stores.[488]  In some stores, C&S may need to use three different sets of private labels within the first few years (e.g., Kroger private labels, Albertsons Signature and O-Organics private labels, and then C&S's own private labels).[489]

133.    C&S's own private label line is limited, has few fresh items,[490] and, even after years of significant investment will still not match that of either Defendant today.[491]  C&S may need to utilize ███████████████████████████████████████████████████████████ .[492]  C&S today has access to 3,000 non-exclusive private label SKUs and C&S plans to add 2,000-3,000 non-exclusive private label SKUs after acquiring the divested stores, far fewer than the approximately 12,600 SKUs and 14,000 SKUs Kroger and Albertsons offer, respectively.[493]  C&S faces challenges finding the right supplier for private label products and creating customer adoption for new private label products is challenging.[494]  Due to projected higher costs of goods for private label products, C&S models that it will have lower margins on private label products, totaling ███ million annually by year 4, ███ of the total expected annual retail EBITDA.[495]  C&S also likely faces higher private label costs due to a lack of manufacturing assets (unlike Albertsons and Kroger today, which self-manufacture products for the divestiture stores) and inability to make "make versus buy"

---

[488] McGowan Hrg. 1016:6-13; Florenz Hrg. 1156:20-21, 1083:1-20; Fox Hrg. 1310:3-20.
[489] Florenz Hrg. 1082:15-1083:20.
[490] Fox Hrg. 1316:6-16; PX7002 (Fox Rpt.) ¶ 87, Fig. 22; PX7008 (Fox Rebuttal Rpt.) ¶ 54.
[491] Florenz Hrg. 1139:15-21; Winn Hrg. 1183:12-1184:25, 1190:1-14; DX1058 (C&S) at 049 ("To develop a private label program and assortment that will match Sellers' program is going to be a resource-intensive multi-year journey.") (emphasis in original).
[492] DX1058 (C&S) at 049.
[493] DX1058 (C&S) at 007; Winn Hrg. 1185:1-4; PX6154 (Kroger) at 005, PX6153 (Albertsons) at 009; McGowan Hrg. 1014:13-20, 1064:10–1065:9; PX7002 (Fox Rpt.) ¶¶ 83-94.
[494] Winn Hrg. 1185:13-15; Van Helden Hrg. 182:3-184:14.
[495] PX4050 (McGowan (C&S) Dep. 131:3-7, 17-20).

PLS' PROPOSED FOF AND COL

decisions.[496]  C&S's deal model, which assumes no decline in private label sales at the divested stores,[497] is contradicted both by its own consultant's analysis, which indicates customers would decrease shopping at stores if private label brands changed,[498] as well as Stater Bros.' experience where sales dropped 15% in the first year it introduced a new private label.[499]

134.    ***IT stack.***  The information technology ("IT") stack C&S is obtaining does not yet exist and it will exclude models and algorithms relating to pricing, customer loyalty, and marketing (as well as inventory management and forecasting).[500]  Currently the stores operate on four different tech stacks and C&S will have to adapt the Kroger, Harris Teeter, and Albertsons United stores it is acquiring to Albertsons' IT stack and all the Albertsons stores it is acquiring to the Kroger human capital management system.[501]  C&S is receiving a license to critical Albertsons intellectual property that is currently used in the tech stack but will have to replace the intellectual property within five years.[502]  C&S will incur substantial IT costs—including transition costs—totaling approximately over ███ million.[503]

135.    ***Loyalty programs.*** Loyalty programs create more incentive for customers to come back to supermarkets.[504]  But C&S is not getting any rights to Defendants' current loyalty programs

---

[496] PX7002 (Fox Rpt.) ¶¶ 117-120; PX 7008 (Fox Rebuttal Rpt.) ¶ 48; Fox Hrg. 1310:21-1312:6.
[497] Florenz Hrg. 1146:15-21.
[498]  PX3636, tab "Survey response summary"; Fox Hrg. 1316:24-1317:18; PX 7008 (Fox Rebuttal Rpt.) ¶ 51; Florenz Hrg. 1145:15-1146:8.
[499] Van Helden Hrg. 187:24-188:12; PX7002 (Fox Rpt.) ¶ 116
[500] Cosset Hrg. 2442:17-2443:10; Florenz Hrg. 1082:2-10, 1084:23-1085:12; McGowan Hrg. 1009:5-7 (pricing algorithms); Fox Hrg. 1326:5-19; PX7002 (Fox Rpt.) ¶¶ 170-175, Fig. 25; Cosset Hrg. 2471:19-2572:13 (loyalty, e-commerce).
[501] Florenz Hrg. 1156:20-1157:8; Cosset Hrg. 2500:9-13; PX7002 (Fox Rpt.) ¶ 176.
[502] Florenz Hrg. 1084:16-22, 1085:23-1086:3.
[503] PX3602 at Assumptions and CF Impacts tab at line 18; Florenz Hrg. 1138:16-1139:3, 1156:22-1157:8; PX3489 at IS Detailed Summary tab.
[504] Sankaran Hrg. 1750:20-23; Cosset Hrg. 2232:21-2233:24.

PLS' PROPOSED FOF AND COL

for the stores and is only getting raw data for the customers that shopped in the stores.[505]  C&S is

not using its current loyalty programs and instead will have to build a new loyalty program.[506]

After one year under the TSA, customers at the divested stores will no longer be able to use their

current loyalty program with the divested stores, potentially causing customer confusion.[507]

C&S currently has small, limited, loyalty programs at the Piggly Wiggly and Grand Union stores

it owns.[508]  In contrast, Albertsons for U loyalty program has over 41 million members,[509] and

Kroger provides the 60 million families in its loyalty program with over 2 trillion personalized

recommendations each year.[510]  Kroger also has the right to use historical customer data from

customers that shopped at both divested and retained stores and will be able to target geographies

where it will compete with C&S with advertising or promotional offers.[511]

136.     ***Retail media.*** C&S will also have to create a retail media network after the divestiture

because it is not receiving either Defendants' retail media network.[512]  Retail media networks are

important sources of income for supermarkets and suppliers expect supermarkets to offer

them.[513]  Suppliers have made retail media an important part of vendor funding to supermarkets,

which in turn affects supermarkets' cost of goods.[514]  In 2023, Kroger's alternative profit

business delivered $1.3 billion in operating profit—roughly ███ more than C&S's entire annual

---

[505] McGowan Hrg. 1020:24-1021:3; Florenz Hrg. 1083:21-1084:7; PX7002 (Fox Rpt.) ¶¶ 141-143; Fox Hrg. 1323:17-19.
[506] McGowan Hrg. 1065:10-22.
[507] McGowan Hrg. 1021:6-9; Fox Hrg. 1297:23-1298:15, 1299:13-1300:8; PX7002 (Fox Rpt.) ¶¶ 68-69, 141.
[508] McGowan Hrg. 1021:13-21; Fox Hrg. 1324:16-1325:1.
[509] Sankaran Hrg. 1750:14-19.
[510] Cosset Hrg. 2233:11-24
[511] Galante Hrg. 3192:20-23; Fox Hrg. 1300:24-1301:11.
[512] McGowan Hrg. 1022:18-1023:11; PX7002 (Fox Rpt.) ¶¶ 141, 151-153; Fox Hrg. 1323:20-1324:12.
[513] Fox Hrg. 1320:20-1321:22; McGowan Hrg. 1023:2-4.
[514] Fox Hrg. 1320:20-1322:24; Aitken Hrg. 1829:8-12.

EBIDTA—and Kroger's retail media alone generated ███ million in 2022.[515]  By contrast, C&S only expects to earn ████████████ and expects it to take three years to build mature retail media capability.[516]  C&S's lack of retail media capabilities threatens its vendor funding and is another indicator of its subpar capabilities—compared to Kroger—post-divestiture.[517]

137.    ***E-commerce.*** E-commerce programs are also an important part of supermarkets' competitiveness.[518]  But C&S is not acquiring any e-commerce assets or programs in the divestiture.[519]  C&S has struggled with these assets—Grand Union's e-commerce volumes fell by roughly ███ during C&S's first two years of ownership, with weekly volumes of just ████ ██████████████████████████████████████.[520]

138.    ***Pharmacy and fuel services.***  C&S would also receive 147 fuel centers and 492 pharmacies in the divestiture.[521]  C&S operates only one pharmacy today and has one full-time corporate retail pharmacy employee.[522]  C&S operates no fuel centers today.[523]  Pharmacy and fuel services combined generate approximately ███ of the revenue of the divested stores today.[524]  Pharmacy and fuel services are valuable because they can be used to cross-promote grocery offerings in supermarket loyalty programs, and because pharmacy customers spend more in stores than non-pharmacy customers and are more loyal.[525]  But pharmacy is a very difficult

---

[515] Cosset Hrg. 2474:15-18; 2493:10-16; PX11188 (Kroger); DX2628 (C&S) at 005.
[516] PX4050 (McGowan (C&S) Dep. at 103:10-16); McGowan Hrg. 1023:16-19; Fox Hrg. 1324:16-1325:6.
[517] Fox Hrg. 1326:21-1327:11; Galante Hrg. 3196:21-3197:8.
[518] Sankaran Hrg. 1751:6-9. Cosset Hrg. 2253:15-23.
[519] McGowan Hrg. 1012:7-24.
[520] McGowan Hrg. 1012:25–1013:4, 1013:22–1014:3; PX4050 (McGowan (C&S) Dep. at 51:23–52:4).
[521] PX7002 (Fox Rpt.) ¶ 195.
[522] McGowan Hrg. 1019:20-1020:11
[523] McGowan Hrg. 1020:12-18
[524] PX7008 (Fox Rebuttal Rpt.) ¶¶ 23-24.
[525] Fox Hrg. 1319:22-1320:3; Morris Hrg. 1988:2-7.

PLS' PROPOSED FOF AND COL

business to be profitable in.[526]

139.    ***Sword/Shield.***  Although there is significant evidence of the execution risks associated with C&S's acquisition of the divestiture package, Defendants and C&S have blocked full discovery into those risks by claiming privilege over documents and testimony regarding the divestiture negotiations.  Defendants and C&S instructed 16 witnesses—including key negotiators and 30(b)(6) designees—not to answer questions in depositions regarding divestiture negotiations.[527]  At the hearing, Defendants asserted privilege over similar questions.[528]

> ii.    *C&S projects sales will decline, even though its deal model fails to account for many risks associated with the divestiture*

140.    C&S's own deal model—"management's best estimate" of what will occur[529]—shows it expects substantial loss in revenues and increases in expenditures as compared to the pre-acquisition performance of the divested stores.[530]  Defendants' expert Mr. Galante acknowledged the deal model identifies "large risks" and projects both "significant declines in sales" and "margin erosion."[531]  C&S's primary consultant, Bain, did not design or verify C&S's deal model.[532]  Mr. Galante claims to have analyzed the deal model but admitted he "would never second guess management's decisions and judgment."[533]  C&S's deal model is still overly optimistic and fails to account for substantial risks C&S will face in operating the divestiture

---

[526] Sankaran Hrg. 1750:9-13.
[527] Sword/Shield Motion at 1.
[528] Winn Hrg. 1179:12-25, 1185:20-25; Cossett Hrg. 2479:23-2480:3.
[529] Galante Hrg. 3202:4-8.
[530] PX3602 (C&S) at tab "Assumptions and CF Impacts"; Florenz Hrg. 1108:20-1109:5; 1112:7-9, 1113:9-11, 1116:8-11 (predicting below-market sales growth for most stores for four years after the divestiture); 1113:18-1114:2 (confirming deal model projects loss of sales volume in some regions); 1116:16-22 (C&S projects 4-wall retail EBITDA to decline over the first three years post-divestiture); 1118:17-20 (C&S projects 4-wall retail EBITDA not to return to pre-divestiture levels until year 11 post-divestiture).
[531] Galante Hrg. 3185:23-3186:6, 3191:25-3192:5.
[532] Galante Hrg. 3205:3-6.
[533] Galante Hrg. 3218:7-12.

PLS' PROPOSED FOF AND COL

assets,[534] including risks of:

- Additional sales losses from introducing a new banner into a geography;[535]

- Sales losses due to "worst case" rebannering scenarios calculated by Bain;[536]

- Sales losses due to needing to rebanner stores twice where C&S plans to utilize the "endorsement" or "variant" concept against the advice of consultants;[537]

- Sales losses from losing access to 100% of Kroger private label brands and brands comprising 85% of Albertsons private label sales;[538]

- Erosion of vendor funding levels;[539]

- Erosion of pharmacy and fuel services sales due to C&S's inexperience;[540] and

- Sales losses from need to establish new e-commerce platforms and loyalty programs.[541]

### iii.    C&S will struggle to acquire the necessary talent

141.    C&S plans to staff both the transferred stores and its new retail corporate operations with 67,000 employees transferred from Kroger and Albertsons,[542] but it is unlikely to be fully staffed on the closing date.  No union has consented to C&S assuming any of the over 100 collective bargaining agreements covering union workers affected by the divestiture and no union currently

---

[534] *See, e.g.*, PX7002 (Fox Rpt.) ¶¶ 27-32; PX7011 (Yeater Rebuttal Rpt.) ¶ 151-152; PX7008 (Fox Rebuttal Rpt.) ¶¶ 22-25. Florenz Hrg. 1114:3-17; 1115:4-8, 1142:4-1146:21.
[535] Florenz Hrg. 1144:18-1145:14; PX7002 (Fox Rpt.) ¶¶ 63, 66, Fig. 14; PX7008 (Fox Rebuttal Rpt.) ¶ 35
[536] PX7011 (Yeater Rebuttal Rpt.) ¶169, Fig. 12 (noting Bain's worst-case scenarios leads to ▮ divestiture stores having negative 4-wall EBITDA by year 4); Florenz Hrg. 1144:8-13; PX7002 (Fox Rpt.) ¶ 29.
[537] PX7008 (Fox Rebuttal Rpt.) ¶ 32; Galante Hrg. 3204:14-17 (acknowledging Bain advised against using endorsement concept).
[538] Florenz Hrg. 1146:15-21; PX7011 (Yeater Rebuttal Rpt.) ¶¶ 162-164 (noting Bain's calculations of private label sales impacts would imply a private label "detriment" of ▮); PX7008 (Fox Rebuttal Rpt.) ¶¶ 48-51, 53-57.
[539] Galante Hrg. 3196:21-3197:8 (acknowledging Bain identified risk relating to vendor funding); McGowan Hrg. 1025:16-19; PX7011 (Yeater Rebuttal Rpt.) ¶¶151-152; PX7008 (Fox Rebuttal Rpt.) ¶ 25.
[540] Florenz Hrg. 1111:6-11; McGowan Hrg. 1019:20-1020:18; PX7011 (Yeater Rebuttal Rpt.) ¶¶151-152; PX7008 (Fox Rebuttal Rpt.) ¶¶ 23-24.
[541] Florenz Hrg. 1142:8-16; PX7008 (Fox Rebuttal Rpt.) ¶¶44-46.
[542] Winn Hrg. 1244:3-7.

PLS' PROPOSED FOF AND COL

supports the acquisition or divestiture.[543]

142.    The loss of skilled workers will be heightened in Southern California, where CBAs include "bumping" rights that permit a more senior employee of a divested store to transfer to a retained Kroger store, claiming the position of a less senior employee of a retained store.[544] Bumping provisions could be a risk to C&S acquiring enough talent to succeed.[545]

143.    Unions have informed C&S they may advise their members to exercise bumping rights to not go work for C&S, and in some cases have already recommended that members exercise their bumping rights (and expects those members to exercise those rights) to transfer to a retained Kroger store.[546]  The union membership in Southern California has "a very strong memory of what happened in" the Haggen divestiture and has done research on C&S, concluding "[i]t's hard to imagine how they will be able to successfully compete" or "survive."[547]

144.    At the corporate level, only certain employees—not a full management team—will be made available for employment with C&S,[548] and Kroger has to approve any C&S request for subject matter experts and district resource employees.[549]  Albertsons' corporate and national teams currently increase Albertsons' competitiveness and include 4,000 to 5,000 employees, but C&S only plans to hire ▮ corporate employees.[550]

> iv.    *C&S is purchasing stores to benefit its wholesale business consistent with C&S's prior retail history and there is a risk of*

---

[543] Winn Hrg. 1265:21-23; Clay Hrg. 718:4-6; 721:8-10.

[544] *See, e.g.*, PX2252 (Albertsons) at 067; Zinder Hrg. 766:22-767:24.

[545]  McGowan Hrg. 1026:7-1027:19; Zinder Hrg. 770:14-21 ("C&S would not have any of the experienced grocery workers if all the senior employees exercised their bumping rights.").

[546] McGowan Hrg. 1027:7-19; Zinder Hrg. 769:1- 25.

[547] Zinder Hrg. 769:1-25, 771:10-772:13 ("We have done research on C&S and their lack of actual retail experience and also their lack of pharmacy experience. . . And C&S just don't have that experience. They have one pharmacy . . .")

[548] Winn Hrg. 1175:16-20.

[549] PX1654A (Kroger) at 111-112.

[550] Sankaran Hrg. 1749:22-1750:5; DX3019 (Kroger) at 001.

PLS' PROPOSED FOF AND COL

*store closures and sales*

145.    In 2021, a C&S quarterly report read, "We do not intend to grow our grocery retailing operations or to operate the retail grocery stores in the long term.  We expect to divest our retail grocery stores as opportunities arise."[551]  After agreeing to buy divestiture stores in 2023, C&S's annual report stated that "[f]rom time to time, we may acquire retail store locations in connection with strategic transactions to maintain or expand our grocery wholesaling and distribution business."[552]  Consistent with these statements, C&S has evaluated the divestiture for its wholesaling benefits.[553]

146.    C&S's internal correspondence also indicate a lack of commitment to operating all of the stores it is acquiring long-term.  In response to a consultant suggesting the potential of C&S selling divestiture stores to wholesale customers, Ms. Florenz responded: "Yes just careful with FTC . . . we want to say we can run them."[554]  A current C&S board member and C&S's then-CEO, in a call with C&S's current CEO Mr. Winn, also asked: "Do we have to say that we won't close stores? (the 'all' is a problem) – the trick is that they stay open as they transition but then what? Are we committed to this?"[555]  Mr. Winn circulated wholesale customer talking points before the initial divestiture agreement was announced previewing a future willingness to sell stores: "If asked if we would sell . . . at this point that isn't something we can discuss, but we have always viewed you as a potential partner in that regard and we definitely want to support your growth" and "[w]e are committed to being a much larger wholesaler than retailer so we are focused on excellence in being a wholesaler and growing our wholesale business."[556]

---

[551] PX3077 (C&S) at 036-037.
[552] PX3948 (C&S) at 011; Winn Hrg. 1268:2-12.
[553] McGowan Hrg. 1049:3-19; Florenz Hrg. 1122:13-1123:12.
[554] PX3348 (C&S) at 002; Florenz Hrg. 1120:14-1122:11.
[555] PX3115 (C&S) at 001; Winn Hrg. 1200:11-1202:2.
[556] PX3111 (C&S) at 001; Winn Hrg. 1197:24-1199:12.

147.    Defendants' and C&S's purported commitment not to close stores or layoff frontline staff as a result of the merger is not binding on C&S, and C&S is free to close or sell stores following the divestiture, including for poor performance.[557]  40 stores in the divestiture package are currently unprofitable,[558] and C&S predicts sales will decline across the entire divestiture package in the first year.[559]  C&S's deal model assumptions would result in an additional ▮▮ stores having negative 4-wall EBITDA by Year 4.[560]  Applying Bain's worst-case rebannering scenarios to the divested stores would result in ▮ stores having negative 4-wall EBITDA by the time rebannering is complete.[561]  Finally, further adjusting C&S's assumptions regarding fixed and variable costs would lead to ▮ stores having a negative 4-wall EBITDA by the time rebannering is complete.[562]  In Alaska, C&S is receiving union stores that "have a $7 to $9 per hour [labor cost] disadvantage" to Defendants' retained non-union stores and an underfunded $80 million pension liability, leading UFCW Local Union 555 president Dan Clay to testify "I don't know how [C&S] could compete in that environment," meaning those stores are at risk.[563]

*v.    The divestiture purchase price is low*

148.    C&S admits the divestiture purchase price is low compared to the revenues and profit Kroger and Albertsons currently earn from these assets, as well as the value of the real estate included.[564]  SoftBank, which will invest in C&S, and Kroger, separately modeled that the

---

[557] Winn Hrg. 1199:15-1200:10; Florenz Hrg. 1119:23-1120:10.
[558] DX2738 (Galante Rpt.) ¶ 80, Fig. 11; Galante Hrg. 3209:24-3210:1.
[559] Florenz Hrg. 1111:12-20.
[560] PX7011 (Yeater Rebuttal Rpt.) ¶¶ 160-161, Fig. 10.
[561] PX7011 (Yeater Rebuttal Rpt.) ¶ 169, Fig. 12.
[562] PX7011 (Yeater Rebuttal Rpt.) ¶¶ 170-176, Fig. 14.
[563] Clay Hrg. 723:22-726:10.
[564] DX2628 (C&S) at 017; Winn Hrg. 1258:13-21; *see also* PX4101 (Davison (SoftBank) Dep. 50:10-51:3); Florenz Hrg. 1119:16-20 (store real estate worth $1.9 billion).

PLS' PROPOSED FOF AND COL

acquisition would still be profitable even if C&S lost significant sales at the divestiture stores.[565]

Mr. Galante opines that the divestiture is attractive for C&S, even if it generates less revenues

and requires more expenditures than projected, because it will generate free cash flow and will

help C&S expand its wholesale distribution network and product offerings.[566]  The financial

projections show that C&S will be able to recoup its investment and generate wholesaling

profits, regardless of whether all its purchased stores compete successfully with Defendants.[567]

### vi.    Supermarket divestitures are inherently risky

149.    In addition to the failed *Price Chopper/Tops* divestiture to C&S, other supermarket

divestiture remedies have likewise failed to maintain competition, demonstrating the risk

inherent in such transactions.[568]  In the Albertsons/Safeway divestitures in 2015, 168

supermarkets were divested to four buyers, but most of those stores were closed, sold, or

reacquired by Albertsons within just a few years.[569]  Haggen failed in its attempt to expand from

a regional operator of supermarkets to a multi-regional operation through acquisition of 146

divested stores.[570]  Three wholesalers also acquired supermarkets—Associated Wholesale

Grocers (AWG), SuperValu, and Associated Food Stores—but many of those stores likewise

---

[565] PX3776 (SoftBank) at 018; PX4101 (Davison (SoftBank) Dep. 61:13-62:2); PX4029 (Millerchip (Kroger) IH 64:21-67:19, 69:11-24) (". . . based on the business that those stores represent today and taking some sensitivity around what if sales were significantly lower, what if margins were significantly compressed . . we got very comfortable in our mind that they would – there was significant margin for error. . .").
[566] DX2738 (Galante Rpt.) ¶¶ 42-43, 60, 174-175, Figs. 4, 28.
[567] *See* PX3776 (SoftBank) at 018; PX4101 (Davison (SoftBank) Dep. 61:18-62:2); Florenz Hrg. 1122:13-1123:12; PX3602 at tab "Model".
[568] Hill Hrg. 1486:19-1491:11; PX7004 (Hill Rpt.) ¶¶ 224-240, Figs. 56-57; PX7006 (Hill Rebuttal Rpt.) ¶¶ 146-150, Fig. 29.
[569] PX7004 (Hill Rpt.) ¶¶ 231-240, Fig. 57; Hill Hrg. 1486:19-1489:2.
[570] PX7004 (Hill Rpt.) ¶¶ 235-236; Van Helden Hrg. 208:5-13; Zinder Hrg. 765:4-24, 766:19-768:25.

experienced high failure rates.[571]  AWG partnered with a regional retailer (Minyards) to acquire

and operate a dozen divested Albertsons/Safeway stores in Texas, but those stores struggled to

retain sales upon rebannering and faced significant competition from the retained

Albertsons/Safeway stores.[572]  The AWG/Minyard stores failed within a few years, with several

being reacquired by Albertsons.[573]  In total, 95 of the 168 stores were either closed or reacquired

by Albertsons.[574]  The closure rate of divested stores was significantly higher (by a factor of 7-

8x) than the closure rate of retained stores over the same period.[575]

150.    The Ahold/Delhaize merger in 2016 resulted in 81 supermarkets divested to seven

buyers, but the divested stores again experienced a high closure rate (24 stores, or 30% of the

total) after a few years.[576]  Among the failed divestiture buyers was another wholesaler that

"experienced a steep decline in sales" at the 18 supermarkets it acquired, which were closed (or

sold back to Ahold) within a few years.[577]  The closure rate of the stores was again significantly

higher (by a factor of 5-6x) than the failure rate of retained stores over the same period.[578]

151.    The Albertsons/American Stores merger in 1999 resulted in failed divestitures, including

the failed divestiture of 27 supermarkets in Nevada and Arizona to Raley's.[579]  Raley's struggled

after rebannering, especially since the seller had remained in the market as a competitor with

---

[571] PX7004 (Hill Rpt.) ¶¶ 232, 237-240, Fig. 57.

[572] PX7004 (Hill Rpt.) ¶¶ 237-238.

[573] PX7004 (Hill Rpt.) ¶ 238.

[574] PX7004 (Hill Rpt.) ¶ 239-240, Fig. 57.

[575] PX7004 (Hill Rpt.) at Fig. 57; Hill Hrg. 1486:19-1489:2.

[576] PX7006 (Hill Rebuttal Rpt.) ¶¶ 148-150, Fig. 28-29; Hill Hrg. 1489:3-11.

[577] Application for Approval, In the Matter of Koninklijke Ahold N.V. and Delhaize Group, NV/SA, FTC Dkt. No. C-4588, at 005, https://www.ftc.gov/system/files/documents/cases/c4588_ahold_delhaize_application_filed_by_s upervalu_to_sell_supervalu_assets_to_giant_public.pdf.

[578] PX7006 (Hill Rebuttal Rep.) ¶¶ 149-150, Fig. 29; Hill Hrg. 1489:3-11.

[579] Knopf Hrg. 959:13-960:24.

PLS' PROPOSED FOF AND COL

retained assets and brand names.[580]  Within a few years, Raley's sold the New Mexico stores

back to Albertsons, and sold the Nevada stores to Kroger.[581]

<em>vii.    An imperfect divestiture increases likely consumer harm</em>

152.    Dr. Hill, who concluded that a *perfect* divestiture would not remedy the acquisition's

anticompetitive effects, found that an imperfect divestiture considerably compounds the amount

of likely consumer harm.  For instance, a 30% sales decline at divested stores—roughly the size

of the drop-off C&S experienced at the divested stores it acquired and then rebannered in the

Tops/Price Chopper merger—results in 1,276 presumptively illegal supermarket markets with

$53 billion in annual sales at the focal stores.[582]  Closure of 30% of the divested stores—akin to

the experience of stores divested in the Ahold/Delhaize merger—yields 1,410 presumptively

illegal supermarket markets with $56 billion in annual focal store sales.[583]

### 4.    The divestiture fails to mitigate a substantial lessening of competition for union grocery labor markets

153.    C&S will be too small for unions to credibly leverage against a combined Kroger and

Albertsons.  *See* § IV.C, *supra*.  C&S would be a "minor" union grocery employer post-

divestiture that would not constrain the much larger Kroger.[584]  Unions benefit today from

negotiating against two large employers with a similar size, scope, and regional density (Kroger

and Albertsons).[585]  Unions can play off competing employers to obtain concessions only where

---

[580] Knopf Hrg. 959:13-963:16.  Mr. Knopf testified that Raley's acquired Bashas stores in 2021 only because it was an acquisition of the entire business organization and company (including all stores, banners, and executive team), and Raley's would not have done the transaction if the seller had retained stores and continued to compete in those markets against Raley's, since the incumbent would have had better real estate, store positioning, knowledge of the market, and knowledge of the customer.  *Id.* at 960:25-966:7.

[581] Knopf Hrg. 960:7-11.

[582] PX7006 (Hill Rebuttal Rpt.) ¶¶ 152-154, Fig. 51 (Appendix E).

[583] PX7006 (Hill Rebuttal Rpt.) ¶¶ 155-57, Fig. 52 (Appendix E).

[584] *See* Zinder Hrg. 772:19-775:11.

[585] *See* Zinder Hrg. 755:13-756:15, 758:5-758:25.

the employers are of comparable size.[586]  In Washington, Oregon, and Southern California, for

instance, post-divestiture C&S will be significantly smaller than either Defendant is today.[587]

154.    Although C&S has agreed to assume current CBAs, some of those agreements expire

within a year.[588]  C&S has been criticized as "anti-union" for its past activity, including by

moving distribution from union warehouses to non-union warehouses.[589]

### C.  Albertsons Is a Fierce Competitor and Will Continue to Be

155.    Albertsons is "a financially sound company" and is "not in trouble."[590]  It holds the

number one or number two position by market share in 70% of the metropolitan statistical areas

in which it operates.[591]  Compared to 2019, when its CEO Mr. Sankaran joined the company,

Albertsons is doing better as a company, including on its balance sheet, growth performance, and

capabilities (including e-commerce).[592]  Only one month before the acquisition was announced,

Albertsons was "the top beneficiary of Kroger [share of wallet] losses" and was "catching up to

Kroger on share of wallet."[593]  Since its latest initial public offering in 2020, Albertsons' total

stockholder return has exceeded the S&P 500 and S&P 500 Retail Composite.[594]

156.    Albertsons continues to invest in its company, including $5 billion from 2020-22, with

40% of that investment going into Albertsons' stores.[595]  Albertsons' investments have paid off

with consistent growth, including a 3% increase in identical store sales in 2023, leading

---

[586] *See* Zinder Hrg. 756:22-757:15.
[587] PX7004 (Hill Rpt.) ¶ 276, Fig. 65.
[588] McPherson Hrg. 668:3-17.
[589] Winn Hrg. 1164:24-1165:14.
[590] Sankaran Hrg. 1727:1-13.
[591] Sankaran Hrg. 1745:3-7; PX6153 (Albertsons) at 008.
[592] Sankaran Hrg. 1769:4-13.
[593] Kinney Hrg. 3031:15-3032:12; PX12107 (Albertsons) at 001.
[594] PX6153 (Albertsons) at 035.
[595] Sankaran Hrg. 1779:2-20; *see also* PX6077 (Albertsons) at 002.

PLS' PROPOSED FOF AND COL

Albertsons to tell investors it was pleased with its 2023 financial results.[596]

157.    Albertsons paid a $4 billion dividend to shareholders in January 2023 after agreeing to the acquisition.[597]  In statements to Congress, Mr. Sankaran said that "the dividend does not affect any of our future plans to invest in our stores, our capabilities, and our employees."[598]  Mr. Sankaran told Congress that Albertsons has "ample resources" "to meet our needs, pay our employees, and compete effectively," and "every intention, and the financial wherewithal, to continue to make these investments regardless of whether the merger is consummated."[599]

158.    Albertsons' future is bright: Mr. Sankaran believes its sales can increase from $79 billion in 2023 to ███ billion by 2026, and has outlined a plan to do so.[600]  Albertsons identified no ordinary course documents or concrete plans to lay off workers, close stores, or exit markets absent the acquisition.[601]

### D.  Entry or Expansion Is Unlikely to Be Timely or Sufficient to Prevent a Loss of Competition

159.    Would-be entrants into the supermarket space face significant barriers to entry.  Building new supermarkets is expensive.[602]  Even a single new store commonly costs tens of millions of dollars to build.[603]  A prospective entrant also needs a distribution system that can deliver products to the new store in a cost-efficient manner.[604]  Finally, opening a supermarket is a time-consuming multi-step process that can take anywhere from 2 to 11 years.[605]

---

[596] Sankaran Hrg. 1787:23-1788:3.
[597] Sankaran Hrg. 1772:7-10.
[598] Sankaran Hrg. 1774:10-18, 1775:16-1776:4; PX6077 (Albertsons) at 004.
[599] Sankaran Hrg. 1776:1-18; PX6077 (Albertsons) at 004.
[600] PX12428 (Albertsons) at 002-005.
[601] Sankaran Hrg. 1776:19-1777:15; 1780:6-1781:9.
[602] Van Helden Hrg. 190:10-12 (building new store costs about $20 million).
[603] Van Helden Hrg. 190:10-12; Curry Hrg. 874:16-19; Sankaran Hrg. 1783:3-10.
[604] Van Helden Hrg. 190:13-25.
[605] Sankaran Hrg. 1782:24-1783:2; Van Helden Hrg. 189:21-190:1; Curry Hrg. 873:23-874:15.

PLS' PROPOSED FOF AND COL

### E.  Efficiencies Do Not Outweigh Likely Competitive Harm

160.    Defendants failed to establish that most of their claimed efficiencies are cognizable under the Merger Guidelines.[606]  Defendants' own efficiencies expert, Mr. Rajiv Gokhale, concluded that only between ███████████████ of efficiencies (less than half of Kroger's estimated "synergies") are merger-specific and verifiable.[607]  But even this figure drastically overstates cognizable efficiencies.  First, Defendants have not independently demonstrated, using reliable methodologies, assumptions, and data that their efficiency claims are verifiable.[608]  Second, Defendants do not substantiate why this acquisition is necessary to achieve these purported efficiencies.[609]  Finally, Defendants failed to establish that their claimed efficiencies would benefit consumers and outweigh the competitive harm from the acquisition.[610]

161.    A proper analysis shows that only ██████ of Defendants' expert's claimed efficiencies are verifiable and merger-specific, and thus even potentially cognizable.[611]  But even if Defendants' full claimed synergies of ██████ were cognizable, it amounts to only a small share of the firm's combined costs, and is insufficient to offset the predicted anticompetitive harm to consumers.[612]

#### 1.  *Defendants' claimed incremental revenue and profit synergies are neither cognizable nor cost savings*

162.    Revenue synergies are not equivalent to cost efficiencies as they do not reflect a change

---

[606] Yeater Hrg. 3240:12-25.
[607] Gokhale Hrg. 2151:13-23; DX2736 (Gokhale Rpt.) ¶¶ 13, 24, Tbl. 3.
[608] Yeater Hrg. 3240:12-23, 3248:3-3249:5; PX7011 (Yeater Rebuttal Rpt.) ¶¶ 8-9.
[609] Yeater Hrg. 3240:12-23, 3249:6-22; PX7011 (Yeater Rebuttal Rpt.) ¶¶ 8-9.
[610] Gokhale Hrg. 2144:21-23.
[611] Yeater Hrg. 3250:7-3251:9 (discussing confidential findings from PX7011 (Yeater Rebuttal Rpt.) ¶¶ 9-10); PX7011 (Yeater Rebuttal Rpt.) ¶¶ 8-10.
[612] Yeater Hrg. 3240:12-25, 3272:20-3273:19; PX7006 (Hill Rebuttal Rpt.) ¶¶ 180-182 & n.200; *see also* Hill Hrg. 3388:4-9.

PLS' PROPOSED FOF AND COL

in the company's costs and thus would not offset any competitive harm.[613]

163.     Defendants estimate incremental revenue and profit synergies of ▮▮▮▮▮▮▮ through Merchandising, Alternative Profit, and Health & Wellness synergies.[614]  Mr. Gokhale, however, concluded that none of the Merchandising or Health & Wellness synergies were verifiable.[615]

164.     Defendants' claimed incremental revenues and profits from Alternative Profit are driven primarily by the consolidation of Defendants' customers and related data, including shopper data.[616]  This increase in revenue would arise not from saving costs but rather from: (1) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (2) ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[617]

165.     Mr. Gokhale failed to properly verify these Alternative Profit (e.g., retail media services) synergies because he glossed over a series of unsubstantiated decisions and assumptions, including: his unsupported selection of one of two models prepared by Kroger without justification for his choice;[618] his adoption of Kroger's estimates of incremental revenues and profitability without any discussion;[619] and his unsupported application of Kroger's low-end realization rate.[620]

---

[613] Yeater Hrg. 3244:17-3245:9, 3246:2-9, 3247:6-12; PX7011 (Yeater Rebuttal Rpt.) ¶¶ 14-15, 28.
[614] DX2736 (Gokhale Rpt.) ¶ 9, Tbl. 2.
[615] DX2736 (Gokhale Rpt.) ¶¶ 24, Tbl. 3, 232, 246.
[616] DX2736 (Gokhale Rpt.) ¶ 238.
[617] PX7011 (Yeater Rebuttal Rpt.) ¶ 28.
[618] DX2736 (Gokhale Rpt.) ¶ 239 ("In analyzing incremental revenues and profits, Kroger prepared two cases . . . . I use the latter in this report . . . .").
[619] DX2736 (Gokhale Rpt.) ¶ 241 ("I understand that Kroger's subject-matter experts (based on their experience with Kroger's own initiative and 20 years of data analysis) have estimated the incremental revenues and profitability . . . . As such, the model underlying the Parties' revenue opportunities identifies various assumptions underlying the estimates.").
[620] DX2736 (Gokhale Rpt.) ¶ 241 ("Given that the Parties have, for the most part, used realization rates of 60% to 80% . . . , I apply the low end (60%) . . . .").

PLS' PROPOSED FOF AND COL

166.    These synergies also are not merger-specific, as Albertsons plans to grow its retail media business into a "multi-billion dollar high-margin business" separate from this acquisition.[621]

167.    Lastly, retail media services are also not within the relevant markets and therefore do not address the harm to competition in the relevant markets.[622]

### 2. *Most of Defendants' claimed cost savings have not been verified*

168.    Defendants failed to verify nearly all of their claimed cost savings.  For the majority, Mr. Gokhale merely relied on the work done by Kroger or its consultants and conducted no independent analysis.[623]  As a result, Plaintiffs' efficiencies expert Mr. Aaron Yeater identified a host of Mr. Gokhale's and Kroger's consultants' unsubstantiated assumptions as one reason he could not verify Defendants' claimed efficiencies.[624]

169.    Defendants' National Brand sourcing cost savings claim, the largest component of their efficiency claims, are not verifiable because of several unsupported assumptions.[625]  For example, the calculation of National Brand sourcing efficiencies uses an array of realization rates (to adjust for contingencies) as a key input or assumption for which there is no support.[626]  Plaintiffs' expert, Mr. Yeater, conducted robustness testing and found that the estimated efficiencies were highly sensitive to changes in the assumed realization rate.[627]  Also, Defendants

---

[621] PX12428 (Albertsons) at 005.
[622] Yeater Hrg. 3247:6-13; PX7011 (Yeater Rebuttal Rpt.) ¶ 28.
[623] Yeater Hrg. 3255:3-7, 3261:7-11, 3263:19-3; *see also* DX2736 (Gokhale Rpt.) ¶¶ 76-95 (summarizing Bain's National Brands synergy analysis), ¶¶ 96-98 (adopting Bain's National Brands analysis), ¶¶ 103-109 (summarizing Bain's Own Brand synergy analysis), ¶ 110 (adopting Bain's Own Brand analysis), ¶¶ 112-129 (summarizing Bain's Fresh synergy analysis), ¶¶ 130-132 (adopting Bain's Fresh analysis).
[624] PX7011 (Yeater Rebuttal Rpt.) ¶¶ 38, 49 (National Brands sourcing), ¶¶ 56, 58 (Own Brand sourcing), ¶¶ 68, 71 (Fresh sourcing), ¶¶ 75, 77 (Goods Not For Resale sourcing); Yeater Hrg. 3255:3-7, 3261:7-11, 3263:19-3264:3.
[625] Yeater Hrg. 3255:8-17, 3263:19-25; PX7011 (Yeater Rebuttal Rpt.) ¶ 38.
[626] Yeater Hrg. 3260:15-3261:11; PX7011 (Yeater Rebuttal Rpt.) ¶ 38.d.
[627] Yeater Hrg. 3261:12-3262:1; PX7011 (Yeater Rebuttal Rpt.) ¶ 38.d.

PLS' PROPOSED FOF AND COL

have not established that they would actually manage to achieve these efficiencies when they negotiate prices with their suppliers post-acquisition.[628]  The National Brand sourcing efficiencies estimate is only an opportunity or "the starting point of those negotiations."[629] Defendants will still have to get suppliers to agree to better pricing and trade promotion programs.[630]  Defendants' claim is dependent upon the subjective predictions of the merging parties and is thus not verifiable.[631]  Similarly, the other categories of Defendants' National Brand sourcing cost efficiencies cannot be independently verified because they also rely on unsupported assumptions.[632]

170.    To estimate National Brand sourcing efficiencies, Defendants engaged consultants from Bain to analyze pricing differences between Kroger and Albertsons and utilized a "best-of-both" pricing approach to estimate cost savings.[633]  But Mr. Gokhale failed to explain the reasonableness or robustness of Bain's assumptions driving its cost savings estimates.  For example, the best-of-both pricing approach assumes that the merged entity would get the lower of the two costs between Kroger and Albertsons,[634] but neither Bain nor Mr. Gokhale have established whether, and to what extent, the merged entity would be able to capture price differences in negotiation with suppliers.[635]  Further, Mr. Gokhale relied on interviews of Kroger employees and consultants to support his cost savings estimates, but did not document or even

---

[628] Yeater Hrg. 3262:8-20; PX7011 (Yeater Rebuttal Rpt.) ¶¶ 40-45.
[629] Yeater Hrg. 3262:8-20; PX3471 (Bain) at 003 ███████████████████████████████; PX7011 (Yeater Rebuttal Rpt.) ¶¶ 40-45.
[630] Yeater Hrg. 3262:8-20; Gokhale Hrg. 2167:4-8.
[631] Yeater Hrg. 3263:8-3264:3; PX7011 (Yeater Rebuttal Rpt.) ¶ 49.
[632] PX7011 (Yeater Rebuttal Rpt.) at Section V.A.
[633] Gokhale Hrg. 2166:6-16; PX7011 (Yeater Rebuttal Rpt.) ¶¶ 30-31.
[634] DX2736 (Gokhale Rpt.) ¶ 77.
[635] Yeater Hrg. 3263:19-3264:3; PX7011 (Yeater Rebuttal Rpt.) ¶¶ 9(a), 49.

PLS' PROPOSED FOF AND COL

cite to most of those interviews in his report.[636]  Thus, Defendants have not produced the information necessary for their claimed efficiencies to be independently verified.  Mr. Gokhale has been criticized previously by a district court for lack of independent analysis and relying on similar assumptions and similar methodology in the Aetna/Humana matter.[637]

171.    Defendants' "high end" estimate of Administrative Labor cost savings, estimated at ███

███, is also not verifiable.[638]  Mr. Gokhale relied on a yet-to-be-completed analysis by a consultant to conclude that the claimed efficiency was verifiable.[639]  But this claimed efficiency cannot be independently verified because the consultant's analysis is not yet complete and because it relies on a "proprietary database" whose underlying data was not produced to the Plaintiffs' expert.[640]  In fact, Defendants and their expert did not even have access to the underlying data and assumptions upon which they rely.[641]

172.    Defendants' estimates of efficiencies from Own More Transportation (i.e., managing more of the transportation of goods themselves rather than using vendors) are also not verifiable because their estimate relied on a key, unsupported input.[642]  Defendants' calculation hinges on an unsourced input, prepared by and dependent on the subjective predictions of former Kroger executives.[643]  Similarly, the other claimed Supply Chain and Manufacturing cost efficiencies

---

[636] Gokhale Hrg. 2175:9-25.
[637] Gokhale Hrg. 2169:6-21, 2170:2-8.
[638] Yeater Hrg. 3254:3-3255:2; PX7011 (Yeater Rebuttal Rpt.) ¶¶ 112-116.
[639] DX2736 (Gokhale Rpt.) ¶ 209 ("the parties have decided to delay this exercise until closer to the closing of the transaction").
[640] PX7011 (Yeater Rebuttal Rpt.) ¶¶ 114-115; Yeater Hrg. 3284:19-3285:15; 3309:10-15.
[641] Yeater Hrg. 3284:9 (Defendants' counsel stating that "So, to be clear, we don't have access to the [BCG] data . . . .").
[642] Yeater Hrg. 3269:10-3270:18; *see also* PX7011 (Yeater Rebuttal Rpt.) ¶¶ 94-98.
[643] Yeater Hrg. 3269:10-3270:18 (with the exception of one part of "Ways of Working"); s*ee also* PX7011 (Yeater Rebuttal Rpt.) ¶¶ 94-98.

PLS' PROPOSED FOF AND COL

cannot be independently verified because they rely on unsupported assumptions.[644]

173.    Only ███████ of Defendants' claimed efficiencies are verified and merger-specific.[645]
This includes ███████ of Supply Chain and Manufacturing "Ways of Working" savings from

████████████████████████████████████████████████████████████

███[646]  These ███████ in Supply Chain and Manufacturing estimated savings are the only

verified and merger-specific variable cost savings.[647]  The additional ███████ of the verified

and merger-specific savings result from the elimination of duplicative employees, which are

corporate-level cost Administrative Labor fixed cost savings.[648]

### 3.  *Most of Defendants' claimed cost savings are not merger-specific*

174.    Defendants also failed to establish that the majority of their claimed efficiencies are

merger-specific, meaning that they could not be achieved without the acquisition.

175.    Albertsons is always looking for projects that reduce the cost of doing business.[649]  In

three years, Albertsons has removed $1 billion of costs and plans to cut another ███████ over

the next two years.[650]  Albertsons plans to implement additional cost savings initiatives,

including by hiring the consulting firm McKinsey, reducing cost of goods sold, improving

supply chain, and reducing transportation costs.[651]  Albertsons was also on target to achieve $2.3

---

[644] PX7011 (Yeater Rebuttal Rpt.) at Section V.B.
[645] Yeater Hrg. 3250:7-3251:9 (discussing confidential findings from PX7011 (Yeater Rebuttal Rpt.) ¶¶ 9-10).
[646] PX7011 (Yeater Rebuttal Rpt.) ¶¶ 9.b., 10, 102-105.
[647] PX7011 (Yeater Rebuttal Rpt.) ¶¶ 29, 126.
[648] PX7011 (Yeater Rebuttal Rpt.) ¶¶ 9.c., 10, 109-111.
[649] Sankaran Hrg. 1718:16-22.
[650] Sankaran Hrg. 1783:11-1784:9; PX12428 (Albertsons) at 005 (Albertsons' CEO in memo to board: "line of sight to an additional ██████ of cost take out over the next 2 years").
[651] Sankaran Hrg. 1785:7-13, 1786:19-1787:6; *see also* PX12428 (Albertsons) at 004 (Albertsons plans to "[r]educe COG[S] by further consolidating buying and further nationalizing category management in center store").

PLS' PROPOSED FOF AND COL

billion in savings between fiscal year 2022 and fiscal year 2025.[652]  For its part, Kroger is

engaging in "thousands of things . . . every day to figure out a way to reduce cost" on its own.[653]

176.    Mr. Gokhale failed to consider what cost savings Albertsons could achieve on its own,

did not interview any Albertsons' employees and does not cite to any internal Albertsons'

documents in his report.[654]  For example, in one instance Mr. Gokhale concludes that Albertsons

will obtain cost savings by moving to Kroger's lower price even though he did not analyze

whether Albertsons could obtain the same lower price without the merger.[655]

177.    Further, Mr. Gokhale deems many of the cost savings merger-specific solely based on

"best-of-both" pricing applied by Bain that assumes, without evidence, that the merged firm will

simply be able to demand the lowest price offered to either firm by its suppliers.[656]  Both Kroger

and Albertsons currently have the opportunity to receive the same lowest possible list prices and

have access to the same trade promotion programs.[657]  And Kroger has not discussed post-

merger pricing with any supplier and will not do so until after the merger closes.[658]

178.    Defendants' National Brand sourcing cost efficiency claims, ███████████████

█████████████, relies on a best-of-both pricing approach and are not merger-specific.[659]

The differences in prices (including trade funds) currently paid by Kroger and Albertsons for

national brands are explained by the differences in how Kroger and Albertsons choose to

---

[652] Morris Hrg. 1988:22-1989:2.
[653] McMullen Hrg. 1590:16-1591:16.
[654] Gokhale Hrg. 2176:16-25, 2177:8-25.
[655] *Id.* at 2165:14-17.
[656] Gokhale Hrg. 2176:1-10; PX7011 (Yeater Rebuttal Rpt.) ¶¶ 50-51.
[657] *See* Crane Hrg. 2566:9-21, 2568:13-15; ███████████████ ¶¶ 22, 27; PX7011 (Yeater Rebuttal Rpt.) ¶ 41.a-d.
[658] Maharoof Hrg. 2104:17-22; *see also, e.g.*, Crane Hrg. 2570:13-21.
[659] Yeater Hrg. 3264:16-3265:19; PX7011 (Yeater Rebuttal Rpt.) ¶ 20, Fig. 1.

merchandise and promote their products.[660]  Kroger could today get the Albertsons' price for a given product, if they chose to merchandise and promote that product in the same way that Albertsons does.[661]  But because of limitations in shelf space, the merged firm would not be able to put all products at eye-level, and or on an end cap display, for example, to get the lower or lowest price for all products.[662]  The National Brands sourcing cost efficiency is not merger-specific because Defendants have not demonstrated that to the extent it can even be achieved, that the same savings could not be achieved absent the merger.[663]  Similarly, the other categories of Defendants' sourcing cost efficiencies are not merger-specific because Defendants have not demonstrated that the merger is needed to achieve better pricing from (or that better pricing would even be achieved through negotiations with) suppliers.[664]

179.    Defendants' estimates of efficiencies from Own More Transportation are not merger-specific.[665]  Defendants did not demonstrate that Albertsons could not invest in owning more transportation itself, but rather only that Albertsons has so far chosen not to make the investments.[666]  Indeed, Albertsons recently considered and evaluated opportunities to pursue productivity and reduce costs in transportation.[667]  Kroger has no special knowledge about owning more transportation; in fact, Kroger only started investing in this area "a couple of years ago."[668]  Additionally, Albertsons is still ahead of Kroger in some categories of goods, including

---

[660] Yeater Hrg. 3265:12-3266:1; *see also* Crane Hrg. 2568:16-25.
[661] Yeater Hrg. 3265:12-19; Crane Hrg. 2570:1-9.
[662] Yeater Hrg. 3265:12-3266:1.
[663] *Id.* 3264:16-3268:7; PX7011 (Yeater Rebuttal Rpt.) ¶¶ 33-51.
[664] PX7011 (Yeater Rebuttal Rpt.) at Section V.A.
[665] Yeater Hrg. 3269:5-9; PX7011 (Yeater Rebuttal Rpt.) ¶¶ 94-100.
[666] Yeater Hrg. 3270:23-3272:9.
[667] Sankaran Hrg. 1786:19-1787:6 (discussing PX12428 (Albertsons)).
[668] Yeater Hrg. 3271:6-15.

PLS' PROPOSED FOF AND COL

Fresh.[669]  Similarly, the other categories of Supply Chain and Manufacturing efficiencies are not merger-specific because Defendants have not taken into account what cost savings Albertsons could achieve without the merger.[670]

### 4.  Defendants' claimed efficiencies are not likely to benefit consumers

180.    Defendants failed to establish that claimed efficiencies outweigh potential harm.  Neither Mr. Gokhale nor Dr. Israel analyzed what portion of efficiencies would benefit consumers and offset harm.[671]  Even if the full amount of the claimed efficiencies were credited as cognizable, that amount would be insufficient to offset the predicted anticompetitive harm to consumers.[672]

### 5.  Kroger's non-binding $1 billion price investment is not an efficiency that may be passed through to consumers

181.    As Kroger admits, price investments are not an efficiency.[673]  Rather, Kroger purports to use price investments to lower prices to "strengthen them as a competitor."[674]  But eliminating Albertsons as a competitor will extinguish an important constraint on Kroger that is more powerful, and reliable, than unenforceable promises to make price investments.[675]

182.    Kroger routinely seeks to increase prices but is restrained from doing so by competition. For example, Kroger's pricing strategies incorporate a process to identify "items where we may be priced lower than we need to be compared to our competition" and increase prices on those items to improve gross margins.[676]  When Kroger sees cost increases, Kroger's strategy is to lead

---

[669] Yeater Hrg. 3272:2-6; *see also* PX7011 (Yeater Rebuttal Rpt.) ¶ 100.

[670] PX7011 (Yeater Rebuttal Rpt.) at Section V.B (with one exception of the small category of "Ways of Working").

[671] Gokhale Hrg. 2144:21-23; Israel Hrg. 2715:6-10, 2727:11-25.

[672] PX7006 (Hill Rebuttal Rpt.) ¶¶ 180-182 & n.200; *see also* Hill Hrg. 3388:4-9 (discussing what it means if CMCR values are greater than 5%).

[673] Aitken Hrg. 1892:18-20.

[674] Gokhale Hrg. 2139:18-2140:1.

[675] *See* FOF § III.F, *supra*.

[676] PX1129 (Kroger) at 003; Groff Hrg. 286:11-288:17.  Kroger achieved a $20 million margin improvement in 2020 using this process.  PX1129 (Kroger) at 003; Groff Hrg. 289:2-12.

on cost changes, meaning that Kroger will increase prices and see whether its competitors respond.[677]  If competitors do not respond, Kroger brings prices back down.[678]

183.     Similarly, Kroger's "goal is to pass through th[e] inflation to customers."[679]  In 2021, Kroger sought to "pass through as much inflation as we can," but needed to "watch the impact this has on our spread positioning . . . versus Walmart, Meijer, and [Albertsons]."[680]  In 2021, Kroger's Chief Merchant and Marketing Officer wrote, "Additional price investments not recommended.  We need to pass on as much inflation on as the customer will let us with spreads being a key guardrail for us."[681]  When Kroger stores are in areas with little to no competition, Kroger has taken the opportunity to profitably increase prices for that "no competition" zone.[682]

> ### i.    Evidence from Kroger's prior mergers does not demonstrate that price investments occurred following those mergers

184.     Evidence from Kroger's prior mergers does not demonstrate that price investments have occurred following those mergers.[683]  While Harris Teeter's gross margin declined from 2014 to 2021 following its acquisition by Kroger, erosions of gross margin can occur for a number of reasons and do not prove that price investments have been made.[684]  Gross margins may decline because: (1) prices have increased at a rate slower than cost of goods sold increased, (2) of changes in the allocation of products on shelves, or (3) of changes in purchasing behavior and the mix of products purchased.[685]  Indeed, following the Harris Teeter transaction, Kroger performed an analysis and concluded that the expected price investments had not been made

---

[677] Groff Hrg. 289:14-22.
[678] *Id.*
[679] *Id.* at 289:17.
[680] PX11337 (Kroger) at 001; Groff Hrg. 291:15-292:7.
[681] PX1254 (Kroger) at 001; Aitken Hrg. 1855:20-1857:11.
[682] Groff Hrg. 294:17-295:14.
[683] Yeater Hrg. 3240:12-21, 3241:1-3243:14, 3275:7-25.
[684] Yeater Hrg. 3241:18-3242:13.
[685] *Id.* at 3241:25-3242:10.

PLS' PROPOSED FOF AND COL

because Harris Teeter operated autonomously from Kroger and made decisions counter to management expectations.[686]  Similarly, following Kroger's 2015 acquisition of Roundy's, there was an erosion of gross margin that fell short of what was budgeted.[687]

*ii.    Purported price investments will not offset harm*

185.    Defendants plan to make price investments only at certain Albertsons stores, which will not benefit Kroger customers harmed by the acquisition.[688]  Kroger pricing executives agreed that post-merger price investments could be offset by less aggressive promotions so that Kroger can ███████████████████████████████████████████████[689]  Kroger's price investments also do not address non-price harm that could occur.[690]

186.    Defendants also have not shown that the promised price investment is incremental to what Albertsons is investing today.  Albertsons makes price investments "all the time" in "many, many markets" to compete.[691]  Albertsons does not track these investments because it is "trying to adjust pricing all the time with everything else we offer so that we are giving customers something they want and gaining market share."[692]  As Kroger's CEO admits, "Albertsons has always been investing in pricing."[693]  Defendants have not provided analysis of the difference between its purported price investments and those that Albertsons is executing today.[694]

## VI.    THE EQUITIES WEIGH IN FAVOR OF A PRELIMINARY INJUNCTION

### A.  If the Acquisition Closes, Significant Harm Will Result

---

[686] Yeater Hrg. 3242:22-3243:6 (referring to PX1353 (Kroger)); PX7011 (Yeater Rebuttal Rpt.) ¶¶ 136-137, 140.
[687] Yeater Hrg. 3243:7-14; PX7011 (Yeater Rebuttal Rpt.) ¶¶ 138-139.
[688] Gokhale Hrg. 2140:23-2141:7; McMullen Hrg. 1673:16-1674:8.
[689] PX11056 (Kroger) at 002.
[690] Gokhale Hrg. 2140:23-2141:16 (only discussing impact on prices of price investments).
[691] Sankaran Hrg. 1762:14-1763:16, 1764:15-18; PX6153 (Albertsons) at 009, 041.
[692] Sankaran Hrg. 1762:23-1763:5.
[693] PX6684 (Kroger) at 011.
[694] *See* McMullen Hrg. 1674:14-22.

PLS' PROPOSED FOF AND COL

187.    If the acquisition closes with the administrative trial is pending, Defendants will have access to each others' competitively sensitive information, including cost of goods sold.[695] Additionally, Defendants' divestiture to C&S will consummate, meaning that millions of shoppers and workers will lose access to the divestiture stores as they compete today.[696]

### B. Alleged Benefits Remain Available After a Merits Decision

188.    Albertsons will remain a vigorous competitor if the acquisition does not consummate. Albertsons invests billions of dollars in its company a year and plans to continue this level of investment going forward.[697]  Albertsons' COO recognized that "[Albertsons is] literally crushing it consistently."[698]

---

[695] *See id*. 1664:8-22.
[696] DX2238 (Kroger, Albertsons, C&S) at 007; *see* § V.A-B, *supra*.
[697] Sankaran Hrg. 1779:2-7, 1779:21-1780:5.
[698] PX2616 (Albertsons) at 001.

PLS' PROPOSED FOF AND COL

## PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW

1.      Section 13(b) of the FTC Act authorizes a preliminary injunction pending an administrative merits proceeding.  15. U.S.C. § 53(b).  Section 16 of the Clayton Act enables the State Plaintiffs to bring this action.  15 U.S.C. § 26.

2.      Courts "follow a two-step inquiry that asks (1) whether the FTC has shown a likelihood of ultimate success on the merits in the administrative proceeding and (2) whether the equities weigh in favor of an injunction."  *IQVIA*, 710 F. Supp. 3d at 347.  The court "must exercise its 'independent judgment' to determine" if the FTC has met its burden but it "may not require the FTC to prove the merits of its case or to establish a violation of the Clayton Act.  That inquiry is reserved for the administrative proceeding."  *Id.* at 349-50; *accord FTC v. Lancaster Colony Corp., Inc.*, 434 F. Supp. 1088, 1090-91 (S.D.N.Y. 1977); *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1162-64 (9th Cir. 1984) (the Court does not "resolve the conflicts in the evidence, compare concentration ratios and effects on competition in other cases, or undertake an extensive analysis of the antitrust issues").

3.      Plaintiffs need only "raise[] serious questions about the antitrust merits that warrant thorough investigation in the first instance by the FTC."  *IQVIA*, 710 F. Supp. 3d at 350; *accord Warner*, 742 F.2d at 1162; *Whole Foods*, 548 F.3d at 1035; *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1217-18 (11th Cir. 1991).

4.      Section 7 of the Clayton Act, 15 U.S.C. § 18, was enacted "to arrest potential harm to competition in its incipiency."  *St. Luke's*, 778 F.3d at 783 (citing *Phila. Nat'l Bank*, 374 U.S. at 362).  This incipiency standard requires that "wherever possible, without doing violence to the legislative objectives underlying the antitrust laws, we should 'lighten the burden of proof,' 'simplify the test of illegality' and 'dispense with elaborate proof of market structure, market behavior or probable anticompetitive effects.'"  *Lancaster*, 434 F. Supp. at 1094 (citing *Phila.*

*Nat'l Bank*, 374 U.S. at 362-63).  Thus, even as to the ultimate merits, "any 'doubts are to be resolved against the transaction.'"  *FTC v. Penn State Hershey Med. Ctr*., 838 F.3d 327, 337 (3rd Cir. 2016) (quoting *FTC v. Elders Grain, Inc*., 868 F.2d 901, 906 (7th Cir. 1989) (Posner, J.)).

5.      At the administrative merits proceeding, the FTC will apply a three-step burden-shifting framework.  *Olin Corp. v. FTC*, 986 F.2d 1295, 1305 (9th Cir. 1993).  The plaintiff must first establish its *prima facie* case or a presumption of illegality and then the burden shifts to the defendants to produce evidence rebutting the *prima facie* case or countervailing procompetitive benefits.  *Id.*  If the defendants meet their burden, then the burden of production shifts back to the plaintiff to produce additional evidence of competitive harm (merging with the plaintiff's ultimate burden of persuasion).  *Id.*  Here, Plaintiffs have shown a likelihood of success on the merits of its Section 7 challenge in the administrative court, and the equities favor issuing a preliminary injunction.

## I.      THE FTC IS LIKELY TO SUCCEED ON THE MERITS

### A.  The Acquisition is Presumptively Illegal and Likely to Cause Anticompetitive Effects in the Supermarkets Product Market

6.      In the merits proceeding, the FTC will show that the acquisition is illegal because it significantly increases concentration in both (i) the supermarket product market in local areas, and (ii) the union grocery labor market in collective bargaining agreement ("CBA") areas.

#### 1.  *Supermarkets are a relevant product market*

7.      A relevant product market consists of products "that are reasonably interchangeable" such that "purchasers are willing to substitute one for the other."  *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 565 (6th Cir. 2014).  In a Section 13(b) proceeding, it is "not necessary" for Plaintiffs "to *prove* the existence of the [relevant] market."  *IQVIA*, 710 F. Supp. 3d at 368 (quoting *Whole Foods*, 548 F.3d at 1041) (emphasis in original).  Instead, Plaintiffs need only

PLS' PROPOSED FOF AND COL

"rais[e] some question of whether [the alleged market] is a well-defined market." *Whole Foods*, 548 F.3d at 1037.

8.      "In evaluating reasonable interchangeability, 'the mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes.'" *IQVIA*, 710 F. Supp. 3d at 368 (quoting *Sysco*, 113 F. Supp. 3d at 26).

9.      Further, the inquiry does not look at all products that are interchangeable for any purpose—only products "reasonably interchangeable by consumers for the same purpose." *E.g.*, *Optronic Techs., Inc.*, 20 F.4th at 482.  "In other words, the existence of a larger market within which two products compete does not necessarily mean that they are reasonably interchangeable substitutes for one another." *IQVIA*, 710 F. Supp. 3d at 368; *see also FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1075 (D.D.C. 1997) ("*Staples I*").

10.      In assessing the relevant market, courts "regularly consider ordinary course documents." *IQVIA*, 710 F. Supp. 3d at 362-63.  The Government can also define a market using quantitative evidence of interchangeability derived from the HMT.  *Optronic Techs., Inc.*, 20 F.4th at 483. Here both the qualitative evidence and quantitative evidence show that supermarkets are a relevant "line of commerce" in which to assess the competitive effects of this acquisition is supermarkets.  *See, e.g., California v. Am. Stores Co.*, 872 F.2d 837, 841 (9th Cir. 1989).

         *i.*     *The Brown Shoe practical indicia demonstrate that supermarkets are a relevant product market*

11.      The Supreme Court has identified multiple "practical indicia" that signify a relevant product market, including "industry or public recognition of the [relevant market] as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown*

PLS' PROPOSED FOF AND COL

*Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).

12.    These *Brown Shoe* "practical indicia" serve an "evidentiary usefulness" in determining substitutability and "cross-elasticities of demand." *Epic Games*, 67 F.4th at 976. The indicia must be "viewed in totality" and not in isolation. *FTC v. Surescripts, LLC*, 665 F. Supp. 3d 14, 43 (D.D.C. 2023). Indeed, "[a]ll the factors need not be satisfied for the Court to conclude that the FTC has identified a relevant market." *IQVIA*, 710 F. Supp. 3d at 355.

13.    Analysis of the *Brown Shoe* practical indicia establishes that supermarkets constitute a relevant product market. *See* FOF § III.A.1, *supra*.

> ii.    *Other store formats are not reasonably interchangeable with supermarkets*

14.    Other store formats do not share the same *Brown Shoe* practical indicia and are not reasonably interchangeable with supermarkets. *See IQVIA*, 710 F. Supp. 3d at 367.

15.    Although other stores sell some of the same products, their smaller assortment does not allow one-stop shopping and, accordingly, they are not "reasonably interchangeable by consumers *for the same purposes*." *Optronic Techs.*, 20 F.4th at 482 (emphasis added); *see also Staples I*, 970 F. Supp. at 1074-75

16.    Supermarkets also differ from other retail formats in customer experience. *See Bon-Ton Stores, Inc. v. May Dep't Stores Co.*, 881 F. Supp. 860, 874 (W.D.N.Y. 1994) (analyzing as a *Brown Shoe* factor the physical appearance of retail stores, for example, "the location of checkout counters, the manner in which goods are displayed, and so on"); *see also Staples I*, 970 F. Supp. at 1078 (finding "that office superstores are, in fact, very different in appearance, physical size, format, the number and variety of SKU's offered, and the type of customers targeted and served than other sellers of office supplies"). As the district court explained in *California v. Am. Stores Co.*, 697 F. Supp. 1125 (C.D. Cal. 1988), the mere fact that other store

PLS' PROPOSED FOF AND COL

formats also sell groceries does not mean that "grocery shoppers seriously consider, for example, gasoline service stations or department stores as competing sources with supermarkets for their grocery needs." *Id.* at 1129, *aff'd in the rel. part*, 872 F.2d 837 (9th Cir. 1989); *see also Whole Foods*, 548 F.3d at 1040 ("The fact that a customer might buy a stick of gum at a supermarket or at a convenience store does not mean there is no definable groceries market."); *Sysco*, 113 F. Supp. 3d at 26 ("[F]ruit can be bought from both a grocery store and a fruit stand, but no one would reasonably assert that buying all of one's groceries from a fruit stand is a reasonable substitute for buying from a grocery store.").

### iii.   Evidence of cross-shopping does not support a broader market

17.    Relevant markets can exist even if certain customers "cross-shop" in other markets. *Whole Foods*, 548 F.3d at 1040-41 (evidence of cross-shopping "entirely consistent" with the existence of a submarket consisting of premium natural and organic supermarkets).

18.    Courts refuse "to lump together" various channels of shopping "merely because [consumers] spend in different channels." *United States v. Google*, 2024 WL 3647498, at *86 (D.D.C. Aug. 5, 2024); *IQVIA*, 710 F. Supp. 3d at 358-59 (same).

19.    In *Google*, the court rejected Dr. Israel's reliance upon a cross-product usage theory for market definition. 2024 WL 3647498, at *71-74. There, Dr. Israel argued that users "cross-query," i.e., run searches on Google's general search engine (GSE) and on specialized vertical providers (SVPs) like Amazon. *Id.* at *71-72. Dr. Israel opined that cross-querying is evidence that SVPs are reasonably interchangeable with GSEs like Google, and thus belong in the same product market. *Id.* The court rejected Dr. Israel's approach and conclusions, holding that neither the existence of cross-querying nor the fact that "Google and Amazon have some overlapping users" meant that the two companies' services belong in the same product market and are reasonably interchangeable. *Id.*

92

### 2. *Local areas around Defendants' stores are relevant geographic markets*

20.    "The relevant geographic market is the area of effective competition where buyers can turn for alternate sources of supply." *St. Luke's*, 778 F.3d at 784. Dr. Hill's store-based, draw area approach to geographic market definition is well-supported. *Id.* at 785 (affirming geographic market where at least one-third of patients traveled outside the market for services). Indeed, the *Sysco* court accepted geographic markets based upon 75% draw areas that *Dr. Israel* advanced over criticisms that they were "arbitrary." 113 F. Supp. 3d at 51-52.

21.    Dr. Hill's customer-based draw area is similarly well-supported. *See, e.g.*, *FTC v. Hackensack*, 30 F.4th at 169 (defining geographic market based on patient location and supplier location); *St. Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys.*, 2014 WL 407446, at *6-8 (D. Idaho Jan. 24, 2014), *aff'd* 778 F.3d at 775 (same).

### 3. *Economic analysis confirms that supermarkets in local areas are relevant geographic markets*

22.    Plaintiffs have also shown a likelihood of establishing a relevant antitrust market of supermarkets in local areas by use of the HMT. *See* FOF § III.D, *supra*. The HMT is "commonly used in antitrust actions to define the relevant market." *IQVIA*, 710 F. Supp. 3d at 368. Conversely, no court has applied Dr. Israel's "'actual' hypothetical monopolist test." *See* FOF § III.D.1.iii, *supra*.

23.    The HMT asks whether a hypothetical monopolist of products within a candidate market could profitably impose a small but significant and non-transitory increase in price or other worsening of terms on at least one product in the set. *Id.* If the monopolist could do so, "then a relevant product market exists for antitrust purposes." *IQVIA*, 710 F. Supp. 3d at 368-69; *see also Sysco*, 113 F. Supp. 3d at 34-35 (describing aggregate diversion analysis).

24.    Both the *Brown Shoe* practical indicia and the HMT show that supermarkets in local

PLS' PROPOSED FOF AND COL

areas are a relevant antitrust market.  *See* FOF §§ III.A-D, *supra*.

### 4. *The acquisition is illegal even when analyzed using a large format store product market*

25.    Plaintiffs in merger cases commonly offer broader product market definitions as a sensitivity test to demonstrate the likely competitive effects of a merger.  *See, e.g.*, *FTC v. Hackensack Meridian Health, Inc.*, 2021 WL 4145062, at *20 & n.25 (D.N.J. Aug. 4, 2021), *aff'd*, 30 F.4th 160 (3d Cir. 2022) (adopting plaintiff's geographic market where the expert performed a "sensitivity check" by analyzing concentration in a more conservative market); *FTC v. Advocate Health Care Network*, 841 F.3d 460, 466 (7th Cir. 2016) (noting that plaintiff's expert tested the robustness of his results by "test[ing] another, larger market").

26.    Within a broader market, "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes."  *Brown Shoe*, 370 U.S. at 325.  "[R]elevant submarkets are common in merger analysis."  *Olin Corp.*, 986 F.2d at 1301.  "[T]he viability of such additional markets does not render the one identified by the government unusable."  *IQVIA*, 710 F. Supp. 3d at 368 (quoting *United States v. Bertelsmann SE & Co.*, 646 F. Supp. 3d 1, 28 (D.D.C. 2022)).

27.    The Court as a finder of fact can determine whether the record contains evidence sufficient to establish any or all of the following: a supermarket product market, a large format product market, or some other alternative market.  *Epic Games,* 67 F.4th at 978 n.9 (holding that Ninth Circuit precedent "squarely forecloses" the argument that antitrust claims automatically fail if the court does not adopt the plaintiff's market).  In *Rockford Memorial*, for example, the Seventh Circuit affirmed the district court's decision to reject both the government's and the defendants' proposed market definitions and, based on evidence from the preliminary injunction hearing, define its own market.  898 F.2d at 1285; *see also Epic Games*, 67 F.4th at 981

PLS' PROPOSED FOF AND COL

(affirming unpleaded "middle-ground market").

28.     Here, Plaintiffs have maintained from the start of this litigation that the acquisition is presumptively unlawful even if non-supermarket retail formats are included in the relevant product market.  *See* Compl. at 23, ECF No. 1 (Feb. 26, 2024).  And both the *Brown Shoe* practical indicia and the HMT show that large format stores in local areas are a relevant antitrust market.  *See* FOF §§ III.B-D, *supra*.

### 5.  *The proposed acquisition creates a presumptively illegal increase in concentration in both the relevant supermarket local areas and in large format local areas*

29.     "A commonly used metric for determining market share is the Herfindahl–Hirschman Index ('HHI')."  *St. Luke's*, 778 F.3d at 786.  The HHI for a market is calculated by "summing the squares of the individual firms' market shares."  *Id*.

30.     Plaintiffs can establish a *prima facie* case by showing that the merger will yield high market concentrations.  *Id*. at 785.  The Merger Guidelines explain that a merger is presumptively unlawful when it increases a market's HHI by more than 100 and results in either (a) post-merger market share greater than 30% or (b) post-merger HHI exceeding 1,800.  2023 Merger Guidelines § 2.1.  These presumption thresholds, mirroring those in the 1992 Merger Guidelines, have been endorsed by numerous courts.  *See, e.g.*, *Am. Stores Co.*, 872 F.2d at 842; *Heinz*, 246 F.3d at 716; *Chicago Bridge*, 534 F.3d at 431; *IQVIA*, 710 F. Supp. 3d at 378.

31.     The Supreme Court has also held that mergers are presumptively unlawful if they result in a single entity controlling a 30% market share.  *See Phila. Nat'l Bank*, 374 U.S. at 364; *RSR*, 602 F.2d at 1324; *see also IQVIA*, 710 F. Supp. 3d at 377-79 (reaffirming validity of "30% threshold" above which a transaction is presumably illegal).

32.     Here, Dr. Hill found that 1,922 supermarket local areas meet the presumption of illegality.  *See* FOF § III.E, *supra*.  Dr. Hill also calculated market shares for the broader product

market—"large format stores."  Even using this more conservative approach, he found that the

merger is presumptively unlawful in 1,785 large format local areas.  *Id.*

33.    A finding of harm in any market satisfies Plaintiffs' *prima facie* burden.  *E.g.*, *Anthem*,

236 F. Supp. 3d at 254 ("The Court concludes that the merger is likely to lessen competition

substantially in Richmond, Virginia at least, and it does not reach any of the other markets.").

### B.  The Proposed Acquisition is Unlawful in a Market for Union Grocery Labor in Collective Bargaining Agreement Areas

34.    The antitrust laws protect labor.  *See, e.g.*, 21 Cong. Rec. 2457 (Mar. 21, 1890) (Sen.

Sherman: "The sole object of such a combination [a trust] is to make competition impossible

. . . . [I]t commands the price of labor without fear of strikes, for in its field it allows no

competitors."); *Bertelsmann*, 646 F. Supp. 3d at 34-35 (confirming that the Clayton Act applies

to mergers that harm competition for workers).  Defendants' attempts to avoid antitrust scrutiny

ignore the Supreme Court's warning that antitrust exemptions should not apply to "agreement[s]

among employers . . . sufficiently distant in time and in circumstances from the collective-

bargaining process." *Brown v. Pro Football, Inc.*, 518 U.S. 231, 250 (1996).  A merger of

employers is not a "restraint[] . . . imposed through the bargaining process," *id.* at 237, but a

choice entirely outside of the bargaining process that subverts unions' negotiating leverage.  *See*

Br. of Amicus Curiae NLRB at 11, ECF No. 333 ("Defendants are mistaken to suggest that our

nation's labor laws grant them unfettered rights 'to join forces in collective bargaining *today.*'").

35.    An antitrust analysis of a labor, or "buy-side" case is the "mirror image" of the

supermarket, or "sell-side" case.  *See Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001).

Contrary to Defendants' focus on the interchangeability of workers (the *sellers* of labor services),

here the proper inquiry is "the commonality and interchangeability of the buyers."  *Id.*  That is,

which employers the workers negotiating a CBA view as interchangeable.

PLS' PROPOSED FOF AND COL

36.     The *Brown Shoe* factors and the market realities support a finding that union grocery

labor in CBA areas is a relevant antitrust market.  As applied to labor, the practical indicia

include "industry or public recognition of the [relevant market] as a separate economic entity, the

[labor's] peculiar characteristics and uses, unique production facilities, distinct [buyers], distinct

[compensation], sensitivity to [compensation] changes, and specialized vendors."  *See Brown*

*Shoe*, 370 U.S. at 325; *see also* 2023 Merger Guidelines § 4.3.D.8 ("The same market definition

tools and principles discussed above can be used for input markets and labor markets . . . .").

37.     While "[i]t is always possible to take pot shots at a market definition," *Rockford*

*Memorial Corp.*, 898 F.2d at 1285, "[a] market need not be defined with the precision of a

NASA scientist."  *Sysco*, 113 F. Supp. 3d at 54.  Defining "a relevant market is not an end unto

itself; rather, it is an analytical tool used to ascertain the 'locus of competition.'" *Bertelsmann*,

646 F. Supp. 3d at 24 (citing *Brown Shoe*, 370 U.S. at 320).

38.     "There is no legal requirement that a plaintiff supply quantitative proof to define a

relevant market."  *Google*, 2024 WL 3647498, at *68; *see also Optronic Techs., Inc.*, 20 F.4th at

482-83; *Sidibe v. Sutter Health*, 2019 WL 2078788, at *25-27 (N.D. Cal. May 9, 2019).

### C.  The Acquisition is Also Unlawful Because it Will Eliminate Substantial Head-To-Head Competition

39.     Independent from market concentration, Plaintiffs can meet their *prima facie* burden by

demonstrating that an acquisition will eliminate substantial head-to-head competition between

close competitors.  *FuboTV*, 2024 WL 3842116, at *17, *29 (granting preliminary injunction

based on competitive effects, not market concentration); *IQVIA*, 710 F. Supp. 3d at 385 ("It is

sufficient to show, as the FTC has, that Defendants vigorously compete head-to-head and that

this competition would be eliminated by the proposed transaction."); *Bertelsmann*, 646 F. Supp.

3d at 50 ("[C]ourts have recognized that a merger that eliminates head-to-head competition

PLS' PROPOSED FOF AND COL

between close competitors can result in a substantial lessening of competition.") (quoting cases);

*United States v. Mfrs. Hanover Tr. Co*., 240 F. Supp. 867, 950 (S.D.N.Y. 1965) (eliminating

significant competition may by "'itself constitute[] a violation of § 1 of the Sherman Act,' and, a

fortiori, of the Clayton Act"); 2023 Merger Guidelines § 2.2; 2010 Guidelines § 6 ("The

elimination of competition between two firms that results from their merger may alone constitute

a substantial lessening of competition.").

40.    Plaintiffs can meet their burden to show a relevant market in which head-to-head

competition will be eliminated even if they fail to meet their burden to define a market in which

to measure the extent of any post-merger increase in share. *Mfrs. Hanover Tr. Co*., 240 F. Supp.

at 923, 955 (enjoining merger based on elimination of competition even though court rejected

Government's proposed market); *see also FuboTV*, 2024 WL 3842116, at *24 (holding plaintiff

likely to succeed on merits when "at least one of the . . . aspects of the [joint venture] will tend to

produce anticompetitive effects *in a relevant market*.").

41.    When assessing head-to-head competition, "[c]ourts frequently rely on ordinary course

documents and witness testimony illustrating that two merging parties view each other as strong

competitors." *IQVIA*, 710 F. Supp. 3d at 383; *see also, e.g.*, *Hackensack*, 2021 WL 4145062, at

*21 (collecting cases); *Anthem*, 236 F. Supp. 3d at 216 ("Relevant evidence of a merger's

potential unilateral effects include the merging companies' ordinary course of business

documents, testimony of industry participants, and the history of head-to-head competition

between the two merging parties.").

42.    Extensive evidence of head-to-head competition is "an important consideration when

analyzing possible anti-competitive effects." *Anthem*, 236 F. Supp. 3d at 216.  It shows both that

consumers will have fewer options *overall*, and fewer of the options they consider *close*

PLS' PROPOSED FOF AND COL

*substitutes*. *Bertelsmann*, 646 F. Supp. 3d at 39.

43.     "[T]his is true even where the merging parties are not the only two, or even the largest,

competitors in the market." *Anthem*, 236 F. Supp. 3d at 216 (collecting cases); *see also RSR*, 602

F.2d at 1325 ("[A] merger of the second and fifth largest firms . . . is not the merger of 'two

small firms.'").  Courts have rejected attempts to point out allegedly closer competitors to avoid

antitrust scrutiny. *See, e.g.*, *Anthem*, 236 F. Supp 3d at 216 ("Anthem's insistence that United,

not Cigna, is its 'closest' competitor, is beside the point."); *Sysco*, 113 F. Supp. 3d at 62 ("[T]he

merging parties need not be the top two firms to cause unilateral effects . . . ."); *H&R Block*, 833

F. Supp. 2d at 83 ("The fact that Intuit may be the closest competitor for both HRB and TaxACT

does not necessarily prevent a finding of unilateral effects for this merger.").

44.     Additionally, courts routinely consider evidence that the acquirer constrains the prices of

the target firm as well as non-price competition.  In *Hackensack*, for example, the Third Circuit

highlighted that the acquiring firm "places a strong competitive constraint on [the seller]"

including a constraint on non-price competition.  30 F.4th at 174.

### D.  Defendants Cannot Rebut Plaintiffs' Case

45.     Defendants' attempts to rebut the *prima facie* case are unsuccessful.

#### 1.  *The proposed divestiture does not address the acquisition's anticompetitive harm*

46.     Proposed divestitures are rebuttal evidence for which Defendants bear the burden of

production. *See, e.g.*, *Aetna*, 240 F. Supp. 3d 1 at 60; *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100,

137 n.15 (D.D.C. 2016); *Sysco*, 113 F. Supp. 3d at 72.

47.     Where the "*prima facie* case anticipates and addresses the respondent's rebuttal evidence,

as in this case, the *prima facie* case is very compelling and significantly strengthened," and "the

respondent's burden of production on rebuttal is also heightened." *Chicago Bridge*, 534 F.3d at

PLS' PROPOSED FOF AND COL

426. The more the merger threatens competitive harm, as here, the surer the remedy must be—that is, the "more evidence the defendant must present to rebut [the *prima facie* case] successfully." *Heinz*, 246 F.3d at 725.

48.    To rebut Plaintiffs' *prima facie* case, Defendants have the burden to establish a divestiture would "sufficiently mitigate[] the merger's effect such that it [is] no longer likely to substantially lessen competition." *Illumina*, 88 F.4th at 1059; *see also Sysco*, 113 F. Supp. 3d at 72 (divestiture must "restore competition" and "replac[e] the competitive intensity lost as a result of the merger").

### i. The proposed divestiture does not address harm in hundreds of markets

49.    Defendants bear the burden of proving that the divestiture would be sufficient to fill the competitive void left by the acquisition in every presumptively illegal market. "[I]f anticompetitive effects of a merger are probable in 'any' significant market," the merger violates Section 7. *Brown Shoe*, 370 U.S. at 337; *see also Anthem*, 855 F.3d at 368 (threat of anticompetitive effects in one local market "provides an independent basis for the injunction" prohibiting merger). As this Circuit has held, in "the statutory phrase 'in any line of commerce', the word entitled to emphasis is 'any' . . . . The line of commerce need not even be a large part of the business of any of the corporations involved." *Crown Zellerbach*, 296 F.2d 812; *see also RSR*, 602 F.2d at 1323 (merger violates Section 7 "if anticompetitive effects of a merger are probable in 'any' significant market"); *Whole Foods*, 548 F.3d at 1034 ("if, as appears to be the situation, it remains possible to reopen or preserve a Wild Oats store in just one of those markets, such a result would at least give the FTC a chance to prevent a § 7 violation in that market"); *Pargas, Inc. v. Empire Gas Corp.*, 423 F. Supp. 199, 227 (D. Md. 1976), *aff'd*, 546 F.2d 25 (4th Cir. 1976) (preliminarily enjoining acquisition alleged to affect "only a limited number of communities" since divestiture must address "any geographic area").

50.    Even assuming a perfectly successful divestiture, Plaintiffs have shown that the acquisition is presumptively unlawful in hundreds of supermarket and large format markets that the divestiture does not address.  *See* FOF § V.A *supra*.  The divestiture fails on this basis.

### ii.  *The proposed divestiture will not mitigate a substantial lessening of competition in the remaining markets*

51.    Where a divestiture buyer does not "already [have], or could easily attain, the other capabilities needed to compete effectively," divesting an "existing business entity" is more likely to preserve competition.  *Aetna*, 240 F. Supp. 3d at 60; *Sysco*, 113 F. Supp. 3d at 73-76.

52.    Courts have found divestitures inadequate where the divestiture buyer would not be able to operate on its own and therefore "[would] not be a truly independent competitor."  *See Sysco*, 113 F. Supp. at 77-78 (finding divestiture insufficient where buyer would be "dependent on the merged entity for years following the transaction," including licensing private label products for three years and licensing a database for five years); *CCC Holdings*, 605 F. Supp. 2d at 59.  As the *Aetna* court explained: "Courts are skeptical of a divestiture that relies on a continuing relationship between the seller and buyer of divested assets because that leaves the buyer susceptible to the seller's actions—which are not aligned with ensuring that the buyer is an effective competitor."  240 F. Supp. 3d at 60.

53.    Courts have also found divestitures inadequate where the buyer would have higher costs, fewer private label products, or less expertise, and thus may not be able to effectively.  *See Sysco*, 113 F. Supp. at 76-78; *FTC v. Libbey, Inc.*, 211 F. Supp. 2d 34, 52 (D.D.C. 2002) (buyer would have higher costs and "thus may not be able to effectively compete").

54.    Executive experience does not make up for a divestiture buyer's lack of critical capabilities.  *See Sysco*, 113 F. Supp. 3d at 73 ("Defendants also point to the industry acumen and experience of PFG's executives . . . . [T]he court is not persuaded that post-merger PFG will

PLS' PROPOSED FOF AND COL

be able to step into USF's shoes to maintain—certainly not in the near term—the pre-merger level of competition that characterizes the present marketplace.").

55.    A divestiture buyer's experience in the markets at issue is a relevant factor in assessing whether the buyer will be able to successfully compete with the divested assets.  *See Aetna*, 240 F. Supp. 3d at 59, 72-73 (buyer's "history in the individual Medicare Advantage market also raises concerns about its ability to successfully compete following the divestiture").

56.    Courts in antitrust merger cases do not defer to the business judgment of divestiture buyers or treat them as disinterested.  In *Aetna*, both the divestiture buyer and Defendants testified to their confidence in the plans for the divestiture.  The court did not take those representations at face value and independently reviewed the facts and internal statements, ultimately holding that "[t]he totality of the evidence suggests that [the buyer] is not likely to have the internal capacity . . . to successfully operate the divestiture plans so as to replace the competition lost by the merger."  240 F. Supp. 3d at 70; *see also Sysco*, 113 F. Supp. 3d at 73.

57.    The court in *Aetna* observed that the divestiture's "low purchase price raises concerns about whether [the divestiture buyer] can be a successful competitor" and "supports the conclusion that [the buyer] has serious doubts about its own ability to manage all the divestiture [assets] but is willing to try given the low risk to the company reflected in the bargain price." *Aetna*, 240 F. Supp. 3d at 72.  The court found "especially" probative "statements made by [the divestiture buyer's] executives and board members while the deal was being negotiated."  *Id*. at 64.  Equivalent evidence has been shielded by Defendants and C&S here on claims of privilege. *See* FOF § V.B.3.i, *supra*.

58.    Defendants' made-for-litigation divestiture to C&S fails to meet Defendants' substantial burden.  *See* FOF §§ V.A-B, *supra*.

### 2. The purported efficiencies do not rebut Plaintiffs' prima facie case

59.    No circuit court has held that claimed efficiencies justified an otherwise unlawful merger. *Hackensack*, 30 F.4th at 176.  Indeed, it is unclear whether this is even a valid defense in the Ninth Circuit.  *St. Luke's*, 778 F.3d at 789.

60.    Courts recognizing the efficiencies defense have made clear that defendants pursuing the defense bear the burden to meet a "rigorous standard," showing that the alleged efficiencies are "cognizable," meaning they enhance competition, are verifiable, and are merger specific.  *Penn State*, 838 F.3d at 347-51.  "[P]roof of 'extraordinary efficiencies' is required to offset the anticompetitive concerns in highly concentrated markets."  *St. Luke's*, 778 F.3d at 792.

61.    The Clayton Act does not excuse anticompetitive mergers "simply because the merged entity can improve its operations."  *Id*. at 791-792 ("It is not enough to show that the merger would allow St. Luke's to better serve patients.").  Further, "anticompetitive effects in one market cannot be offset by procompetitive effects in another market."  *RSR*, 602 F.2d at 1325; *accord Phila. Nat'l Bank*, 374 U.S. at 370-71.

62.    Defendants must show that efficiencies "ultimately would benefit competition and, hence, consumers."  *Univ. Health*, 938 F.2d at 1223; *Hackensack*, 30 F.4th at 177; *CCC Holdings*, 605 F. Supp. 2d. at 74.  Further, Defendants must make this showing in the relevant antitrust markets where harm would occur.  In *Aetna*, for example, the court expressed "serious concerns" about efficiencies because (1) it was "very likely that a significant share of the claimed efficiencies may be retained by the merged firm," and (2) defendants' expert (Mr. Gokhale) did not attribute the claimed efficiencies to particular markets.  240 F. Supp. 3d at 98. As a result, the court lacked confidence that the consumers who were likely to be harmed by the merger would also share in its benefits.  *Id*.

63.     To show that purported efficiencies are verifiable, defendants must provide sufficient

bases for their work such that efficiencies are "reasonably verifiable by an independent party."

*Wilhelmsen*, 341 F. Supp. 3d at 72 (quoting *H&R Block*, 833 F. Supp. 2d at 89). Confidence of

executives and endorsement by hired consultants are not enough to establish cognizable

efficiencies.  *See id.* at 73 ("The court cannot substitute Defendants' assessments and projections

for independent verification."); *Sysco*, 113 F. Supp. 3d at 82-85 (criticizing defendants' expert

for relying solely on information created by defendants or their consultants); *see also FTC v.*

*Sanford Health*, 2017 WL 10810016, at *15 (D.N.D. Dec. 15, 2017), *aff'd*, 926 F.3d 959 (8th

Cir. 2019) (rejecting efficiencies "based only on Defendants' estimates"). The court in *Aetna*, for

example, considered the best-of-both analysis proposed by defendants' expert (Mr. Gokhale), but

took issue with the rigor of his analysis.  240 F. Supp. 3d at 97-98.  Specifically, the court

explained that Mr. Gokhale could have reviewed underlying contracts himself rather than relying

on the work of consultants, which was insufficient to qualify as the type of "robust analysis"

needed to verify claimed efficiencies.  *Id.* at 97.  And where savings are projected to occur

through negotiations with third parties, the court in *Anthem* deemed claimed efficiencies

unverified when defendants offered no explanation for why third parties would agree to the

favorable rates claimed by defendants. 236 F.Supp. 3d at 244-45. "If this were not so, then the

efficiencies defense might well swallow the whole of Section 7 of the Clayton Act because

management would be able to present large efficiencies based on its own judgment and the Court

would be hard pressed to find otherwise."  *H&R Block*, 833 F. Supp. 2d at 91 (rejecting

efficiencies based on "management judgments" rather than "an analysis of facts that could be

verified by a third party"); *see also Univ. Health*, 938 F.2d at 1223.

64.     To show that purported efficiencies are merger specific, Defendants must establish that

PLS' PROPOSED FOF AND COL

they "cannot readily 'be achieved without the concomitant loss of a competitor.'" *St. Luke's*, 778 F.3d at 790-91 (quoting *Heinz*, 246 F.3d at 722). "If a company could achieve certain cost savings without any merger at all, then those stand-alone cost savings cannot be credited as merger-specific efficiencies." *H&R Block*, 833 F. Supp. 2d at 90.

65. Increased profits are not cognizable efficiencies. *ProMedica*, 2011 WL 1219281, at *36 ("The numerous claimed revenue enhancement opportunities are not true efficiencies because they merely shift revenue among the participants in the market and, in effect, do nothing more than increase [defendant's] bottom-line."); *CCC Holdings*, 605 F. Supp. 2d at 73-74 ("[W]hile reducing the costs of doing business provides several advantages for the merged firm, these advantages could show up in higher profits instead of benefitting customers or competition.").

### 3. Defendants cannot satisfy the weakened competitor defense

66. Testimony that Albertsons *may* in the future close stores or lay off workers cannot justify the acquisition. FOF § V.C, *supra*. Such claims are evaluated under the "weakened competitor" defense, requiring "a substantial showing that the acquired firm's weakness, which cannot be resolved by any competitive means, would cause that firm's market share to reduce to a level that would undermine the government's *prima facie* case. *ProMedica*, 749 F.3d at 572.

67. Courts credit such defenses "only in rare cases," and have described the defense as "the Hail-Mary pass of presumptively doomed mergers." *Id*. at 572; *see also Kaiser Aluminum & Chem. Corp. v. FTC*, 652 F.2d 1324, 1339 (7th Cir. 1981) ("Financial weakness, while perhaps relevant in some cases, is probably the weakest ground of all for justifying a merger.").

68. Defendants' arguments fail under the weakened competitor defense. Defendants do not assert that concentration levels are on the verge of dropping below those that trigger a presumption of illegality in any of the relevant markets identified Plaintiffs' *prima facie* case.

PLS' PROPOSED FOF AND COL

Nor do they show that Albertsons' claimed "weakness . . . cannot be resolved by any competitive means." *ProMedica*, 794 F.3d at 572; *see also Warner Commc'ns*, 742 F.2d at 1164-65 ("[A] company's stated intention to leave the market . . . does not in itself justify a merger.").

69.     Likewise, Defendants' arguments fail under a failing firm defense, which requires a company to show that "its resources were so depleted and the prospect of rehabilitation so remote that it faced the grave probability of a business failure" and (2) "that it tried and failed to merge with a company other than the acquiring one." *Olin Corp.*, 986 F.2d at 1306-1307.

### 4.   *The promised "price investments" do not rebut Plaintiffs' prima facie case*

70.     Defendants' promise to lower prices is entitled to no weight. *See, e.g.*, *Meta Platforms*, 654 F. Supp. 3d at 937 ("[S]ubjective corporate testimony is generally deemed self-serving and entitled to low weight."); *Bertelsmann*, 646 F. Supp. 3d at 50 (CEO's promise about post-merger conduct "lack[ed] credibility" because it "would not be profit-maximizing and is thus unreliable evidence of future conduct" and could "be broken at will"); *see also State of Washington v. Kroger Co. et al.*, No. 24-2-00977-9, Superior Court of the State of Washington, County of King (September 10, 2024 Hrg. Tr. at 52:13-19) ("The Court's ruling is that the motion *in limine* regarding the defendants' non-binding promise to lower prices is granted.").

71.     In merger cases, the critical question is whether the merger will enable the merging companies to increase prices profitably.  While a defendant may make promises—even credible promises— not to raise prices, "this type of guarantee cannot rebut a likelihood of anticompetitive effects." *H&R Block*, 833 F. Supp. 2d at 82 (rejecting defense that defendants pledged to maintain the acquired firm's current prices for three years, even though it "has no reason to doubt that defendants would honor their promise").

### 5.   *Entry and expansion will not be timely, likely, or sufficient to counteract the acquisition's anticompetitive effects*

72.     Defendants bear the burden of showing that "low barriers to entry" rebut Plaintiffs' *prima*

*facie* case.  *United States v. Bazaarvoice, Inc.*, 2014 WL 203966, at *71 (N.D. Cal. Jan. 8, 2014);

*see also Heinz*, 246 F.3d at 715 n.7.  To meet their burden, Defendants must demonstrate that

any entry by new firms, or expansion by existing firms, will be "timely, likely, and sufficient in

its magnitude, character, and scope to deter or counteract the competitive effects of concern" of

the merger.  *IQVIA*, 710 F. Supp. 3d at 393; 2023 Merger Guidelines § 3.2.  Put differently, entry

or expansion must "fill the competitive void" resulting from the merger.  *H&R Block*, 833 F.

Supp. 2d at 73.  Entry must be "of a sufficient scale to compete on the same playing field."

*Chicago Bridge*, 534 F.3d at 431-32.  And entry must occur before the merger causes

anticompetitive effects and must maintain competition over the long term.  *Aetna*, 240 F. Supp.

3d at 52-53.  Defendants cannot make that showing here.  *See* FOF § V.D, *supra*.

## II.     THE EQUITIES FAVOR A PRELIMINARY INJUNCTION

### A.     Defendants' Interest in Completing the Transaction Before the Merits Proceeding Does Not Outweigh the Public Equities

73.     The second step in determining whether to grant preliminary relief is to "weigh the

equities in order to decide whether enjoining the merger would be in the public interest." *IQVIA*,

710 F. Supp. 3d at 400 (quoting *Penn State Hershey*, 838 F.3d at 352).

74.     The equities under Section 13(b) go to the "consequences resulting from the requested

injunction"—not any equities concerning the merger itself.  *FTC v. Meta Platforms, Inc*., 2022

WL 16637996, at *6 (N.D. Cal. Nov. 2, 2022); *accord Penn State Hershey*, 838 F.3d at 353.

75.     "The prevailing view is that, although private equities may be considered, they are not to

be afforded great weight." *IQVIA*, 710 F. Supp. 3d at 400 (quoting *Penn State Hershey*, 838

F.3d at 352); *accord Univ. Health*, 938 F.2d at 1225 (interests of private parties carry "little

weight").  As such, "no court has denied a Section 13(b) motion for a preliminary injunction

PLS' PROPOSED FOF AND COL

based on weight of the equities where the FTC has demonstrated a likelihood of success on the merits." *Peabody*, 492 F. Supp. 3d at 918.

76.     "The principal public equity weighing in favor of issuance of preliminary [] relief is the public interest in effective enforcement of the antitrust laws." *Heinz*, 246 F.3d at 726.  As the Supreme Court explained in *United States v. E. I. du Pont de Nemours & Co.*: "The proper disposition of antitrust cases is obviously of great public importance, and their remedial phase, more often than not, is crucial.  For the suit has been a futile exercise if the Government proves a violation but fails to secure a remedy adequate to redress it."  366 U.S. 316, 323 (1961).

77.     "If the acquisition is allowed to proceed but is later found to be violative of the antitrust laws, divestiture will be required.  At best, divestiture is a slow, cumbersome, difficult, disruptive and complex remedy." *Lancaster*, 434 F. Supp. at 1096; *accord Heinz*, 246 F.3d at 726 (recognizing that "divestiture is an inadequate and unsatisfactory remedy in a merger case").

78.     Here, the equities support entry of a preliminary injunction.  Without it, Kroger can acquire Albertsons and begin integrating immediately.  The divestiture to C&S will also consummate.  *See Sysco*, 113 F. Supp. 3d at 87 (FTC may face the "daunting and potentially impossible task" of "unscrambling the eggs" if merger ultimately deemed unlawful).

79.     In contrast, Defendants cannot establish harm merely from waiting for the administrative process to play out.  There is "no reason why, if the merger makes economic sense now, it would not be equally sensible to consummate the merger following a[n] FTC adjudication on the merits that finds the merger lawful." *Penn State Hershey*, 838 F.3d at 353.

80.     Defendants' claims they will abandon the acquisition if a preliminary injunction is granted do not weigh against enjoining the acquisition.  *See id.* ("[E]ven accepting [Defendants'] assertion that they would abandon the merger following issuance of the injunction, the result—

that the public would be denied the procompetitive advantages of the merger—would be [Defendants'] doing."); *IQVIA*, 710 F. Supp. 3d at 400-01 (similar); *Wilhelmsen*, 341 F. Supp. 3d at 74 (similar).

**B.   Plaintiffs are Not Required to Establish Irreparable Harm**

81.    When Congress adopted Section 13(b) was adopted, it made plain its intent "to maintain the statutory or 'public interest' standard . . . The Conferees did not intend, nor do they consider it appropriate, to burden the Commission with the requirements imposed by the traditional equity standard . . . ." H.R. Rep. No. 93-624 (1973) (Conf. Rep.), *as reprinted in* 1973 U.S.C.C.A.N. 2523, 2533; *Lancaster*, 434 F. Supp. at 1090.

82.    Contrary to Defendants' argument, the recent *Starbucks* decision does not hold to the contrary.  Instead, *Starbucks* held that when Congress seeks to depart from traditional equity practice, it must "ma[k]e its desire plain."  *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1577 (2024); *see also Gilley v. Stabin*, 2024 WL 3507982, at *1 n.3 (D. Or. July 23, 2024) ("Defendants have not convinced the Court that *Starbucks* invalidated the 'serious questions' test.").  That is exactly what Congress did here: Section 13(b) expressly departs from traditional equity practice by (1) relieving the FTC of the requirement to show irreparable harm, (2) substituting a "public interest" standard in its place, and (3) directing courts to "consider" the likelihood of success along with the equities.

83.    Further, even if the FTC needed to show irreparable harm (which it does not), it has.  As the Ninth Circuit stated plainly in *Boardman v. Pac. Seafood Grp.*, "A lessening of competition constitutes an irreparable injury under our law."  822 F.3d 1011, 1023 (9th Cir. 2016) (affirming injunction where plaintiffs showed a reasonable probability that the challenged merger would substantially lessen competition).

Dated: September 27, 2024                Respectfully submitted,

/s/ Susan A. Musser
Susan A. Musser, DC Bar # 1531486
Charles Dickinson, DC Bar # 997153
Rohan Pai, DC Bar # 1015652
Laura Hall, NY Bar # 4337408
Barrett Anderson, CA Bar # 318539
Elizabeth Arens, DC Bar # 982662
Jeanine Balbach, MD Bar
Emily Blackburn, DC Bar # 1032506
Alexander J. Bryson, VA Bar # 85737
Guia Dixon, CA Bar # 305751
Katherine Drummonds, DC Bar # 1044289
Paul Frangie, DC Bar # 474225
Trisha Grant, DC Bar # 1021419
Jacob Hamburger, DC Bar # 1025538
Lily Hough, CA Bar # 315277
Janet Kim, DC Bar # 489075
Kenneth A. Libby, NY Bar # 2035129
Eric Olson, DC Bar # 1708530
Harris Rothman, NY Bar # 5780283
Joshua Smith, MD Bar
Albert Teng, DC Bar # 1021115
Le'Ora Tyree, IL Bar # 6288669
Theodore Zang, Jr., NY Bar # 2186518

Federal Trade Commission
Bureau of Competition
600 Pennsylvania Avenue, NW
Washington, DC 20580
Telephone: (202) 326-2122
smusser@ftc.gov
cdickinson@ftc.gov

*Attorneys for Plaintiff Federal Trade Commission*

/s/ Robert A. Bernheim

Robert A. Bernheim, AZ Bar No. 024664
Jayme L. Weber, AZ Bar No. 032608
Vinny Venkat, AZ Bar No. 038587
Connor Nolan, AZ Bar No. 038088

Arizona Office of the Attorney General
2005 N. Central Avenue
Phoenix, AZ 85004
Tel: (602) 542-5025
Robert.Bernheim@azag.gov
Jayme.Weber@azag.gov
Vinny.Venkat@azag.gov
Connor.Nolan@azag.gov

*Attorneys for Plaintiff State of Arizona*

/s/ Nicole Gordon
Nicole Gordon, CA Bar No. 224138

State of California
California Department of Justice
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102
Tel: (415) 510-3458
Facsimile: (415) 703-5480
Nicole.Gordon@doj.ca.gov

*Attorney for Plaintiff State of California*

PLS' PROPOSED FOF AND COL

/s/ C. William Margrabe

C. William Margrabe, DC Bar No. 90013916

Office of the Attorney General for the District of
Columbia
400 6th Street, N.W, 10th Floor
Washington, D.C. 20001
Tel: (202) 727-3400
Will.Margrabe@dc.gov

*Attorney for Plaintiff District of Columbia*

/s/ Brian M. Yost

Brian M. Yost, IL Bar No. 6334138
Paul J. Harper, IL Bar No. 6335001
Alice Riechers, IL Bar No. 6272933

Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
Tel: (872) 276-3598
Email: Brian.Yost@ilag.gov
Paul.Harper@ilag.gov
Alice.Riechers@ilag.gov

*Attorneys for Plaintiff State of Illinois*

/s/ Schonette J. Walker

Schonette J. Walker, MD Bar No. 0512290008
Gary Honick, MD Bar No. 7806010078
Byron Warren, MD Bar No. 1612140330

Office of the Attorney General
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
Tel: (410) 576-6470
swalker@oag.state.md.us
ghonick@oag.state.md.us
bwarren@oag.state.md.us

*Attorneys for Plaintiff State of Maryland*

/s/ Lucas J. Tucker
Lucas J. Tucker, NV Bar No. 10252
Samantha B. Feeley, NV Bar No. 14034

Office of the Nevada Attorney General
100 N. Carson St.
Carson City, Nevada 89701
Tel: (775) 684-1100
ltucker@ag.nv.gov
sfeeley@ag.nv.gov

*Attorneys for Plaintiff State of Nevada*

/s/ Julie Ann Meade
Julie Ann Meade, NM Bar No. 8143
Jeff Dan Herrera, NM Bar No. 154030

New Mexico Department of Justice
408 Galisteo St.
Santa Fe, NM 87504
Tel: (505) 717-3500
jmeade@nmag.gov
jherrera@nmag.gov

*Attorneys for Plaintiff State of New Mexico*

/s/ Cheryl F. Hiemstra
Cheryl F. Hiemstra, OSB#133857
Tim D. Nord, OSB#882800
Chris Kayser, OSB#984244

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel: (503) 934-4400
Facsimile: (503) 378-5017
Cheryl.Hiemstra@doj.state.or.us
Tim.D.Nord@doj.state.or.us
cjkayser@lvklaw.com

*Attorneys for Plaintiff State of Oregon*

/s/ William Young
_____
William Young, WY Bar No. 8-6746

Office of the Wyoming Attorney General
109 State Capitol
Cheyenne, WY 82002
Tel: (307) 777-7847
William.Young@wyo.gov

*Attorney for Plaintiff State of Wyoming*