1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF OREGON

3   FEDERAL TRADE COMMISSION, et  )
    al.,                          )
4                                 )
              Plaintiffs,         )  Case No. 3:24-cv-00347-AN
5                                 )
         v.                       )
6                                 )
    THE KROGER COMPANY and        )  August 26, 2024
7   ALBERTSONS COMPANIES, INC.,   )
                                  )
8             Defendants.         )  Portland, Oregon
    _____)

9

10

11

12

13

14            PRELIMINARY INJUNCTION HEARING

15              DAY 1 - MORNING SESSION

16             TRANSCRIPT OF PROCEEDINGS

17        BEFORE THE HONORABLE ADRIENNE NELSON

18          UNITED STATES DISTRICT COURT JUDGE

19

20

21

22

23

24

25

1                             APPEARANCES

2

3    FOR PLAINTIFF FEDERAL
     TRADE COMMISSION:        Ms. Susan Musser
4                             Mr. Charles Dickinson
                              Federal Trade Commission
5                             400 7th Street S.W.
                              Washington, DC 20024
6

7                             Mr. Rohan Pai
                              Ms. Laura Hall
8                             Mr. Barrett James Anderson
                              Federal Trade Commission
9                             600 Pennsylvania Avenue, N.W.
                              Washington, DC 20580
10

11

12   FOR PLAINTIFF STATE
     OF ARIZONA:              Ms. Jayme L. Weber
13                            Office of the Arizona Attorney General
                              400 W. Congress Street, Suite S-215
14                            Tucson, AZ 85701

15

16   FOR PLAINTIFF STATE
     OF CALIFORNIA:           Ms. Nicole Gordon
17                            Office of the California Attorney
                              General
18                            455 Golden Gate Avenue, Suite 11000
                              San Francisco, CA 94102
19

20   FOR PLAINTIFF DISTRICT
     OF COLUMBIA:             Ms. Estefania Yulianny Torres Paez
21                            Office of Attorney General for the
                              District of Columbia
22                            400 6th Street N.W., 10th Floor
                              Washington, DC 20001
23

24

25

```
 1   FOR PLAINTIFF STATE
     OF ILLINOIS:           Mr. Brian Yost
 2                          Mr. Paul Harper
                            Office of the Illinois Attorney General
 3                          115 S. LaSalle Street
                            Chicago, IL 60603
 4

 5   FOR PLAINTIFF STATE
     OF MARYLAND:           Mr. Byron Warren
 6                          Office of the Maryland Attorney General
                            200 St. Paul Place
 7                          Baltimore, MD 21202

 8

 9   FOR PLAINTIFF STATE
     OF NEVADA:             Mr. Lucas J. Tucker
10                          Nevada Attorney General's Office
                            8945 W. Russell Road, Suite 204
11                          Las Vegas, NV 89148

12   FOR PLAINTIFF STATE
     OF NEW MEXICO:         Mr. Jeff Dan Herrera
13                          New Mexico Office of the Attorney
                            General
14                          Consumer Protection Division
                            408 Galisteo Street
15                          Sante Fe, NM 87501

16   FOR PLAINTIFF STATE
     OF OREGON:             Mr. Christopher J. Kayser
17                          Larkins Vacura Kayser LLP
                            121 S.W. Morrison Street, Suite 700
18                          Portland, OR 97204

19                          Mr. Tim D. Nord
                            Oregon Department of Justice
20                          Civil Enforcement
                            1162 Court Street NE
21                          Salem, OR  97301

22

23   FOR PLAINTIFF STATE
     OF WYOMING:            Mr. William Talley Young
24                          109 State Capitol
                            Cheyenne, WY 82002
25
```

```
 1   FOR DEFENDANT KROGER
     COMPANY:                    Mr. B. John Casey
 2                               Stoel Rives LLP
                                 760 S.W. Ninth Avenue, Suite 3000
 3                               Portland, OR 97205

 4                               Mr. Bambo Obaro
                                 Weil, Gotshal & Manges LLP
 5                               201 Redwood Shores Parkway
                                 Redwood Shores, CA 94065
 6
                                 Ms. Luna Ngan Barrington
 7                               Weil, Gotshal & Manges LLP
                                 767 Fifth Avenue
 8                               New York, NY 10153

 9                               Mr. Matthew M. Wolf
                                 Ms. Sonia Kuester Pfaffenroth
10                               Mr. Christian Schultz
                                 Mr. Joshua Davis
11                               Arnold & Porter Kaye Scholer LLP
                                 601 Massachusetts Avenue, N.W.
12                               Washington, DC 20001

13                               Mr. Mark Andrew Perry
                                 Weil, Gotshal & Manges
14                               2001 M Street NW, Suite 600
                                 Washington, DC 20036
15

16                               Ms. Christine Wheatley
                                 Kroger General Counsel
17                               The Kroger Company
                                 1014 Vine Street
18                               Cincinnati, OH 45202

19

20

21

22

23

24

25
```

```
 1   FOR DEFENDANT
     ALBERTSONS COMPANIES,
 2   INC.:                     Mr. David H. Angeli
                               Angeli Law Group LLC
 3                             121 S.W. Morrison Street, Suite 400
                               Portland, OR 97204
 4

 5                             Ms. Enu Mainigi
                               Mr. Jonathan Bradley Pitt
 6                             Mr. Adam Joshua Podoll
                               Ms. Beth A. Stewart
 7                             Mr. Michael Cowie
                               Ms. Tyler Infinger
 8                             Ms. Adwea Seymour
                               Mr. Thomas Moriarty
 9                             Williams & Connolly
                               680 Maine Avenue S.W.
10                             Washington, DC 20024

11

12

13

14

15

16

17

18

19   COURT REPORTER:          Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
                               United States District Courthouse
20                             1000 S.W. Third Avenue, Room 301
                               Portland, OR 97204
21                             jill_jessup@ord.uscourts.gov

22

23

24

25
```

```
1                          INDEX
2  OPENING STATEMENTS:                        PAGE:
3   Opening Statement by Ms. Musser            33
4   Opening Statement by Mr. Wolf              83
5   Opening Statement by Ms. Mainigi          123
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                    TRANSCRIPT OF PROCEEDINGS

2                        (August 26, 2024)

3    (In open court:)

4              DEPUTY COURTROOM CLERK:  All rise.

5              THE COURT:  Please be seated.  Good morning.

6        So we are here in the matter of Federal Trade

7    Commission, et al. v. The Kroger Company and Albertsons

8    Companies, Incorporated.  Case No. 3:24-cv-00347.  This is

9    the first day of a three-week preliminary hearing, an

10   injunction, to determine what will happen with the proposed

11   merger that has clearly gotten a lot of attention because of

12   the large number of people that I have sitting in my

13   courtroom.

14       I trust that everyone has received a copy of the

15   courtroom management and decorum order.  Just to reiterate,

16   there will not be any beverages or food allowed.  That does

17   not include water.  I will allow you to have water in here.

18       You cannot have any type of electronic devices.  If

19   someone somehow does possess one and they're sitting in the

20   gallery, you will be removed and not be able to attend the

21   hearing for the entirety of it.  This is your warning.

22       If counsel will state their appearances for the record

23   while I log on to my device, we'll begin with the pretrial

24   matters that we are continuing to address from Friday's

25   pretrial hearing.

1          MS. MUSSER:  Good morning, Your Honor.
2   Susan Musser on behalf of the Federal Trade Commission, and
3   I'll let my co-counsel introduce themselves.
4          THE COURT:  Absolutely.
5          MS. HALL:  Laura Hall on behalf of the Federal
6   Trade Commission.
7          MR. DICKINSON:  Good morning, Your Honor.
8   Charles Dickinson from the Federal Trade Commission.
9          MR. PAI:  Good morning, Your Honor, Rohan Pai on
10  behalf of the Federal Trade Commission.
11         MR. ANDERSON:  Barrett Anderson for the FTC.
12         MR. KAYSER:  Chris Kayser on behalf of the State
13  of Oregon.  And with me today I have Tim Nord from the
14  Oregon Department of Justice.
15         MR. NORD:  Good morning.
16         THE COURT:  Good morning.
17         MR. HERRERA:  Good morning, Your Honor,
18  Jeff Herrera on behalf of the plaintiff, State of New
19  Mexico.
20         MR. YOUNG:  Good morning, Your Honor.  William
21  Young on behalf of the State of Wyoming.
22         MR. TUCKER:  Good morning, Your Honor.
23  Lucas Tucker on behalf of the State of Nevada.
24         MS. TORRES PAEZ:  Good morning, Your Honor.
25  Estefania Torres Paez for the District of Columbia.

1              MS. GORDON:  Good morning, Your Honor.

2    Nicole Gordon for the State of California.

3              MR. WARREN:  Good morning, Your Honor.

4    Byron Warren for the State of Maryland.

5              THE COURT:  Good morning.

6              MS. WEBER:  Good morning, Your Honor.  Jamie Weber

7    for the State of Arizona.

8              MR. WOLF:  Good morning, Your Honor.  Matt Wolf

9    from Arnold & Porter for Kroger.  With me, from Arnold &

10   Porter, is Sonia Pfaffenroth, Christian Schultz, Josh Davis.

11   From Stoel, John Casey.  From a client, Christine Wheatley,

12   General Counsel.

13             THE COURT:  Yes.  We saw her in July.

14             MR. WOLF:  And Yael Cosset, our Chief Information

15   Officer, in the gallery.

16        And from Weil Gotshal, Mark Perry.

17             MR. PERRY:  Good morning.

18             THE COURT:  Good morning.

19             MR. WOLF:  Bambo Obaro.

20             MR. OBARO:  Good morning.

21             THE COURT:  Good morning.

22             MR. WOLF:  And Luna Barrington.

23             THE COURT:  Good morning.

24             MS. MAINIGI:  Good morning, Your Honor.

25   Enu Mainigi from Willams & Connolly for Albertsons.  Also

1    from Williams & Connolly are Beth Stewart, Joshua Podoll,

2    Jonathan Pitt, and Tyler Infinger.

3         From Dechert, Mike Cowie.

4              THE COURT:  Good morning.

5              MS. MAINIGI:  And from the Angeli Law Group,

6    David Angeli.

7              THE COURT:  Yes.

8              MS. MAINIGI:  And, Your Honor, from the client, we

9    have Tom Moriarty, General Counsel.

10             MR. MORIARTY:  Good morning, Your Honor.

11             THE COURT:  Yes, good morning.

12             MS. MAINIGI:  Adwea Seymour, head of litigation;

13   and we also have Mr. Vivek Sankaran, CEO; as well as

14   Ms. Susan Morris, COO of Albertsons.

15             THE COURT:  All right.

16             MS. MAINIGI:  Thank you.

17

18

19

20

21

22

23

24

25

1            THE COURT:  I know you have been working over the

2     weekend.  We had talked about your working to try to confer

3     around a number of issues.  So if you can update the Court.

4            MS. MUSSER:  Thank you, Your Honor.  From -- on

5     behalf of plaintiffs, Mr. Anderson and Ms. Hall are going to

6     provide updates which I think will please this Court.  We

7     have been able to resolve or at least narrow many of the

8     issues.

9            MR. ANDERSON:  Good morning, Your Honor.

10    Barrett Anderson.  As my colleague indicated, we have, I

11    hope, mostly good news here.

12       A couple of the issues that were left on the table, the

13    first one was the briefing by the parties on the scope of

14    the administrative record.

15            THE COURT:  Yes.

16            MR. ANDERSON:  I'm pleased to say the parties have

17    reached agreement.  We'll be filing a joint stipulation and

18    order later today.

19            THE COURT:  All right.  And I look forward to

20    receiving it.  I hope --

21            MR. ANDERSON:  Yes, Your Honor.

22            THE COURT:  -- to be able to sign off on it later

23    tonight.  I too will be working around the clock, as are all

24    of the attorneys, because that's just the nature of

25    litigation, but it will happen as soon as possible.

 1              MR. ANDERSON:  Thank you, Your Honor.  I can tell

 2      you that it contemplates the parties filing things at the

 3      end of the hearing, so no rush on that.

 4              THE COURT:  All right.  Fair enough.

 5              MR. ANDERSON:  The parties also discussed a

 6      variety of other issues.  We've reached agreement on

 7      disclosures of exhibits for direct examinations and

 8      demonstratives, and we're going to continue to meet and

 9      confer regularly on exhibits.

10              THE COURT:  Great.

11              MR. ANDERSON:  With respect to confidentiality,

12      which I know was front and center, we also have had

13      productive conversations on that over the weekend of the

14      scope of the defendants' confidentiality designations.

15      Based on the guidance that we received over the weekend from

16      the defendants, we believe there is a path forward here for

17      the parties to continue to work together.

18              THE COURT:  Okay.

19              MR. ANDERSON:  That will both protect the truly

20      confidential information while allowing plaintiffs to openly

21      discuss a broader scope of information than what defendants

22      had originally designated.

23          So our understanding, just so the Court is aware, is

24      that, consistent with what counsel for Kroger represented on

25      Friday at the prehearing conference, defendants are most

1    concerned with the specific numbers, the data, like prices

2    and margins.  We can work with that sort of information,

3    along with the disclosure process, and the continued

4    meet-and-confers, we expect that we'll be able to present

5    most of our case without issue.  Of course working with

6    Your Honor to remove any documents that should not be

7    displayed at the right time and otherwise arranging our

8    examinations and the courtroom appropriately.

9         With that in mind and with the idea that we'll continue

10   to work together, we don't believe there's reason for the

11   Court to rule on the defendants' motions to seal today.

12             THE COURT:  All right.

13             MR. ANDERSON:  Instead, recommend deferring ruling

14   on that.

15             THE COURT:  Fair enough.

16             MR. ANDERSON:  I'll pause there in case defendants

17   have anything to say, and I have one more issue after that,

18   Your Honor.

19             MR. OBARO:  Good morning, Your Honor.

20             THE COURT:  Good morning.

21             MR. OBARO:  Bambo Obaro, with Weil Gotchal, from

22   Kroger.  We agree with the characterization from the FTC

23   about the nature of the conversations.  With respect to the

24   confidentiality designations, as the FTC noted, we intend to

25   continue to work with them the day before -- before trial to

1   make sure that we're aligned on what needs to be sealed.  We

2   do not intend to seal the courtroom and plan to work

3   cooperatively with them.  That's the agreement that we have.

4       There's an issue that we want to discuss with respect

5   to the exhibits, and my colleague Josh Podoll will discuss

6   that issue with the Court.

7           MR. PODOLL:  Yes, Your Honor.  As Mr. Anderson

8   said and Mr. Obaro said, we reached agreement on the vast

9   majority of the issues.

10      The one sort of outstanding issue is -- revolves around

11  cross-examination exhibits, which is to say not rebuttal or

12  impeachment, but a document that either side affirmatively

13  intends to admit through cross-examination.

14          THE COURT:  Okay.

15          MR. PODOLL:  The defense's proposal as to those

16  documents is that, like direct exhibits, they should be

17  shared 48 hours in advance.  The idea is that those

18  documents, no less than direct exhibits, have

19  confidentiality issues.  There may be evidentiary issues.

20      I understand every lawyer wants to protect the secret

21  sauce of cross-examination, but the reality is there aren't

22  secrets at this point in this case.  We've been through

23  extensive discovery.  The record is well-known.  So we think

24  the most efficient path forward would be for any document

25  that's going to be admitted.  Be it on cross or be it on

1    direct, that document should be part of the regular

2    disclosure of exhibits.

3                THE COURT:  So what was the agreement?

4                MR. PODOLL:  The agreement is that exhibits that

5    will be used on direct with a witness will be disclosed 48

6    hours in advance.

7                THE COURT:  Okay.

8                MR. PODOLL:  And given to Your Honor, and the

9    parties will meet and confer and bring in any issues on

10   confidentiality or any evidentiary issues to you in advance.

11        The defense's proposal is to do the same thing with

12   cross-examination exhibits too, not just direct exhibits.

13        My understanding is the Government would limit the

14   agreement to sharing the direct exhibits.

15                THE COURT:  How would that work in terms of the

16   timing of the witnesses, in terms of -- because if you -- if

17   you're not -- it can affect how quickly you can do

18   cross-examination, it seems like.

19                MR. PODOLL:  Yes.  Our position is that it would

20   be most efficient and would --

21                THE COURT:  I understand that, but I'm just trying

22   to understand timing of witnesses.  Because I also am

23   acknowledging that based on what was just shared as who's in

24   the courtroom, we have three witnesses here, and I'm not

25   sure witnesses are supposed to be present.

1          MS. MAINIGI:  Your Honor, I believe the executives

2     from the companies are here just for opening statements, and

3     then they're intending to depart.

4          THE COURT:  I see.  Good.  I just wanted to raise

5     that.  I know there are a lot of moving parts, and I have

6     been trying to manage them all, and I'm trying to make sure

7     nothing gets past me, and that's why I'm raising it, because

8     I didn't want that to get past me.  Fair enough.

9        Government's response?

10         MR. ANDERSON:  Yes, Your Honor, two points.  One

11    is, as my colleague Mr. Podoll indicated, sharing

12    cross-examination exhibits -- it's very unusual -- in

13    advance.  Cross-examination is, by definition, flexible.

14    And, Your Honor, at this point there could be issues where

15    we have planned cross-examination.  It may not even come up

16    because it doesn't come up on direct.

17       And, Your Honor, the last issue -- the concern about

18    confidentiality, we expect that, through the course of the

19    next few days and this week, we're going to better

20    understand even what the guardrails are with respect to

21    confidentiality.  There's likely not going to be a lot of

22    necessity to review specific exhibits as we get further into

23    the case when cross-examinations from the Federal Government

24    actually proceed.

25         THE COURT:  All right.  Go ahead.

1            MR. PODOLL:  I think, Your Honor, it's really just

2      an efficiency point.  We appreciate -- I appreciate what

3      Mr. Anderson says.  I don't really disagree with it.  We

4      just think that, given the limited time we have, the more we

5      can do to streamline the operation, the better.

6          And by the way, we would be giving to the Government,

7      under our proposal, any documents we would use on

8      cross-examination during their case.

9            THE COURT:  I believe that, for efficiency, I

10     think you all have done an incredible amount of work to try

11     and meet the requests of the Court, but I'm not going to

12     interfere with your ability to try your case.  So I'm not

13     going to include cross-examination exhibits at this point.

14           MR. PODOLL:  Thank you.

15           MR. ANDERSON:  Yes, Your Honor.

16         One last issue before --

17           THE COURT:  Did they have another?

18           MR. ANDERSON:  No.

19           THE COURT:  Go ahead.

20           MR. ANDERSON:  The last issue is, Your Honor, we

21     did receive the Court's ruling with respect to Dr. Israel's

22     surrebuttal report, the motion to strike.

23           THE COURT:  Yes.

24           MR. ANDERSON:  I just wanted to make sure that we

25     were forthright as well.  Plaintiffs -- we do intend to call

1   our expert, Dr. Hill, during our case-in-chief, but at this

2   point Dr. Hill would not plan to affirmatively address

3   Dr. Israel's new analysis.  That came up in that surrebuttal

4   in our case-in-chief.  At most, if he comes up to address

5   it, Dr. Hill would do so during our rebuttal case.

6         So to the extent that Dr. Hill, our expert, prepares a

7   surreply to the new analysis -- and I realize there's a lot

8   going on here, Your Honor, but to the extent he does that,

9   we would disclose that surreply 48 hours in advance of

10  Dr. Israel's testimony during defendants' case-in-chief.

11            MR. WOLF:  We have no objection to that procedure,

12  Your Honor.

13            THE COURT:  That will happen.

14            MR. ANDERSON:  Now I hand it to my colleague

15  Laura Hall.

16            THE COURT:  All right.  No?  Oh, okay.

17            MS. HALL:  Your Honor, pursuant to your direction

18  on Friday, we met and conferred with counsel for C&S on

19  the -- on Saturday regarding their motion to seal.  It was a

20  very productive discussion and resulted in C&S providing

21  narrowed redactions for a number of documents and deposition

22  transcripts, but we have two areas where we have reached an

23  impasse that we'd like Your Honor's guidance on, and they're

24  related.  They are both related to the concept of

25  rebannering, which you're going to hear a lot about, which

1    is, at bottom, changing the name of the store.

2              THE COURT:  Right.

3              MS. HALL:  And so in preparation for operating the

4    divested stores, C&S's commissioned studies of different

5    consumer perceptions of different brands that they have

6    available to them, and they are taking the position that

7    some of the reports they received on consumer perception are

8    competitively sensitive and they want it to be sealed.

9        If Your Honor would like, I can hand up a document

10   that's an example of that.

11             THE COURT:  Was it not already provided?

12             MS. HALL:  It was.  It's just, I believe, counsel

13   referred to 7,000 pages arriving.

14             THE COURT:  All right.  You can't --

15             MS. HALL:  Like a one-page --

16             THE COURT:  You can -- you may approach.

17   Absolutely.

18             MS. HALL:  This is a page from PX3406.  It's

19   page 8, and the green highlighted area is discussing

20   consumer perceptions of certain brands that C&S would be

21   acquiring in the divestiture.

22       Our view is that this is not confidential information

23   of C&S.  C&S doesn't own these banners.  It didn't do any of

24   the work that resulted in consumer perceptions of these

25   banners.  And even if they did own the banners, this is

 1   about the public perception.  This is not internal,

 2   confidential, or proprietary information.

 3        I can stop here for C&S to respond on this issue, or I

 4   can raise the related issue, whichever would be more

 5   effective -- efficient for you.

 6             THE COURT:  Are they interrelated, or are they

 7   separate?

 8             MS. HALL:  The other issue is also about

 9   rebannering and which stores C&S plans to rebanner to

10   particular acquired banners.

11             THE COURT:  You can go ahead and address it.

12             MS. HALL:  Okay.  So currently there is what I

13   understand to be tentative plans to rebanner the divestiture

14   stores to particular acquired banners in particular regions.

15        And I also can hand up an example of this, Your Honor,

16   which is from DX2905 at slide 49.

17        So this is a little hard to see at this scale, but this

18   shows the originating banner on the left and then a

19   description of an interim -- a potential interim state, and

20   then on the right a sort of destination banner they're

21   currently planning for particular stores in particular

22   states.

23        And we think that this is important to assess because

24   whether the particular destination banner, if you will, we

25   believe will affect the likelihood of success of those

1    stores being competitive.

2        For example, if it's a better known brand or similar to

3    the current brand, it is more likely to be accepted by

4    consumers.  If it's totally unknown, if it's a very

5    different format and assortment, that's a riskier choice.

6        So we don't think this is competitively sensitive.  We

7    understand that it's currently confidential, but the options

8    are known because the press releases state which banners

9    they're getting, either in whole or licensed in certain

10   jurisdictions, and we don't understand how the plan to use a

11   particular jurisdiction in a particular region is

12   competitively sensitive.

13             THE COURT:  So let me make sure that I'm

14   understanding.  You, on Friday, were wanting to mention this

15   in your opening statements.

16             MS. HALL:  Yes.

17             THE COURT:  I don't think that's necessary.

18             MS. HALL:  I have edited my opening statement

19   already, Your Honor.

20             THE COURT:  All right.  I don't think it's

21   necessary.

22             MS. HALL:  All right.  But we would like the

23   ability to explore it with our expert, Dr. Fox, as well as

24   with C&S's witnesses later this week.

25             THE COURT:  Oh, absolutely.

1          MS. HALL:  Since we were at an impasse, we wanted

2    to bring it to you today.

3          THE COURT:  Understood.

4          MR. PERRY:  Your Honor, Mark Perry for Kroger.

5      I'm not here to argue that point but rather to

6    introduce Renata Hesse for C&S.  And while she comes up,

7    it's very crowded today for openings.  We may come back at

8    the next break to discuss whether C&S may have a place

9    somewhere in the courtroom with electronics since they will

10   be here for the entirety of the trial.

11         THE COURT:  I wondered if they were.  I know they

12   had local counsel here on Friday.

13         MR. PERRY:  International counsel will be here for

14   the entire trial, but I don't think we have to do that right

15   now.  I just wanted to alert the Court to that issue.

16         THE COURT:  You see we're pretty tight.  We have

17   to figure some things out because -- we may have to bring in

18   some less-than-comfortable chairs to make people -- to make

19   space.

20         MR. PERRY:  Your Honor, my prediction is perhaps

21   this afternoon or tomorrow there might not be quite as many

22   people.

23         THE COURT:  Oh, all right.

24         MR. PERRY:  Ms. Hesse.

25         MS. HESSE:  Good morning, Your Honor.

1          THE COURT:  Good morning.

2          MS. HESSE:  Renata Hesse for C&S from

3   Sullivan & Cromwell.

4      On the rebannering issue, the key point here for our

5   client is that -- what it is thinking about where it will be

6   rebannering and which banners it will use in which

7   jurisdiction is not public at the moment and is

8   confidential, and they feel that it is competitively

9   sensitive in the sense that, when it goes out into the

10  marketplace, assuming that it does acquire these stores

11  ultimately, what it will be doing, which banners it will be

12  picking, what the public perception of those banners are,

13  based on a confidential study commission on C&S, is

14  something our competitors, including Kroger, would find

15  valuable because it will allow them to figure out how to

16  better attack us in competition.

17     So we think it is competitively sensitive.  We don't

18  believe that it's necessary for the FTC to be able to

19  describe our -- these plans in detail.  We have told them

20  that it's fine for them to ask our witnesses about which

21  banners are known where and which banners could potentially

22  be used in other places, but we don't think it's appropriate

23  for them to question our witnesses or make public

24  information about where C&S plans to use particular banners,

25  particularly when that is still an unsettled question for

 1  C&S.

 2          THE COURT:  Did you create this information -- how

 3  was this -- let me start over.

 4      The question is how was this information gathered, and

 5  why do you feel it's confidential?

 6          MS. HESSE:  So there are two different sets of

 7  information.  One -- the first example that Ms. Hall gave

 8  you is a portion of a study that we -- that we

 9  commissioned --

10          THE COURT:  Okay.

11          MS. HESSE:   -- regarding the banners and

12  perception of banners.

13      And that was important for us to do because we wanted

14  to figure out what people thought about the banners so we

15  could figure out where we might use them.

16      The second is -- I believe is a piece of our business

17  plan, and so that is a confidential document where we go

18  through -- and it's an example of what we're thinking about

19  where we might use particular banners and what the approach

20  to rebannering might be.

21      So that's a -- that is a confidential internal document

22  that's an active business plan that is -- that C&S is

23  working.

24          THE COURT:  Are you opposed that you would

25  acknowledge that you went through these two efforts to

1   determine the viability of taking on this project?

2           MS. HESSE:  Not at all.

3           THE COURT:  It's the details.

4           MS. HESSE:  It's the details.

5           THE COURT:  The locations?

6           MS. HESSE:  Yes.

7           THE COURT:  You're saying it's fluid?  My word,

8   not your word.

9           MS. HESSE:  It is fluid at the moment.  We're

10  still actively working on determining where we will use

11  particular banners and how those will be rolled out and over

12  what timeline.  That is fluid.  We have no objection to the

13  FTC asking our witnesses about the banners and where they

14  are and anything like that.

15          THE COURT:  Fair enough.  Thank you.

16          MS. HALL:  I have nothing further.

17          THE COURT:  All right.

18          MS. HALL:  On that issue, yeah.

19          THE COURT:  I'm going to allow limited questions,

20  but I'm not going to allow the specifics.

21      If we don't know for sure, I don't want to put them in

22  a disadvantage at this point.

23          MS. HESSE:  Thank you, Your Honor.

24          THE COURT:  You're welcome.

25          MS. HALL:  Ms. Hesse, you may want to stay up for

1    a second.

2        One other issue arose unexpectedly on Friday afternoon

3    when we received a new amended errata for Ms. Florenz, who

4    is a C&S executive and on plaintiffs' witness list.  We

5    believe the delivery of errata two and a half months after

6    her deposition was inappropriate.  We can address that with

7    the court now or we can address it during lunch so we don't

8    delay opening.

9            THE COURT:  Let's have you discuss it over lunch,

10   and if you need to, let me know and we can come back a

11   little early.

12           MS. HALL:  Oh, I think we need to discuss it with

13   the Court.  We have met and conferred on the issue.

14           THE COURT:  Let's talk about it.

15           MS. HALL:  Now, Your Honor?

16           THE COURT:  Yes.

17           MS. HALL:  Okay.  So Ms. Florenz testified on

18   June 6th as the corporate representative on a number of

19   topics, including the treatment of certain customer data in

20   the divestiture purchase agreement, and she testified that

21   she had personal knowledge of that provision, that she had

22   met with counsel the prior day to prepare for her

23   deposition, and she was represented by counsel during her

24   deposition.

25       Her testimony about that provision was consistent with

1    the plaintiffs' understanding of the provisions of the

2    divestiture purchase agreement.

3          She served errata on July 9th, which did not address

4    this particular page, page 163, of her deposition -- and I

5    can hand up the errata in question if it would be of

6    assistance.  Basically, the errata that we received at

7    4:15 p.m. the last business day before trial completely

8    reverses Ms. Florenz's testimony about the meaning of the

9    contract provision.  We believe that violates controlling

10   Ninth Circuit case law, which is *Hambleton Bros. Lumber v.*

11   *Balkin Enterprises, Inc*., 397 F.3d 1217 at 1225.  Ninth

12   Circuit, 2005, which requires substantial compliance with

13   the 30-day deadline in the Federal Rule of Civil Procedure

14   30(e) governing errata.

15         Ms. Florenz's July 9th errata includes items on pages

16   162 and 168.  So bracketing the page in question.  The

17   amended errata was accompanied by a cover letter stating

18   that they had only discovered her testimony was incorrect in

19   the course of preparing her to testify for trial.

20         And, Your Honor, we have no objection to her testifying

21   consistent with her current understanding of the provisions,

22   but giving effect to this errata would mean that we cannot

23   confront her with her prior inconsistent statement, and so

24   we think that that's unfair.

25         Our other concern is that defendants' expert,

1   Mr. Galante, includes in his report an observation about the

2   same provision of the divestiture purchase agreement.

3        We ask C&S whether they had conferred with defendants

4   on their understanding of this provision.  They said yes.

5   So we now have a concern that Mr. Galante's report may also

6   be amended to change the interpretation given there.

7        So we are prejudiced by the belated disclosure of this

8   position.  We know that the CEO of C&S, Mr. Winn, testified

9   in his personal capacity to a different understanding, but

10  we relied on the corporate representative's testimony up

11  until Friday afternoon, and so we just ask that this errata

12  be stricken so that we can confront Ms. Florenz with her

13  prior inconsistent statement under oath.

14            MS. HESSE:  Your Honor, I think we were really

15  trying to do plaintiffs a favor here by letting them know

16  that the understanding of the contract terms that

17  Ms. Florenz articulated was incomplete.  I would not say it

18  was incorrect.  And that Mr. Winn's testimony on this same

19  issue was, in fact, more -- had more detail and was

20  therefore complete.

21       But what's -- the issue here is the meaning of

22  "customer data."  That's the -- the key issue, and the

23  question is how -- how long and whether Kroger can retain

24  customer data after the close of the transition period.  So

25  after the TSA, the transition services agreement, concludes.

1        We think we and Kroger have the exact same view on this
2   provision and the transition services agreement, and that is
3   that for customer data relating to customer demographics,
4   Kroger is able to retain that information after the close of
5   the transition period; so after day one starts.  But for the
6   transaction data that Kroger collects during the
7   transition -- transition period, that data, consistent with
8   Mr. Winn's testimony, must be deleted.
9        The other issue that I think was somewhat confusing in
10  Ms. Florenz's testimony is that if you look at the complete
11  passage of the -- of the testimony, I believe what she was
12  talking about was about what would happen during the
13  transition period because she was asked immediately after
14  the part of the testimony that the FTC is quoting, doesn't
15  she have concerns that she would -- that Kroger would be
16  able to use this data, and she said, "No.  Because
17  everything would be regular or go back to regular business
18  practices on day one."
19       So I don't think that there's -- I think this is a
20  little bit of a tempest in a teapot.  They're free to ask
21  Ms. Florenz whatever they would like to ask her, but I think
22  the contract says what it says.  The parties interpret it
23  the way they interpret it.  We interpret it consistent with
24  the way the parties interpret it, and allow Mr. Perry to
25  talk about the potential inconsistency with Dr. Galante.

1              MR. PERRY:  Thank you, Your Honor.  Mark Perry for

2     Kroger.  We were not notified of this issue by the FTC, but

3     C&S did tell us about it.

4          The contract provision -- the Court's going to hear a

5     lot more about this later, and this is, I don't think, a

6     today issue, by the way, but the transition services

7     agreement, the Court will hear a great deal about.  It's a

8     very extensive negotiated document that goes with the asset

9     purchase agreement.  They're two combined documents, and you

10    will hear testimony, lay and expert, about it.

11         This particular issue relates to a provision of the

12    APA, Section 7.7 (B)(3)(iii) that deals with the use and

13    retention, and so forth, of certain data.

14         The provision means what it says, is Kroger's position,

15    defendants' position, to be clear, and the witnesses may of

16    course be questioned about it.

17         Mr. Galante, our expert -- and by the way, Your Honor.

18    If I could detour.  We do have three experts today in the

19    witness box; as you were looking around the courtroom, I'm

20    sure the Court was curious as to who it is.

21              THE COURT:  Well, I recognize Dr. Israel.

22              MR. PERRY:  Dr. Israel on the left; Mr. Galante,

23    who we're speaking about, in the middle, which is why I

24    would mention it; and Mr. Roger King on the right --

25              THE COURT:  Good morning.

1          MR. PERRY:  -- who you heard about on Friday.

2      So Mr. Galante does not intend to amend his report on

3   this issue, Your Honor, to the extent the Government raised

4   that issue, and as Ms. Hesse said, the witness has clarified

5   her testimony.  I think that's -- the Court should have the

6   most complete and accurate representation from witnesses as

7   to their understanding of the facts.

8      Thank you.

9          MS. HALL:  Well, thank you very much.  I'm very

10   glad to hear about Mr. Galante.

11      We weren't sure whether to contact Kroger on this.  I

12   had heard from Mr. Wolf on Friday.  "Leave us out of it.  Go

13   deal with C&S.  We've got enough to do."

14      So I thought I was sparing you folks from yet another

15   thing to do over the weekend.

16      We have no objection to Ms. Florenz testifying in

17   whatever manner she believes is consistent with the

18   contract.  We object only to errata that purports to change

19   what she said two and a half months ago, and that is all we

20   ask, is that that errata be stricken.

21          THE COURT:  It will be stricken.  Understanding

22   *Hambleton Bros. Lumber Company* and its holding, I -- I

23   have -- that that's my ruling.

24      So I know you know that we didn't start right at 9:00.

25   So I want us to have a truncated lunch just so that we can

1    stay on track.  I am sure with all of the changes that I see

2    in my courtroom, and I know that we had a printer installed

3    at some point on Friday.  That's what you told me.  I'm

4    assuming that it happened.  We may be able to make up our

5    time.  Because I would rather us truncate today than trying

6    to push in other days.  Because I am sure there are a lot of

7    people who've made plans to leave the city on

8    September 13th.

9          Is there any other pretrial matter that we need to

10   address?

11              MS. MUSSER:  Nothing from FTC.

12              MR. WOLF:  Nothing from Kroger, Your Honor.

13              MS. MAINIGI:  Nothing, Your Honor.

14              THE COURT:  All right.  Let's transition to

15   opening statements.

16              MS. MUSSER:  Good morning, Your Honor.  Before we

17   get started, may my colleague approach the bench with copies

18   of our opening demonstrative?

19              THE COURT:  Absolutely.

20              MS. MUSSER:  And I'm also going to ask my

21   colleague, Mr. Anderson, to flip over this whiteboard if

22   Your Honor is okay with it.

23              THE COURT:  I am fine with it.  Thank you.

24              MS. MUSSER:  And, Your Honor, in the binder in

25   front of you is an unredacted copy of the slides that

1    plaintiffs will be showing today.

2              THE COURT:  Wonderful.

3              MS. MUSSER:  In order to facilitate protection of

4    confidential information, per our discussions, we will be

5    showing the redacted version on the slides for the public

6    today.

7              THE COURT:  We understand that now we have the

8    public line open, and it will be open through the opening

9    statements.  So anyone who chose to call in on that number

10   can hear.

11

12              OPENING STATEMENT ON BEHALF OF FTC

13              MS. MUSSER:  Thank you, Your Honor.  My name is

14   Susan Musser, and I'll be presenting the opening statement

15   on behalf of plaintiffs, along with my colleague Ms. Hall.

16       Your Honor, Americans across the country are united by

17   the common experience of coming together over the dinner

18   table to break bread with their friends and family.  Whether

19   they're paying by cash, putting groceries on credit, or

20   paying with an EBT, Americans depend on supermarkets to

21   provide affordable, quality groceries to feed their

22   families.

23       But feeding your family has gotten more and more

24   expensive over the last several years.  Rising grocery

25   prices has squeezed budgets, making it more difficult for

1  Americans to put food on the table.  In thousands of

2  communities across the country, Americans currently turn to

3  supermarkets run by Kroger and Albertsons, such as Kroger's

4  Fred Meyer or Albertsons Safeway stores here in Portland, to

5  get groceries for the week.

6      Kroger and Albertsons, in turn, compete to increase

7  foot traffic and the amount shoppers purchase at their

8  stores.  They do this by enticing shoppers through lower

9  prices, promotion, increasing selection, and creating an

10 overall more enticing shopping experience.

11     American families, in turn, benefit by reaping the

12 fruits of this competition, by receiving better groceries

13 for less.

14     To serve their shoppers, Kroger and Albertsons employ

15 over 710,000 employees across the country.  Many of these

16 employees are union workers.  Currently, workers across the

17 country benefit from being able to leverage Kroger and

18 Albertsons' competition against each other when coming to

19 the bargaining table to get better benefits and wages for

20 workers.

21     Kroger has now entered into a $25 billion deal to

22 purchase Albertsons.  This is the largest American grocery

23 acquisition in history.  This multibillion-dollar deal would

24 result in Kroger swallowing Albertsons and would eliminate

25 the competition between these two companies that shoppers

1  and union workers depend on in one fell swoop.

2       The FTC is joined by its co-plaintiff states:  Arizona,

3  California, the District of Columbia, Illinois, Maryland,

4  Nevada, New Mexico, Oregon, and Wyoming, in seeking to block

5  this transaction.

6       Colorado and Washington have filed separate lawsuits in

7  their own respective state courts, similarly seeking to

8  block this deal.

9       This lawsuit is part of an effort aimed at helping

10  Americans feed their families.  Stopping this

11  multibillion-dollar deal will keep in place the vigorous

12  competition that acts as a check on rising grocery prices

13  and spurs improvements in quality and innovation.

14       But plaintiffs are not asking this Court to stop the

15  transaction.  That is an issue that will be resolved in the

16  related administrative proceeding, which is where the full

17  merits adjudication is happening.

18       Rather, plaintiffs are here today, in this proceeding,

19  to simply ask this Court to push pause on the transaction

20  and to prevent the defendants from closing the deal during

21  the time the FTC will meet -- will need to complete the

22  merits proceeding that it has asked to begin on October 1st.

23       To meet our burden here in this proceeding, plaintiffs

24  need only raise serious and substantial questions justifying

25  a full inquiry in the merits.

1    To meet that burden, plaintiffs will raise serious and

2    substantial questions in two ways:  The first is by

3    producing evidence showing harm in thousands of local

4    supermarket product markets accounting for over $70 billion

5    in sales; second, by producing evidence of harm in dozens of

6    markets for union grocery workers.

7    Defendants will not be able to meet their burden to

8    rebut this prima facie showing, either by showing evidence

9    of efficiencies or showing that their fixed -- and facts

10   fixes the problems with this deal.

11   But taking a step back is helpful to put the scope of

12   these companies' operations and competition in context.  In

13   preview, some of the evidence this Court will hear.

14   On the screen in front of you and on the left,

15   demonstrative in front of the Court, shows the dozens of

16   banners or brands of supermarkets that Kroger and Albertsons

17   operate across the country.

18   Again, for example, here in Portland, Kroger operates

19   QFC and Fred Meyer's banners, and Alberts -- Albertsons

20   operates the Safeway and Albertsons stores.  Kroger

21   acquired -- Kroger and Albertsons both acquired these

22   banners through a series of acquisitions following a general

23   trend of consolidation across the supermarket industry.

24   As a result of these acquisitions, these companies

25   today are two of the largest supermarkets in the country.

1      Separately, Kroger owns over 2,700 stores; 2,257

2 pharmacies; employs over 414,000 workers; and operates in 35

3 states and the District of Columbia.

4      In turn, Albertsons employs over 2,200 stores -- or

5 owns 2,200 stores; operates 1,725 pharmacies; and employs

6 285,000 workers.  It also operates in 34 states and across

7 District of Columbia.

8      Collectively, these two companies would operate over

9 5,000 stores; 4,000 fuel centers; 4,000 pharmacies; 66

10 distribution centers; 52 manufacturing plants.

11      Together, defendants would control $220 billion of

12 annual commerce and employ over 710,000 workers.

13      Today, Kroger and Albertsons compete in communities

14 spanning 22 states, running from -- ranging from D.C. to

15 southern states, like New Mexico, and all along the West

16 Coast.

17      Now, defendants like to use this map to argue that

18 these companies are complements, not competitors.  And I'm

19 sure if you zoom out far enough from a boardroom in

20 Cincinnati or Boise, it may look like that.  But antitrust

21 laws tell you to look closer to see where the competition is

22 occurring in order to understand the impact of an

23 acquisition.

24      So let's zoom in just a little bit.  Let's zoom in to

25 here in Oregon.  And when you zoom in, the picture becomes

1    just a little clearer, and you start to see the extent that

2    Kroger and Albertsons overlap in local communities across

3    the state.

4        After this merger, instead of having two options, these

5    Oregon stores will be owned by one company.

6        Now, the FTC has an email where the public can write

7    the FTC to express any antitrust concerns they may have.

8    After this merger was announced, over 100,000 members of the

9    public took time out of their day to email the FTC to say

10    that they were worried.  This is an unprecedented number.

11        In Oregon alone, 4,961 Oregonians wrote to express

12    concern.  But to understand where competition is

13    flourishing, you can't just look at Oregon.  You need to

14    zoom in further, which makes sense, Your Honor, because, as

15    evidence throughout the course of this proceeding will tell,

16    grocery competition is local.  And if a shopper in Portland

17    is faced with higher prices, they can't practically go to

18    somewhere in Eugene.  So you need to focus on where the harm

19    is felt which is to zoom in further to local communities.

20        So let's do that.  Zooming in further to Corvallis, for

21    example, here you see the Kroger and Albertson stores are

22    represented by blue and red teardrops.

23        Currently, Albertsons owns 33 percent of the market

24    share in this area and Kroger 27.  If this acquisition is

25    allowed to go through, they collectively will own four out

1   of six supermarkets in this area and control 60 percent of

2   the market.  That means less choices for the Corvallis

3   community and more power for the collective Kroger and

4   Albertsons entity.

5        Unsurprisingly, Corvallis shoppers are concerned about

6   the acquisition in their community.  107 took the time to

7   write to the FTC, and when you expand that to the

8   surrounding communities, that number jumps to 669.

9        But, of course, this harm just isn't about Corvallis or

10  even Oregon, but this dynamic and this story plays out in

11  community after community across the country.  So let's look

12  at just one more example.  Let's zoom into Santa Fe

13  represented by my co-plaintiffs' state.

14       Here, Santa Fe shows that pre-merger Albertsons has a

15  37 percent market share and Kroger has a 22 percent market

16  share.

17       Collectively, after this acquisition, that market share

18  will jump to a combined 59 percent, and the combined entity

19  will own five out of eight options in this local area.

20  Again, meaning less choices for customers and more power for

21  the merging form.

22       And, again, Santa Fe shoppers are concerned.  278 took

23  time out of their day to write to the FTC expressing that

24  concern over this transaction.  In the upcoming weeks,

25  plaintiffs will show this Court evidence support its prima

1    facie case that validates these shoppers' concerns.

2        Let's start with the evidence plaintiffs will put

3    forward to show harm in the supermarket line of commerce.

4        Now, the supermarket line of commerce includes

5    traditional grocery stores, such as Kroger and Albertsons,

6    as well as supercenters, such as Walmart and Target.

7        And plaintiffs' supermarket case rests on two pillars

8    of evidence.  First, plaintiffs will introduce documents and

9    testimony showing current robust head-to-head competition

10   between Kroger and Albertsons across multiple lines of

11   commerce.

12       Second, plaintiffs will show that this merger increases

13   market concentration in thousands of communities across the

14   country.  Both types of evidence, both pillars, point to the

15   same conclusion, that this transaction will substantially

16   lessen competition and shoppers will face the risk of

17   increased prices, lower quality, and less innovation.

18       So let's start with some of the evidence that this

19   Court will see about head-to-head competition.

20       Courts have recognized that a merger that eliminates

21   head-to-head competition can result in a substantial

22   lessening of competition.  When assessing the extent of

23   head-to-head competition, courts look at two buckets of

24   evidence.  They look at ordinary course documents and

25   witness testimony.

1    Here, plaintiffs will present both types of evidence

2   throughout this hearing.

3    First, evidence will show that Kroger and Albertsons

4   compete both in non-price and price competition.  Let's

5   start with some non-price examples.

6    On the screen in front of you are statements taken from

7   Kroger and Albertsons' 10-K.  And what these statements show

8   is that they both go to market trying to provide better

9   products and better services for their shoppers across the

10  country in a lot of the same ways.

11   For example, evidence will show and their 10-Ks explain

12  that they can compete to provide fresh produce.  They also

13  can compete by providing private label products called Our

14  Brands by Kroger and Own Brands by Albertsons.  They compete

15  by offering promotions and lower prices to drive loyalty.

16  They also compete to provide convenient pickup and delivery

17  options.  And, finally, they can beat by providing back-end

18  services to support their customer-facing efforts.

19   And shoppers benefit from that competition today.  They

20  benefit with better choices at both stores.  At Albertsons

21  stores and Kroger stores listed on these banners in front of

22  the Court.  Benefits that they will lose if this acquisition

23  is allowed to go through.

24   Turning next to price competition, you will hear

25  testimony from -- today and tomorrow from two pricing

1  executives at Kroger and Albertsons, Andy Groff and

2  Tony Silva.  These two executives will explain that

3  Albertsons and Kroger execute what they call "high-low

4  pricing."  And this high-low pricing has two components.  It

5  has a base price, and it has a promotional price.  And these

6  promotions are certain discounts, such as coupons, off that

7  base price.

8      And Kroger's and Albertsons' witnesses and documents

9  will show that they both compete with each other on both

10  types of pricing.

11      Turning first to Albertsons, to set their base pricing

12  Albertsons uses two inputs:  Walmart and what it identifies

13  as a primary food competitor.  A Kroger banner in most

14  markets today.

15      Albertsons' goal with this primary food competitor is

16  to have an imperceptible price gap.  In other words, they

17  try to match or reduce that gap as much as possible.  They

18  compete.  For example, witnesses will explain that here, in

19  Portland, Albertsons' primary food competitor or grocery

20  competitor is Fred Meyer, and when pricing products across

21  its stores, Albertsons tries to price as closely as possible

22  to its Fred Meyer competitor.

23      Indeed, throughout this hearing, the Court will see

24  evidence from data collected by the parties that show that

25  Kroger's banners account for 79 percent of Albertsons'

1    primary grocery competitor in overlap areas.  So where

2    both -- where both companies have overlap, where they both

3    have a presence, 79 percent of the time that price that

4    they're trying to imperceptibly narrow that gap is a Kroger

5    banner.

6        The Court will also hear evidence that over the last

7    seven several years Albertsons has gotten increasingly

8    aggressive to try and match Kroger prices.  Albertsons has

9    created a new program it calls the Price Advisor Program.

10   This program mechanizes the process of searching and

11   comparing Albertsons' prices to its primary grocery

12   competitors' prices, and it makes alerts and recommendations

13   based on that competitor's pricing.  Again, Kroger banners

14   in areas where they overlap.

15       But absent this acquisition, Albertsons won't stop

16   there.  Evidence will show that Albertsons will continue to

17   develop this program to make pricing against its primary

18   grocery competitor more and more automatic; in other words,

19   institutionalizing this price competition between Kroger and

20   Albertsons.

21       Now, Kroger's pricing is a little bit more complicated.

22   But, again, when you zoom in, you'll see that Kroger's

23   prices are also impacted by Albertsons'.

24       Now, Kroger uses two tools in order to set its pricing.

25   It use a parity pricing, which is simple.  It means matching

1    the lowest price.  So pricing at parity.  And it uses what's

2    called the high-priced retail rule.  Also called or referred

3    to as HPR.

4        Plaintiffs will present evidence in either scenario.

5    Kroger is lowering prices in response to competition from

6    Albertsons.

7        So turning to the slide in front of you, which has been

8    redacted -- and, Your Honor, just one admin note on these

9    slides:  On the lower left of these slides you'll see a "PX"

10   number.  That's the document that these exhibits have been

11   taken from.  And on the lower right, you'll see which

12   company they come in as identified by their logo.

13       So looking at this document, you can see both types of

14   pricing in action.  Under certain types of products, the

15   parity pricing, those are products that they are trying to

16   match the price of.

17       Frequently, Kroger tries to match Albertsons' pricing

18   or Walmart's pricing but not always.

19       Here in this market, as you see in the star in the

20   middle of the screen, QFC strategy is a Safeway match.  So

21   in some markets, that parity pricing is set against an

22   Albertsons store.

23       You also see the floor-ceiling shown throughout this

24   graphic.  That floor-ceiling shows the high-price retail

25   rule in action.

1    The next slide is an additional ordinary course

2    document which explains this HPR rule in greater detail.  As

3    this slide explains, when using the HPR rule, Kroger uses

4    Walmart as a floor and Target's -- a particular spread or

5    range above Walmart.

6    That range, however, is capped by a ceiling.  That

7    ceiling is set from pricing against a traditional or

8    supermarket competitor, called the HPR.  This ceiling is

9    designed -- and I quote -- "To ensure they are not priced

10   significantly higher than a traditional retail competitor."

11   At bottom, what this sailing -- ceiling does is prevent

12   Kroger's from losing sales to its traditional supermarket

13   competitor.

14   And as this slide shows, to ensure that they are

15   pricing under the ceiling, Kroger invested millions of

16   dollars, which I'm not displaying because of the

17   confidentiality issues; but, again, what this document shows

18   is the millions of dollars that, in just this example, in

19   just this quarter, and in just this region, Kroger is

20   investing in order to reduce their price to match

21   competition from their high-priced retailer rule; so, in

22   other words, to not go above that ceiling.

23   On the right-hand side there's a couple of charts.  And

24   these charts show that often Albertsons is the HPR.  For

25   example, you can see throughout this -- these two charts

1   that Albertsons' banners, such as the Albertsons and Safeway

2   banners, are listed as the HPR.

3        Now, the graphic in front of you can --

4        You can turn to the next slide, please.  Go ahead and

5   click on the animation.

6        The graphic in front of you shows the impact of this

7   HPR rule on prices.  As I mentioned earlier, Albertsons is

8   trying to lower and lower that ceiling.  Meaning, Albertsons

9   is putting downward pricing pressure by lowering that

10  ceiling and reducing the spread that our -- that Kroger can

11  price against Walmart.  This is competition in action.

12       If this acquisition is allowed to go through,

13  Albertsons will no longer have that same incentive to

14  compete and to lower that ceiling.  Kroger, in turn, will no

15  longer have the same pressure from Albertsons to also

16  compete to avoid losing shares by bumping up against that

17  lowered ceiling, which means, absent this merger -- or if

18  this merger is allowed to go through, there will be an

19  increased ability and incentive, by Kroger, to raise prices

20  post-merger, all competition that will be lost if this

21  acquisition proceeds.

22       In addition to Tony Silva and Andy Groff, this Court

23  will also hear evidence from division presidents from both

24  Kroger and Albertsons in charge of Alaska, Washington,

25  Oregon, Colorado, Idaho -- Idaho, Utah, southern California,

1    and Illinois.  These division presidents will testify about

2    boots-on-the-ground pricing and non-pricing competition

3    between Kroger and Albertson banners.

4         For example, in this next slide, there is an email from

5    John Beretta reporting out on competition in particular

6    divisions around the Easter holiday.  He is reporting to

7    Susan Morris, the CE -- COO, and one of defendants'

8    witnesses.

9         And in reporting on the progress of these different

10   divisions, there's a common theme here.  And the common

11   theme is that when reading out on the status of competition

12   and how they're doing, that they're reading out on the

13   results of competition with a Kroger banner.

14        For example, you see Kings listed here, which is King

15   Soopers; FM, which is Fred Meyer; Mariano's, another banner;

16   and Ralphs and Fry's.  In each case, they are discussing

17   beating or winning -- in some cases, losing -- against

18   Kroger.

19        These are all discussing the results of competition,

20   and this competition is what's at stake with this merger.

21        In addition, this Court will also see and hear evidence

22   about promotional pricing.  And promotions can either be set

23   through a weekly printed ad or through access through an app

24   on a Kroger and Albertsons app on your phone.

25        Promos are often targeted at competition to try and

1    steal customers through lower prices, and here you can see a

2    division President, Todd Broderick, from the Denver

3    Division, comparing promo ads from Safeway's and Albertsons'

4    banners on the left, to King Soopers, a Kroger banner, on

5    the right.

6         These two ads show that they're offering promotions on

7    similar products.  Mr. Broderick reports out the results of

8    this competition.  He explains that the beating continues,

9    and his colleague, Tina Lucero, who produced these text

10   messages, responds, "Crush them."

11        He replies, "Their lower lips are quivering."

12        On the next slide is yet another example of the type of

13   documents and testimony this Court will see.  This is

14   another business deck showing the plans to compete around

15   the holiday time.

16        Here, Albertsons -- Albertsons is assessing what its

17   competitor Fred Meyer's is trying to do around the holidays

18   and trying to predict trends in history in order to beat

19   that, in order to compete, to drive traffic to their stores.

20        And, finally, one additional example of non-price

21   competition:  Here's an email CCing Todd Broderick, and this

22   email is planning for what to do in response to a

23   King Soopers entry in this particular market.  Here, an

24   Albertsons employee is emailing Mr. Broderick a rough list

25   of items that they could do to better compete with the

1    impending King Soopers store.  How can they make their store

2    better in order to respond to new competition from Kroger?

3         This brainstorming list includes everything from

4    polishing the floor to putting in a new kiosk to updating

5    various cases and delis.

6         Throughout this hearing, the FTC will show extensive

7    evidence of competition between Kroger and Albertsons and

8    markets across the country.  But we are not relying on this

9    evidence alone, which leads to the second way that

10   plaintiffs will meet their prima facie burden in their

11   supermarket case.

12        Plaintiffs will also show that this acquisition is

13   presumptively anticompetitive due to changes in market

14   structure and concentration in communities throughout the

15   country.

16        As the Supreme Court explained in *Philadelphia National

17   Bank*, when a merger results in a significant increase in

18   competition, it is, and I quote, "inherently likely to

19   lessen competition substantially, that it must be enjoined,"

20   which makes sense, Your Honor, because the fewer choices

21   consumers have, the more likely consumers will suffer when

22   there is consolidation in a particular industry.

23        To determine whether there's an increase in

24   competition, plaintiffs must first define a product and a

25   geographic market, and the purpose of defining a market is a

1    very pragmatic one.  Namely, it asks the question, "If this

2    merger is allowed to go through, are there sufficient

3    alternative products or services that customers can turn to

4    to avoid being harmed, but a small and a significant

5    increase in price or a decrease in quality?"

6         Here, plaintiffs define two markets:  They define the

7    supermarket's product market on the left, which is composed

8    of two big buckets.  The first is traditional supermarkets,

9    such as Stater Brothers, who you will hear from later today,

10   as well as Kroger, Albertsons, and Raley's.  It's also

11   composed of supercenters, such as Walmart, Fred Meyer, and

12   Target.

13        Plaintiffs also expand that market to see whether harm

14   is occurring in a broader market.  This market takes a

15   supermarket product market and adds club stores, limited

16   assortment stores, and natural and gourmet stores.

17        Starting first with plaintiffs' analysis and the

18   supermarket product market.  Courts have made clear that a

19   market can be comprised of a set of stores that offer a

20   unique experience.

21        Here, the supermarket stores offer a unique one-stop

22   shop experience.

23        Now, defendants make two primary arguments against

24   plaintiffs' market definition.  First, that because people

25   buy food at different places, plaintiffs have not properly

1   defined a market, but evidence -- as the evidence will show,

2   customers shop at different stores in different situations.

3       For example, a shopper may buy a Gatorade on the way

4   home from sports practice at a convenience store and also

5   purchase a case of water at a supermarket.

6       As Dr. Hill will explain, plaintiffs' expert, this does

7   not illustrate that these stores are in any way substitutes.

8       The second primary argument is that because you can buy

9   a Gatorade both at a convenience store and a supermarket,

10  those two formats must be in the same market.  This is

11  commonly called cross-shopping.  But courts have already

12  rejected this argument.

13      As the court explained in *Whole Foods* and the *Google*

14  court recently validated, the fact that a customer might buy

15  a stick of gum at a supermarket and a convenience store does

16  not mean there is no definable groceries market.

17      In support of its market, plaintiffs will produce three

18  buckets of evidence.

19      First, plaintiffs will introduce ordinary course

20  documents and testimony establishing the *Brown Shoe*

21  practical indicia, which assesses the characteristics of

22  products in and out of the market to draw distinctions

23  between the two.

24      Second, plaintiffs will present expert testimony

25  regarding the hypothetical monopolist test.  This is the

1    gold standard used by economists and supported by case law

2    to define a market.

3        And, third, plaintiffs will present extensive evidence

4    of the head-to-head competition, such as the evidence that I

5    just walked through.

6        First, supermarkets are a one-stop shop.  This Court

7    will hear evidence and see ordinary course documents

8    establishing what a one-stop shop is and that both Kroger

9    and Albertsons are such shops.

10       First, Ms. Morris explains that winning means having

11   the items our customer wants when they want them.  And what

12   they are telling Albertsons is that they want one-stop

13   shopping.

14       Second, Kroger's own website says that early on people

15   had to shop at a butcher, a baker, and a grocer, and that

16   Kroger became the first grocer in the country to establish

17   its own bakeries, followed by integration of the meat

18   department.

19       Their innovation was one-stop shopping.

20       Now, to provide this one-stop shop experience,

21   supermarkets offer a breadth and depth of products.  Breadth

22   refers to the range of products that a supermarket offers,

23   and depth refers to the range of products within a

24   particular type of category.

25       For example, you see on this screen an example of a

1    Kroger supermarket, and the breadth of products is shown by

2    the row after row after row of glass cases in the back

3    providing a myriad of options for shoppers to choose from.

4        The depth of product selection is shown by the three or

5    four options of tomatoes shown on the front of the screen.

6    A few additional examples of the depth and breadth of

7    product assortment include that supermarkets offer both

8    what's called a national brand, such as Coke or Pepsi, as

9    well as their private label brands.

10       These private label brands are specific to a certain

11   store.  For example, O Organics at Albertsons or Simple

12   Truth at Kroger.

13       Second, supermarkets also provide a range of package

14   sizes.  For example, you can choose between getting a

15   multipack bag of chips as well as just a single bag of

16   Tostitos.

17       Third, supermarkets also offer a wide range of meat and

18   seafood counters as well as grab-and-go snacks and other

19   meals.

20       Throughout the course of this hearing, this Court will

21   also hear from witnesses from a variety of store formats

22   that explain these differences in more detail.

23       For example, this Court will hear from Raley's and

24   Stater Brothers that explain how their supermarkets offer

25   the same one-stop shopping experience as Kroger and

1   Albertsons.

2        In contrast, witnesses from Dollar Tree, Sprouts, and

3   other store formats will explain how they provide a

4   fundamentally different shopping experience.

5        And their testimony is supported by common sense and an

6   observation of the different characteristics of these

7   formats.

8        For example, the store format on the right, at

9   Dollar Tree, has a smaller footprint and a much smaller

10  selection, as you can see.  So too with convenience stores,

11  such as CVS.  This common sense will be supported by

12  testimony from witnesses and other ordinary course

13  documents.

14       So too with the next store format, which is Natural

15  Grocers and Trader Joe's.  Natural Grocers is an example of

16  a premium organic market, and these premium and organic

17  markets involve a different type of shopping experience.

18       Sprouts will explain that their stores offer what they

19  call a treasure hunt experience, and Trader Joe's executive

20  explained in deposition that they offer a much smaller

21  selection than what you would see at a supermarket.

22       So, for example, you're not going to find a box of

23  Lucky Charms at National Grocers or a Red Baron Pizza at

24  Trader Joe's.

25       Similarly, stores such as Aldi's, commonly referred to

1  as "limited assortment stores," also offer a different range

2  of options.

3       For example, as you can see here in the bakery, you

4  don't have the option to get a personalized cake for your

5  son's birthday, nor do you have the same selection of

6  national brands that you're going to find in a supermarket.

7       And, finally, club stores, such as Sam's Club or

8  Costco, also have a fundamentally different experience.

9       First, they require a membership, so you have to pay to

10 go in the store.

11      Second, they often provide purchases in bulk, as you

12 can see on the screen in front of you.  As their witness

13 explained, you can't just get a single avocado at a Costco.

14      Throughout the course of this hearing, plaintiffs will

15 show that supermarkets differ from other store formats

16 across key characteristics.  An analysis of those features

17 under the *Brown Shoe* practical indicia will show that

18 shoppers view supermarkets differently, and having to

19 replace their supermarket shopping with another store format

20 will simply not offer that same experience.

21      Turning quickly from product market to geographic

22 market, throughout the course of this hearing, plaintiffs

23 will also present ordinary course evidence showing that

24 competition is local.

25      For example, this Court will hear from both

1    Vivek Sankaran and Rodney McMullen who will explain that

2    customers prefer to shop local and, as such, their

3    competition is local, which, again, Your Honor, makes sense,

4    as I started this presentation with whether or not a shopper

5    has good grocery offers in Portland is irrelevant to a

6    shopper in Corvallis.

7         Plaintiffs' market definition will also be supported by

8    the testimony of Dr. Nicholas Hill.  He will provide support

9    in both -- in support of the proposed markets as well as the

10   finding that this acquisition causes a reasonable

11   probability of substantially lessen competition.

12        First, Dr. Hill will assess data produced in the

13   ordinary course and maintained by defendants that shows how

14   frequently they price check other supermarkets.

15        For example, as you can see on the left, Albertsons

16   price checks other supermarkets 99 percent of the time.  So

17   too with Kroger.  In this particular category of items,

18   called EDE, they price check supermarkets 79 percent of the

19   time.

20        Dr. Hill will also provide evidence in support of his

21   application of the hypothetical monopolist test.  This

22   hypothetical monopolist test is the standard -- the gold

23   standard that economists use to analyze a relevant product

24   market.

25        Again, Dr. Hill uses real ordinary course data to show

1  what would happen if all supermarkets raised their price.

2  And in applying the hypothetical monopolist test, Dr. Hill

3  will explain both the precise methodology that he will use,

4  which I won't get into here today, as well as his finding

5  that over 2000 local supermarket markets passed that test,

6  which means in those markets, supermarkets -- there's not

7  reasonable choices outside of those markets to offset a

8  potential small but significant increase in price.

9      Now, once the market has been defined, the next step of

10  the analysis, as described by case law, is to assess the

11  total market share and changes in concentration levels.

12      The FTC and DOJ merger guidelines provide certain

13  thresholds supported by case law that provide a rubric of

14  when the change in market structure, the change in shares

15  and concentration, is presumptively anticompetitive.

16      Dr. Hill will explain that, after looking at

17  concentration levels post-merger, 1,922 local supermarket

18  markets meet that threshold.  The total sales of those

19  markets are $73 billion, Your Honor.

20      Dr. Hill will not just offer the opinion regarding

21  changes in concentration levels.  He analyzed this harm in

22  this case using an economic tool called CMCRs or

23  compensating marginal cost reduction.  CMCRs assess the

24  incentive for the firm post-merger to increase price.  Here,

25  Dr. Hill will explain both the mechanics of that rule in his

1    application of it as well as his results, which is that he

2    identified 1,472 supermarket local markets where the merger

3    would need to generate efficiencies of more than five

4    percent to offset the incentive to raise prices in those

5    local markets.

6         Dr. Hill will also talk about a second market, the

7    large-format market that I previously introduced.  Here,

8    Dr. Hill will expand his market to include both

9    supermarkets, as well as club stores, limited assortment

10   stores, and natural stores.  His results don't change

11   fundamentally.

12        He will show that even in the large format market,

13   which includes Costco and Whole Foods --

14        If you could go to the next slide, please.

15        -- that there are still harm in thousands of stores

16   affecting billions of dollars of sales.

17        Now, I expect that throughout the course of this

18   hearing you will hear much ado about Walmart, Target,

19   Amazon, and Costco, but plaintiffs account for each of these

20   competitors when defining markets and assessing harm.

21        So taking each of those in turn, Walmart and Target,

22   those two companies are included in our supermarket product

23   market.  Amazon.  Now, Amazon has two components of their

24   brick-and-mortar grocery business.  The first is Amazon

25   Fresh.  Evidence produced throughout the course of this

hearing will show that Amazon Fresh has quite a limited
footprint and that defendants will not be able to meet their
burden to show that Amazon Fresh is going to expand in a
timely, sufficient, and likely way to offset any of
Dr. Hill's conclusions.

And the second type of brick-and-mortar store that
Amazon owns is Whole Foods, and as I previously mentioned,
Dr. Hill accounts for that in his large format market.

And, finally, Costco.  Similarly, Costco is accounted
in the plaintiffs' analysis of their large format market.

Over the upcoming weeks, plaintiffs will present
emails, text, and witnesses in support of his prima fascia
supermarket case, but plaintiffs will also produce evidence
in support of their labor case as well.

Today defendants are the two largest employers of union
grocery workers in the country.  Currently, when unions are
negotiating with one company, let's say Albertsons, it can
leverage Kroger to obtain better terms at the bargaining
table.  Plaintiffs will raise a serious and substantial
question that this acquisition will lessen competition for
union grocery workers by reducing that bargaining leverage.

Throughout the course of this hearing, plaintiffs will
put on testimony of both union witnesses and defendants' own
employees responsible for union bargaining.  These witnesses
and ordinary course documents will support that there's --

1    the credible threat of strikes matter, that the threat of

2    being able to strike is an important tool for witnesses --

3    or for unions at the bargaining table.

4        Now, strikes can have an extraordinary impact on

5    stores.  The stores can lose sales and suffer lasting

6    reputational harm.  Unions, in particular, use what they

7    call a whipsaw strike.  In a whipsaw strike, workers start

8    by targeting one employer, threatening that employer with a

9    strike.  Once an agreement is reached, workers then go to

10   that employer's competitor to try and extract terms from

11   that competitor, or they say they will strike there, and all

12   of those shoppers will go to their competitor.

13       And because each company doesn't want to lose sales to

14   their main competitor, they're more likely to give in to the

15   union's request for better wages and working conditions.

16       Now, today Kroger and Albertsons negotiate separately.

17       Ordinary course documents will show that Kroger

18   attempts to align with Albertsons on negotiation tactics but

19   that Albertsons resists those efforts.  Plaintiffs will

20   present ordinary course documents, such as this text chain

21   from Jon McPherson from Kroger, to say that Kroger's

22   frustrated by this because they, quote, get stuck with

23   their -- Albertsons' deal -- every time.

24       And I just want to take a pause here, and I want to be

25   clear that that deal, while worse for Kroger, is better for

1   workers, meaning higher wages or better benefits.

2       And this deal will allow Kroger a way out of having to

3   get stuck with Albertsons' terms.

4       Due to time constraints, plaintiffs are only presenting

5   a limited snapshot of evidence throughout this hearing.

6   Plaintiffs will be presenting the remaining witnesses at the

7   administrative hearing.  But throughout the upcoming weeks,

8   plaintiffs will more than meet their burden to show a

9   serious and substantial question that this transaction will

10  have a reasonable probability of substantially lessening

11  competition by reducing bargaining leverage in the market

12  for union grocery worker -- workers in CBA areas throughout

13  the country.

14      Now, once plaintiffs meet their prima facie burden, the

15  burden then shifts to defendants to produce evidence in

16  response.  Defendants will be unable to meet their burden.

17      Now, defendants' attorneys in the past have admitted

18  that defendants compete with each other and that this

19  proposed merger would raise competitive concerns absent a

20  divestiture.  Defendants' lawyers' statements are supported

21  by boots-on-the-ground evidence from their workers.

22      Defendants' employees expressed concern when this

23  acquisition was announced.  For example, Usman Humayun, the

24  group VP of Enterprise Marketing, said, "Unless you try to

25  argue that Walmart and Target would never let you have a

1    monopoly, you are basically creating a monopoly in grocery

2    with the merger.  So it makes no sense."  He goes on to say,

3    "It's like AT&T and Verizon wanting to merge."

4        Mike Brown, a senior category manager at Kroger,

5    explained that the FTC would be all over this.

6        Now, it's no surprise that defendants are now walking

7    away from their counsel's statements and their own

8    employees' statements, but plaintiffs are confident that

9    defendants will be unable to provide sufficient evidence

10   here to rebut plaintiffs' prima facie case.  As such, their

11   case will hinge on their ability to meet their burden on

12   their purported efficiencies and the fix.

13       I'd like to focus briefly on their arguments regarding

14   efficiencies and the evidence you will see rebutting those,

15   and then my colleague will discuss defendants' proposed

16   divestitures.

17       First, defendants bear the burden to show cognizable

18   efficiencies.  To show these efficiencies, defendants must

19   do four things:  They must show they're verifiable,

20   merger-specific, pass on to customers, and sufficient to

21   offset the competitive harm.  The reason that the law

22   requires the defendants to bear this burden is twofold:

23   First, under the burden-shifting framework, efficiencies are

24   only assessed once plaintiff had met their burden, meaning

25   they have raised a question of a likelihood of harm.

1  Because of that, the law requires evidence to provide

2  evidence sufficient to allow plaintiffs in the court to

3  recreate their efficiencies.

4      They also have to show that these efficiencies couldn't

5  be achieved in a non-anticompetitive manner, meaning that

6  they're merger-specific.  The only way these efficiencies

7  will result is risking harm to shoppers.

8      And, third, they must be of sufficient scope to offset

9  the harm.  Again, to ensure that the risk of an

10 anticompetitive transaction does not go to American

11 shoppers.

12     The second reason defendants bear the burden is because

13 they have unique access to the evidence needed to support

14 their claims.  As such, the Supreme Court has counseled that

15 defendants in these cases should bear the burden to provide

16 facts in support of it.

17     Plaintiffs will present the evidence of Mr. Yeater to

18 analyze these purported efficiencies.  Mr. Yeater will

19 explain that he will only -- was only able to validate or

20 verify a small percentage of them.  Specifically, he will

21 explain that, at bottom, most of defendants' purported

22 efficiencies suffer from the same fundamental flaw.

23 Meaning, they look at Scenario B under Kroger, Scenario A

24 under Albertsons, and assume that the best case will happen;

25 and there's no basis for that assumption, as Dr. --

1   Mr. Yeater will explain.

2        Now, I want to address one related point separately,

3   and this is defendants' promise of a $1 billion price

4   investment.

5        First, it's helpful to put that promise in context.

6   While a billion is a lot of money to ordinary Americans, in

7   the context of the state of this -- stakes of this

8   acquisition, it's pennies on the dollar.  For example, it's

9   1/75th the amount of sales at the stores impacted by this

10  acquisition.  It's less than .5 percent of Kroger and

11  Albertsons' total revenues, and it's only slightly more than

12  the amount of money that Kroger and Albertsons have spent to

13  push this acquisition through.

14       Second, these investments are contingent on the

15  realization of certain efficiencies; meaning, unless those

16  efficiencies that Mr. Yeater can't verify go through, this

17  billion-dollar promise won't happen.

18       And, third, these promises need to be weighed against

19  the competition that is already happening between these two

20  companies.

21       As I have previously explained and as the evidence will

22  show, the company, Albertsons in particular, are currently

23  investing in price investments to price max against

24  competition; and, in response, Kroger is also investing in

25  order to reduce prices and attract customers.

1     And as we walked through and as the evidence will show,

2  head-to-head competition between these two companies is

3  certain, and it's also certain that this acquisition will

4  eliminate that head-to-head competition.

5     That certainty must be weighed against unenforceable

6  promises by defendants based on assumptions and

7  contingencies that are not tailored to the scope of this

8  harm here on either a scale or where these promises

9  allegedly will be effectuated.

10    As such, with logic, evidence, and the law, we'll

11 explain where the scales should tip, which is towards

12 pushing pause on this merger.

13    As you can see from this text message on the screen,

14 this was a text sent from Matt Shores to Todd Broderick

15 while watching Rodney McMullen testify in Congress.

16 Mr. Shores writes:  It's all about pricing and competition,

17 and we all know prices will not go down.  A 500 million

18 investment and pricing in our company won't get our prices

19 down to Kroger's level, in my view.  Therefore, the

20 conclusion that's easily drawn is overall, prices will

21 increase, as it's all about -- overall, prices will

22 increase.

23    As Matt Shore wrote to Broderick, defendants will be

24 unable to meet their burden to show cognizable efficiencies

25 to balance the certain harm this acquisition will cause.

1       I'll now turn it over to my colleague Ms. Laura Hall to

2   discuss divestiture.

3           MS. HALL:  Your Honor, today I'd like to address a

4   number of reasons why the proposed divestiture of 579 stores

5   and other assets to C&S will not remedy the substantial

6   lessening of competition likely to be caused by the

7   acquisition.

8       Defendants say, "After the merger, prices will go down,

9   no stores will close, and all store employees will remain

10  employed."  They claim that the proposed divestiture to C&S

11  will sufficiently remedy any harm to competition.  They also

12  told the Part 3 administrative court that the prior

13  divestiture of 413 stores, quote, included all the assets

14  and personnel C&S will need to succeed.

15      Defendants say C&S will be able to improve poorly

16  performing stores in the divestiture package, has

17  experienced management to lead it through a transformative

18  acquisition, and has made conservative assumptions about

19  post-divestiture performance.  We have heard these claims

20  before about prior divestitures, and they did not bear out.

21      In connection with the Safeway acquisition, Albertsons

22  represented to the FTC it would use efficiencies to cut

23  prices, but its corporate representative could not

24  specifically quote that that occurred.

25      About the divestiture of stores to Haggen, in

1    connection with the same merger, Albertsons told the FTC no

2    stores would close, poor performance would be improved, all

3    employees would keep their job, and Haggen had management to

4    lead it through a transformative acquisition.

5         Haggen was in bankruptcy within months of the

6    divestiture.

7         In seeking to acquire twelve stores divested from the

8    Tops grocery chain, in connection with the Tops Price

9    Chopper merger, C&S represented to the FTC that it had set

10   up the retail organization to succeed and had a conservative

11   deal model.  The store's financial performance that

12   divestiture and rebannering them to Grand Union has been

13   challenged, to say the least.  We will be calling

14   Mark McGowan, the current head of C&S's retail business, to

15   testify about this poor performance.

16        Defendants are primarily going to be relying on the

17   testimony of hand-selected executives from their companies

18   and C&S to testify to the divestiture's likelihood of

19   success.

20        Essentially, defendants argue that C&S's business

21   judgment should be trusted, but their proof stands in stark

22   contrast to the ordinary course documents and assessment of

23   past failures and an analysis of the deal package.

24        In ordinary course documents, C&S senior executives

25   have expressed skepticism about the quality and long-term

1  viability of the stores they are acquiring.  The stores from

2  Kroger are their worst chains says Alona Florenz, whom we

3  will be calling to testify about her projections for the

4  divestiture.

5      Eric Kepner views the divestiture as a massive

6  undertaking for a wholesaler with limited retail capability

7  that poses more downside for C&S than for Kroger because C&S

8  will have to establish new brands in many markets while

9  trying to stand up a retail organization.

10     In response to a suggestion about reselling the

11 divestiture stores, Ms. Florenz says, "Just be careful with

12 FTC.  We want to say we can run them."

13     Eric Winn, in talking points for notifying wholesale

14 customers of the divestiture, likewise, suggests the stores

15 may be for sale.  Mr. Winn will also testify about C&S's

16 plans in our case-in-chief.

17     Current C&S's board member and Mr. Winn's predecessor,

18 Bob Palmer, commented on draft press release about the

19 divestiture.  "Do we have to say that we won't close doors?

20 The 'all' is a problem.  The trick is that they stay open as

21 they transition, but then what?  Are we committed to this?"

22     Let's turn to the legal framework under which the court

23 evaluates the proposed divestiture.

24     Courts consider a structural remedy, like a

25 divestiture, under the Sysco test, requiring that the

1  defendants produce evidence showing that the divestiture

2  will restore all the competitive intensity lost as a result

3  of the merger.

4      In *Illumina*, considering a conduct-based remedy, the

5  Fifth Circuit held that it was sufficient for defendants to

6  show that the proposed remedy sufficiently mitigates the

7  merger's effect, such that it was no longer likely to

8  substantially lessen competition.

9      Defendants cannot meet either standard.

10     At this stage the Court is presented with a binary

11  choice:  To pause the transaction pending the merits

12  proceeding or not.

13     When applying the *Illumina* and *Sysco* standards in cases

14  involving allegations of harm across multiple markets, a

15  likelihood of harm in any market warrants enjoining the

16  transaction, which makes sense.  Whether or not the

17  divestiture is sufficient in Denver will not help Portland

18  shoppers if the divestiture is inadequate.

19     Antitrust law does not allow defendants to offset harms

20  to some communities with benefits to others.  The Court

21  should enter a preliminary injunction if we show a serious

22  issue with respect to post-transaction harm in a single

23  geographic market and a single product market, whether

24  supermarket or labor.

25     To be clear, plaintiffs will show a serious issue with

1   many more markets.

2       The economic evidence in this case will show that

3   hundreds of markets are unremedied by the divestiture.

4       Dr. Hill's baseline calculation of the effect of the

5   divestiture uses defendants' assumption of a perfect

6   divestiture.  That is, all of the stores continue their

7   current level of competitive operation, which is not what

8   C&S itself projects.

9       Dr. Hill calculated 1,002 supermarket product markets

10  and 551 large format store markets in which the acquisition

11  is presumptively unlawful, accounting for a perfect

12  divestiture.

13      Let's look at how the divestiture affects the markets

14  Ms. Musser discussed earlier.

15      Santa Fe is an example where the market around the

16  Market Street at the top center of the map is presumptively

17  unlawful, but there is no divestiture in this market.  In

18  fact, three other stores on this Santa Fe map are focal

19  stores of markets that defendants' economist, Dr. Israel,

20  concedes are presumptively illegal.

21      Corvallis, Oregon, is an example of a market where one

22  store is divested, but the market around this Fred Meyer

23  store, in the center, remains presumptively illegal.

24  Post-divestiture -- post-merger, the combined market share

25  is 60 percent, post-divestiture the combined market share is

1    51 percent.  The C&S store is predicted to have 9 percent of

2    the market share.

3        In addition to the hundreds of markets that a perfect

4    divestiture would not remedy, the evidence will show that

5    competition is likely to be harmed in many additional

6    markets.

7        Returning to the legal framework, because plaintiffs

8    will be addressing the proposed divestiture remedy in our

9    case-in-chief, defendants' burden of production in rebuttal

10   is heightened.

11       In the face of the substantial evidence plaintiffs will

12   present on the infirmities of the divestiture package and

13   C&S as buyer, defendants have the burden of coming forward

14   with evidence from which the Court could conclude that the

15   divestiture will be successful.

16       Defendants' claims about the divestiture contradict

17   their claims about the merger.  Defendants simultaneously

18   claim that the merger is necessary to improve Kroger's

19   ability to compete against Walmart and Amazon and that C&S

20   will be an effective competitor with a fraction of the

21   stores.  Dependency on Kroger for transition services,

22   billions in extra cost, and an abysmal track record.  Both

23   of those claims can't be true.

24       As we will show, C&S is unlikely to be an effective

25   competitor for a litany of reasons, including the failure to

1   even attempt to remedy hundreds of affected markets, as

2   discussed earlier.

3       I will touch on each of these items briefly in

4   connection with the product -- supermarket product market

5   before discussing the union labor market.

6       Historically, C&S has closed underperforming retail

7   stores and sold others to independent operators in

8   connection with wholesale supply contracts.

9   Post-divestiture, it has ample incentive to do the same.

10      C&S has never even operated 110 retail stores at any

11  one time.  C&S's prior failures to operate in the same

12  market are probative of the likely outcome of the

13  divestiture; particularly, as it had then many of the same

14  advantages defendants tout now, such as being an experienced

15  wholesaler, having low debt, and hiring experienced retail

16  executives.

17      As recently as last year, C&S stated that it acquires

18  retail store locations in connection with strategic

19  transactions to maintain or expand our grocery wholesaling

20  and distribution business.

21      One glaring example of C&S's inexperience in retail

22  operations, its diligence request to Kroger for a call,

23  quote, "to discuss what it takes to operate a grocery

24  store."

25      C&S executives have acknowledged the divestiture is not

a standalone business and lacks many assets necessary to run a successful retail grocery business.

As Mr. Winn testified, "The alternative is you buy a company, a fully functioning company, and that's not what we are buying here."

Turning to plaintiffs' expert evidence on the divestiture, Dr. Edward Fox, an expert on retail operations and customer behavior, has identified and assessed the challenges that C&S must overcome to turn the hodgepodge of stores, distribution centers, and various intellectual property licenses into a competitive retail grocery business.

Based on his expertise, Dr. Fox concludes that C&S will struggle across a number of areas that are important to attracting, retaining, and serving supermarket customers.

One of those areas is rebannering the acquired stores where C&S does not have ownership of or a license to the banner currently on the store. C&S will need to rebanner hundreds of stores. Rebannering a supermarket can mean not only changing the brand name on the storefront, but also the layout and the product assortment, to correspond with the brand identity. Rebannering on the scale required by the divestiture agreement, 286 stores in three years is unprecedented.

Moreover, C&S's currently plans to use banners

1  including QFC, Mariano's, and Carrs.  Those are currently

2  present only in the markets of Oregon and Washington,

3  Illinois, and Alaska, respectively; but they plan to use

4  them in numerous states in which they are unknown.

5       As Dr. Fox will explain and C&S acknowledges,

6  introducing an unknown banner magnifies the risk of a

7  substantial sales decline in each market.

8       This next slide, for confidentiality reasons, is only

9  being shown to the Court and describes a transition services

10 agreement under which C&S will be dependent on Kroger for a

11 variety of services, including store operations, pricing,

12 distribution, and supply of private label products for up to

13 four years; and a license to the software backbone, known as

14 the tech stack, for five.

15      C&S is also dependent on Kroger to provide hundreds of

16 subject matter experts across a whole range of corporate

17 operations, including experts in Kroger and Albertsons

18 legacy systems it will need to operate.

19      These notes on C&S lists of requested IT employees make

20 clear that C&S cannot simply hire in the general market to

21 fulfill these needs.

22      This is a slide from a business plan that C&S produced

23 in late June, after the close of fact discovery.  So we have

24 not had the opportunity to question any C&S witness about

25 it.  Particularly, this last bullet.  "We will run the same

1    program between where we share markets until banner brands

2    are separated.  Pricing, promotion, loyalty, and other

3    customer-basing programs."  What it means is pretty clear,

4    C&S does not intend to compete with Kroger on price for

5    either base or promotional for up to three years.  The

6    deadline for C&S to complete rebannering.  And under the

7    transition services agreement, Kroger has to supply those

8    base and promotional plans for at least a year.

9         C&S also has less incentive to compete aggressively

10   than Albertsons currently does, because the divestiture

11   purchase price is low compared to the value of the assets.

12   That means C&S can recover on its investment without turning

13   a profit in its retail operations.  The store real estate

14   alone is valued at more than two-thirds of the purchase

15   price.

16        Together, with the benefit to C&S and its wholesale

17   business of gaining new distribution centers and the retail

18   stores as their captive customers, C&S can recoup its

19   investment without the retail stores having to perform

20   anywhere near as well as they currently do in defendants'

21   hands.

22        C&S will thus have less incentive to incur the

23   substantial costs to build out the infrastructure needed to

24   operate the divestiture assets effectively.

25        Even with making those investments, C&S predicts the

1    divested stores will be less competitive in the future than

2    they are now.

3        They predict that the -- that they will lose revenue

4    following the divestiture and grow slower than the retail

5    grocery market as a whole for the first three years.

6        C&S projects sales loss due to rebannering and over a

7    billion dollars in expense rebannering, building new

8    distribution centers, and creating a private label line of

9    products.  None of which are risks or costs the stores face

10   today.

11       Not until eleven years after the divestiture, does

12   C&S's own deal model predict returning to the stores'

13   current level of profitability.

14       Turning to C&S's prior experience as a divestiture

15   buyer -- this slide is also only for the Court -- defendants

16   tout the FTC's approval of C&S as a divestiture buyer in

17   connection with twelve stores divested from the Tops Price

18   Chopper merger, but the post-divestiture performance of

19   those stores, shown on this slide, has been a failure.

20       As of the end of 2023, the stores had experienced a

21   30 percent loss of sales with little prospect for

22   improvement.  C&S's sales volumes at these stores fell

23   another 13 percent as of March 2020.  These are rural

24   stores, close to C&S's home base, all from one company.  All

25   of which C&S already supplied.  Some of which C&S had

1    previously owned and operated.  Those should be easier to

2    run than the geographically dispersed package of stores that

3    C&S now seeks to acquire.  Yet, C&S is struggling with those

4    stores.

5        If C&S struggles with operating the divestiture stores,

6    Dr. Hill shows that as the divested stores lose sales --

7        This can be for the whole courtroom.

8        -- the number of presumptive illegal markets rises.

9    Here, showing you the effect in the more conservative large

10   format market.

11       As the stores lose sales, lose market share to other

12   nearby supermarkets, many of which will be owned by Kroger,

13   and the resulting increase in share by the Kroger, combined

14   Kroger-Albertsons, increases the number of affected markets

15   and the value of affected commerce.  A 30 percent reduction

16   in revenues at the divested stores, less than C&S has

17   experienced to date with the Grand Union stores, causes

18   nearly a 30 percent increase in presumptive illegal markets,

19   and nearly a 40 percent increase in the value of affected

20   commerce.

21       Turning to the labor product market, defendants do not

22   even attempt to contend that the proposed divestiture to C&S

23   will remedy the harms to labor markets caused by the

24   acquisition.

25       First, in many markets, Kroger will become the only

1  union grocery employer, rendering the whipsaw strike tactic

2  useless.

3      Second, Albertsons currently makes labor decisions,

4  including whether and how to cooperate with Kroger,

5  independently, and as Ms. Musser discussed, defendants

6  struggle to coordinate effectively, such as by entering into

7  mutual strike assistance agreements.  Mr. McPherson says

8  he's never actually signed one.  C&S's dependence on Kroger

9  for transition services is going to tilt the scales in favor

10  of letting Kroger take the lead.

11      C&S doesn't have the experience to do otherwise.  It

12  has requested Kroger to provide it with labor relations

13  employees.  Kroger has only filled half of C&S's requests.

14      Even if C&S wanted to take an independent approach to

15  labor -- to union negotiations, it will be too small in most

16  markets.  It will be a minor, not a major, like Kroger and

17  Albertsons are today.  The Court will hear from union

18  representatives, third parties, and the parties themselves,

19  that minors have little effect on the deals struck by the

20  majors.

21      Thus, the divestiture is not going to eliminate the

22  harm to competition in the supermarket product market or the

23  labor market product market and -- or render it

24  insubstantial.

25      Plaintiffs' proof will demonstrate the existence of a

1    substantial question worthy of further study in the merits

2    proceeding, warranting an injunction pending resolution of

3    the administrative proceeding.

4         The equities also favor an injunction.  Defendants do

5    not face the loss of a unique time-sensitive opportunity.

6    If time were of the essence, defendants could have had

7    resolution on the merits sooner if they had not sought to

8    suspend the administrative merits proceeding.

9         They have already taken nearly two years from signing

10   the merger agreement to get to this day.  They are already

11   enjoined from closing the transaction until a ruling by the

12   Colorado state court after a trial that commences over a

13   month from now.

14        The efficiencies that they claim are generic costs of

15   doing business and will be there in three months or next

16   year.

17        In any event, private equities have little weight in

18   the Section 13(b) analysis.  The purpose of 13(b) and the

19   FTC Act is to serve the public interest in effective

20   enforcement of the antitrust laws by the antitrust agencies.

21        Allowing an acquisition to close where the parties are

22   direct competitors would be difficult to unwind and cause

23   immediate harm to competition.

24        In a competitive market, companies act zealously to

25   protect the confidential information.  Their prices, their

1   discounts, their products and development.

2       We've seen that in this case, Your Honor, expressed

3   through the confidentiality claims of the parties and the

4   third parties.  Irreversibly sharing that competitively

5   sensitive information may frustrate any remedy ordered at

6   the conclusion of the administrative proceedings.

7       Moreover, where the parties employ hundreds of

8   thousands of people and feed millions, extra care is

9   warranted.  Consideration of the public equities means

10  considering the risk that divestiture stores close and limit

11  communities' access to fresh, healthy food.

12      Defendants claim an injunction would delay price cuts

13  that they plan to make, but the Court will hear that their

14  price investment plan starts with just a handful of products

15  in Albertsons stores.  Four state Attorneys General have

16  submitted an amicus brief in support of the merger, but

17  their states' residents will see price investment, at most,

18  in one Jewel-Osco in Iowa.  There are no Albertsons stores

19  in the other three states.

20      The total price investment will also be staged over

21  time, and Kroger has jettisoned to pass price investment

22  plans to make earnings per share targets.

23      Consideration of the public equities also means

24  considering employees, like Naomi Oligario, who wrote to the

25  FTC about losing her job when Haggen's bankruptcy closed the

1    supermarket she had worked at for decades.  Your Honor will

2    hear directly from Ms. Oligario in these proceedings.

3        We respectfully submit, Your Honor, that the risk to

4    employees and communities across the country, as well as the

5    public interest in effective antitrust enforcement, weigh

6    heavily against the parties' claimed equities.

7        Defendants are trying to make the standard one of

8    absolute certainty that the merger will harm customers and

9    that the divestiture will fail, but that turns the

10   probabilistic standard of Section 7 of the Clayton Act on

11   its head.  The purpose of the Clayton Act is to arrest

12   monopolies in their incipiency, and that requires

13   considering whether a substantial lessening of competition

14   may occur if the transaction proceeds.

15       The risks of harm to the parties from not getting a

16   business deal through as quickly as they would like are

17   vastly outweighed by the risk of being unable to effectuate

18   a complete remedy if the merger is found to be unlawful and

19   the risk to communities of losing well-paying union jobs and

20   access to food to feed their families.

21       Because the divestiture is proposed to remedy the

22   substantial loss to competition that may occur due to the

23   acquisition, defendants bear the burden to establish it is

24   likely to be effective in every single market in which the

25   parties overlap.

1    In asking the Part 3 administrative court to let them

2    again amend their divestiture package, defendants all but

3    concede they cannot carry their burden to meet that

4    standard.

5    This is a preliminary injunction hearing, not trial on

6    the merits, and time permits us to present only a sliver of

7    the voluminous record that will be before the administrative

8    law judge.  Therefore, any doubt should be resolved in favor

9    of enjoining the transaction, pending adjudication on a full

10   record, with the ability to order an effective remedy.

11   Thank you, Your Honor.

12          THE COURT:  Thank you.

13   How are we doing on time?

14          MR. WOLF:  Your Honor, might I suggest for the

15   court reporter's benefit and perhaps for my own that --

16          THE COURT:  I was going to suggest a break.

17   That's why I was saying, "How are we doing on time?"

18   Let's take a 15-minute break.

19          MR. WOLF:  Thank you, Your Honor.

20                  (Recess taken.)

21          DEPUTY COURTROOM CLERK:  All rise.

22          THE COURT:  Pleat be seated.  We'll continue with

23   opening statements.

24          MR. WOLF:  Your Honor, may I approach with the

25   copies?

1          THE COURT:  Please, yes.

2          MR. WOLF:  Thank you, Your Honor.

3

4               OPENING STATEMENT FOR KROGER

5          MR. WOLF:  Matthew Wolf for Kroger.

6      The day after this merger closes, a shopper walking

7  into the Safeway on Southwest Jefferson Street, just a few

8  blocks away, will be in for a pleasant surprise.  They will

9  find that prices have come down on dozens of their most

10  important purchases.

11      Those same reductions will be seen by folks around the

12  country when they shop at the more than 1,700 Albertsons

13  stores now owned by Kroger, and within 90 days, all of those

14  shoppers will see further price reductions on more than 600

15  items that matter to them.

16      Beyond that, Kroger will be ramping up to investing a

17  billion dollars every year specifically to bring down prices

18  for the former Albertsons customers who are now part of the

19  Kroger family.

20      Counsel minimized, attempted to diminish, the value of

21  $1 billion annual incremental price investment in her

22  opening.

23      I suggest this betrays a fundamental misapprehension

24  and misunderstanding of how such an investment works and the

25  profound effect that investment will have on former

1   Albertsons customers throughout the country.

2        But Kroger is not just committed to bringing former

3   Albertsons customers lower prices.  It will invest $1.3

4   billion dedicated to Albertsons stores to enhance the

5   customer experience, and just as importantly, Kroger will

6   spend an additional billion dollars a year, every year, on

7   wages benefits for its associates.

8        All of this will only be possible if the merger goes

9   through.  And all of this comes with additional commitments,

10  that there will be no store closures, no frontline job

11  losses, enhance local food sourcing.  It benefits both the

12  farmer and the shopper.  There will be 10 billion meals

13  distributed to combat food insecurity in our neediest

14  regions, and every single collective bargaining agreement

15  will be transferred and maintained when the merger goes

16  through.

17       Inexplicably, the plaintiffs in this case insist that

18  this must not be allowed.  Plaintiffs have, outside of this

19  courtroom, and in, repeatedly and very publicly stated they

20  are working to bring prices down, but their decision to

21  bring this suit and the arguments they have made since

22  filing suggest that they neither understand the industry nor

23  the parties within it.

24       Now, I assume counsel misspoke earlier when she said

25  the difference between Albertsons' pricing and Kroger's

1    pricing is -- the word was used -- "imperceptible."  That is

2    not reality.  Kroger's prices are 10 to 12 percent lower

3    than Albertsons'.  10 to 20 -- 12 percent lower.

4         One would think the plaintiffs would be pleased that a

5    higher cost grocery store was going to be run by a lower

6    cost competitor, but plaintiffs insist, by bringing this

7    suit, by making the arguments they made this morning, that

8    current Albertsons customers should continue to be forced to

9    shop at stores with margins nearly a dozen percentage points

10   higher than Kroger.

11        And in so doing, inexplicably, plaintiffs refuse to

12   recognize the tectonic shift that has occurred in the

13   grocery industry over the last 20 years.  Refusing to

14   acknowledge that, unless traditional grocers act, the

15   dominance of Walmart and Costco and Amazon, and their ilk,

16   will only grow with the inevitable and regrettable impact on

17   shoppers' choices, downtown communities, local farmers, and

18   union jobs.

19        And, inexplicably, we've heard just this morning

20   plaintiffs denigrate and claim to know more about groceries

21   than C&S, Kroger's divestiture partner.  A 107-year-old

22   family grocer company servicing more than 7,500 stores.

23        Your Honor, I submit that C&S has more institutional

24   knowledge of the grocery industry in just one of its senior

25   executives than all of the experts that the plaintiffs have

1    chosen to present to Your Honor combined.

2        So let's dig a little deeper to understand the players,

3    the industry, and the deal.

4        First, Kroger.

5        Kroger was founded in 1883 in Cincinnati.  And if you

6    walk the streets of Cincinnati, you will still see corporate

7    headquarters to this day.  It has remained true to its

8    roots.  It has remained true to its community.

9        It is now composed of 2,700 stores in 35 states under

10   28 different banners, as plaintiffs helpfully put up on the

11   board.

12       These are the folks you know.  Fred Meyer, locally.

13   Around the country, some of the most trusted brands in

14   grocery.

15       And what is the guiding principle of Kroger?  What is

16   its DNA when it comes to groceries?

17       Well, Rodney McMullen, the CEO and chair of Kroger, who

18   you'll hear from next week -- he'll be in this courtroom to

19   answer any of Your Honor's or any of the plaintiffs'

20   questions -- he said to the Senate last year, "Together,

21   with Albertsons, our principal, Kroger's current principal,

22   is allowing customers to stretch their grocery -- grocery

23   budget without compromise."

24       Well, what does "without compromise" mean?  It means,

25   and this is a piece of a dec you'll hear from with

1   Mr. McMullen and Mr. Aitken as well, that, when it comes to

2   fresh foods, we want to be as good as Whole Foods.  When it

3   comes to personalization, when it comes to knowing our

4   customers, to giving them what they want, what they need,

5   what matters to them the most, we want to be as good as

6   Amazon, and we are.  When it comes to our brands, what we

7   call "private label," we want to be as good, we strive to be

8   as good, we are as good as Costco.  And when it comes to

9   seamless.  That means you can order in stores.  You can get

10  your curbside delivery.  You can get delivered to your home.

11  We want to be as good as Target, and we want to do all of

12  this and we do do all of this at prices competitive to

13  Walmart.

14        "Prices competitive to Walmart."  What does that mean?

15        Well, you're going to hear also next week from

16  Stuart Aitken, the chief merchandising and marketing

17  officer.  He's going to tell you, among other things, that

18  notwithstanding the extraordinary inflation and cost of

19  goods sold and fuel and everything else over the last three,

20  four, five years, that during that very window, when

21  inflation was pushing everyone to their limits, Kroger was

22  year after year after year bringing their prices more in

23  line with Walmart, bringing their margins down every year.

24        And they've done this, unlike many of our competitors,

25  with the help of our union associates.  83 percent of

1    in-store Kroger associates work in a unionized store.  We

2    are a proud union shop, just as our merger partners,

3    Albertsons.

4         We are also proud of the communities we live in, work

5    in, and sell in.

6         Local food sourcing.  We've talked about how critical

7    that is.  Service member support.  Top scorers in equity

8    indexes and otherwise.  And the capstone of our community

9    involvement, the Zero Hunger, Zero Waste Project, that to

10   date has provided 3.5 billion meals to those in need, and

11   with this merger, we'll be able to provide another

12   6.5 billion, all while reducing our carbon footprint,

13   reducing waste.  And all of this in what has been a tectonic

14   shift in the grocery market over the last 10 years.

15        Your Honor has seen these headlines, but I think *The*

16   *Wall Street Journal* summed it up best just last year:

17   Supermarkets are losing this food fight.  And who are they

18   losing it to?  Walmart, Costco, Amazon, among others.

19        You're going to hear a lot in the next three weeks

20   about what these companies have done to the market; what

21   they have brought to the market, in terms of

22   competitiveness; and what pressure they've put on Kroger and

23   Albertsons and others to remain competitive and to get ever

24   more competitive with pricing, quality, freshness,

25   community, labor, et cetera.

1          So Walmart, a brief snapshot:  In 2003 there were 40 --

2     3,400 Walmart stores.  By 2023 there were 5,300.  Maybe

3     60 percent more.  But their grocery sales have increased at

4     a much more rapid pace.  2003, 63 billion in sales; last

5     year, $247 billion in sales.  That's the focus -- the people

6     we should be worrying about.  That's the competitor you're

7     going to be hearing about for the next three weeks.  That's

8     the company that we all are trying to reach, in terms of

9     price, while at the same time maintaining commitments to our

10    associates, to our customers, and to our union employees,

11    which we have, unlike Walmart.

12         How about Costco?

13         2003:  318 stores.  Roughly doubled by 2023.  But their

14    grocery sales far more than outstripped that doubling.  In

15    2003 $25 billion in sales, by 2023, 128 billion in sales;

16    and, again, with trivial union involvement.

17         Amazon, similar.

18         2003, no brick-and-mortar grocery presence.  Through

19    the acquisition of Whole Foods and the creation of

20    Amazon Fresh, they now have 600 stores.  And what does that

21    mean in terms of grocery sales?  They've gone from 3 billion

22    in 2003 to 36 billion in 2023.  Remarkable growth.  But,

23    again, with almost no union involvement.  Unlike Kroger.

24    Unlike Albertsons.

25         And their competitive footprint is truly nationwide.

1    Walmart from coast to coast, Costco from coast to coast,

2    Amazon from coast to coast.  Every address, every community,

3    every market.

4         And they're not alone.  You're going to hear in this

5    case from -- about Aldi, and Dollar General, and Lidl.

6    Folks that hope that in the next five, ten years they're

7    going to have charts that look an awful lot like what I just

8    showed you for Walmart and Costco and Amazon.  These folks

9    are taking enormous shares of the grocery market already and

10   are poised to do much more, all at prices much lower than

11   the incumbents'.

12        Now I'm going to talk very briefly about Albertsons

13   because in a few minutes, my colleague, Ms. Mainigi, is

14   going to talk about Albertsons' perspective.  What brings

15   them to the courthouse today, what brought them to the

16   merger table last year.

17        But, briefly, Albertsons has 2,200 stores in 35 states.

18   In 2022, it became known to Kroger that Albertsons was on

19   the market, that Albertsons was potentially for sale, and we

20   reached out and said, "Hey, this looks like a match that

21   would make sense for us and, more importantly, would make

22   sense for consumers and our associates."

23        Why?

24        Well, part of it is simple geography.  I showed you

25   that Walmart and Costco and Amazon are nationwide.  The same

1    can't be said of either Albertsons or Kroger today.

2         Albertsons has a significant presence in the Northeast

3    and West Texas and Northern California but next to nothing

4    in the Midwest or the Southeast.

5         Kroger, on the other hand, almost the mirror image.

6    Significant presence in the Midwest, the Southeast;

7    significant presence in East Texas and the Plains states.

8    You put them together, we now have a footprint that can

9    compete against Walmart and Amazon and Costco.  It is

10   clearly complementary.  It gives us the opportunity to

11   benefit from scale, to benefit from savings, to pass that

12   along to customers, to compete more effectively against the

13   folks that have been dominating the market for the last 10

14   years.

15        But it's not just about scale.  The savings that come

16   from the merger are obvious and intuitive.  Kroger might

17   have the best price on Pepsi.  Albertsons might have the

18   best price on Coke.  Put them together, and we get the best

19   price on both, and then can pass that savings along to our

20   customers.

21        With supply chain, we avoid redundancies, expand it.

22   Not only are we cheaper and, therefore, less expensive for

23   our customers, but also faster, which means fresher for our

24   customers.

25        Technology.  Rather than running these

1    extraordinarily -- extraordinarily expensive tech stacks one

2    to one, we combine them, save money, pass it along to

3    customers.

4        You're going to hear in this case from Mafaz Maharoof,

5    who's going to talk about the billions of dollars of savings

6    and efficiencies that this merger will bring.  Billions of

7    dollars that will allow us to lower prices for our

8    customers, to bring them fresher food, to bring them more

9    local produce, to bring them competitive products.

10   Competitive not just on pricing to Walmart and Costco and

11   Amazon, but better, fresher, faster, broader.

12       Now, we recognize and we recognized then, at the time

13   we signed the merger agreement, that the map was not

14   entirely complementary, that there were some overlaps; that

15   we would need to divest some stores.  And this trial, this

16   preliminary injunction proceeding, will, in part, be about

17   whether that divestiture will work.

18       You're going to hear from C&S Wholesale Grocers about

19   their extraordinary story.  They started in 1918 as a

20   supplier of independent grocery stores.  Now they have a

21   nationwide network.  Notice that word "nationwide" again,

22   Your Honor.  That's really important.  That scale benefits

23   us in the merger.  It benefits C&S now.

24       Scale of 7,500 independent stores, all the way up to

25   large chains.  From the mom-and-pop and the bodega on the

corner, all the way up to nationally known brands they service today.  They are, in fact, the eighth largest private company in the United States.  They have more than 3,000 private label brands of their own today, and they support roughly 200 stores as -- as -- runs -- excuse me -- not support, but run 200 stores.  20 or so as owners, about 180 as franchisees.  They have the experience.  They have the infrastructure.  They have the motivation.  They have the commitment.  They have the customers already raised up here in the Pacific Northwest they support.  Holiday Market as well, in addition to national stores like Winn-Dixie, Target, and Giant.

And you're going to hear more later this week from Eric Winn, the CEO of C&S, who's going to be able to respond to counsel's suggestions at the end of her opening statement about all the purported inadequacies of C&S, about their lack of commitment, about their somewhat nefarious motivations implied, and you're going to hear from Mr. Winn directly about their excitement, their enthusiasm, their commitment, and their competence in performing their duties under this divestiture.

And you're going to hear about what C&S does today, from providing fresh produce to store design, from retail technology to digital marketing, from food shows and buying programs to private label products.  Everything that a

1    supermarket does, they do today.  They have the skills

2    today.

3         But let's talk about what else the deal is going to

4    bring them tomorrow.  With the deal, Kroger will run about

5    4,500 stores.  C&S about 600 stores, complementing the 7,500

6    they already run.  Mr. Cosset, who's in the courtroom now,

7    will explain the structure of the deal, explain what C&S is

8    getting, both from Kroger and from Albertsons, and what it

9    will allow them to do to compete successfully in those

10   markets where there is overlap, where the parties

11   acknowledge that there needs to be something done and there

12   is being something done creating a vital new competitor.

13        After the merger, C&S is not just getting stores,

14   they're getting people.  You're going to hear from

15   Susan Morris -- Ms. Mainigi is going to tell her more --

16   tell us more about her in a few minutes -- who's the current

17   Chief Operating Officer of Albertsons.  She is going to go

18   over and run the grocery facility.  She's got four decades

19   of experience.  Four decades of experience in the industry,

20   and she's enthused and excited about this opportunity.

21        But it's not just Ms. Morris.  You're going to hear

22   about dozens of other senior executives, thousands of

23   specialists, and 60,000 frontline associates, all of whom

24   are working in stores today and will work in those same

25   stores the day after the merger.

1    You're going to hear that C&S is going to get more than

2  a half dozen private labels to expand their base, that

3  they're getting a dairy, they're getting a transition

4  services agreement to make sure that the handoff is

5  seamless, increased distribution centers; and, again, of

6  critical import, C&S is committed to a transfer of all

7  collective bargaining agreements.  Union jobs will be

8  protected.

9    After the merger -- after the merger, you heard counsel

10  refer in her opening statement to majors and minors, and she

11  referred to C&S as a minor.  And, respectfully, that's just

12  plain wrong.  After the merger, C&S will be the eighth

13  largest grocery store in America.  That's not minor.

14    They'll be bigger than H-E-B, Dollar General, Aldi,

15  Walgreens, Trader Joe's, BJ's, I could go on.  A vital new

16  competitor both to Kroger and, just as importantly, Walmart,

17  Costco, and Amazon.

18    Now let's move on to what brings us here today:  The

19  preliminary injunction standard.

20    And, Your Honor, you've read some of this in the

21  pretrial briefing.  You'll read more of it after.  But there

22  is a fundamental disagreement about what you're going to be

23  deciding.  Because, respectfully, we believe that the

24  standard four-factor preliminary injunction test that

25  Your Honor has applied time after time, that applies here.

The Supreme Court told us that just a few months ago in
*Starbucks*.  And so we're going to be talking about the test,
the preliminary injunction standard, the four factors
Your Honor is familiar with, and we're going to start with
public interest, the extraordinary public interest in making
sure that this merger happens for the benefit of consumers,
for the benefit of associates, for the benefit of
communities, for the benefit of unions.

First of all, the benefits to new Kroger customers and
communities:  Lower prices from day one, ramping up to a
billion-dollar annual price investment.  Revitalize
Albertsons stores.  Remember that $1.35 billion in
revitalized Albertsons stores and infrastructure?  Fresher
foods.  Excuse me while I take a sip, Your Honor.  I'm
speaking too fast.

Enhanced stores and fulfillment networks.  Improved
data so that customers are told when a sale occurs or asked
what they want to see prices lowered, that it's -- we're
more reactive, more responsive, that our customers have a
greater stake in how we price, how we ship, how we stock.

And a broader supplier base.  More choices, more
opportunities -- both national brands and private label --
all of this as a result of the merger.

And, Your Honor, there was a little sleight of hand
that happened in plaintiffs' case.  They talked about states

1    where there are overlapping stores, but their own expert,

2    Dr. Hill, acknowledges that throughout 34 states there's no

3    competitive risk, no competitive threat whatsoever.

4    Two-thirds of this country will experience all of the

5    benefits of the merger with none of the alleged risk that

6    counsel has been talking about.

7         Now, we're going to suggest to you in just a few

8    moments that risk is nonexistent.  Certainly not sufficient

9    to justify a preliminary injunction.  But, in any event,

10   when you're talking about the public interest, two-thirds of

11   this country has nothing but benefit with none of the

12   ascribed risk.

13        All right.  Let's move on to the benefit to the new

14   Kroger associates.  The folks that were at Albertsons.

15        They're going to see higher wages, greater benefits,

16   greater flexibility to transfer locations, a new tuition

17   reimbursement program and financial coaching for all the

18   associates.  Up to $21,000 an associate.  And, again, a

19   transfer of all CBAs.  All of these opportunities will be

20   presented to Albertsons' associates as a result of the

21   merger.

22        How about C&S's customers?  They're going to see 1.2

23   billion in C&S's own commitment to improving the Albertsons

24   stores they're going to be acquiring.  They're going to have

25   private label expansion.  I mentioned that C&S has 3,000 of

1   their own label brands already, but they're taking over

2   seven -- some by license, some outright -- existing

3   Albertsons private label brands.  All of those will be

4   accessible to their customers and extraordinary enhancements

5   to distribution supply chain, which not only lowers prices,

6   but it makes food fresher on the shelf.

7       Even current C&S customers -- remember you're on to

8   those 7,500 folks that -- and "folks," that's a strange way

9   to describe Winn-Dixie or Harris Teeter, but even the

10  current folks will experience benefits.  Let's focus on

11  Ray's, for example.  A small local Pacific Northwest grocery

12  chain.  They currently use C&S.  They rely on C&S.  C&S is

13  their lifeblood, keeps them in business, keeps their prices

14  low, keeps their shelves stocked.

15      They're going to benefit too from this merger, even

16  though no one -- they're not changing hands.  They're

17  staying with Ray's.

18      Why?

19      They're going to have access to those same private

20  label products that C&S is getting that they can put into

21  the old Albertsons stores.  They can put into the -- C&S can

22  put into the 7,500 stores they currently service.  That

23  enhanced distribution and supply chain, that lowers prices

24  and increases product availability.  That becomes available

25  to the existing C&S customers, not just the new C&S stores.

1        All of the services they provide will be enhanced, and

2    so it will benefit not just Kroger stores and former

3    Albertsons stores, but 7,500 other grocery stores that are

4    striving to compete against the global behemoths:  Walmart,

5    Amazon, Costco, et cetera.

6        Public interest, Your Honor, we will show you over the

7    next three weeks it unambiguously favors this merger.  It

8    unambiguously suggests to Your Honor that a preliminary

9    injunction should not enter.

10       Now I want to talk about the middle two factors:  The

11   likelihood of irreparable harm and the balance of harms.

12   Here's where we have a fundamental disconnect with the

13   Government -- well, maybe one of many places we have a

14   fundamental disconnect with the Government.  This proceeding

15   will decide the fate of the merger.  Let there be no

16   mistake.  The suggestion that all you're being asked to do,

17   Your Honor, is tap the brakes, let the FTC do its job over

18   the next 12, 18, 24 months, let that process -- that's not

19   going to happen.  It never happens.

20       If you look at the history, there's never a merger --

21   and by "never," I mean, I think once in history -- never a

22   merger if it has to go through the extraordinarily tortuous,

23   serpentine, labyrinthine, what other adjective could I come

24   up with, name for the FTC Part 3 process?  It just doesn't

25   happen.  Why?  Because there are 60,000 people whose jobs

1    are currently in limbo.  There's financing that Kroger has,

2    that C&S has, that expires if it doesn't happen quickly.

3    There are licenses you need to procure, whether it's

4    pharmacy or alcohol or otherwise, from state agencies.

5    Those transfers expire, and there are 85 million families

6    that are waiting to hear what will happen.  This merger will

7    not occur if this injunction is in place.

8        Let's turn to the final factor:  Likelihood of success

9    on the merits.

10       The fundamental question Your Honor has to ask is:

11   What is the chance of ultimate success?  Really, what will

12   this merger do?  Is it pro-competitive?  Is it neutral?  Or,

13   as the Government contends incorrectly, is it

14   anticompetitive?

15       And this is kind of interesting, Your Honor:  There's

16   an established framework, it's called a Baker Hughes

17   framework, and counsel alluded to it but really didn't walk

18   us through it, and there's a pretty profound reason why.

19       The first step of the Baker Hughes framework is asking

20   the question, "Have plaintiffs properly, one, defined a

21   product market; two, defined a geographic market; and,

22   three, established a presumption of competitive harm?"

23       We're going to talk about product markets and the shell

24   game that's going on there.  But, Your Honor, you heard

25   almost nothing about geographic market in counsel's opening

1    statements.

2        Literally, she said, "I will quickly turn to it."  And

3    there's a reason that it was quickly turned to, and we'll

4    talk about that in just a few minutes.  It's because there

5    is simply no way that plaintiffs' case, as to geographic

6    market, stands up to the law, the facts, the industry, the

7    circumstances, or common sense.

8        And if I am right in that statement, we are done.  If

9    they can't establish an appropriate geographic market that

10   they are -- asserted market is right, then there is no

11   likelihood of success.

12       But if they manage to show you, which they can't, that

13   they've defined a proper product market and defined a proper

14   geographic market, the burden of production, not persuasion,

15   that always rests with the Government.  The burden of proof

16   always rests with the Government.  But if the burden -- if

17   they prove the markets, then the burden of production shifts

18   to defendants.

19       Is there a way to get that purple line on the screen

20   that I managed just --

21             THE COURT:  No idea.  Not me.

22             MR. WOLF:  It was one hundred percent me, Your

23   Honor.  I did not mean to graffiti your screen.

24             THE COURT:  It is okay.  It's gone.

25             MR. WOLF:  Thank you very much.  The burden of

production shifts to defendants to show that there's no

threat of substantial anticompetitive effect, and we'll show

you just that.  And I'll talk about just that in a few

minutes.  But at the end of the day, the burden rests with

the Government to show we're wrong.

All right.  Let's talk about the first step.  Have

plaintiffs properly defined a product market and a

geographic market?

And here, Your Honor, I have to confess to a little

bafflement, and we're going to be on a ride together

because, in the complaint, the Government asserted the

supermarket market.  That's the market that excludes Amazon.

That's the market -- well, in fact, both markets exclude

Amazon.com, but they exclude Amazon Fresh, they exclude

Costco, they exclude Whole Foods, et cetera.  That was in

the complaint.

Then we get Dr. Hill's expert report, and we think,

aha, they've gotten slightly more reasonable with regard to

the market, because he introduces the concept of a large

format market; that, in terms of product, is closer to the

facts on the ground.  But then we get the preliminary

injunction brief and the preliminary injunction reply where

the Government shifts back to the supermarket market.

And then today we saw a slide with both of these

markets side by side, and I can't tell whether the

1    Government's picked one or not.

2          But we're not playing a game of whack-a-mole here.  The

3    future of 60,000 employees and 85 million consumers just for

4    one of us is on the line, and we need to know now what their

5    alleged market is.  And I ask them, when they bring Dr. Hill

6    up, for them to say, once and for all, which one of these

7    are they picking?  But I'll tell you right now I don't know.

8    But I'm going to show you that either one will fail in light

9    of the evidence, the facts on the ground, and the law.

10         First, the supermarket market.  This is the narrower

11   one, Your Honor.  This is the one that's in the pleadings.

12   This is the one that's in the reply brief.  It fails for the

13   simple reason that it excludes real world competitors.  The

14   parties will -- the parties rely on third-party companies

15   for data, and one of these companies provides what's called

16   "share of wallet" and you're going to hear a lot about share

17   of wallet in this case, and it essentially says "For your

18   customers, the folks that actually walk into" -- in my case

19   Kroger stores -- "what percentage of their dollar, their

20   grocery dollar, spent is on you and is on your competitors?"

21         And the Government points to a world in which nearly

22   100 percent-- remember this one-stop shopping idea? --

23   nearly 100 percent must be with you, but that's not reality.

24         For our most loyal customers, a quarter of their

25   spending, only a quarter, is with us.  Walmart is next, then

1    Costco, then Albertsons, Sam's Club, and about 40 percent

2    with other folks.

3         Now, what's wrong with the supermarket market?  It just

4    disregards where more than half of our customers' grocery

5    dollars actually go.  It excludes Costco.  It excludes Sam's

6    and Whole Foods and Sprouts and all the -- and Amazon and

7    Trader Joe's and all the folks that intuitive we know --

8    intuitively we all know competes with Kroger, compete with

9    Albertsons.  That doesn't make any sense.

10        Your Honor, this is from *The New York Times* less than a

11   week ago:  How Costco Hacked the American Shopping Psyche.

12   More than 100 million people visit the retailer for their

13   groceries.

14        The Government is asking you to ignore those

15   100 million people.  They're asking you to say they don't

16   count for the market.  They don't put competitive pressure

17   on us.  That if we raise our price of milk by $0.20, that

18   those shoppers won't go to Costco and punish us for raising

19   that price.  They're saying just ignore the effect of

20   Costco.  They don't count.  That doesn't make any sense.

21   That won't make any sense in light of the evidence you're

22   going to hear.

23        Similarly, with Amazon.  This is a press release from a

24   few months ago:  Amazon.  Our goal is to build a best in

25   class grocery shopping experience, whether shopping in store

or online, where Amazon is the first choice for selection, value, and convenience.  And the Government says in their preferred market, we shouldn't think about Amazon.  That Amazon isn't relevant to whether we can raise our prices or not, whether we can decrease the quality of our products, whether our freshness, if it slips, whether there isn't someone to check us.  That just doesn't jibe with the facts.

Your Honor, it's also in a bit of irony.  We're, of course, against the Federal Trade Commission, an instrument of the United States Government.  The FTC apparently hasn't checked notes with the Council of Economic Advisers just down the street in my hometown in D.C.  This is from a press release just a few months ago.  Update:  Grocery price inflation has cooled substantially.  Some of the most prominent grocery retailers, including Aldi, who the Government says shouldn't count for the market; Amazon, who the Government says shouldn't count for the market; Target, who they acknowledge; Walgreens, who the Government says shouldn't count for the market, recently announced price cuts.

So the very folks at the Council of Economic Advisers at the White House say are part of the market, the Government says you should disregard when deciding what the proper geographic market is in this case.

And not to gild the lily, but to gild the lily,

1    Your Honor, Trader Joe's?  Nope.  Costco?  Nope.  Sam's

2    Club?  Nope.  Whole Foods?  No.  Aldi?  Vallarta?  H Mart?

3    Amazon?  None of them are included in the market that they

4    asserted in the complaint.

5         There's another problem with the market asserted in the

6    complaint, and that's geography and the interrelationship of

7    geography and store in the unique complex grocery world.

8         You're going to hear a lot in this case about an

9    article by Paul Ellickson, Paul Grieco, and

10   Oleksii Khvastunov -- I practiced that last night.  I don't

11   know if I got it right -- and I again smudged the screen --

12   that we find, the authors find, that club stores represent

13   significant competition -- to traditional grocers, due in

14   large part to consumers' greater willingness to travel to

15   them.

16        In other words, and in simple terms, customers,

17   shoppers are willing to drive farther for a Costco or

18   farther for a Target or farther for a Walmart than they are

19   for the corner grocery store, and I think that's consistent

20   with all of our experiences.  It's certainly consistent with

21   my household, Your Honor.

22        And you need to take that fact into account when you're

23   asking about the second question, the geographic market.

24   Remember, product market, geographic market.  They're

25   intertwined in this industry.  And what does that mean?

1        What the Government says is -- and their typical

2    example is a five-mile boundary for geographic market.

3    That -- there -- that's the norm, the median, the mean of

4    their -- of their geographic markets.  When we're asking

5    Albertsons, the Albertsons at the center of that circle,

6    who's putting pressure on them so they don't raise the price

7    of milk or eggs or bread?

8        First of all, they exclude Trader Joe's and Aldi and

9    Whole Foods because they say they're outside of the product

10   market, and we, of course, disagree with that, but they also

11   say we're going to disregard the Costco and Walmart and

12   Target that are just outside of the circle because they're

13   too far away, even though the evidence shows -- and you'll

14   hear evidence from the Government's own witnesses that

15   customers drive farther, are willing to drive farther for

16   these stores, and therefore these stores put price pressure

17   on Albertsons.

18       If Albertsons in that circle raises the price of milk,

19   of course customers will drive an extra quarter mile to get

20   to a Walmart just outside of that five-mile circle.

21       So the narrower market fails.

22       And if you hold the Government or the Government

23   insists to leaning on their narrower market, we are done

24   here.  We can go home.  We can have a nice Labor Day.

25   Because they cannot establish likelihood of success if they

1  cannot establish the appropriate product and geographic

2  market.

3       Let's turn, though, to Dr. Hill's large format market,

4  which includes more of the stores that plainly compete.

5       The problem with Dr. Hill's market and the reason that

6  counsel said "Let's quickly turn to geography," rather than

7  "Let's study geography," is because Dr. Hill's market, the

8  broader market, while better on product, fails when it comes

9  to geography.

10      You heard about the hypothetical monopolist test.  And,

11  Your Honor, the hypothetical monopolist test is a check.  It

12  says, "Did you get the right market?"  And how do we know if

13  you get the right market?

14      If, in the market that we allege to be the right one,

15  if you can raise prices by five percent or more, then you're

16  a monopolist, and therefore we have the right market.  If

17  you can't, if prices are less than five percent higher, then

18  you screwed something up.  You've made a mistake.  You've

19  excluded competitors either because of product or geographic

20  market.  That's the monopolist test.  It's a check.  Did you

21  get it right?  And we know in the real world they got it

22  wrong.

23      On the left is a representation, and you'll hear about

24  actual markets that look exactly like this, where there are

25  Albertsons or Kroger stores within the five-mile radius, but

1  Costco or Walmart stores are just outside, and therefore

2  excluded from whatever market the Government relies on, and

3  we can compare that in the real world markets where there

4  are admitted competitors.

5      And then we ask the question.  The left-hand market.

6  The one where Costco and Walmart are just outside of the

7  geography, and therefore the Government says they don't

8  count, are prices higher five percent or more higher than

9  Albertsons?  And the answer is, "No, they're not."  They're

10  not statistically significantly higher at all.

11      And so the Government's markets, whether the narrow one

12  or their larger one, don't just fail the hypothetical

13  monopolist test.  They fail the actual monopolist test.  In

14  the real world, Costco and Walmart and Amazon put pricing

15  pressures at greater distances, and so you have to take that

16  into account, and the Government doesn't.

17      Again, they fail.

18      Here's a real world example.  This is from Portland,

19  Oregon.  There's a Fred Meyer that they've drawn a five-mile

20  circle around, and they say that that Costco that's

21  sixth-tenths of a mile outside the Fred Meyer circle

22  shouldn't be included.

23      In this case, you'll hear evidence that of course it

24  should be included.  Of course it puts price pressure on

25  that Fred Meyer; that if the Fred Meyer jacks up its prices,

1    people will drive to that Costco even though it's six-tenths

2    of a mile further than the Government and the Government's

3    witnesses suggest.  But it's not just under-inclusive;

4    bizarrely, it's also over-inclusive.

5        Here's the actual map the Government actually drew in

6    Dallas, Texas.  Unlike the five-mile map they thought was

7    helpful to prove their case for Oregon, they drew a 26-mile

8    circle in Texas.  That's how broad they wanted to get it,

9    they had to get it, to make their facts hold up, and that

10   26-mile circle now includes 561 total stores.  It includes

11   competitively irrelevant stores.  That's the way they have

12   to torture the data to make it sing the way they want it to.

13       The evidence will show that, when you define product

14   markets correctly, when you define geographic markets

15   correctly, this merger poses no risk, let alone a

16   substantial risk of anticompetitive harm.  In other words,

17   they can't prove the first step.  We are done.

18       But if we weren't, let's move on to the question of

19   substantial anticompetitive effect.

20       Defendants' evidence will show definitively there is no

21   threat of substantial anticompetitive effect.  The first

22   reason is simple.  Walmart keeps prices low.

23       And here I'm using Walmart.  A bit of a shorthand for

24   Walmart and Amazon and Costco, but only a bit of a

25   shorthand, because I'm going to tell you we are really,

1    really focused on Walmart.

2         You're going to see from -- hear from Mr. McMullen, the

3    CEO; Mr. Aiken; and Andy Groff, who you're going to hear

4    from probably tomorrow or maybe even later today, who's the

5    senior director of pricing strategy, that Walmart is

6    singularly focused on being the leader in price.

7         Kroger, in turn, is monomaniacally focused -- that's

8    not my word.  That's a word from one of the depositions.  I

9    learned it in the deposition -- on closing the gap to

10   Walmart's prices.  Simply put, Walmart at the corporate

11   level and it all but a handful of irrelevant divisions,

12   prices based on Walmart.  Kroger based -- prices based on

13   Walmart.  And that Kroger price investment in Albertsons

14   will narrow the Walmart price gap between Albertsons -- the

15   current Albertsons stores and Walmart, and the evidence is

16   unambiguous.  I don't think Your Honor will be surprised

17   when you hear from Marc Lieberman at Walmart, the Vice

18   President of Walmart, that they believe price leadership is

19   a critical part of their business.

20        And you will see document after document, you will hear

21   witness after witness say that Walmart is the lodestar for

22   Kroger in setting prices.

23        Here's an actual document:  Summary of Kroger's Pricing

24   Strategy for its Key Pricing Program.

25        And program after program after program, either match

1    Walmart's prices or stay within a band.  And in yellow,

2    there's another.  Match Walmart's prices, stay within a

3    band.  We can see every place in yellow on this document.

4    That's what monomaniacal obsession looks like.  It's

5    everything is based on Walmart.

6         And of course, when we invest a billion dollars

7    annually in lower -- lowering Albertsons' prices to bring

8    them closer to Walmart, that benefits consumers, that

9    constrains prices, that ensures competition.

10        Now, what is the Government's response to this?

11        I asked -- I took Dr. Hill's deposition.  How does your

12   modeling take into account the prospect that Albertsons'

13   pricing model will change to Kroger's model upon

14   acquisition?  In other words, Kroger is now going to own

15   Albertsons.  It makes common sense that the old Albertsons

16   stores will now -- their strategy will be guided by their

17   new owners, their new management, and Dr. Hill pushed back

18   on that.  He said, "The model looks at the current

19   incentives which are captured in the version and the

20   margin."

21        And I said, "Well, wait.  What about choices made by

22   boards of directors and senior management?"

23        And his response was, "Neoclassical economics assumes

24   firms are profit maximizing."

25        Your Honor, this case isn't going to be decided by

neoclassical economics.  This case is going to be decided by
facts and executives and the law, and the executives and the
facts and the law all say that Kroger will do what they say
they're going to do, that the efficiencies will allow them
to do what they say they're going to do, and that prices
will come down for current Albertsons customers.

       And when I say "the facts," I also mean history.  In
the last 20 years, our profit margin has gone down, down
five percent, resulting in $5 billion in savings for current
Kroger customers.

       When year after year -- here's a chart from our public
filings.  From 2006 to 2021 our margin has declined every
year but three.  The three crises year in that window.
Every single year we brought our margin down, brought it
closer to Walmart.

       And when we've merged with companies, we follow the
same path.  In 2014 we merged with Harris Teeter.  We bought
prices down $125 million annually.  A 1.8 percent decline in
margin.

       That's what will happen with Albertsons.  With
Roundy's, the same thing.  In 2016 we acquired them.  We
brought the margin down 1.1 percent.  $100 million in
benefits to then Roundy's customers.  The same thing will
happen.

       The last thing I'll say about the data, the real world

1    data, we actually have markets where Kroger exists and

2    competes with other folks, but no Albertsons, and Kroger

3    competes with Albertsons.

4        Remember all those slides counsel showed you of price

5    checking Kroger and Albertsons?  What's the effect of that

6    in light of Walmart?  Remember, five percent is the

7    threshold?

8        The difference in prices between those markets where

9    Albertsons exists and it doesn't, is not five percent.  It's

10   not five-tenths of one percent.  It's five one-hundredths of

11   one percent.

12       In the real world, that's the effect that Albertsons

13   has on Kroger's pricing five one-hundredths of one percent.

14   That is not substantial anticompetitive injury.  In the real

15   world, there is no threat of anticompetitive injury.  In the

16   real world, there is no threat of anticompetitive injury.

17   In the real world, we will be bringing Albertsons' prices

18   ever closer to Kroger's prices, ever Kroger -- ever closer

19   to Walmart's prices.

20       Your Honor, we saw head-to-head slides over and over

21   and over again, head-to-head competition.  You could say

22   that Albertsons is monomaniacally focused on Kroger.  That

23   may be true, but Kroger -- it's not reciprocated, Your

24   Honor.  It's a kind of a one-way love affair.  The reason is

25   Kroger's looking ahead, trying to catch up with Walmart.

1    Albertsons -- and you'll hear more from Ms. Mainigi about

2    their financial situation.  Their business situation is

3    focused on catching up with us.

4        And then, if they could, which they can't, they would

5    turn their attention to Walmart.

6        Albertsons is focused on us.  We're focused on Walmart.

7    What the merger will allow us to do is Kroger will get ever

8    closer to Walmart and day by day, week by week, Kroger will

9    bring former Albertsons stores in line with Kroger pricing

10   and Kroger pricing collectively closer to Walmart.

11       Now let's talk about the neoclassical economics.

12   Because the real world disputes it, but it turns out the

13   neoclassical economics also isn't right here.

14       Dr. Hill tells us, and I don't think there's going to

15   be a significant dispute about this.  He sets up a good

16   standard for us.  The competitive harm caused by the merger

17   is measured by the number of stores that as a result of the

18   merger have a CMCR value greater than five percent.

19       You're going to hear about CMCR, and you're going to

20   hear about GUPPI.  That distinction is Celsius and

21   Fahrenheit for our purposes.  It's not going to matter.

22       What does matter?

23       Well, the experts use the same models.  They start with

24   the diversion ratio, which is, simply, if we raise prices or

25   someone else raises prices, how many customers vote with

1    their feet and go to a store nearby?  And you multiply that

2    times the variable margin.  How much does that move voting

3    with their feet cost you?  What is the effect of it in

4    dollar terms?

5         And the result is either CMCR or GUPPI, depending on

6    which -- what's the numerator and what's the denominator.

7         Again, that's going to be a pillow fight in this case,

8    Your Honor.  You're not going to have to worry about

9    deciding which one of those is the right way to measure

10   things.  The experts agree on this approach, but they

11   disagree on the inputs.

12        And the inputs the Government and their experts choose

13   to use are frankly a little bizarre.  Dr. Hill, when it

14   comes to diversion ratios, he derives them from market share

15   approaches used for hospital mergers.  Hospitals.  A very

16   different kind of market, a very different textured market

17   than grocery stores.

18        Dr. Israel, on the other hand, uses diversions based on

19   grocery industry-specific, that EGK, that paper I told you

20   you're going to be hearing so much about, he uses a model

21   from there, a well-established, well-known, and, more

22   importantly, very appropriate model for the grocery

23   industry.

24        Now, how about the other inputs?  Variable margin.  All

25   the experts, indeed the entire economic community, agrees

1  you need to use variable margins; but, for some reason,

2  Dr. Hill uses gross margins, whereas Dr. Israel uses

3  variable.

4      Again, as to the diversion, Dr. Hill uses hospital

5  literature.  Dr. Israel uses store-level census of the

6  grocery industry that identifies key determinants of store

7  choice and competitive overlap in the complex setting of

8  groceries.

9      In terms of the inputs, it's common sense, Your Honor.

10  If you sell more stuff, your hourly wages go up, your costs

11  of your employees goes up.  The bags you bag the new

12  additional groceries, that costs more.  The gloves the deli

13  workers use costs more.  The cleaning products you have to

14  use to the increased traffic costs more.  Your credit card

15  goes -- credit card fees go up, your warehousing costs go

16  up, your transportation costs go up.  All of those are real

17  costs that really decrease your profit, and Dr. Hill ignores

18  all of them, despite the fact that the very model he uses

19  says you have to take into account.

20      Why does this matter?

21      You saw a very similar chart in plaintiffs' opening

22  statement.

23      Dr. Hill tells us that there are 1,513 problematic

24  stores, concerning stores, stores where the CMCR is at or

25  above five percent.  But he admits, if you take into account

1  variable margins, Dr. Israel's margins -- this is adapted
2  from a chart that you're going to see that was in Dr. Hill's
3  report.  These are his own columns.  He admits, if you apply
4  variable margins, like the model suggests you have to, that
5  1,513 goes down to 693, or if you take into account
6  divestitures, the divestiture of the 579 stores, that number
7  of problematic stores goes from 1,513 to 234.
8      But what happens -- and for some reason Dr. Hill never
9  does that final column on his chart -- if rather than
10 considering how many stores are problematic, how many
11 anticompetitive risks are there if you have divestitures or
12 variable margins as inputs -- the proper divestiture -- what
13 happens if you do both?  What happens if you consider both
14 the fact of the divestiture and variable margins?
15     The answer:  If you combine Dr. Israel's margins, the
16 correct ones, variable ones, with the divestiture, there are
17 zero price zones of concern.  There are zero price zones of
18 concern.  There is zero anticompetitive effect based on
19 Dr. Hill's, based on the Government's own data, own
20 analysis, own model.  Zero.
21     So even if the Government somehow convinces you that
22 they've chosen the right product market and the right
23 geographic market, they cannot -- they will not be able to
24 show you over the next three weeks any threat of substantial
25 anticompetitive effect.  There is no likelihood of success.

1    There is no reason to block this merger.

2         I want to talk briefly about the labor theory and then

3    turn it over to my colleague Ms. Mainigi.

4         As I expressed to you, Your Honor, both companies,

5    Kroger and Albertsons, support union.  The claim that there

6    is a unique labor union market is legally unprecedented, it

7    is economically unsupported, and it is factually wrong.

8         As to the first, this is more a subject of briefing,

9    Your Honor, than the evidence you're going to hear in the

10   case.  This will be more in the post-trial briefing and what

11   you've seen to date.  But Section 6 the Clayton Act talks

12   about the labor of human beings is not a commodity or

13   article of commerce.  It's not subject to the Clayton Act.

14   End of story.

15        As for economic evidence, the experts, where is their

16   expert testifying -- where will there be expert testimony

17   that the union grocery labor market is a relevant antitrust

18   market?  There will be none.  Where is the Government's

19   expert testimony that the merger would substantially lessen

20   competition in any relevant labor market?

21        There will be none.

22        Where is the evidence -- expert evidence the merger

23   would cause a negative impact on union workers?

24        Again, there will be none.

25        And I bet you know what the next slide is going to

1    show.   The merger -- where's the evidence the merger would

2    reduce bargaining leverage of union workers from the

3    experts?

4          There will be none.

5          There is no expert evidence to support the theory the

6    Government has put forward today, nor could there be,

7    because there is no such thing as a union grocery labor

8    market.

9          To understand in simple terms, look at our workforce.

10   A couple of key metrics.

11         70 percent of Kroger-Albertsons, their first job is at

12   the companies.   86 percent at Kroger.   97 percent at

13   Albertsons.   The jobs have no particular education

14   requirement.   95 percent of workers are paid on an hourly

15   basis.

16         What does that mean?

17         It means that when we're competing for workers, we're

18   not competing against each other, primarily.   We're

19   competing against the McDonald's and the Lowe's and the

20   Amazons, and the FedExes, and the Wawas, the Macy's and the

21   Taco Bells of the world, that's the relevant labor market.

22   There is no such thing as a tiny sliver called the union

23   grocery labor market.   How do we know?   Well, we can look.

24   We keep track.

25         First, if there were such a thing as a union grocery

1    labor market, you would expect that when an employee comes

2    to Albertsons or to Kroger and they have prior work

3    experience, that the most likely prior work experience would

4    be at the other company or at least at another union

5    grocery-based company.  But, in fact, more than 99 percent

6    of our current employees come from folks outside the

7    Government's purported market.  99 percent come from UPS or

8    Lowe's or Home Depot or stores -- or companies like that,

9    not from the union grocery labor market, because no such

10   market exists.

11        Let's flip it around.  Let's say where do our employees

12   go to when they leave us?  Again, if there was a union

13   grocery labor market, you would expect them to go to another

14   union grocery company.  But the facts say that more than 98

15   percent of them don't.  They go to UPS or Lowe's or Home

16   Depot or Macy's or Subway.  There is no union grocery labor

17   market.

18        There also -- their theory leads to bizarre results,

19   like folks would be willing to travel seven hours to get

20   another union labor job rather than go to their local Subway

21   or Macy's or Amazon.

22        Your Honor, you heard a bit about whipsaw bargaining.

23   What the evidence is going to show in this trial is whatever

24   you think of whipsaw bargaining -- and we're actually never

25   going to get here because they won't be able to establish a

market -- and, Your Honor, I'm wrapping up here.  I've got a
few slides left.

    The facts will show that a union labor force that is
double its current size exercises much more leverage than
one that's half its size.  When the union forces of
Albertsons and Kroger get together, when it's -- when they
decide it's time to take a stand, they will have more
influence, more leverage than they do today.  This merger
will be good for unions.

    And, again, where the rubber meets the road, I told you
before in the real world we could compare prices when
Albertsons existed and when it doesn't -- when it didn't,
and there was no distinction, no difference.

    Well, it's the same with the labor concept.  We can
compare union wages where there's a Kroger but no Albertsons
versus areas where there's a Kroger and an Albertsons, and
we can compare union wages.  And what's the difference?
None.  None.  There is no difference between those two
markets.  What does that tell us?  Even if they could
establish there was such a thing, which there isn't, of a
union grocery market, it would have no implications.  It
wouldn't result in any change in wages.

    Before I turn it over to Ms. Mainigi, I just want to
conclude.  A billion dollars a year in price investments
await Albertsons' customers.  $1.3 billion in improved

1    stores and infrastructure await Albertsons' customers.  A

2    billion dollars a year in union and nonunion wages and

3    benefits await our associates with no store closures, with

4    more given to the communities, no frontline job losses,

5    protection of union jobs, benefits to local farmers and

6    shoppers alike.

7         Your Honor, we respectfully request you allow this

8    merger to happen, allow it to benefit the hundreds of

9    millions of folks, the 85 million families that stand to

10   gain if this merger goes through.

11        Thank you for your time.

12             THE COURT:  Thank you.

13             MS. MAINIGI:  Your Honor, may I go up?

14             THE COURT:  Yes.

15             MS. STEWART:  Your Honor, may I approach with

16   copies?

17             THE COURT:  Yes.

18

19             OPENING STATEMENT FOR ALBERTSONS

20             MS. MAINIGI:  Good morning, Your Honor.

21             THE COURT:  Good morning.

22             MS. MAINIGI:  My name is Enu Mainigi, and I

23   represent Albertsons.  I have about 35 minutes.

24             THE COURT:  That's fine.

25             MS. MAINIGI:  But my goal, Your Honor, is to

1   highlight Alberstons' views of some of the upcoming points

2   that the Court is going to consider, as well as preview some

3   of the testimony from the Alberstons witnesses.

4        Now, I'm going to cover about eight separate points,

5   and I may have a little bit of overlap with Mr. Wolf, but

6   they really are the key points from Albertsons' perspective,

7   especially as Your Honor considers the facts that you will

8   hear at trial, matched up against the law.

9        So point one, Your Honor -- obviously, this is going to

10  be a big focus because everybody's talking about it, and

11  that is prices.

12       And we submit to you, Your Honor, that the first and

13  most fundamental point here is that, if the merger is

14  allowed to go through, prices will go down at Albertsons

15  stores around the country, and I can say that with 100

16  percent certainty, day one.

17       Now, the FTC, of course, is taking the position that if

18  two big grocery stores, like Kroger and Albertson, combine,

19  that automatically means prices are going to go up, that

20  that's what history tells us.

21       But there are multiple reasons why that will not be the

22  case, Your Honor.  Let me start with the first.

23       Kroger's prices are already lower than Albertsons'.

24  This is an undisputed fact that you will hear about at

25  trial.

1      So even if all Kroger did was lower Albertsons store

2   prices to Kroger levels, that would be a win for the

3   Albertsons consumer.

4      And as you already heard from Mr. Wolf, there are plans

5   underway, if the merger is allowed to go through, to do

6   that.

7      But those price reductions, Your Honor, and certainly

8   price reductions of that magnitude, are only going to happen

9   if the merger goes through.  Albertsons cannot provide those

10  price reductions on its own, in the absence of a deal.

11     But the next reason, Your Honor, that prices will go

12  down is scale.  The Walmarts and the Targets of the world

13  have a scale that Albertsons, and even Kroger alone, do not.

14     And one of the things that scale allows them to do is

15  to buy for less and thereby sell for less.

16     Let me give you a real world example, Your Honor, that

17  we deal with.  In some of Albertsons' markets, we sell one

18  type of Kraft Mac & Cheese for $3.49.  In the same markets

19  Walmart sells the same Kraft Mac & Cheese for $2.98.

20     Now, the idea that Walmart is selling a product for

21  less than Albertsons may not be surprising, Your Honor, but

22  this is surprising.  The cost at which Albertsons can buy

23  the Mac & Cheese is higher than the price at which Walmart

24  can sell it.

25     Now, due to confidentiality reasons, Your Honor, I

can't necessarily reveal that price, but what I will
represent to the Court is that starts with a 3 and falls
between the price that Walmart sells it and Albertsons sells
it.

And that's true not just for Mac & Cheese but for
dozens, if not hundreds, of products.

So how does Walmart do that?

Scale.  They do it with scale.

And the same thing with Costco.  When Costco goes out
and buys Cheerios, it's buying for a much larger scale of
stores than Albertsons.

Costco buys more of those Cheerios in bulk at a lower
cost, and it can sell them to customers at better prices,
and that's a big part of what makes people want to go shop
at Costco and why Albertsons is losing more and more
business to them.

And of course the same is true with Amazon and others.

Right now Albertsons cannot compete with that type of
scale, but the merger will give the combined company the
scale to help better compete with Walmart, Costco, and
Amazon.

And that's a fact that this Court should take very
seriously when considering whether it would be in the public
interest to enjoin this merger.

Now, one point that the FTC wants to make is, well, how

can we guarantee that a combined Kroger will keep prices
low, that they won't shoot back up next year or the year
after, when nobody is looking?  Because the FTC says,
Your Honor, that you have to assume -- assume that a
combined Kroger will raise prices even beyond where they are
today.

     And the reason is -- Your Honor, the reason they won't
is survival, and obviously you've heard a bit of that from
Mr. Wolf.  The combined company will not be able to survive
in this world if it raises prices, and the reasons for that
have everything to do with the changed competitive landscape
that you will hear about at trial.

     Now, why does that matter, Your Honor?

     Well, one -- one of the cases that the plaintiffs
actually cite again and again, and I heard it from my
colleagues, is *Brown Shoe*, and *Brown Shoe* says you need to
look at commercial realities.  And to understand the effects
of the merger, the Court needs to understand and take into
account the commercial realities that Albertsons deals with
every day.

     Now, I do think I heard the FTC say, "Well, we are
accounting for the Costcos, the Targets, the Whole Foods,
the Walmarts in our economic analysis," but they have not
accounted for those entities, Your Honor, in their
commercial realities, and those commercial realities show

1  that Walmart is not going to raise its prices.  Costco is

2  not going to raise its prices.  Amazon is not going to raise

3  its prices.  And other important competitors, like Target

4  and Aldi, are not going to raise their prices.

5      And as these companies have told the world over and

6  over again, their strategy is to lower prices, not raise

7  them, and they've done so even with -- in the face of record

8  inflation over the last several years.

9      And so I'll just quickly run through a few of their

10  statements, but the first thing is a Costco earnings report

11  from 2022.  They're championing the fact that we're always

12  trying to push more into lowering the prices.

13      And then there's a Target press release from May

14  announcing that we are lowering everyday regular prices on

15  5,000 frequently shopped items.  And then a Walmart earnings

16  release, Your Honor, from just two weeks ago, saying that

17  there's been real progress made related to value or lowering

18  prices.

19      So this is not just a theory.  Scale and low prices are

20  actually the business models of these companies with whom

21  Albertsons and Kroger compete.

22      And if they were going to raise prices, they would have

23  done it by now.  But, instead, they fight not to do that.

24      So if supermarkets are going to survive in this

25  completely changed industry, they're not going to be able to

1   do it by raising prices.  They're going to have to lower

2   prices and keep them down.

3        That leads me to my second point, Your Honor, which is

4   this:  The traditional one-stop shopping supermarket is a

5   thing of the past.

6        Now, Mr. Wolf referred to a tectonic shift.  I'm going

7   to refer to a seismic shift.  But there has been a seismic

8   shift in the competitive landscape, which has magnified the

9   importance of the scale and the prices, and it's the whole

10  reason that Albertsons is here seeking a merger, Your Honor.

11       But before I get into the facts, I want to take a

12  little bit of a detour to talk about one of the key elements

13  that the plaintiffs have the burden of proving in this case,

14  and that is the relevant market.

15       And as you know, Your Honor, the FTC is claiming the

16  relevant market here is limited -- sometimes the FTC is

17  claiming that the relevant market here is limited to just

18  traditional supermarkets and supercenters, and that's

19  primarily based on their view that customers are still going

20  to go to one store to get most of their groceries for the

21  week.

22       But I want to draw Your Honor's attention to their

23  reply brief, the recent reply brief that the plaintiffs

24  filed, and they said something very telling in that reply

25  brief.

1        The relevant antitrust question, the FTC said, is for

2    those consumers who value a one-stop shop supermarket

3    experience, which companies offer reasonably interchangeable

4    substitutes for that purpose.

5        Now, Your Honor, I had to read that a few times to make

6    sure that I followed along, but what they seem to be saying

7    is that very small group of customers who might still want

8    to engage in one-stop shopping should be the only people you

9    look at when you decide whether this merger is good for the

10   whole rest of the country.

11       Who are these consumers who only get their groceries at

12   supermarkets and supercenters?  The plaintiffs don't say,

13   Your Honor, because they haven't actually tried to prove

14   their market with any data about that tiny sliver of U.S.

15   consumers, and you won't hear their experts talk about

16   market shares in terms of consumers who want to one-stop

17   shop.  You'll hear them talk about consumers as a whole.

18       But for an overwhelming number of U.S. consumers, the

19   world looks a whole lot different than it used to.

20       And let me turn to some of the facts that you will hear

21   from Albertsons' witnesses at trial.  So there was a time,

22   Your Honor, when Albertsons thought of itself as a one-stop

23   shop neighborhood supermarket, where people went once a week

24   to buy all of their groceries.  And it was certainly true

25   back then, but it was even true 20 or 30 years ago, but it

1    is not the reality today.

2        Today, people might go to Albertsons to get some of

3    what they need for the week, but then they're going to do

4    their grocery shopping -- but they're also going to do their

5    grocery shopping at Target at the same time that they might

6    go there to get school supplies for their kids or clothing.

7        And depending on where they live in the country,

8    instead of going to Target, they may go to Dollar General.

9    At some point they may make a Costco run, and then they

10   might stop at CVS on their way home in their neighborhood.

11       And then when they get home, they may realize they have

12   forgotten a few things, and so they'll hop on Amazon or

13   Instacart to order online.

14       And there's a phenomenon that this is called, Your

15   Honor.  You're going to hear witnesses refer to this as

16   channel blurring.  And that's referring to a phenomenon

17   where retailers, who traditionally did not offer groceries,

18   are increasingly entering and growing market share in the

19   grocery space.

20       And the reason that's happening, Your Honor, is because

21   the consumers -- the consumers are blurring the lines of

22   where they buy groceries.

23       The Wall Street Journal recently wrote about this

24   phenomenon just a few months ago, and the title of this

25   article says it all.  The title is:  The Era of One-Stop

1    Grocery Shopping is Over.

2         And this article, Your Honor, points out that the

3    average consumer bought groceries from over 20 different

4    retailers in the last year, and that number was up

5    23 percent from just four years ago.

6         Now, do we wish that were different?  Yes.  But this is

7    the reality that Albertsons faces every day.  And that

8    seismic shift that's happened has only been magnified in the

9    last decade.

10        Your Honor, Albertsons' witnesses will pinpoint two

11   especially critical moments in the last decade, moments when

12   they've really felt the Earth move underneath their feet.

13        The first was October 2015, when Walmart announced

14   several billion dollars in price reductions throughout its

15   stores, including grocery; the second, Your Honor, was 2017,

16   when Amazon announced it was buying Whole Foods.  And the

17   day that Amazon made that announcement, stock prices of

18   so-called traditional grocers plummeted.  And why was that?

19   Because their space was being invaded.

20        Now, since that time, the retail giants have doubled

21   down on grocery, and they show no sign of slowing down.

22   They have made it clear to their shareholders and the market

23   that they view grocery as a lucrative investment.

24        And so, again, Your Honor, in earnings call after

25   earnings call you will see Walmart, Amazon, and even names

that you may not have heard that often, like Dollar General,
talk about the importance of grocery to their economic
future.

     And here's Amazon's saying that grocery is one of our
fastest growing categories.  Walmart telling investors that
customers came to them less frequently in the past.  They're
now coming to them to shop more frequently.  And Dollar
General talking about the fact -- Dollar General talking
about the fact that they're in the process of expanding
many, many stores to fresh.

     And of course that's also true, Your Honor, for Costco
and Target and the other competitors we've mentioned.

     But Walmart and Amazon and some of these others have
succeeded, in part, because they've had the enormous
advantage of national scale, and they leveraged that scale
to gain additional consumers through lower prices.

     And now they're being joined by names of other
so-called nontraditional grocers that you just would not
expect to see.

     A startling fact, Your Honor, that we will learn about
a trial is that 80 percent of the $130 billion economic
profit generated in the grocery sector since 2020 is
attributable to four retailers:  Amazon, Walmart, Costco,
and Dollar General.

     None of these are who any of us would say was a

1   traditional grocer a few years ago.  And two of the four --
2   Amazon and Dollar General -- are not even fully captured by
3   even the broadest market offered by the plaintiffs' expert
4   Dr. Hill.  The large format market.
5       Now, Your Honor, let me pause on Dollar General, and
6   you might be surprised to see it here, because I was
7   certainly surprised to see it here, but their presence does
8   not surprise the people at Albertsons who have been watching
9   Dollar General's ascent for several years.
10      Dollar General has more than 19,000 stores, and they
11  are aggressively expanding to offer fresh produce.  Already
12  over 3,000 of their stores carry fresh, and that number is
13  going up to 5,000 by the end of this year.
14      And, by the way, Your Honor, I just want to make clear
15  that Dollar General is different than Dollar Tree, who the
16  FTC is bringing to testify this week at trial.
17      Now, Your Honor, there are other new names on the
18  market as well.  New names to many of us.  Value grocery
19  retailers, like Aldi and Lidl, who are already two of the
20  biggest grocers worldwide, have exploded in the United
21  States in the last several years.  And Aldi, in particular,
22  is becoming a big threat to the grocery industry.
23      20 years ago they only had 680 stores, and today they
24  have 2,800, and they're just getting bigger and bigger.
25      They recently acquired 500 stores from Winn-Dixie.

1    And in March of this year they announced that they're

2    going to invest another $9 billion over the next five years

3    to open 800 new stores by the end of 2028, including in

4    states where Albertsons competes.

5    So today, Your Honor, these players dominate the

6    industry, and in significant part, it's because they

7    dominate on price.  And the impact of all of these new

8    entrants and channel blurring is that the traditional

9    supermarkets are losing out to these large national and

10   value players, and the data supports this fact.

11   As you will hear at trial, Your Honor, 20-plus years

12   ago, in 2003, supermarket grocers were the primary choice

13   for 79 percent of consumers for their groceries, and today

14   that is down to 38 percent.

15   Now, you're going to hear, Your Honor, about all these

16   industry shifts from Lisa Kinney, who's Albertsons VP of

17   Customer and Market Intelligence, and she's going to tell

18   you that she jokingly sometimes gets called the "Chief

19   Reality Check Officer" at Albertsons because her job is to

20   tell everyone the truth on what's happening in the industry,

21   what the trends are, what consumers are shopping.

22   She's also going to talk about share of wallet, which

23   you heard about a bit from Mr. Wolf, and share of wallet,

24   just as a refresher, Your Honor, tries to encapsulate

25   basically the idea that for every dollar an Albertsons

1  customer spends on groceries, how much do they actually

2  spend at Albertsons?

3      And what Ms. Kinney will testify to, Your Honor, is

4  that Albertsons' own customers are spending almost $0.88 out

5  of every dollar they have for groceries somewhere else,

6  somewhere other than the Albertsons.

7      So Albertsons is losing -- or the word is "leaking" --

8  88 percent of its customers grocery dollars to competitors.

9      And where is that 88 percent going?  It's actually

10 going to many of the same retailers that we've been talking

11 about.  The two biggest being Walmart and Costco.  Albertson

12 leaks about 15 percent of their customer share of wallet to

13 Walmart and 12 percent to Costco.  Kroger, on the other

14 hand, Your Honor, takes about seven percent of Albertsons'

15 share of wallet.

16     So when the FTC says that Kroger is our number one

17 competitor, that's not what the data shows.

18     Now, the FTC will be able to show you some

19 cherry-picked documents where we are monitoring Kroger's

20 price or going back and forth about Kroger pricing in some

21 way.  There's going to be documents about that.  But for

22 every document they show you that mentions Kroger, there are

23 five others that mention Walmart and Aldi and Costco and

24 Target.

25     And Albertsons' witnesses will tell you some of the

focus on Kroger is explained by the fact that for a long
time there was actually not readily available data on the
big competitors that we've been talking about.  There was
not data available as to who was shopping at Costco, for
example.

Now, one of the ways, Your Honor, that the FTC responds
to what our witnesses have to say about the changed
competitive landscape is to say that a lot of the big
competitors that Albertsons now faces are not important.
Because even if Albertsons' customers go somewhere like a
Costco for some things, like toothpaste, they're still going
to just get about everything else from their neighborhood
supermarket.

And I believe one of the ways that Ms. Musser
illustrated that was the Gatorade/water example.

But Ms. Kinney is going to explain to you why that's
wrong.  Her team has looked at this exact question, and she
calls it the toothpaste phenomenon.  And here's what that
means:  There was a time when Albertsons' customers might go
to Costco or Target or Dollar General to buy basic goods,
like toothpaste, toilet paper, at a lower price, but they
would return to Albertsons to buy their tomatoes, their
milk, and their deli meats.  But what Ms. Kinney's team has
discovered is that when the customer goes to buy the
toothpaste or the toilet paper at the cheaper store, they

1   often end up staying and buying their tomatoes and

2   everything else there as well.

3       So the FTC may come in here with its maps and its

4   circles and its charts, but the commercial reality,

5   Your Honor, is that Albertsons' competitors are all of these

6   different retailers who are taking money out of Albertsons'

7   customers' wallets.

8       Now, the third key point, Your Honor, that I would like

9   you to understand through this trial and our witnesses is

10  that Albertsons explored other alternatives before we got to

11  this point.

12      We did not arrive at the idea of a merger lightly.  We

13  made tremendous efforts to compete with all of these

14  competitors that I've been discussing and that Mr. Wolf

15  discussed before we arrived at the merger as our best

16  opportunity for long-term competitiveness.

17      And there's going to be an interesting dynamic at this

18  trial, which I think we've already seen, because at the same

19  time you'll be hearing from Albertsons' employees about how

20  difficult it has been to compete in this changing industry.

21  The FTC may talk about how great Albertsons is.  They'll

22  take documents out of context and suggest Albertsons is

23  crushing it against Kroger, against Walmart, and has

24  successfully brought down prices.

25      Now, the evidence at trial, Your Honor, will be that

1    Albertsons has tried to lower the costs at which it buys

2    goods, and it has tried to lower the prices it charges

3    customers, and you're going to hear about various

4    initiatives that they've undertaken to do so, and these

5    initiatives were designed to lower costs and achieve what

6    they needed to achieve without making the kind of huge

7    structural change that comes with a merger.

8        And you'll hear from Albertsons' witnesses, Your Honor,

9    that those efforts, and others like them, have had success

10   around the margins.  They've taken costs down, but a lot of

11   those costs, those saved costs, have been offset by rising

12   prices and other things.

13       And over the last five years, in particular, it has

14   become clear, Your Honor, that Albertsons cannot compete on

15   price with these giants that have true national scale.

16       Now, if you ask the people at Albertsons, "Do you want

17   to merge with Kroger?"  And if you ask that question in a

18   vacuum, they would say, "No.  Of course not."

19       Who would want to be the company being acquired?  This

20   is a company that was founded in 1939 and still bears the

21   name of its founder, Joe Albertson, and some of their

22   banners have been around even longer.  160 years.

23       But if you can't even by the Kraft Mac & Cheese for the

24   price that Walmart sells it at, there's a limit to what

25   you're going to be able to do.

1    And so after taking a look at all of their options,

2    Albertsons reluctantly made clear to the market that it was

3    interested in strategic partnerships in 2022.  And the

4    option that presented itself and that actually turned out to

5    make a lot of sense was Kroger, as the evidence will show.

6    And if you look at the map, Your Honor, Kroger is in a

7    lot of places where Albertsons isn't, and Albertsons is in a

8    lot of places where Kroger isn't.  So by combining these two

9    companies, we'll not only get the scale of a much bigger

10   company but also a national footprint that is complementary.

11   Now, Your Honor, let me take a detour for a minute.

12   Because one thing you might wonder about this national

13   footprint point, which has been made by Mr. Wolf, and you'll

14   hear through this trial, is, "Well, if Albertsons can't

15   compete effectively without national scale, then how do some

16   of these regional supermarkets do it, like H-E-B in Texas or

17   Publix in Florida?  How do they do it so well?"

18   And one of the most important differences for those

19   regional players, Your Honor, is density.

20   So if you spent any time in Texas, you might have

21   noticed that there's an H-E-B nearly at every corner, and

22   that density gives them the advantages in their supply chain

23   and distribution network that Albertsons, which is more

24   dispersed throughout the country, as you can see, just does

25   not have.

1    And one way to think about it, Your Honor, is that

2  Albertsons is too big to be an H-E-B but too small to be a

3  Walmart; but by combining with Kroger, Albertsons will be

4  able to get more of that density nationally so it can

5  compete better with all of these other national players who

6  already have the benefit of the national scale.

7    So, Your Honor, my fourth point is this:  What does

8  Albertsons do?  What does Albertsons look like if there is

9  no merger?

10    And this point goes directly to one of the issues

11  Your Honor must consider, whether issuing an injunction

12  would be in the public interest, and here it would not be in

13  the public interest, Your Honor, because Albertsons' backup

14  plan, if the merger were enjoined, would be worse for

15  consumers, worse for employees, and worse for competition in

16  the long-term.

17    You're going to hear at this trial, Your Honor, next

18  week from Albertsons CEO, Vivek Sankaran, who's here with us

19  today, and he'll be testifying next week, I believe.  He

20  joined the company in 2019 to help tackle the challenges

21  that it was facing competitively.

22    And as you'll hear, he and Albertsons have done

23  everything they can to try to set this company up for

24  long-term success, but what they ultimately realized is that

25  the merger is best thing for the company, its customers, and

1  its employees.

2      And he'll explain to you that if this merger doesn't

3  happen, of course the company will regroup and try to

4  compete and deliver value to its customers, associates, and

5  shareholders, and he and other Albertsons witnesses will

6  tell you, "We will do our best, and the next two to four

7  years will be okay, but there are limits to what we can

8  accomplish without the scale."

9      And he'll tell you that it will be difficult to compete

10  against the Goliaths who do have scale, like Walmart and

11  Costco, Target, and Amazon.  These companies are always

12  going to have an incredible advantage on reducing costs and

13  buying at scale and, therefore, reducing prices for

14  consumers.

15      Mr. Sankaran will also tell you that, because of the

16  seismic shifts in the industry, if a go-it-alone Albertsons

17  is going to have a chance of competing effectively,

18  Your Honor, it will need to fundamentally change its cost

19  structure, and that could mean taking a hard look at a few

20  different options.  It could mean layoffs.  It could include

21  closing stores.  It may include exiting certain markets

22  altogether.  These are the kind of things that are on the

23  table if the merger does not go through, and we recognize as

24  a company the disruption that happens at the community level

25  and the impact on our customers, our employees, their

families, and the broader community with these kinds of
changes, and we hope we don't have to get there.

       And, of course, if somehow Albertsons does not succeed
in those kind of measures, then it likely -- the likelihood
is that it is a candidate for a sale to somebody else.  And
that's why, Mr. Sankaran will tell you, that it will be an
incredible loss for American consumers, Albertsons
employees, and the communities that Albertsons serves if
this merger doesn't go through.

       You're going to hear his enthusiasm for the merger,
because after spending years working hard to reduce costs so
that Albertsons can deliver price reductions to customers
and higher wages to its employees, he will tell you that
this merger will make those changes possible by bringing
together two complementary companies that have the combined
wherewithal to do what Albertsons cannot do alone.

       So let me shift gears again, Your Honor, for my fifth
and sixth points, and let me touch briefly on a couple of
the benefits of the merger that you'll hear about at trial
that I haven't talked about yet.  Obviously, we've talked
about price reductions.

       But as you heard from Mr. Wolf, the merger will also
bring benefits in terms of investments in employee wages and
store improvements, that Albertsons is not going to be able
to achieve but for the merger, and let me take those one at

1    a time.

2        So the first of these is the impact on our store

3    associates and their wages.  Kroger has pledged that it

4    won't close any stores or distribution centers or

5    manufacturing facilities or lay off any frontline associates

6    as a result of the merger.  And on top of that, it has

7    pledged that it will invest in employee wages and benefits.

8    Albertsons cannot make those same commitments on its own.

9        And, obviously, there are other options that may be on

10   the table if the merger does not go through.

11       Now, in addition to those points, Mr. Sankaran is going

12   to come in and add another layer to this conversation

13   because he's going to talk about the fact that Albertsons

14   and Kroger are both large union employers.

15       Now, this matters, obviously, Your Honor, from an

16   antitrust perspective, because the plaintiffs have tried to

17   suggest that one reason Your Honor should enjoin this merger

18   is because it's supposedly going to hurt union employees by

19   causing unions to lose their leverage.  That's their harm in

20   the labor market theory.

21       But the reality is the opposite, Your Honor.  This

22   merger is going to protect union jobs and make two of the

23   only handful of union grocery store employers stronger.

24   There's no way plaintiffs can show harm in a labor market.

25   And that will be discussed by Albertsons' witnesses at

1    trial.

2         But you know who does not have union labor or very

3    little union labor?  Walmart, Amazon, and Costco.  And

4    that's why we struggle to understand any union opposition to

5    this merger, because, in fact, this merger presents an

6    opportunity to reverse the multi-decade shift that we've

7    been seeing to shrinking union jobs.

8         The other point, Your Honor, my sixth point, is that,

9    if the merger does go through, Kroger is going to invest

10   over a billion dollars in store improvements.

11        Now, store improvements may not sound like a big deal,

12   but they are a win-win-win for the customers and the

13   employees and the communities around the stores.  And we all

14   know that it's -- to be able to walk into a grocery store

15   with a nice layout, a nice setup, clean, well-stocked

16   product displays, is a pleasure, and that is what we are

17   trying to achieve with the merger.  It matters to the

18   consumers who shop there.  It matters to the associates who

19   work there, and it matters to the neighbors who live there.

20        And it's just one more benefit, Your Honor, that

21   frankly is not going to be achievable without the merger.

22        Seventh, Your Honor, I want to shift gears to the

23   divestiture and talk about why C&S is set up for success,

24   and Albertsons has a perspective on the divestitures because

25   most of the stores that would be going as part of the

1    divestiture are Albertsons' stores, and, of course, the
2    people who work there are our people.
3        The plaintiffs are trying to claim that C&S will fail
4    and it does not know how to operate stores, and they make
5    three basic points in a variety of ways.
6        Let me try to take some of those points on right now,
7    Your Honor.
8        One of the points that we've heard made by the FTC, and
9    we think they'll continue making, is that 579 stores, the
10   number of stores being divested, is not enough for C&S to
11   make a go of it, that that is not enough scale.  But what
12   the FTC is forgetting, Your Honor, and that you will learn
13   about at trial, is that C&S has something that neither
14   Kroger nor Albertsons has right now.  It has national scale.
15       And specifically what it has is a distribution network
16   that services 7,500 stores nationwide, and what that means
17   is when those stores want frozen food or cereal or some
18   other product category, C&S is the one that acquires it and
19   C&S is the one that puts it in the store.
20       Now, by supporting 7,500 grocery stores, C&S is
21   actually bigger than Kroger and Albertsons combined from
22   both a distribution standpoint and a buying standpoint right
23   now.
24       And Mr. Sankaran will tell you he wishes he had C&S's
25   supply chain scale and distribution power.

1    And you'll learn at this trial, Your Honor, that there

2  are times when the price at which C&S can get a product to

3  our store is cheaper than Albertsons can get it there by

4  itself.

5    Now, the next thing, Your Honor, the FTC will say is

6  that C&S isn't getting the right assets, as part of this

7  merger, to be competitive, and that is incorrect also.

8    Let me run through briefly some of the significant

9  assets C&S is getting from Albertsons, and of course they'll

10  be discussed at trial.

11    From Albertsons alone, they are getting ownership of

12  our Haggen and Carr banners and exclusive perpetual licenses

13  to our Albertsons and Safeway banners in certain states,

14  Your Honor.

15    And this is important because these are names that

16  customers know and have positive associations with today,

17  and C&S will be able to use those banners to retain and grow

18  their customers.

19    They're getting ownership of or licenses to a whole

20  bunch of private label brands, Your Honor, with loyal

21  followings.  They're getting Open Nature, Signature Select,

22  and O Organics, and you're going to hear about those at

23  trial.  And then there's the tech stack that C&S is getting

24  from Albertsons.

25    And at trial, Albertsons' employees will testify about

the plans they've been executing to ensure that C&S is ready
on day one from a technology standpoint, and that includes
giving C&S a clone of Albertsons IT system that will allow
all of the divested stores to run on the same system that
the Albertsons stores run on today.

Now, Your Honor, as far as people resources, C&S is
getting all of the frontline employees of Albertsons stores
and distribution centers that are being divested.  So what
that means is that all of the same people who are running
those stores, the same people you see at the checkout line
the day before the divestiture will be there the day after
the divestiture also.

C&S is also getting, as Your Honor heard, Susan Morris,
who is currently Albertsons' Chief Operating Officer, and
has signed on to become CEO of C&S retail if the divestiture
happens, and Ms. Morris is here with us today.

Ms. Morris has spent her entire career, more than 39
years, in the retail grocery industry, and almost all of
that time has been at Albertsons.  She's worked through
multiple grocery store mergers, and she's uniquely qualified
to help C&S grow and thrive because she has done exactly
that with Albertsons previously.

In 2010, Your Honor, Albertsons was a 200-store
company, and in the span of five years, Ms. Morris has
helped it grow into a 2,000-store company.  And she's

1   already spent months conferring with C&S and planning for

2   how to be ready on day one.

3         And she won't go there alone.  Many of the senior

4   leadership who are running the divisions Ms. Morris oversees

5   now would come with her to C&S in the event of a -- of a

6   divestiture.

7         Now, Your Honor, I think we've already heard the FTC

8   begin to focus on something called the Haggen divestiture,

9   which was associated with the Safeway merger.  They're going

10  to want to characterize that as a failure and say that this

11  divestiture will be Haggen 2.0, but you are going to hear

12  from Albertsons' witnesses that this divestiture and the

13  Haggen are nowhere near the same.

14        Now, the biggest issue with that divestiture,

15  Your Honor, was that Haggen bought grocery stores, but the

16  people who are ultimately calling the shots and running the

17  stores were not grocers.

18        So they made a number of mistakes in terms of

19  rebannering, now they approached the supply chain, and how

20  they ran the business; but that's not what we have here with

21  Ms. Morris and the talented people that she's bringing with

22  her from Albertsons, if this divestiture goes through, who

23  are going to apply their decades of industry knowledge and

24  experience to help make C&S a success.

25        I think that there were some reference by Ms. Hall to

1    rebannering and -- and abrupt rebannering, and Ms. Morris

2    will discuss the concept of rebannering and the different

3    ways, for example, that you can mitigate a change of name,

4    and she's got a lot of ideas as to how to do that; but, more

5    importantly, she's got the experience in already doing that.

6          Your Honor, for my final point, I want to briefly

7    address the stakes involved and why time is of the essence.

8          I know we heard from the FTC that it was not; but,

9    respectfully, we disagree.

10         The FTC is going to continue to try to tell you that

11   this whole trial is just a prelude to the main event, their

12   administrative hearing, and that may be how the FTC would

13   like the world to be; but the reality is, Your Honor, that

14   the outcome of this hearing is going to most certainly be

15   dispositive of whether this merger goes through or not.

16         Mergers are fragile things, and what you decide is

17   going to determine what happens to these two companies.

18         Now, the plaintiffs will also say to the Court that you

19   can just freeze things in time, preserve the status quo, by

20   granting the injunction; but as you will hear at trial,

21   Your Honor, the status quo is just not going to be an option

22   for Albertsons.  Change is coming one way or another for

23   this company, and it's for that reason, Your Honor, why

24   we're hoping, not just for a timely decision, but also a

25   decision that allows this merger to bring the benefits that

1    I've described to customers, employees, and the communities.

2        Thank you very much for your time, Your Honor.

3            THE COURT:  Thank you.  So we're going to take a

4    short recess.  I would encourage counsel to check in so

5    they'll know where they are timewise, and we'll start up

6    again at 1:00.  It's going to be a quick lunch.

7            MS. MAINIGI:  Thank you, Your Honor.

8            (Morning session concluded at 12:38 PM.)

1                    C E R T I F I C A T E

2

3          Federal Trade Commission v. Kroger, et al.

4                     3:24-cv-00347-AN

5      Preliminary Injunction Hearing - Day 1 - AM Session

6                      August 26, 2024

7

8          I certify, by signing below, that the foregoing is

9   a true and correct transcript of the record, taken by

10  stenographic means, of the proceedings in the above-entitled

11  cause.  A transcript without an original signature,

12  conformed signature, or digitally signed signature is not

13  certified.

14

15  /s/Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
    _____
16
    Official Court Reporter      Signature Date: 8/26/2024
17  Oregon CSR No. 98-0346        CSR Expiration Date: 9/30/2026

18

19

20

21

22

23

24

25