1          IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF OREGON

3   FEDERAL TRADE COMMISSION, et  )
    al.,                          )
4                                 )
                Plaintiffs,       )   Case No. 3:24-cv-00347-AN
5                                 )
        v.                        )
6                                 )
    THE KROGER COMPANY and        )   August 27, 2024
7   ALBERTSONS COMPANIES, INC.,   )
                                  )
8               Defendants.       )   Portland, Oregon
    _____)

9

10

11

12

13

14          PRELIMINARY INJUNCTION HEARING

15             DAY 2 - MORNING SESSION

16      BEFORE THE HONORABLE ADRIENNE NELSON

17      UNITED STATES DISTRICT COURT JUDGE

18

19

20

21

22

23

24

25

1                              APPEARANCES

2

3   FOR PLAINTIFF FEDERAL
    TRADE COMMISSION:          Ms. Susan Musser
4                              Mr. Charles Dickinson
                               Federal Trade Commission
5                              400 7th Street S.W.
                               Washington, DC 20024
6

7                              Ms. Laura Hall
                               Ms. Elizabeth Arens
8                              Ms. Lily Hough
                               Mr. Harris Rothman
9                              Federal Trade Commission
                               600 Pennsylvania Avenue, N.W.
10                             Washington, DC 20580

11  FOR PLAINTIFF STATE
    OF CALIFORNIA:             Ms. Nicole Gordon
12                             Office of the California Attorney
                               General
13                             455 Golden Gate Avenue, Suite 11000
                               San Francisco, CA 94102
14

15  FOR PLAINTIFF STATE
    OF ILLINOIS:               Mr. Paul Harper
16                             Office of the Illinois Attorney General
                               115 S. LaSalle Street
17                             Chicago, IL 60603

18

19  FOR PLAINTIFF STATE
    OF OREGON:                 Mr. Christopher J. Kayser
20                             Larkins Vacura Kayser LLP
                               121 S.W. Morrison Street, Suite 700
21                             Portland, OR 97204

22                             Mr. Tim D. Nord
                               Oregon Department of Justice
23                             Civil Enforcement
                               1162 Court Street NE
24                             Salem, OR  97301

25

```
 1   FOR DEFENDANT KROGER
     COMPANY:                Mr. B. John Casey
 2                           Stoel Rives LLP
                             760 S.W. Ninth Avenue, Suite 3000
 3                           Portland, OR 97205

 4                           Mr. Bambo Obaro
                             Weil, Gotshal & Manges LLP
 5                           201 Redwood Shores Parkway
                             Redwood Shores, CA 94065
 6
                             Ms. Luna Ngan Barrington
 7                           Weil, Gotshal & Manges LLP
                             767 Fifth Avenue
 8                           New York, NY 10153

 9                           Mr. Matthew M. Wolf
                             Ms. Sonia Kuester Pfaffenroth
10                           Mr. Christian Schultz
                             Mr. Joshua Davis
11                           Arnold & Porter Kaye Scholer LLP
                             601 Massachusetts Avenue, N.W.
12                           Washington, DC 20001

13                           Mr. Mark Andrew Perry
                             Weil, Gotshal & Manges
14                           2001 M Street NW, Suite 600
                             Washington, DC 20036
15

16                           Ms. Christine Wheatley
                             Kroger General Counsel
17                           The Kroger Company
                             1014 Vine Street
18                           Cincinnati, OH 45202

19

20

21

22

23

24

25
```

```
 1   FOR DEFENDANT
     ALBERTSONS COMPANIES,
 2   INC.:                      Mr. David H. Angeli
                                Angeli Law Group LLC
 3                              121 S.W. Morrison Street, Suite 400
                                Portland, OR 97204
 4

 5                              Ms. Enu Mainigi
                                Mr. Jonathan Bradley Pitt
 6                              Mr. Adam Joshua Podoll
                                Ms. Beth A. Stewart
 7                              Mr. Michael Cowie
                                Ms. Tyler Infinger
 8                              Ms. Adwoa Seymour
                                Mr. Thomas Moriarty
 9                              Mr. Thomas Ryan
                                Williams & Connolly
10                              680 Maine Avenue S.W.
                                Washington, DC 20024
11

12

13

14   Also Present for Witness John Scott Neal:

15                    Michael Lindsay
                      Dorsey & Whitney LLP
16                    50 So. 6th Street
                      Suite 1500
17                    Minneapolis, MN 55402

18

19

20   COURT REPORTER:          Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
                              United States District Courthouse
21                            1000 S.W. Third Avenue, Room 301
                              Portland, OR 97204
22                            jill_jessup@ord.uscourts.gov

23

24

25
```

1                              INDEX
2    ANDREW GROFF
3     Cross-Examination by Ms. Pfaffenroth            8
4     Redirect Examination                          53
5     Recross-Examination by Ms. Pfaffenroth        64
6    JOHN SCOTT NEAL
7     Direct Examination by Ms. Hough               67
8     Cross-Examination by Ms. Stewart              97
9     Redirect Examination by Ms. Hough            114
10   MICHAEL MARX
11    Direct Examination by Mr. Rothman            118
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                    TRANSCRIPT OF PROCEEDINGS

2                       (August 27, 2024)

3   (In open court:)

4           THE COURT:  Good morning.  Please be seated.

5   We're in day two of the preliminary injunction hearing in

6   FTC, et al. v. Kroger and Albertsons.  Case

7   No. 3:24-cv-00347.  We can continue with the witness from

8   yesterday.  We will swear him in again.

9

10                      ANDREW GROFF,

11  called as a witness in behalf of the Plaintiffs, being first

12  duly sworn, is examined and testified as follows:

13

14          THE WITNESS:  I do.

15          DEPUTY COURTROOM CLERK:  Please have a seat.

16      State your first and last name for the record, please.

17          THE WITNESS:  Andrew Groff.

18          THE COURT:  Good morning.

19          MS. PFAFFENROTH:  Good morning, Your Honor.  May

20  we approach with binders for the witness and the Court?

21          THE COURT:  Yes.

22          MS. PFAFFENROTH:  I will be referring to at least

23  one document from plaintiffs' binder from yesterday.

24      All right.  As long as it's up on the screen.

25

Groff - X

CROSS-EXAMINATION

1

2    BY MS. PFAFFENROTH:

3    Q.    Good morning, Mr. Groff.

4    A.    Good morning.

5    Q.    I know you spent a lot of time with the Court

6    yesterday, but could you just explain your history in the

7    grocery industry, how long you have been doing this, and how

8    you got started?

9    A.    Yeah.  Sure.  I first became interested in the food

10   retailing business when I was in graduate school studying

11   for my master's degree at Cornell in applied economics, and

12   I had the opportunity there to be a teaching assistant in

13   the food industry management program, and so that's where my

14   interest started.

15        So upon graduation, I sought and accepted a role with

16   Harris Teeter supermarkets in Charlotte, North Carolina, in

17   their management development program; and I spent about a

18   year in that program, after which I joined the management

19   team of one of the stores in Charlotte.

20        From there, over the next 28 years, with Kroger and --

21   well, Harris Teeter and then with Kroger.  Held roles in

22   store operations, operations analytics, category management.

23   Our Brands leadership; merchandising analytics, such as

24   space management and space planning; and, most recently, for

25   the past nine years with my role in program pricing.

Groff - X

1    Q.    Thank you.

2         And so just to start off, the FTC has characterized the

3    differences between Kroger and Albertsons' prices as

4    imperceptible; so almost too small to be noticed.

5         Do you agree with that characterization?

6    A.    No, I do not agree with that characterization.

7    Q.    How would you describe the spread between Kroger and

8    Albertsons' prices?

9    A.    Our spreads, when you account for promotions -- since

10   we're both promotional-type retailers, when you account for

11   all those promotions, Kroger has about an 11 percent

12   advantage.

13   Q.    And Ms. Arens asked a lot of questions yesterday about

14   Albertsons.

15        Does Kroger compete with Albertsons?

16   A.    Yes.   Certainly, we do compete with Albertsons.

17   Q.    Are they your primary competitor?

18   A.    No, they are not our primary competitor.   Walmart is

19   our primary competitor.

20   Q.    And so Walmart is your primary competitor.   Who else do

21   you consider to be competitors to Kroger?

22   A.    You have Walmart.   Obviously, you know, Costco club

23   stores are a significant competitor.   Amazon's a significant

24   competitor.   Really, anybody -- from my perspective, anybody

25   who sells food and grocery products is somebody who we

Groff - X

1    compete with, and that's a very broad range.  So that
2    includes the club stores.  That includes the discount
3    stores, like Aldi and Lidl and WinCo.  It would include
4    dollar stores, like Dollar General.  It would include
5    natural and organic stores, like Whole Foods and Trader
6    Joe's.  It would include other full service grocery stores
7    like Meijer in the Midwest, Publix in the Southeast, Food
8    Lion in the Southeast, Hy-Vee in the Midwest.  Stater
9    Brothers in California.  That's just -- the list is very
10   extensive.
11   Q.    So a very extensive list.  Could you help explain to
12   the Court different types of ways that these grocery
13   retailers approach their strategy?
14   A.    Sure.  There's -- there's really two -- two primary
15   ways to think about it.  One would be everyday low price
16   competitors.  So Walmart, obviously, would be a prime
17   example of an everyday low price retailer.  A retailer who
18   offers consistently low prices every day but then runs very
19   limited amounts of promotional activity or price reductions.
20         So that would be one end of the spectrum.
21         The other end of that spectrum, opposite of an everyday
22   low price, would be a promotional retailer.  And so
23   Albertsons would be considered a promotional retailer.
24   Publix, in the Southeast, would be considered a promotional
25   retailer.  These are retailers who are priced at a

Groff - X

1  significantly higher price point every day for their
2  everyday or white tag prices but then supplement that with
3  deep promotions and run price reductions on a frequent
4  basis.
5  Q.    And so you mentioned some examples of promotional
6  retailers, and you mentioned Walmart as an EDLP retailer.
7  Are there other examples or categories that you would
8  consider to be EDLP?
9  A.    Yes.  The club stores are generally EDLP.  Very limited
10  running of promotions.  The discounters, if you think about,
11  like, Aldi and Lidl, those limited assortment discounters,
12  they run some small amount of promotions; but, typically,
13  their price position is to be level every day on their
14  assortment.
15  Q.    And for Kroger -- could you explain to the judge how
16  Kroger fits in?
17  A.    Yeah.  There's another group of competitors, and I
18  would say we're with them a little bit in that you're not
19  fully promotional or you're not fully everyday low price,
20  and we call those sort of hybrid players.
21       So examples of those would be like Meijer.  Not Fred
22  Meyer, but Meijer in the Midwest, who they offer prices that
23  are pretty low every day, but not as low as a true EDLP
24  player, like Walmart; but then you do run some promotions,
25  but just, again, not nearly as deep of promotions as you

Groff - X

 1 would see from an Albertsons or a Publix.

 2      Kroger would be somewhere on that spectrum of a hybrid

 3 retailer, leaning a little bit more towards the promotional

 4 side, but we strive to offer great promotions to our

 5 customers.  But then we also strive on the items that matter

 6 most to them to be priced pretty competitively every day.

 7 Q.    And so just in terms of giving a little bit more color

 8 to what you mean when you say "promotions," could you

 9 explain to the Court what you're talking about?

10 A.    Sure.  There are probably -- there's many types of

11 promotions; so I'll try and simplify it as much as I can.

12      So the first grouping of promotions I would talk about

13 would be kind of standard promotions.  It's what you would

14 think about when you go to the store and you see a yellow

15 tag with a lower price on it for a week or two weeks at a

16 time.

17      An example might be a can of soup that's $1.99

18 regularly that is on sale that week for $0.99, and any

19 customer who's shopping with the loyalty account would earn

20 that discount just by buying the item that week.

21      Then there's a set of promotions that are a little bit

22 more complicated or complex and require a little bit more

23 from the customer in order to earn those discounts.

24      So an example of those might be a digital coupon, where

25 they could download a digital coupon, which is a little

Groff - X

1  extra step, but then they would get additional savings by

2  downloading that additional coupon.

3      Another example might be a promotion where there's a

4  subset of items and if you buy, like, five of those items,

5  out of that grouping of items, you get an additional $5 off

6  your order.

7      So, again, something that the customer has to do a

8  little bit additionally beyond just shopping in order to

9  earn the discount.

10      MS. PFAFFENROTH:  So could we pull up -- this is

11  one of plaintiffs' exhibits from yesterday -- PX1130?

12      Part of this document is for the public and part is

13  not.  We'll start with a page that can be publicly

14  displayed.

15      Could we go to page 00 -- one more.

16      Thank you.

17  BY MS. PFAFFENROTH: (Continuing):

18  Q.   So, Mr. Groff, in the middle of this page, it talks

19  about everyday price strategy.  Do you see that?

20  A.   Yes.

21  Q.   And how does Kroger achieve its everyday price

22  strategy?

23  A.   We achieve that by being priced right every day on the

24  items that matter most to our two core segments of

25  customers:  Our most price-sensitive customers and our most

Groff - X

1  loyal customers.

2  Q.    And how do you do that?

3  A.    We do that by pricing those items very close to

4  Walmart.

5  Q.    And why Walmart?

6  A.    Walmart, as I mentioned, is one of those everyday low

7  price competitors.  They've done a very good job of having

8  the public recognize them as offering low prices every day.

9  It's the promise that they give, and they do a great job of

10  living up to that promise, and customers recognize that.

11      So we believe that if we can maintain competitive

12  prices relative to Walmart on the items that matter the most

13  to our core customer segments, then they're going to give us

14  credit for being priced competitive, and that will make us

15  competitive with just about every competitor across the

16  market that we compete with.

17  Q.    And would that include, when you're thinking about it,

18  in terms of what you're achieving by pricing against

19  Walmart?

20  A.    It would -- it would make us competitive against all

21  of -- you know, I rattled off that litany of competitors

22  earlier.  We feel that by being priced close to Walmart on

23  these items, it would put us in a competitive stance against

24  all of those things: the club stores, the discounters, the

25  natural organic stores, the dollar stores, and other -- and

Groff - X

1    other traditional grocery retailers.

2    Q.    And so yesterday, with Ms. Arens, you talked about

3    everyday essentials.  We spent some time talking about

4    pricing programs.

5         Could you just explain to the Court how Kroger

6    approaches its pricing strategy?

7    A.    We take all of our items and we try -- we group them

8    into kind of three primary groupings, and you heard the term

9    "everyday essentials" yesterday.  That's really five core

10   items.  It's milk, eggs, bananas, sugar, and head lettuce.

11   So a very small number of items, but items that customers

12   tell us are super important to them and are frequently

13   purchased and in their baskets.

14        So that's one segment, and we try and price those items

15   very locally, competitively against competitors that would

16   be close to each Kroger location.  Because we really want to

17   make sure that every competitor -- every customer shopping

18   at Kroger is getting a really good price on those items.

19        The second grouping, because everyday essentials is

20   only five items and our customers tell us that there's a lot

21   more items than that that are important to them, the second

22   group of items are what we refer to internally as our

23   program items, and program items is -- it's thousands of

24   items -- multiple thousands of items that we also strive to

25   disclose to Walmart.

1    And then beyond that would be everything else in the

2    store, and those would be considered nonprogram items.

3    Q.   And so let's circle back to those everyday essential

4    items, those five items.

5    So you talked about pricing those locally.  Are there

6    competitors that are most typically the competitors that are

7    influential in those prices, those everyday essential

8    prices?

9    A.   Sure.  The retailers that tend to be everyday low

10   price -- so think about Walmart, think about Aldi.  Lidl,

11   think about WinCo in the Northwest, those types of retailers

12   are the ones that we really want to pay a lot of attention

13   to.  But we don't just look at them because, again, we're

14   trying to make sure that we're really good on these items;

15   so we really look at every competitor that is close to each

16   Kroger location.

17        MS. PFAFFENROTH:  And so could we pull up -- this

18   will not be for the public screens.  I'd ask to have the

19   public screens turned off.  DX2560.

20   And I'll represent to the Court that this was provided

21   electronically.  It's not in the binder because I was told

22   that it is an Excel spreadsheet that is unprintable.  I

23   don't know how many pages that is, but it is only -- it is

24   only in the electronic set.

25   ///

Groff - X

1    BY MS. PFAFFENROTH: (Continuing):

2    Q.    Mr. Groff, could you just explain for the Court what

3    this spreadsheet represents?

4    A.    Yeah.  We call this spreadsheet our Everyday Essentials

5    Pricing Grid.  And what it does is, it tells you by -- if

6    you look at the first column, Column A, we look at each of

7    the competitors in each one of the micro-zones that we have,

8    and those zones are really small.  Most of them are one

9    Kroger store.  The largest one is many as six Kroger stores,

10   but there's only a couple that large.  So this is at a very

11   localized level.

12        Column A on the spreadsheet shows what the lowest price

13   that we see at that competitor is.  So we identify for each

14   particular item what's the lowest price we see in that zone,

15   and we find that on here.

16        So if we take, for example, a gallon of milk, if you

17   look here, I think it's 3.89.  In this area 3.79 is a pretty

18   common price right now for a gallon of milk.

19        So what you would do is you would come across the grid,

20   and in that very next column, Column B, where you can see a

21   gallon of whole milk, it shows where we would be priced

22   relative to that.

23        So our goal is to price very close to the lowest price

24   in that zone, understanding that we check multiple

25   competitors in that zone.  So if we're close to the lowest

Groff - X

1   one, that we feel we're going to be at or even lower than

2   most of the rest of them, it will put us at a very fair

3   price for those items in all locations.

4       And this is how that grid would work for any particular

5   item as you go across the grid.

6   Q.   And, Mr. Groff, are you and your team responsible for

7   this -- maintaining this pricing grid?

8   A.   Yes, we are.   Uh-huh.

9           MS. PFAFFENROTH:   I would like to move to admit

10  DX2560 into evidence.

11          MS. ARENS:   No objection.

12          THE COURT:   It will be received.

13          MS. PFAFFENROTH:   Thank you.

14      We can take that one down.

15      So you mentioned previously Walmart or Aldi in

16  connection with everyday essentials.

17      Could we pull back up PX1130, but this time we're going

18  to keep it off the public screens.

19      Could we go to slide ending in -0008?

20  BY MS. PFAFFENROTH: (Continuing):

21  Q.   You discussed the slide with Ms. Arens yesterday.   Do

22  you recall that?

23  A.   Yes, I do.

24  Q.   Okay.   And she drew your attention to several things on

25  the slide; but with respect to the second bullet, what does

1  it say in connection with everyday essentials with respect

2  to the primary focus?

3  A.   It says, "All local competition considered, primary

4  focus on Walmart and Aldi," and then the key traditional

5  retailers.

6  Q.   And at the bottom of this slide there's a chart?

7  A.   Yes, there is.

8  Q.   And -- sorry.  And Ms. Arens directed you to the fact

9  that Albertsons is one of the competitors listed on this

10 chart; is that correct?

11 A.   That is correct.

12 Q.   Could you list for the Court the other competitors that

13 are listed here?

14 A.   Yes.  Walmart, which is abbreviated "WM"; Aldi; Meijer;

15 ACI; but then also WinCo; and H-E-B, which is a competitor

16 in Texas.

17 Q.   And looking specifically at the eggs line item there,

18 egg line item -- and, again, this is not on the public

19 screen, so I'd ask you not to say any numbers out loud, but

20 if we look at the line for eggs, is the average price listed

21 for Walmart higher or lower than for Kroger?

22 A.   It's a little bit lower.

23 Q.   And what about Aldi?

24 A.   It's a little bit lower.

25 Q.   And what about Albertsons?

Groff - X

1  A.    It's a little bit higher.

2  Q.    So let's shift from everyday essentials to the program

3  items that you were talking about, that larger category of

4  items.

5  A.    Yes.

6  Q.    Can you describe for the Court sort of what is

7  contained within that program, the pricing program category?

8  A.    Sure.  So, again, those five items, everyday

9  essentials -- a very small set of items -- customers tell us

10  there's a lot more that's important to them.  So what we do

11  is we take those multiple thousands of items and we group

12  those into lists.

13        Yesterday they were pointing to a document that showed

14  10 lists.  We have about 15 lists of items.  They kind of

15  spread across different areas of the store.

16        So some lists might be particular to a certain

17  department, like the meat department, in the store.  Other

18  lists might be pertaining to the grocery section of the

19  store.

20        And those lists are set with the type view based upon

21  how important those items are to customers.

22        So there's different degrees of importance of those

23  items, and the ones that are the most important, we would

24  price most competitively to Walmart; and for the ones that

25  are a little less, we will allow -- we would allow a little

Groff - X

1    bit more of a gap to Walmart on those.

2        So we use a pricing strategy for each list to try and

3    keep us where we want to be positioned relative to Walmart

4    on an everyday price basis.

5            MS. PFAFFENROTH:  Okay.  And so let's pull back up

6    once again PX1130, but this time we're going to go to the

7    slide ending in 007.

8        Again, this is nonpublic and --

9        Oh, great.

10   BY MS. PFAFFENROTH: (Continuing):

11   Q.    And so, just to explain some more context about the

12   pricing program items and how they relate to the overall

13   volume of items that you're thinking about in your stores,

14   could you explain that to the Court with reference to that

15   yellow line at the top?

16   A.    Sure.  So I said "multiple thousands of items."  That

17   number there that's under the column titled Average Number

18   of UPCs, we tell you how many items.

19       A UPC is just -- if you don't know it, it's a universal

20   product code.  Is the scant bar on an item.  So think about,

21   like, Yoplait strawberry yogurt would be one UPC, and

22   Yoplait peach yogurt would be another UPC, so that -- that

23   number there tells you how many items, beyond those, you

24   know, core items, we would include in these pricing program

25   lists.

1    And then the next column over shows the percentage that

2    that is of the total items that Kroger sells, and then the

3    next column over shows the percentage of sales that those

4    items represent.

5    And you can see that that's a significantly larger

6    number than the percentage of items, and that's because

7    these are the items that matter most to the customer, so

8    they are the ones that are in their basket more frequently,

9    so they account for a much larger proportion of the sales

10   dollars.

11   And then the last column is the percentage of movement,

12   and I would think about that as the number of units that we

13   sell or the number of times that there's a beep at the check

14   stand.  That's the percentage of time that it's one of these

15   program items.

16   Q.   And then moving on over to that Program Strategy

17   column -- you explained this a little bit in your

18   introduction -- can you just explain to the Court what that

19   Program Strategy column represents in the context of the

20   pricing program?

21   A.   Yes.  That would just be a summary of the positioning

22   that we're looking to attain versus Walmart.

23   So in the top section, you know, I would maybe call out

24   that center store signpost list, and you can see how tight

25   of a spread that we would put on those.

Groff - X

1      If you come down to the next section, these are items

2  that are just a little bit less important than that top

3  section, and you can see that we do allow, then, some

4  additional spread over Walmart on those items because

5  there -- they're items that are still important but just not

6  quite as important as is items in the top section.

7  Q.    And for that you mentioned "center store signpost."

8  What's an example of an item that would be a center store

9  signpost item?

10  A.    A classic item to think about would be just like that

11  old-fashioned Kraft Macaroni & Cheese.

12  Q.    And continuing with this for one moment, but we can --

13  we can take this slide down -- yesterday, do you recall

14  Ms. Arens asking you about an initiative called the

15  Super SPI Pricing Initiative?

16  A.    Yes, I do.

17  Q.    And she asked you if part of that initiative was to

18  raise prices on certain items, and you said, "Yes, so that

19  we can invest in the items that are on our pricing

20  programs."

21      Could you just expand for the Court what you meant by

22  that?

23  A.    Sure.  So that, if my memory serves correctly from the

24  document, it was back in the 2020ish time period.  I believe

25  I have the date right on that.  At that point in time the

Groff - X

1   divisions were still responsible for managing all of the
2   nonprogram prices.
3       So my team at the corporate office was managing the
4   pricing programs.  The division personnel were managing
5   everything else.
6       And so what we were finding, as we were beginning to
7   collect a lot more data from web scrapes, we had so much
8   more data that the division personnel really didn't have
9   available to them to show us that we were pricing pretty
10  close to Walmart on some items that our customers aren't
11  telling us are very important.
12      And we had the thought, if we were to really be
13  following our strategy, we really should be pricing those
14  items higher so that we could take the money that you earn
15  from pricing those higher to invest in these pricing program
16  items, which are the ones that mattered the most to our
17  customers.
18      So what we did was an initiative -- and we called it
19  Super SPI -- to take prices on these items more consistently
20  to our strategy than what the divisions who lack the data
21  and the resources to do that, and we helped them do that
22  through that process.
23  Q.   Thank you.
24           MS. PFAFFENROTH:  So I would like to pull up
25  another document now.  This is going to be nonpublic again.

Groff - X

1       This will be DX2630A.  If we go pull that up.

2   BY MS. PFAFFENROTH: (Continuing):

3   Q.   Mr. Groff, were you responsible for creating this

4   document?

5   A.   Yes, I am.

6   Q.   Could you just explain for the Court what this -- what

7   this is, without reference to specifics?

8   A.   Sure.  This represents how we measure our positioning

9   versus Walmart, and it shows it over time.

10       And this is not just for the set of pricing program

11   items.  This would be all-inclusive of every item in the

12   store that we can get a price check on from -- from Walmart.

13   So we call that a full book price check.

14       And it shows the positioning for various different ways

15   that we measure that positioning over time.

16   Q.   And what does that -- what does that top line show?

17   A.   So the top line that we call -- that's labeled there as

18   regular, would be what we consider to be what we call our

19   range price spreads.  That's a comparison of our

20   non-promoted white tag everyday prices relative to the same

21   non-promoted everyday prices at Walmart.

22       And so you can see the numbers that go across there and

23   the number at the very end.  You know, across all items,

24   there's a decent gap between where we are and where Walmart

25   is again -- Walmart's an everyday low price, and we're a

Groff - X

1   promotional, so we would expect that gap; but we track this
2   to make sure that we're not letting that gap get too large.
3   Q.   And just walking down the page, could you explain
4   what's involved in "Active," the "Active" line?
5   A.   Yes.   Active price spreads.   It's just another measure
6   that includes not just the everyday non-promoted prices, but
7   also the standard promotions that I was talking about.
8        So if you include both of those for us, as well as any
9   regular price at Walmart, plus any Rollbacks that they may
10  have in place, that spread percentage would be the
11  comparison; and, again, that percentage would be the
12  percentage that we are above Walmart.
13       And you can see it gets a little tighter because we're
14  taking our -- we're taking credit for the promotions that we
15  run.
16  Q.   And then what about moving down one more, the Weighted
17  Active line?
18  A.   The Weighted Active line is simply that same set of
19  items comparison in the line above it.   Although, this time
20  weighted by the velocity of items that we sell.
21       So items that we sell more of carry a heavier weight in
22  that index, and you can see that brings the spreads down
23  even further, showing that, you know, based on what
24  customers buy, that would be recognized gap between us and
25  Walmart.

Groff - X

1   Q.   And, finally, on that weighted average line --

2           MS. PFAFFENROTH:  And could we call out the

3   percentage on the far right?

4           THE WITNESS:  Yes.  It's 2.52.

5   BY MS. PFAFFENROTH: (Continuing):

6   Q.   Oh.

7   A.   You asked me to call it out.  I'm sorry.

8   Q.   I'm sorry.  I was meaning for Alex, but --

9   A.   We're proud of that number, so --

10  Q.   Apologies.

11          So from the -- if you're thinking about this now from

12  the -- from the customers' perspective, what -- which of

13  these is the way to think about Kroger's prices compared to

14  Walmart?

15  A.   What the weighted average is, it takes -- we talked

16  about simple promotions and complex promotions.  The

17  weighted average actually takes credit for all of our

18  complex promotions also.

19          So things that -- and we feel comfortable making a

20  comparison like that against an everyday low price

21  competitor.  We wouldn't feel comfortable making that same

22  comparison against a promotional retailer because we don't

23  know that those prices for the promotional retailer -- we

24  don't know if they're offering a coupon to somebody.  So we

25  wouldn't try and use that measure against them, but versus

Groff - X

1  an everyday low price competitor, we feel comfortable to do

2  that.

3       And so what this really says is that after all of the

4  discounts that we provide, this would be the positioning

5  that the customer would feel at the checkout relative to

6  Walmart.

7  Q.   And why did you create this document?

8  A.   Stuart Aitken asked me to create this document.

9  Q.   And did he ask you to make the same document for

10  Albertsons?

11  A.   No, he did not.

12            MS. PFAFFENROTH:  We can take this one down.

13  BY MS. PFAFFENROTH: (Continuing):

14  Q.   So yesterday Ms. Arens ask you about two divisions at

15  Kroger -- QFC and Mariano's -- that price against Albertsons

16  as opposed to the Walmart pricing strategy that we've just

17  been talking about.

18       What's your understanding with respect to who will own

19  the QFC stores and banner post-merger?

20  A.   The banner will be owned by C&S, and my understanding

21  is that all but five of the stores at QFC will be divested

22  to C&S.

23  Q.   And what about with respect to Mariano's banner and the

24  stores?  What's your understanding there?

25  A.   My understanding is the banner would also be divested

Groff - X

1  and owned by C&S, and then all but 13 of the Mariano's

2  stores would be divested.

3  Q.    So, again, we've been talking a lot about the strategy

4  with respect to Walmart, pricing against Walmart, Walmart

5  with those spreads.

6        Yesterday the FTC asked you questions about a,

7  quote/unquote, HPR rule.

8        Do you recall that?

9  A.    Yes, I do.

10 Q.    And so why do you have this, quote/unquote, rule?

11 A.    We're hyper-focused on Walmart, I think you can tell,

12 but we don't want to be so myopic that we take our eyes off

13 of other players that are out there, other competitors that

14 are out there.  So the HPR rule was really put into place to

15 make sure that the positioning that we want to be at against

16 Walmart doesn't make us uncompetitive against other players

17 in the marketplace.  So that's -- the rule is put in place

18 to kind of ensure that that doesn't happen.

19 Q.    And how do you -- can you characterize for the Court

20 the circumstances in which the rule is more likely for

21 the -- the -- to lead to prices being lowered by execution

22 of the rule?

23 A.    Sure.  So not all -- not all HPR retailers are created

24 equal.  Where we can, we try and pick a highly promotional

25 retailer to serve as a high price retailer.  But in some

Groff - X

1  markets it makes more sense for us to be really looking at

2  the -- at a retailer who has more presence than that.

3      So if you -- if you think about, like, in the Midwest

4  and the Columbus Division, the Meijer corporation, which is

5  one of those hybrid retailers that has lower everyday prices

6  but not as low as Walmart, we use them as the HPR in that

7  market simply because that's the point of reference that a

8  customer in Columbus is going to have, other than Kroger and

9  other than Walmart.  That's another point of reference that

10  they're going to have, and we want to make sure we're in

11  line with them as well.

12      So they affect us.  Those types of hybrid retailers as

13  the HPR affect us much more significantly in the pricing

14  decisions we make versus true HPRs like a Publix or like an

15  Albertsons do.

16  Q.   And so how would you characterize the impact at a high

17  level of Albertsons as an HPR?

18  A.   It would be very, very minimal.

19  Q.   And you've been talking, with respect to the HPR rule

20  in terms of lowering prices, does Kroger raise prices based

21  that analysis under the HPR?

22  A.   No.  The HPR rule is to serve as that ceiling that we

23  don't want to go above, but we're not looking to try and

24  push retailers up to the ceiling.

25      Again, we're focused on Walmart and a spread to

Groff - X

1  Walmart, and as long as that works with where the HPR retail

2  is, we're good.  If it's higher, we want to bring it down to

3  that.

4  Q.    And yesterday Ms. Arens walked you through a document

5  that listed the HPR associated that -- the high-priced

6  retailers associated various Kroger divisions.

7  A.    Yes.

8  Q.    I'd just like to go back to those for a minute.

9        So, for example, Dallas, Tom Thumb is an Albertsons

10  banner.  Post-merger, where would the -- where would the

11  Dallas Division look?

12  A.    We would have a choice to make, and so it would either

13  be C&S, because they're going to be buying stores from us in

14  that market.  It could also be H-E-B.

15      H-E-B has recently entered the Dallas market and has

16  opened several stores, with plans to open a number more, so

17  we've already started making some decisions against H-E-B in

18  Dallas.

19      So H-E-B might become who we -- who we look at.

20  Q.    What about the King Soopers Division in Colorado?

21  A.    In King Soopers, it would very likely be C&S.

22  Q.    What about Fry's?

23  A.    And Fry's, it would also very likely be C&S.

24  Q.    And Fred Meyer here in -- here in Portland.

25  A.    It would very likely be C&S here as well.

Groff - X

1   Q.   Okay.  I won't go through all of them, but so in the

2   divisions we were discussing yesterday, was C&S acquiring

3   divested stores in each of those divisions?

4   A.   Yes.

5   Q.   So shifting gears, you talked a little bit yesterday

6   about price zones.  Can you just explain to the Court how

7   you use price zones in setting prices?

8   A.   Sure.  So I talked a little about the everyday

9   essentials.  Those are zones that are very granular, most of

10  which are single stores for Kroger, the largest up to about

11  six stores.  We really look at very tight ranges around

12  this, kind of seven- to ten-minute drive times is who we

13  then -- within that we consider for those micro-zones.

14  Beyond that, everything else is at a much more broader

15  geographical zone.

16      And so pricing programs we have a concept that we call

17  an RBP zone.  RBP is just an acronym for "Rules Based

18  Pricing," which is the name of the system that we use at

19  Kroger to group and manage those groupings of stores, so we

20  call them "RBP zones."

21      And so those RBP zones are much larger and span, you

22  know, across -- in general, we think about at least a metro

23  area or even larger.

24      While we can execute prices at an RBP zone level, we

25  tend to most commonly execute at a much larger level than

Groff - X

1  that, which would be a grouping of RBP zones within a

2  division that we call an execution level, and an execution

3  level can sometimes be as large as the whole division, and

4  sometimes there might be several execution levels within a

5  division.

6  Q.   And so when you talk about execution levels, you mean

7  you price -- can you explain what that means with respect

8  to, like, program pricing, non- -- non-program price items

9  within the execution level with respect to price?

10 A.   Yes.  Within an execution level and -- you know, an

11 item would have the same price in all stores across that

12 execution level.

13      And there's minor exceptions to that.  There's -- if

14 you think about, like, adult beverage, there's some legal

15 restrictions on zoning.  They have state lines and things

16 like that come into play.  We follow those rules.  So the

17 zoning for things like adult beverage can be a little

18 different.

19      Distributor-based items, so items like Coke and Pepsi,

20 who are sold to us directly to the store from independent

21 bottlers, are zones that typically follow that coverage area

22 of those distributors, as opposed to these other zones.

23      But with those few exceptions like that, everything

24 else would have a common price across the entire execution

25 level.

Groff - X

1   Q.   And so taking, for example, the Smith's Division, how
2   many execution levels are within the Smith's Division?
3   A.   We have three execution levels at Smith's.  So we think
4   about -- Smith goes -- it's an interesting example.  If we
5   go all the way to the stores very close to the -- to the
6   southern border with Mexico, all the way to stores in the
7   Smith's Division that are very close to the border with
8   Canada.  So it's very broad and covers a lot of states.
9        So we have -- we divided it into three execution
10  levels.  One based in Salt Lake City and points north, one
11  based in Las Vegas and the general Nevada area, and then one
12  based in Albuquerque that encompasses all of the New Mexico
13  area.
14  Q.   So that's talking about price zones from the
15  perspective of geographic coverage.  Are there other factors
16  that you may consider in setting price zones?
17  A.   Yes, there are.
18       So we look at, first, geography; but then within that
19  geography that we've defined, we look at the competitive
20  situation.  So if competitors differ across that geography,
21  we'll break that into a smaller geography and likely a
22  smaller execution level.
23  Q.   And what other factors would you consider?
24  A.   The other factor we would consider would be operational
25  costs.  So if we have some stores in an area that have

Groff - X

 1  significantly different costs of operations, such as maybe

 2  labor, transportation, et cetera, we will take that into

 3  account.

 4      An example of that, in addition to being geographically

 5  separated, but, more importantly, Alaska -- you know, we

 6  have to ship products to Alaska on a boat to get there,

 7  which adds tons of transportation expense.  So we have to

 8  have -- that has to be a separate zone of pricing for us, a

 9  different execution level of pricing.

10      So that would be one example.

11  Q.   And yesterday Ms. Arens asked you about an example of a

12  smaller price zone that had been set in Colorado.

13      What drove the establishing of that zone?

14  A.   What drove the establishment of what we call that

15  no-comp or low-comp zone in Western Colorado was the fact

16  that operational costs were going up.

17      So a new contract was under -- considering a labor

18  contract was under consideration, the labor costs were going

19  to go up.  So when we looked across and said, "How are we

20  going to offset this additional expense?" we looked at what

21  stores is this going to make it the most painful in?  And

22  when you -- when you look at those costs, including the

23  transportation costs, the stores on the western side of the

24  mountain have significantly higher labor costs and

25  transportation costs.

Groff - X

1        So we said rather than raise prices across the whole

2    division to try and offset the increased labor in that

3    contract, let's -- let's try and go to where the operational

4    costs are driving us the most, and we tried to -- we didn't

5    take all the stores on the western side of the mountains.

6    We've limited it.  And we looked at competition to say, hey,

7    this is, perhaps, maybe the least painful way for us and for

8    customers to do what we needed to do from a business

9    perspective, but to minimize the impact of the overall price

10   changes.

11   Q.    And are there any other examples that come to mind

12   where labor costs, for example, have driven the creation of

13   price zones?

14   A.    Yeah.  Here in the Pacific Northwest, Seattle in

15   particular, it's affected both Fred Meyer and QFC.

16        So at Fred Meyer we've always had an RBP zone that was

17   called the Federal Way zone.  That's just the name of what

18   we call the Seattle area.  But it was -- it was part of a

19   larger execution level, but we needed to break it out as its

20   own execution level because wages in Seattle are -- it's the

21   highest labor market that we participate in, in the country.

22        And, again, rather than raise prices across the entire

23   division, we decided to raise prices only in Seattle by

24   making it its own execution level.

25        Similarly, at QFC, we didn't have a separate zone for

Groff - X

 1   just Seattle, but we created one.  And that specifically was

 2   spurred when, during COVID, the City of Seattle requested

 3   and mandated that we pay frontline workers more for the risk

 4   that they were taking on being in stores, and we had to pay

 5   that higher amount in Seattle, which is what led us to

 6   creating that one.

 7   Q.    And are you familiar with the term "fixed costs" and

 8   "variable costs"?

 9   A.    Yes.

10   Q.    So from your perspective, what are variable costs?

11   A.    Variable cost would be anything that -- that the

12   cost -- the dollar amount of a cost changes with the more

13   you sell.

14         So if you think about the labor, labor would be a

15   variable cost.  The more you sell, the more you have to pay

16   labor to stock it.  The more labor you have to check it out

17   at the front end, the more labor you have to get it to

18   people's cars.  To get bags would be, like, you know, a

19   variable cost.  The more you sell, the more bags it takes at

20   the front end to bag them.  Credit card fees.  I mean, the

21   more transactions that run through the front end, the higher

22   the fees.

23         The transportation.  If you've got to run additional

24   trucks because you're selling more volume, that's a higher

25   cost, and it would be a variable cost.

Groff - X

1   Q.    And do you take variable costs into account in setting

2   prices?

3   A.    Yes, we do.

4   Q.    So switching gears a little bit again here and circling

5   back on -- on to that -- that price spread with respect to

6   Walmart and setting the pricing program items, in terms of

7   their -- their spread to a Walmart benchmark, how do you

8   determine the Walmart to use?  How do you determine what to

9   look at when you're doing that?

10  A.    So our system, that RBP system that I was talking about

11  earlier, has the ability to accept one location per

12  competitive banner per RBP zone.  So we try and find that a

13  location, a Walmart location that's somewhat central within

14  that zone of stores, to be the representative Walmart that

15  we use.

16        We then also work closely with the division leadership

17  and personnel who are on the ground because they know those

18  geographies really well to make sure that it's a Walmart

19  that makes sense to them, but then we also have -- we

20  collect a lot more Walmart data than just that one location.

21  We collect full website scrapes, full book scrapes of over a

22  thousand Walmarts every week.

23        And so we have that data that we can use to validate

24  that the one that we've picked is a representative Walmart

25  for that area and not an outlier.

Groff - X

1  Q.   And so is it possible that the Walmart that's used to

2  set prices for any given store could be fairly distant from

3  that store?

4  A.   Yes.   That would be very likely, yeah.

5  Q.   And so could you just explain, to illustrate, how it

6  works for Portland?  For, like, Fred Meyer in Portland?

7  A.   So Portland itself is an RBP zone, but it's part of a

8  larger execution level that includes multiple RBP zones, and

9  those would be Bellingham, Washington; Yakima, Washington.

10 It would be Portland itself.  It would be Boise, Idaho, and

11 it would be Spokane, Washington.

12      So there would be Walmarts from all five of those areas

13 that we look at and say, "What is the most common Walmart

14 price across those areas?"  And that's the one that we would

15 use to benchmark to set the price for all of the stores,

16 including the ones in Portland.

17 Q.   And so, then, focusing more broadly on price-checks,

18 Ms. Arens asked you yesterday about price-checks and -- with

19 respect to, you know, specific pricing program items,

20 whether you were price-checking, for example, Costco or Aldi

21 or Trader Joe's.  Can you just explain for the Court a

22 little bit how you go about the price-checking process and

23 how you decide who you're going to price check against?

24 A.   There's two primary methods to collect prices, and with

25 the advent of e-commerce platforms that retailers have, it's

Groff - X

1   allowed us to get a lot more data.

2       So the preferred way for us is to collect the prices

3   electronically.  It's less expensive to collect that way,

4   and you can collect a lot more, and you can collect it a lot

5   more frequently.

6       In cases where we can't do that, we send physical

7   auditors into stores.  And sometimes those are our own

8   people, like for the everyday essentials, and other times we

9   use a third party and contract with a third party to send

10  auditors in to collect those prices.

11  Q.   And so if you are -- if you are for some specific

12  purpose not price-checking a given competitor, does that

13  mean that you don't consider them a competitor anymore?

14  A.   No.  No.  That's -- that's -- the challenge that we

15  have is balancing the cost and effort to get those

16  price-checks with the value that you get from having the

17  data.

18      And so we're focused, obviously, on Walmart the most,

19  and so that's who we're price-checking the most.  And,

20  fortunately, we are able to collect them electronically; so

21  we can collect -- and that's by far and away the most amount

22  of data that we collect is -- is Walmart data.

23      As more e-commerce platforms become available, the

24  important thing is, is the price that's available online the

25  same as the price that's in store?  Because that's really

Groff - X

 1  the price that we want to understand.  And if that's the

 2  case, the more of that that becomes available, the more that

 3  we will collect.

 4      But from the physical audit perspective, we collect as

 5  much of that as we can, but there's just some retailers that

 6  are very difficult to collect from.

 7  Q.  So can you talk a little bit about that?  Who's

 8  difficult to collect from?

 9  A.  So Costco.  We do some limited price-checking at

10  Costco, but it's really hard to price-check them.  So their

11  assortment is all big packs, bigger packages than what we

12  sell, and so that requires somebody to make linkages between

13  the big pack brand that they sell and that same brand of us

14  that we sell in a smaller pack and then do that calculation

15  of equivalizing those retails.

16      The hard part is keeping the links.  The second hard

17  part with Costco is that their online pricing doesn't match

18  their in-store pricing, and so you have to send an auditor

19  in.  So that becomes expensive also.

20      So it's just -- we've tried to price-check Costco.

21  It's very difficult to do, so we just -- we trust that

22  Walmart is a good proxy for that because Walmart has their

23  own club division, Sam's Club.  I believe -- this is my

24  belief -- is that they -- they have a pretty good way of

25  understanding what Costco is doing with prices because they

1   have a club division of their owned that they're competitive

2   with, and they would use that information in their Walmart

3   stores' pricing also.

4   Q.    What about Aldi?

5   A.    Aldi is difficult too.

6         Again, can't collect it online.  You can in some

7   locations, but it doesn't reflect the in-store price.  It's

8   different.  It's higher.  So we don't want that.  So you

9   have to send physical auditors.

10        And everything they sell is an Aldi-branded item.

11        So, again, you have to create a link for every single

12  item that you're price-checking to the item that you want to

13  compare it to at Kroger, which is really hard.

14        We did price-check Aldi for a period of time on our --

15  one of our pricing lists.  We call it our opening price

16  point or value list.  We actually stopped doing that a while

17  back because we weren't making any different decisions had

18  we just been looking at Walmart instead.

19        So what we found was Aldi and Walmart were very closely

20  priced on those.  So we really only needed to be watching

21  Walmart in order to make sure we were staying competitive

22  with both, and then we could save that time resource and

23  expense on checking Aldi.

24  Q.    And is Trader Joe's difficult to price-check?

25  A.    The same reasons as Aldi would be, yes.  Yes.

Groff - X

1   Q.   So you discussed with Ms. Arens yesterday you do

2   price-check Albertsons; correct?

3   A.   Yes, we do.

4          MS. PFAFFENROTH:  Let's pull up another document.

5   This is going to be not on the public screen again.  So this

6   will be DX2631B.  And it is -- it is challenging to read; so

7   we're going to blow a part of it up after we explain what it

8   is.

9   BY MS. PFAFFENROTH: (Continuing):

10  Q.   Mr. Groff, could you just explain to the Court what

11  this document is?

12  A.   Yeah.  This document is a representation of a way that

13  we look at our competitive spreads.  And this page that

14  you're looking at here is versus Walmart, and it would be

15  across a number of different markets across the Kroger

16  Enterprise.  And this would be specifically for that period

17  13, week two, would be our quarter four of 2023 report.

18      And we do this report once per quarter, and it

19  includes -- it includes a look at Walmart.  It includes a

20  look at Meijer, and it includes a look at ACI.

21  Q.   And are you or your team responsible for creating this?

22  A.   Yes.  My team creates this once every quarter.

23          MS. PFAFFENROTH:  I'd like to move to admit

24  DX2631B into evidence.

25          MS. ARENS:  I do object to that because this is an

Groff - X

1   attachment to an email which includes multiple other

2   attachments, including relevant context, like spreads to

3   Albertsons and Meijer, as Mr. Groff just stated.

4           MS. PFAFFENROTH:  I do not believe an objection

5   was made with respect to this exhibit during the objection

6   process.

7           MS. ARENS:  This exhibit is a partial document.

8   It's not the full document.  It's an attachment to an email

9   that has multiple other attachments.  So if we were

10  presented with the full document, we would not object.  But

11  this is not a full document.  This is just part of a family

12  of documents.

13          MS. PFAFFENROTH:  Your Honor, may I ask Mr. Groff

14  an additional question?

15          THE COURT:  Yes.

16  BY MS. PFAFFENROTH: (Continuing):

17  Q.   Mr. Groff, is this -- although it may have been an

18  attachment to an email and is circulated as such, is this a

19  standalone document?

20  A.   Yes.  This is a standalone document each quarter.

21          THE COURT:  It will be received over the

22  objection.

23          MS. PFAFFENROTH:  Thank you, Your Honor.

24       Could we move to page 3 of this document?

25  ///

Groff - X

1    BY MS. PFAFFENROTH: (Continuing):

2    Q.    And, again, it's hard to read, so we'll expand it a

3    little bit.

4        Mr. Groff, you mentioned that Albertsons was one of the

5    three retailers contained in this document, in particular.

6        Could you explain to the Court what this page is?

7    A.    This page is specific to the Albertsons banners in

8    markets that we compete against them, and here on the screen

9    you can see each of those markets listed as well as the

10    banner at ACI that we're comparing against.

11    Q.    Okay.  And there's a line at the top that says

12    "Enterprise."  Could you just explain what the "Enterprise"

13    line represents?

14    A.    Yes.  That's summation across all of those different

15    markets so that we could see, you know, on average, across

16    all of those markets, what our positioning is.  So we call

17    that the enterprise roll-up.

18            MS. PFAFFENROTH:  And could we zoom in on the reg

19    price column at the top?

20    BY MS. PFAFFENROTH: (Continuing):

21    Q.    And, Mr. Groff, in connection with that previous

22    document about Walmart, the blue lines on it, does the reg

23    price here represent the same reg price that you were

24    talking about in that context?

25    A.    Yes.  These are the non-promotional prices compared to

Groff - X

1    Amazon's non-promotional prices.

2    Q.    And, again, without saying the number out loud, could

3    you draw the Court's attention to the enterprise level reg

4    price spread?

5              MS. PFAFFENROTH:  Alex, could we -- there we go.

6              THE WITNESS:  Yes.  It would be that number right

7    there.

8        And that -- the negative number indicates that's the

9    percentage that our prices -- Kroger's prices are lower than

10   Albertsons' prices on an everyday basis.

11   BY MS. PFAFFENROTH: (Continuing):

12   Q.    And so then could we move over to the Active Price

13   Spread column, and call out, again, not out loud, but with

14   the red box, that same current spread and the percentage

15   right below it?

16   A.    Yes.  So this is, once you take standard promotions

17   into account -- and, again, not weighting by volume or

18   anything, just taking those standard promotion prices into

19   account -- that would be the percentage that Kroger's prices

20   are below Albertsons'.

21       And you can see that it gets a little bit more

22   favorable for Kroger once you account all of the standard

23   promotions.

24   Q.    And then moving one more column over, and, again, with

25   a red box highlighting that, that current spread percentage,

Groff - X

1   for weighted active price spreads, could you just refresh us
2   on what that means and what that percentage represents?
3   A.   Yes.  So the weighted active spreads are taking regular
4   and promotional prices combined and then weighting that by
5   the sales velocity of those items, and that shows that we
6   even have an even larger advantage, and I believe it was
7   mentioned in the opening, as well as earlier today, so
8   that's an 11 percent advantage underneath Albertsons'
9   prices.
10  Q.   Okay.  And so, if we look -- if we look further down on
11  this page -- let's take a look at Fred Meyer.  About halfway
12  down there's a group of five Fred Meyer subsections there.
13  A.   Yes.
14  Q.   And could we highlight in a red box with respect to
15  those the specific spreads for Fred Meyer?
16  A.   It would be those right there.  Those five.
17  Q.   And, Mr. Groff, are those generally in line with the
18  average?
19  A.   Yes, they are.
20  Q.   And just looking down that entire column, is there any
21  division for Kroger where Albertsons has a lower weighted
22  active price than Kroger?
23  A.   No, there are not.
24          MS. PFAFFENROTH:  And we can take this one down.
25  Thank you.

Groff - X

1  BY MS. PFAFFENROTH: (Continuing):

2  Q.   So one more document.  This is DX0149I.  And this,

3  again, is on the non- -- no, this one is on the public

4  screen.  We have a redacted version of this one.

5       So, Mr. Groff, could you explain what this document is.

6  A.   Yes.  This is a document that my team produces once

7  every period.  For us, a period is every four weeks.  And

8  it's specific -- this one is specific to Fred Meyer from

9  period three, but what it shows is the spread positioning

10 pricing programs, individual pricing programs, relative to

11 different competitors.

12      And for Fred Meyer, that would be Wal-Mart and

13 Albertsons and Safeway in this market, and it shows that

14 over time, is what it'll show.

15           MS. PFAFFENROTH:  And could we go to the second

16 page of this?

17 BY MS. PFAFFENROTH: (Continuing):

18 Q.   All right.  And so could you explain what the --

19 recognizing that some of the text is obscured for the

20 public, what that line is?

21 A.   The line is obscured here, is -- what it does is states

22 the positioning strategy for that particular set of items,

23 but then the words that are -- was it the ones that you were

24 highlighting that you want me to read?

25 Q.   Yeah.

Groff - X

1    A.    Okay.  Yeah.  So while remaining -- so it's the

2    strategy spread that we want to be versus Walmart, which is

3    the redacted part, and then while remaining above cost.

4    Q.    And so in this chart, in particular, what do the red

5    lines represent?

6    A.    The red lines here -- so the solid red line represents

7    those everyday non-promoting prices, comparisons to Walmart,

8    and the dotted line represents, after you account for our

9    standard promotions, what those gaps are.

10        Positive numbers indicate that that's above Walmart.  A

11   negative number would indicate slightly below.

12   Q.    And what are the blue lines on this chart?

13   A.    The blue lines are the same but in respect to Safeway

14   instead of Walmart.

15        So, again, the solid blue line would be our everyday

16   prices on this set of items relative to Safeway, and the

17   dotted line would be, after you include promotions, what --

18   what that gap versus Safeway would be.  And you can see

19   these numbers are significantly negative, which implies that

20   Kroger is that much cheaper than Safeway on this set of

21   items.

22        And this graph is for the center store signpost

23   program, one of the ones I pointed out earlier, where we

24   have a very tight spread to Walmart.

25            MS. PFAFFENROTH:  And if we could go back to just

Groff - X

1   the big -- the big picture page here.

2   BY MS. PFAFFENROTH: (Continuing):

3   Q.    Could you just explain to the judge where Kroger's

4   pricing would fall here?

5   A.    Yes.  Kroger would be -- you can see the second line

6   down, where it says zero percent, that would be the -- where

7   Kroger's prices are.

8         So this assumes Kroger would be the comparison point,

9   zero, and the competitors -- the percentage difference from

10  them.

11  Q.    And so earlier, when you testified about the HPR --

12  we'll come back to the HPR rule again, and we talked about

13  the fact that Safeway's the HPR for Fred Meyer in Portland,

14  what does this slide tell you about the impact of Safeway in

15  Portland on Kroger's pricing?

16  A.    It tells me that it would be really unusual for a price

17  on these items at Safeway to be something that would cause

18  us to make a different decision relative to the spread

19  position we have to Walmart.

20        If this whole basket of items is that far below ACI, it

21  would be really hard to have too many items in that basket

22  that we've had to lower a price on in order to be below

23  them.

24  Q.    Okay.  And there was a slide used in the opening

25  yesterday that showed Albertsons pushing down on Kroger

Groff - X

1    prices.

2        Is that consistent with what you see here?

3    A.    No, it is not.

4    Q.    So taking a very, very big step back, will Kroger

5    change its pricing strategy if this merger is approved?

6    A.    No, we will not.

7    Q.    And why not?

8    A.    Because it works.  You know, we've survived and

9    actually have grown, you know, by this strategy.  So we've

10   been employing this strategy for two decades.  And over that

11   time, Walmart has grown significantly.  Over that time, the

12   club stores have exploded and grown significantly.  Over

13   that time, the discounters, like Aldi and Lidl, have grown

14   significantly.  Amazon's come into play.  All of those are

15   price merchants.  So our pricing strategy is -- we look at

16   it as being very crucial and critical in order of keeping us

17   in the game and allowing us to continue to grow in the face

18   of that competition, and I'm certain and very confident that

19   if we were to move away from that strategy and raise prices,

20   we would lose customers.  There's no doubt in my mind that

21   that's what would happen.

22       You know, I've -- yeah, I think I told you I've been

23   doing this job for nine years.  So that's a third of my

24   entire working career in this single job at Kroger, which is

25   a long time, and there's a reason that I stay in this job,

Groff - X

1    and it's because I'm really passionate about it; and, you

2    know, I take my role within the organization to be kind of

3    the voice of the customer and enforcing these strategies,

4    these pricing strategies.  I take it really seriously.

5         And I think Kroger keeps me in this role and has kept

6    me in this role for so long because I think they share that

7    same passion, and they also recognize that passion in me.

8    And I'm confident and excited about the merger and what we

9    can do with continuing the strategy and taking the strategy

10   to a much broader set of stores post- -- post-merger.

11             MS. PFAFFENROTH:  Thank you, Mr. Groff.

12        I pass the witness.

13             THE COURT:  Any redirect?

14             MS. ARENS:  Just briefly, Your Honor.

15             MS. PFAFFENROTH:  Oh, apologies.  I was -- I was

16   just advised I failed to move the final exhibit into

17   evidence.  Could I do that quickly?

18             THE COURT:  Go ahead.

19             MS. PFAFFENROTH:  Thank you.

20        Could I please move DX149I into evidence?

21             MS. ARENS:  Your Honor, I would again request that

22   this document be admitted together with the many other

23   attachments and the cover email to which it --

24             THE COURT:  If you want to add the other portions

25   in at redirect, you can; but it will be admitted.

1          MS. PFAFFENROTH:  Thank you, Your Honor.

2

3                    REDIRECT EXAMINATION

4    BY MS. ARENS:

5    Q.    This is Elizabeth Arens for the Federal Trade

6    Commission.

7          Can we please bring back up the document that we were

8    just looking at for the defendants, if possible?

9          THE COURT:  Which one?  Which one?

10         MS. ARENS:  DX2631.  My apologies, DX0149I.

11         THE COURT:  Okay.

12         MS. ARENS:  I don't believe that's it DX0149I.

13         THE COURT:  Do you want the public or just to --

14         MS. ARENS:  I believe it's just to -- this was

15    confidential; right?

16         MS. PFAFFENROTH:  There's a redacted version.

17         MS. ARENS:  I would like it just to the Court and

18    the witness and counsel, please.

19         THE COURT:  All right.  It is up.

20         MS. ARENS:  DX0149I?

21         THE COURT:  I have that on my screen.  I don't

22    have that one on my screen.  I have a different one.

23         THE WITNESS:  Is it this one?  All right.

24         THE COURT:  But it's not on the screen.

25         THE WITNESS:  Yeah, that's why I was curious.

Groff - ReD

1          THE COURT:  Yeah.  It's not on the screen.

2      You're going to have to speak up.  People are having a

3  hard time hearing you.

4      They asked:  What is the number?

5          MS. ARENS:  DX0149I.

6      We're not able to bring it up.

7          THE COURT:  I have something up.  I don't know if

8  you have the same thing up, and I'm not comfortable

9  describing it because you don't have it as a public view.

10          MS. ARENS:  Okay.  I'm not seeing it.  So I

11  apologize.  I -- it was the document we were just looking at

12  with the defendant.  DX0149I.

13          THE COURT:  So what I have in front of me looks

14  different than what was provided before.

15      I understood your objection to be that it was not

16  complete.

17      So I only have what was before me earlier.

18          MS. ARENS:  Okay.  I'm seeing the document now.

19          THE COURT:  All right.

20  BY MS. ARENS: (Continuing):

21  Q.    So, Mr. Groff, you were discussing this document a

22  minute ago with your counsel, and this type of pricing graph

23  analysis is something that your pricing team prepares and

24  circulates each period; is that right?

25  A.    Yes.

Groff - ReD

1    Q.   And you typically include the same competitors in the

2    graph in each pricing period; right?

3    A.   Yes.   There are rarely changes made; but, yes, it's

4    very consistent.

5    Q.   And on the pricing graphs, you typically include

6    Walmart and the HPR retailer; right?

7    A.   Yes, that's correct.

8    Q.   And, again, for Fred Meyer, the HPR is Safeway; right?

9    A.   Yes.

10   Q.   So I'd like to just look through the slides on this

11   graph briefly.

12           MS. ARENS:  Can we turn to the next slide, please.

13   BY MS. ARENS: (Continuing):

14   Q.   So here, for Portland, the graph is presenting spreads

15   to Safeway and Walmart; correct?

16   A.   Yes.

17           MS. ARENS:  Let's turn to the next slide, please.

18   BY MS. ARENS: (Continuing):

19   Q.   These is for Fred Meyer, Alaska.  You're again

20   presenting spreads to Safeway and Walmart; correct?

21   A.   Yes.

22           MS. ARENS:  Next slide, please.

23   BY MS. ARENS: (Continuing):

24   Q.   For Portland, Oregon, you're again presenting spreads

25   to Safeway and Walmart; correct?

Groff - ReD

1  A.    Yes.

2           MS. ARENS:  Next slide, please.

3  BY MS. ARENS: (Continuing):

4  Q.    For Alaska, you're again presenting spreads to Safeway

5  and Walmart; correct?

6  A.    Yes.

7           MS. ARENS:  Next slide, please.

8  BY MS. ARENS: (Continuing):

9  Q.    Again, for Portland, Oregon, you're again presenting

10  slides for Safeway and Walmart; correct?

11  A.    Yes.

12           MS. ARENS:  Next slide, please.

13  BY MS. ARENS: (Continuing):

14  Q.    Again, for Alaska.  This is just Walmart; right?

15  A.    Yes, this one is just Walmart.

16           MS. ARENS:  Next slide, please.

17  BY MS. ARENS: (Continuing):

18  Q.    For Portland, Oregon, this is Whole Foods; correct?

19  A.    Yes.  This is against our Simple Truth private label

20  brands.

21           MS. ARENS:  Next slide, please.

22  BY MS. ARENS: (Continuing):

23  Q.    For Portland, Oregon, you're presenting Safeway,

24  Walmart, and Whole Foods; correct?

25  A.    Yes.  For our natural foods.

Groff - ReD

1          MS. ARENS:  Next slide, please.

2    BY MS. ARENS:  (Continuing):

3    Q.   Again for Alaska.  You're presenting Safeway and

4    Walmart; correct?

5    A.   Correct.

6          MS. ARENS:  Next slide, please.

7    BY MS. ARENS:  (Continuing):

8    Q.   This is for Portland, Oregon.  You're presenting

9    Safeway and Walmart; correct?

10   A.   Yes, that's correct.

11         MS. ARENS:  Next slide, please.

12   BY MS. ARENS:  (Continuing):

13   Q.   This is for Portland, Oregon.  You're again presenting

14   Safeway and Walmart; correct?

15   A.   Correct.

16         MS. ARENS:  Next slide, please.

17   BY MS. ARENS:  (Continuing):

18   Q.   For Alaska, Safeway and Walmart; correct?

19   A.   Yes.

20         MS. ARENS:  Next slide, please.

21   BY MS. ARENS:  (Continuing):

22   Q.   Portland, Oregon.  You're again presenting Safeway and

23   Walmart; correct?

24   A.   Yes.

25         MS. ARENS:  Next slide, please.

Groff - ReD

1  BY MS. ARENS:  (Continuing):

2  Q.    For Alaska, Safeway and Walmart; correct?

3  A.    Yes.

4          MS. ARENS:  Next slide, please.

5  BY MS. ARENS:  (Continuing):

6  Q.    Portland, Oregon.  You're again presenting Safeway and

7  Walmart; correct?

8  A.    Yes.

9          MS. ARENS:  Next slide, please.

10  BY MS. ARENS:  (Continuing):

11  Q.    For Alaska.  HBC Candy Critical.  You're again

12  representing Safeway and Walmart; correct?

13  A.    Yes.

14          MS. ARENS:  Next slide, please.

15  BY MS. ARENS:  (Continuing):

16  Q.    Portland, Oregon.  Produce Critical.  Safeway, Walmart,

17  and Whole Foods; correct?

18  A.    Correct.

19          MS. ARENS:  Next slide, please.

20  BY MS. ARENS:  (Continuing):

21  Q.    Alaska.  Produce Critical.  Representing Safeway and

22  Walmart; correct?

23  A.    Yes.

24          MS. ARENS:  Next slide, please.

25  ///

Groff - ReD

1    BY MS. ARENS: (Continuing):

2    Q.    Portland, Oregon.  Packaged Meats Critical.  You're

3    presenting Safeway and Walmart; correct?

4    A.    Yes.

5              MS. ARENS:  Next slide, please.

6    BY MS. ARENS: (Continuing):

7    Q.    Packaged Meats Critical, Alaska.  You're presenting

8    Safeway and Walmart; correct?

9    A.    Yes, that's correct.

10             MS. ARENS:  Next slide, please.

11        Perhaps we have reached the end.

12   BY MS. ARENS: (Continuing):

13   Q.    So these are pricing graphs that, again, your team

14   circulates for each pricing period; correct?

15   A.    Yes, that's correct.

16   Q.    And the pricing graphs for Fred Meyer don't show

17   pricing spreads to Costco; right?

18   A.    Correct.  They do not.

19   Q.    They don't show pricing spreads to Sam's Club; correct?

20   A.    No, they do not.

21   Q.    They don't show pricing spreads to Aldi; correct?

22   A.    No, they don't.

23   Q.    They don't show pricing spreads to Trader Joe's;

24   correct?

25   A.    Correct.

Groff - ReD

1   Q.    They don't show pricing spreads to Target; correct?

2   A.    Correct.

3   Q.    They don't show pricing spreads to Grocery Outlet;

4   correct?

5   A.    Correct.

6   Q.    They don't show pricing spreads to dollar stores;

7   correct?

8   A.    That's correct.

9   Q.    You don't show pricing spreads to drugstores or

10  convenience stores; correct?

11  A.    That's correct.

12  Q.    You testified a little while ago about using Walmart to

13  understand other retailers' prices; right?

14  A.    Yes.

15  Q.    You don't have any specific information about which

16  retailers, if any, Walmart price checks; right?

17  A.    No, I wouldn't have any proprietary information.  All I

18  can see is evidence in price checks.

19  Q.    And information about who Walmart price-checks is not

20  publicly available; right?

21  A.    That's correct.

22  Q.    You don't know of anyone at Kroger who has specific

23  information about who -- which retailers Walmart

24  price-checks; right?

25  A.    No, I don't have any specific information like that.

Groff - ReD

1    Q.    Kroger does not rely on Walmart as a proxy for

2    price-checking Albertsons' prices; right?

3    A.    That's correct, because it's EDLP versus highly

4    promotional.

5    Q.    Kroger collects full book pricing from Albertsons

6    weekly; correct?

7    A.    Yes, we do.

8    Q.    That's in all areas where Kroger and Albertsons

9    overlap; correct?

10   A.    Yes, that's correct.

11         It's easily collectible through the web, which is

12   consistent with my statement earlier about anyone who we can

13   collect that way, we do.

14              MS. ARENS:  I'd like to bring back PX1130, please.

15         Okay.  And I'm going to go back to the slide ending in

16   -8, which I believe is redacted; so I think we should not

17   show that on the public screen.

18   BY MS. ARENS: (Continuing):

19   Q.    So there's a number of retailers listed at the bottom

20   of this screen as we saw yesterday and as your counsel asked

21   you about today.

22         Do you see that?

23   A.    Yes, I do.

24   Q.    Okay.  And, again, "ACI" stands for Albertsons?

25   A.    Yes, it does.

Groff - ReD

1   Q.   And one of the other retailers listed here is Aldi;
2   correct?
3   A.   Yes, that's correct.
4   Q.   And this may be obvious, but you're not price-checking
5   Aldi in areas where Aldi is not present; correct?
6   A.   Yes.  We can only check them where they exist.
7   Q.   Aldi isn't present here in Oregon; correct?
8   A.   That's correct.
9   Q.   Aldi isn't present in Washington; correct?
10  A.   No.
11  Q.   Aldi isn't present in Colorado; correct?
12  A.   No.
13  Q.   Aldi isn't present in New Mexico; correct?
14  A.   I believe that's correct.
15  Q.   And Aldi isn't present in Alaska; correct?
16  A.   That's correct.
17  Q.   And I don't see them on this slide, but I believe when
18  your counsel asked you about everyday essentials today, you
19  mentioned the retailer Lidl.  Is that right?
20  A.   Yes.
21  Q.   And Lidl is not present on the West Coast; right?
22  A.   No.  Not currently.
23  Q.   And it's also not present in Texas, the Southwest, or
24  Colorado; right?
25  A.   That's correct.

Groff - ReD

1    Q.    And another retailer listed here is WinCo; right?

2    A.    Yes.

3    Q.    WinCo isn't in all the same states that Albertsons is

4    in; right?

5    A.    I know roughly where all the WinCos are, and there's

6    definitely some overlap in the West.  There's WinCo in the

7    Northwest here.  There's WinCo in Phoenix.  There's WinCo in

8    Southern California.  There's WinCo in Nevada.

9    Q.    But there is not WinCo, for example, in Illinois.

10   A.    No, there's not.

11   Q.    And Meijer listed here is also not in all the states

12   that Albertsons is in; correct?

13   A.    That would be correct, with the exception of Illinois.

14   Q.    So we talked about HPR rule yesterday as well as with

15   your counsel today.  Albertsons hasn't -- Albertsons hasn't

16   chosen any other retailer to serve as the primary HPR in the

17   divisions where Albertsons is the HPR; correct?

18   A.    I'm sorry.  Could you repeat that question?

19   Q.    That was a bit awkward.

20         Yesterday we walked through a number of divisions where

21   Albertsons' banner is the primary HPR; correct?

22   A.    Yes.

23   Q.    Kroger hasn't chosen any other retailer currently to

24   serve as the HPR in those divisons; correct?

25   A.    Not currently, no.

Groff - ReD/ReX

1    Q.    And if the merger takes place, you testified that you

2    would designate C&S as the HPR in the majority of those

3    divisions where Albertsons is currently the HPR; correct?

4    A.    Yes, in most.

5              MS. ARENS:  I have no further questions.

6        Thank you very much.

7              MS. PFAFFENROTH:  Your Honor, I have just like

8    three questions of redirect.

9              THE COURT:  No.

10       Wait a minute.  You all are sharing them.

11             MS. PFAFFENROTH:  We're sharing them.

12             THE COURT:  Go ahead.

13

14                    RECROSS-EXAMINATION

15   BY MS. PFAFFENROTH:

16   Q.    Hello, Mr. Groff.

17   A.    Hello.

18   Q.    Ms. Arens showed you many slides from Fred Meyers.  On

19   those slides Safeway is represented?

20   A.    Yes.

21   Q.    Are you price-checking Safeway as a high-priced

22   retailer?

23   A.    Yes.

24   Q.    Would you price-check Aldi as a high-priced retailer?

25   A.    Aldi doesn't exist in Fred Meyer.

Groff - ReX

1   Q.   But, in general, would you price-check Aldi as a

2   high-priced retailer?

3   A.   No.  Because they're not a high-priced retailer.

4   Q.   Would you price-check Costco as a high-priced retailer?

5   A.   No.  Because they're an EDLP retailer.

6   Q.   Would you price-check Lidl as a high-priced retailer?

7   A.   No.  For the same reason.

8   Q.   And as you -- as you testified before, it's challenging

9   to price-check these competitors at all, isn't it?

10  A.   It is very challenging.

11          MS. PFAFFENROTH:  Thank you.  No further

12  questions.

13          THE COURT:  You can step down.

14      All right.  I know we have a number of witnesses to

15  call; so you may call your next witness.

16          MS. HOUGH:  Good morning, Your Honor.  I'm

17  Lily Hough on behalf of the Federal Trade Commission, and

18  for our next witness, plaintiffs call Scott Neal.

19      Mr. Neal is testifying remotely today, and he's

20  represented by counsel, who's also here today.  I'll let his

21  counsel state his appearance.

22          MR. LINDSAY:  Michael Lindsay of Dorsey & Whitney.

23  I'm representing Sprouts and the witness.

24          MS. HOUGH:  Could you please state your full name

25  and --

Neal - D

1          THE COURT:  Hold on.

2          MS. HOUGH:  Oh, I'm sorry.

3          THE COURT:  We need to swear him in.

4          MS. HOUGH:  Thank you.

5

6                   JOHN SCOTT NEAL,

7   called as a witness in behalf of the Plaintiffs, being first

8   duly sworn, is examined and testified as follows:

9

10          THE WITNESS:  Yes.  Thank you.

11          DEPUTY COURTROOM CLERK:  Please state and spell

12   your first and last name for the record.

13          THE WITNESS:  John Scott Neal.  J-o-h-n.  N-e-a-l.

14          MS. HOUGH:  Your Honor, would you like my

15   colleague to approach with a binder?

16          THE COURT:  You can approach, and they can take

17   the ones that are on the witness stand from the previous

18   witness.

19          MR. OBARO:  Is it possible to have the witness

20   appear on the monitors for counsel as well?

21          THE COURT:  Probably not.  You can come around.

22   There is only so much for technology.  You can turn your

23   chairs around.

24          MS. MAINIGI:  Is it okay, Your Honor, for this

25   witness, if we flip around?

Neal - D

1          THE COURT:  That's fine.

2          MS. STEWART:  I was just concerned about my neck.

3          THE COURT:  Oh.

4      Mr. Angeli, you're going to have to move up.  You can

5  go into the well if you want to as well.

6      Are you good?  All right.

7          MS. HOUGH:  May I proceed?

8          THE COURT:  Yes.

9          MS. HOUGH:  Thank you.

10

11                  DIRECT EXAMINATION

12  BY MS. HOUGH:

13  Q.    Can you please -- could you please state your full name

14  and your employer for the record.

15  A.    John Scott Neal.  Sprouts Farmers Market.

16  Q.    How long have you worked at Sprouts?

17  A.    Just over four years.

18  Q.    And what's your current role?

19  A.    I'm the Chief Merchandising Officer.

20  Q.    What are the responsibilities of the Chief

21  Merchandising Officer at Sprouts?

22  A.    I'm responsible for all the products that are sold

23  across the store and the merchandising of that product.

24  Q.    For context, can you tell us what merchandising

25  entails?

Neal - D

1  A.    Yeah.  So anything that's bought and sold out of the

2  store, the products, we work with the suppliers.  We

3  negotiate the contracts with the suppliers.  We bring the

4  product in.  Any of the -- anything that is sold across the

5  store, from produce to vitamins, we sell, and I'm

6  responsible for.

7  Q.    Prior to becoming Chief Merchandising Officer, did you

8  have any other roles at Sprouts?

9  A.    Yes.  When I first came on from 2020 to 2022, I was the

10  Chief Fresh Merchandising Officer, which I was responsible

11  for all of the perishable categories.  So produce, meat,

12  deli, bakery, those kinds of things.

13  Q.    Before you joined Sprouts in 2020, did you have any

14  other experience in the industry?

15  A.    Yes.  I was at Walmart for 20 -- 23 years.  Began in

16  Walmart International for 13.  I was an expatriate in Mexico

17  City for -- for three years, running the general merchandise

18  business for Walmart, Mexico.  I came back to the United

19  States and was responsible for multiple categories across

20  bakery, produce, meat, and then eventually ended up being

21  the senior vice president, chief -- sorry -- chief -- excuse

22  me -- Senior Vice President, General Merchandise Manager of

23  Fresh.

24  Q.    Mr. Neal, are you familiar with Kroger and Albertsons

25  stores?

Neal - D

1    A.    Yes.

2    Q.    How are you familiar with Kroger and Albertsons stores?

3    A.    I have shopped them and also, over the years, doing

4    competitive price checks for my prior employer.

5    Q.    What type of a store is Kroger considered in your

6    industry?

7    A.    Kroger is considered a conventional grocer.

8    Q.    What about Albertsons?

9    A.    Albertsons as well, yes.

10   Q.    Do you use the term "conventional grocer" in your

11   industry?

12   A.    Yes.  Yeah, we will talk about club.  We'll talk about

13   mass, conventional, and then natural organic channel.

14   Q.    Is there a distinction between a conventional grocer

15   and a conventional supermarket?

16   A.    No.

17   Q.    Is "conventional supermarket" also a term you use in

18   your industry?

19   A.    Yes.

20   Q.    Since you said you use "conventional grocer," we can

21   use that one today.

22   A.    Okay.

23   Q.    Can you define what a conventional grocer is?

24   A.    A conventional grocer is a purveyor that sells -- you

25   know, it sells meat, produce, a lot of the branded CPG

Neal - D

1  items.  So when I say "CPG" that's consumer packaged goods.

2  Everything from Coke to Pepsi to Doritos to, you know, the

3  different categories across what you would think of in terms

4  of grocery and floral.  So a food retailer.

5  Q.   What are some other examples of stores that you

6  consider conventional supermarkets?

7  A.   Winn-Dixie.  We think about H-E-B, Publix, Vons.  Those

8  would be conventional grocers.

9  Q.   What is it about Kroger that makes it a conventional

10 grocer?

11 A.   For me, as I look at it, it's the assortment, and it's

12 very similar -- you know, a lot of times would be a

13 pharmacy, the conventional departments that you would expect

14 to see; and then, for me, it's more about the assortment of

15 what they sell.  It's, you know, you find a lot of the

16 conventional brands that are ubiquitous across the market,

17 things like Doritos, Coke, Pepsi, Tide, Charmin, those --

18 those major brands.  That's, to me, what makes them

19 conventional.

20 Q.   Are those brands you just described also referred to as

21 national brands?

22 A.   Yes.  National brands, yes.

23 Q.   And what makes Albertsons a conventional grocer?

24 A.   The same.  They carry -- they have an assortment very

25 similar to Kroger.  They have departments that are the same,

Neal - D

1  and likely overlap of the national brands and what they

2  carry would be really high, in terms of item overlap, the

3  same items in the stores.

4  Q.   Do online grocery retailers fall into the category of

5  conventional grocers?

6  A.   No.  I mean, they'll sell many of the same things, but

7  because the go-to-market is so different, we don't generally

8  categorize them as conventional.  We talk about them as

9  online.

10  Q.   What's different about the go-to-market of an online

11  retailer from a conventional grocer?

12  A.   Well, online there's -- many times there's delivery

13  that has to occur.  So it's the last mile.  It's also the

14  long tail.  So when you think about the assortment, when

15  they're online, many of them have the ability to have a much

16  longer tail, in terms of how many items they carry; but very

17  similar assortments.

18  Q.   Now I'd like to ask you about Sprouts.

19       Is Sprouts a conventional supermarket?

20  A.   No.

21  Q.   Why not?

22  A.   We're not because the way we go to market is different.

23       We are smaller box, so our stores are much smaller.

24  Our assortment is a lot more narrow, in terms of number of

25  items.  When I think of conventional retailers, I think of

Neal - D

1    around 60,000 items in the store.  Sprouts carries somewhere

2    around 20,000.  Right?  I think that we're not conventional,

3    in that we lean heavier into some of the categories that

4    conventional don't.  Vitamins, for example.  Much broader

5    assortment, much deeper assortment, larger percentage of our

6    mix, and very differentiated offering than a lot of the

7    brands you can find in other places.

8        We over-index in fresh and, you know, in produce in a

9    big way.  It's at the center of our store.  It plays, kind

10   of, within the box, a different -- a different role for us.

11   It's a much higher penetration.

12       And then organic penetration is much higher as well.

13   Our organic penetration, in some cases, is 4- to 5X, which

14   you'll find in some of our -- some of the other retailers

15   out there.

16       I think the other piece, too, is we're not conventional

17   in the brands and things that we -- in the products that we

18   carry.  So they are differentiated, attribute, and certainly

19   not as ubiquitous across the market.

20   Q.   Does your industry have a different category that

21   Sprouts falls into?

22   A.   There's a natural organic channel, if that's what

23   you're asking.

24   Q.   Does Sprouts fall into that channel?

25   A.   Yes.

Neal - D

1  Q.   Now I want to ask a few questions to unpack Sprouts'

2  product mix.

3       You described Sprouts' product assortment as

4  differentiated and attribute.

5       Is "differentiated" a word you use at Sprouts?

6  A.   Yeah.  That's kind of -- when I talk to my teams and

7  we, as merchants, talk about the business, we try to focus

8  on items that are differentiated.  And when we say

9  "differentiated," that means, basically, they're not found

10  across the market easily.  Right?  They're not like some of

11  those other national brands.

12      When I say "attribute-driven," those are attributes

13  like -- whether it be organic, regenerative farmed, vegan,

14  gluten free, those kinds of things.

15  Q.   Can you give some examples of specific products that

16  would be attribute-driven?

17  A.   Yeah.  So one of the brands that we carry in chicken is

18  called Pasture Bird.  Right?  And it is a natural bird

19  that -- that actually migrates across the fields.  They feed

20  it differently than the conventional -- like, a Tyson and

21  some of the other companies would.  So their go-to-market,

22  their sustainability and social responsibility levels are

23  much, much higher than you'd find in the market.

24      We sell vegan white cheddar chipotle -- I mean,

25  chickpea puffs, Himalayan salt banana chips.  You know, we

Neal - D

1   have, you know, grass-fed beef Bolognese in our ready meals

2   that are made.

3       So there -- they are attributes that are attached to

4   each of the items that we sell.

5   Q.   And when you describe Sprouts' product mix as

6   differentiated, are you including produce in that?

7   A.   In many cases, produce is commodified -- commoditized.

8   Sorry.  It's commoditized.  So, you know, I think the

9   differentiation that happens within produce is around

10  organic or locally sourced.

11      Sometimes we'll get new varieties.  We'll work with

12  universities and develop new varieties of a -- of a sweet

13  cherry plum, or something to that effect; but the majority

14  of what we sell in produce is commoditized across the

15  market.

16  Q.   And you mentioned Sprouts' vitamin and supplement

17  offering.  Can you describe what that offering is?

18  A.   Well, in our stores, we will have an offering of, you

19  know, north of 4,000 SKUs, which is a lot more than what

20  you'll find in some of the -- in the conventional grocer.

21  You'll also find brands that you can't find anywhere else.

22      Additionally, we have team members in our stores that

23  are specifically taught and trained around the vitamin

24  industry and our offering, and they're there full time to

25  help our customers as they shop the stores.

Neal - D

1  Q.   You've used the term "SKU."  Are you referring to a

2  stock keeping unit?

3  A.   Yeah.  An individual item.  Right.

4  Q.   And for the record, could you define what a stock

5  keeping unit is?

6  A.   It's one individual item.  So if you were to sell, I

7  don't know, a magnesium tablet that you had 50 tablets in it

8  versus a magnesium tablet that had 100 tablets in it, those

9  would be two different SKUs.

10  Q.   Can you just repeat, for clarity, how many SKUs are in

11  a typical Sprouts store?

12  A.   North of 20,000.

13  Q.   And do you know how that compares to what you'd find in

14  a typical conventional supermarket?

15  A.   A conventional is usually as -- you know, what I'm

16  familiar with is somewhere around 60.  So about a third of

17  the number of SKUs.

18  Q.   Are there products that conventional supermarkets carry

19  that you can't find at Sprouts?

20  A.   Yes.  So a lot of those national brands that I

21  mentioned earlier.

22  Q.   Can you get, for example, Kraft Macaroni & Cheese at

23  Sprouts?

24  A.   No.

25  Q.   Does Sprouts have requirements for the ingredients in

Neal - D

1  the food products you sell?

2  A.    Yeah.   We -- there's kind of a no-go list on some

3  ingredients, and we have those listed; and if items have

4  those, we won't bring them into the stores.

5  Q.    Are there popular products that have those no-go

6  ingredients that you won't sell because they contain them?

7  A.    Yeah.   A perfect one would be aspartame.   You know, a

8  lot of the sodas, the popular diet sodas that you'll have

9  with the national brands, have aspartame; so we don't have

10  those.

11  Q.    Now I want to ask about how Sprouts positions itself in

12  the market in relation to conventional supermarkets.

13        First, I have some questions about terminology.

14        Are you familiar, Mr. Neal, with the concepts of

15  primary and secondary shops?

16  A.    Yes.

17  Q.    What's the difference between a primary and secondary

18  shop?

19  A.    A primary shop is where a customer will go in and get

20  everything that they need -- soup to nuts, top to bottom --

21  such that they don't, in many cases, need to shop anywhere

22  else for anything else.

23        A secondary shop, which is really how Sprouts positions

24  itself, is a fill-in.   So a customer will go to their

25  primary shop, in many cases, and get 90 percent of what they

Neal - D

1   need, and then there are a few things that are specific to a

2   Sprouts store or secondary shop that they'll go in to fill

3   in.

4   Q.   Could you --

5   A.   Also, a secondary shop can be a convenience play where,

6   you know, the customer needs to run out and grab something

7   real quick, and they'll fill in with the convenience.

8   Q.   For illustrative purposes, could you give an example of

9   what you mean by visiting a primary and then filling in at a

10  secondary?

11  A.   Yeah.  So, you know, our family, we drink a lot of

12  Diet Coke.  And so my wife will go, and she'll go and buy

13  her Diet Coke.  And a lot of the staples that our family was

14  used to purchasing before beginning at Sprouts, but now that

15  we're healthier, that list is getting shorter and shorter,

16  it used to be our primary shop.

17       And then our secondary shop, she would go and shop at

18  Sprouts and buy all of the -- all of the fresh offerings

19  that we -- that we had, because she believed our fresh was

20  better.

21       So the example is Walmart was the primary and the

22  secondary was when she would fill in with produce and some

23  of the ready-made meals.

24  Q.   Are you familiar with the concept of a treasure hunt?

25  A.   Yes.

Neal - D

1   Q.    What's a treasure hunt?

2   A.    A treasure hunt is -- and I'll give you an example,

3   more than a description, but a treasure hunt is a customer

4   walking into a store, not really knowing what they're going

5   to find; but as they walk the aisles and discover new

6   products and they decide that they want to try that product

7   or they move to that product, they found a hidden treasure,

8   something that they didn't know that they wanted, and so

9   that -- that really encapsulate what -- encapsulates what a

10  treasure hunt is for the customer.

11  Q.    So what kind of a shopping trip does Sprouts position

12  itself to be?

13  A.    We position it to be -- it can be a primary shop for

14  some customers, but primarily it's a secondary shop; and we

15  want it to be a treasure hunt.

16        So the purpose of our stores are, is we have smaller

17  boxes, we have cleaner sightlines, which means that our --

18  you know, the racking and things that we have are lower, so

19  you can see across the store and it's more easily navigable.

20  Right?

21        And as customers go through and buy the products,

22  they -- you know, it's an environment where our team members

23  are there to help.  They're there to discover products and

24  find things that they didn't know that they necessarily

25  wanted.

Neal - D

1      And that's part of the magic of what we believe Sprouts

2  is.

3  Q.    I want to ask now about the customers that typically

4  shop Sprouts stores.  Is there a kind of customer that

5  Sprouts is trying, in particular, to draw into its store?

6  A.    Yes.  Through our customer segmentation work, we've

7  really come up with two primary segments.  The health

8  enthusiasts, which are -- which are customers that are

9  really focused on the healthy offering.  They're very

10  concerned about what goes into their body, what's in their

11  food, and where it comes from.  Right?

12      Then there are the selective shoppers, and that's the

13  other segment that we really focus on.  And those are folks

14  that want healthy items, but they're also looking for the

15  treasure hunt that you mentioned.  They want a really great

16  store experience.  They want to come in, in an atmosphere

17  that's comfortable and doesn't feel rushed, where they can

18  engage with our team members around service.  So it's about

19  that experience in the stores.

20  Q.    What does Sprouts do to win the business of health

21  enthusiasts and selective shoppers?

22  A.    Well, it's primarily around a couple of things.  One is

23  our people.  So our people are our magic sauce.  We have

24  people that are passionate about living and eating better,

25  and -- and that's the beginning.

Neal - D

1      So when customers come in, they're greeted with people

2  that are focused on the mission.

3      But the other piece is, is about the assortment.  It's

4  all really about the assortment.  It's about having organic

5  products, regenerative farmed, you know, socially

6  responsible products that they can find and they can

7  purchase; and it's about, again, knowing what's in their

8  food and where it came from.

9  Q.    Does Sprouts use targeted advertising to reach those

10  customer segments that you describe?

11  A.    We attempt to.

12      You know, we are in the process of improving our data

13  and understanding who's shopping our stores.  But from the

14  limited data that we have, we do try to target, one, our --

15  our stores, where they're located, and the people that are

16  within a ten-mile radius of the stores, and those that we

17  think fit into the profile of health enthusiasts and

18  selective shopper.

19  Q.    And can you explain what targeted advertising refers

20  to?

21  A.    It's -- for us, right now, it's primarily -- it's

22  digital social media channels, and a lot of it is around

23  through our email capture.  Having people sign up for the

24  Sprouts app and then getting their information and sending

25  them digital circulars to let them know what we offer and

Neal - D

1  some of the specials and events that we're having in the

2  stores.

3              MS. HOUGH:  Now I'm going to ask the courtroom

4  deputy to please share with the witness the document that's

5  marked as PX3713.

6       And, Mr. Duncan, can I ask you to please project

7  PX3713.

8  BY MS. HOUGH: (Continuing):

9  Q.   Mr. Neal, do you recognize this document?

10 A.   Yes.  This is -- this is a profile of our selective

11 shopper.

12 Q.   Do you know --

13 A.   The health -- sorry.  Go ahead.

14 Q.   Go ahead.

15 A.   Oh, I was going to say our selective shopper and our

16 health enthusiasts.

17 Q.   Do you know what this document was used for at Sprouts?

18 A.   This document was used to profile the customers that we

19 were going after to really drive our assortment around.  So

20 as -- as merchants or people who are doing the buying.  And

21 I mentioned earlier that our assortment, our products, are

22 what differentiate us.  Understanding who this customer is

23 and what they care about is really important.

24      So a lot of the work we do around assortments is guided

25 and directed towards these folks here.

Neal - D

1    MS. HOUGH:  Your Honor, we move to admit PX3713

2    into evidence.

3    THE COURT:  It will be received, without

4    objection.

5    BY MS. HOUGH: (Continuing):

6    Q.   Mr. Neal, could you please read out loud the header at

7    the top of the slide?

8    A.   Sprouts Shopper:  Higher Income Customer who Craves

9    Health and Wellness.

10    Q.   What does that header describe?

11    A.   Sorry.  You cut out a minute.

12    Q.   What does that header describe?

13    A.   That header just describes the shopper that we are

14    targeting.

15    Q.   At Sprouts, do you understand your typical customer to

16    have a higher income than the average shopper?

17    A.   Yes.

18    Q.   And where it says "Over-index on lifestyle choices," in

19    that right column, does this describe the typical Sprouts

20    customer?

21    A.   Oh, yeah.  Yes, it does.

22    Q.   What does "Over-index on lifestyle choices" mean?

23    A.   Over-index, meaning the, you know average -- an average

24    customer will balance life choices versus value versus

25    convenience.  A lot of different choices; right?

Neal - D

1    For our customer, we believe that they over-index on

2    these health and wellness-type experiences, whether it be in

3    the store, whether it be the products that we sell, those

4    kinds of things.

5    Q.   Thank you.

6         MS. HOUGH:  Mr. Duncan, you can take that document

7    down now.

8    BY MS. HOUGH: (Continuing):

9    Q.   Has Sprouts identified any other customer segments that

10   exist beyond health enthusiasts and selective shoppers?

11   A.   Yes.  There are a few others.  There's the adventurous

12   chef, coupon clippers, I think shopping avoider -- avoiders

13   would be some, just from memory.

14   Q.   Are there any that you believe are less likely to visit

15   a Sprouts store?

16   A.   I think over the last four years, in pursuing our

17   strategy, the coupon clippers are certainly less interested

18   in shopping our stores.

19   Q.   Why is that?

20   A.   We used to be really promotionally focused, trying to

21   drive traffic through price, which didn't serve our model

22   well.  And so in moving towards these two segments that I

23   just covered with you, we're able to do less of that.

24        And so it's less about promotion.  It's less about

25   price, and it's more about all the reasons to believe that

Neal - D

1    I've outlined today.

2        And so they're not going to come in and get ten ears of

3    corn for a dollar, you know, the way they might have in the

4    past.

5    Q.    Does Sprouts do anything today to try to win coupon

6    clippers from competitors?

7    A.    Not intentionally.

8        We will provide offers for our target customers that we

9    see as great values, and if that happens to resonate with a

10    coupon clipper, then they may come in, but it's a result of

11    us pursuing our strategy with other segments.

12    Q.    Does Sprouts publish weekly ads?

13    A.    Depending on what you mean by "publish," we do -- we're

14    a hundred percent digital.  We don't print any ads.  So,

15    yes, we have digital ads.

16    Q.    Are you aware of the ads put out by conventional

17    supermarkets?

18    A.    Yes.

19    Q.    Do you pay any attention to those at Sprouts in your

20    business?

21    A.    No.

22    Q.    Why not?

23    A.    Because, in many cases, the assortment doesn't overlap.

24    You know, they'll be advertising national brands.  They'll

25    be advertising things that we don't sell; so that's one

Neal - D

1   reason.

2        I think the other reason is, is I'm not really

3   concerned about price week in and week out.  That's not my

4   focus.  That's not our focus.  Our focus is to bring

5   attention to what we do offer at a really good value.

6   Q.   Do you make any changes at Sprouts in response to what

7   you see in a conventional supermarket's ad?

8   A.   No.

9   Q.   Next, I have a few questions about Sprouts' physical

10  stores.  Could you describe, generally, the design and the

11  layout of Sprouts' stores?

12  A.   Yeah.  Your general store -- the store will generally

13  have around, I don't know, 30,000 square feet.  Our new

14  format is 23,000 square feet.  So it's a smaller box than

15  you would be used to for a grocery store.

16       You walk in, and produce is at the center, and it's

17  really the focus of the store, and the rest of the --

18  "departments," is what we call them, or areas, are around

19  the store.

20       So we have a meat and seafood area.  We have a bakery

21  area.  There's a bulk area, and we've talked a little bit

22  about an expanded vitamins-type area, and then we have

23  grocery and frozen as well.

24       So that may not be all the categories, but you get the

25  gist of what the store looks like.

Neal - D

1  Q.   And you said the company's full name is Sprouts Farmers

2  Market.   Does Sprouts consider itself to be a farmers

3  market?

4  A.   We try to be as close to the farmers market feel as we

5  can be.

6       Farmers markets are generally outdoors and there are a

7  lot of different purveyors, but we try to curate our

8  assortment and curate the experience so it's very similar,

9  yes.

10 Q.   Can you elaborate a little more on how you curate the

11 experience so that it's similar to a farmers market?

12 A.   Well, when you walk in, we want the store to feel light

13 and bright.   We want it to feel homey and nostalgic,

14 something that you recognize.   We want fresh to be at the

15 center of everything.

16      When you think of a farmers market, fresh is the hero,

17 produce is the hero.   So that's really what we've gone

18 after.   So we have disproportionate space assigned to

19 produce.   And then the other departments around it are

20 focused to be shoppable and also to entice the customer to

21 walk through and explore.

22 Q.   When you say "disproportionate," what do you mean by

23 that?

24 A.   I mean, there's a -- if you think about the space

25 allocated in the store for produce versus the other

Neal - D

1  departments, it's much larger than the other departments

2  within the store, and if you were to think about it as --

3  you know, against maybe conventional or other grocers, the

4  percentage of space is a lot higher.

5  Q.   Are there any other ways that Sprouts' physical stores

6  are different from conventional supermarkets?

7  A.   I think it's just they're a lot smaller.  We have a

8  smaller team.  There's a greater emphasis on fresh and just

9  having really clean sightlines so you can see the entire

10  store when you walk in.

11  Q.   Does Sprouts have a private label brand?

12  A.   Yes.

13  Q.   Are all the private label products Sprouts-branded?

14  A.   Not all, but most.  There are some that are not

15  Sprouts-branded, and those you'd find in the fresh

16  production areas.  So, like, if we're producing a meal

17  in-house, like a chicken piccata or, you know, a chicken

18  parmesan with green beans or something, those are developed

19  and designed by our Sprouts-brand team, but they don't have

20  the Sprouts brand on them.

21  Q.   Is it Sprouts' preference to have more of its private

22  label products Sprouts-branded?

23  A.   Yes.

24  Q.   Why is that?

25  A.   It creates loyalty.  Our customers come in, and Sprouts

Neal - D

1    is a trusted brand.  Our customers trust us.  That's why

2    they come to us.  And so the more that we can communicate

3    and share our brand and the products that we have, the

4    greater loyalty it creates with that customer.  Things you

5    can only get at Sprouts.  Differentiation.  Right?

6    Q.    Are Sprouts' private label products available in

7    non-Sprouts stores?

8    A.    No.

9    Q.    Why not?

10   A.    Because they're proprietary to our brand.  We want them

11   sold in an environment where the customer can experience

12   them the way that we want them to, then bring them home and

13   enjoy them.

14       They're not sold anywhere else because of loyalty as

15   well.  We want the customers to be loyal to the brand and

16   only shop with us.

17   Q.    Now I want to ask about who Sprouts competes with for

18   customers.  So when you think of the broad industry in which

19   Sprouts exists, does that industry break down into any

20   submarkets?

21   A.    Are you talking about geographics, or are you talking

22   about market segmentation?  I missed the beginning of your

23   question.

24   Q.    What do you mean by "market segmentation"?

25   A.    "Market segmentation," meaning mass, conventional,

Neal - D

1  natural, you know, pharmacy, those kinds of things.  I'm not

2  sure if that's what you're looking for, or if you're asking

3  about geographic segmentation.

4  Q.   Yeah, that's what I mean.

5  A.   Yeah.  So, yes, we have different segments of the

6  industry within retail that we look at.  So you have

7  apparel.  You have pharmacy.  You have natural.  You have

8  mass, you know.

9  Q.   And is there a submarket of natural and organic

10  grocers?

11  A.   No.  We don't segment the natural -- natural and

12  organic beyond that.

13  Q.   I think you misunderstood my question.

14      Is there -- apart from apparel, pharmacy, and some of

15  those other segments you mentioned, a segment for natural

16  and organic grocers?

17  A.   Yes.  Yes, there is.

18  Q.   Does Sprouts compete --

19  A.   And we --

20  Q.   Go ahead.

21  A.   I was going to say, "And we call it the natural organic

22  channel."

23  Q.   Okay.  Thank you.

24      Does Sprouts compete with all retailers across the

25  industry you've laid out to the same extent?

Neal - D

1    A.    No.  We more heavily compete with the folks in the --

2    in the natural channel.  That's why we particularly look at

3    that channel, and we will indirectly compete with others

4    outside of that channel.

5    Q.    Can you elaborate on what you mean by "indirectly

6    compete"?

7    A.    Well, I think, when you think about the retail

8    universe -- right? -- especially in food, customers are

9    going in and out of different competitors within the --

10   within that segment and that universe.  So as you think a

11   primary shop, a secondary shop, there -- you know, some of

12   the other conventional brands or retailers are part of that

13   experience.  So they're seeing products there.  It's part of

14   their universe in terms of when they're making decisions on

15   where they want to shop.

16   Q.    I want to ask a few questions about who Sprouts sees as

17   its primary competitor, but I understand that Sprouts has

18   designated material on this topic as confidential.  So I'm

19   going to do my best to ask without needing you to reveal any

20   of that confidential information.

21         But when I say "Sprouts' primary competitor," is there

22   a retailer that comes to mind?

23   A.    Yes.

24   Q.    And how do you know that's Sprouts' primary competitor?

25   A.    A few reasons.  They -- many of the products that they

Neal - D

1   sell are within that natural and organic segment.  And as I

2   think about our assortment and how we're working to

3   differentiate versus everyone else, there is more product

4   overlap with that competitor than really any other

5   competitor that we have.

6   Q.    Is Kroger a primary competitor?

7   A.    No.

8   Q.    Why don't you consider Kroger to be a primary

9   competitor?

10  A.    Again, we don't sell many of the brands that they sell.

11  Our mission is different, and our assortment, again, is very

12  different than what they sell.

13  Q.    Is Albertsons a primary competitor?

14  A.    No.

15  Q.    Why not?

16  A.    For the same reasons.  Their assortment, in many -- in

17  many cases, is not even -- there isn't any overlap between

18  what we sell and they sell, and so for our customer

19  segments, they aren't finding what they want in those

20  locations.

21  Q.    Can you tell me which category your primary competitor

22  falls into?

23  A.    Our primary falls into the natural -- the natural

24  channel.

25  Q.    To what extent does Sprouts view itself as competing

Neal - D

1  with conventional grocers?

2  A.    Could you clarify the question?

3  Q.    You mentioned earlier you compete indirectly with other

4  retailers.   Could you elaborate on how you see yourself

5  competing with conventional grocers?

6  A.    I think a couple of -- a couple of reasons why we would

7  compete with them as customers or have established

8  purchasing patterns, in many cases they've shopped at the

9  conventions for a long time, and it's habit.

10       I think, additionally, there's convenience.  It's

11  close.   It's what they're used to, so it's part of their

12  retail universe, and there are some of those brands that

13  overlap.  So we do have some things that are the same.  We

14  both sell produce.  We both sell meat.

15       Although we feel our offering in meat is

16  differentiated, but we sell meat.  So we sell many of the

17  categories they're used to shopping.  So they're in and out

18  of those stores on a daily basis.  It's part of what their

19  customers see and our customers see.  So we indirectly

20  compete.

21  Q.    Does Sprouts monitor the prices of conventional

22  supermarkets?

23  A.    Yes.

24  Q.    What does Sprouts do with that information?

25  A.    I think what it does is it just informs us of the

Neal - D

1    retail landscape.  And, again, the mindset of our customer,

2    we understand what they're seeing.  We do not define our

3    price strategy based on what our competitors do, but it's

4    good to have an understanding, especially with inflation and

5    everything else, what's happening and what the customers are

6    seeing in terms of price.

7    Q.    Does Sprouts change its prices in any way in response

8    to what it sees at conventional supermarkets?

9    A.    No, we don't.  We don't price off of what our -- what

10   others do.  Then you end up running their price strategy,

11   and we're not interested in that.

12        Again, it's about our assortment and making sure that

13   it's a value.  So when we price, we price based off of

14   elasticity.  So we have models that track our prices.  We

15   understand what kind of lift in units and dollars we see

16   when we change price, and based on that, combined with our

17   margin expectations, we develop our own pricing

18   go-to-market.

19   Q.    Does Sprouts ever run promotions to compete against

20   conventional supermarkets?

21   A.    No.

22   Q.    Does Sprouts make any adjustments to its assortment to

23   compete against conventional supermarkets?

24   A.    No.  If it were -- if it were up to me, we wouldn't

25   have any product overlap.

Neal - D

1    Q.    Why do you say that?

2    A.    Because, again, it's further differentiating ourselves

3    from the market.  We don't want to be -- we don't want our

4    customers to find the same products in our stores that they

5    can find in other places.

6         And so, for me, that's why Sprouts' brand is really

7    important.  Those are differentiated products you can't find

8    anywhere else.  We want brands that are innovative that you

9    can't find anywhere else.

10        So we are, you know, actively pushing to continually

11   move our assortment to be one that's less ubiquitous in the

12   market.

13   Q.    Does Sprouts monitor the services of conventional

14   supermarkets to compete with them?

15   A.    No.

16   Q.    To what extent does Sprouts compete with online

17   retailers?

18   A.    You know, I think as long as there are online retailers

19   out there and customers are looking for that ease in

20   convenience, and if they're able to find some of the items

21   that we do carry, you know, they -- they are engaging

22   with -- with competition that way, but we don't track or

23   develop strategies specifically to compete against online

24   either.

25   Q.    Why is that?

Neal - D

1  A.   Because, again, we want to stay in our own lane.  We
2  want to appeal to those two customer segments that we talked
3  about earlier.  We are 100 percent focused on what's
4  important to them and what we believe is important to them
5  and how do we appeal to them.  What happens around in the
6  rest of the market, we are less interested in.
7  Q.   Do those Sprouts customers you described prefer a
8  brick-and-mortar store experience over online?
9  A.   Well, I think that we can see that online is playing an
10 important role in the industry.  So, certainly, it's
11 important to some of them.
12     There are omni customers that participate in both
13 online and in-store, and we find those to be the most
14 valuable customers.  So that store experience is really,
15 really important.
16     But for us, that store and that selective shopper that
17 we talked about earlier, that store experience and
18 interaction with our team members, is critical to who we
19 are.
20 Q.   You may have referenced this previously, but does
21 Sprouts maintain or keep track of any market share data?
22 A.   Yes.
23 Q.   And does Sprouts track its share relative to that
24 narrower natural and organic channel you described?
25 A.   Yes.

Neal - D

1  Q.    Does Sprouts track its market share relative to the

2  narrower channel of conventional supermarkets?

3  A.    No.

4  Q.    Why not?

5  A.    Because we're focused on where our customer

6  segmentation is heaviest and there's most appeal for our

7  customers, and so within that natural channel, that's where

8  most of our customers are playing and their spending more of

9  their dollars; so, for us, we want to understand how we're

10  in that particular channel.

11      I'm less interested, when you start thinking about

12  market share, of what's happening, for example, in beverage.

13  Right?  If the national brands are making a big push on

14  beverage and we don't have any of those national brands and

15  we are moving because of what's happening there?  It doesn't

16  make any sense for us to look at that.

17          MS. HOUGH:  Okay.  Thank you.  I don't have any

18  other questions at this time; so I'll pass the witness.

19          THE COURT:  Any cross-examination?

20          MS. STEWART:  Please, Your Honor.

21          THE COURT:  You'll go that way.

22          MS. STEWART:  Thank you.  And, Your Honor, may my

23  colleague, Mr. Ryan, provide some binders, please, to the

24  Court?

25          THE COURT:  That's fine.

Neal - X

1        Why don't you leave your chair there, because you're

2   probably going back there to sit.

3              MS. STEWART:  You're ahead of me, Your Honor.

4   Thank you.  But you want me to walk this way?

5              THE COURT:  I do.

6              MS. STEWART:  Your Honor, while those are being

7   passed out, could I just flag a brief

8   confidentiality-related procedural note?

9        Obviously, to test the Government's theory that Sprouts

10  is outside the relevant market, we need to ask about their

11  competitors and their pricing.  Several of those documents

12  have been sealed in their entirety, but I wanted the Court

13  to be aware we've met and conferred at length with Sprouts'

14  counsel, Mr. Lindsay; and so we've agreed on the parameters

15  of what we can ask about with respect to those documents in

16  open court, if that's okay.

17             THE COURT:  As long as his client knows what the

18  parameters are.

19             MR. LINDSAY:  Yes, Your Honor.

20             THE COURT:  All right.

21

22                       CROSS-EXAMINATION

23  BY MS. STEWART:

24  Q.   Good morning, Mr. Neal.  How are you sir?

25  A.   I'm well.

Neal - X

1   Q.   My name is Beth Stewart, and I represent Albertsons,

2   and I have a few questions for you this morning.

3        Sir, you'll have to forgive me.  I've never been to a

4   Sprouts store.  So I was looking online.  There's not one in

5   Portland I could visit; so I just wanted to try to get a

6   sense of what these stores looked like if I walked into

7   them.

8        And so with that in mind, let me mark our first

9   exhibit.  It's a demonstrative exhibit, which will be DDX2.

10       And Mr. Simmons will pull that up on the screen.  And,

11  sir, if you can't see that, let me know.  I know we emailed

12  that to you separately.

13  A.   Yes, I can see that now.

14            MS. STEWART:  Your Honor, this should be at the

15  end of your binder as DDX2.

16            THE COURT:  I have it.

17  BY MS. STEWART: (Continuing):

18  Q.   Sir, this is just a collection of the first 11, or so,

19  photos of Sprouts stores that I found on Yelp last night.

20       The first photo is a thick picture of a produce

21  section.  Fair to say Sprouts stores typically have produce

22  departments?

23  A.   Yes.

24  Q.   Okay.  And then the second one is a bakery department.

25       Fair to say Sprouts stores have bakery departments?

Neal - X

1    A.    Yes.

2    Q.    And I see things like cakes and doughnuts and bagels in

3    there.  Those are things you would typically carry; correct?

4    A.    True.

5    Q.    Okay.  Another department you offer is bulk foods;

6    right?

7    A.    Yes.

8    Q.    And there a consumer might get some cashews or some

9    granola or something; is that right?

10   A.    Yeah.

11   Q.    And then you would have a milk and dairy section in

12   your stores; correct?

13   A.    Yes.

14   Q.    And you would also have a frozen foods section, as in

15   Slide 5.  Is that also correct?

16   A.    Correct.

17   Q.    And there I see things such as frozen pizzas and frozen

18   vegetables, and those are products that you would carry in

19   your stores; correct?

20   A.    Correct.

21   Q.    And then in Slides 6, 7, and 8, we see three photos of

22   meats and a seafood section, and those are also departments

23   that you carry in your stores; correct?

24   A.    Correct.

25   Q.    And Slide 9, I think, is just another bulk foods photo

Neal - X

1   that we talked about.

2       Slide 10.  I think you mentioned Sprouts also has

3   vitamins and natural health departments in your store and a

4   beauty care department; is that right?

5   A.   Yes.

6   Q.   So, for example, if I wanted some Tom's of Maine

7   organic toothpaste, I might come to this section to buy that

8   in your store; correct?

9   A.   Correct.

10  Q.   Okay.  Let's go to Slide 11.  I'll confess I sort of

11  picked this one because I thought it was funny.  It says,

12  "Old Tyme Quality Meats."  Fair to say this photo depicts a

13  fairly extensive wine section, and that's something you

14  would also have in your stores; is that right?

15  A.   Yeah.  We have it in a segment of our stores.  There

16  are a lot of our stores that don't have liquor licenses; so

17  you wouldn't find that in all of them.

18  Q.   And this is probably a result of the imaging, but fair

19  to say that would be a labeled section within the stores who

20  carry it; correct?

21  A.   Yes.

22  Q.   And if I walked into a Sprouts store, I would also see

23  a deli; is that right?

24  A.   Yes.

25  Q.   And in some of your stores you offer, for example, make

1    your own sandwich, where you go up and you ask them to put

2    avocado and turkey on a ciabatta or something like that; is

3    that right?

4    A.    Yes.

5    Q.    And I would see packaged goods, like cereals?

6    A.    Yes.

7    Q.    And I would see florals.  Is that also right?

8    A.    Yes.

9    Q.    And I think you mentioned earlier you don't carry Diet

10   Coke, but you carry other sparkling beverages for the

11   consumer; right?

12   A.    True.

13   Q.    And you don't carry Doritos, but you carry chickpea

14   puffs.  Is that what you said?

15   A.    Yes.

16   Q.    And you don't carry OREOs, but I'm betting you have --

17   what? -- a cacao sandwich of some kind; is that right?

18   A.    That's right.

19   Q.    All right.  And the reason you do those things, you

20   said, was because you want differentiated products; right?

21   A.    Yes.

22   Q.    And the reason you want differentiated --

23   differentiated products is because that's part of how you

24   compete in this marketplace; right?

25   A.    That's right.

Neal - X

1    So those items that you -- that you just mentioned, if
2    they are differentiated, they're easy for the customer to
3    understand.  It resonates with them.  If they're similar,
4    they're cleaner.  They're natural.  They don't contain some
5    of those ingredients that we talked about before.
6    Q.    So, for example, that hypothetical shopper out there
7    who's been buying Tyson's chicken, you want that shopper to
8    come into your store and buy what I think you described as
9    the natural bird brand; is that right?
10   A.    Yes.
11   Q.    Okay.  And so we've heard a lot at this trial about
12   price, but price is not the only way that you differentiate
13   yourself to compete; correct?
14   A.    Correct.
15   Q.    And let me actually bring up our first exhibit for
16   evidence.  This is Defendants' Exhibit 0222.  We'll look at
17   page 15 of that.
18         Now, sir, you recognize this as Sprouts' 10-K; right?
19   A.    Yes.
20   Q.    And this is for the year ending 2023, and you've seen
21   this document several times before; correct?
22   A.    Correct.
23         MS. STEWART:  Your Honor, At this time we'd seek
24   to admit Defendants' 0222 into evidence.
25         MS. HOUGH:  No objection.

Neal - X

1    THE COURT:  It will be received.

2    MS. STEWART:  Okay.  Thank you.

3  BY MS. STEWART: (Continuing):

4  Q.   So I wanted to focus your attention there on page 15,

5  if I could.

6    MS. STEWART:  And, Mr. Simmons, I apologize.  I'm

7  on the fly moving things around.

8  BY MS. STEWART: (Continuing):

9  Q.   So we're looking at page 15, believe.

10    I'll look at mine.

11    Okay.  I have my page wrong, so I'll come back to that.

12    But let's keep moving, sir.

13    I'll have you look at another part of this.  That's who

14  you compete with.  That's page 11, as Mr. Simmons originally

15  pulled up.

16    Let's take a look at that.

17  A.   Yeah.

18  Q.   And you've seen this before; is that right?

19  A.   I have.

20  Q.   And in the third paragraph, under the section Our

21  Competition and Industry, do you see where it says:  Our

22  competitors primarily include other special food --

23  specialty food retailers, such as Whole Foods and

24  Trader Joe's, and smaller local or regional operators.

25  Conventional supermarkets, such as Kroger, Albertsons,

Neal - X

1    Safeway, H-E-B, and Publix.  And we'll pause there.

2        You see that; right, sir?

3    A.    Yes.

4    Q.    So this is Sprouts' filing with the SEC publicly

5    stating that we compete with Kroger and with Albertsons;

6    correct?

7    A.    Correct.

8    Q.    And competing also with Safeway, which is owned by

9    Albertsons; correct?

10   A.    Correct.

11   Q.    And it goes on to say that Sprouts competes with

12   warehouse membership clubs; correct?

13   A.    Correct.

14   Q.    Like Costco?

15   A.    Uh-huh.

16   Q.    And it also competes with mass or discount retailers

17   such as Target and Walmart?

18   A.    Yes.

19   Q.    And also Amazon?

20   A.    Yes.

21   Q.    And, again, the reason for that is people have a dollar

22   they want to spend on groceries, and they can spend it at

23   your store or they can spend it at any of those places,

24   depending on what's available to them in their market;

25   correct?

Neal - X

1   A.   Correct.

2   Q.   And, in fact, you go to the first paragraph of that

3   section, Defendants' 22 there -- I want to ask you about

4   something else.   I heard you say on direct that you don't

5   track market share against conventional supermarkets.

6        Do you recall that?

7   A.   Yep.

8   Q.   Well, let me have you look at this.   Do you see where

9   it says:   Based on our industry experience, we believe our

10  new stores capture market share from conventional

11  supermarkets.

12       Do you see that?

13  A.   I do.

14  Q.   So someone at Sprouts is tracking market share against

15  conventional supermarkets.   You would agree, would you not?

16  A.   Maybe.   I mean, it says "we believe."

17       You know, when we -- when we drop a new store into a

18  market and customers begin shopping from us, they were

19  shopping someplace else.

20       So if there's not natural in that area, we believe that

21  we may be capturing something from conventional

22  supermarkets.

23  Q.   That's Sprouts' belief, that when you open a new store,

24  you capture market share from conventional supermarkets;

25  correct?

Neal - X

1  A.    Depending on who's in the area, yes.

2  Q.    Now let me have you look at another exhibit.  This is

3  Tab 4, Defendants' Exhibit 227.

4          MS. STEWART:  Your Honor, just for the record,

5  this exhibit has been sealed in its entirety, but I have

6  conferred with counsel about appropriate parameters for

7  asking about this document, but it's not on the public

8  screen.

9  BY MS. STEWART: (Continuing):

10  Q.    So, sir, Defendants' 227 reflects the results of a

11  survey Sprouts conducted of its grocery customers in 2019;

12  is that correct?

13  A.    I can't see the document you're talking about right

14  now.  I could open it up on my computer, but --

15          MS. STEWART:  Just for the record, Your Honor, in

16  anticipation there might be tech hiccups, we agreed to

17  share, through their counsel, the exhibits we intended to

18  use in advance.

19  BY MS. STEWART: (Continuing):

20  Q.    And you have those available to you.  Is that correct,

21  sir?

22  A.    That's correct.  I'm looking at Document DXO227 --

23  Q.    Great.

24  A.    -- now.

25  Q.    Sir, Defendants' Exhibit 227 reflects the results of a

Neal - X

1  survey Sprouts conducted of its grocery customers in 2019;

2  is that correct?

3  A.    Yes.  I think what it is, is it's not just our

4  customers.  It's the market customers.

5  Q.    Including --

6  A.    The different segments within those markets, yes.

7  Q.    And I apologize for talking over you, sir.

8          MS. STEWART:  So, Your Honor, at this time I'd

9  moved to admit Defendants' Exhibit 227 into evidence.

10          MS. HOUGH:  No objection.

11          THE COURT:  It will be received.

12  BY MS. STEWART: (Continuing):

13  Q.    And, sir, it's fair to say that what this slide tries

14  to do is segment grocery consumers into various types and

15  then gain an understanding of their demographics and where

16  they shop; is that right?

17  A.    That's correct.

18  Q.    So, for example, you talked about health enthusiasts on

19  direct.  They want to live a healthier lifestyle?

20  A.    Yes.

21  Q.    And experience seekers who are willing to drive out of

22  their way for a better shopping experience?

23  A.    Yes.

24  Q.    And adventurous chefs are here?

25  A.    Yes.

Neal - X

1   Q.   And shopping avoiders who prefer to eat out?

2   A.   Yes.

3   Q.   And convenience seekers who shop based on location;

4   correct?

5   A.   Yes.

6   Q.   And the bottom part of this slide identifies where

7   these customer segments shop; correct?

8   A.   Correct.

9   Q.   And it's fair to say -- again, I'm not going to name

10  the stores, but you would agree with me that this slide

11  reflects that your customers shop at a wide variety of

12  retailers; correct?

13  A.   Correct.

14  Q.   And so now let's actually look at the next page.

15       And at the bottom of that page, sir, you see there's a

16  row called Percentage of Sprouts Shoppers Today, (Current

17  Stores).

18       Do you see that?

19  A.   Yes.

20  Q.   And you understand that that is intending to

21  encapsulate how your current shopper, as of the date of this

22  presentation, fall into those various buckets; correct?

23  A.   Correct.

24  Q.   And if we add up those last four columns, everything

25  but the first category -- again, I'm not going to give the

Neal - X

1  number, but fair to say those last four columns add up to

2  well over half of your customers; correct?

3  A.    At that time that this was done, yes.

4           MR. STEW:  Okay.  And, Mr. Simmons, if you could

5  please copy the bottom row of the prior page onto this page

6  so that we can see how that lines up with the stores.

7  BY MS. STEWART:  (Continuing):

8  Q.    And in addition to that, Mr. Neal, for your benefit, I

9  prepared demonstrative Defendants' DDX3, and all that

10  does -- again, it should be in everyone's binder, but we'll

11  do it on the screen as well -- is take the first page of

12  this document and paste those percentages from the second

13  page right below them.

14       Okay.  And, sir, when you see that together, again,

15  focusing on those last four columns that are well over half

16  your customers, you would agree with me that, at least as of

17  the time of this, your customers were shopping at a lot of

18  conventional supermarkets, wouldn't you?

19  A.    I can't see the document that you're -- that you're

20  showing right now.  It's not showing on my computer.

21  Q.    Do you have a DDX3, sir, which we had emailed to you in

22  advance?

23  A.    Yeah.  Yeah.

24  Q.    Let me have you take a look at DDX3, which is --

25  A.    I'm looking at what you're talking about now, yes.

Neal - X

 1      The answer at the time, yes.

 2  Q.   And so, again, just for the clarity of the record, as

 3  of the time of this document, the far majority of your

 4  customers were shopping at a lot of conventional

 5  supermarkets?

 6          THE COURT:  Can I ask you a question?

 7          MS. STEWART:  Yes.

 8          THE COURT:  Are you talking about the last four

 9  columns?

10          MS. STEWART:  I am, Your Honor.

11          THE COURT:  That does not come to over the

12  percentage you're saying.

13          MS. STEWART:  The last five.  Thank you.

14          THE COURT:  All right.

15          MS. STEWART:  Thank you.

16  BY MS. STEWART: (Continuing):

17  Q.   The last five columns, and that comes to well over

18  half.  Right, sir?

19  A.   Yeah.  The last five do, yes.

20  Q.   Okay.  And so as to that set, you would agree with me

21  that your shoppers are shopping at a lot of conventional

22  supermarkets, according to this slide; correct?

23  A.   According to that slide, yes.

24  Q.   Including a lot of banners for defendants in this case;

25  correct?

Neal - X

1  A.    Correct.

2  Q.    And I understand that maybe you shifted your strategy a

3  little bit.  Now you're a little bit less focused on some of

4  these categories, but you certainly would agree that, even

5  today, it's the case that a lot of your shoppers are still

6  shopping at conventional supermarkets; correct?

7  A.    We don't know that for sure, but we had a massive

8  change in strategy.  But, you know, if we were to assume,

9  there certainly is some crossover, yes.

10  Q.    Well, and, again, we saw in your 10-K you're stealing

11  share from those conventional supermarkets; right?

12  A.    With a new store in a new market, yes.

13  Q.    Okay.  I heard you say on direct that you position

14  yourself as a fill-in trip; is that right?

15  A.    Yes.

16  Q.    So you mean customers maybe are just coming for a

17  couple of items; right?

18  A.    Yes.

19  Q.    But it's also true that part of your strategy is to try

20  to get those customers who maybe just come in for one thing

21  to buy a bunch of other things while they're there; right?

22  A.    Yes.

23  Q.    Including the treasure hunts you referenced; correct?

24  A.    Yes.

25  Q.    So, for example, we talked about Tom's Organic

Neal - X

1  Toothpaste.  So someone might come in to buy Tom's Organic

2  Toothpaste, but while they're there, they might end up

3  buying tomatoes and deli meat; right?

4  A.    Sure.  Yes.

5  Q.    And that's part of your strategy, and you see shoppers

6  doing that; correct?

7  A.    Yes.  Correct.

8  Q.    Let me talk to you now very briefly about pricing, sir.

9        I'm going to show you Exhibit DX0224.

10            MS. STEWART:  Once again, Your Honor, this has

11  been sealed in its entirety, but Mr. Lindsay and I have

12  conferred about an appropriate scope for open court.

13  BY MS. STEWART: (Continuing):

14  Q.    Sir, you recognize this as an internal Sprouts

15  document; correct?

16  A.    Let's see.  I've got to -- you need to give me a

17  minute.  I need to go get that.  I can't see the document

18  you're showing right now.  I can go pull it up.  One moment.

19  Q.    And that, for the record, sir, is DX0224.

20  A.    Yes.  The other ones, -226, -227.  I'm opening -224.

21  One moment.

22        Okay.  Yes.  I'm looking at it now.

23  Q.    And you recognize --

24  A.    Yes, I recognize.

25  Q.    Sir, you recognize this as one of the regular price

Neal - X

1  looks that you were talking about on direct; correct?

2  A.    Correct.

3  Q.    And we see on this slide -- for example, this is

4  current price gaps versus competition; correct?

5  A.    Yes.  Correct.

6  Q.    And then we see a key that talks about which competitor

7  it's referring to; right?

8  A.    Correct.

9  Q.    Okay.  And, again, I'm not going to name those in open

10  court, but you would agree with me that one of them that

11  you're tracking here is a defendant in this case; is that

12  right?

13  A.    Yes.

14  Q.    Okay.  Again, these are price looks that you do on a

15  regular basis; is that right?

16  A.    That's right, yes.

17  Q.    And then if we go on to the next page, for example, we

18  see that you're looking at produce; and then if we look at

19  other slides in this stack, just to flip through them

20  quickly, we see that in this stack you are tracking various

21  product segments against one of the defendants in this case;

22  correct?

23  A.    Correct.

24  Q.    And then if we look at Bates stamp ending in -205 -- I

25  think it's page 11 -- earlier you said, you know, you look

Neal - ReD

1   at ads for other competitors; correct?

2   A.    Yes.

3   Q.    We would see on this page -- and then if you'll flip to

4   the next page, we see ads for defendants in this case that

5   Sprouts was monitoring; correct?

6   A.    Correct.

7   Q.    Sir, just one final question from me:  To your

8   knowledge, does Sprouts compete with nonfood retailers for

9   labor?

10  A.    Okay.  Let me -- nonfood --

11          MS. HOUGH:  I'm going to object here, Your Honor.

12  That's beyond the scope of Mr. Neal's testimony.

13          THE COURT:  Sustained.

14          MS. STEWART:  Okay.  That's fine.  I don't have

15  any further questions, Your Honor.

16          THE COURT:  Any redirect?

17          MS. HOUGH:  May I redirect?

18          THE COURT:  I just asked you did you have

19  redirect.

20          MS. HOUGH:  Thank you.

21

22                  REDIRECT EXAMINATION

23  BY MS. HOUGH:

24  Q.   Mr. Neal, is Sprouts moving towards a smaller store

25  format?

Neal - ReD

1  A.    Yes.

2  Q.    Could you explain what that means?

3  A.    We've traditionally operated boxes between 30- and

4  32,000 square feet.  We have a new design that we're rolling

5  out in our stores that are 23,000 square feet.  It's to make

6  the box smaller and more efficient.

7  Q.    And the photos that Ms. Stewart showed you previously,

8  did those reflect Sprouts' newer, smaller format?

9  A.    No.  Those were the older format.

10  Q.    I'd like to ask you about the document marked

11  DX02227 -- I'm sorry -- DX0227.

12          MS. HOUGH:  And for efficiency's sake,

13  Mr. Simmons, could I ask you to please display that?  Not to

14  the public, but as you had displayed it previously.

15      Thank you.

16  BY MS. HOUGH: (Continuing):

17  Q.    If we look at the page marked 000001, do you see at the

18  top it says -- there's a segment Experience Seekers?

19  A.    Yes.

20  Q.    Is that the selective shopper you described previously?

21  A.    Yes.

22  Q.    So do these first two columns here -- Health

23  Enthusiasts and Experience Seekers -- reflect the target

24  customers you described previously?

25  A.    Yes.

Neal - ReD

1   Q.   And if we go on to the next page, I want to revisit

2   these numbers again.

3        Are more than half of the customers that visit Sprouts

4   either health enthusiasts or selective shoppers or

5   experience seekers?

6   A.   Yes.

7   Q.   And can you give us a rough approximation of what

8   percentage of Sprouts' shoppers are health enthusiasts

9   compared to the other segments?

10  A.   Close to 40 percent.

11  Q.   I'm sorry to jump around here, but if we go back to the

12  first page, are more than half of Sprouts' shoppers not

13  shopping conventional supermarkets?

14  A.   Are more than half of customers not shopping

15  conventional?

16       Form the data that we're looking at there -- well, I'm

17  not sure if, with the data, I can tell that.

18  Q.   Ms. Stewart previously asked you about the market share

19  that Sprouts is capturing from conventional supermarkets.

20       Is it your understanding that Sprouts would be

21  capturing the sales of natural, organic, or specialty

22  products from conventional supermarkets?

23  A.   Some, yes.

24            MS. HOUGH:   I don't have any other questions.

25  Thank you very much.

Neal - ReD

1          THE COURT:  We're going to take a 15-minute break.

2          MR. LINDSAY:  Is the witness excused?

3          THE COURT:  He is.

4          MR. LINDSAY:  Thank you, Your Honor.

5                    (Recess taken.)

6          THE COURT:  I have a question about the next

7     witness.

8        Do you know how long that witness would be?

9          MS. MUSSER:  I would say, for plaintiffs, probably

10    about a half hour or less.

11         THE COURT:  All right.

12         MR. OBARO:  For defendants, about 20 minutes.

13         THE COURT:  So we're going to do direct and then

14    break for lunch.

15         MR. OBARO:  Thank you, Your Honor.

16         MR. ROTHMAN:  Good morning, Your Honor,

17    Harris Rothman for the Federal Trade Commission.

18         THE COURT:  Can you get closer to the mic?

19    Because we need to be sure we can hear you so the court

20    transcript can be accurate.

21         MR. ROTHMAN:  Of course, Your Honor.

22    Harris Rothman for the Federal Trade Commission.

23         THE COURT:  All right.

24         MR. ROTHMAN:  The FTC calls Michael Marx,

25    Your Honor.

Marx - D

```
 1              THE COURT:  All right.  Mr. Marx.

 2              DEPUTY COURTROOM CLERK:  Please raise your right

 3    hand.

 4

 5                        MICHAEL MARX,

 6    called as a witness in behalf of the Plaintiffs, being first

 7    duly sworn, is examined and testified as follows:

 8

 9              THE WITNESS:  I do.

10              DEPUTY COURTROOM CLERK:  Thank you.  Have a seat,

11    sir.

12         Please speak into the microphone and state and spell

13    your first and last for the record.

14              THE WITNESS:  Michael Marx.  M-i-c-h-a-e-l.

15    M-a-r-x.

16              MR. ROTHMAN:  Permission to approach with binders,

17    Your Honor?

18              THE COURT:  Yes.

19              THE WITNESS:  Thank you.

20

21                     DIRECT EXAMINATION

22    BY MR. ROTHMAN:

23    Q.   Good morning, sir.  We have not met.  My name is

24    Harris Rothman, and I represent the Federal Trade

25    Commission.
```

Marx - D

```
1   A.    Good morning.
2   Q.    Mr. Marx, you are an employee of the Kroger Company;
3   correct?
4   A.    Correct.
5   Q.    And how long have you worked at the Kroger Company?
6   A.    Approximately 49 years.
7   Q.    You're the president of Kroger's Roundy's Division;
8   correct?
9   A.    That's correct.
10  Q.    How long have you held that position?
11  A.    Almost nine years.
12  Q.    And could you tell us a little bit about your
13  responsibilities as division president?
14  A.    Sure.  I oversee all levels of the operation.
15  Merchandising, strategic planning, marketing, e-comm,
16  associate relations, amongst many other things.
17  Q.    And the Roundy's Division consists of three banners;
18  right?  The Pick 'n Save, Metro Markets, and Mariano's
19  banners; right?
20  A.    Correct.
21  Q.    And in the Mariano's banner, there are 44 stores;
22  right?
23  A.    That is correct.
24  Q.    And they're all in Illinois; right?
25  A.    Yes.
```

Marx - D

1   Q.   So I'm going to focus our discussion today on the state

2   of Illinois and on the Mariano's banner.

3        But first I'd like to talk a little bit about how

4   pricing works at Mariano's.

5        You use pricing analysis from Kroger to set pricing at

6   Mariano's; right?

7   A.   I use some of that, yes.

8   Q.   And two types of pricing at Mariano's are promotional

9   pricing and white tag pricing; right?

10  A.   Correct.

11  Q.   And promotional pricing refers to temporary discounted

12  pricing on an item that's intended to promote that item;

13  right?

14  A.   Correct.

15  Q.   And then white tag pricing would be the price of an

16  item that's not currently on a promotion?

17  A.   That's correct.

18  Q.   You provide guidance on the setting of promotional

19  pricing at Mariano's; correct?

20  A.   I do.

21  Q.   And you have a team of analysts who are also involved

22  in setting pricing at Mariano's; right?

23  A.   Yes, they are.

24  Q.   Specifically, that would be Mike Goke, Kassandra Brown,

25  and Selina Marquez Martinez; right?

Marx - D

1   A.    Yes.

2   Q.    And those team members report up to you as the division

3   president; correct?

4   A.    That's correct.

5   Q.    And you would agree that your team members who deal

6   with pricing are very competent, wouldn't you?

7   A.    Yes.

8   Q.    I'd like to talk a little bit about Mariano's stores

9   and the features that they offer.

10        The average Mariano's store is about 60,000 square

11  feet; right?

12  A.    Yes.

13  Q.    And it has a deli counter; right?

14  A.    It does.

15  Q.    And that deli counter is staffed?

16  A.    Yes, it is.

17  Q.    That means that a customer could go up to the counter

18  and get a deli product that's sliced to their

19  specifications, like a certain weight of thinly sliced

20  turkey; right?

21  A.    Yes.

22  Q.    And you have a butcher counter too; right?

23  A.    I do.

24  Q.    That's staffed as well?

25  A.    They are, yes.

Marx - D

1   Q.   So a customer could get meat that's trimmed or cut to

2   their specifications?

3   A.   That's correct.

4   Q.   You also have a seafood counter?

5   A.   Yes, I do.

6   Q.   And it's staffed?

7   A.   It is.

8   Q.   So a customer could get a certain weight of salmon

9   fillet; right?

10  A.   Yes, they could.

11  Q.   Mariano's stores also have bakeries; right?

12  A.   Yes, we do.

13  Q.   And they're staffed?

14  A.   Yes, they are.

15  Q.   So a customer can get a custom decorated cake at that

16  bakery; right?

17  A.   They can, yes.

18  Q.   And your stores have a Starbucks; right?

19  A.   Some stores, yes.

20  Q.   Also, about 36, or so, of your stores have an in-store

21  pharmacy; is that right?

22  A.   That's correct.

23  Q.   So customers, while they shop, can get their

24  prescriptions filled?

25  A.   Yes, they can.

Marx - D

1    Q.    And your stores have a floral department; right?

2    A.    Yes.

3    Q.    And most of the time that's staffed?

4    A.    Yes.

5    Q.    So customers can get a custom floral arrangement there?

6    A.    They can, yes.

7    Q.    I have some questions now about the variety of products

8    that Mariano's carries.

9          Mariano's stores offer a wide selection of groceries;

10   right?

11   A.    Yes.  I'd say so.

12   Q.    And, for example, you carry about a dozen varieties, or

13   so, of apples; right?

14   A.    That's probably true, yes.

15   Q.    And for most types of products that Mariano's carries,

16   you offer options at multiple price points; right?

17   A.    Typically, yes.

18   Q.    And the reason you do that is to offer your customers

19   options?

20   A.    Correct.

21   Q.    You're familiar with the term "national brands"; right?

22   A.    I am.

23   Q.    National brand products are products that are carried

24   across the country in multiple retailers.  They are not

25   specific to one retailer; right?

Marx - D

1   A.   That's correct.

2   Q.   And Mariano's stores typically offer more than one

3   national brand for the products that they sell; right?

4   A.   Generally, yes.

5   Q.   Mariano's also sells private label products; right?

6   A.   We do.

7   Q.   And offering a variety of national brand and private

8   label products is another way that you offer your customers

9   choices; right?

10  A.   That is correct.

11  Q.   Mariano's carries most products in different pack

12  sizes; right?

13  A.   Yes.

14  Q.   And that's another way that you offer your customers

15  choices?

16  A.   Yes.

17  Q.   In your experience, customers value having options;

18  right?

19  A.   We believe so, yes.

20  Q.   I have some questions now about functions that

21  Mariano's relies on for Kroger today.

22       To begin with -- and I realize this is a bit of an

23  obvious question, given that demonstrative -- Mariano's is a

24  Kroger banner; right?

25  A.   We are.

Marx - D

1   Q.   But Mariano's is not a separate company; right?

2   A.   We are not.

3   Q.   You'd agree that to operate, Mariano's relies on

4   Kroger's support; right?

5   A.   Yes.

6   Q.   For example, Mariano's relies on data analytics; right?

7   A.   We do.

8   Q.   And those are provided by the Kroger Company's data

9   analytics arm?

10  A.   That's correct.

11  Q.   And that's called 8451; right?

12  A.   That's true.

13  Q.   And the data that 8451 provides is called -- the data

14  includes pricing analytics; right?

15  A.   Yes.

16  Q.   Mariano's also uses Kroger's loyalty program; is that

17  right?

18  A.   That's correct.

19  Q.   So you don't have a loyalty program that's housed

20  within the banner or within the Roundy's Division; right?

21  A.   No.

22  Q.   Mariano's relies on Kroger to negotiate supply

23  agreements with national brand manufacturers; right?

24  A.   We do.

25  Q.   And also with private label manufacturers; right?

Marx - D

1    A.    Yes.

2    Q.    I'd like to talk now about your competition.  You're

3    familiar with Jewel-Osco; right?

4    A.    I am.

5    Q.    Jewel-Osco is an Alberstons banner; right?

6    A.    That is correct.

7    Q.    And they're sometimes called "Jewel" for short?

8    A.    Yes.

9    Q.    I'll use that shorthand as well today.

10         Jewel has stores in Illinois; right?

11   A.    They do.

12   Q.    In fact, Jewel has a lot of stores that are around

13   where Mariano's stores are, don't they?

14   A.    Yes, they do.

15   Q.    And Jewel is a competitor to Mariano's; right?

16   A.    Yes.

17   Q.    I have some questions about pricing competition.  I

18   know we spoke a little bit earlier about two types of

19   pricing:  Promotional and white tag.  I'm going to start

20   with the promotional pricing.

21         Mariano's monitors Jewel's promotional pricing; right?

22   A.    Yes.

23   Q.    And one way that you do that is by sending employees

24   into Jewel stores and looking at the promotional pricing in

25   those stores; right?

Marx - D

1   A.    One way, yes.

2   Q.    And as division president, you yourself make visits to

3   Jewel stores; right?

4   A.    I do.

5   Q.    In fact, you visit Jewel stores a couple of times per

6   month at least; right?

7   A.    Typically, yes.

8   Q.    And another way that Mariano's monitors Jewel's

9   promotional pricing is by reviewing Jewel's ads and looking

10  at the promo prices in those ads; right?

11  A.    Yes.

12  Q.    And your division circulates a weekly merchandising

13  report that has a recap of a competitor's promotional

14  pricing; right?

15  A.    Yes.

16  Q.    And that recap looked separately at Illinois and

17  Wisconsin; right?

18  A.    Yes.

19  Q.    And in Illinois, Jewel's promotional prices are in the

20  recap, aren't they?

21  A.    Some of them, yes.

22  Q.    And, in fact, Mr. Marx, you've seen Illinois recaps

23  that only include Jewel's promotional prices, haven't you?

24  A.    Yes.

25  Q.    And Mariano's has changed its prices in response to

Marx - D

1  Jewel's promotional pricing, haven't they?

2  A.    We have.

3  Q.    Let's move on to discuss white tag pricing.

4        Mariano's also monitors Jewel's white tag pricing,

5  don't they?

6  A.    Yes.

7  Q.    And, for example, you monitor Jewel's white tag prices

8  on eggs; right?

9  A.    Correct.

10 Q.    Eggs are what Kroger calls an essential item; right?

11 A.    That is correct.

12 Q.    And company-wide, Kroger classifies just five items as

13 essential; right?

14 A.    Yes.

15 Q.    And eggs would be one?

16 A.    It is.

17 Q.    Milk is another?

18 A.    That's correct.

19 Q.    And sugar?

20 A.    Yes.

21 Q.    And bananas?

22 A.    Yes.

23 Q.    And, finally, iceberg lettuce; right?

24 A.    Correct.

25 Q.    And essential products like eggs are some of the most

Marx - D

1   meaningful items to consumers; right?

2   A.    Yes.

3   Q.    They're some of the most often purchased items?

4   A.    Yes, they are.

5   Q.    And your team circulates a weekly email report on egg

6   prices at your competitors', don't you?

7   A.    We do.

8   Q.    And those reports are part of your day-to-day business?

9   A.    Yes.

10  Q.    And you and your team make business decisions based on

11  those reports, don't you?

12  A.    We do.

13  Q.    Decisions about how to price your eggs; right?

14  A.    Yes.

15  Q.    And Jewel is one of the competitors that you check in

16  your weekly ad reports; right?

17  A.    They are.

18  Q.    And Mariano's competes with Jewel on egg prices; right?

19  A.    We do.

20  Q.    So let's take a look at some of those egg reports.

21       If you could open up your binder, please turn to Tab 1,

22  of PX1805.

23       Mr. Marx, you recognize this document; right?

24  A.    I do.

25  Q.    You've seen it before; right?

Marx - D

1    A.    Yes.

2    Q.    Look at the email addresses here, please.  All of these

3    people at the time of this email were Kroger personnel;

4    right?

5    A.    That's correct.

6    Q.    And if we could look back at the body of the email,

7    this is one of those egg reports we were just talking about;

8    right?

9    A.    Yes.

10   Q.    If we could turn now to PX1824 at Tab 2.  And you've

11   seen -- you've seen this document before as well, haven't

12   you, Mr. Marx?

13   A.    I have.

14   Q.    And if we could turn up to the email addresses, all the

15   people on this email, again at the time of this document,

16   were Kroger personnel?

17   A.    They are.

18   Q.    And this is another one of these egg reports?

19   A.    Yes, that's correct.

20   Q.    And, finally, I'm just going to turn to one more for

21   now.  It's Tab 3 PX1823.

22            MR. ROTHMAN:  If we can get that pulled up,

23   please.

24   BY MR. ROTHMAN: (Continuing):

25   Q.    You've seen this document before; right?

Marx - D

1   A.    I have.

2   Q.    And all of the people on this email, again, were Kroger

3   personnel at the time of the document?

4   A.    Yes, that's correct.

5   Q.    And this is another one of the egg reports; right?

6   A.    Yes, it is.

7            MR. ROTHMAN:   Your Honor, we move to admit PX1805

8   PX1824 and PX1823.

9            THE COURT:   Any objection?

10            MR. OBARO:   No objection, Your Honor.

11            THE COURT:   They will be received.

12   BY MR. ROTHMAN: (Continuing):

13   Q.    All right.   Mr. Marx, please turn back to Tab 1 and

14   look at PX1805.

15       And this is --

16            MR. ROTHMAN:   If we could look at the full

17   document, please.

18   BY MR. ROTHMAN: (Continuing):

19   Q.    This is an email from you to Mr. Goke, dated May 26,

20   2022.

21       That's Michael Goke?

22   A.    Yes, that's Michael Goke.

23   Q.    And Mr. Goke is responding to an email originally from

24   Mr. Pat Thorsen; right?

25   A.    Correct.

Marx - D

1    Q.    And Mariano's -- strike that.

2          As of May 2022, Mr. Thorsen and Mr. Goke reported to

3    you; right?

4    A.    They report to Mr. Brown, and Mr. Brown reports to me.

5    Q.    Okay.  They were ultimately under your authority as

6    head of the division; right?

7    A.    That's correct.

8    Q.    And in this document, Mariano's is comparing its egg

9    prices to three other retailers'; correct?

10   A.    Yes, we are.

11   Q.    And those three retailers are Jewel, Walmart, and

12   Meijer; right?

13   A.    Correct.

14   Q.    And Mr. Thorsen writes that eggs are going down $0.14

15   per dozen starting this upcoming Sunday.

16         Do you see that?

17   A.    I do.

18   Q.    And he's talking about the cost of procuring eggs?

19   A.    Yes.

20   Q.    And Walmart's prices are going down as well; right?  In

21   the next line?

22   A.    That's correct.

23   Q.    And Meijer's prices were also going down; right?

24   A.    Yes.

25   Q.    But Jewel's prices stayed the same, didn't they?

Marx - D

1    A.    They did.

2    Q.    And Mariano didn't change its prices either, did you?

3    A.    I don't believe so.

4    Q.    And to that, Mr. Goke replied, "Good plan."

5          Do you see that?

6              MR. ROTHMAN:  If we could have -- yes, thank you.

7              THE WITNESS:  I see that.

8    BY MR. ROTHMAN: (Continuing):

9    Q.    Just so we have a clear record, you see that Mr. Goke

10   replied to that, "Good plan"?

11   A.    Yes.

12   Q.    Mr. Marx, you approved that plan to keep Mariano's

13   price at the same price as Jewel, didn't you?

14   A.    I did.

15   Q.    I'd like to fast-forward 11 months, going to April

16   2023, and look at another example of when Mariano's prices

17   were influenced by Jewel's.

18         This will be at Tab 227, and this is PX1824.

19         PX1824 is an April 13, 2023, email from Mr. Goke to you

20   and Tony Brown; right?

21   A.    Yes, that's correct.

22   Q.    And do you see the three bolded lines above this table

23   here?

24   A.    I do.

25   Q.    In the second of those bolded lines, Mr. Goke writes,

Marx - D

1  "Jewel and Meijer's held their retails this week"; right?

2  A.   That's correct.

3  Q.   That means that Jewel and Meijer were holding their

4  retail prices steady on eggs?

5  A.   Yes.

6  Q.   He adds, "Walmart moved down."

7       That means Walmart dropped its price?

8  A.   Yes.

9  Q.   And in the line beneath that, he writes, "We will stay

10 the same"; right?

11 A.   That's correct.

12 Q.   And he notes that that's still lower than Jewel by

13 $0.50; right?

14 A.   That's correct.

15 Q.   So Mariano's wasn't changing its price.  It was holding

16 it steady; correct?

17 A.   That is correct.

18 Q.   Let's turn up to the second overall line of the email

19 where Mr. Goke writes, "We look at Jewel, Walmart, and

20 Meijer."  Do you see that?

21 A.   Yes.

22 Q.   He continues, "We focus against Jewel but look at

23 Walmart and Meijer to make sure we aren't out of bounds in

24 the market"; correct?

25 A.   That is correct.

Marx - D

1   Q.   So on egg pricing, Mariano's looks at Jewel, Walmart,

2   and Meijer; correct?

3   A.   Correct.

4   Q.   But Mariano's focuses against Jewel; correct?

5   A.   As part of the decision-making, yes.

6   Q.   And do you see Mariano's pricing on the 12-count and

7   the 18-count in this table?

8   A.   I do.

9   Q.   Both sizes there -- your price is more expensive than

10  the other retailers', except for Jewel; right?

11  A.   That's correct.

12  Q.   Let's fast-forward another three weeks to May 2023.

13       And this will be at Tab 3.  It's PX1823.

14       And let's look at the earliest email here from

15  Mr. Thorsen.  The email header is at the bottom of page 1,

16  but the body of the email is all on page 2.

17       Mr. Thorsen reports that egg costs are going down $0.32

18  on Sunday.

19       Do you see that?

20  A.   I do.

21  Q.   And he adds, "Jewel got very aggressive this week";

22  right?

23  A.   Yes.

24  Q.   And he describes a number of pricing cuts by Jewel;

25  right?

Marx - D

1   A.    That's correct.

2   Q.    Look towards the end of the third line and onto the

3   fourth.    Mr. Thorsen says, "Jewel has lowered its white tag

4   price on the 18-count to $4.29"; right?

5   A.    Yes.

6   Q.    He writes that "They've lowered their white tag to

7   $4.29 to beat our $4.49"; correct?

8   A.    That is correct.

9   Q.    Let's turn to page 1 and look at Mr. Goke's response to

10  this.

11        Mr. Goke writes, "Let's move our white tag on the

12  18-count to $4.29."

13        Do you see that?

14  A.    I do.

15  Q.    $4.29.    That's the price that Jewel was at; right?

16  A.    That's correct.

17  Q.    And Mr. Goke said to lower the white tag, but he also

18  said, "Please match Jewel on the TPRs on the 12-count and

19  18-count"; right?

20  A.    Correct.

21  Q.    And "TPR" is short for "temporary price reduction"?

22  A.    Yes, it is.

23  Q.    That's not a white tag price; right?    That's a form of

24  promotional pricing?

25  A.    Correct.

Marx - D

1  Q.   And Mr. Thorsen said, "Will do"; right?

2  A.   Yes.

3  Q.   And you -- Mr. Marx, you approved that plan, didn't

4  you?

5  A.   I did.

6        MR. ROTHMAN:  Your Honor, I have no further

7  questions at this time.

8        THE COURT:  All right.  You can step down.  We're

9  going to take a break, and we'll come back at 1:00.

10     Court is adjourned.

11          (Morning session concluded at 12:06 PM.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3         Federal Trade Commission v. Kroger, et al.

4                    3:24-cv-00347-AN

5         Preliminary Injunction Hearing - Day 2 - AM Session

6                      August 27, 2024

7

8         I certify, by signing below, that the foregoing is

9    a true and correct transcript of the record, taken by

10   stenographic means, of the proceedings in the above-entitled

11   cause.  A transcript without an original signature,

12   conformed signature, or digitally signed signature is not

13   certified.

14

15   /s/Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
     _____
16
     Official Court Reporter         Signature Date: 8/27/2024
17   Oregon CSR No. 98-0346          CSR Expiration Date: 9/30/2026

18

19

20

21

22

23

24

25