Cheryl F. Hiemstra, OSB #133857
Chris Kayser, OSB #984244
Tim D. Nord, OSB #882800
Special Assistants Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel: (503) 934-4400
Facsimile: (503) 378-5017
Cheryl.Hiemstra@doj.oregon.gov
Tim.D.Nord@doj.oregon.gov
cjkayser@lvklaw.com

*Attorneys for Plaintiff State of Oregon*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

# PORTLAND DIVISION

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, STATE OF ARIZONA, STATE OF CALIFORNIA, DISTRICT OF COLUMBIA, STATE OF ILLINOIS, STATE OF MARYLAND, STATE OF NEVADA, STATE OF NEW MEXICO, STATE OF OREGON, and STATE OF WYOMING, <br><br> Plaintiffs, <br> v. <br><br> THE KROGER COMPANY and ALBERTSONS COMPANIES, INC., <br><br> Defendants. | Case No. 3:24-cv-00347 <br><br> **PLAINTIFF STATES' MOTION FOR AWARD OF ATTORNEY'S FEES AND COSTS** |

## TABLE OF CONTENTS

CERTIFICATION OF CONFERRAL...........................................................................1

MOTION..................................................................................................................1

MEMORANDUM OF LAW ......................................................................................2

   I.     INTRODUCTION ...........................................................................2

   II.    BACKGROUND ..............................................................................3

      A.   The States conduct an extensive investigation of the proposed merger. .......3

      B.   The Plaintiff States and the FTC file suit to block the merger. ....................4

         1.   Defendants contend that a robust preliminary injunction hearing would be dispositive............................................................................5

         2.   The Court grants the preliminary injunction following a three-week evidentiary hearing and based on a comprehensive record...............................6

   III.    ARGUMENT .................................................................................8

      A.   The Plaintiff States substantially prevailed in this action. ...........................8

      B.   Section 16 of the Clayton Act mandates fees to the States. .........................15

   IV.    CONCLUSION ............................................................................23

## TABLE OF AUTHORITIES

**Cases**

*ADT Security Services, Inc. v. Lisle Woodridge Fire Protection District*,
86 F. Supp. 3d 857 (N.D. Ill. 2015) ...................................................................17, 18

*Albertsons Co., Inc. v. Kroger Co.*,
C.A. No. 2024-1276 (Dec. 14, 2024 Del. Ch. Ct.)......................................................8

*Atlantic Cleaners & Dyers, Inc. v. United States*,
286 U.S. 427 (1932) ...................................................................................................12

*BedRoc Ltd. v. United States*,
541 U.S. 176 (2004) ...................................................................................................16

*Boardman v. Pacific Seafood Group*,
822 F.3d 1011 (9th Cir. 2016) ...................................................................................22

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ...................................................................................................19

*Buckhannon Board & Care Home v. West Virginia Department of Health and Human
Resources*,
532 U.S. 598 (2001) ...................................................................................................13

*California v. American Stores Co.*,
495 U.S. 271 (1990) ...................................................................................................22

*Cann v. Carpenters' Pension Trust Fund*,
989 F.2d 313 (9th Cir.1993) ......................................................................................16

*Carreras v. City of Anaheim*,
768 F.2d 1039 (9th Cir. 1985) ..............................................................................18, 21

*Connell v. Lima Corp.*,
988 F.3d 1089 (9th Cir. 2021) ...................................................................................16

*Costco Wholesale Corp. v. Hoen*,
538 F.3d 1128 (9th Cir. 2008) ...................................................................................20

*CRST Van Expedited, Inc. v. EEOC*,
578 U.S. 419 (2016)....................................................................................................14

*Davidson v. Deschutes County*,
No. 6:15-cv-00052, 2015 WL 13730888 (D. Or. Oct. 8, 2015) ...............................18

*Doe v. Fitzgerald*,
102 F.4th 1089 (9th Cir. 2024) ............................................................................16, 17

*FTC v. Penn State Hershey Medical Center*,
914 F.3d 193 (3d Cir. 2019)..............................................................................15, 19, 21

*FTC v. Staples, Inc.*,
239 F. Supp. 3d 1 (D.D.C. 2017) ................................................................15, 21, 23

*FTC v. Warner Communications Inc.*,
742 F.2d 1156 (9th Cir. 1984) ................................................................19

*Gross v. FBL Financial Services Inc.*,
557 U.S. 167 (2009) ................................................................10

*Hardt v. Reliance Standard Life Insurance Co.*,
560 U.S. 242, (2010) ................................................................10

*Hawaii v. Standard Oil Co.*,
405 U.S. 251 (1972) ................................................................20

*Illinois v. Sangamo Construction Co.*,
657 F.2d 855 (7th Cir. 1981) ................................................................20, 21

*Kroger Co. v. FTC*,
Civ. Action No. 1:24-cv-00438 (S.D. Ohio Aug. 19, 2024) ................................5

*Lackey v. Stinnie*,
604 U.S. __, 2025 WL 594737 (Feb. 25, 2025) ................................ passim

*Lamie v. United States Trustee*,
540 U.S. 526 (2004) ................................................................16

*Loughrin v. United States*,
573 U.S. 351 (2014) ................................................................9, 12

*Lowe v. SEC*,
472 U.S. 181 (1983) ................................................................11

*Miller v. City of Fort Myers*,
No. 2:18-cv-195, 2020 WL 5802424 (M.D. Fla. Aug. 31, 2020) ................................14

*Miller v. Hedlund*,
CIV. No. 78-259, 1989 WL 131274 (D. Or. Oct. 12, 1989) ................................10

*Naturaland Trust v. Dakota Finance LLC*,
41 F.4th 342 (4th Cir. 2022) ................................................................16

*O'Bannon v. National Collegiate Athletic Ass'n*,
739 F. App'x 890 (9th Cir. 2018) ................................................................10

*Ohio Valley Environmental Coal, Inc. v. Wheeler*,
387 F. Supp. 3d 654 (S.D. W. Va. 2019) ................................................................11

*Perez-Arellano v. Smith*,
279 F.3d 791 (9th Cir. 2002) ................................................................12

*Perrin v. United States*,
444 U.S. 37 (1979) ................................................................16

*Peterson v. Continental Casualty Co.*,
   282 F.3d 112 (2d Cir. 2002) ................................................................16

*Pierce v. Underwood*,
   487 U.S. 552 (1988) ..........................................................................11

*Resolution Trust Corp. v. Love*,
   36 F.3d 972 (10th Cir. 1994) .............................................................16

*Ruckelshaus v. Sierra Club*,
   463 U.S. 680 (1983) ..........................................................................10

*Russello v. United States*,
   464 U.S. 16, 23 (1983) .........................................................................9

*Scott v. Vantage Corp.*,
   64 F.4th 462 (3d Cir. 2023) ...............................................................11

*Southwest Marine, Inc. v. Campbell Industries*,
   732 F.2d 744 (9th Cir. 1984) ...............................................9, 14, 20

*TLI, Inc. v. United States*,
   100 F.3d 424 (5th Cir. 1996) .............................................................16

*United States v. Bertelsmann SE & Co.*,
   646 F. Supp. 3d 1 (D.D.C. 2022) ......................................................19

*United States v. Ivaco, Inc.*,
   704 F. Supp. 1409 (W.D. Mich. 1989) .............................................19

*United States v. Siemens Corp.*,
   621 F.2d 49 (2d Cir. 1980) .................................................................22

*United States v. Tribune Publishing Co.*,
   Case No. CV 16-01822, 2016 WL 2989488 (C.D. Cal. Mar. 18, 2016) ................22

*University of Texas v. Camenisch*,
   451 U.S. 390 (1981 ...........................................................................12

*Williams v. Taylor*,
   529 U.S. 362 (2000) ..........................................................................12

**Statutes**

15 U.S.C. § 18 ............................................................................................4

15 U.S.C. § 26 ................................................................................... passim

18 U.S.C. § 1595 ....................................................................................17

33 U.S.C.S. § 1365 .................................................................................11

5 U.S.C. § 552 ......................................................................................2, 9

Civil Rights Attorney's Fees Awards Act,
   Pub. L. No. 94–559 (Oct. 19, 1976) ..................................................10

Hart-Scott-Rodino Antitrust Improvements Act,
Pub. L. No. 94-435 (Sept. 30, 1976) ..........................................................10

**Other Authorities**

Black's Law Dictionary (4th ed. 1968)..........................................................13

Black's Law Dictionary (5th ed.1983)...........................................................16

Black's Law Dictionary (6th ed. 1990)....................................................11, 16

Black's Law Dictionary (8th ed. 2004)....................................................16, 18

Henry Campbell Black,
A Dictionary of Law (1891)....................................................................18

House Report 94-499(I) (1975)................................................................14, 20

Merriam-Webster's Collegiate Dictionary (11th ed. 2003)...........................16

SEC Form 8-K,
The Kroger Co. (Dec. 11, 2024) ..............................................................8

Senate Report No. 100-144, Vol. 2 at 1454 ..................................................11

Statements of Introduced Bills and Joint Resolutions,
145 Cong. Rec. 28422 (1999) .................................................................21

**CERTIFICATION OF CONFERRAL**

In compliance with LR 7-1, counsel for Plaintiff States made a good faith effort to confer with defense counsel regarding the issues in this motion. Plaintiff States and Defendants have not reached any accord on an award of attorney's fees to Plaintiff States but, consistent with this Court's February 25, 2025 order, agreed to brief the issue of Plaintiff States' entitlement to fees separately.

**MOTION**

Pursuant to Fed. R. Civ. P. 6(b)(1) and 54(d), LR 54, and this Court's February 25, 2025 Order, ECF No. 562, Plaintiffs, the states of Arizona, California, Illinois, Maryland, Nevada, New Mexico, Oregon, and Wyoming and the District of Columbia (collectively, the "Plaintiff States" or the "States"), move this Court for an Order awarding attorney's fees and reimbursement of litigation expenses under Section 16 of the Clayton Act. 15 U.S.C. § 26. Section 16 mandates the payment of attorney's fees and costs in any action "in which the plaintiff substantially prevails." *Id*. Here, the Plaintiff States "substantially prevailed," securing a preliminary injunction, along with Co-Plaintiff the Federal Trade Commission ("FTC"), that put an end to the proposed merger of the two largest supermarkets in the United States, Kroger and Albertsons. Should the Court find that the Plaintiff States are entitled to an award of attorney's fees and costs, the States will file a petition, along with supporting materials, thirty days after entry of the Court's order. Order, ECF No. 562.

## MEMORANDUM OF LAW

### I.  INTRODUCTION

After conducting a year-long investigation that required interviewing countless witnesses, reviewing documents, and consulting with and retaining experts, the States and the FTC sued to enjoin a threatened violation of Section 7 of the Clayton Act. Though the Plaintiff States' statutory authority to bring the suit is different than the FTC's, the remedy sought was the same, an injunction preventing the merger that violated Section 7 of the Clayton Act. The States contributed at each stage of the litigation, reviewing thousands of pages of documents produced by Defendants and third parties, taking 15 depositions (and assisting on many more), drafting and editing filings, preparing and serving subpoenas, fully briefing a motion in limine, examining two witnesses at trial, and preparing for a third. The Plaintiff States weighed in on all major strategic decisions, which ultimately led to a successful outcome.

For actions brought under Section 16, the Clayton Act provides an award of attorney's fees and costs in any action in which the plaintiff "substantially prevails." Just last week, the Supreme Court recognized that statutory fee-shifting provisions for a plaintiff who "substantially prevails" impose a lower burden than those that require a plaintiff to "prevail." For example, in FOIA suits, "Congress authorized courts to assess attorney's fees when a complainant has 'substantially prevailed,' even if through 'a voluntary or unilateral change in position by the [defendant].'" *Lackey v. Stinnie*, 604 U.S. __, 2025 WL 594737, at *7 (Feb. 25, 2025) (quoting 5 U.S.C. § 552(a)(4)(E)),

APP-156.[1] Here, the States have done just that. Their objective—to block the largest supermarket merger ever—has been achieved. As Kroger's counsel asserted before the hearing, "[i]f the government wins [the preliminary injunction], the merger dies." Ex. 1 at 5 (Mar. 11, 2024 Tr. 16:15). That turned out to be true. The day after this Court granted the preliminary injunction, Kroger and Albertsons abandoned the merger. Section 16 now mandates the payment of reasonable attorney's fees and costs.

## II. BACKGROUND

### A. The States conduct an extensive investigation of the proposed merger.

On October 14, 2022, Kroger and Albertsons—two of the largest traditional supermarket chains in the United States—announced they had agreed to merge. If consummated, the $24.6 billion merger would have been the largest supermarket merger in U.S. history.

Shortly after the merger announcement, a group of interested states pooled resources to investigate the merger and evaluate Defendants' proposed remedies. Where Kroger and Albertsons banners overlapped, both the increased concentration of supermarkets from the merged entity and the competitive impacts varied greatly by state, necessitating state-by-state evaluation.

The States also conducted their own independent investigation and analysis of the merger's in-state impact for each Plaintiff State's particular residents and competitive landscape. The States established their own database to review and analyze over 19 million documents that were produced by the Defendants and other third

---

[1] For the convenience of the Court, unpublished cases and secondary materials are included as an appendix to this motion.

**PLAINTIFF STATES' MOTION FOR AWARD OF ATTORNEY'S FEES AND COSTS**    Page 3

parties. Declaration of Tim Nord ("Nord Decl.") at 3 ¶¶ 7, 9. During the investigation, the States also issued their own investigative demands to the Defendants and other third parties, interviewed witnesses in the industry, attended FTC investigative hearings, conducted outreach to consumers, and conducted market research. *Id.* ¶ 7. Some States hired their own economic experts to analyze the relevant markets and state-specific competitive effects of the merger. *Id*. ¶ 10.

**B. The Plaintiff States and the FTC file suit to block the merger.**

On February 26, 2024, the FTC commenced an administrative proceeding and scheduled a full trial on the antitrust merits of the merger for July 31, 2024. On the same day, the States and the FTC filed a complaint praying for a Temporary Restraining Order and Injunctive Relief in order to halt the proposed acquisition pending FTC administrative adjudication pursuant to Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 16 of the Clayton Act, 15 U.S.C. § 26. They also sought an award of costs in this action, including attorney's fees, to the States.

During the litigation, the States and the FTC engaged in extensive discovery. They analyzed documents from databases hosting 28,988,497 documents. Nord Decl. ¶ 13. They conducted 112 depositions, including multiple expert depositions. *Id.* Collectively, they issued 109 subpoenas. *Id.* The States significantly contributed to each phase of the litigation, including document review and analysis, depositions, and issuing and enforcing subpoenas.

### 1. Defendants contend that a robust preliminary injunction hearing would be dispositive.

Ordinarily, a preliminary injunction proceeding is conducted on an expedited basis to preserve the status quo pending the outcome of a full hearing on the merits. But that is not what the Defendants wanted. During the March 11, 2024 scheduling hearing, the Court offered to hold the preliminary injunction hearing in May of 2024—the only available dates prior to the July administrative hearing on the merits. The States and the FTC were prepared to move forward with the proposed May dates because "it avoids having to step on top of the administrative proceeding [scheduled for July]." Ex. 1 at 9 (Mar. 11, 2024 Tr. 32:19–20). The Defendants, however, argued that a May hearing was "just really not enough time." *Id.* at 8 (Mar. 11, 2024 Tr. 30:3–10). According to the Defendants, "the preliminary injunction decision is dispositive. It is the whole ballgame …. If the government wins, the merger dies." *Id.* at 5 (Mar. 11, 2024 Tr. 16:12–15). The Defendants wanted something more akin to a merits hearing.[2]

In setting the date for the preliminary injunction hearing to begin on August 26, the Court noted "that the decision made around the preliminary … injunction is the decision that will be the one that has the most weight in all these proceedings." *Id.* at 6, 7 (Mar. 11, 2024 Tr. 24:20–23, 29:22–25). Later, in its opening statement, Kroger again emphasized its view that the outcome of the hearing would be dispositive: "This

---

[2] Indeed, the Defendants were so averse to an administrative hearing on the merits that Kroger filed an action in the U.S. District Court for the District of Ohio seeking to establish that the administrative hearing was unconstitutional. Compl. for Declaratory and Inj. Relief, *Kroger Co. v. FTC*, Civ. Action No. 1:24-cv-00438 (S.D. Ohio Aug. 19, 2024).

**PLAINTIFF STATES' MOTION FOR AWARD OF ATTORNEY'S**          Page 5
**FEES AND COSTS**

proceeding will decide the fate of the merger. … This merger will not occur if this injunction is in place." Ex. 2 at 6–7 (Aug. 26, 2024 Tr. 99:14–100:7).

### 2. The Court grants the preliminary injunction following a three-week evidentiary hearing and based on a comprehensive record.

The preliminary injunction hearing began on August 26, 2024 and continued for three weeks. There were 33 fact witnesses, 10 expert witnesses, and 217 exhibits received into evidence. Nord Decl. at 4 ¶ 15. The Court, in excluding post-trial exhibits that lacked a sponsoring witness, noted that the additional exhibits were not necessary in part because the parties had already "created a large, comprehensive record that was sufficient for the Court to render an opinion on the motion for preliminary injunction" without needing to admit any additional exhibits. Op. & Order at 9, ECF No. 521. The 71-page opinion included many significant findings on whether the merger would substantially lessen competition and consequently violate Section 7 of the Clayton Act, including:

- Plaintiffs Properly Defined the Relevant Market: "Based on the evidence presented, the Court finds that the 'supermarkets' and 'large format stores' markets, using the local geographic market delineated by Dr. Hill's focal store approach, are the relevant markets." *Id.* at 27.

- The Proposed Merger Would Lessen Competition: Plaintiffs established "that the proposed merger would presumptively lessen competition in multiple markets," *id.* at 30, and that Plaintiffs' analysis "shows that the loss of head-to-head competition will incentivize price increases in many markets." *Id.* at 36.

**PLAINTIFF STATES' MOTION FOR AWARD OF ATTORNEY'S FEES AND COSTS**    Page 6

- The Proposed Merger Was Presumptively Unlawful: "On balance, the Court finds that both qualitative and quantitative evidence shows that defendants engage in substantial head-to-head competition and the proposed merger would remove that competition." *Id.*

- Defendants Failed to Rebut Plaintiffs' Prima Facie Case: "Defendants' rebuttal evidence is not sufficient to overcome plaintiffs' *prima facie* case." *Id.* at 55.

- Defendants' Own Expert Concluded the Merger Was Presumptively Unlawful in Several Markets: "Looking at plaintiffs' large format stores market, [Defendants' expert] Dr. Israel found twenty-two were presumptively unlawful under the 2010 Merger Guidelines, while 231 were presumptively unlawful under the 2023 Merger Guidelines. This evidence, on its own, is sufficient to find that the divestiture will not mitigate the merger's anticompetitive effect such that it is no longer likely to substantially lessen competition." *Id.* at 47.

Not surprisingly, the day after the Court issued these findings, the Defendants abandoned the merger. The writing was on the wall: The merger violated Section 7 of the Clayton Act.[3]

---

[3] In public filings, Kroger and Albertsons each acknowledged that its termination of the merger was linked to this Court's preliminary injunction decision:

### III. ARGUMENT

The States brought this action under Section 16 of the Clayton Act seeking "injunctive relief … against threatened loss or damage by a violation of the antitrust laws." Under Section 16, attorney's fees and costs are mandatory when a plaintiff "substantially prevails." 15 U.S.C. § 26 ("In any action under this section in which the plaintiff substantially prevails, the court *shall* award the cost of suit, including a reasonable attorney's fee, to such plaintiff." (emphasis added)). The States substantially prevailed when they established the threat to competition and obtained the injunctive relief they sought and, subsequently, when Defendants abandoned their anticompetitive merger. As a result, the Clayton Act requires the Court to award reasonable attorney's fees.

### A. **The Plaintiff States substantially prevailed in this action.**

Last week, the Supreme Court clarified the difference between statutory fee awards that require the plaintiff to "prevail" from those that only require a plaintiff to "substantially prevail." *Lackey*, 2025 WL 594737, at *7, APP-156. *Lackey* addressed a materially different fee-shifting statute: Section 1988, which authorizes courts to grant

---

- "On December 10, 2024, the District of Oregon granted the FTC's motion for a preliminary injunction, dooming the transaction." Compl. (Redacted Public Version), at 22 ¶ 40, *Albertsons Co., Inc. v. Kroger Co.*, C.A. No. 2024-1276 (Dec. 14, 2024 Del. Ch. Ct.), APP-22.

- "The Company's termination of the Merger Agreement followed the December 10, 2024 decision of United States District Court for the District of Oregon in the case Federal Trade Commission et al. v. The Kroger Company and Albertsons Companies, Inc. (Case No.: 3:24-cv-00347-AN), whereby the court issued a preliminary injunction enjoining the consummation of the Merger." SEC Form 8-K, at 2, The Kroger Co. (Dec. 11, 2024), APP-207.

fees to a "prevailing party" in actions that involve claims under Section 1983 and other federal civil rights statutes. *Id.* at *2, APP-152. The Court held that, in that context, success on a preliminary injunction does not, on its own, give the moving party "prevailing" status. *Id.* at *5, APP-155. In reaching that conclusion, the Court expressly distinguished statutes that use language like the relevant text of the Clayton Act.

*Lackey* pointed to the Freedom of Information Act's fee-shifting provision, which—just like the Clayton Act provision at issue here—authorizes "courts to assess attorney's fees when a complainant has 'substantially prevailed,' even if through 'a voluntary or unilateral change in position by the agency.'" *Id.* at *7 (quoting 5 U.S.C. § 552(a)(4)(E)), APP-156.[4] In the Court's view, language of that nature "empower[s] courts to award attorney's fees to plaintiffs who have enjoyed *some* success but have not prevailed in a judgment on the merits," such as success in obtaining a preliminary injunction. *Id.* (emphasis added). That analysis equally applies here, because Congress used the same "substantially prevails" language. *See id.*; *Loughrin v. United States*, 573 U.S. 351, 358 (2014) ("[W]hen 'Congress includes particular language in one section of a statute but omits it in another' … this Court 'presume[s]' that Congress intended a difference in meaning." (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). In fact, the same Congress that added the "substantially prevails" language to the Clayton

---

[4] Prior to *Lackey*, the Ninth Circuit had ruled that Section 1988 fee awards applied the same standard as Clayton Act fee awards despite the difference in language. *Sw. Marine, Inc. v. Campbell Inds.*, 732 F.2d 744, 746–47 (9th Cir. 1984). In light of *Lackey*'s holding, which places a higher bar on fee awards than the "substantially prevailing" party statutes like the Clayton Act, the Ninth Circuit's contrary cases are no longer good law. *Southwest Marine* also predated *Hardt v. Reliance Standard Life Insurance Co*., which also recognized the many different fee-shifting formulations which apply distinct standards for fee awards. 560 U.S. 242, 253 (2010).

**PLAINTIFF STATES' MOTION FOR AWARD OF ATTORNEY'S FEES AND COSTS**     Page 9

Act enacted Section 1988(b)'s "prevailing party" language in the same year, distinguishing the two terms further. *Compare* Hart-Scott-Rodino Antitrust Improvements Act, Pub. L. No. 94-435 (Sept. 30, 1976), *with* Civil Rights Att'y's Fees Awards Act, Pub. L. No. 94–559 (Oct. 19, 1976).

Similarly, in *Ruckelshaus v. Sierra Club*, the Court recognized these distinctions, explaining that "statutes contain varying standards as to the precise degree of success necessary for an award of fees—such as whether the fee claimant was the 'prevailing party,' the 'substantially prevailing' party, or 'successful'[.]" 463 U.S. 680, 684 (1983). Indeed, the Supreme Court has repeatedly "caution[ed] courts 'conducting statutory interpretation … not to apply rules applicable under one statute to a different statute without careful and critical examination'"—including with respect to applying "prevailing party" jurisprudence to statutes that omit that language. *Hardt v. Reliance Std. Life Ins. Co.*, 560 U.S. 242, 253–54 (2010) (quoting *Gross v. FBL Fin. Servs. Inc.*, 557 U.S. 167, 174 (2009)). Under Section 16 of the Clayton Act, a "plaintiff 'substantially prevails' … by achieving injunctive relief." *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 739 F. App'x 890, 893 (9th Cir. 2018) (quoting 15 U.S.C. § 26); *Miller v. Hedlund*, CIV. No. 78-259, 1989 WL 131274, at *2 (D. Or. Oct. 12, 1989) ("Section 16 of the Clayton Act provides that plaintiffs are entitled to collect fees and costs in an action in which they have substantially prevailed in receiving injunctive relief for a violation of the antitrust laws."), APP-174.

Congress's amendment of the Clean Water Act ("CWA") is instructive here. In 1987, Congress amended the attorney's fees provision of the CWA from the discretionary term "whenever appropriate" to "any prevailing or substantially

prevailing party." 33 U.S.C.S. § 1365; *Ohio Valley Envt'l Coal, Inc. v. Wheeler*, 387 F. Supp. 3d 654, 660 & n.5 (S.D. W. Va. 2019). In doing so, "the Senate Report accompanying the 1987 CWA amendments explained the addition of 'prevailing or substantially prevailing' to the CWA fee-shifting provision is 'not intended to preclude the awarding of costs to a partially prevailing party with respect to the issues on which that party has prevailed, if such an award is deemed appropriate by the court.'" *Id.* at 660 n.5 (quoting S. Rep. No. 100-144, Vol. 2 at 1454). Accordingly, Congress has shown that the word "substantially" has a distinct meaning that is intended to allow for partially prevailing parties to obtain fees. *Lowe v. SEC*, 472 U.S. 181, 207 n.53 (1983) ("[W]e must give effect to every word that Congress used in the statute.").

That Congress intended to impose a lower burden for a fee award on a Clayton Act plaintiff who "substantially" prevails adheres to the Black's Law Dictionary definition of "'substantially' as '[e]ssentially, without material qualification, in the main, in substance, or materially.'" *Scott v. Vantage Corp*., 64 F.4th 462, 475 (3d Cir. 2023) (simplified) (quoting *Substantial*, Black's Law Dictionary 1428–29 (6th ed. 1990)). Indeed, the Supreme Court has defined "substantially justified" as "not 'justified to a high degree,' but rather 'justified in substance or in the main'—that is, justified to a degree that could satisfy a reasonable person." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Thus, Congressional enactments and Supreme Court precedents illustrate that, as in this case, a Clayton Act plaintiff who establishes that a merger's likely effect "may be substantially to lessen competition"—and therefore violate the Clayton Act—"substantially prevails" for purposes of an award of fees, particularly when the merging parties' response is to abandon the merger the very next day. A

**PLAINTIFF STATES' MOTION FOR AWARD OF ATTORNEY'S**    Page 11
**FEES AND COSTS**

different result would contradict the very reasoning of *Lackey,* ignore Congress's intentional use of specific and distinct language, and render the word "substantially" meaningless—violating the "'cardinal principle' of interpretation that courts 'must give effect, if possible, to every clause and word of a statute.'" *Loughrin*, 573 U.S. at 358 (quoting *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (O'Connor, J., concurring)).[5]

The *Lackey* Court's reasoning limits its application to Section 1988—or at least excludes the Clayton Act from its ambit. The Court reasoned that a plaintiff who obtains a preliminary injunction in a civil rights case should not be deemed to have "prevailed" because preliminary injunctions in those proceedings are "customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Lackey*, 2025 WL 594737, at *4 (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)), APP-154. But here, and as is commonly the case in antitrust preliminary injunction proceedings, this Court held a three-week evidentiary hearing with 33 fact witnesses, 10 expert witnesses, and procedures akin to a full-blown trial— far more than a typical preliminary injunction hearing under other statutes. In fact, in the companion case in Washington, a full-scale trial on the merits seeking a permanent injunction was held. That trial lasted for 16 days did not differ substantively or procedurally from the 15-day preliminary injunction proceeding in this Court. Nord Decl. at 4 ¶ 16.

---

[5] Even if the language were the same, the "purpose, history, and overall design or context of" the Clayton Act manifests a "different intention of Congress" sufficient to avoid application of the "prevailing party" jurisprudence. *Perez-Arellano v. Smith*, 279 F.3d 791, 794 (9th Cir. 2002) (citing *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932)), *as amended*, Feb. 21, 2002.

*Lackey* also reasoned that the plaintiffs could not be prevailing parties because they "achieved only temporary success at an intermediary 'stage[ ] of the suit'" and "[i]t cannot yet be said that [the plaintiff] will 'ultimately prevail[ ] when the matter is finally set at rest[.]'" 2025 WL 594737, at *5 (quoting *Prevailing Party*, Black's Law Dictionary 1352 (4th ed. 1968)), APP-155. By contrast, here, the Court's preliminary injunction ruling went beyond achieving temporary success. The Court found that even Defendants' own expert "found twenty-two [markets] were presumptively unlawful under the 2010 Merger Guidelines, while 231 were presumptively unlawful under the 2023 Merger Guidelines." Op. & Order at 47, ECF No. 521. And because "[t]his evidence, on its own, is sufficient to find that the divestiture will not mitigate the merger's anticompetitive effect such that it is no longer likely to substantially lessen competition," there was little left to determine in a full-scale hearing on the merits.[6] *Id.* The merger violates the Clayton Act, leaving the Defendants with no option other than to abandon the merger altogether and give the States the exact relief they sought from the beginning.

Here, the States substantially prevailed. They obtained a preliminary injunction that is still in effect and prevents the Defendants from consummating their merger until

---

[6] A merger challenge differs from a civil rights action in other key ways as well. The *Lackey* Court noted that in the 1988 context, plaintiffs typically have damages claims not susceptible to mooting and "voluntary cessation of the challenged conduct does not moot an action 'unless it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" 2025 WL 594737, at *6 (quoting *Buckhannon Bd. & Care Home v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 609 (2001)), APP-156. Neither applies to a Clayton Act merger challenge. No Plaintiff sought—nor could seek—damages here. And given the costs and complexities of Hart-Scott-Rodino filing requirements for merger agreements, once the parties abandon the merger, the issue is not reasonably likely to recur.

after the conclusion of the administrative hearing—the exact relief the States sought in their Complaint. *Id.* at 1, 8, 71; *see also Lackey*, 2025 WL 594737, at *6 n.* (recognizing the importance of parties' "different objectives" in awarding fees (quoting *CRST Van Expedited, Inc. v. EEOC*, 578 U.S. 419, 431 (2016))), APP-165. The Court granted this preliminary injunction following a 15-day hearing delving deep into the merits of the Plaintiffs' Clayton Act claim. Op. & Order at 1, 8, 71, ECF No. 521. That Defendants chose not to proceed with the administrative hearing on the merits effectively converted the preliminary injunction (which is still in place) into permanent relief barring the merger. *See Miller v. City of Fort Myers*, No. 2:18-cv-195, 2020 WL 5802424, at *3 n.3 (M.D. Fla. Aug. 31, 2020) ("[I]n certain circumstances it may be fair to say that a party who obtained legally temporary, though practically permanent, judicial relief 'substantially prevailed.'"), *report and rec. adopted*, 2020 WL 5797694 (M.D. Fla. Sept. 29, 2020), APP-171. "The legislative history of the 1976 amendment to section 26 suggests that awards of attorney's fees are essential if private attorneys-general are to enforce the antitrust laws." *Sw. Marine, Inc. v. Campbell Indus.*, 732 F.2d 744, 746 (9th Cir. 1984) (citing H.R. Rep. 94-499(I), at *18–20 (1975), *reprinted in* 1976 U.S.C.C.A.N. 2572, 2588–90, APP-196–97), *abrogated in another part by Lackey*, 2025 WL 594737, at *6-7, APP-155–57. Thus, "[t]o permit defendants to avoid the award of attorney's fees in suits for injunctive relief by ceasing their illegal conduct would reduce the incentive to bring suit, thereby frustrating Congress's intent." *Id.* By obtaining their preliminary injunction, the States substantially prevailed.

### B. Section 16 of the Clayton Act mandates fees to the States.

That the Court applied the preliminary injunction standard under Section 13(b) is a distinction without a difference. The States brought an action under Section 16 of the Clayton Act to enjoin Defendants' proposed merger and substantially prevailed. They did so after the three-week evidentiary hearing in which the Court concluded that: (1) Plaintiffs properly defined the relevant markets; (2) Plaintiffs established that the merger would presumptively lessen competition in any of the defined markets; and (3) Defendants did not rebut the Plaintiffs prima facie case. They are, therefore, entitled to fees.

Only two cases, both out of circuit, have addressed this scenario. Both cases concluded—inconsistently with Ninth Circuit precedent—that states bringing actions under Section 16 are not entitled to attorney's fees when they join the FTC in obtaining a preliminary injunction under Section 13(b). *FTC v. Penn State Hershey Med. Ctr.*, 914 F.3d 193, 197 (3d Cir. 2019) (concluding that "to the extent that the Commonwealth can be said to have 'prevailed,' it did so under Section 13(b) of the FTC Act and not Section 16 of the Clayton Act" and denying fees); *FTC v. Staples, Inc.*, 239 F. Supp. 3d 1, 4 (D.D.C. 2017) (same).

The *Penn State Hershey* and *Staples* rulings run counter to the express statutory language of Section 16 of the Clayton Act, which requires an award of attorney's fees

to a plaintiff that "substantially prevails" in "*any action* under this section." [7] 15 U.S.C.
§ 26 (emphasis added). In the Ninth Circuit, "'action' … refers to the entire legal
proceeding," including all claims or causes of action brought in the proceeding. *Doe v.
Fitzgerald*, 102 F.4th 1089, 1101 (9th Cir. 2024) (citing *Action*, Black's Law Dictionary
31 (8th ed. 2004), and *Action*, Merriam-Webster's Collegiate Dictionary 12 (11th ed.
2003)); *see also Cann v. Carpenters' Pension Tr. Fund*, 989 F.2d 313, 316 (9th Cir.
1993) ("The word 'action' in its usual legal sense means 'a suit brought in a court; a
formal complaint within the jurisdiction of a court of law,' and 'includes all the formal
proceedings in a court of justice attendant upon the demand of a right … in such
court[.]" (quoting *Action*, Black's Law Dictionary 26 (5th ed. 1983))).[8]

  In *Fitzgerald*, for example, the Ninth Circuit addressed the scope of the stay
provision of the Trafficking Victims Protection Reauthorization Act (TVPRA), "which

---

[7] In the Ninth Circuit, a court "begin[s] with the statutory text, and end[s] there as well
if the text is unambiguous." *Connell v. Lima Corp.*, 988 F.3d 1089, 1097 (9th Cir. 2021)
(quoting *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004)). Indeed, "[w]hen the
statute's language is plain, the sole function of the courts … is to enforce it according to
its terms." *Id.* (quoting *Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004)). Thus,
"'[u]nless otherwise defined, words will be interpreted as taking their ordinary,
contemporary, common meaning' existing 'at the time Congress enacted the statute.'"
*Id.* (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)).

[8] The Ninth Circuit is not an outlier: Other courts interpret "action" identically.
*Naturaland Tr. v. Dakota Fin. LLC*, 41 F.4th 342, 348 (4th Cir. 2022) ("In the legal
context, the term 'action' typically refers to 'an entire case or suit[.]''"); *Peterson v.
Cont'l Cas. Co.*, 282 F.3d 112, 119–20 (2d Cir. 2002) (citing *Action*, Black's Law
Dictionary 28 (6th ed. 1990)) ("Used in a statute, the term 'action' traditionally connotes
a formal adversarial proceeding under the jurisdiction of a court of law."); *TLI, Inc. v.
United States*, 100 F.3d 424, 427 (5th Cir. 1996) ("An 'action' in its 'usual legal sense
means a lawsuit brought in a court; a formal complaint brought within the jurisdiction
of a court of law.'" (quoting *Action*, Black's Law Dictionary 28 (6th ed. 1990)); *Res. Tr.
Corp. v. Love*, 36 F.3d 972, 976 (10th Cir. 1994) (same).

requires that '[a]ny civil action' filed under [the TVPRA] 'shall be stayed during the pendency of any criminal action arising out of the same occurrence in which the claimant is the victim.'" 102 F.4th at 1091 (quoting 18 U.S.C. § 1595(b)(1)). Applying the "ordinary meaning" of "action," the panel held that the statute required staying "the entire civil action," not just the TVPRA claims. *Id.* at 1101. In fact, the stayed claims included federal and state law claims and counterclaims, including libel (a cause of action entirely distinct from the TVPRA). Order Granting U.S. Att'y's Office's Mot. to Intervene & Stay Proceedings, *Doe v. Fitzgerald*, No. CV 20-10713, 2022 WL 18110021, at *1-2 (C.D. Cal. Dec. 14, 2022), *aff'd*, 102 F.4th 1089 (9th Cir. 2024), APP-144–45.

Applying these holdings to the Clayton Act, the ordinary meaning of "action" indicates that Section 16 entitles the States to fees because they substantially prevailed in the legal proceeding for a preliminary injunction—i.e., the "action." *ADT Security Services, Inc. v. Lisle Woodridge Fire Protection District* illustrates this exact analysis. 86 F. Supp. 3d 857, 864 (N.D. Ill. 2015). In *ADT*, the court addressed a fee petition for a successful action seeking injunctive relief under multiple causes of action, including constitutional claims, a state statutory claim, and a Clayton Act claim. *Id.* at 860–62. In granting partial summary judgment on the state statutory claim, the *ADT* court issued an injunction. *Id.* at 861. Later, faced with a fee petition under Section 16 of the Clayton Act, the *ADT* court noted that the Clayton Act "positively mandates that fees be awarded to a party who substantially prevails in '*any action* under this section.'" *Id.* at 864. Thus, the court concluded, because "[i]n common legal parlance, 'actions' are simply lawsuits … the proper inquiry is whether [plaintiffs] have prevailed as to the

**PLAINTIFF STATES' MOTION FOR AWARD OF ATTORNEY'S     Page 17
FEES AND COSTS**

*action* as a whole, not as to any particular theory or theories of relief." *Id.* (citing *Action*,

Black's Law Dictionary 31 (8th ed. 2004)).[9] In doing so, the *ADT* court rejected the

argument that, "because this Court entered the permanent injunction on the basis of the

Illinois Act and not a federal fee-shifting statute, [plaintiffs] did not 'prevail' in respect

to any fee-shifting statute and hence are not entitled to fees." *Id.* at 864.

This interpretation does not depart from Ninth Circuit authority on other types

of fee awards. Although a plaintiff's "prevailing party" status under Section 1988 now

turns on a standard that differs from the standard governing fees under the Clayton Act,

*see Lackey*, 2025 WL 594737, at *5, APP-155, precedent on Section 1988 remains

instructive in construing the term "action." For example, the Circuit has interpreted

*Maher v. Gagne*—the Supreme Court's pronouncement on the scope of the § 1983's

fee-shifting provision 42 U.S.C. § 1988—to establish that "[w]hen the plaintiff in a

civil rights action prevails on a pendent state claim based on a common nucleus of

operative fact with a substantial federal claim, fees may be awarded under § 1988."

*Carreras v. City of Anaheim*, 768 F.2d 1039, 1050 (9th Cir. 1985). Thus, a court may

award fees "even where a federal constitutional claim ultimately fails." *Davidson v.*

*Deschutes County*, No. 6:15-cv-00052, 2015 WL 13730888, at *1 (D. Or. Oct. 8, 2015),

*report and rec. adopted*, 2015 WL 8490974 (D. Or. Dec. 10, 2015), APP-142. The

Ninth Circuit's interpretation of *Maher* diverges sharply from that of the Third Circuit

---

[9] Applying the definition contemporaneous to the Clayton Act's enactment results in the same outcome. The original Black's Law Dictionary from 1891 defines "action" as "an ordinary proceeding in a court of justice[.]" Henry Campbell Black, A Dictionary of Law 27 (1891), https://books.google.com/books?id=jLtDAQAAMAAJ&q=action#v=snippet&q=action&f=false, APP-183.

**PLAINTIFF STATES' MOTION FOR AWARD OF ATTORNEY'S**     Page 18
**FEES AND COSTS**

in *Penn State Hershey*, which concluded that *Maher* addressed only "whether the plaintiff's including the Social Security Act violation in its Section 1983 complaint disqualified it from receiving fees authorized by Section 1988." 914 F.3d at 198.

Here, the underlying claims, and thus the nucleus of operative facts, are identical: Both the States and the FTC claimed that the Defendants' merger violated Section 7 of the Clayton Act. Only the statutory authority authorizing their suits and the preliminary injunction standard differed. Op. & Order at 2, ECF No. 521 (comparing Section 13(b) of the FTC Act and the *Winter* test as applied to other preliminary injunction hearings and concluding that "[t]he *Winter* test imposes a higher burden, requiring plaintiffs to show that they are likely to suffer irreparable harm in the absence of a preliminary injunction in addition to a likelihood of success on the merits and that the equities weigh in their favor"). But facts admitted under either standard remain the same. *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1162–63 (9th Cir. 1984) (relying on non-FTC Act case law in listing relevant types of facts). For example, under either preliminary injunction standard, *Brown Shoe Co. v. United States* establishes the factors—and thus, the facts—that define a relevant market. 370 U.S. 294, 325 (1962); *see also, e.g.*, Op. & Order at 9–22, ECF No. 521 (relying on the *Brown Shoe* factors under FTC Act standard); *United States v. Ivaco, Inc.*, 704 F. Supp. 1409, 1415 (W.D. Mich. 1989) (relying on the *Brown Shoe* factors under traditional equitable standards for preliminary injunction); *United States v. Bertelsmann SE & Co.*, 646 F. Supp. 3d 1, 23–24 (D.D.C. 2022) (relying on the *Brown Shoe* factors under traditional equitable standards for permanent injunction).

**PLAINTIFF STATES' MOTION FOR AWARD OF ATTORNEY'S FEES AND COSTS**    Page 19

Indeed, the purpose of the Clayton Act supports this construction. "The legislative history of the 1976 amendment to [Section 16 of the Clayton Act] suggests that awards of attorney's fees are essential if private attorneys-general are to enforce the antitrust laws." *Sw. Marine*, 732 F.2d at 746 (quoting H.R. Rep. 94-499(I), at *18–20, *reprinted in* 1976 U.S.C.C.A.N. at 2588–90, APP-196–97). That same Congress intended that the "States would be entitled to recover reasonable attorneys' fees whenever they prevail in Sec[tion] 16 cases." H.R. Rep. 94-499(I), at *20, *reprinted in* 1976 U.S.C.C.A.N. at 2590 (describing the "need for the awarding of attorney's fees in Sec[tion] 16 injunction cases"), APP-197; *see also Hawaii v. Standard Oil Co.*, 405 U.S. 251, 260–61 (1972) (holding that a state qualifies as a "person" under Section 16). And regardless of under which standard the court decides the injunction, fees remain "necessary … because antitrust cases are 'normally very expensive to bring and maintain' and claims for injunctive relief by nature provide no prospect of money damages." *Costco Wholesale Corp. v. Hoen*, 538 F.3d 1128, 1136–37 (9th Cir. 2008) (quoting H.R. Rep. 94-499(I), at *19, *reprinted in* 1976 U.S.C.C.A.N. at 2588, APP-196); *see also id.* ("Congress made fee awards mandatory under [Clayton Act Section 16.]"). "In this age of budget-cutting and cost-consciousness in government, the cost-effectiveness of state antitrust enforcement efforts very likely will be an important factor when funding proposals for [state antitrust enforcement] are considered." *Illinois v. Sangamo Constr. Co.*, 657 F.2d 855, 860 (7th Cir. 1981). Thus, "recovery of reasonable attorneys' fees by [the States] will create greater incentives for

state enforcement of the antitrust laws[.]"[10] *Id.* Accordingly, this Court should not create a disincentive to state antitrust enforcement where the plain text and legislative history of the Clayton Act instruct otherwise.

Faced with this same issue, the *Penn State Hershey* court diverged from the Ninth Circuit's interpretation. Specifically, the court conflated "action" with "relief" and "requests for relief." 914 F.3d at 199. In doing so, it rewrote the plain language of Section 16. This mischaracterization of the provision distanced it from the Ninth Circuit's interpretation of *Maher*[11]—*e.g.*, *Carreras*, 768 F.2d at 1050—resulting in its incorrect holding. *See Penn State Hershey*, 914 F.3d at 199 (focusing on "requests for relief under Section 16 of the Clayton Act").

The *Staples* court diverged similarly. 239 F. Supp. 3d at 4. Further, the facts the *Staples* court emphasized differ from those here. In *Staples*, "neither party disputed the

---

[10] For similar reasons, the Court's discussion of Section 13(b) does not invalidate the States' entitlement to fees under Section 16 of the Clayton Act. Although Section 13(b) does not explicitly afford the FTC fees, that does not stem from its standard or burden. Indeed, the Defendants have paid FTC fees already (so to speak) because Congress funds the FTC through filing fees that merging parties pay. Statements of Introduced Bills and Joint Resolutions, 145 Cong. Rec. 28422, 28425 (1999) (noting that merger fees are important to ensure that the FTC is sufficiently funded "to carry out their increasingly demanding mission of enforcing the nation's antitrust laws"), APP-212. Those fees are paid whether or not the FTC opposes a merger and are intended to help fund the FTC's litigation regardless of the outcome.

[11] As noted above, The Ninth Circuit held that *Maher* established that "[w]hen the plaintiff in a civil rights action prevails on a pendent state claim based on a common nucleus of operative fact with a substantial federal claim, fees may be awarded under § 1988." *Carreras*, 768 F.2d at 1050. In *Penn State Hershey*, the Third Circuit concluded that *Maher* addressed only "whether the plaintiff's including the Social Security Act violation in its Section 1983 complaint disqualified it from receiving fees authorized by Section 1988." 914 F.3d at 198. Thus, the Ninth Circuit's interpretation of *Maher* diverges sharply from that of the Third Circuit in *Penn State Hershey*.

Court's intended resolution pursuant to Section 13(b) of the FTC Act, rather than Section 16 of the Clayton Act." *Id.* at 5. As a result, "at no point in their preliminary injunction submissions did they assert, much less prove at the hearing, the elements of a preliminary injunction under Section 16." *Id.*

But here, Defendants vigorously disputed the applicable standard, arguing that *Winter*'s traditional equitable standards applied. Op. & Order at 2, ECF No. 521. In response to Defendants' arguments and uncertainty over which standard the Court would apply, the Plaintiffs argued, and proved, the alternative:

> Further, even if the FTC needed to show irreparable harm (which it does not), it has. As the Ninth Circuit stated plainly in *Boardman v. Pac. Seafood Grp.*, "A lessening of competition constitutes an irreparable injury under our law." 822 F.3d 1011, 1023 (9th Cir. 2016) (affirming injunction where plaintiffs showed a reasonable probability that the challenged merger would substantially lessen competition).

Pls.' Post-Hearing Brief, Proposed Findings of Fact, and Proposed Conclusions of Law (Public Version) at 149 ¶ 83, ECF No. 490; *accord, e.g.*, *United States v. Siemens Corp.*, 621 F.2d 499, 506 (2d Cir. 1980) ("[O]nce the Government demonstrates a reasonable probability that [Section] 7 [of the Clayton Act] has been violated, irreparable harm to the public should be presumed."); *United States v. Trib. Publ'g Co.*, Case No. CV 16-01822, 2016 WL 2989488, at *5 (C.D. Cal. Mar. 18, 2016), APP-180; *see also California v. Am. Stores Co.*, 495 U.S. 271, 295 (1990) ("In a Government case the proof of the violation of law may itself establish sufficient public injury to warrant relief."). Accordingly, the concerns underlying the *Staples* court's decision do not arise here: The Plaintiffs raised, and argued, the action under both the FTC Act and

Clayton Act Section 16 standard.[12] As a result, *Penn State Hershey* and *Staples* do not apply; the Court should award the States fees.

## IV. CONCLUSION

For all of the foregoing reasons, the Court should hold that the Plaintiff States substantially prevailed in this action under Section 16 of the Clayton Act and that they are therefore entitled to their costs and attorney's fees.

---

[12] Moreover, unlike in *Staples*¸ this Court referenced Section 16 in its decision and the States referenced Section 16 in their complaint, pretrial briefing, and proposed conclusions of law. *Compare* Op. & Order at 1, ECF No. 521, *and* Compl. for Temp. Restraining Order and Inj. Relief at 7–9 ¶¶ 17–26, 13–15 ¶¶ 31–37, 44 ¶ 118, ECF No. 1, *and* Pls.' Mem. of Law in Supp. of Prelim. Inj. Mot. at 6, ECF No. 205, *and* Pls.' Post-Hearing Brief, Proposed Findings of Fact, and Proposed Conclusions of Law (Public Version) at 128 ¶ 1, ECF No. 490, *with Staples*, 239 F. Supp. 3d at 4 n.1, 5 n.2.

Dated: March 5, 2025.
Respectfully submitted,

/s/ Tim D. Nord
Cheryl F. Hiemstra, OSB #133857
Tim D. Nord, OSB #882800
Chris Kayser, OSB #984244
Special Assistants Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel: (503) 934-4400
Facsimile: (503) 378-5017
Cheryl.Hiemstra@doj.oregon.gov
Tim.D.Nord@doj.oregon.gov
cjkayser@lvklaw.com

Attorneys for Plaintiff State of Oregon

/s/ Brian M. Yost
Brian M. Yost, IL Bar No. 6334138
Paul J. Harper, IL Bar No. 6335001
Alice Riechers, IL Bar No. 6272933

Office of the Illinois Attorney
General
115 S. LaSalle St.
Chicago, IL 60603
Tel: (872) 276-3598
Email: Brian.Yost@ilag.gov
Paul.Harper@ilag.gov
Alice.Riechers@ilag.gov

Attorneys for Plaintiff State of
Illinois

/s/ Robert A. Bernheim
Robert A. Bernheim, AZ Bar No.
024664
Jayme L. Weber, AZ Bar No. 032608
Vinny Venkat, AZ Bar No. 038587
Connor Nolan, AZ Bar No. 038088
Arizona Office of the Attorney General
2005 N. Central Avenue
Phoenix, AZ 85004
Tel: (602) 542-5025
Robert.Bernheim@azag.gov
Jayme.Weber@azag.gov
Vinny.Venkat@azag.gov
Connor.Nolan@azag.gov

Attorneys for Plaintiff State of Arizona

/s/ Nicole Gordon
Nicole Gordon, CA Bar No. 224138

California Department of Justice
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102
Tel: (415) 510-4400
Facsimile: (415) 703-5480
Nicole.Gordon@doj.ca.gov


Attorney for Plaintiff State of California


/s/ C. William Margrabe
C. William Margrabe, DC Bar No. 90013916

Office of the Attorney General for the District of
Columbia
400 6th Street, N.W, 10th Floor
Washington, D.C. 20001
Tel: (202) 727-3400
Will.Margrabe@dc.gov

Attorney for Plaintiff District of Columbia


/s/ Schonette J. Walker
Schonette J. Walker, MD Bar No. 0512290008
Byron Warren, MD Bar No. 1612140330

Office of the Attorney General
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
Tel: (410) 576-6470
swalker@oag.state.md.us
bwarren@oag.state.md.us

Attorneys for Plaintiff State of Maryland


**PLAINTIFF STATES' MOTION FOR AWARD OF ATTORNEY'S**     Page 25
**FEES AND COSTS**

/s/ Lucas J. Tucker
Lucas J. Tucker, NV Bar No. 10252
Samantha B. Feeley, NV Bar No. 14034

Office of the Nevada Attorney General
100 N. Carson St.
Carson City, Nevada 89701
Tel: (775) 684-1100
ltucker@ag.nv.gov
sfeeley@ag.nv.gov

Attorneys for Plaintiff State of Nevada


/s/ Julie Ann Meade
Julie Ann Meade, NM Bar No. 8143
Jeff Dan Herrera, NM Bar No. 154030

New Mexico Department of Justice
408 Galisteo St.
Santa Fe, NM 87504
Tel: (505) 717-3500
jmeade@nmag.gov
jherrera@nmag.gov

Attorneys for Plaintiff State of New Mexico


/s/ William Young
William Young, WY Bar No. 8-6746

Office of the Wyoming Attorney General
109 State Capitol
Cheyenne, WY 82002
Tel: (307) 777-7847
William.Young@wyo.gov

Attorney for Plaintiff State of Wyoming

**PLAINTIFF STATES' MOTION FOR AWARD OF ATTORNEY'S**     Page 26
**FEES AND COSTS**

CERTIFICATE OF SERVICE

I certify that on the date noted below, I caused a true and correct copy of the Plaintiff States' Motion for Award of Attorney's Fees and Costs to be served upon the parties of record through the Court's ECF system.

Dated: March 5, 2025.

LARKINS VACURA KAYSER

/s/ Christopher J. Kayser
Christopher J. Kayser, OSB #984244
cjkayser@lvklaw.com

```
  1              IN THE UNITED STATES DISTRICT COURT

  2                   FOR THE DISTRICT OF OREGON

  3   FEDERAL TRADE COMMISSION, et  )
      al,                           )
  4                                 )
               Plaintiffs,          )  Case No. 3:24-cv-00347-AN
  5                                 )
          v.                        )
  6                                 )
      THE KROGER COMPANY and        )  March 11, 2024
  7   ALBERTSONS COMPANIES, INC.,   )
                                    )
  8            Defendants.          )  Portland, Oregon
      _____)
  9

 10

 11

 12

 13

 14

 15              Telephone Status Conference

 16               TRANSCRIPT OF PROCEEDINGS

 17        BEFORE THE HONORABLE ADRIENNE NELSON

 18         UNITED STATES DISTRICT COURT JUDGE

 19

 20

 21

 22

 23

 24

 25
```

Exhibit 1 Page 1 of 9

APPEARANCES

```
 1

 2                              APPEARANCES

 3

 4   FOR PLAINTIFF FEDERAL
     TRADE COMMISSION:        Mr. James Harris Weingarten (by phone)
 5                            Mr. Charles E. Dickinson (by phone)
                              Federal Trade Commission
 6                            400 7th Street S.W.
                              Washington, DC 20024
 7
     FOR PLAINTIFF STATE
 8   OF ARIZONA:              Ms. Jayme L. Weber (by phone)
                              Mr. Robert Bernheim (by phone)
 9                            Office of the Arizona Attorney General
                              400 W. Congress Street, Suite S-215
10                            Tucson, AZ 85701

11   FOR PLAINTIFF STATE
     OF CALIFORNIA:           Ms. Nicole Gordon (by phone)
12                            Office of the California Attorney
                              General
13                            455 Golden Gate Avenue, Suite 11000
                              San Francisco, CA 94102
14

15   FOR PLAINTIFF DISTRICT
     OF COLUMBIA:             Ms. Amanda Hamilton (by phone)
16                            Office of Attorney General for the
                              District of Columbia
17                            400 6th Street N.W.
                              Washington, DC 20001
18

19   FOR PLAINTIFF STATE
     OF ILLINOIS:             Mr. Paul Harper (by phone)
20                            Office of the Illinois Attorney General
                              115 S. LaSalle Street
21                            Chicago, IL 60603

22   FOR PLAINTIFF STATE
     OF MARYLAND:             Mr. Byron Warren (by phone)
23                            Office of the Maryland Attorney General
                              200 St. Paul Place
24                            Baltimore, MD 21202

25
```

Exhibit 1 Page 2 of 9

```
 1   FOR PLAINTIFF STATE
     OF NEVADA:                Ms. Samantha Feeley (by phone)
 2                             Office of the Nevada Attorney General
                               8945 W. Russell Road, Suite 204
 3                             Las Vegas, NV 89148

 4   FOR PLAINTIFF STATE
     OF OREGON:                Mr. Christopher J. Kayser
 5                             Ms. Tania Manners (by phone)
                               Larkins Vacura Kayser LLP
 6                             121 S.W. Morrison Street, Suite 700
                               Portland, OR 97204
 7

 8

 9   FOR DEFENDANT KROGER
     COMPANY:                  Mr. B. John Casey
10                             Ms. Rachel C. Lee (by phone)
                               Stoel Rives LLP
11                             760 S.W. Ninth Avenue, Suite 3000
                               Portland, OR 97205
12

13                             Ms. Luna Ngan Barrington (by phone)
                               Weil, Gotshal & Manges LLP
14                             767 Fifth Avenue
                               New York, NY 10153
15

16                             Mr. Mark Andrew Perry (by phone)
                               Weil, Gotshal & Manges LLP
17                             2001 M Street, N.W., Suite 600
                               Washington, DC 20036
18

19                             Mr. Matthew M. Wolf (by phone)
                               Ms. Sonia Kuester Pfaffenroth (by phone)
20                             Mr. Kolya Glick (by phone)
                               Arnold & Porter Kaye Scholer LLP
21                             601 Massachusetts Avenue, N.W.
                               Washington, DC 20001
22

23

24

25
```

Exhibit 1 Page 3 of 9

```
 1   FOR DEFENDANT
     ALBERTSONS COMPANIES,
 2   INC.:                    Mr. David H. Angeli
                              Ms. Kristen L. Tranetzki (by phone)
 3                            Angeli Law Group LLC
                              121 S.W. Morrison Street, Suite 400
 4                            Portland, OR 97204

 5                            Ms. Enu Mainigi (by phone)
                              Williams & Connolly
 6                            680 Maine Avenue S.W.
                              Washington, DC 20024

 7

 8                            Mr. Edward Hassi (by phone)
                              Debevoise & Plimpton LLP
 9                            801 Pennsylvania Avenue N.W., Suite 500
                              Washington, DC 20004

10

11

12

13

14

15

16

17   COURT REPORTER:         Bonita J. Shumway, CSR, RMR, CRR
                              United States District Courthouse
18                            1000 S.W. Third Avenue, Room 301
                              Portland, OR 97204
19                            (503)326-8188
                              bonita_shumway@ord.uscourts.gov
20

21

22

23

24

25
```

Exhibit 1 Page 4 of 9

1    critical, it is likely the decision that decides whether this

2    merger happens.

3              As the government well knows, they've come here today

4    with a scheduling proposal designed to short circuit a fair

5    consideration of the proposed transaction.  The difference

6    between the June proposal they make and the July proposal we do

7    is the difference between an extraordinarily expedited but fair

8    process and a fundamental denial of the public's right to a

9    reasonable adjudication of the benefits of the proposed merger.

10             To understand why this is, we need to take a quick

11   step back.  To start with, in all but a tiny fraction, a tiny

12   fraction of cases over the last 30 years of FTC challenges, the

13   preliminary injunction decision is dispositive.  It is the

14   whole ballgame, Your Honor.  If the defendants win, the merger

15   closes.  If the government wins, the merger dies.  No

16   administrative trial ever happens.

17             In this case the government has spent nearly 18

18   months investigating the merger.  They have a massive head

19   start and a massive head start on discovery.  They've obtained

20   millions of documents and deposed or gotten declarations from

21   dozens of people.  My client, Kroger and Albertsons, on the

22   other hand, have not even had a chance to start issuing

23   discovery because discovery has not opened yet from perspective

24   of the defendants.

25             And to give you just two examples why a July date --

Exhibit 1 Page 5 of 9

1    is no need to rush precipitously and step over or on top of the

2    administrative hearing, just as in *Tronox*.

3           I'm trying to think about the administratability of

4    the matter.  We can hear the evidence where it is frankly meant

5    to be heard, with all due respect, in the administrative

6    proceeding.  That's not the statute, the FTC Act, step one.

7    That's where the merits trial is intended to be.  The Ninth

8    Circuit in *Warner* could not be more clear about that, and then

9    Your Honor can receive it.  But if Your Honor -- if the defense

10   doesn't like that and Your Honor is inclined to offer dates in

11   May, we can try to work with that as well.  The government,

12   again, simply wants the opportunity to the meet the *Warner*

13   standard.  We're very confident we can meet it.  We will take

14   whatever time Your Honor has and use it wisely, but we will get

15   to you the evidence to show that this merger -- Well, strike

16   that.  We don't have to show the merger is unlawful, simply to

17   show there are substantial questions about the merger.

18          THE COURT:  Well, the Court understands that there

19   needs to be a hearing, and the Court has given its flexibility

20   in May and in August.  I also understand that the decision made

21   around the preliminary judgment -- injunction is the decision

22   that will be the one that has the most weight in all of these

23   proceedings.  I understand all of that.

24          I want to make sure that all parties feel that they

25   have the time that they need to present the evidence that they

Exhibit 1 Page 6 of 9

1    negotiating in the interim dates, we can get to work on the

2    discovery and we can plan to see you for a, as I said, perhaps

3    a prehearing session in July, the hearing in August, and we

4    will get this on and off promptly and fair.

5              THE COURT:  Well --

6              MR. WEINGARTEN:  Your Honor --

7              THE COURT:  Go ahead.  Someone else was saying

8    something.

9              MR. WEINGARTEN:  I apologize, Your Honor.  This is

10   James Weingarten.

11             Just on the August date, again it doesn't resolve the

12   issue of having a simultaneous proceeding.

13             THE COURT:  That's what I was going to say.  To me, I

14   would prefer to start the preliminary injunction the week of

15   August 6th, and that way we could just go into September.  And

16   that way there's a full three-week time frame but for the

17   holiday.

18             MR. WOLF:  That certainly works for Kroger, Your

19   Honor.

20             MS. MAINIGI:  Your Honor, would you repeat that?  I'm

21   sorry, I missed that.

22             THE COURT:  I understand.  Starting the preliminary

23   injunction the week of August 26th, and but for the Labor Day

24   holiday of September 2nd, continuing until the 16th of

25   September.

Exhibit 1 Page 7 of 9

1     MS. MAINIGI:  Thank you, Your Honor.  And that would

2 also work for Albertsons.

3     THE COURT:  Now, I'm trying to also understand what

4 would happen if we did it in May.  Because if you issue -- if

5 you start your discovery process, say, tomorrow, that gives you

6 60 days.  Is that not enough time, which is about two months?

7     MS. MAINIGI:  Your Honor, if I may address this.

8 Again, this is Enu Mainigi for Albertsons.

9     That is just really not enough time, with all due

10 respect.  I mean, the FTC here, as Mr. Wolf indicated, has had

11 18 months to do extensive discovery, and a significant part of

12 that discovery is third-party discovery.  If this was a case

13 where really the discovery was just going to be of two parties

14 to the action without the need to involve third parties, then I

15 think something like May could be feasible.  But in the

16 circumstance like this, when there are third parties involved,

17 the number of counsel involved, the tremendous amounts of

18 documents that have to be reviewed -- just to pause there for a

19 minute, Your Honor.  The FTC has produced their investigative

20 file, are in the process of finalizing the production of their

21 investigative file, but there's just a tremendous amount of

22 information in there that needs to be digested by us before we

23 move forward.  So I think the August dates will work very well.

24 I just think May would be an impossibility and would really put

25 the parties on our side at a tremendous, tremendous

Exhibit 1 Page 8 of 9

1   the investigation and the discovery.  The vast majority of

2   discovery from the investigation was discovery from Kroger and

3   Albertsons.  Kroger produced 7 million documents, Albertsons

4   produced 13 million documents.  The defendants, I think, are

5   fairly charged with knowledge of the material they produced to

6   the government over the last 18 months.  We have -- the FTC has

7   produced the third-party documents it received.  That's 300,000

8   documents.  The one wrinkle on that on numbers of the case are

9   the third-party documents, and we have voluntarily begun and

10  completed production of all of those third-party productions to

11  us, so the defendants have them.  So I think the situation is

12  more akin to what Ms. Mainigi was talking about.  This is a

13  case about competition between Kroger and Albertsons.  The vast

14  majority of the evidence will be evidence from Kroger and

15  Albertsons.  This is a preliminary injunction hearing under a

16  special standard.  The defendants can seek discovery, bring it

17  to the Court, do what they need to do, and they will continue

18  to be able to have discovery as part of the administrative

19  proceeding.  So we are comfortable with the May date, and it

20  avoids having to step on top of the administrative proceeding.

21      MS. MAINIGI:  Your Honor, again, Enu Mainigi for

22  Albertsons, if I may.

23      It certainly seems that the date that Your Honor has

24  suggested of August 26th would accommodate whatever

25  Mr. Weingarten chooses to do with the administrative hearing,

Exhibit 1 Page 9 of 9

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF OREGON

3    FEDERAL TRADE COMMISSION, et  )
     al.,                          )
4                                  )
              Plaintiffs,          )   Case No. 3:24-cv-00347-AN
5                                  )
         v.                        )
6                                  )
     THE KROGER COMPANY and        )   August 26, 2024
7    ALBERTSONS COMPANIES, INC.,   )
                                   )
8             Defendants.          )   Portland, Oregon
     _____)
9

10

11

12

13

14            PRELIMINARY INJUNCTION HEARING

15               DAY 1 - MORNING SESSION

16             TRANSCRIPT OF PROCEEDINGS

17        BEFORE THE HONORABLE ADRIENNE NELSON

18         UNITED STATES DISTRICT COURT JUDGE

19

20

21

22

23

24

25

Exhibit 2 Page 1 of 7

```
 1                         APPEARANCES

 2

 3  FOR PLAINTIFF FEDERAL
    TRADE COMMISSION:        Ms. Susan Musser
 4                           Mr. Charles Dickinson
                             Federal Trade Commission
 5                           400 7th Street S.W.
                             Washington, DC 20024
 6

 7                           Mr. Rohan Pai
                             Ms. Laura Hall
 8                           Mr. Barrett James Anderson
                             Federal Trade Commission
 9                           600 Pennsylvania Avenue, N.W.
                             Washington, DC 20580
10

11

12  FOR PLAINTIFF STATE
    OF ARIZONA:              Ms. Jayme L. Weber
13                           Office of the Arizona Attorney General
                             400 W. Congress Street, Suite S-215
14                           Tucson, AZ 85701

15

16  FOR PLAINTIFF STATE
    OF CALIFORNIA:           Ms. Nicole Gordon
17                           Office of the California Attorney
                             General
18                           455 Golden Gate Avenue, Suite 11000
                             San Francisco, CA 94102
19

20  FOR PLAINTIFF DISTRICT
    OF COLUMBIA:             Ms. Estefania Yulianny Torres Paez
21                           Office of Attorney General for the
                             District of Columbia
22                           400 6th Street N.W., 10th Floor
                             Washington, DC 20001
23

24

25
```

Exhibit 2 Page 2 of 7

```
 1   FOR PLAINTIFF STATE
     OF ILLINOIS:              Mr. Brian Yost
 2                             Mr. Paul Harper
                               Office of the Illinois Attorney General
 3                             115 S. LaSalle Street
                               Chicago, IL 60603
 4

 5   FOR PLAINTIFF STATE
     OF MARYLAND:              Mr. Byron Warren
 6                             Office of the Maryland Attorney General
                               200 St. Paul Place
 7                             Baltimore, MD 21202

 8

 9   FOR PLAINTIFF STATE
     OF NEVADA:                Mr. Lucas J. Tucker
10                             Nevada Attorney General's Office
                               8945 W. Russell Road, Suite 204
11                             Las Vegas, NV 89148

12   FOR PLAINTIFF STATE
     OF NEW MEXICO:            Mr. Jeff Dan Herrera
13                             New Mexico Office of the Attorney
                               General
14                             Consumer Protection Division
                               408 Galisteo Street
15                             Sante Fe, NM 87501

16   FOR PLAINTIFF STATE
     OF OREGON:                Mr. Christopher J. Kayser
17                             Larkins Vacura Kayser LLP
                               121 S.W. Morrison Street, Suite 700
18                             Portland, OR 97204

19                             Mr. Tim D. Nord
                               Oregon Department of Justice
20                             Civil Enforcement
                               1162 Court Street NE
21                             Salem, OR  97301

22

23   FOR PLAINTIFF STATE
     OF WYOMING:               Mr. William Talley Young
24                             109 State Capitol
                               Cheyenne, WY 82002
25
```

Exhibit 2 Page 3 of 7

```
 1   FOR DEFENDANT KROGER
     COMPANY:                      Mr. B. John Casey
 2                                 Stoel Rives LLP
                                   760 S.W. Ninth Avenue, Suite 3000
 3                                 Portland, OR 97205

 4                                 Mr. Bambo Obaro
                                   Weil, Gotshal & Manges LLP
 5                                 201 Redwood Shores Parkway
                                   Redwood Shores, CA 94065
 6
                                   Ms. Luna Ngan Barrington
 7                                 Weil, Gotshal & Manges LLP
                                   767 Fifth Avenue
 8                                 New York, NY 10153

 9                                 Mr. Matthew M. Wolf
                                   Ms. Sonia Kuester Pfaffenroth
10                                 Mr. Christian Schultz
                                   Mr. Joshua Davis
11                                 Arnold & Porter Kaye Scholer LLP
                                   601 Massachusetts Avenue, N.W.
12                                 Washington, DC 20001

13                                 Mr. Mark Andrew Perry
                                   Weil, Gotshal & Manges
14                                 2001 M Street NW, Suite 600
                                   Washington, DC 20036
15

16                                 Ms. Christine Wheatley
                                   Kroger General Counsel
17                                 The Kroger Company
                                   1014 Vine Street
18                                 Cincinnati, OH 45202

19

20

21

22

23

24

25
```

Exhibit 2 Page 4 of 7

```
1    FOR DEFENDANT
     ALBERTSONS COMPANIES,
2    INC.:                       Mr. David H. Angeli
                                  Angeli Law Group LLC
3                                 121 S.W. Morrison Street, Suite 400
                                  Portland, OR 97204
4

5                                 Ms. Enu Mainigi
                                  Mr. Jonathan Bradley Pitt
6                                 Mr. Adam Joshua Podoll
                                  Ms. Beth A. Stewart
7                                 Mr. Michael Cowie
                                  Mr. Tyler Infinger
8                                 Ms. Adwea Seymour
                                  Mr. Thomas Moriarty
9                                 Williams & Connolly
                                  680 Maine Avenue S.W.
10                                Washington, DC 20024

11

12

13

14

15

16

17

18

19   COURT REPORTER:             Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
                                  United States District Courthouse
20                                1000 S.W. Third Avenue, Room 301
                                  Portland, OR 97204
21                                jill_jessup@ord.uscourts.gov

22

23

24

25
```

Exhibit 2 Page 5 of 7

1    All of the services they provide will be enhanced, and

2    so it will benefit not just Kroger stores and former

3    Albertsons stores, but 7,500 other grocery stores that are

4    striving to compete against the global behemoths:  Walmart,

5    Amazon, Costco, et cetera.

6        Public interest, Your Honor, we will show you over the

7    next three weeks it unambiguously favors this merger.  It

8    unambiguously suggests to Your Honor that a preliminary

9    injunction should not enter.

10       Now I want to talk about the middle two factors:  The

11   likelihood of irreparable harm and the balance of harms.

12   Here's where we have a fundamental disconnect with the

13   Government -- well, maybe one of many places we have a

14   fundamental disconnect with the Government.  This proceeding

15   will decide the fate of the merger.  Let there be no

16   mistake.  The suggestion that all you're being asked to do,

17   Your Honor, is tap the brakes, let the FTC do its job over

18   the next 12, 18, 24 months, let that process -- that's not

19   going to happen.  It never happens.

20       If you look at the history, there's never a merger --

21   and by "never," I mean, I think once in history -- never a

22   merger if it has to go through the extraordinarily tortuous,

23   serpentine, labyrinthine, what other adjective could I come

24   up with, name for the FTC Part 3 process?  It just doesn't

25   happen.  Why?  Because there are 60,000 people whose jobs

Exhibit 2 Page 6 of 7

1    are currently in limbo.  There's financing that Kroger has,
2    that C&S has, that expires if it doesn't happen quickly.
3    There are licenses you need to procure, whether it's
4    pharmacy or alcohol or otherwise, from state agencies.
5    Those transfers expire, and there are 85 million families
6    that are waiting to hear what will happen.  This merger will
7    not occur if this injunction is in place.
8        Let's turn to the final factor:  Likelihood of success
9    on the merits.
10        The fundamental question Your Honor has to ask is:
11    What is the chance of ultimate success?  Really, what will
12    this merger do?  Is it pro-competitive?  Is it neutral?  Or,
13    as the Government contends incorrectly, is it
14    anticompetitive?
15        And this is kind of interesting, Your Honor:  There's
16    an established framework, it's called a Baker Hughes
17    framework, and counsel alluded to it but really didn't walk
18    us through it, and there's a pretty profound reason why.
19        The first step of the Baker Hughes framework is asking
20    the question, "Have plaintiffs properly, one, defined a
21    product market; two, defined a geographic market; and,
22    three, established a presumption of competitive harm?"
23        We're going to talk about product markets and the shell
24    game that's going on there.  But, Your Honor, you heard
25    almost nothing about geographic market in counsel's opening

Exhibit 2 Page 7 of 7

# INDEX

**Cases**

Complaint (Redacted Public Version),
*Albertsons Co., Inc. v. Kroger Co.*,
C.A. No. 2024-1276 (Dec. 14, 2024 Del. Ch. Ct.) ............................................................APP-1

*Davidson v. Deschutes County*,
No. 6:15-cv-00052, 2015 WL 13730888 (D. Or. Oct. 8, 2015) ....................................APP-141

Order Granting United States Attorney's Office's Motion to Intervene and to Stay Proceedings,
*Doe v. Fitzgerald*,
Case No. CV 20-10713, 2022 WL 18110021 (C.D. Cal. Dec. 14, 2022) .....................APP-144

*Lackey v. Stinnie*,
604 U.S. __, 2025 WL 594737 (Feb. 25, 2025) ...........................................................APP-150

*Miller v. City of Fort Myers*,
No. 2:18-cv-195, 2020 WL 5802424  (M.D. Fla. Aug. 31, 2020)..................................APP-167

*Miller v. Hedlund*,
CIV. No. 78-259, 1989 WL 131274 (D. Or. Oct. 12, 1989)...........................................APP-173

*United States v. Tribune Publishing Co.*,
Case No. CV 16-01822, 2016 WL 2989488 (C.D. Cal. Mar. 18, 2016) .......................APP-177

**Other Authorities**

Henry Campbell Black,
A Dictionary of Law (1891) ........................................................................................APP-183

House Report 94-499(I) (1975) .......................................................................................APP-185

SEC Form 8-K,
The Kroger Co. (Dec. 11, 2024) ...................................................................................APP-206

Statements of Introduced Bills and Joint Resolutions,
145 Cong. Rec. 28422 (1999) ......................................................................................APP-209

# INDEX

**Cases**

Complaint (Redacted Public Version),
*Albertsons Co., Inc. v. Kroger Co.*,
C.A. No. 2024-1276 (Dec. 14, 2024 Del. Ch. Ct.) ...........................................................APP-1

*Davidson v. Deschutes County*,
No. 6:15-cv-00052, 2015 WL 13730888 (D. Or. Oct. 8, 2015) ...................................APP-141

Order Granting United States Attorney's Office's Motion to Intervene and to Stay Proceedings,
*Doe v. Fitzgerald*,
Case No. CV 20-10713, 2022 WL 18110021 (C.D. Cal. Dec. 14, 2022) .....................APP-144

*Lackey v. Stinnie*,
604 U.S. __, 2025 WL 594737 (Feb. 25, 2025) ..........................................................APP-150

*Miller v. City of Fort Myers*,
No. 2:18-cv-195, 2020 WL 5802424  (M.D. Fla. Aug. 31, 2020).................................APP-167

*Miller v. Hedlund*,
CIV. No. 78-259, 1989 WL 131274 (D. Or. Oct. 12, 1989)..........................................APP-173

*United States v. Tribune Publishing Co.*,
Case No. CV 16-01822, 2016 WL 2989488 (C.D. Cal. Mar. 18, 2016) .......................APP-177

**Other Authorities**

Henry Campbell Black,
A Dictionary of Law (1891) ........................................................................................APP-183

House Report 94-499(I) (1975) ........................................................................................APP-185

SEC Form 8-K,
The Kroger Co. (Dec. 11, 2024) ..................................................................................APP-206

Statements of Introduced Bills and Joint Resolutions,
145 Cong. Rec. 28422 (1999).......................................................................................APP-209

EFiled:  Dec 14 2024 04:34PM EST
Transaction ID 75228023
Case No. 2024-1276-LWW

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| ALBERTSONS COMPANIES, INC., | |
| Plaintiff, | C.A. No. 2024-1276-LWW |
| v. | **Redacted Public Version** |
| THE KROGER COMPANY, | **Filed: December 14, 2024** |
| Defendant. | |

## VERIFIED COMPLAINT

Plaintiff Albertsons Companies, Inc. ("Albertsons"), by and through its attorneys, for its Verified Complaint against The Kroger Company ("Kroger," and in conjunction with Albertsons, the "Parties") alleges as follows:

## PRELIMINARY STATEMENT

1.      For many Americans, the local supermarket is a trusted brand and an iconic feature of the community.  It is a place where American families spend, on average, nearly six percent of their disposable income and where they depend on access to affordable nutrition.  On October 14, 2022, Albertsons and Kroger, who collectively own and operate more than 30 of America's trusted grocery brands, announced that they had agreed to merge after signing an agreement (the "Merger Agreement")[1] by which Kroger would acquire Albertsons in a transaction valued at

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Merger Agreement.

almost $25 billion (the "Merger"). The transaction was not just a boon to Albertsons' stockholders—after the announcement, Albertsons' stock price closed at a 32.8% premium to the unaffected stock price—it also would have benefitted American consumers by creating a combined company with the necessary scale to drive down prices, invest in higher quality products, promote and protect consumer choice in the face of expanding industry behemoths (such as Walmart, Costco, Target, and Amazon), and protect union jobs. For many American communities, this transaction represented hope for the continued viability of the local grocery stores that have sustained their communities for generations.

2.      But Kroger derailed the merger after suffering a classic case of buyer's remorse. At first, Kroger was eager to acquire Albertsons, and it willingly assumed stringent obligations in the Merger Agreement to do everything necessary to close the Merger as quickly as possible. Obtaining the necessary antitrust clearances was at the top of the list. As both Albertsons and Kroger knew when negotiating the Merger Agreement, the ability to close the Merger depended on obtaining approval from the Federal Trade Commission ("FTC") and relevant state regulators, which in turn would require Kroger, as the surviving company, to divest a substantial number of supermarkets and other assets to ensure that the Merger would comply with antitrust law and achieve its aim of promoting competition in communities across

2

the country.  Accordingly, the Parties agreed to a specific series of escalating obligations on the part of Kroger, first to exercise "best efforts" and then, in the face of any threatened regulatory action to block the Merger, to take "any and all actions" necessary to "eliminate each and every impediment" to closing the Merger.

3.    But Kroger later had second thoughts after a negative market reaction to the Merger and falling post-pandemic profits, and it decided it would go through with the deal, if at all, only on terms far more advantageous to Kroger than those for which it had bargained.  Immediately after the Merger was announced, Kroger received sharp criticism from rating agencies, saw its stock price decline, and faced pushback from politicians.  The day after the Merger announcement, Kroger's stock dropped by 7.3%.  S&P Global Ratings ("S&P"), Moody's Investor Service ("Moody's"), and DBRS Morningstar ("Morningstar") all published negative reports.  Both Moody's and S&P highlighted the stress the Merger would put on Kroger's debt levels and questioned whether Kroger would be able to maintain its commercial-grade credit rating.    Kroger also faced highly public political opposition—including having its and Albertsons' executives called before a U.S. Senate Subcommittee to be grilled on the Merger the month after the deal was signed.  At the same time, net profits for Kroger and Albertsons fell as purchasing trends abated after COVID: whereas during the pandemic, customers had shifted

3

their food purchasing to grocery stores and away from restaurants and had consolidated their shopping in a fewer number of stores, those trends reversed.

4.    In the face of these headwinds, rather than take the steps it knew would give the Merger the best chance to succeed, and which it had agreed to take, Kroger put itself first.  Despite knowing better, Kroger squandered its credibility with regulators from the outset by proposing a plainly indefensible divestiture package that elevated Kroger's bottom line over its contractual obligations to Albertsons to put forward a tenable divestiture proposal.  Kroger then deepened that rift with regulators by refusing to adjust its proposed divestiture package in response to regulators' predictable and readily addressable feedback.

5.    Kroger compounded these breaches by turning away divestiture buyers with long track records of successfully running large-scale retail grocery businesses and instead selecting a bidder whose primary experience was as a wholesaler.  And, although obligated by contract to work with Albertsons in good faith, Kroger kept Albertsons in the dark about regulatory strategy and ignored Albertsons' suggestions for how to get the Merger approved.

6.    Instead of complying with its contractual obligations to exercise "best efforts" and to take "any and all actions" to get the Merger approved, Kroger

4

prioritized its own financial self-interest and refused to do what was required to close the deal. It therefore breached the Merger Agreement at least by:

      a.      Failing to divest an adequate package of up to 650 stores to satisfy regulators' concerns;

      b.      Failing to divest an adequate package of non-store assets (like banners, technology, and private label brands) to satisfy regulators' concerns;

      c.      Delaying its engagement with regulators and failing to respond adequately to regulators' questions and concerns;

      d.      Mismanaging the process of identifying a divestiture buyer; and

      e.      Failing to cooperate with Albertsons in good faith.

7.      Ultimately, the FTC (joined by several states) and the states of Washington and Colorado each filed a separate lawsuit to enjoin the Merger.

8.      On December 10, 2024, and as a direct result of Kroger's malfeasance, the United States District Court for the District of Oregon and the King County Superior Court in the State of Washington issued injunctions blocking the Merger on antitrust grounds. The Merger's failure has significant consequences for Albertsons and its stockholders, who endured more than two years of uncertainty,

5

spent hundreds of millions of dollars preparing for the Merger, and now will lose the significant premium on their shares Kroger committed to pay.

9.       As a direct result of Kroger's willful breaches, Albertsons' stockholders suffered billions of dollars in damages, and the American public suffered the loss of a supermarket option offering lower prices and increased choice.  This action seeks to hold Kroger responsible for the harm it caused.

## SUMMARY OF ALLEGATIONS

10.       The impact of Kroger's breaches and the resulting failure of the Merger are particularly significant given the state of the grocery industry, which in recent years, has undergone a fundamental shift.  Retail giants like Walmart, Costco, Amazon, and Target increasingly have focused on selling food as part of their diverse product offerings.  Because of their massive scale, those retailers can sell groceries at rock-bottom prices—often lower than Albertsons' prices.  At the same time, consumers are spreading their shopping trips across several different retailers, searching for value wherever they can find it.  Together, these dynamics pose an existential threat to Albertsons and Kroger, and to their ability to serve their customers.

11.       The Merger was an ideal solution to this problem.  The combined company would have been more competitive with the behemoths, benefitting from

6

improved economies of scale by allowing it to expand in new locations at lower costs, to operate with more efficient overhead, and to take advantage of a national supply chain, an enhanced distribution infrastructure, and the ability to borrow at a lower cost of capital.  From these synergies and others, Albertsons and Kroger expected that the combined company would deliver a more diverse and lower-cost product offering to consumers, while still providing fair-paying union jobs.  The combined company also could invest in new projects related to advertising and digital sales, leveraging Albertsons' and Kroger's larger combined set of consumers and consumer data to provide added value to customers nationwide.  All of that would have allowed the combined company to better compete with retail giants Walmart, Costco, Amazon, and Target, and other grocery competitors.

12.    Kroger and Albertsons understood from the beginning that their ability to close the Merger was dependent upon obtaining FTC and state regulatory approval.  And despite all the benefits that would flow from the Merger, both Parties expected that the Merger would face scrutiny by antitrust regulators due to the overall size of the transaction and the fact that Kroger and Albertsons operate in a limited number of overlapping geographic areas.

13.    To address those concerns, as is typical in large retail mergers, Albertsons and Kroger contemplated that the FTC and state regulators would require

7

Kroger to divest certain assets. Thus, from early on in their negotiations, the Parties understood that antitrust regulatory approval was likely to require (1) a large divestiture; (2) careful selection of the stores to be divested based on sound economic modeling and neutral, objective criteria; and (3) the inclusion of other assets regulators deemed essential to the successful operation of the divested business, like "banners" (the stores' trade names), private label brands, distribution centers, supply chain agreements, and information technology assets.

14.     Albertsons knew from the start that regulatory approval in general and a robust divestiture in particular would be critical to the Merger's ability to close. As a result, Albertsons began negotiations by insisting on significant assurances that Kroger would take all necessary steps to secure regulatory approval and close the Merger. Albertsons raised the need for these assurances at the outset of the Parties' negotiations. They were in the initial draft of the Merger Agreement, which was exchanged in August 2022. And those provisions remained largely unchanged in the final Merger Agreement that the Parties signed two months later, on October 13, 2022.

15.     The core assurances Albertsons insisted on during negotiations were embodied in three provisions. Those provisions impose on Kroger a series of escalating obligations around its efforts to obtain regulatory approval:

8

a.  *First*, Kroger generally agreed to use "reasonable best efforts" to satisfy all closing conditions "as promptly as reasonably practicable."

b.  *Second*, Kroger assumed a more stringent obligation to use its "best efforts"—not limited by any standard of reasonableness— "to avoid, eliminate, and resolve any and all impediments under any Antitrust Law . . . so as to enable the Closing to occur as promptly as practicable."  That "best efforts" provision explicitly required Kroger to divest any assets and make any changes to its operations that were necessary to obtain antitrust approval.

c.  *Third*, if a regulator threatened or instituted an antitrust challenge, Kroger committed to take "any and all actions" necessary to "eliminate each and every impediment under any Antitrust Law" to closing the Merger.  This "any and all actions" obligation is an exceptionally high standard: Kroger had to resolve antitrust concerns, as Delaware courts have put it, "come hell or high water."

16.  There was only one caveat to Kroger's "best efforts" and "any and all actions" obligations: those commitments did not require Kroger to divest more than

9

RLF1 32016433v.1

650 physical stores.  Albertsons bargained hard for this 650-store threshold, rejecting Kroger's repeated proposals for a lower cutoff.  Indeed, Albertsons withheld its consent to the Merger until Kroger's CEO personally committed to divest 650 stores and shook hands on that term with the CEO of Albertsons' largest stockholder.

17.     The Merger Agreement contained no other limitations on what Kroger was required to do to facilitate the close of the Merger.  For example, nothing in the Merger Agreement limited *which stores* Kroger had to divest.  In other words, to satisfy its "best efforts" and "any and all actions" obligations, Kroger was required to divest *any* combination of up to 650 stores that would satisfy regulators.  It could not (as it later tried to do) select plum stores to retain and offer up largely unprofitable stores for divestiture.  Similarly, the Merger Agreement did not in any way limit Kroger's obligation to part with assets other than stores themselves.  For example, Kroger had an unlimited obligation to sell any non-store assets such as store banners, private label food brands, distribution centers, and IT systems, if doing so would resolve regulators' antitrust concerns.

18.     As a result of the procompetitive aspects of the Merger and the Parties' clear commitment—at least on the face of the Merger Agreement—to offer a robust divestiture, the transaction should have been able to close.  So long as Kroger fulfilled its obligations to provide necessary non-store assets and divest a reasonable

10

set of stores, regulatory approval could have been achieved. Nonetheless, Kroger owed Albertsons yet further obligations, to help ensure that the Parties' incentives remained aligned and Kroger would work diligently to ensure the Merger closed.

19.    First, because of Kroger's "best efforts" and "any and all actions" promises, Albertsons agreed that Kroger would have the principal responsibility for devising and implementing a strategy to obtain antitrust approval. But Kroger committed to "cooperate" with Albertsons in the antitrust clearance process; consult with Albertsons before meeting or communicating with regulators; give Albertsons the opportunity to attend and participate in such meetings; consider Albertsons' strategic views; and "work together in good faith to resolve [any] disagreement." Thus, Kroger was required to actively include and engage with Albertsons throughout the regulatory review process, even though the final call on decisions if the Parties disagreed on a particular strategy was Kroger's to make.

20.    Second, the Parties agreed that Kroger would pay Albertsons a $600 million termination fee if the Merger failed to close by the outside date set in the Merger Agreement. The Parties knew that this termination fee, totaling less than 2.5% of the total merger consideration, was lower than other mergers of comparable size and complexity. Albertsons was willing to accept this smaller termination fee because Kroger was contractually obligated to use its "best efforts" and to take "any

11

and all actions" to make sure the Merger would close.  As further protection to ensure Kroger's full commitment to the Merger, Albertsons expressly negotiated for an additional independent right, beyond the $600 million termination fee: in the event the Merger failed, Albertsons could seek all legally available damages for any "Willful Breach" of the Merger Agreement by Kroger.

21.     Yet, despite all its obligations in the Merger Agreement, Kroger did not hold up its end of the bargain.  Kroger failed to act promptly to secure regulatory approval, and it repeatedly delayed its responses to and its interactions with federal and state regulators.  When it did engage, Kroger took untenable positions and failed to answer routine questions about its assumptions and data for proposed divestitures. Kroger also failed to adjust its positions in response to regulators' feedback.  And Kroger ignored Albertsons' recommended strategy and general best practices to obtain regulatory approval at every step.  Kroger's conduct created frustration and distrust among regulators, who repeatedly informed Kroger that it had failed to address their concerns, and ultimately caused an unprecedented litigation onslaught where the Parties were sued contemporaneously in three separate jurisdictions.

22.     Indeed, Kroger willfully squandered every opportunity to obtain antitrust approval through a divestiture.  As Albertsons repeatedly told Kroger, and as Kroger should have known from its own previous merger clearance experience,

12

the Merger would have the best chance of obtaining FTC approval if Kroger proposed a robust divestiture package within the first thirty days after signing the Merger Agreement. Such a package would (at a minimum) include a set of stores designed to allay regulators' local concentration concerns, based upon thorough economic analysis. Putting a serious divestiture offer on the table right from the start would make FTC staff reluctant to recommend that the agency block the Merger and would provide a solid platform from which to negotiate a solution. Kroger chose not to do this.

23.    Instead, Kroger proposed an initial divestiture package that was facially deficient. When Kroger first met with the FTC in December 2022, Kroger proposed to divest only 238 stores—just over one third of the 650-store ceiling in the Merger Agreement and nearly half of the 440 stores that Kroger's own expert's economic analysis demonstrated would be needed to offer to close the deal. It quickly became clear that Kroger had not used any supportable basis to select these stores: in meetings with the FTC, Kroger could not even answer basic questions about the economic analysis underlying its proposal or the principles underlying the selection of the stores to be divested. That, of course, was because the proposal reflected *no* objective economic analysis: Kroger cherry-picked the Kroger stores included in the

13

RLF1 32016433v.1

238-store set based on their poor financial performance, not because their divestiture would alleviate the FTC's concerns about localized concentration of stores.

24.     Days after the initial December 2022 meeting, the FTC issued a second request (the "Second Request") to both Parties. A second request is universally understood by antitrust practitioners as putting the Merger at risk for future litigation and requiring an extensive series of document productions and engagements with the FTC regarding the competitive effects of the Merger.

25.     The FTC's issuance of a Second Request triggered Kroger's obligation to take "any and all actions" to remove antitrust impediments, requiring Kroger to address each and any concern raised by regulators during the Parties' negotiations with the FTC.

26.     Around the same time, the Attorneys General of multiple states, including Washington, which sent Albertsons and Kroger a Civil Investigative Demand on January 6, 2023, initiated investigations into the Merger, further heightening the risk of enforcement action and the need for Kroger to take "any and all actions" to either avoid or win any litigation challenging the Merger. Throughout their investigations, the states and the FTC coordinated their actions closely, sharing all material information they obtained from the Parties and frequently joining the same meetings with the Parties.

14

27.     Any buyer that was serious about making "best efforts," let alone taking "any and all actions" to obtain antitrust approval, would have responded to the initial FTC meeting, the FTC's issuance of the Second Request, and the initiation of multiple state Attorney General investigations by immediately proposing a new divestiture package based on rigorous economic analysis.

28.     Not Kroger.  Instead, Kroger stalled, resisting any effort to improve its divestiture proposal for months. Rather than address the FTC's concerns when next meeting with the FTC in March 2023, Kroger presented *the same* indefensible proposal to divest 238 cherry-picked stores, with a buyer to be named later.  This willfully obstructive and high-risk tactic was inexplicable, except as a decision by Kroger to press its own independent economic best interests over meaningful engagement with the FTC about resolving the agency's concerns.

29.     Kroger's initial shirking of its obligations under the Merger Agreement escalated to outright repudiation of its obligations as the Parties discussed identifying a divestiture buyer.  Kroger waited for months after signing the Merger Agreement before even starting to court potential divestiture buyers.  When Kroger finally began that process, it received ample interest: approximately 60 potential bidders signed non-disclosure agreements to initiate talks with Kroger in the first half of 2023, including established, large-scale grocery retail competitors like ▮

15

These companies were strong candidates: they had the experience, resources, and scale to acquire stores and operate them as strong competitors from Day One, thus allaying concerns about grocery competition in the vicinities of those stores.

30.     Kroger kept Albertsons largely in the dark about the identities of these potential buyers and Kroger's negotiations with them, rejecting Albertsons' pleas to be included in the process.  Kroger waited until August 2023, and then only told Albertsons that it had shortlisted three bidders—C&S Wholesale Grocers ("C&S"), ████████ and ████████—while concealing from Albertsons that it had eliminated ████ and other qualified buyers from consideration.

31.     On September 8, 2023—nearly a year after the Merger Agreement was signed, and nine months after the FTC made its Second Request—Kroger finally entered into an Asset Purchase Agreement with C&S (the "APA").  Kroger's choice of C&S as the divestiture buyer came with obvious risks.  C&S was primarily a grocery wholesaler and operated only 23 retail grocery locations at the time it was selected.  Lacking a large-scale grocery retail business of its own, C&S would need significant management and transition resources from Kroger and Albertsons to operate the divested stores effectively.  C&S was subject to heightened scrutiny by the FTC because it previously had sold numerous retail locations in the early 2000s and 2010s just a few years after purchasing them, which would predictably cause the

16

FTC to be concerned that C&S might attempt another quick sale with divested assets.

Moreover, C&S would need significant new financing to purchase up to 650 stores.

These attributes of C&S were bound to draw scrutiny from antitrust regulators, given

that any plan to divest stores to C&S would necessarily be premised on C&S's ability

to operate those stores as strong local competitors.  Selecting C&S as a divestiture

buyer was thus highly risky and inconsistent with Kroger's obligations to make its

"best efforts" and take "any and all actions" when buyers such as ▮▮▮ were

available.  Yet, Kroger made this selection without informing Albertsons of the other

potentially stronger bidders.

32.    Once it selected C&S, it was incumbent on Kroger to demonstrate to

the FTC that Kroger would divest the assets C&S would need to thrive as a

competitor.  Kroger failed on this front too.  Kroger's initial APA with C&S was

also grossly deficient.  It provided for the divestiture of just 413 stores, many of

which still were chosen based on Kroger's financial interests rather than the required

objective and neutral economic analysis.  The APA also failed to include the non-

store assets that Kroger knew any potential buyer, as well as the FTC, would regard

as essential to making the divested stores competitive, such as key IT infrastructure

and private label food products.

17

33.    Over a number of months, both Albertsons and C&S urged Kroger to address these deficiencies by divesting a cohesive selection of 650 stores and non-store assets that would meaningfully address competitive concerns.  Kroger ignored these entreaties and focused on its own economic interests, to the detriment of its credibility with regulators and its ultimate ability to negotiate a solution that would avoid litigation.    Demonstrating the seriousness of Kroger's blunders, the Washington Attorney General highlighted in its opening statement at trial an example of a store that Kroger's management had suggested be included in the divestiture package, but which was vetoed by Kroger's CEO Rodney McMullen because "this store has real estate that is worth a lot."  In its opinion enjoining the Merger, the Washington Court ultimately concluded—citing that very example— that "Kroger kept the best performing assets for itself."  As the Washington Court put it:  "Where it could, Kroger followed a simple rule:  if a store was a 'good EBITDA producer, . . . we wouldn't want to divest.'"

34.    Similar self-serving conduct by Kroger occurred throughout its negotiations with the FTC and other regulators.

35.    In addition to deficient interactions with the regulators and proposed divestiture buyers, Kroger failed to adequately inform and cooperate with Albertsons, as the Merger Agreement required.  Throughout the Parties' interactions

18

with regulators from October 2022 through February 2024, Kroger failed to meaningfully include Albertsons in strategy sessions with its legal team and experts, provide updates to Albertsons about the bases for its divestiture proposal, explain its methodologies for analyzing local competition effects, or consider feedback from Albertsons about the proper process and substance for engaging with regulators. At each turn, Kroger failed to meaningfully engage and respond to Albertsons' feedback. Instead, Kroger acted consistent with what it perceived to be in its financial interest, spending months delaying responses to regulators and then providing half-baked proposals that were objectively destined to fail.

36.     Kroger's recalcitrance toward cooperating with Albertsons was the opposite of Albertsons' approach for working with Kroger. Albertsons offered to meet with Kroger's experts and repeatedly provided Kroger with economic analyses and models from its own experts reflecting a divestiture proposal to remedy the shortcomings of Kroger's proposals and to fully address the stated concerns of the FTC and state regulators. In numerous instances, Albertsons pushed Kroger to add more stores and assets to its proposed divestitures, engage more quickly with agency officials, and provide comprehensive, economic-based rationales for its offers. And Albertsons pleaded with Kroger to offer a divestiture closer to the 650-store threshold, selected through rigorous economic analysis, and buttressed by key non-

19

store assets that would allow a divestiture buyer to become a viable competitor. Kroger brushed this input aside and omitted it from submissions to the FTC, eschewing its duty of cooperation under the Merger Agreement.

37.     Finally, Kroger failed to make a best and final offer to the FTC with the terms and on a timing that could allow the deal to close, dooming the Merger.  As a result of Kroger's conduct, the Parties lost out not only on their opportunity for a pre-litigation settlement but also compromised their defense in the eventual litigation.

38.     On September 13, 2023, Kroger met with the FTC to discuss its new proposal to sell 413 stores to C&S.  The FTC reiterated the same concerns from nearly a year prior regarding how Kroger was selecting stores to divest.  The FTC thereafter met or communicated with Kroger multiple times in October 2023, seeking additional information about Kroger's proposal, which Kroger did not provide.  Nearly a year after Kroger first engaged with the FTC, on November 22, 2023, the FTC informed Kroger that its 413-store offer remained woefully inadequate.  Kroger still had not addressed the FTC's questions about the economic methodology for its divestiture offer, nor had it addressed the FTC's prior concerns with how Kroger was defining a relevant product market.  As a result, the FTC wrote that Kroger's proposed divestiture failed to address "dozens, if not hundreds, of

20

'markets' where the [M]erger would be presumed likely to enhance market power." And yet, between November 2023 and January 2024, Kroger made just small adjustments to the number of stores it was willing to divest, first offering 510 stores and then 541 stores, but still failing to provide any additional explanation for how it was selecting those stores. When two of the FTC Commissioners convened "last rites" meetings on February 22, 2024, with litigation imminent, Kroger still refused to address the FTC's longstanding concerns, even though these were the same concerns Albertsons and C&S had been pressing for Kroger to address for months.

39.    In early 2024, as a direct result of Kroger's failure to take "any and all actions" to remove antitrust impediments, the FTC (joined by several states) and the states of Washington and Colorado each filed a separate lawsuit to enjoin the Merger. While Albertsons and Kroger entered those lawsuits at a disadvantage because of Kroger's willful blunders in the pre-litigation regulatory process, Kroger had a final opportunity to save the Merger by pivoting to a 650-store divestiture package proposed by C&S that was both responsive to the FTC's competitive concerns and within Kroger's obligations under the Merger Agreement. Instead, Kroger proposed a more limited 579-store package, knowing that it would be subject to more criticisms by the FTC and had a lower probability of passing muster with a court. That 579-store package remained highly vulnerable to attack by antitrust

21

regulators. Indeed, even Kroger's own economics expert could not fully justify the package and was forced to concede at trial in the FTC's enforcement action that the Merger was presumptively anticompetitive in nearly two dozen markets, taking the divestiture package into account.

40. On December 10, 2024, the District of Oregon granted the FTC's motion for a preliminary injunction, dooming the transaction. The judge highlighted Kroger's hand-picked economics expert's concession that at least 22 markets were presumptively unlawful, holding: "This evidence on its own is sufficient to find that the divestiture will not mitigate the merger's anticompetitive effect such that it is no longer likely to substantially lessen competition." The Oregon Court also repeatedly highlighted the glaring deficiencies in Kroger's divestiture package, particularly in light of C&S's inexperience as a retail operator.

41. Had Kroger lived up to its contractual obligations, this Merger would have succeeded. Instead, Kroger flagrantly violated its obligations to take "any and all actions" to remove antitrust impediments; to "cooperate" with Albertsons; to use "best efforts" to obtain antitrust approval; and to use "reasonable best efforts" to satisfy closing conditions generally. As a result, Albertsons has endured more than two years of limbo, during which time it has been blocked from taking on new projects, making new investments, or exploring alternative transactions it would

22

otherwise pursue.  Further, Albertsons' stockholders have been denied the multi-billion-dollar premium Kroger agreed to pay for Albertsons' shares and suffered from a decrease in stockholder value.  Meanwhile, American consumers who value fresh, high-quality food have been deprived of an opportunity for lower prices and greater choice and competition in the relevant market(s).

## PARTIES

42.     Albertsons is a Delaware corporation headquartered in Boise, Idaho.  It is one of the largest food and drug retailers in the United States.  As of September 7, 2024, Albertsons operated 2,267 stores and 1,726 pharmacies across 34 states and the District of Columbia.  Albertsons serves 36.8 million customers per week and, as of September 7, 2024, employed approximately 285,000 associates.

43.     Kroger is an Ohio corporation headquartered in Cincinnati, Ohio.  As of February 3, 2024, Kroger operated 2,722 supermarkets, of which 2,257 had pharmacies and 1,665 had fuel centers, across 35 states and the District of Columbia.  As of February 3, 2024, Kroger employed approximately 414,000 associates.

## JURISDICTION

44.     Subject matter jurisdiction is proper in this Court pursuant to 8 *Del. C.* § 111(a), which confers jurisdiction over "[a]ny civil action to interpret, apply,

23

enforce or determine the validity of . . . [a]ny agreement, certificate of merger or consolidation," under 8 *Del. C.* § 251, which governs the Merger.

## FACTUAL ALLEGATIONS

**I.     Albertsons and Kroger Face Fierce Competition, Increasingly Dominated by Walmart, Amazon, and Other Diversified Behemoths**

45.     Albertsons and Kroger have operated retail grocery stores since 1939 and 1883, respectively.  Unlike many of their competitors, Kroger and Albertsons have majority-union workforces.

46.     The grocery business has become increasingly competitive over the last few decades.  While thirty or forty years ago, customers commonly would choose one store at which to do their primary grocery shopping for the week, customers now typically split their grocery shopping across multiple trips and multiple formats, including online.

47.     At the same time, Walmart, Costco, Amazon, and Target have emerged as significant grocery competitors.  These competitors have immense scale and diversified businesses, including between grocery and non-grocery products.  Their workforces are mostly non-union, resulting in lower labor costs.  These factors, among others, enable them to consistently offer low prices to their customers.

48.     Other new competitive threats also have emerged.  Foreign-owned grocery companies like Ahold Delhaize, Aldi, and Lidl are rapidly expanding in the

24

U.S. market.    Other historically non-food retailers like Dollar General have recognized an opportunity for growth in grocery and have invested aggressively in the space.  Once-niche natural food and organic grocers like Whole Foods, Sprouts, and Trader Joe's have expanded and diversified their offerings.  And ethnically-focused sellers like H Mart, Patel Brothers, Fiesta Mart, and 99 Ranch Market have expanded from localized chains to regional competitors, operating between 50 and nearly 100 locations each.

49.    As a result, so-called "traditional grocery stores" like Albertsons and Kroger have faced increased pressure on price, quality, and diversity of their offerings and have been losing market share to both global giants and agile new entrants.

50.    During the COVID-19 pandemic, Albertsons and Kroger both enjoyed a short period of outsized profitability; overall grocery revenue rose as customers shifted from restaurants to grocery stores and consolidated their weekly trips.  As a result, grocers like Albertsons were able to hire new employees and invest in long-term projects like increasing digital sales.  In recent years, however, that trend has reversed, and competition in grocery retail has grown even more fierce.

51.    To address this increasing competition, Albertsons has implemented various initiatives to leverage its existing scale and reduce its costs, for example,

25

increasing its digital sales and improving overall productivity in its stores. Those changes have allowed Albertsons to offset a certain amount of food-based inflation and some of its rising labor costs. But these measures alone did not and could not do enough to allow Albertsons to lower its product prices to compete effectively with Walmart, Costco, Amazon, Target, and the other competitors.

52.    If dedicated grocery stores like those operated by Albertsons were forced to close due to their inability to match the prices of their superstore competitors, consumers would suffer. Through vigorous competition, Albertsons has cultivated many customers who choose to shop at its stores—either instead of or in addition to other grocery options. These consumers would lose a desirable alternative if they were forced to shop for groceries only at Walmart, Costco, and their ilk.

## II.    Kroger Approaches Albertsons, Proposing a Merger

53.    Beginning in 2021, the Albertsons board of directors engaged in a strategic review of the ways in which it could maximize stockholder value in the face of increasing pressure from larger-scale competitors. One of the options that the board explored was a potential transaction by which Albertsons might be acquired. From these discussions, and after engaging in a process to identify potential buyers, Albertsons entered negotiations with another company

26

("Company A") regarding Company A's interest in acquiring Albertsons. After Albertsons expended significant effort on the potential sale, including engaging in due diligence, Company A informed Albertsons in February 2022 that it did not wish to pursue a transaction at that time.

54. Shortly thereafter, Albertsons publicly announced on February 28, 2022 that it had commenced a Board-led review of potential strategic alternatives aimed at enhancing the Company's growth and maximizing stockholder value, and weeks later, in April 2022, representatives of Kroger approached Albertsons' outside financial advisor to discuss the possibility of Kroger acquiring Albertsons. Albertsons considered an acquisition by Kroger to be an attractive opportunity. The deal would result in a company of considerable scale: together, Kroger and Albertsons own and operate approximately 5,000 retail stores and 4,000 retail pharmacies. They also employ approximately 700,000 employees, many of whom are union members, across 48 states. This expanded scale would enable the surviving company to obtain more favorable terms from suppliers, improve its long-term supply chain management, and centralize administrative functions. In turn, the newly-merged company would use the cost savings generated by these efficiencies to deliver lower prices and expanded product offerings to customers. The surviving

27

company would also be better situated to invest in capital improvements, online shopping operations, and non-grocery business segments, including pharmacies.

55.    Critically, the combined company would be more competitive against retail giants like Walmart, Costco, Amazon, and Target, benefiting consumers. Joining forces would allow the combined entity to offer more competitive prices without compromising their fundamental business model.

56.    A merger between Kroger and Albertsons would also allow the companies to build a more valuable retail media platform than either company could build on its own.  Like other grocery retailers, Kroger and Albertsons earn revenue by selling digital and physical media space for advertisements of consumer-packaged goods, and by providing advertisers with insights on consumer purchases in response to advertisements.  This non-grocery revenue can enable a virtuous cycle: profits from retail media allow the companies to invest more in lowering grocery prices; lower prices attract more shoppers; increasing customer traffic raises the value of the advertising space the companies are able to sell; and greater future media revenue enables further grocery price reductions.  However, today, Kroger and Albertsons lack the scale and resulting network effects of superstores like Walmart, which generate much greater retail media revenues.  Building a single, nationwide retail media platform for Albertsons and Kroger, instead of two separate

28

platforms with only regional coverage, would also generate cost savings that could be passed on to consumers.

57.     Moreover, while there are certain geographic markets in which Albertsons and Kroger both operate, the two companies have different overall geographic footprints.  Albertsons stores are predominantly located in the Northeast and on the West Coast; Kroger has no presence in the Northeast.  Kroger stores are predominantly located in the Midwest, Southeast, and West; Albertsons has no presence in the Midwest or Southeast.  A merger between Albertsons and Kroger would thus create a grocery chain with broader geographic scope across the country, improving and streamlining supply chain and distribution resources, as well as unlocking new value from existing resources like consumer data.

58.     While Albertsons saw great upside in a potential deal with Kroger from Kroger's initial outreach, it needed to receive assurances from Kroger that it would do all that was necessary to close the deal.  During the time from negotiations to execution of a merger agreement, to obtaining antitrust clearance, to closing, Albertsons would have to bear significant transaction costs, including fees for attorneys and financial advisors, as well as significant costs and employee time for integration planning.

29

59.    Albertsons also knew any agreement to merge would also create a period of strategic limbo for it between signing and closing. The Merger Agreement, for example, required Albertsons to commit to significant limitations on its ability to enter contracts, including leases, above a threshold of $10,000,000. And Albertsons had to forgo other strategic alternatives at a time of significant and rapid market evolution.

60.    If the Merger never closed, Albertsons' investment of resources and effort would go to waste—a risk that was front of mind for Albertsons in the wake of its recent failed negotiations with Company A.

61.    It also was clear to both Kroger and Albertsons that their potential merger would not achieve its procompetitive aspirations and would face a substantial risk of being blocked on antitrust grounds unless the Parties pursued a principled and robust regulatory strategy, including by making divestitures in limited local geographic areas where Kroger and Albertsons both operated stores.

62.    Because the antitrust aspects of any prospective deal between Kroger and Albertsons were critical, both Parties involved antitrust counsel almost immediately after Kroger's initial outreach to Albertsons. Kroger engaged a team of accomplished, sophisticated antitrust lawyers at Arnold & Porter Kaye Scholer LLP ("A&P"), including a former Deputy Assistant Attorney General in the

30

Antitrust Division of the U.S. Department of Justice, who had had a front-row seat for four years to both the Trump and Biden Administrations' enforcement of antitrust laws. The A&P antitrust practice group was led by the former Director of the FTC's Bureau of Competition from 2013 to 2017. These attorneys and their colleagues were intimately familiar with what antitrust regulators would require from Kroger to get the deal done and how the agency's views could be affected by changes in the political climate.

63.    Through their respective competition attorneys, the Parties discussed antitrust issues extensively at the very outset of their negotiations, even before negotiating pricing and other material terms. On May 5, 2022, Kroger's and Albertsons' outside antitrust counsel discussed the geographic overlap of their stores in select areas and the intense competition that their stores face from a variety of retailers. The same outside counsel spoke about these topics again on May 11, 2022. On May 19, 2022, Albertsons CEO Vivek Sankaran met with Kroger CEO Rodney McMullen to discuss the potential deal, including the importance of developing a plan to achieve regulatory clearance by divesting specific stores to a qualified third party.

64.    As these deal discussions were ongoing, Albertsons retained Charles River Associates ("CRA"), an economic consulting firm, to conduct a preliminary

31

economic analysis of the proposed deal.  CRA adopted a fulsome approach and considered each of the 83 metropolitan areas where both Parties operated stores as part of its analysis.  From this analysis, Albertsons formed the view that a substantial number of divestitures would be required to address competitive issues in many communities and that a realistic store divestiture figure would be approximately 600 to 650 stores.

65.     Kroger engaged CompassLexecon, another economic consulting firm with significant experience in competition analysis.  To Albertsons' surprise, Kroger's consulting economists concluded that only 400 to 500 stores would need to be divested in a potential merger.  Albertsons immediately flagged flaws with this analysis, including that CompassLexecon had only evaluated competitive effects in 24 metropolitan areas, not all metropolitan areas where both Parties operated stores. When Albertsons attempted to re-create Kroger's analysis using similar assumptions but expanding results to 83 metropolitan areas, it identified hundreds more stores that presented concentration concerns and thus would likely need to be included in a divestiture package.  Kroger also did not consider either a uniform threshold of market concentration or specific radius around Kroger and Albertsons stores to determine overlaps.  Nor did it apply a market definition that the FTC was likely to use in its own analysis.  For example, Kroger included club stores like Costco,

32

natural foods stores, and ethnically-focused sellers in its early estimates even though the FTC had rejected including those stores in prior merger clearance reviews. Kroger's approach had the overall effect of significantly undercounting the number of stores it would likely need to divest.

66.     It was also clear from the outset that a successful divestiture package would require more than merely divesting a certain number of stores.  From the Parties' initial estimation exercises, there were a large number of overlapping stores in Los Angeles, San Diego, Chicago, Dallas, Las Vegas, Phoenix/Tuscon, and Washington, D.C.  As a result, the Parties would need to select stores for divestiture that would alleviate regulatory concerns related to those specific, limited set of local markets.  In effect, Kroger would need to select the "right" stores and accompany those with key non-store assets, including banners, distribution centers, manufacturing facilities, and private label brands and products that supported those stores, so that the regulators would be persuaded that a divestiture buyer would be able to establish a competitive operation.  In short, while the number of stores was important, divesting other assets would be key to resolving regulatory competition concerns.

67.     Thereafter, the Parties continued to analyze the extent of necessary divestitures while further negotiating other material terms of a deal.

33

### III.   Albertsons Bargains for Stringent Requirements for Kroger in Seeking Antitrust Approval

68.     Given the importance of a strong antitrust strategy, coupled with the risk of immense costs to Albertsons if it became entangled in a deal that never closed, Albertsons was unwilling to proceed with even drafting a merger agreement—let alone signing one—unless Kroger committed to make extraordinary efforts to close the deal, minimizing the risk of transaction failure.

69.     On June 25, 2022, Kroger, through its outside financial advisor, provided Albertsons with a nonbinding indication of interest that described terms and conditions to be further discussed, including a cap on the number of stores to be divested to obtain regulatory clearance, the time period for obtaining regulatory clearance, and the termination fee each Party might have to pay if the transaction failed to close.

70.     During the several weeks following Kroger's June 25, 2022 opening proposal, the Parties—through their senior executives, outside counsel, and outside financial advisors—discussed certain material terms that would need to be included in any merger agreement, although no draft contract had yet been shared between the Parties.

71.     To proceed with the negotiations, Albertsons demanded assurances that Kroger was willing to agree to stringent protections.  Kroger provided this assurance

34

RLF1 32016433v.1

by indicating early in the Parties' discussions that it would accept eight key deal points to mitigate the risk that the Merger would fail. Albertsons incorporated each of these protections into the first draft of the Merger Agreement, which it sent to Kroger on August 12, 2022. These protections remained materially unchanged in all subsequent drafts and were included in the final Merger Agreement, which was executed on October 13, 2022.

72. *First*, Kroger and Albertsons both agreed to use "reasonable best efforts" to satisfy all conditions to closing of the Merger, including but not limited to antitrust approval, "as promptly as reasonably practicable." This provision ultimately appeared in Section 6.3(a) of the final Merger Agreement.

73. *Second*, in addition to the mutual obligation to use "reasonable best efforts" to satisfy all closing conditions, Kroger agreed to a separate and higher standard for its antitrust strategy: Kroger alone would be obligated to use its "**best efforts**"—not limited by any standard of reasonableness—"to take . . . **any and all actions necessary** to avoid, eliminate, and resolve any and all impediments under any Antitrust Law . . . so as to enable the Closing to occur **as promptly as practicable**." The "actions" Kroger was required to take included (but were not limited to) (1) divesting "assets, properties, or businesses"; (2) entering any "arrangements" needed "to effect the dissolution of any injunction, temporary

35

restraining order or other order in any suit or proceeding" that would otherwise block the Merger; (3) "changing or modifying any course of conduct regarding [Kroger's] future operations"; and (4) taking "any other action that would limit [Kroger] or its Subsidiaries or Affiliates' freedom of action with respect to, or their ability to retain," any "operations, divisions, businesses, product lines, customers, assets or rights or interests, or their freedom of action with respect to the assets, properties, or businesses to be acquired" from Albertsons.  This provision ultimately appeared in Section 6.3(d) of the final Merger Agreement.

74.     *Third*, if any proceeding was "instituted (or threatened) challenging the Merger as violating any Antitrust Law," Kroger committed to take "**any and all actions** . . . **to eliminate each and every impediment** under Antitrust Law to close the [Merger] prior to the Outside Date" (a contractually specified date that could be extended to no later than approximately two years after signing of the contract).  This "any and all actions" obligation was even more demanding than the "reasonable best efforts" standard under Section 6.3(a): Kroger was agreeing to remove antitrust impediments "come hell or high water."  This provision appeared in Section 6.3(e) of the final Merger Agreement.

75.     *Fourth*, as a further protection for Albertsons' interest in accelerating antitrust approval and closing  the Merger, the Parties agreed that, unless both Parties

36

consented, neither Party would "enter into any agreement with any Governmental Entity to delay" the Merger or withdraw its regulatory filing seeking clearance for the Merger under the Hart-Scott-Rodino Antitrust Improvements Act ("HSR Act"). This protection would be particularly important once the Parties substantially complied with a potential second request. At that point, the FTC would have 30 days to either sue to block the Merger or permit the Merger to close—and Albertsons could insist on holding the FTC to this timeframe, even if Kroger wanted to allow an extension. By vetoing any proposed timing agreement with the FTC, Albertsons could ensure that if litigation with the FTC was necessary, it would begin promptly so Albertsons and Kroger would have time to defend themselves fully, including through any appeals. This provision appeared in Section 6.3(c) of the final Merger Agreement.

76. *Fifth*, Albertsons and Kroger agreed that the *sole* limit on Kroger's obligations to make its "best efforts" and take "any and all actions" in addressing antitrust issues would be a cap on the total number of stores Kroger could be required to divest if necessary to address regulators' antitrust concerns. There was no limit on Kroger's obligation to sell any *non-store assets* such as store banners and intellectual property to obtain regulatory approval. And there was no limit on the *specific* stores Kroger was required to divest. Kroger, in other words, could not

37

simply offer to divest its most unprofitable or otherwise unattractive stores, even if it offered enough of them to meet the contractual cap on required store divestitures. This deal point was memorialized in Sections 1.1 and 6.3(d) of the final Merger Agreement, which respectively (1) defined "Material Divestment Event" as the divestment of over 650 stores, and (2) provided that the sole limit on Kroger's "best efforts" and "any and all actions" obligation was that no Material Divestment Event would be required.

77.     *Sixth*, the Parties agreed that neither could be cut out of the antitrust approval process. They agreed to (1) "cooperate in all respects" on regulatory submissions and documents filed in any litigation or other proceeding; (2) promptly inform each other of any communication from the government or any communication regarding a proceeding; (3) allow each other "to review in advance and incorporate their reasonable comments in any communication" to the government; and (4) "to the extent practicable," consult with each other before "any material meeting, written communications or teleconference" regarding regulatory approval or any proceeding, and give each other "the opportunity to attend and participate in such meetings and teleconferences." These obligations were included in Section 6.3(b) of the final Merger Agreement.

38

78.    *Seventh*, the Parties agreed that if the Merger failed to close, Kroger would pay Albertsons a termination fee.  This obligation appeared in the August 12, 2022 Merger Agreement draft, with the amount of the termination fee provisionally left blank.  The Parties later agreed to a $600 million termination fee.

79.    *Eighth*, the Parties agreed that, even if the Merger Agreement was terminated and the $600 million termination fee was paid, the termination would not release any Party from liability for any "Willful Breach" of the Merger Agreement— *i.e.*, a "material breach … that is the consequence of an act or omission by the breaching [P]arty with the actual knowledge that the taking of such act (or, in the case of an omission, failure to take such act) would cause or constitute such material breach, regardless of whether breaching was the object of the act or failure to act." In the case of a Willful Breach, the aggrieved Party would be "entitled to all rights and remedies available at law or in equity," such as "benefit of the bargain" damages suffered by Albertsons' stockholders from the loss of the premium that they would have received had the Merger closed.  Thus, if Kroger willfully breached any of its obligations under Merger Agreement—including its obligations regarding antitrust matters under Section 6.3—Albertsons could seek damages for the breach, which would not be limited by the $600 million termination fee.  The final Merger

39

Agreement memorialized this point in Sections 8.3 and 9.5 and in the definition of "Willful Breach" in Section 1.1.

80.     Thus, as of August 12, 2022, when Albertsons shared the initial draft Merger Agreement with Kroger, the basic framework protecting Albertsons from the risk of Kroger failing to obtain antitrust regulatory approval already was in place. The only open issues for further negotiation on this topic included (1) the cap on how many stores Kroger could be required to divest, (2) the amount of the termination fee Albertsons would receive if the deal failed, and (3) the extent of control Kroger would exercise over the process of seeking antitrust regulatory approval, notwithstanding Albertsons' agreed-upon right to participate in that process.

81.     On August 19, 2022, Kroger sent Albertsons proposed revisions to the initial draft Merger Agreement.  Some of Kroger's edits focused on the issue of control over the regulatory process.  While accepting Albertsons' proposed language requiring cooperation, Kroger rejected Albertsons' proposal that the Parties resolve any disagreements about any regulatory "communication, strategy or process" by "work[ing] together in good faith to resolve the disagreement and endeavor[ing] to implement such communication, strategy or process in a mutually acceptable manner."  Kroger instead proposed language stating that Kroger "shall have the

40

principal responsibility for devising and implementing" the antitrust strategy "and shall lead and direct all submissions" in the antitrust regulatory process and any litigation.

82.    That proposed transfer of control to Kroger was not acceptable to Albertsons—unless Kroger committed to a divestiture package sufficiently large and robust to give Albertsons confidence that the Merger would receive antitrust approval.  On August 26, 2022, Albertsons sent Kroger a draft Merger Agreement that reversed Kroger's edits on the issue of control but added, in a footnote: "Control of strategy to be discussed after [Albertsons'] review of [Kroger's] proposed divestment package."

83.    Accordingly, for the next several weeks, the Parties temporarily tabled the question of control over post-signing antitrust strategy, instead focusing their negotiations largely on the cap on the number of stores that Kroger would be contractually required to divest and the size of the termination fee Kroger would be contractually obligated to pay if the deal failed.

84.    Kroger's incentive was to bargain for the lowest possible cap on the number of stores it would potentially need to divest because, other things being equal, divesting more stores would mean Kroger was giving up more value.  But

41

Albertsons was unwilling to enter into a Merger Agreement that did not require a divestiture level that Albertsons could be confident would secure antitrust approval.

85.    On September 2, 2022, Kroger proposed a 600-store cap on Kroger's obligation to divest stores to obtain regulatory approval.

86.    Albertsons was not satisfied.  The next day, the Parties' respective antitrust attorneys discussed Kroger's proposal and the importance of Kroger proposing a viable divestiture package to antitrust regulators.

87.    On September 5, 2022, Albertsons communicated a counterproposal in which the cap for Kroger's divestiture obligation would be increased to 650 stores, and the termination fee payable by Kroger to Albertsons would be $800 million.

88.    Kroger countered the next day, proposing a 600-store divestiture cap and a $600 million termination fee.  Albertsons rejected that proposal.  On September 22, 2022, it communicated to Kroger that it would agree to a $600 million termination fee, but only on the condition that the divestiture cap was raised to 725 stores.

89.    Kroger initially balked at raising the divestiture cap above 600 stores. But after discussions between the Parties' financial advisors and attorneys on September 27 and 28, 2022, Kroger made a September 29, 2022, counteroffer that included a 650-store divestiture cap and a $600 million termination fee.

42

90.     The same day, Albertsons communicated to Kroger that it was prepared to accept Kroger's economic terms, subject to a few final demands including increasing the divestiture cap to 725 stores.

91.     Finally, in discussions between September 30 and October 1, 2022, Albertsons and Kroger reached an agreement in principle on the termination fee and divestiture cap.  Kroger would agree to set the cap for required divestiture at 650 stores, despite having insisted repeatedly that it should be no higher than 600 stores. While lower than the 725-store threshold Albertsons had proposed, this 650-store threshold was still conservative and thus protective of Albertsons; the Parties understood that if Kroger met its stringent obligations to make "best efforts" and take "any and all actions" to secure antitrust approval, it would be readily achievable to construct a divestiture package that would fully address any antitrust concerns without needing to divest more than 650 stores.  In return for Kroger's agreement to the 650-store threshold, Albertsons would accept Kroger's proposal for a $600 million termination fee.  While the termination fee was below market expectations for a merger of similar size and complexity, Albertsons was willing to accept the lower termination fee because of the strong protections designed to minimize the risk of transaction failure as a result of Kroger accepting the 650-store cap, and because Albertsons had preserved the right to seek damages beyond the termination

43

fee for any Willful Breach by Kroger.  Ultimately, the final Merger Agreement reflected the Parties' agreement on a 650-store divestiture cap and provided for the $600 million termination fee.

92.     That left the issue of control over antitrust strategy to be negotiated.  In a markup of the Merger Agreement on October 7, 2022, Kroger proposed a compromise: Kroger would agree to Albertsons' proposed language requiring "good faith" efforts to resolve disagreements, in exchange for Albertsons agreeing that, "following such good faith efforts" to resolve disagreements, Kroger "shall have the principal responsibility for devising and implementing the strategy for obtaining any necessary antitrust consents or approvals."  Albertsons agreed.  Whereas Albertsons could not unliterally approach the FTC to provide updates on the Merger or proposed divestiture package, it could rely on the strong contractual protections that mitigated the risk of Kroger abusing its asymmetric control over the antitrust process.  Section 6.3(b) of the final Merger Agreement reflected this compromise.

93.     Before Albertsons made its final decision to accept Kroger's terms, Kroger CEO Rodney McMullen met face-to-face with Stephen A. Feinberg, the CEO of Albertsons' then-largest stockholder, Cerberus Capital Management. McMullen explicitly committed to Feinberg that Kroger would divest 650 stores to get the Merger done, and shook hands with Feinberg on that point.  This personal

44

commitment from the highest level of Kroger's management gave Albertsons the added assurance to feel comfortable selling the business to Kroger.

**IV.    Albertsons and Kroger Agree to Merge**

94.    On October 13, 2022, Albertsons and Kroger entered into the Merger Agreement.  A true and correct copy of the Merger Agreement is annexed to this Complaint as Exhibit 1.

95.    In the Merger Agreement, Kroger and Albertsons agreed to merge Kroger's subsidiary, Kettle Merger Sub Inc., into Albertsons, in a transaction that valued Albertsons at approximately $24.6 billion and would provide $34.10 per share in consideration to Albertsons' stockholders, representing a 32.8% premium over Albertsons' closing stock price of $25.67 on October 12, 2022, the day before news of the Merger became public.  The premium alone was valued at approximately $6 billion.

96.    The executed Merger Agreement imposed on Kroger all the stringent obligations regarding its pursuit of regulatory approval for which Albertsons had bargained, and that Albertsons had insisted on maintaining throughout negotiations. *See supra* Section III.

45

97.    Section 8.1(e) of the Merger Agreement set the "Outside Date"—the date on which either Party could terminate the Merger Agreement if the deal had not closed—as January 13, 2024.

98.    That same subsection provides that if regulatory approval was still pending, either Party could unilaterally extend the Outside Date in increments of 30 days, for up to 270 days total, *i.e.*, until October 9, 2024.  If either Albertsons or Kroger was in breach of the Merger Agreement, however, that Party was not permitted to extend the Outside Date.  Albertsons later exercised its rights under Section 8.1(e) of the Merger Agreement to extend the Outside Date nine times in one-month increments from January 13, 2024 through October 9, 2024 in an effort to salvage the Merger despite Kroger's breaches of its obligations.

99.    Under Section 8.4(c), if the Merger Agreement was terminated by either Party (i) following the passage of the Outside Date if the Merger had not received regulatory approval or an antitrust injunction remained pending or (ii) following the issuance of a final non-appealable order enjoining the Merger on antitrust grounds, then Kroger would be required to pay Albertsons the $600 million termination fee.  Kroger also would be obligated to pay the $600 million termination fee if Albertsons terminated because the transaction was otherwise ready to close but Kroger refused to close.

46

100.   Further, in the event of a "Willful Breach" of the Merger Agreement by Kroger, Section 8.3 allows Albertsons to recover its damages over and above the $600 million reverse termination fee, providing that Albertsons "shall be entitled to all rights and remedies available at law or in equity."

101.   Finally, Section 9.5 of the Merger Agreement expressly contemplates that the damages Albertsons may seek for a Willful Breach include "benefit of the bargain" damages, which Albertsons may "pursue[] on behalf of the holders of [Albertsons] Common Stock."  These "benefit of the bargain" damages include the premium that Albertsons' stockholders would have received if the Merger had closed.

## V.     Kroger Immediately Receives Negative Market Feedback After the Merger Is Announced

102.   When Albertsons and Kroger agreed to merge, both companies believed the transaction was in their economic interest.  But the ink on the Merger Agreement was barely dry before Kroger began to develop buyer's remorse. Multiple factors—including negative market feedback on the deal and its impact on Kroger's debt burden; and ominous economic signals for the grocery sector— combined to change Kroger's financial assumptions, creating a disincentive for Kroger to go as far in seeking antitrust approval (including the divestiture process)

47

as might be necessary to close the deal on the terms it had agreed to, despite its contractual obligations.

103. *First*, Kroger received near-instant feedback from the market indicating that investors and analysts viewed its acquisition of Albertsons negatively.

104. News of the likely merger became public on October 13, 2022, preceding the formal announcement the next day. Following the initial news reports and continuing after the formal announcement, there was a significant sell-off of Kroger's stock, causing a 7.3% decrease in share price that day—the stock's largest single-day decline in the second half of 2022.

105. After the public announcement on October 14, 2022, well-known investment ratings companies, including S&P, Moody's, and Morningstar, all published reports on Kroger. These analyses recognized that Albertsons was an attractive acquisition target for Kroger, and none suggested that the deal overvalued Albertsons. S&P, for example, noted that both companies had "performed well recently" and that "[t]he combined enterprise will have a more balanced footprint across the U.S. with the benefit of [Albertsons'] solid western U.S. presence and should present the organization with significant synergy opportunities." Nevertheless, S&P, Moody's, and Morningstar each concluded that the Merger's overall effect on their outlook for Kroger was "negative." In addition to recognizing

48

that obtaining antitrust clearance would likely require a large divestiture package, analysts were concerned about potential increases in debt levels at the post-merger company, as well as potential integration risks in an uncertain time for grocery retailers.

106.    Kroger's post-merger debt load was an especially significant concern to third-party analysts.    Morningstar, for example, emphasized that Kroger's additional leverage as a result of the Albertsons acquisition could result in a debt-to-adjusted-EBITDA ratio of well over 3.00x, which could lead to challenges in achieving future revenue growth.    Analysts at S&P and Moody's were similarly concerned that high leverage might hinder future growth for Kroger and ultimately affect its ability to maintain a commercial-grade credit rating.

107.    Analysts also expressed concern that a general cooldown in grocery sales, following record high performance during the COVID-19 pandemic, might create integration risks.    S&P, for example, explained that in an industry that "continue[d] to evolve rapidly to meet customer expectations," there might be unforeseen execution risks in the management of the combined entity.    Moody's warned that these risks could even lead to potential operational shortfalls, endangering the short-term financial well-being of the new company.

49

108.   These negative reactions from influential ratings agencies—and the implicit risk of a near-term credit downgrade, which could make borrowing for Kroger more expensive going forward—soured investors' opinion of Kroger.  That, in turn, created a powerful incentive for Kroger to revise its approach to the deal.

109.   *Second*, concerns emerged about the risk of deflation in the U.S. economy following years of inflation, which could have undermined Kroger's assumptions related to the value it expected to capture from the deal.  During the Merger negotiations, post-pandemic inflation was high—but as pandemic-era stimulus programs began to wind down, and global monetary policy tightened, some economists predicted lower inflation or even deflation, pushing down the prices of groceries and other consumer goods.  Analysts warned that, based on historical data, a period of deflation would depress grocery companies' earnings.

110.   *Third*, over the two years following the Merger Agreement, both Albertsons and Kroger experienced financial results that fell short of expectations in some respects.  Albertsons, for example, had forecasted around the time of the Merger Agreement that its adjusted EBITDA for fiscal year 2023 would be approximately $4.7 billion, but it ultimately reported adjusted EBITDA of approximately $4.3 billion for that fiscal year.  The headwinds reflected in these results were also felt by other grocery retailers, as overall consumer spending at

50

grocery stores trended downward.  These financial realities made the Merger less accretive to Kroger, other things being equal.

111.  These post-signing market developments were no excuse for Kroger to walk back from its contractual obligations in the Merger Agreement.  After a deal announcement, it is not unusual for the buyer to receive negative market feedback and to experience economic headwinds that partially erode the deal's value.  Kroger bore this risk under the Merger Agreement, and it was Kroger's responsibility to consider this possibility before it irrevocably committed to acquire Albertsons and to use "best efforts" and take "any and all actions" to secure antitrust approval. Despite its contractual obligations, however, economic factors after the signing of the Merger Agreement gave Kroger an incentive to breach the contract by approaching the regulatory process in a way that prioritized preserving value for Kroger at the expense of antitrust approval risk.

## VI.    Kroger Faces Political and Labor Pushback to the Merger, Which It Refuses to Take Reasonable Measures to Mitigate

112.  From the Merger's announcement, Kroger also faced significant political and labor group pushback.  Albertsons proposed a proactive advocacy and public relations strategy to Kroger, but Kroger ignored its advice.  These political and labor pressures increased the scrutiny on antitrust approval of the Merger and

51

ultimately added fodder to the FTC's concern that the Merger could be problematic for labor market competition.

113.   Organized labor groups representing grocery store employees voiced opposition to the Merger.  For example, on November 29, 2022, the Local United Food and Commercial Workers Unions, which represented over 100,000 Kroger and Albertsons employees in twelve states, held a press conference opposing the Merger. Only one labor group representing employees from either company subsequently supported the Merger, and it later retracted its support.  Opposition from labor groups further inflamed the political pressure that Kroger faced.

114.   Albertsons proposed ways for Kroger to allay political and labor concerns.  In or around June of 2023, Albertsons encouraged Kroger to develop a grassroots communications and advocacy strategy.  Albertsons urged Kroger to proactively reach out to and meet with members of Congress to discuss the Merger and its procompetitive benefits.  Kroger did not do so.

115.   Albertsons also advised Kroger to seek negotiations with pertinent unions. The Parties knew that FTC Chair Lina Khan had indicated that labor issues were among the FTC's considerations when evaluating a potential merger.  Thus, proactively engaging with labor interests would help get the deal done.  Albertsons

52

believed that at least one national union would favor the deal if the Parties provided meaningful incentives.  Kroger CEO Rodney McMullen refused to engage.

116.   Union opposition was far from inevitable.  In fact, unions had powerful incentives to support the Merger.  Unionized grocers' jobs fell from about 50% to 14% among the top 15 grocers in the last 20 years.  Against that backdrop, the Merger would preserve union jobs by helping Albertsons and Kroger keep stores in business.  Unions would thus be natural allies of the Merger, but only if Kroger successfully addressed their concerns.

117.   Those concerns were readily solvable.  One of the United Food and Commercial Workers International Union's main complaints about the Merger was "lack of transparency."  Another was that Kroger was not pro-union.  Had Kroger engaged with the unions, demonstrated transparency, and explained the Merger's benefits to labor, the Merger would have likely found some union support.  That support would have helped to blunt public opposition to the Merger and promote a favorable regulatory review.

118.   Kroger let these manageable headwinds turn into large roadblocks through its refusal to heed Albertsons' advice and failure to take steps from early 2023 onwards to educate key constituencies about the benefits of the Merger.

RLF1 32016433v.1

119.    None of these developments changed Kroger's obligations under the Merger Agreement.  And despite political and labor concerns about the Merger, the path to FTC approval was still attainable.  Large, complex deals often face considerable public scrutiny and political controversy, and many such transactions clear agency review without litigation.  Kroger, however, flouted its contractual obligations, insisting on the Merger going forward on its own terms or not at all.

## VII.   The Merger Has a Viable Path to Antitrust Approval, Provided Kroger Complies with its Contractual Obligations

120.    As discussed above, the Merger Agreement specifies that Kroger was responsible for shepherding the Merger through the regulatory-approval process. This task was entirely achievable, so long as Kroger performed as required under the Merger Agreement.

121.    In evaluating proposed mergers, antitrust regulators and courts consider not only whether the merger could cause competitive concerns, but also whether it would have procompetitive benefits.  In this case, the Merger would have provided significant procompetitive benefits to the customers that Albertsons and Kroger serve.

122.    The path to obtaining antitrust clearance of mergers between large supermarket companies is well-trodden.  For example, in 2016, the FTC settled a $28 billion merger between Koninklijke Ahold ("Ahold") and Delhaize Group,

54

which together owned grocery chains such as Giant, Martin's, Stop & Shop, Food Lion and Hannaford, after the two companies agreed to divest 81 stores. As the Ahold-Delhaize merger illustrated, two large companies can assuage FTC concerns if they take appropriate steps to address those concerns, including by presenting defensible and timely divestiture proposals.

123.    After a merger is first presented to the FTC pursuant to the HSR Act, the FTC has a certain amount of time to issue additional requests for documents and information—referred to as second requests—seeking additional information about the transaction. Statutory waiting periods differ depending on the type of transaction at issue. The operative waiting period for the Merger was 30 days. If the FTC does not issue a second request during the waiting period, the transaction can close. If, however, the FTC issues second requests within the waiting period, the Parties must work with the FTC to address its additional inquiries. When the Parties have substantially complied with the FTC's requests, absent a timing agreement with the Parties stating otherwise, the FTC then has 30 days to either (1) sue to enjoin the transaction or (2) reach a negotiated agreement to allow the transaction to close without the need for litigation. Each of these steps must occur before the Parties' agreed-upon outside date, *i.e.*, the final deadline for closing the deal, after which the Parties can walk away.

55

124. Under Section 8.1(e) of the Merger Agreement, either Albertsons or Kroger could walk away from the transaction "if the Closing d[id] not occur on or before" January 13, 2024—the Outside Date. That date could thereafter be extended by one of the Parties to October 9, 2024, with certain limitations.

125. Given this timeline, a party intent on seeing the Merger close before the Outside Date—as was Kroger's obligation—would have and should have taken a proactive approach on appealing to and working with the FTC from the moment the Merger was first presented to the agency. That would mean presenting to the FTC, as an initial offer, a sizeable divestiture package that was supported by detailed economic analysis and that contained stores selected by objective, neutral criteria. Such a package would be structured to address local concentration concerns and thereafter, be updated to timely respond to the FTC's feedback in subsequent divestiture package proposals.

## VIII. Kroger Proposes a Woefully Inadequate Initial Divestiture Package

126. Given the timing pressures the Merger faced and the importance of establishing credibility before the FTC, it was imperative that Kroger propose workable solutions to the FTC early on in its negotiations with the agency. Kroger instead proposed a facially deficient divestiture package of only 238 stores. That

56

was inadequate under Kroger's own experts' economic analyses, and well below the 650-store threshold in the Merger Agreement.

127.   The inadequacy of Kroger's proposal was especially surprising, since as described in Section II, Kroger was being advised by sophisticated legal counsel with extensive experience in antitrust matters, including government leadership experience.  Those lawyers understood what it would take for the Merger to close: a meaningful divestiture package and serious and efficient cooperation with the regulatory agency.

128.  In particular, a well-reasoned divestiture package would have considered and been drafted in light of the FTC's well-known methodology for assessing competitive effects in merger analysis.   As part of any merger investigation, the FTC examines the merger's impact on market concentration in relevant product and geographic markets, which can and may include multiple sub-markets in localized areas of competition.  Especially when evaluating merging grocery sellers, the FTC has a long history of evaluating hyper-local areas of competition, for example, competition within a 3 or 5-mile radius.  Knowing the likely approach the FTC would take in analyzing the competitive effects of the merger, Kroger should have created a highly detailed initial divestiture proposal

57

focused on areas of local competition that could be affected by the Merger. It did not.

129.   Instead, Kroger's initial proposed package ignored settled economic principles and methods and cherry-picked its low-performing, unattractive stores, in a hodgepodge of localities. Other localities with areas of overlap between Kroger and Albertsons but with high-performing Kroger stores were not prioritized for divestitures. This clearly was an indefensible approach designed only to benefit Kroger's balance sheet at the expense of time and credibility before the FTC, and ultimately, to the detriment of consumers and Albertsons.

### A.     Kroger Presents an Initial Divestiture Package of Just 238 Stores

130.   On October 14, 2022, the day the Merger was made public, the Parties had an initial call with the FTC. Kroger explained the rationale for the deal and that the Parties expected considerable synergies. Kroger expressed its willingness to present a divestiture package that would get the deal done.

131.   On December 1, 2022, Kroger and Albertsons had their first formal meeting with FTC staff. At that meeting, Kroger presented its initial divestiture proposal of 238 stores. Kroger had developed this proposal unilaterally, rejecting Albertsons' advice and warnings that a low initial divestiture number would be problematic for the FTC; ignoring Albertsons' recommendations about which stores

58

should and should not be included on the list; and ultimately refusing to share with the FTC how it had arrived at the 238 stores. The package contained approximately a third of the 650 stores contemplated by the Merger Agreement and approximately half of the stores that Kroger had told Albertsons that its economic experts had modeled that it would likely need to divest.

132. Following receipt of Kroger's initial proposal, the FTC issued second requests (the "Second Request") on December 5, 2022, to Kroger and Albertsons requiring them to assemble massive document productions in support of the Merger. The FTC's Second Request to Albertsons contained 91 separate requests for narrative responses and/or documents, many of which had several sub-parts, touching all aspects of Albertsons' businesses. The Parties ultimately produced many million documents to the FTC over a period of several months, at a considerable expense.

133. Nonetheless, despite the seriousness of having received a Second Request, indicating the Merger stood a good chance of ultimately being litigated, between December 2022 and March 2023, Kroger dragged its feet and failed to address adequately the FTC's concerns.

134. In the initial December 1, 2022 meeting with regulators, for example, the FTC had raised questions regarding local concentrations of stores in specified

59

geographies. Kroger took months to respond. This laggard approach colored its later interactions with regulators as well.

### B.    Kroger Doubles Down on Its Inadequate Divestiture Package of 238 Stores

135.    On March 17, 2023, after months of little to no contact about Kroger's divestiture proposal, the Parties met with the FTC again. Kroger presented a slide deck about the merger and about its divestiture proposal, which remained the same 238-store proposal from December 1, 2022.

136.    Kroger's presentation on the divestiture proposal provided more detail about how its 238 stores were selected; those details only revealed that Kroger had failed to use uniform, neutral criteria for selecting stores. Kroger did not, as the FTC would have expected, evaluate stores using a uniform metric like radius around existing Kroger and Albertsons stores. Nor did it evaluate market shares with a recognized 30% threshold or evaluate whether there were four or fewer remaining competitors in the relevant geographic area that it defined. Whereas Kroger stated it was evaluating a "localized, store-by-store competition analysis," this appeared to be a non-rigorous, cherry-picking approach. As later analysis confirmed, out of the 238 stores that Kroger proposed to divest, those belonging to Kroger were largely unprofitable stores, and divesting them would protect Kroger's bottom line. Kroger's failure to use an objective, neutral approach to select stores was a

60

purposeful one aligned with Kroger's self-interest, rather than one aimed at alleviating local concentration concerns.

137.    Kroger's presentation to the FTC also failed to evaluate local competition in the "traditional supermarket and supercenter" market that the FTC had used in prior successful mergers.  Kroger should have known, based on the FTC's approach to prior grocery mergers, that the FTC was likely to rely on this kind of "traditional supermarket and supercenter" definition and Kroger thus should have tailored its presentation and analyses accordingly to address that approach.  It did not.

138.    Unsurprisingly, Kroger's presentation was not well received by the FTC.  The FTC made clear that the number of stores Kroger was proposing to divest was inadequate, and it was not clear how stores were being selected or why certain local geographies with concentration issues were not addressed.

## IX.    Kroger Mismanages the Process of Identifying a Divestiture Buyer, Culminating in the Selection of Wholesale-Focused C&S

139.    Kroger also failed to live up to its obligations under the Merger Agreement in identifying a buyer for the divested stores.

140.    The selection of an appropriate divestiture buyer, or group of buyers, is a critical part of any antitrust regulatory process that involves a potential divestiture.  In assessing whether a divestiture plan would sufficiently address any competitive

61

concerns otherwise posed by a merger, the FTC and other antitrust regulators assess not only the scope of assets to be divested, but whether the buyer has the skills, resources, and motivation to operate those assets in a way that preserves competition.

141.    Kroger's search for a divestiture buyer was disorganized, protracted, and contributed to the ultimate failure of the Merger.  Kroger passed up highly qualified divestiture buyers—including a buyer that its own executives characterized in their internal communications revealed at trial as a "no brainer"—in favor of a divestiture buyer whose primary business was wholesale distribution with a limited record of running retail stores.  Kroger's selection of a divestiture buyer introduced new obstacles for the Parties throughout trial and ultimately contributed significantly to the Oregon and Washington Courts' decisions to enjoin the merger.

142.    As an initial matter, Kroger dragged its feet.  Kroger failed to sign a single nondisclosure agreement ("NDA") with a prospective buyer until February 2023, months after it signed the Merger Agreement.

143.    Once it finally began its search for a buyer, Kroger received substantial interest from the market.  During the course of the solicitation process, approximately 90 potential buyers were contacted about the transaction, and about 60 indicated their interest in exploring the divestiture transaction by signing NDAs. Unbeknownst to Albertsons at the time, some of these prospective buyers were

62

experienced, large-scale grocery retailers including ███ who should have been front runners and would have been strong competitors to Kroger. Instead, Kroger turned them away.

144. ███ for example, ████████████████████ ████████████ when it was ██████████████████████ ███ expressed specific interest in ██████████████████████████ an area that was flagged by regulators as having specific local concentration concerns. ████ was an ideal candidate to purchase divested stores: it had a strong track record of operating retail supermarkets ██████████████, which would quell any doubts about its ability to operate the divested stores, and had ██████████████████

████████████████████████████████████████████.

██████████████████████████████████, later stated that ████ would have been a better buyer than C&S because it "already ha[d] a solid backbone" and was "very profitable at retail." Nonetheless, Kroger rejected ███ never informing Albertsons that they were even in the mix of potential buyers. ███

████████████████████████████████████████████

█████████████████

145. In evaluating prospective buyers, Kroger also focused on criteria that were not aligned with securing regulatory approval for the Merger. In October 2024,

63

Kroger admitted to the FTC that it had evaluated initial divestiture offers based on "value, transaction certainty, and buyer flexibility to acquire additional stores." This was at the expense of prioritizing criteria that would be critical to the FTC, such as a company's track record of running retail grocery stores, the strength of a company's management team, the reliability of a company's existing financing arrangement, and the depth and complexity of transitional services and non-store assets that would be required to support a buyer. While Kroger used some of these criteria to evaluate final bids, Kroger should have prioritized them throughout the buyer selection process.

146.  Kroger also artificially narrowed the field of potential buyers by insisting on a single buyer for all divested assets. In numerous other large merger transactions, the FTC had accepted proposals for multiple buyers to purchase divested assets. Assembling multiple buyers who could purchase stores in different geographical regions would avoid triggering new antitrust concerns from the divestiture transaction, as it would spread store ownership among more, not fewer, owners than prior to the Merger. For example, assembling multiple buyers could allow Kroger to sell stores and related assets in "clean sweeps," that is, larger bundles in specific geographies. Kroger refused even to consider that possibility. Its insistence on a single buyer substantially limited the number of potential buyers

64

for to-be-divested stores, as few prospective bidders had the size, management expertise, existing supply chain contracts, distribution infrastructure, and access to capital to purchase hundreds of store locations in a single transaction.

147.   The divestiture package Kroger offered to buyers further narrowed the number of potentially interested buyers—even buyers Kroger did not improperly exclude.  Kroger offered potential buyers an unattractive 413-store package of underperforming stores and paltry non-store assets.  As Albertsons already had warned Kroger, that package failed to adequately address regulatory concerns about local store concentration or set up a divestiture buyer to meaningfully compete.  Yet, as in its interactions with the FTC and Albertsons, Kroger did not react to potential buyers' concerns; rather, Kroger only offered take-it-or-leave-it bundles.  The results were predictable: of the approximately 60 companies that signed NDAs with Kroger and indicated initial interest, only 3 ultimately submitted formal bids.

148.   Kroger received formal bids from potential divestiture buyers by August 3, 2023, approximately a month before the date by which Kroger had told Albertsons that it would have an executed asset purchase agreement in place with a divestiture buyer.  This time crunch created new concerns, as it prevented Kroger from adequately considering those bids, going back to the market for additional bids,

65

negotiating better offers from existing bidders, or considering a proposal to work with multiple bidders in a joint process.

149.   Throughout June and July 2023, Kroger kept Albertsons in the dark regarding the process of selecting a divestiture buyer.   Kroger did not inform Albertsons of the details of its interactions with potential buyers, nor did it tell Albertsons that strong buyers were being turned away.   Kroger also did not include Albertsons in its process of assessing the bids that it received, even though a large number of stores that would be divested were current Albertsons stores.

150.   Without any input from Albertsons, Kroger ultimately chose C&S as the sole divestiture buyer.   Nearly a year after entering into the Merger Agreement, on September 8, 2023, Kroger and C&S entered into an APA.

151.   Kroger's choice of C&S raised several challenges that the FTC seized upon.   *First*, while C&S is a leading, large-scale competitor in grocery wholesale, C&S currently operates only 23 retail grocery stores, mostly in upstate New York, Vermont, and Wisconsin, and this lack of retail experience would raise questions about its ability to operate successfully an up-to-650-store supermarket chain, including fuel and pharmacy operations, across multiple states.   C&S also lacked any significant retail experience in states like Washington or Colorado, where Kroger anticipated needing to divest a meaningful number of stores.

66

152.  *Second*, C&S's existing banners for stores, limited to Piggly Wiggly and Grand Union banners, and private label brands, limited to Best Yet, are unknown to customers in Arizona, Colorado, Oregon, Washington, and California, where Kroger needed to divest stores.  C&S would need to invest in significant re-bannering of stores and Kroger would need to transfer lucrative private labels like "O Organic" and "Signature," associated with significant execution risk.  In many grocery stores, private label sales make up 25% of sale volume; any issues in transferring banners or brands could significantly undermine the future success of divested stores.

153.  *Third*, given the limited footprint of C&S's existing retail stores, Kroger would need to divest a broad array of non-store assets.  C&S required thousands of store associates, managers, back-office personnel, and a comprehensive IT solution that it did not have in order to run the divested stores.  And while C&S operated a large distribution network that supplied grocery stores around the country, that network had gaps in Arizona, Colorado, and Southern California, areas where Kroger was divesting a substantial number of stores.  Kroger therefore would need to divest distribution centers in those regions as well.

154.  *Fourth*, given its lack of a significant grocery retail business, C&S would require continued transition support from Kroger over a long period of time

67

to operate the divested stores, raising concerns about ongoing entanglements between competitors in these very markets.

155.  *Fifth*, after Kroger selected C&S, Albertsons learned that C&S also has a history of acquiring stores and then selling them when they become unprofitable. As the FTC later highlighted in its preliminary injunction trial to stop the Merger, C&S acquired over 370 retail grocery stores between 2001 and 2012 but sold or closed all but three of those stores by 2012.  Indeed, it was revealed at trial that C&S stated as recently as 2021 that any retail grocery stores it operates were intended to support its *wholesale* business, and the company stated in a 2021 quarterly report that "[w]e do not intend to grow our grocery retailing operations or to operate the retail grocery stores in the long term.  We expect to divest our retail grocery stores as opportunities arise."  Similarly, in 2023, C&S stated that "[f]rom time to time, we acquire retail store locations in connection with strategic transactions to maintain or expand our grocery wholesaling and distribution business."

156.  *Sixth*, C&S would require months of fundraising negotiations with its bankers to obtain the financing necessary for it to purchase the required number of to-be-divested stores, which would delay its ability to enter any definitive agreement to acquire those stores.  Given these attributes of C&S, Kroger and its sophisticated antitrust counsel surely knew that the FTC would closely scrutinize any plan to

68

preserve competition after the Merger by divesting stores to C&S. While the FTC had approved C&S as a divestiture buyer in a 2022 merger between grocers Price Chopper and Tops, that divestiture was for just twelve stores. C&S, however, has faced challenges operating these stores. It has had to close one and the remaining stores have lost significant sales and are losing money.

157. Kroger's choice of C&S ultimately would fuel plaintiffs' efforts to challenge the Merger. The FTC, Colorado Attorney General, and Washington Attorney General focused much of their cases on C&S's perceived shortcomings as a divestiture buyer. The FTC, for example, repeatedly emphasized C&S's thin and uneven track record in grocery retail. The agency also noted what it perceived as tension between Kroger's arguments that (1) it needed to merge with Albertsons to obtain the scale to compete with Walmart, Costco, Amazon, and Target, and (2) C&S would be a viable competitor, even though its existing retail supermarket operations were nearly nonexistent, and it would acquire only a few hundred stores in the divestiture. The Colorado and Washington Attorneys General echoed these points in their cases challenging the deal. Regardless of whether those critiques of C&S are accurate, they would not have been made, or would not have persuaded the Court, had Kroger selected a buyer with a clear track record of retail success.

69

158.    Kroger's mismanagement of the search for a divestiture buyer thus left the Merger vulnerable to attacks from regulators and was emblematic of Kroger's broader failure to use "best efforts" and take "any and all actions" to secure timely antitrust approval.  While C&S may well be capable of succeeding as a divestiture operator, that is beside the point.  The point is that Kroger had an obligation to remove any and all regulatory concerns, and it selected C&S knowing that the selection was risky and would generate objections from the regulators.

## X.    Kroger Proposes an Inadequate Package of Assets to Divest to C&S

159.    Once Kroger selected C&S as a divestiture buyer, it was required to take any and all steps necessary to ensure that C&S had the tools regulators believed it needed to succeed so that the regulators would approve the Merger.

160.    Kroger failed to do so by refusing to assemble an adequate package of store and non-store assets to be divested.  From the outset of its interactions with potential buyers, Kroger prioritized negotiating a divestiture package that was consistent with its economic interests and the financial models it had built before signing the Merger Agreement—not its contractual obligations in seeking regulatory approval.

70

### A.     Kroger Rejects Albertsons' Input in Crafting its Proposed Divestiture Package

161.   By early June 2023, Kroger had developed a plan to divest 413 stores to the buyer that emerged from its then-ongoing divestiture process.  Kroger told this plan to Albertsons, but did not yet reveal it to the FTC until it had a buyer ready in September 2023.

162.   In June 2023, Albertsons met with Kroger and urged Kroger to add additional stores to its divestiture package.  Albertsons emphasized to Kroger that the divestiture process with the FTC was not a typical back-and-forth negotiation, and that Kroger needed to lead with an offer for a large and rigorously supported divestiture package.  Albertsons also expressed concern about Kroger's lack of communication with the FTC, and asked Kroger to schedule regular weekly meetings with the FTC to discuss substantive issues concerning the divestiture package.  Albertsons also expressed concern at the nature of Kroger's negotiations with the FTC, which were drawn out.  Kroger had no excuse for taking 10 months to increase its 238-store package to 413 stores, nor for its negotiations with divestiture buyers still being unresolved throughout the summer of 2023.

163.   In subsequent emails, meetings, and calls, Albertsons expressed concern about Kroger's proposed 413-store divestiture package, which was deficient for multiple reasons—in particular, because it did not adequately address the FTC's

71

concerns from the March 17, 2023 meeting about the number of stores that were being divested and how stores were being selected.  It also did not include adequate non-store assets for a prospective divestiture buyer.

164.    On July 19, 2023, Albertsons asked Kroger for a meeting to discuss its latest divestiture package.  On July 24, 2023, Albertsons emailed Kroger a list of approximately 100 additional stores for Kroger to consider adding to the package, along with supporting analysis from Albertsons' economists.

165.    The next day, on July 25, 2023, the Parties met to discuss Kroger's latest divestiture package.  Albertsons shared with Kroger detailed modeling results which showed that Kroger's 413-store package was unlikely to resolve the FTC's concerns about the Merger's potential anticompetitive effects.    Albertsons communicated that the stores in Kroger's proposed package clearly were not selected based on the guidelines and feedback from the FTC, since numerous geographies were not addressed and stores with obvious concentration issues were not being divested.  Albertsons expressed concern that the FTC would not view the 413-store offer as a good faith effort but, instead, as further lowballing.  Albertsons noted such an offer could cause the FTC to sue to block the transaction rather than engaging in further work on a divestiture package.  From its own economic analysis, Albertsons pointed Kroger to the specific stores it believed would go the furthest in

72

addressing regulators' local concentration concerns, which were selected based on the FTC's guidelines and feedback.

166.   On July 27, 2023, following up from the Parties' meeting two days before, Albertsons emailed Kroger a revised list of stores for Kroger to consider adding to the divestiture package.  The list included about 160-170 stores that Albertsons' economists determined were at incremental risk of enforcement after the 413-store divestiture, bringing the total divestiture size to approximately 580 stores. Again, Kroger ignored Albertsons' feedback.

167.   Kroger acknowledged that additional stores needed to be added to its divestiture package.  Nonetheless, across June, July, August, and September, Kroger did not add a single store to its divestiture package.

## B.   The Assets in the APA Are a Cherry-Picked Selection of 413 Stores and Paltry Non-Store Assets

168.   In the APA, Kroger agreed to sell, and C&S agreed to buy, 413 Kroger stores.  Kroger alone picked the stores.  C&S had no role in selecting the total number of stores or the store composition—Kroger developed the package and C&S had to take it or leave it.

169.   The 413-store divestiture package was woefully inadequate in terms of the total number of stores, the selection of specific stores, and the scope of non-store assets.

73

170.    The 413 stores included in the package were not selected through an objective methodology.  Instead, Kroger once again cherry-picked the stores in an attempt to offload its least profitable stores to C&S, while holding on to its most profitable stores.  The package was designed for Kroger's economic benefit, at the expense of securing regulatory approval of the Merger.

171.    Kroger's CEO, Rodney McMullen, participated directly in that egregious breach of Kroger's best-efforts obligation.  In a September 2023 email exchange, which the Washington Attorney General featured prominently at trial, McMullen directed that a specific Seattle store be removed from the divestiture list because "this store has real estate that is worth a lot."

172.    McMullen's Kroger-first attitude infected the entire package, as a comparison of Kroger's non-divested stores with the stores included in the 413-store package proves.  In particular, Kroger hand-picked Kroger stores to divest with average sales that were substantially below stores it planned to retain—to the tune of tens of millions of dollars of sales per year.  The Kroger stores it chose to maintain had higher gross margins and EBITDA as well.  This trend was true overall and within specific metropolitan areas, like Seattle, where Kroger chose to divest only the worst, lowest performing Kroger stores while retaining the highest performers.  More than 50 of the stores that Kroger marked to divest had negative EBITDA for

74

the fiscal year 2022.  Kroger's strategy was clear—Kroger tried to offload its worst performing stores in the 413-store package while keeping the best stores for itself.

173.   In addition to including too few and poorly-selected stores, Kroger's divestiture package also withheld vital non-store assets that were necessary to persuade regulators that C&S was well-positioned to successfully enter the market, including manufacturing facilities, access to certain private labels, a technology stack, and transition services.  For example, Kroger did not include the technology C&S would need to run a grocery store and gave C&S only 18 months to build its own systems.  Kroger also refused to transfer either ownership of or a license to Albertsons' "O Organic" and "Signature" private label brands in the package, even though Kroger already had its own private label brands in those categories and knew those brands would improve C&S's ability to successfully operate the divested stores as well as make the package more palatable to the FTC and State regulators.[2]

174.   At Kroger's request, Albertsons agreed to sign onto the APA with C&S as a party, even though it was not necessary to do so given the structure of the

---

[2] At the preliminary injunction hearing in the District of Oregon, C&S CEO Eric Winn testified that the private labels C&S would acquire from Albertsons—Open Nature, Waterfront Bistro, Debi Lilly Design, Ready Meals, and Primo Taglio—made up only 10–20% of Albertsons' total private label sales.  Kroger refused to divest Albertsons' larger Signature and O Organics private labels.  Mr. Winn also testified that the divestiture package did not include banners which would have reduced C&S's risk entering the market, nor did it include existing customer loyalty programs.

75

Merger: the divestiture was set to close following the closing of the Merger when Albertsons would be a wholly owned subsidiary of Kroger.

175.   Although Albertsons signed the APA, Albertsons did not endorse the divestiture package or agree that it was sufficient.  This was reflected in a separate Letter Agreement where both Albertsons and Kroger acknowledged and agreed that Albertsons' signing of the APA did not affect in any way the rights or obligations pursuant to the Merger Agreement or constitute an agreement or acknowledgement on the part of Albertsons that Kroger had complied with its obligations under the Merger Agreement.

### C.     The APA Allows Kroger to Increase the Divestiture Package to 650 Stores and Add Additional Non-Store Assets

176.   Consistent with the Merger Agreement, the APA for the divestiture package contemplated that Kroger could divest up to 650 stores to address antitrust concerns.  Section 2.11(a) of the APA provided that if Kroger "determine[d] in good faith" that it must sell more stores "to obtain . . . Clearances or an Order from a Governmental Entity," Kroger could require C&S to buy up to 237 more stores by submitting to C&S a "Put Notice," for a total of up to 650 stores.  Similarly, if "a Governmental Entity requires (or has otherwise indicated in connection with any Action by or before such Governmental Entity that it is unlikely to issue the Clearances or an Order . . .)," that section allows Kroger to exercise the same "Put

76

Notice" option and require C&S to buy up to 237 more stores, for a total of up to 650 stores.

177.    Section 6.2(f) of the APA also required the Parties to ". . . use their respective reasonable best efforts to modify or agree to such provisions as may be necessary to satisfy the FTC's requirements," which allowed Kroger and C&S to change or expand the divestiture package to meet regulatory requirements.

178.    Section 2.11 of the APA provided a formula to compensate Kroger for the additional stores sold pursuant to a Put Notice, based on the number and characteristics of the additional stores.  Regardless of the number and characteristics of the additional stores, however, the purchase price increase was capped at $725,000,000, up to a total maximum transaction price of $2.525 billion.

179.    Section 2.11(c) of the APA also contemplated Kroger adding non-store assets to the divestiture—specifically, "distribution centers or other assets (including transportation assets, offices or employees) or . . . modifications to the Transition Services Agreement that may be reasonably necessary to support such operations" of the divested stores.

180.    Thus, the APA enabled Kroger to meet its unqualified obligation under the Merger Agreement to divest whatever non-store assets were necessary to satisfy regulators.

77

181.   Section 2.11(e) of the APA further provided that "there shall be no change to the purchase price" paid by C&S to Kroger "on account of any [non-store assets] agreed to be transferred between [Kroger] and [C&S]."  In other words, if Kroger exercised a Put Notice, C&S was entitled to receive, at no additional cost, *all* additional non-store assets necessary to satisfy the Regulators of its ability to compete following the Closing, or to defend that ability in enforcement litigation.

182.   Despite these provisions, and despite specific concerns raised by Albertsons about the 413-store package provided for in the APA and the need to act before litigation, Kroger did not improve the divestiture package.

## XI.   Kroger Ignores Feedback from the FTC and Others Repeatedly Informing Kroger that Its Divestiture Package Is Deficient under the Antitrust Laws

183.   Even after C&S had been chosen and Kroger and C&S had formed a concrete divestment plan, Kroger continually delayed and prolonged final negotiations with the FTC—moving only incrementally up from its flawed 413-store proposal and never excising the core set of stores chosen for economic, not competitive reasons.  Kroger ignored feedback from the FTC, C&S, and Albertsons, who eagerly wanted to close the deal and offered viable paths to doing so.

184.   Kroger's 413-store divestiture proposal was itself a breach of its obligations under the Merger Agreement to remove antitrust impediments by making

78

"best efforts" and taking "any and all actions"—including the divestiture of unlimited non-store assets and up to 650 stores selected to give the Merger the best possible chance of antitrust approval (and not to protect Kroger's bottom line).

185.    Kroger further breached its obligations under the Merger Agreement through its handling of the subsequent steps in the regulatory process: having predictably failed to sell the FTC on its initial 238-store and 413-store divestiture proposals, Kroger had a duty to act "as promptly as practicable" to propose an appropriate set of stores and non-store assets that addressed the FTC's feedback, which it failed to do.  And Kroger was obligated to cooperate with Albertsons throughout this process, which it failed to do as well.

### A.    Kroger Proposes Its Inadequate 413-Store Package to the FTC

186.    The selection of C&S as buyer and the signed APA paved the way forward for the Parties to certify substantial compliance with the FTC's Second Request.  Under the then-operative timing agreement for the Merger, the date on which the Parties certified substantial compliance would begin a 60-day clock at the FTC, at the end of which the FTC was required to either sue or allow the Merger to go forward.

187.    Concerned about the FTC's reaction to the lowball, 413-store offer, Albertsons told Kroger that when it went back to the FTC to present C&S as the

79

divestiture buyer and the APA, Kroger needed to be clear that this was just a starting point for additional divestiture proposals, not another take-it-or-leave it offer from Kroger. The Parties understood that if they moved quickly and proposed a divestiture offer that the FTC was likely to accept, they still could close the Merger by the end of the year. But Kroger failed to incorporate Albertsons' advice, in violation of its commitment in Section 6.3(d) of the Merger Agreement to take "any and all actions necessary to avoid, eliminate, and resolve any and all impediments under any Antitrust Law." Kroger thus caused negotiations to stretch into 2024—further endangering the Merger.

188. On September 13, 2023, the Parties met with the FTC to discuss Kroger's selection of C&S as the divestiture buyer, the APA, and Kroger's latest divestiture proposal—the 413-store proposal. During the call, the FTC provided initial criticism of Kroger's proposal, explaining that, just as with the initial 238-store package, Kroger had failed to follow the modeling approaches the FTC uses to analyze local competitive effects. The FTC asked for additional information about how Kroger's economists had selected stores for divestiture.

189. On October 6, 2023, the Parties had a follow-up call with the FTC about Kroger's 413-store proposal. The FTC delivered more detailed feedback on the proposal and raised a number of questions. The FTC remained confused about how

80

stores were being selected and how the 413-store package set up a divestiture buyer to be able to compete, asking "[w]hy divestiture assets that are geographically disperse and include a collection of components from two different companies will succeed." The FTC requested Kroger evaluate head-to-head competition between itself and Albertsons by calculating diversion ratios as part of its next proposal instead. The FTC continued to be concerned about how the Merger and divestiture would affect labor markets and asked for more information on that topic. Additionally, the FTC expressed concern about the logistics of transitioning stores from Kroger to C&S, questioning whether it required too much long-term support from Kroger.

190. The FTC's concerns—including about specific local markets and non-store assets that were missing from the divestiture proposal—were readily addressable, and the Merger Agreement required Kroger to address them. Yet, for months after the October 6, 2023 meeting with the FTC, Kroger refused to do so. Even in later, revised iterations of its divestiture proposal, Kroger continued to build on the same defective package of 413 stores and to substantially limit which non-store assets it included.

191. The Parties knew from prior experience with the FTC that by October 6, 2023, the FTC soon would discontinue remedy discussions and shift to litigation

81

preparation, underscoring the urgency with which Kroger needed to act to develop a satisfactory divestiture package. Albertsons urged a substantial increase to the 650 stores allowed under the Merger Agreement. Time was of the essence, as C&S would need time to conduct diligence on any new stores it was allocated to buy, and the FTC needed to review and assess any new proposals put forward by Kroger with adequate time before deciding on whether to sue. Yet, Kroger largely stopped engaging with the FTC and dragged its feet.

192.    On October 26, 2023, the FTC sent the Parties an email that reiterated its input and request for information about Kroger's divestiture package "in the interest of keeping the process moving." The FTC again requested that Kroger explain: (1) its methodology to select stores to be divested, (2) whether the package would resolve other areas of potential competitive concerns (*e.g.*, labor and pharmacy services), (3) the anticipated success of the divestiture assets, (4) Kroger's expert analysis of the 413-store package, and (5) what customer data the Parties can transfer to C&S. The FTC also asked that Kroger provide delinquent "[d]ocuments and information responsive to" requests that the FTC made over one month prior.

193.    Kroger's continued delays and the sentiment from the FTC that litigation was imminent alarmed Albertsons. Albertsons pushed Kroger to respond and address regulators' concerns quickly, but Kroger did not. It was not until later

82

in the Parties' communications that Kroger revealed the reason for this delay: rather than being guided by its commitment to take any and all actions in obtaining antitrust approval, Kroger's divestiture proposals were being driven and delayed by insistence that the divestiture package create optimal financial results for Kroger. In other words, Kroger was deliberately delaying its engagement with the FTC to engineer a package that would prioritize Kroger's financial interests over getting the deal done.

194.    Kroger's most senior executives suggested that this prioritization was justified, because they were acting according to their fiduciary duties to get the best deal for Kroger stockholders. But no fiduciary duty permitted Kroger to abdicate its contractual obligations under the Merger Agreement—including the obligation to take "any and all actions" necessary to obtain antitrust approval. Kroger already had entered into the Merger Agreement with full approval from its Board of Directors, reflecting the board's view that the Merger Agreement was in the interests of Kroger's stockholders. Kroger now had to live with the terms of that agreement, even if that meant offering a divestiture package that, viewed in isolation, was less than economically optimal for Kroger.

195.    Indeed, Kroger's counsel already had indicated that they understood the potential problems with the 413-store divestiture package, but that they were

83

constrained by client expectations from offering additional stores or selecting stores by a more robust methodology. And whereas Kroger's economists represented to Albertsons that they were going back to the drawing board to propose a new divestiture package without a particular total number of stores in mind, that turned out not to be the case.

196.   Even after receiving feedback from Albertsons that made clear Kroger must prioritize addressing the FTC's and other regulators' antitrust concerns, Kroger continued to push back on the FTC's requests for additional information regarding its divestiture proposals and submitted proposals guided by internal financing considerations rather than Kroger's commitments in the Merger Agreement.

### B.     Kroger's Small Increase to 510 Stores Fails to Address the FTC's Concerns

197.   During the week of November 13, 2023—days before the deadline for the Parties' notice of intent to certify compliance with the FTC's Second Request and when the FTC likely already was preparing for litigation—Kroger finally responded to the FTC with a new package, and certified substantial compliance with the FTC's Second Request. Even then, the proposed package was clearly insufficient and not responsive to regulatory concerns.

198.   On November 16, 2023, Kroger told the FTC it was considering increasing its proposed divestiture from 413 to 510 stores—still 140 stores less than

the 650-store divestiture threshold in the Merger Agreement and APA. Kroger would delay for yet another month before officially committing to this 510-store proposal to the FTC. Kroger's new offer also did not change the composition of the first 413 stores. Kroger merely added 97 stores on top of that set. This was despite the FTC's explicit demand that any divestiture reflect a reasoned methodology, not cherry picking, and its concerns about the stores in Kroger's 413-store divestiture package. It was also despite Kroger's prior representations that its next proposal would represent a new, ground-up calculation created by its hired economic experts.

199. The additional 97 stores that Kroger identified to divest as part of its 510-store proposal were selected using a diversion ratio calculation, as the FTC had instructed Kroger to use, but set up in such a way as to be deliberately helpful to Kroger. In fact, Kroger admitted to Albertsons that aspects of how it had set up its diversion ratio analysis diverged from what the FTC had done for prior mergers and what the FTC had instructed for Kroger to do to calculate diversion ratios. In analyzing sales diversions from Kroger or Albertsons, Kroger only flagged stores that were associated with a 25% diversion threshold, not a 20% threshold, a more conservative and more broadly followed approach. Kroger also calculated the ratio using a dynamic model, instead of a static model, which was associated with a lower number of stores being identified. Just changing Kroger's assumptions to a more

85

appropriate 20% threshold would have caused Kroger to identify at least 80 more stores for divestiture, and using a static model could have identified 120 more stores for divestiture beyond those Kroger presented to the FTC.

200.   In structuring its 510-store proposal, Kroger also did not address any other comments or concerns that the FTC had expressed in the months prior regarding local concentration issues in specific states and setting up a divestiture buyer for success with the right mix of non-store assets.  Nor did Kroger address the 160-170 stores that Albertsons had identified for divestiture in July 2023.  As a result of Kroger's mash-up approach, some local geographic areas like the Phoenix area would receive dozens of additional stores, while the areas around Seattle, Los Angeles, Portland, Dallas, Chicago, Las Vegas, and San Diego would receive three or fewer stores.  On net, California, Washington, and Illinois remained under-addressed.  Despite incorporating diversion ratio analysis for some of the stores it selected, Kroger's overall approach had still not changed—it focused only on maximizing value from the deal, and not on achieving approval by "any and all actions necessary," as the Merger Agreement required.

201.   On November 22, 2023, the FTC emailed the Parties a statistical analysis of Kroger's 413-store divestiture package and its recently-presented 510-store package.   Regarding the 413-store package, the FTC wrote that it was

RLF1 32016433v.1

"surprised to find that [Kroger's] divestiture fails to address dozens, if not hundreds of 'markets'" in which the proposed merger would presumptively have an anticompetitive effect. The FTC again took issue with the methodology Kroger used to select the 413 stores that Kroger proposed to divest. FTC reiterated its request for a more detailed explanation of Kroger's methodology.

202.    The FTC stated that Kroger's new 510-store package suffered from its reliance on the same flawed methodology as the inadequately-constructed 413-store list. Simply adding 97 stores on top of the 413-store proposal based on the results of a poorly formulated diversion ratio analysis did not address the FTC's concerns with the 413-store set. Unless Kroger could support its methodology for the selection of the 413 stores, Kroger needed to craft a new proposal from scratch with a sound economic rationale.

### C.    Kroger's Failure to Propose a Workable Package Leads to a Renegotiation of the Timing Agreement with the FTC

203.    Originally, the Parties had intended to complete the divestiture package and Merger by the end of 2023, or shortly thereafter. After the certification of compliance with the Second Request on November 15, 2023 (and subsequent feedback from the FTC), that target closing date was still possible, as the compliance certification had put the FTC on a 60-day countdown to either sue to block the Merger or allow it to go forward.

204.   Kroger's continued failure to propose a workable divestiture package to the FTC destroyed the viability of that timeline.  Given that the FTC had indicated that Kroger needed to go back to the drawing board to get to a workable proposal, the FTC and Kroger renegotiated the timing agreement on December 15, 2023. Under the new agreement, the FTC could provide notice at any time that negotiations had stalled, starting a four-week countdown to the filing of litigation.

205.   Despite that additional time, Kroger did not follow the FTC's clear instructions regarding the stores in its proposal.  Albertsons urged Kroger to provide meaningful improvements, but Kroger did not heed Albertsons' advice.

206.   By December 6, 2023, Kroger still had not provided the FTC with the detailed explanation and support for the methodology it used to create its 413-store list, now the backbone of Kroger's operative 510-store proposal.  In a deposition of Kroger's then-Chief Financial Officer, Gary Millerchip, the FTC asked for an explanation of Kroger's methodology for selecting the 413 stores.  The FTC did not obtain satisfactory answers, but Millerchip confirmed that Kroger unilaterally created the 413-store list without input from C&S.

207.   Another week passed and Kroger still had not explained its methodology for constructing its store list.  On December 12, 2023, the FTC emailed the Parties and asked Kroger to "clarify the status of the current asset package."  The

88

FTC further asked whether Kroger had discussed the 510-store package with C&S and whether Kroger was considering adding any additional assets to the package.

208.    Alarmed that Kroger was not moving faster, Albertsons again advised Kroger to move quickly to answer the FTC's basic questions about the status of Kroger's divestiture package.  Despite the extension of the timing agreement, resulting from the FTC's obvious dissatisfaction with Kroger's proposals to date, Kroger could afford no further delay.  Nonetheless, Kroger put forward only incremental, minor improvements to its proposal from December 2023 through February 2024, largely continuing to ignore the FTC's concerns.

209.    During a telephone call with the Parties on December 20, 2023, the FTC told Kroger that its 510-store divestiture package still was inadequate, including because it would not position C&S to successfully enter the market.  Specifically, the FTC raised concerns about:

> a.    Challenges C&S would face entering the market because it would not be acquiring a stand-alone business but, instead, an assortment of assets from two different companies;
>
> b.    C&S's need to re-banner the majority of stores it would acquire;
>
> c.    C&S's acquisition of insufficient distribution and manufacturing assets;

89

d.    C&S not acquiring a well-known private brand; and

e.    Kroger not providing an adequate transition agreement for information technology, pharmacy, and other services.

210.    Again, Albertsons urged Kroger to take this feedback seriously and move quickly to address it to satisfy antitrust regulators, as the Parties' window to reach a settlement with regulators was closing rapidly.  In an email sent on December 27, 2023, Albertsons conveyed that Kroger's 510-store divestiture proposal failed to address local concentration issues in Arizona, Colorado, Illinois, and Idaho, and that Kroger's delay was holding up C&S's ability to perform due diligence of additional sores.  Non-store assets like re-bannering, distribution assets, manufacturing assets, private labels, data, and transitions services had not been adequately addressed yet either.

211.    On January 3, 2024, the FTC emailed the Parties and reiterated its request for "any responses to our November 22 feedback on your initial diversion analysis, [and] any updates you have on the divestiture package based on our feedback."  Hamstrung by its inability under the Merger Agreement to unilaterally approach the FTC, Albertsons was forced to stand by and watch as still more days ticked by without an adequate response by Kroger.

90

**D.     The FTC Asks for a Final Offer from Kroger, and Kroger Still Refuses to Cooperate, Forcing the FTC to Litigate**

212.    The FTC met with the Parties on January 11, 2024, and told Kroger that its economic analysis indicated that Kroger's proposals to date were inadequate.  The next day, the FTC emailed the Parties and requested an updated divestiture package—with supporting economic analysis—by no later than January 18, 2024.  This was, in essence, the FTC's request for Kroger's "best-and-final" offer.  The message was clear: the FTC would likely soon disengage from negotiations and prepare for litigation by providing the four weeks' notice provided for in the timing agreement entered into between the Parties and the FTC.

213.    Kroger still had a strong card left to play: it could increase its divestiture offer and improve the composition of its package to address concerns about geographic overlap.  Kroger also had highly motivated partners in C&S and Albertsons, which were eager to help get the deal through the regulatory process.  Yet, Kroger continued to insist on unsatisfactory divestiture packages which prioritized its own financial well-being, even though all other relevant parties, including Albertsons and the FTC, implored Kroger to make a satisfactory final offer and gave it multiple opportunities to do so.

214.    On January 16, 2024, anticipating that Kroger would be working to prepare that "best offer," C&S emailed Kroger and outlined a suggested approach

91

for addressing regulators' concerns.  That approach was tailored to structuring a package that regulators were likely to approve, addressing local store concentrations and increasing the total store count, as well as re-bannering, distribution and IT assets, private brands, and transition services.

215.  The next day, January 17, 2024, on the eve of Kroger's deadline to submit to the FTC an updated divestiture package (its best and final offer), the Parties were scheduled to meet to discuss a new proposal by Kroger to divest 541 stores (still 109 stores short of 650).  But Kroger cancelled the meeting and did not reschedule it—depriving Albertsons of the opportunity to provide meaningful feedback before the package was submitted to the FTC the next day, in violation of Section 6.3(b) of the Merger Agreement.

216.  In the meantime, Albertsons' attorneys and business executives repeatedly reached out to Kroger urging it to make its best and final offer with a divestiture package at or close to 650 stores.

217.  Instead, Kroger continued trickling out proposed stores for divestiture in dribs and drabs.  On January 18, 2024, after already being sued by Washington (as discussed below in Section XIV), Kroger wrote to the FTC proposing to increase its divestiture package from 510 stores to 541 stores—an irresponsibly and inexplicably small increase.  Kroger's proposal still did not address the FTC's core

92

concerns pertaining to the composition of the stores and other assets.  For example, the package failed to address the gaps that the FTC had identified in C&S's distribution centers and other infrastructure to operate the stores that were being divested.  Further, although purportedly drawn up from scratch using diversion ratio calculations, Kroger conceded that approximately 65-70% of the stores in its new proposal had been included in its 510-store proposal.  And the new proposal was, like Kroger's prior proposals, drafted unilaterally by Kroger without input from C&S.  In fact, C&S only learned of the package the day before Kroger submitted it to the FTC.

218.   On January 31, 2024, the FTC wrote to the Parties that Kroger's most recent 541-store divestiture offer was "largely unchanged" from its prior offer, as it "fail[ed] to address the numerous and substantial concerns that [the FTC has] previously identified," which had "only been corroborated upon further investigation."  Specifically, the FTC identified lingering "deficiencies in the list of individual stores proposed for divestiture" and noted that it "remain[ed] unconvinced that the package conveys sufficient assets to position [C&S] for success, that the transition services are appropriately tailored, and that C&S can be successful with this massive and complex new structure."  The FTC made clear that merely adding

93

stores to the list would not suffice if the proposal did not change the existing store composition and add other assets.

219.    After being presented with one inadequate package after another, the FTC decided that talks with Kroger no longer were productive.  In the same January 31, 2024 letter, the FTC informed the Parties that negotiations were over, and it was providing the four-week notice under the timing agreement between the Parties and the FTC, which meant that the Parties could not consummate the Merger prior to 11:59 PM on February 28, 2024.

220.    In an effort to avoid litigation with the FTC, Albertsons and C&S continued to press Kroger to make a viable proposal to the FTC.  Yet despite multiple entreaties and specific requests, Kroger refused to improve its proposal.

221.    On February 16, 2024, the FTC again told Kroger that in its view, Kroger's divestiture proposal offered only "dispersed" stores to C&S and not the prospect of a profitable, self-sustaining business.

222.    The following week, on February 20, 2024, FTC Chair Lina Khan reiterated the FTC's concern that Kroger's divestiture proposal merely offered a "hodgepodge" of assets that would not resolve the potential anticompetitive effects of the Merger, and would not adequately position C&S to successfully enter the market.  FTC Chair Khan and Commissioners Slaughter and Bedoya all indicated

94

that they agreed with the concerns that FTC Staff had raised over the past months, namely that the proposal was not designed to function as a standalone business and would not fully address the anti-competitive concerns raised by the FTC.

223. On February 22, 2024, two FTC Commissioners held "last rites" meetings with the Parties—meetings that typically precede the filing of a lawsuit. Despite Albertsons' warnings, Kroger did not budge from its 541-store divestiture proposal in advance of those meetings.

224. At the meetings, the FTC Commissioners unsurprisingly told Kroger that its proposed divestiture package was inadequate. They informed Kroger that it needed to revise its proposed package to include more stores in specific geographical areas, and that other key changes were needed. They reiterated concerns that the FTC had been communicating to Kroger for over a year about the need for Kroger to sell additional assets and banners, to no avail. They expressed a concern about the proper "formula" for a successful divestiture. They stated that the FTC repeatedly had communicated to Kroger that its proposed divestiture package included a disjointed "hodgepodge" of stores that may not coalesce into a successful business.

225. Further, one FTC Commissioner made the view clear to the Parties that even as of this late date there was a productive resolution available for them, if they

95

could reach a negotiated settlement with the FTC. Such a reasonable settlement would require Kroger to divest an adequate number of stores and non-store assets but would allow the Merger to close and avoid a trial. Albertsons reiterated this message to Kroger and asked it to do so.

226.   Kroger asked the FTC for until February 28, 2024—the very last day for the FTC to bring suit to challenge the Merger—to make a final proposal. Albertsons tried yet again to prevail upon Kroger to make a divestiture proposal that met its obligations under the Merger Agreement and to do so quickly. But on the eve of a lawsuit with the FTC and the specter of a potential nationwide injunction that would block the merger, Kroger refused and doubled down on its 541-store package.

## XII.   Kroger Fails to Cooperate with Albertsons and Repeatedly Ignores Feedback from Albertsons

227.   In addition to ignoring feedback from regulators about the deficiencies of its divestiture proposals, time and time, Kroger ignored entreaties from Albertsons throughout the relevant time period, in breach of Kroger's obligations under the Merger Agreement. Albertsons was a good partner to Kroger throughout their negotiations with regulators, but Kroger refused to hold up its end of the bargain.

RLF1 32016433v.1

### A.    Albertsons Cooperates with Kroger and Attempts to Aid Kroger in Seeking Regulatory Clearance for the Deal

228.    Albertsons held up its obligations under the Merger Agreement in spades, providing constant support and aid to Kroger to attempt to get the Merger cleared.  Kroger rebuffed that support.

229.    From before the Parties' initial call with the FTC in October 2022, and continuing after the FTC filed suit against Kroger and Albertson in February 2024, Albertsons repeatedly attempted to work cooperatively with Kroger on antitrust strategy.  Before the Merger Agreement was signed, Albertsons' economists created an analysis of store overlaps, which they shared with Kroger's economists.  After the deal was signed, Albertsons stood ready to assist Kroger, providing feedback on talking points for meetings with the FTC, comments on white papers for regulators, and economic analyses of potential divestiture packages.  Economists hired by Kroger and Albertsons engaged in regulatory meetings to discuss divestiture packages, and Albertsons and Kroger attorneys and management teams were in frequent communications as well.

230.    Albertsons insisted from the outset of negotiations with regulators that Kroger offer a meaningful, robust divestiture package, and Albertsons pledged its support in efforts to do so.  Kroger rebuffed Albertsons' input, just as it did with regulators.  Kroger further cut Albertsons out of critical planning processes for

97

communicating with regulators, and did not share how it was selecting a divestiture bidder.  Albertsons pleaded with Kroger to no avail in dozens of calls, emails, and letters to include it in planning meetings, to move more quickly and to be responsive to regulators, including in at least the following examples:

a.  On June 27, 2023, Albertsons' general counsel conducted a call with Kroger's general counsel regarding coordination between the Parties;

b.  On at least June 30 and July 3, 2023, outside counsel for Albertsons emailed outside counsel for Kroger regarding the divestiture bidder selection process; and

c.  Through its general counsel, its outside counsel, and its business executives (including its CEO), Albertsons frequently contacted Kroger regarding its then-current divestiture proposals.  These communications occurred on at least July 24, 2023; July 25, 2023; September 8, 2023; September 11, 2023; October 13, 2023; October 25, 2023; October 31, 2023; November 10, 2023; November 29, 2023; December 19, 2023; December 27, 2023; January 17, 2024; January 19, 2024; February 1, 2024; February 4, 2024; February 9, 2024; February 21, 2024; February 23,

98

2024; February 27, 2024; March 4, 2024; March 28, 2024; April 4, 2024; July 19, 2024; September 25, 2024; and October 9, 2024.

231.   In its communications with Kroger, Albertsons further emphasized the need for Kroger to address regulators' labor market concerns.  Although the Parties had ongoing communications about strategies for government and labor group outreach, Kroger was slow to address Albertsons' feedback, at certain points disregarding it altogether.  Albertsons, to the extent it was permitted under the terms of the Merger Agreement, ultimately moved forward with its own plans for public relations and government relations, such as through direct outreach to State antitrust regulators.  Kroger did not participate in those efforts.

232.   Kroger also failed to cooperate with Albertsons in its selection and preparation of its testifying expert economist, Dr. Mark Israel.  Kroger retained Dr. Israel—the Parties' primary economic expert supporting the Merger—unilaterally, without input from Albertsons. Kroger then denied Albertsons any meaningful opportunity to review and comment on key materials Dr. Israel produced—for example, giving Albertsons less than one full business day before the deadline for Dr. Israel's affirmative expert report to comment on hundreds of pages of new

99

material and failing to provide materials for a court-ordered economics tutorial until the day before the tutorial was set to take place.

233.   At trial, Dr. Israel was forced to admit that the Merger would be presumptively anticompetitive in at least 22 markets—a failure that the Oregon Court held was, "on its own . . . sufficient to find that the divestiture will not mitigate the merger's anticompetitive effects such that it is no longer likely to substantially lessen competition."  Dr. Israel's admission further demonstrates Kroger's failures to prepare an appropriate divestiture package consistent with Kroger's obligations under the Merger Agreement.

234.   Additionally, Kroger's refusal to coordinate with Albertsons and to address its well-reasoned concerns flew in the face of its obligation to work closely with Albertsons in presenting its divestiture strategy to the FTC, including its obligation in Section 6.3(b) of the Merger Agreement to "permit [Albertsons] to review in advance and incorporate their reasonable comments" in communications with the FTC.  Freezing out Albertsons' sound advice also contributed to Kroger's ultimate failure to address regulators' concerns, violating Kroger's duties to make "best efforts" and take "any and all actions" to remove antitrust impediments.

100

**B.     Albertsons Provides Kroger with Detailed Economic Analysis Showing a Path to Regulatory Approval, but Kroger Ignores It**

235.    While pressing Kroger to address regulators' concerns, Albertsons provided specific economic analyses for Kroger to use in doing so, including at an in-person meeting between the Parties on July 25, 2023, and in communications on November 29, 2023, December 19, 2023, February 1, 2024, February 4, 2024, February 9, 2024, and February 21, 2024.  Kroger ignored this valuable information, as it did with Albertsons' other input.

236.    The FTC typically uses certain mathematical calculations to help guide its analysis of the competitive effects of a merger and how well those effects are mitigated by a divestiture package or other remedy.  One metric the FTC calculates is the Gross Upward Pricing Pressure Index ("GUPPI"), which measures a company's incentives to raise prices unilaterally after a merger, based on that company's pre-merger profit margins and the diversion ratio of sales between the two merging parties.  A GUPPI calculation measures a company's incentives to raise prices post-merger in the absence of any merger-induced synergies, entry by other firms, or competitor re-positioning.  A GUPPI calculation can help to determine the effect that a potential merger can have on the company's post-merger incentives to raise prices after it faces a lessening of competition.  Historically, the FTC has been more amenable to approving mergers resulting in "proportionately small" GUPPI

101

measurements.  In practice, this is typically a GUPPI below 5%, although the FTC has not officially adopted this threshold as a safe harbor for merger clearance review.

237.  In addition to being used as part of a GUPPI analysis, a "diversion ratio" can also be analyzed on its own.  A diversion ratio measures the proportion of consumers who would switch from one product to another in the face of a small price increase and helps to identify whether two products are close substitutes for each other.  This ratio helps regulators to understand the area of effective competition between products and sellers, which may constitute a relevant antitrust market.  Agencies and private parties also evaluate an Herfindahl–Hirschman index ("HHI"), a common measure of market concentration calculated by squaring the market share of each firm competing in a market before and after a merger.

238.  Using these economic concepts and metrics that are often utilized by the FTC, Albertsons repeatedly provided Kroger with economic analyses and models regarding a divestiture proposal to remedy the FTC's and state Attorneys Generals' concerns.  In its correspondence to Kroger on November 29, 2023, December 19, 2023, February 1, 2024, February 4, 2024, February 9, 2024, and February 21, 2024, Albertsons offered Kroger its own economic analyses supporting a viable store divestiture proposal.

102

239.　For example, Albertsons' economists developed a store package using a 3% GUPPI limitation that would require a divestiture of fewer than 650 stores, thus demonstrating how Kroger could address the FTC's concerns about post-Merger concentration without triggering a Material Divestment Event under the Merger Agreement. A 3% GUPPI limitation is considered conservative, as it is well below a 5% threshold commonly used as part of merger analysis, and therefore attractive to the FTC. Albertsons shared this analysis with Kroger and repeatedly informed Kroger—including on February 1 and 4, 2024—that Albertsons' economists were available to assist Kroger's team with finalizing an updated, realistic proposal to the FTC.

240.　Albertsons' economists also evaluated the HHI index of numerous packages proposed by Kroger and communicated the results of those analyses to Kroger, in particular, that Kroger needed to divest more stores and a different mix of stores than it had included in its 238-, 413-, and 510-store packages. These analyses matched feedback Kroger was receiving from the FTC, which flagged concerns with the HHI in local markets resulting from the merger.

241.　Kroger ignored Albertsons' analyses and persisted in proposing an inferior divestiture package, as measured by the FTC's accepted metrics.

103

242.   By freezing Albertsons out of this process, Kroger violated its contractual obligation to cooperate with Albertsons, as well as its obligations to use reasonable best efforts, best efforts, and to take any and all actions to secure regulatory approval of the Merger.

## XIII.  The FTC Files Suit to Enjoin the Merger

243.   On February 26, 2024, the FTC, joined by the states of Arizona, California, Illinois, Maryland, Nevada, New Mexico, Oregon, and Wyoming and the District of Columbia, filed a federal action against Kroger and Albertsons in the District of Oregon, seeking to enjoin the Merger nationwide as anticompetitive.

244.   Consistent with the FTC's prior criticisms, and with the concerns Albertsons had raised to Kroger time and again, the FTC alleged in its complaint that Kroger's proposed divestiture package did not include sufficient store and non-store assets.

245.   The FTC criticized the "hodgepodge" of stores that Kroger proposed to sell to C&S, as well as the failure to transfer necessary "banners, distribution centers, information technology, corporate contracts, loyalty programs, manufacturing assets, pharmacy resources, data analytics and e-commerce tools, employees, and others" that a successful supermarket business required.

104

246.    The FTC's complaint also alleged that C&S would "need to construct a brand new supermarket business on the fly" because key assets were not included in Kroger's divestiture package.

247.    The content of the FTC's complaint was not a surprise to Kroger.  For months before it filed its complaint, the FTC repeatedly had expressed the same concerns to Kroger regarding deficiencies that the FTC perceived in Kroger's various divestiture packages, but Kroger failed to remedy the concerns.

## XIV.    Kroger Ignores Feedback from State Antitrust Regulators that the Proposed Divestiture Package Is Deficient

248.    The FTC was not the only regulator with whom the Parties would need to engage and from whom skepticism of the Merger would be expected.  Kroger's foot-dragging to avoid proposing a more robust divestiture package resulted in needless scrutiny from state Attorneys General, which culminated in the states of Washington and Colorado filing independent lawsuits to block the Merger.

249.    The Attorneys General of the District of Columbia, California, Arizona, Idaho, Illinois, and Washington commenced a multi-state investigation shortly after the announcement of the Merger.  Additional states participated in reviewing materials produced to the FTC as a result of the Second Request.  Both Kroger and Albertsons understood that state Attorneys General, like the FTC, would want to see

105

a divestiture package that ensured their constituents would be protected from anti-competitive effects.

250.    Albertsons sought to mitigate the risk of state enforcement action. Albertsons ensured Kroger was fully informed of its interactions with state Attorneys General. Albertsons' General Counsel met with the Attorneys General of Arizona, California, Colorado, Nevada, Washington, and the District of Columbia in the fall and winter of 2023. During those meetings, Albertsons' General Counsel provided information about the Merger and its likely effect on local competition in relevant states. He also stood ready to answer regulators' questions, and often did, including in state-specific letters to Attorneys General offices in at least California, Colorado, Nevada, Washington, and the District of Columbia. Albertsons also provided those offices information about the nature of competition that Albertsons faces locally and nationally, its track record for prior mergers, and how Albertsons planned to address employees at affected stores, among other information.

251.    Albertsons informed Kroger of its outreach and suggested that Kroger do the same. Kroger ignored Albertsons.

252.    After Kroger selected C&S as the divestiture buyer in September 2023, state regulators sought information from C&S. In compliance with the multi-state investigation, on October 31, 2023, C&S responded to questions from the California

106

Attorney General and explained the significant deficiencies of Kroger's 413-store divestiture package.  C&S commented that the package included an ill-fitting mix of assets and banners from Albertsons and Kroger.  C&S wrote that the package also did not include a full range of private brands or well-known brands, a cohesive IT system, or full-function distribution centers in every geographic region where divested stores operated.

253.    On January 16, 2024, the State of Washington filed the first government enforcement action seeking to enjoin the Merger in Superior Court in Seattle. Washington alleged that Kroger's 413-store package was "woefully inadequate to restore the competition lost" through the Merger.  It likewise expressed serious doubts as to C&S's ability to operate and rebanner the divested stores in Washington and serve as a viable competitor in Washington markets.

254.    Instead of responding to Washington's lawsuit by improving its divestiture package, Kroger largely disregarded the allegations in the lawsuit as well as C&S's and Albertsons' similar comments related to the lawsuit.

255.    For example, while the FTC was finalizing its view of the Merger and preparing for litigation, the State Attorneys General also expressed strong concerns with the inadequacy of Kroger's divestiture proposals.  Kroger and Albertsons each met separately with Colorado's Attorney General Phil Weiser in early February,

107

where he gave specific and detailed feedback on the inadequacies of Kroger's divestiture strategy and asset package. Whereas Albertsons pleaded with Kroger to agree to a divestiture agreement that would address regulators' concerns, including the most recent issues stated by Attorney General Weiser pertaining to the Colorado area, Kroger did not improve its offer.

256.    Unsurprisingly, Kroger's continued failure led to another state Attorney General filing suit. On February 9, 2024, the Attorney General of Colorado informed C&S that he believed that Kroger was not acting in good faith because it had designed the divestiture package to cause the divestiture to fail. The Attorney General also stated the obvious: these ongoing and substantial divestiture negotiations should have taken place in 2023. The Attorney General outlined multiple deficiencies in the proposed divestiture package, including missing distribution centers, private label rights, banners, and access to loyalty data.

257.    The next week, on February 14, 2024, the State of Colorado sued Kroger and Albertsons in state court in Colorado, alleging that the Merger was anticompetitive and seeking to enjoin it.

258.    The Colorado Attorney General also contended that Kroger's proposed divestiture of stores was "woefully insufficient to restore the competition" eliminated by the Merger. Moreover, the Colorado Attorney General asserted that

108

Kroger's 413-store proposed package did not divest enough "infrastructure" to C&S to allow C&S to be a "viable competitor" in Colorado after the Merger. Colorado thus requested that the Court find the Merger unlawful under Colorado law and enjoin Kroger and Albertsons from consummating the transaction.

259. Specifically, the Colorado Attorney General alleged the following deficiencies with Kroger's proposed divestiture package, many of which C&S and Albertsons had urged Kroger to address in the preceding weeks and months:

    a.    It did not include enough stores in Colorado to give C&S "adequate scale to compete effectively and cure the anticompetitive effects of the" Merger;

    b.    There was a significant re-bannering risk as C&S would be "required to re-banner over 80% of divested stores across the country," including all but two in Colorado;

    c.    There was high integration risk since C&S is not acquiring a standalone business line;

    d.    C&S did "not have enough employees to run the business"; and

    e.    C&S was "not getting sufficient distribution assets across the country."

109

260.   Kroger's failure to address the problems raised by the Washington and Colorado Attorneys General further illustrates Kroger's overall failure to take "any and all actions necessary to avoid, eliminate, and resolve … impediments under any Antitrust Law."

## XV.   C&S Offers Kroger a Final Path to Regulatory Approval, but Kroger Refuses

261.   After the three lawsuits were filed, C&S extended Kroger one final lifeline.   On March 1, 2024, C&S sent Kroger a term sheet that responded to regulators' outstanding concerns.   C&S offered to purchase a more highly concentrated package of stores in California, Nevada, and Washington and up to 650 stores in total.   C&S also requested improved banners in key geographies, more robust distribution assets, improved IT and integration support, improved transition support, and improved private labels.   C&S's offer thus represented a better path to avoid, eliminate, and resolve all impediments under antitrust law with respect to the Merger before the Outside Date.

262.   Despite Kroger's obligation to take "any and all actions" to remove any impediments to the Merger and the pending litigations to block the deal, Kroger rejected C&S's offer.   Kroger stated that it would only accept the terms in the March 1 letter if C&S would pay "market price," *i.e.*, several billion dollars more than C&S was willing to pay.   Kroger's insistence that C&S pay the "market price"

110

laid bare Kroger's willful rejection of its duty under the Merger Agreement to agree to a plan that would garner regulatory approval, whether the financial terms favored Kroger or not. Kroger did not consult Albertsons before rejecting C&S's proposal.

263. Kroger then made a counteroffer of divestiture packages of either 564 or 613 stores—still short of the 650-store divestiture threshold set forth in the Merger Agreement and APA. Both of these offers would be under "the terms set forth in the APA," or in other words, the terms that failed to address critical non-store assets and other FTC concerns. As a result, and contrary to Albertsons' advice, Kroger's counterproposal suffered from many of the same issues C&S's offer was designed to fix—including the lack of geographic diversity among stores, which the FTC had stressed was a dealbreaker.

264. To illustrate the point, two days after Kroger rejected C&S's offer (without consulting Albertsons), Albertsons sent Kroger an analysis of the Hosken-Tenn diversion model GUPPI for each Kroger proposal, which laid bare the clear deficiencies in Kroger's latest offer. Whereas C&S's offer for 650 stores resulted in no stores with GUPPI calculations above 3.5% and only 45 stores with a GUPPI above 3%, Kroger's 613-store proposal resulted in 95 stores above a 3% GUPPI, 24 stores above 3.5%, two stores above 4%, and one store above 5%. C&S's proposal was far superior and went meaningfully further in addressing regulatory concerns

111

about post-merger upward pricing pressure. This was especially the case in the local geographies regulators were most concerned about, including the areas around Dallas, Seattle, Las Vegas, Chicago, and Phoenix.

265. Nonetheless, on March 10, 2024, without consulting with Albertsons in good faith as required under the Merger Agreement, Kroger submitted to C&S a "Put Notice" for an additional 237 stores, on top of the same nonviable 413 stores identified in the APA, for a total of 650 stores. Although the number of stores had been increased, the mix of stores continued to be inadequate because Kroger was still employing a flawed methodology in store selection, which the FTC had informed Kroger it would not accept. Kroger's 650 stores were clearly deficient when compared to the 650 stores in C&S's offer, as they did not address local concentration or non-store assets nearly as comprehensively.[3] For example, C&S already would be required to re-banner nearly 80% of the stores in Kroger's 413-store package, and yet Kroger was adding additional stores that C&S would need to re-banner. Kroger also included limited distribution and back-office support to operate the 237 stores it was adding. Like Kroger's prior offers, this offer was take

---

[3] For example, Kroger's package still resulted in 8 stores above the 3.5% GUPPI threshold, including two stores above 4% and one above 5%, compared to zero stores above those thresholds in C&S's offer.

112

it or leave it.  Further, when Albertsons tried to get clarity from Kroger about whether Kroger's economists had selected the new stores that were being added, Kroger would not clarify its methodology.

266.    C&S responded on March 15, 2024, refusing to purchase the 650 stores identified by Kroger.  C&S observed, among other things, that Kroger's Put Notice did not address the local concentration concerns raised by regulators related to the original 413-store divestiture package—the whole point of continuing to negotiate the divestiture while already defending against multiple litigations.  Aspects of Kroger's proposal arguably made the divestiture package worse than even Kroger's own prior offers, because C&S would be required to rebanner more stores and because C&S was not being provided adequate distribution resources to service the additional stores.  Simply put, adding additional stores onto an already deficient package would not resolve regulators' concerns about C&S's ability to enter and compete in the market.

267.    Three days later, on March 18, 2024, Kroger responded to C&S admitting that its proposal would not resolve all regulatory concerns.  Nonetheless, Kroger told C&S that Kroger's Put Notice was enforceable under the APA.[4]

---

[4] Kroger conceded that the divestiture package embodied in the Put Notice would not "resolve all regulatory concerns" the FTC had raised with Kroger's divestiture proposals,

113

268.   This Put Notice self-evidently failed to meet Kroger's obligations to Albertsons in the Merger Agreement.  In face of ongoing litigations, Kroger was required under the Merger Agreement to use its best efforts and to take any and all actions necessary to avoid, eliminate, and resolve any and all impediments under any antitrust law with respect to the Merger, and to take any and all actions to eliminate each and every impediment under any antitrust law to close the Merger before October 9, 2024.  Yet, by its own admission, the Put Notice was not issued with the aim of resolving the FTC's remaining concerns.

269.   For the next week, Kroger and C&S negotiated Kroger's latest proposal.  Kroger refused to make C&S an offer for the 650 stores and non-store assets that C&S requested.

270.   On March 25, 2024, Kroger sent C&S a new proposal, this time including only 579 stores.  Kroger's new 579-store proposal was both smaller and less responsive to the FTC's stated concerns than the 650-store package C&S had proposed.  The offer did not address local concentration issues nearly as well, and it provided for the transfer or temporary use of some additional non-store assets, but at a much lower level than C&S had requested on March 1, 2024.  Specific

including "concerns with rebannering," but took the position that this failure was irrelevant because, under the APA, "the Put Notice need not resolve all regulatory concerns."

114

geographies that the FTC had requested for Kroger to address remained under-addressed, including areas around Los Angeles, Las Vegas, Seattle, and San Diego. Kroger also did not agree to transfer banners that C&S had requested for months, including the Safeway banner, and it did not transfer plum private labels, like "Signature" and "O Organics."

271.   Albertsons warned Kroger that, yet again, its latest package did not go far enough in addressing the FTC's concerns and was not sufficient under its obligations.  For example, Kroger's new proposal resulted in 59 stores above the 3% GUPPI threshold and 8 stores above the 3.5% threshold, compared to only 45 stores above the 3% threshold in C&S's offer and no stores over the 3.5% threshold. Albertsons pleaded for Kroger to instead agree to the terms proposed by C&S on March 1, 2024.  Kroger did not do so.

272.   Because Kroger was unwilling to accept C&S's 650-store package, C&S responded with its own revised 579-store package.  Even though C&S's package included the same number of stores that Kroger had insisted on, Kroger refused to entertain the stores C&S selected for that offer, again putting its own self-interest ahead of its commitment to take "any and all actions" necessary for regulatory approval.

RLF1 32016433v.1

273.  Kroger and C&S continued to deliberate over a package of 579 stores and, on April 22, 2024, the Parties and C&S executed an Amended and Restated Asset Purchase Agreement ("A&R APA") for 579 stores.  This final set of stores was proposed entirely by Kroger; C&S did not have an input into the final store selection.

274.  Albertsons expressed strong concerns about the 579-store proposal's ability to satisfy regulators' concerns before it was publicly announced.  But Kroger refused to change its approach.  Albertsons also urged Kroger to include the same "Put Notice" framework in the A&R APA as had been included the original APA, so that the package could be increased if the FTC disapproved of it.  Kroger again pushed back, and the A&R APA ultimately only required the Parties to exercise "reasonable best efforts" to modify any provision, obligation, or agreement.

275.  Kroger's refusal to consider viable paths toward regulatory approval suggested by both Albertsons and C&S laid bare that its ultimate goal was not to uphold its agreement to take "any and all actions" necessary for regulatory approval, but rather to maximize the profitability of any proposed divestiture package, even at the risk of jeopardizing regulatory approval and, thus, the Merger.

116

## XVI. During the Litigations to Enjoin the Merger, Kroger Continues Its Self-Serving Conduct

276.   As the litigations progressed and in the weeks leading up to the FTC preliminary injunction hearing and state trials, Kroger continued to breach its obligations under the Merger Agreement.   Kroger refused to cooperate with Albertsons to improve its divestiture package and ensure that its expert witness could support the Merger, in blatant violation of its obligations under the Merger Agreement to cooperate with Albertsons in good faith, and use reasonable best efforts, best efforts, and take any and all actions necessary to remove any impediment to closing the Merger.

277.   As litigation proceeded, the perceived deficiencies the FTC, state Attorneys General, C&S, and Albertsons had highlighted during negotiations were unsurprisingly front and center.   The plaintiffs in all three lawsuits exploited Kroger's shortcomings, featuring them prominently in opening statements, during the evidence, and in closing.   At trial, Kroger's expert was forced to concede that nearly two dozen geographic markets would have presumptively anticompetitive levels of concentration after the Merger, even accounting for the divestiture.

278.   Unsurprisingly, the FTC focused a significant portion of the preliminary injunction hearing and post-trial briefing on the inadequacies of the

117

divestiture package. That strategy was later replicated by Washington and Colorado in their respective trials.

279. The FTC, along with Washington and Colorado, highlighted that Kroger picked a divestiture buyer without experience running a large grocery retail operation. They highlighted C&S's struggles as a buyer in prior divestitures and characterized C&S as a "retail liquidator" because of its history of closing stores after acquisitions when they became unprofitable. Indeed, it came out at trial that Yael Cosset, a senior executive at Kroger who was heavily involved in divestiture planning, had communicated to others at Kroger that it was a "no brainer" to pick a different divestiture buyer over C&S. And the Washington Court expressly found that Kroger "selected C&S as the divestiture buyer over a buyer that other senior executives thought more capable."

280. The FTC and Washington highlighted that Kroger failed to provide C&S the banners or private labels it requested.

281. And the FTC and Washington highlighted that Kroger, not C&S (or Albertsons), picked the stores to be divested. Due to Kroger's failure to consider C&S's and Albertsons' views during the process, the FTC was able to obtain an admission from C&S's CEO Eric Winn at the preliminary injunction hearing that "C&S [did not] have a role in selecting the 579 stores in" the final April 2024

118

package.  In its closing arguments, Washington highlighted the example of one store that Kroger's management suggested be included in the divestiture package, but was vetoed by Kroger's CEO Rodney McMullen because the store was too valuable to Kroger.

282.   Also at the preliminary injunction hearing in Oregon, Kroger's own expert Dr. Israel agreed that Kroger's divestiture did not resolve all competitive concerns—a "remarkable concession," as the FTC emphasized in its post-trial brief, that "***alone dooms the divestiture***."  Instead of bolstering the case for the Merger as intended, because of Kroger's willful breach, Dr. Israel's testimony became a strong point for the FTC.

283.   On September 25, 2024, after the FTC preliminary injunction hearing concluded and while the Colorado and Washington trials were ongoing, Albertsons again contacted Kroger, pleading for it to improve its divestiture proposal.  Kroger did not act on this request.

284.   After the FTC, Colorado, and Washington trials concluded, Kroger remained obligated to make "best efforts" and take "any and all actions" to prevail while awaiting the Courts' decisions.  Yet, during Kroger's quarterly earnings call on December 5, 2024, with the Court decisions still outstanding, Kroger sabotaged its own defense by publicly walking back its representations to the relevant Courts

119

about the Merger's procompetitive benefits.  On the earnings call, Kroger CEO McMullen volunteered in his prepared remarks that "regardless of the outcome of the trials, Kroger is operating from a position of strength" and "we don't need to do mergers to make our business successful." Those gratuitous statements contradicted Kroger's closing argument in the District of Oregon preliminary injunction hearing, where its counsel had represented to the Court that the Merger would be procompetitive because Kroger "*needs the help of this merger to continue to succeed*." Kroger's counsel had also described the Merger as a "fundamental imperative" to respond to the "existential threat to the corner grocery store" posed by competitors like Walmart, Costco, and Amazon.  McMullen's comments on the December 2024 earnings call signaled that Kroger was not serious about its representations at trial.   While undermining its defense of the Merger, those comments aligned with Kroger's ulterior motive to weaken Albertsons as a future competitor by implying to the market that Albertsons' value to Kroger had diminished.

## XVII. Kroger's Failure to Abide by Its Contractual Obligations Results in the Merger Being Enjoined

285.   As a direct result of Kroger's refusal to work with Albertsons in good faith and abide by its contractual obligations, the U.S. District Court for the District

120

of Oregon enjoined the Merger on December 10, 2024.  The State of Washington King County Superior Court also enjoined the merger on the same day.

286.  The Oregon Court found that the stores Kroger included in the divestiture package were insufficient.  To that end, the Court repeatedly emphasized Kroger's economics expert's concession that at least 22 markets were presumptively anticompetitive, even after the divestiture.  "This evidence, on its own," the Court held, "is sufficient to find that the divestiture will not mitigate the merger's anticompetitive effect such that it is no longer likely to substantially lessen competition."

287.  The Oregon Court also criticized the non-store assets included in Kroger's divestiture package.  For example, the Court credited Plaintiffs' suggestion that "C&S may not be receiving the most desirable banners" and noted that C&S would have to rebanner extensively, including introducing entirely new banners in a number of markets.  The Court also emphasized that "C&S will have limited use of the Albertsons Signature and O Organics private label brands."  And the Court credited Plaintiffs' expert's testimony that "because defendants will have a more robust loyalty program, customer data, and targeted advertising, C&S is vulnerable to having defendants target its customers after the merger."  In short, as the Oregon

121

Court put it, "[t]he structure of the divestiture package . . . creates many risks for C&S that could make it difficult to compete."

288.   In addition, the Oregon Court endorsed the FTC's critiques of C&S as a divestiture buyer, finding that there were "serious concerns about C&S's ability to run a large-scale grocery business."  In particular, the Court emphasized that "C&S does not have any experience running a large portfolio of retail grocery businesses," and that C&S's "past divestiture purchases have not been successful."  The Court maintained that view even though C&S would have retained thousands of existing Kroger and Albertsons employees and executives.  Those employees' "presence," the Court held, "does not fully mitigate C&S' inexperience and lack of success in grocery retail and cannot overcome the difficulties inherent to the selection of assets" Kroger included in its divestiture package.

289.   The Washington Court identified many of the same deficiencies in Kroger's divestiture package and selection of a divestiture buyer.  As to the stores Kroger chose to include, the Washington Court held that "Kroger kept the best performing assets for itself," including by "retaining the UVillage QFC store in Seattle because Kroger CEO Rodney McMullen personally requested that it not be divested due to its significant real estate value."  As the Court found:  "Where it

122

could, Kroger followed a simple rule:  if a store was a 'good EBITDA producer, . . . we wouldn't want to divest.'"

290.   Like the Oregon Court, the Washington Court credited the State's criticisms of C&S.  The Washington Court concluded that "Kroger Picked an Inexperienced and Ill Equipped Divestiture Buyer" and that "Kroger was well aware of C&S's limited retail capabilities when it selected C&S as the divestiture buyer."

## XVIII.    Kroger's Thwarting the Merger Harms Albertsons

291.   Albertsons and its stockholders have suffered and will be reasonably certain to suffer harms as a result of Kroger's breaches of the Merger Agreement.

292.   *First*, Albertsons' stockholders are facing the loss of a considerable Merger premium that they expected to receive in return for Albertsons agreeing to enter into the Merger Agreement.  Albertsons agreed to a transaction that valued the company at approximately $24.6 billion and would provide $34.10 per share in consideration to Albertsons' stockholders, representing a 32.8% premium over Albertsons' closing stock price of $25.67 on October 12, 2022, the day before news of the Merger became public.  That loss to Albertsons' stockholders, totaling in the billions of dollars, is due directly and causally to Kroger's breach as are further stockholder losses that have followed.

123

RLF1 32016433v.1

293.   *Second*, Albertsons invested years of time, energy, and resources to try to make the Merger a success.  Albertsons hired scores of advisors from bankers to attorneys to economists to assist with all aspects of contract drafting, antitrust review, integration oversight, and investor relations, to the tune of millions of dollars in fees and costs.  Albertsons also invested considerable energy and resources to integration work with Kroger, and millions more in legal and expert consulting fees to defend the Merger in multiple litigations.  Albertsons continued to perform and stand ready to close even after the passage of the Outside Date.  Those are all sunk costs.

294.   *Third*, Albertsons has put itself at a competitive disadvantage vis-à-vis one of its largest competitors—Kroger—who has had an up-close look into almost every aspect of Albertsons' business, and other rivals, who have had two and a half years to invest and innovate while Albertsons was stuck in a standstill as a result of the Merger.   Under Section 6.1(a) of the Merger Agreement, Albertsons was prohibited from "conduct[ing] its business and the business of the Company Subsidiaries other than in the ordinary course consistent with past practices in any material respect."  The operating covenants forced Albertsons to consult with Kroger on a litany of business decisions.  As a result, for the past two years, Albertsons has been constrained in making any material changes in how it allocates existing capital

124

and investments.  The only exceptions to this stand-still requirement are if the change meets a limited category of exceptions or if Albertsons reveals its innovative strategies to Kroger and Kroger consents—which has its own downsides for Albertsons.  Due to these terms, Albertsons largely has been unable to react to and address changes in the grocery sector, such as the growing use of digital media and the increased competitiveness of ethnically-focused grocery stores.  Now, without the Merger, Albertsons is left to play catch up in an increasingly crowded field.  And, in instances where Albertsons sought Kroger's consent to make changes to its business or pay employees retention bonuses not contemplated by existing employment agreements to retain key personnel, Kroger refused, causing loss of personnel.  Albertsons agreed to the limitations in Section 6.1 only because Kroger had committed to use its best efforts and take any and all actions to remove regulatory impediments to closing the Merger—commitments Kroger breached.

295.   In addition to abusing its veto power over Albertsons' ability to make significant strategic decisions, Kroger used its position as the proposed buyer to denigrate Albertsons and weaken its competitive position—for example, by telling the market during Kroger's December 5, 2024 earnings call that Kroger did not "need" Albertsons for the future of its business, despite having publicly represented the opposite in antitrust litigation.

125

296.    *Fourth*, and relatedly, the failure of the Merger leaves Albertsons facing the very dilemma the Merger was intended to solve: how to better compete with grocery titans like Walmart, Costco, Amazon, and Target.  Albertsons has lost out on the ability to pursue competitive advantages and synergies like those that would have resulted from the Merger.  As Albertsons' counsel explained in open court, lacking similar economies of scale, Albertsons is unable to offer prices as low as its competitors.  Kroger and Albertsons had anticipated synergies in the billions of dollars as a result of supply chain and manufacturing consolidation, procurement optimization, new opportunities for brands and private labels, and optimization of certain corporate and back-office support.  Albertsons and Kroger had also anticipated significant new revenue from new projects like a national advertisement platform.  Without the Merger, Albertsons will be forced to recalibrate its strategy to attempt to achieve the kinds of benefits the Merger would have afforded.

## COUNT I

### (Breach of Contract, Merger Agreement § 6.3(a))

297.    Albertsons repeats and incorporates all of the allegations set forth in the preceding paragraphs as if they are fully set forth herein.

298.    Albertsons and Kroger entered into the Merger Agreement.

299.    The Merger Agreement is a binding contract.

126

300.    Albertsons performed all its obligations under the Merger Agreement.

301.    Section 6.3(a) of the Merger Agreement required Kroger to use its reasonable best efforts to "take or cause to be taken all actions . . . necessary, proper or advisable to cause the conditions to the Closing to be satisfied as promptly as reasonably practicable and to eliminate, and resolve any and all impediments under any Antitrust Law with respect to the Transactions."

302.    Through the actions and inactions described above, Kroger failed to use its reasonable best efforts to take the actions necessary to satisfy Closing conditions as promptly as reasonably practicable and eliminate any and all impediments under any antitrust law.  Those actions include, but are not limited to, Kroger's inadequate 238-store offer, Kroger mismanaging the process of identifying a divestiture buyer, Kroger's inadequate 413-store offer, Kroger's inadequate 510-store offer, Kroger's inadequate 541-store offer, Kroger declining C&S's 650-store offer, Kroger entering into an insufficient A&R APA, Kroger refusing to supplement the A&R APA, and Kroger failing to develop an adequate divestiture package in the more than two years since the Merger Agreement was signed.

303.    Through the actions and inactions described above, Kroger materially breached the Merger Agreement.

304.    Section 1.1 of the Merger Agreement defines "Willful Breach" as a "material breach … that is the consequence of an act or omission by the breaching [P]arty with the actual knowledge that the taking of such act (or, in the case of an omission, failure to take such act) would cause or constitute such material breach, regardless of whether breaching was the object of the act or failure to act."

305.    Kroger's breach of Section 6.3(a) of the Merger Agreement constituted a Willful Breach.  Kroger had actual knowledge that its actions and inactions violated the Merger Agreement and would make securing regulatory approval less likely.  Kroger chose to pursue its own economic interests by trying to hold on to as many valuable assets as it could through the Merger and divestiture, instead of striving to secure regulatory approval of the Merger, despite clear and consistent feedback from the FTC, the state Attorneys General, C&S, and Albertsons that its approach was unlikely to lead to regulatory approval.

306.    Kroger's willful breach of the "reasonable best efforts" provision of the Merger Agreement has caused and continues to cause significant damages to Albertsons.

307.    Kroger's willful breach of the "reasonable best efforts" provision of the Merger Agreement has caused and continues to cause irreparable harm to Albertsons.

128

RLF1 32016433v.1

308. Kroger's willful breach of the "reasonable best efforts" provision of the Merger Agreement caused Albertsons to spend over two painstaking years attempting to consummate the Merger.  During that time, Albertsons suffered uncertainty regarding its future dealings, employee flight, investor doubts, and harm to its brand, and Albertsons was forced to forgo other strategic projects as it attempted to salvage the Merger.

## COUNT II

### (Breach of Contract, Merger Agreement § 6.3(d))

309. Albertsons repeats and incorporates all of the allegations set forth in the preceding paragraphs as if they are fully set forth herein.

310. Albertsons and Kroger entered into the Merger Agreement.

311. The Merger Agreement is a binding contract.

312. Albertsons performed all its obligations under the Merger Agreement.

313. Section 6.3(d) of the Merger Agreement required Kroger to use its "best efforts to take, or cause to be taken, any and all actions necessary to avoid, eliminate, and resolve any and all impediments under any Antitrust Law with respect to the Transactions."

314. Through the actions and inactions described above, Kroger failed to use its best efforts to avoid, eliminate, and resolve any and all impediments under the

129

antitrust law as promptly as practicable.  Those actions include, but are not limited to, Kroger's inadequate 238-store offer, Kroger mismanaging the process of identifying a divestiture buyer, Kroger's inadequate 413-store offer, Kroger's inadequate 510-store offer, Kroger's inadequate 541-store offer, Kroger declining C&S's 650-store offer, Kroger entering into an insufficient A&R APA, Kroger refusing to supplement the A&R APA, and generally, Kroger failing to develop an adequate divestiture package in the more than two years since the Merger Agreement was signed.

315.   Through the actions and inactions described above, Kroger materially breached the Merger Agreement.

316.   Section 1.1 of the Merger Agreement defines "Willful Breach" as a "material breach … that is the consequence of an act or omission by the breaching [P]arty with the actual knowledge that the taking of such act (or, in the case of an omission, failure to take such act) would cause or constitute such material breach, regardless of whether breaching was the object of the act or failure to act."

317.   Kroger's breach of Section 6.3(d) of the Merger Agreement constituted a Willful Breach.  Kroger had actual knowledge that its actions and inactions violated the Merger Agreement and would make securing regulatory approval less likely.  Kroger chose to pursue its own economic interests by trying to hold on to as

130

many valuable assets as it could through the Merger and divestiture, instead of striving to secure regulatory approval of the Merger, despite clear and consistent feedback from the FTC, the state Attorneys General, C&S, and Albertsons that its approach was unlikely to lead to regulatory approval.

318. Kroger's willful breach of the "best efforts" provision of the Merger Agreement has caused and continues to cause significant damages to Albertsons.

319. Kroger's willful breach of the "best efforts" and provision of the Merger Agreement has caused and continues to cause irreparable harm to Albertsons.

320. Kroger's willful breach of the "best efforts" provision of the Merger Agreement caused Albertsons to spend over two painstaking years attempting to consummate the Merger. During that time, Albertsons suffered uncertainty regarding its future dealings, employee flight, investor doubts, harm to its brand, and Albertsons was forced to forgo other strategic projects as it attempted to salvage the Merger.

## COUNT III

### (Breach of Contract, Merger Agreement § 6.3(e))

321. Albertsons repeats and incorporates all of the allegations set forth in the preceding paragraphs as if they are fully set forth herein.

131

322.    Albertsons and Kroger entered into the Merger Agreement.

323.    The Merger Agreement is a binding contract.

324.    Albertsons performed all its obligations under the Merger Agreement.

325.    Section 6.3(e) of the Merger Agreement required Kroger to "take any and all actions . . . to eliminate each and every impediment under any Antitrust Law to close the" Merger before the October 9, 2024 Outside Date if a proceeding is instituted or threatened challenging the Merger as violating any antitrust law.

326.    One or more proceedings were threatened, and then instituted, that challenged the Merger on the grounds that it violated the antitrust laws.

327.    Through the actions and inactions described above, Kroger failed to take any and all actions to eliminate each and every impediment under any antitrust law to close the Merger before the October 9, 2024 Outside Date.  Those actions include, but are not limited to, Kroger's inadequate 238-store offer, Kroger mismanaging the process of identifying a divestiture buyer, Kroger's inadequate 413-store offer, Kroger's inadequate 510-store offer, Kroger's inadequate 541-store offer, Kroger declining C&S's 650-store offer, Kroger entering into an insufficient A&R APA, Kroger refusing to supplement the A&R APA, and generally, Kroger failing to develop an adequate divestiture package in the more than two years since the Merger Agreement was signed.

132

328. Through the actions and inactions described above, Kroger materially breached the Merger Agreement.

329. Section 1.1 of the Merger Agreement defines "Willful Breach" as a "material breach … that is the consequence of an act or omission by the breaching [P]arty with the actual knowledge that the taking of such act (or, in the case of an omission, failure to take such act) would cause or constitute such material breach, regardless of whether breaching was the object of the act or failure to act."

330. Kroger's breach of Section 6.3(e) of the Merger Agreement constituted a Willful Breach. Kroger had actual knowledge that its actions and inactions violated the Merger Agreement and would make securing regulatory approval less likely. Kroger chose to pursue its own economic interests by trying to hold on to as many valuable assets as it could through the Merger and divestiture, instead of striving to secure regulatory approval of the Merger, and despite clear and consistent feedback from the FTC, the state Attorneys General, C&S, and Albertsons that its approach was unlikely to lead to regulatory approval.

331. Kroger's breach of the "any and all actions" provision of the Merger Agreement has caused and continues to cause significant damages to Albertsons.

332. Kroger's breach of the "any and all actions" provision of the Merger Agreement has caused and continues to cause irreparable harm to Albertsons.

133

333.   Kroger's breach of the "any and all actions" provision of the Merger Agreement caused Albertsons to spend over two painstaking years attempting to consummate the Merger.   During that time, Albertsons suffered uncertainty regarding its future dealings, employee flight, investor doubts, harm to its brand, and Albertsons was forced to forgo other strategic projects as it attempted to salvage the Merger.

## COUNT IV

### (Breach of Contract, Merger Agreement § 6.3(b))

334.   Albertsons repeats and incorporates all of the allegations set forth in the preceding paragraphs as if they are fully set forth herein.

335.   Albertsons and Kroger entered into the Merger Agreement.

336.   The Merger Agreement is a binding contract.

337.   Albertsons performed all its obligations under the Merger Agreement.

338.   Section 6.3(b) of the Merger Agreement required Kroger to "work together in good faith" with Albertsons to resolve any disagreements regarding regulatory strategy.

339.   Through the actions and inactions described above, Kroger failed to "work together in good faith" with Albertsons to resolve any disagreements regarding regulatory strategy.

134

340.    Through the actions and inactions described above, Kroger materially breached the Merger Agreement.

341.    Section 1.1 of the Merger Agreement defines "Willful Breach" as a "material breach … that is the consequence of an act or omission by the breaching [P]arty with the actual knowledge that the taking of such act (or, in the case of an omission, failure to take such act) would cause or constitute such material breach, regardless of whether breaching was the object of the act or failure to act."

342.    Kroger's breach of Section 6.3(b) of the Merger Agreement constituted a Willful Breach.  Kroger had actual knowledge that, by refusing to work together in good faith with Albertsons, it was violating the Merger Agreement and making it less likely that the Parties would secure regulatory approval of the Merger.  Kroger chose to pursue its own economic interests by trying to hold on to as many valuable assets as it could through the Merger and divestiture process.

343.    Kroger's willful breach of the "good faith" provision of the Merger Agreement has caused and continues to cause significant damages to Albertsons.

344.    Kroger's willful breach of the "good faith" provision of the Merger Agreement has caused and continues to cause irreparable harm to Albertsons.

345.    Kroger's willful breach of the "good faith" provision of the Merger Agreement caused Albertsons to spend over two painstaking years attempting to

135

consummate the Merger. During that time, Albertsons suffered uncertainty regarding its future dealings, employee flight, investor doubts, harm to its brand, and Albertsons was forced to forgo other strategic projects as it attempted to salvage the Merger.

## COUNT V

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

346.   Albertsons repeats and incorporates all of the allegations set forth in the preceding paragraphs as if they are fully set forth herein.

347.   Albertsons and Kroger entered into the Merger Agreement. The Merger Agreement is a binding contract.

348.   The purpose of the Merger Agreement was to benefit both Kroger and Albertsons and to create a combined entity better positioned to compete against rivals like Walmart, Costco, Target, and Amazon—not to give Kroger a competitive advantage over Albertsons.

349.   Pursuant to the implied covenant of good faith and fair dealing, Kroger had an implied duty not to use its position under the Merger Agreement as the putative buyer, and the party responsible for leading the development and implementation of the strategy to obtain regulatory approval, to damage Albertsons.

136

Kroger was obligated to work in good faith toward regulatory approval for the Merger.

350.    Kroger willfully inflicted competitive harm on Albertsons as part of a broader effort to prioritize Kroger's financial interests at the expense of its express and implied obligations to Albertsons under the Merger Agreement.  Kroger dragged out the regulatory process for more than two years, knowing that its regulatory strategy put the Merger at risk.  During that period, Albertsons suffered uncertainty regarding its future dealings, employee flight, investor doubts, and harm to its brand, and Albertsons was forced to forgo other strategic projects as it attempted to salvage the Merger.

351.    At the same time that Kroger was dilatory in its negotiations with regulators, it was pushing full steam ahead on extensive integration efforts, including review of critical business documents from Albertsons.  Over the course of two-and-a-half-years, Kroger gained unmatched insights into Albertsons' core capabilities, including how it operates its supply chain, merchandising, and contracting.  Kroger continued to seek that information up until the eve of the Oregon and Washington decisions, giving itself a competitive advantage at Albertsons' expense.

352.    Kroger further sought to harm Albertsons as a competitor by denigrating Albertsons in public communications regarding the Merger, including

137

Kroger's comments during its December 5, 2024 earnings call that Kroger no longer "need[ed]" Albertsons.

353.   Kroger's bad faith actions and inaction violated the covenant of good faith and fair dealing that is implied in the Merger Agreement.  Those actions and omissions deprived Albertsons of the benefit of its bargain with Kroger because they prevented the Merger Agreement from being consummated and prolonged the period during which the Merger was under regulatory review.

## PRAYER FOR RELIEF

WHEREFORE, and based on the foregoing, Albertsons respectfully requests that the Court grant the following relief:

a.   Enter judgment in Albertsons' favor, finding that Kroger willfully breached the Merger Agreement;

b.   Award to Albertsons damages in an amount to be determined at trial, including but not limited damages due to Albertsons' stockholders pursuant to Section 9.5 of the Merger Agreement;

c.   Award Albertsons all the attorney's fees and costs it has incurred and incurs in the future in this action;

d.   Award Albertsons all available interest; and

138

e.     Award all such other and further relief as this Court deems just

and appropriate.

139

*/s/ Blake Rohrbacher* _____

Blake Rohrbacher (#4750)

*OF COUNSEL*:

Kyle H. Lachmund (#6842)

Sandy Xu (#6966)

Enu Mainigi                          Elizabeth J. Freud (#6803)

Craig D. Singer                      RICHARDS, LAYTON & FINGER, P.A.

Steven Pyser                         920 North King Street

WILLIAMS & CONNOLLY LLP              Wilmington, Delaware 19801

680 Maine Avenue, SW                 (302) 651-7700

Washington, DC 20024                 rohrbacher@rlf.com

(202) 434-5000                       lachmund@rlf.com

                                     xu@rlf.com

Philippe Z. Selendy                  freud@rlf.com

Jennifer M. Selendy

David S. Flugman

SELENDY GAY PLLC

1290 Avenue of the Americas

New York, New York 10104

(212) 390-9000

Mike Cowie

DECHERT LLP

1900 K Street NW

Washington, DC 20006

(202) 261-3300

Dated: December 10, 2024          *Attorneys for Plaintiff Albertsons Companies, Inc.*

140

Davidson v. Deschutes County, Not Reported in Fed. Supp. (2015)
2015 WL 13730888

2015 WL 13730888
Only the Westlaw citation is currently available.
United States District Court, D. Oregon.

Martie DAVIDSON, Plaintiff,
v.
DESCHUTES COUNTY, John and Caren Burton, Chris Kaber, and Jennifer Gaspard, Defendants.

6:15-cv-00052-TC
|
Signed 10/08/2015

**Attorneys and Law Firms**

Mikel R. Miller, Law Office of Mikel R. Miller, PC, Bend, OR, for Plaintiff.

John E. Laherty, Deschutes County Legal Counsel, Bend, OR, Geordie L. Duckler Geordie Duckler, LLC, Tigard, OR, Andrew D. Campbell, Oregon Department of Justice Salem, OR, for Defendants.


FINDINGS & RECOMMENDATION

THOMAS M. COFFIN, United States Magistrate Judge

 **\*1**  Plaintiff brought this action raising claims for malicious prosecution, defamation, and false arrest asserted under both state and federal law related to a her arrest and prosecution for animal abuse. Plaintiff also sought a declaration about the constitutionality of the charges added to the indictment against her. After defendants filed dispositive motions, the court dismissed the case without prejudice to seek leave to amend to allege claims of malicious prosecution against the individual state actors. Plaintiff did not seek leave to amend and the court entered a judgment dismissing the case.

Private individual defendants, John and Caren Burton now seek attorney fees pursuant to 42 U.S.C. § 1988. It does not appear that the County, deputy Sheriff Jennifer Gaspard, or Oregon State police officer Chris Kaber seek fees. Plaintiff asserted state law claims of malicious prosecution and defamation against the Burtons. The federal claims were directed at the remaining defendants.

The court granted summary judgment in favor of the Burtons based on a settlement agreement stipulation that the claims against the Burtons had been resolved in a Deschutes County case involving the same underlying facts. The court further granted summary judgment, to the extent a claim for defamation based on post-settlement conduct survived, because the court lacked jurisdiction due to a lack of a common nucleus of operative facts with the federal claims. In other words, none of the federal claims in this case were supported by facts relevant to the remaining state law claim against the Burtons. Accordingly, the defamation claim against the Burtons had no relation to any claims brought pursuant to 42 U.S.C. § 1983.

Pursuant to 42 U.S.C. § 1988, defendants prevailing in civil rights actions may be awarded attorney's fees where the action brought is found to be unreasonable. Mayer v. Wedgewood Neighborhood Coalition, 707 F.2d 1020, 1021 (9th Cir. 1983). Defendants note that plaintiff's claims against them were unreasonable because: (1) they spent considerable effort to explain why plaintiff's case lacked merit, but received no response requiring the filing of an answer and dispositive motion; (2) the court dismissed the claims because plaintiff had already released much of the claims and the court otherwise lacked jurisdiction to even hear the remaining claim; (3) plaintiff failed to offer objections to the recommendation to dismiss or to amend the complaint when given leave to seek to amend; (4) the entire case was dismissed on the first set of motions.

APP-141

Davidson v. Deschutes County, Not Reported in Fed. Supp. (2015)

2015 WL 13730888

Plaintiff does not offer any substantive argument in response to the suggestion that her case is frivolous. Plaintiff does contend that fees under section 1988 are not available due to the lack of relation between the section 1983 claims and the defamation claim. The court finds that, given the release and lack of jurisdiction otherwise, the claims against the Burtons were unreasonable.

The Federal Civil Rights Act may provide for an award of attorneys' fees upon successful ancillary state law claims even where a federal constitutional claim ultimately fails. E.g., Maher v. Gagne, 448 U.S. 122, 132 (1980) (clarifying that attorney's fees under Section 1988 are available in cases "in which the plaintiff prevails on a wholly statutory, non-civil rights claim pendent to a substantial constitutional claim"); Milwe v. Cavuoto, 653 F.2d 80, 84 (2d Cir. 1981) (holding that attorney fees may be awarded as against a defendant found to have committed the state law tort of assault, a claim pendent to the Section 1983 claim, even though defendant was not found to have committed a violation of federal constitutional law). The Ninth Circuit Court of Appeals has held that, when the plaintiff in a civil rights action prevails on a pendent state claim based on a common nucleus of operative fact with a substantial federal claim, fees may be awarded under Section 1988. Carreras v. City of Anaheim, 768 F.2d 1039, 1050 (9th Cir. 1985); cf. Mateyko v. Felix, 924 F.2d 824, 828–29 (9th Cir. 1990) (denying Section 1988 fees for successful pendent state law claims if plaintiff "loses on his federal claim").

**\*2** The malicious prosecution claim, had it not been released, arguably shared a common nucleus of facts to what may have been appropriate claims under section 1983 had plaintiff chosen to flesh out the pleadings. However, the defamation claim, as already noted, did not. Accordingly, defendants may recover reasonable fees associated with that claim only.

Defendants, as the party seeking fees, have the burden of showing that time spent by their attorney was reasonably necessary. Gates v. Deukmajian, 987 F.2d 1392, 1397 (9th Cir. 1992); Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 886 F.2d 1545, 1557 (9th Cir. 1989). In order to support a finding of reasonableness, defendants must document the hours spent in the litigation and provide evidence supporting those hours. Gates, 987 F.2d at 1397. Plaintiff, as the party opposing the fees, must then rebut defendants' evidence by "challenging the accuracy and reasonableness of the hours charged or the facts asserted by the prevailing party in its submitted affidavits." Id. at 1397-98.

In determining the reasonableness of fees, the court is not required to respond to each specific objection. Id. at 1400. Rather, all that is required is a "concise but clear" explanation of reasons for the fee award. Id.

Calculating a "reasonable attorney's fee" involves a two pronged approach. A court must first calculate a lodestar figure by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate. Blum v. Stenson, 465 U.S. 886, 888, 104 S.Ct. 1541, 1543 (1984). This lodestar figure is presumed to represent an appropriate fee. Under certain circumstances, however, a court may adjust the award upward or downward to take into account the Kerr factors not subsumed within the initial lodestar calculation. Cunningham v. County of Los Angeles, 879 F.2d 481, 487 (9th Cir. 1988). [1]

Reasonable hourly rates are those that the local legal market would pay for a case of this nature to a lawyer of comparable skill, experience, and reputation to plaintiff's counsel of record. Blum, 465 U.S. at 897. Blum, instructs courts to look at the prevailing rates in the relevant market. Id. at 895, n. 11. Defendants counsel, who has 28 years of experience, charged $250 per hour. The 2012 Oregon State Bar economic survey reveals that the median hourly rate for a defense attorney practicing in Oregon was $291 per hour with an average of $250. An attorney with 28 years of experience practicing in the Lower Willamette Valley averaged $277 per hour as of 2012. The hourly rate charged by counsel is reasonable.

**\*3** The fee claimant must next demonstrate that the number of hours spent was reasonable and that counsel made a good faith effort to exclude excessive, redundant, or unnecessary hours. Hensley v. Eckerhart, 461 U.S. 424, 434 (1983). Here, counsel seeks $4,650 for 18.6 hours of work. There appears to be no effort to single out work solely related to the effort to attack the defamation claim beyond the release issue. While any effort regarding the release is necessarily related to the malicious prosecution claim, the effort attacking the claim based on the statute of limitations is not. However, parsing out the amount of time spent on the statute of limitation issue does not appear feasible as it was a small part of the motion. [2] Accordingly, the court

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.     2

2015 WL 13730888

should reduce the request by 10% as the statute of limitations argument was a minor part of defendant's summary judgment motion. Therefore, the court should find that defendants' counsel reasonably spent 16.74 hours on claims compensable under section 1988 and award fees in the amount of $4,185.


## CONCLUSION

For the reasons stated above, defendants John and Caren Burton's motion for attorneys' fees (#38) should be allowed in the amount of $4,185.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. The parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the court. Thereafter, the parties shall have fourteen (14) days within which to file a response to the objections. Failure to timely file objections to any factual determination of the Magistrate Judge will be considered as a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to this recommendation.


**All Citations**

Not Reported in Fed. Supp., 2015 WL 13730888


## Footnotes

1    The <u>Kerr</u> factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to the acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. <u>Kerr v. Screen Guild Extras, Inc.</u>, 526 F.2d 67, 70 (9th Cir 1975). Among the many subsumed factors in the lodestar calculation are the novelty and complexity of the issues involved, the special skill and experience of counsel, and the results obtained. <u>Cabrales v. County of Los Angeles</u>, 864 F.2d 1454, 1464 (9th Cir. 1988).

2    The court notes that neither party addressed the relation of any claims to the section 1983 claims for purposes of supplemental jurisdiction over the state law claims. Thus, counsel likely did not keep track of which hours were dedicated to the issues not related to the claims over which the court had jurisdiction.

---

End of Document                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Doe v. Fitzgerald, Not Reported in Fed. Supp. (2022)

2022 WL 18110021

2022 WL 18110021
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Jane DOE No. 1 et al

v.

Daniel S. FITZGERALD

Case No. CV 20-10713-MWF (RAOx)
|
Filed December 14, 2022

**Attorneys and Law Firms**

Deborah S. Dixon, John H. Gomez, San Diego, CA, Joshua Lax, Pro Hac Vice, DiCello Levitt Gutzler LLC, Greg G. Gutzler, F. Franklin Amanat, Pro Hac Vice, DiCello Levitt LLC, New York, NY, Lisa D. Haba, Pro Hac Vice, The Haba Law Firm P.A., Longwood, FL, Mark A. DiCello, Pro Hac Vice, Dicello Levitt Gutzler LLC, Mentor, OH, for Jane Doe No. 1 et al.

Brandon Akio Takahashi, Gordon Rees Scully Mansukhani LLP, Los Angeles, CA, Ernest E. Badway, Pro Hac Vice, Fox Rothschild LLP, New York, NY, Jeffrey R. Whitley, Pro Hac Vice, Fox Rothschild LLP, Raleigh, NC, for Daniel S. Fitzgerald.

**Proceedings (In Chambers):** ORDER GRANTING UNITED STATES ATTORNEY'S
OFFICE'S MOTION TO INTERVENE AND TO STAY PROCEEDINGS [210]

MICHAEL W. FITZGERALD, United States District Judge

**\*1** Before the Court is the United States Attorney's Office for the Southern District of New York's ("USAO") Motion to Intervene and to Stay Proceedings (the "Motion"), filed on October 19, 2022. (Docket No. 210).

In light of the Motion, this Court ordered the current parties to this action to show cause why the Motion should not be granted (the "OSC"). (Docket No. 214). On November 8, 2022, Plaintiff Jane Doe No. 5 filed a Response to the OSC ("JD5 Response"). (Docket No. 215). On November 10, 2022, Defendant Daniel S. Fitzgerald filed a Response to the OSC ("Fitzgerald Response"). (Docket No. 216). On November 17, 2022, the USAO filed a Reply. (Docket No. 217).

The Court has read and considered the papers and held a hearing on December 12, 2022.

Because there is an overlap between the claimant-victims and conduct at issue in this civil action and the federal criminal case pending against Peter Nygard in the Southern District of New York (the "Nygard Case"), a complete mandatory stay of this action is required pursuant to 18 U.S.C. § 1595(b)(1). Therefore, the Motion is **GRANTED,** and this action is **STAYED** until there is a final adjudication in the Nygard Case.

## I. BACKGROUND

Plaintiffs in this action have alleged claims under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §§ 1591, *et seq.*, and other laws, allegedly arising from, among other things, Fitzgerald's trafficking of women, and his conspiring with Peter Nygard and others to do the same, in California and elsewhere. The Amended Fourth Amended Complaint (the "Complaint") alleges that Fitzgerald trafficked certain Plaintiffs (Plaintiffs Jane Doe Nos. 1-4 and 7-9) as part of a conspiracy with Nygard, and other plaintiffs as part of his own sex trafficking venture. (*See* Docket. 177 ("Compl.") ¶¶ 3-4).

Doe v. Fitzgerald, Not Reported in Fed. Supp. (2022)

2022 WL 18110021

In or about December 2020, a grand jury sitting in the Southern District of New York charged Peter Nygard in a nine-count Indictment with racketeering, sex trafficking, and Mann Act offenses, including violations of 18 U.S.C. §§ 1591 and 1594. (Motion at 2) (referencing *United States v. Peter Nygard*, 20 Cr. 624 (PGG) (the "Nygard Indictment")). As alleged in the Nygard Indictment, Nygard engaged in a decades-long scheme to use the corporate entities he controlled to facilitate his sexual exploitation of dozens of adult and minor victims and conspired with others to do the same. (*Id.*). On December 14, 2020, Nygard was arrested in Canada and is currently detained pending extradition to the United States. (*Id.*). Therefore, Nygard has not yet entered an appearance in the criminal action and the action is being held in abeyance. In addition to the pending charges against Nygard, according to the USAO, investigations into Nygard's co-conspirators are ongoing. (*Id.*).

The USAO has been informed by certain of Plaintiffs' counsel that, as part of discovery in this civil action, at least some Plaintiffs have been served with discovery requests, seeking, *inter alia*, information and materials relating to Nygard and the "Nygard-Defendant Sex Trafficking Venture." (*Id.*). The USAO notes that while the TVPRA authorizes victims of the sex trafficking statutes to bring a civil action against perpetrators, the TVPRA also includes a mandatory stay provision requiring that any civil action filed under the TVPRA "shall be stayed during the pendency of any criminal action arising out of the same occurrence in which the claimant is the victim." 18 U.S.C. § 1595(b)(1).

**\*2** Pursuant to the mandatory stay provision and Federal Rule of Civil Procedure 24, the USAO seeks to intervene in this action as of right and asks this Court to issue a complete stay of this civil action during the pendency of the criminal proceedings. (Motion at 4).

In response, Plaintiff Jane Doe No. 5 does not oppose a stay as to her claims but argues that the mandatory stay provision does not require a stay of Fitzgerald's counterclaims against her for (1) libel per se; (2) libel per quod; and (3) conspiracy to commit fraud. (*See* Fitzgerald's Answer and Counterclaims ¶¶ 408-434 (Docket No. 181); *see also* JD5 Response at 3). Jane Doe No. 5 contends that because her free speech rights are implicated by the counterclaims, it is important that she have the ability to timely "frankly and completely respond[ ]" to the counterclaims in the public record. (JD5 Response at 3). No other Plaintiff filed a response to the Court's OSC.

Defendant Fitzgerald opposes the stay in its entirety, arguing that "there is no evidence showing an identity of plaintiffs or facts to hinder any criminal case." (Fitzgerald Response at 1). Further, Fitzgerald argues that if a stay is granted it should not extend to include any Jane Does not shown by actual evidence, to be alleged victims in a parallel criminal proceeding (including, at least, Plaintiffs Jane Doe Nos. 5, 6, and 10). (*Id.* at 7). Defendant argues that having to "endure additional years without being able to respond to the[ ] false allegations [in the Complaint] is improper—particularly, where the sole basis for the requested stay is an unrelated criminal proceeding not involving Fitzgerald." (*Id.* at 1).

In response to both Jane Doe No. 5's and Fitzgerald's papers, the USAO argues that "[o]n its face, the statute mandates a stay of any civil action while an overlapping criminal case is pending" and because the mandatory stay provision clearly applies here, a complete stay over the entire action is mandatory. (Reply at 2).

## II. DISCUSSION

The USAO seeks to intervene in this action under Federal Rule 24 and seeks a stay under 18 U.S.C. § 1595(b)(1).

### A. Intervention as of Right

None of the parties to the current action have directly opposed the USAO's motion to intervene. The Court determines that the USAO is entitled to intervene as of right under Federal Rule 24(a).

Rule 24(a) permits intervention as of right where the movant files a timely motion and either: (1) the movant "is given an unconditional right to intervene by a federal statue," or (2) the movant shows an interest in the litigation, that its interest may

APP-145

be impaired by the disposition of the action, and that its interest is not adequately protected by the parties to the action. Fed. R. Civ. P. 24(a)(1), 24(a)(2).

The Court agrees with the USAO that intervention is appropriate under either provision. As noted by the USAO, Congress implicitly granted the USAO a right to intervene by including the mandatory stay provision in the TVPRA, as intervention is the only way for the United States to move for and obtain the stay to which it is statutorily entitled. (Motion at 3). Further, the USAO clearly has an interest in the civil litigation that may be impaired by disposition of this action and inadequately protected by the parties. (*Id.*).

 **\*3**  Accordingly, the Court **GRANTS** the Motion to the extent it seeks intervention as of right.

### B. TVPRA Mandatory Stay Provision

Fitzgerald argues that the mandatory stay provision in the TVPRA does not apply to this action because the Nygard Case does not arise out of the "same occurrence" as the civil complaint, particularly because Fitzgerald is not an indicted defendant in the Nygard Case. (Fitzgerald Response at 4). Further, Fitzgerald argues that the USAO has failed to make an evidentiary showing that Plaintiffs in this action are the victims in the Nygard Case. (*Id.* at 5). Jane Doe No. 5 argues that any stay should not extend to Fitzgerald's counterclaims against her because "there is no overlap" between Fitzgerald's counterclaims and the Nygard Case. (JD5 Response at 4).

The USAO contends that TVPRA stay provision does not require the civil defendant be named in the parallel criminal proceeding; that the USAO's proffer that there is overlap between the Jane Doe Plaintiffs and the victims in the Nygard Case is all that is required by the statute; and that permitting any subset of claims to go forward would be inconsistent with the statute's plain meaning. The USAO argues that the statute's plain text requires that the entire civil "action" be stayed, and that a complete stay is necessary to serve the legislative purpose of allowing criminal investigations and prosecutions to proceed without hindrance. (Reply at 3-4, 6).

### 1. Whether the USAO Has Established that the TVPRA Stay Provision Applies

The TVPRA provides that "[a]n individual who is a victim of [sexual trafficking] may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in [sexual trafficking])." 18 U.S.C. § 1595(a). The statute, however, also requires that "[a]ny civil action filed under this section shall be stayed during the pendency of any criminal action arising out of the same occurrence in which the claimant is the victim." 18 U.S.C. § 1595(b)(1). For purposes of the TVPRA, a "criminal action" includes investigation and prosecution and is pending until final adjudication in the trial court. 18 U.S.C. § 1595(b)(2). The statute requires that "a civil action be stayed if the victim of the criminal action is the same as the claimant in the civil action, and if the conduct underlying both cases arise out of the same occurrence." *Doe v. Mindgeek USA Inc.*, No. SA CV 21-00338-CJC-ADSx, 2021 WL 6618628, at \*3.

The USAO contends that some of the victims in the Nygard Case are the same as the plaintiffs in this civil action and that the conduct alleged in the civil Complaint "relates directly to the criminal conduct alleged against Peter Nygard and his co-conspirators in the Nygard Indictment." (Reply at 3). The USAO explains that Fitzgerald is "alleged to have acted as Nygard's co-conspirator in the sex trafficking conduct described in the Nygard Indictment and to have modeled his solo trafficking exploits on that same venture." (*Id.*). Indeed, the civil Complaint appends and extensively quotes the Nygard Indictment. (*Id.* at 4). Therefore, the USAO contends, that "there is no plausible argument that the allegations in the instant case are not 'arising out of the same occurrence in which the claimant[s] [are] the victim[s].' " (*Id.* at 3-4) (citing 18 U.S.C. § 1595(b)(2)).

APP-146

Doe v. Fitzgerald, Not Reported in Fed. Supp. (2022)
2022 WL 18110021

**\*4**  At the hearing, Jane Doe No. 5's and Fitzgerald's counsel reiterated their contention that there is not a significant "overlap" between this action and the Nygard Case. However, to reiterate, the Defendant in this case is an alleged *co-conspirator* with the defendant in the Nygard Case, and the USAO contends that some of the *Plaintiffs in this case are victims in the Nygard Case*. Those facts alone are sufficient to convince the Court that the mandatory stay provision has been fairly invoked by the USAO.

Fitzgerald argues that the USAO has not made the required evidentiary showing to demonstrate "an identity of 'claimant[-]victims' or the 'conduct at issue.' " (Fitzgerald Response at 5).

Fitzgerald relies on two cases for the proposition that "there must be a baseline evidentiary threshold to warrant the requested stay, establishing the identity of 'victims' and the same 'occurrences' involved in the criminal proceeding." (*Id.* at 6) (citing *Tianming Wang v. Gold Mantis Constr. Decoration (CNMI), LLC*, No. 1:18-CV-0030, 2020 WL 5983939, at \*2 (D. N. Mar. I. Oct. 9, 2020); *Cortez-Romero v. Marin J Corp.*, No. 2:20-CV-14058, 2020 WL 3162979, at \*1 (S.D. Fla. June 11, 2020). However, in both *Tianming* and *Marin*, it was the *civil defendant*, not the USAO, seeking a stay. That distinction is significant given the USAO prosecuting a parallel criminal case is inevitably in a better position than any other party to determine whether there is an overlap of claimant-victims and conduct at issue. Indeed, the *Tianming* court noted that it had urged (without success) the civil defendant to contact the USAO to obtain the information it needed to justify the request for a stay. 2020 WL 5983939, at \*1. Moreover, in *Marin*, the defendant sought a stay based on an uncharged investigation and the court could not even determine the subject of the investigation based on the proffer of the defendant. 2020 WL 3162979, at \*1.

The fact that it is the USAO, rather than the civil defendant, seeking a stay justifies a lower evidentiary burden not only because of the USAO's unique knowledge of the parallel criminal case, but also because of the purpose of the statute. As a case cited by Fitzgerald acknowledges, "courts that considered the legislative history of the TVPRA have held that the mandatory stay provision was designed to protect the DOJ's ability to try criminal cases unfettered by the complications of civil discovery." *Tianming*, 2020 WL 5983939, at \*2. The *Tianming* court noted that while courts have granted stays by the motion of the defendant, courts have nonetheless cautioned that the purpose of the stay provision is "not [to] help defendants delay civil actions." *Id.* Therefore, it appears that some courts have required a civil defendant seeking a TVPRA stay to make a threshold evidentiary proffer to demonstrate that the provision applies to ensure the provision was not being improperly used as a delay tactic by the civil defendant. But where, as here, the USAO seeks a stay, there is no similar concern.

Indeed, at least one court has issued a stay in response to a request by the USAO without even allowing responses by the civil parties. *See Ara v. Khan*, No. CV 07-1251 (ARR) (JO, 2007 WL 1726456, at \*1 (E.D.N.Y. June 14, 2007) ("The relief the government seeks is mandatory if a criminal investigation is pending, and the government is uniquely competent to provide a conclusive report of that fact. Accordingly, there is nothing that any party to the civil action could say in response to the motion for a stay that would likely change the outcome I now order.").

**\*5**  Fitzgerald insists that the standard must require more than the USAO's "say so," and cites to another case where a district court required a city defendant to make an evidentiary showing that a years-long investigation of the plaintiff warranted a stay of a civil case brought by that plaintiff against the city. (Fitzgerald Response at 3-4) (citing *Klein v. City of Beverly Hills*, No. CV 13-110-JFW (VBKX), 2013 WL 12470381, at \*1 (C.D. Cal. Apr. 19, 2013)). However, *Klein* was not a TVPRA case, and it is particularly inapposite given the city was a defendant to the civil action it wished to stay, and therefore the moving party could have had self-interested intentions in seeking a stay. Here, the USAO seeks a stay of a civil action to which it has no direct stake, except to the extent that the action may interfere with its criminal prosecution and investigation. Given the USAO's limited interest in this action, the Court has no reason to question the representations made to the Court by the USAO.

Therefore, the Court concludes that the USAO has sufficiently established that the mandatory, TVPRA-stay provision applies.

## 2. The Proper Scope of the Stay

2022 WL 18110021

Neither any party nor the Court has identified binding authority that answers the question of whether the TVPRA-stay provision is limited to particular defendants or claims. However, every district court to consider the issue has apparently determined that the plain language of the statute requires a stay of "*any* ***action***," and is, therefore not limited to particular defendants or claims. *See* 18 U.S.C. § 1595(b)(1) (emphasis added); *see also Sharma v. Balwinder*, No. 21-CV-00480-BLF, 2021 WL 4865281, at *2 (N.D. Cal. Sept. 29, 2021) ("[W]here, as here, the statute's language is plain, the sole function of the courts is to enforce it according to its terms."); *Mindgeek*, 2021 WL 6618628, at *3 ("Section 1591(b) does not contain any limiting language suggesting that it applies only when there is an overlap in defendants in the relevant civil and criminal actions."); *Lunkes v. Yannai*, 882 F. Supp. 2d 545, 548–49 (S.D.N.Y. 2012) (collecting cases noting that a stay under § 1595 extends to a plaintiff's non-TVPRA claims and holding that the stay also must encompass all defendants in a related civil action regardless of whether a particular defendant has been indicted).

As the *Lunkes* court reasoned, "[d]iscovery with respect to those civil defendants not facing criminal charges ... will frequently overlap significantly with the discovery relating to criminally charged defendants." 882 F. Supp. 2d at 550. Therefore, "the risk of interference with criminal prosecution is fully addressed only be extending the stay to all defendants." *Id.* Likewise, "discovery with respect to a plaintiff's non-TVPRA claims will commonly overlap with the TVPRA-specific discovery." *Id.* Therefore, courts have read the stay provision broadly to effectuate "the statute's goal of protecting the government's ability to prosecute traffickers criminally." *Id.*

Jane Doe No. 5 argues that Fitzgerald's counterclaims are limited to allegations relating to a single sexual assault in Mexico. But, in fact, Fitzgerald's allegations are not so limited and clearly refer to relevant aspects of the Nygard Case. (*See, e.g.*, Fitzgerald Answer and Counterclaims, ¶ 399) (referencing statements allegedly made by Jane Doe No. 5 about Fitzgerald being "investigated by the fbi for sex trafficking/rape/sex w minors etc" and that Fitzgerald was attempting to prevent Jane Doe No. 5 from "testifying in the trial.").

The Court also rejects Fitzgerald's arguments that the stay should not extend to claims brought by Plaintiffs who are not victims in the Nygard Case. As an initial matter, such parsing of claims would inevitably require the USAO to publicly identify the identity of the victims in the Nygard Case. Fitzgerald does not explain how such parsing could possibly be consistent with the provision's purpose of allowing a criminal case to be unfettered by related civil litigation. Furthermore, because Fitzgerald is alleged to have modeled his individual trafficking exploits on Nygard's model, the claims by Plaintiffs who allege only to have been victims of Fitzgerald's trafficking are nonetheless substantially related to the Nygard Case.

 **\*6**  At the hearing, Jane Doe No. 5's and Fitzgerald's counsel reiterated the lack of evidence regarding overlap between the claims and defendant in this action verses the claims and defendant in the Nygard Case. However, as the Assistant U.S. Attorney argued, it would undermine the purposes of the statute if the USAO were to be required to come forward with evidence and defend the stay as to each and every claim and defendant because such a requirement could impede and unduly burden ongoing criminal investigations.

The Court therefore concludes that the stay provision extends to all counterclaims and parties. *See Sharma*, 2021 WL 4865281, at * 2 ("The plain language of [§ 1595] requires a stay of '[a]ny civil ***action***' .... The statute does not limit the stay to particular defendants or claims.") (citing 18 U.S.C. § 1595(b)(1)) (emphasis in original).

While the Court acknowledges that Fitzgerald has an interest in promptly clearing his name of the allegations in the Complaint, and that Jane Doe No. 5 has First Amendment interests at stake with respect to the counterclaims against her, as noted by the USAO, applying the typical balancing test under the factors set forth in *Keating v. Office of Thrift Supervision*, 45 F.3d 322, 324 (9th Cir. 1995) would be "contrary to the statute's clear, broad, and mandatory language." *See Doe v. Athens Cnty.*, No. 2:22-CV-00855, 2022 WL 1569979, at *1 (S.D. Ohio May 18, 2022) (citing *Mindgeek*, 2021 WL 6618628, at *3)). Therefore, the Court concludes that a complete stay is required here given the overlap in the identity between the claimant-victims and the conduct at issue in the civil and criminal actions.

2022 WL 18110021

Finally, the Court addresses Fitzgerald's concerns regarding the aging and availability of evidence by ordering all parties to this action to preserve evidence until the proceedings in the civil action resume, as more fully described below.

Accordingly, the stay is **GRANTED**.

### III. CONCLUSION

The Motion is **GRANTED** as to both the intervention and the stay. This action is **STAYED** until there is a final adjudication in the Nygard Case.

All parties to this action are **ORDERED** to preserve and protect all relevant documents, data compilations (including electronically recorded or stored data), and tangible objects in their custody or control, including the custody or control of their subagents. In this context, "relevant" refers to relevance for purposes of discovery, which is "an extremely broad concept." *See Lunkes*, 882 F. Supp. 2d at 551 (implementing a similar protective order after granting at TVPRA stay).

Going forward, as an intervening party, the USAO will be required to make all filings directly on the public docket. The USAO should decide how it wants to present its positions. It may either file its briefs on behalf of the United States of America and act through the Civil Division of the United States Attorney's Office for the Central District of California, as is routinely done with trial attorneys from "Main Justice." Or it may file its briefs as its own entity, in which case the AUSAs should apply for admission *pro hac vice* and designate a Central District AUSA as local counsel.

In either case, the USAO shall file a status report concerning the proceedings in the Nygard Case in this action every six months. If at any time prior to the final adjudication of the Nygard Case the USAO determines that it is no longer necessary to stay this action to protect the integrity of its investigation and prosecution, the USAO shall immediately file a status report in this action to that effect.

 **\*7**  At the hearing, Fitzgerald's counsel asked if the Court would consider requiring a status report every three months. The Court declines that invitation given the above instruction requires the USAO immediately notify the Court if and when it determines that a stay is no longer necessary.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 18110021

---

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

--- S.Ct. ----

Only the Westlaw citation is currently available.

Supreme Court of the United States.

Gerald F. LACKEY, in His Official Capacity as the Commissioner

of the Virginia Department of Motor Vehicles, Petitioner

v.

Damian STINNIE, et al.

No. 23-621

|

Argued October 8, 2024

|

Decided February 25, 2025

**Synopsis**

**Background:** Drivers commenced putative class-action under § 1983 to challenge Virginia statute that triggered the automatic suspension of their driver's licenses for nonpayment of court costs and fines. After drivers obtained a preliminary injunction, Virginia lawmakers repealed the statute. The parties then stipulated to dismissal of the action, but drivers moved for attorney fees under § 1988(b). The United States District Court for the Western District of Virginia, Norman K. Moon, Senior District Judge, 2021 WL 2292807, adopted the report and recommendation of Joel C. Hoppe, United States Magistrate Judge, 2021 WL 627552, and denied the fee request. Drivers appealed. A panel of the United States Court of Appeals for the Fourth Circuit, Thacker, Circuit Judge, 37 F.4th 977, affirmed. Drivers filed a petition for rehearing en banc. On rehearing en banc, the United States Court of Appeals for the Fourth Circuit, Harris, Circuit Judge, 77 F.4th 200, reversed. Certiorari was granted.

The Supreme Court, Chief Justice Roberts, held that drivers did not qualify as "prevailing parties" eligible for attorney's fees under § 1988(b).

Reversed and remanded.

Justices Thomas, Alito, Kagan, Gorsuch, Kavanaugh, and Barrett, JJ., joined.

Justice Jackson issued a dissenting opinion which Justice Sotomayor joined.

**Procedural Posture(s):** Petition for Writ of Certiorari; On Appeal; Motion for Attorney's Fees.

*Syllabus* [*]

**\*1**  Drivers whose licenses were suspended under a Virginia statute for failure to pay court fines sued the Commissioner of the Virginia Department of Motor Vehicles under 42 U.S.C. § 1983, challenging the statute as unconstitutional. The District Court granted a preliminary injunction prohibiting the Commissioner from enforcing the statute. Before trial, the Virginia General Assembly repealed the statute and required reinstatement of licenses suspended under the law. The parties then agreed to dismiss the pending case as moot.

Section 1988(b) allows an award of attorney's fees to "prevailing parties" under § 1983. The District Court declined to award attorney's fees to the drivers under that section on the ground that parties who obtain a preliminary injunction do not qualify

--- S.Ct. ----, 2025 WL 594737

as "prevailing part[ies]." A Fourth Circuit panel affirmed, but the Fourth Circuit reversed en banc. The en banc court held that some preliminary injunctions can provide lasting, merits-based relief and qualify plaintiffs as prevailing parties, even if the case becomes moot before final judgment.

*Held*: The plaintiff drivers here—who gained only preliminary injunctive relief before this action became moot—do not qualify as "prevailing part[ies]" eligible for attorney's fees under § 1988(b) because no court conclusively resolved their claims by granting enduring judicial relief on the merits that materially altered the legal relationship between the parties. Pp. ——— – ———.

(a) Under the "American Rule," a prevailing litigant is ordinarily not entitled to collect attorneys' fees from the loser absent express statutory authorization. See *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 249, 95 S.Ct. 1612, 44 L.Ed.2d 141. Congress has provided that in actions brought under certain civil rights statutes—including 42 U.S.C. § 1983—"the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." § 1988(b).

To determine whether the drivers here qualify as "prevailing part[ies]" under § 1988(b), the Court begins with the statute's text. The Court has recognized "prevailing party" as a legal term of art. *Buckhannon Board & Care Home, Inc. v. West Virginia Dept. of Health and Human Resources*, 532 U.S. 598, 603, 121 S.Ct. 1835, 149 L.Ed.2d 855. When § 1988(b) was adopted, contemporary dictionaries defined a prevailing party as one who successfully maintains its claim when the matter is finally resolved. See Black's Law Dictionary 1352 (4th ed. 1968); Ballentine's Law Dictionary 985 (3d ed. 1969).

Preliminary injunctions do not make a party "prevailing" because they do not conclusively decide the case on the merits. Such injunctions only determine if a plaintiff is *likely* to succeed, along with factors such as irreparable harm, the balance of equities, and the public interest. See *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249. The purpose of a preliminary injunction is to preserve the status quo until a trial can occur, see *University of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175, and external events that render a dispute moot do not convert that temporary order into a conclusive adjudication. Pp. ——— – ———.

 **\*2**  (b) The Court's precedents interpreting § 1988(b) establish that a plaintiff "prevails" when a court grants enduring judicial relief that materially alters the legal relationship between the parties. Two recent decisions emphasize that this change must be both judicially sanctioned and enduring. In *Buckhannon*, the Court rejected the "catalyst theory"—the theory that a plaintiff may receive attorney's fees under § 1988(b) when he "achieves the desired result because the lawsuit brought about a voluntary change in the defendant's conduct." 532 U.S., at 601, 121 S.Ct. 1835. The Court explained that the plaintiff was not a "prevailing party" because there had been "no judicially sanctioned change in the legal relationship of the parties." *Id*., at 605, 121 S.Ct. 1835. And in *Sole v. Wyner*, 551 U.S. 74, 127 S.Ct. 2188, 167 L.Ed.2d 1069, the Court decided that a plaintiff initially granted a preliminary injunction after an abbreviated hearing, but denied a permanent injunction after an adjudication on the merits, did not qualify as a "prevailing party" within the meaning of § 1988(b) because the plaintiff gained no *enduring* change in the legal relationship between herself and the defendants. *Id*., at 77, 78, 86, 127 S.Ct. 2188. The Court's holding in this case—that the enduring nature of that change must itself be judicially sanctioned—follows naturally from *Sole* and *Buckhannon*. A plaintiff who wins a transient victory on a preliminary injunction does not become a "prevailing party" simply because external events convert the transient victory into a lasting one. Pp. ——— – ———.

(c) The rule established serves the interests of judicial economy. A straightforward, bright-line rule is easy to administer, reducing the risk of significant litigation over attorney's fees. Concerns that government defendants who have lost at the preliminary injunction stage will strategically moot litigation are speculative, and such a risk could arise in only a small number of contexts. The judicial role here is limited. Congress may amend the statutory language to empower courts to award attorney's fees to plaintiffs who have enjoyed some success but have not prevailed in a judgment on the merits. Pp. ——— – ———.

(d) The drivers' remaining arguments are unpersuasive. The argument that § 1988(b) was enacted against a historical backdrop that favored awarding interim costs at equity, including for preliminary injunctions, was rejected by the Court in *Alyeska*

--- S.Ct. ----, 2025 WL 594737

*Pipeline.* 421 U.S., at 241, 247, 95 S.Ct. 1612. The drivers also contend that the availability of fees in some cases while litigation is ongoing suggests that § 1988(b) includes no finality requirement, but the Court's decisions simply indicate that attorney's fees may be awarded when conclusive, enduring judicial relief is meted out on an incremental basis. Finally, the availability of fees after a court-ordered consent decree is consistent with the rule announced here. While the decree reflects the parties' own resolution of the merits, it is approved and given force of law by a court, and it may grant enduring relief that materially alters the legal relationship between the parties. The dissent conflates preliminary judicial relief that becomes *irreversible* by way of mootness with relief that is *permanent* by virtue of a judicial order. Pp. —— – ——.

77 F.4th 200, reversed and remanded.

ROBERTS, C. J., delivered the opinion of the Court, in which THOMAS, ALITO, KAGAN, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined. JACKSON, J., filed a dissenting opinion, in which SOTOMAYOR, J., joined.

**Attorneys and Law Firms**

Erika L. Maley, Solicitor General, Richmond, VA, for Petitioner.

Anthony A. Yang, Washington, DC, for the United States, as amicus curiae, supporting petitioner.

Brian D. Schmalzbach, Richmond, VA, for Respondents.

Jason S. Miyares, Attorney General of Virginia, Maya M. Eckstein, Trevor S. Cox, David M. Parker, Hunton Andrews Kurth LLP, Richmond, VA, Erika L. Maley, Solicitor General, Counsel of Record, Kevin M. Gallagher, Principal Deputy Solicitor General, Graham K. Bryant, Deputy Solicitor General, M. Jordan Minot, Assistant Solicitor General, Office of the Virginia Attorney General, Richmond, VA, for Petitioner.

Angela A. Ciolfi, Legal Aid Justice Center, Charlottesville, VA, Brian D. Schmalzbach, Counsel of Record, Matthew A. Fitzgerald, John J. Woolard, McGuireWoods LLP, Richmond, VA, Patrick Levy-Lavelle, Legal Aid Justice Center, Richmond, VA, Jonathan T. Blank, McGuireWoods LLP, Charlottesville, VA, for Respondents Damian Stinnie, Melissa Adams, Adrainne Johnson, Williest Bandy, Brianna Morgan.

**Opinion**

Chief Justice ROBERTS delivered the opinion of the Court.

Respondents are Virginia drivers whose licenses were suspended due to their failure to pay court fines or costs. The drivers sued the Commissioner of the Virginia Department of Motor Vehicles under 42 U.S.C. § 1983, arguing that the Virginia statute requiring suspension of their licenses was unconstitutional. The District Court preliminarily enjoined the Commissioner from enforcing the statute. But before the case reached final judgment, the Virginia General Assembly repealed the challenged law, rendering the action moot. The question presented is whether the drivers are "prevailing part[ies]" who qualify for an award of attorney's fees under § 1988(b).

I

Until recently, a Virginia statute directed the state courts to suspend the license of any driver who failed to pay "any fine, costs, forfeitures, restitution, or penalty lawfully assessed against him" for violation of a federal, state, or local law. The suspension remained in force until the amount due was paid in full or the driver entered into a court-approved payment plan. Va. Code Ann. § 46.2–395(B) (2016) (repealed 2020). Virginia drivers—whose licenses were suspended under the law and who asserted that they could not afford to pay the fines or costs or keep up with a payment plan—sued the Commissioner of the Virginia Department of Motor Vehicles on their own behalf and on behalf of a putative class. The drivers alleged that the statute facially

violated the Due Process Clause by "failing to provide sufficient notice or hearing to any driver before license suspension" and violated both the Due Process and Equal Protection Clauses "as applied to people who cannot afford to pay due to their modest financial circumstances." First Amended Class Action Complaint in *Stinnie* v. *Holcomb*, No. 3:16–cv–00044 (WD Va., Sept. 11, 2018), ECF Doc. 84, pp. 2–3; see also *id*., at 37–43. The drivers sought declaratory relief, preliminary and permanent injunctive relief, and attorney's fees under 42 U.S.C. § 1988(b).

**\*3**  In December 2018, the District Court granted a preliminary injunction, prohibiting the Commissioner from enforcing the statute against the drivers or future class members. See *Stinnie v. Holcomb*, 355 F.Supp.3d 514, 520 (WD Va. 2018). The court explained that the drivers had made "a clear showing that [they were] likely to succeed" on their procedural due process claim, though it noted that they need not "establish a certainty of success." *Id*., at 527 (quoting *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (CA4 2017)). The court also determined that the remaining preliminary injunction factors—the risk of irreparable harm, the balance of equities, and the public interest—weighed in the drivers' favor. *Stinnie*, 355 F.Supp.3d at 532; see *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). The Commissioner did not appeal the grant of the preliminary injunction.

In April 2019, about four months before a bench trial was scheduled to begin, the Commissioner moved to dismiss as moot or, in the alternative, stay the case. See *Stinnie v. Holcomb*, 396 F.Supp.3d 653, 656 (WD Va. 2019). The Virginia General Assembly had recently adopted Budget Amendment No. 33, which "eliminate[d] the suspension of drivers' licenses for failure to pay court fines and costs through July 1, 2020, but [did] not repeal § 46.2–395." *Ibid.* The Commissioner represented that the General Assembly was likely to repeal the law during the next legislative session. The District Court granted a stay, reasoning in part that doing so served the interests of judicial economy and enabled the court to avoid "weigh[ing] in on sensitive constitutional questions about license suspension schemes about which other courts ha[d] disagreed." *Id*., at 660.

In April 2020, the Virginia General Assembly repealed § 46.2–395 and required the permanent reinstatement of licenses suspended under the law. See 2020 Va. Acts ch. 965. As a result, the parties agreed that the action had become moot and stipulated to dismissal. The drivers, however, asserted that they were entitled to attorney's fees under § 1988(b), so the parties jointly requested that the court retain jurisdiction to resolve that dispute. The District Court declined to award attorney's fees, following *Smyth v. Rivero*, 282 F.3d 268 (CA4 2002). See *Stinnie v. Holcomb*, 2021 WL 2292807 (WD Va., June 4, 2021). In *Smyth* the Fourth Circuit held that a plaintiff awarded a preliminary injunction is not a "prevailing party" within the meaning of § 1988(b). 282 F.3d at 277. A Fourth Circuit panel affirmed, again relying on *Smyth. Stinnie v. Holcomb*, 37 F.4th 977 (2022). Judge Harris concurred, suggesting that the Circuit may wish to reconsider that precedent. *Id*., at 983.

The Fourth Circuit did so, rehearing the case en banc and overturning its decision in *Smyth. Stinnie v. Holcomb*, 77 F.4th 200 (2023). It observed that *Smyth* had become the "outlier" among the courts of appeals. 77 F.4th at 209. It reasoned that some preliminary injunctions "provide enduring, merits-based relief that satisfies all the requisites of the prevailing party standard." *Id*., at 203. And it explained, in light of this Court's decision in *Winter v. Natural Resources Defense Council*, that a plaintiff could no longer prevail on a preliminary injunction for reasons that "had virtually nothing to do with the merits of her claim." 77 F.4th at 208–209; see *Winter*, 555 U.S., at 20, 129 S.Ct. 365 (clarifying that a finding of *likely* success on the merits is a prerequisite to preliminary injunctive relief). Finally, it noted that Congress had enacted § 1988(b) in the interest of facilitating the redress of civil rights grievances. 77 F.4th at 210.

**\*4**  The en banc court articulated a new standard: "When a preliminary injunction provides the plaintiff concrete, irreversible relief on the merits of her claim and becomes moot before final judgment because no further court-ordered assistance proves necessary, the subsequent mootness of the case does not preclude an award of attorney's fees." *Ibid*. Applying that standard, the en banc court vacated and remanded the case to allow the District Court to determine a reasonable fee. *Id*., at 218. Judge Quattlebaum dissented, arguing that a preliminary injunction does not constitute a judicial decision on the merits and that a fee award on the basis of such an injunction therefore conflicts with both the text of § 1988(b) and this Court's precedents. See *id*., at 225, 227, 231.

--- S.Ct. ----, 2025 WL 594737

We granted certiorari to determine whether the term "prevailing party" in § 1988(b) encompasses a party who is awarded a preliminary injunction, if the case becomes moot before the court reaches a final judgment. 601 U. S. ——, 144 S.Ct. 1390, 218 L.Ed.2d 678 (2024).

II

Since 1796, this Court has maintained that "the Judiciary itself would not create a general rule, independent of any statute, allowing awards of attorneys' fees in federal courts." *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 249, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975) (citing *Arcambel v. Wiseman*, 3 U.S. 306, 3 Dall. 306, 1 L.Ed. 613 (1796)). The principle that "the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser" became known as the "American Rule." *Alyeska Pipeline*, 421 U.S., at 247, 95 S.Ct. 1612. Federal courts may depart from this rule only when "there is express statutory authorization" to do so. *Hensley v. Eckerhart*, 461 U.S. 424, 429, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

In 1976, Congress adopted the Civil Rights Attorney's Fees Awards Act. 90 Stat. 2641. The law provides that, in actions brought under certain civil rights statutes—including 42 U.S.C. § 1983—"the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." § 1988(b). The question is whether the drivers in this case qualify as "prevailing part[ies]" within the meaning of § 1988(b).

A

When interpreting a statute, we begin with the text. As we have previously recognized, the phrase "prevailing party" in § 1988(b) is a "legal term of art." *Buckhannon Board & Care Home, Inc. v. West Virginia Dept. of Health and Human Resources*, 532 U.S. 598, 603, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001). We assume that "when Congress 'borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word.' " *United States v. Hansen*, 599 U.S. 762, 774, 143 S.Ct. 1932, 216 L.Ed.2d 692 (2023) (quoting *Morissette v. United States*, 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952)).

At the time § 1988(b) was adopted, Black's Law Dictionary defined "prevailing party" as the party "who successfully prosecutes the action or successfully defends against it." Black's Law Dictionary 1352 (rev. 4th ed. 1968). It explained that prevailing party status "does not depend upon the degree of success at different stages of the suit, but whether, at the end of the suit, or other proceeding, the party who has made a claim against the other, has successfully maintained it." *Ibid.*; accord, Ballentine's Law Dictionary 985 (3d ed. 1969). A prevailing party, in other words, is "[t]he party ultimately prevailing when the matter is finally set at rest." Black's Law Dictionary 1352.

Preliminary injunctions, however, do not conclusively resolve legal disputes. In awarding preliminary injunctions, courts determine if a plaintiff is *likely* to succeed on the merits—along with the risk of irreparable harm, the balance of equities, and the public interest. *Winter*, 555 U.S., at 20, 129 S.Ct. 365. "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held," *University of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981), and "to balance the equities as the litigation moves forward," *Trump v. International Refugee Assistance Project*, 582 U.S. 571, 580, 137 S.Ct. 2080, 198 L.Ed.2d 643 (2017) (*per curiam*). "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Id.*, at 579, 137 S.Ct. 2080. Such relief is also "customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Camenisch*, 451 U.S., at 395, 101 S.Ct. 1830. As a result, we have previously cautioned against "improperly equat[ing] 'likelihood of success' with 'success' " and treating preliminary injunctions as "tantamount to decisions on the underlying merits." *Id.*, at 394, 101 S.Ct. 1830.

**\*5**  The transient nature of preliminary injunctions is most apparent when a court reaches a different conclusion upon full consideration of the merits. For example, in one of our more recent cases interpreting § 1988, *Sole v. Wyner*, 551 U.S. 74, 78–79, 127 S.Ct. 2188, 167 L.Ed.2d 1069 (2007), protesters sought a preliminary injunction against a state regulation of beach attire in order to assemble nude in the form of a peace sign. The day after the complaint was filed, the District Court held a hearing and granted the preliminary injunction. *Id.*, at 79, 127 S.Ct. 2188. The preliminary injunction permitted the protest to occur and thus preserved the participants' rights until a final determination could be made on the merits of their claim. Ultimately, however, the court declined to award a permanent injunction, ruling that the regulation was no more burdensome than necessary to protect the public. *Id.*, at 80–81, 127 S.Ct. 2188.

Because preliminary injunctions do not conclusively resolve the rights of parties on the merits, they do not confer prevailing party status. A plaintiff who secures a preliminary injunction has achieved only temporary success at an intermediary "stage[ ] of the suit." Black's Law Dictionary 1352. It cannot yet be said that he will "ultimately prevail[ ] when the matter is finally set at rest" or that he will have "successfully maintained" his claim "at the end." *Ibid.* And external events that render a dispute moot do not convert a temporary order designed to preserve the status of the parties into a conclusive adjudication of their rights.

The Fourth Circuit en banc was persuaded that "*Winter*'s stringent merits requirement" avoided the "risk" that "a plaintiff may prevail, and thus be entitled to fees, based on a preliminary injunction that had virtually nothing to do with the merits of her claim." 77 F.4th at 209. But it is not enough that *Winter* guarantees a preliminary injunction award has at least *something* to do with the merits. The plaintiff must succeed on the merits.

B

This conclusion is consistent with our precedents interpreting § 1988(b). We have held that, for the purposes of § 1988(b), a plaintiff "prevails" when a court grants enduring judicial relief that constitutes a "material alteration of the legal relationship of the parties." *Texas State Teachers Assn. v. Garland Independent School Dist.*, 489 U.S. 782, 792–793, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989). For example, we have ruled that a plaintiff may qualify as a "prevailing party" based on an award of nominal damages, *Farrar v. Hobby*, 506 U.S. 103, 112, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992), or a final victory on a material even if not predominant claim, *Texas State Teachers Assn.*, 489 U.S., at 791–793, 109 S.Ct. 1486. By contrast, a party does not qualify as a "prevailing party" when a court of appeals overturns directed verdicts and discovery orders entered against him, *Hanrahan v. Hampton*, 446 U.S. 754, 756, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980) (*per curiam*), or when a court enters a declaratory judgment but does not modify the defendant's behavior toward the plaintiff, *Rhodes v. Stewart*, 488 U.S. 1, 3–4, 109 S.Ct. 202, 102 L.Ed.2d 1 (1988) (*per curiam*) (holding that no fees were available under § 1988 when the judgment afforded no relief to the plaintiff due to mootness).

Two of our more recent decisions highlight the requirements that the change in legal relationship be judicially sanctioned and enduring. In *Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health and Human Resources*, we rejected the "catalyst theory"—the theory that a plaintiff may receive attorney's fees under § 1988(b) when he "achieves the desired result because the lawsuit brought about a voluntary change in the defendant's conduct." 532 U.S., at 601, 121 S.Ct. 1835; see *id.*, at 600, 121 S.Ct. 1835. In that context, we explained that the plaintiff was not a "prevailing party" because there had been "no judicially sanctioned change in the legal relationship of the parties." *Id.*, at 605, 121 S.Ct. 1835. The defendant's voluntary actions "lack[ed] the necessary judicial *imprimatur*." *Ibid*. We were not persuaded that § 1988(b) "authorizes federal courts to award attorney's fees to a plaintiff who" filed a "potentially meritless lawsuit" and "reached the 'sought-after destination' without obtaining any judicial relief." *Id.*, at 606, 121 S.Ct. 1835 (quoting *id.*, at 634, 121 S.Ct. 1835 (Ginsburg, J., dissenting)).

**\*6**  In *Sole v. Wyner*, we decided that "a plaintiff who gain[ed] a preliminary injunction after an abbreviated hearing, but [was] denied a permanent injunction after a dispositive adjudication on the merits," did not qualify as a "prevailing party" within the meaning of § 1988(b). 551 U.S., at 77, 127 S.Ct. 2188; see *id.*, at 78, 127 S.Ct. 2188. That plaintiff, we explained, "gained no *enduring* change in the legal relationship" between herself and the defendants. *Id.*, at 86, 127 S.Ct. 2188 (emphasis

added; alterations and internal quotation marks omitted). Although we left open the question presented in this case, see *ibid.*, we described the plaintiff's success at the preliminary injunction stage as "a transient victory at the threshold of an action," a "fleeting success" that "did not establish that [the plaintiff] prevailed on the gravamen of her plea for injunctive relief," one "tentative [in] character, in view of the continuation of the litigation to definitively resolve the controversy," *id.*, at 78, 83, 84, 127 S.Ct. 2188.

We recognize that neither opinion resolves this case, but our holding today follows naturally from these precedents. In *Sole*, we established that the change in the legal relationship between the parties must be "enduring." *Id.*, at 86, 127 S.Ct. 2188. In *Buckhannon*, we established that the change must be "judicially sanctioned." 532 U.S., at 605, 121 S.Ct. 1835. Today, we establish that the enduring nature of that change must itself be judicially sanctioned. A plaintiff who wins a transient victory on a preliminary injunction does not become a "prevailing party" simply because external events convert the transient victory into a lasting one. Rather, a plaintiff "prevails" under the statute when a court conclusively resolves a claim by granting enduring judicial relief on the merits that materially alters the legal relationship between the parties. [*]

C

The rule we establish today also serves the interests of judicial economy. A straightforward, bright-line rule is easy to administer, reducing the risk of "a second major litigation" over attorney's fees. Cf. *Hensley*, 461 U.S., at 437, 103 S.Ct. 1933. The drivers, however, suggest that our rule promotes simplicity at the cost of creating perverse incentives. They fear that government defendants who have lost at the preliminary injunction stage will strategically moot litigation rather than risk a fee award were they to ultimately lose on the merits. See Brief for Respondents 42–47. We found similar concerns to be "entirely speculative" when we rejected the catalyst theory in *Buckhannon*, 532 U.S., at 608, 121 S.Ct. 1835. We reiterate that such risk could arise in only a small number of contexts. After all, if a plaintiff "has a cause of action for damages, a defendant's change in conduct will not moot the case." *Id.*, at 609, 121 S.Ct. 1835. And even if the plaintiff seeks only injunctive relief, voluntary cessation of the challenged conduct does not moot an action "unless it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.' " *Ibid.* (quoting *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)); see also *FBI v. Fikre*, 601 U.S. 234, 241, 144 S.Ct. 771, 218 L.Ed.2d 162 (2024) (characterizing this burden as "formidable" (quoting *Friends of the Earth*, 528 U.S., at 190, 120 S.Ct. 693)). A survey asking public interest organizations to self-report on the impact of *Buckhannon* does not change our minds. See *post*, at —— – —— (JACKSON, J., dissenting).

**\*7** It is Congress's job to craft policy and ours to interpret the words that codify it. "Atextual judicial supplementation is particularly inappropriate when ... Congress has shown that it knows how to adopt the omitted language or provision." *Rotkiske v. Klemm*, 589 U.S. 8, 14, 140 S.Ct. 355, 205 L.Ed.2d 291 (2019). Congress has shown that it knows how to empower courts to award attorney's fees to plaintiffs who have enjoyed some success but have not prevailed in a judgment on the merits. In the Freedom of Information Act, for example, Congress authorized courts to assess attorney's fees when a complainant has "substantially prevailed," even if through "a voluntary or unilateral change in position by the agency." 5 U.S.C. § 552(a)(4) (E). If Congress determines that the rule we adopt today is unwise, it may amend the statutory language—just as it enacted § 1988(b) itself in response to our decision in *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141; see *Hensley*, 461 U.S., at 429, 103 S.Ct. 1933. Until then, "it is of course our job to apply faithfully the law Congress has written." *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89, 137 S.Ct. 1718, 198 L.Ed.2d 177 (2017).

D

The drivers urge the opposite conclusion, but we find their arguments unpersuasive.

First, the drivers, joined by the dissent, argue that the dictionary definitions support them. But they assume that the favorable resolution of a *dispute* is tantamount to success on a *claim* in a legal *action*. A "prevailing party," however, is defined in the latter sense—one who "successfully prosecutes the action," who has "made a claim" against another and "has successfully maintained it." Black's Law Dictionary 1352.

Second, the drivers and dissent contend that § 1988(b) was enacted against a historical backdrop that favored awarding interim costs at equity, including for preliminary injunctions. See Brief for Respondents 19–21. The dissent in *Alyeska Pipeline* similarly invoked "the well-established power of federal equity courts to award attorneys' fees when the interests of justice so require." 421 U.S., at 272, 95 S.Ct. 1612 (Marshall, J., dissenting). We rejected that argument, however, and determined that the American Rule supplied the default rule at law and equity, subject to narrow historical exceptions not at issue here. See *id.*, at 241, 247, 95 S.Ct. 1612 (majority opinion).

Next, the drivers argue that the availability of fees while litigation is ongoing suggests that § 1988(b) includes no finality requirement. See Brief for Respondents 40–42. The dissent likewise points to our statement in *Buckhannon* that a " 'prevailing party' is not intended to be limited to the victor only after entry of a final judgment following a full trial on the merits." 532 U.S., at 607, 121 S.Ct. 1835 (quoting H. R. Rep. No. 94–1558, p. 7 (1976)); see *post*, at ——. We have recognized that "Congress contemplated the award of fees *pendente lite* in some cases." *Hanrahan*, 446 U.S., at 757, 100 S.Ct. 1987. For example, we have explained that, in school desegregation cases, "many final orders may issue in the course of the litigation" because injunctive relief "must prove its efficacy ... over a period of time and often with frequent modifications." *Bradley v. School Bd. of Richmond*, 416 U.S. 696, 723, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). Our decisions simply indicate that attorney's fees may be awarded when conclusive, enduring judicial relief is meted out on an incremental basis. *Hanrahan*, 446 U.S., at 758, 100 S.Ct. 1987 ("Congress intended to permit the interim award of counsel fees only when a party has prevailed on the merits of at least some of his claims."). Key language on which the dissent relies—our statement that a party prevails when it "succeed[s] on any significant claim affording it some of the relief sought," including relief on the merits *pendente lite*—explained our rejection of the "central issue test," which would have required a party to prevail on its central claim in order to be awarded attorney's fees. *Texas State Teachers Assn.*, 489 U.S. at 791, 109 S.Ct. 1486; see *post*, at ——. It did not refer to preliminary relief.

  **\*8** The availability of fees following the entry of a court-ordered consent decree is fully consistent with the rule we announce today. A consent decree reflects the parties' own resolution of the merits, but it is approved and given force of law by the court. See *Firefighters v. Cleveland*, 478 U.S. 501, 523, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986). Violation of a consent decree is enforceable by a citation for contempt. *Ibid.* So a consent decree is like a final judgment in the relevant ways: It conclusively resolves the claim, bears a judicial *imprimatur*, and may grant enduring relief that materially alters the legal relationship between the parties. That is why "[w]e have only awarded attorney's fees where the plaintiff has received a judgment on the merits or obtained a court-ordered consent decree." *Buckhannon*, 532 U.S., at 605, 121 S.Ct. 1835 (citation omitted). For its part, the dissent conflates preliminary judicial relief that becomes *irreversible* by way of mootness with relief that is *permanent* by virtue of a judicial order. See *post*, at —— – ——. That a preliminary order may sometimes "function[ ] ... like" a final order due to external circumstances, see *post*, at —— (citation omitted), is not dispositive of the nature of the order.

* * *

Section 1988(b) permits courts to award attorney's fees to a "prevailing party." A party "prevails" when a court conclusively resolves his claim by granting enduring relief on the merits that alters the legal relationship between the parties. Critically, both the change in relationship and its permanence must result from a judicial order. A preliminary injunction, which temporarily preserves the parties' litigating positions based in part on a prediction of the likelihood of success on the merits, does not render a plaintiff a "prevailing party." Nor do external events that moot the action and prevent the court from conclusively adjudicating the claim. Because the drivers in the present case gained only preliminary injunctive relief before this action became moot, they do not qualify as "prevailing part[ies]" eligible for attorney's fees under § 1988(b).

Lackey v. Stinnie, 604 U.S. ---- (2025)

--- S.Ct. ----, 2025 WL 594737

The judgment of the Court of Appeals for the Fourth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Justice JACKSON, with whom Justice SOTOMAYOR joins, dissenting.

Congress has authorized courts to award attorney's fees to the "prevailing party" in certain civil rights cases. 42 U.S.C. § 1988(b). Today, the Court holds that a plaintiff who secures a preliminary injunction does not "prevail" under this fee-shifting statute, even when the preliminary injunction provides meaningful relief and is never reversed on the merits. The Court maintains that this holding "follows naturally from" our precedents. *Ante,* at ——. But that will come as a surprise to the eleven Courts of Appeals that have previously considered this issue; all of them agree that at least *some* preliminary injunctions trigger fee eligibility under § 1988(b).

Stated simply, the majority's categorical preclusion of fee awards for any plaintiff who successfully obtains preliminary injunctive relief is unwarranted. It lacks any basis in the text of § 1988(b) and is plainly inconsistent with that statutory provision's clear objective, which is to encourage attorneys to file civil rights actions on behalf of the most vulnerable people in our society. The Court has now eliminated fee eligibility for *all* preliminary injunctions—even those that effectively resolve the case. But if Congress had meant for "prevailing party" status to hinge entirely on the "conclusive" nature of a judicial order, it could easily have said so. It is the role of Congress, not this Court, to weigh concerns about administrative ease against the benefits of guaranteeing individuals an opportunity to vindicate their civil rights.

There is no persuasive reason to believe that Congress meant to preclude fee awards for every plaintiff who secures preliminary injunctive relief but not a final judgment, no matter the context. Therefore, I respectfully dissent.

I

A

Nothing in § 1988(b)'s text compels the conclusion that a plaintiff who obtains preliminary injunctive relief is *never* eligible for a fee award. Section 1988(b) states simply that, in actions to enforce certain civil rights statutes, including 42 U.S.C. § 1983, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." § 1988(b). The majority recognizes that "prevailing party" is a legal term of art and begins its analysis by asserting that this term means what legal dictionaries said it meant at the time that § 1988(b) was enacted.

 *9  According to the majority's preferred dictionary, a "prevailing party" is one " 'who successfully prosecutes the action or successfully defends against it.' " *Ante,* at —— (quoting Black's Law Dictionary 1352 (rev. 4th ed. 1968)). Thus, prevailing party status turns on " 'whether, at the end of the suit, or other proceeding, the party who has made a claim against the other, has successfully maintained it.' " *Ante,* at —— (quoting Black's Law Dictionary, at 1352). Reasoning from this definition, the majority holds that preliminary injunctions, which provide interim relief by their nature, can never confer prevailing party status because they do not "conclusively resolve the rights of parties on the merits." *Ante,* at ——.

But the majority's analysis inexplicably conflates the requirement for success *when the suit ends* (which is what the dictionary definition says) with a requirement that the suit end *by virtue of* a "conclusive" judicial ruling on the merits of the plaintiff 's claims (which is nowhere in *Black's Law Dictionary* or anywhere else). In other words, the majority's reasoning elides the fact that a suit can end in various ways—including through acts of the defendant or others that moot the legal action. *Black's Law Dictionary* and its contemporaries simply require a court determining eligibility for a fee award to take stock of where things

--- S.Ct. ----, 2025 WL 594737

stand at the end of the lawsuit. A prevailing party for § 1988(b) purposes is one who has successfully maintained his claim (in the manner I describe below, see Part II–A, *infra*) "when the matter is finally set at rest." Black's Law Dictionary, at 1352.

In essence, then, the majority errs by assuming that the only kind of resolution to a suit that can precipitate a fee award is a "conclusive" final judgment on the merits. See, *e.g., ante,* at —— – ——, ——, ——. That assumption is unfounded. The text of the fee statute does not require a final judgment in the party's favor, "conclusive" or otherwise. Nor does any dictionary definition of "prevailing party" to which the majority cites. Rather, according to *Black's Law Dictionary*, a "prevailing party" is simply a "part[y] to a suit who successfully prosecutes the action or successfully defends against it, prevailing on the main issue, even though not to the extent of his original contention." Black's Law Dictionary, at 1352. *Ballentine's Law Dictionary* is substantially similar; it defines "prevailing party" as "[t]he party who is successful or partially successful in an action, so as to be entitled to costs." Ballentine's Law Dictionary 985 (3d ed. 1969).

Significantly for present purposes, both dictionaries further emphasize that "[t]o be [a prevailing party] does not depend upon the degree of success at different stages of the suit, but whether, at the end of the suit ... the party who has made a claim against the other, has successfully maintained it." Black's Law Dictionary, at 1352; accord, Ballentine's Law Dictionary, at 985. Yet, today, the majority demands that, in order to prevail, the party must have achieved a certain degree of success at a certain point in the case: a conclusive final judgment in his favor at the end of litigation.

### B

This Court has not previously linked prevailing party status to securing a conclusive final judgment. Quite to the contrary, we have held that a prevailing party for fee-shifting purposes is one who has "succeeded on any significant claim affording it some of the relief sought, either *pendente lite*"—*i.e.*, pending the suit—"or at the conclusion of the litigation." *Texas State Teachers Assn. v. Garland Independent School Dist.*, 489 U.S. 782, 791, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989). That is, a plaintiff prevails when he accomplishes his lawsuit's "objectiv[e]," which is to achieve "a material alteration in the legal relationship between the parties." *CRST Van Expedited, Inc. v. EEOC*, 578 U.S. 419, 431, 136 S.Ct. 1642, 194 L.Ed.2d 707 (2016). This is because, for a plaintiff, "[a]t the end of the rainbow lies not a judgment, but some action (or cessation of action) by the defendant that the judgment produces—the payment of damages, or some specific performance, or the termination of some conduct." *Hewitt v. Helms*, 482 U.S. 755, 761, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987).

**\*10** A plaintiff who secures a preliminary injunction awarding actual relief on the merits of his claim that is never reversed by a final decision of the court has "successfully maintained" his claim "at the end." Black's Law Dictionary, at 1352. Such a plaintiff has achieved what he has "come to court" for—the desired "alteration in the legal relationship between the parties." *CRST*, 578 U.S., at 431, 136 S.Ct. 1642.[1]

Take this case, for example. At the point it ended—when the District Court dismissed the litigation as moot—respondents had secured a preliminary injunction against the Commissioner of the Virginia Department of Motor Vehicles. That order enabled respondents to drive their cars on Virginia's highways for sixteen months, over the Commissioner's objection. And, because the District Court's interim award had facilitated respondents' access to the road as licensed drivers, they had prevailed on the merits of their claim in every meaningful sense. Put another way, "at the end of the litigation," respondents did not "leav[e] the courthouse emptyhanded." *Sole v. Wyner*, 551 U.S. 74, 78, 127 S.Ct. 2188, 167 L.Ed.2d 1069 (2007). Instead, they departed having accomplished exactly what they had sought to achieve. The fact that respondents achieved their goal via a preliminary court ruling, as opposed to a final judgment, is irrelevant, for "[n]othing in the language of § 1988 conditions the District Court's power to award fees on *full* litigation of the issues or on a judicial determination that the plaintiff 's rights have been violated." *Maher v. Gagne*, 448 U.S. 122, 129, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980) (emphasis added).

Juxtapose that reality with the text of other statutes that make "prevailing party" status expressly dependent on the entry of a final order. For example, the Emergency School Aid Act of 1972—enacted just four years before § 1988(b)— states that,

**Lackey v. Stinnie, 604 U.S. ---- (2025)**

--- S.Ct. ----, 2025 WL 594737

"*[u]pon the entry of a final order*," a court hearing a school desegregation case may "allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 20 U.S.C. § 1617 (repealed) (emphasis added). Several statutes enacted after § 1988(b) are similarly explicit about when a fee award must be fastened to a final judgment. See, *e.g.*, 28 U.S.C. § 2412(d)(2)(H) (defining "prevailing party" in eminent domain proceedings to "mea[n] a party who obtains a final judgment" of a certain amount); 15 U.S.C. § 6104(d) (authorizing courts hearing actions under the Telemarketing and Consumer Fraud and Abuse Prevention Act to award "reasonable fees ... to the prevailing party" upon "issuing any final order"). The fact that § 1988(b) lacks any such language confirms that a conclusive ruling from the court in the form of a final judgment is not a prerequisite for a fee award under that statute.

C

The majority disregards these important context clues and focuses instead on a provision of the Freedom of Information Act (FOIA) that authorizes fee awards for a "complainant" who "has substantially prevailed" by "obtain[ing] relief through either— (I) a judicial order, or an enforceable written agreement or consent decree; or (II) a voluntary or unilateral change in position by the agency." 5 U.S.C. § 552(a)(4)(E). The term "prevailing party" appears nowhere in this FOIA provision. But, no matter: The majority nevertheless suggests that *this* is how Congress authorizes fee shifting for "plaintiffs who have enjoyed some success but have not prevailed in a judgment on the merits." *Ante,* at ——.

**\*11**  The problem is that Congress had a much more targeted objective when it enacted § 552(a)(4)(E). It sought merely to repudiate this Court's decision in *Buckhannon Board & Care Home, Inc. v. West Virginia Dept. of Health and Human Resources*, 532 U.S. 598, 606, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001), which had held that a plaintiff must obtain some "judicial relief" to be eligible for a fee award in FOIA cases. [2] Since the point of § 552(a)(4)(E) was to "abrogat[e] the rule of *Buckhannon* in the FOIA context and reviv[e] the possibility of FOIA fee awards in the absence of a court decree," *Brayton v. Office of U. S. Trade Rep.*, 641 F.3d 521, 525 (CADC 2011), that statutory provision sheds no light whatsoever on whether the term "prevailing party" requires a plaintiff to secure a conclusive ruling on the merits to qualify as a prevailing party for purposes of § 1988(b).

In short, while the majority insists that obtaining a preliminary injunction can never suffice for a fee award under § 1988(b) "[b]ecause preliminary injunctions do not conclusively resolve the rights of parties on the merits," *ante,* at ——, the text of § 1988(b), contemporary dictionary definitions, and our precedents require far less. All of the Courts of Appeals to consider the question—eleven in total—understood this and thus correctly held that, for fee-shifting purposes, it is possible for a party to prevail based on a preliminary ruling. [3]  The majority's reading of "prevailing party" in § 1988(b) makes obtaining a court's conclusive final judgment the hallmark of that status in a manner that is both novel and in many ways anathema to the legal term of art that Congress actually chose.

II

A

So what *does* it take to qualify as a "prevailing party" for purposes of this fee-shifting statute? In *Farrar v. Hobby*, 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992), we explained that a plaintiff " 'prevails' " if he receives (1) "actual relief on the merits of his claim" in a manner that (2) "materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Id*., at 111–112, 113 S.Ct. 566; see also *Lefemine v. Wideman*, 568 U.S. 1, 4, 133 S.Ct. 9, 184 L.Ed.2d 313 (2012) (*per curiam*). This test is well established, and it leads inexorably to the conclusion that, in some circumstances, an unreversed preliminary injunction can confer prevailing party status.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

--- S.Ct. ----, 2025 WL 594737

**\*12**  Start with the requirement of a " 'material alteration of the legal relationship of the parties,' " which we have repeatedly called the " 'touchstone' " of the prevailing party inquiry. *Sole*, 551 U.S., at 82, 127 S.Ct. 2188 (quoting *Garland*, 489 U.S., at 792–793, 109 S.Ct. 1486). A plaintiff need not obtain *all* of the relief he has requested in the lawsuit to satisfy this requirement. Instead, under our precedents, a plaintiff who has achieved even " '*some* of the benefit' " he sought has secured the change in the parties' legal relationship necessary to "cros[s] the threshold to a fee award of some kind." *Id.*, at 791–792, 109 S.Ct. 1486 (quoting *Nadeau v. Helgemoe*, 581 F.2d 275, 278–279 (CA1 1978); emphasis added).

A permanent injunction—just like a declaratory judgment or a damages award—"will usually satisfy that test," *Lefemine*, 568 U.S., at 4, 133 S.Ct. 9, because permanent injunctive relief generally "affects the behavior of the defendant toward the plaintiff," *Rhodes v. Stewart*, 488 U.S. 1, 4, 109 S.Ct. 202, 102 L.Ed.2d 1 (1988) (*per curiam*). At least some preliminary injunctions also qualify. The preliminary injunction in this case, for example, provided respondents with actual relief by reinstating their suspended licenses, allowing them to drive without fear of sanction for failing to repay their fines and fees. For the roughly sixteen months that the preliminary injunction was in place, "that ruling worked the requisite material alteration in the parties' relationship" by permitting respondents to engage in conduct that would have been prohibited otherwise. *Lefemine*, 568 U.S., at 5, 133 S.Ct. 9.

It is indisputable that the preliminary injunction the District Court issued provided a "direc[t] benefit" to respondents. *Farrar*, 506 U.S., at 111, 113 S.Ct. 566. That relief was also awarded " 'on the merits.' " *Lefemine*, 568 U.S., at 4, 133 S.Ct. 9 (quoting *Farrar*, 506 U.S., at 111–112, 113 S.Ct. 566). We have long taken a "practical" approach to the merits inquiry in this context. *Hanrahan v. Hampton*, 446 U.S. 754, 758, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980) (*per curiam*). Under that approach, relief is granted "on the merits" when it provides "a resolution of the dispute which changes the legal relationship between [the plaintiff] and the defendant." *Garland*, 489 U.S., at 792, 109 S.Ct. 1486 (internal quotation marks omitted).

Notably, for prevailing party status, we have not required that a court actually determine whether a legal claim is meritorious. The majority acknowledges our holding that the entry of a consent decree following "the parties' own resolution of the merits" counts. *Ante*, at ——; see *Farrar*, 506 U.S., at 111, 113 S.Ct. 566 (recognizing that a consent decree satisfies the requirement that the plaintiff "obtain at least some relief on the merits of his claim"). Indeed, in *Maher*, we upheld a fee award based on a consent decree that "did not purport to adjudicate" the plaintiff 's claims at all. 448 U.S., at 126, n. 8, 129, 100 S.Ct. 2570. We have also suggested that default judgments, which do not involve any assessment of the merits of the plaintiff 's claims, "almost invariably give rise to fee awards." *Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197, 208, n. 3, 136 S.Ct. 1979, 195 L.Ed.2d 368 (2016).

A court's entry of a preliminary injunction—which *does* require a judge to make a preliminary assessment of the merits—provides a basis for prevailing party status that is at least as strong as a consent decree or a default judgment. Plaintiffs seeking the "extraordinary remedy" of a preliminary injunction must make a "clear showing" that they are "likely to succeed on the merits." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). And the court's decision to order preliminary injunctive relief often involves "searching" proceedings, *Sole*, 551 U.S., at 84, 127 S.Ct. 2188, even though the "evidence ... is less complete than in a trial on the merits," *University of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981).

**\*13**  In this case, the District Court thoroughly assessed the merits of respondents' claims and granted their request for preliminary injunctive relief after extensive briefing and an evidentiary hearing during which multiple witnesses testified. It blinks reality to suggest that the District Court's order requiring the Commissioner to give respondents their licenses back *now*—based on the court's conclusion that respondents were likely to succeed if this matter proceeded to trial—was "not the stuff of which legal victories are made." *Hewitt*, 482 U.S., at 760, 107 S.Ct. 2672.

It is no answer to simply declare by *ipse dixit* that preliminary injunctions are materially different from consent decrees because "a consent decree is like a final judgment in the relevant ways"—*i.e.,* "[i]t conclusively resolves the claim, bears a judicial *imprimatur*, and may grant enduring relief that materially alters the legal relationship between the parties." *Ante*, at —— –

——. The very question before us is the relevance of this kind of finality to the prevailing party determination. And, luckily, that question has already been answered: Neither the text of § 1988(b) nor any of this Court's past cases make fee eligibility dependent on the entry of a conclusive final judgment, as I explained above.

In any event, if a plaintiff need only obtain an order that is "like a final judgment" to prevail, *ibid.*, it is not at all clear why at least some preliminary injunctions would not count. Consider, for example, a dispute in which the district court reviews the evidence and the parties' arguments and enters the type of preliminary injunction that changes the legal relationship of the parties. The case proceeds but then becomes moot such that the litigation ends; the preliminary injunction is not—and can never be—reversed by a subsequent order of the court. In this scenario, all the purportedly "relevant" characteristics of a consent decree exist, because the parties' legal relationship was materially altered by judicial *imprimatur*, and that preliminary relief is conclusive insofar as the case has ended and the ruling cannot be undone by a later determination. In this circumstance, the preliminary injunction "functions much like the grant of an irreversible partial summary judgment on the merits," *Northern Cheyenne Tribe v. Jackson*, 433 F.3d 1083, 1086 (CA8 2006), which all appear to agree would suffice to confer fee eligibility under § 1988(b).

B

Our decisions in *Buckhannon*, 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855, and *Sole*, 551 U.S. 74, 127 S.Ct. 2188, 167 L.Ed.2d 1069, are not to the contrary. The majority cites these two decisions to support its view that obtaining a preliminary injunction is never sufficient to qualify the recipient for a fee award under § 1988(b). *Ante*, at ——–——. But those cases hold no such thing. Instead, they simply clarify that, for a plaintiff to prevail, the requisite "change in the legal relationship of the parties" must be both "judicially sanctioned," *Buckhannon*, 532 U.S., at 605, 121 S.Ct. 1835, and "enduring," *Sole*, 551 U.S., at 86, 127 S.Ct. 2188. Neither case mandates the majority's categorical rule.

In *Buckhannon*, this Court rejected the so-called "catalyst theory," under which a plaintiff could collect a fee award as a "prevailing party" without securing any judicial relief so long as the lawsuit produced "a voluntary change in the defendant's conduct." 532 U.S., at 601, 121 S.Ct. 1835. We held that such a voluntary change, "although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial *imprimatur* on the change" to trigger fee eligibility. *Id.*, at 605, 121 S.Ct. 1835. In *Sole*, we considered whether a plaintiff who obtains a preliminary injunction but is subsequently denied a permanent one prevails for fee purposes under § 1988(b). 551 U.S., at 77, 127 S.Ct. 2188. We explained that when a plaintiff 's "initial victory" at the preliminary injunction stage is "superseded" by a non-favorable final "ruling on the merits," he does not qualify as a "prevailing party," because the relief he received was not "enduring." *Id.*, at 84–86, 127 S.Ct. 2188.

 **\*14**  A preliminary injunction that mandates a judicially sanctioned legal change in the parties' relationship and is never reversed by a final ruling on the merits satisfies both *Buckhannon* and *Sole*. A court that issues interim injunctive relief unquestionably gives its "judicial *imprimatur*" to the change afforded, as *Buckhannon* requires. 532 U.S., at 605, 121 S.Ct. 1835. For its part, *Sole* stands merely for the proposition that a party can be *divested* of "prevailing party" status if his "success rested on a premise the District Court ultimately rejected." 551 U.S., at 84–86, 127 S.Ct. 2188. But *Sole* is inapposite when a subsequent final decision does not thwart the judge-sanctioned basis for the preliminary injunction. Indeed, *Sole* expressly said so, by specifically reserving the question "whether, in the absence of a final decision on the merits of a claim for permanent injunctive relief, success in gaining a preliminary injunction may sometimes warrant an award of counsel fees," *id.*, at 86, 127 S.Ct. 2188—the precise issue that is before the Court today.

The majority thus overreads our precedents to support its blanket rule that preliminary injunctions can never support fee awards. *Ante*, at ——–——. With respect to *Sole* in particular, it is true that we characterized the preliminary injunction at issue there as "fleeting" and "tentative." 551 U.S., at 83–84, 127 S.Ct. 2188; see also *ante*, at —— (contrasting interim relief with relief that "last[s]"). But the *Sole* Court did not tie the requirement for "enduring" relief to the inherent permanence of the relevant judicial order. Instead, we made crystal clear that "[o]f controlling importance to our decision" was the fact that "the eventual

APP-162

--- S.Ct. ----, 2025 WL 594737

ruling on the merits for defendants, after both sides considered the case fit for final adjudication, *superseded* the preliminary ruling." 551 U.S., at 84–85, 127 S.Ct. 2188 (emphasis added); see also *id.*, at 78, 127 S.Ct. 2188 (observing that a plaintiff does not prevail if "at the end of the litigation, her initial success is undone and she leaves the courthouse emptyhanded").

At the end of the day, *Sole* should be taken to mean only what it expressly holds: Preliminary injunctive relief that is subsequently superseded by a final judgment reversing the ruling does not endure for fee-shifting purposes. Here, the preliminary injunction provided actual relief to respondents for more than sixteen months, and there was no *Sole*-like supplanting of that preliminary relief by a subsequent court order.


III


A


In addition to misinterpreting the text of § 1988(b) and misconstruing our precedents, the majority ignores Congress's clear intent to expand access to justice. It is puzzling, to say the least, that the majority seems to go out of its way to adopt a rule that categorically prohibits fee shifting while interpreting a statute that expressly authorizes fee awards.

There is no dispute that Congress enacted § 1988(b) "for a specific purpose": to respond to this Court's decision in *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), which had rejected the "former equitable practice of awarding attorney's fees to the prevailing party in certain civil rights cases." *Farrar*, 506 U.S., at 118, 113 S.Ct. 566 (O'Connor, J., concurring). The *Alyeska* Court held that, absent statutory authorization, courts should not depart from the " 'American Rule,' " under which litigants ordinarily bear their own attorney's fees. 421 U.S., at 247, 95 S.Ct. 1612. Congress swiftly enacted § 1988(b) in *Alyeska*'s wake to codify a civil rights exception to the American Rule. The majority does not, and cannot, dispute that Congress's intent was "to ensure 'effective access to the judicial process' for persons with civil rights grievances." *Hensley v. Eckerhart*, 461 U.S. 424, 429, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (quoting H. R. Rep. No. 94–1558, p. 1 (1976)).

Consistent with that "clear congressional intent," this Court has previously recognized that fee awards should be available to "partially prevailing civil rights plaintiffs." *Garland*, 489 U.S., at 790, 109 S.Ct. 1486. This principle is, in fact, readily apparent from the statute's enactment history. See *Buckhannon*, 532 U.S., at 607, 121 S.Ct. 1835. The history demonstrates that the question of awarding fees for success based on interim orders was not overlooked by the legislature; to the contrary, Congress specifically "contemplated the award of fees *pendente lite*," at least where a party "has established his entitlement to some relief on the merits of his claims." *Hanrahan*, 446 U.S., at 757, 100 S.Ct. 1987 (citing S. Rep. No. 94–1011, p. 5 (1976); H. R. Rep. No. 94–1558, at 7–8).

 **\*15**  The majority says that Congress merely wanted § 1988(b) to authorize fee awards when "conclusive, enduring judicial relief is meted out on an incremental basis." *Ante,* at ——. But that is not what the historical record establishes, and *Buckhannon* flatly rejects this contention. There, we specifically observed that, per § 1988(b)'s legislative history, " ' "prevailing party" ' is not intended to be limited to the victor only after entry of a final judgment following a full trial on the merits.' " 532 U.S., at 607, 121 S.Ct. 1835 (quoting H. R. Rep. No. 94–1558, at 7); see also *Hanrahan*, 446 U.S., at 756–757, 100 S.Ct. 1987. The legislative history is likewise unequivocal that a prevailing party for § 1988(b) purposes should "also include a litigant who succeeds even if the case is concluded prior to a full evidentiary hearing before a judge or jury." H. R. Rep. No. 94–1558, at 7.


B

--- S.Ct. ----, 2025 WL 594737

Nor could a Congress that wished to authorize fee awards for civil rights victories have intended the absurdities that will result from the majority's categorical preclusion of preliminary injunctive relief from § 1988(b). To state the obvious, the majority's bright-line rule lacks the nuance that is needed to account for the various circumstances in which a preliminary injunction may be "preliminary" in name only.

One example is the plaintiff who requests a preliminary injunction to achieve an interim result, given the timeframe at issue. "When protestors seek an injunction to exercise their First Amendment rights at a specific time and place—say to demonstrate at a Saturday parade—a preliminary injunction will give them all the court-ordered relief they need and the end of the parade will moot the case." *McQueary v. Conway*, 614 F.3d 591, 599 (CA6 2010). Thus, the Courts of Appeals regularly hold that plaintiffs who successfully obtain a preliminary injunction that permits them to engage in the otherwise prohibited conduct "prevail" for fee-shifting purposes. See, *e.g.*, *Young v. Chicago*, 202 F.3d 1000, 1000–1001 (CA7 2000) (*per curiam*) (awarding fees to plaintiffs who obtained a preliminary injunction to protest a political convention even though the "suit became moot before a definitive determination of its merits" could be made).

In its rush to carve preliminary injunctions out of § 1988(b), the majority also overlooks situations in which courts have, in fact, conclusively resolved the merits of a plaintiff's claims at the preliminary injunction stage. A trial court might definitively determine that a law is " ' "facially unconstitutional" ' " in the course of granting preliminary relief, for example. *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229–230, and n. 4 (CA3 2011) (en banc) (quoting *People Against Police Violence v. Pittsburgh*, 520 F.3d 226, 229 (CA3 2008)). But the majority nonetheless adopts a sweeping rule under which preliminary injunctions can *never* be the basis for fee eligibility.

And to what end? The majority seeks to justify its broad holding on the grounds that it discourages fee disputes and thereby "serves the interests of judicial economy." *Ante,* at ——. But concerns about judicial administration cannot supplant Congress's clear intent to promote access to justice via fee shifting in civil rights cases.

What is more, it is actually the majority's categorical rule that will promote wasteful litigation and incentivize litigants to manipulate fee liability. Under the majority's rule, a plaintiff who has incurred substantial attorney's fees in order to secure a preliminary injunction that provides all the relief he needs will face a choice: He may either concede that the litigation has run its course and pay his own fees, or he may seek to litigate the case to final judgment in order to secure a fee award. No one would blame a plaintiff with a strong case for choosing the latter option. But such additional litigation is an inefficient waste of judicial resources if the plaintiff has already achieved his objective at an earlier part of the case.

**\*16** Worse still, the majority's rule appears to preference conservation of judicial resources over the maintenance of meritorious civil rights lawsuits, to the extent that excluding preliminary injunctive relief from § 1988(b) facilitates the strategic mooting of cases by defendants to avoid paying attorney's fees. This case illustrates precisely that problem. After a robust evidentiary hearing, the District Court issued a comprehensive opinion that preliminarily enjoined the Commissioner from enforcing the challenged law against respondents. Seeing the writing on the wall, the Commissioner sought and obtained a stay of the case —over respondents' objections—based on his representation that the legislature was likely to repeal the challenged law. The Commissioner then successfully lobbied the legislature to repeal the legislation, emphasizing that doing so would, in his words, "result in [respondents'] pending litigation being dismissed, relieving the Department from continuing to incur costly legal fees." App. 409.

As the Fourth Circuit observed, precluding fee shifting in this scenario is manifestly inequitable, because it leaves respondents "holding the bag" for considerable litigation fees despite—and largely because of—their having succeeded in obtaining preliminary relief. *Stinnie v. Holcomb*, 77 F.4th 200, 210 (2023) (en banc). Ironically, it was the strength of respondents' challenge as verified by the court's preliminary order that prompted both the change in law and the Commissioner's robust effort to stiff the plaintiffs with respect to attorney's fees. Moreover, it is hardly a revelation that lawyers who would otherwise be willing to litigate meritorious civil rights cases (*i.e.,* matters in which interim relief is critical due to ongoing civil rights violations) will likely be discouraged from taking on such representations if fee awards can be so easily thwarted.

The majority dismisses concerns about strategic mooting as both " 'entirely speculative' " and likely to "arise in only a small number of contexts." *Ante*, at ——— (quoting *Buckhannon*, 532 U.S., at 608, 121 S.Ct. 1835). But, as I have shown, the facts of this very case belie the majority's nonchalance, particularly in light of the *Buckhannon* experience. Research suggests that the Court's rejection of the catalyst theory in that case had the predictable practical effect of discouraging public interest organizations and private attorneys from taking on civil rights actions. C. Albiston & L. Nielsen, The Procedural Attack on Civil Rights: The Empirical Reality of *Buckhannon* for the Private Attorney General, 54 UCLA L. Rev. 1087, 1092 (2007); cf. n. 2, *supra*. Similarly, a multitude of legal advocacy groups have filed *amicus* briefs in this case to explain that losing the ability to recoup fees for securing interim relief will jeopardize their missions. See, *e.g.,* Brief for Alliance Defending Freedom et al. as *Amici Curiae* 7–10; Brief for American Civil Liberties Union et al. as *Amici Curiae* 28–30; Brief for Lawyers' Committee for Civil Rights Under Law et al. as *Amici Curiae* 17–18.

There is thus every reason to believe that the net result of today's decision will be less civil rights enforcement in the long run. Without irony, the majority reads a statute that was "enacted to [e]nsure that private citizens have a meaningful opportunity to vindicate their [civil] rights," *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 559, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986), as if Congress meant to make private civil rights enforcement harder to achieve.

\* \* \*

The majority holds that obtaining a preliminary injunction never entitles a plaintiff to fees under § 1988(b). In doing so, it overrules the decisions of every Court of Appeals to consider the issue, relies on an atextual "conclusive judgment" requirement, and ignores both our precedents and Congress's intent.

It is quite true that Congress has demonstrated its ability to fix our mistakes in this realm. *Ante*, at ———. But, in my view, rather than relying on Congress to check our work, we should give full effect to the plain text and remedial purpose of § 1988(b) in the first instance. This Court should have held that, when a court hearing a civil rights lawsuit issues a preliminary injunction that materially alters the relationship between the parties and is never reversed, the requesting party "prevails" for fee-shifting purposes and is thus eligible for a fee award under § 1988(b).

**All Citations**

604 U.S. ----, --- S.Ct. ----, 2025 WL 594737

---

**Footnotes**

\*   The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499 (1906).

\*   A different body of caselaw addresses when a *defendant* is a "prevailing party" for the purposes of other fee-shifting statutes. Our decision today should not be read to affect our previous holding that a defendant need not obtain a favorable judgment on the merits to prevail, nor to address the question we left open of whether a defendant must obtain a preclusive judgment in order to prevail. See *CRST Van Expedited, Inc. v. EEOC*, 578 U.S. 419, 431–434, 136 S.Ct. 1642, 194 L.Ed.2d 707 (2016). As we have explained, "[p]laintiffs and defendants come to court with different objectives." *Id.*, at 431, 136 S.Ct. 1642.

1   There are, of course, other kinds of preliminary injunctive orders, including orders that maintain the status quo. All that is necessary to reject the majority's categorical rule is the recognition that at least some preliminary injunctions afford the type of material change that confers prevailing party status.

2   Congress enacted 5 U.S.C. § 552(a)(4)(E) because *Buckhannon* had empowered Government agencies to "stonewall valid FOIA claims" and then prevent an award of attorney's fees by "disclosing the documents at the last moment before judgment," thereby mooting the case. *Brayton v. Office of U. S. Trade Rep.*, 641 F.3d 521, 525 (CADC 2011). Under *Buckhannon*, such plaintiffs were not eligible for fee awards because they had not obtained any judicial order —preliminary, final, or otherwise. This strategic behavior ensured that FOIA plaintiffs never became eligible for fee awards despite incurring significant costs, so Congress intervened. 641 F.3d at 525.

3   See, *e.g.*, *Haley v. Pataki*, 106 F.3d 478, 484 (CA2 1997); *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229–230, and n. 4 (CA3 2011) (en banc); *Stinnie v. Holcomb*, 77 F.4th 200, 210 (CA4 2023) (en banc) (case below); *Dearmore v. Garland*, 519 F.3d 517, 524 (CA5 2008); *Planned Parenthood Southwest Ohio Region v. Dewine*, 931 F.3d 530, 534 (CA6 2019); *Dupuy v. Samuels*, 423 F.3d 714, 723, and n. 4 (CA7 2005); *Rogers Group, Inc. v. Fayetteville*, 683 F.3d 903, 909–910 (CA8 2012); *Higher Taste, Inc. v. Tacoma*, 717 F.3d 712, 717–718 (CA9 2013); *Kansas Jud. Watch v. Stout*, 653 F.3d 1230, 1232, 1238–1239 (CA10 2011); *Common Cause Ga. v. Georgia*, 17 F.4th 102, 107 (CA11 2021); *Select Milk Producers, Inc. v. Johanns*, 400 F.3d 939, 942, 948–949 (CADC 2005). The First Circuit has not yet considered the issue. See *Sinapi v. Rhode Island Bd. of Bar Examiners*, 910 F.3d 544, 552 (2018).

---

End of Document                                     © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Miller v. City of Fort Myers, Not Reported in Fed. Supp. (2020)

2020 WL 5802424

2020 WL 5802424
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida.

Deretha MILLER, Tambitha Blanks and Willie Blanks, individually,
and on behalf of a class of persons similarly situated Plaintiffs,
v.
The CITY OF FORT MYERS, Randall P. Henderson, Jr. and Saeed Kazemi, Defendants.

Case No. 2:18-cv-195-FtM-38NPM
|
Filed 08/31/2020

REPORT AND RECOMMENDATION [1]

NICHOLAS P. MIZELL UNITED STATES MAGISTRATE JUDGE

**\*1**  Before the Court is Plaintiff's Motion for an Award of Costs of Litigation Pursuant to 42 U.S.C. § 6972(e). (Doc. 130). Though Defendants obtained judgment entirely in their favor, and Plaintiffs obtained no relief from the Court, Plaintiffs argue they are the "substantially prevailing party" and entitled to $224,393.75 for fees and $55,406.03 for costs. Defendants contest entitlement to, and the reasonableness of, the requested fee and cost award. (Doc. 133). Because Plaintiffs are not substantially prevailing parties, their motion for fees and costs should be denied.

**Factual and Procedural Background**

Some 50 years ago, the City of Fort Myers dumped about 25,000 cubic yards of arsenic-contaminated sludge (a by-product of its water treatment process) in a vacant field (the "Site"). (Doc. 128, p. 2). Allegedly, residents in the surrounding neighborhood —such as the Plaintiffs in this matter—did not learn about the sludge until it was publicized by the local newspaper in June 2017. (Doc. 14, ¶ 45). The next month, in July 2017, Plaintiffs (and other residents) notified the City of their intent to sue under the Florida Tort Claims Act for damages allegedly caused by the dumping of the sludge. (Doc. 14-3). And four months later, in November 2017, they also notified the City of their intent to sue under the federal Resource Conservation and Recovery Act (the "RCRA") for removal of the sludge and further cleanup, as well as civil penalties and an attorney-fee award. (Doc. 14-1). By January 2018, the City had decided to remove the sludge. (Doc. 128, p. 2 (citing Doc. 115-3)).

Nevertheless, on March 11, 2018, Plaintiffs supplemented their pre-suit notice to the City and illuminated the nature of their then-forthcoming, state-law claims by explaining that they intended to advance claims for medical monitoring, inverse condemnation, diminution of property, negligence and strict liability (Docs. 14-4). And then, on March 23, 2018, they filed suit. (Doc. 1).

At the outset, Plaintiffs advanced two claims under the RCRA: an "open dump" claim under 42 U.S.C. § 6972(a)(1)(A) for removal of the sludge and contaminated soil and groundwater as well as the assessment of civil penalties, and an "imminent and substantial endangerment" claim under 42 U.S.C. § 6972(a)(1)(B) for remediation of the site and associated ground water. (Doc. 1, pp. 16-18). They also sought certification of a medical-monitoring class and a property-damage class for their Florida tort law claims. (Doc. 1, pp. 18-35).

Because the dumping occurred before the RCRA became law, and only continuing violations are the proper subject of an open dumping claim, the Court dismissed Plaintiffs' open dump claim with prejudice. (Doc. 61, pp. 12-13; Doc. 86, p. 3). And even though the City had removed nearly 30,000 tons of sludge and soil—and all the sludge was gone—by the summer of 2019 (Doc.

Miller v. City of Fort Myers, Not Reported in Fed. Supp. (2020)

2020 WL 5802424

128, p. 2), Plaintiffs argued their endangerment claim should proceed to trial because the Site continued to present an imminent and substantial endangerment to health due to its purportedly contaminated soil and groundwater. (Doc. 128, pp. 3, 12-13). But finding no evidence of a pathway for human exposure to the alleged contaminant via ingestion, inhalation or skin contact (Doc. 128, pp. 13-22), and no necessity for the Court to order any remediation, the Court found the City [2] entitled to judgment as a matter of law on the endangerment claim. (Doc. 128, pp. 23-24). With all of Plaintiffs' federal RCRA claims dismissed with prejudice, the Court declined to exercise supplemental jurisdiction over the state-law claims (Doc. 128, pp. 24-26), entered judgment in the City's favor, and closed the file. (Doc. 129).

**Plaintiffs' Request for Fees and Costs Under the RCRA**

**\*2**  The RCRA provides in relevant part:

> The court ... may award costs of litigation (including reasonable attorney and expert witness fees) to the prevailing or substantially prevailing party, whenever the court determines such an award is appropriate.

42 U.S.C. § 6972(e). And as the parties agree, this provision states a two-pronged test for a fee and cost award: (1) the party must be a prevailing or substantially prevailing party, and (2) the Court in its discretion must also find an award to be appropriate. (Doc. 130, p. 2; Doc. 133, p. 14).

While Plaintiffs did not obtain a judgment or decree in their favor, or any other form of judicial relief, they argue the Court should find it appropriate to award them nearly $300,000 in fees and costs as substantially prevailing parties. In support, they argue the term "substantially prevailing party" as used in the RCRA includes plaintiffs who end up realizing the objects of their lawsuits because the litigation caused—or in other words served as the "catalyst" for—the defendants to voluntarily provide the relief requested, and Plaintiffs contend it was the filing and prosecution of this lawsuit (rather than the pretrial publicity or other developments) that motivated the City to remove the sludge and remediate the Site. Thus, Plaintiffs' entire argument rises or falls on the proper construction of the term "substantially prevailing" as used in the RCRA, and whether this term is reserved for parties who obtain at least some form of judicial relief.

**Construing "Substantially Prevailing" as Used in the RCRA**

As the Supreme Court of the United States recently reasoned in *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 126, 135 S.Ct. 2158, 192 L.Ed.2d 208 (2015):

> "Our basic point of reference when considering the award of attorney's fees is the bedrock principle known as the American Rule: Each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252–253, 130 S.Ct. 2149, 176 L.Ed.2d 998 (2010) (internal quotation marks omitted). The American Rule has roots in our common law reaching back to at least the 18th century, *see Arcambel v. Wiseman*, 3 Dall. 306, 3 U.S. 306, 1 L. Ed. 613 (1796), and "[s]tatutes which invade the common law are to be read with a presumption favoring the retention of long-established and familiar [legal] principles," *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994) (internal quotation marks and ellipsis omitted). We consequently will not deviate from the American Rule " ' absent explicit statutory authority.' " *Buckhannon Board & Care Home, Inc. v. West Virginia Dept. of Health and Human Resources*, 532 U.S. 598, 602, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001) (quoting *Key Tronic Corp. v. United States*, 511 U.S. 809, 814, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994)).

> "[W]hen Congress has chosen to depart from the American Rule," its statutory fee-shifting provisions contain varying standards as to the precise *degree of success* necessary for an award of fees—such as whether the fee claimant was the 'prevailing party,'

Miller v. City of Fort Myers, Not Reported in Fed. Supp. (2020)

2020 WL 5802424

the 'substantially prevailing' party, or 'successful.' " *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 684, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983) (emphasis added).

**\*3**  A "prevailing party" is "one who has been awarded some form of relief by the court." *Buckhannon*, 532 U.S. at 603, 121 S.Ct. 1835. "A defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial *imprimatur* on the change." *Id*. at 605, 121 S.Ct. 1835. Instead, only judgments and consent decrees serve as the basis for a prevailing-party fee award because they constitute court-ordered changes in the legal relationship between the parties. *Id*. at 604, 121 S.Ct. 1835. Thus, "the 'catalyst theory' is not a permissible basis for the award of attorney's fees" under statutes that authorize fee awards for prevailing parties. *Id*. at 610, 121 S.Ct. 1835.

What about a standard of success that differs in degree rather than kind, such as a "substantially prevailing" party? While this modified term of art may alter the scope of eligible claimants, [3] the fundamental requirement that some form of judicial relief be obtained remains the same. As the United States Court of Appeals for the Eleventh Circuit noted in *Loggerhead Turtle v. Cty. Council of Volusia Cty., Fla.*, 307 F.3d 1318 (2002), the difference between "prevailing party" and "substantially prevailing party" is "generally deemed inconsequential." *Id*. at 1322, n.4. And so, in *United States v. $70,670.00 in U.S. Currency*, 929 F.3d 1293 (2019), the Eleventh Circuit rejected the notion that the catalyst theory may satisfy the "substantially prevailing" standard. There, claimants resisting the government's forfeiture action argued that they substantially prevailed because the government dismissed the action and had no intention of refiling the complaint. Disagreeing with this proposition, the Eleventh Circuit explained:

> The claimants have not substantially prevailed because a dismissal without prejudice places no "judicial imprimatur" on "the legal relationship of the parties," which is "the touchstone of the prevailing party inquiry." *CRST Van Expedited, Inc. v. Equal Emp't Opportunity Comm'n*, —— U.S. ——, 136 S. Ct. 1642, 1646, 194 L.Ed.2d 707 (2016) (citations and internal quotation marks omitted); *see also Loggerhead Turtle v. Cty. Council of Volusia Cty.*, 307 F.3d 1318, 1322 n.4 (11th Cir. 2002) (explaining that we interpret "substantially prevailed" fee-shifting statutes consistently with "prevailing party" fee-shifting statutes).

*Id*. at 1303; *see also United States v. Evans*, 561 F. App'x 877, 881 (11th Cir. 2014) (holding that even though plaintiff's "many motions seeking return of the seized property may indeed have been the catalyst" for the "government voluntarily return[ing] the money at issue," the plaintiff did not "substantially prevail" because "no relief resulting in some change in the legal relationship between [the parties] was ordered by the district court").

The Eleventh Circuit's sister courts of appeal agree with this construction. For example, construing the very same fee-shifting provision at issue here, the Ninth Circuit in *Kasza v. Whitman*, 325 F.3d 1178, 1180 (2003), held that an RCRA plaintiff neither prevailed nor substantially prevailed because "she did not gain by judgment or consent decree a material alteration of the legal relationship of the parties." And construing a nearly identical fee-shifting provision in the federal Clean Water Act, [4] the Eighth Circuit in *Sierra Club v. City of Little Rock*, 351 F.3d 840, 845-846 (2003), reversed a fee award because even though the plaintiff had obtained a declaration that the city violated a pollutant-discharge permit issued by the state, the plaintiff did not obtain any judicially enforceable relief.

**\*4**  Moreover, when Congress wants the term "substantially prevailing" in a particular statute to incorporate the catalyst test, it has amended the statute to explicitly authorize this departure from the American Rule. For example, following the Supreme Court's decision in *Buckhannon*, two federal circuit courts of appeal held that the catalyst test could not be used to satisfy the "substantially prevailed" requirement for an award of fees in a FOIA suit. *See Union of Needletrades, Indus. & Textile Employees, AFL–CIO v. INS*, 336 F.3d 200, 201, 203-207 (2nd Cir. 2003); *Oil, Chem. & Atomic Workers Int'l Union v. Dep't of Energy*, 288 F.3d 452, 453-457 (D.C. Cir. 2002). In response, Congress amended FOIA's fee-shifting provision, 5 U.S.C. § 552(a)(4)(E), to add:

> For purposes of this subparagraph, a complainant has substantially prevailed if the complainant has obtained relief through either—

Miller v. City of Fort Myers, Not Reported in Fed. Supp. (2020)

2020 WL 5802424

(I) a judicial order, or an enforceable written agreement or consent decree; or

(II) a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial.

5 U.S.C. § 552(a)(4)(E)(ii). Accordingly, the catalyst theory (as codified in 5 U.S.C. § 552(a)(4)(E)(ii)(II)) became an explicitly authorized fee-shifting provision for FOIA suits filed after this 2007 amendment. *Zarcon, Inc. v. N.L.R.B.*, 578 F.3d 892, 896 (8th Cir. 2009). And without such an amendment, resort to the catalyst theory is forbidden under "substantially prevailing" fee-shifting statutes. *Id.* at 895-896.

In contrast to the FOIA statute, Congress has not seen fit to amend RCRA's fee-shifting provision, 42 U.S.C. § 6972(e), since the Supreme Court's 2001 decision in *Buckhannon*. Indeed, this fee-shifting provision has remained unchanged since it was amended in 1984 to expressly restrict fee awards to "the prevailing or substantially prevailing party," instead of simply "any party, whenever ... appropriate." [5] *See* Pub. L. 98-616, Title IV, § 401(e), Nov. 8, 1984. Accordingly, RCRA plaintiffs who do not obtain any judicially enforceable relief are not entitled to any fee or cost award. *See PaineWebber Income Properties Three Ltd. P'ship By & Through Third Income Properties v. Mobil Oil Corp.*, 916 F. Supp. 1239, 1243 (M.D. Fla. 1996) (holding that, without a "decision on the merits" in its favor, an RCRA litigant is "not a prevailing or substantially prevailing party in accordance with § 6972(e)"); *see also Davis v. Jackson*, 776 F. Supp. 2d 1314, 1317-1318 (M.D. Fla. 2011) (holding that a party is not entitled to a fee award under the CWA's "prevailing or substantially prevailing party" standard unless it obtains "a judicial determination on the merits").

Notably, losing sight of statutory amendments can lead to unnecessary confusion. For instance, because the fee-shifting provisions in the CWA and RCRA are—in their current form—virtually identical, Plaintiffs' arguments are based in large part on dicta from a post-*Buckhannon*, unpublished decision [6] of the Eleventh Circuit, in which the panel reasoned: "we have held that the catalyst theory is still viable in Clean Water Act cases." *Black Warrior Riverkeeper, Inc. v. Metro Recycling Inc.*, 613 F. App'x 877, 878 (11th Cir. 2015) (citing *Friends of the Everglades v. S. Fla. Water Mgmt. Dist.*, 678 F.3d 1199, 1202 (11th Cir. 2012)). [7] But the *Riverkeeper* court's citation to language in *Friends of the Everglades* about the viability of the catalyst theory in CWA cases, refers, in turn, to a discussion in *Loggerhead Turtle* about a passage from *Ruckelhaus* concerning the meaning of fee-shifting provisions that do not contain any form of prevailing party requirement, and instead authorize a court to award fees "whenever appropriate." *Loggerhead Turtle*, 307 F.3d at 1326 (citing *Ruckelshaus*, 463 U.S. at 682 n.1, 103 S.Ct. 3274 (noting that in 1983, seventeen federal statutes authorized fee awards "whenever appropriate")).

**\*5** *Loggerhead Turtle* held that *Buckhannon* did not extend to the fee-shifting provision in the Endangered Species Act, 16 U.S.C. § 1540(g), because the ESA allowed fee awards "whenever appropriate" and did not require the fee claimant to be either a prevailing or substantially prevailing party. *Loggerhead Turtle*, 307 F.3d at 1324-1326. Hence, *Loggerhead Turtle* did not concern the construction of the CWA or whether the catalyst theory could be used to satisfy a "substantially prevailing party" requirement.

The discussion in *Ruckelshaus* concerned the fee-shifting provisions in the Clean Air Act and other statutes (as they existed in 1983) that similarly authorized fee awards "whenever appropriate." *Ruckelshaus*, 463 U.S. at 682, 103 S.Ct. 3274. But just as the fee-shifting provision in the RCRA was amended in 1984 to add a "prevailing or substantially prevailing party" requirement, the fee-shifting provision in the CWA was likewise restricted by amendment in 1987 to include the same requirement. Pub. L. 100-4, Title V, § 505(c), Feb. 4, 1987.

So citations concerning the viability of the catalyst theory, like the one found in *Riverkeeper*, that are derived from discussions about the pre-1987 version of the CWA are unavailing—and certainly not controlling—in either post-1987 CWA cases or cases concerning other "prevailing or substantially prevailing" fee-shifting provisions. And the discussion in *Friends of the Everglades* concerning the catalyst theory is more in the nature of finding the theory unsatisfied if it were to apply. Indeed, the Eleventh Circuit held in *Friends of the Everglades* that a plaintiff who neither obtained an injunction or declaratory judgment

Miller v. City of Fort Myers, Not Reported in Fed. Supp. (2020)

2020 WL 5802424

in its favor, nor a settlement or consent decree, "did not prevail, or substantially prevail." 678 F.3d at 1202. Moreover, when recently and directly confronted with the meaning of the term "substantially prevailing," the Eleventh Circuit—in *$70,670.00 in U.S. Currency* and *Evans*—rejected any use of the catalyst theory and held that only a legal change in the relationship of the parties via judicial relief satisfies this standard. *See, supra*, p.6.

**Conclusion**

Though the City—as the only party to obtain any judicial relief in its favor—may qualify for an award of fees and costs, it has graciously foregone the pursuit of any such award. (Doc. 133, p.14, n.9). And because the proper construction of the term "substantially prevailing" as used in the RCRA requires parties to obtain at least some form of judicial relief and Plaintiffs did not obtain any, the Court has no explicit authorization by statute to depart from the American Rule and grant them any fees or costs. Consequently, the Court need not reach the separate issue of whether an award would be appropriate if Plaintiffs had prevailed to any degree, or whether, if both prongs of the entitlement inquiry had been satisfied, the amount of their requested fees and costs would be reasonable. Accordingly, it is **RECOMMENDED** that Plaintiffs' Motion for an Award of Costs of Litigation Pursuant to 42 U.S.C. § 6972(e) (Doc. 130) be **DENIED**.

Respectfully recommended in Chambers in Fort Myers, Florida on August 31, 2020.

**NOTICE TO PARTIES**

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 5802424

---

**Footnotes**

1    Documents hyperlinked to CM/ECF are subject to PACER fees. By using hyperlinks, the Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide, nor does it have any agreements with them. The Court is also not responsible for a hyperlink's availability and functionality, and a failed hyperlink does not affect this document.

2    In addition to the City of Fort Myers, its mayor and city manager are named defendants, and for ease of reference, the Court refers to them collectively as the City.

3    For example, in *Sole v. Wyner*, 551 U.S. 74, 127 S.Ct. 2188, 167 L.Ed.2d 1069 (2007), the court held that even though an artist obtained a preliminary injunction allowing her event to take place as scheduled, she was not a "prevailing party" for fee-shifting purposes because the trial court had subsequently denied her request to make the injunction permanent. *Id.* at 86, 127 S.Ct. 2188. But in certain circumstances it may be fair to say that a party who obtained legally temporary, though practically permanent, judicial relief "substantially prevailed."

Miller v. City of Fort Myers, Not Reported in Fed. Supp. (2020)

2020 WL 5802424

4    The CWA's fee-shifting provision, 33 U.S.C. § 1365(d), *currently* provides in relevant part: "The court ... may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such award is appropriate."

5    Even when the "whenever appropriate" standard is the only showing required, "a fees claimant must show some degree of success on the merits before a court may award attorney's fees." *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 255, 130 S.Ct. 2149, 176 L.Ed.2d 998 (2010) (internal quotations and citations omitted).

6    The Eleventh Circuit's unpublished decisions do not constitute controlling authority. *Collado v. J. & G. Transp., Inc.*, 820 F.3d 1256 (11th Cir. 2016) (citing *Twin City Fire Ins. Co. v. Ohio Cas. Ins. Co.*, 480 F.3d 1254, 1260 n.3 (11th Cir. 2007)).

7    The discussion in *Riverkeeper* about the viability of the catalyst theory in CWA cases was unnecessary to the decision because the court held that the plaintiff was a prevailing or substantially prevailing party based on its finding that the plaintiff had obtained a consent decree—that is, judicial relief—requiring the defendant to do more than it would have anyway. *Riverkeeper*, 613 F. App'x 877, 878.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

1989 WL 131274
United States District Court, D. Oregon.

Elsie Viola MILLER and Oretta Bernice Lancaster, dba the Junction Cafe and Tavern;
Taylor's Coffee Shop, Inc., dba Rennie's Landing; and Wian, Inc., dba Barney's
Cable, individually and as representatives of others similarly situated, Plaintiffs,

v.

William H. HEDLUND, Sylvia S. Bedingfield, Reuben Worster, Stan Auderkirk and Jill Thorne, individually in
their representative capacities as the Commissioners of the Oregon Liquor Control Commission; C. Dean Smith,
individually in his capacity as Administrator for the Oregon Liquor Control Commission; Spear Beverage Co.,
Inc., and Coast Distributors, Inc., individually and as representatives of others similarly situated, Defendants.

CIV. No. 78–259–FR.
|
Oct. 12, 1989.

**Attorneys and Law Firms**

David W. Axelrod, Schwabe, Williamson & Wyatt, Portland, Or., for plaintiffs.

Dave Frohnmayer, Attorney General, Luther L. Jensen, Assistant Attorney General, Salem, Or., for defendants.

OPINION

FRYE, District Judge:

 **\*1**  The matter before the court is plaintiffs' petition for attorney fees and litigation expenses pursuant to section 16 of the
Clayton Act, 15 U.S.C. § 26. Plaintiffs request a base fee award of $290,449.00, enhanced by a factor of "3," for a total of
$871,347.00.

Defendants contend that plaintiffs are not entitled to an award of attorney fees, and that if attorney fees are awarded, the amount
requested is inappropriate.

1. *Entitlement*
Section 16 of the Clayton Act, 15 U.S.C. § 26, provides:

Any person ... shall be entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the
antitrust laws.... In any action under this section in which the plaintiff substantially prevails, the court shall award the cost of
suit, including a reasonable attorney's fee, to such plaintiff.

Plaintiffs prevailed on virtually every substantive issue litigated by the defendants. Plaintiffs do not seek attorney fees for the
only issue upon which they did not prevail (whether damages can be recovered from private defendants for conduct required
by administrative regulation).

Defendants argue that section 16 of the Clayton Act does not require an award of attorney fees and costs because no state can
violate the provisions of the Sherman Act. Defendants explain that the issue in this case involves an issue of preemption and
not a claim of violation of the Sherman Act by the State of Oregon.

The fee shifting provision in section 16 of the Clayton Act is intended to insure that citizens are reimbursed for "what it costs them to vindicate their rights in court." *Va. Academy of Clinical Psychologists v. Blue Shield of Va.,* 543 F.Supp. 126, 132 (E.D.Va.1982). The House Report states:

Indeed, the need for the awarding of attorneys' fees in § 16 injunction cases is greater than the need in § 4 treble damage cases. In damage cases, a prevailing plaintiff recovers compensation, at least. In injunction cases, however, without the shifting of attorneys' fees, a plaintiff with a deserving case would personally have to pay the very high price of obtaining judicial enforcement of the law and of the important national policies the antitrust laws reflect. A prevailing plaintiff should not have to bear such an expense. Section 3(3) ... is intended to reiterate congressional encouragement for private parties to bring and maintain meritorious antitrust injunction cases.

1976 U.S.C.A. & A.N., p. 2572.

Plaintiffs sought relief from regulations of the State of Oregon alleging that the regulations violated the Sherman Act. The opinion of the Ninth Circuit in *Miller v. Hedlund,* 813 F.2d 1344 (9th Cir.1987), states that the regulations at issue constitute a violation of the Sherman Act. The Ninth Circuit stated that "[h]aving concluded that the Oregon regulations violate Section 1 of the Sherman Act, a decision must be made as to whether Oregon's involvement in the regulatory scheme is sufficient to establish antitrust immunity." 813 F.2d at 1351.

 **\*2**  While a preemption issue was litigated and resolved, it was only necessary to reach this issue because the regulations of the State of Oregon violated the Sherman Act. Section 16 of the Clayton Act provides that plaintiffs are entitled to collect fees and costs in an action in which they have substantially prevailed in receiving injunctive relief for a violation of the antitrust laws. There is no basis for denying fees and costs to a plaintiff who has substantially prevailed in receiving injunctive relief for a violation of the antitrust laws on the basis that the violator is a state. The court concludes that plaintiffs are entitled to collect "cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 26.

2. *Amount of Cost of Suit and Attorney Fees*
Defendants argue that plaintiffs Elsie Miller, Oretta Lancaster and Wian, Inc. are not prevailing parties; that fees should be adjusted downward and not enhanced; and that plaintiffs are not entitled to recover fees for expert witnesses.

(a) *Miller, Lancaster and Wian, Inc.:*

This action was commenced in 1978 by the Millers. In 1983, the current plaintiff, Rennie's Landing, joined the action. The Millers continued as plaintiffs through eleven years of litigation and until June, 1989 when the court granted a *post-trial* motion to dismiss on the grounds that the Millers' tavern was no longer in business. The history of the litigation up until the dismissal of the Millers is lengthy and predominantly successful for the plaintiffs. The Millers, as plaintiffs, were successful through several appeals and throughout numerous court proceedings.

The test of a prevailing party under section 16 is that "there must ... be a causal relationship between the litigation brought and the practical outcome realized. *Southwest Marine, Inc. v. Campbell Indus.,* 732 F.2d 744, 747 (9th Cir.), *cert. denied,* 469 U.S. 1072 (1984). The court finds that the Millers and Rennie's Landing are "substantially prevailing" parties entitled to recover the costs of this action from its initiation.

(b) *Amount of Fees:*

A lodestar fee is determined by multiplying the attorney hours reasonably expended by an appropriate hourly rate charged for the type of services rendered. The factors considered to determine the lodestar figure include 1) the novelty and difficulty of this issues; 2) the time required; 3) whether acceptance of the case required counsel to decline other representations; 4) the result;

1989 WL 131274, 1989-2 Trade Cases P 68,857

5) the complexity of the work; (6) counsel's ability and efficiency; 7) the prevailing fee in the community; and 8) awards in similar cases, among other things. *Hensley v. Eckerhart,* 461 U.S. 424, 433 (1983); *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67, 70 (9th Cir.1975), *cert. denied,* 425 U.S. 951 (1976).

The lodestar amount requested by plaintiffs, in the sum of $290,499.00, represents the number of hours expended on the litigation multiplied by an hourly rate. The court finds that the hours claimed by plaintiffs are adequately documented, and the hourly fee requested is reasonable.

 **\*3** (c) *Enhancement:*

Plaintiffs assert that the factors noted in determining the reasonableness of the requested base fee argue in favor of the full fee together with an enhancement. Plaintiffs assert that an enhancement of "3" is appropriate to reach a reasonable fee.

In *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* ——U.S. ——, 107 S.Ct. 3078 (1987), the court explained:

Indeed, it may well be that using a contingency enhancement is superfluous and unnecessary under the lodestar approach to setting a fee. The reasons a particular lawsuit are considered to be "risky" for an attorney are because of the novelty and difficulty of the issues presented, and because of the potential for protracted litigation. Moreover, when an attorney ultimately prevails in such a lawsuit, this success will be primarily attributable to his legal skills and experience, and to the hours of hard work he devoted to the case. These factors, however, are considered by the court in determining the reasonable number of hours expended and the reasonable hourly rate for the lodestar, and any further increase in this sum based on the risk of not prevailing would result not in a "reasonable" attorney's fee, but in a windfall for an attorney who prevailed in a difficult case.

... [P]ayment for the time and effort involved—the lodestar—is presumed to be the reasonable fee authorized by the statute, and enhancement for the risk of nonpayment should be reserved for exceptional cases where the need and justification for such enhancement are readily apparent and are supported by evidence in the record and specific findings by the courts.

107 S.Ct. 3087–88.

This litigation has been protracted and the legal issues difficult. Counsel is very able and very professional, and he has achieved a significant result for his clients. All of these factors are reflected in the lodestar amount of $290,499.00. This amount represents a reasonable fee as contemplated by section 16. The court finds no need or justification for enhancement beyond reasonable compensation.

(d) *Expert Witness Fees:*

Plaintiffs seek an award of $35,177.00 in litigation expenses, including expert witness fees. The parties agree that the United States Supreme Court and the Ninth Circuit have not decided whether or not expert witness fees are recoverable under fee shifting statutes. The federal circuits are divided on the question. Defendants point to *Kraus v. Sante Fe Southern Pacific Corp.,* No. 86–361–MA (D.Or. Nov. 10, 1987), in which the Honorable Malcolm F. Marsh, United States District Judge, found that costs are limited to those set forth in 28 U.S.C. § 1920. The taxation of costs under section 1920 is specifically limited to five categories of costs, none of which include expert witness fees.

Section 16 states that a plaintiff substantially prevailing is entitled to "the cost of suit, including a reasonable attorney's fee." In *Crawford Fitting Co. v. J.T. Gibbons, Inc.,* —— U.S. ——, 107 S.Ct. 2494 (1987), the Court disallowed expert witness fees on the grounds that "absent explicit statutory or contractual authorization for the taxation of the expenses of a litigant's witnesses as costs, federal courts are bound by the limitations set out in 28 U.S.C. § 1821 and § 1920." 107 S.Ct. at 2499. The court finds that section 16 does not explicitly provide for the taxation of the expenses of witnesses as costs and that the costs of suit are limited by 28 U.S.C. § 1920. Expert witness fees are therefore not allowed.

CONCLUSION

**\*4**  Plaintiffs are awarded attorney fees in the amount of $290,499.00.

ORDER

IT IS HEREBY ORDERED that plaintiffs are awarded attorney fees in the amount of $290,499.00.

**All Citations**

Not Reported in F.Supp., 1989 WL 131274, 1989-2 Trade Cases P 68,857

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**United States v. Tribune Publishing Company, Not Reported in Fed. Supp. (2016)**

2016 WL 2989488, 2016-1 Trade Cases P 79,544

2016 WL 2989488

United States District Court, C.D. California.

UNITED STATES of America, Plaintiff,

v.

TRIBUNE PUBLISHING COMPANY, Defendant.

Case No. CV 16-01822-AB (PJWx)

|

Signed 03/18/2016

**Attorneys and Law Firms**

Adam C. Speegle, Jeffrey G. Vernon, Nathan P. Sutton, Robin Crauthers, William H. Jones, II, Thomas Carter, US Department of Justice, Washington, DC, for Plaintiff.

Bradley H. Ellis, Helena Tseregounis, Kimberly A. Dunne, Mark E. Haddad, Sidley Austin LLP, Los Angeles, CA, Menesh S. Patel, Sidley Austin LLP, Chicago, IL, Peter K. Huston, Sidley Austin LLP, San Francisco, CA, Karen Kazmerzak, William Blumenthal, Sidley Austin LLP, Washington, DC, for Defendant.

## ORDER GRANTING APPLICATION FOR A TEMPORARY RESTRAINING ORDER

HONORABLE ANDRÉ BIROTTE JR., UNITED STATES DISTRICT COURT JUDGE

**\*1** Before the Court is the United States of America's ("government") Ex Parte Application for a Temporary Restraining Order ("TRO") (Dkt. No. 5.), filed, along with the Complaint (Dkt. No. 1), on March 17, 2016. Defendant Tribune Publishing Company ("Tribune") filed an Opposition, and the government filed a Reply on March 18, 2016. (Dkt. Nos. 12, 16.) [1] Upon consideration of the papers, the Court **GRANTS** the application.

## I. BACKGROUND

The papers set forth the relevant background in detail. The Court will provide only a summary. Tribune owns the *Los Angeles Times*. The government seeks an order enjoining Tribune from finalizing its acquisition of Freedom Communications, Inc. ("Freedom") and its publications, the Orange County *Register* and the Riverside County *Press-Enterprise*. Tribune was the winning bidder – out of two or three bidders – for Freedom's assets in a bankruptcy auction held March 16, 2016 and is scheduled to seek bankruptcy court approval of its acquisition on March 21, 2016. The government argues that the acquisition would immediately end competition between Tribune and Freedom for readers and advertisers in Orange and Riverside counties, leaving Tribune with a monopoly in the market for English-language daily local newspapers in these counties. The government contends that this is prohibited by Section 7 of the Clayton Act, 15 U.S.C. § 18, and seeks to enjoin the acquisition to preserve the status quo pending a motion for preliminary injunction.

## II. APPLICABLE LEGAL STANDARDS

### A. Standard for a Temporary Restraining Order

A temporary restraining order is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). The purpose of a preliminary injunction is to preserve the status quo and the rights of the parties until a final judgment on the merits can be rendered. *See U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010). The purpose of a temporary restraining order is to preserve

the status quo before a preliminary injunction hearing may be held. *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda City.*, 415 U.S. 423, 439 (1974); *Johnson v. Macy*, No. CV 15-7165 FMO (ASX), 2015 WL 7351538, at *3 (C.D. Cal. Nov. 16, 2015). The standard for a temporary restraining order is identical to the standard for a preliminary injunction. *Frontline Med. Assocs., Inc. v. Coventry Healthcare Workers Comp., Inc.*, 620 F. Supp. 2d 1109, 1110 (C.D. Cal. 2009). Specifically, a party seeking preliminary injunctive relief must establish that he is (1) likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest. *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).

 **\*2** Alternatively, " 'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support the issuance of an injunction," provided that the plaintiff also shows irreparable harm and that the injunction is in the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011); *SATA GmbH & Co. Kg v. Wenzhou New Century Int'l, Ltd.*, No. CV 15-08157-BRO (Ex), 2015 WL 6680807, *3 (C.D. Cal. Oct. 19, 2015). A "serious question" is one on which the movant "has a fair chance of success on the merits." *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984).

The elements of this test are "balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies*, 622 F.3d 1045, 1049–50 (9th Cir. 2010), *rev'd on other grounds*, 632 F.3d 1127 (9th Cir. 2011). However, the applicant must *demonstrate* that immediate or imminent irreparable harm is likely: "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction. A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Svcs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (emphasis in original) (internal citations omitted); *see also Fin. & Sec. Prods. Ass'n v. Diebold, Inc.*, Case No. C 04-04347 WHA, 2005 WL 1629813, * 6 (N.D. Cal. Jul. 8, 2005) ("Irreparable harm must not be speculative or merely alleged to be imminent ...."). In the antitrust context, "[r]easonable apprehension of threatened injury" can constitute irreparable harm. *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985); *accord* 15 U.S.C. § 26. Nevertheless, the party seeking injunctive relief still "must demonstrate irreparable harm," *id.*, by showing "a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197,1201 (9th Cir. 1980) (citation and internal quotations omitted). Unsupported allegations without "factual basis" do not suffice. *Id.*

## B. Elements of a Clayton Act Violation

The government challenges the transaction under Section 7 of the Clayton Act. To prove a violation of Section 7, a plaintiff must demonstrate that the challenged transaction is likely to "substantially ... lessen competition or tend to create a "monopoly" in a properly defined "market for a particular product in a particular geographic area." *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 982–83 n.1 (D.C. Cir. 1990). The government must prove that there is a "reasonable probability" of substantial competitive harm; a mere possibility of harm is insufficient to prove a Section 7 violation. *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 616–17, 622–23 (1974) ("[Section] 7 deals in 'probabilities,' not 'ephemeral possibilities.' ") (citing *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 323 (1962)); *United States v. SunGard Data Sys., Inc.*, 172 F. Supp. 2d 172, 180 (D.D.C. 2001). If, on balance, the transaction is not likely to substantially lessen competition, the government cannot carry its burden. *Baker Hughes*, 908 F.2d at 982–83.

 **\*3** Courts evaluate mergers under a "burden-shifting" framework by which the government must (1) establish a cognizable relevant product market, (2) demonstrate market shares that give rise to anticompetitive effects, and (3) show probable adverse effects on customers in the market as a whole. *Id.* at 981. If the government establishes these elements, there arises a presumption that the merger will substantially lessen competition. *California v. Am. Stores Co.*, 872 F.2d 837, 841–42 (9th Cir. 1989), *rev'd on other grounds*, 495 U.S. 271 (1990).

If the government establishes a prima facie case, the burden then shifts to the defendant to produce evidence rebutting the presumption. *Baker Hughes*, 908 F.2d at 982–83. If the defendant successfully rebuts the presumption, the burden of producing additional evidence of anticompetitive effect shifts to the government and merges with the ultimate burden of persuasion, which remains with the government at all times. *Id.*

## III. DISCUSSION

### A. The Government Has Established a Likelihood of Success on the Merits of Its Claim.

Having reviewed the parties' submissions, the Court finds that the Government has shown a likelihood of success on the merits of its claim.

### 1. The Government Is Likely to Establish Its Proposed Relevant Market.

To prove anticompetitive effect, the government must establish the relevant market, which consists of two components: a product market and a geographic market. *FTC v. Freeman Hosp.*, 69 F.3d 260, 268 (8th Cir. 1995). The relevant product market establishes the boundaries within which competition meaningfully exists. Those "commodities reasonably interchangeable by consumers for the same purposes" constitute a product market for antitrust purposes. *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956). The relevant market "must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn." *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 612 n.31 (1953); *see also Brown Shoe*, 370 U.S. at 325 (product markets are delineated "by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it"). A relevant geographic market is an "area in which the seller operates[ ] and to which the purchaser can practicably turn for supplies." *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 359 (1963) (internal quotation marks and emphasis omitted).

Here, the government defines the relevant *product* market as "the sale of Daily English-language local daily newspapers to subscribers and the sale of local advertising in those newspapers." *See* TRO 10:14–16, *and* Exh. B (Decl. of Robin Allen). In particular, the government notes that readers and advertisers are not likely to find local newspapers in *other languages* to be reasonably interchangeable with local English-language newspapers.

The government defines the relevant *geographic* market as Orange County and Riverside County. The government argues that English-language newspapers *from elsewhere* are not likely to be interchangeable with English-language newspapers in Orange and Riverside counties because the former "do not regularly provide local news specific to that county, nor do they have any significant circulation or sales inside Orange County." *See* TRO 13:8–11. And, although the *Los Angeles Times* provides news about and has circulation in these Counties, this fact does not ameliorate but instead exacerbates the potential anticompetitive effects of the acquisition because Tribune also owns the *Los Angeles Times*. In its Reply, the government claims that over 200,000 residents of Orange and Riverside Counties buy daily newspapers.

 **\*4**  Tribune does not contest that local newspapers provide local content and local advertising. Instead, it argues that the government's market definition fails to account for internet-based sources of local news and advertising as potential competition in the relevant product market and that therefore the government's market definition is too narrow. *See, e.g., Reilly v. Hearst Corp.*, 107 F. Supp. 2d 1192, 1201 (N.D. Cal. 2000) (noting that the internet "has opened a staggering array of news sources" and that "[w]hile a merger of the two dominant San Francisco dailies in 1965 might well have posed an unquestionable threat of undue concentration of market power under the old paradigm, that threat today is far from clear."). If the government's relevant market definition is not sound, then its prima facie case collapses.

The Court is not convinced of Tribune's position that the internet renders geography and distinctions between kinds of news sources obsolete. In *Reilly*, Judge Walker questioned whether the geographic scope of the market for San Francisco newspapers was in fact broader than San Francisco. But Judge Walker's discussion cited, in addition to the influence of the internet, the

United States v. Tribune Publishing Company, Not Reported in Fed. Supp. (2016)

2016 WL 2989488, 2016-1 Trade Cases P 79,544

presence of other nearby local papers, the region's recent population explosion, and the availability of other free-distribution newspapers as factors suggesting a broader market. *See Reilly*, 107 F. Supp. 2d at 1200-01. In addition, Judge Walker issued his order after a court trial with a fully-developed record. Thus, *Reilly* is of little assistance to Tribune.

Meanwhile, Tribune has not meaningfully rebutted the government's market definition. Tribune states in conclusory fashion that "[f]or local news in Orange County, [readers] can turn to numerous on-line local sources," *see* Opp'n 16:17–20, without identifying any such sources. Tribune also states that readers can turn to Google News, Apple News, "numerous search engines, or various media," *id.*, for news on any particular topic, but to the Court's knowledge neither Google News, Apple News, nor "search engines" themselves *generate* local content. Rather, news aggregator sites primarily post links to stories on the websites of other content generators – including local newspapers like the *Register* or the *Press-Enterprise*. That other websites post links to local sites only demonstrates that local newspapers continue to serve a unique function in the marketplace: they are the creators of local content. It further stands to reason that local advertisers in search of print advertising would choose to advertise with local news providers. To be sure, there are other "sources" of local news such as bloggers and the like, but Tribune neither argues nor demonstrates that consumers consider the content or advertising they provide as "reasonably interchangeable" with what the local English-language newspapers provide.

The Court is therefore satisfied that the government is likely to establish its proposed relevant product market.

### 2. The Government Is Likely to Demonstrate That the Acquisition Would Have Anti-Competitive Effects and Adverse Effects on the Consumers in the Market.

"[A] merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market[,] is so inherently likely to lessen competition substantially[,] that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." *Philadelphia National Bank*, 374 U.S. at 363; *see also id.* at 364 ("Without attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat."); *United States v. Bazaarvoice, Inc.*, No. 13-cv-00133-WHD, 2014 WL 203966, at *68-70 (N.D. Cal. Jan. 8, 2014) (finding that "the government established that the combined market shares of [the merging parties] far exceeds 30 percent, and is in excess of 50 percent," which "easily made a prima facie showing of a Section 7 violation").

**\*5** Here, the government has shown that, based on the above relevant market definition, Tribune's acquisition of the *Register* will increase its control of local daily newspaper circulation from 41 percent to 98 percent in Orange County, and Tribune's acquisition of the *Press-Enterprise* and *Register* would increase its share of local daily newspapers from 12 percent to over 81 percent in Riverside County. Tribune only contests the government's relevant market definition, but does not meaningfully dispute these figures. Under the cases cited above, such a concentration clearly constitutes a threat to competition and would likely have adverse effects on consumers in the market as whole. The government will therefore likely establish these elements.

The government has therefore shown a likelihood of success on the merits of its Clayton Act claim.

### B. The Government Has Established a Likelihood of Irreparable Harm, That an Injunction is in the Public Interest, and That the Balance of Hardships and Equities Tips in Its Favor.

"In a Government case the proof of the violation of law may itself establish sufficient public injury to warrant relief." *California v. Am. Stores Co.*, 495 U.S. 271, 295 (1990); *see also United States v. Siemens Corp.*, 621 F.2d 499, 506 (2d Cir. 1980) ("[O]nce the United States demonstrates a reasonable probability that § 7 has been violated, irreparable harm to the public should be presumed."); *United States v. Ingersoll-Rand Co.*, 218 F. Supp. 530, 544 (W.D. Pa. 1963) ("The Congressional pronouncement in § 7 embodies the irreparable injury of violations of its provisions.").

Even absent a presumption, the government has established a likelihood of irreparable harm. Should an injunction not issue, Tribune would acquire the *Register* and *Press-Enterprise* and undertake all of the business actions – consolidating operations, taking ownership of business-sensitive information, terminating employees, etc. – that normally accompany mergers. It would be very difficult – if not impossible – to unwind these actions, so the court could not grant an effective remedy in should the government ultimately prevail. *See Consol. Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 261 (2d Cir. 1989) (irreparable harm established where merged firm would "dominate" the market and the acquired firms "would cease to be viable competitors in the market"); *F&MSchaefer Corp. v. C. Schmidt & Sons, Inc.*, 597 F.2d 814, 818 (2d Cir. 1979) (finding irreparable harm because acquisition would allow defendant immediately to "have access to the confidential trade information of one of its leading competitors" and lead to the "risk of decreased organizational morale" of the acquired firm); *United States v. Ivaco, Inc.*, 704 F. Supp. 1409, 1429 (W.D. Mich. 1989) ("If an injunction is denied and the transaction is later found to violate the Act, then the remedy would be a divestiture of acquired assets," but "[t]hat remedy is typically rejected by the courts as ineffective" as it "would not effectively remedy the injury to competition threatened by this transaction."). The Court is simply not convinced by Tribune's attempt to downplay the significance of this potential harm.

The public interest and the balance of hardships inquiries are interrelated and both weigh in favor of an injunction. "By enacting Section 7, Congress declared that the preservation of competition is always in the public interest." *Ivaco*, 704 F. Supp. at 1430; *see also F.T.C. v. Swedish Match*, 131 F. Supp. 2d 151, 173 (D.D.C. 2000) ("There is a strong public interest in effective enforcement of the antitrust laws ...."). The Court finds this especially applicable here where the consumer access to local news is at stake. Newspapers – indeed, local ones – are important to a healthy democracy. Tribune claims that it would be harmed because it would not be able to consummate its purchase before Freedom runs out of financing on March 31, 2016 and the second place bidder would make the purchase instead. It may be that Tribune will lose the opportunity to acquire the *Register* and *Press-Enterprise* in favor of the second place bidder. However, this private harm does not outweigh the public interest in the preservation of competition, especially given the government's likelihood of success on the merits. *See, e.g., Ivaco*, 704 F. Supp. at 1430 ("This private, financial harm must, however, yield to the public interest in maintaining effective competition."); *United States v. Columbia Pictures Indus., Inc.*, 507 F. Supp. 412, 434 (S.D.N.Y. 1980) ("Far more important than the interests of either the defendants or the existing industry... is the public's interest in enforcement of the antitrust laws and in the preservation of competition. The public interest is not easily outweighed by private interests."); *Siemens Corp.*, 621 F.2d at 506 (in Section 7 cases brought by the Government, "private interests must be subordinated to public ones"). That the government enforces antitrust law on behalf of the public interest necessarily weighs heavily in the balance-of-hardships calculus. Furthermore, Tribune could have avoided the risk of harm altogether by vetting the acquisition with the government ahead of time. Finally, the government seeks to preserve the status quo pending a resolution of its case on the merits, thereby avoiding harm to the marketplace that otherwise appears likely.

**\*6** Some cases discuss the "balance" analysis as the balance of equities. Insofar as the balance of equities is distinct from the balance of hardships, it also tips in the government's favor. Tribune faults the government for not interjecting itself into the allegedly well-publicized potential acquisition earlier, while the government faults Tribune for not notifying it of its intentions. Perhaps both sides could have anticipated antitrust problems sooner and dealt with them on some basis other than on an application for a TRO resolved in a matter of hours. Indeed, Tribune evidently anticipated potential antitrust issues long ago because it secured antitrust counsel, yet it appears that it failed to vet its intentions with the government voluntarily. The Court finds that the government's alleged eleventh-hour enforcement of the antitrust law and the arguable prejudice this causes Tribune does not influence the equities or outbalance the paramount importance of the public interest. The balance of the equities therefore strongly favors the government.

The likelihood of irreparable harm, the public interest, and the balance of hardships and equities weigh in favor of an injunction.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Government's Ex Parte Application for a Temporary Restraining Order.

**IT IS HEREBY ORDERED** that, pending a hearing for determination of an Order to Show Cause Why a Preliminary Injunction Should Not Issue, Defendant Tribune Publishing Co., and all of its respective agents, employees, or attorneys, shall be and hereby are **RESTRAINED AND ENJOINED** from acquiring any portion of the assets of Freedom Communications, Inc., or in any way taking control of or gaining access to the assets of Freedom Communications, Inc.

Under Fed. R. Civ. Proc. 65(b)(2), a TRO must expire no later than 14 days after the time it is issued unless the court extends it for good cause. Therefore, the Court hereby **SETS** a hearing on the government's request for an Order to Show Cause Why a Preliminary Injunction Should Not Issue for **Monday, March 28, 2016, at 10:00 a.m.**

**All Citations**

Not Reported in Fed. Supp., 2016 WL 2989488, 2016-1 Trade Cases P 79,544

---

**Footnotes**

1      At 6:30 p.m. on March 18, 2016, Tribune filed an Ex Parte Application to File a Sur-Reply. (Dkt. No. 17.) The Court GRANTS that application. However, the court has reviewed Tribune's sur-reply and it does not change the analysis herein.

---

**End of Document**                                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# A

# DICTIONARY OF LAW

CONTAINING

## DEFINITIONS OF THE TERMS AND PHRASES OF AMER-
## ICAN AND ENGLISH JURISPRUDENCE,
## ANCIENT AND MODERN

INCLUDING

THE PRINCIPAL TERMS OF INTERNATIONAL, CONSTITUTIONAL AND COM
MERCIAL LAW; WITH A COLLECTION OF LEGAL MAXIMS AND
NUMEROUS SELECT TITLES FROM THE CIVIL LAW
AND OTHER FOREIGN SYSTEMS

## By HENRY CAMPBELL BLACK, M. A.

Author of Treatises on "JUDGMENTS," "TAX-TITLES," "CONSTITUTIONAL PROHIBITIONS," etc.

ST. PAUL, MINN.
WEST PUBLISHING CO.
1891

Digitized by Google

ACTIO 27 ACTION

**ACTIO VI BONORUM RAPTORUM.** In the civil law. An action for goods taken by force; a species of mixed action, which lay for a party whose goods or movables (*bona*) had been taken from him by force, (*vi*) to recover the things so taken, together with a penalty of triple the value. Inst. 4, 2; Id. 4, 6, 19. Bracton describes it as lying *de rebus mobilibus vi ablatis sive robbatis,* (for movable things taken away by force, or robbed.) Bract. fol. 103b.

**ACTIO VULGARIS.** In the civil law. A legal action; a common action. Sometimes used for *actio directa.* Mackeld. Rom. Law, § 207.

**ACTION.** Conduct; behavior; something done; the condition of acting; an act or series of acts.

In practice. The legal and formal demand of one's right from another person or party made and insisted on in a court of justice.

An action is an ordinary proceeding in a court of justice by which one party prosecutes another for the enforcement or protection of a right, the redress or prevention of a wrong, or the punishment of a public offense. Code Civil Proc. Cal. § 22; Code N. Y. § 2; Code N. C. 1883, § 126.

An action is merely the judicial means of enforcing a right. Code Ga. 1882, § 3151.

Action is the form of a suit given by law for the recovery of that which is one's due; the lawful demand of one's right. Co. Litt. 284b, 285a.

*Classification of actions.* *Civil* actions are such as lie in behalf of persons to enforce their rights or obtain redress of wrongs in their relation to individuals.

*Criminal* actions are such as are instituted by the sovereign power, for the purpose of punishing or preventing offenses against the public.

*Penal* actions are such as are brought, either by the state or by an individual under permission of a statute, to enforce a penalty imposed by law for the commission of a prohibited act.

*Common law* actions are such as will lie, on the particular facts, at common law, without the aid of a statute.

*Statutory* actions are such as can only be based upon the particular statutes creating them.

*Popular* actions, in English usage, are those actions which are given upon the breach of a penal statute, and which any man that will may sue on account of the king and himself, as the statute allows and the case requires. Because the action is not given to one especially, but generally to any that will prosecute, it is called "action popular;" and, from the words used in the process, (*qui tam pro domino rege sequitur quam pro se ipso,* who sues as well for the king as for himself,) it is called a *qui tam* action. Tomlins.

*Real, personal, mixed.* Actions are divided into real, personal, and mixed; real actions being those brought for the specific recovery of lands or other realty; personal actions, those for the recovery of a debt, personal chattel, or damages; and mixed actions, those for the recovery of real property, together with damages for a wrong connected with it. Litt. § 494; 3 Bl. Comm. 117.

*Local* actions are those founded upon a cause of action which necessarily refers to, and could only arise in, some particular place, *e. g.,* trespass to land.

*Transitory* actions are those founded upon a cause of action not necessarily referring to or arising in any particular locality.

Actions are called, in common-law practice, *ex contractu,* when they are founded on a contract; *ex delicto,* when they arise out of a wrong.

"Action" and "Suit." The terms "action" and "suit" are now nearly, if not entirely synonymous. (3 Bl. Comm. 3, 116, et passim.) Or, if there be a distinction, it is that the term "action" is generally confined to proceedings in a court of law, while "suit" is equally applied to prosecutions at law or in equity. Formerly, however, there was a more substantial distinction between them. An *action* was considered as terminating with the giving of judgment, and the execution formed no part of it. (Litt. § 504; Co. Litt. 289a.) A *suit,* on the other hand, included the execution. (Id. 291a.) So, an action is termed by Lord Coke, "the *right* of a *suit.*" (2 Inst. 40.) Burrill.

In French commercial law. Stock in a company, or shares in a corporation.

**ACTION FOR POINDING OF THE GROUND.** A term of the Scotch law. See POINDING.

**ACTION OF A WRIT.** A phrase used when a defendant pleads some matter by which he shows that the plaintiff had no cause to have the writ sued upon, although it may be that he is entitled to another writ or action for the same matter. Cowell.

Digitized by Google

H.R. REP. 94-499(I), H.R. REP. 94-499, H.R. Rep. No. 499(I), 94TH Cong.,

2ND Sess. 1976, 1976 U.S.C.C.A.N. 2572, 1975 WL 12520 (Leg.Hist.)

**\*\*2572** P.L. 94-435, HART-SCOTT-RODINO ANTITRUST IMPROVEMENTS ACT OF 1976

House Report (Judiciary Committee) No. 94-499(I),

Sept. 22, 1975 (To accompany H.R. 8532)

House Report (Judiciary Committee) No. 94-499(II),

Nov. 4, 1975 (To accompany H.R. 8532)

House Report (Judiciary Committee) No. 94-1343,

July 15, 1976 (To accompany H.R. 13489)

House Report (Judiciary Committee) No. 94-1373,

July 28, 1976 (To accompany H.R. 14580)

Senate Report (Judiciary Committee) No. 94-803,

May 6, 1976 (To accompany S. 1284)

Cong. Record Vol. 122 (1976)

DATES OF CONSIDERATION AND PASSAGE

House March 18, August 2, 24, September 16, 1976

Senate June 10, September 8, 1976

House bill H.R. 8532 was passed in lieu of the Senate bill. The House Reports are set out.

(CONSULT NOTE FOLLOWING TEXT FOR INFORMATION ABOUT OMITTED
MATERIAL. EACH COMMITTEE REPORT IS A SEPARATE DOCUMENT ON WESTLAW.)

HOUSE REPORT NO. 94-499(I)

Sept. 22, 1975

**\*1** The Committee on the Judiciary, to whom was referred the bill (H.R. 8532), to amend the Clayton Act to permit State attorneys general to bring certain antitrust actions, and for other purposes, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

\* \* \* \*

**\*3** I. PURPOSE

The purpose of H.R. 8532 is to provide a new federal antitrust remedy which will permit State attorneys general to recover monetary damages on behalf of State residents injured by violations of the antitrust laws. The bill is intended to compensate the victims of antitrust offenses, to prevent antitrust violators from being unjustly enriched, and to deter future antitrust violations.

II. SUMMARY OF REPORTED BILL

The first section establishes the bill's short title.

Section 2 contains the parens patriae provisions to be added as new sections of the Clayton Act (15 U.S.C. 12 et seq.). Proposed section 4C(a) authorizes State attorneys general to sue for damages on behalf of natural persons who have been injured by antitrust violations. Section 4C(b) authorizes the conversion of 4C(a) actions into class suits **\*\*2573** under certain circumstances. Section 4C(c) requires that individuals on whose behalf parens patriae suits are brought be notified. Se-tion 4C(d) provides an opportunity for individuals to exclude their claims from parens patriae suits. Section 4C(e) requires court approval of settlements of parens patriae cases. Section 4D provides that, in parens patriae cases and other antitrust class suits, damages may be proved and assessed in the aggregate by reasonable methods of estimation. Section 4E requires the opportunity for individuals to secure their appropriate share of the damages recovered, with any amount remaining to be distributed as the

court directs. Section 4F(a) requires the U.S. Attorney General to notify appropriate State attorneys general of their entitlement to bring parens patriae cases. Section 4F(b) requires the U.S. Attorney General to make investigative materials available to State attorneys general in parens patriae cases.

Sections 3(1) and 3(2) amend existing sections of the Clayton Act to include parens patriae actions in that Act's statute of limitations and provision for tolling the statute of limitations, respectively. Section 3(3) amends the Clayton Act to require that plaintiffs who prevail in antitrust injunction cases be awarded reasonable attorney's fees.

III. BACKGROUND

The economic burden of many antitrust violations is borne in large measure by the consumer in the form of higher prices for his goods and services. This is especially true of such common and widespread practices as price-fixing, which usually result in higher prices for the consumer, regardless of the level in the chain of distribution at which the violation occurs. It is also true of other antitrust violations such as monopolization, attempts to monopolize, group boycotts, division of markets, exclusive dealings, tie-in arrangements, and conspiracies to limit production. All of these violations are likely to cause injuries to **\*4** consumers, whether by higher prices, by illegal limitation of consumer choices, or by illegal withholding of goods and services. Moreover, antitrust violations almost always contribute to inflation. They introduce illegal and artificial forces into the market place, thus undermining our economic system of free enterprise.

Frequently, antitrust violations injure thousands or even millions of consumers, each in relatively small amounts. Indeed, many of the Justice Department's recent prosecutions have involved price-fixing of consumer goods on a local or regional basis. In the food industries alone, the Justice Department's cases have included price-fixing prosecutions involving bread and bakery products in the Philadelphia area, milk in Wyoming, dairy products in Colorado, Utah and Idaho, bread and bakery products in Baltimore and the Eastern Shore area of Maryland, milk in Washington and Alaska, soft drinks in Tulsa, bread in New York and Chicago, baking companies in San Diego and Louisiana, and sugar refiners nationally.

Although the antitrust laws have the immediate goals of protecting and promoting competition, it is the consuming public that ultimately benefits from the enforcement of the antitrust laws. Nonetheless, Federal antitrust statutes do not presently provide effective redress for the injury inflicted upon consumers. This lack of an effective consumer remedy sometimes results in the unjust enrichment of antitrust violators **\*\*2574** and undermines the deterrent effect of the treble damage action. H.R. 8532 fills this gap by providing the consumer an advocate in the enforcement process-- his State attorney general.

During the Subcommittee's hearings in the 93d Congress, Assistant Attorney General for Antitrust, Thomas Kauper outlined the problem in this way:

There can be no doubt that the treble damage remedy provides a strong deterrent, especially against price-fixing and other hard-core per se offenses. This damage remedy has been particularly effective in cases involving large purchasers, for these plaintiffs are likely to have detailed evidence, a sufficiently large economic stake to bear the inevitable risks of a lawsuit, and the resources to meet the apparently inevitable costs of protracted and complex litigation. However, the remedy has been less effective in circumstances involving multiple transactions of relatively small size, particularly purchases by ultimate consumers of products that may cost as little as 25 or 30 cents. There, records are not likely to be available, individual claims will be small, and the claimant less likely to have either the sophistication or resources necessary to prosecute their individual claims.

\* \* \* \*

I believe that there is a need for the availability of a method by which damages can be recovered where antitrust violations have caused small individual damages to large numbers of citizen-consumers. Without such a procedure, those antitrust violations which have the broadest scope and, often, the most direct impact on consumers would be most likely to escape the penalty of

the loss of illegally-obtained profits. **5** Those whose injuries were to small to bear the burden of complex litigation would have no effective access to the courts. As a result, the goal of deterrence sought by the Clayton Act would be frustrated in those situations where damages fell directly on small consumers or purchasers. [1]

Under the well established doctrine of parens patriae, States have successfully sued to halt continuing wrongs which injure or threaten to injure their citizens. The Clayton Act has been interpreted by the Supreme Court as authorizing States to maintain parens patriae lawsuits to enjoin violations of the antitrust laws when those violations are injuring the State's citizens. In Georgia v. Pennsylvania R.R., 324 U.S. 439, 451 (1945), [1a] the Court said that the State 'as a representative of the public is complaining of a wrong which, if proven, limits the opportunities of her people, shackles her industries, retards her development, and relegates her to an inferior economic position among her sister States. These are matters of grave public concern in which Georgia has an interest apart from that of particular individuals who may be affected.'

However, when the State of California recently tried to sue to recover monetary damages on behalf of persons who had allegedly been injured by the price-fixing of snack foods, the Ninth Circuit Court of Appeals held that parens patriae damage actions were not authorized by the Clayton Act. In large part, H.R. 8532 is a response to that case **2575** and a recognition that the consuming public currently has no effective means of obtaining compensation for its injuries.

An extremely important benefit which would flow from H.R. 8532 is the promotion of cooperation in antitrust enforcement between the States and the federal government. As Federal Trade Commission Bureau of Competition Director James Halverson put it during the Subcommittee's hearings this year:

There are certain violations of the federal antitrust laws which would be handled more efficiently by a parens patriae suit for damages than by a federal criminal proceeding or action for injunctive relief. An example of such a situation might be where a regional seller of consumer goods has recently discontinued anticompetitive practices that directly injured his customers. The best deterrent to a resumption of the illegal conduct might be a suit by the state which deprives the violator of the profits gained from his bad conduct and provides relief which compensates the injured consumers. [2]

A State attorney general is an effective and ideal spokesman for the public in antitrust cases, because a primary duty of the State is to protect the health and welfare of its citizens. He is normally an elected and accountable and responsible public officer whose duty is to promote the public interest.

**\*6** IV. THE CONSUMER PRESENTLY HAS NO PRACTICAL MEANS OF REDRESS

Section 4 of the Clayton Act, 15 U.S.C. 15, provides a private cause of action for treble damages, costs and attorneys' fees for 'any person . . . injured in his business or property by reason of anything forbidden in the antitrust laws.'

Under this section, a State may sue to recover damages it has sustained in its capacity as a proprietor or purchaser of goods and services. [3] Likewise, under Sec. 4A of the Clayton Act, 15 U.S.C. 15a, the United States may sue whenever it is injured in 'its business or property.' Neither the United States nor any State, however, may presently sue for damages in a representative capacity on behalf of injured citizens unless it has been injured in the same manner.

The impact of this legislative omission on effective antitrust enforcement has become clear in recent years as a result of developing judicial decisions. Under Sec. 4 of the Clayton Act, any person, including any consumer, who can prove he was injured by price-fixing or any other antitrust violation, has a cause of action. [4] In most instances, however, an individual law suit by an injured consumer is, as a practical matter, out of the question. If, for example, a price-fixing conspiracy results in an overcharge of a dollar on a relatively low priced consumer item, and 50 million such items are sold, the aggregate impact of the conspiracy upon consumers and the illegal profits of the price-fixers are not insignificant-- at least $50 million. [5] Yet no

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.                    3

single **2576 consumer could practically be expected to bring suit. He would have no investigative resources-- or incentive-- to discover the conspiracy; should he become aware of the overcharge, he will almost certainly have no proof that he purchased the item at a particular time, place, and price; he will quite obviously have neither the incentive nor the resources to engage in protracted and extremely costly litigation to recover his tiny individual stake.

Attempts to use the revised class action provision of the 1966 amendments to Rule 23 of the Federal Rules of Civil Procedure to fashion a mechanism for consumer redress in this situation have been disappointing. Many courts have found that large consumer classes predicated upon small individual claims present insurmountable problems of 'manageability' in the conduct of the litigation. [6] These manageability problems include proper notice the complexity of evidentiary **7 issues, and distribution of any recoveries. In Eisen v. Carlisle & Jacquelin, the Supreme Court interpreted Rule 23 to require class action plaintiffs to provide individual prelitigation notice to all identifiable members of the class regardless of the cost of providing such notice. In the 1975 hearings, the Director of the FTC's Bureau of Competition, James Halverson, explained that:

The practical effect of Eisen is to eliminate the Rule 23 class action as a feasible means for recovery by a large class of individuals each of whom has sustained relatively minor damages. In situations where the cost of giving notice to the class are much greater than any individual class member's stake in the outcome of the action, it is unlikely that any suit will be brought. The person who deals in certain types of consumer goods, where each transaction may involve only a few dollars, can not fix prices, relatively free from the fear of substantial treble damage actions.

A description of the facts in Eisen will indicate where the Supreme Court's decision has left the consumer class action. The plaintiff, in Eisen, who claimed personal damages of only $70, sought to represent a class of as many as 6 million persons who allegedly were injured as a result of violations of the antitrust and securities laws. It was calculated **2577 that that the cost of giving individual notice to all indentifiable members of the class would be about $315,000. The Court, in ruling that the plaintiff must give such notice, explicitly recognized that its decision sounded the death knell for Eisen's class action because the plaintiff was unlikely to expend $315,000 to proceed with a suit in which he had a stake of only $70. The immediate result was that the defendants retained the profits from their allegedly illegal activities. [7]

At a minimum, the new emphasis on the intricacies of class actions has simply added another round of expensive and delaying litigation on the very propriety of the validity, and therefore certification, of the class.

Individual suits and class actions have worked far better for business entities than for consumers injured by antitrust violations. Wholesales and retailers purchasing from price-fixing manufacturers will frequently buy in sufficient volume to give them a substantial incentive to sue. They maintain accurate purchase records which may be used as proof of purchase, and they will usually have access to attorneys and other resources for investigating the facts and prosecuting the litigation. Their numbers will be smaller, and ordinary business records and the records of trade associations will frequently ease the problem of identifying claimants, so that they will not face many of the obstacles encountered by consumers in class action litigation.

The result has been relatively effective antitrust enforcement where the violation has occurred high up in the chain of distribution, and where the impact has been upon other business entities. Where, however, wholesalers and retailers have passed on all or most of the cost of a violation to the consumer, or where the violation itself occurred at **8 the retail level (hus subjecting the consumer to the major impact of the violation), [8] adequate enforcement mechanisms simply do not exist. The consumer, who benefits from the proper functioning of our free enterprise system with appropriate antitrust enforcement, has been without an effective method of redress of his grievances.

Frustrated by this gap, the State of California brought an action on behalf of its 20 million purchasers of snack foods, claiming they had been the victims of a price-fixing conspiracy and seeking to represent their interest in court. The Ninth Circuit Court of Appeals held in California v. Frito-Lay, 474 F.2d 774 (9th Cir.), cert. denied, 412 U.S. 908 (1973, [8a] that California could not maintain such a 'parens patriae' action for its injured and legally helpless citizens. The court applauded the State's imaginative

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.    4

approach to an obviously important problem, but held that, under the law, California could not recover damages on behalf of its citizens under the Clayton Act. Legislative action was needed, the court said, to enable the State to represent its injured citizens:

The State most persuasively argues that it is essential that this sort of proceeding be made available if antitrust violations of the sort here alleged are to be rendered unprofitable and deterred. It would indeed appear that the State is on the track of a suitable answer (perhaps the most suitable yet proposed) **2578 to problems bearing on antitrust deterrence and the class action as a means of consumer protection. We disclaim any intent to discourage the State in its search for a solution.

However, if the State is to be empowered to act in the fashion here sought we feel that authority must come not through judicial improvisation but by legislation and rule making, where careful consideration can be given to the conditions and procedures that will suffice to meet the many problems posed by one's assertion of power to deal with another's property and to commit him to actions taken in his behalf. [9]

H.R. 8532 is a response to the judicial invitation extended in Frito-Lay. The thrust of the bill is to overturn Frito-Lay by allowing State attorneys general to act as consumer advocates in the enforcement process, while at the same time avoiding the problems of manageability which some courts have found under Rule 23.

Support for these legislative goals was expressed in hearings by every witness before the subcommittee, including some who opposed substantial portions of earlier versions of the bill. The bill as reported by the committee is supported by the Department of Justice and the Acting Director of the Bureau of Competition of the Federal Trade Commission, and, generally, by the National Association of Attorneys General.

## V. THE PROVISIONS OF H.R. 8532

H.R. 8532 employs an ancient concept of our basic English common law-- the power of the sovereign to sue as parens patriae on behalf of **9 the weak and helpless of the realm-- to solve a very modern problem in antitrust enforcement. This doctrine is also firmly embedded in American jurisprudence. Since 1900 the Federal courts have expanded the power of a State to sue 'in her capacity as a quasi-sovereign or as agent and protector of her people against a continuing wrong done to them.'
[10] The parens patriae doctrine already applies to antitrust injunction cases. H.R. 8532 extends the doctrine to permit States to protect their citizens by suing for damages when they are injured by antitrust violations. The following is a discussion of individual sections of the Bill.

### SUBSECTION 4C(a)

This is the heart of H.R. 8532. It permits a State attorney general to bring parens patriae actions for treble damages 'on behalf of natural persons residing in such State injured by any violation of the antitrust laws.'

The subsection creates no new substantive liability. Each person on whose behalf the State attorney general is empowered to sue already has his own cause of action under section 4 of the Clayton Act, even if, for practical reasons, the right to sue is not likely to be exercised. Subsection 4C(a) thus provides an alternative means to make practically available Federal remedies at law, previously denied, for the vindication **2579 of existing substantive claims.It authorizes State attorneys general to sue for damages on behalf of injured persons, subject to the other provisions of the bill, namely, (1) the right of individuals to opt out under section 4C(d), (2) the extinction of the individual's right to maintain his own suit if he does not opt out, and (3) the right of the individual to receive his appropriate share of any recovery.

The establishment of an alternative remedy does not increase any defendant's liability. To the extent an antitrust violator was liable to an individual, H.R. 8532 would make the violator liable to either the individual or the State. The likelihood of

a financial recovery against an antitrust violator, however, is significantly increased because H.R. 8532 creates an effective remedy where none existed before.

The subcommittee and the full committee gave extended consideration to the proper scope of the remedy. The original bill before the subcommittee, H.R. 38, would have permitted actions on behalf of 'citizens' injured by antitrust violations. The subcommittee also considered using the terms 'person' and 'consumers'; it concluded that 'persons' was too broad a term as it might be construed to include business entities, which are able, in general, to fend for themselves. On the other hand, the term 'consumers' was considered potentially too narrow and too prone to definitional problems.

The committee chose 'natural persons' as the best expression of the goals of the legislation. The term is intended to exclude business entities such as corporations, partnerships and sole proprietorships. While some 'natural persons' might be in a position to bring their own actions and some business entities might not, the committee concluded that these instances will be rare and that use of the phrase 'natural persons' will permit actions on behalf of those most in need  **\*10**  of representation but presently unrepresented. Moreover, the 'opt-out' provision of subsection 4C(d) will preserve the separate law suit of any 'natural person' who does not want the State attorney general to pursue his claim.

Under H.R. 8532, parens patriae actions may be maintained to recover damages for any antitrust injuries, except those resulting from violations of section 2 (price discrimination) and section 7 (anticompetitive mergers) of the Clayton Act. The Assistant Attorney General recommended that these sections not be included, and the committee agreed that they are not appropriate for parens patriae actions.

State attorneys general may retain outside private counsel to assist in the prosectuion of parens patriae cases. Private counsel may be especially necessary and useful when there is multistate litigation since private counsel may be better able to coordinate such litigation than any individual State attorney general. Private counsel may not, however, be retained or employed on a contingency fee basis under the committee's bill, because the committee felt that States should be encouraged to develop their own in-house antitrust capability.


SUBSECTION 4C(b)

Subsection 4C(b) provides the courts with a flexible alternative to the parens patriae action in those rare instances where a different approach  **\*\*2580**  is necessary to the efficient conduct of litigation. Under this section the court is empowered, on its own motion or that of any party, to order that an action originally filed as a parens patriae action be maintained as a class action. The attorney general may then represent an appropriate class or classes, regardless of whether he himself is a member of that class or of those classes.

Under the existing class action enforcement scheme, the courts have been reluctant to permit State attorneys general to act as representatives of classes of injured consumers, unless their States, or subdivisions thereof, have been injured in the same way as the other members of the class. [11]  At one level, Sec. 4C(b) reflects the committee's disapproval of this unnecessarily narrow approach to the issue of adequate representation in antitrust class actions. [12]

The Judiciary Committee recognized that there may be occasions when extensive investigations and pretrial proceedings and the interests of all parties involved convince the court that, in the interests of justice, an action which was brought as a 4C(a) parens patriae lawsuit should be transformed to and maintained as a class action. It might, for instance, be fairer to all parties for the court to order that a parens patriae action become a 4C(b) action when both businesses and natural persons have been injured in exactly the same manner. Conversion to a 4C(b) action would be inappropriate except where the interests of justice would be served thereby. And it would clearly be inappropriate for a court to convert a 4C(a) action into a Rule 23 class action and, then, dismiss the case on grounds of unmanageability under Tule 23.

**\*11** If a case is converted to a Sec. 4C(b) class action, the provisions of Secs. 4C(c), 4C(d), 4C(e), 4D, 4E, 4F(b), and 4G apply, even though they may be inconsistent with the provisions of Rule 23. 'Adequacy of representation' may be an issue in Rule 23 actions because of the possibility that the representative may have a conflict of interest or otherwise be inadequate. No such issue should arise in parens patriae cases under section 4C(a) or 4C(b), however, absent extraordinary circumstances involving a particular State attorney general.

Subsection 4C(b) is designed to give the courts maximum flexibility to structure individual and consolidated actions to achieve the goal of full and fair adjudication of claims under the antitrust laws. [13] It will permit the courts to utilize the services of the attorney general in a broad representative capacity in those few cases where the parens patriae action would be clearly inappropriate.

The committee is clear in its preference for parens patriae actions under section 4C(a). One of the subsidiary purposes of H.R. 8532 is to avoid, in consumer actions, the cumbersome litigation of peripheral issues which under Rule 23 has sometimes become more time-consuming and costly than litigating the merits of the case. Only where some positive impediment to the maintenance of a parens patriae action exists should a court have to resort to the alternative provided by section 4C(b).

**\*\*2581** SUBSECTIONS 4C(c) AND 4C(d)

Subsections 4C(c) and 4C(d) must be read together; they are designed to protect the constitutional due process rights of each individual potential claimant and defendant.

The constitutional concept of due process in a civil case embodies at a minimum two components: notice that a court is about to take action which may affect a person's interests, and an opportunity to be heard in defense (or prosecution) of that interest. [14] At the same time, a defendant who litigates a case against a case against a person who purports to represent a particular class has a strong interest in being able to enforce the result against and avoid relitigation with any person who was supposedly represented in the action. That interest is given effective recognition in the legal doctrines of res judicata and collateral estoppel.

Subsection 4C(c) and 4C(d) serve these constitutional interests by providing all potential claimants in the parens patriae action with adequate notice that their interests are to be adjudicated and an opportunity to be heard in vindication of those interests. Simultaneously, they allow a defendant to plead the result as res judicata against all those represented by the State attorney general.

Under Sec. 4C(c), the attorney general in a parens patriae action is required to cause 'notice thereof to be given by publication in accordance **\*12** with applicable State law or in such manner as the court may direct: except that such notice shall be the best notice practicable under the circumstances.'

The subsection reflects a committee preference for notice by publication in all cases where such notice would adequately serve the constitutional and other interests at stake. 'Publication' should, of course, be taken in modern context to include employment of media such as radio and television, as well as traditional newspaper advertisement. [15] When there is no applicable State law, or where the manner of publication provided by State law would, in the court's judgment, be insufficient, the court should determine the method of publication.

The statutory preference for publication is qualified by the proviso that whatever form of notice adopted should be 'the best notice practicable under the circumstances.' This language is taken from Rule 23 and from major Supreme Court decisions under the due process clause. These decisions require the court to engage in a delicate balancing process to determine what is the 'best notice practicable under the circumstances.' This balancing test cannot be reduced to any specific written formula, but a few of the underlying principles are worth mentioning. Where the number of potentially affected parties is large **\*\*2582** and individual interests are small or remote, or where names and addresses are difficult or impossible to obtain, the due process clause does not

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

rigidly require individual written notice of the litigation to be sent to each. [16] Moreover, where the requirement of individual written notice would frustrate a major legislative or judicial policy, that countervailing policy is entitled to considerable weight in the determination whether publication notice will suffice. [17]

In light of these factors and the historically fluid nature of due process requirements, the committee believes that the imaginative use of publication notice will suffice in the vast bulk of parens patriae antitrust suits. The numbers of potential claimants will frequently be very large, the absence of documented proof of purchase will make identification of individual claimants in many instances difficult or impossible and publication through newspapers, radio and television will frequently quite literally be 'the best notice practicable.' At the same time, the strong public interest in enforcement of the antitrust laws against those who have injured large numbers of consumers would be frustrated by a rejection of publication notice in favor of something economically or otherwise impracticable. Only in extraordinary circumstances where publication notice would be manifestly unfair should courts require more.

Subsection 4C(d) provides that any person may exclude his claim from the parens patriae action by filing notice of intent to do so within 60 days after notice has been given. Failure to file such a notice of intent to exclude himself within the given time will result in a potential **\*13** claimant being bound by the result in the parens patriae case, absent a showing of good cause for his failure. If an individual opts out, he may bring his own action under existing law.

Thus subsection 4C(d) provides protection for the potential claimant's interest in prosecuting his own action. At the same time it safeguards the res judicata rights of defendants against claimants who fail to come forward and exclude themselves from the representational action. In this regard it protects the right of a defendant to avoid duplicative liability.

SUBSECTION 4C(e)

Under Rule 41 of the Federal Rules of Civil Procedure parties to litigation are ordinarily allowed to dismiss or compromise the action without court approval. In Rule 23 class actions, however, settlements require court approval, which is intended to offer protection to the class members. Under Sec. 4C(e) of the bill, dismissal or compromise of a parens patriae action without the approval of the court is likewise prohibited. moreover, where an action is dismissed or compromised, notice **\*\*2583** must be given 'in such manner as the court directs,' thus allowing dissatisfied claimants to object to the proposed settlement.

The committee views this section as an important safeguard for consumers in the event an attorney general seeks to terminate a parens patriae action by settlement.

Subsection 4C(e) serves a special prophylactic function, to protect members of the class from unjust or unfair settlements should their champion become fainthearted or inadequate in his representation. This section is intended to promote public confidence in the settlements of parens patriae cases by requiring court approval. As under Rule 23, it will be incumbent on the courts to consider carefully any proposed settlement and to approve that settlement only if it is fair and reasonable and in the interests of justice.

SECTION 4D AND 4E

These two sections deal with the measurement and distribution of damages once liability has been established. They must also be viewed and understood as a unit. Section 4D provides that a State attorney general may prove the damages suffered by a given class in the aggregate by statistical or other reasonable methods of estimation. Section 4E provides that any amounts left over after the satisfaction of individual claims shall be distributed as the court may direct. These sections address another major difficulty in the emerging Rule 23 case law. The potential difficulties of computing and distributing damages large classes of persons have led a number of courts to refuse to certify actions under Rule 23 on the grounds that they would be unreasonable. [18]

The fundamental premise of sections 4D and 4E with regard to the measurement, assessment and distribution of damages is that the antitrust laws should, at a minimum, provide an effective means whereby a plaintiff or plaintiff class can force a guilty defendant to part with **\*14** all measurable fruits of his illegal activity as it relates to the plaintiff, multiplied threefold to reflect the factor Congress has determined is necessary as a punishment, as a deterrent, and as an incentive. This premise is in fall accord with established concepts of damages under the antitrust laws. The cases reiterate that defendants must disgorge ill-gotten gains; [19] and the standard rules for measuring damages allow a reasonable estimate thereof once the fact of injury has been established. [20]

Section 4D draws upon this established body of law by permitting a reasonable estimation of the amount of damage to the class as a whole in a parens patriae or Rule 23 antitrust class action. After the violation and the fact of some injury to the class have been proved, Sec. 4D permits the aggregation of the claims and amounts of injury to the members of the injured class without the requirement of separate proof of the fact and amount of injury to each individual member of the class. Questions relating to causation and the fact and amount of injury to a class may require the court to address such questions separately with respect to different groups within the class of natural persons.

**\*\*2584** Section 4D acknowledges the obvious reality that 'it is far simpler to prove the amount of damages to the members of the class by establishing their total damages than by collecting and aggregating individual claims as a sum to be assessed against the defendants.' [21] In a price-fixing case, for example, frequently the only method of determining the total impact of the conspiracy will be to measure total illegal overcharges in defendants' total sales during the relevant period at the artificially high price to members of the injured class. Once this figure has been computed and assessed against the defendants, their real interests in the case is at an end. The question of how the sum assessed as damages should be distributed and employed is one in which the defendants have no interest. Their only proper remaining interest-- their res judicata rights-- are fully protected by Sec. 4C(d).

Aggregation of damages, as provided by Sec. 4D, is necessary because the proof of individual claims and amounts would be impracticable and virtually impossible. Parens patriae actions will normally be **\*15** brought in instances where thousands or millions of consumers have been injured. Few consumers keep receipts for all the goods and services they purchase or use. In fact, individual receipts or records are not available on a great many consumer goods and services. Snack food machines, for instance, do not issue receipts. Without the aggregation provisions of Sec. 4D, antitrust violators would be able to injure most consumers with impunity, even if Sec. 4C(a) parens patriae actions were permitted. Section 4D is also necessary to avoid endless trials in which thousands or millions of individuals would have to appear to prove their individual claims and the amounts of their individual injuries. The section is needed to make parens patriae cases manageable and effective. It will reduce significantly the time and expense of the parties and it will simplify the job of the court. Section 4D also permits aggregation and estimation of damages in class actions brought by private parties under Sec. 4 of the Clayton Act. In this regard, the section overcomes some problems which have arisen in cases holding that large classes and the difficulties of damage proof render litigation unmanageable.

Section 4D is fair to both plaintiffs and to defendants. It changes the method by which damages are to be measured and assessed, but **\*\*2585** the defendant is entitled to a jury trial on the same issues as before. As in other antitrust cases, the pertinent issues of fact in a parens patriae case will be whether there was a violation of the antitrust laws, whether that violation caused an injury to the plaintiffs, and what the amount of damage was.

Section 4D does not permit speculative damages, but it does permit-- as the courts have done consistently-- the damages to be estimated reasonably. There is no injustice in permitting aggregation and estimation after the defendant's liability to the class has been established. The courts have long permitted damages to be proved in antitrust cases by a 'just and reasonable estimate of the damages based on relevant data.' [22]

As the Supreme Court put it almost 45 years ago in Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563 (1931) [22a] :

Where the tort itself is of such nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts . . . (T)he risk of the uncertainty should be thrown upon the wrongdoer instead of upon the injured party.

The committee believes that a defendant who has committed an antitrust violation has no right, constitutional or otherwise, to the retention of one penny of measurable illegal overcharges or other fruits of the violation. This committee emphatically rejects the notion that our constitutional requirements are so rigid that they somehow require that each of millions of potential claimants for individually trivial sums be paraded through the court to prove his personal damages, when the best evidence and often the only appropriate measure of the scope **16** of the violation is found in the records of the defendants themselves. A number of Federal courts have agreed. [23]

While the premise of Sec. 4D is that defendants should be made to disgorge all measurable profits from an antitrust violation, Sec. 4E, which applies only to parens patriae actions, recognizes that rarely, if ever, will all potential claimants actually come forward to secure their share of the recovery. Section 4E requires that all potential claimants be given a reasonable opportunity to claim their 'appropriate portion of the damages awarded less unrecovered costs of litigation and administration.' once this claims procedure has run its course, Sec. 4E commits the disbursement of the undistributed portion of the fund, which will often be substantial, to the discretion of the court. The funds remaining should be used for some public purposes benefiting, as closely as possible, the class of injured persons.

Section 4E thus adopts a concept developed in highly imaginative fashion by a number of courts over the years. The judicial antecedents of Sec. 4E include cases in which recoveries for illegal overcharges on bus and taxi fares were applied to reduce those fares in future years. [24] and the innovative application of illegal overcharges in the antibiotic drug industry to a variety of programs beneficial to the drug-consuming **2586** public. [25] These include the expansion of State-sponsored health programs, medical research, the training of nurses and paramedical personnel, the staffing of medical and rehabilitation clinics, and other similar programs. [26]

The committee considered and squarely rejected arguments that this method of applying damage recoveries to the general benefit of the injured class is unconstitutional. [27] Once it is acknowledged that the antitrust violator has no constitutional right to retain the profits of his illegal activity, it becomes clear that he has no constitutionally protected interest in how those profits are distributed for the benefit of those whom he has injured. Using the antibiotic litigation example, neither the public nor a person who has been illegally overcharged for his antibiotics receives an unconstitutional 'windfall' at the expense of the price-fixer when the fruits of the conspiracy are used to **17** establish a medical clinic in his neighborhood. The only alternative-- retention of the profits by the adjudicated wrongdoer-- is unconscionable and unacceptable. [28]

## SECTION 4F

Section 4F promotes parens patriae actions as a major aspect of antitrust enforcement by encouraging Federal-State cooperation. The section provides that whenever the United States has brought suit in its proprietary capacity under Sec. 4A of the Clayton Act, and the U.S. Attorney General believes that the same antitrust violation may have given rise to potential parens patriae claims, he shall notify the appropriate State attorneys general. Whenever a State attorney general so requests, in order to evaluate the notice from the U.S. Attorney General or in order to bring a parens patriae action, section 4F(b) requires the U.S. Attorney General to make the Justice Department's investigative files available to the State attorneys general 'to the extent permitted by law.' This means that the files are to be made available except where specifically prohibited.

**\*\*2587**  Section 4F(b) reflects the committee's desire that the Federal Government cooperate fully with State antitrust enforcers.

The benefits of increases in Federal-State cooperation and coordination of antitrust enforcement are obvious, and are achieved in H.R. 8532 without the expenditure of additional Federal funds.

SECTION 4G

Section 4G defines the terms used in Secs. 4C, 4D, 4E, and 4F.

The term 'state attorney general' is defined as the 'chief legal officer of a State, or any other person authorized by State law' to bring parens patriae actions. Since 'State' is defined to include the District of Columbia, the Commonwealth of Puerto Rico and the territories and possessions of the United States, it thus includes the Corporation Counsel of the District of Columbia, and it includes any legally appointed special prosecutors.

The committee strongly supports the development of 'in-house' State antitrust capabilities. At the present time, regrettably, only a few States have the staff and financial ability to prosecute protracted antitrust cases without the assistance of retained private attorneys. Especially in consolidated multistate litigation, retained counsel may well be both necessary and entirely proper for parens patriae cases.

Nonetheless, the Judiciary Committee believes that certain types of fee arrangements between States and private attorneys may inhibit the development of State antitrust capabilities. The definition of State attorney general, therefore, specifically prohibits parens patriae cases  **\*18**  to be brought by 'any person employed or retained on a contingency fee basis.'

Suits in the name of a State are an exercise of State power. The committee believes that the States should exercise control over the use of State power not only in theory but in fact. If a State attorney general were able to delegate this function to private counsel on a contingency fee basis, the political and financial stake he would experience in otherwise prosecuting the action would be substantially diminished. And thus State power would be exercised without the guarantee of State supervision.

The committee bill excludes the use of fee arrangements whereby a State agrees to pay a private attorney a percentage of the recovery if the attorney wins the parens patriae case for the State. H.R. 8532 also prohibits any contracts which make the outside counsel's fee or the amount thereof contingent on the amount, if any, of the recovery or on whether there is a recovery.

The term 'State', as used in proposed Secs. 4C, 4D, 4E, and 4F includes the District of Columbia, the Commonwealth of Puerto Rico, and the territories and possession of the United States.

As used in the parens patriae sections, especially Sec. 4C, the term 'antitrust laws' excludes sections 2 and 7 of the Clayton Act. Section 2  **\*\*2588**  is the Robinson-Patman Act, which concerns price discrimination, and section 7 is the section which prohibits mergers which are anticompetitive.Assistant Attorney General Thomas Kauper recommended that these provisions be excluded from the violations for which State attorneys general could recover damages in parens patriae actions. The committee believes that evolving standards of damage assessment under these sections are in sufficiently embryonic stages that further evaluation is necessary before permitting statewide actions of a parens patriae nature. [29]

Finally, the bill defines the term 'natural persons' so as to exclude sole proprietorships and partnerships. This provision is discussed in connection with Sec. 4C(a).

SECTION 3-ADDITIONAL AMENDMENTS TO THE CLAYTON ACT

Section 3 of H.R. 8532 amends the Clayton Act's provisions concerning the statute of limitations, tolling that statute during the pendency of Government actions, and the injunction section.

Section 3(1) amends the statute of limitations provision to include parens patriae actions under section 4C within the 4-year statute of limitations.

Section 3(2) conforms the tolling provision of the Clayton Act so that States' rights of action under section 4C will be treated the same as other rights of action for which the statute of limitations is tolled (staved) pending the outcome of antitrust civil or criminal cases brought by the United States.

ATTORNEYS' FEES IN INJUNCTION CASES

Section 3(3) of H.R. 8532 provides that in parens patriae injunction cases and in all other private antitrust cases, a prevailing plaintiff shall be awarded reasonable attorneys' fees.

 **\*19** The Clayton Act is intended to provide a sufficient incentive for private parties to sue antitrust violators to redress their grievances effectively. That incentive is primarily achieved by permitting a winning plaintiff to recover treble damages for any injuries he has sustained as a result of the defendant's violation of the antitrust laws.

Another significant incentive provided in Sec. 4 of the Clayton Act is the requirement that a losing defendant in a damage case pay for a 'reasonable attorney's fee' for a winning plaintiff. Because antitrust cases are frequently lengthy and complicated, they are normally very expensive for a person to bring and maintain. Attorneys' fees, therefore, comprise by far the largest portion of the legal expenses incurred in maintaining a private antitrust lawsuit. Since the award of attorneys' fees is made in addition to the treble damage award, a prevailing plaintiff is able to pay for the services of his attorney without having to reduce his damage award. The attorneys' fee provision thus preserves the incentive for a private party to file a meritorious lawsuit.

The injunctive provisions of Sec. 16 of the Clayton Act, 15 U.S.C. 26, however, are silent on the subject of awarding attorneys' fees to prevailing plaintiffs. Until recently, the U.S. courts of appeals were split **\*\*2589** over whether attorneys' fees could be awarded in antitrust injunction cases. Such fees were disapproved in Decorative Stone Co. v. Building Trades Council of Westchester County, 23 F.2d 426 (2d Cir.), cert. denied, 277 U.S. 594 (1928), [29a] but they were approved in ITT v. General Telephone & Elec. Co., 43 U.S.L.W. 2466 (9th Cir., April 25, 1975).

The issue of attorneys' fees in Sec. 16 injunction cases was apparently disposed of on May 12, 1975, [29b] when the Supreme Court rules in Alyeska Pipeline Service Co. v. Wilderness Society, 95 S.Ct. 1612 courts have no power to award attorneys' fees in the absence of specific statutory authority. While Alyeska was not an antitrust case, the principle apparently applies to cases brought under section 16 of the Clayton Act. The court noted in Alyeska that:

It is true that under some, if not most, of the statutes providing for the allowance of reasonable fees, Congress has opted to rely heavily on private enforcement to implement public policy and to allow counsel fees so as to encourage private litigation. Fee-shifting in connection with treble damage awards under the antitrust laws is a prime example. 95 S.Ct.at 1624.

Alyeska invited Congress to enact specific legislation authorizing the award of attorneys' fees when there is a strong public policy. In the case of Sec. 16 antitrust injunction actions, there is such a compelling public policy to justify the award of attorneys' fees, and Sec. 3(3) of H.R. 8432 provides the specific legislative authority necessary.

The antitrust laws clearly reflect the national policy of encouraging private parties (whether consumers, businesses, or possible competitions) to help enforce the antitrust laws in order to protect competition through compensation of antitrust victims, through punishment of antitrust violators, and through deterrence of antitrust violations. Litigation by 'private attorneys general ' for

monetary relief and for injunctive relief has frequently proved to be an effective enforcement tool. Alyeska, however, has apparently eliminated the possibility that prevailing plaintiffs can recover attorneys' fees in meritorious and **\*20** successful injunction cases. As such, Alyeska creates a significant deterrent to potential plaintiffs bringing and maintaining lawsuits to enjoin antitrust violations. Without the opportunity to recover attorneys' fees in the event of winning their cases, many persons and corporations would be unable to afford or unwilling to bring antitrust injunction cases.

Indeed, the need for the awarding of attorneys' fees in Sec. 16 injunction cases is greater than the need in Sec. 4 treble damage cases. In damage cases, a prevailing plaintiff recovers compensation, at least. In injunction cases, however, without the shifting of attorneys' fees, a plaintiff with a deserving case would personally have to pay the very high price of obtaining judicial enforcement of the law and of the important national policies the antitrust laws reflect. A prevailing plaintiff should not have to bear such an expense. Section 3(3) of H.R. 8532, therefore, is intended to reiterate congressional encouragement for private parties to bring and maintain meritorious antitrust **\*\*2590** injunction cases. Under this section, a plaintiff who substantially prevails would be entitled to the award of 'reasonable attorneys' fees.'

In addition to private parties, States would be entitled to recover reasonable attorneys' fees whenever they prevail in Sec. 16 cases.

## VI. COMMITTEE ACTION

In March 1974, during the 93d Congress, the Judiciary Subcommittee on Monopolies and Commercial Law conducted 2 days of hearings on H.R. 12528 and H.R. 12921. Identical bills, H.R. 38 and H.R. 2850, were introduced during the 1st session of the 94th Congress, and the subcommittee held an additional 2 days of hearings in February and March 1975. The subcommittee received testimony from Assistant Attorney General for Antitrust Thomas Kauper, the Federal Trade Commission's Director of the Bureau of Competition James Halverson, National Association of Attorneys General Antitrust Committee Chairman Andrew Miller (attorney general of Virginia), representatives of the attorneys general of Connecticut, New York, Ohio, and California, and representatives of the private antitrust bar and of private industry. In addition, the subcommittee received correspondence or prepared statements from several Members of Congress, a total of 38 State attorneys general, the Mayor of Washington, D.C., the American Bar Association's Section on Antitrust Law, the Chamber of Commerce, the National Association of Manufacturers, the Consumers Union, and other persons and organizations.

In public session on May 7, 1975, after 4 days of marking up H.R. 2850, the Subcommittee on Monopolies and Commercial Law ordered 11 to 2 that the amended version, H.R. 6786, be introduced and reported favorable to the full Committee on the Judiciary. On July 10, 1975, in public session, the subcommittee agreed by unanimous consent to reconsider H.R. 6786, which was then amended. By a 9 to 2 vote, the subcommittee ordered the favorable report of a clean bill, H.R. 8532, to the full Committee on the Judiciary. In public session on July 22 and 24, 1975, the committee considered and amended H.R. 8532, and on July 24, the committee by voice vote ordered that H.R. 8532, as amended, be reported favorably to the House.

## **\*21**  VII. INFORMATION SUBMITTED PURSUANT TO RULES X AND XI

### A

Clause 2(1)(3) of Rule XI is not applicable. Section 308(a) of the Congressional Budget Act of 1974 will not be implemented this year. See last paragraph of House Rept. No. 94-25, 94th Cong., 1st session (1975).

### B

No estimate or comparison from the Director of the Congressional Budget Office as received.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

C

No related oversight findings or recommendations have been made by the Committee on Government Operations under clause 2(b)(2) of Rule X.

**\*\*2591**  D

Pursuant to Clause 2(1)(4) of Rule XI, the committee believes that H.R. 8532 can be a major force in combating the present inflationary spiral, and can have a significant anti-inflationary impact on prices and costs in the operation of the national economy.

In August of 1974, the Assistant Attorney General in charge of the Justice Department's Antitrust Division estimated that ineffective competition in the Nation's economy was adding $80 billion annually to prices paid by consumers. An FTC Commissioner estimated that consumer costs rose as much as $10 billion annually because of price fixing violations alone. The President of the United States, in October, 1974, also recognized and endorsed the anti-inflationary effect of vigorous enforcement of the antitrust laws. In the 93d Congress, the Joint Economic Committee also concluded that it is vitally important to strengthen competition not only to curtail inflation, but also to preserve the free market system itself.

Thus while the precise extent of the inflationary impact of antitrust violations cannot be determined, it is clear that they introduce foreign and artificial forces exerting upward pressure on prices. By providing more effective enforcement of the antitrust laws on a large scale, H.R. 8532 should contribute to a reduction in the level of these forces.

Compensating antitrust victims and preventing violators from being unjustly enriched will not alone reduce consumer prices and combat inflation. But, to the extent that the individual States develop credible antitrust enforcement capabilities, H.R. 8532 will help to convince potential antitrust offenders that violations will not be profitable. The bill gives the States the opportunity to deter future antitrust violations, but the deterrence will depend entirely upon the States' taking advantage of their opportunities to bring parens patriae cases. If States use H.R. 8532 responsibly and are able to deter antitrust violations, then H.R. 8532 will have an anti-inflationary impact locally and regionally, at least, by reducing imperfect competition's contribution to inflation.

**\*23**  MINORITY VIEWS OF MESSRS. HUTCHINSON, RAILSBACK,
WIGGINS, MOORHEAD, ASHBROOK, HYDE AND KINDNESS

In the name of providing a legal remedy to those who, as a practical matter, have none, this bill charges far beyond the mark to impose a mandatory irreducible fine on violators of the antitrust laws. Although this remedy is deemed civil, it partakes of both civil and criminal aspects. In doing so, the remedy fails to meet ordinary standards for civil or criminal remedies. As a civil remedy, the damages paid generally will not be paid to compensate victims for their losses. As a criminal remedy, the damages paid will be a mandatory fine, often astronomical, but irreducible, without regard for the interests of justice in the specific case. In our opinion, this legislative remedy presents the worst of both worlds.

We agree that the bill establishes no new substantive liability. No new antitrust violations are created. However, the bill does establish procedural machinery for the calculation and imposition of damage awards that undoubtedly will revolutionize the law of antitrust damages.

**\*\*2592**  It will be said that all this bill does is to allow defendants' current potential liability to become realized, and that to oppose this legislation is, in effect, to oppose the promise of section 4 of the Clayton Act, now over 60 years old. But since the logic of a single idea does not take account of competing ideas, one may by mere logical extensions step over the precipice.

APP-198

This bill does go too far. It is critical to note that this bill operates in an area where the claimants are often nameless, unidentified, unidentifiable, and ignorant of the trivial injury allegedly suffered and ignorant of who inflicted it. Nevertheless, the bill extracts from defendants three times the damages sustained. Why? Because, it is suggested, that's the way it's done in antitrust law.

But the purpose of treble-damage awards in antitrust law as we understand it is to compensate victims for their injury and to provide the incentive for bringing the action. But in the typical case envisioned by this bill-- for example, one involving price-fixing bread-- there is no incentive to bring the case even though treble damages are obtainable and there generally are no provably known victims to compensate. What the treble-damage award really is in this context is punishment.

Although we believe wrongdoers should not be allowed to retain ill-gotten gains, this principle does not compel the imposition of treble damages. It is respectfully suggested that payments exacted from defendants which, as a general matter, will not go to compensate victims for losses and which will be put to some noble purpose at the discretion of the court may be more accurately termed 'fines' than damage awards.

But the fines imposed by this bill-- and this is critical-- may not be imposed commensurate with the interests of justice. The committee  **\*24**  rejected an amendment that would have permitted the court to take into consideration the 'defendant's degree of culpability, any history of prior such conduct, ability to pay, effect on ability to continue to do business and such other matters as justice may require.' Although these actions may be filed on behalf of millions of unknown individuals and involve millions of dollars, the resultant award must be arbitrarily calculated and may not be reduced even if the interests of justice so require.

The imposition of minimum mandatory penalties may have its place in the law, but such penalties are established at the low end of the scale so as to be 'just' in every application. No so with these fines, which may run into millions of dollars. Moreover, such penalties envision a range of choices from which the court, in the interests of justice, might fashion an appropriate penalty. But this bill goes far beyond that. Under this bill once the extent of the injury is shown, the imposition of the fine, both in fact and in amount, is automatic.

It is argued that it is no concern to the defendant to what purpose the award is put after it has paid it. The argument misses the point. It should be of concern to the Congress how necessary it is to inflict possibly astronomical awards, definitionally three times the damage done, when there is no interest among the victims in bringing the case and where there are no provably known victims or only a few able to make claim against the award.

If the purpose is not to compensate in the manner of a civil remedy, it must be to punish and deter in the manner of a criminal penalty.  **\*\*2593**  But as a criminal penalty, it is harsh and arbitrary. If the major part of an award is committed to the discretion of the court to be used for some related purpose, it is difficult for us to understand how the purpose, to be fashioned by the court after the case is heard, must be satisfied by an amount which is exactly three times the damage proven to have been done by the defendant.

The purpose fashioned by the court will be a public one. For example, it is suggested that in a case involving the price-fixing of drugs, it is appropriate to commit the award to support a drug clinic. But it is patently clear that the needs of the drug clinic do not define the amount of the award. Nor does the need to compensate, nor does the need to provide incentives for enforcement, as stated before.

We believe that the public interest served by the channeling of the award to some analogous purpose must also admit other factors. For example, if the award is such that it will require the defendant to liquidate assets and lay off employees from work, there may be circumstances where the economic well-being of the community should be a matter for the court to consider in determining whether the defendant should be required to pay the full amount.

The provisions of the bill treating with the aggregation and distribution of damages are the crux of this legislation. We believe they are the wrong answer to the problem. Beyond that we believe that the bill will be subject to much abuse. By calling on the State attorneys general to champion these antitrust actions, the bill seeks to provide a political incentive for antitrust enforcement in cases where even treble damage awards provide no economic incentive.

We believe that politics and antitrust will not make a happy marriage. The temptations for the politically ambitious to ride into the **\*25** public eye as its champion against 'fat cat' antitrust violators by filing lawsuits to the sound of political trumpets may be too great. Since antitrust cases take years to complete, the politically ambitious attorney general need not fear the embarrassment of a string of losses. In any event, many of the cases will have been undoubtedly settled because of their adverse publicity and their nuisance value. The bill underscores how quickly we have forgotten the lesson many thought we learned last year that politics and antitrust should not be mixed.

Finally, in our opinion, the committee report foes not correctly describe the notice requirements of the bill. In subcommittee there was substantial debate on the quality of the notice to claimants that should be required. It was recognized that to require only publication notice would certainly streamline the lawsuit, but it was likewise conceded that such a provision without more would be susceptible to constitutional attack on due process grounds in instances where the names and addresses of the claimants were known but where mailed notice-- the best notice practicable-- was not given. Thus in order to insulate the bill from litigation over its procedure and to eliminate the notice issue as a matter of controversy the subcommittee adopted the proviso that the notice had to be the 'best notice practicable, ' which the committee ratified without further debate. Although the report correctly describes where the phrase is found in the Federal rules of civil procedure and in case law, other language of the report can be fairly read to give this phrase of art a new meaning. The repot suggests that the test for adequacy of notice is not whether it is 'best' for the claimants **\*\*2594** to be notified but whether it is 'best' for the policy of authorizing parens patriae actions against antitrust violators. Such a suggestion is foreign to the intention expressed in adopting the language explained in the report.

For these reasons we respectfully dissent.

EDWARD HUTCHISON.

TOM RAILSBACK.

CHARLES E. WIGGINS.

CARLOS J. MOORHEAD.

JOHN M. ASHBROOK.

HENRY J. HYDE.

THOMAS N. KINDNESS.

**\*27** SEPARATE VIEWS OF MS. JORDAN

I wholeheartedly support this bill. As a sponsor of the original measure I believe it represents a vital step forward in both general antitrust enforcement and consumer protection.

I am seriously concerned, however, with one amendment adopted by the committee, which may have the effect of undermining a great deal of what the bill is intended to accomplish.

Section 4G, as amended, by its definition of a 'State Attorney General, ' effectively precludes the States from employing knowledgeable private counsel on the basis of any 'contingency fee.'

The amendment has, I believe, two laudable purposes, namely to encourage States to develop their own antitrust capabilities and to protect them from potential gouging by lawyers who take cases on a flat percentage fee, thus sometimes winding up with unjustifiable windfall fees.

H.R. REP. 94-499(I), H.R. REP. 94-499(I) (1975)

I am in sympathy with both these objectives. Indeed, I would favor an amendment to provide Federal assistance to the States to develop antitrust litigation capabilities. However, I think it is unrealistic to believe that more than a handful of States will be in a position to conduct a significant amount of such litigation on their own in the forseeable future. And some States will never have the resources or the interest to hire and train the large staffs which antitrust litigation requires.

Thus there will persist for the forseeable future a critical need to enlist the services of the private bar if the bill is to have any real impact. I am concerned that a flat ban on 'contingency fees' will effectively place the services of perfectly ethical and highly knowledgeable attorneys beyond the reach of the States.

Most plaintiff's antitrust litigation, like most plaintiff's litigation in general, is conducted presently on a contingent fee basis. Section 4 of the Clayton Act anticipates this. It provides for the court to award a reasonable attorney's fee to a prevailing plaintiff, in addition to his treble damage recovery. Thus for the most part, lawyers agree to take antitrust cases for plaintiffs in return for whatever fee the court awards them at the successful conclusion or settlement of the action. Without such arrangements, there would be precious little private antitrust enforcement, since few, if any, plaintiffs will be able to pay the normal hourly rate of experienced counsel without regard to the outcome of the case. States, while in a better financial position than **2595 ordinary private plaintiffs, will likewise be unable in most instances to commit the required sums to a major case in advance, win or lose.

In some instances, contingency fees can involve overreaching. I do not personally approve of arrangements whereby the lawyer receives both the court-awarded 'reasonable fee' and a percentage of the recovery on top of that. However, I fear that the committee, by striking at the overreaching may have seriously undermined the entire scheme of treble damage prosecution.

*28 At the very best, the amendment adopted by the committee regarding 'contingency fees' creates dangerous ambiguities with respect to permissible fee arrangements. It does not specify what contingent elements must be present in order to render an arrangement unacceptable, and it is clear that not all uncertainty as to final amount will render a fee 'contingent.' Even where the lawyer is being paid an hourly charge, he will usually have little idea at the outset what his actual fee will be. The committee amendment could, therefore, be open to an interpretation which would salvage fee contracts dependent for their ultimate amount on some unknown element, such as the award of the court at the conclusion of the case. The risk is very great, however, that a court would determine that the arrangement was 'contingent' if some element of success-- either at settlement or at trial-- made the difference between a large fee for the lawyer and a low, probably uncompensatory one.

I think that risk is unacceptable, since States are certain to be dependent for many years upon the services of expert private counsel, whom they will be unable to compensate on a hourly basis without regard to the outcome of the case.

There is another vital point at stake. The contingent fee is not merely an honorable means of financing litigation for those who would otherwise be unable to afford it until the award of final judgement. It is also recognized as an important tool for weeding out the frivolous and unmeritorious case on the basis of expert assessment. It is highly unlikely that a lawyer knowledgeable in any field will be prepared to invest large quantities of his own time and effort in a case on the basis that he will be uncompensated unless he obtains a successful result for the client, unless he believes after careful examination that the case has serious merits.

This point is responsive to two concerns which have been expressed by opponents and critics of the bill. Business interests have argued that the enactment of this legislation will bring a plethora of unfounded lawsuits for enormous sums of money, which they will have to defend at great expense. And members of the committee on several occasions questioned whether the law might not present irresistible temptations to politically ambitious State officials bent on making a reputation without regard to the ultimate disposition of the cases they bring.

Neither of these unfortunate predictions is remotely likely to come true if the economic judgment of the legal experts is invoked in the evaluation of cases through the use of the contingent fee.

Hon. BARBARA JORDAN.

\* \* \* \*

N1 Hearings on H.R. 12528 and H.R. 12921 Before the Monopolies and Commercial Law Subcomm. of the House Comm. on the Judiciary, 93d Cong., 2d Sess., ser. 43, at 27 (1974) (emphasis added) (hereinafter cited as 1974 Hearings).

1a 65 S.Ct. 716, 89 .Ed 1051.

2 Hearings on H.R. 38 and H.R. 2850 Before the Monopolies and Commercial Law Subcom. of the House Comm. on the Judiciary, 94th Cong., 1st Sess., ser. 3, at 16 (1975) (hereinafter cited as 1975 Hearings).

3 State and local governmental units have been recognized as 'persons ' under Sec. 4 and its predecessor for the purpose of bringing proprietarial damage actions since at least 1906. See Chattanooga Foundary & Pipe Works v. City of Atlanta, 203 U.S. 390 (1906) 27 S.Ct. 65, 51 L.Ed. 241.

4 Some courts initially interpreted the Supreme Court's decision in Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481 (1968) 88 S.Ct. 2224, 20 L.Ed.2d 1231, rehearing denied, 87 S.Ct. 64, 393 U.S. 901, 21 L.Ed.2d 188, and 89 S.Ct. 65, 393 U.S. 901, 21 L.Ed.2d 188, to limit standing to sue to the first purchaser of a price-fixed product. In Hanover Shoe the Court refused to allow a defendant to escape liability by asserting that his purchaser had passed on any illegal overcharge to the ultimate consumer. A major concern of the Court was to prevent the violator from retaining the ill-gotten gains of his illegal behavior. The Court noted that if the first purchaser was denied standing the ultimate consumers would have neither the incentive nor the ability to bring effective actions for return of the overcharges. 392 U.S. at 494.

More recently lower courts have recognized the pro-enforcement thrusts of Hanover Shoe and have held that plaintiffs at lower levels of the chain of distribution may attempt to prove that illegal overcharges were in fact passed on to them. See, e.g., In re Western Liquid Asphalt Cases, 487 F.2d 191 (9th Cir. 1973).

5 The amount of the overcharge, of course, may not represent either the total social cost of the violation or the total of recoverable damages flowing therefrom. See, e.g., Flintkote Co., v. Lysfjord, 246 F.2d 368, 389-90 (9th Cir.), cert. denied, 355 U.S. 835 (1957) 78 S.Ct. 54, 2 .Ed.2d 46.

6 See, e.g., Dodson Stores, Inc. v. American Bakeries Co., 1973-1 Trade Cases, #74,387 (SD.NY. 1973) (all purchasers of bread in the New York metropolitan area); United Egg Producers v. Bauer Int'l Corp., 312 F.Supp. 319 (S.D.N.Y. 1970) (all purchasers of eggs in the United States).

7 1975 hearings, 16.

8 A single antitrust violation, it must be noted, may cause multiple injuries, and each individual or business which is injured in its business or property has a right to recover damages. A violation occurring at the retail level may, in addition to raising consumer prices, injure other retailers who compete with the violators.

8a 93 S.Ct. 2291, 36 .Ed.2d 974.

9 474 F.2d at 777.

10 Georgia v. Pennsylvania R.R., 324 U.S. 439, 443 (1945) 65 S.Ct. 716, 89 .Ed. 1051. For an historical discussion of the parens patriae doctrine in American law, see Hawaii v. Standard Oil Co., 405 U.S. 251, 257-260 (1972) 92 S.Ct. 885, 31 L.Ed.2d 184.

11 See, e.g., California v. Frito-Lay, Inc., 474 F.2d 774 (9th Cir.), cert. denied, 412 U.S. 908 (1973) 93 S.Ct. 2291, 36 L.Ed.2d 974.

12 As one court put it, 'it is difficult to imagine a better representative of the retail consumers within a State than 'State's attorney general.' In re Antibiotic Antitrust Actions, 333 F.Supp. 278, 280 (S.D.N.Y. 1971).

H.R. REP. 94-499(I), H.R. REP. 94-499(I) (1975)

13 Once a parens patriae action has been converted to a class action under subsection 4C(b), it is not intended to limit in any fashion the existing discretion of the court to define classes and subclasses and to designate appropriate parties to provide adequate representation. To the contrary, the intent is to make clear the breadth of that discretion. Thus the attorney general could, under subsection 4C(b), be designated to act as a representative of a class including business entities, notwithstanding the fact that he could not initially have brought a subsection 4C(a) action on behalf of such entities. Likewise, even though subsection 4C(b) makes it clear that the attorney general or the State need not actually be a member of the class he acts to represent, such membership would not be a disqualification. Thus where the State itself is a purchaser, the attorney general could represent its proprietarial interests and the interests of those of its citizens included in the class designated by the court.

14 See, e.G., Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314-15 (1950) 70 S.Ct. 652, 94 L.Ed. 865.

15 See Nolop v. Volpe, 333 F.Supp. 1364 (D.S.D. 1971).

16 Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, (1950) 70 S.Ct. 652, 94 L.Ed. 865; Hansberry v. Lee, 311 U.S. 32 (1940) 61 S.Ct. 115, 85 L.Ed. 22; Supreme Tribe of Ben-Hur v. Cauble, 255 U.S. 356 (1921) 41 S.Ct. 338, 65 L.Ed. 673; Gonzales v. Cassidy, 474 F.2d 67 (5th Circ. 1973); Berland v. Mack, 48 F.R.D. 121 (S.D.N.Y. 1969); Miller, Problems of Giving Notice in Class Actions, 58 F.R.D. 313, 314-15 (1972); Comment, 62 Geo.L.J. 1123, 1169, and n. 256 (1974); Note, 87 Harv.L.Rev. 589, 590 (1974).

17 Boddie v. Connecticut, 401 U.S. 371, 377-78 (1971) 91 S.Ct. 780, 28 L.Ed.2d 113, conformed to 329 F.Supp. 844; Armstrong v. Manzo, 380 U.S. 545, 550 (1965) 85 S.Ct. 1187, 14 L.Ed.2d 62; Schroeder v. City of New York, 371 U.S. 208, 212-13 (1962) 83 S.Ct. 279, 9 L.Ed.2d 255, 89 A.L.R.2d 1398; Sniadack v. Family Finance Corp., 395 U.S. 337, 339 (Harlan, J. Concurring) 89 S.Ct. 1820, 23 L.Ed.2d 349.

18 See, e.g., Boshes v. General Motors Corp., 59 F.R.D. 589 (N.D. Ill. 1973); City of Philadelphia v. American Oil Co., 53 F.R.D. 45 (D.N.J. 1971).

19 As the Supreme Court put it in a pivotal case:

'Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain. Failure to apply it would mean that the more grievous the wrong done, the less likelihood there would be a recovery.

'The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.'

Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264-65 (1946) 66 S.Ct. 574, 90 L.Ed. 652, rehearing denied 66 S.Ct. 815, 327 U.S. 817, 90 L.Ed. 1040. See also Continental Ore Co. v. Union Carbide & Carbon Co. 370 U.S. 690, 697 (1962) 82 S.Ct. 1404, 8 L.Ed. 2d 777; Bordonaro Bros. Theatres, Inc. v. Paramount Pictures, Inc., 176 F.2d 594, 597 (2d Cir. 1949); Banana Distributors, Inc. v. United Fruit Co., 162 F.Supp. 32, 46 (S.D.N.Y. 1958), rev'd on other grounds, 269 F.2d 790 (2d Circ. 1959).

20 See e.g., Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123-24 (1969) 89 S.Ct. 1562, 23 L.Ed.2d 129, on remand 418 F.2d 21, reversed 91 S.Ct. 795, 401 U.S. 321, 28 L.Ed.2d 77, rehearing denied 91 S.Ct. 1247, 401 U.S. 1015, 28 L.Ed.2d 552; Bigelow v. RKO Radio Pictures, Inc., supra note 19; Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555 (1931) 51 S.Ct. 248, 75 L.Ed. 544; Eastman Kodak Co. v. Southern Photo Materials Co. 273 U.S. 359 (1927) 47 S.Ct. 400, 71 L.Ed. 684.

21 In re Antibiotics Antitrust Actions, 33 F.Supp. 278, 281 (S.D.N.Y. 1971); see e.g., West Virginia v. Chas. Pfizer & Co., 440 F.2d 1079 (2d Cir.), cert. denied, 404 U.S. 871 (1971) 92 S.Ct. 81, 30 L.Ed.2d 115; Hartford Hospital v. Chas. Pfizer & Co., 1971 Trade Case #73,561 (S.D.N.Y. 1971).

H.R. REP. 94-499(I), H.R. REP. 94-499(I) (1975)

22 Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264 (1946) 66 S.Ct. 574, 90 L.Ed. 652, rehearing denied 66 S.Ct. 815, 327 U.S. 817, 90 L.Ed. 1040.

22a 51 S.Ct. 248, 75 L.Ed. 544.

23 The Seventh Circuit put the matter succinctly:

'To permit the defendants to contest liability with each claimant in a single, separate suit, would, in many cases give defendants an advantage which would be almost equivalent to closing the door of justice to all small claimants. This is what we think the class suit was to prevent.'

Hohmann v. Packard Instrument Co., 399 F.2d 711, 715, (7th Cir. 1968), quoting Weeks v. Bareco Oil Co., 125 F.2d 84, 90 (7th Circ. 1941); See Dickenson v. Burnham, 197 F.2d 973 (2d Cir.), cert. denied, 344 U.S. 875 (1952) 73 S.Ct. 169, 97 L.Ed. 678; In re Antibiotics Antitrust Actions, 333 F.Supp. 278, 282, 283, 289 (S.D.N.Y. 1971). See also 1974 Hearings at 29; 1975 Hearings at 17 (testimony of Messrs. Kauper and Halverson).

Statistical and sampling methods are, of course, commonly used in evidence in Federal courts in a variety of contexts. See Manual for Complex Litigation Sec. 2.712 (1973). See also Brown Shoe Co. v. United States, 370 U.S. 294, 339-343 (1962) 82 S.Ct. 1502, 8 L.Ed.2d 510; United States v. United Shoe Mach. Corp., 110 F.Supp. 295, 305-07 (D. Mass. 1953); Rosado v. Wyman, 322 F.Supp. 1173 (E.D.N.Y. 1970), aff'd 437 F.2d 631 (2d Cir. 1971) (citing numerous cases and other authorities 322 F.Supp. at 1180-81); Zippo Mfg. Co. v. Rogers Imports, Inc., 217 F.Supp. 670, 680-84 (S.D.N.Y. 1963).

24 See Bebchick v. Public Utilities Comm'n., 318 F.2d 187 (D.C. Cir.), cert. denied 373 U.S. 913 (1963) 83 S.Ct. 1304, 10 L.Ed.2d 414; Daar v. Yellow Cab Co., 67 Cal.2d 695, 433 F.2d 732, 63 Cal.Rptr. 224 (1967).

25 In re Antibiotics Antitrust Actions, 333 F.Supp. 278 (S.D.N.Y. 1971).

26 Hearings on S. 1284 Before the Subcomm. on Antitrust and Monopoly of the Senate Comm. on the Judiciary, 94th Cong., 1st Sess., at 343 (1975).

27 Compare West Virginia v. Chas. Pfizer & Co., 440 F.2d 1079 (2d Cir. 1971), cert. denied 404 U.S. 871 (1971) 92 S.Ct. 81, 30 L.Ed.2d 115 (approving antitrust class action settlement embodying fluid class recovery concept with Eisen v. Carlisle & Jacqueline, 479 F.2d 1005, 1018 (2d Cir. 1973), vacated and remanded on other grounds, 417 U.S. 156 (1947) 94 S.Ct. 2140, 40 L.Ed.2d 732 (expressing due process doubts concerning what that court termed 'fluid class recovery').

28 The committee disapproves decisions such as City of Philadelphia v. American Oil Co., 53 F.R.D. 45 (D.N.H. 1971); Illinois Bell Tel. Co. v. Slattery, 102 F.2d 58 (7th Cir. 1939), and In re Hotel Telephone Charges, 500 F.2d 86 (9th Cir. 1975), in which, if allegations were accepted as true, defendants were permitted to retain millions of dollars in ill-gotten gains because of the apparent difficulties involved in manageability or in devising an equitable scheme for distribution of the overcharges to specific individual claimants. For added insight on the facts involved in the Illinois Bell outcome, see Newberg, Class Action Legislation, 9 Harv.J.Legis. 217, 231 (1972); Comment, 39 U.Chi.L.Rev. 448, 451, & n. 13 (1972); Note, 31 Md.L.Rev. 354, 361, & n. 50 (1971).

29 See Gottesman v. General Motors Corp., 414 F.2d 956 (2d Cir.), cert. denied, 403 U.S. 911 (1969) 91 S.Ct. 2008, 29 L.Ed.2d 689, rehearing denied 92 S.Ct. 29, 404 U.S. 876, 30 L.Ed.2d 125 (first holding that damages may be recovered under Sec. 7).

29a 48 S.Ct. 530, 72 L.Ed. 1005.

29b 421 U.S. 240, 44 L.Ed.2d 141.

(Note: 1. PORTIONS OF THE SENATE, HOUSE AND CONFERENCE REPORTS, WHICH ARE DUPLICATIVE OR ARE DEEMED TO BE UNNECESSARY TO THE INTERPRETATION OF THE LAWS, ARE OMITTED. OMITTED MATERIAL IS INDICATED BY FIVE ASTERISKS: *****. 2. TO RETRIEVE REPORTS ON A PUBLIC LAW, RUN A TOPIC FIELD SEARCH USING THE PUBLIC LAW NUMBER, e.g., TO(99-495))

H.R. REP. 94-499(I), H.R. REP. 94-499, H.R. Rep. No. 499(I), 94TH Cong., 2ND Sess. 1976, 1976 U.S.C.C.A.N. 2572, 1975 WL 12520 (Leg.Hist.)

**End of Document**                                   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**

**WASHINGTON, DC 20549**

**FORM 8-K**

**CURRENT REPORT PURSUANT**
**TO SECTION 13 OR 15(d) OF THE**
**SECURITIES EXCHANGE ACT OF 1934**

Date of report (Date of earliest event reported): **December 11, 2024**

# The Kroger Co.

(Exact Name of Registrant as Specified in Its Charter)

| **Ohio** | **No. 1-303** | **31-0345740** |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| **1014 Vine Street** | **45202** |
|---|---|
| **Cincinnati, OH** | |
| (Address of Principal Executive Offices) | (Zip Code) |

**(513) 762-4000**
(Registrant's Telephone Number, Including Area Code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities Registered Pursuant to Section 12(b) of the Act:

| Title of Each Class | Trading Symbol(s) | Name Of Each Exchange On Which Registered |
|---|---|---|
| Common Stock, $1.00 par value per share | KR | New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 1.02**          **Termination of a Material Definitive Agreement.**

On December 11, 2024, The Kroger Co. ("Kroger" or the "Company") delivered a notice (the 'Termination Notice") to Albertsons Companies, Inc. ("Albertsons") terminating the previously announced Agreement and Plan of Merger, dated as of October 13, 2022, by and among the Company, Albertsons and Kettle Merger Sub, Inc. ("Merger Sub"), which provided for the merger of Merger Sub with and into Albertsons, with Albertsons as the surviving corporation and a direct, wholly owned subsidiary of Kroger (the "Merger" and such agreement, the "Merger Agreement"). Capitalized terms used and not defined herein have the meanings assigned to them in the Merger Agreement. The Termination Notice further notified Albertsons that a prior termination letter sent by Albertsons to Kroger, dated December 10, 2024, is not an effective termination. In connection with the Termination Notice, Kroger notified Albertsons that Kroger has no obligation to pay the Parent Termination Fee because Albertsons has failed to perform and comply in all material respects with its covenants under the Merger Agreement.

The Company's termination of the Merger Agreement followed the December 10, 2024 decision of United States District Court for the District of Oregon in the case Federal Trade Commission et al. v. The Kroger Company and Albertsons Companies, Inc. (Case No.: 3:24-cv-00347-AN), whereby the court issued a preliminary injunction enjoining the consummation of the Merger.

**Item 7.01.**          **Regulation FD Disclosure.**

On December 11, 2024, the Company issued a press release regarding the matters described in Item 1.02 of this Current Report on Form 8-K, a copy of which is filed as Exhibit 99.1.

**Item 9.01**          **Financial Statements and Exhibits**

(d) Exhibits

| | |
|---|---|
| 99.1 | Press Release, dated December 11, 2024 |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document). |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**THE KROGER CO.**

By:   /s/ Christine S. Wheatley
Name: Christine S. Wheatley
Title:  Senior Vice President, General Counsel and Secretary

Date: December 11, 2024

28422 CONGRESSIONAL RECORD—SENATE *November 4, 1999*

By Mr. MURKOWSKI:

S. 1855. A bill to establish age limitations for airmen; to the Committee on Commerce, Science, and Transportation.

By Mr. SCHUMER (for himself and Mr. TORRICELLI):

S. 1856. A bill to amend title 28 of the United States Code to authorize Federal district courts to hear civil actions to recover damages or secure relief for certain injuries to persons and property under or resulting from the Nazi government of Germany; to the Committee on the Judiciary.

By Mr. DOMENICI:

S. 1857. A bill to provide for conveyance of certain Navajo Nation lands located in northwestern New Mexico and to resolve conflicts among the members of such Nation who hold interests in allotments on such lands; to the Committee on Indian Affairs.

By Mr. BREAUX:

S. 1858. A bill to revitalize the international competitiveness of the United States-flag maritime industry through tax relief; to the Committee on Finance.

By Mr. GRAMS:

S. 1859. A bill to amend the Internal Revenue Code of 1986 to provide a tax credit to taxpayers investing in economically distressed rural communities, and for other purposes; to the Committee on Finance.

By Mr. GRAMS:

S. 1860. A bill to amend the Internal Revenue Code of 1986 to expand income averaging to small agriculture-related businesses; to the Committee on Finance.

S. 1861. A bill to amend the Internal Revenue Code of 1986 to provide comprehensive tax relief for small family farmers, and for other purposes; to the Committee on Finance.

By Mr. JEFFORDS:

S. 1862. A bill entitled "Vermont Infrastructure Bank Program"; to the Committee on Environment and Public Works.

By Mr. BAUCUS:

S. 1863. A bill to amend the Internal Revenue Code of 1986 to provide an incentive to small businesses to establish and maintain qualified pension plans by allowing a credit against income taxes for contributions to, and start-up costs of, the plan; to the Committee on Finance.

By Mr. BURNS:

S. 1864. A bill to amend the Internal Revenue Code of 1986 to provide a tax credit to primary health providers who establish practices in health professional shortage areas; to the Committee on Finance.

By Mr. DEWINE (for himself and Mr. DOMENICI):

S. 1865. A bill to provide grants to establish demonstration mental health courts; to the Committee on the Judiciary.

By Mr. SMITH of New Hampshire (for himself, Mr. BAUCUS, Mr. CRAPO, Mr. REID, Mr. CHAFEE, Mr. LOTT, Mr. DASCHLE, Mr. WARNER, Mr. INHOFE, Mr. THOMAS, Mr. BOND, Mr. VOINOVICH, Mr. BENNETT, Mrs. HUTCHISON, Mr. MOYNIHAN, Mr. LAUTENBERG, Mr. GRAHAM, Mr. LIEBERMAN, Mrs. BOXER, Mr. WYDEN, Ms. SNOWE, Ms. COLLINS, Mr. REED, Mr. DODD, Mr. KENNEDY, Mr. KERRY, Mr. LEAHY, Mr. JEFFORDS, and Mr. GREGG):

S. 1866. A bill to redesignate the Coastal Barrier Resources System as the "John H. Chafee Coastal Barrier Resources System"; considered and passed.

By Mr. SMITH of New Hampshire:

S.J. Res. 37. A joint resolution urging the President to negotiate a new base rights agreement with the Government of Panama in order for United States Armed Forces to be stationed in Panama after December 31, 1999; read the first time.

---

## SUBMISSION OF CONCURRENT AND SENATE RESOLUTIONS

The following concurrent resolutions and Senate resolutions were read, and referred (or acted upon), as indicated:

By Mr. INHOFE (for himself, Mr. WARNER, Mr. ROBERTS, and Mr. LOTT):

S. Res. 220. A resolution expressing the sense of the Senate regarding the February 2000 deployment of the U.S.S. Eisenhower Battle Group and the 24th Marine Expeditionary Unit to an area of potential hostilities and the essential requirements that the battle group and expeditionary unit have received the essential training needed to certify the warfighting proficiency of the forces comprising the battle group and expeditionary unit; to the Committee on Armed Services.

---

## STATEMENTS OF INTRODUCED BILLS AND JOINT RESOLUTIONS

By Mr. CAMPBELL:

S. 1851. A bill to amend the Elementary and Secondary Education Act of 1965 to ensure that seniors are given an opportunity to serve as mentors, tutors, and volunteers for certain programs; to the Committee on Health, Education, Labor, and Pensions.

THE SENIORS AS VOLUNTEERS IN OUR SCHOOLS ACT OF 1999

Mr. CAMPBELL. Mr. President, today I introduce the "Seniors As Volunteers in Our Schools Act of 1999," a bill which will be an important step in ensuring that our schools provide a safe and caring place for our children to learn and grow. This bill will help build lasting partnerships between our local school systems, our children and our country's growing number of senior citizens.

Under the bill, school administrators and teachers are encouraged to use qualified seniors as volunteers in federally funded programs and activities authorized by the Elementary and Secondary Education Act (ESEA.) It specifically encourages the use of seniors as volunteers in the safe and drug free schools programs, Indian education programs, the 21st Century Community before- and after-school programs and gifted and talented programs. I believe the best way to get older Americans to serve as volunteers is to ask them. My bill does just that.

The Seniors as Volunteers in Our Schools Act creates no new programs; rather it suggests another allowable use of funds already allocated. The discretion whether to take advantage of this new resource continues to remain solely with the school systems.

Studies show that consistent guidance by a mentor or caring adult can help reduce teenage pregnancy, substance abuse and youth violence. Evidence also shows that the presence of adults on playgrounds, and in hallways and study halls, stabilizes the learning environment. And recently, the Colorado School Safety Summit, convened by Governor Bill Owens, recommended connecting each child to a caring adult as a way to reduce youth violence.

Our country is in the midst of an age revolution. There are twice as many older adults today as there were 30 years ago. America now possesses not only the largest, but also the healthiest, best-educated, and most vigorous group of seniors in history.

In the years ahead, an increasing number of us will be living decades longer than our own parents and grandparents. We need to think of those extra years of life as a resource. I believe seniors can be role models and share the wisdom, experience, and skills they have acquired over a lifetime of learning.

I know firsthand of the importance of mentoring based on my own experiences as a teacher. A mentor can have a profound positive impact on a child's life.

What better way to expand the number of mentors than to invite our seniors/elders to volunteer in schools? What better way to make our schools safer for our children than to have more adults visibly involved?

I do not expect this legislation to solve all the problems confronting our schools today. But, I see it as a practical way to help make our schools safer, more caring places for our children. If our institutions create opportunities that allow them to make a genuine contribution, I believe America's growing senior population can play an important role in supporting our nations' schools. And, older adults have what the working-age population lacks: time.

I urge my colleagues to support passage of this legislation.

I ask unanimous consent that the bill be printed in the RECORD.

There being no objection, the bill was ordered to be printed in the RECORD, as follows:

S. 1851

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Seniors as Volunteers in Our Schools Act".

**SEC. 2. REFERENCES.**

Except as otherwise specifically provided, whenever in this Act an amendment or repeal is expressed in terms of an amendment to, or a repeal of, a section or other provision, the reference shall be considered to be made to a section or other provision of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6301 et seq.).

**SEC. 3. GOVERNOR'S PROGRAMS.**

Section 4114(c) (20 U.S.C. 7114(c)) is amended—

(1) in paragraph (11), by striking "and" after the semicolon;

(2) by redesignating paragraph (12) as paragraph (13); and

(3) by inserting after paragraph (11) the following:

''(12) drug and violence prevention activities that use the services of appropriately qualified seniors for activities that include mentoring, tutoring, and volunteering; and''.

**SEC. 4. LOCAL DRUG AND VIOLENCE PREVENTION PROGRAMS.**

Section 4116(b) (20 U.S.C. 7116(b)) is amended—

(1) in paragraph (2), by inserting ''(including mentoring by appropriately qualified seniors)'' after ''mentoring'';

(2) in paragraph (2)(C)—

(A) in clause (ii), by striking ''and'' after the semicolon;

(B) in clause (iii), by inserting ''and'' after the semicolon; and

(C) by adding after clause (iii) the following:

''(iv) drug and violence prevention activities that use the services of appropriately qualified seniors for such activities as mentoring, tutoring, and volunteering;'';

(3) in paragraph (4)(C), by inserting ''(including mentoring by appropriately qualified seniors) after ''mentoring programs''; and

(4) in paragraph (8), by inserting ''and which may involve appropriately qualified seniors working with students'' after ''settings''.

**SEC. 5. NATIONAL PROGRAMS.**

Section 4121(a) (20 U.S.C. 7131(a)) is amended—

(1) in paragraph (10), by inserting '', including projects and activities that promote the interaction of youth and appropriately qualified seniors'' after ''responsibility''; and

(2) in paragraph (13), by inserting '', including activities that integrate appropriately qualified seniors in activities, such as mentoring, tutoring, and volunteering'' after ''title''.

**SEC. 6. GIFTED AND TALENTED CHILDREN.**

Section 10204(b)(3) (20 U.S.C. 8034(b)(3)) is amended by striking ''and parents'' and inserting '', parents, and appropriately qualified senior volunteers''.

**SEC. 7. 21ST CENTURY COMMUNITY LEARNING CENTERS.**

Section 10904(a)(3) (20 U.S.C. 8244(a)(3)) is amended—

(1) in subparagraph (D), by striking ''and'' after the semicolon;

(2) by redesignating subparagraph (E) as subparagraph (F); and

(3) by inserting after subparagraph (D) the following:

''(E) a description of how the school or consortium will encourage and use appropriately qualified seniors as volunteers in activities identified under section 10905; and''.

**SEC. 8. AUTHORIZED SERVICES AND ACTIVITIES.**

Section 9115(b) (20 U.S.C. 7815(b)) is amended—

(1) in paragraph (6), by striking ''and'' after the semicolon;

(2) in paragraph (7), by striking the period and inserting ''; and''; and

(3) by inserting after paragraph (7) the following:

''(8) activities that recognize and support the unique cultural and educational needs of Indian children, and incorporate appropriately qualified tribal elders and seniors.''.

**SEC. 9. IMPROVEMENTS OF EDUCATIONAL OPPORTUNITIES FOR INDIAN CHILDREN.**

Section 9121(c) (20 U.S.C. 7831(c)) is amended—

(1) by redesignating subparagraph (K) as subparagraph (L);

(2) in subparagraph (J), by striking ''or'' after the semicolon; and

(3) by inserting after subparagraph (J) the following:

''(K) activities that recognize and support the unique cultural and educational needs of Indian children, and incorporate appropriately qualified tribal elders and seniors; or''.

**SEC. 10. PROFESSIONAL DEVELOPMENT.**

Section 9122(d)(1) (20 U.S.C. 7832(d)(1)) is amended by striking the period the second place it appears and inserting '', and may include programs designed to train tribal elders and seniors.''.

**SEC. 11. NATIVE HAWAIIAN COMMUNITY-BASED EDUCATION LEARNING CENTERS.**

Section 9210(b) (20 U.S.C. 7910(b)) is amended—

(1) by redesignating paragraph (3) as paragraph (4);

(2) in paragraph (2), by striking ''and''; and

(3) by inserting after paragraph (2) the following:

''(3) programs that recognize and support the unique cultural and educational needs of Native Hawaiian children, and incorporate appropriately qualified Native Hawaiian elders and seniors; and''.

**SEC. 12. ALASKA NATIVE STUDENT ENRICHMENT PROGRAMS.**

Section 9306(b) (20 U.S.C. 7935(b)) is amended—

(1) by redesignating paragraphs (3) and (4) as paragraphs (4) and (5), respectively; and

(2) by inserting after paragraph (2) the following:

''(3) activities that recognize and support the unique cultural and educational needs of Alaskan Native children, and incorporate appropriately qualified Alaskan Native elders and seniors;''.

_____

By Mr. BENNETT:

S. 1852. A bill to authorize the Secretary of the Interior to enter into contracts with the Weber Basin Water Conservancy District, Utah, to use Weber Basin Project facilities for the impounding, storage, and carriage of nonproject water for domestic, municipal, industrial, and other beneficial purposes; to the Committee on Energy and Natural Resources.

THE USE OF WEBER BASIN PROJECT FACILITIES FOR NONPROJECT WATER

● Mr. BENNETT. Mr. President, I am pleased to take a step in addressing the long-term water needs of Summit County, Utah. The bill I am introducing today authorizes the Secretary of the Interior to enter into contracts with the Weber Basin Water Conservancy District. This legislation would permit non-federal water intended for domestic, municipal, industrial, and other uses to utilize federal facilities of the original Weber Basin Project for various purposes such as storage and transportation.

In this case, the Smith Morehouse Dam and Reservoir was constructed by the Weber Basin Water Conservancy District in the early 1980's using local funding resources in order to create a supply of non-federal project water. However, it has been determined that there is currently a need to deliver approximately 5,000 acre feet of this non-federal Smith Morehouse water in conjunction with approximately 5,000 acre feet of federal Weber Basin project water to the Snyderville Basin area of Summit County, Utah and to Park City, Utah.

In 1996, the Weber Basin Water Conservancy District entered into a Memorandum of Understanding and Agreement to deliver this water approximately 14 miles from Weber Basin Weber River sources within a certain time frame and dependent upon the execution of an Interlocal Agreement with Park City and Summit County. The Warren Act requires that legislation be enacted to enable the District to move ahead with this agreement with Summit County and Park City to deliver the water utilizing built Weber Basin Project facilities built by the Bureau of Reclamation.

There is an immediate need for the delivery of water to this area. The Utah State Engineer halted the approval of new groundwater developments in the area last year. At the same time, Summit county is experiencing tremendous growth; in fact it is one of the highest growth areas in the state. The areas to be served are within the area taxed by the Weber Basin District, and there is a definite need for a public entity to build a project to supply an adequate, reliable, and cost effective water delivery project to meet the future demands of this area.

Since there is precedent allowing the wheeling of non-federal water through federal facilities, my colleagues should realize that this is a non-controversial piece of legislation. Therefore, I hope that Congress will move quickly to pass this legislation next session and I look forward to working closely with my colleagues on the Energy Committee to move it quickly.●

_____

By Mr. HATCH (for himself, Mr. KOHL, and Mr. DEWINE):

S. 1854. A bill to reform the Hart-Scott-Rodino Antitrust Improvements Act of 1976; to the Committee on the Judiciary.

THE HART-SCOTT-RODINO ANTITRUST IMPROVEMENTS ACT OF 1999

Mr. HATCH. Mr. President, I am pleased to introduce today the Hart-Scott-Rodino Antitrust Improvements Act of 1999. I also am pleased to note that joining with me in sponsoring this important bipartisan legislation are Senators DEWINE and KOHL the chairman and ranking member of the Antitrust, Business Rights and Competition Subcommittee of the Committee on the Judiciary. I thank my colleagues on both sides of the aisle for their efforts and cooperation in working to craft this balanced reform measure which is long overdue.

The Hart-Scott-Rodino Antitrust Improvements Act of 1976 requires companies contemplating a merger or acquisition to file a premerger notification

with the Antitrust Division of the Department of Justice or the Federal Trade Commission if the size of the companies and the size of the proposed transaction are greater than certain monetary thresholds. These monetary thresholds have not been changed—even for inflation—since the legislation was originally enacted in 1976, over 23 years ago. When the statute was first enacted, Congress intended to limit the scope of the Hart-Scott-Rodino Act to very large companies involved in very large transactions. At that time, the House Judiciary Committee reported that the statute would apply "only to the largest 150 mergers annually: These are the most likely to 'substantially lessen competition'—the legal standard of the Clayton act." However, because the monetary thresholds in the statute have never been updated, nearly 5,000 transactions were reported.

Because these monetary thresholds have not been kept current, companies frequently are required to notify the Antitrust Division and the FTC of proposed transactions that do not raise competitive issues. As a result, the agencies are required to expend valuable resources performing needless reviews of transactions that were never intended to be reviewed. In short, current law unnecessarily imposes a costly regulatory and financial burden upon companies, particularly upon small businesses, as well as a sizable drain on the resources of the agencies. Because of the unnecessarily low monetary thresholds, the current Act simply fails to reflect the true economic impact of mergers and acquisitions in today's economy.

In addition, after a premerger notification is filed, the Hart-Scott-Rodino Act imposes a 30-day waiting period during which the proposed transaction may not close and the Antitrust Division or the FTC conducts an antitrust investigation. Prior to the expiration of this waiting period, the agency investigating the transaction may make a "second request"—a demand for additional information or documentary material that is relevant to the proposed transaction. Unfortunately, many second requests require the production of an enormous volume of materials, many of which are unnecessary for even the most comprehensive merger review. Complying with such second requests has become very burdensome, often costing companies in excess of $1 million to comply. Second requests also extend the waiting period for an additional 20 days, a period of time which does not begin to run until the agencies have determined that the transacting companies have "substantially complied" with the second request. This procedure results in many lawful transactions being unnecessarily delayed for extended periods of time.

Mr. President, the legislation that I am introducing today will correct these problems with the Hart-Scott-Rodino Act. First, the legislation increases the size-of-transaction threshold from $15 million to $35 million, effectively exempting from the Act's notification requirement mergers and acquisitions that, based on the FTC's data, do not pose any competitive concerns. Such mergers make up at least one-third of transactions reported in 1999. Therefore, this modest legislation provides significant regulatory and financial relief for small- and medium-sized companies. In addition, the legislation indexes the threshold for inflation, so that the problem of an expanding economy outgrowing the statute's monetary threshold will not recur.

In addition to providing regulatory and financial relief for companies, another purpose of this legislation is to ensure that the Antitrust Division and the FTC efficiently allocate their finite resources to those transactions that truly deserve antitrust scrutiny. To ensure budget neutrality, the legislation adjusts the amount of the filing fee that parties must submit with their notification. For transactions valued between $35 million and $100 million, the filing fee remains unchanged at $45,000; for transactions valued at more than $100 million, the filing fee is increased to $100,000. I have worked with the business community to ensure that this filing fee adjustment is fair by imposing a higher fee on transactions which likely will require more of the agencies' resources to review. Although I would prefer that the filing fees be eliminated completely, in the interest of seeing the reforms in this bill become law, this legislation does not include such a measure.

Second, this legislation reforms the second request process by limiting the scope of the information and documents that the agencies may require transacting companies to produce. Under this legislation, second requests must be limited to information that (1) is not unreasonably cumulative or duplicative and (2) does not impose a cost or burden on the transacting parties that substantially outweighs any benefit to the agencies in conducting their antitrust review. If a company believes that the second request does not meet this standard, then that company may petition a United States magistrate judge for review of the second request. Similarly, if the company produces information and documents pursuant to a second request, but the agency determines that the company has not "substantially complied" with the request, then the company also may petition the magistrate judge for a determination on substantial compliance. To ensure that proposed transactions are not unreasonably delayed, the bill provides deadlines by which the agency must notify a company of its failure to comply with a second request and also imposes certain controls, so that the process is not tied up in litigation by either the transacting party or the government.

Finally, this legislation requires that the Antitrust Division and the FTC jointly report to Congress annually regarding the second request process and jointly publish guidelines on how companies can comply with second requests.

Mr. President, the bill that I am introducing today sets forth reforms to the Hart-Scott-Rodino Act that are long overdue. It provides significant regulatory and financial relief for businesses, while ensuring that transactions that truly deserve antitrust scrutiny will continue to be reviewed. As this bill moves through the legislative process, I remain willing to address any concerns any of my colleagues may have, and look forward to working with the Administration to see that this proposed legislation becomes law, thereby providing relief for small business that is long overdue. I urge my colleagues to support the Hart-Scott-Rodino Antitrust Improvements Act of 1999.

Mr. KOHL. Mr. President, I rise today to co-sponsor the Hart-Scott-Rodino Antitrust Improvements Act of 1999 and to commend Chairman HATCH for his efforts on this legislation. This measure would amend the Hart-Scott-Rodino Act and make several changes to enhance the merger review process undertaken by the Antitrust Division of the Department of Justice and the Federal Trade Commission. We believe that reforms to this statute are long overdue—the threshold hasn't been changed since the statute's enactment in 1976—but we also view the proposals in this legislation as a starting point, and not necessarily the last word on this subject.

The Hart-Scott-Rodino Act is crucial to the enforcement of competition policy in today's economy—it ensure that the antitrust agencies have sufficient time to review mergers and acquisitions prior to their completion. The statute requires that, prior to consummating a merger or acquisition of a certain minimum size, the companies involved must formally notify the antitrust agencies and must provide certain information regarding the proposed transaction. For those transactions covered by the Act, the parties to a merger or acquisition may not close their transaction until the expiration of a thirty day waiting period after making their Hart-Scott-Rodino Act filing. This waiting period may be extended by the antitrust agencies requesting additional information from the parties to the transaction in which case, under current law, the parties may not complete the deal until twenty days after supplying the government with the requested information.

*November 4, 1999*          CONGRESSIONAL RECORD—SENATE          **28425**

While this statute has a very laudable purpose, especially with the tremendous numbers of mergers and acquisitions taking place in recent years, some of its provisions are in need of revision. Most importantly, while inflation has caused the value of a dollar to drop by more than a half in the past 25 years, the monetary test that subjects a transaction to the provisions of the statute has not been revised since the law's enactment in 1976. As a result, many transactions that are of a relatively small size and pose little antitrust concerns are nevertheless swept into the ambit of the Hart-Scott-Rodino review process. This legislation would raise the size of transaction covered by the Hart-Scott-Rodino Act from $15 million to $35 million. This will both lessen the agencies' burden of reviewing small transactions unlikely to seriously affect competition and enable the agencies to allocate their resources to properly focus on those transactions most worthy of scrutiny. Further, exempting smaller transactions from the Hart-Scott-Rodino process will significantly lessen regulatory burdens and expenses imposed on small businesses. The parties to these smaller transactions will no longer need to pay the $45,000 filing fee—or face the often even more onerous legal fees and other expenses typically incurred in preparing a Hart-Scott-Rodino filing—for mergers and acquisitions that usually don't pose any competitive concerns.

In exempting this class of transactions from Hart-Scott-Rodino review, however, it is important that we not cause the antitrust agencies to lose the funding they need to carry out their increasingly demanding mission of enforcing the nation's antitrust laws. Therefore, we have attempted to ensure that our measure is revenue-neutral—indeed, it would raise filing fees for transactions valued at over $100,000,000, which makes sense because these transactions require more scrutiny. In considering this legislation, of course, we will need to carefully study the budgetary implications of this reform to ensure that our goal of revenue-neutrality has been met. As this measure moves forward, however, we ought to consider whether bigger deals of, say, $1 billion or $10 billion and over should require higher fees.

This legislation makes other changes designed to enhance the efficiency of the pre-merger review process. The waiting period has been extended from twenty to thirty days after the parties' compliance with the government's request for additional information, a more realistic waiting period in this era of increasingly complex mergers generating enormous amounts of relevant information and documents. As in the Federal Rules of Civil Procedure, when a deadline for action occurs on a weekend or holiday, the deadline

is extended to the next business day. This simple provision will eliminate gamesmanship by parties who currently may time their compliance so that the waiting period ends on a weekend or holiday, effectively shortening the waiting period to the previous business day.

Mr. President, some have expressed concerns regarding the difficulties and expense imposed on business in complying with allegedly overly burdensome or duplicative government requests for additional information. So we believe that it is reasonable to consider methods to prevent abuse of this process by overbroad or unreasonable requests. Therefore, this legislation includes provisions to amend the statute to add a right of appeal to a U.S. Magistrate Judge to adjudicate disputes regarding the propriety of government requests for additional information. We have not reached any final conclusions regarding the wisdom of these provisions; they are certainly worth "floating" as ideas, and the process will determine if they should be included as part of a final product. Further, we should keep in mind that if this right of appeal provision is enacted it will impose significant additional litigation burdens on the antitrust agencies which might require a corresponding increase in funding for these agencies. Our goal, again, is to improve the functioning of the pre-merger review system which is so vital to antitrust enforcement and, in that context, this provision deserves at least a supportive "look."

Mr. President, let me make one additional point. We recognize that all will not agree with the necessity or efficacy of all of these reform proposals. We are, of course, willing to consider any modification to this legislation that will advance our goals of a more efficient merger review process. But virtually everyone agrees that Hart-Scott-Rodino needs to be updated and we're pleased that this measure moves us forward.

───────

By Mr. MURKOWSKI.
S. 1855. A bill to establish age limitations for airmen; to the Committee on Commerce, Science, and Transportation.

THE AIRLINE PILOT RETIREMENT AGE

Mr. MURKOWSKI. Mr. President, I rise to introduce legislation that attempts to diminish the scope of a problem that is facing our air transport industry, namely a critical shortage of pilots. The pilot shortage is starting to have effects in many rural states.

In response to this problem. I am today introducing a bill that would repeal the Federal Aviation Administration (FAA) rule which now requires pilots who fly under Part 121 to retire at age 60. Under my legislation, pilots in excellent health would be allowed to continue to pilot commercial airliners until their 65th birthday.

The Age 60 rule was instituted 40 years ago when commercial jets were first entering service. The rule was established without the benefit of medical or scientific studies or public comment. The most recent study, the results of which were released in 1993, examined the correlation between age and accident rate as pilots approach 60. That study found no increase in accidents.

The FAA contends that although science does not dictate retirement at the age of 60, it is the age range when sharp increases in disease mortality and morbidity occur. In FAA's view it is too risky to allow older pilots to fly the largest aircraft, carrying the greatest number of passengers over the longest non-stop distances, in the highest density traffic.

However, 44 countries worldwide have relaxed then age 60 rule within the last ten years primarily because the pilot shortage is a worldwide phenomenon. Many of these air carriers currently fly into U.S. airspace.

One of the ways carriers are attempting to adapt to the shortage is to lower their flight time requirements. In my view, this is a risk factor the FAA should be concerned about.

How did this shortage occur? The reason is simple: There has been an explosive growth of the major airlines worldwide, and there's a shortage of military pilots who used to feed the system. In addition, there is an aging pilot pool that must retire at age 60.

Add to this domino effect the decline in the number of people learning to fly, due primarily to the cost, and the pool of available pilots has shrunk.

The shortage acutely affects my home state of Alaska because we depend on air transport far more than any other state. Rural residents in Alaska have no way out other than by air service. There are no rural routes, state or interstate highways serving most rural residents in Alaska and the airplane for many of them is their lifeline to the outside world.

The pilot shortage has left Alaskan carriers scrambling for pilots. Alaska's carriers must hire from the available pilot pool in the lower 48. Many of these pilots view flying in Alaska as a stepping stone that allows them to build up flight time. Although they get great flying experience in my home state, in nearly all instances when a pilot gets a higher-pay job offer with a larger carrier in the lower 48, he leaves Alaska.

According to the Alaska Air Carriers Association, raising the retirement age to 65 will help alleviate the shortage and keep experienced pilots flying and serving rural Alaskans.

Mr. President, I would note that what is happening across the country is that the major carriers are luring pilots from commuter airlines, who in turn recruit from the air charter and

corporate industry, who in turn hire flight instructors, agriculture pilots, etc. Which leaves rural carriers strapped. The big fish are feeding off the little ones.

Small carriers simply cannot compete with the salaries, benefits and training costs of the major carriers. They simply do not have the financial resources.

According to figures provided by the Federal Aviation Administration, there were 694,000 pilots in 1988 and 616,342 in 1997. Within that number, private pilot certificates fell from approximately 300,000 in 1988 to 247,604 in 1997. Commercial certificates, like air taxi and small commuter pilots, fell from 143,000 in 1988 to 125,300 in 1997. The number of total pilots in Alaska fell from more than 10,000 in 1988 to approximately 8,700 in 1997.

However, light is beginning to show at the end of the tunnel.

Organizations such as the Aircraft Owners and Pilots Association (AOPA) and the General Aviation Manufacturers Association (GAMA) have been monitoring this shortage for some time and have stepped up to the plate to get people interested in flying. AOPA has started a pilot mentoring program in 1994 and approximately 30,000 have entered the program. GAMA's ''Be a Pilot'' program is starting to bring more potential pilots into flight training.

Even the Air Force is starting to institute new programs to keep pilots.

In Alaska, as a result of a precedent-setting program involving Yute Air, the Association of Village Council Presidents, the University of Alaska, Anchorage, Aero Tech Flight Service, Inc., and the FAA, a program was developed to train rural Alaska Natives to fly. Seven are on their way to pilot careers.

Also, the number of students working on pilot licenses at the University's Flight Technology program has almost doubled in two years.

It is my hope that the shortage has hit rock bottom. But even so, it will take years before a cadre of qualified pilots is ready to take to the friendly skies.

Mr. President, the time has come for Congress to wrestle with this problem. As long as a pilot can pass the rigorous medical exam, he or she should be allowed to fly. Air service is critical to keep commerce alive, especially in rural states.

I ask unanimous consent that the text of the bill be printed in the RECORD.

There being no objection, the bill was ordered to be printed in the RECORD, as follows:

S. 1855

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. AGE AND OTHER LIMITATIONS.**

(a) GENERAL.—Notwithstanding any other provision of law, beginning on the date that is 30 days after the date of enactment of this Act—

(1) section 121.383(c) of title 14, Code of Federal Regulations, shall not apply;

(2) no certificate holder may use the services of any person as a pilot on an airplane engaged in operations under part 121 of title 14, Code of Federal Regulations, if that person is 65 years of age or older; and

(3) no person may serve as a pilot on an airplane engaged in operations under part 121 of title 14, Code of Federal Regulations, if that person is 65 years of age or older.

(b) CERTIFICATE HOLDER.—For purposes of this section, the term ''certificate holder'' means a holder of a certificate to operate as an air carrier or commercial operator issued by the Federal Aviation Administration.

By Mr. DOMENICI:

S. 1857. A bill to provide for conveyance of certain Navajo Nation lands located in northwestern New Mexico and to resolve conflicts among the members of such Nation who hold interests in allotments on such lands; to the Committee on Indian Affairs.

● Mr. DOMENICI. Mr. President, I am pleased today to be introducing the Bisti PRLA Dispute Resolution Act, which will resolve a conflict regarding coal mining leases in New Mexico. A coal company and the Navajo Nation have been deadlocked within the Department of Interior appeals process regarding preference right lease applications (PRLAs) in the Bisti region of northwestern New Mexico. When enacted, this legislation will resolve a complex set of issues arising from legal rights the Arch Coal Company acquired in federal lands, which are now situated among lands which constitute tribal property and the allotments of members of the Navajo Nation. Both the company and the Nation support this legislation to resolve the situation.

There are many reasons the solution embodied in this bill achieves broad benefits to the interested parties and the public. It will allow the Navajo Nation to complete the land selections that were made in 1981 to promote tribal member resettlement following the partition of lands in Arizona. It also guarantees that Arch Coal, Inc. will be compensated for the economic value of its coal reserves. An independent panel will make recommendations to the Secretary of Interior regarding the fair market value of the coal reserves, gives the company bidding rights, protects a state's financial interest in its share of federal Mineral Leasing Act payments, and allows the Navajo Nation full fee ownership in their lands.

The Secretary of Interior will issue a certificate of bidding rights to Arch Coal upon relinquishment of its interests in the PLRAs. The amount of that certificate will equal the fair market value of the coal reserves as defined by the Department of Interior's regulations. A panel consisting of representatives of the Department of Interior, Arch Coal, and the Governors of Wyo-

ming and New Mexico will help determine fair market value. While the Interior Department is authorized to exchange PRLAs for bidding rights, the Department has not done so, largely because of the difficulty it perceives in determining the fair market value of the coal reserves. The panel method in this legislation will promote the objectivity of that process.

Upon the relinquishment of the PRLAs and the issuance of a certificate of bidding rights, the Department of Interior will execute patents to the Navajo Nation of the selected lands encompassed by the PRLAs. This is a win-win situation for all parties involved; is endorsed by the affected parties, and is a fair resolution to this ongoing problem. I hope for prompt action on this legislation early next year.●

———

By Mr. BREAUX:

S. 1858. A bill to revitalize the international competitiveness of the United States-flag maritime industry through tax relief; to the Committee on Finance.

THE NATIONAL SECURITY SEALIFT
ENHANCEMENT ACT OF 1999

Mr. BREAUX. Mr. President, I am pleased today to introduce tax reform legislation that is long overdue in the effort to revitalize the nation's fourth arm of defense, the United States flag merchant marine. My bill, the National Security Sealift Enhancement Act of 1999, would provide targeted tax relief to enable the United States-flag oceangoing commercial fleet to better compete with foreign-flag commercial fleets registered in nations that have exempted companies from taxes.

Currently, United States companies operating U.S.-flag vessels, and foreign-flag vessels operating under the application of national laws such as Japan or France, are forced to compete against companies that operate vessels under flag-of-convenience registries. Flag-of-convenience shipping registries operate under the legal authority of nations such as Panama, Liberia, Vanuatu, or the Marshall Islands, and attract shipping companies because of the deminimus regulatory costs they impose on companies operating under their flag. All of these nations exempt companies from taxes on income, and employees operating on the vessels do not pay tax on income they earn working aboard. The owners can employ foreign laborers, usually from third world nations, for very little pay, often working in unacceptable conditions. Additionally, the vessel operations are not required to comply with rigorous United States Coast Guard safety and environmental standards, and these operators use private companies to inspect their vessels to ensure that they are in compliance with international safety laws.

*November 4, 1999*    CONGRESSIONAL RECORD—SENATE    **28427**

Mr. President, we are all well aware of the critical role played by the American maritime industry in the economy of Louisiana and our nation. In my home state alone, the total economic impact of that industry was estimated in 1997 to be over $28 billion, supporting approximately 230,000 jobs throughout Louisiana. That economic impact constitutes almost 30 percent of the total gross state product for Louisiana. Louisiana companies were among the first to respond to the nation's call to provide for the rapid transport of critical equipment, munitions, and supplies to the Persian Gulf in those critical days following the 1990 Iraqi invasion of Kuwait. However, the very existence of the American flag fleet, and thus the related economic and national defense benefits that flow from that fleet, are severely threatened by U.S. tax rules that unfairly hamper and restrict American shipping.

I have worked from the first days of my arrival in the Congress to strengthen the U.S.-flag maritime industry and level the playing field in international shipping. Despite the well-intentioned efforts of the Congress, the Maritime Administration and other federal agencies to support the U.S.-flag commercial fleet, unfavorable and clearly noncompetitive U.S. tax policies have led to the continuing decline of that fleet. In fact, according to statistics maintained by the Maritime Administration, the commercial fleet of the United States has fallen into 11th place internationally, in total carrying capacity, ranking behind those fleets of Panama, Liberia, Malta, the Bahamas, and other nations who offer significant economic and tax advantages to their commercial vessels and crews.

These same issues have also plagued other industrialized nations that operate shipping under the application of national laws and policies. For instance, between the period of 1975 and 1992, the national flag fleet operations in terms of deadweight carrying capacity decreased by 94% in the United Kingdom, 98% in Norway, 73% in France, 53% in Germany, 73% in Sweden, 98% in Denmark, and 47% in Japan.

In order to combat decreases in the operation of shipping under national registries, nations have taken steps to provide direct subsidies or indirect support schemes that help owners offset the higher costs of operating under national laws. Other nations, such as Denmark and Norway, have created what are called international registries, or open registries, and have reduced taxes and societal costs to help offset the costs as compared to flag-of-convenience vessels. Out of the eleven largest shipping registries, by carrying capacity, seven operate as flag-of-convenience registries or open registries. The other four nations are Greece, Japan, the People's Republic of China

(which operates it's fleet as a governmentally controlled entity), and the United States.

Mr. President, what is even more astounding is that the percentage of cargoes carried by U.S.-flag vessels in the foreign trades has also declined precipitously. At the end of World War II, after we had been forced to rebuild our shipping fleet in order to satisfy our defense logistic needs, almost 60 percent of the U.S. oceanborne commerce in international trade was carried aboard U.S.-flag vessels. Today, that figure is a mere 3 percent. To state this another way, 97 out of every 100 tons of cargo imported into or exported from the United States is carried aboard foreign-flagged ships. Through a wide variety of favorable tax incentives, including in most cases a total exemption from taxation, many foreign jurisdictions have succeeded in developing commercial maritime fleets that far exceed the capacity of that in the U.S.

What truly concerns me is that the United States is rapidly undermining its very national security through its failure to enable the U.S.-flag commercial fleet to compete on an equal footing with foreign-flagged shipping. I recognize the strategic importance of the U.S.-flag merchant marine and American merchant mariners, and share the views of other senior political and military leaders that the ability of the U.S. to move its military personnel and supplies overseas quickly and effectively is critical to its national security. The United States cannot rely on foreign allies to achieve our national security objectives. We must be able to act decisively, and to act unilaterally, when our strategic interests are jeopardized. To ensure the maritime industry's ability to accomplish this crucial task, the military utilizes privately-owned U.S.-flagged commercial vessels to supplement the military's own transportation systems in both times of war and peace. Without such capability, the military would have to build and operate, at a significantly greater expense to the government and ultimately the U.S. taxpayers, many more military transport vessels to ensure it can effectively respond to military contingencies in a timely manner.

As General Colin Powell so accurately observed following the Persian Gulf War in 1991:

Our [nation's] strategy requires us to be able to project power quickly and effectively across the oceans to deal with the crisis we couldn't avoid or predict. Sealift will be critical to fulfilling this strategic requirement. . . . [The military] also acknowledges that the merchant marine and our maritime industry will be vital to our national security for many years to come . . .

We simply cannot stand idly by while this vital national security asset is undercut through counter productive tax policies that do not allow the U.S.-flag commercial fleet to operate competitively, in the most competitive of all

markets—that of international shipping.

Mr. President, to preserve that vital national security asset, I believe it is essential to provide a tax environment for U.S.-flag carriers that more closely approaches the favorable tax treatment provided by other maritime nations to their own merchant fleets, while also creating incentives for the construction of new vessels in U.S. shipyards. Foreign tax incentives have significantly undermined the ability of the U.S. to retain a viable commercial fleet for defense purposes and to enhance the balance of trade. By way of example, U.S.-flag commercial vessel operators must pay a 34 percent tax on corporate income and a 50 percent duty on vessel repairs made in foreign countries; they are subject to far more restrictive (and expensive) Coast Guard and other federal operational and safety requirements; and their crewmembers engaged in the foreign trade do not share in the tax relief otherwise provided to U.S. citizens working abroad. On the other hand, owners of foreign-flagged vessels of the Bahamas, Liberia, Malta, Panama and many other countries are totally exempt from any taxation. Therefore, it is not surprising to see that the Bahamas, Liberia, Malta, and Panama have four of the top five commercial fleets in the world, and that vessel owners from around the world regularly register their ships with these countries to avoid taxation.

Mr. President, I am not proposing to exempt U.S.-flag vessel owners from U.S. income taxes. Rather, I have developed a comprehensive yet narrowly focused bill that provides the necessary relief to alleviate the tax burden on the U.S.-flag fleet. This legislation is designed to provide a tax environment for U.S.-flag carriers that more closely approaches the favorable tax treatment provided by other maritime nations to their own merchant fleets. The Act includes the following provisions:

Capital Construction Fund (CCF) Reform. Title I of the Act would expand the CCF to allow deposits of earnings from U.S. flag, foreign-built ships to be contributed to a CCF for the construction of vessels in the United States. Qualified withdrawals from a CCF would continue to apply only to U.S. built vessels and would be expanded to include vessels that operate between coastwise points of the United States. Contributions to a CCF would no longer be treated as preference items under the corporate Alternative Minimum Tax, and owners of U.S. flag ships would also be allowed to deposit into a CCF the duty arising from foreign ship repairs.

Election to Expense U.S. Flag Vessels. Significantly, for the majority of the foreign flag commercial fleet, there is no applicable depreciation schedule for commercial vessels because those

vessels and their corporate owners and operators are totally exempt from income taxation. Other maritime nations that impose income taxes on commercial vessel operations still have depreciation schedules far more lenient than the anti-competitive 10-year schedule applicable to U.S.-flagged vessels. Therefore, in order to be internationally competitive, Title II of the Act would enable the owner of any U.S. flag vessel engaged in the international trade of the U.S. to fully deduct that vessel in the year in which the vessel is acquired and documented under the U.S. flag.

Seaman's Wage Exclusion. Consistent with the current policies and objectives of Section 911 of the Internal Revenue Code, Title III of the Act would extend the foreign earned income exclusion to American merchant mariners by changing the definition of ''foreign country'' to include a principal place of employment aboard a commercial vessel operating outside the United States, and amending the foreign residence test to include work aboard a vessel.

Alternative Minimum Tax Relief. In order to be internationally competitive, Title IV of the Act repeals the Alternative Minimum Tax (AMT) with respect to shipping income. No such tax exists on commercial vessels of any other foreign country, and the changes proposed elsewhere in this Act will essentially be meaningless if the AMT continues to apply to shipping income.

Deduction of Expenses. The existing tax provision which permits the deduction of expenses with respect to conventions, seminars or other meetings on U.S.-flag cruise vessels traveling between U.S. ports would be expanded by Title V of the Act to include U.S.-flag cruises between the United States and foreign ports.

Mr. President, absent the tax reforms in the attached proposal, U.S.-flag carriers in Louisiana and elsewhere will continue to face a formidable tax cost disadvantage against foreign flag carriers, who pay little or no tax to their home countries. This cost differential impedes the ability of U.S.-flag carriers to compete in the global marketplace, as evidenced by the ever growing share of non-U.S. flag carriers currently carrying this nation's imports and exports. It is universally recognized that key components of a strong national economy are a strong national merchant marine and shipyard industrial base, and it is now appropriate to alleviate the tax burden on the U.S.-flag fleet and simultaneously promote construction in U.S. shipyards. I urge my colleagues to strongly support this legislation for the good of our American flag fleet and the security of our nation.

I ask unanimous consent that the text of this bill be printed in the RECORD.

There being no objection, the bill was ordered to be printed in the RECORD, as follows:

S. 1858

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the ''National Security Sealift Enhancement Act of 1999''.

**SEC. 2. TABLE OF CONTENTS.**

The table of contents for this Act is as follows:

Sec. 1. Short title.
Sec. 2. Table of contents.

TITLE I—CAPITAL CONSTRUCTION FUND

Sec. 101. Amendments of Internal Revenue Code of 1986.
Sec. 102. Amendment to the Tariff Act of 1930.
Sec. 103. Effective date.

TITLE II—ELECTION TO EXPENSE UNITED STATES FLAG VESSELS

Sec. 201. Election to expense certain United States flag vessels.

TITLE III—INCOME EXCLUSION FOR MERCHANT SEAMEN

Sec. 301. Income of merchant seaman excludable from gross income as foreign earned income.

TITLE IV—EXEMPTION FROM ALTERNATIVE MINIMUM TAX

Sec. 401. Exemption from alternative minimum tax for corporations that operate United States flag vessels.

TITLE V—CONVENTIONS OF UNITED STATES-FLAG CRUISE SHIPS

Sec. 501. Conventions on United States-flag cruise ships.

TITLE I—CAPITAL CONSTRUCTION FUND

**SEC. 101. AMENDMENTS OF INTERNAL REVENUE CODE OF 1986.**

(a) TREATMENT OF CERTAIN LEASE PAYMENTS.—

(1) Paragraph (1) of section 7518(e) of the Internal Revenue Code of 1986 is amended by striking ''or'' at the end of subparagraph (B), by striking the period at the end of subparagraph (C) and inserting '', or'', and by inserting after subparagraph (C) the following new subparagraph:

''(D) the payments of amounts which reduce the principal amount (as determined under regulations) of a qualified lease of a qualified vessel or container which is part of the complement of an eligible vessel.''.

(2) Paragraph (4) of section 7518(f) of such Code is amended by inserting ''or to reduce the principal amount of any qualified lease'' after ''indebtedness''.

(b) AUTHORITY TO MAKE DEPOSITS UNDER THE TARIFF ACT OF 1930.—

(1) Paragraph (1) of section 7518(a) of such Code is amended by striking ''and'' at the end of subparagraph (C), by striking the period at the end of subparagraph (D) and inserting '', and'', and by adding at the end the following new subparagraph:

''(E) the amount elected for deposit under subsection (i) of section 466 of the Tariff Act of 1930 (19 U.S.C. 1466).''.

(2) Subparagraph (A) of section 7518(d)(2) of such Code is amended to read as follows:

''(A) amounts referred to in subsections (a)(1)(B) and (E).''.

(c) AUTHORITY TO MAKE DEPOSITS FOR PRIOR YEARS BASED ON AUDIT ADJUSTMENTS.—Subsection (a) of section 7518 of such Code is amended by adding at the end thereof the following new paragraph:

''(4) DEPOSITS FOR PRIOR YEARS.—To the extent permitted by joint regulations, deposits may be made in excess of the limitation described in paragraph (1) (and any limitation specified in the agreement) for the taxable year if, by reason of a change in taxable income for a period taxable year that has become final pursuant to a closing agreement or other similar agreement entered into during the taxable year, the amount of the deposit could have been made for such prior taxable year.''.

(d) TREATMENT OF CAPITAL GAINS AND LOSSES.—

(1) Paragraph (3) of section 7518(d) of such Code is amended to read as follows:

''(3) CAPITAL GAIN ACCOUNT.—The capital gain account shall consist of—

''(A) amounts representing long-term capital gains (as defined in section 1222) on assets held in the fund, reduced by

''(B) amounts representing long-term capital losses (as defined in such section) on assets held in the fund.''.

(2) Subparagraph (B) of section 7518(d)(4) of such Code is amended to read as follows:

''(B)(i) amounts representing short-term capital gains (as defined in section 1222) on assets held in the fund, reduced by

''(ii) amounts representing short-term capital losses (as defined in such section) on assets held in the fund,''.

(3) Subparagraph (B) of section 7518(g)(3) of such Code is amended by striking ''gain'' and all that follows and inserting ''long-term capital gain (as defined in section 1222), and''.

(4) The last sentence of subparagraph (A) of section 7518(g)(6) of such Code is amended by striking ''20 percent (34 percent in the case of a corporation)'' and inserting ''the rate applicable to net capital gain under such section 1(h)(1)(C) or 1201(a), as the case may be''.

(e) COMPUTATION OF INTEREST WITH RESPECT TO NONQUALIFIED WITHDRAWALS.—

(1) Subparagraph (C) of section 7518(g)(3) of such Code is amended—

(A) by striking clause (i) and inserting the following new clause:

''(i) no addition to the tax shall be payable under section 6651, and'', and

(B) by striking ''paid at the applicable rate (as defined in paragraph (4))'' in clause (ii) and inserting ''paid in accordance with section 6601''.

(2) Subsection (g) of section 7518 of such Code is amended by striking paragraph (5) and (6) as paragraphs (4) and (5), respectively.

(3) Subparagraph (A) of section 7518(g)(5) of such Code, as redesignated by paragraph (2), is amended by striking ''paragraph (5)'' and inserting ''paragraph (4)''.

(f) OTHER CHANGES.—

(1) Paragraph (2) of section 7518(b) of such Code is amended by striking ''interest-bearing securities approved by the Secretary'' and inserting ''interest-bearing assets and other income-producing assets (including accounts receivable) approved by the Secretary''.

(2) The last sentence of paragraph (1) of section 7518(e) of such Code is amended by striking ''and containers'' each place it appears.

(3) Subparagraph (B) of section 543(a)(1) of such Code is amended to read as follows:

''(B) interest on amounts set aside in a capital construction fund under section 607 of the Merchant Marine Act, 1936 (46 App. U.S.C. 1177), or in a construction reserve fund under section 511 of such Act (46 App. U.S.C. 1161),''.

(4) Subsection (c) of section 56 of such Code is amended by striking paragraph (2) and by redesignating paragraph (3) as paragraph (2).

(5) Section 7518(e) is amended by adding at the end the following new paragraph:

"(3) QUALIFIED WITHDRAWAL.—In the case of amounts in any fund as of the date of the enactment of this paragraph, and any earnings thereon, for purposes of this subsection, the term 'qualified withdrawal' has the meaning given such term by applying subsection (i)(2) as of such date."

"(g) DEFINITIONS.—Subsection (i) of Section 7518 of such Code is amended to read as follows:

"(i) DEFINITIONS.—

"(1) IN GENERAL.—Except as provided in paragraph (2), terms used in this section shall have the same meaning as in section 607(k) of the Merchant Marine Act, 1936.

"(2) OTHER DEFINITIONS.—For the purposes of this section—

"(A) The term 'eligible vessel' means any vessel—

"(i) documented under the laws of the United States, and

"(ii) operated in the foreign or domestic commerce of the United States or in the fisheries of the United States.

"(B) QUALIFIED VESSEL.—The term 'qualified vessel' means any vessel—

"(i) constructed in the United States and, if reconstructed, reconstructed in the United States,

"(ii) documented under the laws of the United States, and

"(iii) which the person maintaining the fund agrees with the Secretary will be operated in the fisheries of the United States, or in the United States foreign, Great Lakes, noncontiguous domestic trade, or other oceangoing domestic trade between two coastal points in the United States or in support of operations conducted on the Outer Continental shelf.

"(C) VESSEL.—The term 'vessel' includes containers or trailers intended for use as part of the complement of one or more eligible vessels and cargo handling equipment which the Secretary determines is intended for use primarily on the vessel. The term 'vessel' also includes an ocean-going towing vessel or an ocean-going barge or comparable towing vessel or barge operated on the Great Lakes.

"(D) FOREIGN COMMERCE.—The terms 'foreign commerce' and 'foreign trade' have the meanings given such terms in section 905 of the Merchant Marine Act, 1936, except that these terms should include commerce or trade between foreign ports.

"(E) QUALIFIED LEASE.—The term 'qualified lease' means any lease with a term of at least 5 years."

**SEC. 102. AMENDMENT TO THE TARIFF ACT OF 1930.**

Section 466 of the Tariff Act of 1930 (19 U.S.C. 1466) is amended by adding at the end the following new subsection:

"(i) ELECTION TO DEPOSIT DUTY INTO A CAPITAL CONSTRUCTION FUND IN LIEU OF PAYMENT TO THE SECRETARY OF THE TREASURY.—At the election of the owner or master of any vessel referred to in subsection (a) of this section which is an eligible vessel (as defined in section 7518(i)(2) of the Internal Revenue Code of 1986), the portion of any duty imposed by subsection (a) which is deposited in a fund established under section 607 of the Merchant Marine Act, 1936 shall be treated as paid to the Secretary of the Treasury in satisfaction of the liability for such duty."

**SEC. 103. EFFECTIVE DATE.**

(A) IN GENERAL.—Except as otherwise provided in this section, the amendments made by this title shall apply to taxable years ending after the date of the enactment of this Act.

(b) CHANGES IN COMPUTATION OF INTEREST.—The amendments made by section 101(e) shall apply to withdrawals made after December 31, 1998, including for purposes of computing interest on such a withdrawal for periods on or before such date.

(c) QUALIFIED LEASES.—The amendments made by section 101(a) shall apply to leases in effect on, or entered into after, December 31, 1998.

(d) AMENDMENT TO THE TARIFF ACT OF 1930.—The amendment made by section 102 shall apply with respect to entries not yet liquidated by December 31, 1998, and to entries made on or after such date.

## TITLE II—ELECTION TO EXPENSE UNITED STATES FLAG VESSELS

**SEC. 201. ELECTION TO EXPENSE CERTAIN UNITED STATES FLAG VESSELS.**

(a) IN GENERAL.—Part VI of subchapter B of chapter 1 of the Internal Revenue Code of 1986 is amended by inserting after section 179A the following new section:

**"SEC. 179B. DEDUCTION FOR UNITED STATES FLAG VESSELS.**

"(a) TREATMENT AS EXPENSES.—A taxpayer may elect to treat the cost of any vessel that is a qualified United States flag vessel as an expense which is not chargeable to its capital account.

"(b) YEAR IN WHICH DEDUCTION ALLOWED.—The deduction under subsection (a) shall be allowed for the taxable year in which the vessel first becomes a qualified United States flag vessel.

"(c) DEFINITIONS.—

"(1) QUALIFIED UNITED STATES FLAG VESSEL.—For purposes of this section, the term 'qualified United States flag vessel' means a United States flag vessel that is operated exclusively in the foreign trade of the United States.

"(2) COST.—For purposes of this section, the term 'cost' means an amount equal to the lesser of—

"(A) the purchase price of the vessel, or

"(B) the adjusted basis of the vessel, determined under section 1011, at the time that the vessel becomes a qualified United States flag vessel.

"(d) BASIS REDUCTION.—

"(1) IN GENERAL.—For purposes of this title, the basis of any property shall be reduced by the portion of the cost of such property taken into account under subsection (a).

"(2) ORDINARY INCOME RECAPTURE.—For purposes of section 1245, the amount of the deduction allowable under subsection (a) with respect to any property which is of a character subject to the allowance for depreciation shall be treated as a deduction allowed for depreciation under section 167."

(b) CONFORMING AMENDMENTS.—

(1) Paragraph (1) of section 263(a) of such Code is amended by striking "or" at the end of subparagraph (G), by striking the period at the end of subparagraph (H) and inserting "; or", and by adding at the end the following new subparagraph:

"(I) expenditures for which a deduction is allowed under section 179B.".

(2) Subparagraph (B) of section 312(k)(3) of such Code is amended by striking "or 179A" each place it appears and inserting ", 179A, or 179B".

(3) Subparagraph (C) of section 1245(a)(2) of such Code is amended by inserting "179B," after "179A,".

(4) The table of sections for part VI of subchapter B of chapter 1 of such Code is amended by inserting after the item relating to section 179A the following new item:

"Sec. 179B. Deduction for United States flag vessels."

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to taxable years ending after the date of the enactment of this Act.

## TITLE III—INCOME EXCLUSION FOR MERCHANT SEAMEN

**SEC. 301. INCOME OF MERCHANT SEAMAN EXCLUDABLE FROM GROSS INCOME AS FOREIGN EARNED INCOME.**

(a) SECTION 911 EXCLUSION.—Section 911(d) of the Internal Revenue Code of 1986 (relating to citizens or residents of the United States living abroad) is amended by redesignating paragraph (9) as paragraph (10) and by inserting after paragraph (8) the following:

"(9) APPLICATION TO CERTAIN MERCHANT MARINE CREWS.—In applying this section to an individual who is a citizen or resident of the United States and who is employed for a minimum of 90 days during a taxable year as a regular member of the crew of a vessel or vessels owned, operated, or chartered by a United States citizen—

"(A) the individual shall be treated as a qualified individual without regard to the requirements of paragraph (1); and

"(B) any earned income attributable to services performed by that individual so employed on such vessel while it is engaged in transportation between the United States and a foreign country or possession of the United States shall be treated (except as provided by subsection (b)(1)(B)) as foreign earned income regardless of where payments of such income are made.''

(b) EFFECTIVE DATE.—The amendment made by this section shall apply to taxable years ending after the date of the enactment of this Act.

## TITLE IV—EXEMPTION FROM ALTERNATIVE MINIMUM TAX

**SEC. 401. EXEMPTION FROM ALTERNATIVE MINIMUM TAX FOR CORPORATIONS THAT OPERATE UNITED STATES FLAG VESSELS.**

(a) IN GENERAL.—Section 55 of the Internal Revenue Code of 1986 is amended by adding at the end the following new subsection:

"(f) EXEMPTION FOR CORPORATIONS THAT OPERATE UNITED STATES FLAG VESSELS.—

"(1) IN GENERAL.—The tentative minimum tax of a corporation shall be zero for any taxable year in which the corporation is a qualified corporation.

"(2) DEFINITIONS.—For purposes of this subsection—

"(A) QUALIFIED CORPORATION.—The term 'qualified corporation' means any domestic corporation if—

"(i) substantially all of the assets of such corporation are related to the maritime transportation business, and

"(ii) such corporation owns or demise charters a fleet of 4 or more qualified United States flag vessels.

"(B) QUALIFIED UNITED STATES FLAG VESSEL.—The term 'qualified United States flag vessel' means a United States flag vessel having a deadweight tonnage of not less than 10,000 deadweight tons that is operated exclusively in the foreign trade of the United States during each of the 360 days immediately preceding the last day of the taxable year. Days during which the vessel is drydocked, surveyed, inspected, or repaired shall be considered days of operation for purposes of this subsection.

"(C) FOREIGN TRADE.—The term 'foreign trade' has the meaning given to such term by section 7518(i)(2)."

b. EFFECTIVE DATE.—The amendment made by this section shall apply to taxable years ending after the date of the enactment of this Act.

TITLE V—CONVENTIONS ON UNITED
STATES-FLAG CRUISE SHIPS

SEC. 501. CONVENTIONS ON UNITED STATES-
FLAG CRUISE SHIPS.

(a) IN GENERAL.—Section 274(h)(2) of the
Internal Revenue Code of 1986 (relating to
conventions on cruise ships) is amended by
striking ''that—'' and all that follows
through ''possessions of the United States,''
and inserting ''that the cruise ship is a ves-
sel registered in the United States.''

(b) EFFECTIVE DATE.—The amendment
made by subsection (a) shall apply to taxable
years ending after the date of the enactment
of this Act.

———

By Mr. GRAMS:

S. 1859. A bill to amend the Internal
Revenue Code of 1986 to provide a tax
credit to taxpayers investing in eco-
nomically distressed rural commu-
nities, and for other purposes; to the
Committee on Finance.

RURAL REVITALIZATION ACT OF 1999

S. 1860. A bill to amend the Internal
Revenue Code of 1986 to expand income
averaging to small agriculture-related
businesses; to the Committee on Fi-
nance.

INCOME AVERAGING LEGISLATION

S. 1861. A bill to amend the Internal
Revenue Code of 1986 to provide com-
prehensive tax relief for small family
farmers, and for other purposes; to the
Committee on Finance.

FARMER TAX RELIEF ACT OF 1999

Mr. GRAMS. Mr. President, I rise
today to offer a multi-faceted package
of tax cuts and federal program
changes to help our nation's farmers
weather this period of low commodity
prices. I will first note that this bill is
obviously not a cure-all for the farm-
ers' plight, but significant tax reform
is an essential component of creating
an environment where farmers can
thrive. Regulatory reform, crop insur-
ance reform, and improvements in our
agriculture trade policies are also crit-
ical elements of boosting farm income.

The bill I introduce is a collection of
tax reform concepts that have been
considered individually, but not as a
package of comprehensive relief to
farmers. Some were in the congres-
sional tax cut package that the Presi-
dent summarily vetoed, denying relief
to farmers, middle class workers, and
small business owners. All of the provi-
sions of this bill would benefit the farm
community, and should not be tossed
aside due to partisan posturing as was
the case with this past summer's tax
relief bill. By offering this multi-part
legislation, I hope to provide a vehicle
to move comprehensive tax relief for
an important sector in the American
economy and culture that has not
shared in the prosperity of recent
years.

The first provision in this legislation
is the Farm and Ranch Risk Manage-
ment Accounts, which were also a part
of the recent tax cut bill that the
President vetoed. This provision would
allow producers to put up to 20% of net
farm income in a tax deferred account
where the funds could be held in re-
serve for up to five years for financial
emergencies. Farmers operate in a
volatile market, and they need all the
risk management tools we can provide.
When farmers earn a profit they usu-
ally invest in additional farm assets,
and this would give them a tax incen-
tive and opportunity to instead save
more income as a buffer during down
cycles.

The second provision of my tax bill
would accelerate the 100% deduct-
ibility of health insurance premiums
for the self-employed to make them
immediately effective, rather than the
full phase-in by 2003. I will note again
that this was one of the critical provi-
sions in the tax cut bill that was ve-
toed by the President, and is also in-
cluded in my health care legislation.
Farmers should not receive the same
tax considerations on health benefits
as everyone else who obtains insurance
through their employment, so that
they do not have to choose between de-
cent health care and other necessities
of life. This provision equalizes the tax
treatment for these farmers.

The third provision would raise the
effective exemption from estate taxes
to $5 million and raise the gift tax ex-
emption to $25,000. According to USDA
figures, farmers are six times more
likely to face inheritance taxes than
other Americans. Farmers must farm
more and more acres now to just eke
out a humble income. Thus, they accu-
mulate large capital investments
through the years that provide them a
modest living, but when they die their
estate is treated as if they were very
rich, and many have never even had a
new pickup. Many of these families
want to leave their property to their
children, so that they can continue the
heritage of farming the land. However,
the estate tax can reach such prohibi-
tive levels that sometimes the property
must be sold to satisfy the insatiable
tax revenue appetite of the federal gov-
ernment.

At the present time, the average age
of farmers is 58 years old. We are just
a few years from a period of significant
transfers of real property from one gen-
eration to another. With all the obsta-
cles to success that producers cur-
rently face, why is the federal govern-
ment adding to their burdens by jeop-
ardizing the time honored tradition of
passing the family farm down from
generation to generation, when it only
generates one percent of federal taxes?
Taxes should be gathered to pay for the
necessities of government, not to
transfer wealth from one segment of
the population to another. And even if
you believe that such wealth transfer
is a legitimate function of tax policy,
can we at least agree that family farms
should be shielded from the takings?
The estate tax can be as high as 55%,
which is unfair, threatening the con-
tinuity of family-owned businesses.

The next provision amends the tax
code to treat lands which are contig-
uous to a principal residence and which
were farmed for five years before the
principal residence as part of such resi-
dence, allowing it to be part of the ex-
clusion of gain from the sale of the
principal residence. This allows older
farmers to sell their property without
facing extraordinary capital gains
taxes as a consequence.

The legislation also acknowledges
that farm income can fluctuate signifi-
cantly from year to year, and that
farmers need a break when income goes
does significantly after several good
years. The bill thus includes a provi-
sion to reach back into a previous tax
year and pull income from good years
into a current down year. Farmers
would then be recompensed for tax
overpayments from previous years.
Current law permits farmers to lower
their tax burdens in good years by
averaging in income from less profit-
able past periods, but it does not allow
previous good years to be averaged in
to current low income levels. This pro-
vision would provide this assistance to
struggling farmers, again, giving them
some tools to work within a very vola-
tile market.

The bill also includes a provision to
exempt from the alternative minimum
tax certain income from unincor-
porated farms. Thanks to initiatives to
provide tax credits to working fami-
lies, many farm families would be able
to reduce their tax burden if they were
not bumping up against the alternative
minimum tax. This correction is need-
ed because the alternative minimum
tax also does not always permit farm-
ers to take advantage of current laws
concerning farmer income averaging.

My legislation contains a provision
to exclude from gross income up to
$350,000 of capital gain from the trans-
fer of property in complete or partial
satisfaction of qualified farm indebted-
ness of a taxpayer, subject to means
testing. This would exclude capital
gains taxes from the forced liquida-
tions of farm property.

The bill also ensures that farm land-
lords are treated the same as small
business people and other commercial
landlords, and removes the require-
ment that they pay self-employment
tax on cash rent income. This item cor-
rects an IRS technical advice memo-
randum to ensure that farmers, like
other real estate owners, do not have
to pay self-employment taxes on in-
come from cash rent.

The measure also amends current law
to emphasis certain beneficial farm
program goals. They include a require-
ment that USDA, when approving ap-
plications for loans and grants under
the Consolidated Farm and Rural De-
velopment Act, places a high priority
on projects that encourage the creation
of farmer-owner facilities that process
value-added agricultural products; an

*November 4, 1999*             CONGRESSIONAL RECORD—SENATE                    **28431**

amendment to the Federal Agriculture Improvement and Reform Act to give USDA discretion to use funds for rural development technical assistance; an amendment to the Rural Development Act to emphasize market development education and technical assistance for operators of small- and medium-sized farms, in addition to production assistance. The amendment also requires USDA to explore new marketing avenues such as direct farm to consumer markets, local value-added processing, and farmer-owned cooperatives.

We need a renaissance of new thinking and new marketing opportunities for our farmers. I want to ensure that existing programs are focused on helping farmers receive a larger share of the value of their products. As I have said before, I've always been struck by how we have a Department of Housing and Urban Development and a Department of Agriculture, but no real government emphasis on rural development. I hope that these provisions can help rebuild our rural economies.

The next two components of the bill restore a tax-exemption for value-added farmer-owned cooperatives that was taken away by a recent IRS ruling, and extends declaratory judgment relief for the cooperatives affected by this ruling.

Finally, the bill also includes a provision that increases the threshold amount that triggers when a farmer and employed farm worker would have to pay payroll taxes. The current threshold is $150, and this bill would raise it to $3,000. Farmers need the flexibility to be able to hire part-time workers, such as other nearby farmers or teenagers during the summer. We should free them from the burden and paperwork of having to pay payroll taxes on a minimal amount of expenditures on employees. This $150 figure in current law obviously does not reflect current realities on the farm, and Congress should make this much needed adjustment in the threshold figure.

Again, I believe that it is important to emphasize that major tax relief for farmers is a critical component of making Freedom to Farm work, and that's why I'm introducing this bill. I hope that hearings will be held next year on Freedom to Farm, and some adjustments my need to be made to current law. In fact, I have my own bill pending that would extend the term for producers' marketing loans from nine months up to thirty-six months, to give farmers more flexibility, and thus more market power, in determining when to put their grain on the market. No one on this side of the aisle argues that Freedom to Farm is perfect, but there are fundamental concepts in the bill that farmers requested and I believe still want, such as the freedom to make their own decisions on what and how much to plant. I believe farmers want to plant for the market, not the government.

This bill reflects my commitment to try to deliver on the promises to farmers that were made when Freedom to Farm was passed, such as trade expansion, fast track authority, regulatory reform, and crop insurance reform.

Of course, if the administration was truly attempting to be accommodating the needs of the farm community, there would be less need for the regulatory reform bills currently pending. I know American farmers can compete worldwide, but we cannot drag our feet on creating a climate in which they can succeed. I believe this farmer tax relief bill is a critical piece of the puzzle.

Mr. President, the second tax relief measure I am introducing today would expand income averaging to small agriculture-related businesses.

Before 1986, American farmers, agricultural-related businesses and others could apply income averaging for tax purposes. But the Tax Reform Act of 1986 entirely eliminated income averaging. Congress acted primarily on the assumption that tax reduction would substantially reduce the number of taxpayers whose fluctuating incomes could subject them to higher progressive rates and there was no need for income average. While it was understandable that Congress took such action at that time, I believe it was clearly a mistake because Congress completely ignored the nature of agriculture and our rural communities.

Today, low commodity prices have made the income of American farmers and agriculture-related businesses fluctuate more wildly than that of any other group of taxpayers. In my own state of Minnesota, income in farm communities had decreased dramatically in recent years.

In response to this critical situation, Congress reinstated income averaging for individual farmers temporarily in the Taxpayer Relief Act of 1997, and last year Congress made it permanent for farmers. This was good change and I was pleased to join Senator BURNS and others in passing this important legislation. In my package of tax relief for farmers just discussed, I have added new flexibility for farmers to use income averaging to their benefit.

Unfortunately, Congress unintentionally left one important group out of last year's relief legislation. American small agriculture-related businesses, those who work hard to provide seeds, fertilizer, farming equipment and other farm products for farmers, whose income depends on farmers' income, are not included in current law providing income averaging. As a result, these small businesses are facing hardship and need this relief as well.

Expanding income averaging to small agriculture-related businesses would provide modest, but much needed, assistance to these businesses and allow them to continue serving farmers and

rural communities. It also is consistent with the approach Congress took in the past regarding income averaging. Unlike the permanent income averaging for farmers, my legislation would sunset income averaging for agriculture-related businesses in three years. In addition, it only covers small businesses, not big corporations.

Mr. President, the third tax bill I will introduce today is the Rural Revitalization Tax Credit (RRTC) Act. This bill fits into my overall goal of making rural America a better place to live.

The objective is to attract business investment to rural areas to provide jobs for those who value life in the small towns of rural America. These jobs can also be invaluable for farm families suffering hard times through low commodity prices, crop diseases or weather disasters. Full or part time jobs can often help farmers help their family farms in down cycles.

This legislation is designed to encourage business investment in high poverty rural communities. It would create rural revitalization tax credits which include a development credit that is provided to any company locating in high poverty rural communities. A company would receive a 6 percent tax credit annually of the amount of the investment, which amounts to about 25 percent of the value of the original investment over 7 years.

It also creates a wage tax credit which allows employers in high poverty rural communities to receive up to $3,000 per employee hired in that community. In addition, qualified businesses are allowed to write off up to $37,500 as an expense the cost of depreciable, tangible personal property. This proposal is similar to urban empowerment zone proposals introduced in the Congress. We want to apply it to rural America as well.

Mr. President, this measure will not solve all the problems that farmers and people in rural areas are facing, but I believe it is one way to create more economic opportunities in our rural communities to preserve and improve the excellent quality of life in these areas.

I send the three bills to the desk and ask that they be assigned to the appropriate committees.

The PRESIDING OFFICER. The bills will be received and appropriately referred.

Mr. GRAMS. I thank the President. I yield the floor.

———

By Mr. JEFFORDS:
S. 1862. A bill entitled ''Vermont Infrastructure Bank Program''; to the Committee on Environment and Public Works.

VERMONT INFRASTRUCTURE BANK PROGRAM

Mr. JEFFORDS. Mr. President, I rise today to introduce legislation to permit my home state of Vermont to enter the State Infrastructure Bank

(SIB) program. Before the enactment of the Transportation Equity Act for the 21st Century (TEA–21) all 50 states were qualified for SIB revolving funds. These funds are capitalized with federal and state contributions and used to provide loans and other sorts of non-grant aid to transportation projects. TEA–21 expanded the SIB program to California, Florida, Missouri, and Rhode Island. With this bill, I am proposing to add Vermont as a participant in the SIB program.

The SIB program functions to authorize loans to public or private organizations to cover the whole or partial costs of an approved project, and to make allowances for the planning and development of funding streams for repayment, which would not begin until five years after the completion of the project. Also, there is a provision in the TEA–21 for the creation of a multistate infrastructure bank system among the pilot states. In this system, states are encouraged to share both funds and ideas for curbing pollution and traffic problems and encouraging other forms of transportation.

It is my feeling that Vermont can be a national model on the efficiency of meeting clean air standards and managing sprawl while promoting economic growth. Under the SIB program the Vermont Agency of Transportation (VAOT) will collaborate with other state agencies and local organizations such as the Chittenden County Metropolitan Planning Organization (CCMPO) in order to reduce traffic, pollution, and growth problems that arise.

In order to fulfill these goals through creative, cutting-edge projects, VAOT will require sufficient funds. To secure these funds, the legislation that I am introducing today would extend the SIB program to include Vermont. This program will be an invaluable resource in the funding of projects that will prevent our beautiful state from moving in the direction of gridlock and congestion.

Vermont can be a model for the nation—an example for other states facing similar issues of finding a balance between growth and livability. Vermont's participation in the SIB program would provide more options to find the solutions that will permit this proper balance to be attained.

I ask unanimous consent that the bill be printed in the RECORD.

There being no objection, the bill was ordered to be printed in the RECORD, as follows:

S. 1862

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. STATE INFRASTRUCTURE BANK PILOT PROGRAM.**

Section 1511(b)(1)(A) of the Transportation Equity Act for the 21st Century (23 U.S.C. 181 note; 112 Stat. 251) is amended by inserting ''Vermont,'' after ''Florida''.

———

By Mr. BAUCUS:

S. 1863. A bill to amend the Internal Revenue Code of 1986 to provide an incentive to small businesses to establish and maintain qualified pension plans by allowing a credit against income taxes for contributions to, and start-up costs of, the plan; to the Committee on Finance.

SMALL EMPLOYER PENSION START-UP INCENTIVE ACT

Mr. BAUCUS. Mr. President, I rise to introduce a bill I believe will provide important benefits for our country's small businesses and the millions of people who work for them. The Small Employer Pension Start-up Incentive Act (SEPSI) will provide help to small businesses who want to help their employees save for their retirement.

Congress has spent a great deal of time recently exploring the impact on our country of the impending wave of baby boomer retirements. Much of this debate has centered around strengthening the Social Security Trust Fund, so we can keep the promise we made to all working Americans that Social Security will be there for them when they retire. During this debate, however, we have all but neglected the important role the private pension system plays in American's retirement security.

Social Security was never intended to provide the sole source of income for our retirees. Despite that, however, it is the only source of retirement income for 16% of elderly Americans. And it is the primary source of income for two-thirds of all retirees. Unless we can change this disturbing trend, preserving Social Security for the 21th Century will not be enough—there will still be far too many Americans who will spend their retirement years one step away from poverty.

In addition to preserving Social Security, we must help Americans better prepare for their retirement years. When the President submitted this budget this year, he proposed dedicating most of our projected surpluses to create Universal Savings Accounts for all Americans. I strongly believe the concept behind the USA proposal was a good one. If our projected surpluses actually materialize, we have an unprecedented opportunity to plan for our nation's future, to make the kinds of investments that will pay off for ourselves and for our children. Helping strengthen our private pension system is one of those key investments we should be making now, before the wave of retirements begins.

An important place to start is with our small businesses and their employees. Over 38 million workers in this country work for small businesses, that is, companies with less than 100 employees each. And even though almost everyone employed by a large company has access to a pension plan through their employer, only 20% of small business employees have pension plans available where they work. This means 31 million working Americans have no opportunity to save for their retirement through their employers.

Small business owners don't offer plans, not because they don't want to, but because they simply can't afford to. Administrative costs are disproportionately high for businesses with few employees, as are the costs associated with meeting all of the regulatory requirements that can apply to pension plans. And their employees, who frequently earn minimum wage and don't have access to health insurance either, couldn't afford to set money aside for their retirement even if their employers offered pension plans.

The bill I am introducing today will help reverse this trend. The Small Employer Pension Start-up Incentive Act will provide two new tax credits to small businesses that are providing pension plans to their employees for the first time. The first credit will help defray the administrative costs that accompany starting a new pension plan. It will provide up to $500 per year in tax relief for small businesses to compensate for the administrative costs they incur in providing a new plan. The credit would be available for three years, for employers with up to 100 workers.

The second credit goes right to the heart of the pension problem—it helps subsidize the contributions employers make into a new plan on behalf of their employees. Studies have shown that pension participation increases dramatically when employers offer to match employee savings. But in far too many small businesses, neither the employer nor the employee can afford to set aside the money. My bill will provide a 50% tax credit for any employer contributions into a new pension plan on behalf of their lower paid employees, up to a maximum of 3% of the salaries of these workers. The credit will be available for the first 5 years of any new qualified pension plan offered by a small business employing up to 50 workers.

I believe that enactment of the Small Employer Pension Start-up Incentive Act will help dramatically increase the number of Americans working for small businesses that can begin saving for their retirement. Providing these tax credits to small businesses, along with the other pension reform proposals that are included in S. 741, the Pension Coverage and Portability Act I introduced with Senators GRAHAM and GRASSLEY, will go a long way toward helping Americans plan for a secure retirement in the 21st century.

Mr. President, I ask unanimous consent that the bill be printed in the RECORD.

There being no objection, the bill was ordered to be printed in the RECORD, as follows:

S. 1863

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Small Employer Pension Start-up Incentive Act".

**SEC. 2. CREDIT FOR SMALL EMPLOYER PENSION PLAN CONTRIBUTIONS AND START-UP COSTS.**

(a) IN GENERAL.—Subpart D of part IV of subchapter A of chapter 1 of the Internal Revenue Code of 1986 (relating to business related credits) is amended by adding at the end the following new section:

"**SEC. 45D. SMALL EMPLOYER PENSION PLAN CREDIT.**

"(a) GENERAL RULE.—For purposes of section 38, in the case of an eligible employer, the small employer pension plan credit determined under this section for any taxable year is an amount equal to the sum of—

"(1) 50 percent of the qualified employer contributions of the taxpayer for the taxable year, and

"(2) the qualified start-up costs paid or incurred by the taxpayer during the taxable year.

"(b) LIMITATIONS.—

"(1) LIMITS ON CONTRIBUTIONS.—For purposes of subsection (a)(1)—

"(A) qualified employer contributions may only be taken into account for each of the first 5 taxable years ending after the date the employer establishes the qualified employer plan to which the contribution is made, and

"(B) the amount of the qualified employer contributions taken into account with respect to any qualified employee for any such taxable year shall not exceed 3 percent of the compensation (as defined in section 414(s)) of the qualified employee for such taxable year.

"(2) LIMITS ON START-UP COSTS.—The amount of the credit determined under subsection (a)(2) for any taxable year shall not exceed—

"(A) $500 for each of the first, second, and third taxable years ending after the date the employer established the qualified employer plan to which such costs relate, and

"(B) zero for each taxable year thereafter.

"(c) DEFINITIONS.—For purposes of this section—

"(1) ELIGIBLE EMPLOYER.—

"(A) IN GENERAL.—The term 'eligible employer' means, with respect to any year, an employer which has no more than—

"(i) for purposes of subsection (a)(1), 50 employees, and

"(ii) for purposes of subsection (a)(2), 100 employees,

who received at least $5,000 of compensation from the employer for the preceding year.

"(B) 2-YEAR GRACE PERIOD.—An eligible employer who establishes and maintains a qualified employer plan for 1 or more years and who fails to be an eligible employer for any subsequent year shall be treated as an eligible employer for the 2 years following the last year the employer was an eligible employer.

"(C) REQUIREMENT FOR NEW QUALIFIED EMPLOYER PLANS.—Such term shall not include an employer if the employer (or any predecessor employer) established or maintained a qualified employer plan with respect to which contributions were made, or benefits were accrued, for service in the 3 taxable years ending prior to the first taxable year in which the credit under this section is allowed.

"(2) QUALIFIED EMPLOYER CONTRIBUTIONS.—

"(A) IN GENERAL.—The term 'qualified employer contributions' means, with respect to any taxable year, any employer contributions made on behalf of a qualified employee to a qualified employer plan for a plan year ending with or within the taxable year.

"(B) EMPLOYER CONTRIBUTIONS.—The term 'employer contributions' shall not include any elective deferral (within the meaning of section 402(g)(3)).

"(3) QUALIFIED EMPLOYEE.—The term 'qualified employee' means an individual who—

"(A) is eligible to participate in the qualified employer plan to which the employer contributions are made, and

"(B) is not a highly compensated employee (within the meaning of section 414(q)) for the year for which the contribution is made.

"(4) QUALIFIED START-UP COSTS.—The term 'qualified start-up costs' means any ordinary and necessary expenses of an eligible employer which are paid or incurred in connection with—

"(A) the establishment or maintenance of a qualified employer plan in which qualified employees are eligible to participate, and

"(B) providing educational information to employees regarding participation in such plan and the benefits of establishing an investment plan.

"(5) QUALIFIED EMPLOYER PLAN.—The term 'qualified employer plan' has the meaning given such term in section 4972(d).

"(d) SPECIAL RULES.—

"(1) AGGREGATION RULES.—All persons treated as a single employer under subsection (a) or (b) of section 52, or subsection (n) or (o) of section 414, shall be treated as one person. All qualified employer plans of an employer shall be treated as 1 qualified employer plan.

"(2) DISALLOWANCE OF DEDUCTION.—No deduction shall be allowable under this chapter for any qualified start-up costs or qualified employer contributions for which a credit is determined under subsection (a).

"(3) ELECTION NOT TO CLAIM CREDIT.—This section shall not apply to a taxpayer for any taxable year if such taxpayer elects to have this section not apply for such taxable year.".

(b) CREDIT ALLOWED AS PART OF GENERAL BUSINESS CREDIT.—Section 38(b) of the Internal Revenue Code of 1986 (defining current year business credit) is amended by striking "plus" at the end of paragraph (11), by striking the period at the end of paragraph (12) and inserting ", plus", and by adding at the end the following new paragraph:

"(13) in the case of an eligible employer (as defined in section 45D(c)), the small employer pension plan credit determined under section 45D(a).".

(c) CONFORMING AMENDMENT.—The table of sections for subpart D of part IV of subchapter A of chapter 1 of the Internal Revenue Code of 1986 is amended by adding at the end the following new item:

"Sec. 45D. Small employer pension plan credit.".

(d) EFFECTIVE DATE.—The amendments made by this section shall apply to costs paid or incurred or contributions made in connection with qualified employer plans established after December 31, 1999.

By Mr. BURNS:

S. 1864. A bill to amend the Internal Revenue Code of 1986 to provide a tax credit to primary health providers who establish practices in health professional shortage areas; to the Committee on Finance.

THE HEALTH CARE ACCESS IMPROVEMENT ACT

● Mr. BURNS. Mr. President, I rise today to introduce a bill which will dramatically expand rural America's access to modern health care.

The Health Care Access Improvement Act creates a significant tax incentive, which encourages doctors, dentists, physician assistants, licensed mental health providers, and nurse practitioners to establish practices in underserved areas. Until now, rural areas have not been able to compete with the financial draw of urban settings and therefore have had trouble attracting medical professionals to their communities. The $1,000 per month tax credit will allow health care workers to enjoy the advantages of rural life without drastic financial sacrifices. But the real winners in this bill are the thousands of Americans whose access to health care is almost impossible due to a lack of doctors and dentists in small town America.

There are nine counties in the great state of Montana which do not have even one doctor. In these rural settings, agriculture is often the only employer. Farming and ranching is hard, dangerous work. Serious injuries can happen in an instant. And while Montanans have always been known as a heartier breed of people, we get sick too. It is unreasonable to expect the farmer who has had a run-in with an auger or the elderly rancher's widow to drive two hours or more to get stitched up or to have a crown on a tooth replaced. As doctors, dentists, physicians assistants, mental health providers, and nurse practitioners are attracted to under-served areas, Montanans and others in isolated communities will finally enjoy the medical treatment they deserve.

Mr. President, everyone wins with this legislation. Rural Montana, rural America, and providers all benefit from increased access, service and a better quality of life. I look forward to this legislation's quick passage.●

By Mr. DEWINE (for himself and Mr. DOMENICI):

S. 1865. A bill to provide grants to establish demonstration mental health courts; to the Committee on the Judiciary.

AMERICA'S LAW ENFORCEMENT AND MENTAL HEALTH PROJECT ACT OF 1999

● Mr. DEWINE. Mr. President, I rise today to introduce "America's Law Enforcement and Mental Health Project. This bill is designed to address the impact that the increased deinstitutionalization of America's mentally ill has had on our criminal justice system. This is a serious problem affecting both the health and safety of our Nation. Essentially, the situation we have today in our prisons and jails is the result of over thirty years of cuts in the budgets of mental health institutions, as well as the outlawing of involuntary

commitments. Faced with fewer dollars and greater legal requirements, these mental health care facilities began de-institutionalizing America's mentally ill in record numbers. According to one estimate, the number of persons finding treatment in mental health facilities plummeted from 560,000 in 1955 to just 100,000 in 1989.

A recent Justice Department study revealed that 16 percent of all inmates in America's State prisons and local jails today are mentally ill. The American Jails Association estimates that 600,000 to 700,000 seriously mentally ill persons each year are being booked into local jails alone. In my own home State of Ohio, 18 percent of all prison inmates were in mental health programs last year. That's the highest percentage in the country.

Far too many of our nation's mentally ill persons have ended up in our prisons and jails. In fact, today, the Los Angeles County Jail is the largest mental health care institution in our country. It treats 3,200 seriously mentally ill people every day. The impact on law enforcement has been significant. Institutions and agencies designed to fight crime have had to spend valuable time and scarce resources providing mental health services to prisoners. In Ohio, nearly 1 in 5 prisoners need special psychiatric services or accommodations.

Tragically, many mentally ill inmates could have received proper treatment from a variety of private and public sources before they ended up in the prison system. Part of the problem is a serious lack of coordination between our local law enforcement and social service systems. The interaction within law enforcement—between our courts and prisons—is even worse. All too often, the mentally ill act out their symptoms on the streets. They are arrested for minor offenses and wind up in jail, where appropriate treatment simply does not exist. They serve their sentences or are paroled, but find themselves right back in the system after committing further crimes—often more serious—only a short time later.

The Justice Department has found that over 75 percent of mentally ill inmates are repeat offenders. In some States, the problem is even worse. California's Department of Corrections, for example, recently reported that 94 percent of mentally ill parolees returned to prison within two years, versus 57 percent of the parolee population at large.

Throughout this destructive cycle, law enforcement and corrections spend time and money trying to cope with the unique problems posed by these individuals. Certainly, some mentally ill offenders must be incarcerated because of the severity of their crimes. Many others who commit very minor offenses could receive appropriate care early on, reducing recidivism and unnecessary burdens on our police and corrections officials, as well as many mentally ill offenders, themselves.

That's why, Mr. President, I am introducing America's Law Enforcement and Mental Health Project (LAMP), to begin to identify—early—those who are mentally ill within our justice system and to use the power of the court to assist them in obtaining the treatment they need. This will be a step toward making some of the changes necessary to effectively address the issues surrounding the mentally ill in our justice system.

This bill would establish a federal grant program to help states and localities develop ''Mental Health Courts'' in their jurisdictions. These courts would be specialized courts with separate dockets. They would hear cases exclusively involving nonviolent offenses committed by mentally ill or retarded individuals. Fundamentally, Mental Health Courts would enable state and local courts to offer alternative sentences or alternatives to prosecution for those offenders who could be served best by mental health services.

To deal with the separate needs of mentally ill offenders, these Mental Health Courts would be staffed by a core group of specialized professionals, including a dedicated judge, prosecutor, public defender and court liaison to the mental health service community. The courts would promote efficiency and consistency by centrally managing all outstanding cases involving a mentally ill defendant admitted to the Mental Health Court.

The Mental Health Court judge ultimately would decide whether or not to hear each case referred to the court. The Mental Health Court would not deal with defendants unless they are deemed mentally ill by a qualified mental professional or the mental health court judge. Similarly, participation in the court by the mentally ill would be completely voluntary. Once the defendant volunteers for the Mental Health Court, however, he or she would be expected to follow the decision of the court. For instance, in any given case, the Mental Health Court judge, attorneys, and health services liaison may all agree on a plan of treatment as an alternative sentence or in lieu of prosecution. The defendant must adhere strictly to this court-imposed treatment plan. The court must then provide supervision with periodic review. This way, the court could quickly deal with any failure of the defendant to fulfill the treatment plan obligations. In this sense, the Mental Heath Court would function similar to drug courts.

Mr. President, the idea of Mental Health Courts is innovative, but not untested. Broward County, Florida, established the nation's first Mental Health Court almost two years ago. This court hears an average of 69 cases per month. Remarkably, Broward's Mental Health Court has been able to link over one-third of all its defendants with community health care providers or private psychiatric help. Notably, less than ten percent of all defendants were deemed inappropriate for mental health court and only eight percent refused community health services.

Although a voluntary system, Broward has found that many mentally ill persons do choose to have their cases heard in the Mental Health Court. These defendants don't always know what treatment options are available to them before they fall into the hands of the criminal justice system. A judicial program offering the possibility of effective treatment—rather than jail time—gives a measure of hope and a chance for rehabilitation to defendants.

Other jurisdictions across America have studied the Broward County model and have established their own Mental Health Courts or seek to do so, such as Butler County in my state of Ohio. King County, Washington, also has developed a more expansive Mental Health Court this past year. Our nation's communities are trying desperately to find the best way to cope with the problems associated with mental illness. Law enforcement agencies and correctional facilities simply do not have the means, nor the expertise, to properly treat mentally ill inmates in general. Mental Health Courts offer an alternative.

Mr. President, I urge my colleagues to join in support of this legislation.●

---

## ADDITIONAL COSPONSORS

**S. 115**

At the request of Ms. SNOWE, the name of the Senator from South Dakota (Mr. JOHNSON) was added as a cosponsor of S. 115, a bill to require that health plans provide coverage for a minimum hospital stay for mastectomies and lymph node dissection for the treatment of breast cancer and coverage for secondary consultations.

**S. 345**

At the request of Mr. ALLARD, the name of the Senator from Maine (Ms. SNOWE) was added as a cosponsor of S. 345, a bill to amend the Animal Welfare Act to remove the limitation that permits interstate movement of live birds, for the purpose of fighting, to States in which animal fighting is lawful.

**S. 405**

At the request of Mr. HOLLINGS, the name of the Senator from Oklahoma (Mr. INHOFE) was added as a cosponsor of S. 405, a bill to prohibit the operation of civil supersonic transport aircraft to or from airports in the United States under certain circumstances.

**S. 486**

At the request of Mr. GRAMS, his name was added as a cosponsor of S.