Cheryl F. Hiemstra, OSB #133857
Chris Kayser, OSB #984244
Tim D. Nord, OSB #882800
Special Assistants Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel: (503) 934-4400
Facsimile: (503) 378-5017
Cheryl.Hiemstra@doj.oregon.gov
Tim.D.Nord@doj.oregon.gov
cjkayser@lvklaw.com

*Attorneys for Plaintiff State of Oregon*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

**PORTLAND DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, STATE OF ARIZONA, STATE OF CALIFORNIA, DISTRICT OF COLUMBIA, STATE OF ILLINOIS, STATE OF MARYLAND, STATE OF NEVADA, STATE OF NEW MEXICO, STATE OF OREGON, and STATE OF WYOMING,<br><br>Plaintiffs,<br>v.<br><br>THE KROGER COMPANY and ALBERTSONS COMPANIES, INC.,<br><br>Defendants. | Case No. 3:24-cv-00347<br><br>**REPLY IN SUPPORT OF PLAINTIFF STATES' MOTION FOR AWARD OF ATTORNEY'S FEES AND COSTS** |

In opposing the States' motion for attorney's fees, Defendants ignore what they dislike. They argue that *Lackey v. Stinnie* forecloses the States' petition. But they miss the important distinction between statutes that award attorney's fees to "prevailing" parties from those—like the Clayton Act—that award fees to a plaintiff that "substantially prevails." And they do not address the many Supreme Court cases the States cited explaining why that difference matters. Next, Defendants contend that the States did not bring a claim under the Clayton Act. But they ignore that (1) the Complaint states that each State is bringing the action "pursuant to Section 16 of the Clayton Act," Compl. at 7–9 ¶¶ 17–26, ECF No. 3-2, (2) this Court's order states explicitly that the States did exactly that, and (3) their own state-court filings affirm the same. These oversights fatally undermine Defendants' Opposition. Accordingly, the Court should award the States' reasonable attorney's fees.

## I.    Supreme Court precedent establishes the material difference between the "substantially prevails" and "prevailing party" standards.

Defendants first contend that (1) *Lackey v. Stinnie* requires this Court to deny the States' petition and (2) any contrary holding would violate Ninth Circuit precedent. Defs.' Opp. to Pl. States' Mot. for Att'ys' Fees at 5–13, ECF No. 569 ("Opp.") (discussing *Lackey v. Stinnie*, 145 S. Ct. 659 (2025)). But the former argument rests solely on a misleading reading of *Lackey*'s dissent—rather than its majority—and the latter contorts precedent into a rule inconsistent with itself, Ninth Circuit authority, and Supreme Court precedent. Both are wrong.

### A.    Contrary to Defendants' reading, *Lackey* distinguishes the "substantially prevails" and "prevailing party" standards.

Defendants' argument rests on the flawed notion that "substantially" is meaningless when it comes to fee awards under the Clayton Act for a plaintiff who "substantially prevails." On that point, *Lackey* provides them no assistance. *Lackey*'s holding addressed only the "prevailing

party" standard, not the Clayton Act's "substantially prevails" standard. The Supreme Court

made clear that the two are not the same. The *Lackey* Court—citing the Freedom of Information

Act ("FOIA"), which awards fees to a plaintiff who has "substantially prevailed" even if

"through 'a voluntary or unilateral change in position by the agency'"—explained that when

Congress wants a different standard to apply, it uses different language. 145 S. Ct. at 670

(quoting 5 U.S.C. § 552(a)(4)(E)). Defendants argue that the distinction is irrelevant because

FOIA states that a voluntary change in agency position meets this standard. But the States never

argued that the FOIA and Clayton Act standards were identical, only that the key qualifying term

"substantially" has a distinct meaning from "prevailing party" statutes like the one *Lackey*

addressed. *Lackey* emphasized that point when it quoted both FOIA's "substantially prevailed"

standard and the statutorily defined circumstances that meet it. This construction follows the

Court's past admonitions that "statutes contain varying standards as to the precise degree of

success necessary for an award of fees," *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 684 (1983),

and "not to apply [prevailing party] rules applicable under one statute to a different statute

without careful and critical examination," *Hardt v. Reliance Std. Life Ins.*, 560 U.S. 242, 253–54

(2010) (quoting *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 174 (2009)). *See also* Pl. States' Mot.

for Award of Att'y's Fees & Costs at 10, ECF No. 563 ("Mot."). Defendants ignore both cases.

Disregarding the Supreme Court decisions that distinguish these varying statutory

standards, Defendants misleadingly claim the *Lackey* dissent concluded that, under *any* fee-

shifting regime, "it is no longer 'possible for a party to prevail based on a preliminary ruling'

unless a federal statute abrogates the 'finality' requirement." Opp. at 6 (quoting *Lackey*, 145 S.

Ct. at 675 (Jackson, J., dissenting)). But that quote was limited to section 1988 and "the legal

term of art that Congress actually chose" for that section. *Lackey*, 145 S. Ct. at 675 (Jackson, J.,

**REPLY ISO STATES' MOT. FOR AWARD OF ATT'Y'S FEES & COSTS**        Page 2

dissenting). It does not address other statutes with other standards, much less import a "finality" requirement into them. *Id.* Even if the dissent were binding—which it obviously is not, *cf. Ballinger v. City of Oakland*, 24 F.4th 1287, 1295 (9th Cir. 2022) ("Dissenting opinions cannot be considered when determining the holding of a fractured Supreme Court decision[.]")—it has no bearing on whether a plaintiff substantially prevails under the Clayton Act.

**B**.     **The context and reasoning of pre-*Lackey* precedent confirms that a preliminary injunction still satisfies the "substantially prevails" standard.**

Defendants incorrectly suggest that pre-*Lackey* Ninth Circuit decisions equating "prevailing party" with "substantially prevails" import *Lackey*'s holding into "substantially prevails" statutes. Opp. at 10–11. But pre-*Lackey* Ninth Circuit decisions held that a preliminary injunction met the "prevailing party" standard. *E.g.*, *Watson v. County of Riverside*, 300 F.3d 1092, 1096 (9th Cir. 2002). Prior to *Lackey*, the Ninth Circuit applied a lower threshold to *both* standards. *Lackey* held only that the lower threshold does not apply to "prevailing parties"—not that it no longer applies to a plaintiff who "substantially prevails." *See* Opp. at 10–11, 15.

Defendants also obfuscate the Ninth Circuit's reasoning in *Southwest Marine*. There, the Ninth Circuit relied on the remedial purposes of the Clayton Act and its legislative history to conclude that a plaintiff "substantially prevails" when it obtains its relief sought, even absent permanent injunctive relief. *Sw. Marine, Inc. v. Campbell Indus.*, 732 F.2d 744, 746 (9th Cir. 1984). The Ninth Circuit observed that the Clayton Act's legislative history "suggests that awards of attorney's fees are essential if private attorneys-general are to enforce the antitrust laws." *Id.* (citing H.R. Rep. 94-499(I), at *18–20 (1975), *reprinted in* 1976 U.S.C.C.A.N. 2572, 2588–90, APP-308–10). The court reasoned that "[t]o permit defendants to avoid the award of attorney's fees in suits for injunctive relief by ceasing their illegal conduct would reduce the incentive to bring suit, thereby frustrating Congress's intent." *Id.*

**REPLY ISO STATES' MOT. FOR AWARD OF ATT'Y'S FEES & COSTS**     Page 3

When *Southwest Marine* was decided, the catalyst theory provided a basis for "prevailing party" fees under 42 U.S.C. § 1988. *See Am. Const. Party v. Munro*, 650 F.2d 184, 187 (9th Cir. 1981). Thus, the court in *Southwest Marine* reasonably chose to "apply the standard for determining a 'prevailing party' developed under section 1988 to awards under section 16," under which "a plaintiff need not obtain formal relief to recover fees[;] . . . there must simply be a causal relationship between the litigation brought and the practical outcome realized." 732 F.2d at 747. For civil rights cases, the Supreme Court repudiated the catalyst theory in 2001. *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res.*, 532 U.S. 598, 600, 605 (2001). But beyond the Court's discussion of FOIA in *Lackey,* the Supreme Court has not addressed the issue in the context of the Clayton Act or any other "substantially prevails" statute. To read *Southwest Marine* as applying the new section 1988 "prevailing party" standard to the Clayton Act—despite the fact that it predates both *Lackey* and *Buckhannon*—cannot be reconciled with the Ninth Circuit's reasoning for doing so in the first place: to encourage enforcement of the antitrust laws and to prevent defendants from "avoid[ing] the award of attorney's fees in suits for injunctive relief by ceasing their illegal conduct." 732 F.2d at 746.

At the time, the Ninth Circuit had no reason to distinguish "prevailing party" from "substantially prevails" because it had already interpreted the former broadly. So it "infer[red] that Congress intended that the identical language in the [Clayton Act] section 16 and section 1988 attorney's fees provisions be identically construed." *Id.* But after *Southwest Marine* was decided, the Supreme Court concluded the "prevailing party" and "substantially prevails" were not, in fact, identical. *Ruckelshaus*, 463 U.S. at 684. And in *Lackey*, the Court emphasized how differences in statutory fee provisions have material impacts. 145 S. Ct. at 670. In light of these changed circumstances, this Court need not apply the new "prevailing party" standard to the

**REPLY ISO STATES' MOT. FOR AWARD OF ATT'Y'S FEES & COSTS**      Page 4

Clayton Act simply because the Ninth Circuit applied the old "prevailing party" standard to it

decades ago. *See, e.g.*, *Miller v. Gammie*, 335 F.3d 889, 893, 900 (9th Cir. 2003) (en banc)

(holding that "where the reasoning or theory of our prior circuit authority is clearly irreconcilable

with the reasoning or theory of intervening higher authority, a three-judge panel should consider

itself bound by the later and controlling authority, and should reject the prior circuit opinion as

having been effectively overruled" and applying this rule to district courts). Indeed, doing so

would violate the Supreme Court's guidance "not to apply rules applicable under one statute to a

different statute without careful and critical examination." *Hardt*, 560 U.S. at 253–54 (quoting

*Gross*, 557 U.S. at 174).

    In fact, the only interpretation of *Southwest Marine* not "clearly irreconcilable" with

*Buckhannon*, *Hardt*, and *Lackey* entitles the States to fees. Both *Buckhannon* and *Lackey*

addressed civil rights law's "prevailing party" standard, not the Clayton Act's "substantially

prevails" standard. Neither expressly overruled the catalyst rule for antitrust fee petitions.

Accordingly, the only way to reconcile *Southwest Marine* with intervening precedent is to apply

its *entire* holding, that the States need only show "a causal relationship between the litigation

brought and the practical outcome realized." 732 F.2d at 746; *see also FTC v. Penn State*

*Hershey Med. Ctr.*, 914 F.3d 193, 196 (3d Cir. 2019) (cited in Opp. at 14–20) (leaving open

"whether the Supreme Court's rejection of the catalyst theory controls claims for fees under

Section 16 of the Clayton Act"). This interpretation reconciles *Southwest Marine* with *Lackey*,

which addressed a different statute, with different language expressing congressional intent,

arising under a different set of procedures and circumstances.

    This focus on reasoning emphasizes why the similarity of this Court's three-week

evidentiary hearing to a full merits trial matters. Mot. at 12–14; Opp. at 12–13. The preliminary

injunction hearing in *Lackey* involved six witnesses and four exhibits and lasted just under 4.5 hours, nothing like the substantial hearing in this case which is typical of merger cases under the Clayton Act. That difference underscores the limited scope of *Lackey* and its impact on *Southwest Marine. See* Prelim. Inj. Hearing Tr. at 3–5, 193, *Stinnie v. Holcomb*, No. 3:16-CV-00044 (W.D. Va. Nov. 15, 2018), APP-84–86, 274.

       Finally, Defendants argue that, if the word "substantially" modifies "prevailing" (it does), then it sets a higher bar for recovery (it does not). Defendants again ignore contrary Supreme Court precedent: *Pierce v. Underwood* interpreted "substantially" as "in substance" or "to a degree that would satisfy a reasonable person." 487 U.S. 552, 565 (1988) (quoted in Mot. at 11). Dictionaries defined "substantially" nearly identically at the time Congress enacted Section 16. *See substantially*, Black's Law Dictionary 1281 (5th ed. 1979) ("Essentially; without material qualification; in the main; in substance; materially; in a substantial manner."), APP-297; *substantial*, Am. Heritage Dictionary 1213 (2d. coll. ed. 1982) ("Of, pertaining to, or having substance; material"), APP-320. Moreover, Congress enacted FOIA's attorney's fees provision a mere two years before adding identical language to the Clayton Act. *Compare* FOIA, amend., Pub. L. No. 93-502, 88 Stat. 1561 (1974), *with* Hart-Scott-Rodino Antitrust Improvements Act of 1976, Pub. L. No. 94-435, 90 Stat. 1383 (1976). Thus, *Pierce* provides context for the *Lackey* Court's emphasis on both FOIA's "substantially prevailed" and "voluntary or unilateral change" provisions. Defendants do not. Under their view, FOIA would nonsensically require both more success (prevailing and then prevailing substantially) and less (their so-called "finality" rule). But, consistent with contemporaneous definitions of the word "substantially," *Lackey* assigns a

*lower* bar to FOIA fee petitions. So too does the Clayton Act require a different, lower showing

of success—one that entitles the States to fees.[1]

## II.     This Court and Defendants recognized that the States brought a claim under the Clayton Act—one which did not preclude future enforcement by the States.

The Complaint clearly alleges that the States are enforcing the Clayton Act. In doing so,

the States carefully preserved further enforcement throughout the merger process, if necessary.

Essentially, Defendants argue that *Penn State Hershey* and *Staples* apply here. Opp. at 14–17.

But these out-of-circuit cases conflict with binding Ninth Circuit precedent and the plain

language of Section 16 itself. *See* Mot. at 15–23. To remedy this, Defendants claim that the

States did not bring or allege *any* claim under the Clayton Act and thus they cannot prevail under

the Clayton Act. *E.g.*, Opp. at 20. But that is simply not true. In the Complaint, each State

alleged that it was bringing claims "pursuant to Section 16 of the Clayton Act." Compl. ¶¶ 17–

26. One need not read past the first line of the Court's opinion to rebuff this argument:

> Plaintiffs Federal Trade Commission ("FTC"), the District of Columbia, and the States of Arizona, California, Illinois, Maryland, Nevada, New Mexico, Oregon, and Wyoming bring this action pursuant to the Federal Trade Commission Act, 15 U.S.C. § 53(b), *and the Clayton Act, 15 U.S.C. § 26*, against defendants Kroger Company ("Kroger") and Albertsons Companies, Inc. ("Albertsons"), seeking to enjoin a proposed merger of the two companies.

---

[1] Defendants assert without authority that "to *substantially* prevail, a plaintiff must first 'prevail.'" Opp. at 13. They allude to dicta in *Kasza v. Whitman*, that the plaintiff "is not a 'prevailing party' (and thus cannot be a *substantially* 'prevailing party')." 325 F.3d 1178, 1180 (9th Cir. 2003). But *Kasza* relied on *Buckhannon*'s requirement of "a material alteration of the legal relationship of the parties." *Id.* The prevailing/substantially prevails distinction did not control the holding. *See id.* Thus, the Court need not follow this unexplained dicta. *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1173 (9th Cir. 2004) (statement "unnecessary to the decision in the case" or not both "germane to the eventual resolution of the case, and resolve[d] . . . after reasoned consideration," is non-binding dictum (quoting *Best Life Assur. v. CIR*, 281 F.3d 828, 834 (9th Cir. 2002), and *United States v. Johnson*, 256 F.3d 895, 914 (9th Cir. 2001) (en banc)). Moreover, one can read *Kasza* to say the two standards were the same.

**REPLY ISO STATES' MOT. FOR AWARD OF ATT'Y'S FEES & COSTS**     Page 7

Op. & Order at 1, ECF 521 (emphasis added). Moreover, the Opinion's first section explains the States' underlying Clayton Act claim. *Id.* at 1–2.

In fact, Defendants asserted in the Washington action that "[t]he FTC, eight other states, and the District of Columbia jointly sued to enjoin this same transaction *under the Clayton Act*."[2] And in the Colorado action, Defendants explained that "the FTC, joined by eight states and the District of Columbia, sued Kroger and Albertsons (but not C&S) in the District of Oregon to enjoin the transaction *under Section 7 of the Clayton Act*."[3] Until now, Defendants agreed that the States sought an injunction under the Clayton Act.

Indeed, the States have consistently affirmed that they sought relief under the Clayton Act. *See* Mot. at 23 n.12 (collecting examples). For instance, the Complaint alleges that the merger would violate Section 7 of the Clayton Act (i.e., the "claim") and that "[s]ection 16 of the Clayton Act, 15 U.S.C. § 26, authorize[d] the Plaintiff States to sue for and have injunctive relief to prevent threatened loss or damage from Defendants' consummation of the proposed acquisition" (i.e., the statutory right of action). Compl. ¶¶ 118–20. Similarly, Defendants' Answers admitted that each State brought "this action on behalf of the State pursuant to Section 16 of the Clayton Act" and "is seeking relief pursuant to Clayton Act § 16." Compl. ¶¶ 17–26; Albertsons Cos., Inc. Answer & Aff. Defs. to Compl. ¶¶ 17–26, ECF No. 91 ("Albertsons admits that Plaintiff States have brought this action as described in Paragraph 26[.]"); Kroger Co.'s Answer & Aff. Defs. at 7–8 ¶¶ 17–26, ECF No. 90 (admitting same). Defendants confuse the

---

[2] Reply in Supp. of Defs.' Mot. to Dismiss at 2, *Washington v. Kroger Co.*, No. 24-2-00977-9 (Wash. Sup. Ct. Apr. 17, 2025) ("Defs.' Wash. Reply") (emphasis added), APP-276.

[3] Defs.' Opp. to State of Colo.'s Mot. for Prelim. Inj. at 25, *Colorado v. Kroger Co.*, No. 2024CV30459 (Dist. Ct. Colo. June 26, 2025) ("Defs.' Colo. Opp.") (emphasis added), APP-37.

standard of review applied with the States' claim and right to sue.[4]

This mistake alone dooms the rest of Defendants' Opposition. Defendants attempt to distinguish *Doe 1–10 v. Fitzgerald* by arguing that "Plaintiffs brought no claims under the Clayton Act." Opp. at 18 (citing 102 F.4th 1089, 1091 (9th Cir. 2024)). Similarly, Defendants argue that *Maher v. Gagne* does not apply because "there is no 'pendent' Clayton Act claim," Opp. at 19 (citing 448 U.S. 122 (1980))—but again, this Court has recognized that there is.[5] The States could not—and did not—bring any federal claim except under the Clayton Act; the FTC Act does not provide the States a right of action. *See* 15 U.S.C. § 53; *Alfred Dunhill Ltd. v. Interstate Cigar Co.*, 499 F.2d 232, 237 (2d Cir. 1974) ("[T]he provisions of the Federal Trade Commission Act may be enforced only by the Federal Trade Commission.").

Further, Defendants misrepresent *ADT Security Services v. Lisle Woodridge Fire Protection District*: There, the plaintiffs sued under the Clayton Act but obtained an injunction through the court adjudicating their state-law—not their antitrust—claims. 86 F. Supp. 3d 857, 861 (N.D. Ill. 2015). Although "[Plaintiffs'] constitutional and antitrust theories of relief went unadjudicated," the court held that Section 16 of the Clayton Act authorized fees. *Id.* at 866–67.

---

[4] Defendants cite the lack of a bond as distinguishing the Clayton and FTC Acts, thereby barring the States' fee claim. It does not. Courts often eschew a bond for "[a]n attempt to enforce compelling public interests"—particularly merger challenges. *Washington v. Texaco Ref. & Mktg. Inc.*, No. C91-39R, 1991 WL 47081, at *3 (W.D. Wash. Jan. 11, 1991) (collecting cases), APP-294. Further, to obtain a bond, a defendant must request one and prove a likelihood of harm. *fuboTV Inc. v. Walt Disney Co.*, 745 F. Supp. 3d 109, 151 & n.42 (S.D.N.Y. 2024). Defendants did not do so here. The absence of a bond means nothing.

[5] Putting aside what case *Carreras v. City of Anaheim* technically interpreted, its fee-shifting standard binds this court. 768 F.2d 1039, 1050 (9th Cir. 1985) (citing *Gagne v. Maher*, 594 F.2d 336, 339–40 (2d Cir. 1979), *aff'd*, 448 U.S. 122 (1980)). Defendants do not challenge the binding legal rules in *Carreras*. Opp. at 19–20. Instead, they rely solely on the incorrect contention that "Plaintiffs never alleged any pendent Clayton Act claim at all." Opp. at 20.

Finally, Defendants portray the States as free-riders who should have prosecuted this suit under the Clayton Act standards alone, thus—in whole or in part—separately from the FTC. But this is the *opposite* tack they took with Washington and Colorado, each of whom they asked to join this case. Defs.' Wash. Reply, Ex. A at 1, APP-288; Defs.' Colo. Opp. at 25, APP-37. Defendants lauded this case as "provid[ing] an efficient forum for all interested parties." Defs.' Wash. Reply at 5, APP-280. They explained that "[l]itigating all antitrust challenges to the Kroger-Albertsons merger in a single proceeding will benefit all parties, . . . [including] avoid[ing] unnecessary and duplicative litigation." *Id.*, Ex. A at 2, APP-289. As to efficiency, the States agree: In an example of federalism at its finest, the States deferred to the FTC's procedure, seeking injunctive relief pending the administrative hearing. But should something have interrupted this procedure—e.g., Kroger's challenge to the FTC procedure's constitutionality— the States could have moved to convert the preliminary injunction into a permanent one. The States anticipated this possibility, asking the Court to retain jurisdiction until the administrative proceeding had concluded and to "award such other and further relief as the Court may determine is appropriate, just, and proper." Compl. at 46 ¶ 124(e). Contrary to their earlier desire to avoid "unnecessary and duplicative litigation," Defendants now contend that, to seek fees, the States should have sought a permanent injunction that this Court would have decided in parallel with the FTC's administrative hearing. Defendants cannot have it both ways. No argument justifies denying the States fees for choosing—as Defendants put it—the "efficient" path.

*     *     *

Defendants ignore the plain language of the Clayton Act, binding Supreme Court and Ninth Circuit precedent, this Court's Opinion, and even their own related state-court filings. Taken together, these all point to the same conclusion: The States are entitled to fees.

Dated: April 18, 2025

Respectfully submitted,

| /s/ Tim D. Nord | /s/ Brian M. Yost |
| --- | --- |
| Cheryl F. Hiemstra, OSB #133857 | Brian M. Yost, IL Bar No. 6334138 |
| Tim D. Nord, OSB #882800 | Paul J. Harper, IL Bar No. 6335001 |
| Chris Kayser, OSB #984244 | Alice Riechers, IL Bar No. 6272933 |
| Special Assistants Attorney General | |
| Oregon Department of Justice | Office of the Illinois Attorney |
| 100 SW Market Street | General |
| Portland, OR 97201 | 115 S. LaSalle St. |
| Tel: (503) 934-4400 | Chicago, IL 60603 |
| Facsimile: (503) 378-5017 | Tel: (872) 276-3598 |
| Cheryl.Hiemstra@doj.oregon.gov | Email: Brian.Yost@ilag.gov |
| Tim.D.Nord@doj.oregon.gov | Paul.Harper@ilag.gov |
| cjkayser@lvklaw.com | Alice.Riechers@ilag.gov |
| | |
| Attorneys for Plaintiff State of Oregon | Attorneys for Plaintiff State of Illinois |

/s/ Jayme L. Weber

Robert A. Bernheim, AZ Bar No. 024664
Jayme L. Weber, AZ Bar No. 032608
Vinny Venkat, AZ Bar No. 038587
Connor Nolan, AZ Bar No. 038088
Arizona Office of the Attorney General
2005 N. Central Avenue
Phoenix, AZ 85004
Tel: (602) 542-5025
Robert.Bernheim@azag.gov
Jayme.Weber@azag.gov
Vinny.Venkat@azag.gov
Connor.Nolan@azag.gov

Attorneys for Plaintiff State of Arizona

/s/ Nicole Gordon
Nicole Gordon, CA Bar No. 224138

California Department of Justice
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102
Tel: (415) 510-4400
Facsimile: (415) 703-5480
Nicole.Gordon@doj.ca.gov

Attorney for Plaintiff State of California

/s/ C. William Margrabe
C. William Margrabe, DC Bar No. 90013916

Office of the Attorney General for the District of
Columbia
400 6th Street, N.W, 10th Floor
Washington, D.C. 20001
Tel: (202) 727-3400
Will.Margrabe@dc.gov

Attorney for Plaintiff District of Columbia

/s/ Schonette J. Walker
Schonette J. Walker, MD Bar No. 0512290008
Byron Warren, MD Bar No. 1612140330

Office of the Attorney General
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
Tel: (410) 576-6470
swalker@oag.state.md.us
bwarren@oag.state.md.us

Attorneys for Plaintiff State of Maryland

**REPLY ISO STATES' MOT. FOR AWARD OF ATT'Y'S FEES & COSTS**    Page 12

/s/ Lucas J. Tucker
Lucas J. Tucker, NV Bar No. 10252
Samantha B. Feeley, NV Bar No. 14034

Office of the Nevada Attorney General
100 N. Carson St.
Carson City, Nevada 89701
Tel: (775) 684-1100
ltucker@ag.nv.gov
sfeeley@ag.nv.gov

Attorneys for Plaintiff State of Nevada

/s/ Julie Ann Meade
Julie Ann Meade, NM Bar No. 8143
Jeff Dan Herrera, NM Bar No. 154030

New Mexico Department of Justice
408 Galisteo St.
Santa Fe, NM 87504
Tel: (505) 717-3500
jmeade@nmag.gov
jherrera@nmag.gov

Attorneys for Plaintiff State of New Mexico

/s/ William Young
William Young, WY Bar No. 8-6746

Office of the Wyoming Attorney General
109 State Capitol
Cheyenne, WY 82002
Tel: (307) 777-7847
William.Young@wyo.gov

Attorney for Plaintiff State of Wyoming

CERTIFICATE OF SERVICE

I certify that on the date noted below, I caused a true and correct copy of the

Reply in support of Plaintiff States' Motion for Award of Attorney's Fees and Costs to be served

upon the parties of record through the Court's ECF system.

Dated: April 18, 2025

LARKINS VACURA KAYSER LLP

/s/ Christopher J. Kayser

Christopher J. Kayser, OSB #984244
cjkayser@lvklaw.com

## INDEX

**Cases**

Defendants' Opposition to the State of Colorado's Motion for a Preliminary Injunction,
*Colorado v. Kroger Co.*,
No. 2024CV30459 (Dist. Ct. Colo. June 26, 2025)...........................................................APP-1

Preliminary Injunction Hearing Transcript,
*Stinnie v. Holcomb*,
No. 3:16-CV-00044 (W.D. Va. Nov. 15, 2018) ...............................................................APP-82

Reply in Support of Defendants' Motion to Dismiss,
*Washington v. Kroger Co.*,
No. 24-2-00977-9 (Wash. Sup. Ct. Apr. 17, 2025)........................................................APP-275

*Washington c. Texaco Refining and Marketing Inc.*,
No. C91-39R, 1991 WL 47081 (W.D. Wash. Jan. 11, 1991)........................................APP-393

**Other Authorities**

Henry Campbell Black,
A Dictionary of Law (5th ed. 1979) ..............................................................................APP-296

House Report 94-499(I) (1975) .....................................................................................APP-298

William Morris,
The American Heritage Dictionary (New College ed. 1976) ........................................ APP-319

| | |
|---|---|
| pDISTRICT COURT, CITY AND COUNTY OF DENVER, COLORADO<br>1437 Bannock Street<br>Denver, Colorado 80202 | DATE FILED: June 26, 2024 10:45 PM<br>FILING ID: F6F174D7DAD3A<br>CASE NUMBER: 2024CV30459 |
| STATE OF COLORADO<br>*ex rel.* PHILIP J. WEISER, Attorney General,<br><br>Plaintiff,<br><br>v.<br><br>THE KROGER CO.; ALBERTSONS COMPANIES, INC.; and C&S WHOLESALE GROCERS, LLC,<br><br>Defendants. | ▲ COURT USE ONLY ▲<br><br>Case Number: 2024CV30459<br><br>Div.: 414  Ctrm.: |
| Randall H. Miller, Atty. Reg. No. 33694<br>Luke Westerman, Atty. Reg. No. 51243<br>ARNOLD & PORTER KAYE SCHOLER LLP<br>1144 Fifteenth Street, Suite 3100,<br>Denver, Colorado 80202<br>Phone: (303) 863-2363<br>Fax: (303) 863-2301<br>randy.miller@arnoldporter.com<br>luke.westerman@arnoldporter.com<br><br>Matthew M. Wolf (admitted *pro hac vice*)<br>Sonia K. Pfaffenroth (admitted *pro hac vice*)<br>Jason Ewart (admitted *pro hac vice*)<br>Kolya D. Glick (admitted *pro hac vice*)<br>ARNOLD & PORTER KAYE SCHOLER LLP<br>601 Massachusetts Avenue NW<br>Washington, DC 20001<br>Phone: (202) 942-5462<br>Fax: (202) 942-5999<br>matthew.wolf@arnoldporter.com<br>sonia.pfaffenroth@arnoldporter.com<br>jason.ewart@arnoldporter.com<br>kolya.glick@arnoldporter.com<br><br>Mark A. Perry (admitted *pro hac vice*)<br>WEIL, GOTSHAL & MANGES LLP<br>2001 M Street, NW, Suite 600<br>Washington, D.C. 20036<br>Phone: (202) 682-7000 | |

Fax: (202) 857-0940
E-mail: Mark.Perry@weil.com

Luna Ngan Barrington (*pro hac vice* pending)
WEIL, GOTSHAL & MANGES LLP
767 5th Avenue,
New York, New York 10153
Phone: (212) 310-8421
luna.barrington@weil.com

Bambo Obaro (*pro hac vice* pending)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway,
Redwood Shores, California 94065
Phone: (650) 802-3083
bambo.obaro@weil.com

*Counsel for Defendant The Kroger Co.*

Christopher H. Toll, #15388
Maureen R. Witt, #10665
Alexander D. White, #48767
HOLLAND & HART LLP
555 17th Street, Suite 3200
Denver, CO 80202
Phone: (303) 295-8000
Email: ctoll@hollandhart.com
     mwitt@hollandhart.com
        adwhite@hollandhart.com

Enu Mainigi (admitted *pro hac vice*)
Jonathan Pitt (admitted *pro hac vice*)
Joshua A. Podoll (admitted *pro hac vice*)
WILLIAMS & CONNOLLY LLP
680 Maine Ave., S.W.
Washington, D.C. 20024
Phone: (202) 434-5000
Email: emainigi@wc.com
        jpitt@wc.com
        jpodoll@wc.com

Edward D. Hassi (admitted *pro hac vice*)
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Avenue, N.W.
Washington, DC 20004
Phone: (202) 383-8000

Email: thassi@debevoise.com

Michael Schaper (admitted *pro hac vice*)
Shannon Rose Selden (admitted *pro hac vice*)
J. Robert Abraham (admitted *pro hac vice*)
Natascha Born (admitted *pro hac vice*)
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
Phone: (212) 909-6000
Email: mschaper@debevoise.com
srselden@debevoise.com
jrabraham@debevoise.com
nborn@debevoise.com

Michael G. Cowie (admitted *pro hac vice*)
James A. Fishkin (admitted *pro hac vice*)
DECHERT LLP
1900 K Street N.W.
Washington, DC 20006
Phone: (202) 261-3339
Email: mike.cowie@dechert.com
james.fishkin@dechert.com

*Counsel for Defendant Albertsons Companies, Inc.*

Kathryn A. Reilly, #37331
Jennifer J. Oxley, #51587
WHEELER TRIGG O'DONNELL LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202-5647
Phone: (303) 244-1800
Email: reilly@wtotrial.com
oxley@wtotrial.com

Renata B. Hesse (admitted pro hac vice)
Daniel J. Richardson (admitted pro hac vice)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW, Suite 700
Washington, DC 20006-5215
Phone: (202) 956-7500
Email: hesser@sullcrom.com
richardson@sullcrom.com

Steven L. Holley (admitted pro hac vice)
SULLIVAN & CROMWELL LLP
125 Broad St
New York, NY 10004
Phone: (212) 558-4737
Email: holleys@sullcrom.com

*Counsel for Defendant C&S Wholesale Grocers, LLC*

**DEFENDANTS' OPPOSITION TO THE STATE OF COLORADO'S MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION .............................................................................................................. 1

BACKGROUND ................................................................................................................ 7

   A.   Competition in the Modern Grocery Industry ......................................................... 7

      1.   Key Competitors in the Grocery Industry................................................... 7

      2.   The Modern Grocery Consumer .............................................................. 10

      3.   Kroger's and Albertsons' Businesses ....................................................... 13

      4.   The Businesses of Other Grocery Retailers ............................................. 15

   B.   The Merger Transaction ......................................................................................... 17

      1.   The Structure of the Merger..................................................................... 17

      2.   The Divestiture Agreements ..................................................................... 18

      3.   The Overwhelming Benefits of the Merger ............................................. 22

   C.   Procedural History ................................................................................................. 23

      1.   Pre-Litigation Discussions ....................................................................... 23

      2.   The State's Complaint and Motion for a Preliminary Injunction ............. 24

      3.   Parallel Merger Challenges and the State's Refusal to Consolidate........... 24

      4.   Fact and Expert Discovery and Hearing Schedules ................................. 26

   D.   The State's Motion in Limine to Exclude Divestiture Evidence ........................... 27

   E.   Expert Testimony Regarding Modern Grocery Competition ............................... 28

      1.   The State's Single Economic Expert ........................................................ 28

      2.   Defendants' Anticipated Experts .............................................................. 29

LEGAL STANDARD....................................................................................................... 31

ARGUMENT .................................................................................................................... 32

**I. THE STATE CANNOT DEMONSTRATE A REASONABLE PROBABILITY OF
SUCCESS ON THE MERITS OF ITS CLAIM UNDER THE COLORADO
ANTITRUST ACT** ................................................................................................... 33

   A.   The State Bears the Burden to Show a Reasonable Probability that the Merger Will
Substantially Lessen Competition. ........................................................................ 33

   B.   The State Has Not and Cannot Satisfy Its Prima Facie Burden............................. 37

      1.   The State Fails to Establish a Relevant Product Market for the "Retail Sale of Food and
Other Grocery Products". ........................................................................ 37

      2.   The State's Vague "Highly Localized" Geographic Markets Are Unsupported .......... 45

      3.   The State Cannot Establish Harm in Any Relevant Market ........................................ 47

    C.   Even if the State Could Meet Its Prima Facie Burden, Defendants Would Rebut It ........ 53

    D.   The State Cannot Satisfy Its Ultimate Burden of Persuasion to Show That the Merger
         Will Substantially Lessen Competition in Colorado ....................................................... 58

**II.    THE STATE FAILS TO SATISFY THE "PUBLIC INTEREST" CRITERIA,
         WHICH INCLUDES THE INTERESTS OF THE ENTIRE UNITED STATES,
         NOT JUST COLORADO**.......................................................................................... 58

**III.   THE STATE HAS NOT DEMONSTRATED THAT THE BALANCE OF
         EQUITIES FAVOR A PRELIMINARY INJUNCTION**........................................... 61

**IV.    THE STATUS QUO IS PRESERVED UNDER THE FTC ACTION**...................... 62

**V.     THE STATE HAS FAILED TO DEMONSTRATE IRREPARABLE HARM**........... 63

**VI.    THE STATE'S REQUESTED REMEDY IS DISPROPORTIONATE TO ITS
         ALLEGED HARM AND IMPERMISSIBLE AS A MATTER OF LAW** ............... 64

CONCLUSION.................................................................................................................. 65

APP-6

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bd. of Cnty. Comm'rs, Cnty. of Eagle, State of Colo v. Fixed Base Operators, Inc.*,
939 P.2d 464 (Colo. App. 1997) ................................................................61

*Bd. of Cnty. Comm'rs of Cnty. of Logan v. Vandemoer*,
205 P.3d 423 (Colo. App. 2008) ................................................................64

*Bowman v. Sawyer*,
No. 19-CV-1411, ECF 41 (D. Colo. Feb. 5, 2020) ...................................59

*Bradt v. T-Mobile US, Inc.*,
No. 19-cv-07752, 2020 WL 1233939 (N.D. Cal. Mar. 13, 2020) ...........52

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ........................................................................ *passim*

*California v. Am. Stores Co.*,
495 U.S. 271 (1990) ...................................................................................32

*City & Cnty. of Denver v. Denver Firefighters Loc. No. 858, IAFF, AFL-CIO*,
320 P.3d 354 (Colo. 2014) .................................................................59, 60

*Concord Assocs., L.P. v. Entm't Props. Tr.*,
817 F.3d 46 (2d Cir. 2016) ........................................................................35

*DeHoog v. Anheuser-Busch InBev SA/NA*,
899 F.3d 758 (9th Cir. 2018) .....................................................................34

*Demartini v. Microsoft Corp.*,
662 F. Supp. 3d 1055 (N.D. Cal. 2023) ...............................................35, 52

*Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*,
612 F. Supp. 2d 330 (S.D.N.Y. 2009).......................................................43

*Florida v. HHS*,
19 F.4th 1271 (11th Cir. 2021) .................................................................62

*Fount-Wip, Inc. v. Reddi-Wip, Inc.*,
568 F.2d 1296 (9th Cir. 1978) ...................................................................45

*Fraser v. ATF*,
689 F. Supp. 3d 203 (E.D. Va. 2023) ........................................................59

*FTC v. Arch Coal, Inc.*,
  2004 WL 7389952 (D.D.C. July 7, 2004)..................................................35, 36

*FTC v. Arch Coal, Inc.*,
  329 F. Supp. 2d 109 (D.D.C. 2004) ..........................................................32

*FTC v. CCC Holdings*,
  605 F. Supp. 2d 26 (D.D.C. 2009) ............................................................56

*FTC v. Cmty. Health Sys., Inc.*,
  2024 WL 2854690 (W.D.N.C. June 5, 2024) ..............................................63

*FTC v. Foster*,
  2007 WL 1793441 (D.N.M. May 29, 2007)......................................31, 32, 61

*FTC v. H.J. Heinz Co.*,
  246 F.3d 708 (D.C. Cir. 2001) ......................................................44, 50, 55

*FTC v. Kroger Co.*,
  No. 3:24-CV-347 (D. Or.)...........................................................................6, 25

*FTC v. Lab. Corp. of Am.*,
  2011 WL 3100372 (C.D. Cal. Mar. 11, 2011) ............................................32

*FTC v. Microsoft Corp.*,
  681 F. Supp. 3d 1069 (N.D. Cal. 2023) ..........................................35, 36, 54

*FTC v. Penn State Hershey Med. Ctr.*,
  838 F.3d 327 (3d Cir. 2016)........................................................................50

*FTC v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020) ......................................................................34

*FTC v. RAG-Stiftung*,
  436 F. Supp. 3d 278 (D.D.C. 2020) ....................................................*passim*

*FTC v. Staples, Inc.*,
  190 F. Supp. 3d 100 (D.D.C. 2016) ......................................................38, 39

*FTC v. Steris Corp.*,
  133 F. Supp. 3d 962 (N.D. Ohio 2015)......................................................32

*FTC v. Sysco*,
  113 F. Supp. 3d 1 (D.D.C. 2015)..........................................................54, 57

*FTC v. Thomas Jefferson Univ.*,
  505 F. Supp. 3d 522 (E.D. Pa. 2020) ........................................................32

iv

*FTC v. Tronox Ltd.*,
    332 F. Supp. 3d (D.D.C. 2018) ..................................................................37

*FTC v. Weyerhaeuser Co.*,
    665 F.2d 1072 (D.C. Cir. 1981) ..............................................................61

*FTC v. Whole Foods Mkt., Inc.*,
    548 F.3d 1028 (D.C. Cir. 2008) .................................................................4

*FTC v. Wilh. Wilhelmsen Holding ASA*,
    341 F. Supp. 3d 27 ....................................................................................37

*Georgia v. President of the United States*,
    46 F.4th 1283 (11th Cir. 2022) ................................................................62

*Gitlitz v. Bellock*,
    171 P.3d 1274 (Colo. App. 2007) ..........................................31, 32, 33, 63

*Guardsmark, Inc. v. Borg-Warner Protective Servs.*,
    1998 WL 959664 (Tenn. Ct. App. Nov. 4, 1998) ....................................59

*Gulf States Reorganization Grp., Inc. v. Nucor Corp.*,
    822 F. Supp. 2d 1201 (N.D. Ala. 2011) ..................................................40

*Illumina, Inc. v. FTC*,
    88 F.4th 1036 (5th Cir. 2023) ..................................................................34

*In re AMR Corp.*,
    No. 22-901, 2023 WL 2563897 (2d Cir. Mar. 20, 2023) ........................52

*In re HH Liquidation, LLC*,
    590 B.R. 211 (Bankr. D. Del. 2018) ........................................................49

*In re Price Chopper/Tops Markets*,
    FTC Dkt. No. C-4753 ................................................................................20

*In re Qwest Communications International, Inc. Securities Litigation*,
    243 F. Supp. 2d 1179 (D. Colo. 2003) ..............................................60, 61

*Lloyd A. Fry Roofing Co. v. State Dep't of Health Air Pollution Variance Bd.*,
    553 P.2d 800 (Colo. 1976) ......................................................................64

*Malaney v. UAL Corp.*,
    2010 WL 3790296 (N.D. Cal. Sept. 27, 2010) ......................................52

*Minn. v. N. Sec. Co.*,
    194 U.S. 48 (1904) ...................................................................................64

*Mo. Portland Cement Co. v. Cargill, Inc.*,
  498 F.2d 851 (2d Cir. 1974)..................................................................................7, 61

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010).....................................................................................................65

*New York v. Deutsche Telekom AG*,
  439 F. Supp. 3d 179 (S.D.N.Y. 2020).........................................................25, 57, 64

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018).............................................................................................34, 37

*People ex rel. Woodard v. Colo. Springs Bd. of Realtors, Inc.*,
  692 P.2d 1055 (Colo. 1984)..................................................................................33

*ProMedica Health Sys., Inc. v. FTC*,
  749 F.3d 559 (6th Cir. 2014) ................................................................................43

*Protocol for Coordination in Merger Investigations*,
  FTC, https://bit.ly/42Atf1d (last visited June 25, 2024) ........................................23

*Rathke v. MacFarlane*,
  648 P.2d 648 (Colo. 1982) ................................................................................ *passim*

*Rebel Oil Co. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ................................................................................45

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
  778 F.3d 775 (9th Cir. 2015) ................................................................................35

*Starbucks Corp. v. McKinnkey*,
  No. 23-367, slip op. (U.S. June 13, 2024) ...........................................................61

*State ex rel. Meyer v. Ranum High Sch.*,
  895 P.2d 1144 (Colo. App. 1995).......................................................................65

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
  875 F.2d 1369 (9th Cir. 1989) ................................................................................39

*U.S. Healthcare, Inc. v. Healthsource, Inc.*,
  986 F.2d 589 (1st Cir. 1993)................................................................................41

*United States v. Anthem, Inc.*,
  236 F. Supp. 3d 171 (D.D.C. 2017)....................................................................53

*United States v. AT&T Inc.*,
  310 F. Supp. 3d 161 (D.D.C. 2018)................................................................34, 37

*United States v. AT&T Inc.*,
    916 F.3d 1029 (D.C. Cir. 2019) ...................................................................33, 35

*United States v. Baker Hughes Inc.*,
    908 F.2d 981 (D.C. Cir. 1990) ................................................................. *passim*

*United States v. E.I. du Pont de Nemours & Co.*,
    353 U.S. 586 (1957) ...........................................................................................37

*United States v. Energy Sols., Inc.*,
    265 F. Supp. 3d 415 (D. Del. 2017) ..................................................................38

*United States v. Engelhard Corp.*,
    126 F.3d 1302 (11th Cir. 1997) .........................................................................39

*United States v. H&R Block, Inc.*,
    833 F. Supp. 2d 36 (D.D.C. 2011) .....................................................................57

*United States v. Int'l Tel. & Tel. Corp.*,
    342 F. Supp. 19 (D. Conn. 1970) .......................................................................45

*United States v. M.P.M., Inc.*,
    397 F. Supp. 78 (D. Colo. 1975) .......................................................................57

*United States v. Philadelphia Nat'l Bank*,
    374 U.S. 321 (1963) ...........................................................................................53

*United States v. Sungard Data Sys.*,
    172 F. Supp. 2d 172 (D.D.C. 2001) ...................................................................39

*United States v. U.S. Sugar Corp.*,
    73 F.4th 197 (3d Cir. 2023) ...............................................................................43

*United States v. UnitedHealth Grp., Inc.*,
    630 F. Supp. 3d 118 (D.D.C. 2022) .......................................................34, 35, 37

*W. Parcel Express v. United Parcel Serv. of. Am., Inc.*,
    65 F. Supp. 2d 1052 (N.D. Cal. 1998) ..............................................................38

*Westman Comm'n Co. v. Hobart Int'l, Inc.*,
    796 F.2d 1216 (10th Cir. 1986) .........................................................................42

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..............................................................................................31

**<u>Statutes</u>**

C.R.S. § 6-4-107(1) ..............................................................................................33

Clayton Act, 15 U.S.C. §§ 12-27 ............................................................... *passim*

**<u>Other Authorities</u>**

*Protocol for Coordination in Merger Investigations*,
    FTC, https://bit.ly/42Atf1d (last visited June 25, 2024) .........................................23

APP-12

## INTRODUCTION

The Kroger Co.'s acquisition of Albertsons Companies, Inc. will benefit consumers nationwide, providing Coloradans with lower prices and better shopping experiences at their local grocery stores. As part of the merger, Kroger will invest billions of dollars into price investments, capital improvements, and associate wages and benefits at Albertsons stores nationwide. It will ensure that no stores close as a result of the merger, that all frontline associates will remain employed, that existing collective bargaining agreements will continue, and that associates will continue to receive industry-leading health care and pension benefits. It will improve consumers' and employees' experiences immediately, and for years into the future.

The Colorado Attorney General's lawsuit asks this Court to deprive the entire country of those benefits by enjoining the $24.6 billion merger in its entirety. But the State's Motion for a Preliminary Injunction ("Mot.") attacks a transaction that does not—and will never—exist. Specifically, both the State's Motion and its recently filed expert report completely fail to address the real-world implications of Defendants' April 22, 2024 Amended Divestiture Agreement. Pursuant to that Agreement, Kroger will acquire *just 14 stores* in Colorado, meaning Kroger will divest almost the entirety of Albertsons' Colorado-based operations to C&S Wholesale Grocers, LLC ("C&S"), a family-owned business with more than 100 years of operational experience in the grocery industry. The Amended Divestiture Agreement ensures that C&S will compete rigorously with Kroger after the merger.

C&S is an ideal candidate to provide that competition. C&S is the supplier to more than 7,500 grocery stores, retail chain stores, and military bases nationwide; it operates under multiple store names (known as "banners"), including "Piggly Wiggly" and "Grand Union"; and it was approved by the Federal Trade Commission ("FTC") as a divestiture buyer in a recent grocery

1

transaction.  In addition to its wholesale and retail operations, C&S provides a comprehensive suite of services to its customers—from retail development to digital marketing and private brand support—demonstrating that C&S knows what it takes to run a successful grocery store.  C&S also has the necessary capital:  It is the eighth-largest privately owned company in the country, with net revenues in the 2023 fiscal year of ███████, and it has agreed to invest more than $2.9 billion in purchasing Albertsons' assets.  The State's scattershot and speculative attacks on C&S provide no basis for this Court to second-guess C&S's reasoned business judgment.

Merger litigation requires this Court to predict how the merger will affect competition in the future.  In Colorado, the post-merger competitive landscape will not reduce the number of grocery options available to Coloradans.  In the 14 Albertsons stores that Kroger will acquire, consumers will see an improved shopping experience, with lower prices, fresher produce, and better customer service.  And in the stores that will be divested to C&S, consumers will walk into Albertsons stores (mostly Safeways) run by an enthusiastic and well-capitalized new owner with an expansive supply-chain network and more than a century of experience in the grocery industry. The State's predictions of competitive harm in the post-merger world flatly ignore that reality.

The State ignores the market realities of today's grocery industry as well.  The State's theory of harm rests on an antiquated image of suburban consumer behavior, in which a single member of each household goes on a weekly shopping trip to buy all their family's groceries and household goods, from "soaps" to "paper goods," to "wine, beer, and/or distilled spirits," spending the family's entire grocery budget at a single store.  Mot. 4-5.  But the State's depiction finds no support in real-world consumer behavior.  To the contrary, the data shows that the average household takes 2.6 trips to the grocery store per week; that less than 7% of customers shop at a

single store for their groceries; and that consumers are purchasing their groceries and household goods from a wide variety of online and brick-and-mortar retailers.

In today's landscape, this merger will ensure the continuation of robust competition in the grocery industry, both in Colorado and across the United States.  The merger will allow Kroger to better compete with global behemoths like Walmart, the nation's largest grocery retailer and the biggest company by revenue in the United States; with Costco, the twelfth-largest company in the country, which has grown exponentially over the past decade while increasing its grocery selection; and with Amazon, the multinational powerhouse, which has leapt into the grocery space through its massive online grocery platform, its acquisition of Whole Foods, and the launch of its Amazon Fresh business.  These Fortune 15 companies (and others) are laser-focused on the grocery retail market:  Groceries provide Walmart with "most of its U.S. revenue," and it "competes fiercely" with grocery retailers, "including discounters like Aldi and traditional grocers such as Publix and Kroger."  Sarah Nassauer, *Walmart's Reign as America's Biggest Retailer Is Under Threat*, Wall Street Journal (May 15, 2024) (Ex. 1).[1]  At the same time, "Amazon could grab up to 20% of the U.S. grocery market by 2030."  *Id.*  Simply put, modern competition for groceries and "household goods" extends far beyond Kroger and Albertsons, and the State fails to confront that reality.

*     *     *     *

For a host of reasons, this Court should deny the Motion.  The State has a heavy burden to show that is it entitled to the "extraordinary relief" of a preliminary injunction, *Rathke v. MacFarlane*, 648 P.2d 648, 654 (Colo. 1982), and it plainly has not carried that burden.

---

[1] All references to exhibits are attached to the Declaration of Randall H. Miller, filed concurrently with this submission.  Citations to the C&S Amended Divestiture Agreement ("Am. C&S Agreement") refer to the submission filed under seal with this Court on May 17, 2024.

3

To begin, the State fails to establish the foundational elements of an antitrust claim challenging a merger: a well-defined (1) product market and (2) geographic market in which to assess competition. The State's suggested product market delineates different categories of competitors (*i.e.*, mass merchandisers, club stores, natural grocers) then excludes those categories *entirely* from its analysis without even examining the data showing where consumers shop for groceries. But in the real world—as under antitrust law—the Attorney General does not determine the scope of a relevant product market; consumers do. *See Brown Shoe Co. v. United States,* 370 U.S. 294, 337 (1962) (emphasizing market definition must reflect "commercial realities of the industry"); *see also FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1063 (D.C. Cir. 2008) (Kavanaugh, J., dissenting) ("[T]he FTC's case is weak and seems a relic of a bygone era when antitrust law was divorced from basic economic principles."). And in the real world, concrete data on consumer behavior fundamentally undermines the State's proposed product market.

The State's case ignores the robust competition that Kroger and Albertsons face from all angles: It barely acknowledges the competitive pressure of large retailers like Walmart and Target, *see, e.g.*, Mot. 39; it asks this Court to disregard "[c]lub [s]tores like Costco and Sam's Club," Mot. 5; and it fails to even *mention* Amazon. Yet these modern retailers recognize that groceries draw shoppers into their stores and onto their websites, and they have made every effort to expand their food offerings. Other competitors are following the same playbook: value stores like Dollar General challenge Kroger's market position, regularly opening new locations and expanding their food offerings; retailers like Whole Foods and Sprouts apply strong competitive pressure for premium, natural, and organic products, proliferating in urban centers like Denver and Boulder; meanwhile, Colorado-based Natural Grocers and stores like Clark's provide important regional competition. The State ignores all of those competitors, refusing to even mention them by name.

4

But by failing to consider the world of grocery retail as it exists today, the State tethers itself to a deeply misinformed and short-sighted theory of competition that is not supported by data, evidence, or logic.

The State's proposed geographic markets—consisting of entire "city areas"—lack a logical foundation as well.  The State's geographic markets fail to account for consumers' willingness to travel farther to certain stores (like Costco and Walmart), or their ability to order groceries delivered to their doorstep through e-commerce services like Instacart, DoorDash, Amazon, and Uber.  Not even the State's expert, Dr. Nitin Dua (whose report was served just last week) agrees with the State's version of Colorado's geographic markets:  The State's Motion counts 39 separate "city areas" within the State, while Dr. Dua ███████████.  Expert Rep. of Nitin Dua at 4 (June 17, 2024) ("Dua Rep.") (Ex. 2).  The State and its expert fail to explain the disparity.

The State and its expert also pretend the Amended Divestiture Agreement does not exist, notwithstanding this Court's holding that "it is appropriate for the Court to consider that evidence at the preliminary injunction hearing."  MIL Hr'g Tr. at 82 (May 31, 2024).  Thus, despite the State's concession that "some of [its] concerns … were addressed, in part, by the new [divestiture] plan," MIL Hr'g Tr. at 19 (May 31, 2024) (R. Alexander), the State has not supplemented or amended its Motion to account for the expansive new package of assets that C&S is now purchasing.  The effects of the State's tactics are tangible and prejudicial:  While the Motion asserts that Kroger will acquire 52 Albertsons stores in Colorado, Mot. 14, the reality is that Kroger will acquire just 14.  Accordingly, Defendants largely are forced to speculate in this Opposition about the State's concerns over C&S and the Amended Divestiture Agreement.  Yet this Court cannot grant a Motion that demonstrably fails to take into account the facts of the *actual* merger.

Even beyond the merits of the State's antitrust claim, the State fails to meaningfully confront the criteria required to receive the "extraordinary relief" of a preliminary injunction. *Rathke*, 648 P.2d at 651. For example, the State cites no evidence whatsoever in support of the "public interest" element. Nor can it. Where, as here, a merger is nationwide, the "public" includes the citizens of all 50 states. Yet the State has not even *attempted* to prove that enjoining the merger is in the interest of the entire nation; nor is it empowered to act as a nationwide antitrust enforcer. And while this Court held today that the scope and constitutionality of the State's requested relief could not be decided "as a matter of law" on a motion to dismiss, *see* Order Denying Defs.' Mot. to Dismiss at 13, 21 (June 26, 2024), the procedural posture of the State's Motion is fundamentally different. On this Motion, *the State* is the movant, and it now has the burden of satisfying the "public interest" element with *evidence*. Its perfunctory two-paragraph argument, Mot. 65, does not meaningfully attempt to meet that burden.

Finally, the State filed this Motion at the same time as its Complaint, with remarkably little evidentiary support, and before any discovery took place. As a result, it has forced Defendants into an unorthodox two-phased procedural posture that is both inequitable and prejudicial. Kroger and Albertsons have already stipulated that they will not close the merger until after a ruling on the motion for a preliminary injunction in the parallel FTC Action: *FTC v. Kroger Co.*, No. 3:24-CV-347 (D. Or.). If this Court denies the State's request for a preliminary injunction, therefore, the status quo remains. In that scenario, the State will seek to supplement its evidence and expert reports and take a second bite at the apple. June 10, 2024 Hr'g Tr. at 40-41 (A. Biller) (claiming it is "undoable" for the State's experts to prepare for the preliminary injunction hearing with the discovery gathered by the discovery deadline). If the State wins its Motion, however, it can claim victory and score the publicity points that it seeks. Meanwhile, Defendants bear all the risk. Were

6

this Court to enjoin the merger, even "preliminarily," it could threaten the entire transaction by delaying the closing beyond the contractual "outside date" of October 9, 2024. *See Mo. Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851, 870 (2d Cir. 1974) ("Experience seems to demonstrate that … the grant of a temporary injunction in a Government antitrust suit is likely to spell the doom of an agreed merger."). Particularly with stakes this high, this Court should not be the first court in history to grant a preliminary injunction against a merger nationwide under state law.

## BACKGROUND

### A.    Competition in the Modern Grocery Industry

Colorado's theory of the case rests on the premise that the American grocery industry caters to an antiquated suburban prototype: a single-family home with one working adult and another stay-at-home spouse who handles all the family's weekly grocery shopping at a single store. But the State's vision of grocery consumers is unsupported by any data, and it is divorced from today's reality. The State disregards entirely the competitive pressure from high-volume grocery sellers like Costco, which is steadily gaining share. It relegates to the fringes grocers like Whole Foods and Sprouts. And it ignores the emergence of same-day deliveries through Amazon Prime and other e-commerce platforms. In short, the State refuses to acknowledge that so-called "traditional" grocery stores no longer hold an unchallenged grip on consumers' weekly grocery purchasing.

### 1.    Key Competitors in the Grocery Industry

Times have changed, and the State's outdated view of competition in the grocery industry no longer reflects reality. Most prominently, powerful companies in the grocery retail space have overhauled how consumers buy their groceries. Walmart—a store that rose to prominence selling household goods ranging from kids' bikes to lawn chairs—is now by far the biggest grocery

7

retailer in the United States.[2]  Stores like Target are trying to catch up.  Target's "PFresh" line, for

example, offers fresh produce along with its other full-scale grocery services.[3]  Target's Chief

Food and Beverage Officer observed that its grocery sections are "actually a gateway to the rest of

the store," and Target "wants more customers to think of it when checking off the[ir] grocery list."[4]

Meanwhile, club stores like Costco and Sam's Club have expanded their grocery footprints.

Sarah George, Costco's Senior Vice President of Merchandising for Corporate Food and Sundries,

testified that Costco's grocery business ███████████████████████████[5]  Costco's

business model has allowed the company to ██████████████████████████████

██████████████████████████████████████████████████████████.[6]

For its part, Sam's Club has explained that, ████████████████████████████

██████████████████████████████████████████████████████████

██████████████████[7]

The data shows that a high percentage of Kroger and Albertsons customers are also club-

store members, placing retailers like Costco and Sam's Club at the forefront of competition in the

grocery industry.[8]  Moreover, "club" stores do not require a membership for customers to shop at

their stores through services like Instacart, which further expands their reach.[9]

---

[2] *See* Nassauer, *Walmart's Reign as America's Biggest Retailer Is Under Threat* (Ex. 1).
[3] Tanzina Vega, *Shopping at Target? Now You Can Pick Up a Dozen Eggs*, New York Times (Dec. 16, 2010) https://nyti.ms/4eGHrva ("Target, the store that sells things like diapers and electronics, has been aggressively marketing its fresh food offerings this year in a major nationwide campaign.").
[4] Melissa Repko, *Target Wants Shoppers to Think of it for Groceries as Retailer Braces for Leaner Spending*, CNBC (May 16, 2023), https://cnb.cx/3xiO9XK..
[5] Deposition of Sarah George at 67:10-20 (June 10, 2024) ("George Dep.") (Ex. 3).
[6] George Dep. at 71:4-11, 85:3-7 (Ex. 3)
[7] Deposition of Evan Grisham at 27:6-13, 39:14-21 (June 18, 2024) ("Grisham Dep.") (Ex. 4).
[8] *See, e.g.*, KRPROD-CO-LIT-000218285 (███████████████████████████
███████) (Ex. 5).
[9] George Dep. at 42:4-13 (Ex. 3).

Trader Joe's has also strengthened its market reach, with its grocery performance hailed as one of the "breakthrough stories in retail."[10]  Its success has fueled nationwide growth, with dozens of recent and planned store openings as the company expands into new markets.[11]

Other grocery retailers have gained footholds, too.  This month, the *New York Times* heralded a new era of so-called "ethnic" grocery stores:  "As Asian groceries like H Mart, Patel Brothers and 99 Ranch expand, they are reshaping American eating habits, and the American grocery market."[12]  Colorado-based Natural Grocers likewise illustrates the growth of regional chains, tailoring offerings to urban centers across the Front Range and coupling its all-natural 100% organic and non-GMO products with in-store nutrition classes, a one-on-one nutrition coaching service, and the largest selection of vitamins and supplements of any grocery chain.[13]

And then there's Amazon.  In 2017, the e-commerce giant announced its entry into the brick-and-mortar grocery industry with a bang, purchasing Whole Foods and increasing competition overnight.[14]  Today, Whole Foods has an extensive Colorado footprint, with 24 stores across Colorado (~5% of Whole Foods stores nationwide).[15]

---

[10]  R.J. Hottovy, *The Secret to Trader Joe's Success in 2023*, Placer.ai (Sept. 15, 2023), https://bit.ly/4blbPZc..
[11]  Linda Moss, *Trader Joe's Scouts Out Two Dozen New Stores Across US as Competition Picks Up*, CoStar News (June 3, 2024), https://bit.ly/4civOsT; Deposition of Kathryn Cahan at 63:18-25 (June 6, 2024) ("Cahan Dep.") (Ex. 6).
[12]  Priya Krishna, *Don't Call It an 'Ethnic' Grocery Store*, New York Times (June 11, 2024), https://nyti.ms/3z9ZGZC.
[13]  *Our Standards*, Natural Grocers,  https://bit.ly/45ARlKI (last visited June 25, 2024); *Event-Finder*, Natural Grocers, https://bit.ly/3zgNyq5 (last visited June 25, 2024); *Nutritional Health Coaches*, Natural Grocers,  https://bit.ly/3KV1W9R  (last visited  June 25, 2024); NG-Kroger_0000118 (Ex. 7).
[14]  Seth Stevenson, *It's Finally Clear Why Amazon Bought Whole Foods*, Slate.com  (June 28, 2021), https://bit.ly/3VXIVtD.
[15]  WholeFoods, https://bit.ly/3VWuR3E (last visited June 25, 2024).

9

Both Amazon's brick-and-mortar grocery stores and its online grocery business ████ ███████████████████████████████.[16] To ensure its pricing is competitive, ████ ██████████████████████████████████████████████████████████ ██████████████████.[17] Amazon's grocery sales ████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ █████████████████[19] Amazon's same-day fulfillment centers, █████████████ ██████████████████████████████████████████████████████████[20]

Amazon is expanding these same-day fulfillment centers, ████████████████████ ████████.[21] Amazon also has partnerships with third-party stores, ███████████ ██████████████████████████████████████████████████████████[22]



### 2.    *The Modern Grocery Consumer*

The proliferation of grocery retail competitors reflects changes in consumers' grocery-purchasing behavior. While consumers might once have relied on a single store to provide "substantially all of their food and grocery shopping requirements," as the State claims, Mot. 27, such a world no longer exists. The data shows that less than 7% of U.S. customers shop exclusively at one food store in a month,[23] indicating that they seek value across different stores and channels

---

[16] Deposition of Sam Heyworth at 48:18-49:8 (June 7, 2024) ("Heyworth Dep.") (Ex. 8) (████████████████████████████████████████████████████████████).
[17] *Id.* at 32:16-33:5.
[18] *Id.* at 28:8-13, 30:3-8.
[19] *Id.* at 24:12-25:19, 67:22-68:2.
[20] *Id.* at 39:11-24.
[21] *Id.* at 40:18-22.
[22] *Id.* at 77:6-78:22.
[23] Food Marketing Institute, 2023 US Grocery Shopper Trends at 17 (Ex. 9).

10

rather than gravitating to the alleged "ease of one-stop shopping." *Contra* Mot. 4.[24] Indeed, in 2023, the average household made 2.6 trips to purchase groceries each week.[25] The modern grocery consumer shops in multiple trips, at multiple stores, and across multiple channels.[26]

The data shows that Americans' shopping trips—and consumers' grocery dollars more broadly—are no longer concentrated at so-called "traditional" grocery stores. Industry reports show that consumers shopped at an average of 3.6 channels and 5.2 banners per month, with millennials shopping at considerably more channels (with particularly high Internet shopping usage).[27] Supporting that data, the Department of Agriculture found that, in 1997, "grocery stores" accounted for 72% of food for home consumption.[28] By 2022, however, that figure had dropped to approximately 54%.[29] In contrast, "warehouse clubs and supercenters" like Costco and Walmart increased their share of food spending almost threefold over the same period, from 8% to about 22%.[30] Meanwhile, by around 2010, consumers' overall spending on "food away from home" had surpassed the amount they spend on food at home; the data shows that Americans are dining out more and shopping for groceries less.[31]

Reinforcing these trends, Kroger's customers spend just a small fraction of their total "grocery dollars" each week at Kroger and Albertsons stores. In 2023, ███████████████████

████████████████████████████████████████████

---

[24] *Id.*
[25] *Id.* at 16.
[26] *Id.* at 15.
[27] *Id.* at 17.
[28] U.S.D.A. ERS, *Interactive Charts: Food Expenditures*, last updated Sept. 27, 2023, https://bit.ly/3XAGRJh.
[29] *Id.*
[30] *Id.*
[31] *Id.*

11



[33]

The same is true for Albertsons:  From early 2023 to early 2024,

[36]  Indeed, the typical Albertsons' customer

[37]

The expansion of e-commerce grocery retailers has also changed how people shop for food and groceries, with online grocery shopping now accounting for approximately 18% of consumers' weekly grocery spending.[38]  Unsurprisingly, Amazon dominates online grocery shopping,

.[39]  As of Q4 2022,

."[40]

The COVID-19 pandemic in March 2020 accelerated the ongoing competitive changes to the grocery ecosystem.[41]  In a matter of days, consumers were forced to overhaul their shopping

---

[32] KRPROD-WA-LIT-000168076 at -8092 (Ex. 10).
[33] *Id.*
[34] ACI_LIT_0003144423 at -4457 (Ex. 11).
[35] *Id.*
[36] *Id.* at -4424.
[37] ACI_LIT_0004380550 at -0550, -0555, -0557(Ex. 12).
[38] Food Marketing Institute, 2023 US Grocery Shopper Trends at 24 (Ex. 9).
[39] ACI2R-0018145814 at 3 (Ex. 13).
[40] ACI2R-0015502256 (Ex. 14)
[41] U.S.D.A. ERS, *Interactive Charts: Food Expenditures*, last updated Sept. 27, 2023, https://bit.ly/3XAGRJh.

habits, and competitors recognized the transformation as an opportunity. E-commerce companies like UberEats, DoorDash, Amazon, and Instacart expanded consumers' geographic grocery delivery options. Other delivery competitors have emerged, too. And there will be more. Simply put, consumers do not need to push a cart down an aisle to buy their groceries. Kroger must compete vigorously to ensure that many still choose to do so.

### 3. *Kroger's and Albertsons' Businesses*

In Colorado, Kroger competes under the City Market and King Soopers banners, while Albertsons operates the Safeway and Albertsons banners. Mot. 1-2. Those banners face competition from multiple angles within Colorado.

Joe Kelley, the president of King Soopers, testified that Walmart███████████████████████████████████████[42] Across all levels of the company, ███████████████████████



███████████████████████████[45] Apart from Walmart, Kroger also faces a broad swath of competitors in Colorado, including Costco, Natural Grocers, Whole Foods, Amazon, Sprouts, Clark's, drug stores, and convenience stores.[46]

---

[42] Deposition of Joseph Kelley at 76:13-15, 99:20-23 (May 29, 2024) ("Kelley Dep. Day 1") (Ex. 15).
[43] *See, e.g.*, Deposition of Andy Groff at 329:20-330:16 (May 29, 2024) ("Groff Dep.") (Ex. 16); *see also id.* at 92:17-93:18 ████████████████████████████████████████.
[44] *See, e.g.*, Kelley Dep. Day 1 at 119:13-15 (Ex. 15).
[45] Deposition of Rodney McMullen at 170:22-171:1 (June 6, 2024) ("McMullen Dep.") (Ex. 17); *see* Deposition of Stuart Aitken at 210:9-211:8 (June 5, 2024) ("Aitken Dep.") (Ex. 18).
[46] Deposition of Joseph Kelley (Day 2) at 27:17-28:11 (May 30, 2024) ("Kelley Dep. Day 2") (Ex. 19).

Albertsons' witnesses and ordinary-course documents confirm that it too faces intense competition in Colorado from many retailers.[47] Todd Broderick, the President of the Denver Division (which includes the vast majority of Albertsons' stores in Colorado), ███████████

███████████████████████████████████

██████████████[48] Tina Lucero, former Vice President of Marketing & Merchandising for the Denver Division, observed that ██████████████████████████████

████████████████████[49] Lucero ███████████████

███████████████████████████████████

██████[50] And John Colgrove, President of the Intermountain Division at Albertsons (which covers five stores in Colorado), testified that ████████████████████

███████████████████████████████████

███████[51] Others at Albertsons have described the same evolving competitive threats—both

---

[47] ACI_LIT_0003144423 at -4431, -4437 (national competition) (Ex. 11); ACI2R-0007338568 at -8579 to -8582, -8586, -8604 to -8605 (Colorado competition) (Ex. 20); *see also* ACI2R-0003307404 at 2 (further detail on Colorado competition) (Ex. 21); ACI2R-0000069406 (email discussing Colorado competition) (Ex. 22); ACI2R-0000902619 (email discussing national competition) (Ex. 23).

[48] Deposition of Todd Broderick at 156:3-11 (June 11, 2024) ("Broderick Dep.") (Ex. 24); *see also* Deposition of Dennis Schwarz at 107:6-9, 115:14-12 (June 5, 2024) ("Schwarz Dep.") (Ex. 25).

[49] Deposition of Bettina Lucero at 25:16-23 (June 19, 2024) ("Lucero Dep.") (Ex. 26); ACI2R-0006625206 (███████████████████████████████ (Ex. 27); ACI2R-0003307404 ████████ (Ex. 21); ACI2R-0023362735 ██████████████ (Ex. 28).

[50] *See, e.g.*, ACI2R-0015165210 (Ex. 29); ACI2R-0015207363 (Ex. 30).

[51] Deposition of John Colgrove at 23:3-25:21 (May 22, 2024) ("Colgrove Dep.") (Ex. 31); *see also* Deposition of Teresa Whitney at 57:20-62:15 (May 16, 2024) ("Whitney Dep.") (Ex. 32)

███████████████████████████████████
███████████████████████████████████

nationwide and in the Denver Division.[52]  Indeed, as of March 2023, ███████████
█████████████████████████ [53]

### 4. *The Businesses of Other Grocery Retailers*

Third-party retailers in Colorado recognize the same competitive dynamics that Kroger and

Albertsons are confronting.  Costco, which has sixteen locations in Colorado, ████████████

█████████████████████████████████████████ [54] Costco's

perspective is ███████████████████████████ [55] Costco competes with

its grocery competitors on multiple dimensions, ████████████████████████████

█████████████████████ [56]

Sprouts, a national grocery retailer with 33 stores in Colorado,[57] similarly competes ██

████████████████████████████████████████████████████

██████████ [58] Sprouts regularly ██████████████████████████████

████████ [59] Trader Joe's, with ten Colorado stores, likewise ███████████

████████████████████████████████████████████████████

██████████ [60]

---

[52]ACI2R-0000069406 ████████████████████████████████████████

█████████████████████████████████████████ ) (Ex. 22); *see also* ACI2R-

0009845992 ███████

█████████████) (Ex. 33).

[53] ACI2R-0015502134 at -2167 (Ex. 34).

[54] George Dep. at 26:7-27:3 (Ex. 3).

[55] *Id.* at 27:16-24.

[56] *Id.* at 22:22-23:10.

[57] *See* Sprouts Farmers Market, https://bit.ly/3zjlPFa (last visited June 25, 2024).

[58] Deposition of John Neal at 43:19-44:15 (June 4, 2024) ("Neal Dep.") (Ex. 35).

[59] *Id.* at 58:3-64:4.

[60] Cahan Dep. at 39:15-21, 151:5-9 (Ex. 6).

15

Whole Foods—another major retailer—views the grocery market as █████████ ███████████████████████████████████[61] Whole Foods, which has more than twenty locations across Colorado, views █████████████████████████████████ ███████[62] Amazon Fresh shares Whole Foods' view of the competitive landscape.[63] And an Amazon.com representative testified ██████████████████████████████ █████████████████████████████████████████████████████████ ███████████[64]

For its part, Walmart, the nation's largest grocer, ████████████████████████ █████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████[66] Walmart also ████████████████████████████████████████████ ██████[67] Walmart sees ████████████████████████████████████ ███████████████████████████████████████████████ Sam's Club, which is owned by Walmart, ███████████████████████████████████ █████████████████████████████████████████████████████████ █████████████████████████████[69] Together, Walmart and Sam's Club have more than 100 locations across Colorado.



---

[61] Deposition of Sonya Oblisk at 132:3-18 (June 11, 2024) ("Oblisk Dep.") (Ex. 36).
[62] *Id.* at 13:15-16:13.
[63] *Id.* at 21:13-25:8.
[64] Heyworth Dep. at 48:18-49:8 (Ex. 8); *see id.* at 24:8-25:19; 26:4-24.
[65] Deposition of Marc Lieberman at 23:18-27:15 (June 20, 2024) ("Lieberman Dep." (Ex. 37).
[66] *Id.* at 43:15-24.
[67] *Id.* at 40:13-41:20.
[68] *Id.* at 105:9-18.
[69] Grisham Dep. at 23:1-33:4 (Ex. 4).

Dollar stores likewise compete with various retailers for share of shoppers' grocery wallet.

Dollar General testified ███████████████████████████████████

███████████████[70] Family Dollar recognizes ████████████████████

████████████████[71] In addition, █████████ Family Dollar stores offer delivery of

consumables through Instacart.[72]

### B.    The Merger Transaction

The merger at issue in this case consists of two components: (1) Kroger's acquisition of

Albertsons' stores and assets in the Merger Agreement; and (2) Kroger's divestiture of 579 stores

and substantial supporting assets to C&S (the "Amended Divestiture Agreement").

#### 1.    The Structure of the Merger

In early 2022, Albertsons issued a press release and SEC filings announcing that it was

considering various strategic alternatives, including the potential sale of assets.[73] After that

announcement, Kroger pursued the acquisition of Albertsons, seeking to combine the companies'

complementary assets and expand Kroger's lower-priced business model to Albertsons' existing

operations. After months of negotiations, on October 13, 2022, Kroger and Albertsons announced

the Merger Agreement, under which Kroger will acquire Albertsons for $24.6 billion, subject to

certain adjustments.[74]

Kroger and Albertsons operate nationwide, with Kroger stores in 35 states and Albertsons

stores in a different set of 34 states.[75] In the vast majority of states, Kroger and Albertsons do not

overlap. In the following 29 states, either Kroger or Albertsons (or both) own no stores at all, such

---

[70] Deposition of Nicholas Snow at 37:12-38:14 (June 6, 2024) ("Snow Dep.") (Ex. 38).
[71] Deposition of Kurt Unkelbach at 72:8-73:3 (May 30, 2024) ("Unkelbach Dep.") (Ex. 39).
[72] *Id.* at 74:16-22.
[73] Albertsons' 8-K SEC Filing (Apr. 12, 2022), https://bit.ly/4cklr7W.
[74] Compl. ¶ 53.
[75] Compl. ¶ 19 & n.7; *id.* ¶ 22 n.8.

that they do not even arguably compete for the same consumers: OK, MN, PA, NJ, NY, CT, RI, MA, VT, NH, ME, WV, KY, TN, NC, SC, GA, FL, AL, MS, OH, MI, WI, IA, MO, KS, ND SD, and HI.[76]  And in another three states, Kroger and Albertsons' stores are nowhere near each other: in Arkansas, Albertsons has only one store in the southwest, where Kroger is not present; in Nebraska, Kroger operates in Omaha, while Albertsons operates only in the western part of the state; and in Delaware, there is no Albertsons store within five miles of a Kroger store.[77]

In the states without overlap, the merger undisputedly will be a story of expansion and efficiencies that will allow Kroger to strengthen Albertsons' presence, improve the consumer shopping experience, and better compete against powerful retailers.  None of those states have challenged the merger, and the State of Colorado has not alleged any harm in those states.

Anticipating regulators' concerns in specific geographic markets where Kroger and Albertsons do overlap, however, the Merger Agreement employs the common antitrust solution of a divestiture, providing for the potential divestiture of up to 650 stores.[78]  A significant divestiture of assets was accordingly built into the Merger Agreement from the beginning.

## 2.     *The Divestiture Agreements*

On September 8, 2023, Kroger and Albertsons announced that it had entered into a binding divestiture agreement with C&S.[79]  That agreement permitted Kroger to add up to 237 additional stores to the original 413-store divestiture package to address any concerns from regulators.  Thus, for nine months, the State has known that C&S will be the divestiture buyer.

---

[76] *Investor Presentation*, KrogerAlbertsons.com (Oct. 14, 2022), https://bit.ly/4eGd7ki.
[77] *Id.*
[78] Agreement and Plan of "Merger By and Among Albertsons Companies, Inc. The Kroger Co. and Kettle Merger Sub, Inc. ("Merger Agreement") (Oct. 13, 2022) at 65 (Ex. 40).
[79] *See* Compl. ¶ 173-185; Kroger Press Release, *Kroger and Albertsons Companies Announce Comprehensive Divestiture Plan with C&S Wholesale Grocers, LLC in Connection with Proposed Merger*, Kroger.com (Sept. 8, 2023), https://bit.ly/4bgcUBx.

As discovery has shown, C&S is a well-capitalized and established grocery operator, with more than 100 years of successful grocery industry experience. Indeed, C&S is the eighth-largest privately owned company in the United States, with annual revenues exceeding ███████ ████████████████████████.[80]

C&S is an ideal divestiture candidate. C&S's primary business is grocery wholesale, meaning it has expertise in the core logistics of the grocery business: shipping food and household goods across the country. As part of that business, C&S delivers groceries and other household goods to an extensive network of retail customers, supplying more than 7,500 stores with nearly 137,000 different products.[81] C&S also boasts a comprehensive suite of services to its retail customers, including retail development such as store design and layout, equipment supply, merchandising support, and business planning solutions; pharmacy network support; retail marketing and advertising; digital marketing such as social media management and loyalty and personalized marketing; retail technology including mobile order entry, point-of-sale support, and accounting/payroll services; and private brand support.[82]

Despite C&S's extensive experience in the grocery industry as a wholesaler and service provider, it has in the past suggested that it did not have plans to expand into the retail space. *See* Mot. 3. But C&S has changed its long-term business plan.[83] Just as companies like Walmart and

---

[80] Deposition of Eric Winn at 148:23-149:3 (June 4, 2024) ("Winn Dep. Day 1") (Ex. 41); *id.* at 154:23-155:3.

[81] *See* Forbes, *America's Largest Private Companies: C&S Wholesale Grocers* (Nov. 14, 2023) https://bit.ly/4eukueR.

[82] Our Stores and Services, C&S Wholesale Grocers, https://www.cswg.com/services/.

[83] Deposition of Eric Winn at 378:2-10 (June 5, 2024) ("Winn Dep. Day 2") (Ex. 42) ██████████████████████████████████████████████████████████████ *see* Project 2025 Update deck (FTC-CS-00001695) (Ex. 43).

Amazon have sought to grow their grocery business, C&S started searching for new opportunities in the grocery retail industry.

As part of that expansion plan, C&S has acquired multiple retail grocery outlets. Today, C&S operates retail banners in various states, including stores in Wisconsin under the banner "Piggly Wiggly Midwest" and in New York and Vermont under the banner "Grand Union."[84] C&S increased these retail operations in the Northeast as part of a divestiture that the FTC blessed in a prior grocery merger. *See In re Price Chopper/Tops Markets*, FTC Dkt. No. C-4753, https://bit.ly/45wUxXW. As part of that divestiture process, in 2021, the FTC reviewed C&S's business and found C&S to be "a suitable purchaser that is well-positioned to enter the relevant markets through the divested stores and prevent the increase in market concentration and likely competitive harm that otherwise would have resulted from the Merger." *Id.* at 3. C&S has continued to run and maintain the competitiveness of each of those divested stores.[85]

When Kroger approached C&S with the opportunity to purchase up to 650 divested stores as part of this merger, C&S jumped at the opportunity.[86] After announcing the Original Divestiture Agreement with C&S on September 8, 2023, Kroger and Albertsons continued discussions with the FTC and state attorneys general (including Colorado's) about the scope of the divestiture. On January 18, 2024, Defendants presented the State with a proposed divestiture package that included nearly all the stores in Colorado covered by the now-binding Amended Divestiture Agreement.

---

[84] *Grand Union Supermarkets*, C&S Wholesale Grocers, https://bit.ly/4cA3mSW (last visited June 25, 2024); *Piggly Wiggly Supermarkets*, C&S Wholesale Grocers, https://bit.ly/4eDH6JG (last visited June 25, 2024).

[85] Winn Dep. Day 2 at 490:10-492:20 (███████████████████████████████████████); Deposition of Mark McGowan at 69:11-19 (May 31, 2024) ("McGowan Dep.") (Ex. 44) (███████████████████████; *id.* at 77:8-15 ███████████████████████).

[86] *See, e.g.*, Winn Dep. Day 1 at 210:14-211:13, 239:12-240:10 (Ex. 41).

Discussions concerning the divestiture were ongoing when the State brought this suit, while Defendants continued working on a divestiture package that addressed the regulators' concerns.

On April 22, 2024, Kroger announced an updated, binding divestiture agreement with C&S, which it promptly disclosed to the State.[87]  The Amended Divestiture Agreement was calibrated to resolve competitive concerns that the FTC and other regulators had raised, and it specifically addresses the competitive concerns the State raised in its Motion:

- **Number of Stores**.  In response to the State's concerns that the initial divestiture of 52 stores in Colorado was insufficient, Mot. 14, the Amended Divestiture Agreement provides C&S with 91 Albertsons stores in Colorado, leaving Kroger with only 14 new stores across the state.[88]

- **Safeway Banner**.  In response to the State's concerns about the expense, risk, and burden of re-bannering Safeway stores in Colorado, Mot. 54, the Amended Divestiture Agreement provides C&S with a full exclusive license to the Safeway banner in Colorado.[89]

- **Dairy Facilities**.  In response to the State's concerns about inadequate dairy facilities, Mot. 14, ██████████████████████████████████████████████████████████████████████████████████████████████████████████████[ ]

- **Private Labels**.  In response to the State's concerns about C&S's access to private label products, Mot. 15, the Amended Divestiture Agreement provides C&S with five of Albertsons' private label brands, in addition to ████████ licensed access to another two Albertsons private label brands, Signature and O Organics.[92]

- **Employees and Staffing**.  In response to concerns about C&S's ability to staff its new operations, Mot. 57, the Amended Divestiture Agreement provides that all store and distribution center-level employees will transfer to C&S with the divested stores and distribution centers. ██████████████████████████████████████████████████

---

[87] *See* Am. C&S Agreement at 1.
[88] *Id.* Schedule 2.1(a)-A, Schedule 2.1(c)-A.
[89] *Id.* Ex. J at 1, 4.
[90] *Id.* at 32.
[91] Winn Dep. Day 1 at 243:5-13 (Ex. 41); McGowan Dep. at 235:11-23 (Ex. 44).
[92] *Id.* Ex. B at 10-11.

▮▮▮▮▮▮▮▮[93]

- **Technology Services**. In response to concerns about the transition of technology services, the Amended Divestiture Agreement provides for C&S to receive a clone of Albertsons' "tech stack," along with a license to the "tech stack" for five years.[94]

Despite these changes, the State has neither amended nor supplemented its Motion to account for the Amended Divestiture Agreement.

### 3. *The Overwhelming Benefits of the Merger*

Since its founding in 1883, Kroger has developed and adapted its business model to account for changing competitive dynamics. Kroger's current business model focuses on revenue growth and cost savings to enable price investments that help Kroger compete with Walmart, the country's number one grocery retailer, along with myriad other retail grocery competitors. *Supra* at 10-15. As one Kroger executive testified: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[95] Kroger has proven its commitment to that strategy in prior acquisitions, investing more than $100 million to lower prices at each of Harris Teeter and Roundy's after acquiring those chains.[96]

Kroger now seeks to bring its business model to Albertsons stores, and it expects to achieve significant efficiencies by doing so. Since the deal was announced in 2022, Kroger has retained multiple consultants and conducted extensive analyses to identify opportunities to lower costs and unlock additional revenue after the merger closes.[97] Kroger's internal target is ▮▮▮▮▮▮ ▮▮▮ in annual run-rate efficiencies from the transaction—from cost savings in sourcing, supply

---

[93] *Id.* at Schedule 4.15(a), Schedule 9.1.
[94] *Id.* at 102-104, Ex. B at 16-21.
[95] Aitken Dep. at 210:9-211:8 (Ex. 18).
[96] Deposition of Tim Springer at 20:4-20, 22:17-23:1 (June 11, 2024) ("Springer Dep.") (Ex. 45).
[97] *See* KRPROD-FTC-2R-027400159 at -0169, -0171 (Ex. 46).

chain, and manufacturing, among other areas, along with revenue growth.[98]  Kroger will start lowering prices at Albertsons stores on day one:  It has publicly announced that, during the first four years, Kroger will invest at least $500 million to lower prices at Albertsons stores,[99] even before any efficiencies are realized.[100]  Kroger also will add another $1.3 billion to improve Albertsons' stores.[101]

Through the merger, Kroger will improve Albertsons' operations, private label offerings,[102] product selection,[103] and data analytics,[104] providing both cost savings and a better experience for consumers at existing Albertsons stores.

### C.    Procedural History

#### 1.    Pre-Litigation Discussions

After the merger was announced, Kroger and Albertsons initiated discussions with the State, the FTC, and numerous other stakeholders in an effort to address any concerns about the merger.[105]  The FTC then issued a Request for Additional Information and Documentary Materials ("Second Request") to the merging parties, pursuant to which the parties produced nearly 20 million documents, terabytes of data, and written responses to regulators, including the State.  The FTC also took testimony during investigational hearings from 15 individuals at Kroger and

---

[98] Deposition of Mafaz Maharoof at 133:24-135:1 (June 4, 2024) ("Maharoof Dep. Day 1") (Ex. 47).

[99] Maharoof Dep. Day 1 at 111:23-112:9 (Ex. 47).

[100] Aitken Dep. at 170:11-171:14, 209:7-210:7 (Ex. 18).

[101] *See* Kroger Press Release, *Kroger, Albertsons Companies and C&S Wholesale Grocers, LLC Announce an Updated and Expanded Divestiture Plan* (Apr. 22, 2024) https://bit.ly/3xyEjB1.

[102] McMullen Dep. at 30:16-23 (Ex. 17).

[103] *Id.* at 32:25-33:10.

[104] *Id.* at 180:14-22.

[105] *See generally Protocol for Coordination in Merger Investigations*, FTC, https://bit.ly/42Atf1d (last visited June 25, 2024) ("To the extent lawful, practicable and desirable in the circumstances of a particular case, the Antitrust Division or the FTC and the State Attorneys General will cooperate in analyzing the merger")

Albertsons, as well as from 13 third-party individuals (including C&S's CEO), to which the State also had access. Separately, the State issued its own Civil Investigative Demand on June 23, 2023 seeking much of the same information as the Second Request and further document productions.

Thus, by the time the State filed its Complaint, it already had collected extensive discovery from Defendants, including a "stack of hard drives in [counsel's] office with terabytes of data that were produced." Hr'g Tr. at 34 (Mar. 25, 2024) (A. Biller). Defendants, meanwhile, had no opportunity to serve discovery on either the State or critical third parties until after litigation began.

### 2.  The State's Complaint and Motion for a Preliminary Injunction

On February 14, 2024, the State filed its Complaint, asserting two counts under the Colorado Antitrust Act. Count I alleges that the merger would substantially lessen competition in Colorado, yet it seeks an injunction against the merger from proceeding in any state. Compl. ¶¶ 247-49, Prayer. Unlike every other plaintiff to challenge the merger, the State filed its Motion on the same day as its Complaint, before any formal discovery had begun.

Also unlike any of the other plaintiffs, the State's Complaint named C&S as a defendant, making the divestiture a centerpiece of its case. The Complaint spends more than 75 paragraphs arguing that the September 8, 2023 divestiture to C&S fails to address the State's competitive concerns. *See, e.g.*, Compl. ¶¶ 172-246. The State similarly focuses its Motion on the September 8, 2023 divestiture, spending 15 of its 66 pages discussing that now-superseded agreement, asserting that it was inadequate. Mot. 49-64. The State has not attempted to supplement its Complaint or Motion to account for the April 22, 2024 Amended Divestiture Agreement—which addresses most if not all of the State's professed concerns.

### 3.  Parallel Merger Challenges and the State's Refusal to Consolidate

The State's approach to this merger litigation is unprecedented. Before this merger, no State in history had ever filed a pre-closing challenge seeking to enjoin a merger on a nationwide

basis under state law.[106]  Instead, when states have challenged mergers in the past, they have done

so under *federal* law, in coordination with other states, and usually in conjunction with federal

authorities.  *See, e.g.*, *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 198 (S.D.N.Y.

2020) (noting Colorado sued alongside the U.S. Department of Justice but later withdrew).

In accordance with that longstanding practice, on March 29, 2024, Kroger and Albertsons

formally invited the State to join the FTC Action as a plaintiff.[107]  The State responded on April

25, 2024, declining to join the FTC Action.[108]  The State's response did not explain its refusal to

coordinate with the parties in the FTC Action.  To the contrary, when this Court asked: "Couldn't

the State join the FTC action in Oregon?," the State replied, "We could have, Your Honor, but

there was no requirement on us to do that."  Mar. 25, 2024 Hr'g Tr. at 13 (A. Biller).  The State

offered no further explanation for its refusal to join the FTC Action.

Instead of coordinating with other regulators, the State has piled onto the four other

lawsuits that also challenge this merger.  *See* Defs.' Mot. for Permanent Inj. Hr'g Date (Mar. 13,

2024) (detailing parallel cases).  Most relevant here, on February 26, 2024, the FTC, joined by

eight states and the District of Columbia, sued Kroger and Albertsons (but not C&S) in the District

of Oregon to enjoin the transaction under Section 7 of the Clayton Act. Compl., *FTC v. Kroger

Co.*, No. 3:24-CV-347 (D. Or. Feb. 26, 2024).  The FTC Complaint alleges harm in Colorado

markets.  *Id.* ¶ 52.  The court in the FTC Action set an evidentiary hearing on the plaintiffs'

preliminary injunction motion, which is scheduled to begin on August 26, 2024.  *Id.*, ECF No. 74.

The court in the FTC Action has ordered that "Kroger and Albertsons shall not consummate the

Proposed Transaction until after 11:59 PM Eastern Time on the fifth (5th) business day after the

---

[106] *See generally* Defs.' Mot. to Dismiss ("Defs.' MTD") (filed Mar. 21, 2024).
[107] Kroger and Albertsons' March 29, 2024 Letter to P. Weiser at 2 (Ex. 48).
[108] S. Kaufmann's April 25, 2024 Letter to M. Wolf *et al*. (Ex. 49).

court rules on the FTC's motion for a preliminary injunction, or until after the date set by the District Court, whichever is later." *Id.*, ECF No. 14 at 1-2.

The State's request for a preliminary injunction in this case will thus be legally meaningless except in the scenario where the court in the FTC Action has ruled *in Defendants' favor*, thereby creating a direct conflict between this Court and the U.S. District Court for the District of Oregon.

### 4.    *Fact and Expert Discovery and Hearing Schedules*

The State's decision to file its Motion on the same day as its Complaint has created an unprecedented procedural posture. Despite the existing protections of the stipulated order in the FTC Action, the State in this case has demanded multiple evidentiary hearings before the same tribunal on the same legal issues. This Court is accordingly scheduled to hold two evidentiary hearings in two months: (1) a "preliminary" injunction hearing lasting nine days starting on August 12, 2024; and (2) a permanent injunction hearing lasting 14 days and scheduled to begin on September 30, 2024. *See* Case Mgmt. Order (June 10, 2024).

**Fact Discovery**. Although the State has demanded the earliest evidentiary hearing in all the parallel judicial proceedings, it has repeatedly argued that it has insufficient time to complete discovery before that August 12 hearing. *See, e.g.*, June 10, 2024 Hr'g Tr. at 9-11, 23, 38-40 (A. Biller). Accordingly, the State has sought (and received) a two-phase discovery process to account for its professed inability to prepare fully for any merits trial in August. *See, e.g.*, June 10, 2024 Hr'g Tr. at 23 (A. Biller) ("Another two weeks, I still don't think is enough time.").

**Expert Discovery**. The State's approach to expert discovery presents the same one-sided posture, allowing for (1) an expert discovery deadline before the preliminary injunction hearing and; (2) another deadline for the permanent injunction hearing. Pursuant to the Case Management Order, the State disclosed four expert witnesses on May 31, 2024. Yet when the State served its

initial expert reports for the preliminary injunction hearing on June 17, 2024, it served only *one* report, for economist Dr. Nitin Dua.

The State directed Dr. Dua to *not* address the Amended Divestiture Agreement in his initial report.  Dua Rep. at 1 (Ex. 2).  Meanwhile, Defendants' expert reports are not due until July 8, after this brief is filed.  This schedule thus provides Defendants' experts with no opportunity to address the State's actual theory of the case regarding the Amended Divestiture Agreement.

**Briefing Schedule**.  Under the current briefing schedule, the State will make arguments regarding its own expert report for the first time in Reply.  And the State's Reply will be the first time the State articulates its position regarding the Amended Divestiture Agreement (assuming it does not continue to ignore it).  Unless the Court grants Defendants a sur-reply, they will be forced to respond to all the State's arguments for the first time at the preliminary injunction hearing.[109]

### D.    The State's Motion in Limine to Exclude Divestiture Evidence

On April 8, 2024, the State filed a motion in limine seeking to preclude Defendants from presenting any evidence of their Amended Divestiture Agreement at the preliminary injunction hearing.  After full briefing and a hearing on the merits, the Court denied the State's motion.  Excluding the divestiture, the Court noted, would be the equivalent of what other courts have called ignoring "the elephant in the room."  MIL Hr'g Tr. at 82 (May 31, 2024).  The Court therefore reasoned that "it is appropriate for the Court to consider [evidence of the Amended Divestiture Agreement] at the preliminary injunction hearing."  *Id.*  The State chose not to amend or supplement its Motion to address this material factual development, despite now knowing about it for more than two months.

---

[109] Given the State's procedural maneuvering, Defendants expect to seek leave to file a sur-reply.

E.    **Expert Testimony Regarding Modern Grocery Competition**

The parties' experts in this case will offer economic opinions on critical issues, including the relevant market definition.

1.    ***The State's Single Economic Expert***

The State disclosed four experts in its pre-trial filing, but it submitted a report from just one of them (Dr. Nitin Dua) at the expert deadline of June 17, 2024.

Dr. Dua defines the "relevant product market" ████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████████████████████████████████████████████████████████ *Id.*

Dr. Dua defines the relevant geographic market ████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████

In assessing alleged competitive harm, Dr. Dua ignores Defendants' binding Amended Divestiture Agreement, stating that he intends to address it in rebuttal. *Id.* at 1.

### 2.    *Defendants' Anticipated Experts*

Defendants' expert reports are not due until July 8.  By way of proffer, however, Defendants anticipate submitting at least four experts for the preliminary injunction hearing.

**Dr. Mark Israel.**  Dr. Israel is an economist specializing in industrial organization and the President of Compass Lexecon.  Dr. Israel will testify about the likely competitive effects resulting from the merger, which includes the divestiture of all but 14 Safeway stores in Colorado.  Dr. Israel's analysis will show that Colorado's proposed product market does not align with the modern retail grocery landscape, artificially excluding competitors that are important to Colorado consumers, including, among others, Whole Foods, Costco, Sam's Club, and Trader Joe's.

By analyzing data on how much consumers spend at Kroger's and its competitors' stores (known as "share-of-wallet" data), Dr. Israel will explain how Kroger's customers spend more of their grocery "wallet" at Walmart and Costco than they do at Safeway or any other competitors in Colorado.  Dr. Israel will explain how the State's market definition improperly ignores the fact that Kroger sets prices primarily against Walmart and will have every incentive to continue to do so after the merger, corroborating the fact testimony of Kroger executives with data-driven analysis. *See supra* at 13.

Dr. Israel will also show how Colorado's one-size-fits-all approach to geographic market definition fails to account for market realities.  The State's rigid "city area" approach breaks down many relevant markets along artificial lines, inappropriately discounting the importance of major competitors that fall just outside of those lines.  Further, the State's approach fails to appropriately consider how the competitive options for consumers differ based on where in a "city area" they live or their grocery shopping preferences.  The State also fails to address the fact that club stores and supercenters compete with Kroger from greater distances than Safeway.

After demonstrating the unreliability of the State's analysis, Dr. Israel will provide multiple, complementary analyses of the likely competitive effects of the transaction, using well-accepted economic methods that do not ignore important competitors or draw markets based on arbitrary circles around Kroger or Albertsons stores. These analyses capture numerous factors the State overlooks or minimizes, including the differentiation of stores' grocery offerings, consumer demographics, and the relative geographic proximity of stores to customers. Rather than performing monolithic effects analyses unmoored from modern grocery shopping behavior—as Dr. Dua has done—Dr. Israel's analyses will account for variability in consumers' competitive options based on their location and key demographic characteristics. These analyses will confirm that the proposed transaction, including the divestiture of 91 stores in Colorado, will not substantially lessen competition in the State.

**Rajiv B. Gokhale**, an expert in financial economics and an Executive Vice President at Compass Lexecon, will testify as to the efficiencies that Kroger expects the merger to produce. *See supra* at 22-23. Mr. Gokhale will testify that the underlying data and analyses used to identify these efficiencies are reasonable, and that a significant portion of the projected efficiencies are merger-specific, verifiable, and do not arise from anticompetitive reductions in output or service. Kroger plans to reinvest the efficiencies generated by the transaction to lower prices and improve shopping experiences for customers at stores nationwide, including in Colorado.

**Dan Galante** is a Managing Director of the Berkeley Research Group and expert on mergers and acquisitions, with experience as an advisor on over eight hundred transactions. Mr. Galante will testify that the merging parties and C&S engaged in a robust due diligence process related to the divested business, and that C&S is a strong buyer who will receive all necessary assets and transitional support to maintain competition. Mr. Galante will also testify that the

divestiture process was supported by experienced management teams and sophisticated external advisors who identified and developed a plan to mitigate risks associated with the sale.

Defendants also expect to present **Herb Kleinberger**, a retail industry expert with more than 25 years of experience consulting with retailers on business, operations, and IT strategy. Mr. Kleinberger will testify about the evolution of the grocery retail industry, including changes in consumer grocery shopping behavior and the emergence of a variety of grocery retail formats, which offer consumers multiple grocery shopping options.

## LEGAL STANDARD

The State bears the burden to show that the "extraordinary relief" of a preliminary injunction is necessary. *See Rathke v. MacFarlane*, 648 P.2d 648, 651 (Colo. 1982). A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the [movant] is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *see Rathke*, 648 P.2d at 651. "The need for caution in issuing a preliminary injunction is particularly important in the merger and acquisition context, because the grant of a temporary injunction in a Government antitrust suit is likely to spell the doom of an agreed merger." *FTC v. Foster*, 2007 WL 1793441, at *51 (D.N.M. May 29, 2007) (quotation marks omitted).

"In considering a motion for a preliminary injunction, the trial court must find that the moving party has demonstrated (1) a reasonable probability of success on the merits; (2) a danger of real, immediate, and irreparable injury which may be prevented by injunctive relief; (3) lack of a plain, speedy, and adequate remedy at law; (4) no disservice to the public interest; (5) balance of equities in favor of the injunction; and (6) preservation by the injunction of the status quo pending a trial on the merits." *Gitlitz v. Bellock*, 171 P.3d 1274, 1278 (Colo. App. 2007) (citing *Rathke*,

648 P.2d at 653-54). "If each criterion is not met, injunctive relief should not be granted." *Id.*; *see California v. Am. Stores Co.*, 495 U.S. 271, 275 (1990).[110]

Thus, the State must produce evidence in support of every element of its claim under the Colorado Antitrust Act. *See Gitlitz*, 171 P.3d at 1278. And courts regularly deny injunctive relief in merger cases when the government fails to meet its burden. *See, e.g.*, *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278 (D.D.C. 2020); *FTC v. Thomas Jefferson Univ.*, 505 F. Supp. 3d 522, 528 (E.D. Pa. 2020); *FTC v. Steris Corp.*, 133 F. Supp. 3d 962 (N.D. Ohio 2015); *FTC v. Lab. Corp. of Am.*, 2011 WL 3100372 (C.D. Cal. Mar. 11, 2011); *FTC v. Foster*, 2007 WL 1793441 (D.N.M. May 29, 2007); *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109 (D.D.C. 2004).

## ARGUMENT

This Court should deny the State's bid to preliminarily enjoin the merger. Although the State bears the burden on every *Rathke* criteria, the Motion fails to offer sufficient evidence on any of them. Unlike virtually every other plaintiff in antirust merger litigation, the State elected to file its brief in support of its motion for a preliminary injunction the same day it filed its Complaint, before it served expert reports and before any witnesses had been deposed. And despite having a "stack of hard drives … with terabytes of data that were produced" before this litigation even began, Hr'g Tr. at 34 (Mar. 25, 2024) (A. Biller), the State's brief offers only the "basic facts" of the case, with the bare assertion that "[a]n additional factual record will be developed after further discovery," Mot. v n.1. The State has thus made it impossible for Defendants to address the actual case it intends to present at the upcoming hearing. *See supra* at 26-28.

The State's basic failure to submit sufficient evidence in support of the preliminary injunction criteria is fatal to its Motion, and its evidentiary failing pervades every aspect of the

---

[110] As explained *infra* at 64, no exceptions to *Rathke*'s six-part test apply.

preliminary injunction test.  Accordingly, there are multiple, independent grounds to reject the State's unprecedented request for this Court to enjoin a $24.6 billion merger nationwide.

## I. THE STATE CANNOT DEMONSTRATE A REASONABLE PROBABILITY OF SUCCESS ON THE MERITS OF ITS CLAIM UNDER THE COLORADO ANTITRUST ACT

The State dramatically understates its burden to obtain the extraordinary relief of a preliminary injunction, particularly as it relates to the merits of its claim under the Colorado Antitrust Act.  *See Gitlitz*, 171 P.3d at 1278.  The State appears to believe it can satisfy its "success on the merits" burden *without any economic or expert evidence* and without even articulating which competitors are included (and which are excluded) in its proposed product market.  *See* Mot. v & n.1; Mot. 30 n.28 (promising to produce expert evidence later).  The State is wrong.

To demonstrate the flaws in the State's approach, this Section: (A) sets forth the legal framework that the State must satisfy to show a reasonable probability of success on the merits, including the *Baker Hughes* burden-shifting framework; (B) demonstrates that the State has failed to meet its prima facie burden under that standard; (C) explains that Defendants have met their burden of production to undermine the State's prima facie case; and (D) summarizes why the State cannot satisfy its burden of persuasion under any balancing of the evidence.

### A. The State Bears the Burden to Show a Reasonable Probability that the Merger Will Substantially Lessen Competition

The State's likelihood of success on the merits turns on its ability to show that the merger is likely to "substantially lessen competition."  C.R.S. § 6-4-107(1).  In applying this standard, "decisions of federal courts construing the Sherman and Clayton Acts, although not controlling, are entitled to careful scrutiny in resolving issues arising under Colorado's antitrust statute." *People ex rel. Woodard v. Colo. Springs Bd. of Realtors, Inc.*, 692 P.2d 1055, 1061 (Colo. 1984).

The Clayton Act prohibits mergers only where a plaintiff has established a "reasonable probability" that the proposed merger will "substantially" lessen competition. *United States v. AT&T Inc.*, 916 F.3d 1029, 1932 (D.C. Cir. 2019) (citation omitted). The "mere possibility" of harm to competition is insufficient. *See United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 189-90 (D.D.C. 2018) (citations omitted), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019); *United States v. Baker Hughes Inc.*, 908 F.2d 981, 984 (D.C. Cir. 1990) (Thomas, J.).

Contrary to the State's suggestions, Mot. 51-52, the Clayton Act does not require merging parties to "preserve exactly the same level of competition that existed before the merger." *United States v. UnitedHealth Grp., Inc.*, 630 F. Supp. 3d 118, 133 (D.D.C. 2022). Indeed, as courts have recognized, adopting the State's "proposed standard would effectively erase the word 'substantially' from [the statute]." *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1058-59 (5th Cir. 2023) (quoting *UnitedHealth*, 630 F. Supp. 3d at 133).

Courts typically analyze a horizontal merger's likely effect on competition using the three-part burden-shifting framework from *United States v. Baker Hughes Inc.*, 908 F.2d 981 (D.C. Cir. 1990). Under this framework, the burden of persuasion "remains with the [plaintiff] at all times," but the burden of *production* shifts between the plaintiff and the defendant. *Id.* at 982-83.

*First*, the State must produce evidence to "establish a prima facie case that a merger is anticompetitive." *DeHoog v. Anheuser-Busch InBev SA/NA*, 899 F.3d 758, 763 (9th Cir. 2018) (citation omitted). The State can meet this burden "[b]y showing that a transaction will lead to undue concentration in the market for a particular product in a particular geographic area." *Baker Hughes*, 908 F.2d at 982.

A "threshold step" in this phase is "to accurately define the relevant market, which refers to 'the area of effective competition.'" *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020)

(quoting *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018)). "[D]etermination of the relevant product and geographic markets is a necessary predicate to deciding whether a merger contravenes the Clayton Act." *Demartini v. Microsoft Corp.*, 662 F. Supp. 3d 1055, 1061 (N.D. Cal. 2023) (quoting *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 788 (9th Cir. 2015)). "[W]ithout a definition of [the] market, there is no way to measure the defendant's ability to lessen or destroy competition." *Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46, 53 (2d Cir. 2016).

Broadly, the State's burden requires it to show a likelihood of competitive harm in a *specific* market following the merger. More specifically, if the State accurately defines the relevant product and geographic market(s), it must then analyze whether the merger will result in "undue concentration" in one or more of those markets, typically through an assessment of post-merger market shares or other structural evidence. *Baker Hughes*, 908 F.2d at 982-83. That analysis must account for "the *entire* transaction in question," including any divestiture. *FTC v. Arch Coal, Inc.*, 2004 WL 7389952, at *3 (D.D.C. July 7, 2004); *see also AT&T, Inc.*, 916 F.3d at 1040-41 (considering no-blackout commitments and arbitration agreement offers in determining government failed to meet its burden); *FTC v. Microsoft Corp.*, 681 F. Supp. 3d 1069, 1093 (N.D. Cal. 2023). To allow otherwise would permit the State to "meet its *prima facie* burden with market-share statistics that have no connection to the post-acquisition world." *UnitedHealth Grp.*, 630 F. Supp. 3d at 133.

For that reason, the State bears the burden at the first step of the burden-shifting framework to show why the transaction—taking the divestiture into account—would substantially lessen competition. *See UnitedHealth*, 630 F. Supp. 3d at 140 ("Under what the Court believes is the correct legal standard, [the divestiture evidence] prevents the Government from meeting its *prima*

*facie* burden."). The divestiture is part the merger, and it is an essential component of what the Court is being asked to evaluate. *See* MIL Hr'g Tr. at 82 (May 31, 2024). There can be no accurate assessment of post-merger market shares without accounting for what the division of shares in the alleged market *actually* will be post-merger. *See Arch Coal*, 2004 WL 7389952, at *3; *see also Microsoft Corp.*, 681 F. Supp. 3d at 1093 (rejecting FTC's argument that litigating-the-fix evidence has no "relevance to [the government's] *prima facie* burden").

In short, because Defendants do not bear any burden at step one, Defendants need not prove that C&S is a viable divestiture buyer. By challenging the viability of the divestiture, the State is asking this Court to substitute its own business judgment in place of C&S's, and the State bears the burden to justify that exceptional request.

*Second*, if the State makes a *prima facie* case, the burden of production shifts to Defendants to present evidence that the merger would not substantially lessen competition. *Baker Hughes*, 908 F.2d at 982-83. The types of evidence a defendant may rely on at this stage are myriad, including evidence related to "industry structure," "changing market conditions," "the nature of the product and the terms of sale," the relative "significance of market shares and concentration" in a given market, the sufficiency of existing competitors in the market to replace any potential loss of competition, "ease of entry" by new competitors, the potential for coordination between the merging firms, and the prospect of efficiencies resulting from the merger. *Id.* at 985-86 (collecting sources). The ultimate question is whether a defendant has produced sufficient evidence to "show that the prima facie case inaccurately predicts the relevant transaction's probable effect on future competition," such as by "showing why a given transaction is unlikely to substantially lessen competition, or by discrediting the data underlying the initial presumption in the government's favor." *Id.* at 991.

Defendants' burden at this stage is one of *production*, not persuasion; the burden of persuasion remains with the State "at all times." *Id.* at 983. So even if the Court were to treat the divestiture as part of step two, Defendants would need only to *produce* evidence of the divestiture and its effect on competition. *See UnitedHealth*, 630 F. Supp. 3d at 140 (observing that even "under the Government's preferred standard, the [divestiture] evidence enables [the defendant] to meet its burden at the rebuttal stage, and the Government provides no additional evidence to carry its burden of persuasion"). No matter what, the State has the burden to persuade the Court that C&S's investment is unlikely to provide any meaningful competition. *See id.*

*Third*, after Defendants satisfy their rebuttal burden of production, the burden of production shifts back to the State, which must produce "additional evidence of anticompetitive effect[s]." *Baker Hughes*, 908 F.2d at 983. The State retains "the ultimate burden of proving a [Clayton Act] violation by a preponderance of the evidence," and a "failure of proof in any respect will mean the transaction should not be enjoined." *AT&T Inc.*, 310 F. Supp. 3d at 189 (citations omitted).

### B.     The State Has Not and Cannot Satisfy Its Prima Facie Burden

To establish a prima facie case, the State has the burden to: (1) define a relevant product market, (2) define a relevant geographic market, and (3) demonstrate likely harm in that specific market. The State has neither established a relevant market nor shown harm in any such market.

#### 1.     *The State Fails to Establish a Relevant Product Market for the "Retail Sale of Food and Other Grocery Products"*

The State's inadequate market definition dooms its case. *See United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957) ("Determination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act."); *see Am. Express*, 138 S. Ct. at 2285.

a.    Legal Standard for Defining Product Markets

Defining a relevant product market is inherently a question of consumer demand, or "demand substitution." *See FTC v. Tronox Ltd.*, 332 F. Supp. 3d at 187, 198 (D.D.C. 2018); *see also FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 45 ("[T]he touchstone is demand substitution."). Demand substitution describes "customers' ability and willingness to substitute away from one product to another in response to a price increase or a corresponding non-price change such as a reduction in product quality or service." *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 292 (D.D.C. 2020) (citing FTC-DOJ Horizontal Merger Guidelines § 4 (2010)). Demand substitution thus polices the "outer boundaries of a product market" and is governed by either (1) consumers' "reasonable interchangeability of use" or (2) the "cross-elasticity of demand" (price sensitivity) between a product and substitutes for it. *Brown Shoe*, 370 U.S. at 325.

As courts recognize, the "reasonable interchangeability" principle contemplates that "[p]roducts in the same market need not be identical, only reasonable substitutes." *See, e.g.*, *United States v. Energy Sols., Inc.*, 265 F. Supp. 3d 415, 436 (D. Del. 2017); *W. Parcel Express v. United Parcel Serv. of Am., Inc.*, 65 F. Supp. 2d 1052, 1059 (N.D. Cal. 1998) ("The services need not be identical to be considered reasonably interchangeable."). Accordingly, "[w]hen aggregating products into a relevant market, courts focus on demand substitution because it illuminates whether customers can switch to one product and constrain anticompetitive pricing in another." *RAG-Stiftung*, 436 F. Supp. 3d at 292 (citations omitted). "For instance, if customers would switch from Jif peanut butter to Peter Pan following a price increase, those two products are more likely to be included in a relevant product market." *Id.*

To help define a "relevant product market," courts often use what is called the "hypothetical monopolist test." FTC & DOJ Horizontal Merger Guidelines § 4.1.1 (2010). The test asks whether a hypothetical monopolist controlling the products in the alleged market could

38

profitably impose a small but significant and non-transitory increase in price ("SSNIP"), generally assumed to be about five percent, "on at least one product in the market." *See FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 121-22 (D.D.C. 2016). If a hypothetical monopolist can profitably impose a SSNIP, the products may compose a relevant market. *Id.* at 121.

Applying that test, it is not sufficient for the State to show that *some* consumers would remain in the candidate market in response to a price increase. Rather, to satisfy the hypothetical monopolist test, the State must show that enough customers would remain such that the price increase would be profitable. *See, e.g.*, *United States v. Sungard Data Sys.*, 172 F. Supp. 2d 172, 192 (D.D.C. 2001) (although the evidence showed that some customers could not switch to a substitute product, the government failed "to show whether this captive group is substantial enough that a hypothetical monopolist would find it profitable to impose such an increase in price"); *United States v. Engelhard Corp.*, 126 F.3d 1302, 1306 (11th Cir. 1997) ("[I]t is possible for only a few customers who switch to alternatives to make the price increase unprofitable.").[111]

### b.    The State Fails to Define a Relevant Product Market

The State's proposed product market is contradictory, unsupported by the evidence, and divorced from the realities of modern consumer behavior. It bears no relationship to consumer demand, and it provides no rational baseline for Defendants (or this Court) to assess the State's theory of competitive harm.

---

[111] Courts have used what are called the "the *Brown Shoe* factors" to help define the relevant market. Those factors include: "industry or public recognition of the [relevant market] as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe*, 370 U.S. at 325. "[T]he *Brown Shoe* indicia are practical aids for identifying" markets, but "their presence or absence does not decide automatically" the issue of market definition. *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1375 (9th Cir. 1989). In all instances, the touchstone for determining a relevant product market is consumer demand. *Brown Shoe*, 370 U.S. at 325.

*First*, while the State acknowledges that proving a relevant market is part of its prima facie case, Mot. 24, it offers no evidence to support its proposed market definitions. Instead, its paragraph-long product-market definition simply repeats the Complaint's conclusory allegations without any evidentiary support. The State claims: "The relevant product market here is food and other grocery products available for retail sale in Supermarkets," and it defines a "supermarket" as a "full-line retail grocery store that enables customers to purchase substantially all of their food and grocery shopping requirements in a single shopping visit with substantial offerings in each of" a long list of product categories. Mot. 27; *see* Compl. ¶ 80.

After that evidence-free description of the product market, the State offers an equally unilluminating application of the hypothetical monopolist test, consisting of just two sentences: "Here, the vast majority of Supermarket customers are not likely to start shopping at other types of stores in response to a SSNIP. A relevant product market comprised of Supermarkets therefore passes the Hypothetical Monopolist Test." Mot. 30. These two conclusory sentences—unsupported by evidence or explanation—fall far short of carrying the State's burden.

The State's evidentiary failure is a problem of its own creation. The State filed its Motion the same day as its Complaint, relying on conclusory allegations to satisfy its burden, and arguing that "[t]he evidence presented with [its] motion sets forth the basic facts to establish the need for a preliminary injunction." Mot. v & n.1. The State is wrong. In fact, the State even appears to acknowledge its evidentiary deficiencies, recognizing the need to produce further evidence (including critical expert testimony) at a live hearing in the first instance. *Id.* at v & n.1; *id.*at 30 n.28; *id.* at 31; *id.* at 33. Those concessions reflect the reality that defining a relevant market depends on an economic analysis that requires expert evidence. *See, e.g.*, *Gulf States Reorganization Grp., Inc. v. Nucor Corp.*, 822 F. Supp. 2d 1201, 1234 (N.D. Ala. 2011) ("Eleventh

40

Circuit precedent requires an antitrust plaintiff to proffer expert testimony to establish a relevant product market and a relevant geographic market.") (surveying caselaw), *aff'd*, 721 F.3d 1281 (11th Cir. 2013); *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 599 (1st Cir. 1993). The law does not permit the "extraordinary relief" of a preliminary injunction based on the State's proffer that it will produce evidence at a future date. Its failure to present any evidence on the critical element of the product-market definition is dispositive here.

*Second*, the State's proposed product market rests on a concept of "one-stop shopping," Mot. 4, that is "inconsistent with the commercial realities of the industry," *RAG-Stiftung*, 436 F. Supp. 3d at 292. The State offers no basis for using "one-stop shopping" as a principle to define a product market. As the data demonstrates, consumers increasingly shop at a diverse array of stores for their groceries and household goods, with less than 7% of them shopping at just one store. *Supra* at 10-11. More broadly, the USDA has reported an 18% decrease in consumer spending at grocery stores from 1997 to 2022, while consumer spending on food at club stores (*e.g.*, Costco) and supercenters (*e.g.*, Walmart) nearly tripled. *Supra* at 12. Data on consumer shopping behavior confirms that reality, indicating that Kroger customers spend ███████ ███ of their grocery budget at non-Kroger stores. *Supra* at 11-12.

The modern consumer also purchases grocery products from e-commerce grocery options like Amazon, and delivery services such as Instacart and Shipt, which enable customers to access a variety of retail options outside the geographic area where consumers live or work. The COVID-19 pandemic only advanced the fragmentation and diversification of grocery shopping patterns. Yet despite the drastic shifts in the grocery-buying landscape over the past decades, the State clings to the notion that grocery consumers push their carts down the aisle of their local grocery store every week to purchase all or "substantially all of their food and grocery shopping requirements

in a single shopping visit." Mot. 4. The State's ignorance of e-commerce as a competitive force defies reality.

*Third*, the State also ignores the fact that a range of differentiated retailers offer the same "grocery and consumable" products in the State's alleged product market. Consumers pick and choose between a range of differentiated retail grocery options to meet their grocery shopping preferences. According to the State, consumers do not buy soap, zip-lock bags, or other goods at "dollar stores" because those stores do not *also* "carry fresh produce, meat, or seafood." Mot. 28. According to the State, Costco is not a substitute for a consumer because Costco does "not offer the same depth and product variety as do Supermarkets." *Id.* And according to the State's expert, Whole Foods is not a substitute for a consumer because Whole Foods ██████████████████

████████████████████ *See* Dua Rep. at 38 (Ex. 2). (Apparently, the State's one-stop shopper is not "affluent."). In effect, the State defines the product market to include Kroger and Albertsons only and then reverse-engineers a hypothetical shopper who refuses to go elsewhere.

The problem is that the State's product market must account for *all* consumers, not just the State's hypothetical one-stop shopper. As the Tenth Circuit has long recognized, "the reality [is] that customers simultaneously can, and routinely do, choose to patronize competitors of all stripes offering fungible goods through different but overlapping distribution channels." *Westman Comm'n Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216, 1221 (10th Cir. 1986). If customers *can* use those other channels—*e.g.*, club stores, dollar stores, and "natural organic" stores—to protect themselves from a price increase in its alleged product market, then the State's "traditional-supermarket-only" theory is not a separate market for purposes of the antitrust laws.

*Fourth*, the State has not defined a product market around a "full basket" or "cluster" of grocery products—nor could it. In some instances, courts permit plaintiffs to define a market by

42

showing that "if most customers would be willing to pay monopoly prices for the convenience of receiving certain products as a package, then the relevant market for those products is the market for the package as a whole."  *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 567 (6th Cir. 2014) (quotation marks omitted); *see Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*, 612 F. Supp. 2d 330, 354-55 (S.D.N.Y. 2009) (no cluster market where the plaintiff failed to show higher prices for clustering).  But the State has not even attempted to establish any coherent "cluster" theory here, instead simply listing the categories of products that Kroger and Albertsons offer—from "fresh fruit" to "beer"—and declaring that the "product market" includes those products, but only when they are sold at Defendants' stores.  *See United States v. U.S. Sugar Corp.*, 73 F.4th 197, 205 (3d Cir. 2023) (rejecting proposed market because "defining the product market to include production and sale is irrelevant to consumer welfare and a purely self-serving description by the government").

*Fifth*, the State's proposed product market is facially under-inclusive.  For example, while the State claims that competitors like Costco fall outside the relevant product market, Costco meets its definition of a "supermarket":  It is a "full-line retail grocery store that enables customers to purchase substantially all of their food and grocery shopping requirements in a single shopping visit," and has "substantial offerings" in all (or nearly all) the State's product categories.  Mot. 27. So too for the litany of other stores throughout the State—including Whole Foods, Sprouts, Natural Grocers, Clark's, and Esh's—all of which the Motion fails to mention.  *Supra* at 7-10.

Even the State's expert Dr. Dua acknowledges that ██████████████████ ████████████████████████████████████████████ ████████████████    Dua Rep. at 10  (Ex. 2).  Yet Dr. Dua excludes competitors like Whole Foods from his market definition, apparently concluding that it does not compete with Kroger and

43

Albertsons even in affluent and health-conscious cities like Boulder.  *See id.* at 59 (███████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████).  In short, the State's amorphous

product-market definition lacks any analytical basis.

*Sixth*, the *Brown Shoe* factors referenced by the State, Mot. 26, demonstrate that the

relevant market is far broader than the State contends.  For example, there is no "distinct consumer"

in the grocery industry; consumers from all different backgrounds shop at a range of grocery

retailers.  *See Brown Shoe*, 370 U.S. at 325.  Indeed, the State's myopic focus on a hypothetical

"distinct consumer" (the one-stop shopper) is precisely why its proposed product market fails to

reflect the "commercial realities of the industry."  *Id.* at 337.  Similarly, the testimony and ordinary

course documents of virtually every third-party deposed in this litigation confirm that retail grocery

competition is expansive.  *Supra* at 7-10, 15-17.  The "industry" and "public recognition" factors

demonstrate that the product market for retail groceries extends far beyond the State's narrow

picture of "supermarket" competition.  *Brown Shoe*, 370 U.S. at 325.  *Brown Shoe*'s practical

indicia thus undermine the State's gerrymandered definition of the relevant product market.

*Finally*, the State attempts to rely on evidence of competition between Defendants to define

its market, Mot. 28, but the mere existence of horizontal competition does not define a market.

Rather, as the D.C. Circuit has explained, the "definition of [a] product market … 'focuses solely

on demand substitution factors,' *i.e.*, that *consumers* regard the products as substitutes."  *FTC v.*

*H.J. Heinz Co.*, 246 F.3d 708, 718 (D.C. Cir. 2001) (emphasis added).  The question is not whether

"[s]upermarket pricing is constrained by pricing at other [s]upermarkets," Mot. 28, as the State

bluntly suggests.  Rather, the question is whether there will be *other* competitive constraints on a

post-merger company.  Yet while the State apparently concedes that Walmart is in the product

44

market, Mot. 28, it fails to address the competitive constraints provided by the array of other grocery retailers in Colorado and across the country that compete with Kroger and Albertsons.

Each of these points shows that the State fails to properly define a product market. Together, they fundamentally undermine the State's case.

### 2. The State's Vague "Highly Localized" Geographic Markets Are Unsupported

The State also fails to define a relevant geographic market. A properly defined geographic market includes the "sellers or producers who have the … 'ability to deprive each other of significant levels of business'" within a given geographic area. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (citation omitted). Like a product market, a geographic market must "correspond to the commercial realities of the industry." *Brown Shoe*, 370 U.S. at 336 (quotation marks omitted).

The State's proposed geographic market lacks any factual grounding. Instead, it copies the Complaint's generalized allegations of geographic markets in "39 city areas," without offering any evidence to support that definition. *See* Mot. 31 ("The Attorney General will present evidence at a hearing related to … 39 city areas."). The State appears to acknowledge its evidence is insufficient, stating that "[a]dditional discovery and expert analysis will be needed to further refine the relevant geographic markets." Mot. 30 n.28. But as courts interpreting the Clayton Act have cautioned, "alleged anticompetitive effects of a merger must be examined in the context of *specific* … geographic markets." *United States v. Int'l Tel. & Tel. Corp.*, 342 F. Supp. 19, 52 (D. Conn. 1970) (emphasis added). The State's failure to provide evidence of its proposed geographic market precludes the State's request for "extraordinary relief."

The State's evidentiary failing is no mere technicality. Without clarity on how the State intends to define "city areas" in light of the Amended Divestiture Agreement, Defendants face a

moving target. *Fount-Wip, Inc. v. Reddi-Wip, Inc.*, 568 F.2d 1296, 1301 (9th Cir. 1978) (plaintiffs failed to meet their burden because "of their failure adequately to define and to prove the relevant market, which is 'a necessary predicate' for evaluating [merger] claims under" the Clayton Act (citation omitted)).  And even without the divestiture, the State's own sources are confused.  While the State's Motion identified 39 "city areas" in which competition would be constrained, the State's expert has inflated that number to ███████.  Dua Rep. at 4 (Ex. 2).  Dr. Dua does not acknowledge this inconsistency, and it is unclear how he reached a different "geographic market" tally from the State itself.

Dr. Dua's alternative approach of analyzing competition in ████████████████████ ████████████████ also fails to account for the modern grocery-shopping experience. Dua Rep. at 4 (Ex. 2); *see* Mot. 34.  Simply drawing circles around stores does not provide an accurate picture of modern grocery-buying dynamics.  Even the minimal analysis of geographic markets that the State has provided demonstrates three critical flaws.

*First*, the State treats all grocery retailers as having the same geographic-draw area, but economic evidence suggests that consumers do not.  For example, the evidence will show that customers will travel farther to shop at stores like Costco and Walmart than they will for Kroger. Defining a market by drawing a 3-mile circle would fail to account for a Costco 3.1 miles away from a Kroger store, even though consumers may consider that Costco a substitute for the Kroger.

*Second*, the State's Motion does not account for online retailers—including Amazon—that offer *identical* products that the State itself contends are quintessential "Supermarket" offerings. *See* Mot. 4-5 (listing products).  Amazon's offerings are not merely "reasonably interchangeable"; they are *exactly* interchangeable:  The exact same box of cereal available at a store can be purchased on Amazon from the comfort of a living room.  The same is true of other boxed goods,

paper goods, detergent, and so on.  The State fails to acknowledge, let alone address, the effect that retailers like Amazon—who have virtually no geographic limitations—have on the relevant geographic market in this case.  The State's model likewise fails to acknowledge grocery delivery services like Instacart, which allow customers to access more distant stores.  Instacart and other platforms also allow customers to buy from club stores without a membership, further increasing their choices.[112]

*Third*, the State's geographic analysis rests on the concept that customers "shop at stores close to where they live."  Mot. 30.  But this analysis is incomplete.  As the evidence will show, the geographic market depends on much more than the proximity of a store to a customer's home.  Customers shop at different stores based on their preferences and demographics.  Customers shop at stores near their offices, schools, daycares, and other routine locations.  The State's rigid geographic model ignores those realities.

### 3.    *The State Cannot Establish Harm in Any Relevant Market*

Even if the State had adequately defined geographic and product markets, it must still show a likelihood of harm *in those markets*.  *See RAG-Stiftung*, 436 F. Supp. 3d at 291.  It falls well short of satisfying its burden.  *Baker Hughes*, 908 F.2d at 982.

#### a.    The C&S Divestiture Torpedoes the State's Prima Facie Case

The State is uniquely ill-suited to claim harm from this merger because the Amended Divestiture Agreement has resolved the key concerns that the Complaint identified.  Accounting for the divestiture, the State cannot meet its burden of production or persuasion.  Yet the State has failed to address the Amended Divestiture Agreement *at all* to date, *see* Dua Rep. at 1 (Ex. 2), betting its entire case on the theory that the divestiture is irrelevant to its prima facie burden.  For

---

[112] George Dep. at 42:4-13 (Ex. 3) .

the reasons discussed above, the State is wrong as a legal matter, *supra* at 33-37, and this Court need not proceed further to deny the Motion. In any event, the State cannot carry its burden of persuasion even if this Court considers the divestiture as part of Defendants' rebuttal case.

*First*, the Amended Divestiture Agreement destroys the State's concerns about market-share concentration. In the real world, Kroger will acquire just 14 Albertsons stores in Colorado, divesting the remaining stores to C&S. Thus, the State's "market concentration" statistics must focus on those 14 Albertsons stores. Yet the State ignores those stores altogether.

*Second*, C&S is an experienced, well-capitalized grocery operator that will compete strongly with Kroger and others. Given its wholesale operations, C&S already supplies over 7,500 stores—three times as many stores as Kroger even owns. *Supra* at 19. Moreover, C&S has the industry know-how to succeed: It has more than a century of experience as a highly successful grocery company and provides a wide range of retail services to its independent grocery retailer customers, including retail technology and development, digital marketing, merchandising and pricing services, private brand support, and pharmacy network services. *Supra* at 19. Thus, C&S already provides many of the support services that it needs to run a retail store.

C&S is poised to successfully operate the divested stores. C&S already operates its own retail grocery stores under the banners "Piggly Wiggly Midwest" and "Grand Union," and it has no intention of selling those stores. *Supra* at 20. Indeed, the FTC has approved C&S as a divestiture buyer in a 2021 grocery merger. *Supra* at 20. And C&S's strength as one of the largest and most forward-thinking grocery wholesalers in the country uniquely supports C&S to successfully run the divested stores. *Supra* at 19-22.

*Third*, C&S has every incentive to compete with Kroger after the merger. Through the Divestiture, C&S has committed $2.9 billion to an expansion of its grocery retail business. While

48

the State claims that C&S is purchasing stores at a "low" price that reflects the risk of the deal, it provides no economic support for that accusation. Mot. 62. No such evidence exists.

*Fourth*, the point of the divestiture is to resolve potential competitive concerns, and this Amended Divestiture Agreement is intended to ensure the future success of C&S. C&S is ███████████████ a standalone business of nearly all of Albertsons Colorado's stores. Those stores will operate in Colorado under the well-known Safeway banner (███████████████████ ██████████████████████████).

*Fifth*, the Transition Services Agreement ("TSA"), which is a binding part of the Amended Divestiture Agreement, ensures that C&S will be able to hit the ground running. The TSA provides that ███████████████████████████████████ ████████████████████████████████████ C&S will also receive supporting facilities, ███████████████████ ████████████; it will receive five new private label brands, █████████████ access to the highly popular Signature and O Organics private brands, supplementing its existing private label offering. ██████████████████████ ████████████████████████████████████ ████████████████████████████. *Supra* at 21.

*Finally*, the State's repeated invocation of the unsuccessful Haggen divestiture demonstrates its lack of evidence regarding *this* divestiture to C&S. A single unsuccessful divestiture to a different buyer—among dozens of successful retail grocery divestitures—is insufficient to carry the State's burden of production or persuasion. Indeed, the Haggen-divestiture saga was the product of a unique confluence of factors, detailed at length in the 97-page opinion regarding the company's eventual bankruptcy. *See In re HH Liquidation, LLC*, 590 B.R. 211, 220

49

(Bankr. D. Del. 2018).  Those same factors simply are not present here.  Unlike Haggen, C&S is extremely well-capitalized.  Indeed, it is the eighth-largest privately-owned company in the United States.  *Supra* at 19.  Unlike Haggen, C&S has a long history of operating in the grocery industry, providing the supply-chain network and logistical know-how to hit the ground running.  And unlike Haggen, C&S was *previously approved* as a divestiture buyer by the FTC.

Divestitures happen all the time, and most of them succeed.  The suggestion that this Court should reject C&S as a divestiture buyer because a different divestiture failed under markedly different circumstances only underscores the State's lack of evidence to contest C&S's viability as a divestiture buyer in *this* case.

> b.    The State Cannot Establish Market Concentration Statistics that Meet the Presumption of Harm

The State's vague, unsupported allegations of the effect of the merger on market concentration, Mot. 32-33, are facially insufficient.  "Market concentration, or the lack thereof, is often measured by the Herfindahl-Hirschmann Index (HHI)."[113]  *Heinz*, 246 F.3d at 716.  Courts thus use HHI as a general heuristic to approximate when relevant product and geographic markets are concentrated enough to trigger a presumption of anticompetitive harm.  To calculate HHI, however, the State must provide *actual* market-share concentration numbers both before and after the merger in a *specific* market.  *See RAG-Stiftung*, 436 F. Supp. 3d at 310 ("The Court is unaware of a single case in which a court has enjoined a merger, even at this preliminary stage, where the

---

[113] The HHI is calculated by totaling the squares of the market shares of every firm in the relevant market.  *See FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 346 (3d Cir. 2016).  "Squaring the individual market shares allocates proportionately greater weight to firms with larger shares, reflecting the larger threat to competitive behavior they pose."  *RAG-Stiftung*, 436 F. Supp. 3d at 310 n.26.  Thus, a higher HHI indicates a more concentrated market.  For instance, under the 2010 Merger Guidelines, a transaction was considered presumptively unlawful if the relevant market would have a post-merger HHI score of 2,500 or more and if the merger would increase the HHI score by 200 points or more.  *See* 2010 Guidelines § 5.3 at 19.

Government failed to show undue concentration in a relevant market as its prima facie case requires, almost always through an HHI or similar metric.").

The State does not even attempt to show its work. Rather, the Motion claims in conclusory fashion the merger will result in an average change of around 1,400 in the HHI in all of the 39 "city areas" it alleged. *See* Mot. 33. The State does not say which competitors it included in its market concentration statistics; nor does it articulate the market concentration in any *specific* market. Instead, the State defers, claiming "the Attorney General will present expert economic evidence at a hearing." *Id.* Thus, by the State's own admission, its Motion fails to establish a presumption of anticompetitive effect with *evidence*. *See Baker Hughes*, 908 F.2d at 982.

The State's perfunctory HHI calculation also fails to address the Amended Divestiture Agreement. Even if Dr. Dua had properly defined a relevant product and geographic market (as explained, he has not), his market-concentration statistics would still fail to say anything about actual post-merger concentration because they do not account for the divestiture to C&S.

        c.      The State's So-Called "Qualitative" Factors and Alleged Harm to Consumers Are Easily Debunked

Perhaps due to its failure to support its market concentration statistics, the State leans on various "qualitative" factors that cannot satisfy its prima facie case.

*First*, the State argues that there will be harm in product markets that it does not allege as part of its claim: harm in the "labor market," the market for "local supply," and to "supply chain resiliency" generally. Mot. 36-41. Putting aside the fact that C&S is perhaps the foremost supply-chain specialist in the country, none of these vague arguments are relevant to the market for *consumer* goods, which is the only market alleged in this case. Mot. 27. Regardless, the evidence will show that C&S's well-established grocery operations will compete with Kroger for employees and suppliers as well.

51

*Second*, the State's examples of harm in its Motion demonstrate how its failure to consider C&S dooms its arguments. It alleges a "monopoly" ███████ after the merger, Mot. 41, ███████████████████████████████████████ It alleges a "duopoly" with Walmart in ███████████████████████████████████████████ Mot. 42, ████████████████████. The consumers in those cities will enjoy the same number of grocery options before and after the merger. Or, put in "market concentration" terms, the HHI will not change at all.

*Third*, the State's evidence focuses almost entirely on proving that Kroger and Albertsons compete on price. Mot. 35. But the mere elimination of a horizontal rival is insufficient to demonstrate anticompetitive harm. *See, e.g.*, *Demartini*, 662 F. Supp. 3d at 1064-65; *Malaney v. UAL Corp.*, 2010 WL 3790296, at *7 n.11 (N.D. Cal. Sept. 27, 2010) ("Simply put, there is no support for the notion that, merely by removing one competitor, any horizontal merger in the airline industry will be anticompetitive and thereby violate Section 7."), *aff'd*, 434 F. App'x 620 (9th Cir. 2011); *Bradt v. T-Mobile US, Inc.*, No. 19-cv-07752, 2020 WL 1233939, at *4 (N.D. Cal. Mar. 13, 2020); *In re AMR Corp.*, No. 22-901, 2023 WL 2563897, at *1 (2d Cir. Mar. 20, 2023). And again, there will be no elimination of a horizontal rival: C&S will step into Albertsons' shoes as a competitor in Colorado on day one post-merger.

Moreover, the State's myopic focus on Albertsons' business documents (rather than Kroger's) underscores why prices will *decrease* following the merger. The State contends that Albertsons ███████████████████████████████ Mot. 35, but it cannot say the same for Kroger, which has spent the past ███████████████████████ ██████████████████████ R. McMullen Dep. at 170-71. C&S also plans to make

expansive price investments in its newly acquired Albertsons stores to compete with Kroger.[114] The evidence will thus show that Albertsons is a higher-priced retailer than Kroger, and that Kroger's acquisition of Albertsons will *reduce* prices for consumers following the merger.

This point bears emphasis, because the State wants to ignore it:  Granting the relief requested by the State in its Motion will result in *higher prices* for Colorado grocery shoppers than if the merger is permitted to go through.

### C.     Even if the State Could Meet Its Prima Facie Burden, Defendants Would Rebut It

Even if the state could meet its *prima facie* burden, Defendants would have the opportunity to present rebuttal evidence.  *Baker Hughes*, 908 F.3d at 982.  If Defendants successfully rebut the prima facie case, the burden of production shifts back to the State "and merges with the ultimate burden of persuasion, which remains with the government at all times."  *Id.* at 983.  "The standard for the quantum of evidence defendants must produce to shift the burden back is relatively low." *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 213 (D.D.C. 2017), *aff'd* 855 F.3d 345 (D.C. Cir. 2017); *see also Baker Hughes*, 908 F.2d at 991 (defendants are not required to "'clearly' disprove anticompetitive effect," but rather to make merely "a 'showing'" (quoting *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 363 (1963))).

Under the *Baker Hughes* framework, numerous factors can rebut a prima facie antitrust violation, even assuming market concentration exists.  *See Baker Hughes*, 908 F.2d at 984 ("[E]vidence on a variety of factors can rebut a *prima facie* case.").  Among these factors are (1)

---

[114] *See* Winn Dep. Day 1 at 120:21-121:17 (Ex. 41); Winn Dep. Day 2 at 467:22-470:14 (describing C&S's plans to make improvement investments to the stores in Colorado that it is acquiring including investments in maintenance, remodels, security, inventory, and assortment) (Ex. 42); *see also* McGowan Dep. at 180:8-25, 181:5-18 (discussing C&S's planned price investment of 180 million into re-bannering, 90 million into private-label pricing, and an estimated half a billion into its newly acquired stores in the short-term) (Ex. 44).

the misleading nature of the statistics underlying the government's *prima facie* case; (2) the absence of significant entry barriers in the relevant market; (3) the lack of a likelihood of express collusion or tacit coordination; and (4) the efficiencies the merger will generate. *Baker Hughes*, 908 F.2d at 985. Thus, even if the State had satisfied its *prima facie* burden, the *Baker Hughes* factors show that the merger will not result in the anticompetitive effects the State asserts.

*First*, even if the State had properly defined a relevant market, the HHI statistics on which the State relies to demonstrate concentration in that market do not tell the full story. As discussed above, *supra* at 50-52, the State's statistics do not account for the divestiture. Failing to capture the divestiture means that the State's statistics hold no weight. *See Microsoft*, 681 F. Supp. 3d at 1093 (regulators "must address the circumstances surrounding the merger as they actually exist").

More fundamentally, binary market concentration statistics are ill-suited for the type of market the State alleges, which focus on a wide range of grocery products that can be purchased at a variety of retailers. This case does not involve a merger between suppliers of a single product, such as hydrogen peroxide or peanut butter. *See RAG-Stiftung*, 436 F. Supp. 3d 278. The State's calculations therefore do no account in any way for the fact that, if Kroger were to raise prices on a can of soup, consumers could—and likely would—buy that can of soup online, at competing grocery retail stores, or at any nearby corner market. Indeed, because of the myriad products Kroger sells, Kroger faces competitive constraints from the wide range of retailers that sell baked goods, dry goods, fresh produce, and the like. The State's narrow focus on so-called "traditional supermarkets" captures none of these constraints.

Rather, the State offers a binary approach where firms in its purported markets exert a full competitive restraint, while firms outside the markets exert no competitive restraint. But as Defendants will show, this all-or-nothing approach does not reflect consumer behavior or the

competition Kroger faces.  To be sure, "no one would reasonably assert that buying all of one's groceries from a fruit stand is a reasonable substitute for buying from a grocery store."  *FTC v. Sysco*, 113 F. Supp. 3d 1, 26 (D.D.C. 2015).  But given the wide range of competitors constraining Kroger and Albertsons today, a rote recitation of "market concentration" statistics does not accurately reflect competition.

*Second*, the barriers to entry in the grocery business are low.  "Low barriers to entry enable a potential competitor to deter anticompetitive behavior by firms within the market simply by its ability to enter the market."  *Heinz*, 246 F.3d at 717 n.13.  In Colorado, new stores that compete with Kroger are opening all the time.  For example, Sprouts opened six new stores in Colorado from 2016 to 2022, as well as an additional store in 2023[115]; Costco continues to expand in Colorado, opening two new stores near Denver and Boulder in 2023[116]; and Target has expanded in Denver in particular, opening two new stores in 2021 and another in 2018.[117]  Yet again, the State's arguments are unsupported by any real-world facts.

Without evidentiary support, the State's attempts to construct barriers to entry fail.  *Contra* Mot. 47-49.  The State claims that large retail spaces are a barrier, but online retailers—primarily Amazon—are increasingly expanding their foothold in the industry without needing brick-and-mortar store fronts.  And companies like Amazon do not struggle with the "highly acute" logistical challenges the State identifies.  Mot. 48-49.  The State also points to the closure of unsuccessful

---

[115] Jaleesia Fobbs, *Sprouts Farmers Market Announces Grand Opening of New Colorado Springs Location*, KRDO (Aug. 2, 2023), https://bit.ly/4chkE7R.

[116] Lucas High, *Longmont Costco to Open May 4*, BIZWEST (Apr. 7, 2023), https://bit.ly/3RIwkbA; Desiree Mathurin, *The Long-Awaited Green Valley Ranch Costco Has an Official Opening Date*, Denverite (June 27, 2023) https://bit.ly/3ztF26U.

[117] Jennifer Tom, *Target Brings its Newest Store Concept to Downtown Denver this Sunday*, 303 Magazine (July 19, 2018), https://bit.ly/4cC6Y6S/; Micah Smith, *What's That?: Small-Format Target Store Opens at University Hills Plaza*, Denver 7 (Aug. 13, 2021), https://bit.ly/45Edmsg.

Albertsons stores after the Safeway/Albertsons merger as evidence that the industry has significant barriers to entry. *See* Mot. 48. Under the State's theory, the fact that no grocery store opened in place of the closed Albertsons stores reflect barriers to entry. But the State overlooks the simpler explanation: that these grocery stores were closed because they were unsuccessful in the first place. That other grocers have not clamored to fill the shoes of failed Albertsons stores reflects that those locations were not profitable; not—as the State would have it—some broader barrier to entry.

The State also fails to account for entry and expansion by C&S. The State's alarms about logistics and marketing capability, *see* Mot. 48-49, obviously do not apply to C&S. C&S is a multi-billion dollar company with an established distribution chain and the capital necessary to support robust marketing and promotions. Because C&S will immediately gain a foothold in the market via the divestiture agreement, its competitive presence will constrain Kroger's pricing and other conduct from day one.

*Third*, the sheer number of products at issue in the grocery industry discourages collusion. "Whether a merger will make coordinated interaction more likely depends on whether market conditions, on the whole, are conducive to reaching terms of coordination and detecting and punishing deviations from those terms." *FTC v. CCC Holdings*, 605 F. Supp. 2d 26, 60 (D.D.C. 2009) (quotation marks omitted). Collusion in the grocery industry is implausible. While Kroger price-checks other grocery businesses, the prices and promotional offerings at competing stores are constantly in flux, preventing coordination on any large-scale basis.

The State's only suggested evidence of "collusion" exposes the weakness of its claim. It relies on a single, out-of-context email in which an Albertsons employee stated an "inten[t]" to not hire striking employees from King Soopers (a Kroger banner) and to not solicit pharmacy customers during a strike. *See* Mot. 44-45. The State does not allege any reciprocal action by

Kroger as part of the supposed "agreement."  Moreover, even if the State's cited evidence suggested coordination between Kroger and Albertsons regarding *labor relations*, such conduct would not constitute evidence of collusion in the market for consumer-facing *grocery* retail.

*Fourth*, the merger will create significant efficiencies that will be passed to consumers. Courts have long recognized that mergers can create efficiencies that benefit the economy.  *See United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 89 (D.D.C. 2011) ("One of the key benefits of a merger to the economy is its potential to generate efficiencies.").  The State cites *Sysco* for the proposition that the U.S. Supreme Court has not recognized efficiencies to support a merger, *see* Mot. 46, but *Sysco* itself acknowledged that efficiencies play a role, *see Sysco*, 113 F. Supp. 3d at 81-86 (analyzing alleged post-merger efficiencies).  Indeed, the "trend among lower courts has … been to recognize or at least assume that evidence of efficiencies may rebut the presumption that a merger's effects will be anticompetitive."  *Deutsche Telekom*, 439 F. Supp. 3d at 207; *see also United States v. M.P.M., Inc.*, 397 F. Supp. 78, 93 (D. Colo. 1975) ("Service offered" by the new firm "was superior to that offered by either of the previously independent companies alone").

The evidence will show that the merger will result in substantial efficiencies that are both verifiable and "merger specific," meaning they "could not be achieved without the merger."  *H&R Block, Inc.*, 833 F. Supp. 2d at 89; *see supra* at 22-23, 30.  Kroger's internal target is to achieve ██████████ in efficiencies from the transaction, stemming from cost savings related to, among other things, sourcing, supply chain, manufacturing, and administrative functions, as well as from revenue growth related to increased private label sales penetration and greater sales in health and wellness.  Generating these efficiencies will help Kroger invest in its customers and associates. As noted, Kroger plans to invest $1.3 billion to improve customer experience and another $1 billion to raise associate wages and benefits, plus at least $500 billion in price investments in

57

Albertsons stores post-merger. These efficiencies are quantifiable by reliable methodologies and are unlikely to be realized absent the merger.

These merger-driven efficiencies will be passed to customers who will enjoy lower prices and an improved experience. In the years following Kroger's acquisitions of Roundy's and Harris Teeter, Kroger invested more than $100 million and $125 million respectively in lowering prices. The State wants this Court to deprive Coloradans of similar savings.

**D.     The State Cannot Satisfy Its Ultimate Burden of Persuasion to Show That the Merger Will Substantially Lessen Competition in Colorado**

Stepping back, this is a case about competition. The ultimate question—on which the State bears the burden of persuasion—is whether allowing this merger to go forward will substantially lessen grocery competition in Colorado. For the reasons discussed above, it will not. Kroger and Albertsons are two players in a cutthroat industry that is only becoming more competitive. Kroger has developed a business model hyper-focused on lowering prices to compete with Walmart, and it intends to extend that strategy to the newly acquired Albertsons stores. Given the market realities of the industry, a merged Kroger entity will not—and could not—raise prices without losing significant market share. And in any event, the presence of C&S in the market will maintain (if not increase) the level of grocery competition that a merged Kroger entity would face. The bottom-line reality is apparent: This proposed merger is procompetitive, not anticompetitive.[118]

**II.     THE STATE FAILS TO SATISFY THE "PUBLIC INTEREST" CRITERIA, WHICH INCLUDES THE INTERESTS OF THE ENTIRE UNITED STATES, NOT JUST COLORADO**

The State bears the burden to show that "the granting of a preliminary injunction will not disserve the public interest." Mot. 19 (citation omitted); *see City & Cnty. of Denver v. Denver*

---

[118] Defendants also intend to introduce evidence to establish a number of statutory, constitutional, and equitable defenses, and they expressly reserve the right to do so. This Opposition, however, focuses on the State's failure to meet its burdens of production and persuasion.

*Firefighters Loc. No. 858, IAFF, AFL-CIO*, 320 P.3d 354, 356 n.4 (Colo. 2014) ("[T]he moving

party [must] successfully demonstrate[] that" there would be "no disserve to the public interests

if the injunction is granted.") (quoting *Rathke*, 648 P.2d at 653-54).  Nevertheless, the State does

not even attempt to demonstrate how the preliminary injunction it seeks would advance any

nationwide public interests.  *See* Mot. 65.  It offers just two conclusory paragraphs, devoid of any

factual citations or meaningful analysis of what the public interest even *is*.  *Id.*  The State's

perfunctory showing is inadequate.  *See, e.g.*, *Bowman v. Sawyer*, No. 19-CV-1411, ECF 41 at 3

(D. Colo. Feb. 5, 2020) (denying preliminary injunction because plaintiff "entirely failed—indeed,

[did] not even tr[y]—to carry his burden as to the fourth preliminary injunction factor, regarding

public interest").

When a requested injunction would have extraterritorial effects, those effects are crucial to

the public-interest analysis.  *See, e.g.*, *Fraser v. ATF*, 689 F. Supp. 3d 203, 216 (E.D. Va. 2023)

(it is "an aspect of the exercise of common sense that, of necessity," "the scope of the injunction

is to be considered as a matter of public interest").  And the issuance of an injunction under one

state's law "is clearly inappropriate" if the plaintiff fails to account for "the facts in a particular

situation and the laws and public policy of the [other affected] state[s]." *Guardsmark, Inc. v. Borg-

Warner Protective Servs.*, 1998 WL 959664, at *12-13 (Tenn. Ct. App. Nov. 4, 1998); *see, e.g.*,

Margaret H. Lemos & Ernest A. Young, *State Public-Law Litigation in an Age of Polarization*, 97

Tex. L. Rev. 43, 85 (2018) ("If New York aggressively pursues Microsoft, Washington may feel

aggrieved. And if pro-environment states undermine the fortunes of big oil companies, the oil-

producing states may share in the consequences.").

In *In re Qwest Communications International, Inc. Securities Litigation*, 243 F. Supp. 2d

1179, 1187 (D. Colo. 2003), for example, the court denied plaintiff-shareholders' request for a

preliminary injunction to freeze the defendant-company's assets during the sale of its subsidiary, in part because the company not only "employ[ed] fifteen thousand people in Colorado alone," but also "employ[ed] thousands of additional employees in each of the thirteen other states it serve[d]." Thus, the court explained, "a major disruption of [the company's] operations d[id] present a significant threat to the multifaceted public interest." *Id.*

The State has readily admitted that it seeks an injunction with vast extraterritorial effect, asking that this Court enjoin the "[c]onsummation" of the merger as a whole. Mot. 65. As the State has made clear: "The Attorney General does not dispute that he requests an injunction to block the transaction in full, nor that the transaction involves assets in numerous states." Pl.'s Reply to Defs.' Resp. to U.S. Statement of Interest at 3 (May 17, 2024). But despite that broad request, the State addresses only its *own* unique interests, ignoring those of the public in other states. In fact, the State does not even *allege* that the transaction will "disserv[e]" national interests. *See Denver Firefighters*, 320 P.3d at 356. Instead, the State's case is limited to "local markets" in Colorado, Compl. ¶¶ 78, 97; *see id.* ¶ 108; alleges anticompetitive effects unique to Colorado, *id.* ¶¶ 132-33, 136, 141-42; and objects to the divestiture on the ground that it would not do enough in Colorado—irrespective of its extraterritorial benefits, *id.* ¶¶ 189, 191, 196-97. Colorado-specific interests are not a proxy for the interests of the United States as a whole.

Even if the State had attempted to show "that the granting of a preliminary injunction will not disserve the public interest" in these other states, *Rathke*, 648 P.2d at 654, it would come up empty. The State ignores the transaction's substantial public benefits both within and outside Colorado. *See supra* at 22-23, 30. The evidence will show that the injunction the State requests would "present a significant *threat* to the multifaceted public interest" by depriving consumers and workers in other states of the benefits of a superior customer experience and increased efficiency.

*See Qwest Communications*, 243 F. Supp. 2d at 1187 (emphasis added).  It will show that Kroger

stores offer a superior customer experience, and the merger will allow Kroger to extend that

experience to new customers, reinvigorating the Albertsons stores it acquires.  *See supra* at 22-23,

30.  Preventing the "[c]onsummation" of the merger, Mot. 65, would eliminate those benefits

without so much as a thought for the vast majority of out-of-state beneficiaries.

## III.    THE STATE HAS NOT DEMONSTRATED THAT THE BALANCE OF EQUITIES FAVOR A PRELIMINARY INJUNCTION

A preliminary injunction is an equitable remedy, and the State must establish "that the

balance of equities favors the injunction."  *Bd. of Cnty. Comm'rs, Cnty. of Eagle, State of Colo v.*

*Fixed Base Operators, Inc.*, 939 P.2d 464, 467 (Colo. App. 1997).  Even where the plaintiff is a

government entity attempting to enforce a statute, "[t]he default rule is that [the] plaintiff seeking

a preliminary injunction must make a clear showing … that the balance of equities tips in [its]

favor."  *Starbucks Corp. v. McKinnkey*, No. 23-367, slip op. at 5 (U.S. June 13, 2024) (quotation

marks omitted).  The State's minimal discussion of the balance of the equities confirms that it

cannot satisfy its burden.  Mot. 64-66.

*First*, the State ignores the harm that an injunction would cause the parties. "[T]he grant of

a temporary injunction in a Government antitrust suit is likely to spell the doom of an agreed

merger."  *Mo. Portland Cement Co.*, 498 F.2d at 870. [119]  By urging the Court to preliminarily

enjoin the merger, therefore, the State is essentially asking the Court to decide the entire case on a

partial record at a preliminary stage.  Yet if the State succeeds in dragging out this litigation beyond

---

[119] *See also FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1087 (D.C. Cir. 1981) (Ginsburg, J.) ("A preliminary injunction may kill, rather than suspend, a proposed transaction."); *FTC v. Foster*, 2007 WL 1793441, at *51 (D.N.M. May 29, 2007) ("The need for caution in issuing a preliminary injunction is particularly important in the merger and acquisition context, because the grant of a temporary injunction in a Government antitrust suit is likely to spell the doom of an agreed merger." (quotation marks omitted)).

the outside date of October 9, 2024, the merger could die even if this Court ultimately concludes it is in the best interests of consumers and competition.

*Second*, the State's Motion ignores the proceedings in the FTC Action and in Washington State. As courts recognize, issuing injunctions with extraterritorial effect "may create comity problems when similar, parallel lawsuits involving different plaintiffs are pending in other [jurisdictions'] courts." *Florida v. HHS*, 19 F.4th 1271, 1285 (11th Cir. 2021). At the preliminary injunction stage, affording such extraterritorial relief "encourage[s] gamesmanship, motivating plaintiffs to seek out the friendliest forum and rush to litigate important legal questions in a preliminary posture," thereby "disturb[ing] comity by hindering other courts from evaluating legal issues for themselves." *Georgia v. President of the United States*, 46 F.4th 1283, 1305 (11th Cir. 2022).

That is precisely what the State attempts to do here, seeking five whacks at the transaction alongside other enforcers, in: (1) the FTC's administrative challenge to the merger at the administrative hearing beginning July 31; (2) the FTC's judicial challenge to the merger in federal court on August 26; (3) the Washington trial scheduled for September 16; (4) the preliminary injunction hearing in this case on August 12; and (5) the September 30 trial on the merits in this case. Defendants are prepared to defend the transaction in all of these proceedings. But given the lopsided procedural posture, this Court must hold the State to its burden of actually proving its equitable arguments with *evidence* rather than rhetoric.

## IV.     THE STATUS QUO IS PRESERVED UNDER THE FTC ACTION

The State also fails to show that the sweeping preliminary injunction it seeks "is necessary to preserve the status quo pending a trial on the merits." Mot. 64; *see Gitlitz*, 171 P.3d at 1278 (citing *Rathke*, 648 P.2d at 653-54). Pursuant to the stipulated temporary restraining order in the FTC Action, the "status quo" is that Defendants will not close the transaction until at least five

business days after the court rules on Plaintiffs' forthcoming request for injunctive relief. *Supra* at 25-26. The State cannot dispute that, in light of the order in the FTC Action, the State's request for injunctive relief is not "necessary" to preserve anything in the immediate term. Mot. 65.[120]

Indeed, given the stipulated injunction in the FTC Action, the only scenario in which State's requested preliminary injunction would take effect is if the federal court in the FTC Action were to *deny* the request for preliminary injunctive relief by the FTC and nine other attorneys general. Stated differently, the State's requested injunction will be effective if *and only if* it directly conflicts with a ruling from the federal court in the FTC Action. But because the FTC Action includes express allegations about alleged harm in Colorado (and will apply a materially identical legal standard), an order denying injunctive relief in that case would be dispositive here.[121] In any event, there is no risk of the merger closing before the federal hearing concludes.

## V.    THE STATE HAS FAILED TO DEMONSTRATE IRREPARABLE HARM

The State also fails to demonstrate irreparable harm. Despite its burden, the State offers only two conclusory paragraphs about irreparable harm, insisting that "sharing of information post-merger alone creates potential harm to competition," and the merger "will be almost impossible and highly disruptive to unwind." Mot. 64. But both of those arguments assume the State is correct on the merits, which—for the reasons discussed, *see supra* at 37-58—it has not shown.

---

[120] The State's framing of the "status quo" also misses the mark. As one court recently noted, while "[p]reservation of the 'status quo' is regularly argued as a reason to enter injunctive relief" against a merger, "it is also true that, absent a legal prohibition, the parties would currently be free to merge or otherwise pursue their private business interests." *FTC v. Cmty. Health Sys., Inc.*, 2024 WL 2854690, at *4 n.6 (W.D.N.C. June 5, 2024). The court therefore concluded that "a call to maintain the 'status quo' under these circumstances is, at best, of uncertain consequence," and the better approach is to assess the traditional injunctive factors, including the balance of the equities and the effect of an injunction on the public interest. *Id.*

[121] Because the State is in privity with the FTC, it would be bound by any decision in the FTC Action. But at minimum, the decision in the FTC Action addressing Colorado-specific issues would be highly persuasive in this case.

Although the State initially concedes that it must satisfy all six equitable requirements for a preliminary injunction, Mot. 19-20, it later argues that it "is not required to plead or prove immediate or irreparable injury when a statute concerning the public interest is implicated," Mot. 64 (citing *Bd. of Cnty. Comm'rs of Cnty. of Logan v. Vandemoer*, 205 P.3d 423, 431 (Colo. App. 2008)). The State is wrong.

This case is not the type of suit "in behalf of the public" where the government is sometimes exempt from showing irreparable harm. *Lloyd A. Fry Roofing Co. v. State Dep't of Health Air Pollution Variance Bd.*, 553 P.2d 800, 808 (Colo. 1976). Because this case involves a nationwide merger and the State seeks extraterritorial relief, the "public" is the entire nation, not Colorado. But the *federal* government "enforces the federal antitrust laws on behalf of the American people," "according to some uniform plan, operative throughout the entire country." Statement of Interest of the United States at 13, *Deutsche Telekom*, 439 F. Supp. 3d 179, ECF No. 348 (S.D.N.Y. Dec. 20, 2019) (citing *Minn. v. N. Sec. Co.*, 194 U.S. 48, 70-71 (1904)). The challenge "in behalf of the public" is the FTC Action, not the State's go-it-alone lawsuit.

## VI.   THE STATE'S REQUESTED REMEDY IS DISPROPORTIONATE TO ITS ALLEGED HARM AND IMPERMISSIBLE AS A MATTER OF LAW

Injunctive relief must be tailored to the precise harm shown. Indeed, as this Court recognized when it denied Defendants' Motion to Dismiss: "Whether an injunction is proper, and the proper tailoring of such an injunction, are questions that … must be determined at a later stage." Order Denying Defendants' Mot. to Dismiss at 13 (June 26, 2024). The "later stage" now arises with the State's Motion, which offers no tailoring of any kind to limit its requested relief to the alleged harm in the State of Colorado. In fact, while the Court's Order did not "read Plaintiffs' Complaint as an all-or-nothing request seeking an injunction stopping the merger," *id.* at 8, the State's Motion seeks precisely that all-or-nothing relief, *see* Mot. 65.

64

The law is clear that, "[i]f a less drastic remedy" than the State's requested injunction would be "sufficient to redress" the alleged "injury, no recourse to the additional and extraordinary relief of [such] an injunction [is] warranted." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010). A court may enjoin "only the specific conduct that it determines was improper." *State ex rel. Meyer v. Ranum High Sch.*, 895 P.2d 1144, 1145 (Colo. App. 1995). The State asserts harm in Colorado only, yet it asks for an injunction affecting every State in the nation. It therefore has demonstrated the tailoring that the law requires.

By devoting more than 75 paragraphs of its Complaint to the adequacy of Defendants' initial proposed divestiture to C&S, the State has acknowledged that *some* divestiture would address its alleged harms. *See, e.g.*, Compl. ¶¶ 172-246. The State objects to the proposed divestiture because, among other things, it "does not include enough stores in Colorado," *id.* ¶ 189, "[t]he number of stores also fails to address all local markets," *id.* ¶ 190, it fails to include sufficient distribution centers, *id.* ¶ 219, it does not include Albertsons' dairy facility in Denver, *id.* ¶¶ 55, 179, and it requires re-bannering of Safeway stores, *id.* ¶ 177. The State's Motion is the same, spending fifteen pages on the purported inadequacy of a hypothetical divestiture that is not before the Court. *See* Mot. 49-65. The State does not seek a different or more tailored divestiture that it believes would address its alleged concerns. Nor does it suggest any limitation on its requested relief. The State's insistence on impermissible and disproportionate remedy means it cannot obtain the extraterritorial preliminary injunction that it seeks here.

## CONCLUSION

For these reasons and others to be expounded at the August 12 hearing, if necessary, the Court should deny the State's Motion for a Preliminary Injunction.

DATED this 26th day of June, 2024.          Respectfully submitted,

65

*/s/ Randall H. Miller*
Randall H. Miller
Atty Reg. No. 33694
ARNOLD & PORTER KAYE SCHOLER LLP
1144 Fifteenth Street, Suite 3100
Denver, Colorado 80202
Phone: (303) 863-2363
randall.miller@arnoldporter.com

Matthew M. Wolf (*pro hac vice*)
Sonia K. Pfaffenroth (*pro hac vice*)
Jason Ewart (*pro hac vice*)
Kolya D. Glick (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue NW
Washington, DC 20001
Phone: (202) 942-5462
Fax: (202) 942-5999
matthew.wolf@arnoldporter.com
sonia.pfaffenroth@arnoldporter.com
jason.ewart@arnoldporter.com
kolya.glick@arnoldporter.com

*Counsel for Defendant The Kroger Co.*

*/s/ Christopher H. Toll*
Christopher H. Toll, #15388
Maureen R. Witt, #10665
HOLLAND & HART LLP
555 17th Street, Suite 3200
Denver, CO 80202
Phone: (303) 295-8000
Email: ctoll@hollandhart.com
      mwitt@hollandhart.com

Enu Mainigi (*pro hac vice*)
Jonathan Pitt (*pro hac vice*)
A. Joshua Podoll (*pro hac vice*)
WILLIAMS & CONNOLLY LLP
680 Maine Ave., S.W.
Washington, D.C. 20024
Phone: (202) 434-5000
Email: emainigi@wc.com
      jpitt@wc.com
      jpodoll@wc.com

66

Edward D. Hassi (*pro hac vice*)
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Avenue, N.W.
Washington, DC 20004
Phone: (202) 383-8000
Email: thassi@debevoise.com

Michael Schaper (*pro hac vice*)
Shannon Rose Selden (*pro hac vice*)
J. Robert Abraham (*pro hac vice*)
Natascha Born (*pro hac vice*)
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
Phone: (212) 909-6000
Email: mschaper@debevoise.com
    srselden@debevoise.com
    jrabraham@debevoise.com
    nborn@debevoise.com

Michael G. Cowie, (*pro hac vice*)
James A. Fishkin, (*pro hac vice*)
DECHERT LLP
1900 K Street N.W.
Washington, DC 20006
Phone: (202) 261-3339
Email: mike.cowie@dechert.com
    james.fishkin@dechert.com

*Counsel for Defendant Albertsons Companies, Inc.*

/s/ *Kathryn A. Reilly*
Kathryn A. Reilly, #37331
Jennifer J. Oxley, #51587
WHEELER TRIGG O'DONNELL LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202-5647
Phone: (303) 244-1800
Email: reilly@wtotrial.com
oxley@wtotrial.com

Renata B. Hesse (admitted pro hac vice)
Daniel J. Richardson (admitted pro hac vice)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW, Suite 700
Washington, DC 20006-5215

67

Phone: (202) 956-7500
Email: hesser@sullcrom.com
richardson@sullcrom.com

Steven L. Holley (admitted pro hac vice)
SULLIVAN & CROMWELL LLP
125 Broad St
New York, NY 10004
Phone: (212) 558-4737
Email: holleys@sullcrom.com

*Counsel for Defendant C&S Wholesale Grocers, LLC*

68

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that the foregoing document has been served on all counsel who have entered an appearance in this matter through Colorado Courts E-Filing, on June 26, 2024, including the following:

**State of Colorado:**

Steven M. Kaufmann
Bryn A. Williams
Arthur Biller
Ian L. Papendick
Robin E. Alexander
Aric J. Smith
Conor J. May
Office of the Attorney General
Colorado Department of Law
Ralph L. Carr Judicial Building
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720) 508-6000

*/s/ Randall H. Miller*
Randall H. Miller

69

1

Stinnie, et al. v. Holcomb, 11/15/18

```
 1              UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF VIRGINIA
 2                 CHARLOTTESVILLE DIVISION

 3   _____

     DAMIAN STINNIE, individually
 4   and on behalf of all others
     similarly situated, et al.,     CIVIL ACTION 3:16-CV-00044
 5                                    NOVEMBER 15, 2018, 1:32 P.M.
                                      CHARLOTTESVILLE, VA
 6            Plaintiffs,             PRELIMINARY INJUNCTION HEARING
                                      VOLUME I OF I
 7   vs.

 8   RICHARD D. HOLCOMB, in his
     official capacity as the
 9   Commissioner of the Virginia
     Department of Motor Vehicles,   Before:
10                                    HONORABLE NORMAN K. MOON
                                      UNITED STATES DISTRICT JUDGE
11            Defendant.             WESTERN DISTRICT OF VIRGINIA

12   _____

13   APPEARANCES:
     For the Plaintiffs:        ANGELA A. CIOLFI, ESQUIRE
14                              Legal Aid Justice Center
                                1000 Preston Avenue, Suite A
15                              Charlottesville, VA 22903

16                              JONATHAN TODD BLANK, ESQUIRE
                                BENJAMIN PETER ABEL, ESQUIRE
17                              McGuireWoods, LLP
                                Court Square Building
18                              310 Fourth Street, N.E., Suite 300
                                Charlottesville, VA 22902
19
                                ALYSSA M. PAZANDAK, ESQUIRE
20                              McGuireWoods LLP - Texas
                                2000 McKinney Avenue, Suite 1400
21                              Dallas, TX 75201
                                214-932-6480
22
     Court Reporter:    JoRita B. Meyer, RMR, CRR
23                      210 Franklin Road, S.W., Room 540
                        Roanoke, Virginia 24006
24                      (540)857-5100 Ext. 5311
     Proceedings recorded by mechanical stenography,
25   transcript produced by computer.
```

2

Stinnie, et al. v. Holcomb, 11/15/18

```
1   APPEARANCES (Continued):

2   For the Plaintiffs:        LESLIE CAROLYN KENDRICK, ESQUIRE
                               University of Virginia School of Law
3                              580 Massie Road
                               Charlottesville, VA 22903
4

5   For the Defendant:         MARGARET HOEHL O'SHEA, ESQUIRE
                               NANCY HULL DAVIDSON, ESQUIRE
6                              Office of the Attorney General
                               of Virginia
7                              202 North Ninth Street
                               Richmond, VA 23219
8   ///

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

Stinnie, et al. v. Holcomb, 11/15/18

1                    INDEX OF WITNESSES

2    WITNESSES ON BEHALF OF THE PLAINTIFFS:            PAGE

3    **ADRAINNE JOHNSON**

4      Direct Examination by Ms. Ciolfi..................14
       Cross-Examination by Ms. O'Shea...................22
5      Redirect Examination by Ms. Ciolfi...............38

6    **LLEZELLE A. DUGGER**

7      Direct Examination by Mr. Blank...................42
       Cross-Examination by Ms. O'Shea...................49
8      Redirect Examination by Mr. Blank................61

9    **JULIE MOATS**

10     Direct Examination by Mr. Blank...................63
       Cross-Examination by Ms. O'Shea...................66
11
     **DIANA PEARCE, Ph.D.**
12
       Direct Examination by Ms. Pazandak...............76
13     Cross-Examination by Ms. O'Shea...................91
       Redirect Examination by Ms. Pazandak.............99
14

15   **STEVEN ROBERT PETERSON, Ph.D.**

16     Direct Examination by Mr. Abel...................101
       Cross-Examination by Ms. O'Shea..................122
17

18

19   WITNESSES ON BEHALF OF THE DEFENDANT:

20   **MILLICENT FORD**

21     Direct Examination by Ms. O'Shea.................132
       Cross-Examination by Mr. Blank...................143
22     Redirect Examination by O'Shea...................147

23   ///

24

25

4

Stinnie, et al. v. Holcomb, 11/15/18

1                            INDEX OF EXHIBITS

2    EXHIBITS ON BEHALF OF THE PLAINTIFFS:

3            EXHIBIT:                          Admitted

4            1                                131

5            2                                131

6

7    EXHIBITS ON BEHALF OF THE DEFENDANT:

8            EXHIBIT:                          Admitted

9            1                                61

10           2                                150

11   ///

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

Stinnie, et al. v. Holcomb, 11/15/18

1  (Proceedings commenced, 1:32 p.m.)

2      THE COURT:  Good afternoon.

3      MR. BLANK:  Good afternoon, Judge.

4      MS. O'SHEA:  Good afternoon, Your Honor.

5      THE COURT:  Call the case, please.

6      THE CLERK:  Yes, Your Honor.  This is Civil Action

7  Number 3:16-CV-44, *Damian Stinnie and others versus Richard*

8  *B. Holcomb.*

9      THE COURT:  Plaintiffs ready?

10     MS. CIOLFI:  Yes, Your Honor.

11     THE COURT:  Defendants ready?

12     MS. O'SHEA:  Yes, sir.

13     THE COURT:  All right.  You may proceed.

14     MS. CIOLFI:  Good afternoon, Your Honor.  Angela

15 Ciolfi for the plaintiffs.  With me here is Jonathan Blank,

16 Leslie Kendrick, Alyssa Pazandak, and Ben Abel for the

17 plaintiffs.  We are here on the plaintiffs' motion for a

18 preliminary injunction.

19     Your Honor, we welcome the opportunity to be back in

20 front of this Court.  We have carefully read and re-read the

21 Court's opinion on the motion to dismiss and Judge Gregory's

22 opinion on the appeal, and we have made every effort to

23 satisfy the Court's concerns.  And that's critically

24 important because since we filed the complaint in 2016, the

25 Commonwealth has suspended hundreds of thousands of licenses

Stinnie, et al. v. Holcomb, 11/15/18

1  for failure to pay and hundreds of thousands of people have

2  been convicted and/or gone to jail for driving while

3  suspended where the underlying reason for the suspension was

4  solely failure to pay.

5          So what has changed since we were last before you?

6          Two federal courts in Tennessee and Michigan have

7  issued statewide injunctions against the future enforcement

8  of similar statutes, and in ruling on a motion to stay the

9  Sixth Circuit said the state was unlikely to succeed on the

10 merits of this appeal, challenging the District Court's

11 ruling on procedural due process.

12         Judge Gregory, who is the only judge from the Fourth

13 Circuit who examined the jurisdictional issues on this

14 appeal, said unequivocally that this court has jurisdiction,

15 and we have amended our complaint in several significant

16 ways, including alleging clearly and unequivocally that,

17 despite what the statute says, the Commissioner issues the

18 automatic suspension without any order from the Court.

19         We've alleged clearly and unequivocally that the

20 electronic transmission that goes to the DMV from the courts

21 is just a notification of an unpaid account, no more and no

22 less.  And we are ready to present testimony today to

23 establish the truth of those allegations.

24         We've also added plaintiffs whose licenses were

25 suspended well after any appeal deadlines had run and they

Stinnie, et al. v. Holcomb, 11/15/18

1  defaulted on payment plans.

2      And finally, we clarified that the relief we are

3  seeking is an order declaring the statute unconstitutional

4  and enjoining the DMV officer from enforcing it.

5      This statewide enforcement scheme is devastating to

6  individuals and families in every jurisdiction in the

7  Commonwealth.  Today we plan to present evidence

8  demonstrating that a narrowly crafted preliminary injunction

9  should issue in order to prevent further devastation, but

10  first we would like to address some of the procedural issues

11  raised by the defendant.

12      First, this Court has and cannot abrogate

13  jurisdiction based on *Rooker-Feldman*, because no state court

14  has heard or decided plaintiffs' constitutional claims and

15  because any role the state courts play in plaintiffs'

16  suspension is purely ministerial.  *Rooker-Feldman* only bars

17  federal courts from reviewing decisions where the state court

18  actually weighs the issues and renders a decision.

19      The plaintiffs also have standing because the

20  Commissioner is at least partly responsible for their

21  injuries, which is all we need to show for causation and

22  because an order to the Commissioner would address most, if

23  not all, of the plaintiffs' injuries.

24      As Judge Gregory pointed out, if the Court issues an

25  injunction, it would be because the suspensions were

Stinnie, et al. v. Holcomb, 11/15/18

1   effectuated pursuant to an unconstitutional process, and so

2   the plaintiffs' licenses would no longer be suspended even in

3   a legal, technical sort of sense, but also because an order

4   waiving the reinstatement fee alone is enough to confer

5   standing to these plaintiffs.

6           Finally, the Commissioner is not entitled to

7   Eleventh Amendment immunity because the Commissioner has

8   express enforcement responsibilities under 46.2-395 and is,

9   in fact, the only state official responsible for

10  reinstatement of licenses.  No more is required to apply the

11  *Ex Parte Young* exception.

12          Your Honor, fundamentally, the Commonwealth's

13  arguments on jurisdiction boil down to three words:  It

14  wasn't me.  They point the finger at the courts.  They would

15  like this court to focus on what I will call time one, which

16  is the time of conviction.  They want you to do that because

17  time one is messy, dealing with payment plans and community

18  service and what the judges do versus what the clerks do.

19  But we simply didn't challenge what happens at time one.  We

20  challenged what happens at time two, which is the time of

21  default; and at time two, this case is very simple, because

22  there is no due process.

23          At the time of default, there is no notice of

24  alleged default.  There is no ability-to-pay hearing.  There

25  is no determination of willfulness, no process at all.  There

Stinnie, et al. v. Holcomb, 11/15/18

1    is just an electronic transmission from the court computer to

2    the DMV computer and, zap, there goes your license, and in

3    many cases, for many of our plaintiffs, their livelihood.

4    Nothing in the Commonwealth's briefs or Ms. Ford's

5    declaration attached thereto contradicts that.

6           Perhaps the Commonwealth would like us to sue

7    hundreds of court clerks and hundreds of judges, but putting

8    aside the waste of judicial resources that would entail, if

9    we sue the courts they are likely to say exactly the same

10   thing that the DMV Commissioner is now saying:  We are immune

11   and, hey, it wasn't us, it was the DMV.

12          And we know that's what they'll say because that's

13   what the clerk of the Circuit Court for the City of

14   Charlottesville says:  It's the DMV.  And that's what the

15   chief judge of the Albemarle General District Court says:  It

16   is the DMV, in his policy regarding payment plans, which was

17   attached to our reply brief at footnote 3.

18          We never said the courts had no role to play.  Sure

19   they do.  They track payments on court debt and input

20   deadlines into the computer system, but that role is purely

21   ministerial, and nothing this court could do would upset any

22   judicial decision-making.

23          There is no rule that says that we have to sue

24   everybody responsible for the plaintiffs' suspensions, but we

25   chose to sue the DMV Commissioner.  And why did we do that?

Stinnie, et al. v. Holcomb, 11/15/18

1   Because he is the single statewide actor who represents the

2   Commonwealth's interests in this uniform statewide

3   enforcement scheme.  Because we aren't contesting what the

4   courts do with respect to payment plans or community service,

5   however flawed they may be, and because he is the proximate

6   cause of the plaintiffs' injuries.  He is the one who

7   maintains the database that the police check when they decide

8   whether to pull someone over for driving while suspended.  He

9   produces the driving transcripts that prosecutors and courts

10  rely on for driving while suspended convictions, and he

11  imposes the $145 reinstatement fee.  An order against the

12  Commissioner would prevent all of those injuries, and more.

13          Your Honor, you need look no further than Ms. Ford's

14  declaration submitted by the defendant at paragraph 5 to see

15  that the DMV Commissioner has a special relationship to the

16  statute that we're challenging.  She says, "I have specific

17  knowledge of the process mandated by Virginia Code 46.2-395

18  and DMV's responsibilities thereunder.  In addition, I have

19  been instrumental in working with the Office of the Executive

20  Secretary of the Supreme Court, OES, to implement those

21  policies and procedures."  She then goes on to describe all

22  of the activities that DMV engages in to enforce the statute.

23          So this is the point:  The Commonwealth enacted a

24  statute that mandates license suspension for unpaid court

25  debt.  The Commonwealth tasked the OES and the DMV to set up

Stinnie, et al. v. Holcomb, 11/15/18

1   a system to enforce that statute as automatically and as

2   administratively efficiently as possible.

3        All that the Ford declaration proves is that the

4   enforcement scheme works exactly as it was intended to work:

5   Automatically, mandatorily, and with utter disregard for

6   whether people are unwilling or simply unable to pay.  It is

7   the Commonwealth that chose to set it up that way, and

8   although the evidence we present today will demonstrate that

9   the DMV suspends the licenses without a court order,

10  ultimately it doesn't matter whether the court initiates the

11  suspension or not, because the Commonwealth cannot deny that

12  the Commissioner is absolutely indispensable to the

13  enforcement scheme.  It simply doesn't work without him.  And

14  it's clear that the Commissioner is a proper defendant so

15  long as an order against him would provide meaningful relief

16  to the plaintiffs.

17       With the Court's indulgence, we are prepared to put

18  on evidence today to demonstrate we're likely to succeed on

19  the merits, that the plaintiffs will continue to suffer

20  irreparable harm in the absence of an junction, and that the

21  balance of the equities are in the plaintiffs' favor and an

22  injunction is in the public interest.  Such an order would

23  bring this court into alignment with the other two federal

24  courts that have looked at this issue, found that the federal

25  courts did have jurisdiction and that the plaintiffs had

Stinnie, et al. v. Holcomb, 11/15/18

1    established likelihood of success on the merits on at least

2    one of their claims, which is all we need for preliminary

3    injunctive relief.

4         You'll hear from Ms. Adrainne Johnson, mother of

5    three, who recently lost her job because she could not get to

6    and from the new location she was assigned to across town

7    without a license; Llezelle Dugger, the clerk of the court

8    for the City of Charlottesville Circuit Court, and Julie

9    Moats, a former general district court clerk, who will both

10   testify that all they do on the court side is enter a payment

11   due date and that licenses are suspended not by any clerk or

12   judge, but by the DMV after the court computer talks to the

13   DMV computer, transmitting a record of nonpayment; Dr. Diana

14   Pearce, who is an expert in poverty and economic inequality,

15   will testify that each of the named plaintiffs, and others

16   like them, cannot afford to meet their basic needs while also

17   making payments to the court; and Dr. Steven Peterson, an

18   economist who will testify that license suspension

19   disparately impacts Virginia's poor, limits their ability to

20   work, and also makes it more difficult to pay their costs and

21   fines to the court.

22        Under Rule 43, we are also prepared to offer

23   declarations from Jon Carnegie and Robert Fuentes, experts on

24   the relationship between reliance on driving and access to

25   economic opportunities.

Stinnie, et al. v. Holcomb, 11/15/18

1     At the close of the evidence we'll ask this Court to

2  enter a preliminary injunction enjoining the Commissioner

3  from enforcing Section 46.2-395 against the plaintiffs and

4  the future suspended class unless and until the Commissioner,

5  or another state actor, determines through a hearing and

6  adequate notice thereof that their failure to pay was

7  willful, and ordering the Commissioner to remove any current

8  suspensions imposed under the statute against the individual

9  named plaintiffs without charging a reinstatement fee.

10     The relief we are asking for here is modest.  The

11  Commonwealth simply can't claim it is administratively

12  burdensome to remove three suspensions from their database

13  and not to process future suspensions.  Their burden is

14  insignificant, especially compared to the burden on the

15  plaintiffs.

16     As Judge Trauger in the Middle District of Tennessee

17  observed, "Every day without adequate transportation is a day

18  in which a person is likely to be pulled more deeply into

19  poverty; to grow more isolated from family and community; and

20  to fail to receive needed medical care or perform necessary

21  tasks.  A person cannot merely put his participation in life

22  on hold for months or years at a time and hope to return no

23  worse for wear."

24     After the Commonwealth responds, we'd like to be

25  able to put on evidence in support of our motion.

14

Johnson - Direct

1          Thank you, Your Honor.

2          THE COURT:  All right.

3          MS. O'SHEA:  Good afternoon, Your Honor.  Margaret

4   O'Shea on behalf of Commissioner Holcomb.

5          In light of the fact that the plaintiffs are

6   intending to present evidence to the Court for consideration

7   of the preliminary injunction, the Commissioner will reserve

8   our substantive arguments for closing in the interest of

9   moving things along this afternoon.

10          THE COURT:  All right.

11          MS. O'SHEA:  Thank you.

12          THE COURT:  Maybe you can agree to some of the --

13   what they're putting on evidence for.

14          MS. O'SHEA:  Yes, Your Honor, and we have.

15   Considering that this is a motion for preliminary injunction,

16   we've stipulated that the documentary evidence can be entered

17   to the Court without need to go through hearsay exceptions

18   and so on and so forth.  Yes, sir.

19          THE COURT:  All right.  Call your first witness,

20   then.

21          MS. CIOLFI:  Plaintiffs call Ms. Adrainne Johnson.

22          ADRAINNE JOHNSON, CALLED BY PLAINTIFFS, SWORN

23                    DIRECT EXAMINATION

24   BY MS. CIOLFI:

25   Q   Good afternoon, Ms. Johnson.

Johnson - Direct

1   A    Good afternoon.

2   Q    Please state your name.

3   A    Adrainne Johnson.

4   Q    And how old are you?

5   A    34.

6   Q    And where do you live?

7   A    Charlottesville, Virginia.

8   Q    How long have you lived here?

9   A    All my life.

10  Q    Do you have any children?

11  A    Yes.

12  Q    How many?

13  A    Three.

14  Q    And what are their ages?

15  A    15, 14, and 12.

16  Q    Can you tell us what the status of your driver's license

17  is?

18  A    Suspended.

19  Q    And how long has it been suspended?

20  A    Off and on since 2016.

21  Q    Why is it suspended?

22  A    For court fines and costs.

23  Q    And for nonpayment of court costs and fines?

24  A    Yes.

25  Q    And why didn't you pay your court costs and fines?

Johnson - Direct

1  A   I went on -- I tried to pay it.  I was on a payment

2  arrangement agreement, and my expenses as far as with my

3  income didn't work out.  It left me with nothing to have to

4  pay on it.

5  Q   What is your income now?

6  A   My income now is only $9 an hour.

7  Q   And about how many hours do you work a week?

8  A   37.

9  Q   Do you have any money left over at the end of the week?

10  A   No.

11  Q   Do you have any savings?

12  A   No.

13  Q   Do you have any debts?

14  A   Yes.

15  Q   And can you tell us about those?

16  A   To a previous landlord.

17  Q   And how much?

18  A   It's over a thousand dollars.

19  Q   And do you know how much you owe to the courts?

20  A   A little over a thousand.

21  Q   Can you afford to pay that now?

22  A   No.

23  Q   Did you have a hearing at the time that your license was

24  suspended?

25  A   No.

17

Johnson - Direct

1   Q   And has your license been suspended more than once for

2   failure to pay court costs and fines?

3   A   Yes.

4   Q   And did you have a hearing at any time?

5   A   Yes.

6   Q   I'm sorry.  Did you have a hearing at any time when it

7   was suspended?

8   A   No.

9   Q   Has anyone from the courts or the DMV ever asked you what

10  you could afford to pay?

11  A   No.

12  Q   What is it like not to have a license?

13  A   It's very stressful.  It's very inconvenient to me and to

14  my children.  I have my daughter who has medical issues, and

15  she has to see a counselor, and it's not on the bus line.

16  And my son, he plays sports, and I'm unable to take him or to

17  go to any of his games.  And he doesn't understand.  It's

18  very -- it hurts him very bad.  It's very emotional to him

19  and myself.

20  Q   How has not having a license affected your employment

21  options?

22  A   With me not being able to have my license, I have lost a

23  job.  I have also been to the point where I went through

24  interviews and was offered a job, but without my license, I

25  could not accept the job, because my license was suspended.

18

Johnson - Direct

1  Q   How far did you get in the process when you were not

2  getting the job because of your license?

3  A   All the way to the end, to the point where, if my license

4  wasn't suspended, I would have had the job.

5  Q   And you mentioned that you lost a job because of not

6  having a license.  Can you tell us more about that?

7  A   Yes.  I was working for a company and our hours got cut

8  back, and I went to my manager complaining about it.  And

9  they reached out to another store, where the other store had

10 opportunity for me to get some hours there, but it was not in

11 the bus route.  It was all the way past out Ivy Road, and I

12 explained to them that I did not have the transportation to

13 get there.  And when I didn't go, they gave me a no call, no

14 show, and I got terminated.

15 Q   And when was that?

16 A   Beginning of October.

17 Q   Of this year?

18 A   Yes, sir -- ma'am.

19 Q   And were you unemployed then, after that happened?

20 A   Yes.

21 Q   And how long were you unemployed?

22 A   I was unemployed for two to three weeks.

23 Q   And were there any consequences to being unemployed?

24 A   Yes.  I fell behind in my rent.  And then I received a

25 30-day eviction notice.

Johnson - Direct

1   Q    Are you employed now?

2   A    Yes.

3   Q    And how do you get to work?

4   A    I have two job locations.  The store that I work for has

5   two locations; one on Cherry Avenue, one on Pantops.  If I

6   work the Cherry Avenue store, I will walk.  If I work

7   Pantops, I have to catch the bus, and I will have to leave

8   home a whole hour to hour and a half before my scheduled

9   shift.

10  Q    And when you walk, about how long does it take?

11  A    Like, 20 to 25 minutes.

12  Q    Do you have any opportunities for advancement at your

13  current job?

14  A    Yes, I do.

15  Q    Can you tell us about that?

16  A    My manager has spoke with me about being the manager for

17  the Pantops store.  And with that position I would have to --

18  I am required to do bank deposits.  And I can't do bank

19  deposits without having a license, because I can't drive.

20  And if I don't -- can't do that, I won't be able to take the

21  position.

22  Q    And would that position pay more?

23  A    Yes, it will.

24  Q    How do you buy food?

25  A    I buy food every two weeks, and I try to get enough to

Johnson - Direct

1  last for two weeks; but by the end of the second week, we're

2  running out.

3      I have to sit there and get -- try to find a ride.  If I

4  don't have a ride, because I don't have the income to pay

5  someone to take me, I don't -- I have to walk to the grocery

6  store.  I have to walk to the grocery store, and I'm only

7  limited to getting a little bit of stuff because of not being

8  able to carry all the bags and stuff.

9  Q   Can you tell us about your current housing situation?

10 A   My current housing situation is overcrowded.  It's a

11 shared housing.  It's overcrowded.

12 Q   And would your housing situation be any different if you

13 had a driver's license?

14 A   Yes, it would be.

15 Q   How is that?

16 A   Because with my driver's license, I will be able to have

17 a better paying job, where I can afford to be somewhere with

18 me and my kids where they have their own privacy and we

19 wouldn't have to be in a shared housing.

20 Q   Have you ever driven while your license was suspended?

21 A   Yes, I have.

22 Q   And what happened?

23 A   I got pulled over.  And when I got pulled over, the

24 officer asked me for my driver's license; I gave it to him.

25 He went back to his vehicle, he came back, and he said, Well,

Johnson - Direct

1   Ms. Johnson, your license is suspended.  Are you aware of

2   that?

3       And at the time, I was not aware.  And then it was a

4   second time.  But the first time, he gave me a paper where I

5   had to surrender my driver's license to him, and he gave me a

6   paper stating that I surrendered my driver's license, and

7   then he also told me that my license was suspended.

8   Q   And you said there was a second time?

9   A   Yes.

10  Q   And so why did you -- and were you charged with driving

11  while suspended the second time?

12  A   Yes.

13  Q   And convicted?

14  A   Yes.

15  Q   And as a result of that, what happened?

16  A   More court costs and court fines.

17  Q   And why did you keep driving when you knew your license

18  was suspended?

19  A   Because I needed to get to work so that I could be able

20  to provide for my kids and myself.  And where I was living at

21  at the time did not have no public transportation.

22  Q   And do you drive now?

23  A   No.

24  Q   Why not?

25  A   Because I don't want to go to jail and I don't want to

Johnson - Cross

1    leave my kids.

2    Q    How would your life be different if you had a license?

3    A    If I had a license, I would be -- my life would be

4    different because I would be able to have a better paying job

5    so that I could be more able to provide for my kids and

6    myself better.  And I also would be able to pay my court

7    costs and my court fines because of a better paying job

8    instead of a low-paying job.

9            MS. CIOLFI:  Thank you, Ms. Johnson.

10                         CROSS-EXAMINATION

11   BY MS. O'SHEA:

12   Q    Good afternoon, Ms. Johnson.

13   A    Good afternoon.

14   Q    My name is Margaret O'Shea.  I'm going to ask you a few

15   questions about the testimony that you have just given.

16       You testified that you live here in Charlottesville, and

17   that you're able to walk to one of your jobs and take a bus

18   to a different location; is that correct?

19   A    Yes.

20   Q    And you said that you work for a store?

21   A    Yes.

22   Q    What type of store is that?

23   A    It's Boost Mobile.  It's Tower Associates.

24   Q    Okay.  So, like, an electronics-type store, then?

25   A    Uh-huh.

Johnson - Cross

1    Q    Okay.

2    A    Cellular phones.

3    Q    Okay.  What other sort of job opportunities would you be

4    interested in pursuing apart from the job that you currently

5    have?

6    A    A driving job.

7    Q    Like what?

8    A    Driving, like, a shuttle bus for a hotel.  Or even I

9    wanted to drive the bus; not the school bus, but the city

10   bus.

11   Q    What are the qualifications for being able to drive a

12   city bus?

13   A    You have to have a license and then you have to get your

14   CDLs.

15   Q    Well, are you able to obtain those things with a prior

16   felony conviction?

17   A    Yes.

18   Q    Are you sure about that?

19   A    Yes.

20   Q    Apart from driving a city bus or a shuttle bus, what

21   other sorts of jobs would you be interested in pursuing?

22   A    Umm, I don't know.

23   Q    How much money would you get paid if you drove a city

24   bus?

25   A    I don't remember off the top of my head.

24

Johnson - Cross

1   Q   How much money would you get paid for driving a shuttle
2   bus for a hotel?
3   A   With my interviews, it was $12 an hour.
4   Q   How many hours a week?
5   A   40.
6   Q   Now, you agree that there's a bus system here in
7   Charlottesville, correct?
8   A   Yes.
9   Q   There are taxis, too, right?
10  A   Yes.
11  Q   There are bike paths, correct?
12  A   Uh-huh.
13  Q   Would you agree that there's a large student population
14  here in Charlottesville that's able to get around without a
15  car on campus?
16  A   I mean, I can't speak on that one.
17  Q   I'm going to ask you a few questions now about your
18  driving history and some things that have come up in the past
19  here in Virginia.  All right?
20  A   Uh-huh.
21  Q   So it appears that back in 2008, going back to 2008, you
22  got some traffic infractions here in Charlottesville in
23  general district court.
24      Do you recall that?
25  A   Uh-huh.

Johnson - Cross

1    Q    And you were assessed fines and costs as a result of

2    those traffic infractions, correct?

3    A    Yes.

4    Q    And you were able to pay those, right?

5    A    Yes.

6    Q    And you did, in fact, pay those, right?

7    A    Yes.

8    Q    Okay.  And then the next time that you ended up with a

9    traffic infraction was in Albemarle General District Court,

10   and that was in 2011.

11        Do you recall that?

12   A    Yes.

13   Q    And you were assessed fines and costs as a result those

14   traffic infractions, too, right?

15   A    Yes.

16   Q    And you paid those, right?

17   A    Yes.

18   Q    And then the next time that you had some traffic

19   infractions, there was one here in Charlottesville in 2012,

20   correct?

21        Do you recall that?

22   A    (Shaking head.)

23   Q    For failing to obey a stop sign?

24   A    Yes.

25   Q    Okay.  And again you were assessed fines and costs as a

Johnson - Cross

1  result of that traffic infraction, right?

2  A    Yes.

3  Q    And you paid those, right?

4  A    Yes.

5  Q    The next time that you were brought before the court was

6  not for a traffic infraction; that was for your prior felony

7  conviction in Brunswick Circuit Court, correct?

8  A    Yes.

9  Q    And that was the felony for delivering drugs to a

10 prisoner?

11          MS. CIOLFI:  Objection, Your Honor, the relevance of

12 the type of felony.

13          THE COURT:  What is it?

14          MS. O'SHEA:  It goes to employability.  It was a

15 felony for delivering drugs to a prisoner.

16          MS. CIOLFI:  Your Honor, there's --

17          THE COURT:  I don't think it's particularly

18 relevant.  I mean, it may keep her from getting certain jobs,

19 but not all jobs.

20          MS. O'SHEA:  Correct.

21          THE COURT:  All right.  It just makes it harder for

22 her to get a job.

23 BY MS. O'SHEA:

24 Q    All right.  And as a result of that conviction in 2013 in

25 Brunswick County, you were assessed court costs in the amount

Johnson - Cross

1  of $865?

2  A    Yes.

3  Q    Did you have any other costs associated with that

4  conviction other than that $865?

5  A    No.

6  Q    Okay.  And what did you do when you got that felony

7  conviction and you were assessed the $865 in terms of paying

8  that off?  For example, did you get a payment plan or

9  installment plan with the Brunswick Circuit Court?

10 A    Yes.

11 Q    And you were, in fact, able to make payments for about

12 three years on that particular -- on those outstanding court

13 costs, correct?

14 A    Yes.

15 Q    Do you know how much of that $865 you paid off during the

16 three years that you were on the payment plan?

17 A    No.

18 Q    Do you know how much of that $865 is left today?

19 A    I think it's 700-and-something.

20 Q    At any time before or after you defaulted on the payment

21 plan that you got, did you go to the Brunswick Circuit Court

22 and file anything with the court or ask them to change that

23 payment plan?

24 A    No.  What happened was I spoke with the clerk.

25 Q    So did you physically go to the clerk, or did you call

28

Johnson - Cross

1    them up on the phone?

2    A    Phone.

3    Q    And so when you talked to the clerk, what did you tell

4    the clerk?

5    A    I explained to her about my situation and my income.

6    Q    Okay.

7    A    And she advised me that my payments, they couldn't go no

8    lower than what I was already on at the time.

9    Q    How much were you paying?

10   A    I was doing $100 a month.

11   Q    So you paid $100 a month for three years and it only took

12   off --

13   A    No.

14   Q    I'm confused.  Help me with the math.

15   A    That was my payment arrangement, was $100 per month.

16   Q    For the entire three years that you were on the payment

17   plan?

18   A    No.

19   Q    Okay.  What was it when you started on the payment plan?

20   A    $100.

21   Q    Okay.

22   A    And then I lost my employment, so the payment plan had

23   stopped.

24   Q    The payment plan stopped, meaning the court stopped

25   offering the payment plan --

Johnson - Cross

1  A    No.

2  Q    -- or meaning that you stopped making your payments under

3  the payment plan?

4  A    Yes, because I didn't have no income.

5  Q    I guess my question is:  At what point in time did that

6  happen?  Was that 2016, or was that before 2016?

7  A    It was, like, 2016.

8  Q    Okay.  So my question is:  Between 2013 and 2016, were

9  you continuously making your payments during that time

10 period?

11 A    Yes, I was making payments, but it wasn't for the $100.

12 Q    Okay.  So how much were those payments during that

13 three-year period of time?

14 A    $75.  And then I got knocked off of the payment plan

15 because of not being able to pay because I lost employment.

16 Q    No, I understand.  I just -- I'm having some problems

17 with the math here.  Because you were convicted in 2013, and

18 you're saying you got knocked off in 2016, but you were

19 paying -- making payments, monthly payments, during those

20 three years.  I'm just trying to figure out how much those

21 payments added up to.

22     Okay.  So at one point it was $75 a month, and at a

23 different time it was $100 a month?  Yes?

24 A    Yes.

25 Q    So after you lost your job, you said that you called the

Johnson - Cross

1  clerk's office, correct?

2  A   Yes.

3  Q   All right.  And what, if anything, did the clerk's office

4  from Brunswick County advise you?

5  A   What she had told me was that she would have to get back

6  with me to let me know if I could restart a payment plan

7  because of the payment plan, being that I didn't complete it.

8  And so she never -- I never had heard nothing back from her,

9  so I reached back out to her.  And when I reached back out to

10 her, she said that they can restart my payment plan, but I

11 would have to pay a certain amount down and this is the

12 amount that I would have to pay each month.

13 Q   And have you, in fact, restarted a payment plan in

14 Brunswick County?

15 A   No, I haven't.

16 Q   Have you gone to the Brunswick County courts and asked

17 them to give you a restricted driver's license?

18 A   No, because I wasn't eligible at the time because my

19 license -- I didn't have a job when I spoke with her.

20 Q   You have a job now, though, right?

21 A   Yes, I do.

22 Q   And when did you get this job?

23 A   On Halloween.  I started on Halloween.

24 Q   October of this year?

25 A   Yes.

Johnson - Cross

1  Q   Is this the first time that you've been employed in the

2  past 12 months?

3  A   No.

4  Q   What job did you hold before this?

5  A   It was at a gas station.

6  Q   And when did you hold that job?

7  A   For, like, six months.  I started there approximately

8  August.

9  Q   2018?

10  A   Yes.

11  Q   And how long were you at the gas station for?

12  A   Approximately six months.

13  Q   Well, August -- do you mean August 2017?

14  A   No.  It was May -- sorry, sorry.  April.  It was April.

15  April until the beginning of October.

16  Q   So from April of 2018 until October 2018, you were

17  employed at a gas station?

18  A   Yes.

19  Q   And then in October of 2018, after Halloween, or on

20  Halloween, right about Halloween, is when you got the job

21  that you have now?

22  A   Uh-huh.  Yes.

23  Q   Make sure you say yes or no for the court reporter.

24      Prior to working at the gas station in April of 2018,

25  what was the last job you had before that?

Johnson - Cross

1  A   I used to do home health.

2  Q   And when was the last time you had a job in home health?

3  A   2016.

4  Q   How long did you -- did you stop in 2016 or start in

5  2016?

6  A   I stopped in 2016.

7  Q   So between 2016 and April of 2018, you were unemployed?

8  A   Yes.

9  Q   What was your source of income during those two years?

10 A   I had no income.

11 Q   What did you do for money?

12 A   I had tried to file unemployment, but I couldn't get

13 unemployment.

14 Q   Did you have any other source of funding at all?

15 A   No, I didn't have any income.  I mean, my kids had

16 income, but I didn't have income personally myself.

17 Q   Do you receive child support for your children?

18 A   No, I don't receive child support for my children.

19 Q   Do your children receive child support for them?

20 A   No, they don't.  My daughter received an SSI check, but

21 she doesn't receive that anymore.

22 Q   The oldest daughter, the 15-year-old?

23 A   Yes.  I only have one daughter.

24 Q   So your family, your household, during those two years,

25 the only money that was coming into it was through your

Johnson - Cross

1  daughter's social security check?

2  A    Yes.

3  Q    So I think we agreed that you haven't gone to the

4  Brunswick County Circuit Court to ask them to issue you a

5  restricted license.

6      Have you gone to the Brunswick County Circuit Court to

7  ask them if you could convert your payments to them into a

8  community service obligation?

9  A    No.  I wasn't aware of any of that.  And how am I going

10  to get to Brunswick?  I have no license.

11  Q    But the answer, though, is no --

12  A    Yes.

13  Q    -- you haven't done that?

14      Have you ever asked the Brunswick County Circuit Court to

15  forgive the debt?

16  A    No.

17  Q    Before your license was suspended in 2016, were you aware

18  that it could be suspended if you didn't pay the money that

19  you owed the court?

20  A    Yes.

21  Q    The job you have right now, how much money do you believe

22  that you can pay on a monthly basis from your existing income

23  towards a payment plan?  Like, $5 a month?  $10 a month?  Are

24  you able to say?

25  A    No.  I don't have anything left over after my expenses

34

Johnson - Cross

1    with my household and my kids.  I have nothing left because I

2    also -- I have a child support obligation that I pay out,

3    too.

4    Q   Is that for a child who is not presently physically

5    living with you?

6    A   Yes.

7    Q   How much is your child support obligation?

8    A   264.

9    Q   What other monthly expenses do you have apart from that

10   child support obligation?  For example, do you have a phone

11   bill?

12   A   Yes, I do.

13   Q   How much is that?

14   A   $100 a month.

15   Q   Is that for your phone and your children -- and phones

16   for your children, or just for you?

17   A   No, me and my children.

18   Q   Do you have a cable bill, like television, television

19   cable bill?

20   A   No.  I don't have cable.  We don't have cable.

21   Q   Apart from your monthly child support obligation and your

22   $100 a month cell phone bill?

23   A   Rent.

24   Q   Rent.  How much is your monthly rent?

25   A   Currently my rent is $200 right now.

Johnson - Cross

1  Q   Do you have any other recurring monthly expenses that are

2  set like that?  So apart from, like, groceries, like, do you

3  have a set electricity bill or water bill or anything like

4  that?

5  A   Just groceries.

6  Q   Now, you mentioned that you were pulled over at one point

7  and you were unaware that your license was suspended so the

8  officer let you know that it was.

9      Where was that?

10 A   In Waynesboro.

11 Q   Okay.  So that was in Waynesboro.  And that was in 2017,

12 September 2017?

13 A   No.  September 2017 is when I got the summons for court.

14 It was before that.

15 Q   I'm sorry.  When did that happen, the prior action?

16 A   I don't remember the exact date, but I know that I was on

17 my way to work and he pulled me over.

18 Q   So if you were on your way to work, would it be fair to

19 say that was probably back in 2016?

20 A   Uh-huh.

21 Q   Or before that, but right around 2016?

22 A   Uh-huh.

23 Q   So your testimony is you were on your way to work, you

24 got pulled over, the officer informed you that you were

25 suspended for -- did he tell you why you were suspended, or

Johnson - Cross

1  did he just tell you you were suspended?

2  A   He just told me that my license was suspended.  He asked

3  was I aware my license was suspended, and I told him no, I

4  was not aware.

5  Q   And at that time you were on your way to work?

6  A   Yes, ma'am.

7  Q   So you still had an income at that point, but you

8  apparently then defaulted on your payment plan already?

9  A   Yeah.  Before I got that job, yeah.

10  Q   Now, you mentioned the 2017 incident.  And that was in

11  Augusta County General District Court; is that correct?

12  A   Yes.

13  Q   And that's when you had the infraction for driving on a

14  suspended license, right?

15  A   Yes.

16  Q   And you were assessed a $100 fine and $139 in court

17  costs?  Does that sound right?

18  A   Yes, that's what the papers said.

19  Q   So it's a $239 total that you owe to that jurisdiction,

20  correct?

21  A   Yeah.  It's more than that; but yeah.

22  Q   You say that you think it's more than that.  How much do

23  you think it is?

24  A   It's like -- when I checked it, it was, like,

25  three-something.  I think it was, like, three-something with

Johnson - Cross

1   interest or something.

2   Q   So in the neighborhood of $300 owed to Augusta General

3   District Court?

4   A   Yes, ma'am.

5   Q   And then you still owe, you said, you think about $700 to

6   the Brunswick County Circuit Court, correct?

7   A   Yes.

8   Q   Okay.  Are those the only two financial obligations that

9   you're aware of that you owe to courts in the Commonwealth of

10  Virginia right now?

11  A   Yes.

12          MS. O'SHEA:  If I could have just one moment, Your

13  Honor.

14  BY MS. O'SHEA:

15  Q   Now, isn't it also true, Ms. Johnson, that you are

16  currently facing new felony charges in Albemarle Circuit

17  Court?

18  A   Yes.

19  Q   And those felony charges are set to go before the Grand

20  Jury on December the 3rd, correct?  Yes?

21  A   Yes.

22  Q   Okay.  And those are for felony failure to return bail

23  property; is that correct?

24  A   Yes.

25  Q   But you're out of custody on that right now on a personal

Johnson - Redirect

1    recognizance bond, right?

2    A    Yes.

3    Q    Do you have any knowledge of what a conviction in that

4    case would do to your employment prospects?

5              MS. CIOLFI:  Objection, Your Honor.

6              THE COURT:  Sustained.

7              MS. O'SHEA:  Thank you, Judge.  I don't have any

8    other questions.

9              THE COURT:  All right.

10                     REDIRECT EXAMINATION

11   BY MS. CIOLFI:

12   Q    Ms. Johnson, Ms. O'Shea ran through a number of minor

13   traffic infractions from earlier in the 2000s where you paid

14   your court costs and fines.

15        Did you try to pay when you could?

16   A    Yes, I did.

17   Q    And for the most recent charges, have you always tried to

18   pay when you could?

19   A    Yes.

20   Q    When you -- when the Brunswick County Circuit Court gave

21   you a $100 payment plan, did they ask you how much you could

22   afford?

23   A    No.

24   Q    Could you afford that amount?

25   A    No.

39

Johnson - Redirect

1  Q    Did anyone tell you in either Brunswick County or in

2  Amherst County about the availability of a restricted

3  license?

4  A    No.

5  Q    How did you know about it?

6  A    I looked it up myself.

7  Q    And you determined you were ineligible because you were

8  unemployed; is that right?

9  A    Yes.

10  Q    And at the time that you were employed, would you have

11  been able to pay the $145 reinstatement fee --

12  A    No.

13  Q    -- in order to get the restricted license?

14  A    No.

15  Q    Did anybody at either of those courts tell you about

16  community service being available?

17  A    No.

18  Q    And when you missed payments on your payment plan to

19  Brunswick County, what happened?

20  A    My license was re-suspended.

21  Q    And did you get a hearing?

22  A    No.

23  Q    Did you get notice of it?

24  A    No, I didn't receive any notice.

25  Q    Have you tried to get on a payment plan recently?

Johnson - Redirect

1    A    Yes.

2    Q    And what happened?

3    A    I couldn't get on it because I had lost my job.  And

4    without me having a job, I can't pay on something.

5    Q    And when did you try to get on a payment plan?

6    A    It was the beginning -- it was, like, the end of

7    September, beginning of October.  Right when I lost my job.

8    Q    And did either court -- so you called both courts,

9    correct?

10   A    Yes, I did.

11   Q    And what did the courts say?

12   A    Brunswick told me that they could restart me on a payment

13   plan, I would pay the $35 to start off, and then I would have

14   to pay $50 every two weeks on my payment arrangement.

15       And then I told the clerk that I would not be able to

16   afford the $100, $50 every two weeks.  And she told me that

17   she was going to check and see if she could do something

18   about it.

19       So when I reached back out to her, she had told me

20   that -- asked me if I could pay $25.  I told her yes.

21       But Augusta, when I called Augusta Court, they told me

22   that I have to come in there, I would have to bring in my

23   compliance letter from DMV, and I would have to come in there

24   before they can do anything about a payment arrangement.

25   Q    And you would have to come in person?

Johnson - Redirect

1   A    In person to the court.

2   Q    How far away is that?

3   A    It's like 45 minutes.

4   Q    And back to the Amherst County, where they said you could

5   pay $35 down and $25 a month, why didn't you do that?

6   A    Because I didn't have it.  I don't have it.  Like, the

7   job that I have is, like, a low-paying job.  And with a

8   low-paying job, with me having my obligations with my

9   children, child support, my obligations with taking care of

10  my other two kids and being able to provide for them, it just

11  leaves me with nothing, nothing at all.

12          MS. CIOLFI:  Thank you, Ms. Johnson.

13          THE COURT:  All right.  Is that all?

14          MS. O'SHEA:  Yes.

15          THE COURT:  Thank you.  You may step down.  Call the

16  next witness.

17          MS. CIOLFI:  Judge, at this time I'd like to

18  approach and give you this binder, which is the exhibits

19  we've given to the Commonwealth, so you can follow along.

20          THE COURT:  All right.

21          MS. CIOLFI:  I'll pass that up.

22          Your Honor, before I call the next witness, in the

23  exhibits that we just handed you, the first five exhibits are

24  the declarations from the plaintiffs.  You just heard from

25  Ms. Johnson, Damian Stinnie, Melissa Adams, Williest Bandy,

Dugger - Direct

1    and Brianna Morgan.

2           And again, their statements are very similar to

3    Ms. Johnson.  Their licenses were suspended for failure to

4    pay court fines and costs; none of them were asked by anyone

5    at the court about their ability to pay; and all of them

6    suffer, and continue to suffer, the immediate injury because

7    of their license suspension.  They're attached to the

8    complaint as well, but we wanted to put them into evidence.

9           The next is the declaration of Llezelle Dugger, but

10   I'll call Llezelle Dugger to the stand.

11        LLEZELLE A. DUGGER, CALLED BY THE PLAINTIFFS, SWORN

12                       DIRECT EXAMINATION

13   BY MR. BLANK:

14   Q    Please state your name for the Court.

15   A    Llezelle Agustin Dugger.

16   Q    And what's your current employment?

17   A    I'm the clerk of court for the Charlottesville Circuit

18   Court.

19   Q    And how long have you been the clerk of the court?

20   A    Since January 1st, 2012.

21   Q    So that's approximately?

22   A    Seven years.

23   Q    Excellent.  In your position as the clerk of the court,

24   do you have knowledge of Virginia Code Section 46.2-395 and

25   defendants' -- license suspensions because of defendants'

Dugger - Direct

1  failure to pay court debts and costs?

2  A    I do.

3  Q    In your position as clerk of the court, what is your job

4  responsibility with regard to creating and maintaining court

5  files, financial records, preparing court orders, charging

6  and collecting fees due to the court, and preparing financial

7  and other reports required to be submitted to state and local

8  agencies?

9  A    All of the above.

10 Q    Tell us just a little bit more than "all of the above."

11 A    When a case comes into the circuit court, myself, as well

12 as the staff I have, we will enter it into what we call the

13 Circuit Case Management System, which we call CCMS.  It is a

14 case management system run by the Supreme Court.

15      In addition, if there are any filing fees or bond that

16 comes up from, say, general district court, we will receipt

17 that into what we now call FAS.  It used to be FMS.  They

18 upgraded -- "they" being the Supreme Court -- upgraded to the

19 Financial Accounting System.  Those two systems are

20 intertwined in many ways.

21      For purposes of this hearing, when we have a criminal

22 case that finishes at sentencing, my deputy clerk on the

23 bench or myself, whoever is doing the case, will then enter

24 the disposition in Case Management, and then also enter what

25 the costs they're assessed, meaning the felony fixed fee or

Dugger - Direct

1    any add-ons, which then get transferred into FAS, which

2    creates the financial accounting for the individual account.

3    Q   You had submitted a declaration that we had put into the

4    evidence before you stepped up.  There you discuss FMS versus

5    FAS.

6        Can you explain to the Court how FMS is different or the

7    same as FAS?

8    A   So when I started in 2012, the circuit court, the general

9    district court, and the juvenile courts are all on FMS, which

10   is Financial Management System.  It's a DOS-based program

11   written in Fortran code, which means I look at an amber

12   screen with green letters on it, that I hadn't seen since

13   before I got to college.  So that was the first learning

14   curve as a clerk, was relearning DOS and Fortran.

15       Last year, year and a half, the Supreme Court finally

16   started rolling out a Java overlay on that program.  And what

17   they call the system now is FAS, which is Financial

18   Accounting System.

19       I understand all our circuit courts that are with the

20   Supreme Court are using it.  I'm not quite sure if the

21   District Courts have completely rolled out onto FAS.  They

22   may still be using FMS.

23   Q   And how is FMS -- I think you started to say this.  How

24   is FMS integrated with the Case Management System, or CMS?

25   A   I guess in layman's terms, they talk to each other.  So

45

Dugger - Direct

1  when I and my deputies enter court costs into the Case

2  Management System, it says this is how much we're assessing

3  this defendant for this type of felony and any add-ons that

4  the statute requires.  That then gets transmitted to FMS, so

5  then there's what's called an individual account that's

6  created in FMS.  When you type in a defendant's name, that

7  will pull up how much they owe the court and for what.

8      We've got three number systems.  You know, one is the

9  felony fixed fee.  One is internet crime that we collect, the

10  fees; all the add-ons that we would do for court costs.

11 Q   When a person fails to pay court costs or fines, what

12  order is entered by a clerk or a judge with regard to a

13  driver's license suspension for failure to pay court fines

14  and costs?

15 A   You mean at the time that they default?

16 Q   Correct.

17 A   When they're supposed to pay, my judge does not enter a

18  separate order.

19 Q   Does the clerk enter an order?

20 A   No, sir.

21 Q   How does the FMS system transmit the record of nonpayment

22  to DMV?

23 A   So at sentencing hearing, my judge will, or if we have a

24  substitute judge, the substitute judge will say that the

25  defendant is ordered to pay court costs and fines.  My deputy

APP-126

Dugger - Direct

1  clerk, through a chart, we have what those costs are.  We

2  assess them, and depending on what the Court says when the

3  due date is -- so in our court, our judge will typically say

4  the defendant is ordered to pay court costs and fines during

5  the period of supervised probation.

6      So let's take, for example, the defendant gets a one-year

7  sentence and he's placed on two years' supervised probation

8  upon release from incarceration.  My clerk will then put --

9  there's a field in FMS and in CCMS that has the due date.  So

10 we will look at one year, plus the two years supervised

11 probation, and the due date we put into our system will be

12 three years from the date of sentencing, because that's the

13 time period that the judge is deferring the payment of court

14 costs for the defendant.

15 Q   And then when that time hits, do you enter anything if

16 somebody doesn't make a payment, or does it automatically go

17 to DMV?

18 A   So when the due date approaches, and passes, if no

19 payment is made, DMV's computer system pings our systems, and

20 it will then go to DMV that this person has failed to pay

21 court costs.  And then that person will then get a letter

22 from DMV saying their license has been suspended for failure

23 to pay court costs.

24 Q   But your court doesn't enter an order that says that the

25 license has been suspended?

Dugger - Direct

1    A    Not at the time of default, no.

2    Q    And you don't send a letter as the clerk that says your

3    license is suspended?

4    A    No, sir.

5    Q    Ms. Ford from DMV, I think, is here.  You don't know

6    Ms. Ford, do you?

7    A    No, sir.

8    Q    Okay.  Did you read her affidavit?

9    A    I did.

10   Q    In paragraph 6 of her affidavit, Ms. Ford states that DMV

11   never receives physical paper copies of any orders.

12        Again, there are no orders that come; is that correct?

13   A    Not at the time where someone fails to pay court costs,

14   no.

15   Q    And in paragraph 11, Ms. Ford states the clerk office

16   inputs an indicator into the system to DMV that the court has

17   suspended the driver's license of that person.

18        What is your response to that, the accuracy of that

19   statement?

20   A    So there's not any run-of-the-mill felony, but in a

21   run-of-the-mill felony that is not driving-related, we just

22   enter what -- the costs we enter.  There's no field that says

23   the license is suspended.

24        You compare that with a felony for -- or it could be a

25   misdemeanor -- DUI or a drug conviction.  In that, you will

Dugger - Direct

1  have a field that says:  Is this DMV reportable?  And it is,

2  because under the statute there's a six months' loss of

3  license under drug conviction.  And depending what type of

4  DUI it is, it's either a year, three years, or indefinite.

5  And that does have a yes/no field for us that says, sent to

6  DMV.  And my deputies or I would put in yes if it's a drug

7  conviction, if it's a DUI conviction.  Leaving the scene of a

8  crime after a car accident, that also is reportable.

9     But let's say grand larceny, when someone gets convicted

10  of a grand larceny and we get to sentencing, there's no field

11  there that we put that this is DMV reportable.  That's

12  different from the court costs.

13     And so no, I don't know what field she would be talking

14  about, at the circuit court level, at least.

15  Q   And she indicates in her affidavit there's a field 14.

16     Do you have any knowledge of what a field 14 is?

17  A   We don't have numbers on our fields of the screens we

18  see.

19  Q   In paragraph 14, Ms. Ford states that DMV must assume if

20  the clerk included such indicator that the Court issued a

21  suspension.

22     What's your response to that?

23  A   I don't issue a suspension, and my judge hasn't given me

24  an order of suspension.

25          MR. BLANK:  No further questions.

Dugger - Cross

1          THE COURT:  Okay.

2                      CROSS-EXAMINATION

3   BY MS. O'SHEA:

4   Q    Good afternoon, Ms. Dugger.

5   A    Good afternoon.

6   Q    Just to follow up on a few questions, you would agree

7   that there are different types of license suspensions that

8   occur in the Virginia system, right?

9   A    Yes.

10  Q    I mean, there are mandatory suspensions by statute for

11  different types of things?

12  A    Yes.

13  Q    And under some circumstances, DMV is the entity that

14  makes the decision whether or not a suspension should be

15  made, right?

16  A    Yes.

17  Q    So, like, for a DUI third offense, I think it is, you

18  know, DMV will suspend a license upon entry of that

19  conviction, right?

20  A    Yes.  And my judge also orders from the bench that --

21  let's just take a DUI first.  He'll order from the bench:

22  Your punishment is one year loss of license.  So he actually

23  orders a suspension, loss of license.  He orders a $500 fine;

24  suspends $350 of it if they go to VASAP; and then a 30-day

25  jail sentence, all suspended, is the typical first DUI

50

Dugger - Cross

1  sentence.

2  Q   So all that information has to be communicated to DMV,

3  right?

4  A   It goes into our Case Management System, and then there's

5  a field that says, yes/no, DMV.

6      If it's one of those -- drug, DUI, leaving the scene of

7  the accident; anything that has that mandatory DMV

8  suspension -- we put in a yes.  And that's a field that comes

9  up.  So yeah, those would get to DMV via our computer.

10     We don't transmit the final sentencing order to DMV.  We

11 transmit it to DOC.  We transmit it to the sentencing

12 commission and the parties involved, Commonwealth Attorney

13 and defense attorney, but we don't typically send the final

14 sentencing order for those types of cases.  For any type of

15 cases, actually.

16 Q   So the order the judge signs never goes out, but the

17 information is sent, is my question; right?

18 A   Depending on the case, yes, the information goes

19 electronically.

20 Q   Correct.  Does it also go to, like, the state police to

21 populate a VCIN, or to the FBI to populate a NCIC?

22 A   So CCMS, and I believe also the general district court

23 system, has an interface with DMV, and it also has an

24 interface with the state police.  They are currently working

25 on an interface with DOC.

51

Dugger - Cross

1   Q    So let's say you get back an order in one of these

2   mandatory license suspension cases; a DUI third offense, for

3   example.  The Court has entered an order suspending an

4   individual's driver's license for a year.  You pull it up on

5   your database.  Is there, like, a specific code that keys to

6   these different traffic felonies?

7   A    Well, if done correctly, once it gets into our -- so DUI

8   third is a felony, so there would have been a preliminary

9   hearing down in general district court.  So at the general

10  district court level, from the magistrates, all the

11  information regarding the statute he was charged under,

12  whether it was a misdemeanor or a felony, would have all been

13  entered.  It comes up to our system from general district

14  court once it gets certified.  So all that is typically all

15  filled in when we get there.

16      What my clerks and I will then fill in is the

17  disposition --

18  Q    Correct.

19  A    -- that the Court orders from the bench.  So, you know,

20  one year loss of license will go in.  There's a field -- in

21  there, when you pull up that statute, there's a field in

22  there that says "operator license suspended."  Then you put

23  in what period of time it's suspended.

24  Q    Right.  So then you finish filling out these fields,

25  right?

Dugger - Cross

1  A    Yes, ma'am.

2  Q    And so then how is it that the finalized record is

3  transmitted out, like, to DMV or to the other authorities

4  that you're talking about your computer is interfacing with?

5  A    So my understanding is that DMV's computer will ping the

6  state system at regular intervals.  And these will then come

7  up to DMV to show -- particularly when we say, yes, this goes

8  to DMV, then it will go to the DMV computer system, and they

9  do with it what they need to do with it.

10  Q    You said that's your understanding, this pinging.  Is

11  that something you've talked about to somebody, or is that

12  your assumption of how it happens?

13  A    It's -- no, it's not an assumption.  It's what they -- so

14  as a new clerk or as a deputy clerk, we have new training,

15  ongoing training.  So at our training we are taught by OES

16  what the interface means.

17      So, for example, the state police interface, that pings

18  every 15 minutes.  That will pick up stuff, particularly sex

19  offense crimes.  So that has a faster ping rate than the DMV.

20  Q    So when you say "ping," do you mean kind of like prodding

21  your system to put out any new information that's been

22  entered since the last time it was prodded?

23  A    It's computer talking to computer, basically.

24  Q    So I'm trying to figure out what your understanding is,

25  though, of this pinging.  Is that the outside system telling

Dugger - Cross

1   your system to transmit any new information that's been
2   entered?  Is that what it is?
3   A    That would be my understanding.  But the programmers at
4   OES are probably the better folks to ask how the mechanics
5   work.  We enter the information, and at some point it goes to
6   DMV electronically.
7   Q    Okay.  So then you were testifying before about a fines
8   and costs situation in a non-traffic felony.  So let's say
9   we've got a grand larceny, assessed fines and costs; your
10  judge gave them three years to pay; the three years has come
11  up.  And you testified that DMV's computer pings your
12  computer.
13  A    So when we put in a due date -- so what's today?
14  November 15th, 2018.  So, three years, I'm going to put in a
15  due date that your court costs are due November 13th, 2021.
16  If you don't make a payment when that due date passes, it
17  goes into a report, I guess, for lack of a better term.  And
18  it will be 30 days -- well, now it's 40, because the law
19  changed.  40 days it will sit there to see if someone pays.
20      If nothing happens, if no payment is made or nothing, if
21  they don't enter into a payment plan or do something, on day
22  41, that report is automatically transmitted to DMV stating
23  that someone has failed to pay their court costs.
24  Q    And what form does that report take?
25  A    I -- there's no -- there's a report called IN05.  And

54

Dugger - Cross

1  that tells me when you look at it which ones were sent off to

2  DMV.

3      What DMV receives in terms of their report, I can't speak

4  to that.

5  Q   Is that something that you review before it's

6  transmitted?

7  A   Yes.  Just in case someone did make a payment, someone

8  did enter a payment plan and it mistakenly got into this

9  report, I have a deputy, and my chief deputy and I review

10 that to make sure, as much as possible, we don't have

11 someone's license suspended by DMV that shouldn't be.

12 Q   So as a clerk, you want to make sure that your

13 recordkeeping is accurate --

14 A   Correct.

15 Q   -- so that you're not sending stuff off to DMV that's not

16 true?

17 A   Correct.

18 Q   All right.  So when you're looking over this report that

19 reflects, you know, an individual hasn't paid their fines and

20 costs, as a clerk's office, do you send another letter to

21 that individual letting them know that their driver's license

22 is about to be suspended?

23 A   No, ma'am.

24 Q   Do you or anyone in your office call that individual or

25 take any steps to let them know that their license is about

Dugger - Cross

1  to be suspended?

2  A    No.

3  Q    Reach out to them, do anything at all to see why they

4  haven't paid their fines and costs?

5  A    No, ma'am.

6  Q    Would you agree that the authority for creating

7  installment plans and payment plans is with your office?

8  You're able to do that, right?

9  A    It's with the court.  So the judge actually has to sign

10 the order on payment plans.  But my judge has given our

11 office some discretion, up to a certain point.  If someone

12 owes less than, I think it's $2,500, we can sign off on that.

13 But anything above that, our judge likes to review the

14 payment plan.

15 Q    So is that the order from November 1st, 2015 that

16 delegated certain responsibility to your office for different

17 payment plans?  Is that what you're referring to?

18 A    Yes.

19 Q    I have handed you a document that reads something along

20 the lines of "Guidelines for Installment Payment Plan

21 Options," correct?

22 A    Yes, ma'am.

23 Q    And there's a judge's signature there on that form,

24 correct?

25 A    Yes.

56

Dugger - Cross

1   Q    And then your signature appears on that form as well,

2   right?

3   A    Yes.

4   Q    And is that the guidelines that you were talking about in

5   terms of your office and your authority to set up installment

6   payment plans without having to go to a judge first?

7   A    Correct.

8   Q    If you've got a situation that falls outside the scope of

9   those particular guidelines there, and you said the judge

10  wants to review it, how does that happen?

11  A    So anytime someone comes into our office wanting to set

12  up a payment plan, they will typically meet with either

13  Ms. Pugh, Mr. Schmidt, or myself, because the form,

14  application, the petition for payment plan, has detailed

15  information regarding what's your take-home pay, what are

16  your expenses, and things like that.  So we go over it with

17  them to make sure it's accurate.  We don't want all zeros.

18       If it doesn't fall within the parameters that my office

19  has discretion to sign off on it, we then submit that

20  petition up to the judge, and the judge will review it, and

21  then we'll -- in the bottom part, in the order part, we'll

22  order "approved" or put in whatever payment plan conditions

23  he may require.

24  Q    Okay.  And once the judge has done that, approved or

25  modified a payment plan that's been submitted to him for

Dugger - Cross

1    consideration, how is the debtor notified that the payment

2    plan has been approved?

3    A    So if a payment plan comes back down from the judge's

4    office, Ms. Pugh, she runs point on it.  She will call the

5    person and say, We have a certified copy of the payment plan

6    for you to come pick up.  Because they need to take that to

7    DMV so that they can show DMV that they have an active

8    payment plan so that DMV can unsuspend or unrestrict --

9    unsuspend their license.

10       Once we have the order, we also enter all that

11   information into their individual account, and we put in that

12   it's under a TTP, which is a time-to-pay plan.  And then we

13   put in whatever due date is next.  So we would probably say

14   January 1st, 2019, your first payment of $50 a month is due,

15   or whatever date the judge wants to put in there.

16       And so that's how that individual account is then created

17   for that payment plan.

18   Q    So when someone goes on an installment payment plan

19   that's been either approved through your office or approved

20   through the judge, either way, let's say they make payments

21   for a certain period of time -- six months, a year -- and

22   then they stop making payments.

23       What steps are taken by your court or by your office to

24   let the debtor know that they are missing payments?

25   A    Nothing.  We have over 1,500 cases any given year.  We

Dugger - Cross

1  have probably over 700 folks on payment plans, if not more,

2  at any given day.  And the computer does all of that.

3      If there is no payment made by the due date, it goes into

4  that 40-day window.  And if nothing happens in 40 days, day

5  41, DMV is then electronically sent that this person has

6  paid -- has failed to pay their court costs.

7  Q    So the situation where someone who has been on an

8  installment plan and then defaulted, they also appear on that

9  40-day report that you were talking about earlier?

10 A    Yes, ma'am.

11 Q    Does your office -- does your jurisdiction offer

12 community service as an option for remitting fines and costs?

13 A    On a case-by-case basis.  That's completely within the

14 judge's purview.

15 Q    Are you -- do you have any knowledge of how this system

16 operated before we had these computers that talk to each

17 other?

18 A    No.  The computers were there when I started as a clerk.

19 Prior to that, as a defense attorney, I had no clue how all

20 that would work.

21 Q    Fair enough.  Would you agree, though, that somebody has

22 to make this information available for DMV to even know that

23 there are outstanding fines and costs that have not been

24 paid?

25 A    Yes.  And the report, like I said, once the due date has

59

Dugger - Cross

1    passed, that's the report that goes to DMV; so that's how DMV

2    gets notified electronically through the computer systems.

3    Q   And would you agree that when you look at the statute,

4    the language of the statute actually says "the Court shall

5    suspend," right?

6    A   That's what the statute says.

7           MS. O'SHEA:  If I can just have a moment.

8           THE COURT:  If a person makes a partial payment, say

9    they're supposed to pay $50 a month and they pay $25, is

10   there an exception made automatically by you with regard to

11   sending the report to DMV?

12          THE WITNESS:  My staff would have the discretion to

13   ask Judge Moore if this is something we could do and then

14   change the due date to say that something has been paid.

15          I've been fortunate that both Judge Moore and Judge

16   Hogshire before him have been very liberal in helping folks

17   make their court costs possible, and their payments.  And so

18   there is a lot more liberalness in my court, and I understand

19   that.  And that's because I've worked for two judges, with

20   two judges, that really do believe folks need their driver's

21   license.

22   BY MS. O'SHEA:

23   Q   Would you agree that -- if you know.  The system that you

24   have in place in Charlottesville, you know, you have intimate

25   knowledge of that.  Would you agree that it's different from

Dugger - Cross

1    jurisdiction to jurisdiction to jurisdiction around the

2    Commonwealth?

3    A    So every -- I'm just going to talk about circuit courts.

4        Every circuit court except Fairfax and Arlington are on

5    the Case Management System and on the Financial Accounting

6    System that the Supreme Court has.

7    Q    Do you mean Arlington or Alexandria?

8    A    Alexandria.  I'm sorry.  I get the As confused.

9    Q    I'm not talking about the computers.  I'm talking about

10   your mechanisms for installment plans and approval for the

11   judges, and what you offer, and so on and so forth.

12   A    Correct.  So the Supreme Court promulgated a rule saying

13   each circuit court should have available installment or

14   deferred payment plans for defendants to enter into one.

15       We've always had it, even before then.  We just put it

16   into writing once that rule was promulgated.

17       But as people like to say, there's 120 different ways to

18   do things in Virginia because there are 120 different circuit

19   courts.  And each clerk is elected.  Each clerk has a

20   different judge.  So it literally varies from circuit court

21   to circuit court.

22   Q    Right.  So, like, a deferred payment plan that might be

23   okay or acceptable in Charlottesville might not be okay in

24   Augusta County or Harrisonburg or somewhere else?

25   A    Yes, that's correct.

Dugger - Redirect

1  Q   Ms. Dugger, you serve on the advisory board for the Legal

2  Aid Justice Center here in Charlottesville; is that correct?

3  A   I do, for about five years now.

4          MS. O'SHEA:  Okay.  Very nice.  Thank you.

5          I don't have any other questions.

6          THE WITNESS:  Do you want your exhibit back?

7          MS. O'SHEA:  If I could have that marked and

8  admitted as Defendant's Exhibit 1.

9          MR. BLANK:  No objection.

10          THE COURT:  It will be admitted.

11          (Defendant's Exhibit 1 admitted)

12                    REDIRECT EXAMINATION

13  BY MR. BLANK:

14  Q   Ms. Dugger, just a short follow-up.  I heard about the

15  120 jurisdictions and circuit courts and that the payment

16  plans may be a little bit different, but once a person

17  defaults, once a default has occurred, the process is the

18  same for every jurisdiction with regard to the FMS, FAS

19  system, and CMS?

20  A   Yes.  Once the due date passes or the time-to-pay date

21  has passed, the report will go to DMV on day 41.

22  Q   And then DMV will suspend, correct?

23  A   That's when they will get the suspension letter from DMV,

24  yes.

25          MR. BLANK:  Thank you.

Dugger - Redirect

1          Oh, Your Honor, if we could have one second.

2          (Counsel conferring)

3    BY MR. BLANK:

4    Q   And on that $25, if there was a change, that would have

5    to go to DMV in order for there to be a change in the due

6    date?

7    A   We would do a -- and that's why it has to go up to Judge

8    Moore.  We need to do a new payment plan.

9    Q   And it will go to DMV by default unless you change the

10   due date?

11   A   Yes.  If a due date comes and I haven't or one of my

12   staff members has not changed it, the computer will

13   automatically send it to DMV.

14          MR. BLANK:  Okay.

15          THE COURT:  All right.  Thank you.

16          MR. BLANK:  Judge, before I call Ms. Moats to the

17   stand, I'd like to turn your attention to tab 7 and tab 8 in

18   the book, specifically tab 7 to start with, Your Honor.  And

19   you have to go pretty far back in the back, but it's on page

20   6-4.  And what you're looking at, Your Honor, this is a

21   record, it's from the Virginia Commonwealth auditor of

22   accounts -- excuse me, Auditor of Public Accounts.  It's in

23   our brief.  There's a website link that you can access to

24   actually see this.

25          But if you go to page 6-4, this is the audit of a

Moats - Direct

1   circuit court, and it says, "All unpaid accounts are

2   submitted to the Department of Motor Vehicles for license

3   suspension and each unpaid case must be submitted to the

4   Department of Taxation for set-off debt collection for at

5   least three years."

6           Again, we want to note that the agency, the Auditor

7   of Public Accounts, is stating that the Department of Motor

8   Vehicles is the one that suspends the license.

9           Second, Judge Moon, we'd like to turn your attention

10  to tab 8, and that is a 2000 report.  It's a special report.

11  It's a review of Virginia courts management unpaid fines and

12  costs, again the Auditor of Public Accounts.  And if you go

13  on the top of page 5 -- and this goes to this statement of

14  FMS and CMS.  And the acronyms get a little bit fuzzy for me,

15  but if you look at the top of page 5, the system also

16  interfaces with the Department of Motor Vehicles for

17  automated submission of license suspension.  And that goes

18  back to Ms. Ford's affidavit, paragraph 8, that says, "DMV

19  receives no information via the financial management system."

20          It's clear these systems are talking to each other.

21          At this time we'll call Ms. Moats.

22          JULIE MOATS, CALLED BY THE PLAINTIFF, SWORN

23                    DIRECT EXAMINATION

24  BY MR. BLANK:

25  Q   Can you state your name for the record, please?

Moats - Direct

1  A    Julie Moats.

2  Q    And where do you currently work, Ms. Moats?

3  A    At the Charlottesville Circuit Court.

4  Q    And what's your job title?

5  A    Deputy clerk.

6  Q    And how long have you been in that position?

7  A    I've been there a little over two years.

8  Q    Excellent.  And before you were deputy clerk of the

9  circuit court, where did you work?

10 A    I was at the Charlottesville General District Court.

11 Q    And how long did you work at the -- what was your title

12 there?

13 A    I was deputy clerk.

14 Q    And how long did you work at the general district court?

15 A    That was actually a little over two years.

16 Q    I -- did I -- did you have an opportunity to review

17 Ms. Ford's affidavit in this case?

18 A    Yes.

19       MR. BLANK:  And I just want to let the record show,

20 Your Honor, that I correctly grabbed the ring of the Elmo

21 instead of the top of it.

22       THE WITNESS:  As you so practiced earlier.

23 BY MR. BLANK:

24 Q    And this document was attached to Ms. Ford's affidavit.

25 It's titled "CASINQ Inquire CAIS Original Transaction."

Moats - Direct

1    As a deputy clerk for the circuit court and deputy clerk

2   of the general district court, have you ever seen this

3   document before?

4   A    No, I have not.

5   Q    As a deputy clerk for the general district court or the

6   circuit court, did you ever fill out this document or screen?

7   A    No, I have not.

8   Q    When Ms. Ford put in her affidavit, paragraph 11 and 12,

9   that the clerk's office inputs an indicator in the system in

10  identified field 14, CTORNIND -- which, Judge, is right there

11  on the document -- what is your knowledge of such indicator?

12  A    I have none.

13  Q    And what is your knowledge of field 14?

14  A    I have no knowledge of a field 14.  None of our fields

15  have numbers, or at the general district court, either.

16  Q    From your observation and knowledge as a general district

17  court clerk, who suspends a driver's license for failure to

18  pay court fines and costs?  The court, the clerk, or DMV?

19         MS. O'SHEA:  Your Honor, I'm going to object to the

20  extent that requires a legal conclusion.

21         THE COURT:  Well, she can testify as to what they

22  do, but not more.

23         THE WITNESS:  DMV.

24         THE COURT:  I'll accept it as evidence, a lay

25  opinion.

66

Moats - Cross

1        MR. BLANK:  Understood, Your Honor.

2   BY MR. BLANK:

3   Q    Does the judge enter a suspension order for a driver's

4   license for failure to pay court costs and fines?

5   A    Not for failure to pay court costs and fines, no.

6   Q    Does the clerk?

7   A    No.

8   Q    How long after the conviction did DMV -- how long after

9   the conviction would it take before DMV suspended a license

10  for failure to pay court fines and costs?

11  A    On the 41st day.  It used to be 30, and then it increased

12  to 40; and on the 41st day.

13  Q    And how did that happen in the general district court?

14  As you heard Ms. Dugger describe how it does in the circuit

15  court, tell us how it happened in the district court.

16  A    When someone does not pay their fines and costs, they had

17  that time period in which to pay, and if they didn't pay on

18  the 41st day, the computers would talk to each other and DMV

19  would suspend their license.

20  Q    And was there ever an order on that 41st day from the

21  general district court ordering you to suspend the license?

22  A    No, I didn't -- we didn't suspend their license.

23        MR. BLANK:  No further questions.

24        THE COURT:  Okay.

25                    CROSS-EXAMINATION

Moats - Cross

1   BY MS. O'SHEA:

2   Q   Good afternoon, Ms. Motts.  I'm going to talk --

3   A   Moats.

4   Q   Moats.  Sorry.  Moats.

5       I'm going to talk specifically about general district

6   court and traffic court in Charlottesville.

7   A   Okay.

8   Q   All right.  Traffic court is held in general district

9   court, right?

10  A   Yes.

11  Q   So people come to general district court and they've been

12  charged with a set of traffic infractions, right?

13  A   Uh-huh.

14  Q   Okay.  And they show up for their hearing and they come

15  before the judge, and let's say the judge elects to

16  adjudicate them guilty of the traffic infractions, right?

17  A   Sure.

18  Q   And the judge assesses a particular sentence or fines or

19  costs, or whatever he elects to do for those fines and costs,

20  from the bench in general district court, right?

21  A   He generally has to follow the laws, yes.

22  Q   Okay.  So he will say, for example, I'm going to, you

23  know, convict you of speeding, I'm going to impose a

24  statutory fine and costs; something like that, right?

25  A   Yes.

68

Moats - Cross

1    Q    And then before him he's going to have a uniform summons,

2    usually, right?

3    A    Yes.

4    Q    Or some sort of warrant of arrest?

5    A    Talking about traffic infractions, it would be a uniform

6    summons.

7    Q    So he's going to note his disposition, usually, on that

8    document, correct?

9    A    Uh-huh.  Uh-huh.

10   Q    And then when the Court assesses whatever that sentence

11   is, the individual is in court usually, but not necessarily

12   always, right?

13   A    Correct.

14   Q    Because there are certain traffic infractions for which

15   you can be found guilty in absentia?

16   A    Yeah, you can be found guilty of all of them in absentia.

17   Q    For the traffic infractions, but not the traffic

18   misdemeanors?

19   A    Well, if you're not there, you're going to get a capias;

20   but yeah.

21   Q    So in any case, I'm talking about a situation when the

22   person is present in court.  All right?

23   A    Okay.

24   Q    And hears the judge pronounce sentence.  Okay?

25   A    Okay.

Moats - Cross

1   Q    And then that document gets taken to the clerk's office
2   in general district court in some manner of speaking, right?
3   A    Okay.
4   Q    Either there's a -- well, if I'm wrong, tell me.  Don't
5   assume.
6        So there's probably the clerk sitting in the courtroom
7   who gets the documents from the judge, right?
8   A    Yes.
9   Q    And then someone in the clerk's office is responsible for
10  inputting that information into your computerized system,
11  right?
12  A    Yes.
13  Q    So you look at what the judge has ordered, and you put it
14  in the system, right?
15  A    Yes.
16  Q    So let's say the court has imposed a certain amount of
17  fines and costs in a particular case, the individual has been
18  given the 30 days, 40 days, however you want to phrase it, to
19  pay, right?
20  A    That's not ordered by the judge.  That's an automatic.
21  That's a state law.
22  Q    But that's automatic?
23  A    Yeah.
24  Q    So the Court imposed fines and costs.  You input into
25  your system whatever it is the Court ordered?

Moats - Cross

1  A   Yes, the amount that they owe.

2  Q   Right.  So let's say day 40 rolls around and the

3  individual who has been assessed the fines and costs hasn't

4  paid their fines and costs.  Now, we heard from Ms. Dugger

5  with respect to circuit court that, basically, they generate

6  an order, review it, and then send it on to DMV.

7         MR. BLANK:  Objection, Judge.  That's not what she

8  testified to.

9         THE COURT:  Well, just ask her --

10         THE WITNESS:  Yeah, I'm confused.

11 BY MS. O'SHEA:

12 Q   So you're saying the person --

13         THE COURT:  Just rephrase the question.

14         MS. O'SHEA:  Okay.

15 BY MS. O'SHEA:

16 Q   Day 40 rolls around, the person hasn't paid.  What does

17 the general district court do with that information?

18 A   Nothing.

19 Q   Do you generate a report?

20 A   No.

21 Q   Do you contact the individual who has defaulted?

22 A   No.

23 Q   Do you take any measures to go back and look at the

24 accounting and make sure that the person who hasn't paid,

25 that it's not just been entered incorrectly at some point in

Moats - Cross

1  the system?

2  A   I as a deputy clerk, no.

3  Q   Anybody in the office?

4  A   I can't speak on the clerk herself.

5  Q   Okay.  To your knowledge, does anybody do that

6  doublecheck of the failure to pay on day 40?

7  A   Not to my knowledge.

8  Q   Are deferred payment plans and installment payment plans

9  offered in the Charlottesville General District Court?

10 A   Yes.

11 Q   Is community service offered as an option in the

12 Charlottesville General District Court?

13 A   I do not deal typically with payment plans, but I have

14 heard that they are up to the judge.

15 Q   If somebody wants to go on a deferred payment plan in the

16 general district court as opposed to the circuit court, what

17 are they supposed to do?

18 A   They would ask.

19 Q   Ask who?

20 A   They would just come to the clerk's office and say, I

21 want to enter a payment plan.  And then we have them fill out

22 the financial form and we -- they go in to talk to the judge,

23 and the judge puts them under oath regarding their financial

24 status and sets them up on a plan.

25     It's usually -- down at the general district court, Judge

Moats - Cross

1    Downer is usually very generous.  He does not want anyone to

2    not have a license.

3    Q    Okay.  So the person -- that's the process:  The judge

4    puts them under oath and the judge decides what the payment

5    plan is going to be?

6    A    Yes.

7    Q    With respect to the Charlottesville General District

8    Court, is there a minimum monthly payment, an amount that has

9    to be on that installment plan?

10   A    I cannot speak to that.  I don't have anything to do with

11   the plans in Charlottesville Circuit Court.  I'm in land

12   records at the circuit court.

13   Q    What about when you were in general district court?  My

14   questions are all focused on general district court.

15   A    Oh, at general district court?

16   Q    Yes, ma'am.

17   A    What was the question about?

18   Q    Was there a minimum amount that had to be paid per month

19   in order to enter into a deferred payment plan in general

20   district court, or an installment payment plan?

21   A    To my recollection, Judge Downer would, depending on

22   their finances, sometimes ask for a certain amount down and

23   then a certain amount a month.  And then if they couldn't

24   afford that for whatever reason, to -- asked him to reduce it

25   or he would renegotiate or redo their financial plan.

Moats - Cross

1  Q    So it varied according to the circumstances?

2  A    Yes.

3  Q    Now, with respect to someone who has been found guilty in

4  absentia, so they didn't show up in court --

5  A    Okay.

6  Q    -- and the Court just imposed, say, the statutory fine

7  for a speeding offense and then, like, a $25 court cost on

8  top of that.  All right?

9  A    Uh-huh.

10 Q    How is the information relative to that sentence

11 communicated to the person who didn't show up in court?

12 A    How do they know that they owe money?

13 Q    Correct.

14 A    The next day after trial, when someone has been tried in

15 absence, the court mails out a 225.

16 Q    What is a 225?

17 A    It's a DC225.  It's a notice to pay, which tells them

18 they have 40 days to pay, or enter into a payment plan.

19 Q    Or their license will be suspended?

20 A    I don't -- I'm not sure if it says that.  I just know it

21 says that they owe fines.  I'm not sure exactly of the

22 wording of it.  It's a 225.  I don't know the wording of it

23 precisely.

24 Q    Okay.

25 A    Sorry.

74

Moats - Cross

1   Q   And that 225 form is going to be mailed to the person's
2   last known address of record, correct?
3   A   Which would have been what's on the summons that was on
4   their driver's license.
5   Q   Do you ever get those returned as, you know, the
6   recipient not found, recipient unavailable?
7   A   Occasionally.
8   Q   If those were returned, you know, the person wasn't at
9   the address that was written down on the uniform summons,
10  what, if anything, does your office do with that information?
11  A   You know, I wasn't in charge of anything that had to do
12  with those, so I'm not sure exactly what they did with them.
13  Q   And you said that you work in land records now in circuit
14  court?
15  A   Uh-huh.  Yes.
16  Q   In your position in circuit court, have you ever been
17  responsible for inputting information relative to criminal
18  convictions?
19  A   No, ma'am.
20      MS. O'SHEA:  Thank you.  I don't have any other
21  questions.
22      THE COURT:  Is that all?
23      MR. BLANK:  She's free to go.  Thank you, Ms. Moats.
24      Judge, if you follow along in the -- in the notebook
25  that we submitted, there are four documents that we wanted to

Moats - Cross

1    draw attention to the Court.  They're behind tab 9, 10, 11,

2    and 12.  These are screenshots from four District Courts.

3    One is from Charlottesville.  And if you go to the second

4    page, in all caps bold:  "IF YOUR AMOUNT HAS NOT BEEN PAID IN

5    FULL OR AN EXTENSION HAS NOT BEEN GRANTED, YOUR DRIVER'S

6    LICENSE WILL BE SUSPENDED BY DMV."  That's one.

7         Number two is Albemarle.  Not in bold, but it's in

8    there, and it says:  "If payment in full is not made by the

9    due date, your driver's license will be suspended by DMV."

10        11 is from Chesterfield County.  And in Chesterfield

11   County, on page 1:  "Notification is sent to the Department

12   of Motor Vehicles for suspension of defendant's operator's

13   license."

14        And then Henrico County, which is the smallest

15   print -- I know it's in here because I wrote it out.  It

16   says, "You will have 30 calendar days to pay" -- I'm looking

17   for it, Judge.  Why can't I find it?  I think I'm missing a

18   page on mine, Judge.  We'll go back and find it.  My notes

19   say:  "You will have 30 calendar days to pay all fines and

20   costs owed to the court.  Failure to pay your fines and costs

21   will result in your privilege to drive being suspended or

22   revoked by the Virginia Department of Motor Vehicles."

23        Your Honor, at this time, I'll pass the podium over

24   to Ms. Pazandak.

25        Was that the correct pronunciation, or was I close?

Pearce - Direct

1          MS. PAZANDAK:  Pazandak.

2          MR. BLANK:  Pazandak.  I apologize.  She's been pro

3     hac'd into this court.  She's with McGuire, Woods, and she

4     will take the examination of Diana Pearce.

5          THE COURT:  All right.

6          MS. PAZANDAK:  Plaintiffs call Dr. Diana Pearce.

7          MS. O'SHEA:  Your Honor, to the extent it's helpful,

8     before Ms. Pearce testifies we're certainly willing to

9     stipulate that driving is an important part of people's lives

10    and that it's harder to get to work when you don't have a

11    driver's license.  If that's basically what Ms. Pearce is

12    going to testify to, we're happy to stipulate that if this

13    will move things along.

14         THE COURT:  Well, you can take that as agreed to,

15    admitted, and not touch on those matters --

16         MS. PAZANDAK:  Okay.

17         THE COURT:  -- any further.

18         MS. PAZANDAK:  Understood.

19     DIANA PEARCE, Ph.D., CALLED BY THE PLAINTIFFS, SWORN

20                      DIRECT EXAMINATION

21    BY MS. PAZANDAK:

22    Q    Dr. Pearce, can you please state your name?

23    A    Diana Pearce.

24    Q    And where do you live?

25    A    Seattle, Washington.

Pearce - Direct

1   Q   And where are you currently employed?

2   A   University of Washington.

3   Q   What's your title at the University of Washington?

4   A   I'm a senior lecturer and director of the Center for

5   Women's Welfare.

6   Q   How long have you held that position?

7   A   I've been at the university for 20 years.

8   Q   And what are your current job responsibilities?

9   A   I direct the Center for Women's Welfare and teach as

10  required, and the center conducts research.

11  Q   What is the subject of your research?

12  A   Basically, what we do is we calculate and write reports

13  and analyze data using a measure that I developed called The

14  Self-Sufficiency Standard.

15  Q   And where did you work before the University of

16  Washington?

17  A   I was in Washington, DC.  I had an independent project

18  called the Women in Poverty Project associated with wider

19  opportunities for women.

20          MS. PAZANDAK:  Your Honor, may I approach the

21  witness?

22          THE COURT:  You may.

23  BY MS. PAZANDAK:

24  Q   Dr. Pearce, I'm handing you a stack of documents, and

25  we'll go through them.  I'll put them on the screen.

78

Pearce - Direct

1    Can you identify the first document in front of you?

2  A    It's my curriculum vitae.

3  Q    And Dr. Pearce, is this a true and accurate copy of your

4  CV?

5  A    Yes, it is.

6  Q    Where did you go to college, Dr. Pearce?

7  A    I went to the College of Wooster in Wooster, Ohio.

8  Q    And what degree did that lead to?

9  A    Bachelor's degree in sociology and history.

10        MS. O'SHEA:  Your Honor, is there some sort of --

11  are we leading up to a request to certify as an expert?  So

12  if you can tell me the field, because I may be able just to

13  stipulate to that so we don't have to walk through the entire

14  CV.

15        MS. PAZANDAK:  Sure.  We would like to qualify

16  Dr. Pearce as an expert in The Self-Sufficiency Standard,

17  which is a standard that she created.  It talks about whether

18  someone's income is adequate to meet their basic needs for

19  housing, food, healthcare, other basic costs.  We'd also like

20  to qualify her as an expert witness in the self-sufficiency

21  standard as compared to the federal poverty level and the

22  self-sufficiency standard for the Commonwealth of Virginia.

23        MS. O'SHEA:  So you want to qualify her as an expert

24  in the standard that she created, basically?

25        MS. PAZANDAK:  Yes.

Pearce - Direct

1    MS. O'SHEA:  And what is the relevance of that
2    standard to this litigation?
3    MS. PAZANDAK:  We think it's a more appropriate
4    measure than the federal poverty level to say whether someone
5    has enough income to be able to meet their basic needs and
6    pay court costs and fines or make payments on a payment plan.
7    MS. O'SHEA:  Your Honor, I'm not sure that it's
8    relevant, Your Honor, but I certainly stipulate that she's an
9    expert in the standard that she has created and published
10   about.
11   THE COURT:  All right.  You may proceed.
12   BY MS. PAZANDAK:
13   Q   Okay.  Dr. Pearce, can you tell us what The
14   Self-Sufficiency Standard is?
15   A   The Self-Sufficiency Standard is a measure of income
16   adequacy based on a basic needs budget.  It varies by where
17   you live and it varies by your family composition, including
18   the number of adults and children and the ages of children,
19   because costs differ by age of children, such as childcare.
20   Q   And when was it developed?
21   A   I developed it and first calculated it in 1996 for the
22   State of Iowa under a grant from The Women's Bureau, the
23   United States Women's Bureau.
24   Q   And why was the standard developed?
25   A   The standard was developed because I was doing research

Pearce - Direct

1    on the performance standards used in job training programs,

2    which at that time were called JTPA and now are called WIOA,

3    Workforce Investment Opportunity Act.

4        They measured -- the performance standard was

5    self-sufficiency, but they measured it by averaging together

6    all the participants in a program's wages.  It didn't take

7    into account what it took to be self-sufficient.

8        So a single person would need much less income to be

9    self-sufficient than, say, a person with children to support.

10   And by putting everybody together, you ignored that and you

11   weren't really measuring self-sufficiency.  So I was asked to

12   develop that.

13       So I drew upon a number of sources, looking at the

14   various critiques of the federal poverty level, as well as

15   others who had developed a similar thing.  But not really

16   developed it, just had, you know, put out some ideas for

17   doing this by building it up from the various basic needs.

18   Q    Okay.  So how did you go about developing the standard?

19   A    So the way I -- you mean how do I calculate it?

20   Q    Yes.

21   A    What we do is we take basic needs -- housing, food,

22   childcare, transportation, healthcare, plus, of course, and

23   miscellaneous, which covers things like clothing and personal

24   necessities, household necessities like soap, and as well as

25   taxes and tax credits, because everybody has to pay taxes --

Pearce - Direct

1   and then we look at those costs using credible government

2   sources, such as Census Bureau, Housing and Urban Development

3   for housing costs, the food budgets from the United States

4   Department of Agriculture.

5       So we use credible sources that also distinguish those

6   costs by geography and by age, as appropriate.

7   Q   And how is The Self-Sufficiency Standard different from

8   the federal poverty level?

9   A   Well, the federal poverty level was developed in the

10  1960s by Mollie Orshansky.  At the time, the only standard we

11  had for what you needed to meet your basic needs was

12  nutrition standards from those USDA food budgets.

13      So she used a food budget, and at that time people spent

14  about a third of their income on food; the average family

15  spent a third of their income on food.  So she just

16  multiplied food times three.  Well, that froze -- and it's

17  only been updated for inflation since then.  So that froze in

18  place that relationship between food and other things.  And,

19  of course, food is one of the things that's increased the

20  least of all.  As everybody knows, housing and healthcare

21  have increased enormously, particularly in recent years.

22      So what we do is allow each of those costs to increase

23  independently of each other.  So there's not a fixed ratio of

24  one-to-three like there is in the federal poverty level.

25      Also, the federal poverty level, she didn't have the

Pearce - Direct

1  data.  It doesn't vary geographically, so it doesn't take

2  account of the very different costs of living.

3      We take account of the different costs of living to the

4  lowest geographical area that we -- that is available, that's

5  accurate and available, and standardize across the country.

6  Q    When did you first develop the standard for the

7  Commonwealth of Virginia?

8  A    First developed that in 2002.

9  Q    And when was it last updated?

10 A    2018.  This year.

11 Q    How was it updated for 2018?

12 A    Well, it turns out that IKEA was using this data to vary

13 their starting wages by where their stores were located so it

14 would reflect the local cost of living.  And they noted that

15 it had not been updated in some states as regularly, because

16 we're dependent upon our partners in each state.  And so they

17 paid for updating the standard in 27 states where there's

18 IKEA stores.

19 Q    Would you look at the second document I handed you?

20 A    Yes.

21 Q    And will you identify that document, please?

22 A    That's the Methodology Appendix for The Self-Sufficiency

23 Standard for Virginia in 2012.

24      MS. PAZANDAK:  And, Your Honor, this is in your

25 notebook behind tab 13.

Pearce - Direct

1    BY MS. PAZANDAK:

2    Q    What agency of the Commonwealth of Virginia requested the

3    2012 calculation?

4    A    This was prepared for -- in 2012 for the Virginia

5    Department of Social Services.

6    Q    And is this a fair and accurate copy of the Methodology

7    Appendix?

8    A    Yes, it is.  And it specifies our data sources,

9    assumptions, and our calculation methods for Virginia, which

10   is standardized but gives us specifics for Virginia.

11   Q    Would you identify this next document?

12   A    This is a Technical Brief for The Self-Sufficiency

13   Standard for 2018 for the -- all the standards that were

14   calculated under the IKEA project.

15   Q    And is this a fair and accurate copy of that methodology?

16   A    Yes, it is.

17   Q    So you were going into this before, but what are these

18   appendices?  What do they show?

19   A    They show where our data sources are, what assumptions

20   are made; basically tells you how we calculated, where we get

21   the numbers, how we -- the methodology and the sources of the

22   data.

23   Q    Are there any significant differences between the two?

24   A    No significant differences.  There's -- you know, we do

25   some fine-tuning.

Pearce - Direct

1    Unlike the poverty standard, which got frozen in the

2   1960s based on what data that was available then, if we get

3   data that provides a more accurate way of calculating

4   something, then we will refine it.  But, basically, it's the

5   same categories and the same sources.

6   Q    Dr. Pearce, do you have an opinion as to whether the

7   suspension of licenses for failure to pay court debts and

8   fines disproportionately impacts individuals in Virginia that

9   do not meet self-sufficiency standards?

10  A    Yes.

11         MS. O'SHEA:  I'm going to object to that; that the

12  basis of that is not in evidence and it's beyond the scope of

13  her expertise, which is in self-sufficiency, it's not in

14  legal fields.

15         THE COURT:  What was the question again?

16  BY MS. PAZANDAK:

17  Q    Do you have an opinion as to whether the suspension of

18  licenses for failure to pay court debts and fines

19  disproportionately impacts individuals in Virginia that do

20  not meet The Self-Sufficiency Standard?

21  A    Yes.

22         THE COURT:  I understand the objection.  I'll let

23  her answer and explain her answer.

24  BY MS. PAZANDAK:

25  Q    Okay.  So why don't you tell us your opinion?

Pearce - Direct

1  A   My opinion is that it does affect them, because they are

2  not able to meet their basic needs as it is, so taking away

3  their driver's licenses obviously makes it impossible to earn

4  an income to meet their basic needs.

5  Q   Okay.  And what's the basis of your opinion?

6  A   The basis of my opinion is my research on the standard.

7  Q   Dr. Pearce, have you reviewed any information related to

8  Adrainne Johnson?

9  A   Yes, I have.

10  Q   What have you reviewed?

11  A   I've looked at her income, benefits, which provide a

12  source of resources to meet her basic needs, and compared

13  these to the standard.  So her income and benefits and

14  expenditures.

15  Q   Is there a way to zoom out?

16      Do you have an opinion as to whether Adrainne Johnson

17  meets The Self-Sufficiency Standard?

18  A   No, she does not.  Yes, I have an opinion.

19  Q   Do you hold that opinion to a reasonable degree of

20  certainty in your field of expertise?

21  A   Yes.

22  Q   And what is that opinion?

23  A   She does not.  She's not able to meet her basic needs,

24  given her income and benefits.

25  Q   And what is the basis of that opinion?

Pearce - Direct

1   A    From reviewing, again, her income, benefits, and

2   expenditures versus The Self-Sufficiency Standard.

3   Q    Okay.  And if you'll turn to the fourth document I handed

4   you, which is also up here on the screen, can you please

5   identify that document?

6   A    That's a demonstrative for Adrainne Johnson.

7   Q    And can you explain what that demonstrative shows?

8   A    So this compares the amounts in The Self-Sufficiency

9   Standard for housing and food to what she spends for those

10  standards, and then shows what the shortfall for the surplus

11  is for each of these items.

12      So, for example, for housing, we used the fair market

13  rents, which is what the Department of Housing and Urban

14  Development has determined is the minimum you need to spend

15  to meet, minimally meet -- you know, adequately meet your

16  need for housing.  So this includes housing.  This includes

17  both the rent and utilities.

18      So in Charlottesville, Virginia, you should be spending

19  $1,179.

20      She's only spending $200.  She's doubled-upped.  And she

21  didn't quite say it, but basically she's sharing housing,

22  where she and her two children share a room, and they have a

23  shared kitchen and shared bath, and it's not acceptable, you

24  know, living conditions.  It's both overcrowded and not

25  clean.

Pearce - Direct

1      And so she's way spending under what she needs to meet
2  her basic needs.  I mean, she doesn't have any extra income
3  for other things, because she's not even meeting what she
4  should be, what the government thinks, because the fair
5  market rents are established for people receiving housing
6  assistance.  So this is what low-income people who do not
7  have enough income to meet their housing need, this is the
8  level at which the rent, including -- and plus utilities,
9  they get from HUD.

10     And the same thing for food.  So for food, again, this is
11  what the USDA gives people who are getting stamps, getting
12  the full benefit from food stamps, for people who don't have
13  any income to pay for their food stamps.  So, again, it's the
14  minimum.

15     And it only covers groceries.  It doesn't cover a pizza
16  or lattes.  It's a very bare minimum of what you need to meet
17  your food needs if you have an adult, a school-aged child,
18  and a teenager.  This is where age makes a difference.

19     She's spending less than half that, so clearly she is not
20  able to meet her family's nutrition needs on her income.  So
21  even just, you know, these two things aren't enough to
22  meet -- you know, these two items in the basic needs budget
23  is less than -- is more than her income.

24          MS. O'SHEA:  I'm going to object to that last bit of
25  testimony of finding that somebody is not getting sufficient

Pearce - Direct

1   nutrition based on the amount of money that's spent on

2   groceries.  I certainly think the doctor can testify about

3   what people normally spend on groceries versus what was spent

4   on groceries here, but unless she has personal knowledge of

5   what's in those grocery bags when they come home from the

6   grocery store, I think that's beyond the scope of her

7   knowledge and expertise.

8         THE WITNESS:  This is what the United States

9   Department of Agriculture has determined is the minimum you

10  need to meet your nutritional needs, looking at all, you

11  know, the vitamins and minerals and protein that we need.

12  And they do a market basket; they determine what it costs to

13  meet those needs.  One survey found that, using this budget,

14  only about 30 percent of people were able to meet their basic

15  needs.

16        THE COURT:  With that information, thank you, that's

17  sufficient.  The Court can decide whether it's nutritious or

18  not.

19  BY MS. PAZANDAK:

20  Q   If you'll turn to the next page in your demonstrative,

21  Dr. Pearce, can you tell us what this chart shows?

22  A   This is just a way of showing graphically what I've been

23  saying in terms of numbers.

24        So she's only spending about 17 percent of what HUD

25  thinks you need to spend to minimally meet your needs for

Pearce - Direct

1    housing.  She's clearly spending a great deal less than that.

2    And she should spend more than that.  If she had more

3    dollars, she would spend more to better meet her --

4            MS. O'SHEA:  I object to that as speculative.

5            THE COURT:  Go ahead.

6    BY MS. PAZANDAK:

7    Q    And can you tell us what this final demonstrative shows,

8    Dr. Pearce?

9    A    Again, it's the food.  So she's spending 39 percent of

10   what the USDA food budget says should be spent to meet your

11   nutritional needs for this size and age of children.  It says

12   family and age of children.

13   Q    Dr. Pearce, have you been given information about the

14   other four named plaintiffs in this matter?

15   A    Yes, I have.

16   Q    And what type of information have you been given?

17   A    Similar information on their income, expenditures, and

18   benefits.

19   Q    Do you have an opinion as to whether any of those meet

20   The Self-Sufficiency Standard?

21   A    Yes, I do.

22   Q    And do you hold that opinion to a reasonable degree of

23   certainty in your field of expertise?

24   A    Yes.

25   Q    And what is that opinion?

Pearce - Direct

1   A   All of them are well below The Self-Sufficiency Standard.

2   They are not able, with their current income, to meet their

3   basic needs.  So, basically, asking them to pay court fines

4   is taking milk away from babies.

5   Q   And do you have an opinion as to whether any of the named

6   plaintiffs can afford a payment plan to get their license

7   back and still meet The Self-Sufficiency Standard for their

8   locality?

9   A   I can say that they would not be able to meet their basic

10  needs using The Self-Sufficiency Standard as a measure of

11  that.

12  Q   And if they were put on a payment plan, what would that

13  mean for them and their families?

14  A   I assume it would mean being deeper in the hole and less

15  able to meet their basic needs.

16       MS. O'SHEA:  I'm going to object to that as

17  speculative as well.

18       THE COURT:  Okay.  Well, they don't have enough

19  money now and, of course, if you take what little they've got

20  from them, it's pretty obvious, I mean.

21       MS. O'SHEA:  We don't need expert testimony, Your

22  Honor, frankly.

23       THE COURT:  What I'm saying is it's not prejudicial.

24  It's just stating.  The facts she is telling the Court are

25  sufficient for the Court to reach the same conclusion as

Pearce - Cross

1   she's reaching.  So her information is helpful to the Court.

2   Her opinion, no one would disagree with it, with all these

3   facts, I wouldn't think.

4            MS. O'SHEA:  I was objecting to the extent that she

5   was opining as to some contingencies that may depend on facts

6   and circumstances that aren't before the Court.

7            THE COURT:  All right.

8            MS. PAZANDAK:  That's our final question.  Thank

9   you, Dr. Pearce.

10           THE COURT:  Okay.  You may cross.  Do you want to

11  cross?

12           MS. O'SHEA:  Yes, sir.

13           THE COURT:  Okay.

14                      CROSS-EXAMINATION

15  BY MS. O'SHEA:

16  Q    Good afternoon.  Is it Pearce?

17  A    Yes.

18  Q    Dr. Pearce?

19  A    Yes.  Thank you.

20  Q    Okay.  I'm just going to ask you just a few follow-up

21  questions with respect to the information that underlies the

22  opinions that you've arrived at for this case.

23       All right?

24  A    Okay.

25  Q    You testified that you were given information about

Pearce - Cross

1   Ms. Johnson and her finances and circumstances, correct?

2   A   Yes.

3   Q   How did you get that information?

4   A   By computer.  I mean, I'm not sure what you mean, how did

5   I get that information.

6   Q   Was it communicated to you from Ms. Johnson or from

7   Ms. Johnson's counsel?

8   A   Both.

9   Q   Were you given financial statements and invoices and W-2s

10  and receipts, or were you just kind of given a different type

11  of information?

12  A   I wasn't given documents, if you're asking that.

13  Q   So you weren't given documents.  So then were you told,

14  this is what Ms. Johnson's income is?

15  A   Yes.

16  Q   Were you told what her source of income was, where she

17  was getting the income from?

18  A   Yes.

19  Q   So you were given a figure and you were given a source,

20  correct?

21  A   Yes.

22  Q   Okay.

23  A   I mean, not a specific employer or anything like that.

24  Q   I understand.  So you were told that she was working for

25  a certain hourly wage and a certain number of hours per week,

Pearce - Cross

1  right?

2  A   Right.

3  Q   And is that the figure that you used to come up with the

4  current income of $1,399 per month?

5  A   Yes.  That's her new job.

6  Q   Right.  Now, with respect to expenditures, a similar

7  question.  Were you just told, this is what her monthly

8  expenditures are for groceries?

9  A   Yes.

10  Q   So that was reported to you.  Did that come from

11  Ms. Johnson herself, or did that come through her attorney?

12  A   It came through her attorney.

13  Q   Did you ever speak with or interview Ms. Johnson?

14  A   Yes.

15  Q   Was that in person or over the phone?

16  A   Both.

17  Q   And have you been to the residence where she's currently

18  living?

19  A   No.

20  Q   Did you interview her children?

21  A   No, I did not.

22  Q   Did you speak to her children in school about whether or

23  not they obtain, like, free lunches through school programs?

24  A   No, I did not.

25  Q   Did you speak with her -- the people that she lives with?

Pearce - Cross

1   A   No, I did not.

2   Q   Okay.  So you have this self-reported here expenditure of

3   $320 for groceries per month, correct?

4   A   Yes.

5   Q   Did you inquire as to whether or not she had any other

6   fixed expenditures?

7   A   Yes.

8   Q   And what were those?

9   A   She has child support, the rent.  I mean -- I mean, to

10  some extent food is a fixed expenditure, a necessary

11  expenditure.  I don't know what you mean exactly by "fixed."

12  Q   Like a cell phone bill, for example.

13  A   Yes, I did use a telephone bill, too.

14  Q   So there's a phone bill, rent, groceries.  Did you ask

15  her about her eating habits, how often they eat out or

16  ordered food out?

17  A   No.

18  Q   Did you ask about things like if they go to the movies?

19  A   No.

20  Q   Or have entertainment expenses?

21  A   No.

22  Q   So based on the numbers that were given to you, you

23  calculated that she had an income of $1,399 a month, right?

24  Correct?

25  A   Correct.

95

Pearce - Cross

1   Q   Okay.  And then from that, with that starting figure, you
2   take out the $200 in rent, right?
3   A   Yes.
4   Q   Okay.  And then the $320 that she reported in groceries,
5   right?
6   A   Yes.
7   Q   And the math on that, if you take approximately $1,400
8   and you subtract $520, that leaves you with what?  Sorry.
9   I'm trying to do the math here.
10      $880, right?  Correct?
11  A   From 1994, 520?
12  Q   No.  I'm saying, she reported an income of $1,399 a
13  month, right?
14  A   Oh, okay.
15  Q   And then if you take that as her budget, and you take out
16  the $200 in rent, and you take out the $320 in groceries, you
17  are left with $880, right?
18  A   Yes.
19  Q   All right.  And from that $880, then out of that comes
20  the child support payment, correct?
21  A   Yes.
22  Q   And then the only other fixed budget item that she
23  reported was a $100 phone bill, right?
24  A   There were several others, actually.  I think we have
25  some other -- there were several other costs, I think.  There

96

Pearce - Cross

1   was a Y membership and a number of other costs.

2   Q   A wine membership?

3   A   I can't remember exactly.

4   Q   Oh, you said "Y," like YMCA.  I thought you said "wine,"

5   like alcohol.

6   A   No, I said "Y," YMCA.  I'm sorry.

7   Q   Thank you.  I misheard.  All right.  Thank you.

8       So other than the YMCA membership, can you remember any

9   other specific recurring monthly costs?

10  A   Well, of course she has transportation.

11  Q   Like a bus pass?

12  A   Well, she can't always get places by bus, so she would

13  have to take other things as well if she's going to get to --

14  you know, get to her employment.

15  Q   Were you in the courtroom when she testified before?

16  A   Yeah.

17  Q   You heard her testify?

18  A   She also takes a bus.

19  Q   Correct.

20  A   Yeah.

21  Q   So do you know how much a bus pass is in the City of

22  Charlottesville?

23  A   I think it's $20.

24  Q   Per month or per year?

25  A   Per month.

Pearce - Cross

1   Q    So if she has a bus pass, that's an additional $20,

2   correct?

3   A    Right.

4   Q    Okay.  So would you agree, then, that taking out these

5   other sorts of fixed sources, that it appears that she still

6   has around 400 or $500 in cash every month left over of the

7   amount that she earns?

8   A    Yes.

9   Q    Now, you testified before, your exact language was, if I

10  recall correctly, that it's impossible for people who are

11  below the self-sufficiency threshold to pay back their fines

12  and costs.

13       Was that your testimony?

14  A    I said that if they did so, they would be taking it out

15  from meeting their basic needs.

16       So if she has additional, you know, income now that she

17  has a current job, she should be spending that towards her

18  housing and towards her food, because she's not spending

19  enough now to meet her nutritional needs or to meet her

20  housing needs.  Living in one room with two children is not

21  meeting a basic need.

22  Q    Would you agree that if you have a house, a roof over

23  your head, heat, water, aren't those life's basic

24  necessities?

25  A    Not if you're living in housing that's overcrowded.  It

Pearce - Cross

1  affects your health.  It affects your children's.  I mean, by

2  basic needs, they have no more than two people in a bedroom,

3  and children and adults do not share a bedroom.  That's a

4  basic rule for HUD in every housing, public housing, that

5  they subsidize, and not to be sharing a housing unit that was

6  meant for one family with two families.

7  Q   Would you agree that everyone's ability to pay certain

8  recurring expenses is going to be dependent upon their own

9  unique factual circumstances?

10  A   No.  I think the whole point of developing something like

11  The Self-Sufficiency Standard is to say that, yes, you have

12  to meet some arbitrary decisions, but you do come up with

13  some numbers that say, this is the minimum people need to

14  meet their basic needs.

15      And the government, in fact, does that when they do that

16  for housing assistance, when they do it for childcare

17  assistance, when they do it for food assistance.

18  Q   So I understand you've got a general rule.  The general

19  rule is, this is the amount of money people should have in

20  order to meet their basic needs.  I get that that's basically

21  what your standard says.

22      But what I'm saying is:  Don't you also have to look at

23  the individual circumstances of the person to decide whether

24  or not their needs are being met and whether or not they

25  might have extra income that could go to pay things like

Pearce - Redirect

1  their court-ordered fines and costs?

2  A   It's not extra income.  It's income that is now

3  available, maybe, to begin to meet her basic needs.

4      But you can't count on the fact that people will find

5  wonderful housing for $200 a month.  Maybe a few people

6  could, but you can't count on that.  And when you look at

7  what people can afford, you have to give some credence to

8  what basically government agencies have said is necessary to

9  meet your basic needs.

10 Q   So, then, your testimony is basically, regardless, some

11 people might get lucky?

12 A   You can't count on luck.

13 Q   You can't count on luck, but some people do?

14 A   Right.

15 Q   So if you're got somebody and you're trying to assess

16 whether or not they have enough money to meet their needs,

17 don't you need to look at things like that that are unique to

18 each circumstance?

19 A   I think that becomes essentially arbitrary.

20      MS. O'SHEA:  All right.  I don't have any other

21 questions.  Thank you, Judge.

22      THE COURT:  Redirect?

23                  REDIRECT EXAMINATION

24 BY MS. PAZANDAK:

25 Q   Dr. Pearce, just a couple more questions.  Do you believe

100

Pearce - Redirect

1  that Adrainne Johnson got lucky with her housing situation?

2  A    Not at all.

3       That's crooked.

4  Q    Sorry.

5       Can you identify the document up on the screen?

6  A    That is a document looking at Adrainne Johnson's expenses

7  in all different areas and compared to the standard, and

8  again looking at benefits.

9  Q    So before we were just looking at an example?

10  A    Yeah.  Just a couple of the items, yeah.

11  Q    A couple items?

12  A    Because those items alone are, you know --

13  Q    So certainly, although you couldn't recall all them from

14  memory, Ms. Johnson has a number of other expenses --

15  A    Right.

16  Q    -- is that correct?

17  A    Right.

18  Q    And in your opinion, is Ms. Johnson meeting her family's

19  basic needs with the income that she has now?

20  A    No.

21  Q    Are any of the named plaintiffs?

22  A    No.

23           MS. PAZANDAK:  That's all.

24           THE COURT:  Okay.  Let's take about a ten-minute

25  recess.

Peterson - Direct

1          MR. BLANK:  Thank you, Your Honor.

2          THE MARSHAL:  All rise.

3          (Recess, 3:36 to 3:47 p.m.)

4          THE COURT:  All right.

5          MR. BLANK:  Your Honor, we're going to ask Mr. Abel

6    to call Mr. Peterson.

7          Judge, just to make it clear for the record, because

8    speaking to the court reporter, my expectation at the end of

9    our presentation is to put in our notebook as one exhibit to

10   make it easy on the court reporter.  I understand from the

11   Commonwealth they're okay with that.  The only exception is,

12   I didn't have Ms. Adrainne Johnson, the last one.  We'll put

13   that in as Exhibit 2.

14         So the whole notebook will be 1, with everything.

15   We'll put the additional demonstrative in as Exhibit 2.

16         THE COURT:  Thank you.

17         MR. BLANK:  Thank you.

18         MR. ABEL:  Your Honor, plaintiffs will call

19   Dr. Steven Peterson.

20    STEVEN PETERSON, Ph.D., CALLED BY THE PLAINTIFFS, SWORN

21                      DIRECT EXAMINATION

22   BY MR. ABEL:

23   Q   Good afternoon.  Would you state your name for the

24   record?

25   A   My name is Steven Robert Peterson.

Peterson - Direct

1   Q    Where do you live?

2   A    I live in Arlington, Massachusetts.

3   Q    Where are you currently employed?

4   A    I work for Compass Lexicon.

5   Q    What is Compass Lexicon?

6   A    Compass Lexicon is an economic consulting firm that

7   specializes in finance and competition issues, and so we

8   provide expert testimony and other analysis for law firms,

9   corporations, and the government.

10  Q    What's your title at Compass Lexicon?

11  A    I'm an executive vice president.

12  Q    How long have you been an executive vice president?

13  A    I believe I was promoted to that level in April 2013.

14  Q    As an executive vice president, what do your job duties

15  include?

16  A    I serve my clients and do economic studies and provide

17  expert testimony.  I supervise expert testimony that will be

18  given by others, and write reports, draft reports.  And I

19  share responsibility for managing the Boston office.

20  Q    How long have you been employed by Compass Lexicon?

21  A    I started working for a predecessor to Compass Lexicon in

22  1990, while I was still in graduate school.

23  Q    Where did you go to college?

24  A    I went to the University of California Davis.

25  Q    What degree did you receive from them?

Peterson - Direct

1   A   I received a bachelor's degree in economics.

2   Q   What other degrees do you hold?

3   A   In 1992, I received a Ph.D. in economics from Harvard

4   University.

5   Q   Do you teach?

6   A   I teach when I have the time, yes.

7   Q   Where have you taught?

8   A   Well, I taught in graduate school, obviously; and over

9   the last six or seven years, I've taught at Northeastern

10  University in Boston.

11  Q   What have you taught at Northeastern?

12  A   I've taught Principles of Economics, but I more generally

13  would teach a class called Government and Business, which

14  covers antitrust, economic regulation, the political economy

15  of regulation, which is sort of the theory of where

16  regulations come from economically, and other aspects of

17  government policy.

18      I also created a course with a colleague called Image

19  Economics and Policy, which we've taught together there a few

20  times.

21  Q   Within economics, what's your field of expertise?

22  A   I'm a microeconomist.

23  Q   What is microeconomics?

24  A   Well, in general, microeconomics is the study of the

25  incentives that people face and how they respond to them.

Peterson - Direct

1    And I guess that would cover people and firms.

2    Q    What speciality do you have within microeconomics?

3    A    Well, my work at Compass Lexicon involves using data,

4    typically large amounts of data, to understand markets and

5    the incentives that firms face.

6    Q    Do you work with large datasets as part of that work?

7    A    Frequently we do, yes.  For example, I'm currently

8    working with data for an airline matter.  One client -- one

9    party has 200 million tickets and 500 million individual

10   flight coupons, and so we're working on that data.  Other

11   datasets have, you know, more or less.

12   Q    As part of your work at Compass Lexicon, do you routinely

13   make economic inferences based on those large datasets?

14   A    Yes.  We try to characterize markets and apply economic

15   principles to what we see to make economic inferences.  We

16   also test economic inferences and, you know, validate them

17   with the data.

18   Q    Have you published in your field?

19   A    I have.

20   Q    What --

21        MS. O'SHEA:  I'm sorry, I didn't mean to cut you

22   off.  We're happy to stipulate that he's an expert in the

23   field of economics, with a subspecialty in microeconomics, if

24   that will facilitate matters.

25        THE COURT:  All right.

Peterson - Direct

1    MR. ABEL:  For purposes of the record, Your Honor,

2    I'll just show Dr. Peterson.

3    BY MR. ABEL:

4    Q    Do you recognize that document?

5    A    That's my curriculum vitae, yes.

6    MR. ABEL:  For the Court's reference, that's at tab

7    14A within the binder.

8    THE COURT:  All right.

9    BY MR. ABEL:

10   Q    Dr. Peterson, what were you asked to address today?

11   A    I was asked to address two primary questions, and the

12   first is whether the loss of a driver's license for failure

13   to pay court fines would have a negative impact on an

14   individual's ability to obtain work and maintain employment.

15   And I was also asked to address the question of whether

16   suspending licenses for failure to pay would

17   disproportionately affect poor people rather than more

18   affluent people.

19   Q    In answering that first question, what research did you

20   do to prepare to answer it?

21   A    Well, the first thing I wanted to do was determine the

22   importance of being a legal driver for employment, and so I

23   think we have some data from the Department of

24   Transportation --

25   Q    Sure.

Peterson - Direct

1   A   -- that shows that.

2   Q   Based on your review and that research, did you create a

3   series of demonstratives for the Court?

4   A   Yes, I did.  My staff created them under my direction.

5         MR. ABEL:  And, Your Honor, these demonstratives,

6   for the record, begin at tab 14B within the binder.

7   BY MR. ABEL:

8   Q   Dr. Peterson, is this the first of those demonstratives?

9   A   It is.

10  Q   And what does this demonstrative show?

11  A   This shows the different categories of work, you know,

12  the type of jobs that require driving.  And for our purposes

13  here, in general, all jobs are reported to require, on

14  average, 30 -- it shows that, of all jobs, 30 percent require

15  some type of driving.

16        MR. ABEL:  Your Honor, if I can approach the

17  witness, just because it seems like we might be having some

18  zoom issues, just so I can hand him up a copy of the

19  demonstrative so he can view it in full?

20        THE COURT:  All right.

21        THE WITNESS:  Thank you.

22  BY MR. ABEL:

23  Q   Dr. Peterson, did you and your team create a second

24  demonstrative for the Court?

25  A   Yes, we did.

Peterson - Direct

1  Q    Is this that demonstrative?

2  A    It is.

3  Q    What does this demonstrative show?

4  A    Well, this just shows that most people use private

5  vehicles in order to commute to work nationally and in

6  Virginia.  The red bars represent Virginia.

7       So over 75 percent drive to work alone, and not quite

8  10 percent carpool.  And, notably, relatively small numbers

9  of people use public transportation or walk or use other

10 transportation.

11 Q    So in answering that first question, how did this

12 information help you answer that?

13 A    Well, what it shows is that the usual experience of

14 people is that a car is useful for getting to work.  And we

15 heard today what is economic common sense, I suppose; that if

16 a job is distant from a bus line or something like that,

17 there will be jobs that people cannot readily reach.

18      And so here we see a car is important for a lot of people

19 to reach jobs; and the more jobs you can reach, the better

20 your employment opportunities are.  And so this gives support

21 for that economic conclusion.

22      MR. ABEL:  Your Honor, for the record, I'll state

23 that a study from which this demonstrative comes is attached

24 as Exhibit 12 to the memorandum in support of the motion for

25 preliminary injunction?

Peterson - Direct

1          THE COURT:  All right.

2    BY MR. ABEL:

3    Q    Dr. Peterson, in addition to the data and the figures

4    we've discussed already, did you review any studies to answer

5    that first question?

6    A    I reviewed a number of studies.  And we have a third

7    demonstrative, I think, where I extracted a quote from a

8    study by the National Center for State Courts.

9    Q    Is this that demonstrative?

10   A    It is.

11   Q    What does this demonstrative show?

12   A    Well, this study would support the previous two

13   conclusions: that jobs require driving and that driving makes

14   more jobs accessible for people.

15        But it also reached this additional conclusion, and it

16   basically points out -- the last phrase here is that, "Some

17   employers view having a valid driver's license as an

18   indicator of reliability."

19        So a valid driver's license is, in a sense, a screen for

20   employability with at least some employers, and so not having

21   a valid driver's license could hurt the opportunity to obtain

22   a job, even if you can reach it.

23          MR. ABEL:  Your Honor, for the record, I'll state

24   that the Center for State Courts study is attached in full to

25   the memorandum in support of the motion for the preliminary

Peterson - Direct

1  injunction at Exhibit 17.

2       THE COURT:  Thank you.

3  BY MR. ABEL:

4  Q   Dr. Peterson, in addition to this study, did you review

5  any other studies?

6  A   There is one other study that I found interesting and

7  supportive of what we have already talked about, and that is

8  a study from the Voorhees Center for Transportation at

9  Rutgers University that was done in conjunction with the New

10 Jersey Department of Transportation.

11 Q   What did that study show?

12 A   Well, that study used a number of different methodologies

13 to address the issue of what happens when you suspend

14 licenses for failure to pay.  And one thing that they did was

15 just ask people who had their licenses suspended, and what

16 they found was that between 40 and 45 percent of people with

17 suspended licenses reported losing their jobs.  And

18 approximately 45 percent, as I recall, of the people who lost

19 their jobs reported having some difficulty in finding another

20 job or reported not being able to find another job.

21     And finally, they report that, even for the people who

22 found another job, 88 percent experienced a reduction in

23 income.

24     So that shows that, you know, the immediate effect for a

25 large number of people was a reduction in income.  The

Peterson - Direct

1    immediate effect of losing a driver's license is a reduction

2    of income.  And, of course, you know, for others, if they

3    have a change in circumstance or something, then their

4    flexibility to change jobs is affected as well.

5         MR. ABEL:  Your Honor --

6         THE WITNESS:  I should say successfully change jobs.

7         MR. ABEL:  Your Honor, for the record, I'll state

8    that the Voorhees study is attached in full in the memorandum

9    in support of the motion for preliminary injunction as

10   Exhibit 18.

11        THE COURT:  Thank you.

12   BY MR. ABEL:

13   Q   Dr. Peterson, you heard Ms. Johnson testify here today;

14   is that correct?

15   A   That's right.

16   Q   Before you testified here today, were you able to speak

17   to any of the other named plaintiffs in this case?

18   A   I was.

19   Q   Do you remember which named plaintiffs you spoke with?

20   A   Let's see.  Ms. Abrams.  Is that --

21   Q   Adams.

22   A   Adams.  I'm sorry.  And Brianna --

23   Q   Does Morgan sound right?

24   A   Morgan.

25   Q   Based on -- were you able to talk to Ms. Johnson before

Peterson - Direct

1    her testimony here today?

2    A    I was.

3    Q    Based on Ms. Johnson's testimony here today, as well as

4    the conversations you had with other named plaintiffs before

5    your testimony here today, what did those conversations and

6    that testimony do to help you to answer that question, the

7    first question you were asked?

8    A    Well, we heard directly from Ms. Johnson that she lost a

9    job because of an inability to reach work.  So that's

10   consistent with what we're finding in the studies here and

11   the evidence showing the importance of driving as related to

12   employability and reaching work.

13      We also heard that she would like to get jobs that

14   require driving, and even has an opportunity to raise her

15   income if she could drive and take receipts to the bank as a

16   manager.

17      So her experiences are very consistent with what we're

18   hearing here.  And other people basically reported continuing

19   to drive because they had to support their families, and so

20   driving was an important aspect of their being able to

21   maintain employment and support their families.

22   Q    Dr. Peterson, based on your review of the data, the

23   information that you've shown the Court so far in the

24   demonstratives, and in listening to the testimony of

25   Ms. Johnson, as well as the conversations you had with the

Peterson - Direct

1    other named plaintiffs before today, were you able to form an

2    opinion as to the first question you were asked to answer

3    here today?

4    A    I was.

5    Q    And were you able to form that opinion within a

6    reasonable degree of certainty in your field of expertise?

7    A    Yes.

8    Q    And what is that opinion?

9    A    My opinion is that the loss of a driver's license for

10   failure to pay court fines adversely affects people's ability

11   to gain employment and maintain employment, and that the loss

12   of a driver's license can readily lead to a reduction in

13   income from the loss of employment or from having to take a

14   less desirable job.

15   Q    Dr. Peterson, I want to turn to that second question you

16   were asked to answer here today.

17        In addressing that second question, did you seek out any

18   information?

19   A    I did.

20   Q    What information did you seek out?

21   A    Well, first I wanted to understand the scale of the

22   problem, and so I sought out information on the number of

23   people with suspended driver's licenses in the state of

24   Virginia and, in particular, the number of people with

25   suspended driver's licenses for failure to pay court fines

113

Peterson - Direct

1   and costs.

2   Q    Were you able to find that information?

3   A    I was.

4   Q    Where were you able to find that information?

5   A    It was contained in an e-mail that I understand to be

6   part of this case.

7   Q    Does this look like that e-mail?

8   A    It does.

9   Q    What does this e-mail show?

10  A    Well, what's important to me is what's blown up and

11  highlighted, and that's that there are basically 978,000

12  people in Virginia with suspended licenses, and 647,000 or

13  648,000 of those are suspended only as a result not paying

14  fines and costs.

15  Q    Did you review any other information in seeking to answer

16  the second question?

17  A    I did.

18  Q    What information is that?

19  A    I was able to obtain information showing the results of

20  court cases in Virginia over the period 2010 through 2017.

21  Q    Can you describe that dataset in more detail to the

22  Court?

23  A    Sure.  As I understand it, the state of Virginia posts

24  the results of its hearings and court cases and citations on

25  the internet, with people's names and some identifying

Peterson - Direct

1  information, and this is present on different systems across

2  the Commonwealth.

3      A computer scientist named Ben Schoenfeld wrote software

4  to basically scrape all of that information off of all of the

5  different websites and pull it together into a common

6  database.

7      And what's notable about this is it has identifying

8  information, so we can match records.  And it shows what the

9  charge was.  It shows hearing dates.  It shows the results of

10  the hearing, what fines were assessed, whether they've been

11  paid, what the payment date is, jail days that have been

12  sentenced and suspended, and so forth.

13      So we have, basically, a row of information for each

14  charge.

15  Q   And how many individual pieces of data are included in

16  Mr. Schoenfeld's dataset?

17  A   For the years I looked at, there were approximately

18  14 million records.

19  Q   Have you spoken to Mr. Schoenfeld about this data?

20  A   I have.

21  Q   Did you and your team create a series of demonstratives

22  for the Court based on your review of that data?

23  A   I have.

24  Q   Is this the first of those demonstratives?

25  A   It is.

Peterson - Direct

1    Q    What does this demonstrative show?

2    A    This is a subset of the data for Adrainne Johnson.  So

3    this shows, you know, the charge, as written in the data.

4    There's a free-form field that describes the charge.  There's

5    a code section, offense date, file date, and the costs and

6    the fines that were imposed.  There would also be jail time

7    and other information in each record.

8    Q    Did you prepare another demonstrative for the court based

9    on your review of Mr. Schoenfeld's data?

10   A    Yes.  I was interested in understanding, given that there

11   are, call it 650,000 or so people who are suspended with --

12   with a suspended license for failure to pay, how often are

13   they entering the system and being charged with driving with

14   a license suspended?

15       And so I was able to calculate, basically just count,

16   those cases in Mr. Schoenfeld's dataset, or in our version of

17   it.

18       And what I should say is these are DWLS cases related to

19   the failure to pay.  We can observe license suspensions in

20   the data as well.  And so for offense dates that would fall

21   inside of a license suspension, we didn't count those.

22   Q    Is this that demonstrative?

23   A    It is.

24   Q    What does this demonstrative show?

25   A    It shows the prevalence of these DWLS cases for failure

Peterson - Direct

1    to pay fines and costs.  And between 2015 and 2017, there

2    have been roughly 50 to 54,000 DWLS cases per year, affecting

3    40 to 44,000 individuals a year.

4    Q    In addition to DWLS cases, were you able to see other

5    offenses appear in Mr. Schoenfeld's data?

6    A    Yes.

7    Q    Being able to see other offenses other than DWLS, what

8    did that allow you do?

9    A    Well, it allowed us to make a comparison of payment rates

10   for DWLS.  And we chose speeding as what we thought would be

11   sort of an equal-opportunity offense that would be committed

12   by, you know, affluent and less affluent people together.

13          MR. ABEL:  Your Honor, I'll just mention that the

14   demonstrative shown before, there was a change in the order,

15   so I just wanted to call that out.

16   BY MR. ABEL:

17   Q    Based on that comparison that you and your team did,

18   Dr. Peterson, did you create another demonstrative for the

19   Court?

20   A    Yes.

21   Q    Is that this demonstrative?

22   A    It is.

23   Q    What does this demonstrative show?

24   A    This demonstrative shows the share of DWLS fines that

25   were paid within 60 days and the share of speeding fines that

Peterson - Direct

1    were paid within 60 days.  So we see a dramatic difference,

2    where over 85 percent of speeding fines are paid off in 60

3    days, but over these years, only a little over 8 to

4    10 percent of DWLS charges or fines were paid in 60 days.

5    Q    What did that disparity tell you?

6    A    Well, this is exactly the results you would expect if the

7    people who are suspended for failure to pay also have trouble

8    paying the fine related to a DWLS charge.

9        I mean, I suppose this isn't surprising, because if their

10   license was suspended for a failure to pay previous fines,

11   you know, it's not surprising that this fine wouldn't be paid

12   as well, at a high rate.

13   Q    Did you create another demonstrative for the Court based

14   on your review of Mr. Schoenfeld's data?

15   A    I did.

16   Q    Is this that demonstrative?

17   A    It is.

18   Q    What does this demonstrative show?

19   A    This demonstrative answers another question that I had

20   with regard to answering the second question about the focus

21   of suspensions on -- the effect of suspensions on poor

22   people.

23       And so I wanted to understand if, you know, people are

24   treading water and paying off fines while they're getting

25   DWLS offenses, as we're sampling some of these people with

Peterson - Direct

1   suspended licenses, or if they're going deeper into debt.

2       So the way we did that was we looked in 2016, and we

3   chose 2016 because it was late in the database and -- but

4   likely to have complete data.  And that gave us a history, a

5   potential history, for each individual back through 2010,

6   which is the first year that we downloaded.  And we looked in

7   2016 for people who, in 2016, were having their first DWLS

8   offense, and we found that they had $709 of unpaid court fees

9   and fines and debt at the time of their DWLS.

10      For people having their second DWLS in 2016, their

11  outstanding debt was $982.

12      And for the third DWLS, for people with the third in

13  2016, they had accumulated nearly $1,400 worth of debt.

14      And then for people with four or more in 2016, we see

15  over $2,000 worth of debt, nearly $2,200 worth of debt.

16      My conclusion from this is that there are people here

17  who, you know, are continuing to drive and are falling

18  further behind.  They're not able -- you know, they are not

19  paying off their debts to the court.

20  Q   Did you create another demonstrative for the Court based

21  on your review of Mr. Schoenfeld's data?

22  A   I did.  I wanted to understand, you know, what the

23  incentives were to pay off this debt, particularly for this

24  group of people who were driving.  And I understand that,

25  with a third DWLS offense, there's a mandatory jail sentence.

Peterson - Direct

1    And so I -- I was able to look at DWLS cases that resulted in

2    jail time, and we find there are about 9,600 to 11,500 of

3    those in 2017 to 2015 where people were getting 23 to 26 days

4    of jail.  And I show the total jail days here.

5        And I should just note, we don't observe jail time

6    served.  What we observe in this dataset is sentenced jail

7    time and less -- we subtracted out suspended jail time.  So

8    that's what's shown here.

9    Q    Dr. Peterson, based on everything we've discussed here

10   today, including the studies and data contained in the

11   demonstratives you've shown the Court, were you able to form

12   an opinion as to question number two you were asked?

13   A    I was.

14   Q    Were you able to form that opinion within a reasonable

15   degree of certainty in your field of expertise?

16   A    Yes.

17   Q    What is that opinion?

18   A    That opinion -- well, I think it's important to recognize

19   how all this data fits together in reaching that opinion.

20       So going back to the beginning, what we observed is that

21   the loss of a driver's license hurts people's income, and so

22   you would expect that people would pay, you know, their

23   traffic fines and things like that rather than suffer the

24   income from the loss of a license.

25       And, of course, for those who continue to drive, we see

Peterson - Direct

1   that they are at risk of being cited for driving with a

2   suspended license.  And that's a path that people really

3   shouldn't want to go down, because it ultimately ends up with

4   jail time.

5       And upon going to jail in Virginia and being released, I

6   understand that people's fines are not extinguished.  So

7   there is no benefit to going to jail.  So we don't even have

8   to assess whether there are people who are going to jail as a

9   way to extinguish court debt.

10      So what we have to conclude is that suspending licenses

11  for failure to pay is affecting poor people, because the

12  economic incentives are to pay the debt, if you can.  And, of

13  course, that's consistent with the incentives that are built

14  into the sanction of not paying debt.

15      Suspending a driver's license is supposed to be a strong

16  incentive to pay that debt; and for the people who don't

17  respond to that incentive, the economic conclusion is that

18  they're going to have difficulty paying that debt or

19  sustaining a payment plan, or something like that.

20  Q   Dr. Peterson, I want to draw your attention first back to

21  demonstrative 8, the data contained there, and then to

22  demonstrative 9, jail time.

23      Looking at those two numbers together, what is that able

24  to tell you?

25  A   Well, for me, you know, people going to jail are going to

Peterson - Direct

1   jail for relatively small amounts of money, you know, if

2   $1,300 is a small amount of money.

3       Now, if you're making $1,399 a month, $1,370 is not a

4   small amount of money.  But for, you know, people working in

5   an office or something like that, executive assistants or

6   whatever, I think that that is an amount of money that you

7   would not expect someone to go to jail over.

8   Q   Dr. Peterson, you heard Ms. Johnson testify here today?

9   A   I did.

10  Q   You heard her say that after her second violation, or

11  being pulled over the second time for driving with a license

12  suspended, she didn't drive anymore because she didn't want

13  to go to jail.

14      Do you remember that?

15  A   I do.

16  Q   How did that factor into your analysis of the second

17  question?

18  A   Well, it warmed my economist's heart, because it shows

19  that she was responding to incentives.  As the potential

20  sanction for driving without a license changed, her behavior

21  changed.  So she was behaving in a perfectly rational way.

22      Based on my conversation with her, her primary goal is to

23  take care of her family, and she can't do that if she goes to

24  jail.  And so driving without a license for a while was one

25  way to take care of her family and accept some risks, and

Peterson - Cross

1   when the risks grew, she changed her behavior.

2        And so that supports the economic inferences that we

3   would draw from that data, or from this data.  That is an

4   example of why the economic inferences we're drawing are

5   correct.

6           MR. ABEL:  Your Honor, no further questions at this

7   time.

8                 CROSS-EXAMINATION

9   BY MS. O'SHEA:

10  Q   I just have a couple of follow-up questions about your

11  underlying data, Dr. Peterson.  Is it Peterson?

12  A   Yes.

13  Q   So referring to your demonstrative number 2, where you

14  report people across the United States versus people in

15  Virginia who choose to drive alone in order to go to work,

16  and the data here, it says 77.4 percent of people in the

17  United States versus -- I can't tell which number is which --

18  versus 76.4 choose to drive alone in a car to work?

19  A   Virginia is in red.

20  Q   Oh.  My copy is in black and white.

21  A   Oh.  I'm sorry.

22  Q   So hence the difficulty.

23  A   The left-hand bars are Virginia, then.

24  Q   Thank you.

25        So my question is:  Do you know, the study that these

Peterson - Cross

1    numbers were pulled for, were the people asked if they had to

2    drive alone to go to work versus they chose to drive alone to

3    go to work?  Was that information included?

4    A    I don't know.  And I assume that they're choosing,

5    because, obviously, if you want to round up a carpool, you're

6    able to do that.  So as an economist, that question isn't

7    really very important to me.

8        This is how -- people want the flexibility.  This is

9    evidence that people, when they are able to, want the

10   flexibility of driving to work alone, for schedule and

11   getting to the specific location that they need to go.

12   Q    Certainly.  I choose to drive to work alone.  But I could

13   get a carpool out of my neighborhood if I wanted to.  I'd

14   still like not to.

15       But so how, if at all, does the difference between people

16   who choose to drive to work alone versus people who have to

17   drive to work alone, how does that plug into your ultimate

18   conclusion that not having a driver's license makes it so

19   that those people have problems getting to work?

20   A    Well, certainly when we see more than three-quarters of

21   people driving to work alone, it suggests that people may

22   have trouble getting a carpool.

23       I mean, we heard from Ms. Johnson -- or, actually, we

24   spoke to her, and she has different start times at work, I

25   believe.  So it can depend on which store she works at.  So I

Peterson - Cross

1  think a car -- you know, she would have to find someone with

2  matching -- a matching schedule.  And matching is always

3  difficult.  We know that in economics, right?  So carpools

4  are often difficult, would be difficult to assemble, because

5  they require a confluence of timing and location for work in

6  order to not be extremely inconvenient.  So I don't see this

7  as an important consideration.

8      We see what people are choosing to do, and also, we also

9  see that it largely -- you may not have to drive, but, you

10  know, private transportation is very important for people

11  commuting to work.

12  Q   So is this -- back to the report that pulled these

13  figures on the manner in which people choose to go to work,

14  did it break down at all different localities within the

15  Commonwealth of Virginia, or did it just lump together

16  everyone from Virginia?

17  A   The data we have is for Virginia as a whole.

18  Q   And would you agree that, then, these numbers might vary

19  depending on from location to location; urban center versus a

20  rural center, for example?

21  A   I would expect there to be some variations, yes.

22  Q   Or if you live in a city like Charlottesville that has a

23  bus line, versus you live in a different city that doesn't

24  have a bus line, that might be different, too, right?

25  A   Well, if there's no bus line, then I expect the public

Peterson - Cross

1  transportation bars would go down.

2  Q   Right.  So going to my point, then, it's going to vary

3  from locality to locality within the Commonwealth of

4  Virginia, right?

5  A   Well, these particular results will vary, but the overall

6  principle, the economic principle that this speaks to, is

7  that more -- when people are trying to do the best they can,

8  having a wider range of opportunities allows them to do

9  better.  And so not having a driver's license limits their

10 range of ability, their opportunity to get to particular

11 places and to perform certain jobs.  And so that's the

12 overarching conclusion here.

13 Q   Fair enough.

14 A   And so some of those details -- someone might be lucky

15 and find a good job in walking distance to work, but that

16 isn't, you know, the regular experience.

17 Q   Depending on location?  I mean, if you live in a place

18 like Alexandria, where there's a ton of things within walking

19 distance, it might be easier, right?

20 A   I guess that might be easier.  And the relevance would

21 depend on the cost of living in downtown Alexandria, I

22 suppose.

23 Q   Certainly.

24     I'm going to ask you now about the dataset that you

25 reviewed from the -- I think you said through the Virginia

Peterson - Cross

1    courts?

2    A    Yes.  It was data that was compiled by Ben Schoenfeld.

3    Q    All right.  And so it references in the graphics that you

4    put together convictions for driving while on a suspended

5    license, correct?

6    A    Correct.

7    Q    Are you aware that, in Virginia, driver's licenses can be

8    suspended for lots of different reasons?

9    A    Yes.

10   Q    Right.  It's not just failure to pay fines and costs; it

11   can be for failing to pay child support; it can be because

12   you have a felony traffic offense, something along those

13   lines?  Right?

14   A    Right.

15   Q    And are you aware that people in Virginia can have their

16   driver's licenses suspended -- have multiple suspensions in

17   effect at the same time?

18   A    That's right.

19   Q    So you can be suspended for three or four different

20   reasons all over the same period, right?

21   A    Correct.

22   Q    Now, you said that you were looking at information from

23   the website or the dataset that you were given on convictions

24   for driving while on a suspended license, while your license

25   is suspended.

Peterson - Cross

1    Now, are you also aware that the code section in Virginia

2  law for driving on a suspended license doesn't differentiate

3  between the reasons that you are suspended?

4  A    My data analysis assumes that.

5  Q    So I guess my question is how -- when you're reporting

6  your data, you're making -- you're reporting, like, this

7  number of people who are convicted for driving while on a

8  suspended license.  How are you able to make the leap that

9  the people who were convicted of driving on a suspended

10 license were suspended solely for failure pay fines and

11 costs, when the crime that you're charged with doesn't

12 differentiate between the reason that you're charged?  Does

13 that make sense?

14 A    Yes.  I thought I explained this on direct, but the

15 dataset also shows license suspension times.  And so I can

16 see a DWI where an individual is suspended for 365 days, for

17 example, and so from the hearing date that we see, if we see

18 a suspension, a DWLS offense in the year following that

19 hearing date, we don't count it here.

20     So if we see evidence of a suspension in the data, we can

21 determine the time when that suspension should be in effect.

22 And we did not count DWLS charges that took -- that occurred

23 when another suspension was in effect.

24 Q    Okay.  So you lifted out all of the driving while

25 suspended convictions that you were able to determine

128

Peterson - Cross

1  corresponded to something other than a suspension for failure
2  to pay fines and costs?
3  A   That's right.  So the suspensions -- the DWLS offenses
4  that we are observing here are those that occurred when there
5  is no evidence of a suspension for a driving-related reason;
6  where that is part of your sentence, if you will.
7  Q   Understood.
8      I don't think it was available to you, but I'm asking
9  just to make sure.  Things like the average income of the
10  individuals whose driver's licenses were suspended for
11  failure to pay fines and costs, that's not data that's
12  available to you, correct?
13  A   No, we do not have data that would allow us to identify
14  those specific individuals or anything like that.  And we
15  don't -- there's no income information.  It's purely data
16  related to the court proceeding; the fields I described,
17  generally.
18          MS. O'SHEA:  All right.  Thank you.  I don't have
19  any other questions.
20          THE WITNESS:  Thank you.
21          MR. ABEL:  Just a second, Your Honor.
22          That's all we have, Your Honor.
23          THE COURT:  Thank you, sir.  You may step down.
24          MR. BLANK:  Your Honor, I've got three more -- four
25  more pieces of evidence.  Three are going to be very short.

Peterson - Cross

1    One is going to be about ten minutes, but I just need to ask

2    him one question.

3           I was checking.  He has a flight to catch.  I didn't

4    want him to miss his flight.

5           Your Honor, the next piece of evidence that we would

6    put in are two declarations -- excuse me, two affidavits.

7    One of them is behind tab 15, which is the affidavit of

8    Robert Fuentes.  His résumé is attached, as is one of his

9    studies.

10          The second affidavit is of Jon Carnegie, with his

11   résumé; the AAMVA Best Practices Guide to Reducing Suspended

12   Licenses; and an AAMVA video, which I will play in a second.

13          Just to summarize for Your Honor, but you can read

14   the affidavits, Mr. Fuentes puts in his affidavit that:

15   Virginia has limited public transportation.  87 percent of

16   Virginians travel to work by car.  Lack of public

17   transportation and license cuts off job opportunities for

18   low-income individuals.  And Virginia Code Section 46.2-395

19   deprives workers of economic opportunities.  That's a general

20   synopsis of it.

21          For Mr. Carnegie, his affidavit testifies that

22   suspending driver's licenses for failure to pay court debt

23   potentially undermines traffic safety; in the local

24   communities, employers experience negative consequences from

25   the license suspension because those who have licenses have

Peterson - Cross

1    more stable employment.

2          Your Honor, we have attached as a video to our -- we

3    cited to it, and with your indulgence -- I know we've run

4    over.  It is about ten minutes.  I'd like to play it for Your

5    Honor so that you can see it so you don't have to go back and

6    look at it, and then we will wrap up shortly with our case in

7    chief on the preliminary injunction.

8          Mr. Abel, if you will play it.

9          This is the video from AAMVA that Mr. Carnegie

10   authenticates.

11         (Video played)

12         MR. BLANK:  Thank you, Your Honor, for indulging us

13   in the video.

14         Two more pieces of evidence.  One is behind tab 17,

15   and this is the -- from the AAMVA website, and it's the Board

16   of Directors.  And our defendant, Mr. Holcomb, is a Board

17   Director of AAMVA.  Just to legitimize, if needed to, AAMVA's

18   legitimacy, our defendant is on the Board of Directors of

19   AAMVA.  That's behind tab 17.

20         And behind tab 18, while a different issue, is a

21   letter that's been issued by the Attorney General to Senator

22   Obenshain dealing with the issue of bail bonds.  And while it

23   is a different issue, the issue dealing with whether or not

24   low-income defendants and those with money could raise equal

25   protection questions, that is addressed in his letter.  So

Peterson - Cross

1    the Attorney General himself, both in this letter and then we

2    cited to an interview that he gave in the last three weeks,

3    where he does expressly address that, tying these issues to

4    low-income defendants, those with money could raise equal

5    protection concerns.

6           Your Honor, with that, that is the plaintiffs' case

7    on our preliminary injunction.  We at this time ask for the

8    notebook to be admitted as Exhibit 1.  And if I can approach

9    the clerk, I'll hand the supplemental Adrainne Johnson

10   demonstrative as Exhibit 2.

11          THE COURT:  All right.

12          MR. BLANK:  I think, Your Honor -- I have the

13   notebook, an additional notebook to hand to the clerk.  What

14   is missing, and I can ask the Commonwealth, is behind tab 16

15   there is a thumb drive in cellophane, and I would like to

16   have the thumb drive back.

17          THE COURT:  There is a thumb drive in the back of

18   the one I have.

19          MR. BLANK:  That's correct, Your Honor.  I didn't

20   know if the Court -- we were going to give one to the clerk

21   and one for you to have.  So yours has a thumb drive in it as

22   well.

23          THE COURT:  Okay.

24          (Plaintiff's Exhibits 1 and 2 admitted)

25          MR. BLANK:  Let me -- Your Honor, we will pass the

Ford - Direct

1   baton to the Commonwealth.

2           THE COURT:  All right.

3           MS. O'SHEA:  Thank you, Your Honor.  The defendant

4   calls Millicent Ford, please.

5           THE COURT:  Okay.

6       MILLICENT FORD, CALLED BY THE DEFENDANT, SWORN

7                   DIRECT EXAMINATION

8   BY MS. O'SHEA:

9   Q   Good afternoon, Ms. Ford.

10  A   Good afternoon.

11  Q   Would you please introduce yourself to the Court?

12  A   Your Honor, I'm Millicent Ford.  I'm the Assistant

13  Commissioner for Driver, Vehicle, and Data Management

14  Services at DMV.

15  Q   What are your responsibilities as the Assistant

16  Commissioner?

17  A   I am responsible for executive level oversight, guidance,

18  and direction to the driver services, vehicle services, and

19  data management services administrations at DMV, including

20  major initiatives and efforts related to process

21  improvements, policies and procedures related to those areas,

22  driver licensing, vehicle titling and registration,

23  suspensions, conviction processing.

24      I'm also responsible for the implementation of special

25  projects, legislation -- any process improvements, really --

Ford - Direct

1  as well as delivering presentations to judges, Commonwealth's

2  attorneys, and serving as liaison with our various

3  stakeholders related to those areas.

4  Q   How long have you had your current position?

5  A   I've been in my current position for approximately two

6  years.

7  Q   And how long have you been with the Department of Motor

8  Vehicles?

9  A   I've been with the Department of Motor Vehicles since May

10  of 1991.

11  Q   During the course of your employment at the Department of

12  Motor Vehicles, have you had any sort of relationship with

13  the Office of the Executive Secretary, the OES?

14  A   Yes, I have.

15  Q   Would you describe that for the Court, please?

16  A   My primary responsibility was serving and has been

17  serving as a liaison with the Supreme Court Office of the

18  Executive Secretary, working primarily with the Court

19  Services Managers that -- related to the interface that

20  exists between the courts, OES, and DMV.

21  Q   So you are the liaison between DMV and OES?

22  A   Yes.

23  Q   Now, you brought up the computer systems, so I will ask

24  you about those now.

25       How long has the current system been in place, if you

Ford - Direct

1   know?

2   A    The current system has been in place since -- for about

3   three years, but there have been gradual improvements in that

4   process.

5   Q    Okay.  Currently under the DMV system -- the computer

6   system, as opposed to receiving papers -- under the computer

7   system, how do you receive notification that an individual in

8   a jurisdiction has not paid court-ordered fines and costs?

9   A    We receive that information electronically, except for

10  two courts that exist that transmit paper court orders to us.

11  But we receive that information electronically from the

12  courts, through OES, to DMV.

13  Q    So when you say you receive it electronically from OES --

14  A    Yes.

15  Q    -- what is the system called where it's sent from OES to

16  DMV?

17  A    It's referred to as the Court Automated Information

18  System, and it's basically a system-to-system, a

19  server-to-server process that exists.

20  Q    Now, do you know whether there is a different system or

21  some other way that the courts get their information to OES,

22  the individual trial courts?

23  A    Based on my work with OES over the years, the court

24  clerks enter the information into their system.  OES has

25  worked, along with DMV, to program and -- program the

Ford - Direct

1  transmission of the data so that certain information

2  ultimately gets to DMV from the courts through OES so that we

3  can populate a driver's record.  And that might be conviction

4  information, suspension information, including suspensions

5  for failure to pay fines and costs.

6  Q    Now, do you know whether the -- were you in the courtroom

7  when Ms. Dugger was testifying earlier?

8  A    Yes.

9  Q    And she referenced the CCMS system, or the Court Case

10  Management System?

11  A    Yes.

12  Q    Is that a system that you are familiar with?

13  A    I've heard of the system, the system referred to as the

14  Case Management System, yes, over the years.

15  Q    Okay.  Do you know whether the CCMS system is different

16  than the Court Automated Information System that you were

17  referring to, CAIS?

18  A    I think it's -- I believe the Case Management System that

19  she referred to feeds into the Court Automated Information

20  System, again moving data from the courts through OES to DMV.

21  Q    And when that data is transferred from CCMS, the Court

22  Case Management System, to CAIS, the Court Automated

23  Information System, is that something that -- you know, is

24  DMV a middleman in that at all?

25  A    No.  We simply wait to receive information from the

136

Ford - Direct

1  courts through that system.

2  Q    So you only get your information through the Court

3  Automated Information System, or CAIS?

4  A    Yes.

5  Q    From the Office of the Executive Secretary?

6  A    Yes.

7  Q    Now, would you explain to the Court how it is you know

8  that there has been a suspension issue for nonpayment of

9  fines and costs?

10 A    There is an electronic -- the process that exists in Case

11 includes an electronic notification regarding court

12 indicators; first, that the person has -- that the Court is

13 ordering a suspension for failure to pay fines and costs;

14 that they were either in person at the time of that

15 notification of that suspension, or that the court has mailed

16 that notification to them via the DC225, that process; or

17 that no notice was given at all.

18     But once that indicator regarding that fines and costs

19 order comes to us, it comes to us along with an effective

20 date.  So the fines and costs indicator, along with the --

21 along with the suspension effective date, is what DMV uses

22 and receives as an order from the Court for us to implement

23 and record that on the customer's record.

24 Q    So, then, when you run the DMV transcript or the driver

25 history transcript, the suspension for failure to pay fines

Ford - Direct

1  and costs will show up?

2  A   Yes.

3  Q   If you didn't receive this information from the courts

4  electronically, does DMV have the discretion to go in and

5  enter a fines and costs suspension anyways?

6  A   No.

7  Q   Do you ever get in an order from the courts and say, hey,

8  maybe this shouldn't be a fines and costs suspension, and

9  kick it back?

10  A   No.

11  Q   Do you ever receive any information about how much money

12  somebody owes in fines and costs?

13  A   We get that information.  I don't believe it's a

14  mandatory field, but we -- but we never -- that's not a field

15  that we use.  It's just a part of the information that we

16  receive related to the conviction, and it comes in as a part

17  of the conviction record.  But that's not anything that DMV

18  acts upon or takes any action.

19  Q   So some courts might send it in and other courts might

20  not?

21  A   Right.

22  Q   Okay.  Now, with respect to -- are there different types

23  of suspensions that are entered by DMV administratively as

24  opposed to through this Court Automated Information System?

25  A   Yes.

138

Ford - Direct

1   Q    Okay.  What are those types of suspensions?

2   A    There are suspensions for non-motor-vehicle-related drug

3   violations.  There are suspensions for DUIs.  There are

4   suspensions for driving while suspended, when you're

5   suspended for a DUI-related offense.

6        Those are just examples of times when DMV is required to

7   take administrative action based upon receipt of the

8   conviction.

9   Q    So even if the Court hadn't included a suspension in its

10  order, DMV will administratively suspend it based on those

11  specific statutes?

12  A    Yes.

13  Q    But, again, the difference here is, if the court doesn't

14  send you the information about nonpayment of fines and costs,

15  DMV has no discretion to go in and suspend anyone?

16  A    That's correct.

17  Q    Okay.  And once you receive this fines and costs

18  indicator and the effective date from the court, it then gets

19  updated on the driving transcript, correct?

20  A    That's correct.

21  Q    And who is that transcript made available to?

22  A    Transcripts are made available to law enforcement,

23  courts, attorneys; insurance companies have the ability to

24  get transcripts; and individuals, for personal use.

25  Q    Now, we talked about the computer systems and how

Ford - Direct

1   information gets funneled through OES electronically and then

2   is brought to DMV.

3       Now, you mentioned that there are two jurisdictions that

4   don't use the computer system, right?

5   A    Yes.

6   Q    It's Alexandria and Fairfax?

7   A    Yes.

8   Q    How do you receive information regarding nonpayment of

9   fines and costs from those jurisdictions?

10  A    Those courts send us paper documents directly.  They

11  send -- they mail their paper documents directly to DMV.

12  Q    I've handed you a sample form that's labeled at the top

13  "Abstract of Conviction."

14      Is this an example of the type of form that you might

15  receive from those two -- the court systems that don't

16  transmit information electronically?

17  A    Yes, it is.

18  Q    Okay.  So you receive these in the mail?

19  A    Yes.

20  Q    And what do you do with them when you receive them?

21  A    We update the record, update the record to reflect what's

22  noted on the document.

23  Q    Now, if you look in the lower right-hand corner of that

24  form, there is a specific field regarding fines and costs; is

25  that correct?

Ford - Direct

1  A    Yes.

2  Q    And what is the purpose of that little box down there?

3  A    The purpose of that box is to -- is to indicate whether

4  the Court has ordered a suspension for failure to pay court

5  fines and costs, and when they want DMV to make that

6  suspension effective.

7  Q    If that box isn't filled out from those courts that are

8  sending you in these paper documents, would DMV suspend a

9  driver's license or update a transcript to show a suspension?

10  A    No.

11  Q    From DMV's perspective, is a suspension for nonpayment of

12  fines and costs done by the court at the time of the

13  conviction, or is it done administratively by the Department

14  of Motor Vehicles?

15  A    It's done by the courts, not administratively by DMV.

16         MS. O'SHEA:  I don't have any other questions.

17  Thank you.

18         THE COURT:  Who adds the $145 reinstatement fee?

19         THE WITNESS:  I'm sorry, Judge?

20         THE COURT:  The reinstatement fee of $145, does the

21  court have anything to do with it?

22         THE WITNESS:  That is -- by statute, it requires DMV

23  to impose $145 reinstatement fee whenever a person is

24  suspended for nonpayment of fines and costs.  And there's a

25  few other suspensions that relate to that.  But that's

141

Ford - Direct

1    specifically directed by statute.

2            THE COURT:  All right.  Okay.  Another question.

3            THE WITNESS:  Yes.

4            THE COURT:  What does it cost to get your initial

5    driver's license?  The fee, what fee do you pay when you go

6    in and --

7            THE WITNESS:  I believe now -- it went up recently,

8    but I believe it's $32; $8 per year.

9            THE COURT:  Does it cost any more to process the

10   initial driver's license than it does to reinstate?

11           THE WITNESS:  Umm.

12           THE COURT:  Or any less?

13           THE WITNESS:  For reinstatement it's -- it's -- when

14   you're reinstating your driving privilege, there's a process

15   of all the compliance transactions that we have to handle in

16   addition to the -- if the person, if they're testing, if

17   there's testing involved, that has to be completed as well.

18   It's a little longer process --

19           THE COURT:  Okay.

20           THE WITNESS:  -- depending upon how long they've

21   been suspended.

22           THE COURT:  All right.  Okay.

23           MR. BLANK:  The Commonwealth would like to ask

24   another question based on what you said.  I don't mind you

25   going --

Ford - Direct

1          THE COURT:  All right.  Go ahead.

2   BY MS. O'SHEA:

3   Q    Do you know what happens to that DMV reinstatement fee?

4   A    Yes.  By statute the -- yes.

5   Q    What happens to it?

6   A    The statute specifically directs DMV to retain $45 of

7   that, and $100 of that goes to the Trauma Center Fund.

8          THE COURT:  To the what fund?

9          THE WITNESS:  Trauma Center Fund.

10  BY MS. O'SHEA:

11  Q    Do you know what the Trauma Center Fund is?

12         MR. BLANK:  Judge, I have to object.  I don't know

13  what relevance that could possibly have.

14         THE COURT:  Well, I mean, it doesn't have -- it's

15  another way of the state collecting revenue --

16         MS. O'SHEA:  Right.

17         THE COURT:  -- to pay other costs that the

18  Commonwealth incurs.

19         THE WITNESS:  I'm not positive of that.

20         THE COURT:  It's sort of like the lottery that goes

21  to the education fund.  It has nothing to do -- I mean, you

22  don't have anything to do with it, I know.

23         THE WITNESS:  No.

24         THE COURT:  But the $100 is just earmarked by the

25  legislature, I'm sure, to pay --

143

Ford - Cross

1       MS. O'SHEA:  Correct.  The point of the question was

2  just that only the $45 stays at DMV, and that's commensurate

3  with the --

4       THE COURT:  I understand.

5       MS. O'SHEA:  -- amount for the initial license.

6       THE COURT:  The driver has to pay it; doesn't make

7  any difference what it's for.

8       All right.  I'm sorry.  Go ahead.

9       MS. O'SHEA:  Thank you.  No, that was the only

10  question I had.  Thank you.

11       THE COURT:  Okay.  Go ahead.

12       MR. BLANK:  Thank you, Your Honor.

13                     CROSS-EXAMINATION

14  BY MR. BLANK:

15  Q   Ms. Ford, thank you for your time.  You're not -- you've

16  never been employed by a district court, have you?

17  A   I have not.

18  Q   You've never been employed by a circuit court?

19  A   I have not.

20  Q   You've never been behind a desk dealing with the computer

21  screens that Ms. Moats testified about?

22  A   I have not.

23  Q   And you haven't been in a circuit court dealing with the

24  screens that Ms. Dugger was testifying about?

25  A   I have not.

Ford - Cross

1   Q    In fact, you've not gone and looked at any of the court

2   records for any of these plaintiffs, correct?

3   A    The court records?

4   Q    Yes.

5   A    No, I have not.

6   Q    And you haven't looked at any court records for anybody

7   that's driving while suspended, or had their license

8   suspended for failure to court debts and fines, have you?

9   A    No, I don't have access to that.

10  Q    You don't have access to the court records, correct?  You

11  don't have access to the court records; is that what you

12  said?

13  A    Just as it relates to the information that's been

14  transmitted by the court.

15  Q    You don't -- you're not -- you have no idea whether or

16  not there's a court order that suspends the license in the

17  court record, do you?

18  A    Only based upon the information; but no.

19  Q    You haven't seen it?

20  A    No.

21  Q    You haven't seen it?

22  A    I haven't seen it.

23  Q    And, in fact, in your affidavit, you said you assume that

24  it's there.

25       You're just making an assumption of what's in that court

Ford - Cross

1  record, correct?

2  A    Based upon what the court has submitted to us.

3  Q    But you haven't gone and looked at the record?

4  A    No.

5  Q    And Ms. Dugger said there's no order in the court file.

6  You have nothing to refute that, do you?

7  A    No.

8  Q    And Ms. Moats said there's no court order.  You have

9  nothing to refute that?

10  A    No, just based upon what the Court said.

11  Q    You're not saying that the DMV doesn't have anything to

12  do with the license suspension, are you?

13  A    I'm saying that, by statute, certain suspensions are

14  ordered by the Court and certain suspensions are ordered by

15  DMV; and fines and costs isn't one.

16  Q    That's not my question.

17  A    Oh.

18  Q    Let's refine it.  For court suspensions -- excuse me, for

19  license suspensions for failure to pay court debts and

20  fines -- let's focus on that, because that's what this case

21  is about.

22  A    Okay.

23  Q    You're not saying that DMV has anything to do with

24  license suspensions, are you?

25  A    The ordering of a suspension, yes, that's what I'm

146

Ford - Cross

1  saying.

2  Q   No, no, I'm not talking -- you're parsing words.

3  A   Okay.

4  Q   I'm talking about any part of it.  DMV has got something

5  to do with license suspensions, correct?

6  A   Correct.

7  Q   And they have something to do with license suspensions

8  for failure to court debts and fines; something?

9  A   Reinstating them, yes.

10  Q   Even the actual computer system that you talked about has

11  something to do with the actual suspension.  Not

12  reinstatement; I'm talking about suspension.  Those computer

13  systems are talking to each other.

14      Your system and the court system and the OES system,

15  they're interfaced, correct?

16  A   There's an interface, yes.

17  Q   So if DMV wasn't there, it couldn't happen, could it?

18  There couldn't be a suspension, could there, for failure to

19  pay court debts and costs?

20  A   We act on what the court sends us, yes.

21  Q   But you have to be there for it to be suspended, correct?

22  A   We put it on the record, yes, sir.

23  Q   If DMV didn't exist, would a license be suspended for

24  failure to pay court debts and fines?

25  A   We would not do it based upon -- I --

147

Ford - Redirect

1   Q    If DMV didn't exist --

2   A    Uh-huh.

3   Q    -- could you suspend a license for failure to pay court

4   debts and fines?

5   A    No.  The record would not show it.

6         MR. BLANK:  No further questions, Your Honor.

7         THE WITNESS:  Wow.

8         THE COURT:  All right.  Thank you.

9                    REDIRECT EXAMINATION

10  BY MS. O'SHEA:

11  Q    Would you agree that there's a difference between the

12  record reflecting a suspension and the entity that issues the

13  suspension in the first instance?

14  A    Yes, there is.

15  Q    So when the court issues a suspension, is it effective

16  from the moment that the court issues it, regardless of

17  whether or not it's ultimately updated on somebody's

18  transcript?

19  A    Yes.

20        MR. BLANK:  Objection to the question, Judge,

21  because it definitely calls for a legal conclusion.  She's

22  not in the court system to make --

23        THE COURT:  Well, that's covered by the statute.  I

24  mean, the law makes it effective as stated, right?

25        MS. O'SHEA:  Correct.

Ford - Redirect

1          MR. BLANK:  Your Honor, we disagree with that

2    interpretation, which we can deal with.

3          THE COURT:  Okay.

4          MR. BLANK:  And I think the testimony --

5          THE COURT:  It's a legal question.

6          MR. BLANK:  I think the testimony so far is that it

7    doesn't happen until 41 days, and it's after the failure to

8    pay.

9          THE COURT:  Right.

10          MR. BLANK:  So I think she testified that it's day

11   one, and I don't think that's what the evidence shows.

12          THE COURT:  Okay.

13   BY MS. O'SHEA:

14   Q   So if there's been a court-ordered suspension, let's say,

15   in a different context -- somebody is convicted of a DUI

16   third and the Court suspends their license for 90 days, all

17   right, and it's an actual court conviction, or the judge

18   signs an order that says, I am suspending your license --

19       Right?

20   A   Yes.

21   Q   -- does DMV have to receive a copy of that order before

22   the suspension is real, or is it real from the moment that

23   the judge signs his name on the bottom line?

24          MR. BLANK:  Objection.  Again, I'm not sure she can

25   testify to that, but --

Ford - Redirect

1       THE COURT:  Well, I think when the judge suspends it

2  and the person is there, it's effective right then.  Isn't

3  that the point you're making?

4       MS. O'SHEA:  It is, Judge.  So if Your Honor is

5  satisfied with that, then I won't --

6       THE COURT:  Yeah, there's no question about that.

7       MS. O'SHEA:  I won't walk down that path any

8  further, then.

9  BY MS. O'SHEA:

10 Q   So you were asked, as well, if you had been in court or

11 in the court clerk's offices.

12     In your role as liaison to OES and your job as Assistant

13 Commissioner, though, do you interact at all with the court

14 clerks?

15 A   In past years in roles prior to this, I attended clerk's

16 conferences, circuit court conferences, as well as general

17 district court conferences.

18 Q   Were you involved in any training at all with the court

19 clerks?

20 A   Yes, when they had regional conferences, regional

21 meetings, which involved presentations from DMV, as well as

22 the all-state conferences.

23 Q   Did any of those presentations or trainings revolve

24 around this information communication from the clerk's

25 offices to DMV through the computer system?

Ford - Redirect

1   A   Yes, because we wanted the clerks to understand how the

2   process works so that when there were questions about what

3   DMV received and why a customer may be in front of us saying,

4   you know, the Court suspended, we would -- they would

5   understand how the process worked and how we knew what we had

6   on the record was correct or incorrect.

7           MS. O'SHEA:  Okay.  Thank you.

8           And, Your Honor, at this time I'd also like to move

9   to admit the blank sample document that I handed up to the

10  witness earlier, and that would be Defense Exhibit 2.

11          MR. BLANK:  No objection.

12          THE COURT:  Okay.  It will be admitted.

13          (Defendant's Exhibit 2 admitted)

14          MS. O'SHEA:  Thank you.  I don't have any other

15  questions.

16          THE COURT:  Thank you.  You may step down.

17          MS. O'SHEA:  No further evidence or witnesses from

18  the defense, sir.  Just argument.

19          THE COURT:  Okay.  Would y'all like to argue just

20  for a few minutes?

21          MR. BLANK:  Judge, I know it's a little abnormal,

22  but I have a specific presentation that I would like to make,

23  and then Ms. Ciolfi would like to address some specific

24  issues that were brought up today in terms of payment plans,

25  statute interpretation, and redressability.  So we'd like to

1    split up the argument briefly.

2            THE COURT:  All right.

3            MR. BLANK:  And I won't take too long in opening,

4    Your Honor.

5            Judge, why are we here today?  That's always a

6    question that I know you ask yourself and ask me.  And I'll

7    start basically with our order that we're asking.

8            We're asking for a preliminary injunction.  We're

9    asking for an order that during the pendency of this

10   action -- because we're not at motion to dismiss; we're not

11   at ultimate issue; we're at pendency of action right now --

12   that the Commissioner is enjoined from enforcing 46.2-395 of

13   the Virginia Code against the plaintiffs, and the putative

14   class, unless and until defendant or another entity

15   determines through a hearing, with adequate notice thereof,

16   that the failure to pay was willful, not excusable because of

17   inability to pay.  We think that you should stop this

18   practice of just automatically suspending without asking

19   people:  Can you pay?

20           The Commissioner also should remove the current

21   suspension of the five plaintiffs, because you have the

22   evidence in their declaration to show that they've got

23   irreparable and immediate harm and that their constitutional

24   rights have been deprived.  So we would ask to remove the

25   suspension for them.

1          And then we ask that the Commissioner's enjoined

2    from charging the fee to reinstate them.

3          That's the three things we're asking.  But why?  Why

4    are we asking that?

5          It's not often that I get to come here and argue

6    constitutional law.  I spent a lot of time preparing for it.

7    But to answer the question of why we're here:  We're here

8    because the Constitution of the United States of America

9    guarantees that the Commonwealth of Virginia may not deprive

10   any person of life, they may not deprive them of liberty or

11   property, without due process of law.  We learned it in

12   elementary school up through high school and college.  We're

13   here.  It is real.  It is real because of Ms. Johnson and it

14   is real because of the other people that are in this

15   Commonwealth that are suffering.

16         We're here because the United States Supreme Court

17   in *Bearden* tells you, and tells us, you cannot punish a

18   person because they lack the resources to pay a debt, like

19   Ms. Johnson told you.

20         We're here because the United States Supreme Court

21   in *Bell*, the Fourth Circuit in *Scott* and *Plummer*, told us

22   that a driver's license is a property -- protected property

23   right that can't be taken away without procedural due

24   process.  It can't be taken away without a form of a

25   pre-deprivation hearing, with notice and opportunity to be

153

1   heard.

2        And the evidence in this case is uncontradicted that

3   that doesn't happen.  That doesn't happen before the default.

4        When Ms. Ciolfi said T1, that's not what we're

5   talking about.  We're talking about T2.  T2, Time 2, when

6   that default happens, nobody gets any notice.  Ms. Johnson

7   testified to it.  No Court asks you: Can you pay?  Can you

8   not pay?  That is just what is just diametrically wrong and

9   diabolically wrong with this system.

10       We're here because the Supreme Court, in *Griffin* and

11  *Williams* and *Tate* and *Meyer* and *Bearden*, this history of

12  court cases, they made it clear you can't treat people who

13  are unable to pay differently from people who are able to

14  pay.

15       We're here because this is the modern-day debtors'

16  prison.  We've got close to a million people, or 700,000

17  prisoners, who are facing captivity in our system that

18  requires a driver's license.  You heard Mr. Peterson, you

19  heard -- excuse me, Dr. Peterson, you heard Dr. Pearce, that,

20  again, our system requires this driver's license to have

21  specific jobs, to get to jobs, to take your kids, to go see

22  them in a sporting event.  It is there as a protected

23  property right.  And we've got hundreds -- we've got

24  thousands of people that, through this system, end up in

25  jail; hundreds of thousands of days of jail time.

1          We're here because Justice Gregory told the

2    Commonwealth in oral argument -- you can go back and you can

3    listen to it -- the Commissioner is doing it.  He's carrying

4    out the will of the state.  It's a question of whether or not

5    it's constitutional in terms of economic justice.

6          Almost nearly a million Virginians, many of whom

7    because of their poverty can't drive, poverty alone.  And

8    there's no differentiation between someone who is

9    recalcitrant, refusal to pay, versus the inability to pay,

10   because our system doesn't ask that question.

11         We're here because the Tennessee federal judge, less

12   than a month ago, and earlier in June, took the exact same

13   arguments that I expect you're going to hear from the

14   Commonwealth -- and you saw it in their briefs -- and she

15   rejected every single one of them.  It's on appeal to the

16   Sixth Circuit, granted, but she rejected them because they

17   are constitutional principles that do not support the

18   argument to defend this system based on the *Rooker-Feldman* or

19   the abstention doctrine or immunity.  There's constitutional

20   violations going on.

21         A separate Michigan judge, separate from the

22   Tennessee judge, looked at those statutes that are similar to

23   ours and entered injunctions stopping the state from

24   continuing the practice.

25         We're here because our named plaintiffs, Ms. Johnson

1    included, and 700 of our fellow citizens, are being harmed

2    immediately and irreparably by 46.2-395 in an

3    unconstitutional and an un-American way.  We're here to ask

4    you to stop that practice.  Stop the practice to allow people

5    who are unable to pay to have the license to take care of

6    their kids.  Let them drive to a job.  Let them go to a

7    medical appointment.  Let them take their kids to a medical

8    appointment.  Let them have the opportunity to lift

9    themselves up so that they can pay the fine, so that Virginia

10    can get the money.

11        We're here to ask you to take the action based on

12    your statement.  With all due respect, Judge, you put it in

13    your opinion in the last pages.  You said on your statement

14    on Virginia Code 46.2-395, "Automatic suspension of a

15    driver's license for nonpayment of court fees and fines,

16    regardless of inability to pay, may very well violate

17    plaintiffs' rights to due process and equal protection."

18        That goes to the very first prong, the elements for

19    the motion for a protective order -- for preliminary

20    injunction.  Excuse me.  Are we likely to prevail on

21    plaintiffs' claims?  We don't have to prove all of them.  We

22    don't have to prove them today.  We have to show that we're

23    likely to be successful on the merits.

24        And you even said it yourself.  Taking aside the

25    jurisdictional question that, according to you and according

1  to the Tennessee judge, according to Justice Gregory,

2  according to Michigan, we are likely to prevail on the legal

3  side, the legal discussion on these constitutional

4  deprivations, on the fact that there's a fundamental

5  fairness, a due process, that's been violated; that there's a

6  procedural due process leg to the deprivation claim,

7  substantive due process of taking away a property right,

8  equal protection of treating people different because they're

9  unable to pay versus unwilling to pay; equal protection

10  because it treats debtors in the Commonwealth differently

11  from those with civil debts.

12          We are likely to succeed, I think, on all of it, but

13  we are certainly likely to succeed on one of them; and that's

14  the criteria that we're here today on.

15          Look at the physical evidence that we brought before

16  you, the physical evidence.  Again, Ms. Johnson testified in

17  terms of wanting to be able to do this; the inability to pay,

18  what it does to her; the likelihood that she should be able

19  to succeed on the merits because she was not given the

20  opportunity at the default time, not later, not earlier, but

21  at the time of default, to be asked -- and Ms. Ciolfi asked

22  her:  Were you asked could you pay?  How could you pay?

23  Could you do community service?  Those things, nobody asked

24  her, because it doesn't exist in our system.  It doesn't

25  exist at that time, the time before default.

1          You heard Dr. Peterson testify, $1,200 to get out of

2     jail, no rational person would not pay that money unless they

3     were unable to pay.  That's the uncontroverted evidence from

4     a Harvard Ph.D. economist that came here from Arlington,

5     Massachusetts, outside of Boston.  That's his testimony.

6          You heard Dr. Pearce that, again, basic needs, the

7     inability to pay for basic needs, if you put one more dollar

8     on the payment plan, that person is going to not -- these

9     people can't even afford their basic needs, but you're going

10    to add to it.

11         Again, the inability to pay is fundamental to these

12    constitutional rights.  If you're just going to set up that

13    system that automatically does it, it's just not there.

14         You heard irreparable harm.  You heard it from

15    Ms. Johnson.  You heard it from Dr. Pearce.  You heard it

16    from Dr. Peterson.  Those caught up in this vicious cycle,

17    they continue to suffer immediate and irreparable harm.

18         And I don't know how the Commonwealth can come up

19    and say that those people aren't being harmed on a daily

20    basis, in a society that we should not do that.  We should be

21    giving people an opportunity to lift themselves up.  We

22    shouldn't be forcing them down.

23         That may sound like a political speech, but that's a

24    constitutional fundamental fairness if it's based on

25    inability to pay versus ability to pay.

1          We're not saying get rid of the system for people

2     that can pay.  If somebody -- if you have this injunction

3     that's in place, it's not getting rid of any of the things

4     that the state has the ability to do.  Let them ask the

5     person:  Can you pay?  Test it.  Can you pay?  Because I'm

6     going to pay if I have the money.  I'm not going -- as

7     Dr. Peterson says, I'm not going to put myself in jeopardy of

8     going to jail.  I'm not going to put myself in jeopardy of

9     going to court.

10          If you have that pre-deprivation hearing, the

11    constitutional rights will be acknowledged.  The equities are

12    clearly in favor.  The Commissioner has no hardship enforced

13    upon him by following this constitutional standard.  If you

14    are following the Constitution, again, by asking this

15    question, are people unable to pay versus able to pay, again,

16    that is not a hardship on a Commissioner when close to a

17    million Virginians or, again, if it's the 700,000, have been

18    stripped of their right because they're too poor.

19          The Attorney General, who they work for, said in his

20    interview we cannot have a justice system that determines

21    fairness and freedom based on wealth and means.

22          That is the system we have with an automatic

23    suspension of licenses.

24          And, again, Judge Moon, you said yourself in that

25    opinion, it may very well violate plaintiffs' constitutional

1    rights to due process and equal protection.

2          You should stop it today.  Stop it today, until we

3    find out the ultimate issue in this case of the violation of

4    the plaintiffs' constitutional rights to due process and

5    equal protection.

6          We put on all of this evidence.  It's overwhelmingly

7    in our favor to enter this injunction now so that it doesn't

8    continue to happen to more Virginians, to put them in this

9    vicious cycle that could ultimately end up in jail time.  But

10   even if it doesn't, it's keeping them from having a protected

11   property right, keeping them from satisfying the basic needs

12   that they need to to support their families and to be a

13   productive part of this society.

14         We ask you today to stop it today, and then we can

15   go on, we can have whatever hearings we want, we can come in

16   and we can deal with the constitutional issues, but this

17   should stop today.

18         I pass it to Ms. Ciolfi and she can answer the three

19   specific questions that came up with regard to the payment

20   plan, redressability, and interpretation.

21         Thank you, Your Honor.

22         MS. CIOLFI:  Your Honor, I really appreciate the

23   time that the Court has given us to put on our case today,

24   and I just want to address a few matters that came up during

25   the testimony.

1          You heard a lot about payment plans today.  And as

2     an initial matter, it is important to stress that the

3     plaintiffs are not challenging the availability of payment

4     plans, the availability of community service and debt

5     forgiveness.

6          The availability, or lack thereof, of these

7     alternatives does nothing to change the fact that when a

8     payment is due and not received, the nonpayment is assumed by

9     the Commonwealth to be willful for the purpose of license

10    suspension.

11         And so putting aside the questions, serious

12    questions, about whether plaintiffs -- or whether defendants

13    in criminal traffic cases receive adequate notice of the

14    availability of these alternatives, their hypothetical

15    availability of payment plans or community service is no

16    substitute for a pre-deprivation hearing or a determination

17    of willfulness, which is required before the state can take

18    action to punish nonpayment.

19         And, in fact, Ms. O'Shea's questioning of Dr. Pearce

20    about an individualized determination of ability to pay only

21    demonstrates the need for that kind of inquiry before the

22    state takes action to penalize a person for nonpayment.

23         In rejecting a similar defense from the Tennessee

24    Commissioner Judge Trauger in the Middle District of

25    Tennessee says, "What the plaintiffs seek is not merely the

1    opportunity to throw themselves upon the mercy of the Court

2    in a proceeding in which indigence may be one factor of many

3    for the Court to consider or disregard; they seek the right

4    to a pre-deprivation hearing in which they are allowed to

5    demonstrate their eligibility for an exception based on

6    indigence."

7         I also want to address the references to debt

8    forgiveness, which came up during Ms. Johnson's testimony and

9    also has been in the Commonwealth's briefs.  Those references

10   to Virginia Code 19.2-358(C) are misleading.  The forgiveness

11   of court debt is available only upon the issuance of a show

12   cause by a Court or a prosecutor for failure to pay which may

13   result in the defendant's confinement or the imposition of an

14   additional fine.

15        So it's simply not the case that one of our

16   plaintiffs could walk into court and ask for debt

17   forgiveness.  And it's only in the event of a successful

18   defense to the show cause does the Court even have the option

19   of considering debt forgiveness.  And the show cause statute

20   doesn't address license suspension at all.

21        There have been amendments to the code regarding

22   payment plans, but those ultimately have nothing to do with

23   the plaintiffs' challenge to the automatic suspension

24   statute.  They didn't amend the suspension statute.  And the

25   lack of a meaningful alternative can be inferred from the

1    fact that the Commissioner continued to suspend licenses each

2    month for failure to pay court costs and fines from February

3    2017, when first the Supreme Court ruled, and then later that

4    year, in July, the statute which made those amendments to

5    payment plans.  The Commissioner continued to suspend

6    licenses, tens of thousands of licenses each month, for

7    failure to pay.  And as of December 2017, ten months after

8    the rule went into effect, there were still nearly a million

9    licenses suspended.

10        I suspect the Commissioner is going to rely heavily

11   on the wording of the statute where it says "The Court shall

12   forthwith suspend" and cleave to the Court's previous holding

13   that every conviction involving the assessment of court debt

14   immediately triggers a court-ordered suspension of the

15   defendant's license that is a legal reality without

16   involvement by the Commissioner.

17        But this interpretation simply fails to make sense

18   of the text of that statute.  It renders the statute

19   inconsistent with related statutes, which clearly gives

20   30 days to pay in order to avoid license suspension, and

21   conflicts with the interpretation of that statute, the

22   authoritative interpretation of that statute, by two distinct

23   Courts of Appeals, Virginia Courts of Appeals, in *Plummer* and

24   *Carew*.

25        And, in fact, under the statute as interpreted by

163

 1    the Virginia courts and as alleged in the amended complaint,

 2    payment is due 30 days after sentencing, not immediately upon

 3    assessment.  The suspension of the driver's license is

 4    triggered by the failure to pay within 30 days, not at the

 5    moment of conviction.  And the suspension is not effective

 6    until it is implemented by the DMV and the debtor receives

 7    notice of that implementation.

 8         It's just not plausible that everyone who is

 9    convicted of an offense is walking around with a latent

10    license suspension hanging over their heads.  That's not, in

11    fact, what the Commonwealth said in 2017 when we were back

12    here arguing the motion to dismiss, and it's not what two

13    different Virginia Courts of Appeals have held.

14         And on what the Commonwealth said, quoting from the

15    transcript of the motion to dismiss hearing at page 15, Ms.

16    O'Shea, in response to the Court's questioning, said, "I'm

17    talking about at the time of your criminal conviction and the

18    Court says, 'You owe us $500.  Pay us $500.  You have 30 days

19    to pay under the statute.'  There is no suspension at all

20    until the 30 days has lapsed and you haven't paid, and that's

21    when the suspension goes into effect."

22         Your Honor, *Plummer* and later in -- as recently as

23    2013, in *Carew*, the Virginia Court of Appeals has made it

24    clear that it is the DMV, not the sentencing court, that

25    suspends the driver's license, and that the suspension is not

164

1    self-executing but occurs after the DMV executes the

2    suspension.

3        That makes it different from the colloquy that Your

4    Honor had with Ms. O'Shea earlier about licenses that are

5    suspended for driving reasons, where the person has actually

6    been tried and convicted of a driving offense and is standing

7    right there in the court when the Court orders the

8    suspension.

9        And then, finally, to address some of the standing

10   issues, the plaintiffs, of course, contend that it's the DMV

11   that actually suspended their licenses, but even if one

12   relies on the statutory language to conclude it's the courts,

13   the plaintiffs' injuries are nevertheless directly traceable

14   to the Commissioner's conduct in implementing those

15   suspensions, which cannot be accomplished legally, according

16   to the Court of Appeals in *Plummer* and *Carew*, without action

17   by the DMV, regardless of any upstream activity by the

18   courts.

19       And in a case, an opinion issued just a couple of

20   weeks after this Court rendered its decision in the motion to

21   dismiss in 2017, in *Lamar versus Ebert*, the Fourth Circuit

22   made it absolutely clear that in challenging a statute's

23   constitutionality, the fact that the defendant, quote, "is

24   but one of several persons or entities in charge of

25   implementing it is not controlling," unquote, so long as

165

 1   there's a causal connection.  That's *Lamar versus Ebert*,

 2   which is cited in our briefs.  It's 2017 WestLaw 1040450, at

 3   page 5.

 4          The amended complaint at paragraphs 62 to 84

 5   describe the Commissioner's role in enforcing the statute,

 6   that's corroborated by Ms. Ford here today, including the

 7   Commissioner's overall responsibility for the issuance and

 8   suspension of driver's licenses, the Commissioner's specific

 9   role in working with OES to develop and implement an

10   automated system to enforce the statute, the Commissioner's

11   maintenance of an database of individual driver profiles that

12   are updated based on information received from the state, and

13   the fact that, as you'll see from Exhibit 3 of the amended

14   complaint, that the Commissioner issues automatic suspensions

15   without confirming the existence of a Court order and, in

16   many cases, when there is no evidence thereof.

17          The Commissioner further will not reinstate the

18   plaintiffs' licenses until they satisfy their court debt

19   entirely or obtain payment plans and then, should the

20   plaintiffs ever become eligible to reinstate, the

21   Commissioner would first have to be paid $145, at least,

22   possibly more if they have multiple orders.

23          Turning to redressability, and then I'll wrap up:

24   Redressability turns on whether an order from this Court

25   would provide meaningful relief to the plaintiffs.  And it

166

1    would.  If the plaintiffs are successful in proving that the

2    suspension process is constitutionally flawed, this Court

3    could declare Virginia Code 46.2-395 unconstitutional, which

4    would invalidate the suspensions flowing from it.

5         Moreover, the Court could order the Commissioner to

6    remove the unconstitutional suspensions from DMV's database

7    and enjoin the Commissioner from participating in future

8    enforcement of the statute.

9         It's, again, the DMV that makes these suspensions

10   meaningful because everyone, including law enforcement and

11   the courts -- I don't think there's any disagreement about

12   that -- relies solely on the information maintained by the

13   DMV to document license suspensions.

14        Once those suspensions are removed from the

15   database, the plaintiffs would not have to pay reinstatement

16   fees, they would not be arrested for driving on suspended

17   licenses, and they would be able to provide proof of a valid

18   license to employers.

19        In other words, removal of these invalid suspensions

20   from the database would free most of the plaintiffs from the

21   terrible dilemma they now face: driving illegally and risking

22   incarceration, or staying at home and failing to pay off

23   their court debt or meet the needs of their families.

24        Importantly, none of these changes would affect the

25   manner in which Virginia courts go about the business of

1   assessing and collecting fines and costs.  The Courts could

2   still enter judgments imposing fees and costs; court clerks

3   could continue to enter payment information into the system,

4   which would continue to flag accounts in default.

5          The Court could also issue orders to show cause for

6   failure to pay, make contempt findings, impose fines or jail

7   time, garnish wages, impose liens on personal property, and

8   obtain hold-backs from the tax department from federal and

9   state tax refunds.  All of the remedies currently available

10  to the courts to enforce judgments, assessing fees and costs,

11  would remain available to them.  The only thing that would

12  not happen is that the DMV would no longer issue a driver's

13  license suspension upon receiving notice of nonpayment.

14         And, finally, perhaps the best proof that the courts

15  need not be part of any relief is that the Commissioner is

16  currently working on a system where a debtor can walk into a

17  DMV customer service center and pay all of their court debt,

18  and DMV will reinstate their license without any court

19  involvement.  That is a system that is being worked on and

20  reported on by the Commissioner.  And you'll see that is

21  attached to our -- the letter from Commissioner Holcomb to

22  the General Assembly is attached to our amended complaint at

23  Exhibit 4.

24         And the point is, if the Commissioner's customer

25  service representatives can accept payment from the

168

1    plaintiffs and remove their suspensions that were issued

2    under the Virginia Code 46.2-395, and reinstate their

3    licenses upon payment of the $145 fee, all without any action

4    by the convicting courts, then certainly the Commissioner

5    could comply with an order from this Court to remove the

6    unconstitutional license suspensions.

7             Thank you.

8             THE COURT:  Okay.

9             MS. O'SHEA:  Good afternoon, Your Honor.

10            Mr. Blank stood up before the Court and he gave you

11   a litany of reasons why he believes that we are here in the

12   courtroom today.  I would submit to the Court that there is a

13   question on the part of the DMV Commissioner as to why we are

14   here in the courtroom today.

15            In the Court's detailed prior opinion, the Court let

16   the plaintiffs know, with no uncertainty, that they had sued

17   the wrong defendant.  The DMV Commissioner does not suspend

18   licenses for failure to pay fines and costs.  They are

19   seeking a remedy against a defendant who is not empowered to

20   grant the relief that they seek.  There are other forums.

21   There are policymaking forums and there are the courts.

22            THE COURT:  If the Commissioner did not make

23   available to the police the records, then that would go a

24   long ways toward --

25            MS. O'SHEA:  Well, not necessarily.  I still don't

169

1    think that that wouldn't erase the fact that the Court issued

2    the suspension in the first place.

3          The analogy I would make would be to, like, a VCIN,

4    or an NCIC report, the criminal records that are made

5    available by computer to a police officer.  VCIN, for

6    example, is run through the state police, the Virginia state

7    police.  And so a police officer pulls over somebody or

8    interacts with somebody, pulls up their VCIN, and sees what

9    their criminal record is.

10         This Court could order, perhaps, the Department of

11   the State Police to take a conviction off of that abstract so

12   it would no longer be available to the officer who was

13   looking to see what a person's prior convictions were.  For

14   example, maybe he's trying to see if they have prior petty

15   larceny convictions to make a petty larceny third.

16         Taking a conviction off the transcript doesn't make

17   the conviction go away.  It still exists.  It's still on the

18   Court order.  It may not be available to as many people.  The

19   record of it might not be disseminated as freely to the

20   public and other law enforcement agencies, but the conviction

21   still exists.

22         THE COURT:  Well, if the Court should rule that the

23   process is unconstitutional and say that the Commissioner

24   cannot do anything to enforce the law, I mean, the ruling

25   would affect the courts, too.

 1          MS. O'SHEA:  Well, Your Honor, I think that relies

 2     on the faulty supposition that the Commissioner enforces the

 3     order.  The Commissioner is the record-keeper for these

 4     suspensions; he puts it on the transcript, but he doesn't

 5     enforce them.  He updates the information and puts it on the

 6     database, certainly, but he's not the enforcing entity.  The

 7     courts are.  The court clerks are, not the Commissioner.

 8          The plaintiffs are asking this Court to judicially

 9     rewrite the statute, to give the Commissioner a role he does

10     not have and the General Assembly has not seen fit to give

11     him.

12          In this role specific to fines and costs,

13     suspensions, he is a record-keeper and not an actor.  They

14     need to bring their suit against an actor.

15          THE COURT:  What is the remedy of the debtor when

16     the license is suspended and he sends the -- he gets the

17     letter, I guess, from the court, some form comes from the

18     court, saying your license has been suspended because you did

19     not pay the fine and costs.  Okay?

20          MS. O'SHEA:  Yes.

21          THE COURT:  What is his remedy then?

22          MS. O'SHEA:  To go to the court that issued the

23     suspension and talk to the Court, go in and talk to the judge

24     in chambers, like you heard one of the witnesses talk about;

25     enter into a payment plan; apply for a restricted license; do

1   all of those things that are made available to you as a

2   judgment debtor under Virginia law.  But to go to the courts.

3           If you were to show up at DMV headquarters and say,

4   hey, the Court suspended my license for nonpayment of fines

5   and costs, there's nothing the DMV Commissioner can do for

6   you.

7           THE COURT:  But even if he paid the court costs, all

8   he gets is a right to go to DMV to pay another $145 to get

9   his license.

10          MS. O'SHEA:  To get his license completely restored,

11  yes, but not to undo the suspension.  The suspension is

12  undone upon the payment, and then it's marked as restored

13  once you pay the reinstatement fee.

14          THE COURT:  Right.  But he can still be convicted in

15  between the time he pays his court fees and the time that --

16  if he drives, in between the time he pays his court fees and

17  pays the $145.

18          MS. O'SHEA:  Not for driving on a suspended license.

19  It would be for driving without a license, which is

20  different.

21          So it's different, Your Honor.  The suspension is

22  undone once you pay that to the court.  You don't have an

23  effective license, but you also don't have a suspended

24  license, which implicates different principles.

25          THE COURT:  But if you're poor, maybe you can pay

172

1    the court all your money, but then you can't -- you don't

2    have the $145 to pay the Commissioner.

3          MS. O'SHEA:  But you're not suspended.

4          THE COURT:  But you're still hurt, because if you

5    pay the court all your money to get rid of the fines and

6    costs, you still owe the $145, and you might not be able to

7    pay it.

8          MS. O'SHEA:  You do owe the $145 to the Department

9    of Motor Vehicles to get an effective license.

10         THE COURT:  There's no forgiveness there.  I mean,

11   right?

12         MS. O'SHEA:  I don't believe so.  That's the statute

13   that was set up by the General Assembly.  The Commissioner

14   doesn't have any discretion there, either.

15         THE COURT:  Well, I know, because the state can't

16   just charge people money without some sort of process.

17         MS. O'SHEA:  Well, but the state can condition the

18   granting of a privilege upon the payment of money.  That's

19   what they do with going to get your driver's license in the

20   first place.  You don't get a driver's license for free.

21   There are other privileges that you don't get for free,

22   either.  The state can condition --

23         THE COURT:  But the DMV then is getting the

24   advantage of what the plaintiff says is an unconstitutional

25   process.

173

1          MS. O'SHEA:  What they say is an unconstitutional

2   process.

3          THE COURT:  Well, that will be determined.

4          MS. O'SHEA:  Right.

5          THE COURT:  But still, if it's an unconstitutional

6   process that the state has imposed on the courts, that

7   requires the courts to act in an unconstitutional way through

8   the statute, then they're getting a second crack at it by

9   requiring the Commissioner to collect $145 and send them $100

10  and the Commissioner takes -- keeps $45.  Or I guess it goes

11  in the general fund as a matter of accounting, but still, the

12  Commissioner is getting the -- the Commissioner is enforcing

13  the $145 extra charge.

14         MS. O'SHEA:  Right.  But the $145 is separate and

15  apart from the suspension.  It's not part and parcel.

16         THE COURT:  It wouldn't be there except for the

17  suspension having occurred.

18         MS. O'SHEA:  I'm not a hundred percent certain that

19  that's true.  Like, if I allow my driver's license to lapse

20  and I don't get it renewed, I don't know if there's --

21         THE COURT:  That's not this situation, though.  Your

22  license is suspended because you didn't pay the fines and

23  costs.

24         MS. O'SHEA:  Right.  What I'm saying is, I don't

25  know if this $145 is only for people who seek reinstatement

174

1    after suspension, or it's for anybody who seeks reinstatement

2    after a license stops being effective.

3            THE COURT:  Well, everybody -- you have to do

4    something to owe the $145.

5            MS. O'SHEA:  Correct.

6            THE COURT:  But here, taking the plaintiffs' case,

7    unconstitutionally the defendant, the debtor, is put in a

8    position where he owes the $145.

9            MS. O'SHEA:  If -- but --

10           THE COURT:  Or he loses a property right, which is

11   his driver's license, or is not able to have it restored to

12   him.

13           MS. O'SHEA:  Correct.  So the argument there, A, it

14   presupposes that there was an unconstitutional deprivation in

15   the first place, which the Commissioner contests; and B, I'm

16   not aware of any case law that says that the Commonwealth

17   can't --

18           THE COURT:  Well, if it's not unconstitutional,

19   there's no problem.

20           MS. O'SHEA:  There's no problem.

21           THE COURT:  So, I mean, just presuming for the --

22   assuming hypothetically that it's an unconstitutional

23   process, either the courts did it all in -- I don't want to

24   say "cahoots," but following the directions of the

25   legislature, still there's a separate -- the debtor still has

175

1   to pay this other $145, which comes about because of the

2   unconstitutional process in the court.

3           MS. O'SHEA:  Right, assuming that it's an

4   unconstitutional process in the court.

5           THE COURT:  Okay.

6           MS. O'SHEA:  Right.

7           THE COURT:  And Judge Gregory was quite impressed

8   with that fact, as I recall.

9           MS. O'SHEA:  Right, Judge Gregory and only Judge

10  Gregory.

11          THE COURT:  Well, you don't know.  The others said

12  they didn't -- they didn't say they disagreed with Judge

13  Gregory in that respect.

14          MS. O'SHEA:  They elected not to reach the issue.

15          THE COURT:  Right.

16          MS. O'SHEA:  But I wanted to address, though, Your

17  Honor, the two Court of Appeals cases that were brought up

18  from the Virginia Court of Appeals.

19          THE COURT:  Right.

20          MS. O'SHEA:  The *Plummer* case was from 1991.  And in

21  1991, the statutory suspension mechanism gave the

22  Commissioner the authority to suspend for fines and costs.

23          The statute was amended in 1994.  So the version of

24  the statute that was being construed by the Court of Appeals

25  in 1991 included the Commissioner as a suspending entity.

176

1          The General Assembly took that out in 1994.  And so

2     to the extent that *Plummer* at all stands for the rather

3     tenuous proposition that DMV is the suspending entity, the

4     General Assembly changed the statute.  So *Plummer* can no

5     longer be considered good authority for that particular

6     proposition.

7          The other Virginia Court of Appeals opinion that was

8     cited was *Carew v. Commonwealth* from 2013.  That case dealt

9     with an administrative DMV suspension, a suspension that is

10    done by DMV.  And the DMV will admit that they do.  So you

11    can't take *Carew* out of context and say, based on *Carew*, now

12    the Virginia Court of Appeals thinks that DMV does all

13    license suspensions.  That is too big of a stretch.

14         So, Your Honor, the Commissioner maintains, for all

15    of the arguments that we raised initially and that we've

16    raised now in this current iteration of the litigation, that

17    he is immune from suit, that he's not the right person to

18    have sued here.

19         And even setting aside that, *Rooker-Feldman* still

20    applies, from the Commissioner's perspective, because they're

21    still challenging an aspect of the initial Court order of

22    conviction, and rather than doing that through the state

23    courts, they've elected to bring it to the federal court

24    system.

25         I mean, one of these plaintiffs, according to his

1   allegations in the complaint, Mr. Stinnie, the lead named

2   plaintiff, was just convicted for driving on a suspended

3   license.  For a defense, rather than appealing that up

4   through the Virginia state court systems and raising his

5   arguments anew, he didn't.  He's here in federal court.

6           THE COURT:  Well, if you don't pay the fine, then

7   you go back to the Court and ask the Court to reduce, give

8   you a different payment plan, and you disagree with what the

9   Court did, what's the procedure for appealing that?

10          MS. O'SHEA:  For appealing the Court not changing

11  the fine?  Well, I think that you have to --

12          THE COURT:  For not giving you a payment plan that

13  you can get along with.

14          MS. O'SHEA:  I don't know that you can appeal the

15  payment plan, but what you can appeal is your criminal

16  sentence at the time it's given.

17          I mean, in Mr. Stinnie's case, a jury elected to

18  find him --

19          THE COURT:  Well, that seems to be the problem.  The

20  defendant may think he's able to pay at the time, he's

21  waiting for a payday loan on Saturday or he's going to -- you

22  know, expecting a bonus or a gift over the weekend, and then

23  that doesn't come through.

24          Can they -- you know, I guess you've got ten days.

25  You used to have ten days to appeal.  But anyway, after the

178

1     appeal time has gone by, something might intervene and he's
2     not able to pay.  I don't see that that -- doesn't seem he
3     has any appeal from that.
4          MS. O'SHEA:  He could, under Virginia state law
5     precedent, file a petition for modification.
6          THE COURT:  Right.
7          MS. O'SHEA:  And if the Court denied the petition
8     for modification, then there is a denial of a request that
9     would form the basis for a resulting appeal.
10          THE COURT:  Good luck on getting a lawyer that would
11     be cheaper than paying the fines and costs.
12          MS. O'SHEA:  It could be, but that doesn't mean that
13     remedy is not there.
14          THE COURT:  Right.
15          MS. O'SHEA:  If you've got a problem with the way
16     the courts are structuring the payment plans, you need to
17     raise that in the courts and give the Virginia state courts a
18     chance to fix that.
19          You heard testimony from the two court clerks today
20     that it's different across the Commonwealth.  Different court
21     clerks are going to offer different payment plans and they're
22     going to administer them in different manners.  And to the
23     extent that there's a problem with the way in which the
24     payment plans are offered and administered, that's an issue
25     that needs to be taken up with the courts and the court

179

1    clerks.

2          The Commissioner doesn't even know how much money

3    people owe in fines and costs.  He has no idea if a payment

4    plan has been offered or has been appropriately structured.

5    That's not --

6          THE COURT:  At this point, though, if the -- he

7    knows what the process is, and if the process is

8    unconstitutional on its face, then -- in particular, on its

9    face, then he would not -- he couldn't enforce an

10   unconstitutional process, or should not.

11         MS. O'SHEA:  Well, he's not enforcing it.

12         But to the broader question, the statute is not

13   unconstitutional on its face.  In order to make a facial

14   challenge to a statute, you have to show that the statute

15   cannot be constitutional under any application.

16         And all the plaintiffs said in a footnote in their

17   complaint that they were bringing a facial challenge to the

18   statute.  In argument today they seem to have conceded that

19   there are circumstances under which the statute can operate

20   constitutionally, meaning when someone who has the ability to

21   pay and deliberately fails to do so has their license

22   suspended.  They haven't raised any sort of plausible

23   argument that that scenario would violate the Constitution.

24         THE COURT:  Well, why wouldn't even that person be

25   entitled to notice and the right to be heard?

180

```
 1              MS. O'SHEA:  They get notice.  They have notice.

 2              In fact, Ms. Johnson testified today that she knew

 3      that if she didn't pay her fines and costs, her license was

 4      going to be suspended.  Notice is --

 5              THE COURT:  Well, what's the right to be heard,

 6      then?

 7              MS. O'SHEA:  The right to be heard exists at the

 8      time of your criminal sentence.  The right to be heard

 9      attaches --

10              THE COURT:  Well, that's before you have the

11      problem.

12              MS. O'SHEA:  "Before you have the problem" meaning

13      your inability to pay fines and costs?

14              THE COURT:  Right.

15              MS. O'SHEA:  There's an ability to be heard and a

16      mechanism that the Virginia General Assembly has set up in

17      the statutes that says that you can petition for

18      modification, that says that you can go to the Court after

19      the fact and say, hey, I can't afford this, I need a change.

20              The Virginia Supreme Court enacted in Rule 1:24, and

21      that the General Assembly codified just last year, that you

22      have the opportunity to be heard, and that opportunity is in

23      the courts.  The opportunity is not before the DMV

24      Commissioner, who has no ability or authority to convene a

25      pre-deprivation or post-deprivation ability-to-pay hearing
```

1    with respect to fines and costs, that he doesn't even know

2    how much they are.  That's not his role.  That's not his

3    bailiwick.  This is not an issue that he can redress.

4         I'm happy to talk more about the specifics of the

5    equal protection analysis or the procedural due process

6    analysis, if the Court wishes.  I've spelled it all out in

7    the briefs, Your Honor.

8         THE COURT:  Yeah.

9         MS. O'SHEA:  I did want to note with respect to the

10   out-of-circuit precedents that have been cited by the

11   plaintiffs, the cases from Tennessee, the case from Michigan,

12   the Tennessee cases have been stayed pending appeal.  That

13   case is notable in that the DMV -- the Tennessee statute for

14   suspension for nonpayment of fines and costs, the person who

15   suspends there is the Commissioner; and that's why they sued

16   the Commissioner of the DMV, because that's what the

17   Tennessee statute says.

18        It's the same in Michigan.  In Michigan, the

19   Secretary of State suspends for nonpayment of fines and

20   costs.  And so the Court in Michigan, in a suit brought

21   against the Michigan Secretary of State, said, well, the

22   Secretary of State needs to have some sort of ability-to-pay

23   hearing.

24        So those cases are distinguishable from these

25   circumstances both in that it deals with different statutes

182

1   and in that the person who is responsible for the enforcement

2   mechanism and the determination of the ability to pay was, in

3   fact, before the Court.  And that's not what we have here.

4          By contrast, I did want to point out that the

5   Eleventh Circuit recently affirmed Florida's statute, very

6   similar to Virginia's, against a due process challenge that

7   was raised in that jurisdiction.  And that Eleventh Circuit

8   Court case is *Evans v. Rhodes*.  We had cited to an earlier

9   version of it, but now it was affirmed earlier this year.

10  And the cite for the Eleventh Circuit case is 735 Federal

11  Appendix 986.

12         So the Eleventh Circuit, to my knowledge, is the

13  first federal Court of Appeals to address this issue.  They

14  addressed it and they affirmed the judgment of the district

15  court that upheld the Florida statute against a very

16  analogous due process that was brought by courts -- brought

17  in courts in that jurisdiction.

18         Just briefly touching on the irreparable harm

19  question, this Court should not presume irreparable harm,

20  particularly not as to an entire class of individuals who are

21  not before the Court.

22         For example, Ms. Johnson, who came up and testified

23  today, said that she is being irreparably harmed because she

24  might be able to get other jobs that might pay her more, but

25  I would note that she has not applied for a restricted

183

1   license, which is available to her under the terms of

2   Virginia law.  And I would also note she also testified that

3   she has other miscellaneous expenses, like a $100 phone fee,

4   that could easily be taken and applied to a court payment

5   plan.

6           So I would hesitate to presume irreparable harm in

7   this particular context.  And I think that the Fourth Circuit

8   has expressly said that you don't presume irreparable harm,

9   even in a constitutional context, outside of cases involving

10  the First Amendment and the Fourth Amendment right to privacy

11  in your home.

12          So the bottom line on irreparable harm, they're

13  basically just alleging economic injuries; and that, by its

14  very definition, is not irreparable.

15          With respect to the public policy prong of the

16  injunction analysis, I wanted to note that if this Court

17  says, hey, Commonwealth of Virginia, Department of Motor

18  Vehicles, whatever entity is bound by this particular Court

19  order, you can no longer enforce Code Section 46.2-395, you

20  can't do it, Virginia basically would be left with no

21  enforcement mechanism as to its fines and costs.

22          Despite what the plaintiffs argue, the only other

23  alternative that would be available would be a show cause,

24  leading to incarceration.  Incarceration is surely a much

25  harsher measure.  And I believe the United States Supreme

1   Court has said that you can't incarcerate where someone

2   refuses to pay fines -- or cannot pay fines and costs and is

3   indigent, that you're implicating their liberty interest at

4   that point.

5        THE COURT:  Well, what's wrong with if the only

6   person you would incarcerate would be that one that willfully

7   was not paying?

8        MS. O'SHEA:  Because the Commonwealth still needs to

9   have an enforcement.  You have a line there between people

10  who are willfully not paying -- okay, fine, incarcerate those

11  individuals -- and individuals who claim that they can't pay.

12  But there's a bit of a question mark associated with that.

13       THE COURT:  Back in my time in state court, I mean,

14  there was sort of an assumption that if someone didn't pay

15  their child support, if you put them in jail, probably by the

16  end of the week the family -- somewhere the money would show

17  up.  It wouldn't necessarily be from the person in jail, but

18  all the family would feel bad and get together and pay it.

19       But that's not proper, to put people in jail in the

20  hope that somebody will come along.

21       MS. O'SHEA:  Well, I agree.  And that's why

22  incarceration is a last-ditch effort.  That's not what the

23  courts want to resort to doing, if they can.

24       THE COURT:  Well, but here you're taking their

25  property.

1           MS. O'SHEA:  Which is a lesser measure.

2           THE COURT:  Well, I know it, but you're taking their

3      property when they cannot -- they cannot pay.  They shouldn't

4      be punished if they cannot pay.

5           MS. O'SHEA:  I would argue it's not punishment, at

6      least not in the constitutional context, when you take away

7      someone's privilege to drive.  That's not punishment.  That

8      is giving them --

9           THE COURT:  Well, if you charge them an extra $145,

10     I mean, that's --

11          MS. O'SHEA:  I don't know that you can call that

12     punishment, either, Your Honor, at least not within the

13     constitutional context.

14          THE COURT:  Well, if it's keeping you from having

15     your car --

16          MS. O'SHEA:  My point, Your Honor, is that there are

17     fact-finders, there are juries, that impose these fines, and

18     they impose them for a reason, and they become part and

19     parcel of a criminal order of conviction.  And the

20     Commonwealth of Virginia has an interest in continuing to

21     have some enforcement mechanism to go with those fines that

22     have been assessed by the juries, by the voices of the people

23     who live in the Commonwealth of Virginia.

24          The Court shouldn't strip them of what is one of

25     their only ways of trying to incentivize people to comply

186

1    with these Court orders, because otherwise, the only option

2    that's going to be left to the Court is incarceration.  And

3    nobody wants that.

4          So I also wanted to note, Your Honor, that enjoining

5    the Commissioner from updating DMV transcripts -- because

6    that's basically what that would be.  It would be saying,

7    record-keeper, when you get a suspension notice from the

8    court, don't put it in your system.  It's not going to stop

9    the courts from issuing those orders.  And the plaintiffs

10   admitted as much.  The injunction they're seeking, then,

11   isn't tailored to the actual outcome they want.  Not having

12   updated DMV transcripts isn't going to change the fact that

13   these licenses have been suspended for nonpayment of fines

14   and costs.  It's not going to stop the Commonwealth from

15   being able to charge these individuals with driving on a

16   suspended license.  All it's going to change is the type of

17   proof that is offered in those conviction proceedings.

18   Rather than being a DMV transcript, you're going to get

19   certified Court orders.  It's not going to change anything.

20         I would note, to the extent that the plaintiffs have

21   asked this Court to order full restoration of the five

22   plaintiffs' driver's licenses, two of the plaintiffs have

23   their driver's licenses; they're not suspended right now.

24   Well, actually, one is not suspended and the other has a

25   learner's permit.  It's not clear that he ever even had a

187

1    valid driver's license.  And that would be Williest Bandy

2    from Norfolk.

3            With respect to the other three, if the Court is

4    entertaining this at all, then I would submit that there

5    would be need to be some inclusion in the Court order for

6    restoration only to the extent that they are otherwise

7    eligible, because I don't know -- for example, they might

8    have enough points on their license or other things outside

9    the context of fines and costs that would also bar them from

10   having a valid driver's license.

11           THE COURT:  Well, the Court couldn't do anything but

12   what's connected with this case.  If they can't drive for

13   other reasons, that's --

14           MS. O'SHEA:  I understand.

15           THE COURT:  -- that's not --

16           MS. O'SHEA:  But to the extent that they've asked

17   for a broad injunction, saying nobody should be suspended in

18   the future for payment of fines and costs, period, like,

19   starting now, moving on, DMV, if you get these orders, don't

20   update the transcripts, I would submit that that's not

21   narrowly tailored to the issues present in this particular

22   dispute.  That's saying under no circumstances, regardless of

23   ability to pay versus, you know, just inability to pay, don't

24   enforce the statute.  And that's overbroad.  It paints too

25   far.

1          Ultimately, Your Honor, it's the plaintiffs' burden

2    of showing entitlement to a preliminary injunction.  And

3    they're asking for extraordinarily equitable relief, and they

4    need to show that they are likely to succeed on the merits

5    and all of the other elements that go part and parcel with a

6    preliminary injunction.  They have not.  They have not met

7    their burden.

8          The injunction would be ineffective.  It would not

9    stop the suspension orders from coming.  It would presumably

10   bind or affect parties who are not before the Court to state

11   their interests, like the court clerks, who are involved in

12   all of this very intimately at the clerk's office.

13         Now, I will certainly concede from a personal

14   perspective, if not from that of the Commissioner, that there

15   may very well be more effective ways to handle this problem.

16   I get that.  I think the Court gets that.  I think everybody

17   sitting in this courtroom gets that.  But the fact that there

18   might be more effective ways, from a policy perspective, of

19   handling the issue of indigent individuals who cannot pay

20   their fines and costs does not mean that they are entitled to

21   the preliminary injunction they seek.

22         Their arguments should be for the General Assembly.

23   Their economic experts should go to the General Assembly and

24   talk to the General Assembly or, at the very least, bring

25   these issues up through the state courts, who would be

1    empowered to actually address this issue.

2         As before this Court, this federal court is not the

3    appropriate forum.  This defendant, the Commissioner of the

4    DMV, is not the appropriate defendant.

5         This Court should -- in the exercise of its

6    discretion, the Court should stay its hand, let the case

7    develop, and deny the request for a preliminary injunction.

8         THE COURT:  All right.  Thank you.

9         MR. BLANK:  We're way over time, Judge, so I'm going

10   to be brief.  I'm not going to address all the things, but I

11   do want to address two specific points.  It really ends where

12   we started.

13        THE COURT:  Let me ask you one thing.

14        MR. BLANK:  Yes, sir.

15        THE COURT:  Does the Court have to first decide not

16   likely to prevail and that sort of thing?  With regard to the

17   jurisdictional issues, does the Court have to decide that the

18   case -- jurisdictionally the case can proceed?

19        MS. CIOLFI:  Judge, I don't think so, because that's

20   not actually before you today.  The preliminary injunction is

21   before you.  Their jurisdictional issues are not.

22        THE COURT:  Well, but if I don't have jurisdiction,

23   I mean, that -- is there any law, I mean, what --

24        MR. BLANK:  Your Honor, it may be the case where you

25   order the injunction and then say, I want to then, you know,

190

1  go to a jurisdictional hearing and deal with the

2  jurisdictional issue.  But I don't -- again, at this point in

3  time, that issue is not before you.

4          THE COURT:  Okay.

5          MR. BLANK:  If we're going to deal with that, we can

6  deal with it, but I don't think you have to deal with that up

7  front.  I agree with you jurisdiction is always the issue,

8  but that's not what is at issue in this hearing.

9          THE COURT:  Okay.

10          MR. BLANK:  Again, if there's immediate need and

11  irreparable harm, you can stop the practice; and then if they

12  come back and raise this issue on jurisdiction, we can

13  address it.

14          But, Judge, again, I want to deal with two quick

15  issues.  One is where we started -- sort of where we ended

16  with Judge Gregory in the Commonwealth and where we started

17  with Ms. Ciolfi today, and it's the "it's not me" argument.

18  They want to say, it's not me; it's the clerks, it's the

19  payment plan, it's the judges.  That's just not -- that's not

20  true and it's not required.  And first I want to say what's

21  not true.

22          There's not a shred of evidence before you that

23  there are orders by the Court to suspend the licenses for

24  failure to pay.  There's not a shred of evidence.  They

25  didn't bring it.  We had a circuit court clerk say that it

1  didn't happened.  We had a district court clerk say there's
2  no orders.  We had Ms. Ford say she didn't see any orders.
3  We had before you the auditor of public accounts say that the
4  DMV suspends.  We have four district court websites to say
5  it's the DMV.  And we have no Court orders.

6         And you -- again, Judge, back in the Court of
7  Appeals, and we cited to it, *McBride versus Commonwealth of
8  Virginia*, and it's time-honored, a Court speaks through its
9  orders and those orders are presumed to be accurate.

10        There is no Court order, so this idea when she --
11 when my learned opposition stands up and says, it's not the
12 DMV, it's the Court, the Court orders, Courts speak through
13 orders, and there are no orders.  And there's not a scintilla
14 of evidence that there's orders here.

15        What we have is a DMV that is directly involved in
16 the license suspension for failure to pay court debts and
17 fines.  You can say the court has something to do with it, as
18 Ms. Ciolfi said; you can say the DMV has all of it; but you
19 cannot say that the DMV is not involved in license
20 suspension.

21        And I made the point on cross -- again, it may have
22 seemed silly at the time, but I didn't think it was silly --
23 it doesn't happen without the DMV.  And the computers don't
24 talk to each other without the DMV.  And the convictions
25 don't get abstracted without the DMV.  And the $145 doesn't

192

1  get collected without the DMV.  And the suspension doesn't
2  happen without the DMV.

3          The DMV is involved.  You can say how much, but you
4  cannot refute that they are involved.  And without a Court
5  order, without any evidence of a Court order, and with all
6  the evidence that we put in from the public record that it is
7  the DMV, again, that issue shouldn't even be on the table in
8  terms of the order that you can enter.

9          And go back to the last two points.  There's not a
10  hint of due process, not a hint of it, with regard to that
11  time of default.  It's just not there.  There's nobody asking
12  the question of the ability to pay.  It doesn't exist.  The
13  default happens.  There's no due process.  It's not fair.

14          It shouldn't be -- in America, it shouldn't be -- if
15  it's not constitutional, this Court should stop that process.
16  And our order that we request is narrowly tailored to that.

17          "During the pendency of the action, the Commissioner
18  is enjoined from enforcing Section 46.2-395 against
19  plaintiffs and future suspended class members unless and
20  until defendant or another entity determines through a
21  hearing, with adequate notice, that their failure to pay was
22  willful."

23          That doesn't exist with what we've got right now.
24  She says that they should do it at the time of conviction.
25  There isn't even -- as you said, they could be waiting for

1    the payday loan.  It's 30 or 41 days down the path.  That is

2    not the time.  The time is T2.  And until we have a system

3    that says that that inability to pay versus willfulness to

4    pay, then you do not have a hint of due process.  We are

5    likely to prevail on its merits.  And the other issues and

6    the other elements, if you look at the totality of the

7    evidence that we presented today, is overwhelmingly in the

8    favor of the plaintiffs.

9           We ask you to enter this injunction.  Stop this

10   process now.  It is unconstitutional.

11          Thank you, Your Honor.

12          THE COURT:  All right.  Thank you all.  We'll recess

13   court.

14          THE MARSHAL:  All rise.

15   (Proceedings adjourned, 6:01 p.m.)

16                        CERTIFICATE

17      I, JoRita B. Meyer, certify that the foregoing is a

18   correct transcript from the record of proceedings in

19   the above-entitled matter.

20   /s/ JoRita B. Meyer                    Date: 11/19/2018

21

22

23

24

25

Hon. Marshall Ferguson

Hearing Date: April 26, 2024 at 1:30 p.m.

With Oral Argument

SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

| | |
|---|---|
| STATE OF WASHINGTON, | No. 24-2-00977-9 SEA |
| Plaintiff, | REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS |
| v. | |
| THE KROGER CO.;<br>ALBERTSONS COMPANIES, INC.;<br>ALBERTSON'S COMPANIES<br>SPECIALTY CARE, LLC;<br>ALBERTSON'S LLC;<br>ALBERTSON'S STORES SUB LLC;<br>and KETTLE MERGER SUB, INC.. | |
| Defendants. | |

REPLY IN SUPPORT OF DEFS.' MOTION TO DISMISS

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA  98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

APP-275

## I.    INTRODUCTION

The State's Response concedes that this action is the first time in history that a State has sought to enjoin a nationwide merger under state antitrust law.  Mot. 1-2.  The State's suggestion that the Complaint's requested relief is "commonplace," Resp. 8, and that Defendants' arguments "have previously been considered and rejected," Resp. 2, is belied by the State's failure to cite *any* precedent in which *any* state sought similar relief.  The Response thus confirms that the State seeks to usher in a new age of merger enforcement, in which any state attorney general has license to enjoin any out-of-state transaction under state law without regard to its nationwide impacts.  Resp. 2.  This Court should reject the State's unprecedented overreach.

Rather than confronting the serious legal issues raised in Defendants' Motion and the consequences of the State's heavy-handed approach, the Response largely attacks strawman arguments about preemption, declaratory relief, and the scope of the Consumer Protection Act ("CPA").

*First*, the State offers no real defense of the disproportionality between its allegations of Washington-specific harm and its request for nationwide injunctive relief.  Although the State resists the label of "nationwide injunction," Resp. 14-15, it concedes that it seeks to prohibit the merger in all 50 states.  On these facts, the State cannot show that the sweeping relief sought—which would enable one state to dictate merger policy for the entire country—is appropriately tailored to the alleged harm.

*Second*, the State fails to address the significant constitutional and comity concerns with its requested relief.  The U.S. Supreme Court's balancing test under the Dormant Commerce Clause, as articulated in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), is binding precedent.

REPLY IN SUPPORT OF DEFS.' MOTION TO DISMISS - 1

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

The State's perfunctory *Pike* analysis, Resp. 22-23, cannot overcome the clear imbalance between the Complaint's Washington-specific allegations and the extraterritorial effects of its requested relief in all other states. And the State's refusal to even *acknowledge* the multiple parallel actions challenging the merger on the same grounds and seeking the same relief, Mot. 5, underscores its failure to rebut Defendants' Full Faith and Credit and comity arguments.

**Third**, the State's so-called "express lane" to avoid the merits of the Motion by focusing on possible relief *other than* a nationwide injunction, Resp. 2, is a road to nowhere. The only tangible, non-advisory relief the Complaint actually seeks is an order enjoining the merger across the country. That relief is impermissible.

**Finally**, dismissal would not prejudice the State or its ability to act on behalf of Washingtonians. The FTC, eight other states, and the District of Columbia jointly sued to enjoin this same transaction under the Clayton Act, *see FTC v. The Kroger Co.*, No. 3:24-cv-347 (D. Or.) ("FTC Action"), and Defendants have invited the State to join that suit, which does not suffer from the legal infirmities raised here. *See* Defs.' Mar. 29, 2024 Letter to R. Ferguson (Ex. A). Joining the FTC Action—which is consistent with long-standing practice and constitutional limitations regarding merger litigation—would enable the State to litigate this nationwide merger while appropriately considering the interests of Washingtonians and conserving taxpayer resources.

## II.    ARGUMENT

### A.    The State's Proposed Injunction Is Disproportionate to the Alleged Harm

The State agrees that "[i]njunctions must be tailored to remedy the specific harms shown," Resp. 12 (quoting Mot. 9), but refuses to apply that rule.

The State confuses the merger itself, which is a contract between out-of-state companies

REPLY IN SUPPORT OF DEFS.' MOTION TO DISMISS - 2

**K&L GATES LLP**
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA  98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

1   governed by Delaware law, and the merger's predicted *effects*, which are nationwide. Resp. 15.

2   As the merger itself will be consummated out-of-state, *see* Resp. 8, the State has authority to

3   address only the *effects* of the merger within Washington. Mot. 7-8.

4        The State's requested relief far exceeds that narrow mandate. Although it resists the

5   "nationwide injunction" label as a "red herring," Resp. 14, the State does not dispute that its

6   requested injunction would have nationwide effect. The State's requested relief would thus

7   dictate merger policy for the entire country based on alleged harm in Washington alone. Such

8   sweeping relief would exceed both the State's own mandate and that of this Court. *See, e.g.*,

9   *Washington v. FDA*, 668 F. Supp. 3d 1125, 1144 (E.D. Wash. 2023) (rejecting nationwide

10  injunction where harm alleged was "not shared nationwide").

11       The State misses the point of Defendants' divestiture arguments, which highlight the

12  overbroad relief sought. Mot. 9-10. Of course, divestiture is not *always* an appropriate remedy

13  in merger cases.[1] But the State does not dispute that a Washington-specific divestiture would

14  be *more tailored* to address its alleged Washington-specific harms. Resp. 14-18. The

15  Complaint's fatal flaw is the State's *insistence* on nationwide relief against the *entire*

16  transaction, rather than state-specific relief. Resp. 15. That requested remedy is plainly "more

17  burdensome to the defendant than necessary to provide complete relief to the plaintiff[]."

18  Mot. 7 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

19       **B.    The State's Requested Relief Contravenes the U.S. Constitution**

20       Contrary to the State's distortions, Defendants' Motion presents an *as-applied*

21  constitutional challenge to the State's novel lawsuit, Mot. 10-13, not a facial attack on the CPA,

22  *contra* Resp. 4. The State's defense of the CPA *generally* fails to confront Defendants' *actual*

23  arguments for dismissal, much less rebut them.

24

25  _____

26  [1] Divestiture as a court-ordered *remedy* after trial is different from the contractual divestiture in
    this case, which must be addressed at the liability phase. *See Illumina, Inc. v. FTC*, 88 F.4th
    1036, 1057 (5th Cir. 2023).

REPLY IN SUPPORT OF DEFS.' MOTION TO DISMISS - 3

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

*First*, the State's response to Defendants' actual argument—a straightforward as-applied Dormant Commerce Clause challenge under *Pike*, Mot. 10-12—consists of two conclusory paragraphs declaring the issue premature. Resp. 22-23. The State fails to address the reality that the merger's alleged effects in Washington, even if proven, cannot outweigh the extraterritorial effects of a nationwide injunction in all other states. Mot. 9-10. The State refuses to engage with Defendants' authority explaining as much, including *Allergan, Inc. v. Athena Cosmetics, Inc.*, 738 F.3d 1350 (Fed. Cir. 2013), and *Hyatt Corp. v. Hyatt Legal Services*, 610 F. Supp. 381, 385 (N.D. Ill. 1985), which are directly on point. Mot. 11.

*Second*, the State wrongly suggests that *Pike* was overruled. Resp. 22. Although a plurality in *Pork Producers* sought to narrow *Pike*, the *majority* of the Supreme Court disagreed. *See Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 402 (2023) (Roberts, J., concurring). *Pike* is binding precedent, and "the extraterritoriality analysis [is a] facet[] of the *Pike* test." *Bostain v. Food Exp., Inc.*, 159 Wn.2d 700, 719 (2007). Under *Pike*, the extraterritorial effects of the State's proposed remedy are "clearly excessive" compared to any Washington-specific effects. Mot. 11-12.

*Third*, the State's assertion that *Washington Bankers Association v. State*, 198 Wn.2d 418, 452 (2021), eliminates *Pike* is incorrect. The parties in *Washington Bankers* "d[id] not contest *Pike*'s applicability," and *Washington Bankers* involved a *facial* challenge to a tax law, not an enforcement action seeking nationwide relief. *Id.* Thus, the State's suggestion that *Washington Bankers* "made clear" that *Pike* does not apply to facially neutral laws, Resp. 22, is simply wrong.

*Fourth*, the State overreads *State v. Sterling Theatres Co.*, 64 Wn.2d 761 (1964), which addressed a broad preemption argument that businesses with sufficient interstate activities were categorically "exempt from the scope of the state law." *Id.* at 765. The actual enforcement action at issue in *Sterling* was focused on theaters *in Seattle*—a "primarily local impact." *Id.* at 764. Here, Defendants raise no facial challenge to the CPA and do not seek to limit the

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

1   State's authority to enforce the CPA *within its own borders*. *Contra* Resp. 20-21. With *Sterling*

2   properly framed, the State's suggestion that the U.S. Constitution does not apply to "state

3   antitrust law," Resp. 18-21, offends basic rules of federalism.

4       ***Finally***, the State's argument that the Full Faith and Credit Clause should not apply

5   without a judgment, Resp. 23, ignores that its requested injunction conflicts with other state

6   laws and would prohibit other courts' consideration of the merger under those laws (or

7   applicable federal law). A state may not "project its laws across state lines so as to preclude

8   the other from prescribing for itself the legal consequences of acts within it." Mot. 12 (quoting

9   *Pac. Emps. Ins. Co. v. Indus. Accident Comm'n of Cal.*, 306 U.S. 493, 504-05 (1939)); *see*

10  *Baker v. Gen. Motors Corp.*, 522 U.S. 222, 235-36 (1998) (invalidating extraterritorial

11  injunction against witness testifying). The State does not dispute that the merger is *lawful* under

12  other states' laws, Resp. 24, yet it asks this Court to prohibit other courts from making that

13  judgment.

14      **C.**    **Interstate Comity Precludes the State's Action**

15      The State does not acknowledge the elephant in the courthouse: the FTC Action

16  involving nine attorneys general. Mot. 5. Nor does the State contest that it could bring an

17  identical claim under the Clayton Act, or that the FTC Action provides an efficient forum for

18  all interested parties (including the State) to be heard. Mot. 13-14. Yet the State persists in this

19  unprecedented action, without regard to constitutional limitations, potentially inconsistent court

20  rulings, and the significant practical concerns arising from this unnecessary parallel proceeding.

21  In short, the State's position flouts basic principles of interstate comity.

22      **D.**    **The State's Purported Alternative Remedies Cannot Save the Complaint**

23      The State's focus on *other* possible remedies—divestiture and declaratory relief—

24  cannot salvage its impermissible request for nationwide relief. Resp. 11. At most, the State's

25  arguments would yield a partial dismissal or an order striking the request for nationwide

26  injunctive relief, not denial of Defendants' Motion. *See Perez v. Leprino Foods Co.*, 2018 WL

REPLY IN SUPPORT OF DEFS.' MOTION TO DISMISS - 5

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

1426561, at *3 (E.D. Cal. Mar. 22, 2018) (noting overlap between striking and dismissing improper relief).  Regardless, neither alternative remedy is permissible.

**First**, although the State argues that the possibility of divestiture should save the Complaint, Resp. 9, the State has not sought any state-specific relief, including a divestiture.  This case should not proceed on a hypothetical divestiture the State has not requested.

**Second**, the State's reliance on declaratory relief as a standalone remedy likewise fails.  Where "no monetary or injunctive relief is available" and a declaratory judgment would not independently remedy the alleged injury, a plaintiff "lacks standing to assert any remaining claims for declaratory relief."  *Karl v. City of Bremerton*, 7 Wn. App. 2d 1047, 2019 WL 720834, *6 (2019).  Because the State alleges the *only* relief that would redress its claimed injury is a nationwide injunction, the State "lacks standing to assert any remaining claims for declaratory relief."  *Id.*

The State's reliance on *State v. Ralph Williams' Northwest Chrysler Plymouth, Inc.*, 82 Wn.2d 265, 276 (1973), is misplaced.  That case involved *injunctive* relief, and the declaratory relief at issue was expressly in service of *other* private lawsuits.  *Id.*  Those real-world implications are absent here.

### III.     CONCLUSION

Defendants respectfully request that this Court dismiss the Complaint.

DATED this 17th day of April, 2024.

Respectfully submitted,

By:   *s/ Pallavi Mehta Wahi*

Pallavi Mehta Wahi, WSBA #32799
Christopher M. Wyant, WSBA #35561
Aaron Millstein, WSBA #44135
K&L GATES LLP
925 Fourth Avenue, Suite 2900
Seattle, WA  98104
Phone: (206) 623-7580
Fax: (206) 623-7022

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA  98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Email:  pallavi.wahi@klgates.com
          chris.wyant@klgates.com
          aaron.millstein@klgates.com

*I certify that this memorandum contains 1750 words, in compliance with the Local Civil Rules.*

  *s/ Matthew M. Wolf*
Matthew M. Wolf (*pro hac vice*)
Sonia K. Pfaffenroth (*pro hac vice*)
Jason Ewart (*pro hac vice*)
Kolya D. Glick (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue NW
Washington, DC  20001
Phone: (202) 942-5462
Fax: (202) 942-5999
Email:  matthew.wolf@arnoldporter.com
          sonia.pfaffenroth@arnoldporter.com
          jason.ewart@arnoldporter.com
          kolya.glick@arnoldporter.com

  *s/ Mark A. Perry*
Mark A. Perry (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC  20036
Phone: (202) 682-7511
Fax: (202) 857-0940
Email:  mark.perry@weil.com

*Attorneys for Defendants The Kroger Co. and Kettle Merger Sub, Inc.*

  *s/ Claire Martirosian*
Daniel M. Weiskopf, WSBA No. 44941
Claire Martirosian, WSBA No. 49528
McNAUL EBEL NAWROT & HELGREN PLLC
600 University Street, Suite 2700
Seattle, Washington 98101
Phone: (206) 467-1816
Email: dweiskopf@mcnaul.com
          cmartirosian@mcnaul.com

REPLY IN SUPPORT OF DEFS.' MOTION TO DISMISS - 7

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA  98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

APP-282

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

_s/ Enu Mainigi_
Enu Mainigi (*pro hac vice*)
Jonathan Pitt (*pro hac vice*)
A. Joshua Podoll (pro hac vice)
WILLIAMS & CONNOLLY LLP
680 Maine Ave., S.W.
Washington, D.C. 20024
Phone: (202) 434-5000
Email: emainigi@wc.com
        jpitt@wc.com
        apodoll@wc.com

_s/ Edward D. Hassi_
Edward D. Hassi (*pro hac vice*)
Leah S. Martin (*pro hac vice*)
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Avenue, N.W.
Washington, DC 20004
Phone: (202) 383-8000
Email: thassi@debevoise.com
        lmartin@debevoise.com

Michael Schaper (*pro hac vice*)
Shannon Rose Selden (*pro hac vice*)
J. Robert Abraham (*pro hac vice*)
Morgan Davis (*pro hac vice*)
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
Phone: (212) 909-6000
Email: mschpaer@debevoise.com
        srselden@debevoise.com
        jrabraham@debevoise.com
        mdavis@debevoise.com

_s/ Michael G. Cowie_
Michael G. Cowie (*pro hac vice*)
James A. Fishkin (*pro hac vice*)
DECHERT LLP
1900 K Street N.W.
Washington, DC 20006
Phone: (202) 261-3339
Email: mike.cowie@dechert.com
        james.fishkin@dechert.com

REPLY IN SUPPORT OF DEFS.' MOTION TO DISMISS - 8

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

APP-283

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

*Attorneys for Defendants Albertsons Companies, Inc., Albertsons Companies Specialty Care, LLC, Albertson's LLC, and Albertson's Stores Sub LLC*

REPLY IN SUPPORT OF DEFS.' MOTION TO DISMISS - 9

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA  98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

1

## CERTIFICATE OF SERVICE

2

I certify that on this date I arranged for a copy of the foregoing document to be served on the parties listed below by King County eFiling Application, to:

3

4

5

| State of Washington | |
|---|---|
| Amy N. L. Hanson | amy.hanson@atg.wa.gov |
| Paula Pera C. | paula.pera@atg.wa.gov |
| Miriam R. Stiefel | miriam.stiefel@atg.wa.gov |
| Helen Lubetkin | helen.lubetkin@atg.wa.gov |
| Glenn D. Pomerantz | Glenn.Pomerantz@mto.com |
| Kuruvilla J. Olasa | Kuruvilla.Olasa@mto.com |
| Lauren Ross | Lauren.Ross@mto.com |
| Xiaonan April Hu | April.Hu@mto.com |
| Carson J. Scott | Carson.Scott@mto.com |
| James Berry | james.berry@mto.com |
| Daniel Zea | daniel.zea@mto.com |
| Kate Iiams, Paralegal | kate.iiams@atg.wa.gov |
| Michelle Oliver, Paralegal | michelle.oliver@atg.wa.gov |
| Keriann Snider, Paralegal | keriann.snider@atg.wa.gov |
| Grace Monastrial, Paralegal | grace.monastrial@atg.wa.gov |
| Electronic Inbox | atseaef@atg.wa.gov |
| Valerie Balch | Valerie.balch@atg.wa.gov |
| Ashley Locke | Ashley.locke@atg.wa.gov |
| Robert Bowen | Robert.Bowen@mto.com |

| Albertsons Companies, Inc.; Albertson's Companies Specialty Care, LLC; Albertson's LLC; and Albertson's Stores Sub LLC | |
|---|---|
| Daniel M. Weiskopf | dweiskopf@mcnaul.com |
| Claire Martirosian | cmartirosian@mcnaul.com |
| Thao Do | tdo@mcnaul.com |
| Jennifer Hickman | jhickman@mcnaul.com |
| Lisa Nelson | lnelson@mcnaul.com |
| Richard W. Redmond | rredmond@mcnaul.com |
| Edward D. Hassi | thassi@debevoise.com |
| Shannon Rose Selden | srselden@debevoise.com |
| Michael Schaper | mschaper@debevoise.com |
| J. Robert Abraham | jrabraham@debevoise.com |
| Leah Martin | lmartin@debevoise.com |
| Morgan A. Davis | mdavis@debevoise.com |
| Jaime Fried | jmfried@debevoise.com |
| Mari Cardenas | mcardena@debevoise.com |

REPLY IN SUPPORT OF DEFS.' MOTION TO DISMISS - 10

**K&L GATES LLP**
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

| | |
|---|---|
| Marie S. Ventimiglia | msventim@debevoise.com |
| Natascha Born | nborn@debevoise.com |
| Mike Cowie | mike.cowie@dechert.com |
| James A. Fishkin | james.fishkin@dechert.com |
| Enu Mainigi | emainigi@wc.com |
| A. Joshua Podoll | apodoll@wc.com |
| Jonathan Pitt | jpitt@wc.com |

| *Invervenor:  C&S Wholesale Grocers, LLC* | |
|---|---|
| Brendan T. Mangan | Brendanmangan@dwt.com |
| Caleah N. Whitten | Caleahwhitten@dwt.com |

DATED this 17th day of April, 2024.

*s/ Pallavi Mehta Wahi*
Pallavi Mehta Wahi
K&L Gates LLP
925 Fourth Avenue, Suite 2900
Seattle, WA  98104
Phone: (206) 623-7580
Fax: (206) 623-7022
Email:  Pallavi.Wahi@klgates.com

REPLY IN SUPPORT OF DEFS.' MOTION TO DISMISS - 11

APP-286

# Exhibit A

# Arnold&Porter

March 29, 2024

**VIA EMAIL**

Robert W. Ferguson
*Attorney General of the State of Washington*

Jonathan Mark
*Senior Assistant Attorney General*
*Antitrust Division Chief*

Paula Pera C.
Amy N. L. Hanson
Miriam R. Stiefel
Helen M. Lubetkin
*Assistant Attorneys General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188

      Re:    *Washington v. The Kroger Co.*, 24-2-00977-9 SEA (Wash. Super. Ct.):
                Defendants' Request for Joint Proceedings

Mr. Attorney General:

      Because the above-captioned case is one of three government enforcement actions seeking to enjoin The Kroger Co.'s acquisition of Albertsons Companies Inc. on a nationwide basis, we ask that you consider consolidating your case (the "Washington Case") with the federal case brought by the Federal Trade Commission ("FTC"), eight states, and the District of Columbia: Compl., *FTC v. The Kroger Co.*, No. 3:24-cv-00347-AR (D. Or.) (the "Federal Case") by joining as a plaintiff in the Federal Case.

# Arnold&Porter

March 29, 2024
Page 2

The Federal Case has been scheduled for a hearing on plaintiffs' motion for injunctive relief between August 26 and September 16, 2024, while the Washington Case is not scheduled to begin until September 16. Litigating all antitrust challenges to the Kroger-Albertsons merger in a single proceeding will benefit all parties, save millions of dollars in taxpayer money, avoid unnecessary and duplicative litigation, and ensure a final resolution of all critical issues in a timely manner. Below are a few additional reasons why we believe you should accept our proposal and agree to consolidation and join as a plaintiff in the Federal Case.

*First*, the issues raised in the Washington case overlap completely with those raised in the Federal Case. Specifically, the Federal Case seeks to represent the citizens of the entire United States, including the citizens of Washington. The Federal Case alleges that the proposed Transaction will likely cause anticompetitive harm in Washington. *See, e.g.*, Fed. Compl. ¶¶ 52, 80. And the Federal Case relies on the same legal principles as the Complaint in your case. In fact, as the Complaint in the Washington Case acknowledges, Washington law generally *requires* Washington courts to follow federal law unless there is a specific basis to depart from that law. Compl. ¶ 64; *see State v. LG Elecs., Inc.*, 185 Wash. App. 123, 134, 340 P.3d 915, 920 (2014) ("[D]eparture from federal law . . . must be for a reason rooted in [Washington's] own statutes or case law and not in the general policy arguments that this court would weigh if the issue came before us as a matter of first impression." (citation omitted)). In short, because both the Washington Case and the Federal Case require a court to determine the competitive effects of a merger that has not yet closed, the factual and legal issues in both cases are materially identical.

Washington will, of course, be free to raise any factual or legal arguments that it believes are unique to it in the joined case. But to the extent that you believe there are any material factual or legal distinctions between the Washington Case and the Federal Case, we ask that you state them specifically in response to this letter.

*Second*, duplicative litigation would impose unnecessary burdens on Washington taxpayers. Litigation is expensive, and Washington's legal fees are likely to be particularly expensive given that it has hired Munger Tolles & Olsen LLP, a California law firm with rates exceeding $1,000 per hour, per attorney. Indeed, given the extensive discovery and trial preparation process that will have to take place on an extremely expedited timeframe, the costs that Washington taxpayers will have to bear for the State's litigation are certain to be significant. Coordination with the FTC and other states in the Federal Case, by contrast, will allow Washington to benefit from splitting the costs of investigating the matter and preparing for trial, thereby reducing the time and taxpayer money Washington will have to spend litigating this case.

*Third*, Washington will suffer no prejudice as a result of consolidation. Indeed, eight other states and the District of Columbia have already joined the FTC challenge, demonstrating that coordination among the states and the FTC is feasible and efficient. Those states have pooled their

# Arnold&Porter

March 29, 2024
Page 3

resources and coordinated their efforts to litigate *nationwide* issues in a single *nationwide* case on behalf of all consumers *nationwide*.  If Washington were to join the Federal Case, it would be able to raise any arguments and evidence that it sees fit, and it would not be prejudiced by a single consolidated proceeding.  Again, to the extent Washington believes it has unique legal or factual arguments, it would be free to raise those arguments in a consolidated proceeding.

  *Fourth*, Washington has already participated in coordinated investigative efforts with other government enforcers.  Before filing the Washington Case, Washington served as liaison counsel for all the states investigating the proposed merger.  In that role, Washington coordinated directly and effectively with the FTC and other states to distribute investigatory materials and develop strategy.  Although Washington abandoned that formal liaison role when it chose to litigate on its own, you have nonetheless acknowledged the need to coordinate litigation between the Washington Case and the Federal Case.  For example, you have agreed that the federal trial should proceed before the Washington trial.  Insisting on separate litigation will only make coordination efforts more complicated.

  *Fifth*, Washington has already expended significant unnecessary public and private resources by insisting on duplicative litigation against Kroger and Albertsons separate from other state attorneys general.  In October 2022, Washington filed a lawsuit in Washington state court challenging Albertsons' payment of a Dividend to its shareholders, which Washington alleged was made in conjunction with the proposed Transaction.  Around the same time, the attorneys general of California, Illinois, and the District of Columbia brought a materially identical challenge to the dividend payment in federal court in the District of Columbia.  Washington refused to coordinate litigation efforts with those state attorneys general.  As you are aware, the plaintiffs in both the Washington state and federal dividend cases eventually voluntarily dismissed their complaints after having their claims rejected at multiple levels of the state and federal judiciaries.  But Washington's refusal to coordinate meant that it ended up spending three times as much time and energy on litigating a case that was entirely duplicative of other coordinated litigation, and which ultimately proved meritless.

  For these reasons and others, the Washington Case should be joined or consolidated with the Federal Case to allow for a single streamlined proceeding that will avoid further duplicative litigation, alleviate unnecessary burdens on Washington state courts, and minimize further waste of Washington taxpayer resources.  Although Washington may have been concerned that the FTC and the nine other attorneys general would not ultimately seek to enjoin the merger when Washington first filed its litigation in January of this year, there is no conceivable reason to keep litigating in Washington state court now that the Federal Case has been commenced.  We are not aware of any case in history in which a state attorney general has decided to challenge a merger in parallel with a merger challenge from the federal government.  We do not believe there is a reason to break new ground in this suit, particularly when the FTC and nine other attorneys general are

# Arnold&Porter

March 29, 2024
Page 4

litigating the same issues in the pending Federal Case.

**Finally**, as you know, in a suit by the Attorney General under the Washington Consumer Protection Act, the prevailing party "may recover the costs of said action including a reasonable attorney's fee." RCW 19.86.080. In *State v. Black*, 100 Wn.2d 793 (1984), the Washington Supreme Court recognized "the Attorney General has an important role to play in enforcing th[e] State's antitrust laws," but it nonetheless affirmed the imposition of costs and attorneys' fees against the State in light of "the complexity of th[e] case, the enormous amount of time and energy spent in discovery and the duplicative nature of lawsuit," specifically citing the fact that the "Attorney General need not have brought th[e] suit as an identical civil action was filed [in federal court]." *Id.* at 806. If Washington refuses to join the Federal Case and continues to insist on duplicative and unnecessary litigation, we hereby reserve our right to seek appropriate relief against Washington, including but not limited to attorneys' fees.[1]

We would be pleased to discuss any questions or concerns you may have.

Sincerely,

/s/ *Matthew M. Wolf*
Matthew M. Wolf
Sonia Kuester Pfaffenroth
**Arnold & Porter Kaye Scholer LLP**

/s/ *Mark A. Perry*
Mark A. Perry
Luna Ngan Barrington
**Weil, Gotshal & Manges LLP**

*Counsel for The Kroger Co.*

/s/ *Enu Mainigi*
Enu Mainigi
**Williams & Connolly LLP**

---

[1] Because your litigation is entirely duplicative of the Federal Case, Washington is unlikely to be able to recover attorneys' fees for its litigation efforts, even if it were to prevail. *See, e.g.*, *Black Lives Matter Seattle-King Cnty. v. Seattle Police Dep't*, 516 F. Supp. 3d 1202, 1213 (W.D. Wash. 2021) (excluding "those hours that are not reasonably expended because they are 'excessive, redundant, or otherwise unnecessary.'" (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).

**Arnold&Porter**

March 29, 2024
Page 5

*/s/ Edward D. Hassi*
Edward D. Hassi
**Debevoise & Plimpton LLP**

*/s/ Michael G. Cowie*
Michael G. Cowie
**Dechert LLP**

*Counsel for Albertsons Companies, Inc.*

APP-292

State of Wash. v. Texaco Refining and Marketing Inc., Not Reported in F.Supp. (1991)

1991 WL 47081, 1991-1 Trade Cases P 69,345

1991 WL 47081
United States District Court, W.D. Washington.

The STATE OF WASHINGTON
v.
TEXACO REFINING AND MARKETING INC. and
Shell Oil Co.

No. C91–39R.
|
Jan. 11, 1991.

Temporary Restraining Order and Order Setting Trial

ROTHSTEIN, Chief Judge.

**\*1** This Matter comes before the court on plaintiff's motion for a temporary restraining order and order to show cause. Having reviewed the motion, together with all documents filed in support and in opposition, having heard oral argument and being fully advised, the court finds and rules as follows:

Plaintiff State of Washington ("State"), through its Attorney General Kenneth O. Eikenberry, brings this motion for a temporary restraining order and order to show cause for preliminary injunction to enjoin consummation of a transaction which the State believes will violate federal antitrust law and will lead to irreparable harm to the State and its residents. The transaction at issue is the proposed acquisition by defendant Texaco Refining and Marketing, Inc. ("Texaco"), of all of the 55 service stations owned by defendant Shell Oil Company ("Shell") in Snohomish, King and Pierce counties within Washington. The transaction's sale price exceeds $25 million. Unless otherwise ordered by this court, Texaco and Shell have announced they intend to close the transaction on Thursday, January 10, 1991.

*Discussion*

A. *Standard for Injunctive Relief*

Section 26 of 15 U.S.C. provides that any "person" may sue for injunctive relief under the antitrust laws, including § 7 of the Clayton Act. Washington, as a sovereign state of the United States, qualifies as a "person" under 15 U.S.C. § 26 and may sue in either its proprietary or *parens patriae* capacity for injunctive relief against any threatened loss or damage including damage to its general economy. *Hawaii v. Standard Oil Company of California* [1972 TRADE CASES ¶ 73,862], 405 U.S. 251, 257–262 (1972).

Section 16 of the Clayton Act authorizes the court to grant injunctive relief in cases involving unlawful acquisitions on the same conditions and principles that such relief is generally granted by courts in equity. This court may issue a preliminary injunction if the moving party demonstrates either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in its favor. *William Inglis & Sons v. ITT Continental Baking Co.* [1975–2 TRADE CASES ¶ 60,634], 526 F.2d 86, 88 (9th Cir.1975).

As a form of interlocutory relief, a court may issue a temporary restraining order to preserve the *status quo* until the court can consider an application for a preliminary injunction. 7 J. Moore, *Federal Practice,* 65.05 (1990); see e.g. *Smith v. Grady,* 411 F.2d 181, 186 (5th Cir.1969). Fed.R.Civ.P. 65(b) provides that a temporary restraining order may be granted if:

... it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition.

B. *Irreparable Injury*

**\*2** After reviewing the evidence, the court concludes that the State would suffer irreparable injury if a temporary restraining order is not issued at this juncture. The first element of potential injury to the public is the immediate elimination of Shell as a competitive alternative in the market. Lessening of competition is recognized as the kind of irreparable injury that the interlocutory remedies under the Clayton Act were intended to prevent. See *United States v. BNS, Inc.* [1988–2 TRADE CASES ¶

State of Wash. v. Texaco Refining and Marketing Inc., Not Reported in F.Supp. (1991)

1991 WL 47081, 1991-1 Trade Cases P 69,345

68,223], 858 F.2d 456, 466 (9th Cir.1988).

Defendants argue that interlocutory relief is inappropriate given the State's alternative remedy of pursuing a post-acquisition divestiture action. The court agrees that under certain conditions divestiture would be an alternate remedy. However, if the transaction were to be completed, the potential exists for Texaco to close some of the newly acquired service stations, or to make substantial modifications to the existing stations. Should this occur, these service stations would become substantially less desirable for acquisition by third parties. A loss in the attractiveness of the assets will potentially frustrate the court's ability to grant divestiture relief.

Since Texaco is unwilling to assure the court that no closures or modifications of current stations will be undertaken prior to trial, divestiture is not a feasible remedy in this case. Rather, interlocutory relief for the state is warranted to protect the public's interest from anti-competitive injury.[1]

Defendants have alleged that it is they, not the State, that will suffer irreparable injury if the pending acquisition is halted. This anticipated injury takes the form of loss of investment spent by the companies and dealers preparing for the changeover in ownership, and by the confusion and disruption of gasoline supply to the dealers. Defendants also allege that business good will may be lost for dealers that have told customers about the planned change in ownership. The court finds that the harm to defendants from this restraining order is minimal given that the current supply contracts between the Shell dealers and suppliers will be maintained by the court's order. Further, the court and parties are committed to a very accelerated trial schedule which will bring resolution of the suit within approximately a month.

C. *Issuance of Bond*

Texaco moves the court to require the State to post a bond pursuant to Fed.R.Civ.P. 65(c), which states:

No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. No such security shall be required of the United States or of an officer or agency thereof.

Texaco requests a bond in the amount of $533,000 per month for the first two months.

**\*3** The requirement and amount of a bond or other security in support of an injunction or restraining order is within the discretion of the district court, and will not be overturned unless an actual abuse of discretion is demonstrated. *California v. Tahoe Regional Planning Agency,* 766 F.2d 1319, amended 775 F.2d 998 (9th Cir.1985). In deciding on a request for bond, the court looks at the possible harm to the enjoined party if the order is found unlawful, the likelihood of the applicant's success on the merits, the applicant's ability to post a substantial bond, and the possible adverse impact that requiring substantial security might have on the enforcement of rights created by remedial legislation. *Crowley v. Local 82, Furniture & Piano Etc.,* 679 F.2d 978, 999–1001 (1st Cir.1981). An attempt to enforce compelling public interests is a significant factor which must be addressed by a district court in considering this type of bond issue. *Id.* The *Crowley* court took note of the line of cases holding that no bond is required in suits to enforce important federal rights or "public interests." *Id.* at 1000; in accord, *Bass v. Richardson,* 388 F.Supp. 478, 490 (S.D.N.Y.1971); *California v. Tahoe RPA, supra* at 1325–26.

In other analogous cases, federal district courts have exhibited a continuing willingness to fashion equitable remedies for public relief with little or no security. See e.g., *Bass v. Richardson, supra,* (no bond required of New York to protect public interest because Congress had demonstrated its intent for vigorous private enforcement and bond might discourage such actions); *Natural Resources Defense Council, Inc. v. Morton,* 337 F.Supp. 167 (D.D.C.1971), aff'd on other grounds, 458 F.2d 827 (D.C.Cir.1972) (security of $100 required in face of $750,000 to several million dollars damages claimed as result of injunction where higher bond would stifle intent to allow public interest suit).

Texaco cites *Squaxin Island Tribe v. Washington,* 781 F.2d 715 (9th Cir.1986) for the proposition that Rule 65(c) should not be extended to insulate the State from the requirement of posting bond. This case established that Washington state was not barred from collecting the security bond posted by an Indian tribe, typically subject to federal sovereign immunity. The court did not address the issue of whether the *state* should be required to post bond when bringing suit in its capacity of protecting the public interest.

The court has balanced the following factors in its decision on the requested bond: the relative harm to defendants as well as the fact that the matter should be

**State of Wash. v. Texaco Refining and Marketing Inc., Not Reported in F.Supp. (1991)**

1991 WL 47081, 1991-1 Trade Cases P 69,345

resolved in the very near future given that a trial date has been set within three weeks; the State's likelihood of success on the merits; and the fact that the state is financially not in the position to post a substantial bond at this time. The court has then factored into its finding the substantial public interest in the State's ability to pursue injunctive relief in this type of matter, which should not be impeded by the requirement of high bond. The court therefore declines to require the posting of a bond upon issuance of this order.

**\*4** Therefore, It Is Now Ordered As Follows:

(1) Defendants Texaco, Shell and all persons acting on their behalf are restrained and enjoined from taking any action, either directly or indirectly, in furtherance of the intended acquisition by Texaco of 55 Shell gasoline service stations located in the Pierce, King and Snohomish county areas, including actions to close or otherwise consummate the acquisition;

(2) Shell Oil company dealer and jobber franchises and franchise relationships subject to the Petroleum Marketing Practices Act on January 9, 1991, shall be continued on the same terms and conditions pending further order of this court;

(3) The supply contracts, leases and other contracts between Texaco Refining and Marketing Inc. and the dealers scheduled to take effect on January 10, 1991, will not take effect until such time as this court further orders;

and

(4) The parties have agreed and stipulated that this temporary restraining order shall remain in full force and effect through the 4th day of February, 1991, at 9:30 am, at which time a trial will be conducted on the merits of this action and the court will determine whether this temporary restraining order shall be converted to a permanent injunction.

[1]     Defendants also object to the motion for temporary restraining order by asserting the doctrine of laches. Texaco argues that the state waited too long to act, and it would be inequitable to allow interlocutory relief at this late stage. The court is indeed frustrated by the state's delay in bringing this matter before it. However, in light of the amount of work the state needed to do in a relatively short period of time, and in light of the strong public interest in protection from anti-competitive actions, the court declines to apply the doctrine of laches to this motion.

**All Citations**

Not Reported in F.Supp., 1991 WL 47081, 1991-1 Trade Cases P 69,345

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

APP-295

# BLACK'S
# LAW DICTIONARY

Definitions of the Terms and Phrases of
American and English Jurisprudence,
Ancient and Modern

By

## HENRY CAMPBELL BLACK, M. A.

Author of Treatises on Judgments, Tax Titles, Intoxicating Liquors,
Bankruptcy, Mortgages, Constitutional Law, Interpretation
of Laws, Rescission and Cancellation of Contracts, Etc.

## FIFTH EDITION

By

THE PUBLISHER'S EDITORIAL STAFF

Contributing Authors

JOSEPH R. NOLAN
Associate Justice, Massachusetts Supreme Judicial Court
and
M. J. CONNOLLY
Associate Professor of Linguistics
and Eastern Languages, Boston College

ST. PAUL MINN.
**WEST PUBLISHING CO.**
**1979**

**SUBSTITUTED BASIS**

ing in name, form, or shape. Bedell v. Dictograph Products Co., 251 App.Div. 243, 296 N.Y.S. 25, 32; Freeman v. Altvater, C.C.A.Mo., 66 F.2d 506, 511.

**Substantial evidence.** Such evidence that a reasonable mind might accept as adequate to support a conclusion. It is that quality of evidence necessary for a court to affirm a decision of an administrative board. Under the "substantial evidence rule," reviewing courts will defer to an agency determination so long as, upon an examination of the whole record, there is substantial evidence upon which the agency could reasonably base its decision. Marshall v. Consumers Power Co., 65 Mich.App. 237, 237 N.W.2d 266, 280.

Substantial evidence is evidence possessing something of substance and relevant consequence and which furnishes substantial basis of fact from which issues tendered can be reasonably resolved. State v. Green, 218 Kan. 438, 544 P.2d 356, 362. Evidence which a reasoning mind would accept as sufficient to support a particular conclusion and consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. Marker v. Finch, D.C.Del., 322 F.Supp. 905, 910. For purposes of considering sufficiency of evidence in criminal case, "substantial evidence" means evidence from which trier of fact reasonably could find issue rail therewith. Kansas City v. Stamper, Mo.App., 528 S.W.2d 767, 768.

Under the substantial evidence rule, as applied in administrative proceedings, all evidence is competent and may be considered, regardless of its source and nature, if it is the kind of evidence that "a reasonable mind might accept as adequate to support a conclusion." In other words, the competency of evidence for purposes of administrative agency adjudicatory proceedings is made to rest upon the logical persuasiveness of such evidence to the reasonable mind in using it to support a conclusion.

**Substantial justice.** Justice administered according to the rules of substantive law, notwithstanding errors of procedure. Interstate Bankers Corporation v. Kennedy, D.C.Mun.App., 33 A.2d 165, 166.

**Substantially.** Essentially; without material qualification; in the main; in substance; materially; in a substantial manner. About, actually, competently, and essentially. Gilmore v. Red Top Cab Co. of Washington, 171 Wash. 346, 17 P.2d 886, 887.

**Substantial performance.** Exists where there has been no willful departure from the terms of the contract, and no omission in essential points, and the contract has been honestly and faithfully performed in its material and substantial particulars, and the only variance from the strict and literal performance consists of technical or unimportant omissions or defects. Substantial performance of a contract is shown when party alleging substantial performance has made an honest endeavor in good faith to perform his part of the contract, when results of his endeavor are beneficial to other party, and when such benefits are retained by the other party; if any one of these circumstances is not established the performance is not substantial, and the party has no right of recovery. Alliance Tractor & Implement Co. v. Lukens Tool & Die Co., 194 Neb. 473, 233 N.W.2d 299, 301. Equitable doctrine of "substantial performance"

protects against forfeiture for technical inadvertence or trivial variations or omissions in performance. Sgarlat v. Griffith, 349 Pa. 42, 36 A.2d 330, 332.

**Substantiate** /səbstǽnshiyèyt/. To establish the existence or truth of, by true or competent evidence, or to verify. State v. Lock, 302 Mo. 400, 259 S.W. 116, 120; Graves v. School Committee of Wellesley, 299 Mass. 80, 12 N.E.2d 176, 179.

**Substantive.** An essential part or constituent or relating to what is essential. Stewart-Warner Corporation v. Le Vally, D.C.Ill., 15 F.Supp. 571, 576.

**Substantive due process.** Such may be broadly defined as the constitutional guarantee that no person shall be arbitrarily deprived of his life, liberty or property; the essence of substantive due process is protection from arbitrary and unreasonable action. Babineaux v. Judiciary Commission, La., 341 So.2d 396, 400. See **Due process** of law.

**Substantive evidence.** That adduced for the purpose of proving a fact in issue, as opposed to evidence given for the purpose of discrediting a witness (i.e., showing that he is unworthy of belief), or of corroborating his testimony. See also **Substantial evidence.**

**Substantive felony.** An independent felony; one not dependent upon the conviction of another person for another crime.

**Substantive law.** That part of law which creates, defines, and regulates rights, as opposed to "adjective or remedial law," which prescribes method of enforcing the rights or obtaining redress for their invasion. That which creates duties, rights and obligations, while "procedural or remedial law" prescribes methods of enforcement of rights or obtaining redress. Kilbreath v. Rudy, 16 Ohio St.2d 70, 242 N.E.2d 658, 660, 45 O.O.2d 370. The basic law of rights and duties (contract law, criminal law, tort law, law of wills, etc.) as opposed to procedural law (law of pleading, law of evidence, law of jurisdiction, etc.).

**Substantive offense.** One which is complete of itself and not dependent upon another. U. S. v. Martinez-Gonzales, D.C.Cal., 89 F.Supp. 62, 64.

**Substantive rights.** A right to the equal enjoyment of fundamental rights, privileges and immunities; distinguished from procedural right.

**Substitute,** n. /sə́bstət(y)ùwt/. One who or that which stands in the place of another; that which stands in lieu of something else. A person hired by one who has been drafted into the military service of the country, to go to the front and serve in the army in his stead.

**Substitute,** v. To put in the place of another person or thing; to exchange. Toledo Edison Co. v. McMaken, C.C.A.Ohio, 103 F.2d 72, 75.

**Substituted basis.** In taxation, the basis of the value of an asset determined by reference to the basis in the hands of a transferor, donor or grantor or by reference to other property held at any time by the person for whom the basis is to be determined. I.R.C. § 1016(b).

H.R. REP. 94-499(I), H.R. REP. 94-499, H.R. Rep. No. 499(I), 94TH Cong.,

2ND Sess. 1976, 1976 U.S.C.C.A.N. 2572, 1975 WL 12520 (Leg.Hist.)

**2572 P.L. 94-435, HART-SCOTT-RODINO ANTITRUST IMPROVEMENTS ACT OF 1976

House Report (Judiciary Committee) No. 94-499(I),

Sept. 22, 1975 (To accompany H.R. 8532)

House Report (Judiciary Committee) No. 94-499(II),

Nov. 4, 1975 (To accompany H.R. 8532)

House Report (Judiciary Committee) No. 94-1343,

July 15, 1976 (To accompany H.R. 13489)

House Report (Judiciary Committee) No. 94-1373,

July 28, 1976 (To accompany H.R. 14580)

Senate Report (Judiciary Committee) No. 94-803,

May 6, 1976 (To accompany S. 1284)

Cong. Record Vol. 122 (1976)

DATES OF CONSIDERATION AND PASSAGE

House March 18, August 2, 24, September 16, 1976

Senate June 10, September 8, 1976

House bill H.R. 8532 was passed in lieu of the Senate bill. The House Reports are set out.

(CONSULT NOTE FOLLOWING TEXT FOR INFORMATION ABOUT OMITTED
MATERIAL. EACH COMMITTEE REPORT IS A SEPARATE DOCUMENT ON WESTLAW.)

## HOUSE REPORT NO. 94-499(I)

Sept. 22, 1975

**\*1** The Committee on the Judiciary, to whom was referred the bill (H.R. 8532), to amend the Clayton Act to permit State attorneys general to bring certain antitrust actions, and for other purposes, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

\* \* \* \*

### **\*3** I. PURPOSE

The purpose of H.R. 8532 is to provide a new federal antitrust remedy which will permit State attorneys general to recover monetary damages on behalf of State residents injured by violations of the antitrust laws. The bill is intended to compensate the victims of antitrust offenses, to prevent antitrust violators from being unjustly enriched, and to deter future antitrust violations.

### II. SUMMARY OF REPORTED BILL

The first section establishes the bill's short title.

Section 2 contains the parens patriae provisions to be added as new sections of the Clayton Act (15 U.S.C. 12 et seq.). Proposed section 4C(a) authorizes State attorneys general to sue for damages on behalf of natural persons who have been injured by antitrust violations. Section 4C(b) authorizes the conversion of 4C(a) actions into class suits **2573** under certain circumstances. Section 4C(c) requires that individuals on whose behalf parens patriae suits are brought be notified. Se-tion 4C(d) provides an opportunity for individuals to exclude their claims from parens patriae suits. Section 4C(e) requires court approval of settlements of parens patriae cases. Section 4D provides that, in parens patriae cases and other antitrust class suits, damages may be proved and assessed in the aggregate by reasonable methods of estimation. Section 4E requires the opportunity for individuals to secure their appropriate share of the damages recovered, with any amount remaining to be distributed as the

APP-298

court directs. Section 4F(a) requires the U.S. Attorney General to notify appropriate State attorneys general of their entitlement to bring parens patriae cases. Section 4F(b) requires the U.S. Attorney General to make investigative materials available to State attorneys general in parens patriae cases.

Sections 3(1) and 3(2) amend existing sections of the Clayton Act to include parens patriae actions in that Act's statute of limitations and provision for tolling the statute of limitations, respectively. Section 3(3) amends the Clayton Act to require that plaintiffs who prevail in antitrust injunction cases be awarded reasonable attorney's fees.

### III. BACKGROUND

The economic burden of many antitrust violations is borne in large measure by the consumer in the form of higher prices for his goods and services. This is especially true of such common and widespread practices as price-fixing, which usually result in higher prices for the consumer, regardless of the level in the chain of distribution at which the violation occurs. It is also true of other antitrust violations such as monopolization, attempts to monopolize, group boycotts, division of markets, exclusive dealings, tie-in arrangements, and conspiracies to limit production. All of these violations are likely to cause injuries to **\*4** consumers, whether by higher prices, by illegal limitation of consumer choices, or by illegal withholding of goods and services. Moreover, antitrust violations almost always contribute to inflation. They introduce illegal and artificial forces into the market place, thus undermining our economic system of free enterprise.

Frequently, antitrust violations injure thousands or even millions of consumers, each in relatively small amounts. Indeed, many of the Justice Department's recent prosecutions have involved price-fixing of consumer goods on a local or regional basis. In the food industries alone, the Justice Department's cases have included price-fixing prosecutions involving bread and bakery products in the Philadelphia area, milk in Wyoming, dairy products in Colorado, Utah and Idaho, bread and bakery products in Baltimore and the Eastern Shore area of Maryland, milk in Washington and Alaska, soft drinks in Tulsa, bread in New York and Chicago, baking companies in San Diego and Louisiana, and sugar refiners nationally.

Although the antitrust laws have the immediate goals of protecting and promoting competition, it is the consuming public that ultimately benefits from the enforcement of the antitrust laws. Nonetheless, Federal antitrust statutes do not presently provide effective redress for the injury inflicted upon consumers. This lack of an effective consumer remedy sometimes results in the unjust enrichment of antitrust violators **\*\*2574** and undermines the deterrent effect of the treble damage action. H.R. 8532 fills this gap by providing the consumer an advocate in the enforcement process-- his State attorney general.

During the Subcommittee's hearings in the 93d Congress, Assistant Attorney General for Antitrust, Thomas Kauper outlined the problem in this way:

There can be no doubt that the treble damage remedy provides a strong deterrent, especially against price-fixing and other hard-core per se offenses. This damage remedy has been particularly effective in cases involving large purchasers, for these plaintiffs are likely to have detailed evidence, a sufficiently large economic stake to bear the inevitable risks of a lawsuit, and the resources to meet the apparently inevitable costs of protracted and complex litigation. However, the remedy has been less effective in circumstances involving multiple transactions of relatively small size, particularly purchases by ultimate consumers of products that may cost as little as 25 or 30 cents. There, records are not likely to be available, individual claims will be small, and the claimant less likely to have either the sophistication or resources necessary to prosecute their individual claims.

\* \* \* \*

I believe that there is a need for the availability of a method by which damages can be recovered where antitrust violations have caused small individual damages to large numbers of citizen-consumers. Without such a procedure, those antitrust violations which have the broadest scope and, often, the most direct impact on consumers would be most likely to escape the penalty of

the loss of illegally-obtained profits. **\*5** Those whose injuries were to small to bear the burden of complex litigation would have no effective access to the courts. As a result, the goal of deterrence sought by the Clayton Act would be frustrated in those situations where damages fell directly on small consumers or purchasers. [1]

Under the well established doctrine of parens patriae, States have successfully sued to halt continuing wrongs which injure or threaten to injure their citizens. The Clayton Act has been interpreted by the Supreme Court as authorizing States to maintain parens patriae lawsuits to enjoin violations of the antitrust laws when those violations are injuring the State's citizens. In Georgia v. Pennsylvania R.R., 324 U.S. 439, 451 (1945), [1a] the Court said that the State 'as a representative of the public is complaining of a wrong which, if proven, limits the opportunities of her people, shackles her industries, retards her development, and relegates her to an inferior economic position among her sister States. These are matters of grave public concern in which Georgia has an interest apart from that of particular individuals who may be affected.'

However, when the State of California recently tried to sue to recover monetary damages on behalf of persons who had allegedly been injured by the price-fixing of snack foods, the Ninth Circuit Court of Appeals held that parens patriae damage actions were not authorized by the Clayton Act. In large part, H.R. 8532 is a response to that case **\*\*2575** and a recognition that the consuming public currently has no effective means of obtaining compensation for its injuries.

An extremely important benefit which would flow from H.R. 8532 is the promotion of cooperation in antitrust enforcement between the States and the federal government. As Federal Trade Commission Bureau of Competition Director James Halverson put it during the Subcommittee's hearings this year:

There are certain violations of the federal antitrust laws which would be handled more efficiently by a parens patriae suit for damages than by a federal criminal proceeding or action for injunctive relief. An example of such a situation might be where a regional seller of consumer goods has recently discontinued anticompetitive practices that directly injured his customers. The best deterrent to a resumption of the illegal conduct might be a suit by the state which deprives the violator of the profits gained from his bad conduct and provides relief which compensates the injured consumers. [2]

A State attorney general is an effective and ideal spokesman for the public in antitrust cases, because a primary duty of the State is to protect the health and welfare of its citizens. He is normally an elected and accountable and responsible public officer whose duty is to promote the public interest.

**\*6** IV. THE CONSUMER PRESENTLY HAS NO PRACTICAL MEANS OF REDRESS

Section 4 of the Clayton Act, 15 U.S.C. 15, provides a private cause of action for treble damages, costs and attorneys' fees for 'any person . . . injured in his business or property by reason of anything forbidden in the antitrust laws.'

Under this section, a State may sue to recover damages it has sustained in its capacity as a proprietor or purchaser of goods and services. [3] Likewise, under Sec. 4A of the Clayton Act, 15 U.S.C. 15a, the United States may sue whenever it is injured in 'its business or property.' Neither the United States nor any State, however, may presently sue for damages in a representative capacity on behalf of injured citizens unless it has been injured in the same manner.

The impact of this legislative omission on effective antitrust enforcement has become clear in recent years as a result of developing judicial decisions. Under Sec. 4 of the Clayton Act, any person, including any consumer, who can prove he was injured by price-fixing or any other antitrust violation, has a cause of action. [4] In most instances, however, an individual law suit by an injured consumer is, as a practical matter, out of the question. If, for example, a price-fixing conspiracy results in an overcharge of a dollar on a relatively low priced consumer item, and 50 million such items are sold, the aggregate impact of the conspiracy upon consumers and the illegal profits of the price-fixers are not insignificant-- at least $50 million. [5] Yet no

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.     3

single **2576 consumer could practically be expected to bring suit. He would have no investigative resources-- or incentive-- to discover the conspiracy; should he become aware of the overcharge, he will almost certainly have no proof that he purchased the item at a particular time, place, and price; he will quite obviously have neither the incentive nor the resources to engage in protracted and extremely costly litigation to recover his tiny individual stake.

Attempts to use the revised class action provision of the 1966 amendments to Rule 23 of the Federal Rules of Civil Procedure to fashion a mechanism for consumer redress in this situation have been disappointing. Many courts have found that large consumer classes predicated upon small individual claims present insurmountable problems of 'manageability' in the conduct of the litigation. [6] These manageability problems include proper notice the complexity of evidentiary **7 issues, and distribution of any recoveries. In Eisen v. Carlisle & Jacquelin, the Supreme Court interpreted Rule 23 to require class action plaintiffs to provide individual prelitigation notice to all identifiable members of the class regardless of the cost of providing such notice. In the 1975 hearings, the Director of the FTC's Bureau of Competition, James Halverson, explained that:

The practical effect of Eisen is to eliminate the Rule 23 class action as a feasible means for recovery by a large class of individuals each of whom has sustained relatively minor damages. In situations where the cost of giving notice to the class are much greater than any individual class member's stake in the outcome of the action, it is unlikely that any suit will be brought. The person who deals in certain types of consumer goods, where each transaction may involve only a few dollars, can not fix prices, relatively free from the fear of substantial treble damage actions.

A description of the facts in Eisen will indicate where the Supreme Court's decision has left the consumer class action. The plaintiff, in Eisen, who claimed personal damages of only $70, sought to represent a class of as many as 6 million persons who allegedly were injured as a result of violations of the antitrust and securities laws. It was calculated **2577 that that the cost of giving individual notice to all indentifiable members of the class would be about $315,000. The Court, in ruling that the plaintiff must give such notice, explicitly recognized that its decision sounded the death knell for Eisen's class action because the plaintiff was unlikely to expend $315,000 to proceed with a suit in which he had a stake of only $70. The immediate result was that the defendants retained the profits from their allegedly illegal activities. [7]

At a minimum, the new emphasis on the intricacies of class actions has simply added another round of expensive and delaying litigation on the very propriety of the validity, and therefore certification, of the class.

Individual suits and class actions have worked far better for business entities than for consumers injured by antitrust violations. Wholesales and retailers purchasing from price-fixing manufacturers will frequently buy in sufficient volume to give them a substantial incentive to sue. They maintain accurate purchase records which may be used as proof of purchase, and they will usually have access to attorneys and other resources for investigating the facts and prosecuting the litigation. Their numbers will be smaller, and ordinary business records and the records of trade associations will frequently ease the problem of identifying claimants, so that they will not face many of the obstacles encountered by consumers in class action litigation.

The result has been relatively effective antitrust enforcement where the violation has occurred high up in the chain of distribution, and where the impact has been upon other business entities. Where, however, wholesalers and retailers have passed on all or most of the cost of a violation to the consumer, or where the violation itself occurred at **8 the retail level (hus subjecting the consumer to the major impact of the violation), [8] adequate enforcement mechanisms simply do not exist. The consumer, who benefits from the proper functioning of our free enterprise system with appropriate antitrust enforcement, has been without an effective method of redress of his grievances.

Frustrated by this gap, the State of California brought an action on behalf of its 20 million purchasers of snack foods, claiming they had been the victims of a price-fixing conspiracy and seeking to represent their interest in court. The Ninth Circuit Court of Appeals held in California v. Frito-Lay, 474 F.2d 774 (9th Cir.), cert. denied, 412 U.S. 908 (1973, [8a] that California could not maintain such a 'parens patriae' action for its injured and legally helpless citizens. The court applauded the State's imaginative

approach to an obviously important problem, but held that, under the law, California could not recover damages on behalf of its citizens under the Clayton Act. Legislative action was needed, the court said, to enable the State to represent its injured citizens:

The State most persuasively argues that it is essential that this sort of proceeding be made available if antitrust violations of the sort here alleged are to be rendered unprofitable and deterred. It would indeed appear that the State is on the track of a suitable answer (perhaps the most suitable yet proposed) **2578 to problems bearing on antitrust deterrence and the class action as a means of consumer protection. We disclaim any intent to discourage the State in its search for a solution.

However, if the State is to be empowered to act in the fashion here sought we feel that authority must come not through judicial improvisation but by legislation and rule making, where careful consideration can be given to the conditions and procedures that will suffice to meet the many problems posed by one's assertion of power to deal with another's property and to commit him to actions taken in his behalf. [9]

H.R. 8532 is a response to the judicial invitation extended in Frito-Lay. The thrust of the bill is to overturn Frito-Lay by allowing State attorneys general to act as consumer advocates in the enforcement process, while at the same time avoiding the problems of manageability which some courts have found under Rule 23.

Support for these legislative goals was expressed in hearings by every witness before the subcommittee, including some who opposed substantial portions of earlier versions of the bill. The bill as reported by the committee is supported by the Department of Justice and the Acting Director of the Bureau of Competition of the Federal Trade Commission, and, generally, by the National Association of Attorneys General.

## V. THE PROVISIONS OF H.R. 8532

H.R. 8532 employs an ancient concept of our basic English common law-- the power of the sovereign to sue as parens patriae on behalf of **9 the weak and helpless of the realm-- to solve a very modern problem in antitrust enforcement. This doctrine is also firmly embedded in American jurisprudence. Since 1900 the Federal courts have expanded the power of a State to sue 'in her capacity as a quasi-sovereign or as agent and protector of her people against a continuing wrong done to them.'
[10] The parens patriae doctrine already applies to antitrust injunction cases. H.R. 8532 extends the doctrine to permit States to protect their citizens by suing for damages when they are injured by antitrust violations. The following is a discussion of individual sections of the Bill.

### SUBSECTION 4C(a)

This is the heart of H.R. 8532. It permits a State attorney general to bring parens patriae actions for treble damages 'on behalf of natural persons residing in such State injured by any violation of the antitrust laws.'

The subsection creates no new substantive liability. Each person on whose behalf the State attorney general is empowered to sue already has his own cause of action under section 4 of the Clayton Act, even if, for practical reasons, the right to sue is not likely to be exercised. Subsection 4C(a) thus provides an alternative means to make practically available Federal remedies at law, previously denied, for the vindication **2579 of existing substantive claims. It authorizes State attorneys general to sue for damages on behalf of injured persons, subject to the other provisions of the bill, namely, (1) the right of individuals to opt out under section 4C(d), (2) the extinction of the individual's right to maintain his own suit if he does not opt out, and (3) the right of the individual to receive his appropriate share of any recovery.

The establishment of an alternative remedy does not increase any defendant's liability. To the extent an antitrust violator was liable to an individual, H.R. 8532 would make the violator liable to either the individual or the State. The likelihood of

a financial recovery against an antitrust violator, however, is significantly increased because H.R. 8532 creates an effective remedy where none existed before.

The subcommittee and the full committee gave extended consideration to the proper scope of the remedy. The original bill before the subcommittee, H.R. 38, would have permitted actions on behalf of 'citizens' injured by antitrust violations. The subcommittee also considered using the terms 'person' and 'consumers'; it concluded that 'persons' was too broad a term as it might be construed to include business entities, which are able, in general, to fend for themselves. On the other hand, the term 'consumers' was considered potentially too narrow and too prone to definitional problems.

The committee chose 'natural persons' as the best expression of the goals of the legislation. The term is intended to exclude business entities such as corporations, partnerships and sole proprietorships. While some 'natural persons' might be in a position to bring their own actions and some business entities might not, the committee concluded that these instances will be rare and that use of the phrase 'natural persons' will permit actions on behalf of those most in need  **\*10**  of representation but presently unrepresented. Moreover, the 'opt-out' provision of subsection 4C(d) will preserve the separate law suit of any 'natural person' who does not want the State attorney general to pursue his claim.

Under H.R. 8532, parens patriae actions may be maintained to recover damages for any antitrust injuries, except those resulting from violations of section 2 (price discrimination) and section 7 (anticompetitive mergers) of the Clayton Act. The Assistant Attorney General recommended that these sections not be included, and the committee agreed that they are not appropriate for parens patriae actions.

State attorneys general may retain outside private counsel to assist in the prosectuion of parens patriae cases. Private counsel may be especially necessary and useful when there is multistate litigation since private counsel may be better able to coordinate such litigation than any individual State attorney general. Private counsel may not, however, be retained or employed on a contingency fee basis under the committee's bill, because the committee felt that States should be encouraged to develop their own in-house antitrust capability.

SUBSECTION 4C(b)

Subsection 4C(b) provides the courts with a flexible alternative to the parens patriae action in those rare instances where a different approach  **\*\*2580**  is necessary to the efficient conduct of litigation. Under this section the court is empowered, on its own motion or that of any party, to order that an action originally filed as a parens patriae action be maintained as a class action. The attorney general may then represent an appropriate class or classes, regardless of whether he himself is a member of that class or of those classes.

Under the existing class action enforcement scheme, the courts have been reluctant to permit State attorneys general to act as representatives of classes of injured consumers, unless their States, or subdivisions thereof, have been injured in the same way as the other members of the class. [11] At one level, Sec. 4C(b) reflects the committee's disapproval of this unnecessarily narrow approach to the issue of adequate representation in antitrust class actions. [12]

The Judiciary Committee recognized that there may be occasions when extensive investigations and pretrial proceedings and the interests of all parties involved convince the court that, in the interests of justice, an action which was brought as a 4C(a) parens patriae lawsuit should be transformed to and maintained as a class action. It might, for instance, be fairer to all parties for the court to order that a parens patriae action become a 4C(b) action when both businesses and natural persons have been injured in exactly the same manner. Conversion to a 4C(b) action would be inappropriate except where the interests of justice would be served thereby. And it would clearly be inappropriate for a court to convert a 4C(a) action into a Rule 23 class action and, then, dismiss the case on grounds of unmanageability under Tule 23.

H.R. REP. 94-499(I), H.R. REP. 94-499(I) (1975)

---

**\*11** If a case is converted to a Sec. 4C(b) class action, the provisions of Secs. 4C(c), 4C(d), 4C(e), 4D, 4E, 4F(b), and 4G apply, even though they may be inconsistent with the provisions of Rule 23. 'Adequacy of representation' may be an issue in Rule 23 actions because of the possibility that the representative may have a conflict of interest or otherwise be inadequate. No such issue should arise in parens patriae cases under section 4C(a) or 4C(b), however, absent extraordinary circumstances involving a particular State attorney general.

Subsection 4C(b) is designed to give the courts maximum flexibility to structure individual and consolidated actions to achieve the goal of full and fair adjudication of claims under the antitrust laws. [13] It will permit the courts to utilize the services of the attorney general in a broad representative capacity in those few cases where the parens patriae action would be clearly inappropriate.

The committee is clear in its preference for parens patriae actions under section 4C(a). One of the subsidiary purposes of H.R. 8532 is to avoid, in consumer actions, the cumbersome litigation of peripheral issues which under Rule 23 has sometimes become more time-consuming and costly than litigating the merits of the case. Only where some positive impediment to the maintenance of a parens patriae action exists should a court have to resort to the alternative provided by section 4C(b).

**\*\*2581** SUBSECTIONS 4C(c) AND 4C(d)

Subsections 4C(c) and 4C(d) must be read together; they are designed to protect the constitutional due process rights of each individual potential claimant and defendant.

The constitutional concept of due process in a civil case embodies at a minimum two components: notice that a court is about to take action which may affect a person's interests, and an opportunity to be heard in defense (or prosecution) of that interest. [14] At the same time, a defendant who litigates a case against a case against a person who purports to represent a particular class has a strong interest in being able to enforce the result against and avoid relitigation with any person who was supposedly represented in the action. That interest is given effective recognition in the legal doctrines of res judicata and collateral estoppel.

Subsection 4C(c) and 4C(d) serve these constitutional interests by providing all potential claimants in the parens patriae action with adequate notice that their interests are to be adjudicated and an opportunity to be heard in vindication of those interests. Simultaneously, they allow a defendant to plead the result as res judicata against all those represented by the State attorney general.

Under Sec. 4C(c), the attorney general in a parens patriae action is required to cause 'notice thereof to be given by publication in accordance **\*12** with applicable State law or in such manner as the court may direct: except that such notice shall be the best notice practicable under the circumstances.'

The subsection reflects a committee preference for notice by publication in all cases where such notice would adequately serve the constitutional and other interests at stake. 'Publication' should, of course, be taken in modern context to include employment of media such as radio and television, as well as traditional newspaper advertisement. [15] When there is no applicable State law, or where the manner of publication provided by State law would, in the court's judgment, be insufficient, the court should determine the method of publication.

The statutory preference for publication is qualified by the proviso that whatever form of notice adopted should be 'the best notice practicable under the circumstances.' This language is taken from Rule 23 and from major Supreme Court decisions under the due process clause. These decisions require the court to engage in a delicate balancing process to determine what is the 'best notice practicable under the circumstances.' This balancing test cannot be reduced to any specific written formula, but a few of the underlying principles are worth mentioning. Where the number of potentially affected parties is large **\*\*2582** and individual interests are small or remote, or where names and addresses are difficult or impossible to obtain, the due process clause does not

---

rigidly require individual written notice of the litigation to be sent to each. [16] Moreover, where the requirement of individual written notice would frustrate a major legislative or judicial policy, that countervailing policy is entitled to considerable weight in the determination whether publication notice will suffice. [17]

In light of these factors and the historically fluid nature of due process requirements, the committee believes that the imaginative use of publication notice will suffice in the vast bulk of parens patriae antitrust suits. The numbers of potential claimants will frequently be very large, the absence of documented proof of purchase will make identification of individual claimants in many instances difficult or impossible and publication through newspapers, radio and television will frequently quite literally be 'the best notice practicable.' At the same time, the strong public interest in enforcement of the antitrust laws against those who have injured large numbers of consumers would be frustrated by a rejection of publication notice in favor of something economically or otherwise impracticable. Only in extraordinary circumstances where publication notice would be manifestly unfair should courts require more.

Subsection 4C(d) provides that any person may exclude his claim from the parens patriae action by filing notice of intent to do so within 60 days after notice has been given. Failure to file such a notice of intent to exclude himself within the given time will result in a potential  **\*13**  claimant being bound by the result in the parens patriae case, absent a showing of good cause for his failure. If an individual opts out, he may bring his own action under existing law.

Thus subsection 4C(d) provides protection for the potential claimant's interest in prosecuting his own action. At the same time it safeguards the res judicata rights of defendants against claimants who fail to come forward and exclude themselves from the representational action. In this regard it protects the right of a defendant to avoid duplicative liability.

SUBSECTION 4C(e)

Under Rule 41 of the Federal Rules of Civil Procedure parties to litigation are ordinarily allowed to dismiss or compromise the action without court approval. In Rule 23 class actions, however, settlements require court approval, which is intended to offer protection to the class members. Under Sec. 4C(e) of the bill, dismissal or compromise of a parens patriae action without the approval of the court is likewise prohibited. moreover, where an action is dismissed or compromised, notice  **\*\*2583**  must be given 'in such manner as the court directs,' thus allowing dissatisfied claimants to object to the proposed settlement.

The committee views this section as an important safeguard for consumers in the event an attorney general seeks to terminate a parens patriae action by settlement.

Subsection 4C(e) serves a special prophylactic function, to protect members of the class from unjust or unfair settlements should their champion become fainthearted or inadequate in his representation. This section is intended to promote public confidence in the settlements of parens patriae cases by requiring court approval. As under Rule 23, it will be incumbent on the courts to consider carefully any proposed settlement and to approve that settlement only if it is fair and reasonable and in the interests of justice.

SECTION 4D AND 4E

These two sections deal with the measurement and distribution of damages once liability has been established. They must also be viewed and understood as a unit. Section 4D provides that a State attorney general may prove the damages suffered by a given class in the aggregate by statistical or other reasonable methods of estimation. Section 4E provides that any amounts left over after the satisfaction of individual claims shall be distributed as the court may direct. These sections address another major difficulty in the emerging Rule 23 case law. The potential difficulties of computing and distributing damages large classes of persons have led a number of courts to refuse to certify actions under Rule 23 on the grounds that they would be unreasonable. [18]

The fundamental premise of sections 4D and 4E with regard to the measurement, assessment and distribution of damages is that the antitrust laws should, at a minimum, provide an effective means whereby a plaintiff or plaintiff class can force a guilty defendant to part with **\*14** all measurable fruits of his illegal activity as it relates to the plaintiff, multiplied threefold to reflect the factor Congress has determined is necessary as a punishment, as a deterrent, and as an incentive. This premise is in fall accord with established concepts of damages under the antitrust laws. The cases reiterate that defendants must disgorge ill-gotten gains; [19] and the standard rules for measuring damages allow a reasonable estimate thereof once the fact of injury has been established. [20]

Section 4D draws upon this established body of law by permitting a reasonable estimation of the amount of damage to the class as a whole in a parens patriae or Rule 23 antitrust class action. After the violation and the fact of some injury to the class have been proved, Sec. 4D permits the aggregation of the claims and amounts of injury to the members of the injured class without the requirement of separate proof of the fact and amount of injury to each individual member of the class. Questions relating to causation and the fact and amount of injury to a class may require the court to address such questions separately with respect to different groups within the class of natural persons.

**\*\*2584** Section 4D acknowledges the obvious reality that 'it is far simpler to prove the amount of damages to the members of the class by establishing their total damages than by collecting and aggregating individual claims as a sum to be assessed against the defendants.' [21] In a price-fixing case, for example, frequently the only method of determining the total impact of the conspiracy will be to measure total illegal overcharges in defendants' total sales during the relevant period at the artificially high price to members of the injured class. Once this figure has been computed and assessed against the defendants, their real interests in the case is at an end. The question of how the sum assessed as damages should be distributed and employed is one in which the defendants have no interest. Their only proper remaining interest-- their res judicata rights-- are fully protected by Sec. 4C(d).

Aggregation of damages, as provided by Sec. 4D, is necessary because the proof of individual claims and amounts would be impracticable and virtually impossible. Parens patriae actions will normally be **\*15** brought in instances where thousands or millions of consumers have been injured. Few consumers keep receipts for all the goods and services they purchase or use. In fact, individual receipts or records are not available on a great many consumer goods and services. Snack food machines, for instance, do not issue receipts. Without the aggregation provisions of Sec. 4D, antitrust violators would be able to injure most consumers with impunity, even if Sec. 4C(a) parens patriae actions were permitted. Section 4D is also necessary to avoid endless trials in which thousands or millions of individuals would have to appear to prove their individual claims and the amounts of their individual injuries. The section is needed to make parens patriae cases manageable and effective. It will reduce significantly the time and expense of the parties and it will simplify the job of the court. Section 4D also permits aggregation and estimation of damages in class actions brought by private parties under Sec. 4 of the Clayton Act. In this regard, the section overcomes some problems which have arisen in cases holding that large classes and the difficulties of damage proof render litigation unmanageable.

Section 4D is fair to both plaintiffs and to defendants. It changes the method by which damages are to be measured and assessed, but **\*\*2585** the defendant is entitled to a jury trial on the same issues as before. As in other antitrust cases, the pertinent issues of fact in a parens patriae case will be whether there was a violation of the antitrust laws, whether that violation caused an injury to the plaintiffs, and what the amount of damage was.

Section 4D does not permit speculative damages, but it does permit-- as the courts have done consistently-- the damages to be estimated reasonably. There is no injustice in permitting aggregation and estimation after the defendant's liability to the class has been established. The courts have long permitted damages to be proved in antitrust cases by a 'just and reasonable estimate of the damages based on relevant data.' [22]

As the Supreme Court put it almost 45 years ago in Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563 (1931) [22a] :

Where the tort itself is of such nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts . . . (T)he risk of the uncertainty should be thrown upon the wrongdoer instead of upon the injured party.

The committee believes that a defendant who has committed an antitrust violation has no right, constitutional or otherwise, to the retention of one penny of measurable illegal overcharges or other fruits of the violation. This committee emphatically rejects the notion that our constitutional requirements are so rigid that they somehow require that each of millions of potential claimants for individually trivial sums be paraded through the court to prove his personal damages, when the best evidence and often the only appropriate measure of the scope **\*16** of the violation is found in the records of the defendants themselves. A number of Federal courts have agreed. [23]

While the premise of Sec. 4D is that defendants should be made to disgorge all measurable profits from an antitrust violation, Sec. 4E, which applies only to parens patriae actions, recognizes that rarely, if ever, will all potential claimants actually come forward to secure their share of the recovery. Section 4E requires that all potential claimants be given a reasonable opportunity to claim their 'appropriate portion of the damages awarded less unrecovered costs of litigation and administration.' once this claims procedure has run its course, Sec. 4E commits the disbursement of the undistributed portion of the fund, which will often be substantial, to the discretion of the court. The funds remaining should be used for some public purposes benefiting, as closely as possible, the class of injured persons.

Section 4E thus adopts a concept developed in highly imaginative fashion by a number of courts over the years. The judicial antecedents of Sec. 4E include cases in which recoveries for illegal overcharges on bus and taxi fares were applied to reduce those fares in future years. [24] and the innovative application of illegal overcharges in the antibiotic drug industry to a variety of programs beneficial to the drug-consuming **\*\*2586** public. [25] These include the expansion of State-sponsored health programs, medical research, the training of nurses and paramedical personnel, the staffing of medical and rehabilitation clinics, and other similar programs. [26]

The committee considered and squarely rejected arguments that this method of applying damage recoveries to the general benefit of the injured class is unconstitutional. [27] Once it is acknowledged that the antitrust violator has no constitutional right to retain the profits of his illegal activity, it becomes clear that he has no constitutionally protected interest in how those profits are distributed for the benefit of those whom he has injured. Using the antibiotic litigation example, neither the public nor a person who has been illegally overcharged for his antibiotics receives an unconstitutional 'windfall' at the expense of the price-fixer when the fruits of the conspiracy are used to **\*17** establish a medical clinic in his neighborhood. The only alternative-- retention of the profits by the adjudicated wrongdoer-- is unconscionable and unacceptable. [28]

SECTION 4F

Section 4F promotes parens patriae actions as a major aspect of antitrust enforcement by encouraging Federal-State cooperation. The section provides that whenever the United States has brought suit in its proprietary capacity under Sec. 4A of the Clayton Act, and the U.S. Attorney General believes that the same antitrust violation may have given rise to potential parens patriae claims, he shall notify the appropriate State attorneys general. Whenever a State attorney general so requests, in order to evaluate the notice from the U.S. Attorney General or in order to bring a parens patriae action, section 4F(b) requires the U.S. Attorney General to make the Justice Department's investigative files available to the State attorneys general 'to the extent permitted by law.' This means that the files are to be made available except where specifically prohibited.

  **2587** Section 4F(b) reflects the committee's desire that the Federal Government cooperate fully with State antitrust enforcers.

The benefits of increases in Federal-State cooperation and coordination of antitrust enforcement are obvious, and are achieved in H.R. 8532 without the expenditure of additional Federal funds.


SECTION 4G

Section 4G defines the terms used in Secs. 4C, 4D, 4E, and 4F.

The term 'state attorney general' is defined as the 'chief legal officer of a State, or any other person authorized by State law' to bring parens patriae actions. Since 'State' is defined to include the District of Columbia, the Commonwealth of Puerto Rico and the territories and possessions of the United States, it thus includes the Corporation Counsel of the District of Columbia, and it includes any legally appointed special prosecutors.

The committee strongly supports the development of 'in-house' State antitrust capabilities. At the present time, regrettably, only a few States have the staff and financial ability to prosecute protracted antitrust cases without the assistance of retained private attorneys. Especially in consolidated multistate litigation, retained counsel may well be both necessary and entirely proper for parens patriae cases.

Nonetheless, the Judiciary Committee believes that certain types of fee arrangements between States and private attorneys may inhibit the development of State antitrust capabilities. The definition of State attorney general, therefore, specifically prohibits parens patriae cases **18** to be brought by 'any person employed or retained on a contingency fee basis.'

Suits in the name of a State are an exercise of State power. The committee believes that the States should exercise control over the use of State power not only in theory but in fact. If a State attorney general were able to delegate this function to private counsel on a contingency fee basis, the political and financial stake he would experience in otherwise prosecuting the action would be substantially diminished. And thus State power would be exercised without the guarantee of State supervision.

The committee bill excludes the use of fee arrangements whereby a State agrees to pay a private attorney a percentage of the recovery if the attorney wins the parens patriae case for the State. H.R. 8532 also prohibits any contracts which make the outside counsel's fee or the amount thereof contingent on the amount, if any, of the recovery or on whether there is a recovery.

The term 'State', as used in proposed Secs. 4C, 4D, 4E, and 4F includes the District of Columbia, the Commonwealth of Puerto Rico, and the territories and possession of the United States.

As used in the parens patriae sections, especially Sec. 4C, the term 'antitrust laws' excludes sections 2 and 7 of the Clayton Act. Section 2 **2588** is the Robinson-Patman Act, which concerns price discrimination, and section 7 is the section which prohibits mergers which are anticompetitive. Assistant Attorney General Thomas Kauper recommended that these provisions be excluded from the violations for which State attorneys general could recover damages in parens patriae actions. The committee believes that evolving standards of damage assessment under these sections are in sufficiently embryonic stages that further evaluation is necessary before permitting statewide actions of a parens patriae nature. [29]

Finally, the bill defines the term 'natural persons' so as to exclude sole proprietorships and partnerships. This provision is discussed in connection with Sec. 4C(a).


SECTION 3-ADDITIONAL AMENDMENTS TO THE CLAYTON ACT

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Section 3 of H.R. 8532 amends the Clayton Act's provisions concerning the statute of limitations, tolling that statute during the pendency of Government actions, and the injunction section.

Section 3(1) amends the statute of limitations provision to include parens patriae actions under section 4C within the 4-year statute of limitations.

Section 3(2) conforms the tolling provision of the Clayton Act so that States' rights of action under section 4C will be treated the same as other rights of action for which the statute of limitations is tolled (staved) pending the outcome of antitrust civil or criminal cases brought by the United States.

### ATTORNEYS' FEES IN INJUNCTION CASES

Section 3(3) of H.R. 8532 provides that in parens patriae injunction cases and in all other private antitrust cases, a prevailing plaintiff shall be awarded reasonable attorneys' fees.

**\*19** The Clayton Act is intended to provide a sufficient incentive for private parties to sue antitrust violators to redress their grievances effectively. That incentive is primarily achieved by permitting a winning plaintiff to recover treble damages for any injuries he has sustained as a result of the defendant's violation of the antitrust laws.

Another significant incentive provided in Sec. 4 of the Clayton Act is the requirement that a losing defendant in a damage case pay for a 'reasonable attorney's fee' for a winning plaintiff. Because antitrust cases are frequently lengthy and complicated, they are normally very expensive for a person to bring and maintain. Attorneys' fees, therefore, comprise by far the largest portion of the legal expenses incurred in maintaining a private antitrust lawsuit. Since the award of attorneys' fees is made in addition to the treble damage award, a prevailing plaintiff is able to pay for the services of his attorney without having to reduce his damage award. The attorneys' fee provision thus preserves the incentive for a private party to file a meritorious lawsuit.

The injunctive provisions of Sec. 16 of the Clayton Act, 15 U.S.C. 26, however, are silent on the subject of awarding attorneys' fees to prevailing plaintiffs. Until recently, the U.S. courts of appeals were split **\*\*2589** over whether attorneys' fees could be awarded in antitrust injunction cases. Such fees were disapproved in Decorative Stone Co. v. Building Trades Council of Westchester County, 23 F.2d 426 (2d Cir.), cert. denied, 277 U.S. 594 (1928), [29a] but they were approved in ITT v. General Telephone & Elec. Co., 43 U.S.L.W. 2466 (9th Cir., April 25, 1975).

The issue of attorneys' fees in Sec. 16 injunction cases was apparently disposed of on May 12, 1975, [29b] when the Supreme Court rules in Alyeska Pipeline Service Co. v. Wilderness Society, 95 S.Ct. 1612 courts have no power to award attorneys' fees in the absence of specific statutory authority. While Alyeska was not an antitrust case, the principle apparently applies to cases brought under section 16 of the Clayton Act. The court noted in Alyeska that:

It is true that under some, if not most, of the statutes providing for the allowance of reasonable fees, Congress has opted to rely heavily on private enforcement to implement public policy and to allow counsel fees so as to encourage private litigation. Fee-shifting in connection with treble damage awards under the antitrust laws is a prime example. 95 S.Ct.at 1624.

Alyeska invited Congress to enact specific legislation authorizing the award of attorneys' fees when there is a strong public policy. In the case of Sec. 16 antitrust injunction actions, there is such a compelling public policy to justify the award of attorneys' fees, and Sec. 3(3) of H.R. 8432 provides the specific legislative authority necessary.

The antitrust laws clearly reflect the national policy of encouraging private parties (whether consumers, businesses, or possible competitors) to help enforce the antitrust laws in order to protect competition through compensation of antitrust victims, through punishment of antitrust violators, and through deterrence of antitrust violations. Litigation by 'private attorneys general ' for

monetary relief and for injunctive relief has frequently proved to be an effective enforcement tool. Alyeska, however, has apparently eliminated the possibility that prevailing plaintiffs can recover attorneys' fees in meritorious and **\*20** successful injunction cases. As such, Alyeska creates a significant deterrent to potential plaintiffs bringing and maintaining lawsuits to enjoin antitrust violations. Without the opportunity to recover attorneys' fees in the event of winning their cases, many persons and corporations would be unable to afford or unwilling to bring antitrust injunction cases.

Indeed, the need for the awarding of attorneys' fees in Sec. 16 injunction cases is greater than the need in Sec. 4 treble damage cases. In damage cases, a prevailing plaintiff recovers compensation, at least. In injunction cases, however, without the shifting of attorneys' fees, a plaintiff with a deserving case would personally have to pay the very high price of obtaining judicial enforcement of the law and of the important national policies the antitrust laws reflect. A prevailing plaintiff should not have to bear such an expense. Section 3(3) of H.R. 8532, therefore, is intended to reiterate congressional encouragement for private parties to bring and maintain meritorious antitrust **\*\*2590** injunction cases. Under this section, a plaintiff who substantially prevails would be entitled to the award of 'reasonable attorneys' fees.'

In addition to private parties, States would be entitled to recover reasonable attorneys' fees whenever they prevail in Sec. 16 cases.

## VI. COMMITTEE ACTION

In March 1974, during the 93d Congress, the Judiciary Subcommittee on Monopolies and Commercial Law conducted 2 days of hearings on H.R. 12528 and H.R. 12921. Identical bills, H.R. 38 and H.R. 2850, were introduced during the 1st session of the 94th Congress, and the subcommittee held an additional 2 days of hearings in February and March 1975. The subcommittee received testimony from Assistant Attorney General for Antitrust Thomas Kauper, the Federal Trade Commission's Director of the Bureau of Competition James Halverson, National Association of Attorneys General Antitrust Committee Chairman Andrew Miller (attorney general of Virginia), representatives of the attorneys general of Connecticut, New York, Ohio, and California, and representatives of the private antitrust bar and of private industry. In addition, the subcommittee received correspondence or prepared statements from several Members of Congress, a total of 38 State attorneys general, the Mayor of Washington, D.C., the American Bar Association's Section on Antitrust Law, the Chamber of Commerce, the National Association of Manufacturers, the Consumers Union, and other persons and organizations.

In public session on May 7, 1975, after 4 days of marking up H.R. 2850, the Subcommittee on Monopolies and Commercial Law ordered 11 to 2 that the amended version, H.R. 6786, be introduced and reported favorable to the full Committee on the Judiciary. On July 10, 1975, in public session, the subcommittee agreed by unanimous consent to reconsider H.R. 6786, which was then amended. By a 9 to 2 vote, the subcommittee ordered the favorable report of a clean bill, H.R. 8532, to the full Committee on the Judiciary. In public session on July 22 and 24, 1975, the committee considered and amended H.R. 8532, and on July 24, the committee by voice vote ordered that H.R. 8532, as amended, be reported favorably to the House.

## **\*21** VII. INFORMATION SUBMITTED PURSUANT TO RULES X AND XI

### A

Clause 2(1)(3) of Rule XI is not applicable. Section 308(a) of the Congressional Budget Act of 1974 will not be implemented this year. See last paragraph of House Rept. No. 94-25, 94th Cong., 1st session (1975).

### B

No estimate or comparison from the Director of the Congressional Budget Office as received.

C

No related oversight findings or recommendations have been made by the Committee on Government Operations under clause 2(b)(2) of Rule X.

**2591  D

Pursuant to Clause 2(1)(4) of Rule XI, the committee believes that H.R. 8532 can be a major force in combating the present inflationary spiral, and can have a significant anti-inflationary impact on prices and costs in the operation of the national economy.

In August of 1974, the Assistant Attorney General in charge of the Justice Department's Antitrust Division estimated that ineffective competition in the Nation's economy was adding $80 billion annually to prices paid by consumers. An FTC Commissioner estimated that consumer costs rose as much as $10 billion annually because of price fixing violations alone. The President of the United States, in October, 1974, also recognized and endorsed the anti-inflationary effect of vigorous enforcement of the antitrust laws. In the 93d Congress, the Joint Economic Committee also concluded that it is vitally important to strengthen competition not only to curtail inflation, but also to preserve the free market system itself.

Thus while the precise extent of the inflationary impact of antitrust violations cannot be determined, it is clear that they introduce foreign and artificial forces exerting upward pressure on prices. By providing more effective enforcement of the antitrust laws on a large scale, H.R. 8532 should contribute to a reduction in the level of these forces.

Compensating antitrust victims and preventing violators from being unjustly enriched will not alone reduce consumer prices and combat inflation. But, to the extent that the individual States develop credible antitrust enforcement capabilities, H.R. 8532 will help to convince potential antitrust offenders that violations will not be profitable. The bill gives the States the opportunity to deter future antitrust violations, but the deterrence will depend entirely upon the States' taking advantage of their opportunities to bring parens patriae cases. If States use H.R. 8532 responsibly and are able to deter antitrust violations, then H.R. 8532 will have an anti-inflationary impact locally and regionally, at least, by reducing imperfect competition's contribution to inflation.

*23  MINORITY VIEWS OF MESSRS. HUTCHINSON, RAILSBACK,
WIGGINS, MOORHEAD, ASHBROOK, HYDE AND KINDNESS

In the name of providing a legal remedy to those who, as a practical matter, have none, this bill charges far beyond the mark to impose a mandatory irreductible fine on violators of the antitrust laws. Although this remedy is deemed civil, it partakes of both civil and criminal aspects. In doing so, the remedy fails to meet ordinary standards for civil or criminal remedies. As a civil remedy, the damages paid generally will not be paid to compensate victims for their losses. As a criminal remedy, the damages paid will be a mandatory fine, often astronomical, but irreducible, without regard for the interests of justice in the specific case. In our opinion, this legislative remedy presents the worst of both worlds.

We agree that the bill establishes no new substantive liability. No new antitrust violations are created. However, the bill does establish procedural machinery for the calculation and imposition of damage awards that undoubtedly will revolutionize the law of antitrust damages.

**2592  It will be said that all this bill does is to allow defendants' current potential liability to become realized, and that to oppose this legislation is, in effect, to oppose the promise of section 4 of the Clayton Act, now over 60 years old. But since the logic of a single idea does not take account of competing ideas, one may by mere logical extensions step over the precipice.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

This bill does go too far. It is critical to note that this bill operates in an area where the claimants are often nameless, unidentified, unidentifiable, and ignorant of the trivial injury allegedly suffered and ignorant of who inflicted it. Nevertheless, the bill extracts from defendants three times the damages sustained. Why? Because, it is suggested, that's the way it's done in antitrust law.

But the purpose of treble-damage awards in antitrust law as we understand it is to compensate victims for their injury and to provide the incentive for bringing the action. But in the typical case envisioned by this bill-- for example, one involving price-fixing bread-- there is no incentive to bring the case even though treble damages are obtainable and there generally are no provably known victims to compensate. What the treble-damage award really is in this context is punishment.

Although we believe wrongdoers should not be allowed to retain ill-gotten gains, this principle does not compel the imposition of treble damages. It is respectfully suggested that payments exacted from defendants which, as a general matter, will not go to compensate victims for losses and which will be put to some noble purpose at the discretion of the court may be more accurately termed 'fines' than damage awards.

But the fines imposed by this bill-- and this is critical-- may not be imposed commensurate with the interests of justice. The committee **\*24** rejected an amendment that would have permitted the court to take into consideration the 'defendant's degree of culpability, any history of prior such conduct, ability to pay, effect on ability to continue to do business and such other matters as justice may require.' Although these actions may be filed on behalf of millions of unknown individuals and involve millions of dollars, the resultant award must be arbitrarily calculated and may not be reduced even if the interests of justice so require.

The imposition of minimum mandatory penalties may have its place in the law, but such penalties are established at the low end of the scale so as to be 'just' in every application. No so with these fines, which may run into millions of dollars. Moreover, such penalties envision a range of choices from which the court, in the interests of justice, might fashion an appropriate penalty. But this bill goes far beyond that. Under this bill once the extent of the injury is shown, the imposition of the fine, both in fact and in amount, is automatic.

It is argued that it is no concern to the defendant to what purpose the award is put after it has paid it. The argument misses the point. It should be of concern to the Congress how necessary it is to inflict possibly astronomical awards, definitionally three times the damage done, when there is no interest among the victims in bringing the case and where there are no provably known victims or only a few able to make claim against the award.

If the purpose is not to compensate in the manner of a civil remedy, it must be to punish and deter in the manner of a criminal penalty. **\*\*2593** But as a criminal penalty, it is harsh and arbitrary. If the major part of an award is committed to the discretion of the court to be used for some related purpose, it is difficult for us to understand how the purpose, to be fashioned by the court after the case is heard, must be satisfied by an amount which is exactly three times the damage proven to have been done by the defendant.

The purpose fashioned by the court will be a public one. For example, it is suggested that in a case involving the price-fixing of drugs, it is appropriate to commit the award to support a drug clinic. But it is patently clear that the needs of the drug clinic do not define the amount of the award. Nor does the need to compensate, nor does the need to provide incentives for enforcement, as stated before.

We believe that the public interest served by the channeling of the award to some analogous purpose must also admit other factors. For example, if the award is such that it will require the defendant to liquidate assets and lay off employees from work, there may be circumstances where the economic well-being of the community should be a matter for the court to consider in determining whether the defendant should be required to pay the full amount.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.    15

H.R. REP. 94-499(I), H.R. REP. 94-499(I) (1975)

The provisions of the bill treating with the aggregation and distribution of damages are the crux of this legislation. We believe they are the wrong answer to the problem. Beyond that we believe that the bill will be subject to much abuse. By calling on the State attorneys general to champion these antitrust actions, the bill seeks to provide a political incentive for antitrust enforcement in cases where even treble damage awards provide no economic incentive.

We believe that politics and antitrust will not make a happy marriage. The temptations for the politically ambitious to ride into the  **\*25**  public eye as its champion against 'fat cat' antitrust violators by filing lawsuits to the sound of political trumpets may be too great. Since antitrust cases take years to complete, the politically ambitious attorney general need not fear the embarrassment of a string of losses. In any event, many of the cases will have been undoubtedly settled because of their adverse publicity and their nuisance value. The bill underscores how quickly we have forgotten the lesson many thought we learned last year that politics and antitrust should not be mixed.

Finally, in our opinion, the committee report foes not correctly describe the notice requirements of the bill. In subcommittee there was substantial debate on the quality of the notice to claimants that should be required. It was recognized that to require only publication notice would certainly streamline the lawsuit, but it was likewise conceded that such a provision without more would be susceptible to constitutional attack on due process grounds in instances where the names and addresses of the claimants were known but where mailed notice-- the best notice practicable-- was not given. Thus in order to insulate the bill from litigation over its procedure and to eliminate the notice issue as a matter of controversy the subcommittee adopted the proviso that the notice had to be the 'best notice practicable, ' which the committee ratified without further debate. Although the report correctly describes where the phrase is found in the Federal rules of civil procedure and in case law, other language of the report can be fairly read to give this phrase of art a new meaning. The repot suggests that the test for adequacy of notice is not whether it is 'best' for the claimants  **\*\*2594**  to be notified but whether it is 'best' for the policy of authorizing parens patriae actions against antitrust violators. Such a suggestion is foreign to the intention expressed in adopting the language explained in the report.

For these reasons we respectfully dissent.

EDWARD HUTCHISON.

TOM RAILSBACK.

CHARLES E. WIGGINS.

CARLOS J. MOORHEAD.

JOHN M. ASHBROOK.

HENRY J. HYDE.

THOMAS N. KINDNESS.

**\*27**  SEPARATE VIEWS OF MS. JORDAN

I wholeheartedly support this bill. As a sponsor of the original measure I believe it represents a vital step forward in both general antitrust enforcement and consumer protection.

I am seriously concerned, however, with one amendment adopted by the committee, which may have the effect of undermining a great deal of what the bill is intended to accomplish.

Section 4G, as amended, by its definition of a 'State Attorney General, ' effectively precludes the States from employing knowledgeable private counsel on the basis of any 'contingency fee.'

The amendment has, I believe, two laudable purposes, namely to encourage States to develop their own antitrust capabilities and to protect them from potential gouging by lawyers who take cases on a flat percentage fee, thus sometimes winding up with unjustifiable windfall fees.

I am in sympathy with both these objectives. Indeed, I would favor an amendment to provide Federal assistance to the States to develop antitrust litigation capabilities. However, I think it is unrealistic to believe that more than a handful of States will be in a position to conduct a significant amount of such litigation on their own in the forseeable future. And some States will never have the resources or the interest to hire and train the large staffs which antitrust litigation requires.

Thus there will persist for the forseeable future a critical need to enlist the services of the private bar if the bill is to have any real impact. I am concerned that a flat ban on 'contingency fees' will effectively place the services of perfectly ethical and highly knowledgeable attorneys beyond the reach of the States.

Most plaintiff's antitrust litigation, like most plaintiff's litigation in general, is conducted presently on a contingent fee basis. Section 4 of the Clayton Act anticipates this. It provides for the court to award a reasonable attorney's fee to a prevailing plaintiff, in addition to his treble damage recovery. Thus for the most part, lawyers agree to take antitrust cases for plaintiffs in return for whatever fee the court awards them at the successful conclusion or settlement of the action. Without such arrangements, there would be precious little private antitrust enforcement, since few, if any, plaintiffs will be able to pay the normal hourly rate of experienced counsel without regard to the outcome of the case. States, while in a better financial position than **2595 ordinary private plaintiffs, will likewise be unable in most instances to commit the required sums to a major case in advance, win or lose.

In some instances, contingency fees can involve overreaching. I do not personally approve of arrangements whereby the lawyer receives both the court-awarded 'reasonable fee' and a percentage of the recovery on top of that. However, I fear that the committee, by striking at the overreaching may have seriously undermined the entire scheme of treble damage prosecution.

*28 At the very best, the amendment adopted by the committee regarding 'contingency fees' creates dangerous ambiguities with respect to permissible fee arrangements. It does not specify what contingent elements must be present in order to render an arrangement unacceptable, and it is clear that not all uncertainty as to final amount will render a fee 'contingent.' Even where the lawyer is being paid an hourly charge, he will usually have little idea at the outset what his actual fee will be. The committee amendment could, therefore, be open to an interpretation which would salvage fee contracts dependent for their ultimate amount on some unknown element, such as the award of the court at the conclusion of the case. The risk is very great, however, that a court would determine that the arrangement was 'contingent' if some element of success-- either at settlement or at trial-- made the difference between a large fee for the lawyer and a low, probably uncompensatory one.

I think that risk is unacceptable, since States are certain to be dependent for many years upon the services of expert private counsel, whom they will be unable to compensate on a hourly basis without regard to the outcome of the case.

There is another vital point at stake. The contingent fee is not merely an honorable means of financing litigation for those who would otherwise be unable to afford it until the award of final judgement. It is also recognized as an important tool for weeding out the frivolous and unmeritorious case on the basis of expert assessment. It is highly unlikely that a lawyer knowledgeable in any field will be prepared to invest large quantities of his own time and effort in a case on the basis that he will be uncompensated unless he obtains a successful result for the client, unless he believes after careful examination that the case has serious merits.

This point is responsive to two concerns which have been expressed by opponents and critics of the bill. Business interests have argued that the enactment of this legislation will bring a plethora of unfounded lawsuits for enormous sums of money, which they will have to defend at great expense. And members of the committee have on several occasions questioned whether the law might not present irresistible temptations to politically ambitious State officials bent on making a reputation without regard to the ultimate disposition of the cases they bring.

Neither of these unfortunate predictions is remotely likely to come true if the economic judgment of the legal experts is invoked in the evaluation of cases through the use of the contingent fee.

Hon. BARBARA JORDAN.

\* \* \* \*

N1 Hearings on H.R. 12528 and H.R. 12921 Before the Monopolies and Commercial Law Subcomm. of the House Comm. on the Judiciary, 93d Cong., 2d Sess., ser. 43, at 27 (1974) (emphasis added) (hereinafter cited as 1974 Hearings).

1a 65 S.Ct. 716, 89 .Ed 1051.

2 Hearings on H.R. 38 and H.R. 2850 Before the Monopolies and Commercial Law Subcom. of the House Comm. on the Judiciary, 94th Cong., 1st Sess., ser. 3, at 16 (1975) (hereinafter cited as 1975 Hearings).

3 State and local governmental units have been recognized as 'persons ' under Sec. 4 and its predecessor for the purpose of bringing proprietarial damage actions since at least 1906. See Chattanooga Foundary & Pipe Works v. City of Atlanta, 203 U.S. 390 (1906) 27 S.Ct. 65, 51 L.Ed. 241.

4 Some courts initially interpreted the Supreme Court's decision in Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481 (1968) 88 S.Ct. 2224, 20 L.Ed.2d 1231, rehearing denied, 87 S.Ct. 64, 393 U.S. 901, 21 L.Ed.2d 188, and 89 S.Ct. 65, 393 U.S. 901, 21 L.Ed.2d 188, to limit standing to sue to the first purchaser of a price-fixed product. In Hanover Shoe the Court refused to allow a defendant to escape liability by asserting that his purchaser had passed on any illegal overcharge to the ultimate consumer. A major concern of the Court was to prevent the violator from retaining the ill-gotten gains of his illegal behavior. The Court noted that if the first purchaser was denied standing the ultimate consumers would have neither the incentive nor the ability to bring effective actions for return of the overcharges. 392 U.S. at 494.

More recently lower courts have recognized the pro-enforcement thrusts of Hanover Shoe and have held that plaintiffs at lower levels of the chain of distribution may attempt to prove that illegal overcharges were in fact passed on to them. See, e.g., In re Western Liquid Asphalt Cases, 487 F.2d 191 (9th Cir. 1973).

5 The amount of the overcharge, of course, may not represent either the total social cost of the violation or the total of recoverable damages flowing therefrom. See, e.g., Flintkote Co., v. Lysfjord, 246 F.2d 368, 389-90 (9th Cir.), cert. denied, 355 U.S. 835 (1957) 78 S.Ct. 54, 2 .Ed.2d 46.

6 See, e.g., Dodson Stores, Inc. v. American Bakeries Co., 1973-1 Trade Cases, #74,387 (SD.NY. 1973) (all purchasers of bread in the New York metropolitan area); United Egg Producers v. Bauer Int'l Corp., 312 F.Supp. 319 (S.D.N.Y. 1970) (all purchasers of eggs in the United States).

7 1975 hearings, 16.

8 A single antitrust violation, it must be noted, may cause multiple injuries, and each individual or business which is injured in its business or property has a right to recover damages. A violation occurring at the retail level may, in addition to raising consumer prices, injure other retailers who compete with the violators.

8a 93 S.Ct. 2291, 36 .Ed.2d 974.

9 474 F.2d at 777.

10 Georgia v. Pennsylvania R.R., 324 U.S. 439, 443 (1945) 65 S.Ct. 716, 89 .Ed. 1051. For an historical discussion of the parens patriae doctrine in American law, see Hawaii v. Standard Oil Co., 405 U.S. 251, 257-260 (1972) 92 S.Ct. 885, 31 L.Ed.2d 184.

11 See, e.g., California v. Frito-Lay, Inc., 474 F.2d 774 (9th Cir.), cert. denied, 412 U.S. 908 (1973) 93 S.Ct. 2291, 36 L.Ed.2d 974.

12 As one court put it, 'it is difficult to imagine a better representative of the retail consumers within a State than 'State's attorney general.' In re Antibiotic Antitrust Actions, 333 F.Supp. 278, 280 (S.D.N.Y. 1971).

13 Once a parens patriae action has been converted to a class action under subsection 4C(b), it is not intended to limit in any fashion the existing discretion of the court to define classes and subclasses and to designate appropriate parties to provide adequate representation. To the contrary, the intent is to make clear the breadth of that discretion. Thus the attorney general could, under subsection 4C(b), be designated to act as a representative of a class including business entities, notwithstanding the fact that he could not initially have brought a subsection 4C(a) action on behalf of such entities. Likewise, even though subsection 4C(b) makes it clear that the attorney general or the State need not actually be a member of the class he acts to represent, such membership would not be a disqualification. Thus where the State itself is a purchaser, the attorney general could represent its proprietary interests and the interests of those of its citizens included in the class designated by the court.

14 See, e.G., Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314-15 (1950) 70 S.Ct. 652, 94 L.Ed. 865.

15 See Nolop v. Volpe, 333 F.Supp. 1364 (D.S.D. 1971).

16 Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, (1950) 70 S.Ct. 652, 94 L.Ed. 865; Hansberry v. Lee, 311 U.S. 32 (1940) 61 S.Ct. 115, 85 L.Ed. 22; Supreme Tribe of Ben-Hur v. Cauble, 255 U.S. 356 (1921) 41 S.Ct. 338, 65 L.Ed. 673; Gonzales v. Cassidy, 474 F.2d 67 (5th Circ. 1973); Berland v. Mack, 48 F.R.D. 121 (S.D.N.Y. 1969); Miller, Problems of Giving Notice in Class Actions, 58 F.R.D. 313, 314-15 (1972); Comment, 62 Geo.L.J. 1123, 1169, and n. 256 (1974); Note, 87 Harv.L.Rev. 589, 590 (1974).

17 Boddie v. Connecticut, 401 U.S. 371, 377-78 (1971) 91 S.Ct. 780, 28 L.Ed.2d 113, conformed to 329 F.Supp. 844; Armstrong v. Manzo, 380 U.S. 545, 550 (1965) 85 S.Ct. 1187, 14 L.Ed.2d 62; Schroeder v. City of New York, 371 U.S. 208, 212-13 (1962) 83 S.Ct. 279, 9 L.Ed.2d 255, 89 A.L.R.2d 1398; Sniadack v. Family Finance Corp., 395 U.S. 337, 339 (Harlan, J. Concurring) 89 S.Ct. 1820, 23 L.Ed.2d 349.

18 See, e.g., Boshes v. General Motors Corp., 59 F.R.D. 589 (N.D. Ill. 1973); City of Philadelphia v. American Oil Co., 53 F.R.D. 45 (D.N.J. 1971).

19 As the Supreme Court put it in a pivotal case:

'Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain. Failure to apply it would mean that the more grievous the wrong done, the less likelihood there would be a recovery.

'The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.'

Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264-65 (1946) 66 S.Ct. 574, 90 L.Ed. 652, rehearing denied 66 S.Ct. 815, 327 U.S. 817, 90 L.Ed. 1040. See also Continental Ore Co. v. Union Carbide & Carbon Co. 370 U.S. 690, 697 (1962) 82 S.Ct. 1404, 8 L.Ed. 2d 777; Bordonaro Bros. Theatres, Inc. v. Paramount Pictures, Inc., 176 F.2d 594, 597 (2d Cir. 1949); Banana Distributors, Inc. v. United Fruit Co., 162 F.Supp. 32, 46 (S.D.N.Y. 1958), rev'd on other grounds, 269 F.2d 790 (2d Circ. 1959).

20 See e.g., Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123-24 (1969) 89 S.Ct. 1562, 23 L.Ed.2d 129, on remand 418 F.2d 21, reversed 91 S.Ct. 795, 401 U.S. 321, 28 L.Ed.2d 77, rehearing denied 91 S.Ct. 1247, 401 U.S. 1015, 28 L.Ed.2d 552; Bigelow v. RKO Radio Pictures, Inc., supra note 19; Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555 (1931) 51 S.Ct. 248, 75 L.Ed. 544; Eastman Kodak Co. v. Southern Photo Materials Co. 273 U.S. 359 (1927) 47 S.Ct. 400, 71 L.Ed. 684.

21 In re Antibiotics Antitrust Actions, 33 F.Supp. 278, 281 (S.D.N.Y. 1971); see e.g., West Virginia v. Chas. Pfizer & Co., 440 F.2d 1079 (2d Cir.), cert. denied, 404 U.S. 871 (1971) 92 S.Ct. 81, 30 L.Ed.2d 115; Hartford Hospital v. Chas. Pfizer & Co., 1971 Trade Case #73,561 (S.D.N.Y. 1971).

22 Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264 (1946) 66 S.Ct. 574, 90 L.Ed. 652, rehearing denied 66 S.Ct. 815, 327 U.S. 817, 90 L.Ed. 1040.

22a 51 S.Ct. 248, 75 L.Ed. 544.

23 The Seventh Circuit put the matter succinctly:

'To permit the defendants to contest liability with each claimant in a single, separate suit, would, in many cases give defendants an advantage which would be almost equivalent to closing the door of justice to all small claimants. This is what we think the class suit was to prevent.'

Hohmann v. Packard Instrument Co., 399 F.2d 711, 715, (7th Cir. 1968), quoting Weeks v. Bareco Oil Co., 125 F.2d 84, 90 (7th Circ. 1941); See Dickenson v. Burnham, 197 F.2d 973 (2d Cir.), cert. denied, 344 U.S. 875 (1952) 73 S.Ct. 169, 97 L.Ed. 678; In re Antibiotics Antitrust Actions, 333 F.Supp. 278, 282, 283, 289 (S.D.N.Y. 1971). See also 1974 Hearings at 29; 1975 Hearings at 17 (testimony of Messrs. Kauper and Halverson).

Statistical and sampling methods are, of course, commonly used in evidence in Federal courts in a variety of contexts. See Manual for Complex Litigation Sec. 2.712 (1973). See also Brown Shoe Co. v. United States, 370 U.S. 294, 339-343 (1962) 82 S.Ct. 1502, 8 L.Ed.2d 510; United States v. United Shoe Mach. Corp., 110 F.Supp. 295, 305-07 (D. Mass. 1953); Rosado v. Wyman, 322 F.Supp. 1173 (E.D.N.Y. 1970), aff'd 437 F.2d 631 (2d Cir. 1971) (citing numerous cases and other authorities 322 F.Supp. at 1180-81); Zippo Mfg. Co. v. Rogers Imports, Inc., 217 F.Supp. 670, 680-84 (S.D.N.Y. 1963).

24 See Bebchick v. Public Utilities Comm'n., 318 F.2d 187 (D.C. Cir.), cert. denied 373 U.S. 913 (1963) 83 S.Ct. 1304, 10 L.Ed.2d 414; Daar v. Yellow Cab Co., 67 Cal.2d 695, 433 F.2d 732, 63 Cal.Rptr. 224 (1967).

25 In re Antibiotics Antitrust Actions, 333 F.Supp. 278 (S.D.N.Y. 1971).

26 Hearings on S. 1284 Before the Subcomm. on Antitrust and Monopoly of the Senate Comm. on the Judiciary, 94th Cong., 1st Sess., at 343 (1975).

27 Compare West Virginia v. Chas. Pfizer & Co., 440 F.2d 1079 (2d Cir. 1971), cert. denied 404 U.S. 871 (1971) 92 S.Ct. 81, 30 L.Ed.2d 115 (approving antitrust class action settlement embodying fluid class recovery concept with Eisen v. Carlisle & Jacqueline, 479 F.2d 1005, 1018 (2d Cir. 1973), vacated and remanded on other grounds, 417 U.S. 156 (1947) 94 S.Ct. 2140, 40 L.Ed.2d 732 (expressing due process doubts concerning what that court termed 'fluid class recovery').

28 The committee disapproves decisions such as City of Philadelphia v. American Oil Co., 53 F.R.D. 45 (D.N.H. 1971); Illinois Bell Tel. Co. v. Slattery, 102 F.2d 58 (7th Cir. 1939), and In re Hotel Telephone Charges, 500 F.2d 86 (9th Cir. 1975), in which, if allegations were accepted as true, defendants were permitted to retain millions of dollars in ill-gotten gains because of the apparent difficulties involved in manageability or in devising an equitable scheme for distribution of the overcharges to specific individual claimants. For added insight on the facts involved in the Illinois Bell outcome, see Newberg, Class Action Legislation, 9 Harv.J.Legis. 217, 231 (1972); Comment, 39 U.Chi.L.Rev. 448, 451, & n. 13 (1972); Note, 31 Md.L.Rev. 354, 361, & n. 50 (1971).

29 See Gottesman v. General Motors Corp., 414 F.2d 956 (2d Cir.), cert. denied, 403 U.S. 911 (1969) 91 S.Ct. 2008, 29 L.Ed.2d 689, rehearing denied 92 S.Ct. 29, 404 U.S. 876, 30 L.Ed.2d 125 (first holding that damages may be recovered under Sec. 7).

29a 48 S.Ct. 530, 72 L.Ed. 1005.

29b 421 U.S. 240, 44 L.Ed.2d 141.

(Note: 1. PORTIONS OF THE SENATE, HOUSE AND CONFERENCE REPORTS, WHICH ARE DUPLICATIVE OR ARE DEEMED TO BE UNNECESSARY TO THE INTERPRETATION OF THE LAWS, ARE OMITTED. OMITTED MATERIAL IS INDICATED BY FIVE ASTERISKS: *****. 2. TO RETRIEVE REPORTS ON A PUBLIC LAW, RUN A TOPIC FIELD SEARCH USING THE PUBLIC LAW NUMBER, e.g., TO(99-495))

H.R. REP. 94-499(I), H.R. REP. 94-499, H.R. Rep. No. 499(I), 94TH Cong., 2ND Sess. 1976, 1976 U.S.C.C.A.N. 2572, 1975 WL 12520 (Leg.Hist.)

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.



Words that are believed to be registered trademarks
have been checked with authoritative sources. No in-
vestigation has been made of common-law trademark
rights in any word, because such investigation is im-
practicable. Words that are known to have current
registrations are shown with an initial capital and are
also identified as trademarks. The inclusion of any
word in this Dictionary is not, however, an expres-
sion of the Publisher's opinion as to whether or not it
is subject to proprietary rights. Indeed, no definition
in this Dictionary is to be regarded as affecting the
validity of any trademark.

Copyright © 1982 by Houghton Mifflin Company. All
rights reserved. No part of this work may be repro-
duced or transmitted in any form or by any means,
electronic or mechanical, including photocopying and
recording, or by any information storage or retrieval
system, except as may be expressly permitted by
1976 Copyright Act or in writing by the Publisher.

All correspondence and inquiries should be directed to
Reference Division, Houghton Mifflin Company
Two Park Street, Boston, MA 02108

**Library of Congress Cataloging in Publication Data**
Main entry under title.
American Heritage dictionary.
  Rev. ed. of: American Heritage dictionary of the
English language. New college ed. c1976.
  1. English language—Dictionaries.   I. Morris,
William, 1913–
PE1625.A54   1982       423     82-9346
ISBN 0-395-32943-4
ISBN 0-395-32944-2 (thumb index)
ISBN 0-395-33999-6 (deluxe edition)

  Manufactured in the United States of America

APP-319

1213

subprincipal | substrate