Timothy D. Smith, OSB #914374
Senior Assistant Attorney General
Christopher J. Kayser, OSB #984244
Special Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel: (503) 934-4400
Facsimile: (503) 378-5017
Tim.smith@doj.oregon.gov
cjkayser@lvklaw.com

*Attorneys for Plaintiff State of Oregon*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

**PORTLAND DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, STATE OF ARIZONA, STATE OF CALIFORNIA, DISTRICT OF COLUMBIA, STATE OF ILLINOIS, STATE OF MARYLAND, STATE OF NEVADA, STATE OF NEW MEXICO, STATE OF OREGON, and STATE OF WYOMING, | Case No. 3:24-cv-00347-AN |
| Plaintiffs, | **PLAINTIFF STATES' REPLY IN SUPPORT OF THEIR PETITION FOR ATTORNEYS' FEES AND COSTS** |
| v. | |
| THE KROGER COMPANY and ALBERTSONS COMPANIES, INC., | |
| Defendants. | |

## I. INTRODUCTION

Nike founders Phil Knight and Bill Bowerman. Mt. Everest summiteers Sir Edmund Hillary and Tenzing Norgay. Defendants' lead trial counsel and their army of attorneys. Under Defendants' reasoning, only the work of the former—the more visible partner—matters. The latter—working "largely in the background"—purportedly "did not play a significant role." Opp. 1, ECF 611. Any lawyer who has tried a case would disagree.

Here, the States played a "background," but still significant, role in successfully blocking Kroger and Albertsons' $24 billion merger. And the States ask for only a tiny fraction of the fees Kroger and Albertsons expended in their unsuccessful defense of their anticompetitive merger. Defendants' objections to the States' pre-litigation fees, labor claim fees, hourly rates, document review platform expenses, and purportedly unnecessary, duplicative, or unsupported fees are factually and legally wrong. But at bottom, Defendants ignore that the States achieved a tremendous result. They ignore that "the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008). They ignore that "[t]he essential goal in shifting fees . . . is to do rough justice, not to achieve auditing perfection." *Fox v. Vice*, 563 U.S. 826, 838 (2011). And they do it all without providing the "one particularly good indicator of how much time is necessary": their own hours. *Democratic Party of Wash. State v. Reed*, 388 F.3d 1281, 1287 (9th Cir. 2004). Although Defendants do not deny that they spent $1.5 billion in fees on their failed merger effort, they argue for reductions in the States' fees that would reduce the award to between $211,292 and $801,047. Kayser Decl. ¶ 3, Ex. 1.

Page 1 - PLAINTIFF STATES' REPLY IN SUPPORT OF THEIR PETITION FOR ATTORNEYS' FEES AND COSTS

Taking into account the revisions to the Petition the States have made in response to some of the issues raised,[1] the Court should award the States $9,729,601.45 in fees and expenses.

## II. ARGUMENT

The $10 million in fees and costs the States are seeking is by no means extraordinary. In cases of this size and complexity with similarly broad public interest, courts have awarded far more in fees. *See, e.g.*, *Fikes Wholesale, Inc. v. Visa U.S.A., Inc.*, 62 F.4th 704, 723 (2d Cir. 2023) (justifying $523 million award on public policy grounds); *In re Coll. Athlete NIL Litig.*, 2025 WL 3171376, at *2 (N.D. Cal. July 11, 2025) (awarding $484.3 million in fees and costs); *Huang v. Equifax Inc.*, 999 F.3d 1247, 1280–81 (11th Cir. 2021) (affirming $77.5 million award). That these awards were for contingency fees does not make a difference. If anything, it provides further justification for why the fees requested here are reasonable. If the States' requested fees were based on a percentage of the financial impact of this $24 billion merger, they would be orders of magnitude higher.

### A. The Ninth Circuit authorizes pre-suit investigation fees.

Defendants argue that attorneys' fees are limited to the "cost of suit," which they define as excluding any "fees incurred *before* filing suit." Opp. 4. The Ninth Circuit disagrees. *Dishman v. UNUM Life Ins. Co. of Am.*, 269 F.3d 974, 987–88 (9th Cir. 2001); *accord Cobbler Nev., LLC v. Reardon*, 2015 WL 9239773, at *3 n.4 (D. Or. Dec. 16, 2015) ("Attorney fees for investigative work done prior to filing a lawsuit are recoverable."). The question is whether the "pre-litigation costs are reasonably characterized as having been spent 'on the litigation.'" *Sierra Club v. U.S. E.P.A.*, 625 F. Supp. 2d 863, 869–70 (N.D. Cal. 2007) (quoting and distinguishing *Webb v. Bd. of Educ.*, 471 U.S. 234, 243 (1985)).

---

[1] The States withdraw their requests for expert fees ($398,138.14) and clerical entries ($220,795.70).

Page 2 - PLAINTIFF STATES' REPLY IN SUPPORT OF THEIR PETITION FOR
ATTORNEYS' FEES AND COSTS

Here, the States' prelitigation work entailed fact development used to draft the Complaint and prosecute the case.[2] *E.g.*, Smith Decl., Ex. 1 at 14–27, ECF 602 (listing dozens of pre-complaint hours spent reviewing documents produced by Defendants and third parties). That this work occurred before the filing of the complaint is irrelevant. The large volume of documents Defendants and third parties produced before the complaint was filed would still have needed to be reviewed for the litigation if they had instead been produced after the complaint was filed. Indeed, because the States have subpoena powers with which to investigate and prosecute anticompetitive transactions, their thorough investigation mimicked aspects of litigation discovery in a way private plaintiffs' investigations would not have. That is, much of the discovery a private plaintiff would have done after filing a complaint, the States did before.

In response, Defendants argue only that *Cann v. Carpenters' Pension Trust Fund* limits the States "to fees incurred in the litigation in Court." Opp. 4 (quoting 989 F.2d 313, 316 (9th Cir. 1993)). *Cann* does not. Defendants ignore *Dishman*, in which the Ninth Circuit explained that *Cann* "does not stand for the proposition that ERISA plaintiffs may not recover attorneys' fees for any work done prior to the date they file their complaint [but] simply holds that ERISA's attorneys' fee provision . . . was not meant to reimburse claimants for legal expenses 'incurred during administrative proceedings prior to suit.'" 269 F.3d at 987–88 (quoting *Cann*, 989 F.2d at 315) (allowing fees for pre-suit work not connected to exhausting administrative procedures); *see also Sierra Club*, 625 F. Supp. 2d at 869 ("In *Webb* the Supreme Court affirmed the Court of Appeals decision to withhold attorneys' fees for hours spent pursuing a *separate, optional administrative proceeding*." (emphasis added) (discussing 471 U.S. at 244)). Accordingly, courts

---

[2] In fact, in line with *Webb* and *Dishman*, the States of California and Illinois and the District of Columbia scrubbed any hours relating to their related, but ultimately distinct, challenge to Albertsons' special dividend in proximity to the merger agreement. *See generally D.C. v. Kroger Co.*, 2022 WL 18911128 (D.D.C. Dec. 12, 2022).

often award fees for pre-complaint work reasonably directed towards litigation. *See* States' Fee Pet. 6–7, ECF 594; *Dishman*, 269 F.3d at 987–88. The Court should do so here.

### B. The States' hourly rates are reasonable.

Defendants do not deny they spent nearly $1.5 billion in fees and costs in seeking to consummate their merger. Nor do they deny that the eight prominent law firms they hired to do so charged rates for their attorneys that in some cases were more than double the effective rates the States seek. Instead, Defendants misstate case law to offer unsupported alternatives for the States' hourly rates. This Court can, and should, apply the Oregon State Bar's 95th percentile rates. The OSB survey provides "an initial benchmark for determining the reasonableness of a party's requested rates." *Santoro v. Ocwen Loan Servicing*, 2025 WL 2633215, at *10 (D. Or. Sept. 12, 2025) (Nelson, J.) (quoting *Rust-Oleum Corp. v. NIC Indus., Inc.*, 2025 WL 1982291, at *4 (D. Or. July 15, 2025)). But "[a]ttorneys may argue for higher rates based on inflation, specialty, or any number of other factors." *Id.* (quoting *Edwards v. Cincinnati Ins. Co.*, 2021 WL 6427817, at *11 (D. Or. Feb. 8, 2021)). Indeed, "[f]actors that may warrant a higher hourly rate include whether the case involved a contingency fee agreement, whether the case was complex, controversial, and high risk, and the results obtained." *Id.* at *10 (citation modified). The OSB Survey rates "are not compulsory." *Rust-Oleum*, 2025 WL 1982291, at *5. And, contrary to Defendants' misstatement of law, Opp. 8, rates need not "account for differences in 'experience, reputation, and ability of the attorneys'"—*Kerr v. Screen Extras Guild* describes these as "factors," which a court *may* consider. 526 F.2d 67, 70 (9th Cir. 1975).

Here, most of the States' attorneys are antitrust specialists. *See, e.g.*, Yost Decl. 2, ECF 597. As government attorneys, their offices can recover their fees only through fee-shifting statutes—essentially, as contingency fees. Further, as the record indicates, this case was complex,

difficult, and important to millions of consumers. Finally, the result obtained—blocking an anticompetitive $24 billion merger backed by some of the most prestigious law firms in the country—was exemplary.

In similar cases, courts have awarded fees near the 95th percentile. In *Rust-Oleum*, the Court applied an hourly rate near the state-wide 95th percentile—then increased it by 30%—for southern-Oregon litigators who achieved an "extraordinary" result in a "difficult[] and complex[]" business suit against a corporation "able to hire many excellent attorneys to prosecute this case to the fullest extent." 2025 WL 1982291, at *5–8. In fact, the *Rust-Oleum* Court found the defendant's hourly rate objections to be "disingenuous, considering that Rust-Oleum[—like Kroger and Albertsons here—]retained a large number of high-caliber attorneys from some of the largest legal markets around the country to litigate th[e] case." *Id.* at *6.

The antitrust specialization required to oppose a $24 billion merger is sufficient justification on its own for 95th percentile rates. In *Santoro*, this Court awarded fees near the 95th percentile (and well above the mean) to a successful plaintiff in an action regarding illegal foreclosure—despite counsel's "general lack of experience litigating in federal court." 2025 WL 2633215, at *4, 13 (Nelson, J.). In *OmniGen Research, LLC v. Wang*, the Court awarded fees near the 75th percentile for attorneys who specialized in intellectual property (a specialty not included in the OSB survey) by looking to a multistate survey of intellectual property attorney rates. *See* 2017 WL 5505041, at *29–30 (D. Or. Nov. 16, 2017). The States did similarly here, comparing the OSB 95th percentile rates to the Fitzpatrick matrix. *See* States' Fee Pet. 8–10.

The size, complexity, specialization, and comprehensive lawyering of this case warrant specialist fees. *See id.* at 10 (some of Albertsons' counsel bill between $1,625 and $1,975 per

hour); *State v. Kroger Co.*, No. 24-2-00977-9, ¶ 98 (King Cnty. Wash. Sup. Ct. Aug. 19, 2025)[3]

(opposing counsel rates are probative of reasonableness and failure to provide rates implies that

they are higher than plaintiff's). Defendants' arguments to the contrary—that the Court should

apply mean-OSB, salary-adjusted, or Oregon's outside counsel rates—fall flat. First, the mean

OSB rate fails to capture the specialization, complexity, and enormity of this case and its result.

Second, courts have rejected Defendants' citationless suggestion that attorneys' fees should

encompass only the salaries of the government attorneys involved. *See Nadarajah v. Holder,* 569

F.3d 906, 916 (9th Cir. 2009) (rejecting argument that ACLU attorneys' salaries should determine

reasonable hourly rate); States' Fee Pet. 8 (collecting cases); *Kroger*, No. 24-2-00977-9, ¶ 115

(rejecting same argument). And third, the discounted rates charged by Oregon's outside counsel

are an inappropriate barometer here, as they do not reflect the prevailing market rates for this

type of litigation. *See LA Int'l Corp. v. Prestige Brands Holdings, Inc.*, 168 F.4th 608, 624–25

(9th Cir. 2026) (finding abuse of discretion where fees were awarded at previous rates rather than

prevailing market rates for specific type of litigation). Oregon's outside counsel's effective rate

for complex antitrust and securities contingency fee cases ranges from $1,200 to $2,000 an hour,

which reflects a more appropriate baseline and is consistent with the rates charged by

Defendants' own attorneys. Kayser Decl. ¶ 7. As in *Rust-Oleum*, outside counsel provided a

below-market discount in light of the important public interest the case represented. *See* 2025

WL 1982291, at *7–8. Defendants, who are already receiving the benefit of the public interest

discount on Oregon's outside counsel fees, provide no justification for why that discount should

be applied across the board. If anything, Oregon's discounted rates and the FTC's unrecoverable

hours gift a windfall to Defendants, underscoring the reasonableness of the rates in total.

---

[3] Kayser Decl. (Mar. 31, 2026), Ex. 1.

Page 6 - PLAINTIFF STATES' REPLY IN SUPPORT OF THEIR PETITION FOR
ATTORNEYS' FEES AND COSTS

Defendants also complain that the States did not adequately account for the "experience, reputation, and ability" of their attorneys. Opp. 7. Not true. Each of the seven states seeking hourly fees submitted a declaration documenting the extensive antitrust and complex litigation experience of their lead attorneys, who did the vast majority of the work on the case.[4] But that is not enough for Defendants, who insist the Court must also scrutinize the skills and experience of each and every other supervised attorney, regardless of the amount of time they billed on the case. That, however, is precisely the reason why courts use surveys like the OSB or Fitzpatrick Matrix to avoid turning fee petitions into "a second major litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983), *superseded in part by statute*, 42 U.S.C. § 1997e.

**C. The States may recover fees for work on the labor theory.**

Defendants assert that the States cannot recover fees for work spent on their labor claim. But they conflate a "claim" with an "action." *Compare* Opp. 7 ("Under the Clayton Act, a prevailing plaintiff is only allowed to recover attorneys' fees for a *claim* on which it substantially prevailed." (emphasis added)), *with* 15 U.S.C. § 26 ("In any *action* under this section in which the plaintiff substantially prevails, the court shall award the cost of suit, including a reasonable attorney's fee, to such plaintiff." (emphasis added)); *see also* Order 5, ECF 588 ("The term 'action' in the legal context refers to the entire legal proceeding." (quoting *Doe 1-10 v. Fitzgerald*, 102 F.4th 1089, 1101 (9th Cir. 2024))). More problematically, Defendants ignore Ninth Circuit law, which holds that "in a lawsuit where the plaintiff presents different claims for relief that 'involve a common core of facts' or are based on 'related legal theories,' the district

---

[4] *See* ECF 598 ¶¶ 2–3 (Arizona); ECF 603 ¶¶ 13–16 (D.C.); ECF 602 ¶¶ 7–8, 13 (Oregon), ECF 597 ¶¶ 2–4 (Illinois); ECF 601 ¶¶ 2–3 (Maryland); ECF 599 ¶¶ 2–3 (Nevada); ECF 600 ¶ 2 (California). To the extent that Defendants' concern is directed at California, which had the greatest number of attorneys working on the case, California has filed a supplemental declaration mooting the issue. *See* Manzo Decl. ¶¶ 2–24.

court should not attempt to divide the request for attorney's fees on a claim-by-claim basis." *McCown v. City of Fontana*, 565 F.3d 1097, 1103 (9th Cir. 2009) (quoting *Hensley,* 461 U.S. at 435). The only question is whether the plaintiff "achieve[d] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award." *Id.* (quoting *Hensley*, 461 U.S. at 434). And "[t]he case law interprets 'common core of facts' broadly." *Versluys v. Weizenbaum*, 2024 WL 913589, at *3 (D. Or. Mar. 4, 2024).

In *McCown*, the plaintiff's fees were "'related' for the purpose of determining attorneys fees" because, "though brought on the basis of different legal theories against different defendants, [they] arose from a common core of facts, namely, [plaintiff's] arrest." 565 F.3d at 1103. Here, to the extent the States' labor theory constitutes a "claim," it arose from the same "common core of facts" as the grocery theory: Defendants' proposed merger. *See id*. That each legal theory addressed different relevant markets does not preclude fees. *O'Bannon v. NCAA,* 2016 WL 1255454, at *3 (N.D. Cal. Mar. 31, 2016), *aff'd*, 739 F. App'x 890 (9th Cir. 2018). Indeed, if the *Rust-Oleum* defendant's *multiple* counterclaims satisfy this test, 2025 WL 1982291, at *2, so do the States' labor and grocery theories underlying the *same* claim.

Next, *McCown* looked to whether the suit achieved an "excellent result" relative to the goal of the action, including "significant nonmonetary results" to "other members of society." 565 F.3d at 1105. Unlike in *McCown*—where the Ninth Circuit tasked the district court with better assessing this step—the States achieved the entire, significant remedy they sought: blocking the merger. This parallels *O'Bannon*, where the plaintiffs succeeded on their "core claims" and obtained an injunction under the antitrust laws, justifying their fees on unsuccessful legal theories too. 114 F. Supp. 3d 819, 830 (N.D. Cal. 2015), *adopted in relevant part by* 2016 WL 1255454, at *3. And the benefits of the States' victory accrued to society at large. *See* Op. &

Page 8 - PLAINTIFF STATES' REPLY IN SUPPORT OF THEIR PETITION FOR ATTORNEYS' FEES AND COSTS

Order 36, 54–55, ECF 521 (concluding that the merger was likely to have anticompetitive effects). Accordingly, the Court "should not attempt to divide the request for attorney's fees on a claim-by-claim basis." *McCown*, 565 F.3d at 1103 (citing *Hensley*, 461 U.S. at 435).

**D. Each State's work was efficient, targeted, and intentional.**

Defendants argue that much of the States' work was duplicative of the FTC and of each other. But the FTC did not seek fees; if anything, Defendants have significantly benefited from the States' decision to allow the FTC to lead rather than filing individual suits as Colorado and Washington did. And New Mexico and Wyoming are not seeking recovery of any hourly fees because they did not sufficiently track their time. Any duplication of work between the other states is more than offset by the unbilled work of the FTC, New Mexico, and Wyoming.

With respect to the professional judgment of the States on how to staff the case, Defendants also miss the mark. First, in the Ninth Circuit, "the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker." *Moreno*, 534 F.3d at 1112. Indeed, the Circuit has concluded that "lawyers are not likely to spend unnecessary time on contingency fee cases in the hope of inflating their fees [because the] payoff is too uncertain, as to both the result and the amount of the fee." *Id.* This admonition rings uniquely true for the States here. Beyond the contingent nature of any recovery, Attorney General staff are not paid by the hour or grasping for any billable hours minimum. They deploy limited State resources to enforce the antitrust laws. The States had every incentive to efficiently staff the case.

Second, the "[p]articipation of more than one attorney does not necessarily amount to unnecessary duplication of effort." *Reed*, 388 F.3d at 1286. Indeed, "common practice" dictates that litigants "ensur[e] that all employees participating on a matter remain up-to-date on the

Page 9 - PLAINTIFF STATES' REPLY IN SUPPORT OF THEIR PETITION FOR ATTORNEYS' FEES AND COSTS

litigation." *Washington v. Freedom of Expression LLC*, 2024 WL 4452799, at *5 (D. Ariz. Oct. 9, 2024) (awarding fees for allegedly redundant calls and emails among prevailing counsel and for reviewing court orders). Thus, in "complex[]" cases like this one, courts routinely award fees for calls to "strategize, determine a division of labor, and coordinate work." *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 2012 WL 273604, at *3 (N.D. Cal. Jan. 30, 2012).

Here, the purportedly duplicative weekly calls facilitated the States and FTC's ability to do just that. *See* Pfaffenroth Decl., Ex. 13 at 2, ECF 612-13. And time entries do not lack sufficient explanation, contrary to Defendants' admonition: For example, Defendants' list of unacceptable entries includes "internal team strategy meeting to discuss evaluation of Oregon related claims and strategy for further handling and corresponding review of relevant legal authority concerning procedural and antitrust issues," and "Telephone conference with states only regarding new states' SharePoint, document subpoena negotiations, and splitting deposition responsibilities with the FTC." *Id.* at 2–4. Even if some entries were "duplicati[ve]," they were not "needless[ly]" so. *See Lucas R. v. Kennedy*, 2026 WL 1046711, at *12 (C.D. Cal. Mar. 6, 2026) ("Although Defendants have identified duplicative entries, the Court is not persuaded that Defendants have shown it was 'needless duplication.'" (citing *Reed*, 388 F.3d at 1286)).

Furthermore, at the same time Defendants complain about the States' trial attendance, they forget the legions of attorneys they each had attending trial, both at counsel table and in the gallery. Like Defendants' attorneys, the States' (far fewer) attorneys were very much needed to craft and revise trial strategy in real time and edit examination outlines in response to trial testimony. *Compare Reed*, 388 F.3d at 1287 ("But if, for example, [lawyers] are [at a hearing] because their assistance is or may be needed by the lawyer arguing the case . . . then the assistance is most definitely necessary."), *with, e.g.*, Kayser Decl. ¶ 16, ECF 595; Weber Decl.

Page 10 - PLAINTIFF STATES' REPLY IN SUPPORT OF THEIR PETITION FOR ATTORNEYS' FEES AND COSTS

¶ 11, ECF 598. To coauthor examination outlines and briefing, State lawyers "need[ed] to observe argument [and examination] to judge how to proceed later." *Reed*, 388 F.3d at 1287 (affirming fees for such observation).

Third, comments Kroger made in its post-merger lawsuit against Albertsons underscore why it was important for each State to stay active and involved in the suit. Kroger explained that it had "discussed with Albertsons the strategy of re-engaging with the FTC in a matter of weeks under a new administration . . . [and the two agreed] that the incoming administration presented an opportunity to obtain regulatory approval of the merger even in the event of an adverse court decision." Kroger Co.'s Answer to Verified Am. Compl., *Albertsons Cos. V. Kroger Co.*, C.A. No. 2024-1276, at 178 (Ct. Ch. Del. Mar. 25, 2025), APP-178.[5] Had Defendants successfully used political pressure to reverse the FTC's merger opposition, only the States would have stood in the way of an anticompetitive merger affecting millions. *Cf. Reed*, 388 F.3d at 1288 (justifying duplication in hours because "[t]here is no reason that one party should simply trust the others to take care of its interests").

**E. The States' billing records support their reasonable attorneys' fees.**

Defendants' characterization of the States' billing records as "block-billing" is both factually incorrect and legally irrelevant. First, Defendants improperly sweep in large swaths of billing entries simply for using "and" or a semi-colon in the entry.[6] *See* Pfaffenroth Decl. ¶ 19, ECF 612. Second, contrary to Defendants' complaint, a substantial number of these one-sentence entries are part of a single task performed or service provided, and many of the entries Defendants challenge involve "closely related" tasks.[7] *Magallon v. Robert Half Int'l*, 2025 WL

---

[5] For the convenience of the Court, this Delaware court filing is attached as an appendix to this reply.
[6] Manzo Decl. ¶ 27.
[7] Manzo Decl. ¶ 28.

Page 11 - PLAINTIFF STATES' REPLY IN SUPPORT OF THEIR PETITION FOR ATTORNEYS' FEES AND COSTS

1326740, at *5 (D. Or. May 7, 2025). "Such entries are not block billing, but rather are detailed descriptions of the task completed and/or service performed." *Kulapala v. Delgoda*, 2016 WL 1618285, at *1 (D. Or. Apr. 21, 2016); *see also Bala v. Or. Health & Sci. Univ.*, 2024 WL 3785975, at *8–9 (D. Or. Aug. 12, 2024) (entries for time spent preparing for, conferring about, reviewing, and drafting a summary of a deposition were not block billing).

Third, the relevant question is whether the billing records provide sufficient detail to permit meaningful review of the tasks performed and support the hours claimed. *Ctr. for Biological Diversity*, 2012 WL 273604, at *2. Even if "time descriptions are minimal," they suffice if "they establish that the time was spent on the matters for which the district court awarded attorneys' fees." *Lytle v. Carl*, 382 F.3d 978, 989 (9th Cir. 2004); *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 2006 WL 4081215, at *5 (C.D. Cal. Dec. 12, 2006) ("[C]ounsel's use of 'block billing' . . . is permissible because it successfully identifies the general subject of the time expenditure."). Here, the States' time entries do so.

**F. Quarter-hour billing entries are reasonable and adequately documented.**

Defendants challenge California's quarter-hour billing entries. However, "[t]he Ninth Circuit has not found anything inherently improper with quarter hour billing, rather the salient question is whether the time records presented are sufficient to allow the court to adequately assess the reasonableness of the time expended." *Lexington Luminance LLC v. Feit Elec. Co.*, 2020 WL 6594991, at *8 (C.D. Cal. Sept. 3, 2020) (citing *Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 948 (9th Cir. 2007)); *see also Bailey ex rel. Pace v. Colvin*, 2013 WL 6887158, at *4 (D. Or. Dec. 31, 2013) ("Although Plaintiff's counsel did not use this District's preferred incremental .1 hour billing increments, the total amount of hours of attorney time sought by Plaintiff is within the standard range for [the type of case involved]."). California's Office of the Attorney General

has used quarter-hour billing for decades and has submitted detailed time records that identify the tasks performed and their subject matter. Manzo Decl. ¶ 26; Gordon Decl., Ex. A, ECF 600. Just because California records its billing entries in quarter-hour increments does not mean that each of the challenged tasks took 6 or 12 minutes rather than 15 minutes. Defendants provide no evidence to the contrary.

### G. The States can recover document review platform fees as attorneys' fees.

In objecting to the States' document review platform expenses, Defendants conflate fees and costs. In the Ninth Circuit, attorneys' fees include "reasonable out-of-pocket litigation expenses that would normally be charged to a fee paying client, even if the court cannot tax these expenses as 'costs' under 28 U.S.C. § 1920." *Trs. of the Constr. Indus. & Laborers Health & Welfare Tr. v. Redland Ins. Co.*, 460 F.3d 1253, 1257 (9th Cir. 2006). Thus, courts in this District and the Circuit have awarded parties' document management and review expenses as attorneys' fees, because clients customarily pay for them. *See, e.g.*, *Lane v. Brown*, 2016 WL 589684, at *4 (D. Or. Feb. 11, 2016) (awarding "third party document management" expenses); *Campbell v. Union Pac. R.R. Co.*, 2022 WL 43878, at *8 (D. Idaho Jan. 4, 2022) (allowing recovery of litigation expenses under ADA); *Bd. of Trs. v. Piedmont Lumber & Mill Co.*, 2016 WL 4446993, at *3 (N.D. Cal. Aug. 24, 2016) (same under ERISA); *see also* Kayser Decl. ¶ 9.

Defendants' argument relies on a mischaracterization of *Rimini St., Inc. v. Oracle USA, Inc.*, which stated only that "[a] statute awarding 'costs' will not be construed as authorizing an award of litigation expenses beyond the six categories listed in §§ 1821 and 1920, absent an explicit statutory instruction to that effect." 586 U.S. 334, 340 (2019). *Rimini* distinguished "costs" and "attorney's fees" but did not address what attorneys' fees might encompass; instead,

it merely held that the e-discovery expenses could not be awarded as *costs* under the Copyright Act because its *costs* provision did not expressly authorize them. *Id.* at 340–41, 346.

Accordingly, because document management expenses are commonly charged to clients, the Court should award them as part of the reasonable attorneys' fees here.[8]

**H. The States are entitled to recover for fees-related work.**

"[T]ime spent in preparing fee applications . . . must be included in calculating a reasonable fee[.]" *Anderson v. Dir., Off. of Workers Comp. Programs*, 91 F.3d 1322, 1325 (9th Cir. 1996) (holding that this rule "applies uniformly to all federal fee-shifting statutes"). Accordingly, the States are entitled to recover attorneys' fees for hours expended to recover fees.

First, the hours claimed include time spent on a bifurcated proceeding with full briefing and oral argument to determine that the States were entitled to fees in this scenario—an issue of first impression in this Circuit. *See United States v. City & Cnty. of San Francisco*, 748 F. Supp. 1416, 1438 (N.D. Cal. 1990) ("[T]he total number of hours expended [on the fee motion], just under 600, is quite reasonable given the vigor with which the City challenged the fee petition."), *aff'd in relevant part, Davis v. City & Cnty. of San Francisco,* 976 F.2d 1536 (9th Cir. 1992). That three states opted to seek limited or no fees on this portion of the litigation is not relevant to the reasonableness of the fees sought. In fact, it is an unsurprising reflection of the States' efficiency and effectiveness in working together throughout this litigation.

Second, the States' hourly rate is reasonable. Defendants cite to a case holding that applying a multiplier to the loadstar was an abuse of discretion "because the court announced its intention to award fees even before fee petition work began." *Hasbrouck v. Texaco, Inc.*, 879

---

[8] Defendants argue that the States should not receive duplicative recovery on document review software fees also awarded in Washington. If Defendants pay the fees awarded here and in Washington, the States will ensure that Defendants are not being asked to pay for the document review software twice. But Defendants are currently appealing the Washington award, which was narrower than what the States are seeking anyway.

Page 14 - PLAINTIFF STATES' REPLY IN SUPPORT OF THEIR PETITION FOR ATTORNEYS' FEES AND COSTS

F.2d 632, 638 (9th Cir. 1989) (cited at Opp. 14). Here, the States do not seek a multiplier; they seek an hourly rate commensurate with the complexity and importance of the case. *See Berardo v. USCIS*, 2021 WL 228890, at *5 (D. Or. Jan. 22, 2021) (awarding EAJA "enhanced" rate— attorney's usual billing rate—for both merits and fee petition hours because "distinctive knowledge and specialized skill was necessary to achieve success in this case"). Moreover, here, the Court had not announced any intention to award fees. The States incurred these hours litigating Defendants' vigorous challenge to their entitlement to fees.

Here, the significant work on complex issues litigating whether fees could be recovered makes the States' proposed fees reasonable.

### I.  Finally, the States should receive the full hourly rate for their travel time.

In general, "[r]easonable attorneys' fees include reasonable travel time compensated at the full hourly rate." *City & Cnty. of San Francisco*, 748 F. Supp. at 1422; *see also Rust-Oleum*, 2025 WL 1982291, at *7. A simple rationale underlies this rule: When traveling for one case, a lawyer loses the opportunity to work on another. *Henry v. Webermeier*, 738 F.2d 188, 194 (7th Cir. 1984). Because attorneys charge their clients for travel time, "they are entitled to charge the defendants for that time in a case such as this where the plaintiffs have shown a statutory right to reasonable attorneys' fees." *Id.* That the States may have recorded these time entries simply as travel does not automatically warrant the 50% reduction Defendants seek. Nor does the availability of remote trial access render the States' in-person attendance superfluous. *See Reed*, 388 F.3d at 1287 (reasoning that when attorneys attend "because their assistance is or may be needed by the lawyer arguing the case . . . then the assistance is most definitely necessary").

### III. CONCLUSION

The Court should award the States $9,729,601.45 in fees and costs.

Page 15 - PLAINTIFF STATES' REPLY IN SUPPORT OF THEIR PETITION FOR ATTORNEYS' FEES AND COSTS

Dated: June 2, 2026

Respectfully submitted,

/s/Timothy D. Smith

Timothy D. Smith, OSB#914374
Senior Assistant Attorney General
Christopher J. Kayser, OSB#984244
Special Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel: (503) 934-4400
Facsimile: (503) 378-5017
tim.smith@doj.oregon.gov
cjkayser@lvklaw.com


Attorneys for Plaintiff State of Oregon

/s/ Brian M. Yost

Brian M. Yost, IL Bar No. 6334138
Paul J. Harper, IL Bar No. 6335001
Alice Riechers, IL Bar No. 6272933
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
Tel: (872) 276-3598
Brian.Yost@ilag.gov
Paul.Harper@ilag.gov
Alice.Riechers@ilag.gov


Attorneys for Plaintiff State of Illinois

/s/ Robert A. Bernheim

Robert A. Bernheim, AZ Bar No.
024664
Jayme L. Weber, AZ Bar No. 032608
Arizona Office of the Attorney General
2005 N. Central Avenue
Phoenix, AZ 85004
Tel: (602) 542-5025
Robert.Bernheim@azag.gov
Jayme.Weber@azag.gov


Attorneys for Plaintiff State of Arizona

/s/ Nicole Gordon

Nicole Gordon, CA Bar No. 224138
California Department of Justice
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102
Tel: (415) 510-4400
Facsimile: (415) 703-5480
Nicole.Gordon@doj.ca.gov


Attorney for Plaintiff State of California

Page 16 - PLAINTIFF STATES' REPLY IN SUPPORT OF THEIR PETITION FOR
ATTORNEYS' FEES AND COSTS

/s/ Schonette J. Walker

Schonette J. Walker, MD Bar No.
0512290008
Byron Warren, MD Bar No. 1612140330
Office of the Attorney General
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
Tel: (410) 576-6470
swalker@oag.maryland.gov
bwarren@oag.maryland.gov

Attorneys for Plaintiff State of Maryland

/s/ Estefania Y. Torres Paez

Estefania Y. Torres Paez
Office of the Attorney General for the
District of Columbia
400 6th Street, N.W, 10th Floor
Washington, D.C. 20001
Tel: (202) 631-9492
estefania.torrespaez@dc.gov

Attorney for Plaintiff District of Columbia

/s/ Lucas J. Tucker

Lucas J. Tucker, NV Bar No. 10252
Samantha B. Feeley, NV Bar No. 14034
Office of the Nevada Attorney General
100 N. Carson St.
Carson City, Nevada 89701
Tel: (775) 684-1100
ltucker@ag.nv.gov
sfeeley@ag.nv.gov

Attorneys for Plaintiff State of Nevada

/s/ Anthony R. Juzaitis

Anthony R. Juzaitis, NM Bar No. 164428
New Mexico Department of Justice
408 Galisteo St.
Santa Fe, NM 87501
Tel: (505) 651-7565
ajuzaitis@nmdoj.gov

Attorney for Plaintiff State of New Mexico

/s/ William T. Young

William T. Young, WY Bar No. 8-6746
Office of the Wyoming Attorney General
109 State Capitol
Cheyenne, WY 82002
Tel: (307) 777-7847
william.young@wyo.gov

Attorney for Plaintiff State of Wyoming

# APPENDIX

**INDEX**

Answer to Verified Amended Complaint *Albertson Companies, Inc. v. The Kroger Co.*
   C.A. No. 2024-1276-LWW, (Ct. Ch. Del., Mar. 25, 2025) …………………..……...…..APP-1

EFiled: Mar 25 2025 09:30AM EDT
Transaction ID 75924014
Case No. 2024-1276-LWW

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| ALBERTSONS COMPANIES, INC., )<br><br>        Plaintiff/ )<br>        Counterclaim Defendant, )<br><br>    v. )<br><br>THE KROGER COMPANY, )<br><br>        Defendant/ )<br>        Counterclaim Plaintiff. ) | C.A. No. 2024-1276-LWW<br><br>**PUBLIC VERSION FILED:**<br>March 25, 2025 |

### THE KROGER CO.'S ANSWER TO THE VERIFIED AMENDED COMPLAINT AND VERIFIED COUNTERCLAIMS

Defendant/Counterclaim Plaintiff The Kroger Co. ("Kroger"), by its undersigned attorneys, responds to the Verified Amended Complaint (the "Complaint") as follows:

Unless expressly admitted below, Kroger denies each allegation in the Complaint, including the headings and sub-headings contained therein. Unless otherwise expressly stated, Kroger uses the defined terms and phrases set forth in the Complaint for purposes of this Answer. In so doing, however, Kroger does not concede that any such defined terms or phrases are proper. Kroger reserves the right to amend and/or supplement this Answer, including the defenses set forth herein.

### PRELIMINARY STATEMENT

1. For many Americans, the local supermarket is a trusted brand and an iconic feature of the community. It is a place where American families spend, on average, nearly six percent of their disposable income and where they depend on

access to affordable nutrition. On October 14, 2022, Albertsons and Kroger, which collectively own and operate more than 30 of America's trusted grocery brands, announced that they had agreed to merge after signing an agreement (the "Merger Agreement")[1] pursuant to which Kroger would acquire Albertsons in a transaction valued at almost $25 billion (the "Merger"). The transaction was not just a boon to Albertsons' stockholders—after the announcement, Albertsons' stock price closed at a 32.8% premium to the unaffected stock price—it also would have benefitted American consumers by creating a combined company with the necessary scale to drive down prices, invest in higher quality products, promote and protect consumer choice in the face of expanding industry behemoths (such as Walmart, Costco, Target, and Amazon), and protect union jobs. For many American communities, this transaction represented hope for the continued viability of the local grocery stores that have sustained their communities for generations.

**RESPONSE**: Admits that on October 14, 2022, Kroger and Albertsons (the "Parties") announced that they had entered into a definitive agreement under which the companies would merge two complementary organizations for a total enterprise value of approximately $24.6 billion (the "Merger"); refers to the testimony and evidence presented in the trial records of *Federal Trade Commission, et al. v. Kroger Company, et al.*, Case No. 3:24-cv-00347, *State of Colorado v. The Kroger Co. et al.*, Case No. 2024-cv-30459, and *State of Washington v. The Kroger Co.*, Case No. 24-2-00977-9 (individually the "Oregon Litigation", the "Colorado Litigation", the "Washington Litigation," and collectively, the "Antitrust Trials") for a description of the benefits of the Merger to Kroger and the American public generally; refers to

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Merger Agreement.

2

publicly available information concerning Albertsons's stock price; and otherwise denies the allegations contained in Paragraph 1.

2.      But Kroger derailed the merger after suffering a classic case of buyer's remorse. At first, Kroger was eager to acquire Albertsons, and it willingly assumed stringent obligations in the Merger Agreement to do everything necessary to close the Merger as quickly as possible. Obtaining the necessary antitrust clearances was at the top of the list. As both Albertsons and Kroger discussed on multiple occasions when negotiating the Merger Agreement, the ability to close the Merger depended on obtaining approval from the Federal Trade Commission ("FTC") and relevant state regulators, which in turn would require Kroger, as the surviving company, to divest a substantial number of supermarkets and other assets to ensure that the Merger would comply with antitrust law and achieve its aim of promoting competition in communities across the country. Accordingly, the Parties agreed to a specific series of escalating obligations on the part of Kroger, first to exercise "best efforts" to overcome antitrust obstacles "as promptly as practicable" and then, in the face of any threatened regulatory action to block the Merger, to take "any and all actions" necessary to "eliminate each and every impediment" to closing the Merger, subject only to a limit of 650 on the number of stores Kroger would be required to divest. Kroger made these promises explicitly in the public Merger Agreement, ensuring that regulators would understand the scope of Kroger's obligations and expect it to live up to those obligations in the antitrust approval process.

**RESPONSE**: Admits that obtaining antitrust clearances was a condition to the closing of the Merger; refers to the Agreement and Plan of Merger dated October 13, 2022 (the "Merger Agreement") for a complete and accurate description of its contents; and otherwise avers that no response is required to the allegations contained in Paragraph 2 insofar as they purport to describe Albertsons's legal arguments or conclusions, and to the extent a response is required, denies the allegations contained in Paragraph 2.

3.      Kroger later had second thoughts after a negative market reaction to the Merger and falling post-pandemic profits, and it decided it would go through with

the deal, if at all, only on terms far more advantageous to Kroger than those for which it had bargained. Immediately after the Merger was announced, Kroger received sharp criticism from rating agencies, saw its stock price decline, and faced pushback from politicians. The day after the Merger announcement, Kroger's stock dropped by 7.3%. S&P Global Ratings ("S&P"), Moody's Investor Service ("Moody's"), and DBRS Morningstar ("Morningstar") all published negative reports. Both Moody's and S&P highlighted the stress the Merger would put on Kroger's debt levels and questioned whether Kroger would be able to maintain its commercial-grade credit rating. Kroger also faced highly public political opposition—including having its executives (along with Albertsons' executives) called before a U.S. Senate Subcommittee to be grilled on the Merger the month after the deal was signed. At the same time, net profits for Kroger and Albertsons fell as purchasing trends that had developed during the COVID-19 pandemic abated: In particular, whereas during the pandemic, customers had shifted their food purchasing more to grocery stores and away from restaurants and had consolidated their shopping in fewer stores, those trends reversed in the aftermath of the pandemic.

**RESPONSE**:    Admits that consumer trends towards grocery stores experienced shifts during and after the COVID-19 pandemic and that in November 2022, Rodney McMullen testified before the Senate Judiciary Subcommittee on Competition Policy, Antitrust, and Consumer Rights; refers to the public news reports, ratings agency reports, and Kroger's and Albertsons's publicly filed financial statements referenced in Paragraph 3 for a complete and accurate description of their contents; refers to publicly available information concerning Kroger's stock price; and otherwise denies the allegations contained in Paragraph 3.

4.    In the face of these significant headwinds, Kroger put itself first rather than comply with the Merger Agreement by taking the steps Kroger had agreed to take and that it knew would give the Merger the best chance to succeed. Despite its extensive experience navigating regulatory clearance for mergers with state and federal regulators, Kroger squandered its credibility with regulators. It started by proposing a plainly indefensible divestiture package of just 238 stores that

4

prioritized Kroger's bottom line over its contractual obligations to Albertsons to put forward a tenable divestiture proposal. Not only was Kroger's opening position manifestly inadequate, but it set the wrong tone right from the start with regulators, who knew from the public Merger Agreement that Kroger had obligated itself to act promptly to divest up to 650 stores and any other assets necessary to fashion an acceptable divestiture package. Kroger then deepened its rift with regulators by dragging its feet (despite its contractual obligation to move expeditiously) and by refusing to adjust its proposed divestiture package in response to regulators' predictable and readily addressable feedback.

**RESPONSE**:  Admits that Kroger's proposed initial divestiture package included 238 stores; and otherwise denies the allegations contained in Paragraph 4.

5.    Even after mishandling its initial approach to the FTC, Kroger had many opportunities to engage in meaningful dialogue with the FTC and state regulators, address their concerns, and negotiate a settlement that would allow the Merger to close without litigation. Those opportunities included regular meetings with the FTC and its state counterparts—culminating in a meeting shortly before the FTC initiated litigation, where an FTC Commissioner expressly told Kroger that it was in the interest of all parties to reach a settlement. Kroger squandered every such opportunity.

**RESPONSE**:  Admits that after signing the Merger Agreement, Kroger met with the FTC and various state regulators regarding the Merger; and otherwise denies the allegations contained in Paragraph 5.

6.    Kroger compounded these breaches by waiting nearly a year to select a divestiture buyer, and then ultimately failing to select a divestiture buyer, or group of buyers, that would maximize the Merger's chance of approval. Kroger had multiple opportunities to negotiate divestiture agreements with buyers that had long track records of successfully running large-scale retail grocery businesses, but instead, it selected a bidder whose primary experience was as a wholesaler. Moreover, although obligated by contract to work with Albertsons in good faith, Kroger kept Albertsons in the dark about regulatory strategy and ignored Albertsons' suggestions for how to get the Merger approved.

**RESPONSE**:  Denies the allegations contained in Paragraph 6.

5

7.     Throughout the regulatory process, instead of complying with its contractual obligations to exercise "best efforts" and to take "any and all actions" to get the Merger approved "as promptly as practicable," Kroger prioritized its own financial self-interest and refused to do what was required to close the deal. It therefore breached the Merger Agreement at least by:

a.     Failing to divest an adequate package of up to 650 stores to satisfy regulators' concerns;

b.     Failing to divest an adequate package of non-store assets (like banners, technology, and private label brands) to satisfy regulators' concerns;

c.     Failing to commit to modify its future conduct in a way that would allay concerns about any anticompetitive effects of the Merger;

d.     Delaying its engagement with regulators, thus losing goodwill with the regulators and causing settlement discussions to drag into the 2024 presidential general election season, to the Parties' disadvantage;

e.     Failing to respond adequately to regulators' questions and concerns when it did engage with them;

f.     Mismanaging the process of identifying a divestiture buyer; and

g.     Failing to cooperate with Albertsons in good faith.

**RESPONSE**: Denies the allegations contained in Paragraph 7.

8.     At every turn, Kroger's mismanagement of the antitrust process violated well-established norms and regulatory practices, including guidelines published by the FTC and other regulators articulating their expectations for divestitures to resolve antitrust concerns with mergers. Kroger continually ran roughshod over the express guidance in those guidelines.

**RESPONSE**: Denies the allegations contained in Paragraph 8.

9.     Ultimately, the FTC (joined by several states) and the states of Washington and Colorado each filed a separate lawsuit to enjoin the Merger. These lawsuits would never have been filed if Kroger had fully and expeditiously addressed

6

the regulators' concerns through the pre-litigation settlement process, as the Merger Agreement required.

**RESPONSE**:   Admits the allegations contained in the first sentence of Paragraph 9; and otherwise denies the allegations contained in Paragraph 9.

10.     After squandering the opportunity for a negotiated settlement with regulators, Kroger continued its malfeasance during the litigation, refusing to propose a new divestiture package that would maximize the Merger's chance of passing muster with the courts. Exasperated by Kroger's refusal to uphold its own obligation to take all steps necessary to overcome antitrust impediments to closing the Merger, in September 2024, Albertsons conveyed its willingness to contribute hundreds of millions of dollars in financial support to Kroger—in the range of $1-2 per Albertsons share—to subsidize the expansion of Kroger's proposed divestiture package so that it would better address regulator concerns. Albertsons communicated its willingness to make such a "material" contribution both to Kroger's counsel and to Kroger's CEO, who shared it with another Kroger executive with primary responsibility for the Merger. Kroger never even followed up on this extraordinary offer.

**RESPONSE**:  Denies the allegations contained in Paragraph 10.

11.     On December 10, 2024, the United States District Court for the District of Oregon and the King County Superior Court in the State of Washington both issued injunctions prohibiting the Merger from proceeding, citing the same competitive concerns that regulators had long expressed and that Albertsons had pleaded with Kroger to solve. Kroger could have fixed those problems long before litigation by selecting a divestiture buyer with greater experience and scale in grocery retail; divesting additional stores; including key non-store assets in the divestiture package; and making enforceable commitments for post-merger conduct to address any lingering concerns about price increases, store closures, adverse effects on labor markets, or other possible anticompetitive effects. Kroger chose not to do so.

**RESPONSE**: Admits that on December 10, 2024, the United States District Court for the District of Oregon granted the FTC's motion for a preliminary injunction, and that the King County Superior Court enjoined the Merger; refers to

7

the opinions issued by the United States District Court for the District of Oregon (the

"Oregon Opinion") and the King County Superior Court (the "Washington

Opinion") for a complete and accurate description of their contents; and otherwise

denies the allegations contained in Paragraph 11.

12.    Kroger then further breached the Merger Agreement by repudiating its independent obligation to pay Albertsons a $600 million termination fee. Under the Merger Agreement, Kroger's duty to pay the termination fee was automatically triggered—without regard to whether Kroger had otherwise breached the agreement—when Albertsons validly terminated the agreement following the two injunctions. The termination fee was negotiated to compensate Albertsons for the effort and forgone opportunities it sank into the failed Merger; it is wholly independent of Albertsons' damages for Kroger's refusal to make the efforts required to obtain regulatory approval

**RESPONSE**:  Admits that Kroger did not pay Albertsons the $600 million

termination fee because Albertsons is not entitled to it under the terms of the Merger

Agreement; and otherwise denies the allegations contained in Paragraph 12.

13.    Kroger's failure to pay the termination fee was not just an independent breach of the Merger Agreement, it was further confirmation of what Kroger had made apparent from its actions—Kroger was perfectly willing to breach any agreement, ignore any obligation, and take advantage of any perceived opportunity to harm Albertsons and seek a competitive advantage

**RESPONSE**:  Denies the allegations contained in Paragraph 13.

14.    The failure of the Merger has had significant consequences for Albertsons and its stockholders, who endured more than two years of uncertainty, spent hundreds of millions of dollars preparing for the Merger, and now will lose the significant premium on their shares Kroger committed to pay. As a direct result of Kroger's willful breaches, Albertsons' stockholders have suffered billions of dollars in damages (above and beyond the $600 million termination fee Kroger wrongfully withheld), and the American public has suffered the loss of a supermarket option

8

offering lower prices and increased choice. This action seeks to hold Kroger responsible for the harm it has caused.

**RESPONSE**: Denies the allegations contained in Paragraph 14.

## SUMMARY OF ALLEGATIONS

15.    The impact of Kroger's breaches and the resulting failure of the Merger are particularly significant given the state of the grocery industry, which in recent years, has undergone a fundamental shift. Retail giants like Walmart, Costco, Amazon, and Target increasingly have focused on selling food as part of their diverse product offerings. Because of their massive scale, those retailers can sell groceries at rock-bottom prices—often lower than Albertsons' prices. At the same time, consumers are spreading their shopping trips across several different retailers, searching for value wherever they can find it. Together, these dynamics pose an existential threat to Albertsons and Kroger, and to their ability to serve their customers.

**RESPONSE**:  Admits that the American grocery industry has undergone fundamental shifts during recent years and that Kroger and other traditional grocery stores now compete with retail giants including Walmart, Costco, Amazon, and Target, that Albertsons's prices are generally higher than many other retailers, including Kroger's, that many consumers shop at different retailers, and that increased competition from competitors—including retailers with different formats such as Costco, Amazon, and Target—present a competitive threat to Albertsons and Kroger; and otherwise denies the allegations contained in Paragraph 15.

16.    The Merger was an ideal solution to this problem. The combined company would have been more competitive with the behemoths, benefitting from improved economies of scale by allowing it to expand in new locations at lower costs, to operate with more efficient overhead, and to take advantage of a national supply chain, an enhanced distribution infrastructure, and the ability to borrow at a lower cost of capital. From these synergies and others, Albertsons and Kroger expected that the combined company would deliver a more diverse and lower-cost

9

product offering to consumers, while still providing fair-paying union jobs. The combined company also could invest in new projects related to advertising and digital sales, leveraging Albertsons' and Kroger's larger combined set of consumers and consumer data to provide added value to customers nationwide. All of that would have allowed the combined company to better compete with retail giants Walmart, Costco, Amazon, and Target, as well as other grocery competitors.

**RESPONSE**: Admits the allegations contained in Paragraph 16.

17. Kroger and Albertsons understood from the beginning that their ability to close the Merger was dependent upon obtaining FTC approval and addressing any state regulatory concerns. And despite all the benefits that would flow from the Merger, both Parties expected that the Merger would face scrutiny by antitrust regulators due to the overall size of the transaction and the fact that Kroger and Albertsons operate in a limited number of overlapping geographic areas. The importance of a strong antitrust strategy was not lost on Kroger—it was advised by sophisticated antitrust lawyers, including some who had recently served in high-ranking government antitrust roles.

**RESPONSE**: Admits the allegations contained in Paragraph 17.

18. To address those concerns, as is typical in large retail mergers, Albertsons and Kroger contemplated that the FTC and state regulators would require Kroger to divest certain assets. Thus, from early on in their negotiations, the Parties understood that antitrust regulatory approval was likely to require (1) a large divestiture of stores in geographic areas where both Albertsons and Kroger operated; (2) careful selection of the stores to be divested based on sound economic modeling and neutral, objective criteria; and (3) the inclusion of other assets regulators deemed essential to the successful operation of the divested business, like "banners" (the stores' trade names), private label brands, distribution centers, supply chain agreements, and information technology assets.

**RESPONSE**: Admits that Kroger expected to make divestitures of stores owned by both Albertsons and Kroger; and otherwise denies the allegations contained in Paragraph 18.

19. Albertsons and Kroger knew from the start that regulatory approval in general and a robust divestiture in particular would be critical to the Merger's ability to close. Albertsons also knew that Kroger, as the buyer, likely would demand

10

substantial control over the strategy for seeking regulatory approval and would insist further that Albertsons refrain from pursuing other strategic opportunities while the Merger was pending. Thus, by agreeing to the Merger with Kroger, Albertsons would be exposed to asymmetric risk: if Kroger failed to follow a sound regulatory strategy, it could doom the transaction and leave Albertsons—after an extended period of limbo—worse off than if no agreement had been signed.

**RESPONSE**: Admits the Parties understood that the Merger could not close without regulatory approval and/or approval by a reviewing court, that at various points in time throughout 2022, the Parties engaged in negotiations regarding Kroger's and Albertsons's respective duties under the Merger Agreement, and that the Parties signed the Merger Agreement on October 13, 2022; refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise avers that no response is required to the allegations contained in Paragraph 19 insofar as they purport to describe Albertsons's legal arguments or conclusions, and, to the extent a response is required, denies the allegations contained in Paragraph 19.

20.    As a result, Albertsons began negotiations by insisting on significant assurances that Kroger would take all necessary steps—and do so promptly—to secure regulatory approval and close the Merger. Albertsons raised the need for these assurances at the outset of the Parties' negotiations. They were in the initial draft of the Merger Agreement, which was exchanged in August 2022. And those provisions remained largely unchanged in the final Merger Agreement that the Parties signed two months later, on October 13, 2022.

**RESPONSE**: Admits that at various points in time throughout 2022, the Parties engaged in negotiations regarding Kroger's and Albertsons's respective duties under the Merger Agreement and that the Parties signed the Merger Agreement on October 13, 2022; refers to the Merger Agreement for a complete and

11

accurate description of its contents; and otherwise avers that no response is required to the allegations contained in Paragraph 20 insofar as they purport to describe Albertsons's legal arguments or conclusions, and to the extent a response is required, denies the allegations contained in Paragraph 20.

21.    Albertsons insisted on binding Kroger to three different and customized effort provisions that escalated sharply based on potential regulatory impediments to closing the Merger. Those unambiguous provisions are as follows:

a.    *First*, Kroger generally agreed to use "reasonable best efforts" to satisfy all closing conditions "as promptly as reasonably practicable."

b.    *Second*, Kroger assumed a more stringent obligation to use its "best efforts"—not limited by any standard of reasonableness—"to avoid, eliminate, and resolve any and all impediments under any Antitrust Law . . . so as to enable the Closing to occur as promptly as practicable." That "best efforts" provision explicitly required Kroger to divest any assets and make any changes to its operations that were necessary to obtain antitrust approval. Moreover, Kroger was required to make these "best efforts" expeditiously, "so as to enable the Closing to occur as promptly as practicable."

c.    *Third*, if a regulator threatened or instituted an antitrust challenge, Kroger committed to take "any and all actions" necessary to "eliminate each and every impediment under any Antitrust Law" to closing the Merger. This "any and all actions" obligation is an exceptionally high standard: Kroger had to resolve antitrust concerns, as Delaware courts have put it, "come hell or high water."

**RESPONSE**:  Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise avers that no response is required to the allegations contained in Paragraph 21 insofar as they purport to describe

12

Albertsons's legal arguments or conclusions, and to the extent a response is required, denies the allegations contained in Paragraph 21.

22.    Critically, the Merger Agreement did not include any "material adverse effect" clause qualifying Kroger's obligations. These clauses, which are common in merger agreements, set an outer-bound on a party's best-efforts obligations: the party does not need to take steps that would materially and adversely affect its business. Here, however, the *only* contractual limitation on Kroger's best-efforts and any-and-all-actions obligations was to the absolute number of stores—up to 650—that Kroger would have to divest in the event of antitrust challenges. Albertsons bargained hard for this 650-store threshold, rejecting Kroger's repeated proposals for a lower cutoff. Albertsons did not consent to the Merger until Kroger's CEO personally committed to increase the limit on the number of divested stores, shook hands on that term with the CEO of Albertsons' largest stockholder, and accepted 650 stores in the Merger Agreement.

**RESPONSE**:  Refers to the Merger Agreement for a complete and accurate description of its contents; avers that no response is required to the allegations contained in Paragraph 22 insofar as they purport to describe Albertsons's legal arguments or conclusions, and to the extent a response is required, denies those allegations; and otherwise denies the allegations contained in Paragraph 22.

23.    The Merger Agreement included no other limitations on what Kroger was required to do to facilitate the close of the Merger. For example, nothing in the Merger Agreement limited which stores Kroger had to divest. In other words, to satisfy its "best efforts" and "any and all actions" obligations, Kroger was required to divest any combination of up to 650 stores that would satisfy regulators, and do so promptly. It could not (as it later tried to do) select plum stores to retain and offer up largely unprofitable stores for divestiture. Similarly, the Merger Agreement did not in any way limit Kroger's obligation to part with assets other than stores themselves. For example, Kroger had an unlimited obligation to sell any non-store assets such as store banners, private label food brands, distribution centers, and IT systems, if doing so would resolve regulators' antitrust concerns. Nor was there any limit on Kroger's obligation to submit to enforceable constraints on its post-Merger

13

conduct, if doing so would alleviate any competition concerns not fully addressed by the divestiture itself.

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise avers that no response is required to the allegations contained in Paragraph 23 insofar as they purport to describe Albertsons's legal arguments or conclusions, and to the extent a response is required, denies the allegations contained in Paragraph 23.

24.    Because of the many procompetitive aspects of the Merger and the Parties' clear contractual commitment—on the face of the Merger Agreement—to offer a robust set of remedies to address any competitive concerns, the transaction should have been able to close. Other multi-billion-dollar mergers, including in the grocery sector, have been approved when the buyer offered a sufficient divestiture package, sometimes accompanied by forward-looking constraints on the parties' conduct, to address any remaining concerns about anticompetitive effects. So long as Kroger fulfilled its obligations to provide necessary non-store assets, divest a reasonable set of stores, and commit to any necessary conduct remedies, regulatory approval of the Merger could have been achieved at the state and federal levels.

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate description of its contents and to the "[o]ther multi-billion-dollar mergers" referenced in Paragraph 24 for a complete and accurate description of those transactions and associated regulatory circumstances and decisions; avers that no response is required to the allegations contained in Paragraph 24 insofar as they purport to describe Albertsons's legal arguments or conclusions, and to the extent a response is required, denies those allegations; and otherwise denies the allegations contained in Paragraph 24.

14

25.    Kroger also owed Albertsons further obligations, to help ensure that the Parties' incentives remained aligned and Kroger would work diligently to ensure the Merger closed.

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise avers that no response is required to the allegations contained in Paragraph 25 insofar as they purport to describe Albertsons's legal arguments or conclusions, and to the extent a response is required, denies the allegations contained in Paragraph 25.

26.    First, because of Kroger's promises to take "any and all actions," and to make its "best efforts" to obtain antitrust approval "as promptly as practicable," Albertsons agreed that Kroger would have the principal responsibility for devising and implementing a strategy to obtain antitrust approval. But Kroger committed to "cooperate" with Albertsons in the antitrust clearance process; consult with Albertsons before meeting or communicating with regulators; give Albertsons the opportunity to attend and participate in such meetings; consider Albertsons' strategic views; and "work together in good faith to resolve [any] disagreement." Thus Kroger was required to actively include and engage with Albertsons throughout the regulatory review process, even though the final call on decisions if the Parties disagreed on a particular strategy was Kroger's to make.

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise avers that no response is required to the allegations contained in Paragraph 26 insofar as they purport to describe Albertsons's legal arguments or conclusions, and to the extent a response is required, denies the allegations contained in Paragraph 26.

27.    Second, the Parties agreed that Kroger would pay Albertsons a $600 million termination fee if the Merger failed to close by the outside date set in the Merger Agreement. The Parties knew that this termination fee, totaling less than 2.5% of the total merger consideration, was lower than other mergers of comparable

15

size and complexity. Albertsons accepted this smaller termination fee because Kroger was contractually obligated to use its "best efforts," to take "any and all actions," and to act "as promptly as practicable" to make sure the Merger would close. As further protection to ensure Kroger's full commitment to the Merger, Albertsons expressly negotiated for an additional independent right, beyond the $600 million termination fee: in the event the Merger failed, Albertsons could seek all legally available damages for any "Willful Breach" of the Merger Agreement by Kroger.

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise avers that no response is required to the allegations contained in Paragraph 27 insofar as they purport to describe Albertsons's legal arguments or conclusions, and to the extent a response is required, denies the allegations contained in Paragraph 27.

28.    Despite all its obligations in the Merger Agreement, Kroger did not hold up its end of the bargain. Not only did Kroger fail to move proactively to position the Merger for success, Kroger failed to respond promptly to regulatory feedback, and repeatedly delayed its responses to and its interactions with federal and state regulators. When it did engage, Kroger took untenable positions and failed to answer routine questions about its assumptions and data purportedly supporting proposed divestitures. Kroger also failed to adjust its positions in response to feedback, notwithstanding the fact that the regulators were well aware of Kroger's contractual obligation to act promptly to divest "any and all" assets, including up to 650 stores and unlimited non-store assets. And Kroger ignored Albertsons' recommended strategy and general best practices to obtain regulatory approval at every step. Kroger's conduct created frustration and distrust among regulators, which repeatedly informed Kroger that it had failed to address their concerns, and ultimately caused an unprecedented litigation onslaught, with regulators suing the Parties contemporaneously in three separate jurisdictions.

**RESPONSE**: Denies the allegations contained in Paragraph 28.

29.    Kroger willfully squandered every opportunity to obtain antitrust approval through a well-reasoned divestiture package. As Albertsons repeatedly told Kroger, and as Kroger should have known from its own previous merger clearance

16

experience, the Merger would have the best chance of obtaining FTC approval if Kroger proposed a robust divestiture package as expeditiously as possible after signing the Merger Agreement. Such a package would (at a minimum) include a set of stores designed to allay regulators' local concentration concerns, based upon thorough economic analysis. Putting a serious divestiture offer on the table right from the start would accord with standard antitrust practice and would make FTC staff reluctant to recommend that the agency block the Merger and would provide a solid platform from which to negotiate a solution. Kroger chose not to do this.

**RESPONSE**: Denies the allegations contained in Paragraph 29.

30.    Instead, Kroger proposed an initial divestiture package that was facially deficient. When Kroger first met with the FTC in December 2022, Kroger proposed to divest only 238 stores—just over one third of the 650-store ceiling in the Merger Agreement and nearly half of the 440 stores that Kroger's own expert's economic analysis demonstrated would be needed to offer to close the deal. That opening proposal was both woefully small and devoid of a coherent economic rationale. Instead of choosing stores with an eye towards alleviating concerns about local concentration, Kroger adversely selected the Kroger stores in the 238-store set, which were among the least profitable in Kroger's portfolio. This gambit quickly became obvious, injuring Kroger's credibility with regulators. In meetings with the FTC, Kroger could not even answer basic questions about the economic analysis underlying its proposal or the principles underlying the selection of the stores to be divested.

**RESPONSE**: Admits that on December 1, 2022, Kroger met with the FTC,

and that the proposed initial divestiture package included 238 stores; and otherwise

denies the allegations contained in Paragraph 30.

31.    Days after the initial December 2022 meeting, the FTC issued a second request (the "Second Request") to both Parties. A second request is universally understood by antitrust practitioners as putting the Merger at risk for future litigation and requiring an extensive series of document productions and engagements with the FTC regarding the competitive effects of the Merger.

17

**RESPONSE**: Admits that on December 5, 2022, Kroger received a request for additional information (the "Second Request") from the FTC; and otherwise denies the allegations contained in Paragraph 31.

32.    The FTC's issuance of a Second Request triggered Kroger's obligation to take "any and all actions" to remove antitrust impediments, on top of its obligation to make its "best efforts" to obtain approval expeditiously. Kroger was required promptly to address each and every concern raised by regulators during the Parties' negotiations with regulators.

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise avers that no response is required to the allegations contained in Paragraph 32 insofar as they purport to describe Albertsons's legal arguments or conclusions, and to the extent a response is required, denies the allegations contained in Paragraph 32.

33.    Around the same time, the Attorneys General of multiple states, including Washington, which sent Albertsons and Kroger a Civil Investigative Demand on January 6, 2023, initiated investigations into the Merger, further heightening the risk of enforcement action and the need for Kroger to move expeditiously to take "any and all actions" to either avoid or win any litigation challenging the Merger. Throughout their investigations, the states and the FTC coordinated their actions closely, sharing all material information they obtained from the Parties and frequently joining the same meetings with the Parties.

**RESPONSE**: Admits that on January 6, 2023, the Washington State Attorney General sent Albertsons and Kroger a Civil Investigative Demand, and that in or around January 2023, the Attorneys General of various states began investigations into the Merger; denies knowledge or information sufficient to form a belief as to

18

the truth of the allegations contained in the second sentence of Paragraph 33; and

otherwise denies the allegations contained in Paragraph 33.

34.     Any buyer that was serious about making "best efforts" to eliminate antitrust impediments to the Merger "as promptly as practicable"—let alone taking "any and all actions" to obtain antitrust approval—would have responded to the initial FTC meeting, the FTC's issuance of the Second Request, and the initiation of multiple state Attorney General investigations by immediately proposing a new divestiture package based on rigorous economic analysis.

**RESPONSE**:  Refers to the Merger Agreement for a complete and accurate

description of its contents; and otherwise avers that no response is required to the

allegations contained in Paragraph 34 insofar as they purport to describe

Albertsons's legal arguments or conclusions, and to the extent a response is required,

denies the allegations contained in Paragraph 34.

35.     Not Kroger. Instead, Kroger stalled, resisting any effort to improve its divestiture proposal for months. Rather than address the FTC's concerns when next meeting with the FTC in March 2023, Kroger presented the same indefensible proposal to divest 238 adversely selected stores, with a buyer to be named later. This willfully obstructive and high-risk tactic was inexplicable, except as a decision by Kroger to press its own independent economic best interests over meaningful engagement with the FTC about resolving the agency's concerns.

**RESPONSE**:  Admits that in or around March 2023, Kroger met with the

FTC regarding a proposed 238-store divestiture package; and otherwise denies the

allegations contained in Paragraph 35.

36.     Kroger's initial shirking of its obligations under the Merger Agreement escalated to outright repudiation of its obligations as the Parties discussed identifying a divestiture buyer. When Kroger began that process, it received ample interest: approximately 60 prospective buyers signed non-disclosure agreements to initiate talks with Kroger in the first half of 2023, including established, large-scale

19

grocery retail competitors like ███. These companies were strong candidates: they had the experience, resources, and scale to acquire stores and operate them as strong competitors from Day One, thus allaying concerns about grocery competition in the vicinities of those stores. Yet, Kroger did not make its "best efforts," act "promptly," or take "any and all actions" to divest assets to one or more of these strong buyers. By the time Kroger's divestiture process progressed to the stage of formal bidding by prospective buyers, Kroger had eliminated the best candidates, either by rejecting them outright or by failing to offer them sufficiently attractive terms to hold their interest. All the while, Kroger kept Albertsons largely in the dark about Kroger's negotiations with potential divestiture buyers, rejecting Albertsons' pleas to be included in the process despite simultaneously relying on Albertsons to expend significant resources on due diligence for the divestiture.

**RESPONSE**:  Admits that starting in October 2022, 55 parties entered into NDAs with Kroger, including ███; and otherwise denies the allegations contained in Paragraph 36.

37.    On September 8, 2023—nearly a year after the Merger Agreement was signed, and nine months after the FTC made its Second Request—Kroger finally entered into an Asset Purchase Agreement with C&S (the "APA"). Kroger's choice of C&S as the divestiture buyer came with obvious risks. C&S was primarily a grocery wholesaler and operated only 23 retail grocery locations at the time it was selected. Lacking a large-scale grocery retail business of its own, C&S would need significant management and transition resources from Kroger and Albertsons to operate the divested stores effectively. C&S was subject to heightened scrutiny by the FTC because it previously had sold numerous retail locations in the early 2000s and 2010s just a few years after purchasing them, which would predictably cause the FTC to be concerned that C&S might attempt another quick sale with divested assets. Moreover, C&S would need significant new financing to purchase up to 650 stores. These attributes of C&S were bound to draw scrutiny from antitrust regulators, given that any plan to divest stores to C&S would necessarily be premised on C&S's ability to operate those stores as strong local competitors. Selecting C&S as a divestiture buyer was thus highly risky and inconsistent with Kroger's obligations to make expeditious "best efforts" and take "any and all actions" when buyers such as ███ were available. Yet, Kroger made this selection without informing Albertsons of the other potentially stronger bidders' proposals and without adequately exploring potentially strong multi-buyer solutions

20

**RESPONSE**:  Admits that on September 8, 2023, Kroger and Albertsons entered into an Asset Purchase Agreement with C&S Wholesale Grocers ("C&S"); and otherwise denies the allegations contained in Paragraph 37.

38.    Once it selected C&S, it was incumbent on Kroger to demonstrate to the FTC that Kroger would divest the assets C&S would need to thrive as a retail competitor. Kroger failed on this front too. Kroger's initial APA with C&S was also grossly deficient. It provided for the divestiture of just 413 stores, many of which still were chosen based on Kroger's financial interests rather than the required objective and neutral economic analysis. The APA also failed to include the non-store assets that Kroger knew any potential buyer, as well as the FTC, would regard as essential to making the divested stores competitive, such as key IT infrastructure and private label food products.

**RESPONSE**:  Admits that the initial APA provided for the divestiture of 413 stores; and otherwise denies the allegations contained in Paragraph 38.

39.    Over multiple months, both Albertsons and C&S urged Kroger, consistent with applicable FTC divestiture guidelines, to address these deficiencies by divesting a cohesive selection of 650 stores and non-store assets that would meaningfully address competitive concerns. Kroger ignored these entreaties and focused on its own economic interests, to the detriment of its credibility with regulators and its ultimate ability to negotiate a solution that would avoid litigation. Demonstrating the seriousness of Kroger's blunders, the Washington Attorney General highlighted in its opening statement at trial an example of a store that Kroger's management had suggested be included in the divestiture package, but which was vetoed by Kroger's CEO Rodney McMullen because "this store has real estate that is worth a lot." In its opinion enjoining the Merger, the Washington Court ultimately concluded—citing that very example—that "Kroger kept the best performing assets for itself." As the Washington Court put it: "Where it could, Kroger followed a simple rule: if a store was a 'good EBITDA producer, . . . we wouldn't want to divest.'"

**RESPONSE**:  Admits that at various points in time throughout 2023 and 2024, C&S, Albertsons, and Kroger communicated regarding the proposed

21

divestitures; refers to the testimony and evidence presented in the trial record of the

Washington Litigation and to the Washington Opinion for a complete and accurate

description of their contents; and otherwise denies the allegations contained in

Paragraph 39.

40.     Similar self-serving conduct by Kroger occurred throughout its discussions with the FTC and other regulators.

**RESPONSE**: Denies the allegations contained in Paragraph 40.

41.     In addition to deficient interactions with the regulators and proposed divestiture buyers, Kroger failed to adequately inform and cooperate with Albertsons, as the Merger Agreement required. Throughout the Parties' interactions with regulators from October 2022 through February 2024, Kroger failed to meaningfully include Albertsons in strategy sessions with its legal team and experts, provide updates to Albertsons about the bases for its divestiture proposal and alternative divestiture buyers, explain its methodologies for analyzing local competition effects, or consider feedback from Albertsons about the proper process and substance for engaging with regulators. At each turn, Kroger failed to meaningfully engage and respond to Albertsons' feedback. Instead, Kroger acted consistent with what it perceived to be in its financial interest, spending months delaying responses to regulators and then providing half-baked proposals that were objectively destined to fail.

**RESPONSE**: Denies the allegations contained in Paragraph 41.

42.     Kroger's recalcitrance toward cooperating with Albertsons was the opposite of Albertsons' approach for working with Kroger. Albertsons offered to meet with Kroger's experts and repeatedly provided Kroger with economic analyses and models from its own experts reflecting a divestiture proposal to remedy the shortcomings of Kroger's proposals. Albertsons tailored its proposals to follow the FTC's divestiture guidelines and to fully address the stated concerns of the FTC and state regulators about the Merger. In numerous instances, Albertsons pushed Kroger to increase the number and quality of stores in its proposed divestiture packages; add non-store assets that regulators viewed as critical to the successful operation of divested stores, such as banners, private label brands, distribution centers, and IT systems; engage more quickly with federal and state regulators to address all stated

22

concerns; and provide comprehensive, economic-based rationales for its offers. And Albertsons pleaded with Kroger to offer a divestiture closer to the 650-store threshold, selected through rigorous economic analysis, and buttressed by key non-store assets that would allow a divestiture buyer to become a viable competitor. Kroger brushed this input aside and omitted it from submissions to the FTC, eschewing its duty of cooperation under the Merger Agreement.

**RESPONSE**: Admits that at various points in time throughout 2023 and 2024, the Parties communicated regarding the proposed divestitures; and otherwise denies the allegations contained in Paragraph 42.

43.    Finally, Kroger failed to make a best and final offer to the FTC with the terms and on a timing that could allow the deal to close, dooming the Merger. As a result of Kroger's conduct, the Parties lost out not only on their opportunity for a timely pre-litigation settlement but also compromised their defense in the eventual litigation.

**RESPONSE**: Denies the allegations contained in Paragraph 43.

44.    On September 13, 2023, eleven months after signing the Merger Agreement, Kroger met with the FTC to discuss its new proposal to sell 413 stores to C&S. The FTC reiterated the same concerns from nearly a year prior regarding how Kroger was selecting stores to divest. The FTC thereafter met or communicated with Kroger multiple times in October 2023, seeking additional information about Kroger's proposal, which Kroger did not provide. Nearly a year after Kroger first engaged with the FTC, on November 22, 2023, the FTC informed Kroger that its 413-store offer remained woefully inadequate. Kroger still had not addressed the FTC's questions about the economic methodology for its divestiture offer, nor had it addressed the FTC's prior concerns with how Kroger was defining a relevant product market. As a result, the FTC wrote that Kroger's proposed divestiture failed to address "dozens, if not hundreds, of 'markets' where the [M]erger would be presumed likely to enhance market power." And yet, between November 2023 and January 2024, Kroger made just small adjustments to the number of stores it was willing to divest, first offering 510 stores and then 541 stores, but still failing to provide any additional explanation for how it was selecting those stores.

**RESPONSE**: Admits that at various points in time throughout 2022 and 2023, Kroger met with the FTC, including on September 13, 2023 and November 22,

23

2023, and that Kroger made divestiture proposals to the FTC that included 510 and 541 stores; refers to the correspondence referenced in Paragraph 44 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 44.

45.    Even when the FTC convened "last rites" meetings with two of the FTC Commissioners on February 22, 2024, indicating that litigation was imminent, Kroger still failed to do what it needed to do to get the Merger done. The FTC was aware of Kroger's contractual commitment to divest up to 650 stores if necessary. Against that backdrop, in the last rites meeting, FTC Commissioner Rebecca Slaughter conveyed to the parties that it was in everyone's interest to reach a negotiated settlement before litigation commenced. Notwithstanding that direct signal to Kroger to improve its divestiture package, Kroger still did not offer to divest anywhere near 650 stores or otherwise improve its divestiture package.

**RESPONSE**:  Admits that on February 22, 2024, Kroger met with the FTC; and otherwise denies the allegations contained in Paragraph 45.

46.    On February 26, 2024, as a direct result of Kroger's failure to make expeditious "best efforts" and take "any and all actions" to remove antitrust impediments, the FTC (joined by several states) and the states of Washington and Colorado each filed a separate lawsuit to enjoin the Merger. While Albertsons and Kroger entered those lawsuits at a disadvantage because of Kroger's willful blunders in the pre-litigation regulatory process, Kroger had an opportunity to save the Merger by pivoting to a 650-store divestiture package proposed by C&S that was both responsive to the FTC's competitive concerns and within Kroger's obligations under the Merger Agreement. Instead, Kroger proposed a more limited 579-store package, knowing that it would be subject to more criticisms by the regulators and had a lower probability of passing muster with the courts. That 579-store package remained highly vulnerable to attack by antitrust regulators. Indeed, even Kroger's own economics expert could not fully justify the package and was forced to concede at trial in the FTC's enforcement action that the Merger was presumptively anticompetitive in nearly two dozen markets, taking the divestiture package into account. That admission by Kroger's own expert was the final nail in the Merger's coffin.

24

**RESPONSE**: Admits that in January and February 2024, the Washington and Colorado State Attorneys General, as well as the FTC, joined by Attorneys General of additional States and the District of Columbia, filed suit to enjoin the Merger, and that Kroger proposed a divestiture package to the FTC that included 579 stores; and otherwise denies the allegations contained in Paragraph 46.

47.     Even short of divesting 650 stores, Kroger could have at least solved the local concentration concerns of the Washington and Colorado Attorneys General without needing to go above the 650-store limit. Adding just 33 Washington stores and two Colorado stores to its 579-store divestiture package would potentially resolve the state litigations. That would create a new pathway to close the Merger through negotiations with the FTC—even after entry of any preliminary injunction in the FTC's lawsuit. These minimal improvements to the divestiture package were well within Kroger's obligations to make expeditious "best efforts" and take "any and all actions" to remove antitrust impediments, yet Kroger refused even to take those basic steps.

**RESPONSE**: Denies the allegations contained in Paragraph 47.

48.     Remarkably, Kroger even failed to act on offers that would have provided additional assets for the deal. In the midst of multiple trials to defend the Merger, recognizing that Kroger had apparently soured on the Merger and was not motivated to close it despite its contractual obligations, Albertsons decided to help try to get the deal done. In discussions at the board level, Albertsons agreed to offer Kroger financial consideration potentially exceeding $1 per Albertsons share—approximately $800 million in value—for Kroger to use to give the Merger the best remaining chance of achieving approval through a settlement with regulators or favorable court rulings. Albertsons' CEO Vivek Sankaran and its then-co-Chairman of the Board Chan Galbato conveyed to Kroger's CEO Rodney McMullen on September 13, 2024 that if Kroger would add assets to its divestiture package that would better address regulatory concerns, Albertsons would voluntarily participate in that effort through a "material" financial commitment—even though Kroger was already obligated to improve the divestiture package to a satisfactory level under the existing terms of the Merger Agreement. McMullen shared this information with Kroger Senior Vice President Yael Cosset, who had primary responsibility at that time for the Merger. In addition, Albertsons' financial advisor conveyed to Kroger's

25

CEO and Kroger's counsel that Albertsons was prepared to contribute hundreds of millions of dollars—in the range of $1-2 per Albertsons share—to improve the divestiture package. Yet, Kroger ultimately took no action in response to Albertsons' proposal.

**RESPONSE**: Denies the allegations contained in Paragraph 48.

49.    Under the Merger Agreement—which contained no clause allowing Kroger to limit its efforts to avoid a material adverse effect on its profitability—Kroger was supposed to bear the cost of whatever divestiture or other remedy was necessary for regulatory approval, subject only to the 650-store cap. Its failure to improve the divestiture package, even in the face of Albertsons' proposal to provide additional consideration, was irreconcilable with its obligations.

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate

description of its contents; and otherwise denies the allegations contained in

Paragraph 49.

50.    On December 10, 2024, the District of Oregon granted the FTC's motion for a preliminary injunction, dooming the transaction. The judge highlighted Kroger's hand-picked economics expert's concession that at least 22 markets were presumptively unlawful, finding that "[t]his evidence on its own is sufficient to find that the divestiture will not mitigate the merger's anticompetitive effect such that it is no longer likely to substantially lessen competition." The Oregon Court also repeatedly highlighted the glaring deficiencies in Kroger's divestiture package, particularly in light of C&S's inexperience as a retail operator. That same day, the Washington Court issued a permanent injunction blocking the Merger, similarly finding Kroger's proposed divestiture package deficient.

**RESPONSE**: Admits that on December 10, 2024, the United States District

Court for the District of Oregon granted the FTC's motion for a preliminary

injunction, and that the King County Superior Court enjoined the Merger; refers to

the Oregon Opinion and to the Washington Opinion for a complete and accurate

26

description of their contents; and otherwise denies the allegations contained in Paragraph 50.

51.     On December 10, 2024, following the courts' decisions enjoining the Merger, Albertsons exercised its right to terminate the Merger Agreement. Albertsons' decision to terminate triggered Kroger's unambiguous obligation to pay Albertsons a $600 million termination fee within two business days. Yet, in another willful breach of the Merger Agreement, Kroger refused to pay the termination fee.

**RESPONSE**:  Admits that on December 10, 2024, Albertsons purported to terminate the Merger Agreement and that Kroger did not pay Albertsons the termination fee because Albertsons is not entitled to it under the terms of the Merger Agreement; and otherwise denies the allegations contained in Paragraph 51.

52.     Had Kroger lived up to its contractual obligations, this Merger would have succeeded. Instead, Kroger flagrantly violated its obligations to take "any and all actions" to remove antitrust impediments; to "cooperate" with Albertsons; to use "best efforts" to obtain antitrust approval "as promptly as practicable"; and to use "reasonable best efforts" to satisfy closing conditions generally. As a result, Albertsons has endured more than two years of limbo, during which time it has been blocked from taking on new projects, making new investments, or exploring alternative transactions it would otherwise pursue. Further, Albertsons' stockholders have been denied the multi-billion-dollar premium Kroger agreed to pay for Albertsons' shares and the $600 million termination fee owed by Kroger, and have suffered from a decrease in stockholder value. Meanwhile, American consumers who value fresh, high-quality food have been deprived of an opportunity for lower prices and greater choice and competition in the relevant market(s).

**RESPONSE**:  Denies the allegations contained in Paragraph 52.

## PARTIES

53.     Albertsons is a Delaware corporation headquartered in Boise, Idaho. It is one of the largest food and drug retailers in the United States. As of September 7, 2024, Albertsons operated 2,267 stores and 1,726 pharmacies across 34 states and

27

the District of Columbia. Albertsons serves 36.8 million customers per week and, as of September 7, 2024, employed approximately 285,000 associates.

**RESPONSE**: Admits the allegations contained in Paragraph 53 generally comport with Kroger's understanding of Albertsons's public disclosures.

54.    Kroger is an Ohio corporation headquartered in Cincinnati, Ohio. As of February 3, 2024, Kroger operated 2,722 supermarkets, of which 2,257 had pharmacies and 1,665 had fuel centers, across 35 states and the District of Columbia. As of February 3, 2024, Kroger employed approximately 414,000 associates.

**RESPONSE**: Admits the allegations contained in Paragraph 54.

## JURISDICTION

55.    Subject matter jurisdiction is proper in this Court pursuant to 8 Del. C. § 111(a), which confers jurisdiction over "[a]ny civil action to interpret, apply, enforce or determine the validity of . . . [a]ny agreement, certificate of merger or consolidation," under 8 Del. C. § 251, which governs the Merger.

**RESPONSE**: Admits the allegations contained in Paragraph 55.

## FACTUAL ALLEGATIONS

**I.    Albertsons and Kroger Face Fierce Competition, Increasingly Dominated by Walmart, Amazon, and Other Diversified Behemoths**

56.    Albertsons and Kroger have operated retail grocery stores since 1939 and 1883, respectively. Unlike many of their competitors, Kroger and Albertsons have majority-union workforces.

**RESPONSE**: Admits the allegations contained in Paragraph 56.

57.    The grocery business has become increasingly competitive over the last few decades. While thirty or forty years ago, customers commonly would choose one store at which to do their primary grocery shopping for the week, customers now typically split their grocery shopping across multiple trips and multiple formats, including online.

**RESPONSE**: Admits the allegations contained in Paragraph 57.

28

58.    At the same time, Walmart, Costco, Amazon, and Target have emerged as significant grocery competitors. These competitors have immense scale and diversified businesses, including between grocery and non-grocery products. Their workforces are mostly non-union, resulting in lower labor costs. These factors, among others, enable them to consistently offer low prices to their customers.

**RESPONSE**:  Admits the allegations contained in Paragraph 58.

59.    Other new competitive threats also have emerged. Foreign-owned grocery companies like Ahold Delhaize, Aldi, and Lidl are rapidly expanding in the U.S. market. Other historically non-food retailers like ▮▮▮▮▮▮▮ have recognized an opportunity for growth in grocery and have invested aggressively in the space. Once-niche natural food and organic grocers like Whole Foods, Sprouts, and Trader Joe's have expanded and diversified their offerings. And ethnically-focused sellers like H Mart, Patel Brothers, Fiesta Mart, and 99 Ranch Market have expanded from localized chains to regional competitors, operating between 50 and nearly 100 locations each.

**RESPONSE**:  Admits the allegations contained in Paragraph 59.

60.    As a result, so-called "traditional grocery stores" like Albertsons and Kroger have faced increased pressure on price, quality, and diversity of their offerings and have been losing market share to both global giants and agile new entrants.

**RESPONSE**:    Admits that since 2021 Kroger has faced increasing competitive pressure from different store formats; denies knowledge or information sufficient as to form a belief as to the truth of the allegations contained in Paragraph 60 concerning Albertsons's business; and otherwise denies the allegations contained in Paragraph 60.

61.    During the COVID-19 pandemic, Albertsons and Kroger both enjoyed a short period of outsized profitability; overall grocery revenue rose as customers shifted from restaurants to grocery stores and consolidated their weekly trips. As a result, grocers like Albertsons were able to hire new employees and invest in long-term projects like increasing digital sales. In recent years, however, that trend has reversed, and competition in grocery retail has grown even more fierce.

29

**RESPONSE**:  Admits that Kroger benefited from increased spending by customers in grocery stores during the COVID-19 pandemic; denies knowledge or information sufficient as to form a belief as to the truth of the allegations contained in Paragraph 61 concerning Albertsons's business; and otherwise denies the allegations contained in Paragraph 61.

62.    To address this increasing competition, Albertsons has implemented various initiatives to leverage its existing scale and reduce its costs, for example, increasing its digital sales and improving overall productivity in its stores. Those changes have allowed Albertsons to offset a certain amount of food-based inflation and some of its rising labor costs. But these measures alone did not and could not do enough to allow Albertsons to lower its product prices to compete effectively with Walmart, Costco, Amazon, Target, and the other competitors.

**RESPONSE**: Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 62 and, on that basis, denies the allegations contained in Paragraph 62.

63.    If dedicated grocery stores like those operated by Albertsons were forced to close due to their inability to match the prices of their superstore competitors, consumers would suffer. Through vigorous competition, Albertsons has cultivated many customers who choose to shop at its stores—either instead of or in addition to other grocery options. These consumers would lose a desirable alternative if they were forced to shop for groceries only at Walmart, Costco, and their ilk.

**RESPONSE**: Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 63, and, on that basis, denies the allegations contained in Paragraph 63.

64.    Communities affected by the closure of dedicated grocery stores would also suffer broader harms. As multiple recent research papers demonstrate, the

30

opening of new Walmart locations tends to impoverish surrounding communities by depressing workers' wages and putting smaller retail competitors out of business, which in turn cuts off revenue to those smaller retailers' former local suppliers. A grocery landscape dominated entirely by Walmart and similar superstores would diminish the vibrancy and prosperity of many local economies.

**RESPONSE**: Refers to the research papers referenced in Paragraph 64 for a complete and accurate description of their contents; and otherwise denies the allegations contained in Paragraph 64.

## II.    Kroger Approaches Albertsons, Proposing a Merger

65.    Beginning in 2021, the Albertsons board of directors engaged in a strategic review of the ways in which it could maximize stockholder value in the face of increasing pressure from larger-scale competitors. One of the options that the board explored was a potential transaction by which Albertsons might be acquired. From these discussions, and after engaging in a process to identify potential buyers, Albertsons entered negotiations with another company ("Company A") regarding Company A's interest in acquiring Albertsons. After Albertsons expended significant effort on the potential sale, including engaging in due diligence, Company A informed Albertsons in February 2022 that it did not wish to pursue a transaction at that time.

**RESPONSE**: Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 65, and, on that basis, denies the allegations contained in Paragraph 65.

66.    Shortly thereafter, Albertsons publicly announced on February 28, 2022 that it had commenced a Board-led review of potential strategic alternatives aimed at enhancing the Company's growth and maximizing stockholder value, and weeks later, in April 2022, representatives of Kroger approached Albertsons' outside financial advisor to discuss the possibility of Kroger acquiring Albertsons. Albertsons considered an acquisition by Kroger to be an attractive opportunity. The deal would result in a company of considerable scale: together, Kroger and Albertsons own and operate approximately 5,000 retail stores and 4,000 retail pharmacies. They also employ approximately 700,000 employees, many of whom

31

are union members, across 48 states. This expanded scale would enable the surviving company to obtain more favorable terms from suppliers, improve its long-term supply chain management, and centralize administrative functions. In turn, the newly-merged company would use the cost savings generated by these efficiencies to deliver lower prices and expanded product offerings to customers. The surviving company would also be better situated to invest in capital improvements, online shopping operations, and non-grocery business segments, including pharmacies.

**RESPONSE**: Admits the allegations contained in Paragraph 66.

67.    Critically, the combined company would be more competitive against retail giants like Walmart, Costco, Amazon, and Target, benefiting consumers. Joining forces would allow the combined entity to offer more competitive prices without compromising their fundamental business model.

**RESPONSE**: Admits the allegations contained in Paragraph 67.

68.    A merger between Kroger and Albertsons would also allow the companies to build a more valuable retail media platform than either company could build on its own. Like other grocery retailers, Kroger and Albertsons earn revenue by selling digital and physical media space for advertisements of consumer-packaged goods, and by providing advertisers with insights on consumer purchases in response to advertisements. This non-grocery revenue can enable a virtuous cycle: profits from retail media allow the companies to invest more in lowering grocery prices; lower prices attract more shoppers; increasing customer traffic raises the value of the advertising space the companies are able to sell; and greater future media revenue enables further grocery price reductions. However, today, Kroger and Albertsons lack the scale and resulting network effects of superstores like Walmart, which generate much greater retail media revenues. Building a single, nationwide retail media platform for Albertsons and Kroger, instead of two separate platforms with only regional coverage, would also generate cost savings that could be passed on to consumers.

**RESPONSE**:  Admits that Kroger earns revenue from alternative profit businesses, including related to advertising, and that Kroger invests profits from its alternative profit businesses into lowering prices for grocery customers; denies knowledge or information sufficient to form a belief as to the truth of the allegations

32

contained in Paragraph 68 concerning Albertsons's business; and otherwise denies the allegations contained in Paragraph 68.

69.    Moreover, while there are certain geographic markets in which Albertsons and Kroger both operate, the two companies have different overall geographic footprints. Albertsons stores are predominantly located in the Northeast and on the West Coast; Kroger has no presence in the Northeast. Kroger stores are predominantly located in the Midwest, Southeast, and West; Albertsons has no presence in the Midwest or Southeast. A merger between Albertsons and Kroger would thus create a grocery chain with broader geographic scope across the country, improving and streamlining supply chain and distribution resources, as well as unlocking new value from existing resources like consumer data.

**RESPONSE**:  Admits the allegations contained in Paragraph 69.

70.    While Albertsons saw great upside in a potential deal with Kroger from Kroger's initial outreach, it needed to receive assurances from Kroger that it would do all that was necessary to close the deal. During the time from negotiations to execution of a merger agreement, to obtaining antitrust clearance, to closing, Albertsons would have to bear significant transaction costs, including fees for attorneys and financial advisors, as well as significant costs and employee time for integration planning.

**RESPONSE**:  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 70, and, on that basis, denies the allegations contained in Paragraph 70.

71.    Albertsons also knew any agreement to merge would also create a period of strategic limbo for it between signing and closing. The Merger Agreement, for example, required Albertsons to commit to significant limitations on its ability to enter contracts, including leases, above a threshold of $10,000,000. And Albertsons had to forgo other strategic alternatives at a time of significant and rapid market evolution.

**RESPONSE**:  Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise denies knowledge or information sufficient

33

to form a belief as to the truth of the allegations contained in the first and third sentences of Paragraph 71; and otherwise denies allegations contained in Paragraph 71.

72.    If the Merger never closed, Albertsons' investment of resources and effort would go to waste—a risk that was front of mind for Albertsons in the wake of its recent failed negotiations with Company A.

**RESPONSE**: Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 72, and, on that basis, denies the allegations contained in Paragraph 72.

73.    It also was clear to both Kroger and Albertsons that their potential merger would not achieve its procompetitive aspirations and would face a substantial risk of being blocked on antitrust grounds unless the Parties pursued a principled and robust regulatory strategy, including by making divestitures in limited local geographic areas where Kroger and Albertsons both operated stores.

**RESPONSE**: Admits that Kroger developed a comprehensive regulatory strategy; denies knowledge or information sufficient to form a belief as to the truth of the allegations concerning Albertsons's knowledge; and otherwise denies the allegations contained in Paragraph 73.

74.    Because the antitrust aspects of any prospective deal between Kroger and Albertsons were critical, both Parties involved antitrust counsel almost immediately after Kroger's initial outreach to Albertsons. Kroger engaged a team of accomplished, sophisticated antitrust lawyers at Arnold & Porter Kaye Scholer LLP ("A&P"), including a former Deputy Assistant Attorney General in the Antitrust Division of the U.S. Department of Justice, who had had a front-row seat for four years to both the Trump and Biden Administrations' enforcement of antitrust laws. The A&P antitrust practice group was led by the former Director of the FTC's Bureau of Competition from 2013 to 2017. These attorneys and their colleagues were intimately familiar with what antitrust regulators would require from Kroger

34

to get the deal done and how the agency's views could be affected by changes in the political climate.

**RESPONSE**:     Admits that Kroger engaged Arnold & Porter Kaye Scholer LLP as antitrust counsel for the Merger; refers to the publicly available biographies of Kroger's antitrust counsel for a complete and accurate description of their contents; and otherwise denies allegations contained in Paragraph 74.

75.     Through their respective competition attorneys, the Parties discussed antitrust issues extensively at the very outset of their negotiations, even before negotiating pricing and other material terms. On May 5, 2022, Kroger's and Albertsons' outside antitrust counsel discussed the geographic overlap of their stores in select areas and the intense competition that their stores face from a variety of retailers. The same outside counsel spoke about these topics again on May 11, 2022. On May 19, 2022, Albertsons CEO Vivek Sankaran met with Kroger CEO Rodney McMullen to discuss the potential deal, including the importance of developing a plan to achieve regulatory clearance by divesting specific stores to a qualified third party.

**RESPONSE**: Admits that at various points in time throughout 2022, Kroger and Albertsons's antitrust counsel, along with senior executives and high-level personnel from Kroger and Albertsons, met regarding the regulatory review process, including meetings between outside counsel on May 5 and May 11, 2022, and a meeting between Messrs. Sankaran and McMullen on May 19, 2022; and otherwise denies the allegations contained in Paragraph 75.

76.     As these deal discussions were ongoing, Albertsons retained Charles River Associates ("CRA"), an economic consulting firm, to conduct a preliminary economic analysis of the proposed deal. CRA adopted a robust approach and considered each of the 83 metropolitan areas where both Parties operated stores as part of its analysis. From this analysis, Albertsons formed the view that a substantial number of divestitures would be required to address competitive issues in many

35

communities and that a realistic store divestiture figure would be approximately 600 to 650 stores.

**RESPONSE**: Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 76, and, on that basis, denies the allegations contained in Paragraph 76.

77.    Kroger engaged Compass Lexecon, another economic consulting firm with significant experience in competition analysis. To Albertsons' surprise, Kroger's consulting economists concluded that only 400 to 500 stores would need to be divested in a potential merger. Albertsons immediately flagged flaws with this analysis, including that Compass Lexecon had only evaluated competitive effects in 24 metropolitan areas, not all metropolitan areas where both Parties operated stores. When Albertsons attempted to re-create Kroger's analysis using similar assumptions but expanding results to 83 metropolitan areas, it identified hundreds more stores that presented concentration concerns and thus would likely need to be included in a divestiture package. Kroger also did not consider either a uniform threshold of market concentration or specific radius around Kroger and Albertsons stores to determine overlaps, as required by traditional antitrust analysis. Nor did it apply a market definition that the FTC was likely to use in its own analysis. For example, Kroger included club stores like Costco, natural foods stores, and ethnically-focused sellers in its early estimates even though the FTC had rejected including those stores in prior merger clearance reviews. Kroger's approach had the overall effect of significantly undercounting the number of stores it would likely need to divest.

**RESPONSE**: Admits that Kroger engaged Compass Lexecon to act as an economic consulting firm for the Merger; refers to the Compass Lexecon reports referenced in Paragraph 77 for a complete and accurate description of their contents; and otherwise denies the allegations contained in Paragraph 77.

78.    It was also clear from the outset that a successful divestiture package would require more than merely divesting a certain number of stores. From the Parties' initial estimation exercises, there were a large number of overlapping stores in Los Angeles, San Diego, Chicago, Dallas, Las Vegas, Phoenix/Tucson, and Washington, D.C. As a result, the Parties would need to select stores for divestiture

36

that would alleviate regulatory concerns related to those specific, limited set of local markets. In effect, Kroger would need to select the "right" stores and accompany those with key non-store assets, including banners, distribution centers, manufacturing facilities, and private label brands and products that supported those stores, so that the regulators would be persuaded that a divestiture buyer would be able to establish a competitive operation. In short, while the number of stores was important, divesting other assets would be key to resolving regulatory competition concerns.

**RESPONSE**: Admits that certain geographic areas in the United States included both Kroger and Albertsons stores, and Kroger analyzed divesting a certain number of those stores; and otherwise denies the allegations contained in Paragraph 78.

79. Thereafter, the Parties continued to analyze the extent of necessary divestitures while further negotiating other material terms of a deal

**RESPONSE**. Admits that Kroger analyzed potential divestiture packages in connection with its negotiation of the Merger Agreement; denies knowledge or information sufficient to form a belief as to the truth of the allegations concerning Albertsons's actions or beliefs; and otherwise denies the allegations contained in Paragraph 79.

### III.   Albertsons Bargains for Stringent Requirements for Kroger in Seeking Antitrust Approval

80. Given the importance of a strong antitrust strategy, coupled with the risk of immense costs to Albertsons if it became entangled in a deal that never closed, Albertsons was unwilling to proceed with even drafting a merger agreement—let

37

alone signing one—unless Kroger committed to make extraordinary efforts to close the deal, minimizing the risk of transaction failure.

**RESPONSE**: Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 80, and, on that basis, denies the allegations contained in Paragraph 80.

81.    On June 25, 2022, Kroger, through its outside financial advisor, provided Albertsons with a nonbinding indication of interest that described terms and conditions to be further discussed, including a cap on the number of stores to be divested to obtain regulatory clearance, the time period for obtaining regulatory clearance, and the termination fee each Party might have to pay if the transaction failed to close.

**RESPONSE**:  Admits that on June 25, 2022, Kroger's financial advisor Citigroup Global Markets, Inc. ("Citi"), submitted a preliminary, non-binding indication of interest to Albertsons; refers to the indication of interest referenced in Paragraph 81 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 81.

82.    During the several weeks following Kroger's June 25, 2022 opening proposal, the Parties—through their senior executives, outside counsel, and outside financial advisors—discussed certain material terms that would need to be included in any merger agreement, although no draft contract had yet been shared between the Parties.

**RESPONSE**: Admits the allegations contained in Paragraph 82.

83.    To proceed with the negotiations, Albertsons demanded assurances that Kroger was willing to agree to stringent protections. Kroger provided this assurance by indicating early in the Parties' discussions that it would accept eight key deal points to mitigate the risk that the Merger would fail. Albertsons incorporated each of these protections into the first draft of the Merger Agreement, which it sent to Kroger on August 12, 2022. These protections remained materially unchanged in all

38

subsequent drafts and were included in the final Merger Agreement, which was executed on October 13, 2022.

**RESPONSE**: Admits that at various points in time throughout 2022, the Parties engaged in negotiations regarding Kroger's and Albertsons's respective duties under the Merger Agreement, and that on October 13, 2022, the Merger Agreement was executed; refers to the August 12, 2022 draft of the Merger Agreement referenced in Paragraph 83 and to the final executed Merger Agreement for a complete and accurate description of their contents; and otherwise denies the allegations contained in Paragraph 83.

84.    *First*, Kroger and Albertsons both agreed to use "reasonable best efforts" to satisfy all conditions to closing of the Merger, including but not limited to antitrust approval, "as promptly as reasonably practicable." This provision ultimately appeared in Section 6.3(a) of the final Merger Agreement.

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 84.

85.    *Second*, in addition to the mutual obligation to use "reasonable best efforts" to satisfy all closing conditions, Kroger agreed to a separate and higher standard for its antitrust strategy: Kroger alone would be obligated to use its "**best efforts**"—not limited by any standard of reasonableness—"to take . . . **any and all actions necessary** to avoid, eliminate, and resolve any and all impediments under any Antitrust Law . . . so as to enable the Closing to occur **as promptly as practicable**." The "actions" Kroger was required to take included (but were not limited to) (1) divesting "assets, properties, or businesses"; (2) entering any "arrangements" needed "to effect the dissolution of any injunction, temporary restraining order or other order in any suit or proceeding" that would otherwise block the Merger; (3) "changing or modifying any course of conduct regarding [Kroger's] future operations"; and (4) taking "any other action that would limit [Kroger] or its

39

Subsidiaries or Affiliates' freedom of action with respect to, or their ability to retain," any "operations, divisions, businesses, product lines, customers, assets or rights or interests, or their freedom of action with respect to the assets, properties, or businesses to be acquired" from Albertsons. This provision ultimately appeared in Section 6.3(d) of the final Merger Agreement.

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 85.

86.    *Third*, if any proceeding was "instituted (or threatened) challenging the Merger as violating any Antitrust Law," Kroger committed to take **"any and all actions . . . to eliminate each and every impediment** under Antitrust Law to close the [Merger] prior to the Outside Date" (a contractually specified date that could be extended to no later than approximately two years after signing of the contract). This "any and all actions" obligation was even more demanding than the "reasonable best efforts" standard under Section 6.3(a): Kroger was agreeing to remove antitrust impediments "come hell or high water." This provision appeared in Section 6.3(e) of the final Merger Agreement.

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 86.

87.    *Fourth*, as a further protection for Albertsons' interest in accelerating antitrust approval and closing the Merger, the Parties agreed that, unless both Parties consented, neither Party would "enter into any agreement with any Governmental Entity to delay" the Merger or withdraw its regulatory filing seeking clearance for the Merger under the Hart-Scott-Rodino Antitrust Improvements Act ("HSR Act"). This protection would be particularly important once the Parties substantially complied with a potential second request. At that point, the FTC would have 30 days to either sue to block the Merger or permit the Merger to close—and Albertsons could insist on holding the FTC to this timeframe, even if Kroger wanted to allow an extension. By vetoing any proposed timing agreement with the FTC, Albertsons could ensure that if litigation with the FTC was necessary, it would begin promptly so Albertsons and Kroger would have time to defend themselves fully, including

40

through any appeals. This provision appeared in Section 6.3(c) of the final Merger Agreement.

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 87.

88.    *Fifth*, Albertsons and Kroger agreed that the *sole* limit on Kroger's obligations to make expeditious "best efforts" and take "any and all actions" in addressing antitrust issues would be a cap on the total number of stores Kroger could be required to divest if necessary to address regulators' antitrust concerns. There was no limit on Kroger's obligation to sell any *non-store assets* such as store banners and intellectual property to obtain regulatory approval. And there was no limit on the *specific* stores Kroger was required to divest. Kroger, in other words, could not simply offer to divest its most unprofitable or otherwise unattractive stores, even if it offered enough of them to meet the contractual cap on required store divestitures. Nor could Kroger avoid taking a particular action or set of actions to obtain antitrust approval, even on the basis that it would result in a material adverse effect on Kroger's business. This deal point was memorialized in Sections 1.1 and 6.3(d) of the final Merger Agreement, which respectively (1) defined "Material Divestment Event" as the divestment of over 650 stores, and (2) provided that the sole limit on Kroger's obligation to make prompt "best efforts" and take "any and all actions" was that no Material Divestment Event would be required.

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 88.

89.    *Sixth*, the Parties agreed that neither could be cut out of the antitrust approval process. They agreed to (1) "cooperate in all respects" on regulatory submissions and documents filed in any litigation or other proceeding; (2) promptly inform each other of any communication from the government or any communication regarding a proceeding; (3) allow each other "to review in advance and incorporate their reasonable comments in any communication" to the government; and (4) "to the extent practicable," consult with each other before "any material meeting, written communications or teleconference" regarding regulatory

41

approval or any proceeding, and give each other "the opportunity to attend and participate in such meetings and teleconferences." These obligations were included in Section 6.3(b) of the final Merger Agreement.

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 89.

90.    *Seventh*, the Parties agreed that if the Merger failed to close, Kroger would pay Albertsons a termination fee. This obligation appeared in the August 12, 2022 Merger Agreement draft, with the amount of the termination fee provisionally left blank. The Parties later agreed to a $600 million termination fee.

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 90.

91.    *Eighth*, the Parties agreed that, even if the Merger Agreement was terminated and the $600 million termination fee was paid, the termination would not release any Party from liability for any "Willful Breach" of the Merger Agreement—*i.e.*, a "material breach … that is the consequence of an act or omission by the breaching [P]arty with the actual knowledge that the taking of such act (or, in the case of an omission, failure to take such act) would cause or constitute such material breach, regardless of whether breaching was the object of the act or failure to act." In the case of a Willful Breach, the aggrieved Party would be "entitled to all rights and remedies available at law or in equity," such as "benefit of the bargain" damages suffered by Albertsons' stockholders from the loss of the premium that they would have received had the Merger closed. Thus, if Kroger willfully breached any of its obligations under Merger Agreement—including its obligations regarding antitrust matters under Section 6.3—Albertsons could seek damages for the breach, which would not be limited by the $600 million termination fee. The final Merger Agreement memorialized this point in Sections 8.3 and 9.5 and in the definition of "Willful Breach" in Section 1.1.

42

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 91.

92.　　Thus, as of August 12, 2022, when Albertsons shared the initial draft Merger Agreement with Kroger, the basic framework protecting Albertsons from the risk of Kroger failing to obtain antitrust regulatory approval already was in place. The only open issues for further negotiation on this topic included (1) the cap on how many stores Kroger could be required to divest, (2) the amount of the termination fee Albertsons would receive if the deal failed, and (3) the extent of control Kroger would exercise over the process of seeking antitrust regulatory approval, notwithstanding Albertsons' agreed-upon right to participate in that process.

**RESPONSE**: Admits that on August 12, 2022, Albertsons sent an initial draft of the Merger Agreement to Kroger; refers to the August 12, 2022 draft of the Merger Agreement referenced in Paragraph 92 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 92.

93.　　On August 19, 2022, Kroger sent Albertsons proposed revisions to the initial draft Merger Agreement. Some of Kroger's edits focused on the issue of control over the regulatory process. While accepting Albertsons' proposed language requiring cooperation, Kroger rejected Albertsons' proposal that the Parties resolve any disagreements about any regulatory "communication, strategy or process" by "work[ing] together in good faith to resolve the disagreement and endeavor[ing] to implement such communication, strategy or process in a mutually acceptable manner." Kroger instead proposed language stating that Kroger "shall have the principal responsibility for devising and implementing" the antitrust strategy "and shall lead and direct all submissions" in the antitrust regulatory process and any litigation.

43

**RESPONSE**: Admits that on August 19, 2022, Kroger sent Albertsons proposed revisions to the draft Merger Agreement; refers to the August 19, 2022 draft of the Merger Agreement referenced in Paragraph 93 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 93.

94.     That proposed transfer of control to Kroger was not acceptable to Albertsons—unless Kroger committed to a divestiture package sufficiently large and robust to give Albertsons confidence that the Merger would receive antitrust approval. On August 26, 2022, Albertsons sent Kroger a draft Merger Agreement that reversed Kroger's edits on the issue of control but added, in a footnote: "Control of strategy to be discussed after [Albertsons'] review of [Kroger's] proposed divestment package."

**RESPONSE**: Admits that on August 26, 2022, Albertsons sent Kroger proposed revisions to the draft Merger Agreement; refers to the August 26, 2022 draft of the Merger Agreement referenced in Paragraph 94 for a complete and accurate description of its contents; denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 94; and otherwise denies the allegations contained in Paragraph 94.

95.     Accordingly, for the next several weeks, the Parties temporarily tabled the question of control over post-signing antitrust strategy, instead focusing their negotiations largely on the cap on the number of stores that Kroger would be contractually required to divest and the size of the termination fee Kroger would be contractually obligated to pay if the deal failed.

**RESPONSE**: Admits that at various points in time throughout 2022, the Parties engaged in negotiations regarding Kroger's and Albertsons's respective

44

duties under the Merger Agreement; and otherwise denies the allegations contained in Paragraph 95.

96.    Kroger's incentive was to bargain for the lowest possible cap on the number of stores it would potentially need to divest because, other things being equal, divesting more stores would mean Kroger was giving up more value. But Albertsons was unwilling to enter into a Merger Agreement that did not require a divestiture level that Albertsons could be confident would secure antitrust approval.

**RESPONSE**: Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in the second sentence of Paragraph 96; and otherwise denies the allegations contained in Paragraph 96.

97.    On September 2, 2022, Kroger proposed a 600-store cap on Kroger's obligation to divest stores to obtain regulatory approval.

**RESPONSE**: Admits that on September 2, 2022, Kroger submitted a revised proposal to Albertsons; refers to the September 2, 2022 revised proposal referenced in Paragraph 97 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 97.

98.    Albertsons was not satisfied. The next day, the Parties' respective antitrust attorneys discussed Kroger's proposal and the importance of Kroger proposing a viable divestiture package to antitrust regulators.

**RESPONSE**: Admits that on September 3, 2022, Kroger had a call with Albertsons's antitrust attorneys; denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 98 and otherwise denies the allegations contained in Paragraph 98.

45

99.    On September 5, 2022, Albertsons communicated a counterproposal in which the cap for Kroger's divestiture obligation would be increased to 650 stores, and the termination fee payable by Kroger to Albertsons would be $800 million.

**RESPONSE**: Admits that on September 5, 2022, Albertsons communicated a counterproposal to Kroger; refers to the September 5, 2022 counterproposal referenced in Paragraph 99 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 99.

100.    Kroger countered the next day, proposing a 600-store divestiture cap and a $600 million termination fee. Albertsons rejected that proposal. On September 22, 2022, it communicated to Kroger that it would agree to a $600 million termination fee, but only on the condition that the divestiture cap was raised to 725 stores.

**RESPONSE**: Admits that on September 6, 2022, Kroger communicated a counterproposal to Albertsons, and that on September 22, 2022, Albertsons communicated a counterproposal to Kroger; refers to each of the counterproposals referenced in Paragraph 100 for a complete and accurate description of their contents; and otherwise denies the allegations contained in Paragraph 100.

101.    Kroger initially balked at raising the divestiture cap above 600 stores. But then, Kroger CEO Rodney McMullen met face-to-face with Stephen A. Feinberg, the CEO of Albertsons' then-largest stockholder, Cerberus Capital Management. Feinberg told McMullen that Kroger needed to increase the number of stores it would divest to get the Merger done. McMullen agreed to do so and shook hands with Feinberg on that point. This personal commitment from the highest level of Kroger's management was critical to Albertsons.

**RESPONSE**: Admits that in or around late September 2022, Kroger's and Albertsons's financial advisors, along with senior executives and high-level personnel from Kroger and Albertsons, met regarding the terms of the proposed

46

Merger Agreement; denies knowledge or information sufficient to form a belief as to the truth of the allegation concerning what was critical to Albertsons; and otherwise denies the allegations contained in Paragraph 101.

102.   After discussions between the Parties' financial advisors and attorneys on September 27 and 28, 2022, Kroger made a September 29, 2022, counteroffer that increased the store divestiture cap to 650 stores—consistent with McMullen's promise to Feinberg—and proposed a $600 million termination fee.

**RESPONSE**:   Admits that on September 27 and 28, 2022, Kroger's and Albertsons's financial advisors, along with senior executives and high-level personnel from Kroger and Albertsons met regarding the terms of the proposed Merger Agreement, and that on September 29, 2022, Kroger communicated a counterproposal to Albertsons; refers to the counterproposal referenced in Paragraph 102 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 102.

103.   The same day, Albertsons communicated to Kroger that it was prepared to accept Kroger's economic terms, subject to a few final demands including increasing the divestiture cap to 725 stores.

**RESPONSE**: Refers to the counterproposal referenced in Paragraph 103 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 103.

104.   Finally, in discussions between September 30 and October 1, 2022, Albertsons and Kroger reached an agreement in principle on the termination fee and divestiture cap. Kroger would agree to set the cap for required divestiture at 650 stores, despite having insisted repeatedly that it should be no higher than 600 stores. While lower than the 725-store threshold Albertsons had proposed, this 650-store

47

threshold was still conservative and thus protective of Albertsons; the Parties understood that if Kroger met its stringent obligations to take "any and all actions" and make its "best efforts" "as promptly as practicable" to secure antitrust approval, it would be readily achievable to construct a divestiture package that would fully address any antitrust concerns without needing to divest more than 650 stores. In return for Kroger's agreement to the 650-store threshold, Albertsons would accept Kroger's proposal for a $600 million termination fee. While the termination fee was below market expectations for a merger of similar size and complexity, Albertsons was willing to accept the lower termination fee because of the strong protections designed to minimize the risk of transaction failure as a result of Kroger accepting the 650-store cap, and because Albertsons had preserved the right to seek damages beyond the termination fee for any Willful Breach by Kroger. Ultimately, the final Merger Agreement reflected the Parties' agreement on a 650-store divestiture cap and provided for the $600 million termination fee.

**RESPONSE**: Admits that between September 30 and October 1, 2022, the Parties met regarding the terms of the proposed Merger Agreement; refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 104.

105.   That left the issue of control over antitrust strategy to be negotiated. In a markup of the Merger Agreement on October 7, 2022, Kroger proposed a compromise: Kroger would agree to Albertsons' proposed language requiring "good faith" efforts to resolve disagreements, in exchange for Albertsons agreeing that, "following such good faith efforts" to resolve disagreements, Kroger "shall have the principal responsibility for devising and implementing the strategy for obtaining any necessary antitrust consents or approvals." Albertsons agreed. Whereas Albertsons could not unilaterally approach the FTC to provide updates on the Merger or proposed divestiture package, it could rely on the strong contractual protections that mitigated the risk of Kroger abusing its asymmetric control over the antitrust process. Section 6.3(b) of the final Merger Agreement reflected this compromise.

**RESPONSE**: Admits that at various points in time throughout October 2022, the Parties engaged in negotiations regarding Kroger's and Albertsons's respective duties under the Merger Agreement; refers to the October 7, 2022 counterproposal

48

referenced in Paragraph 105 and to the Merger Agreement for a complete and accurate description of their contents; and otherwise denies the allegations contained in Paragraph 105.

## IV.    Albertsons and Kroger Agree to Merge

106.    On October 13, 2022, Albertsons and Kroger entered into the Merger Agreement. A true and correct copy of the Merger Agreement is annexed to this Complaint as Exhibit 1.

**RESPONSE**: Admits the allegations contained in Paragraph 106.

107.    In the Merger Agreement, Kroger and Albertsons agreed to merge Kroger's subsidiary, Kettle Merger Sub Inc., into Albertsons, in a transaction that valued Albertsons at approximately $24.6 billion and would provide $34.10 per share in consideration to Albertsons' stockholders, representing a 32.8% premium over Albertsons' closing stock price of $25.67 on October 12, 2022, the day before news of the Merger became public. The premium alone was valued at approximately $6 billion.

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate representation of its contents; and otherwise denies the allegations contained in Paragraph 107.

108.    The executed Merger Agreement imposed on Kroger all the stringent obligations regarding its pursuit of regulatory approval for which Albertsons had bargained, and that Albertsons had insisted on maintaining throughout negotiations. See supra Section III.

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise avers that no response is required to the allegations in Paragraph 108 insofar as they purport to describe Albertsons's legal

49

arguments or conclusions, and to the extent a response is required, denies the allegations contained in Paragraph 108.

109. Section 8.1(e) of the Merger Agreement set the "Outside Date"—the date on which either Party could terminate the Merger Agreement if the deal had not closed—as January 13, 2024.

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 109.

110. That same subsection provides that if regulatory approval was still pending, either Party could unilaterally extend the Outside Date in increments of 30 days, for up to 270 days total, i.e., until October 9, 2024. If either Albertsons or Kroger was in breach of the Merger Agreement, however, that Party was not permitted to extend the Outside Date. Albertsons later exercised its rights under Section 8.1(e) of the Merger Agreement to extend the Outside Date nine times in one-month increments from January 13, 2024 through October 9, 2024 in an effort to salvage the Merger despite Kroger's breaches of its obligations.

**RESPONSE**: Admits that the Outside Date was extended to October 9, 2024; refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 110.

111. Under Section 8.4(c), if the Merger Agreement was terminated by either Party (i) following the passage of the Outside Date if the Merger had not received regulatory approval or an antitrust injunction remained pending or (ii) following the issuance of a final non-appealable order enjoining the Merger on antitrust grounds, then Kroger would be required to pay Albertsons the $600 million termination fee. Kroger also would be obligated to pay the $600 million termination fee if Albertsons terminated because the transaction was otherwise ready to close but Kroger refused to close.

50

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 111.

112.   Further, in the event of a "Willful Breach" of the Merger Agreement by Kroger, Section 8.3 allows Albertsons to recover its damages over and above the $600 million reverse termination fee, providing that Albertsons "shall be entitled to all rights and remedies available at law or in equity."

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 112.

113.   Finally, Section 9.5 of the Merger Agreement expressly contemplates that the damages Albertsons may seek for a Willful Breach include "benefit of the bargain" damages, which Albertsons may "pursue[] on behalf of the holders of [Albertsons] Common Stock." These "benefit of the bargain" damages include the premium that Albertsons' stockholders would have received if the Merger had closed.

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 113.

## V.    Kroger Immediately Receives Negative Market Feedback After the Merger Is Announced

114.   When Albertsons and Kroger agreed to merge, both companies believed the transaction was in their economic interest. But the ink on the Merger Agreement was barely dry before Kroger began to develop buyer's remorse. Multiple factors—including negative market feedback on the deal and its impact on Kroger's debt burden; and ominous economic signals for the grocery sector—combined to change Kroger's financial assumptions, creating a disincentive for Kroger to go as far in seeking antitrust approval (including the divestiture process)

51

as might be necessary to close the deal on the terms it had agreed to, despite its contractual obligations.

**RESPONSE**:  Admits the allegations contained in the first sentence of Paragraph 114; and otherwise denies the allegations contained in Paragraph 114.

115.  *First*, Kroger received near-instant feedback from the market indicating that investors and analysts viewed its acquisition of Albertsons negatively.

**RESPONSE**:  Denies the allegations contained in Paragraph 115.

116.  News of the likely merger became public on October 13, 2022, preceding the formal announcement the next day. Following the initial news reports and continuing after the formal announcement, there was a significant sell-off of Kroger's stock, causing a 7.3% decrease in share price that day—the stock's largest single-day decline in the second half of 2022.

**RESPONSE**:  Refers to the news reports referenced in Paragraph 116 for a complete and accurate description of their contents; refers to publicly available information concerning Kroger's stock price; and otherwise denies the allegations contained in Paragraph 116.

117.  After the public announcement on October 14, 2022, well-known investment ratings companies, including S&P, Moody's, and Morningstar, all published reports on Kroger. These analyses recognized that Albertsons was an attractive acquisition target for Kroger, and none suggested that the deal overvalued Albertsons. S&P, for example, noted that both companies had "performed well recently" and that "[t]he combined enterprise will have a more balanced footprint across the U.S. with the benefit of [Albertsons'] solid western U.S. presence and should present the organization with significant synergy opportunities." Nevertheless, S&P, Moody's, and Morningstar each concluded that the Merger's overall effect on their outlook for Kroger was "negative." In addition to recognizing that obtaining antitrust clearance would likely require a large divestiture package, analysts were concerned about potential increases in debt levels at the post-merger company, as well as potential integration risks in an uncertain time for grocery retailers.

52

**RESPONSE**: Refers to the ratings agency reports referenced in Paragraph 117 for a complete and accurate description of their contents; and otherwise denies the allegations contained in Paragraph 117.

118. Kroger's post-merger debt load was an especially significant concern to third-party analysts. Morningstar, for example, emphasized that Kroger's additional leverage as a result of the Albertsons acquisition could result in a debt-to-adjusted-EBITDA ratio of well over 3.00x, which could lead to challenges in achieving future revenue growth. Analysts at S&P and Moody's were similarly concerned that high leverage might hinder future growth for Kroger and ultimately affect its ability to maintain a commercial-grade credit rating.

**RESPONSE**: Refers to the ratings agency reports referenced in Paragraph 118 for a complete and accurate description of their contents; and otherwise denies the allegations contained in Paragraph 118.

119. Analysts also expressed concern that a general cooldown in grocery sales, following record high performance during the COVID-19 pandemic, might create integration risks. S&P, for example, explained that in an industry that "continue[d] to evolve rapidly to meet customer expectations," there might be unforeseen execution risks in the management of the combined entity. Moody's warned that these risks could even lead to potential operational shortfalls, endangering the short-term financial well-being of the new company.

**RESPONSE**: Refers to the ratings agency reports referenced in Paragraph 119 for a complete and accurate description of their contents; and otherwise denies the allegations contained in Paragraph 119.

120. These negative reactions from influential ratings agencies—and the implicit risk of a near-term credit downgrade, which could make borrowing for Kroger more expensive going forward—soured investors' opinion of Kroger. That, in turn, created a powerful incentive for Kroger to revise its approach to the deal.

**RESPONSE**: Denies the allegations contained in Paragraph 120.

53

121. *Second,* concerns emerged about the risk of deflation in the U.S. economy following years of inflation, which could have undermined Kroger's assumptions related to the value it expected to capture from the deal. During the Merger negotiations, post-pandemic inflation was high—but as pandemic-era stimulus programs began to wind down, and global monetary policy tightened, some economists predicted lower inflation or even deflation, pushing down the prices of groceries and other consumer goods. Analysts warned that, based on historical data, a period of deflation would depress grocery companies' earnings.

**RESPONSE**: Denies the allegations contained in Paragraph 121.

122. *Third,* over the two years following the Merger Agreement, both Albertsons and Kroger experienced financial results that fell short of expectations in some respects. Albertsons, for example, had forecasted around the time of the Merger Agreement that its adjusted EBITDA for fiscal year 2023 would be approximately $4.7 billion, but it ultimately reported adjusted EBITDA of approximately $4.3 billion for that fiscal year. The headwinds reflected in these results were also felt by other grocery retailers, as overall consumer spending at grocery stores trended downward. These financial realities made the Merger less accretive to Kroger, other things being equal.

**RESPONSE**: Refers to public filings referenced in Paragraph 122 for a complete and accurate description of their contents; denies knowledge or information sufficient to form a belief as to the truth of the allegations concerning Albertsons's and other grocery retailers' expectations of financial results, and, on that basis, denies those allegations; and otherwise denies the allegations contained in Paragraph 122.

123. These post-signing market developments were no excuse for Kroger to walk back from its contractual obligations in the Merger Agreement. After a deal announcement, it is not unusual for the buyer to receive negative market feedback and to experience economic headwinds that partially erode the deal's value. Kroger bore this risk under the Merger Agreement, and it was Kroger's responsibility to consider this possibility before it irrevocably committed to acquire Albertsons and to use expeditious "best efforts" and take "any and all actions" to secure antitrust

54

approval. Despite its contractual obligations, however, economic factors after the signing of the Merger Agreement gave Kroger an incentive to breach the contract by approaching the regulatory process in a way that prioritized preserving value for Kroger at the expense of antitrust approval risk.

**RESPONSE**: Avers that no response is required to the allegations contained in Paragraph 123 insofar as they purport to describe Albertsons's legal arguments or conclusions, and to the extent a response is required, denies the allegations contained in Paragraph 123.

## VI.    Kroger Faces Political and Labor Pushback to the Merger, Which It Refuses to Take Reasonable Measures to Mitigate

124. From the Merger's announcement, Kroger also faced significant political and labor group pushback. Albertsons proposed a proactive advocacy and public relations strategy to Kroger, but Kroger ignored its advice. These political and labor pressures increased the scrutiny on antitrust approval of the Merger and ultimately added fodder to the FTC's concern that the Merger could be problematic for labor market competition.

**RESPONSE**: Admits that at various points in time throughout 2022, 2023, and 2024, the Parties communicated regarding public relations and advocacy strategies related to the Merger; and otherwise denies the allegations contained in Paragraph 124.

125. Organized labor groups representing grocery store employees voiced opposition to the Merger. For example, on November 29, 2022, the Local United Food and Commercial Workers Unions, which represented over 100,000 Kroger and Albertsons employees in twelve states, held a press conference opposing the Merger. Only one labor group representing employees from either company subsequently supported the Merger, and it later retracted its support. Opposition from labor groups further inflamed the political pressure that Kroger faced.

55

**RESPONSE**: Admits that certain organized labor groups voiced opposition to the Merger, and that the Local United Food and Commercial Workers Union held a press conference expressing opposition to the Merger; and otherwise denies the allegations contained in Paragraph 125.

126. Albertsons proposed ways for Kroger to allay political and labor concerns. In or around June of 2023, Albertsons encouraged Kroger to develop a grassroots communications and advocacy strategy. Albertsons urged Kroger to proactively reach out to and meet with members of Congress to discuss the Merger and its procompetitive benefits. Kroger did not do so.

**RESPONSE**: Admits that at various points in time throughout 2022, 2023, and 2024, the Parties communicated regarding public relations and advocacy strategies regarding the Merger, including in or around June 2023; and otherwise denies the allegations contained in Paragraph 126.

127. Albertsons also advised Kroger to seek negotiations with pertinent unions. The Parties knew that then-FTC Chair Lina Khan had indicated that labor issues were among the FTC's considerations when evaluating a potential merger. Thus, proactively engaging with labor interests would help get the deal done. Albertsons believed that at least one national union would favor the deal if the Parties provided meaningful incentives. Kroger CEO Rodney McMullen refused to engage.

**RESPONSE**: Admits that at various points in time throughout 2022, 2023, and 2024, the Parties communicated regarding public relations and advocacy strategies regarding the Merger; denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in the fourth sentence of Paragraph 127; and otherwise denies the allegations contained in Paragraph 127.

56

128. Union opposition was far from inevitable. In fact, unions had powerful incentives to support the Merger. Unionized grocers' jobs fell from about 50% to 14% among the top 15 grocers in the last 20 years. Against that backdrop, the Merger would preserve union jobs by helping Albertsons and Kroger keep stores in business. Unions would thus be natural allies of the Merger, but only if Kroger successfully addressed their concerns.

**RESPONSE**: Admits that there has been a decrease in union jobs at grocery stores over the last two decades and that the Merger would have preserved union jobs; denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first and second sentences of Paragraph 128; and otherwise denies the allegations contained in Paragraph 128.

129. Those concerns were readily solvable. One of the United Food and Commercial Workers International Union's main complaints about the Merger was "lack of transparency." Another was that Kroger was not pro-union. Had Kroger engaged with the unions, demonstrated transparency, and explained the Merger's benefits to labor, the Merger would have likely found some union support. That support would have helped to blunt public opposition to the Merger and promote a favorable regulatory review.

**RESPONSE**: Refers to the statement of the United Food and Commercial Workers International Union referenced in Paragraph 129 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 129.

130. Kroger let these manageable headwinds turn into large roadblocks through its refusal to heed Albertsons' advice and failure to take steps from early 2023 onwards to educate key constituencies about the benefits of the Merger.

**RESPONSE**: Denies the allegations contained in Paragraph 130.

131. None of these developments changed Kroger's obligations under the Merger Agreement. And despite political and labor concerns about the Merger, the

57

path to FTC approval was still attainable. Large, complex deals often face considerable public scrutiny and political controversy, and many such transactions clear agency review without litigation. Kroger, however, flouted its contractual obligations, insisting on the Merger going forward on its own terms or not at all.

**RESPONSE**: Avers that no response is required to the allegations contained in the first, second, and third sentences of Paragraph 131 insofar as they purport to describe Albertsons's legal arguments or conclusions, and to the extent a response is required, denies the allegations contained in the first, second, and third sentences of Paragraph 131; and otherwise denies the allegations contained in Paragraph 131.

## VII.    The Merger Has a Viable Path to Antitrust Approval, Provided Kroger Complies with its Contractual Obligations

132.    As discussed above, the Merger Agreement specifies that Kroger was responsible for shepherding the Merger through the regulatory-approval process. This task was entirely achievable, so long as Kroger performed as required under the Merger Agreement.

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 132.

133.    In evaluating proposed mergers, antitrust regulators and courts consider not only whether the merger could cause competitive concerns, but also whether it would have procompetitive benefits. In general, procompetitive benefits could come from more efficient operations of a combined company, such as through reduced overhead or technology transfer, or from new revenue growth opportunities, attributable to combining resources to take on new projects. In this case, the Merger would have provided significant procompetitive benefits to the customers that Albertsons and Kroger serve.

**RESPONSE**: Admits that the proposed Merger would have pro-competitive benefits; denies knowledge or information sufficient to form a belief as to the truth

58

of the allegations contained in the first and second sentences of Paragraph 133; and

otherwise denies the allegations contained in Paragraph 133.

134. Competitive concerns flowing from a proposed merger are routinely addressed by divesting assets. Regulators scrutinize divestiture packages carefully, and will not approve a proposed divestiture package that fails to include enough assets relative to the size of the transaction, in addition to the right mix of services, licensing agreements, and other support to realistically set up a selected divestiture buyer to be successful. As the FTC has explained in public guidance, parties offering a divestiture to solve antitrust concerns must be prepared to "explain how the proposed divestiture business contains all assets and capabilities needed for it to operate on its own" and "how a proposed buyer could acquire the ongoing business and begin competing right away." When parties propose to divest a "more limited asset package" instead of a complete "ongoing business," the FTC may require the parties to augment the package with additional assets such as "manufacturing facilities" and "brands or trade names," and further may require the divesting party to "affirmatively help the buyer become an effective competitor, including, for example, by facilitating the transfer of customers."

**RESPONSE**: Refers to the FTC guidance referenced in Paragraph 134 for a

complete and accurate description of its contents; and otherwise denies the

allegations contained in Paragraph 134.

135. The selection of an appropriate divestiture buyer or buyers is also crucial in assuring regulators that divested assets will be managed in a way that retains competition. According to the FTC, "[i]t is the responsibility of the merging parties to propose an acceptable buyer, one with the experience, commitment, and incentives necessary to be an effective competitor." If a proposed divestiture buyer has engaged in "past attempts at entering the market," then the FTC will consider "why those attempts were unsuccessful."

**RESPONSE**: Refers to the FTC guidance referenced in Paragraph 135 for a

complete and accurate description of its contents; and otherwise denies the

allegations contained in Paragraph 135.

59

136.    In conjunction with asset divestitures, federal and state regulators also carefully consider any proposals to eliminate or mitigate anticompetitive effects through restrictions on future conduct (sometimes known as "conduct remedies" or "behavioral remedies"). The FTC has explained in public guidance that, even when an appropriate divestiture is proposed, conduct remedies "may also be required in aid of [the] divestiture." State regulators also liberally use conduct remedies to help resolve antitrust matters. For example, in October 2019, the Attorney General of Colorado settled the state's challenge to the $26.5 billion merger of telecommunications companies T-Mobile and Sprint in an agreement requiring T-Mobile to offer Colorado customers specific low-cost mobile plans for at least five years, capped at $15 and $25 per month; requiring T-Mobile to take specific steps to improve its 5G coverage in Colorado; and requiring divestiture buyer Dish Network to headquarter its wireless business and employ at least 2,000 people in Colorado. T-Mobile later settled with other state Attorneys General, similarly committing to constraints on its future prices and promising to protect the jobs of pre-merger T-Mobile and Sprint employees. The Colorado Attorney General similarly entered a 2019 consent decree that allowed UnitedHealthcare's acquisition of two physician groups in the Colorado Springs area but imposed conduct remedies, prohibiting UnitedHealthcare from enforcing an exclusivity contract with a regional healthcare provider and requiring the acquired physician groups to renew a contract with one of UnitedHealthcare's competitors. The Attorney General of Washington has also accepted conduct remedies—for example, in a May 2012 consent decree allowing the merger of school bus service providers National Express Partners and Petermann Partners with conduct remedies to protect competitors' access to third-party facilities, in addition to a divestiture remedy the merging parties agreed to with federal regulators.

**RESPONSE**: Refers to the FTC guidance and to the consent decrees between third parties referenced in Paragraph 136 for a complete and accurate description of their contents; and otherwise denies the allegations contained in Paragraph 136.

137.    The path to obtaining antitrust clearance of mergers between large supermarket companies is well-trodden and can involve a combination of divestitures and conduct remedies. For example, in 2016, the FTC settled a $28 billion merger between Koninklijke Ahold ("Ahold") and Delhaize Group, which together owned grocery chains such as Giant, Martin's, Stop & Shop, Food Lion and Hannaford, after the two companies agreed to divest 81 stores to seven divestiture buyers in seven different states. The settlement also imposed a conduct remedy on

60

one of the divestiture buyers (Supervalu), requiring it not to sell or otherwise convey certain divested assets without prior FTC approval. As the Ahold-Delhaize merger illustrated, two large companies can assuage FTC concerns if they take appropriate steps to address those concerns, including by presenting defensible and timely divestiture proposals and other remedies.

**RESPONSE**: Refers to the previously announced settlement between third parties referenced in Paragraph 137 for a complete and accurate description of its contents; and otherwise avers that no response is required to the allegations contained in Paragraph 137 insofar as they purport to describe Albertsons's legal arguments or conclusions, and to the extent a response is required, denies the allegations contained in Paragraph 137.

138.    During the Biden Administration, the FTC continued to permit mergers between parties that agreed to appropriate remedies. For example, in May 2023, the FTC permitted a $13.1 billion merger between Intercontinental Exchange, Inc. and Black Knight, Inc., two mortgage loan technology providers that the FTC considered each other's largest rivals, under a consent decree that required the merging companies to divest two Black Knight businesses to another mortgage technology company, provide transition support to ensure the success of the divested businesses, and refrain from enforcing noncompete agreements to prevent employees from taking new jobs with the divested businesses. Similarly, in September 2023, the FTC—joined by the Attorneys General of six states, including Washington— reached a settlement with pharmaceutical companies Amgen Inc. and Horizon Therapeutics PLC after filing suit to block their $27.8 billion merger. The settlement allowed the merger to close but required conduct remedies to resolve concerns about future drug competition, including a prohibition on bundling Amgen products with certain Horizon Drugs.

**RESPONSE**: Refers to the consent order between the third parties and to the settlement with the third parties referenced in Paragraph 138 for a complete and

61

accurate description of their contents; and otherwise denies the allegations contained in Paragraph 138.

139.    After a merger is first presented to the FTC pursuant to the HSR Act, the FTC has a certain amount of time to issue additional requests for documents and information—referred to as second requests—seeking additional information about the transaction. Statutory waiting periods differ depending on the type of transaction at issue. The operative waiting period for the Merger was 30 days. If the FTC does not issue a second request during the waiting period, the transaction can close. If, however, the FTC issues second requests within the waiting period, the Parties must work with the FTC to address its additional inquiries. When the Parties have substantially complied with the FTC's requests, absent a timing agreement with the Parties stating otherwise, the FTC then has 30 days to either (1) sue to enjoin the transaction or (2) reach a negotiated agreement to allow the transaction to close without the need for litigation. Each of these steps must occur before the Parties' agreed-upon outside date, i.e., the final deadline for closing the deal, after which the Parties can walk away.

**RESPONSE**: Admits the allegations contained in Paragraph 139.

140.    Under Section 8.1(e) of the Merger Agreement, either Albertsons or Kroger could walk away from the transaction "if the Closing d[id] not occur on or before" January 13, 2024—the Outside Date. That date could thereafter be extended by one of the Parties to October 9, 2024, with certain limitations.

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 140.

141.    Kroger knew, however, that it should do everything possible to obtain antitrust clearance well before the original Outside Date, rather than rely on extensions. Changes in political climate can affect the difficulty of obtaining antitrust clearance. In this case, the timing of the Merger Agreement—more than two years before the next presidential election, which would take place in November 2024—gave Kroger a window of opportunity to negotiate a resolution with regulators. While a merger of this size would receive antitrust scrutiny in any year, political pressure on regulators to be seen as tough on corporate consolidation would

62

predictably escalate in the presidential election year. That was especially true for a merger between grocery retailers. Because affordable groceries are highly important to a broad swath of voters, the election year predictably would—and ultimately did—bring a significant increase in political focus on the industry, naturally making regulators eager to protect themselves from any perception that they allowed a merger that could lead to higher grocery prices (despite the reality that the Merger was designed to lower prices). Kroger and its sophisticated D.C.-based antitrust counsel understood these political dynamics. Kroger thus knew that its best opportunity to obtain regulatory approval was to do so before the 2024 presidential general election cycle began. Given that the Merger Agreement was executed and announced in October 2022, Kroger had approximately a year and a half to do so.

**RESPONSE**: Denies the allegations contained in Paragraph 141.

142. Given this timeline, a party intent on seeing the Merger close "as promptly as practicable" and before the Outside Date—as was Kroger's obligation—would have and should have taken a proactive approach on appealing to and working with the FTC from the moment the Merger was first presented to the agency. That would mean presenting to the FTC, as an initial offer, a sizeable divestiture package that was supported by detailed economic analysis and that contained stores selected by objective, neutral criteria. Such a package would be structured to address local concentration concerns and thereafter, be updated to timely respond to the FTC's feedback in subsequent divestiture package proposals.

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 142.

## VIII. Kroger Proposes a Woefully Inadequate Initial Divestiture Package

143. Given the timing pressures the Merger faced and the importance of establishing credibility before the FTC, it was imperative that Kroger propose workable solutions to the FTC early on in its negotiations with the agency. Kroger instead proposed a facially deficient divestiture package of only 238 stores. That was inadequate under Kroger's own experts' economic analyses, and well below the 650-store threshold in the Merger Agreement.

**RESPONSE**: Denies the allegations contained in Paragraph 143.

63

144. The inadequacy of Kroger's proposal was especially surprising, since as described in Section II, Kroger was being advised by sophisticated legal counsel with extensive experience in antitrust matters, including government leadership experience. Those lawyers understood what it would take for the Merger to close: a meaningful divestiture package and serious and efficient cooperation with the regulatory agency.

**RESPONSE**: Admits that Kroger was being advised by sophisticated legal counsel with extensive experience in antitrust matters; and otherwise denies the allegations contained in Paragraph 144.

145. In particular, a well-reasoned divestiture package would have considered and been drafted in light of the FTC's well-known methodology for assessing competitive effects in merger analysis. As part of any merger investigation, the FTC examines the merger's impact on market concentration in relevant product and geographic markets, which can and may include multiple sub-markets in localized areas of competition. Especially when evaluating merging grocery sellers, the FTC has a long history of evaluating hyper-local areas of competition, for example, competition within a 3 or 5-mile radius. Knowing the likely approach the FTC would take in analyzing the competitive effects of the merger, Kroger should have created a highly detailed initial divestiture proposal focused on areas of local competition that could be affected by the Merger. It did not.

**RESPONSE**: Denies the allegations contained in Paragraph 145.

146. Instead, Kroger's initial proposed package ignored settled economic principles and methods and adversely selected its low-performing, unattractive stores, in a hodgepodge of localities. Other localities with areas of overlap between Kroger and Albertsons but with high-performing Kroger stores were not prioritized for divestitures. This clearly was an indefensible approach designed only to benefit Kroger's balance sheet at the expense of time and credibility before the FTC, and ultimately, to the detriment of consumers and Albertsons.

**RESPONSE**: Denies the allegations contained in Paragraph 146.

64

### A.    Kroger Presents an Initial Divestiture Package of Just 238 Stores

147.    On October 14, 2022, the day the Merger was made public, the Parties had an initial call with the FTC. Kroger explained the rationale for the deal and that the Parties expected considerable synergies. Kroger expressed its willingness to present a divestiture package that would get the deal done.

**RESPONSE**:  Admits that on October 14, 2022, Kroger had a call with the FTC where Kroger explained the rationale for the Merger; and otherwise denies the allegations contained in Paragraph 147.

148.    On December 1, 2022, Kroger and Albertsons had their first formal meeting with FTC staff. At that meeting, Kroger presented its initial divestiture proposal of 238 stores. Kroger had developed this proposal unilaterally, rejecting Albertsons' advice and warnings that a low initial divestiture number would be problematic for the FTC; ignoring Albertsons' recommendations about which stores should and should not be included on the list; and ultimately refusing to share with the FTC how it had arrived at the 238 stores.

**RESPONSE**:  Admits that on December 1, 2022, Kroger and Albertsons met with the FTC and that Kroger presented the proposed divestiture package at that meeting; and otherwise denies the allegations contained in Paragraph 148.

149.    Kroger's choice to open its negotiations with the FTC by offering just 238 stores was indefensible. The FTC knew from the publicly disclosed Merger Agreement that Kroger had committed to divest up to 650 stores to ensure that the deal closed. Yet, Kroger's 238-store package contained approximately one third of the 650-store threshold. Moreover, 238 stores was only approximately half the number Kroger had told Albertsons that its economic experts had modeled that it would likely need to divest.

**RESPONSE**:  Denies the allegations contained in Paragraph 149.

150.    Following receipt of Kroger's initial proposal, the FTC issued second requests (the "Second Request") on December 5, 2022 to Kroger and Albertsons requiring them to assemble massive document productions in support of the Merger. The FTC's Second Request to Albertsons contained 91 separate requests for

65

narrative responses and/or documents, many of which had several sub-parts, touching all aspects of Albertsons' businesses. The Parties ultimately produced many million documents to the FTC over a period of several months, at a considerable expense.

**RESPONSE**: Admits that on December 5, 2022, the FTC issued second requests to the Parties and that Kroger produced millions of documents to the FTC over a period of several months at considerable expense to Kroger; refers to the Second Request issued by the FTC referenced in Paragraph 150 for a complete and accurate description of its contents; denies knowledge or information sufficient to form a belief as to the truth of the allegations concerning Albertsons's document productions or alleged expense; and otherwise denies the allegations contained in Paragraph 150.

151. Nonetheless, despite the seriousness of having received a Second Request, indicating the Merger stood a good chance of ultimately being litigated, between December 2022 and March 2023, Kroger dragged its feet and failed to address adequately the FTC's concerns.

**RESPONSE**: Denies the allegations contained in Paragraph 151.

152. In the initial December 1, 2022 meeting with regulators, for example, the FTC had raised questions regarding local concentrations of stores in specified geographies. Kroger took months to respond. This laggard approach colored its later interactions with regulators as well.

**RESPONSE**: Admits that counsel for Kroger met with the FTC on December 1, 2022; and otherwise denies the allegations contained in Paragraph 152.

66

**B.    Kroger Doubles Down on Its Inadequate Divestiture Package of 238 Stores**

153.   On March 17, 2023, after months of little to no contact about Kroger's divestiture proposal, the Parties met with the FTC again. Kroger presented a slide deck about the merger and about its divestiture proposal, which remained the same 238-store proposal from December 1, 2022. State regulators from Washington, Colorado, and other Attorneys General offices joined the meeting as well.

**RESPONSE**:  Admits that on March 17, 2023, Kroger met with the FTC and state regulators regarding the Merger and the proposed divestiture; refers to the slide deck referenced in Paragraph 153 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 153.

154.   Kroger's presentation on the divestiture proposal provided more detail about how its 238 stores were selected; those details only revealed that Kroger had failed to use uniform, neutral criteria for selecting stores. Kroger did not, as the FTC would have expected, evaluate stores using a uniform metric like a fixed radius around existing Kroger and Albertsons stores. Nor did it evaluate market shares with a recognized 30% threshold or evaluate whether there were four or fewer remaining competitors in the relevant geographic area that it defined. Whereas Kroger stated it was evaluating a "localized, store-by-store competition analysis," this appeared to be a non-rigorous approach where Kroger adversely selected stores to divest. As later analysis confirmed, out of the 238 stores that Kroger proposed to divest, those belonging to Kroger were largely unprofitable stores, and divesting them would protect Kroger's bottom line. Kroger's failure to use an objective, neutral approach to select stores was a purposeful one aligned with Kroger's self-interest, rather than one aimed at alleviating local concentration concerns.

**RESPONSE**:  Refers to the presentation referenced in Paragraph 154 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 154.

155.   Kroger's presentation to the FTC also failed to evaluate local competition in the "traditional supermarket and supercenter" market that the FTC had used in prior successful mergers. Kroger should have known, based on the

67

FTC's approach to prior grocery mergers, that the FTC was likely to rely on this kind of "traditional supermarket and supercenter" definition and Kroger thus should have tailored its presentation and analyses accordingly to address that approach. It did not.

**RESPONSE**: Refers to the presentation referenced in Paragraph 155 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 155.

156.  Unsurprisingly, Kroger's presentation was not well received by the FTC. The FTC made clear that the number of stores Kroger was proposing to divest was inadequate, and it was not clear how stores were being selected or why certain local geographies with concentration issues were not addressed.

**RESPONSE**:  Admits that the FTC did not accept Kroger's proposal presented on March 17, 2023; and otherwise denies the allegations contained in Paragraph 156.

### IX.    Kroger Mismanages the Process of Identifying a Divestiture Buyer, Culminating in the Selection of Wholesale-Focused C&S

157.  Kroger also failed to live up to its obligations under the Merger Agreement in identifying a buyer for the divested stores.

**RESPONSE**: Denies the allegations contained in Paragraph 157.

158.  The selection of an appropriate divestiture buyer, or group of buyers, is a critical part of any antitrust regulatory process that involves a potential divestiture. In assessing whether a divestiture plan would sufficiently address any competitive concerns otherwise posed by a merger, the FTC and other antitrust regulators assess not only the scope of assets to be divested, but whether the buyer has the skills, resources, and motivation to operate those assets in a way that preserves competition. As the FTC has stated, regulators scrutinize buyer attributes like experience in a relevant industry, the size of the divested assets relative to the size of the buyer, and whether a sale to a particular buyer requires ongoing entanglements with a merging party.

68

**RESPONSE**: Avers that no response is required to the allegations contained in Paragraph 158 insofar as they purport to describe Albertsons's legal arguments or conclusions, and to the extent a response is required, denies those allegations; refers to the FTC guidance referenced in Paragraph 158 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 158.

159.    Kroger's search for a divestiture buyer was disorganized, protracted, and contributed to the ultimate failure of the Merger. Kroger passed up highly qualified divestiture buyers—including a buyer that its own executives characterized in their internal communications, revealed at trial, as a "no brainer"—in favor of a divestiture buyer whose primary business was wholesale distribution with a limited record of running retail stores. Kroger's selection of a divestiture buyer introduced new obstacles for the Parties throughout trial and ultimately contributed significantly to the Oregon and Washington Courts' decisions to enjoin the merger.

**RESPONSE**: Refers to the court decisions referenced in Paragraph 159 for a complete and accurate description of their contents; and otherwise denies the allegations contained in Paragraph 159.

160.    Once it began its search for a buyer, Kroger received substantial interest from the market. During the course of the solicitation process, approximately 90 potential buyers were contacted about the transaction, and about 60 indicated their interest in exploring the divestiture transaction by signing NDAs. Some of these prospective buyers were experienced, large-scale grocery retailers including ██ , which should have been front runners and would have been strong competitors to Kroger. Others were growing regional players, with existing retail locations in areas identified by regulators as having concentration issues. But Kroger failed to advance its negotiations with the best potential buyers beyond the initial stages, reflecting that Kroger either rejected those buyers outright or failed to offer them sufficiently attractive terms to hold their interest in the divestiture process. Meanwhile, Kroger kept Albertsons in the dark about the substance of its discussions with those strong

69

potential buyers, preventing Albertsons from understanding why those discussions had not progressed further or offering any advice or support in the negotiations.

**RESPONSE**:  Admits that Kroger's financial advisors contacted over 90 potential divestiture buyers, including ██ , and that many of those potential buyers executed NDAs with Kroger; and otherwise denies the allegations contained in Paragraph 160.

161.    ██ , for example, ███████████████████████ when it was ████████████████████████████████████ would have been a better buyer than C&S, as was underscored by ███ ████████████████████████████████████████ ████████████████████████████ expressed specific interest in ████████████████████████ , an area that was flagged by regulators as having specific local concentration concerns. ██ was an ideal candidate to purchase divested stores: it had a strong track record of operating retail supermarkets ████████████ , which would quell any doubts about its ability to operate the divested stores, and had ██████████████████████ ██████████████████████████ , later stated that ██ would have been a better buyer than C&S because it "already ha[d] a solid backbone" and was "very profitable at retail."

**RESPONSE**:  Admits that Kroger received interest from many potential buyers in 2023, including ██ ; and otherwise denies the allegations contained in Paragraph 161.

162.    Kroger also failed to advance its negotiations with other strong grocery competitors with broad national footprints. For example, Kroger executed NDAs with ████████████████████████████████ ████████████████████████ Kroger also had contact with ████████████████████ regarding the divestiture process. Each of these potential divestiture buyers has a long history of operating retail locations ███████████████████████████████████

70

█████████. These buyers also had significant ███████████: as of January 2025, ████████████████████████████████████████████████ ████████████████████ Each of these retailers already has ████████████ and ███████████████████. Yet, none of these companies advanced far enough in Kroger's divestiture process to be considered top contenders by Kroger.

**RESPONSE**: Admits that Kroger received interest from many potential buyers in 2023 and that the description of ████████████████████ ████████████████████████████ generally comport with Kroger's understanding of public statements from those companies; denies knowledge or information sufficient to form a belief as to the truth of the allegations concerning ██████████████████████████████████ ████████; and otherwise denies the allegations contained in Paragraph 162.

163. Kroger similarly failed to prioritize potential buyers with significant and growing footprints on the West Coast, which could have been strong buyers for at least of a regionally focused subset of the stores to be divested. To the extent that these regionally focused buyers would have been interested in purchasing a geographically focused subset of the stores to be divested, Kroger foreclosed potentially fruitful negotiations by insisting on seeking a single buyer instead of a consortium of regional buyers.

**RESPONSE**: Denies the allegations contained in Paragraph 163.

164. For example, ██████████████████, a ██████████████ ██████████████, executed an NDA with Kroger but did not progress beyond the initial stages of Kroger's auction process, despite being a strong potential buyer that Kroger should have taken seriously. ██████ has a nearly ██████ track record of successfully running retail locations, and it ██████ ████████████████████████████████████████████████ ████████████████████████████████████████████. As either a sole or joint divestiture buyer, ██████████ could have addressed regulators' concerns about

71

Kroger's and Albertsons' divested stores being sold to a buyer without an established ██████████████ or a long history of running retail stores ███████ ██████████████████ Kroger, however, stopped negotiating with ██████ early in the divestiture process.

**RESPONSE**: Admits that ████████████ executed an NDA with Kroger and that the allegations regarding ████████████████████████ comport with Kroger's understanding of public statements from ██████; and otherwise avers that no response is required to the allegations in Paragraph 164 insofar as they purport to describe Albertsons's legal arguments or conclusions, and to the extent a response is required, denies the allegations contained in Paragraph 164.

165. ████████████████ ████████, was another potentially strong ████████ with whom Kroger engaged only briefly. ████ has ████████████████████████████████████████ ████████████ which could enable it to provide services to ████████████████████. ██ has ███████████████████ and has █████████████—including████████████████████ also ██████████, giving it ████████████. Kroger contacted █████ and executed an NDA with ███████████. Yet, Kroger failed to advance its negotiations with ████ beyond the initial stages.

**RESPONSE**: Admits Kroger executed an NDA with ████, and that the description of ████████████████████████ ████████████████ generally comport with Kroger's understanding of

72

public statements from ███████; denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in the third and fourth sentences of Paragraph 165; and otherwise denies the allegations contained in Paragraph 165.

166.   In evaluating prospective buyers, Kroger also focused on criteria that were not aligned with securing regulatory approval for the Merger. As the FTC knew, Kroger's obligation under the Merger Agreement was to select a divestiture buyer or buyers to maximize the Merger's chance of obtaining antitrust approval— not to maximize the financial consideration Kroger would receive for the divested assets. Kroger thus should have prioritized criteria that would be critical to the FTC, such as a company's track record of running retail grocery stores, the strength of a company's management team, the reliability of a company's existing financing arrangement, and the depth and complexity of transitional services and non-store assets that would be required to support a buyer. Yet, in October 2024, Kroger admitted to the FTC that it had evaluated initial divestiture offers based on "value," as well as "transaction certainty, and buyer flexibility to acquire additional stores." Kroger privately made clear to Albertsons that it was focused on its own financial "value" above all else. Kroger's then-Chief Financial Officer, Gary Millerchip, conveyed to Albertsons multiple times that he had a "fiduciary duty" to Kroger stockholders in negotiating a divestiture. As Albertsons' General Counsel explained to Millerchip, that was wrong: Kroger already had entered into the Merger Agreement with full approval from its Board of Directors, reflecting the board's view that the Merger Agreement was in the interests of Kroger's stockholders. Kroger now had to live with the terms of that agreement, which required Kroger to take "any and all actions" necessary to obtain antitrust approval "as promptly as practicable," even if that meant offering a divestiture package that, viewed in isolation, was less than economically optimal for Kroger.

**RESPONSE**: Admits that in October 2024, Kroger communicated with the FTC regarding the Merger, and that at various points in time throughout 2023 and 2024, the Parties communicated regarding the Merger and proposed divestiture; and otherwise denies the allegations contained in Paragraph 166.

167.   Kroger also artificially narrowed the field of potential buyers by focusing unduly on finding a single buyer for all divested assets. In numerous other

73

large merger transactions, the FTC had accepted proposals for multiple buyers to purchase divested assets, including in Ahold's 2016 acquisition of Delhaize Group, discussed above. Assembling multiple buyers that could purchase stores in different geographical regions would avoid triggering new antitrust concerns from the divestiture transaction, as it would spread store ownership among more, not fewer, owners than prior to the Merger. For example, assembling multiple buyers could allow Kroger to sell stores and related assets in "clean sweeps"—that is, larger bundles of unified assets, such as stores, banners, and distribution infrastructure, from the same pre-merger company in a specific geographic area, as the FTC's published divestiture guidelines expressly favor. Kroger refused even to consider such solutions. Its myopic focus on a single buyer substantially limited the number of potential buyers for to-be-divested stores, as few prospective bidders had the size, management expertise, existing supply chain contracts, distribution infrastructure, and access to capital to purchase hundreds of store locations in a single transaction.

**RESPONSE**: Denies the allegations contained in Paragraph 167.

168.  The divestiture package Kroger offered to buyers further narrowed the number of potentially interested buyers. Kroger initially solicited buyers with its woefully inadequate 238-store divestiture proposal. Kroger only received 28 indications of interest related to that offer. Thereafter, in May 2023, Kroger conducted another round of bidding, where Kroger offered potential buyers an almost equally unattractive 413-store package of underperforming stores and paltry non-store assets. As Albertsons already had warned Kroger, that package failed to adequately address regulatory concerns about local store concentration or set up a divestiture buyer to meaningfully compete. Yet, as in its interactions with the FTC and Albertsons, Kroger did not react to potential buyers' concerns; rather, Kroger only offered take-it-or-leave-it bundles. The results were predictable: of the approximately 60 companies that signed NDAs with Kroger and indicated initial interest, ten submitted preliminary offers and only three ultimately submitted final, formal bids.

**RESPONSE**: Admits that Kroger received three formal bids from potential divestiture buyers; and otherwise denies the allegations contained in Paragraph 168.

169.  Kroger received formal bids from potential divestiture buyers by August 3, 2023, approximately a month before the date by which Kroger had told Albertsons that it would have an executed asset purchase agreement in place with a divestiture buyer. This time crunch created new concerns, as it prevented Kroger

74

from adequately considering those bids, going back to the market for additional bids, negotiating better offers from existing bidders, or considering a proposal to work with multiple bidders in a joint process.

**RESPONSE**: Admits that Kroger received three formal bids from potential divestiture buyers; and otherwise denies the allegations contained in Paragraph 169.

170.   Kroger also failed to provide Albertsons the information it needed to participate meaningfully in the process of selecting a divestiture buyer. As the auction process progressed, Kroger did not inform Albertsons of the details of its interactions with potential buyers, nor did it identify to Albertsons the strong buyers that were not advancing to the stage of formal bids. Even after Kroger winnowed the group of potential buyers to three bidders and received their written bids, it sidelined Albertsons in its process of assessing those bids, even though a large number of stores that would be divested were current Albertsons stores.

**RESPONSE**: Denies the allegations contained in Paragraph 170.

171.   After blocking Albertsons from playing a meaningful role in the buyer selection process, Kroger chose C&S as the sole divestiture buyer. Nearly a year after entering into the Merger Agreement, on September 8, 2023, Kroger and C&S entered into an APA.

**RESPONSE**: Admits that on September 8, 2023, Kroger and C&S entered into an Asset Purchase Agreement; and otherwise denies the allegations contained in Paragraph 171.

172.   Kroger's choice of C&S raised several challenges that the FTC seized upon. First, while C&S is a leading, large-scale competitor in grocery wholesale, C&S currently operates only 23 retail grocery stores, mostly in upstate New York, Vermont, and Wisconsin, and this lack of retail experience would raise questions about its ability to operate successfully an up-to-650-store supermarket chain, including fuel and pharmacy operations, across multiple states. C&S also lacked any significant retail experience in states like Washington or Colorado, where Kroger anticipated needing to divest a meaningful number of stores.

75

**RESPONSE**:  Admits that C&S operates 25 retail grocery stores in New York, Vermont, and Wisconsin, and has not previously operated locations in Washington and Colorado; and otherwise denies the allegations contained in Paragraph 172.

173.   *Second*, C&S's existing banners for stores, limited to Piggly Wiggly and Grand Union banners, and private label brands, limited to Best Yet, are unknown to customers in Arizona, Colorado, Oregon, Washington, and California, where Kroger needed to divest stores. C&S would need to invest in significant re-bannering of stores and Kroger would need to transfer lucrative private labels like "O Organic" and "Signature," associated with significant execution risk. In many grocery stores, private label sales make up 25% of sale volume; any issues in transferring banners or brands could significantly undermine the future success of divested stores.

**RESPONSE**:  Denies the allegations contained in Paragraph 173.

174.   *Third*, given the limited footprint of C&S's existing retail stores, Kroger would need to divest a broad array of non-store assets. C&S required thousands of store associates, managers, back-office personnel, and a comprehensive IT solution that it did not have in order to run the divested stores. And while C&S operated a large distribution network that supplied grocery stores around the country, that network had gaps in Arizona, Colorado, and Southern California, areas where Kroger was divesting a substantial number of stores. Kroger therefore would need to divest distribution centers in those regions as well.

**RESPONSE**:  Denies the allegations contained in Paragraph 174.

175.   *Fourth*, given its lack of a significant grocery retail business, C&S would require continued transition support from Kroger over a long period of time to operate the divested stores, raising concerns about ongoing entanglements between competitors in these very markets.

**RESPONSE**:  Denies the allegations contained in Paragraph 175.

176.   *Fifth*, C&S also has a history of acquiring stores and then selling them when they become unprofitable. As the FTC later highlighted in its preliminary injunction trial to stop the Merger, C&S acquired over 370 retail grocery stores between 2001 and 2012 but sold or closed all but three of those stores by 2012.

76

Indeed, it was revealed at trial that C&S stated as recently as 2021 that any retail grocery stores it operates were intended to support its *wholesale* business, and the company stated in a 2021 quarterly report that "[w]e do not intend to grow our grocery retailing operations or to operate the retail grocery stores in the long term. We expect to divest our retail grocery stores as opportunities arise." Similarly, in 2023, C&S stated that "[f]rom time to time, we acquire retail store locations in connection with strategic transactions to maintain or expand our grocery wholesaling and distribution business."

**RESPONSE**:  Refers to the testimony and evidence presented in the trial records of the Antitrust Trials for a complete and accurate description of their contents; and otherwise denies the allegations contained in Paragraph 176.

177.  *Sixth*, C&S would require months of fundraising negotiations with its bankers to obtain the financing necessary for it to purchase the required number of to-be-divested stores, which would delay its ability to enter any definitive agreement to acquire those stores. Given these attributes of C&S, Kroger and its sophisticated antitrust counsel surely knew that the FTC would closely scrutinize any plan to preserve competition after the Merger by divesting stores to C&S. While the FTC had approved C&S as a divestiture buyer in a 2022 merger between grocers Price Chopper and Tops, that divestiture was for just twelve stores. C&S, however, has faced challenges operating these stores. It has had to close one and the remaining stores have lost significant sales and are losing money.

**RESPONSE**:  Admits that the FTC previously approved C&S as a divestiture buyer; and otherwise denies the allegations contained in Paragraph 177.

178.  Kroger's choice of C&S ultimately would fuel regulators' efforts to challenge the Merger. The FTC, Colorado Attorney General, and Washington Attorney General focused much of their cases on C&S's perceived shortcomings as a divestiture buyer. The FTC, for example, repeatedly emphasized C&S's thin and uneven track record in grocery retail. The agency also noted what it perceived as tension between Kroger's arguments that (1) it needed to merge with Albertsons to obtain the scale to compete with Walmart, Costco, Amazon, and Target, and (2) C&S would be a viable competitor, even though its existing retail supermarket operations were nearly nonexistent, and it would acquire only a few hundred stores in the divestiture. The Colorado and Washington Attorneys General echoed these

77

points in their cases challenging the deal. Regardless of whether those critiques of C&S are accurate, Kroger should have expected them based on the FTC's longstanding criteria for assessing proposed divestiture buyers, and they would not have been made, or would not have persuaded the Washington and Oregon Courts, had Kroger selected a buyer with a clear track record of retail success.

**RESPONSE**: Refers to the testimony and evidence presented in the trial records of the Antitrust Trials for a complete and accurate description of their contents; and otherwise denies the allegations contained in Paragraph 178.

179.    Kroger's mismanagement of the search for a divestiture buyer thus left the Merger vulnerable to attacks from regulators and was emblematic of Kroger's broader failure to use prompt "best efforts" and take "any and all actions" to secure timely antitrust approval. While C&S may well be capable of succeeding as a divestiture operator, that is beside the point. The point is that Kroger had an obligation to remove any and all regulatory concerns expeditiously, and it selected C&S knowing that the selection was risky and would generate objections from the regulators. And thereafter, Kroger failed to adequately address those concerns, despite knowing regulators like the FTC would have been open to receiving a divestiture proposal that appropriately set up a divestiture buyer or buyers to maintain competitive intensity with those assets.

**RESPONSE**: Denies the allegations contained in Paragraph 179.

## X.    Kroger Proposes an Inadequate Package of Assets to Divest to C&S

180.    Once Kroger selected C&S as a divestiture buyer, it was required to promptly take any and all steps necessary to ensure that C&S had the tools regulators believed it needed to succeed so that the regulators would approve the Merger.

**RESPONSE**: Denies the allegations contained in Paragraph 180.

181.    Kroger failed to do so by refusing to assemble an adequate package of store and non-store assets to be divested. From the outset of its interactions with potential buyers, Kroger prioritized negotiating a divestiture package that was consistent with its economic interests and the financial models it had built before signing the Merger Agreement—not its contractual obligations in seeking regulatory approval.

78

**RESPONSE**: Denies the allegations contained in Paragraph 181.

### A.    Kroger Rejects Albertsons' Input in Crafting its Proposed Divestiture Package

182.    By early May 2023, Kroger had developed a plan to divest 413 stores to the buyer that emerged from its then-ongoing divestiture process. Kroger told this plan to Albertsons, but did not yet reveal it to the FTC until it had a buyer ready in September 2023.

**RESPONSE**:  Admits that in 2023, Kroger developed a plan to divest 413 stores and that in 2023, Kroger communicated that plan to Albertsons and the FTC; and otherwise denies the allegations contained in Paragraph 182.

183.    In June 2023, Albertsons met with Kroger and urged Kroger to add additional stores to its divestiture package. Albertsons emphasized to Kroger that the divestiture process with the FTC was not a typical back-and-forth negotiation, and that Kroger needed to lead with an offer for a large and rigorously supported divestiture package. Albertsons also expressed concern about Kroger's lack of communication with the FTC, and asked Kroger to schedule regular weekly meetings with the FTC to discuss substantive issues concerning the divestiture package. Albertsons also expressed concern at the nature of Kroger's negotiations with the FTC, which were drawn out. Kroger had no excuse for taking 10 months to increase its 238-store package to 413 stores, nor for its negotiations with divestiture buyers still being unresolved throughout the summer of 2023.

**RESPONSE**:  Admits that in or around June 2023, the Parties met regarding the proposed divestiture; and otherwise denies the allegations contained in Paragraph 183.

184.    In subsequent emails, meetings, and calls, Albertsons expressed concern about Kroger's proposed 413-store divestiture package, which was deficient for multiple reasons—in particular, because it did not adequately address the FTC's concerns from the March 17, 2023 meeting about the number of stores that were being divested and how stores were being selected. It also did not include adequate non-store assets for a prospective divestiture buyer.

79

**RESPONSE**: Admits that at various points in time throughout 2023, the Parties met, exchanged correspondence, and had calls regarding the proposed divestiture; refers to the communications referenced in Paragraph 184 for a complete and accurate description of their contents; and otherwise denies the allegations contained in Paragraph 184.

185.   On July 19, 2023, Albertsons asked Kroger for a meeting to discuss its latest divestiture package. On July 24, 2023, Albertsons emailed Kroger a list of approximately 100 additional stores for Kroger to consider adding to the package, along with supporting analysis from Albertsons' economists.

**RESPONSE**: Admits the allegations contained in Paragraph 185.

186.   The next day, on July 25, 2023, the Parties met to discuss Kroger's latest divestiture package. Albertsons shared with Kroger detailed modeling results which showed that Kroger's 413-store package was unlikely to resolve the FTC's concerns about the Merger's potential anticompetitive effects. Albertsons communicated that the stores in Kroger's proposed package clearly were not selected based on the guidelines and feedback from the FTC, since numerous geographies were not addressed and stores with obvious concentration issues were not being divested. Albertsons expressed concern that the FTC would not view the 413-store offer as a good faith effort but, instead, as further lowballing. Albertsons noted such an offer could cause the FTC to sue to block the transaction rather than engaging in further work on a divestiture package. From its own economic analysis, Albertsons pointed Kroger to the specific stores it believed would go the furthest in addressing regulators' local concentration concerns, which were selected based on the FTC's guidelines and feedback.

**RESPONSE**: Admits that on July 25, 2023, the Parties met regarding the regulatory review process and the proposed divestiture; and otherwise denies the allegations contained in Paragraph 186.

187.   On July 27, 2023, following up from the Parties' meeting two days before, Albertsons emailed Kroger a revised list of stores for Kroger to consider

80

adding to the divestiture package. The list included about 160-170 stores that Albertsons' economists determined were at incremental risk of enforcement after the 413-store divestiture, bringing the total divestiture size to approximately 580 stores. Again, Kroger ignored Albertsons' feedback.

**RESPONSE**:  Admits that on July 27, 2023, Albertsons sent an email to Kroger regarding the proposed divestiture; refers to the email referenced in Paragraph 187 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 187.

188.    Kroger acknowledged that additional stores needed to be added to its divestiture package. Nonetheless, across June, July, August, and September, Kroger did not add a single store to its divestiture package.

**RESPONSE**:  Admits that at various points in time throughout 2023, the Parties communicated regarding the proposed divestiture; and otherwise denies the allegations contained in Paragraph 188.

**B.    The Assets in the APA Are an Adversely Selected Group of 413 Stores and Paltry Non-Store Assets**

189.    In the APA, Kroger agreed to sell, and C&S agreed to buy, 413 Kroger stores. Kroger alone picked the stores. C&S had no role in selecting the total number of stores or the store composition—Kroger developed the package and C&S had to take it or leave it.

**RESPONSE**:  Refers to the APA for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 189.

190.    The 413-store divestiture package was woefully inadequate in terms of the total number of stores, the selection of specific stores, and the scope of non-store assets.

**RESPONSE**:  Denies the allegations contained in Paragraph 190.

81

191. The 413 stores included in the package were not selected through an objective methodology. Instead, Kroger once again adversely selected the stores in an attempt to offload its least profitable stores to C&S, while holding on to its most profitable stores. The package was designed for Kroger's economic benefit, at the expense of securing regulatory approval of the Merger.

RESPONSE: Denies the allegations contained in Paragraph 191.

192. Kroger's CEO, Rodney McMullen, participated directly in that egregious breach of Kroger's best-efforts obligation. In a September 2023 email exchange, which the Washington Attorney General featured prominently at trial, McMullen directed that a specific Seattle store be removed from the divestiture list because "this store has real estate that is worth a lot."

RESPONSE: Admits that a September 2023 email from Kroger's former CEO was referenced during the Washington Litigation; refers to the email referenced in Paragraph 192 and to the testimony and evidence presented in the trial record of the Washington Litigation for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 192.

193. McMullen's Kroger-first attitude infected the entire package, as a comparison of Kroger's non-divested stores with the stores included in the 413-store package proves. In particular, Kroger hand-picked Kroger stores to divest with average sales that were substantially below stores it planned to retain—to the tune of tens of millions of dollars of sales per year. The Kroger stores it chose to maintain had higher gross margins and EBITDA as well. This trend was true overall and within specific metropolitan areas, like Seattle, where Kroger chose to divest only the worst, lowest performing Kroger stores while retaining the highest performers. More than 50 of the stores that Kroger marked to divest had negative EBITDA for the fiscal year 2022. Kroger's strategy was clear—Kroger tried to offload its worst performing stores in the 413-store package while keeping the best stores for itself.

RESPONSE: Denies the allegations contained in Paragraph 193.

194. In addition to including too few and poorly-selected stores, Kroger's divestiture package also withheld vital non-store assets that were necessary to persuade regulators that C&S was well-positioned to successfully enter the market,

82

including manufacturing facilities, access to certain private labels, a technology stack, and transition services. For example, Kroger did not include the technology C&S would need to run a grocery store and gave C&S only 18 months to build its . own systems. Kroger also refused to transfer either ownership of or a license to Albertsons' "O Organic" and "Signature" private label brands in the package, even though Kroger already had its own private label brands in those categories and knew those brands would improve C&S's ability to successfully operate the divested stores as well as make the package more palatable to the FTC and State regulators.[2]

**RESPONSE**: Refers to the APA and to the testimony of Mr. Winn in the trial record of the Oregon Litigation referenced in footnote 2 for a complete and accurate description of their contents; and otherwise denies the allegations contained in Paragraph 194 and footnote 2.

195.    At Kroger's request, Albertsons agreed to sign onto the APA with C&S as a party, even though it was not necessary to do so given the structure of the Merger: the divestiture was set to close following the closing of the Merger when Albertsons would be a wholly owned subsidiary of Kroger.

**RESPONSE**: Admits that Albertsons was a party to the APA, and that the divestiture's closing would have followed the Merger's closing, and that Albertsons would have become a wholly-owned subsidiary of Kroger; and otherwise denies the allegations contained in Paragraph 195.

196.    Although Albertsons signed the APA, Albertsons did not endorse the divestiture package or agree that it was sufficient. This was reflected in a separate Letter Agreement where both Albertsons and Kroger acknowledged and agreed that

---

[2] At the preliminary injunction hearing in the District of Oregon, C&S CEO Eric Winn testified that the private labels C&S would acquire from Albertsons—Open Nature, Waterfront Bistro, Debi Lilly Design, Ready Meals, and Primo Taglio—made up only 10–20% of Albertsons' total private label sales. Kroger refused to divest Albertsons' larger Signature and O Organics private labels. Mr. Winn also testified that the divestiture package did not include banners which would have reduced C&S's risk entering the market, nor did it include existing customer loyalty programs.

83

Albertsons' signing of the APA did not affect in any way the rights or obligations pursuant to the Merger Agreement or constitute an agreement or acknowledgement on the part of Albertsons that Kroger had complied with its obligations under the Merger Agreement.

**RESPONSE**: Refers to the Letter Agreement referenced in Paragraph 196 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 196.

### C. The APA Allows Kroger to Increase the Divestiture Package to 650 Stores and Add Additional Non-Store Assets

197. Consistent with the Merger Agreement, the APA for the divestiture package contemplated that Kroger could divest up to 650 stores to address antitrust concerns. Section 2.11(a) of the APA provided that if Kroger "determine[d] in good faith" that it must sell more stores "to obtain . . . Clearances or an Order from a Governmental Entity," Kroger could require C&S to buy up to 237 more stores by submitting to C&S a "Put Notice," for a total of up to 650 stores. Similarly, if "a Governmental Entity requires (or has otherwise indicated in connection with any Action by or before such Governmental Entity that it is unlikely to issue the Clearances or an Order . . .)," that section allows Kroger to exercise the same "Put Notice" option and require C&S to buy up to 237 more stores, for a total of up to 650 stores.

**RESPONSE**: Refers to the APA for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 197.

198. Section 6.2(f) of the APA also required the Parties to ". . . use their respective reasonable best efforts to modify or agree to such provisions as may be necessary to satisfy the FTC's requirements," which allowed Kroger and C&S to change or expand the divestiture package to meet regulatory requirements.

**RESPONSE**: Refers to the APA for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 198.

199. Section 2.11 of the APA provided a formula to compensate Kroger for the additional stores sold pursuant to a Put Notice, based on the number and

84

characteristics of the additional stores. Regardless of the number and characteristics of the additional stores, however, the purchase price increase was capped at $725,000,000, up to a total maximum transaction price of $2.525 billion.

**RESPONSE**: Refers to the APA for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 199.

200.    Section 2.11(c) of the APA also contemplated Kroger adding non-store assets to the divestiture—specifically, "distribution centers or other assets (including transportation assets, offices or employees) or . . . modifications to the Transition Services Agreement that may be reasonably necessary to support such operations" of the divested stores.

**RESPONSE**: Refers to the APA for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 200.

201.    Thus, the APA enabled Kroger to meet its unqualified obligation under the Merger Agreement to divest whatever non-store assets were necessary to satisfy regulators.

**RESPONSE**: Refers to the APA and the Merger Agreement for a complete and accurate description of their contents; and otherwise denies the allegations contained in Paragraph 201.

202.    Section 2.11(e) of the APA further provided that "there shall be no change to the purchase price" paid by C&S to Kroger "on account of any [non-store assets] agreed to be transferred between [Kroger] and [C&S]." In other words, if Kroger exercised a Put Notice, C&S was entitled to receive, at no additional cost, all additional non-store assets necessary to satisfy the Regulators of its ability to compete following the Closing, or to defend that ability in enforcement litigation.

**RESPONSE**: Refers to the APA for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 202.

85

203. Despite these provisions, and despite specific concerns raised by Albertsons about the 413-store package provided for in the APA and the need to act before litigation, Kroger did not improve the divestiture package.

**RESPONSE**: Denies the allegations contained in Paragraph 203.

## XI.    Kroger Ignores Feedback from the FTC and Others Repeatedly Informing Kroger that Its Divestiture Package Is Deficient Under the Antitrust Laws

204. Even after C&S had been chosen and Kroger and C&S had formed a concrete divestment plan, Kroger continually delayed and prolonged final negotiations with the FTC—moving only incrementally up from its flawed 413-store proposal and never excising the core set of stores chosen for economic, not competitive reasons. Kroger ignored feedback from the FTC, C&S, and Albertsons, which eagerly wanted to close the deal and offered viable paths to doing so.

**RESPONSE**: Denies the allegations contained in Paragraph 204.

205. Kroger's 413-store divestiture proposal was itself a breach of its obligations under the Merger Agreement to remove antitrust impediments by making prompt "best efforts" and taking "any and all actions"—including the divestiture of unlimited non-store assets and up to 650 stores selected to give the Merger the best possible chance of antitrust approval (and not to protect Kroger's bottom line).

**RESPONSE**: Denies the allegations contained in Paragraph 205.

206. Kroger further breached its obligations under the Merger Agreement through its handling of the subsequent steps in the regulatory process: having predictably failed to sell the FTC on its initial 238-store and 413-store divestiture proposals, Kroger had a duty to act "as promptly as practicable" to propose an appropriate set of stores and non-store assets that addressed the FTC's feedback, which it failed to do. And Kroger was obligated to cooperate with Albertsons throughout this process, which it failed to do as well.

**RESPONSE**: Denies the allegations contained in Paragraph 206.

207. Kroger's duty to act promptly to submit a sound proposal was especially important because its best opportunity to obtain antitrust approval for the Merger was in the settlement negotiation process, before any litigation. The FTC often compromises and makes reasonable tradeoffs in the settlement negotiation

86

process. If settlement fails and the FTC sues to enjoin a merger, the FTC may take more uncompromising positions in the litigation than it would have been willing to accept in a settlement.

**RESPONSE**: Avers that no response is required to the allegations contained in Paragraph 207 insofar as they purport to describe Albertsons's legal arguments or conclusions, and to the extent a response is required, denies the allegations contained in Paragraph 207.

### A.     Kroger Proposes Its Inadequate 413-Store Package to the FTC

208.    The selection of C&S as buyer and the signed APA paved the way forward for the Parties to certify substantial compliance with the FTC's Second Request. Under the then-operative timing agreement for the Merger, the date on which the Parties certified substantial compliance would begin a 60-day clock for the FTC, at the end of which the FTC was required to either sue or allow the Merger to go forward.

**RESPONSE**: Avers that no response is required to the allegations contained in Paragraph 208 insofar as they purport to describe Albertsons's legal arguments or conclusions, and to the extent a response is required, denies the allegations contained in Paragraph 208.

209.    Concerned about the FTC's reaction to the lowball, 413-store offer, Albertsons told Kroger that when it went back to the FTC to present C&S as the divestiture buyer and the APA, Kroger needed to be clear that this was just a starting point for additional divestiture proposals, not another take-it-or-leave it offer from Kroger. The Parties understood that if they moved quickly and proposed a divestiture offer that the FTC was likely to accept, they still could close the Merger by the end of the year. But Kroger failed to incorporate Albertsons' advice, in violation of its commitment in Section 6.3(d) of the Merger Agreement to take "any and all actions necessary to avoid, eliminate, and resolve any and all impediments under any Antitrust Law . . . as promptly as practicable." Kroger thus caused negotiations to stretch into 2024—further endangering the Merger.

87

**RESPONSE**:    Refers to the APA, the Merger Agreement, and the communications referenced in Paragraph 209 for a complete and accurate description of their contents; and otherwise denies the allegations contained in Paragraph 209.

210.  On September 8, 2023 and again on September 13, 2023, the Parties had calls with the FTC to discuss Kroger's selection of C&S as the divestiture buyer, the APA, and Kroger's latest divestiture proposal—the 413-store proposal. During the September 13, 2023 call, the FTC provided initial criticism of Kroger's proposal, explaining that, just as with the initial 238-store package, Kroger had failed to follow the modeling approaches the FTC uses to analyze local competitive effects. The FTC asked for additional information about how Kroger's economists had selected stores for divestiture.

**RESPONSE**:  Admits that on September 8 and September 13, 2023, Kroger met with the FTC; and otherwise denies the allegations contained in Paragraph 210.

211.  On October 6, 2023, the Parties had a follow-up call with the FTC about Kroger's 413-store proposal. The FTC delivered more detailed feedback on the proposal and raised a number of questions. The FTC remained confused about how stores were being selected and how the 413-store package set up a divestiture buyer to be able to compete, asking "[w]hy divestiture assets that are geographically disperse and include a collection of components from two different companies will succeed." The FTC requested Kroger evaluate head-to-head competition between itself and Albertsons by calculating diversion ratios as part of its next proposal instead. The FTC continued to be concerned about how the Merger and divestiture would affect labor markets and asked for more information on that topic. Additionally, the FTC expressed concern about the logistics of transitioning stores from Kroger to C&S, questioning whether it required too much long-term support from Kroger.

**RESPONSE**:  Admits that on October 6, 2023, Kroger had a call with the FTC; and otherwise denies the allegations contained in Paragraph 211.

88

212.    The FTC's concerns—including about specific local markets and non-store assets that were missing from the divestiture proposal—were readily addressable, and the Merger Agreement required Kroger to address them. Yet, for months after the October 6, 2023 meeting with the FTC, Kroger refused to do so. Even in later, revised iterations of its divestiture proposal, Kroger continued to build on the same defective package of 413 stores and to substantially limit which non-store assets it included.

**RESPONSE**:  Denies the allegations contained in Paragraph 212.

213.    The Parties knew from prior experience with the FTC that by October 6, 2023, the FTC soon would discontinue remedy discussions and shift to litigation preparation, underscoring the urgency with which Kroger needed to act to develop a satisfactory divestiture package. Albertsons urged a substantial increase to the 650 stores allowed under the Merger Agreement. Time was of the essence, as C&S would need time to conduct diligence on any new stores it was allocated to buy, and the FTC needed to review and assess any new proposals put forward by Kroger with adequate time before deciding on whether to sue. Yet, Kroger largely stopped engaging with the FTC and dragged its feet.

**RESPONSE**:  Admits that at various points in time throughout 2023, the Parties communicated regarding regulatory strategy; and otherwise denies the allegations contained in Paragraph 213.

214.    On October 26, 2023, the FTC sent the Parties an email that reiterated its input and request for information about Kroger's divestiture package "in the interest of keeping the process moving." The FTC again requested that Kroger explain: (1) its methodology to select stores to be divested, (2) whether the package would resolve other areas of potential competitive concerns (e.g., labor and pharmacy services), (3) the anticipated success of the divestiture assets, (4) Kroger's expert analysis of the 413-store package, and (5) what customer data the Parties can transfer to C&S. The FTC also asked that Kroger provide delinquent "[d]ocuments and information responsive to" requests that the FTC made over one month prior.

**RESPONSE**:  Admits that on October 26, 2023, the FTC sent an email to Kroger regarding the proposed divestiture; refers to the email referenced in

89

Paragraph 214 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 214.

215.  Kroger's continued delays and the sentiment from the FTC that litigation was imminent alarmed Albertsons. Albertsons pushed Kroger to respond and address regulators' concerns quickly, but Kroger did not. It was not until later in the Parties' communications that Kroger revealed the reason for this delay: rather than being guided by its commitment to take any and all actions in obtaining antitrust approval, Kroger's divestiture proposals were being driven and delayed by insistence that the divestiture package create optimal financial results for Kroger. In other words, Kroger was deliberately delaying its engagement with the FTC to engineer a package that would prioritize Kroger's financial interests over getting the deal done.

**RESPONSE**:  Denies the allegations contained in Paragraph 215.

216.  Kroger's most senior executives suggested that this prioritization was justified, because they were acting according to their fiduciary duties to get the best deal for Kroger stockholders. But no fiduciary duty permitted Kroger to abdicate its contractual obligations under the Merger Agreement—including the obligation to take "any and all actions" necessary to obtain antitrust approval, which was not qualified by any "material adverse effect" clause.

**RESPONSE**:  Denies the allegations contained in Paragraph 216.

217.  Indeed, Kroger's counsel already had indicated that they understood the potential problems with the 413-store divestiture package, but that they were constrained by client expectations from offering additional stores or selecting stores by a more robust methodology. And whereas Kroger's economists represented to Albertsons that they were going back to the drawing board to propose a new divestiture package without a particular total number of stores in mind, that turned out not to be the case.

**RESPONSE**:  Denies the allegations contained in Paragraph 217.

218.  Even after receiving feedback from Albertsons that made clear Kroger must prioritize addressing the FTC's and other regulators' antitrust concerns, Kroger continued to push back on the FTC's requests for additional information regarding its divestiture proposals and submitted proposals guided by internal financing considerations rather than Kroger's commitments in the Merger Agreement.

90

**RESPONSE**: Denies the allegations contained in Paragraph 218.

### B.    Kroger's Small Increase to 510 Stores Fails to Address the FTC's Concerns

219.    During the week of November 13, 2023—days before the deadline for the Parties' notice of intent to certify compliance with the FTC's Second Request and when the FTC likely already was preparing for litigation—Kroger finally responded to the FTC with a new package, and certified substantial compliance with the FTC's Second Request. Even then, the proposed package was clearly insufficient and not responsive to regulatory concerns.

**RESPONSE**:    Admits that on November 16, 2023, Kroger proposed a divestiture package to the FTC and that Kroger certified substantial compliance with the FTC's Second Request; and otherwise denies the allegations contained in Paragraph 219.

220.    On November 16, 2023, Kroger told the FTC it was considering increasing its proposed divestiture from 413 to 510 stores—still 140 stores less than the 650-store divestiture threshold in the Merger Agreement and APA. Kroger would delay for yet another month before officially committing to this 510-store proposal to the FTC. Kroger's new offer also did not change the composition of the first 413 stores. Kroger merely added 97 stores on top of that set. This was despite the FTC's explicit demand that any divestiture reflect a reasoned methodology, not self-interested offloading of underperforming stores, and its concerns about the stores in Kroger's 413-store divestiture package. It was also despite Kroger's prior representations that its next proposal would represent a new, ground-up calculation created by its hired economic experts.

**RESPONSE**:    Admits that in or around November 2023, Kroger communicated with the FTC regarding the proposed divestiture and that Kroger proposed a revised package that included divestiture of 510 stores; and otherwise denies the allegations contained in Paragraph 220.

91

221.  The additional 97 stores that Kroger identified to divest as part of its 510-store proposal were selected using a diversion ratio calculation, as the FTC had instructed Kroger to use, but set up in such a way as to be deliberately helpful to Kroger. In fact, Kroger admitted to Albertsons that aspects of how it had set up its diversion ratio analysis diverged from what the FTC had done for prior mergers and what the FTC had instructed for Kroger to do to calculate diversion ratios. In analyzing sales diversions from Kroger or Albertsons, Kroger only flagged stores that were associated with a 25% diversion threshold, not a 20% threshold, a more conservative and more broadly followed approach. Kroger also calculated the ratio using a dynamic model, instead of a static model, which was associated with a lower number of stores being identified. Just changing Kroger's assumptions to a more appropriate 20% threshold would have caused Kroger to identify at least 80 more stores for divestiture, and using a static model could have identified 120 more stores for divestiture beyond those Kroger presented to the FTC.

**RESPONSE**:  Admits that Kroger used a diversion ratio calculation to identify stores to add to the divestiture package; and otherwise denies the allegations contained in Paragraph 221.

222.  In structuring its 510-store proposal, Kroger also did not address any other comments or concerns that the FTC had expressed in the months prior regarding local concentration issues in specific states and setting up a divestiture buyer for success with the right mix of non-store assets. Nor did Kroger address the 160-170 stores that Albertsons had identified for divestiture in July 2023. As a result of Kroger's mash-up approach, some local geographic areas like the Phoenix area would receive dozens of additional stores, while the areas around Seattle, Los Angeles, Portland, Dallas, Chicago, Las Vegas, and San Diego would receive three or fewer stores. On net, California, Washington, and Illinois remained under-addressed. Despite incorporating diversion ratio analysis for some of the stores it selected, Kroger's overall approach had still not changed—it focused only on maximizing value from the deal, and not on achieving prompt approval by "any and all actions necessary," as the Merger Agreement required.

**RESPONSE**: Denies the allegations contained in Paragraph 222.

223.  On November 22, 2023, the FTC emailed the Parties a statistical analysis of Kroger's 413-store divestiture package and its recently-presented 510-store package. Regarding the 413-store package, the FTC wrote that it was

92

"surprised to find that [Kroger's] divestiture fails to address dozens, if not hundreds of 'markets'" in which the proposed merger would presumptively have an anticompetitive effect. The FTC again took issue with the methodology Kroger used to select the 413 stores that Kroger proposed to divest. FTC reiterated its request for a more detailed explanation of Kroger's methodology.

**RESPONSE**: Admits that on November 22, 2023, the FTC sent an email to Kroger regarding the proposed divestiture; refers to the email referenced in Paragraph 223 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 223.

224. The FTC stated that Kroger's new 510-store package suffered from its reliance on the same flawed methodology as the inadequately-constructed 413-store list. Simply adding 97 stores on top of the 413-store proposal based on the results of a poorly formulated diversion ratio analysis did not address the FTC's concerns with the 413-store set. Unless Kroger could support its methodology for the selection of the 413 stores, Kroger needed to craft a new proposal from scratch with a sound economic rationale.

**RESPONSE**: Admits that on November 22, 2023, the FTC sent an email to Kroger regarding the proposed divestiture; refers to the email referenced in Paragraph 224 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 224.

### C. Kroger's Failure to Propose a Workable Package Leads to a Renegotiation of the Timing Agreement with the FTC

225. Originally, the Parties had intended to complete the divestiture package and Merger by the end of 2023, or shortly thereafter. After the certification of compliance with the Second Request on November 15, 2023 (and subsequent feedback from the FTC), that target closing date was still possible, as the compliance certification had put the FTC on a 60-day countdown to either sue to block the Merger or allow it to go forward.

93

**RESPONSE**:    Admits that on November 15, 2023, Kroger certified

compliance with the Second Request; and otherwise denies the allegations contained

in Paragraph 225.

226.    Kroger's continued failure to propose a workable divestiture package to the FTC destroyed the viability of that timeline. Given that the FTC had indicated that Kroger needed to go back to the drawing board to get to a workable proposal, the FTC and Kroger renegotiated the timing agreement on December 15, 2023. Under the new agreement, the FTC could provide notice at any time that negotiations had stalled, starting a four-week countdown to the filing of litigation.

**RESPONSE**:    Admits that on December 15, 2023, the FTC and Kroger

reached a timing agreement; and otherwise denies the allegations contained in

Paragraph 226.

227.    Despite that additional time, Kroger did not follow the FTC's clear instructions regarding the stores in its proposal. Albertsons urged Kroger to provide meaningful improvements, but Kroger did not heed Albertsons' advice.

**RESPONSE**:    Denies the allegations contained in Paragraph 227.

228.    By December 6, 2023, Kroger still had not provided the FTC with the detailed explanation and support for the methodology it used to create its 413-store list, now the backbone of Kroger's operative 510-store proposal. In a deposition of Kroger's then-Chief Financial Officer, Gary Millerchip, the FTC asked for an explanation of Kroger's methodology for selecting the 413 stores. The FTC did not obtain satisfactory answers, but Millerchip confirmed that Kroger unilaterally created the 413-store list without input from C&S.

**RESPONSE**:    Refers to the transcript of Gary Millerchip's testimony

referenced in Paragraph 228 for a complete and accurate description of its contents;

and otherwise denies the allegations contained in Paragraph 228.

229.    Another week passed and Kroger still had not explained its methodology for constructing its store list. On December 12, 2023, the FTC emailed

94

the Parties and asked Kroger to "clarify the status of the current asset package." The FTC further asked whether Kroger had discussed the 510-store package with C&S and whether Kroger was considering adding any additional assets to the package.

**RESPONSE**: Admits that on December 12, 2023, the FTC sent an email to Kroger regarding the proposed divestiture; refers to the email referenced in Paragraph 229 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 229.

230.    Alarmed that Kroger was not moving faster, Albertsons again advised Kroger to move quickly to answer the FTC's basic questions about the status of Kroger's divestiture package. Despite the extension of the timing agreement, resulting from the FTC's obvious dissatisfaction with Kroger's proposals to date, Kroger could afford no further delay. Nonetheless, Kroger put forward only incremental, minor improvements to its proposal from December 2023 through February 2024, largely continuing to ignore the FTC's concerns.

**RESPONSE**: Admits that at various points in time throughout 2023, the Parties communicated regarding the proposed divestiture; and otherwise denies the allegations contained in Paragraph 230.

231.    During a telephone call with the Parties on December 20, 2023, the FTC told Kroger that its 510-store divestiture package still was inadequate, including because it would not position C&S to successfully enter the market. Specifically, the FTC raised concerns about:

    a.    Challenges C&S would face entering the market because it would not be acquiring a stand-alone business but, instead, an assortment of assets from two different companies;

    b.    C&S's need to re-banner the majority of stores it would acquire;

    c.    C&S's acquisition of insufficient distribution and manufacturing assets;

    d.    C&S not acquiring a well-known private brand; and

95

e.   Kroger not providing an adequate transition agreement for information technology, pharmacy, and other services.

**RESPONSE**: Admits that on December 20, 2023, the FTC, Kroger, and Albertsons had a call regarding the proposed divestiture; and otherwise denies the allegations contained in Paragraph 231.

232.   Again, Albertsons urged Kroger to take this feedback seriously and move quickly to address it to satisfy antitrust regulators, as the Parties' window to reach a settlement with regulators was closing rapidly. In an email sent on December 27, 2023, Albertsons conveyed that Kroger's 510-store divestiture proposal failed to address local concentration issues in Arizona, Colorado, Illinois, and Idaho, and that Kroger's delay was holding up C&S's ability to perform due diligence of additional stores. Non-store assets like re-bannering, distribution assets, manufacturing assets, private labels, data, and transitions services had not been adequately addressed yet either.

**RESPONSE**: Admits that on December 27, 2023, Albertsons sent an email to Kroger regarding the proposed divestiture; refers to the email referenced in Paragraph 232 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 232.

233.   On January 3, 2024, the FTC emailed the Parties and reiterated its request for "any responses to our November 22 feedback on your initial diversion analysis, [and] any updates you have on the divestiture package based on our feedback." Hamstrung by its inability under the Merger Agreement to unilaterally approach the FTC, Albertsons was forced to stand by and watch as still more days ticked by without an adequate response by Kroger.

**RESPONSE**: Admits that on January 3, 2024, the FTC sent an email to Kroger regarding the proposed divestiture; refers to the email referenced in Paragraph 233 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 233.

96

**D.    The FTC Asks for a Final Offer from Kroger, and Kroger Still Refuses to Cooperate, Forcing the FTC to Litigate**

234.    The FTC met with the Parties on January 11, 2024, and told Kroger that its economic analysis indicated that Kroger's proposals to date were inadequate. The next day, the FTC emailed the Parties and requested an updated divestiture package—with supporting economic analysis—by no later than January 18, 2024. This was, in essence, the FTC's request for Kroger's "best-and-final" offer. The message was clear: the FTC would likely soon disengage from negotiations and prepare for litigation by providing the four weeks' notice provided for in the timing agreement entered into between the Parties and the FTC.

**RESPONSE**:  Admits that on January 11, 2024, Kroger met with the FTC regarding the proposed divestiture and that on January 12, 2024, the FTC sent an email to Kroger; refers to the email referenced in Paragraph 234 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 234.

235.    Kroger still had a strong card left to play: it could increase its divestiture offer and improve the composition of its package to address concerns about geographic overlap. Kroger also had highly motivated partners in C&S and Albertsons, which were eager to help get the deal through the regulatory process. Yet, Kroger continued to insist on unsatisfactory divestiture packages which prioritized its own financial well-being, even though all other relevant parties, including Albertsons and the FTC, implored Kroger to make a satisfactory final offer and gave it multiple opportunities to do so.

**RESPONSE**:  Denies the allegations contained in Paragraph 235.

236.    On January 16, 2024, anticipating that Kroger would be working to prepare that "best offer," C&S emailed Kroger and outlined a suggested approach for addressing regulators' concerns. That approach was tailored to structuring a package that regulators were likely to approve, addressing local store concentrations and increasing the total store count, as well as re-bannering, distribution and IT assets, private brands, and transition services.

97

**RESPONSE**: Admits that on January 16, 2024, C&S sent an email to Kroger regarding the proposed divestiture; refers to the email referenced in Paragraph 236 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 236.

237. The next day, January 17, 2024, on the eve of Kroger's deadline to submit to the FTC an updated divestiture package (its best and final offer), the Parties were scheduled to meet to discuss a new proposal by Kroger to divest 541 stores (still 109 stores short of 650). But Kroger cancelled the meeting and did not reschedule it—depriving Albertsons of the opportunity to provide meaningful feedback before the package was submitted to the FTC the next day, in violation of Section 6.3(b) of the Merger Agreement.

**RESPONSE**: Denies the allegations contained in Paragraph 237.

238. In the meantime, Albertsons' attorneys and business executives repeatedly reached out to Kroger urging it to make its best and final offer with a divestiture package at or close to 650 stores.

**RESPONSE**: Admits that at various points in time throughout 2023 and 2024, the Parties communicated regarding the proposed divestiture; and otherwise denies the allegations contained in Paragraph 238.

239. Instead, Kroger continued trickling out proposed stores for divestiture in dribs and drabs. On January 18, 2024, after already being sued by Washington (as discussed below in Section XIV), Kroger wrote to the FTC proposing to increase its divestiture package from 510 stores to 541 stores—an irresponsibly and inexplicably small increase. Kroger's proposal still did not address the FTC's core concerns pertaining to the composition of the stores and other assets. For example, the package failed to address the gaps that the FTC had identified in C&S's distribution centers and other infrastructure to operate the stores that were being divested. Further, although purportedly drawn up from scratch using diversion ratio calculations, Kroger conceded that approximately 65-70% of the stores in its new proposal had been included in its 510-store proposal. And the new proposal was, like Kroger's prior proposals, drafted unilaterally by Kroger without input from C&S. In fact, C&S

98

only learned of the package the day before Kroger submitted it to the FTC, and Kroger was forced to admit to the FTC that C&S was reviewing this latest proposal in real-time, along with the agency.

**RESPONSE**: Admits that in January 2024, the Washington State Attorney General filed suit to enjoin the Merger, and that in January 2024, Kroger proposed a revised divestiture package with 541 stores; refers to the revised divestiture package referenced in Paragraph 239 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 239.

240.    On January 31, 2024, the FTC wrote to the Parties that Kroger's most recent 541-store divestiture offer was "largely unchanged" from its prior offer, as it "fail[ed] to address the numerous and substantial concerns that [the FTC has] previously identified," which had "only been corroborated upon further investigation." Specifically, the FTC identified lingering "deficiencies in the list of individual stores proposed for divestiture" and noted that it "remain[ed] unconvinced that the package conveys sufficient assets to position [C&S] for success, that the transition services are appropriately tailored, and that C&S can be successful with this massive and complex new structure." The FTC made clear that merely adding stores to the list would not suffice if the proposal did not change the existing store composition and add other assets.

**RESPONSE**: Admits that on January 31, 2024, the FTC sent an email to Kroger regarding the proposed divestiture; refers to the email referenced in Paragraph 240 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 240.

241.    After being presented with one inadequate package after another, the FTC decided that talks with Kroger no longer were productive. In the same January 31, 2024 letter, the FTC informed the Parties that negotiations were over, and it was providing the four-week notice under the timing agreement between the Parties and the FTC, which meant that the Parties could not consummate the Merger prior to 11:59 PM on February 28, 2024.

99

**RESPONSE**: Admits that on January 31, 2024, the FTC sent an email to Kroger regarding the proposed divestiture; refers to the email referenced in Paragraph 241 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 241.

242.    In an effort to avoid litigation with the FTC, Albertsons and C&S continued to press Kroger to make a viable proposal to the FTC. Yet despite multiple entreaties and specific requests, Kroger refused to improve its proposal.

**RESPONSE**: Admits that at various points in time throughout 2024, the Parties communicated regarding the regulatory review process and proposed divestiture, including in January and February 2024; and otherwise denies the allegations contained in Paragraph 242.

243.    On February 16, 2024, the parties met again with the FTC. Henry Liu, the Director of the FTC's Bureau of Competition, attended the meeting and expressed that, in his view, Kroger's divestiture proposal offered only "dispersed" stores to C&S and not the prospect of a profitable, self-sustaining business.

**RESPONSE**: Admits that on February 16, 2024, the FTC communicated with Kroger; and otherwise denies the allegations contained in Paragraph 243.

244.    The following week, on February 20, 2024, then-FTC Chair Lina Khan reiterated the FTC's concern that Kroger's divestiture proposal merely offered a "hodgepodge" of assets that would not resolve the potential anticompetitive effects of the Merger, and would not adequately position C&S to successfully enter the market.

**RESPONSE**: Admits that on February 20, 2024, Kroger met with the FTC; and otherwise denies the allegations contained in Paragraph 244.

245.    FTC Chair Khan and Commissioners Slaughter and Bedoya all indicated that they agreed with the concerns that FTC Staff had raised over the past

100

months, namely that the proposal was not designed to function as a standalone business and would not fully address the anti-competitive concerns raised by the FTC.

**RESPONSE**: Admits that on February 20, 2024, Kroger met with the FTC;

and otherwise denies the allegations contained in Paragraph 245.

246. On February 22, 2024, two FTC Commissioners held "last rites" meetings with the Parties—meetings that typically precede the filing of a lawsuit. Despite Albertsons' warnings, Kroger did not budge from its 541-store divestiture proposal in advance of those meetings.

**RESPONSE**: Admits that on February 22, 2024, Kroger met with the FTC;

and otherwise denies the allegations contained in Paragraph 246.

247. At the meetings, the FTC Commissioners unsurprisingly told Kroger that its proposed divestiture package was inadequate. They informed Kroger that it needed to revise its proposed package to include more stores in specific geographical areas, and that other key changes were needed. They reiterated concerns that the FTC had been communicating to Kroger for over a year about the need for Kroger to sell additional assets and banners, to no avail. They expressed a concern about the proper "formula" for a successful divestiture. They stated that the FTC repeatedly had communicated to Kroger that its proposed divestiture package included a disjointed "hodgepodge" of stores that may not coalesce into a successful business. They noted that any intention that Kroger had expressed to invest in its stores and lower prices was not binding and not enforceable by the FTC.

**RESPONSE**: Admits that on February 22, 2024, Kroger met with the FTC;

and otherwise denies the allegations contained in Paragraph 247.

248. But even at this late date, FTC Commissioner Slaughter conveyed that it was in everyone's interest to reach a negotiated settlement, thus making clear to the Parties that there was a productive resolution available for them that would allow the Merger to close and avoid a trial. Such a reasonable settlement would require Kroger to divest an adequate number of stores—closer to the 650-store threshold, of which the FTC was aware—and adequate non-store assets. Albertsons reiterated this message to Kroger and asked it to make a settlement offer that would satisfy the regulators.

101

**RESPONSE**: Admits that on February 22, 2024, Kroger met with the FTC; and otherwise denies the allegations contained in Paragraph 248.

249.    Kroger asked the FTC for until February 28, 2024—the very last day for the FTC to bring suit to challenge the Merger—to make a final proposal. Albertsons tried yet again to prevail upon Kroger to make a divestiture proposal that met its obligations under the Merger Agreement and to do so quickly. But on the eve of a lawsuit with the FTC and the specter of a potential nationwide injunction that would block the merger, Kroger refused and doubled down on its 541-store package.

**RESPONSE**: Admits that in or around February 2024, Kroger communicated with the FTC to request until February 28, 2024 to make a final proposal, and that at various points in time throughout 2024, the Parties communicated regarding the proposed divestiture; and otherwise denies the allegations contained in Paragraph 249.

## XII.    Kroger Fails to Cooperate with Albertsons and Repeatedly Ignores Feedback from Albertsons

250.    In addition to ignoring feedback from regulators about the deficiencies of its divestiture proposals, time and time, Kroger ignored entreaties from Albertsons throughout the relevant time period, in breach of Kroger's obligations under the Merger Agreement. Albertsons was a good partner to Kroger throughout their negotiations with regulators, but Kroger refused to hold up its end of the bargain.

**RESPONSE**: Denies the allegations contained in Paragraph 250.

### A.    Albertsons Cooperates with Kroger and Attempts to Aid Kroger in Seeking Regulatory Clearance for the Deal

251.    Albertsons held up its obligations under the Merger Agreement in spades, providing constant support and aid to Kroger to attempt to get the Merger cleared. Kroger rebuffed that support.

**RESPONSE**: Denies the allegations contained in Paragraph 251.

102

252.    From before the Parties' initial call with the FTC in October 2022, and continuing after the FTC filed suit against Kroger and Albertson in February 2024, Albertsons repeatedly attempted to work cooperatively with Kroger on antitrust strategy. Before the Merger Agreement was signed, Albertsons' economists created an analysis of store overlaps, which they shared with Kroger's economists. After the deal was signed, Albertsons stood ready to assist Kroger, providing feedback on talking points for meetings with the FTC, comments on white papers for regulators, and economic analyses of potential divestiture packages. Economists hired by Kroger and Albertsons engaged in regulatory meetings to discuss divestiture packages, and Albertsons and Kroger attorneys and management teams were in frequent communication as well.

**RESPONSE**:  Admits that Kroger hired economists to discuss divestiture packages, and that the Parties had attorneys and management teams who communicated with each other; and otherwise denies the allegations contained in Paragraph 252.

253.    Albertsons insisted from the outset of negotiations with regulators that Kroger offer a meaningful, robust divestiture package, and Albertsons pledged its support in efforts to do so. Kroger rebuffed Albertsons' input, just as it did with regulators. Kroger further cut Albertsons out of critical planning processes for communicating with regulators, and did not share how it was selecting a divestiture bidder. Albertsons pleaded with Kroger to no avail in dozens of calls, emails, and letters to include it in planning meetings, to move more quickly and to be responsive to regulators, including in at least the following examples:

    a.    On June 27, 2023, Albertsons' general counsel conducted a call with Kroger's general counsel regarding coordination between the Parties;

    b.    On at least June 30 and July 3, 2023, outside counsel for Albertsons emailed outside counsel for Kroger regarding the divestiture bidder selection process; and

    c.    Through its general counsel, its outside counsel, and its business executives (including its CEO), Albertsons frequently contacted Kroger regarding its then-current divestiture proposals. These communications occurred on at least July 24, 2023; July 25,

103

2023; September 8, 2023; September 11, 2023; October 13, 2023; October 25, 2023; October 31, 2023; November 10, 2023; November 29, 2023; December 19, 2023; December 27, 2023; January 17, 2024; January 19, 2024; February 1, 2024; February 4, 2024; February 9, 2024; February 21, 2024; February 23, 2024; February 27, 2024; March 4, 2024; March 28, 2024; April 4, 2024; July 19, 2024; September 25, 2024; and October 9, 2024.

**RESPONSE**: Admits that at various points in time throughout 2023 and 2024, the Parties communicated regarding the Merger, including on the dates referenced in Paragraph 253; and otherwise denies the allegations contained in Paragraph 253.

254. In its communications with Kroger, Albertsons further emphasized the need for Kroger to address regulators' labor market concerns. Although the Parties had ongoing communications about strategies for government and labor group outreach, Kroger was slow to address Albertsons' feedback, at certain points disregarding it altogether. Albertsons, to the extent it was permitted under the terms of the Merger Agreement, ultimately moved forward with its own plans for public relations and government relations, such as through direct outreach to State antitrust regulators. Kroger did not participate in those efforts.

**RESPONSE**: Denies the allegations contained in Paragraph 254.

255. Kroger also failed to cooperate with Albertsons in its selection and preparation of its testifying expert economist, Dr. Mark Israel. Kroger retained Dr. Israel—the Parties' primary economic expert supporting the Merger—unilaterally, without input from Albertsons. Kroger then denied Albertsons any meaningful opportunity to review and comment on key materials Dr. Israel produced—for example, giving Albertsons less than one full business day before the deadline for Dr. Israel's affirmative expert report to comment on hundreds of pages of new material and failing to provide materials for a court-ordered economics tutorial until the day before the tutorial was set to take place.

104

**RESPONSE**: Admits that Kroger retained economics expert Dr. Mark Israel to prepare an expert report and testify during antitrust proceedings; and otherwise denies the allegations contained in Paragraph 255.

256.    At trial, Dr. Israel was forced to admit that the Merger would be presumptively anticompetitive in at least 22 markets—a failure that the Oregon Court held was, "on its own . . . sufficient to find that the divestiture will not mitigate the merger's anticompetitive effects such that it is no longer likely to substantially lessen competition." Dr. Israel's admission further demonstrates Kroger's failures to prepare an appropriate divestiture package consistent with Kroger's obligations under the Merger Agreement.

**RESPONSE**: Admits that Dr. Israel testified at trial in the Oregon Litigation; refers to Dr. Israel's testimony in the Oregon Litigation and to the Oregon Opinion for a complete and accurate description of their contents; and otherwise denies the allegations contained in Paragraph 256.

257.    Additionally, Kroger's refusal to coordinate with Albertsons and to address its well-reasoned concerns flew in the face of its obligation to work closely with Albertsons in presenting its divestiture strategy to the FTC, including its obligation in Section 6.3(b) of the Merger Agreement to "permit [Albertsons] to review in advance and incorporate their reasonable comments" in communications with the FTC. Freezing out Albertsons' sound advice also contributed to Kroger's ultimate failure to address regulators' concerns, violating Kroger's duties to make prompt "best efforts" and take "any and all actions" to remove antitrust impediments.

**RESPONSE**: Denies the allegations contained in Paragraph 257.

**B.    Albertsons Provides Kroger with Detailed Economic Analysis Showing a Path to Regulatory Approval, but Kroger Ignores It**

258.    While pressing Kroger to address regulators' concerns, Albertsons provided specific economic analyses for Kroger to use in doing so, including at an in-person meeting between the Parties on July 25, 2023, and in communications on November 29, 2023, December 19, 2023, February 1, 2024, February 4, 2024,

105

February 9, 2024, and February 21, 2024. Kroger ignored this valuable information, as it did with Albertsons' other input.

**RESPONSE**:  Admits that at various points in time throughout 2023 and 2024, Albertsons engaged economists who ran their own economic analyses and that the Parties communicated regarding these analyses; and otherwise denies the allegations contained in Paragraph 258.

259.  The FTC typically uses certain mathematical calculations to help guide its analysis of the competitive effects of a merger and how well those effects are mitigated by a divestiture package or other remedy. One metric the FTC calculates is the Gross Upward Pricing Pressure Index ("GUPPI"), which measures a company's incentives to raise prices unilaterally after a merger, based on that company's pre-merger profit margins and the diversion ratio of sales between the two merging parties. A GUPPI calculation measures a company's incentives to raise prices post-merger in the absence of any merger-induced synergies, entry by other firms, or competitor re-positioning. A GUPPI calculation can help to determine the effect that a potential merger can have on the company's post-merger incentives to raise prices after it faces a lessening of competition. Historically, the FTC has been more amenable to approving mergers resulting in "proportionately small" GUPPI measurements. In practice, this is typically a GUPPI below 5%, although the FTC has not officially adopted this threshold as a safe harbor for merger clearance review.

**RESPONSE**:  Admits that the Gross Upward Pricing Pressure Index is a method of economic analysis sometimes used in antitrust cases; and otherwise denies the allegations contained in Paragraph 259.

260.  In addition to being used as part of a GUPPI analysis, a "diversion ratio" can also be analyzed on its own. A diversion ratio measures the proportion of consumers who would switch from one product to another in the face of a small price increase and helps to identify whether two products are close substitutes for each other. This ratio helps regulators to understand the area of effective competition between products and sellers, which may constitute a relevant antitrust market. Agencies and private parties also evaluate an Herfindahl–Hirschman index ("HHI"),

106

a common measure of market concentration calculated by squaring the market share of each firm competing in a market before and after a merger.

**RESPONSE**:   Admits that the diversion ratio and HHI are methods of economic analysis and metrics sometimes used in antitrust cases; and otherwise denies the allegations contained in Paragraph 260.

261.   Using these economic concepts and metrics that are often utilized by the FTC, Albertsons repeatedly provided Kroger with economic analyses and models regarding a divestiture proposal to remedy the FTC's and state Attorneys General's concerns. In its correspondence to Kroger on November 29, 2023, December 19, 2023, February 1, 2024, February 4, 2024, February 9, 2024, and February 21, 2024, Albertsons offered Kroger its own economic analyses supporting a viable store divestiture proposal.

**RESPONSE**:   Admits that at various points in time throughout 2023 and 2024, the Parties exchanged correspondence regarding the proposed divestiture, including on the dates referenced in Paragraph 261; refers to the correspondence referenced in Paragraph 261 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 261.

262.   For example, Albertsons' economists developed a store package using a 3% GUPPI limitation that would require a divestiture of fewer than 650 stores, thus demonstrating how Kroger could address the FTC's concerns about post-Merger concentration without triggering a Material Divestment Event under the Merger Agreement. A 3% GUPPI limitation is considered conservative, as it is well below a 5% threshold commonly used as part of merger analysis, and therefore attractive to the FTC. Albertsons shared this analysis with Kroger and repeatedly informed Kroger—including on February 1 and 4, 2024—that Albertsons' economists were available to assist Kroger's team with finalizing an updated, realistic proposal to the FTC.

**RESPONSE**:   Admits that at various points in time throughout 2024, the Parties communicated regarding the proposed divestiture, including on February 1

107

and 4, 2024, and that at various points in time, Albertsons engaged economists who performed their own economic analyses; refers to the communications referenced in Paragraph 262 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 262.

263. Albertsons' economists also evaluated the HHI index of numerous packages proposed by Kroger and communicated the results of those analyses to Kroger, in particular, that Kroger needed to divest more stores and a different mix of stores than it had included in its 238-, 413-, and 510-store packages. These analyses matched feedback Kroger was receiving from the FTC, which flagged concerns with the HHI in local markets resulting from the merger.

**RESPONSE**: Admits that Albertsons had economists who ran their own economic analyses, and that at various points in time throughout 2023 and 2024, the Parties communicated regarding their economic analyses; refers to the communications referenced in Paragraph 263 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 263.

264. Kroger ignored Albertsons' analyses and persisted in proposing an inferior divestiture package, as measured by the FTC's accepted metrics.

**RESPONSE**: Denies the allegations contained in Paragraph 264.

265. Albertsons and its economists urged Kroger to share more information with Albertsons about Kroger's economic analysis and how it was formulating its divestiture proposals. Instead, as litigation with the FTC and state regulators grew more imminent, Kroger's economists became less transparent about their work, brushing off inquiries by claiming that they were too busy to keep Albertsons' economists fully informed.

108

**RESPONSE**:  Admits that at various points in time throughout 2023 and 2024, the Parties communicated regarding their economic analyses; and otherwise denies the allegations contained in Paragraph 265.

266.  By freezing Albertsons out of this process, Kroger violated its contractual obligation to cooperate with Albertsons, as well as its obligations to use reasonable best efforts, best efforts, and to take any and all actions to secure regulatory approval of the Merger as promptly as practicable.

**RESPONSE**:  Denies the allegations contained in Paragraph 266.

## XIII.  The FTC Files Suit to Enjoin the Merger

267.  On February 26, 2024, the FTC, joined by the states of Arizona, California, Illinois, Maryland, Nevada, New Mexico, Oregon, and Wyoming and the District of Columbia, filed a federal action against Kroger and Albertsons in the District of Oregon, seeking to enjoin the Merger nationwide as anticompetitive.

**RESPONSE**:  Admits the allegations contained in Paragraph 267.

268.  Consistent with the FTC's prior criticisms, and with the concerns Albertsons had raised to Kroger time and again, the FTC alleged in its complaint that Kroger's proposed divestiture package did not include sufficient store and non-store assets.

**RESPONSE**:  Refers to the complaint filed by the FTC on February 26, 2024 (the "Oregon Complaint") for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 268.

269.  The FTC criticized the "hodgepodge" of stores that Kroger proposed to sell to C&S, as well as the failure to transfer necessary "banners, distribution centers, information technology, corporate contracts, loyalty programs, manufacturing assets, pharmacy resources, data analytics and e-commerce tools, employees, and others" that a successful supermarket business required.

109

**RESPONSE**: Refers to the Oregon Complaint for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 269.

270. The FTC's complaint also alleged that C&S would "need to construct a brand new supermarket business on the fly" because key assets were not included in Kroger's divestiture package.

**RESPONSE**: Refers to the Oregon Complaint for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 270.

271. The content of the FTC's complaint was not a surprise to Kroger. For months before it filed its complaint, the FTC repeatedly had expressed the same concerns to Kroger regarding deficiencies that the FTC perceived in Kroger's various divestiture packages, but Kroger failed to remedy the concerns. These were the same concerns that Kroger should have expected and prepared for all along, based on the FTC's prior reviews of divestiture proposals for other mergers.

**RESPONSE**: Refers to the Oregon Complaint for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 271.

## XIV. Kroger Ignores Feedback from State Antitrust Regulators that the Proposed Divestiture Package Is Deficient

272. The FTC was not the only regulator with whom the Parties would need to engage and from whom skepticism of the Merger would be expected. Kroger's foot-dragging to avoid proposing a more robust divestiture package resulted in needless scrutiny from state Attorneys General, which culminated in the states of Washington and Colorado filing independent lawsuits to block the Merger.

110

**RESPONSE**: Admits that the states of Washington and Colorado filed lawsuits to enjoin the Merger; and otherwise denies the allegations contained in Paragraph 272.

273. Starting shortly after the announcement of the Merger, the Attorneys General of numerous states—including Washington (as part of a multi-state investigation in which the District of Columbia, California, Arizona, Idaho, and Illinois participated) and Colorado—investigated the Merger, coordinating with the FTC. State regulators participated in reviewing materials produced to the FTC as a result of the Second Request. Representatives of state Attorneys General's offices also participated regularly in calls with the Parties, sometimes actively voicing their state-specific concerns and sometimes deferring to the FTC to lead the discussion from the regulatory side. Kroger was thus well acquainted with state regulators' views.

**RESPONSE**: Admits that at various points in time throughout 2023, the Attorneys General of various states investigated the merger and had calls with the Parties regarding the proposed divestiture; and otherwise denies the allegations contained in Paragraph 273.

274. Both Kroger and Albertsons understood that state Attorneys General, like the FTC, would want to see a divestiture package that ensured their constituents would be protected from anti-competitive effects. They also knew that Washington and Colorado were especially important states to address through the divestiture package, given the relatively high geographic overlap between the Parties' stores in those states. Even Kroger's initial, facially deficient divestiture proposal for 238 stores included 67 stores in Washington and 39 stores in Colorado—together comprising almost 45 percent of the proposed divestiture.

**RESPONSE**: Admits that the Attorneys General of various states investigated the Merger; denies knowledge or information sufficient to form a belief

111

as to the truth of the allegations concerning what "Albertsons understood"; and otherwise denies the allegations contained in Paragraph 274.

275. The Parties further understood that state Attorneys General are becoming increasingly active and aggressive. Thus, if their concerns were not adequately addressed, they could file lawsuits in their respective home state courts, separate from any litigation by the FTC, increasing the burden of defending the Merger in litigation and the probability that at least one court would block the Merger. Moreover, any injunctions against the Merger obtained by state Attorneys General in state courts would likely be permanent injunctions—unlike the preliminary injunctions typically sought by the FTC, which can leave leeway for post-injunction negotiations to resolve antitrust issues and close the transaction.

**RESPONSE**: Denies knowledge or information sufficient to form a belief as to the truth of the allegations concerning what "Albertsons understood"; and otherwise avers that no response is required to the allegations contained in Paragraph 275 insofar as they purport to describe Albertsons's legal arguments or conclusions, and to the extent a response is required, denies the allegations contained in Paragraph 275.

276. Understanding these risks, Albertsons sought to mitigate the risk of state enforcement action through outreach to and discussions with state Attorneys General. Albertsons ensured Kroger was fully informed of its interactions with state Attorneys General. Albertsons' General Counsel met with the Attorneys General of Arizona, California, Colorado, Nevada, Washington, and the District of Columbia in the fall and winter of 2023. During those meetings, Albertsons' General Counsel provided information about the Merger and its likely effect on local competition in relevant states. He also stood ready to answer regulators' questions, and often did, including in state-specific letters to Attorneys General's offices in at least California, Colorado, Nevada, Washington, and the District of Columbia. Albertsons also provided those offices information about the nature of competition that Albertsons faces locally and nationally, its track record for prior mergers, and how Albertsons planned to address employees at affected stores, among other information.

112

**RESPONSE**: Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in the third, fourth, fifth, and sixth sentences of Paragraph 276; and otherwise denies the allegations contained in Paragraph 276.

277.    Albertsons informed Kroger of its outreach and suggested that Kroger do the same. Kroger ignored Albertsons.

**RESPONSE**: Admits that at various points in time throughout 2023, the Parties communicated regarding regulatory strategy and outreach; and otherwise denies the allegations contained in Paragraph 277.

278.    After Kroger selected C&S as the divestiture buyer in September 2023, state regulators sought information from C&S. In compliance with the multi-state investigation, on October 31, 2023, C&S responded to questions from the California Attorney General and explained the significant deficiencies of Kroger's 413-store divestiture package. C&S commented that the package included an ill-fitting mix of assets and banners from Albertsons and Kroger. C&S wrote that the package also did not include a full range of private brands or well-known brands, a cohesive IT system, or full-function distribution centers in every geographic region where divested stores operated.

**RESPONSE**: Refers to the October 31, 2023 responses from C&S referenced in Paragraph 278 for a complete and accurate description of their contents; and otherwise denies the allegations contained in Paragraph 278.

279.    C&S's candid assessment of Kroger's divestiture proposal reinforced state regulators' concerns about the Merger. The Attorneys General's offices of multiple states—including Washington and Colorado—repeatedly told Kroger they were concerned that the divestiture package would not sufficiently reduce local concentration in store ownership and that the stores divested to C&S would not remain competitive, especially given Kroger's failure to divest key non-store assets to C&S. These concerns were readily addressable, yet Kroger squandered opportunities to ameliorate them and avoid litigation against the states.

113

**RESPONSE**:  Admits that at various points in time throughout 2023, Kroger met with the Attorneys General of various states; and otherwise denies the allegations contained in Paragraph 279.

### A.     Kroger Fails to Address Regulator Concerns in Washington

280.   The Attorney General of Washington quickly made clear that the office was focused on and concerned about the Merger. That was unsurprising. Albertsons and Kroger both had significant holdings in Washington. And Haggen, a Washington banner, had previously been involved in a failed divestiture. Given that background, it was naturally important to the Washington Attorney General to ensure that any loss of competition between nearby Albertsons and Kroger stores in Washington was adequately remedied and that any divestiture was viable.

**RESPONSE**:  Admits that at various points in time throughout 2023, Kroger met with the Washington State Attorney General, and that Haggen had been involved in a failed divestiture with Albertsons; and otherwise denies the allegations contained in Paragraph 280.

281.   The Washington Attorney General's office sent Albertsons and Kroger a Civil Investigative Demand on January 6, 2023, which included 45 interrogatories (20 to Kroger and 25 to Albertsons) and 116 demands for production (52 to Kroger and 64 to Albertsons). Thereafter, the Washington Attorney General coordinated its investigation with the FTC; Paula Pera, the Washington Assistant Attorney General, generally participated in calls with the FTC and the Parties starting in early 2023.

**RESPONSE**:  Admits the allegations contained in Paragraph 281.

282.   Kroger squandered multiple opportunities to improve its divestiture package in light of specific feedback from the Washington Attorney General. Its failure to do so was a blatant breach of its obligations under Section 6.3 of the Merger Agreement and ultimately contributed to the Washington Attorney General's decision to seek an injunction against the Merger and the court's decision to grant that injunction.

**RESPONSE**:  Denies the allegations contained in Paragraph 282.

114

283. Kroger could have offered to divest a greater number of stores in Washington and could have selected stores that better addressed concerns over local concentration. Indeed, the 579-store list that Kroger ultimately presented to the FTC and state Attorneys General contained eight fewer stores in Washington than the 650-store list proposed by C&S. Among these were four stores in high-concentration markets: a Haggen in Lake Stevens, a Quality Food Center in Seattle, a Quality Food center in Issaquah, and a Haggen in Starwood. Albertsons made clear to Kroger that C&S's 650-store list better addressed competitive concerns in Washington than prior lists that Kroger had proposed. Indeed, as Albertsons told Kroger, even adding a mere 33 Washington stores to Kroger's 579-store package, for a total of 612 stores, would address market concentration concerns in Washington under the market definition proposed by Washington's economist expert witness, which consisted of "supermarkets" (but not other grocery retailers, such as Costco) within 57 specific geographic areas. These 33 incremental stores were located across the state, with five in Spokane, two in Seattle, two in Tacoma, and the remaining 26 spread across 18 cities. Kroger did not listen.

**RESPONSE**: Denies the allegations contained in Paragraph 283.

284. Moreover, as the Washington Court later recognized, Kroger kept the best performing stores for itself. The 579-store list allowed Kroger to retain its 25 highest-performing stores in Washington while also divesting many stores with negative EBIDTA. Kroger even retained a Quality Food Center in Seattle after CEO Rodney McMullen specifically requested that Kroger keep the store due to its significant real estate value, despite the store being located in a high-concentration market. The result was that Kroger presented the Washington Attorney General with an inadequate store divestiture proposal, both as to the number and quality of stores to be divested.

**RESPONSE**: Refers to the Washington Opinion for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 284.

285. Kroger also knew the Washington Attorney General was concerned that even if Kroger divested an appropriate group of Washington stores, C&S—which had no retail presence in Washington—might be unable to run the divested stores as strong competitors to Kroger. During its investigation, the Washington Attorney General raised concerns including that C&S lacked distribution centers in

115

Washington and that the divestiture would fail unless C&S received sufficient non-store assets, including IT assets, distribution centers, banners, and private brands.

**RESPONSE**:  Admits that at various points in time throughout 2023 and 2024, Kroger met with the Washington State Attorney General regarding the Merger; and otherwise denies the allegations contained in Paragraph 285.

286.   Kroger could have addressed these concerns about a failed divestiture of Washington stores in multiple ways. To start, Kroger could have selected a buyer for Washington stores that, unlike C&S, had a track record of successfully operating retail stores in Washington. Such a buyer need not have replaced C&S as the sole, nationwide buyer; Kroger could have divested Washington stores to a company with a strong presence in or around Washington, while divesting stores in other regions to other buyers.

**RESPONSE**:  Denies the allegations contained in Paragraph 286.

287.   There is precedent for the use of multiple regionally focused divestiture buyers in a large grocery merger. To obtain FTC clearance for the $28 billion Ahold-Delhaize merger in 2016, the merging parties agreed to divest regional groups of stores to seven different buyers—for example, Weis Markets Inc. bought 38 stores in Delaware, Maryland, and Virginia, while Publix North Carolina, LP bought ten stores in Virginia. Instead of emulating that successful model, Kroger chose to make C&S its sole buyer.

**RESPONSE**:  Refers to the agreement between the FTC and third parties referenced in Paragraph 287 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 287.

288.   Even with C&S as the divestiture buyer, Kroger could have made its divestiture proposal more responsive to the Washington Attorney General's concerns by improving banner rights and private labels that it transferred to C&S for use in the state. For example, Kroger could have sold C&S exclusive rights to use the Safeway banner in Washington, where that banner has strong customer recognition. Doing so would have helped address the Washington Attorney General's concerns about C&S's ability to compete effectively in Washington and the number of stores that C&S would need to rebanner. Kroger also could have

116

further addressed the Washington Attorney General's concerns by divesting successful private brands to C&S such as Albertsons' Signature Select, O Organics, and Lucerne brands; providing C&S with greater rights to sell other private brands; and providing C&S with additional support to build its own private label business.

**RESPONSE**: Denies the allegations contained in Paragraph 288.

289.  Kroger also could have worked with C&S to adopt post-closing behavioral remedies, such as constraints on pricing and store closures, that were responsive to the Washington regulators' concerns. For example, to ameliorate regulators' concerns over C&S's ability or willingness to operate divested stores for the long-term—which was front-of-mind in light of the Haggen divestiture—Kroger could have required C&S to make an enforceable commitment not to close or sell any divested stores it purchased in Washington for a defined period following the Merger. Kroger proposed no such solutions, leaving an opening for Washington to argue in litigation that C&S would be free to sell or close stores post-divestiture.

**RESPONSE**: Denies the allegations contained in Paragraph 289.

290.  Kroger also could have offered to undertake constraints on its own post-Merger conduct in Washington. For example, Kroger could have entered an enforceable consent decree with regulators prohibiting it from setting prices above a benchmark calculated by reference to other Washington retailers' prices or, alternatively, Kroger's own prices in other geographic markets where it would face undisputedly strong post-Merger competition. There is strong precedent for comparable pricing commitments helping to obtain regulatory approval for mergers—for example, T-Mobile's agreement with state regulators to offer mobile plans with specific price caps following its merger with Sprint. Such a commitment likely would have alleviated regulators' concerns about the Merger leading to higher grocery prices in Washington. Kroger chose not to offer such remedies.

**RESPONSE**: Refers to the agreement between various state regulators and the third parties referenced in Paragraph 290 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 290.

291.  Unsurprisingly, after months of failing to address the Washington Attorney General's concerns, the office took action to block the Merger. On January 16, 2024, the State of Washington filed the first government enforcement action seeking to enjoin the Merger in Superior Court in Seattle. Washington alleged that

117

Kroger's 413-store package was "woefully inadequate to restore the competition lost" through the Merger. It likewise expressed serious doubts as to C&S's ability to operate and rebanner the divested stores in Washington and serve as a viable competitor in Washington markets—complaints it had repeatedly raised prior to its litigation.

**RESPONSE**:    Admits that on January 16, 2024, the Washington State Attorney General filed a Complaint in King County Superior Court (the "Washington Complaint"); refers to the Washington Complaint for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 291.

292.    Instead of responding to Washington's lawsuit by improving its divestiture package, Kroger largely disregarded the allegations in the lawsuit as well as C&S's and Albertsons' similar comments related to the lawsuit.

**RESPONSE**:  Denies the allegations contained in Paragraph 292.

**B.    Kroger Fails to Take Basic Steps to Address Regulator Concerns in Colorado, Leading to Colorado's Decision to Sue**

293.    As in Washington, Albertsons and Kroger had relatively high geographic overlap in Colorado. Accordingly, the Attorney General of Colorado was intently focused on the Merger and issued an extensive Civil Investigative Demand to the parties on June 23, 2023. The Parties understood the importance of addressing Colorado's concerns, yet Kroger again failed to do so—a failure that ultimately led the Colorado Attorney General to file its own lawsuit seeking to enjoin the Merger.

**RESPONSE**:    Admits there are certain geographically overlapping Albertsons and Kroger stores in Colorado, and that on June 23, 2023, the Colorado State Attorney General issued a Civil Investigative Demand; refers to the Civil Investigative Demand referenced in Paragraph 293 for a complete and accurate description of its contents; denies knowledge or information sufficient to form a

118

belief concerning what Albertsons "understood"; and otherwise denies the allegations contained in Paragraph 293.

294.    In September 2023, in the process of preparing a white paper for the Colorado Attorney General regarding the Merger's effects on local concentration in Colorado, Albertsons told Kroger that it expected the Colorado Attorney General to "quickly identify … deficiencies" with Kroger's proposed 413-store divestiture package because that divestiture would leave Kroger with "high post-merger local market shares" in several Colorado markets. Kroger did not modify its divestiture package in response to that feedback.

**RESPONSE**:    Admits that in or around September 2023, the Parties communicated regarding regulatory strategy, including interactions with the Colorado State Attorney General; and otherwise denies the allegations contained in Paragraph 294.

295.    Albertsons' prediction proved correct. Kroger and Albertsons met separately with Colorado Attorney General Phil Weiser and members of his staff on September 26, 2023, and October 17, 2023, respectively. The Colorado Attorney General expressed concerns about market concentration under Kroger's 413-store divestiture package, the list of stores to be divested, and whether C&S would operate the divested stores successfully.

**RESPONSE**:    Admits that at various points in time throughout 2023, the Parties met with the Colorado State Attorney General, including on September 26, 2023 and October 17, 2023; and otherwise denies the allegations contained in Paragraph 295.

296.    Attorney General Weiser personally voiced his skepticism about how the divestiture to C&S would perform. As his staff explained, the Attorney General's office was concerned about C&S's ability to operate the divested business, given the small scale of its existing grocery retail holdings; worried that C&S would resell the unprofitable stores it acquired; and questioned whether grocery retail would be a

119

priority for C&S. The Colorado regulators were also concerned about C&S's troubled relationship with unions. They further explained that they had a negative view of Kroger's proposal to transfer the Albertsons banner to C&S for use in Colorado, given that numerous other Albertsons-bannered stores in Colorado had previously closed or rebannered, leaving just two existing Albertsons stores in the entire state.

**RESPONSE**: Admits that at various points in time throughout the fall of 2023, the Parties met with the Colorado State Attorney General regarding the proposed divestiture; and otherwise denies the allegations contained in Paragraph 296.

297. Following up on its September 26, 2023 meeting with Kroger in a letter the next day, the Colorado Attorney General's office pressed Kroger to "mak[e] a full disclosure related to the divestiture" and "ensur[e] that the Colorado Attorney General has a fair opportunity to review the proposed divestiture," underscoring the urgency of the Colorado regulators' concerns about Kroger's divestiture plan.

**RESPONSE**: Admits that on September 27, 2023, the Colorado State Attorney General sent a letter to Kroger; refers to the letter referenced in Paragraph 297 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 297.

298. Kroger failed to resolve those concerns. On December 20, 2023—more than three months after Attorney General Weiser had personally met with Kroger— Arthur Biller of the Colorado Attorney General's Office participated in a call with the FTC, the Parties, and other state regulators. Biller highlighted outstanding problems with Kroger's divestiture package, including that it would not transfer Albertsons' Denver dairy plant to C&S; it failed to include certain popular Albertsons private brands; C&S would not receive the strong Safeway banner for use in Colorado; and the "the number of stores in Colorado" to be divested was "insufficient as a matter of scale and to address anticompetitive concerns." Albertsons pushed Kroger to improve its divestiture package to address all concerns

120

raised by the Colorado Attorney General and other regulators, but Kroger did not listen.

**RESPONSE**: Admits that on December 20, 2023, Kroger and Albertson had a call with the FTC and various state regulators regarding the proposed divestiture; and otherwise denies the allegations contained in Paragraph 298.

299. On February 7, 2024, after the Washington Attorney General had already sued to enjoin the Merger, Kroger and Albertsons each met separately with Attorney General Weiser. In those meetings, Weiser provided specific and detailed feedback on the remaining inadequacies of Kroger's divestiture strategy and new 541-store asset package. The Attorney General's Office voiced concerns regarding private labels, manufacturing capacity, and loyalty programs. Weiser was particularly concerned with how protracted and late the negotiations had become. Albertsons pleaded with Kroger to agree to a divestiture agreement that would address regulators' concerns, including the most recent issues stated by Attorney General Weiser pertaining to the Colorado area.

**RESPONSE**: Admits that on February 7, 2024, the Parties met with the Colorado State Attorney General regarding the proposed divestiture; and otherwise denies the allegations contained in Paragraph 299.

300. Kroger easily could have taken steps to resolve those concerns before the Colorado Attorney General filed suit. Kroger could have agreed at that time—as it ultimately did—to divest only Albertsons stores in Colorado. Kroger's subsequent 579-store divestiture proposal, which it did not agree to until more than two months after Colorado filed suit, see infra Section XV, contemplated divestiture of 91 of Albertsons' 105 stores in Colorado. Moreover, Kroger could have allayed the Colorado Attorney General's concerns about increased market concentration by divesting just two of the remaining 14 Albertsons stores—those in Colorado Springs and Pueblo—as these were the only Albertsons locations in markets with existing Kroger stores. Kroger did not offer to make these divestitures.

121

**RESPONSE**: Refers to the divestiture package referenced in Paragraph 300 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 300.

301. Kroger also easily could have taken steps to resolve the Colorado regulators' concerns about the post-Merger performance of the divested Colorado stores. Had Kroger selected a divestiture buyer with existing scale in Colorado and a track record of operating retail stores in the state, then the Colorado Attorney General's concerns about divested stores failing would have been lessened substantially. To the extent it divested any Colorado stores to C&S, Kroger could have better positioned C&S for success in Colorado by supplementing its proposed divestiture of private brands, banners, and other non-store assets. Kroger failed to make these improvements.

**RESPONSE**: Denies the allegations contained in Paragraph 301.

302. Kroger also could have addressed any remaining concerns through behavioral commitments that would govern Kroger, C&S, or both after closing of the Merger—for example, a commitment by C&S not to sell or close any divested stores in Colorado within a defined period after the Merger, or a commitment by Kroger not to raise prices in Colorado above a defined benchmark level. Again, Kroger did not do so.

**RESPONSE**: Denies the allegations contained in Paragraph 302.

303. Unsurprisingly, Kroger's continued failure to address Colorado's concerns led to another lawsuit. On February 9, 2024, the Attorney General of Colorado informed C&S that he believed that Kroger was not acting in good faith because it had designed the divestiture package to cause the divestiture to fail. The Attorney General also stated the obvious: these ongoing and substantial divestiture negotiations should have taken place in 2023. The Attorney General outlined what it saw as multiple deficiencies in the proposed divestiture package, including missing distribution centers, private label rights, banners, and access to loyalty data.

**RESPONSE**: Denies the allegations contained in Paragraph 303.

304. The next week, on February 14, 2024, the State of Colorado sued Kroger and Albertsons in state court in Colorado, alleging that the Merger was anticompetitive and seeking to enjoin it.

122

**RESPONSE**: Admits the allegations contained in Paragraph 304.

305.   The Colorado Attorney General also contended that Kroger's proposed divestiture of stores was "woefully insufficient to restore the competition" eliminated by the Merger. Moreover, the Colorado Attorney General asserted that Kroger's 413-store proposed package did not divest enough "infrastructure" to C&S to allow C&S to be a "viable competitor" in Colorado after the Merger. Colorado thus requested that the Court find the Merger unlawful under Colorado law and enjoin Kroger and Albertsons from consummating the transaction.

**RESPONSE**:   Refers to the State of Colorado Complaint (the "Colorado Complaint") for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 305.

306.   Specifically, the Colorado Attorney General alleged the following deficiencies with Kroger's proposed divestiture package, many of which C&S and Albertsons had urged Kroger to address in the preceding weeks and months:

   a.   It did not include enough stores in Colorado to give C&S "adequate scale to compete effectively and cure the anticompetitive effects of the" Merger;

   b.   There was a significant re-bannering risk as C&S would be "required to re-banner over 80% of divested stores across the country," including all but two in Colorado;

   c.   There was high integration risk since C&S is not acquiring a standalone business line;

   d.   C&S did "not have enough employees to run the business"; and

   e.   C&S was "not getting sufficient distribution assets across the country."

**RESPONSE**: Refers to the Colorado Complaint for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 306.

123

307.   By failing to act to address the Colorado Attorney General's concerns and to agree to a revised divestiture package within a reasonable time frame, Kroger missed the opportunity to avoid the Colorado lawsuit altogether.

**RESPONSE**:  Denies the allegations contained in Paragraph 307.

308.   These failures, as well as Kroger's failure to address the concerns raised by the Washington Attorney General, further illustrate Kroger's overall failure to take "any and all actions necessary to avoid, eliminate, and resolve … impediments under any Antitrust Law."

**RESPONSE**:  Denies the allegations contained in Paragraph 308.

## XV.    C&S Offers Kroger Another Path to Regulatory Approval, but Kroger Refuses

309.   After the three lawsuits were filed, C&S extended Kroger one final lifeline. On March 1, 2024, C&S sent Kroger a term sheet that responded to regulators' outstanding concerns. C&S offered to purchase a more highly concentrated package of stores in California, Nevada, and Washington and up to 650 stores in total. C&S also requested improved banners in key geographies, more robust distribution assets, improved IT and integration support, improved transition support, and improved private labels. C&S's offer thus represented a better path to avoid, eliminate, and resolve all impediments under antitrust law with respect to the Merger before the Outside Date.

**RESPONSE**:  Admits that on March 1, 2024, C&S sent a letter to Kroger with an attached term sheet; refers to the term sheet referenced in Paragraph 309 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 309.

310.   Despite Kroger's obligations to make expeditious "best efforts" and take "any and all actions" to remove any impediments to the Merger and the pending litigations to block the deal, Kroger rejected C&S's offer. Kroger stated that it would only accept the terms in the March 1 letter if C&S would pay "market price," i.e., several billion dollars more than C&S was willing to pay. Kroger's insistence that C&S pay the "market price" laid bare Kroger's willful rejection of its duty under the Merger Agreement to agree to a plan that would garner regulatory approval, whether

124

the financial terms favored Kroger or not. Kroger did not consult Albertsons before rejecting C&S's proposal.

**RESPONSE**: Admits that on March 1, 2024, Kroger sent a letter to C&S; refers to the letter referenced in Paragraph 310 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 310.

311.   Kroger then made a counteroffer of divestiture packages of either 564 or 613 stores—still short of the 650-store divestiture threshold set forth in the Merger Agreement and APA. Both of these offers would be under "the terms set forth in the APA," or in other words, the terms that failed to address critical non-store assets and other FTC concerns. As a result, and contrary to Albertsons' advice, Kroger's counterproposal suffered from many of the same issues C&S's offer was designed to fix—including the lack of geographic diversity among stores, which the FTC had stressed was a dealbreaker.

**RESPONSE**: Admits that on March 4, 2024, Kroger sent a counterproposal to C&S; refers to the counterproposal referenced in Paragraph 311 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 311.

312.   To illustrate the point, two days after Kroger rejected C&S's offer (without consulting Albertsons), Albertsons sent Kroger an analysis of the Hosken-Tenn diversion model GUPPI for each Kroger proposal, which laid bare the clear deficiencies in Kroger's latest offer. Whereas C&S's offer for 650 stores resulted in no stores with GUPPI calculations above 3.5% and only 45 stores with a GUPPI above 3%, Kroger's 613-store proposal resulted in 95 stores above a 3% GUPPI, 24 stores above 3.5%, two stores above 4%, and one store above 5%. C&S's proposal was far superior and went meaningfully further in addressing regulatory concerns about post-merger upward pricing pressure. This was especially the case in the local geographies regulators were most concerned about, including the areas around Dallas, Seattle, Las Vegas, Chicago, and Phoenix.

125

**RESPONSE**: Admits that on March 6, 2024, Albertsons sent a Hosken-Tenn diversion model GUPPI analysis to Kroger; refers to the analysis referenced in Paragraph 312 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 312.

313.    Nonetheless, on March 10, 2024, without consulting with Albertsons in good faith as required under the Merger Agreement, Kroger submitted to C&S a "Put Notice" for an additional 237 stores, on top of the same nonviable 413 stores identified in the APA, for a total of 650 stores. Although the number of stores had been increased, the mix of stores continued to be inadequate because Kroger was still employing a flawed methodology in store selection, which the FTC had informed Kroger it would not accept. Kroger's 650 stores were clearly deficient when compared to the 650 stores in C&S's offer, as they did not address local concentration or non-store assets nearly as comprehensively.[3] For example, C&S already would be required to re-banner nearly 80% of the stores in Kroger's 413-store package, and yet Kroger was adding additional stores that C&S would need to re-banner. Kroger also included limited distribution and back-office support to operate the 237 stores it was adding. Like Kroger's prior offers, this offer was take it or leave it. Further, when Albertsons tried to get clarity from Kroger about whether Kroger's economists had selected the new stores that were being added, Kroger would not clarify its methodology.

**RESPONSE**: Admits that on March 10, 2024, Kroger exercised a "Put Notice"; refers to the Put Notice referenced in Paragraph 313 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 313.

314.    C&S responded on March 15, 2024, refusing to purchase the 650 stores identified by Kroger. C&S observed, among other things, that Kroger's Put Notice did not address the local concentration concerns raised by regulators related to the

---

[3] For example, Kroger's package still resulted in eight stores above the 3.5% GUPPI threshold, including two stores above 4% and one above 5%, compared to zero stores above those thresholds in C&S's offer.

126

original 413-store divestiture package—the whole point of continuing to negotiate the divestiture while already defending against multiple litigations. Aspects of Kroger's proposal arguably made the divestiture package worse than even Kroger's own prior offers, because C&S would be required to rebanner more stores and because C&S was not being provided adequate distribution resources to service the additional stores. Simply put, adding additional stores onto an already deficient package would not resolve regulators' concerns about C&S's ability to enter and compete in the market.

**RESPONSE**: Admits that on March 15, 2024, C&S declined the "Put Notice"; refers to the response from C&S referenced in Paragraph 314 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 314.

315. Three days later, on March 18, 2024, Kroger sent a letter responding to C&S. In attempting to argue that C&S was required to comply with Kroger's Put Notice under the APA, Kroger admitted in substance that it had not lived up to its own obligations to Albertsons under the Merger Agreement. Kroger asserted that its 650-store Put Notice was "'reasonably likely to assist in obtaining' regulatory approval" because (1) by divesting more stores, it would "squarely address" the FTC's stated "concern with the "scale" of the divestiture operation," and (2) the Put Notice would also address the "regulatory concern" about distribution by divesting a distribution center Kroger previously sought to retain. In other words, Kroger conceded that its previous divestiture proposals—which included far fewer than 650 stores and failed to include the additional distribution center—fell short of what was needed to maximize the Merger's chance of regulatory approval, violating its obligation under the Merger Agreement to take "any and all actions" to remove antitrust impediments.

**RESPONSE**: Admits that on March 18, 2024, Kroger sent a letter to C&S; refers to the letter referenced in Paragraph 315 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 315.

127

316. Moreover, Kroger conceded that even the Put Notice proposal would not "resolve all regulatory concerns" because "other items remain[ed] on the regulators' list of concerns," including the concern that Kroger's divestiture would require C&S to undertake significant rebannering of divested stores. The Put Notice thus self-evidently failed to meet Kroger's obligations to Albertsons in the Merger Agreement. In the face of ongoing litigations, Kroger was required under the Merger Agreement to use its best efforts and to take any and all actions necessary to avoid, eliminate, and resolve any and all impediments under any antitrust law with respect to the Merger as promptly as practicable, and to take any and all actions to eliminate each and every impediment under any antitrust law to close the Merger before October 9, 2024. Yet, by its own admission, the Put Notice was not issued with the aim of resolving the FTC's remaining concerns.

**RESPONSE**: Admits that on March 18, 2024, Kroger sent a letter to C&S; refers to the letter referenced in Paragraph 316 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 316.

317. While admitting the deficiencies of Kroger's divestiture proposals, Kroger's March 18, 2024 letter also disclosed to C&S that Albertsons previously had communicated some of these deficiencies to Kroger. In that letter, Kroger noted that Albertsons had stated in a February 9, 2024 letter to Kroger that "[i]t is imperative that Kroger submit an updated proposal . . . at or near the 650-store limit." C&S—which had not been copied on Albertsons' February 9 letter—promptly requested a copy after receiving Kroger's March 18 letter. As Albertsons later stated in a March 28, 2024 letter to Kroger, it was "surprised" to see the "private[]" February 9 letter referenced in Kroger's March 18 letter to C&S. Regardless, there was no going back: Kroger not only had informed C&S that Albertsons had criticized Kroger's divestiture offers, but admitted in the same March 18 letter that those criticisms were valid.

**RESPONSE**: Admits that on March 18, 2024, Kroger sent a letter to C&S; refers to the letter referenced in Paragraph 317 for a complete and accurate

128

description of its contents; and otherwise denies the allegations contained in Paragraph 317.

318.    For the next week following Kroger's March 18 letter, Kroger and C&S negotiated Kroger's latest proposal. Kroger refused to make C&S an offer for the 650 stores and non-store assets that C&S requested.

**RESPONSE**:    Admits that Kroger and C&S exchanged correspondence following Kroger's March 18, 2024 letter to C&S; refers to the correspondence referenced in Paragraph 318 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 318.

319.    On March 25, 2024, Kroger sent C&S a new proposal, this time including only 579 stores. Kroger's new 579-store proposal was both smaller and less responsive to the FTC's stated concerns than the 650-store package C&S had proposed. The offer did not address local concentration issues nearly as well, and it provided for the transfer or temporary use of some additional non-store assets, but at a much lower level than C&S had requested on March 1, 2024. Specific geographies that the FTC had requested for Kroger to address remained under-addressed, including areas around Los Angeles, Las Vegas, Seattle, and San Diego. Kroger also did not agree to transfer banners that C&S had requested for months, including the Safeway banner, and it did not transfer plum private labels, like "Signature" and "O Organics."

**RESPONSE**:    Admits that on March 25, 2024, Kroger sent a letter to C&S; refers to the letter referenced in Paragraph 319 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 319.

320.    Albertsons warned Kroger that, yet again, its latest package did not go far enough in addressing the FTC's concerns and was not sufficient under its obligations. For example, Kroger's new proposal resulted in 59 stores above the 3% GUPPI threshold and 8 stores above the 3.5% threshold, compared to only 45 stores

129

above the 3% threshold in C&S's offer and no stores over the 3.5% threshold. Albertsons pleaded for Kroger to instead agree to the terms proposed by C&S on March 1, 2024. Kroger did not do so.

**RESPONSE**: Admits that at various points in time throughout 2023 and 2024, the Parties communicated regarding the proposed divestiture and the appropriate GUPPI threshold; and otherwise denies the allegations contained in Paragraph 320.

321. Because Kroger was unwilling to accept C&S's 650-store package, C&S responded with its own revised 579-store package. Even though C&S's package included the same number of stores that Kroger had insisted on, Kroger refused to entertain the stores C&S selected for that offer, again putting its own self-interest ahead of its commitment to take "any and all actions" necessary for regulatory approval

**RESPONSE**: Admits that C&S sent a counterproposal to Kroger with a 579-store divestiture package; refers to the counterproposal referenced in Paragraph 321 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 321.

322. Kroger and C&S continued to deliberate over a package of 579 stores and, on April 22, 2024, the Parties and C&S executed an Amended and Restated Asset Purchase Agreement ("A&R APA") for 579 stores. This final set of stores was proposed entirely by Kroger; C&S did not have an input into the final store selection. As the Washington Court later observed in its decision blocking the Merger, Kroger selected those stores to keep its highest-performing assets for itself.

**RESPONSE**: Admits that the Parties and C&S continued to negotiate over the divestiture package, and executed an Amended and Restated Asset Purchase Agreement (the "A&R APA") on April 22, 2024; refers to the Washington Opinion

130

for a complete and accurate description of its contents; and otherwise denies the

allegations contained in Paragraph 322.

323.   Moreover, as the Washington Court further explained, the A&R APA did not materially reduce the risks C&S would face in seeking to compete with Kroger post-Merger. To start, the Washington Court agreed with the Washington Attorney General that C&S would still be receiving a mix of Kroger and Albertsons stores, and Kroger still would not transfer to C&S the existing banners for many of those stores, requiring C&S to rebanner just two fewer stores than under the prior divestiture package. For example, the Court pointed out that Kroger refused to sell C&S rights to use the valuable Safeway banner in Washington, requiring C&S to rebanner Safeway stores under weaker brands such as Kroger's QFC immediately upon closing.

**RESPONSE**: Refers to the Washington Opinion for a complete and accurate

description of its contents; and otherwise denies the allegations contained in

Paragraph 323.

324.   Meanwhile, as the plaintiffs in all three lawsuits repeatedly pointed out, C&S would still receive the same private labels as under the original APA, exposing it to the same risk of losing customers loyal to the private labels Kroger would retain. While C&S would license certain legacy Kroger and Albertsons private labels after the Merger, those licenses would be non-exclusive and would last only a few years—potentially insufficient time to allow C&S to develop its own comprehensive portfolio of private labels.

**RESPONSE**: Refers to the testimony and evidence presented in the trial

records of the Antitrust Trials for a complete and accurate description of their

contents; and otherwise denies the allegations contained in Paragraph 324.

325.   As the plaintiffs also repeatedly argued, the A&R APA also failed to provide C&S with long-term data analytics, pricing, promotions, or customer loyalty capabilities, which C&S lacked. Similarly, C&S would need to complete a rapid, high-risk transition to new information technology systems, with only a limited period of technical support from Kroger.

131

**RESPONSE**: Refers to the A&R APA and to the testimony and evidence presented in the trial records of the Antitrust Trials for a complete and accurate description of their contents; and otherwise denies the allegations contained in Paragraph 325.

326. Albertsons expressed strong concerns about the 579-store proposal's ability to satisfy regulators' concerns before it was publicly announced. But Kroger refused to change its approach. Albertsons also urged Kroger to include the same "Put Notice" framework in the A&R APA as had been included the original APA, so that the package could be increased if the FTC disapproved of it. Kroger again pushed back, and the A&R APA ultimately only required the Parties to exercise "reasonable best efforts" to modify any provision, obligation, or agreement.

**RESPONSE**: Admits that at various points in time throughout 2023 and 2024, the Parties communicated regarding the proposed divestiture; refers to the A&R APA for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 326.

327. Kroger's refusal to consider viable paths toward regulatory approval suggested by both Albertsons and C&S laid bare that its ultimate goal was not to uphold its agreement to take "any and all actions" necessary for regulatory approval, but rather to maximize the profitability of any proposed divestiture package, even at the risk of jeopardizing regulatory approval and, thus, the Merger.

**RESPONSE**: Denies the allegations contained in Paragraph 327.

## XVI. During the Litigations to Enjoin the Merger, Kroger Continues Its Self-Serving Conduct

328. As the litigations progressed and in the weeks leading up to the FTC preliminary injunction hearing and state trials, Kroger continued to breach its obligations under the Merger Agreement. Kroger refused to cooperate with Albertsons to improve its divestiture package and ensure that its expert witness could support the Merger, in blatant violation of its obligations under the Merger Agreement to cooperate with Albertsons in good faith, and use reasonable best

132

efforts, make expeditious best efforts, and take any and all actions necessary to remove any impediment to closing the Merger.

**RESPONSE**: Denies the allegations contained in Paragraph 328.

329.   Kroger also failed to make meaningful non-divestiture commitments regarding post-Merger conduct that would address concerns about anticompetitive effects. Kroger could have made commitments regarding its post-Merger conduct, placed those commitments in binding contracts or consent decrees, and done so before litigation began—but it did not.

**RESPONSE**: Denies the allegations contained in Paragraph 329.

330.   For example, on February 13, 2024—after Washington and Colorado had filed suit, and shortly before the FTC sued—Kroger announced in a press release that if the Merger closed, it would invest $500 million in lowering grocery prices and $1.3 billion in improving Albertsons stores. Six months later, shortly before the trial on the FTC's preliminary injunction request, Kroger announced it would invest $1 billion in grocery price reductions, tacitly admitting its earlier promise to invest $500 million was too small by half. Kroger's delay in making its $1 billion price-reduction promise further demonstrated that it was prioritizing its own financial interests, not taking any and all actions to remove antitrust impediments to the Merger.

**RESPONSE**:  Admits that on February 13, 2024, Kroger issued a press release announcing it would make a $500 million investment in lowering prices and a $1.3 billion investment to improve former Albertsons's stores following the merger; refers to the press release referenced in Paragraph 330 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 330.

331.   Moreover, as Kroger CEO McMullen was later forced to admit at trial in the FTC action, and the Oregon Court observed in its decision, Kroger's eleventh-hour promises to invest in grocery price reductions and store improvements were not legally or contractually binding, making them vulnerable to regulators' litigation arguments that they could not be trusted. Even taking Kroger at its word, its promises

133

stopped short of a commitment to take all non-divestiture actions necessary to allay concerns about post-Merger price increases, wage reductions, and other potential anticompetitive effects. Kroger could have proposed a binding mechanism for these investments, such as a consent decree. It did not.

**RESPONSE**: Refers to Mr. McMullen's testimony in the trial record of the Oregon Litigation and to the Oregon Opinion for a complete and accurate description of their contents; and otherwise denies the allegations contained in Paragraph 331.

332. Similarly, Kroger had asserted to the FTC before litigation that "no stores will close as a result of the transaction" and "all frontline associates in the divested stores and distribution centers will remain employed," but it did not offer to put those commitments into a judicially enforceable consent decree so that state regulators could sue Kroger, C&S, or both if they broke their promises. Doing so would have directly addressed regulatory concerns that C&S lacked commitment to operating divested stores as viable competitors to Kroger. Regulators have previously accepted such commitments. As part of the FTC's settlement approving the $28 billion merger between Ahold and Delhaize Group, one of the divestiture buyers (Supervalu) agreed not to sell or otherwise convey certain divested assets without prior FTC approval. Similarly, state regulators' labor concerns about the merger between T-Mobile and Sprint were resolved through conduct remedies, including enforceable commitments that pre-merger T-Mobile and Sprint employees would receive offers of substantially similar employment with the surviving company and that divestiture buyer Dish Network would employ at least 2,000 people in Colorado. Despite these available precedents, Kroger did not offer any such commitments to regulators.

**RESPONSE**: Admits that Kroger stated that there would be no store closure or frontline staff laid off as a result of the Merger, and that Kroger communicated with the FTC prior to the commencement of litigation; refers to the FTC and various state's consent orders with the third parties referenced in Paragraph 332 for a complete and accurate description of their contents; and otherwise denies the allegations contained in Paragraph 332.

134

333. In a similar vein, Kroger could have promised to make its distribution centers and warehouses available to competitors and potential new entrants to relevant markets on a discounted basis. This would help ensure the continued strength of existing Kroger competitors and increase the ease of entry to markets in which Kroger operates. Federal regulators previously have accepted promises to make company assets available to competitors on a non-discriminatory basis as part of merger approval settlements. Again, Kroger did not even explore these possibilities.

**RESPONSE**: Refers to the other "merger approval settlements" referenced in Paragraph 333 for a complete and accurate description of their contents; and otherwise denies the allegations contained in Paragraph 333.

334. As litigation proceeded, the perceived deficiencies the FTC, state Attorneys General, C&S, and Albertsons had highlighted during negotiations were unsurprisingly front and center. The plaintiffs in all three lawsuits exploited Kroger's shortcomings, featuring them prominently in opening statements, during the evidence, and in closing. At trial, Kroger's expert was forced to concede that nearly two dozen geographic markets would have presumptively anticompetitive levels of concentration after the Merger, even accounting for the divestiture.

**RESPONSE**: Denies the allegations contained in Paragraph 334.

335. Unsurprisingly, the FTC focused a significant portion of the preliminary injunction hearing and post-trial briefing on the inadequacies of the divestiture package. That strategy was later replicated by Washington and Colorado in their respective trials.

**RESPONSE**: Refers to the testimony and evidence presented in the trial records of the Antitrust Trials for a complete and accurate description of their contents; and otherwise denies the allegations contained in Paragraph 335.

336. The FTC, along with Washington and Colorado, highlighted that Kroger picked a divestiture buyer without experience running a large grocery retail operation. They highlighted C&S's struggles as a buyer in prior divestitures and characterized C&S as a "retail liquidator" because of its history of closing stores after acquisitions when they became unprofitable. Indeed, it came out at trial that

135

Yael Cosset, a senior executive at Kroger who was heavily involved in divestiture planning, had communicated to others at Kroger that it was a "no brainer" to pick a different divestiture buyer over C&S. And the Washington Court expressly found that Kroger "selected C&S as the divestiture buyer over a buyer that other senior executives thought more capable."

**RESPONSE**: Refers to the testimony and evidence presented in the trial records of the Antitrust Trials and to the Oregon and Washington Opinions for a complete and accurate description of their contents; and otherwise denies the allegations contained in Paragraph 336.

337. The FTC and Washington highlighted that Kroger failed to provide C&S the banners or private labels it requested.

**RESPONSE**: Refers to the testimony and evidence presented in the trial records of the Antitrust Trials for a complete and accurate description of their contents; and otherwise denies the allegations contained in Paragraph 337.

338. And the FTC and Washington highlighted that Kroger, not C&S (or Albertsons), picked the stores to be divested. Due to Kroger's failure to consider C&S's and Albertsons' views during the process, the FTC was able to obtain an admission from C&S's CEO Eric Winn at the preliminary injunction hearing that "C&S [did not] have a role in selecting the 579 stores in" the final April 2024 package. In its closing arguments, Washington highlighted the example of one store that Kroger's management suggested be included in the divestiture package, but was vetoed by Kroger's CEO Rodney McMullen because the store was too valuable to Kroger.

**RESPONSE**: Refers to the testimony and evidence presented in the trial records of the Antitrust Trials for a complete and accurate description of their contents; and otherwise denies the allegations contained in Paragraph 338.

339. Also at the preliminary injunction hearing in Oregon, Kroger's own expert Dr. Israel agreed that Kroger's divestiture did not resolve all competitive

136

concerns—a "remarkable concession," as the FTC emphasized in its post-trial brief, that "alone dooms the divestiture." Instead of bolstering the case for the Merger as intended, because of Kroger's willful breach, Dr. Israel's testimony became a strong point for the FTC.

**RESPONSE**: Refers to the testimony and evidence presented in the trial records of the Antitrust Trials for a complete and accurate description of their contents; and otherwise denies the allegations contained in Paragraph 339.

## XVII. Kroger Rejects Albertsons' Offer to Provide Financial Support for an Improved Divestiture Proposal

340. In the midst of multiple trials to defend the Merger, Kroger further breached the Merger Agreement by rejecting assistance from Albertsons that could have materially advanced the Merger's prospects of success.

**RESPONSE**: Denies the allegations contained in Paragraph 340.

341. Albertsons recognized that Kroger's conduct toward regulators, both before and after the initiation of litigation, was indicative of buyer's remorse: Kroger appeared not to believe it was in its financial interest to offer a strong divestiture package that would include the necessary stores, banners, private labels, and other key assets that regulators would expect—despite its obligation to do so under the Merger Agreement. The contract placed this risk on Kroger and required it to make "any and all" necessary improvements to its divestiture package promptly, subject only to the 650-store limit. But Albertsons grew exasperated with Kroger's failure to live up to its contractual obligations, even after litigation was initiated. Albertsons thus decided to address what it perceived to be Kroger's financial incentives to disregard the contract. In discussions at the board level, Albertsons agreed to offer Kroger financial consideration—amounting, in effect, to a reduction of the purchase price for Albertsons under the Merger Agreement—of at least $1 per Albertsons share, or approximately $800 million in value. This money would be available to Kroger to add assets to its divestiture package so that it would better address regulatory concerns and comply with agency guidelines. Such improvements would materially improve the Merger's chance of success. For example, if Kroger used the additional resources to resolve all concerns raised by Washington and Colorado, it could end the litigation brought by those states and focus on negotiating a resolution with the FTC—which would then become far more achievable, even after the entry of any preliminary injunction in the FTC's litigation.

137

**RESPONSE**: Admits that at various points in time throughout 2024, the Parties met regarding the Merger and the proposed divestitures; and otherwise denies the allegations contained in Paragraph 341.

342. On September 13, 2024, Albertsons CEO Vivek Sankaran and its then-co-Chairman of the Board Chan Galbato spoke by telephone with Kroger CEO Rodney McMullen. Sankaran conveyed to McMullen that if improving the divestiture package to increase the Merger's odds of success required more investment, Albertsons would be willing to provide "material" support for it. McMullen shared this information with Kroger Senior Vice President Yael Cosset, who had primary responsibility for the Merger at that time. Albertsons' financial advisor also conveyed to Kroger's CEO and Kroger's counsel that Albertsons was prepared to contribute hundreds of millions of dollars—in the range of $1-2 per Albertsons share—to improve the divestiture package.

**RESPONSE**: Admits that at various points in time throughout 2024, senior executives from Kroger and Albertsons met regarding the Merger, including in or around September 2024; and otherwise denies the allegations contained in Paragraph 342.

343. No one at Kroger followed up on Albertsons' proposal.

**RESPONSE:** Denies the allegations contained in Paragraph 343.

344. Kroger's rejection of material financial support to improve its divestiture proposal on the eve of multiple injunctions to block the Merger was a further breach of the Merger Agreement. Not only was Kroger already obligated to divest up to 650 stores—of which its final divestiture proposal of 579 stores was still 71 short—Kroger was required to take any and all actions to improve its offer in additional ways, including with an improved mix of stores, non-store assets, and behavioral remedies. Albertsons' financial contribution could have subsidized any of these improvements, at no cost to Kroger. Yet, Kroger failed to take Albertsons up on its proposal or in any other way improve its divestiture proposal, demonstrating that Kroger's primary goal was not to close the Merger but to

138

maximize its own competitive advantage regardless of its impact on the Merger's fate.

**RESPONSE**:  Denies the allegations contained in Paragraph 344.

345. On September 25, 2024—almost two weeks after Albertsons' September 13 offer, a week after the FTC preliminary injunction hearing concluded, and while the Colorado and Washington trials were ongoing—Albertsons' general counsel emailed Kroger, copying Sankaran and Galbato. Albertsons again pleaded with Kroger to improve its divestiture proposal. Albertsons urged Kroger to divest the 33 stores needed to resolve the Washington Attorney General's local concentration concerns. Albertsons also told Kroger it should divest the four Albertsons stores in Colorado that were within ten miles of a Kroger store. Of those four stores, the first two—in Colorado Springs and Pueblo—needed to be divested to resolve the Colorado Attorney General's stated local concentration concerns. Beyond those, divesting two additional Colorado stores could give the Attorney General additional comfort about post-Merger competition, at minimal cost to Kroger. As Albertsons stressed, the resulting modified divestiture package addressing Washinton- and Colorado-specific concerns would improve meaningfully on Kroger's 579-store package while staying well within the 650-store limit. Kroger still did not act on this request.

**RESPONSE**:  Admits that the Parties exchanged correspondence following the conclusion of the FTC preliminary injunction hearing; refers to the correspondence referenced in Paragraph 345 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 345.

## XVIII. Kroger Undermines Its Litigation Defense Through Public Statements After Trial

346. After the FTC, Colorado, and Washington trials concluded, Kroger remained obligated to make expeditious "best efforts" and take "any and all actions" to prevail while awaiting the Courts' decisions. Yet, during Kroger's quarterly earnings call on December 5, 2024, with the Court decisions still outstanding, Kroger sabotaged its own defense by publicly walking back its representations to the relevant Courts about the Merger's procompetitive benefits.

139

**RESPONSE**: Avers that no response is required to the allegations contained in Paragraph 346 insofar as they purport to describe Albertsons's legal arguments or conclusions, and to the extent a response is required, denies those allegations; refers to the December 5, 2024 quarterly earnings call referenced in Paragraph 346 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 346.

347. On the earnings call, Kroger CEO McMullen volunteered in his prepared remarks that "regardless of the outcome of the trials, Kroger is operating from a position of strength" and "we don't need to do mergers to make our business successful." Those gratuitous statements contradicted Kroger's closing argument in the District of Oregon preliminary injunction hearing, where its counsel had represented to the Court that the Merger would be procompetitive because Kroger "needs the help of this merger to continue to succeed." Kroger's counsel had also described the Merger as a "fundamental imperative" to respond to the "existential threat to the corner grocery store" posed by competitors like Walmart, Costco, and Amazon. McMullen's comments on the December 2024 earnings call signaled that Kroger was not serious about its representations at trial. While undermining its defense of the Merger, those comments aligned with Kroger's ulterior motive to weaken Albertsons as a future competitor by implying to the market that Albertsons' value to Kroger had diminished.

**RESPONSE**: Refers to the December 5, 2024 quarterly earnings call referenced in Paragraph 347 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 347.

## XIX. Kroger's Failure to Abide by Its Contractual Obligations Results in the Merger Being Enjoined

348. As a direct result of Kroger's refusal to work with Albertsons in good faith and abide by its contractual obligations, the U.S. District Court for the District of Oregon enjoined the Merger on December 10, 2024. The State of Washington King County Superior Court also enjoined the merger on the same day.

140

**RESPONSE**:  Admits that on December 10, 2024, the United States District Court for the District of Oregon granted the FTC's motion for a preliminary injunction, and that the King County Superior Court enjoined the Merger; and otherwise denies the allegations contained in Paragraph 348.

349.  The Oregon Court found that the stores Kroger included in the divestiture package were insufficient. To that end, the Court repeatedly emphasized Kroger's economics expert's concession that at least 22 markets were presumptively anticompetitive, even after the divestiture. "This evidence, on its own," the Court held, "is sufficient to find that the divestiture will not mitigate the merger's anticompetitive effect such that it is no longer likely to substantially lessen competition."

**RESPONSE**:  Refers to the Oregon Opinion for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 349.

350.  The Oregon Court also criticized the non-store assets included in Kroger's divestiture package. For example, the Court credited Plaintiffs' suggestion that "C&S may not be receiving the most desirable banners" and noted that C&S would have to rebanner extensively, including introducing entirely new banners in a number of markets. The Court also emphasized that "C&S will have limited use of the Albertsons Signature and O Organics private label brands." And the Court credited Plaintiffs' expert's testimony that "because defendants will have a more robust loyalty program, customer data, and targeted advertising, C&S is vulnerable to having defendants target its customers after the merger." In short, as the Oregon Court put it, "[t]he structure of the divestiture package . . . creates many risks for C&S that could make it difficult to compete."

**RESPONSE**:  Refers to the Oregon Opinion for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 350.

141

351.   In addition, the Oregon Court endorsed the FTC's critiques of C&S as a divestiture buyer, finding that there were "serious concerns about C&S's ability to run a large-scale grocery business." In particular, the Court emphasized that "C&S does not have any experience running a large portfolio of retail grocery businesses," and that C&S's "past divestiture purchases have not been successful." The Court maintained that view even though C&S would have retained thousands of existing Kroger and Albertsons employees and executives. Those employees' "presence," the Court held, "does not fully mitigate C&S' inexperience and lack of success in grocery retail and cannot overcome the difficulties inherent to the selection of assets" Kroger included in its divestiture package.

**RESPONSE**:  Refers to the Oregon Opinion for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 351.

352.   The Washington Court identified many of the same deficiencies in Kroger's divestiture proposal. It found that, even if C&S succeeded in retaining all the pre-Merger sales of the divested stores, the Merger would lead to either 19 presumptively anticompetitive local markets in Washington (applying the FTC's 2010 merger guidelines) or 21 such markets (applying the 2023 version of the guidelines).

**RESPONSE**:  Refers to the Washington Opinion for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 352.

353.   As to the stores Kroger chose to include in its divestiture package, the Washington Court held that "Kroger kept the best performing assets for itself," including by "retaining the UVillage QFC store in Seattle because Kroger CEO Rodney McMullen personally requested that it not be divested due to its significant real estate value." As the Court found, "[w]here it could, Kroger followed a simple rule: if a store was a 'good EBITDA producer, . . . we wouldn't want to divest.'".

142

**RESPONSE**: Refers to the Washington Opinion for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 353.

354. Like the Oregon Court, the Washington Court credited the State's criticisms of C&S. The Washington Court concluded that "Kroger Picked an Inexperienced and Ill-Equipped Divestiture Buyer" and that "Kroger was well aware of C&S's limited retail capabilities when it selected C&S as the divestiture buyer." It further found that Kroger's proposed divestiture package would put C&S at a "competitive disadvantage" due to Kroger's poor selection of stores and its failure to provide adequate non-store assets including banners; private labels; pricing, promotions, and data analytics capabilities; and information technology.

**RESPONSE**: Refers to the Washington Opinion for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 354.

355. Section 7.1(b) of the Merger Agreement provides that the Merger cannot close over any preliminary, temporary, or permanent injunction issued by a Court. As such, the Oregon Court's preliminary injunction and the Washington Court's permanent injunction prohibited the closing from taking place.

**RESPONSE**: Avers that no response is required to the allegations contained in Paragraph 355 insofar as they purport to describe Albertsons's legal arguments or conclusions, and to the extent a response is required, denies those allegations; refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 355.

356. The Washington Court's permanent injunction, by itself, was an insurmountable barrier to closing the Merger. Appealing the ruling to the Washington Court of Appeals was off the table because that process would likely

143

take too long for Kroger and C&S to maintain the necessary financing arrangements to complete the Merger, even if any appeal were successful.

**RESPONSE**:  Denies the allegations contained in Paragraph 356.

357.   It was also too late to modify Kroger's proposed divestiture package in a way that could convince the Washington Court to vacate its own injunction and allow the Merger to proceed. The Washington Court's concerns were based, in significant part, on C&S itself as the divestiture buyer. At this late stage—more than a year after Kroger announced C&S as its sole divestiture buyer, and after the Merger had been enjoined by two courts—it was practically impossible for Kroger to recruit a new buyer for Washington stores and renegotiate its deal with C&S accordingly. Had Kroger pursued other alternatives, such as assembling a consortium of regionally strong divestiture buyers from the beginning, it might have had the flexibility to adjust the Washington divestiture in the wake of an injunction—but instead, it had insisted on choosing a single divestiture buyer and passed over candidates that were better positioned than C&S to absorb Washington stores.

**RESPONSE**:  Refers to the Washington Opinion for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 357.

358.   On top of the Washington Court's permanent injunction, the Oregon Court's preliminary injunction created a further obstacle to closing. Kroger's counsel previously had represented to the Oregon Court, during Kroger's opening statement at trial, that "this merger will not occur if this [preliminary] injunction is in place" because, among other issues, Kroger's and C&S's financing for the Merger would "expire[.]" Had the Oregon Court's preliminary injunction been the only injunction against the Merger, it might have been possible for Kroger and C&S to extend their financing until shortly after the January 2025 inauguration of President Donald Trump, which would potentially bring new FTC leadership and an opportunity to negotiate a settlement of the FTC's litigation that would allow the Merger to close. That hypothetical was academic, however, because the Washington Court's injunction was independently fatal and unaffected by the federal change of administration.

144

**RESPONSE**:  Refers to the transcript of Kroger's opening statement in the Oregon Litigation for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 358.

359.  In a January 2, 2025 statement concerning the District of Oregon decision, then-FTC Chair Lina Khan emphasized that the Commission under her leadership did not reflexively support or oppose mergers in general, but "continued to review carefully any proposed divestiture put before us" in connection with a proposed merger, rejecting divestitures that "failed to resolve the underlying competition harms or posed too high a risk of failure." In the case of Kroger's proposed divestiture to the FTC and other regulators, Chair Khan wrote that there were multiple "red flags" that Kroger refused to cure, including:

- (i)  "[c]omposition of the divested assets: whether the divestiture involves a hodgepodge of assets rather than a full, standalone business";

- (ii)  "[c]ompleteness of the divestiture: whether the divestiture resolves competition harms in each of the markets where the merger is presumptively illegal, or whether it leaves many markets unaddressed";

- (iii)  "[d]ivestiture buyer's experience: whether the buyer has a demonstrated record of successfully operating assets similar to those that it would be buying, or whether the buyer would be standing up entirely new or nascent lines of business";

- (iv)  "[s]ize of the divested assets relative to size of the divestiture buyer: whether the proposed divestiture would mean the buyer is drastically growing its holdings at a scale it has never before successfully operated"; and

- (v)  "[c]ontinued entanglements: whether the divestiture buyer would remain entangled with or dependent on the merged firm rather than function as a real rival and competitive check on day one."

These were the same criticisms that regulators had leveled against Kroger's divestiture package for over two years, first in negotiations and then in litigation. They were also among the issues the Washington and Oregon Courts identified in enjoining the Merger. Had Kroger addressed them, the Merger would have succeeded.

145

**RESPONSE**:    Refers to the statement by Lina Kahn referenced in Paragraph 359, and to the Oregon and Washington Opinions for a complete and accurate description of their contents; and otherwise denies the allegations contained in Paragraph 359.

## XX.    Albertsons Validly Terminates the Merger Agreement, but Kroger Refuses to Pay the Termination Fee

360.    For over two years, from when the Parties entered into the Merger Agreement on September 13, 2022 to the decision by the District of Oregon on December 10, 2024—even after the extended Outside Date for the Merger Agreement had passed—Albertsons performed all of its obligations under the Merger Agreement and worked diligently to close the Merger while holding its business in limbo, unable to pursue other strategic opportunities. Recognizing that the injunctions by the Oregon and Washington courts resulting from Kroger's conduct had made the Merger impossible to close, Albertsons exercised its right to terminate the Merger Agreement and move on with building its own future.

**RESPONSE**:  Admits that Albertsons purported to terminate the Merger Agreement on December 10, 2024; and otherwise denies the allegations contained in Paragraph 360.

361.    On December 10, 2024, Albertsons provided valid written notice to Kroger that Albertsons was terminating the Merger pursuant to Section 8.1(e) of the Merger Agreement. That termination was valid. Under Section 8.1(e), Albertsons had the unilateral right to terminate the Merger Agreement if the Merger did not close by the Outside Date, including all applicable extensions. Albertsons had validly extended the Outside Date to October 9, 2024, but it could not be extended further.

**RESPONSE**:  Admits that Albertsons purported to terminate the Merger Agreement on December 10, 2024; and otherwise denies the allegations contained in Paragraph 361.

146

362.    Under Sections 8.2 and 8.4(c) of the Merger Agreement, Albertsons' termination was effective when received, and it required Kroger to pay Albertsons the $600 million termination fee within two business days. The termination fee was thus due to Albertsons on December 12, 2024.

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 362.

363.    On December 11, 2024, Kroger asserted in a press release that Albertsons was "not entitled" to the termination fee and shortly thereafter sent Albertsons a letter stating that Kroger "will not" pay the Termination Fee, purportedly "on the ground that Albertsons is in breach of Section 6.3 of the Merger Agreement." Kroger's December 11, 2024 letter further purported to "provide[] notice that Kroger terminates the Merger Agreement pursuant to Sections 8.1(c) and 8.1(e)" of the Merger Agreement.

**RESPONSE**: Admits that Kroger issued a press release on December 11, 2024; refers to the press release referenced in Paragraph 363 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 363.

364.    On December 12, 2024, Albertsons sent Kroger a letter informing Kroger that its purported termination of the Merger Agreement was invalid. For one, there was no Merger Agreement left to terminate because Albertsons already had validly terminated it on December 10, 2024. Regardless, Kroger could not terminate the Merger Agreement under Sections 8.1(c) and 8.1(e) for multiple reasons, including Kroger's breaches of the Merger Agreement.

**RESPONSE**: Admits that on December 12, 2024, Albertsons sent a letter to Kroger; refers to that correspondence for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 364.

147

365.  Kroger failed to pay Albertsons the termination fee by December 12, 2024, as required by the Merger Agreement.

**RESPONSE**: Admits that Kroger did not pay Albertsons the termination fee because Albertsons is not entitled to it under the terms of the Merger Agreement; and otherwise denies the allegations contained in Paragraph 365.

366.  By refusing to pay Albertsons the $600 million termination fee within the contractually mandated two-day period, Kroger willfully breached its obligations under Sections 8.1(e) and 8.4(c) of the Merger Agreement.

**RESPONSE**: Denies the allegations contained in Paragraph 366.

367.  Kroger also became obligated, under Section 8.4(f) of the Merger Agreement, to pay interest, costs, and expenses to Albertsons, including the attorneys' fees and expenses expended by Albertsons in order to enforce payment of the termination fee.

**RESPONSE**: Denies the allegations contained in Paragraph 367.

## XXI.  Kroger's Thwarting the Merger Harms Albertsons

368.  Albertsons and its stockholders have suffered and will be reasonably certain to suffer harms as a result of Kroger's breaches of the Merger Agreement.

**RESPONSE**: Denies the allegations contained in Paragraph 368.

369.  *First*, Albertsons' stockholders are facing the loss of a considerable Merger premium that they expected to receive in return for Albertsons agreeing to enter into the Merger Agreement. Albertsons agreed to a transaction that valued the company at approximately $24.6 billion and would provide $34.10 per share in consideration to Albertsons' stockholders, representing a 32.8% premium over Albertsons' closing stock price of $25.67 on October 12, 2022, the day before news of the Merger became public. That loss to Albertsons' stockholders, totaling in the billions of dollars, is due directly and causally to Kroger's breach as are further stockholder losses that have followed.

**RESPONSE**: Denies the allegations contained in Paragraph 369.

148

370. *Second*, Albertsons invested years of time, energy, and resources to try to make the Merger a success. Albertsons hired scores of advisors from bankers to attorneys to economists to assist with all aspects of contract drafting, antitrust review, integration oversight, and investor relations, to the tune of millions of dollars in fees and costs. Albertsons also invested considerable energy and resources to integration work with Kroger, and millions more in legal and expert consulting fees to defend the Merger in multiple litigations. Albertsons continued to perform and stand ready to close even after the passage of the Outside Date. Those are all sunk costs.

**RESPONSE**: Denies the allegations contained in Paragraph 370.

371. *Third*, Albertsons has put itself at a competitive disadvantage vis-à-vis one of its largest competitors—Kroger—which has had an up-close look into almost every aspect of Albertsons' business, and other rivals, which have had two and a half years to invest and innovate while Albertsons was stuck in a standstill as a result of the Merger. Under Section 6.1(a) of the Merger Agreement, Albertsons was prohibited from "conduct[ing] its business and the business of the Company Subsidiaries other than in the ordinary course consistent with past practices in any material respect." The operating covenants forced Albertsons to consult with Kroger on a litany of business decisions. As a result, for the past two years, Albertsons has been constrained in making any material changes in how it allocates existing capital and investments. The only exceptions to this stand-still requirement are if the change meets a limited category of exceptions or if Albertsons reveals its innovative strategies to Kroger and Kroger consents—which has its own downsides for Albertsons. Due to these terms, Albertsons largely has been unable to react to and address changes in the grocery sector, such as the growing use of digital media and the increased competitiveness of ethnically-focused grocery stores. Now, without the Merger, Albertsons is left to play catch up in an increasingly crowded field. And, in instances where Albertsons sought Kroger's consent to make changes to its business or pay employees retention bonuses not contemplated by existing employment agreements to retain key personnel, Kroger refused, causing loss of personnel. Albertsons agreed to the limitations in Section 6.1 only because Kroger had committed to use its best efforts and take any and all actions to remove regulatory impediments to closing the Merger as promptly as practicable—commitments Kroger breached.

149

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 371.

372. In addition to abusing its veto power over Albertsons' ability to make significant strategic decisions, Kroger used its position as the proposed buyer to denigrate Albertsons and weaken its competitive position—for example, by telling the market during Kroger's December 5, 2024 earnings call that Kroger did not "need" Albertsons for the future of its business, despite having publicly represented the opposite in antitrust litigation.

**RESPONSE**: Refers to the December 5, 2024 quarterly earnings call referenced in Paragraph 372 for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 372.

373. *Fourth*, and relatedly, the failure of the Merger leaves Albertsons facing the very dilemma the Merger was intended to solve: how to better compete with grocery titans like Walmart, Costco, Amazon, and Target. Albertsons has lost out on the ability to pursue competitive advantages and synergies like those that would have resulted from the Merger. As Albertsons' counsel explained in open court, lacking similar economies of scale, Albertsons is unable to offer prices as low as its competitors. Kroger and Albertsons had anticipated synergies in the billions of dollars as a result of supply chain and manufacturing consolidation, procurement optimization, new opportunities for brands and private labels, and optimization of certain corporate and back-office support. Albertsons and Kroger had also anticipated significant new revenue from new projects like a national advertisement platform. Without the Merger, Albertsons will be forced to recalibrate its strategy to attempt to achieve the kinds of benefits the Merger would have afforded.

**RESPONSE**: Admits that Kroger anticipated realizing certain synergies if the merger was consummated; refers to the transcript from the Antitrust Trial that contains Albertsons counsel's statement for a complete and accurate description of their contents; and otherwise denies the allegations contained in Paragraph 373.

150

## COUNT I

### (Breach of Contract, Merger Agreement § 6.3(a))

374.    Albertsons repeats and incorporates all of the allegations set forth in the preceding paragraphs as if they are fully set forth herein.

**RESPONSE**:  Repeats and incorporates the responses to Paragraphs 1-373 as if they are fully set forth herein.

375.    Albertsons and Kroger entered into the Merger Agreement.

**RESPONSE**:  Admits the allegations contained in Paragraph 375.

376.    The Merger Agreement is a binding contract.

**RESPONSE**:  Admits the allegations contained in Paragraph 376.

377.    Albertsons performed all its obligations under the Merger Agreement.

**RESPONSE**:  Denies the allegations contained in Paragraph 377.

378.    Section 6.3(a) of the Merger Agreement required Kroger to use its reasonable best efforts to "take or cause to be taken all actions . . . necessary, proper or advisable to cause the conditions to the Closing to be satisfied as promptly as reasonably practicable and to eliminate, and resolve any and all impediments under any Antitrust Law with respect to the Transactions."

**RESPONSE**:  Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 378.

379.    Through the actions and inactions described above, Kroger failed to use its reasonable best efforts to take the actions necessary to satisfy Closing conditions as promptly as reasonably practicable and eliminate any and all impediments under any antitrust law. Those actions include, but are not limited to, Kroger's inadequate 238-store offer, Kroger mismanaging the process of identifying a divestiture buyer, Kroger's inadequate 413-store offer, Kroger's inadequate 510-store offer, Kroger's inadequate 541-store offer, Kroger declining C&S's 650-store offer, Kroger entering

151

into an insufficient A&R APA, Kroger refusing to supplement the A&R APA, Kroger generally failing to develop an adequate divestiture package in the more than two years since the Merger Agreement was signed, and Kroger failing to commit to constraints on its future operations that would address any concerns about anticompetitive effects of the Merger.

**RESPONSE**: Denies the allegations contained in Paragraph 379.

380.  Through the actions and inactions described above, Kroger materially breached the Merger Agreement.

**RESPONSE**: Denies the allegations contained in Paragraph 380.

381.  Section 1.1 of the Merger Agreement defines "Willful Breach" as a "material breach … that is the consequence of an act or omission by the breaching [P]arty with the actual knowledge that the taking of such act (or, in the case of an omission, failure to take such act) would cause or constitute such material breach, regardless of whether breaching was the object of the act or failure to act."

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 381.

382.  Kroger's breach of Section 6.3(a) of the Merger Agreement constituted a Willful Breach. Kroger had actual knowledge that its actions and inactions violated the Merger Agreement and would make securing regulatory approval less likely. Kroger chose to pursue its own economic interests by trying to hold on to as many valuable assets as it could through the Merger and divestiture, instead of striving to secure regulatory approval of the Merger, despite clear and consistent feedback from the FTC, the state Attorneys General, C&S, and Albertsons that its approach was unlikely to lead to regulatory approval.

**RESPONSE**: Denies the allegations contained in Paragraph 382.

383.  Kroger's willful breach of the "reasonable best efforts" provision of the Merger Agreement has caused and continues to cause significant damages to Albertsons.

**RESPONSE**: Denies the allegations contained in Paragraph 383.

152

384.    Kroger's willful breach of the "reasonable best efforts" provision of the Merger Agreement has caused and continues to cause irreparable harm to Albertsons.

**RESPONSE**: Denies the allegations contained in Paragraph 384.

385.    Kroger's willful breach of the "reasonable best efforts" provision of the Merger Agreement caused Albertsons to spend over two painstaking years attempting to consummate the Merger. During that time, Albertsons suffered uncertainty regarding its future dealings, employee flight, investor doubts, and harm to its brand, and Albertsons was forced to forgo other strategic projects as it attempted to salvage the Merger.

**RESPONSE**: Denies the allegations contained in Paragraph 385.

## COUNT II

### (Breach of Contract, Merger Agreement § 6.3(d))

386.    Albertsons repeats and incorporates all of the allegations set forth in the preceding paragraphs as if they are fully set forth herein.

**RESPONSE**: Repeats and incorporates the responses to Paragraphs 1-385 as if they are fully set forth herein.

387.    Albertsons and Kroger entered into the Merger Agreement.

**RESPONSE**: Admits the allegations contained in Paragraph 387.

388.    The Merger Agreement is a binding contract.

**RESPONSE**: Admits the allegations contained in Paragraph 388.

389.    Albertsons performed all its obligations under the Merger Agreement.

**RESPONSE**: Denies the allegations contained in Paragraph 389.

390.    Section 6.3(d) of the Merger Agreement required Kroger to use its "best efforts to take, or cause to be taken, any and all actions necessary to avoid, eliminate, and resolve any and all impediments under any Antitrust Law with respect to the Transactions . . . as promptly as practicable."

153

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 390.

391.    Through the actions and inactions described above, Kroger failed to use its best efforts to avoid, eliminate, and resolve any and all impediments under the antitrust law as promptly as practicable. Those actions include, but are not limited to, Kroger's inadequate 238-store offer, Kroger mismanaging the process of identifying a divestiture buyer, Kroger's inadequate 413-store offer, Kroger's inadequate 510-store offer, Kroger's inadequate 541-store offer, Kroger declining C&S's 650-store offer, Kroger entering into an insufficient A&R APA, Kroger refusing to supplement the A&R APA, Kroger generally failing to develop an adequate divestiture package in the more than two years since the Merger Agreement was signed, and Kroger failing to commit to constraints on its future operations that would address any concerns about anticompetitive effects of the Merger.

**RESPONSE**: Denies the allegations contained in Paragraph 391.

392.    Through the actions and inactions described above, Kroger materially breached the Merger Agreement.

**RESPONSE**: Denies the allegations contained in Paragraph 392.

393.    Section 1.1 of the Merger Agreement defines "Willful Breach" as a "material breach … that is the consequence of an act or omission by the breaching [P]arty with the actual knowledge that the taking of such act (or, in the case of an omission, failure to take such act) would cause or constitute such material breach, regardless of whether breaching was the object of the act or failure to act."

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 393.

394.    Kroger's breach of Section 6.3(d) of the Merger Agreement constituted a Willful Breach. Kroger had actual knowledge that its actions and inactions violated the Merger Agreement and would make securing regulatory approval less likely. Kroger chose to pursue its own economic interests by trying to hold on to as many

154

valuable assets as it could through the Merger and divestiture, instead of striving to secure regulatory approval of the Merger, despite clear and consistent feedback from the FTC, the state Attorneys General, C&S, and Albertsons that its approach was unlikely to lead to regulatory approval.

**RESPONSE**: Denies the allegations contained in Paragraph 394.

395.  Kroger's willful breach of the "best efforts" provision of the Merger Agreement has caused and continues to cause significant damages to Albertsons.

**RESPONSE**: Denies the allegations contained in Paragraph 395.

396.  Kroger's willful breach of the "best efforts" and provision of the Merger Agreement has caused and continues to cause irreparable harm to Albertsons.

**RESPONSE**: Denies the allegations contained in Paragraph 396.

397.  Kroger's willful breach of the "best efforts" provision of the Merger Agreement caused Albertsons to spend over two painstaking years attempting to consummate the Merger. During that time, Albertsons suffered uncertainty regarding its future dealings, employee flight, investor doubts, harm to its brand, and Albertsons was forced to forgo other strategic projects as it attempted to salvage the Merger.

**RESPONSE**: Denies the allegations contained in Paragraph 397.

## COUNT III
### (Breach of Contract, Merger Agreement § 6.3(e))

398.  Albertsons repeats and incorporates all of the allegations set forth in the preceding paragraphs as if they are fully set forth herein.

**RESPONSE**: Repeats and incorporates the responses to Paragraphs 1-397 as if they are fully set forth herein.

399.  Albertsons and Kroger entered into the Merger Agreement.

**RESPONSE**: Admits the allegations contained in Paragraph 399.

400.  The Merger Agreement is a binding contract.

155

**RESPONSE**: Admits the allegations contained in Paragraph 400.

401.   Albertsons performed all its obligations under the Merger Agreement.

**RESPONSE**: Denies the allegations contained in Paragraph 401.

402.   Section 6.3(e) of the Merger Agreement required Kroger to "take any and all actions . . . to eliminate each and every impediment under any Antitrust Law to close the" Merger before the October 9, 2024 Outside Date if a proceeding is instituted or threatened challenging the Merger as violating any antitrust law.

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 402.

403.   One or more proceedings were threatened, and then instituted, that challenged the Merger on the grounds that it violated the antitrust laws.

**RESPONSE**: Admits the allegations contained in Paragraph 403.

404.   Through the actions and inactions described above, Kroger failed to take any and all actions to eliminate each and every impediment under any antitrust law to close the Merger before the October 9, 2024 Outside Date. Those actions include, but are not limited to, Kroger's inadequate 238-store offer, Kroger mismanaging the process of identifying a divestiture buyer, Kroger's inadequate 413-store offer, Kroger's inadequate 510-store offer, Kroger's inadequate 541-store offer, Kroger declining C&S's 650-store offer, Kroger entering into an insufficient A&R APA, Kroger refusing to supplement the A&R APA, Kroger generally failing to develop an adequate divestiture package in the more than two years since the Merger Agreement was signed, and Kroger failing to commit to constraints on its future operations that would address any concerns about anticompetitive effects of the Merger.

**RESPONSE**: Denies the allegations contained in Paragraph 404.

405.   Through the actions and inactions described above, Kroger materially breached the Merger Agreement.

**RESPONSE**: Denies the allegations contained in Paragraph 405.

156

406. Section 1.1 of the Merger Agreement defines "Willful Breach" as a "material breach ... that is the consequence of an act or omission by the breaching [P]arty with the actual knowledge that the taking of such act (or, in the case of an omission, failure to take such act) would cause or constitute such material breach, regardless of whether breaching was the object of the act or failure to act."

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 406.

407. Kroger's breach of Section 6.3(e) of the Merger Agreement constituted a Willful Breach. Kroger had actual knowledge that its actions and inactions violated the Merger Agreement and would make securing regulatory approval less likely. Kroger chose to pursue its own economic interests by trying to hold on to as many valuable assets as it could through the Merger and divestiture, instead of striving to secure regulatory approval of the Merger, and despite clear and consistent feedback from the FTC, the state Attorneys General, C&S, and Albertsons that its approach was unlikely to lead to regulatory approval.

**RESPONSE**: Denies the allegations contained in Paragraph 407.

408. Kroger's breach of the "any and all actions" provision of the Merger Agreement has caused and continues to cause significant damages to Albertsons.

**RESPONSE**: Denies the allegations contained in Paragraph 408.

409. Kroger's breach of the "any and all actions" provision of the Merger Agreement has caused and continues to cause irreparable harm to Albertsons.

**RESPONSE**: Denies the allegations contained in Paragraph 409.

410. Kroger's breach of the "any and all actions" provision of the Merger Agreement caused Albertsons to spend over two painstaking years attempting to consummate the Merger. During that time, Albertsons suffered uncertainty regarding its future dealings, employee flight, investor doubts, harm to its brand, and Albertsons was forced to forgo other strategic projects as it attempted to salvage the Merger.

**RESPONSE**: Denies the allegations contained in Paragraph 410.

157

## COUNT IV

### (Breach of Contract, Merger Agreement § 6.3(b))

411.   Albertsons repeats and incorporates all of the allegations set forth in the preceding paragraphs as if they are fully set forth herein.

**RESPONSE**:  Repeats and incorporates the responses to Paragraphs 1-410 as if they are fully set forth herein.

412.   Albertsons and Kroger entered into the Merger Agreement.

**RESPONSE**:  Admits the allegations contained in Paragraph 412.

413.   The Merger Agreement is a binding contract.

**RESPONSE**:  Admits the allegations contained in Paragraph 413.

414.   Albertsons performed all its obligations under the Merger Agreement.

**RESPONSE**:  Denies the allegations contained in Paragraph 414.

415.   Section 6.3(b) of the Merger Agreement required Kroger to "work together in good faith" with Albertsons to resolve any disagreements regarding regulatory strategy.

**RESPONSE**:  Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 415.

416.   Through the actions and inactions described above, Kroger failed to "work together in good faith" with Albertsons to resolve any disagreements regarding regulatory strategy.

**RESPONSE**:  Denies the allegations contained in Paragraph 416.

417.   Through the actions and inactions described above, Kroger materially breached the Merger Agreement.

158

**RESPONSE**: Denies the allegations contained in Paragraph 417.

418.   Section 1.1 of the Merger Agreement defines "Willful Breach" as a "material breach … that is the consequence of an act or omission by the breaching [P]arty with the actual knowledge that the taking of such act (or, in the case of an omission, failure to take such act) would cause or constitute such material breach, regardless of whether breaching was the object of the act or failure to act."

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 418.

419.   Kroger's breach of Section 6.3(b) of the Merger Agreement constituted a Willful Breach. Kroger had actual knowledge that, by refusing to work together in good faith with Albertsons, it was violating the Merger Agreement and making it less likely that the Parties would secure regulatory approval of the Merger. Kroger chose to pursue its own economic interests by trying to hold on to as many valuable assets as it could through the Merger and divestiture process.

**RESPONSE**: Denies the allegations contained in Paragraph 419.

420.   Kroger's willful breach of the "good faith" provision of the Merger Agreement has caused and continues to cause significant damages to Albertsons.

**RESPONSE**: Denies the allegations contained in Paragraph 420.

421.   Kroger's willful breach of the "good faith" provision of the Merger Agreement has caused and continues to cause irreparable harm to Albertsons.

**RESPONSE**: Denies the allegations contained in Paragraph 421.

422.   Kroger's willful breach of the "good faith" provision of the Merger Agreement caused Albertsons to spend over two painstaking years attempting to consummate the Merger. During that time, Albertsons suffered uncertainty regarding its future dealings, employee flight, investor doubts, harm to its brand, and Albertsons was forced to forgo other strategic projects as it attempted to salvage the Merger.

**RESPONSE**: Denies the allegations contained in Paragraph 422.

159

## COUNT V

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

423.   Albertsons repeats and incorporates all of the allegations set forth in the preceding paragraphs as if they are fully set forth herein.

**RESPONSE**:  Repeats and incorporates the responses to Paragraphs 1-422 as if they are fully set forth herein.

424.   Albertsons and Kroger entered into the Merger Agreement. The Merger Agreement is a binding contract.

**RESPONSE**:  Admits the allegations contained in Paragraph 424.

425.   The purpose of the Merger Agreement was to benefit both Kroger and Albertsons and to create a combined entity better positioned to compete against rivals like Walmart, Costco, Target, and Amazon—not to give Kroger a competitive advantage over Albertsons.

**RESPONSE**:  Admits that a purpose of the Merger Agreement was to benefit Kroger—the surviving company—by enabling it to more effectively compete, including against competitors such as Walmart, Costco, Target, and Amazon; and otherwise denies the allegations contained in Paragraph 425.

426.   Pursuant to the implied covenant of good faith and fair dealing, Kroger had an implied duty not to use its position under the Merger Agreement as the putative buyer, and the party responsible for leading the development and implementation of the strategy to obtain regulatory approval, to damage Albertsons. Kroger was obligated to work in good faith toward regulatory approval for the Merger.

**RESPONSE**:  Denies the allegations contained in Paragraph 426.

427.   Kroger willfully inflicted competitive harm on Albertsons as part of a broader effort to prioritize Kroger's financial interests at the expense of its express and implied obligations to Albertsons under the Merger Agreement. Kroger dragged

160

out the regulatory process for more than two years, knowing that its regulatory strategy put the Merger at risk. During that period, Albertsons suffered uncertainty regarding its future dealings, employee flight, investor doubts, and harm to its brand, and Albertsons was forced to forgo other strategic projects as it attempted to salvage the Merger.

**RESPONSE**: Denies the allegations contained in Paragraph 427.

428.  Kroger further sought to harm Albertsons as a competitor by denigrating Albertsons in public communications regarding the Merger, including Kroger's comments during its December 5, 2024 earnings call that Kroger no longer "need[ed]" Albertsons.

**RESPONSE**: Denies the allegations contained in Paragraph 428.

429.  Kroger's bad faith actions and inaction violated the covenant of good faith and fair dealing that is implied in the Merger Agreement. Those actions and omissions deprived Albertsons of the benefit of its bargain with Kroger because they prevented the Merger Agreement from being consummated and prolonged the period during which the Merger was under regulatory review.

**RESPONSE**: Denies the allegations contained in Paragraph 429.

## COUNT VI
### (Breach of Contract, Merger Agreement § 8.4)

430.  Albertsons repeats and incorporates all of the allegations set forth in the preceding paragraphs as if they are fully set forth herein.

**RESPONSE**: Repeats and incorporates the responses to Paragraphs 1-429 as if they are fully set forth herein.

431.  Albertsons and Kroger entered into the Merger Agreement.

**RESPONSE**: Admits the allegations contained in Paragraph 431.

432.  The Merger Agreement is a binding contract.

**RESPONSE**: Admits the allegations contained in Paragraph 432.

161

433.   Albertsons performed all its obligations under the Merger Agreement.

**RESPONSE**: Denies the allegations contained in Paragraph 433.

434.   Section 8.1(e) of the Merger Agreement provides that a Party may terminate the Merger Agreement if the Merger does not close before the Outside Date and the failure to close was not primarily due to that Party's material breach.

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 434.

435.   Section 8.2 of the Merger Agreement provides that written notice shall be given to the other Party to effect termination and that such notice will be effective immediately upon delivery to the other Party, without any further action.

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 435.

436.   Under Section 8.4(c) and (d) of the Merger Agreement, Kroger is required to pay Albertsons a $600 million termination fee within two business days of Albertsons terminating the Merger Agreement.

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 436.

437.   Under Section 8.4(f) of the Merger Agreement, if a Party that is required to pay the termination fee fails to do so promptly as required within the Merger Agreement, interest shall accrue at the amount and under the terms sets forth in the Merger Agreement and that Party that fails to pay the termination fee shall be responsible for its counterparty's costs and expenses incurred in a proceeding to enforce payment of the termination fee, including attorneys' fees and expenses.

162

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 437.

438.  Both Parties have recognized and set forth in Section 8.4(f) of the Merger Agreement that Section 8.4 is an "integral part" of the Merger Agreement.

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 438.

439.  The Merger did not close on or before the Outside Date, and the failure of the Merger to close on or before the Outside Date was not due to any breach of the Merger Agreement by Albertsons.

**RESPONSE**: Admits that the Merger did not close on or before the Outside Date, and otherwise denies the allegations contained in Paragraph 439.

440.  On December 10, 2024, Albertsons terminated the Merger Agreement as set forth under Section 8.1(e) by providing written notice of its termination to counsel for Kroger. That notice was effective immediately upon its delivery to Kroger.

**RESPONSE**: Admits that Albertsons purported to terminate the Merger Agreement on December 10, 2024; and otherwise denies the allegations contained in Paragraph 440.

441.  After Albertsons gave notice of termination, which was effectively immediately, two business days passed, and Kroger did not pay the termination fee and other expenses.

163

**RESPONSE**:  Admits Kroger did not pay Albertsons the termination fee because Albertsons is not entitled to it under the terms of the Merger Agreement; and otherwise denies the allegations contained in Paragraph 441.

442.   No demand for payment or any other action by Albertsons is required to be entitled to payment of the termination fee, and payment of the termination fee is an integral part of the Merger Agreement.

**RESPONSE**:  Denies the allegations contained in Paragraph 442.

443.   Through the actions and inactions described above, Kroger breached the Merger Agreement.

**RESPONSE**:  Denies the allegations contained in Paragraph 443.

444.   Kroger's breach of the termination provisions of the Merger Agreement has caused and continues to cause significant damages to Albertsons.

**RESPONSE**:  Denies the allegations contained in Paragraph 444.

## COUNT VII
### (Declaratory Judgment)

445.   Albertsons repeats and incorporates all of the allegations set forth in the preceding paragraphs as if they are fully set forth herein.

**RESPONSE**:  Repeats and incorporates the responses to Paragraphs 1-444 as if they are fully set forth herein.

446.   Albertsons and Kroger entered into the Merger Agreement.

**RESPONSE**:  Admits the allegations contained in Paragraph 446.

447.   The Merger Agreement is a binding contract.

**RESPONSE**:  Admits the allegations contained in Paragraph 447.

448.   Albertsons performed all its obligations under the Merger Agreement.

164

**RESPONSE**: Denies the allegations contained in Paragraph 448.

449. An actual controversy exists between Albertsons and Kroger concerning whether Kroger has a right to terminate the Merger Agreement. In a letter to Albertsons dated December 11, 2024, Kroger purported to terminate the Merger Agreement pursuant to Sections 8.1(c) and 8.1(e). On December 12, 2024, Albertsons sent Kroger a letter informing Kroger that its purported termination of the Merger Agreement was invalid.

**RESPONSE**: Admits that on December 11, 2024, Kroger sent a letter to Albertsons terminating the Merger Agreement and that on December 12, Albertsons sent a letter to Kroger; refers to the correspondence referenced in Paragraph 449 for a complete and accurate description of their contents; and otherwise denies the allegations contained in Paragraph 449.

450. Section 8.1(c) of the Merger Agreement provides that Kroger may terminate the Merger Agreement only if: (1) Albertsons has committed a breach of the Merger Agreement that would result in the failure of a closing condition set forth in Section 7.3(a) or Section 7.3(b); (2) the breach by Albertsons must be "incapable of being cured or, if capable of being cured, is not cured by the earlier of (x) the Outside Date or (y) thirty (30) days following receipt by [Albertsons] of notice of such breach from [Kroger]"; and (3) Kroger is not "in breach" of the Merger Agreement in such a way as "would result in the failure of a condition set forth in Section 7.2(a) or Section 7.2(b)." Section 7.2(b) conditions closing of the Merger on Kroger having "duly performed and complied … in all material respects" with all of its pre-closing "agreements and covenants."

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 450.

451. Albertsons did not commit any breach of the Merger Agreement that would result in the failure of a closing condition set forth in Section 7.3(a) or Section 7.3(b). Alternatively, if Albertsons committed such a breach, the breach was cured

165

by the earlier of the Outside Date or thirty days following receipt by Albertsons of notice of such breach from Kroger.

**RESPONSE**: Denies the allegations contained in Paragraph 451.

452. As set forth in the preceding paragraphs, including the preceding Counts, Kroger committed multiple breaches of the Merger Agreement. Those breaches by Kroger caused the failure of the closing condition set forth in Section 7.2(b).

**RESPONSE**: Denies the allegations contained in Paragraph 452.

453. Kroger never cured or removed the conditions that prevented it from terminating the Merger Agreement.

**RESPONSE**: Denies the allegations contained in Paragraph 453.

454. Accordingly, Kroger's purported termination of the Merger Agreement under Section 8.1(c) is invalid.

**RESPONSE**: Denies the allegations contained in Paragraph 454.

455. Section 8.1(e) of the Merger Agreement provides that a Party may terminate the Merger Agreement if the Merger does not close before the Outside Date and the failure to close was not primarily due to that Party's material breach.

**RESPONSE**: Refers to the Merger Agreement for a complete and accurate description of its contents; and otherwise denies the allegations contained in Paragraph 455.

456. As set forth in the preceding paragraphs, including the preceding Counts, Kroger committed multiple material breaches of the Merger Agreement.

**RESPONSE**: Denies the allegations contained in Paragraph 456.

457. Albertsons did not commit any material breach of the Merger Agreement. Alternatively, any material breach of the Merger Agreement by Albertsons was not the primary cause of the Merger's failure to close before the Outside Date.

166

**RESPONSE**: Denies the allegations contained in Paragraph 457.

458.   Accordingly, Kroger's purported termination of the Merger Agreement under Section 8.1(e) is invalid.

**RESPONSE**: Denies the allegations contained in Paragraph 458.

459.   Albertsons is entitled to a declaratory judgment that (1) Kroger had no right to terminate the Merger Agreement, and (2) Kroger's purported termination of the Merger Agreement is invalid.

**RESPONSE**: Denies the allegations contained in Paragraph 459.

## ANSWER TO PRAYER FOR RELIEF

The Prayer for Relief states the relief Albertsons seeks, to which no response is required.  To the extent that a response is required, Kroger denies that Albertsons is entitled to any of the relief sought.

## DEFENSES AND AFFIRMATIVE DEFENSES

Without assuming the burden of proof or persuasion, and without waiving its right to assert any additional or supplemental defenses and affirmative defenses at such time and to such extent as discovery and factual developments establish a basis therefor, Kroger asserts the below defenses and affirmative defenses below with respect to the causes of action alleged in the Complaint.

Kroger reserves the right to:  (a) amend or supplement this Answer, its defenses and affirmative defenses, and all other pleadings; and (b) assert (i) any and all additional defenses and affirmative defenses if discovery and factual developments show that such defenses would be appropriate, and (ii) any and all

167

additional cross-claims, counterclaims, and third-party claims when and if they become appropriate in this case.

## FIRST DEFENSE

Albertsons's claims are barred, in whole or in part, because of its failure to state a claim. Among other things, Albertsons cannot establish that Kroger breached any obligation under the Merger Agreement given the extraordinary effort that Kroger exerted seeking regulatory approval for the Merger. Nor can Albertsons establish that Kroger committed a "Willful" breach of the Merger Agreement as Kroger acted at all times with the good faith belief that its actions were in accordance with the Merger Agreement. Albertsons likewise cannot establish any entitlement to damages—much less the billions of dollars in damages it seeks—because, in addition to being factually flawed, the various challenges Albertsons makes to Kroger's conduct were not the cause of the Merger's failure to close. Rather, the Merger failed to close for reasons independent from Kroger's challenged conduct, including the positions taken by regulators and the courts regarding the Merger.

## SECOND DEFENSE

Albertsons is not entitled to the Termination Fee because Albertsons failed to comply with its obligations under the Merger Agreement in all material respects. As set forth in the Counterclaims, Albertsons actively undermined Kroger's regulatory strategy with state and federal antitrust authorities through a series of acute and

168

recurring breaches of the Merger Agreement. These breaches include, but are not limited to: (1) Albertsons coordinating with C&S to affirmatively criticize the 413-store and asset divestiture package in communications to regulators; and (2) Albertsons concealing its scheme and communications with C&S from Kroger throughout the regulatory review process and regulatory litigation.

### THIRD DEFENSE

Albertsons is not entitled to any of the relief it seeks because Albertsons breached its own obligations under the Merger Agreement. Specifically, as set forth in the Counterclaims, Albertsons actively undermined Kroger's regulatory strategy with state and federal antitrust authorities through a series of acute and recurring breaches of the Merger Agreement. These breaches include, but are not limited to: (1) Albertsons coordinating with C&S to affirmatively criticize the 413-store and asset divestiture package in communications to regulators; and (2) Albertsons concealing its scheme and communications with C&S from Kroger throughout the regulatory review process.

### FOURTH DEFENSE

Albertsons may not recover any claimed damages or the losses it purports to have suffered because any such claim is barred, in whole or in part, because any such damages or purported losses cannot be proved with reasonable certainty.

169

## FIFTH DEFENSE

Albertsons may not recover any claimed damages or the losses it purports to have suffered because it failed to act reasonably to mitigate damages. For example, Albertsons prematurely purported to terminate the Merger Agreement, which precluded the Parties from (a) appealing the Oregon Opinion and the Washington Opinion, and (b) negotiating potential resolutions with the FTC (under a new Administration) and state regulators.

## SIXTH DEFENSE

Albertsons's claims are barred, in whole or in part, under the doctrine of equitable estoppel. Albertsons should be barred from recovery for any alleged breaches of the Merger Agreement due to Albertsons's contractual breaches and inequitable conduct. As set forth in the Counterclaims, Albertsons breached the Merger Agreement and engaged in inequitable conduct by undermining Kroger's regulatory strategy with state and federal antitrust authorities. These breaches and inequitable conduct include but are not limited to: (1) Albertsons coordinating with C&S to affirmatively criticize the 413-store and asset divestiture package in communications to regulators; and (2) Albertsons concealing its scheme and communications with C&S from Kroger throughout the regulatory review process and regulatory litigation. Kroger was unaware of Albertsons's inequitable conduct

170

and relied, to its detriment, on Albertsons's assurances that it was working with Kroger in good faith to secure regulatory approval for the Merger.

## SEVENTH DEFENSE

Albertsons's claims are barred, in whole or in part, by the doctrine of *in pari delicto*. As set forth in the Counterclaims, Albertsons's conduct in undermining Kroger throughout the regulatory-approval process was inequitable and prevents Albertsons from recovering any damages. This inequitable conduct includes but is not limited to: (1) Albertsons coordinating with C&S to affirmatively criticize the 413-store and asset divestiture package in communications to regulators; and (2) Albertsons concealing its scheme and communications with C&S from Kroger throughout the regulatory review process and regulatory litigation.

## VERIFIED COUNTERCLAIMS

Defendant The Kroger Co., by and through its undersigned attorneys, for its Counterclaims against Plaintiff Albertsons Companies Inc., alleges as follows:

## INTRODUCTION

1. Kroger announced an industry-shifting transaction to acquire Albertsons for $24.6 billion in October 2022 (the "Merger"). Had the transaction closed, it would have been the largest grocery store merger in U.S. history.

2. Although both Parties stood arm-in-arm in entering the Merger Agreement, Albertsons later broke from Kroger and dramatically undermined

171

Kroger's regulatory strategy with state and federal antitrust authorities through a series of repeated and willful breaches of the Merger Agreement.

3.  The Merger stood to be transformative for both companies and result in lower grocery prices for the American consumer. For Kroger, it would form a more competitive, national grocery chain that would provide more affordable food and better compete with all of the food retailers where consumers now purchase their groceries, including industry giants like Amazon, Walmart, and Costco. For Albertsons and its largest stockholder, private-equity titan Cerberus, the Merger would provide a long-awaited exit. For years, Albertsons had been employing a short-term strategy primarily focused on inflated grocery prices to support increasing returns to Cerberus and its other stockholders at the expense of a viable long-term strategy.

4.  After signing the Merger Agreement, Kroger worked tirelessly for two years to secure regulatory approval for the transaction. Kroger did so with the guidance of sophisticated antitrust counsel and many other advisors. After conducting a thorough search, Kroger identified a divestiture buyer—C&S Wholesale Grocers—that had many strengths: It had deep grocery experience, a nationwide distribution network due to its wholesaling business, significant equity to purchase an adequate number of stores (and relatively low debt levels), and a billionaire founder who was committing a half-billion dollars of his own capital to

172

the deal. In addition, C&S had been approved as a divestiture buyer by the Federal Trade Commission ("FTC") before. In the words of Albertsons's CEO, "*C&S is an incredibly strong company.* They're well financed. They've been around for 100 years. They bring incredible capabilities and distribution, and they're getting a great combination of retail assets and talent, literally packaged to execute."

5. Kroger spared no expense in identifying a divestiture buyer and executing its regulatory strategy. Kroger spent hundreds of millions of dollars doing so, and never wavered in its effort to secure regulatory approval given Kroger's belief in the immense impact the transaction would have for not only Kroger, but also for American consumers.

6. At first, Albertsons worked hand-in-hand with Kroger to secure regulatory approval and supported Kroger's strategy, even when reasonable disagreements arose. Kroger appreciated this approach from Albertsons but also expected it. The Merger Agreement not only gave Kroger "principal" responsibility and final authority for devising and executing the Parties' regulatory strategy, but it also expressly required Albertsons to "reasonably cooperate" with Kroger's chosen strategy. Albertsons's initial conduct under the Merger Agreement comported with these fundamental contractual rights for which Kroger bargained.

7. As Kroger was trying to secure regulatory approval of the Merger, the regulatory environment became more challenging, including when the FTC

173

overhauled its Merger Guidelines for the first time in nearly 15 years. Around the same time, Albertsons hired a new General Counsel who disapproved of the contractual bargain his predecessor had struck and was skeptical the Merger would close. And as public rhetoric against the Merger continued, Albertsons's skepticism turned to fear that the Merger would not secure regulatory approval—in which case Albertsons would be stuck running its outdated, higher-priced business model that was struggling to maintain market share.

8.    Thus, fearful of not being able to execute its long-sought-after exit from the grocery industry, Albertsons disregarded its obligations under the Merger Agreement and took matters into its own hands. Specifically, Albertsons began a surreptitious process of working to implement its preferred regulatory strategy behind Kroger's back—mainly by secretly communicating with the divestiture buyer, C&S, and coaxing C&S to make statements to regulators that would ratchet up the regulatory pressure on Kroger.

9.    Albertsons believed that, if C&S told regulators it needed more stores and assets from Kroger to compete effectively, then Kroger could be pressured to provide them to C&S (for free or at markedly discounted prices). Albertsons (incorrectly) believed that expanding the divestiture package in this way would make the deal more likely to close. But this strategy was highly risky; after all, C&S telling regulators it needed more stores or assets from Kroger could easily (and did

174

ultimately) make regulators believe that C&S was an inadequate divestiture buyer in the first place—irreparably compromising C&S's reputation and credibility.

10.    Albertsons's then-Executive Vice President and Chief Operations Officer, Susan Morris, was at the center of its strategy. She was incentivized to work with C&S to extract additional (albeit unnecessary) assets from Kroger by leveraging the regulators because if the Merger closed, she was slated to become the CEO of C&S's Retail Division. And she was simultaneously willing to overreach with C&S and the regulators because, if the Merger did not close, she was nevertheless ingratiating herself with Albertsons's management. That was paramount to Ms. Morris because, in the event the regulators rejected the deal, she aspired to become the CEO of Albertsons, replacing its then-CEO, Vivek Sankaran, whom she kept apprised of her contacts with C&S. And that is precisely what happened—just three months after the Merger was enjoined, Albertsons announced its new CEO succession plan: Ms. Morris will replace Mr. Sankaran as CEO of Albertsons, effective May 1, 2025.

11.    Albertsons knew its scheme with C&S was reckless and could backfire. So Albertsons also developed a "Plan B" to execute in parallel: manufacture a faux litigation record that Kroger's regulatory efforts fell short of what was required by the Merger Agreement, so Albertsons could sue Kroger for billions of dollars if the Merger failed to close. This litigation strategy was, at its core, a business strategy.

175

Albertsons (and Cerberus) knew that, absent a merger, Albertsons's business model that relied on inflated grocery prices would make continued business success difficult and other exit options limited. But, its lack of merit aside, a lawsuit against Kroger seeking billions of dollars offered a potential solution: if successful, it would give Albertsons the cash it desperately needed to survive, and Cerberus the opportunity to realize a sufficient return on its decades-long investment.

12.     Albertsons executed its two-prong strategy aggressively and dishonorably. Albertsons's officers and executives secretly coordinated with C&S to take positions with regulators that were critical of the stores and assets that Kroger was divesting to C&S. Albertsons did so based on the misguided view that these communications would somehow (1) pressure Kroger to increase the number of stores and assets it was providing to C&S, and (2) lead the regulators to approve the transaction. But Albertsons's plan backfired, with C&S's communications only causing the regulators to sour on C&S. Thus, when Kroger *did* increase the size of the divestiture package to C&S, it was too late: Albertsons's scheme with C&S had poisoned the well and destroyed C&S's credibility with the regulators.

13.     Litigation thus commenced. The FTC, together with nine State Attorneys General, sued to block the transaction in federal court. The Washington and Colorado Attorneys General both also separately sued in different state courts. This litigation onslaught was unprecedented—never before had two State Attorneys

176

General filed independent lawsuits in state court seeking to block a transaction, rather than joining a parallel lawsuit filed by the FTC in federal court. Kroger thus understood that the litigation presented a serious obstacle to closing the transaction, but Kroger still believed in the deal and worked tirelessly to defend against the three parallel litigations.

14. Albertsons took a different approach. Rather than focus on the three pending litigations, Albertsons increasingly focused on its "Plan B" to sue Kroger. Albertsons thus continued manufacturing a faux paper trail of purported breaches by Kroger—none of which had merit, and all of which were intended to create the misleading impression that Kroger was not using best efforts to secure regulatory approval for the deal.

15. In the end, despite Kroger's best efforts, the federal court in Oregon and state court in Washington issued decisions enjoining the Merger on the same day. Both did so primarily because they adopted the regulators' narrow definition of the market. According to the courts, the relevant antitrust market included only "traditional supermarkets" and not club, premium, natural, organic, value, ethnic, and e-commerce grocery retailers. Under this narrow and clearly outdated definition of the market, regulatory approval for the Merger was out of reach. For example, the Oregon court concluded that "even assuming a perfect divestiture . . . 1,002 markets would remain presumptively unlawful."

177

16.    But even after the adverse lower court decisions, Kroger maintained hope that the Merger might still close.  Not only had Kroger been preparing to expeditiously file an appeal (as it had discussed with Albertsons), but the decisions were issued in December 2024 after the election of President Donald Trump.  Kroger therefore discussed with Albertsons the strategy of re-engaging with the FTC in a matter of weeks under a new administration that was expected to be less hostile to mergers.  Indeed, President Trump's nominee to serve as Chair of the FTC, Andrew Ferguson, pitched himself for the job by promising to "stop [then-FTC Chair] Lina Khan's war on mergers."  Albertsons acknowledged that the incoming administration presented an opportunity to obtain regulatory approval of the Merger even in the event of an adverse court decision.  Indeed, in the weeks following the election, Albertsons and Kroger had numerous discussions, directly among executives as well as their advisors and outside counsel.  And Albertsons even touted to Kroger the personal connections Albertsons's executives had with individuals in the incoming administration.

17.    Unbeknownst to Kroger, however, Albertsons had already decided to go full-steam ahead with "Plan B," thus irrevocably destroying any prospect of an appeal or of negotiating a settlement with the Trump Administration's FTC.  Just hours after the two court decisions were released enjoining the transaction, Albertsons purported to terminate the Merger Agreement and filed a 140-page

178

complaint against Kroger in this Court. No doubt, capable counsel represents Albertsons, but even they could not draft a 140-page complaint in a few hours. Albertsons's rocket-speed filing left no doubt that Albertsons had been executing "Plan B" long before any court decisions blocking the Merger.

18.    Kroger always knew that antitrust litigation in multiple courts would be challenging, which is why it sought to obtain regulatory approval without litigation. But when litigation ensued, Kroger continued its all-out effort to close the deal, spending at least tens of millions of dollars in attorneys' fees, advisory and transaction costs, and expenses required to prepare for the integration if the Merger closed. These costs came on top of the extraordinary time and money that Kroger had poured into securing regulatory approval for the Merger, as well as costs associated with preparing for a successful integration throughout 2022 and 2023 and the separation of the divested business and transition of assets and services to C&S.

19.    Kroger made these substantial investments without knowing that Albertsons had begun materially and flagrantly breaching the Merger Agreement through its surreptitious scheme with C&S. If Kroger had known about Albertsons's misconduct at the time, Kroger would have terminated the Merger Agreement and saved at least tens of millions of dollars if not substantially more.

20.    Kroger now brings these counterclaims to recover for Albertsons's repeated Willful Breaches of the Merger Agreement. In particular, Kroger seeks a

179

judgment that Albertsons has Willfully Breached the Merger Agreement, and an award of monetary damages in an amount to be proven at trial.

## PARTIES

21.    Plaintiff Kroger is a retail company based in Cincinnati, Ohio, that operates supermarkets, multi-department stores, and fulfillment centers throughout the United States. It has 2,722 supermarkets across 35 states and the District of Columbia. It maintains its principal executive offices in Cincinnati, Ohio.

22.    Defendant Albertsons is one of the largest food and drug retailers in the United States with 2,269 stores across 34 states and the District of Columbia. It is a Delaware corporation with its principal executive office in Boise, Idaho.

## JURISDICTION

23.    Personal jurisdiction is proper in this Court because (i) Albertsons is a Delaware corporation and (ii) the parties agreed in Section 9.7(b) of the Merger Agreement that the courts of Delaware shall have exclusive jurisdiction over any disputes related to the Merger Agreement.

24.    This Court has jurisdiction over the subject matter of this action pursuant to both (i) 6 *Del. C.* 6 § 2708(b), which grants the courts of Delaware jurisdiction over actions on contracts, such as the Merger Agreement, in which the Parties have specified that Delaware law governs (*see* Merger Ag. § 9.7(a)) and (ii) 8 *Del. C.* § 111(a)(6), which grants the Court of Chancery jurisdiction over "[a]ny

180

civil action to interpret, apply, enforce or determine the validity of the provisions of . . . [a]ny agreement . . . of merger" governed by the merger provisions of the Delaware General Corporation Law ("DGCL"), as is the Merger Agreement.

<b><u>FACTUAL ALLEGATIONS</u></b>

**A.    Kroger Faces Fierce and Increasing Competition From Large National Retailers**

25.    Kroger was founded in 1883 in Cincinnati, Ohio when Bernard Kroger invested his life savings of $372 to open a single grocery store in downtown Cincinnati.  Since then, Kroger has grown to nearly 2,800 stores in 35 states under 28 different banners.  Its retail business was built on a unique combination of diversified brands, product categories, channels of distribution, geographies, and consumer demographics.

26.    Although it came from humble beginnings, Kroger is now a Fortune 25 company.  Kroger was able to achieve this status by staying true to its core focus of providing Americans with access to fresh, affordable, high-quality food.  Over the years, Kroger advanced this mission through strategic acquisitions, investing in its brands, increasing customers' access to products, and offering a personalized experience.

27.    Despite Kroger's efforts to continue offering fresh groceries at an affordable price, the retail grocery industry has recently undergone transformational changes that have fundamentally altered the competitive landscape.  Among other

181

things, large retailers such as Costco, Walmart, Target, and Amazon have begun using bulk buying and e-commerce to reduce conventional supermarkets' market share for grocery sales. Amazon, Costco, and Walmart, for example, started selling groceries to increase the frequency that consumers shop with them, and in doing so have been able to rapidly increase their grocery market share by providing a wide variety of products to consumers. Walmart, for instance, is the largest grocery retailer in the United States and alone holds 21.4% of the U.S. grocery retail market share (compared to Kroger's 8.9%). Additionally, the number of retailers in which consumers spend their grocery money has increased, with club, premium, natural, organic, value, ethnic, and e-commerce grocery retailers, as well as mass merchandisers, increasing in popularity. Indeed, according to the United States Department of Agriculture, the share of total food spending for traditional grocery stores including supermarkets and smaller formats has fallen significantly—from 37% in 1997 to 25% in 2022, whereas clubs and supercenters (such as Sam's Club or Costco) increased from 4% in 1997 to 10% in 2022.

28. In an effort to stay competitive, provide fresh affordable food for customers, and grow profits for its stockholders, Kroger has sought to grow both organically and through strategic acquisitions.

182

29. For example, Kroger acquired Harris Teeter in 2014, which predominantly operates in the mid-Atlantic states. Kroger then separately acquired Roundy's in 2015, which operates in Illinois and Wisconsin.

30. Even with these strategic acquisitions and its consistent, organic growth, Kroger still only operates in 35 states today as well as the District of Columbia. Kroger's status as a large grocery chain lacking a national footprint puts it at a significant disadvantage vis-à-vis large companies like Walmart, Costco, and Amazon, which have national distribution networks and a nationwide advertising market.

## B. Private Equity Titan Cerberus Acquires a Position in Struggling Albertsons and Looks for an Exit Opportunity

31. Albertsons began as a small grocery store in Boise, Idaho in 1939, but grew to have a grocery footprint that spans many states. By the early 2000s Albertsons had grown to thousands of stores, but it too had come under competitive pressures from club and big-box stores entering grocery.

32. As a result, in 2001, Albertsons announced that it would be restructuring the business, starting with the closure of 165 underperforming stores across 25 states. Despite cutting costs, Albertsons reported lower sales in 2003. In November 2005, Albertsons reported that its third-quarter profit fell 30% from 2004 as it struggled with flat sales and an increasing number of competitors.

183

33. Given Albertsons's struggles, its Board of Directors decided to place the company up for sale, including to potential private equity buyers who could maximize operations, minimize expenses, and adjust the workforce as necessary.

34. In 2006, private equity titan Cerberus paid $350 million for 655 struggling Albertsons stores in a real estate play. By 2013, Albertsons had an improved financial condition. That positioned it to engage in multiple acquisitions, including buying back stores Albertsons had sold in 2006 to third parties other than Cerberus. It also undertook a $9.2 billion acquisition of Safeway, which took almost a year to obtain regulatory approval.

35. Within months of the Safeway deal closing, and with more than 2,000 Albertsons stores now under its belt, Cerberus was ready for an exit and attempted to take Albertsons public through an IPO. The IPO was initially filed in 2015 and sought to raise $1.7 billion from investors. But a few days before the IPO, Walmart, one of the fiercest grocery competitors and a low-price leader, reported poor quarterly performance, spooking investors in the sector. Albertsons pulled its offering just before pricing and the IPO failed.

36. Cerberus and Albertsons kept an eye on the public market while relentlessly pursuing other deals, none of which panned out. In 2017, Bloomberg News reported that Albertsons held preliminary talks to merge with Sprouts Farmers Market. Also that year, the Financial Times wrote that Albertsons was considering

184

a takeover of Whole Foods Market, which was instead later purchased by retail-behemoth Amazon. And in February 2018, Albertsons announced a merger with Rite Aid, but the merger agreement was terminated after Cerberus and Albertsons refused to increase their offer in response to Rite Aid stockholders who were planning to vote down the deal.

37.    In June 2020, Cerberus finally took Albertsons public at a valuation of $7.66 billion, raising $800 million in an IPO after having sought as much as $1.32 billion. Prior to the IPO, additional private equity firms invested in Albertsons. At the time the Merger with Kroger was announced in October 2022, private equity firms collectively owned almost 80% of Albertsons. Most of those private equity owners sold their shares between 2022 and 2024 during the regulatory review of the Merger. However, Cerberus still maintains a 26.2% stake in Albertsons today, and has the right to nominate four of the eleven seats on the Albertsons Board of Directors.

38.    Post-IPO, analysts have commented that Cerberus had far exceeded the typical three-to-five year period for a private equity investment and had spent years looking for an exit opportunity. As one analyst put it, Cerberus had spent "16 years in the checkout line" trying to offload its investment in Albertsons.

39.    In February 2022, Albertsons announced that it would launch yet another strategic review of alternatives for the company, including exploring a

185

potential acquisition, sale, break-up, or other alternative. During an investor call, Albertsons's CFO specifically cited Cerberus's investment as one of the main factors leading the company to launch a strategic review so soon after an IPO. There were lock-ups on Cerberus's shares that would soon expire and there did not appear to be an avenue for Cerberus to sell shares without depressing Albertsons's stock price. Albertsons also recognized that Albertsons's stock had traded at a discount to some of its competitors, including Kroger.

40. One of the alternatives pursued by Albertsons in the fall of 2021 was a merger with ████████—a large multinational food retail group—but those discussions fell apart as well. As a result, Albertsons was forced to once again put up a "for sale" sign.

## C. Kroger Agrees to Acquire Albertsons and Bargains for Key Rights and Protections Related to the Anticipated Antitrust Review of the Merger

41. In April 2022, in response to Albertsons's announcement that it was officially for sale, Kroger contacted Albertsons's financial advisor, Goldman Sachs, regarding a potential acquisition.

42. Kroger was excited about the prospect of acquiring Albertsons to form a more competitive, national grocery chain that could better compete with new and ever-growing industry giants like Amazon, Costco, and Walmart.

43. Over the next several months, the Parties met extensively to discuss terms and other considerations with respect to a potential acquisition of Albertsons

186

by Kroger. Chief among the issues discussed was the potential for significant synergies that would result from the transaction, including approximately $1 billion of annual run-rate synergies that Kroger expected to achieve within the first four years of combined operations alone. Kroger planned to achieve these synergies by reducing sourcing, supply chain, and manufacturing costs, and by improving Albertsons's private label offering, product selection, and data analytics, among other things. Kroger believed that these synergies would allow the merged company to lower grocery prices, increase access to fresh and affordable food for all, improve the shopping experience, and raise associate wages, all while allowing the merged company to better compete with the large retailers like Amazon, Costco, and Walmart that were gaining increasingly large shares of the market.

44. For example, grocery items at Albertsons-owned stores cost 10% to 12% more than the same items at Kroger-owned stores. That is because Kroger has a "flywheel" business strategy that uses revenue generated from non-grocery "alternative profit" businesses (such as digital advertising and personal finance) to drive grocery prices lower. Albertsons, on the other hand, has a short-term business model that is primarily focused on enriching its largest stockholder, Cerberus. By applying the flywheel business model to the Albertsons-owned stores, Kroger could have driven prices lower in Albertsons-owned stores across the country as well.

187

45.    The Parties also discussed competition issues, including expected inquiries from antitrust authorities related to the transaction.  Both Parties engaged sophisticated antitrust counsel to advise them throughout the process.  In total, seven global law firms advised the Parties on the Merger and corresponding antitrust issues.

46.    The Parties recognized that they were operating in a challenging regulatory environment given that the then-current Chair of the FTC, Lina Khan, had been publicly outspoken about her disdain for grocery-industry consolidation and skepticism of even the best divestiture packages.  *See* Lina Khan & Sandeep Vaheesan, *Market Power and Inequality:  The Antitrust Counterrevolution and Its Discontents*, 11 HARV. L. & POL'Y REV. 235, 254 (2017) ("Retail consolidation has enabled firms to squeeze their suppliers . . . and led to worse outcomes for consumers."); *id.* at 289 ("Even if divestitures could be perfectly tailored and if they preserved competition in narrow markets in every instance, they would fail to advance the citizen interest standard.").

47.    The Parties also recognized that the FTC had historically distinguished between what the FTC considered to be "traditional" supermarkets like Kroger and Albertsons from other grocery retailers, like club, premium, natural, organic, value, ethnic, and e-commerce grocery retailers, as well as mass merchandisers.  The Parties therefore appreciated that obtaining regulatory approval would likely require

188

the regulators or courts accepting that the competitive landscape had fundamentally changed since the last grocery merger the FTC had challenged in litigation: Whole Foods and Wild Oats in 2007. In particular, regulators or courts would need to recognize that Kroger and Albertsons now faced fierce and increasing competition from retailers like Amazon, Whole Foods (now also owned by Amazon), and Costco.

48.    Notwithstanding the FTC's historical view, the Parties believed the Merger was procompetitive and permissible under state and federal antitrust laws, including because it would lower grocery prices and expand access to fresh and affordable food for consumers around the country.

49.    Given the significant anticipated regulatory scrutiny, Kroger knew that a carefully executed strategy would be critical to obtaining regulatory approval of the Merger. Kroger therefore specifically bargained for—and received in the Merger Agreement—key rights and protections related to the anticipated regulatory review of the Merger.

**D.    The Parties Agree That Kroger Would Have Principal Authority Over the Antitrust Strategy and That Albertsons Would Cooperate and Use Reasonable Best Efforts to Support That Strategy**

50.    The Parties extensively negotiated key rights and protections in the Merger Agreement relating to, among other things, securing regulatory approval of the Merger. While both Parties would "cooperate with one another, and consider in

189

good faith the views of one another, in connection with" any antitrust proceedings, the Parties agreed that Kroger would have "principal" responsibility and final authority for devising and executing the strategy related to securing antitrust approval of the Merger.

51.    This agreement was memorialized in Section 6.3(b) of the Merger Agreement, and provides in relevant part as follows:

> In addition, the Parties shall jointly develop, and *each of the Parties shall consult and reasonably cooperate with one another*, and consider in good faith the views of one another, in connection with the form and content of any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any Party in connection with proceedings under or relating to any Antitrust Law with respect to the Transactions prior to their submission. If the Company, on the one hand, and Parent or Merger Sub, on the other hand, initially disagree upon any such proposed communication, strategy or process, the Parties agree to work together in good faith to resolve the disagreement and endeavor to implement such communication, strategy or process in a mutually acceptable manner; provided, that, following such good faith efforts by the Parties, *Parent shall have the principal responsibility for devising and implementing the strategy for obtaining any necessary antitrust consents or approvals*. . . .

(Ex. 1[4] [Merger Agreement] § 6.3(b) (emphases added)).

52.    It is common in large acquisitions for the acquiring company to have principal authority over the regulatory strategy because it is the acquiring company—here, Kroger—that would be responsible for managing the merged

---

[4] The Merger Agreement is attached as Exhibit 1 to Albertsons's First Amended Complaint. Capitalized terms not otherwise defined herein have the meaning as provided for in the Merger Agreement.

190

company. The acquiring company would also be responsible for abiding by any agreements with, or representations made to, the regulators post-closing. In contrast, the target company does not have the same incentives to pursue a regulatory strategy (including a divestiture strategy) that would allow the merged company or the divested stores to succeed after closing because the target company is cashing out.

53.     Kroger also believed that speaking with one unified voice to the regulators would give the Merger the best chance of approval. It would ensure consistency in communications with the regulators, and likewise prevent the regulators from leveraging strategic disagreements between the Parties in order to challenge the transaction.

54.     Both Parties knew that a divestiture of stores would be needed to obtain regulatory approval of the Merger. Albertsons, however, had a poor track record with divestitures. Indeed, as part of Albertsons's settlement with the FTC in connection with the Safeway transaction in 2015, Albertsons had agreed to divest 146 stores to Haggen, an under-capitalized and highly leveraged regional grocery chain. Less than a year after the divestiture, Haggen had closed all of the stores it acquired from Albertsons, entered bankruptcy, and filed a billion-dollar lawsuit against Albertsons alleging that Albertsons intentionally "sabotaged" the divestiture.

55.     In part because of the Haggen disaster, Kroger feared that Albertsons's credibility with the FTC with respect to divestitures had been severely tarnished.

191

56.    That fear turned out to be well warranted, as the regulators seized on the Haggen debacle in challenging the Merger.  For example:

- The FTC highlighted in its opening statement in the Oregon trial that in "the divestiture of stores to Haggen, in connection with the [Safeway] merger, Albertsons told the FTC no stores would close, poor performance would be improved, all employees would keep their job, and Haggen had management to lead it through a transformative acquisition.  Haggen was in bankruptcy within months of the divestiture."

- The Colorado Attorney General stressed in its post-trial brief that the Haggen "divestiture was a complete failure, and resulted in Haggen's complete collapse in a few short months."

- And the economic expert for the Washington and Colorado Attorneys General testified regarding the divestiture that "the idea was [that] the divestiture will . . . maintain the competition, instead, Albertsons ended up buying Haggen, too. And the . . . outcome was wors[e] than just a merger of Albertsons and Safeway."

57.    Given Albertsons's blemished credibility and that it was Kroger, not Albertsons, that would run the combined company post-Merger, it was a non-starter for Kroger when Albertsons initially requested that *Albertsons* be given responsibility over the antitrust regulatory strategy.  Kroger rejected that demand from the outset.  But Kroger realized that the Merger was between two sophisticated parties with sophisticated antitrust counsel and outside advisors.  So Kroger agreed that the Parties would cooperate with each other and consider each others' views regarding regulatory strategy, but insisted that Kroger would at all times retain "principal responsibility" for that strategy.

192

58.    Importantly, the Parties also agreed to use reasonable best efforts to support Kroger's strategy and to "take or cause to be taken all actions . . . necessary, proper or advisable . . . to avoid, eliminate, and resolve any and all impediments under any Antitrust Law with respect to the Transactions," regardless of whether Albertsons disagreed with strategy decisions made by Kroger.

59.    Section 6.3(a) of the Merger Agreement provides in relevant part:

Subject to the terms and conditions of this Agreement (including any differing standard set forth herein with respect to any covenant or obligation, including, with respect to Antitrust Law, as provided below), the Company, on the one hand, and each of Parent and Merger Sub, on the other hand, *will cooperate with the Other Party and use (and will cause their respective Subsidiaries to use) its reasonable best efforts to (i) take or cause to be taken all actions, and do or cause to be done all things, necessary, proper or advisable to cause the conditions to the Closing to be satisfied as promptly as reasonably practicable and to consummate and make effective, as promptly as reasonably practicable, the Merger, including taking actions necessary to avoid, eliminate, and resolve any and all impediments under any Antitrust Law with respect to the Transactions,* including without limitation preparing and filing promptly and fully all documentation to effect all necessary filings, notifications, notices, petitions, statements, registrations, submissions of information, applications and other documents (including filing any Notification and Report Form required pursuant to the HSR Act within fifteen (15) Business Days following the execution of this Agreement), (ii) obtain promptly all Consents, clearances, expirations or terminations of waiting periods, registrations, authorizations and other confirmations from any Governmental Entity or third party necessary, proper or advisable to consummate the Merger and (iii) defend, contest and resist any Proceedings, whether judicial or administrative, challenging this Agreement or the consummation of the Merger.

(Ex. 1 [Merger Agreement] § 6.3(a) (emphasis added)).

193

60.     These two provisions—providing Kroger with principal authority over the regulatory strategy, and requiring Albertsons to cooperate and use reasonable best efforts to support that strategy and the Merger—were foundational to the entire deal. (*See* Ex. 1 [Merger Agreement] § 6.3(a), (b)).  Regulatory strategy is always important but it was particularly imperative here because the Parties had to convince regulators that they should include non-traditional grocery retailers, like Amazon, Whole Foods, and Costco, to the list of competitors.  For these reasons, the Parties expected a rigorous regulatory review process, and it was critical to Kroger that— regardless of whether Albertsons disagreed with reasonable strategic decisions made by Kroger—Albertsons would not undermine that strategy or the Merger with the regulators.

61.     Kroger had obligations under the Merger Agreement too, including that it would use reasonable best efforts to "cause the conditions to the Closing to be satisfied as promptly as reasonably practicable" (Section 6.3(a)), and "resolve any and all impediments under any Antitrust law" (Section 6.3(d)).

**E.      The Parties Agree to a Maximum of 650 Stores That the Parties Could Potentially Divest to Obtain Regulatory Approval of the Merger**

62.     Given that the Merger would result in the combination of two retail grocery stores with overlapping footprints in some geographic regions, the Parties and their advisors knew that a divestiture of a certain number of stores and other assets would be necessary to obtain regulatory clearance of the Merger.

194

63.    Kroger, however, needed protection from the possibility that the regulators would view the relevant market narrowly and would require a divestiture of so many stores that it would eliminate the strategic rationale for the deal. Albertsons, of course, did not have those same concerns. Because Albertsons, its stockholders, and its executives would cash out once the Merger closed, it made no difference to them (i) how many stores the merged company divested, or (ii) whether the number of stores the merged company divested was even consistent with proper economic analysis.

64.    Kroger therefore bargained for the protection in Section 6.3(d) of the Merger Agreement that Kroger's efforts obligations under the Merger Agreement would not extend to a "Material Divestment Event":

> . . . nothing contained in this Agreement shall require Parent or the Company to take, or cause to be taken, or commit to take, or commit to cause to be taken, any divestiture, license, hold separate, sale or other disposition, of or with respect to assets of the Company or any of its Subsidiaries, or Parent or any of its Subsidiaries, if doing so would result in a Material Divestment Event.

(Ex. 1 [Merger Agreement] § 6.3(d)).

65.    A "Material Divestment Event" was defined in the Merger Agreement as a divestiture "in excess of 650 Stores":

> "Material Divestment Event" means Parent, the Company or their respective Subsidiaries divesting (by way of sale, separation or otherwise), prior to, as of, or immediately following the Effective Time, *in excess of 650 Stores* (inclusive of the Stores divested by virtue of the Distribution to the extent the Distribution is consummated as of the

195

Effective Time) in order to eliminate and resolve any and all impediments under Antitrust Laws with respect to the Transactions.

(Ex. 1 [Merger Agreement] Article I (emphasis added)).

66.     The 650-store maximum was another one of the many negotiated provisions governing the anticipated regulatory review of the Merger, and reflected the Parties' assessment that regulatory approval could be achieved with a divestiture of 650 or fewer stores.  This assessment by the Parties was predicated on, among other things, the assumption that the regulators would agree that the market in which the Parties compete now included retailers that regulators did not consider to be "traditional" supermarkets, like Amazon, Whole Foods, and Costco and other club, premium, natural, organic, value, ethnic, and e-commerce grocery retailers, as well as most mass merchandisers.

67.     Importantly, the Merger Agreement does not require that the merged company divest 650 stores—it was not a minimum threshold.  Rather, it set a maximum limit, providing that the merged company would not be required to divest more than 650 stores.  The Parties understood that the number of stores divested would ultimately turn on economic analyses regarding the competitive effects of the transaction, and potentially feedback from regulators.  The Parties also recognized that divestitures are complex and their likelihood of success depends on numerous factors beyond the number of stores divested.  For instance, the success of divestitures may turn on factors including the location of the stores and other assets

196

being sold with the stores such as distribution centers, warehouses, private label brands, and particular store "banners" such as Mariano's or Safeway. Divesting 650 stores all located in one region, for example, would not cure anticipated regulator concerns relating to competition in other regions. The Parties accordingly recognized that the divestiture needed to be well-planned, targeted, supported by economic analysis, and designed to replace competition in specific geographies.

## F.     The Parties Agree to Closing Conditions and Circumstances in Which Albertsons Would Receive a Parent Termination Fee

68.    To close the Merger, the Parties needed to satisfy several closing conditions outlined in the Merger Agreement. Many of them were commonplace provisions. For example, for the Merger to close, a majority of Albertsons's stockholders had to approve the deal in accordance with Delaware law. Additionally, both Parties' representations and warranties had to remain true at the time of closing, and both Parties' executive officers needed to certify all conditions to closing were satisfied.

69.    Other closing conditions were specific to the antitrust considerations the Parties had anticipated. In particular, the Merger Agreement provided that the transaction could not close until the waiting period applicable under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 had expired, and the Merger could not close if there was any law or governmental order prohibiting the transactions contemplated by the Merger Agreement. (Ex. 1 [Merger Agreement] §§ 7.1(b)–(c)).

197

70.    Furthermore, the Merger Agreement provided that the transaction could not close unless both Parties fulfilled their respective covenants in the Merger Agreement, including that Albertsons had complied in all material ways with its obligation to cooperate with Kroger's strategy to obtain antitrust clearance. (Ex. 1 [Merger Agreement] §§ 6.3, 7.2(a)–(b)).

71.    The Merger Agreement also provided for a Parent Termination Fee of $600 million to Albertsons, but only in certain circumstances.  For example, if the Merger Agreement was terminated by either Party pursuant to Section 8.1(b) after a government entity "issued a final *nonappealable* order … permanently restraining, enjoining or otherwise prohibiting the consummation" of the Merger, then Kroger owed Albertsons the Parent Termination Fee. (Ex. 1 [Merger Agreement] §§ 8.1(b), 8.4(c) (emphasis added)).

72.    But if the Merger were blocked by a permanent or preliminary injunction that the Parties could still appeal, termination of the Merger would only trigger the Parent Termination Fee if the (1) the Outside Date had passed, (2) regulatory approval had not been granted, and (3) Albertsons was in compliance with all its "agreement and covenants" in the Merger Agreement "in all material respects."  (Ex. 1 [Merger Agreement] §§ 7.3(b), 8.4(c)).  This includes the covenants in Sections 6.3(a) and 6.3(b) that Albertsons would "cooperate" with Kroger and use "reasonable best efforts" to support the Merger, and allow Kroger to

198

have "principal responsibility for devising and implementing the strategy for obtaining any necessary antitrust consents or approvals." (*Id.* §§ 7.1(a)–(b), 7.3(a)–(b), 8.1(e), 8.4(c)).    This allocation incentivized both Parties to pursue consummation of the Merger—through an appeal, if necessary—and ensured that Albertsons would not be rewarded with the $600 million payment if the Merger had not closed and Albertsons was in material breach of the Merger Agreement.

### G.    Kroger Announces the Merger with Albertsons and Forecasts Billions of Dollars in Anticipated Synergies From the Merger

73.    On October 13, 2022, Kroger and Albertsons entered into the Merger Agreement pursuant to which Kroger would acquire all outstanding shares of Albertsons through a reverse triangular merger.  The deal was to create a combined company that would expand Kroger's customer reach and improve proximity to deliver fresh and affordable food to approximately 85 million American households.  The Parties jointly publicly announced their entry into a definitive Merger Agreement the next day, on October 14, 2022.

74.    Under the Merger Agreement, Albertsons stockholders were initially expected to receive a total consideration valued at $34.10 per share, implying a total enterprise value of approximately $24.6 billion, including the assumption of approximately $4.7 billion of Albertsons's net debt.  Kroger was willing to pay this price because it expected that the combined business would benefit from synergies and continued investment, and that Kroger through this acquisition would be able to

199

more effectively compete with the nation's largest grocery retailers, including Walmart, Costco, and Amazon.

75.    In the press release announcing the Merger, the Parties jointly touted their expectation that the deal would "Strengthen[] Kroger's Value Creation Model to Drive Profitability and Enhance Shareholder Returns."  As is typical with companies providing projections to the market, Kroger was conservative in touting its expected $1 billion of annual run-rate synergies that it expected to achieve within the first four years of combined operations.  Indeed, while Kroger was undertaking the integration work for the potential Merger with Albertsons, including additional diligence, it discovered even more efficiencies that could be realized by combining the two companies.  Kroger's internal projections for the performance of the combined company were therefore even higher than what was publicly projected when the Merger was announced.

76.    Kroger also provided details to the market on its anticipated investments in the combined company to further drive growth.  Kroger has a long track record of lowering prices, improving the customer experience, and investing in its associates and communities.  Consistent with prior transactions, Kroger planned to invest approximately $500 million of cost savings from synergies to reduce prices for customers on an annual basis in Albertsons stores where prices were 10-12% higher than prices for the same items at Kroger stores.  Kroger later

200

increased this amount to $1 billion after realizing that a higher investment would be necessary to narrow the pricing gap. Kroger also planned to invest an incremental $1.3 billion into Albertsons stores on deferred maintenance, store refreshes and remodels, and other improvements to enhance the customer experience. And Kroger publicly committed that the combined company would invest $1 billion to continue raising associate wages and providing comprehensive employee benefits after close.

77. Kroger always viewed these investments as essential to the Merger. Kroger expected the combination would result in a premier seamless grocery ecosystem across 48 states and the District of Columbia, providing customers with a best-in-class shopping experience across stores and digital channels. Through the Merger, Kroger would accelerate its strategy of serving Americans with fresher food faster and strengthen its value creation model to deliver enhanced returns. Additionally, Kroger expected to grow its private label sales and become one of the largest consumer packaged goods brands in the United States. Ultimately, the deal would strengthen Kroger's value-creation model to drive profitability and deliver enhanced total stockholder returns.

78. Prior to the transaction, Albertsons advised Kroger that it sought to pay a special cash dividend of up to $4 billion to its stockholders. The cash component of the $34.10 per share Merger consideration would then be reduced by the per-share amount of the special cash dividend, which was $6.85 per share. This dividend was

201

proposed by Albertsons as a "plan to return capital to its stockholders." It was described to Kroger as a transaction that would take place "regardless of whether a transaction with Kroger was consummated." Kroger was reluctant, but did not preclude Albertsons from paying the special dividend, provided that it would not impact the amount Kroger was paying to acquire Albertsons.

79. Albertsons's payment of a special dividend was immediately criticized widely in the media and by government officials, and it caused state and federal regulators to view the Merger unfavorably before antitrust review had even began. Indeed, various State Attorneys General sued to enjoin the payout, viewing the dividend recap as a "windfall to Albertsons's private equity consortium." Those Attorneys General noted that Albertsons is a publicly traded company "controlled by a consortium of private equity entities" and that those private equity firms would be "the primary beneficiaries of the $4 billion Special Cash Dividend." Nearly "one-third of this payment" was to go to "Albertson's largest shareholder, the private equity firm Cerberus Capital Management, L.P."

80. Other officials criticized the dividend recap as short-sighted and severely hindering Albertsons's ability to compete if the Merger was not consummated. The Superior Court of Washington for King County noted that Albertsons would use "75% of its liquid assets and borrow about $1.5 billion" for payment of the dividend, which would "eliminat[e] its cash-on-hand and nearly

202

doubl[e] its debt[.]" Similarly, the Attorneys General for the District of Columbia, California, and Illinois stated that if the payout were permitted to proceed, "Albertsons [would] be unable to respond effectively to shifts in the market through promotions and advertising more generally, have less available cash to pay employee wages and benefits to retain staffing, and be unable to make necessary investments into their stores, or heavily disincentivized from doing so."

81.    Albertsons ultimately prevailed in the litigations and paid the special dividend, sending most of Albertsons's cash reserves to its private-equity owners and other stockholders, and saddling Albertsons with $1.5 billion of additional debt. But Albertsons's payment of the special dividend continued to have a negative impact on the regulatory review of the Merger and the subsequent antitrust trials. For example, during trial, the regulators attempted to undermine the Parties' arguments that the Merger was needed to lower prices in Albertsons stores by questioning why Albertsons did not use the $4 billion it paid to its private-equity owners and other stockholders to instead invest in lowering grocery prices.

## H.    The Parties Begin the Regulatory Review Process

82.    The antitrust review process began on November 3, 2022 (while the dividend litigations were still pending), when Kroger and Albertsons made initial filings with the FTC to indicate that they were seeking clearance to pursue the Merger.

203

83.    About a month later, on December 5, 2022, the FTC issued a Second Request to Kroger and Albertsons, indicating that the FTC sought more information to review the transaction. The Second Request automatically extended the 30-day initial waiting period for antitrust review under the Hart-Scott-Rodino Act through "substantial completion" of the Second Request. In other words, in order to clear antitrust review, the Parties were required to respond to the Second Request and submit certifications that they had "substantially complied" with the Second Request and observe a second waiting period before consummating the Merger.

84.    Around the same time, several states, including Alaska, Arizona, Arkansas, California, Colorado, the District of Columbia, Idaho, Illinois, Maryland, Nevada, New Mexico, Oregon, Texas, Vermont, Virginia, Washington, and Wyoming announced that they were also reviewing the Merger under applicable state and federal antitrust and consumer protection laws.

85.    As they were required to do, Kroger and Albertsons cooperated with the FTC and the States on the merger review process, including by responding to the Second Request, responding to state Civil Investigative Demands and information requests, and by issuing waivers allowing the States to coordinate with the FTC on their ongoing review.

86.    As reflected in the Merger Agreement itself, regulatory scrutiny of the Merger was not a surprise. Kroger and Albertsons knew that their combination

204

would likely pose anticompetitive concerns to regulators, require a carefully crafted divestiture package, and potentially result in litigation. Nevertheless, the Parties remained optimistic that a negotiated resolution without the need for litigation was possible, and Kroger worked hard to achieve that outcome.

87. From the outset, Kroger and its advisors had a four-pronged strategy for obtaining regulatory approval for the Merger: (1) identify a highly capable and well-capitalized divestiture buyer that could purchase and run the divested stores in the geographic areas of the planned divestitures; (2) make incremental divestiture offers to the regulators based on their feedback that were supported by economic analysis; (3) advocate to the regulators that the market in which Kroger and Albertsons compete had fundamentally changed and now includes competitors like Amazon, Whole Foods, and Costco; and (4) defend the divestiture package and the Parties' market definition in litigation, if necessary. Kroger and its advisors believed that this was the strategy that was most likely to result in the Merger closing, and Kroger remained committed to it (and the Merger) throughout the regulatory review process.

88. Kroger's commitment to the Merger never wavered, despite having numerous meetings with regulators without getting the kind of meaningful feedback Kroger was hoping for and expecting based on prior dealings with the FTC. Kroger continued to spend hundreds of millions of dollars in advisor and transaction costs

205

in an effort to secure regulatory approval of the Merger. From the time the Merger was announced until the courts issued injunctions blocking the Merger, Kroger consistently reiterated to the market that the Merger was the best path forward for the company and its stockholders.

## I.    Kroger Scours the Market for a Divestiture Buyer

89.    As part of Kroger's regulatory strategy, it proactively sought a potential divestiture buyer to address the regulators' competition concerns. Following the announcement of the Merger, Kroger embarked on a competitive process to identify a well-capitalized buyer who could meaningfully compete with the post-Merger combined company. Kroger worked with its outside counsel and advisors to cast a wide net for the divestiture buyer. The Parties' bankers led the consulting group, which also included economists and antitrust experts.

90.    The search for a buyer began in October 2022, almost immediately after the execution of the Merger Agreement. From October 2022 until January 2023, the Parties and their advisors worked together to finalize the proposal that would be provided to prospective bidders.

91.    The Parties' investment bankers then scoured the market for companies that they thought, based on their knowledge and expertise, may be interested in purchasing hundreds of retail grocery stores. They contacted 92 parties to solicit bids for the divestiture package. Of those 92 companies, 28 decided to submit Phase

206

offers. Kroger and its advisors reviewed these proposals and received regular reports on the bidding process from the Parties' bankers. While Kroger was trying to move quickly to identify an appropriate divestiture buyer, Albertsons and its counsel often inexplicably dragged their feet on simple matters during this process. But Kroger was undeterred.

92.    Kroger, along with its counsel and advisors, evaluated each potential divestiture buyer's: (1) strategic commitment to operating the business; (2) experience in the grocery industry; (3) financial wherewithal (including their ability to commit to invest in the business in the long-term); (4) ability and desire to purchase a significant portion, or all, of the stores that may need to be divested; and (5) willingness and ability to assume the union contracts of the employees at the divested stores.

93.    Additionally, there were several factors outside of the Parties' control that limited the pool of potential buyers. For example, the potential buyer had to be willing and able to run the divested stores in a manner similar to how Albertsons was currently running them to avoid a substantial lessening of competition from Albertsons leaving the market. The potential buyer also could not have already been operating a significant number of retail stores near the stores to be divested because of market concentration concerns. And of course, the potential buyer also had to

207

actually be interested in purchasing stores in the geographic areas with overlapping Kroger and Albertsons stores.

94. Based on discussions that the Parties' bankers had with the 28 companies that submitted Phase 1 Offers, nine companies decided to submit Phase 2 Offers.

95. From there, Kroger used the relative strength of each prospective buyer with respect to the five criteria described above to narrow the prospective buyers down to four. The four buyers who ultimately submitted bids included only two buyers who had an interest in purchasing the entire package, C&S Wholesale Grocers and ███████. The two other buyers, ████████████████████████, were only interested in purchasing part of the package. Kroger negotiated potential asset purchase and transition service agreements with all four of these potential buyers to determine the best-qualified buyer.

96. At the same time, Kroger was also negotiating with Albertsons for *Albertsons* to potentially purchase divested stores. The Merger Agreement provided that, if the Parties could not find a buyer for all of the stores that needed to be divested, Albertsons's stockholders would purchase them through an entity called "SpinCo." SpinCo was essentially a failsafe to ensure the Parties could propose a divestiture package to the regulators even without a viable third-party purchaser for all of the stores that needed to be divested. Thus, while Kroger was negotiating with

208

C&S, ███████████████, and ███████████████, Kroger was also simultaneously negotiating with SpinCo (i.e., Albertsons) in the event negotiations with those four potential third-party purchasers did not result in the sale of the full divestiture package.

97.    Since Albertsons was a potential buyer of a portion of the assets to be divested, confidentiality obligations limited the amount of information that Kroger could share with Albertsons regarding the other divestiture buyers.  Kroger could not share, for example, confidential information regarding the other potential buyers' bids or capabilities.  Likewise, Kroger could not share with the third-party bidders confidential information regarding SpinCo's operations or bids.

98.    While Kroger and its advisors considered all available divestiture strategies, including divesting stores to multiple buyers, Kroger ultimately determined that divesting to a single buyer was the strategy that was most likely to obtain regulatory approval for the Merger.  Divesting to a single capable buyer had the distinct advantage of only requiring the regulators to approve one buyer, as opposed to a multi-buyer package that would require approval of each buyer and the stores and other assets each would receive.

99.    Ultimately, C&S was selected because C&S's proposal satisfied all five criteria described above, which made it the most qualified and attractive bidder.  Specifically, C&S was led by an experienced management team with an extensive

209

background in food retail and nationwide distribution operations, and it had the financial strength to continue investing in the divested stores for the long run. C&S also had the distinct advantage of having been approved as a divestiture buyer of retail grocery stores by the FTC in a previous transaction.

100.   Kroger and C&S subsequently negotiated asset purchase and transition services agreements pursuant to which Kroger and Albertsons would divest certain stores and other assets to C&S if the Merger was consummated.  The particular combination of stores and related assets to be sold to C&S was designed to address competitive concerns with the Merger and to ensure that C&S had the operational infrastructure to effectively compete as a supermarket operator on its own post-transaction.

101.   As Vivek Sankaran, Albertsons's CEO, would later testify under oath during the Colorado trial, "C&S is an incredibly strong company.  They're well financed.  They've been around for 100 years.  They bring incredible capabilities and distribution, and they're getting a great combination of retail assets and talent, literally packaged to execute."

102.   Although Kroger had principal authority for controlling the regulatory strategy under the Merger Agreement, Kroger cooperated with and considered the suggestions of Albertsons every step of the way during the regulatory review process, including with respect to developing the divestiture package.   This

210

cooperation and consideration of Albertsons's opinions included, but was not limited to, regular calls with Albertsons and its advisors, the exchange of written analyses conducted by the Parties' respective advisors, and providing Albertsons opportunities to comment on written materials before they were finalized.

103.    Reflecting this cooperation, on September 8, 2023, C&S, Albertsons, and Kroger entered into an asset purchase agreement (the "Original APA") for the sale of select stores based on the Parties' economic analyses.  Under the Original APA, C&S agreed to purchase 413 stores from the post-Merger company, including stores then-owned by both Kroger and Albertsons, on specified terms, plus additional stores identified later if Kroger sent a "put notice" to C&S.

104.    The Original APA's 413-store package also included significant non-store assets, including two regional headquarters, distribution centers and offices, as well as banners and private label brands with strong consumer recognition.  Kroger believed that the 413-store package sufficiently addressed the potential antitrust concerns from the transaction, and also left the Parties with flexibility to add additional stores to the package if the regulators provided feedback that doing so was necessary to obtain antitrust approval.

## J.    The FTC Overhauls its Merger Guidelines to Take a More Aggressive Stance in Antitrust Enforcement

105.    When the Parties signed the Merger Agreement and selected C&S as the divestiture buyer, they expected the regulators to apply the FTC's 2010 Merger

211

Guidelines. But on July 19, 2023, while the Parties were negotiating the Original APA, the FTC released new draft Merger Guidelines for the first time in nearly 15 years. A final version of the Merger Guidelines was published on December 18, 2023 (the "2023 Merger Guidelines").

106. The final 2023 Merger Guidelines reflected an aggressive shift in antitrust merger enforcement. Among other significant changes to the 2010 Merger Guidelines, the 2023 Merger Guidelines lowered the concentration levels that the agency viewed as sufficient to trigger a presumption of illegality. The 2023 Merger Guidelines also added competition among buyers of union labor as an analytical framework that the FTC could use to attempt to block a transaction.

107. The 2023 Merger Guidelines created additional challenges for the Parties in two ways. First, the 2023 Merger Guidelines increased the importance of convincing the regulators that the grocery market in which Albertsons and Kroger compete had fundamentally changed. Under the 2023 Merger Guidelines, excluding competitors like Amazon, Whole Foods, and Costco would almost certainly result in hundreds or potentially thousands of presumptively anticompetitive markets nationwide due to the FTC's lower concentration thresholds, even with a divestiture of up to 650 stores. Second, given that Kroger and Albertsons both employ union workers, the 2023 Merger Guidelines' inclusion of an analytical framework for

212

Mergers involving labor-union employees endorsed a second and independent basis that the FTC could use to block the Merger.

108.    In short, the 2023 Merger Guidelines increased the challenges the Parties were facing in an already challenging regulatory environment, and made it even more important that the Parties execute a carefully coordinated and unified regulatory strategy.  They also confirmed the generally anti-merger policy stance of then-Chair Khan's FTC and emboldened the FTC attorneys to take aggressive positions (including with respect to market definition) in litigation, which they ultimately did here.

## K.    Albertsons Undergoes a Change in Leadership and Begins Undermining Kroger's Strategy With the Regulators

109.    In June 2023, just before the new 2023 Merger Guidelines were unveiled, Albertsons underwent a leadership change on its Merger team, including a new General Counsel.

110.    The tone and tenor of cooperation degenerated almost immediately.  On information and belief, at the same time, Albertsons began manufacturing a "Plan B" litigation record against Kroger to deflect blame and position Albertsons to sue Kroger if the Merger did not close.

111.    Plan B was a failsafe.  The purpose of the Plan B litigation was to seek to protect Albertsons and Cerberus even if the Merger did not close.  Upon information and belief, Albertsons and Cerberus were becoming increasingly

213

concerned that the regulators would not approve the Merger, including because of the ongoing political opposition and regulatory challenges. And without an acquisition by Kroger, Albertsons did not have a viable long-term path forward. After the investment by Cerberus, Albertsons had been primarily focused on improving the short-term financial position of the company so that Cerberus could pursue a profitable short-term exit. As news outlets would later report, competitors such as "Walmart, Costco and Amazon are miles ahead [of Albertsons] on investments" and other competitors like "Kroger [have] a much more advanced advertising business, an important margin driver." As a result, "Albertsons's grocery market share has been shrinking." To make matters worse, Albertsons had stripped itself of most of its cash reserves by paying the special dividend to its stockholders (primarily its private-equity owners). In other words, if the Merger did not close, Albertsons would need the Merger consideration to survive, and the faux Plan B litigation would be Albertsons's final desperate play to save its company and deflect responsibility for its own strategic shortcomings and missteps.

112. With the Plan B litigation as its perceived failsafe, Albertsons's new leadership team pushed for a different divestiture strategy than the Parties had been consistently employing. Specifically, Albertsons insisted Kroger abandon its strategy and instead adopt a myopic approach to the divestiture. This approach involved proposing to the FTC that Kroger divest at, or close to, the maximum of

214

650 stores under the Merger Agreement immediately, regardless of whether the economic analysis supported the package and regardless of whether it was more likely to cause the regulators to approve the Merger.

113. Indeed, Albertsons's leadership wanted Kroger to jump to a divestiture of (or close to) 650 stores without any feedback from regulators. To be sure, even after executing the Original APA with 413 stores and other assets, Kroger understood that regulatory approval might require increasing the size of the divestiture package based on feedback from regulators. But the antitrust economic analysis supported the divestiture package in the Original APA, and Kroger's approach ensured the Parties had flexibility to respond to regulator feedback.

114. When Kroger asked Albertsons to explain how its proposals were supported by the economic literature or more likely to secure regulatory approval for the transaction, Albertsons provided no cogent response. As a result, after considering Albertsons's proposal, Kroger and its advisors pressed forward with developing a divestiture package that was based on supported economic analysis while also maintaining the optionality and ability to add more stores if the regulators indicated that doing so was necessary to obtain regulatory approval.

115. But Albertsons did not relent. Instead, Albertsons elected to surreptitiously coordinate with C&S—unbeknownst to Kroger—and embarked on a

215

months-long quest to supplant Kroger's regulatory strategy with Albertsons's alternative strategy. As addressed below, the result was devastating.

**L.    Kroger and Albertsons Present the 413-Store Divestiture Package to Regulators While Albertsons Simultaneously Works to Undermine It**

116.    Kroger and Albertsons presented a 413-store package to the FTC on September 13, 2023 less than a week after the Original APA with C&S was executed.

117.    In the months leading up to that, and for the next several months that followed, Kroger worked tirelessly on written advocacy to the FTC and state regulators regarding the appropriate market for the antitrust analysis. Kroger and Albertsons knew that a divestiture within the 650-store cap in the Merger Agreement would only be acceptable to the regulators if the regulators agreed that Kroger and Albertsons faced fierce and increasing competition from non-traditional grocery retailers like Amazon, Whole Foods, and Costco. To that end, between May 2023 and January 2024, the Parties sent nine white papers to the FTC advocating that these and other similar retailers should be included in the relevant product market for antitrust purposes.

118.    The Parties also submitted advocacy to regulators emphasizing the importance of the geographic dimensions of grocery competition. For example, the Parties submitted white papers to the FTC detailing the conclusions from recent economic literature that customers are more willing to travel longer distances to shop

216

for groceries at club stores like Costco and Sam's Club than other grocery retail formats like Kroger and Albertsons. In total, the Parties sent approximately two dozen white papers to the FTC and state regulators during this time period in response to specific concerns that the regulators had raised with respect to the Merger.

119. While Kroger worked in earnest to defend the Merger and the Parties' divestiture proposal, Albertsons worked to undermine it. Albertsons sent Kroger nearly a dozen communications telling Kroger to adopt its preferred regulatory strategy of divesting at or close to the maximum number of stores regardless of whether the antitrust economics supported it.

120. While Kroger elected to continue with its own reasonable regulatory strategy, Albertsons turned to C&S. Specifically, Albertsons engaged in secret communications with C&S in which it encouraged C&S to convey to the regulators that C&S needed more stores to operate effectively—even though C&S had previously concluded it could operate effectively under the divestiture package in the Original APA that C&S had voluntarily signed. Albertsons hoped that the regulators would hear this request from the divestiture buyer and then pressure Kroger to divest the requested stores and other assets. C&S was happy to oblige, and added asset requests of its own in the hope that it would force Kroger to give

217

more assets to C&S for below-market value or for free, regardless of whether it was necessary to secure regulatory approval of the Merger.

121. In October 2023, unbeknownst to Kroger, and just a month after executing the Original APA, C&S sent a letter to the California Attorney General's Office that conveyed changes that C&S (and Albertsons) wanted to see be made to the Original APA. First and foremost, C&S sought to "increase[e] the number of stores in the divestiture package." C&S also sought more "private brand products," additional distribution centers, "exclusive rights" to additional store banners like Safeway and Jewel-Osco, a package that included "only stores and distribution centers that are owned by Albertsons," and a "fully-operational replica of Albertsons IT systems and the personnel needed to run those IT systems."

122. Similarly, in November 2023, and also unbeknownst to Kroger, C&S sent a corresponding email to the Washington Attorney General's Office listing changes that C&S (and Albertsons) would like made to the divestiture package. The message to regulators could not be clearer. The email conveyed that to compete effectively, in contrast to the Original APA it had just signed, C&S would need: (1) an "all Albertsons" package instead of a mix of Kroger and Albertsons stores; (2) more Safeway stores; (3) additional pharmacy infrastructure; and (4) additional private-label brands.

218

123.  Several weeks later, during an investigational hearing with the FTC ▮

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████ .

124.  C&S did not actually need additional assets to be an effective competitor—it was all a charade.  Kroger later learned that C&S was merely implementing its coordinated scheme with Albertsons to increase the divestiture package, even where doing so directly undermined Kroger's regulatory strategy.

125.  Indeed, unlike what it was then telling regulators, C&S had previously told Kroger that the package had a sufficient number of stores, enough "distribution centers to support the 413 stores," and sufficient "banners and private labels," among other representations to Kroger.

126.  These representations to Kroger—in C&S's words—were based on "significant diligence on [the] stores," including "store visits and distribution visits," as well as an analysis of "market dynamics, brand evaluation, and competitive assessment."  C&S's representations to the regulators, on the other hand, reflected

219

Albertsons's myopic desire for an increased store divestiture, and the hope that doing so would result in a windfall of affiliated assets for C&S.

127. C&S kept Albertsons and its executives, including the COO of Albertsons, Susan Morris, updated on Albertsons and C&S's scheme to undermine Kroger's regulatory strategy. In these undisclosed communications, which were conducted through personal cellphones and email accounts of senior executives at Albertsons, C&S kept Albertsons apprised of what C&S was requesting from the regulators. For instance, in December 2023, Mr. Winn told Ms. Morris in a text message that "what we ended up saying in final letter [to the California AG is] that we needed banner(s) that would match the stores as much as possible in California, not knowing exactly which [Albertsons] stores the competitive pairs to the Ralph's actually comprise." Ms. Morris, pleased that C&S was executing Albertsons's strategy, "liked" this message.

128. Kroger was shocked to learn of these communications for the first time in the middle of the antitrust trials. It was a dramatic courtroom scene when Ms. Morris was asked under oath specifically about her prior communications with C&S. She initially testified that there were "certain . . . conversation[s] I've not been able to have with C&S," but the FTC—to Kroger's surprise—impeached that testimony by referencing a previously undisclosed "text message with Eric Winn, advising him to make sure to acquire the Albertsons banner in California[.]"

220

129. Prior to the FTC's questions at trial, Kroger had no knowledge of this communication—and Albertsons had never disclosed that Ms. Morris or other Albertsons executives were corresponding with C&S about the Merger or divestiture. When a sampling of these communications was revealed at trial, Kroger notified Albertsons in writing that its efforts with C&S to undermine Kroger's regulatory strategy constituted a clear breach of the Merger Agreement.

130. To make matters worse, through its advisors, Albertsons also deliberately misled and lied to Kroger. For example, Albertsons's attorneys told Kroger that Albertsons had not undermined Kroger's regulatory strategy and only "*privately* urge[d] Kroger to" increase the size of the divestiture package. But in reality, Albertsons was secretly working with C&S behind the scenes to undermine Kroger's regulatory strategy. Albertsons's misrepresentations and lies to Kroger lay bare Albertsons's willful flouting of its contractual obligation to cooperate with Kroger and support Kroger's regulatory strategy.

131. These back-channel communications between Albertsons and C&S were prohibited under both the Original APA between Kroger, C&S, and Albertsons, and the Amended Asset Purchase Agreement ("Amended APA") that the Parties and C&S would later sign. Section 6.6 in both the Original and Amended APAs prohibited communications between C&S and "employees . . . of [Albertsons or

221

Kroger] in connection with or pertaining to any subject matter of this Agreement" without prior consent.

132. Albertsons appreciated this, and specifically asked Kroger for its "permission" to allow Ms. Morris to "discuss and negotiate a position now [] for post closing employment with C+S," while at the same time specifying that "[Ms. Morris] will not . . . be permitted to . . . engage in a store by store evaluation of the stores or other assets included in the divestiture package." Kroger refused to grant such permission, at which time, Albertsons promised that it would "hold for now on this and any engagement of Susan with C+S not approved by you[.]" And although Kroger later granted Ms. Morris written permission to speak with C&S on May 29, for the purpose of discussing "a potential role with C + S post-closing of the merger and divestiture agreement," Kroger and Albertsons had explicitly agreed that at all times Ms. Morris would not be permitted to "engage in a store by store evaluation of the stores or other assets included in the divestiture package" with C&S.

133. Despite these representations, the prohibited back-channel communications between Albertsons and C&S to implement Albertsons's preferred regulatory strategy were done at the direction, and with the full knowledge, of Albertsons's executives, including Albertsons's CEO and General Counsel. This was confirmed during Ms. Morris's sworn testimony when she was questioned at the Colorado trial regarding her communications with C&S. Specifically, Ms.

222

Morris testified that she "told [the] CEO, Vivek Sankaran, and counsel, Tom Moriarty, that C&S had been reaching out to [her]. And [she] kept them abreast of when [she] was meeting with them[.]" And when asked at the Oregon trial whether her discussions with C&S's executives were "within the scope of what [she] was permitted to be discussing" with them in December of 2023, Ms. Morris confirmed that she never had authorization to have those discussions: "I had no permissions . . . in December of 2023" and it "was not part of my [May 29, 2024] permission slip."

134. Ms. Morris was particularly willing to implement Albertsons's scheme because she personally stood to gain substantially from it. Ms. Morris had spent her entire career working in the grocery industry, starting at Albertsons at sixteen years old as a customer service clerk. Having now spent almost 40 years at Albertsons, she had her sights set on the pinnacle of her profession—the CEO of a large grocery company. By implementing Albertsons's scheme, she could achieve that goal. If the Merger closed, Ms. Morris would become the CEO of C&S's Retail Division, and she would have created for herself a larger grocery company with more assets to run. But if the Merger was blocked, Ms. Morris expected that her loyalty to Albertsons and its surreptitious scheme would garner favor with Mr. Sankaran and Albertsons's Board when it came time to select Mr. Sankaran's successor as CEO.

135. Predictably, Albertsons's plan to implement an alternative regulatory strategy backfired. Rather than cause the regulators to request that Kroger divest

223

650 stores in exchange for regulatory approval, the repeated requests for additional stores and other assets caused the regulators to view C&S as a weak buyer that would not be an effective competitor regardless of the number of stores that it received in the divestiture package. Ms. Morris, however, gained substantially from implementing Albertsons's scheme—just three months after the Merger was enjoined, Albertsons announced its new CEO succession plan: Ms. Morris will replace Mr. Sankaran as CEO, effective May 1, 2025. Albertsons confirmed in its press release announcing Ms. Morris's promotion that the search for Mr. Sankaran's successor was ongoing during the time period of the regulatory review of the Merger and the subsequent antitrust litigations.

136.   Had Kroger known in the fall of 2023 (or at any time afterwards) the full extent of Albertsons's efforts to undermine Kroger's strategy with the antitrust regulators, it would have terminated the Merger Agreement pursuant to Section 8.1(c) due to Albertsons's breach.

137.   Section 8.1(c) provides that the Merger Agreement could be terminated at any time by Kroger if Albertsons "has breached" the Merger Agreement and that breach is either "incapable of being cured, or if capable of being cured, is not cured" by the earlier of the Outside Date or within 30 days of being given notice:

> This Agreement may be terminated at any time prior to the Closing as follows . . . (c) *by Parent, if the Company has breached this Agreement*, which breach would result in the failure of a condition set forth in Section 7.3(a) or Section 7.3(b) to be satisfied and such breach

224

is incapable of being cured or, if capable of being cured, *is not cured by the earlier of (x) the Outside Date or (y) thirty (30) days following receipt by the Company of notice of such breach*[.]

(Ex. 1 [Merger Agreement] § 8.1(c) (emphasis added)).

138. Had Kroger had full visibility into Albertsons's breach and terminated the Merger Agreement, Kroger would have saved over a year's worth of additional monumental costs associated with defending the Merger that Albertsons was undermining, and preparing for the potential integration with Albertsons and separation of the divested business to C&S.

139. Instead, unaware of Albertsons's scheme to undermine Kroger's regulatory strategy, Kroger pressed on with trying to obtain meaningful feedback on the proposed divestiture package from the FTC. The FTC was often slow to engage, gave very little or vague feedback, and was reticent to share its view. Albertsons was aware of the lack of meaningful input from the regulators and the regulators' slow responses, because Albertsons participated in all of the meetings with the regulators regarding the Merger, and was copied on all of Kroger's written submissions to and correspondence with the regulators. Despite the lack of meaningful feedback and slow responses, Kroger stayed engaged, while Albertsons worked to undermine the Merger.

140. Eventually, the FTC asked the Parties in the fall of 2023 whether the divestiture package took into account certain "diversion" analyses to measure the

225

competitive effects of the divestiture proposal. Quick to act, Kroger had its economic experts undertake this analysis, and on November 6, 2023, presented to the FTC the results of the analysis and a corresponding proposal to add 97 stores to the divestiture package in addition to the original 413 stores (for a total of 510 stores).

141. On December 6, 2023, the FTC sent Kroger and Albertsons a list of over 2,000 stores that the FTC contended "have significant local competitive interaction," and cautioned that even the list of over 2,000 stores did "not account for the numerous other ways in which Kroger and Albertsons compete," did not "account for non-grocery markets (e.g., labor or pharmacy)," and did not "account for all the issues any divestiture proposal would need to address[.]"

142. Discouraged but not defeated, Kroger remained hopeful that a divestiture package supported by economic analysis would result in regulatory approval of the Merger, either through a negotiated resolution or in court. Accordingly, even after receiving the list, Kroger kept meeting with the FTC, kept advocating for the Merger, and kept discussing potential adjustments to the divestiture package with Albertsons and C&S.

143. The FTC provided additional feedback during a call on January 11, 2024, and suggested the Parties should run a new diversion analysis from scratch (i.e., without consideration of the already proposed 413-store package). Despite

226

Kroger's concern that building a divestiture package all over again could create complications with C&S, which had modeled its bid based on the original 413-store package, Kroger agreed to undertake the analysis.

**M.    Regulators Sue to Block the Merger While Kroger Continues to Work to Amend the Divestiture Package in Response to Feedback from Regulators**

144.    On January 15, 2024, the Attorney General for the State of Washington filed suit in Washington state court, seeking a permanent injunction that would prevent the Merger from closing.

145.    Three days later, on January 18, 2024, Kroger made another proposed divestiture offer to the FTC. Based on the results of the diversion analysis conducted by the Parties' experts that the FTC requested, Kroger proposed increasing the number of stores in the package from 413 to 541.

146.    On January 31, the FTC sent an email to Kroger's antitrust counsel informing them that, notwithstanding the increased number of stores in the divesture package and creation of that package based on the diversion analysis the FTC had requested, the FTC believed that there were "still deficiencies in the list of individual stores proposed for divestiture[.]"

147.    The FTC also for the first time raised to Kroger its concerns with C&S, including questioning whether C&S could be "successful with this massive and complex new venture." Upon information and belief, these concerns were the direct

227

result of the communications that Albertsons and C&S coordinated in October and November 2023 to send to the regulators requesting additional assets in the divestiture, and C&S's related investigational hearing testimony.

148.   Less than 30 days later, and while the Parties were still considering the impact of the FTC's most recent feedback, regulators filed two more lawsuits seeking to block the Merger.  First, on February 14, the Attorney General for the State of Colorado filed a lawsuit in Colorado state court seeking to enjoin the Merger.  Less than two weeks later, the FTC filed suit to block the Merger in federal court in Portland, Oregon.

149.   The FTC sought a preliminary injunction enjoining the Merger long enough for an administrative hearing to take place before an Administrative Law Judge at the FTC.  The FTC case was set for trial only months later, in September 2024.  So once the FTC complaint was filed, and throughout the spring of 2024, the Parties were defending against active litigation while simultaneously continuing to negotiate potential changes to the divestiture package that could address the regulators' concerns.

**N.    Kroger Works on an Amended Divestiture Package While Albertsons Continues to Secretly Undermine Kroger's Regulatory Strategy**

150.   For the next several months after the regulators filed suit, Kroger and its advisors conducted dozens of analyses in order to come up with and support alternative proposals that could resolve the regulators' concerns.

228

151. While Kroger and its advisors were working on a revised divestiture package to incorporate the latest feedback from regulators, Albertsons and C&S continued privately undermining Kroger's antitrust strategy.

152. This secret coordination might have never been known to Kroger but for the regulatory litigations that resulted. As noted above, some of the communications between Albertsons and C&S were the subject of testimony at trial. In addition, in connection with a privilege dispute in the Colorado litigation, Kroger became aware of communications between Albertsons and C&S regarding regulatory strategy and potential changes to the divestiture package. This privilege dispute in Colorado occurred during the Parties' trial against the FTC in Oregon. Yet Albertsons had hidden these communications from Kroger and never revealed them in discovery.

153. These communications revealed that throughout the spring of 2024, Albertsons's COO, Ms. Morris, used her personal email to facilitate backchannel conversations with C&S's CEO, Mr. Winn, regarding a potential amended divestiture package. All such communications occurred without Kroger's knowledge or consent. Again, Ms. Morris was personally invested in having the divestiture package maximize the assets included, regardless of whether they were necessary to obtain (or even likely to lead to) regulatory approval.

229

154. While Albertsons never produced many of its communications with C&S under a claim of common interest privilege, the few documents that Kroger has seen and testimony from the trials reveal that Albertsons was in repeated and regular contact with C&S's senior executives and was goading C&S regarding its communications with the regulators relating to Kroger's divestiture package.

155. For instance, on March 8, 2024, Alona Florenz, a senior vice president at C&S, emailed Ms. Morris's personal email account, attaching a list of 564 stores that would make up a potential divestiture package and stating "let me know if this works – call me with any questions[.]" In other words, C&S was seeking *explicit input and approval* from Albertsons regarding its position on the amended divestiture package and negotiations with Kroger, all without Kroger's knowledge.

156. The next day, on March 9, 2024, Ms. Morris emailed Mr. Winn regarding Kroger's most recent divestiture offer, stating that the proposal was "[m]aybe a good deal after all."

157. Those conversations continued throughout April 2024, with Ms. Morris repeatedly using her personal email address to email stores lists to and from C&S executives, without Kroger's knowledge.

158. Use of personal email addresses and cellphones was not accidental. Albertsons and its executives went that far to hide their clandestine communications

230

from Kroger (and from Kroger's access to Albertsons's email servers post-Merger, if the Merger closed).

159.   Albertsons also deleted thousands of text messages from the phones of Albertsons's executives in violation of Albertsons's document-preservation obligations.  The Friday before trial started in the federal case in Oregon, the court acknowledged that four Albertsons executives had deleted thousands of text messages, and determined that "some skepticism" was appropriate in terms of what those messages contained.  The court also made clear that it would give Albertsons's deletion of text messages some "weight" in assessing the evidence and issuing her decision.

160.   Albertsons's efforts were intended to (and did) shield many of its surreptitious communications from civil discovery.  As a result, full extent and nature of Albertsons's and C&S's coordination remains concealed from Kroger, even today.

161.   Blind to Albertsons's and C&S's back-channel communications, Kroger kept trying to make the Merger work.  Kroger, Albertsons, and C&S negotiated for months on an amended divesture agreement after regulators sued. During that time, Kroger and Albertsons had been unable to reach an agreement on an amended divestiture package with C&S.  In a last-ditch effort, Kroger sent C&S a "put notice" for a 650-store package pursuant to its right under the Original APA.

231

In a March 15, 2024 letter, C&S rejected the put notice and took the position that the 650-store package was not "reasonably likely to assist in obtaining" regulatory approval. Instead, C&S elected to resume negotiations for a package of fewer than 650 stores.

162. After several more weeks of negotiations between the Parties and C&S, on April 22, Albertsons, Kroger, and C&S entered into the Amended APA. Under the new agreement, Kroger agreed to divest 579 stores to C&S, including all fuel centers and pharmacies associated with the divested stores. Additionally, Kroger agreed to provide C&S with the QFC, Mariano's, Carrs and Haggen banner names, as well as exclusive use of the Albertsons banner in California and Wyoming, and the Safeway banner in Arizona and Colorado. As part of the deal, C&S would also receive from Kroger the Debi Lilly Design, Primo Taglio, Open Nature, ReadyMeals, and Waterfront Bistro private label brands, and access to the Signature and O Organics private label brands for an extended period of time.

163. The revised 579-store divestiture package reflected the input and analyses of the Parties' numerous counsel and advisors. Ultimately, over the course of the Merger and subsequent litigation, Kroger paid its advisors in excess of $500 million in support of its efforts to negotiate the Merger Agreement, structure an appropriate divestiture package, and close the Merger.

232

**O.    Kroger Vigorously Litigates Three Trials While Albertsons Focuses on Its Plan B Litigation Against Kroger**

164.    The Oregon, Washington, and Colorado trials began on August 26, September 16, and September 30, 2024, respectively.  From early September until all of the post-trial briefing was complete in November 2024, Kroger was laser-focused on litigating three back-to-back trials, including preparing company executives for direct testimony and cross-examination, drafting pre- and post-trial briefing, and developing opening and closing statements.

165.    Albertsons, on the other hand, had by then realized that its surreptitious scheme to undermine Kroger's regulatory strategy had backfired.  It continued to focus more on manufacturing a record for its Plan B litigation against Kroger than preparing for the actual Merger trials.

166.    In particular, Albertsons sent Kroger numerous correspondence with litigation-inspired suggestions about additional divestitures.  Those letters, which often copied fact witnesses, were reckless in the context of the ongoing trials in which those witnesses were testifying.  Despite the regulators taking the position that no amount of divested stores would cure the competitive harm from the Merger, Albertsons sent Kroger a stream of letters urging Kroger to divest even more stores to C&S, including in the middle of trial while Kroger and Albertsons were arguing to regulators (and representing to the courts) that the 579-store package was sufficient.

233

167. While Albertsons was manufacturing its litigation record with almost a dozen lawyer-crafted letters, its senior executives were testifying under oath and taking positions directly contrary to what Albertsons would later allege in its Plan B litigation against Kroger.

168. For example, despite alleging in its Amended Complaint that selecting "C&S as a divestiture buyer was thus highly risky and inconsistent with Kroger's obligations to make expeditious 'best efforts'" (Am. Compl. ¶ 37), Albertsons's CEO, Mr. Sankaran, testified under oath during the Colorado trial on October 9, 2024 that "C&S is an incredibly strong company. They're well financed. They've been around for 100 years. They bring incredible capabilities and distribution, and they're getting a great combination of retail assets and talent, literally packaged to execute."

169. Similarly, while Albertsons would later allege in this litigation that the "Stores [Kroger] chose to maintain had higher gross margins and EBIDTA," (Am. Compl. ¶ 193), Ms. Morris, Albertsons's COO, testified during the Washington trial that "the stores that [C&S will] be getting are slightly better capitalized. They have slightly higher average EBITDA per store, slightly higher average sales per store. I feel very comfortable . . . with what [C&S has] gotten here."

170. And while Albertsons would later allege in this litigation that Kroger needed "to offer a divestiture closer to the 650-store threshold" for the "divestiture

234

buyer to become a viable competitor" (Am. Compl. ¶ 42), during the Washington trial, in response to the question of whether he believes after the divestiture C&S "will be a strong competitor to other grocery retailers," Mr. Sankaran testified "I do . . . I think their ability to leverage scale in buying and supply chain is significant[.]"

171.    In sum, Albertsons's own executives were testifying under oath that the Parties' divestiture proposal would cure any anticompetitive harm from the Merger, while at the same time attempting to manufacture a litigation record against Kroger for that very same proposal.

**P.    The Washington and Oregon Courts Adopt the Regulators' Narrow Market Definition and Issue Injunctions Blocking the Merger**

172.    Despite Kroger's efforts and the massive investment of resources it expended to defend three back-to-back trials—while simultaneously also preparing for integration if the courts approved the Merger—the FTC and state regulators prevailed.  On December 10, 2024, the United States District Court for the District of Oregon issued a preliminary injunction preventing consummation of the Merger until after an administrative proceeding in front of the FTC.

173.    Later that day, the King County Superior Court for the State of Washington issued a permanent injunction preventing consummation of the Merger.

174.    Both courts ruled in favor of the government primarily because they adopted the regulators' narrow view of the relevant antitrust market—that is, one that included only traditional "supermarkets."  This resulted in the courts finding

235

that thousands of markets nationwide were presumptively unlawful even with the Parties' 579-store divestiture package. For example, the federal court in Oregon found that "[f]or the supermarkets market, 1,002 markets would remain presumptively unlawful assuming a perfect divestiture[,]" and "more than 113 [markets] do not include a single divested store. The proposed divestiture cannot offset anticompetitive harm in those markets." Similarly, the Washington Court found that the proposed Merger was "presumptively anticompetitive in all 57 markets" in Washington "even assuming a perfectly successful divestiture."

175. Predictably, the Washington court's decision also cited the very correspondence that Albertsons and C&S coordinated to send to the California and Washington Attorneys General as support for the court's conclusion that the proposed divestiture to C&S was unlikely to be successful. For example, the Washington court noted that "[o]n October 31, 2023, C&S sent a letter to the California Attorney General's Office . . . that assessed the 'execution risk associated with' the September 2023 divestiture package" and that "[o]n November 30, 2023, C&S's counsel emailed the Washington Attorney General's Office . . . that 'many of the items reflected in the materials we provided to California would be of particular importance to consumers in Washington.'"

236

**Q.    Albertsons Purports to Terminate the Merger Agreement While Kroger Is Preparing for Potential Appeals and Negotiations With a New Administration to Obtain Approval of the Merger**

176.    While waiting for the courts to issue their decisions, Kroger was working on alternative strategies to obtain regulatory clearance of the Merger in the event any of the lower courts issued injunctions blocking the Merger.  One of these strategies, which Kroger discussed with Albertsons, was to seek emergency relief from the appropriate appellate courts and, if necessary, the U.S. Supreme Court.

177.    An appeal of any adverse decision could have allowed the Merger to close in at least two ways.  First, if the appellate court overturned the lower court's order blocking the Merger, the Parties would have been able to close the transaction.  Second, an appeal would have bought time until the new administration took office just over a month later, and allowed for a potential negotiated resolution with a more merger-friendly FTC.  Indeed, the day after the presidential election, Kroger's stock jumped nearly 4%, which some commenters suggested was due to the "prospect[] of a more lax environment for corporate mergers[.]"  Kroger also had a pending lawsuit challenging the constitutionally of the FTC's administrative proceeding seeking to permanently enjoin the Merger, which likewise could have acted as settlement leverage with the new administration.

178.    At the same time, Kroger was publicly reaffirming its commitment to the market to acquire Albertsons.  In a December 5, 2024 call with investors,

237

Kroger's then-CEO, Rodney McMullen, told investors that Kroger remained "excit[ed]" about the "complementary strengths of both Kroger and Albertsons," including because it would help Kroger operate in a "more competitive" environment, and "provide meaningful and measurable benefits for customers, for associates and for communities across the country."

179. But Albertsons—having already been planning for its Plan B litigation against Kroger for months—had no intention of using *any* efforts "to take or cause to be taken all actions . . . to cause the conditions to the Closing to be satisfied[.]"

180. Less than four hours after the Oregon court's decision, Albertsons served a purported Notice of Termination on Kroger. The notice pretextually claimed that Albertsons was terminating the Merger Agreement because the "Outside Date for Closing was October 9, 2024, yet the closing has not occurred[.]" Albertsons also claimed that, as a result of Albertsons's purported termination, Kroger was "required to pay to [Albertsons] the Parent Termination Fee" of $600 million. But the plain language of the Merger Agreement entitles Albertsons to no such relief for several reasons.

181. *First*, as Kroger explained in its December 11, 2024 Notice of Termination, Albertsons—due to its repeated breaches of the Merger Agreement— had no right to terminate the Merger Agreement. Albertsons was therefore still

238

contractually obligated to use "reasonable best efforts" to consummate the Merger, even after an adverse lower-court decision.

182.    *Second*, in the absence of a final, non-appealable order (which did not exist, because both the Oregon and Washington orders were appealable), the Parent Termination Fee was payable to Albertsons only if (1) the Outside Date had passed, (2) regulatory approval had not been granted, and (3) Albertsons was in compliance with all its "agreement and covenants" in the Merger Agreement "in all material respects." (Ex. 1 [Merger Agreement] §§ 7.3(b) (emphasis added), 8.4(c)).  These covenants included Albertsons's covenants in Sections 6.3(a) and 6.3(b) that Albertsons would "cooperate" with Kroger and use "reasonable best efforts" to support the Merger, and allow Kroger to have "principal responsibility for devising and implementing the strategy for obtaining any necessary antitrust consents or approvals."    Albertsons breached Sections 6.3(a) and 6.3(b) of the Merger Agreement by repeatedly undermining Kroger's strategy with the regulators, failing to cooperate with Kroger, and failing to use reasonable best efforts to ensure the Merger was consummated.

183.    Less than five hours after serving its Termination Notice, Albertsons filed a 140-page complaint in this action that it had long been working on as part of its "Plan B" to deflect blame for Albertsons and its executives' own misdeeds and repeated breaches of the Merger Agreement.

239

184. After receiving Albertsons's Termination Notice and its complaint seeking billions of dollars in damages, Kroger sent Albertsons a letter the next day contesting the basis for Albertsons's Termination Notice but agreeing that the Merger Agreement had been terminated under the circumstances. Kroger also explained that the Parent Termination Fee was not owed to Albertsons because "the conditions set forth in Section 7.3(b)" had not been satisfied—particularly the condition that "all of the agreements and covenants of the Company and the Company Subsidiaries . . . have been duly performed and complied with in all material respects." (Ex. 1 [Merger Agreement] § 8.4(c)).

185. Given Albertsons's repeated Willful Breaches of the Merger Agreement, not only is the Parent Termination Fee not owed to Albertsons, but Kroger is also "entitled to all rights and remedies available at law or in equity" against Albertsons, as provided in Section 8.3 of the Merger Agreement:

> Section 8.3 <u>Effect of Termination</u>. In the event that this Agreement is validly terminated as provided in Section 8.1, each of the Parties will be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination will be without liability to Parent or the Company; provided that the agreements and obligations of the Parties set forth in Section 6.7(b), Section 6.15(e), this Section 8.3, Section 8.4 and ARTICLE IX (other than Section 9.14) hereof will survive any such termination and are enforceable hereunder; ***provided, further, that nothing in this Agreement shall release any Party from liability for fraud or any Willful Breach of any covenant or agreement contained herein occurring prior to termination***, or as provided in the Confidentiality Agreement or the Clean Team Agreement, in which case the aggrieved Party shall be entitled to all rights and remedies available at law or in equity.

240

(Ex. 1 [Merger Agreement] § 8.3 (emphasis added)).

**R.    Albertsons's Willful Breaches of the Merger Agreement Harm Kroger**

186.    Kroger and its stockholders have suffered and will be reasonably certain to suffer harms as a result of Albertsons's Willful Breaches of the Merger Agreement.

187.    Had Kroger known in the fall of 2023 (or at any subsequent point) the full extent of Albertsons's efforts to undermine Kroger's strategy with the antitrust regulators, it would have terminated the Merger Agreement pursuant to Section 8.1(c) of the Merger Agreement due to Albertsons's breach. This would have saved Kroger over a year's worth of additional litigation and transactions costs associated with defending the Merger and planning for integration and separation. These costs collectively total tens of millions of dollars and include fees paid to bankers, consultants, attorneys, economists and other advisors to assist with developing the divestiture package, drafting the various agreements, oversight of the potential integration between the Parties, and defending against three litigations simultaneously.

**COUNT I**

**(Willful Breach of Contract, Merger Agreement § 6.3(a))**

188.    Kroger repeats and incorporates all of the allegations set forth in the preceding paragraphs as if they are fully set forth herein.

241

189. Albertsons and Kroger entered into the Merger Agreement on October 13, 2022.

190. The Merger Agreement is a binding contract.

191. Kroger performed its obligations under the Merger Agreement.

192. Section 6.3(a) of the Merger Agreement required Albertsons to "cooperate with" Kroger and "use (and [] cause [its] respective Subsidiaries to use) its reasonable best efforts to (i) take or cause to be taken all actions . . . necessary, proper or advisable to cause the conditions to the Closing to be satisfied as promptly as reasonably practicable" including "taking actions necessary to avoid, eliminate, and resolve any and all impediments under any Antitrust Law[.]"

193. Through the actions described above, Albertsons failed to cooperate with Kroger and use its reasonable best efforts to take all actions necessary, proper or advisable to cause the conditions to the Closing to be satisfied as promptly as reasonably practicable. Those actions include, but are not limited to: (1) Albertsons coordinating with C&S to suggest to the California Attorney General's Office that C&S needed additional assets to compete effectively; (2) Albertsons coordinating with C&S to suggest to the Washington Attorney General's Office that C&S needed additional assets to compete effectively; (3) Albertsons's other surreptitious communications with C&S to undermine Kroger's regulatory strategy; (4) Albertsons's failure to disclose these communications to Kroger; and (5)

242

Albertsons's manufacturing of a faux litigation record against Kroger while the Parties were preparing for and in the middle of trial.

194. Each of the foregoing breaches, individually and collectively, was a material breach of the Merger Agreement because each breach went to the essence of the Merger Agreement—obtaining regulatory approval for and closing the Merger.

195. Section 1.1 of the Merger Agreement defines "Willful Breach" as a "material breach . . . that is the consequence of an act or omission by the breaching party with the actual knowledge that the taking of such act . . . would cause or constitute such material breach, regardless of whether breaching was the object of the act or failure to act."

196. Albertsons's material breaches of Section 6.3(a) of the Merger Agreement constitute Willful Breaches as well. Albertsons had actual knowledge that partnering with C&S to advance Albertsons's preferred regulatory strategy did not amount to "cooper[ation]" with Kroger, and thus amounted to a material breach of the Merger Agreement. Indeed, Albertsons and its executives deliberately kept the evidence of their breaches—their communications with C&S—secret by excluding Kroger from these communications and using personal devices to facilitate them.

243

197.   Albertsons's Willful Breaches of the Section 6.3(a) have caused and continue to cause significant damage to Kroger, including because they caused the regulators to sour on C&S.

198.   Had Kroger been aware of the nature and extent of Albertsons's Willful Breaches of the Merger Agreement, it would have terminated the Merger Agreement due to Albertsons's Willful Breaches.  By concealing the evidence of these breaches from Kroger, Albertsons caused Kroger to incur over a year's worth of additional significant out-of-pocket costs, including ongoing legal and transaction costs, associated with defending the Merger in federal and state courts.

## COUNT II

### (Willful Breach of Contract, Merger Agreement § 6.3(b))

199.   Kroger repeats and incorporates all of the allegations set forth in the preceding paragraphs as if they are fully set forth herein.

200.   Albertsons and Kroger entered into the Merger Agreement on October 13, 2022.

201.   The Merger Agreement is a binding contract.

202.   Kroger performed its obligations under the Merger Agreement.

203.   Section 6.3(b) of the Merger Agreement required Albertsons to "cooperate in all respects with [Kroger] in connection with any filing to or submission with any Governmental Entity" and provided that, "following such good

244

faith efforts" of cooperation, Kroger "shall have the principal responsibility for devising and implementing the strategy for obtaining any necessary antitrust consents or approvals."

204.  Through the actions described above, Albertsons failed to cooperate with Kroger and failed to allow Kroger to have principal responsibility for devising and implementing the strategy for obtaining any necessary antitrust consents or approvals.   Those actions include, but are not limited to:   (1) Albertsons's undermining of Kroger's regulatory strategy by coordinating with C&S to suggest to the California Attorney General's Office that C&S needed additional assets to compete effectively; (2) Albertsons's undermining of Kroger's regulatory strategy by coordinating with C&S to suggest to the Washington Attorney General's Office that C&S needed additional assets to compete effectively; (3) Albertsons's other surreptitious communications with C&S to undermine Kroger's regulatory strategy; and (4) Albertsons's failure to disclose these communications to Kroger.

205.  Each of the foregoing breaches, individually and collectively, was a material breach of the Merger Agreement because each breach went to the essence of the Merger Agreement—obtaining regulatory approval for and closing the Merger.

206.  Section 1.1 of the Merger Agreement defines "Willful Breach" as a "material breach . . . that is the consequence of an act or omission by the breaching

245

party with the actual knowledge that the taking of such act . . . would cause or constitute such material breach, regardless of whether breaching was the object of the act or failure to act."

207. Albertsons's material breaches of Section 6.3(b) of the Merger Agreement constitute Willful Breaches as well. Albertsons had actual knowledge that coordinating with C&S to advance Albertsons's preferred regulatory strategy did not amount to "cooper[ation]" with Kroger. Instead, Albertsons sought to substitute its regulatory strategy for Kroger's, despite the fact that Section 6.3(b) provides that Kroger shall have "principal responsibility" for the regulatory strategy. Albertsons and its executives deliberately kept the evidence of their breaches—their communications with C&S—secret by excluding Kroger from these communications and using personal devices to facilitate them.

208. Albertsons's Willful Breaches of the Section 6.3(b) have caused and continue to cause significant damages to Kroger, including because they caused the regulators to sour on C&S.

209. Had Kroger been aware of the nature and extent of Albertsons's Willful Breaches of the Merger Agreement, it would have terminated the Merger Agreement due to Albertsons's breaches. By concealing the evidence of these breaches from Kroger, Albertsons caused Kroger to incur over a year's worth of additional

246

significant out-of-pocket costs, including ongoing legal and transaction costs, associated with defending the Merger in federal and state courts.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Kroger, on behalf of itself and its stockholders, respectfully requests judgment and relief against Albertsons as follows:

A.  Enter judgment in Kroger's favor, finding that Albertsons Willfully Breached the Merger Agreement;

B.  Award to Kroger monetary damages in an amount to be determined at trial, including but not limited to actual damages, incidental damages, reliance damages, consequential damages, lost profits, lost goodwill, and other costs and damages it has and will incur by reason of Albertsons's breaches of the Merger Agreement;

C.  Award Kroger its attorneys' fees, costs and expenses incurred in connection with this litigation;

D.  Award Kroger all available interest; and

E.  Grant such other, further and different relief as the Court may deem just and proper.

247

ROSS ARONSTAM & MORITZ LLP

*Of Counsel*:

Chantale Fiebig
Arianna M. Scavetti
Dan J. Nadratowski
Luke Sullivan
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW, Suite 600
Washington, DC 20036
(202) 682-7000

Evert J. Christensen, Jr.
(DE Bar No. 4996)
Jessica L. Falk
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

*/s/ Bradley R. Aronstam*
Bradley R. Aronstam (Bar No. 5129)
S. Michael Sirkin (Bar No. 5389)
Holly E. Newell (Bar No. 6687)
Benjamin M. Whitney (Bar No. 7284)
Kevin A. Rudolph (Bar No. 7106)
Hercules Building
1313 North Market Street, Suite 1001
Wilmington, Delaware 19801
(302) 576-1600
baronstam@ramllp.com
msirkin@ramllp.com
hnewell@ramllp.com
bwhitney@ramllp.com
krudolph@ramllp.com

*Attorneys for Defendant /Counterclaim
Plaintiff The Kroger Co.*

March 17, 2025

**PUBLIC VERSION FILED:**
March 25, 2025

248